1

**COTCHETT, PITRE & MCCARTHY, LLP**
Joseph W. Cotchett (SBN 36324)

2
*jcotchett@cpmlegal.com*
Mark C. Molumphy (SBN 168009)

3
*mmolumphy@cpmlegal.com*
Tyson C. Redenbarger (SBN 294424)

4
*tredenbarger@cpmlegal.com*
Julia Q. Peng (SBN 318396)

5
*jpeng@cpmlegal.com*
San Francisco Airport Office Center

6
840 Malcolm Road, Suite 200

7
Burlingame, California 94010
Telephone:   (650) 697-6000

8

9
BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)

10
*fbottini@bottinilaw.com*
Albert Y. Chang (SBN 296065)

11
*achang@bottinilaw.com*
Yury A. Kolesnikov (SBN 271173)

12
*ykolesnikov@bottinilaw.com*
7817 Ivanhoe Avenue, Suite 102

13
La Jolla, California 92037
Telephone: (858) 914-2001

14
Facsimile:  (858) 914-2002

15

16
*Attorneys for Plaintiff Giuseppe Pampena
and the Proposed Class*

17

18
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

19
**SAN FRANCISCO DIVISION**

20

| | |
|---|---|
| **GIUSEPPE PAMPENA, individually and on behalf of all others similarly situated,** | CASE NO.: |
| Plaintiff, | **CLASS ACTION** |
| vs. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| **ELON MUSK,** | |
| Defendant. | JURY TRIAL DEMANDED |

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

Page

I.     NATURE OF THE ACTION .................................................................................. 1

II.    JURISDICTION AND VENUE .............................................................................. 1

III.   DIVISIONAL ASSIGNMENT ............................................................................... 2

IV.    PARTIES ................................................................................................................ 2

V.     INTRODUCTION AND SUMMARY OF THE ACTION ....................................... 2

VI.    EVENTS LEADING UP TO THE BEGINNING OF THE CLASS PERIOD ............. 10

       A.     Musk Fails to Timely Disclose His 9+% Stake in Twitter ................................12

       B.     Musk Fails to Disclose He Had Been Invited to Join the Twitter Board..........................14

       C.     After Unexpectedly Announcing He Would Not Join Its Board, Musk Discloses an Intent
              to Buy Twitter, and Threatens to Go Hostile Through a Tender Offer if Twitter's Board
              Does Not Acquiesce ................................................................................................18

       D.     Musk Finances the Proposed Buyout in Part by Pledging Billions of Dollars of His Tesla
              Stock as Collateral for a Loan From Morgan Stanley, But the Proxy Fails to Disclose the
              Full Risks of Such Loans ................................................................................................22

VII.   FALSE STATEMENTS DURING THE CLASS PERIOD ....................................... 27

       A.     Musk's May 13, 2022 Tweet .........................................................................28

       B.     Musk's May 14, 2022 Tweet .........................................................................30

       C.     Musk's May 16, 2022 Statement ....................................................................32

       D.     Musk's May 17, 2022 Tweet .........................................................................33

       E.     Musk's May 21, 2022 Tweets.........................................................................34

VIII.  MUSK'S SCIENTER AND MOTIVE AND OPPORTUNITY TO COMMIT FRAUD ........... 40

IX.     LOSS CAUSATION.................................................................................................. 42

X.     PLAINTIFF'S CLASS ACTION ALLEGATIONS.................................................. 42

COUNT I ................................................................................................................................. 45

PRAYER FOR RELIEF ......................................................................................................... 46

DEMAND FOR TRIAL BY JURY ....................................................................................... 47

Plaintiff Giuseppe Pampena ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendant Elon Musk, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendant's public documents, and announcements made by defendant, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Twitter, Inc. ("Twitter" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons and entities who sold the publicly traded securities of Twitter, Inc. between May 13, 2022 and October 4, 2022, both dates inclusive (the "Class Period"). Plaintiff seeks to recover damages caused by Defendant's violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## II.   JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §10(b) of the Exchange Act (15 U.S.C. §78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.      Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements were made in and subsequent damages took place within this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendant, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

### III.   DIVISIONAL ASSIGNMENT

6.     In compliance with Local Rule 3-5(b), Plaintiff requests that this action be assigned to the San Francisco Division of this District because a substantial part of the events or conduct giving rise to the claims in this action occurred in the County of San Francisco.

### IV.   PARTIES

7.     Plaintiff, as set forth in the accompanying certification incorporated by reference herein, sold Twitter's securities during the Class Period and was damaged thereby.

8.     Defendant Elon Musk ("Musk") is an individual and the Chief Executive Officer ("CEO") of Tesla, Inc. and the founder of SpaceX and other businesses.  Prior to the Class Period, Musk announced an Agreement and Plan of Merger (the "Merger") to buy all of Twitter's stock for $54.20 per share.

9.     Musk, as a result of the announced Merger:

a)     directly participated in the management of the Company during the Class Period and/or had veto power over major operational decisions at Twitter;

b)     was privy to confidential proprietary information concerning the Company and its business and operations;

c)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

d)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or;

e)     approved or ratified these statements in violation of federal securities laws.

### V.   INTRODUCTION AND SUMMARY OF THE ACTION

10.     Plaintiff brings this class action on behalf of all stockholders of Twitter, Inc., a San Francisco based company, who sold their Twitter stock during the Class Period and have suffered losses due to false statements issued by Defendant Elon R. Musk.

11.     Twitter, Inc., headquartered in San Francisco, operates a social media platform that allows its users to send and receive "tweets."  Defendant Musk is a prolific user of Twitter and one of its most-followed members, with 90 million followers, making Musk's Twitter account the eighth most

popular account on Twitter.

12.     On **April 25, 2022**, Twitter, Inc. announced that it had agreed to sell itself to Elon Musk for $54.20 per share, or approximately $44 billion (the "Buyout" or "Merger").  Musk negotiated the Twitter Buyout over the weekend of April 23-24, 2022 without carrying out any due diligence.  The Buyout was only conditioned on the approval of Twitter's shareholders at a shareholder meeting, regulatory approval, and closing of the Buyout by October 24, 2022.  A joint press release announcing the Merger contained a quote from Musk promising to "make Twitter better" by "defeating the spam bots."

13.     Before agreeing to buy Twitter for $44 billion, Musk, one of the world's richest individuals valued at $276 billion according to the Bloomberg Billionaires Index, and a sophisticated businessman with a phalanx of lawyers and investment bankers, specifically agreed to waive detailed due diligence as a condition of the Merger.  At the time, Musk was well aware that Twitter had a certain amount of "fake accounts" and accounts controlled by "bots" and that Twitter had in fact settled a lawsuit based on the fake accounts for millions of dollars.  Musk had tweeted about that issue at Twitter several times in the past, prior to making his offer to acquire Twitter with full knowledge of the bots.  Indeed, on April 13, 2022, when he sent a letter to Twitter's Board offering to buy Twitter, he later tweeted that "If our Twitter bid succeeds, we will defeat the spam bots or die trying!"

14.     Musk and his team were also well aware of the ***$809.5 million settlement*** Twitter entered into ***in September 2021,*** in a securities fraud class action alleging Twitter overstated its user numbers and growth rate -- *In re Twitter Inc. Securities Litigation*, 16-cv-05314, U.S. District Court, Northern District of California (San Francisco).  All the documents from that case were publicly available to Musk, including a website (www.twittersecuritieslitigation.com) containing, among other things, the Court's order denying Twitter's motion for summary judgment, wherein the court held that Twitter's false statements about its Daily Active Users (DAUs) and Monthly Active Users (MAUs) were material because "Twitter has publicly stated that its success and financial performance depend, at least in part, on the size and engagement of its user base."

15.     Musk presumably believed he was obtaining Twitter at a sale price, since Twitter's stock price had decreased significantly in the months before he made his offer, declining from $71.69 on July 23, 2021 to just $32.42 on March 7, 2022.  But after Musk agreed to buy Twitter for $54.20, the stock market experienced a further decline.  The market decline, however, did not affect Twitter's stock price due to the signed Merger agreement.  After the announcement of the Buyout, Twitter's stock consistently traded close to the Buyout price, and around $50 per share.  The small delta between its trading price and the $54.20 buyout price was typical of the trading prices of companies who have agreed to be acquired, characterized by a small discount for the time value of money and a relatively small risk that the deal will not go through.

16.     Musk had a unique and multi-billion-dollar problem, however, Musk pledged his ***Tesla*** stock as collateral for a $12.5 billion loan to finance the buyout of Twitter, and ***Tesla's shares had declined by over 37%*** after the announcement of the Buyout, as reflected below:



17.     Because Tesla's stock was worth much less than when Musk agreed to buy Twitter, Musk was at risk of a margin call or a requirement to put up more cash.  Musk quickly acted to attempt

to mitigate these personal risks to himself by engaging in unlawful conduct that moved the price of Twitter's stock down.  Musk proceeded to make statements, send tweets, and engage in conduct designed to create doubt about the deal and drive Twitter's stock down substantially in order to create leverage that Musk hoped to use to either back out of the purchase or re-negotiate the buyout price by as much as 25% which, if accomplished, would result in an $11 billion reduction in the Buyout consideration.  As detailed herein, Musk's conduct was fraudulent and illegal.

18.    Musk's market manipulation worked – ***Twitter lost $8 billion in valuation*** after the Buyout was announced.  As subsequently disclosed, Musk first started purchasing Twitter shares on January 31, 2022.  Musk thereafter exceeded the 5% threshold, requiring him to file a Form 13G with the SEC.  Musk did <u>not timely file</u> the Form 13G; failing to do so benefitted Musk because he was able to continue to buy Twitter shares at depressed prices.  When Musk belatedly filed the Form 13G, Twitter's shares increased substantially, rising 27% after he filed the 13G.

19.    ***Musk benefitted himself by approximately $156 million*** by failing to timely file a Form 13G.[1]  By delaying his disclosure of his stake in Twitter, Musk engaged in market manipulation and bought Twitter stock at an artificially low price, in violation of the law.

20.    Musk's disregard demonstrates how one can flaunt the law and the tax code to build their wealth at the expense of other Americans.  Musk's insider trading profits may come with a slap on the wrist in the form of a fine from the SEC but will probably be limited to hundreds of thousands of dollars, according to legal and security experts.[2]

21.    When Musk eventually filed his Form 13G on April 4, 2022, it was materially misleading.  He did not disclose his intent to join the Twitter Board and he failed to disclose that he was contemplating buying Twitter.  Both disclosures would have caused Twitter's stock to increase more than it did when his filing was made.  Musk was later forced to file an amended Form 13G to comply

---

[1] *See* Reed Albergotti, "Elon Musk Delayed Filing a Form and Made $156 Million," The Washington Post, April 6, 2022.

[2] *Id.*

with the law.  As Tesla shares cratered by almost 30% in April and May 2022, Musk began to make disparaging comments about Twitter in an effort to drive its stock price down further.

22.    On **May 13, 2022**, at 5:44 a.m. (*i.e.*, before the stock market opened), Musk issued a tweet which stated that the buyout was "temporarily on hold:"



Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users

23.    Musk's tweet (and public statement) was misleading and constituted an effort to manipulate the market for Twitter shares, since he already knew all about the fake accounts.  The statement was false because the buyout was not, in fact, "temporarily on hold."  There is nothing in the buyout contract that allows Musk to put the deal "temporarily on hold."  Moreover, Musk's statement was misleading because it stated or implied that Musk's obligation to consummate the buyout was conditioned on his satisfaction with due diligence to determine whether "spam/fake accounts do indeed represent less than 5% of users."  This was false because Musk had specifically waived detailed due diligence as a condition precedent to his obligations under the buyout contract.  Thus, Musk had and has no right to cancel the buyout based on any results from due diligence concerning the number of spam/fake accounts at Twitter.  Musk then continued issuing false and disparaging tweets about Twitter in an effort to drive its stock price down further.

24.    Musk's false and misleading tweets had the desired effect, as they caused Twitters' stock to decline in the days following the tweets, in stark contrast to the Nasdaq index, which increased, as reflected in the following chart:



25.     On **May 17, 2022**, Musk doubled down on his "Friday the 13th" tweet, issuing another tweet stating that the deal "cannot go forward" while claiming almost 20% of accounts were fake.



26.     Musk's wrongful conduct during the Class Period not only substantially harmed Twitter's shareholders by causing many Twitter stockholders to sell at depressed prices, but it also substantially harmed Twitter's business, thus further damaging the stock. As reported by the Wall Street Journal on May 21, 2022:

*In one 24-hour period this month, Twitter Inc.'s chief executive fired two widely liked senior executives and announced a hiring freeze, while billionaire Elon Musk suddenly said he was putting "on hold" an acquisition plan that could lead to a wholesale revamp of the social-media company*.

It is a tricky time to work at Twitter. Far beyond the usual uncertainty at an acquisition target, *Mr. Musk's $44 billion takeover deal has left employees bewildered about what their jobs are and will be, as well as how to keep operating a platform with around 229 million daily users* while its would-be owner uses it to publicly assail the company for everything from its free-speech policies to its business model.

Internal conversations and Slack channels are awash in distress and anger over the criticism, while *company leaders who themselves have no way to know the outcome have responded with repeated staff meetings to try to soothe the angst and encourage people to press forward,* according to current and former staffers and internal communications viewed by The Wall Street Journal.

*"I expect the 'chaos tax' and ups and downs to continue," Jay Sullivan, Twitter's new head of product, wrote on May 13* in an internal message to thousands of employees that was viewed by the Journal.

Whatever the fate of the deal, many *current and former employees say the company has been irrevocably shaped by the five weeks since Mr. Musk publicly disclosed his unsolicited bid to buy Twitter*, one of the world's most influential social-media platforms. Some employees have left. Many more say they are looking for new jobs. Others are hunkering down to await an uncertain fate under *Mr. Musk*, who *recently tweeted an image of cartoon excrement at the current CEO*.

*On May 12, Mr. Agrawal told employees the company was pausing hiring and looking to cut costs, and that two senior executives*—Bruce Falck, general manager of revenue, and Kayvon Beykpour, general manager of consumer—*were leaving. Mr. Beykpour tweeted he was on paternity leave when he got the news*.

*The next day, Mr. Musk tweeted that the deal was "on hold"* until he could get more clarification from the company about how pervasive bots were on the platform. *That rattled already wobbly investor confidence that the deal will happen at the price*

*Mr. Musk agreed to—if at all. Twitter shares are down more than 25% since late April*.[3]

27.    Musk's manipulation of Twitter stock also encouraged some other market participants to short Twitter's stock.  After Musk began disparaging Twitter and his own buyout, Hindenburg shorted Twitter.  On May 17, 2022, Hindenburg closed its short position for a large profit.[4]

28.    In the ensuing months, Musk sent three separate letters to Twitter officially terminating the Merger.  Those letters were dated July 8, August 29, and September 9, 2022.  *See* Exhibits A, B, C, attached.

29.    Twitter sued Musk in Delaware Chancery Court after receiving the July 8, 2022 termination letter, but Musk's emphatic and repeated cancellation of the Merger led the market to continue to discount Twitter's stock.

30.    Because the Merger price represented a premium for Twitter's stock, Musk's statements which created uncertainty about the Merger, including his termination of the Merger, caused the market to discount Twitter's shares to a price that reflected the risk of the Merger not occurring.

31.    Twitter's lawsuit against Musk, which sought specific performance, was expedited and set for trial beginning on October 17, 2022.  Musk made several attempts to obtain a continuance of the trial date, but each was rejected by the court.

32.    Then, on October 4, 2022, less than two weeks before the trial was set to commence, Musk shocked the markets by announcing that he intended to go through with the Merger at the original price of $54.20.  Twitter's stock immediately jumped by over 15% before trading in the stock was halted by the stock exchange.  When trading resumed later in the day, the stock increased another 7%, eventually closing up over 22% in one day, as reflected in the following chart:

---

[3] *See* Deepa Seetharaman & Sarah Needleman, "Twitter Employees Face 'Chaos Tax'," The Wall Street Journal, May 21, 2022.

[4] *See* Joshua Fineman, "Hindenburg Research Closes Twitter Short Position," Seeking Alpha, May 17, 2022.

## VI.    EVENTS LEADING UP TO THE BEGINNING OF THE CLASS PERIOD

33.    Elon Musk is an active user of the Twitter platform with close to 90 million followers, making him one of Twitter's most popular accounts.

34.    Musk has violated SEC rules related to going-private transactions before.  He issued false tweets in the past claiming he was going to take his company, Tesla, Inc., private, and that he had already secured financing.  The SEC sued Musk, and he was forced to settle the case and agree to a consent decree dated September 29, 2018, as amended on April 26, 2019.  The settlement and consent decree required Musk to pay a $20 million fine, give up his role as Tesla's chairman, and refrain from issuing tweets related to Tesla without the pre-approval of a "Securities Counsel" and Tesla's Disclosure Controls Committee.  Musk later demanded that his law firm, Cooley LLP, fire a former SEC lawyer who had worked on the SEC case and later joined Cooley, or else Cooley would lose Musk's business.[5]

---

[5] *See* Rebecca Elliott, "Elon Musk's Tesla Asked Law Firm to Fire Associate Hired From SEC," THE WALL STREET JOURNAL, Jan. 15, 2022.

35.     Musk has also been sued by Tesla shareholders.  On April 1, 2022, the United States District Court for the Northern District of California issued an order granting in part Plaintiffs' Motion for Summary Judgment and holding that Musk's tweets regarding his intent to take Tesla private <u>were false and misleading</u> and that Musk <u>knew or recklessly disregarded the falsity of the tweets</u>.  *See In re Tesla, Inc. Sec. Litig.*, Case No. 18-cv-04685 (N.D. Cal.), Docket No. 387.

36.     Musk continues to flaunt court and governmental findings and orders.  Musk gave a TED Talk in Vancouver on April 14, 2022, during which he emphatically proclaimed, in reference to his August 7, 2018 Tesla tweets, *inter alia*, that "funding was actually secured – I want to be clear about that – in fact that gives me a good opportunity to clarify that – and funding was indeed secured" before going on to refer to the SEC's San Francisco office as "bastards" and claiming that he settled with the agency only because they had a "gun to [his] child's head."[6]

37.     On **May 12, 2022**, it was announced that the SEC was again investigating Musk, this time for his failure to timely file the Form 13D regarding his more than 5% stake in Twitter.  In addition to violating SEC rules, Musk's false tweets and his wrongful conduct constitute securities fraud.

38.     On **March 26, 2022**, Musk called Jack Dorsey (Twitter's founder) in California to discuss the future direction of social media, including the benefits of open social protocols.  Dorsey had previously communicated his views on these topics to the Twitter Board and publicly.  Dorsey lives in the Sea Cliff neighborhood of San Francisco and his communications with Musk were made to and from California.

39.     Also on **March 26, 2022**, Musk contacted Egon Durban, one of Twitter's directors, to set up a discussion between Musk and Durban.  Musk and Durban subsequently spoke on March 26, 2022 and March 27, 2022 ***and discussed the potential of Musk joining the Twitter Board, as well as the fact that Musk had purchased a significant stake of more than five percent of Twitter's common stock***.[7]

---

[6]*See* https://www.ted.com/talks/elon_musk_elon_musk_talks_twitter_tesla_and_ how_his_brain_works_ live_at_ted2022.

[7] *See* May 17, 2022 Proxy Statement at 42.

Durban informed Bret Taylor, the chairperson of the Twitter Board,[8] Martha Lane Fox, one of Twitter's directors and the chairperson of Twitter's Nominating and Corporate Governance Committee (the "NomGov Committee"), and Parag Agrawal, Twitter's chief executive officer, of Musk's communication.  Durban, Taylor, Agrawal and Lane Fox discussed Musk's communications and determined (1) that Durban would connect Musk with Taylor, Agrawal and Lane Fox, and they would also discuss with Musk his potential interest in joining the Twitter Board; (2) to call meetings of the NomGov Committee and of the Twitter Board to discuss Musk's communications and potential interest in joining the Twitter Board; and (3) that Lane Fox would inform each member of the Twitter Board in advance of the Twitter Board meeting of Musk's communications.  Lane Fox subsequently informed the members of the Twitter Board of Musk's initial communications.

### A.    Musk Fails to Timely Disclose His 9+% Stake in Twitter

40.    Despite the fact that Twitter has admitted that Musk already owned 5% of Twitter's stock on or before March 26, 2022, Musk failed to file a Schedule 13D with the SEC, as he was required to do. Musk belatedly filed a Schedule 13G on April 4, 2022, at least 10 days after his stake surpassed the trigger point for disclosure. Musk has not publicly explained why he did not file the form in a timely manner.

41.    Moreover, Musk's April 4, 2022 filing was false and misleading because it was improperly filed on Form 13G, not 13D.  Form 13G is only to be used by passive investors, and thus Musk was required to use Form 13D.  Musk's 13G filing failed to disclose that he had been offered a position on Twitter's Board and that he was interested in buying Twitter.  Form 13G contains an Item 10, called "Certification," which states that "By signing below I certify that, to the best of my knowledge and belief, the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or

---

[8] Taylor, in addition to being a Twitter director, is the Co-CEO of Salesforce.com and lives in the San Francisco Bay Area.  His communications with Musk were disseminated from and to California.

effect."  Musk's Form 13G inserted a false and misleading representation in Item 10 stating "Not applicable."  Musk personally signed the Form 13G.

42.     On April 5, 2022, Musk filed a Form 13D.  The 13D disclosed that Musk had entered into a letter agreement to join Twitter's board.  But it misrepresented that Musk "holds the Common Stock of the Issuer for investment purposes" and that Musk "has no present plans or intentions which would result in or relate to any of the transactions described in subparagraphs (a) through (j) of Item 4 of Schedule 13D."  This was false.  Item 4(b) required Musk to disclose his intentions with respect to "An extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving the issuer or any of its subsidiaries."  *See* 17 CFR § 240.13d-101.  As noted *infra*, Twitter's Proxy Statement ***admits that just four days*** later, on April 9, 2022, Musk notified Twitters' Chairman Taylor and CEO Agrawal that he ***would be making an offer to take Twitter private***.

43.     April 9, 2022 was a Saturday.  Two days later, on Monday, April 11, 2022, Musk filed an Amended Schedule 13D that stated that he would not join Twitter's Board and that he "***might*** engage in discussions with the Board" about "potential business combinations."  This constituted yet again a false and misleading misrepresentation to investors.  The Amended 13D failed to disclose that he had ***already told*** Twitter two days before, on April 9, 2022, that he would be making an offer to take the Company private.

44.     On **May 11, 2022**, the Wall Street Journal reported that the SEC was investigating Musk over his failure to timely disclose his 9.2% stake in Twitter.[9]  ***Musk likely saved more than $143 million by not reporting that his trades had crossed the 5% threshold***, according to Daniel Taylor, a University of Pennsylvania accounting professor, since the share price could have been higher had the market known of Musk's growing stake.

---

[9] *See* Dave Michaels, "Elon Musk's Belated Disclosure of Twitter Stake Triggers Regulators' Probes," The Wall Street Journal, May 11, 2022.

45.     Because Musk had acquired more than 5% of Twitter's stock, he was required to file a Schedule 13D with the SEC within 10 days.  Musk's Twitter holdings surpassed 5% on March 14, 2022, securities filings show, meaning he should have disclosed his stake by March 24, 2022 under SEC rules.

46.     After March 24, Musk purchased roughly $513 million of stock at prices between $38.20 and $40.31 a share, according to a regulatory filing.  The total buying spree made him Twitter's largest individual shareholder with 9.2% of its shares.

**B.      Musk Fails to Disclose He Had Been Invited to Join the Twitter Board**

47.     On **March 27, 2022**, Musk, Taylor and Agrawal discussed Musk's interest in Twitter and potentially joining the Twitter Board.  As part of that discussion, Musk stated that he was considering various options with respect to his ownership, including potentially joining the Twitter Board, seeking to take Twitter private or starting a competitor to Twitter.

48.      On **March 30, 2022**, Lane Fox and Musk discussed his potential interest in joining the Twitter Board and the benefits that Musk believed he could potentially bring to Twitter as a Twitter director.

49.     On **March 31, 2022**, Agrawal and Taylor met with Musk in California to discuss Twitter's business and Musk's potential interest in joining the Twitter Board.  At the meeting, Musk reiterated his interest in potentially joining the Twitter Board to help improve Twitter's business as a director of Twitter, and that he was also considering the possibility of taking Twitter private or starting a competitor to Twitter.

50.     On **April 2, 2022**, the NomGov Committee met in California, with Taylor, members of Twitter management and a representative of Wilson Sonsini Goodrich & Rosati, Professional Corporation, Twitter's outside legal counsel reporting to the Twitter Board ("Wilson Sonsini"), in attendance.  Durban, Taylor, Agrawal, and Lane Fox each updated the NomGov Committee on their discussions with Musk.  After considering, among other things, Musk's interest in Twitter's business, his statement that he is one of Twitter's substantial stockholders, his active use of the Twitter platform, his technical expertise in areas critical to Twitter's products and technology, and the perspectives that he could bring to the Twitter Board, the NomGov Committee determined to recommend that the Twitter

Board consider inviting Musk to join the Twitter Board, subject to completion of customary onboarding procedures, such as a background check and completing and signing a director onboarding questionnaire.

51.     Upon information and belief, Musk completed the director questionnaire and returned it to Twitter in California.

52.     Also on **April 2, 2022**, at the direction of Taylor and the NomGov Committee, Twitter requested that J.P. Morgan attend the scheduled meeting of the Twitter Board in San Francisco, California to assist Twitter in reviewing Musk's purchase of a significant stake in Twitter's common stock, Musk's potential appointment to the Twitter Board and related matters.

53.     On **April 3, 2022**, the Twitter Board met in San Francisco, California, with members of Twitter management and representatives of each of Wilson Sonsini and J.P. Morgan in attendance. Durban, Taylor, Agrawal, and Lane Fox each updated the Twitter Board on their discussions with Musk. The NomGov Committee reported on its discussions at its meeting the previous day and provided its recommendation that the Twitter Board consider inviting Musk to join the Board.  In evaluating the NomGov Committee's recommendation, the Board considered, among other things, Musk's qualifications, business expertise, knowledge of Twitter's business and user base and technical expertise in areas critical to Twitter's products and technology.

54.     At the meeting, Dorsey informed the Twitter Board that he and Musk were friends, and Durban informed the Twitter Board that he had worked on unrelated matters with Musk in the past.  At this and other meetings of the Twitter Board in California relating to Musk joining the Twitter Board, Musk's acquisition proposal and the Merger, the Twitter Board regularly met in executive sessions of independent directors. ***The Twitter Board determined to invite Musk to join the Twitter Board***, subject to his completion of a background check and other customary onboarding procedures.  In connection with Musk joining the Twitter Board, ***it was the desire of the Twitter Board that Musk enter into a cooperation agreement that included "standstill" provisions that, among other things, would limit his public statements regarding Twitter***, including the making of unsolicited public proposals to acquire Twitter (but not private proposals) without the prior consent of the Twitter Board.

55.     Following the meeting, at the direction of the Twitter Board, **_Lane Fox called Musk to invite him to join the Twitter Board_**, subject to completion of customary onboarding procedures.  Lane Fox also noted the desire of the Twitter Board that Musk enter into a cooperation agreement.  Following that discussion, representatives of Twitter sent a copy of Twitter's customary director onboarding questionnaire to representatives of Musk.

56.     As noted *supra*, on April 4, 2022, Musk publicly disclosed his ownership of approximately 9.2 percent of Twitter common stock.  Musk's Schedule 13G did not disclose his intent to join the Twitter Board and also failed to disclose that he was contemplating buying Twitter.  Both disclosures would have caused Twitter's stock to increase more than it did when his filing was made.  Musk was later forced to file an amended disclosure form on Schedule 13D on April 5, 2022.

57.     Musk benefitted himself **_by approximately $156 million_** by failing to timely file the Form 13G.[10]  By delaying his disclosure of his stake in Twitter, Musk engaged in market manipulation and bought Twitter stock at an artificially low price.  Musk was 11 days late in publicly declaring he had amassed a large stake in Twitter.  Musk became a 5% stockholder on  March 14, 2022, according to the SEC filings, but failed to file his Form 13G until April 4, 2022

58.     Between March 14 and April 4, 2022,  Musk continued to buy Twitter stock at the price of around $39 per share, bringing his total stake to 9.2 percent.  After his disclosure, Twitter's share price rose roughly 30 percent and then traded at above $50 per share until Musk began disparaging Twitter.

59.     Musk saved about $156 million, according to David Kass, a finance professor at University of Maryland's business school, who stated "I really don't know what's going through his mind. Was he ignorant or knowledgeable that he was violating securities law?"  "Whoever was handling the trades for Musk should have known," Kass said.[11]

---

[10] *See* Reed Albergotti, "Elon Musk Delayed Filing a Form and Made $156 Million," The Washington Post, April 6, 2022.

[11] *Id*.

60.     Musk's disregard for securities laws demonstrates how billionaires can skirt the law and the tax code to build their wealth at the expense of the average American.

61.     On **April 4, 2022**, representatives of Twitter in San Francisco California provided Musk with a draft of a cooperation agreement that provided for Musk's appointment to the Twitter Board and included customary "standstill" provisions.  For example, for so long as Musk were to serve on the Twitter Board and for 90 days thereafter, Musk agreed to refrain from, either alone or as a member of a group, becoming the beneficial owner of more than 14.9 percent of Twitter common stock.

62.     Also on **April 4, 2022**, Twitter sent Musk a draft of a letter agreement providing that Twitter would appoint Musk to the Twitter Board to serve as a Class II director with a term expiring at Twitter's 2024 Annual Meeting of Stockholders.  Twitter requested, but Musk refused, to agree to a customary "cooperation agreement" limiting his public statements about Twitter.  Musk did, however, agree at Twitter's request to limit his purchase of additional Twitter stock to no more than 14.9% *so long as he was a Twitter director*.

63.     On **April 5, 2022**, Twitter and Musk issued a joint announcement from San Francisco California disclosing the entry into the letter agreement. Musk and Agrawal tweeted the following:



64.     Over the next three days, Agrawal and Musk continued to discuss Twitter's business and products *in anticipation of Musk joining the Twitter Board*.  Later that day, Musk called Dorsey in San Francisco to ask Dorsey for his perspectives on Twitter in connection with the announcement of Musk

joining the Twitter Board. During this time period, Defendant Dorsey failed to protect the best interests of Twitter and instead preferred and favored Musk's interests in the Buyout. Dorsey in fact publicly denigrated Twitter's Board on April 16, 2022, stating that the Board had "consistently been the dysfunction of the company."

66. On **April 8, 2022**, Lane Fox informed the Twitter Board of the satisfactory completion of Musk's background check. Taylor informed the Twitter Board of his expectation that Musk's appointment to the Twitter Board would be effective on April 9, 2022.

66. On **April 9, 2022**, before Musk's appointment to the Twitter Board became effective, Musk notified Taylor and Agrawal in San Francisco that he would not be joining the Twitter Board and would be making an offer to take Twitter private.

67. On **April 10, 2022**, Twitter issued an announcement from San Francisco California that Musk had decided not to join its Board.

## C. After Unexpectedly Announcing He Would Not Join Its Board, Musk Discloses an Intent to Buy Twitter, and Threatens to Go Hostile Through a Tender Offer if Twitter's Board Does Not Acquiesce

68. On **April 13, 2022**, Musk delivered to Twitter's Chairman Bret Taylor in California a non-binding proposal to acquire Twitter, the full text of which is reproduced below. Musk also called Taylor in California to re-iterate that Musk's proposal represented his best and final offer to acquire Twitter and referred Taylor to Musk's public disclosure of the proposal scheduled for the next day for additional details with respect to the proposal.

*Bret Taylor*

*Chairman of the Board,*

*I invested in Twitter as I believe in its potential to be the platform for free speech around the globe, and I believe free speech is a societal imperative for a functioning democracy. However, since making my investment I now realize the company will neither thrive nor serve this societal imperative in its current form. Twitter needs to be transformed as a private company.*

*As a result, I am offering to buy 100% of Twitter for $54.20 per share in cash, a 54%*
*premium over the day before I began investing in Twitter and a 38% premium over the day*
*before my*
*investment was publicly announced. My offer is my best and final offer and if it is not*
*accepted, I would need to reconsider my position as a shareholder.*

*Twitter has extraordinary potential. I will unlock it.*

*/s/ Elon Musk*
*Elon Musk*

69.     Two aspects of Musk's letter are noteworthy.  First, Musk made one and only one offer.
He refused to negotiate and simply put the $54.20 per share offer to the Twitter Board as a "take it or
leave it" offer.  Second, Musk threatened to sell his Twitter stock if the Twitter Board did not accept his
ultimatum.  As will be shown *infra*, Musk also waived due diligence; he was in a hurry to acquire Twitter,
claimed he knew everything he needed to know about Twitter, and did not condition his offer on his
satisfaction with any due diligence.

70.     On **April 14, 2022**, Musk publicly disclosed his acquisition proposal. He later tweeted that
"If our Twitter bid succeeds, we will defeat the spam bots or die trying!"



71.     On **April 15, 2022**, the Twitter Board responded to Musk's takeover attempt by defensively
adopting a shareholder rights plan or "poison pill," pursuant to which Musk's acquisition of greater than

1   15% of Twitter's outstanding common stock would trigger a right for the Company's other stockholders

2   to acquire additional stock at a considerable discount.

3   72.   In response to Twitter's adoption of a poison pill, Musk began laying the groundwork for

4   a hostile tender offer to acquire Twitter over the Board's objection.  He threatened a tender offer in a

5   series of tweets, posting "Love me tender" on April 16, 2022 and "_____ is the Night" on April 19,

6   2022 (an apparent allusion to the F. Scott Fitzgerald novel Tender is the Night).  Musk also allegedly

7   approached investment firms, including Silver Lake Partners, to help him gain control of Twitter.[12]

8   Durban's allegiance was with Musk, not Twitter.  Market commentators noted  "***Durban's close ties to***

9   ***Elon Musk***, who is in the process of acquiring Twitter. As co-CEO of the private equity firm Silver

10   Lake, Durban has worked with Musk on a number of major equity deals, including the abortive effort to

11   take Tesla private in 2018. As a result, ***he is seen as one of Musk's closest allies on the board and a***

12   ***crucial figure as Musk's proposed buyout of the company limps towards completion***."[13]

13   73.   Musk also filed an amended Schedule 13D/A on April 21, 2022, which stated that Musk

14   was "exploring whether to commence a tender offer" and that he had secured commitment letters from a

15   group of lenders, led by Morgan Stanley, to provide approximately $46.5 billion to finance his

16   acquisition of Twitter.

17   74.   On April 21, 2022, ***Musk filed an Amended Schedule 13D which stated that his***

18   ***acquisition proposal was no longer subject to the completion of financing and business due diligence***:

19   "At the time of delivery, the Proposal was also subject to the completion of financing and business

20   diligence, but it is no longer subject to financing as a result of the Reporting Person's receipt of the

21   financing commitments described below and is no longer subject to business due diligence."

22

23

24   _____

25   [12] *See* Karen Mkrtchyan, "Elon Musk Turns to Silver Lake Partners After Twitter Board
    Rejects Hostile Takeover Bid," April 18, 2022, Coin Chapter.  *See also* Josh Kosman, "Elon Musk
26   considering bringing in partners on Twitter bid," New York Post, April 15, 2022.

27   [13] *See* Russel Brandom, "Musk-linked Investor Resigns From Twitter Board, Then Returns," The
    Verge, May 27, 2022 (also noting that "Jack Dorsey, who is also seen as friendly to Musk").

28

_____

CLASS ACTION COMPLAINT                                                              20

75.     Musk then spoke directly with Taylor on Saturday, April 23, 2022 and "threatened to take his offer directly to Twitter's shareholders."

76.     The following day, Sunday, **April 24, 2022**, the Twitter Board capitulated in the face of Musk's threats and accepted his initial, "best and final" offer to purchase all Twitter's outstanding common stock for $54.20 per share.

77.     On **April 25, 2022**, Twitter approved entry into a definitive agreement to be acquired by an entity wholly-owned by Musk for $54.20 per share in cash, in a transaction valued at approximately $44 billion.  The Board's agreement to the Proposed Buyout was announced via a Form 8-K filed by Twitter that same day.  The documentation for the Proposed Buyout was negotiated and signed in substantial part in San Francisco California.  A joint press release announcing the Buyout contained a quote from Musk promising to "make Twitter better" by "defeating the spam bots."

78.     Dorsey quickly took to Twitter to praise his good friend Elon Musk, admitting that he had preferred Musk over any other option for Twitter and that Musk was the "singular solution I trust":



79.     On **May 5, 2022**, Twitter and Musk entered into a confidentiality agreement with respect to Twitter sharing non-public information with Parent, Musk and their representatives, including pursuant to the terms of the merger agreement. Prior to entry into the merger agreement, ***Musk did not ask to enter into a confidentiality agreement or seek from Twitter any non-public information regarding Twitter***. Further, Musk's obligation to complete the Buyout is not conditioned on his satisfaction with any due diligence.

**D.      Musk Finances the Proposed Buyout in Part by Pledging Billions of Dollars of His Tesla Stock as Collateral for a Loan From Morgan Stanley, But the Proxy Fails to Disclose the Full Risks of Such Loans**

80.      When the Buyout was originally announced on April 25, 2022, Musk's financing consisted of the following:  (1) $21 billion in cash; and (2) $25.5 billion in financing.  As explained below, both the cash component and $12.5 billion of the debt financing are linked to Musk's Tesla shares and the value of those Tesla shares.

81.      With respect to the cash component, at the time the Buyout was announced on April 25, 2022, Musk was expected to sell about 20 million shares of his Tesla stock to provide such cash.  That was predicated on Tesla stock having a value of approximately $1,000 per share at the time of the closing of the Buyout.

82.      Indeed, while Tesla stock was still trading around $1,000 per share, Musk initially acted quickly after the Buyout was announced to sell some of his Tesla shares to raise the cash component. In the three days after the announcement of the deal, Musk sold roughly $8.5 billion worth of shares in Tesla to help fund the purchase.

83.      Musk reported the sale of 9.6 million Tesla shares in filings with the Securities and Exchange Commission on April 28-29, 2022.  The trades were made at prices ranging from $822.68 to $999.13 a share.  But then Musk stopped selling Tesla shares as its price began to decline.  Further, the decline did not abate, and instead got worse.

84.      With respect to the debt financing, Morgan Stanley arranged tens of billions of dollars to finance the Merger, and is the largest single lender facilitating the deal.  Musk has received commitment letters to provide, in addition to a $21 billion contribution of his own cash, an aggregate of approximately $25.5 billion in financing as follows: (i) a debt commitment letter dated April 20, 2022, from Morgan Stanley and certain other financial institutions to provide $13 billion in financing to Musk via a $6.5 billion senior secured term loan facility (the "Term Loan Facility"), a $500 million senior secured revolving facility (the "Revolving Facility"), a $3 billion senior secured bridge loan facility (the "Secured Bridge Facility") and a $3 billion senior unsecured bridge loan facility (the "Unsecured Bridge

Facility"); and (ii) a separate debt commitment letter dated April 20, 2022 from Morgan Stanley and certain other financial institutions pursuant to which they committed to provide Musk with $12.5 billion in margin loans.

85.     The chart below depicts Musk's original financing package:



86.     There are several problems with this financing scenario which provided Musk with a strong motive to make false statements about Twitter and engage in market manipulation.

87.     According to Tesla's regulatory filings, Musk had already pledged about half of his 173 million shares of Tesla stock to fund other ventures and activities. He has now pledged an additional 40 percent to secure the new loans to buy Twitter. That leaves only 10 percent of his Tesla shares available as collateral. Because Tesla's policies allow major shareholders to borrow only 25 percent of the value of each share that is pledged, that would appear to limit further borrowing against his Tesla shares to less than $5 billion.  As noted by Tesla's Amended Form 10-K filed May 2, 2022:

> In order to mitigate the risk of forced sales of pledged shares, *the Board has a policy that limits pledging of Tesla stock by our directors and executive officers. Pursuant to this*

1   ***policy, directors and executive officers may pledge their stock*** (exclusive of options,
2   warrants, restricted stock units or other rights to purchase stock) as collateral for loans and
3   investments, ***provided that the maximum aggregate loan or investment amount***
4   ***collateralized by such pledged stock does not exceed twenty-five percent (25%) of the***
5   ***total value of the pledged stock***.[14]

6       88.     As Musk was well aware prior to the beginning of the Class Period, the Twitter financing
7   was in major peril since the value of the collateral — Tesla stock (TSLA) — needed to remain at or near
8   the $1,000 per share it was trading at when the deal was announced. Yet that has not happened, as Tesla
9   stock dropped by over 35% after the announcement of the Buyout, as shown in the following chart:



[14] Tesla Form 10-K/A, filed May 2, 2022, at p. 21.

89.     If Tesla's stock fell below $750, Musk could violate Tesla's own leverage ratio.  That apparently happened, causing Musk, upon information and belief, to be in violation of Tesla's stock pledging policy.

90.     If Tesla stock fell below $600, Morgan Stanley and other banks could demand that Musk post additional collateral, requiring him to quickly sell some of his Tesla shares, which Musk did not want to do at depressed prices.

91.     Tesla's annual report also warned of the potential consequences of Musk's personal loans on its stock, stating:

> **If Elon Musk were forced to sell shares of our common stock that he has pledged to secure certain personal loan obligations, such sales could cause our stock price to decline.**
>
> Certain banking institutions have made extensions of credit to Elon Musk, our Chief Executive Officer, a portion of which was used to purchase shares of common stock in certain of our public offerings and private placements at the same prices offered to third-party participants in such offerings and placements. We are not a party to these loans, which are partially secured by pledges of a portion of the Tesla common stock currently owned by Mr. Musk. **If the price of our common stock were to decline substantially, Mr. Musk may be forced by one or more of the banking institutions to sell shares of Tesla common stock to satisfy his loan obligations** if he could not do so through other means. Any such sales could cause the price of our common stock to decline further.[15]

92.     Twitter's Proxy Statement did not disclose these risks nor the substantial risk that Musk's proposal to finance $12.5 billion of the Buyout price through loans collateralized by Musk's Tesla stock would be jeopardized by any significant decline in Tesla's stock price.  The Proxy also failed to disclose whether Musk was in compliance with Tesla's stock pledging rules.  The Proxy noted that Musk's debt commitment letter providing for $12.5 billion in margin loan commitments was subsequently reduced to $6.25 billion, but failed to disclose the reason: that the substantial decline in Tesla's stock had caused

---

[15] *See* Tesla's Form 10-K, filed Feb. 7, 2022, at p. 27.

Musk to be in violation of Tesla's stock pledging rules and also that Musk did not want to risk being forced to sell Tesla shares at depressed prices or be forced to re-negotiate the terms of the margin loan. The Proxy admitted that as of April 20, 2022, the Board recognized "the need for additional clarity from Mr. Musk on equity financing and any debt financing and other closing certainty matters with respect to the proposed acquisition."

93.      The following chart from Tesla's Form 10-K/A filed May 2, 2022 set forth Musk's ownership of Tesla stock at the time:

| Beneficial Owner Name | Shares Beneficially Owned | Percentage of Shares Beneficially Owned |
|---|---|---|
| **5% Stockholders** | | |
| Elon Musk(1) | 231,715,206 | 21.2% |
| The Vanguard Group(2) | 62,448,572 | 6.0% |
| Blackrock, Inc.(3) | 52,918,395 | 5.1% |
| **Named Executive Officers & Directors** | | |
| Elon Musk(1) | 231,715,206 | 21.2% |
| Zachary J. Kirkhorn(4) | 635,271 | * |
| Andrew Baglino(5) | 257,383 | * |
| Robyn Denholm(6) | 654,159 | * |
| Ira Ehrenpreis(7) | 560,335 | * |
| Lawrence J. Ellison(8) | 15,270,141 | 1.5% |
| Hiromichi Mizuno(9) | 117,230 | * |
| James Murdoch(10) | 475,765 | * |
| Kimbal Musk(11) | 683,490 | * |
| Kathleen Wilson-Thompson(12) | 260,139 | * |
| All current executive officers and directors as a group (10 persons)(13) | 250,629,119 | 22.9% |

94.      Tesla's Form 10-K/A also revealed the number of Tesla shares Musk had pledged for personal debts, including the Twitter Buyout: "[Musk's shares include] 92,331,125 shares pledged as collateral to secure certain personal indebtedness."[16]

95.      Between April 25, 2022, when the Proposed Buyout was announced, and May 12, 2022, Tesla's stock declined by 27%.  The substantial decline in Tesla's stock threatened a margin call on

---

[16] *See* Tesla Form 10-K/A, filed May 2, 2022, at p. 23.

Musk's Tesla stock which was pledged as collateral for his $12.5 billion loan from Morgan Stanley and other banks.

96.     In addition, according to his financing plan, Musk had not only pledged his Tesla stock for the $12.5 billion loan from Morgan Stanley and other banks, but was going to have to sell $21 billion worth of Tesla stock, about 20 million shares, to fund the cash part of the deal.  With Tesla stock entering a bear market at the time, selling millions of shares was equivalent to having to book a huge loss.  ***Musk thus had a strong motivation*** to attempt to delay the Proposed Buyout by issuing false statements, in the hope that Tesla shares would rebound in value before he was forced to sell them.  It has also been reported that due to his strong aversion to selling more Tesla shares at the depressed valuations during the Class Period, Musk was also looking at funding the Twitter buyout by selling some shares of SpaceX through a private placement.[17]  However, the stock market decline during the Class Period made it difficult for Musk to do so at attractive valuations.

97.     When Musk subsequently abandoned his $12.5 billion in margin loans, he was forced to increase his equity commitment to the Buyout.  Originally, such equity commitment was for a $21 billion equity financing by Musk.  When Musk thereafter was forced to abandon the first half of the margin loan, he was forced to increase his equity commitment by $6.25 billion, to a total of $27.25 billion. The equity financing commitment, however, did not include third party beneficiary rights permitting Twitter to enforce Mr. Musk's equity financing commitment in connection with the Buyout. Musk thereafter was forced to abandon the other half of the margin loan, forcing him to increase his equity funding even further, to the current total of $33.5 billion.

## VII.    FALSE STATEMENTS DURING THE CLASS PERIOD

98.     In response to the problems noted above and the plunging value of Tesla stock, Musk promptly acted to issue false statements about Twitter and the Merger.  In addition to being false and

---

[17] *See, e.g.*, Sissi Cao, "As Tesla Stock Falters, Elon Musk is Considering Selling SpaceX Shares to Fund His Twitter Deal," The Observer, May 18, 2022 ("Elon Musk appears to be hesitating over his $44 billion acquisition of Twitter as a key funding source, his ownership in Tesla, quickly loses value.").

misleading, Musk's statements violated both the non-disparagement and non-disclosure clauses of his contract with Twitter.

99.     The Merger Agreement also states in Paragraph 6.8 that "shall consult with each other before issuing any press release or otherwise making any public statements with respect to this Agreement or the transactions contemplated by this Agreement, and none of the parties hereto or their Affiliates shall issue any such press release or make any public statement prior to obtaining the other parties' consent."

100.     By doing so, Musk hoped to drive down Twitter's stock price and then use that as a pretext to attempt to re-negotiate the Buyout price.  The Buyout agreement is also atypical in that it does not have a standstill agreement.  Thus, Musk could presumably also be buying additional Twitter shares at the depressed prices caused by his market manipulation.

101.     Musk also began to baselessly state that the Merger was "temporarily on hold" in an effort to buy more time and avoid having to sell Tesla stock at depressed prices.  Musk did so predominantly by using his Twitter account, which he established when he was a California citizen. Twitter is headquartered in San Francisco and Musk's tweets were disseminated from San Francisco, California.

102.     Beginning on Friday, May 13, 2022, and continuing through the end of the C.P., Musk has disseminated the following false statements:

**A.     Musk's May 13, 2022 Tweet**

103.     On Friday, May 13, 2022 ("Friday the 13th"), at 5:44 a.m. (*i.e.*, before the stock market opened), Musk issued a tweet which stated that the buyout was "temporarily on hold":

1

2

3

4

5

6

7

8

9

10

11

12





13      104.   Musk's statement was false and misleading and constituted an effort to manipulate the

14   market for Twitter shares.  The statement was false because the Buyout was not, in fact, "temporarily on

15   hold."  Vijaya Gadde, Twitter's top lawyer, has stated that there is nothing in the buyout contract that

16   allows Musk to put the deal "temporarily on hold."  Moreover, Musk's statement was misleading

17   because it stated or implied that Musk's obligation to consummate the Buyout was conditioned on his

18   satisfaction with due diligence to determine whether "spam/fake accounts do indeed represent less than

19   5% of users."  Musk had specifically waived detailed due diligence as a condition precedent to his

20   obligations under the Buyout contract.  Thus, Musk has no right to cancel the Buyout based on any

21   results from due diligence concerning the number of fake accounts at Twitter.

22        ///

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

105.    In response to this Tweet, Twitter's stock price declined.  Later the same day, Musk issued the following Tweet:



106.    In response to a question about why he was using a sample of 100 Twitter users, Musk replied:



**B.    Musk's May 14, 2022 Tweet**

107.    Musk had allegedly obtained non-public information about the process Twitter uses to investigate duplicate and fake accounts from Twitter as part of the Merger diligence.  Musk sent a tweet on Saturday, May 14, 2022, disclosing that he had received a call from Twitter's lawyers advising him that he had violated the terms of the Non-Disclosure Agreement ("NDA"):

108.    Musk's supposed concern about the number of bots and fake accounts at Twitter would appear to be pretextual, given the fact that Musk has known about the issue long before he offered to acquire Twitter.

109.    For example, Musk and his lawyers were well aware of the ***$809.5 million settlement*** Twitter had been forced to enter into ***in September 2021, just hours before trial was set to begin*** in a securities fraud class action alleging Twitter overstated its user numbers and growth rate -- *In re Twitter Inc. Securities Litigation*, 16-cv-05314, U.S. District Court, Northern District of California (San Francisco).  All the documents from that case were publicly available to Musk, including a website (www.twittersecuritieslitigation.com) containing, among other things, the Court's order denying Twitter's motion for summary judgment.

110.    Moreover, Twitter's SEC filings have long disclosed that there are duplicate and fake accounts on Twitter.  For example's Twitter's 2021 Annual Report disclosed that:

> The numbers of mDAU presented in this Annual Report on Form 10-K are based on internal company data. While these numbers are based on what we believe to be reasonable estimates for the applicable period of measurement, there are inherent challenges in measuring usage and engagement across our large number of total accounts around the world. Furthermore, our metrics may be impacted by our information quality efforts, which are our overall efforts to reduce malicious activity on the service, inclusive of spam, malicious automation, and fake accounts. For example, ***there are a number of false or spam accounts in existence on our platform. We have performed an internal review of a sample of accounts and estimate that the average of false or spam accounts during the fourth quarter of 2020 represented fewer than 5% of our mDAU during the quarter.*** The

false or spam accounts for a period represents the average of false or spam accounts in the samples during each monthly analysis period during the quarter. ***In making this determination, we applied significant judgment, so our estimation of false or spam accounts may not accurately represent the actual number of such accounts, and the actual number of false or spam accounts could be higher than we have estimated***.[18]

111.  In addition, news reports and blog posts as far back as 2017 had regularly reported that "It has been extensively reported that incidences of spamming by bots and fake accounts on Twitter have been increasing."[19]

### C.  Musk's May 16, 2022 Statement

112.  On May 16, 2022, Musk stated during the All In Summit, a tech conference in Miami, that fake and spam accounts make up at least 20% of Twitter's users.

113.  Twitter's CEO Parag Agrawal attempted to respond to Musk with the following tweet:



114.  In response, Musk tweeted a poop emoji to Agrawal:

---

[18] See Form 10-K, filed 2/17/21, at p. 5.

[19] *See* Ankit Singh, Identifying Fake Accounts and Twitter Bots using Artificial Intelligence," May 31, 2017, available at https://blog.paralleldots.com/research/identifying-fake-accounts-twitter-bots-using-artificial-intelligence/.



115.    Musk later the same day tweeted the following follow-up comment, stating that information about the number of fake accounts was "fundamental to the financial health of Twitter":



### D.    Musk's May 17, 2022 Tweet

116.    On May 17, 2022, Musk doubled down on his "Friday the 13th" tweet and May 16th statement and issued another tweet stating that the actual number of fake accounts at Twitter could be "much higher" than 20% and that the deal "cannot go forward:"



117.    In response to this Tweet, Twitter's stock price declined.

118.    The same day, Twitter caused Musk's afore-mentioned tweet to be filed with the SEC on Schedule 14A as a supplemental proxy solicitation.

119.    The same day (May 17, 2022), Musk invited the SEC to investigate Twitter.

**E.  Musk's May 21, 2022 Tweets**

120.    On **May 21, 2022**, Musk suggested in a series of tweets that he could be seeking to reduce the price of the Buyout by up to 25% of the original agreed-upon price.  Replying to a tweet from Ion Miles Chong, saying "If 25% of the users are bots then the Twitter acquisition deal should cost 25% less," Musk replied:  "Absolutely."

121.    If the Buyout price was reduced by 25%, that would amount to an $11 billion reduction. Needless to say, Musk's statements had the effect of causing Twitter stock to decline and remain at depressed levels well below the Merger price of $54.20.

122.    On **May 21, 2022**, Musk stated, "I'm worried that Twitter has a disincentive to reduce spam, as it reduces perceived daily users."  Musk also tweeted on May 21, and asked whether Twitter had gotten back to him on the bots number discrepancy, he added: "No, they still refuse to explain how they calculate that 5% of daily users are fake/spam! Very suspicious."

123.    On **May 24, 2022**, Twitter stock closed at $35.76.

124.    Musk continued his false statements and disparaging comments about Twitter, the very company he had agreed to purchase.  Musk's false and misleading tweets and disparagement of Twitter had the desired effect, as they caused Twitters' stock to decline substantially in the days following the tweets, erasing over $8 billion in market capitalization, reflected in the following chart:

1
2
3
4
5
6
7
8
9
10
11
12
13
14



125.   Musk's false and disparaging statements caused the spread between the $54.20 Buyout price and Twitter's stock price to exceed $15 per share, which is highly unusual:

126.   Unfortunately for Musk, Tesla's stock price also continued its decline.  On Friday, May 20, 2022, Tesla stock closed at $635.07.  That represented an even further deterioration of Tesla's stock

since the Merger was announced – *a 35% drop in Tesla's stock price*.  As noted by the Washington Post:

> *Tesla's stock — and Elon Musk's wealth — took a huge hit Friday, continuing a downward spiral and possibly imperiling the billionaire's deal to buy Twitter*.
>
> *Shares of the electric car company*, from which much of Musk's wealth comes, *sank more than 10 percent during trading Friday*, *falling at one point to about $636 per share. That's about a 35 percent drop from its price on the day Musk's deal to buy Twitter* was announced.
>
> The downturn of Tesla's stock could have more than just a superficial impact on Musk's wealth.
>
> Tesla's value dropped Tuesday by more than double the cost of Twitter
> Musk has taken out extensive personal loans that are heavily tied to the value of Tesla's stock. At times, he has put down as much as 50 percent of his Tesla shares as collateral to back them. *As the company's share price approaches $600, Musk enters dangerous territory with lenders — where they could seek some of his equity to ease their confidence in his ability to pay*, according to analysts. [20]

127.    Then, on July 8, 2022, Musk issued a statement that he was terminating the Merger.  In his announcement, Musk falsely stated that Twitter had breached several provisions of the Merger Agreement.  In a letter of the same date from his lawyers at Skadden Arps to Twitter, which letter was filed the same day with the SEC, Musk stated:

> While Section 6.4 of the Merger Agreement requires Twitter to provide Mr. Musk and his advisors all data and information that Mr. Musk requests "for any reasonable business purpose related to the consummation of the transaction," *Twitter has not complied with its contractual obligations*. For nearly two months, Mr. Musk has sought the data and information necessary to "make an independent assessment of the prevalence of fake or spam accounts on Twitter's

---

[20] *See* Rachel Lerman, "Tesla's Stock Price Plummets as Twitter Deal Hangs in the Balance," THE WASHINGTON POST, May 20, 2022.

platform" (our letter to you dated May 25, 2022 (the "May 25 Letter")). ***This information is fundamental*** *to Twitter's business and financial performance* ***and is necessary to consummate the transactions contemplated by the Merger Agreement because it is needed to ensure Twitter's satisfaction of the conditions to closing, to facilitate Mr. Musk's financing and financial planning for the transaction, and to engage in transition planning for the business. Twitter has failed or refused to provide this information***. Sometimes Twitter has ignored Mr. Musk's requests, sometimes it has rejected them for reasons that appear to be unjustified, and sometimes it has claimed to comply while giving Mr. Musk incomplete or unusable information. . . .

In addition to the foregoing, Twitter is in breach of the Merger Agreement because the Merger Agreement appears to contain materially inaccurate representations. . . Twitter's representation in the Merger Agreement regarding the accuracy of its SEC disclosures relating to false and spam accounts may have also caused, or is reasonably likely to result in, a Company Material Adverse Effect, which may form an additional basis for terminating the Merger Agreement. While Mr. Musk and his advisors continue to investigate the exact nature and extent of this event, Mr. Musk has reason to believe that the true number of false or spam accounts on Twitter's platform is substantially higher than the amount of less than 5% represented by Twitter in its SEC filings.

. . .

***Accordingly, for all of these reasons, Mr. Musk hereby exercises X Holdings I, Inc.'s right to terminate the Merger Agreement*** and abandon the transaction contemplated thereby, and this letter constitutes formal notice of X Holding I, Inc.'s termination of the Merger Agreement pursuant to Section 8.1(d)(i) thereof.

128.    A true and correct copy of Musk's full July 8, 2022 termination letter is attached hereto as **Exhibit A.**

129.    Musk's letter was sent after the market closed on Friday, July 8th.  In response to the letter, Twitter's stock price dropped precipitously, falling from $38.79 on July 7, 2022 to $32.65 on Monday, July 11, 2022.   While Twitter subsequently announced an intent to sue Musk, news reports commented that any lawsuit was likely to entail a protracted, costly legal battle with an uncertain outcome.

130.    On **July 12, 2022**, Twitter sued Musk in Delaware Chancery Court over his termination of the deal, seeking specific performance.

131.    On **August 30, 2022**, it was reported that Musk had sent a second termination letter to Twitter, dated July 29, 2022, making additional false statements supposedly justifying his termination of the Merger.   That letter stated in part:

"On July 8, 2022, the Musk Parties terminated the Merger Agreement (the "July 8 Termination Notice") on certain bases. Since that time, Twitter has challenged the validity of the July 8 Termination Notice and contends that the Merger Agreement remains in force, a position that the Musk Parties are contesting. Allegations regarding certain facts, known to Twitter prior to and as of July 8, 2022, but undisclosed to the Musk Parties prior to and at that time, have since come to light that provide additional and distinct bases to terminate the Merger Agreement.

. . .

On August 23, 2022, the Washington Post published a whistleblower report to Congress, the SEC, FTC, and DOJ filed by Peiter "Mudge" Zatko, Twitter's former chief security officer, on July 6, 2022 (the "Zatko Complaint"). The Zatko Complaint alleges far-reaching misconduct at Twitter—all of which was disclosed to Twitter's directors and senior executives, including Parag Agrawal—that is likely to have severe consequences for Twitter's business. . . These allegations, if true, demonstrate that Twitter has breached the following provisions of the Merger Agreement, thereby giving the Musk Parties the right to terminate the Merger Agreement pursuant to its terms as more fully described below.

132.    A true and correct copy of Musk's full July 29, 2022 termination letter is attached hereto as **Exhibit B.**   The letter cited Sections 4.5, 4.6, 4.8, 4.11, 4.14, and 7.2 of the Merger Agreement as provisions that had allegedly been breached by Twitter. In response to Musk's statements, Twitter's stock price declined from $41.61 per share on July 29, 2022 to $40.89 on August 1, 2022.   ***The stock continued thereafter to decline, falling to $38.65 by September 6, 2022***.

133.    On September 9, 2022, Musk sent a ***third termination letter*** to Twitter. It was also sent by his attorneys at Skadden Arps and filed with the SEC the same day.   The letter stated in part:

"We write on behalf of X Holdings I, Inc. and X Holdings II, Inc. (the "Musk Parties") to

provide an additional notice of termination of the Agreement and Plan of Merger by and among the Musk Parties and Twitter, Inc. ("Twitter") dated as of April 25, 2022 (the "Merger Agreement"). On July 8, 2022, the Musk Parties terminated the Merger Agreement (the "July 8 Termination Notice") on certain bases. Although the Merger Agreement was properly terminated on that date, on August 29, 2022 the Musk Parties sent a separate letter informing Twitter of additional facts that would independently justify termination of that Agreement (the "August 29 Termination Notice"). In the time that has elapsed since that letter was sent, additional facts have come to light that reveal that Twitter has further breached its obligations under the Merger Agreement.

On June 28, 2022, Twitter entered into a separation agreement with Peiter Zatko under which Twitter made severance payments to Zatko and his counsel totaling $7.75 million. ***Twitter did not seek Defendants' consent under Section 6.1(e) before making this payment nor was this payment disclosed to Defendants*** . . . ***This severance payment violated Section 6.1(e) and cannot be cured. Defendants are thus not required to close under Section 7.2(a) and have an additional basis to terminate the Merger Agreement.***

134.    A true and correct copy of Musk's full September 9, 2022 termination letter is attached hereto as **Exhibit C.**

135.    The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Merger and the Company's business, operational and financial results, which were known to Defendant or recklessly disregarded by him. Specifically, Defendant made false and/or misleading statements and/or failed to disclose that: (1) Musk was not entitled to due diligence under the Merger Agreement and had in fact waived due diligence; (2) Musk was well aware of the problem of bots and spam on Twitter's platform and had vowed to eliminate the bots after the acquired Twitter; (3) there were no legally justifiable reasons for Musk to terminate the Merger; (4) Musk was issuing false statements and unjustified terminations of the Merger in order to drive Twitter's stock price down so that Musk could attempt to negotiate a reduction in the Merger price; (5) there was no MAE; (6) Musk was trying to delay the Merger in the hope that the price of Tesla stock would rebound before he had to sell more of it to fund

the Merger price; and (9) as a result, Defendant's public statements were materially false and misleading at all relevant times.

## VIII.   MUSK'S SCIENTER AND MOTIVE AND OPPORTUNITY TO COMMIT FRAUD

136.   Musk had actual knowledge of the falsity of all his statements because all the statements pertained to Musk himself and the Merger Agreement he had personally negotiated.  Musk agreed to buy Twitter personally, not as an executive of some large, publicly-trade company.  Thus, Musk and Musk alone was the buyer and made all decisions about the Merger, including the false and disparaging comments about Twitter that were made after the Merger Agreement was signed.

137.   As alleged herein, Musk also had the motive and opportunity to commit the fraud.  The detailed allegations herein demonstrate the precarious financial position Musk found himself in after he agreed to buy Twitter.  The stock market decline and particularly the large decline in Tesla stock post-signing put Musk in a bind, as a result of which he had a strong motive to attempt at all costs to get out of the Merger or delay it in the hope that that market would rebound before he was forced to sell large amounts of his most prized asset – his Tesla stock – to pay for the Merger.

### The Truth Emerges

138.   The truth about Musk's fraud emerged on October 4, 2022, when Musk announced an abrupt about-face less than two weeks before the October 17, 2022 Delaware Chancery action was set to begin.  Forced to face the lack of merit of his baseless positions contending that Twitter had breached multiple provisions of the Merger Agreement and that there had allegedly been a MAE, Musk essentially acknowledged that he had been bluffing all along.  Musk capitulated and announced he would honor the Merger Agreement on the original terms and at the original $54.20 price. *See* Laura Forman, "In Twitter, Musk Buys Walking Dead," THE WALL STREET JOURNAL, October 5, 2022 ("the seemingly sudden reversal is a surprising capitulation to the status quo.").

139.   In response, Twitter's stock immediately jumped by over 15% before trading in the stock was halted by the New York Stock Exchange.  When trading resumed later in the day, the stock increased another 7%, eventually ***closing up over 22% in one day***, as reflected in the following chart:



140.    Subsequent news articles revealed that Musk had, in fact, been using his false statements about Twitter's alleged breaches of the Merger Agreement to try to negotiate a lower price for the Merger. *See, e.g.*, Cara Lombardo, "Elon Musk and Twitter at Odds Over Terms of Agreement to Close Deal," THE WALL STREET JOURNAL, Oct. 6, 2022 ("informal discussions about a cut in the $44 billion purchase price happened in a series of conference calls in recent weeks between lawyers and ended after the two sides failed to agree on terms of a potential deal").  When Twitter rejected Musk's requests to lower the deal price and called his bluff, "Musk caught Twitter off guard by sending its lawyers a two-sentence letter proposing to move forward on the original terms." *Id.*

141.    According to those familiar with Musk's failed attempt to negotiate a lower price, Musk "initially sought a discount of as much as 30 percent, which would have valued the social media platform at about $31 billion. But offers of a potential price cut never led to meaningful negotiations or term sheets. Musk's last effort narrowed the amount to a possible discount of about 10 percent."  *See* Andrew Ross Sorkin, "Twitter Wants Assurances from Musk," THE NEW YORK TIMES, Oct. 6, 2022.

142.    As a result of Musk's wrongful acts and false statements, and the precipitous increase in the market value of Twitter's securities after the truth was revealed, Plaintiff and other Class members

1   have suffered significant losses and damages.

2   ## IX.    **LOSS CAUSATION**

3   143.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused

4   the economic loss suffered by Plaintiff and the Class.

5   144.    During the Class Period, as detailed herein, Defendant made materially false and

6   misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially

7   depressed the price of Twitter securities and operated a fraud or deceit on the Class (as defined below).

8   Later, when Defendant's prior misrepresentations and fraudulent conduct were disclosed to the market,

9   the price of Twitter securities increased precipitously, with the common stock increasing 22% in one

10  day alone, as the prior artificial deflation came out of the price. As a result of their sale of Twitter

11  common stock during the Class Period, Plaintiff and other members of the Class suffered economic

12  loss, *i.e.,* damages, under the federal securities laws.

13  ## X.    **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

14  145.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure

15  23(a) and (b)(3) on behalf of a Class, consisting of all those who sold the publicly traded securities of

16  Twitter during the Class Period (the "Class") and were damaged upon the revelation of the corrective

17  disclosure. Excluded from the Class are Defendant herein, the officers and directors of the Company at

18  all relevant times, members of their immediate families and their legal representatives, heirs, successors

19  or assigns and any entity in which Defendants have or had a controlling interest.

20  146.    The members of the Class are so numerous that joinder of all members is impracticable.

21  Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the

22  exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through

23  appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed

24  Class. Record owners and other members of the Class may be identified from records maintained by the

25  Company or its transfer agent and may be notified of the pendency of this action by mail, using the form

26  of notice similar to that customarily used in securities class actions.

27

28

---

147.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

148.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

149.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)   whether Defendant's acts as alleged violated the federal securities laws;

b)   whether Defendant's statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company and/or about the Merger;

c)   whether Defendant's statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d)   whether Defendant issued false and misleading SEC filings and public statements during the Class Period;

e)   whether Defendant acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f)   whether the prices of the Company's securities during the Class Period were artificially depressed because of the Defendant's conduct complained of herein; and

g)   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

150.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

151.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud- on-the-market doctrine in that:

    a)  Defendant made public misrepresentations or failed to disclose material facts during the Class Period;

    b)  the omissions and misrepresentations were material;

    c)  the Company's securities are traded in efficient markets;

    d)  the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

    e)  the Company's securities traded on the NYSE, and were covered by multiple analysts;

    f)  the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

    g)  Plaintiff and members of the Class sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

    h)  unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

152.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

153.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5

### Against Defendant Musk

154. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

155. This Count is asserted against the Company and the Individual Defendant and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

156. During the Class Period, Defendant Musk, directly or indirectly, disseminated or approved the false statements specified above, which he knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

157. Musk violated §10(b) of the 1934 Act and Rule 10b-5 in that the: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their sales of the Company's securities during the Class Period.

158. Musk acted with scienter in that he knew that the public documents and statements issued or disseminated were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Musk participated directly in the fraudulent scheme alleged herein.

159. Musk had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when he failed to ascertain and disclose the true facts in the statements made by him or his agents to members of the investing public, including Plaintiff

and the Class.

160.    As a result of the foregoing, the market price of the Company's securities was artificially depressed during the Class Period. In ignorance of the falsity of t Defendant's statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in selling the Company's securities at prices that were artificially depressed as a result of Defendant Musk's false and misleading statements.

161.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely depressed by Musk's misleading statements and by the material adverse information which Defendant Musk did not disclose, they would not have sold the Company's securities at the artificially depressed prices that they did, or at all.

162.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

163.    By reason of the foregoing, Musk has violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and is liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their sales of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants Musk to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post- judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

1

## DEMAND FOR TRIAL BY JURY

2          Plaintiff hereby demands a trial by jury.

3   Dated:  October 10, 2022                    Respectfully submitted,

4
                                                **COTCHETT, PITRE & MCCARTHY,**
5                                               **LLP**
                                                Joseph W. Cotchett (SBN 36324)
6                                               Mark C. Molumphy (SBN 168009)
                                                Anne Marie Murphy (SBN 202540)
7                                               Tyson C. Redenbarger (SBN 294424)
                                                Julia Q. Peng (SBN 318396)
8
9                                                _/s/ Mark C. Molumphy_
                                                    MARK C. MOLUMPHY
10
                                                San Francisco Airport Office Center
11                                              840 Malcolm Road, Suite 200
                                                Burlingame, California 94010
12                                              Telephone:     (650) 697-6000

13                                              **BOTTINI & BOTTINI, INC.**
                                                Francis A. Bottini, Jr. (SBN 175783)
14                                              Albert Y. Chang (SBN 296065)

15
                                                 _/s/ Francis A. Bottini, Jr._
16                                                  FRANCIS A. BOTTINI, JR.

17                                              7817 Ivanhoe Avenue, Suite 102
18                                              La Jolla, California 92037
                                                Telephone:     (858) 914-2001
19                                              Facsimile:     (858) 914-2002
                                                fbottini@bottinilaw.com
20                                              achang@bottinilaw.com

21                                              _Attorneys for Plaintiff Giuseppe_
                                                _Pampena and the Proposed Class_
22

23

24

25

26

27

28

CLASS ACTION COMPLAINT                                                            47

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Giuseppe Pampena, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint with my counsel and authorize its filing.

2.      I did not sell the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.      The following are my transactions during the Class Period in the securities of Twitter, Inc.:

| Date | Transaction | Amount | Price |
|------|-------------|--------|-------|
| 08/10/2022 | SELL | 600 | $44.245 |
| 08/10/2022 | SELL | 200 | $44.2401 |

5.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____.
     10/7/2022 | 11:53 AM PDT

*Mr. Giuseppe Pampena*

_____

**GIUSEPPE PAMPENA**

# EXHIBIT A

EX-99.P 2 tm2220599d1_ex99-p.htm EXHIBIT 99.P

**Exhibit P**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

525 UNIVERSITY AVENUE
PALO ALTO, CALIFORNIA 94301

———

TEL: (650) 470-4500
FAX: (650) 470-4570
www.skadden.com

July 8, 2022

Twitter, Inc.
1355 Market Street, Suite 900
San Francisco, CA 94103
Attn: Vijaya Gadde, Chief Legal Officer

Dear Ms. Gadde:

We refer to (i) the Agreement and Plan of Merger by and among X Holdings I, Inc., X Holdings II, Inc. and Twitter, Inc. dated as of April 25, 2022 (the "Merger Agreement") and (ii) our letter to you dated as of June 6, 2022 (the "June 6 Letter"). As further described below, Mr. Musk is terminating the Merger Agreement because Twitter is in material breach of multiple provisions of that Agreement, appears to have made false and misleading representations upon which Mr. Musk relied when entering into the Merger Agreement, and is likely to suffer a Company Material Adverse Effect (as that term is defined in the Merger Agreement).

While Section 6.4 of the Merger Agreement requires Twitter to provide Mr. Musk and his advisors all data and information that Mr. Musk requests "for any reasonable business purpose related to the consummation of the transaction," Twitter has not complied with its contractual obligations. For nearly two months, Mr. Musk has sought the data and information necessary to "make an independent assessment of the prevalence of fake or spam accounts on Twitter's platform" (our letter to you dated May 25, 2022 (the "May 25 Letter")). This information is fundamental to Twitter's business and financial performance and is necessary to consummate the transactions contemplated by the Merger Agreement because it is needed to ensure Twitter's satisfaction of the conditions to closing, to facilitate Mr. Musk's financing and financial planning for the transaction, and to engage in transition planning for the business. Twitter has failed or refused to provide this information. Sometimes Twitter has ignored Mr. Musk's requests, sometimes it has rejected them for reasons that appear to be unjustified, and sometimes it has claimed to comply while giving Mr. Musk incomplete or unusable information.

1

Mr. Musk and his financial advisors at Morgan Stanley have been requesting critical information from Twitter as far back as May 9, 2022—and repeatedly since then—on the relationship between Twitter's disclosed mDAU figures and the prevalence of false or spam accounts on the platform. If there were ever any doubt as to the nature of these information requests, the May 25 Letter made clear that Mr. Musk's goal was to understand how many of Twitter's claimed mDAUs were, in fact, fake or spam accounts. That letter noted that "Items 1.03 to 1.13 of the diligence request list contain high-priority requests for enterprise data and other information intended to enable Mr. Musk and his advisors to make an independent assessment of the prevalence of fake or spam accounts on Twitter's platform…" The letter then provided Twitter with a detailed list of requests to this effect.

Since then, Mr. Musk has provided numerous additional follow-up requests, all aimed at filling the gaps in the incomplete information that Twitter provided in response to his broad requests for information relating to Twitter's reported mDAU counts and reported estimates of false and spam accounts.[1] For example, in our letter to you dated June 29, 2022 (the "June 29 Letter"), we referenced Mr. Musk's request in the May 25 Letter for "information that would allow him 'to make an independent assessment of the prevalence of fake or spam accounts on Twitter's platform.'" Because Twitter, by its own admission, provided only incomplete data that was not sufficient to perform such an independent assessment,[2] the June 29 Letter "endeavored to be *even more* specific, and to reduce the burden of the [original] request," by identifying a specific subset of high priority information, responsive to Mr. Musk's prior requests, for Twitter to immediately make available.

---

[1] Mr. Musk sought the same information in letters dated June 6, 2022, June 17, 2022, and June 29, 2022. In each of these letters, Mr. Musk referenced his information rights under Section 6.4 of the Merger Agreement. Twitter has thus been on notice of the information sought by Mr. Musk—and the contractual bases for these requests—for two months. For the past month, Mr. Musk has been clear that he views Twitter's non-responsiveness as a material breach of the Merger Agreement giving him the right to terminate the Merger Agreement if uncured. *See* June 6, 2022 (explaining that Twitter was "refusing to comply with its obligations under the Merger Agreement"). Thus, Mr. Musk has been clear about his requests, his right to seek such information, and his view regarding Twitter's material breach of the Merger Agreement.

[2] *See* your letter to us dated June 20, 2022 (noting that the information Twitter was agreeing to provide was "insufficient to perform the spam analysis that [Mr. Musk] purport[s] to wish to do.").

2

Notwithstanding these repeated requests over the past two months, Twitter has still failed to provide much of the data and information responsive to Mr. Musk's repeated requests, including, but not limited to:

1. *Information related to Twitter's process for auditing the inclusion of spam and fake accounts in mDAU.* Twitter has still not provided much of the information specifically requested by Mr. Musk in Sections 1.01-1.03 of the May 19 diligence request list that is necessary for him to make an assessment of the prevalence of false or spam accounts on its website. As recently as the June 29 Letter, Mr. Musk reiterated this long-standing request for information related to Twitter's sampling process for detecting fake accounts. The June 29 Letter identified specific data necessary to enable Mr. Musk to independently verify Twitter's representations regarding the number of mDAU on its platform—including, but not limited to (1) daily global mDAU data since October 1, 2020; (2) information regarding the sampling population for mDAU, including whether the mDAU population used for auditing spam and false accounts is the same mDAU population used for quarterly reporting; (3) outputs of each step of the sampling process for each day during the weeks of January 30, 2022 and June 19, 2022; (4) documentation or other guidance provided to contractor agents used for auditing mDAU samples; (5) information regarding the user interface of Twitter's ADAP tool and any internal tools used by the contractor agents; and (6) mDAU audit sampling information, including anonymized information identifying the contractor agents and Quality Analyst that reviewed each sampled account, the designation given by each contractor agent and Quality Analyst, and the current status of any accounts labelled "compromised." A subsequent request along these lines should not have been necessary, as this information should have been provided in response to Mr. Musk's original diligence request. Yet, to date, Twitter has not provided any of this information.

2. *Information related to Twitter's process for identifying and suspending spam and fake accounts.* In addition to information regarding Twitter's mDAU audits, the June 29 Letter also reiterated requests for data specifically identified in Sections 1.04-1.05 of the May 19 diligence request list regarding Twitter's methodology and performance data relating to identification and suspension of spam and false accounts, including, but not limited to, information regarding account suspensions, including information sufficient to identify daily numbers of account suspensions since October 2020 and numbers of account suspensions for each of Twitter's internal reasons for suspension. In addition, during the June 30, 2022 call, Twitter's representatives indicated for the first time that the workflow and processes for detecting spam and false accounts in the mDAU population is different and separate from the workflow and processes for identifying and suspending accounts in violation of Twitter's policies. On that call, Twitter indicated that it would not be willing to provide information regarding the methodologies employed to identify and suspend such accounts.

3

3. *Daily measures of mDAU for the past eight (8) quarters*. On June 17, 2022 (the "June 17 Letter") Mr. Musk reiterated his request for "access to the sample set used and calculations performed, as well as any related reports or analysis, to support Twitter's representation that fewer than 5% of its mDAUs are false or spam account." To that end, Mr. Musk requested that Twitter provide "daily measures of mDAU for the previous eight quarters, and through the present." This information is derivative of the information Mr. Musk first sought in Sections 1.01-1.03 of the May 19 diligence request list. Although Twitter has provided certain summary data regarding the mDAU calculations, Twitter has not provided the complete daily measures as requested.

4. *Board materials related to Twitter's mDAU calculations*. In the June 17 Letter, Mr. Musk requested a variety of board materials and communications related to Twitter's mDAU metric, its calculation of the number of spam and false accounts, its disclosure of the mDAU metric, and the company's disclosure of the number of spam accounts on the platform. Twitter has provided an incomplete data set in response to this request, and has not provided information sufficient to enable Mr. Musk to make an independent assessment of Twitter's board and management's understanding of its mDAU metric.

5. *Materials related to Twitter's financial condition*. Mr. Musk is entitled, under Section 6.4 of the Merger Agreement to "all information concerning the business … of the Company … for any reasonable business purpose related to the consummation of the transactions" and under Section 6.11 of the Merger Agreement, to information "reasonably requested" in connection with his efforts to secure the debt financing necessary to consummate the transaction. To that end, Mr. Musk requested on June 17 a variety of board materials, including a working, bottoms-up financial model for 2022, a budget for 2022, an updated draft plan or budget, and a *working* copy of Goldman Sachs' valuation model underlying its fairness opinion. Twitter has provided only a pdf copy of Goldman Sachs' final Board presentation.

4

In short, Twitter has not provided information that Mr. Musk has requested for nearly two months notwithstanding his repeated, detailed clarifications intended to simplify Twitter's identification, collection, and disclosure of the most relevant information sought in Mr. Musk's original requests.

While Twitter has provided some information, that information has come with strings attached, use limitations or other artificial formatting features, which has rendered some of the information minimally useful to Mr. Musk and his advisors. For example, when Twitter finally provided access to the eight developer "APIs" first explicitly requested by Mr. Musk in the May 25 Letter, those APIs contained a rate limit lower than what Twitter provides to its largest enterprise customers. Twitter only offered to provide Mr. Musk with the same level of access as some of its *customers* after we explained that throttling the rate limit prevented Mr. Musk and his advisors from performing the analysis that he wished to conduct in any reasonable period of time.

Additionally, those APIs contained an artificial "cap" on the number of queries that Mr. Musk and his team can run regardless of the rate limit—an issue that initially prevented Mr. Musk and his advisors from completing an analysis of the data in any reasonable period of time. Mr. Musk raised this issue as soon as he became aware of it, in the first paragraph of the June 29 Letter: "we have just been informed by our data experts that Twitter has placed an artificial cap on the number of searches our experts can perform with this data, which is now preventing Mr. Musk and his team from doing their analysis." That cap was not removed until July 6, after Mr. Musk demanded its removal for a second time.

Based on the foregoing refusal to provide information that Mr. Musk has been requesting since May 9, 2022, Twitter is in breach of Sections 6.4 and 6.11 of the Merger Agreement.

Despite public speculation on this point, Mr. Musk did not waive his right to review Twitter's data and information simply because he chose not to seek this data and information before entering into the Merger Agreement. In fact, he negotiated access and information rights within the Merger Agreement precisely so that he could review data and information that is important to Twitter's business before financing and completing the transaction.

5

As Twitter has been on notice of its breach since at least June 6, 2022, any cure period afforded to Twitter under the Merger Agreement has now lapsed. Accordingly, Mr. Musk hereby exercises X Holdings I, Inc.'s right to terminate the Merger Agreement and abandon the transaction contemplated thereby, and this letter constitutes formal notice of X Holding I, Inc.'s termination of the Merger Agreement pursuant to Section 8.1(d)(i) thereof.

In addition to the foregoing, Twitter is in breach of the Merger Agreement because the Merger Agreement appears to contain materially inaccurate representations. Specifically, in the Merger Agreement, Twitter represented that no documents that Twitter filed with the U.S. Securities and Exchange Commission since January 1, 2022, included any "untrue statement of a material fact" (Section 4.6(a)). Twitter has repeatedly made statements in such filings regarding the portion of its mDAUs that are false or spam, including statements that: "We have performed an internal review of a sample of accounts and estimate that the average of false or spam accounts during the first quarter of 2022 represented fewer than 5% of our mDAU during the quarter," and "After we determine an account is spam, malicious automation, or fake, we stop counting it in our mDAU, or other related metrics." Mr. Musk relied on this representation in the Merger Agreement (and Twitter's numerous public statements regarding false and spam accounts in its publicly filed SEC documents) when agreeing to enter into the Merger Agreement. Mr. Musk has the right to seek rescission of the Merger Agreement in the event these material representations are determined to be false.

Although Twitter has not yet provided complete information to Mr. Musk that would enable him to do a complete and comprehensive review of spam and fake accounts on Twitter's platform, he has been able to partially and preliminarily analyze the accuracy of Twitter's disclosure regarding its mDAU. While this analysis remains ongoing, all indications suggest that several of Twitter's public disclosures regarding its mDAUs are either false or materially misleading. *First*, although Twitter has consistently represented in securities filings that "fewer than 5%" of its mDAU are false or spam accounts, based on the information provided by Twitter to date, it appears that Twitter is dramatically understating the proportion of spam and false accounts represented in its mDAU count. Preliminary analysis by Mr. Musk's advisors of the information provided by Twitter to date causes Mr. Musk to strongly believe that the proportion of false and spam accounts included in the reported mDAU count is wildly higher than 5%. *Second*, Twitter's disclosure that it ceases to count fake or spam users in its mDAU when it determines that those users are fake appears to be false. Instead, we understand, based on Twitter's representations during a June 30, 2022 call with us, that Twitter includes accounts that have been suspended—and thus are known to be fake or spam—in its quarterly mDAU count even when it is aware that the suspended accounts were included in mDAU for that quarter. *Last*, Twitter has represented that it is "continually seeking to improve our ability to estimate the total number of spam accounts and eliminate them from the calculation of our mDAU…" But, Twitter's process for calculating its mDAU, and the percentage of mDAU comprised of non-monetizable spam accounts, appears to be arbitrary and ad hoc. Disclosing that Twitter has a reasoned process for calculating mDAU when the opposite is true would be false and misleading.

6

Twitter's representation in the Merger Agreement regarding the accuracy of its SEC disclosures relating to false and spam accounts may have also caused, or is reasonably likely to result in, a Company Material Adverse Effect, which may form an additional basis for terminating the Merger Agreement. While Mr. Musk and his advisors continue to investigate the exact nature and extent of this event, Mr. Musk has reason to believe that the true number of false or spam accounts on Twitter's platform is substantially higher than the amount of less than 5% represented by Twitter in its SEC filings. Twitter's true mDAU count is a key component of the company's business, given that approximately 90% of its revenue comes from advertisements. For this reason, to the extent that Twitter has underrepresented the number of false or spam accounts on its platform, that may constitute a Company Material Adverse Effect under Section 7.2(b)(i) of the Merger Agreement. Mr. Musk is also examining the company's recent financial performance and revised outlook, and is considering whether the company's declining business prospects and financial outlook constitute a Company Material Adverse Effect giving Mr. Musk a separate and distinct basis for terminating the Merger Agreement.

Finally, Twitter also did not comply with its obligations under Section 6.1 of the Merger Agreement to seek and obtain consent before deviating from its obligation to conduct its business in the ordinary course and "preserve substantially intact the material components of its current business organization." Twitter's conduct in firing two key, high-ranking employees, its Revenue Product Lead and the General Manager of Consumer, as well as announcing on July 7 that it was laying off a third of its talent acquisition team, implicates the ordinary course provision. Twitter has also instituted a general hiring freeze which extends even to reconsideration of outstanding job offers. Moreover, three executives have resigned from Twitter since the Merger Agreement was signed: the Head of Data Science, the Vice President of Twitter Service, and a Vice President of Product Management for Health, Conversation, and Growth. The Company has not received Parent's consent for changes in the conduct of its business, including for the specific changes listed above. The Company's actions therefore constitute a material breach of Section 6.1 of the Merger Agreement.

7

Accordingly, for all of these reasons, Mr. Musk hereby exercises X Holdings I, Inc.'s right to terminate the Merger Agreement and abandon the transaction contemplated thereby, and this letter constitutes formal notice of X Holding I, Inc.'s termination of the Merger Agreement pursuant to Section 8.1(d)(i) thereof.

Sincerely,

/s/ Mike Ringler

Mike Ringler
Skadden, Arps, Slate, Meagher & Flom LLP

cc:
Katherine A. Martin, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Martin W. Korman, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Douglas K. Schnell, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Remi P Korenblit, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Alan Klein, Simpson Thacher & Bartlett LLP
Anthony F. Vernace, Simpson Thacher & Bartlett LLP
Katherine M. Krause, Simpson Thacher & Bartlett LLP

Elon Musk
Alex Spiro, Quinn Emanuel Urquhart & Sullivan, LLP
Andrew Rossman, Quinn Emanuel Urquhart & Sullivan, LLP

8

# EXHIBIT B

EX-99.Q 2 tm2224790d1_ex99-q.htm EXHIBIT 99.Q

**Exhibit Q**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 UNIVERSITY AVENUE
PALO ALTO, CALIFORNIA 94301

_____

TEL: (650) 470-4500
FAX: (650) 470-4570
www.skadden.com

August 29, 2022

Twitter, Inc.
1355 Market Street, Suite 900
San Francisco, CA 94103
Attn: Vijaya Gadde, Chief Legal Officer

Dear Ms. Gadde:

We write on behalf of X Holdings I, Inc. and X Holdings II, Inc. (the "Musk Parties") to provide an additional notice of termination of the Agreement and Plan of Merger by and among the Musk Parties and Twitter, Inc. ("Twitter") dated as of April 25, 2022 (the "Merger Agreement"). On July 8, 2022, the Musk Parties terminated the Merger Agreement (the "July 8 Termination Notice") on certain bases. Since that time, Twitter has challenged the validity of the July 8 Termination Notice and contends that the Merger Agreement remains in force, a position that the Musk Parties are contesting. Allegations regarding certain facts, known to Twitter prior to and as of July 8, 2022, but undisclosed to the Musk Parties prior to and at that time, have since come to light that provide additional and distinct bases to terminate the Merger Agreement. Although the Musk Parties believe this termination notice is not legally necessary to terminate the Merger Agreement because they have already validly terminated it pursuant to the July 8 Termination Notice, the Musk Parties are delivering this additional termination notice in the event that the July 8 Termination Notice is determined to be invalid for any reason.

1

On August 23, 2022, the Washington Post published a whistleblower report to Congress, the SEC, FTC, and DOJ filed by Peiter "Mudge" Zatko, Twitter's former chief security officer, on July 6, 2022 (the "Zatko Complaint"). The Zatko Complaint alleges far-reaching misconduct at Twitter—all of which was disclosed to Twitter's directors and senior executives, including Parag Agrawal—that is likely to have severe consequences for Twitter's business. For example, Mr. Zatko alleges that:

- Twitter is in material noncompliance with both its obligations under a 2011 FTC consent decree and its general obligations under data privacy, unfair trade practice, and consumer protection laws and regulations;

- Twitter is uniquely vulnerable to systemic disruption resulting from data center failures or malicious actors, a fact which Twitter leadership (including its CEO) have ignored and sought to obfuscate;

- Twitter's platform is built in significant part on the misappropriation and infringement of third party intellectual property; and

- Twitter acquiesced to demands made by the Indian government that its agents be hired by Twitter and given access to Twitter user information.

These allegations, if true, demonstrate that Twitter has breached the following provisions of the Merger Agreement, thereby giving the Musk Parties the right to terminate the Merger Agreement pursuant to its terms as more fully described below.

<u>Section 4.5   Permits; Compliance With Laws</u>. In the Merger Agreement, Twitter represented, *inter alia*, that it was in compliance with all applicable laws. That representation was apparently false when made on the date of the Merger Agreement and as of the date of the July 8 Termination Notice, and continues to be inaccurate. The Zatko Complaint alleges that Twitter has been violating a consent decree it entered into with the FTC in 2011. That consent decree required Twitter to establish and maintain "a comprehensive information security plan" to ensure that its users' personal data was sufficiently protected from disclosure. Mr. Zatko's statements purport to reveal that Twitter has not been, and perhaps never will be, in compliance with that decree. Twitter has already paid a fine of $150 million for violating an aspect of that decree, and Facebook recently paid *$5 billion* for similar user data violations. In addition, the Zatko Complaint alleges that Twitter has repeatedly violated the 2011 FTC consent decree (by going well beyond the violations settled in Twitter's recent $150 million settlement), in addition to breaching a slew of other data privacy, unfair trade practice, cybersecurity, and consumer protection laws and regulations that Twitter must comply with, including but not limited to Twitter granting agents of the Indian government access to confidential user data. These violations would have material, if not existential, consequences to Twitter's business, constituting a Company Material Adverse Effect as defined in the Merger Agreement.

2

    Section 4.6      Company SEC Documents; Financial Statements. In the Merger Agreement, Twitter also represented, *inter alia*, that no documents it filed with the SEC since January 1, 2022, "contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary to make the statements therein . . . not misleading." That representation was apparently false when made on the date of the Merger Agreement and as of the date of the July 8 Termination Notice, and continues to be inaccurate. The Zatko Complaint alleges that Twitter's SEC filings contained untrue statements of material fact or omitted to state material facts necessary to make the statements therein not misleading. For example, Twitter's 2021 10-K, dated February 16, 2022, states that "concerns related to . . . privacy, data protection, safety, [and] cybersecurity" "could potentially negatively affect mDAU growth and engagement," while omitting the significant privacy, data protection, safety, [and] cybersecurity risks Mr. Zatko alerted the board of prior to the filing of the 10-K, including those facts outlined above. Similarly, Twitter's representation in its 2021 10-K that Twitter "strive[s] to comply with applicable laws and regulations relating to privacy, data protection, and cybersecurity" was materially misleading if, in reality, Twitter was ignoring Mr. Zatko's warnings that the company was in violation of privacy, data protection, and cybersecurity laws and regulations.

    Twitter's material misrepresentations and/or omissions in the Merger Agreement and Twitter's 2021 10-K regarding these serious allegations also constitute fraud in the inducement, giving the Musk Parties the right to recission.

    Section 4.8      Disclosure Controls and Procedures. In the Merger Agreement, Twitter also represented, *inter alia*, that it had disclosed "any fraud to the Knowledge of the Company, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting." That representation was apparently false when made on the date of the Merger Agreement and as of the date of the July 8 Termination Notice, and continues to be inaccurate. One component of the Zatko Complaint is that Twitter's CEO, Parag Agrawal, knowingly presented false and misleading reports to Twitter's Board of Directors in order to cover up flagrant vulnerabilities in Twitter's security and data protection infrastructure. Twitter was made aware of precisely that in an internal report prepared by Mr. Zatko in February 2022. Twitter was obligated to disclose Mr. Agrawal's conduct "whether or not material" (although it was clearly material), and failed to do so.

3

Section 4.11.    Litigation. In the Merger Agreement, Twitter represented, *inter alia*, that there were no threatened or pending lawsuits or Government investigations that would constitute a Company Material Adverse Effect (within the meaning of the Merger Agreement). It is likely the case—given the extensive information withheld from the Musk Parties detailed in the Zatko Complaint— that the representations set forth in Section 4.11 will be false as of the date of any potential closing of the transactions contemplated by the Merger Agreement, resulting in a failure of the closing condition set forth in Section 7.2(b). Indeed, Twitter is now facing multiple Congressional inquiries: the Senate Judiciary Committee has announced a full Committee hearing, the House Energy and Commerce Committee announced that it is "assessing next steps," and multiple US Senators have publicly called for the FTC and DOJ to open investigations.                    *See*                    https://www.washingtonpost.com/technology/2022/08/24/twitter-whistleblower-senate-hearing; https://www.washingtonpost.com/technology/2022/08/23/twitter-whistleblower-congress-investigation. The data privacy authorities of Ireland and France are also investigating the claims in the Zatko Complaint. https://techcrunch.com/2022/08/24/twitter-whistleblower-security-eu/. It is likely that the SEC, FTC, and DOJ, as well as additional foreign regulators are not far behind. Twitter will also now face a myriad of civil lawsuits, asserting claims pursuant to various privacy and cybersecurity laws, state consumer protection laws, false advertising laws, intellectual property theft and misappropriation and common law claims, such as unjust enrichment, fraud, and breach of contract. Many of these civil claims are likely to be asserted as class action claims that could threaten the viability of the platform. This still-rolling litigation avalanche brings with it billions of dollars of potential damages, fines, and penalties, to say nothing of the significant reputational and operational harm that comes in parallel, clearly constituting a Company Material Adverse Effect under the terms of the Merger Agreement.

Section 4.14.    Intellectual Property. In the Merger Agreement, Twitter represented, *inter alia*, that it was not infringing the intellectual property of others (the "Non-Infringement Rep") and that it was in compliance with all applicable data privacy and protection requirements (the "Data Privacy Rep"). Both representations were apparently false when made on the date of the Merger Agreement and as of the date of the July 8 Termination Notice, and both continue to be inaccurate. As revealed by the Zatko Complaint, Twitter apparently never acquired the rights to Twitter's core machine learning models, which the Musk Parties understand to be fundamental to the Twitter platform itself. That infringement threatens not just significant monetary damages, but the potential for injunctive relief that would threaten Twitter's ongoing business as currently operated. Either alone would be a Company Material Adverse Effect under the terms of the Merger Agreement. Similarly, the Zatko Complaint lays out widespread, egregious violations of the data privacy protections that a company like Twitter is expected—and, indeed, legally required—to have in place. This would be a gross violation of trust by the Twitter platform that will have legal and commercial consequences, and which also gives rise to a Company Material Adverse Effect under the terms of the Merger Agreement.

4

  <u>Section 7.2.  Conditions to the Obligations of Parent and Acquisition Sub</u>. Finally, in the Merger Agreement, Twitter represented, *inter alia*, that it had not and would not (prior to closing) experience a Company Material Adverse Effect (within the meaning of the Merger Agreement). The breaches and consequences described above, individually and collectively, suggest that Twitter has in fact already experienced a Company Material Adverse Effect under the terms of the Merger Agreement, the full extent of which remains to be seen.

  The facts supporting these breaches, which were withheld from the Musk Parties but known to Twitter as of the date of the Merger Agreement and at the time of the July 8 Termination Notice, provided additional bases to terminate the Merger Agreement as of that date and provide additional bases to terminate the Merger Agreement today if the Musk Parties' termination of the Merger Agreement pursuant to the July 8 Termination Notice is determined to be invalid for any reason. This also provides a basis for recission. Because these facts were known to Twitter and withheld from the Musk Parties, and because Twitter has since taken the position that the Merger Agreement remains in effect, the Musk Parties hereby provide this additional notice of termination of the Merger Agreement effective as of July 8, 2022 pursuant to Section 8.1(d)(i) thereof on the basis of the facts set forth above. For the avoidance of doubt, these bases are in addition to, and not in lieu of, the bases for termination identified in the July 8 Termination Notice.

5

---

Sincerely,

/s/ Mike Ringler

Mike Ringler
Skadden, Arps, Slate, Meagher & Flom LLP

cc:
Katherine A. Martin, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Martin W. Korman, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Douglas K. Schnell, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Remi P Korenblit, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Alan Klein, Simpson Thacher & Bartlett LLP
Anthony F. Vernace, Simpson Thacher & Bartlett LLP
Katherine M. Krause, Simpson Thacher & Bartlett LLP


Elon Musk
Alex Spiro, Quinn Emanuel Urquhart & Sullivan, LLP
Andrew Rossman, Quinn Emanuel Urquhart & Sullivan, LLP

# EXHIBIT C

**Exhibit 99.R**

## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

525 UNIVERSITY AVENUE
PALO ALTO, CALIFORNIA 94301

———

TEL: (650) 470-4500
FAX: (650) 470-4570
www.skadden.com

September 9, 2022

Twitter, Inc.
1355 Market Street, Suite 900
San Francisco, CA 94103
Attn: Vijaya Gadde, Chief Legal Officer

Dear Ms. Gadde:

We write on behalf of X Holdings I, Inc. and X Holdings II, Inc. (the "Musk Parties") to provide an additional notice of termination of the Agreement and Plan of Merger by and among the Musk Parties and Twitter, Inc. ("Twitter") dated as of April 25, 2022 (the "Merger Agreement"). On July 8, 2022, the Musk Parties terminated the Merger Agreement (the "July 8 Termination Notice") on certain bases. Although the Merger Agreement was properly terminated on that date, on August 29, 2022 the Musk Parties sent a separate letter informing Twitter of additional facts that would independently justify termination of that Agreement (the "August 29 Termination Notice"). In the time that has elapsed since that letter was sent, additional facts have come to light that reveal that Twitter has further breached its obligations under the Merger Agreement. Although the Musk Parties believe this termination notice is not legally necessary to terminate the Merger Agreement because they have already validly terminated it pursuant to the July 8 termination notice, the Musk Parties are delivering this additional termination notice in the event that the July 8 Termination Notice or, alternatively, the August 29 Termination Notice is determined to be invalid for any reason.

In Section 6.1(e) the Merger Agreement, Twitter covenanted that between signing and closing it would not "except as required pursuant to existing Company Benefit Plans . . . grant or provide any severance or termination payments or benefits to any Company Service Provider other than the payment of severance amounts or benefits in the ordinary course of business consistent with past practice and subject to the execution and non-revocation of a release of claims in favor of the Company and its Subsidiaries." The definition of "Company Service Provider" includes Twitter's former employees. Under Section 7.2(a) of the Merger Agreement, Defendants are not obligated to close if Twitter has not "performed or complied, in all material respects, with its obligations required under this Agreement."

1

On June 28, 2022, Twitter entered into a separation agreement with Peiter Zatko under which Twitter made severance payments to Zatko and his counsel totaling $7.75 million. Twitter did not seek Defendants' consent under Section 6.1(e) before making this payment nor was this payment disclosed to Defendants. In fact, Defendants only learned of this payment when Twitter filed the separation agreement with the court on September 3, 2022. This severance payment violated Section 6.1(e) and cannot be cured. Defendants are thus not required to close under Section 7.2(a) and have an additional basis to terminate the Merger Agreement if the Musk Parties' termination of the Merger Agreement pursuant to the July 8 Termination Notice and the August 29 Termination Notice is determined to be invalid for any reason. Because Twitter has taken the position that the Merger Agreement remains in effect, the Musk Parties hereby provide this additional notice of termination of the Merger Agreement pursuant to Section 8.1(d)(i) thereof on the basis of the facts set forth above. For the avoidance of doubt, these bases are in addition to, and not in lieu of, the bases for termination identified in the July 8 Termination Notice and the August 29 Termination Notice.

Sincerely,

/s/ Mike Ringler

Mike Ringler
Skadden, Arps, Slate, Meagher & Flom LLP

2

cc:
Katherine A. Martin, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Martin W. Korman, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Douglas K. Schnell, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Remi P Korenblit, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Alan Klein, Simpson Thacher & Bartlett LLP
Anthony F. Vernace, Simpson Thacher & Bartlett LLP
Katherine M. Krause, Simpson Thacher & Bartlett LLP

Elon Musk
Alex Spiro, Quinn Emanuel Urquhart & Sullivan, LLP
Andrew Rossman, Quinn Emanuel Urquhart & Sullivan, LLP

3