QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice* forthcoming)
alexspiro@quinnemanuel.com
51 Madison Ave 22nd floor
New York, NY 10010
Telephone:     (212) 849-7000
Facsimile:      (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Joseph C. Sarles (Bar No. 254750)
josephsarles@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:     (213) 443-3000
Facsimile:      (213) 443-3100

*Attorneys for Defendant Elon Musk*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | CASE NO. 3:22-CV-05937-CRB<br><br>**DEFENDANT ELON MUSK'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**<br><br>Judge:        Hon. Charles R. Breyer<br>Courtroom:  6, 17th Floor<br><br>Hearing Date:  September 22, 2023<br>Time:            10 a.m. |

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES TO BE DECIDED.................................................................1

SUMMARY OF ARGUMENT ......................................................................................1

RELEVANT ALLEGATIONS AND BACKGROUND ..................................................4

ARGUMENT ..............................................................................................................10

I.  PLAINTIFFS FAIL TO PLEAD A CAUSE OF ACTION UNDER SECTION 10(B)................................................................................................................10

    A.  Plaintiffs' Claim Is Subject To Strict Pleading Requirements.................................10

    B.  The FAC Fails To Plead The Statements Are Materially False Or Misleading ...............................................................................................11

        1.  The First Alleged Misstatement—May 13, 2022 Tweet—Was Not False ...............................................................................................11

        2.  The Second Alleged Misstatement—May 14, 2022 Tweet—Is Not False ...............................................................................................12

        3.  The Third Alleged Misstatement—May 16, 2022 Tweets—Are Not False ...............................................................................................13

        4.  The Fourth Alleged Misstatement—May 17, 2022 Tweet—Is Not False ...............................................................................................14

        5.  The Fifth Alleged Misstatement—May 21, 2022 Tweets—Are Not False ...............................................................................................15

        6.  The Final Alleged Misstatements—Notices of Termination—Are Not False ...............................................................................................15

    C.  The FAC Does Not Plead Materiality ....................................................16

    D.  Plaintiffs Cannot Plead Scienter............................................................17

    E.  Plaintiffs' Theory Of Loss Causation Is Fatally Defective ......................................19

II.  MR. MUSK'S STATEMENTS REGARDING BREACH AND TERMINATION OF THE MERGER AGREEMENT ARE NOT ACTIONABLE ........................................21

    A.  All Of The Statements Were Incidental To The Delaware Action And Are Protected From Liability By The *Noerr-Pennington* Doctrine ...............................21

    B.  Mr. Musk's Participation In The Delaware Action Was Not A Sham....................23

CONCLUSION ..........................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>Cases</u>

*Adams v. Johnson*,
    355 F.3d 1179 (9th Cir. 2004) ................................................................................................. 15

*Aircapital Cablevision, Inc. v. Starlink Commc'ns Grp., Inc.*,
    634 F. Supp. 316 (D. Kan. 1986) ........................................................................................... 23

*Allied Tube & Conduit Corp. v. Indian Head*,
    486 U.S. 492 (1988) ................................................................................................................ 22

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
    980 F. Supp. 2d 564 (S.D.N.Y. 2013) .............................................................................. 12, 13

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) .......................................................................................................... 15, 16

*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002) ................................................................................................. 13

*Catch Curve, Inc. v. Venali, Inc.*,
    2008 WL 11334024 (C.D. Cal. Nov. 3, 2008) ...................................................................... 24

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) .............................................................................. 14, 15, 16, 17

*Columbia Pictures Indus., Inc. v. Pro. Real Est. Invs., Inc.*,
    944 F.2d 1525 (9th Cir. 1991) ......................................................................................... 23, 24

*In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010) ......................................................................................... 16, 17

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ................................................................................................................ 20

*EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*,
    711 F. Supp. 2d 1074 (C.D. Cal. 2010) ........................................................................... 22, 23

*In re Facebook, Inc. Sec. Litig.*,
    405 F. Supp. 3d 809 (N.D. Cal. 2019) ............................................................................... 2, 18

*In re Facebook, Inc. Sec. Litig.*,
    477 F. Supp. 3d 980 (N.D. Cal. 2020) ................................................................................... 21

*In re FVC.COM Sec. Litig.*,
    32 F. App'x 338 (9th Cir. 2002) ............................................................................................ 19

*Gamble v. Kaiser Found. Health Plan, Inc.*,
    348 F. Supp. 3d 1003 (N.D. Cal. 2018) ............................................................. 3, 24

*Gen-Probe, Inc. v. Amoco Corp.*,
    926 F. Supp. 948 (S.D. Cal. 1996) ............................................................................ 25

*Hard2Find Accessories, Inc. v. Amazon.com, Inc.*,
    691 F. App'x 406 (9th Cir. 2017) ............................................................................... 22

*Inchen Huang v. Higgins*,
    443 F. Supp. 3d 1031 (N.D. Cal. 2020) .................................................................... 16

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
    2018 WL 4181954 (N.D. Cal. Aug. 31, 2018) ...................................................... 16, 17

*Kearney v. Foley & Lardner, LLP*,
    590 F.3d 638 (9th Cir. 2009) ..................................................................................... 22

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ................................................................................... 21

*Manistee Town Ctr. v. City of Glendale*,
    227 F.3d 1090 (9th Cir. 2000) .............................................................................. 22, 23

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ..................................................................................................... 16

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F. 3d 1049 (9th Cir. 2008) ........................................................ 2, 3, 11, 13, 14, 20, 21

*Nazir v. United Air Lines*,
    2009 WL 2912518 (N.D. Cal. Sept. 9, 2009) ........................................................... 25

*In re Netflix, Inc. Sec. Litig.*,
    647 F. App'x 813 (9th Cir. 2016) .......................................................................... 2, 11

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ................................................................................... 16

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) ...................................................................................... 21

*Oregon Nat. Res. Council v. Mohla*,
    944 F.2d 531 (9th Cir. 1991) ..................................................................................... 23

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*
    774 F.3d 598 (9th Cir. 2014) ................................................................................ 10, 20

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993) ..................................................................................................... 25

*Prodanova v. H.C. Wainwright & Co., LLC,*
    993 F.3d 1097 (9th Cir. 2021) ........................................................................ 19

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.,*
    845 F.3d 1268 (9th Cir. 2017) ........................................................................ 17

*In re Solarcity Corp. Sec. Litig.,*
    274 F. Supp. 3d 972 (N.D. Cal. 2017) ........................................................ 13, 15

*Sosa v. DIRECTV, Inc.,*
    437 F.3d 923 (9th Cir. 2006) ...................................................................... 3, 22

*Teachers' Ret. Sys. Of LA v. Hunter,*
    477 F.3d 162 (4th Cir. 2007) .......................................................................... 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ................................................................................... 17, 18

*Theme Promotions, Inc. v. News Am. Mktg. FSI,*
    546 F.3d 991 (9th Cir. 2008) ................................................................. 3, 22, 23

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976) ....................................................................................... 16

*Webb v. Solarcity Corp.,*
    884 F.3d 844 (9th Cir. 2018) .......................................................................... 17

*White v. Lee,*
    227 F.3d 1214 (9th Cir. 2000) .................................................................... 23, 25

*Zendano v. Basta, Inc.,*
    804 F. App'x 803 (9th Cir. 2020) ................................................................... 23

*Zucco Partners, LLC v. Digimarc Corp.,*
    552 F.3d 981 (9th Cir. 2009) ..................................................................... 3, 19

**<u>Statutes</u>**

15 U.S.C. § 78u–4(b)(1) ...................................................................................... passim

15 U.S.C. § 78u-4(b)(2)(A) ................................................................................... 2, 17

1

## **Regulations**

17 C.F.R. § 240.10b-5 ........................................................................................... 1, 2, 3, 10, 11, 16, 22

## **Rules**

Federal Rules of Civil Procedure 12(b)(6) ................................................................................ 1, 11

Federal Rules of Civil Procedure  9(b)...................................................................................... 10

## **Constitutional Provisions**

U.S. Const. amend. I. ........................................................................................................... 22, 23

PLEASE TAKE NOTICE THAT, on September 22, 2023 at 10 a.m., or as soon thereafter as it may be heard, defendant Elon Musk will hereby move the above-entitled Court to dismiss the First Amended Complaint (Dkt. 31, "FAC") with prejudice pursuant to Federal Rules of Civil Procedure Rule 12(b)(6), the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b)(1), and the *Noerr-Pennington* doctrine for failure to state a claim.

## STATEMENT OF ISSUES TO BE DECIDED

1.  Should the Court dismiss the FAC's sole cause of action for violation of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 because the FAC fails to plead falsity, materiality, scienter, and/or causation under the PSRLA's exacting pleading requirements and because the statements giving rise to the claim constitute petitioning conduct immune from civil liability under the *Noerr-Pennington* doctrine?

## SUMMARY OF ARGUMENT

The First Amended Complaint unsuccessfully seeks to convert Defendant Elon Musk's legal dispute with Twitter, Inc. over his acquisition of the company and concerns about the accuracy of the number of spam or bot users on Twitter's platform—into a claim for securities fraud.  It alleges without foundation or analysis that true statements—like Mr. Musk's announcement that the closing of the deal was "temporarily on hold"—and legal arguments about the terms of the Merger Agreement asserted by Mr. Musk's lawyers in connection with his litigation against Twitter in the Delaware Court of Chancery ("Delaware Action") were supposedly false or misleading.  To manufacture an inference of scienter, it spends pages discussing irrelevant matters like discovery disputes in the Delaware Action (including with a third party) and  Mr. Musk's personnel decisions regarding his Merger financing team, because it otherwise is devoid of facts showing that Mr. Musk or his lawyers consciously or recklessly lied. And it claims that Mr. Musk's two sentence announcement that he intended to close the Merger—which makes no reference to any of the alleged misstatements at issue—revealed his purported fraud to the market.  The FAC is defective from top-to-bottom, fails to allege a viable 10b-5 claim under the Private Securities Litigation Reform Act's ("PSLRA") exacting standards, and seeks to impose civil liability on protected petitioning conduct.  It should be dismissed with prejudice.

First and fundamentally, the FAC should be dismissed because it fails to plead a viable 10b-5 claim under the "formidable" pleading standards of the PSLRA. *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F. 3d 1049, 1054-55 (9th Cir. 2008).  The FAC fails to plead sufficient and plausible facts required to establish falsity, materiality, scienter, or loss causation for any of the alleged misstatements giving rise to its claim.

The PSLRA is clear that any complaint "shall specify each statement alleged to have been misleading" and "***the reason or reasons why the statement is misleading***," 15 U.S.C. § 78u–4(b)(1) (emphasis added), and Ninth Circuit law is clear that a statement is not false unless it "'affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists.'" *In re Netflix, Inc. Sec. Litig.*, 647 F. App'x 813, 815 (9th Cir. 2016) (citation omitted).  The alleged misstatements identified in the FAC fail on both accounts.  For instance, the allegations in the FAC itself confirm that Plaintiffs' first alleged misstatement—that Mr. Musk was placing the deal "temporarily on hold" pending additional information from Twitter concerning the number of spam accounts on its platform—was accurate.  Mr. Musk ***had*** asked for more information relating to the spam accounts and the deal's closing ***was*** delayed due to this dispute.  (*See e.g.* FAC Ex. A.)  As to the remaining alleged misstatements, the FAC fails to plead any specific facts explaining why they are misleading and in most cases, as with their claims arising from Mr. Musk's Notices of Termination, fails to even identify which statements are misleading at all.  Moreover, the FAC does not plead facts to show the alleged misstatements themselves—as opposed to the reality, well known to the market, that Mr. Musk was delaying closing of the Merger and sought to terminate it—significantly altered the total mix of information available to investors and were material.

The FAC also fails to plead scienter or loss causation.  The FAC cannot meet the PSLRA's requirement that it "state with particularity ***facts*** giving rise to a ***strong*** inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added).  At its core, the scienter element mandates that a plaintiff plead facts showing that the speaker knew the statements were false when made or recklessly disregarded their falsity, *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 848-49 (N.D. Cal. 2019), but the FAC alleges no such facts

as to the particular statements at issue.  Instead, it leans on a sundry of irrelevant events from the Merger and Delaware Action to generally accuse Mr. Musk of having a bad motive and points to the fact that he settled—as most litigants to—as *ipse dixit* that he was lying all along.  But merely "compiling a large quantity of otherwise questionable allegations" does not "create a strong inference of scienter." *See Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 1008 (9th Cir. 2009).  Moreover, the FAC advances a theory of loss causation that is fatally defective as it relies on Mr. Musk's terse announcement that he intended to close the merger as its purported corrective disclosure.  But this announcement made no reference to any alleged misstatements—or any reason for the decision at all—and cannot be reasonably read to reveal any fraud.  *See e.g.*, *Metzler Inv. GMBH*, 540 F.3d at 1063 (dismissing for failure to plead loss causation where corrective disclosure made no reference to the alleged misstatements).

Even if the FAC could state a viable claim under Rule 10b-5—and it cannot—each of the alleged misstatements are immunized from liability under the *Noerr-Pennington* doctrine because they are "sufficiently related" or "incidental" to Mr. Musk's protected petitioning conduct in the Delaware Action.  *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934-35 (9th Cir. 2006).  It is well established that pre-suit demand letters and notices—like the Termination Notices—and public announcements and statements relating to litigation—like the remaining statements—"fall[] within the protection of the *Noerr-Pennington* doctrine.  *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008).  And while the FAC makes bare unsupported conclusions that Mr. Musk's positions in the Delaware Action were "frivolous and baseless," it offers no analysis and pleads no specific facts to support its labels, cannot meet its high burden to establish that Mr. Musk's participation in the underlying litigation was a "sham," and cannot therefore avail itself of the narrow exception to *Noerr-Pennington*.  *Gamble v. Kaiser Found. Health Plan, Inc.*, 348 F. Supp. 3d 1003, 1028 (N.D. Cal. 2018) ("[T]he Ninth Circuit has required a plaintiff seeking to establish the sham exception to *Noerr-Pennington* to plead around the defense with specificity.").

The FAC does not allege any viable theory of liability under Rule 10b-5 and should be dismissed with prejudice.

## RELEVANT ALLEGATIONS AND BACKGROUND

<u>Mr. Musk makes an offer to acquire Twitter Inc. and enters into the Merger Agreement.</u> On April 13, 2022, Mr. Musk transmitted a non-binding cash offer to Twitter's Board of Directors to take the company private at $54.20 per share.  (FAC ⁋ 76.)  On April 21, Mr. Musk disclosed that he secured commitments to finance the acquisition.  (FAC ⁋ 82.)  On April 24, Twitter's Board of Directors accepted Mr. Musk's offer.  (*Id.* ⁋ 84.)  The following day, the parties[1] executed the Merger Agreement, which was made public via a Form 8-K filed with the Securities and Exchange Commission ("SEC") that same day.

<u>The relevant terms of the Merger Agreement.</u>  The provisions of the Merger Agreement relevant to the FAC are as follows.  Section 7.2 provided that the Holding Companies' obligation to consummate and close the Merger were subject to their satisfaction or waiver that (1) the Twitter parties "shall have performed or complied, in all material respects, with its obligations required under this Agreement to be performed or complied with by the [Twitter parties] on or prior to the Closing Date," and (2) "each of the representations and warranties of [Twitter] contained in this Agreement"—except those contained in Sections 4.2(a) and 4.2(b)—"shall be true and correct as of the Closing Date…except for such failures to be true and correct as would not have a Company Material Adverse Effect."[2]  (*Id.* at § 7.2.)

Article VI imposed a number of covenants and requirements on Twitter including affording the representatives, employees, agents, and advisors of X Holdings I "reasonable access" to "the properties, books and records of [Twitter]…for any reasonable business purpose related to the consummation of the transactions contemplated by this Agreement." (Merger Agreement §

---

[1]   The "buyer" was two Delaware corporations, X Holdings I, Inc. and X Holdings II, Inc. that Mr. Musk established to serve as Parent and Acquisition Subsidiary in the Merger (collectively, the "Holding Companies").   Mr. Musk served as President, Secretary, and Treasurer of the Holding Companies.  (Declaration of Alex Bergjans ("Bergjans"), attached herein, Ex. 1 ("Merger Agreement").)  Mr. Musk signed the Merger Agreement on behalf of the Holding Companies (*id.*).
[2]   "Company Material Adverse Effect" was defined to mean "any change, event, effect or circumstance which, individually or in the aggregate, has resulted in or would reasonably be expected to result in a material adverse effect on the business, financial condition or results of operations of the Company and its Subsidiaries, taken as a whole," subject to a number of conditions not reproduced here.  (Merger Agreement at p. 5.)

6.4)  Twitter also agreed to "provide any reasonable cooperation reasonably requested by Parent in writing in connection with (i) the arrangement of the Bank Debt Financing and any other debt financing expressly contemplated by the Bank Debt Commitment Letter[3]," subject to certain conditions.  (*Id.* at § 6.11.)

Article IV included Twitter's representations and warranties related to the Merger including: Compliance With Laws (Merger Agreement § 4.5), the warranty that none of Twitter's filings with the SEC since January 2022 "contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, or are to be made, not misleading" (*id.* at § 4.6), Disclosure Controls and Procedures (*id.* at § 4.8), the certification that "there is no suit, action or proceeding pending or, to the Knowledge of [Twitter], threatened in writing against [Twitter] or any of its Subsidiaries, that would have a Company Material Adverse Effect" (*id.* at § 4.11), and a certification that Twitter "does not infringe, misappropriate or otherwise violate any Intellectual Property Rights of any other Person, except for any such infringement, misappropriation or other violation that would not have a Company Material Adverse Effect" (*id.* at § 4.14).

Article VIII outlined the process for termination by any party. (Merger Agreement, Art. VIII).  For example, the agreement could be terminated by the Holding Companies if Twitter breached and subsequently failed to cure its representations and warranties.  (Merger Agreement §§ 7.2(b); 8.1(d)(i).)

<u>Prior to closing the Merger and pursuant to the Merger Agreement, Mr. Musk seeks information from Twitter relating to the number of spam accounts on the platform.</u>  Monetizable daily active users, or mDAU, is the measurement of the number of Twitter users "who accessed Twitter on any given day through Twitter.com or Twitter applications that are able to show ads." (Bergjans Ex. 2 at 5.)  Some percentage of Twitter's mDAU are not human beings capable of

---

[3]  The Bank Debt Commitment Letter referred to the April 25, 2022 debt commitment letter with Morgan Stanley Senior Funding relating to the debt financing required to fund the Merger. (Merger Agreement § 5.4.)

engaging with and purchasing products from advertisers, but rather bots or spam and the calculation of that percentage is relevant to projecting Twitter' potential revenue and growth. (*See* FAC ⁋ 118.)  On February 16, 2022, Twitter filed its 2021 Annual Report with the SEC, disclosing that "there are a number of false or spam accounts in existence on our platform," and stating that Twitter "ha[s] performed an internal review of a sample of accounts and estimate that the average of false or spam accounts during the fourth quarter of 2020 represented fewer than 5% of our mDAU during the quarter." (FAC ⁋ 118.)  As noted above, Twitter warranted under 4.6(a) of the Merger Agreement that this Annual Report was true and accurate.[4]

On or around May 9, 2022, Mr. Musk and his financial advisors at Morgan Stanley requested "critical information from Twitter…on the relationship between Twitter's disclosed mDAU figures and the prevalence of false or spam accounts on the platform." (FAC, Ex. A ("July 8 Notice") at 2.)   Mr. Musk believed that the "information was necessary to consummate the transactions contemplated by the Merger Agreement because it is needed to ensure Twitter's satisfaction of the conditions to closing, to facilitate Mr. Musk's financing and financial planning for the transaction" and that he was entitled to it under sections 6.4 and 6.11 of the Merger Agreement. (*Id.* at 1, 5-7.)

First Alleged Misstatement: On May 13, after making that initial request for information regarding spam accounts, Mr. Musk tweeted "Twitter deal temporarily on hold pending details supporting calculation that spam accounts do indeed represent less than 5% of users." (FAC ⁋⁋ 112, 120.)  A few hours later, he replied to the Tweet stating that he was "[s]till committed to acquisition." (Bergjans Ex. 3.)[5]  Following this Tweet, the Merger was effectively put on hold and did not close for nearly six months.  (FAC ⁋⁋ 112-150.)  Instead, Mr. Musk spent the following two months continuing to seek this spam account information from Twitter before sending a Notice of Termination of the Merger Agreement on July 8, 2022 asserting that Twitter breached its

---

[4]  In September 2021, Twitter agreed to pay $809.5 million to settle a securities class action that alleged the company overstated user numbers. (*Id.* ⁋ 117.)
[5]  That same day Mr. Musk published Tweets relating to the sample size Twitter used to calculate the percentage of spam bots on its platform.  (FAC ⁋⁋ 113-114.)  The FAC does not allege these statements are false or identify any specific facts explaining why they are misleading.  (*Id.*)

obligations under sections 6.4 and 6.11 of the Merger Agreement by failing to provide this information.  (July 8 Notice, at 5).  According to the FAC, there is nothing in the buyout contract that allows Musk to put the deal "temporarily on hold."  (FAC ¶ 112.)  However, this allegation makes no reference to the actual text of the Merger Agreement, including Articles VI-VIII, which govern Twitter's disclosure obligations, the conditions to closing, or the termination provision.  (*See supra*).[6]  Nor does the FAC acknowledge that the closing of the deal was indeed delayed from the posting of the Tweet to October 2022 (*i.e.*, it was temporarily put on hold).

Second Alleged Misstatement: On May 14, Mr. Musk tweeted "Twitter legal just called to complain that I violated NDA by saying bot check sample size is 100!  This actually happened."  (FAC ¶ 115.) The FAC pleads no facts alleging or stating why this statement is false or misleading, except to vaguely assert it was "pretextual."  (FAC ¶¶ 115-119.)

Third Alleged Misstatement: On May 16, 2022, Mr. Musk stated at a tech conference that fake and spam accounts make up at least 20% of Twitter's users.  (FAC ¶¶ 5, 120.)  The FAC does not allege this estimate is false or allege a percentage of spam bots that is purportedly accurate.  (*Id.*)  To the contrary, the FAC alleges that Twitter itself acknowledges that its own estimates of the number of spam accounts "may not accurately represent the actual number of such accounts, and the actual number of false or spam accounts could be higher than" estimated.  (*Id.* ¶ 118.)

According to the FAC, Twitter's then-CEO responded to Mr. Musk's statement by tweeting the opinion that Twitter did not "believe that this specific estimation can be performed externally" but did not refute the estimate or offer one of his own.  (*Id.* ¶ 121.)  Mr. Musk responded to that Tweet with a "poop emoji" and a reply asking "[s]o how to advertisers know what they're getting for their money? This is fundamental to the financial health of Twitter." (*Id.* at ¶¶ 122-123.).  The FAC does not plead any facts alleging that these Tweets were false, despite being part of Plaintiffs' claims here.  (*Id.*)

---

[6]    The FAC incorrectly states that "Musk had specifically waived detailed due diligence as a condition precedent to his obligations under the Buyout contract.  Thus, Musk has no right to cancel the Buyout based on any results from due diligence concerning the number of fake accounts at Twitter."  (FAC ¶ 112, *see also* ¶¶ 77, 149, 155).  The text of the Merger Agreement says otherwise. *See supra* Merger Agreement, §§ 4.6, 7.2, 8.1, *see also* Bergjans Ex. 5 at ¶¶ 60-62.

**Fourth Alleged Misstatement**: The following day, Mr. Musk tweeted "20% fake/spam accounts, while 4 times what Twitter claims, could be much higher.  My offer was based on Twitter's SEC filings being accurate.  Yesterday, Twitter's CEO publicly refused to show proof of <5%.  This deal cannot move forward until he does," (FAC ¶¶ 6, 125.)  The FAC also alleges he invited the SEC to investigate Twitter that same day. (*Id.* ¶127.)  Again, the FAC does not even allege that the Tweets or SEC invitation were false, never mind plead any specific facts explaining their purported falsity.  (*Id.* ¶¶ 125-27.) The FAC further fails to allege that Mr. Musk lacked the subjective belief that the two opinions expressed in the Tweet—that the number of spam bots "could be much higher" than twenty percent or that the "deal cannot move forward" until Twitter substantiates its spam bot estimates—were true.

**Fifth Alleged Misstatement**: On May 21, 2022, Mr. Musk replied "Absolutely" to a Tweet posing the hypothetical that "If 25% of the users are bots then the Twitter acquisition deal should cost 25% less." (FAC ¶¶ 7, 128.)  That same day, Mr. Musk also tweeted the concern that "I'm worried that Twitter has a disincentive to reduce spam, as it reduces perceived daily users" and, in response to a question whether Twitter provided him the spam information he requested, "No, they still refuse to explain how they calculate that 5% of daily users are fake/spam! Very suspicious." (*Id.* ¶¶ 7, 130.)  Plaintiffs do not allege that these statements are false, the reasons for their falsity, or that Mr. Musk did not subjectively hold the opinions expressed in the first and second Tweets.  (*Id.* ¶¶ 128-132.)

**Final Alleged Misstatements ("Notices of Termination") and subsequent litigation**.  On July 8, 2022, the FAC asserts Mr. Musk issued a public statement announcing that he was terminating the Merger.  (FAC ¶¶ 8, 140.)  Plaintiffs allege that the statement "falsely" contended that Twitter breached several provisions of the Merger Agreement, but does not reproduce the alleged statement in the FAC, identify the specific alleged falsehoods in the statement, or describe the reasons why the alleged statement was false.  (*Id.*)  That same day, Mr. Musk's attorneys sent the July 8 Notice of Termination to Twitter.  The Notice of Termination, which was publicly filed with the SEC, outlined Mr. Musk's and his financial advisors' efforts to obtain "critical information" relating to the number of spam accounts on Twitter that he believed were "needed to

ensure Twitter's satisfaction of the conditions to closing. (FAC, Ex. A at 2.)   The Notice of Termination explained that Twitter's refusal to provide this information materially breached sections 6.4 and 6.11 of the Merger Agreement and provided notice that Mr. Musk was exercising his termination rights under section 8.1(d)(i).   (*Id.* at 5.)   Additionally, the July 8 Notice stated that Twitter's February 2022 SEC disclosure of its spam level appeared to be materially inaccurate and that Mr. Musk therefore had the right to rescind the Merger Agreement.   (*Id.* at 6.)

On July 12, 2022, Twitter sued Mr. Musk for specific performance in Delaware Chancery Court (the "Delaware Action").   (FAC ¶ 143; Bergjans Ex. 4.)   Twitter's 61-page complaint was made available the public shortly after its filing and articulated Twitter's theory for specific performance and response to the arguments asserted in the July 8 Notice of Termination. (Bergjans Ex. 4.)   Mr. Musk filed counterclaims on August 4, 2022, (the "Musk Counterclaims"), (*Id.*, Ex. 5.), seeking rescission of the Merger Agreement, based on Twitter's common law and statutory securities fraud, or, in the alternative, a finding that Twitter breached Article VI of the Merger Agreement, leading to the failure of a condition listed in Section 7.2(a), allowing Mr. Musk's Buyers to terminate under 8.1(d); or otherwise a declaration that Twitter suffered a Company Material Adverse Effect as a result of the falsity of its representation under Section 4.6 leading to the failure of a condition listed in Section 7.2(b), allowing Mr. Musk to terminate under 8.1(d).   *See* Bergjans Ex. 5 at 91.

On August 29, 2022, Mr. Musk sent a second Notice of Termination ("August 29 Notice of Termination") to Twitter, which was made public the following day.   (FAC ¶ 144, Ex. B.)   The August 29 Notice of Termination describes a whistleblower report filed by Twitter's former chief security officer that alleged security vulnerabilities and misconduct at Twitter which Mr. Musk asserted constituted material violations of sections 4.5, 4.6, 4.8, 4.11, 4.14, and 7.2 of the Merger Agreement.   (FAC ¶ 145).   The FAC does not assert that any specific statements in this Notice were false or plead any facts to support any contention that the Notice contained false statements. (*Id.*)   On September 8,   Mr. Musk filed Amended Counterclaims pleading the issues raised in the August 29 Notice of Termination.   On September 9, 2022, Mr. Musk sent a third Notice of Termination to Twitter ("September 9 Notice of Termination").   (FAC ¶ 147, Ex. C.)   The

September 9 Notice of Termination notes that Twitter entered into a $7.75 million separation agreement with its former chief security officer without seeking Mr. Musk or the Holding Companies' consent and asserts that this agreement violated sections 6.1(e) and 7.2(a) of the Merger Agreement. (*Id.*) The FAC does not assert that any specific statements in this Notice were false or plead any facts to support any contention that the Notice contained false statements.  (*Id.*)

      <u>Musk announces intent to close Merger.</u> On October 4, 2022, Mr. Musk publicly filed with the SEC an announcement that on October 3, 2022 he sent a letter to Twitter notifying it that he intended to close the merger on the terms in the Merger Agreement.  ("October 4 Announcement," Bergjans Ex. 6.)  Neither the October 4 Announcement nor the October 3 letter made reference to the merits of the Delaware Action, the claims and arguments asserted in the Notices of Termination, or the number of spam accounts on Twitter's platform.  (*Id.*)  Despite this, the FAC alleges the October 4 Announcement revealed "the truth about Mr. Musk's fraud" and caused Twitter's stock to rise 22 percent.  (FAC ¶¶ 167-68)  The Class Period ends that day.  (*Id.*)

      <u>Complaint here.</u>  The FAC, filed June 8, 2023 asserts a single cause of action for Violation of Section 10(b) of the Exchange Act and Rule 10b-5 against Mr. Musk arising from (1) Mr. Musk's May 13, 2022 Tweets (FAC at ¶¶ 111-114); (2) Mr. Musk's May 14, 2022 Tweet (*id.* at ¶¶ 115-119); (3) Mr. Musk's May 16, 2022 statement and subsequent Tweets (*id.* at ¶¶ 120-124); (4) Mr. Musk's May 17, 2022 Tweet (*id.* at ¶¶ 125-127); (5) Mr. Musk's May 21, 2022 Tweets (*id.* at ¶¶ 128-134); and (6) the three Notices of Termination (*id.* at ¶¶ 135-151).  The purported class period is the five-months from May 13, 2022, the date of the first tweet, through October 4, 2022, the closing announcement date.

## ARGUMENT

### I.    <u>PLAINTIFFS FAIL TO PLEAD A CAUSE OF ACTION UNDER SECTION 10(B)</u>

#### A.    Plaintiffs' Claim Is Subject To Strict Pleading Requirements

      Under Section 10(b), Plaintiffs must plead: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) [] causation." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.* 774 F.3d 598, 603 (9th Cir. 2014). Each element requires particularized facts

satisfying Rule 9(b) and the "formidable" pleading standards of the PSLRA. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F. 3d 1049, 1054-55 (9th Cir. 2008).  Thus, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1).

**B.     The FAC Fails To Plead The Statements Are Materially False Or Misleading**

Plaintiffs fails to plead that any of Mr. Musk's statements are false or misleading  under the strict and exacting pleading requirements of the PSLRA and Rule 9(b), as the FAC is devoid of specific factual allegations necessary to establish falsity.  It should thus be dismissed under Rule 12(b)(6).

1.     <u>The First Alleged Misstatement—May 13, 2022 Tweet—Was Not False</u>

Under Rule 10b-5, a statement is not false unless it "'affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *In re Netflix, Inc. Sec. Litig.,* 647 F. App'x 813, 815 (9th Cir. 2016) (citation omitted).  Mr. Musk's tweet that the "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users" (FAC ⁋ 111) did not differ in a material way from the actual state of affairs.  Mr. Musk's position that Twitter had not provided adequate information on the number of spam accounts on its platform did indeed cause the deal to be put temporarily on hold and in fact led to the termination of the Merger and subsequent litigation that paused the closing of the transaction.  (FAC ⁋⁋ 140-144.)  As the FAC acknowledges, Mr. Musk and his financial advisors sought information "on the relationship between Twitter's disclosed mDAU figures and the prevalence of false or spam accounts on the platform" since May 9, 2022—before Mr. Musk published the May 13 Tweet.  (FAC, Ex. A at 2.)   Mr. Musk spent two months attempting to obtain this information from Twitter in order to "facilitate [his] financing and financial planning for the transaction" before sending notice of termination on the grounds that Twitter's failure to provide that information was a material breach of Section 6.4 and 6.11 of the Merger Agreement.  (*Id.*; *see also* Ex. A at 6).  The delay in providing this information and the

1   subsequent litigation that arose following Mr. Musk's notice of termination actually put the

2   "Twitter deal temporarily on hold."

3         The FAC's contention (FAC ⁋ 112) that the Tweet was false because "Twitter had not

4   agreed to put the Merger on hold and there was nothing in the Buyout contract that allowed Musk

5   to put the deal 'temporarily on hold'" and because "it stated or implied that Musk's obligation to

6   consummate the Buyout was conditioned on his satisfaction with due diligence to determine

7   whether 'spam/fake accounts do indeed represent less than 5% of users'" is belied by the content

8   of the Tweet itself and the terms of the Merger Agreement.  Very simply, the Tweet does not state

9   or imply that Twitter "agreed to" to the hold or that the hold was caused by business due diligence,

10  as opposed to these other obligations Twitter had under the Merger Agreement.  (FAC ⁋ 111.)[7]

11  Moreover, as the FAC itself acknowledges, Twitter had obligations—and had agreed to—provide

12  Mr. Musk with mDAU data as part of the "provisions of the merger agreement governing the

13  sharing of information . . . facilitating the closing of the transaction." (FAC ⁋ 137).  Any delay in

14  providing that information—and its subsequent impact on the satisfaction of closing conditions—

15  would necessarily put the deal on hold.

16        2.    The Second Alleged Misstatement—May 14, 2022 Tweet—Is Not False

17        The FAC identifies a May 14, 2022 Tweet—"Twitter legal just called to complain that I

18  violated their NDA by revealing the bot check sample size is 100! This actually happened"—but

19  does not allege any factual misstatements.  (FAC ⁋ 115.) Nor does it identify a single fact

20  indicating why this Tweet is purportedly false—there is no allegation, for instance, that Twitter

21  legal did not call or that its bot check sample size was not one-hundred.  (*Id.*)  Any claim based on

22  that Tweet must fail accordingly. *Metzler Inv. GMBH*, 540 F.3d at 1070.  Instead of pleading

23

24  _____

[7]  And to the extent that Plaintiffs contend the statement is false because Mr. Musk omitted the

25  fact that he waived diligence, it also fails.  Plaintiffs allege that Mr. Musk's purported waiver of
    "business due diligence" was already made public (FAC ⁋ 82), and accordingly Mr. Musk could

26  not be held liable for failing to premise this statement with his waiver of due diligence in that
    Tweet.  *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576 (S.D.N.Y. 2013),

27  *aff'd*, 566 F. App'x 93 (2d Cir. 2014) ("Where allegedly undisclosed material information is in fact
    readily accessible in the public domain…a defendant may not be held liable for failing to disclose

28  this information.").

falsity, Plaintiffs allege that Mr. Musk's "concern about the number of bots and fake accounts at Twitter would appear to be pretextual, given the fact that [Mr. Musk] has known about the issue long before he offered to acquire Twitter." (FAC ⁋ 116.)  The appearance of pretext is not material factual falsity—it does not create an impression of a state of affairs that differs in a material way from the one that actually exists as to the matters about which Mr. Musk tweeted.  *See Brody v. Transitional Hosps. Corp*., 280 F.3d 997, 1006 (9th Cir. 2002).  To the extent that Plaintiffs are attempting to pursue an omissions theory of liability arising from Mr. Musk's failure to disclose his preexisting knowledge of Twitter's spam account problems, they too fail because that knowledge was publicly known and he thus had no obligation to disclose it.  (*Cf. id.* at ⁋ 78 *with In re Bank of Am. AIG Disclosure Sec. Litig*., 980 F. Supp. 2d at 576).

### 3.   The Third Alleged Misstatement—May 16, 2022 Tweets—Are Not False

The FAC identifies a statement that Mr. Musk allegedly made on May 16, 2022 that "fake and spam accounts make up at least 20% of Twitter's users," but it does not even allege that the estimate is false, let alone proffer any specific facts that show how the estimate is false.  FAC ⁋ 120; *In re Solarcity Corp. Sec. Litig*., 274 F. Supp. 3d 972, 998 (N.D. Cal. 2017) (dismissing claim where plaintiffs failed to "allege specific facts that show" how the "key operating metrics were false.").  The FAC does not allege the purportedly true percentage of spam bots on Twitter's platform at any point, let alone in May 2022.  The closest it comes to alleging falsity is its identification of Twitter's then-CEO's Tweet that merely explains "we don't believe that this specific calculation can be performed externally" and does not deny that bots could make up at least twenty percent of Twitter's users.  (FAC ⁋ 121.)  Instead, the allegations in the FAC actually **support** Mr. Musk's contention that Twitter's estimates that spam accounts only made up five percent of its monetizable daily active users is inaccurate or, at the very least, unverifiable.  The FAC alleges that Twitter disclosed that its determination that spam accounts accounted for only five percent of its users in the fourth quarter of 2020 was made only after "appl[ying] significant judgment" and therefore "may not accurately represent the actual number of such accounts, and the actual number of false or spam accounts could be higher than we have estimated." (*Id.*, ⁋ 118.) The FAC further alleges that Twitter settled a securities class action "alleging [it] overstated its

user numbers and growth rate" and that "incidences of spamming by bots and fake accounts on Twitter have been increasing." (*Id.* ¶¶ 117, 119.)  The circumstances alleged in the FAC are thus not inconsistent with the statements so as to show that the statements must have been false or misleading when made.

The FAC further identifies two Tweets published on May 17, 2022—a "poop emoji" and comment that having an accurate account of the number real, as opposed to bot, users it "fundamental to the financial health of Twitter" (FAC ¶¶ 122-123)—but again does not allege that either of them were false or misleading.  (*Id.*) Any claim based on these Tweets must therefore be dismissed as well.

### 4.  The Fourth Alleged Misstatement—May 17, 2022 Tweet—Is Not False

Plaintiffs next identify a May 17, 2022 Tweet that states "20% fake/spam accounts, while 4 times what Twitter claims, could be much higher.  My offer was based on Twitter's SEC filings being accurate.  Yesterday, Twitter's CEO publicly refused to show proof of <5%.  This deal cannot move forward until he does" (FAC ¶ 125) and Mr. Musk's purported invitation for the SEC to investigate Twitter (*id* at ¶ 127).  Again, Plaintiffs do not plead any "specific facts indicating why" the statements at issue were false.  *See Metzler Inv. GMBH.*, 540 F.3d at 1070; FAC ¶¶ 125-27.  Any claim based on these statements should be dismissed for this reason alone.  The Tweet is not actionable in any event.  In the first sentence, Mr. Musk reiterates his estimate of the number of spam accounts—which Plaintiffs do not allege is false—and then makes a statement of opinion or belief that the number "could be much higher." (FAC ¶ 125.)  To be actionable, a statement of belief or opinion must be both subjectively and objectively untrue. *Omnicare v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc*., 856 F.3d 605, 615-16 (9th Cir. 2017).  The FAC fails on both counts: there are no allegations that Mr. Musk did not believe the statement nor are there allegations showing that spam bots do not make up more than twenty percent of Twitter's users.  The second statement—that Mr. Musk's offer was based on Twitter's SEC filings being accurate—is true.  (Merger Agreement § 4.6(b).)  And there are no allegations that the third or fourth statements are false.  (FAC ¶¶ 125-27)

5.  The Fifth Alleged Misstatement—May 21, 2022 Tweets—Are Not False

Plaintiffs identify three Tweets from May 21, 2022.   In the first, Mr. Musk replies "Absolutely" to a Tweet stating "If 25% of the users are bots then the Twitter acquisition deal should cost 25%."   In the second, Mr. Musk states "I'm worried that Twitter has a disincentive to reduce spam, as it reduces perceived daily users."   And in the third, he states that Twitter "still refuse[s] to explain how they calculate that 5% of daily users are fake/spam! Very suspicious." (FAC ¶¶ 128-130.)   Again, the FAC fails to plead any specific facts articulating why these statements are purportedly false or misleading, as required under the PSLRA.   (*Compare id.* at FAC ¶¶ 128-130 *with* 15 U.S.C. § 78u–4(b)(1).)   And as to the first two statements—which reflect Mr. Musk's opinions as to whether a deal price should be reduced and whether Twitter is disincentivized to reduce spam—the FAC further fails to plead that Mr. Musk did not subjectively believe his opinions.  *See City of Dearborn Heights*, 856 F.3d at 615-16.

6.  The Final Alleged Misstatements—Notices of Termination—Are Not False

Finally, Plaintiffs contend that the legal arguments advanced in Mr. Musk's Notices of Termination are false.   As an initial matter, the FAC fails to identify which specific statements in the Notices were false and should be dismissed on that basis alone.  *See* 15 U.S.C. § 78u–4(b)(1). Instead it generally avers that Mr. Musk was not entitled to due diligence and did not have a legally justifiable reason to terminate, that Twitter was not in violation of the Merger Agreement, the Merger was not on hold, that Twitter had not failed to provide Mr. Musk with any information that he was entitled to under the Merger Agreement, and there was no Company Material Adverse Effect.   (FAC ¶¶ 135-150.)   But, it pleads no facts supporting these threadbare legal conclusions and thus cannot rely on them to defeat a motion to dismiss. *See Adams v. Johnson*, 355 F.3d 1179,1183 (9th Cir. 2004); *In re Solarcity Corp.*, 274 F. Supp. 3d at 989 ("the Court is not required to assume the truth of legal conclusions merely because they are cast in the form of factual allegations.") (internal citations omitted).   Moreover, these notions have been thoroughly debunked here, *see e.g., supra* n.6.  The FAC also alleges that Mr. Musk fraudulently omitted his purported motives for making the statements.   But Mr. Musk had no duty to do so, *see Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17 (1988) ("Silence, absent a duty to disclose, is not misleading

1   under Rule 10b–5"), and the FAC does not allege how disclosure of these motives was "necessary

2   to make" any of the statements made "not misleading," *see In re NVIDIA Corp. Sec. Litig.*, 768

3   F.3d 1046, 1054 (9th Cir. 2014) (internal citations omitted).  These general allegations do not meet

4   the level of specificity required by the PSLRA and the caselaw interpreting it, and fail to state a

5   claim.[8]

6   ### C.       The FAC Does Not Plead Materiality

7          The FAC also fails to plead that any alleged misstatements were material *i.e.*, that there is

8   "a substantial likelihood that, under all the circumstances, the omitted [or misstated] fact would

9   have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Indus.,*

10  *Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  A fact is material only if "a reasonable investor"

11  would view it "as having significantly altered the 'total mix' of information." *Matrixx Initiatives,*

12  *Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (citation omitted).  "To plead materiality, a complaint's

13  allegations must suffice to raise a reasonable expectation that discovery will reveal evidence

14  satisfying the materiality requirement, and to allow the court to draw the reasonable inference that

15  the defendant is liable." *Inchen Huang v. Higgins*, 443 F. Supp. 3d 1031, 1042 (N.D. Cal. 2020)

16  (internal citation omitted).  "Although determining materiality in securities fraud cases should

17  ordinarily be left to the trier of fact, conclusory allegations of law and unwarranted inferences are

18  insufficient to defeat a motion to dismiss for failure to state a claim." *In re Cutera Sec. Litig.*, 610

19  F.3d 1103, 1108–09 (9th Cir. 2010).

20         Here, the FAC fails to allege how any purportedly false statements, as opposed to actual

21  events of the well-publicized dispute over the Merger—such as the delay of the closing,

22  transmission of Notices of Termination, and litigation with Twitter—"significantly altered the

23  total mix of information" available to investors.  *See Irving Firemen's Relief & Ret. Fund v. Uber*

24  *Techs.*, 2018 WL 4181954, at *8 (N.D. Cal. Aug. 31, 2018) (dismissing claim for failure to

25

---

26  [8]   To the extent Plaintiffs contend that any legal argument or analysis in the Notices are false or
     misleading, his claims fail because such representations are opinions as to Mr. Musk's entitlement
27  to legal relief and Plaintiffs fail to allege facts showing that Mr. Musk did not subjectively believe
     them at the time they were expressed.  *See City of Dearborn Heights*, 856 F.3d at 615-16.
28

"plausibly suggest that disclosure of [] information would have altered the total mix of information then available and material to investors").   For instance, the FAC alleges that Twitter's stock price fell after Mr. Musk sent the July 8 Notice of Termination, but it does not allege how the purportedly misleading statements in the Notice—as opposed to the fact of the Termination Notice itself—would have altered the "decisionmaking by stockholders concerning their investments." *See Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co*., 845 F.3d 1268, 1274-77 (9th Cir. 2017); (FAC ⁋ 141.)   And the mere fact that Twitter's stock price may have fallen after certain statements were made does not establish on its own that those statements were material.   *See Retail Wholesale*, 845 F.3d at 1277 ("Retail Wholesale's contention that a slump in HP's stock indicates materiality is not well-taken.").   The FAC must plead facts, not mere conclusions, showing that the misstatements themselves were material.   *In re Cutera Sec. Litig.*, 610 F.3d at 1108–09.   Again, bare conclusions are all Plaintiffs have, and their claim should be dismissed.   *See id.*

### D.    Plaintiffs Cannot Plead Scienter

The FAC also fails because it does not adequately plead scienter.   The FAC is required to "state with particularity ***facts*** giving rise to a ***strong*** inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added).   In the Ninth Circuit that means Plaintiffs must allege facts demonstrating an "intent to deceive, manipulate, or defraud" or at least acts that are "deliberate[ly] reckless."[9]   *Webb v. Solarcity Corp*., 884 F.3d 844, 851 (9th Cir. 2018) (internal citations omitted).   The required ***strong*** inference, means an "inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong ***in light of other explanations***." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 324 (2007).   That is, to evaluate scienter, a court "must consider plausible, nonculpable explanations for the defendant's conduct" as well.   *Id.*   And then dismiss the

---

[9]   "Deliberate recklessness is an extreme departure from the standards of ordinary care[,] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it."   *City of Dearborn Heights*, 856 F.3d at 619 (internal citations omitted).

1   complaint unless "a reasonable person would deem the inference of scienter cogent and at least as

2   compelling as any opposing inference." *Id.*

3        Plaintiffs have not even tried to meet this requirement here.  First and foremost, the FAC

4   fails to plead "particularized facts" to show that Mr. Musk "intentionally or recklessly lied" when

5   making any of the statements at issue.  *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 848-

6   49 (N.D. Cal. 2019).  As to the First Alleged Misstatement, when Mr. Musk tweeted that the

7   Merger was "temporarily on hold pending details supporting" Twitter's mDAU calculation, he and

8   his financial advisors were in fact exercising his information rights in an attempt obtain mDAU

9   data that was needed to satisfy conditions to closing and any delay in obtaining this information

10  would hold the closing.  (*Compare* FAC ¶ 111 *with* Ex. A, p. 2).  As to Alleged Misstatements

11  Nos. 2-5, the FAC pleads no facts showing that Mr. Musk knew that his public statements about

12  his interactions with Twitter regarding his attempts to obtain mDAU data were false or that he

13  knew that his May 2022 statements about the number of spam accounts on Twitter was false when

14  made.  (FAC ¶¶ 114-130.)  To the contrary, the FAC pleads facts showing that Twitter itself

15  acknowledged that the "actual number of false or spam accounts could be higher than we have

16  estimated." (*Id.*, ¶ 118.)  Finally, the FAC alleges no facts showing that Mr. Musk knew that the

17  legal arguments advanced by his lawyers in the Final Alleged Misstatements, the Notices of

18  Termination, were false or misleading, indeed it engages in no analysis of the specific grounds for

19  termination identified in the Notices at all.  Rather than establishing knowledge or reckless

20  disregard, the Notice of Termination allegations show that Mr. Musk and Twitter were engaged in

21  a dispute over their respective rights and obligations under the Merger Agreement.  (*Id.* ¶¶ 130-

22  150.)

23       Lacking specific factual allegations to meet their high burden to establish scienter,

24  Plaintiffs rely on general allegations of motive and opportunity, red herrings, and incomplete and

25  irrelevant descriptions of the Delaware Action.  These general assertions do not come close to

26  adequately pleading scienter:

27  •     The FAC advances profit motive allegations of the kind that can be presumed in any case
           (FAC ¶¶ 90-106, 132-34), and makes general allegations of "motive and opportunity" (*id.*

28

at ⁋ 153), but a complaint cannot rely on "mere motive and opportunity or recklessness" to plead scienter. *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021).

- The FAC also alleges that Mr. Musk's statements were false because he "had actual knowledge that he had waived due diligence," (FAC ⁋ 155) but that is again a red herring. None of Mr. Musk's alleged statements referenced due diligence and the Notices of Termination show that the dispute related to other rights under the Merger Agreement. (FAC Exs. A-C.)

- The FAC's allegations concerning Bob Swan are nothing more than a distraction as there was "no financing condition in the Merger Agreement" (*id.* ⁋ 162), there are no facts asserted to support a conclusion that Mr. Musk failed to procure financing (he did procure it), and whether Mr. Musk retained an advisor is irrelevant to the truth or falsity of his statements.

- Similarly, Plaintiffs cannot plausibly plead scienter because Mr. Musk later sought to prevent the disclosure of a non-testifying expert's work product in litigation. As an initial matter, resistance to such a disclosure is common to litigation and furthermore, the FAC pleads no facts—beyond a bare conclusion—that the work product was inconsistent with the representations made in the July 8 Notice (FAC ⁋ 159) or that it influenced any of Mr. Musk's other statements.

- Plaintiffs' plausibly cannot allege scienter based on a third-party's response to a subpoena (*id.* ⁋⁋ 160-61) as Mr. Sack's reaction has no bearing on ***Mr. Musk's*** state of mind.

- Scienter is also not plausibly alleged by referencing that five months after putting the Merger on hold, Mr. Musk ultimately settled the dispute. (FAC ⁋ 166). "That kind of bare inference by hindsight is not permitted under the PSLRA," *In re FVC.COM Sec. Litig.*, 32 F. App'x 338, 341 (9th Cir. 2002), and the fact that Mr. Musk decided to resolve the dispute after months of litigation and discovery does not establish that he knew that any of the statements were false when made.

Absent any particularized or specific allegations that Mr. Musk or his lawyers consciously or recklessly lied—as opposed to engaging in a legal dispute that ultimately settled—the FAC's compilation of "a large quantity of otherwise questionable allegations" does not "create a strong inference of scienter." *See Zucco Partners,* 552 F.3d at 1008 (9th Cir. 2009) (affirming dismissal with prejudice where "voluminous" allegations were not as cogent as a plausible alternative inference).

### E.    Plaintiffs' Theory Of Loss Causation Is Fatally Defective

Plaintiffs' claim also fails because they fail to adequately plead loss causation, the  "causal connection between the [defendant's] material misrepresentation and the [plaintiff's] loss."

*Metzler Inv. GMBH*, 540 F.3d at 1062 (*citing Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)).   To plead loss causation, the FAC must allege that representations that Plaintiffs "contend[] are fraudulent were revealed to the market [to be fraudulent] and caused the resulting losses." *Metzler Inv. GMBH*, 540 F.3d at 1063; *see also Oregon Pub. Emps. Ret. Fund,* 774 F.3d at 608.

Here, Plaintiffs allege that the fraud was revealed to the market by the October 4 Announcement.[10]   (FAC ⁋ 167.)   However, this news did not reveal that any of the statements at issue were fraudulent, nor did it mention or even allude to them.   The October 4 Announcement simply stated that Mr. Musk "intend[s] to proceed to closing of the transaction contemplated by the April 25, 2022 Merger Agreement, on the terms and subject to the conditions set forth therein and pending receipt of the proceeds of the debt financing contemplated thereby" provided that the Delaware Action was stayed.   (Bergjans Ex. 6.)   Mr. Musk's announcement, made nearly six months after the May 13 Tweet, did not reveal his statement that the deal was "temporarily on hold" was false.   The deal ***was*** placed temporarily on hold.   Nor did it reveal to be false Mr. Musk's contention that twenty percent of Twitter's users were spam bots.

*Metzler* and *Oregon Pub. Emps. Ret. Fund.* are instructive.   In *Metzler*, plaintiff alleged that Corinthian College was manipulating student enrollment figures in order to procure excess federal funding and contended that the fraud was revealed in a *Financial Times* story.   *Metzler Inv. GMBH*, 540 F.3d at 1063.   However, the article in question did not reveal widespread financial aid manipulation and thus did not actually disclose the alleged fraud.   *Id.*   In *Oregon Pub. Emps. Ret. Fund*, plaintiff alleged that a for-profit college operator made false statements about enrollment growth and that fraud was revealed when the defendants announced that the Department of Education "expressed a concern" about enrollment practices.   774 F.3d at 608.   But plaintiff did not plead which specific "claims made by the Defendants were invalidated by this statement." *Id.*   Accordingly, in both cases, the Ninth Circuit held that plaintiffs failed to plead loss causation

---

[10]   The FAC cannot rely on post-October 4 news reports (FAC ⁋⁋ 169-170) to establish loss causation since it alleged that the purported corrective disclosure was made October 4. (*Id*. at ⁋ 167.)

because they could not link its losses to the revelation of the underlying fraud.  *Id.*; *Metzler Inv. GMBH*, 540 F.3d at 1063-65. So too here.

Accordingly, Plaintiffs have failed to plead that Mr. Musk's alleged "misstatement[s], **as opposed to some other fact**, foreseeably caused [their] loss." *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1034 (N.D. Cal. 2020) (emphasis added) (*citing Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016)).  Here, the allegations in the FAC show that the stock declined as a result of the **fact** of the dispute with Twitter, subsequent litigation, and surrounding uncertainty concerning the consummation of the deal—not any particular misstatement.  That the stock price rose not on the revelation of any fraud or invalidation of any of Mr. Musk's specific statements, but on the simple fact that Mr. Musk announced his intent to settle suggests that the **dispute itself** caused the market movement.  The FAC has not pleaded that any of the misstatements were the "ultimate reason" for Plaintiffs losses and cannot establish causation.  *Facebook*, 477 F. Supp. at 1034 (granting motion to dismiss where loss was also attributable to other non-fraud events).

Moreover, to the extent that Plaintiffs assert that Mr. Musk's decision to close the Merger revealed his legal positions to be meritless—which it did not—the information necessary to make that assessment was already revealed to the market by Twitter's public statements and lawsuit. (Compl. ⁋ 104, FAC ⁋ 143; Ex. 4-5.)  This purported revelation cannot be the basis of a viable loss causation theory, which requires the disclosure "new" information and not the recharacterization of previously known facts.  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) ("A negative journalistic characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the journalists' opinions."); *Teachers' Ret. Sys. Of LA v. Hunter*, 477 F.3d 162, 187-88 (4th Cir. 2007).

## II.   MR. MUSK'S STATEMENTS REGARDING BREACH AND TERMINATION OF THE MERGER AGREEMENT ARE NOT ACTIONABLE

### A.   All Of The Statements Were Incidental To The Delaware Action And Are Protected From Liability By The *Noerr-Pennington* Doctrine

Even if the FAC did state a 10b-5 claim under the PSLRA's exacting standards—which it did not—the action would still fail because it seeks to convert Mr. Musk's protected petitioning

1   communications about his legal dispute with Twitter and positions in the Delaware Action into

2   securities fraud.  That is not a viable theory as a matter of law and would undoubtedly chill market

3   participants from petitioning the judicial system for redress.

4           Plaintiffs' 10b-5 claim fails because all of the statements at issue are protected petitioning

5   conduct under the First Amendment and cannot give rise to liability pursuant to the *Noerr-*

6   *Pennington* doctrine.  The *Noerr-Pennington* doctrine, which "derives from the Petition Clause of

7   the First Amendment," *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 643-44 (9th Cir. 2009) ,

8   "immunizes petitions directed at any branch of government, including the . . . judicial," *Manistee*

9   *Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000).  Importantly, to give

10  "adequate 'breathing space' to the right of petition," *Sosa*, 437 F.3d at 934 (citation omitted),

11  *Noerr-Pennington*'s protections extend beyond statements made directly to judicial tribunals and

12  are instead imposed broadly to protect conduct that that is "sufficiently related", *id.* at 935, or

13  "incidental" to judicial petitions, *Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 499

14  (1988).  Accordingly, communications made outside of litigation and indeed before litigation is

15  even initiated, like pre-suit demand letters, notices, and related public announcements are

16  immunized from liability. *E.g, Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991,

17  1007 (9th Cir. 2008) ("Conduct incidental to a lawsuit, including a pre-suit demand letter, falls

18  within the protection of the *Noerr–Pennington* doctrine."); *Hard2Find Accessories, Inc. v.*

19  *Amazon.com, Inc.,* 691 F. App'x 406, 407 (9th Cir. 2017) (infringement notice that Apple sent to

20  Amazon is sufficiently related to petitioning conduct); *EcoDisc Tech. AG v. DVD Format/Logo*

21  *Licensing Corp.*, 711 F. Supp. 2d 1074, 1082 (C.D. Cal. 2010) (rejecting argument that public

22  announcements on a website about licenses were not petitioning activity).

23          Here, each of the statements purportedly giving rise to Plaintiffs' 10b-5 claim are

24  "sufficiently related" and "incidental" to Mr. Musk's petitioning conduct in the Delaware Action

25  and are immunized from liability under *Noerr-Pennington*.  The Final Alleged Misstatements, the

26  Termination Notices, which articulated Mr. Musk's legal position and were sent in the lead up to

27  and during the Delaware Action, plainly fall within *Noerr-Pennington*'s protections.  FAC ¶¶ 131-

28  150, Exs. A-C; *Sosa*, 437 F.3d at 934; *Theme Promotions*, 546 F.3d at 1007.  Mr. Musk's public

communications articulating his positions in his legal dispute with Twitter and his rights under the Merger Agreement, including Alleged Misstatements Nos. 1-5 (FAC ¶¶ 111, 115, 120-21, 125, 128-30), were also incidental to the upcoming lawsuit with Twitter and are similarly immunized from liability.  *See EcoDisc Tech. AG*, 711 F. Supp. 2d at 1082 (holding that public website announcements intended to enforce rights were "sufficiently related to petitioning activity to trigger the *Noerr-Pennington* doctrine"); *Aircapital Cablevision, Inc. v. Starlink Commc'ns Grp., Inc.*, 634 F. Supp. 316, 324 (D. Kan. 1986) (holding that "bully-type conduct" in press release discussing pending litigation was "incidental to the lawsuit" and protected by *Noerr-Pennington*) (*cited by Columbia Pictures Indus., Inc. v. Pro. Real Est. Invs., Inc.*, 944 F.2d 1525, 1529 (9th Cir. 1991) for proposition that "where underlying litigation is not a sham, attendant publicity is protected by *Noerr-Pennington* doctrine").  As a result, the FAC should be dismissed.

### B.     Mr. Musk's Participation In The Delaware Action Was Not A Sham

Plaintiffs cannot escape dismissal of their claim through *Noerr-Pennington*'s "narrow" sham litigation exception.  *Zendano v. Basta, Inc.*, 804 F. App'x 803, 804 (9th Cir. 2020) (affirming dismissal of claim under *Noerr-Pennington*).  Plaintiffs cannot avail themselves of this exception because they failed to plead sufficient facts to meet the high bar to show that Mr. Musk's litigation conduct was (1) "objectively baseless," and (2) that the baseless conduct was motivated by a subjective intent to act unlawfully. *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1094 (9th Cir. 2000); *Oregon Nat. Res. Council v. Mohla*, 944 F.2d 531, 533 (9th Cir. 1991) (a "heightened level of protection [is] accorded petitioning activity[,] necessary to avoid a chilling effect on the exercise of this fundamental First Amendment right") (internal citation and quotation marks omitted).

First and foremost, Plaintiffs failed to plead sufficient facts to meet the "threshold prerequisite" showing that Mr. Musk's positions in the Delaware Litigation were "objectively baseless."  *White v. Lee*, 227 F.3d 1214, 1232 (9th Cir. 2000) (citation omitted).  Whether a party's litigation positions were "objectively baseless" is a question of law, *Columbia Pictures*, 944 F.2d at 1532, that requires a showing that "no reasonable litigant could reasonably expect success on the merits" in the underlying action.  *Theme Promotions, Inc.*, 546 F.3d at 1007.

"Conclusory allegations are insufficient" to meet this burden. *Boone v. Redevelopment Agency of City of San Jose*, 841 F.2d 886, 894 (9th Cir. 1988); *Gamble v. Kaiser Found. Health Plan, Inc.*, 348 F. Supp. 3d 1003, 1028 (N.D. Cal. 2018) ("the Ninth Circuit has required a plaintiff seeking to establish the sham exception to *Noerr-Pennington* to plead around the defense with specificity.").

Plaintiffs have failed to meet this burden, as all they have is conclusory allegations with no substance. The FAC simply concludes that Mr. Musk took "frivolous and baseless positions" (FAC ¶ 155) in the Delaware Action but does not plead any specific facts establishing that Mr. Musk's position that Twitter's February 2022 SEC disclosure of its spam level appeared to be materially inaccurate was factually baseless or that Mr. Musk had no legal right to rescind the Merger Agreement as a result of this material breach (which he did, *see* Merger Agreement, §§ 4.6, 7.2, 8.1). The FAC does not plead any facts to establish that Twitter's mDAU calculations were ***not*** overstated and conducts no analysis of the merits of the counterclaims, those stated under contract claim, nor of any of Mr. Musk's similar fraud counterclaims against Twitter. The FAC merely concludes—again without any supporting allegations or citations—that the analyses underlying Mr. Musk's position were "bogus" and "did not support his false claims about his alleged right to terminate the merger." (FAC ¶¶ 158-59.) The FAC also ignores and conducts no analyses of the other grounds Mr. Musk asserted for terminating the Merger. *See* FAC Exs. A-C. That is not enough.

Instead, the FAC concludes that Mr. Musk's positions were "objectively baseless" because he settled the Delaware Action after receiving advice that he was unlikely to prevail at trial. (FAC ¶ 166). But the mere fact that Mr. Musk did not achieve his desired outcome does not—without more—establish that the action was baseless. *Catch Curve, Inc. v. Venali, Inc.*, 2008 WL 11334024, at *3 (C.D. Cal. Nov. 3, 2008) (noting courts should not "engage in post hoc reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation.") (*citing Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 61 n.5 (1993)). And contrary to the FAC's misrepresentation of Mr. Musk's statements to the BBC, he did not admit that he "lacked any legitimate defenses" in the Delaware Action only that he was advised to settle. (*Compare* FAC ¶ 166 *with* Bergjans Ex. 7).

1      Because the FAC has not pled facts that "disprove the challenged lawsuit[s'] legal

2 viability" under prong one, the Court need not even consider its allegations concerning Mr.

3 Musk's subjective "motives" under prong two. *Prof'l Real Estate Invs., Inc.*, 508 U.S. at 60;

4 *White*, 227 F.3d at 1232 (9th Cir. 2000) ("Because, in the present case, the first requirement

5 cannot be sustained, we need not even consider the second"); *Nazir v. United Air Lines*, 2009 WL

6 2912518, at *5 (N.D. Cal. Sept. 9, 2009) (concluding based on judicially noticeable evidence that

7 the conduct was not a sham and declining to reach subjective intent). But in any event, the FAC

8 fails to establish that Mr. Musk was motivated by a subjective intent to act unlawfully. "The

9 hallmark of a [sham] proceedings [is one] aimed at securing, through the very process of litigation,

10 a benefit other than the prayed-for relief." *Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948,

11 958 (S.D. Cal. 1996). Here, the FAC alleges that Mr. Musk's conduct was motivated by a desire

12 to "get out of the Merger," (FAC ¶¶ 153-54), but that was ***precisely*** his prayed-for-relief, (FAC

13 Ex. A-C, Bergjans Ex. 4 at 91 (requesting to rescind the Merger Agreement). The FAC fails

14 simply for this reason alone.

### CONCLUSION

16      For the reasons stated herein, Mr. Musk respectfully requests that the Court dismiss the

17 FAC without leave to amend.

18 DATED: July 10, 2023              QUINN EMANUEL URQUHART &
                                      SULLIVAN, LLP

21                            By _/s/ Michael T. Lifrak_
                               Alex Spiro

22                                Michael T. Lifrak

23                                Joseph C. Sarles
                               Alex Bergjans

24                                *Attorneys for Elon Musk*

1

**CERTIFICATE OF SERVICE**

2    I hereby certify that the foregoing document was served on all counsel of record electronically or

3    by another manner authorized under FED. R. CIV. P. 5(b) on this the 10th day of July 2023.

4
                                        QUINN EMANUEL URQUHART &
5                                       SULLIVAN, LLP

6

7                                   By  _/s/ Alex Bergjans_
                                        _____
8                                       Alex Spiro
                                        Michael T. Lifrak
9                                       Joseph C. Sarles
                                        Alex Bergjans
10

11                                      *Attorneys for Elon Musk*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### ATTESTATION

Pursuant to Civil L.R. 5-1,  I attest under penalty of perjury that concurrence in the filing of this document has been obtained from the other signatory herein.


By /s/ Alex Bergjans
Alex Spiro
Michael T. Lifrak
Joseph C. Sarles
Alex Bergjans

*Attorneys for Defendant Elon Musk*