COTCHETT, PITRE & MCCARTHY, LLP
Joseph W. Cotchett (SBN 36324)
  jcotchett@cpmlegal.com
Mark C. Molumphy (SBN 168009)
  mmolumphy@cpmlegal.com
Tyson C. Redenbarger (SBN 294424)
  tredenbarger@cpmlegal.com
Gia Jung (SBN 340160)
  gjung@cpmlegal.com
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:    (650) 697-6000

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
  fbottini@bottinilaw.com
Albert Y. Chang (SBN 296065)
  achang@bottinilaw.com
Yury A. Kolesnikov (SBN 271173)
  ykolesnikov@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:    (858) 914-2001

*Lead Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| GIUSEPPE PAMPENA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | Case No. 22-cv-5937-CRB<br><br>Class Action<br><br>**Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant Elon Musk's Motion to Dismiss the First Amended Complaint**<br><br>Date:      September 22, 2023<br>Time:      10:00 a.m.<br>Courtroom:  6, 17th Floor<br>Judge:     Honorable Charles R. Breyer |

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF ISSUES TO BE DECIDED ...................................................................... vi

SUMMARY OF ARGUMENT ............................................................................................ vi

STATEMENT OF FACTS .................................................................................................... 1

ARGUMENT ........................................................................................................................ 3

    I.      Plaintiffs Have Sufficiently Alleged a Cause of Action for Securities Fraud ............ 3

            A.     Musk's Statements Were Materially False and Misleading Because They Misrepresented the Terms of the Merger and His True Intent ........................ 3

                      1.     Musk Falsely Claimed That the Merger Was "on Hold," and That He Had Evidence That, Contrary to Twitter's SEC Filings, the Number of Fake/Spam Accounts at Twitter Exceeded 5% ............... 4

                      2.     Musk Falsely Claimed That Twitter Violated the Merger Agreement ..................................................................................... 5

                      3.     Musk Falsely Claimed That He Was Entitled to Due Diligence Under the Merger Agreement ............................................ 6

            B.     Plaintiffs Have Adequately Alleged Materiality ............................................ 9

            C.     Plaintiff Has Adequately Alleged Scienter ..................................................... 12

            D.     Plaintiff Has Adequately Alleged Loss Causation .......................................... 18

    II.     Musk Cannot Escape Liability for Securities Fraud by Hiding Behind the *Noerr-Pennington* Doctrine ...................................................................................... 20

            A.     The *Noerr-Pennigton* Doctrine Does Not Apply to Securities Fraud Claims ............................................................................................................. 20

            B.     Even If the *Noerr-Pennigton* Doctrine Applies, Musk's Conduct Was Not a Government Petition, and Falls Within the Sham Litigation Exception     20

                      1.     Musk's Statements Are Not Protected Petitioning Activity ............... 21

                      2.     This Lawsuit Does Not Burden Musk's Petitioning Rights .................................................................................................. 22

                      3.     Musk's Representations Were Baseless and Fall Within the "Sham Litigation" Exception ...................................................... 23

CONCLUSION ................................................................................................................... 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aircapital Cablevision, Inc. v. Starlink Commc'ns Grp., Inc.*
634 F. Supp. 316 (D. Kan. 1986) ........................................................................................22

*Allied Tube & Conduit Corp. v. Indian Head*
486 U.S. 492 (1988) .................................................................................................21, 22

*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*
794 F. Supp. 1424 (D. Ariz. 1992) .....................................................................................20

*In re Bank of America AIG Disclosure Securities Litigation*
980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) ..........................7

*Basic Inc. v. Levinson*
485 U.S. 224 (1988) .........................................................................................................3

*BE & K Constr. Co. v. NLRB*
536 U.S. 516 (2002) .......................................................................................................21

*Brody v. Transitional Hosps. Corp.*
280 F.3d 997 (9th Cir. 2002) ..................................................................................... *passim*

*Catch Curve, Inc. v. Venali, Inc.*
2008 WL 11334024 (C.D. Cal. Nov. 3, 2008) ......................................................................25

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*
856 F.3d 605 (9th Cir. 2017) .........................................................................................8, 12

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*
690 F.2d 1240 (9th Cir. 1982) ...........................................................................................23

*Columbia Pictures Indus., Inc. v. Pro. Real Est. Invs., Inc.*
944 F.2d 1525 (9th Cir. 1991), *aff'd*, 508 U.S. 49 (1993) ......................................................22

*In re Convergent Tech. Sec. Litig.*
948 F.2d 507, 512 (9th Cir.1991) ........................................................................................8

*In re Credit Suisse First Boston Corp.*
431 F.3d 36 (1st Cir. 2005) .........................................................................................16, 17

*In re Daou Sys., Inc.*
411 F.3d 1006 (9th Cir. 2005) ...........................................................................................18

*Dura Pharmaceuticals, Inc. v. Broudo*
544 U.S. 336 (2005) .......................................................................................................18

*EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*
    711 F. Supp. 2d 1074 (C.D. Cal. 2010) ...............................................................................22, 23

*Evanston Police Pension Fund v. McKesson Corp.*
    411 F. Supp. 3d 580 (N.D. Cal. 2019) ........................................................................ iv, 13, 19

*Glazer Capital Management, L.P. v. Forescourt Technologies, Inc.*
    63 F.4th 747 (9th Cir. 2023) .............................................................................................5, 6, 11

*Gen-Probe, Inc. v. Amoco Corp.*
    926 F. Supp. 948 (S.D. Cal. 1996).........................................................................................25

*Hard2Find Accessories, Inc. v. Amazon.com, Inc.*
    691 F. App'x 406 (9th Cir. 2017) ...........................................................................................22

*Howard v. Everex Sys.*
    228 F.3d 1057 (9th Cir. 2000) ...............................................................................................17

*In re HP Sec. Litig.*
    2013 WL 6185529 (N.D. Cal. Nov. 26, 2013) .............................................................. iv, 5, 6

*In re Intuitive Surgical Sec. Litig.*
    2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) ...........................................................10, 11, 17

*Kearney v. Foley & Lardner, LLP*
    590 F.3d 638 (9th Cir. 2009) ...........................................................................................20, 22

*Kottle v. Nw. Kidney Ctrs.*
    146 F.3d 1056 (9th Cir. 1998) ...............................................................................................21

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*
    416 F.3d 940 (9th Cir. 2005) ...................................................................................................3

*Lloyd v. CVB Fin. Corp.*
    811 F.3d 1200 (9th Cir. 2016) ...................................................................................10, 18, 19

*Loos v. Immersion Corp.*
    762 F.3d 880 (9th Cir. 2014) .................................................................................................18

*Manistee Town Ctr. v. City of Glendale*
    227 F.3d 1090 (9th Cir. 2000) ...............................................................................................21

*Metzler v. Corinthian*
    540 F.3d 1049 (9th Cir. 2008) ...............................................................................................18

*Milkovich v. Lorain Journal Co.*
    497 U.S. 1 (1990)......................................................................................................................21, 22

*Miller v. Thane Intern., Inc.*
    519 F.3d 879 (9th Cir. 2008) ................................................................................................8

*Mineworkers' Pension Scheme v. First Solar Inc.*
    881 F.3d 750 (9th Cir. 2018) ..............................................................................................19

*Nazir v. United Air Lines*
    2009 WL 2912518 (N.D. Cal. Sept. 9, 2009) ....................................................................25

*New Mexico State Inv. Council v. Ernst & Young LLP*
    641 F.3d 1089 (9th Cir. 2012) ............................................................................................13

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*
    575 U.S. 175 (2015)..........................................................................................7, 10, 11, 17

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*
    508 U.S. 49 (1993)........................................................................................................23, 25

*Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*
    745 F.3d 343 (9th Cir. 2014) ..............................................................................................25

*Rosenbaum Capital L.L.C. v. Boston Communs. Group, Inc.*
    445 F. Supp. 2d 170 (D. Mass. 2006) .............................................................................12, 16

*Rubinstein v. Gonzalez*
    241 F. Supp. 3d 841 (N.D. Ill. 2017) ..............................................................................11, 12

*Schueneman v. Arena Pharms.,* Inc.
    840 F.3d 698 (9th Cir. 2016) ...........................................................................................12, 13

*Sosa v. DIRECTV, Inc.*
    437 F.3d 923 (9th Cir. 2006) ......................................................................................20, 21, 23

*In re STEC Inc. Sec. Litig.,*
    2011 WL 2669217 (C.D. Cal., June 17, 2011) ...................................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
    551 U.S. 308 (2007)..............................................................................................................13

*In re Tesla, Inc. Sec. Litig.*
    477 F. Supp. 3d 903 (N.D. Cal. 2020) .................................................................................9

*Theme Promotions, Inc. v. News Am. Mktg. FSI*
    546 F.3d 991 (9th Cir. 2008) ......................................................................................20, 22, 23, 24

*TSC Indus., Inc. v. Northway, Inc.*
    426 U.S. 438 (1976)...............................................................................................................9

*White v. Lee*
    227 F.3d 1214 (9th Cir. 2000) .............................................................................................25

*Zucco Partners, LLC v. Digimarc Corp.*
    552 F.3d 981 (9th Cir. 2009) .......................................................................................................13

**Statutes**

15 U.S.C. §78u-4(b)(2) .......................................................................................................3, 12, 16

**STATEMENT OF ISSUES TO BE DECIDED**

Whether the Court should deny Defendant Elon Musk's Motion to Dismiss the First Amended Complaint ("Motion") because Plaintiffs have pleaded a cause of action for violation of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 by sufficiently alleging falsity, materiality, scienter, and loss causation under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and because the *Noerr-Pennington* doctrine is inapplicable.

**SUMMARY OF ARGUMENT**

The First Amended Complaint ("FAC") adequately alleges that Musk issued false and misleading statements in an attempt to manipulate the price of Twitter, Inc. stock in connection with his $44 billion buyout of Twitter (the "Buyout" or "Merger"). *See* ¶¶19–41.[1] This storied Buyout was extraordinary and unusual. Musk, who personally agreed to buy Twitter after making a "take it or leave it" offer of $54.20 per share and agreeing to an extremely "seller friendly" merger agreement, almost immediately began to denigrate the company he had agreed to buy for $44 billion. Musk did this because the financial markets had turned south and he was threatened with a margin call on his Tesla stock that he planned to use to fund a material portion of the deal. ¶¶4, 84, 26, 106. Musk's false statements about Twitter and the Merger were intended to drive down Twitter's stock price, which he hoped to then use as leverage to coerce Twitter into agreeing to a lower deal price. ¶¶26–27. As the FAC alleges in detail, at every stage of this Buyout, Musk perpetuated false narratives designed to destabilize the Merger and depress the price of Twitter stock.

Musk's false statements can be generally sorted into three categories: (1) false statements that the Merger was on hold and that Musk had evidence that Twitter's spam accounts exceeded 5%; (2) false statements that Twitter violated the Merger Agreement; and (3) false statements that he was entitled to due diligence under the Merger Agreement. *See* ¶¶111–135. Under the Ninth Circuit's recent decision in *Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, a securities-fraud case concerning an impending merger, Musk's false statements are actionable because Plaintiffs have sufficiently alleged falsity, materiality, scienter, and loss causation. *See* 63 F.4th 747, 778–79

---

[1] The allegations in the FAC (Dkt. No. 31) are cited as "¶ __."

(9th Cir. 2023).

Musk's Motion fails to rebut the detailed allegations demonstrating that each of these three categories of statements were false. *See In re HP Sec. Litig.*, 2013 WL 6185529, at *9 (N.D. Cal. Nov. 26, 2013) (Breyer, J.) (defendants' statements regarding an acquisition were false because they failed to disclose material facts known to defendants). And Musk's argument that his statements were immaterial is frivolous. The FAC alleges in great detail how Musk's numerous false statements each caused a large drop in Twitter's stock price, and how Twitter's stock subsequently skyrocketed 22% in one day when the truth was revealed on October 4, 2022, clearly demonstrating loss causation. ¶168; *see also Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 604–05 (N.D. Cal. 2019) (Breyer, J.) (finding that plaintiff sufficiently pleaded loss causation).

Likewise, Musk's arguments concerning scienter are unavailing, because the FAC alleges in great detail that Musk did not believe his own statements at the time he made them. *See* ¶¶152–166. As the Ninth Circuit held in *Glazer*, Musk's scienter is sufficiently pleaded because the FAC alleges in detail how Musk's conduct was inconsistent with his statements, and that he had the substantial and specific motive and opportunity to lie. *See Glazer*, 63 F.4th at 779–80 (finding scienter and rejecting defendant's self-serving assertion that "the original merger agreement was binding"). As demonstrated in the FAC (*see*, *e.g.*, ¶¶159, 166), Musk abandoned his bogus legal arguments in the Delaware litigation through a complete capitulation by agreeing to pay the full Merger price of $54.20 per share—an unusual move for Musk, a seasoned litigant with a reputed appetite for litigation risks.

Finally, Musk's argument concerning the *Noerr-Pennington* doctrine is inapplicable in this case. The *Noerr-Pennington* doctrine does not protect fraudulent conduct, nor was Musk's conduct "petitioning activity." And even if the doctrine were appliable here, it does not protect Musk's conduct because his arguments were so baseless that they fall within the sham litigation exception.

Accordingly, the Court should deny Musk's motion to dismiss the FAC.

**STATEMENT OF FACTS**

On April 13, 2022, Musk made an offer to buy Twitter at $54.20 per share. ¶76. On April 21, 2022, Musk filed an Amended Schedule 13D which confirmed that he had waived due diligence and that his acquisition proposal was no longer subject to the completion of financing or business due diligence. ¶82.

On April 25, 2022, Twitter agreed to be acquired by Musk, in a transaction valued at approximately $44 billion. ¶85. However, soon thereafter, the stock market declined and Tesla stock, which Musk had pledged as collateral, began to decline. ¶25. Musk was therefore at risk of a margin call or a requirement to put up more cash. ¶26. Faced with these significant risks, which amounted to billions of dollars, Musk proceeded to make false statements, send misleading tweets, and engage in conduct designed to create unfounded uncertainty and drive Twitter's stock down. ¶26. Musk did this to create leverage to either back out of the purchase or renegotiate the Buyout price. ¶26.

For example, on May 13, 2022, Musk tweeted a statement that the Buyout was "***temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users***." ¶111. This statement was false as there was no legal or factual basis to put the deal on hold. ¶112. In response to this Tweet, Twitter's stock price dropped substantially, falling 9.67% from the previous day's close of $45.08, on an extraordinarily high volume of 101.62 million shares to close at $40.72. On the next trading day, the stock declined another 8.18%, resulting in a combined decline of 17.85% over two trading days. ¶113.

On May 16, 2022, to create further doubt about the Merger, Musk baselessly stated that ***fake and spam accounts make up at least 20% of Twitter's users***. ¶120. The statements caused Twitter's stock to decline 8.18% to close at $37.39 on volume of 52.2 million shares. ¶124. On May 17, 2022, Musk tweeted that ***the actual number of fake accounts at Twitter could be*** "***much higher***" ***than 20% and that the deal*** "***cannot go forward***." ¶125. The same day, Twitter caused Musk's tweet to be filed with the SEC on Schedule 14A as a supplemental proxy solicitation. That filing stated that "X Holdings I, Inc., X Holdings II, Inc. and Elon Musk, the filing persons hereunder, may also be deemed to be participants in the solicitation of proxies from Twitter's stockholders in connection with the Transaction." ¶126. The same day (May 17, 2022), Musk invited the SEC to investigate Twitter.

¶127.

On May 21, 2022, Musk stated, "*I'm worried that Twitter has a disincentive to reduce spam*" and that "*they* [*Twitter*] *still refuse to explain how they calculate that 5% of daily users are fake/spam! Very suspicious.*" ¶130. Twitter's stock declined by 6.67%, closing at $35.76. ¶131.

During this time, Musk made repeated statements that he was entitled to "firehose data" and other information from Twitter, and that the deal could not go forward until he received and was satisfied with such data. Musk's demand for Twitter's "firehose" data and other information was a ruse. Musk was not entitled to the information under the Merger Agreement and Musk was simply making false statements in an effort to create unfounded uncertainty about the Merger that he hoped he could use to either negotiate a reduction in the Merger price or back out of the deal. ¶138.

On July 8, 2022, Musk issued a statement that he was terminating the Merger. ¶140. In his announcement, Musk falsely, and baselessly, stated that Twitter had breached several provisions of the Merger Agreement, that "*Twitter has not complied with its contractual obligations*," and that *the information* "*is necessary to consummate the transactions contemplated by the Merger Agreement because it is needed to ensure Twitter's satisfaction of the conditions to closing.*" ¶140.[2] The letter caused Twitter's stock to drop 11.3% from $38.79 on July 7, 2022, to $32.65 on Monday, July 11, 2022, on an unusually heavy volume of over 67 million shares traded. ¶142.

On July 12, 2022, Twitter sued Musk in Delaware Chancery Court, seeking specific performance. ¶143. On August 29, 2022 and September 9, 2022, Musk sent two more termination letters to Twitter that contained false statements. ¶¶144, 147.[3] The August 29, 2022 letter represented that "Allegations regarding certain facts, known to Twitter prior to and as of July 8, 2022, but undisclosed to the Musk Parties prior to and at that time, have since come to light that provide additional and distinct bases to terminate the Merger Agreement." ¶144 & FAC Ex. B. The letter stated that Twitter had breached Sections 4.5, 4.6, 4.8, 4.11, 4.14, and 7.2 of the Merger Agreement.

---

[2] Musk's letter also falsely asserted that "Twitter is in breach of the Merger Agreement because the Merger Agreement appears to contain materially inaccurate representations … Musk has reason to believe that *the true number of false or spam accounts on Twitter's platform is substantially higher than the amount of less than 5% represented by Twitter in its SEC filings*." ¶140 & Ex. A.

[3] Paragraphs 144 and 145 of the FAC contains a typographic error: the second termination letter was dated August 29, not July 29. *See* FAC, Ex. B (letter containing correct August 29th date).

¶145.

On September 13, 2022, Twitter's stockholders met and approved the Buyout. ¶150. On October 4, 2022, two weeks before the Delaware trial was set to begin, Musk shocked the market by announcing that he intended to go through with the Merger at the initial price of $54.20. ¶151.

On April 12, 2023, in an interview with the BBC, Musk admitted that he made false statements about the Merger to drive Twitter's stock down because he did not want to pay the price he had agreed to (¶10) and that he agreed to complete the Buyout at the full $54.20 price to avoid the trial in Delaware because he knew he was going to lose. ¶166.

## ARGUMENT

### I.    Plaintiffs Have Sufficiently Alleged a Cause of Action for Securities Fraud

#### A.    Musk's Statements Were Materially False and Misleading Because They Misrepresented the Terms of the Merger and His True Intent

To prevail on a § 10(b) claim, a plaintiff must show that the defendant made a statement that was "misleading as to a material fact." *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). A statement is misleading if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). A misrepresentation "is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

Musk's several statements were all false and misleading because they misrepresented that the number of spam or fake accounts at Twitter exceeded 5% and that the Merger was "on hold," falsely asserted that Twitter had breached multiple specific provisions of the Merger Agreement and that Musk was entitled to due diligence, and failed to disclose Musk's intent to try to use the false statements to renegotiate the deal at a lower price. ¶149. However, the Merger was not conditioned on due diligence nor the number of fake accounts at Twitter—the Buyout was only conditioned on the approval of Twitter's shareholders at a shareholder meeting, regulatory approval, and closing of the Buyout by October 24, 2022. ¶21. It was also untrue that Twitter had breached the Merger Agreement. ¶145.

Musk also failed to disclose that he sought to undermine the deal in order to enable him to renegotiate the price. ¶10. A reasonable investor who <u>sold</u> during the months when Musk was claiming the deal was "on hold" and "terminated" would have acted differently had they known that Twitter had not breached any deal terms, that Musk had no evidence that the number of spam/fake accounts exceeded 5%, that Musk had no right to due diligence, and that Musk still intended to go through with the Merger, just "not at that price." ¶171 (quoting Musk from his interview with BBC in April 2023). Therefore, Musk's statements, as explained below, were all false and misleading.

> **1.      Musk Falsely Claimed That the Merger Was "on Hold," and That He Had Evidence That, Contrary to Twitter's SEC Filings, the Number of Fake/Spam Accounts at Twitter Exceeded 5%**

Musk issued several statements falsely claiming on the first day of the Class Period (May 13, 2022) that the deal was "on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users." ¶¶111, 113–114. This statement caused Twitter stock to decline by 17.85%. ¶113. Similar statements were made several more times. *See e.g.*, ¶124 ("this deal cannot move forward"). However, Musk did not have the contractual right to place the Merger "on hold" and Twitter had not agreed to do so. ¶¶29, 112, 145. Musk himself highlighted the speed of the deal and his waiver of normal buyer conditions in his April 24, 2022 letter to Twitter's board that described the Merger Agreement as "seller-friendly" and not contingent on the board's recommendation nor on due diligence. ¶84. The Buyout was only conditioned on the approval of Twitter's shareholders at a shareholder meeting, regulatory approval, and closing of the Buyout by October 24, 2022. ¶21.

Musk later made additional false statements, claiming that he actually had evidence demonstrating that Twitter's SEC filings were false and that the number of fake accounts exceeded 5%. On May 16, 2022, Musk stated that fake and spam accounts made up at least 20% of Twitter's users. ¶¶12–23. These statements caused Twitter stock to decline by over 8%. ¶124. On May 17, 2022, Musk stated that the actual number of fake accounts at Twitter could be "much higher" than 20% and that the deal "cannot go forward." ¶125. The same day, Musk invited the SEC to investigate Twitter. ¶127. On May 21, 2022, Musk stated, "I'm worried that Twitter has a disincentive to reduce spam, as it reduces perceived daily users." When asked whether Twitter explained the bots number

discrepancy, he added: "No, they still refuse to explain how they calculate that 5% of daily users are fake/spam! Very suspicious." ¶130.  Over May 23 — 24, 2022, Twitter's stock declined by 6.67%, closing at $35.76.  ¶131.  On July 8, 2022, Musk stated in his first termination letter that "Twitter is in breach of the Merger Agreement because the Merger Agreement appears to contain materially inaccurate representations … ***Musk has reason to believe that the true number of false or spam accounts on Twitter's platform is substantially higher than the amount of less than 5% represented by Twitter in its SEC filings*.**" ¶140 & Ex. A.  The letter caused Twitter stock to drop 11.3%. ¶142.

These statements were all false.  Musk did not have the right to put the deal on hold, Twitter had not agreed to do so, and Musk did not have any evidence that the number of fake/spam accounts at Twitter was greater than 5%.  ¶34; s*ee HP*, WL 6185529, at *9 (a defendant who chooses to speak on a subject must disclose the whole truth and not conceal material information).

For the same reasons that the Ninth Circuit upheld merger-related statements in *Glazer,* Musk's false statements are actionable.  In *Glazer*, shareholders asserted fraud claims against Forescourt Technologies, Inc. and its officers for falsely assuring the public that Forescourt's impending merger with Advent International, Inc., was expected to close on time, while defendants knew that Advent was reconsidering the merger.  *Glazer*, 63 F.4th at 746.  The district court found that the statement "'[w]e look forward to completing our pending transaction with Advent'" (*id*. at 763) did not create an affirmative impression that the merger would close.  *Id*. at 778.  The Ninth Circuit reversed, finding defendants' statement to be false because, before making that statement, they learned Avent "was considering not closing the merger." *Id*. at 779.  The same logic applies here, with even more force. Musk bought Twitter personally and knew that he did not have any evidence that Twitter's spam accounts exceeded 5%, and that he had no right to due diligence or to terminate the Merger.  His statements to the contrary were thus false.

### 2.    Musk Falsely Claimed That Twitter Violated the Merger Agreement

Musk affirmatively represented in three letters, dated July 8, 2022, August 29, 2022, and September 9, 2022, that Twitter had materially breached the Merger Agreement.  FAC Exs. A–C; ¶¶140–42, 144–49.  The August 29, 2022 letter asserted additional alleged breaches by Twitter: "Allegations regarding certain facts, known to Twitter prior to and as of July 8, 2022, but undisclosed

to the Musk Parties prior to and at that time, have since come to light that provide additional and distinct bases to terminate the Merger Agreement." FAC Ex. B. The letter stated that Twitter had breached Sections 4.5, 4.6, 4.8, 4.11, 4.14, and 7.2 of the Merger Agreement because its financial statements were false and because Twitter had refused to provide Musk with requested information. ¶145. These statements were false.

First, Twitter's SEC filings were not false. ¶149. Second, under the Merger Agreement, Twitter was only obligated to share information for a "very specific purpose: facilitating the closing of the transaction while simultaneously protecting Twitter from damage, including competitive harm should the transaction not close." ¶137. Thus, Musk's statement claiming Twitter was in breach for failing to provide information relating to bots and spam accounts was false. ¶125 ("My offer was based on Twitter's SEC filings being accurate. Yesterday, Twitter's CEO publicly refused to show proof of <5%. The deal cannot move forward until he does."); ¶140 ("Twitter is in breach"); ¶144 (same); ¶147 (same). Just like the statements in *Glazer* and *HP*, Musk's statements regarding Twitter's purported breach were false. *See Glazer*, 63 F.4th at 746; *HP*, WL 6185529 at *9.

Musk does not address the falsity of his claims that Twitter violated the Merger Agreement. Instead, Musk generally cites the Merger Agreement without analysis or context and points to an argument made in Delaware. *See* Motion at 7. That is insufficient. Simply put, the FAC adequately alleges that Twitter did not breach the Merger Agreement and that Musk's claims to that effect were false. In fact, Twitter's Delaware lawsuit (which concerned whether Twitter had breached any of its obligations) was 100% successful and Musk ultimately paid the full Buyout amount without any price reduction. ¶¶158–159.

### 3. Musk Falsely Claimed That He Was Entitled to Due Diligence Under the Merger Agreement

Musk was not entitled to due diligence under the Merger Agreement ***because he waived it***. *See* ¶¶88, 112. However, Musk's Tweets and statements falsely assert otherwise. ¶111 ("on hold pending details supporting calculation"); ¶125 ("offer based on Twitter's SEC filings being accurate"); ¶140 ("provide … Musk and his advisors all data and information that [he] requests"); ¶147 ("Merger Agreement was properly terminated"). Additionally, Musk was not entitled to demand spam or

"firehose" data, yet his Tweets and statements falsely claimed he was. ¶130 ("they [Twitter] still refuse to explain how they calculate … spam!"); ¶123 (information about bots "fundamental to the financial health of Twitter"); ¶140 (Data "necessary to consummate the transaction"). Accordingly, Musk's statements that the deal was somehow in jeopardy because of a lack of information, or the existence of bots, were false as he had no valid basis to terminate the Merger based on due diligence. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015) (statement would be misleading to a reasonable person reading it "fairly and in context," *i.e.*, "in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information.").

Musk claims that, because his "purported waiver … was already made public," he cannot be held liable. Motion at 12, n.7. That argument fails. Liability attaches when a statement "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006. That is the precise situation here. Musk falsely created not only the impression that he was entitled to due diligence but that he had the right to terminate the Merger because Twitter's SEC filings were false and that the actual number of fake/spam accounts was 20% or more. ¶¶120, 125, 130, 140. Thus, because Musk's false statements went far beyond claiming he had a right to due diligence, the public disclosure that he had waived due diligence cannot immunize the broader and more damaging statements.

On this point, Musk mistakenly cites *In re Bank of America AIG Disclosure Securities Litigation* to support his argument. 980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014). However, that case involved a purported omission (incomplete disclosure) without any alleged false statement, and involved a situation where the alleged omission "was not materially different from the information that was publicly disclosed." *Id at 576.* Conversely, Musk was ***making false claims*** about the Merger, including that he had evidence that the number of fake accounts on Twitter was as high as 20% or more. Reasonable investors would—and did—understand Musk's statements as representations that he had some right to data or to cancel the Merger agreement thereto, which he did not. ¶139 (merger agreement clearly d[id] not give Musk the right to "unfettered access to vast amounts of proprietary and competitively sensitive data to conduct," "Musk insisted on a rapid negotiation of a merger agreement on a take it or leave it price basis." And "due diligence … was

knowingly waived."). Therefore, Musk's *false* statements were contrary to what was in the public domain, and he can be held liable for creating an impression of a state of affairs that differs in a material way from the one that actually existed. *Brody*, 280 F.3d at 1006.

Musk's other attacks on the sufficiency of Plaintiffs' falsity allegations are unavailing. In his Motion, Musk relies heavily on the assertion that his statements were not literally false. *See, e.g.*, Motion at 12 (claiming deal was actually "temporarily on hold"). But this is not correct, as Twitter disputed that the Merger was on hold and that the number of fake accounts exceeded 5%. ¶¶4, 149. Further, the statements, even if they had been true, are actionable because they were highly misleading. "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *Miller v. Thane Intern., Inc.* 519 F.3d 879, 886 (9th Cir. 2008) (quoting *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir.1991)). Musk's statements, when considered in context, failed to accurately represent the truth about the Merger and omitted Musk's true intent to jeopardize and renegotiate the Buyout.

Additionally, Plaintiffs' allegations are not conclusory or unsupported, as Musk claims. The FAC includes detailed factual allegations that clearly and plainly outline Musk's fraud, including the fact that "Musk eventually admitted he had made statements about terminating the Merger *because he didn't want to pay the $44 billion he had agreed to*." ¶10 (emphasis added), *see also* ¶¶29, 39, 108, 138, 171. Had Musk actually told the truth, *Musk would have indicated that he did not believe Twitter had breached the Merger Agreement*, *that he had no evidence that fake accounts exceeded 5%, that he intended to go through with the Merger*, *and that he was only seeking to renegotiate the Merger price*. None of those facts were disclosed.

Musk cites *City of Dearborn Heights* for the proposition that Plaintiffs fail to show that he did not subjectively believe his opinions, but that case is distinguishable. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,* 856 F.3d 605, 618 (9th Cir. 2017); Motion at 15–16. In *Dearborn*, the plaintiffs failed to plead that the statements at issue "were knowingly false or misleading when made." *Id*. Here, Plaintiffs clearly allege that Musk knew that his Tweets were false

and misleading.  ¶¶10, 29, 39, 108, 138, 171.

Indeed, this is not the first time that Musk's Tweets have misled investors in an attempt to manipulate stock prices.  In 2018, Musk acted to mislead investors in order to hurt short-sellers of Tesla's stock. *See In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 909 (N.D. Cal. 2020).  Specifically, Musk falsely tweeted that Tesla had "secured" funding to go private at $420 per share, which caused the stock to go up, thus harming the short-sellers. *Id.* at 933.  The *Tesla* court denied Musk's motion to dismiss, finding that the funding was not, as Musk had claimed, secured; therefore, Musk's Tweets and statements when read in ***context***, were materially misleading because they "would mislead a reasonable investor." *Id*. at 916, 922.

Finally, Musk argues that he had no duty to disclose his true motives.  Not so.  When Musk, as the buyer of the company, decided to make public statements about that deal, he "had a duty to do so in a way that would not mislead investors…in context, the statements could have been reasonably interpreted to misrepresent the nature" of the circumstances. *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *7 (C.D. Cal., June 17, 2011) (citations omitted).  As shown by how substantially Twitter's stock declined in response to Musk's statements, investors understood Musk's statements as material.  ¶174.  In sum, Musk's statements are each false and misleading, and together, "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006.  Therefore, the Court should deny the Motion.

**B.      Plaintiffs Have Adequately Alleged Materiality**

Musk's contention that Plaintiffs have not adequately alleged materiality is unavailing. Materiality is not subject to any heightened pleadings standard and merely requires an allegation that the false statement or omission "would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Indus., Inc. v. Northway, Inc*., 426 U.S. 438, 449 (1976).  Motion at 16. Musk baselessly argues that "the FAC fails to allege how any purportedly false statements, as opposed to actual events of the well-publicized dispute over the Merger … 'significantly altered the total mix of information' available to investors."  Motion at 16.

Musk's contention is patently false.  It was not some event unrelated to Musk's statements that caused Twitter's stock to tank.  It was Musk's statements that falsely declared that the Merger was

"on hold" and terminated and that Twitter had breached the merger agreement, that caused Twitter's stock to decline materially.  The FAC plainly alleges the direct causation and materiality of Musk's false statements to the total mix of information available to investors and then to the immediate substantial drop in Twitter's stock price.  *See*, *e.g.*, ¶¶8–10; *see also* ¶¶30, 39, 113, 124, 129, 131–133, 142, 146 (detailing decline in Twitter stock after each of Musk's false statements).

The FAC also alleges that:

> Musk's statements were highly material because he was the buyer and thus the person responsible for paying the Merger consideration.  In addition, Delaware courts rarely award specific performance.  Thus, if a buyer states that the merger is "on hold" or "terminated," rational stockholders logically infer a high degree of risk that a merger may not go forward at all, or at least at the original merger price.

¶39.  Musk cannot now claim that he was lying but that no one should have believed him.  He was the buyer and rational investors reasonably sold Twitter's stock after Musk claimed that the deal was terminated and that he had legitimate legal grounds for the termination.  It was Musk's false statements that materially affected the total mix of information available to investors, not anything Twitter or some random analyst or market participant said.  *See*, *e.g.*, *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (finding materiality); *Brody*, 280 F.3d at 1006.

Additionally, Musk's false statements about the buyout were material and are actionable because the FAC alleges that Musk did not actually believe his statements.  ¶¶163–64.  In *Omnicare*, the Supreme Court instructed that opinion statements can serve as the basis of a securities fraud claim under two circumstances.  The first is when the speaker did not "actually hold the stated belief." *Omnicare*, 135 S.Ct. at 1326.  The second is when the opinion statement omitted a material fact that rendered it "misleading to an ordinary investor," even if it was "literally accurate."  *Id.* at 1327–28.

In *In re Intuitive Surgical Sec. Litig.*, 2017 WL 4355072 (N.D. Cal. Sept. 29, 2017), Judge Davila held that the defendants' "opinion statements regarding da Vinci's safety and efficacy" were material under *Omincare*'s second prong "because they omitted numerous material facts." *Id.* at *3. The court held that "it is plausible that a reasonable investor would find that the statements of opinion regarding da Vinci's safety and efficacy did not 'fairly align[]' with the unreported and misclassified MDRs." *Id.*

Here, Musk's statement that the Merger was "on hold" was not a statement of opinion but was

a statement of fact and was false because the Merger was not in fact on hold. ¶149; *see also Glazer*, 63 F.4th at 779 (finding that defendant's statement that "[w]e look forward to completing our pending [merger]" is material and actionable). With respect to Musk's termination letters and statements that Twitter had allegedly breached the Merger Agreement, they asserted false facts, not opinions. *See, e.g.*, ¶140 (Musk stated that the number of fake accounts "is substantially higher than the amount of less than 5% represented by Twitter in the SEC filings"). To the extent any of his statements represented opinions, they are actionable under both prongs of *Omnicare*—prong one is satisfied because the FAC alleges Musk did not believe he had any legally justifiable reasons to terminate the Merger. *See* ¶149.

Prong two is also satisfied because Musk's statements failed to disclose additional material facts necessary to prevent his statements from being misleading, namely the fact that (1) Musk was not entitled to due diligence under the Merger Agreement and had in fact waived due diligence; (2) Musk was well aware of the problem of bots and spam on Twitter's platform and had vowed to eliminate the bots after the acquired Twitter; (3) there were no legally justifiable reasons for Musk to terminate the Merger; (4) Musk's statements about Twitter and its business were false and lacked evidentiary support; (5) Twitter was not in violation of any provisions of the Merger Agreement; (6) Musk had no right to place the Merger "on hold" and the Merger was not, in fact, on hold because Twitter had not agreed to do so; (7) Twitter had not failed to provide Musk with any information that he was entitled to under the Merger Agreement; (8) Musk was issuing false statements and unjustified terminations of the Merger in order to drive Twitter's stock price down so that Musk could attempt to negotiate a reduction in the Merger price and/or pressure Twitter to agree to terminate the Merger; (9) there was no "material adverse effect"; (10) Musk was trying to manipulate and delay the Merger in the hope that the price of Tesla stock would rebound before he had to sell more of it to fund the Merger price. ¶149. Similar to the statements involved in *Intuitive Surgical*, "it is plausible that a reasonable investor would find that the statements of opinion regarding [the Merger being "on hold" and terminated in a supposedly legally justifiable manner] did not 'fairly align[]' with the [actual facts and terms of the merger agreement]." 2017 U.S. Dist. WL 4355072, at *3.

Moreover, Musk's contention that his statements about the Merger and potential litigation over

the Merger are not actionable is incorrect. In *Rubinstein v. Gonzalez*, 241 F. Supp. 3d 841 (N.D. Ill. 2017), the court upheld the actionability of a CEO's statements about a $54 billion merger in a thank-you letter to employees of the target company stating that he was "more energized than ever about our two companies coming together" and "more confident than ever about the potential of our combined organizations," and that "[w]e have a very busy few months ahead as we work on integration planning." *Id.* at 852. If false statements affirming the intent to consummate a $54 billion "inversion" merger are actionable due to the speaker's reckless disregard of risks related to the tax benefits of the inversion, so too are the sole buyer's statements in a $44 billion merger falsely claiming that the Merger is "on hold," "terminated," and falsely claiming that Twitter breached the Merger Agreement.

In *Rosenbaum Capital L.L.C. v. Boston Communs. Group, Inc.*, 445 F. Supp. 2d 170 (D. Mass. 2006), the court found the allegedly false statements regarding litigation to be sufficiently material, rejecting the defendants' contention that the statements were too vague and involved only opinions. The plaintiff there alleged that the defendant had falsely stated its belief (1) that it did not infringe patents; (2) that it had a meritorious defense; and (3) that the other company's patents were invalid. The court held that such statements could form the basis for liability, stating "[a] company's own assessment regarding the outcome of litigation in which it is involved would certainly 'alter the total mix of information' for a reasonable investor and is not merely a 'rosy affirmation.'" *Id.* at 176. The court also held that "[a]ssuming, as alleged, that Boston Communications' statements of belief were knowingly false when made, they are inaccurate by definition." *Id.* The same is true here. Musk's statements painted a false impression of the Merger and his rights under the agreement. Moreover, the statements, to the extent that any involved a "forward-looking statement," are not immunized by the safe-harbor doctrine because Musk's statements were not accompanied by any meaningful cautionary language. *Id.* at 176-77.

C.      **Plaintiff Has Adequately Alleged Scienter**

The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required statement of mind." 15 U.S.C. §78u-4(b)(2). "A defendant is liable under Section 10(b) and Rule 10b-5 when he acts with scienter, a 'mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness.'" *City of Dearborn*

*Heights, supra* 856 F.3d at 619 (quoting *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)). "Deliberate recklessness is 'an extreme departure from the standards of ordinary care … which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'" *Schueneman*, 840 F.3d at 705 (italics in original). In ruling on a motion to dismiss, the inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007) (italics in original). "A securities fraud complaint will survive a motion to dismiss under Rule 12(b)(6) 'if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2012) (quoting *Tellabs*, 551 U.S. at 324).

Here, Musk's scienter is alleged with great particularity. Musk cannot deny that he had actual knowledge of all facts about the Merger because ***he bought Twitter personally***, and thus was the only person with knowledge about all the facts of the Buyout. ¶152. This is obviously a highly unusual fact, since most buyouts are accomplished by corporations where decision-making is dispersed among many executives and directors. Thus, Plaintiffs do not need to avail themselves of the "group pleading" doctrine sometimes utilized in alleging scienter. There was no group here; it was Musk and Musk alone. *See*, *e.g.*, *Evanston Police Pension Fund*, 411 F. Supp. 3d at 601 ("[F]alsity may itself be indicative of scienter where it is combined with allegations regarding a management's role in the company that are particular and suggest that the defendant had actual access to the disputed information, and where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.") (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009)). As this Court held in *Evanston Police Pension*, the "core operations" theory of scienter applies here because, in connection with events underlying the FAC, the Merger is the sole business for Musk and X Corp., and X Corp was formed solely for the Merger (*see* ¶20, n.3). *See id.* (applying the "core operations" theory to the underlying action due to the significance of the events to the company's revenues).

Musk's motion to dismiss largely ignores the FAC's detailed scienter allegations and argues

in a conclusory fashion that Plaintiffs have not sufficiently alleged that Musk knew his statements were false. *See* Motion at 18. Not so. First, as demonstrated *supra* with respect to the issue of materiality, the FAC contains detailed allegations demonstrating that Musk did not believe his statements were true, and that he failed to disclose facts necessary to prevent his affirmative statements from misleading investors. *See, e.g.*, ¶149. The FAC also adds detailed allegations derived from evidence in the Delaware litigation, demonstrating that Musk's legal and factual positions in the Delaware case were totally baseless and unsupported by any facts or evidence. *See* ¶155 (Musk knew that his claims—that he was entitled to terminate the Merger, or that he was entitled to due diligence about bots—were baseless.)

Musk's knowledge that his positions and statements were false is reflected by the fact that he abandoned his arguments. For example, in May 2022, before Musk terminated the Merger Agreement, he demanded information pursuant to Section 6.4 of the Merger Agreement concerning Twitter's methods of calculating monetizable daily active usage or users ("mDAU").[4] ¶156. In response, Twitter provided its "firehose" data—*i.e.*, a live feed of data concerning public accounts on Twitter's platform. *Id.* Musk then provided Twitter's firehose data to what Musk called his "Data Scientists," who conducted a "preliminary analysis" of that data. *Id.* Based in part on that preliminary analysis, Musk terminated the Merger Agreement on July 8, 2022. ¶157. Twitter filed suit, and Musk responded with counterclaims that expressly reference analyses performed by the Data Scientists (with the preliminary analysis, the "Analyses") at least eight times. *Id.* Musk then advanced a variety of positions to attempt to shield his Data Scientists' information, including the Analyses, from discovery. Musk's knowledge that his positions and statements were false is reflected by the fact that he abandoned those positions after Twitter filed a motion to compel on August 15, 2022, which sought the production of the Analyses performed by his Data Scientists. ¶157. Yet Musk continued his attempts to avoid producing the Analyses to Twitter by maintaining that the Data Scientists' information was insulated from discovery by the non-testifying expert protection and the work product

---

[4] Section 6.4 of the Merger Agreement granted Musk the right to information from Twitter (subject to certain conditions, restrictions, and exceptions) "for any reasonable business purpose related to the consummation of the transactions contemplated by this [Merger] Agreement." As Twitter pointed out, this is not the same as due diligence. ¶139.

doctrine. *Id.*

In a detailed opinion dated August 25, 2022, Chancellor McCormick granted Twitter's motion to compel and rejected Musk's efforts to shield his bogus Data Scientists' Analyses. ¶158. Chancellor McCormick noted that the Analyses were not privileged because Musk "relied on the Data Scientists' preliminary analysis to justify making additional information requests and later terminating the Merger Agreement." *Id*. Musk was thereafter forced to produce the Analyses, which did not support his false claims about his alleged right to terminate the Merger, forcing Musk to completely capitulate to Twitter and settle the Delaware litigation by agreeing to pay the full Merger price of $54.20 per share. ¶159.

Musk's scienter is also reflected in his conduct in refusing to make a fulsome production of documents in the Delaware litigation and in the conduct of others who acted in concert with Musk to thwart legitimate discovery requests. ¶160. In one discovery opinion, Chancellor McCormick noted that David Sacks was one of four individuals identified by Elon Musk as persons with whom he privately communicated about the Twitter transaction, and that Sacks' response to a subpoena in the case included Tweeting a virtual middle-finger at Twitter's lawyers and posting a video of a man urinating on a subpoena while yelling expletives to a cheering crowd. ¶161.

Musk's scienter is also suggested by his failure to act in good faith with respect to arranging financing for the Buyout. ¶162. Musk had an obligation under the Merger Agreement to arrange all necessary financing. But after he began making his false statements about the Merger, he all but abandoned efforts to secure such financing. *Id*. Initially, Musk designated Bob Swan, the former CEO of Intel, to spearhead the financing efforts. But Musk unexpectedly dismissed Swan in June 2022 and then failed to appoint anyone to replace Swan. *Id.* Had Musk genuinely believed his false statements, then he would have taken steps to ensure his compliance with the Merger Agreement. ¶163. Musk's compliance with the terms of the Merger Agreement was important to him because, while he could terminate the Merger and pay a $1 billion termination fee to Twitter if he was in compliance with his obligations, the Merger Agreement provided that Musk "shall not have the right to terminate this Agreement pursuant to this Section 8.1(d)(i) if Parent, Acquisition Sub or the Equity Investor is then in material breach of any of its representations, warranties, covenants or agreements hereunder." ¶163.

Because the merger agreement had an unusual "specific performance" clause, Musk was on the hook for the entire $44 billion merger consideration if he materially breached any of his obligations. ¶165. As such, he had a very strong incentive to comply with his obligations so that his "worst case" scenario would be a $1 billion loss rather than having to pay $44 billion. *Id*. Thus, Musk's failure to replace Swan was unusual and inconsistent with what a rational, non-fraudulent actor would have done.

These particularized facts are more than sufficient to allege that Musk acted with scienter because he did not genuinely believe his statements at the time he made them. *See, e.g.*, *In re Credit Suisse First Boston Corp*., 431 F.3d 36, 48 (1st Cir. 2005) ("[I]f a plaintiff adequately pleads that a statement of opinion was subjectively false when made, the complaint will, ex proprio vigure,' satisfy the pleading requirements of the PSLRA relative to scienter."); *Rosenbaum Capital L.L.C. v. Boston Comms. Grp., Inc*., 445 F. Supp. 2d 170 (D. Mass. 2006) (defendant's false statements about patent litigation were made with scienter because complaint alleged facts showing defendant did not believe statements). In *Rosenbaum*, the defendant had "hired experts to draft a variation of its c2c system, with additional unnecessary components, merely so that it would appear to be different from Freedom [Wireless's] now patented system." *Id*. at 175. Here, the FAC alleges that Musk falsely claimed that he had evidence performed by his "Data Scientists" that supported his position—however, the falsity of this claim is demonstrated by the fact that Musk tried to shield this supposed evidence from discovery in the Delaware litigation and then suddenly and unexpectedly decided to capitulate in Delaware after the judge issued an order which would have forced him to turn over the supposed Data Scientists' evidence.  ¶¶157–159.

Similarly, in *Glazer*, the Ninth Circuit found sufficient allegations of scienter where defendants made statements assuring shareholders that the merger between the company (Forescourt) and a private equity firm (Advent) would be closed on time. 63 F.4th at 779–80. There, the plaintiff alleged that, prior to making the statement, defendants were told that Advent was reconsidering the merger. *Id*. at 779. To refute a finding of scienter, defendants argued that "they were confident that the transaction was binding, as evidenced by Forescourt's seeking specific performance of the merger in [the] Delaware Court [of Chancery]." *Id*. at 780. Rejecting this argument, the Ninth Circuit reasoned that the terms of the underlying merger agreement, even if they were favorable to defendants' position,

were "not relevant," because:

> The issue is whether Defendants knew that Advent was reconsidering the original merger agreement—it was Advent's reconsideration of the merger, not whether such reconsideration was proper, that rendered the May 11 statement misleading to shareholders.

*Id*. at 80.  The Ninth Circuit also rejected defendants' self-serving assertion that "they did not believe that Advent was seriously reconsidering the merger." *Id*.  Just like in *Glazer*, the issue here is whether Musk himself knew that he lacked any legal basis to conduct due diligence or put the Merger "on hold."  Plaintiffs have alleged ample facts demonstrating that he did.  *See*, *e.g*., ¶¶ 149, 155–163.

The FAC also alleges that Musk had the motive and opportunity to commit the fraud.  ¶153.  Musk found himself in a precarious financial position after he agreed to buy Twitter.  The large decline in Tesla stock post-signing put Musk in a bind, as a result of which he had a strong motive to attempt at all costs to get out of the Merger, renegotiate the price, or delay it in the hope that that market would rebound before he was forced to sell large amounts of his most prized asset—his Tesla stock—to pay for the Merger.  ¶153.  Allegations of "motive and opportunity" have been held to be sufficient to allege scienter when combined, as here, with detailed factual allegations demonstrating an individual defendants' knowledge or reckless disregard of the true facts.  *See Howard v. Everex Sys*., 228 F.3d 1057, 1063–64 (9th Cir. 2000).

In light of all these fact-specific allegations, Musk cannot prevail on the scienter requirement through his self-serving statement that he allegedly genuinely believed his false statements.  This kind of argument was rejected by both the U.S. Supreme Court in *Omnicare* and by Judge Davila in *Intuitive Surgical*.  As Judge Davila noted:

> Defendants contend that the obvious, nonculpable explanation for Defendants' statements is that Defendants honestly believed in their opinion that the da Vinci was safe and effective.  The Supreme Court in *Omnicare*, however, rejected this argument.  In *Omnicare*, the defendant argued that "as long as an opinion is sincerely held," it "cannot mislead as to any matter, regardless what related facts the speaker has omitted." *Omnicare*, 135 S. Ct. at 1328.  Although finding more than a "kernel of truth" in Omnicare's argument,  the Court ultimately concluded that "literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another." *Id.* at 1330.  In the present case, Plaintiffs have alleged that Defendants said 'one thing' regarding the safety and efficacy of da Vinci, and "held back" several "particular and material facts going to the basis" of Defendants' opinion statements, whose omission makes the opinion statements misleading to a reasonable investor.

2017 U.S. Dist. WL 4355072, at *4 (internal ellipses omitted).

**D.    Plaintiff Has Adequately Alleged Loss Causation**

Loss causation is the "causal connection between the material misrepresentation and the [economic] loss" faced by the plaintiff. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005). A complaint must give the defendant "notice" of this causal connection; in other words, "the complaint must allege that the defendant's share price fell significantly after the truth became known." *Metzler v. Corinthian*, 540 F.3d 1049, 1062 (9th Cir. 2008) (internal citations omitted). The misrepresentation need not be the "sole" reason for the decline as long as it is a "substantial cause," and the allegations, "if assumed true, are sufficient" to indicate a causal relationship between the company's "financial misstatements" and "the drop in [its] stock price." *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1025-26 (9th Cir. 2005).

"At the pleading stage, however, the plaintiff need only allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity," rather than other factors. *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014). The ultimate question is "whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd*, 811 F.3d at 1210.

Here, loss causation is more than adequately alleged by the FAC's allegation of a "corrective disclosure" on October 4, 2022, when Musk announced an abrupt about-face less than two weeks before the October 17, 2022 trial in the Delaware Chancery action was set to begin. ¶167. Forced to face the lack of merit of his baseless contention that Twitter had breached multiple provisions of the Merger Agreement and that there had allegedly been a material adverse effect, Musk essentially acknowledged that he had been bluffing all along. Musk capitulated and announced he would honor the Merger Agreement on the original terms and at the original $54.20 price. *Id*. In response, Twitter's stock immediately jumped by over 15% before trading in the stock was halted by the New York Stock Exchange. When trading resumed later in the day, the stock increased another 7%, eventually closing up over 22% in one day. ¶168.

Subsequent news articles revealed that Musk had, in fact, been using his false statements about Twitter's alleged breaches of the Merger Agreement to try to negotiate a lower price for the Merger.

¶169. For example, when Twitter rejected Musk's requests to lower the deal price and called his bluff, "Musk caught Twitter off guard by sending its lawyers a two-sentence letter proposing to move forward on the original terms." *Id.* In an interview with BBC in April 2023, Musk eventually admitted he had made statements about terminating the Merger because he didn't want to pay the $44 billion he had agreed to. ¶171. Therefore, his statements that the Merger was terminated were false, misleading, and failed to disclose that Musk simply wanted to renegotiate a lower Merger price. ¶171.

These well-plead facts are sufficient to plead loss causation. *See*, *e.g.*, *Evanston Police Pension Fund*, 411 F. Supp. 3d at 603–05 (loss causation adequately pled by alleging corrective disclosure of missed earnings combined with governmental investigation). Here, the corrective disclosure was not only Musk's shocking about-face statement that he would go through with the deal on the original terms, but the simultaneous disclosure that he was completely capitulating in the Delaware litigation despite his prior representations that Twitter had breached the Merger Agreement, made false statements, and that Musk had evidence from "Data Scientists" to prove it. And all this from an individual who had in the past refused to settle cases (*e.g.*, Tesla/SolarCity merger and Tesla securities fraud lawsuit). ¶166.

Indeed, "in an interview with the BBC on April 12, 2023, Musk admitted that he agreed to go through with the Buyout at the full $54.20 price in order to avoid a trial in Delaware because he knew he was going to lose." ¶166. Musk's admission that he lacked any legitimate defenses demonstrates his knowledge and scienter of the falsity of his statements at the time they were made. *Id.* This satisfies loss causation. *See Lloyd*, 811 F.3d at 1210–11 (loss causation is a "context-dependent inquiry"; to be corrective, the disclosure need not precisely mirror the earlier misrepresentation and need only relate back to the misrepresentation); *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (loss causation "requires no more than the familiar test for proximate cause").

///

**II.    Musk Cannot Escape Liability for Securities Fraud by Hiding Behind the *Noerr-Pennington* Doctrine**

**A.    The *Noerr-Pennigton* Doctrine Does Not Apply to Securities Fraud Claims**

Securities fraud is not—and cannot be—immunized by the *Noerr-Pennington* doctrine:

> The federal securities laws, for example, are predicated upon openness and truthfulness in the sale of securities.  Similarly, regulation of the nation's financial institutions are predicated at least in part upon the integrity of professionals who issue opinions with respect to those institutions.  A rule of law which excused misrepresentations when it is the truth of the information which is fundamentally at issue would undermine the fabric of both systems.  Whatever the ultimate breadth of *Noerr–Pennington*, it is not a shield for fraud.

*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp. 1424, 1448 (D. Ariz. 1992).

Here, Plaintiffs are asserting securities-fraud claims under the Exchange Act.  ¶186.  Plaintiff alleges that Musk's statements were false and misrepresented the truth about the Merger.  ¶188.  The *Noerr-Pennington* doctrine is not applicable in such situations and certainly "is not a shield for fraud." *Am. Cont'l Corp*, 794 F. Supp. at 1448.  To find otherwise would undermine securities laws as defendants would simply claim any false statement was made in anticipation of, or in connection with, litigation.  The Court should reject Musk's absurd arguments that his conduct was "protected"—as he fails to cite a single ***securities*** case where the *Noerr-Pennington* doctrine was applied.

**B.    Even If the *Noerr-Pennigton* Doctrine Applies, Musk's Conduct Was Not a Government Petition, and Falls Within the Sham Litigation Exception**

The *Noerr-Pennington* doctrine initially emerged in the antitrust context.  *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 644 (9th Cir. 2009).  Under the doctrine, some conduct may be immune to statutory liability when that conduct involves ***petitioning the government*** for redress.  *Sosa v. DIRECTV, Inc*., 437 F.3d 923, 929 (9th Cir. 2006) (emphasis added).  Examples of conduct that may be immune under *Noerr-Pennington* include communications made to a court during a lawsuit, *e.g.*, filing "[a] complaint, an answer, a counterclaim and other assorted documents and pleadings, in which plaintiffs or defendants make representations and present arguments to support their request that the court do or not do something."  *Id.* at 933 (citation omitted).  Conduct related to a lawsuit, including a pre-suit demand letter, may also fall within the protection of the *Noerr-Pennington* doctrine. *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008).

The Supreme Court adopted a three-part test to determine whether conduct is immunized: (1) decide whether the alleged activities constitute protected petitioning activity, (2) identify whether the lawsuit imposes a burden on petitioning rights, and (3) analyze whether the statutes at issue may be construed to preclude that burden on the protected petitioning activity. *See BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 530–33, 535–37 (2002). A "sham" exception to the doctrine developed to prevent the immunization of conduct that used governmental process "as an anticompetitive weapon." *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998).

### 1.     Musk's Statements Are Not Protected Petitioning Activity

The First Amendment does not shield fraud or misrepresentation. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990) ("There is no constitutional value in false statements of fact.") *quoting Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974). In contrast to fraud, protected petitioning activity includes truthful "petitions directed at any branch of government, including the executive, legislative, judicial and administrative agencies." *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1092 (9th Cir. 2000). To give "adequate breathing space to the right of petition," *Noerr-Pennington* also protects conduct that is "incidental to a valid effort to influence governmental action." *Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 499 (1988).

Here, Musk's false statements are not protected because they are false and because they were not directed to the government. Nor was Musk seeking government action. Musk's statements purporting to terminate the Merger were made to the public, or Twitter, or both. For example, Musk's statements on May 13, 2022 that the "deal was temporality on hold" (¶28), and later on July 8, 2022 that he was terminating the deal (¶140), were public statements and did not contemplate nor seek any government action. *Id*. In fact, at the time those statements were made there was no litigation nor any threat of litigation. And Musk never filed a lawsuit—thus he cannot claim any of his actions related to his own **petition to the government** for redress. *Sosa*, 437 F.3d at 935.

Musk argues that statements made after July 12, 2022 (when Twitter's Delaware action was filed) are protected. However, Musk's statements after that date continued to be false and, like his earlier statements, are not protected activity. ¶149; *Milkovich*, 497 U.S. at 12. Moreover, as explained below, Musk's litigation positions were so baseless that the sham exception applies to his conduct.

The cases cited by Musk are distinguishable and inapplicable on a motion to dismiss as they either involved active litigation, clear threats of litigation, the conduct involved antitrust claims, or decisions on summary judgment. Specifically, *EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.,* is distinguishable as the defendant in that case sent demand letters and then filed litigation when licensees failed to adequately respond. 711 F. Supp. 2d 1074, 1082 (C.D. Cal. 2010). *EcoDisc* did not involve securities fraud claims—instead asserting antitrust violations, false advertising, and related contractual claims. *Id.* None of those circumstances are present here. In this case, Musk did not threaten litigation, nor did he ever bring litigation; instead, Musk issued false statements about a publicly traded stock, which influenced the market. *Theme Promotions, Inc. v. News Am. Mktg. FSI*, also involved letters threatening litigation. 546 F.3d 991, 1008 (9th Cir. 2008). Here, Musk's Tweets cannot be understood as threatening litigation—he was issuing false statements to escape or renegotiate his deal. *See* ¶4. In *Hard2Find Accessories, Inc. v. Amazon.com, Inc*., unlike this case, the conduct involved an infringement notice and there were no securities or fraud-based claims. 691 F. App'x 406, 407 (9th Cir. 2017). *See also, Allied Tube & Conduit Corp. v. Indian Head, Inc*., 486 U.S. 492, 495 (1988) (*Noerr* immunity did not apply in antitrust case where there was no government action at issue); *Aircapital Cablevision, Inc. v. Starlink Commc'ns Grp., Inc*., 634 F. Supp. 316, 323 (D. Kan. 1986) (court in antitrust case, at summary judgment, found that incidental publicity about an *ongoing* litigation was protected); *Columbia Pictures Indus., Inc. v. Pro. Real Est. Invs., Inc*., 944 F.2d 1525, 1527–28 (9th Cir. 1991), *aff'd*, 508 U.S. 49 (1993) (ruling on motion for summary judgment).

### 2. This Lawsuit Does Not Burden Musk's Petitioning Rights

The question at this stage is whether the success of the lawsuit would constitute a burden on petitioning rights. *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 645 (9th Cir. 2009).

Here, Musk was not petitioning the government, he was making false statements on a social media platform about the Merger he agreed to. Holding Musk liable for his false statements, which manipulated the market for Twitter's stock and harmed shareholders, does not burden his petitioning rights because he was never petitioning the government. As to the statements Musk made after Twitter sued him in Delaware, those statements fall within the sham exception given that Musk's positions were so baseless.

### 3.    Musk's Representations Were Baseless and Fall Within the "Sham Litigation" Exception

"*Noerr–Pennington* immunity is not a shield for petitioning conduct that, although 'ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor.'" *Sosa*, 437 F.3d at 938 (quoting *Noerr*, 365 U.S. at 144). Accordingly, conduct otherwise protected by the *Noerr– Pennington* doctrine may nevertheless be restricted by law if it falls within the "sham litigation" exception. *See Theme Promotions, Inc*., 546 F.3d at 1007.

In *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., In*c., the Supreme Court established a two-part test for determining whether the sham litigation exception applies. 508 U.S. 49, 60–61 (1993). To establish the conduct was a "sham," the court considers (1) whether the statements were objectively baseless in the sense that the defendant could not have reasonably expected to prevail in litigation and (2) defendant's subjective motivation was to interfere with business relationships. *See id.* The second question, whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships, looks to whether defendant's conduct attempts to use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon. *Theme Promotions, Inc*, 546 F.3d 1007. On a motion to dismiss, the Court need not conclude whether the conduct was a sham. It must decide only whether Plaintiff has properly pleaded that the conduct was a sham. *EcoDisc Tech. AG*, 711 F. Supp. 2d at 1083; *see also Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.,* 690 F.2d 1240, 1253–54 (9th Cir. 1982) (noting that whether the sham exception to the *Noerr–Pennington* doctrine applies is a question of fact and dismissal is not appropriate where the facts are disputed).

Here, even if the Court finds that Musk's statements constituted a petition of the government for redress (which they were not), Musk's basis for termination was a sham. Musk knew he was not entitled to due diligence, but claimed he was. ¶¶29, 82. Additionally, Musk's claim for why diligence was needed—the existence of bots—was false as Musk had known all along that bots existed on Twitter, and he even pledged to fix the issue when he announced the Merger. ¶¶22, 23. Experts agreed his position was baseless. ¶34. Musk's entire position in Delaware was that a breach had occurred

and that his "Data Scientists" had evidence, but Musk then refused to produce this "evidence" and then completely capitulated after Chancellor McCormick issued a ruling requiring Musk to turn over the data. ¶¶155-161.

The FAC also adequately alleges that Musk could not have reasonably expected to prevail in litigation. ¶140, 149. For example, Musk's baseless position is evidenced by the fact that he shifted arguments in August of 2022 and claimed he could terminate the deal because of a whistleblower complaint concerning misconduct at Twitter. ¶144. However, that claim did not supplement Musk's original argument for termination, but rather asserted a totally separate reasoning, which further establishes that Musk's "bot account" argument was baseless, and that Musk was making any statement he could to get out of the deal or renegotiate the price. ¶145.

Additionally, the fact that Musk capitulated in the Delaware trial and agreed to *the original terms of the Merger* proves this very point. ¶167. Musk even admitted on April 12, 2023, that "he agreed to go through with the Buyout at the full $54.20 price in order to avoid a trial in Delaware because he knew he was going to lose." ¶166. Contrary to Musk's assertion, these are not conclusory statements. The FAC includes numerous detailed facts that establish that Musk's position was baseless. *See* ¶21 (Musk waived due diligence and was aware of the bot problem); ¶82 ("acquisition proposal was no longer subject to the completion of financing and business due diligence"); ¶112 ("nothing in the Buyout contract that allowed Musk to put the deal "temporarily on hold.""); ¶139 ("Musk insisted on a rapid negotiation of a merger agreement on a take it or leave it price basis. Section 6.4 and 6.11 provide limited rights, not a vehicle to conduct the due diligence that was knowingly waived."). At this stage of the case, these are sufficient allegations to establish that Musk's conduct (which was not petitioning conduct in the first place) was objectively baseless and therefore a sham.

The FAC also alleges sufficient facts to satisfy the second part of the test—that Musk's subjective motivation was to interfere with a contractual relationship and to abuse the litigation process. *Theme Promotions, Inc*, 546 F.3d 1007. Specifically, the FAC adequately alleges that Musk was motivated by the decrease in the value of his Tesla stock and overall market decline, which explains why he sought to interfere with his obligation to pay Twitter shareholders $54.20 per share. ¶¶25, 26, 102–106. A jury could easily conclude that Musk knew he could not terminate the Merger

(Musk waived due diligence and was aware of the bot issue), and therefore his assertions about bot information and breaches were baseless.  Additionally, Musk's ultimate decision to avoid the Delaware trial by paying the original price—coupled with his admission that he was going to lose the trial—shows that Musk was hoping to terminate the Merger by creating doubt rather than through actual litigation. *See Rock River Commc'ns, Inc. v. Universal Music Grp., Inc*., 745 F.3d 343, 353 (9th Cir. 2014) (court found a reasonable jury could therefore conclude that UMG, which was hoping to enforce its claim to exclusive licensing rights through the *threat* of litigation rather than through actual litigation, was attempting to achieve its aim through the litigation *process* rather than through the *result* of that process, satisfying the second criterion for the sham exception.)

The cases cited by Musk are not relevant here, either because they involve motions for summary judgment or involve distinctly different factual issues, incomparable to the situation here. *See Catch Curve, Inc. v. Venali, Inc.*, 2008 WL 11334024, at *1 (C.D. Cal. Nov. 3, 2008) (motion for partial summary judgment); *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc*., 508 U.S. 49, 52 (1993) (cross-motions for summary judgment); *White v. Lee*, 227 F.3d 1214, 1220 (9th Cir. 2000)(motion for summary judgment); *Gen-Probe, Inc. v. Amoco Corp*., 926 F. Supp. 948, 959 (S.D. Cal. 1996) (lawsuits at issue had survived motions for summary judgment and thus were not baseless); *Nazir v. United Air Lines*,  2009 WL 2912518, at *4 (N.D. Cal. Sept. 9, 2009) (the court ruled based on evidence admitted by *judicial notice*, that plaintiff claims were based on defendant's successful conduct in separate state and bankruptcy court proceedings).

Here, Musk's conduct is not protected because it was false, he was not petitioning the government, and even if he was, his positions were so baseless that they qualify as sham litigation. Therefore, the Court should reject Musk's arguments concerning the *Noerr-Pennington* doctrine.

### CONCLUSION

For the reasons stated above, Defendant Musk's Motion to Dismiss should be denied.

Dated:  August 9, 2023                                   Respectfully submitted,

                                                                          COTCHETT, PITRE & MCCARTHY, LLP

                                                                          *s/ Tyson C. Redenbarger*
                                                                          Tyson C. Redenbarger

Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
Tyson C. Redenbarger (SBN 294424)
Gia Jung (SBN 340160)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:   (650) 697-6000
Email:          jcotchett@cpmlegal.com
                    mmolumphy@cpmlegal.com
                    tredenbarger@cpmlegal.com
                    gjung@cpmlegal.com

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Yury A. Kolesnikov (SBN 271173)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:   (858) 914-2001
Email:          fbottini@bottinilaw.com
                    achang@bottinilaw.com
                    ykolesnikov@bottinilaw.com

*Lead Counsel for Plaintiffs*

Case No. 22-cv-5937-CRB
Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss