United States District Court<br>Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUISEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>  Plaintiff,<br><br>  v.<br><br>ELON R. MUSK,<br>  Defendant. | Case No. 22-cv-05937-CRB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** |

Lead Plaintiffs Steve Garrett, Nancy Price, John Garrett, and Brian Belgrave ("Plaintiffs") bring this securities class action against Defendant Elon Musk ("Defendant") on behalf of all persons and entities who sold Twitter, Inc. ("Twitter") stock from May 13, 2022 to October 4, 2022 (the "Class Period"). Plaintiffs argue that Defendant violated Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, by making multiple misstatements to artificially depress the price of Twitter stock and to pressure Twitter to lower the price Defendant would have to pay to acquire it.

Defendant moves to dismiss Plaintiffs' complaint with prejudice for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). In addition, Defendant argues that each of the alleged misstatements are immunized from liability under the Noerr-Pennington doctrine. Because Plaintiffs plausibly allege their Section 10(b) claim as to the May 13 tweet that the deal was "temporarily on hold," the May 16 statement that fake and spam accounts make up at least 20% of Twitter's users, and the May 17 tweet, and for the additional reasons stated below, the Court DENIES Defendant's motion to dismiss Plaintiffs' claims to the extent they are predicated on those statements. Because Plaintiffs fail to plausibly allege that the remaining statements are false or misleading, the

Court GRANTS, with LEAVE TO AMEND, Defendant's motion with respect to those statements.

## I.    BACKGROUND

### A.    Factual History

On April 25, 2022, Twitter entered into an agreement (the "Merger Agreement") to be acquired by an entity wholly-owned by Defendant for $54.20 per share, resulting in a total transaction value of approximately $44 billion.  First Am. Compl. ("FAC") (dkt. 31) ¶ 85.  Below, the Court summarizes: (1) the events leading to the Merger Agreement between Defendant and Twitter; (2) Defendant's financing for the deal; and (3) the alleged misstatements Defendant made during the Class Period.

### 1.    Events Leading to the Merger Agreement

On March 26, 2022, Defendant had a call with Jack Dorsey, the founder of Twitter, about the future direction of social media.  Id. ¶ 45.  That same day, Defendant contacted one of Twitter's directors to discuss the potential for Defendant to join the Twitter Board.[1] Id. ¶ 46.  After multiple discussions and internal Twitter meetings, Defendant and Twitter issued a joint announcement that Twitter had appointed Defendant to the Twitter Board. Id. ¶ 71.  However, before Defendant's appointment became effective, Defendant notified the chairman of the Board and Twitter's Chief Executive Officer that he would not be joining the Board—and would instead be making an offer to take Twitter private.  Id. ¶ 74. On April 13, 2022, Defendant delivered to Twitter's chairman a non-binding proposal to acquire Twitter, reproduced below.  Id. ¶ 76.

> *Bret Taylor*
> *Chairman of the Board,*

---

[1] During that discussion, Defendant also mentioned that he recently purchased more than five percent of Twitter's common stock.  Id. ¶ 46.  Plaintiffs allege that Defendant engaged in "market manipulation" by accumulating stock from the day he became a 5% stockholder, March 14, 2022, to the day he publicly disclosed his ownership on April 4, 2022, because it allowed him to buy the stock at an artificially low price.  Id. ¶ 65.  This activity is the subject of an SEC investigation, see SEC v. Musk, No. 3:23-mc-80253 (N.D. Cal October 5, 2023), as well as another class action lawsuit, see Rasella v. Musk, No. 1:22-cv-03026 (S.D.N.Y. 2022).  But because Plaintiffs do not allege that this activity caused them losses during the Class Period, the Court does not discuss the issue further.

*I invested in Twitter as I believe in its potential to be the platform for free speech around the globe, and I believe free speech is a societal imperative for a functioning democracy.*

*However, since making my investment I now realize the company will neither thrive nor serve this societal imperative in its current form. Twitter needs to be transformed as a private company.*

*As a result, I am offering to buy 100% of Twitter for $54.20 per share in cash, a 54% premium over the day before I began investing in Twitter and a 38% premium over the day before my investment was publicly announced. My offer is my best and final offer and if it is not accepted, I would need to reconsider my position as a shareholder.*

*Twitter has extraordinary potential. I will unlock it.*

*/s/ Elon Musk*
*Elon Musk*

The next day, Twitter's board responded defensively to Defendant's takeover attempt by adopting a "poison pill."[2]  In response, Defendant appeared to threaten a hostile takeover in a series of tweets, including a tweet that said "Love me tender."[3]  Id. ¶¶ 78–79. Defendant then submitted an amended Schedule 13D filing in which he stated that he was "exploring whether to commence a tender offer" and that he had secured commitment letters from a group of lenders.[4]  Id. ¶ 81.  The amendment indicated that Defendant's offer to acquire Twitter was no longer conditioned on financing or subject to due diligence, as it

---

[2]  A "poison pill" is a provision in a company's charter or bylaws that is typically used to thwart a hostile takeover—a type of business acquisition in which an acquiring entity takes control of a target company against the wishes of the target company board, usually by buying shares directly from the target company's shareholders.  When "triggered," the poison pill gives shareholders the right to buy additional shares at a highly discounted price, thus diluting the shares and making it significantly more difficult for the investor who triggered the provision to buy a controlling number of shares (because the person who triggered the provision is excluded from the discount). In this case, the poison pill provision would have been triggered had Defendant acquired more than 15% of Twitter stock.  See id. ¶ 79.

[3]  The tweet appeared to reference Defendant's threat to launch a hostile tender offer.  See id.  A tender offer is a solicitation by a third party to purchase a substantial portion of a company's securities for a certain price.

[4]  Any person who acquires beneficial ownership of more than 5% of registered securities must report that acquisition within ten business days by filing a Schedule 13D with the SEC.  See 17 C.F.R. § 240.13d-1.  The Schedule 13D must be amended to report any material change in the information provided, including acquisition of 1% or more of additional shares, as well as any change in an investor's reason for accumulating shares.  See id.

United States District Court
Northern District of California

originally was when it was delivered to Twitter on April 13.  Id. ¶ 82.  Specifically, the filing stated: "At the time of delivery [April 13], the Proposal was also subject to the completion of financing and business due diligence, but it is no longer subject to financing as a result of the [Defendant's] receipt of the financing commitments described below and is no longer subject to business due diligence."  Id.  The next day, Defendant tweeted: "If our twitter bid succeeds, we will defeat the spam bots or die trying!"  Id. ¶ 78.

On April 23, 2022, Defendant reiterated to Twitter that the offer was his "best and final."  Id. ¶ 84.  The next day, Defendant sent Twitter what he called a more "seller friendly" merger agreement.  Id.  Finally, on April 25, 2022, Twitter entered into the Merger Agreement.  Id. ¶ 85.  Twitter and Defendant filed a joint press release announcing the purchase, which contained a quote from Defendant promising to "make Twitter better" by "defeating the spam bots."  Id.

### 2.    Defendant's Financing for the Merger

When the Merger Agreement was announced on April 25, 2022, Defendant's financing for the deal consisted of: (1) $21 billion in equity financing, and (2) $25.5 in debt financing.  Id. ¶ 90.  With respect to the equity financing, Defendant was expected to sell about 20 million shares of Tesla,[5] valued at about $1,000 per share.  Id. ¶ 91. Defendant did sell roughly $8.5 billion of Tesla shares in the three days after the announcement of the deal, but he stopped when the price of Tesla shares began to decline—Tesla's stock declined from about $1,000 at the time the deal closed, April 25, 2022, to $635.07 on May 20, 2022.  Id. ¶¶ 92–93, 134.

The debt financing of the deal was established by: (i) a debt commitment letter from Morgan Stanley and other financial institutions to provide $13 billion in financing through a $6.5 billion senior secured term loan facility, a $500 million senior secured revolving facility, a $3 billion senior secured bridge loan facility, and a $3 billion senior unsecured bridge loan facility; and (ii) a separate debt commitment letter from Morgan Stanley and

---

[5]  Defendant is the Chief Executive Officer of electric-vehicle maker Tesla, Inc.

United States District Court
Northern District of California

certain other financial institutions in which they committed to provide Defendant with $12.5 billion in margin loans.[6]  Id. ¶ 94.  Defendant later allowed the $12.5 billion in margin loan commitments to expire, allegedly due to the decrease in Tesla's stock price, and increased the pledged equity financing from $21 billion to $33.5 billion.  Id. ¶ 106.

Initially, Defendant designated Bob Swan, the former CEO of Intel, to lead Defendant's financing efforts.  Id. ¶ 162.  However, Defendant dismissed Swan in June 2022 and did not appoint anyone to replace him.  Id.

### 3.   Alleged Misstatements During Class Period

In the weeks after the Merger Agreement was entered into, Defendant posted several tweets about the deal.  These tweets, which Plaintiffs claim are material misstatements, are at the center at this suit.

### a.   May 13, 2022 Tweets

On May 13, 2022, at 5:44 a.m. EST, Defendant tweeted that the Twitter deal was "temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users."   Id. ¶ 111.



United States District Court
Northern District of California

---

[6] A margin loan is a loan that allows someone to borrow against the value of the securities they hold.

United States District Court
Northern District of California

A few hours later, at 7:50 a.m. EST, Musk tweeted that he was "[s]till committed to [the] acquisition." Mot. to Dismiss (dkt. 34) at 6; Bergjans Decl. (dkt. 34) Ex. 3.

By the close of the market, Twitter stock had declined 9.67% from the previous day's close of $45.08, closing at $40.72. Id. Later in the evening—at 10:47 p.m. EST—Defendant tweeted that his team would do a "random sample" of 100 followers of Twitter to find out whether spam and fake accounts did in fact make up less than 5% of users, and "invite[d] others to repeat the same process." Id. ¶ 113.



In response to a question about why he was using a sample of 100 users, Defendant replied roughly an hour later, at 10:39 p.m. EST, that he picked 100 as the sample size "because that is what Twitter uses to calculate <5% fake/spam/duplicate." Id. ¶ 114.



**b.    May 14, 2022 Tweet**

6

On May 14, 2022, Defendant tweeted that he received a call from Twitter's lawyers advising him that he had violated the terms of their Non-Disclosure Agreement ("NDA"). <u>Id.</u> ¶ 115.



### c.   May 16, 2022 Statement and Tweets

On May 16, 2022, during the "All In Summit" tech conference in Miami, Defendant stated that fake and spam accounts make up at least 20% of Twitter's users.  <u>Id.</u> ¶ 120. Twitter's CEO tweeted, in response, that Twitter did not believe that Defendant's estimations could be "performed externally" by an outside party, because private data is necessary to make the calculation.  <u>Id.</u> ¶ 121.



Defendant responded with a tweet of a poop emoji.  <u>Id.</u> ¶ 122.  Later in the day, at 1:17 p.m. EST, Defendant responded to the CEO's tweet, asking how advertisers know what they're getting for their money, and stating that information about the number of fake accounts was "fundamental to the financial health of Twitter."  <u>Id.</u> ¶ 123.



Twitter stock declined 8.18% on this day, May 16, 2022, from $40.72 on the prior trading day, May 13, 2022, to $37.39.  Id. ¶ 124.

### d.    May 17, 2022 Tweet

On May 17, 2022, Defendant tweeted that the actual number of fake accounts at Twitter "could be *much* higher" than 20%, and that the deal could not go forward until the Twitter CEO showed proof that fake/spam accounts accounted for less than 5% of Twitter accounts.  Id. ¶ 125.



### e.    May 21, 2022 Tweets

On May 21, 2022, Defendant replied "Absolutely" to a Twitter user who tweeted

that "[i]f 25% of the users are bots then the Twitter acquisition deal should cost 25% less." Id. ¶ 128.  That same day, Defendant stated: "I'm worried that Twitter has a disincentive to reduce spam, as it reduces perceived daily users." Id. ¶ 130.  Defendant then tweeted, when asked whether Twitter had responded to him about the bots-number discrepancy: "No, they still refuse to explain how they calculate that 5% of daily users are fake/spam! Very suspicious." Id.

Over the next two trading days following Saturday, May 21, 2022—May 23 and May 24—Twitter's stock declined by 6.67%, closing at $35.76.  Id. ¶ 131.

### f.    Letters to Twitter and Notices of Termination

On May 25, 2022, Defendant's attorney sent a letter to Twitter which described Defendant's "request[] that Twitter apply more rigorous computer-aided and third-party testing to determine the prevalence of fake or spam accounts on its platform with greater certainty." Id. ¶ 135.  On May 31, 2022, Defendant's attorney sent another letter which stated that while Defendant "appreciates the company's latest efforts to further explain its own testing methodologies for spam and fake accounts . . . those explanations did not change [Defendant's] view that those methodologies are inadequate." Id. ¶ 136.

On June 1, 2022, Twitter's attorneys responded that Defendant's requests went "well beyond the bounds of what the parties agreed to under the merger agreement." Id. ¶ 137.  Twitter's attorneys sent another letter reiterating this point a few weeks later; the letter cited to Section 6.4 of the Merger Agreement, noting that it required Twitter to provide only "reasonable access" to information for any "reasonable business purpose related to the consummation of the transactions," as well as Section 6.11, which "contains limitations protecting the Company." Id. ¶ 139.  The letter further stated: "As you know, Parent and [Defendant] insisted on a rapid negotiation of a merger agreement on a take it or leave it price basis.  Section 6.4 and 6.11 provide limited rights, not a vehicle to conduct the due diligence that was knowingly waived." Id.

On July 8, 2022, Defendant stated, in a letter to Twitter that was publicly filed with the SEC, that he was exercising his right to terminate the Merger Agreement and abandon

United States District Court
Northern District of California

the transaction pursuant to Section 8.1(d)(i) of the Agreement.  Id.  ¶ 140.  The letter read:

> For nearly two months, [Defendant] has sought the data and information necessary to "make an independent assessment of the prevalence of fake or spam accounts on Twitter's platform" (our letter to you dated May 25, 2022 (the "May 25 Letter")). This information is fundamental to Twitter's business and financial performance and is necessary to consummate the transactions contemplated by the Merger Agreement because it is needed to ensure Twitter's satisfaction of the conditions to closing, to facilitate [Defendant's] financing and financial planning for the transaction, and to engage in transition planning for the business. Twitter has failed or refused to provide this information. Sometimes Twitter has ignored [Defendant's] requests, sometimes it has rejected them for reasons that appear to be unjustified, and sometimes it has claimed to comply while giving [Defendant] incomplete or unusable information.
> . . .
> In addition to the foregoing, Twitter is in breach of the Merger Agreement because the Merger Agreement appears to contain materially inaccurate representations. . . Twitter's representation in the Merger Agreement regarding the accuracy of its SEC disclosures relating to false and spam accounts may have also caused, or is reasonably likely to result in, a Company Material Adverse Effect, which may form an additional basis for terminating the Merger Agreement.

Id.

In the letter, Defendant also refuted Twitter's characterization of Sections 6.4 and 6.11 of the Merger Agreement.  Id. Ex. A at 4.  Defendant claimed that he was entitled, under Section 6.4 of the Merger Agreement to "all information concerning the business . . . of the Company . . . for any reasonable business purpose related to the consummation of the transactions" and under Section 6.11 of the Merger Agreement, to information "'reasonably requested' in connection with his efforts to secure the debt financing necessary to consummate the transaction."  Id.

Defendant sent the letter after the market closed on Friday, July 8, 2022.  Id. ¶ 142.  Twitter's stock price fell 11.3% from $38.79 on Thursday, July 7, 2022, to $32.65 on Monday, July 11, 2022,.  Id. ¶ 142.  The next day, Twitter sued Defendant in Delaware Chancery Court over his termination of the deal (the "Delaware Action"), seeking specific performance.  Id. ¶ 143.

On August 29, 2022, Defendant sent a second termination letter to Twitter.  Id. Ex. B.  The letter pointed to a Washington Post whistleblower report that alleged "far-reaching misconduct at Twitter" as evidence that Twitter breached the Merger Agreement, "thereby giving the [Defendant] Parties the right to terminate the Merger Agreement." Id. ¶ 144.

On September 9, 2022, Defendant sent a third termination letter to Twitter.  Id.  ¶ 147.  The letter noted that although the two prior letters provided independent justifications for the termination of the Merger Agreement, "[i]n the time that has elapsed since that [second] letter was sent, additional facts have come to light that reveal that Twitter has further breached its obligations under the Merger Agreement." Id. Ex. C at 1.  According to the letter, Twitter violated Section 6.1(e) of the Merger Agreement by making a severance payment of $7.75 million to Peiter Zatko, Twitter's former chief security officer, which gave Defendant an additional, independent, basis to terminate the Agreement.  Id. at 2.

Finally, on October 4, 2022, Defendant filed an amended Schedule 13D which stated that he had informed Twitter the day prior that he intended to go through with the Merger Agreement at the initial offer price of $54.20.  See FAC ¶ 14; Bergjans Decl. Ex. 6.  Twitter's stock jumped 15% after this announcement, before the markets closed.  FAC ¶ 41.  The next, day the stock increased another 7%, closing at $51.30.  Id.

### B.  Procedural History

On October 10, 2022, Giuseppe Pampena filed a class action complaint against Defendant.  See Complaint (dkt. 1).  The Court appointed Plaintiffs and counsel as Lead Plaintiff and Lead Counsel.  See Order Denying/Granting Motion to Appoint Lead Plaintiff and Lead Counsel (dkt. 30).  Plaintiffs subsequently filed an amended class action complaint, see FAC, which Defendant moves to dismiss, see Mot. to Dismiss (dkt. 34).  The Court held a motion hearing on October 27, 2023.  See Mot. Transcript (dkt. 46).

## II.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted.  Dismissal may be based on

either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). For purposes of evaluating a motion to dismiss, a court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of L.A., 828 F.2d 556, 561 (9th Cir. 1987). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

Fraud claims must meet the heightened pleading standard of Rule 9(b), which requires that "a party . . . state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) requires "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted). Securities fraud claims must also meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"): "[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); Tellabs, Inc. v. Maker Issues & Rights, Ltd., 551 U.S. 308, 321 (2007). The Court is to dismiss any complaint that does not meet these requirements. See 15 U.S.C. § 78u-4(b)(3)(A).

## III.   JUDICIAL NOTICE

Defendant moves to incorporate by reference and/or for the Court to take judicial notice of seven documents for purposes of his Motion. Those documents are: Exhibit 1, Twitter's April 25, 2022 Form 8-k ("Merger Agreement"); Exhibit 2, Twitter's February

17, 2021 Form 10-k; Exhibit 3, Defendant's May 13, 2022 tweet thread; Exhibit 4, Twitter's complaint in the Delaware Action; Exhibit 5, Defendant's answer and counterclaims in the Delaware Action; Exhibit 6, the October 5, 2022 Amendment to Schedule 13D filed with the SEC; and Exhibit 7, excerpts of the transcript from an April 11, 2023 BBC interview with Defendant.  Def. Request for Judicial Notice (dkt. 35) at 1–2.

District courts generally may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6).  Lee v. City of L.A., 250 F.3d 668, 688 (9th Cir. 2001).  When "'matters outside the pleading are presented to and not excluded by the court,' the 12(b)(6) motion must instead be treated as a motion for summary judgment under Rule 56."  Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 998 (9th Cir. 2018) (quoting Fed. R. Civ. P. 12(d)).  The "two exceptions to this rule are the incorporation-by-reference doctrine and judicial notice under Federal Rule of Evidence 201."  Id.

A document is incorporated by reference when the complaint "refers extensively to the document or the document forms the basis of the plaintiff's claim."  Khoja, 899 F.3d at 1002 (quoting United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003)).  This doctrine "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims."  Id. at 1002.  "Although incorporation by reference generally permits courts to accept the truth of matters asserted in incorporated documents, . . . it is improper to do so only to resolve factual disputes against the plaintiff's well-pled allegations in the complaint."  Id. at 1014.

Judicial notice under Rule 201, in contrast, "permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.'"  Id. at 999 (quoting Fed. R. Evid. 201(b)).  A fact is "not subject to reasonable dispute" if it is "generally known," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Id. (quoting Fed. R. Evid. 201(b)(1)–(2)).

Khoja warned of the "alluring temptation" for defendants "to pile on numerous

documents to their motions to dismiss to undermine the complaint" and get it dismissed at an early stage.  Id. at 998.  This risk "is especially significant in SEC fraud matters, where there is already a heightened pleading standard, and the defendants possess materials to which the plaintiffs do not yet have access."  Id.  Notwithstanding this risk, for the following reasons, the Court incorporates by reference Exhibits 1–3, 6 and 7, and takes judicial notice of Exhibits 4 and 5.

### A. Incorporation by Reference: Exhibits 1–3; 6–7

A defendant "may seek to incorporate a document into the complaint 'if the plaintiff refers extensively to the document or forms the basis of the plaintiff's claim.'"  Id. at 1002 (quoting Ritchie, 342 F.3d at 908).  Here, Plaintiffs' claims rely on, or cite heavily to, the documents that make up Exhibits 1–3 and 6–7.  For example, the Merger Agreement contained in Exhibit 1 forms the basis of Plaintiffs' claim that Defendant never had a contractual right to receive the requested information from Twitter, and thus that the tweet was a misstatement.  See Opp'n (dkt. 36) at 4.  Plaintiffs' claim that Defendant was aware of spam and bot accounts and therefore that his tweets about such accounts were "pretextual" is based in part on Twitter's disclosure about bot accounts in its 2022 10-K, Exhibit 2.  See FAC ¶¶ 116–118.  The "tweet thread" in Exhibit 3 contains Defendant's May 13, 2022 tweet, see FAC ¶ 111, which Plaintiffs allege is a material misstatement, as well as an additional tweet by Defendant posted on the same day and before markets opened, see Bergjans Decl. Ex. 3.  Plaintiffs allege that the announcement contained in Exhibit 6 revealed the "truth about [Defendant's] fraud."  Id. ¶ 167.  Finally, Plaintiffs rely on alleged admissions Defendant made in his interview with BBC—excerpts of which Defendant seek to incorporate in Exhibit 7—as evidence of Defendant's scienter.  See id. ¶ 171 ("In an interview with BBC in April 2023, [Defendant] eventually admitted he had made statements about terminating the Merger because he didn't want to pay the $44 billion he had agreed to.").

Plaintiffs argue that Defendant seeks to incorporate these documents solely to refute the truth of Plaintiffs' allegations.  See Opp'n to Judicial Notice (dkt. 37) at 5.  Although

14

incorporation by reference "generally permits courts to accept the truth of matters asserted in incorporated documents, it is improper to do so only to resolve factual disputes against the plaintiff's well-pled allegations in the complaint." Khoja, 899 F.3d at 1014.  These documents, however, do not dispute facts stated in a well-pleaded complaint, but instead provide a basis for Defendant's arguments that Plaintiffs inaccurately characterize the documents or portions of the documents.  See, e.g., Reply (dkt. 38) at 2–3 ("The Opposition does not address the actual language of the Merger Agreement [Exhibit 1]. Instead, Plaintiff simply asks the Court to ignore it in favor of his incomplete and inaccurate characterization of its terms."), 11 ("The FAC's bare characterization that the October 4 Announcement [Exhibit 6] 'essentially acknowledged that [Defendant] had been bluffing all along' is not sufficient to plead loss causation."); Mot. to Dismiss at 24 (describing "the FAC's misrepresentation of [Defendant's] statements to the BBC," contained in Exhibit 7).

The policy concern underlying incorporation by reference is to "[p]revent[] plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based." Khoja, 899 F.3d at 1002 (quoting Abrego Abrego v. Dow Chem. Co., 443 F.3d 676, 681–82 (9th Cir. 2006)).  Accordingly, "nothing in Khoja prevents [a] [c]ourt from analyzing an alleged false statement in context." See In re Eventbrite, Inc. Sec. Litig., No. 5:18-CV-02019-EJD, 2020 WL 2042078, at *7 (N.D. Cal. Apr. 28, 2020); see also In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1058 n.10 (9th Cir. 2014) (explaining that a document may be "consider[ed] . . . in its entirety" where plaintiffs "rel[ied] on portions of it in their complaint").  Because Exhibits 1–3 and 6–7 are either referenced extensively in Plaintiffs' complaint or form the basis of their claims, and because Defendant does not seek to incorporate the document merely as a defense to Plaintiffs' allegations, the Court incorporates them by reference. See Khoja, 899 F.3d at 1002–3.

### B.      Judicial Notice: Exhibits 4 and 5

Exhibits 4 and 5, the complaint and answer in the Delaware Action, are not subject

to incorporation by reference because they are not "extensively" referenced, nor do they form the basis of Plaintiffs' claim.  See Khoja, 899 F.3d at 1006 (holding that SEC filings that were not extensively referenced in the complaint were not subject to incorporation by reference).  Nonetheless, judicial notice is appropriate here because these Exhibits are matters of public record not subject to reasonable dispute.  See Fed. R. Evid. 201(b).  "Materials from a proceeding in another tribunal are appropriate for judicial notice."  Biggs v. Terhune, 334 F.3d 910, 915 n.3 (9th Cir. 2003); see also Huipio v. City of San Jose, No. 21-CV-07838-SVK, 2023 WL 4409849, at *3 n.2 (N.D. Cal. July 7, 2023) ("Court records are properly the subject of judicial notice.").  However, Plaintiffs are correct that the Court should not judicially notice the documents for the truth of the information contained in the documents.  See Opp'n to Judicial Notice at 6.  Rather, the Court will take notice of the documents for the limited purpose of ascertaining the claims involved in the Delaware Action.  See Wochos v. Tesla, Inc., No. 17-CV-05828-CRB, 2019 WL 1332395, at *2 (N.D. Cal. Mar. 25, 2019), aff'd, 985 F.3d 1180 (9th Cir. 2021) ("The Court thus considers these documents for the sole purpose of determining what representations Tesla made to the market.  The Court does not take notice of the truth of any of the facts asserted in these documents.").

## IV.   DISCUSSION

Defendant argues that Plaintiffs' complaint should be dismissed because it: (A) fails to state a claim under 12(b)(6) and the PSLRA, and (B) relies on statements protected from liability under the Noerr-Pennington doctrine.

### A.   Motion to Dismiss for Failure to State a Claim

Section 10(b) of the Securities Exchange Act prohibits "any manipulative or deceptive device or contrivance in contravention of" SEC regulations "in connection with the purchase or sale of any security registered on a national securities exchange."  15 U.S.C. § 78j(b) (2010).  Under SEC Rule 10b-5, a company may not "make any untrue statement of a material fact" or "omit to state a material fact necessary in order to make the statements made . . . not misleading."  See 17 C.F.R. § 2401.10b-5(b).

16

Plaintiffs alleging securities fraud under Section 10(b) must plead the following elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misrepresentation; (5) economic loss; and (6) loss causation (a causal connection between the material misrepresentation and the economic loss).  See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005); Loos v. Immersion Corp., 762 F.3d 880, 886–87 (9th Cir. 2014).  Defendant contests three of these elements: (1) material misrepresentations[7]; (2) scienter; and (3) loss causation.

### 1.    Material Misrepresentations

The PSLRA requires a securities fraud complaint to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u–4(b)(1); Tellabs, 551 U.S. at 313.  In setting forth the reasons why each challenged statement is misleading, securities plaintiffs may rely on either an affirmative misrepresentation theory or an omission theory.  See 17 C.F.R. § 240.10b-5(b).  A statement is false or misleading if it "directly contradict[s] what the defendant knew at that time" or "omits material information."  Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc., 63 F.4th 747, 764 (9th Cir. 2023) (quoting Khoja, 899 F.3d at 1008–09).

When determining if a statement is misleading, a court must apply the objective standard of a "reasonable investor."  Id. (quoting In re Alphabet, Inc. Sec. Litig., 1 F.4th 687, 699 (9th Cir. 2021)).  While Section 10(b) and Rule 10b-5 do not create an affirmative duty to disclose all material information, disclosure is required when it is necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading."  Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b-5(b)).

Regardless of whether a plaintiff alleges a misstatement or an omission, a plaintiff must also allege "materiality."  Khoja, 899 F.3d at 1009.  To establish materiality, "there

---

[7] Defendant contests the materiality and falsity of the alleged misstatements separately, see Mot. to Dismiss at 11, 16.  The Court considers Defendant's arguments together when evaluating the "material misrepresentation" requirement.  See Dura Pharm., Inc. 544 U.S. at 341.

17

1  must be a substantial likelihood that the disclosure of the omitted fact would have been

2  viewed by the reasonable investor as having significantly altered the 'total mix' of

3  information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231–32 (1988)

4  (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).  Assessments of

5  the inferences a shareholder might draw from a given set of facts and the significance of

6  such inferences are "peculiarly ones for the trier of fact."  See In re Alphabet, 1 F. 4th at

7  700 (quoting Fecht v. Price Co., 70 F.3d 1078, 1080 (9th Cir. 1995)).  As a result,

8  "resolving materiality as a matter of law is generally appropriate 'only if the adequacy of

9  the disclosure or the materiality of the statement is so obvious that reasonable minds could

10  not differ.'"  Id. (quoting Fecht, 70 F.3d at 1081 (cleaned up)).

**a.**      **May 13, 2022 Tweet**

12         The parties' arguments about the May 13 tweet boil down into two distinct issues:

13  first, what representations a reasonable investor understood Defendant to be making, and

14  second, whether those representations were materially misleading.  The Court resolves

15  each issue in turn.

16         Plaintiffs argue that Defendant's May 13 tweet suggested to reasonable investors

17  that the Merger was conditioned on Twitter providing Defendant with "details supporting

18  [the] calculation that spam/fake accounts do indeed represent 5% of users."  FAC ¶ 112;

19  Opp'n at 7.  Or, put differently, reasonable investors would have understood that Twitter

20  was obligated to provide Defendant with that information under the terms of the deal.

21  Defendant disagrees, arguing that the tweet did not explicitly state that the deal was

22  conditioned on receiving this information or that Twitter agreed the deal was on hold for

23  that reason.  See Mot. Dismiss at 12.

24         To determine what reasonable investors would—and did—plausibly understand

25  from Defendant's statement, it is necessary to look at the exact phrasing that Defendant

26  used.  The May 13 tweet reads as follows: "Twitter deal temporarily on hold pending

27  details supporting calculation that spam/fake accounts do indeed represent less than 5% of

28  users."  FAC ¶ 111.  The "calculation" that Defendant is referring to, from the perspective

United States District Court<br>Northern District of California

18

of a reasonable investor, is Twitter's calculation of bot accounts.  And specifically, Twitter's calculation underlying its SEC filings, in which the company averred that its false or spam accounts represented fewer than 5% of the company's mDAU—the same number Defendant mentions in the tweet.  Defendant does not disagree with this interpretation.  Similarly, a reasonable investor would have understood that Defendant was waiting for details <u>from Twitter</u> supporting Twitter's calculation.  This interpretation is perhaps obvious on its face—that is, that Defendant was waiting for details from the same entity that made the underlying calculation.  But it is obvious from context too: Defendant made this statement after entering into the Merger Agreement with Twitter and as the parties were working toward closing.  A reasonable investor would have understood that Defendant was waiting for details from the party he was actively working to close the deal with.  Again, Defendant does not argue otherwise.  Lastly, a reasonable investor would have plausibly understood Defendant's statement that the deal was on hold "pending" this information from Twitter to mean that, absent the provision of such information, the deal would not close.

Putting these reasonable inferences together: Defendant represented to a reasonable investor that the Twitter deal was on hold—and would not close—until Twitter provided information supporting its bot calculations.  Or, put another way, a reasonable investor could have plausibly understood that Twitter was obligated to provide Defendant with the requested information for the deal to close.

Given this representation, the falsity question is simple.  A statement is misleading if it would give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists."  <u>See</u> <u>Berson v. Applied Signal Tech., Inc.</u>, 527 F.3d 982, 987 (9th Cir. 2008) (quoting <u>Brody v. Transitional Hosps. Corp.</u>, 280 F.3d 997, 1006 (9th Cir. 2002)).  Thus, the inquiry is whether Defendant's representation that Twitter was required to provide details about bot numbers "differ[ed] in a material way from the [state of affairs] that actually exist[ed]."  <u>Id.</u>

The Court finds that Defendant's statement did give an impression materially

1   different from the state of affairs that existed.  Plaintiffs have plausibly alleged that

2   Defendant waived due diligence as a condition to the Merger Agreement, <u>see</u> FAC ¶¶ 21,

3   82, 112, and thus that Twitter had no obligation under the Merger Agreement to provide

4   information supporting its bot calculations.  Because Twitter <u>did not</u> have an obligation to

5   provide this data to Defendant under the terms of the Merger Agreement, Defendant's

6   representation that Twitter <u>did</u> have this obligation in order for the deal to close was false.

7        Defendant argues that the statement was not false, because Twitter was obligated to

8   provide him the requested information under Sections 6.4 and 6.11 of the Merger

9   Agreement.  The Court disagrees.  Plaintiffs plausibly allege that Defendant's right to data

10  under Sections 6.4 and 6.11 of the Merger Agreement was far more limited than the broad

11  due diligence rights he undisputedly waived prior to his May 13 tweet—and that the

12  information about bot calculations fell into the category of due diligence that Twitter had

13  no obligation to provide.[8]  Defendant also asserts that the May tweet could not have been a

14  false statement because the deal <u>was</u> delayed for months while Defendant awaited details

15  supporting Twitter's claim that spam/bot users make up less than 5% of users.  Mot. to

16  Dismiss at 6–7.  But this argument misses what makes the statement false.  The question is

17  not whether or not the deal slowed down, but whether Twitter had an obligation to provide

18  the requested information for the deal to close.  Because Plaintiffs have plausibly alleged

19  that Twitter did not have that obligation, Defendant's statement that the deal was on hold

20  <u>pending details from Twitter about its bot calculations</u> was materially misleading to

21  reasonable investors.

22        Finally, Defendant argues that Plaintiffs have not pleaded facts showing that the

23

24  [8] At the motion hearing, Defendant argued that because the Merger Agreement was publicly filed
    with the SEC, <u>see</u> Mot. Tr., Defendant's tweets could not have been misleading as to Twitter's
25  obligation under the Merger Agreement.  However, Defendant does not point to a specific
    disclosure in the Merger Agreement that would prevent a reasonable investor from being misled
26  by Defendant's tweet—i.e., a countervailing statement that the deal will close even if Twitter fails
    to provide him the bot data he requests.  <u>See, e.g.</u> <u>In re eHealth, Inc. Sec. Litig.</u>, No. 20-CV-
27  02395-JST, 2023 WL 6390593, at *5 (N.D. Cal. Sept. 28, 2023) (finding that although the
    defendants referenced SEC filings on the calls in which the alleged misstatements were made,
28  nothing in the filings directly addressed the specific issue about which reasonable investors would
    be misled).

United States District Court
Northern District of California

May 13 tweet was material.  See Mot. to Dismiss at 16–17.  The materiality standard asks whether there is a "substantial likelihood" that the information at issue "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available for the purpose of decisionmaking by stockholders concerning their investments."  In re Alphabet., 1 F.4th at 704 (quoting Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co., 845 F.3d 1268, 1274 (9th Cir. 2017)).  Certainly, a reasonable investor would find Twitter not complying with its contractual obligations—particularly, its contractual obligation to provide details about its bot calculations—to be material to their investing decision-making.  For one, it might suggest to the market that Twitter was refusing to provide this information because it had something to hide regarding the amount of fake/spam accounts that make up its mDAU.  The immediate market reaction—causing Twitter stock to decline 9.67% by the close of the market on the day of the tweet, see FAC ¶ 113—further supports materiality.  See In re Alphabet., 1 F.4th at 703.  See Mot. to Dismiss at 6; Bergjans Decl. Ex. 3.[9]  Construing all reasonable inferences in Plaintiffs' favor, the Court concludes that Plaintiffs have adequately pleaded materiality and falsity as to the May 13, 2022 tweet.

### b.    May 14, 2022 Tweet

Next, Plaintiffs challenge Defendant's tweet that Twitter legal "called to complain that [he] violated their NDA by revealing the bot check sample size."  FAC ¶ 115.  According to Plaintiffs, this tweet is misleading because it indicated Defendant's "supposed concern about the number of bots and fake accounts at Twitter," despite Defendant being "aware of the issue long before he offered to acquire Twitter."  FAC ¶ 116.  In support of this claim, Plaintiffs allege that Defendant was "well aware" that

---

[9] To the extent that Defendant argues his May 13 tweet is immaterial because the market reacted only to Defendant's intent to place the merger on hold until he received the information, not the misstatement itself, see Reply at 8, his argument fails.  The market reacted negatively despite Defendant's follow up tweet a few hours later, before markets opened, that he was "[s]till committed to [the] acquisition," see Bergjans Decl. Ex. 3— indicating that it was more likely the misleading statement about Twitter's failure to provide information, not necessarily his intent to put the deal on hold, to which the market reacted.

Twitter entered into a $809.5 million class action settlement in September 2021 in a securities class action alleging Twitter overstated its user numbers and growth rate. Id. ¶ 117.  Plaintiffs also point to Twitter's SEC filings, which "have long disclosed that there are duplicate and fake accounts on Twitter." Id. ¶ 118.  For example, Twitter's 2021 Annual Report disclosed that:

> We have performed an internal review of a sample of accounts and estimate that the average of false or spam accounts during the fourth quarter of 2020 represented fewer than 5% of our mDAU [Monetizable daily active usage] or users during the quarter. . . . In making this determination, we applied significant judgment, so our estimation of false or spam accounts may not accurately represent the actual number of such accounts, and the actual number of false or spam accounts could be higher than we have estimated.

Id.  Moreover, "news reports and blog posts as far back as 2017 had regularly reported" about bots and fake accounts. Id. ¶ 119.

However, as Defendant points out, Plaintiffs cite no facts indicating that Defendant's statement is false—i.e., that he did not actually receive a phone call from Twitter legal about their NDA. See Mot. to Dismiss at 12.  Further, Plaintiffs do not cite any facts suggesting that the tweet would give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists." See Berson, 527 F.3d at 987 (quoting Brody, 280 F.3d at 1006).  In other words, Plaintiffs do not show how Defendant's alleged preexisting awareness of false or bot accounts makes a statement that he received a call from Twitter misleading.  Plaintiffs therefore fail to meet the pleading standard under the PSLRA, which requires that they "specify the reason or reasons why the statements made by [Defendant] were misleading or untrue, not simply why the statements were incomplete." See Brody, 280 F.3d at 1006 (citing 15 U.S.C. § 78u–4(b)(1)).  Accordingly, the Court concludes that Plaintiffs have not adequately pleaded falsity with respect to the May 14, 2022 tweet.

### c.   May 16, 2022 Statement and Tweets

Plaintiffs state the Defendant "baselessly" announced that fake and spam accounts make up at least 20% of Twitter's users during the "All in Summit," a tech conference in

Miami.  See Opp'n at 1.  Plaintiffs argue that each of Defendant's statements misled investors in "represent[ing] that [Defendant] had some right to data or to cancel the Merger agreement thereto, which he did not."  See id. at 7.  Defendant argues that Plaintiffs do not offer any specific facts to show that the "20%" estimate is false, beyond pointing to the Twitter CEO's tweets that the specific estimation could not "be performed externally." See Mot. to Dismiss at 13.

Again, a statement is misleading if it would give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists."  See Berson, 527 F.3d at 987 (quoting Brody, 280 F.3d at 1006).  Words "cannot be viewed 'in complete isolation' but must instead be 'read in light of all the information then available to the market' to decide if they 'conveyed a false or misleading impression.'"  In re Vaxart, Inc. Sec. Litig., 576 F. Supp. 3d 663, 670 (N.D. Cal. 2021) (quoting In re Convergent Techs. Sec. Litig., 948 F.2d 507, 512 (9th Cir. 1991)).  Even if Defendant's statement was literally true based on his "random sample" calculation or some other means of data analysis, the complaint plausibly alleges that the statement misled the investing public to believe that Defendant received—and was basing his statement on—bot user data from Twitter, which was not the case.  See id. (quoting Miller v. Thane International, Inc., 519 F.3d 879, 886 (9th Cir. 2008)) ("[S]tatements 'literally true on their face may nonetheless be misleading when considered in context.'").  Defendant had tweeted just three days prior that the deal was on hold pending details about Twitter's bot userbase, so a reasonable investor could have reasonably concluded that Defendant was later able to make a statement about the percentage of bot users because he had received such information from Twitter.  See FAC ¶ 111.  In the context of Defendant's May 13, 2022 tweet, Plaintiffs have adequately pleaded that the May 16 statement is misleading. See In re Vaxart, 576 F. Supp. 3d at 670 (holding that the defendants' statements created a "materially misleading impression" in the context of the defendants' prior statements).

For these same reasons, Defendant's argument that the statement was immaterial because it did not alter the "total mix of information" available to investors given the

United States District Court
Northern District of California

"well-publicized" dispute over the merger also fails.  See Mot. to Dismiss at 16 (quoting Matrixx, 563 U.S. at 38).  In light of Defendant's May 13, 2022 tweet that the deal was on hold pending details that spam/fake accounts represent less than 5% of users, a reasonable investor would likely find Defendant's access to and findings about Twitter's data to be material to their investment decision-making.  Moreover, Defendant's statement suggested that Twitter had significantly more bot users than reported in its most recent SEC filings, see FAC ¶ 118, a fact which would certainly be material to an investor given the nature of Twitter's business.  Accordingly, the Court concludes that Plaintiffs adequately plead both materiality and falsity with respect to the May 16, 2022 statement.

Plaintiffs do not state how Defendant's later tweet from this same day—that "[t]his [information about fake accounts] is fundamental to the financial health of Twitter"—is false or misleading, and the Court concludes that Plaintiffs have not adequately pleaded falsity with regard to this tweet.

### d.    May 17, 2022 Tweet

Plaintiffs argue that Defendant's May 17, 2022 tweet that the number of fake accounts on Twitter could be "much higher" than 20% and that the deal "cannot move forward" was false because it created the impression that Defendant was entitled to due diligence and that he had the right to terminate the merger.  See FAC ¶ 125; Opp'n at 7.  The tweet is composed of two parts: (1) Twitter is made up of 20% fake/spam accounts, which Defendant thinks could be higher than 20%, and (2) the deal cannot move forward until the Twitter CEO shows proof that the spam accounts are less than 5%.  See FAC ¶ 125.

Defendant argues that the first statement constitutes an opinion that the number of fake accounts could be "much higher," and therefore is not actionable because it is not subjectively untrue.  Mot. to Dismiss at 14.  However, the statement is a reiteration of Defendant's May 16, 2022 tweet—that the number of spam or bot accounts is greater than 20%.  As previously explained, Defendant had not been given access to any user data from Twitter to support that number; to the contrary, he specifically waived due diligence as

part of the Merger Agreement.  See FAC ¶ 149.  In addition, the Twitter CEO stated the day prior, in response to Defendant's "20%" spam or false user claim, that an mDAU calculation could not be performed externally.  See id. ¶ 121.  Viewed in the context of this statement, it is reasonable that investors would infer that Defendant, the next day, tweeted about user data because he actually received evidence from Twitter "demonstrating that Twitter's SEC filings were false and that the number of fake accounts exceeded 5%."  See Opp'n at 4.  For the same reason, Plaintiffs have adequately alleged that this tweet would alter the "total mix" of information available to investors, and is therefore material.  See Matrixx, 563 U.S. at 38.

The second statement is materially false or misleading for the same reasons that the May 13, 2022 tweet is materially false or misleading.  Plaintiffs plausibly allege that Defendant waived due diligence as a condition to the Merger Agreement, see FAC ¶¶ 82, 112, and thus that Twitter did not have an obligation to provide him with "proof" that spam accounts make up less than 5% of users, see ¶ 149; Opp'n at 6–7.  In contrast, the statement that the deal "cannot move forward" until he receives "proof of <5%" fake/spam account implies that Twitter did have an obligation to provide this data to Defendant and that Defendant was able to terminate the deal absent Twitter doing so.  Accordingly, the Court concludes that Plaintiffs have adequately pleaded a material misrepresentation with respect to this tweet.

### e.      May 21, 2022 Tweets

The May 21, 2022 tweets include two opinions—(1) the deal should cost 25% less, and (2) Twitter may have a disincentive to reduce spam because it reduces perceived daily users—as well a statement that Twitter "refuse[s]" to explain how they calculate that 5% of daily users are fake or spam users.  See FAC ¶¶ 128–130.  Plaintiffs fail to plead particular facts that make either the opinions or the statement false or misleading, beyond conclusory statements that the tweets were "false" and "disparaging."  Id. ¶¶ 132–133.

A "statement of opinion is not misleading just because external facts show the opinion to be incorrect" or the "issuer knows, but fails to disclose, some fact cutting the

other way." <u>Omnicare</u>, 575 U.S. at 188–89.  To state a claim that an opinion is false or misleading, Plaintiffs must demonstrate that the speaker did not hold a stated belief, or must identify particular material facts regarding the basis for the issuer's opinion, the omission of which make the statement "misleading to a reasonable person reading the statement fairly and in context." <u>Id.</u> at 194.  Plaintiffs have not attempted to do either.  <u>See</u> Mot. to Dismiss. ¶¶ 128–134.

Nor do Plaintiffs allege facts showing why the statement that Twitter "refuse[s]" to explain its calculations is an affirmative misstatement or how it would give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists" <u>see</u> <u>Berson</u>, 527 F.3d at 987.  It seems undisputed that Twitter had, in fact, refused to provide Defendant with all the data he requested at the time of the tweet.  Accordingly, the Court concludes that Plaintiffs have not adequately pleaded falsity with respect to the May 21, 2022 tweets.

### f.      Letters to Twitter and Notices of Termination

Defendant, through his attorneys, sent multiple letters to Twitter demanding user data, as well as three letters terminating the Merger Agreement with three independent justifications on July 8, 2022, August 29, 2022, and September 9, 2022.  Plaintiffs argue that Defendant's demand for information from Twitter "was a ruse," and that Defendant was "simply making false statements in an effort to create uncertainty about the Merger that he hoped he could use to either negotiate a reduction in the Merger price or back out of the deal."  FAC ¶ 138.  Plaintiffs specifically point to the August 29, 2022 termination letter, which "did not supplement the original argument for termination but rather asserted a totally separate reasoning, which further establishes that [Defendant's] spam account argument was baseless," to argue that Defendant "was making any statement he could to get out of the deal or renegotiate the price." [10]  <u>Id.</u> ¶ 145.

---

[10] The August 29, 2022 termination letter lists a whistleblower report made to Congress by Twitter's former chief security officer as a basis for Defendant's termination of the Merger Agreement.  <u>See</u> FAC ¶ 144.  The July 8, 2022 termination letter, in contrast, lists Twitter's refusal to provide data and information to Defendant as a basis for his termination of the Merger

United States District Court
Northern District of California

Defendant can be held liable for the statements of his lawyers in the letters.  See Janus Cap. Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 142 (2011) ("For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.").  However, Defendant is correct that Plaintiffs do not sufficiently plead falsity as to the requests for information or the legal claims advanced in the termination letters.  See Mot. to Dismiss at 15.  For example, the July 8, 2022 termination letter states that "Twitter has not complied with its contractual obligations.  For nearly two months [Defendant] has sought the data and information necessary to 'make an independent assessment of the prevalence of fake or spam accounts on Twitter's platform.'"  FAC ¶ 140 (quoting Defendant's May 25 letter to Twitter).  The August 29, 2022 termination letter states that: "These allegations [in the Peiter Zatko complaint], if true, demonstrate that Twitter has breached the following provisions of the Merger Agreement."  FAC ¶ 144.

Plaintiffs do not adequately specify which statements within the various letters are misleading or state the reason or reasons why they are.  See 15 U.S.C. § 78u-4(b)(1)(B).  In the July 8 letter, Defendant states that Twitter is in breach of the Merger Agreement for several reasons, including that the Merger Agreement contains materially inaccurate representations, which are likely to result in a "Company Material Adverse Effect."  See FAC ¶ 140.  Plaintiffs do not identify how this legal assertion is false or misleading; they simply assert that it is false, that Twitter's SEC filings were not inaccurate, and that Twitter was not actually obligated to share the bot information under the Merger Agreement.  See Opp'n at 6.  Yet the PSLRA requires more.  See Falkowski v. Imation Corp., 309 F.3d 1123, 1133 (9th Cir. 2002) ("Although the allegations here are voluminous, they do not rise to the level of specificity required under the PSLRA.  The allegations consist of vague claims about what statements were false or misleading, how they were false, and why we can infer intent to mislead.  We have dismissed much more

Agreement.  See id.

specific and compelling allegations."). Plaintiffs also generally allege that Defendant's motive in sending letters requesting data was to create uncertainty and the requests were a "ruse." See FAC ¶ 138. But, again, Plaintiffs do not point to an objectively verifiable affirmative statement or misleading omission. See Retail Wholesale, 845 F.3d at 1275 (quoting Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 606 (9th Cir. 2014) ("To be misleading, a statement must be 'capable of objective verification.'"); Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1061 (9th Cir. 2008) ("By requiring specificity, [PSLRA] prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions are deceitful.").

Plaintiffs cite to an out of circuit case, Rosenbaum Capital LLC v. Boston Communications Group., Inc., 445 F. Supp. 2d 170, 176 (D. Mass. 2006), in support of their allegation that Defendant's legal claims "painted a false impression of the Merger and [Defendant's] rights under the agreement." See Opp'n at 12. In that case, the company "affirmatively claimed that it did not infringe the patents and that it had meritorious defenses." See Rosenbaum Cap. LLC, 445 F. Supp. 2d at 175. The court found that the plaintiffs had sufficiently alleged such statements were "fraudulently inaccurate and incomplete," where there had been a jury verdict of willful patent infringement and allegations that the defendants hired experts to draft a system with unnecessary components to avoid identity to the infringed patent. Id. at 173, 175. Here, in contrast, there was no jury verdict with respect to Defendant's rights, nor have Plaintiffs cited any other legal determinations that would make the statements and legal positions in the letters misleading when made. The Court is not convinced that Defendant's entry into a legal dispute with Twitter, and statements made in support thereof, "create an impression of a state of affairs that differs in a material way from the one that actually exists." See Berson, 527 F.3d at 987 (quoting Brody, 280 F.3d at 1006).

### 2.      Scienter

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."

<u>Tellabs</u>, 551 U.S. at 319 (internal quotation marks omitted).  A complaint must "state with particularity facts giving rise to a strong inference that the defendant acted" with scienter. <u>See</u> 15 U.S.C. § 78u–4(b)(2)(A); <u>Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.</u>, 759 F.3d 1051, 1061 (9th Cir. 2014).  To demonstrate scienter, the defendant must have contemporaneously made "false or misleading statements either intentionally or with deliberate recklessness."  <u>See</u> <u>Zucco Partners, LLC v. Digimarc Corp.</u>, 552 F.3d 981, 991 (9th Cir. 2009).  "[M]ere recklessness or a motive to commit fraud and opportunity to do so" is not enough.  <u>Reese v. Malone</u>, 747 F.3d 557, 569 (9th Cir. 2014).  "Deliberate recklessness" is "an extreme departure from the standards of ordinary care," that "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  <u>In re Alphabet</u>, 1 F.4th at 701 (internal quotation omitted).

To plead scienter adequately under the PSLRA, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  A "strong inference" exists "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  <u>Tellabs,</u> 551 U.S. at 324.  Courts conduct a "dual inquiry" when assessing whether the strong inference standard is met: first, courts determine whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter; second, if no individual allegations are sufficient, courts conduct a "holistic review" to determine whether the allegations combine to give rise to a strong inference of scienter.  <u>Glazer</u>, 63 F.4th at 766 (citing <u>Zucco Partners</u>, 552 F.3d at 992).

Plaintiffs argue that Defendant possessed scienter because: (a) Defendant "personally negotiated" the Merger and therefore had actual knowledge of the falsity of the statements; (b) Defendant had a motive to depress Twitter stock; (c) Defendant's actions and ultimate settlement in the Delaware action are evidence of scienter; and (d) Defendant's dismissal of his financing lead is evidence of scienter.  <u>See</u> FAC ¶¶ 152–55.

29

1    Defendant argues that Plaintiffs rely on "general allegations of motive and opportunity, red

2    herrings, and incomplete and irrelevant descriptions of the Delaware Action," and do not

3    meet their burden to establish scienter.  See Mot. to Dismiss at 18.  With respect to the

4    May 13, 2022 Tweet, the May 16, 2022 Statement, and the May 17, 2022 Tweet, the Court

5    finds that Plaintiffs' allegations, when viewed holistically, give rise to a strong inference of

6    scienter.

7    **a.      Defendant's Personal Negotiation of the Merger**

8             Plaintiffs allege that "[Defendant] had actual knowledge of the falsity of all his

9    statements because all the statements pertained to [Defendant] himself and the Merger

10   agreement he had personally negotiated."  FAC ¶ 152.  Plaintiffs cite to Evanston Police

11   Pension Fund v. McKesson Corporation in support of the "core operations" theory of

12   scienter—the proposition that falsity "may itself be indicative of scienter where it is

13   combined with allegations regarding a management's role in the company that are

14   particular and suggest that the defendant had actual access to the disputed information, and

15   where the nature of the relevant fact is of such prominence that it would be absurd to

16   suggest that management was without knowledge of the matter."  See 411 F. Supp. 3d 580,

17   601 (N.D. Cal. 2019) (quoting Zucco Partners, 552 F.3d at 1000).  The "core operations

18   theory" permits general allegations about a defendant's involvement in a transaction when

19   the allegations are "buttressed with 'detailed and specific allegations about management's

20   exposure to factual information within the company.'"  Zucco Partners, 552 F.3d at 1000

21   (quoting S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 785 (9th Cir. 2008)).  In Evanston,

22   the plaintiffs alleged that the defendants had more than just "general awareness of the day-

23   to-day" workings of the company, but rather "touted intimate knowledge" of drug

24   manufacturers and conditions.  See 552 F. Supp. 3d at 602.  Given this knowledge, the

25   court found that it would be "at least deliberately reckless" for the defendants not to

26   investigate the accuracy of their statements about the cause of drug price increases.  Id.

27            Plaintiffs argue that Defendant "cannot deny that he had actual knowledge of all

28   facts about the Merger because he bought Twitter personally and thus was the only person

30

United States District Court
Northern District of California

United States District Court
Northern District of California

with knowledge about all the facts of the [Merger Agreement]." Opp'n at 13.  Plaintiffs point to several facts in support of Defendant's "intimate knowledge" with the facts of the Merger Agreement.  First, Plaintiffs allege that Defendant was heavily involved in the Merger Agreement process—tweeting about a potential tender offer, see FAC ¶ 80, and directly calling Twitter's executives during the bidding process, see id. ¶ 83.  In addition, Defendant tweeted prior to the Merger Agreement, on April 14, 2022, that "[i]f our Twitter bid succeeds, we will defeat the spam bots or die trying!," id. ¶ 78, indicating that he was to some extent aware of the issue with "spam bots," before entering into the Merger Agreement, see id. ¶ 116.  Defendant sent a letter to Twitter on April 24, 2022 which stated that the Merger Agreement was "seller friendly." Id. ¶ 84.  Defendant consistently tweeted nearly real-time updates about the Merger Agreement, "touting" his "intimate knowledge" of the deal.  Even if he truly believed that Twitter had the contractual obligation to provide details about the company's spam and bot data—which he argues he did, see Mot. to Dismiss at 18—it was at least deliberately reckless to not investigate that obligation with the respect to the Merger Agreement before making his statements, see Evanston, 552 F. Supp. 3d at 602; see Gebhart v. S.E.C., 595 F.3d 1034, 1044 (9th Cir. 2010) (finding scienter where the defendants "conducted no meaningful independent investigation to confirm the truth of their representations").

### b.     Defendant's Motive and Opportunity

Plaintiffs allege that Defendant "had the motive and opportunity to commit the fraud" to get out of the Merger Agreement because of the large price decline of Tesla stock and the realization that "he had greatly overpaid for Twitter by agreeing to buy it shortly before a significant market decline." See FAC ¶ 154.  In support of this claim, Plaintiffs point to the financial pressure Defendant experienced immediately after signing the Merger Agreement.  See id. ¶¶ 103–105.  Between April 25, 2022, when the Merger Agreement was announced, and May 12, 2022, Tesla's stock declined by 27%, which threatened a margin call on the stock he had pledged as collateral to fund the merger.  Id. ¶ 103.

1     Plaintiffs also point to Defendant's comments in an interview, in which he

2    "admitted he had made statements about terminating the Merger because he didn't want to

3    pay the $44 billion."  See FAC ¶ 171.

> **Interviewer**: So you were still trying to get out of it and then you were just advised by lawyers, "Look, you're going to have to buy this."
>
> **[Defendant]**: Yes.
>
> **Interviewer**: Interesting. So you didn't actually want to purchase it even when you said you were go-
>
> **[Defendant]**: Well not at that price. I think the analogy is pretty close. Let's say there's a warehouse full of goods. They say less than 5% of what's in the warehouse is broken. Then you walk into warehouse and say, "Actually it's 25%." So you might still want to buy what's in that warehouse, but probably at a lower price. You're not buying the stuff that's broken.

Bergjans Decl. Ex. 7.

    Defendant has not persuasively responded to Plaintiffs' allegations except to argue that they are not sufficiently particularized.  See Mot. to Dismiss 17–19.  Defendant states that Plaintiffs simply rely on "general allegations of motive and opportunity," see Mot. to Dismiss at 18, which are, without more, "not enough to establish a cogent and compelling inference of scienter," see Zucco Partners, 552 F.3d at 998.  Yet while "allegations of a motive to mislead, standing alone, cannot satisfy the heightened scienter standard," a court is "not precluded from considering allegations of motive in combination with other allegations of Defendants' intent to mislead or deliberate recklessness."  See Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 949 (9th Cir. 2005).  Accordingly, Plaintiffs adequately allege a motive to terminate the deal or renegotiate the price that should be considered alongside Plaintiffs' other allegations of scienter.

### c.    Positions in the Delaware Action

    Plaintiffs state that Defendant's scienter is also demonstrated by his "frivolous and baseless positions advanced in the Delaware Action," during which he stated that he was

entitled to due diligence, despite having "actual knowledge that he had waived due diligence." FAC ¶ 155. Plaintiffs also point to Defendant's actions in the course of litigating the Delaware Action, in which he "attempt[ed] to shield from discovery" analyses that data scientists he hired conducted, and "refus[ed] to make a fulsome production of documents," as well as other parties' actions, such as a third party associated with Defendant who tried and failed to quash a subpoena against him. Id. ¶¶ 157–160. Finally, Plaintiffs point to the fact that Defendant ultimately agreed to the original merger price he offered: "[t]he fact that [Defendant] settled the Delaware litigation is a strong indicia that [Defendant] knew his prior statements were false since [Defendant] almost never settles cases and instead almost always takes them to trial." See id. ¶ 166.

The existence and quick settlement of ancillary lawsuits can be a relevant factor in evaluating scienter. In re Tesla, Inc. Sec. Litig., 477 F. Supp. 3d 903, 931 (N.D. Cal. 2020) (citing City of Monroe Employees Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 683 (6th Cir. 2005)). Here, the settlement occurred after months of litigation and discovery, as Defendant points out, see Mot. to Dismiss at 19, so the Court does not give the settlement significant weight.

However, to the extent Defendant argues that the settlement in the Delaware Action does not indicate "subjective falsity" at all, see Reply at 9–10, Plaintiffs' reliance on Glazer is helpful to establish otherwise. See Opp'n at 16–17. In Glazer, the defendants argued that "they lacked scienter because they were confident that the transaction was binding, as evidenced by [their company's] seeking specific performance of the merger in Delaware Court." See 63 F.4th at 780. However, the Ninth Circuit held such alleged confidence unpersuasive. See id. What mattered for purposes of scienter was that the defendants were aware of information—the acquirer's reconsideration of the merger— which rendered their statement about the merger misleading regardless of their alleged subjective belief that the merger would nevertheless happen. See id. Here, even if Defendant made statements that were subjectively consistent with his beliefs about the Merger Agreement in the course of litigation (such as that the deal could not move forward

United States District Court
Northern District of California

if Twitter did not provide certain data), Plaintiffs allege facts raising a strong inference that he knew or recklessly disregarded the fact that he had material information (such as the waiver of due diligence) that would render his statements false or misleading.  See Matrixx, 563 U.S. at 38 ("The inference that [the defendant] acted recklessly (or intentionally, for that matter) is at least as compelling, if not more compelling, than the inference that it simply thought the reports did not indicate anything meaningful about adverse reactions.").

The Court considers Defendant's ultimate settlement in the Delaware Action holistically alongside Plaintiffs' other allegations of scienter.

### d. Dismissal of Financing Lead

Plaintiffs finally point to Defendant's dismissal of Bob Swan—the financing lead for the merger—"sometime in June 2020"—as probative of his scienter.  Id. ¶¶ 162–165. Plaintiffs argue that if Defendant genuinely believed his statements about Twitter, he would have taken steps to replace Swan (which he did not do), to avoid materially breaching the Merger Agreement and accordingly "preserve his ability to lawfully terminate the merger agreement and only have to pay the termination fee."  Id. ¶ 164. Defendant argues that there was no financing provision in the Merger Agreement for him to breach, and that his retention of an advisor is "irrelevant to the truth or falsity of his statements."  Mot. to Dismiss at 19.  Plaintiffs' argument here is more tenuous, and does not raise a strong inference that Defendant had scienter.

However, in viewing all the evidence holistically in the light most favorable to Plaintiffs, Plaintiffs plausibly allege facts giving rise to a strong inference that Defendant made false or misleading statements about Twitter and the Merger Agreement intentionally or with deliberate recklessness.  Plaintiffs have demonstrated with particularity that Defendant was in a position to know that the statements he made were not true and have laid out in detail Defendant's motive for misleading the market.  See In re Tesla, 477 F. Supp. at 931 (finding the same).

### 3.  Loss Causation

The plaintiff in a securities fraud action must demonstrate an economic loss that was caused by the defendant's misrepresentations, rather than some intervening event. Dura Pharm., 544 U.S. at 343–44.  Loss causation is a "context-dependent" inquiry.  Miller v. Thane Int'l, Inc., 615 F.3d 1095, 1102 (9th Cir. 2010).  Generally, loss causation "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss."  In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1057 (9th Cir. 2008) (internal quotation marks omitted).  "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate."  Id.  The "burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through corrective disclosures which caused the company's stock price to drop and investors to lose money."  Lloyd v. CVB Fin. Corp., 811 F.3d 1200, 1209 (9th Cir. 2016) (internal quotation marks omitted).[11]  "Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss."  Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal., 730 F.3d 1111, 1120 (9th Cir. 2013).  The "ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss."  Lloyd, 811 F.3d at 1210.

Here, Plaintiffs plead loss causation under a corrective disclosure theory.  In support of the causal connection between the misstatements and the depressed nature of the prices, Plaintiffs allege that when Defendant's "prior misrepresentations and fraudulent conduct" were disclosed to the market on October 4, 2022 (when Defendant filed an amended Schedule 13D which stated that he had, the day prior, sent a letter to Twitter notifying it that he intended to go forward the merger at the original Merger Agreement price), the price of Twitter securities thereafter "increased precipitously, with the common stock

---

[11] In this case, where Plaintiffs argue that Defendant's statement artificially depressed, rather than inflated, the company's stock price, the corrective disclosure would cause the stock price to increase.  Neither party contests that a corrective disclosure that causes an increase in stock price (rather than a decrease) can potentially establish loss causation.

increasing 22% in one day alone on October 4, 2022." FAC ¶ 175.  In other words, Plaintiffs argue that the "corrective disclosure" was both Defendant's statement that he would go through with the deal as well as his abandonment of his position in the Delaware Action.  See Opp'n at 19.  Defendant argues that because he made no reference to any of the alleged misstatements, there was no corrective disclosure.  See FAC ¶ 151.  Defendant states that "the allegations in the FAC show that the stock declined as a result of the fact of the dispute with Twitter, subsequent litigation, and surrounding uncertainty concerning the consummation of the deal—not any particular misstatement."  Id. at 21.

As with the scienter inquiry, the Court considers loss causation only for the statements adequately pleaded as material misrepresentations.  With respect to the statements that the deal was "temporarily on hold" (the May 13, 2022 tweet) as well as the statement that the deal "cannot move forward" until Twitter showed proof of its bot-user claims (within the May 17, 2022 tweet), Plaintiffs adequately plead loss causation through corrective disclosure.  A corrective disclosure must reveal "new facts" that, taken as true, "render some aspect of the defendant's prior statements false or misleading."  In re BofI Holding, Inc. Sec. Litig., 977 F.3d 781, 790 (9th Cir. 2020).  Plaintiffs have plausibly alleged that when Defendant announced that he would move forward with the deal—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the bot-account information to Defendant.  See Opp'n at 18.

With respect to Defendant's statement that fake and spam accounts "make up at least 20% of Twitter's users" in the May 16, 2022 statement, however, Plaintiffs' contention that the October 4 announcement showed that he had "been bluffing all along" and disclosed the truth of his prior false statements is more shaky.  See FAC ¶ 167.  It is unclear how the October 4 announcement—where Defendant said he would go through with the deal—is related to, or could have corrected, his prior alleged misstatement that bots make up 20% of Twitter's users.  However, "[r]evelation of fraud in the marketplace

is simply one of the 'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause." Mineworkers' Pension Scheme v. First Solar Inc., 881 F.3d 750, 754 (9th Cir. 2018) (quoting Lloyd, 811 F.3d at 1205).

The Court believes that Plaintiffs have alleged facts supporting a direct causal relationship theory. The Ninth Circuit has "recognized that loss causation can be established by showing 'that the Defendants' misrepresentation was directly related to the actual economic loss [the plaintiff] suffered.'" Nuveen Mun., 730 F.3d at 1120 (quoting Livid Holdings, 416 F.3d at 949). "Put another way, a plaintiff can satisfy loss causation by showing that 'the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss.'" Id. (quoting McCabe v. Ernst & Young, LLP, 494 F.3d 418, 425 (3d Cir. 2007)); see Mineworkers', 881 F.3d at 753 (quoting Nuveen Mun., 730 F.3d at 1119) ("To prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss, by tracing the loss back to 'the very facts about which the defendant lied.'").

On the day the May 16, 2022 statement was made, the stock price of Twitter decreased from $40.72 on the previous day to $37.39. Id. ¶¶ 113, 124. Plaintiffs claim that if they had been aware that the market price was artificially depressed by Defendant's misstatement, "they would not have sold the Company's securities at the artificially depressed prices that they did, or not [sold] at all." FAC ¶ 192.

At this stage, Plaintiffs have pleaded sufficient factual allegations that the May 16, 2022 statement proximately caused the decline in Twitter's stock, resulting in losses when they sold their shares at this artificially depressed price. See In re Tesla, 477 F. Supp. at 935; see also In re Gilead, 536 F.3d at 1057 (quoting Twombly, 550 U.S. at 556) ("So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate. This is not 'a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' loss causation."). Therefore, the Court concludes that Plaintiffs have plausibly established loss causation for each of Defendant's misrepresentations.

### B.    Immunization under <u>Noerr-Pennington</u> Doctrine

Defendant argues that even if Plaintiffs' first amended complaint states a viable claim under Rule 10b-5, "the action would still fail because it seeks to convert [Defendant's] protected petitioning communications about his legal dispute with Twitter and positions in the Delaware Action into securities fraud," which, if accepted by the court, would "chill market participants from petitioning the judicial system for redress." <u>See</u> Mot. to Dismiss at 21–22.

"The <u>Noerr–Pennington</u> doctrine arose in the antitrust context and initially reflected the Supreme Court's effort to reconcile the Sherman Act with the First Amendment Petition Clause." <u>Sosa v. DIRECTV, Inc.</u>, 437 F.3d 923, 929 (9th Cir. 2006).  Under the doctrine, "those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." <u>Id.</u>  Consistent with First Amendment jurisprudence, the Supreme Court has articulated that the right to petition must be given "breathing space," and has found that reasonably based but unsuccessful lawsuits fall within the protection of the Petition Clause and cannot be found illegal. <u>See</u> <u>BE & K Const. Co. v. N.L.R.B.</u>, 536 U.S. 516, 531 (2002).  This protection has been extended beyond lawsuits to "conduct incidental to the prosecution of the suit." <u>Sosa</u>, 437 F.3d at 934–35 (quoting <u>Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc.</u>, 944 F.2d 1525, 1528–29 (9th Cir. 1991)).

To determine whether a defendant's conduct is immunized under the <u>Noerr-Pennington</u> doctrine, a court must determine, as a threshold matter, "whether a claim arises from petitioning activity or conduct incidental to it." <u>See</u> <u>Gamble v. Kaiser Found. Health Plan, Inc.</u>, 348 F. Supp. 3d 1003, 1027 (N.D. Cal. 2018).  Courts have previously held the following to be sufficiently related to petitioning activity: pre-suit demand letters, <u>see</u> <u>Sosa</u>, 437 F3d at 936; discovery communications, <u>see</u> <u>Freeman v. Lasky, Haas & Cohler</u>, 410 F.3d 1180, 1185 (9th Cir. 2005); the refusal to enter into settlement negotiations, <u>see</u> <u>Columbia Pictures</u>, 944 F.2d at 528.

Here, Defendant argues that each of the alleged misstatements were "incidental" to

the Delaware Action.  See Mot. to Dismiss at 22.  However, even assuming the Delaware

Action is protected petitioning activity—which Plaintiffs contest, see Opp'n at 23–25—

there is plainly not an "intimate relationship" between Defendant's tweets or his May 16

conference statement and the "actual litigation process" to warrant the protection of the

Petition Clause, see Sosa, 437 F.3d at 936.  Unlike demand letters or discovery

communications, tweeting and publicly speaking about a transaction are not "the type of

activit[ies] that typically arise[] only in the context of contemplated petitioning activity."

See id.  The termination letters, in contrast, are potentially incidental to the Delaware

Action.  However, because Plaintiffs have not adequately alleged falsity with respect to the

letters, the Court need not decide whether they are entitled to Noerr-Pennington immunity.

Accordingly, the Court rejects Defendant's argument as to immunization of the May 13,

May 16, and May 17 statements under the Noerr-Pennington doctrine.

## II.    CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's motion to dismiss

Plaintiffs' claims to the extent they are predicated on the May 13 tweet that the deal was

"temporarily on hold," the May 16 statement that fake and spam accounts make up at least

20% of Twitter's users, and the May 17 tweet.  The Court GRANTS Defendant's motion

with respect to Plaintiffs' claims to the extent they are predicated on all other challenged

statements.  As this is the Court's first substantive order on a complaint in this case, the

Court grants Defendant's motion, as described, with LEAVE TO AMEND within 30 days.

See Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th Cir. 2008).

**IT IS SO ORDERED.**

Dated: December 11, 2023

_____
CHARLES R. BREYER
United States District Judge

United States District Court
Northern District of California