1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Alex Spiro (*pro hac vice* forthcoming)
2  alexspiro@quinnemanuel.com
   Jesse A. Bernstein (*pro hac vice*)
3  Jessebernstein@quinnemanuel.com
   Jonathan E. Feder (*pro hac vice* forthcoming)
4  jonathanfeder@quinnemanuel.com
   51 Madison Ave 22nd floor
5  New York, NY 10010
   Telephone:     (212) 849-7000
6  Facsimile:     (212) 849-7100

7  Michael T. Lifrak (Bar No. 210846)
   michaellifrak@quinnemanuel.com
8  Joseph C. Sarles (Bar No. 254750)
   josephsarles@quinnemanuel.com
9  Alex Bergjans (Bar No. 302830)
   alexbergjans@quinnemanuel.com
10 865 S. Figueroa Street, 10th Floor
   Los Angeles, California 90017
11 Telephone:     (213) 443-3000
   Facsimile:     (213) 443-3100

12
   *Attorneys for Defendant Elon Musk*
13
                  UNITED STATES DISTRICT COURT
14
                NORTHERN DISTRICT OF CALIFORNIA
15

16

17 GIUSEPPE PAMPENA, on behalf of            CASE NO. 3:22-CV-05937-CRB
   himself and all others similarly situated,
                                             **DEFENDANT ELON MUSK'S NOTICE
18                                           OF MOTION AND MOTION FOR
             Plaintiff,                      JUDGMENT ON THE PLEADINGS
19                                           UNDER FED. R. CIV. P. 12(c)**

20      vs.
                                             Judge:      Hon. Charles R. Breyer
21 ELON R. MUSK,
                                             Hearing Date: May 10, 2024
                                             Time:         10:00 a.m.
22           Defendant.                      Courtroom:    6, 17th Floor

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

SUMMARY OF ARGUMENT ..................................................................................................1

RELEVANT FACTS ...........................................................................................................2

LEGAL STANDARD ..........................................................................................................6

ARGUMENT .....................................................................................................................6

I.      Mr. Musk's Statements About Pausing The Deal Could Not Have Materially
        Misled The Market Because Twitter's Legal Obligations Were Publicly Known.................7

II.     Mr. Musk's Statements About Pausing The Deal Could Not Have Been
        Intentionally False If There Was No Countervailing Statement In The Merger
        Agreement. ......................................................................................................11

III.    Mr. Musk's Statements About Pausing The Deal Could Not Have Caused Any
        Loss. ..............................................................................................................12

IV.     Mr. Musk's Statements About Percentage Of Spam Accounts Could Not Have
        Been Misleading Because He Disclosed The Basis Of His Statement. ...............................13

V.      Mr. Musk's Statements About Percentage Of Spam Accounts Could Not Have
        Been Intentionally False Because He Transparently Disclosed His Basis.........................14

VI.     Mr. Musk's May 16 And May 17 Statements About Percentage Of Spam Accounts
        Could Not Have Caused Investor Losses. ..............................................................14

CONCLUSION .................................................................................................................15

1

## **TABLE OF AUTHORITIES**

2

### **Cases**

3

*In re Convergent Techs. Sec. Litig.*,
   948 F.2d 507 (9th Cir. 1991) ............................................................................. 9

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ........................................................................................ 15

*In re Facebook, Inc. Sec. Litig.*,
   87 F.4th 934 (9th Cir. 2023) ............................................................................. 9

*Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*,
   53 F. Supp. 3d 882 (E.D. La. 2014) ................................................................. 10

*Fleming v. Pickard*,
   581 F.3d 922 (9th Cir. 2009) ............................................................................. 6

*Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*,
   2017 WL 114401 (C.D. Cal. Jan. 9, 2017) ...................................................... 6

*Heresniak v. Musk*,
   2023 WL 3605978 (N.D. Cal. May 22, 2023) ................................................. 5

*Kalin v. Semper Midas Fund, Ltd.*,
   2023 WL 8821325 (9th Cir. Dec. 21, 2023) ................................................... 11

*Kilroy v. L.A. Unified Sch. Dist. Bd. of Educ.*,
   2014 WL 12967357 (C.D. Cal. Oct. 14, 2014) ............................................... 6

*Klein v. Facebook, Inc.*,
   580 F. Supp. 3d 743 (N.D. Cal. 2022) ............................................................ 11

*L.P.P.R., Inc. v. Keller Crescent Corp.*,
   532 F. App'x 268 (3d Cir. 2013) ...................................................................... 10

*In re MBIA, Inc., Sec. Litig.*,
   700 F. Supp. 2d 566 (S.D.N.Y. 2010) ............................................................. 10

*In re Nektar Therapeutics Sec. Litig.*,
   34 F.4th 828 (9th Cir. 2022) ............................................................................. 13

*Padnes v. Scios Nova Inc.*,
   1996 WL 539711 (N.D. Cal. Sept. 18, 1996) .................................................. 6

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
   2021 WL 8153575 (N.D. Cal. Sept. 16, 2021) ................................................ 9

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Sam Horse Corp. v. TQL Trading Inc.*,
    2014 WL 4656433 (C.D. Cal. Sept. 17, 2014) ................................................................... 6

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    325 F.R.D. 280 (D. Minn. 2018) ....................................................................................... 13

*Webb v. Trader Joe's*,
    999 F.3d 1196 (9th Cir. 2021) ............................................................................................ 6

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ............................................................................................ 11

### Rules and Regulations

17 C.F.R. § 240.10b ..................................................................................................................... 1

17 C.F.R. § 240.10b5 ................................................................................................................... 1

Fed. R. Civ. P. 9(b) ...................................................................................................................... 1

Fed. R. Civ. P. 12(b)(6) ............................................................................................................... 1

Fed. R. Civ. P. 12(c) ................................................................................................................ 1, 6

Fed. R. Civ. P. 12(h)(2) ............................................................................................................... 6

### Statutes

15 U.S.C. § 78u-4(a), ................................................................................................................... 1

DEFENDANT ELON MUSK'S NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS
UNDER FED. R. CIV. P. 12(c)

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on May 10, 2024, at 10:00 a.m., before The Honorable Charles R. Breyer, United States District Court, San Francisco Courthouse, Courtroom 6, 17th Floor, at 450 Golden Gate Avenue, San Francisco, CA, Defendant Elon R. Musk ("Defendant" or "Mr. Musk") will move for an order entering judgment on the pleadings that, as a matter of law, Plaintiff's Amended Complaint ("Am. Compl.") (Dkt. 31) fails to state a claim, pursuant to the Private Securities Litigation Reform Act of 1995 ("Reform Act"), 15 U.S.C. § 78u-4(a) et seq., and Fed. R. Civ. P. 9(b) and 12(c).  This Motion is based on this Notice of Motion and Motion; Defendant's Memorandum of Points and Authorities, incorporated herein; Defendant's Request for Judicial Notice; the Declaration of Alex Bergjans ("Bergjans Decl.") and accompanying exhibits ("Ex."); and other matters before the Court.

## STATEMENT OF ISSUES TO BE DECIDED (CIVIL L.R. 7-4(a)(3))

Whether the allegations in the Amended Complaint that survived the Court's Rule 12(b)(6) dismissal order are sufficient to prove material falsity, scienter, and loss causation as necessary to maintain a claim for violation of Sections 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5.

## SUMMARY OF ARGUMENT

On May 13 and 17, 2022, Mr. Musk tweeted that his acquisition of Twitter was paused until he gained comfort on certain metrics about spam and bots.  (MTD Op. 5, 8.)  That Mr. Musk actually put the merger on hold is not in dispute—he delayed the acquisition in "months of litigation" before closing (MTD Op. 33).  What is set for litigation here is whether the market drew, and reacted to, a "plausible" inference from Mr. Musk's tweets—"that Twitter was obligated to provide Defendant with the requested information for the deal to close." (MTD Op. 19-20.)  However, a final threshold question, not previously briefed, is set out in note 8 to the Court's motion to dismiss opinion: whether any specifically-identifiable "countervailing statement" existed that "would prevent a reasonable investor from being misled by Defendant's tweet." (MTD Op. 20 n.8.)  The answer to the Court's question is an unequivocal yes:  Twitter's securities filings, exactly as pled by Plaintiffs

1  in their Amended Complaint, were authoritative and decisive "countervailing statement[s] that the

2  deal will close even if Twitter fails to provide [Mr. Musk] the bot data," *id.*

3      As set forth below and among other things, Plaintiffs pleaded the "countervailing statement,"

4  and for purposes of this motion their allegations should be taken as true: "The Buyout was only

5  conditioned on the approval of Twitter's shareholders at a shareholder meeting, regulatory approval,

6  and closing of the Buyout by October 24, 2022" (Am Compl. ¶ 21).  Those conditions to closing are

7  in the **publicly filed** merger agreement; together with the **publicly filed** April 21, 2022 Amended

8  Schedule 13D.  Plaintiffs themselves plead that a reasonable investor knew "Musk had specifically

9  waived detailed due diligence as a condition precedent to his obligations under the Buyout contract.

10  Thus, Musk has no right to cancel the Buyout based on any results from due diligence concerning

11  the number of fake accounts at Twitter" (Am. Compl. ¶¶ 82, 112).  Knowing that, a reasonable

12  investor would not have concluded from a tweet that Twitter *was* obligated to provide bot data.

13      Moreover, *prior* to any "corrective disclosures," Twitter unequivocally and publicly

14  disputed any claims that it was required to provide the bot data Mr. Musk requested.  And while

15  Mr. Musk pointed to specific provisions in the merger agreement, he contended required Twitter to

16  provide such data, Plaintiffs claim those **publicly available** provisions clearly demonstrate that

17  Mr. Musk did not have the right to the information he requested.  Thus, prior to any "corrective

18  disclosure," the market was, accepting Plaintiffs' allegations as true, aware that Twitter was not

19  obligated to provide Defendant with the requested information for the deal to close.

20      In sum, accepting Plaintiffs' allegations, as a result of the **public disclosures,** investors were

21  aware that Mr. Musk had waived any business due diligence as a condition of closing and the merger

22  agreement did not entitle Mr. Musk to the information he requested.  As such, Plaintiffs cannot plead

23  material falsity, scienter, or loss causation.

24                    **RELEVANT FACTS**

25      On April 13, 2022, Mr. Musk made an initial offer to purchase Twitter, "conditioned upon,

26  among other things, . . . confirmatory legal, business, regulatory, accounting and tax due diligence."

27  (Am. Compl. ¶ 76; Bergjans Decl. Ex. 1 at 3.)  Eight days later, on April 21, 2022, Mr. Musk revised

28  his offer in a public Amended Schedule 13D, to waive "business due diligence."  (MTD Op. 3-4.)

Business media also covered this development, noting the significance of the diligence waiver.  *See, e.g.*, Bergjans Decl. Exs. 3-9.  Twitter's May 17, 2022, proxy statement disclosed that Mr. Musk waived all pre-signing diligence: "Prior to entry into the merger agreement, Mr. Musk did not ask to enter into a confidentiality agreement or seek from Twitter any non-public info regarding Twitter."  (Bergjans Decl. Ex. 2 at 54.)  On April 25, 2022, Twitter and Mr. Musk entered into a publicly filed Agreement and Plan of Merger.  (MTD Op. 4.)  This reported waiver was also covered by the Wall Street Journal (among others).  (Bergjans Decl. Ex. 3 at 3) ("[H]is proposal was no longer subject to his team's completing due diligence, clearing a path for a deal to be reached at rapid speed.").

As relevant to this case, Mr. Musk made several post-signing statements.  Though Plaintiffs pled falsity as to over six statements (MTD Op. 5-11), only three survived past the Court's order on Defendant's motion to dismiss (MTD Op. 1-2).

On May 13, 2022, Mr. Musk tweeted: "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users."  (MTD Op. 18.)  After this tweet and within hours of the market opening on May 13, 2022, Bloomberg columnist Matt Levine explained what he characterized as "obvious[]" to the market:  Twitter's pre-signing securities filings included disclosures about the 5% number and Mr. Musk chose not to diligence those representations pre-signing; therefore, Twitter was not legally obligated to provide diligence regarding those numbers as a condition to closing (Bergjans Decl. Ex. 9. at 3):

> He can't now go to Twitter and say "actually now you need to prove that your user numbers are right." If he wants to walk, he has to prove that they're wrong, and also that they're wrong in a way that has a material adverse effect on the business. Which he obviously can't do.

"Contractually this is all pretty buttoned-up," he concluded.  *Id.* at 4.  "That contract does not allow Musk to walk away if it turns out that 'spam/fake accounts' represent more than 5% of Twitter users."  *Id.* at 3.

Journalists and analysts also converged on the possibility that Musk would potentially renegotiate the price—regardless of the merits of any claims he made—because, although "Twitter

could sue to compel Musk to complete the deal[,] . . . such suits are rare and undesirable for obvious reasons."  (Bergjans Decl. Ex. 10. at 1.)

On May 16, 2022, Mr. Musk complained that Twitter informed him "there's just no way to know the number of bots" and though he tried "calling people" there, "I haven't got a response" and then stated that "it seems beyond reasonable for twitter to claim that the number of . . . [bots] . . . [is] five percent" because his own "anecdotal" experience made it beyond belief that "the number of real unique humans that you see making comments on a daily basis on Twitter is above 95%." (Bergjans Decl. Ex. 12 at 2, https://www.youtube.com/watch?v=CnxzrX9tNoc&t=189s at 1:09– 2:40.)  Mr. Musk then provided an estimate:  "I think it's some number that is probably at least four or five times that, . . . [my] estimate would be probably 20."  (Bergjans Decl. Ex. 12 at 2, https://www.youtube.com/watch?v=CnxzrX9tNoc&t=189s at 3:06–27; MTD Op. 7.)  He also provided his basis: "And this is a bunch of quite smart outside firms have done analysis of Twitter and looked at the sort of daily users.  And their conclusion is also about 20%.  But that's a lower bound.     It's   not   an   upper   bound."     (Bergjans   Decl.   Ex.   12   at   2, https://www.youtube.com/watch?v=CnxzrX9tNoc&t=189s at 3:28-46.[1])  In response, Twitter's CEO tweeted: "Unfortunately, we don't believe that this specific estimation can be performed externally, given the critical need to use both public and private information (which we can't share)." (MTD Op. 7.)  Mr. Musk responded with a poop emoji and later commented: "So how do advertisers know what they're getting for their money?  This is fundamental to the financial health of Twitter." (MTD Op. 7-8.)

On May 17, 2022, Mr. Musk tweeted: "20% fake/spam accounts, while 4 times what Twitter claims, could be *much* higher.  My offer was based on Twitter's SEC filings being accurate.

---

[1] *See also* Bergjans Decl. Ex. 14 (Megan McCluskey, *Elon Musk Wants to Rid Twitter of 'Spam Bots.' Nearly Half His Followers Are Fake*, TIME, (April 18, 2022), https://time.com/6171726/elon-musk-fake-followers/); Ex. 15 (Luca Luceri, Felipe Cardoso, and Silvia Giordano, *Down the bot hole: Actionable insights from a one-year analysis of bot activity on Twitter*, FIRST MONDAY, (February 12, 2021) https://firstmonday.org/ojs/index.php/fm/article/download/11441/10079) (noting the study's "percentage of bots (around 20%) and human accounts (around 80%) is line with previous [studies]").).

1   Yesterday Twitter's CEO publicly refused to show proof of <5%.  This deal cannot move forward
2   until he does."  (MTD Op. 8.)

3       On May 25, 2022, a suit filed by the same counsel representing the putative class here alleged
4   that Mr. Musk's May 13 and May 17, 2022, tweets were false because they contradicted the April
5   21, 2022 Amended Schedule 13D *and the April 25, 2022 Merger Agreement*.  *See* Complaint,
6   *Heresniak v. Musk*, No. 22-cv-03074-CRB, Dkt. 1 (N.D. Cal. May 25, 2022) (Bergjans Decl. Ex.
7   13).  On May 22, 2023, this Court dismissed that case for lack of standing and for failure to state
8   any claims upon which relief could be granted.  *See Heresniak v. Musk*, 2023 WL 3605978 (N.D.
9   Cal. May 22, 2023).

10      On July 8, 2022, Mr. Musk sent a publicly filed termination letter to Twitter stating, among
11  other things, that "Twitter has failed or refused to provide this information" regarding the number
12  of spam/fake accounts on Twitter and discussed "Twitter's characterization [that] the Merger
13  Agreement" did not require Twitter to provide the requested information as a condition to Mr.
14  Musk's obligation to close.  (MTD Op. 9-10.)  Twitter's stock price fell 11.3% after the filing of
15  this letter.  (MTD Op. 10.)

16      On July 18, 2022, Wells Fargo published a summary of a July 15, 2022 "expert call" in
17  which its chosen scholar on Delaware law "noted the atypical (and unusually seller-friendly
18  language) in the agreement" which made it "unlikely . . . that TWTR [Twitter] has breached the
19  information covenant" by not providing bot data.  (Bergjans Decl. Ex. 11.)

20      On October 4, 2022, Mr. Musk filed an Amended Schedule 13D disclosing that he "intended
21  to go through with the Merger Agreement."  (MTD Op. 11.)  Twitter's stock price jumped in
22  response.  (MTD Opp. 11.)

23      On October 10, 2022, Plaintiffs filed this action.  (Dkt. 1.)  On June 8, 2023, Plaintiffs filed
24  their now-operative Amended Complaint.  (Dkt. 31.)  On December 11, 2023, the Court granted in
25  part and denied in part Defendant's motion to dismiss.  (Dkt. 48.)  The Court gave Plaintiffs thirty
26  days to amend (Dkt. 48 at 39) and later granted a request to extend the amendment deadline an
27  additional 30 days to February 9, 2024.  (Dkt. 51 at 3.)  Plaintiffs chose not to amend, and Defendant
28  timely filed his Answer on March 8, 2024.  (Dkt. 51 at 3; Dkt. 58.)

## LEGAL STANDARD

A Federal Rule of Civil Procedure Rule 12(c) motion is properly granted where "taking all the allegations in the pleading as true," together with "documents incorporated into the complaint by reference . . . and matters of which a court may take judicial notice," *Webb v. Trader Joe's*, 999 F.3d 1196, 1201 (9th Cir. 2021) (citation omitted), "the moving party is entitled to judgment as a matter of law." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). "[C]onclusory allegations and unwarranted inferences are insufficient to defeat a motion for judgment on the pleadings." *Sam Horse Corp. v. TQL Trading Inc.*, 2014 WL 4656433, at *2 (C.D. Cal. Sept. 17, 2014). And though a "Rule 12(c) motion for judgment on the pleadings raises the same legal questions as a 12(b)(6) motion to dismiss in that both motions test the formal sufficiency of a statement of claim for relief," *Kilroy v. L.A. Unified*, 2014 WL 12967357, at *3 (C.D. Cal. Oct. 14, 2014), a Rule 12(c) motion raising "[f]ailure to state a claim" may be brought at any time before a trial date is set and may raise any issues not raised in a previous motion. *See* Fed. R. Civ. P. 12(h)(2).

## ARGUMENT

"[I]n a securities fraud action based on 'fraud-on the-market,' plaintiffs cannot prevail on a motion to dismiss where they have alleged selective misrepresentations or omissions and have failed to explain how these misstatements are misleading in light of known contemporaneous countervailing statements generally recognized by the market." *Padnes v. Scios Nova Inc.*, 1996 WL 539711, at *9 (N.D. Cal. Sept. 18, 1996). This rule is a sensible extension of the fraud-on-the-market doctrine that Plaintiffs rely upon. *See* Am. Compl. ¶ 182. As plaintiffs plead, the market is efficient and saturated with rational and sophisticated actors able and eager to act on the best available information (and immediately taking any opportunities to arbitrage against irrational actors acting on deficient information). *See* Am. Compl. ¶ 182(c)-(e). Thus, even at the pleading stage, "[w]here contemporaneous statements contradict or qualify the alleged false statements," plaintiffs "must allege why they remain misleading despite that context." *Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*, 2017 WL 114401, at *5 (C.D. Cal. Jan. 9, 2017).

Here, because of certain known countervailing statements in Twitter's securities filings, Mr. Musk's May 13 and 17 tweets could not have been false or misleading. The false inference that

1    Plaintiffs plead—that Twitter was legally obligated to provide bot data—would not have been drawn

2    by the market because, accepting Plaintiffs' own allegations as true, the legal truth was available

3    and known.  A reasonable investor and an efficient market would not look to a tweet by Mr. Musk

4    to infer Twitter's legal obligations when the contract itself (along with the proxy statement laying

5    out all material negotiating history) were equally and already accessible.

6    **I.      Mr. Musk's Statements About Pausing The Deal Could Not Have Materially Misled**
     **The Market Because Twitter's Legal Obligations Were Publicly Known.**

7            The Court found that Mr. Musk's May 13 and May 17 tweets were false because "a

8    reasonable investor could have plausibly understood that Twitter was obligated to provide

9    Defendant with the requested information for the deal to close." (MTD Op. 19.)  On May 13, 2022,

10   this impression flowed from a default assumption that "the parties were working toward closing"

11   and so, Mr. Musk "was waiting for details from the party he was actively working to close the deal

12   with." (MTD Op. 19.)  At the close of the pleadings, this theory is ultimately untenable for Plaintiffs

13   to maintain here because of Plaintiffs' own allegations that Mr. Musk had ***publicly*** waived due

14   diligence as a condition to closing and that no provision in the ***publicly*** disclosed merger agreement

15   required Twitter to provide Mr. Musk the requested information.

16           As alleged in the Amended Complaint, "Twitter <u>did not</u> have an obligation to provide this

17   data to Defendant under the terms of the Merger Agreement" because "Defendant waived due

18   diligence as a condition to the Merger Agreement."  (MTD Op. 20 (emphasis in original).)

19   Plaintiffs' pleading on this point is in three paragraphs, *see* MTD Op. 20 (citing to paragraphs 21,

20   82, and 112):

21           **Paragraph 21.**   "…The Buyout was only conditioned on the approval of Twitter's

22                   shareholders at a shareholder meeting, regulatory approval, and closing of the

23                   Buyout by October 24, 2022."

24           **Paragraph 82**.  "***On April 21, 2022, Musk filed an Amended Schedule 13D which stated***

25                   ***that his acquisition proposal was no longer subject to the completion of***

26                   ***financing and business due diligence*** …." (emphasis in original)

27

28

**Paragraph 112.**  "…Musk had specifically waived detailed due diligence as a condition precedent to his obligations under the Buyout contract . . ."

As pleaded, the only facts that Plaintiffs point to are two public SEC filings, (i) the "April 21, 2022 . . . Amended Schedule 13D" (Am. Compl. ¶ 82) and (ii) "the Buyout contract" (i.e., the Merger Agreement) (Am. Compl. ¶ 112).  Accepting Plaintiffs' allegations as true, both were public *and dispositive*.  The April 21, 2022, Amended Schedule 13D was publicly filed and revealed that Mr. Musk "waived detailed due diligence" (Am. Compl. ¶¶ 82 & 112).  And the Merger Agreement codified this in Article VII and section 8.1:

**Article VII.**     Article VII of the Merger Agreement contains the full and definitive set of the "Conditions to the Merger" containing the conditions to each party's obligations to close.  Section 7.1 contains the "Conditions to the Obligations of Each Party," and Section 7.2 contains the "Conditions to the Obligations of [Mr. Musk's entities]."

**Section 8.1.**     Section 8.1 of the Merger Agreement is the only provision that allows a party to avoid closing.  It sets forth the specific circumstances under which Mr. Musk may terminate upon a failure by Twitter to meet a condition to closing.

Although Sections 7.1, 7.2, and 8.1 contain cross-references to provisions of the Merger Agreement and assign various materiality levels, their import is summarized by Plaintiffs (which summary is assumed to be true and correct for purposes of this motion): "the [Merger Agreement] only conditioned [closing] on the approval of Twitter's shareholders at a shareholder meeting, regulatory approval, and closing of the Buyout by October 24, 2022" (Am. Compl. ¶¶ 21 & 112).  Plaintiffs' counsel, representing a similar putative class in a derivative pre-closing action, provided the same conclusion:

> There is nothing in the buyout contract that allows Musk to put the deal 'temporarily on hold.

Complaint, *Heresniak v. Musk*, Bergjans Decl. Ex. 13, ¶ 14 ("… Musk had <u>specifically waived detailed due diligence</u> as a condition precedent to his obligations under the buyout contract.  Thus,

1   Musk had and has no right to cancel the buyout based on any results from due diligence concerning

2   the number of spam/fake accounts at Twitter." (emphasis in original)).

3        At the motion to dismiss stage, the Court agreed:  if Musk had "investigate[d] . . . the Merger

4   Agreement before making his statements," (MTD Op. 31) he would have discovered that the

5   agreement "waived detailed due diligence" because it was "only conditioned on the approval of

6   Twitter's shareholders at a shareholder meeting, regulatory approval, and closing . . . by October

7   24, 2022." (Am. Compl. ¶¶ 21 & 112).   That investigation—looking through the Merger

8   Agreement—was equally available to Mr. Musk and the public.  *See Police Ret. v. Granite Constr.*,

9   2021 WL 8153575, at *2 (N.D. Cal. Sept. 16, 2021) (finding that "the alleged misrepresentations

10  were publicly known" because they were disclosed "in SEC filings").

11       Accepting these allegations, anyone with access to Twitter's public SEC filings would know

12  from Schedule 13D that Mr. Musk "waived detailed due diligence" and would know from the

13  Merger Agreement that Twitter was not legally obligated to provide the bot data as a condition to

14  closing:  the Merger Agreement "was only conditioned on the approval of Twitter's shareholders at

15  a shareholder meeting, regulatory approval, and closing of the Buyout by October 24, 2022" (Am.

16  Compl. ¶ 12).  And, in fact, the market contemporaneously did opine that Mr. Musk was not entitled

17  to the information he requested.  *See supra* at 3-5.  Indeed, Plaintiffs' own counsel alleged ***within***

18  ***days*** of Mr. Musk's statements that they were false because Mr. Musk waived all due diligence as

19  a closing condition.  *Id.*

20       Thus, "in light of all the information then available to the market," Mr. Musk's May 13 and

21  17, 2022 tweets could not have "conveyed a false or misleading impression" about Twitter's

22  obligation to provide bot data as a condition to closing under the Merger Agreement.  *In re*

23  *Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991) ("[P]laintiff[s] must demonstrate

24  that a particular statement, when read in light of all the information then available to the market, or

25  a failure to disclose particular information, conveyed a false or misleading impression."); *accord In*

26  *re Facebook Inc., Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023); MTD Op. 23 ("Words cannot be

27  viewed in complete isolation but must instead be read in light of all the information then available

28

to the market to decide if they conveyed a false or misleading impression." (internal quotation marks omitted)).

Indeed, even if a reasonable investor could infer that Twitter was obligated to provide bot data, that inference would not have been material to the market. Commonly known as the *truth-on-the-market* defense, the market's saturation with the truth about Twitter's obligations—before, during, and after Mr. Musk's statements—renders an inquiry into the meaning, intent, and perception of Mr. Musk's statements unnecessary and unwarranted here. *See In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 581 (S.D.N.Y. 2010) ("Under the 'truth-on-the-market' theory, 'a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market.'"). Although typical *truth-on-the-market* defenses are fact-specific inquiries rarely decided at the pleadings stage, a key factor distinguishes here: the "truth" was available in the public filings pled by Plaintiffs as the basis for their complaint.

Plaintiffs plead that a reasonable investor would not have known until October 2022 that Mr. Musk waived due diligence, and so the Merger Agreement did not require bot data as a condition to closing. But Plaintiffs also plead that these very facts are evident from the April 21, 2022, Amended Schedule 13D and the Merger Agreement itself (Am. Compl. ¶¶ 21, 82, & 112). Assuming Plaintiffs are right (as required here), the market already knew the truth. *See Firefighters Pension & Relief Fund v. Bulmahn*, 53 F. Supp. 3d 882, 899 (E.D. La. 2014) ("[T]he 'reasonable investor' is 'presumed to have read prospectuses, quarterly reports and other information relating to their investments.'").

And if Plaintiffs are wrong, they cannot plead falsity: if the Merger Agreement and related public filings are not dispositive of Twitter's obligations to provide bot data as a condition to closing, Mr. Musk could not have made any ***objectively*** false statement about Twitter's obligations to provide the bot data. *See L.P.P.R., Inc. v. Keller Crescent Corp.*, 532 F. App'x 268, 274 (3d Cir. 2013) ("The factfinder plays a role in contract interpretation under Delaware law only when the court, without looking to any 'evidence from outside the contract's four corners,' determines that the words of the contract are ambiguous, meaning that 'reasonable minds could differ as to the contract's meaning.'"). Without any objective standard to determine falsity, Plaintiffs fail to plead an

actionable statement.  *See Kalin v. Semper Midas Fund*, 2023 WL 8821325, at *1 (9th Cir. Dec. 21, 2023) ("Actionable statements of fact . . . 'can be [proven] true or false on an objective standard.'"); *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 794 (N.D. Cal. 2022) ("To qualify as a 'material misrepresentation,' a statement must be 'capable of objective verification.'").  Plaintiffs cannot plead *both* that the statement was objectively false based on the Merger Agreement *and that* a reasonable investor would have been blind to this truth for months, oblivious to those public filings.

## II.     Mr. Musk's Statements About Pausing The Deal Could Not Have Been Intentionally False If There Was No Countervailing Statement In The Merger Agreement.

As discussed above, in order to survive dismissal on falsity and materiality grounds, Plaintiffs must argue that there was ***no countervailing statement*** in the merger agreement and related public documents that demonstrated that Twitter was not obligated to provide Mr. Musk with the bot data.  However, any such argument would necessarily defeat scienter.  The Court's ruling with respect to scienter rested upon the notion that had Mr. Musk "investigate[d] . . . the Merger Agreement before making his statements" (MTD Op. 31), he would have discovered that the agreement "waived detailed due diligence" because it was "only conditioned on the approval of Twitter's shareholders at a shareholder meeting, regulatory approval, and closing . . . by October 24, 2022."  (Am. Compl. ¶¶ 21 & 112.)  But, as explained above, *supra* § I, Plaintiffs *must* argue that there was no clear statement in the merger agreement contradicting Mr. Musk's view that Twitter was obligated to provide him with the requested data in order to close the merger agreement; for that same reason, Mr. Musk would not be reckless in taking that position.   Under such circumstances, it would be far more plausible that Mr. Musk truly and honestly believed he was entitled to the information he requested—and was therefore not misleading the market—than the malicious inference that Mr. Musk believed he could mislead the entire market regarding his rights under a publicly available document.  *See* MTD Op. 29; *Zucco Partners v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (emphasis added) ("A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint . . .").

**III.   Mr. Musk's Statements About Pausing The Deal Could Not Have Caused Any Loss.**

Even assuming Plaintiffs could plausibly allege that investors understood Mr. Musk's statements to suggest that Twitter was obligated to provide Defendants with the requested information for the deal to close, Plaintiffs cannot plead loss causation.  The Court ruled Plaintiffs "plausibly alleged that when Defendant announced that he would move forward with the deal— after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his due diligence requests—the market reasonably reacted to the 'truth' that Twitter never had the obligation to provide the bot-account information to Defendant."  (MTD Op. 35-36.)  But to the extent it was true that Twitter did not have an obligation to provide the bot-account information, the market learned that far earlier than the October 4, 2022 "corrective disclosure."

In fact, within weeks of Mr. Musk's allegedly false statements, Twitter not only ***publicly refused*** to provide the information (*see* MTD Op. 7-9), it also ***publicly stated*** that it was not obligated to provide that information (*see* MTD Op. 9-10).  Market commentators confirmed their belief that the merger agreement did not entitle Mr. Musk to the information he requested.  *See supra* at 3-5.  By July 8, 2022—prior to any corrective disclosure—Twitter's position that it would not provide Mr. Musk with bot data was once again publicly disclosed.  (MTD Op. 10.)

That same day, Mr. Musk identified the specific contractual provisions (Sections 6.4 and 6.11) that he contended entitled him—and Twitter contended did not entitle him—to the bot data.  (MTD Op. 10.)  Armed with these disclosures, investors were fully capable of evaluating the specific publicly available contractual provisions and determining whose interpretation was correct.  According to Plaintiffs, those contractual provisions—on their face—were narrow and did not require Twitter to provide the bot information.  (MTD Op. 20.)  Market analysts agreed.  *See supra* at 3-4.

Thus, accepting Plaintiffs' allegations, any investor reviewing those provisions would know—no later than July 8, 2022—"that Twitter never had the obligation to provide the bot-account information to Defendant."  (MTD Op. 36.)  Accordingly, because the full "truth" was revealed, according to Plaintiffs' own allegations, no later than July 8, 2022, Plaintiffs cannot plead loss causation based on a disclosure ***months later*** since "a corrective disclosure must by definition reveal

new information to the market that has not yet been incorporated into the [stock] price." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 839 (9th Cir. 2022) (internal quotation marks omitted); *see also W. Va. Pipe v. Medtronic, Inc.*, 325 F.R.D. 280, 291 (D. Minn. 2018) ("Corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time, because, if investors already know the truth, false statements won't affect the price.").

## IV. Mr. Musk's Statements About Percentage Of Spam Accounts Could Not Have Been Misleading Because He Disclosed The Basis Of His Statement.

On May 16, 2022, Mr. Musk stated "that fake and spam accounts make up at least 20% of Twitter's users." (MTD Op. 22.) On May 17, 2022, Mr. Musk tweeted, "20% fake/spam accounts, while 4 times what Twitter claims, could be *much* higher . . . Yesterday, Twitter's CEO publicly refused to show proof <5%." (MTD Op. 8, 24.) The Court found that Plaintiffs adequately pleaded that the May 16 and 17, 2022 statements could have misled a reasonable investor because of the plausible inference from the May 13, 2022 tweet. (MTD Op. 22.) Specifically, because a reasonable investor could have plausibly inferred that Twitter was legally obligated to provide bot data, the same investor could reasonably interpret the May 16 and 17 statements to mean that Twitter's own data supported Mr. Musk's 20% estimates. *See* MTD Op. 23-25 ("In the context of Defendant's May 13, 2022 tweet, Plaintiffs have adequately pleaded that the May 16 statement is misleading.").

Because, as explained above, the May 13, 2022 tweet was not capable of misleading a reasonable investor to believe that Mr. Musk was legally entitled to bot data under the Merger Agreement, the May 16 and 17, 2022 statements could not have misled the same investor to believe that Mr. Musk had "access to and findings about Twitter's data" (MTD Op. 24.)

However, even if a reasonable investor could have been misled to believe that Mr. Musk had "access to and findings about Twitter's data," that misimpression could not have even survived the day. On May 16, 2022, in a recorded event, Mr. Musk disclosed that Twitter **refused** to provide him "a response" on his requests regarding "the number of bots on Twitter." (Bergjans Decl. Ex. 12 at 1, *see* https://www.youtube.com/watch?v=CnxzrX9tNoc&t=189s at 0:56-1:36.) Colorfully, Mr. Musk characterized how Twitter told him "that there's just no way to know the number of bots. It's like as unknowable as the human soul." *Id.* And Mr. Musk disclosed that his "estimate" of 20%

was based on "analysis" from "a bunch of quite smart outside firms," meaning, expressly *not* from Twitter which he again characterized as stonewalling him and trying to sell him "the Brooklyn Bridge." (Bergjans Decl. Ex. 12 at 2, *see* www.youtube.com/watch?v=CnxzrX9tNoc&t=189s at 2:18-3:43.) This was all in the same recorded event that Plaintiffs rely upon for the first misstatement regarding the number of bots. *See* MTD Op. 22. And it was simultaneous with a response from Twitter that Mr. Musk's "specific estimation" was not credible because he did not have access to "private information" that was only available internally at Twitter. (MTD Op. 7.) Thus, like his statements regarding pausing the deal with Twitter, Mr. Musk's own countervailing statements—not previously before the Court—render implausible that any investor would have understood Mr. Musk's tweets to mean that his 20% estimate was based on information from Twitter. Indeed, he explicitly said he was ***not*** getting information from Twitter and that the figure was based on ***outside*** firms' estimates.

## V.   Mr. Musk's Statements About Percentage Of Spam Accounts Could Not Have Been Intentionally False Because He Transparently Disclosed His Basis.

Even assuming investors could have been misled by Mr. Musk's tweets, his transparent disclosure that Twitter refused to provide him "a response" on his requests regarding "the number of bots on Twitter" and that the basis for his statement was not Twitter-provided information or his own analysis, but rather, estimates from outside firms, debunks scienter. Indeed, it is implausible— let alone cogent and compelling—that Mr. Musk would attempt to mislead investors into believing his 20% figure was based on information from Twitter only to admit the same day that it was not from Twitter.

## VI.   Mr. Musk's May 16 And May 17 Statements About Percentage Of Spam Accounts Could Not Have Caused Investor Losses.

This Court has already rejected Plaintiffs' argument that any disclosure "revealed" the truth regarding the alleged misstatements concerning spam accounts. Instead, the Court accepted that, even in the absence of a corrective disclosure, an allegation that Plaintiffs "sold their shares at an artificially depressed price" satisfies loss causation. (MTD Op. 37.) This alternative theory—which Mr. Musk did not address in the motion to dismiss briefing—fails as a matter of fact and law.

1    What Plaintiffs received for their sale of securities was cash—a perfect substitute for the

2    securities they sold.  For as long as Twitter stock sold at or below the price which Plaintiffs sold at,

3    they held the equivalent to that stock and suffered no loss at all.  *Cf. Dura Pharms. v. Broudo*, 544

4    U.S. 336, 342 (2005) ("[A]s a matter of pure logic, at the moment the transaction takes place, the

5    plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at

6    that instant possesses equivalent value.").  On that fact alone, they suffered no loss, as a matter of

7    law—they can only show a loss *if* they can prove that the stock would have increased in value, a

8    wholly uncertain fact.

9    But even as a matter of fact, on July 8, 2022, by their own pleadings, Plaintiffs were aware

10   that Twitter had refused to provide the bot data.  (MTD Op. 10.)  And on that date, the price of

11   Twitter stock was materially *lower* than on May 16 and 17, 2022.[2]  Thus, if Plaintiffs *were* misled

12   and sold as a result, it inured to their benefit; by the time of their enlightenment to the truth, they

13   could repurchase the exact same securities at a discount to the date they sold it, turning a net profit—

14   holding the same security *plus cash* they would not otherwise hold.  *Dura Pharms.*, 544 U.S. at 346

15   ("[P]laintiffs[] need to *prove* proximate causation and economic loss." (emphasis in original)).  For

16   that reason, Plaintiffs' direct causal relationship theory fails.

### CONCLUSION

18   Defendant respectfully requests that the Court grant his Motion for Judgment on the

19   Pleadings and dismiss Plaintiffs' Amended Complaint with prejudice.

---

[2] *See* Bergjans Decl. Ex. 16, https://www.macrotrends.net/stocks/delisted/TWTR/Twitter/stock-price-history ($38.32 on May 17, 2022 and $36.85 on May 18, 2022; $36.81 on July 8, 2022).

DATED:  March 26, 2024

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By _____/s/ Michael T. Lifrak_____
    Alex Spiro
    Michael T. Lifrak
    Joseph C. Sarles
    Jesse A. Bernstein
    Alex Bergjans
    Jonathan E. Feder

    *Attorneys for Defendant Elon Musk*

DEFENDANT ELON MUSK'S NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS
UNDER FED. R. CIV. P. 12(c)

1

## CERTIFICATE OF SERVICE

2          I hereby certify that the foregoing document was served on all counsel of record

3 electronically or by another manner authorized under FED. R. CIV. P. 5(b) on this the 26th day of

4 March, 2024.

5

6                                    QUINN EMANUEL URQUHART &
                                     SULLIVAN, LLP
7

8                                    By  /s/ Alex Bergjans
9                                        Alex Spiro
                                         Michael T. Lifrak
10                                       Joseph C. Sarles
                                         Jesse A. Bernstein
11                                       Alex Bergjans
                                         Jonathan E. Feder
12

13                                       *Attorneys for Defendant Elon Musk*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>ATTESTATION</u>

Pursuant to Civil L.R. 5-1,  I attest under penalty of perjury that concurrence in the filing of this document has been obtained from the other signatory herein.


By <u>*/s/ Alex Bergjans*</u>
Alex Spiro
Michael T. Lifrak
Joseph C. Sarles
Alex Bergjans
Jonathan E. Feder

*Attorneys for Defendant Elon Musk*