1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Alex Spiro (*pro hac vice* forthcoming)
2  alexspiro@quinnemanuel.com
   Jesse Bernstein (*admitted pro hac vice*)
3  jessebernstein@quinnemanuel.com
   Jonathan E. Feder (*pro hac vice* forthcoming)
4  jonathanfeder@quinnemanuel.com
   51 Madison Ave 22nd floor
5  New York, NY 10010
   Telephone:      (212) 849-7000
6  Facsimile:      (212) 849-7100

7  Michael T. Lifrak (Bar No. 210846)
   michaellifrak@quinnemanuel.com
8  Joseph C. Sarles (Bar No. 254750)
   josephsarles@quinnemanuel.com
9  Alex Bergjans (Bar No. 302830)
   alexbergjans@quinnemanuel.com
10 865 S. Figueroa Street, 10th Floor
   Los Angeles, California 90017
11 Telephone:      (213) 443-3000
   Facsimile:      (213) 443-3100

12
   *Attorneys for Defendant Elon Musk*
13
                    UNITED STATES DISTRICT COURT
14
                  NORTHERN DISTRICT OF CALIFORNIA
15

16
   GIUSEPPE PAMPENA, on behalf of              CASE NO. 3:22-CV-05937-CRB
17 himself and all others similarly situated,
                                               **DECLARATION OF ALEX BERGJANS**
18                Plaintiff,                    **IN SUPPORT OF MOTION FOR**
                                               **JUDGMENT ON THE PLEADINGS**
19          vs.                                **UNDER FED. R. CIV. P. 12(c)**

20 ELON R. MUSK,                               Judge:      Hon. Charles R. Breyer

21                Defendant.                    Hearing Date:    May 10, 2024
                                               Time:            10:00 a.m.
22                                             Courtroom:  6, 17th Floor

23

24

25

26

27

28

## DECLARATION OF ALEX BERGJANS

I, Alex Bergjans, declare as follows:

I am a member of the bar of the State of California and an associate at Quinn Emanuel Urquhart & Sullivan, LLP, attorneys for Defendant Elon R. Musk in this action. I have personal knowledge of the facts set forth herein and if called as a witness, I could and would competently testify thereto. I make this declaration in support of Mr. Elon R. Musk's Motion for Judgment on the Pleadings filed herewith.

1.      Attached hereto as Exhibit 1 is a true and correct copy of Twitter Inc.'s April 13, 2022, Amendment No. 2 to Schedule 13D/A, which is available online at: https://www.sec.gov/Archives/edgar/data/1418091/000110465922045641/tm2212748d1_sc13da.htm.

2.      Attached hereto as Exhibit 2 is a true and correct copy of Twitter Inc.'s July 15, 2022, Proxy, which is available online at: https://www.sec.gov/Archives/edgar/data/1418091/000119312522152250/d283119dprem14a.htm.

3.      Attached hereto as Exhibit 3 is a true and correct copy of an April 26, 2022, article which appeared in *The Wallstreet Journal* titled "How Elon Musk Won Twitter," which is available online at:  https://www.wsj.com/articles/how-elon-musk-won-twitter-11650943029.

4.      Attached hereto as Exhibit 4 is a true and correct copy of an April 21, 2022, article which appeared in *Bloomberg News* titled "Elon Got His Money," which is available online at: https://www.bloomberg.com/opinion/articles/2022-04-21/elon-got-his-money?embedded-checkout=true.

5.      Attached hereto as Exhibit 5 is a true and correct copy of an April 26, 2022, article which appeared in *Fortune* titled "Elon Musk's deal to buy Twitter diverges from Wall Street norms in 5 ways, according to an insider," which is available online at: https://fortune.com/2022/05/12/elon-musk-twitter-financing-details/.

6.      Attached hereto as Exhibit 6 is a true and correct copy of an April 30, 2022, article which appeared in *The New York Times* titled "How Twitter's Board Went from Fighting Elon Musk to Accepting Him," which is available online at: https://www.nytimes.com/2022/04/30/technology/twitter-board-elon-musk.html.

7.      Attached hereto as Exhibit 7 is a true and correct copy of a May 2, 2022, article which appeared in *Bloomberg News* titled "Twitter's Board Gave Up" which is available online at: https://www.bloomberg.com/opinion/articles/2022-05-02/twitter-s-board-gave-up.

8.      Attached hereto as Exhibit 8 is a true and correct copy of a May 11, 2022 article which appeared in *Yahoo News* titled "Explainer: Can Elon Musk renegotiate a lower price for his Twitter deal,?" which is available online at:   https://news.yahoo.com/explainer-elon-musk-renegotiate-lower-100347862.html.

9.      Attached hereto as Exhibit 9 is a true and correct copy of a May 13, 2022, article which appeared in *Bloomberg News* titled "Elon Musk Trolls Twitter" which is available online at:
https://web.archive.org/web/20220513171030/https://www.bloomberg.com/opinion/articles/2022-05-13/elon-musk-trolls-twitter.

10.      Attached hereto as Exhibit 10 is a true and correct copy of a June 21, 2022, analyst report from Rosenblatt Securities regarding Twitter, Inc. (TWTR).

11.      Attached hereto as Exhibit 11 is a true and correct copy of a July 18, 2022, Company Update from Wells Fargo regarding Twitter, Inc. (TWTR).

12.      Attached hereto as Exhibit 12 is a true and correct copy of a transcript of a May 16, 2022, YouTube video of an All-In Podcast (https://www.youtube.com/watch?v=CnxzrX9tNoc) which is available online at: https://steno.ai/conference/allin-summit-2022/e69-elon-musk-on-twitters-bot-problem-spacexs-grand-plan-tesla-stories-giga-texas-more.

13.      Attached hereto as Exhibit 13 is a copy of the Complaint (Dkt. 1) in *Heresniak v. Musk*, No. 22-cv-03074-CRB, (N.D. Cal. May 25, 2022).

14.      Attached hereto as Exhibit 14 is a true and correct copy of an April 28, 2022, article which appeared in *Time* titled "Elon Musk Wants to Rid Twitter of 'Spam Bots.' Nearly Half His Followers Are Fake," which is available online at:  https://time.com/6171726/elon-musk-fake-followers.

15.      Attached hereto as Exhibit 15 is a true and correct copy of a February 12, 2021, journal article titled "Down the bot hole: Actionable insights from a one-year analysis of bot

1   activity on Twitter," which is available online at:

2   https://firstmonday.org/ojs/index.php/fm/article/download/11441/10079.

3       16.     Attached hereto as Exhibit 16 is a true and correct copy of screenshots of share

4   price data for Twitter available at

5   https://www.macrotrends.net/stocks/delisted/TWTR/Twitter/stock-price-history.

6       I declare under penalty of perjury under the laws of the United States and the state of

7   California that the foregoing is true and correct.

8       Executed this 26th day of March 2024, in Los Angeles, California.

9

10

11                                  By  */s/ Alex Bergjans*
                                        Alex Bergjans
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that the foregoing document was served on all counsel of record

3

electronically or by another manner authorized under FED. R. CIV. P. 5(b) on this the 26th day of

4

March 2024.

5

6

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

7

8

By  */s/ Alex Bergjans*

9

Alex Spiro
Jesse Bernstein

10

Michael T. Lifrak
Joseph C. Sarles

11

Jonathan E. Feder
Alex Bergjans

12

13

*Attorneys for Defendant Elon Musk*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

SC 13D/A 1 tm2212748d1_sc13da.htm SC 13D/A

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

AMENDMENT No. 2 to
SCHEDULE 13D/A
Under the Securities Exchange Act of 1934
(Amendment No. 2 to Schedule 13D)

---

Twitter Inc.

(Name of Issuer)

---

Common Stock

(Title of Class of Securities)

---

90184L102

(Cusip Number)

---

John Lutz
Heidi Steele
McDermott Will & Emery LLP
444 West Lake Street, Suite 4000
Chicago, IL 60657
(312) 984-3624

(Name, Address and Telephone Number of Person
Authorized to Receive Notices and Communications)

---

April 13, 2022

(Date of Event Which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box. ☒

*The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the act (however, see the Notes).

SCHEDULE 13D

CUSIP No. 90184L102

| 1 | Name of Reporting Person: I.R.S. Identification Nos. of Above Person (entities only): Elon R. Musk |
|---|---|
| 2 | Check the Appropriate Box if a Member of a Group (See Instructions): (a) ☐ (b) ☐ |
| 3 | SEC Use Only: |
| 4 | Source of Funds (See Instruction): OO |
| 5 | Check if Disclosure of Legal Proceedings is Required Pursuant to Items 2(d) or 2(e): ☒ |
| 6 | Citizenship or Place of Organization: USA |

| Number of Shares Beneficially Owned by Each Reporting Person With | 7 | Sole Voting Power: 73,115,038 |
|---|---|---|
| | 8 | Shared Voting Power: -- |
| | 9 | Sole Dispositive Power: 73,115,038 |
| | 10 | Shared Dispositive Power: -- |

| 11 | Aggregate Amount Beneficially Owned by Each Reporting Person: 73,115,038 |
|---|---|
| 12 | Check if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions) ☐ |
| 13 | Percent of Class Represented by Amount in Row (11): 9.1%[1] |
| 14 | Type of Reporting Person (See Instructions): IN |

[1] Based on 800,641,166 shares of Common Stock outstanding as of February 10, 2022 as reported in the Issuer's Annual Report on Form 10-K for the year ended December 31, 2021.

SCHEDULE 13D

Explanatory Note: This statement on Schedule 13D amends the Schedule 13D of Elon Musk (the "Reporting Person") that was filed with the Securities and Exchange Commission on April 5, 2022, as amended on April 11, 2022 (collectively, the "Schedule 13D"), with respect to the Common Stock of Twitter Inc. (the "Issuer'). This amendment to the Schedule 13D constitutes Amendment No. 2 to the Schedule 13D. Capitalized terms used but not defined herein have the meanings given to such terms in the Schedule 13D. Except as set forth herein, the Schedule 13D is unmodified.

**Item 4.    Purpose of Transaction.**

Item 4 of the Schedule 13D is amended and restated in its entirety to read as follows:

On April 13, 2022, the Reporting Person delivered a letter to the Issuer (the "Letter") which contained a non-binding proposal (the "Proposal") to acquire all of the outstanding Common Stock of the Issuer not owned by the Reporting Person for all cash consideration valuing the Common Stock at $54.20 per share (the "Proposed Transaction"). This represents a 54% premium over the closing price of the Common Stock on January 28, 2022, the trading day before the Reporting Person began investing in the Issuer, and a 38% premium over the closing price of the Common Stock on April 1, 2022, the trading day before the Reporting Person's investment in the Issuer was publicly announced.

The Proposal is non-binding and, once structured and agreed upon, would be conditioned upon, among other things, the (i) receipt of any required governmental approvals; (ii) confirmatory legal, business, regulatory, accounting and tax due diligence; (iii) the negotiation and execution of definitive agreements providing for the Proposed Transaction; and (iv) completion of anticipated financing.

There can be no assurance that a definitive agreement with respect to the Proposal will be executed or, if executed, whether the transaction will be consummated. There is also no certainty as to whether, or when, the Issuer may respond to the Letter, or as to the time table for execution of any definitive agreement. The Reporting Person reserves the right to withdraw the Proposal or modify the terms at any time including with respect to the amount or form of consideration. The Reporting Person may, directly or indirectly, take such additional steps as he may deem appropriate to further the Proposal.

If the Proposed Transaction is completed, the Common Stock would become eligible for termination of its registration pursuant to Section 12(g)(4) of the Securities Exchange Act of 1934, as amended, and would be delisted from the New York Stock Exchange.

The foregoing description is qualified in its entirety by reference to the full text of the Letter, a copy of which is attached hereto as Exhibit B and is incorporated herein by reference.

The Reporting Person has engaged Morgan Stanley as its financial advisor.

Neither the Letter nor this Schedule 13D is meant to be, nor should be construed as, an offer to buy or the solicitation of an offer to sell any of the Issuer's securities.

The Reporting Person intends to review his investment in the Issuer on a continuing basis. Depending on the factors discussed herein, the Reporting Person may, from time to time, acquire additional shares of Common Stock and/or retain and/or sell all or a portion of the shares of Issuer common stock held by the Reporting Person in the open market or in privately negotiated transactions, and/or may distribute the Common Stock held by the Reporting Person to other entities. Any actions the Reporting Person might undertake will be dependent upon the Reporting Person's evaluation of numerous factors, including, among other things, the outcome of any discussions referenced in this Schedule 13D, the price levels of the Common Stock, general market and economic conditions, ongoing evaluation of the Issuer's business, financial condition, operations and prospects, the relative attractiveness of alternative business and investment opportunities, investor's need for liquidity, and other future developments.

From time to time, the Reporting Person may engage in discussions with the Board and/or members of the Issuer's management team concerning, including, without limitation, the Proposal, potential business combinations and strategic alternatives, the business, operations, capital structure, governance, management, strategy of the Issuer and other matters concerning the Issuer. The Reporting Person may express his views to the Board and/or members of the Issuer's management team and/or the public through social media or other channels with respect to the Issuer's business, products and service offerings.

Except as set forth above, the Reporting Person has no present plans or intentions which would result in or relate to any of the transactions described in subparagraphs (a) through (j) of Item 4 of Schedule 13D. However, the Reporting Person reserves the right to change his plans at any time, as he deems appropriate, and in light of his ongoing evaluation of numerous factors, including, among other things, the price levels of the Common Stock, general market and economic conditions, ongoing evaluation of the Issuer's business, financial condition, operations and prospects, the relative attractiveness of alternative business and investment opportunities, Reporting Person's need for liquidity, and other future developments.

**Item 7.    Material to be Filed as Exhibits.**

| | |
|---|---|
| Exhibit A: | Letter Agreement, dated as of April 4, 2022, by and between Twitter, Inc. and the Reporting Person (incorporated herein by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by the Issuer with the Securities and Exchange Commission on April 5, 2022). |
| Exhibit B: | Letter from the Reporting Person to the Issuer dated April 13, 2022. |

**SIGNATURE**

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Date: April 13, 2022

By: /s/ Elon Musk
    Elon Musk

**Exhibit B**

Bret Taylor
Chairman of the Board,

I invested in Twitter as I believe in its potential to be the platform for free speech around the globe, and I believe free speech is a societal imperative for a functioning democracy.

However, since making my investment I now realize the company will neither thrive nor serve this societal imperative in its current form. Twitter needs to be transformed as a private company.

As a result, I am offering to buy 100% of Twitter for $54.20 per share in cash, a 54% premium over the day before I began investing in Twitter and a 38% premium over the day before my investment was publicly announced. My offer is my best and final offer and if it is not accepted, I would need to reconsider my position as a shareholder.

Twitter has extraordinary potential.  I will unlock it.


/s/ Elon Musk
_____

Elon Musk

**<u>Script</u>**

[SEND VIA TEXT]

As I indicated this weekend, I believe that the company should be private to go through the changes that need to be made.

After the past several days of thinking this over, I have decided I want to acquire the company and take it private.

I am going to send you an offer letter tonight, it will be public in the morning.

Are you available to chat?

[VOICE SCRIPT]

1. Best and Final:
   a. I am not playing the back-and-forth game.
   b. I have moved straight to the end.
   c. It's a high price and your shareholders will love it.
   d. If the deal doesn't work, given that I don't have confidence in management nor do I believe I can drive the necessary change in the public market, I would need to reconsider my position as a shareholder.
      i. This is not a threat, it's simply not a good investment without the changes that need to be made.
      ii. And those changes won't happen without taking the company private.

2. My advisors and my team are available after you get the letter to answer any questions
   a. There will be more detail in our public filings. After you receive the letter and review the public filings, your team can call my family office with any questions.

---

# EXHIBIT 2

PREM14A 1 d283119dprem14a.htm PREM14A

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# SCHEDULE 14A

**PROXY STATEMENT PURSUANT TO SECTION 14(a) OF THE
SECURITIES EXCHANGE ACT OF 1934**

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☒ Preliminary Proxy Statement

☐ Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))

☐ Definitive Proxy Statement

☐ Definitive Additional Materials

☐ Soliciting Material under §240.14a-12

# TWITTER, INC.
**(Name of Registrant as Specified In Its Charter)**

Payment of Filing Fee (Check all boxes that apply):

☐ No fee required.

☐ Fee paid previously with preliminary materials.

☒ Fee computed on table in exhibit required by Item 25(b) per Exchange Act Rules 14a-6(i)(1) and 0-11.

**Table of Contents**

**PRELIMINARY PROXY STATEMENT—SUBJECT TO COMPLETION**



**TWITTER, INC.**
**1355 MARKET STREET, SUITE 900**
**SAN FRANCISCO, CALIFORNIA 94103**

**To the Stockholders of Twitter, Inc.:**

You are cordially invited to attend a special meeting of stockholders (which we refer to, together with any adjournment, postponement or other delay thereof, as the "**special meeting**") of Twitter, Inc. (which we refer to as "**Twitter**"). The special meeting will be held on **[•]**, **2022, at [•], Pacific time**. You may attend the special meeting via a live interactive webcast at http://www.virtualshareholdermeeting.com/TWTR2022SM. You will be able to listen to the special meeting live and vote online. We believe that a virtual meeting provides expanded access, improved communication and cost savings for our stockholders and Twitter.

At the special meeting, you will be asked to consider and vote on a proposal to adopt the Agreement and Plan of Merger (as it may be amended from time to time), dated as of April 25, 2022 (which we refer to as the "**merger agreement**"), among X Holdings I, Inc. (which we refer to as "**Parent**"), X Holdings II, Inc., a wholly owned subsidiary of Parent (which we refer to as "**Acquisition Sub**"), Twitter, and, solely for the purposes of certain provisions of the merger agreement, Elon R. Musk. Parent is wholly owned by Mr. Musk. We refer to the merger of Acquisition Sub with and into Twitter as the "**merger**."

At the special meeting, you will also be asked to consider and vote on a proposal to approve, on a non-binding, advisory basis, the compensation that will or may become payable by Twitter to its named executive officers in connection with the merger; and a proposal for the adjournment of the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting.

If the merger is completed, you will be entitled to receive $54.20 in cash, without interest and subject to any applicable withholding taxes, for each share of our common stock that you own (unless you have properly exercised your appraisal rights). This amount constitutes a premium of approximately 38 percent to the closing price of our common stock on April 1, 2022, which was the last full trading day before Mr. Musk disclosed his approximately nine percent stake in Twitter.

**Twitter's Board of Directors, after considering the factors more fully described in the enclosed proxy statement, unanimously: (1) determined that the merger agreement is advisable and the merger and the other transactions contemplated by the merger agreement are fair to, advisable and in the best interests of Twitter and its stockholders; and (2) adopted and approved the merger agreement, the merger and the other transactions contemplated by the merger agreement.**

**Twitter's Board of Directors unanimously recommends that you vote:**

(1) **"FOR" the adoption of the merger agreement;**

(2) **"FOR" the compensation that will or may become payable by Twitter to its named executive officers in connection with the merger; and**

Table of Contents

(3)      "**FOR**" the adjournment of the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting.

The accompanying proxy statement provides detailed information about the special meeting, the merger agreement and the merger, and the other proposals to be considered at the special meeting. A copy of the merger agreement is attached as Annex A to the proxy statement.

The accompanying proxy statement also describes the actions and determinations of Twitter's Board of Directors in connection with its evaluation of the merger agreement and the merger. Please read the proxy statement and its annexes, including the merger agreement, carefully and in their entirety, as they contain important information.

Even if you plan to virtually attend the special meeting, please sign, date and return, as promptly as possible, the enclosed proxy card (a proxy card and a prepaid reply envelope are enclosed for your convenience) or grant your proxy electronically over the internet or by telephone (using the instructions found on the proxy card). If you virtually attend the special meeting and vote at the special meeting, your vote will revoke any proxy that you have previously submitted. If you fail to return your proxy or to attend the special meeting, your shares will not be counted for purposes of determining whether a quorum is present at the special meeting and will have the same effect as a vote against the adoption of the merger agreement.

If your shares are held through a bank, broker or other nominee, you are considered the "beneficial owner" of shares held in "street name." If you hold your shares in "street name," you will receive instructions from your bank, broker or other nominee that you must follow in order to submit your voting instructions and have your shares counted at the special meeting. Your bank, broker or other nominee cannot vote on any of the proposals to be considered at the special meeting without your instructions. Without your instructions, your shares will not be counted for purposes of a quorum or be voted at the special meeting, and that will have the same effect as voting against the adoption of the merger agreement.

Your vote is very important, regardless of the number of shares that you own.

If you have any questions or need assistance voting your shares, please contact our proxy solicitor:

Innisfree M&A Incorporated
501 Madison Avenue, 20th Floor
New York, New York 10022
Stockholders call: (877) 750-8338 (toll-free from the U.S. and Canada) or
+1 (412) 232-3651 (from other countries)
Banks and brokers call collect: (212) 750-5833

On behalf of Twitter's Board of Directors, thank you for your support.

Very truly yours,

**Parag Agrawal**
*Chief Executive Officer and Director*

**Bret Taylor**
*Chairman of the Board of Directors*

The accompanying proxy statement is dated [•], 2022 and, together with the enclosed form of proxy card, is first being sent to stockholders on or about [•], 2022.

**Table of Contents**

**PRELIMINARY PROXY STATEMENT—SUBJECT TO COMPLETION**



**TWITTER, INC.**
**1355 MARKET STREET, SUITE 900**
**SAN FRANCISCO, CALIFORNIA 94103**

**NOTICE OF SPECIAL MEETING OF STOCKHOLDERS**
**TO BE HELD ON [•], 2022**

Notice is given that a special meeting of stockholders (which we refer to, together with any adjournment, postponement or other delay thereof, as the "**special meeting**") of Twitter, Inc., a Delaware corporation (which we refer to as "**Twitter**"), will be held on [•], 2022, at [•], Pacific time, for the following purposes:

1. To consider and vote on the proposal to adopt the Agreement and Plan of Merger (as it may be amended from time to time) dated as of April 25, 2022, among X Holdings I, Inc., X Holdings II, Inc., Twitter, and, solely for the purposes of certain provisions of the merger agreement, Elon R. Musk (which we refer to as the "**merger agreement**");

2. To consider and vote on the proposal to approve, on a non-binding, advisory basis, the compensation that will or may become payable by Twitter to its named executive officers in connection with the merger of X Holdings II, Inc., a wholly owned subsidiary of X Holdings I, Inc., with and into Twitter (which we refer to as the "**merger**");

3. To consider and vote on any proposal to adjourn the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting; and

4. To transact any other business that may properly come before the special meeting.

The special meeting will be held by means of a live interactive webcast on the internet at http://www.virtualshareholdermeeting.com/TWTR2022SM. You will be able to listen to the special meeting live and vote online. The special meeting will begin promptly at [•], Pacific time. Online check-in will begin a few minutes prior to the special meeting. You will need the control number found on your proxy card or voting instruction form in order to participate in the special meeting (including voting your shares).

Only Twitter stockholders as of the close of business on [•], 2022 are entitled to notice of, and to vote at, the special meeting.

**Twitter's Board of Directors unanimously recommends that you vote: (1) "FOR" the adoption of the merger agreement; (2) "FOR" the compensation that will or may become payable by Twitter to its named executive officers in connection with the merger; and (3) "FOR" the adjournment of the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting.**

Twitter stockholders who do not vote in favor of the proposal to adopt the merger agreement will have the right to seek appraisal of the "fair value" of their shares of our common stock (exclusive of any

Table of Contents

elements of value arising from the accomplishment or expectation of the merger and together with interest (as described in the accompanying proxy statement) to be paid on the amount determined to be "fair value") in lieu of receiving $54.20 per share in cash if the merger is completed, as determined in accordance with Section 262 of the Delaware General Corporation Law (which is referred to as the "**DGCL**"). To do so, a Twitter stockholder must properly demand appraisal before the vote is taken on the merger agreement and comply with all other requirements of the DGCL, including Section 262 thereof, which are summarized in the accompanying proxy statement, and must meet certain other conditions. Section 262 of the DGCL is reproduced in its entirety in Annex B to the accompanying proxy statement and is incorporated in this notice by reference.

Even if you plan to attend the special meeting, please sign, date and return, as promptly as possible, the enclosed proxy card (a proxy card and a prepaid reply envelope are enclosed for your convenience) or grant your proxy electronically over the internet or by telephone (using the instructions found on the proxy card). If you attend the special meeting and vote at the special meeting, your vote will revoke any proxy that you have previously submitted. If you fail to return your proxy or to attend the special meeting, your shares will not be counted for purposes of determining whether a quorum is present at the special meeting and will have the same effect as a vote against the adoption of the merger agreement.

If your shares are held through a bank, broker or other nominee, you are considered the "beneficial owner" of shares held in "street name." If you hold your shares in "street name," you will receive instructions from your bank, broker or other nominee that you must follow in order to submit your voting instructions and have your shares counted at the special meeting. Your bank, broker or other nominee cannot vote on any of the proposals to be considered at the special meeting without your instructions. Without your instructions, your shares will not be counted for purposes of a quorum or voted at the special meeting, and that will have the same effect as voting against the adoption of the merger agreement.

By Order of the Board of Directors,

**Parag Agrawal**

*Chief Executive Officer and Director*
Dated: [•], 2022
San Francisco, California

Table of Contents

**IMPORTANT INFORMATION**

**Even if you plan to attend the special meeting, we encourage you to submit your proxy as promptly as possible: (1) over the internet; (2) by telephone; or (3) by signing, dating and returning the enclosed proxy card (a proxy card and a prepaid reply envelope are enclosed for your convenience). You may revoke your proxy or change your vote at any time before your proxy is voted at the special meeting.**

If your shares are held through a bank, broker or other nominee, you are considered the "beneficial owner" of shares held in "street name." If you hold your shares in "street name," you will receive instructions from your bank, broker or other nominee that you must follow in order to submit your voting instructions and have your shares counted at the special meeting. Your bank, broker or other nominee cannot vote on any of the proposals to be considered at the special meeting without your instructions. Without your instructions, your shares will not be counted for purposes of a quorum or voted at the special meeting, and that will have the same effect as voting against the adoption of the merger agreement.

If you are a stockholder of record, voting at the special meeting will revoke any proxy that you previously submitted. If you hold your shares through a bank, broker or other nominee, you must provide a "legal proxy" from the bank, broker or other nominee that holds your shares in order to vote at the special meeting.

We encourage you to read the accompanying proxy statement and its annexes, including all documents incorporated by reference into the accompanying proxy statement, carefully and in their entirety. If you have any questions concerning the merger, the special meeting or the accompanying proxy statement, would like additional copies of the accompanying proxy statement, or need help voting your shares, please contact our proxy solicitor:

Innisfree M&A Incorporated
501 Madison Avenue, 20th Floor
New York, New York 10022
Stockholders call: (877) 750-8338 (toll-free from the U.S. and Canada) or
+1 (412) 232-3651 (from other countries)
Banks and brokers call collect: (212) 750-5833

Table of Contents

## TABLE OF CONTENTS

| | |
|---|---|
| TRANSACTION SUMMARY | 1 |
| Introduction | 1 |
| Parties Involved in the Merger | 1 |
| Effect of the Merger | 2 |
| Per Share Price | 2 |
| The Special Meeting | 3 |
| Recommendation of the Twitter Board and Reasons for the Merger | 5 |
| Opinion of Goldman Sachs & Co. LLC | 5 |
| Opinion of J.P. Morgan Securities LLC | 5 |
| Treatment of Equity Awards in the Merger | 6 |
| Employee Benefits | 8 |
| Interests of Twitter's Directors and Executive Officers in the Merger | 9 |
| Appraisal Rights | 10 |
| Material U.S. Federal Income Tax Consequences of the Merger | 10 |
| Regulatory Approvals Required for the Merger | 11 |
| Financing of the Merger | 11 |
| Restrictions on Solicitation of Other Acquisition Offers | 12 |
| Change in the Twitter Board's Recommendation | 14 |
| Conditions to the Closing of the Merger | 14 |
| Termination of the Merger Agreement | 15 |
| Termination Fees and Remedies | 16 |
| Limited Guarantee | 17 |
| Delisting and Deregistration of Our Common Stock | 18 |
| Effect on Twitter if the Merger is Not Completed | 18 |
| Litigation Relating to the Merger | 18 |
| QUESTIONS AND ANSWERS | 19 |
| FORWARD-LOOKING STATEMENTS | 31 |
| THE SPECIAL MEETING | 33 |
| Date, Time and Place | 33 |
| Purpose of the Special Meeting | 33 |
| Attending the Special Meeting | 33 |
| Record Date; Shares Entitled to Vote; Quorum | 33 |
| Vote Required; Abstentions and Broker Non-Votes | 34 |
| Shares Held by Twitter's Directors and Executive Officers | 34 |
| Voting of Proxies | 34 |
| Revocability of Proxies | 35 |
| The Twitter Board's Recommendation | 36 |

-i-

Table of Contents

| | |
|---|---|
| Adjournment | 36 |
| Solicitation of Proxies | 36 |
| Anticipated Date of Completion of the Merger | 37 |
| Appraisal Rights | 37 |
| Other Matters | 38 |
| Important Notice Regarding the Availability of Proxy Materials | 38 |
| Householding of Special Meeting Materials | 38 |
| Questions and Additional Information | 38 |
| THE MERGER | 39 |
| Parties Involved in the Merger | 39 |
| Effect of the Merger | 40 |
| Effect on Twitter if the Merger is Not Completed | 40 |
| Per Share Price | 41 |
| Background of the Merger | 41 |
| Recommendation of the Twitter Board and Reasons for the Merger | 55 |
| Opinion of Goldman Sachs & Co. LLC | 60 |
| Opinion of J.P. Morgan Securities LLC | 71 |
| Unaudited Prospective Financial Information | 78 |
| Interests of Twitter's Directors and Executive Officers in the Merger | 81 |
| Closing and Effective Time of the Merger | 89 |
| Appraisal Rights | 89 |
| Accounting Treatment | 95 |
| Material U.S. Federal Income Tax Consequences of the Merger | 95 |
| Regulatory Approvals Required for the Merger | 98 |
| Limited Guarantee | 102 |
| Financing of the Merger | 102 |
| Delisting and Deregistration of Our Common Stock | 105 |
| Litigation Relating to the Merger | 105 |
| PROPOSAL 1: ADOPTION OF THE MERGER AGREEMENT | 106 |
| PROPOSAL 2: APPROVAL, ON A NON-BINDING, ADVISORY BASIS, OF CERTAIN MERGER-RELATED EXECUTIVE COMPENSATION | 107 |
| PROPOSAL 3: ADJOURNMENT OF THE SPECIAL MEETING | 108 |
| THE MERGER AGREEMENT | 109 |
| Closing and Effective Time of the Merger | 109 |
| Effects of the Merger; Certificate of Incorporation; Bylaws; Directors and Officers | 110 |
| Conversion of Shares | 110 |
| Payment Agent, Exchange Fund and Exchange and Payment Procedures | 112 |
| Representations and Warranties | 113 |
| Conduct of Business Pending the Merger | 116 |

-ii-

**Table of Contents**

| | |
|---|---|
| Restrictions on Solicitation of Other Acquisition Offers | 119 |
| The Twitter Board's Recommendation; Board Recommendation Change | 121 |
| Stockholder Meeting | 122 |
| Employee Benefits | 122 |
| Efforts to Close the Merger | 123 |
| Indemnification and Insurance | 126 |
| Conditions to the Closing of the Merger | 128 |
| Termination of the Merger Agreement | 128 |
| Termination Fees and Remedies | 130 |
| Fees and Expenses | 131 |
| No Third Party Beneficiaries | 132 |
| Assignment | 132 |
| Amendment and Waiver | 132 |
| Governing Law and Venue | 132 |
| Waiver of Jury Trial | 132 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 133 |
| FUTURE STOCKHOLDER PROPOSALS | 136 |
| WHERE YOU CAN FIND MORE INFORMATION | 137 |
| MISCELLANEOUS | 139 |
| ANNEX A – Agreement and Plan of Merger | |
| ANNEX B – Section  262 of the Delaware General Corporation Law | |
| ANNEX C – Opinion of Goldman Sachs  & Co. LLC | |
| ANNEX D – Opinion of J.P. Morgan Securities LLC | |

-iii-

Table of Contents

**TRANSACTION SUMMARY**

*Except as otherwise specifically noted in this proxy statement, "**Twitter**," "**we**," "**our**," "**us**" and similar words refer to Twitter, Inc., including, in certain cases, our subsidiaries. Throughout this proxy statement, the "**Twitter Board**" refers to Twitter's Board of Directors. Throughout this proxy statement, we refer to X Holdings I, Inc. as "**Parent**" and X Holdings II, Inc. as "**Acquisition Sub**." In addition, throughout this proxy statement we refer to the Agreement and Plan of Merger (as it may be amended from time to time), dated April 25, 2022, between Twitter, Parent, Acquisition Sub and, solely for the purposes described therein, Elon Musk as the "**merger agreement**."*

*This summary highlights selected information from this proxy statement related to the proposed merger of Acquisition Sub (a wholly owned subsidiary of Parent) with and into Twitter, with Twitter surviving and continuing as a wholly owned subsidiary of Parent. We refer to that transaction as the "**merger**."*

*This proxy statement may not contain all of the information that is important to you. To understand the merger more fully and for a complete description of its legal terms, you should carefully read this proxy statement, including the annexes to this proxy statement and the other documents to which we refer in this proxy statement. You may obtain the information incorporated by reference in this proxy statement without charge by following the instructions in the section of this proxy statement captioned "Where You Can Find More Information." A copy of the merger agreement is attached as Annex A to this proxy statement. We encourage you to read the merger agreement, which is the legal document that governs the merger, carefully and in its entirety.*

**Introduction**

On April 25, 2022, Twitter agreed to be acquired by an affiliate of Elon Musk. If the merger is completed, each outstanding share of our common stock (which we refer to as our "**common stock**") (subject to certain exceptions) will be converted into the right to receive $54.20 per share in cash.

**Parties Involved in the Merger**

   *Twitter, Inc.*

Twitter is what's happening in the world and what people are talking about right now. Our primary product, Twitter, is a global platform for public self-expression and conversation in real time. We have democratized content creation and distribution so people can consume, create, distribute and discover content about the topics and events they care about most. Through Topics, Interests, and Trends, we help people discover what's happening through text, images, on demand and live video, and audio from people, content partners, media organizations, advertisers and others. Media outlets, websites, and other partners extend the reach of Twitter content by distributing Tweets beyond our app and website.

Our common stock is listed on the New York Stock Exchange (which we refer to as the "**NYSE**") under the symbol "TWTR." Twitter's corporate offices are located at 1355 Market Street, Suite 900, San Francisco, California 94103, and its telephone number is (415) 222-9670.

   *X Holdings I, Inc.*

Parent was formed on April 19, 2022, solely for the purpose of engaging in the transactions contemplated by the merger agreement and has not engaged in any business activities other than as

-1-

Table of Contents

incidental to its formation and in connection with the transactions contemplated by the merger agreement and arranging of the equity financing and the debt financing in connection with the merger.

Parent's address is c/o Elon Musk, 2110 Ranch Road 620 S. #341886, Austin, TX 78734.

### *X Holdings II, Inc.*

Acquisition Sub is a wholly owned subsidiary of Parent and was formed on April 19, 2022, solely for the purpose of engaging in the transactions contemplated by the merger agreement. Acquisition Sub has not engaged in any business activities other than as incidental to its formation and in connection with the transactions contemplated by the merger agreement and arranging of the equity financing and the debt financing in connection with the merger. Upon completion of the merger, Acquisition Sub will cease to exist and Twitter will continue as the surviving corporation.

Acquisition Sub's address is c/o Elon Musk, 2110 Ranch Road 620 S. #341886, Austin, TX 78734.

### *Elon Musk*

Elon Musk leads SpaceX, Tesla, Inc., Neuralink Corp. and The Boring Company. Mr. Musk has served as the Chief Executive Officer of Tesla, Inc. since October 2008, as a member of the Board of Directors of Tesla, Inc. since April 2004, as the Chief Executive Officer, Chief Technology Officer and Chairman of the Board of SpaceX since May 2002, and served as Chairman of the Board of SolarCity Corporation, a solar installation company, from July 2006 until its acquisition by Tesla in November 2016. Mr. Musk is also the founder of The Boring Company and of Neuralink Corp. Mr. Musk also co-founded Zip2 Corporation, an early internet company, and PayPal. Mr. Musk has served on the board of directors of Endeavor Group Holdings, Inc. since April 2021. Mr. Musk holds a B.A. in physics from the University of Pennsylvania and a B.S. in business from the Wharton School of the University of Pennsylvania.

Mr. Musk's address is 2110 Ranch Road 620 S. #341886, Austin, TX 78734.

**Effect of the Merger**

Upon the terms and subject to the conditions of the merger agreement, and in accordance with the Delaware General Corporation Law (which we refer to as the "**DGCL**"), at the effective time of the merger: (1) Acquisition Sub will merge with and into Twitter; (2) the separate existence of Acquisition Sub will cease; and (3) Twitter will continue as the surviving corporation in the merger and as a wholly owned subsidiary of Parent. Throughout this proxy statement, we use the term "**surviving corporation**" to refer to Twitter as the surviving corporation following the merger.

As a result of the merger, Twitter will cease to be a publicly traded company. If the merger is completed, you will not own any shares of capital stock of the surviving corporation.

The time at which the merger becomes effective (which we refer to as the "**effective time of the merger**") will occur upon the filing of a certificate of merger with, and acceptance of that certificate by, the Secretary of State of the State of Delaware (or at a later time as Twitter, Parent and Acquisition Sub may agree and specify in the certificate of merger).

**Per Share Price**

At the effective time of the merger, each outstanding share of our common stock (subject to certain exceptions) will be automatically canceled and will cease to exist and will be converted into the right to

-2-

Table of Contents

receive $54.20 in cash, without interest. We refer to this amount as the "**per share price**." For more information, see the section of this proxy statement captioned "*The Merger Agreement—Conversion of Shares.*"

Prior to the closing of the merger, Parent will designate an appropriate paying agent to make payments of the merger consideration to our stockholders. At or prior to the effective time of the merger, Parent will deposit (or cause to be deposited) with the paying agent cash constituting an amount equal to the aggregate merger consideration in accordance with the merger agreement. Once a stockholder (subject to certain exceptions) has provided the paying agent with any documentation required by the paying agent, the paying agent will pay such stockholder the appropriate portion of the aggregate merger consideration (subject to any applicable withholding taxes) in exchange for the shares of our common stock held by that stockholder. For more information, see the section of this proxy statement captioned "*The Merger Agreement—Paying Agent, Exchange Fund and Exchange and Payment Procedures.*"

After the merger is completed, you will have the right to receive the per share price for each share of our common stock that you own, but you will no longer have any rights as a stockholder of Twitter (except that our stockholders who properly and validly exercise and perfect, and do not validly withdraw or otherwise lose, their demand for appraisal or dissenters' rights under the DGCL or other applicable law will have the right to receive a payment for the "fair value" of their shares as determined pursuant to an appraisal proceeding as contemplated by the DGCL, as described in the section of this proxy statement captioned "*The Merger—Appraisal Rights*").

**The Special Meeting**

*Date, Time and Place*

A special meeting of our stockholders will be held on [•], 2022, at [•], Pacific time. You may attend the special meeting via a live interactive webcast at http://www.virtualshareholdermeeting.com/TWTR2022SM. We refer to the special meeting, and any adjournment, postponement or other delay of the special meeting, as the "**special meeting**." You will need the control number found on your proxy card or voting instruction form in order to participate in the special meeting (including voting your shares). We believe that a virtual meeting provides expanded access, improved communication and cost savings for our stockholders and Twitter.

*Purpose*

At the special meeting, we will ask stockholders to vote on proposals to: (1) adopt the merger agreement; (2) approve, on a non-binding, advisory basis, the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger; and (3) adjourn the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting.

*Record Date; Shares Entitled to Vote*

You are entitled to vote at the special meeting if you owned shares of our common stock as of the close of business on [•], 2022 (which we refer to as the "**record date**"). For each share of our common stock that you owned as of the close of business on the record date, you will have one vote on each matter submitted for a vote at the special meeting.

-3-

Table of Contents

### Quorum

As of the record date, there were [•] shares of our common stock outstanding and entitled to vote at the special meeting. The holders of a majority of the voting power of our stock issued and outstanding and entitled to vote, present in person or represented by proxy, shall constitute a quorum.

### Required Vote

The proposals to be voted on at the special meeting require the following votes:

- Proposal 1: Approval of the proposal to adopt the merger agreement requires the affirmative vote of the holders of a majority of the shares of our common stock outstanding as of the record date.

- Proposal 2: Approval of the proposal to approve the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger requires the affirmative vote of a majority of the voting power of the shares of our common stock present in person or represented by proxy at the special meeting and entitled to vote on the proposal. This vote will be on a non-binding, advisory basis.

- Proposal 3: Approval of the proposal to adjourn the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting requires the affirmative vote of a majority of the voting power of the shares of our common stock present in person or represented by proxy at the special meeting and entitled to vote on the proposal.

### Voting and Proxies

Any stockholder of record entitled to vote at the special meeting may vote in any of the following ways:

- by proxy, by returning a signed and dated proxy card (a proxy card and a prepaid reply envelope are enclosed for your convenience);

- by proxy, by granting a proxy electronically over the internet or by telephone (using the instructions found on the proxy card); or

- by attending the special meeting and voting at the special meeting using the control number on the enclosed proxy card.

If you are a stockholder of record, you may change your vote or revoke your proxy at any time before it is voted at the special meeting by (1) signing another proxy card with a later date and returning it prior to the special meeting; (2) submitting a new proxy electronically over the internet or by telephone after the date of the earlier submitted proxy; (3) delivering a written notice of revocation to our Corporate Secretary; or (4) attending the special meeting and voting at the special meeting.

If you are a beneficial owner and hold your shares of our common stock in "street name" through a bank, broker or other nominee, you should instruct your bank, broker or other nominee on how you wish to vote your shares of our common stock using the instructions provided by your bank, broker or other nominee. Under applicable stock exchange rules, banks, brokers or other nominees have the discretion to vote on routine matters, but not on non-routine matters. **The proposals to be considered**

-4-

Table of Contents

**at the special meeting are all non-routine matters, and banks, brokers and other nominees cannot vote on these proposals without your instructions. Therefore, it is important that you cast your vote or instruct your bank, broker or nominee on how you wish to vote your shares.**

If you hold your shares of our common stock in "street name," you should contact your bank, broker or other nominee for instructions regarding how to change your vote. You may also vote at the special meeting if you provide a "legal proxy" from your bank, broker or other nominee giving you the right to vote your shares at the special meeting.

**Recommendation of the Twitter Board and Reasons for the Merger**

The Twitter Board, after considering various factors described in the section of this proxy statement captioned "*The Merger— Recommendation of the Twitter Board and Reasons for the Merger*," unanimously: (1) determined that the merger agreement is advisable and the merger and the other transactions contemplated by the merger agreement are fair to, advisable and in the best interests of Twitter and its stockholders; and (2) adopted and approved the merger agreement, the merger and the other transactions contemplated by the merger agreement.

The Twitter Board unanimously recommends that you vote: (1) "**FOR**" the adoption of the merger agreement; (2) "**FOR**" the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger; and (3) "**FOR**" the adjournment of the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting.

**Opinion of Goldman Sachs & Co. LLC**

At a meeting of the Twitter Board held on April 25, 2022, Goldman Sachs & Co. LLC (which we refer to as "**Goldman Sachs**") rendered its oral opinion, subsequently confirmed by delivery of its written opinion, dated April 25, 2022, to the Twitter Board that, as of the date of the written opinion and based upon and subject to limitations, qualifications and assumptions set forth therein, the $54.20 in cash per share of Twitter common stock to be paid to the holders (other than Parent, Mr. Musk and their respective affiliates) of such shares pursuant to the merger agreement was fair from a financial point of view to such holders, as more fully described in the section of this proxy statement captioned "*The Merger—Opinion of Goldman Sachs & Co. LLC.*"

The full text of the written opinion of Goldman Sachs, dated April 25, 2022, which sets forth assumptions made, procedures followed, matters considered and limitations on the review undertaken in connection with the opinion, is attached as Annex C to this proxy statement. Goldman Sachs provided advisory services and its opinion for the information and assistance of the Twitter Board in connection with its consideration of the merger. The Goldman Sachs opinion is not a recommendation as to how any holder of our common stock should vote with respect to the merger or any other matter.

**Opinion of J.P. Morgan Securities LLC**

At the meeting of the Twitter Board on April 25, 2022, J.P. Morgan Securities LLC (which we refer to as "**J.P. Morgan**") rendered its oral opinion to the Twitter Board that, as of such date and based upon and subject to the factors and assumptions set forth in its opinion, the consideration to be paid to our common stockholders in the proposed transaction was fair, from a financial point of view, to such stockholders. J.P. Morgan has confirmed its April 25, 2022 oral opinion by delivering its written opinion to the Twitter Board, dated April 25, 2022, that, as of such date, the consideration to be paid to

-5-

Table of Contents

Twitter's common stockholders in the proposed merger was fair, from a financial point of view, to such stockholders, as more fully described in the section of this proxy statement captioned "*The Merger—Opinion of J.P. Morgan Securities LLC.*"

The full text of the written opinion of J.P. Morgan dated April 25, 2022, which sets forth, among other things, the assumptions made, matters considered and limits on the review undertaken, is attached as Annex D to this proxy statement. The summary of the opinion of J.P. Morgan set forth in this proxy statement is qualified in its entirety by reference to the full text of such opinion. Twitter's stockholders are urged to read the opinion in its entirety. J.P. Morgan's written opinion was addressed to the Twitter Board (in its capacity as such) in connection with and for the purposes of its evaluation of the proposed merger, was directed only to the $54.20 per share in cash to be paid to holders of our common stock pursuant to the merger agreement and did not address any other aspect of the merger. J.P. Morgan expressed no opinion as to the fairness of the consideration to the holders of any class of securities, creditors or other constituencies of Twitter or as to the underlying decision by Twitter to engage in the proposed merger. The issuance of J.P. Morgan's opinion was approved by a fairness committee of J.P. Morgan. The summary of the opinion of J.P. Morgan set forth in this proxy statement is qualified in its entirety by reference to the full text of such opinion. The opinion does not constitute a recommendation to any stockholder of Twitter as to how such stockholder should vote with respect to the proposed merger or any other matter.

**Treatment of Equity Awards in the Merger**

The merger agreement provides that Twitter's equity awards that are outstanding immediately prior to the effective time of the merger will be treated in the following manner in connection with the merger. For more information, see the section of this proxy statement captioned "*The Merger Agreement—Conversion of Shares—Equity Awards; ESPP.*" We refer to awards of restricted stock units as "**Twitter RSUs**" (including performance-based restricted stock units, or "**Twitter PSUs**") and restricted stock as "**Twitter equity-based awards.**" We refer to awards of stock options to purchase shares of our common stock as "**Twitter options.**"

*Treatment of Twitter Equity-based Awards*

- At the effective time of the merger, each vested Twitter equity-based award (other than a vested Twitter option) outstanding as of immediately prior to the effective time of the merger will be canceled and converted into the right to receive an amount in cash, without interest and less any required withholding taxes, equal to the product of (1) the per share price and (2) the total number of shares of our common stock subject to such vested Twitter equity-based award (and with respect to any vested equity-based awards subject to performance vesting conditions, calculated based on the achievement of the applicable performance metrics at the level of performance at which such equity-based award vested in accordance with its terms).

- At the effective time of the merger, each unvested Twitter equity-based award (other than an unvested Twitter option) outstanding as of immediately prior to the effective time of the merger will be canceled and converted into the right to receive an amount in cash, without interest and less any required withholding taxes, equal to the product of (1) the per share price and (2) the total number of shares of our common stock subject to such unvested Twitter equity-based award (and with respect to any unvested equity-based awards subject to performance vesting conditions, calculated based on the achievement of the applicable performance metrics at the target level of performance), which amount will, subject to the holder's continued service with Parent and its affiliates (including the surviving corporation and its subsidiaries) through the

-6-

Table of Contents

applicable vesting dates, vest and be payable at the same time as the unvested Twitter equity-based award for which such cash amount was exchanged would have vested pursuant to its terms and will otherwise remain subject to the same terms and conditions as were applicable to the unvested Twitter equity-based award immediately prior to the effective time of the merger (other than performance-based vesting conditions, which will not apply following the effective time of the merger).

**Treatment of Twitter Options**

- At the effective time of the merger, each vested Twitter option outstanding as of immediately prior to the effective time of the merger will be canceled and converted into the right to receive an amount in cash, without interest and less any required withholding taxes, equal to the product of (1) the excess, if any, of the per share price less the exercise price per share of our common stock underlying such Twitter option, and (2) the total number of shares of our common stock subject to such Twitter option.

- At the effective time of the merger, each unvested Twitter option outstanding as of immediately prior to the effective time of the merger will be canceled and converted into the right to receive an amount in cash, without interest and less any required withholding taxes, equal to the product of (1) the excess, if any, of the per share price less the exercise price per share of our common stock underlying such Twitter option, and (2) the total number of shares of our common stock subject to such Twitter option, which cash amount will, subject to the holder's continued service with Parent and its affiliates (including the surviving corporation and its subsidiaries) through the applicable vesting dates, vest and be payable at the same time as the unvested Twitter option for which such cash amount was exchanged would have vested pursuant to its terms and will otherwise remain subject to the same terms and conditions as were applicable to the unvested Twitter option immediately prior to the effective time of the merger.

- At the effective time of the merger, any Twitter option outstanding as of immediately prior to the effective time of the merger and for which the exercise price per share of our common stock underlying such Twitter options is equal to or greater than the per share price will be canceled without any cash payment or other consideration being made in respect of such Twitter option.

**Treatment of the ESPP**

- As provided in the merger agreement, the Twitter Board has adopted resolutions that provide that (1) the current offering period under our 2013 Employee Stock Purchase Plan (which we refer to as the "**ESPP**") will be the final offering period and no further offering period will commence pursuant to the ESPP after the date of the merger agreement, and (2) except as may be required by law, each individual participating in the final offering period as of the date of the merger agreement will not be permitted to (a) increase his or her payroll contribution rate pursuant to the ESPP from the rate in effect when the final offering period commenced or (b) make separate non-payroll contributions to the ESPP on or following the date of the merger agreement.

- Prior to the effective time of the merger, Twitter will take all actions that may be necessary to give effect to the treatment described above and to (1) cause the final offering period, to the extent that it would otherwise be outstanding at the effective time, to be terminated no later

-7-

Table of Contents

than 10 business days prior to the date on which the effective time of the merger occurs; (2) make any pro rata adjustments that may be necessary to reflect the final offering period, but otherwise treat the final offering period as a fully effective and completed offering period for all purposes pursuant to the ESPP; and (3) cause the exercise (as of no later than 10 business days prior to the date on which the effective time of the merger occurs) of each outstanding purchase right pursuant to the ESPP.

- On such exercise date, Twitter will apply the funds credited as of such date pursuant to the ESPP within each participant's payroll withholding account to the purchase of whole shares of our common stock in accordance with the terms of the ESPP, and such shares of our common stock will be entitled to the per share price. Immediately prior to and effective as of the effective time of the merger (but subject to the consummation of the merger), Twitter will terminate the ESPP.

**Employee Benefits**

- For a period of one year following the effective time of the merger, Parent will, or will cause the surviving corporation or any of their affiliates to, provide for each continuing employee (1) at least the same base salary and wage rate, (2) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such continuing employee immediately prior to the effective time of the merger (provided that Parent will not be obligated to provide such incentives in the form of equity or equity-based awards) and (3) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such continuing employee immediately prior to the effective time of the merger. During the one-year period following the effective time of the merger, Parent will, or will cause the surviving corporation or any of their affiliates to, provide severance payments and benefits to each continuing employee that are no less favorable than those applicable to the continuing employee immediately prior to the effective time of the merger under the existing arrangements providing for compensation or employee benefits (which we refer to as "**Twitter benefit plans**").

- Parent agrees that the surviving corporation will cause the surviving corporation's employee benefit plans established following the closing of the merger (if any) and any other employee benefit plans covering the continuing employees following the effective time of the merger (which we refer to, collectively, as the "**post-closing benefit plans**"), to recognize the service of each continuing employee (to the extent such service was recognized by Twitter) for purposes of eligibility, vesting and determination of the level of benefits (but not for the benefit accrual purposes under a defined benefit pension plan) under the post-closing benefit plans, to the extent such recognition does not result in the duplication of any benefits.

- For the calendar year including the effective time of the merger, the continuing employees will not be required to satisfy any deductible, co-payment, out-of-pocket maximum or similar requirements under the post-closing benefit plans that provide medical, dental and other welfare benefits (which we refer to, collectively, as the "**post-closing welfare plans**") to the extent amounts were previously credited for such purposes under comparable Twitter benefit plans that provide medical, dental and other welfare benefits.

- As of the effective time of the merger, any waiting periods, pre-existing condition exclusions and requirements to show evidence of good health contained in such post-closing welfare

-8-

Table of Contents

plans will be waived with respect to the continuing employees (except to the extent any such waiting period, pre-existing condition exclusion or requirement to show evidence of good health was already in effect with respect to such employees and has not been satisfied under the applicable Twitter benefit plan in which the participant then participates or is otherwise eligible to participate as of immediately prior to the effective time of the merger).

For more information, see the section of this proxy statement captioned "*The Merger Agreement—Employee Benefits*."

**Interests of Twitter's Directors and Executive Officers in the Merger**

When considering the recommendation of the Twitter Board that you vote to approve the proposal to adopt the merger agreement, you should be aware that our directors and executive officers may have interests in the merger that are different from, or in addition to, your interests as a stockholder. In (1) evaluating and negotiating the merger agreement, (2) approving the merger agreement and the merger and (3) recommending that the merger agreement be adopted by our stockholders, the Twitter Board was aware of and considered these interests to the extent that they existed at the time, among other matters. These interests include the following:

- For our executive officers, the treatment of their Twitter equity-based awards, as described in more detail in the section of this proxy statement captioned "*The Merger—Interests of Twitter's Directors and Executive Officers in the Merger—Treatment of Equity-Based Awards.*"

- For our non-employee directors, the treatment of their Twitter equity-based awards and Twitter options, as described in more detail in the section of this proxy statement captioned "*The Merger—Interests of Twitter's Directors and Executive Officers in the Merger—Treatment of Equity-Based Awards.*"

- The entitlement of each of our executive officers to receive payments and benefits pursuant to Twitter's Change of Control and Involuntary Termination Policy (which we refer to as the "**severance policy**") if, during the period beginning on our change of control (or, in the case of Mr. Agrawal, beginning three months before our change of control) and ending 12 months after our change of control (which we refer to as the "**COC period**"), Twitter terminates their employment with Twitter for a reason other than "cause," death or "disability" or they resign for "good reason" (which we refer to as an "**involuntary termination**"), in each case as set forth in the severance policy. These payments and benefits include:

  - a lump sum payment equal to 100 percent of base salary;

  - payment of continuation of coverage premiums under the Consolidated Omnibus Budget Reconciliation Act of 1985 (which we refer to as "**COBRA**") for up to 12 months, or taxable payments in lieu of such payment; and

  - 50 percent (or 100 percent in the case of Mr. Agrawal and Mr. Segal) acceleration of vesting of unvested equity awards (with performance-based vesting deemed achieved at target levels as to that percentage).

- The continued indemnification and insurance coverage for our directors and executive officers from the surviving corporation and Parent under the terms of the merger agreement.

-9-

Table of Contents

**Appraisal Rights**

If the merger is consummated, our stockholders who (1) do not vote in favor of the adoption of the merger agreement; (2) continuously hold their applicable shares of our common stock through the effective time of the merger; (3) properly demand appraisal of their applicable shares; (4) meet certain statutory requirements described in this proxy statement; and (5) do not withdraw their demands or otherwise lose their rights to appraisal, will be entitled to seek appraisal of their shares in connection with the merger under Section 262 of the DGCL if certain conditions set forth in Section 262(g) of the DGCL are satisfied. This means that these stockholders will be entitled to have their shares appraised by the Delaware Court of Chancery and to receive payment in cash of the "fair value" of their shares of our common stock, exclusive of any elements of value arising from the accomplishment or expectation of the merger, together with (unless the Delaware Court of Chancery in its discretion determines otherwise for good cause shown) interest on the amount determined by the Delaware Court of Chancery to be fair value from the effective date of the merger through the date of payment of the judgment at a rate of five percent over the Federal Reserve discount rate (including any surcharge) as established from time to time during the period between the effective date of the merger and the date of payment of the judgment, compounded quarterly (except that, if at any time before the entry of judgment in the proceeding, the surviving corporation makes a voluntary cash payment to stockholders seeking appraisal, interest will accrue thereafter only upon the sum of (1) the difference, if any, between the amount so paid and the fair value of the shares as determined by the Delaware Court of Chancery; and (2) interest theretofore accrued, unless paid at that time). The surviving corporation is under no obligation to make such voluntary cash payment prior to such entry of judgment. Due to the complexity of the appraisal process, stockholders who wish to seek appraisal of their shares are encouraged to seek the advice of legal counsel with respect to the exercise of appraisal rights.

Stockholders considering seeking appraisal should be aware that the fair value of their shares as determined pursuant to Section 262 of the DGCL could be more than, the same as or less than the value of the consideration that they would receive pursuant to the merger agreement if they did not seek appraisal of their shares.

Only a stockholder of record may submit a demand for appraisal. To exercise appraisal rights, the stockholder of record must (1) submit a written demand for appraisal to Twitter before the vote is taken on the proposal to adopt the merger agreement; (2) not vote, in person or by proxy, in favor of the proposal to adopt the merger agreement; (3) continue to hold the subject shares of our common stock of record through the effective time of the merger; and (4) strictly comply with all other procedures for exercising appraisal rights under the DGCL. The failure to follow exactly the procedures specified under the DGCL may result in the loss of appraisal rights. In addition, the Delaware Court of Chancery will dismiss appraisal proceedings in respect of Twitter unless certain conditions are satisfied by the stockholders seeking appraisal, as described further below. The requirements under Section 262 of the DGCL for exercising appraisal rights are described in further detail in this proxy statement, which description is qualified in its entirety by Section 262 of the DGCL, the relevant section of the DGCL regarding appraisal rights, a copy of which is attached as Annex B to this proxy statement. If you hold your shares of our common stock through a bank, broker or other nominee and you wish to exercise appraisal rights, you should consult with your bank, broker or other nominee to determine the appropriate procedures for the making of a demand for appraisal on your behalf by your bank, broker or other nominee.

**Material U.S. Federal Income Tax Consequences of the Merger**

For U.S. federal income tax purposes, the receipt of cash by a U.S. Holder (as defined in the section of this proxy statement captioned "*The Merger—Material U.S. Federal Income Tax Consequences of the*

-10-

Table of Contents

*Merger*") in exchange for such U.S. Holder's shares of our common stock in the merger generally will result in the recognition of gain or loss in an amount measured by the difference, if any, between the amount of cash that such U.S. Holder receives in the merger and such U.S. Holder's adjusted tax basis in the shares of our common stock surrendered in the merger.

A Non-U.S. Holder (as defined in the section of this proxy statement captioned "*The Merger—Material U.S. Federal Income Tax Consequences of the Merger*") generally will not be subject to U.S. federal income tax with respect to the exchange of our common stock for cash in the merger unless such Non-U.S. Holder has certain connections to the United States, but may be subject to backup withholding tax unless the Non-U.S. Holder complies with certain certification procedures or otherwise establishes a valid exemption from backup withholding tax.

For more information, see the section of this proxy statement captioned "*The Merger—Material U.S. Federal Income Tax Consequences of the Merger*." **Stockholders should consult their own tax advisors concerning the U.S. federal income tax consequences relating to the merger in light of their particular circumstances and any consequences arising under U.S. federal non-income tax laws or the laws of any territory, state, local or non-U.S. taxing jurisdiction.**

**Regulatory Approvals Required for the Merger**

The merger cannot be completed until the waiting periods (and any extensions thereof, if any) applicable to the merger under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (which we refer to as the "**HSR Act**") and the laws of certain other jurisdictions have expired or otherwise been terminated, or all requisite consents pursuant to those laws have been obtained. Under the merger agreement, each of Twitter, Parent and Acquisition Sub agreed to (1) promptly make its respective filings under the HSR Act, and (2) as promptly as reasonably practicable, make any other applications and filings as are mutually agreed by Parent and Twitter, under any antitrust laws or foreign investment laws with respect to the transactions contemplated by the merger agreement. Although we expect that all required regulatory clearances and approvals will be obtained, we cannot assure you that these regulatory clearances and approvals will be timely obtained or obtained at all, or that the granting of these regulatory clearances and approvals will not involve the imposition of additional conditions on the completion of the merger. For more information, please see the section of this proxy statement captioned "*The Merger—Regulatory Approvals Required for the Merger*."

**Financing of the Merger**

The total amount of funds necessary to consummate the merger and related transactions, including payment of related fees and expenses, will be approximately $46.5 billion. The transactions contemplated by the merger agreement, including (1) the payment of consideration due to our stockholders and the holders of our equity awards under the merger agreement, (2) the repayment of all or a portion of Twitter's outstanding indebtedness, and (3) the aggregate of all other amounts, costs, fees and expenses required to be paid by Parent will be funded with the proceeds of committed equity and debt financing, as further described below.

Pursuant to an equity commitment letter, as amended and restated (which we refer to as the "**equity commitment letter**"), Mr. Musk initially committed to contribute or otherwise provide equity capital to Parent in an aggregate amount of up to approximately $21.0 billion in immediately available funds, as necessary to fully discharge, when taken together with the aggregate proceeds of the debt financing (or, if applicable, alternative financing) actually funded at the closing, the amounts required to be funded by Parent in connection with the merger agreement, including (1) the consideration due to our

-11-

Table of Contents

stockholders and the holders of our equity awards under the merger agreement and (2) the aggregate of all other amounts, costs, fees and expenses required to be paid by Parent in connection with the transactions pursuant to and in accordance with the merger agreement. On May 4, 2022, the equity commitment letter was amended to increase Mr. Musk's financing commitment thereunder to $27.25 billion (which we refer to as the "**equity financing**").

Pursuant to a debt commitment letter (which we refer to as the "**debt commitment letter**"), Morgan Stanley Senior Funding, Inc. and the other financial institutions party thereto committed to provide to Acquisition Sub (which we collectively refer to as the "**bank debt financing**"):

- a senior secured term loan facility in an aggregate principal amount of $6.5 billion;

- a senior secured revolving facility in an aggregate committed amount of $500.0 million;

- up to $3.0 billion in aggregate principal amount of senior secured bridge commitments (which commitments may be replaced by the proceeds of the issuance of one or more series of senior secured notes (in escrow or otherwise) pursuant to a Rule 144A offering or other private placement, as contemplated by the debt commitment letter); and

- up to $3.0 billion in aggregate principal amount of senior unsecured bridge commitments (which commitments may be replaced by the proceeds of the issuance of one or more series of senior unsecured notes (in escrow or otherwise) pursuant to a Rule 144A offering or other private placement, as contemplated by the debt commitment letter).

The proceeds of the bank debt financing would be used at the closing of the merger, together with the proceeds of the equity financing, for the purposes of (1) financing the consummation of the merger, paying fees and expenses incurred in connection with the merger, and (2) the repayment of all or a portion of Twitter's outstanding indebtedness (we refer to clause (2) as the "**refinancing**").

Pursuant to a margin loan commitment letter (which we refer to as the "**margin loan commitment letter**"), Morgan Stanley Senior Funding, Inc. and the other financial institutions party thereto committed to provide $12.5 billion (which we refer to as the "**margin loan financing**") to X Holdings III, LLC, a Delaware limited liability company of which Mr. Musk is the sole member (which we refer to as "**X Holdings III**"). The margin loan financing is to be used, together with the proceeds of the equity financing and the bank debt financing, for the purpose of financing the consummation of the merger and paying fees and expenses incurred in connection with the merger. On May 4, 2022, the aggregate principal amount of the commitments available to X Holdings III under the margin loan commitment letter was reduced to an aggregate principal amount of $6.25 billion. For more information, please see the section of this proxy statement captioned "*The Merger Agreement—Efforts to Close the Merger—Financing.*"

**Restrictions on Solicitation of Other Acquisition Offers**

Under the merger agreement, during the period commencing on the date of the merger agreement and continuing until the earlier of the effective time of the merger or the date, if any, of termination of the merger agreement, Twitter has agreed that it will, and will cause each of its directors, executive officers and subsidiaries to, and will instruct its other representatives to, immediately cease and cause to be terminated any existing solicitation of, or discussions or negotiations with, any third party relating to any competing proposal.

-12-

Table of Contents

Until the earlier of the effective time of the merger or the date, if any, of termination of the merger agreement, except as otherwise provided in the relevant provisions of the merger agreement, Twitter has agreed that it will not, and will cause each of its directors, executive officers and subsidiaries not to, and it will instruct its other representatives not to:

- solicit, initiate, knowingly encourage or knowingly facilitate, whether publicly or otherwise, any substantive discussion, offer or request that constitutes, or would reasonably be expected to lead to, a competing proposal; or

- engage in negotiations or substantive discussions with, or furnish any material non-public information to, any person relating to a competing proposal or any inquiry or proposal that would reasonably be expected to lead to a competing proposal.

In addition, until the earlier of the effective time of the merger or the date, if any, of termination of the merger agreement, Twitter has agreed to:

- as promptly as reasonably practicable, and in any event within one business day of receipt by Twitter or any of its directors, executive officers or subsidiaries of any competing proposal or any request that would reasonably be expected to lead to the making of a competing proposal, deliver to Parent a written notice setting forth the identity of the person making such competing proposal or request and the material terms and conditions of any such competing proposal; and

- keep Parent reasonably informed of any material amendment or other modification of any such competing proposal or request on a prompt basis, and in any event within two business days following Twitter's receipt in writing of such an amendment or modification.

However, at any time prior to obtaining the requisite stockholder approval, in the event that Twitter receives a competing proposal from any person or group of persons, (1) Twitter and its representatives may contact such person to clarify the terms and conditions thereof and (2) Twitter, the Twitter Board and their respective representatives may engage in negotiations or discussions with, or furnish any information and other access to, any person or group of persons making such competing proposal and any of its representatives or potential sources of financing if the Twitter Board determines in good faith (after consultation with its legal counsel and financial advisors) that such competing proposal either constitutes a superior proposal or would reasonably be expected to result in a superior proposal; provided that (a) prior to furnishing any material non-public information concerning Twitter or its subsidiaries, Twitter receives from such person or group, to the extent that such person or group is not already subject to a confidentiality agreement with Twitter, an executed confidentiality agreement containing customary confidentiality terms (it being understood that such confidentiality agreement need not contain a standstill provision or otherwise restrict the making, or amendment, of a competing proposal to Twitter or the Twitter Board) and (b) any such material non-public information so furnished in writing shall be promptly made available to Parent to the extent it was not previously made available to Parent or its representatives. For more information, see the section of this proxy statement captioned "*The Merger Agreement—Restrictions on Solicitation of Other Acquisition Offers.*"

Twitter is not entitled to terminate the merger agreement to enter into an agreement for a superior proposal unless it complies with certain procedures in the merger agreement, including engaging in good faith negotiations with Parent during a specified period. If Twitter terminates the merger agreement in order to accept a superior proposal from a third party it must pay a termination fee to Parent. For more information, see the section of this proxy statement captioned "*The Merger Agreement—The Twitter Board's Recommendation; Board Recommendation Change.*"

-13-

Table of Contents

**Change in the Twitter Board's Recommendation**

Under the merger agreement, the Twitter Board will not (1) publicly recommend that Twitter's stockholders vote against the adoption of the merger agreement, (2) approve or recommend to Twitter's stockholders any competing proposal (we refer to the actions described in (1) and (2), collectively, as a "**Twitter Board recommendation change**"), or (3) approve or recommend or allow Twitter to enter into an agreement with respect to a competing proposal, other than, under certain circumstances, if it determines in good faith, after consultation with its legal counsel and financial advisors, that (a) failure to take such action would reasonably be expected to be inconsistent with the Twitter Board's fiduciary duties under applicable law or (b) a competing proposal constitutes a superior proposal, and, in each case, the Twitter Board complies with the terms of the merger agreement. If Twitter or Parent terminates the merger agreement under certain circumstances, including because of a Twitter Board recommendation change prior to the adoption of the merger agreement, then Twitter must pay to Parent a termination fee. For more information, see the section of this proxy statement captioned "*The Merger Agreement—The Twitter Board's Recommendation; Board Recommendation Change.*"

**Conditions to the Closing of the Merger**

The obligations of Parent, Acquisition Sub and Twitter, as applicable, to consummate the merger are subject to the satisfaction or waiver of certain conditions, including the following:

- the adoption of the merger agreement by the requisite affirmative vote of our stockholders;

- the expiration or termination of the waiting period applicable to the merger under the HSR Act, and, to the extent applicable, each consent or approval required under any antitrust laws or foreign investment laws in certain specified jurisdictions having been made, obtained or received (or, as applicable, the waiting periods, if any, with respect thereto will have expired or been terminated); and

- the absence of any then-effective law or order enacted, issued, promulgated, enforced or entered into by any governmental authority in certain specified jurisdictions which has the effect of restraining, enjoining, rendering illegal or otherwise prohibiting consummation of the merger, or causing the merger to be rescinded following the consummation thereof.

The obligations of Parent and Acquisition Sub to consummate the merger are subject to the satisfaction or waiver of each of the following additional conditions, any of which may be waived by Parent:

- Twitter having performed and complied in all material respects with the obligations required by the merger agreement to be performed or complied with by it on or prior to the closing of the merger;

- the accuracy of the representations and warranties of Twitter in the merger agreement, subject to applicable materiality or other qualifiers, as of the effective time of the merger or the date in respect of which such representation or warranty was specifically made; and

- the absence of any Company Material Adverse Effect (as defined in the section of this proxy statement captioned "*The Merger Agreement—Representations and Warranties*") having occurred that is continuing.

-14-

Table of Contents

The obligation of Twitter to consummate the merger are subject to the satisfaction or waiver of each of the following additional conditions, any of which may be waived by Twitter:

- Parent and Acquisition Sub having performed and complied in all material respects with the obligations required by the merger agreement to be performed or complied with by Parent or Acquisition Sub on or prior to the closing of the merger; and

- the accuracy of the representations and warranties of Parent and Acquisition Sub in the merger agreement, subject to applicable materiality or other qualifiers, as of the effective time of the merger or the date in respect of which such representation or warranty was specifically made.

**Termination of the Merger Agreement**

The merger agreement may be terminated at any time prior to the effective time of the merger, whether before or after the adoption of the merger agreement by our stockholders (except as otherwise provided in the merger agreement), in the following ways:

- by mutual written agreement of Twitter and Parent;

- by either Twitter or Parent if:

  - the merger has not been consummated by 5:00 p.m., Pacific time, on October 24, 2022 (as such date may be extended pursuant to the terms of this provision, which we refer to as the "**termination date**"), except that (1) a party may not terminate the merger agreement pursuant to this provision if such party's failure to perform or comply with any of its obligations under the merger agreement has been the principal cause of, or resulted in, the failure to consummate the merger by the termination date, and (2) the termination date will be extended for an additional six months if, as of the termination date, the closing condition regarding (a) the expiration or termination of the waiting period under the HSR Act or the receipt of approvals under the other specified antitrust laws or foreign investment laws or (b) the absence of any applicable legal restraint prohibiting the consummation of the merger has not been satisfied;

  - prior to the effective time of the merger, any governmental authority of competent jurisdiction has enacted, issued, promulgated, enforced or entered any law or order or taken any other action permanently restraining, enjoining, rendering illegal or otherwise prohibiting the consummation of the transactions contemplated by the merger agreement, and such law or order or other action has become final and non-appealable, except, in each case, that the right to terminate will not be available to any party (1) that has failed to use the efforts required by the merger agreement to remove such law, order or other action, or (2) if the issuance of such law or order or taking of such action was primarily due to the failure of such party, and, in the case of Parent, the failure of Acquisition Sub or Mr. Musk, to perform any of its obligations under the merger agreement; or

  - our stockholders do not adopt the merger agreement at the special meeting (or at any adjournment or postponement thereof at which the merger agreement and the transactions contemplated thereby are voted on);

-15-

Table of Contents

- by Twitter if:

  ○ subject to a 30-day cure period, Parent, Acquisition Sub or Mr. Musk has breached or failed to perform any of their respective representations, warranties, covenants or other agreements in the merger agreement, which breach or failure would give rise to the failure of relevant conditions to effect the closing of the merger, except that the right to terminate will not be available to Twitter if Twitter is then in material breach of any of its representations, warranties, covenants or agreements under the merger agreement;

  ○ the Twitter Board has authorized Twitter to enter into a definitive agreement with respect to a superior proposal, if, substantially concurrently with the termination of the merger agreement, Twitter enters into such definitive agreement and pays (or causes to be paid) the termination fee to and at the direction of Parent; or

  ○ (1) Parent and Acquisition Sub have been notified in writing that the conditions precedent to Parent's and Acquisition Sub's obligations to close the merger set forth in the merger agreement (other than those conditions that by their nature are to be satisfied at the closing, each of which is capable of being satisfied if the closing were to occur at such time) have been satisfied or waived in accordance with the merger agreement; (2) Parent and Acquisition Sub fail to consummate the merger within three business days following the date on which the closing should have occurred; and (3) during such three business day period, Twitter stood ready, willing and able to consummate the merger and the other transactions contemplated by the merger agreement; and

- by Parent if:

  ○ subject to a 30-day cure period, Twitter has breached or failed to perform any of its representations, warranties, covenants or other agreements in the merger agreement, which breach or failure would give rise to the failure of relevant conditions to effect the closing of the merger, except that the right to terminate will not be available to Parent if Parent, Acquisition Sub or Mr. Musk is then in material breach of any of its representations, warranties, covenants or agreements under the merger agreement; or

  ○ prior to the adoption of the merger agreement by the requisite affirmative vote of our stockholders, the Twitter Board has made a Twitter Board recommendation change.

**Termination Fees and Remedies**

The merger agreement contains certain termination rights for Twitter and Parent.

Upon valid termination of the merger agreement under specified circumstances, Twitter will be required to pay, at the direction of Parent, a termination fee of $1,000,000,000. Specifically, this termination fee will be payable by Twitter to Parent if:

- (1) a third party will have made a competing proposal after the date of the merger agreement, (2) the merger agreement is subsequently terminated by (a) Twitter or Parent because our stockholders have failed to approve the merger agreement at the special meeting or (b) Parent as a result of a breach or failure by Twitter to perform any of its representations, warranties,

-16-

Table of Contents

covenants or other agreements in the merger agreement (subject to a 30-day cure period), which breach or failure would give rise to the failure of any condition to effect the closing of the merger, and at the time of such special meeting or breach, as applicable, a competing proposal has been publicly announced and has not been withdrawn, and (3) within 12 months of such termination of the merger agreement, Twitter consummates a transaction involving a competing proposal or enters into a definitive agreement providing for the consummation of a competing proposal and such competing proposal is subsequently consummated (provided that, for purposes of this paragraph, all percentages in the definition of competing proposal are increased to 50 percent);

- the merger agreement is terminated by Twitter to enter into a definitive agreement with respect to a superior proposal; or

- the merger agreement is terminated by Parent if the Twitter Board made a Twitter Board recommendation change prior to the adoption of the merger agreement by the requisite affirmative vote of our stockholders.

Upon valid termination of the merger agreement under certain specified circumstances, Parent will be required to pay, at the direction of Twitter, a termination fee of $1,000,000,000, the payment of which has been guaranteed pursuant and subject to the terms and conditions of the limited guaranty. Specifically, the termination fee will be payable by Parent to Twitter if the merger agreement is terminated by Twitter:

- as a result of a breach or failure by Parent, Acquisition Sub or Mr. Musk to perform any of its respective representations, warranties, covenants or other agreements in the merger agreement (subject to a 30-day cure period), which breach or failure would give rise to the failure of relevant conditions to effect the closing of the merger; or

- because Parent and Acquisition Sub failed to consummate the merger as required pursuant to, and in the circumstances specified in, and subject to the terms of, the merger agreement while Twitter stood ready, willing and able to consummate the merger and the other transactions contemplated by the merger agreement.

The merger agreement also provides that Twitter, on one hand, or Parent and Acquisition Sub, on the other hand, may specifically enforce the obligations under the merger agreement in accordance with its terms. In addition, Twitter is entitled to obtain specific performance or other equitable relief to enforce Parent's and Acquisition Sub's obligations to cause Mr. Musk to fund the equity financing, or to enforce Mr. Musk's obligation to fund the equity financing directly, and to consummate the closing of the merger, if certain conditions are satisfied, including the funding or availability of the debt financing.

Neither Parent nor Twitter is required to pay to the other a termination fee on more than one occasion.

**Limited Guarantee**

Pursuant to the limited guarantee delivered by Elon Musk in favor of Twitter, dated as of April 25, 2022 (which we refer to as the "**limited guarantee**"), Mr. Musk agreed to guarantee the due, complete and punctual payment, observance, performance and discharge of the payment obligations of Parent under the merger agreement, including the termination fee payable by Parent, plus amounts in respect of reimbursement, indemnification or other payment obligations of Parent for certain costs, expenses, monetary damages or losses incurred or sustained by Twitter, subject to the conditions set forth in the limited guarantee. For more information, please see the section of this proxy statement captioned "*The Merger—Limited Guarantee.*"

-17-

Table of Contents

**Delisting and Deregistration of Our Common Stock**

If the merger is completed, our common stock will no longer be traded on the NYSE and will be deregistered under the Securities Exchange Act of 1934 (which we refer to as the "**Exchange Act**"). We will no longer be required to file periodic reports, current reports and proxy and information statements with the Securities and Exchange Commission (which we refer to as the "**SEC**") on account of our common stock.

**Effect on Twitter if the Merger is Not Completed**

If the merger agreement is not adopted by our stockholders, or if the merger is not completed for any other reason, our stockholders will not receive any payment for their shares of our common stock in connection with the merger. Instead: (1) Twitter will remain an independent public company; (2) our common stock will continue to be listed and traded on the NYSE and registered under the Exchange Act; and (3) we will continue to file periodic reports with the SEC.

Furthermore, if the merger is not completed, and depending on the circumstances that cause the merger not to be completed, the price of our common stock may decline significantly.

Accordingly, there can be no assurance as to the effect of the merger not being completed on the future value of your shares of our common stock. If the merger is not completed, the Twitter Board will continue to evaluate and review, among other things, Twitter's business, operations, strategic direction and capitalization, and will make whatever changes it deems appropriate. If the merger agreement is not adopted by our stockholders or if the merger is not completed for any other reason, Twitter's business, prospects or results of operations may be adversely impacted.

In certain specified circumstances in which the merger agreement is terminated, Parent has agreed to pay Twitter a reverse termination fee, the payment of which has been guaranteed by Mr. Musk. Similarly, in certain specified circumstances in which the merger agreement is terminated, Twitter has agreed to pay Parent (or its designee) a termination fee.

**Litigation Relating to the Merger**

On May 6, 2022, a complaint was filed in the Delaware Court of Chancery by a putative Twitter stockholder against Twitter, members of the Twitter Board, and Mr. Musk. The complaint alleges that Mr. Musk reached an "agreement, arrangement or understanding," as those terms are defined in Section 203 of the Delaware General Corporation Law (which we refer to as "**Section 203**"), with certain other Twitter stockholders prior to the Twitter Board's approval of the merger, pursuant to which the shares of Twitter owned by these other stockholders would be voted in favor of the merger, thereby triggering Section 203's requirement that at least 66 and 2/3 percent of Twitter's outstanding stock unaffiliated with Mr. Musk vote in favor of the merger. The complaint seeks, among other things, (1) an order declaring that the merger is subject to Section 203's supermajority voting requirement and (2) a finding that the members of the Twitter Board breached their fiduciary duties by entering into the merger agreement without providing for a supermajority stockholder vote contemplated by Section 203.

Twitter disputes the complaint's allegations, including the allegation that Section 203's supermajority voting requirement applies to the merger. For more information, see the section of this proxy statement captioned "*The Merger—Litigation Relating to the Merger.*"

-18-

Table of Contents

# QUESTIONS AND ANSWERS

*The following questions and answers address some commonly asked questions regarding the merger, the merger agreement and the special meeting. These questions and answers may not address all questions that are important to you. We encourage you to carefully read the more detailed information contained elsewhere in this proxy statement, including the annexes to this proxy statement and the other documents to which we refer in this proxy statement. You may obtain the information incorporated by reference in this proxy statement without charge by following the instructions in the section of this proxy statement captioned "Where You Can Find More Information."*

**Q:**    **Why am I receiving these materials?**

**A:**    On April 25, 2022, Twitter entered into the merger agreement. Under the merger agreement, Parent will acquire Twitter for $54.20 in cash per share of our common stock. In order to complete the merger, stockholders representing a majority of all issued and outstanding shares of our common stock must vote to approve the adoption of the merger agreement at the special meeting. This approval is a condition to the consummation of the merger. See the section of this proxy statement captioned "*The Merger Agreement—Conditions to the Closing of the Merger.*" The Twitter Board is furnishing this proxy statement and form of proxy card to the holders of shares of our common stock in connection with the solicitation of proxies of our stockholders to be voted at the special meeting.

This proxy statement, which you should read carefully, contains important information about the merger, the merger agreement, the special meeting and the matters to be voted on at the special meeting. The enclosed materials allow you to submit a proxy to vote your shares of our common stock without attending the special meeting and to ensure that your shares of our common stock are represented and voted at the special meeting.

Your vote is very important. Even if you plan to attend the special meeting, we encourage you to submit a proxy as soon as possible.

**Q:**    **What is the merger and what effects will it have on Twitter?**

**A:**    The merger is the acquisition of Twitter by Parent. If the proposal to adopt the merger agreement is approved by our stockholders and the other closing conditions under the merger agreement are satisfied or waived, Acquisition Sub will merge with and into Twitter, with Twitter continuing as the surviving corporation. As a result of the merger, Twitter will become a wholly owned subsidiary of Parent, and our common stock will no longer be publicly traded and will be delisted from the NYSE. In addition, our common stock will be deregistered under the Exchange Act, and we will no longer file periodic reports with the SEC.

**Q:**    **What will I receive if the merger is completed?**

**A:**    Upon completion of the merger, you will be entitled to receive $54.20 in cash, without interest, for each share of our common stock that you own, unless you have properly exercised, and not validly withdrawn or subsequently lost, your appraisal rights under the DGCL, and certain other conditions under the DGCL are satisfied. For example, if you own 100 shares of our common stock, you will receive $5,420.00 in cash in exchange for your shares of our common stock, without interest and less any applicable withholding taxes.

-19-

**Table of Contents**

**Q:**      **How does the per share price compare to the market price of Twitter's common stock?**

**A:**      This amount constitutes a premium of approximately 38 percent to the closing price of our common stock on April 1, 2022, which was the last full trading day before Mr. Musk disclosed his approximately nine percent stake in Twitter.

**Q:**      **What will happen to Twitter equity-based awards and Twitter options?**

**A:**      Generally speaking, Twitter equity-based awards and Twitter options will be treated as follows:

- At the effective time of the merger, each vested Twitter equity-based award (other than a vested Twitter option) outstanding as of immediately prior to the effective time of the merger will be canceled and converted into the right to receive an amount in cash, without interest and less any required withholding taxes, equal to the product of (1) the per share price and (2) the total number of shares of our common stock subject to such vested Twitter equity-based award (and with respect to any vested equity-based awards subject to performance vesting conditions, calculated based on the achievement of the applicable performance metrics at the level of performance at which such equity-based award vested in accordance with its terms).

- At the effective time of the merger, each unvested Twitter equity-based award (other than an unvested Twitter option) outstanding as of immediately prior to the effective time of the merger will be canceled and converted into the right to receive an amount in cash, without interest and less any required withholding taxes, equal to the product of (1) the per share price and (2) the total number of shares of our common stock subject to such unvested Twitter equity-based award (and with respect to any unvested equity-based awards subject to performance vesting conditions, calculated based on the achievement of the applicable performance metrics at the target level of performance), which amount will, subject to the holder's continued service with Parent and its affiliates (including the surviving corporation and its subsidiaries) through the applicable vesting dates, vest and be payable at the same time as the unvested Twitter equity-based award for which such cash amount was exchanged would have vested pursuant to its terms and will otherwise remain subject to the same terms and conditions as were applicable to the unvested Twitter equity-based award immediately prior to the effective time of the merger (other than performance-based vesting conditions, which will not apply following the effective time of the merger).

- At the effective time of the merger, each vested Twitter option outstanding as of immediately prior to the effective time of the merger will be canceled and converted into the right to receive an amount in cash, without interest and less any required withholding taxes, equal to the product of (1) the excess, if any, of the per share price less the exercise price per share of our common stock underlying such Twitter option, and (2) the total number of shares of our common stock subject to such Twitter option.

- At the effective time of the merger, each unvested Twitter option outstanding as of immediately prior to the effective time of the merger will be canceled and converted into the right to receive an amount in cash, without interest and less any required withholding taxes, equal to the product of (1) the excess, if any, of the per share price less the exercise price per share of our common stock underlying such Twitter option, and (2) the total number of shares of our common stock subject to such Twitter option, which cash amount will, subject to the holder's continued service with Parent and its affiliates (including the surviving corporation and its subsidiaries) through the applicable vesting dates, vest and be payable at the same time as the unvested Twitter option for which such cash amount was exchanged would have vested

-20-

Table of Contents

pursuant to its terms and will otherwise remain subject to the same terms and conditions as were applicable to the unvested Twitter option immediately prior to the effective time of the merger.

•    At the effective time of the merger, any Twitter option outstanding as of immediately prior to the effective time of the merger and for which the exercise price per share of our common stock underlying such Twitter options is equal to or greater than the per share price will be canceled without any cash payment or other consideration being made in respect of such Twitter option.

**Q:   What will happen to the ESPP?**

A:    Generally speaking, the ESPP will be treated as follows:

•    The Twitter Board has adopted resolutions that provide that (1) the current offering period under the ESPP will be the final offering period and no further offering period will commence pursuant to the ESPP after the date of the merger agreement, and (2) except as may be required by law, each individual participating in the final offering period as of the date of the merger agreement will not be permitted to (a) increase his or her payroll contribution rate pursuant to the ESPP from the rate in effect when the final offering period commenced or (b) make separate non-payroll contributions to the ESPP on or following the date of the merger agreement.

•    Prior to the effective time of the merger, Twitter will take all actions that may be necessary to give effect to the treatment described above and to (1) cause the final offering period, to the extent that it would otherwise be outstanding at the effective time, to be terminated no later than 10 business days prior to the date on which the effective time of the merger occurs; (2) make any pro rata adjustments that may be necessary to reflect the final offering period, but otherwise treat the final offering period as a fully effective and completed offering period for all purposes pursuant to the ESPP; and (3) cause the exercise (as of no later than 10 business days prior to the date on which the effective time of the merger occurs) of each outstanding purchase right pursuant to the ESPP.

•    On such exercise date, Twitter will apply the funds credited as of such date pursuant to the ESPP within each participant's payroll withholding account to the purchase of whole shares of our common stock in accordance with the terms of the ESPP, and such shares of our common stock will be entitled to the per share price. Immediately prior to and effective as of the effective time of the merger (but subject to the consummation of the merger), Twitter will terminate the ESPP.

**Q:   What am I being asked to vote on at the special meeting?**

A:    You are being asked to vote on the following proposals:

•    Proposal 1: to adopt the merger agreement, pursuant to which Acquisition Sub will merge with and into Twitter, with Twitter continuing as the surviving corporation, and Twitter will become a wholly owned subsidiary of Parent;

•    Proposal 2: to approve, on a non-binding, advisory basis, the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger; and

-21-

Table of Contents

     •    Proposal 3: to approve the adjournment of the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting.

**Q:**    **When and where is the special meeting?**

A:    The special meeting will take place on [•], 2022, at [•], Pacific time. You may attend the special meeting via a live interactive webcast at http://www.virtualshareholdermeeting.com/TWTR2022SM. You will be able to listen to the special meeting live and vote online. You will need the control number found on your proxy card or voting instruction form in order to participate in the special meeting (including voting your shares).

**Q:**    **Who is entitled to vote at the special meeting?**

A:    All of our stockholders as of the close of business on [•], 2022, which is the record date for the special meeting, are entitled to vote their shares of our common stock at the special meeting. As of the close of business on the record date, there were [•] shares of our common stock outstanding and entitled to vote at the special meeting. Each share of our common stock outstanding as of the record date is entitled to one vote per share on each matter properly brought before the special meeting.

**Q:**    **What vote is required to approve the proposal to adopt the merger agreement?**

A:    The affirmative vote of the holders of a majority of the shares of our common stock outstanding as of the record date is required to adopt the merger agreement.

    The failure of any stockholder of record to (1) submit a signed proxy card; (2) grant a proxy over the internet or by telephone; or (3) attend and vote at the special meeting will have the same effect as a vote "AGAINST" the proposal to adopt the merger agreement. If you hold your shares in "street name," the failure to instruct your bank, broker or other nominee how to vote your shares will have the same effect as a vote "AGAINST" the proposal to adopt the merger agreement. Abstentions will have the same effect as a vote "AGAINST" the proposal to adopt the merger agreement.

**Q:**    **What vote is required to approve (1) the proposal to approve, on a non-binding, advisory basis, the compensation that will or may become payable by Twitter to its named executive officers in connection with the merger; and (2) the proposal to adjourn the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting?**

A:    Approval of the proposal to approve, on a non-binding, advisory basis, the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger requires the affirmative vote of a majority of the voting power of the shares of our common stock present in person or represented by proxy at the special meeting and entitled to vote on the proposal.

    Approval of the proposal to adjourn the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting requires the affirmative vote of a majority of the voting power of the shares of our common stock present in person or represented by proxy at the special meeting and entitled to vote on the proposal.

-22-

Table of Contents

The failure of any stockholder of record to (1) submit a signed proxy card; (2) grant a proxy over the internet or by telephone; or (3) attend and vote at the special meeting will not have any effect on the proposal to approve, on a non-binding, advisory basis, the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger, or the proposal to adjourn the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting, except, in all cases, to the extent that such failure affects obtaining a quorum at the meeting. If you hold your shares in "street name," the failure to instruct your bank, broker or other nominee how to vote your shares will not have any effect on these proposals, except to the extent that such failure affects obtaining a quorum at the meeting. In all cases, abstentions will have the same effect as a vote "AGAINST" these proposals.

**Q:**      **What do I need to do now?**

A:      We encourage you to read this proxy statement, the annexes to this proxy statement and the documents that we refer to in this proxy statement carefully and consider how the merger affects you. Then, even if you expect to attend the special meeting, please sign, date and return, as promptly as possible, the enclosed proxy card (a proxy card and a prepaid reply envelope are enclosed for your convenience), or grant your proxy electronically over the internet or by telephone (using the instructions found on the proxy card), so that your shares can be voted at the special meeting. If you hold your shares in "street name," please refer to the voting instruction form provided by your bank, broker or other nominee for information on how to vote your shares. Please do not send your stock certificates with your proxy card.

**Q:**      **How does the Twitter Board recommend that I vote?**

A:      The Twitter Board unanimously recommends that you vote: (1) "**FOR**" the adoption of the merger agreement; (2) "**FOR**" the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger; and (3) "**FOR**" the adjournment of the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting.

**Q:**      **What happens if the merger is not completed?**

A:      If the merger agreement is not adopted by our stockholders or if the merger is not completed for any other reason, our stockholders will not receive any payment for their shares of our common stock. Instead: (1) Twitter will remain an independent public company; (2) our common stock will continue to be listed and traded on the NYSE and registered under the Exchange Act; and (3) we will continue to file periodic reports with the SEC.

In specified circumstances in which the merger agreement is terminated, Twitter has agreed to pay Parent (or its designee) a termination fee. In specified circumstances in which the merger agreement is terminated, Parent has agreed to pay Twitter a reverse termination fee, the payment of which has been guaranteed by Mr. Musk. For more information, see the section of this proxy statement captioned "*The Merger Agreement—Termination Fees and Remedies.*"

**Q:**      **What is the compensation that will or may become payable by Twitter to its named executive officers in connection with the merger?**

A:      The compensation that will or may become payable by Twitter to our named executive officers in connection with the merger is certain compensation that is tied to or based on the merger

-23-

[Table of Contents](#)

and payable to certain of Twitter's named executive officers pursuant to underlying plans and arrangements that are contractual in nature. Compensation that will or may become payable by Parent or its affiliates (including, following the consummation of the merger, the surviving corporation) to our named executive officers in connection with or following the merger is not subject to this advisory vote. For further information, see the section of this proxy statement captioned "*Proposal 2: Approval, on a Non-Binding, Advisory Basis, of Certain Merger-Related Executive Compensation.*"

**Q:   Why am I being asked to cast a vote to approve the compensation that will or may become payable by Twitter to its named executive officers in connection with the merger?**

A:   Twitter is required by law to seek approval, on a non-binding, advisory basis, of compensation that will or may become payable by Twitter to our named executive officers in connection with the merger. Approval of the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger is not required to consummate the merger.

**Q:   What will happen if Twitter's stockholders do not approve the compensation that will or may become payable by Twitter to its named executive officers in connection with the merger?**

A:   Approval of the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger is not a condition to consummation of the merger. This is an advisory vote and will not be binding on Twitter or Parent. The underlying plans and arrangements providing for such compensation are contractual in nature and are not, by their terms, subject to stockholder approval.

Accordingly, if the merger agreement is adopted by our stockholders and the merger is consummated, the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger will or may be paid to Twitter's named executive officers as contractually required even if our stockholders do not approve such compensation.

**Q:   What is the difference between holding shares as a stockholder of record and as a beneficial owner?**

A:   If your shares are registered directly in your name with our transfer agent, Computershare Trust Company, N.A., you are considered, with respect to those shares, to be the "stockholder of record." If you are a stockholder of record, this proxy statement and your proxy card have been sent directly to you by or on behalf of Twitter. As a stockholder of record, you may attend the special meeting and vote your shares at the special meeting using the control number on the enclosed proxy card.

If your shares are held through a bank, broker or other nominee, you are considered the "beneficial owner" of shares of our common stock held in "street name." If you are a beneficial owner of shares of our common stock held in "street name," this proxy statement has been forwarded to you by your bank, broker or other nominee who is considered, with respect to those shares, to be the stockholder of record. As the beneficial owner, you have the right to direct your bank, broker or other nominee how to vote your shares by following their instructions for voting. You are also invited to attend the special meeting. However, because you are not the stockholder of record, you may not vote your shares at the special meeting

-24-

Table of Contents

unless you provide a "legal proxy" from your bank, broker or other nominee giving you the right to vote your shares at the special meeting.

**Q:**      **If my broker holds my shares in "street name," will my broker vote my shares for me?**

A:        No. Your bank, broker or other nominee is permitted to vote your shares on any proposal currently scheduled to be considered at the special meeting only if you instruct your bank, broker or other nominee how to vote. You will receive instructions from your bank, broker or other nominee that you must follow in order to submit your voting instructions and have your shares counted at the special meeting. Without instruction, your shares will not be counted for the purpose of obtaining a quorum or voted on the proposals, which will have the same effect as if you voted "AGAINST" adoption of the merger agreement, but will have no effect on the proposal to approve, on a non-binding, advisory basis, the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger or the proposal to adjourn the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting, except to the extent affecting the obtaining of a quorum at the meeting.

**Q:**      **How may I vote?**

A:        If you are a stockholder of record (that is, if your shares of our common stock are registered in your name with Computershare Trust Company, N.A., our transfer agent), there are four ways to vote:

- by signing, dating and returning the enclosed proxy card (a proxy card and a prepaid reply envelope are enclosed for your convenience);

- by visiting the internet address on your proxy card;

- by calling the toll-free (within the United States or Canada) phone number on your proxy card; or

- by attending the special meeting and voting at the special meeting using the control number on the enclosed proxy card.

The control number located on your proxy card is designed to verify your identity and allow you to vote your shares of our common stock and to confirm that your voting instructions have been properly recorded when voting electronically over the internet or by telephone. Although there is no charge for voting your shares, if you vote electronically over the internet or by telephone, you may incur costs such as internet access and telephone charges for which you will be responsible.

Even if you plan to attend the special meeting, you are strongly encouraged to vote your shares of our common stock by proxy. If you are a stockholder of record or if you provide a "legal proxy" to vote shares that you beneficially own, you may vote your shares of our common stock at the special meeting even if you have previously voted by proxy. If you attend the special meeting and vote at the special meeting, your vote will revoke any previously submitted proxy.

If your shares are held in "street name" through a bank, broker or other nominee, you may vote through your bank, broker or other nominee by completing and returning the voting instruction

-25-

Table of Contents

form provided by your bank, broker or other nominee, or, if such a service is provided by your bank, broker or other nominee, electronically over the internet or by telephone. To vote over the internet or by telephone through your bank, broker or other nominee, you should follow the instructions on the voting instruction form provided by your bank, broker or nominee. However, because you are not the stockholder of record, you may not vote your shares at the special meeting unless you provide a "legal proxy" from your bank, broker or other nominee giving you the right to vote your shares at the special meeting.

**Q:**    **May I attend the special meeting and vote at the special meeting?**

**A:**    Yes. You may attend the special meeting via a live interactive webcast at http://www.virtualshareholdermeeting.com/ TWTR2022SM. You will be able to listen to the special meeting live and vote online. The special meeting will begin at [•], Pacific time. Online check-in will begin a few minutes prior to the special meeting. You will need the control number found on your proxy card or voting instruction form in order to participate in the special meeting (including voting your shares). As the special meeting is virtual, there will be no physical meeting location.

Even if you plan to attend the special meeting, to ensure that your shares will be represented at the special meeting, we encourage you to promptly sign, date and return the enclosed proxy card (a proxy card and a prepaid reply envelope are enclosed for your convenience) or grant your proxy electronically over the internet or by telephone (using the instructions found on the proxy card). If you attend the special meeting and vote at the special meeting, your vote will revoke any proxy previously submitted.

If, as of the record date, you are a beneficial owner of shares held in "street name," you may not vote your shares at the special meeting unless you provide a "legal proxy" from your bank, broker or other nominee giving you the right to vote your shares at the special meeting. Otherwise, you should instruct your bank, broker or other nominee how to vote your shares in accordance with the voting instruction form provided by your bank, broker or other nominee. Your bank, broker or other nominee cannot vote on any of the proposals to be considered at the special meeting without your instructions. Without your instructions, your shares will not be counted for purposes of a quorum or voted at the meeting, which will have the same effect as voting against the adoption of the merger agreement.

**Q:**    **Why did Twitter choose to hold a virtual special meeting?**

**A:**    The Twitter Board decided to hold the special meeting virtually in order to facilitate stockholder attendance and participation by enabling stockholders to participate fully, and equally, from virtually any location around the world, at no cost. However, you will bear any costs associated with your internet access, such as usage charges from internet access providers and telephone companies. We believe this is the right choice for a company with a global footprint. A virtual special meeting makes it possible for more stockholders (regardless of size, resources or physical location) to have direct access to information, while saving us and our stockholders time and money. We also believe that the online tools that we have selected will increase stockholder communication. We remain very sensitive to concerns that virtual meetings may diminish stockholder voice or reduce accountability. Accordingly, we have designed our virtual format to enhance, rather than constrain, stockholder access, participation and communication.

**Q:**    **What is a proxy?**

**A:**    A proxy is your legal designation of another person, referred to as a "proxy," to vote your shares of our common stock. The written document describing the matters to be considered

-26-

Table of Contents

and voted on at the special meeting is called a "proxy statement." The document used to designate a proxy to vote your shares of our common stock is called a "proxy card." You may follow the instructions on the proxy card to designate a proxy by telephone or by the internet in the same manner as if you had signed, dated and returned a proxy card. Parag Agrawal, Ned Segal and Sean Edgett, each with full power of substitution and re-substitution, have been designated as proxy holders for the special meeting by the Twitter Board.

**Q:**      **May I change my vote after I have mailed my signed and dated proxy card?**

**A:**      Yes. If you are a stockholder of record, you may change your vote or revoke your proxy at any time before it is voted at the special meeting by:

- signing another proxy card with a later date and returning it to us prior to the special meeting;

- submitting a new proxy electronically over the internet or by telephone after the date of the earlier submitted proxy;

- delivering a written notice of revocation to our Corporate Secretary; or

- attending the special meeting and voting at the special meeting using the control number on the enclosed proxy card.

If you hold your shares of our common stock in "street name," you should contact your bank, broker or other nominee for instructions regarding how to change your vote. You may also vote at the special meeting if you provide a "legal proxy" from your bank, broker or other nominee giving you the right to vote your shares at the special meeting.

**Q:**      **If a stockholder gives a proxy, how are the shares voted?**

**A:**      Regardless of the method you choose to grant your proxy, the individuals named on the enclosed proxy card, with full power of substitution and re-substitution, will vote your shares in the way that you direct.

If you sign and date your proxy card but do not mark the boxes showing how your shares should be voted on a matter, the shares represented by your properly signed proxy will be voted as recommended by the Twitter Board with respect to each proposal. This means that they will be voted: (1) "**FOR**" the adoption of the merger agreement; (2) "**FOR**" the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger; and (3) "**FOR**" the adjournment of the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting.

**Q:**      **Should I send in my stock certificates now?**

**A:**      No. After the merger is completed, any holders of physical stock certificates will receive a letter of transmittal containing instructions for how to send your stock certificates to the payment agent in order to receive the appropriate cash payment for the shares of our common stock represented by your stock certificates. Unless you are seeking appraisal, you should use the letter of transmittal to exchange your stock certificates for the cash payment to which you are entitled. Please do not send your stock certificates with your proxy card. If you hold your shares of our common stock in book-entry form, you will not receive a letter of transmittal.

-27-

Table of Contents

Instead, the payment agent will pay you the appropriate portion of the aggregate merger consideration (subject to any applicable withholding taxes) upon receipt of a customary "agent's message" and any other items specified by the payment agent.

**Q:**      **What happens if I sell or transfer my shares of common stock after the record date but before the special meeting?**

**A:**      The record date for the special meeting is earlier than the date of the special meeting and the expected effective date of the merger. If you sell or transfer your shares of our common stock after the record date but before the special meeting, unless special arrangements (such as provision of a proxy) are made between you and the person to whom you sell or transfer your shares and each of you notifies Twitter in writing of such special arrangements, you will transfer the right to receive the per share price with respect to such shares, if the merger is completed, to the person to whom you sell or transfer your shares, but you will retain your right to vote those shares at the special meeting. Even if you sell or transfer your shares of our common stock after the record date, we encourage you to sign, date and return the enclosed proxy card (a proxy card and a prepaid reply envelope are enclosed for your convenience) or grant your proxy electronically over the internet or by telephone (using the instructions found on the proxy card).

**Q:**      **What should I do if I receive more than one set of voting materials?**

**A:**      Please sign, date and return (or grant your proxy electronically over the internet or by telephone for) each proxy card and voting instruction form that you receive to ensure that all of your shares are voted.

You may receive more than one set of voting materials, including multiple copies of this proxy statement and multiple proxy cards or voting instruction forms, if your shares are registered differently or are held in more than one account. For example, if you hold your shares in more than one brokerage account, you will receive a separate voting instruction form for each brokerage account in which you hold shares. If you are a stockholder of record and your shares are registered in more than one name, you will receive more than one proxy card. Please vote all voting materials that you receive.

**Q:**      **Where can I find the voting results of the special meeting?**

**A:**      If available, Twitter may announce preliminary voting results at the conclusion of the special meeting. Twitter intends to publish final voting results in a Current Report on Form 8-K to be filed with the SEC following the special meeting. All reports that Twitter files with the SEC are publicly available when filed. See the section of this proxy statement captioned "*Where You Can Find More Information*."

**Q:**      **Will I be subject to U.S. federal income tax upon the exchange of common stock for cash pursuant to the merger?**

**A:**      If you are a U.S. Holder, the exchange of our common stock for cash pursuant to the merger will be a taxable transaction for U.S. federal income tax purposes, which generally will require a U.S. Holder to recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between the amount of cash received by such U.S. Holder in the merger and such U.S. Holder's adjusted tax basis in the shares of our common stock surrendered in the merger.

A Non-U.S. Holder (as defined in the section of this proxy statement captioned "*The Merger—Material U.S. Federal Income Tax Consequences of the Merger*") generally will not be subject

-28-

Table of Contents

to U.S. federal income tax with respect to the exchange of our common stock for cash in the merger unless such Non-U.S. Holder has certain connections to the United States, but may be subject to backup withholding tax unless the Non-U.S. Holder complies with certain certification procedures or otherwise establishes a valid exemption from backup withholding tax.

Because particular circumstances may differ, we recommend that you consult your own tax advisor to determine the U.S. federal income tax consequences relating to the merger in light of your own particular circumstances and any consequences arising under U.S. federal non-income tax laws or the laws of any territory, state, local or foreign taxing jurisdiction. This discussion is provided for general information only and does not constitute legal advice to any holder. A more complete description of material U.S. federal income tax consequences of the merger is provided in the section of this proxy statement captioned "*The Merger—Material U.S. Federal Income Tax Consequences of the Merger.*"

**Q:   When do you expect the merger to be completed?**

A:   We currently expect to complete the merger in 2022. However, the exact timing of completion of the merger, if at all, cannot be predicted because the merger is subject to the closing conditions specified in the merger agreement, many of which are outside of our control.

**Q:   What governmental and regulatory approvals are required?**

A:   Under the terms of the merger agreement, the merger cannot be completed until the waiting period applicable to the merger under the HSR Act has expired or been terminated. Additionally, under the terms of the merger agreement, the merger cannot be completed until all consents, approvals and filings that are mutually agreed by Parent and Twitter, acting reasonably, to be (1) material and (2) required or advisable under the antitrust or foreign investment laws of certain specified jurisdictions have been obtained or made or, as applicable, the waiting periods, if any, have expired or been terminated. For more information, please see the section of this proxy statement captioned "*The Merger—Regulatory Approvals Required for the Merger.*"

**Q:   Am I entitled to appraisal rights under the DGCL?**

A:   If the merger is consummated and certain conditions set forth in Section 262(g) of the DGCL are satisfied, our stockholders who (1) do not vote in favor of the adoption of the merger agreement, (2) continuously hold their applicable shares of our common stock through the effective time of the merger, (3) properly demand appraisal of their applicable shares, (4) meet certain statutory requirements as described in this proxy statement and (5) do not withdraw their demands or otherwise lose their rights to appraisal, will be entitled to seek appraisal of their shares in connection with the merger under Section 262 of the DGCL. This means that such stockholders will be entitled to have their shares appraised by the Delaware Court of Chancery and to receive payment in cash of the "fair value" of their shares, exclusive of any elements of value arising from the accomplishment or expectation of the merger, together with (unless the Delaware Court of Chancery in its discretion determines otherwise for good cause shown) interest on the amount determined by the Delaware Court of Chancery to be fair value from the effective date of the merger through the date of payment of the judgment at a rate of five percent over the Federal Reserve discount rate (including any surcharge) as established from time to time during the period between the effective date of the merger and the date of payment of the judgment, compounded quarterly (except that, if at any time before the entry of judgment in the proceeding, the surviving corporation makes a voluntary cash payment to each stockholder seeking appraisal, interest will accrue thereafter only upon the sum of (1) the

-29-

Table of Contents

difference, if any, between the amount so paid and the fair value of the shares as determined by the Delaware Court of Chancery; and (2) interest theretofore accrued, unless paid at that time). The surviving corporation is under no obligation to make such voluntary cash payment prior to such entry of judgment. Stockholders who wish to seek appraisal of their shares are encouraged to seek the advice of legal counsel with respect to the exercise of appraisal rights due to the complexity of the appraisal process. The DGCL requirements for exercising appraisal rights are described in additional detail in the section of this proxy statement captioned "*The Merger—Appraisal Rights*," which description is qualified in its entirety by Section 262 of the DGCL regarding appraisal rights, attached as Annex B to this proxy statement.

**Q:**    **Do any of Twitter's directors or officers have interests in the merger that may differ from those of Twitter stockholders generally?**

**A:**    Yes. In considering the recommendation of the Twitter Board with respect to the proposal to adopt the merger agreement, you should be aware that our directors and executive officers may have interests in the merger that are different from, or in addition to, the interests of our stockholders generally. In: (1) evaluating and negotiating the merger agreement; (2) approving the merger agreement and the merger; and (3) unanimously recommending that the merger agreement be adopted by our stockholders, the Twitter Board was aware of and considered these interests to the extent that they existed at the time, among other matters. For more information, see the section of this proxy statement captioned "*The Merger—Interests of Twitter's Directors and Executive Officers in the Merger.*"

**Q:**    **Who can help answer my questions?**

**A:**    If you have any questions concerning the merger, the special meeting or this proxy statement, would like additional copies of the accompanying proxy statement or need help submitting your proxy or voting your shares of our common stock, please contact our proxy solicitor:

Innisfree M&A Incorporated
501 Madison Avenue, 20th Floor
New York, New York 10022
Stockholders call: (877) 750-8338 (toll-free from the U.S. and Canada) or
+1 (412) 232-3651 (from other countries)
Banks and brokers call collect: (212) 750-5833

-30-

**Table of Contents**

## FORWARD-LOOKING STATEMENTS

This proxy statement, the documents to which we refer you in this proxy statement and information included in oral statements or other written statements made or to be made by us or on our behalf contain "forward-looking statements" that do not directly or exclusively relate to historical facts, including, without limitation, statements relating to the completion of the merger. You can typically identify forward-looking statements by the use of forward-looking words, such as "may," "will," "should," "could," "project," "believe," "anticipate," "expect," "estimate," "continue," "potential," "plan," "forecast," "intend," "target," "possible" and other words of similar import, or the negative versions of such words. Our stockholders are cautioned that any forward-looking statements are not guarantees of future performance and may involve significant risks and uncertainties, and that actual results may vary materially from those in the forward-looking statements. These risks and uncertainties include, but are not limited to, the risks detailed in our filings with the SEC, including in our most recent filings on Forms 10-K and 10-Q, factors and matters described or incorporated by reference in this proxy statement, and the following factors:

- the inability to complete the merger due to the failure of our stockholders to adopt the merger agreement or the failure to satisfy the other conditions to the completion of the merger, including that a governmental entity may prohibit, delay or refuse to grant a necessary regulatory approval;

- the occurrence of any event, change or other circumstances that could give rise to the right to terminate the merger, and the risk that the merger agreement may be terminated in circumstances that require us to pay a termination fee;

- the nature, cost and outcome of any legal proceedings that may be instituted against us and others related to the merger agreement;

- risks that the pendency of the merger affects our current operations or our ability to retain or recruit employees;

- economic, market, business or geopolitical conditions (including resulting from the COVID-19 pandemic, inflation, or the conflict in Ukraine and related sanctions against Russia and Belarus) or competition, or changes in such conditions, negatively affecting Twitter's business, operations and financial performance;

- the fact that receipt of the all-cash per share price will be taxable to our stockholders that are treated as U.S. Holders and may be taxable to our stockholders that are treated as non-U.S. Holders;

- the fact that, if the merger is completed, our stockholders will forgo the opportunity to realize the potential long-term value of the successful execution of Twitter's current strategy as an independent company;

- the possibility that Twitter could, following the merger, engage in operational or other changes that could result in meaningful appreciation in its value;

- the possibility that Twitter could, at a later date, engage in unspecified transactions, including restructuring efforts, special dividends or the sale of some or all of Twitter's assets to one or more as yet unknown purchasers, that could conceivably produce a higher aggregate value than that available to our stockholders in the merger;

-31-

Table of Contents

- the fact that under the terms of the merger agreement, Twitter is restrained from soliciting other acquisition proposals during the pendency of the merger;

- the effect of the announcement or pendency of the merger on our business relationships, customers, operating results and business generally, including risks related to the diversion of the attention of Twitter management or employees or the loss of employees or customers during the pendency of the merger;

- the amount of the costs, fees, expenses and charges related to the merger agreement or the merger;

- the risk that the merger will not be consummated in a timely manner, creating potential uncertainty around the transaction and exceeding the expected costs of the merger;

- the risk that our stock price may fluctuate during the pendency of the merger and may decline significantly if the merger is not completed; and

- risks related to obtaining the requisite stockholder approval to the merger.

Consequently, all of the forward-looking statements that we make in this proxy statement are qualified by the information contained or incorporated by reference in this proxy statement, including: (1) the information contained under this caption; and (2) information in our most recent filings on Form 10-K and Form 10-Q, including the information contained under the caption "Risk Factors," and information in our consolidated financial statements and notes thereto. No assurance can be given that these are all of the factors that could cause actual results to vary materially from the forward-looking statements.

Except as required by applicable law, we undertake no obligation to publicly update forward-looking statements, whether as a result of new information, future events or otherwise. Our stockholders are advised to consult any future disclosures that we make on related subjects as may be detailed in our other filings made from time to time with the SEC.

-32-

Table of Contents

## THE SPECIAL MEETING

**Date, Time and Place**

We will hold the special meeting on [•], 2022, at [•], Pacific time. You may attend the special meeting via a live interactive webcast at http://www.virtualshareholdermeeting.com/TWTR2022SM. You will be able to listen to the special meeting live and vote online. You will need the control number found on your proxy card or voting instruction form in order to participate in the special meeting (including voting your shares). We believe that a virtual meeting provides expanded access, improved communication and cost savings for our stockholders and Twitter.

**Purpose of the Special Meeting**

At the special meeting, we will ask stockholders to vote on proposals to (1) adopt the merger agreement; (2) approve, on a non-binding, advisory basis, the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger; and (3) adjourn the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting.

**Attending the Special Meeting**

The special meeting will begin at [•], Pacific time. Online check-in will begin a few minutes prior to the special meeting. We encourage you to access the meeting prior to the start time.

As the special meeting is virtual, there will be no physical meeting location. To attend the special meeting, log in at http://www.virtualshareholdermeeting.com/TWTR2022SM. You will need the control number found on your proxy card or voting instruction form in order to participate in the special meeting (including voting your shares). If you encounter technical difficulties accessing the special meeting or during the special meeting, a support line will be available on the login page of the special meeting website.

Once online access to the special meeting is open, stockholders may submit questions pertinent to meeting matters, if any, through the special meeting website. Such questions will be answered during the meeting, subject to time constraints. You will need the control number found on your proxy card or voting instruction form in order to submit questions.

**Record Date; Shares Entitled to Vote; Quorum**

Only our stockholders as of the close of business on the record date are entitled to notice of, and to vote at, the special meeting. A list of stockholders of record entitled to vote at the special meeting will be available at our corporate offices located at 1355 Market Street, Suite 900, San Francisco, California 94103, during regular business hours for a period of no less than 10 days before the special meeting and on the virtual meeting website during the special meeting.

As of the record date, there were [•] shares of our common stock outstanding and entitled to vote at the special meeting. Each share of our common stock outstanding as of the close of business on the record date is entitled to one vote per share on each matter submitted for a vote at the special meeting.

The holders of a majority of the voting power of our stock issued and outstanding and entitled to vote, present in person or represented by proxy, shall constitute a quorum.

-33-

Table of Contents

**Vote Required; Abstentions and Broker Non-Votes**

Approval of the proposal to adopt the merger agreement requires the affirmative vote of the holders of a majority of the issued and outstanding shares of our common stock as of the record date. Adoption of the merger agreement by our stockholders is a condition to the closing of the merger.

Approval, on a non-binding, advisory basis, of the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger requires the affirmative vote of a majority of the voting power of the shares of our common stock present in person or represented by proxy at the special meeting and entitled to vote on the proposal.

Approval of the proposal to adjourn the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting requires the affirmative vote of a majority of the voting power of the shares of our common stock present in person or represented by proxy at the special meeting and entitled to vote on the proposal.

If a stockholder abstains from voting, that abstention will have the same effect as if the stockholder voted: (1) "AGAINST" the proposal to adopt the merger agreement; (2) "AGAINST" the proposal to approve, on a non-binding, advisory basis, compensation that will or may become payable by Twitter to our named executive officers in connection with the merger; and (3) "AGAINST" the proposal to adjourn the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting. Abstentions will be counted as present for purposes of determining whether a quorum exists.

A "broker non-vote" generally occurs when a bank, broker or other nominee holding shares on your behalf does not vote on a proposal because the bank, broker or other nominee has not received your voting instructions and lacks discretionary power to vote your shares. We do not expect any "broker non-votes" at the special meeting, but if there are any, they will be counted for the purpose of determining whether a quorum is present. If there are broker non-votes, each broker non-vote will count as a vote "AGAINST" the proposal to adopt the merger agreement, but will have no effect on: (1) the proposal to approve, on a non-binding, advisory basis, the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger; or (2) the proposal to adjourn the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting.

**Shares Held by Twitter's Directors and Executive Officers**

As of the record date, our directors and executive officers beneficially owned and were entitled to vote, in the aggregate, [•] shares of our common stock, representing approximately [•] percent of the shares of our common stock outstanding as of the record date. Twitter has not been informed that any of our directors and executive officers intend to vote any of their shares of our common stock other than: (1) "**FOR**" the adoption of the merger agreement; (2) "**FOR**" the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger; and (3) "**FOR**" the adjournment of the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting.

**Voting of Proxies**

If your shares are registered in your name with our transfer agent, Computershare Trust Company, N.A., you may vote your shares by returning a signed and dated proxy card (a proxy card and a

-34-

Table of Contents

prepaid reply envelope are enclosed for your convenience), or you may vote at the special meeting using the control number located on the enclosed proxy card. Additionally, you may grant a proxy electronically over the internet or by telephone by following the instructions on your proxy card. You must have your proxy card available, and follow the instructions on the proxy card, in order to grant a proxy electronically over the internet or by telephone.

If you attend the special meeting and wish to vote at the special meeting, you will need the control number located on the enclosed proxy card. Beneficial owners of shares held in "street name" must also provide a "legal proxy" from their bank or broker in order to vote at the special meeting. You are encouraged to vote by proxy even if you plan to attend the special meeting. If you attend the special meeting and vote at the special meeting, your vote will revoke any previously submitted proxy.

All shares represented by properly signed and dated proxies (or proxies granted electronically over the internet or by telephone) will, if received before the special meeting, be voted at the special meeting in accordance with the instructions of the stockholder. Properly signed and dated proxies (or proxies granted electronically over the internet or by telephone) that do not contain voting instructions will be voted: (1) "**FOR**" adoption of the merger agreement; (2) "**FOR**" the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger; and (3) "**FOR**" the adjournment of the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting.

If your shares are held in "street name" through a bank, broker or other nominee, you may vote through your bank, broker or other nominee by completing and returning the voting instruction form provided by your bank, broker or other nominee. You may also attend the special meeting and vote at the special meeting if you provide a "legal proxy" from your bank, broker or other nominee giving you the right to vote your shares at the special meeting. If available from your bank, broker or other nominee, you may vote over the internet or telephone through your bank, broker or other nominee by following the instructions on the voting instruction form provided by your bank, broker or other nominee. If you do not (1) return your bank's, broker's or other nominee's voting instruction form; (2) vote over the internet or by telephone through your bank, broker or other nominee; or (3) attend the special meeting and vote at the special meeting with a "legal proxy" from your bank, broker or other nominee, it will have the same effect as if you voted "AGAINST" the proposal to adopt the merger agreement. It will not, however, have any effect on the proposals (1) to approve, on a non-binding, advisory basis, the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger; or (2) to adjourn the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting, except to the extent affecting the obtaining of a quorum at the meeting.

**Revocability of Proxies**

If you are a stockholder of record, you may change your vote or revoke your proxy at any time before it is voted at the special meeting by:

- signing another proxy card with a later date and returning it to us prior to the special meeting;

- submitting a new proxy electronically over the internet or by telephone after the date of the earlier submitted proxy;

- delivering a written notice of revocation to our Corporate Secretary; or

-35-

Table of Contents

- attending the special meeting and voting at the special meeting using the control number on the enclosed proxy card.

If you have submitted a proxy, your attendance at the special meeting, in the absence of voting at the special meeting or submitting an additional proxy or revocation, will not have the effect of revoking your prior proxy.

If you hold shares of our common stock in "street name" through a bank, broker or other nominee, you should contact your bank, broker or other nominee for instructions regarding how to change your vote. You may also vote at the special meeting if you provide a "legal proxy" from your bank, broker or other nominee giving you the right to vote your shares at the special meeting.

Any adjournment, postponement or other delay of the special meeting, including for the purpose of soliciting additional proxies, will allow our stockholders who have already sent in their proxies to revoke them at any time prior to their use at the special meeting as adjourned, postponed or delayed.

**The Twitter Board's Recommendation**

The Twitter Board, after considering various factors described in the section of this proxy statement captioned "*The Merger— Recommendation of the Twitter Board and Reasons for the Merger*," has unanimously: (1) determined that the merger agreement is advisable and the merger and the other transactions contemplated by the merger agreement are fair to, advisable and in the best interests of Twitter and its stockholders; and (2) adopted and approved the merger agreement, the merger and the other transactions contemplated by the merger agreement.

The Twitter Board unanimously recommends that you vote: (1) "**FOR**" the adoption of the merger agreement; (2) "**FOR**" the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger; and (3) "**FOR**" the adjournment of the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting.

**Adjournment**

In addition to the proposals to (1) adopt the merger agreement and (2) approve, on a non-binding, advisory basis, the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger, our stockholders are also being asked to approve a proposal to adjourn the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting. Subject to the limitations on such actions set forth in the merger agreement, the Twitter Board may cancel, postpone or reschedule any previously scheduled special meeting at any time, before or after the notice for such meeting has been sent to the stockholders. If the special meeting is adjourned or postponed, our stockholders who have already submitted their proxies will be able to revoke them at any time before they are voted at the special meeting.

**Solicitation of Proxies**

The expense of soliciting proxies will be borne by Twitter. We have retained Innisfree M&A Incorporated, a professional proxy solicitation firm, to assist in the solicitation of proxies, and provide related advice and informational support during the solicitation process, for a fee of up to $[•], plus reasonable out-of-pocket expenses. We will indemnify this firm against losses arising out of its provisions of these services on our behalf. In addition, we may reimburse banks, brokers and other nominees representing beneficial owners of shares of our common stock for their expenses in

-36-

Table of Contents

forwarding soliciting materials to such beneficial owners. Proxies may also be solicited by our directors, officers and employees, personally or by telephone, email, fax or over the internet. No additional compensation will be paid for such services.

**Anticipated Date of Completion of the Merger**

We currently expect to complete the merger in 2022. However, the exact timing of completion of the merger, if at all, cannot be predicted because the merger is subject to the closing conditions specified in the merger agreement, many of which are outside of our control.

**Appraisal Rights**

If the merger is consummated and certain conditions set forth in Section 262(g) of the DGCL are satisfied, our stockholders who (1) do not vote in favor of the adoption of the merger agreement, (2) continuously hold their applicable shares of our common stock through the effective time of the merger, (3) properly demand appraisal of their applicable shares, (4) meet certain statutory requirements described in this proxy statement and (5) do not withdraw their demands or otherwise lose their rights to appraisal will be entitled to seek appraisal of their shares in connection with the merger under Section 262 of the DGCL. This means that such stockholders will be entitled to seek appraisal of their shares by the Delaware Court of Chancery and to receive payment in cash of the "fair value" of their shares of our common stock, exclusive of any elements of value arising from the accomplishment or expectation of the merger, together with (unless the Delaware Court of Chancery in its discretion determines otherwise for good cause shown) interest on the amount determined by the Delaware Court of Chancery to be fair value from the effective date of the merger through the date of payment of the judgment at a rate of five percent over the Federal Reserve discount rate (including any surcharge) as established from time to time during the period between the effective date of the merger and the date of payment of the judgment, compounded quarterly (except that, if at any time before the entry of judgment in the proceeding, the surviving corporation makes a voluntary cash payment to each stockholder seeking appraisal, interest will accrue thereafter only upon the sum of (1) the difference, if any, between the amount so paid and the fair value of the shares as determined by the Delaware Court of Chancery; and (2) interest theretofore accrued, unless paid at that time). The surviving corporation is under no obligation to make such voluntary cash payment prior to such entry of judgment. Due to the complexity of the appraisal process, stockholders who wish to seek appraisal of their shares are encouraged to seek the advice of legal counsel with respect to the exercise of appraisal rights.

**Stockholders considering seeking appraisal should be aware that the fair value of their shares as determined pursuant to Section 262 of the DGCL could be more than, the same as or less than the value of the consideration that they would receive pursuant to the merger agreement if they did not seek appraisal of their shares.**

Only a stockholder of record may submit a demand for appraisal. To exercise appraisal rights, the stockholder of record must (1) submit a written demand for appraisal to Twitter before the vote is taken on the proposal to adopt the merger agreement; (2) not vote, in person or by proxy, in favor of the proposal to adopt the merger agreement; (3) continue to hold the subject shares of our common stock of record through the effective time of the merger; and (4) strictly comply with all other procedures for exercising appraisal rights under the DGCL. The failure to follow exactly the procedures specified under the DGCL may result in the loss of appraisal rights. In addition, the Delaware Court of Chancery will dismiss appraisal proceedings in respect of Twitter unless certain conditions set forth in Section 262(g) of the DGCL are satisfied by the stockholders seeking appraisal. The requirements under Section 262 of the DGCL for exercising appraisal rights are described in further detail in this proxy statement, which description is qualified in its entirety by Section 262 of the DGCL, the relevant section of the DGCL regarding appraisal rights, a copy of which is attached as Annex B to this proxy

-37-

Table of Contents

statement. If you hold your shares of our common stock through a bank, broker or other nominee and you wish to exercise appraisal rights, you should consult with your bank, broker or other nominee to determine the appropriate procedures for the making of a demand for appraisal on your behalf by your bank, broker or other nominee.

**Other Matters**

At this time, we know of no other matters to be voted on at the special meeting. If any other matters properly come before the special meeting and you deliver a proxy to us, your shares of our common stock will be voted in accordance with the discretion of the appointed proxy holders, with full power of substitution and re-substitution.

**Important Notice Regarding the Availability of Proxy Materials for the Stockholder Meeting to be Held on [•], 2022**

This proxy statement is available on our website located at *https://investor.twitterinc.com*.

**Householding of Special Meeting Materials**

We have adopted a procedure approved by the SEC called "householding." Under this procedure, stockholders who have the same address and last name will receive only one copy of this proxy statement unless one or more of these stockholders notifies us that they wish to continue receiving individual copies. This procedure reduces printing costs, postage fees and the use of natural resources. Each stockholder who participates in householding will continue to be able to access or receive a separate proxy card upon request. If, at any time, you no longer wish to participate in householding and would prefer to receive a separate set of our disclosure documents, or if you are receiving multiple copies and wish to receive only one copy, please contact us as follows:

Twitter, Inc.
Attention: Investor Relations
1355 Market Street, Suite 900
San Francisco, California 94103
Tel: (415) 222-9670

**Questions and Additional Information**

If you have any questions concerning the merger, the special meeting or this proxy statement, would like additional copies of this proxy statement or need help submitting your proxy or voting your shares of our common stock, please contact our proxy solicitor at:

Innisfree M&A Incorporated
501 Madison Avenue, 20th Floor
New York, New York 10022
Stockholders call: (877) 750-8338 (toll-free from the U.S. and Canada) or
+1 (412) 232-3651 (from other countries)
Banks and brokers call collect: (212) 750-5833

-38-

Table of Contents

## THE MERGER

The rights and obligations of the parties to the merger agreement are governed by the specific terms and conditions of the merger agreement and not by any summary or other information provided in this proxy statement. Therefore, this discussion of the merger is qualified in its entirety by reference to the merger agreement, a copy of which is attached as Annex A to this proxy statement and incorporated into this proxy statement by reference. You should read the entire merger agreement carefully as it is the legal document that governs the merger.

### Parties Involved in the Merger

*Twitter, Inc.*
1355 Market Street, Suite 900
San Francisco, California 94103
(415) 222-9670

Twitter is what's happening in the world and what people are talking about right now. Our primary product, Twitter, is a global platform for public self-expression and conversation in real time. We have democratized content creation and distribution so people can consume, create, distribute and discover content about the topics and events they care about most. Through Topics, Interests, and Trends, we help people discover what's happening through text, images, on demand and live video, and audio from people, content partners, media organizations, advertisers and others. Media outlets, websites, and other partners extend the reach of Twitter content by distributing Tweets beyond our app and website.

Our common stock is listed on the NYSE under the symbol "TWTR."

*X Holdings I, Inc.*
c/o Elon Musk
2110 Ranch Road 620 S. #341886
Austin, TX 78734

Parent was formed on April 19, 2022, solely for the purpose of engaging in the transactions contemplated by the merger agreement and has not engaged in any business activities other than as incidental to its formation and in connection with the transactions contemplated by the merger agreement and arranging of the equity financing and the debt financing in connection with the merger.

*X Holdings II, Inc.*
c/o Elon Musk
2110 Ranch Road 620 S. #341886
Austin, TX 78734

Acquisition Sub is a wholly owned subsidiary of Parent and was formed on April 19, 2022, solely for the purpose of engaging in the transactions contemplated by the merger agreement. Acquisition Sub has not engaged in any business activities other than as incidental to its formation and in connection with the transactions contemplated by the merger agreement and arranging of the equity financing and the debt financing in connection with the merger. Upon completion of the merger, Acquisition Sub will cease to exist and Twitter will continue as the surviving corporation.

*Elon Musk*
2110 Ranch Road 620 S. #341886
Austin, TX 78734

-39-

Table of Contents

Elon Musk leads SpaceX, Tesla, Inc., Neuralink Corp. and The Boring Company. Mr. Musk has served as the Chief Executive Officer of Tesla, Inc. since October 2008, as a member of the Board of Directors of Tesla, Inc. since April 2004, as the Chief Executive Officer, Chief Technology Officer and Chairman of the Board of SpaceX since May 2002, and served as Chairman of the Board of SolarCity Corporation, a solar installation company, from July 2006 until its acquisition by Tesla in November 2016. Mr. Musk is also the founder of The Boring Company and of Neuralink Corp. Mr. Musk also co-founded Zip2 Corporation, an early internet company, and PayPal. Mr. Musk has served on the board of directors of Endeavor Group Holdings, Inc. since April 2021. Mr. Musk holds a B.A. in physics from the University of Pennsylvania and a B.S. in business from the Wharton School of the University of Pennsylvania.

**Effect of the Merger**

Upon the terms and subject to the conditions of the merger agreement, and in accordance with the DGCL, at the effective time of the merger, (1) Acquisition Sub will merge with and into Twitter; (2) the separate existence of Acquisition Sub will cease; and (3) Twitter will continue as the surviving corporation in the merger and a wholly owned subsidiary of Parent.

As a result of the merger, Twitter will cease to be a publicly traded company, our common stock will be delisted from the NYSE and deregistered under the Exchange Act and Twitter will no longer file periodic reports with the SEC. If the merger is completed, you will not own any shares of capital stock of the surviving corporation.

The effective time of the merger will occur upon the filing of a certificate of merger with, and acceptance of that certificate by, the Secretary of State of the State of Delaware (or at a later time as we, Parent and Acquisition Sub may agree and specify in such certificate of merger).

**Effect on Twitter if the Merger is Not Completed**

If the merger agreement is not adopted by our stockholders, or if the merger is not completed for any other reason, our stockholders will not receive any payment for their shares of our common stock in connection with the merger. Instead, (1) Twitter will remain an independent public company; (2) our common stock will continue to be listed and traded on the NYSE and registered under the Exchange Act; and (3) we will continue to file periodic reports with the SEC. In addition, if the merger is not completed, we expect that: (1) our management will continue to operate the business as it is currently being operated; and (2) our stockholders will continue to be subject to the same risks and opportunities to which they are currently subject, including risks related to the highly competitive industry in which Twitter operates and adverse economic conditions.

Furthermore, if the merger is not completed, and depending on the circumstances that cause the merger not to be completed, the price of our common stock may decline significantly.

Accordingly, there can be no assurance as to the effect of the merger not being completed on the future value of your shares of our common stock. If the merger is not completed, the Twitter Board will continue to evaluate and review, among other things, Twitter's business, operations, strategic direction and capitalization, and will make whatever changes it deems appropriate. If the merger agreement is not adopted by our stockholders or if the merger is not completed for any other reason, Twitter's business, prospects or results of operations may be adversely impacted.

In specified circumstances in which the merger agreement is terminated, Twitter has agreed to pay Parent (or its designee) a termination fee. In specified circumstances in which the merger agreement is terminated, Parent has agreed to pay Twitter a reverse termination fee, the payment of which has been guaranteed by Mr. Musk.

-40-

Table of Contents

**Per Share Price**

Upon the terms and subject to the conditions of the merger agreement, at the effective time of the merger:

- each share of our common stock that is (1) held by Twitter or any of its subsidiaries or (2) held, directly or indirectly, by Mr. Musk, Parent or Acquisition Sub immediately prior to the effective time of the merger will no longer be outstanding and will automatically be canceled and will cease to exist, and no consideration will be delivered or deliverable in exchange therefor;

- each share of our common stock that is issued and outstanding as of immediately prior to the effective time of the merger (other than the shares identified in the prior bullet) and held by our stockholders who have (1) neither voted in favor of the adoption of the merger agreement nor consented thereto in writing; and (2) properly and validly exercised their statutory rights of appraisal in respect of such shares in accordance with the DGCL (and have not validly withdrawn or subsequently lost such appraisal rights) will be entitled to the "fair value" of such shares, determined pursuant to an appraisal proceeding contemplated by the DGCL as described in the section of this proxy statement captioned "—*Appraisal Rights*"; and

- each share of our common stock that is issued and outstanding as of immediately prior to the effective time of the merger (other than the shares identified in the prior bullets) will automatically be canceled and retired and all such shares will cease to exist and will thereafter only represent the right to receive the per share price.

At or prior to the closing of the merger, a sufficient amount of cash will be deposited with a designated paying agent to pay the aggregate merger consideration. Once a stockholder has provided the paying agent with his, her or its stock certificates (or an affidavit of loss in lieu of a stock certificate) or customary agent's message with respect to book-entry shares, appropriate letter of transmittal and other items specified by the paying agent, then the paying agent will pay the stockholder the appropriate portion of the aggregate merger consideration (subject to any applicable withholding taxes). For more information, see the section of this proxy statement captioned "*The Merger Agreement—Paying Agent, Exchange Fund and Exchange and Payment Procedures*."

After the merger is completed, each of our stockholders will have the right to receive the per share price for each share of our common stock that such stockholder owned, as described in the section of this proxy statement captioned "*The Merger Agreement—Conversion of Shares*," but will no longer have any rights as a Twitter stockholder (except that our stockholders who properly and validly exercise and perfect, and do not validly withdraw or subsequently lose, their appraisal rights will have the right to receive payment for the "fair value" of their shares, determined pursuant to an appraisal proceeding contemplated by the DGCL as described in the section of this proxy statement captioned "*The Merger—Appraisal Rights*").

**Background of the Merger**

*The following chronology summarizes the key meetings and events that led to the signing of the merger agreement. This chronology does not purport to catalog every conversation of or among the Twitter Board, the Transactions Committee (as defined below), our representatives, or other parties.*

The Twitter Board regularly evaluates Twitter's strategic direction and ongoing business plans with a view toward strengthening Twitter's business, furthering Twitter's mission to serve the public conversation, and enhancing stockholder value. As part of this evaluation, the Twitter Board has, from time to time, considered a variety of strategic alternatives. These have included, among others, (1) the

-41-

Table of Contents

continuation of, and potential improvements to, Twitter's current business plan, with Twitter remaining an independent entity; (2) the investment in, and development of, new products, services and functionalities; (3) capital raising activities; (4) potential expansion opportunities through acquisitions, partnerships or other commercial relationships; and (5) business combinations, acquisitions and other financial and strategic alternatives, including the sale of Twitter.

Elon Musk is an active user of the Twitter platform. In March 2022, Mr. Musk Tweeted comments regarding Twitter's business, the Twitter platform and functionality, and Twitter's content moderation policies.

On March 26, 2022, Mr. Musk contacted Jack Dorsey, Twitter's founder, former chief executive officer and one of Twitter's current directors, to discuss the future direction of social media, including the benefits of open social protocols. Mr. Dorsey had previously communicated his views on these topics to the Twitter Board and publicly.

Also on March 26, 2022, Mr. Musk contacted Egon Durban, one of Twitter's directors, to set up a discussion between Mr. Musk and Mr. Durban. Mr. Musk and Mr. Durban subsequently spoke on March 26, 2022 and March 27, 2022 and discussed the potential of Mr. Musk joining the Twitter Board, as well as the fact that Mr. Musk had purchased a significant stake of more than five percent of our common stock. Mr. Durban informed Bret Taylor, the chairperson of the Twitter Board, Martha Lane Fox, one of Twitter's directors and the chairperson of Twitter's Nominating and Corporate Governance Committee (which we refer to as the "**NomGov Committee**"), and Parag Agrawal, Twitter's chief executive officer, of Mr. Musk's communication. Messrs. Durban, Taylor and Agrawal and Ms. Lane Fox discussed Mr. Musk's communications and determined (1) that Mr. Durban would connect Mr. Musk with Messrs. Taylor and Agrawal and Ms. Lane Fox, and they would also discuss with Mr. Musk his potential interest in joining the Twitter Board; (2) to call meetings of the NomGov Committee and of the Twitter Board to discuss Mr. Musk's communications and potential interest in joining the Twitter Board; and (3) that Ms. Lane Fox would inform each member of the Twitter Board in advance of the Twitter Board meeting of Mr. Musk's communications. Ms. Lane Fox subsequently informed the members of the Twitter Board of Mr. Musk's initial communications.

On March 27, 2022, Messrs. Musk, Taylor and Agrawal discussed Mr. Musk's interest in Twitter and potentially joining the Twitter Board. As part of that discussion, Mr. Musk stated that he was considering various options with respect to his ownership, including potentially joining the Twitter Board, seeking to take Twitter private or starting a competitor to Twitter.

On March 30, 2022, Ms. Lane Fox and Mr. Musk discussed Mr. Musk's potential interest in joining the Twitter Board and the benefits that Mr. Musk believed he could potentially bring to Twitter as a Twitter director.

On March 31, 2022, Messrs. Agrawal and Taylor met with Mr. Musk to discuss Twitter's business and Mr. Musk's potential interest in joining the Twitter Board. At the meeting, Mr. Musk reiterated his interest in potentially joining the Twitter Board to help improve Twitter's business as a director of Twitter, and that he was also considering the possibility of taking Twitter private or starting a competitor to Twitter.

On April 2, 2022, the NomGov Committee met, with Mr. Taylor, members of Twitter management and a representative of Wilson Sonsini Goodrich & Rosati, Professional Corporation, Twitter's outside legal counsel reporting to the Twitter Board (which we refer to as "**Wilson Sonsini**"), in attendance. Messrs. Durban, Taylor and Agrawal and Ms. Lane Fox each updated the NomGov Committee on their discussions with Mr. Musk. After considering, among other things, Mr. Musk's interest in Twitter's business, his statement that he is one of Twitter's substantial stockholders, his active use of the Twitter

-42-

Table of Contents

platform, his technical expertise in areas critical to Twitter's products and technology, and the perspectives that he could bring to the Twitter Board, the NomGov Committee determined to recommend that the Twitter Board consider inviting Mr. Musk to join the Twitter Board, subject to completion of customary onboarding procedures, such as a background check and completing and signing a director onboarding questionnaire.

Also on April 2, 2022, at the direction of Mr. Taylor and the NomGov Committee, Twitter requested that J.P. Morgan attend the scheduled meeting of the Twitter Board to assist Twitter in reviewing Mr. Musk's purported purchase of a significant stake in our common stock, Mr. Musk's potential appointment to the Twitter Board and related matters.

On April 3, 2022, the Twitter Board met, with members of Twitter management and representatives of each of Wilson Sonsini and J.P. Morgan in attendance. Messrs. Durban, Agrawal, Taylor and Ms. Lane Fox each updated the Twitter Board on their discussions with Mr. Musk. The NomGov Committee reported on its discussions at its meeting the previous day and provided its recommendation that the Twitter Board consider inviting Mr. Musk to join the Twitter Board. In evaluating the NomGov Committee's recommendation, the Twitter Board considered, among other things, Mr. Musk's qualifications, business expertise, knowledge of Twitter's business and user base and technical expertise in areas critical to Twitter's products and technology, as well as (1) the perspectives that he could bring to the Twitter Board and benefits he could bring to Twitter's business, strategy and brand as a Twitter director; (2) his statements that he is one of Twitter's substantial stockholders; and (3) his active use of the Twitter platform. The Twitter Board also considered possible disruption to Twitter's business and the potential for adverse impacts on stockholder value if Mr. Musk determined to pursue the other alternatives that he expressed an interest in considering. The representatives of Wilson Sonsini reviewed with the members of the Twitter Board their fiduciary duties. Mr. Dorsey informed the Twitter Board that he and Mr. Musk were friends, and Mr. Durban informed the Twitter Board that he had worked on unrelated matters with Mr. Musk in the past. At this and other meetings of the Twitter Board relating to Mr. Musk joining the Twitter Board, Mr. Musk's acquisition proposal and the merger, the Twitter Board regularly met in executive session of independent directors. The Twitter Board determined to invite Mr. Musk to join the Twitter Board, subject to his completion of a background check and other customary onboarding procedures. In connection with Mr. Musk joining the Twitter Board, it was the desire of the Twitter Board that Mr. Musk enter into a cooperation agreement that included "standstill" provisions that, among other things, would limit his public statements regarding Twitter, including the making of unsolicited public proposals to acquire Twitter (but not private proposals) without the prior consent of the Twitter Board. Following the meeting, at the direction of the Twitter Board, Ms. Lane Fox called Mr. Musk to invite him to join the Twitter Board, subject to completion of customary onboarding procedures. Ms. Lane Fox also noted the desire of the Twitter Board that Mr. Musk enter into a cooperation agreement. Following that discussion, representatives of Twitter sent a copy of Twitter's customary director onboarding questionnaire to representatives of Mr. Musk.

On April 4, 2022, Mr. Musk publicly disclosed his ownership of approximately 9.2 percent of our common stock.

Also on April 4, 2022, representatives of Twitter provided Mr. Musk with a draft of a cooperation agreement that provided for Mr. Musk's appointment to the Twitter Board and included customary "standstill" provisions. Subsequently, Mr. Musk informed Mr. Taylor that Mr. Musk would not agree to limit his public statements regarding Twitter, but would be open to an agreement limiting his ownership of Twitter to approximately 15 percent (with any increase to be subject to future Twitter Board approval).

Later on April 4, 2022, the Twitter Board met, with members of Twitter management and representatives of Wilson Sonsini in attendance. The Twitter Board reviewed Mr. Musk's disclosures

-43-

Table of Contents

regarding his ownership of our common stock made earlier that day. Mr. Taylor provided an update on Mr. Musk's response to the request that he enter into a cooperation agreement. The Twitter Board again considered the possible disruption to Twitter's business and the possible impact on stockholder value if Mr. Musk determined to seek to acquire Twitter on an unsolicited basis, as well as the additional stockholder value that could be derived from (1) requiring Mr. Musk to negotiate the terms of a potential acquisition with the Twitter Board; and (2) ensuring that the Twitter Board had sufficient time to evaluate strategic alternatives in response to a takeover proposal from Mr. Musk. The Twitter Board also discussed terms of an agreement that would be asked of Mr. Musk if he were appointed to the Twitter Board in light of Mr. Musk's refusal to sign the cooperation agreement previously proposed. The Twitter Board directed Twitter management and Wilson Sonsini to request that Mr. Musk, in connection with joining the Twitter Board as a director, simply enter into an agreement that would restrict Mr. Musk from purchasing more than 14.9 percent of our common stock. The Twitter Board delegated authority to each of Mr. Taylor and Ms. Lane Fox to approve the execution of such agreement by Twitter. The Twitter Board also approved increasing the size of the Twitter Board by one seat and appointing Mr. Musk to the Twitter Board to serve as a Class II director, effective upon the latest of (1) a determination by Mr. Taylor and/or Mr. Lane Fox that Mr. Musk had executed such agreement on terms consistent with those discussed by the Twitter Board and in a form acceptable to Mr. Taylor and/or Ms. Lane Fox; (2) confirmation by Mr. Musk in a manner acceptable to Mr. Taylor and/or Ms. Lane Fox that Mr. Musk was prepared to join the Twitter Board; and (3) the completion to the satisfaction of Mr. Taylor and/or Ms. Lane Fox of customary director onboarding procedures (including a customary background check of Mr. Musk and a director onboarding questionnaire by Mr. Musk).

Still later on April 4, 2022, representatives of Twitter sent Mr. Musk a draft of a letter agreement providing that (1) Twitter would appoint Mr. Musk to the Twitter Board to serve as a Class II director with a term expiring at Twitter's 2024 Annual Meeting of Stockholders, subject to and contingent upon the provision by Mr. Musk of any information that Twitter reasonably required to complete customary director onboarding procedures (including a customary background check and director onboarding questionnaire); and (2) for so long as Mr. Musk were to serve on the Twitter Board and for 90 days thereafter, Mr. Musk would not, either alone or as a member of a group, become the beneficial owner of more than 14.9 percent of our common stock outstanding at such time. Mr. Musk and Twitter (with Mr. Taylor's and Ms. Lane Fox's approval) subsequently executed the letter agreement in the form sent to Mr. Musk.

On April 5, 2022, Twitter and Mr. Musk publicly announced the entry into the letter agreement. Over the next three days, Messrs. Agrawal and Musk continued to discuss Twitter's business and products in anticipation of Mr. Musk joining the Twitter Board.

Also on April 5, 2022, Mr. Musk contacted Mr. Dorsey to ask Mr. Dorsey his perspectives on Twitter in connection with the announcement of Mr. Musk joining the Twitter Board. As part of this discussion, Mr. Dorsey shared his personal view that Twitter would be better able to focus on execution as a private company. Mr. Musk further inquired if Mr. Dorsey would stay on the Twitter Board, and Mr. Dorsey declined.

On April 8, 2022, Ms. Lane Fox informed the Twitter Board of the satisfactory completion of Mr. Musk's background check. Mr. Taylor informed the Twitter Board of his expectation that Mr. Musk's appointment to the Twitter Board would be effective on April 9, 2022.

On April 9, 2022, before Mr. Musk's appointment to the Twitter Board became effective, Mr. Musk notified Messrs. Taylor and Agrawal that he would not be joining the Twitter Board and would be making an offer to take Twitter private. Mr. Agrawal informed the members of the Twitter Board of Mr. Musk's communication.

On April 10, 2022, Twitter announced that Mr. Musk had decided not to join the Twitter Board.

-44-

Table of Contents

Also on April 10, 2022, at Mr. Taylor's direction, Twitter requested that Goldman Sachs attend meetings of the Twitter Board to assist in Twitter's evaluation of a potential acquisition proposal from Mr. Musk and related matters.

On April 12, 2022, the Twitter Board met, with members of Twitter management and representatives of each of Goldman Sachs, Wilson Sonsini and Simpson Thacher & Bartlett LLP, outside legal counsel to the Twitter Board (which we refer to as "**Simpson Thacher**"), in attendance. Messrs. Taylor and Agrawal provided an update on their communications with Mr. Musk. The representatives of Goldman Sachs (1) provided preliminary market and trading perspectives on Twitter; (2) discussed with the Twitter Board the possibility that Mr. Musk would seek to acquire Twitter on a negotiated or unsolicited basis; and (3) discussed with the Twitter Board potential strategic alternatives available to Twitter, including continuing to execute Twitter's business plan as an independent entity or commencing a process to solicit interest from counterparties with respect to a transaction involving Twitter. The Twitter Board and representatives of Goldman Sachs reviewed various potential strategic and financial counterparties to a strategic transaction involving Twitter, including those with whom it had previous discussions, the likelihood that each party would be interested in and have the capability to consummate an acquisition of Twitter, including, among other things, based on the regulatory, financing and other execution risks applicable to each party discussed with representatives of Goldman Sachs and Twitter's legal advisors. The Twitter Board also discussed the possible impact on stockholder value if Mr. Musk sought to acquire Twitter on an unsolicited basis, and the additional stockholder value that could be derived from requiring Mr. Musk to negotiate the terms of an acquisition of Twitter with the Twitter Board. The Twitter Board also considered the possibility of adopting a shareholder rights plan in response to an unsolicited acquisition proposal from Mr. Musk or Mr. Musk continuing to purchase shares of our common stock in the open market, including (1) the terms of a potential shareholder rights plan and (2) whether a shareholder rights plan would be a reasonable and proportionate response to these actions by Mr. Musk. The representatives of Twitter's legal advisors reviewed with the members of the Twitter Board their fiduciary duties. The Twitter Board also directed members of Twitter management to present Twitter management's then current business plan for Twitter at a subsequent meeting so that the Twitter Board would be better prepared to evaluate a potential takeover proposal from Mr. Musk and other strategic alternatives, including relative to continuing to execute Twitter's business plan as an independent entity.

On April 13, 2022, Mr. Musk delivered to Mr. Taylor a non-binding proposal to acquire Twitter, the full text of which is reproduced below. Mr. Musk also called Mr. Taylor to re-iterate that Mr. Musk's proposal represented his best and final offer to acquire Twitter and referred Mr. Taylor to Mr. Musk's public disclosure of the proposal scheduled for the next day for additional details with respect to the proposal.

> *Bret Taylor*
> *Chairman of the Board,*
>
> *I invested in Twitter as I believe in its potential to be the platform for free speech around the globe, and I believe free speech is a societal imperative for a functioning democracy.*
>
> *However, since making my investment I now realize the company will neither thrive nor serve this societal imperative in its current form. Twitter needs to be transformed as a private company.*
>
> *As a result, I am offering to buy 100% of Twitter for $54.20 per share in cash, a 54% premium over the day before I began investing in Twitter and a 38% premium over the day before my*

-45-

Table of Contents

*investment was publicly announced. My offer is my best and final offer and if it is not accepted, I would need to reconsider my position as a shareholder.*

*Twitter has extraordinary potential. I will unlock it.*

*/s/ Elon Musk*
*Elon Musk*

On April 14, 2022, Mr. Musk publicly disclosed his acquisition proposal. As part of the disclosure, Mr. Musk also disclosed that his acquisition proposal would be conditioned upon, among other things, (1) the receipt of any required governmental approvals; (2) confirmatory legal, business, regulatory, accounting and tax due diligence; (3) the negotiation and execution of definitive agreements providing for the proposed acquisition; and (4) completion of anticipated financing. Over the next eight days, Mr. Musk from time to time Tweeted comments that could be interpreted to refer to Mr. Musk's acquisition proposal, which comments led the Twitter Board to believe Mr. Musk might commence an unsolicited tender offer for our common stock imminently. Also during this period and around the time of the announcement of the merger, Mr. Dorsey from time to time Tweeted about his personal views on Twitter's history and operations as either a public or private company.

Also on April 14, 2022, and from time to time over the next eight days, representatives of financial sponsors and institutional investors communicated to members of Twitter management and representatives of each of Goldman Sachs and J.P. Morgan their preliminary and non-specific interest in participating in a potential acquisition of Twitter, including as a financing source for an acquisition of Twitter by Mr. Musk. None of these parties (or any other party) made a proposal to acquire Twitter.

Also on April 14, 2022, the Twitter Board met, with members of Twitter management and representatives of each of Goldman Sachs, Wilson Sonsini and Simpson Thacher in attendance. Mr. Taylor provided an update on Mr. Musk's communication the previous day. The Twitter Board reviewed the terms and conditions of Mr. Musk's acquisition proposal with the representatives of Goldman Sachs and Twitter's legal advisors. The representatives of Goldman Sachs provided an update on the outreach from financial sponsors and institutional investors regarding their interest in participating in a potential acquisition. The Twitter Board determined not to engage with these parties because (1) they had not made an acquisition proposal; and (2) Mr. Musk's acquisition proposal had been publicly disclosed (and the subject of significant press coverage) and any interested party was free to contact Mr. Musk about participating in a potential acquisition. The Twitter Board again discussed the possibility of adopting a shareholder rights plan in response to Mr. Musk's proposal, including (1) to reduce the likelihood that an unsolicited potential acquiror could take actions not in the best interests of all Twitter stockholders, including by seeking to obtain control of Twitter without paying all Twitter stockholders an appropriate control premium; and (2) to provide the Twitter Board with sufficient time to evaluate Mr. Musk's proposal and other strategic alternatives available to Twitter. As part of this discussion, the Twitter Board discussed with Twitter's legal advisors and the representatives of Goldman Sachs the terms of a potential shareholder rights plan that would be reasonable and proportionate in response to these risks. The representatives of Goldman Sachs reviewed considerations relating to shareholder rights plans, including with respect to the exercise price of rights under a potential shareholder rights plan. The representatives of Twitter's legal advisors reviewed with the members of the Twitter Board their fiduciary duties. The Twitter Board considered strategic alternatives to an acquisition of Twitter by Mr. Musk and whether to contact other parties to solicit their interest in a potential acquisition of Twitter. The Twitter Board determined not to make such contacts based on (1) the fact that Mr. Musk's acquisition proposal had been publicly disclosed; and (2) the Twitter Board's assessment that other parties were unlikely to have the interest in, or capability to, acquire Twitter, including, among other things, based on the regulatory, financing and other execution risks applicable to each party discussed with representatives of Goldman Sachs and

-46-

Table of Contents

Twitter's legal advisors. To assist in the Twitter Board in its evaluation and negotiation of Mr. Musk's acquisition proposal and consideration of other strategic alternatives and to provide additional feedback and guidance to members of Twitter management, the Twitter Board established a Transactions Committee of the Twitter Board (which we refer to as the "**Transactions Committee**"). The Transactions Committee was formed in light of (1) the possibility that Twitter management may need feedback and direction on relatively short notice; and (2) the benefits and convenience of having a subset of directors oversee and direct these matters. The Twitter Board authorized and instructed the Transactions Committee, among other things, to (1) oversee and provide assistance to Twitter management and Twitter's advisors with respect to the exploration, evaluation, consideration, review and negotiation of the terms and conditions of any strategic alternative, including any sale of Twitter; and (2) explore, evaluate, consider, review and negotiate the terms and conditions of any strategic alternative, including any sale of Twitter, and to take such other actions with respect to any strategic alternative as the Transactions Committee deemed necessary, appropriate or advisable. The Twitter Board retained the power and authority to approve the final decision on pursuing a strategic alternative, including a sale of Twitter. It was also understood that the Twitter Board would continue to have an active role in the consideration of strategic alternatives. The Twitter Board appointed Mr. Taylor, Ms. Lane Fox and Patrick Pichette as the members of the Transactions Committee, each of whom is an independent director. The Twitter Board determined not to provide any additional compensation to the members of the Transactions Committee for their service on the Transactions Committee. After the representatives of Goldman Sachs left the meeting, the Twitter Board also approved retaining Goldman Sachs and J.P. Morgan to act as financial advisors to Twitter and the Twitter Board in connection with a potential takeover proposal from Mr. Musk and strategic alternatives thereto. The Twitter Board selected Goldman Sachs and J.P. Morgan in view of their respective qualifications, extensive expertise, international reputation, familiarity with Twitter and its business and industry, given their past experience working with Twitter and others in Twitter's industry, and experience in similar situations. The Twitter Board also considered the advantages of engaging two financial advisors, including the additional and independent perspectives that each financial advisor could provide. Following the meeting, at the direction of the Twitter Board, Mr. Taylor communicated to Mr. Musk that the Twitter Board had received his acquisition proposal and would evaluate the course of action in the best interests of Twitter's stockholders and be back in touch with Mr. Musk when the Twitter Board's work was done.

Also on April 14, 2022, members of Twitter management informed Goldman Sachs and J.P. Morgan that the Twitter Board had approved retaining Goldman Sachs and J.P. Morgan to act as financial advisors to Twitter and the Twitter Board in connection with a potential takeover proposal from Mr. Musk and strategic alternatives thereto.

On April 15, 2022, the Twitter Board adopted a shareholder rights plan (which we refer to as the "**rights plan**") scheduled to expire on April 14, 2023, providing for a distribution of rights to stockholders that will become exercisable if an entity, person or group acquires beneficial ownership of 15 percent or more of our outstanding common stock in a transaction not approved by the Twitter Board. In that instance, each right will entitle its holder (other than the person, entity or group triggering the shareholder rights plan, whose rights will become void and will not be exercisable) to purchase, at the then-current exercise price, additional shares of common stock having a then-current market value of twice the exercise price of $210.00 per right.

Later on April 15, 2022, Twitter publicly announced the adoption of the rights plan.

Also on April 15, 2022, the Transactions Committee met, with members of Twitter management and representatives of each of Goldman Sachs, Wilson Sonsini and Simpson Thacher in attendance. The Transactions Committee discussed Mr. Musk's acquisition proposal and other strategic alternatives available to Twitter. The Transactions Committee noted that Mr. Musk had not provided any information on financing arrangements to fund the proposed acquisition, and that additional clarity on

-47-

Table of Contents

financing and other execution risks related to the proposed acquisition would be required to better evaluate Mr. Musk's acquisition proposal. The Transactions Committee also discussed next steps with respect to the Twitter Board's evaluation of Twitter's business plan and Mr. Musk's acquisition proposal.

On April 16, 2022, the Transactions Committee met, with members of Twitter management and representatives of each of Goldman Sachs, J.P. Morgan, Wilson Sonsini and Simpson Thacher in attendance. The Transactions Committee determined that it would be helpful to the Twitter Board's evaluation of Mr. Musk's acquisition proposal and other strategic alternatives available to Twitter to understand the perspectives of Twitter's significant institutional stockholders on such matters. As such, the Twitter Board coordinated an outreach process to gather those perspectives. The Transactions Committee also discussed next steps with respect to the Twitter Board's evaluation of Twitter's business plan and Mr. Musk's acquisition proposal.

On April 17, 2022, the Transactions Committee met, with members of Twitter management and representatives of each of Goldman Sachs, J.P. Morgan, Wilson Sonsini and Simpson Thacher in attendance. The Transactions Committee continued its coordination of an outreach process to Twitter's largest institutional stockholders. The Transactions Committee also discussed Twitter's response to Mr. Musk while the Twitter Board continued its evaluation of Mr. Musk's acquisition proposal. Over the subsequent four days, Messrs. Taylor and Pichette held meetings with a number of Twitter's largest institutional stockholders to discuss the perspectives of these stockholders on Mr. Musk's acquisition proposal and Twitter more generally. As part of these meetings, these Twitter stockholders generally (1) expressed that Twitter has much opportunity, but indicated a perceived failure of historical execution; (2) expressed understanding there has been recent management change and openness to a stand-alone plan to give them confidence in the long term; and (3) encouraged the Twitter Board to seriously consider Mr. Musk's proposal and weigh the risks of future execution. The Transactions Committee instructed Mr. Taylor to reiterate to Mr. Musk that the Twitter Board was taking Mr. Musk's acquisition proposal seriously. Mr. Taylor did that following the meeting of the Transactions Committee.

On April 19, 2022, the Transactions Committee met, with members of Twitter management and representatives of each of Goldman Sachs, J.P. Morgan, Wilson Sonsini and Simpson Thacher in attendance. Messrs. Taylor and Pichette provided an update on their ongoing discussions with Twitter's institutional stockholders. The representatives of Goldman Sachs and J.P. Morgan also provided an update on the outreach from financial sponsors and institutional investors regarding their interest in participating in a potential acquisition of Twitter. Members of Twitter management presented their then current business plan for Twitter, including their then current estimated projections of Twitter's financial prospects and underlying assumptions and market share case sensitivities. The Transactions Committee directed Twitter management to present their then current business plan to the Twitter Board for review.

On April 20, 2022, the Twitter Board met, with members of Twitter management and representatives of each of Wilson Sonsini and Simpson Thacher in attendance. Members of Twitter management reviewed their then current business plan for Twitter, including their then current estimated projections of Twitter's financial prospects and underlying assumptions and market share case sensitivities. The Twitter Board provided feedback with respect to these matters. The Twitter Board determined to take additional time to review the then current business plan, but instructed Twitter management to share the then current business plan with Goldman Sachs and J.P. Morgan so that both firms could begin their preliminary financial analysis of Twitter and Mr. Musk's acquisition proposal. The Twitter Board also discussed next steps for responding to Mr. Musk's acquisition proposal, including the need for additional clarity from Mr. Musk on equity financing and any debt financing and other closing certainty matters with respect to the proposed acquisition, and determined to request that Goldman Sachs and J.P. Morgan present their respective preliminary financial analyses of Twitter and Mr. Musk's

-48-

Table of Contents

acquisition proposal, that the Twitter Board wanted to consider prior to concluding how to respond to Mr. Musk's acquisition proposal, at an upcoming meeting of the Twitter Board to be held on April 24, 2022.

On April 21, 2022, the Transactions Committee met, with members of Twitter management and representatives of each of Goldman Sachs, J.P. Morgan, Wilson Sonsini and Simpson Thacher in attendance. The Transactions Committee continued its review and discussion of Twitter's business plan. The Transactions Committee also discussed the timing of a formal response to Mr. Musk's acquisition proposal.

Later on April 21, 2022, Mr. Musk publicly disclosed that he and Parent had obtained commitment letters for approximately $46.5 billion in financing to fund the proposed acquisition, including (1) a debt commitment letter providing for an aggregate of $13 billion in various secured and unsecured debt financing commitments; (2) a debt commitment letter providing for an aggregate of $12.5 billion in margin loan commitments (which commitments were subsequently reduced to $6.25 billion, as described below); and (3) an equity commitment letter providing for a $21 billion equity financing by Mr. Musk to Parent (which commitment was subsequently increased to $27.25 billion, as described below). The equity financing commitment did not include third party beneficiary rights permitting Twitter to enforce Mr. Musk's equity financing commitment in connection with a potential transaction. Mr. Musk also disclosed that his acquisition proposal was no longer subject to the completion of financing and business due diligence. The debt commitment letters referenced drafts of agreements and documents providing for a tender offer for our common stock that had been shared with the lenders party to the debt commitment letters, but that had not been shared with Twitter.

Still later on April 21, 2022, Twitter management sent to the members of the Twitter Board and to Goldman Sachs and J.P. Morgan an updated version of Twitter's business plan and estimated projections of Twitter's financial prospects, noting the changes to the business plan reviewed at the meeting of the Twitter Board the previous day, including to reflect the Twitter Board's feedback on these matters.

On April 22, 2022, the Transactions Committee met, with other Twitter directors, members of Twitter management and representatives of each of Goldman Sachs, J.P. Morgan, Wilson Sonsini and Simpson Thacher in attendance. Messrs. Taylor and Pichette provided an update on their ongoing discussions with Twitter's institutional stockholders. The representatives of Goldman Sachs and J.P. Morgan also reviewed Goldman Sachs' and J.P. Morgan's respective preliminary financial analyses of Twitter's then current business plan. The representatives of Goldman Sachs and J.P. Morgan also reviewed the outreach from financial sponsors and institutional investors regarding their interest in participating in a potential acquisition of Twitter. The representatives of Goldman Sachs and J.P. Morgan reviewed the financing commitments for, and the other details with respect to, Mr. Musk's acquisition proposal that were disclosed the previous day. The Transactions Committee noted that Mr. Musk's disclosure provided additional clarity with respect to financing and other closing certainty risks, but that additional information regarding these matters would be helpful in the Twitter Board's evaluation of Mr. Musk's acquisition proposal. The Transactions Committee instructed Goldman Sachs and J.P. Morgan to contact representatives of Morgan Stanley & Co. LLC, Mr. Musk's outside financial advisor (which we refer to as "**Morgan Stanley**"), to obtain additional information with respect to the debt and equity financing aspects of Mr. Musk's acquisition proposal. Mr. Taylor confirmed with each of the other members of the Twitter Board that they concurred with this approach. Representatives of Goldman Sachs and J.P. Morgan subsequently contacted Mr. Musk's representatives as instructed by the Transactions Committee.

Later on April 22, 2022, representatives of each of Goldman Sachs and J.P. Morgan met with representatives of Morgan Stanley to obtain additional information with respect to the debt and equity financing commitments and the financing aspects of Mr. Musk's acquisition proposal.

-49-

[Table of Contents](#)

On April 23, 2022, the Transactions Committee met, with other Twitter directors, members of Twitter management and representatives of each of Goldman Sachs, J.P. Morgan, Wilson Sonsini and Simpson Thacher in attendance. The representatives of Goldman Sachs and J.P. Morgan provided an update on their review of the debt and equity financing commitments to Mr. Musk's acquisition proposal, as well as their discussions with representatives of Morgan Stanley. The Transactions Committee also discussed Twitter's business plan, Twitter's upcoming earnings announcements, circumstances and developments in Twitter's industry and in the economy generally affecting the business of and trading prices of technology companies and Twitter, as well as potential next steps with respect to responding to Mr. Musk's acquisition proposal.

Later on April 23, 2022, Mr. Musk contacted Mr. Taylor requesting to speak with Mr. Taylor or other representatives of Twitter.

Still later on April 23, 2022, following Mr. Musk's outreach, the Transactions Committee met, with members of Twitter management and representatives of each of Goldman Sachs, J.P. Morgan, Wilson Sonsini and Simpson Thacher in attendance. The Transactions Committee directed Mr. Taylor and a representative of Goldman Sachs to respond to Mr. Musk's request, and to invite Mr. Musk to provide additional information regarding his acquisition proposal for the benefit of the Twitter Board. This conversation among Messrs. Musk and Taylor and a representative of Goldman Sachs subsequently occurred on April 23, 2022. During the conversation, Mr. Musk reiterated that his acquisition proposal represented his best and final offer, and communicated to Mr. Taylor that he would be willing to take his proposal to our stockholders.

Also on April 23, 2022, J.P. Morgan provided Twitter with customary relationship disclosures regarding J.P. Morgan's relationships with Twitter and Mr. Musk's affiliates. In addition, J.P. Morgan provided to the Twitter Board certain estimates and analyses concerning the potential impact of the proposed transaction on the convertible note hedge and warrant transactions that Twitter entered into with an affiliate of J.P. Morgan, with respect to Twitter's convertible senior notes, which are more fully described in the section of this proxy statement captioned "—*Opinion of J.P. Morgan Securities LLC—Miscellaneous*." Such estimates and analyses were based on theoretical models and various assumptions concerning the terms of the proposed transaction and market conditions and other information available to J.P. Morgan at the time.

On April 24, 2022, the Twitter Board met, with members of Twitter management and representatives of each of Goldman Sachs, J.P. Morgan, Wilson Sonsini and Simpson Thacher in attendance. Members of Twitter management reviewed Twitter's then current business plan, including their estimated projections of Twitter's long-term financial prospects and underlying assumptions and market share case sensitivities. The representatives of Goldman Sachs and J.P. Morgan presented their respective preliminary financial analyses of Twitter and Mr. Musk's acquisition proposal based on Twitter's then current business plan. The Twitter Board considered various risks associated with executing the business plan, including with respect to achieving the various market share sensitivity cases relative to Twitter's historical market share, and authorized Goldman Sachs and J.P. Morgan to use, for purposes of performing their respective financial analyses in connection with rendering their respective fairness opinions to the Twitter Board (as more fully described in the sections of this proxy statement captioned "—*Opinion of Goldman Sachs & Co. LLC*" and "—*Opinion of J.P. Morgan Securities LLC*"), the estimated projections of Twitter's long-term financial performance assuming an increase in Twitter's market share to 3.3 percent by fiscal year 2027 (relative to Twitter's trailing 7-year historical average market share of approximately 2.1 percent) as reflected in the Unaudited Prospective Financial Information. (The term Unaudited Prospective Financial Information is defined in, and further information about the substance of the Unaudited Prospective Financial Information is contained in, the section of this proxy statement captioned "—*Unaudited Prospective Financial Information*.") Mr. Taylor provided an update on the discussions with Mr. Musk the previous day. The Twitter Board also

-50-

Table of Contents

considered the possibility that Mr. Musk might imminently commence an unsolicited tender offer for our common stock, and the fact that Mr. Musk would not be contractually committed to offer $54.20 in cash per share of our common stock or to consummate a tender offer absent a negotiated agreement with Twitter. The Twitter Board also discussed the recent general decline in trading prices of social media companies and the potential impact of the decline on the likelihood that Mr. Musk would be prepared to improve his proposal. Based on these discussions, it was the consensus of the Twitter Board that (1) Mr. Musk would not be willing to increase the value of his acquisition proposal; (2) Mr. Musk's proposal merited further evaluation, given the preliminary financial analyses presented by Goldman Sachs and J.P. Morgan; and (3) Twitter should engage with Mr. Musk in an effort to improve the certainty of a potential acquisition for the benefit of our stockholders. The Twitter Board requested that the Transactions Committee and Twitter's advisors engage with Mr. Musk on that basis promptly following the conclusion of that meeting, including to determine whether an agreement could be finalized with Mr. Musk with respect to an acquisition of Twitter as promptly as practicable. The Twitter Board again considered strategic alternatives to an acquisition of Twitter by Mr. Musk and whether to contact other parties to solicit their interest in a potential acquisition of Twitter. As part of this discussion, the Twitter Board reviewed discussions with Twitter's institutional stockholders and the outreach by the various financial sponsors and institutional investors regarding the possibility of participating in support of a potential acquisition by Mr. Musk. The Twitter Board determined not to contact other parties at this time based on (1) the fact that Mr. Musk's acquisition proposal had been publicly disclosed (and the subject of significant press coverage); (2) the Twitter Board's assessment that other parties were unlikely to have the interest in, or capability to, acquire Twitter, including, among other things, based on the regulatory, financing and other execution risks applicable to each party discussed with representatives of Twitter's financial and legal advisors; (3) the likelihood that other potential acquirors would require substantial due diligence, creating a delay and risk to reaching the signing of such a potential transaction; and (4) the possibility that outreach to additional counterparties could jeopardize reaching an agreement with Mr. Musk at the per share price and could cause significant disruption to Twitter.

Later on April 24, 2022, promptly following the meeting of the Twitter Board, the Transactions Committee met, with members of Twitter management and representatives of each of Goldman Sachs, J.P. Morgan, Wilson Sonsini and Simpson Thacher in attendance, to coordinate next steps for engaging with Mr. Musk in accordance with the Twitter Board's request. During the meeting, but before the Transactions Committee had informed Mr. Musk of the Twitter Board's determination, representatives of Morgan Stanley delivered a letter to Goldman Sachs and J.P. Morgan, the full text of which is reproduced below.

*April 24, 2022*

*Bret Taylor*
*Chairman of the Board,*

*Thank you for the conversation yesterday.*

*We remain committed to our transaction with Twitter at $54.20 and appreciate your contact on the matter. As we discussed, $54.20 has been and will remain my best and final offer, period. This is binary – my offer will either be accepted or I will exit my position. At the time my $54.20 offer was made, it represented a 54% premium to Twitter's share price prior to the day before my investment in Twitter began, and a 38% premium to the day before my investment in Twitter was announced. Since that time, the attractiveness of my proposal has only increased given the market's continued correction. Had your stock traded inline with comparable social media companies, my offer would represent approximately 90% and 70% premiums to those times.*

-51-

Table of Contents

*While I strongly believe that you should recommend my offer to shareholders based upon its superior value to the value of Twitter without my offer and my equity position, I recognize that you may elect not to do so. As such, I have attached a merger agreement that is "seller friendly" and that does not require you to recommend in favor of my offer. This will provide all shareholders a voice, and allow for a democratic decision consistent with Twitter's ethos. With your cooperation, we can negotiate changes that you require to be able to announce a transaction before the market opens tomorrow that the shareholders can then vote on. I would respect the outcome of that vote if the shareholders prefer the management plan to my $54.20, and exit my position entirely if that is the outcome of the vote.*

*In order to provide further value and choice to shareholders (within the legal boundaries of a private, unlisted company), we are willing to explore options that allow existing shareholders (including convertible securities and other related instruments) to invest all or a portion of their proceeds into the proposed transaction. Any such rollover transaction would be structured as a separate negotiated transaction consistent with laws and regulations and not be a public offer, and would not affect the proposed $54.20 cash offer transaction.*

*My strong preference continues to be a negotiated transaction with you at $54.20 per share. I look forward to the board's response to my proposal.*

*Elon Musk*

Also during the meeting, and shortly after receipt of the letter, representatives of Skadden, Arps, Slate, Meagher & Flom LLP, Mr. Musk's outside legal counsel (which we refer to as "**Skadden**"), delivered to representatives of Twitter an initial draft of the merger agreement. The Transactions Committee directed Twitter's legal advisors to engage with representatives of Skadden to discuss the initial draft of the merger agreement. This discussion subsequently occurred.

Still later on April 24, 2022, following the discussion between Twitter's legal advisors and representatives of Skadden, the Transactions Committee reconvened, with members of Twitter management and representatives of each of Goldman Sachs, J.P. Morgan, Wilson Sonsini and Simpson Thacher in attendance. The representatives of Twitter's legal advisors reviewed the nature and key terms of the initial draft of the merger agreement and discussed with the Transactions Committee potential open issues to be negotiated with Mr. Musk and Parent, including to improve the certainty of the completion of the merger for the benefit of our stockholders. Based on these discussions, the Transactions Committee directed Twitter's legal advisors to proceed with the negotiation of the merger agreement and related transaction documents.

Also on April 24, 2022, Goldman Sachs provided the Twitter Board with customary relationship disclosures regarding Goldman Sachs' relationships with Twitter and Mr. Musk and his affiliates. In addition, Goldman Sachs provided to Twitter management for the information of the Twitter Board materials that summarized, based on theoretical models, the potential effects of the announcement and of the consummation of an acquisition of Twitter on the convertible note hedge and warrant transactions that Twitter entered into with Goldman Sachs and other counterparties, each acting as principal for its own account, with respect to Twitter's 0% convertible senior notes due 2026 in March 2021, as more fully described in the section of this proxy statement captioned "—*Opinion of Goldman Sachs & Co. LLC— General.*"

-52-

Table of Contents

Throughout the remainder of April 24, 2022, and into April 25, 2022, Twitter, Parent and Mr. Musk and their respective legal advisors negotiated the terms of the merger agreement and related transaction documents. Key terms negotiated between the parties included (1) Twitter's specific enforcement rights to require Parent and Mr. Musk to perform their obligations under the merger agreement and consummate the closing on the terms set forth in the merger agreement, as well as third-party beneficiary rights under the equity commitment letter to enforce Mr. Musk's obligations to fund the equity commitment; (2) the circumstances in which a termination fee would be payable by Parent and Mr. Musk and the amount of the termination fee; (3) the availability of potential monetary damages under the merger agreement; (4) the terms and conditions applicable to Parent's and Mr. Musk's obligations to obtain regulatory approvals, and the closing conditions related to regulatory approvals; (5) the terms and conditions applicable to Parent's and Mr. Musk's obligations to complete debt financing arrangements for the acquisition, and Twitter's obligations to assist Parent and Mr. Musk in such efforts; (6) the terms of the "no-shop" restrictions and the circumstances in which the Twitter Board could change its recommendation to its stockholders or negotiate or accept an alternative acquisition transaction; (7) the circumstances in which the merger agreement could be terminated by the parties and the applicable outside date; (8) the interim operating covenants applicable to Twitter prior to the closing of the merger and related exceptions; (9) limitations on the parties' ability to make public statements regarding the merger; (10) the assignability of Mr. Musk's equity financing commitments to Parent and of Mr. Musk's limited guarantee of certain obligations under the merger agreement; and (11) the parties' other representations, warranties and covenants.

On April 25, 2022, the Twitter Board met, with members of Twitter management and representatives of each of Goldman Sachs, J.P. Morgan, Wilson Sonsini and Simpson Thacher in attendance. Members of Twitter management and the representatives of Twitter's legal advisors provided an update on the negotiation of the merger agreement and related transaction documents. The representatives of each of Goldman Sachs and J.P. Morgan reviewed with the Twitter Board Goldman Sachs' and J.P. Morgan's respective financial analyses of the $54.20 in cash per share of our common stock to be paid to the holders (other than Mr. Musk, Parent and their respective affiliates) of such shares pursuant to the merger agreement. The Twitter Board noted the customary relationship disclosures previously provided by each of Goldman Sachs and J.P. Morgan regarding their relationship with Mr. Musk and his affiliates and with Twitter; the Twitter Board did not identify any concerns with these disclosures. All of the members of the Twitter Board, and the members of Twitter management present at the meeting, were asked and confirmed that they had no discussions or arrangements with Mr. Musk or his affiliates with respect to participating with Mr. Musk in the acquisition. The representatives of Goldman Sachs discussed the procedures and process in connection with delivery of its opinion, assuming successful completion of the negotiations and finalization of the terms of the merger agreement and related transaction documents. The representatives of J.P. Morgan discussed the procedures and process in connection with delivery of its opinion, assuming successful completion of the negotiations and finalization of the terms of the merger agreement and related transaction documents. The representatives of Twitter's legal advisors reviewed with the members of the Twitter Board their fiduciary duties. The representatives of Twitter's legal advisors also reviewed the key terms of the merger agreement, debt commitment letter, the margin loan commitment letter, equity commitment letter and limited guarantee. Following this discussion, the Twitter Board directed Twitter's legal advisors to finalize the merger agreement and related transaction documents. Following the meeting, Twitter and Mr. Musk and their respective legal advisors finalized the terms of the merger agreement, the debt commitment letter, the margin loan commitment letter, the equity commitment letter and the limited guarantee.

Later on April 25, 2022, the Twitter Board met, with members of Twitter management and representatives of each of Goldman Sachs, J.P. Morgan, Wilson Sonsini and Simpson Thacher in attendance. The representatives of Twitter's legal advisors provided an update on the negotiation of the merger agreement and related transaction documents, including updates to the final terms of the

-53-

Table of Contents

merger agreement since the earlier meeting of the Twitter Board. The representatives of each of Goldman Sachs and J.P. Morgan again reviewed with the Twitter Board Goldman Sachs' and J.P. Morgan's respective financial analyses of the $54.20 in cash per share of our common stock to be paid to the holders (other than Mr. Musk, Parent and their respective affiliates) of such shares pursuant to the merger agreement. The representatives of Goldman Sachs then rendered the oral opinion of Goldman Sachs, subsequently confirmed by delivery of its written opinion, dated April 25, 2022, to the Twitter Board that, as of the date of the written opinion and based upon and subject to the limitations, qualifications and assumptions set forth therein, the $54.20 in cash per share of our common stock to be paid to the holders (other than Mr. Musk, Parent and their respective affiliates) of such shares pursuant to the merger agreement was fair from a financial point of view to such holders. The representatives of J.P. Morgan then also rendered the oral opinion of J.P. Morgan (subsequently confirmed by delivery of its written opinion dated April 25, 2022) to the Twitter Board that, as of the date of such opinion and based upon and subject to the factors and assumptions set forth therein, the merger consideration to be paid to holders of our common stock in the proposed transaction was fair, from a financial point of view, to such holders. Following discussion, and taking into consideration various factors, including those described in the section titled "—*Recommendation of the Twitter Board and Reasons for the Merger*," the Twitter Board unanimously (1) determined that the merger agreement is advisable and the merger and the other transactions contemplated by merger agreement are advisable and in the best interests of Twitter and the Twitter stockholders; (2) authorized the execution and delivery of the merger agreement and approved the consummation of the transactions contemplated by the merger agreement, including the merger, and (3) resolved to recommend that the Twitter stockholders adopt the merger agreement and approve the transactions contemplated by the merger agreement, including the merger.

Still later on April 25, 2022, following the meeting of the Twitter Board, the applicable parties executed the merger agreement and the limited guarantee and Parent delivered to Twitter fully executed revised versions of the debt commitment letter, margin loan commitment letter and equity commitment letter. Promptly following execution of the merger agreement, Twitter and Mr. Musk publicly announced the merger agreement and the merger.

On May 4, 2022, in connection with Mr. Musk's and Parent's financing activities for the merger, Mr. Musk and Parent amended the equity commitment letter to increase the amount of Mr. Musk's equity financing commitment thereunder by $6.25 billion to an aggregate amount of $27.25 billion, and reduced the amount of the margin loan financing commitments under the margin loan commitment letter by $6.25 billion to an aggregate amount of $6.25 billion.

On May 5, 2022, Twitter and Mr. Musk entered into a confidentiality agreement with respect to Twitter sharing non-public information with Parent, Mr. Musk and their representatives, including pursuant to the terms of the merger agreement. Prior to entry into the merger agreement, Mr. Musk did not ask to enter into a confidentiality agreement or seek from Twitter any non-public info regarding Twitter. Twitter did not enter into a confidentiality agreement with any other third party regarding strategic alternatives to Mr. Musk's acquisition proposal.

Also on May 5, 2022, Mr. Musk publicly disclosed that he (on behalf of Parent) was having, and would continue to have, discussions with certain existing holders of our common stock (including Mr. Dorsey) regarding the possibility of contributing shares of our common stock of such holders to Parent, at or immediately prior to the closing of the merger, in order to retain an equity investment in Twitter following completion of the merger in lieu of receiving merger consideration in the merger. Mr. Dorsey informed Twitter that his communications with Mr. Musk regarding these matters first occurred following execution of the merger agreement and that these communications may continue, and may result in Mr. Dorsey continuing to hold equity of the surviving corporation or one or more of its affiliates following the merger. There are no assurances that an agreement will result, or of the

-54-

Table of Contents

amount, if any, of Mr. Dorsey's holdings that will be contributed to Parent, or of the amount, if any, of equity of the surviving corporation or one or more of its affiliates that Mr. Dorsey will hold following the merger.

**Recommendation of the Twitter Board and Reasons for the Merger**

### Recommendation of the Twitter Board

The Twitter Board unanimously: (1) determined that the merger agreement is advisable and the merger and the other transactions contemplated by the merger agreement are fair to, advisable and in the best interests of Twitter and its stockholders; and (2) adopted and approved the merger agreement, the merger and the other transactions contemplated by the merger agreement.

**The Twitter Board unanimously recommends that you vote: (1) "FOR" the adoption of the merger agreement; (2) "FOR" the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger; and (3) "FOR" the adjournment of the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting.**

### Reasons for the Merger

In evaluating the merger agreement and the merger, the Twitter Board consulted with Twitter management, as well as representatives of each of Goldman Sachs, J.P. Morgan, Wilson Sonsini and Simpson Thacher. In recommending that Twitter stockholders vote "FOR" the adoption of the merger agreement, the Twitter Board considered and analyzed a number of factors, including the following (which factors are not necessarily presented in order of relative importance). Based on these consultations, considerations and analyses, and the factors discussed below, the Twitter Board unanimously concluded that entering into the merger agreement was advisable and in the best interests of Twitter and our stockholders.

The Twitter Board believed that the following material factors and benefits supported its determination and recommendation:

- *Financial Condition, Results of Operations and Prospects of Twitter; Risks of Execution.* The current, historical and projected financial condition, results of operations and business of Twitter, as well as Twitter's prospects and risks if it were to remain an independent company. In particular, the Twitter Board considered Twitter's then current business plan, including management's then current estimated projections of Twitter's financial prospects, as reflected in the Unaudited Prospective Financial Information, and underlying assumptions and market share case sensitivities. As part of this, the Twitter Board considered Twitter's current business plan and the potential opportunities and risks that it presented, against, among other things, various execution, operational and other risks to achieving the business plan and related uncertainties, including: (1) the impact of market, customer and competitive trends on Twitter; (2) the likelihood that the business plan could be achieved in the face of operational and execution risks, including loss of market share, user dissatisfaction or employee attrition; and (3) general risks related to market conditions that could negatively impact our valuation or reduce the price of our common stock. In particular, the Twitter Board considered the likelihood and timing of, and risks to, achieving the operational improvements, monetization objectives and market share capture assumptions underlying the business plan, as well as the estimated

-55-

Table of Contents

projections of Twitter's financial prospects, all as reflected in the Unaudited Prospective Financial Information. Among the potential risks identified by the Twitter Board were:

○ Twitter's competitive positioning and prospects as an independent company. Included among these risks were consideration of (1) Twitter's size, as well as its financial resources, relative to those of its competitors; (2) new and evolving competitive threats; (3) changes in the industry in which Twitter operates; and (4) the substantial risks to achieving Twitter's business plan.

○ The historical growth rate of Twitter's monetizable daily active usage or users, ad engagement or other general engagement on its platform and the impact that this has had, and could continue to have, on Twitter's ability to achieve stable and consistent revenue, business and operating results. The Twitter Board also considered Twitter's historical challenges in increasing market share, and noted that the Unaudited Prospective Financial Information included various assumptions regarding increased market share.

○ The historical challenges to Twitter's ability to grow its advertising revenue and the impact that this has had, and could continue to have, on our future revenue, profitability and stock price.

○ The continued economic uncertainty, including related to the COVID-19 pandemic, the conflict in Ukraine and related sanctions against Russia and Belarus, and inflationary pressures, as well as the impact that such uncertainty has had, and could continue to have, on the digital advertising market (and brand advertising specifically) and Twitter's business and operating results.

○ The challenges to a public company of making investments, and operational changes and improvements (including meaningful cost reductions) to achieve long-term growth and profitability. The Twitter Board was aware that such investments, changes and improvements could lead to disruption in our performance and expose us to scrutiny based on our quarter-over-quarter operational and financial metrics and results. The Twitter Board was also aware that the price of our common stock could be negatively impacted if we failed to meet investor expectations, including if we failed to meet our monetization, growth and profitability objectives.

○ The historical execution track record of Twitter's business plan by Twitter management and their ability to continue to drive Twitter's business.

• *Potential Strategic Alternatives.* The assessment of the Twitter Board that none of the possible alternatives to the merger (including continuing to operate Twitter as an independent company or pursuing a different transaction, and the desirability and perceived risks of those alternatives, as well as the potential benefits and risks to our stockholders of those alternatives and the timing and likelihood of effecting such alternatives) was reasonably likely to present superior opportunities for Twitter to create greater value for our stockholders, taking into account execution risks as well as business, financial, industry, competitive and regulatory risks. The Twitter Board considered other potential acquirors of Twitter, and determined that other parties were unlikely to have the interest in, or capability to, acquire Twitter, including based on the regulatory, financing and other execution risks applicable to each party. In that regard, the Twitter Board noted that although Mr. Musk's acquisition proposal had been publicly disclosed (and the subject of significant press coverage) and a number of financial sponsors had contacted Twitter and its representatives regarding their interest in participating as a financing source in a potential acquisition of Twitter, the Twitter Board did not receive any alternative acquisition proposals from any potential acquirers other that Mr. Musk. The Twitter

-56-

Table of Contents

Board also noted the likelihood that other potential acquirors would require substantial due diligence, creating a delay and risk to reaching the signing of such a potential transaction.

- *Possibility that Mr. Musk Could Commence an Unsolicited Takeover or Exit His Stake.* The possibility that, absent a negotiated agreement with Twitter, Mr. Musk might commence an unsolicited tender offer for our common stock imminently based on his public statements and disclosures, and the fact that Mr. Musk would not be contractually committed to offer the per share price to all of our stockholders, or otherwise be subject to contractual obligations and commitments (including with respect to receipt of regulatory approvals) to complete an acquisition transaction. As part of this, the Twitter Board noted (1) the possible disruption to our business and the possible impact on stockholder value if Mr. Musk determined to seek to acquire Twitter on an unsolicited basis; and (2) the additional stockholder value, including with respect to closing certainty, that could be derived from requiring Mr. Musk to negotiate the terms of a potential acquisition with the Twitter Board. In addition, the Twitter Board considered the possible disruption to our business and the possible impact on stockholder value if Mr. Musk did not pursue an acquisition or exited his stake of our common stock.

- *Certainty of Value.* The consideration to be received by our stockholders in the merger consists entirely of cash, which provides certainty of value measured against the ongoing business and financial execution risks of Twitter's business plan, and allows our stockholders to realize that value immediately upon the closing of the merger. In that regard, the Twitter Board noted that the amount of cash to be received for each outstanding share of our common stock is fixed and will not be reduced if the share price of our common stock declines prior to the effective time of the merger.

- *Best Value Reasonably Obtainable.* The belief of the Twitter Board that the per share price represented Mr. Musk's best and final offer and the best value that Twitter could reasonably obtain from Mr. Musk for the shares of our common stock, taking into account (1) Mr. Musk's statements (both publicly and to Mr. Taylor) and reputation; (2) the Twitter Board's assessment that other parties were unlikely to have the interest in, or capability to, acquire Twitter, including based on the regulatory, financing and other execution risks applicable to each party; and (3) the Twitter Board's familiarity with the business, operations, prospects, business strategy, assets, liabilities and general financial condition of Twitter on a historical and prospective basis and its assessment of associated risks, including execution risks with respect to Twitter's business plan. In addition, the Twitter Board believed that, measured against the longer-term execution risks described above, the per share price reflects a fair and favorable price for the shares of our common stock. The Twitter Board also considered that the per share price constitutes (1) a premium of approximately 38 percent to the closing price of our common stock on April 1, 2022, which was the last full trading day before Mr. Musk's investment in Twitter became public; and (2) a premium of approximately 51 percent to Twitter's 30-trading day volume-weighted average closing stock price ending on such date.

- *Opinion of Goldman Sachs.* The oral opinion of Goldman Sachs rendered to the Twitter Board, subsequently confirmed by delivery of its written opinion, dated April 25, 2022, that, as of such date, and based upon and subject to the limitations, qualifications and assumptions set forth therein, the $54.20 in cash per share of Twitter common stock to be paid to the holders (other than Parent, Mr. Musk and their respective affiliates) of such shares pursuant to the merger agreement was fair from a financial point of view to such holders. The opinion is more fully described in the section of this proxy statement captioned "—*Opinion of Goldman Sachs & Co. LLC*" and the full text of the opinion is attached as Annex C to this proxy statement.

- *Opinion of J.P. Morgan.* The oral opinion of J.P. Morgan rendered to the Twitter Board on April 25, 2022 that, as of such date and based upon and subject to the factors and

-57-

Table of Contents

assumptions set forth in its opinion, the consideration to be paid to Twitter's common stockholders in the proposed transaction was fair, from a financial point of view, to such stockholders. J.P. Morgan has confirmed its April 25, 2022 oral opinion by delivering its written opinion to the Twitter Board, dated April 25, 2022, that, as of such date, the consideration to be paid to Twitter's common stockholders in the proposed merger was fair, from a financial point of view, to such stockholders. The opinion is more fully described in the section of this proxy statement captioned "—*Opinion of J.P. Morgan Securities LLC*" and the full text of the opinion is attached as Annex D to this proxy statement.

- *Negotiations with Parent and Terms of the Merger Agreement*. The terms of the merger agreement, which was the product of arm's-length negotiations, and the belief of the Twitter Board that the merger agreement contained terms and conditions that provided the Twitter Board with a high level of closing certainty. The factors considered included:

  ○ Twitter's ability, under certain circumstances, to furnish information to, and conduct negotiations with, third parties submitting unsolicited takeover proposals.

  ○ The Twitter Board's belief that the terms of the merger agreement would be unlikely to deter third parties from making a superior proposal.

  ○ The Twitter Board's ability, under certain circumstances, to withdraw or modify its recommendation that our stockholders vote in favor of the adoption of the merger agreement.

  ○ The Twitter Board's ability, under certain circumstances, to terminate the merger agreement to enter into a definitive agreement with respect to a superior proposal. In that regard, the Twitter Board believed that the termination fee payable by Twitter in such instance was reasonable, consistent with or below similar fees payable in comparable transactions, and not preclusive of other offers.

  ○ The obligations of Parent, under certain circumstances, to take the actions necessary to consummate the merger, including to obtain required regulatory approvals or waivers on the terms set forth in the merger agreement.

  ○ The limited conditions to Parent's obligation to consummate the merger, making the merger reasonably likely to be consummated.

  ○ The reverse termination fee of $1,000,000,000 payable by Parent in certain circumstances, our ability to specifically enforce Parent's and Mr. Musk's obligations under the merger agreement in accordance with its terms and to cause the equity financing to be funded if the conditions to closing are satisfied and the debt financing is available, and the other remedies available to Twitter under the merger agreement, including monetary damages. The Twitter Board also considered the terms of the limited guarantee, which guarantees payment of the reverse termination fee.

  ○ The consummation of the merger not being subject to a financing condition. The Twitter Board also considered the terms of the (1) debt commitment letters, which commit the debt sources to lend a portion of the amounts needed by Parent to fund the transaction; and (2) equity commitment letter, which commit Mr. Musk to invest the balance of the amounts needed by Parent to fund the transaction (including Twitter's third-party beneficiary rights to enforce Mr. Musk's equity commitments under the equity commitment letter in accordance with its terms and the terms of the merger agreement).

-58-

Table of Contents

- *Reasonable Likelihood of Consummation*. The belief of the Twitter Board that an acquisition by Mr. Musk has a reasonable likelihood of closing. In that regard, the Twitter Board considered Mr. Musk's business reputation and financial resources, as well as those of Parent's debt financing sources, which the Twitter Board believed increased the likelihood that the required debt and equity financing for the merger would be available.

- *Appraisal Rights*. The appraisal rights in connection with the merger available to our stockholders who timely and properly exercise such appraisal rights under the DGCL if certain conditions are met.

The Twitter Board also considered a number of uncertainties and risks and other potentially negative factors, including the following:

- *No Stockholder Participation in Future Growth or Earnings*. The nature of the merger as a cash transaction means that our stockholders will not participate in Twitter's future earnings or growth and will not benefit from any appreciation in value of the surviving corporation. The Twitter Board considered the other potential alternative strategies available to Twitter as an independent company, which, despite significant uncertainty, had the potential to result in a more successful and valuable company.

- *No-Shop Restrictions*. The restrictions in the merger agreement on Twitter's ability to solicit competing transactions (subject to certain exceptions to allow the Twitter Board to exercise its fiduciary duties and to accept a superior proposal, and then only upon the payment of a termination fee).

- *Risk Associated with Failure to Consummate the Merger*. The possibility that the merger might not be consummated, and if it is not consummated, that: (1) Twitter's directors, senior management and other employees will have expended extensive time and effort and will have experienced significant distractions from their work on behalf of Twitter during the pendency of the merger; (2) Twitter will have incurred significant transaction and other costs; (3) Twitter's continuing business relationships with customers, business partners and employees may be adversely affected; (4) the trading price of our common stock could be adversely affected; (5) the contractual and legal remedies available to Twitter in the event of the breach or termination of the merger agreement may be insufficient, costly to pursue, or both; (6) the reverse termination fee of $1,000,000,000 payable by Parent to Twitter will not be available in all instances in which the merger agreement is terminated and such reverse termination fee may not be sufficient to compensate Twitter for the damage suffered by its business as a result of the pendency of the merger or of the strategic initiatives forgone by Twitter during this period; and (7) the failure of the merger to be consummated could result in an adverse perception among our customers, potential customers, employees and investors about Twitter's prospects.

- *Regulatory Risks*. The possibility that regulatory agencies may delay, object to, challenge or seek to enjoin the merger, or may seek to impose terms and conditions on their approvals that are not acceptable to Mr. Musk, notwithstanding his obligations under the merger agreement.

- *Impact of Interim Restrictions on Twitter's Business Pending the Completion of the Merger*. The restrictions on the conduct of Twitter's business prior to the consummation of the merger, which may delay or prevent us from undertaking strategic initiatives before the completion of the merger that, absent the merger agreement, we might have pursued, or from taking certain actions aimed at incentivizing and retaining our employees.

-59-

Table of Contents

- *Effects of the Merger Announcement.* The effects of the public announcement of the merger, including the: (1) effects on our employees, customers, operating results and stock price; (2) impact on our ability to attract and retain key management, sales and marketing, and technical personnel; and (3) potential for litigation in connection with the merger.

- *Termination Fee Payable by Twitter.* The requirement that Twitter pay Parent a termination fee under certain circumstances following termination of the merger agreement, including if the Twitter Board terminates the merger agreement to accept a superior proposal. The Twitter Board considered the potentially discouraging impact that this termination fee could have on a third party's interest in making a competing proposal to acquire Twitter.

- *Taxable Consideration.* The receipt of cash in exchange for shares of our common stock in the merger will be a taxable transaction for U.S. federal income tax purposes for many Twitter stockholders.

- *Interests of Twitter's Directors and Executive Officers.* The interests that Twitter's directors and executive officers may have in the merger, which may be different from, or in addition to, those of our other stockholders.

This discussion is not meant to be exhaustive. Rather, it summarizes the material reasons and factors evaluated by the Twitter Board in its consideration of the merger. After considering these and other factors, the Twitter Board concluded that the potential benefits of entering into the merger agreement outweighed the uncertainties and risks. In the light of the variety of factors considered by the Twitter Board and the complexity of these factors, the Twitter Board did not find it practicable to, and did not, quantify or otherwise assign relative weights, ranks or values to the foregoing factors in reaching its determination and recommendations. Moreover, each member of the Twitter Board applied his or her own personal business judgment to the process and may have assigned different relative weights, ranks or values to the different factors. The Twitter Board unanimously adopted and approved the merger agreement and the merger, and recommended that Twitter stockholders adopt the merger agreement, based upon the totality of the information presented to, and considered by, the Twitter Board.

**Opinion of Goldman Sachs & Co. LLC**

At a meeting of the Twitter Board held on April 25, 2022, Goldman Sachs rendered its oral opinion, subsequently confirmed by delivery of its written opinion, dated April 25, 2022, to the Twitter Board that, as of the date of the written opinion and based upon and subject to limitations, qualifications and assumptions set forth therein, the $54.20 in cash per share of our common stock to be paid to the holders (other than Parent, Mr. Musk and their respective affiliates) of such shares pursuant to the merger agreement was fair from a financial point of view to such holders.

The full text of the written opinion of Goldman Sachs, dated April 25, 2022, which sets forth assumptions made, procedures followed, matters considered and limitations on the review undertaken in connection with the opinion, is attached as Annex C to this proxy statement. Goldman Sachs provided advisory services and its opinion for the information and assistance of the Twitter Board in connection with its consideration of the merger. The Goldman Sachs opinion is not a recommendation as to how any holder of our common stock should vote with respect to the merger or any other matter.

In connection with rendering its opinion, Goldman Sachs, among other things, reviewed:

- the merger agreement;

Table of Contents

- annual reports to stockholders and Annual Reports on Form 10-K of Twitter for the five years ended December 31, 2021;

- certain interim reports to stockholders and Quarterly Reports on Form 10-Q of Twitter;

- certain publicly available research analyst reports for Twitter;

- certain other communications from Twitter to its stockholders; and

- certain internal financial analyses and forecasts for Twitter prepared by its management, as approved for Goldman Sachs' use by Twitter, which are referred to in this section of the proxy statement as the "**Forecasts**."

Goldman Sachs also held discussions with members of the senior management of Twitter regarding their assessment of the past and current business operations, financial condition and future prospects of Twitter; reviewed the reported price and trading activity for the Twitter common stock; compared certain financial and stock market information for Twitter with similar information for certain other companies the securities of which are publicly traded; reviewed the financial terms of certain recent business combinations in the internet industry; and performed such other studies and analyses, and considered such other factors, as it deemed appropriate.

For purposes of rendering this opinion, Goldman Sachs, with the consent of the Twitter Board, relied upon and assumed the accuracy and completeness of all of the financial, legal, regulatory, tax, accounting and other information provided to, discussed with or reviewed by it, without assuming any responsibility for independent verification thereof. In that regard, Goldman Sachs assumed, with the consent of the Twitter Board, that the Forecasts were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of Twitter. Goldman Sachs did not make an independent evaluation or appraisal of the assets and liabilities (including any contingent, derivative or other off-balance-sheet assets and liabilities) of Twitter or any of its subsidiaries and it was not furnished with any such evaluation or appraisal. Goldman Sachs assumed that all governmental, regulatory or other consents and approvals necessary for the consummation of the merger will be obtained without any adverse effect on the expected benefits of the merger in any way meaningful to its analysis. Goldman Sachs also assumed that the merger will be consummated on the terms set forth in the merger agreement, without the waiver or modification of any term or condition the effect of which would be in any way meaningful to its analysis.

Goldman Sachs' opinion does not address the underlying business decision of Twitter to engage in the merger or the relative merits of the merger as compared to any strategic alternatives that may be available to Twitter; nor does it address any legal, regulatory, tax or accounting matters. Goldman Sachs was not requested to solicit, and did not solicit, interest from other parties with respect to an acquisition of, or other business combination with, Twitter or any other alternative transaction. Goldman Sachs' opinion addresses only the fairness from a financial point of view, as of the date of the written opinion, of the $54.20 in cash per share of Twitter common stock to be paid to the holders (other than Parent, Mr. Musk and their respective affiliates) of such shares pursuant to the merger agreement. Goldman Sachs' opinion does not express any view on, and does not address, any other term or aspect of the merger agreement or the merger or any term or aspect of any other agreement or instrument contemplated by the merger agreement or entered into or amended in connection with the merger, including the fairness of the merger to, or any consideration received in connection therewith by, the holders of any other class of securities, creditors, or other constituencies of Twitter; nor as to the fairness of the amount or nature of any compensation to be paid or payable to any of the officers, directors or employees of Twitter, or class of such persons in connection with the merger, whether relative to the $54.20 in cash per share of Twitter common stock to be paid to the holders (other than

-61-

Table of Contents

Parent, Mr. Musk and their respective affiliates) of such shares pursuant to the merger agreement or otherwise. Goldman Sachs did not express any opinion as to the prices at which shares of Twitter common stock will trade at any time, as to the potential effects of volatility in the credit, financial and stock markets on Twitter, Mr. Musk, Parent or the merger, or as to the impact of the merger on the solvency or viability of Twitter, Mr. Musk or Parent or the ability of Twitter, Mr. Musk or Parent to pay their respective obligations when they come due. Goldman Sachs' opinion was necessarily based on economic, monetary, market and other conditions, as in effect on, and the information made available to it as of, the date of the opinion and Goldman Sachs assumed no responsibility for updating, revising or reaffirming its opinion based on circumstances, developments or events occurring after the date of its opinion. Goldman Sachs' advisory services and its opinion were provided for the information and assistance of the Twitter Board in connection with its consideration of the merger and such opinion does not constitute a recommendation as to how a holder of shares of Twitter common stock should vote with respect to such transaction or any other matter. Goldman Sachs' opinion was approved by a fairness committee of Goldman Sachs.

### *Summary of Material Financial Analysis*

The following is a summary of the material financial analyses presented by Goldman Sachs to the Twitter Board in connection with rendering the opinion described above. The following summary, however, does not purport to be a complete description of the financial analyses performed by Goldman Sachs, nor does the order of analyses described represent relative importance or weight given to those analyses by Goldman Sachs. Some of the summaries of the financial analyses include information presented in tabular format. The tables must be read together with the full text of each summary and are alone not a complete description of Goldman Sachs' financial analyses. Except as otherwise noted, the following quantitative information, to the extent that it is based on market data, is based on market data as it existed on or before April 22, 2022, the last trading day before the public announcement of the merger, and is not necessarily indicative of current market conditions.

### *Implied Premia Analysis*

Goldman Sachs calculated and compared certain implied premia described below based on the $54.20 in cash per share of Twitter common stock to be paid to the holders (other than Parent, Mr. Musk and their respective affiliates) of such shares pursuant to the merger agreement.

Goldman Sachs calculated the implied premia represented by the $54.20 in cash per share of Twitter common stock relative to:

- • $39.31, the undisturbed closing price for Twitter common stock on April 1, 2022, the last trading day prior to the filing of the Schedule 13G filed by Elon Musk disclosing his ownership of Twitter common stock (which we refer to for purposes of this section of the proxy statement as the "**Undisturbed Share Price**");

- • $48.93, the closing price for Twitter common stock on April 22, 2022, the last full trading day prior to the signing of the merger agreement (which we refer to for purposes of this section of the proxy statement as the "**Current Share Price**");

- • $71.69, the highest closing trading price of the shares of Twitter common stock over the 52-week period ended April 22, 2022 (which we refer to for purposes of this section of the proxy statement as the "**52-Week High**");

- • $32.42, the lowest closing trading price of the shares of Twitter common stock over the 52-week period ended April 22, 2022 (which we refer to for purposes of this section of the proxy statement as the "**52-Week Low**");

-62-

Table of Contents

- $35.89, the volume weighted average price of Twitter common stock over the 30-trading-day period ended April 1, 2022 (which we refer to for purposes of this section of the proxy statement as "**30-day Undisturbed VWAP**"); and

- $53.91, the average closing trading price of the shares of Twitter common stock over the 1-year period ended April 1, 2022 (which we refer to for purposes of this section of the proxy statement as "**1-year Undisturbed Average**").

The results of these calculations and comparisons were as follows:

| Common Stock Reference Price | Implied Premium Represented by $54.20 in Cash per Share of Twitter Common Stock |
|---|---|
| Undisturbed Share Price of $39.31 | 38% |
| Current Share Price of $48.93 | 11% |
| 52-Week High of $71.69 | (24)% |
| 52-Week Low $32.42 | 67% |
| 30-day Undisturbed VWAP $35.89 | 51% |
| 1-year Undisturbed Average of $53.91 | 1% |

*Illustrative Present Value of Future Share Price Analysis*

Goldman Sachs performed an illustrative analysis of the implied present value of an illustrative future value per share of Twitter common stock, which is designed to provide an indication of the present value of a theoretical future value of Twitter's equity as a function of Twitter's financial multiples. For this analysis, Goldman Sachs used the Forecasts for each of the fiscal years 2022 to 2025. Goldman Sachs first calculated the implied future enterprise value of Twitter as of December 31, 2022, 2023 and 2024, by applying a range of enterprise value to one-year forward EBITDA estimates (which are referred to for purposes of this section of the proxy statement as "**forward EV/EBITDA**") multiples of 15.0x to 17.5x to the EBITDA estimates contained in the Forecasts for each of Twitter's fiscal years 2023, 2024 and 2025. These illustrative multiples were derived by Goldman Sachs utilizing its professional judgment and experience, taking into account, among other things, current and historical average forward EV/EBITDA multiples for Twitter and certain selected internet companies described in the section below captioned "—*Selected Public Company Comparables.*"

Goldman Sachs then added the amount of Twitter's estimated total cash and cash equivalents and equity investments and subtracted the amount of Twitter's estimated total debt, as of December 31, 2022, 2023 and 2024, each as provided by management of Twitter and approved for Goldman Sachs' use by the management of Twitter, to the range of implied enterprise values to derive a range of illustrative equity values as of December 31, 2022, 2023 and 2024. Goldman Sachs then divided these implied equity values by the projected number of fully diluted outstanding shares of Twitter, as provided by management of Twitter and approved for Goldman Sachs' use by the management of Twitter, to derive a range of implied future equity values per share of Twitter common stock. Goldman Sachs then discounted these implied equity values per share to December 31, 2021, using an illustrative discount rate of 11.4%, reflecting an estimate of Twitter's cost of equity. Goldman Sachs derived such discount rate by application of the Capital Asset Pricing Model (which we refer to for purposes of this section of the proxy statement as "**CAPM**"), which requires certain company-specific inputs, including a beta for Twitter, as well as certain financial metrics for the United States financial markets generally. This analysis resulted in a range of implied present values per share of Twitter common stock, rounded to the nearest $0.10, of $45.50 to $60.10.

-63-

Table of Contents

*Illustrative Discounted Cash Flow Analysis*

Using the Forecasts, Goldman Sachs performed an illustrative discounted cash flow analysis on Twitter to derive a range of illustrative present values per share of Twitter common stock. Using the mid-year convention for discounting cash flows and discount rates ranging from 10.0% to 12.0%, reflecting estimates of Twitter's weighted average cost of capital, Goldman Sachs discounted to present value as of December 31, 2021 (i) estimates of unlevered free cash flow for Twitter for the fiscal years 2022 through 2027 as reflected in the Forecasts and referred to as Unlevered Free Cash Flow (less stock-based compensation expenses) in the section of this proxy statement captioned "—*Unaudited Prospective Financial Information*" and (ii) a range of illustrative terminal values for Twitter, which were calculated by applying illustrative exit terminal year EV/EBITDA multiples ranging from 10.0x to 15.0x to a terminal year estimate of EBITDA, as reflected in the Forecasts (which analysis implied perpetuity growth rates ranging from 5.6% to 9.0%). Goldman Sachs derived such discount rates by application of the CAPM, which requires certain company-specific inputs, including Twitter's target capital structure weightings, the cost of long-term debt, after-tax yield on permanent excess cash, if any, future applicable marginal cash tax rate and a beta for Twitter, as well as certain financial metrics for the United States financial markets generally. The illustrative terminal year EV/EBITDA multiple range for Twitter was derived by Goldman Sachs using its professional judgment and experience, taking into account, among other things, current and historical average forward EV/EBITDA multiples for Twitter and certain selected internet companies described in the section below captioned "—*Selected Public Company Comparables*." In addition, using discount rates ranging from 10.0% to 12.0%, reflecting estimates of Twitter's weighted average cost of capital, Goldman Sachs discounted to present value as of December 31, 2021 the estimated benefits of Twitter's net operating losses, as provided by the management of Twitter and approved for Goldman Sachs' use by the management of Twitter.

Goldman Sachs derived a range of illustrative enterprise values for Twitter by adding the ranges of present values it derived as described above. Goldman Sachs then added to the range of illustrative enterprise values it derived for Twitter the amount of Twitter's estimated total cash and cash equivalents and equity investments and subtracted the amount of Twitter's estimated total debt as of December 31, 2021, adjusted for any subsequent publicly announced changes to these figures, as provided by the management of Twitter and approved for Goldman Sachs' use by the management of Twitter, to derive a range of illustrative equity values for Twitter. Goldman Sachs then divided the range of illustrative equity values it derived by the number of fully diluted outstanding shares of Twitter as of March 31, 2022, as provided by the management of Twitter and approved for Goldman Sachs' use by the management of Twitter, to derive a range of illustrative present values per share of Twitter common stock, rounded to the nearest $0.10, of $39.10 to $60.90.

*Selected Precedent Transactions Analysis*

Goldman Sachs analyzed certain publicly available information relating to the following selected transactions involving companies with an enterprise value in excess of $1 billion in the internet industry since 2010. For each of the selected transactions, where information was publicly available, Goldman Sachs calculated and compared the implied enterprise value of the applicable target company based on the consideration paid in the transaction as a multiple of the target company's EBITDA over the last twelve month period ended prior to the announcement of the applicable transaction (which we refer to for purposes of this section of the proxy statement as "**EV/LTM EBITDA**").

-64-

Table of Contents

The following table identifies the transactions reviewed by Goldman Sachs as part of this analysis:

| Announcement Date | Acquiror | Target | EV/LTM EBITDA |
|---|---|---|---|
| Feb 2021 | Magnite, Inc. | SpotX, Inc. | 33.4x |
| Jun 2020 | Just Eat Takeaway.com N.V. | Grubhub Inc. | 47.4x |
| Dec 2019 | Hellman & Friedman LLC | AutoScout24 | 26.1x |
| May 2018 | Silver Lake | ZPG Plc | 21.5x |
| Jun 2016 | Microsoft Corporation | LinkedIn Corporation | 31.2x |
| Nov 2015 | Expedia, Inc. | HomeAway, Inc. | 36.4x |
| Aug 2015 | Liberty Interactive Corporation | zulily, inc. | 50.6x |
| Jul 2014 | Zillow, Inc. | Trulia, Inc. | NM(1) |
| Jun 2014 | The Priceline Group Inc. | OpenTable, Inc. | 29.9x |
| Nov 2012 | priceline.com Incorporated | KAYAK Software Corporation | 27.6x |
| May 2011 | Microsoft Corporation | Skype Global S. à r.l. | 32.2x |

(1)    Not meaningful

While none of the selected transactions or companies that participated in the selected transactions are directly comparable to the proposed merger of Twitter, the transactions included as selected transactions were chosen because the target companies that participated in the selected transactions are companies with operations that, for the purpose of this analysis, may be considered similar to certain of Twitter's operations, market size and product profile.

The foregoing analysis indicated a 25th percentile EV/LTM EBITDA multiple of 28.2x and a 75th percentile EV/LTM EBITDA multiple of 35.7x. Using this analysis and its professional judgment and experience, Goldman Sachs applied a range of illustrative EV/EBITDA multiples of 28.2x to 35.7x to Twitter's last twelve months Adjusted EBITDA (adjusted to exclude a one-time litigation-related net charge of $766 million) as of December 31, 2021, as provided by the management of Twitter and approved for Goldman Sachs' use by the management of Twitter, to derive a range of implied enterprise values for Twitter. Goldman Sachs then added to the range of implied enterprise values the amount of Twitter's estimated total cash and cash equivalents and equity investments and subtracted the amount of Twitter's estimated total debt, as of December 31, 2021, adjusted for any subsequent publicly announced changes to those figures, as provided by the management of Twitter and approved for Goldman Sachs' use by the management of Twitter, to derive a range of illustrative equity values for Twitter. Goldman Sachs divided the range of illustrative equity values by the number of fully diluted outstanding shares of Twitter as of March 31, 2022, as provided by the management of Twitter and approved for Goldman Sachs' use by the management of Twitter, to derive a range of implied values per share of Twitter common stock, rounded to the nearest $0.10, of $50.30 to $62.90.

*Premia Paid Analysis*

Goldman Sachs reviewed and analyzed, using publicly available information, the acquisition premia for 149 all-cash acquisition transactions announced from January 2012 through April 2022, involving a public technology, media, or telecommunication company based in the United States as the target where the disclosed enterprise value for the transaction was greater than $1 billion. For the entire period, using publicly available information, Goldman Sachs calculated the median, 25th percentile and 75th percentile premia of the price paid in the transactions relative to the target's last undisturbed closing stock price prior to announcement of the transaction. This analysis indicated a median premium of 29% across the period. This analysis also indicated a 25th percentile premium of 18% and a 75th percentile premium of 44% across the period. Using this analysis and its professional judgment and experience, Goldman Sachs applied a reference range of illustrative premia of 18% to 44% to the

-65-

Table of Contents

undisturbed closing price per share of Twitter common stock of $39.31 as of April 1, 2022 and calculated a range of implied values per share of Twitter common stock, rounded to the nearest $0.10, of $46.40 to $56.60.

*Selected Public Company Comparables*

Using publicly available information, Goldman Sachs reviewed and compared forward EV/EBITDA multiples for Twitter and the following publicly traded corporations in the internet industry, which are collectively referred to as the "selected companies":

- Alphabet Inc.

- Meta Platforms, Inc.

- Pinterest, Inc.

- Snap Inc.

Although none of the selected companies is directly comparable to Twitter, the companies included were chosen because they are publicly traded companies in the internet industry with certain operations that for purposes of analysis may be considered similar to certain operations of Twitter.

Goldman Sachs calculated the average multiple of enterprise value to EBITDA for the next twelve-month period (which we refer to for purposes of this section of the proxy statement as "**NTM EBITDA**"), for each of Twitter and the selected companies over the 3-month, 6-month, 1-year, 2-year and 3-year periods prior to April 22, 2022, based on financial and trading data as of April 22, 2022 obtained from public filings, Bloomberg, Capital IQ and Institutional Brokers' Estimate System (which we refer to for purposes of this section of the proxy statement as "**IBES**") estimates. The results of this analysis are summarized as follows:

**EV/NTM EBITDA**
**Averages Over Periods Prior to April 22, 2022**

|  | 3-Month | 6-Month (1) | 1-Year (1) | 2-Year (1) | 3-Year (1) |
|---|---|---|---|---|---|
| Alphabet Inc. | 13.3x | 14.3x | 15.0x | 14.6x | 13.5x |
| Meta Platforms, Inc. | 9.0x | 10.8x | 12.3x | 13.4x | 12.8x |
| Pinterest, Inc. | 17.5x | 21.3x | 35.2x | — | — |
| Snap Inc. | 57.3x | — | — | — | — |
| Twitter | 20.6x | 22.3x | 27.2x | 28.4x | 25.1x |

(1)   Average multiples excluded if respective company does not have meaningful trading data for the entire period.

-66-

Table of Contents

Goldman Sachs also calculated and compared the current forward EV/EBITDA multiples for Twitter, based on the Forecasts and based on IBES estimates, and the selected companies for calendar years 2022 and 2023, based on financial and trading data as of April 22, 2022 obtained from public filings, Bloomberg, Capital IQ and IBES estimates. The forward EV/EBITDA multiples for Twitter were calculated using the undisturbed closing price per share of Twitter common stock on April 1, 2022. The results of this analysis are summarized as follows:

| | 2022E EV/ EBITDA | 2023E EV/ EBITDA |
|---|---|---|
| Alphabet Inc. | 12.0x | 10.4x |
| Meta Platforms, Inc. | 7.8x | 6.7x |
| Pinterest, Inc. | 16.2x | 11.2x |
| Snap Inc. | 62.8x | 30.2x |
| Twitter (based on the Forecasts) | 19.6x | 11.7x |
| Twitter (based on IBES Estimates) | 21.8x | 16.9x |

*General*

The preparation of a fairness opinion is a complex process and is not necessarily susceptible to partial analysis or summary description. Selecting portions of the analyses or of the summary set forth above, without considering the analyses as a whole, could create an incomplete view of the processes underlying Goldman Sachs' opinion. In arriving at its fairness determination, Goldman Sachs considered the results of all of its analyses and did not attribute any particular weight to any factor or analysis considered by it. Rather, Goldman Sachs made its determination as to fairness on the basis of its experience and professional judgment after considering the results of all of its analyses. No company or transaction used in the above analyses as a comparison is directly comparable to Twitter or the merger.

Goldman Sachs prepared these analyses for purposes of Goldman Sachs' providing its opinion to the Twitter Board as to the fairness from a financial point of view of the $54.20 in cash per share of Twitter common stock to be paid to the holders (other than Parent, Mr. Musk and their respective affiliates) of such shares pursuant to the merger agreement. These analyses do not purport to be appraisals nor do they necessarily reflect the prices at which businesses or securities actually may be sold. Analyses based upon forecasts of future results are not necessarily indicative of actual future results, which may be significantly more or less favorable than suggested by these analyses. Because these analyses are inherently subject to uncertainty, being based upon numerous factors or events beyond the control of the parties or their respective advisors, none of Twitter, Parent, Goldman Sachs or any other person assumes responsibility if future results are materially different from those forecast.

The merger consideration was determined through arm's-length negotiations between Twitter and Parent and was approved by the Twitter Board. Goldman Sachs provided advice to Twitter during these negotiations. Goldman Sachs did not, however, recommend any specific amount of consideration to Twitter or the Twitter Board or that any specific amount of consideration constituted the only appropriate consideration for the merger.

As described above, Goldman Sachs' opinion to the Twitter Board was one of many factors taken into consideration by the Twitter Board in making its determination to approve the merger agreement. The foregoing summary does not purport to be a complete description of the analyses performed by Goldman Sachs in connection with the fairness opinion and is qualified in its entirety by reference to the written opinion of Goldman Sachs attached as Annex C.

-67-

Table of Contents

Goldman Sachs and its affiliates are engaged in advisory, underwriting and financing, principal investing, sales and trading, research, investment management and other financial and non-financial activities and services for various persons and entities. Goldman Sachs and its affiliates and employees, and funds or other entities they manage or in which they invest or have other economic interests or with which they co-invest, may at any time purchase, sell, hold or vote long or short positions and investments in securities, derivatives, loans, commodities, currencies, credit default swaps and other financial instruments of Twitter, affiliates of Mr. Musk, Parent, any of their respective affiliates and third parties, or any currency or commodity that may be involved in the merger. Goldman Sachs acted as financial advisor to Twitter in connection with, and participated in certain of the negotiations leading to, the merger. Goldman Sachs has provided certain financial advisory and/or underwriting services to Twitter and its affiliates from time to time for which the Investment Banking Division of Goldman Sachs has received, and may receive, compensation, including having acted as an initial purchaser with respect to the offering of Twitter's 0% Convertible Senior Notes due 2026 in March 2021 (aggregate principal amount of approximately $1.4 billion) (which we refer to for purposes of this section of the proxy statement as the "**convertible notes**") and as an initial purchaser with respect to the offering of Twitter's 5.000% Senior Notes due 2030 in February 2022 (aggregate principal amount of $1.0 billion). During the two year period ended April 25, 2022, Goldman Sachs has recognized compensation for financial advisory and/or underwriting services provided by its Investment Banking Division to Twitter and/or its affiliates of approximately $7.4 million. Goldman Sachs also has provided certain financial advisory and/or underwriting services to Elon Musk and/or his affiliates from time to time for which the Investment Banking Division of Goldman Sachs has received, and may receive, compensation, including having acted as lead left bookrunner of follow-on public offerings by Tesla, Inc., an affiliate of Elon Musk, in September 2020 and December 2020. During the two year period ended April 25, 2022, Goldman Sachs has recognized compensation for financial advisory and/or underwriting services provided by its Investment Banking Division to Elon Musk and/or his affiliates of approximately $[●]. Goldman Sachs may also in the future provide financial advisory and/or underwriting services to Twitter, Elon Musk, Parent and their respective affiliates for which the Investment Banking Division of Goldman Sachs may receive compensation.

In addition, concurrent with the issuance of the convertible notes, Twitter entered into convertible note hedge transactions and warrant transactions (which we collectively refer to for purposes of this section of the proxy statement as the "**convertible note hedge and warrant transactions**") with respect to the convertible notes, with Goldman Sachs (as to 25%) and other counterparties (which we collectively refer to for purposes of this section of the proxy statement as the "**convertible note hedge and warrant counterparties**"), each acting as a principal for its own account. The convertible note hedge and warrant transactions consisted of the purchase by Twitter of call options, and the sale by Twitter of warrants, with respect to collectively approximately 11.1 million shares of Twitter common stock, the aggregate number of shares of Twitter common stock underlying the convertible notes.

As of March 16, 2022, all of the convertible note hedge transactions remain outstanding with a strike price of approximately $130.03, and are exercisable upon conversion of the convertible notes. The convertible notes hedge transactions were intended to generally reduce the potential dilutive effect on stockholders of Twitter of the conversion of the convertible notes and/or offset any potential cash payment in excess of the principal amount of the convertible notes that Twitter may make in the event that the market value per share of Twitter common stock, as measured under the convertible notes hedge transactions at the time of exercise, is greater than the exercise price of the call options purchased by Twitter in the convertible notes hedge transactions. The warrant transactions provide Goldman Sachs with warrants on shares of Twitter common stock, the value of which depends on the price of Twitter common stock exceeding the strike price of the warrants. As of March 16, 2022, all of the warrant transactions remain outstanding with a strike price of approximately $163.02. If the market value per share of Twitter common stock, as measured under the warrant transactions, exceeds the

-68-

Table of Contents

strike price of the warrants, the warrant transactions will have a dilutive effect on Twitter's earnings per share, unless Twitter elects, subject to certain conditions, to settle the warrant transactions in cash.

The convertible note hedge and warrant transactions may be adjusted, exercised, cancelled and/or terminated in accordance with their terms in connection with certain events, including the announcement or consummation of the merger. In particular, under the terms of the convertible note hedge transactions, each of Goldman Sachs and the other convertible note hedge counterparties, each acting separately as calculation agent under the convertible note hedge transactions to which it is a party, is entitled or obligated in certain circumstances to make adjustments to the exercise price of the call options purchased by Twitter from Goldman Sachs and the other counterparties to reflect the adjustments made under the convertible notes indenture or the economic effect of the announcement of the merger on the call options embedded in the convertible note hedge. Under the terms of the warrant transactions, each of Goldman Sachs and the other warrant counterparties, each acting separately as calculation agent under the warrant transactions to which it is a party, is entitled or obligated in certain circumstances to make adjustments to the exercise price of the warrants sold by Twitter to Goldman Sachs and the other counterparties to reflect certain adjustments under the ISDA equity definitions, including adjustments to account for the economic effect of the announcement of the merger on the warrants embedded in the warrant transactions. In addition, each of Goldman Sachs and the other convertible note hedge and warrant counterparties may, each acting separately as the calculation agent, determining party or otherwise as principal under the call options and warrants embedded in the convertible note hedge and warrant transactions to which it is a party, determine such additional adjustments and/or value owed upon termination or cancellation in respect of such options and warrants, respectively, in accordance with their terms, including on or following consummation or abandonment of the merger. All actions or exercises of judgment by Goldman Sachs, in its capacity as calculation agent, pursuant to the terms of the call options and warrants embedded in the convertible note hedge and warrant transactions to which it is a party, must be performed in good faith and a commercially reasonable manner.

As a result of the convertible note hedge and warrant transactions, the convertible note hedge and warrant counterparties are expected to have market exposure to the price of the shares of Twitter common stock. It is the ordinary practice of the convertible note hedge and warrant counterparties to engage in hedging activities to limit their respective market exposure to the price of the stock underlying privately negotiated equity derivative transactions with issuers of such stock, such as the convertible note hedge and warrant transactions. In connection with the convertible note hedge and warrant transactions, Goldman Sachs (and its affiliates) have engaged, and will continue to engage, in accordance with applicable law in hedging and other market transactions (which may include the entering into or unwinding of various derivative transactions with respect to Twitter common stock) that are generally intended to substantially neutralize Goldman Sachs' exposure as a result of the convertible note hedge and warrant transactions to changes in the price of Twitter common stock. Such hedging activity is at Goldman Sachs' own risk and may result in a gain or loss to Goldman Sachs that may be greater than or less than the initial expected contractual benefit to Goldman Sachs under the convertible note hedge and warrant transactions. The amount of any such gain or loss will not be known until the applicable convertible note hedge and warrant transactions have been exercised, expired or terminated in accordance with their terms and Goldman Sachs shall have completed all of its hedge unwind activities.

To mitigate the exposure from the convertible note hedge and warrant transactions, as of March 16, 2022, Goldman Sachs held a net long economic position of approximately 90,000 shares of Twitter common stock and was long and short a small number of various options on Twitter common stock.

Under the terms of the convertible notes, upon the consummation of a merger, tender offer or certain other events involving Twitter (including the merger), holders of the convertible notes will be entitled to

-69-

[Table of Contents](#)

convert their notes at a higher conversion rate. If holders of the convertible notes elect to convert or put their notes in these circumstances or otherwise under the terms of the convertible notes, a portion of the convertible note hedge corresponding to the portion of the convertible notes that are converted or put may terminate. In the event of such termination, each convertible note hedge counterparty will determine the amount of any termination payment owed to Twitter under its convertible note hedge in accordance with the termination provisions of its convertible note hedge, unless otherwise agreed by the parties. If any convertible notes are not converted or put in connection with a merger, tender offer or other event involving Twitter (including the merger) and remain outstanding following the consummation of such an event, a corresponding portion of the convertible note hedge will remain outstanding, subject to any adjustments made to the terms of the convertible note hedge as a result of the announcement and the consummation of a merger, tender offer or other event involving Twitter (including the merger), as described above. Warrant transactions are also subject to adjustments made to the terms of the warrant transactions as a result of the announcement and the consummation of a merger, tender offer or other event involving Twitter (including the merger), as described above.

Goldman Sachs provided to the management of Twitter, for the information of the Twitter Board, materials that summarized, based on theoretical models, the potential effects of the announcement and of the consummation of an acquisition of Twitter on the convertible note hedge and warrant transactions. The materials included preliminary illustrative analyses by Goldman Sachs' Investment Banking Division for a range of stated assumptions regarding takeout prices for shares of Twitter common stock and volatilities, as well as based on other reasonable assumptions (which will ultimately be subject to negotiation between Twitter and counterparties), in the event of an acquisition of Twitter for greater than 10% cash consideration. The materials calculated over a range of potential takeout prices for the shares of Twitter common stock ranging from $50.00 per share to $70.00 per share and volatilities (from 30% to 60%) and for an announcement date of April 13, 2022, and other stated assumptions that, upon the full unwind of the convertible note hedge and warrant transactions, Goldman Sachs might realize, after taking into account any estimated hedging gains or losses, a net gain ranging from approximately $4.6 million to approximately $56.1 million. The methodology employed for the aforementioned materials assumed an intrinsic unwind of the note hedge transaction and fair value unwind of the warrant contract. In accordance with industry practice, Goldman Sachs maintains customary institutional information barriers reasonably designed to prevent the unauthorized disclosure of confidential information by personnel in its Investment Banking Division to the personnel in its Securities Division who are undertaking hedging and other market transactions with respect to Goldman Sachs' convertible note hedge and warrant transactions. In connection with the preparation of presentations to Twitter senior management and the Twitter Board, personnel in Goldman Sachs' Investment Banking Division, including the representatives of Goldman Sachs who have advised Twitter in connection with the merger, from time to time, have received or may receive input from personnel in Goldman Sachs' Securities Division into how to model, or reports of historical measures or estimates of, Goldman Sachs' and/or Goldman Sachs' Investment Banking Division's profit and/or loss over certain measurement periods related to the call spread transactions.

The amount of any termination payment owed to Twitter as a result of the termination of the convertible note hedge transactions will vary depending on the number of convertible notes converted by note-holders, the actual conversion date(s) of the convertible notes, and market conditions (including, for example, interest rates and volatility and price of Twitter common stock) and the valuation model used to determine such amount and, accordingly, the amount of any termination payment owed by a convertible note hedge counterparty to Twitter may be significantly different from the illustrative amounts described above. The amount of any termination payment owed to Goldman Sachs as a result of the termination of the warrant transactions will vary depending on market conditions (including, for example, interest rates and volatility and price of Twitter common stock) and the valuation model used to determine such amount and, accordingly, the amount of any termination payment owed by Twitter to a warrant counterparty may be significantly different from the illustrative

-70-

Table of Contents

amounts described above. The consummation of the merger could result in a convertible note hedge and warrant counterparty, in aggregate, paying Twitter an amount that is greater than, equal to, or less than the amount such convertible note hedge and warrant counterparty would have paid or delivered to Twitter upon exercise, expiration or termination of its convertible note hedge and warrant transaction in the absence of the merger.

The indenture governing the convertible notes and the confirmations containing the terms of the convertible note hedge and warrant transactions were included as exhibits to Twitter's Current Report on Form 8-K filed with the SEC on March 4, 2021, which contains additional disclosure regarding the convertible notes and a description of the convertible note hedge and warrant transactions. All references related to the convertible note hedge and warrant transactions in this section to share counts, conversion prices, and strike prices are subject to adjustment from time to time in accordance with the terms of the confirmations relating to the convertible note hedge and warrant transactions.

The Twitter Board selected Goldman Sachs as its financial advisor because it is an internationally recognized investment banking firm that has substantial experience in transactions similar to the merger. Pursuant to a letter agreement dated April 25, 2022, Twitter engaged Goldman Sachs to act as its financial advisor in connection with the merger. The engagement letter between Twitter and Goldman Sachs provides for a transaction fee that is estimated, based on the information available as of the date of announcement, at approximately $80 million, $15 million of which became payable at announcement of the merger, and the reminder of which is contingent upon consummation of the merger. In addition, Twitter has agreed to reimburse Goldman Sachs for certain of its expenses, including attorneys' fees and disbursements, and to indemnify Goldman Sachs and related persons against various liabilities, including certain liabilities under the federal securities laws.

**Opinion of J.P. Morgan Securities LLC**

Pursuant to an engagement letter, Twitter retained J.P. Morgan as its financial advisor in connection with the proposed merger.

At the meeting of the Twitter Board on April 25, 2022, J.P. Morgan rendered its oral opinion to the Twitter Board that, as of such date and based upon and subject to the factors and assumptions set forth in its opinion, the consideration to be paid to Twitter's common stockholders in the proposed transaction was fair, from a financial point of view, to such stockholders. J.P. Morgan has confirmed its April 25, 2022 oral opinion by delivering its written opinion to the Twitter Board, dated April 25, 2022, that, as of such date, the consideration to be paid to Twitter's common stockholders in the proposed merger was fair, from a financial point of view, to such stockholders.

**The full text of the written opinion of J.P. Morgan dated April 25, 2022, which sets forth, among other things, the assumptions made, matters considered and limits on the review undertaken, is attached as Annex D to this proxy statement and is incorporated herein by reference. The summary of the opinion of J.P. Morgan set forth in this proxy statement is qualified in its entirety by reference to the full text of such opinion. Twitter's stockholders are urged to read the opinion in its entirety. J.P. Morgan's written opinion was addressed to the Twitter Board (in its capacity as such) in connection with and for the purposes of its evaluation of the proposed merger, was directed only to the $54.20 per share in cash to be paid to holders of Twitter common stock pursuant to the merger agreement and did not address any other aspect of the merger. J.P. Morgan expressed no opinion as to the fairness of the consideration to the holders of any class of Twitter securities, creditors or other constituencies of Twitter or as to the underlying decision by Twitter to engage in the proposed merger. The issuance of J.P. Morgan's opinion was approved by a fairness committee of J.P. Morgan. The summary of the opinion of J.P. Morgan set forth in this proxy statement is qualified in its entirety by reference to the full text of**

-71-

Table of Contents

**such opinion. The opinion does not constitute a recommendation to any stockholder of Twitter as to how such stockholder should vote with respect to the proposed merger or any other matter.**

In arriving at its opinion, J.P. Morgan, among other things:

- reviewed the merger agreement;

- reviewed certain publicly available business and financial information concerning Twitter and the industries in which it operates;

- compared the proposed financial terms of the merger with the publicly available financial terms of certain transactions involving companies J.P. Morgan deemed relevant and the consideration paid for such companies;

- compared the financial and operating performance of Twitter with publicly available information concerning certain other companies J.P. Morgan deemed relevant and reviewed the current and historical market prices of the Twitter common stock and certain publicly traded securities of such other companies;

- reviewed certain internal financial analyses and forecasts prepared by the management of Twitter relating to its business; and

- performed such other financial studies and analyses and considered such other information as J.P. Morgan deemed appropriate for the purposes of its opinion.

In addition, J.P. Morgan held discussions with certain members of the management of Twitter with respect to certain aspects of the merger, and the past and current business operations of Twitter, the financial condition and future prospects and operations of Twitter, and certain other matters J.P. Morgan believed necessary or appropriate to its inquiry.

In giving its opinion, J.P. Morgan relied upon and assumed the accuracy and completeness of all information that was publicly available or was furnished to or discussed with J.P. Morgan by Twitter or otherwise reviewed by or for J.P. Morgan, and J.P. Morgan did not independently verify (and did not assume responsibility or liability for independently verifying) any such information or its accuracy or completeness. J.P. Morgan did not conduct and was not provided with any valuation or appraisal of any assets or liabilities, nor did J.P. Morgan evaluate the solvency of Twitter or Parent under any state or federal laws relating to bankruptcy, insolvency or similar matters. In relying on financial analyses and forecasts provided to J.P. Morgan or derived therefrom, J.P. Morgan assumed that they were reasonably prepared based on assumptions reflecting the best currently available estimates and judgments by management as to the expected future results of operations and financial condition of Twitter to which such analyses or forecasts relate. J.P. Morgan expressed no view as to such analyses or forecasts or the assumptions on which they were based. J.P. Morgan also assumed that the merger and the other transactions contemplated by the merger agreement will be consummated as described in the merger agreement. J.P. Morgan also assumed that the representations and warranties made by Twitter and Parent in the merger agreement and the related agreements were and will be true and correct in all respects material to its analysis. J.P. Morgan is not a legal, regulatory or tax expert and relied on the assessments made by advisors to Twitter with respect to such issues. J.P. Morgan further assumed that all material governmental, regulatory or other consents and approvals necessary for the consummation of the merger will be obtained without any adverse effect on Twitter or on the contemplated benefits of the merger.

-72-

Table of Contents

The projections furnished to J.P. Morgan were prepared by Twitter's management, as discussed more fully in the section of this proxy statement captioned "—*Unaudited Prospective Financial Information*." Twitter does not publicly disclose internal long-term forecasts or management projections of the type provided to J.P. Morgan in connection with J.P. Morgan's analysis of the proposed merger, and such projections were not prepared with a view toward public disclosure. These projections were based on numerous variables and assumptions that are inherently uncertain and may be beyond the control of Twitter's management, including, without limitation, factors related to general economic and competitive conditions and prevailing interest rates. Accordingly, actual results could vary significantly from those set forth in such projections. For more information regarding the use of projections and other forward-looking statements, please refer to the section captioned "—*Unaudited Prospective Financial Information*."

J.P. Morgan's opinion was necessarily based on economic, market and other conditions as in effect on, and the information made available to J.P. Morgan as of, the date of such opinion. J.P. Morgan's opinion noted that subsequent developments may affect J.P. Morgan's opinion, and that J.P. Morgan does not have any obligation to update, revise, or reaffirm such opinion. J.P. Morgan's opinion is limited to the fairness, from a financial point of view, of the $54.20 per share in cash to be paid to holders of Twitter common stock in the transaction pursuant to the merger agreement, and J.P. Morgan has expressed no opinion as to the fairness of any consideration to the holders of any other class of securities, creditors or other constituencies of Twitter or the underlying decision by Twitter to engage in the merger. Furthermore, J.P. Morgan expressed no opinion with respect to the amount or nature of any compensation to any officers, directors, or employees of any party to the proposed merger, or any class of such persons relative to the consideration in the proposed merger or with respect to the fairness of any such compensation. J.P. Morgan expressed no opinion as to the price at which Twitter's common stock will trade at any future time.

J.P. Morgan was not authorized and did not solicit any expressions of interest from any other parties with respect to the sale of all or any part of Twitter or any other alternative transaction.

The terms of the merger agreement, including the merger consideration, were determined through arm's length negotiations between Twitter, Elon Musk and Parent, and the decision to enter into the merger agreement was solely that of the Twitter Board. J.P. Morgan's opinion and financial analyses were only one of the many factors considered by the Twitter Board in its evaluation of the proposed merger and should not be viewed as determinative of the views of the Twitter Board or management with respect to the proposed merger or the $54.20 per share in cash to be paid to holders of Twitter common stock pursuant to the merger agreement.

In accordance with customary investment banking practice, J.P. Morgan employed generally accepted valuation methodology in rendering its opinion to the Twitter Board on April 25, 2022 and in the financial analyses presented to the Twitter Board on such date in connection with the rendering of such opinion. The following is a summary of the material financial analyses utilized by J.P. Morgan in connection with rendering its opinion to the Twitter Board and does not purport to be a complete description of the analyses or data presented by J.P. Morgan. Some of the summaries of the financial analyses include information presented in tabular format. The tables are not intended to stand alone, and in order to more fully understand the financial analyses used by J.P. Morgan, the tables must be read together with the full text of each summary. Considering the data set forth below without considering the full narrative description of the financial analyses, including the methodologies and assumptions underlying the analyses, could create a misleading or incomplete view of J.P. Morgan's analyses.

-73-

**Table of Contents**

### Public Trading Multiples

Using publicly available information, J.P. Morgan compared selected financial data of Twitter with similar data for selected publicly traded companies engaged in businesses which J.P. Morgan judged to be analogous to the business of Twitter. The companies selected by J.P. Morgan (which we refer to for purposes of this section of the proxy statement as the "**selected companies**") were:

- Alphabet Inc.

- Meta Platforms, Inc.

- Pinterest, Inc.

- Snap Inc.

The selected companies were chosen, among other reasons, because they are publicly traded companies with operations and businesses that, for purposes of J.P. Morgan's analyses, may be considered sufficiently similar to those of Twitter based on business sector participation, operational characteristics and financial metrics. However, none of the selected companies reviewed is identical to Twitter and certain of these companies have financial and operating characteristics that are materially different from those of Twitter. The analyses necessarily involve complex considerations and judgments concerning differences in financial and operational characteristics of the companies involved and other factors that could affect the companies differently than they would affect Twitter.

Using information obtained from the selected companies' public filings and FactSet Research Systems as of April 22, 2022, J.P. Morgan calculated, for each selected company, the ratio of such company's firm value (which we refer to for purposes of this section of the proxy statement as "**FV**") to the consensus equity research analyst estimates for the company's adjusted earnings before interest, taxes, depreciation and amortization pre-stock based compensation (which we refer to for purposes of this section of the proxy statement as "**Adj. EBITDA**") for the year ending December 31, 2023 (which we refer to for purposes of this section of the proxy statement as the "**FV/2023E Adj. EBITDA**"). The results of this analysis are indicated in the following table:

|  | FV/<br>2023E Adj. EBITDA |
|---|---|
| Alphabet Inc. | 10.4 x |
| Meta Platforms, Inc. | 6.7 x |
| Pinterest, Inc. | 11.2 x |
| Snap Inc. | 30.2 x |
| **Median** | **10.8 x** |

Based on the results of the above analysis and on other factors J.P. Morgan considered appropriate based on their experience and professional judgment, J.P. Morgan selected a FV/2023E Adj. EBITDA multiple reference range for Twitter of 15.0x to 17.5x. J.P. Morgan then applied that range to Twitter's adjusted EBITDA of $2,685 million forecasted for the year ending December 31, 2023, as provided by Twitter management, yielding implied trading values for Twitter's common stock, rounded to the nearest $0.10, of approximately $49.70 to $57.50 per share.

### Selected Transaction Multiples Analysis

Using publicly available information, J.P. Morgan reviewed selected transactions since 2009 in excess of $1 billion involving companies that engaged in businesses that J.P. Morgan judged to be reasonably

-74-

Table of Contents

analogous to the business of Twitter or aspects thereof. None of the selected transactions reviewed was identical to the merger contemplated by the merger agreement. Certain of these transactions may have characteristics that are materially different from those of the merger. However, the selected transactions were chosen because certain aspects of the transactions, for purposes of J.P. Morgan's analysis, may be considered similar to the merger. The analyses necessarily involve complex considerations and judgments concerning differences in financial and operational characteristics of the companies involved and other factors that could affect the transactions differently than they would affect the merger. For each of the selected transactions, using publicly available information, J.P. Morgan calculated the multiple of the target company's firm value implied in the relevant transaction by the consideration paid in such transaction to the target company's Adj. EBITDA for the 12-month period immediately preceding the announcement of the applicable transaction (which we refer to for purposes of this section of the proxy statement as the "**FV/LTM Adj. EBITDA**"). Specifically, J.P. Morgan reviewed the following transactions:

| Announcement Date | Acquiror | Target | FV/LTM Adj. EBITDA |
|---|---|---|---|
| Feb 2021 | Magnite, Inc. | SpotX, Inc. | 33.4 x |
| Jun 2020 | Just Eat Takeaway.com N.V. | Grubhub Inc. | 47.4 |
| Dec 2019 | Hellman & Friedman LLC | AutoScout24 | 26.1 |
| May 2018 | Silver Lake | ZPG Plc | 21.5 |
| Jun 2016 | Microsoft Corporation | LinkedIn Corporation | 31.2 |
| Nov 2015 | Expedia, Inc. | HomeAway, Inc. | 36.4 |
| Aug 2015 | Liberty Media Corporation | zulily, inc. | 50.6 |
| Jul 2014 | Zillow, Inc. | Trulia, Inc. | nm |
| Jun 2014 | The Priceline Group Inc. | OpenTable, Inc. | 29.9 |
| Nov 2012 | priceline.com Incorporated | KAYAK Software Corporation | 27.6 |
| May 2011 | Microsoft Corporation | Skype S. à r.l | 32.2 |

Based on the results of this analysis and other factors that J.P. Morgan considered appropriate based on their experience and professional judgment, J.P. Morgan selected a FV/LTM Adj. EBITDA multiple reference range of 28.0x to 36.0x. J.P. Morgan then applied that reference range to Twitter's adjusted EBITDA of $1,448 million (which is adjusted to exclude a one-time litigation-related net charge of $766 million) for the year ended December 31, 2021, to produce a range of implied equity values per share of Twitter common stock, rounded to the nearest $0.10, of $50.00 to $63.40.

### Discounted Cash Flow Analysis

J.P. Morgan conducted a discounted cash flow analysis for the purpose of determining the fully diluted equity value per share for Twitter's common stock. A discounted cash flow analysis is a method of evaluating an asset using estimates of the future unlevered free cash flows generated by the asset and taking into consideration the time value of money with respect to those future cash flows by calculating their "**present value**." The "**unlevered free cash flows**," for purposes of the discounted cash flow analysis, refers to a calculation of the future cash flows generated by an asset without including in such calculation any debt servicing costs. "**Present value**" refers to the current value of the future cash flows generated by the asset, and is obtained by discounting those cash flows back to the present using a discount rate that takes into account macro-economic assumptions and estimates of risk, the cost of capital and other appropriate factors. "**Terminal value**" refers to the present value of all future cash flows generated by the asset for periods beyond the projections period.

J.P. Morgan calculated the unlevered free cash flows that Twitter is expected to generate during fiscal years 2022 through 2027 based upon financial projections prepared by Twitter's management through the year ended December 31, 2027 and more fully described in the section of this proxy statement captioned "—*Unaudited Prospective Financial Information*." J.P. Morgan also calculated a range of terminal values for

-75-

Table of Contents

Twitter by applying terminal growth rates ranging from 6.0% to 7.0% to the unlevered free cash flows of Twitter at the end of fiscal year 2027. The unlevered free cash flows and the range of terminal values were then discounted to present values using a range of discount rates from 10.25% to 11.25%, which was chosen by J.P. Morgan based upon an analysis of the cost of capital of Twitter, which takes into account certain company-specific metrics, including Twitter's target capital structure, the cost of equity, the pre-tax cost of debt, long-term debt, forecasted tax rate and predicted (Barra) beta.

In addition, as directed by the management of Twitter, J.P. Morgan calculated the present value of certain tax credits expected to be utilized by Twitter through fiscal year 2027, which were discounted from June 30 of each year to present values as of December 31, 2021 using the same mid-year convention and a discount range of 10.25% to 11.25%. The total tax credit utilization amounts provided by management of Twitter were $0 million, $689 million, $934 million, $1,226 million, $127 million and $0 million for each of fiscal years 2022 through 2027, respectively. The present values were then added together with the present values derived based on the unlevered free cash flows to derive a range of firm values for Twitter, which was then adjusted to take into account Twitter's net cash totaling $1,364 million in the aggregate as of December 31, 2021 to derive a range of implied equity values for Twitter.

Based on the results of this analysis, J.P. Morgan arrived at a range of implied equity value per share for Twitter common stock, rounded to the nearest $0.10, of $36.50 to $57.60.

### Miscellaneous

The foregoing summary of certain material financial analyses does not purport to be a complete description of the analyses or data presented by J.P. Morgan. The preparation of a fairness opinion is a complex process and is not necessarily susceptible to partial analysis or summary description. J.P. Morgan believes that the foregoing summary and its analyses must be considered as a whole and that selecting portions of the foregoing summary and these analyses, without considering all of its analyses as a whole, could create an incomplete view of the processes underlying the analyses and its opinion. As a result, the ranges of valuations resulting from any particular analysis or combination of analyses described above were merely utilized to create points of reference for analytical purposes and should not be taken to be the view of J.P. Morgan with respect to the actual value of Twitter. The order of analyses described does not represent the relative importance or weight given to those analyses by J.P. Morgan. In arriving at its opinion, J.P. Morgan did not attribute any particular weight to any analyses or factors considered by it and did not form an opinion as to whether any individual analysis or factor (positive or negative), considered in isolation, supported or failed to support its opinion. Rather, J.P. Morgan considered the totality of the factors and analyses performed in determining its opinion.

Analyses based upon forecasts of future results are inherently uncertain, as they are subject to numerous factors or events beyond the control of the parties and their advisors. Accordingly, forecasts and analyses used or made by J.P. Morgan are not necessarily indicative of actual future results, which may be significantly more or less favorable than suggested by those analyses. Moreover, J.P. Morgan's analyses are not and do not purport to be appraisals or otherwise reflective of the prices at which businesses actually could be acquired or sold. None of the selected companies reviewed as described in the above summary is identical to Twitter, and none of the selected transactions reviewed was identical to the merger. However, the companies selected were chosen because they are publicly traded companies with operations and businesses that, for purposes of J.P. Morgan's analysis, may be considered similar to those of Twitter. The transactions selected were similarly chosen because their participants, size and other factors, for purposes of J.P. Morgan's analysis, may be considered similar to the merger. The analyses necessarily involve complex considerations and judgments concerning differences in financial and operational characteristics of the companies involved and other factors that could affect the companies compared to Twitter and the transactions compared to the merger.

-76-

Table of Contents

As a part of its investment banking business, J.P. Morgan and its affiliates are continually engaged in the valuation of businesses and their securities in connection with mergers and acquisitions, investments for passive and control purposes, negotiated underwritings, secondary distributions of listed and unlisted securities, private placements, and valuations for corporate and other purposes. J.P. Morgan was selected to advise Twitter with respect to the merger and deliver an opinion to the Twitter Board with respect to the merger on the basis of, among other things, such experience and its qualifications and reputation in connection with such matters and its familiarity with Twitter and the industries in which it operates.

For services rendered in connection with the merger and the delivery of the opinion, Twitter has agreed to pay J.P. Morgan a fee of approximately $53,000,000, of which $5,000,000 became payable upon delivery of the opinion and the remainder of which is contingent and payable only upon the closing of the merger. In addition, Twitter has agreed to reimburse J.P. Morgan for its expenses incurred in connection with its services, including the fees and disbursements of counsel, and will indemnify J.P. Morgan against certain liabilities arising out of J.P. Morgan's engagement. During the two years preceding the date of J.P. Morgan's opinion, J.P. Morgan and its affiliates have had commercial or investment banking relationships with Twitter for which J.P. Morgan and such affiliates have received customary compensation. Such services during such period have included acting as joint lead bookrunner on Twitter's offerings of convertible debt securities in March 2021 and senior debt securities in February 2022. In addition, J.P. Morgan's commercial banking affiliate is an agent bank and a lender under outstanding credit facilities of Twitter, for which it receives customary compensation or other financial benefits. In addition, J.P. Morgan and its affiliates hold, on a proprietary basis, less than 1% of the outstanding common stock of Twitter. During the two year period preceding delivery of its opinion on April 25, 2022, the aggregate fees recognized by J.P. Morgan from Twitter were approximately $9,000,000. During the two years preceding the date of J.P. Morgan's opinion, neither J.P. Morgan nor its affiliates have had any financial advisory or other material commercial or investment banking relationships with Elon Musk or his affiliates, Elon Musk Revocable Trust, Tesla Inc. and Space Exploration Technologies Corp. In the ordinary course of their businesses, J.P. Morgan and its affiliates may actively trade the debt and equity securities or financial instruments (including derivatives, bank loans or other obligations) of Twitter for their own accounts or for the accounts of customers and, accordingly, they may at any time hold long or short positions in such securities or other financial instruments.

In addition, an affiliate of J.P. Morgan is a party to certain note hedge and warrant transactions relating to convertible debt securities issued by Twitter in June 2018, (which we refer to for purposes of this section of the proxy statement as the "**note hedge and warrant transactions**"). Such J.P. Morgan affiliate entered into such note hedge and warrant transactions as principal for its own account and not as an advisor to Twitter. Pursuant to the terms of the note hedge and warrant transactions, such transactions may be adjusted, exercised, cancelled and/or terminated in connection with certain events relating to the merger.

Prior to Twitter's entry into the merger agreement, J.P. Morgan provided to the management of Twitter certain estimates and analyses concerning the impact of the proposed transaction on the note hedge and warrant transactions, based on, among other things, certain theoretical models, various assumptions concerning the terms of the proposed transaction, certain information provided by the derivatives trading personnel responsible for J.P. Morgan's affiliate's position as principal in the note hedge and warrant transactions and market conditions and other information available at the time. The estimates and analyses calculated, over a range of hypothetical purchase prices for the shares of Twitter common stock (ranging from $54.20 per share to $80.00 per share) and other stated assumptions, that such J.P. Morgan affiliate might realize an estimated net gain ranging from approximately $49 million to approximately $58 million upon a full unwind of the note hedge and warrant transactions (after taking into account any hedging gains or losses).

-77-

Table of Contents

**Unaudited Prospective Financial Information**

Other than in connection with our regular earnings press releases and related investor materials, we do not, as a matter of course, make public projections as to our long-term future financial performance, due to, among other reasons, the uncertainty, unpredictability and subjectivity of the underlying assumptions and estimates. However, Twitter management regularly prepares projections as to our future financial performance for internal use.

In connection with our strategic planning process and evaluation of strategic alternatives (including continuing as an independent company), Twitter management prepared and reviewed with the Twitter Board various unaudited forward-looking financial information for fiscal years 2022 through 2027 as part of Twitter management's business plan, including the Unaudited Prospective Financial Information set forth below. As part of its review, the Twitter Board assessed and considered certain other estimates prepared by Twitter management as to our long-term prospects, reflecting different assumptions with respect to market share sensitivities (ranging in increases from 2.5% to 4.6% of market share by fiscal year 2027), cost efficiencies and growth. The Twitter Board used these sensitivities to inform its assessment of the Unaudited Prospective Financial Information. The Unaudited Prospective Financial Information was prepared for internal use only and not for public disclosure and was provided to the Twitter Board for the purposes of considering, analyzing and evaluating the merger and strategic alternatives thereto. At the direction of the Twitter Board, the Unaudited Prospective Financial Information was also provided to, and approved for use by, Goldman Sachs and J.P. Morgan for purposes of performing their respective financial analyses in connection with rendering their respective opinions to the Twitter Board (as more fully described in the sections of this proxy statement captioned "—*Opinion of Goldman Sachs & Co. LLC*" and "—*Opinion of J.P. Morgan Securities LLC*"). With Twitter's consent, Goldman Sachs and J.P. Morgan assumed that the Unaudited Prospective Financial Information was reasonably prepared and reflected the best currently available estimates and judgments as to Twitter's future financial performance. No Unaudited Prospective Financial Information was provided to Mr. Musk or any of his affiliates or representatives prior to the execution of the merger agreement.

The Unaudited Prospective Financial Information was developed by Twitter management as then current estimates of our future financial performance as an independent company, without giving effect to the merger, including any impact of the negotiation or execution of the merger agreement or the merger, the expenses that have already and will be incurred in connection with completing the merger, or any changes to Twitter's operations or strategy that may be implemented in connection with the pendency of, or following the consummation of, the merger. The Unaudited Prospective Financial Information also does not consider the effect of any failure of the merger to be completed; it should not be viewed as accurate or continuing in that context.

The Unaudited Prospective Financial Information was not prepared with a view toward public disclosure or complying with accounting principles generally accepted in the United States (which we refer to as "**GAAP**"). In addition, the Unaudited Prospective Financial Information was not prepared with a view toward compliance with published guidelines of the SEC or the guidelines established by the American Institute of Certified Public Accountants for preparation or presentation of prospective financial information. The Unaudited Prospective Financial Information included in this document has been prepared by, and is the responsibility of, Twitter's management. Neither PricewaterhouseCoopers LLP nor any other independent accountants have audited, reviewed, examined, compiled nor applied agreed-upon procedures with respect to the Unaudited Prospective Financial Information and, accordingly, they do not express an opinion or any other form of assurance with respect thereto. The PricewaterhouseCoopers LLP report incorporated by reference relates solely to Twitter's previously issued financial statements. It does not extend to the Unaudited Prospective Financial Information and should not be read to do so.

-78-

Table of Contents

Although the Unaudited Prospective Financial Information is presented with numerical specificity, it reflects numerous assumptions and estimates as to future events, including those detailed above, made by Twitter management that Twitter management believed in good faith were reasonable. Twitter's ability to achieve the financial results contemplated by the Unaudited Prospective Financial Information will be affected by our ability to achieve our strategic goals, objectives and targets over the applicable periods and subject to operational and execution risks associated therewith. The Unaudited Prospective Financial Information reflects assumptions as to certain business decisions that are subject to change. Important factors that may affect actual results and cause the Unaudited Prospective Financial Information not to be achieved include, among others, (1) general economic conditions; (2) our ability to achieve operating objectives with respect to expenses and operating margins, as well the risks to our ability to retain and grow users and revenues resulting from the execution of those objectives; (3) our ability to achieve the various monetization, market share and other assumptions underlying the Unaudited Prospective Financial Information; (4) changes in laws, regulations and taxes relevant to Twitter's business; (5) competitive pressures in the social media industry, including new products and market entrants and changes in the competitive environment; (6) customer demand for our products and services; (7) our ability to attract, integrate and retain qualified personnel; and (8) uncertainty in the timing of relevant transactions and resulting cash inflows and outflows. Additional factors that may impact us or our business can be found in the various risk factors included in our periodic filings with the SEC. All of these factors are difficult to predict, and many of them are outside of our control. As a result, there can be no assurance that the Unaudited Prospective Financial Information will be realized, and actual results may be materially better or worse than those contained in the Unaudited Prospective Financial Information. The Unaudited Prospective Financial Information may differ from publicized analyst estimates and forecasts and does not consider any events or circumstances after the date that it was prepared, including the announcement of or the entry into the merger agreement. You should evaluate the Unaudited Prospective Financial Information, if at all, in conjunction with our historical financial statements and other information regarding Twitter contained in our public filings with the SEC. The Unaudited Prospective Financial Information may not be consistent with Twitter's historical operating data as a result of the assumptions detailed above. Except to the extent required by applicable federal securities laws, we do not intend to update or otherwise revise the Unaudited Prospective Financial Information to reflect circumstances existing after the date that such information was prepared or to reflect the occurrence of future events.

Because the Unaudited Prospective Financial Information reflects estimates and judgments, it is susceptible to sensitivities and assumptions, as well as to multiple interpretations based on actual experience and business developments. The Unaudited Prospective Financial Information also covers multiple years, and such information by its nature becomes less predictive with each succeeding year. The Unaudited Prospective Financial Information is not, and should not be considered to be, a guarantee of future operating results. Further, the Unaudited Prospective Financial Information is not fact and should not be relied upon as being necessarily indicative of our future results or for purposes of making any investment decision.

Certain of the financial measures included in the Unaudited Prospective Financial Information are non-GAAP financial measures (which we refer to as the "**non-GAAP financial measures**"). These are financial performance measures that are not calculated in accordance with GAAP. These non-GAAP financial measures should not be viewed as a substitute for GAAP financial measures, and may be different from similarly titled non-GAAP financial measures used by other companies. Furthermore, there are limitations inherent in non-GAAP financial measures because they exclude charges and credits that are required to be included in a GAAP presentation. Accordingly, these non-GAAP financial measures should be considered together with, and not as an alternative to, financial measures prepared in accordance with GAAP. Financial measures included in forecasts provided to a financial advisor and a board of directors in connection with a business combination transaction, such as the Unaudited Prospective Financial Information, are excluded from the definition of "non-GAAP financial

-79-

Table of Contents

measures" under applicable SEC rules and regulations. As a result, the Unaudited Prospective Financial Information is not subject to SEC rules regarding disclosures of non-GAAP financial measures, which would otherwise require a reconciliation of a non-GAAP financial measure to a GAAP financial measure. Reconciliations of non-GAAP financial measures were not provided to or relied upon by the Twitter Board, Goldman Sachs or J.P. Morgan. Accordingly, no reconciliation of the financial measures included in the Unaudited Prospective Financial Information is provided in this proxy statement.

The Unaudited Prospective Financial Information constitutes forward-looking statements. By including the Unaudited Prospective Financial Information in this proxy statement, none of Twitter, Goldman Sachs or J.P. Morgan, or any of our or Goldman Sachs' or J.P. Morgan's representatives, has made or makes any representation to any person regarding our ultimate performance as compared to the information contained in the Unaudited Prospective Financial Information. The inclusion of the Unaudited Prospective Financial Information should not be regarded as an indication that the Twitter Board, Twitter, Goldman Sachs, J.P. Morgan or any other recipient of the Unaudited Prospective Financial Information considered, or now considers, the Unaudited Prospective Financial Information to be predictive of Twitter's performance or actual future results. For information on factors that may cause our future results to materially vary, see the section of this proxy statement captioned "Forward-Looking Statements." Further, the inclusion of the Unaudited Prospective Financial Information in this proxy statement does not constitute an admission or representation by Twitter that the information presented is material. The Unaudited Prospective Financial Information is included in this proxy statement solely to give our stockholders access to the information that was made available to the Twitter Board, Goldman Sachs and J.P. Morgan. The Unaudited Prospective Financial Information is not included in this proxy statement in order to influence any Twitter stockholder as to how to vote at the special meeting with respect to the merger, or whether to seek appraisal rights with respect to their shares.

The following table presents a summary of unaudited projections with respect to Twitter's long-term future financial performance as an independent company for fiscal years 2022 through 2027, as prepared and used as described above (which we refer to as the "**Unaudited Prospective Financial Information**"). Twitter management made various judgments and assumptions when preparing the Unaudited Prospective Financial Information, including, among others (1) revenues growing 22% year-over-year in fiscal year 2022 (excluding in fiscal year 2021 revenues from Twitter's MoPub and MoPub Acquire (formerly known as CrossInstall) businesses that were sold or wound down by Twitter on or before January 1, 2022) and 21% year-over-year in fiscal year 2023, estimated taking into account the impact of ongoing macroeconomic concerns (including inflation, rising energy costs, and declining consumer confidence) and the military conflict in Ukraine on the digital advertising market and brand advertising specifically, and excluding potential revenues from new initiatives; (2) operating improvements to Twitter's business resulting in total cash operating expenses growing 19% year-over-year in fiscal year 2022 (excluding in fiscal year 2021 expenses related to the settlement of a shareholder class action lawsuit in 2021) and 4% year-over-year in fiscal year 2023, estimated taking into account actions that Twitter management anticipated to execute as an independent company in response to macroeconomic concerns, and resulting in Adjusted EBITDA margins of 27% in fiscal year 2022 and 37% in fiscal year 2023; (3) revenue extrapolations for fiscal years 2024 through 2027 assuming market share increases to 3.3% by fiscal year 2027 of the relevant digital advertisements market (excluding China and search advertisement markets); (4) expense extrapolations for fiscal years 2024 through 2027 assuming expenses will grow at a rate of approximately 82.5% to 90% of revenue growth in the long-term; and (5) a cash tax rate of 18% of GAAP operating income, excluding the impact of cash tax savings from net operating losses (which we refer to as "**NOLs**").

-80-

Table of Contents

|  | Fiscal year ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E |
|  | (in millions) | | | | | |
| Revenue | $5,928 | $7,200 | $8,481 | $9,793 | $11,264 | $12,917 |
| Adjusted EBITDA (1) | $1,602 | $2,685 | $3,243 | $3,846 | $4,558 | $5,399 |
| GAAP operating income | $(47) | $917 | $1,192 | $1,517 | $1,932 | $2,455 |
| Cash taxes (2) | $ 0 | $165 | $215 | $273 | $348 | $442 |
| Amortization of intangibles | $33 | $45 | $51 | $58 | $64 | $71 |
| Depreciation | $669 | $823 | $934 | $1,033 | $1,132 | $1,230 |
| Capital expenditures | $968 | $982 | $1,018 | $1,077 | $1,014 | $1,033 |
| Changes in net working capital | $11 | $(259) | $(111) | $(125) | $(150) | $(181) |
| Stock-based compensation expenses | $864 | $900 | $1,066 | $1,238 | $1,430 | $1,643 |
| Unlevered free cash flow (3) | $561 | $1,279 | $1,900 | $2,371 | $3,046 | $3,742 |
| Unlevered free cash flow (less stock-based compensation expenses) (4) | $(303) | $379 | $834 | $1,133 | $1,616 | $2,099 |

(1)   Adjusted EBITDA is calculated as GAAP operating income adjusted to exclude stock-based compensation expense, depreciation and amortization expense, and other expenses.

(2)   Cash taxes is based on a cash tax rate of 18% of GAAP operating income, excluding the impact of cash tax savings from NOLs.

(3)   Unlevered Free Cash Flow is calculated as GAAP operating income, subtracting the impact of cash taxes (excluding the impact of cash tax savings from NOLs) and capital expenditures, adding the impact of stock-based compensation and depreciation and amortization (including amortization of intangibles), and adding or subtracting, as applicable, changes in net working capital.

(4)   Unlevered Free Cash Flow (less stock-based compensation expenses) is calculated as GAAP operating income, subtracting the impact of cash taxes (excluding the impact of cash tax savings from NOLs) and capital expenditures, adding the impact of depreciation and amortization (including amortization of intangibles) and adding or subtracting, as applicable, changes in net working capital. Unlevered Free Cash Flow (less stock-based compensation expenses) was used by Goldman Sachs in performing its financial analyses in connection with its opinion as described in the section of this proxy statement captioned "—*Opinion of Goldman Sachs & Co. LLC*" and by J.P. Morgan in performing its financial analyses in connection with its opinion as described in the section of this proxy statement captioned "—*Opinion of J.P. Morgan Securities LLC.*"

## Interests of Twitter's Directors and Executive Officers in the Merger

When considering the recommendation of the Twitter Board that you vote to approve the proposal to adopt the merger agreement, you should be aware that our directors and executive officers may have interests in the merger that are different from, or in addition to, the interests of our stockholders. In (1) evaluating and negotiating the merger agreement; (2) approving the merger agreement and the merger; and (3) recommending that the merger agreement be adopted by our stockholders, the Twitter Board was aware of and considered these interests to the extent that they existed at the time, among other matters. These interests are more fully described below.

### *Insurance and Indemnification of Directors and Executive Officers*

Pursuant to the terms of the merger agreement, directors and officers of Twitter will be entitled to certain ongoing indemnification and insurance coverage, including under directors' and officers' liability

-81-

Table of Contents

insurance policies. For more information, see the section of this proxy statement captioned "*The Merger Agreement—Indemnification and Insurance.*"

### Treatment of Equity-Based Awards

#### Treatment of Twitter equity-based awards

As of April 29, 2022, there were outstanding awards of Twitter RSUs (or portions thereof) that cover an aggregate of 68,591,795 shares of our common stock, of which Twitter RSUs covering an aggregate of 9,546 shares of our common stock were held by our current non-employee directors and of which Twitter RSUs covering an aggregate of 6,275,132 shares of our common stock were held by our current executive officers. As of the same date, there were outstanding awards of Twitter PSUs that cover an aggregate of 4,559,722 shares of our common stock (at target level of performance) and 9,119,444 shares of our common stock (at maximum level of performance), of which Twitter PSUs covering an aggregate of 4,186,561 shares of our common stock (at target level of performance) and 8,373,122 shares of our common stock (at maximum level of performance) were held by our current executive officers and of which none were held by our current non-employee directors.

At the effective time of the merger, each vested Twitter equity-based award (other than a vested Twitter option) outstanding as of immediately prior to the effective time of the merger will be canceled and converted into the right to receive an amount in cash, without interest and less any required withholding taxes, equal to the product of (1) the per share price and (2) the total number of shares of our common stock subject to such vested Twitter equity-based award (and with respect to any vested equity-based awards subject to performance vesting conditions, calculated based on the achievement of the applicable performance metrics at the level of performance at which such equity-based award vested in accordance with its terms).

At the effective time of the merger, each unvested Twitter equity-based award (other than an unvested Twitter option) outstanding as of immediately prior to the effective time of the merger will be canceled and converted into the right to receive an amount in cash, without interest and less any required withholding taxes, equal to the product of (1) the per share price and (2) the total number of shares of our common stock subject to such unvested Twitter equity-based award (and with respect to any unvested equity-based awards subject to performance vesting conditions, calculated based on the achievement of the applicable performance metrics at the target level of performance), which amount will, subject to the holder's continued service with Parent and its affiliates (including the surviving corporation and its subsidiaries) through the applicable vesting dates, vest and be payable at the same time as the unvested Twitter equity-based award for which such cash amount was exchanged would have vested pursuant to its terms and will otherwise remain subject to the same terms and conditions as were applicable to the unvested Twitter equity-based award immediately prior to the effective time of the merger (other than performance-based vesting conditions).

#### Treatment of Twitter options

As of April 29, 2022, there were outstanding Twitter options to purchase an aggregate of 938,282 shares of our common stock with an exercise price below the per share price, 800,000 of which were held by our current non-employee directors and none of which were held by our current executive officers.

At the effective time of the merger, each vested Twitter option outstanding as of immediately prior to the effective time of the merger will be canceled and converted into the right to receive an amount in cash, without interest and less any required withholding taxes, equal to the product of (1) the excess, if any, of the per share price less the exercise price per share of our common stock underlying such Twitter option, and (2) the total number of shares of our common stock subject to such Twitter option.

-82-

Table of Contents

At the effective time of the merger, each unvested Twitter option outstanding as of immediately prior to the effective time of the merger will be canceled and converted into the right to receive an amount in cash, without interest and less any required withholding taxes, equal to the product of (1) the excess, if any, of the per share price less the exercise price per share of our common stock underlying such Twitter option, and (2) the total number of shares of our common stock subject to such Twitter option, which cash amount will, subject to the holder's continued service with Parent and its affiliates (including the surviving corporation and its subsidiaries) through the applicable vesting dates, vest and be payable at the same time as the unvested Twitter option for which such cash amount was exchanged would have vested pursuant to its terms and will otherwise remain subject to the same terms and conditions as were applicable to the unvested Twitter option immediately prior to the effective time of the merger. Any Twitter options for which the exercise price per share of our common stock underlying such Twitter options is equal to or greater than the per share price will be canceled without any cash payment or other consideration being made in respect of such Twitter option.

*Treatment of the ESPP*

The Twitter Board has adopted resolutions that provide that (1) the current offering period under the ESPP will be the final offering period and no further offering period will commence pursuant to the ESPP after the date of the merger agreement, and (2) except as may be required by law, each individual participating in the final offering period as of the date of the merger agreement will not be permitted to (a) increase his or her payroll contribution rate pursuant to the ESPP from the rate in effect when the final offering period commenced or (b) make separate non-payroll contributions to the ESPP on or following the date of the merger agreement. Prior to the effective time of the merger, Twitter will take all actions that may be necessary to give effect to the treatment described above and to (x) cause the final offering period, to the extent that it would otherwise be outstanding at the effective time, to be terminated no later than 10 business days prior to the date on which the effective time of the merger occurs; (y) make any pro rata adjustments that may be necessary to reflect the final offering period, but otherwise treat the final offering period as a fully effective and completed offering period for all purposes pursuant to the ESPP; and (z) cause the exercise (as of no later than 10 business days prior to the date on which the effective time of the merger occurs) of each outstanding purchase right pursuant to the ESPP. On such exercise date, Twitter will apply the funds credited as of such date pursuant to the ESPP within each participant's payroll withholding account to the purchase of whole shares of our common stock in accordance with the terms of the ESPP, and such shares of our common stock will be entitled to the per share price. Immediately prior to and effective as of the effective time of the merger (but subject to the consummation of the merger), Twitter will terminate the ESPP.

*Equity Interests of Twitter's Directors and Executive Officers*

The following table sets forth for each of Twitter's executive officers and non-employee directors, (1) the number of shares of our common stock directly held; (2) the number of shares of our common stock subject to his or her Twitter RSUs and Twitter PSUs (at levels of achievement assumed in the merger agreement); and (3) the number of shares of our common stock subject to Twitter options with a per share exercise price less than the per share price, assuming the following and such additional assumptions set forth in the footnotes to the table:

- the shares held directly include shares of our common stock directly held by the individual as of April 29, 2022, plus any shares of our common stock subject to Twitter RSUs and Twitter PSUs that are scheduled to vest and be settled before July 29, 2022 (which, solely for purposes of this proxy statement, is the assumed closing date of the merger), without regard to any change in control-related accelerated vesting;

-83-

Table of Contents

- the Twitter RSUs and Twitter PSUs include those that would be outstanding as of July 29, 2022, in accordance with their regular vesting schedules and assuming continued service by the individual through such date;

- the Twitter options include those that would be outstanding as of July 29, 2022, assuming continued service by the individual through such date;

- the values of these shares of our common stock and the shares underlying equity awards are equal to the per share price of $54.20 (minus any applicable exercise price in the case of in-the-money Twitter options); and

- none of the individuals exercises any of his or her Twitter options on or before July 29, 2022, and that no additional Twitter options, Twitter RSUs or Twitter PSUs are granted to any such individual on or before such date.

| Name | Shares Held Directly (1) | | Twitter RSUs and Twitter PSUs (2) | | In-the-Money Twitter Options | | Total ($) |
|---|---|---|---|---|---|---|---|
| | Number of Shares (#) | Value of Shares ($) | Number of Shares (#) | Value ($) | Number of Shares Subject to Option (#) | Value of Shares Subject to Option ($) | |
| Parag Agrawal | 128,753 | 6,978,413 | 1,090,582 | 59,109,544 | — | — | 66,087,957 |
| Ned Segal | 397,493 | 21,544,121 | 845,087 | 45,803,715 | — | — | 67,347,836 |
| Vijaya Gadde | 623,156 | 33,775,055 | 751,176 | 40,713,739 | — | — | 74,488,794 |
| Sarah Personette | 153,931 | 8,343,060 | 717,706 | 38,899,665 | — | — | 47,242,725 |
| Kayvon Beykpour | 120,439 | 6,527,794 | 833,190 | 45,158,898 | — | — | 51,686,692 |
| Nick Caldwell | 19,939 | 1,080,694 | 768,819 | 41,669,990 | — | — | 42,750,684 |
| Bruce Falck (3) | 144,301 | 7,821,114 | — | — | — | — | 7,821,114 |
| Jack Dorsey | 18,042,428 | 977,899,598 | — | — | — | — | 977,899,598 |
| Matthew Derella (4) | 185 | 10,027 | — | — | — | — | 10,027 |
| Michael Montano (5) | 324,674 | 17,597,331 | — | — | — | — | 17,597,331 |
| Mimi Alemayehou | 3,735 | 202,437 | — | — | — | — | 202,437 |
| Jesse Cohn (6) | 7,535 | 408,397 | — | — | — | — | 408,397 |
| Egon Durban (7) | 15,013 | 813,705 | — | — | — | — | 813,705 |
| Martha Lane Fox | 32,545 | 1,763,939 | — | — | — | — | 1,763,939 |
| Omid Kordestani (8) | 934,247 | 50,636,187 | 50,000 | 2,710,000 | 800,000 | 20,112,000 | 73,458,187 |
| Fei-Fei Li | 10,676 | 578,639 | — | — | — | — | 578,639 |
| Ngozi Okonjo-Iweala (9) | 16,230 | 879,666 | — | — | — | — | 879,666 |
| Patrick Pichette | 24,823 | 1,345,407 | — | — | — | — | 1,345,407 |
| David Rosenblatt | 109,827 | 5,952,623 | — | — | — | — | 5,952,623 |
| Bret Taylor | 56,597 | 3,067,557 | — | — | — | — | 3,067,557 |
| Robert Zoellick | 21,535 | 1,167,197 | — | — | — | — | 1,167,197 |

_____

(1)   Represents shares of our common stock held as of April 29, 2022, plus any shares of our common stock subject to Twitter RSUs and Twitter PSUs that are scheduled to vest and be settled before July 29, 2022 (without regard to any change in control-related accelerated vesting). The amounts shown are determined assuming that no individual will acquire or dispose of shares of our common stock from April 29, 2022, through July 29, 2022, and that the Twitter RSUs and Twitter PSUs scheduled to vest and be settled prior to July 29, 2022, are so settled. The number of shares shown does not include shares of our common stock that the executive officer may purchase after the date of the merger agreement under the ESPP. The number of

-84-

Table of Contents

shares shown does not include equity awards that Twitter expects to grant to its non-employee directors on the date of its annual meeting of stockholders, as discussed in Twitter's definitive proxy statement on Schedule 14A filed with the SEC on April 13, 2021 in the section captioned "Board of Directors and Corporate Governance—Director Compensation—Equity Compensation." For additional information regarding the treatment of our ESPP in the merger, see the section of this proxy statement captioned "—*Treatment of the ESPP.*" For additional information regarding beneficial ownership of common stock, see the section of this proxy statement captioned "*Security Ownership of Certain Beneficial Owners and Management.*"

(2)    Represents outstanding Twitter RSUs and Twitter PSUs (at levels of achievement assumed in the merger agreement) that are not scheduled to vest on or before July 29, 2022. The values shown with respect to Twitter RSUs and Twitter PSUs are determined as the product of the per share merger consideration multiplied by the total number of shares of our common stock subject to Twitter RSUs or Twitter PSUs, as applicable. The number of shares of our common stock subject to Twitter PSUs is based on the levels of achievement assumed in the merger agreement. Accordingly, the number of shares represents unvested Twitter PSUs covering a total of 711,862 shares of our common stock for Mr. Agrawal; 498,721 shares of our common stock for Mr. Segal; 445,814 shares of our common stock for Ms. Gadde; 352,373 shares of our common stock for Ms. Personette; 490,522 shares of our common stock for Mr. Beykpour; 373,161 shares of our common stock for Mr. Caldwell; and 50,000 shares of our common stock for Mr. Kordestani. As described further in the section of this proxy statement captioned "—*2013 Equity Incentive Plan*" Twitter RSUs outstanding as of the date of the closing of the merger (which date, solely for purposes of this proxy statement, is assumed to be July 29, 2022) that are held by our non-employee directors will accelerate vesting in full (at target levels of achievement) if a non-employee director's service is terminated, other than upon a voluntary resignation. In addition, each of the Twitter executive officers is eligible for vesting acceleration of his or her Twitter RSUs and Twitter PSUs in connection with certain qualifying terminations of employment under the severance policy. For additional information regarding the Twitter RSUs and Twitter PSUs for our named executive officers, see the section of this proxy statement captioned "—*Golden Parachute Compensation.*"

(3)    Mr. Falck served as an executive officer of Twitter until May 2022. The table reflects Mr. Falck's holdings as of the date of his termination of service as an employee rather than his holdings using the assumptions in footnotes (1) and (2) above.

(4)    Mr. Derella served as an executive officer of Twitter until August 2021. To Twitter's knowledge, as of December 31, 2021, Mr. Derella held 185 shares of our common stock.

(5)    Mr. Montano served as an executive officer of Twitter until December 2021. To Twitter's knowledge, as of December 31, 2021, Mr. Montano held 324,674 shares of our common stock.

(6)    Mr. Cohn served as a member of the Twitter Board until June 2021. To Twitter's knowledge, as of the date of his departure, Mr. Cohn held 7,535 shares of our common stock.

(7)    These securities are held by Mr. Durban for the benefit of Silver Lake Technology Management, L.L.C., certain of its affiliates, and certain of the funds they manage.

(8)    All of the shares subject to the option held by Mr. Kordestani are fully vested and exercisable as of April 29, 2022.

(9)    Dr. Okonjo-Iweala served as a member of the Twitter Board until February 2021. To Twitter's knowledge, as of the date of her departure, Dr. Okonjo-Iweala held 16,230 shares of our common stock.

*2013 Equity Incentive Plan*

We have granted certain Twitter RSUs and Twitter PSUs under our 2013 Equity Incentive Plan (which we refer to as the "**2013 Plan**") that are outstanding and held by our non-employee directors and executive officers, including pursuant to our Outside Director Compensation Policy for awards that are held by our non-employee directors. The 2013 Plan provides that in the event of a merger or change in control, with respect to awards granted to a non-employee director that are assumed or substituted for, the participant will fully vest in and have the right to exercise any outstanding options and stock appreciation rights and all restrictions on other outstanding awards will lapse if such participant's service is terminated following the merger or change in control (other than by voluntary resignation).

-85-

Table of Contents

The 2013 Plan further provides that in connection with such vesting acceleration, with respect to any awards with performance-based vesting, all performance goals or other vesting criteria applicable to such award will be deemed achieved at 100 percent of target levels. The closing of the merger will constitute a "change in control" under the 2013 Plan. Under the merger agreement, all awards held by non-employee directors will vest immediately prior to the effective time.

### Severance Policy

We have entered into participation agreements with each of our executive officers under our severance policy, which provides payments and benefits to the executive officers in the event of an involuntary termination within the COC period (which we refer to as a "**COC Qualifying Termination**") or during the normal course of business and outside of the COC period (which we refer to as a "**Non-COC Qualifying Termination**").

Upon the occurrence of a Non-COC Qualifying Termination, each of our executive officers will become eligible to receive the following payments and benefits:

- a lump sum payment equal to 100 percent of base salary;

- payment of COBRA continuation coverage premiums for up to 12 months, or taxable payments in lieu of such payment; and

- acceleration of vesting of 12.5 percent of the executive officer's then-unvested equity awards for executive officers (with performance-based vesting deemed achieved at target levels as to that percentage), other than with respect to our chief executive officer (as described below).

Upon the occurrence of a COC Qualifying Termination, each of our executive officers will become eligible to receive the following payments and benefits:

- a lump sum payment equal to 100 percent of base salary;

- payment of COBRA continuation coverage premiums for up to 12 months, or taxable payments in lieu of such payment; and

- 50 percent (or, in the case of Messrs. Agrawal and Segal, 100 percent) acceleration of vesting of unvested equity awards (with performance-based vesting deemed achieved at target levels as to that percentage).

Notwithstanding the foregoing, the benefits and rights payable to Mr. Agrawal under the severance policy are qualified by the terms of certain provisions set forth in his offer letter with us, entered into on November 29, 2021 (which we refer to as the "**Agrawal offer letter**"), which are described in the immediately following section below.

All payments under the severance policy are subject to the execution and non-revocation of our standard separation agreement and release of claims, which includes non-solicitation, non-disparagement and confidentiality conditions.

In the event that payments to an executive officer under the severance policy would be subject to excise taxes under Section 280G and 4999 of the Internal Revenue Code, such payments will be reduced if and to the extent such reduction would result in a better result to the executive officer taking into account applicable taxes.

-86-

Table of Contents

### *Agrawal Offer Letter*

The terms of the participation in our severance policy of our chief executive officer, Mr. Agrawal, are subject to the terms of certain provisions provided for in the Agrawal offer letter. The Agrawal offer letter, in relevant part, provides (1) that in the event of a Non-COC Qualifying Termination, there will be accelerated vesting of equity awards that would have vested within 12 months after the termination of employment (or 37.5 percent of all outstanding awards if the termination is before January 1, 2025), but otherwise consistent with the terms of the severance policy, including (but not limited to) with respect to performance-based awards, provided that performance-based awards granted after the date of the Agrawal offer letter will be subject to the terms of the applicable award agreement if such agreement expressly sets forth a different treatment, and provided that for any equity awards with respect to which, at the time of termination of employment, it is known that the applicable performance goals were attained, vesting will be applied at the greater of target or actual performance, (2) "Good Reason" will include (among other items) "a material adverse change in the nature or scope of Mr. Agrawal's authority, powers, functions, duties, responsibilities, or reporting relationship (including ceasing to directly report to our board of directors of a publicly traded entity, if applicable) ," and (3) no amendment to the severance policy that would adversely affect Mr. Agrawal's rights under the severance policy will be made without his prior written consent, provided that commencing January 1, 2024, Twitter may, following a notice period of at least 12 months, adopt amendments that are materially detrimental to his rights under the severance policy so long as the amendment is not effective until January 1, 2025 at the earliest.

### *Golden Parachute Compensation*

The information set forth in the tables below is intended to comply with Item 402(t) of Regulation S-K, which requires disclosure of information about certain compensation for each of Twitter's named executive officers (who we refer to as "**NEOs**") that is based on or otherwise relates to the merger and assumes, among other things, that the merger is consummated, the merger constitutes a COC of Twitter and that the NEOs will incur a severance-qualifying termination of employment immediately following consummation of the merger.

The amounts indicated below are estimates based on multiple assumptions that may or may not actually occur or be accurate on the relevant date, including assumptions described below, and do not reflect certain compensation actions that may occur before the consummation of the merger. If payments to an NEO under the severance policy would be subject to excise taxes under Section 280G and 4999 of the Internal Revenue Code, such payments will be reduced if and to the extent such reduction would result in a better result to the NEO taking into account applicable taxes. For purposes of calculating such amounts, Twitter has assumed:

- July 29, 2022 as the date on which the merger is consummated.

- Each NEO experiences an involuntary termination on July 29, 2022, based on the terms of the severance policy and, for Mr. Agrawal, the Agrawal offer letter.

-87-

Table of Contents

- A price per share of our common stock of $54.20.

| Name | Cash ($) (1) | Equity ($) (2) | Perquisites Benefits ($) (3) | Total ($) |
|------|-------------|----------------|------------------------------|-----------|
| Parag Agrawal | 1,000,000 | 59,109,544 | 9,172 | 60,118,716 |
| Ned Segal | 600,000 | 45,803,715 | 31,730 | 46,435,445 |
| Vijaya Gadde | 600,000 | 20,357,032 | 31,730 | 20,988,762 |
| Sarah Personette | 600,000 | 19,449,995 | 27,377 | 20,077,372 |
| Jack Dorsey (4) | — | — | — | — |
| Mike Montano (5) | — | — | — | — |

(1) As discussed above, under the severance policy and the Agrawal offer letter, upon an involuntary termination during the applicable COC period, each of the NEOs would be entitled to receive a cash amount equal to 100 percent of the NEO's annual base salary, which is in each case payable in a lump sum on the 61st day following the involuntary termination:

All components of the cash severance amount are "double-trigger" (i.e., they are contingent upon an involuntary termination during the applicable COC period) and are subject to the NEO's execution, effectiveness and non-revocation of a release of claims our standard separation agreement and release of claims.

(2) Under the severance policy and the Agrawal offer letter, an involuntary termination within the applicable COC period would result in acceleration of vesting of 50 percent (or 100 percent in the case of Mr. Agrawal and Mr. Segal) of the shares underlying all of the executive officer's then-unvested equity awards (with performance-based vesting deemed achieved at target levels as to that percentage), subject to the NEO's execution and non-revocation of our standard separation agreement and release of claims, which currently includes non-solicitation, non-disparagement and confidentiality conditions. Set forth below are the values of each type of unvested equity-based award held by the NEOs that would become vested upon an involuntary termination immediately following the consummation of a change of control of Twitter. Amounts are calculated assuming a price of $54.20 per share.

| Name | Twitter RSUs ($) (i) | Twitter PSUs ($) (i)(ii) |
|------|----------------------|--------------------------|
| Parag Agrawal | 20,526,624 | 38,582,920 |
| Ned Segal | 18,773,037 | 27,030,678 |
| Vijaya Gadde | 8,275,364 | 12,081,668 |
| Sarah Personette | 9,900,660 | 9,549,335 |

(i) Reflects the value of accelerated vesting of 50 percent (or 100 percent in the case of Mr. Agrawal and Mr. Segal) of outstanding Twitter RSUs and Twitter PSUs for all NEOs, pursuant to the severance policy and the Agrawal offer letter, as described in more detail above.

(ii) Reflects the value of Twitter PSUs that would be available for vesting upon deemed achievement of all performance goals at target levels, pursuant to the severance policy and the Agrawal offer letter, as described in more detail above.

(3) This amount represents the value of the cost of payment for up to 12 months of premiums under COBRA to continue health insurance coverage for each NEO and their eligible dependents that were covered under our healthcare plan, which would be triggered upon an involuntary termination immediately following the consummation of a change of control of Twitter. This double-trigger benefit is subject to the NEO's execution and non-revocation of our standard separation agreement and release of claims, which currently includes non-solicitation, non-disparagement and confidentiality conditions.

(4) Mr. Dorsey is a named executive officer of Twitter for Twitter's most recently completed fiscal year. Mr. Dorsey resigned as Chief Executive Officer of Twitter effective as of November 29, 2021 and has never participated in the severance policy or has any outstanding equity awards. Mr. Dorsey continues to serve on the Twitter Board as a non-employee director.

(5) Mr. Montano is a named executive officer of Twitter for Twitter's most recently completed fiscal year. Mr. Montano stepped down from his position as Engineering Lead effective December 31, 2021 and remained

-88-

Table of Contents

an advisor of Twitter through March 31, 2022, to ensure an orderly transition. Mr. Montano no longer participates in the severance policy or has any outstanding equity awards.

### *Arrangements with Parent, Acquisition Sub and Mr. Musk*

As of the date of this proxy statement, none of our directors or executive officers has entered into an agreement with Parent, Acquisition Sub, Mr. Musk, or any of their respective affiliates regarding the potential terms of their individual employment arrangements or other retention following the consummation of the merger, or the right to purchase or participate in the equity of the surviving corporation or one or more of its affiliates in connection with the merger. However, prior to the effective time of the merger, Parent, Mr. Musk, or their respective affiliates may have discussions with certain of Twitter's employees (including certain of its executive officers) regarding employment or other retention terms and may enter into definitive agreements regarding employment, retention, or the right to purchase or participate in the equity of the surviving corporation or one or more of its affiliates in connection with the merger.

On May 5, 2022, Mr. Musk publicly disclosed that he (on behalf of Parent) was having, and would continue to have, discussions with certain existing holders of our common stock (including Mr. Dorsey, one of Twitter's directors) regarding the possibility of contributing shares of our common stock of such holders to Parent, at or immediately prior to the closing of the merger, in order to retain an equity investment in Twitter following completion of the merger in lieu of receiving merger consideration in the merger. Mr. Dorsey informed Twitter that his communications with Mr. Musk regarding these matters first occurred following execution of the merger agreement and that these communications may continue, and may result in Mr. Dorsey continuing to hold equity of the surviving corporation or one or more of its affiliates following the merger. There are no assurances that an agreement will result, or of the amount, if any, of Mr. Dorsey's holdings that will be contributed to Parent, or of the amount, if any, of equity of the surviving corporation or one or more of its affiliates that Mr. Dorsey will hold following the merger.

### Closing and Effective Time of the Merger

The closing of the merger will take place as soon as possible in accordance with the terms of the merger agreement, but no later than the second business day after the satisfaction or waiver of all of the conditions to closing of the merger, other than conditions that by their terms are to be satisfied at the closing of the merger, but subject to the satisfaction or waiver of such conditions at the closing, unless another time, date or place is agreed to in writing by the parties. On the closing date of the merger, the parties will file a certificate of merger with the Secretary of State of the State of Delaware as provided under the DGCL. The merger will become effective on the date and time at which the certificate of merger has been duly filed with the Secretary of State of the State of Delaware or such other date and time as may be agreed to by Twitter and Parent and set forth in such certificate of merger in accordance with the DGCL.

### Appraisal Rights

If the merger is consummated, our stockholders who (1) do not vote in favor of the adoption of the merger agreement, (2) properly demand an appraisal of their applicable shares of our common stock prior to the vote on the adoption of the merger agreement, (3) continuously hold their applicable shares through the effective time of the merger, (4) otherwise comply with the procedures of Section 262 of the DGCL (which we refer to as "**Section 262**"), including by satisfying certain ownership thresholds set forth therein, and (5) do not withdraw their demands or otherwise lose their rights to appraisal may, subject to the conditions of Section 262, seek appraisal of their shares in connection with the merger under Section 262. Unless the context requires otherwise, all references in Section 262 and in this summary to a "stockholder" or to a "holder of shares" are to a record holder of our common stock.

-89-

Table of Contents

The following discussion is not a complete statement of the law pertaining to appraisal rights under the DGCL and is qualified in its entirety by the full text of Section 262, which is attached to this proxy statement as Annex B and incorporated into this proxy statement by reference. The following summary does not constitute any legal or other advice and does not constitute a recommendation that our stockholders exercise their appraisal rights under Section 262. Only a holder of record of shares of our common stock is entitled to demand appraisal of the shares registered in that holder's name. A person having a beneficial interest in shares of our common stock held of record in the name of another person, such as a bank, broker or other nominee, must act promptly to cause the record holder to demand an appraisal of such holder's shares. **If you hold your shares of our common stock through a bank, broker or other nominee and you wish to exercise appraisal rights, you should consult with your bank, broker or the other nominee to ensure that appraisal rights are exercised. Stockholders should carefully review the full text of Section 262 as well as the information discussed below.**

Under Section 262, if the merger is completed, holders of record of shares of our common stock who (1) submit a written demand for appraisal of such stockholder's shares to Twitter prior to the vote on the adoption of the merger agreement; (2) do not vote in favor of the adoption of the merger agreement; and (3) continuously are the record holders of such shares through the effective time of the merger may be entitled to have their shares of our common stock appraised by the Delaware Court of Chancery and to receive payment in cash of the "fair value" of the shares of our common stock, exclusive of any element of value arising from the accomplishment or expectation of the merger, together with (unless the Delaware Court of Chancery in its discretion determines otherwise for good cause shown) interest on the amount determined by the Delaware Court of Chancery to be fair value from the effective date of the merger through the date of payment of the judgment. However, after an appraisal petition has been filed, the Delaware Court of Chancery, at a hearing to determine stockholders entitled to appraisal rights, will dismiss appraisal proceedings as to all of our stockholders who asserted appraisal rights unless (1) the total number of shares of our common stock entitled to appraisal exceeds one percent of the outstanding shares of our common stock as measured in accordance with subsection (g) of Section 262; or (2) the value of the merger consideration in respect of such shares exceeds $1 million. We refer to these conditions as the "**ownership thresholds**." Unless the Delaware Court of Chancery, in its discretion, determines otherwise for good cause shown, interest on an appraisal award will accrue and compound during the period from the effective time of the merger through the date the judgment is paid at five percent over the Federal Reserve discount rate (including any surcharge) as established from time to time during such period (except that, if at any time before the entry of judgment in the proceeding, the surviving corporation makes a voluntary cash payment to each stockholder entitled to appraisal, interest will accrue thereafter only upon the sum of (1) the difference, if any, between the amount so paid and the fair value of the shares as determined by the Delaware Court of Chancery; and (2) interest theretofore accrued, unless paid at that time). The surviving corporation is under no obligation to make such voluntary cash payment prior to such entry of judgment.

Under Section 262, where a merger agreement is to be submitted for adoption at a meeting of stockholders, the corporation, not less than 20 days prior to the meeting, must notify each of its stockholders of record as of the record date for notice of such meeting that appraisal rights are available and include in the notice a copy of Section 262. This proxy statement constitutes Twitter's notice to our stockholders that appraisal rights are available in connection with the merger, and the full text of Section 262 is attached to this proxy statement as Annex B. In connection with the merger, any holder of shares of our common stock who wishes to exercise appraisal rights, or who wishes to preserve such holder's right to do so, should review Annex B carefully. Failure to strictly comply with the requirements of Section 262 in a timely and proper manner may result in the loss of appraisal rights under the DGCL. A stockholder who loses his, her or its appraisal rights will be entitled to receive the per share price described in the merger agreement without interest and less any applicable withholding taxes. Because of the complexity of the procedures for exercising the right to seek appraisal of shares

-90-

Table of Contents

of our common stock, Twitter believes that if a stockholder is considering exercising such rights, that stockholder should seek the advice of legal counsel.

Stockholders wishing to exercise the right to seek an appraisal of their shares of our common stock must do **ALL** of the following:

- the stockholder must not vote in favor of the proposal to adopt the merger agreement;

- the stockholder must deliver to Twitter a written demand for appraisal before the vote on the merger agreement at the special meeting; and

- the stockholder must continuously hold the shares from the date of making the demand through the effective time of the merger (a stockholder will lose appraisal rights if the stockholder transfers the shares before the effective time of the merger).

In addition, after an appraisal petition has been filed, the Delaware Court of Chancery, at a hearing to determine stockholders entitled to appraisal rights, will dismiss appraisal proceedings as to all of our stockholders who asserted appraisal rights unless one of the ownership thresholds is met.

Because a proxy that does not contain voting instructions will, unless revoked, be voted in favor of the adoption of the merger agreement, each of our stockholders who votes by proxy and who wishes to exercise appraisal rights must vote against the adoption of the merger agreement or abstain with respect to such proposal.

### *Filing Written Demand*

A stockholder wishing to exercise appraisal rights must deliver to Twitter, before the vote on the adoption of the merger agreement at the special meeting, a written demand for the appraisal of such stockholder's shares. In addition, that stockholder must not vote or submit a proxy in favor of the adoption of the merger agreement. A vote in favor of the adoption of the merger agreement, in person at the special meeting or by proxy (whether by mail or via the internet or telephone), will constitute a waiver of appraisal rights in respect of the shares so voted and will nullify any previously filed written demands for appraisal. A stockholder exercising appraisal rights must hold of record the shares on the date the written demand for appraisal is made and must continue to hold the shares of record through the effective time of the merger. Neither voting (in person or by proxy) against the adoption of the merger agreement nor abstaining from voting or failing to vote on the proposal to adopt the merger agreement will, in and of itself, constitute a written demand for appraisal satisfying the requirements of Section 262. The written demand for appraisal must be in addition to and separate from any proxy or vote on the adoption of the merger agreement.

Only a holder of record of shares of our common stock is entitled to demand appraisal rights for the shares registered in that holder's name. A demand for appraisal in respect of shares of our common stock should be executed by or on behalf of the holder of record and must reasonably inform Twitter of the identity of the holder and that the stockholder intends thereby to demand an appraisal of such stockholder's shares. If the shares are owned of record in the name of another person, such as a broker, fiduciary, depositary or other nominee, such demand must be executed by or on behalf of the record owner, and if such shares are owned of record by more than one person, as in a joint tenancy or tenancy in common, the demand should be executed by or on behalf of all joint owners. An authorized agent, including an authorized agent for two or more joint owners, may execute a demand for appraisal on behalf of a holder of record; however, the agent must identify the record owner or owners and expressly disclose that, in executing the demand, the agent is acting as agent for the record owner or owners. If a stockholder holds shares of our common stock through a broker who in

-91-

Table of Contents

turn holds the shares through a central securities depository nominee such as Cede & Co., a demand for appraisal of such shares must be made by or on behalf of the depository nominee and must identify the depository nominee as record holder.

STOCKHOLDERS WHO HOLD THEIR SHARES IN "STREET NAME" BY A BANK, BROKER, TRUST OR OTHER NOMINEE AND WHO WISH TO EXERCISE APPRAISAL RIGHTS SHOULD CONSULT WITH THEIR BANK, BROKER, TRUST OR OTHER NOMINEE, AS APPLICABLE, TO DETERMINE THE APPROPRIATE PROCEDURES FOR THE BANK, BROKER, TRUST OR OTHER NOMINEE TO MAKE A DEMAND FOR APPRAISAL OF THOSE SHARES. A PERSON HAVING A BENEFICIAL INTEREST IN SHARES HELD OF RECORD IN THE NAME OF ANOTHER PERSON, SUCH AS A BANK, BROKER, TRUST OR OTHER NOMINEE, MUST ACT PROMPTLY TO CAUSE THE RECORD HOLDER TO FOLLOW PROPERLY AND IN A TIMELY MANNER THE STEPS NECESSARY TO PERFECT APPRAISAL RIGHTS.

All written demands for appraisal pursuant to Section 262 should be mailed or delivered to:

Twitter, Inc.
1355 Market Street, Suite 900
San Francisco, California 94103
Attention: Corporate Secretary

At any time within 60 days after the effective date of the merger, any holder of shares of our common stock who has not commenced an appraisal proceeding or joined that proceeding as a named party may withdraw his, her or its demand for appraisal and accept the per share price offered pursuant to the merger agreement, without interest and less any applicable withholding taxes, by delivering to Twitter, as the surviving corporation, a written withdrawal of the demand for appraisal. However, any such attempt to withdraw the demand made more than 60 days after the effective time of the merger will require written approval of the surviving corporation. Notwithstanding the foregoing, no appraisal proceeding in the Delaware Court of Chancery will be dismissed as to any stockholder without the approval of the Delaware Court of Chancery, and such approval may be conditioned upon such terms as the Delaware Court of Chancery deems just; provided, however, that this will not affect the right of any stockholder who has not commenced an appraisal proceeding or joined that proceeding as a named party to withdraw such stockholder's demand for appraisal and to accept the merger consideration within 60 days after the effective time of the merger. If Twitter, as the surviving corporation, does not approve a request to withdraw a demand for appraisal when that approval is required, or, except with respect to any stockholder who withdraws such stockholder's demand in accordance with the proviso in the immediately preceding sentence, if the Delaware Court of Chancery does not approve the dismissal of an appraisal proceeding with respect to a stockholder, the stockholder will be entitled to receive only the appraised value determined in any such appraisal proceeding, which value could be less than, equal to or more than the per share price being offered pursuant to the merger agreement.

### *Notice by the Surviving Corporation*

If the merger is completed, within 10 days after the effective time of the merger, the surviving corporation will notify each record holder of shares of our common stock who has properly made a written demand for appraisal pursuant to Section 262, and who has not voted in favor of the adoption of the merger agreement, that the merger has become effective and the effective date thereof.

### *Filing a Petition for Appraisal*

Within 120 days after the effective time of the merger, but not thereafter, the surviving corporation or any holder of shares of our common stock who has complied with Section 262 and is entitled to

-92-

Table of Contents

appraisal rights under Section 262 (or a beneficial owner in the circumstances described in the next paragraph) may commence an appraisal proceeding by filing a petition in the Delaware Court of Chancery, with a copy served on the surviving corporation in the case of a petition filed by a stockholder, demanding a determination of the fair value of the shares held by all dissenting stockholders entitled to appraisal. The surviving corporation is under no obligation, and has no present intention, to file a petition, and stockholders should not assume that the surviving corporation will file a petition or initiate any negotiations with respect to the fair value of the shares of our common stock. Accordingly, any holders of shares of our common stock who desire to have their shares appraised should initiate all necessary action to perfect their appraisal rights in respect of their shares of our common stock within the time and in the manner prescribed in Section 262. If no petition for appraisal is filed with the Delaware Court of Chancery within 120 days after the effective time of the merger, stockholders' rights to appraisal shall cease, and all holders of shares of our common stock will be entitled to receive the consideration offered pursuant to the merger agreement, without interest.

Within 120 days after the effective time of the merger, any holder of shares of our common stock who has complied with the requirements for an appraisal of such holder's shares pursuant to Section 262 will be entitled, upon written request, to receive from the surviving corporation a statement setting forth the aggregate number of shares not voted in favor of the adoption of the merger agreement and with respect to which Twitter has received demands for appraisal, and the aggregate number of holders of such shares. The surviving corporation must send this statement to the requesting stockholder within 10 days after receipt by the surviving corporation of the written request for such a statement or within 10 days after the expiration of the period for delivery of demands for appraisal, whichever is later. A beneficial owner of shares of our common stock held either in a voting trust or by a nominee on behalf of such person may, in such person's own name, file a petition seeking appraisal or request from the surviving corporation the foregoing statements. As noted above, however, the demand for appraisal can only be made by a stockholder of record.

If a petition for an appraisal is duly filed by a holder of shares of our common stock and a copy thereof is served upon the surviving corporation, the surviving corporation will then be obligated within 20 days after such service to file with the Delaware Register in Chancery a duly verified list containing the names and addresses of all stockholders who have demanded payment for their shares and with whom agreements as to the value of their shares have not been reached. The Delaware Court of Chancery may order that notice of the time and place fixed for the hearing of such petition be given to the surviving corporation and all of the stockholders shown on the verified list at the addresses stated therein. Any such notice shall also be given by one or more publications at least one week before the day of the hearing in a newspaper of general circulation published in the City of Wilmington, Delaware or any other publication which the Delaware Court of Chancery deems advisable. The costs of any such notice are borne by the surviving corporation.

After notice to dissenting stockholders as required by the court, at the hearing on such petition, the Delaware Court of Chancery will determine the stockholders who have complied with Section 262 and who have become entitled to appraisal rights thereunder. The Delaware Court of Chancery may require the stockholders who demanded appraisal for their shares to submit their stock certificates to the Register in Chancery for notation thereon of the pendency of the appraisal proceedings. If any stockholder fails to comply with the direction, the Delaware Court of Chancery may dismiss the proceedings as to such stockholder.

Pursuant to Section 262(g) of the DGCL, the Delaware Court of Chancery will dismiss appraisal proceedings as to all of our stockholders who assert appraisal rights unless (1) the total number of shares entitled to appraisal exceeds one percent of the outstanding shares of our common stock as measured in accordance with Section 262(g) of the DGCL; or (2) the value of the merger consideration in respect of such shares exceeds $1 million.

-93-

Table of Contents

### Determination of Fair Value

Where proceedings are not dismissed, the appraisal proceeding will be conducted in accordance with the rules of the Delaware Court of Chancery, including any rules specifically governing appraisal proceedings. Through such proceeding, the Delaware Court of Chancery will determine the "fair value" of the shares of our common stock, exclusive of any element of value arising from the accomplishment or expectation of the merger, together with interest, if any, to be paid upon the amount determined to be the fair value. In determining fair value, the Delaware Court of Chancery will take into account all relevant factors. Unless the Delaware Court of Chancery in its discretion determines otherwise for good cause shown, interest from the effective date of the merger through the date of payment of the judgment will be compounded quarterly and will accrue at five percent over the Federal Reserve discount rate (including any surcharge) as established from time to time during the period between the effective date of the merger and the date of payment of the judgment. However, the surviving corporation has the right, at any time prior to the Delaware Court of Chancery's entry of judgment in the proceedings, to make a voluntary cash payment to each stockholder seeking appraisal. If the surviving corporation makes a voluntary cash payment pursuant to subsection (h) of Section 262, interest will accrue thereafter only on the sum of (1) the difference, if any, between the amount paid by the surviving corporation in such voluntary cash payment and the fair value of the shares as determined by the Delaware Court of Chancery; and (2) interest accrued before such voluntary cash payment, unless paid at that time. In *Weinberger v. UOP, Inc.*, the Supreme Court of Delaware discussed the factors that could be considered in determining fair value in an appraisal proceeding, stating that "proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court" should be considered, and that "[f]air price obviously requires consideration of all relevant factors involving the value of a company." The Delaware Supreme Court stated that, in making this determination of fair value, the court must consider market value, asset value, dividends, earnings prospects, the nature of the enterprise and any other facts that could be ascertained as of the date of the merger that throw any light on future prospects of the merged corporation. Section 262 provides that fair value is to be "exclusive of any element of value arising from the accomplishment or expectation of the merger." In *Cede & Co. v. Technicolor, Inc.*, the Delaware Supreme Court stated that such exclusion is a "narrow exclusion [that] does not encompass known elements of value," but which rather applies only to the speculative elements of value arising from such accomplishment or expectation. In *Weinberger*, the Supreme Court of Delaware also stated that "elements of future value, including the nature of the enterprise, which are known or susceptible of proof as of the date of the merger and not the product of speculation, may be considered."

Stockholders considering seeking appraisal should be aware that the fair value of their shares as so determined by the Delaware Court of Chancery could be more than, the same as or less than the consideration they would receive pursuant to the merger if they did not seek appraisal of their shares and that an opinion of an investment banking firm as to the fairness from a financial point of view of the consideration payable in a merger is not an opinion as to, and may not in any manner address, fair value under Section 262. No representation is made as to the outcome of the appraisal of fair value as determined by the Delaware Court of Chancery, and stockholders should recognize that such an appraisal could result in a determination of a value higher or lower than, or the same as, the per share price. Neither Twitter nor Parent anticipates offering more than the per share price to any stockholder exercising appraisal rights, and each of Twitter and Parent reserves the rights to make a voluntary cash payment pursuant to subsection (h) of Section 262 and to assert, in any appraisal proceeding, that for purposes of Section 262, the "fair value" of a share of our common stock is less than the per share price. The costs of the appraisal proceedings (which do not include attorneys' fees or the fees and expenses of experts) may be determined by the Delaware Court of Chancery and taxed upon the parties as the Delaware Court of Chancery deems equitable under the circumstances. Upon application of a stockholder, the Delaware Court of Chancery may also order that all or a portion of the

-94-

Table of Contents

expenses incurred by any stockholder in connection with the appraisal proceeding, including, without limitation, reasonable attorney's fees and the fees and expenses of experts, be charged pro rata against the value of all the shares entitled to an appraisal. In the absence of such determination or assessment, each party bears its own expenses.

If any stockholder who demands appraisal of his, her or its shares of our common stock under Section 262 fails to perfect, or loses or validly withdraws, such holder's right to appraisal, the stockholder's shares of our common stock will be deemed to have been converted at the effective time of the merger into the right to receive the per share price as provided in the merger agreement.

From and after the effective time of the merger, no stockholder who has demanded appraisal rights in compliance with Section 262 will be entitled to vote such shares of our common stock for any purpose or to receive payment of dividends or other distributions on the stock (except dividends or other distributions payable to stockholders of record at a date which is prior to the effective date of the merger).

Failure to comply strictly with all of the procedures set forth in Section 262 may result in the loss of a stockholder's statutory appraisal rights. In that event, you will be entitled to receive the per share price for your dissenting shares in accordance with the merger agreement, without interest and less any applicable withholding taxes. Consequently, any stockholder wishing to exercise appraisal rights is encouraged to consult legal counsel before attempting to exercise those rights.

**Accounting Treatment**

The merger is expected to be accounted for as a "purchase business combination" for financial accounting purposes.

**Material U.S. Federal Income Tax Consequences of the Merger**

The following discussion is a summary of the material U.S. federal income tax consequences of the merger that may be relevant to U.S. Holders and Non-U.S. Holders (each as defined below) of shares of our common stock whose shares are converted into the right to receive cash pursuant to the merger. This discussion is based upon the Internal Revenue Code of 1986 (which we refer to as the "**Code**"). Treasury Regulations promulgated under the Code, court decisions, published positions of the Internal Revenue Service (which we refer to as the "**IRS**") and other applicable authorities, all as in effect on the date of this proxy statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. This discussion is limited to holders who hold their shares of our common stock as "capital assets" within the meaning of Section 1221 of the Code (generally, property held for investment purposes).

This discussion is for general information only and does not address all of the tax consequences that may be relevant to holders in light of their particular circumstances. For example, this discussion does not address:

- tax consequences that may be relevant to holders who may be subject to special treatment under U.S. federal income tax laws, such as financial institutions; tax-exempt organizations; S corporations, partnerships and any other entity or arrangement treated as a partnership or pass-through entity for U.S. federal income tax purposes; insurance companies; mutual funds; dealers in stocks and securities; traders in securities that elect to use the mark-to-market method of accounting for their securities; regulated investment companies; real estate investment trusts; entities subject to the U.S. anti-inversion rules; holders who hold their common stock as "qualified small business stock" for purposes of Sections 1045 and 1202 of the Code; or certain former citizens or long-term residents of the United States;

-95-

Table of Contents

- tax consequences to holders holding the shares as part of a hedging, constructive sale or conversion, straddle or other risk reduction transaction;

- tax consequences to holders who received their shares of our common stock in a compensatory transaction or pursuant to the exercise of options or warrants or whose common stock is subject to employment-based vesting;

- tax consequences to U.S. Holders whose "functional currency" is not the U.S. dollar;

- tax consequences to holders who hold their common stock through a bank, financial institution or other entity, or a branch thereof, located, organized or resident outside the United States;

- tax consequences arising from the Medicare tax on net investment income;

- tax consequences to holders subject to special tax accounting rules as a result of any item of gross income with respect to the shares of our common stock being taken into account in an "applicable financial statement" (as defined in the Code);

- the U.S. federal estate, gift or alternative minimum tax consequences, if any;

- any territory, state, local or non-U.S. tax consequences; or

- tax consequences to holders that do not vote in favor of the merger and who properly demand appraisal of their shares under Section 262 of the DGCL.

If a partnership (including an entity or arrangement, domestic or foreign, treated as a partnership for U.S. federal income tax purposes) is a beneficial owner of shares of our common stock, then the tax treatment of a partner in such partnership will generally depend upon the status of the partner and the activities of the partner and the partnership. Partnerships holding shares of our common stock and partners therein should consult their tax advisors regarding the consequences of the merger.

No ruling has been or will be obtained from the IRS regarding the U.S. federal income tax consequences of the merger described below. If the IRS contests a conclusion set forth herein, no assurance can be given that a holder would ultimately prevail in a final determination by a court.

**THIS DISCUSSION IS PROVIDED FOR GENERAL INFORMATION ONLY AND DOES NOT CONSTITUTE LEGAL ADVICE TO ANY HOLDER. A HOLDER SHOULD CONSULT ITS OWN TAX ADVISORS CONCERNING THE U.S. FEDERAL INCOME TAX CONSEQUENCES RELATING TO THE MERGER IN LIGHT OF ITS PARTICULAR CIRCUMSTANCES AND ANY CONSEQUENCES ARISING UNDER FEDERAL NON-INCOME TAX LAWS OR THE LAWS OF ANY TERRITORY, STATE, LOCAL OR NON-U.S. TAXING JURISDICTION.**

*U.S. Holders*

For purposes of this discussion, a "**U.S. Holder**" is a beneficial owner of shares of our common stock that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States or any state thereof or the District of Columbia;

-96-

Table of Contents

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust that (1) is subject to the primary supervision of a court within the United States and the control of one or more United States persons as defined in section 7701(a)(30) of the Code; or (2) has a valid election in effect under applicable Treasury regulations to be treated as a United States person.

The receipt of cash by a U.S. Holder in exchange for shares of our common stock pursuant to the merger will be a taxable transaction for U.S. federal income tax purposes. In general, such U.S. Holder's gain or loss will be equal to the difference, if any, between the amount of cash received and the U.S. Holder's adjusted tax basis in the shares surrendered pursuant to the merger. A U.S. Holder's adjusted tax basis generally will equal the amount that such U.S. Holder paid for the shares. Such gain or loss will be capital gain or loss and will be long-term capital gain or loss if such U.S. Holder's holding period in such shares is more than one year at the time of the completion of the merger. A reduced tax rate on capital gain generally will apply to long-term capital gain of a non-corporate U.S. Holder (including individuals). The deductibility of capital losses is subject to limitations. If a U.S. Holder acquired different blocks of shares of our common stock at different times and different prices, such holder must determine its adjusted tax basis and holding period separately with respect to each block of our common stock.

### Non-U.S. Holders

#### General

For purposes of this discussion, the term "**Non-U.S. Holder**" means a beneficial owner of shares of our common stock that is neither a U.S. Holder nor a partnership for U.S. federal income tax purposes.

Subject to the discussion below relating to FATCA, any gain realized by a Non-U.S. Holder pursuant to the merger generally will not be subject to U.S. federal income tax unless:

- the gain is effectively connected with a trade or business of such Non-U.S. Holder in the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States), in which case such gain generally will be subject to U.S. federal income tax at rates generally applicable to U.S. persons, and, if the Non-U.S. Holder is a corporation, such gain may also be subject to the branch profits tax at a rate of 30 percent (or a lower rate under an applicable income tax treaty);

- such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of the completion of the merger, and certain other specified conditions are met, in which case such gain will be subject to U.S. federal income tax at a rate of 30 percent (or a lower rate under an applicable income tax treaty); or

- Twitter is or has been a "United States real property holding corporation" as such term is defined in Section 897(c) of the Code (which we refer to as "**USRPHC**"), at any time within the shorter of the five-year period preceding the merger or such Non-U.S. Holder's holding period with respect to the applicable shares of our common stock (which we refer to as the "relevant period") and, if shares of our common stock are regularly traded on an established securities market (within the meaning of Section 897(c)(3) of the Code), such Non-U.S. Holder owns (directly, indirectly or constructively) more than five percent of our common stock at any time during the relevant period, in which case such gain will be subject to U.S. federal income tax at

-97-

Table of Contents

rates generally applicable to U.S. persons (as described in the first bullet point above), except that the branch profits tax will not apply. Generally, a corporation is a USRPHC if the fair market value of its U.S. real property interests (as defined in the Code) equals or exceeds 50 percent of the sum of the fair market value of its worldwide real property interests plus its other assets used or held for use in a trade or business. For this purpose, U.S. real property interests generally include land, improvements and associated personal property. Although there can be no assurances in this regard, we believe that we are not, and have not been, a USRPHC at any time during the five-year period preceding the merger. Non-U.S. Holders are encouraged to consult their own tax advisors regarding the possible consequences to them if we are a USRPHC.

*Withholding on Foreign Entities*

Sections 1471 through 1474 of the Code, and the Treasury regulations and administrative guidance issued thereunder (which we refer to as "**FATCA**"), impose a U.S. federal withholding tax of 30 percent on certain payments made to a "foreign financial institution" (as specially defined under these rules) unless such institution enters into an agreement with the U.S. government to withhold on certain payments and to collect and provide to the U.S. tax authorities substantial information regarding certain U.S. account holders of such institution (which includes certain equity and debt holders of such institution, as well as certain account holders that are foreign entities with U.S. owners) or an exemption applies. FATCA also generally will impose a U.S. federal withholding tax of 30 percent on certain payments made to a non-financial foreign entity unless such entity provides the withholding agent a certification identifying certain direct and indirect U.S. owners of the entity or an exemption applies. An intergovernmental agreement between the United States and an applicable foreign country may modify these requirements. Under certain circumstances, a Non-U.S. Holder might be eligible for refunds or credits of such taxes. The Treasury Department recently released proposed regulations which, if finalized in their present form, would eliminate the federal withholding tax of 30 percent applicable to the gross proceeds of a sale or other disposition of our common stock. In its preamble to such proposed regulations, the U.S. Treasury Department stated that taxpayers may generally rely on the proposed regulations until final regulations are issued.

Holders of our common stock are encouraged to consult with their own tax advisors regarding the possible implications of FATCA on the disposition of our common stock pursuant to the merger.

### *Information Reporting and Backup Withholding*

Information reporting and backup withholding (at a current rate of 24 percent) may apply to the proceeds received by a holder pursuant to the merger. Backup withholding generally will not apply to (1) a U.S. Holder that furnishes a correct taxpayer identification number and certifies that such U.S. Holder is not subject to backup withholding on IRS Form W-9 (or a substitute or successor form); or (2) a Non-U.S. Holder that (a) provides a certification of such Non-U.S. Holder's non-U.S. status on the appropriate series of IRS Form W-8 (or a substitute or successor form); or (b) otherwise establishes an exemption from backup withholding. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against the holder's U.S. federal income tax liability, if the required information is timely furnished to the IRS.

## Regulatory Approvals Required for the Merger

### *General Efforts*

Under the merger agreement, Parent, Acquisition Sub and Twitter agreed to use their respective reasonable best efforts to consummate and make effective the transactions contemplated by the

-98-

Table of Contents

merger agreement and to cause the conditions to the merger to be satisfied, including using reasonable best efforts to accomplish the following:

- the obtaining of all necessary actions or non-actions, consents and approvals from governmental authorities necessary in connection with the consummation of the transactions contemplated by the merger agreement, including the merger, and the making of all necessary registrations and filings (including filings with governmental authorities, if any) and the taking of all reasonable steps as may be necessary to obtain an approval from, or to avoid an action or proceeding by, any governmental authority necessary in connection with the consummation of the transactions contemplated by the merger agreement, including the merger;

- the obtaining of all other necessary consents, approvals or waivers from third parties;

- the defending of any lawsuits or other legal proceedings through the termination date, whether judicial or administrative, challenging the merger agreement or the consummation of the transactions contemplated by the merger agreement, including the merger, performed or consummated by such party in accordance with the terms of the merger agreement, including seeking to have any stay or temporary restraining order entered by any court or other governmental authority vacated or reversed; and

- the execution and delivery of any additional instruments reasonably necessary to consummate the merger and any other transactions to be performed or consummated by such party in accordance with the terms of the merger agreement and to carry out fully the purposes of the merger agreement.

Mr. Musk, Parent and Acquisition Sub have further agreed to, subject to the terms of the merger agreement, take promptly any and all steps necessary to avoid or eliminate each and every impediment and obtain all consents, approvals or waivers (or, as applicable, expiration or termination of the waiting periods with respect thereto) under any antitrust laws, foreign investment laws or other law that may be required by any foreign or U.S. federal, state or local governmental authority, in each case, with competent jurisdiction, so as to enable the parties to consummate the transactions contemplated by the merger agreement, including the merger, as promptly as practicable, except that none of Parent, Acquisition Sub or any of their affiliates are obligated under the merger agreement to (i) propose, take, or agree to take any actions that would individually or in the aggregate have a material adverse effect on the business, assets, or financial condition of Twitter and its subsidiaries, taken as a whole or (ii) propose, negotiate, effect or agree to, the sale, divestiture, lease, license, hold separate, transfer, or disposition of, or any restriction on the freedom of action with respect to, any assets, business, or equity holdings of, or held or controlled directly or indirectly by, Mr. Musk or any affiliate of Parent (other than Parent, Acquisition Sub or Twitter after giving effect to the merger and subject to the restrictions set forth in this paragraph).

The obligations of Twitter, Parent and Acquisition Sub to consummate the merger are subject to, among other conditions, the expiration of any waiting period (and any extension thereof) applicable to the merger under the HSR Act and the receipt of consents or approvals that are material and required or advisable, in the view of Parent and Twitter, under applicable antitrust laws and foreign investment laws of certain specified jurisdictions (which we collectively refer to as the "**specified regulatory laws**") or, as applicable, the waiting periods with respect thereto shall have expired or been terminated, to the extent applicable. In addition, additional consents and approvals under applicable antitrust laws, foreign investment laws and other laws of other jurisdictions may be sought pursuant to the obligations described above if Parent and Twitter determine a filing, submission or notification is material and required or advisable in such jurisdiction or if regulators in such a jurisdiction open an investigation regarding the merger.

-99-

Table of Contents

### HSR Act; Competition Laws and Foreign Investment Laws

#### HSR Act

Under the HSR Act, the merger cannot be completed until Parent and Twitter file a Notification and Report Form with the Federal Trade Commission (which we refer to as the "**FTC**") and the Antitrust Division of the Department of Justice (which we refer to as the "**DOJ**"), and the applicable waiting period has expired or been terminated. A transaction notifiable under the HSR Act may not be completed until the expiration of a 30-calendar day waiting period following the parties' filing of their respective HSR Act notification forms or the early termination of the waiting period. The parties filed a notification and report form with the FTC and DOJ pursuant to the HSR Act on May 3, 2022. The waiting period under the HSR Act is set to expire at 11:59 p.m., Eastern time, on June 2, 2022. The DOJ or the FTC may extend the 30 day waiting period by issuing a Request for Additional Information and documentary materials (also known as a "**Second Request**"). If either agency issues a Second Request, the waiting period is extended until 30 days after the parties substantially comply with the request.

At any time before or after consummation of the merger, notwithstanding the termination of the waiting period under the HSR Act, the FTC or the DOJ could take such action under the antitrust laws as it deems necessary or desirable, including seeking to enjoin the completion of the merger, seeking divestiture of substantial assets of the parties or requiring the parties to license, or hold separate, assets or terminate existing relationships and contractual rights. At any time before or after the completion of the merger, and notwithstanding the termination of the waiting period under the HSR Act, any state or the District of Columbia could take such action under the antitrust laws as it deems necessary or desirable. Such action could include seeking to enjoin the completion of the merger or seeking divestiture of substantial assets of Twitter or Parent. Private parties may also seek to take legal action under the antitrust laws under certain circumstances.

#### United Kingdom – Competition Laws

Specifically, the completion of the merger is subject to obtaining a favorable outcome from the United Kingdom's Competition and Markets Authority (which we refer to as the "**CMA**") either by (i) the CMA indicating that it has no further questions about the merger in response to an informal briefing paper submitted by the parties; or (ii) if the parties file a formal merger notice, the CMA approving the merger (either unconditionally or conditional upon certain remedies). Upon the acceptance by the CMA of a complete merger notice, the CMA has 40 working days in which to complete its initial Phase I review. At the end of Phase I, the CMA must confirm whether it has a reasonable belief that there is a realistic prospect that the merger will lessen competition substantially. If so, the CMA must refer the merger to a Phase II review, unless adequate remedies are offered by the parties within five working days of the CMA's Phase I decision. Where Phase I remedies are offered, the CMA must decide whether to accept the remedies "in principle" within 10 working days of the Phase I decision and must take a final decision on whether to accept the remedies within 50 working days of the Phase I decision, subject to a possible 40 working day extension at the CMA's discretion. If a Phase II investigation is launched, the CMA has 24 weeks, extendable by up to eight weeks at the CMA's discretion if it considers there are special reasons for doing so, to decide if the merger should be prohibited or approved conditional on remedies. The parties submitted an informal briefing paper to the CMA on May 16, 2022.

#### United Kingdom – Foreign Investment Laws

If the merger is a "notifiable acquisition" under the United Kingdom's National Security and Investment Act 2021 (which we refer to as the "**NSI Act**"), the completion of the merger is subject to obtaining a favorable outcome under the NSI Act either by: (i) the Secretary of State for Business, Energy and

-100-

**Table of Contents**

Industrial Strategy (who we refer to as the "**Secretary of State**") confirming that no further action will be taken in relation to the merger under the NSI Act; or (ii) the Secretary of State making a final order in relation to the merger under the NSI Act that permits the merger to be completed subject to the provisions of such final order (and, to the extent relevant, all conditions, provisions or obligations contained in such final order necessary for completion of the merger having been satisfied or complied with).

Upon the acceptance by the Investment Security Unit within the Department for Business, Energy and Industrial Strategy of an NSI Act notice, the Secretary of State has 30 working days to complete an initial review of the merger. Following the completion of the initial review, the Secretary of State can either notify the parties that no further action will be taken in relation to the merger under the NSI Act or "call-in" the merger for a full national security assessment. If the Secretary of State "calls-in" the merger, they will have an initial review period of 30 working days to review the merger, which the Secretary of State may extend by an additional period of 45 working days. The review period may be further extended for a further period or periods as may be agreed between the Secretary of State and the acquirer. At the conclusion of the assessment period in respect of the call-in notice, the Secretary of State can: (i) notify the parties that no further action will be taken in relation to the merger under the NSI Act; (ii) issue a final order in relation to the merger under the NSI Act that permits the merger to be completed subject to provisions of such final order; or (iii) issue a final order in relation to the merger under the NSI Act that prohibits the parties from completing the merger.

### Foreign Competition Laws and Foreign Investment Laws

Under the merger agreement, the merger cannot be completed until all consents, approvals and filings that are mutually agreed by Parent and Twitter, acting reasonably, to be (1) material and (2) required or advisable under specified regulatory laws have been obtained or deemed to be obtained. The parties must observe mandatory waiting periods and/or obtain the necessary approvals, clearance, consents or no-actions (if and when mutually agreed by Parent and Twitter under the criteria set forth above) under the specified regulatory laws.

Beyond the actions required under the specified regulatory laws, the merger agreement states that the parties may make additional regulatory filings that are mutually agreed to by Parent and Twitter, acting reasonably, to be material and either required or advisable under any antitrust laws or foreign investment laws with respect to the merger. However, notwithstanding the foregoing, the submission of additional regulatory filings under laws other than the specified regulatory laws will not create additional conditions to the consummation of the merger.

### Other Regulatory Approvals

One or more governmental bodies may impose a condition, restriction, qualification, requirement or limitation when it grants the necessary approvals and consents to the merger. Such governmental bodies – including those in jurisdictions outside of those responsible for the specified regulatory laws – may also assert the right to enjoin or nullify certain legal effects of the transaction, both in those cases in which their conditions, restrictions, qualifications, requirements or limitations are not accepted and in other cases. Any one of these requirements, limitations, costs, divestitures or restrictions could jeopardize or delay the completion – or reduce the anticipated benefits – of the merger. Third parties may also seek to intervene in the regulatory process or litigate to enjoin or overturn regulatory approvals, which actions could significantly impede or even preclude obtaining required regulatory approvals. There is currently no way to predict how long it will take to obtain all of the required regulatory approvals or whether such approvals will ultimately be obtained, and there may be a substantial period of time between the approval by our stockholders and the completion of the merger.

[Table of Contents](#)

Although we expect that all required regulatory clearances and approvals will be obtained, we cannot assure you that these regulatory clearances and approvals will be timely obtained, obtained at all or that the granting of these regulatory clearances and approvals will not involve the imposition of additional conditions on the completion of the merger or require changes to the terms of the merger agreement. These conditions or changes could result in the conditions to the merger not being satisfied.

**Limited Guarantee**

Pursuant to the limited guarantee, Mr. Musk agreed to guarantee the due, complete and punctual payment, observance, performance and discharge of the payment obligations of Parent under the merger agreement (which we refer to as the "**obligations**"), including the termination fee payable by Parent, plus amounts in respect of reimbursement, indemnification or other payment obligations of Parent for certain costs, expenses, monetary damages or losses incurred or sustained by Twitter, as specified in the merger agreement, up to a specified amount (which we refer to as the "**cap**").

Subject to specified exceptions, the limited guarantee will terminate upon the earliest of:

- the closing of the merger in accordance with the terms of the merger agreement;

- subject to the cap, payment in full pursuant to the limited guarantee of all amounts payable with respect to the obligations;

- the termination of the merger agreement by mutual written consent of Twitter and Parent pursuant to Section 8.1(a) of the merger agreement; and

- sixty days after the valid termination of the merger agreement in accordance with its terms (other than a termination for which the prior bullet point applies), unless (1) a notice of a claim for payment of any obligation is presented in writing by Twitter to Parent or Mr. Musk or (2) Twitter shall have commenced a legal proceeding against Mr. Musk or Parent alleging that Parent is liable for payment obligations under the merger agreement or against Mr. Musk that amounts are due and owing from him pursuant to the limited guarantee, in each of the cases of clauses (1) or (2), on or prior to such sixty-day period.

**Financing of the Merger**

The total amount of funds necessary to consummate the merger and related transactions, including payment of related fees and expenses, will be approximately $46.5 billion.

### *Equity Commitment*

In connection with the merger agreement, Parent has obtained equity financing on the terms and conditions set forth in the equity commitment letter, pursuant to which Mr. Musk initially provided a commitment to contribute or otherwise provide equity capital to Parent in an aggregate amount of $21.0 billion, in U.S. dollars in immediately available funds, as necessary to fully discharge, when taken together with the aggregate proceeds of the debt financing (or, if applicable, alternative financing) actually funded at the closing, the amounts required to be funded by Parent in connection with the merger agreement, including (1) the aggregate consideration required to be paid by Parent and/or Acquisition Sub under the merger agreement and (2) the aggregate of all other amounts, costs, fees and expenses required to be paid by Parent in connection with the transactions pursuant to and in accordance with the merger agreement.

The obligation of Mr. Musk to fund his equity commitment is subject to the satisfaction of each of the following conditions: (1) the terms of the equity commitment letter, (2) the satisfaction or waiver of the

-102-

Table of Contents

conditions to Parent's obligation to consummate the transactions contemplated by the merger agreement as set forth in the merger agreement (other than those conditions that by their nature are to be satisfied by the taking of actions or delivery of documents at the closing, but subject to the prior or substantially contemporaneous satisfaction or waiver of such conditions at the closing) and (3) the substantially contemporaneous receipt by Parent or Acquisition Sub of the cash proceeds of the debt financing contemplated by the debt commitment letters in accordance with the terms and conditions of such debt commitment letters or any alternative financing that Parent accepts from alternative providers of debt financing pursuant to the terms of the merger agreement (subject only to the funding of Mr. Musk's equity commitment contemplated by the equity commitment letter).

On May 4, 2022, the equity commitment letter was amended and restated to increase Mr. Musk's financing commitment thereunder (which we refer to as the "**equity financing**") to $27.25 billion.

### *Debt Commitments*

#### *Bank Debt Financing*

In connection with the merger agreement, Parent has received a debt commitment letter, dated as of April 25, 2022, among Parent, Acquisition Sub, Morgan Stanley Senior Funding, Inc., and the other financial institutions party thereto, pursuant to which, and subject to the terms and conditions therein, the financing sources party thereto have committed to provide to Acquisition Sub (which we collectively refer to as the "**bank debt financing**"):

- a senior secured term loan facility in an aggregate principal amount of $6.5 billion;

- a senior secured revolving facility in an aggregate committed amount of $500.0 million;

- up to $3.0 billion in aggregate principal amount of senior secured bridge commitments (which commitments may be replaced by the proceeds of the issuance of one or more series of senior secured notes (in escrow or otherwise) pursuant to a Rule 144A offering or other private placement, as contemplated by the debt commitment letter); and

- up to $3.0 billion in aggregate principal amount of senior unsecured bridge commitments (which commitments may be replaced by the proceeds of the issuance of one or more series of senior unsecured notes (in escrow or otherwise) pursuant to a Rule 144A offering or other private placement, as contemplated by the debt commitment letter).

The proceeds of the bank debt financing would be used at the closing of the merger, together with the proceeds of the equity financing, for the purposes of (1) financing the consummation of the merger, paying fees and expenses incurred in connection with the merger and (2) the refinancing.

The initial borrowing under the bank debt financing is subject to the satisfaction (or waiver by the bank debt financing sources) of a number of limited conditions, including, without limitation:

- consummation of the merger in all material respects in accordance with the terms of the merger agreement (without giving effect to any modifications, amendments or express waivers or consents by Parent or Acquisition Sub (or one of their affiliates) thereto that are materially adverse to the lenders without the consent of the lenders holding a majority of the aggregate amount of the bank debt financing commitments immediately prior to, or substantially concurrently with, the initial borrowings under the bank debt financing;

- consummation of an equity contribution in an amount not less than an agreed minimum amount to Parent or Acquisition Sub by Mr. Musk and other investors arranged by and designated by Mr. Musk prior to, or substantially concurrently with, the initial borrowings under the bank debt financing;

-103-

Table of Contents

- since April 25, 2022, no Company Material Adverse Effect shall have occurred;

- consummation of the refinancing prior to, or substantially simultaneously with, the initial borrowings under the bank debt financing;

- payment of required fees prior to, or substantially simultaneously with, the initial borrowings under the bank debt financing;

- delivery of certain historical financial statements of Twitter;

- engagement of investment banks reasonably satisfactory to the lenders to privately place the secured notes and unsecured notes anticipated to be issued to replace the commitments under the bridge facilities;

- delivery of certain documentation required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations;

- subject to certain exceptions, delivery of certain documents required to create and perfect the security interests granted to the agents under the bank debt financing in the collateral provided thereunder; and

- subject to certain exceptions, delivery of definitive documentation with respect to the bank debt financing, including customary closing documents, certificates and legal opinions.

Commitments in respect of the bank debt financing commitment letter shall terminate on the earliest to occur of (1) the termination of the merger agreement in accordance with its terms prior to the consummation of the merger, (2) the consummation of the merger with or without the funding of the bank debt financing and (3) 11:59 p.m. New York City time on April 25, 2023.

*Margin Loan Financing*

In connection with the merger agreement, Parent has received a margin loan commitment letter, dated as of April 25, 2022 (which we refer to as the "**margin loan commitment letter**"), among Morgan Stanley Senior Funding, Inc., the other financial institutions party thereto and X Holdings III pursuant to which, and subject to the terms and conditions therein, the financing sources party thereto have committed to provide $12.5 billion (which we refer to as the "**margin loan financing**") to X Holdings III, to be used, together with the proceeds of the equity financing and the bank debt financing, for the purpose of financing the consummation of the merger and paying fees and expenses incurred in connection with the merger.

The initial borrowing under the margin loan financing is subject to the satisfaction (or waiver by the margin loan financing sources) of a number of limited conditions, including, without limitation: (1) consummation of the merger in all material respects in accordance with the terms of the merger agreement (without giving effect to any modifications, amendments or express waivers or consents by Parent or Acquisition Sub (or one of their affiliates) thereto that are materially adverse to the lenders without the consent of Morgan Stanley) immediately prior to, or substantially concurrently with, the initial borrowings under the margin loan financing; (2) delivery of certain documentation with respect to X Holdings III and the guarantor required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations; (3) subject to certain exceptions, delivery of (a) all documents required to create or perfect the security interests granted to the agents under the margin loan financing in the collateral provided thereunder and (b) definitive documentation with respect to the margin loan financing, including customary closing documents and certificates (including

-104-

Table of Contents

a customary solvency certificate) and an opinion of counsel; (4) establishment of collateral accounts and crediting of the common stock of Tesla, Inc. as collateral shares to such collateral accounts; (5) payment of required fees prior to, or substantially simultaneously with, the initial borrowings under the margin loan financing; (6) the accuracy in all material respects of the specified representations set forth in the margin loan financing commitment letter; (7) delivery of a borrowing notice by X Holdings III at least three business days prior to the initial funding date; (8) immediately after giving effect to the advances under the margin loan financing, the loan-to-value ratio not exceeding 20 percent; (9) no collateral shortfall occurring, or default, event of default, potential adjustment event or mandatory prepayment event, in each case, that is continuing; and (10) the initial funding date occurring no later than April 24, 2023.

The margin loan financing commitment letter terminates on the earliest to occur of (1) the initial funding date of the margin loan financing, (2) the consummation of the merger with or without the funding of the margin loan financing, (3) the termination by Mr. Musk of the merger and (4) April 24, 2023.

On May 4, 2022, the aggregate principal amount of the commitments available to X Holdings III under the margin loan commitment letter was reduced to an aggregate principal amount of $6.25 billion.

### Delisting and Deregistration of Our Common Stock

If the merger is completed, our common stock will no longer be traded on the NYSE and will be deregistered under the Exchange Act. We will no longer be required to file periodic reports, current reports and proxy and information statements with the SEC on account of our common stock.

### Litigation Relating to the Merger

As of the date of this proxy statement, we are aware of one complaint related to the merger agreement having been filed: *Orlando Police Pension Fund v. Twitter, Inc., et al.*, C.A. No. 2022-0396-KSJM (Del. Ch.) (which we refer to as the "**Delaware Complaint**"). The Delaware Complaint, which was filed on May 6, 2022 in the Delaware Court of Chancery, is a purported class action complaint brought by a putative Twitter stockholder against Twitter, members of the Twitter Board, and Mr. Musk. The Delaware Complaint alleges that Mr. Musk reached an "agreement, arrangement or understanding," as those terms are defined in Section 203 of the Delaware General Corporation Law, with certain other Twitter stockholders prior to the Twitter Board's approval of the merger, pursuant to which the shares of Twitter owned by these other stockholders would be voted in favor of the merger, thereby triggering Section 203's requirement that at least 66 and 2/3 percent of Twitter's outstanding stock unaffiliated with Mr. Musk vote in favor of the merger. The Delaware Complaint seeks, among other things, (1) an order declaring that the merger is subject to Section 203's supermajority voting requirement and (2) a finding that the members of the Twitter Board breached their fiduciary duties by entering into the merger agreement without providing for a supermajority stockholder vote contemplated by Section 203.

Twitter disputes the Delaware Complaint's allegations, including the allegation that Section 203's supermajority voting requirement applies to the merger. Additional lawsuits arising out of the merger may be filed in the future.

-105-

Table of Contents

**PROPOSAL 1: ADOPTION OF THE MERGER AGREEMENT**

We are asking you to approve the adoption of the merger agreement. For a summary of and detailed information regarding this proposal, see the information about the merger agreement throughout this proxy statement, including the information set forth in the sections of this proxy statement captioned "*The Merger*" and "*The Merger Agreement*." A copy of the merger agreement is attached as Annex A to this proxy statement. You are urged to read the merger agreement carefully and in its entirety.

**The Twitter Board unanimously recommends that you vote "FOR" this proposal.**

-106-

Table of Contents

### PROPOSAL 2: APPROVAL, ON A NON-BINDING, ADVISORY BASIS, OF CERTAIN MERGER-RELATED EXECUTIVE COMPENSATION

Section 14A of the Exchange Act, which was enacted as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, requires that we provide stockholders with the opportunity to vote, on a non-binding, advisory basis, on the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger, as disclosed in the section of this proxy statement captioned "*The Merger—Interests of Twitter's Directors and Executive Officers in the Merger—Golden Parachute Compensation*," including the additional disclosures referenced therein that otherwise are disclosed in the section of this proxy statement captioned "*The Merger—Interests of Twitter's Directors and Executive Officers in the Merger*."

We are asking our stockholders to approve the compensation that will or may become payable by Twitter to our named executive officers in connection with the merger. These payments are set forth in the section of this proxy statement captioned "*The Merger—Interests of Twitter's Directors and Executive Officers in the Merger—Golden Parachute Compensation*" and the accompanying footnotes and additional disclosures referenced therein. The various plans and arrangements pursuant to which these compensation payments may be made generally have previously formed part of Twitter's overall compensation program for our named executive officers and previously have been disclosed to stockholders as part of the Compensation Discussion and Analysis and related sections of our annual proxy statements. These historical arrangements were adopted and approved by the Compensation Committee of the Twitter Board, which is composed solely of non-employee directors, and are believed to be reasonable and in line with marketplace norms.

Accordingly, we are seeking approval of the following resolution at the special meeting:

"RESOLVED, that the stockholders of Twitter, Inc. approve the compensation that will or may become payable to Twitter's named executive officers in connection with the merger as disclosed pursuant to Item 402(t) of Regulation S-K in the section captioned "The Merger—Interests of Twitter's Directors and Executive Officers in the Merger—Golden Parachute Compensation" in Twitter's proxy statement for the special meeting."

This proposal is not a condition to completion of the merger, and as a non-binding, advisory vote, the result will not be binding on Twitter, the Twitter Board or Parent. Further, the underlying plans and arrangements are contractual in nature and not, by their terms, subject to stockholder approval. Accordingly, regardless of the outcome of the advisory vote, if the merger is consummated our named executive officers will be eligible to receive the compensation that is based on or that otherwise relates to the merger in accordance with the terms and conditions applicable to those payments.

**The Twitter Board unanimously recommends that you vote "FOR" this proposal.**

-107-

Table of Contents

## PROPOSAL 3: ADJOURNMENT OF THE SPECIAL MEETING

We are asking you to approve a proposal to adjourn the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting. If stockholders approve this proposal, we can adjourn the special meeting and any adjourned session of the special meeting and use the additional time to solicit additional proxies, including soliciting proxies from stockholders that have previously returned properly signed proxies voting against adoption of the merger agreement. Among other things, approval of the proposal to adjourn the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the special meeting could mean that, even if we received proxies representing a sufficient number of votes against adoption of the merger agreement such that the proposal to adopt the merger agreement would be defeated, we could adjourn the special meeting without a vote on the adoption of the merger agreement and seek to convince the holders of those shares to change their votes to votes in favor of adoption of the merger agreement. Additionally, we may seek stockholder approval to adjourn the special meeting if a quorum is not present. Finally, the chairperson of the special meeting is permitted by our bylaws to adjourn the special meeting even if our stockholders have not approved this proposal.

**The Twitter Board unanimously recommends that you vote "FOR" this proposal.**

-108-

Table of Contents

## THE MERGER AGREEMENT

*The following summary describes the material provisions of the merger agreement. The descriptions of the merger agreement in this summary and elsewhere in this proxy statement are not complete and are qualified in their entirety by reference to the merger agreement, a copy of which is attached to this proxy statement as Annex A and incorporated into this proxy statement by reference. We encourage you to carefully read and consider the merger agreement, which is the legal document that governs the merger, and in its entirety because this summary may not contain all the information about the merger agreement that is important to you. **The rights and obligations of the parties are governed by the express terms of the merger agreement, and not by this summary or any other information contained in this proxy statement.***

*The representations, warranties, covenants and agreements described below and included in the merger agreement (1) were made only for purposes of the merger agreement and as of specific dates; (2) were made solely for the benefit of the parties to the merger agreement; (3) may be subject to important qualifications, limitations and supplemental information agreed to by Twitter, Parent, Acquisition Sub and Mr. Musk in connection with negotiating the terms of the merger agreement; and (4) may also be subject to a contractual standard of materiality different from those generally applicable to reports and documents filed with the SEC and in some cases were qualified by confidential matters disclosed to Parent and Acquisition Sub by Twitter in connection with the merger agreement. In addition, the representations and warranties may have been included in the merger agreement for the purpose of allocating contractual risk between Twitter and Parent, Acquisition Sub and Mr. Musk rather than to establish matters as facts, and may be subject to standards of materiality applicable to such parties that differ from those applicable to investors. Further, the representations and warranties were negotiated with the principal purpose of establishing the circumstances in which a party to the merger agreement may have the right not to consummate the merger if the representations and warranties of the other party prove to be untrue due to a change in circumstance or otherwise. Our stockholders are not generally third-party beneficiaries under the merger agreement and should not rely on the representations, warranties, covenants and agreements or any descriptions thereof as characterizations of the actual state of facts or condition of Twitter, Parent or Acquisition Sub or any of their respective affiliates or businesses. Moreover, information concerning the subject matter of the representations and warranties may change after the date of the merger agreement. None of the representations and warranties will survive the closing of the merger, and, therefore, they will have no legal effect under the merger agreement after the effective time of the merger. In addition, you should not rely on the covenants in the merger agreement as actual limitations on the respective businesses of Twitter, Parent and Acquisition Sub because the parties may take certain actions that are either expressly permitted in the confidential disclosure letter to the merger agreement or as otherwise consented to by the appropriate party, which consent may be given without prior notice to the public. The merger agreement is described below, and included as Annex A, only to provide you with information regarding its terms and conditions, and not to provide you with any other factual information regarding Twitter, Parent, Acquisition Sub, Mr. Musk or their respective businesses. Accordingly, the representations, warranties, covenants and other agreements in the merger agreement should not be read alone, and you should read the information provided elsewhere in this document and in our filings with the SEC regarding Twitter and our business.*

### Closing and Effective Time of the Merger

The closing of the merger will take place as soon as possible in accordance with the terms of the merger agreement, but no later than the second business day after the satisfaction or waiver of all of the conditions to closing of the merger, other than conditions that by their terms are to be satisfied at the closing of the merger, but subject to the satisfaction or waiver of such conditions at the closing, unless another time, date or place is agreed to in writing by the parties. On the closing date of the

-109-

Table of Contents

merger, the parties will file a certificate of merger with the Secretary of State of the State of Delaware as provided under the applicable law of the State of Delaware. The merger will become effective on the date and time at which the certificate of merger has been duly filed with the Secretary of State of the State of Delaware or such other date and time as may be agreed to by Twitter and Parent and set forth in such certificate of merger in accordance with the DGCL.

**Effects of the Merger; Certificate of Incorporation; Bylaws; Directors and Officers**

The merger agreement provides that, subject to the terms and conditions of the merger agreement, and in accordance with the DGCL, at the effective time of the merger: (1) Acquisition Sub will be merged with and into Twitter; (2) the separate existence of Acquisition Sub will cease; and (3) Twitter will continue as the surviving corporation in the merger. From and after the effective time of the merger, all the property, rights, privileges, immunities, powers, franchises and liabilities of Twitter and Acquisition Sub are vested in the surviving corporation and Twitter will continue to be governed by the laws of the State of Delaware.

The parties will take all necessary actions so that, at the effective time of the merger, the certificate of incorporation and bylaws of Acquisition Sub, each as in effect immediately prior to the effective time of the merger, will be the certificate of incorporation and the bylaws, respectively, of Twitter as the surviving corporation (except that the titles thereof will read "Certificate of Incorporation of Twitter, Inc." and "Bylaws of Twitter, Inc.," respectively) until thereafter amended in accordance with the applicable provisions of the DGCL and the certificate of incorporation and bylaws of the surviving corporation.

The board of directors of the surviving corporation as of, and immediately following, the effective time of the merger, will consist of the directors of Acquisition Sub as of immediately prior to the effective time of the merger, each to serve in accordance with the certificate of incorporation and bylaws of the surviving corporation until their successors shall have been duly elected and qualified, or until their earlier death, resignation or removal in accordance with the certificate of incorporation and bylaws of the surviving corporation. From and after the effective time of the merger, the officers of Twitter at the effective time of the merger will be the officers of the surviving corporation, until their respective successors are duly elected or appointed and qualified in accordance with applicable law.

**Conversion of Shares**

***Common Stock***

Upon the terms and subject to the conditions of the merger agreement, at the effective time of the merger, each outstanding share of our common stock (other than shares: (1) held by Twitter or any of its subsidiaries immediately prior to the effective time of the merger; (2) held, directly or indirectly, by Mr. Musk, Parent or Acquisition Sub immediately prior to the effective time of the merger; or (3) held by stockholders who have properly exercised and perfected, and not withdrawn or otherwise lost, their demand for appraisal or dissenters' rights under the DGCL or other applicable law) will be automatically canceled and will cease to exist and will be converted into the right to receive the per share price in cash, without interest.

At the effective time of the merger, each outstanding share of our common stock that is (1) held by Twitter or any of its subsidiaries; or (2) held, directly or indirectly, by Mr. Musk, Parent or Acquisition Sub immediately prior to the effective time of the merger will automatically be canceled and retired and will cease to exist as issued or outstanding shares, and no consideration or payment will be delivered in exchange therefor or in respect thereof.

-110-

Table of Contents

At the effective time of the merger, by virtue of the merger and without any action on the part of the holder thereof, each share of common stock of Acquisition Sub issued and outstanding immediately prior to the effective time of the merger will be converted into and become one fully paid share of common stock of the surviving corporation and constitute the only issued or outstanding shares of capital stock of the surviving corporation.

### Equity Awards; ESPP

The merger agreement provides that Twitter's equity awards that are outstanding immediately prior to the effective time of the merger will be subject to the following treatment at the effective time of the merger:

#### Treatment of Twitter Equity-based Awards

At the effective time of the merger, each vested Twitter equity-based award (other than a vested Twitter option) outstanding as of immediately prior to the effective time of the merger will be canceled and converted into the right to receive an amount in cash, without interest and less any required withholding taxes, equal to the product of (1) the per share price and (2) the total number of shares of our common stock subject to such vested Twitter equity-based award (and with respect to any vested equity-based awards subject to performance vesting conditions, calculated based on the achievement of the applicable performance metrics at the level of performance at which such equity-based award vested in accordance with its terms).

At the effective time of the merger, each unvested Twitter equity-based award (other than an unvested Twitter option) outstanding as of immediately prior to the effective time of the merger will be canceled and converted into the right to receive an amount in cash, without interest and less any required withholding taxes, equal to the product of (1) the per share price and (2) the total number of shares of our common stock subject to such unvested Twitter equity-based award (and with respect to any unvested equity-based awards subject to performance vesting conditions, calculated based on the achievement of the applicable performance metrics at the target level of performance), which amount will, subject to the holder's continued service with Parent and its affiliates (including the surviving corporation and its subsidiaries) through the applicable vesting dates, vest and be payable at the same time as the unvested Twitter equity-based award for which such cash amount was exchanged would have vested pursuant to its terms and will otherwise remain subject to the same terms and conditions as were applicable to the unvested Twitter equity-based award immediately prior to the effective time of the merger (other than performance-based vesting conditions, which will not apply following the effective time of the merger).

#### Treatment of Twitter Options

At the effective time of the merger, each vested Twitter option outstanding as of immediately prior to the effective time of the merger will be canceled and converted into the right to receive an amount in cash, without interest and less any required withholding taxes, equal to the product of (1) the excess, if any, of the per share price less the exercise price per share of our common stock underlying such Twitter option, and (2) the total number of shares of our common stock subject to such Twitter option.

At the effective time of the merger, each unvested Twitter option outstanding as of immediately prior to the effective time of the merger will be canceled and converted into the right to receive an amount in cash, without interest and less any required withholding taxes, equal to the product of (1) the excess, if any, of the per share price less the exercise price per share of our common stock underlying such Twitter option, and (2) the total number of shares of our common stock subject to such Twitter option, which cash amount will, subject to the holder's continued service with Parent and its affiliates (including

-111-

Table of Contents

the surviving corporation and its subsidiaries) through the applicable vesting dates, vest and be payable at the same time as the unvested Twitter option for which such cash amount was exchanged would have vested pursuant to its terms and will otherwise remain subject to the same terms and conditions as were applicable to the unvested Twitter option immediately prior to the effective time of the merger.

At the effective time of the merger, any Twitter option outstanding as of immediately prior to the effective time of the merger and for which the exercise price per share of our common stock underlying such Twitter options is equal to or greater than the per share price will be canceled without any cash payment or other consideration being made in respect of such Twitter option.

### Treatment of the ESPP

The Twitter Board has adopted resolutions that provide that (1) the current offering period under the ESPP will be the final offering period and no further offering period will commence pursuant to the ESPP after the date of the merger agreement, and (2) except as may be required by law, each individual participating in the final offering period as of the date of the merger agreement will not be permitted to (a) increase his or her payroll contribution rate pursuant to the ESPP from the rate in effect when the final offering period commenced or (b) make separate non-payroll contributions to the ESPP on or following the date of the merger agreement. Prior to the effective time of the merger, Twitter will take all actions that may be necessary to give effect to the treatment described above and to (i) cause the final offering period, to the extent that it would otherwise be outstanding at the effective time, to be terminated no later than 10 business days prior to the date on which the effective time of the merger occurs; (ii) make any pro rata adjustments that may be necessary to reflect the final offering period, but otherwise treat the final offering period as a fully effective and completed offering period for all purposes pursuant to the ESPP; and (iii) cause the exercise (as of no later than 10 business days prior to the date on which the effective time of the merger occurs) of each outstanding purchase right pursuant to the ESPP. On such exercise date, Twitter will apply the funds credited as of such date pursuant to the ESPP within each participant's payroll withholding account to the purchase of whole shares of our common stock in accordance with the terms of the ESPP, and such shares of our common stock will be entitled to the per share price. Immediately prior to and effective as of the effective time of the merger (but subject to the consummation of the merger), Twitter will terminate the ESPP.

## Paying Agent, Exchange Fund and Exchange and Payment Procedures

Prior to the closing of the merger, Parent will designate a reputable bank or trust company (which we refer to as the "**paying agent**"), the identity and terms of appointment of which to be reasonably acceptable to Twitter to make payments of the merger consideration to our stockholders. At or prior to the effective time of the merger, Parent will deposit (or cause to be deposited) with the paying agent cash constituting an amount equal to the aggregate merger consideration in accordance with the merger agreement.

As promptly as reasonably practicable (and in any event not later than two business days) following the effective time of the merger, the surviving corporation will cause the paying agent to mail to each holder of record of a certificate that immediately prior to the effective time of the merger represented outstanding shares of our common stock (1) a letter of transmittal, which will specify that delivery will be effected, and risk of loss and title to the certificates will pass, only upon proper delivery of the certificates (or affidavits of loss in lieu thereof) to the paying agent, and which will be in the form and have such other provisions as Parent and Twitter may reasonably specify and (2) instructions for use in effecting the surrender of the certificates in exchange for merger consideration. Any holder of book-entry shares will not be required to deliver a certificate or an executed letter of transmittal to receive the

-112-

Table of Contents

merger consideration with respect to such book-entry shares. Upon surrender of a certificate (or affidavit of loss in lieu thereof) or book-entry share for cancellation to the paying agent, together with, in the case of certificates, a letter of transmittal duly completed and validly executed in accordance with the instructions thereto, or, in the case of book-entry shares, receipt of an "agent's message" by the paying agent (it being understood that holders of book-entry shares will be deemed to have surrendered such book-entry shares upon receipt of an "agent's message" with respect to such book-entry shares), and such other customary evidence of surrender as the paying agent may reasonably require, the holder of such certificate or book-entry share will be entitled to receive in exchange therefor the merger consideration for each share of our common stock formerly represented by such certificate or book-entry share on the later to occur of (a) the effective time of the merger or (b) the paying agent's receipt of such certificate (or affidavit of loss in lieu thereof) or book-entry share, and the certificate (or affidavit of loss in lieu thereof) or book-entry share so surrendered will be canceled. The amount of any per share price paid to our stockholders will not include interest and may be reduced by any applicable withholding taxes.

Any cash deposited with the paying agent that remains undistributed to the holders of the certificates or book-entry shares for one year following the effective time of the merger will be returned to the surviving corporation upon written demand, and any of our stockholders as of immediately prior to the merger who have not theretofore complied with the exchange procedures in the merger agreement will thereafter look only to the surviving corporation as a general creditor thereof for payment of their claims for the merger consideration in respect thereof (subject to abandoned property, escheat or similar laws). None of the paying agent, Parent, Acquisition Sub, Twitter or the surviving corporation will be liable to any person with respect to any cash amounts held by the paying agent delivered to a public official pursuant to any applicable abandoned property, escheat or similar laws.

In the event that any share certificates have been lost, stolen or destroyed, then upon the making of an affidavit, in form and substance reasonably acceptable to Parent, of that fact by the person claiming such certificate to be lost, stolen or destroyed, the paying agent will issue, in exchange for such lost, stolen or destroyed certificate, the per share price to such holder.

**Representations and Warranties**

The merger agreement contains representations and warranties of Twitter, Parent and Acquisition Sub.

Some of the representations and warranties in the merger agreement made by Twitter are qualified as to "materiality" or "Company Material Adverse Effect." For purposes of the merger agreement, "**Company Material Adverse Effect**" means, with respect to Twitter, any change, event, effect or circumstance which, individually or in the aggregate, has resulted in or would reasonably be expected to result in a material adverse effect on the business, financial condition or results of operations of Twitter and its subsidiaries, taken as a whole. Changes, events, effects or circumstances, to the extent they directly or indirectly relate to or result from the following, will be excluded from, and not taken into account in, the determination of Company Material Adverse Effect:

- any condition, change, effect or circumstance generally affecting any of the industries or markets in which Twitter or its subsidiaries operate;

- any change in any law or GAAP (or changes in interpretations of any law or GAAP);

- general economic, regulatory or political conditions (or changes therein) or conditions (or changes therein) in the financial, credit or securities markets (including changes in interest or currency exchange rates) in the United States or any other country or region in the world;

-113-

Table of Contents

- any acts of God, force majeure events, natural disasters, terrorism, cyberattack, data breach, armed hostilities, sabotage, war or any escalation or worsening of any of the foregoing;

- any epidemics, pandemics or contagious disease outbreaks (including COVID-19) and any political or social conditions, including civil unrest, protests and public demonstrations or any other quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester, safety or similar laws, directives, restrictions, guidelines, responses or recommendations of or promulgated by any governmental authority, including the Centers for Disease Control and Prevention and the World Health Organization, or other reasonable actions taken in response to the foregoing or otherwise, in each case, in connection with or in response to COVID-19 and any evolutions, variants or mutations thereof or related or associated epidemic, pandemics or disease outbreaks (which we collectively refer to as "COVID-19 measures") that relate to, or arise out of, an epidemic, pandemic or disease outbreak (including COVID-19) or any change in such COVID-19 measures, directive, pronouncement or guideline or interpretation thereof, or any continuation of any of the foregoing, in the United States or any other country or region in the world;

- the negotiation, execution, announcement, performance, consummation or existence of the merger agreement or the transactions contemplated thereby, including by reason of the identity of Mr. Musk, Parent or any of their affiliates or their respective financing sources, or any communication by Parent or any of its affiliates or their respective financing sources, including regarding their plans or intentions with respect to the conduct of the business of Twitter or any of its subsidiaries, and any litigation, claim or legal proceeding threatened or initiated against Parent, Acquisition Sub, Twitter or any of their respective affiliates, officers or directors, in each case, arising out of or relating to the merger agreement or the transactions contemplated by the merger agreement, and including the impact of any of the foregoing on any relationships with customers, suppliers, vendors, collaboration partners, employees, unions or regulators;

- any action taken pursuant to the terms of the merger agreement or with the consent or at the direction of Parent or Acquisition Sub (or any action not taken as a result of the failure of Parent to consent to any action requiring Parent's consent under the merger agreement);

- any changes in the market price or trading volume of our common stock, any failure by Twitter or its subsidiaries to meet internal, analysts' or other earnings estimates or financial projections or forecasts for any period, any changes in credit ratings and any changes in any analysts' recommendations or ratings with respect to Twitter or any of its subsidiaries; and

- any matter disclosed in the SEC filings made by Twitter prior to the date of the merger agreement (other than any disclosures set forth under the headings "Risk Factors" or "Forward-Looking Statements").

In addition, for purposes of the merger agreement, "**Parent Material Adverse Effect**" means any change, effect or circumstance which, individually or in the aggregate, has prevented or materially delayed or materially impaired, or would reasonably be expected to prevent or materially delay or materially impair, the ability of Parent or Acquisition Sub to consummate the merger and the other transactions contemplated by the merger agreement.

In the merger agreement, Twitter has made customary representations and warranties to Parent and Acquisition Sub that are subject, in some cases, to specified exceptions and qualifications contained in the merger agreement and Twitter's confidential disclosure letter to the merger agreement. These representations and warranties relate to, among other things:

- organization and qualification of Twitter and its subsidiaries;

- Twitter's capitalization and ownership of its subsidiaries;

-114-

Table of Contents

- corporate power and authority;

- the nature of the required approval of our stockholders;

- the approval of the Twitter Board;

- the absence of conflicts with applicable laws, organizational documents and certain agreements;

- required consents and regulatory filings and approvals in connection with the merger agreement;

- permits and compliance with laws;

- Twitter's SEC reports and financial statements;

- the accuracy of the information supplied by or on behalf of Twitter or any of its subsidiaries for inclusion in this proxy statement;

- Twitter's disclosure controls and procedures;

- absence of certain changes;

- no undisclosed liabilities;

- litigation;

- employee plans;

- labor matters;

- intellectual property matters;

- tax matters;

- material contracts;

- the inapplicability of anti-takeover statutes to the merger;

- brokers;

- opinions of financial advisors; and

- the inapplicability of Twitter's stockholder rights plan to the transactions contemplated by the merger agreement.

Under the merger agreement, Parent and Acquisition Sub acknowledge that Twitter has not made any representations or warranties other than those expressly set forth in the merger agreement, and expressly disclaim reliance on any representation, warranty or other information regarding Twitter, other than those expressly set forth in the merger agreement.

-115-

Table of Contents

In the merger agreement, Parent and Acquisition Sub have made customary representations and warranties to Twitter that are subject, in some cases, to specified exceptions and qualifications contained in the merger agreement and Parent's confidential disclosure letter to the merger agreement. These representations and warranties relate to, among other things:

- organization and qualification of Parent and Acquisition Sub;

- ownership of Parent and Acquisition Sub capital stock;

- corporate power and authority;

- the approval of the board of directors of Parent and the board of directors of Acquisition Sub;

- the absence of conflicts with applicable laws, organizational documents and certain agreements;

- required consents and regulatory filings and approvals in connection with the merger agreement;

- financing;

- the accuracy of the information supplied by or on behalf of Parent or any of its representatives for inclusion in this proxy statement;

- brokers;

- compliance with laws and absence of legal proceedings or orders;

- ownership of Twitter capital stock;

- solvency; and

- the limited guaranty.

Under the merger agreement, Twitter acknowledges that Parent and Acquisition Sub have not made any representations or warranties other than those expressly set forth in the merger agreement and expressly disclaims reliance on any representation, warranty or other information regarding Parent and Acquisition Sub, other than those expressly set forth in the merger agreement.

The representations and warranties of each of Twitter, Parent and Acquisition Sub contained in the merger agreement will not survive the consummation of the merger.

**Conduct of Business Pending the Merger**

Other than as contemplated by the merger agreement, set forth in Twitter's confidential disclosure letter to the merger agreement or agreed to in writing by Parent or as may be required by law, from the date of the merger agreement to the earlier of the effective time of the merger or the date, if any, of termination of the merger agreement, Twitter has agreed to use its commercially reasonable efforts to conduct its business and the business of its subsidiaries in the ordinary course of business (except with respect to actions or omissions that constitute COVID-19 measures), and to the extent consistent therewith, use its commercially reasonable efforts to preserve substantially intact the material components of its current business organization, and to preserve in all material respects its present

-116-

Table of Contents

relationships with key customers, suppliers and other persons with which it has material business relations; provided, that, no action by Twitter or its subsidiaries with respect to the matters specifically addressed below will be deemed to be a breach of such obligation unless such action would constitute a breach of the relevant provision below.

In particular, subject to certain specified exceptions, Twitter has agreed that it will not, and will not permit any of its subsidiaries to (except for actions or omissions that constitute COVID-19 measures, following reasonable prior consultation with Parent):

- amend or otherwise change, in any material respect, Twitter's charter or bylaws (or, except in the ordinary course of business, any other similar organizational document of any of its subsidiaries);

- split, combine, reclassify, redeem, repurchase or otherwise acquire or amend the terms of any capital stock or other equity interests or rights (except in connection with (1) the acceptance of shares of our common stock as payment for the per share exercise price of Twitter options or as payment for taxes incurred in connection with the exercise, vesting and/or settlement of Twitter equity-based awards, in each case, in accordance with the applicable Twitter benefit plan, (2) the forfeiture of Twitter equity-based awards, (3) pursuant to the exercise of purchase rights under the ESPP or (4) pursuant to certain specified agreements in effect on the date of the merger agreement);

- except as permitted under the merger agreement, issue, sell, pledge, dispose, encumber or grant any shares of Twitter or its subsidiaries' capital stock or other equity interests, or any options, warrants, convertible securities or other rights of any kind to acquire any shares of Twitter or its subsidiaries' capital stock or equity interests except for transactions among Twitter and its direct or indirect wholly owned subsidiaries or among Twitter's direct or indirect wholly owned subsidiaries; provided, however, that Twitter may issue shares of our common stock upon the exercise of any vested Twitter option or payment of any other Twitter equity-based award that becomes vested, pursuant to the exercise of purchase rights under the ESPP or to satisfy any obligations under Twitter's outstanding convertible senior notes;

- other than any shares of our common stock issuable upon conversion of any series of Twitter's outstanding convertible senior notes in accordance with their terms, authorize, declare, pay or make any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to Twitter's or any of its subsidiaries' capital stock or other equity interests, other than dividends paid by any subsidiary of Twitter to Twitter or any wholly owned subsidiary of Twitter;

- except as required pursuant to existing Twitter benefit plans, (1) increase the compensation payable or to become payable or benefits provided or to be provided to any current or former director, employee, consultant or independent contractor of Twitter or its subsidiaries (which we refer to as a "**company service provider**") except for increases in cash compensation or benefits to company service providers in the ordinary course of business consistent with past practice, (2) grant or provide any severance or termination payments or benefits to any company service provider other than the payment of severance amounts or benefits in the ordinary course of business consistent with past practice and subject to the execution and non-revocation of a release of claims in favor of Twitter and its subsidiaries, (3) provide any obligation to gross-up, indemnify or otherwise reimburse any company service provider for any tax incurred by any such individual, including under Section 409A or 4999 of the Internal Revenue Code of 1986, as amended, (4) accelerate the time of payment or vesting of, or the lapsing of restrictions related to, or fund or otherwise secure the payment of, any compensation or benefits (including any equity or equity-based awards) to any company service provider, or

-117-

Table of Contents

(5) establish, amend or terminate any Twitter benefit plan (or any plan, program, arrangement or agreement that would be a Twitter benefit plan if it were in existence on the date of the merger agreement) other than (a) entry into, amendment or termination of any Twitter benefit plan in a manner that would not materially increase costs to Twitter, Parent or the surviving corporation or any of their affiliates, or materially increase the benefits provided under any Twitter benefit plan or (b) new hire offer letters entered into in the ordinary course and consistent with past practices;

• except in the ordinary course of business and consistent with past practice (including with regard to aggregate grant date value, terms and allocation) or as may be required by the terms of a Twitter benefit plan in effect as of the date of the merger agreement, grant, confer or award any Twitter equity-based awards, convertible securities or any other rights to acquire any of Twitter's or its subsidiaries' capital stock, whether settled in cash or shares of our common stock;

• unless required by law or pursuant to existing written Twitter benefit plans, (1) enter into or materially amend any collective bargaining or other labor agreement with any labor organization or (2) recognize or certify any labor organization or group of employees as the bargaining representative for any employees of Twitter or any of its subsidiaries;

• (1) acquire (including by merger, consolidation, or acquisition of stock or assets), except in respect of any merger, consolidation, business combination among Twitter and its wholly owned subsidiaries or among Twitter's wholly owned subsidiaries, any corporation, partnership, limited liability company, other business organization or any division or material amount of assets thereof, or (2) sell, lease, license, abandon or otherwise subject to a lien other than a permitted lien or otherwise dispose of any material properties, rights or assets of Twitter or its subsidiaries other than (a) sales of inventory in the ordinary course of business, (b) licenses of Twitter intellectual property in the ordinary course of business, or (c) pursuant to agreements existing as of the date of the merger agreement or entered into after the date of the merger agreement in accordance with the terms of the merger agreement;

• incur, or amend in any material respect the terms of, any indebtedness for borrowed money for any of Twitter's subsidiaries, or assume or guarantee any such indebtedness for any person (other than a subsidiary), except for indebtedness incurred (1) under Twitter's existing credit facilities or incurred to replace, renew, extend, refinance or refund any existing indebtedness of Twitter or its subsidiaries on terms and conditions not materially less favorable to Twitter and its subsidiaries than, taken as a whole, the terms or conditions of the replaced, renewed, extended, refinanced or refunded debt or otherwise are not inconsistent with prevailing market conditions for substantially similar indebtedness at such time, as determined by Twitter in good faith, (2) pursuant to other agreements in effect prior to the execution of the merger agreement, (3) under capital leases, purchase money financing, equipment financing and letters of credit in the ordinary course of business, (4) between or among Twitter and/ or any of its subsidiaries or (5) otherwise in the ordinary course of business;

• enter into, or amend in any material respect, any material contract of Twitter with a term longer than one year which cannot be terminated without material penalty upon notice of 90 days or less other than (1) in the ordinary course of business or (2) which would not have a Company Material Adverse Effect;

• make any material change to Twitter's methods of accounting in effect at December 31, 2021, except (1) as required by GAAP (or any interpretation thereof), Regulation S-X or a governmental authority or quasi-governmental authority (including the Financial Accounting

-118-

Table of Contents

Standards Board or any similar organization), (2) to permit the audit of Twitter's financial statements in compliance with GAAP, (3) as required by a change in applicable law, (4) as disclosed in Twitter's SEC filings filed prior to the date of the merger agreement or (5) to the extent that such change would not have a Company Material Adverse Effect;

•    make or change any tax election or accounting method, settle or compromise any tax claim or assessment, file any amended tax return, or consent to any extension or waiver of any limitation period with respect to any tax claim or assessment, except, in each case, that would not have a Company Material Adverse Effect;

•    solely with respect to Twitter, adopt or enter into a plan of complete or partial liquidation or dissolution;

•    settle or compromise any litigation other than (1) in the ordinary course of business or (2) settlements or compromises of litigation where the amount paid (less the amount reserved for such matters by Twitter or otherwise covered by insurance) in settlement or compromise, in each case, does not exceed $25 million;

•    adopt a stockholder rights plan (or other similar agreement, plan or arrangement having a similar intent, purpose or effect) that would be triggered (or whose rights would be affected in any way) by the consummation of the transactions contemplated by the merger agreement, including the merger; or

•    enter into any agreement to do any of the foregoing prohibited actions.

**Restrictions on Solicitation of Other Acquisition Offers**

Under the merger agreement, during the period commencing on the date of the merger agreement and continuing until the earlier of the effective time of the merger or the date, if any, of termination of the merger agreement, Twitter has agreed that it will, and will cause each of its directors, executive officers and subsidiaries to, and will instruct its other representatives to, immediately cease and cause to be terminated any existing solicitation of, or discussions or negotiations with, any third party relating to any competing proposal. Twitter further has agreed that it will promptly request that all non-public information previously provided in the past 12 months by or on behalf of Twitter or any of its subsidiaries to any persons that might reasonably be expected to consider making a competing proposal be promptly returned or destroyed in accordance with the terms of the applicable confidentiality agreement.

Until the earlier of the effective time of the merger or the date, if any, of termination of the merger agreement, except as otherwise provided in the relevant provisions of the merger agreement, Twitter has agreed that it will not, and will cause each of its directors, executive officers and subsidiaries not to, and it will instruct its other representatives not to:

•    solicit, initiate, knowingly encourage or knowingly facilitate, whether publicly or otherwise, any substantive discussion, offer or request that constitutes, or would reasonably be expected to lead to, a competing proposal; or

•    engage in negotiations or substantive discussions with, or furnish any material non-public information to, any person relating to a competing proposal or any inquiry or proposal that would reasonably be expected to lead to a competing proposal.

-119-

Table of Contents

Notwithstanding the foregoing, Twitter is permitted to grant a waiver of or terminate any "standstill" or similar obligation of any person with respect to Twitter or any of its subsidiaries to allow such person to submit a competing proposal.

In addition, until the earlier of the effective time of the merger or the date, if any, of termination of the merger agreement, Twitter has agreed to:

- as promptly as reasonably practicable, and in any event within one business day of receipt by Twitter or any of its directors, executive officers or subsidiaries of any competing proposal or any request that would reasonably be expected to lead to the making of a competing proposal, deliver to Parent a written notice setting forth: (1) the identity of the person making such competing proposal or request and (2) the material terms and conditions of any such competing proposal; and

- keep Parent reasonably informed of any material amendment or other modification of any such competing proposal or request on a prompt basis, and in any event within two business days following Twitter's receipt in writing of such an amendment or modification.

Notwithstanding anything to the contrary in the merger agreement, at any time prior to obtaining the requisite stockholder approval, in the event that Twitter receives a competing proposal from any person or group of persons, (1) Twitter and its representatives may contact such person to clarify the terms and conditions thereof and (2) Twitter, the Twitter Board and their respective representatives may engage in negotiations or discussions with, or furnish any information and other access to, any person or group of persons making such competing proposal and any of its representatives or potential sources of financing if the Twitter Board determines in good faith (after consultation with its legal counsel and financial advisors) that such competing proposal either constitutes a superior proposal or would reasonably be expected to result in a superior proposal; provided that (a) prior to furnishing any material non-public information concerning Twitter or its subsidiaries, Twitter receives from such person or group, to the extent that such person or group is not already subject to a confidentiality agreement with Twitter, an executed confidentiality agreement containing customary confidentiality terms (it being understood that such confidentiality agreement need not contain a standstill provision or otherwise restrict the making, or amendment, of a competing proposal to Twitter or the Twitter Board) and (b) any such material non-public information so furnished in writing will be promptly made available to Parent to the extent it was not previously made available to Parent or its representatives.

For purposes of this proxy statement and the merger agreement:

- "**competing proposal**" means any proposal or offer made by any person (other than Parent, Acquisition Sub or any affiliate thereof) or group of persons: (1) to purchase or otherwise acquire, directly or indirectly, in one transaction or a series of transactions, (a) beneficial ownership of 15 percent or more of any class of equity securities of Twitter pursuant to a merger, consolidation or other business combination, sale of shares of capital stock, tender offer, exchange offer or similar transaction, or (b) any one or more assets or businesses of Twitter and its subsidiaries that constitute 15 percent or more of the revenues or assets of Twitter and its subsidiaries, taken as a whole; (2) with respect to the issuance, sale or other disposition, directly or indirectly, to any person (other than Parent, Acquisition Sub or any affiliate thereof) or group of persons of securities (or options, rights, or warrants to purchase, or securities convertible into or exchangeable for, such securities) representing 15 percent or more of the voting power of Twitter; or (3) with respect to any merger, consolidation, business combination, recapitalization, reorganization or other transaction involving Twitter or its subsidiaries pursuant to which any person or group of persons would have beneficial ownership of securities representing 15 percent or more of the total outstanding equity securities of Twitter after giving effect to the consummation of such transaction; and

-120-

Table of Contents

- "**superior proposal**" means a competing proposal (with all percentages in the definition of competing proposal increased to 90 percent) made by a third party on terms that the Twitter Board determines in good faith (after consultation with its legal counsel and financial advisors and considering such factors as the Twitter Board considers to be appropriate), are more favorable to Twitter's stockholders than the transactions contemplated by the merger agreement.

**The Twitter Board's Recommendation; Board Recommendation Change**

The Twitter Board has recommended that the holders of shares of our common stock vote "**FOR**" the proposal to adopt the merger agreement. Under the merger agreement, except as set forth below, the Twitter Board will not:

- publicly recommend that Twitter's stockholders vote against the adoption of the merger agreement and the approval of the transactions contemplated by the merger agreement, including the merger, or make any public statement or knowingly take any action with a similar intent, purpose or effect;

- approve or recommend, or propose publicly to approve or recommend, to Twitter's stockholders any competing proposal (we refer to the actions described in these two bullets as a "**Twitter Board recommendation change**"); or

- approve or recommend, or allow Twitter or any of its subsidiaries to execute or enter into, any letter of intent, memorandum of understanding or definitive merger or similar agreement with respect to any competing proposal (other than a confidentiality agreement as described above).

At any time prior to obtaining the requisite stockholder approval, the Twitter Board may: (1) make a Twitter Board recommendation change in response to an intervening event (as defined below) if the Twitter Board has determined in good faith (after consultation with its legal counsel and financial advisors) that the failure to take such action would reasonably be expected to be inconsistent with Twitter's directors' fiduciary duties under applicable law; or (2) (a) make a Twitter Board recommendation change if Twitter has received a competing proposal that the Twitter Board has determined in good faith (after consultation with its legal counsel and financial advisors) constitutes a superior proposal, and (b) authorize, adopt or approve such superior proposal and cause or permit Twitter to enter into a definitive agreement with respect to such superior proposal substantially concurrently with the termination of the merger agreement; provided, however, that:

- no Twitter Board recommendation change may be made and no termination of the merger agreement may be effected, in each case, until the end of the fourth full business day (which we refer to as the "**notice period**") following Parent's receipt of a written notice from Twitter advising Parent that the Twitter Board intends to make a Twitter Board recommendation change or terminate the merger agreement;

- during the notice period, if requested by Parent, Twitter and its representatives will negotiate with Parent and its representatives in good faith (to the extent Parent so desires to negotiate) to make adjustments to the terms and conditions of the merger agreement so that either the failure to make a Twitter Board recommendation change in response to such intervening event would no longer reasonably be expected to be inconsistent with Twitter's directors' fiduciary duties under applicable law or such competing proposal would cease to constitute a superior proposal, as appropriate; and

-121-

Table of Contents

- in determining whether to make such Twitter Board recommendation change or terminate the merger agreement, the Twitter Board will take into account any changes to the terms of the merger agreement timely proposed by Parent in response to such notice from Twitter advising Parent that the Twitter Board intends to make a Twitter Board recommendation change or terminate the merger agreement.

Any material amendment to the financial terms or any other material amendment of such superior proposal will require a new written notice from Twitter to Parent and Twitter will be required to comply again with the requirements described above with respect to such new superior proposal, except that the new notice period will be three business days.

For purposes of this proxy statement and the merger agreement, "**intervening event**" means an event, occurrence, change, effect, condition, development or state of facts or circumstances (other than related to a competing proposal or superior proposal, or any proposal that constitutes or would reasonably be expected to lead to a competing proposal or superior proposal) that was neither known to, nor reasonably foreseeable by, the Twitter Board as of the date of the merger agreement (or, if known, the consequences of which were not known or reasonably foreseeable to the Twitter Board as of the date of the merger agreement), where, for the avoidance of doubt, (1) the fact, in itself, that Twitter meets or exceeds projections, forecasts or estimates (it being understood that the underlying causes of (or contributors to) such performance that are not otherwise excluded from the definition of intervening event may be taken into account) and (2) changes, in themselves, in the price of our common stock or the trading volume thereof will be considered known and reasonably foreseeable occurrences (it being understood that the underlying causes of (or contributors to) such changes in price or trading volume that are not otherwise excluded from the definition of intervening event may be taken into account).

Nothing in the merger agreement will restrict Twitter or the Twitter Board from taking or disclosing a position contemplated by Rule 14d-9 or Rule 14e-2(a) under the Exchange Act, or otherwise making disclosure to comply with applicable law (it being agreed that a "stop, look and listen" communication by the Twitter Board to Twitter stockholders pursuant to Rule 14d-9(f) under the Exchange Act or a factually accurate public statement by Twitter that describes Twitter's receipt of a competing proposal and the operation of the merger agreement with respect thereto will not be deemed to be a Twitter Board recommendation change or give rise to Parent's right to terminate the merger agreement in connection therewith).

**Stockholder Meeting**

Twitter will, as promptly as practicable following the date on which the SEC confirms that it has no further comments on the proxy statement, (1) establish a record date for and give notice of a meeting of its stockholders, for the purpose of voting upon the approval of the merger and holding the requisite stockholder vote, and (2) duly call, convene and hold the special meeting. Twitter is permitted to postpone or adjourn the special meeting in certain circumstances related to soliciting additional proxies or requirements of applicable law.

**Employee Benefits**

For a period of one year following the effective time of the merger, Parent will, or will cause the surviving corporation or any of their affiliates to, provide for each continuing employee (1) at least the same base salary and wage rate, (2) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such continuing employee immediately prior to the effective time of the merger (provided that Parent will not be obligated to provide such incentives in the form of equity or equity-based awards) and (3) employee benefits

-122-

Table of Contents

(excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such continuing employee immediately prior to the effective time of the merger. During the one-year period following the effective time of the merger, Parent will, or will cause the surviving corporation or any of their affiliates to, provide severance payments and benefits to each continuing employee that are no less favorable than those applicable to the continuing employee immediately prior to the effective time of the merger under the Twitter benefit plans

Parent agrees that the surviving corporation will cause the surviving corporation's employee benefit plans established following the closing of the merger (if any) and any post-closing benefit plans to recognize the service of each continuing employee (to the extent such service was recognized by Twitter) for purposes of eligibility, vesting and determination of the level of benefits (but not for the benefit accrual purposes under a defined benefit pension plan) under the post-closing benefit plans, to the extent such recognition does not result in the duplication of any benefits.

For the calendar year including the effective time of the merger, the continuing employees will not be required to satisfy any deductible, co-payment, out-of-pocket maximum or similar requirements under the post-closing welfare plans to the extent amounts were previously credited for such purposes under comparable Twitter benefit plans that provide medical, dental and other welfare benefits.

As of the effective time of the merger, any waiting periods, pre-existing condition exclusions and requirements to show evidence of good health contained in such post-closing welfare plans will be waived with respect to the continuing employees (except to the extent any such waiting period, pre-existing condition exclusion or requirement to show evidence of good health was already in effect with respect to such employees and has not been satisfied under the applicable Twitter benefit plan in which the participant then participates or is otherwise eligible to participate as of immediately prior to the effective time of the merger).

**Efforts to Close the Merger**

*General*

The parties to the merger agreement agreed to use their respective reasonable best efforts to consummate and make effective the transactions contemplated by the merger agreement and to cause the conditions to the merger to be satisfied, including using reasonable best efforts to accomplish the following:

- the obtaining of all necessary actions or non-actions, consents and approvals from governmental authorities necessary in connection with the consummation of the transactions contemplated by the merger agreement, including the merger, and the making of all necessary registrations and filings (including filings with governmental authorities, if any) and the taking of all reasonable steps as may be necessary to obtain an approval from, or to avoid an action or proceeding by, any governmental authority necessary in connection with the consummation of the transactions contemplated by the merger agreement, including the merger;

- the obtaining of all other necessary consents, approvals or waivers from third parties;

- the defending of any lawsuits or other legal proceedings, through the termination date, if any, whether judicial or administrative, challenging the merger agreement or the consummation of the transactions contemplated by the merger agreement, including the merger, performed or consummated by such party in accordance with the terms of the merger agreement, including seeking to have any stay or temporary restraining order entered by any court or other governmental authority vacated or reversed; and

-123-

Table of Contents

- the execution and delivery of any additional instruments reasonably necessary to consummate the merger and any other transactions to be performed or consummated by such party in accordance with the terms of the merger agreement and to carry out fully the purposes of the merger agreement.

Mr. Musk, Parent and Acquisition Sub have further agreed to, subject to the terms of the merger agreement, take promptly any and all steps necessary to avoid or eliminate each and every impediment and obtain all consents, actions, non-actions, approvals or waivers (or, as applicable, expiration or termination of the waiting periods with respect thereto) under any antitrust laws, foreign investment laws (or, as applicable, expiration or termination of the waiting periods with respect thereto) or other law that may be required by any foreign or U.S. federal, state or local governmental authority, in each case, with competent jurisdiction, so as to enable the parties to consummate the transactions contemplated by the merger agreement, including the merger, as promptly as practicable, but prior to the termination date, if any, including committing to or effecting, by consent decree, hold separate orders, trust, or otherwise, (1) the sale or other disposition of such assets or businesses as are required to be divested or (2) the acceptance of restrictions on freedom of action, conduct, or operations with respect to the business of Twitter, in the case of the foregoing clauses (1) or (2) in order to avoid the entry of, or to effect the dissolution of or vacate or lift, any order, that would otherwise have the effect of preventing or materially delaying the consummation of the merger and the other transactions contemplated by the merger agreement as promptly as practicable. Further, Mr. Musk, Parent and Acquisition Sub will take, subject to the terms of the merger agreement, such actions as are necessary in order to ensure that (a) no requirement for any non-action by, or consent or approval of, any foreign or U.S. federal, state or local governmental authority, (b) no decree, judgment, injunction, temporary restraining order or any other order in any suit or proceeding and (c) no other matter relating to any antitrust laws or foreign investment laws, would preclude consummation of the merger. Notwithstanding the foregoing, nothing in the merger agreement will require or obligate Parent, Acquisition Sub, or any of their respective affiliates to (i) propose, take, or agree to take any actions that would individually or in the aggregate have a material adverse effect on the business, assets, or financial condition of Twitter and its subsidiaries, taken as a whole or (ii) propose, negotiate, effect or agree to, the sale, divestiture, lease, license, hold separate, transfer, or disposition of, or any restriction on the freedom of action with respect to, any assets, business, or equity holdings of, or held or controlled directly or indirectly by, Mr. Musk or any affiliate of Parent (other than Parent, Acquisition Sub or Twitter after giving effect to the merger and subject to the restrictions set forth in this paragraph).

### HSR Act; Other Antitrust and Foreign Investment Laws

The parties to the merger agreement have agreed to (1) promptly (and in no event later than 10 business days following the date that the merger agreement is executed) make their respective filings under the HSR Act, and (2) as promptly as reasonably practicable, make any other applications and filings as are mutually agreed by Parent and Twitter, acting reasonably, to be (a) material and (b) required or advisable under any antitrust laws or foreign investment laws with respect to the transactions contemplated by the merger agreement, including the merger.

### Financing

Under the merger agreement, Mr. Musk, Parent and Acquisition Sub have agreed to take (or cause to be taken), and to cause their respective affiliates and its and their respective representatives to take (or cause to be taken), all actions and to do (or cause to be done) all things necessary, proper or advisable to arrange, obtain and consummate the financing at or prior to the closing of the merger on the terms and subject to the conditions described in the commitment letters (including any "flex"

-124-

Table of Contents

provisions), including executing and delivering all such documents and instruments as may be reasonably required thereunder and:

- complying with and maintaining in full force and effect the financing and commitment letters (and, once entered into, the financing agreements) in accordance with the terms and conditions thereof and negotiating and entering into definitive financing agreements with respect to the debt financing on the terms and conditions set forth in the debt commitment letters (including any "flex" provisions) and containing no (1) conditions to the consummation of all or any portion of the debt financing other than the conditions set forth in the bank debt commitment letter or the margin loan commitment letter, as the case may be, in each case, as in effect on the date of the merger agreement, or (2) provisions that could reasonably be expected to prevent, impede, delay or adversely affect the availability of any of the debt financing or the consummation of the merger and the other transactions contemplated by the merger agreement so that the financing agreements are in full force and effect no later than the closing of the merger;

- satisfying, or obtaining the waiver of, as promptly as practicable and on a timely basis (and in any event, no later than the closing of the merger) all conditions to the debt financing contemplated by the debt commitment letters and financing agreements that are within its or their control;

- accepting (and complying with) to the fullest extent all "flex" provisions contemplated by the debt commitment letters; and

- causing the financing sources to fund the financing no later than the closing of the merger (including by enforcing their rights under the debt commitment letters and/or financing agreements, as applicable).

None of Mr. Musk, Parent, Acquisition Sub or X Holdings III or any of their respective affiliates may agree to or permit any amendment, supplement, modification or replacement of, or grant any waiver of, any condition, remedy or other provision under any applicable financing commitment or financing agreement, or permit any applicable financing agreement to contain any provision, without the prior written consent of Twitter (and subject to customary limitations), if such amendment, supplement, modification, replacement, waiver or provision would or would reasonably be expected to:

- reduce (or would reasonably be expected to have the effect of reducing) the aggregate amount of the financing (or the cash proceeds available therefrom) from that contemplated by the financing commitments delivered as of the date of the merger agreement;

- impose new or additional conditions or contingencies to the financing or otherwise expand, amend or modify any of the existing conditions to the receipt of the financing, or otherwise add, expand, amend or modify any other provision of, or remedies under, the financing commitments as in effect on the date of the merger agreement, in a manner that would reasonably be expected to delay, impede or prevent the consummation or funding of the financing (or satisfaction of the conditions to obtaining any portion of the financing) at the closing of the merger or impair the ability or likelihood of the closing of the merger or impair the ability of Parent and/or Acquisition Sub to timely consummate the merger and the other transactions contemplated by the merger agreement;

- make it less likely that any portion of the financing would be funded (including by making the satisfaction of the conditions to obtaining any portion of the financing less likely to occur) or otherwise prevent, impede or delay or impair the availability of any of the financing or impair the ability or likelihood of the closing of the merger or Parent and/or Acquisition Sub to timely

-125-

Table of Contents

consummate the transactions contemplated by the merger agreement (including by requiring any additional filings, consents or approvals of any governmental authority); or

•    adversely impact the ability of Parent, Acquisition Sub or X Holdings III, or any of their respective affiliates, to enforce their respective rights against the other parties to the financing commitments or the financing agreements.

In the event that (1) all or any portion of the debt financing expires, terminates, becomes or could reasonably be expected to become unavailable on the terms and conditions (including any "flex" provisions) or from the sources contemplated in the applicable debt commitment letters or (2) any of the debt commitment letters or the financing agreements will be withdrawn, terminated, repudiated or rescinded, in whole or in part, for any reason, then: (1) Parent will promptly so notify Twitter in writing and (2) Parent and/or its affiliates will use their respective reasonable best efforts to arrange and obtain, as promptly as practicable following the occurrence of such event (and in any event no later than the closing of the merger), and to negotiate and enter into definitive agreements with respect to, alternative financing from the same or alternative sources with terms and conditions (including market flex provisions) not less favorable taken as a whole to Parent than the terms and conditions set forth in the applicable debt commitment letter and which will not include any conditions or contingencies to the financing not otherwise included in the debt commitment letters as of the date of the merger agreement or include any provision that would reasonably be expected to materially delay or prevent the consummation or funding of the financing (or satisfaction of the conditions to obtaining any portion of the financing) at the closing of the merger or materially impair the ability or likelihood of the closing of the merger or Parent and/or Acquisition Sub to timely consummate the merger and the other transactions contemplated by the merger agreement (which we refer to as the "**alternative financing**") in an amount sufficient to consummate the transactions contemplated by the merger agreement (or replace any unavailable portion of the debt financing).

Parent and Mr. Musk have agreed to be fully responsible for the equity financing and to each take (or cause to be taken) all actions, and do (or cause to be done) all things necessary, proper or advisable to obtain the equity financing, including taking all actions necessary to (1) comply with the terms of and maintain in effect the equity commitment letter, (2) satisfy on a timely basis all conditions and obligations in such equity commitment letter and (3) consummate and fund the equity financing at or prior to the closing of the merger. Parent further agrees that it will take (or cause to be taken) all actions, and do (or cause to be done) all things necessary, proper or advisable to fully enforce its rights (including through litigation) under the equity commitment letter.

Under the merger agreement, Twitter agreed to, and to cause its subsidiaries to, and to use its commercially reasonable best efforts to cause each of its representatives to, at Parent's sole expense, provide any reasonable cooperation reasonably requested by Parent in writing in connection with (1) the arrangement of the bank debt financing and any other debt financing expressly contemplated by the bank debt commitment letter and (2) subject to certain conditions, the payoff, redemption, defeasance, discharge or other satisfaction of Twitter's existing credit agreement and existing senior notes on or subsequent to the closing of the merger, in each case as is necessary, customary and reasonably requested in writing by Parent, and subject to certain limitations set forth in the merger agreement.

Obtaining the financing or any alternative financing is not a condition to the closing of the merger.

**Indemnification and Insurance**

In the merger agreement, Parent and Acquisition Sub have agreed that all rights to exculpation and indemnification for acts or omissions occurring at or prior to the effective time of the merger existing as

-126-

Table of Contents

of the date of the merger agreement in favor of the current or former directors, officers and employees, if any, of Twitter or its subsidiaries (we refer to such persons collectively as the "**indemnified persons**") as provided in their respective organizational documents as in effect on the date of the merger agreement, or in any contract, will survive the merger and will continue in full force and effect. The merger agreement provides that the surviving corporation will (and Parent will cause the surviving corporation to) indemnify, defend and hold harmless, and advance expenses to the indemnified persons with respect to all acts or omissions by them in their capacities as such at any time prior to the effective time of the merger (including any matters arising in connection with the merger agreement or the transactions contemplated thereby), to the fullest extent that Twitter or its subsidiaries would be permitted by applicable law and to the fullest extent required by the organizational documents of Twitter or its subsidiaries as in effect on the date of the merger agreement. Parent has agreed to cause the certificate of incorporation, bylaws or other organizational documents of the surviving corporation and its subsidiaries to contain provisions with respect to exculpation, indemnification, advancement of expenses and limitation of director, officer and employee liability that are no less favorable to the indemnified persons than those set forth in Twitter's and its subsidiaries' organizational documents as of the date of the merger agreement, which provisions thereafter will not, for a period of six years from the effective time of the merger, be amended, repealed or otherwise modified in any manner that would adversely affect the rights thereunder of the indemnified persons.

Furthermore, to the fullest extent that Twitter would be permitted by applicable law to do so, Parent will or will cause the surviving corporation to: (1) indemnify and hold harmless each indemnified person against and from any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, to the extent such claim, action, suit, proceeding or investigation arises out of or pertains to (a) any alleged action or omission in such indemnified person's capacity as a director, officer or employee of Twitter or any of its subsidiaries prior to the effective time of the merger, or (b) the merger agreement or the transactions contemplated by the merger agreement, and (2) pay in advance of the final disposition of any such claim, action, suit, proceeding or investigation the expenses (including reasonable attorneys' fees) of any indemnified person upon confirmation by the indemnified of his or her good faith belief that he or she has met the standard of conduct necessary for indemnification applicable to him or her and a customary written undertaking by him or her or on his or her behalf to repay the amount paid or reimbursed if it is ultimately determined that the standard of conduct for indemnification was not met.

For at least six years after the effective time of the merger, (1) Parent will cause the surviving corporation and its other subsidiaries to maintain in full force and effect the coverage provided by the existing directors' and officers' liability insurance and fiduciary insurance in effect as of the date of the merger agreement and maintained by Twitter or any of its subsidiaries, or provide substitute policies for Twitter and its current and former directors and officers who are currently covered by such existing D&O insurance policies, in either case, on terms and conditions no less advantageous to the indemnified persons than the existing D&O insurance policies, covering claims arising from facts, events, acts or omissions that occurred at or prior to the effective time of the merger, including the transactions contemplated by the merger agreement, subject to customary limitations on policy premiums, and (2) Parent will not, and will not permit the surviving corporation or its other subsidiaries to, take any action that would prejudice the rights of, or otherwise impede recovery by, the beneficiaries of any such insurance, whether in respect of claims arising before or after the effective time of the merger. In lieu of such insurance, prior to the effective time of the merger, Twitter may purchase a six year "tail" prepaid policy on the terms and conditions described above, in which case Parent will cease to have any obligations to maintain the existing D&O insurance policies.

For more information, refer to the section of this proxy statement captioned "*The Merger—Interests of Twitter's Directors and Executive Officers in the Merger*."

-127-

Table of Contents

**Conditions to the Closing of the Merger**

The obligations of Parent, Acquisition Sub and Twitter, as applicable, to consummate the merger are subject to the satisfaction or waiver of certain conditions, including the following:

- the adoption of the merger agreement by the requisite affirmative vote of our stockholders;

- the expiration or termination of the waiting period applicable to the merger under the HSR Act, and, to the extent applicable, each consent or approval required under any antitrust laws or foreign investment laws in certain specified jurisdictions having been made, obtained or received (or, as applicable, the waiting periods, if any, with respect thereto will have expired or been terminated); and

- the absence of any then-effective law or order enacted, issued, promulgated, enforced or entered into by any governmental authority in certain specified jurisdictions which has the effect of restraining, enjoining, rendering illegal or otherwise prohibiting consummation of the merger, or causing the merger to be rescinded following the consummation thereof.

The obligations of Parent and Acquisition Sub to consummate the merger are subject to the satisfaction or waiver of each of the following additional conditions, any of which may be waived by Parent:

- Twitter having performed and complied in all material respects with the obligations required by the merger agreement to be performed or complied with by it on or prior to the closing of the merger;

- the accuracy of the representations and warranties of Twitter in the merger agreement, subject to applicable materiality or other qualifiers, as of the effective time of the merger or the date in respect of which such representation or warranty was specifically made; and

- the absence of any Company Material Adverse Effect having occurred that is continuing.

The obligation of Twitter to consummate the merger are subject to the satisfaction or waiver of each of the following additional conditions, any of which may be waived by Twitter:

- Parent and Acquisition Sub having performed and complied in all material respects with the obligations required by the merger agreement to be performed or complied with by Parent or Acquisition Sub on or prior to the closing of the merger; and

- the accuracy of the representations and warranties of Parent and Acquisition Sub in the merger agreement, subject to applicable materiality or other qualifiers, as of the effective time of the merger or the date in respect of which such representation or warranty was specifically made.

**Termination of the Merger Agreement**

The merger agreement may be terminated at any time prior to the effective time of the merger, whether before or after the adoption of the merger agreement by our stockholders (except as otherwise provided in the merger agreement), in the following ways:

- by mutual written agreement of Twitter and Parent;

-128-

Table of Contents

- by either Twitter or Parent if:

    o   the merger has not been consummated by 5:00 p.m., Pacific time, on the termination date, except that (1) a party may not terminate the merger agreement pursuant to this provision if such party's failure to perform or comply with any of its obligations under the merger agreement has been the principal cause of, or resulted in, the failure to consummate the merger by the termination date, and (2) the termination date will be extended for an additional six months if, as of the termination date, the closing condition regarding (a) the expiration or termination of the waiting period under the HSR Act or the receipt of approvals under the other specified antitrust laws or foreign investment laws or (b) the absence of any applicable legal restraint prohibiting the consummation of the merger has not been satisfied;

    o   prior to the effective time of the merger, any governmental authority of competent jurisdiction has enacted, issued, promulgated, enforced or entered any law or order or taken any other action permanently restraining, enjoining, rendering illegal or otherwise prohibiting the consummation of the transactions contemplated by the merger agreement, and such law or order or other action has become final and non-appealable, except, in each case, that the right to terminate will not be available to any party (1) that has failed to use the efforts required by the merger agreement to remove such law, order or other action, or (2) if the issuance of such law or order or taking of such action was primarily due to the failure of such party, and, in the case of Parent, the failure of Acquisition Sub or Mr. Musk, to perform any of its obligations under the merger agreement; or

    o   our stockholders do not adopt the merger agreement at the special meeting (or at any adjournment or postponement thereof at which the merger agreement and the transactions contemplated thereby are voted on);

- by Twitter if:

    o   subject to a 30-day cure period, Parent, Acquisition Sub or Mr. Musk has breached or failed to perform any of their respective representations, warranties, covenants or other agreements in the merger agreement, which breach or failure would give rise to the failure of relevant conditions to effect the closing of the merger, except that the right to terminate will not be available to Twitter if Twitter is then in material breach of any of its representations, warranties, covenants or agreements under the merger agreement;

    o   the Twitter Board has authorized Twitter to enter into a definitive agreement with respect to a superior proposal, if, substantially concurrently with the termination of the merger agreement, Twitter enters into such definitive agreement and pays (or causes to be paid) the termination fee to and at the direction of Parent; or

    o   (1) Parent and Acquisition Sub have been notified in writing that the conditions precedent to Parent's and Acquisition Sub's obligations to close the merger set forth in the merger agreement (other than those conditions that by their nature are to be satisfied at the closing, each of which is capable of being satisfied if the closing were to occur at such time) have been satisfied or waived in accordance with the merger agreement; (2) Parent and Acquisition Sub fail to consummate the merger within three business days following the date on which the closing should have occurred; and (3) during such three business day period, Twitter stood ready, willing and able to consummate the merger and the other transactions contemplated by the merger agreement; and

-129-

Table of Contents

- by Parent if:

    o   subject to a 30-day cure period, Twitter has breached or failed to perform any of its representations, warranties, covenants or other agreements in the merger agreement, which breach or failure would give rise to the failure of relevant conditions to effect the closing of the merger, except that the right to terminate will not be available to Parent if Parent, Acquisition Sub or Mr. Musk is then in material breach of any of its representations, warranties, covenants or agreements under the merger agreement; or

    o   prior to the adoption of the merger agreement by the requisite affirmative vote of our stockholders, the Twitter Board has made a Twitter Board recommendation change.

In the event that the merger agreement is terminated pursuant to the termination rights above, written notice thereof will be given to the other party or parties specifying the provisions of the merger agreement pursuant to which the termination was made, and the merger agreement will become null and void and of no effect without liability of any party thereto (or any of its representatives), and all rights and obligations of any party thereto will cease, except certain sections of the merger agreement will survive the termination of the merger agreement, in each case in accordance with their respective terms. Notwithstanding the previous sentence, no termination of the merger agreement will relieve any party from any liability or damages resulting from any knowing and intentional breach of the merger agreement prior to the termination of the merger agreement, in which case the aggrieved party will be entitled to all rights and remedies available at law or in equity.

**Termination Fees and Remedies**

The merger agreement contains certain termination rights for Twitter and Parent. Upon valid termination of the merger agreement under specified circumstances, Twitter will be required to pay, at the direction of Parent, a termination fee of $1,000,000,000. Specifically, this termination fee will be payable by Twitter to Parent if:

- (1) a third party will have made a competing proposal after the date of the merger agreement, (2) the merger agreement is subsequently terminated by (a) Twitter or Parent because our stockholders have failed to approve the merger agreement at the special meeting or (b) Parent as a result of a breach or failure by Twitter to perform any of its representations, warranties, covenants or other agreements in the merger agreement (subject to a 30-day cure period), which breach or failure would give rise to the failure of any condition to effect the closing of the merger, and at the time of such special meeting or breach, as applicable, a competing proposal has been publicly announced and has not been withdrawn, and (3) within 12 months of such termination of the merger agreement, Twitter consummates a transaction involving a competing proposal or enters into a definitive agreement providing for the consummation of a competing proposal and such competing proposal is subsequently consummated (provided that, for purposes of this paragraph, all percentages in the definition of competing proposal are increased to 50 percent);

- the merger agreement is terminated by Twitter to enter into a definitive agreement with respect to a superior proposal; or

- the merger agreement is terminated by Parent if the Twitter Board made a Twitter Board recommendation change prior to the adoption of the merger agreement by the requisite affirmative vote of our stockholders.

-130-

Table of Contents

Upon valid termination of the merger agreement under certain specified circumstances, Parent will be required to pay, at the direction of Twitter, a termination fee of $1,000,000,000, the payment of which has been guaranteed pursuant and subject to the terms and conditions of the limited guaranty. Specifically, the termination fee will be payable by Parent to Twitter if the merger agreement is terminated by Twitter:

- as a result of a breach or failure by Parent, Acquisition Sub or Mr. Musk to perform any of its respective representations, warranties, covenants or other agreements in the merger agreement (subject to a 30-day cure period), which breach or failure would give rise to the failure of relevant conditions to effect the closing of the merger; or

- because Parent and Acquisition Sub failed to consummate the merger as required pursuant to, and in the circumstances specified in, and subject to the terms of, the merger agreement while Twitter stood ready, willing and able to consummate the merger and the other transactions contemplated by the merger agreement.

The merger agreement also provides that Twitter, Parent and Acquisition Sub are entitled to specific performance and other equitable relief to prevent breaches of the merger agreement and to enforce specifically the terms and provisions of the merger agreement. In addition, Twitter is entitled to obtain specific performance or other equitable relief to enforce Parent and Acquisition Sub's obligations to cause Mr. Musk to fund the equity financing, or to enforce Mr. Musk's obligation to fund the equity financing directly, and to consummate the closing of the merger if and for so long as (1) the conditions to the obligations of Parent and Acquisition Sub to consummate the merger (other than those conditions to be satisfied at the closing, which conditions are capable of being satisfied if the closing were to occur at such time) have been satisfied or waived and Parent has failed to consummate the closing of the merger on the date required pursuant to the merger agreement, (2) the debt financing (or, as applicable, the alternative financing) has been funded or will be funded at the closing if the equity financing is funded at the closing, and (3) Twitter has confirmed that, if specific performance or other equity remedy is granted and the equity financing and debt financing are funded, then the closing of the merger will occur.

Neither Parent nor Twitter is required to pay to the other a termination fee on more than one occasion.

Except in the case of a knowing and intentional breach of the merger agreement by Mr. Musk, Parent or Acquisition Sub (in which case Twitter will be entitled to seek monetary damages, recovery or award from Mr. Musk, Parent or Acquisition Sub in an amount not to exceed the amount of the termination fee, in the aggregate), Twitter's right to receive payment from Parent of the termination fee pursuant, will constitute the sole and exclusive monetary remedy of Twitter against the Parent, Acquisition Sub and Mr. Musk and his related parties under the merger agreement.

In addition, under no circumstances can Twitter receive both a grant of specific performance to cause the equity financing to be funded, on the one hand, and payment of the termination fee payable by Parent to Twitter or other monetary damages, remedy or award, on the other hand, and in no event will Twitter be permitted or entitled to receive aggregate monetary damages in excess of the termination fee payable by Parent to Twitter (other than Twitter's receipt of certain other amounts under the merger agreement).

**Fees and Expenses**

Except as expressly set forth in the merger agreement, all out-of-pocket expenses incurred in connection with the merger agreement and the transactions contemplated by the merger agreement will be paid by the party incurring such out-of-pocket expenses.

-131-

Table of Contents

**No Third Party Beneficiaries**

The merger agreement is not intended to and will not confer upon any person other than the parties thereto any rights or remedies thereunder, except (1) as set forth in or contemplated by the merger agreement, and (2) with respect to certain terms of the merger agreement, the debt financing sources and their successors and assigns.

**Assignment**

Neither the merger agreement nor any of the rights, interests or obligations thereunder may be assigned by any of the parties thereto (whether by operation of law or otherwise) without the prior written consent of the other parties. Subject to the preceding sentence, the merger agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective permitted successors and assigns. Any attempted assignment in violation of this provision will be null and void.

**Amendment and Waiver**

The merger agreement may be amended by mutual agreement of the parties thereto by action taken by or on behalf of their respective boards of directors at any time before or after receipt of the required approval of our stockholders. However, after receipt of the required approval of our stockholders, no amendment that by law or in accordance with the rules of any stock exchange requires further approval by such stockholders may be made without such approval. In addition, any amendment to certain sections of the merger agreement that would adversely affect the rights of a debt financing source under such section will also be approved by such debt financing source. The merger agreement may not be amended except by an instrument in writing signed by each of the parties hereto.

At any time prior to the effective time of the merger, subject to applicable law, Twitter may extend the time for the performance of any of the obligations or other acts of the other parties, waive any inaccuracies in the representations and warranties of Parent or Acquisition Sub contained in the merger agreement or in any document delivered pursuant thereto, and waive compliance with any of the agreements or conditions by Parent or Acquisition Sub contained in the merger agreement. Any agreement by a party to any such extension or waiver will be valid only if set forth in an instrument in writing signed by such party. No failure or delay by any party in exercising any right pursuant to the merger agreement will operate as a waiver of such right nor will any single or partial exercise of any such right preclude any further exercise of any other right under the merger agreement.

**Governing Law and Venue**

Except for disputes involving the debt financing sources (which will be governed by the laws of the State of New York), the merger agreement is governed by, and construed in accordance with, the laws of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof. The venue for disputes relating to the merger agreement is the Delaware Court of Chancery of the State of Delaware or, to the extent that the Delaware Court of Chancery of the State of Delaware does not have jurisdiction, federal or state court in the State of Delaware. The parties further agreed that the venue for disputes involving the debt financing sources, or arising out of or relating to the debt financing, is the Supreme Court of the State of New York or, if under applicable law exclusive jurisdiction is vested in the federal courts, the United States District Court for the Southern District of New York.

**Waiver of Jury Trial**

Each of the parties irrevocably waived all right to trial by jury in any action arising out of or relating to the merger agreement or the actions of Parent, Acquisition Sub or Twitter in the negotiation, administration, performance and enforcement thereof (including the debt financing).

-132-

Table of Contents

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth certain information with respect to the beneficial ownership of shares of our common stock as of April 29, 2022 for:

- each of our directors;
- each of our named executive officers;
- all of our current directors and executive officers as a group; and
- each person or group who beneficially owned more than five percent of our common stock.

We have determined beneficial ownership in accordance with the rules of the SEC, and thus it represents sole or shared voting or investment power with respect to our securities. Unless otherwise indicated below, to our knowledge, the persons and entities named in the table below have sole voting and sole investment power with respect to all shares that they beneficially owned, subject to community property laws where applicable.

We have based our calculation of the percentage of beneficial ownership on 764,297,195 shares of our common stock outstanding as of April 29, 2022. We have deemed shares of our common stock subject to Twitter options that are currently exercisable or exercisable within 60 days of April 29, 2022 or issuable pursuant to Twitter RSUs and Twitter PSUs which are subject to vesting conditions expected to occur within 60 days of April 29, 2022 to be outstanding and to be beneficially owned by the person holding the stock option, Twitter RSU or Twitter PSU for the purpose of computing the percentage ownership of that person. We did not deem these shares outstanding, however, for the purpose of computing the percentage ownership of any other person.

Unless otherwise indicated, the address of each beneficial owner listed in the table below is c/o Twitter, Inc., 1355 Market Street, Suite 900, San Francisco, California 94103. The information provided in the table is based on our records, information filed with the SEC and information provided to us, except where otherwise noted.

| Name of Beneficial Owner | Number of Shares Beneficially Owned | Percentage of Shares Beneficially Owned |
|---|---:|---:|
| **Named Executive Officers and Directors:** | | |
| Parag Agrawal (1) | 128,753 | * |
| Ned Segal (2) | 397,493 | * |
| Vijaya Gadde (3) | 623,156 | * |
| Sarah Personette (4) | 146,189 | * |
| Jack Dorsey (5) | 18,042,428 | 2.4% |
| Michael Montano (6) | 324,674 | * |
| Mimi Alemayehou (7) | 3,735 | * |
| Egon Durban (8) | 15,013 | * |
| Omid Kordestani (9) | 934,247 | * |
| Martha Lane Fox (10) | 32,545 | * |
| Fei-Fei Li (11) | 10,676 | * |
| Patrick Pichette (12) | 24,823 | * |
| David Rosenblatt (13) | 109,827 | * |
| Bret Taylor (14) | 56,597 | * |
| Robert Zoellick (15) | 21,535 | * |
| All current directors and executive officers as a group (17 persons) (16) | 20,727,209 | 2.7% |

-133-

Table of Contents

| Name of Beneficial Owner | Number of Shares Beneficially Owned | Percentage of Shares Beneficially Owned |
|---|---|---|
| **5% Stockholders:** | | |
| The Vanguard Group [17] | 82,403,665 | 10.8% |
| Elon Musk [18] | 73,115,038 | 9.6% |
| Morgan Stanley and Morgan Stanley Investment Management, Inc. [19] | 67,033,579 | 8.8% |
| Blackrock, Inc. [20] | 52,095,502 | 6.8% |

\*     Represents beneficial ownership of less than one percent of the outstanding shares of our common stock.

(1)     Consists of (i) 77,881 shares held of record by Mr. Agrawal and (ii) 50,872 shares issuable upon vesting of Twitter RSUs within 60 days of April 29, 2022.

(2)     Consists of (i) 361,195 shares held of record by Mr. Segal and (ii) 36,298 shares issuable upon vesting of Twitter RSUs within 60 days of April 29, 2022.

(3)     Consists of (i) 587,148 shares held of record by Ms. Gadde and (ii) 36,008 shares issuable upon vesting of Twitter RSUs within 60 days of April 29, 2022.

(4)     Consists of (i) 116,031 shares held of record by Ms. Personette and (ii) 30,158 shares issuable upon vesting of Twitter RSUs within 60 days of April 29, 2022.

(5)     Consists of (i) 13,704,901 shares held of record by the Jack Dorsey Revocable Trust dated December 8, 2010, for which Mr. Dorsey serves as trustee, (ii) 2,337,527 shares held of record by the Jack Dorsey Remainder LLC, the sole member of which is the Jack Dorsey Remainder Trust #3, of which Mr. Dorsey serves as co-trustee, and (iii) 2,000,000 shares beneficially owned by Mr. Dorsey directly.

(6)     Consists of 324,674 shares held of record by Mr. Montano. Mr. Montano served as an executive officer of Twitter until December 2021. The information reported is based on the most recently available information to Twitter concerning Mr. Montano's holdings.

(7)     Consists of (i) 2,801 shares held of record by Ms. Alemayehou and (ii) 934 shares issuable upon vesting of Twitter RSUs within 60 days of April 29, 2022.

(8)     Consists of (i) 13,786 shares held of record by Mr. Durban and (ii) 1,227 shares issuable upon vesting of Twitter RSUs within 60 days of April 29, 2022. These securities are held by Mr. Durban for the benefit of Silver Lake Technology Management, L.L.C., certain of its affiliates, and certain of the funds they manage (which we refer to as "**Silver Lake**"). Pursuant to Mr. Durban's arrangement with Silver Lake with respect to director compensation, upon the sale of these securities, the proceeds from such sale(s) are expected to be remitted to Silver Lake and/or its limited partners. Mr. Durban, through his role at Silver Lake and its affiliates, may be deemed to have an indirect interest in the securities reported herein.

(9)     Consists of (i) 133,278 shares held of record by Mr. Kordestani, (ii) 969 shares issuable upon vesting of Twitter RSUs within 60 days of April 29, 2022, and (iii) 800,000 shares issuable pursuant to outstanding Twitter options which are exercisable within 60 days of April 29, 2022.

(10)     Consists of (i) 31,576 shares held of record by Ms. Lane Fox and (ii) 969 shares issuable upon vesting of Twitter RSUs within 60 days of April 29, 2022.

(11)     Consists of (i) 9,707 shares held of record by Dr. Li and (ii) 969 shares issuable upon vesting of Twitter RSUs within 60 days of April 29, 2022.

(12)     Consists of (i) 23,854 shares held of record by Mr. Pichette and (ii) 969 shares issuable upon vesting of Twitter RSUs within 60 days of April 29, 2022.

(13)     Consists of (i) 108,557 shares held of record by Mr. Rosenblatt and (ii) 1,270 shares issuable upon vesting of Twitter RSUs within 60 days of April 29, 2022.

(14)     Consists of (i) 55,327 shares held of record by Mr. Taylor and (ii) 1,270 shares issuable upon vesting of Twitter RSUs within 60 days of April 29, 2022.

-134-

Table of Contents

(15) Consists of (i) 20,566 shares held of record by Mr. Zoellick and (ii) 969 shares issuable upon vesting of Twitter RSUs within 60 days of April 29, 2022.

(16) Consists of (i) 19,677,726 shares held of record by our current directors and executive officers, (ii) 800,000 shares issuable pursuant to outstanding Twitter options which are exercisable within 60 days of April 29, 2022, all of which are fully vested and (iii) 249,483 shares issuable upon vesting of Twitter RSUs within 60 days of April 29, 2022.

(17) According to the information reported by The Vanguard Group (which we refer to as "**Vanguard**") on a Schedule 13G/A filed with the SEC on April 8, 2022, Vanguard beneficially owns an aggregate of 82,403,665 shares, which consists of (i) 1,121,405 shares as to which it has shared voting power, (ii) 79,268,380 shares as to which it has sole dispositive power and (iii) 3,135,285 shares as to which it has shared dispositive power. The address of Vanguard is 100 Vanguard Blvd, Malvern, PA 19355.

(18) According to the information reported by Elon Musk on a Schedule 13D filed with the SEC on May 5, 2022, Elon Musk beneficially owns an aggregate of 73,115,038 to which he has sole voting power and shared dispositive power. The address of Elon Musk is 2110 Ranch Road 620 S. #341886, Austin, TX 78734.

(19) According to the information reported by Morgan Stanley and Morgan Stanley Investment Management Inc. on a Schedule 13G/A jointly filed with the SEC on February 10, 2022, (i) Morgan Stanley beneficially owns an aggregate of 67,033,579 shares, which consists of (A) 59,237,336 shares as to which it has shared voting power and (B) 67,033,579 shares as to which it has shared dispositive power and (ii) Morgan Stanley Investment Management Inc. beneficially owns an aggregate of 64,827,920 shares, which consists of (A) 57,039,467 shares as to which it has shared voting power and (B) 64,827,920 shares as to which it has shared dispositive power. The address of Morgan Stanley is 1585 Broadway, New York, NY 10036 and the address of Morgan Stanley Investment Management, Inc. is 522 5th Avenue 6th Floor New York, NY 10036.

(20) According to the information reported by BlackRock, Inc. (which we refer to as "**BlackRock**") on a Schedule 13G/A filed with the SEC on February 8, 2022, BlackRock beneficially owns an aggregate of 52,095,502 shares, which consists of (i) 45,633,971 shares as to which it has sole voting power and (ii) 52,095,502 shares as to which it has sole dispositive power. The address of BlackRock is 55 East 52nd Street, New York, NY 10055.

-135-

[Table of Contents](#)

## FUTURE STOCKHOLDER PROPOSALS

If the merger is completed, we will have no public stockholders and there will be no public participation in any future meetings of our stockholders. However, if the merger is not completed, our stockholders will continue to be entitled to attend and participate in stockholder meetings.

Twitter will hold an annual meeting of stockholders in 2023 only if the merger has not already been completed and Twitter remains a public company.

For a stockholder who intends to have a proposal considered for inclusion in our proxy materials for presentation at our 2023 annual meeting of stockholders (which we refer to as the "**2023 annual meeting**"), if held, our Corporate Secretary must receive the written proposal at our principal executive offices not later than December 13, 2022. In addition, stockholder proposals must comply with the requirements of Rule 14a-8 regarding the inclusion of stockholder proposals in company-sponsored proxy materials. Twitter's bylaws establish an advance notice procedure with regard to specified matters to be brought before an annual meeting of stockholders but not included in our proxy materials. To be timely for our 2023 annual meeting of stockholders, our Corporate Secretary must receive the required written notice at our principal executive offices not earlier than the close of business on January 27, 2023, and not later than the close of business on February 26, 2023.

-136-

Table of Contents

**WHERE YOU CAN FIND MORE INFORMATION**

Twitter files annual, quarterly and current reports, proxy statements and other information with the SEC.

The SEC allows us to "incorporate by reference" information into this proxy statement, which means that we can disclose important information to you by referring you to other documents filed separately with the SEC. The information incorporated by reference is deemed to be part of this proxy statement, except for any information superseded by information contained in this proxy statement or incorporated by reference subsequent to the date of this proxy statement. This proxy statement incorporates by reference the documents set forth below that we have previously filed with the SEC. These documents contain important information about us and our financial condition and are incorporated by reference into this proxy statement.

The following Twitter filings with the SEC are incorporated by reference:

- Annual Report on Form 10-K for the fiscal year ended December 31, 2021, filed on February 16, 2022 (including the portions of our Definitive Proxy Statement on Schedule 14A filed with the SEC on April 12, 2022 incorporated by reference therein);

- Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2022, filed on May 2, 2022; and

- Current Reports on Form 8-K filed on April 5, 2022 (as amended on Form 8-K/A on April 11, 2022), April 18, 2022, April 25, 2022, April 26, 2022.

We also incorporate by reference into this proxy statement each additional document that we may file with the SEC under Sections 13(a), 14 or 15(d) of the Exchange Act between the date of this proxy statement and the earlier of the date of the special meeting or the termination of the merger agreement. These documents include annual, quarterly and current reports (other than Current Reports on Form 8-K furnished pursuant to Item 2.02 or Item 7.01 of Form 8-K, including any exhibits included with such information, unless otherwise indicated therein), proxy statements, proxy solicitation materials and other information.

These SEC filings are available to the public from commercial document retrieval services and at *www.sec.gov*.

You may also obtain any of the documents that we file with the SEC, without charge, by requesting them in writing from us at the following address:

Twitter, Inc.
1355 Market Street, Suite 900
San Francisco, California 94103
Attention: Investor Relations

If you would like to request documents from us, please do so as soon as possible to receive them before the special meeting. If you request any documents from us, we will mail them to you by first class mail, or another equally prompt method. Please note that all of the documents that we file with the SEC are also promptly available through our website at *https://investor.twitterinc.com*. The information included on our website is not incorporated by reference into this proxy statement. The website addresses, and the website addresses included in any documents incorporated by reference in this proxy statement, are not intended to function as hyperlinks, and the information contained on such

-137-

Table of Contents

websites and on the SEC's website is not incorporated by reference in this proxy statement and you should not consider it a part of this proxy statement.

If you have any questions concerning the merger, the special meeting or this proxy statement, would like additional copies of this proxy statement or need help voting your shares of our common stock, please contact our proxy solicitor:

Innisfree M&A Incorporated
501 Madison Avenue, 20th Floor
New York, New York 10022
Stockholders call: (877) 750-8338 (toll-free from the U.S. and Canada) or
+1 (412) 232-3651 (from other countries)
Banks and brokers call collect: (212) 750-5833

-138-

Table of Contents

**MISCELLANEOUS**

Twitter has supplied all information relating to Twitter, and Parent has supplied, and Twitter has not independently verified, all of the information relating to Parent, Acquisition Sub and Mr. Musk contained in this proxy statement.

YOU SHOULD RELY ONLY ON THE INFORMATION CONTAINED OR INCORPORATED BY REFERENCE IN THIS PROXY STATEMENT IN VOTING YOUR SHARES OF OUR COMMON STOCK AT THE SPECIAL MEETING. WE HAVE NOT AUTHORIZED ANYONE TO PROVIDE YOU WITH INFORMATION THAT IS DIFFERENT FROM WHAT IS CONTAINED IN THIS PROXY STATEMENT. THIS PROXY STATEMENT IS DATED [•], 2022. YOU SHOULD NOT ASSUME THAT THE INFORMATION CONTAINED IN THIS PROXY STATEMENT IS ACCURATE AS OF ANY DATE OTHER THAN THAT DATE (OR AS OF AN EARLIER DATE IF SO INDICATED IN THIS PROXY STATEMENT), AND THE SENDING OF THIS PROXY STATEMENT TO STOCKHOLDERS DOES NOT CREATE ANY IMPLICATION TO THE CONTRARY. THIS PROXY STATEMENT DOES NOT CONSTITUTE A SOLICITATION OF A PROXY IN ANY JURISDICTION WHERE, OR TO OR FROM ANY PERSON TO WHOM, IT IS UNLAWFUL TO MAKE A PROXY SOLICITATION.

Table of Contents

**ANNEX A**

**EXECUTION VERSION**

AGREEMENT AND PLAN OF MERGER

by and among

X HOLDINGS I, INC.,

X HOLDINGS II, INC.

and

TWITTER, INC.

Dated as of April 25, 2022

Table of Contents

## TABLE OF CONTENTS

| ARTICLE I DEFINITIONS | | A-2 |
|---|---|---|
| ARTICLE II THE MERGER | | A-11 |
| Section 2.1 | The Merger | A-11 |
| Section 2.2 | The Closing | A-11 |
| Section 2.3 | Effective Time | A-11 |
| Section 2.4 | Certificate of Incorporation and Bylaws | A-12 |
| Section 2.5 | Board of Directors | A-12 |
| Section 2.6 | Officers | A-12 |
| ARTICLE III EFFECT OF THE MERGER ON CAPITAL STOCK | | A-12 |
| Section 3.1 | Effect on Securities | A-12 |
| Section 3.2 | Payment for Securities; Exchange of Certificates | A-13 |
| Section 3.3 | Lost Certificates | A-15 |
| Section 3.4 | Transfers; No Further Ownership Rights | A-15 |
| Section 3.5 | Dissenting Shares | A-15 |
| Section 3.6 | Company Equity Awards | A-16 |
| Section 3.7 | Company ESPP | A-17 |
| ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY | | A-18 |
| Section 4.1 | Organization and Qualification; Subsidiaries | A-18 |
| Section 4.2 | Capitalization | A-18 |
| Section 4.3 | Authority Relative to Agreement | A-19 |
| Section 4.4 | No Conflict; Required Filings and Consents | A-20 |
| Section 4.5 | Permits; Compliance With Laws | A-20 |
| Section 4.6 | Company SEC Documents; Financial Statements | A-21 |
| Section 4.7 | Information Supplied | A-21 |
| Section 4.8 | Disclosure Controls and Procedures | A-22 |
| Section 4.9 | Absence of Certain Changes or Events | A-22 |
| Section 4.10 | No Undisclosed Liabilities | A-22 |
| Section 4.11 | Litigation | A-22 |
| Section 4.12 | Employee Benefit Plans | A-22 |
| Section 4.13 | Labor Matters | A-24 |
| Section 4.14 | Intellectual Property | A-24 |
| Section 4.15 | Taxes | A-24 |
| Section 4.16 | Material Contracts | A-25 |
| Section 4.17 | RESERVED | A-25 |
| Section 4.18 | RESERVED | A-25 |
| Section 4.19 | Takeover Statutes | A-25 |
| Section 4.20 | Vote Required | A-25 |
| Section 4.21 | Brokers | A-26 |
| Section 4.22 | Opinions of Financial Advisors | A-26 |
| Section 4.23 | Rights Agreement | A-26 |
| Section 4.24 | RESERVED | A-26 |
| Section 4.25 | No Other Representations or Warranties | A-26 |
| Article V REPRESENTATIONS AND WARRANTIES OF PARENT AND ACQUISITION SUB | | A-27 |
| Section 5.1 | Organization and Qualification | A-27 |
| Section 5.2 | Authority Relative to Agreement | A-27 |
| Section 5.3 | No Conflict; Required Filings and Consents | A-28 |

i

| Section 5.4 | Financing | A-28 |
| Section 5.5 | Information Supplied | A-30 |
| Section 5.6 | Brokers | A-30 |
| Section 5.7 | Compliance With Laws | A-30 |
| Section 5.8 | Ownership of Company | A-30 |
| Section 5.9 | Solvency | A-31 |
| Section 5.10 | Parent Guarantee | A-31 |
| Section 5.11 | Acknowledgment of Disclaimer of Other Representations and Warranties | A-31 |
| ARTICLE VI COVENANTS AND AGREEMENTS | | A-32 |
| Section 6.1 | Conduct of Business by the Company Pending the Merger | A-32 |
| Section 6.2 | Preparation of the Proxy Statement; Company Stockholders' Meeting | A-34 |
| Section 6.3 | Efforts to Close; Regulatory Filings | A-35 |
| Section 6.4 | Access to Information; Confidentiality | A-37 |
| Section 6.5 | Non-Solicitation; Competing Proposals | A-38 |
| Section 6.6 | Directors' and Officers' Indemnification and Insurance | A-41 |
| Section 6.7 | Notification of Certain Matters | A-43 |
| Section 6.8 | Public Announcements | A-43 |
| Section 6.9 | Employee Benefits | A-43 |
| Section 6.10 | Financing | A-44 |
| Section 6.11 | Financing Cooperation | A-48 |
| Section 6.12 | Acquisition Sub | A-50 |
| Section 6.13 | Rule 16b-3 Matters | A-50 |
| Section 6.14 | Delisting of Company Common Stock | A-51 |
| ARTICLE VII CONDITIONS TO THE MERGER | | A-51 |
| Section 7.1 | Conditions to the Obligations of Each Party | A-51 |
| Section 7.2 | Conditions to the Obligations of Parent and Acquisition Sub | A-51 |
| Section 7.3 | Conditions to the Obligation of the Company to Effect the Merger | A-52 |
| ARTICLE VIII TERMINATION, AMENDMENT AND WAIVER | | A-52 |
| Section 8.1 | Termination | A-52 |
| Section 8.2 | Effect of Termination | A-53 |
| Section 8.3 | Termination Fee | A-54 |
| Section 8.4 | Amendment | A-56 |
| Section 8.5 | Extension; Waiver | A-56 |
| Section 8.6 | Expenses; Transfer Taxes | A-56 |
| ARTICLE IX GENERAL PROVISIONS | | A-56 |
| Section 9.1 | Non-Survival of Representations, Warranties and Agreements | A-56 |
| Section 9.2 | Notices | A-56 |
| Section 9.3 | Interpretation; Certain Definitions | A-58 |
| Section 9.4 | Severability | A-59 |
| Section 9.5 | Assignment | A-59 |
| Section 9.6 | Entire Agreement | A-59 |
| Section 9.7 | No Third-Party Beneficiaries | A-59 |
| Section 9.8 | Governing Law | A-59 |
| Section 9.9 | Specific Performance | A-59 |
| Section 9.10 | Consent to Jurisdiction | A-60 |
| Section 9.11 | Counterparts | A-61 |
| Section 9.12 | WAIVER OF JURY TRIAL | A-61 |
| Section 9.13 | Debt Financing Source Related Part | A-61 |

ii

Table of Contents

**Index of Defined Terms**

| | |
|---|---|
| Acceptable Confidentiality Agreement | Section 6.5(c) |
| Acquisition Sub | Article I, Preamble |
| Acquisition Sub Board | Article I, Recitals |
| Adverse Board Recommendation Change | Section 6.5(d), Article I |
| Affiliate | Article I |
| Aggregate Merger Consideration | Article I |
| Agreement | Article I, Preamble |
| Alternative Financing | Section 6.10(c), Article I |
| Alternative Financing Debt Commitment Letter | Section 6.10(c), Article I |
| Antitrust Laws | Section 4.4(b), Article I |
| Bank Debt Commitment Letter | Section 5.4, Article I |
| Bank Debt Financing | Section 5.4, Article I |
| Blue Sky Laws | Article I |
| Book-Entry Shares | Section 3.1(c), Article I |
| Business Day | Article I |
| Canceled Shares | Section 3.1(b) |
| CCC | Article I |
| Certificate of Merger | Section 2.3(a), Article I |
| Certificates | Section 3.1(c), Article I |
| Closing | Section 2.2, Article I |
| Closing Date | Section 2.2, Article I |
| Code | Article I |
| Company | Article I, Preamble |
| Company ASR Confirmations | Article I |
| Company Benefit Plan | Article I |
| Company Board | Article I, Recitals |
| Company Board Recommendation | Recitals |
| Company Bond Hedge Documentation | Article I |
| Company Bond Hedge Transactions | Article I |
| Company Bylaws | Section 4.1, Article I |
| Company Certificate of Incorporation | Section 4.1, Article I |
| Company Common Stock | Section 3.1(b), Article I |
| Company Disclosure Letter | Article I |
| Company Equity Awards | Article I |
| Company ESPP | Article I |
| Company Intellectual Property | Section 4.14(a), Article I |
| Company Material Adverse Effect | Article I |
| Company Material Contract | Section 4.16(a), Article I |
| Company Option | Article I |
| Company Permits | Section 4.5(a), Article I |
| Company PSU | Article I |
| Company Related Parties | Section 8.3(c), Article I |
| Company RSA | Article I |
| Company RSU | Article I |
| Company SEC Documents | Section 4.6(a), Article I |
| Company Service Provider | Article I |
| Company Stockholder Advisory Vote | Section 4.3(a), Article I |
| Company Stockholder Approval | Section 4.20, Article I |
| Company Stockholders' Meeting | Section 6.2(c), Article I |
| Company Warrant Confirmations | Article I |

iii

[Table of Contents](#)

| | |
|---|---|
| Competing Proposal | Section 6.5(g)(i), Article I |
| Consent | Section 4.4(b), Article I |
| Continuation Period | Section 6.9(a), Article I |
| Continuing Employees | Section 6.9(a), Article I |
| Contract | Article I |
| COVID-19 | Article I |
| COVID-19 Measures | Article I |
| D&O Indemnified Parties | Section 6.6(a), Article I |
| Debt Commitment Letters | Section 5.4, Article I |
| Debt Financing | Section 5.4, Article I |
| Debt Financing Source | Article I |
| Debt Financing Source Related Party | Article I |
| DGCL | Article I, Recitals |
| Dissenting Shares | Section 3.5, Article I |
| DTC | Article I |
| Effective Time | Section 2.3(a), Article I |
| Enforceability Exceptions | Section 4.3(a), Article I |
| Equity Commitment Letter | Section 5.4, Article I |
| Equity Financing | Section 5.4 |
| Equity Investor | Preamble |
| ERISA | Article I |
| ERISA Affiliate | Article I |
| Exchange Act | Article I |
| Exchange Fund | Section 3.2(a), Article I |
| Existing 2027 Senior Notes | Article I |
| Existing 2030 Senior Notes | Article I |
| Existing Convertible Notes | Article I |
| Existing Credit Agreement | Article I |
| Existing D&O Insurance Policies | Section 6.6(c), Article I |
| Existing Senior Notes | Article I |
| Expenses | Article I |
| Final Offering Period | Section 3.7, Article I |
| Financing | Section 5.4, Article I |
| Financing Agreements | Section 6.10(a)(i), Article I |
| Financing Commitments | Section 5.4, Article I |
| Financing Sources | Article I |
| Foreign Investment Laws | Article I |
| Foreign Plan | Article I |
| Funding Obligations | Section 5.4, Article I |
| GAAP | Article I |
| Goldman Sachs | Section 4.21, Article I |
| Governmental Authority | Article I |
| Guarantor | Recitals |
| Hazardous Materials | Article I |
| HSR Act | Article I |
| Intellectual Property Rights | Section 4.14(a), Article I |
| Intervening Event | Section 6.5(d) |
| IRS | Article I |
| J.P. Morgan | Section 4.21 |
| Knowledge | Article I |
| Law | Article I |

iv

**Table of Contents**

| | |
|---|---|
| Lien | Article I |
| Margin Loan Borrower | Section 5.4, Article I |
| Margin Loan Commitment Letter | Section 5.4, Article I |
| Margin Loan Financing | Section 5.4, Article I |
| Merger | Article I, Recitals |
| Merger Consideration | Section 3.1(c), Article I |
| Notice of Adverse Board Recommendation Change | Section 6.5(d), Article I |
| Notice of Superior Proposal | Section 6.5(d), Article I |
| Order | Article I |
| Parent | Article I, Preamble |
| Parent Board | Article I, Recitals |
| Parent Disclosure Letter | Article I |
| Parent Guarantee | Recitals |
| Parent Material Adverse Effect | Article I |
| Parent Owned Shares | Section 5.8 |
| Parent Related Parties | Section 8.3(c), Article I |
| Parent Termination Fee | Article I |
| Paying Agent | Section 3.2(a), Article I |
| Paying Agent Agreement | Section 3.2(a), Article I |
| Permitted Lien | Article I |
| Person | Article I |
| Personal Information | Section 4.14 |
| Post-Closing Plans | Section 6.9(b), Article I |
| Post-Closing Welfare Plans | Section 6.9(c), Article I |
| Proxy Statement | Section 4.7, Article I |
| Representatives | Section 6.4, Article I |
| SEC | Article I |
| Secretary of State | Section 2.3(a), Article I |
| Securities Act | Article I |
| Silver Lake Investment Agreement | Article I |
| Solvent | Section 5.9, Article I |
| Specified Provisions | Article I, Preamble |
| Stockholder Rights | Article I |
| Stockholder Rights Agreement | Article I |
| Stockholder Rights Plan | Article I |
| Subsidiary | Article I |
| Superior Proposal | Section 6.5(g)(iii), Article I |
| Surviving Corporation | Section 2.1, Article I |
| Tax | Article I |
| Tax Returns | Article I |
| Taxes | Article I |
| Termination Date | Section 8.1(b)(i), Article I |
| Termination Fee | Article I |
| Tesla Shares | Article I |
| Third Party | Article I |
| U.S. | Article I |
| Unvested Company Option | Section 3.6(a)(ii) |
| Unvested Company PSU | Section 3.6(b)(ii) |
| Unvested Company RSU | Section 3.6(d)(ii) |
| Unvested Option Consideration | Section 3.6(a)(ii) |
| Unvested PSU Consideration | Section 3.6(b)(ii) |
| Unvested RSA Consideration | Section 3.6(c) |

v

**Table of Contents**

| | |
|---|---|
| Unvested RSU Consideration | Section 3.6(d)(ii) |
| Vested Company Option | Section 3.6(a)(i) |
| Vested Company PSU | Section 3.6(b)(i) |
| Vested Company RSU | Section 3.6(d)(i) |
| Vested Option Consideration | Section 3.6(a)(i) |
| Vested PSU Consideration | Section 3.6(b)(i) |
| Vested RSU Consideration | Section 3.6(d)(i) |

vi

Table of Contents

## AGREEMENT AND PLAN OF MERGER

THIS AGREEMENT AND PLAN OF MERGER, dated as of April 25, 2022 (this "**Agreement**"), is made by and among Twitter, Inc., a Delaware corporation (the "**Company**"), X Holdings I, Inc., a Delaware corporation ("**Parent**"), X Holdings II, Inc., a Delaware corporation and a direct wholly owned Subsidiary of Parent ("**Acquisition Sub**"), and, solely for purposes of Sections 5.4, 6.2(d), 6.3, 6.8, 6.10, 6.11, 6.12 and 9.9 (the "**Specified Provisions**"), Elon R. Musk (the "**Equity Investor**").

W I T N E S S E T H:

WHEREAS, the parties desire for Parent to acquire the Company by way of a merger (the "**Merger**") of Acquisition Sub with and into the Company pursuant to the General Corporation Law of the State of Delaware (the "**DGCL**") upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the board of directors of Acquisition Sub (the "**Acquisition Sub Board**") has determined that it is advisable to, fair to and in the best interests of Acquisition Sub and its stockholders to effect the Merger of Acquisition Sub with and into the Company pursuant to the DGCL upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the Company's board of directors (the "**Company Board**") has, by resolutions duly adopted by the unanimous vote of the directors at a duly held meeting (i) determined that the terms and conditions of this Agreement, the Merger and the other transactions contemplated by this Agreement are advisable and in the best interests of the Company and the Company's stockholders, (ii) authorized the execution and delivery of this Agreement and declared advisable and approved the consummation of the transactions contemplated by this Agreement, including the Merger, (iii) directed that this Agreement be submitted for consideration at a meeting of the Company's stockholders and (iv) subject to the terms of this Agreement, recommended that the Company's stockholders adopt this Agreement and approve the transactions contemplated by this Agreement, including the Merger (the "**Company Board Recommendation**");

WHEREAS, the Acquisition Sub Board has, by resolutions duly adopted, (i) determined that the terms and conditions of this Agreement, the Merger and the other transactions contemplated by this Agreement are advisable and in the best interests of the Acquisition Sub and Parent, as the sole stockholder of Acquisition Sub; (ii) authorized the execution and delivery of this Agreement and declared advisable and approved the consummation of the transactions contemplated by this Agreement, including the Merger, (iii) directed that this Agreement be submitted for consideration by Parent, as the sole stockholder of Acquisition Sub and (iv) recommended that Parent, as the sole stockholder of Acquisition Sub approve the Merger, and Parent, as the sole stockholder of Acquisition Sub, has approved this Agreement and the consummation of the transactions contemplated by this Agreement, including the Merger;

WHEREAS, the board of directors of Parent (the "**Parent Board**") has, by resolutions duly adopted by the unanimous vote of the directors, (i) adopted this Agreement and approved the consummation of the transactions contemplated by this Agreement, including the Merger and (ii) determined that this Agreement and the transactions contemplated by this Agreement are advisable and in the best interests of Parent and Elon Musk, as the sole stockholder of Parent;

WHEREAS, as a material inducement to, and as a condition to, the Company entering into this Agreement, concurrently with the execution of this Agreement, Elon Musk (the "**Guarantor**") has entered into a limited guarantee, dated as of the date hereof, guaranteeing certain of Parent's and Acquisition Sub's obligations under this Agreement (the "**Parent Guarantee**"); and

A-1

Table of Contents

WHEREAS, each of Parent, Acquisition Sub and the Company desires to make certain representations, warranties, covenants and agreements in connection with the Merger and also to prescribe various conditions to the Merger.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties and covenants and subject to the conditions herein contained, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS

As used in this Agreement, the following terms shall have the respective meanings set forth or referenced below:

"**Acquisition Sub**" shall have the meaning set forth in the Preamble.

"**Acquisition Sub Board**" shall have the meaning set forth in the Recitals.

"**Adverse Board Recommendation Change**" shall have the meaning set forth in Section 6.5(d).

"**Affiliate**" has the meaning set forth in Rule 12b-2 of the Exchange Act.

"**Aggregate Merger Consideration**" shall mean the product of (x) the number of shares of Company Common Stock issued and outstanding (other than those shares canceled or retired pursuant to Section 3.1(b)) immediately prior to the Effective Time *multiplied by* (y) the Merger Consideration.

"**Agreement**" shall have the meaning set forth in the Preamble.

"**Alternative Financing**" shall have the meaning set forth in Section 6.10(c).

"**Alternative Financing Debt Commitment Letter**" shall have the meaning set forth in Section 6.10(c).

"**Antitrust Laws**" shall have the meaning set forth in Section 4.4(b).

"**Bank Debt Commitment Letter**" shall have the meaning set forth in Section 5.4.

"**Bank Debt Financing**" shall have the meaning set forth in Section 5.4.

"**Blue Sky Laws**" shall mean state securities or "blue sky" laws.

"**Book-Entry Shares**" shall have the meaning set forth in Section 3.1(c).

"**Business Day**" shall mean any day other than a Saturday, Sunday or a day on which all banking institutions in San Francisco, California or New York, New York are authorized or obligated by Law or executive order to close.

"**CCC**" means the California Corporations Code.

"**Certificate of Merger**" shall have the meaning set forth in Section 2.3(a).

"**Certificates**" shall have the meaning set forth in Section 3.1(c).

"**Closing**" shall have the meaning set forth in Section 2.2.

"**Closing Date**" shall have the meaning set forth in Section 2.2.

A-2

Table of Contents

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Company**" shall have the meaning set forth in the Preamble.

"**Company ASR Confirmations**" means (i) the Master Confirmation re Accelerated Stock Repurchases, dated February 10, 2022, between the Company and Morgan Stanley & Co. LLC and (ii) the Master Confirmation re Accelerated Stock Repurchases, dated February 10, 2022, between the Company and Wells Fargo Bank, National Association, in each case, as amended through the date hereof.

"**Company Benefit Plan**" shall mean (i) "employee benefit plan" (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA), and (ii) each other employment agreement, bonus, stock option, stock purchase or other equity-based, benefit, incentive compensation, profit sharing, savings, retirement (including early retirement and supplemental retirement), disability, insurance, vacation, incentive, deferred compensation, supplemental retirement (including termination indemnities and seniority payments), severance, termination, retention, change of control and other similar fringe, welfare or other employee benefit plans, benefit programs, benefit agreements, benefit contracts, benefit policies or benefit arrangements (whether or not in writing), in each case, (x) which is sponsored, maintained or contributed to for the benefit of or relating to any current or former director, officer or employee of the Company or its Subsidiaries and (y) with respect to which the Company or any of its Subsidiaries has or may have any liability.

"**Company Board**" shall have the meaning set forth in the Recitals.

"**Company Bond Hedge Documentation**" means (a)(i) the call option transaction confirmation, dated June 6, 2018, between the Company and Barclays Bank PLC, (ii) the call option transaction confirmation, dated June 6, 2018, between the Company and JPMorgan Chase Bank, N.A., London Branch, (iii) the call option transaction confirmation, dated June 6, 2018, between the Company and Wells Fargo Bank, National Association, (iv) the additional call option transaction confirmation, dated June 7, 2018, between the Company and Barclays Bank PLC, (v) the additional call option transaction confirmation, dated June 7, 2018, between the Company and JPMorgan Chase Bank, N.A., London Branch, (vi) the additional call option transaction confirmation, dated June 7, 2018, between the Company and Wells Fargo Bank, National Association, and (b)(i) the call option transaction confirmation, dated March 1, 2021, between the Company and Bank of America, N.A., (ii) the call option transaction confirmation, dated March 1, 2021, between the Company and Barclays Bank PLC, (iii) the call option transaction confirmation, dated March 1, 2021, between the Company and Goldman Sachs & Co. LLC, (iv) the call option transaction confirmation, dated March 1, 2021, between the Company and Wells Fargo Bank, National Association, (v) the additional call option transaction confirmation, dated March 12, 2021, between the Company and Bank of America, N.A., (vi) the additional call option transaction confirmation, dated March 12, 2021, between the Company and Barclays Bank PLC, (vii) the additional call option transaction confirmation, dated March 12, 2021, between the Company and Goldman Sachs & Co. LLC, (viii) the additional call option transaction confirmation, dated March 12, 2021, between the Company and Wells Fargo Bank, National Association, (ix) the letter agreement, dated March 1, 2021, between the Company and Bank of America, N.A., (x) the letter agreement, dated March 1, 2021, between the Company and Barclays Bank PLC, (xi) the letter agreement, dated March 1, 2021, between the Company and Goldman Sachs & Co. LLC, (xii) the letter agreement, dated March 1, 2021, between the Company and Wells Fargo Bank, National Association, (xiii) the additional letter agreement, dated March 12, 2021, between the Company and Bank of America, N.A., (xiv) the additional letter agreement, dated March 12, 2021, between the Company and Barclays Bank PLC, (xv) the additional letter agreement, dated March 12, 2021, between the Company and Goldman Sachs & Co. LLC, and (xvi) the additional letter agreement, dated March 12, 2021, between the Company and Wells Fargo Bank, National Association.

A-3

Table of Contents

"**Company Bond Hedge Transactions**" means each of the call option transactions evidenced by the Company Bond Hedge Documentation.

"**Company Bylaws**" shall have the meaning set forth in <u>Section 4.1</u>.

"**Company Certificate of Incorporation**" shall have the meaning set forth in <u>Section 4.1</u>.

"**Company Common Stock**" shall have the meaning set forth in <u>Section 3.1(a)</u>.

"**Company Disclosure Letter**" shall mean the disclosure letter delivered by the Company to Parent simultaneously with the execution of this Agreement.

"**Company Equity Awards**" shall mean, collectively, (i) Company Options, (ii) Company PSUs, (iii) Company RSAs, and (iv) Company RSUs.

"**Company ESPP**" shall mean the Company 2013 Employee Stock Purchase Plan.

"**Company Intellectual Property**" shall have the meaning set forth in <u>Section 4.14(a)</u>.

"**Company Material Adverse Effect**" means any change, event, effect or circumstance which, individually or in the aggregate, has resulted in or would reasonably be expected to result in a material adverse effect on the business, financial condition or results of operations of the Company and its Subsidiaries, taken as a whole; <u>provided</u>, <u>however</u>, that changes, events, effects or circumstances which, directly or indirectly, to the extent they relate to or result from the following shall be excluded from, and not taken into account in, the determination of Company Material Adverse Effect: (i) any condition, change, effect or circumstance generally affecting any of the industries or markets in which the Company or its Subsidiaries operate; (ii) any change in any Law or GAAP (or changes in interpretations of any Law or GAAP); (iii) general economic, regulatory or political conditions (or changes therein) or conditions (or changes therein) in the financial, credit or securities markets (including changes in interest or currency exchange rates) in the United States or any other country or region in the world; (iv) any acts of God, force majeure events, natural disasters, terrorism, cyberattack, data breach, armed hostilities, sabotage, war or any escalation or worsening of any of the foregoing; (v) any epidemics, pandemics or contagious disease outbreaks (including COVID-19) and any political or social conditions, including civil unrest, protests and public demonstrations or any other COVID-19 Measures that relate to, or arise out of, an epidemic, pandemic or disease outbreak (including COVID-19) or any change in such COVID-19 Measures, directive, pronouncement or guideline or interpretation thereof, or any continuation or of of any of the foregoing, in the United States or any other country or region in the world; (vi) the negotiation, execution, announcement, performance, consummation or existence of this Agreement or the transactions contemplated by this Agreement, including (A) by reason of the identity of Elon Musk, Parent or any of their Affiliates or their respective financing sources, or any communication by Parent or any of its Affiliates or their respective financing sources, including regarding their plans or intentions with respect to the conduct of the business of the Company or any of its Subsidiaries and (B) any litigation, claim or legal proceeding threatened or initiated against Parent, Acquisition Sub, the Company or any of their respective Affiliates, officers or directors, in each case, arising out of or relating to this Agreement or the transactions contemplated by this Agreement, and including the impact of any of the foregoing on any relationships with customers, suppliers, vendors, collaboration partners, employees, unions or regulators; (vii) any action taken pursuant to the terms of this Agreement or with the consent or at the direction of Parent or Acquisition Sub (or any action not taken as a result of the failure of Parent to consent to any action requiring Parent's consent pursuant to <u>Section 6.1</u>); (viii) any changes in the market price or trading volume of the Company Common Stock, any failure by the Company or its Subsidiaries to meet internal, analysts' or other earnings estimates or financial projections or forecasts for any period, any

A-4

Table of Contents

changes in credit ratings and any changes in any analysts' recommendations or ratings with respect to the Company or any of its Subsidiaries (provided that the facts or occurrences giving rise to or contributing to such changes or failure that are not otherwise excluded from the definition of "Company Material Adverse Effect" may be taken into account in determining whether there has been a Company Material Adverse Effect); and (ix) any matter disclosed in the Company SEC Documents filed by the Company prior to the date of this Agreement (other than any disclosures set forth under the headings "Risk Factors" or "Forward-Looking Statements").

"**Company Material Contract**" shall have the meaning set forth in Section 4.16(a).

"**Company Option**" shall mean each outstanding option to purchase shares of Company Common Stock granted to any employee or director of, or other Company Service Provider.

"**Company Permits**" shall have the meaning set forth in Section 4.5(a).

"**Company PSU**" shall mean each performance-based restricted stock unit that vests on the basis of time and the achievement of performance metrics and was granted to any Company Service Provider.

"**Company Related Parties**" shall have the meaning set forth in Section 8.3(d).

"**Company RSA**" shall mean each share of Company Common Stock granted to any Company Service Provider that remains subject to vesting, lapse or forfeiture provisions.

"**Company RSU**" shall mean each time-based restricted stock unit that vests on the basis of time and was granted to any Company Service Provider.

"**Company SEC Documents**" shall have the meaning set forth in Section 4.6(a).

"**Company Service Provider**" shall mean each current or former director, employee, consultant or independent contractor of the Company or any of its Subsidiaries

"**Company Stockholder Advisory Vote**" shall have the meaning set forth in Section 4.3(a).

"**Company Stockholder Approval**" shall have the meaning set forth in Section 4.20.

"**Company Stockholders' Meeting**" shall have the meaning set forth in Section 6.2(c).

"**Company Warrant Confirmations**" means (a)(i) the warrant confirmation, dated June 6, 2018, between the Company and Barclays Bank PLC, (ii) the warrant confirmation, dated June 6, 2018, between the Company and JPMorgan Chase Bank, N.A., London Branch, (iii) the warrant confirmation, dated June 6, 2018, between the Company and Wells Fargo Bank, National Association, (iv) the additional warrant confirmation, dated June 7, 2018, between the Company and Barclays Bank PLC, (v) the additional warrant confirmation, dated June 7, 2018, between the Company and JPMorgan Chase Bank, N.A., London Branch, (vi) the additional warrant confirmation, dated June 7, 2018, between the Company and Wells Fargo Bank, National Association, and (b)(i) the warrant confirmation, dated March 1, 2021, between the Company and Bank of America, N.A., (ii) the warrant confirmation, dated March 1, 2021, between the Company and Barclays Bank PLC, (iii) the warrant confirmation, dated March 1, 2021, between the Company and Goldman Sachs & Co. LLC, (iv) the warrant confirmation, dated March 1, 2021, between the Company and Wells Fargo Bank, National Association, (v) the additional warrant confirmation, dated March 12, 2021, between the Company and Bank of America, N.A., (vi) the additional warrant confirmation, dated March 12, 2021, between the

A-5

Table of Contents

Company and Barclays Bank PLC, (vii) the additional warrant confirmation, dated March 12, 2021, between the Company and Goldman Sachs & Co. LLC, and (viii) the additional warrant confirmation, dated March 12, 2021, between the Company and Wells Fargo Bank, National Association.

"**Competing Proposal**" shall have the meaning set forth in Section 6.5(g)(i).

"**Consent**" shall have the meaning set forth in Section 4.4(b).

"**Continuation Period**" shall have the meaning set forth in Section 6.9(a).

"**Continuing Employees**" shall have the meaning set forth in Section 6.9(a).

"**Contract**" means any written contract, subcontract, lease, sublease, conditional sales contract, purchase order, sales order, task order, delivery order, license, indenture, note, bond, loan, instrument, understanding, permit, concession, franchise, commitment or other agreement.

"**COVID-19**" means SARS-Co V-2 or COVID-19 or any evolutions, variants or mutations thereof.

"**COVID-19 Measures**" means quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester, safety or similar laws, directives, restrictions, guidelines, responses or recommendations of or promulgated by any Governmental Authority, including the Centers for Disease Control and Prevention and the World Health Organization, or other reasonable actions taken in response to the foregoing or otherwise, in each case, in connection with or in response to COVID-19 and any evolutions, variants or mutations thereof or related or associated epidemics, pandemics or disease outbreaks.

"**D&O Indemnified Parties**" shall have the meaning set forth in Section 6.6(a).

"**Debt Commitment Letters**" shall have the meaning set forth in Section 5.4.

"**Debt Financing**" shall have the meaning set forth in Section 5.4.

"**Debt Financing Source**" shall mean (i) the commitment parties party, as of the date hereof, to the Debt Commitment Letters that have been delivered to the Company in accordance with Section 5.4, and (ii) the Persons, in their respective capacities as such, that have committed to arrange or provide or have otherwise entered into agreements (including the Debt Commitment Letters or any Financing Agreements), in each case, in connection with all or any portion of the Debt Financing or Alternative Financing in connection with the transactions contemplated hereby, and any joinder agreements, indentures or credit agreements entered into pursuant thereto, together with their Affiliates, and any of their or their Affiliates' respective, direct or indirect, former, current or future stockholders, managers, members, directors, officers, employees, agents, advisors, other representatives or any successors or assignees of any of the foregoing (it being understood that Parent, Acquisition Sub and any of their respective Affiliates shall not constitute "Debt Financing Sources" for any purposes hereunder).

"**Debt Financing Source Related Party**" means any Debt Financing Source, together with their respective Affiliates and their and their respective Affiliates' former, current and future officers, directors, employees, agents and representatives and their respective successors and assigns.

"**DGCL**" shall have the meaning set forth in the Recitals.

"**Dissenting Shares**" shall have the meaning set forth in Section 3.5.

A-6

"**DTC**" shall have the meaning set forth in Section 3.2(b)(ii).

"**Effective Time**" shall have the meaning set forth in Section 2.3(a).

"**Enforceability Exceptions**" shall have the meaning set forth in Section 4.3(a).

"**Equity Commitment Letter**" shall have the meaning set forth in Section 5.4.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" shall mean, for any Person, each trade or business, whether or not incorporated, that, together with such Person, would be deemed a "single employer" within the meaning set forth in Section 414 of the Code.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Exchange Fund**" shall have the meaning set forth in Section 3.2(a).

"**Existing Credit Agreement**" shall mean that certain Revolving Credit Agreement, dated as of August 17, 2018, among the Company, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A. as administrative agent, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Existing D&O Insurance Policies**" shall have the meaning set forth in Section 6.6(c).

"**Existing 2027 Senior Notes**" shall mean the 3.875% Senior Notes due 2027 issued pursuant to that certain Indenture, dated December 9, 2019, among the Company, as issuer, and U.S. Bank National Association, as trustee, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Existing 2030 Senior Notes**" shall mean the 5.000% Senior Notes due 2030 issued pursuant to that certain Indenture, dated February 25, 2022, among the Company, as issuer, and U.S. Bank National Association, as trustee, as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Existing Convertible Notes**" shall mean the (i) 0.25% Convertible Senior Notes due 2024 issued pursuant to that certain Indenture, dated June 11, 2018, among the Company, as issuer, and U.S. Bank National Association, as trustee, (ii) 0.375% Convertible Senior Notes due 2025 issued pursuant to that certain Indenture, dated March 12, 2020, among the Company, as issuer, and U.S. Bank National Association, as trustee, and (iii) 0% Convertible Senior Notes due 2026 issued pursuant to that certain Indenture, dated March 4, 2021, among the Company, as issuer, and U.S. Bank National Association, as trustee, in each case as amended, amended and restated, supplemented or otherwise modified from time to time.

"**Existing Senior Notes**" shall mean the (i) the Existing 2027 Senior Notes and (ii) the Existing 2030 Senior Notes.

"**Expenses**" shall mean all out-of-pocket expenses (including all fees and expenses of counsel, accountants, investment bankers, experts and consultants to a party hereto and its Affiliates) incurred by a party or on its behalf in connection with or related to the authorization, preparation, negotiation, execution and performance of this Agreement, the preparation, printing, filing and mailing of the Proxy Statement and all SEC and other regulatory filing fees incurred in connection with the Proxy Statement,

A-7

Table of Contents

the solicitation of stockholder approvals, any filing with, and obtaining of any necessary action or non-action, Consent or approval from any Governmental Authority pursuant to any Antitrust Laws or Foreign Investment Laws, engaging the services of the Paying Agent, any other filings with the SEC, and all other matters related to the Closing and the other transactions contemplated by this Agreement.

"**Final Offering Period**" shall have the meaning set forth in Section 3.7.

"**Financing**" shall have the meaning set forth in Section 5.4.

"**Financing Agreements**" shall have the meaning set forth in Section 6.10(a).

"**Financing Commitments**" shall have the meaning set forth in Section 5.4.

"**Financing Sources**" means the Debt Financing Sources and Elon Musk.

"**Foreign Investment Laws**" shall mean any Laws designed or intended to prohibit, restrict or regulate actions (i) by foreigners to acquire interests in or control over domestic equities, securities, entities, assets, land or interests, or (ii) to acquire interests in or control over equities, securities, entities, assets, land or interests that might harm domestic national security or public interest, other than Antitrust Laws.

"**Foreign Plan**" shall mean each Company Benefit Plan that primarily covers current or former employees, directors or individual service providers of the Company or any of its subsidiaries based outside of the U.S. and/or that is subject to any Law other than U.S., federal, state or local law (other than any plan or program that is required by statute or maintained by a Governmental Authority to which the Company or any of its subsidiaries contributes pursuant to applicable Law).

"**Funding Obligations**" shall have the meaning set forth in Section 5.4.

"**GAAP**" shall mean the U.S. generally accepted accounting principles.

"**Goldman Sachs**" shall have the meaning set forth in Section 4.21.

"**Governmental Authority**" shall mean any U.S. (federal, state or local) or foreign government, or any governmental, regulatory, judicial or administrative authority, agency or commission.

"**Hazardous Materials**" means all substances (i) defined as hazardous substances, oils, pollutants or contaminants in the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. § 300.5, or (ii) defined as hazardous substances, hazardous materials, pollutants, contaminants, toxic substances (or words of similar import) by or regulated as such under any Environmental Law.

"**HSR Act**" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations thereunder.

"**Intellectual Property Rights**" shall have the meaning set forth in Section 4.14(a).

"**IRS**" shall mean the Internal Revenue Service.

"**Knowledge**" means the actual knowledge of the directors and officers of the relevant party, following due inquiry of their direct reports and others who would be reasonably expected to have knowledge of the subject matter in question.

A-8

Table of Contents

"**Law**" shall mean any and all domestic (federal, state or local) or foreign laws (including common law), rules, regulations, orders, judgments or decrees promulgated by any Governmental Authority.

"**Lien**" shall mean liens, claims, mortgages, encumbrances, pledges, security interests or charges of any kind.

"**Margin Loan Borrower**" shall have the meaning set forth in Section 5.4.

"**Margin Loan Commitment Letter**" shall have the meaning set forth in Section 5.4.

"**Margin Loan Financing**" shall have the meaning set forth in Section 5.4.

"**Merger**" shall have the meaning set forth in the Recitals.

"**Merger Consideration**" shall have the meaning set forth in Section 3.1(c).

"**Notice of Adverse Board Recommendation Change**" shall have the meaning set forth in Section 6.5(d).

"**Notice of Superior Proposal**" shall have the meaning set forth in Section 6.5(d).

"**Order**" shall mean any decree, order, judgment, injunction, temporary restraining order or other order in any suit or proceeding by or with any Governmental Authority.

"**Parent**" shall have the meaning set forth in the Preamble.

"**Parent Board**" shall have the meaning set forth in the Recitals.

"**Parent Disclosure Letter**" shall mean the disclosure letter delivered by Parent to the Company simultaneously with the execution of this Agreement.

"**Parent Material Adverse Effect**" shall mean any change, effect or circumstance which, individually or in the aggregate, has prevented or materially delayed or materially impaired, or would reasonably be expected to prevent or materially delay or materially impair, the ability of Parent or Acquisition Sub to consummate the Merger and the other transactions contemplated by this Agreement.

"**Parent Related Parties**" shall have the meaning set forth in Section 8.3(c).

"**Parent Termination Fee**" shall mean an amount equal to $1,000,000,000.

"**Paying Agent**" shall have the meaning set forth in Section 3.2(a).

"**Paying Agent Agreement**" shall have the meaning set forth in Section 3.2(a).

"**Permitted Lien**" shall mean (i) any Lien for Taxes not yet delinquent or that are being contested in good faith by any appropriate proceedings and for which adequate accruals or reserves have been established in accordance with GAAP, (ii) Liens securing indebtedness or liabilities that are reflected in the Company SEC Documents or incurred in the ordinary course of business since the end of the most recent fiscal year for which an Annual Report on Form 10-K has been filed by the Company with the SEC and Liens securing indebtedness or liabilities that have otherwise been disclosed to Parent in writing, (iii) such Liens or other imperfections of title, if any, that do not have a Company Material

A-9

Table of Contents

Adverse Effect, including (A) easements or claims of easements whether or not shown by the public records, boundary line disputes, overlaps, encroachments and any matters not of record which would be disclosed by an accurate survey or a personal inspection of the property, (B) rights of parties in possession, (C) any supplemental Taxes or assessments not shown by the public records and (D) title to any portion of the premises lying within the right of way or boundary of any public road or private road, (iv) Liens imposed or promulgated by Laws with respect to real property and improvements, including zoning regulations, (v) Liens disclosed on existing title reports or existing surveys, (vi) mechanics', carriers', workmen's, repairmen's and similar Liens incurred in the ordinary course of business, (vii) Liens securing acquisition financing with respect to the applicable asset, including refinancings thereof and (viii) licenses of Intellectual Property Rights.

"**Person**" shall mean an individual, a corporation, a limited liability company, a partnership, an association, a trust or any other entity or organization, including a Governmental Authority.

"**Post-Closing Plans**" shall have the meaning set forth in Section 6.9(b).

"**Post-Closing Welfare Plans**" shall have the meaning set forth in Section 6.9(c).

"**Proxy Statement**" shall have the meaning set forth in Section 4.7.

"**Representatives**" shall have the meaning set forth in Section 6.4.

"**SEC**" shall mean the Securities and Exchange Commission.

"**Secretary of State**" shall have the meaning set forth in Section 2.3(a).

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**Silver Lake Investment Agreement**" means the Investment Agreement, dated as of March 9, 2020, among Twitter, Inc. and Silver Lake Partners V DE (AIV), L.P., as amended, restated, supplemented or otherwise modified from time to time.

"**Solvent**" shall have the meaning set forth in Section 5.12.

"**Specified Provisions**" shall have the meaning set forth in the Preamble.

"**Stockholder Rights**" means the rights distributed to the Stockholders pursuant to Company Stockholder Rights Agreement.

"**Stockholder Rights Plan**" means the Company Stockholder Rights and the Company Stockholder Rights Agreement.

"**Stockholder Rights Agreement**" means the Preferred Stock Rights Agreement, dated as of April 15, 2022, between the Company and Computershare Trust Company, N.A., as rights agent, as amended, restated, supplemented or otherwise modified from time to time

"**Subsidiary**" of any Person shall mean any corporation, partnership, joint venture or other legal entity of which such Person (either above or through or together with any other subsidiary) owns, directly or indirectly, more than 50% of the stock or other equity interests, the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such corporation or other legal entity.

"**Superior Proposal**" shall have the meaning set forth in Section 6.5(g)(iii).

A-10

Table of Contents

"**Surviving Corporation**" shall have the meaning set forth in Section 2.1.

"**Tax**" or "**Taxes**" shall mean all federal, state, local and foreign income, profits, franchise, gross receipts, customs duty, capital stock, severance, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, license, production, value added, occupancy and other taxes of any kind whatsoever, together with all interest, penalties and additions imposed with respect thereto.

"**Tax Returns**" shall mean all returns and reports (including elections, declarations, disclosures, schedules, estimates and information returns) filed or required to be filed with a Tax authority.

"**Termination Date**" shall have the meaning set forth in Section 8.1(b)(i).

"**Termination Fee**" shall mean an amount equal to $1,000,000,000.

"**Tesla Shares**" means shares of common stock of Tesla, Inc., $0.001 par value.

"**Third Party**" shall mean any Person or group other than Parent, Acquisition Sub and their respective Affiliates.

"**U.S.**" means the United States of America and its territories, commonwealths and possessions.

## ARTICLE II

## THE MERGER

Section 2.1 The Merger. Upon the terms and subject to the conditions of this Agreement, and in accordance with the DGCL, at the Effective Time, Acquisition Sub shall be merged with and into the Company, whereupon the separate existence of Acquisition Sub shall cease, and the Company shall continue under the name "Twitter, Inc." as the surviving corporation (the "**Surviving Corporation**") and shall continue to be governed by the laws of the State of Delaware.

Section 2.2 The Closing. Subject to the provisions of Article VII, the closing of the Merger (the "**Closing**") shall take place at 9:00 a.m. (Pacific Time) on a date to be specified by the parties hereto, but no later than the second (2nd) Business Day after the satisfaction or waiver of all of the conditions set forth in Article VII (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing). The Closing shall take place virtually by the electronic exchange of documents, unless another time, date or place is agreed to in writing by the parties hereto (such date, the "**Closing Date**").

Section 2.3 Effective Time.

(a) Concurrently with the Closing, the Company, Parent and Acquisition Sub shall cause a certificate of merger with respect to the Merger (the "**Certificate of Merger**") to be executed and filed with the Secretary of State of the State of Delaware (the "**Secretary of State**") in accordance with the relevant provisions of the DGCL and any other applicable Law of the State of Delaware. The Merger shall become effective on the date and time at which the Certificate of Merger has been duly filed with the Secretary of State or such other date and time as may be agreed to by Parent and the Company and as set forth in the Certificate of Merger in accordance with the DGCL (such date and time hereinafter referred to as the "**Effective Time**").

A-11

Table of Contents

(b) The Merger shall have the effects set forth in this Agreement and in the applicable provisions of the DGCL. Without limiting the generality of the foregoing, from and after the Effective Time, (i) the Company shall be the surviving corporation in the Merger, (ii) all the property, rights, privileges, immunities, powers, franchises and liabilities of the Company and Acquisition Sub are vested in the Surviving Corporation, (iii) the separate existence of Acquisition Sub shall cease and (iv) the Company shall continue to be governed by the laws of the State of Delaware.

Section 2.4 Certificate of Incorporation and Bylaws. The parties will take all necessary actions so that at the Effective Time, the certificate of incorporation and the bylaws of Acquisition Sub, each as in effect immediately prior to the Effective Time, will be the certificate of incorporation and the bylaws, respectively, of the Surviving Corporation (except that the titles thereof shall read "Certificate of Incorporation of Twitter, Inc." and "Bylaws of Twitter, Inc.", respectively) until, subject to Section 6.6, thereafter amended in accordance with the applicable provisions of the DGCL and the certificate of incorporation and bylaws of the Surviving Corporation.

Section 2.5 Board of Directors. The board of directors of the Surviving Corporation effective as of, and immediately following, the Effective Time shall consist of the members of the Acquisition Sub Board immediately prior to the Effective Time, each to serve in accordance with the certificate of incorporation and bylaws of the Surviving Corporation until their respective successors shall have been duly elected and qualified, or until their earlier death, resignation or removal in accordance with the certificate of incorporation and bylaws of the Surviving Corporation.

Section 2.6 Officers. From and after the Effective Time, the officers of the Company at the Effective Time shall be the officers of the Surviving Corporation, until their respective successors are duly elected or appointed and qualified in accordance with applicable Law.

## ARTICLE III

## EFFECT OF THE MERGER ON CAPITAL STOCK

Section 3.1 Effect on Securities. At the Effective Time, by virtue of the Merger and without any action on the part of the Company, Parent, Acquisition Sub or the holders of any securities of the Company or Acquisition Sub:

(a) Conversion of Acquisition Sub Capital Stock. At the Effective Time, by virtue of the Merger and without any action on the part of the holder thereof, each share of common stock, $0.01 par value per share, of Acquisition Sub issued and outstanding immediately prior to the Effective Time shall be converted into and become one (1) fully paid share of common stock, $0.01 par value per share, of the Surviving Corporation and constitute the only issued or outstanding shares of capital stock of the Surviving Corporation.

(b) Cancellation of Certain Company Securities. Each share of common stock, par value $0.000005 per share, of the Company (the "**Company Common Stock**") held by the Company or any of its Subsidiaries or held, directly or indirectly, by the Equity Investor, Parent or Acquisition Sub immediately prior to the Effective Time (collectively, the "**Canceled Shares**") shall automatically be canceled and retired and shall cease to exist as issued or outstanding shares, and no consideration or payment shall be delivered in exchange therefor or in respect thereof.

(c) Conversion of Company Securities. Except as otherwise provided in this Agreement, each share of Company Common Stock issued and outstanding immediately prior to the Effective Time (other than any Canceled Shares or Dissenting Shares) shall be converted into the right to receive

A-12

Table of Contents

$54.20 per share of Company Common Stock in cash, without interest (the "**Merger Consideration**"). Each share of Company Common Stock to be converted into the right to receive the Merger Consideration as provided in this <u>Section 3.1(c)</u> shall no longer be issued or outstanding and shall be automatically canceled and shall cease to exist, and the holders of certificates (the "**Certificates**") or book-entry shares ("**Book-Entry Shares**") which immediately prior to the Effective Time represented such shares of Company Common Stock shall cease to have any rights with respect to such Company Common Stock other than the right to receive, upon surrender of such Certificates or Book-Entry Shares in accordance with <u>Section 3.2(b)</u>, the Merger Consideration, without interest thereon.

(d) <u>Adjustments</u>. Without limiting the other provisions of this Agreement, if at any time during the period between the date of this Agreement and the Effective Time, any change in the number of outstanding shares of Company Common Stock shall occur as a result of a reclassification, recapitalization, stock split (including a reverse stock split) or similar event, or combination or exchange of shares, or any stock dividend or stock distribution with a record date during such period (in each case, other than with respect to the initial distribution of Stockholder Rights under the Stockholder Rights Plan or such Stockholder Rights becoming exercisable as a result of Parent or any of its Affiliates or Representatives becoming an "Acquiring Person" (as defined in the Stockholder Rights Agreement)), the Merger Consideration shall be equitably adjusted to provide the same economic effect as contemplated by this Agreement prior to such event. Nothing in this <u>Section 3.1(d)</u> shall be construed to permit any party to take any action that is otherwise prohibited or restricted by any other provision of this Agreement.

Section 3.2 <u>Payment for Securities; Exchange of Certificates</u>.

(a) <u>Designation of Paying Agent; Deposit of Exchange Fund</u>. Prior to the Closing, Parent shall designate a reputable bank or trust company (the "**Paying Agent**") that is organized and doing business under the laws of the U.S., the identity and the terms of appointment of which to be reasonably acceptable to the Company, to act as Paying Agent for the payment of the Merger Consideration as provided in <u>Section 3.1(b)</u>, and shall enter into an agreement (the "**Paying Agent Agreement**") relating to the Paying Agent's responsibilities with respect thereto, in form and substance reasonably acceptable to the Company. At or prior to the Effective Time, Parent shall deposit, or cause to be deposited with the Paying Agent, cash constituting an amount equal to the Aggregate Merger Consideration (such Aggregate Merger Consideration as deposited with the Paying Agent, the "**Exchange Fund**"). In the event the Exchange Fund shall be insufficient to make the payments contemplated by <u>Section 3.1(b)</u>, Parent shall promptly deposit, or cause to be deposited, additional funds with the Paying Agent in an amount which is equal to the deficiency in the amount required to make such payments in full. Parent shall cause the Exchange Fund to be (A) held for the benefit of the holders of Company Common Stock and (B) applied promptly to make payments pursuant to <u>Section 3.1(b)</u>. The Exchange Fund shall not be used for any purpose other than to fund payments pursuant to <u>Section 3.1</u>, except as expressly provided for in this Agreement.

(b) <u>Procedures for Exchange</u>. As promptly as reasonably practicable following the Effective Time and in any event not later than two (2) Business Days thereafter, the Surviving Corporation shall cause the Paying Agent to mail to each holder of record a Certificate that immediately prior to the Effective Time represented outstanding shares of Company Common Stock (A) a letter of transmittal, which shall specify that delivery shall be effected, and risk of loss and title to the Certificates shall pass, only upon proper delivery of the Certificates (or affidavits of loss in lieu thereof) to the Paying Agent and which shall be in the form and have such other provisions as Parent and the Company may reasonably specify and (B) instructions for use in effecting the surrender of the Certificates in exchange for the Merger Consideration into which the number of shares of Company Common Stock previously represented by such Certificate shall have been converted pursuant to this Agreement (which instructions shall be in the form and have such other provisions as Parent and the Company may

A-13

Table of Contents

reasonably specify). Any holder of Book-Entry Shares shall not be required to deliver a Certificate or an executed letter of transmittal to receive the Merger Consideration with respect to such Book-Entry Shares.

(c) Timing of Exchange. Upon surrender of a Certificate (or affidavit of loss in lieu thereof) or Book-Entry Share for cancellation to the Paying Agent, together with, in the case of Certificates, a letter of transmittal duly completed and validly executed in accordance with the instructions thereto, or, in the case of Book-Entry Shares, receipt of an "agent's message" by the Paying Agent (it being understood that holders of Book-Entry Shares will be deemed to have surrendered such Book-Entry Shares upon receipt of an "agent's message" with respect to such Book-Entry Shares), and such other customary evidence of surrender as the Paying Agent may reasonably require, the holder of such Certificate or Book-Entry Share shall be entitled to receive in exchange therefor (and Parent shall cause the Paying Agent to promptly deliver in exchange therefor) the Merger Consideration for each share of Company Common Stock formerly represented by such Certificate or Book-Entry Share upon the later to occur of (i) the Effective Time and (ii) the Paying Agent's receipt of such Certificate (or affidavit of loss in lieu thereof) or Book-Entry Share, in accordance with Section 3.2(b), as applicable, and the Certificate (or affidavit of loss in lieu thereof) or Book-Entry Share so surrendered shall be forthwith canceled. The Paying Agent Agreement shall provide that the Paying Agent shall accept such Certificates (or affidavits of loss in lieu thereof) or Book-Entry Shares upon compliance with such reasonable terms and conditions as the Paying Agent may impose to effect an orderly exchange thereof in accordance with customary exchange practices. No interest shall be paid or accrued for the benefit of holders of the Certificates or Book-Entry Shares on the Merger Consideration payable upon the surrender of the Certificates or Book-Entry Shares.

(d) Termination of Exchange Fund. Any portion of the Exchange Fund which remains undistributed to the holders of the Certificates or Book-Entry Shares for one (1) year after the Effective Time shall be delivered to the Surviving Corporation, upon written demand, and any such holders prior to the Merger who have not theretofore complied with this Article III shall thereafter look only to the Surviving Corporation as a general creditor thereof for payment of their claims for the Merger Consideration in respect thereof.

(e) No Liability. None of Parent, Acquisition Sub, the Company, the Surviving Corporation or the Paying Agent shall be liable to any Person in respect of any cash held in the Exchange Fund delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law. If any Certificates or Book-Entry Shares shall not have been surrendered immediately prior to the date on which any cash in respect of such Certificate or Book-Entry Share would otherwise escheat to or become the property of any Governmental Authority, any such cash in respect of such Certificate or Book-Entry Share shall, to the extent permitted by applicable Law, become the property of the Surviving Corporation, free and clear of all claims or interest of any Person previously entitled thereto.

(f) Investment of Exchange Fund. The Paying Agent Agreement shall provide that the Paying Agent shall invest any cash included in the Exchange Fund as directed by Parent or, after the Effective Time, the Surviving Corporation; provided that (i) no such investment shall relieve Parent or the Paying Agent from making the payments required by this Article III, and following any losses Parent shall promptly provide additional funds to the Paying Agent for the benefit of the holders of Company Common Stock in the amount of such losses, (ii) no such investment shall have maturities that could prevent or delay payments to be made pursuant to this Agreement and (iii) all such investments shall be in short-term obligations of the U.S. with maturities of no more than thirty (30) days or guaranteed by the U.S. and backed by the full faith and credit of the U.S. Any interest or income produced by such investments will be payable to the Surviving Corporation or Parent, as directed by Parent.

(g) Withholding. Each of Parent, the Surviving Corporation and the Paying Agent shall be entitled to deduct and withhold from the Merger Consideration and any amounts otherwise payable

A-14

Table of Contents

pursuant to this Agreement to any Person such amounts as are required to be deducted and withheld with respect to the making of such payment under any applicable Law. To the extent that amounts are so deducted and withheld, such amounts (i) shall be promptly remitted by Parent, the Surviving Corporation or the Paying Agent, as applicable, to the applicable Governmental Authority, and (ii) shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

Section 3.3 Lost Certificates. If any Certificate shall have been lost, stolen or destroyed, then upon the making of an affidavit, in form and substance reasonably acceptable to Parent, of that fact by the Person claiming such Certificate to be lost, stolen or destroyed, the Paying Agent shall issue, in exchange for such lost, stolen or destroyed Certificate, the Merger Consideration to which the holder thereof is entitled pursuant to this Article III.

Section 3.4 Transfers; No Further Ownership Rights. After the Effective Time, there shall be no registration of transfers on the stock transfer books of the Company of shares of Company Common Stock that were outstanding immediately prior to the Effective Time. If Certificates or Book-Entry Shares are presented to the Surviving Corporation, Parent or Paying Agent for transfer following the Effective Time, they shall be canceled against delivery of the applicable Merger Consideration, as provided for in Section 3.1(b), for each share of Company Common Stock formerly represented by such Certificates or Book-Entry Shares. Payment of the Merger Consideration in accordance with the terms of this Article III, and, if applicable, any unclaimed dividends upon the surrender of Certificates, shall be deemed to have been paid in full satisfaction of all rights pertaining to the shares of Company Common Stock formerly represented by such Certificates or Book-Entry Shares.

Section 3.5 Dissenting Shares. Notwithstanding any other provision of this Agreement to the contrary, to the extent that holders thereof are entitled to appraisal rights under Section 262 of the DGCL or similar appraisal or dissenters' rights under any other applicable Law, shares of Company Common Stock issued and outstanding immediately prior to the Effective Time and held by a holder who has properly exercised and perfected his or her demand for appraisal or dissenters' rights under Section 262 of the DGCL or such other applicable Law (the "**Dissenting Shares**"), shall not be converted into the right to receive the Merger Consideration. At the Effective Time, the Dissenting Shares shall no longer be outstanding and shall automatically be canceled and shall cease to exist, and each holder of Dissenting Shares shall cease to have any rights with respect thereto, but the holders of such Dissenting Shares shall be entitled to receive such consideration as shall be determined pursuant to Section 262 of the DGCL or such other applicable Law; provided, however, that if any such holder shall have failed to perfect or shall have effectively withdrawn or lost his or her right to appraisal or dissenters' rights and payment under the DGCL or such other applicable Law, as applicable (whether occurring before, at or after the Effective Time), such holder's shares of Company Common Stock shall thereupon be deemed to have been converted as of the Effective Time into the right to receive the Merger Consideration, without any interest thereon, and such shares shall not be deemed to be Dissenting Shares. Any payments required to be made with respect to the Dissenting Shares shall be made by Parent (and not the Company or Acquisition Sub), and the Aggregate Merger Consideration shall be reduced, on a dollar-for-dollar basis, as if the holder of such Dissenting Shares had not been a stockholder on the Closing Date. The Company shall give prompt written notice to Parent of any demands for appraisal of or dissenters' rights respecting any shares of Company Common Stock, withdrawals of such demands and any other instruments served pursuant to the DGCL or such other applicable Law received by the Company relating to appraisal or dissenters' demands, and Parent shall have the right to participate in all negotiations and proceedings with respect to such demands. Prior to the Effective Time, the Company shall not, without the prior written consent of Parent (which consent shall not be unreasonably withheld or delayed), voluntarily make any payment with respect to, or settle or offer to settle, any such demands, or agree to do or commit to do any of the foregoing.

A-15

Table of Contents

Section 3.6 Company Equity Awards.

(a) Company Options.

(i) As of the Effective Time, each Company Option that is vested in accordance with its terms and outstanding as of immediately prior to the Effective Time (each, a "**Vested Company Option**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Vested Company Option and (ii) the excess, if any, of the Merger Consideration, over the exercise price per share of Company Common Stock underlying such Vested Company Option (the "**Vested Option Consideration**"); provided, that if the exercise price per share of Company Common Stock underlying such Vested Company Option is equal to or greater than the Merger Consideration, such Vested Company Option shall be canceled without any cash payment or other consideration being made in respect thereof.

(ii) As of the Effective Time, each Company Option that is outstanding and is not a Vested Company Option (each, an "**Unvested Company Option**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Unvested Company Option and (ii) the excess, if any, of the Merger Consideration, over the exercise price per share of Company Common Stock underlying such Unvested Company Option (the "**Unvested Option Consideration**"); provided that, if the exercise price per share of Company Common Stock underlying such Unvested Company Option is equal to or greater than the Merger Consideration, such Unvested Company Option shall be canceled without any cash payment or other consideration being made in respect thereof. Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested Option Consideration will vest and become payable at the same time as the Unvested Company Option from which such Unvested Option Consideration was converted would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company Option immediately prior to the Effective Time.

(b) Company PSUs.

(i) As of the Effective Time, each Company PSU that is vested in accordance with its terms and outstanding as of immediately prior to the Effective Time (each, a "**Vested Company PSU**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Vested Company PSU based on the achievement of the applicable performance metrics at the level of performance for which such Vested Company PSU vested in accordance with its terms and (ii) the Merger Consideration (the "**Vested PSU Consideration**").

(ii) As of the Effective Time, each Company PSU that is outstanding immediately prior thereto and that is not a Vested Company PSU (each, an "**Unvested Company PSU**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Unvested Company PSU based on the achievement of the applicable performance metrics at the target level of performance and (ii) the Merger Consideration (the "**Unvested PSU Consideration**"). Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested PSU Consideration will vest and become payable at the same time as the Unvested Company PSU from which such Unvested PSU Consideration was converted would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company PSU immediately prior to the Effective Time (except that performance-based vesting metrics and criteria shall not apply from and after the Effective Time).

A-16

Table of Contents

(c) <u>Company RSAs</u>. At the Effective Time, each Company RSA that is outstanding immediately prior to the Effective Time shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Company RSA and (ii) the Merger Consideration (the "**Unvested RSA Consideration**"). Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested RSA Consideration will vest and become payable at the same time as the Company RSA from which such Unvested RSA Consideration was converted would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Company RSA immediately prior to the Effective Time; provided that the Company shall be permitted to accelerate the vesting of any unvested Company RSA if the holder thereof would be subject to Taxes in connection with the Closing as a result of the treatment contemplated by this <u>Section 3.3(c)</u>.

(d) <u>Company RSUs</u>.

(i) As of the Effective Time, each Company RSU that is vested in accordance with its terms as of immediately prior to the Effective Time and each Company RSU held by a non-employee member of the Company Board, in either case, that is outstanding immediately prior to the Effective Time, (each, a "**Vested Company RSU**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Vested Company RSU and (ii) the Merger Consideration (the "**Vested RSU Consideration**").

(ii) As of the Effective Time, each Company RSU that is outstanding immediately prior thereto and that is not a Vested Company RSU (each, an "**Unvested Company RSU**") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Unvested Company RSU and (ii) the Merger Consideration (the "**Unvested RSU Consideration**"). Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested RSU Consideration will vest and become payable at the same time as the Unvested Company RSU from which such Unvested RSU Consideration was converted would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company RSU immediately prior to the Effective Time.

(e) <u>Delivery of Company Equity Award Payments</u>. Parent shall cause the Surviving Corporation to pay through the payroll system of the Surviving Corporation (to the extent applicable) the Vested Option Consideration, the Vested PSU Consideration, and the Vested RSU Consideration to each holder of a Vested Company Option, Vested Company PSU and Vested Company RSU, as applicable, less any required withholding Taxes and without interest, within five (5) Business Days following the Effective Time.

Section 3.7 Company ESPP. As soon as practicable following the date of this Agreement, the Company Board or a committee thereof shall adopt resolutions or take other actions as may be required to provide that (A) the Offering Period (as defined in the Company ESPP) in effect as of the date hereof shall be the final Offering Period (such period, the "**Final Offering Period**") and no further Offering Period shall commence pursuant to the Company ESPP after the date hereof, and (B) each individual participating in the Final Offering Period on the date of this Agreement shall not be permitted to (x) increase his or her payroll contribution rate pursuant to the Company ESPP from the rate in effect when the Final Offering Period commenced or (y) make separate non-payroll contributions to the Company ESPP on or following the date of this Agreement, except as may be required by applicable Law. Prior to the Effective Time, the Company shall take all action that may be necessary to, effective

A-17

Table of Contents

upon the consummation of the Merger, (A) cause the Final Offering Period, to the extent that it would otherwise be outstanding at the Effective Time, to be terminated no later than ten (10) Business Days prior to the date on which the Effective Time occurs; (B) make any pro rata adjustments that may be necessary to reflect the Final Offering Period, but otherwise treat the Final Offering Period as a fully effective and completed Offering Period for all purposes pursuant to the Company ESPP; and (C) cause the exercise (as of no later than ten (10) Business Days prior to the date on which the Effective Time occurs) of each outstanding purchase right pursuant to the Company ESPP. On such exercise date, the Company shall apply the funds credited as of such date pursuant to the Company ESPP within each participant's payroll withholding account to the purchase of whole shares of Company Common Stock in accordance with the terms of the Company ESPP, and such Common Shares shall be entitled to the Merger Consideration in accordance with Section 3.1(b). Immediately prior to and effective as of the Effective Time (but subject to the consummation of the Merger), the Company shall terminate the Company ESPP.

<u>ARTICLE IV</u>

<u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY</u>

Except as disclosed in the Company Disclosure Letter or in the Company SEC Documents filed by the Company prior to the date of this Agreement (other than any disclosures set forth under the headings "Risk Factors" or "Forward-Looking Statements" and any other disclosures included therein to the extent they are forward-looking in nature), the Company hereby represents and warrants to Parent and Acquisition Sub as follows:

Section 4.1 <u>Organization and Qualification; Subsidiaries</u>. Each of the Company and its Subsidiaries is a corporation, partnership or other entity duly organized, validly existing and (to the extent applicable) in good standing under the laws of the jurisdiction of its incorporation or organization and has the requisite entity power and authority to conduct its business as it is now being conducted, except where the failure to be duly organized, validly existing or in good standing or to have such power and authority would not have a Company Material Adverse Effect. Each of the Company and its Subsidiaries is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to be so duly qualified or licensed and in good standing would not have a Company Material Adverse Effect. The Company's Amended and Restated Certificate of Incorporation (as may be further amended from time to time, the "**Company Certificate of Incorporation**") and the Company's Amended and Restated Bylaws (as may be further amended from time to time, the "**Company Bylaws**"), in each case, as currently in effect, are included in the Company SEC Documents.

Section 4.2 <u>Capitalization</u>.

(a) As of March 31, 2022, the authorized capital stock of the Company consists of (i) 5,000,000,000 shares of Company Common Stock, 763,577,530 of which were issued and outstanding (including 1,386,850 Company RSAs), and none of which were held in treasury, and (ii) 200,000,000 shares of preferred stock, par value $0.000005 per share, of the Company, none of which were issued and outstanding. As of March 31, 2022, there were (i) 953,365 Company Options outstanding, (ii) 2,900,689 Company PSUs outstanding (assuming attainment of the applicable performance metrics at the target level of performance), (iii) 67,575,223 Company RSUs outstanding, and (iv) shares of Company Common Stock subject to outstanding purchase rights under the Company ESPP. Except as described above and other than the Stockholder Rights, the Existing Convertible Notes, the Company Warrant Confirmations and any issuances or grants (or promises or offers to

A-18

Table of Contents

issue or grant) Company Equity Awards since March 31, 2022 in connection with employee hiring, retention or promotions in the ordinary course of business in an amount less than 5,000,000 Company Equity Awards (assuming attainment of the applicable performance metrics at the target level of performance) in the aggregate, as of the date of this Agreement, there are no additional existing and outstanding (i) options, warrants, calls, subscriptions or other rights, convertible securities, agreements or commitments of any character to which the Company or any of its Subsidiaries is a party obligating the Company or any of its Subsidiaries to issue, transfer or sell any shares of capital stock or other equity interests in the Company or any of its Subsidiaries or securities convertible into or exchangeable for such shares or equity interests, (ii) contractual obligations of the Company or any of its Subsidiaries to repurchase, redeem or otherwise acquire any capital stock of the Company or any of its Subsidiaries, except pursuant to the other than the Company ASR Confirmations and the Company Bond Hedging Transactions or (iii) voting trusts or similar agreements to which the Company is a party with respect to the voting of the capital stock of the Company, other than the Silver Lake Investment Agreement.

(b) Except as would not be material to the Company and its Subsidiaries, taken as a whole, all of the outstanding shares of capital stock or equivalent equity interests of each of the Company's Subsidiaries are owned of record and beneficially, directly or indirectly, by the Company or the relevant wholly owned Subsidiary (except for de minimis equity interests held by a Third Party for local regulatory reasons) and free and clear of all Liens except for restrictions imposed by applicable securities laws and Permitted Liens.

(c) Prior to the Closing, the Company will provide Parent with a correct and complete list, as of such date, of all outstanding Company Equity Awards, including the holder (by employee identification number), type of Company Equity Award, date of grant, number of shares of Company Common Stock underlying such award (and, if applicable, assuming achievement of the applicable performance metrics at the target level of performance), whether such Company Equity Award is intended to qualify as an "incentive stock option" under Section 422 of the Code, the equity plan pursuant to which the Company Equity Award was granted, and, where applicable, the exercise price per share and expiration date.

Section 4.3 Authority Relative to Agreement.

(a) The Company has all necessary corporate power and authority to execute and deliver this Agreement and, assuming the accuracy of the representations and warranties set forth in the second sentence of Section 5.8 and subject to obtaining the Company Stockholder Approval and the occurrence of the stockholder advisory vote contemplated by Rule 14a-21(c) under the Exchange Act, regardless of the outcome of such advisory vote (the "**Company Stockholder Advisory Vote**"), to consummate the transactions contemplated by this Agreement, including the Merger. The execution, delivery and performance of this Agreement by the Company, and the consummation by the Company of the transactions contemplated by this Agreement, including the Merger, have been duly and validly authorized by all necessary corporate action by the Company, and assuming the accuracy of the representations and warranties set forth in the second sentence of Section 5.8 and except for the Company Stockholder Approval, the occurrence of the Company Stockholder Advisory Vote, no other corporate action or proceeding on the part of the Company is necessary to authorize the execution, delivery and performance of this Agreement by the Company and the consummation by the Company of the transactions contemplated by this Agreement, including the Merger. This Agreement has been duly executed and delivered by the Company and, assuming the due authorization, execution and delivery of this Agreement by the other parties hereto, constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except that such enforceability may be subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar Laws, now or hereafter in effect, affecting creditors' rights and remedies generally (the "**Enforceability Exceptions**").

A-19

Table of Contents

(b) The Company Board has, by resolutions duly adopted by the unanimous vote of the directors at a duly held meeting (i) determined that the terms and conditions of this Agreement, the Merger and the other transactions contemplated by this Agreement are advisable and in the best interests of the Company and the Company's stockholders, (ii) authorized the execution and delivery of this Agreement and declared advisable and approved the consummation of the transactions contemplated by this Agreement, including the Merger, (iii) directed that this Agreement be submitted for consideration at a meeting of the Company's stockholders and (iv) subject to the terms of this Agreement, resolved to recommend that the Company's stockholders adopt this Agreement and approve the transactions contemplated hereby, including the Merger.

Section 4.4 No Conflict; Required Filings and Consents.

(a) Neither the execution and delivery of this Agreement by the Company nor the consummation by the Company of the transactions contemplated by this Agreement will (i) violate any provision of the Company Certificate of Incorporation or the Company Bylaws or (ii) assuming the accuracy of the representations and warranties set forth in the second sentence of Section 5.8 and that the Consents, registrations, declarations, filings and notices referred to in Section 4.4(b) have been obtained or made, any applicable waiting periods referred to therein have expired and any condition precedent to any such Consent has been satisfied, conflict with or violate any Law applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound or affected or (iii) except with respect to the Existing Credit Agreement and the Existing Notes, result in any breach of, or constitute a default (with or without notice or lapse of time, or both) under, or give rise to any right of termination, acceleration or cancellation of, any Company Material Contract (other than any Company Benefit Plan) , other than, in the case of clauses (ii) and (iii) any such conflict, violation, breach, default, termination, acceleration or cancellation that would not have a Company Material Adverse Effect.

(b) No consent, approval, clearance, license, permit, order or authorization (each of the foregoing, a "**Consent**") of, or registration, declaration or filing with, or notice to, any Governmental Authority is required to be obtained or made by or with respect to the Company or any of its Subsidiaries under applicable Law in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated by this Agreement, other than (i) the applicable reporting or other requirements of and filings with the SEC under the Exchange Act (including the filing of the Proxy Statement), (ii) the filing of the Certificate of Merger with the Secretary of State in accordance with the DGCL and appropriate documents with the relevant authorities of the other jurisdictions in which the Company or any of its Subsidiaries is qualified to do business, (iii) the applicable requirements under corporation or Blue Sky Laws of various states, (iv) such filings as may be required in connection with the Taxes described in Section 8.6, (v) filings with the New York Stock Exchange, (vi) such other items required solely by reason of the participation of Parent or Acquisition Sub or any of their Affiliates in the transactions contemplated by this Agreement, (vii) compliance with and filings or notifications under the HSR Act and any other applicable U.S. or foreign competition, antitrust or merger control Laws (together with the HSR Act, "**Antitrust Laws**"), (viii) compliance with and filings or notifications under any applicable Foreign Investment Laws, and (ix) such other Consents, registrations, declarations, filings or notices the failure of which to be obtained or made would not have a Company Material Adverse Effect.

Section 4.5 Permits; Compliance With Laws.

(a) As of the date of this Agreement, the Company and its Subsidiaries are in possession of all franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals and orders necessary for the Company and its Subsidiaries to carry on their respective business as it is now being conducted (the "**Company Permits**") and all Company Permits are in full force and effect and no suspension or cancellation of any of the Company Permits is pending

A-20

Table of Contents

or, to the Knowledge of the Company, threatened, except where the failure to be in possession of or be in full force and effect, or the suspension or cancellation of, any of the Company Permits would not have a Company Material Adverse Effect.

(b) Neither the Company nor any of its Subsidiaries is in default or violation of any Law applicable to the Company, any of its Subsidiaries or by which any of their respective properties or assets are bound, except for any such defaults or violations that would not have a Company Material Adverse Effect. Notwithstanding the foregoing, no representation or warranty in Section 4.5(a) or this Section 4.5(b) is made with respect to Company SEC Documents or financial statements, "disclosure controls and procedures" or "internal control over financial reporting," employee benefits matters, Intellectual Property Rights matters, Tax matters, which are addressed exclusively in Section 4.6 (Company SEC Documents; Financial Statements), Section 4.8 (Disclosure Controls and Procedures), Section 4.12 (Employee Benefit Plans), Section 4.14 (Intellectual Property Rights), Section 4.15 (Taxes), respectively.

Section 4.6 Company SEC Documents; Financial Statements.

(a) Since January 1, 2022, the Company has filed or furnished with the SEC all material forms, documents and reports required to be filed or furnished prior to the date of this Agreement by it with the SEC (such forms, documents and reports filed with the SEC, including any amendments or supplements thereto and any exhibits or other documents attached to or incorporated by reference therein, the "**Company SEC Documents**"). As of their respective dates, or, if amended or supplemented, as of the date of the last such amendment or supplement, the Company SEC Documents complied in all material respects with the requirements of the Securities Act and the Exchange Act, as the case may be, and the applicable rules and regulations promulgated thereunder, and none of the Company SEC Documents at the time it was filed (or, if amended or supplemented, as of the date of the last amendment or supplement) contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, or are to be made, misleading.

(b) The consolidated financial statements (including all related notes) of the Company included in the Company SEC Documents fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries as at the respective dates thereof and its consolidated statements of operations and consolidated statements of cash flows for the respective periods then ended (subject, in the case of unaudited interim statements, to normal year-end audit adjustments, none of which would have a Company Material Adverse Effect, to the absence of notes and to any other adjustments described therein, including in any notes thereto) in conformity with GAAP (except, in the case of unaudited statements, as permitted by Form 10-Q, Form 8-K or any successor form or other rules under the Exchange Act).

Section 4.7 Information Supplied. None of the information supplied or to be supplied by or on behalf of the Company or any of its Subsidiaries expressly for inclusion or incorporation by reference in the proxy statement relating to the matters to be submitted to the Company's stockholders at the Company Stockholders' Meeting (such proxy statement and any amendments or supplements thereto, the "**Proxy Statement**") shall, at the time the Proxy Statement is first mailed to the Company's stockholders and at the time of the Company Stockholders' Meeting to be held in connection with the Merger, contain any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading at such applicable time, except that no representation or warranty is made by the Company with respect to statements made therein based on information supplied, or required to be supplied, by Parent or its Representatives in writing expressly for inclusion therein. The Proxy Statement will comply as to form in all material respects with the provisions of the Securities Act and the Exchange Act, and the rules and regulations promulgated thereunder.

A-21

Table of Contents

Section 4.8 Disclosure Controls and Procedures. The Company has established and maintains "disclosure controls and procedures" and "internal control over financial reporting" (as such terms are defined in paragraphs (e) and (f), respectively, of Rule 13a-15 promulgated under the Exchange Act) as required by Rule 13a-15 promulgated under the Exchange Act. The Company has disclosed, based on its most recent evaluation of the Company's internal control over financial reporting prior to the date of this Agreement, to the Company's auditors and the audit committee of the Company Board (i) any significant deficiencies and material weaknesses in the design or operation of its internal controls over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and (ii) any fraud to the Knowledge of the Company, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Section 4.9 Absence of Certain Changes or Events. Since January 1, 2022 and until the date of this Agreement, (a) the businesses of the Company and its Subsidiaries have been conducted in the ordinary course of business (other than as a result of COVID-19 and COVID-19 Measures or with respect to the Existing 2030 Notes or the transactions contemplated hereby) and (b) there has not been any adverse change, event, development or state of circumstances that has had a Company Material Adverse Effect.

Section 4.10 No Undisclosed Liabilities. Except (a) as reflected, disclosed or reserved against in the Company's financial statements (as amended or restated, as applicable) or the notes thereto included in the Company SEC Documents, (b) for liabilities or obligations incurred in the ordinary course of business since December 31, 2021, (c) the Existing 2030 Notes, (d) for liabilities or obligations incurred in connection with the transactions contemplated by this Agreement, including the Merger, or (e) for liabilities or obligations that would not have a Company Material Adverse Effect, as of the date of this Agreement, the Company and its Subsidiaries do not have any liabilities of any nature, whether or not accrued, contingent or otherwise, that would be required by GAAP to be reflected on a consolidated balance sheet (or in the notes thereto) of the Company.

Section 4.11 Litigation. As of the date of this Agreement, there is no suit, action or proceeding pending or, to the Knowledge of the Company, threatened in writing against the Company or any of its Subsidiaries, that would have a Company Material Adverse Effect, nor is there any judgment of any Governmental Authority outstanding against, or, to the Knowledge of the Company, investigation by any Governmental Authority involving the Company or any of its Subsidiaries that would have a Company Material Adverse Effect. As of the date of this Agreement, there is no suit, action or proceeding pending or, to the Knowledge of the Company, threatened in writing seeking to prevent, hinder, modify, delay or challenge the Merger or any of the other transactions contemplated by this Agreement.

Section 4.12 Employee Benefit Plans.

(a) Prior to the Closing, the Company will provide a true and complete list, as of the date of this Agreement, of each material Company Benefit Plan (which list may reference a form of such Company Benefit Plan). Prior to the Closing, the Company will make available to Parent a true and complete copy of each material Company Benefit Plan and all amendments thereto and a true and complete copy of the following items (in each case, only if applicable): (i) each trust or other funding arrangement; (ii) each current summary plan description and current summary of material modifications; (iii) the most recently filed annual report on IRS Form 5500; and (iv) the most recently received IRS determination letter or IRS opinion letter.

A-22

Table of Contents

(b) Except as would not have a Company Material Adverse Effect:

(i) each of the Company Benefit Plans has been maintained, operated, administered and funded in accordance with its terms and in compliance with applicable Laws;

(ii) there are no claims pending, or, to the Knowledge of the Company, threatened actions, suits, disputes or claims (other than routine claims for benefits) against or affecting any Company Benefit Plan, by any employee or beneficiary covered under such Company Benefit Plan, as applicable, or otherwise involving such Company Benefit Plan;

(iii) neither the Company nor its Subsidiaries has any material obligations for post-termination health or life insurance benefits under any Company Benefit Plan (other than for continuation coverage required to be provided pursuant to Section 4980B of the Code); and

(iv) each Foreign Plan (A) if required to be registered or approved by a non-U.S. Governmental Authority, has been registered or approved and has been maintained in good standing with applicable regulatory authorities, and, to the Knowledge of the Company, no event has occurred since the date of the most recent approval or application therefor relating to any such Foreign Plan that would reasonably be expected to adversely affect any such approval or good standing, (B) that is intended to qualify for special Tax treatment meets all requirements for such treatment, and (C) if required to be fully funded or fully insured, is fully funded or fully insured on an ongoing and termination or solvency basis (determined using reasonable actuarial assumptions) in compliance with applicable Laws.

(e) If, and to the extent, the execution or delivery of this Agreement or the consummation of the Merger (either alone or in combination with another event) will: (i) entitle any Company Service Provider to any material payment; (ii) materially increase the amount or value of any benefit or compensation or other obligation payable or required to be provided to any Company Service Provider; (iii) accelerate the time of payment or vesting of amounts due to any Company Service Provider or accelerate the time of any funding (whether to a trust or otherwise) of compensation or benefits in respect of any of the Company Benefit Plans; (iv) give rise to the payment of any amount by the Company or any of its Subsidiaries that would be non-deductible by reason of Section 280G of the Code, then, prior to the Closing, the Company will provide a true and complete list of each Company Benefit Plan that would trigger any of (i) through (iv) above. There is no contract, agreement, plan or arrangement to which the Company or any of its Subsidiaries is a party by which it is required by its terms to compensate, gross-up, indemnify, or otherwise reimburse any Person for excise Taxes imposed pursuant to Section 4999 or Section 409A of the Code.

(f) Except as would not have a Company Material Adverse Effect, there are no claims pending, or, to the Knowledge of the Company, threatened actions, suits, disputes or claims (other than routine claims for benefits) against or affecting any Company Benefit Plan, by any employee or beneficiary covered under such Company Benefit Plan, as applicable, or otherwise involving such Company Benefit Plan.

(g) Except as would not have a Company Material Adverse Effect, neither the Company nor its Subsidiaries has any material obligations for post-termination health or life insurance benefits under any Company Benefit Plan (other than for continuation coverage required to be provided pursuant to Section 4980B of the Code).

(h) Except as would not have a Company Material Adverse Effect, each Foreign Plan (i) has been maintained, operated and administered in compliance with its terms and in compliance with applicable Laws; (ii) if required to be registered or approved by a non-U.S. Governmental Authority, has been registered or approved and has been maintained in good standing with applicable regulatory authorities, and, to the Knowledge of the Company, no event has occurred since the date of the most

A-23

Table of Contents

recent approval or application therefor relating to any such Foreign Plan that would reasonably be expected to adversely affect any such approval or good standing; (iii) that is intended to qualify for special Tax treatment meets all requirements for such treatment; (iv) if required to be fully funded or fully insured, is fully funded or fully insured on an ongoing and termination or solvency basis (determined using reasonable actuarial assumptions) in compliance with applicable Laws; and (v) is not subject to any pending or, to the Knowledge of the Company, threatened claims by or on behalf of any participant in any Foreign Plan, or otherwise involving any such Foreign Plan or the assets of any Foreign Plan, other than routine claims for benefits.

Section 4.13 Labor Matters. If, and to the extent that, the Company or any of its Subsidiaries is a party to or bound by any works council or collective bargaining agreement and no employees of the Company or any of its Subsidiaries are represented by a labor organization with respect to their employment with the Company or any of its Subsidiaries, then, prior to the Closing, the Company will provide a true and complete list of each such works council or collective bargaining agreement, or labor organization, as applicable. There are no labor related strikes, walkouts or work stoppages pending or, to the Knowledge of the Company, threatened in writing.

Section 4.14 Intellectual Property.

(a) Except as would not have a Company Material Adverse Effect, the Company and its Subsidiaries solely and exclusively own all patents, trademarks, trade names, copyrights, Internet domain names, service marks, trade secrets and other intellectual property rights (the "**Intellectual Property Rights**") purported to be owned by the Company and its Subsidiaries (the "**Company Intellectual Property**"), free and clear of all Liens, except Permitted Liens.

(b) To the Knowledge of the Company, the conduct of the business of the Company and its Subsidiaries as currently conducted does not infringe, misappropriate or otherwise violate any Intellectual Property Rights of any other Person, except for any such infringement, misappropriation or other violation that would not have a Company Material Adverse Effect. To the Knowledge of the Company, no other Person is infringing, misappropriating or otherwise violating any Company Intellectual Property, except for any such infringement, misappropriation or other violation as would not have a Company Material Adverse Effect.

The Company and its Subsidiaries are in compliance with all applicable Laws, Contracts to which the Company or its Subsidiaries are bound, and internal- and external-facing policies of the Company or its Subsidiaries, in each case, relating to privacy, data protection, and the collection and use of information that constitutes "personal information" under applicable Laws ("**Personal Information**") collected, used or held for use by the Company or its Subsidiaries, except where the failure to be in compliance would not have a Company Material Adverse Effect.

(e) Neither the Company nor any of its Subsidiaries has experienced any unauthorized access to the information technology systems owned or used by the Company or its Subsidiaries or Personal Information collected, used, held for use or otherwise processed by the Company or its Subsidiaries, except as would not have a Company Material Adverse Effect.

Section 4.15 Taxes.

(a) Except as would not have a Company Material Adverse Effect, (i) the Company and its Subsidiaries have timely filed all Tax Returns (taking into account any extensions) required to be filed, and such Tax Returns (taking into account all amendments thereto) are complete and accurate, and (ii) all Taxes required to be paid by the Company and its Subsidiaries have been paid.

(b) Except as would not have a Company Material Adverse Effect, (i) neither the Company nor any of its Subsidiaries has received written notice of any audit, examination, investigation or other

A-24

Table of Contents

proceeding from any Governmental Authority in respect of liabilities for Taxes of the Company or any of its Subsidiaries, which have not been fully paid or settled; (ii) there are no Liens for Taxes on any of the assets of the Company or any of its Subsidiaries other than Permitted Liens; (iii) with respect to any tax years open for audit as of the date of this Agreement, neither the Company nor any of its Subsidiaries has granted any waiver of any statute of limitations with respect to, or any extension of a period for the assessment of, any Tax; and (iv) neither the Company nor any of its Subsidiaries has any liability for the Taxes of any Person (other than the Company and its Subsidiaries) pursuant to Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or non-U.S. Law) as a transferee or successor, by contract (other than contracts entered into in the ordinary course of business the primary purpose of which does not relate to Tax) or otherwise by operation of law.

(c) Neither the Company nor any of its Subsidiaries has engaged in any "listed transaction" as defined in Treasury Regulation Section 1.6011-4(b)(2) in any tax year for which the statute of limitations has not expired.

(d) The Company is not nor has been during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code.

(e) Except with respect to Section 4.12, the representations in this Section 4.15 are the sole and exclusive representations and warranties concerning Tax matters.

Section 4.16 Material Contracts.

(a) For purposes of this Agreement, "**Company Material Contract**" means any Contract (other than any Company Benefit Plan) to which the Company or any of its Subsidiaries is a party or by which their respective properties or assets are bound, except for this Agreement, that constitutes a "material contract" (as such term is defined in item 601(b)(10) of Regulation S-K of the Securities Act).

(b) Neither the Company nor any of its Subsidiaries is in breach of or default under the terms of any Company Material Contract where such breach or default would have a Company Material Adverse Effect. To the Knowledge of the Company, no other party to any Company Material Contract is in breach of or default under the terms of any Company Material Contract where such breach or default would have a Company Material Adverse Effect. Each Company Material Contract is a valid and binding obligation of the Company or its Subsidiary and, to the Knowledge of the Company, the other parties thereto, except such as would not have a Company Material Adverse Effect; provided that (i) such enforcement may be subject to the Enforceability Exceptions and (ii) the remedies of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

Section 4.17 RESERVED.

Section 4.18 RESERVED.

Section 4.19 Takeover Statutes. Assuming the accuracy of the representation contained in Section 5.8, the Company Board has taken such actions and votes as are necessary to render the provisions of any "fair price," "moratorium," "control share acquisition" or any other takeover or anti-takeover statute or similar federal or state Law inapplicable to this Agreement, the Merger or any other transactions contemplated by this Agreement.

Section 4.20 Vote Required. Assuming the accuracy of the representation contained in Section 5.8, the adoption of this Agreement by the affirmative vote of a majority of the outstanding

A-25

Table of Contents

shares of Company Common Stock entitled to vote to adopt this Agreement (the "**Company Stockholder Approval**") are the only votes of holders of securities of the Company that are required to consummate the Merger.

Section 4.21 Brokers. Except for Goldman Sachs & Co. LLC ("**Goldman Sachs**"), J.P. Morgan Securities LLC ("**J.P. Morgan**") and Allen & Company LLC, each of whose fees and expenses shall be borne solely by the Company, no broker, finder, investment banker, consultant or intermediary is entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with the Merger or any of the other transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company or any of its Subsidiaries.

Section 4.22 Opinions of Financial Advisors. The Company Board has received the oral opinion of Goldman Sachs (to be followed by delivery of a written opinion as of the date hereof), to the effect that, as of such date, and based upon and subject to the limitations, qualifications and assumptions set forth in the written opinion of Goldman Sachs, the Merger Consideration to be paid to the holders of Company Common Stock (other than the Equity Investor, Parent and their respective Affiliates) pursuant to this Agreement is fair from a financial point of view to such holders. On or prior to the date of this Agreement, the Company Board has received the opinion of J.P. Morgan to the effect that, as of the date of such opinion and subject to the assumptions, limitations, qualifications and other factors set forth therein, the Merger Consideration to be paid to holders of Company Common Stock pursuant to this Agreement is fair, from a financial point of view, to such holders.

Section 4.23 Rights Agreement. The Company has taken all action necessary to render the Stockholder Rights Plan, inapplicable to the Merger and this Agreement and the transactions contemplated hereby.

Section 4.24 RESERVED.

Section 4.25 No Other Representations or Warranties. Except for the representations and warranties expressly set forth in this Article IV, neither the Company nor any other Person makes or has made any representation or warranty of any kind whatsoever, express or implied, at Law or in equity, with respect to the Company or any of its Subsidiaries or their respective business, operations, assets, liabilities, conditions (financial or otherwise), notwithstanding the delivery or disclosure to Parent and the Acquisition Sub or any of their Affiliates or Representatives of any documentation, forecasts or other information with respect to any one or more of the foregoing. Without limiting the generality of the foregoing, neither the Company nor any other Person makes or has made any express or implied representation or warranty to Parent, Acquisition Sub or any of their respective Representatives with respect to (a) any financial projection, forecast, estimate or budget relating to the Company, any of its Subsidiaries or their respective businesses or, (b) except for the representations and warranties made by the Company in this Article IV, any oral or written information presented to Parent, Acquisition Sub or any of their respective Representatives in the course of their due diligence investigation of the Company, the negotiation of this Agreement or the course of the Merger, or the accuracy or completeness thereof.

A-26

Table of Contents

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF PARENT AND ACQUISITION SUB**

Except as disclosed in the Parent Disclosure Letter, Parent and Acquisition Sub hereby jointly and severally represent and warrant to the Company as follows:

Section 5.1 Organization and Qualification.

(a) Each of Parent and Acquisition Sub is a corporation duly organized, validly existing and (to the extent applicable) in good standing under the laws of the jurisdiction of its incorporation and has the requisite corporate entity power and authority to conduct its business as it is now being conducted, except where the failure to be duly organized, validly existing or in good standing or to have such power and authority would not have a Parent Material Adverse Effect. Each of Parent and Acquisition Sub is duly qualified or licensed to do business and is in good standing in each jurisdiction in which the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to be so duly qualified or licensed and in good standing would not have a Parent Material Adverse Effect.

(b) As of the date of this Agreement, the authorized share capital of Acquisition Sub consists of 1,000 shares, $0.01 par value per share, all of which are validly issued and outstanding. All of the issued and outstanding share capital of Acquisition Sub is, and at the Effective Time will be, owned by Parent. Acquisition Sub was formed solely for the purpose of acquiring the Company, and it has not conducted any business prior to the date of this Agreement and has no, and prior to the Effective Time will have no, assets, liabilities or obligations of any nature other than those incident to its formation and pursuant to this Agreement and the Merger and other transactions contemplated by this Agreement.

(c) As of the date of this Agreement, all of the issued and outstanding share capital of Parent is owned by the Equity Investor.

Section 5.2 Authority Relative to Agreement.

(a) Parent and Acquisition Sub have all necessary corporate power and authority to (a) execute and deliver this Agreement, (b) perform its covenants and obligations hereunder and (c) consummate the transactions contemplated by this Agreement, including the Merger. The execution, delivery and performance of this Agreement by Parent and Acquisition Sub, and the consummation by Parent and Acquisition Sub of the transactions contemplated by this Agreement, including the Merger, have been duly and validly authorized by all necessary corporate action by Parent and Acquisition Sub, and no other corporate action or proceeding on the part of Parent and Acquisition Sub is necessary to authorize the execution, delivery and performance of this Agreement by Parent and Acquisition Sub and the consummation by Parent and Acquisition Sub of the transactions contemplated by this Agreement, including the Merger. This Agreement has been duly executed and delivered by Parent and Acquisition Sub and, assuming the due authorization, execution and delivery of this Agreement by the other party hereto, constitutes a legal, valid and binding obligation of Parent and Acquisition Sub, enforceable against Parent and Acquisition Sub in accordance with its terms, except that such enforceability may be subject to the Enforceability Exceptions.

(b) The Parent Board has, by resolutions duly adopted by the unanimous vote of the directors, (i) adopted this Agreement and approved the consummation of the transactions contemplated by this Agreement, including the Merger, and (ii) determined that this Agreement and the transactions contemplated by this Agreement are advisable and in the best interests of Parent and its stockholders, as applicable. No vote of, or consent by, the holders of any class or series of capital stock of Parent is

A-27

Table of Contents

necessary to authorize the execution, delivery and performance by Parent of this Agreement and the consummation of the transactions contemplated by this Agreement or otherwise required by the certificate of incorporation or bylaws of Parent, applicable Law (including any stockholder approval provisions under the rules of any applicable securities exchange) or any Governmental Authority.

(c) The Acquisition Sub Board has, by resolutions duly adopted by the unanimous vote of the directors, (i) authorized the execution and delivery of this Agreement and declared advisable and approved the consummation of the transactions contemplated by this Agreement, including the Merger, (ii) directed that this Agreement be submitted for consideration by Acquisition Sub's sole stockholder and (iii) recommended that the sole stockholder of Acquisition Sub approve the Merger. Parent, acting in its capacity as the sole stockholder of Acquisition Sub, has approved this Agreement and the consummation of the transactions contemplated by this Agreement, including the Merger, and no further vote is required.

Section 5.3 No Conflict; Required Filings and Consents.

(a) Neither the execution and delivery of this Agreement by Parent and Acquisition Sub nor the consummation by Parent and Acquisition Sub of the transactions contemplated by this Agreement will (i) violate any provision of Parent's or its Subsidiaries' certificates of incorporation or bylaws, (ii) assuming that the Consents, registrations, declarations, filings and notices referred to in Section 5.3(b) have been obtained or made, any applicable waiting periods referred to therein have expired and any condition precedent to any such Consent has been satisfied, conflict with or violate any Law applicable to Parent or any of its Subsidiaries or by which any property or asset of Parent or any of its Subsidiaries is bound or affected or (iii) result in any breach of, or constitute a default (with or without notice or lapse of time, or both) under, or give rise to any right of termination, acceleration or cancellation of any Contract to which Parent or any of its Subsidiaries is a party, or by which any of their respective properties or assets is bound, other than, in the case of clauses (ii) and (iii), any such conflict, violation, breach, default, termination, acceleration or cancellation that would not have a Parent Material Adverse Effect.

(b) No Consent of, or registration, declaration or filing with, or notice to, any Governmental Authority is required to be obtained or made by or with respect to Parent or any of its Subsidiaries under applicable Law in connection with the execution, delivery and performance of this Agreement or the consummation of the transactions contemplated by this Agreement, other than (i) the applicable reporting or other requirements of and filings with the SEC under the Exchange Act (including the filing of the Proxy Statement), (ii) the filing of the Certificate of Merger with the Secretary of State in accordance with the DGCL and appropriate documents with the relevant authorities of the other jurisdictions in which Parent or any of its Subsidiaries is qualified to do business, (iii) such filings as may be required in connection with the Taxes described in Section 8.6, (iv) such other items required solely by reason of the participation of the Company in the transactions contemplated by this Agreement, (v) compliance with and filings or notifications under the HSR Act, other Antitrust Laws (vi) compliance with and filings or notifications under any Foreign Investment Laws, and (vii) such other Consents, declarations, registrations, filings or notices the failure of which to be obtained or made would not have a Parent Material Adverse Effect.

Section 5.4 Financing. Parent has delivered to the Company true, correct and complete copies of the duly executed (i) debt commitment letter, dated as of April 25, 2022, among Morgan Stanley Senior Funding, Inc., the other financial institutions party thereto, Parent and Acquisition Sub, together with true, correct and complete copies of the executed fee letter related thereto (collectively, including all exhibits, schedules and annexes thereto, the "**Bank Debt Commitment Letter**"), pursuant to which, and subject to the terms and conditions therein, the Debt Financing Sources party thereto have committed to lend the amounts set forth therein to Acquisition Sub for the purpose of funding a portion

A-28

Table of Contents

of the amounts required to fund the transactions contemplated by this Agreement (the "**Bank Debt Financing**"), (ii) debt commitment letter, dated as of April 25, 2022, among Morgan Stanley Senior Funding, Inc., the other financial institutions party thereto and X Holdings III, LLC, a Delaware limited liability company (the "**Margin Loan Borrower**"), together with true, correct and complete copies of the executed fee letter related thereto (collectively, including all exhibits, schedules and annexes thereto, the "**Margin Loan Commitment Letter**" and, together with the Bank Debt Commitment Letter, the "**Debt Commitment Letters**"), pursuant to which, and subject to the terms and conditions therein, the Debt Financing Sources party thereto have committed to lend the amounts set forth therein to the Margin Loan Borrower for the purpose of funding a portion of the amounts required to fund the transactions contemplated by this Agreement (the "**Margin Loan Financing**" and, together with the Bank Debt Financing, the "**Debt Financing**") and (iii) an equity commitment letter from the Equity Investor, dated as of the date hereof (including all exhibits, schedules, annexes and amendments thereto as of the date of this Agreement, the "**Equity Commitment Letter**" and, together with the Debt Commitment Letters, the "**Financing Commitments**") pursuant to which the Equity Investor has committed to invest the amounts set forth therein (the "**Equity Financing**" and, together with the Debt Financing, the "**Financing**"); provided that the fee and other economic provisions (including "flex" provisions) of fee letters may be redacted in a customary manner so long as none of the redacted terms would (i) reduce the amount of the Debt Financing below the amount that is required to pay the Funded Obligations, (ii) impose any new condition or otherwise adversely amend, modify or expand any conditions precedent to the Debt Financing or (iii) affect the enforceability or impair the validity of, or prevent, impede or delay the consummation of, the Debt Financing at the Closing. As of the date hereof, each of Parent and Acquisition Sub has accepted and is a party to the Bank Debt Commitment Letter, the Margin Loan Borrower has accepted and is a party to the Margin Loan Commitment Letter, and the Financing Commitments are in full force and effect and, are legal, valid and binding obligations of the Equity Investor, Parent and Acquisition Sub or the Margin Loan Borrower, as applicable, and, to the knowledge of the Equity Investor, Parent, Acquisition Sub and the Margin Loan Borrower, each of the other parties thereto, enforceable in accordance with their respective terms against the Equity Investor, Parent, Acquisition Sub or the Margin Loan Borrower, as applicable, and, to the knowledge of Parent and Acquisition Sub, against each of the other parties thereto. As of the date hereof, the Financing Commitments, and the respective commitments or obligations thereunder, have not been withdrawn, terminated, reduced, repudiated, rescinded, amended, supplemented or modified, in any respect, and no such withdrawal, termination, reduction, repudiation, rescission, amendment, supplement or modification is contemplated by the Equity Investor, Parent, Acquisition Sub or the Margin Loan Borrower or, to the knowledge of Parent and Acquisition Sub, any other party thereto. None of the Equity Investor, Parent, Acquisition Sub, the Margin Loan Borrower nor any of their respective Affiliates has, nor has, to the knowledge of the Equity Investor, Parent, Acquisition Sub or the Margin Loan Borrower, any other party to the Financing Commitments, committed any breach or threatened breach of the performance, observance or fulfillment of any covenants, conditions or other obligations set forth in, or is in default under, any of the Financing Commitments. No event has occurred which, with or without notice, lapse of time or both, would or would reasonably be expected to (i) constitute or result in a breach or default on the part of Parent, Acquisition Sub, Margin Loan Borrower or any of the other parties thereto (including the Financing Sources) under the Financing Commitments, (ii) constitute or result in a failure to satisfy a condition or other contingency set forth in the Financing Commitments, or (iii) otherwise result in any portion of the Debt Financing or the Equity Financing not being available on the Closing Date. None of the Equity Investor, Parent, Acquisition Sub or the Margin Loan Borrower, nor any of their respective Affiliates has any reason to believe (both before and after giving effect to any "flex" provisions contained in the Debt Commitment Letters) that it will be unable to satisfy, on a timely basis (and in any event, not later than the Closing), any condition to be satisfied by it (or otherwise within the Equity Investor's, Parent's, Acquisition Sub's or the Margin Loan Borrower's any of their respective Representatives' or Affiliates' control) contained in the applicable Financing Commitments or that the full amounts committed pursuant to the applicable Financing Commitments will not be available as of the Closing. There are no conditions precedent or

A-29

Table of Contents

other contingencies or conditions related to the Financing other than those conditions expressly set forth in the unredacted provisions of the Financing Commitments, and there are no side letters, understandings or other agreements, Contracts or arrangements of any kind relating to the Financing Commitments or the Financing that could adversely affect the availability, conditionality, enforceability or amount of the Financing contemplated by the Financing Commitments. As of the date of this Agreement, Parent, Acquisition Sub, the Margin Loan Borrower and/or their respective Affiliates have fully paid any and all commitment fees or other fees or deposits required by the applicable Financing Commitments to be paid on or before the date of this Agreement. The aggregate proceeds from the Financing are sufficient in amount to provide Parent and Acquisition Sub with the funds necessary to consummate the transactions contemplated hereby and to satisfy their obligations under this Agreement, including for Parent to pay (or cause to be paid) the aggregate amounts payable pursuant to Article II and the payment of all fees, costs and expenses to be paid by Parent related to the transactions contemplated by this Agreement, including such fees, costs and expenses relating to the Financing, and payment of all amounts in connection with the refinancing or repayment of any outstanding indebtedness of the Company required by this Agreement or the Financing Commitments (collectively, the "**Funding Obligations**"). Notwithstanding anything contained in this Agreement to the contrary, the Equity Investor, Parent and Acquisition Sub each acknowledge and affirm that it is not a condition to the Closing or to any of its obligations under this Agreement that the Equity Investor, Parent, Acquisition Sub and/or any of their respective Affiliates obtain any financing (including the Debt Financing) for any of the transactions contemplated by this Agreement. As of the date of this Agreement, the Equity Investor owns, directly or indirectly, all the issued and outstanding capital stock and other equity interests of the Margin Loan Borrower.

Section 5.5 Information Supplied. None of the information supplied or required to be supplied by or on behalf of Parent or any of its Representatives expressly for inclusion or incorporation by reference in the Proxy Statement shall, at the time it is first mailed to the Company's stockholders and at the time of the Company Stockholders' Meeting to be held in connection with the Merger, contain any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

Section 5.6 Brokers. Except for Morgan Stanley & Co. LLC, Bank of America Merrill Lynch and Barclays, each of whose fees and expenses shall be borne solely by Parent, no broker, finder, investment banker, consultant or intermediary is entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with the Merger or any of the other transactions contemplated by this Agreement based upon arrangements made by or on behalf of Parent, Acquisition Sub, or any of their respective Subsidiaries.

Section 5.7 Compliance With Laws.

(a) Neither the Parent, Acquisition Sub nor any of their Affiliates is in default or violation of any applicable Law, except for any such defaults or violations that would not have a Parent Material Adverse Effect.

(b) As of the date of this Agreement, there is no suit, action or proceeding pending or, to the knowledge of Parent, threatened in writing against Parent, Acquisition Sub or any of their Affiliates, that would have a Parent Material Adverse Effect, nor is there any judgment of any Governmental Authority outstanding against, or, to the knowledge of Parent, investigation by any Governmental Authority involving Parent, Acquisition Sub or any of their Affiliates or any of the transactions contemplated hereby that would have a Parent Material Adverse Effect.

Section 5.8 Ownership of Company. As of the date hereof, the Equity Investor, Parent and Acquisition Sub beneficially own, in the aggregate, 73,115,038 shares of Company Common Stock

A-30

Table of Contents

(the "**Parent Owned Shares**"). None of Parent, Acquisition Sub or any of their respective directors, officers, general partners or Affiliates has been an "interested stockholder" (as defined in Section 203 of the DGCL) of the Company, in each case during the three years prior to the date of this Agreement.

Section 5.9 Solvency. Neither Parent nor Acquisition Sub is entering into this Agreement with the actual intent to hinder, delay or defraud either present or future creditors of the Company or any of its Subsidiaries. Parent is Solvent as of the date of this Agreement, and each of Parent and the Company and its Subsidiaries (on a consolidated basis) will, after giving effect to the Merger or any other transaction contemplated by this Agreement, including the funding of the Financing, payment of the Funding Obligations, and payment of all other amounts required to be paid in connection with the consummation of the Merger or any other transaction contemplated by this Agreement and the payment of all related fees and expenses, be Solvent at and immediately after the Closing. As used in this Section 5.8, the term "**Solvent**" shall mean, with respect to a particular date, that on such date, (a) the sum of the assets, at a fair valuation, of Parent and, after the Closing, Parent and the Surviving Corporation and its Subsidiaries (on a consolidated basis) and each of them (on a stand-alone basis) will exceed their debts, (b) Parent and, after the Closing, Parent and the Surviving Corporation and its Subsidiaries (on a consolidated basis) and each of them (on a stand-alone basis) has not incurred and does not intend to incur, and does not believe that it will incur, debts beyond its ability to pay such debts as such debts mature, and (c) Parent has and, after the Closing, the Surviving Corporation and its Subsidiaries (on a consolidated basis) and of each of them (on a stand-alone basis) will have, sufficient capital and liquidity with which to conduct its business. For purposes of this Section 5.8, "debt" means any liability on a claim, and "claim" means any (i) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, and (ii) any right to an equitable remedy for breach of performance if such breach gives rise to a payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

Section 5.10 Parent Guarantee. Parent has furnished the Company with a true, complete and correct copy of the Parent Guarantee. The Parent Guarantee is in full force and effect and has not been amended, modified or terminated. The Parent Guarantee is a (i) legal, valid and binding obligation of the Guarantor and of each of the parties thereto and (ii) enforceable in accordance with its respective terms against the Guarantor and each of the other parties thereto. There is no default under the Parent Guarantee by the Guarantor, and no event has occurred that with the lapse of time or the giving of notice or both would constitute a default thereunder by the Guarantor.

Section 5.11 Acknowledgment of Disclaimer of Other Representations and Warranties. Except for the representations and warranties expressly set forth in this Article V, in the Equity Commitment Letter and in the Guarantee none of Parent, Acquisition Sub or any other Person makes or has made any representation or warranty of any kind whatsoever, express or implied, at Law or in equity, with respect to Parent or Acquisition Sub or their Affiliates or their respective business, operations, assets, liabilities, conditions (financial or otherwise), notwithstanding the delivery or disclosure to the Company or any of its Affiliates or Representatives of any documentation, forecasts or other information with respect to any one or more of the foregoing. Each of Parent and Acquisition Sub has conducted, to its satisfaction, its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) or assets of the Company and its Subsidiaries. In making its determination to proceed with the transactions contemplated by this Agreement, including the Merger, each of Parent and Acquisition Sub has relied solely on the results of its own independent review and analysis and the covenants, representations and warranties of the Company contained in this Agreement. Parent and Acquisition Sub hereby acknowledge that, notwithstanding anything contained in this Agreement to the contrary, (i) neither the Company nor any of its Subsidiaries, nor any other Person, makes or has made or is making any express or implied representation or warranty

A-31

Table of Contents

with respect to the Company or any of its Subsidiaries or their respective business or operations, in each case, other than those expressly given solely by the Company in Article IV; and (ii) neither Parent nor Acquisition Sub is relying on any express or implied representation or warranty, or the accuracy or the completeness of the representations and warranties set forth in Article IV, with respect to the Company or any of its Subsidiaries or their respective business or operations, in each case, other than those expressly given solely by the Company in Article IV.

## ARTICLE VI

## COVENANTS AND AGREEMENTS

Section 6.1 Conduct of Business by the Company Pending the Merger. The Company covenants and agrees that, between the date of this Agreement and the earlier of the Effective Time and the date, if any, on which this Agreement is terminated pursuant to Section 8.1, except (a) as may be required by Law, (b) as may be agreed to in writing by Parent (which consent shall not be unreasonably withheld, delayed or conditioned), (c) as may be expressly required or permitted pursuant to this Agreement, or (d) as set forth in Section 6.1 of the Company Disclosure Letter, (x) the Company shall use its commercially reasonable efforts to conduct the business of the Company and its Subsidiaries in the ordinary course of business (except with respect to actions or omissions that constitute COVID-19 Measures), and to the extent consistent therewith, the Company shall use its commercially reasonable efforts to preserve substantially intact the material components of its current business organization, and to preserve in all material respects its present relationships with key customers, suppliers and other Persons with which it has material business relations; provided that no action by the Company or its Subsidiaries with respect to the matters specifically addressed by any provision of this Section 6.1 shall be deemed a breach of this sentence, unless such action would constitute a breach of such relevant provision; and (y) the Company shall not, and shall not permit any of its Subsidiaries to (except for actions or omissions that constitute COVID-19 Measures, following reasonable prior consultation with Parent):

(a) amend or otherwise change, in any material respect, the Company Certificate of Incorporation or the Company Bylaws (or, except in the ordinary course of business, such equivalent organizational or governing documents of any of its Subsidiaries);

(b) split, combine, reclassify, redeem, repurchase or otherwise acquire or amend the terms of any capital stock or other equity interests or rights (except in connection with (i) the acceptance of shares of Company Common Stock as payment for the per share exercise price of the Company Options or as payment for Taxes incurred in connection with the exercise, vesting and/or settlement of Company Equity Awards, in each case, in accordance with the applicable Company Benefit Plan, (ii) the forfeiture of Company Equity Awards), (iii) pursuant to the exercise of purchase rights under the Company ESPP or (iv) pursuant to other than the Company ASR Confirmations and the Company Bond Hedge Transactions;

(c) except as permitted pursuant to Section 6.1(f), issue, sell, pledge, dispose, encumber or grant any shares of its or its Subsidiaries' capital stock or other equity interests, or any options, warrants, convertible securities or other rights of any kind to acquire any shares of its or its Subsidiaries' capital stock or equity interests except for transactions among the Company and its direct or indirect wholly owned Subsidiaries or among the Company's direct or indirect wholly owned Subsidiaries; provided, however, that the Company may issue shares of Company Common Stock upon the exercise of any Vested Company Option or payment of any other Company Equity Award that becomes vested, pursuant to the exercise of purchase rights under the Company ESPP or to satisfy any obligations under the Existing Convertible Notes;

A-32

Table of Contents

(d) other than any shares of the Company Common Stock issuable upon conversion of any series of Existing Convertible Notes in accordance with their terms, authorize, declare, pay or make any dividend or other distribution, payable in cash, stock, property or otherwise, with respect to the Company's or any of its Subsidiaries' capital stock or other equity interests, other than dividends paid by any Subsidiary of the Company to the Company or any wholly owned Subsidiary of the Company;

(e) except as required pursuant to existing Company Benefit Plans, (i) increase the compensation payable or to become payable or benefits provided or to be provided to any Company Service Provider except for increases in cash compensation or benefits to Company Service Providers in the ordinary course of business consistent with past practice, (ii) grant or provide any severance or termination payments or benefits to any Company Service Provider other than the payment of severance amounts or benefits in the ordinary course of business consistent with past practice and subject to the execution and non-revocation of a release of claims in favor of the Company and its Subsidiaries, (iii) provide any obligation to gross-up, indemnify or otherwise reimburse any Company Service Provider for any Tax incurred by any such individual, including under Section 409A or 4999 of the Code, (iv) accelerate the time of payment or vesting of, or the lapsing of restrictions related to, or fund or otherwise secure the payment of, any compensation or benefits (including any equity or equity-based awards) to any Company Service Provider, or (v) establish, amend or terminate any Company Benefit Plan (or any plan, program, arrangement or agreement that would be a Company Benefit Plan if it were in existence on the date hereof) other than (x) entry into, amendment or termination of any Company Benefit Plan in a manner that would not materially increase costs to the Company, Parent or the Surviving Corporation or any of their affiliates, or materially increase the benefits provided under any Company Benefit Plan or (y) new hire offer letters entered into in the ordinary course and consistent with past practices;

(f) except in the ordinary course of business and consistent with past practice (including with regard to aggregate grant date value, terms and allocation) or as may be required by the terms of a Company Benefit Plan in effect as of the date hereof, grant, confer or award any Company Equity Awards or other equity-based awards, convertible securities or any other rights to acquire any of its or its Subsidiaries' capital stock, whether settled in cash or shares of Company Common Stock;

(g) unless required by Law or pursuant to existing written Company Benefit Plans, (i) enter into or materially amend any collective bargaining or other labor agreement with any labor organization or (ii) recognize or certify any labor organization or group of employees as the bargaining representative for any employees of the Company or any of its Subsidiaries;

(i) (i) acquire (including by merger, consolidation, or acquisition of stock or assets), except in respect of any merger, consolidation, business combination among the Company and its wholly owned Subsidiaries or among the Company's wholly owned Subsidiaries, any corporation, partnership, limited liability company, other business organization or any division or material amount of assets thereof, or (ii) sell, lease, license, abandon or otherwise subject to a Lien other than a Permitted Lien or otherwise dispose of any material properties, rights or assets of the Company or its Subsidiaries other than (A) sales of inventory in the ordinary course of business, (B) licenses of Company Intellectual Property in the ordinary course of business, or (C) pursuant to agreements existing as of the date of this Agreement or entered into after the date of this Agreement in accordance with the terms of this Agreement;

(j) incur, or amend in any material respect the terms of, any indebtedness for borrowed money for any of its Subsidiaries, or assume or guarantee any such indebtedness for any Person (other than a Subsidiary), except for indebtedness incurred (i) under the Company's existing credit facilities or incurred to replace, renew, extend, refinance or refund any existing indebtedness of the Company or its Subsidiaries on terms and conditions not materially less favorable to the Company and its

A-33

Table of Contents

Subsidiaries than, taken as a whole, the terms or conditions of the replaced, renewed, extended, refinanced or refunded debt or otherwise are not inconsistent with prevailing market conditions for substantially similar indebtedness at such time, as determined by the Company in good faith, (ii) pursuant to other agreements in effect prior to the execution of this Agreement, (iii) under capital leases, purchase money financing, equipment financing and letters of credit in the ordinary course of business, (iv) between or among the Company and/or any of its Subsidiaries or (v) otherwise in the ordinary course of business;

(k) enter into, or amend in any material respect, any Company Material Contract with a term longer than one (1) year which cannot be terminated without material penalty upon notice of ninety (90) days or less other than (x) in the ordinary course of business or (y) which would not have a Company Material Adverse Effect;

(l) make any material change to its methods of accounting in effect at December 31, 2021, except (i) as required by GAAP (or any interpretation thereof), Regulation S-X or a Governmental Authority or quasi-Governmental Authority (including the Financial Accounting Standards Board or any similar organization), (ii) to permit the audit of the Company's financial statements in compliance with GAAP, (iii) as required by a change in applicable Law, (iv) as disclosed in the Company SEC Documents or (v) to the extent that such change would not have a Company Material Adverse Effect;

(m) make or change any Tax election or accounting method, settle or compromise any Tax claim or assessment, file any amended Tax Return, or consent to any extension or waiver of any limitation period with respect to any Tax claim or assessment, except, in each case, that would not have a Company Material Adverse Effect;

(n) solely with respect to the Company, adopt or enter into a plan of complete or partial liquidation or dissolution;

(o) settle or compromise any litigation other than (i) in the ordinary course of business or (ii) settlements or compromises of litigation where the amount paid (less the amount reserved for such matters by the Company or otherwise covered by insurance) in settlement or compromise, in each case, does not exceed $25 million;

(p) adopt a stockholder rights plan (or other similar agreement, plan or arrangement having a similar intent, purpose or effect) that would be triggered (or whose rights would be affected in any way) by the consummation of the transactions contemplated hereby, including the Merger; or

(q) except as otherwise permitted by clauses (a) through (p) above, enter into any agreement to do any of the foregoing.

Section 6.2 Preparation of the Proxy Statement; Company Stockholders' Meeting.

(a) As promptly as reasonably practicable after the date of this Agreement, (i) the Company shall prepare the Proxy Statement, (ii) Parent and Acquisition Sub shall furnish to the Company all information concerning themselves and their Affiliates that is required to be included in the Proxy Statement and shall promptly provide such other assistance in the preparation of the Proxy Statement as may be reasonably requested by the Company from time to time, and (iii) subject to the receipt from Parent and Acquisition Sub of the information described in clause (ii) above, the Company shall file the Proxy Statement with the SEC. The Company shall, as promptly as practicable after receipt thereof, provide Parent with copies of any written comments, and advise Parent of any oral comments, with respect to the Proxy Statement received from the SEC. The Company shall use its reasonable best efforts (with the assistance of, and after consultation with, Parent as provided by this Section 6.2(a)) to

A-34

Table of Contents

respond as promptly as reasonably practicable to any comments from the SEC with respect to the Proxy Statement. No filing or mailing of, or amendment or supplement to, the Proxy Statement will be made by the Company without providing Parent a reasonable opportunity to review and comment thereon (which comments shall be considered by the Company in good faith) (except as required by applicable Law or in connection with an Adverse Board Recommendation Change.

(b) If, at any time prior to the Company Stockholders' Meeting, any information relating to Parent, Acquisition Sub or the Company, or any of their respective Affiliates, officers or directors, is discovered by Parent, Acquisition Sub or the Company that should be set forth in an amendment or supplement to the Proxy Statement so that the Proxy Statement shall not contain an untrue statement or omit to state any material fact required to be stated therein or necessary to make the statements therein (in light of the circumstances under which they were made) not misleading, the party that discovers such information shall promptly notify the other parties hereto, and, to the extent required by Law, an appropriate amendment or supplement describing such information shall be promptly filed with the SEC and disseminated to the Company's stockholders in accordance with applicable Law.

(c) The Company shall, as promptly as practicable following the date on which the SEC confirms that it has no further comments on the Proxy Statement, (i) establish a record date, for and give notice of a meeting of its stockholders, for the purpose of voting upon the approval of the Merger, holding the Company Stockholder Advisory Vote and voting on customary matters of procedure (together with any postponement, adjournment or other delay thereof, the "**Company Stockholders' Meeting**"), (ii) cause the Proxy Statement to be mailed to the Company's stockholders as of the record date established for the Company Stockholders' Meeting and (iii) duly call, convene and hold the Company Stockholders' Meeting; <u>provided</u> that the Company may postpone or adjourn the Company Stockholders' Meeting (on one or more occasions) (A) with the consent of Parent and Acquisition Sub, (B) for the absence of a quorum, (C) to allow reasonable additional time for any supplemental or amended disclosure that the Company has determined in good faith is necessary under applicable Law and for such supplemental or amended disclosure to be disseminated and reviewed by the Company's stockholders prior to the Company Stockholders' Meeting, (D) to allow additional solicitation of votes in order to obtain the Company Stockholder Approval or (E) if required by applicable Law. Subject to the right of the Company Board to make an Adverse Board Recommendation Change pursuant to <u>Section 6.5</u>, Company Board Recommendation include the Company Board Recommendation in the Proxy Statement, and, unless there has been an Adverse Board Recommendation Change pursuant to <u>Section 6.5</u>, the Company shall use commercially reasonable efforts to solicit proxies in favor of the Company Stockholder Approval at the Company Stockholders' Meeting.

(d) The Equity Investor, Parent and Acquisition Sub shall not sell or dispose any shares of Company Common Stock while this Agreement is in effect, and shall cause their controlled Affiliates to, cause Parent Owned Shares and all other shares of Company Common Stock beneficially as of the record date for the Company Stockholder Meeting owned by them to be (A) present at the Company Stockholder Meeting for quorum purposes; and (B) voted at the Company Stockholder Meeting in favor of the adoption of this Agreement.

<u>Section 6.3 Efforts to Close; Regulatory Filings.</u>

(a) Subject to the terms and conditions of this Agreement (including the limitations set forth in <u>Section 6.5</u>), the parties hereto will use their respective reasonable best efforts to consummate and make effective the transactions contemplated by this Agreement and to cause the conditions to the Merger set forth in <u>Article VII</u> to be satisfied, including using reasonable best efforts to accomplish the following: (i) the obtaining of all necessary actions or non-actions, Consents and approvals from Governmental Authorities necessary in connection with the consummation of the transactions contemplated by this Agreement, including the Merger, and the making of all necessary registrations

A-35

Table of Contents

and filings (including filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to obtain an approval from, or to avoid an action or proceeding by, any Governmental Authority necessary in connection with the consummation of the transactions contemplated by this Agreement, including the Merger; (ii) the obtaining of all other necessary Consents, approvals or waivers from Third Parties; (iii) the defending of any lawsuits or other legal proceedings through the Termination Date, whether judicial or administrative, challenging this Agreement or the consummation of the transactions contemplated by this Agreement, including the Merger, performed or consummated by such party in accordance with the terms of this Agreement, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Authority vacated or reversed; and (iv) the execution and delivery of any additional instruments reasonably necessary to consummate the Merger and any other transactions to be performed or consummated by such party in accordance with the terms of this Agreement and to carry out fully the purposes of this Agreement. Each of the parties hereto shall (x) promptly (and in no event later than ten (10) Business Days following the date that this Agreement is executed) make its respective filings under the HSR Act, and (y) as promptly as reasonably practicable, make any other applications and filings as are mutually agreed by Parent and the Company, acting reasonably, to be (i) material and (ii) required or advisable under any Antitrust Laws or Foreign Investment Laws with respect to the transactions contemplated by this Agreement, including the Merger. Notwithstanding anything in this Agreement to the contrary, except as expressly provided in <u>Section 7.1(b)</u> or <u>Section 7.1(c)</u>, obtaining any Consent of any Third Party, approvals or waivers referenced in this <u>Section 6.3(a)</u> above or otherwise shall not be considered a condition to the obligations of Parent and Acquisition Sub to consummate the Merger.

(b) The Equity Investor, Parent and Acquisition Sub agree to take promptly any and all steps necessary to avoid or eliminate each and every impediment and obtain all Consents, actions, non-actions, approvals or waivers (or, as applicable, expiration or termination of the waiting periods with respect thereto) under any Antitrust Laws, Foreign Investment Laws (or, as applicable, expiration or termination of the waiting periods with respect thereto) or other Law that may be required by any foreign or U.S. federal, state or local Governmental Authority, in each case, with competent jurisdiction, so as to enable the parties to consummate the transactions contemplated by this Agreement, including the Merger, as promptly as practicable, but prior to the Termination Date, including committing to or effecting, by consent decree, hold separate orders, trust, or otherwise, (i) the sale or other disposition of such assets or businesses as are required to be divested or (ii) the acceptance of restrictions on freedom of action, conduct, or operations with respect to the business of Company, in the case of the foregoing clauses (i) or (ii) in order to avoid the entry of, or to effect the dissolution of or vacate or lift, any Order, that would otherwise have the effect of preventing or materially delaying the consummation of the Merger and the other transactions contemplated by this Agreement as promptly as practicable. Further, the Equity Investor, Parent and Acquisition Sub will take such actions as are necessary in order to ensure that (x) no requirement for any non-action by, or Consent or approval of, any foreign or U.S. federal, state or local Governmental Authority, (y) no decree, judgment, injunction, temporary restraining order or any other Order in any suit or proceeding and (z) no other matter relating to any Antitrust Laws or Foreign Investment Laws, would preclude consummation of the Merger by the Termination Date. Notwithstanding the foregoing, nothing in <u>Section 6.3(a)</u>, <u>Section 6.3(b)</u> (including with respect to the foregoing clauses (i) and (ii)), or any other part of this Agreement shall require or obligate Parent, Acquisition Sub, or any of their respective Affiliates to (xx) propose, take, or agree to take any actions that would individually or in the aggregate have a material adverse effect on the business, assets, or financial condition of the Company and its Subsidiaries, taken as a whole or (yy) propose, negotiate, effect or agree to, the sale, divestiture, lease, license, hold separate, transfer, or disposition of, or any restriction on the freedom of action with respect to, any assets, business, or equity holdings of, or held or controlled directly or indirectly by, Equity Investor or any Affiliate of Parent (other than Parent, Acquisition Sub or Company after giving effect to the Merger and subject to the restrictions in subpart (xx) of this paragraph).

A-36

Table of Contents

(c) Each of the parties hereto will furnish to the other such necessary information and reasonable assistance as the other may reasonably request in connection with the preparation of any required governmental filings or submissions and will cooperate in responding to any inquiry from a Governmental Authority, including (i) promptly informing the other party of such inquiry, (ii) consulting in advance before making any presentations or submissions to a Governmental Authority, (iii) cooperating in the filing of any analyses, presentations, memoranda, briefs, arguments, opinions or other written communications explaining or defending the Merger, articulating any regulatory or competitive argument or responding to requests or objections made by any Governmental Authority, (iv) providing each other with a reasonable advance opportunity to review and comment upon, and consider in good faith the views of the other with respect to, all material written communications (including applications, analyses, presentations, memoranda, briefs, arguments and opinions) with a Governmental Authority regarding the Merger or any other transactions, (v) giving the other party the opportunity to attend and participate in any substantive meetings or discussions with any Governmental Authority, to the extent reasonably practical and not prohibited by such Governmental Authority, and (vi) supplying each other with copies of all material correspondence, or communications between any party and any Governmental Authority with respect to this Agreement (provided that such materials may be limited to counsel as required or advisable under applicable Law and may be redacted to remove valuation material). The parties agree that Parent shall control the strategy for all filings, notifications, submissions, and communications, proposals and litigation in connection with any filing, notice, petition, statement, registration, submission of information, application or similar filing under the Antitrust Laws after consulting with, and considering in good faith the view of the Company relating to such strategy.

Section 6.4 Access to Information; Confidentiality. Upon reasonable notice, the Company shall (and shall cause each of its Subsidiaries to) afford to the representatives, officers, directors, employees, agents, attorneys, accountants and financial advisors ("**Representatives**") of Parent reasonable access (at Parent's sole cost and expense), in a manner not disruptive in any material respect to the operations of the business of the Company and its Subsidiaries, during normal business hours and upon reasonable written notice throughout the period commencing on the date of this Agreement until the earlier of the Effective Time and the termination of this Agreement pursuant to Article VIII, to the properties, books and records of the Company and its Subsidiaries and, during such period, shall (and shall cause each of its Subsidiaries to) furnish promptly to such Representatives all information concerning the business, properties and personnel of the Company and its Subsidiaries as may reasonably be requested in writing, in each case, for any reasonable business purpose related to the consummation of the transactions contemplated by this Agreement; provided, however, that nothing herein shall require the Company or any of its Subsidiaries to disclose any information to Parent or Acquisition Sub if such disclosure would, in the reasonable judgment of the Company, (i) cause significant competitive harm to the Company or its Subsidiaries if the transactions contemplated by this Agreement are not consummated, (ii) violate applicable Law or the provisions of any agreement to which the Company or any of its Subsidiaries is a party, or (iii) jeopardize any attorney-client or other legal privilege. No investigation or access permitted pursuant to this Section 6.4 shall affect or be deemed to modify any representation or warranty made by the Company hereunder. Each of Parent and Acquisition Sub agrees that it will not, and will cause its Representatives not to, use any information obtained pursuant to this Section 6.4 (or otherwise pursuant to this Agreement) for any competitive or other purpose unrelated to the consummation of the transactions contemplated by this Agreement. Parent will use its reasonable best efforts to minimize any disruption to the respective business of the Company and its Subsidiaries that may result from requests for access under this Section 6.4 and, notwithstanding anything to the contrary herein, the Company may satisfy its obligations set forth above by electronic means if physical access is not reasonably feasible or would not be permitted under applicable Law as a result of COVID-19 or any COVID-19 Measures. Prior to any disclosure, the Company and Parent shall enter into a customary confidentiality agreement with

A-37

Table of Contents

respect to any information obtained pursuant to this Section 6.4 (or otherwise pursuant to this Agreement).

Section 6.5 Non-Solicitation; Competing Proposals.

(a) From the date of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to Section 8.1, the Company shall, and shall cause each of its directors, executive officers and Subsidiaries to, and shall instruct its other Representatives to, immediately cease and cause to be terminated any existing solicitation of, or discussions or negotiations with, any Third Party relating to any Competing Proposal, and the Company further agrees that it shall promptly request that all non-public information previously provided in the past twelve (12) months by or on behalf of the Company or any of its Subsidiaries to any Persons that might reasonably be expected to consider making a Competing Proposal be promptly returned or destroyed in accordance with the terms of the applicable confidentiality agreement. Except as otherwise provided in this Section 6.5, from the date of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to Section 8.1, the Company shall not, and shall cause each of its directors, executive officers and Subsidiaries not to, and shall instruct its other Representatives not to, (i) solicit, initiate, knowingly encourage or knowingly facilitate, whether publicly or otherwise, any substantive discussion, offer or request that constitutes, or would reasonably be expected to lead to, a Competing Proposal and (ii) engage in negotiations or substantive discussions with (it being understood that the Company may inform Persons of the provisions contained in this Section 6.5), or furnish any material non-public information to, any Person relating to a Competing Proposal or any inquiry or proposal that would reasonably be expected to lead to a Competing Proposal; provided that, notwithstanding the foregoing, the Company shall be permitted to grant a waiver of or terminate any "standstill" or similar obligation of any Person with respect to the Company or any of its Subsidiaries to allow such Person to submit a Competing Proposal.

(b) From the date of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to Section 8.1, as promptly as reasonably practicable, and in any event within one (1) Business Day of receipt by the Company or any of its directors, executive officers or Subsidiaries of any Competing Proposal or any request that would reasonably be expected to lead to the making of a Competing Proposal, the Company shall deliver to Parent a written notice setting forth: (i) the identity of the Person making such Competing Proposal or request; and (ii) the material terms and conditions of any such Competing Proposal. The Company shall keep Parent reasonably informed of any material amendment or other modification of any such Competing Proposal or request on a prompt basis, and in any event within two (2) Business Days following the Company's receipt in writing of such an amendment or modification.

(c) Notwithstanding anything to the contrary in this Agreement, at any time prior to obtaining the Company Stockholder Approval, in the event that the Company receives a Competing Proposal from any Person or group of Persons, (i) the Company and its Representatives may contact such Person to clarify the terms and conditions thereof and (ii) the Company, the Company Board and their respective Representatives may engage in negotiations or discussions with, or furnish any information and other access to, any Person or group of Persons making such Competing Proposal and any of its Representatives or potential sources of financing if the Company Board determines in good faith (after consultation with its legal counsel and financial advisors) that such Competing Proposal either constitutes a Superior Proposal or would reasonably be expected to result in a Superior Proposal; provided that (x) prior to furnishing any material non-public information concerning the Company or its Subsidiaries, the Company receives from such Person or group, to the extent that such Person or group is not already subject to a confidentiality agreement with the Company, an executed confidentiality agreement containing customary confidentiality terms, it being understood that such confidentiality agreement need not contain a standstill provision or otherwise restrict the making, or

A-38

Table of Contents

amendment, of a Competing Proposal (and related communications) to the Company or the Company Board (such confidentiality agreement, an "**Acceptable Confidentiality Agreement**") and (y) any such material non-public information so furnished in writing shall be promptly made available to Parent to the extent that it was not previously made available to Parent or its Representatives. For the avoidance of doubt, none of (A) the determination, in itself with no further action, by the Company Board that a Competing Proposal either constitutes a Superior Proposal or would reasonably be expected to result in a Superior Proposal or (B) the public disclosure, in itself, of such determination will constitute an Adverse Board Recommendation Change or violate this Section 6.5.

(d) Except as otherwise provided in this Agreement, the Company Board shall not (i) (A) publicly recommend that the Company's stockholders vote against the adoption of this Agreement and the approval of the transactions contemplated by this Agreement, including the Merger, or make any public statement or knowingly take any action with a similar intent, purpose or effect, or (B) approve or recommend, or propose publicly to approve or recommend, to the Company's stockholders any Competing Proposal (any action described in this clause (i) being referred to as an "**Adverse Board Recommendation Change**"), or (ii) approve or recommend, or allow the Company or any of its Subsidiaries to execute or enter into, any letter of intent, memorandum of understanding or definitive merger or similar agreement with respect to any Competing Proposal (other than an Acceptable Confidentiality Agreement). Notwithstanding anything in this Agreement to the contrary, at any time prior to receipt of the Company Stockholder Approval, the Company Board may (i) make an Adverse Board Recommendation Change in response to an event, occurrence, change, effect, condition, development or state of facts or circumstances (other than related to a Competing Proposal or Superior Proposal, or any proposal that constitutes or would reasonably be expected to lead to a Competing Proposal or Superior Proposal) that was neither known to, nor reasonably foreseeable by, the Company Board as of the date of this Agreement (or, if known, the consequences of which were not known or reasonably foreseeable to the Company Board as of the date of this Agreement) (an "**Intervening Event**") (where, for the avoidance of doubt, (x) the fact, in itself, that the Company meets or exceeds projections, forecasts or estimates (it being understood that the underlying causes of (or contributors to) such performance that are not otherwise excluded from the definition of Intervening Event may be taken into account) and (y) changes, in themselves, in the price of the Company Common Stock or the trading volume thereof shall be considered known and reasonably foreseeable occurrences (it being understood that the underlying causes of (or contributors to) such changes in price or trading volume that are not otherwise excluded from the definition of Intervening Event may be taken into account)) if the Company Board has determined in good faith (after consultation with its legal counsel and financial advisors) that the failure to take such action would reasonably be expected to be inconsistent with the Company's directors' fiduciary duties under applicable Law; or (ii) (x) make an Adverse Board Recommendation Change if the Company has received a Competing Proposal that the Company Board has determined in good faith (after consultation with its legal counsel and financial advisors) constitutes a Superior Proposal, and (y) authorize, adopt or approve such Superior Proposal and cause or permit the Company to enter into a definitive agreement with respect to such Superior Proposal substantially concurrently with the termination of this Agreement pursuant to Section 8.1(c)(ii); provided, however, that (1) no Adverse Board Recommendation Change may be made and no termination of this Agreement pursuant to this Section 6.5(d) and Section 8.1(c)(ii) may be effected, in each case, until the end of the fourth (4th) full Business Day following Parent's receipt of a written notice from the Company advising Parent that the Company Board intends to make an Adverse Board Recommendation Change (a "**Notice of Adverse Board Recommendation Change**") or terminate this Agreement pursuant to this Section 6.5(d) and Section 8.1(c)(ii) (a "**Notice of Superior Proposal**"); and (2) during such period, if requested by Parent, the Company and its Representatives shall negotiate with Parent and its Representatives in good faith (to the extent Parent so desires to negotiate) to make adjustments to the terms and conditions of this Agreement so that either the failure to make an Adverse Board Recommendation Change in response to such Intervening Event would no longer reasonably be expected to be inconsistent with the Company's directors'

A-39

Table of Contents

fiduciary duties under applicable Law or such Competing Proposal would cease to constitute a Superior Proposal, as appropriate, and (3) in determining whether to make such Adverse Board Recommendation Change or terminate this Agreement pursuant to this Section 6.5(d) and Section 8.1(c)(ii), the Company Board shall take into account any changes to the terms of this Agreement timely proposed by Parent in response to a Notice of Adverse Board Recommendation or a Notice of Superior Proposal (as may be extended). Any material amendment to the financial terms or any other material amendment of such Superior Proposal shall require a new Notice of Superior Proposal and the Company shall be required to comply again with the requirements of this Section 6.5(d) with respect to such new Superior Proposal; provided that the new notice period shall be three (3) Business Days. For the avoidance of doubt, none of (A) the delivery, in itself, of a Notice of Adverse Board Recommendation or a Notice of Superior Proposal or (B) the public disclosure, in itself, of such delivery will constitute an Adverse Board Recommendation Change or violate this Section 6.5.

(f) Nothing in this Agreement shall restrict the Company or the Company Board from taking or disclosing a position contemplated by Rule 14d-9 or Rule 14e-2(a) under the Exchange Act, or otherwise making disclosure to comply with applicable Law (it being agreed that a "stop, look and listen" communication by the Company Board to the Company's stockholders pursuant to Rule 14d-9(f) under the Exchange Act or a factually accurate public statement by the Company that describes the Company's receipt of a Competing Proposal and the operation of this Agreement with respect thereto shall not be deemed to be an Adverse Board Recommendation Change or give rise to a Parent termination right pursuant to Section 8.1(d)(ii)). For the avoidance of doubt, a factually accurate public statement by the Company or the Company Board (or a committee thereof) that (A) describes the Company's receipt of a Competing Proposal; (B) identifies the Person or group of Persons making such Competing Proposal; (C) provides the material terms of such Competing Proposal; or (D) describes the operation of this Agreement with respect thereto will not, in any case, be deemed to be (1) an adoption, approval or recommendation with respect to such Competing Proposal; or (2) an Adverse Board Recommendation Change.

(g) For purposes of this Agreement:

(i) "**Competing Proposal**" shall mean any proposal or offer made by any Person (other than Parent, Acquisition Sub or any Affiliate thereof) or group (as defined in Section 13(d)(3) of the Exchange Act) of Persons (i) to purchase or otherwise acquire, directly or indirectly, in one transaction or a series of transactions, (A) beneficial ownership (as defined under Section 13(d) of the Exchange Act) of fifteen percent (15%) or more of any class of equity securities of the Company pursuant to a merger, consolidation or other business combination, sale of shares of capital stock, tender offer, exchange offer or similar transaction; or (B) any one or more assets or businesses of the Company and its Subsidiaries that constitute fifteen percent (15%) or more of the revenues or assets of the Company and its Subsidiaries, taken as a whole; (ii) with respect to the issuance, sale or other disposition, directly or indirectly, to any Person (other than Parent, Acquisition Sub or any Affiliate thereof) or group (as defined in Section 13(d)(3) of the Exchange Act) of Persons of securities (or options, rights, or warrants to purchase, or securities convertible into or exchangeable for, such securities) representing fifteen percent (15%) or more of the voting power of the Company; or (z) with respect to any merger, consolidation, business combination, recapitalization, reorganization or other transaction involving the Company or its Subsidiaries pursuant to which any Person (as defined in Section 13(d)(3) of the Exchange Act) or group of Persons would have beneficial ownership (as defined pursuant to Section 13(d)(3) of the Exchange Act) of securities representing fifteen percent (15%) or more of the total outstanding equity securities of the Company after giving effect to the consummation of such transaction.

(iii) "**Superior Proposal**" shall mean a Competing Proposal (with all percentages in the definition of Competing Proposal increased to ninety percent (90%)) made by a Third Party on terms that the Company Board determines in good faith (after consultation with its legal counsel

A-40

Table of Contents

and financial advisors) and considering such factors as the Company Board considers to be appropriate, are more favorable to the Company's stockholders than the transactions contemplated by this Agreement (including any changes to the terms of this Agreement committed to by Parent to the Company in writing in response to such Competing Proposal under the provisions of <u>Section 6.5(d)</u>).

<u>Section 6.6 Directors' and Officers' Indemnification and Insurance.</u>

(a) Parent and Acquisition Sub agree that all rights to exculpation and indemnification for acts or omissions occurring at or prior to the Effective Time, whether asserted or claimed prior to, at or after the Effective Time (including any matters arising in connection with the transactions contemplated by this Agreement), now existing in favor of the current or former directors, officers and employees, if any (the foregoing persons, the "**D&O Indemnified Parties**"), as the case may be, of the Company or its Subsidiaries as provided in their respective organizational documents as in effect on the date of this Agreement or in any Contract shall survive the Merger and shall continue in full force and effect. The Surviving Corporation shall (and Parent shall cause the Surviving Corporation to) indemnify, defend and hold harmless, and advance expenses to D&O Indemnified Parties with respect to all acts or omissions by them in their capacities as such at any time prior to the Effective Time (including any matters arising in connection with this Agreement or the transactions contemplated by this Agreement), to the fullest extent that the Company or its Subsidiaries would be permitted by applicable Law and to the fullest extent required by the organizational documents of the Company or its Subsidiaries as in effect on the date of this Agreement. Parent shall cause the certificate of incorporation, bylaws or other organizational documents of the Surviving Corporation and its Subsidiaries to contain provisions with respect to exculpation, indemnification, advancement of expenses and limitation of director, officer and employee liability that are no less favorable to the D&O Indemnified Parties than those set forth in the Company's and its Subsidiaries' organizational documents as of the date of this Agreement, which provisions thereafter shall not, for a period of six (6) years from the Effective Time, be amended, repealed or otherwise modified in any manner that would adversely affect the rights thereunder of the D&O Indemnified Parties.

(b) Without limiting the provisions of <u>Section 6.6(a)</u>, to the fullest extent that the Company would be permitted by applicable Law to do so, Parent shall or shall cause the Surviving Corporation to: (i) indemnify and hold harmless each D&O Indemnified Party against and from any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, to the extent such claim, action, suit, proceeding or investigation arises out of or pertains to: (A) any alleged action or omission in such D&O Indemnified Party's capacity as a director, officer or employee of the Company or any of its Subsidiaries prior to the Effective Time; or (B) this Agreement or the transactions contemplated by this Agreement and (ii) pay in advance of the final disposition of any such claim, action, suit, proceeding or investigation the expenses (including reasonable attorneys' fees) of any D&O Indemnified Party upon confirmation by the D&O Indemnified Party of his or her good faith belief that he or she has met the standard of conduct necessary for indemnification applicable to him or her and a customary written undertaking by him or her or on his or her behalf to repay the amount paid or reimbursed if it is ultimately determined that the standard of conduct for indemnification was not met. Any determination required to be made with respect to whether the conduct of any D&O Indemnified Party complies or complied with any applicable standard shall be made by independent legal counsel selected by the D&O Indemnified Party, which counsel shall be reasonably acceptable to the Surviving Corporation, and the fees of such counsel shall be paid by the Surviving Corporation. Notwithstanding anything to the contrary contained in this <u>Section 6.6(b)</u> or elsewhere in this Agreement, Parent shall not (and Parent shall cause the Surviving Corporation not to) settle or compromise or consent to the entry of any judgment or otherwise seek termination with respect to any claim, action, suit, proceeding or investigation, unless

A-41

Table of Contents

such settlement, compromise, consent or termination includes an unconditional release of all of the D&O Indemnified Parties covered by the claim, action, suit, proceeding or investigation from all liability arising out of such claim, action, suit, proceeding or investigation.

(c) Unless the Company shall have purchased a "tail" policy prior to the Effective Time as provided below, for at least six (6) years after the Effective Time, (i) Parent shall cause the Surviving Corporation and its other Subsidiaries to maintain in full force and effect the coverage provided by the existing directors' and officers' liability insurance and fiduciary insurance in effect as of the date of this Agreement and maintained by the Company or any of its Subsidiaries, as applicable (the "**Existing D&O Insurance Policies**"), or provide substitute policies for the Company and its current and former directors and officers who are currently covered by such Existing D&O Insurance Policies, in either case, on terms and conditions no less advantageous to the D&O Indemnified Parties, or any other Person entitled to the benefit of this Section 6.6, as applicable, than the Existing D&O Insurance Policies, covering claims arising from facts, events, acts or omissions that occurred at or prior to the Effective Time, including the transactions contemplated by this Agreement (provided that Parent or the Surviving Corporation, as applicable, shall not be required to pay an annual premium for such insurance in excess of three hundred percent (300%) of the aggregate annual premiums currently paid by the Company or any of its Subsidiaries, as applicable, on an annualized basis, but in such case shall purchase as much of such coverage as possible for such amount) and (ii) Parent shall not, and shall not permit the Surviving Corporation or its other Subsidiaries to, take any action that would prejudice the rights of, or otherwise impede recovery by, the beneficiaries of any such insurance, whether in respect of claims arising before or after the Effective Time. In lieu of such insurance, prior to the Effective Time, the Company may purchase a six (6) year "tail" prepaid policy on such terms and conditions (provided that the premium for such insurance shall not exceed three hundred percent (300%) of the aggregate annual premiums currently paid by the Company or any of its Subsidiaries, as applicable, on an annualized basis), in which event Parent shall cease to have any obligations under the first sentence of this Section 6.6(c).

(d) In the event that Parent, the Surviving Corporation, any of the Company's Subsidiaries or any of their successors or assigns shall (i) consolidate with or merge into any other Person and shall not be the continuing or surviving company or entity of such consolidation or merger or (ii) transfer all or substantially all its properties and assets to any Person, then, and in each such case, Parent shall cause proper provision to be made so that the successor and assign of Parent, the Surviving Corporation or any such Subsidiary assumes the obligations set forth in this Section 6.6.

(e) The D&O Indemnified Parties to whom this Section 6.6 applies shall be third-party beneficiaries of this Section 6.6. The provisions of this Section 6.6 are intended to be for the benefit of each D&O Indemnified Party and his or her successors, heirs or representatives. The Surviving Corporation shall pay all reasonable expenses, including reasonable attorneys' fees, that may be incurred by any D&O Indemnified Party in enforcing its indemnity and other rights under this Section 6.6. The rights of each D&O Indemnified Party hereunder shall be in addition to, and not in limitation of, any other applicable rights such D&O Indemnified Party may have under the respective organizational documents of the Company or any of its Subsidiaries or the Surviving Corporation, any other indemnification arrangement, the DGCL or otherwise. Notwithstanding any other provision of this Agreement, this Section 6.6 shall survive the consummation of the Merger indefinitely (or any earlier period actually specified in this Section 6.6) and shall be binding, jointly and severally, on all successors and assigns of Parent and the Surviving Corporation, and shall be enforceable by the D&O Indemnified Parties and their successors, heirs or representatives.

(f) Nothing in this Agreement is intended to, or will be construed to, release, waive or impair any rights to directors' and officers' insurance claims pursuant to any applicable insurance policy or indemnification agreement that is or has been in existence with respect to the Company or any of its

A-42

Table of Contents

Subsidiaries for any of their respective directors, officers or other employees, it being understood and agreed that the indemnification provided for in this Section 6.6 is not prior to or in substitution for any such claims pursuant to such policies or agreements. Following the Effective Time, the obligations of Parent and the Surviving Corporation under this Section 6.6 shall not be terminated or modified in any manner adverse to the rights of any D&O Indemnified Party without the consent of such affected D&O Indemnified Party.

Section 6.7 Notification of Certain Matters. From and after the date of this Agreement until the earlier of the Effective Time or the date, if any, on which this Agreement is terminated pursuant to Section 8.1, the Company shall give prompt notice to Parent, and Parent shall give prompt notice to the Company, of (a) any notice or other communication received by such party from any Governmental Authority in connection with this Agreement, the Merger or the other transactions contemplated by this Agreement, or from any Person alleging that the consent of such Person is or may be required in connection with the Merger or the other transactions contemplated by this Agreement, if the subject matter of such communication or the failure of such party to obtain such consent could be material to the Company, the Surviving Corporation or Parent, and (b) any actions, suits, claims, investigations or proceedings commenced or, to such party's Knowledge, threatened against, relating to or involving or otherwise affecting such party or any of its Subsidiaries which relate to this Agreement, the Merger or the other transactions contemplated by this Agreement. The parties agree and acknowledge the Company's, on the one hand, and Parent's, on the other hand, compliance or failure of compliance with this Section 6.7 shall not be taken into account for purposes of determining whether the condition referred to in Section 7.2(a) or Section 7.3(a), respectively, shall have been satisfied with respect to performance in all material respects with this Section 6.7.

Section 6.8 Public Announcements. Except as otherwise contemplated by Section 6.5, so long as this Agreement is in effect, the Company, Parent and Acquisition Sub shall consult with each other before issuing any press release or otherwise making any public statements with respect to this Agreement or the transactions contemplated by this Agreement, and none of the parties hereto or their Affiliates shall issue any such press release or make any public statement prior to obtaining the other parties' consent (which consent shall not be unreasonably withheld or delayed), except that no such consent shall be necessary to the extent disclosure may be required by Law, Order or applicable stock exchange rule or any listing agreement to which any party hereto is subject, in which case the party required to make such disclosure shall use its reasonable best efforts to allow, to the extent legally permitted, each other party reasonable time to comment on such disclosure in advance of its issuance, or is consistent with prior communications previously consented to by the other parties. In addition, the Company may, without Parent or Acquisition Sub's consent, communicate to its employees, customers, suppliers and consultants; provided that such communication is consistent with prior communications of the Company or any communications plan previously agreed to by Parent and the Company, in which case such communications may be made consistent with such plan. Notwithstanding the foregoing, the restrictions set forth in this Section 6.8 shall not apply in connection with any Adverse Board Recommendation Change or dispute between the parties regarding this Agreement or the transactions contemplated hereby. Notwithstanding the foregoing, the Equity Investor shall be permitted to issue Tweets about the Merger or the transactions contemplated hereby so long as such Tweets do not disparage the Company or any of its Representatives.

Section 6.9 Employee Benefits.

(a) Continuing Employee Benefits. Employees of the Company or its Subsidiaries immediately prior to the Effective Time who remain employees of Parent, the Surviving Corporation or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees.**" For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their

A-43

Table of Contents

Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, during the Continuation Period, Parent shall provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.

(b) Parent agrees that the Surviving Corporation shall cause the Surviving Corporation's employee benefit plans established following the Closing Date (if any) and any other employee benefit plans covering the Continuing Employees following the Effective Time (collectively, the "**Post-Closing Plans**"), to recognize the service of each Continuing Employee (to the extent such service was recognized by the Company) for purposes of eligibility, vesting and determination of the level of benefits (but not for benefit accrual purposes under a defined benefit pension plan) under the Post-Closing Plans, to the extent such recognition does not result in the duplication of any benefits.

(c) For the calendar year including the Effective Time, the Continuing Employees shall not be required to satisfy any deductible, co-payment, out-of-pocket maximum or similar requirements under the Post-Closing Plans that provide medical, dental and other welfare benefits (collectively, the "**Post-Closing Welfare Plans**") to the extent amounts were previously credited for such purposes under comparable Company Benefit Plans that provide medical, dental and other welfare benefits.

(d) As of the Effective Time, any waiting periods, pre-existing condition exclusions and requirements to show evidence of good health contained in such Post-Closing Welfare Plans shall be waived with respect to the Continuing Employees (except to the extent any such waiting period, pre-existing condition exclusion or requirement to show evidence of good health was already in effect with respect to such employees and has not been satisfied under the applicable Company Benefit Plan in which the participant then participates or is otherwise eligible to participate as of immediately prior to the Effective Time).

(e) Nothing contained in this <u>Section 6.9</u>, expressed or implied, shall (i) be treated as the establishment, amendment or modification of any Company Benefit Plan, Post-Closing Plan or other employee benefit plan or constitute a limitation on rights to amend, modify, merge or terminate after the Effective Time any Company Benefit Plan, Post-Closing Plan or other employee benefit plan, (ii) give any Company Service Provider (including any beneficiary or dependent thereof) or other Person any third-party beneficiary or other rights or (iii) obligate Parent or any of its Affiliates to (A) maintain any particular Company Benefit Plan, Post-Closing Plan or (B) retain the employment or services of any Company Service Provider.

       Section 6.10 <u>Financing</u>.

(a) Each of the Equity Investor, Parent and Acquisition Sub shall take or cause to be taken, and shall cause their respective Affiliates and its and their respective Representatives to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to arrange, obtain and consummate the Financing at or prior to the Closing on the terms and subject to the conditions set forth in the Financing Commitments (including any "flex" provisions), including

A-44

Table of Contents

executing and delivering all such documents and instruments as may be reasonably required thereunder and:

(i) complying with and maintaining in full force and effect the Financing and the Financing Commitments (and, once entered into, the Financing Agreements) in accordance with the terms and conditions thereof and negotiating and entering into definitive financing agreements with respect to the Debt Financing on the terms and conditions set forth in the Debt Commitment Letters (including any "flex" provisions) and containing no (I) conditions to the consummation of all or any portion of the Debt Financing other than the conditions set forth in Exhibit E to the Bank Debt Commitment Letter or Exhibit B to the Margin Loan Commitment Letter, as the case may be, in each case, in effect on the date hereof, or (II) provisions that could reasonably be expected to prevent, impede, delay or adversely affect the availability of any of the Debt Financing or the consummation of the Merger and the other transactions contemplated by this Agreement (such definitive agreements, the "**Financing Agreements**") so that the Financing Agreements are in full force and effect no later than the Closing;

(ii) satisfying, or obtaining the waiver of, as promptly as practicable and on a timely basis (and in any event, no later than the Closing) all conditions to the Debt Financing contemplated by the Debt Commitment Letters and Financing Agreements that are within its or their control, including, without limitation:

(A) on or prior to the Closing Date, transferring Tesla Shares to the Margin Loan Borrower and causing the Margin Loan Borrower to credit to collateral accounts pledged to the applicable Debt Financing Sources in respect of the Margin Loan Financing and held through the facilities of DTC, in each case, sufficient Tesla Shares, which shall be free from all transfer restrictions and restrictive conditions (other than permitted restrictions contemplated under the Financing Documents in respect of the Margin Loan Financing), to cause the LTV Ratio (as defined in the Margin Loan Commitment Letter) not to exceed 20% as of the Closing Date;

(B) ensuring the absence of (1) any default or event of default (or any equivalent term) under the Financing Agreements in respect of the Margin Loan Financing, or (2) any Potential Adjustment Event or Mandatory Prepayment Event (in each case, under and as defined in the Margin Loan Commitment Letter);

(C) (x) maintaining the Margin Loan Borrower as a wholly owned subsidiary of Parent and Elon Musk, and (y) causing the organizational documents of the Margin Loan Borrower not to contain, and causing the Margin Loan Borrower not to enter into any Contract, that would (1) impede or prevent the Margin Loan Borrower or any of its Affiliates from enforcing or the Margin Loan Borrower's rights in respect of the Debt Financing Sources under the Margin Loan Commitment Letter or any Financing Agreement in respect thereof or (2) impede or prevent the Margin Loan Borrower or any of its Affiliates from applying the proceeds of the loans to pay any Funding Obligations; and

(D) causing Elon Musk to (1) fully and unconditionally guarantee all obligations of the Margin Loan Borrower under the Margin Loan Financing to the extent required to consummate the Margin Loan Financing and (2) at all times through and including the Closing Date to own (beneficially and of record), directly or indirectly, all of the outstanding equity interests of, and Control, the Margin Loan Borrower;

(iii) accepting (and complying with) to the fullest extent all "flex" provisions contemplated by the Debt Commitment Letters;

(iv) causing the Financing Sources to fund the Financing no later than the Closing (including by enforcing its rights under the Debt Commitment Letters and/or Financing Agreements, as applicable).

A-45

Table of Contents

(b) None of the Equity Investor, Parent, Acquisition Sub or the Margin Loan Borrower or any of their respective Affiliates shall agree to or permit any amendment, supplement, modification or replacement of, or grant any waiver of, any condition, remedy or other provision under any Financing Commitment or Financing Agreement, or permit any Financing Agreement to contain any provision, without the prior written consent of the Company, if such amendment, supplement, modification, replacement, waiver or provision would or would reasonably be expected to (i) reduce (or would reasonably be expected to have the effect of reducing) the aggregate amount of the Financing (or the cash proceeds available therefrom) from that contemplated by the Financing Commitments delivered as of the date hereof, (ii) impose new or additional conditions or contingencies to the Financing or otherwise expand, amend or modify any of the existing conditions to the receipt of the Financing, or otherwise add, expand, amend or modify any other provision of, or remedies under, the Financing Commitments as in effect on the date hereof, in a manner that would reasonably be expected to delay, impede or prevent the consummation or funding of the Financing (or satisfaction of the conditions to obtaining any portion of the Financing) at the Closing or impair the ability or likelihood of the Closing or impair the ability of Parent and/or Acquisition Sub to timely consummate the Merger and the other transactions contemplated by this Agreement, (iii) make it less likely that any portion of the Financing would be funded (including by making the satisfaction of the conditions to obtaining any portion of the Financing less likely to occur) or otherwise prevent, impede or delay or impair the availability of any of the Financing or impair the ability or likelihood of the Closing or Parent and/or Acquisition Sub to timely consummate the transactions contemplated by this Agreement (including by requiring any additional filings, consents or approvals of any Governmental Authority) or (iv) adversely impact the ability of Parent, Acquisition Sub or the Margin Loan Borrower, or any of their respective Affiliates, to enforce their respective rights against the other parties to the Financing Commitments or the Financing Agreements; provided, however, subject to compliance with the other provisions of this Section 6.10, Parent, Acquisition Sub or their respective Affiliates may amend, modify, supplement or waive any provision of any Debt Commitment Letter (A) to add lenders, lead arrangers, bookrunners, syndication agents or similar entities that have not executed such Debt Commitment Letter as of the date hereof or (B) amend any Debt Commitment Letters to implement any "market flex" provisions applicable thereto. The Equity Investor, Parent, Acquisition Sub, the Margin Loan Borrower and their respective Affiliates shall not agree to the withdrawal, termination, repudiation or rescission of any Financing Commitment without the prior written consent of the Company, and shall not release or consent to the termination of the commitments or obligations of any Debt Financing Source under any Debt Commitment Letter, in each case, unless such Financing Commitment is contemporaneously replaced with a new Financing Commitment that complies with the first sentence of this Section 6.10(b). Upon any permitted amendment, supplement, modification or replacement of, or waiver of, any Financing Commitment in accordance with this Section 6.10(b), Parent shall promptly deliver to the Company a true, correct and complete copy of each Financing Agreement and each amendment, supplement, modification, replacement or waiver to any Financing Commitment or any Financing Agreement and references herein to "Financing Commitments", "Bank Debt Commitment Letter", "Margin Loan Commitment Letter", "Debt Commitment Letters", "Equity Commitment Letter" and "Financing Agreements" shall include and mean such documents as amended, supplemented, modified, replaced or waived in compliance with this Section 6.10(b), as applicable, and references to "Financing", "Bank Debt Financing", "Margin Loan Financing" and "Equity Financing" shall include and mean the financing contemplated by the Financing Commitments or Financing Agreements as amended, supplemented, modified, replaced or waived in compliance with this Section 6.10(b), as applicable.

(c) In the event that (x) all or any portion of the Debt Financing expires, terminates, becomes or could reasonably be expected to become unavailable on the terms and conditions (including any "flex" provisions) or from the sources contemplated in the applicable Debt Commitment Letters or (y) any of the Debt Commitment Letters or the Financing Agreements shall be withdrawn, terminated, repudiated or rescinded, in whole or in part, for any reason, (i) Parent shall promptly so notify the Company in writing and (ii) Parent and/or its Affiliates shall use their respective reasonable best efforts

A-46

Table of Contents

to arrange and obtain, as promptly as practicable following the occurrence of such event (and in any event no later than the Closing), and to negotiate and enter into definitive agreements with respect to, alternative financing from the same or alternative sources with terms and conditions (including market flex provisions) not less favorable taken as a whole to Parent than the terms and conditions set forth in the applicable Debt Commitment Letter and which shall not include any conditions or contingencies to the Financing not otherwise included in the Debt Commitment Letters as of the date hereof or include any provision that would reasonably be expected to materially delay or prevent the consummation or funding of the Financing (or satisfaction of the conditions to obtaining any portion of the Financing) at the Closing or materially impair the ability or likelihood of the Closing or Parent and/or Acquisition Sub to timely consummate the Merger and the other transactions contemplated by this Agreement (the "**Alternative Financing**") in an amount sufficient to consummate the transactions contemplated by this Agreement (or replace any unavailable portion of the Debt Financing). In the event any Alternative Financing is obtained and any new debt commitment letters are entered into in accordance with this Section 6.10(c) (each such letter, an "**Alternative Financing Debt Commitment Letter**"), Parent shall promptly deliver a copy thereof to the Company (it being understood that any fee letters related thereto may be redacted in the same manner as the fee letters delivered on or prior to the date of this Agreement) and references herein to (A) "Financing Commitments" and "Debt Commitment Letters" shall be deemed to include any Alternative Financing Debt Commitment Letter to the extent then in effect, and (B) "Financing", "Bank Debt Financing", "Margin Loan Financing" or "Debt Financing" shall include the debt financing contemplated by such Alternative Financing Debt Commitment Letter. Parent, Acquisition Sub and Elon Musk shall be subject to the same obligations with respect to any Alternative Financing as set forth in this Agreement with respect to the Debt Financing.

(d) The Equity Investor, Parent, Acquisition Sub and/or the Margin Loan Borrower shall (i) give the Company prompt written notice of any default, breach or threatened default or breach (or any event or circumstance that, with or without notice, lapse of time or both, would reasonably be expected to give rise to any default or breach) by any party to any of the Financing Commitments or the Financing Agreements of which Parent or any of its Affiliates or their respective Representatives becomes aware or any withdrawal, termination, repudiation or rescission or threatened withdrawal, termination, repudiation or rescission thereof, (ii) give the Company prompt notice of any dispute or disagreement between or among any parties to the Debt Commitment Letters, (iii) notify the Company promptly if for any reason Parent, Acquisition Sub or their respective Affiliates no longer believes in good faith that it will be able to obtain all or any portion of the Financing contemplated by the Financing Commitments, (iv) promptly provide and respond to any updates reasonably requested by the Company with respect to the status of Parent's efforts to arrange and finalize the Financing (or any Alternative Financing) and (v) otherwise keep the Company reasonably informed on a current basis of the status of its efforts to arrange and finalize the Financing (or any Alternative Financing). In no event shall Parent or any of its Affiliates be required to provide access to or disclose information that Parent or any of its Affiliates reasonably determines could jeopardize any attorney-client privilege of, or conflict with any confidentiality requirements applicable to, Parent or any of its Affiliates.

(e) Each of Parent and the Equity Investor acknowledges and agrees that it shall be fully responsible for the Equity Financing and each shall take (or cause to be taken) all actions, and do (or cause to be done) all things necessary, proper or advisable to obtain the Equity Financing, including taking all actions necessary to (i) comply with the terms of and maintain in effect the Equity Commitment Letter, (ii) satisfy on a timely basis all conditions and obligations in such Equity Commitment Letter and (iii) consummate and fund the Equity Financing at or prior to the Closing. Parent further agrees that it shall take (or cause to be taken) all actions, and do (or cause to be done) all things necessary, proper or advisable to fully enforce its rights (including through litigation) under the Equity Commitment Letter.

A-47

Table of Contents

(f) Parent acknowledges and agrees that neither the obtaining of the Financing or any alternative financing, nor the completion of any issuance of securities contemplated by the Financing or any alternative financing (including the Alternative Financing), is a condition to the Closing, and reaffirms its obligation to consummate the transactions contemplated by this Agreement irrespective and independently of the availability of the Financing or any alternative financing (including the Alternative Financing), or the completion of any such issuance, subject to the applicable conditions set forth in Article VII.

(g) Each of the Equity Investor, Parent and the Acquisition Sub shall on or prior to the Closing Date cause the Margin Loan Borrower to apply the cash proceeds of the Margin Loan Financing to payment of the Funding Obligations under this Agreement.

Section 6.11 Financing Cooperation.

(a) The Company shall and shall cause its Subsidiaries to, and shall use its commercially reasonable best efforts to cause each of its Representatives to, at Parent's sole expense, provide any reasonable cooperation reasonably requested by Parent in writing in connection with (i) the arrangement of the Bank Debt Financing and any other debt financing expressly contemplated by the Bank Debt Commitment Letter, including senior unsecured notes and senior secured notes, and (ii) subject to the requirements of Section 6.11(b), the payoff, redemption, defeasance, discharge or other satisfaction of the Existing Credit Agreement and the Existing Senior Notes on or subsequent to the Closing Date, in each case as is necessary, customary and reasonably requested in writing by Parent; provided that any notice of, or documentation with respect to, any such payoff, redemption or other satisfaction of existing indebtedness of the Company pursuant to this Section 6.11(a)(ii) shall provide that the obligation to repay, redeem or satisfy such indebtedness shall, as applicable, be subject to and is conditioned upon the occurrence of the Closing; provided, further, that such requested cooperation with respect to clauses (i) and (ii) of this Section 6.11(a) does not unreasonably or materially interfere with the ongoing operations of the Company and its Subsidiaries. Notwithstanding anything in this Agreement to the contrary, (A) neither the Company nor any of its Subsidiaries shall be required to pay any commitment or other similar fee, incur or reimburse any costs or expenses, enter into any binding agreement or commitment or incur any other liability, indemnity or obligation in connection with the Bank Debt Financing or the cooperation required by this Section 6.11(a) that would be effective prior to the Closing, (B) no director, manager, officer or employee or other Representative or equityholder of the Company or any of its Subsidiaries shall be required to execute, deliver, enter into, approve or perform any agreement, commitment, document, instrument or certificate or take any other action pursuant to this Section 6.11(a) to the extent any such action could reasonably be expected to result in personal liability to such Representative or equityholder, (C) neither the Company nor any of its Subsidiaries (nor any of their respective boards of directors (or similar governing bodies) shall be required to adopt any resolutions, execute any consents or otherwise take any corporate or similar action or deliver any certificate, document, instrument or agreement in connection to the Bank Debt Financing or the incurrence of indebtedness required by this Section 6.11(a) and (D) no cooperation under this Section 6.11(a) shall (I) require the Company or any of its Subsidiaries to provide, or cause to be provided, any information the disclosure of which is prohibited or restricted under applicable Law or any binding agreement with a third party or is legally privileged or consists of attorney work product or could reasonably be expected to result in the loss of any applicable legal privilege, (II) require the Company or any of its Subsidiaries to take any action that would reasonably be expected to conflict with or violate its organizational documents or any Laws or would reasonably be expected to result in (with or without notice, lapse of time, or both) a violation or breach of, or default under, or give rise to any right of termination, cancellation or acceleration of any right or obligation of such Person or to a loss of any benefit or privilege to which such Person is entitled under, any agreement to which the Company or any of its Subsidiaries is a party or result in the creation or imposition of any Lien on any asset of the Company or any of its Subsidiaries, except any

A-48

Table of Contents

Lien that becomes effective only upon the Closing, (III) cause (or require the taking of any action that would cause) any representation or warranty in this Agreement to be breached or cause any condition to Closing to fail to be satisfied or otherwise cause any breach of this Agreement or require the Company to waive or amend any terms of this Agreement, (IV) require the Company to disclose any material, non-public information other than to recipients of such information that agree to confidentiality arrangements as contemplated under Section 6.11(b) and Section 6.4 or any adjustments or assumptions used in connection therewith, (V) require the Company to prepare or provide any financial statements or other financial information (other than those financial statements (and any other financial information) from time to time filed by the Company with the SEC (and nothing in this Section 6.11(a) shall create or be implied to create any obligation to make any such filings or other readily available financial information), (VI) waive or amend any terms of this Agreement, (VII) require the Company or its Subsidiaries to take any action that, in the good faith determination of the Company or such Subsidiary would create a risk of damage or destruction to any property or assets of the Company or such Subsidiary, (VIII) require the Company or any of its Subsidiaries or any of their Representatives to deliver any legal opinions or reliance letters, (IX) file or furnish any reports or information with the SEC or change any fiscal period or accelerate the Company's preparation of its SEC reports or financial statements, or (X) prepare or provide any (1) information regarding officers or directors prior to consummation of the Merger, executive compensation and related party disclosure or any Compensation Discussion and Analysis or information required by Item 302 (to the extent not so provided in SEC filings) or 402 of Regulation S-K under the Securities Act and any other information that would be required by Part III of Form 10-K (except to the extent previously filed with the SEC), (2) any description of all or any component of the Bank Debt Financing or other information customarily provided by the Financing Sources or their counsel, (3) risk factors relating to all or any component of the Bank Debt Financing, (4) information regarding affiliate transactions that may exist following consummation of the Merger, or (5) other information that is not available to the Company without undue effort or expense. The parties hereto agree that any information with respect to the prospects, projections and plans for the business and operations of the Company and its Subsidiaries in connection with the Financing will be the sole responsibility of Parent, and none of the Company, any of its Subsidiaries or any of their respective Representatives shall be required to provide any information or make any presentations with respect to capital structure, the incurrence of the Financing, other pro forma information relating thereto or the manner in which Parent intends to operate, or cause to be operated, the business of the Company or its Subsidiaries after the Closing. Nothing contained in this Section 6.11 or otherwise shall require the Company or any of its Subsidiaries, prior to the Closing, to be a borrower, an issuer, a guarantor or other obligor with respect to the Debt Financing. For the avoidance of doubt, the parties hereto acknowledge and agree that the provisions contained in this Section 6.11, represent the sole obligation of the Company, its Subsidiaries and their respective Representatives with respect to cooperation in connection with the arrangement of any financing (including the Financing) to be obtained by the Equity Investor, Parent, Acquisition Sub, the Margin Loan Borrower or any of their respective Affiliates with respect to the transactions contemplated by this Agreement and no other provision of this Agreement (including the Exhibits and Schedules hereto) shall be deemed to expand or modify such obligations. In no event shall the receipt or availability of any funds or financing (including, for the avoidance of doubt, the Financing) by the Equity Investor, Parent, Acquisition Sub, the Margin Loan Borrower or any of their respective Affiliates or any other financing or other transactions be a condition to any of the Equity Investor's, Parent's, Acquisition Sub's or the Margin Loan Borrower's obligations under this Agreement. Notwithstanding anything to the contrary contained in this Agreement, the Company will be deemed to be in compliance with this Section 6.11(a), and neither Parent nor any of its Affiliates shall allege that the Company is or has not been in compliance with this Section 6.11(a), unless Parent's failure to obtain the Bank Debt Financing was due solely to a deliberate action or omission taken or omitted to be taken by the Company in material breach of its obligations under this Section 6.11(a).

A-49

Table of Contents

(b) On or prior to any applicable date of the Company's payoff, redemption or other satisfaction of the Existing Credit Agreement and/or Existing Senior Notes contemplated by Section 6.11(a), or if applicable, date of satisfaction and discharge, Parent shall deposit or cause to be deposited funds with the applicable paying agent sufficient to effect such payoff, redemption and/or satisfaction, as applicable, as required pursuant to the terms of the agreements governing such indebtedness (and in the event of any delay of the anticipated Effective Time, Parent shall deposit additional funds with the applicable paying agents sufficient to satisfy such payoff, redemption or other satisfaction of the Existing Credit Agreement and/or Existing Senior Notes, as required pursuant to the terms of the agreements governing such indebtedness); provided that the release of any such funds shall be subject to the occurrence of the Effective Time. Parent shall, promptly upon request by the Company, reimburse the Company for all reasonable and documented out-of-pocket costs and expenses (including outside attorneys' fees and disbursements) incurred by the Company, its Affiliates and their respective Representatives in connection with the cooperation contemplated by Section 6.11(a). Parent acknowledges and agrees that the Company, its Affiliates and their respective Representatives shall not have any responsibility for, or incur any liability to any Person under, any financing that Parent may raise in connection with the transactions contemplated by this Agreement or any cooperation provided pursuant to Section 6.11(a), and shall indemnify and hold harmless the Company, its Affiliates and their respective Representatives, from and against any and all losses suffered or incurred by any of them in connection with the Debt Financing, any cooperation provided pursuant to Section 6.11(a) or any alternative financing and any information utilized in connection therewith, except to the extent any such cost or expense, judgment, fine, loss, claim, or damage results directly from the bad faith, willful misconduct or gross negligence of the Company or its Representatives or controlled Affiliates as determined by a court of competent jurisdiction in a final and non-appealable judgment. All non-public or other confidential information provided by or behalf of the Company to Parent or its Affiliates or any of their respective Representatives pursuant to this Section 6.11 shall be kept confidential in accordance with the terms of Section 6.4; provided that Parent and its Affiliates may share any confidential information with respect to the Company and its Subsidiaries with any Debt Financing Sources, and that Parent, such Debt Financing Sources and their respective Affiliates may share such information with potential Debt Financing Sources in connection with any marketing efforts with respect to the Debt Financing; provided, however, that the recipients of such confidential information contemplated to be provided by the preceding proviso shall agree to be bound by confidentiality obligations no less restrictive than those set forth in Section 6.4.

Section 6.12 Acquisition Sub. Parent and the Equity Investor shall take all actions necessary to (a) cause Acquisition Sub to perform its obligations under this Agreement and to consummate the Merger on the terms and conditions set forth in this Agreement and (b) ensure that, prior to the Effective Time, Acquisition Sub shall not conduct any business, or incur or guarantee any indebtedness or make any investments, other than as specifically contemplated by this Agreement. Parent hereby (a) guarantees the due, prompt and faithful payment performance and discharge by Acquisition Sub of, and compliance by Acquisition Sub with, all of the covenants and agreements of Acquisition Sub under this Agreement and (b) agrees to take all actions necessary, proper or advisable to ensure such payment, performance and discharge by Acquisition Sub under this Agreement. Parent agrees that any breach by Acquisition Sub of a representation, warranty, covenant or agreement in this Agreement shall also be a breach of such representation, warranty, covenant or agreement by Parent.

Section 6.13 Rule 16b-3 Matters. Prior to the Effective Time, the Company may take such further actions, if any, as may be reasonably necessary or appropriate to ensure that the dispositions of equity securities of the Company (including any derivative securities) pursuant to the transactions contemplated by this Agreement by any officer or director of the Company who is subject to Section 16 of the Exchange Act are exempt under Rule 16b-3 promulgated under the Exchange Act.

A-50

Table of Contents

Section 6.14 Delisting of Company Common Stock. Parent shall, with the reasonable cooperation of the Company, take, or cause to be taken, all actions reasonably necessary to cause the Company's securities to be delisted from the New York Stock Exchange and deregistered under the Exchange Act as soon as reasonably practicable following the Effective Time.

## ARTICLE VII

## CONDITIONS TO THE MERGER

Section 7.1 Conditions to the Obligations of Each Party. The respective obligations of each party hereto to consummate the Merger, are subject to the satisfaction or waiver by the Company and Parent at or prior to the Effective Time of the following conditions:

(a) the Company Stockholder Approval shall have been obtained;

(b) any waiting period (or any extension thereof) applicable to the consummation of the Merger under the HSR Act shall have expired or early termination thereof shall have been granted; and each Consent or approval that is required under any Antitrust Laws or Foreign Investment Laws of the jurisdictions set forth on Schedule A with respect to the transactions contemplated by this Agreement, including the Merger shall have been made, obtained or received (or, as applicable, the waiting periods with respect thereto shall have expired or been terminated); and

(c) no Governmental Authority of the jurisdictions set forth on Schedule A shall have enacted, issued, promulgated, enforced or entered any Law or Order which is then in effect and has the effect of restraining, enjoining, rendering illegal or otherwise prohibiting consummation of the Merger, or causing the Merger to be rescinded following the completion thereof.

Section 7.2 Conditions to the Obligations of Parent and Acquisition Sub. The obligations of Parent and Acquisition Sub to consummate the Merger, are, in addition to the conditions set forth in Section 7.1, further subject to the satisfaction or waiver by Parent at or prior to the Effective Time of the following conditions:

(a) the Company shall have performed or complied, in all material respects, with its obligations required under this Agreement to be performed or complied with by the Company on or prior to the Closing Date;

(b) (i) each of the representations and warranties of the Company contained in this Agreement (except for the representations and warranties contained in Section 4.2(a) and Section 4.2(b)), without giving effect to any materiality or "Company Material Adverse Effect" qualifications therein, shall be true and correct as of the Closing Date (except to the extent such representations and warranties are expressly made as of a specific date, in which case such representations and warranties shall be so true and correct as of such specific date only), except for such failures to be true and correct as would not have a Company Material Adverse Effect; and (ii) each of the representations and warranties contained in Section 4.2(a) and Section 4.2(b) shall be shall be true and correct in all material respects as of the Closing Date (except to the extent such representations and warranties are expressly made as of a specific date, in which case such representations and warranties shall be so true and correct in all material respects as of such specific date only); and

(c) no Company Material Adverse Effect shall have occurred and be continuing.

A-51

Table of Contents

Section 7.3 Conditions to the Obligation of the Company to Effect the Merger. The obligation of the Company to consummate the Merger, is, in addition to the conditions set forth in Section 7.1, further subject to the satisfaction or waiver by the Company at or prior to the Effective Time of the following conditions:

(a) Parent and Acquisition Sub shall have performed or complied, in all material respects, with its obligations required under this Agreement to be performed or complied with by Parent or Acquisition Sub, as the case may be, on or prior to the Closing Date; and

(b) each of the representations and warranties of Parent and Acquisition Sub contained in this Agreement, without giving effect to any materiality or "Parent Material Adverse Effect" qualifications therein, shall be true and correct as of the Closing Date, except for such failures to be true and correct as would not have a Parent Material Adverse Effect (except to the extent such representations and warranties are expressly made as of a specific date, in which case such representations and warranties shall be so true and correct as of such specific date only).

**ARTICLE VIII**

**TERMINATION, AMENDMENT AND WAIVER**

Section 8.1 Termination. Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated at any time prior to the Effective Time, whether before or after the Company Stockholder Approval is obtained (except as otherwise expressly noted), as follows:

(a) by mutual written agreement of each of Parent and the Company;

(b) by either Parent or the Company:

(i) if the Merger shall not have been consummated on or before 5:00 p.m. (Pacific Time) on October 24, 2022 (as such date may be extended pursuant to the terms hereof, the "**Termination Date**"); provided, however, that (x) the right to terminate this Agreement pursuant to this Section 8.1(b)(i) shall not be available to any party if the failure of such party to perform or comply with any of its obligations under this Agreement has been the principal cause of or resulted in the failure of the Closing to have occurred on or before such date and (y) the Termination Date shall be extended for an additional six (6) months if, as at the Termination Date, the condition set forth in Section 7.1(b) or Section 7.1(c) shall not have been satisfied;

(ii) if, prior to the Effective Time, any Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or Order or taken any other action permanently restraining, enjoining, rendering illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, and such Law or Order or other action shall have become final and non-appealable; provided, however, that the party seeking to terminate this Agreement pursuant to this Section 8.1(b)(ii) shall have used the efforts required by this Agreement to remove such Law, Order or other action; provided, further, that the right to terminate this Agreement under this Section 8.1(b)(ii) shall not be available to a party if the issuance of such Law or Order or taking of such action was primarily due to the failure of such party, and, in the case of Parent, the failure of Acquisition Sub or the Equity Investor, to perform any of their obligations under this Agreement; or

(iii) if the Company Stockholder Approval shall not have been obtained at the Company Stockholders' Meeting duly convened therefor or at any adjournment or postponement thereof at which this Agreement and the transactions contemplated by this Agreement have been voted upon; or

A-52

**Table of Contents**

(c) by the Company:

(i) if Parent, Acquisition Sub or the Equity Investor shall have breached or failed to perform any of their respective representations, warranties, covenants or other agreements set forth in this Agreement, which breach or failure to perform (A) would give rise to the failure of any condition set forth in Section 7.3(a) or Section 7.3(b) and (B) is not capable of being cured, or is not cured, by Parent, Acquisition Sub or the Equity Investor on or before the earlier of (x) the Termination Date and (y) the date that is thirty (30) calendar days following the Company's delivery of written notice to Parent, Acquisition Sub or the Equity Investor, as applicable, of such breach; provided, however, that the Company shall not have the right to terminate this Agreement pursuant to this Section 8.1(c)(i) if the Company is then in material breach of any of its representations, warranties, covenants or agreements hereunder;

(ii) if the Company Board shall have authorized the Company to enter into a definitive agreement with respect to a Superior Proposal; provided that, substantially concurrently with such termination, the Company enters into such definitive agreement and pays (or causes to be paid) at the direction of Parent the Termination Fee as specified in Section 8.3(a); or

(iii) if (A) the conditions set forth in Section 7.1 and Section 7.2 (other than those conditions that by their nature are to be satisfied at the Closing, which conditions are capable of being satisfied if the Closing were to occur at such time) have been satisfied or waived in accordance with this Agreement and Parent and Acquisition Sub shall have been notified in writing of the same, (B) Parent and Acquisition Sub fail to consummate the Merger within three (3) Business Days following the date on which the Closing should have occurred pursuant to Section 2.2 and (C) during such three (3)-Business Days period described in clause (B), the Company stood ready, willing and able to consummate the Merger and the other transactions contemplated hereby;

(d) by Parent:

(i) if the Company shall have breached or failed to perform any of its representations, warranties, covenants or other agreements set forth in this Agreement, which breach or failure to perform (A) would give rise to the failure of any condition set forth in Section 7.2(a) or Section 7.2(b), and (B) is not capable of being cured, or is not cured, by the Company on or before the earlier of (x) the Termination Date and (y) the date that is thirty (30) calendar days following Parent's delivery of written notice to the Company of such breach; provided, however, that Parent shall not have the right to terminate this Agreement pursuant to this Section 8.1(d)(i) if Parent, Acquisition Sub or the Equity Investor is then in material breach of any of its representations, warranties, covenants or agreements hereunder; or

(ii) prior to the receipt of the Company Stockholder Approval, if the Company Board shall have made an Adverse Board Recommendation Change.

Section 8.2 Effect of Termination. In the event that this Agreement is terminated and the Merger abandoned pursuant to Section 8.1, written notice thereof shall be given to the other party or parties, specifying the provisions of this Agreement pursuant to which such termination is made, and this Agreement shall forthwith become null and void and of no effect without liability on the part of any party hereto (or any of its Representatives), and all rights and obligations of any party hereto shall cease; provided, however, that, except as otherwise provided in Section 8.3 or in any other provision of this Agreement, no such termination shall relieve any party hereto of any liability or damages (which the parties acknowledge and agree shall not be limited to reimbursement of Expenses or out-of-pocket costs, and, in the case of liabilities or damages payable by Parent and Acquisition Sub, would include the benefits of the transactions contemplated by this Agreement lost by the Company's stockholders) (taking into consideration all relevant matters, including lost stockholder premium, other combination

A-53

Table of Contents

opportunities and the time value of money), which shall be deemed in such event to be damages of such party, resulting from any knowing and intentional breach of this Agreement prior to such termination, in which case, except as otherwise provided in Section 8.3, the aggrieved party shall be entitled to all rights and remedies available at law or in equity; and provided, further, that the expense reimbursement and indemnification obligations contained in Section 6.11 and Section 6.12, and the provisions of this Section 8.2, Section 8.3, Section 8.6 and Article IX shall survive any termination of this Agreement pursuant to Section 8.1 in accordance with their respective terms.

Section 8.3 Termination Fee.

(a) In the event that:

(i) (A) a Third Party shall have made a Competing Proposal after the date of this Agreement, (B) this Agreement is subsequently terminated by (x) the Company or Parent pursuant to Section 8.1(b)(iii) or (y) Parent pursuant to Section 8.1(d)(i), and at the time of such Company Stockholders' Meeting in the case of clause (x) or at the time of such breach in the case of clause (y), a Competing Proposal has been publicly announced and has not been withdrawn, and (C) within twelve (12) months of such termination of this Agreement, the Company consummates a transaction involving a Competing Proposal or enters into a definitive agreement providing for the consummation of a Competing Proposal and such Competing Proposal is subsequently consummated; provided, however, that for purposes of this Section 8.3(a)(i), the references to "fifteen percent (15%)" in the definition of Competing Proposal shall be deemed to be references to "fifty percent (50%)";

(ii) this Agreement is terminated by the Company pursuant to Section 8.1(c)(ii); or

(iii) this Agreement is terminated by Parent pursuant to Section 8.1(d)(ii), then

the Company shall (A) in the case of clause (i) above, no later than two (2) Business Days following the date of the consummation of such transaction involving a Competing Proposal, (B) in the case of clause (ii) above, prior to or substantially concurrently with such termination, and (C) in the case of this clause (iii), no later than two (2) Business Days after the date of such termination, pay, or cause to be paid, by wire transfer of immediately available funds, at the direction of Parent, the Termination Fee; it being understood that in no event shall the Company be required to pay the Termination Fee on more than one occasion.

(b) In the event that:

(i) the Agreement is terminated by the Company pursuant to Section 8.1(c)(i);

(ii) the Agreement is terminated by the Company pursuant to Section 8.1(c)(iii), then

Parent shall no later than two (2) Business Days after the date of such termination, pay, or cause to be paid, by wire transfer of immediately available funds, at the direction of the Company, the Parent Termination Fee; it being understood that in no event shall Parent be required to pay the Parent Termination Fee on more than one occasion.

(c) Notwithstanding anything to the contrary set forth in this Agreement, but subject to Section 9.9, (i) except in the case of a knowing and intentional breach of this Agreement by the Company (in which case Parent shall be entitled to seek monetary damages, recovery or award from the Company in an amount not to exceed the amount of the Termination Fee in the aggregate), Parent's right to receive payment from the Company of the Termination Fee pursuant to Section 8.3(a), shall constitute the sole and exclusive monetary remedy of Parent and Acquisition Sub against the Company and its Subsidiaries and any of their respective former, current or future general or limited partners, stockholders, members, managers, directors, officers, employees, agents, Affiliates or

A-54

Table of Contents

assignees of any of the foregoing (collectively, the "**Company Related Parties**") for all losses and damages suffered as a result of the failure of the transactions contemplated by this Agreement to be consummated or for a breach or failure to perform hereunder, and upon payment of such amount, none of the Company Related Parties shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated by this Agreement (except that the Company shall also be obligated with respect to Section 8.6); provided, that, in no event shall the Company be subject to an aggregate amount for monetary damages (including any payment of the Termination Fee) in excess of an aggregate amount equal to the Termination Fee (except in all cases that the Company shall also be obligated with respect to its applicable obligations under Section 8.3(d) and Section 8.6), and (ii) except in the case of a knowing and intentional breach of this Agreement by the Equity Investor, Parent or Acquisition Sub (in which case the Company shall be entitled to seek monetary damages, recovery or award from the Equity Investor, Parent or Acquisition Sub in an amount not to exceed the amount of the Parent Termination Fee, in the aggregate), the Company's right to receive payment from Parent of the Parent Termination Fee pursuant to Section 8.3(b), shall constitute the sole and exclusive monetary remedy of the Company against the Parent, Acquisition Sub and the Equity Investor and any of their respective former, current or future general or limited partners, stockholders, members, managers, directors, officers, employees, agents, Affiliates or assignees of any of the foregoing (collectively, the "**Parent Related Parties**") for all losses and damages suffered as a result of the failure of the transactions contemplated by this Agreement, the Equity Commitment Letter or the Parent Guarantee to be consummated or for a breach or failure to perform the applicable provisions hereunder, and upon payment of such amount, none of the Parent Related Parties shall have any further liability or obligation relating to or arising out of this Agreement, the Equity Commitment Letter or the Parent Guarantee or the transactions contemplated by thereby (except in all cases that Parent shall also be obligated with respect to its expense reimbursement and indemnification obligations contained in Section 6.11 and its applicable obligations under Section 8.3(d)(iii) and Section 8.6(b)); provided, that, in no event shall Equity Investor, Parent or Acquisition Sub collectively be subject to an aggregate amount for monetary damages (including any payment of the Parent Termination Fee) in excess of an aggregate amount equal to the Parent Termination Fee (except in all cases that Parent shall also be obligated with respect to its expense reimbursement and indemnification obligations contained in Section 6.11 and its applicable obligations under Section 8.3(d)(iii) and Section 8.6(b)). For the avoidance of doubt, any liability or obligation of the Parent, Acquisition Sub or Equity Investor hereunder shall be subject to the terms of the Equity Commitment Letter and the Parent Guarantee.

(d) Each of the parties hereto acknowledges that (i) the agreement contained in this Section 8.3 is an integral part of the transactions contemplated by this Agreement, (ii) the Termination Fee is not a penalty, but is liquidated damages, in a reasonable amount that will compensate Parent and its Affiliates in the circumstances in which such fee is payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated by this Agreement, which amount would otherwise be impossible to calculate with precision, and (iii) without the agreement contained in this Section 8.3, the parties would not enter into this Agreement, accordingly, if the Company or Parent, as the case may be, fails to timely pay any amount due pursuant to this Section 8.3 and, in order to obtain such payment, either Parent or the Company, as the case may be, commences a suit that results in a judgment against the other party for the payment of any amount set forth in this Section 8.3, such paying party shall pay the other party its costs and Expenses in connection with such suit, together with interest on such amount at the annual rate of five percent (5%) plus the prime rate as published in *The Wall Street Journal* in effect on the date such payment was required to be made through the date such payment was actually received, or such lesser rate as is the maximum permitted by applicable law.

A-55

Table of Contents

Section 8.4 Amendment. This Agreement may be amended by mutual agreement of the parties hereto by action taken by or on behalf of their respective boards of directors at any time before or after receipt of the Company Stockholder Approval; provided, however, that (i) after the Company Stockholder Approval has been obtained, there shall not be any amendment that by Law or in accordance with the rules of any stock exchange requires further approval by the Company's stockholders without such further approval of such stockholders nor any amendment or change not permitted under applicable Law and (ii) any amendment of this Section 8.4, Section 8.3(b), Section 8.3(c), Section 9.4, Section 9.7, Section 9.8, Section 9.10, Section 9.12 or Section 9.13, in each case, to the extent such amendment would adversely affect the rights of a Debt Financing Source party to the Debt Commitment Letter under such Section, shall also be approved by such Debt Financing Source. This Agreement may not be amended except by an instrument in writing signed by each of the parties hereto.

Section 8.5 Extension; Waiver. At any time prior to the Effective Time, subject to applicable Law, the Company may (a) extend the time for the performance of any obligation or other act of Parent or Acquisition Sub, (b) waive any inaccuracy in the representations and warranties of Parent or Acquisition Sub contained herein or in any document delivered pursuant hereto and (c) waive compliance with any agreement or condition by Parent or Acquisition Sub contained herein. Any such extension or waiver shall only be valid if set forth in an instrument in writing signed by the party or parties to be bound thereby. Notwithstanding the foregoing, no failure or delay by the Company, Parent or Acquisition Sub in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise of any other right hereunder. Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

Section 8.6 Expenses; Transfer Taxes.

(a) Except as expressly set forth herein, all Expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be paid by the party incurring such Expenses.

(b) Parent shall timely and duly pay all (i) transfer, stamp and documentary Taxes or fees, (ii) sales, use, gains, real property transfer and other similar Taxes or fees arising out of or in connection with entering into and carrying out this Agreement and (iii) filing fees incurred in connection with any applications and filings under any Antitrust Laws or Foreign Investment Laws.

**ARTICLE IX**

**GENERAL PROVISIONS**

Section 9.1 Non-Survival of Representations, Warranties and Agreements. The representations, warranties, covenants and agreements in this Agreement and any certificate delivered pursuant hereto by any Person shall terminate at the Effective Time or, except as provided in Section 8.2, upon the termination of this Agreement pursuant to Section 8.1, as the case may be, except that this Section 9.1 shall not limit any covenant or agreement of the parties which by its terms contemplates performance after the Effective Time or after termination of this Agreement, including those contained in Section 6.6 and Section 6.9.

Section 9.2 Notices. All notices, consents and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by hand delivery, by

A-56

Table of Contents

prepaid overnight courier (providing written proof of delivery) or by confirmed electronic mail, addressed as follows:

if to Parent or Acquisition Sub:

***

Attn: Elon Musk

with a copy (which shall not constitute notice) to:

Skadden, Arps, Slate, Meagher & Flom LLP
525 University Ave, Suite 1400
Palo Alto, California 94301
Attn:    Mike Ringler
            Sonia K. Nijjar
            Dohyun Kim

Email: ***
            ***
            ***

if to the Company:

Twitter, Inc.
1355 Market Street, Suite 900
San Francisco, California 94103
Attn: General Counsel
Email: ***

with a copy (which shall not constitute notice) to:

Wilson Sonsini Goodrich & Rosati
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Attn:      Katharine A. Martin
              Martin W. Korman
              Douglas K. Schnell
              Remi P. Korenblit
Email:      ***
                ***
                ***
                ***

and

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attn: Alan Klein
        Anthony F. Vernace
        Katherine M. Krause
Email:    ***
              ***
              ***

or to such other address or electronic mail address for a party as shall be specified in a notice given in accordance with this Section 9.2; provided that any notice received by electronic mail or otherwise at

A-57

Table of Contents

the addressee's location on any Business Day after 5:00 p.m. (addressee's local time) or on any day that is not a Business Day shall be deemed to have been received at 9:00 a.m. (addressee's local time) on the next Business Day; provided, further, that notice of any change to the address or any of the other details specified in or pursuant to this Section 9.2 shall not be deemed to have been received until, and shall be deemed to have been received upon, the later of the date specified in such notice or the date that is five (5) Business Days after such notice would otherwise be deemed to have been received pursuant to this Section 9.2.

Section 9.3 Interpretation; Certain Definitions.

(a) The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

(b) Disclosure of any fact, circumstance or information in any Section of the Company Disclosure Letter or Parent Disclosure Letter shall be deemed to be disclosure of such fact, circumstance or information with respect to any other Section of the Company Disclosure Letter or Parent Disclosure Letter, respectively, only if it is reasonably apparent that such disclosure relates to any such other Section. The inclusion of any item in the Company Disclosure Letter or Parent Disclosure Letter shall not be deemed to be an admission or evidence of materiality of such item, nor shall it establish any standard of materiality for any purpose whatsoever.

(c) The words "hereof," "herein," "hereby," "hereunder" and "herewith" and words of similar import shall refer to this Agreement as a whole and not to any particular provision of this Agreement. References to articles, sections, paragraphs, exhibits, annexes and schedules are to the articles, sections and paragraphs of, and exhibits, annexes and schedules to, this Agreement, unless otherwise specified, and the table of contents and headings in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the phrase "without limitation." Words describing the singular number shall be deemed to include the plural and vice versa, words denoting any gender shall be deemed to include all genders, words denoting natural persons shall be deemed to include business entities and vice versa, and references to a Person are also to its permitted successors and assigns. The phrases "the date of this Agreement" and "the date of this Agreement" and terms or phrases of similar import shall be deemed to refer to April 25, 2022, unless the context requires otherwise. When used in reference to the Company or its Subsidiaries, the term "material" shall be measured against the Company and its Subsidiaries, taken as a whole. References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder (provided that for purposes of any representations and warranties contained in this Agreement that are made as of a specific date or dates, references to any statute shall be deemed to refer to such statute, as amended, and to any rules or regulations promulgated thereunder, in each case, as of such date). Terms defined in the text of this Agreement have such meaning throughout this Agreement, unless otherwise indicated in this Agreement, and all terms defined in this Agreement shall have the meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. Any Law defined or referred to herein or in any agreement or instrument that is referred to herein means such Law as from time to time amended, modified or supplemented, including (in the case of statutes) by succession of comparable successor Laws (provided that for purposes of any representations and warranties contained in this Agreement that are made as of a specific date or dates, references to any statute shall be deemed to refer to such statute, as amended, and to any rules or regulations promulgated thereunder, in each case, as of such date). All references to "dollars" or "$" refer to currency of the U.S. Nothing contained in Article IV or Article V may be construed as a covenant under

A-58

**Table of Contents**

the terms of this Agreement, other than the acknowledgments and agreements set forth in Section 4.25 and Section 5.10 to the extent necessary to give full effect to the acknowledgments and agreements set forth therein.

Section 9.4 Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, illegal, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. Upon such determination that any term or other provision is invalid, void, illegal, unenforceable or against its regulatory policy, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement, including the Merger, be consummated as originally contemplated to the fullest extent possible.

Section 9.5 Assignment. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of Law or otherwise) without the prior written consent of the other parties. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective permitted successors and assigns. Any attempted assignment in violation of this Section 9.5 shall be null and void.

Section 9.6 Entire Agreement. This Agreement (including the exhibits, annexes and appendices hereto) constitutes, together with the Company Disclosure Letter and the Parent Disclosure Letter, the entire agreement, and supersedes all other prior agreements and understandings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof.

Section 9.7 No Third-Party Beneficiaries. Subject to Section 9.13, this Agreement is not intended to and shall not confer upon any Person other than the parties hereto any rights or remedies hereunder; provided, however, that it is specifically intended that (A) the D&O Indemnified Parties (with respect to Section 6.6 from and after the Effective Time), (B) the Company Related Parties (with respect to Section 8.3) are third-party beneficiaries and (C) the Parent Related Parties (with respect to Section 8.3) are third-party beneficiaries.

Section 9.8 Governing Law. This Agreement and all actions, proceedings or counterclaims (whether based on contract, tort or otherwise) arising out of or relating to this Agreement, or the actions of Parent, Acquisition Sub or the Company in the negotiation, administration, performance and enforcement thereof, shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice or conflict of laws provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

Section 9.9 Specific Performance.

(a) The parties hereto agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the parties hereto do not perform the provisions of this Agreement (including failing to take such actions as are required of it hereunder to consummate this Agreement) in accordance with its specified terms or otherwise breach such provisions. Accordingly, the parties hereto acknowledge and agree that the parties hereto shall be entitled to an injunction, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity. Each of the parties hereto agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that any other

A-59

Table of Contents

party has an adequate remedy at law or that any award of specific performance is not an appropriate remedy for any reason at law or in equity. Any party seeking an injunction or injunctions or any other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to show proof of actual damages or provide any bond or other security in connection with any such order or injunction.

(b) Notwithstanding anything herein to the contrary, including the availability of the Parent Termination Fee or other monetary damages, remedy or award, it is hereby acknowledged and agreed that the Company shall be entitled to specific performance or other equitable remedy to enforce Parent and Acquisition Sub's obligations to cause the Equity Investor to fund the Equity Financing, or to enforce the Equity Investor's obligation to fund the Equity Financing directly, and to consummate the Closing if and for so long as, (i) all of the conditions set forth in Section 7.1 and Section 7.2 (other than those conditions that are to be satisfied at the Closing; provided, that such conditions are capable of being satisfied if the Closing were to occur at such time) have been satisfied or waived and Parent has failed to consummate the Closing on the date required pursuant to the terms of Section 2.2, (ii) the Debt Financing (or, as applicable, the Alternative Financing) has been funded or will be funded at the Closing if the Equity Financing is funded at the Closing, and (iii) the Company has confirmed that, if specific performance or other equity remedy is granted and the Equity Financing and Debt Financing are funded, then the Closing will occur. For the avoidance of doubt, (A) while the Company may concurrently seek (x) specific performance or other equitable relief, subject to the terms of this Section 9.9, and (y) payment of the Parent Termination Fee or other monetary damages, remedy or award if, as and when required pursuant to this Agreement), under no circumstances shall the Company be permitted or entitled to receive both a grant of specific performance to cause the Equity Financing to be funded, on the one hand, and payment of the Parent Termination Fee or other monetary damages, remedy or award, on the other hand; provided, however, that in no event shall the Company be permitted or entitled to receive aggregate monetary damages in excess of the Parent Termination Fee (except in all cases that Parent shall also be obligated with respect to its expense reimbursement and indemnification obligations contained in Section 6.11 and its applicable obligations under Section 8.3(d)(iii) and Section 8.6(b)).

(c) To the extent any party hereto brings an action, suit or proceeding to specifically enforce the performance of the terms and provisions of this Agreement (other than an action to enforce specifically any provision that expressly survives the termination of this Agreement), the Termination Date shall automatically be extended to (i) the twentieth (20th) Business Day following the resolution of such action, suit or proceeding or (ii) such other time period established by the court presiding over such action, suit or proceeding.

Section 9.10 Consent to Jurisdiction.

(a) Each of the parties hereto hereby (i) expressly and irrevocably submits to the exclusive personal jurisdiction of the Delaware Court of Chancery, any other court of the State of Delaware or any federal court sitting in the State of Delaware in the event any dispute arises out of this Agreement or the transactions contemplated by this Agreement, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (iii) agrees that it will not bring any action relating to this Agreement or the transactions contemplated by this Agreement in any court other than the Delaware Court of Chancery, any other court of the State of Delaware or any federal court sitting in the State of Delaware, (iv) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement and (v) agrees that each of the other parties shall have the right to bring any action or proceeding for enforcement of a judgment entered by the state courts of the Delaware Court of Chancery, any other court of the State of Delaware or any federal court sitting in the State of Delaware. Each of the Equity Investor, Parent, Acquisition Sub and

A-60

Table of Contents

the Company agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b) Each party hereto irrevocably consents to the service of process outside the territorial jurisdiction of the courts referred to in Section 9.10(a) in any such action or proceeding by mailing copies thereof by registered or certified U.S. mail, postage prepaid, return receipt requested, to its address as specified in or pursuant to Section 9.2. However, the foregoing shall not limit the right of a party to effect service of process on the other party by any other legally available method.

Section 9.11 Counterparts. This Agreement may be executed in multiple counterparts, all of which shall together be considered one and the same agreement. Delivery of an executed signature page to this Agreement by electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 9.12 WAIVER OF JURY TRIAL. EACH OF THE EQUITY INVESTOR, PARENT, ACQUISITION SUB AND THE COMPANY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF PARENT, ACQUISITION SUB OR THE COMPANY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT THEREOF (INCLUDING THE DEBT FINANCING).

Section 9.13 Debt Financing Source Related Party. Notwithstanding anything in this Agreement to the contrary, but in all cases subject to and without in any way limiting the rights and claims of Parent or any of its Affiliates under and pursuant to any debt commitment letter or other applicable definitive document relating to the Debt Financing, the Company hereby:

(a) agrees that any claim, action, suit, investigation or other proceeding, whether in law or in equity, whether in contract or in tort or otherwise, involving the Debt Financing Sources, arising out of or relating to, this Agreement and/or the Debt Financing or any of the agreements entered into in connection therewith or any of the transactions contemplated hereby or thereby or the performance of any services thereunder shall be subject to the exclusive jurisdiction of the Supreme Court of the State of New York, County of New York, or, if under applicable law exclusive jurisdiction is vested in the Federal courts, the United States District Court for the Southern District of New York sitting in New York County (and appellate courts thereof) and each party hereto irrevocably submits itself and its property with respect to any such claim, action, suit, investigation or other proceeding to the exclusive jurisdiction of such court;

(b) agrees that any such claim, action, suit, investigation or other proceeding shall be governed by the laws of the State of New York (without giving effect to any conflicts of law principles that would result in the application of the laws of another state), except as otherwise provided in any debt commitment letter or other applicable definitive document relating to the Debt Financing;

(c) agrees not to bring or support or permit any of its respective Affiliates to bring or support any claim, action, suit, investigation or other proceeding of any kind or description, whether in law or in equity, whether in contract or in tort or otherwise, against any Debt Financing Source in any way arising out of or relating to, this Agreement or the Debt Financing or any of the transactions contemplated hereby or the performance of any services thereunder in any forum other than the Supreme Court of the State of New York, County of New York, or, if under applicable law exclusive jurisdiction is vested in the Federal courts, the United States District Court for the Southern District of New York sitting in New York County (and appellate courts thereof);

A-61

Table of Contents

(d) irrevocably waives, to the fullest extent that it may effectively do so, the defense of an inconvenient forum to the maintenance of such claim, action, suit, investigation or other proceeding in any such court;

(e) **KNOWINGLY, INTENTIONALLY AND VOLUNTARILY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW TRIAL BY JURY IN ANY CLAIM, ACTION, SUIT, INVESTIGATION OR OTHER PROCEEDING BROUGHT AGAINST ANY DEBT FINANCING SOURCE RELATED PARTY IN ANY WAY ARISING OUT OF OR RELATING TO, THIS AGREEMENT OR THE DEBT FINANCING OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR THE PERFORMANCE OF ANY SERVICES THEREUNDER;**

(f) agrees that no Debt Financing Source Related Party will have any liability to the Company or any its Affiliates or Representatives relating to or arising out of this Agreement or the Debt Financing or any of the transactions contemplated hereby or thereby or the performance of any services thereunder, whether in law or in equity, whether in contract or in tort or otherwise; and

(g) agrees that the Debt Financing Sources are express third party beneficiaries of, and may enforce, any of the provisions of this Section 9.13 and that such provisions and the definitions of "Debt Financing Sources" and "Debt Financing Source Related Party" shall not be amended or waived in any way adverse to the rights of any Debt Financing Source without the prior written consent of such Debt Financing Source.

[Remainder of page intentionally left blank.]

A-62

Table of Contents

IN WITNESS WHEREOF, each of Parent, Acquisition Sub, the Company and, solely with respect to the Specified Provisions, the undersigned individual, have caused this Agreement to be executed as of the date first written above in their individual capacity or by their respective officers thereunto duly authorized, as applicable.

X HOLDINGS I, INC.

By:  /s/ Elon R. Musk

_____
Name: Elon R. Musk
Title: President, Secretary and Treasurer

X HOLDINGS II, INC.

By:  /s/ Elon R. Musk

_____
Name: Elon R. Musk
Title: President, Secretary and Treasurer

[Signature Page to Agreement and Plan of Merger]

A-63

Table of Contents

TWITTER, INC.

By:  /s/ Bret Taylor

Name: Bret Taylor
Title: Chair of the Board of Directors

[Signature Page to Agreement and Plan of Merger]

A-64

Table of Contents

SOLELY WITH RESPECT TO THE SPECIFIED
PROVISIONS:

ELON R. MUSK

/s/ Elon R. Musk
_____

[Signature Page to Agreement and Plan of Merger]

A-65

Table of Contents

**SCHEDULE A**
**Specified Jurisdictions**

With respect to <u>Section 7.1(b)</u>:

Any Consent or approval that is required under any Antitrust Laws or Foreign Investment Laws of the following jurisdictions, including as a result of any interventions by a Governmental Authority or voluntary filings under any Antitrust Laws or Foreign Investment Laws that Parent determines to make (for the avoidance of doubt, an approval shall be deemed to be required once the Parent determines it will make a voluntary filing in that jurisdiction, but only if an approval is typically granted for a filing of such a type in such a jurisdiction, whether through a decision or deemed by expiry of any applicable waiting periods):

1. The federal government of the United States
2. The State of Delaware
3. Japan
4. The United Kingdom
5. The European Commission (but not any member states)

With respect to <u>Section 7.1(c)</u>:

1. The federal government of the United States
2. The State of Delaware
3. Japan
4. The United Kingdom
5. The European Commission (but not any member states)

A-66

Table of Contents

ANNEX B

## Section 262 of the Delaware General Corporation Law

### § 262 Appraisal rights

(a) Any stockholder of a corporation of this State who holds shares of stock on the date of the making of a demand pursuant to subsection (d) of this section with respect to such shares, who continuously holds such shares through the effective date of the merger or consolidation, who has otherwise complied with subsection (d) of this section and who has neither voted in favor of the merger or consolidation nor consented thereto in writing pursuant to § 228 of this title shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock under the circumstances described in subsections (b) and (c) of this section. As used in this section, the word "stockholder" means a holder of record of stock in a corporation; the words "stock" and "share" mean and include what is ordinarily meant by those words; and the words "depository receipt" mean a receipt or other instrument issued by a depository representing an interest in 1 or more shares, or fractions thereof, solely of stock of a corporation, which stock is deposited with the depository.

(b) Appraisal rights shall be available for the shares of any class or series of stock of a constituent corporation in a merger or consolidation to be effected pursuant to § 251 (other than a merger effected pursuant to § 251(g) of this title), § 252, § 254, § 255, § 256, § 257, § 258, § 263 or § 264 of this title:

(1) Provided, however, that no appraisal rights under this section shall be available for the shares of any class or series of stock, which stock, or depository receipts in respect thereof, at the record date fixed to determine the stockholders entitled to receive notice of the meeting of stockholders to act upon the agreement of merger or consolidation (or, in the case of a merger pursuant to § 251(h), as of immediately prior to the execution of the agreement of merger), were either: (i) listed on a national securities exchange or (ii) held of record by more than 2,000 holders; and further provided that no appraisal rights shall be available for any shares of stock of the constituent corporation surviving a merger if the merger did not require for its approval the vote of the stockholders of the surviving corporation as provided in § 251(f) of this title.

(2) Notwithstanding paragraph (b)(1) of this section, appraisal rights under this section shall be available for the shares of any class or series of stock of a constituent corporation if the holders thereof are required by the terms of an agreement of merger or consolidation pursuant to §§ 251, 252, 254, 255, 256, 257, 258, 263 and 264 of this title to accept for such stock anything except:

a. Shares of stock of the corporation surviving or resulting from such merger or consolidation, or depository receipts in respect thereof;

b. Shares of stock of any other corporation, or depository receipts in respect thereof, which shares of stock (or depository receipts in respect thereof) or depository receipts at the effective date of the merger or consolidation will be either listed on a national securities exchange or held of record by more than 2,000 holders;

c. Cash in lieu of fractional shares or fractional depository receipts described in the foregoing paragraphs (b)(2)a. and b. of this section; or

d. Any combination of the shares of stock, depository receipts and cash in lieu of fractional shares or fractional depository receipts described in the foregoing paragraphs (b)(2)a., b. and c. of this section.

(3) In the event all of the stock of a subsidiary Delaware corporation party to a merger effected under § 253 or § 267 of this title is not owned by the parent immediately prior to the merger, appraisal rights shall be available for the shares of the subsidiary Delaware corporation.

Table of Contents

(4)    [Repealed.]

(c)    Any corporation may provide in its certificate of incorporation that appraisal rights under this section shall be available for the shares of any class or series of its stock as a result of an amendment to its certificate of incorporation, any merger or consolidation in which the corporation is a constituent corporation or the sale of all or substantially all of the assets of the corporation. If the certificate of incorporation contains such a provision, the provisions of this section, including those set forth in subsections (d),(e), and (g) of this section, shall apply as nearly as is practicable.

(d)    Appraisal rights shall be perfected as follows:

(1)    If a proposed merger or consolidation for which appraisal rights are provided under this section is to be submitted for approval at a meeting of stockholders, the corporation, not less than 20 days prior to the meeting, shall notify each of its stockholders who was such on the record date for notice of such meeting (or such members who received notice in accordance with § 255(c) of this title) with respect to shares for which appraisal rights are available pursuant to subsection (b) or (c) of this section that appraisal rights are available for any or all of the shares of the constituent corporations, and shall include in such notice a copy of this section and, if 1 of the constituent corporations is a nonstock corporation, a copy of § 114 of this title. Each stockholder electing to demand the appraisal of such stockholder's shares shall deliver to the corporation, before the taking of the vote on the merger or consolidation, a written demand for appraisal of such stockholder's shares; provided that a demand may be delivered to the corporation by electronic transmission if directed to an information processing system (if any) expressly designated for that purpose in such notice. Such demand will be sufficient if it reasonably informs the corporation of the identity of the stockholder and that the stockholder intends thereby to demand the appraisal of such stockholder's shares. A proxy or vote against the merger or consolidation shall not constitute such a demand. A stockholder electing to take such action must do so by a separate written demand as herein provided. Within 10 days after the effective date of such merger or consolidation, the surviving or resulting corporation shall notify each stockholder of each constituent corporation who has complied with this subsection and has not voted in favor of or consented to the merger or consolidation of the date that the merger or consolidation has become effective; or

(2)    If the merger or consolidation was approved pursuant to § 228, § 251(h), § 253, or § 267 of this title, then either a constituent corporation before the effective date of the merger or consolidation or the surviving or resulting corporation within 10 days thereafter shall notify each of the holders of any class or series of stock of such constituent corporation who are entitled to appraisal rights of the approval of the merger or consolidation and that appraisal rights are available for any or all shares of such class or series of stock of such constituent corporation, and shall include in such notice a copy of this section and, if 1 of the constituent corporations is a nonstock corporation, a copy of § 114 of this title. Such notice may, and, if given on or after the effective date of the merger or consolidation, shall, also notify such stockholders of the effective date of the merger or consolidation. Any stockholder entitled to appraisal rights may, within 20 days after the date of giving such notice or, in the case of a merger approved pursuant to § 251(h) of this title, within the later of the consummation of the offer contemplated by § 251(h) of this title and 20 days after the date of giving such notice, demand in writing from the surviving or resulting corporation the appraisal of such holder's shares; provided that a demand may be delivered to the corporation by electronic transmission if directed to an information processing system (if any) expressly designated for that purpose in such notice. Such demand will be sufficient if it reasonably informs the corporation of the identity of the stockholder and that the stockholder intends thereby to demand the appraisal of such holder's shares. If such notice did not notify stockholders of the effective date of the merger or consolidation, either (i) each constituent corporation shall send a second notice before the effective date of the merger or consolidation

B-2

Table of Contents

notifying each of the holders of any class or series of stock of such constituent corporation that are entitled to appraisal rights of the effective date of the merger or consolidation or (ii) the surviving or resulting corporation shall send such a second notice to all such holders on or within 10 days after such effective date; provided, however, that if such second notice is sent more than 20 days following the sending of the first notice or, in the case of a merger approved pursuant to § 251(h) of this title, later than the later of the consummation of the offer contemplated by § 251(h) of this title and 20 days following the sending of the first notice, such second notice need only be sent to each stockholder who is entitled to appraisal rights and who has demanded appraisal of such holder's shares in accordance with this subsection. An affidavit of the secretary or assistant secretary or of the transfer agent of the corporation that is required to give either notice that such notice has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein. For purposes of determining the stockholders entitled to receive either notice, each constituent corporation may fix, in advance, a record date that shall be not more than 10 days prior to the date the notice is given, provided, that if the notice is given on or after the effective date of the merger or consolidation, the record date shall be such effective date. If no record date is fixed and the notice is given prior to the effective date, the record date shall be the close of business on the day next preceding the day on which the notice is given.

(e)   Within 120 days after the effective date of the merger or consolidation, the surviving or resulting corporation or any stockholder who has complied with subsections (a) and (d) of this section hereof and who is otherwise entitled to appraisal rights, may commence an appraisal proceeding by filing a petition in the Court of Chancery demanding a determination of the value of the stock of all such stockholders. Notwithstanding the foregoing, at any time within 60 days after the effective date of the merger or consolidation, any stockholder who has not commenced an appraisal proceeding or joined that proceeding as a named party shall have the right to withdraw such stockholder's demand for appraisal and to accept the terms offered upon the merger or consolidation. Within 120 days after the effective date of the merger or consolidation, any stockholder who has complied with the requirements of subsections (a) and (d) of this section hereof, upon request given in writing (or by electronic transmission directed to an information processing system (if any) expressly designated for that purpose in the notice of appraisal), shall be entitled to receive from the corporation surviving the merger or resulting from the consolidation a statement setting forth the aggregate number of shares not voted in favor of the merger or consolidation (or, in the case of a merger approved pursuant to § 251(h) of this title, the aggregate number of shares (other than any excluded stock (as defined in § 251(h)(6)d. of this title)) that were the subject of, and were not tendered into, and accepted for purchase or exchange in, the offer referred to in § 251(h)(2)), and, in either case, with respect to which demands for appraisal have been received and the aggregate number of holders of such shares. Such statement shall be given to the stockholder within 10 days after such stockholder's request for such a statement is received by the surviving or resulting corporation or within 10 days after expiration of the period for delivery of demands for appraisal under subsection (d) of this section hereof, whichever is later. Notwithstanding subsection (a) of this section, a person who is the beneficial owner of shares of such stock held either in a voting trust or by a nominee on behalf of such person may, in such person's own name, file a petition or request from the corporation the statement described in this subsection.

(f)   Upon the filing of any such petition by a stockholder, service of a copy thereof shall be made upon the surviving or resulting corporation, which shall within 20 days after such service file in the office of the Register in Chancery in which the petition was filed a duly verified list containing the names and addresses of all stockholders who have demanded payment for their shares and with whom agreements as to the value of their shares have not been reached by the surviving or resulting corporation. If the petition shall be filed by the surviving or resulting corporation, the petition shall be accompanied by such a duly verified list. The Register in Chancery, if so ordered by the Court, shall give notice of the time and place fixed for the hearing of such petition by registered or certified mail to the surviving or resulting corporation and to the stockholders shown on the list at the addresses therein

B-3

Table of Contents

stated. Such notice shall also be given by 1 or more publications at least 1 week before the day of the hearing, in a newspaper of general circulation published in the City of Wilmington, Delaware or such publication as the Court deems advisable. The forms of the notices by mail and by publication shall be approved by the Court, and the costs thereof shall be borne by the surviving or resulting corporation.

(g)    At the hearing on such petition, the Court shall determine the stockholders who have complied with this section and who have become entitled to appraisal rights. The Court may require the stockholders who have demanded an appraisal for their shares and who hold stock represented by certificates to submit their certificates of stock to the Register in Chancery for notation thereon of the pendency of the appraisal proceedings; and if any stockholder fails to comply with such direction, the Court may dismiss the proceedings as to such stockholder. If immediately before the merger or consolidation the shares of the class or series of stock of the constituent corporation as to which appraisal rights are available were listed on a national securities exchange, the Court shall dismiss the proceedings as to all holders of such shares who are otherwise entitled to appraisal rights unless (1) the total number of shares entitled to appraisal exceeds 1% of the outstanding shares of the class or series eligible for appraisal, (2) the value of the consideration provided in the merger or consolidation for such total number of shares exceeds $1 million, or (3) the merger was approved pursuant to § 253 or § 267 of this title.

(h)    After the Court determines the stockholders entitled to an appraisal, the appraisal proceeding shall be conducted in accordance with the rules of the Court of Chancery, including any rules specifically governing appraisal proceedings. Through such proceeding the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value. In determining such fair value, the Court shall take into account all relevant factors. Unless the Court in its discretion determines otherwise for good cause shown, and except as provided in this subsection, interest from the effective date of the merger through the date of payment of the judgment shall be compounded quarterly and shall accrue at 5% over the Federal Reserve discount rate (including any surcharge) as established from time to time during the period between the effective date of the merger and the date of payment of the judgment. At any time before the entry of judgment in the proceedings, the surviving corporation may pay to each stockholder entitled to appraisal an amount in cash, in which case interest shall accrue thereafter as provided herein only upon the sum of (1) the difference, if any, between the amount so paid and the fair value of the shares as determined by the Court, and (2) interest theretofore accrued, unless paid at that time. Upon application by the surviving or resulting corporation or by any stockholder entitled to participate in the appraisal proceeding, the Court may, in its discretion, proceed to trial upon the appraisal prior to the final determination of the stockholders entitled to an appraisal. Any stockholder whose name appears on the list filed by the surviving or resulting corporation pursuant to subsection (f) of this section and who has submitted such stockholder's certificates of stock to the Register in Chancery, if such is required, may participate fully in all proceedings until it is finally determined that such stockholder is not entitled to appraisal rights under this section.

(i)    The Court shall direct the payment of the fair value of the shares, together with interest, if any, by the surviving or resulting corporation to the stockholders entitled thereto. Payment shall be so made to each stockholder, in the case of holders of uncertificated stock forthwith, and the case of holders of shares represented by certificates upon the surrender to the corporation of the certificates representing such stock. The Court's decree may be enforced as other decrees in the Court of Chancery may be enforced, whether such surviving or resulting corporation be a corporation of this State or of any state.

(j)    The costs of the proceeding may be determined by the Court and taxed upon the parties as the Court deems equitable in the circumstances. Upon application of a stockholder, the Court may

B-4

Table of Contents

order all or a portion of the expenses incurred by any stockholder in connection with the appraisal proceeding, including, without limitation, reasonable attorney's fees and the fees and expenses of experts, to be charged pro rata against the value of all the shares entitled to an appraisal.

(k)    From and after the effective date of the merger or consolidation, no stockholder who has demanded appraisal rights as provided in subsection (d) of this section shall be entitled to vote such stock for any purpose or to receive payment of dividends or other distributions on the stock (except dividends or other distributions payable to stockholders of record at a date which is prior to the effective date of the merger or consolidation); provided, however, that if no petition for an appraisal shall be filed within the time provided in subsection (e) of this section, or if such stockholder shall deliver to the surviving or resulting corporation a written withdrawal of such stockholder's demand for an appraisal and an acceptance of the merger or consolidation, either within 60 days after the effective date of the merger or consolidation as provided in subsection (e) of this section or thereafter with the written approval of the corporation, then the right of such stockholder to an appraisal shall cease. Notwithstanding the foregoing, no appraisal proceeding in the Court of Chancery shall be dismissed as to any stockholder without the approval of the Court, and such approval may be conditioned upon such terms as the Court deems just; provided, however that this provision shall not affect the right of any stockholder who has not commenced an appraisal proceeding or joined that proceeding as a named party to withdraw such stockholder's demand for appraisal and to accept the terms offered upon the merger or consolidation within 60 days after the effective date of the merger or consolidation, as set forth in subsection (e) of this section.

(l)    The shares of the surviving or resulting corporation to which the shares of such objecting stockholders would have been converted had they assented to the merger or consolidation shall have the status of authorized and unissued shares of the surviving or resulting corporation.

B-5

Table of Contents

**ANNEX C**

200 West Street | New York, NY 10282-2198
Tel: 212-902-1000 | Fax: 212-902-3000

**Goldman Sachs**

**PERSONAL AND CONFIDENTIAL**

April 25, 2022

Board of Directors
Twitter, Inc.
1355 Market Street, Suite 900
San Francisco, CA 94103

Ladies and Gentlemen:

You have requested our opinion as to the fairness from a financial point of view to the holders (other than X Holdings I, Inc. ("Parent"), Elon Musk, the sole shareholder of Parent, and their respective affiliates) of the outstanding shares of common stock, par value $0.000005 per share (the "Shares"), of Twitter, Inc. (the "Company") of the $54.20 in cash per Share to be paid to such holders pursuant to the Agreement and Plan of Merger, dated as of April 25, 2022 (the "Agreement"), by and among Parent, X Holdings II, Inc., a wholly owned subsidiary of Parent, the Company and, solely for purposes of certain provisions specified in the Agreement, Elon Musk.

Goldman Sachs & Co. LLC and its affiliates are engaged in advisory, underwriting and financing, principal investing, sales and trading, research, investment management and other financial and non-financial activities and services for various persons and entities. Goldman Sachs & Co. LLC and its affiliates and employees, and funds or other entities they manage or in which they invest or have other economic interests or with which they co-invest, may at any time purchase, sell, hold or vote long or short positions and investments in securities, derivatives, loans, commodities, currencies, credit default swaps and other financial instruments of the Company, affiliates of Elon Musk, Parent, any of their respective affiliates and third parties, or any currency or commodity that may be involved in the transaction contemplated by the Agreement (the "Transaction"). We have acted as financial advisor to the Company in connection with, and have participated in certain of the negotiations leading to, the Transaction. We expect to receive fees for our services in connection with the Transaction, the principal portion of which is contingent upon consummation of the Transaction, and the Company has agreed to reimburse certain of our expenses arising, and indemnify us against certain liabilities that may arise, out of our engagement. We have provided certain financial advisory and/or underwriting services to the Company and/or its affiliates from time to time for which our Investment Banking Division has received, and may receive, compensation, including having acted as an initial purchaser with respect to the offering of the Company's 0% Convertible Senior Notes due 2026 in March 2021 (aggregate principal amount of approximately $1.4 billion) (the "Convertible Notes") and as an initial purchaser with respect to the offering of the Company's 5.000% Senior Notes due 2030 in February 2022 (aggregate principal amount of $1.0 billion). We have also provided certain financial advisory and/or underwriting services to Elon Musk and/or his affiliates from time to time for which our Investment Banking Division has received, and may receive, compensation, including having acted as lead left bookrunner of follow-on public offerings by Tesla, Inc., an affiliate of Elon Musk, in September

C-1

Table of Contents

2020 and December 2020. We may also in the future provide financial advisory and/or underwriting services to the Company, Elon Musk, Parent and their respective affiliates for which our Investment Banking Division may receive compensation.

We further note that concurrent with the issuance of the Convertible Notes, the Company entered into convertible note hedge and warrant transactions with respect to the Convertible Notes (collectively, the "Convertible Note Hedge and Warrant Transactions") with Goldman Sachs & Co. LLC (as to 25%) and other counterparties, each acting as principal for its own account, consisting of the purchase by the Company of call options, and the sale by the Company of warrants, with respect to collectively approximately 11.1 million Shares, the aggregate number of Shares underlying the Convertible Notes. The Convertible Note Hedge and Warrant Transactions may be adjusted, exercised, cancelled and/or terminated in accordance with their terms in connection with certain events, including the announcement or consummation of the Transaction. In particular, under the terms of the Convertible Note Hedge and Warrant Transactions, each of Goldman Sachs & Co. LLC and the other counterparties, each acting separately as calculation agent under the Convertible Note Hedge and Warrant Transactions to which it is a party, is entitled or obligated in certain circumstances to make adjustments to the exercise price of the call options purchased by the Company from Goldman Sachs & Co. LLC and the other counterparties, and the warrants sold by the Company to Goldman Sachs & Co. LLC and the other counterparties, to reflect the adjustments made under the Convertible Notes indenture or the economic effect of the announcement of the Transaction on the call options and warrants, respectively, embedded in the Convertible Note Hedge and Warrant Transactions. In addition, each of Goldman Sachs & Co. LLC and the other counterparties may, each acting separately as principal under the call options and warrants embedded in the Convertible Note Hedge and Warrant Transactions to which it is a party, determine such additional adjustments and/or value owed upon termination or cancellation in respect of such options and warrants, respectively, in accordance with their terms under various circumstances, including on or following consummation or abandonment of the Transaction. All actions or exercises of judgment by Goldman Sachs & Co. LLC, in its capacity as calculation agent, pursuant to the terms of the call options and warrants embedded in the Convertible Note Hedge and Warrant Transactions to which it is a party must be performed in good faith and a commercially reasonable manner.

In connection with this opinion, we have reviewed, among other things, the Agreement; the annual reports to stockholders and Annual Reports on Form 10-K of the Company for the five years ended December 31, 2021; certain interim reports to stockholders and Quarterly Reports on Form 10-Q of the Company; certain other communications from the Company to its stockholders; certain publicly available research analyst reports for the Company; and certain internal financial analyses and forecasts for the Company prepared by its management, as approved for our use by the Company (the "Forecasts"). We have also held discussions with members of the senior management of the Company regarding their assessment of the past and current business operations, financial condition and future prospects of the Company; reviewed the reported price and trading activity for the Shares; compared certain financial and stock market information for the Company with similar information for certain other companies the securities of which are publicly traded; reviewed the financial terms of certain recent business combinations in the internet industry; and performed such other studies and analyses, and considered such other factors, as we deemed appropriate.

For purposes of rendering this opinion, we have, with your consent, relied upon and assumed the accuracy and completeness of all of the financial, legal, regulatory, tax, accounting and other information provided to, discussed with or reviewed by, us, without assuming any responsibility for independent verification thereof. In that regard, we have assumed with your consent that the Forecasts have been reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of the Company. We have not made an independent evaluation or

C-2

Table of Contents

appraisal of the assets and liabilities (including any contingent, derivative or other off-balance-sheet assets and liabilities) of the Company or any of its subsidiaries and we have not been furnished with any such evaluation or appraisal. We have assumed that all governmental, regulatory or other consents and approvals necessary for the consummation of the Transaction will be obtained without any adverse effect on the expected benefits of the Transaction in any way meaningful to our analysis. We have assumed that the Transaction will be consummated on the terms set forth in the Agreement, without the waiver or modification of any term or condition the effect of which would be in any way meaningful to our analysis.

Our opinion does not address the underlying business decision of the Company to engage in the Transaction, or the relative merits of the Transaction as compared to any strategic alternatives that may be available to the Company; nor does it address any legal, regulatory, tax or accounting matters. We were not requested to solicit, and did not solicit, interest from other parties with respect to an acquisition of, or other business combination with, the Company or any other alternative transaction. This opinion addresses only the fairness from a financial point of view to the holders (other than Elon Musk, Parent and their respective affiliates) of Shares, as of the date hereof, of the $54.20 in cash per Share to be paid to such holders pursuant to the Agreement. We do not express any view on, and our opinion does not address, any other term or aspect of the Agreement or Transaction or any term or aspect of any other agreement or instrument contemplated by the Agreement or entered into or amended in connection with the Transaction, including, the fairness of the Transaction to, or any consideration received in connection therewith by, the holders of any other class of securities, creditors, or other constituencies of the Company; nor as to the fairness of the amount or nature of any compensation to be paid or payable to any of the officers, directors or employees of the Company, or class of such persons, in connection with the Transaction, whether relative to the $54.20 in cash per Share to be paid to the holders (other than Elon Musk, Parent and their respective affiliates) of Shares pursuant to the Agreement or otherwise. We are not expressing any opinion as to the prices at which the Shares will trade at any time or as to the potential effects of volatility in the credit, financial and stock markets on the Company, Elon Musk, Parent or the Transaction, or as to the impact of the Transaction on the solvency or viability of the Company, Elon Musk or Parent or the ability of the Company, Elon Musk or Parent to pay their respective obligations when they come due. Our opinion is necessarily based on economic, monetary, market and other conditions as in effect on, and the information made available to us as of, the date hereof and we assume no responsibility for updating, revising or reaffirming this opinion based on circumstances, developments or events occurring after the date hereof. Our advisory services and the opinion expressed herein are provided for the information and assistance of the Board of Directors of the Company in connection with its consideration of the Transaction and such opinion does not constitute a recommendation as to how any holder of Shares should vote with respect to such Transaction or any other matter. This opinion has been approved by a fairness committee of Goldman Sachs & Co. LLC.

Based upon and subject to the foregoing, it is our opinion that, as of the date hereof, the $54.20 in cash per Share to be paid to the holders (other than Elon Musk, Parent and their respective affiliates) of Shares pursuant to the Agreement is fair from a financial point of view to such holders.

Very truly yours,

/s/ Goldman Sachs & Co. LLC
(GOLDMAN SACHS & CO. LLC)

C-3

**Table of Contents**

ANNEX D

J.P.Morgan

April 25, 2022

The Board of Directors
Twitter, Inc.
1355 Market Street, Suite 900
San Francisco, California 94103

Members of the Board of Directors:

You have requested our opinion as to the fairness, from a financial point of view, to the holders of common stock, par value $0.000005 per share (the "Company Common Stock"), of Twitter, Inc. (the "Company") of the consideration to be paid to such holders in the proposed merger (the "Transaction") of the Company with a wholly-owned subsidiary of X Holdings I, Inc. (the "Acquiror"). Pursuant to the Agreement and Plan of Merger, dated as of April 25, 2022 (the "Agreement"), among the Company, the Acquiror and its subsidiary, X Holdings II, Inc., and, solely for purposes of certain provisions specified in the Agreement, Elon Musk, the Company will become a wholly-owned subsidiary of the Acquiror, and each outstanding share of Company Common Stock, other than the Canceled Shares (as defined in the Agreement) and other than Dissenting Shares (as defined in the Agreement), will be converted into the right to receive $54.20 per share in cash (the "Consideration").

In connection with preparing our opinion, we have (i) reviewed certain publicly available business and financial information concerning the Company and the industries in which it operates; (ii) compared the proposed financial terms of the Transaction with the publicly available financial terms of certain transactions involving companies we deemed relevant and the consideration paid for such companies; (iii) compared the financial and operating performance of the Company with publicly available information concerning certain other companies we deemed relevant and reviewed the current and historical market prices of the Company Common Stock and certain publicly traded securities of such other companies; (iv) reviewed certain internal financial analyses and forecasts prepared by the management of the Company relating to its business; and (v) performed such other financial studies and analyses and considered such other information as we deemed appropriate for the purposes of this opinion.

In addition, we have held discussions with certain members of the management of the Company with respect to certain aspects of the Transaction, and the past and current business operations of the Company, the financial condition and future prospects and operations of the Company, and certain other matters we believed necessary or appropriate to our inquiry.

In giving our opinion, we have relied upon and assumed the accuracy and completeness of all information that was publicly available or was furnished to or discussed with us by the Company or otherwise reviewed by or for us. We have not independently verified any such information or its accuracy or completeness and, pursuant to our engagement letter with the Company, we did not assume any obligation to undertake any such independent verification. We have not conducted or been provided with any valuation or appraisal of any assets or liabilities, nor have we evaluated the solvency of the Company or the Acquiror under any state or federal laws relating to bankruptcy, insolvency or similar matters. In relying on financial analyses and forecasts provided to us or derived

D-1

Table of Contents

therefrom, we have assumed that they have been reasonably prepared based on assumptions reflecting the best currently available estimates and judgments by management as to the expected future results of operations and financial condition of the Company to which such analyses or forecasts relate. We express no view as to such analyses or forecasts or the assumptions on which they were based. We have also assumed that the Transaction and the other transactions contemplated by the Agreement will be consummated as described in the Agreement. We have also assumed that the representations and warranties made by the Company and the Acquiror in the Agreement and the related agreements are and will be true and correct in all respects material to our analysis. We are not legal, regulatory or tax experts and have relied on the assessments made by advisors to the Company with respect to such issues. We have further assumed that all material governmental, regulatory or other consents and approvals necessary for the consummation of the Transaction will be obtained without any adverse effect on the Company or on the contemplated benefits of the Transaction.

Our opinion is necessarily based on economic, market and other conditions as in effect on, and the information made available to us as of, the date hereof. It should be understood that subsequent developments may affect this opinion and that we do not have any obligation to update, revise, or reaffirm this opinion. Our opinion is limited to the fairness, from a financial point of view, of the Consideration to be paid to the holders of the Company Common Stock in the proposed Transaction and we express no opinion as to the fairness of any consideration paid in connection with the Transaction to the holders of any other class of securities, creditors or other constituencies of the Company or as to the underlying decision by the Company to engage in the Transaction. Furthermore, we express no opinion with respect to the amount or nature of any compensation to any officers, directors, or employees of any party to the Transaction, or any class of such persons relative to the Consideration to be paid to the holders of the Company Common Stock in the Transaction or with respect to the fairness of any such compensation.

We note that we were not authorized to and did not solicit any expressions of interest from any other parties with respect to the sale of all or any part of the Company or any other alternative transaction.

We have acted as financial advisor to the Company with respect to the proposed Transaction and will receive a fee from the Company for our services, a substantial portion of which will become payable only if the proposed Transaction is consummated. In addition, the Company has agreed to indemnify us for certain liabilities arising out of our engagement. During the two years preceding the date of this letter, we and our affiliates have had commercial or investment banking relationships with the Company, for which we and such affiliates have received customary compensation. Such services during such period have included acting as joint lead bookrunner on the Company's offerings of convertible debt securities in March 2021 and senior debt securities in February 2022. An affiliate of ours is a party, in a principal capacity, to hedge and warrant transactions with the Company relating to the convertible debt securities that, by their terms, may be adjusted, exercised, cancelled and/or terminated in connection with certain events relating to the proposed Transaction, and are expected to result in an economic gain to such affiliate. In addition, our commercial banking affiliate is an agent bank and a lender under outstanding credit facilities of the Company, for which it receives customary compensation or other financial benefits. In addition, we and our affiliates hold, on a proprietary basis, less than 1% of the outstanding common stock of each of the Company. In the ordinary course of our businesses, we and our affiliates may actively trade the debt and equity securities or financial instruments (including derivatives, bank loans or other obligations) of the Company for our own account or for the accounts of customers and, accordingly, we may at any time hold long or short positions in such securities or other financial instruments.

On the basis of and subject to the foregoing, it is our opinion as of the date hereof that the consideration to be paid to the holders of the Company Common Stock in the proposed Transaction is fair, from a financial point of view, to such holders.

D-2

Table of Contents

The issuance of this opinion has been approved by a fairness opinion committee of J.P. Morgan Securities LLC. This letter is provided to the Board of Directors of the Company (in its capacity as such) in connection with and for the purposes of its evaluation of the Transaction. This opinion does not constitute a recommendation to any shareholder of the Company as to how such shareholder should vote with respect to the Transaction or any other matter. This opinion may not be disclosed, referred to, or communicated (in whole or in part) to any third party for any purpose whatsoever except with our prior written approval. This opinion may be reproduced in full in any proxy or information statement mailed to shareholders of the Company but may not otherwise be disclosed publicly in any manner without our prior written approval.

Very truly yours,

J.P. MORGAN SECURITIES LLC

/s/ J.P. Morgan Securities LLC

D-3

[Table of Contents](#)

# PRELIMINARY PROXY CARD - SUBJECT TO COMPLETION



**SCAN TO**
VIEW MATERIALS & VOTE

TWITTER, INC.
1355 MARKET STREET
SUITE 900
SAN FRANCISCO, CA 94103

**VOTE BY INTERNET - www.proxyvote.com or scan the QR Barcode above**
Use the Internet to transmit your voting instructions and for electronic delivery of information. Vote by 11:59 P.M. ET on   , 2022. Have your proxy card in hand when you access the web site and follow the instructions to obtain your records and to create an electronic voting instruction form.

*During The Meeting* - Go to **www.virtualshareholdermeeting.com/TWTR2022SM**

You may attend the meeting via the Internet and vote during the meeting. Have the information that is printed in the box marked by the arrow available and follow the instructions.

**VOTE BY PHONE - 1-800-690-6903**
Use any touch-tone telephone to transmit your voting instructions. Vote by 11:59 P.M. ET on   , 2022. Have your proxy card in hand when you call and then follow the instructions.

**VOTE BY MAIL**
Mark, sign and date your proxy card and return it in the postage-paid envelope we have provided or return it to Vote Processing, c/o Broadridge, 51 Mercedes Way, Edgewood, NY 11717.

---

TO VOTE, MARK BLOCKS BELOW IN BLUE OR BLACK INK AS FOLLOWS:

D86931-TBD

KEEP THIS PORTION FOR YOUR RECORDS
DETACH AND RETURN THIS PORTION ONLY

THIS PROXY CARD IS VALID ONLY WHEN SIGNED AND DATED.

**TWITTER, INC.**

The Board of Directors recommends you vote FOR proposals 1, 2 and 3.

| | | For | Against | Abstain |
|---|---|---|---|---|
| 1. | To adopt the Agreement and Plan of Merger (as it may be amended from time to time) dated as of April 25, 2022, by and among X Holdings I, Inc., X Holdings II, Inc., Twitter, Inc., and, solely for the purposes of certain provisions of the merger agreement, Elon R. Musk (the "merger agreement"). | ☐ | ☐ | ☐ |
| 2. | To approve, on a non-binding, advisory basis, the compensation that will or may become payable by Twitter to its named executive officers in connection with the merger. | ☐ | ☐ | ☐ |
| 3. | To approve any proposal to adjourn the special meeting, from time to time, to a later date or dates, if necessary or appropriate, to solicit additional proxies if there are insufficient votes to adopt the merger agreement at the time of the Special Meeting. | ☐ | ☐ | ☐ |

**NOTE:** In their discretion, the proxyholders will vote on such other business as may properly come before the Special Meeting. **If no direction is made, this proxy will be voted FOR proposals 1, 2 and 3.**

Please sign exactly as your name(s) appear(s) hereon. When signing as attorney, executor, administrator, or other fiduciary, please give full title as such. Joint owners should each sign personally. All holders must sign. If a corporation or partnership, please sign in full corporate or partnership name by authorized officer.

| Signature [PLEASE SIGN WITHIN BOX] | Date | Signature (Joint Owners) | Date |
|---|---|---|---|

Table of Contents

# PRELIMINARY PROXY CARD - SUBJECT TO COMPLETION

**Important Notice Regarding the Availability of Proxy Materials for the Special Meeting:**
The Notice and Proxy Statement is available at www.proxyvote.com.

D86932-TBD

### TWITTER, INC.
### Special Meeting of Stockholders
### , 2022
### This proxy is solicited by the Board of Directors

The stockholder(s) hereby appoint(s) Parag Agrawal, Ned Segal and Sean Edgett, or any of them, as proxies, each with the power to appoint his substitute, and hereby authorize(s) them to represent and to vote, as designated on the reverse side of this proxy card, all of the shares of common stock of TWITTER, INC. ("Twitter") that the stockholder(s) is/are entitled to vote at the Special Meeting of Stockholders to be held at ___, Pacific time, on ___ , 2022 (together with any postponements, adjournments or other delays there, the "Special Meeting"). The Special Meeting will be held virtually at: www.virtualshareholdermeeting.com/TWTR2022SM.

**This proxy card, when properly executed, will be voted in the manner directed herein. If no such direction is made, this proxy will be voted in accordance with the Board of Directors' recommendations.**

Continued and to be signed on reverse side

# EXHIBIT 3

# How Elon Musk Won Twitter

*Cara Lombardo and Liz Hoffman*

Updated April 26, 2022 6:35 pm ET

○      0:00 / 0:00      ○

This article is in your queue.

The future of Twitter Inc. changed on Thursday.

Elon Musk surprised the social-media company's board that morning by unveiling $46.5 billion in financing he had cobbled together in short order, adding credibility to the bare-bones takeover bid he had made just a week earlier.

Behind the scenes, Twitter's bankers delivered a report to its directors saying that not only was Mr. Musk's $54.20-a-share bid fair, but that the company also could struggle to get there on its own, people familiar with the matter said. Meanwhile, technology stocks—even of money machines like Facebook parent Meta Platforms Inc.—were tanking, making Mr. Musk's all-cash offer seem more attractive.

What looked like a strong hand for Twitter's board just a few days earlier—when Mr. Musk didn't have the financing and had seemingly little shareholder support—was weakening by the hour.

Twitter representatives started asking Mr. Musk's camp questions about the financing, said people familiar with the matter. Then on Saturday, Bret Taylor, the Inc. co-chief who leads Twitter's board, spoke to Mr. Musk, the people said. The full board was going to meet the following morning, he told the billionaire, to discuss taking the deal. He suggested they talk again afterward.

Twitter had been expected to reject Mr. Musk's offer, which was well below the high of nearly $80 that Twitter stock had traded at last year. But by the time the two men reconnected Sunday afternoon, Twitter's board had voted in favor of negotiating with Mr. Musk and advisers were hashing out a $44 billion deal. It was announced Monday afternoon.

This account is based on conversations with people familiar with how the blockbuster deal came together.

Mr. Musk carried out his pursuit with his signature mix of mayhem and winking jabs. When he unveiled his bid, it sparked the same question that has surrounded his other business ventures, from mass-producing electric cars to putting humans on Mars to drilling giant tunnels for superfast travel:

Could he pull it off?

Now he faces fresh challenges. Mr. Musk has hocked roughly $60 billion of his stock—about one third of his stake—as collateral for bank loans, tying his personal fortune to Twitter's. He must come up with $21 billion more in cash, which could mean selling additional shares in Tesla, just as the company is hitting its stride.

Tesla shares have lost about 8% since Mr. Musk first disclosed a Twitter stake, suggesting investors are worried he will be distracted or financially stretched.

Twitter will be saddled with hundreds of millions of dollars in annual interest payments, a risk for any company but especially in this case, as Mr. Musk has said he doesn't care whether it makes money—it has had trouble doing so over the years. And by pushing the company away from content moderation, which Mr. Musk has called censorship, he is likely to embroil it in debates about free speech and online safety.

Mr. Musk will face whether to allow former President Donald Trump back on Twitter. After the Jan. 6 riot last year, the company said it permanently suspended Mr. Trump's personal account. The former president told Fox News on Monday that he had no plans to return to Twitter and would instead use his Truth Social social-media network to reach followers.

The saga began on April 4, when Mr. Musk disclosed a more than 9% stake in Twitter, making him its largest shareholder. His regulatory filing was late, miscounted the number of shares he owned and indicated he would be a passive investor. His lawyers soon amended it to clarify that he could take an active role.

Twitter the next day announced that Mr. Musk would join its board. The two sides had already been discussing the possibility, and Twitter hoped doing so might muzzle him, as he had continued his public criticisms of the company.

Mr. Musk was already balking at how constrained he would be if he joined the board. Still, the two sides charged forward. Twitter completed a background check of Mr. Musk and aimed to make it official by the end of the weekend. But that Saturday, April 9, he told the company he had changed his mind.

Privately, he began plotting his next move: a full-fledged takeover bid. He went public on April 14 with his bid. "I made an offer," he tweeted, along with a link to a regulatory filing. Once his advisers determined the offer should include a roughly 40% premium to Twitter's stock price, he decided to go with $54.20, which incorporated a running gag of his—a reference to April 20, an annual cannabis-celebration day.

The offer said nothing on how he planned to pay for it—no small feat, even for Mr. Musk, given that

the bulk of his billions are tied up in Tesla shares and stakes in his other companies. It was part of an unorthodox plan devised by his team to get Twitter and the market to discount his offer at first, which could provide an edge in negotiations down the line.

Twitter's stock closed down that day, a sign shareholders weren't sure a deal would happen. For Wall Street, the bid brought back flashbacks of when he famously tweeted in 2018 that he had "funding secured" to take Tesla private at $420 a share—yet another marijuana joke. The deal never happened, and he later paid regulators a $20 million fine in connection with the incident.

At first glance, the $54.20 offer appeared underwhelming to Twitter's advisers. The shares were down significantly and the company had been seen as a prize for potential suitors over the years, including deep-pocketed technology companies such as Salesforce.

Twitter quickly installed a "poison pill," a legal maneuver that would make it difficult for Mr. Musk to expand his stake beyond 15%. It was finalized on a quiet Good Friday, with stock markets closed for the holiday.

The turning point came Thursday, April 21, when Mr. Musk said he had lined up financing for his bid from blue-chip banks including , PLC and Corp. The package—three-quarters of it drawn from Mr. Musk's personal fortune—lent credibility to the bid and neutralized potential criticism by Twitter. He also noted that his proposal was no longer subject to his team's completing due diligence, clearing a path for a deal to be reached at rapid speed.

Twitter had already been hearing from shareholders concerned that Mr. Musk's offer might be the best it could do, and the existence of financing ramped up pressure on directors to take it seriously.

In a series of video calls on Friday, Mr. Musk continued making his case to top shareholders, only fleetingly aware at the time that Twitter's board committee tasked with reviewing his bid was beginning to have a change of heart. Twitter's bankers had delivered an opinion that the company's go-it-alone path, in the worst case, could be well below $54.20 a share.

No serious corporate suitors surfaced after Mr. Musk made his bid, perhaps wary of taking on the world's richest person and mindful of a chillier antitrust climate in Washington. A sale to a private-equity firm would be difficult to finance.

Mr. Musk sensed a shift when Mr. Taylor talked to him the following day and pressed him on whether he would sweeten the offer. Mr. Musk had previously said his offer was "best and final" and wouldn't budge now, telling Mr. Taylor that he had a reputation to protect. Mr. Musk was prepared to take the bid directly to shareholders if the board rejected it—something he had already suggested publicly via a series of cryptic tweets.

The pair agreed to reconvene the next day, after Twitter's board would officially vote on whether to

open negotiations with Mr. Musk. On Sunday, Mr. Musk made clear to Twitter he was eager to complete a deal by Monday. Because the price was fixed, Twitter focused its negotiations on protections for shareholders in case the deal didn't go through, given Mr. Musk's fickle nature and his rocky relations with regulators.

Advisers on both sides were still putting the finishing touches on the deal Monday morning, and hopes for a premarket announcement faded. The news came instead in the middle of the trading day —an almost-unheard-of rollout for big corporate news.

It was a fitting coda to an unconventional deal. Mr. Musk trolled Twitter on its own platform through the two-week takeover battle, offering a glimpse of the Twitter he envisions and that he will now be able to pursue—unshackled by content guidelines or niceties. He took swipes at Twitter's bankers, U.S. securities regulators, fellow billionaire Bill Gates and Justin Bieber, whose infrequent tweeting he seemed to take as a symptom of the platform's flaws.

At an all-hands employee meeting Monday afternoon, Twitter CEO Parag Agrawal said there were no layoffs planned and that the company's priorities weren't changing before the deal closed, said people who heard the remarks. Asked about the possibility that Mr. Trump would be allowed back on Twitter, Mr. Agrawal deflected, according to the people, saying that once Mr. Musk takes over, "We don't know what direction the company may go."

**Write to** Cara Lombardo at [cara.lombardo@wsj.com](mailto:cara.lombardo@wsj.com) and Liz Hoffman at [liz.hoffman@wsj.com](mailto:liz.hoffman@wsj.com)

Copyright ©2024 Dow Jones & Company, Inc. All Rights Reserved.
87990cbe856818d5eddac44c7b1cdeb8

Appeared in the April 26, 2022, print edition as 'How Elon Musk Prevailed Over Twitter'.

EXHIBIT 4

# Elon Got His Money

**Published: Thu Apr 21 16:29:10 EDT 2022**

By Matt Levine

(Bloomberg Opinion) --

**Programming note:** *Money Stuff will be off tomorrow, back on Monday.*

# Go Elon

He has commitment letters! Here's Elon Musk's amended Schedule 13D, updating his plans for Twitter Inc.:

> Twitter has not responded to the Proposal. Given the lack of response by Twitter, the Reporting Person is exploring whether to commence a tender offer to acquire all of the outstanding shares of Common Stock (together with the associated rights issued pursuant to the Rights Agreement (the "Rights" and, together with the Common Stock, the "Shares")) that are issued and outstanding (and not held by the Reporting Person) at a price of $54.20 per share, net to the seller in cash, without interest and less any required withholding taxes, subject to certain conditions (the "Potential Offer"), but has not determined whether to do so at this time.

> To finance the Proposed Transaction or a Potential Offer, entities related to the Reporting Person have received commitment letters committing to provide an aggregate of approximately $46.5 billion as follows:

> (i) A debt commitment letter, dated April 20, 2022 (the "Debt Commitment Letter"), from Morgan Stanley Senior Funding, Inc. and certain other financial institutions party thereto as commitment parties (collectively, the "Commitment Parties") pursuant to which the Commitment Parties have committed to provide $13 billion in financing to the Reporting Person and related entities as follows: (a) a senior secured term loan facility in an aggregate principal amount of $6.5 billion, (b) a senior secured revolving facility in an aggregate committed amount of $500 million, (c) a senior secured bridge loan facility in an aggregate principal amount of up to $3 billion and (d) a senior unsecured bridge loan facility in an aggregate principal amount of up to $3 billion ((a) – (d) collectively, the "Debt Facilities");

> (ii) A separate debt commitment letter, dated April 20, 2022 (the "Margin Loan

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

Commitment Letter"), from Morgan Stanley Senior Funding, Inc. and certain other financial institutions party thereto as commitment parties (collectively, the "Margin Loan Commitment Parties") pursuant to which the Margin Loan Commitment Parties have committed to provide $12.5 billion in margin loans (the "Margin Loan Facility"), the proceeds of which will be distributed or otherwise made available to Purchaser; and

(iii) An equity commitment letter, dated April 20, 2022 (the "Equity Commitment Letter"), from the Reporting Person pursuant to which the Reporting Person has committed to provide equity financing for the Proposed Transaction or the Potential Offer sufficient to pay all amounts payable in connection with the Offer and the Merger (plus related fees and expenses), net of the amounts to be funded pursuant to the Debt Commitment Letter and the Margin Loan Commitment Letter, which is currently expected to be approximately $21 billion (the "Equity Financing").

So there you go! Elon Musk needs about $46.5 billion to buy Twitter at $54.20 per share: about $39.4 billion to pay for the 91% of Twitter's stock that he doesn't currently own, about $4.3 billion of debt to refinance and various miscellaneous costs. To pay that, he has:

1. A letter from his banks offering to lend $13 billion to Twitter, if he buys it, with $7 billion of that coming in the form of senior secured bank loans and $6 billion coming in the form of junk bonds.
2. A letter from his banks offering to lend him $12.5 billion personally, secured by $62.5 billion worth of his Tesla Inc. stock. At yesterday's closing price, that comes to about 64 million shares, or about one-third of his Tesla stake.
3. An agreement with himself to put up the other $21 billion, give or take.

I want to discuss these things in more detail but I should lead by saying: Good for him! These are real commitment letters from real banks, or rather at least half of them are. [1] (The $21 billion is a commitment from himself to himself.) He … seems to … want to … buy Twitter? When Musk sent Twitter's board of directors a proposal to buy the company at $54.20 per share, the stock *dropped*, because Musk's casual offer and generally weird behavior did not seem to meaningfully increase the probability that he was actually going to buy Twitter. I was skeptical myself. But this feels real? Twitter's stock is barely changed as of 11 a.m. today, but my own estimate of how likely it is that Musk will buy Twitter has increased considerably.

Musk's filing also says that his buyout proposal to the board, which was previously subject to financing and "business due diligence," is no longer subject to those conditions. He has the financing, and if he is going to launch a hostile tender offer he won't be able to do much diligence first, so there's no real reason for his merger proposal to be contingent on diligence. Also, you know, it's Twitter, he more or less knows what he's getting.

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

Elon Got His Money

A few points about the financing. First, the traditional leveraged-buyout-type financing, the $13 billion of debt that Musk plans to raise against Twitter. Musk attached the commitment letter and term sheet to his filing, so you can get a rough sense of the size and prices of these things:

1. There is a $6.5 billion term loan with a rate of, roughly speaking, SOFR plus 4.75%. Three-month SOFR (the term version of the Secured Overnight Financing Rate, as reported by CME Group Benchmark Administration Limited) is about 0.95% today. (Musk can elect to use one, three or six-month SOFR.) So that is roughly $370 million of interest cost per year.
2. There's a $500 million revolver with a commitment fee of 0.50% and a rate of SOFR plus 4.5% on drawn amounts. So $30 million, if he draws the full revolver.
3. There is $6 billion of bond financing, split evenly between secured and unsecured. The banks have committed to provide bridge loans: Ideally Twitter will sell the bonds before Musk's deal closes, but if not the banks are on the hook to provide the money until the bonds can be issued to take out the bridge loans. The interest rates on the bonds are not specified — the banks have agreed to some maximum rate, but it's in a fee letter that was not filed — but the rates on the bridge loans are SOFR plus 6.75% (secured) and SOFR plus 10% (unsecured). So that's about another $560 million of interest expense, if the bridge loans are drawn, and I am not sure that Twitter can do junk bonds for much less than that. [2]

So you are talking about a bit less than $1 billion of debt service costs for Twitter each year. Bloomberg reports that Twitter's estimated earnings before interest, taxes, depreciation and amortization are $1.43 billion for 2022 and $1.85 billion for 2023. So, uh, sure, doable! It is very unclear what Musk's *business* plan is for Twitter, and some of his statements — that he will cut back on advertising, that he "does not care about the economics at all" — might hint that Twitter's EBITDA under Musk will be lower than the Bloomberg estimates. The margin for error seems slim.

But I guess that's fine? The thing that classically happens, if a company borrows tons of money in a leveraged buyout and then doesn't make enough money to service the debt, is that the lenders get the company and the equity investors lose their investment. [3] Here, though, the equity investor is Elon Musk, and he's putting in something like $33 billion of his own fortune, in the form of his equity commitment (i.e., money from himself) and the margin loan (i.e., hocking his Tesla shares). He has a lot of incentive to make sure that Twitter's lenders get paid, or to pay them himself if it comes to that. As a leveraged buyout loan this package looks large and aggressive, but it is also a loan to the richest person in the world to finance a new toy that he seems to really want, which probably helps the credit.

Second, the Tesla margin loan. Musk will have to post $62.5 billion of stock (a 20% loan-to-value ratio) to secure the loan; if the value of the stock drops below $35.7 billion — a 35% LTV, call it $560 per share [4] — he will need to pay back some of the loan, or post additional cash collateral, until the

Bloomberg Law ®

LTV is back to at least 25% ($50 billion of collateral against a $12.5 billion loan). If the value of the stock goes above $83 billion (15% LTV) he can take some stock back. The lenders do not lose money unless the stock value falls below $12.5 billion, or about $200 per share.

Musk will pay three-month SOFR plus 3% on that $12.5 billion, about $500 million a year, plus amortization of 5% per year (so $625 million in the first year). So Musk will be paying his banks, personally, about $1 billion a year for the privilege of owning Twitter. It is possible that Twitter will be paying him $1 billion a year of dividends, after its own debt servicing costs, but it is, uh, unlikely in the near future. It is more likely that running Twitter will be a continuing expense for him. But, again, he has said that he's not in it for the money. Spending $33 billion to buy Twitter, and then another $1 billion a year to own it, is I suppose in a way a kind of philanthropy for Musk?

(Or … something? "Musk Wants Free Speech on Twitter After Spending Years Silencing Critics," reports Bloomberg News, and while you can certainly draw a distinction between demanding nondisclosure agreements from his employees and wanting unmoderated free speech on Twitter, it is also possible that a whimsical billionaire who owns his favorite venue for public discourse might want it to be reliably nice to him personally. Certainly if I were the richest person in the world I'd pay $1 billion a year to make everyone be nice to me.)

Third, the equity commitment letter, in which Musk promises to give himself $21 billion if he needs it. [5] This does not necessarily mean that that's his plan. "The Aggregate Equity Commitment may be reduced by (x) any other equity contributions made to the Parent and Purchaser (or any of its direct or indirect parent entities) for such purpose and/or (y) any additional Debt Financing obtained by Parent or the Purchaser," the letter says. Much of the reporting about Musk's plan to buy Twitter suggests that he is looking for other equity investors, and presumably he intends to syndicate some of his $21 billion commitment. But as of right now, if he launches the tender offer, he's on the hook for the $21 billion.

Musk probably does not have $21 billion in cash, so funding this entire commitment would require him to sell some Tesla stock. But he could just about do that: He has pledged about 88 million Tesla shares to secure other loans, he is pledging perhaps another 64 million shares to secure this margin loan, so that leaves about 20 million shares — worth about $20 billion — free and clear that he could sell to raise more money.

But Musk also has stock options that could give him tens of millions of Tesla shares, which he could sell to raise more money. In fact, Reuters notes that "With Tesla's strong quarterly report on Wednesday, Chief Executive Elon Musk has scored a hat trick of performance goals worth a combined $23 billion in new compensation," with about 25 million shares of options vesting at an exercise price of $70.01 each. Nice quarter! Here's a little bonus, go buy yourself Twitter.

**Bloomberg Law** ®

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

Elon Got His Money

And the facts that Tesla did have a strong quarter, and that the stock was up about 8% as of 11 a.m. today, seem helpful? If Musk is going to dump tens of billions of dollars of Tesla stock, that will push down the stock price, but if he keeps selling lots of cars the effects will balance out. He can buy a new toy without damaging his existing toys.

I wrote yesterday:

> Broadly speaking, what has happened so far is (1) Musk offered the board $54.20 per share to buy Twitter, (2) the board said "show us the money," and (3) Musk is working on it. If he comes up with the money, then the board will have to make some decisions, but right now the ball is in his court.

Well, he did it. He hasn't launched his tender offer, and he is not committed to launch it; he could still lose interest and walk away. But he found the money, and the board does have some decisions to make. That doesn't mean that it has to accept a deal at $54.20, or let Musk take his tender offer directly to the shareholders by getting rid of its poison pill: If the board thinks that the price is too low or the deal is still too uncertain, or if it has another, better bidder, it can still fight. But I do think that the board's *best* argument for blowing off Musk, as of yesterday, was probably that he was hard to take seriously without real financing. Now it has to take him seriously.

## High water

If you run a hedge fund and get 20% of the profits, that motivates you to make a lot of profits. Your investors want that; they want you to be motivated. If, one year, you lose money and are down 5%, the way most hedge funds work is that you have to earn back that 5% — you have to get back to the previous high-water mark — before taking a cut of the profits. If, the next year, you are up 4%, you will not take a cut of that 4% profit, because you are still below the high-water mark. If instead you earn 30%, you will take your 0% of the profits back to the high-water mark and 20% of the profits above it.

Your investors like this high-water mechanism because:

1. They would resent paying you a cut of the "profits" when they have actually lost money themselves; they only want you to take a cut of *actual* profits.
2. This setup motivates you not to lose money in the first place.

This only goes so far, though. If you lose 39% one year and 21% the next, then in the *third* year you need to make a return of 108% to get back to even and start getting paid any performance fees at all. [6] That is hard to do! Or you could make 30% returns for your investors for the next three years without getting paid, [7] which is unpleasant. On the one hand, yeah: You lost all that money for your

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

investors, it is only fair that you should work for them for free for a few years to make it up to them. On the other hand, your motivation is going to suffer if making way-above-market returns for years on end still won't earn you a bonus. Given the high-water mark, you might give up, fire your analysts, park everything in index funds and live off the fixed management fee. Or more realistically you might quit, close your fund and go get a job at someone else's hedge fund where you can earn a bonus this year.

Obviously one possibility is that you *should* quit, because you repeatedly lost all that money for your investors. The investors might think that! They might pull their remaining money, after you lost so much of it. But if they *don't* pull their money — if they conclude that you are a good investor who can still do good things for them, and you just had two unfortunate years — then really they will have to renegotiate your high-water mark. If they want you to keep working for them — again, a weird choice, but a possible one — they will have to incentivize you to do so. Which means that if you go from down 50% to down 30% they gotta pay you, even if they resent it.

So how's Gabe Plotkin doing?

> Gabe Plotkin's Melvin Capital is looking to reboot after losing more than half its assets under management since the start of 2021.

> Plotkin, 43, is changing the firm's terms, most importantly requiring anyone who wants to stay in the fund to start paying performance fees again even though their investments are underwater. Previously, Plotkin would have had to recoup his losses -- in this case deliver a return of more than 100% -- before charging those fees. …

> As of June 1, performance fees will drop to a range of 15% to 25%, and will revert to the current level of 20% to 30% on Jan. 1, 2025.  ...

> Plotkin is hoping investors will stick with him despite a 39% plunge last year, fueled by a Reddit-fueled short-squeeze that January, and a 21% decline in the first quarter of 2022. Melvin still managed to attract new money, even though returns later in 2021 weren't enough to overcome the huge deficit.

Yeah I mean that is annoying but also the right answer. If you want to keep employing him as a hedge fund manager, that's your business, but you have to keep paying him.

# Arbitration

It costs a lot of money to bring a lawsuit, or to defend one. Lots of bad things might happen to you illegally, and you might want to get them fixed, but it is so expensive to sue that you won't. If the cable

company illegally overcharges you by $5, you can complain, but you can't realistically sue. Lots of things, including much more important things, are like this. If your employer discriminates against you because of racism, your potential monetary damages might not be enough to get a lawyer interested in taking the case.

Often the structure of these things is that some big company *does* the bad thing, and lots of little individuals — consumers, employees, etc. — *suffer* the bad thing. The individuals aren't rich enough to sue to vindicate some point of principle, and the company is rich enough to defend itself.

There are two main solutions to this. One is arbitration: You have some more informal private system of adjudicating claims that is faster and cheaper than the legal system. Generally this favors the big company: It pays less to defend the cases, and there is a sense that the arbitrators might be more favorable to it and that arbitration can be kept quieter than litigation. And so the big company might make arbitration mandatory, in its employment agreements or consumer contracts or whatever. It might like arbitration so much that it will pay the costs of arbitration, making it "cheap" for consumers or employees, in exchange for getting this cheaper and more favorable venue.

The other solution is a class action: Thousands of little individuals band together to sue the company, arguing that their claims are similar enough that they should all be treated as one case. Their individual damages are small, but the total case is big enough to get lawyers interested. Often this favors the little claimants: They get their claims heard in court, for one thing, but also there's a decent chance of big damages against the big company that did the bad thing.

Generally companies that mandate arbitration will also tend to try to prevent class actions; they will require customers, employees, etc. not only to arbitrate their claims but also to do so *as individuals*, not to seek class arbitration.

If you are a very enterprising lawyer this creates an opportunity to troll big companies by filing thousands of identical arbitrations and making the companies pay for them:

> Uber Technologies Inc.'s insistence on arbitrating customer disputes may have backfired in the face of a conservative campaign challenging the company's move to boost Black-owned businesses after George Floyd's murder.

> The firm of William Consovoy, a lawyer best-known for representing former President Donald Trump, used social media to enlist customers who claimed Uber Eats's 2020 waiver of delivery fees for Black-owned restaurants constituted "unlawful reverse discrimination" against those ordering from other businesses and ultimately filed more than 31,000 individual demands for arbitration.

> Last week, a New York appeals court ruled that Uber had to pay the American Arbitration

Association an invoice of nearly $11 million to deal with the Consovoy firm's claims. The total is expected to top $91 million in fees alone, an amount Uber called "astronomical."

But the court said in its Thursday ruling that Uber was bound by its own bargain.

"While Uber is trying to avoid paying the arbitration fees associated with 31,000 nearly identical cases, it made the business decision to preclude class, collective, or representative claims in its arbitration agreement with consumers and AAA's fees are directly attributable to those decisions," the court said.

Arbitration is generally seen as more business-friendly than litigation, and Uber has aggressively defended its right to require customers and workers to arbitrate disputes instead of filing lawsuits.  …

According to the decision, Uber's deal with the AAA calls for the company to pay a $500 filling fee, $1,400 standard case management fee, $1,500 arbitrator fee for each matter. Though AAA had discounted the filing fees, Uber claimed the amount sought was still nearly 75% of the association's total 2020 operating revenue.

Yeah, I'm sorry, without endorsing the specific claim here I have to say that this is good trolling. Also I have to say that if I worked for AAA I'd be quietly trying to sign up more lawyers to do this. For the lawyer and the plaintiffs, this is just trolling. For the AAA it's 75% of its budget!

# Debt for nature

The way modern finance works is that if a developing country borrows money and can't repay it, one tool in its arsenal is to go to the lenders and say "look, if you make us repay this debt, we will chop down a bunch of forests in our country, and you don't want that, do you?" And the lenders don't. Because they are big international financial institutions, and their shareholders and executives and regulators and other stakeholders all want them to (1) make money but also (2) be carbon neutral. If you are a big international lender and a country chops down a bunch of forests because of your loan, that is bad for you as a responsible environmental, social and governance investor. You might prefer the better ESG result (leaving the forests alone) over the better financial result (getting your money back).

I am not sure that paragraph made any sense, but it is basically true:

The UN has asked Sri Lanka to introduce a temporary basic income and negotiate "debt-for-nature" swaps tied to environmental conservation as part of measures to mitigate the country's economic meltdown, as Colombo begins talks with the IMF.

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

The UN Development Programme made the proposals in a document seen by the Financial Times that was submitted to President Gotabaya Rajapaksa's government and that will be reviewed by the cabinet that was sworn in this week. ...

The agency has also asked Sri Lanka to pursue bonds or debt swaps linked to environmental and social sustainability, such as debt-for-nature deals in which some loans are forgiven in exchange for investment in environmental conservation.

Similar measures have been introduced in countries such as Costa Rica, and Wignaraja argued that Sri Lanka — famed for its beaches, forests and mountains — was well-placed to tap such schemes.

We're "moving quite aggressively to see if the debt-for-nature swaps can be a big part of [a deal]. We've got to reduce our debt burden, not just keep restructuring it," she said. "Sri Lanka has amazing natural resources that they can put [up] to draw down the debt."

"If you forgive our debt we will promise not to pollute our beaches" is now a totally normal part of international finance. Honestly that seems good?

## Things happen

Tesla Notches Record Profit, Sees Big 2022 Production Gain. Elon Musk's Boring Co. Raises Funding at Nearly $6 Billion Valuation. Tesla Judge Refuses to Silence Musk in Go-Private Tweet Case. Ackman Loses More Than $430 Million on 3-Month Netflix Bet. Billionaire Carl Icahn Calls Out Wall Street ESG 'Hypocrisy' in McDonald's Fight. Goldman Sachs flagged Morgan Stanley block trades to Hong Kong regulator. Dutch Government Votes to Tighten Bonus Rules for Finance Firms. Hedge funds and brokers take aim at post-Archegos trading reforms. Goldman Sachs sought to woo FTX at Caribbean meeting. Hedge Fund Bets Against a SPAC Tied to Trump After Truth Social 'Disaster.' Fired BNP Boss Accused of ' Emotional Terrorism' Seeks $4 Million. Chip-Starved Firms Are Scavenging Silicon From Washing Machines.

*If you'd like to get Money Stuff in handy email form, right in your inbox, please subscribe at this link. Or you can subscribe to Money Stuff and other great Bloomberg newsletters here. Thanks!*

(Corrects description of margin loan mechanics in first item.)

To contact the author of this story:
Matt Levine at mlevine51@bloomberg.net

To contact the editor responsible for this story:



© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

Elon Got His Money

Daniel Niemi at dniemi1@bloomberg.net

1. One smalldumb point. If you look at the debt and margin loan commitment letters, you will notice that they are signed by a representative of each of the lender banks. And then there is a countersignature block, saying "Accepted and agreed to as of the date first above written," withspaces for a signature by "Elon R. Musk, President, Treasurer and Secretary" of X Holdings I, Inc. and X Holdings II, Inc., the entities that he would use to buy Twitter. And those spaces are blank. The banks have offered him the money, but he hasn't taken it yet. (Or paid them their fees.)The equity commitment letter is fully executed, signed by Musk (as himself, committing the equity) and countersigned by Musk (as president of X Holdings).

2. Sujeet Indap built a leveraged buyout model at FT Alphaville assuming a blended interest rate of 10% on Twitter's debt financing, so, same ballpark.

3. I realize that in the actual world the equity investors tend to be sharp-elbowed financial sponsors and often find ways to keep some value for themselves.

4. Assuming that the deal closes at a Tesla stock price of $977.20 per share, yesterday's closing price. It is up today on strong earnings.

5. Actually he promises to give himself the amount of money needed to close the deal, minus the amounts of the debt commitments; his filing estimates that amount at $21 billion, but the letter does not specify.

6. That is, 100 x (1 - .39) x (1 - .21) = 48.2, and 48.2 x (1 + 1.08) gets you back above 100.

7. Sure you get a management fee but that is not supporting your hedge-fund-manager lifestyle.

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

# EXHIBIT 5

# Elon Musk's deal to buy Twitter diverges from Wall Street norms in 5 ways, according to an insider

*Shawn Tully*

This writer recently spoke to an individual familiar with the [financing for Elon Musk's $46.5 billion bid for Twitter](). This person––a big Musk fan, by the way––noted that the renowned maverick is taking a highly unusual stance as a dealmaker, from eschewing due diligence to deploying leverage on a chronic under-performer so heavy that at least initially, its cash flow won't cover its interest payments. The source highlighted several of the Musk-Twitter transaction's characteristics that diverge from the Wall Street mainstream, to put it mildly, and emphasized what looks like the [Tesla]() CEO's ironclad determination to own Twitter, transform the platform to a fully-open public square, and make tons of money for himself and investors along the way.

## Musk didn't demand an inside look at Twitter's books

Before signing the deal to purchase Twitter on April 25, Musk didn't require the right to conduct the due diligence that's customary in large acquisitions. Hence, he made his wager without examining Twitter's internal customer-trend data and financial numbers not publicly disclosed. "He did the deal with no due diligence," says the source. "On the one hand, that might sound crazy. But it's a public company, so plenty of information was available. So it's not insane, but it is extremely unusual."

## Musk is promising huge returns to investors

According to this individual, Musk has been pitching potential investors that he plans to take Twitter public around three years after the transaction closes, and that over the next half decade, he'll multiple its initial equity value four to five fold. If he succeeds, Musk would mint money for himself and his backers. He's forecasting that their starting stake of over $32 billion would mushroom to as much as $150 billion by around 2027. "Did Musk have the most fully baked plan in the world" for how he'd fix Twitter? asks this person rhetorically. "No. But he was pretty specific about the financial targets. He wants to make big money doing this."

## Musk is using heavy leverage

"Is it a lot of debt? No question about it," notes the source. "Twitter has a slim $1.5 billion in earnings before interest, taxes, depreciation and amortization (EBITDA), and its borrowing $13 billion from a consortium of lenders to help finance what's known as "a leveraged take private" resembling an LBO.

We discussed the numbers. Twitter is already carrying more than $6 billion in long-term debt and capital leases. The *additional* $13 billion in borrowings represents a "hefty" 8.7 times leverage (of debt to EBITDA). After interest and cash taxes, what Twitter has left over to pay extra interest is around $500 million a year. That's less than the $600 million added load from the new loans. Put simply, Musk must rapidly improve Twitter's operations to achieve growth revenues that's much faster than the rise in expenses, the opposite of today's trajectory. If that happens, the big leverage will magnify his partners' gains; if he fails a huge portion of their equity will vanish.

## Musk is looking to lower his equity exposure

As the source points out, the initial deal made Musk responsible for raising every dollar in equity beyond the $13 billion in debt. That could have meant putting up over $30 billion of his own cash—— the most likely fount, of course, was selling and margining Tesla shares and vested options. But Musk's been amazingly successful at recruiting investors to share the burden. He's attracted a group of 19 investors as varied as Oracle's Larry Ellison, Qatar's sovereign wealth fund, and Silicon Valley's Sequoia Capital for a total of $7.14 billion. He's also reportedly in talks to raise billions more in preferred stock. The contributions from co-investors have enabled Musk to reduce what was announced as a $12.5 billion margin loan secured by Tesla's stock by half, to $6.25 billion.

So far, Musk's pocketed $8.4 billion in cash from selling Tesla shares in early May, funds most likely earmarked for the transaction. According to the source, Musk will still have "tens of billions of dollars in the deal," but has significantly reduced his own cash contribution via his great success in marshaling big backers.

## Musk has no intention of bailing

It would appear that sundry factors could prompt Musk to abandon the deal. If Tesla's stock keeps falling, Musk could be forced to sell shares en masse to meet margin payments. By junking the transaction, he could remove that pressure. Or, Twitter's business could deteriorate in the months it will take to win the regulatory approvals needed to close, convincing the gambler that his target is too broken to fix. If he exits, Musk must pay a $1 billion "breakup fee." But the source says that the looming penalty has no bearing on the buyer's determination to own Twitter: "Musk is a binary person. Sure, he could pay the $1 billion and walk away, thereby shedding tens of billions in equity exposure to Twitter. But I see no signs he's remotely considering that course."

## Musk is winning backers for three possible reasons

The source said he's been hearing three motives advanced for why big name co-investors are joining Musk, two from the partners themselves. The first, he says, amounts to an expression of gratitude by

folks Musk helped make wildly rich, and funds that greatly raised their returns, via their stakes in Tesla. For example, longstanding Tesla shareholder and Musk booster Ron Baron can hardly be thrilled that Musk is pledging to run still another company as Tesla's shares drop, yet a subsidiary of Baron Capital is putting $100 million in the deal. "A cynic might say that the only people coming into the common equity are people who owe Elon favors," notes the source. A second reason advanced by funds Musk recruited: Twitter was "barely managed" under former CEO Jack Dorsey, who was criticized for traveling to such remote spots as Fiji while running the social media platform. "No one disputes that it was under-managed," says the source. "So the idea is that given Musk's operating skills, he can turn it around big time."

The third explanation might be called the allure of pure genius. "The bullish case is that this is the greatest single moneymaker in our history, so I'll back him because he can multiply the equity by four or five times," says the person to whom I spoke. In this view, it's not about the Twitter's current numbers but a kind of unquestioned faith in a magician who since he's achieved the seemingly impossible in building a key industry of the future from scratch, and making his stockholders, at one point, around $1 trillion in the process. If the cynics are right, some loyalists are repaying Musk by joining the zany Twitter adventure. Musk's looked crazy before, and defied all odds. His backers are betting billions that he can epitomize the art of the possible once again.

Sign up for the *Fortune Features* email list so you don't miss our biggest features, exclusive interviews, and investigations.

EXHIBIT 6

The New York Times | https://www.nytimes.com/2022/04/30/technology/twitter-board-elon-musk.html

# How Twitter's Board Went From Fighting Elon Musk to Accepting Him

It's highly unusual to move from a "poison pill" to a $44 billion deal in under two weeks. But Twitter's board ran out of options.

**By Lauren Hirsch and Mike Isaac**

Lauren Hirsch, who covers deals, reported from New York, and Mike Isaac, who covers technology, reported from San Francisco.

April 30, 2022

Twitter's board had reached the end of the road.

It was April 24. Ten days earlier, Elon Musk, the world's richest man, had made an unsolicited bid to buy Twitter for $54.20 a share. Alarmed by the out-of-the-blue proposal and uncertain if the offer was for real, the social media company had adopted a "poison pill," a defensive maneuver to stop Mr. Musk from accumulating more of its shares.

But by that Sunday, Twitter was running out of choices. Mr. Musk had lined up financing for his offer and was needling the company with his tweets. And after hours of discussions and reviewing Twitter's plans and finances, the questions the 11 board members were wrestling with — could the company be worth more than $54.20 a share? would any other bidder emerge? — were all leading to one dissatisfying answer: No.

Less than 24 hours later, the blockbuster $44 billion deal was announced.

"What I'll tell you is that based on the analysis and the perception of risk, certainty and value, the board unanimously decided the offer from Elon represented the best value for our shareholders," Bret Taylor, Twitter's chairman, told the company's more than 7,000 employees on Monday in a call that The New York Times listened to.

A central mystery of Mr. Musk's acquisition of Twitter is how the company's board went from installing a poison pill to agreeing to sell to him in just 11 days. In most megadeals, the adoption of a poison pill leads to a protracted fight. The tactic is a clear signal that a company intends to battle. Negotiations then drag out. Sometimes buyers walk away.

But interviews with a dozen people close to the transaction, who were not authorized to speak publicly, show just how few options Twitter's board had.

And while there are many types of buyers that deal advisers are prepared to fend off — hostile ones, aggressive ones, those who lowball and then are willing to negotiate — Twitter faced an acquirer in Mr. Musk who was not in any deal playbook. In essence, he was an "unknown quantity" acquirer, one who would not budge on price and was prepared to publicly trash the company and wield his considerable fortune to get an agreement done with limited diligence.

"Normal buyers might actually say, 'Well, you know, we actually want to talk to the folks inside and see how is the business going and get more data than is available to the public,'" said Edward Rock, a professor of corporate governance at the New York University School of Law. "What was interesting," he said, is that the Twitter board "reached a deal in a short period of time — and such an unconditional deal." He called the deal's speed "unusual."

Twitter declined to comment on its board discussions. Mr. Musk did not respond to a request for comment.

The groundwork for a deal was laid in January, when Mr. Musk began buying Twitter stock, eventually building up a more than 9 percent stake in the company. When he made his holdings known in a securities filing in early April, Twitter offered him a board seat. Mr. Musk briefly agreed to the idea before changing his mind.

Instead, on the evening of April 13, Mr. Musk sent a text message to Mr. Taylor, who has been Twitter's chairman since 2016. (Mr. Taylor is also a co-chief executive of the software company Salesforce.)

"I am going to send you an offer letter tonight, it will be public in the morning," Mr. Musk wrote to Mr. Taylor. The exchange was included in a securities filing.

The next morning, a bare-bones offer letter arrived from Mr. Musk. It declared his intention to buy Twitter for $54.20 a share, but it had few details about his plans for the company or the financing.

"The offer from Elon represented the best value for our shareholders," Bret Taylor, Twitter's chairman, told the company's employees.  David Paul Morris/Bloomberg

Mr. Musk hired the investment bank Morgan Stanley, tapping the services of two bankers, Anthony Armstrong and Michael Grimes. Mr. Grimes, who heads Morgan Stanley's technology banking practice, led the 2012 public stock offering of Facebook and other tech companies, while Mr. Armstrong was a longtime tech banker who had recently been promoted to company vice chairman.

Twitter's board did not quite know how to handle Mr. Musk's bid, the people with knowledge of the discussions said. Mr. Musk did not have a track record of buying companies and had not followed through on some deals, including one in 2018 when he tweeted that he would take his carmaker, Tesla, private but then did not do so.

A day after Mr. Musk's bid became public, Twitter's board voted unanimously to slow him down by authorizing the poison pill. To defend itself, Twitter turned to Goldman Sachs, its longtime banker, and JPMorgan Chase. For legal advice, it added the law firm Simpson Thacher & Bartlett to supplement its longtime law firm, Wilson Sonsini.

JPMorgan declined to comment. Morgan Stanley, Goldman Sachs and Simpson Thacher didn't immediately have comments.

Mr. Musk was undeterred. His bankers began trying to corral tens of billions of dollars in financing for a Twitter deal. His advisers presented prospective lenders with a few pages vaguely outlining Mr. Musk's goals. The billionaire also talked directly with banks, a person with knowledge of the calls said.

That helped persuade Citigroup, Bank of America, BNP Paribas and other banks to put their money in. Despite a lack of details about Mr. Musk's plans, lenders were reassured in part by the entrepreneur's past successes and wealth, the person said.

Mr. Musk also campaigned on Twitter for a deal. He hinted that he would take his proposal directly to shareholders in a so-called tender offer if the company's board did not accept his bid. On April 16, he tweeted, "Love me tender." Three days later, he tweeted "____ is the Night," a reference to the F. Scott Fitzgerald novel, "Tender Is the Night."

Twitter's board fractured. On April 16, Jack Dorsey, a Twitter founder who stepped down as chief executive in November and is a board member, tweeted that the board had been the "consistent dysfunction of the company." When asked by a Twitter user whether he was allowed to say that, Mr. Dorsey responded, "no."

Mr. Dorsey's criticism rankled other board members and Twitter executives, said two people who worked on the deal. Mr. Taylor asked Mr. Dorsey to stop tweeting negatively, one person said. Mr. Dorsey continued posting references to Twitter's board.

A spokesman for Mr. Dorsey declined to comment. A spokeswoman for Mr. Taylor declined to comment.

Jack Dorsey, a Twitter founder, tweeted critically about the company's board.  Alfonso Duran for The New York Times

On April 21, Mr. Musk lined up $46.5 billion in financing. He had obtained commitments from Morgan Stanley and other lenders for $13 billion in debt financing, while another group of banks promised $12.5 billion in loans against his stock in Tesla. Mr. Musk added that he would use another $21 billion in cash to buy the rest of Twitter's equity.

The financing forced Twitter's board to take Mr. Musk seriously. No other offers for the company had emerged, two people familiar with the deliberations said.

At Twitter, Mr. Taylor weighed employee uncertainty and the societal implications of a deal versus the board's fiduciary duty, people with knowledge of the situation said. That meant making a decision based on whether Twitter could reasonably achieve a value better than what Mr. Musk had put forward.

Mr. Taylor and other board members debated whether Twitter's user and revenue growth prospects were realistic. The San Francisco company, which had not turned a profit for eight of the last 10 years, had set aggressive business targets.

Twitter had also initially benefited from the pandemic, attracting a surge of new users and sending its stock to more than $77 in February 2021. But its advertising business lagged those of competitors, and as the pandemic boost wore off, its shares fell below $40.

Still, some board members were wary about having a saviorlike figure such as Mr. Musk swoop in, especially since Twitter had already relied upon such figures — including Mr. Dorsey — to right the ship, two people said.

Mr. Musk began preparing to start a tender offer for Twitter, said one person close to the discussions. He had a potential ally on Twitter's board in Egon Durban, a co-chief executive of the private equity firm Silver Lake, who had worked with Mr. Musk on his failed 2018 effort to take Tesla private. But Mr. Durban made clear to the board that Silver Lake was not teaming up with Mr. Musk to provide financing for a takeover, two people said.

Through a spokesman, Mr. Durban declined to comment.

2/22/24, 2:37 PM
Case 3:22-cv-05937-CRB Document 59-1 Filed 03/26/24 Page 274 of 473
How Twitter's Board Went From Fighting Elon Musk to Accepting Him - The New York Times

Egon Durban, a member of the Twitter board, spoke with Mr. Musk as Mr. Musk tried to buy the social media service. Cindy Ord/Getty Images

Last Saturday, Mr. Musk spoke with Mr. Taylor and threatened to take his offer directly to Twitter's shareholders, without explicitly saying he would start a hostile bid, a person with knowledge of the call said.

On Sunday, Twitter's board concluded that it had to make a deal with Mr. Musk. The company could not hit $54.20 a share on its own, board members agreed, and no white knight was coming.

Mr. Taylor told Mr. Musk that Twitter would proceed with a sale, a person with knowledge of the call said. Even so, Mr. Musk sent a letter to Mr. Taylor threatening a hostile bid.

Twitter's advisers homed in on protections for the deal, like a breakup fee if Mr. Musk walked away and a six-month timeline to closing the deal, which could be particularly important if technology stocks continue to fall. Mr. Musk's advisers shored up financing details, with the billionaire personally signing off on each point, a person familiar with the negotiations said.

After the agreement was announced on Monday afternoon, Mr. Musk took a victory lap.

"Yesss!!!" he tweeted, posting emojis of rockets, stars and hearts.

Anupreeta Das, Maureen Farrell and Kate Conger contributed reporting.

**Lauren Hirsch** joined the New York Times from CNBC in 2020, covering business, policy and mergers and acquisitions. Ms. Hirsch studied comparative literature at Cornell University and has an M.B.A. from the Tuck School of Business at Dartmouth. More about Lauren Hirsch

**Mike Isaac** is a technology correspondent and the author of "Super Pumped: The Battle for Uber," a best-selling book on the dramatic rise and fall of the ride-hailing company. He regularly covers Facebook and Silicon Valley, and is based in San Francisco. More about Mike Isaac

A version of this article appears in print on , Section B, Page 1 of the New York edition with the headline: How Twitter Did Its Deal With Musk

EXHIBIT 7

# Twitter's Board Gave Up

**Published: Mon May 02 14:10:00 EDT 2022**

By Matt Levine

(Bloomberg Opinion) --

# I'm sorry but more Twitter

You can tell a simple story about Elon Musk's pending acquisition of Twitter Inc. that goes like this. Musk offered Twitter $54.20 per share in cash. Twitter's board of directors consulted some bankers, who told them that the market price of Twitter's stock was lower than $54.20, and that it would likely stay lower in the near future, due to Twitter not making all that much money. The board of directors had a fiduciary duty to maximize the stock price for those shareholders. They looked for higher bids than $54.20, but none materialized. So they had no choice but to take Musk's $54.20.

This simple story is the one that, for instance, Twitter Chief Executive Officer Parag Agrawal told Twitter employees last week. [1] Casey Newton reports on a Twitter all-hands call Friday:

> Why did Agrawal vote in favor of the deal? He spoke in the bloodless language of, well, a fiduciary.
>
> Agrawal: "As I've said, the board decides based on two factors. We act in the interest of our shareholders and look for value for them in the long term. Our job is to think about the price, and consider any offer on the table. And we compare that against the intrinsic value of the company based on the future-looking outlooks we have financially."
>
> "We get a lot of advice from several lawyers and bankers in the process … And when we looked at all the information and all of the data, every one of us concluded that based on our fiduciary responsibility … this offer at the price it ended up at was in the best long-term interest of our shareholders."
>
> OK sure, employees said, but how is it in Twitter's best interest to go private?
>
> "This is the answer you don't want to hear, right?" Agrawal said. "Twitter is a public company owned by shareholders. There are other companies which may have other legal mechanics … Twitter is not one of those companies."

You could imagine him giving an answer that employees *did* want to hear. "This will make our product

stronger than ever." "This will give us the funding we need to improve the service." "This means we can focus on delighting our users rather than on the stock price." "This means more free speech, which is a core value of ours." "Elon Musk is a business visionary and he will run the company better." "Elon Musk loves Twitter and uses it way, way more than any of the current executives or directors, so he will run it better than we do." I don't know. I'm not saying that I necessarily believe any of those things, or that Agrawal does, or that you should. I'm just saying you could imagine the CEO of a company, who had just voted to sell that company, telling the employees of the company that that was the right decision *for the company*, whatever that means. You could imagine some enthusiasm. You could imagine the CEO thinking that the person who values the company the most and will pay the most for it — Musk — will do good things with it. Agrawal said the opposite. The implication is that Twitter has interests *as a company* that are distinct from the interests *of its shareholders*, but that Twitter's board felt it had no choice but to do what was best for shareholders even if it was worse for the company.

This is a traditional story, but it sounds a bit strange in 2022. Ten years ago if you had said that the job of a board of directors was to maximize the stock price, a lot of people would say "well sure yes of course," but now we have stakeholder capitalism and environmental, social and governance investing. In 2019, the chief executive officers of many of America's biggest public companies (not Twitter) signed a Business Roundtable statement that "redefines the purpose of a corporation," saying that they "share a fundamental commitment to all of our stakeholders," not just shareholders. (I made fun of it here.) And the shareholders agree! In particular, Larry Fink at BlackRock Inc. has told CEOs that they "must benefit all of their stakeholders, including shareholders, employees, customers, and the communities in which they operate" and that "putting your company's purpose at the foundation of your relationships with your stakeholders is critical to long-term success." (I made fun of this here and here.) Big companies now face activism whose message is not so much "make changes to maximize the share price" as it is "make changes to improve your environmental and social impact"; Exxon Mobil Corp. lost a proxy fight to a tiny activist that wanted it to speed up its transition away from fossil fuels.

Now, to be clear, all of these trends can be described in terms of shareholder value. Being nice to stakeholders and having a purpose and being environmentally friendly and so forth are all things that probably improve the long-term sustainability and profitability of a company, and shareholders can prefer them for purely financial reasons. Still they seem to have some independent weight in modern corporate thought. The Business Roundtable CEOs want to weigh the interests of all stakeholders and sometimes *prefer* other stakeholders over shareholders; at least some ESG investors are surely willing to sacrifice financial performance for environmental performance.

And then Twitter's CEO shrugs and says, in effect, "meh look this deal might be bad for our users and employees and product and mission, but we can't think about that; the price is right and my only duty

is to shareholders." It's strange!

One thing to say about this story is that, as a description of the board's legal duties, it is debatable. [2] The foundational Delaware hostile-takeover cases from the 1980s explicitly say that a board can consider "the impact on 'constituencies' other than shareholders (i.e., creditors, customers, employees, and perhaps even the community generally)," [3] or "the preservation of [a media company's] 'culture'" and "editorial integrity," [4] in rejecting a takeover offer; shareholder value is not the only valid consideration. More recent cases focus more purely on shareholder value maximization, finding that "promoting, protecting, or pursuing non-stockholder considerations must lead at some point to value for stockholder," and that a court "cannot accept as valid … a corporate policy that specifically, clearly, and admittedly seeks not to maximize the economic value of a for-profit Delaware corporation for the benefit of its stockholders." [5]

So if Twitter's board had said "Twitter is not worth $54.20 per share and never will be, but we declined Musk's offer anyway because we think it is bad for users and the product," that would have been at least a *risky* move. But if it had said "we declined Musk's offer because we think it is bad for users and the product, and we think that if we continue to improve the product and user experience then in the long run this obviously important social network should be worth more than $54.20 per share," that would have been a defensible position even if, like, three-year earnings projections did not really support a $54.20 price.

It would help, in making that case, if Twitter's board and managers *had a long-term plan.* What is strange here is that the richest person on earth came in out of the blue with a not-particularly-preemptive offer to buy a service that he is obsessed with and that seems crucial to his success. Hearing that, you might think things like "huh this product must be pretty valuable." You might sit down and try to think of ways to extract value from it, other than selling it to Musk at the first price he proposed. Twitter's board had no ideas.

Meanwhile you know who does? Elon Musk. Maybe? He seems to think that he can make Twitter worth more than $54.20 per share: He has publicly denied wanting to make money from this deal, but he has pitched his banks on how he will improve Twitter's economics. Perhaps he is wrong, but he has a decent track record. And he just got here! He started buying Twitter stock this year, and declined to do any nonpublic due diligence. Some random interloper has a plan to make Twitter worth more than $54.20, and has bet $33 billion of his own money that it will work. Meanwhile Twitter was trading in the $60s in October and Twitter's board cannot fathom ever getting it back to those levels. Their position is pretty much "well we destroyed some value for shareholders and we're gonna go now, bye."

But it is worse than that. A lot of people think of Twitter as a public utility, a public trust, "the town square," a company with an important social mission that many of its users and employees *and Elon*

*Musk* care about deeply. And its CEO and board of directors essentially can't bring themselves to talk about it. When employees asked him about what was best for the company, Agrawal could talk only about the shareholders. Elon Musk is not at all embarrassed to say that Twitter has an important public mission, which is why he's buying it. But its current management can't say that, which is why they're selling it.

I want to be clear here that I am *not* saying that it was a bad decision, for Twitter's product or users, to sell to Elon Musk. I have no idea; that's not the point. The point is that the board seems to have put almost no weight on these questions. (Except Jack Dorsey, who does seem to have thought that Musk would run Twitter better than he did, and who seems happy about the sale.) I have written this before, but the basic problem with Twitter's management and board of directors seems to be that they do not care about Twitter, as a company or as a product, so they are left to care about shareholders. [6] This seems bad for everyone, including shareholders.

There are a lot of tech companies whose CEOs do not think this way. [7] They are not all companies with "other legal mechanics," as Agrawal said: Tesla Inc. and Amazon.com Inc. do not have dual-class stocks, and Elon Musk and Jeff Bezos have exactly the same duties to their shareholders as Agrawal has to his. But what Tesla and Amazon have are executives and boards who believe in what they are doing, and shareholders who trust them to pursue a long-term vision. [8] If you ask Elon Musk about his decision-making, he would never say "Tesla is a public company owned by shareholders and I just try to maximize their profits." He would talk about his master plan to decarbonize the world, he would talk about self-driving cars and rockets and tunnels. He cares about the product, not the shareholders. That's why Musk's shareholders are rich, and why Bezos's are, and why Twitter's are selling at $54.20.

# Even more Twitter

By the time Elon Musk signed his deal to buy Twitter he was operating at quite a high level. He negotiated a gigantic leveraged buyout, and a gigantic and unusual financing package for it, in near-record time and on terms very favorable to himself. But when he *started* his efforts to buy Twitter, not all that long ago, it was all pretty ramshackle. He bought a bunch of stock in the open market, and once he got above 5% of the stock he was required to disclose his position publicly on a Securities and Exchange Commission filing. Due to some combination of sloppiness and disliking the SEC, he filed the wrong form and filed it late.

Ah well! The consequences of this are probably a small fine, which is going to be annoying for everyone: He will be completely undeterred and unpunished, and he'll get to continue complaining that the SEC is harassing him.

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

**Bloomberg Law** ®

Twitter's Board Gave Up

When this all happened, I wrote: "Do you think he bothered to file an HSR notification before buying the stock?" The point here is:

1. With some exceptions, if you are going to buy more than $101 million worth of a company's stock, you have to file a notification with the Federal Trade Commission (under the Hart-Scott-Rodino Antitrust Improvements Act of 1976) and wait for FTC clearance before buying.
2. Elon Musk was not exactly careful about filling out all the forms before buying Twitter stock.

And sure enough!

> Elon Musk's $44 billion Twitter takeover is unlikely to raise antitrust concerns. But what is already being scrutinized is Musk's failure to comply with rules regarding disclosure of his initial 9% stake, according to people with knowledge of the situation.
>
> The Federal Trade Commission recently opened an inquiry into whether Musk failed to comply with an antitrust reporting requirement as he amassed his initial 9.1% stake in Twitter between the end of January and the beginning of April, The Information has learned. At the heart of the inquiry is whether Musk was initially buying as someone who wanted to influence Twitter management or whether he saw himself as more of a passive shareholder. Notably, Musk's initial filing with the Securities and Exchange Commission categorized his purchase as a passive stake—which immediately raised questions given his public comments about how Twitter is run.

Here again the consequences are probably a small fine, if that; the FTC seems slightly embarrassed that these antitrust rules apply to activist investments in public stocks, and it has proposed to change that. Still it is nice to know that Musk was filling out *all* the forms wrong, not just the SEC's.

Elsewhere in Twitter miscellany:

• There is a view out there that Musk's deal is not really an agreement to buy Twitter, but is rather an *option* to buy Twitter: If he decides he doesn't want to do it, he can walk away and pay a $1 billion breakup fee. (See, e.g., Scott Galloway, William Cohan, Fortune, the Financial Times, etc.) This strikes me as a strange view in part because, you know, why would he walk away? The simplest interpretation of why he spent so much of his own money and many hours in negotiations with banks and Twitter is that he really wants to buy Twitter; if not, why go to all this trouble? Also, though, this view is wrong as a contractual matter. As I wrote last week: "If Musk changes his mind without a good reason, Twitter can force him to close the deal, as long as his debt financing is available. That is, if all of the conditions to closing are satisfied, and if Musk's banks are willing to fund … then Twitter can force Musk to put up the $21 billion of cash that he has promised and close the deal." That is tricky — if Musk wants to back out then the financing

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

might fall through on its own — and if it doesn't work the damages are limited to $1 billion. But he can't *just* say "never mind, here's $1 billion."

• "Twitter is rushing to reassure advertisers that it will remain a safe place for brands after Elon Musk takes over the company," which is kind of a weird thing for Twitter to say! How do they know what Elon Musk will do?

• Musk sold about $8.5 billion of Tesla Inc. stock last week to help pay for Twitter, which … seems … early? The deal won't close for months. I suppose it does make sense to de-risk things a bit; of the $46-ish billion that Musk will pay for Twitter, some $30-ish billion will come from his Tesla stock (either selling it for cash or putting it up as collateral for margin loans). Waiting until closing to turn that stock into cash increases the risk that he won't be able to.

# Everything is securities fraud

If a Brazilian iron mining company builds a dam, and the dam collapses, kills 270 people and causes "immeasurable environmental and social harm," is that securities fraud? Of course it is:

> The Securities and Exchange Commission [Thurssday] charged Vale S.A., a publicly traded Brazilian mining company and one of the world's largest iron ore producers, with making false and misleading claims about the safety of its dams prior to the January 2019 collapse of its Brumadinho dam. The collapse killed 270 people, caused immeasurable environmental and social harm, and led to a loss of more than $4 billion in Vale's market capitalization.

> According to the SEC's complaint, beginning in 2016, Vale manipulated multiple dam safety audits; obtained numerous fraudulent stability certificates; and regularly misled local governments, communities, and investors about the safety of the Brumadinho dam through its environmental, social, and governance (ESG) disclosures. The SEC's complaint also alleges that, for years, Vale knew that the Brumadinho dam, which was built to contain potentially toxic byproducts from mining operations, did not meet internationally-recognized standards for dam safety. However, Vale's public Sustainability Reports and other public filings fraudulently assured investors that the company adhered to the "strictest international practices" in evaluating dam safety and that 100 percent of its dams were certified to be in stable condition.

This is all pretty normal stuff. As I often say around here, every bad thing that a public company does, or that happens to a public company, can be recharacterized as securities fraud: (1) you said your dams were safe, (2) I bought the stock, (3) a dam collapsed, (4) the stock went down.

But there are two somewhat unusual points here. One is that Vale is a Brazilian company and the

dam was in Brazil, so it's a bit odd for the U.S. SEC to regulate it. But Vale has American depository receipts that trade on the New York Stock Exchange, and also sold bonds in the U.S., and that's more than good enough for the SEC. When a Brazilian company's dam in Brazil collapses and kills 270 Brazilians, the SEC will step in to protect American shareholders.

The other point is that, as the press release says, "the SEC announced in March 2021 the formation of a Climate and ESG Task Force in the Division of Enforcement with a mandate to identify material gaps or misstatements in issuers' ESG disclosures, like the false and misleading claims made by Vale." Presumably most companies' incorrect environmental, social and governance disclosures will not lead to 270 deaths and wipe out $4 billion of market capitalization. But the SEC is, as it were, staking a claim on them; it is telling companies "we will read your ESG disclosures, and if they're wrong then that's securities fraud just like everything else and we will come after you."

# Elsewhere in mining

The way a gold mining company works is that it digs gold out of the ground and then sells it for money. Then it uses the money to, like, buy shovels and pay workers and pay dividends to shareholders. It would be a bit weird for a gold mining company to dig up the gold and then *keep all of it forever*. The gold mining business, as a business, consists of both digging and selling.

In general if you buy stock in a gold miner you are often betting on the price of gold: The mining company will probably make more money if the price of gold goes up. Sometimes miners hedge their gold production, though, selling gold futures (or buying put options, selling calls, etc.) to reduce the impact of future gold prices on their earnings. Some shareholders will like this, while others will prefer miners that are more levered to the price of gold.

Meanwhile I guess if you buy shares in a Bitcoin mining company you *really* want to bet on the price of Bitcoin. And while a Bitcoin miner's earnings are related to the price of Bitcoin, the relationship is not as direct as it is with a gold miner: Bitcoin miners do not actually sit on top of reserves of Bitcoins that belong to them; they compete with other miners to mine a global pool of Bitcoins. So apparently it is normal for Bitcoin mining companies to dig up their Bitcoins and *not* sell them? Just write some covered calls instead?

> Publicly traded miners very much embrace the HODL, or "hold on for dear life," mantra, hoarding tokens to make their stock more appealing to investors seeking exposure to Bitcoin's gains. But these firms have major expenses; grinding through cryptographic puzzles to spawn new coins takes pricey computer hardware and giant power bills.
>
> Instead of selling Bitcoin to raise money, firms like Marathon Digital Holdings Inc. are selling Bitcoin call options to wring money out of their holdings, turning to a yield-

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

generating strategy deployed throughout conventional finance.

"Bitcoin miners are some of the most voracious yield seekers in the market today," said Joshua Lim, head of derivatives at New York-based brokerage Genesis Global Trading, which offers options overwriting strategies to the industry. …

Public miners have been on the lookout for yield-generating strategies to fund their rapid expansion without issuing new shares or debt.

I … I mean … gold miners and oil companies solve this problem by digging up the gold or oil and then selling it, but the crypto financial industry is more innovative.

# Not mining

At the Wall Street Journal, Richard Rubin writes about conservation easements:

Oglethorpe County, atop a pile of granite, has long been home to rock quarries. Elberton, Ga., the self-proclaimed Granite Capital of the World, turns the region's smooth, gray granite into cemetery headstones and statues.

So promoters canvass Oglethorpe County for property that could become a quarry—and then recruit high-income investors who claim big tax deductions for promising not to build a quarry. ...

By extrapolating from claimed per-acre values in two public court cases from the county, there could be more than $500 million in federal tax deductions generated from a place where all individuals' adjusted gross income in 2019 was $314 million and charitable-donation deductions totaled $4.7 million.

There is sort of a nice economic trick here, which is that if you dig up all of the granite in Georgia and sell it for headstones, the price of granite will probably fall, while if you dig up *none* of it the price of granite will probably rise. The latter doesn't help you much, if you are in the business of digging up granite: If the price goes up but you have not dug up any granite, you can't make money selling it. But if you are in the business of *claiming tax deductions for not digging up granite*, then the higher the price of granite is, the more money you can make by not digging it up.

# Things happen

Buffett Lures Fans to Omaha With Stock Buys, Inflation Talk. Bored Ape Metaverse Frenzy Raises Millions, Crashes Ethereum. Russia Makes Bond Payment In Dollars To Avoid Default. Russia could

still default this week. Disney's Clash With Florida Has CEOs on Alert. Wall Street Reluctantly Embraces Crypto. "Billionaire Mike Cannon-Brookes's personal office bought 11% of AGL Energy Ltd. and will oppose the utility's plan to demerge its retail and power generation assets under a proposal that would keep coal-fired plants running for decades." (Earlier.) Goldman Traders' Streak of $100 Million Days Hits 11-Year High. Ken Griffin's Citadel Hedge Fund Gained 7.5% in April Even as Markets Tanked. Adler shares plunge 45% after KPMG refuses to sign off on results. China Analyst Hong Hao Has Social Media Accounts Frozen. Elon Musk's China problem.

*If you'd like to get Money Stuff in handy email form, right in your inbox, please subscribe at this link. Or you can subscribe to Money Stuff and other great Bloomberg newsletters here. Thanks!*

To contact the author of this story:
Matt Levine at mlevine51@bloomberg.net

To contact the editor responsible for this story:
Brooke Sample at bsample1@bloomberg.net

1. Agrawal's statement on this call is maybe the bluntest version of the story, but it's everywhere.Bloomberg's Michelle Davis and Liana Baker reportedlast week about the boardroom deliberations when the deal was signed: "The question was whether the stock could recover without taking the deal. … Twitter's board concluded from the presentation that, based on where peers were trading, its shares wouldn't reach Musk's bid price anytime soon and they should take the offer." This weekend the New York Times reported on the board's decision-making, and, again, the price seems to have beenthe main consideration: "At Twitter, [Chairman Bret]Taylor weighed employee uncertainty and the societal implications of a deal versus the board's fiduciary duty, people with knowledge of the situation said. That meant making a decision based on whether Twitter could reasonably achieve a value better than what Mr. Musk had put forward." And Taylor told employees: "What I'll tell you is that based on the analysis and the perception of risk, certainty and value, the board unanimously decided the offer from Elon represented the best value for our shareholders."Outside commentators also embraced this view. For instance,on April 14, when Musk first announced his offer, William Cohan wrotethat "the most important question" for the board was"whether the $54.20 price is 'fair,' from a financial point of view," for shareholders, and that "If the answer is yes—and I believe it is, or soon will be—then the board will have little choice but to accept Musk's offer."

2. A good summary is this 2015 paper by former Delaware Supreme Court Chief Justice Leo Strine, who takes a strong view that in fact the sole fiduciary duty of a company's board of directors is to its shareholders, but who goes through the arguments on both sides. On the not-just-shareholders side, I like this 2019 memo from Marty Lipton et al.: "To be clear, Delaware

law does not enshrine a principle of shareholder primacy or preclude a board of directors from considering the interests of other stakeholders. Nor does the law of any other state. Although much attention has been given to theRevlondoctrine, which suggests that the board must attempt to achieve the highest value reasonably available to shareholders, that doctrine is narrowly limited to situations where the board has determined to sell control of the company and either all or a preponderant percentage of the consideration being paid is cash or the transaction will result in a controlling shareholder. Indeed, theRevlondoctrine has played an outsized role in fiduciary duty jurisprudence not because it articulates the ultimate nature and objective of the board's fiduciary duty, but rather because most fiduciary duty litigation arises in the context of mergers or other extraordinary transactions where heightened standards of judicial review are applicable. In addition,Revlon's emphasis on maximizing short-term shareholder value has served as a convenient touchstone for advocates of shareholder primacy and has accordingly been used as a talking point to shape assumptions about fiduciary duties even outside the sale-of-control context, a result that was not intended. Around the same time thatRevlonwas decided, the Delaware Supreme Court also decided theUnocalandHouseholdcases, which affirmed the board's ability to consider all stakeholders in using a poison pill to defend against a takeover—clearly confiningRevlonto sale-of-control situations. The fiduciary duty of the board is to promote the value of the corporation. In fulfilling that duty, directors must exercise their business judgment in considering and reconciling the interests of various stakeholders—including shareholders, employees, customers, suppliers, the environment and communities—and the attendant risks and opportunities for the corporation."

3. Unocal Corp. v. Mesa Petroleum Co., from 1985, which established the modern standard for evaluating takeover defenses: "If a defensive measure is to come within the ambit of the business judgment rule, it must be reasonable in relation to the threat posed. This entails an analysis by the directors of the nature of the takeover bid and its effect on the corporate enterprise. Examples of such concerns may include: inadequacy of the price offered, nature and timing of the offer, questions of illegality, the impact on 'constituencies' other than shareholders (i.e., creditors, customers, employees, and perhaps even the community generally), the risk of nonconsummation, and the quality of securities being offered in the exchange."

4. Paramount Communications Inc. v. Time Inc., from 1989, allowing Time's board to decline a higher-priced cash takeover offer to pursue a merger that better preserved its editorial independence: "Delaware law imposes on a board of directors the duty to manage the business and affairs of the corporation. … This broad mandate includes a conferred authority to set a corporate course of action, including time frame, designed to enhance corporate profitability. …Absent a limited set of circumstances as defined under Revlon, a board of directors, while always required to act in an informed manner, is not under any per se duty to maximize shareholder value in the short term, even in the context of a takeover. … The record attests to

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

the zealousness of Time's executives, fully supported by their directors, in seeing to the preservation of Time's 'culture,' i.e., its perceived editorial integrity in journalism. We find ample evidence in the record to support the Chancellor's conclusion that the Time board's decision to expand the business of the company through its March 3 merger with Warner was entitled to the protection of the business judgment rule."

5. EBay Domestic Holdings Inc. v. Newmark, from 2010: "Promoting, protecting, or pursuing non-stockholder considerations must lead at some point to value for stockholders. When director decisions are reviewed under the business judgment rule, this Court will not question rational judgments about how promoting non-stockholder interests—be it through making a charitable contribution, paying employees higher salaries and benefits, or more general norms like promoting a particular corporate culture—ultimately promote stockholder value. Under the Unocal standard, however, the directors must act within the range of reasonableness. … Having chosen a for-profit corporate form, the craigslist directors are bound by the fiduciary duties and standards that accompany that form. Those standards include acting to promote the value of the corporation for the benefit of its stockholders. The 'Inc.' after the company name has to mean at least that. Thus, I cannot accept as valid for the purposes of implementing the Rights Plan a corporate policy that specifically, clearly, and admittedly seeks not to maximize the economic value of a for-profit Delaware corporation for the benefit of its stockholders—no matter whether those stockholders are individuals of modest means or a corporate titan of online commerce."

6. One half-baked theory of mine is that the fact that Twitter's directors own so little stock makes them especially focused on short-term shareholder value. If you are a director of a public company and you own 5% of its stock, then (1) you believe in the company (that's why you bought all that stock) and (2) you can head off criticism by saying that you have skin in the game. If you own only a tiny slice of the stock, then (1) you probably don't care all that much about the company's social mission and (2) you are very self-conscious about having no skin in the game, so you end up deferring to other shareholders.

7. Famously Mark Zuckerberg, who wrote, when Facebook Inc. went public in 2012, that "Facebook was not originally founded to be a company. We've always cared primarily about our social mission, the services we're building and the people who use them. This is a different approach for a public company to take. …Simply put: we don't build services to make money; we make money to build better services." Since then Facebook has had let's say a mixed social impact and made a gazillion dollars, presumably because Zuckerberg cares about his social mission and not making money.

8. Also executives who own a lot of stock, to be fair, though that cuts both ways; see footnote 6.

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

Bloomberg Law®

EXHIBIT 8

# Explainer-Can Elon Musk renegotiate a lower price for his Twitter deal?

*Greg Roumeliotis*

By Greg Roumeliotis

(Reuters) - Twitter Inc shares have plunged to their lowest level since the social media company agreed to sell itself to Elon Musk for $44 billion on April 25, raising questions over whether the world's richest person will try to renegotiate the deal.

On Tuesday, the implied probability of the deal closing at the agreed price fell below 50% for the first time, when Twitter shares dropped below $46.75. That is halfway between the deal price and the price of the shares before Musk revealed he had amassed a stake in the social media company on April 4.

The shares closed at $47.26, giving the company a market value of $36 billion.

News that Musk would lift a ban on former President Donald Trump's Twitter account, while significant politically, did not move the stock.

Twitter shares have plunged along with the wider collapse in technology stocks, as investors fretted over inflation and a possible economic slowdown. Some investors, such as short seller Hindenburg Research, have speculated about whether Musk would try to negotiate a lower deal price before closing.

Musk has not indicated he is planning to re-open negotiations and his representatives have declined to comment on the issue.

Here are answers to some key questions.

WHY WOULD MUSK WANT TO RENEGOTIATE THE DEAL?

Musk has an estimated net worth of almost $240 billion according to Forbes, yet most of his wealth is tied up in shares of Tesla Inc, the electric car maker he leads.

Musk has already moved to raise some cash to fund the acquisition of Twitter. He sold $8.5 billion worth of Tesla shares and took out a $12.5 billion margin loan secured against his Tesla stock. Last week he reduced that margin loan to $6.25 billion after bringing in co-investors. Musk said in a regulatory filing he may seek more funding for the deal.

While Musk has said he does not care about the economics of buying Twitter, some investors think the 27% drop in Tesla shares since he revealed his stake is driven partly by concerns he may have to sell more shares. Therefore Tesla's stock would be under less pressure if Musk can negotiate a lower acquisition price. Some co-investors may egg him on if they become concerned about overpaying.

HOW COULD MUSK NEGOTIATE A LOWER PRICE?

Musk can threaten to walk away from the deal unless Twitter's board agrees to reopen negotiations. He is contractually obligated to pay a $1 billion break-up fee, but Twitter would have to sue to get

more than that in damages or try to force Musk to complete the deal.

There is plenty of precedent for a renegotiation. Several companies repriced agreed acquisitions when the COVID-19 pandemic broke out in 2020 and delivered a global economic shock.

In one instance, French retailer LVMH threatened to walk away from a deal with Tiffany & Co. The U.S. jewelry retailer agreed to lower the acquisition price by $425 million to $15.8 billion.

Simon Property Group Inc, the biggest U.S. mall operator, managed to cut its purchase price of a controlling stake in rival Taubman Centers Inc by 18% to $2.65 billion.

ARE THERE RISKS TO TRYING TO RENEGOTIATE?

There is no certainty that the strategy would work, and it could end up costing Musk more money.

First, Musk would have to convince Twitter he would really walk away. Then there are legal hurdles, including a "specific performance" clause that the social media company can cite for a judge to force Musk to complete the deal.

Acquirers who lose such a case are almost never forced to complete an acquisition, but target companies can seek monetary relief for the price of the abandoned deal.

Companies that have fought acquirers in court include medical technology firm Channel Medsystems Inc, which sued Boston Scientific Corp for trying to walk away from their $275 million deal. In 2019, a judge ruled the deal should be completed and Boston Scientific paid Channel Medsystems an undisclosed settlement.

Acquirers seeking an out sometimes turn to "material adverse effect" clauses in their merger agreement, arguing the target company has been significantly damaged. But the language in the Twitter deal agreement, as in many recent mergers, does not allow Musk to walk away because of a deteriorating business environment, such as a drop in demand for advertising or because Twitter's shares have plunged.

Musk also waived his right to carry out due diligence when he negotiated the Twitter deal, trying to get the company to accept his "best and final" offer. This makes it harder for him to argue in court that Twitter misled him.

(Reporting by Greg Roumeliotis in New York; Editing by David Gregorio)

# EXHIBIT 9

Bloomberg Law News 2024-03-25T18:40:18465024333-04:00

## Matt Levine's Money Stuff: Elon Musk Trolls Twitter

By Matt Levine 2022-05-13T12:40:21832-04:00

**Programming note:** *Money Stuff was supposed to be off today, but then my boss, Elon Musk, called me in to work anyway.*

## Oh Elon

No, absolutely not:

Matt Levine's Money Stuff: Elon Musk Trolls Twitter



**Elon Musk** ✔
@elonmusk

Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users

reuters.com
Twitter estimates spam, fake accounts comprise less than 5% of users -filing
Twitter Incestimated in a filing on Monday that false or spam accounts represented fewer than 5% of its monetizable daily active users during the first ...

5:44 AM · May 13, 2022 · Twitter for iPhone

None of this! Come on.

- 1. "Temporarily on hold" is not a thing. Elon Musk has signed a binding contract requiring him to

**Bloomberg Law**®

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

**// PAGE 2**

buy Twitter. Legions of bankers and lawyers and Twitter employees and special-purpose-vehicle promoters are working to fulfill his legal obligation to get the deal closed. "The parties hereto will use their respective reasonable best efforts to consummate and make effective the transactions contemplated by this Agreement," says the merger agreement. (Section 6.3(a).) He can't just put that "on hold."

• 2. That contract does not allow Musk to walk away if it turns out that "spam/fake accounts" represent more than 5% of Twitter users. We discussed this last month, when Twitter admitted in a securities filing that it had (slightly) overestimated its daily active users for years. The merger agreement contains a provision that allows Musk to walk away if Twitter's securities filings are wrong — and this 5% number is in its securities filings — but only if the inaccuracy would have a "Material Adverse Effect" on the company. (See Sections 4.6(a) and 7.2(b).) That is an incredibly high standard: Delaware courts have almost never found an MAE. An MAE has to be something that would "substantially threaten the overall earnings potential of the target in a durationally-significant manner," the courts have said; there is a rule of thumb that an MAE requires a 40% decrease in long-term profitability. If it turned out that 6% or 20% or 50% of Twitter accounts are bots, that will be embarrassing and might even reduce Twitter's future advertising revenue, but will it be an MAE? No.

• 3. "Pending details supporting calculation" is not how this works. This disclosure — that "the average of false or spam accounts ... represented fewer than 5% of" Twitter's monetizable daily active users — has been in Twitter's securities filings for many years, always with a caveat that "in making this determination, we applied significant judgment, so our estimation of false or spam accounts may not accurately represent the actual number of such accounts, and the actual number of false or spam accounts could be higher than we have estimated." Musk had the opportunity to read these filings before offering to buy Twitter, and he had the opportunity to do due diligence on these numbers before signing the deal. ( He declined.) He can't now go to Twitter and say "actually now you need to prove that your user numbers are right." If he wants to walk, he has to prove that they're wrong, and also that they're wrong in a way that has a material adverse effect on the business. Which he obviously can't do.

What is going on here? My initial reaction was that Musk was *joking*, that this was just a way to troll people online. It is, after all, Friday the 13th. "Still committed to acquisition," he tweeted two hours later. Obviously this would be a *bad* joke, insofar as it "sent Twitter stock tumbling as much as 25% in premarket trading." You are not supposed to say things that aren't true and that will affect the stock of a public company that you are trying to buy. That is what is usually called "securities fraud," or what I sometimes like to call "lite securities fraud." Musk has a long history of lite securities fraud: He used to make jokes about Tesla Inc. introducing new products or going bankrupt, and he notably settled a fraud lawsuit with the U.S. Securities and Exchange Commission because he tweeted that he had

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

secured funding to take Tesla private but had not. If he just woke up feeling frisky and tweeted a joke about Twitter's bot accounts, a joke that wiped billions of dollars off Twitter's market capitalization, *that would be totally unsurprising*. Bad! Not really allowed! But very much in character.

Another possibility is that Musk really is laying the groundwork to walk away from his deal with Twitter. There is a popular view that Musk has the option to abandon the deal if he pays a $1 billion breakup fee. As we have discussed around here, that just isn't true: The contract gives Twitter the right to force him to close, and put up the $27.5 billion of equity that he has committed to the deal, as long as his debt financing is available. (Section 9.9(b).) The contract also gives Twitter the right to go to court to force him to try to get that debt financing. (Sections 6.10(a) and 9.9(a).) There is, so far, no reason to think the debt financing *won't* be available — his banks are large and solvent and have signed reasonably unconditional commitment letters — and so no reason to think he can get out of the deal.

On the other hand, what if he does it anyway? What if he just says "no, I'd rather not close"? What is Twitter going to do? Sue him? It is easy for me, sitting here and looking at the contract, to say that Twitter would win that lawsuit and a court would order Musk to pay the money and close the deal. I do think that! But actually making that happen requires filing a lawsuit and going to court and asking a judge to make him pay billions of dollars to buy a company he doesn't want. It requires his banks to fund $13 billion of debt for a risky leveraged buyout whose whimsical buyer is no longer interested.

Contractually this is all pretty buttoned-up, and I think a Delaware court would have a ton of sympathy for Twitter and none at all for Musk, who is acting in the most transparent and smirking bad faith. But there is a lot that could still go wrong. Suing would take time, and would cause bad publicity, and would create uncertainty among employees and users and advertisers. Letting him walk, focusing on the business, and taking the $1 billion — or negotiating a slightly higher breakup fee to save face — might be a better, though terrible, outcome for Twitter.

As one merger arbitrageur put it to me, "If you're reading the contract, you've lost. Lots of people reading the contract this morning." Sadly I am one of them, and I do feel like I've lost.

I think it is relevant here that, in his efforts to buy Twitter so far, Elon Musk has violated all sorts of laws with no immediate repercussions. Both the Securities and Exchange Commission and the Federal Trade Commission are "investigating" the obvious facts that Musk did not make required securities disclosures and antitrust filings as he was buying Twitter stock. The likely outcomes of these "investigations" will be that the SEC and FTC will require Musk to pay small fines, likely

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

considerably less than the money he saved by ignoring the rules. And Musk's earlier scorched-earth battles with the SEC and other regulators suggest that the agencies will have a hard time getting even those fines, that he will fight fiercely in court even when he transparently broke simple rules. I wrote last month:

There are rules, and he did not follow them, not as part of an evil scheme but because he does not care. You could imagine the SEC getting mad about that and trying to impose consequences on him for violating the rules, but … what consequences? (The penalties for this stuff are small, and it's not like they will prevent him from buying Twitter.) What's the point? It will just be an exhausting slog of litigation and mean tweets and he will emerge unchastened and richer than ever, and then he will try to stop the SEC lawyers from ever getting jobs in the private sector. Why should they bother? What is the point of trying to enforce the law against Elon Musk?

Elon Musk has made it very clear that the rule of law simply does not apply to him, *and this has worked well for him*. If he wants to ignore the merger agreement that he signed, he will. If you take him to court, he will put up a brutal fight and make things as unpleasant as possible for you. This puts his counterparties, like Twitter, in a tough position. They have a contract. But so what?

The third, most obvious possibility is that Musk is going to make use of that uncertainty to renegotiate the price. "I'd like to pay $42 instead of $54.20," he can say to Twitter's board, "and if you say no I will walk away and you can sue me and, while you will be right, I will make your life horrible and might even win." Given the choice of a long, miserable and uncertain lawsuit to force Musk to close at $54.20, or a semi-amiable restriking of the deal at $42 (a number I just made up, to be clear), Twitter's board might take the $42.

This would be a hugely annoying outcome? For one thing, it would be a real failure by Twitter's board. I have been critical of the board's performance in this deal: Its quick decision to sell at the first price Musk offered, with no protections for Twitter's culture or product, seemed to me like the actions of a board that doesn't really understand or care about the company and a management with no good ideas. On the other hand, since they struck the deal, tech stocks have collapsed, which makes the board's decision to sell at $54.20 look smart. By luck or design, they got a great price for their shareholders at exactly the right time.

If they give it up that will be really bad! Particularly because, as I just said, there is no *good* reason for them to give it up. Musk signed a contract that requires him to buy Twitter for $54.20 per share, and there's no reason to think a court would let him out of it. It's just that it would be fearsomely annoying

to go to court against him. It's hard to imagine Twitter's board playing hardball against Musk, even if it really should.

But mostly this would be an annoying outcome because it would reward Musk for not caring about contracts, for not caring about the rules, and for *curating a reputation* as a guy who doesn't care about rules. My thesis here is in essence: Elon Musk is obligated to close his deal with Twitter at $54.20, but he's obligated to follow lots of other rules too, and he doesn't, and gets away with it, which means that if he ignores this obligation he'll probably get away with it too. That is a terrible thesis! And yet.

Anyway as of noon today there was no securities filing from Twitter or Musk about the deal supposedly being "on hold," no press release or tweet from Twitter investor relations or Chief Executive Officer Parag Agrawal, and no further clarification from Musk. The stock was trading a bit above $41, down almost 9% from yesterday's close, almost 25% below the deal price. I feel for the lawyer who is working right now to file Musk's tweet with the SEC: The filing will have to explain the tweet, and what is there to say?

We have discussed this before, but ordinarily in merger agreements there is a clause saying that the buyer and seller "shall consult with each other before issuing any press release or otherwise making any public statements with respect to" the merger. Clear and consistent communication is really important; you don't want anyone accidentally making statements that spook the market. Twitter's agreement with Musk has that clause (Section 6.8), but it has an exception: "Notwithstanding the foregoing, [Musk] shall be permitted to issue Tweets about the Merger or the transactions contemplated hereby so long as such Tweets do not disparage the Company or any of its Representatives."

You can see why Musk wanted that exception: His highest priority, the thing that he has fought over with the SEC, the *reason he is buying Twitter*, is his desire to tweet unsupervised. "Everyone can tweet whatever they want" has shoved aside "colonize Mars" or "transition the world to sustainable energy" as the thing Musk is interested in these days, so of course his merger agreement lets him tweet whatever he wants without running it by anyone. And you can see why Twitter gave him the exception: They had to, plus I guess more tweeting is good for Twitter.

But there's a reason merger agreements usually say that the buyer and seller will consult with each other before making significant announcements about the merger! What a stupid mess this is.

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

# Syndication

In ancient news from yesterday:

Angel investor Jason Calacanis, an early backer of Uber and Robinhood, is seeking to raise tens of millions of dollars for a stake in Twitter as part of Elon Musk's $44 billion agreement to buy the social media company.

"We are now collecting interest to invest in Twitter with Elon Musk's plan to take it private," Calacanis wrote in a message soliciting funds from his network of high net worth individuals. CNBC viewed Calacanis's email to prospective investors.

The minimum investment required to participate is $250,000, Calacanis wrote, adding that the fees he collects for the deal will total about $18,000. As manager of the fund, he's also asking for 10% of the carry, or the gains that come from the investment.

I wonder how that pitch is going today. Probably great, right? If you liked this deal at $54.20, you like it even more at "Musk being annoying to get leverage to reprice the deal." He really is going to achieve his dream of taking a company private while still having lots of relatively small-dollar enthusiastic retail shareholders, of just shuffling the shareholder base to make it Muskier. Meanwhile getting 10% of the profits for being friends with Musk is nice work if you can get it.

# Robinhood

Before, like, a month ago, it was pretty unusual for a rich guy to look at a public company, think "hey I like that company," buy a big stake in his personal account, and then say "you know what I like it so much I'm going to take it over." Companies bought companies, investment firms bought companies, rich founder-CEOs took their own companies private, but for a rich founder-CEO of one big company to go buy *another* big company as a hobby would have been strange. But then Musk did it and I guess it looked fun and now:

Sam Bankman-Fried, the 30-year-old chief executive officer of crypto trading platform FTX, revealed late Thursday that he'd bought a 7.6% stake in [Robinhood Markets Inc.], which has lost 77% since

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

its July public debut.

The shares surged 22% to $10.42 at 9:43 a.m. Friday in New York. They touched $11.70 in after-market trading Thursday.

Bankman-Fried has said he intends to hold the stock as an investment and not to influence the company.

Yeah I've heard that before. Obviously Robinhood — a retail brokerage and, let's face it, crypto trading platform — is a lot closer to Bankman-Fried's day job than Twitter is to Musk's. (Or is it? Musk does spend a lot of time tweeting.) If he did buy Robinhood that would have a certain logic, though it would be weird for him to do it in his personal account.

## Meanwhile, Luna

We have talked a lot this week about the Terra crypto system, including its cryptocurrency Luna and its algorithmic stablecoin TerraUSD, or UST. Basically an algorithmic stablecoin (UST) is a crypto token that is supposed to have a constant price of $1, and that maintains that peg by being exchangeable for a floating quantity of some other token (Luna) with a market value of $1. If Luna trades at $10, each UST can be exchanged for 0.1 Luna. If Luna trades at $0.10, each UST can be exchanged for 10 Luna. This works great until everyone wants to get out, at which point you have to keep printing more Luna and they trade lower and lower in what is generally known as a "death spiral." This week Terra death spiraled. Here's how that's going:

The stablecoin was trading below 20 cents on Friday morning in London, according to Bloomberg data. The Luna token has sunk to virtually zero, compared with its all-time high of $119.51. Wider crypto markets recovered, with Bitcoin rising as much as 8.4%. ...

The total amount of Luna tokens in circulation is up from 1.46 billion yesterday to more than 6.5 trillion on Friday morning, according to data from CoinMarketCap.

At 11 a.m., Luna was trading at $0.00008254, according to CoinMarketCap, give or take a zero or two, down about 99.99993% from its all-time high, give or take a nine or two. Just an absolutely pristine death spiral.

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

**Bloomberg Law** ®

I want to tell this story in a different way. Ignore the stablecoin for a bit. Luna is a cryptocurrency, the cryptocurrency of the Terra blockchain and ecosystem. That blockchain is, let's assume, useful for something. I don't actually know, but some people seem to think that, or at least say it. "The Terra ecosystem is one of the most vibrant in the crypto industry, with hundreds of passionate teams building category defining applications within," Terra impresario Do Kwon tweeted on Wednesday.

Let's just assume that that's true. People are building stuff on Terra, and Luna is the cryptocurrency of Terra. This makes Luna like Ether for the Ethereum blockchain, or various other cryptocurrencies for various other blockchains. If you think the ecosystem is growing and valuable and can be used to build cool stuff, the price of the currency should go up; if you think it is moribund and pointless, the price should go down.

The prices of lots of cryptocurrencies has gone down this week, which suggests doubts about the viability of the crypto world generally. But they haven't gone down *that* much. Which makes sense. Some people are crypto believers, others are crypto skeptics, and events in the world might change their minds, but gradually. It would be very strange for everyone to wake up on Monday thinking "the future of economics is crypto, HODL" and then to wake up on Friday thinking "this is all fake, sell everything." A trillion-dollar ecosystem based essentially on collective social belief shouldn't lose that value overnight.

Luna really did lose almost all of its value almost overnight. A week ago there were about 343 million Luna outstanding with a total value of $26.5 billion, today there are 6.5 trillion Luna outstanding with a total value of, let's face it, nothing. (CoinMarketCap says about $540 million, but that does not reflect the price at which you could sell a trillion Luna.) A $26 billion ecosystem completely evaporated.

Did that happen because people lost faith in that ecosystem? I mean, sure, yeah; the *main* job of that ecosystem was surely to preserve the value of a $1 stablecoin, and it manifestly failed. But, again, that's a weird thing to happen overnight. The people passionately building apps in the Terra ecosystem last week didn't lose all their passion this week.

But we can't ignore the stablecoin. Some people were passionate believers in Terra, building apps on its blockchain, buying Luna as a bet on its long-term potential. Other people, though, bought *UST*, not because they were betting on Terra but because they wanted a safe place in the crypto world to put their dollars. (And earn 19.5% interest, sure.) UST was not an equity bet on the value of the Terra ecosystem and the passion of its developers; UST was a *safe asset*.

**Bloomberg Law** ®    © 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

*Safe assets are much riskier than risky ones.* This is I think the deep lesson of the 2008 financial crisis, and crypto loves re-learning the lessons of traditional finance. *Systemic* risks live in safe assets. Equity-like assets — tech stocks, Luna, Bitcoin — are risky, and everyone knows they're risky, and everyone accepts the risk. If your stocks or Bitcoin go down by 20% you are sad, but you are not that surprised. And so most people arrange their lives in such a way that, if their stocks or Bitcoin go down by 20%, they are not *ruined.*

On the other hand safe assets — AAA mortgage securities, bank deposits, stablecoins — are not supposed to be risky, and people rely on them being worth what they say they're worth, and when people lose even a little bit of confidence in them they crack completely. Bitcoin is valuable at $50,000 and somewhat less valuable at $40,000. A stablecoin is valuable at $1.00 and worthless at $0.98. If it hits $0.98 it might as well go to zero. And now it might!

I have in the past told the story of TerraUSD and Luna by saying: The weakness in TerraUSD is Luna. One UST can be exchanged for $1 of Luna, but that only works if people continue to have confidence in Luna; if Luna goes to zero then TerraUSD will follow. But you could also tell the story by saying: The weakness in Luna is TerraUSD. Luna, as the cryptocurrency of a blockchain ecosystem, would rise or fall with the value of that ecosystem. But Luna, as the thing supporting a stablecoin, could go to zero in a week if that stablecoin needed support. Terra was so unstable because it was trying to be stable.

# Elsewhere in trolling

Citadel Securities did an employee event at an AMC theater, good for them.

*If you'd like to get Money Stuff in handy email form, right in your inbox, please subscribe at this link. Or you can subscribe to Money Stuff and other great Bloomberg newsletters here. Thanks!*

To contact the author of this story:
Matt Levine at mlevine51@bloomberg.net

To contact the editor responsible for this story:
Brooke Sample at bsample1@bloomberg.net

• 1. Originally $21 billion, but that grew as he syndicated some of the equity and reduced his

**Bloomberg Law** ®

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

margin loan;he has now amended his equity commitment to make it $27.5 billion. He has raised at least $7.1 billion of equity commitments from outside investors, and is working on more, but if they flake he is on the hook for the full amount.

•   2. You can read the banks' commitment letters here; the conditions to funding are in Exhibit E. They include things like there not being a material adverse effect at Twitter, but in general the banks should not be able to get out of their funding obligation unless Musk is able to get out of his merger obligation. His margin loan commitment is even less conditional and, as it's now only $6.25 billion, unlikely to be unavailable.

•   3. The important cases include IBP Inc. v. Tyson Foods Inc., which granted specific performance to make an acquirer close a merger, and Hexion Specialty Chemicals Inc. v. Huntsman Corp., which among other things ordered a private equity buyer to get its financing to close a deal it didn't want to close. (Ultimately that case settled for damages well above the reverse termination fee.)

© 2022 Bloomberg L.P. All rights reserved. Used with permission.

EXHIBIT 10



**ROSENBLATT**
S E C U R I T I E S

Company Update
June 21, 2022

# Twitter, Inc. (TWTR)  **Neutral**

## TWTR: We Now Assume the Musk Deal Price is Cut to $33

## Summary

**We slash our Twitter price target to $33,** substantially below the agreed Twitter/Musk deal price of $54.20, in the belief that this deal is still likely to move forward, but that Musk will have leverage to substantially rework the deal price. This might be an ugly, tortured road that could create substantial share volatility in the interim. **We retain a Neutral rating.**

## Key Points

**\*Absent a deal, Twitter's price could be much lower.** If Twitter's share price were 85% below its 52-week high, like peer Snap, TWTR would be trading at $11. Our price target of $33 is near the median of this and the agreed $54.20 cash offer from Elon Musk. Our belief is that Musk/Twitter will recognize this and eventually agree to a revised deal that splits the difference.

**\*Tough backdrop.** Social media comparables have been hit by evidence of a weakening ad market that would probably become more pronounced if the economy trends toward recession. The disruption of Musk talking about substantial changes to Twitter's business focus, we believe, could be reducing employee effectiveness. Loss of key talent is probably lessened by economic pressures that have slowed/reversed hiring by rivals. But Twitter relative to these peers is more exposed to brand advertising, which appears to be a weaker part of the ad market at the moment than direct response. None of this is an encouraging setup for upcoming earnings reports by Twitter.

**\*Musk's leverage.** The $1 billion breakup fee is immaterial for Musk. Twitter could sue to compel Musk to complete the deal. But such suits are rare and undesirable for obvious reasons. In this instance, Musk has signaled a willingness to go scorched earth with tortured assertions of more bot volume than the 5% Twitter reports. To use this as a legal strategy, Musk would have to allege fraudulent misstatement. That might be completely untrue, but Musk could use his deep access to Twitter data to craft arguments that might or might not be accurate. That, in turn, could damage his ability to finance a deal, which could provide another way for Musk to get out of the deal. Knowing that fundamentals are challenged, and that seemingly no other bidder is waiting in the wings, and that Twitter's stock would be much lower without a deal, I believe Twitter's board could be compelled to accept a meaningful compromise for a much lower price

**\*But Musk seems to want to move ahead.** His agreement to engage in a town hall meeting with Twitter staff suggests engagement and a desire to run the business. Like any good businessman, however, it is reasonable we believe to assume that Musk will work hard to obtain the best price possible.

**\*Model update.** I update estimates, trending from the latest earnings report and guidance for 20% opex growth in 2022.

**PRICE: $37.78**
**TARGET: $33.00**

**Barton Crockett**
Senior Internet Media Analyst
212-607-3108
bcrockett@rblt.com

| Changes | Previous | Current |
|---|---|---|
| Price Target | $54.20 | $33.00 |
| Q2 22(E) Rev ($M) | 1.36B | 1.35B |
| FY 22(E) Rev ($M) | 6.02B | 5.95B |
| Q2 22(E) EPS | 0.14 | 0.16 |
| FY 22(E) EPS | 0.89 | 1.81 |

| | |
|---|---|
| Price | $37.78 |
| Rating | Neutral |
| Price Target | $33.00 |
| Percent Change to PT | (12.7)% |
| 52-Week Low | $31.30 |
| 52-Week High | $73.34 |
| 3M Stock Performance | 1.3% |
| 1Y Stock Performance | (37.8)% |
| 5Y Stock Performance | 126.6% |
| Average Daily Volume (M) | 1,100.9 |
| Short Interest | 36.5 |
| Days to Cover | 1.4 |
| Shares Outstanding (M) | 838.6 |
| Market Cap ($M) | $28,871 |
| Net Debt ($M) | $(1,018) |
| Enterprise Value ($M) | $29,590 |
| FY1 EBITDA | $1,623 |
| FY2 EBITDA | $2,302 |
| FY1 EV/EBITDA | 18.2x |
| FY2 EV/EBITDA | 12.9x |
| FY1 FCF/Share | $0.71 |
| FY2 FCF/Share | $1.42 |
| FY1 Price/FCF | 53.1x |
| FY2 Price/FCF | 26.7x |
| Dividend Yield | 0.0% |



Created by BlueMatrix

| YEAR | Revenue | | | | | | EPS | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mar | Jun | Sep | Dec | Ann | EV/Rev | Mar | Jun | Sep | Dec | Ann | P/E |
| 2020A | 807.6 | 683.4 | 936.2 | 1.29B | 3.72B | 7.5x | 0.11 | (1.58) | 0.19 | 0.38 | (0.87) | NM |
| 2021A | 1.04B | 1.19B | 1.28B | 1.57B | 5.08B | 5.5x | 0.16 | 0.20 | (0.54) | 0.33 | 0.20 | 185.4x |
| 2022E | 1.20BA | 1.35B | 1.46B | 1.93B | 5.95B | 4.7x | 0.90A | 0.16 | 0.19 | 0.55 | 1.81 | 20.9x |

Please see analyst certification and important disclosures on page 6 of this report.

## New Estimates Vs. Old

**Rating, Fair Value, and Estimate Changes**

**New Rating, Fair Value and Estimates**

| Rating | Fair Value | Price | % to FV | Date |
|---|---|---|---|---|
| NEUTRAL | $33.00 | $37.78 | -12.7% | 6/17/2022 |

| Period<br>Actual/Estimated | 2021<br>A | 2022/1F<br>A | 2022/2F<br>E | 2022/3F<br>E | 2022/4F<br>E | 2022<br>E | 2023<br>E | 2031<br>E |
|---|---|---|---|---|---|---|---|---|
| Revenues | $5,077 | $1,201 | $1,349 | $1,462 | $1,934 | $5,947 | $7,421 | $18,716 |
| Adj. EBITDA | $1,448 | $210 | $328 | $359 | $726 | $1,623 | $2,302 | $7,863 |
| Adj. EPS | $0.20 | $0.90 | $0.16 | $0.19 | $0.55 | $1.81 | $1.43 | $5.26 |
| FCF/Share | ($0.46) | ($0.04) | $0.17 | $1.31 | ($0.78) | $0.71 | $1.42 | $4.99 |
| mDAU | 215 | 229 | 235 | 244 | 253 | 253 | 310 | 646 |
| Ad ARPU | $5.56 | $4.83 | $5.34 | $5.59 | $7.24 | $5.93 | $6.18 | $7.66 |

**Old Rating, Fair Value and Estimates**

| Rating | Fair Value | Price | % to FV | Date |
|---|---|---|---|---|
| NEUTRAL | $54.20 | $51.70 | 4.8% | 4/26/2022 |

| Period<br>Actual/Estimated | 2021<br>A | 2022/1F<br>A | 2022/2F<br>E | 2022/3F<br>E | 2022/4F<br>E | 2022<br>E | 2023<br>E | 2031<br>E |
|---|---|---|---|---|---|---|---|---|
| Revenues | $5,077 | $1,201 | $1,362 | $1,464 | $1,946 | $5,973 | $7,511 | $19,212 |
| Adj. EBITDA | $1,448 | $1,180 | $404 | $433 | $831 | $2,848 | $2,634 | $8,809 |
| Adj. EPS | $0.20 | $0.90 | $0.24 | $0.27 | $0.67 | $2.08 | $1.79 | $6.17 |
| FCF/Share | ($0.46) | ($0.04) | $0.28 | $1.40 | ($0.64) | $1.05 | $1.84 | $5.76 |
| mDAU | 217 | 229 | 238 | 247 | 256 | 256 | 316 | 665 |
| Ad ARPU | $5.51 | $5.05 | $5.32 | $5.53 | $7.18 | $5.93 | $6.15 | $7.64 |

Source: Rosenblatt Securities estimates, company reports, FactSet

## Model

**Twitter, Inc.**
millions ($US) except per share & ARPU

**Income Statement**

| Fiscal Period Ending A/E | 2021/1F Mar-21 A | 2021/2F Jun-21 A | 2021/3F Sep-21 A | 2021/4F Dec-21 A | 2021 Dec-21 A | 2022/1F Mar-22 A | 2022/2F Jun-22 E | 2022/3F Sep-22 E | 2022/4F Dec-22 E | 2022 Dec-22 E | 2023 Dec-23 E | 2031 Dec-31 E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | $1,036 | $1,190 | $1,284 | $1,567 | $5,077 | $1,201 | $1,349 | $1,462 | $1,934 | $5,947 | $7,421 | $18,716 |
| Y/Y % chg | 28.3% | 74.2% | 37.1% | 21.6% | 36.6% | 15.9% | 13.3% | 13.9% | 23.4% | 17.1% | 24.8% | 6.8% |
| | | | | | | | | | | | | |
| Cost of revenue | ($381) | ($417) | ($484) | ($515) | ($1,798) | ($507) | ($540) | ($625) | ($732) | ($2,405) | ($2,963) | ($7,285) |
| R&D | ($251) | ($300) | ($324) | ($372) | ($1,247) | ($372) | ($374) | ($375) | ($377) | ($1,498) | ($1,794) | ($4,002) |
| S&M | ($235) | ($302) | ($301) | ($338) | ($1,176) | ($300) | ($301) | ($303) | ($304) | ($1,208) | ($1,417) | ($2,746) |
| G&A | ($118) | ($141) | ($151) | ($174) | ($584) | ($150) | ($151) | ($151) | ($152) | ($604) | ($708) | ($1,373) |
| Other | $0 | ($0) | ($766) | $0 | ($766) | $0 | $0 | $0 | $0 | $0 | ($0) | $0 |
| Oper. Inc. | $52 | $30 | ($743) | $167 | ($493) | ($128) | ($16) | $8 | $368 | $232 | $538 | $3,310 |
| Margin % | 5.0% | 2.5% | -57.8% | 10.7% | -9.7% | -10.6% | -1.2% | 0.5% | 19.0% | 3.9% | 7.2% | 17.7% |
| Interest expense | ($13) | ($14) | ($13) | ($11) | ($51) | ($15) | ($22) | ($22) | ($22) | ($81) | ($87) | ($87) |
| Interest income | $11 | $9 | $8 | $7 | $36 | $8 | $8 | $8 | $9 | $32 | $31 | $78 |
| Other | $0 | $56 | $21 | $21 | $97 | $964 | $0 | $0 | $0 | $964 | $0 | $0 |
| Pretax income | $50 | $81 | ($727) | $185 | ($411) | $829 | ($30) | ($6) | $355 | $1,147 | $482 | $3,302 |
| Tax provision | $18 | ($16) | $190 | ($3) | $190 | ($315) | $0 | $0 | $0 | ($315) | $0 | ($792) |
| Eff. rate | 36.0% | -19.3% | -26.2% | -1.6% | -46.1% | -38.1% | 0.0% | 0.0% | 0.0% | -27.5% | 0.0% | -24.0% |
| Other | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net income | $68 | $66 | ($537) | $182 | ($221) | $513 | ($30) | ($6) | $355 | $832 | $482 | $2,509 |
| Fdil. EPS, GAAP | $0.08 | $0.08 | ($0.67) | $0.21 | ($0.28) | $0.61 | ($0.04) | ($0.01) | $0.43 | $1.00 | $0.58 | $2.87 |
| Adj | $0.08 | $0.13 | $0.13 | $0.12 | $0.48 | $0.29 | $0.20 | $0.20 | $0.13 | $0.81 | $0.85 | $2.39 |
| Non GAAP EPS | $0.16 | $0.20 | ($0.54) | $0.33 | $0.20 | $0.90 | $0.16 | $0.19 | $0.55 | $1.81 | $1.43 | $5.26 |
| Y/Y % chg | 44.6% | 112.9% | -390.0% | -13.5% | 123.3% | 458.0% | -21.2% | 134.6% | 67.2% | 788.6% | -20.8% | 7.9% |
| Diluted shares | 872 | 869 | 798 | 865 | 798 | 839 | 828 | 827 | 827 | 830 | 830 | 875 |

Source: Rosenblatt Securities estimates, company reports

**Twitter, Inc.**
millions ($US) except per share & ARPU

**Cash Flow**

| Fiscal Period Ending A/E | 2021/1F Mar-21 A | 2021/2F Jun-21 A | 2021/3F Sep-21 A | 2021/4F Dec-21 A | 2021 Dec-21 A | 2022/1F Mar-22 A | 2022/2F Jun-22 E | 2022/3F Sep-22 E | 2022/4F Dec-22 E | 2022 Dec-22 E | 2023 Dec-23 E | 2031 Dec-31 E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| + Net Income | $68 | $66 | ($537) | $182 | ($221) | $513 | ($30) | ($6) | $355 | $832 | $482 | $2,509 |
| + Stock comp | $111 | $178 | $164 | $177 | $630 | $177 | $181 | $184 | $188 | $731 | $914 | $2,199 |
| + D&A | $131 | $135 | $133 | $146 | $545 | $160 | $163 | $167 | $170 | $661 | $850 | $2,354 |
| +/- Interest/other | $2 | ($51) | ($15) | ($17) | ($82) | $14 | $14 | $14 | $13 | $55 | $55 | $9 |
| +/- Tax provision | ($18) | $16 | ($190) | $3 | ($190) | $315 | $0 | $0 | $0 | $315 | $0 | $792 |
| +/- Restructure | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| +/- Other | $0 | $0 | $766 | $0 | $766 | ($970) | $0 | $0 | $0 | ($970) | $0 | $0 |
| Adj. EBITDA | $294 | $343 | $321 | $489 | $1,448 | $210 | $328 | $359 | $726 | $1,623 | $2,302 | $7,863 |
| Y/Y % chg | 39.3% | 158.5% | 9.1% | -3.8% | 26.2% | -28.7% | -4.4% | 11.8% | 48.4% | 12.1% | 41.9% | 8.9% |
| Margin % | 28.4% | 28.8% | 25.0% | 31.2% | 28.5% | 17.5% | 24.3% | 24.5% | 37.5% | 27.3% | 31.0% | 42.0% |
| | | | | | | | | | | | | |
| + CFO | $390 | $382 | $389 | ($528) | $633 | $126 | $377 | $1,314 | ($369) | $1,448 | $2,247 | $7,063 |
| - Capex | ($181) | ($279) | ($411) | ($140) | ($1,012) | ($163) | ($233) | ($233) | ($233) | ($861) | ($1,070) | ($2,697) |
| + Sales of PP&E | $2 | $3 | $2 | $2 | $8 | $2 | $0 | $0 | $0 | $2 | $0 | $0 |
| Other | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Free cash flow | $211 | $106 | ($20) | ($667) | ($370) | ($35) | $145 | $1,081 | ($601) | $590 | $1,177 | $4,365 |
| | | | | | | | | | | | | |
| FCF/Share | $0.24 | $0.12 | ($0.03) | ($0.83) | ($0.46) | ($0.04) | $0.17 | $1.31 | ($0.78) | $0.71 | $1.42 | $4.99 |
| Y/Y % chg | 50% | 146% | 73% | -1886% | -384% | -118% | 44% | 5272% | 6% | 253% | 99% | 10% |

Source: Rosenblatt Securities estimates, company reports

**Twitter, Inc.**
millions ($US) except per share & ARPU

Global

| Fiscal Period | 2021/1F | 2021/2F | 2021/3F | 2021/4F | 2021 | 2022/1F | 2022/2F | 2022/3F | 2022/4F | 2022 | 2023 | 2031 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ending | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 | Dec-22 | Dec-23 | Dec-31 |
| A/E | A | A | A | A | A | A | E | E | E | E | E | E |
| Advertising | $899 | $1,053 | $1,141 | $1,413 | $4,506 | $1,107 | $1,255 | $1,362 | $1,829 | $5,553 | $6,988 | $18,019 |
| Y/Y % chg | 31.8% | 87.4% | 41.1% | 22.4% | 40.5% | 23.1% | 19.2% | 19.5% | 29.4% | 23.2% | 25.8% | 6.9% |
| % of total | 86.8% | 88.5% | 88.8% | 90.2% | 88.7% | 92.1% | 93.0% | 93.2% | 94.5% | 93.4% | 94.2% | 96.3% |
| | | | | | | | | | | | | |
| Data license/other | $137 | $137 | $143 | $154 | $572 | $96 | $94 | $100 | $106 | $396 | $433 | $697 |
| Y/Y % chg | 9.4% | 12.8% | 12.2% | 14.9% | 12.3% | -29.8% | -31.4% | -30.3% | -31.6% | -30.8% | 9.4% | 4.7% |
| % of total | 13.2% | 11.5% | 11.2% | 9.8% | 11.3% | 8.0% | 7.0% | 6.8% | 5.5% | 6.7% | 5.8% | 3.7% |
| | | | | | | | | | | | | |
| Global Avg. mDAU | 198 | 204 | 209 | 215 | 215 | 229 | 235 | 244 | 253 | 253 | 310 | 646 |
| Y/Y % chg | 20.1% | 10.6% | 12.8% | 13.5% | 13.5% | 15.9% | 15.1% | 16.4% | 17.7% | 17.7% | 22.7% | 4.1% |
| | | | | | | | | | | | | |
| Global Ad ARPU | $4.55 | $5.16 | $5.45 | $6.58 | $5.56 | $4.83 | $5.34 | $5.59 | $7.24 | $5.93 | $6.18 | $7.66 |
| Y/Y % chg | 9.7% | 69.5% | 25.0% | 7.8% | 18.4% | 6.2% | 3.5% | 2.7% | 10.0% | 6.7% | 4.2% | 2.7% |

Source: Rosenblatt Securities estimates, company reports

**Twitter, Inc.**
millions ($US) except per share & ARPU

United States

| Fiscal Period | 2021/1F | 2021/2F | 2021/3F | 2021/4F | 2021 | 2022/1F | 2022/2F | 2022/3F | 2022/4F | 2022 | 2023 | 2031 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ending | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 | Dec-22 | Dec-23 | Dec-31 |
| A/E | A | A | A | A | A | A | E | E | E | E | E | E |
| U.S. Revenues | $556 | $653 | $742 | $885 | $2,836 | $556 | $695 | $749 | $980 | $2,980 | $3,590 | $6,679 |
| Y/Y % chg | 18.7% | 79.0% | 44.7% | 20.7% | 36.4% | 0.0% | 6.4% | 1.0% | 10.8% | 5.1% | 20.4% | 6.0% |
| % of total | 53.7% | 54.9% | 57.8% | 56.4% | 55.8% | 46.3% | 51.5% | 51.2% | 50.7% | 50.1% | 48.4% | 35.7% |
| | | | | | | | | | | | | |
| U.S. Avg mDAU - Reca | 37 | 36 | 37 | 38 | 38 | 38 | 38 | 39 | 40 | 40 | 43 | 60 |
| Y/Y % chg | 12.7% | 0.6% | 2.5% | 1.6% | 1.6% | 2.6% | 3.6% | 4.6% | 5.6% | 5.6% | 9.6% | 3.0% |
| % of total | 18.8% | 17.7% | 17.6% | 17.5% | 17.5% | 16.7% | 15.9% | 15.7% | 15.7% | 15.7% | 14.0% | 9.4% |
| | | | | | | | | | | | | |
| US Ad ARPU | $12.46 | $15.53 | $17.55 | $20.92 | $17.21 | $15.69 | $16.95 | $17.80 | $23.13 | $18.89 | $20.43 | $27.66 |
| Y/Y % chg | 7.8% | 97.3% | 47.7% | 19.5% | 29.9% | 25.9% | 9.1% | 1.4% | 10.6% | 9.8% | 8.2% | 3.0% |

Source: Rosenblatt Securities estimates, company reports

**Twitter, Inc.**
millions ($US) except per share & ARPU

International

| Fiscal Period | 2021/1F | 2021/2F | 2021/3F | 2021/4F | 2021 | 2022/1F | 2022/2F | 2022/3F | 2022/4F | 2022 | 2023 | 2031 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ending | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 | Dec-22 | Dec-23 | Dec-31 |
| A/E | A | A | A | A | A | A | E | E | E | E | E | E |
| Intl Revenues | $480 | $537 | $542 | $683 | $2,242 | $645 | $654 | $713 | $954 | $2,966 | $3,831 | $12,037 |
| Y/Y % chg | 41.4% | 68.7% | 27.9% | 22.7% | 36.9% | 34.4% | 21.8% | 31.6% | 39.8% | 32.3% | 29.1% | 7.3% |
| % of total | 46.3% | 45.1% | 42.2% | 43.6% | 44.2% | 53.7% | 48.5% | 48.8% | 49.3% | 49.9% | 51.6% | 64.3% |
| | | | | | | | | | | | | |
| Intl Avg mDAU - Reca | 160 | 168 | 172 | 177 | 177 | 187 | 197 | 205 | 213 | 213 | 267 | 585 |
| Y/Y % chg | 20.6% | 11.9% | 13.4% | 15.1% | 15.1% | 16.4% | 17.6% | 18.9% | 20.1% | 20.1% | 25.1% | 4.2% |
| % of total | 81.2% | 82.3% | 82.4% | 82.6% | 82.6% | 81.5% | 84.0% | 84.1% | 84.3% | 84.3% | 86.0% | 90.6% |
| | | | | | | | | | | | | |
| Int'l Ad ARPU | $2.71 | $2.93 | $2.86 | $3.54 | $3.05 | $2.91 | $3.14 | $3.30 | $4.28 | $3.41 | $3.80 | $5.55 |
| Y/Y % chg | 20.0% | 57.6% | 14.2% | 7.3% | 17.1% | 7.1% | 7.2% | 15.2% | 20.9% | 11.6% | 11.4% | 3.0% |

Source: Rosenblatt Securities estimates, company reports

**Twitter, Inc.**
millions ($US) except per share & ARPU

**Balance Sheet**

| Fiscal Period | 2021/1F | 2021/2F | 2021/3F | 2021/4F | 2021 | 2022/1F | 2022/2F | 2022/3F | 2022/4F | 2022 | 2023 | 2031 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ending | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 | Dec-22 | Dec-23 | Dec-31 |
| A/E | A | A | A | A | A | A | E | E | E | E | E | E |
| Cash & Equiv | $4,249 | $4,126 | $3,474 | $2,187 | $2,187 | $2,283 | $2,120 | $2,893 | $2,010 | $2,010 | $2,235 | $12,059 |
| Short term investment | $4,558 | $4,481 | $3,937 | $4,207 | $4,207 | $3,979 | $3,979 | $3,979 | $3,979 | $3,979 | $3,979 | $3,979 |
| Goodwill | $1,316 | $1,325 | $1,294 | $1,302 | $1,302 | $1,298 | $1,298 | $1,298 | $1,298 | $1,298 | $1,298 | $1,298 |
| Other | $4,861 | $5,391 | $5,884 | $6,364 | $6,364 | $5,991 | $6,060 | $6,125 | $6,188 | $6,188 | $6,407 | $9,099 |
| Assets | $14,984 | $15,323 | $14,589 | $14,060 | $14,060 | $13,551 | $13,457 | $14,296 | $13,475 | $13,475 | $13,919 | $26,435 |
|  |  |  |  |  |  |  |  |  |  |  |  |  |
| Convertible notes | $3,553 | $3,555 | $3,557 | $3,559 | $3,559 | $3,561 | $3,561 | $3,561 | $3,561 | $3,561 | $3,561 | $3,561 |
| Senior notes | $693 | $693 | $694 | $694 | $694 | $1,683 | $1,683 | $1,683 | $1,683 | $1,683 | $1,683 | $1,683 |
| Other | $3,001 | $3,359 | $3,166 | $2,499 | $2,499 | $2,402 | $2,402 | $2,402 | $2,402 | $2,402 | $2,402 | $2,402 |
| Liabilities | $7,247 | $7,607 | $7,417 | $6,752 | $6,752 | $7,646 | $7,646 | $7,646 | $7,646 | $7,646 | $7,646 | $7,646 |
|  |  |  |  |  |  |  |  |  |  |  |  |  |
| Equity | $7,737 | $7,716 | $7,173 | $7,307 | $7,307 | $5,905 | $5,811 | $6,650 | $5,829 | $5,829 | $6,273 | $18,789 |

Source: Rosenblatt Securities estimates, company reports

**Twitter, Inc.**
millions ($US) except per share & ARPU

**Statement of Cash Flows**

| Fiscal Period | 2021/1F | 2021/2F | 2021/3F | 2021/4F | 2021 | 2022/1F | 2022/2F | 2022/3F | 2022/4F | 2022 | 2023 | 2031 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ending | Mar-21 | Jun-21 | Sep-21 | Dec-21 | Dec-21 | Mar-22 | Jun-22 | Sep-22 | Dec-22 | Dec-22 | Dec-23 | Dec-31 |
| A/E | A | A | A | A | A | A | E | E | E | E | E | E |
| Net income | $68 | $66 | ($537) | $182 | ($221) | $513 | ($30) | ($6) | $355 | $832 | $482 | $2,509 |
| D&A | $131 | $135 | $133 | $146 | $545 | $160 | $163 | $167 | $170 | $661 | $850 | $2,354 |
| Stock comp | $111 | $178 | $164 | $177 | $630 | $177 | $181 | $184 | $188 | $731 | $914 | $2,199 |
| Working capital | $101 | $56 | $851 | ($1,002) | $5 | $50 | $63 | $969 | ($1,082) | $0 | $0 | $0 |
| Other | ($21) | ($53) | ($223) | ($30) | ($326) | ($774) | $0 | $0 | $0 | ($774) | $0 | $0 |
| CFO | $390 | $382 | $389 | ($528) | $633 | $126 | $377 | $1,314 | ($369) | $1,448 | $2,247 | $7,063 |
|  |  |  |  |  |  |  |  |  |  |  |  |  |
| Capex, gross | ($181) | ($279) | ($411) | ($140) | ($1,012) | ($163) | ($233) | ($233) | ($233) | ($861) | ($1,070) | ($2,697) |
| Sales of PP&E | $2 | $3 | $2 | $2 | $8 | $2 | $0 | $0 | $0 | $2 | $0 | $0 |
| Other | $860 | $66 | $502 | ($373) | $1,056 | $1,226 | $0 | $0 | $0 | $1,226 | $0 | $0 |
| CFI | $680 | ($210) | $93 | ($511) | $53 | $1,065 | ($233) | ($233) | ($233) | $367 | ($1,070) | ($2,697) |
|  |  |  |  |  |  |  |  |  |  |  |  |  |
| Stock comp taxes | ($11) | ($5) | ($6) | ($5) | ($27) | ($4) | ($9) | ($9) | ($9) | ($32) | ($46) | ($110) |
| Share repurchase | ($162) | ($334) | ($169) | ($266) | ($931) | ($2,078) | ($299) | ($299) | ($273) | ($2,948) | ($906) | ($2,642) |
| Other | $1,370 | $40 | ($954) | $29 | $485 | $989 | $0 | $0 | $0 | $989 | $0 | $0 |
| CFF | $1,198 | ($299) | ($1,130) | ($242) | ($473) | ($1,093) | ($308) | ($308) | ($282) | ($1,991) | ($952) | ($2,752) |
|  |  |  |  |  |  |  |  |  |  |  |  |  |
| F/X | ($8) | $4 | ($4) | ($5) | ($13) | ($1) | $0 | $0 | $0 | ($1) | $0 | $0 |
| Net chg, cash | $2,260 | ($123) | ($652) | ($1,286) | $199 | $97 | ($163) | $773 | ($883) | ($176) | $225 | $1,613 |

Source: Rosenblatt Securities estimates, company reports

## Company Description

Twitter, Inc. is a global platform for public self-expression and conversation in real time. It provides a network that connects users to people, information, ideas, opinions and news. The company's services include live commentary, live connections and live conversations. Its application provides social networking services and micro-blogging services through mobile devices and the Internet. The company can also be used as a marketing tool for businesses. Its products and services include Promoted Tweets, Promoted Accounts and Promoted Trends.

## Valuation Summary

We assume Twitter is taken private at $33, midway between Elon Musk's $54.20 agreed deal price and where TWTR could be trading absent a deal, based on performance of social media peers. We assume Musk has leverage to compel TWTR to move substantially lower, but that he wants to complete a deal.

## Risks

**Upside risks include:**

**\*Musk/Twitter could complete this merger close to the agreed $54.20 deal price.** We assume Musk can substantially rework the price lower, but the road there is non-obvious, given contractual terms that include Twitter having a right to sue Musk to complete the transaction, and Musk foregoing pre-merger due diligence rights.

**\*A rival bidder could swoop in last minute to break this deal up.** That seems unlikely at this point, but not impossible.

**Downside risks include:**

**\*Musk's merger offer could fall apart.** This could happen if Musk is able to exit the deal agreement, perhaps by alleging fraud at Twitter, or if debt markets are meaningfully pressured pre-close, or if something dramatic changes in Musk's personal circumstances (such as a sharp decline in the value of his Tesla shares) that impairs his ability to finance the merger.

## Required Disclosures

I, Barton Crockett, attest that the views expressed in this research report accurately reflect my personal views about the subject matter, security, or issuer. Furthermore, no part of my compensation was, is, or will be directly or indirectly related to the specific recommendation or views expressed in this research report.

The material prepared by me employs appropriate expertise, and I believe that it fairly and accurately represents the subject matter reported upon and is not misleading. I accept no liability for any loss resulting from the use of the material presented in this report, except that this disclaimer of liability does not apply to the extent that such disclaimer may be prohibited by specific statutes, laws or regulations. This report is not to be relied upon in substitution for the exercise of independent judgment. I may have issued and may in the future issue, other reports that are inconsistent with, and which reach different conclusions than the information presented in this report. Those reports reflect the different assumptions, views, and analytical methods of the analysts who prepared them at that time and I assume no obligation to ensure that any other reports on the same subject matter addressed herein are brought to the attention of any recipient of this report.

**Ownership & Material Conflicts of Interest:** None.

**Compensation:** The research analyst who authored this report (the "Analyst") does not receive compensation based on Rosenblatt Securities Inc.'s investment banking revenues or from TWTR.K and has not done so for the past twelve months. Rosenblatt Securities Inc. does not have any investment banking relationship with TWTR.K. As such, Rosenblatt Securities Inc. has not received compensation for investment banking activities in the past twelve months and does not expect to receive compensation for investment banking activities in the next 3 months. Rosenblatt Securities Inc. does not have a consulting or other revenue-generating relationship with TWTR.K in the last twelve months.

**Position as Officer/Director:** The Analyst does not serve as an officer, director, or advisory board member of TWTR.K. The same is true for members of the Analyst's household.



**Explanation of Equity Research Ratings:** Rosenblatt Securities Inc. uses the following ratings system: Buy [We believe this stock will outperform relative to other companies in its industry over the following 12 months.] Sell [We believe this stock will underperform relative to other companies in its industry over the following 12 months.] Neutral [We believe that this stock's performance will be in line with the average return of others in its industry over the following 12 months.]

| Distribution of Ratings/IB Services | | | | |
|---|---|---|---|---|
| | | | IB Serv./Past 12 Mos. | |
| **Rating** | **Count** | **Percent** | **Count** | **Percent** |
| **BUY** | 70 | 75.27 | 4 | 5.71 |
| **NEUTRAL** | 20 | 21.51 | 0 | 0 |
| **SELL** | 3 | 3.23 | 0 | 0 |

**Market Making:** Rosenblatt Securities Inc. does not make markets in any securities.

**Other Disclosures**: All the views expressed in the research report accurately reflect the research analyst's personal views about any and all of the subject securities or issuers and no part of the research analyst's compensation was, is, or will be, directly or indirectly, related to the specific recommendations, valuations, or views expressed by the research analyst in the research report.

The information contained in this report is not a complete analysis of every material fact with respect to any company. industry or security and is not an offer or solicitation to buy or sell any security. Although opinions and estimates expressed in this report reflect the current judgment of Rosenblatt Securities Inc., the information upon which such opinions and estimates are based is not necessarily updated on a regular basis.

Estimates are not reviewed on a regular basis. In addition, opinions and estimates are subject to change without notice. Each investor must make its own determination of the appropriateness of an investment in any securities referred to herein based on any legal, tax and accounting considerations applicable to such investor and its own investment strategy.

By virtue of this publication, Rosenblatt Securities Inc. or their employees shall not be responsible for any investment decision. Rosenblatt Securities Inc. from time to time may perform corporate finance services for companies mentioned in this report and may occasionally possess material, nonpublic information regarding such companies.

This information is not used in the preparation of the opinions and estimates contained in this report. Facts and the other information contained in this report have been obtained from public sources considered reliable but are not guaranteed in any way. This report may not be reproduced, distributed, or published without the prior consent of Rosenblatt Securities Inc. Copyright © 2022. All rights reserved by Rosenblatt Securities Inc.

In the United Kingdom, this communication may constitute a financial promotion for the purposes of the Financial Services and Markets Act 2000. Accordingly, it is issued only to, or directed only at, persons who are: (i) investment professionals within the meaning of Article

19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the "FPO") or, (ii) high net worth companies and certain other entities falling within Article 49 (2)(a) to (d) of the FPO.

This communication is issued to, or directed only at, professional persons (this includes persons who are eligible counterparties and professional clients as defined by the MiFID ) who have professional experience in matters relating to investments. The information and products to which this communication relates are only available to such persons and persons of any other description (in particular retail investors) should not rely on this communication.

EXHIBIT 11

## Equity Research



Company Update — July 18, 2022

Internet

# Twitter, Inc. (TWTR)

## TWTR: All Sales Final? Increased Conviction on Deal Close Post Chancery Court Expert Call

### Our Call

On 7/15, we held an expert call with Prof. Robert Miller, an expert on corporate law, M&A, and the Delaware Court of Chancery (replay here; detailed takes in body of this report). We came away from the call with incremental conviction that the acquisition of TWTR by Elon Musk will successfully close. Prof. Miller is of the view that Mr. Musk's purported termination hinges not on potential MAE or operation under ordinary course, but on Mr. Musk's information rights as specified in the merger agreement, where Prof. Miller highlighted unusually seller-friendly language/provisions. While we believe the market is coming around to the view that Mr. Musk's arguments for termination are unlikely to prevail, we believe the market may still be underestimating the Court's power/inclination to enforce specific performance, as well as its broad enforcement powers (most notably, potential appointment of a special master to act in Mr. Musk's place to close the deal).

**Breach of Information Covenant Represents Musk's "Showcase Argument," but Unlikely to Prevail.** On 7/15, we held an expert call with Prof. Robert Miller (U. of Iowa College of Law, NYU), whose writings on material adverse effects have been cited by the Delaware Court of Chancery more than 40 times. His view is that the "showcase argument" in play between Musk/TWTR will hinge on Mr. Musk's information rights as specified in the merger agreement. Here, Professor Miller noted the atypical (and unusually seller-friendly language) in the agreement, which specifies that Mr. Musk is entitled to information requests relevant only to deal consummation, rather than the typical/broader right of information requests "for any reasonable purpose", inclusive of ongoing due diligence. While the Court of Chancery has not previously ruled on an information covenant similar to the one at issue here, Mr. Musk appears unlikely to prevail in his argument that TWTR has breached the information covenant, per Prof. Miller.

**MAE, "Ordinary Course" Also Likely Dead Ends for Musk.** The Court of Chancery sets a very high bar for MAE, on the order of a ~20%+ impairment of the value of the target—in the nine times MAE arguments have been litigated to completion, the court has only once found that an MAE occurred. Prof. Miller views the argument that a bot/spam account percentage >5% of total mDAU would result in an MAE as "an incredibly hard climb." Further, MAE on the basis of a change in financial condition or expectations would require TWTR's business trajectory to depart dramatically from that of the broader industry or relevant peer companies (i.e., those cited in fairness opinions issued by TWTR/Musk's bankers). Per Prof. Miller, it also appears unlikely that TWTR breached the watered-down "ordinary course" covenant included in the merger agreement; Mr. Musk's argument is also weakened as he failed to approve a proposed employee retention program.

**Transaction Size Has No Bearing on Specific Performance.** Merger agreements in Delaware are specifically performable, without regard for transaction size: in the event of a breach, the breached-upon party is entitled to an order of specific performance and, per the merger agreement, Mr. Musk has committed not to oppose such an order. Per Prof. Miller, Delaware has ordered specific performance four times over the past 20 years, including twice last year (once by Chancellor Kathaleen McCormick, who will preside over TWTR v. Musk).

**Court Has Broad Enforcement Powers.** The Court has broad enforcement powers, inc. appointment of a special master, contempt of court, etc., and Prof. Miller expects that the court would use those powers to enforce specific performance in this case.

Equity Analyst(s)

**Brian Fitzgerald**
Equity Analyst | Wells Fargo Securities, LLC
Brian.Fitzgerald@wellsfargo.com | 212-214-5095

**Robert Coolbrith**
Equity Analyst | Wells Fargo Securities, LLC
Robert.Coolbrith@wellsfargo.com | 628-629-7567

| Rating | Equal Weight |
|---|---|
| Ticker | TWTR |
| Price Target/Prior: | $54.20/NC |
| Upside/(Downside) to Target | 43.6% |
| Price (07/15/2022) | $37.74 |
| 52 Week Range | $31.30 - 73.34 |
| Shares Outstanding | 764,180,688 |
| Market Cap (MM) | $28,840 |
| Enterprise Value (MM) | $26,006 |
| Average Daily Volume | 42,355,781 |
| Average Daily Value (MM) | $1,599 |
| Dividend (NTM) | $0.00 |
| Dividend Yield | 0.0% |
| Net Debt (MM) - last reported | $(2,835) |
| ROIC - Current year est. | (1)% |
| 3 Yr EPS CAGR from current year (unless otherwise noted) | NM |

| $ EPS | 2021A | 2022E Curr. | 2022E Prior | 2023E Curr. | 2023E Prior |
|---|---|---|---|---|---|
| Q1 (Mar) | 0.16 A | 0.05 E | NC | 0.10 E | NC |
| Q2 (Jun) | 0.20 A | 0.14 E | NC | 0.21 E | NC |
| Q3 (Sep) | (0.54) A | 0.19 E | NC | 0.28 E | NC |
| Q4 (Dec) | 0.33 A | 0.39 E | NC | 0.51 E | NC |
| FY | 0.19 A | 0.78 E | NC | 1.10 E | NC |
| P/E | NM | 48.7x | | 34.2x | |

Source: Company Data, Wells Fargo Securities estimates, and Refinitiv.
NA = Not Available, Volatility = Historical trading volatility

All estimates/forecasts are as of 7/18/2022 unless otherwise stated. 7/18/2022 7:33:15EDT. Please see page 5 for rating definitions, important disclosures and required analyst certifications. Wells Fargo Securities, LLC does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of the report and investors should consider this report as only a single factor in making their investment decision.

**Breach of Information Covenant the "Showcase Argument" but Unlikely to Prevail...**

- Based on the framing of arguments in Mr. Musk's purported termination letter and TWTR's complaint filed with the Delaware Court of Chancery last week, Professor Miller expects that an alleged breach of the information covenant within the merger agreement will represent the "showcase argument" on which the case will hinge. Professor Miller noted that, of the eight pages of Mr. Musk's purported termination letter, the first six pages pertained to alleged breach of the information covenant by TWTR; similarly, most of the complaint filed by Wachtell, Lipton, Rosen & Katz with the Delaware Court of Chancery on behalf of TWTR last week deals with this issue as well.
- As in most if not all merger agreements, the Musk/TWTR merger agreement contains an information covenant. Typically, the information covenant is almost a boilerplate covenant, and is usually not highly negotiated. Typically, the information covenant states that the target will turn over any information reasonably requested by the buyer, occasionally with caveats protecting attorney-client privilege, information deemed confidential due to a duty to a third party, etc. This typical information covenant language contemplates ongoing due diligence by an acquirer, ongoing review of information by an acquirer to ensure that a target has not suffered a material adverse effect, validation of the truth of a target's representations, etc.
- In contrast, the information covenant in the Musk/TWTR merger agreement limits Musk's information rights in non-customary ways. Specifically, per the merger agreement, Mr. Musk is entitled to information he reasonably requests "for any reasonable business purpose related to the consummation of the transactions contemplated by the agreement." Per Prof. Miller, while the information covenant language in the Musk/TWTR merger agreement does have some precedent in other transactions, it is nonetheless highly unusual and is not mentioned in the American Bar Association model merger agreement or other major treatises on merger agreements.
- This non-customary language in the Musk/TWTR merger agreement has never been litigated in Delaware, and a material breach of the information covenant would entitle Mr. Musk to terminate the merger agreement. However, Prof. Miller views the accompanying narrative assertion— that Mr. Musk has potentially uncovered materially false representations in TWTR's securities filings (and potentially related securities fraud and insider trading violations), and that TWTR has breached the information covenant to avoid this discovery—as highly implausible. Prof. Miller ultimately views Mr. Musk as unlikely to prevail in his argument that TWTR has materially breached the information covenant of the merger agreement.
- To the extent that TWTR may have breached the information covenant, Prof. Miller noted the company may still have an opportunity to cure a breach, if the breach occurred within the past 30 days.

**Potential Material Adverse Effect...**

- Prof. Miller notes that Mr. Musk's purported termination letter stops short of asserting that a material adverse effect has occurred, rather that TWTR "may have" suffered an MAE.
- The Court of Chancery has historically set a very high bar for material adverse effect. Per Prof. Miller, in the one case where the Court of Chancery found an MAE, out of nine where MAE arguments have been litigated to completion, the court found that a 20% or greater reduction in the value of the target would represent an MAE.
- Per Prof. Miller, successful argument of an MAE as to fake/bot/spam accounts would require that TWTR's representations and warranties have been materially false (likely boiling down to a "battle of expert [witnesses]") in such a way to cause the company to have suffered an MAE. Prof. Miller views success along this line of argument as "an incredibly hard climb."
- As to potential MAE arising from a change in the financial condition or expected financial performance of the target, Prof. Miller notes that broad categories of events are typically (and in the case of the Musk/TWTR merger agreement) excepted as potential MAE, including changes in the macroeconomic backdrop or broad industry trends. Per Prof. Miller, prevailing on an argument that TWTR has or may have suffered an MAE due to change in financial condition or expected results would require that the company's performance trajectory dramatically underperform its industry peers.

**Operation Under the Ordinary Course...**

- Per Prof. Miller, the Court of Chancery has previously found against a target (in AB Stable VIII LLC v. Maps Hotels and Resorts One LLC) regarding a violation of the ordinary course covenant. However,

- Prof. Miller noted that in that case, the ordinary course covenant was formulated to require the target to "operate in the ordinary course, consistent with past practice" and the covenant was violated in the context of the COVID-19 pandemic, when the target, a chain of luxury hotels, ceased normal operations.
- In contrast, Prof. Miller noted the Musk/TWTR merger agreement's ordinary course covenant holds TWTR to a lesser standard, that TWTR would "use commercially reasonable efforts to operate in the ordinary course" with no reference to past practice. Given this weaker formulation of the ordinary course covenant, as well as Mr. Musk's alleged failure (per TWTR's complaint) to agree to institute a retention program for key employees, Prof. Miller also views this argument as a "loser" for Mr. Musk.

**Specific Performance...**

- Per Prof. Miller, in Delaware and in M&A generally, companies are considered unique goods and damages are difficult to value in broken deals. As such, for at least the last 20 years, it has been widely assumed and in fact the case that merger agreements in Delaware are specifically performable. Merger agreements typically provide (and Prof. Miller states that every merger agreement he has reviewed over the past 30 years has provided) that in the event of breach by either party, the breached-upon party will be entitled to an order of specific performance. Merger agreements generally, and the Musk/TWTR agreement in particular, also provide that the party ordered to specifically perform cannot oppose the order.
- Per Prof. Miller, in each of the four cases over the past 20 years of breach of a merger agreement by an acquirer (two occurring last year, one presided over by Chancellor Kathaleen McCormick, who will also preside over Twitter v. Musk), the Delaware Court of Chancery has ordered specific performance. Prof. Miller would consider a departure from this standard as injecting "a tremendous amount of uncertainty" into Delaware law.
- Prof. Miller does not expect that the size of the transaction will have any bearing on whether specific performance is ordered by the court. He noted that specific performance has been ordered in relatively large deals in the past, and stated that "all the incentives for Delaware cut in favor of making sure that the big guys get treated the same way as everybody else."

**Court of Chancery's Enforcement Powers...**

- Per Prof. Miller, the Court of Chancery, as a court of equity, is cloaked with very strong powers to enforce its judgments.
- Court of Chancery Rule 70 permits the court to appoint a special master with authority to act on behalf of a party who has refused to follow an order of the court. If Mr. Musk refuses to act to close the acquisition, an appointed special master could step in and take all steps, execute all documents, etc. to complete the transaction, and for all intents and purposes, the acts of the special master would be the acts of Mr. Musk.
- The court is also empowered to hold litigants in contempt, under which penalties could include substantial fines and/or imprisonment. As TSLA is incorporated in Delaware, Prof. Miller noted that Mr. Musk's TSLA holdings could also be attached under Rule 70.

**Timing...**

- The "drop-dead" date for the merger is 10/24/22, but the agreement provides for an automated extension in the case of a dispute that results in litigation. However, Prof. Miller views the operative timing factor as the expiration of Mr. Musk's debt commitment letter. Prof. Miller expects TWTR to seek expedited hearing and that the Court of Chancery is likely to grant such a request. Ultimately, Prof. Miller expects that a judgment from the Court of Chancery and an appellate ruling from the Delaware Supreme Court are likely to be received before the expiration of Mr. Musk's debt commitment letters and even before the original drop-dead date of 10/24/22.
- While it now appears that Mr. Musk is arguing against expedited proceedings, Prof. Miller noted that the loss of his debt commitment letters could simply serve to make the transaction more expensive for Mr. Musk in the long run.

Internet

Equity Research

## Investment Thesis, Valuation and Risks

**Twitter, Inc. (TWTR)**

**Investment Thesis**

We maintain our Equal Weight rating on TWTR shares given ongoing uncertainty related to deal close.

**Target Price Valuation for TWTR: $54.20 from NC**

Our $54.20 represents the per-share deal value offered by Elon Musk to acquire TWTR.

**Risks to Our Price Target and Rating for TWTR**

Given Mr. Musk's offer to take TWTR private, the most salient downside risk is from a failure of the transaction to close. Deal-related upside risk stems from the possibility of a competing offer emerging at a higher valuation. Additional downside risks include uncertain advertising growth and usage trajectories, an increasingly competitive landscape, and downside risk to consensus estimates. Additional upside risks include revenue growth or earnings outperformance, potential disruption to competitors, or exogenous events that can drive additional engagement to Twitter's services.

Twitter, Inc.

Equity Research

## Required Disclosures

We, Brian Fitzgerald and Robert Coolbrith, certify that:

1) All views expressed in this research report accurately reflect my personal views about any and all of the subject securities or issuers discussed; and

2) No part of my compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed by me in this research report.

Wells Fargo Securities, LLC does not compensate its research analysts based on specific investment banking transactions. Wells Fargo Securities, LLC's research analysts receive compensation that is based upon and impacted by the overall profitability and revenue of the firm, which includes, but is not limited to investment banking revenue.

## Additional Information Available Upon Request

**Twitter, Inc. Rating History as of 07-15-2022**

powered by: BlueMatrix



Initiation (I); Drop Coverage (D); Overweight (BUY); Equal Weight (HOLD); Underweight (SELL); Suspended (SR); Not Rated (NR); No Estimate (NE)

Wells Fargo Securities, LLC and/or its affiliates, have beneficial ownership of 0.5% or more of any class of the common stock of Twitter, Inc..

Wells Fargo Securities, LLC, or its affiliates received compensation for investment banking services from Twitter, Inc. in the past 12 months.

Wells Fargo Securities, LLC, or its affiliates intends to seek or expects to receive compensation for investment banking services in the next three months from an affiliate of Twitter, Inc..

Wells Fargo Securities, LLC, maintains a market in the common stock of Twitter, Inc..

Twitter, Inc. currently is or, during the 12-month period preceding the date of distribution of the research report was, a client of Wells Fargo Securities, LLC. Wells Fargo Securities, LLC, provided non-investment banking securities-related services to Twitter, Inc..

Wells Fargo Securities, LLC, or its affiliates, managed or co-managed a public offering of securities for Twitter, Inc. within the past 12 months.

Wells Fargo Securities, LLC, or any of its affiliates, intends to seek or expects to receive compensation for investment banking services from Twitter, Inc. in the next three months.

Wells Fargo Securities, LLC, received compensation for products or services other than investment banking services from Twitter, Inc. in the past 12 months.

Twitter, Inc. currently is or, during the 12 month period preceding the date of distribution of the research report was, a client of Wells Fargo Securities, LLC. Wells Fargo Securities, LLC, provided investment banking services to Twitter, Inc..

Wells Fargo Securities, LLC, or its affiliates has a significant financial interest in Twitter, Inc..

**STOCK RATING**

**1=Overweight**: Total return on stock expected to be 10%+ over the next 12 months. BUY

**2=Equal Weight**: Total return on stock expected to be -10% to +10% over the next 12 months. HOLD

**3=Underweight**: Total return on stock expected to lag the Overweight- and Equal Weight-rated stocks within the analyst's coverage universe over the next 12 months. SELL

**As of July 17, 2022**

55.4% of companies covered by Wells Fargo Securities, LLC Equity Research are rated Overweight.
36.6% of companies covered by Wells Fargo Securities, LLC Equity Research are rated Equal Weight.
8.0% of companies covered by Wells Fargo Securities, LLC Equity Research are rated Underweight.
Wells Fargo Securities, LLC has provided investment banking services for 46.1% of its Equity Research Overweight-rated companies.
Wells Fargo Securities, LLC has provided investment banking services for 39.0% of its Equity Research Equal Weight-rated companies.
Wells Fargo Securities, LLC has provided investment banking services for 34.7% of its Equity Research Underweight-rated companies.

**Important Disclosure for U.S. Clients**

This report was prepared by Wells Fargo Securities Global Research Department ("WFS Research") personnel associated with Wells Fargo Securities, LLC ("Wells Fargo Securities").

WFS Research may, from time to time, provide clients with short-term trading views in its research reports regarding subject companies on which Wells Fargo Securities currently has equity research coverage. A short-term trading view offers a view on how the market price of a subject company's common equity may trend in absolute terms during the 30 days following the date of the short-term trading view. A short-term trading view on a subject company's common equity does not impact our fundamental investment rating or price target for that company, which reflect our view of how the subject company's common equity may perform over a one-year period. A short-term trading view may reach a different conclusion than the firm's fundamental investment rating and price target for a subject company and, therefore, short-term trading views could result in short-term price movements that are contrary to our fundamental investment rating and price target. Short-term trading views are not ratings and the firm does not intend, nor undertakes any obligation, to maintain, update or close out short-term trading views. Short-term trading views may not be suitable for all investors and have not been tailored to individual investor circumstances and objectives, and investors should make their own independent decisions regarding any short-term trading views discussed in WFS Research reports.

**Important Disclosure for International Clients**

**United Kingdom** – The securities and related financial instruments described herein may not be eligible for sale in all jurisdictions or to certain categories of investors. For recipients in the United Kingdom, this report is distributed by Wells Fargo Securities International Limited ("WFSIL"). WFSIL is a UK incorporated investment firm authorised and regulated by the Financial Conduct Authority. For the purposes of Section 21 of the UK Financial Services and Markets Act 2000 (the "Act"), the content of this report has been approved by WFSIL, an authorised person under the Act. WFSIL does not deal with retail clients as defined in the Directive 2014/65/EU ("MiFID2"). The FCA rules made under the Financial Services and Markets Act 2000 for the protection of retail clients will therefore not apply, nor will the Financial Services Compensation Scheme be available. This report is not intended for, and should not be relied upon by, retail clients.

**EEA** – The securities and related financial instruments described herein may not be eligible for sale in all jurisdictions or to certain categories of investors. For recipients in the EEA, this report is distributed by WFSIL or Wells Fargo Securities Europe S.A. ("WFSE"). WFSE is a French incorporated investment firm authorized and regulated by the Autorité de contrôle prudentiel et de résolution and the Autorité des marchés financiers. WFSE does not deal with retail clients as defined in the Directive 2014/65/EU ("MiFID2"). This report is not intended for, and should not be relied upon by, retail clients.

**Australia** – Wells Fargo Securities, LLC, Wells Fargo Securities International Limited and Wells Fargo Securities Asia Limited are exempt from the requirements to hold an Australian financial services license in respect of the financial services they provide to wholesale clients in Australia. Wells Fargo Securities, LLC is regulated under the laws of the United States, Wells Fargo Securities International Limited is regulated under laws of the United Kingdom, and Wells Fargo Securities Asia Limited is regulated under the laws of Hong Kong. All such laws differ from Australian laws. Any offer or documentation provided to Australian recipients by Wells Fargo Securities, LLC, Wells Fargo Securities International Limited or Wells Fargo Securities Asia Limited in the course of providing the financial services will be prepared in accordance with the laws of the United States, United Kingdom or Hong Kong and not Australian laws.

**Canada** – This report is distributed in Canada by Wells Fargo Securities Canada, Ltd., a registered investment dealer in Canada and member of the Investment Industry Regulatory Organization of Canada (IIROC) and Canadian Investor Protection Fund (CIPF). Wells Fargo Securities, LLC's research analysts may participate in company events such as site visits but are generally prohibited from accepting payment or reimbursement by the subject companies for associated expenses unless pre-authorized by members of Research Management.

**Hong Kong** – This report is issued and distributed in Hong Kong by Wells Fargo Securities Asia Limited ("WFSAL"), a Hong Kong incorporated investment firm licensed and regulated by the Securities and Futures Commission to carry on types 1, 4, 6 and 9 regulated activities (as defined in the Securities and Futures Ordinance (Cap. 571 The Laws of Hong Kong), "the SFO"). This report is not intended for, and should not be relied on by, any person other than professional investors (as defined in the SFO). Any securities and related financial instruments described herein are not intended for sale, nor will be sold, to any person other than professional investors (as defined in the SFO). The author or authors of this report is or are not licensed by the Securities and Futures Commission. Professional investors who receive this report should direct any queries regarding its contents to Kelly Chiang and Mandy Wan at WFSAL (email: wfsalresearch@wellsfargo.com).

**Japan** – This report is distributed in Japan by Wells Fargo Securities (Japan) Co., Ltd, registered with the Kanto Local Finance Bureau to conduct broking and dealing of type 1 and type 2 financial instruments and agency or intermediary service for entry into investment advisory or discretionary investment contracts. This report is intended for distribution only to professional investors (Tokutei Toushika) and is not intended for, and should not be relied upon by, ordinary customers (Ippan Toushika). The ratings stated on the document are not provided by rating agencies registered with the Financial Services Agency of Japan (JFSA) but by group companies of JFSA-registered rating agencies. These group companies may include Moody's Investors Services Inc., Standard & Poor's Rating Services and/or Fitch Ratings. Any decisions to invest in securities or transactions should be made after reviewing policies and methodologies used for assigning credit ratings and assumptions, significance and limitations of the credit ratings stated on the respective rating agencies' websites.

**Brazil** - This report was not created for distribution to investors resident in Brazil or to the Brazilian public in general. Wells Fargo Securities, LLC is a broker-dealer registered in United States of America with and regulated by the U.S. Securities and Exchange Commission. Wells Fargo Securities, LLC is not registered in Brazil and its products, including this report and the securities mentioned in this report, have not been and will not be publicly issued, placed, distributed, offered or negotiated in the Brazilian capital markets and, as a result, have not been and will not be registered with the Brazilian Securities Commission (Comissão de Valores

Twitter, Inc.

Equity Research

Mobiliários, the CVM). The offer of Wells Fargo Securities, LLC's products, including this report and any securities mentioned in this report, is intended only for residents in the countries in which Wells Fargo Securities, LLC is authorized to operate.

**About Wells Fargo Securities**

Wells Fargo Securities is the trade name for the capital markets and investment banking services of Wells Fargo & Company and its subsidiaries, including but not limited to Wells Fargo Securities, LLC, a U.S. broker-dealer registered with the U.S. Securities and Exchange Commission and a member of NYSE, FINRA, NFA and SIPC, Wells Fargo Prime Services, LLC, a member of FINRA, NFA and SIPC, Wells Fargo Securities Canada, Ltd., a member of IIROC and CIPF, Wells Fargo Bank, N.A. and Wells Fargo Securities International Limited, authorized and regulated by the Financial Conduct Authority.

This report is for your information only and is not an offer to sell, or a solicitation of an offer to buy, the securities or instruments named or described in the report. This report, including any ratings it contains, should not be considered a recommendation tailored to a particular investor with respect to (i) the security or securities or (ii) any investment strategy or strategies discussed in the report. Interested parties are advised to contact the entity with which they deal, or the entity that provided this report to them, if they desire further information or they wish to effect transactions in the securities discussed in this report. The information in this report has been obtained or derived from sources believed by Wells Fargo Securities Global Research Department ("WFS Research"), to be reliable, but WFS Research does not represent that this information is accurate or complete. Any opinions or estimates contained in this report represent the judgment of WFS Research, at the time that the report was published, and are subject to change without notice. Certain text, images, graphics, screenshots and audio or video clips included in this report are protected by copyright law and owned by third parties (collectively, "Third Party Content"). Third Party Content is made available to clients by Wells Fargo under license or otherwise in accordance with applicable law. Any use or publication of Third Party Content included in this report for purposes other than fair use requires permission from the copyright owner. Any external website links included in this publication are not maintained, controlled or operated by Wells Fargo Securities. Wells Fargo Securities does not provide the products and services on these websites and the views expressed on these websites do not necessarily represent those of Wells Fargo Securities. Please review the applicable privacy and security policies and terms and conditions for the website you are visiting. All Wells Fargo Securities research reports published by WFS Research are disseminated and available to all clients simultaneously through electronic publication to our internal client websites. Additional distribution may be effected via email, fax or regular mail. Clients may also receive our research via third party vendors. Not all research content is redistributed to our clients or available to third-party aggregators, nor is WFS Research responsible for the redistribution of our research by third party aggregators. Equity Strategists focus on investment themes across the equity markets and sectors. Any discussion within an Equity Strategy report of specific securities is not intended to provide a fundamental analysis of any individual company described therein. The information provided in Equity Strategy reports is subject to change without notice, and investors should not expect continuing information or additional reports relating to any security described therein. Wells Fargo Securities' Signature Picks is a product of the Equity Strategy team and represents a portfolio of stocks selected from the Equity Research Department's universe of Overweight rated stocks. Stocks with this designation are selected by the Signature Picks Committee based on factors such as volatility, risks, market cap and liquidity and may not represent the fundamental analysts' top-rated stock in their respective coverage universe. For research or other data available on a particular security, please contact your sales representative or go to http://research.wellsfargosecurities.com. For the purposes of the U.K. Financial Conduct Authority's rules, this report constitutes impartial investment research. Each of Wells Fargo Securities, LLC, Wells Fargo Securities International Limited and Wells Fargo Securities Europe S.A. is a separate legal entity and distinct from affiliated banks. Copyright © 2022 Wells Fargo Securities, LLC

---

SECURITIES: NOT FDIC-INSURED - MAY LOSE VALUE - NO BANK GUARANTEE

---

EXHIBIT 12

 **steno.ai**

Contact us        Sign in

## E69: Elon Musk on Twitter's bot problem, SpaceX's grand plan, Tesla storie...

Expand ⌄

 Overview     Summaries     **Transcript**

### ▶ Chapter 1 - Unraveling the Twitter Bot Mystery & Elon's Twitter Vision

▶ **Jason Calacanis** - 00:00

So live from an undisclosed location with the sultry filter on. Very sultry filter on. Having a great hair day. Yeah, that is a good hair day for you. Great hair day, my pal. And your favorite CEO and Twitterer, Mr. Elon Musk. How you doing, pal? I appreciate you coming to the event and zooming in.

▶ **Elon Musk** - 00:36

in your world? Well, let's see. I guess right now, I'm sort of debating the number of bots on Twitter. Currently, what I'm being told is that there's just no way to know the number of bots. It's like as unknowable as the human soul, basically. We have no idea what level of witchcraft and alchemy is needed to determine these bot percentage. I said, like, why don't I try calling people?

▶ **Elon Musk** - 01:32

Greetings 🦊 Ask me anything!                                                    ✕

But I haven't got a response. You know, like, if you try call~~ing people or something, you~~ know, like, maybe it's not about. No, no, no. I don't know. But I think, like, that would b~~e~~ one of the things to do to say, like, have you tried calling them as opposed to trying ~~to~~ read the tea leaves here? That's, like, impossible.





Contact us     Sign in

You know, obviously, you can have an account that looks exactly like a human account or is being operated where one person is operating a thousand accounts or something. But that person can only buy one toaster. They're not going to buy a thousand toasters. You care about the number of unique, real people that are on the system. It's extremely fundamental. Anyone who uses Twitter is well aware that the comment threads are full of spam, scam, and just a lot of fake accounts.

**Elon Musk** - 02:29

It seems beyond reasonable for Twitter to claim that the number of Essentially, said another way, the number of real unique humans that you see making comments on a daily basis on Twitter is above 95%. That is what they're claiming. Does anyone have that experience? There's a bridge I'd like to sell you, you know. And also, you can buy the Brooklyn Bridge. What do you think it is?

**Elon Musk** - 03:09

Yeah, what's the anecdotal? If it's not 5%, what is it? I think it's a number that is probably at least four or five times that number. The lowest estimate would be probably 20%. And this is a bunch of quite smart outside firms have done analysis of Twitter and looked at the sort of daily users. And their conclusion is also about 20%. But that's a lower bound.

**Elon Musk** - 03:45

It's not an upper bound. If you look at, say, the most liked tweets on Twitter, So I have the honor of having the most liked tweet of any living human. Thank you, everyone, for liking my tweet, including some of the bots out there. But ... million likes. It's like 4.7 or something like that. And that w... that next time buying Coca-Cola to put the cocaine back

Greetings 🐵 Ask me anything!          ✕



**Elon Musk** - 04:31

 steno.ai

**Contact us**    **Sign in**

really think about going back to their roots. Coca-Cola. I mean, this, I guess, is the reason why our grandparents could sort of walk 20 miles in the snow. Because they had Coca-Cola with cocaine. This is the real reason. Anyway, that is literally the most popular tweet of any living human.

▶ **Elon Musk** - 05:08

Twitter says the sort of monetizable daily active users is 217 million. Why would it be that the most popular tweet ever basically is only 2%, 2.5% of the entire user base? This seems a very, very low number. The most popular tweets generally are clustered around that $4 million-like level. It's basically 2% or less than 2% of the daily active users. Technically, monetizable daily active users is how Twitter refers to it.

▶ **Elon Musk / Jason Calacanis** - 05:52

How is this possible? Surely there's something that maybe 10% of people would like, not merely 2%. Well, actually, if you think about it, Elon, there's a corollary on YouTube. What's the total user base of YouTube? And what have the most popular videos gotten there? Yes.

▶ **Jason Calacanis** - 06:10

And I think there's a billion or two, maybe a billion people using YouTube. And the most popular videos have tens of billions of views. Yes. That might be instructive. Exactly. That ratio makes a lot more sense.

▶ **Elon Musk** - 06:26

Greetings 🫨 Ask me anything!   ✕





Contact us      Sign in

potentially 80% or 90% bots? Yeah. I certainly know there are some real people on Twitter, but is it an order of magnitude? Is it 50% instead of 5%? That's obviously an incredibly material number, especially since Twitter relies primarily on brand advertising as opposed to specific click-through advertising where you make a purchase.

**Elon Musk / Jason Calacanis** - 07:03

If you make a purchase, it doesn't really matter that much. But for brand advertising, which is really just awareness advertising, it matters if real humans are seeing that or not. Yeah. And so I guess stepping back for a second, people are curious why you want to buy Twitter. Why is this so important to you? And then I guess, what are the chances you think the deal gets done at this point? So a two-parter.

**Elon Musk** - 07:29

Why is it so important to me. I mean, some of this I've articulated before but I think there's a need for a public town square digital town square that where people can debate issues of all kinds. including the most substantive issues. And in order for that to be the case, you have to have something that is as broadly inclusive as possible, that has as much of the people on the platform as possible, where it feels balance from a political standpoint, it's not biased one way or the other, and where the system is transparent. This is why I think it's important to put the algorithm on GitHub and actually allow the public to see it and critique it and improve it. And if there are any manual changes, sort of shadow banning as it's called, or increasing or decreasing the prominence of a tweet that's done manually, that that should be noted so you know what has happened.

**Elon Musk** - 08:29

And it's not just, you know, you're just where it is right now        Greetings 🐦 Ask me
the heck is going on. Why is one tweet doing well? Why is          anything!
algorithm? Did someone manually intervene? Why are some accounts banned with no
recourse, apparently?

 steno.ai

**Contact us**     **Sign in**

And the reality is that Twitter at this point has a very far left bias. And I would classify myself as a moderate, neither Republican nor Democrat. And in fact, I have voted overwhelmingly for Democrats historically, overwhelmingly. I'm not sure.

## Chapter 2 - The Evolution of Tesla: From Car Company to Super Company

**Elon Musk** - 09.09

I might never have voted for Republican, just to be clear. Now, this election, I will. David, you OK? Keep going. Keep going. He's fine. He's fine. We're going to resuscitate him. We're going to resuscitate David Sachs. I mean, let me ask you a personal point. The point I'm trying to make is that this is not some sort of attempt to, you know, it's not some right wing takeover, as some people on the left may fear, but rather a moderate wing takeover. and an attempt to ensure that people of all political beliefs feel welcome on a digital town square and they can express their beliefs without fear of being banned or shadow banned. And that we obviously need to get rid of the bots and scams and trolls and people that are operating huge bot armies in an attempt to unduly influence the public opinion. I think it's very important that we have that. Some of the smartest people in history have thought about it and said, free speech is important.

**Elon Musk** - 10:20

For a healthy democracy, it is important. Free speech only matters When does free speech matter most? It's when it's someone you don't like saying something you don't like. That's when it actually matters. It's pretty annoying when someone you don't like says something you don't like. That's bad, but it's actually a good sign that you have free speech. So, I mean, I get trashed by the media all the time.

Greetings  Ask me anything!     ✕

**Elon Musk / Jason Calacanis** - 11:00



It's fine. I don't care. Do it twice as much. I couldn't care less. But it's indicative of the



**Jason Calacanis** - 11:24

And then Biden, you've been a lifelong Democrat. You've donated to Obama and to everybody, probably never voted Republican. And yet, and the same is true for Joe Rogan. Joe Rogan is a Bernie Sanders supporter. And that the Democratic Party has been openly hostile to Joe Rogan, and Biden can't even say the word Tesla or invite you to the White House when they do an EV summit. I'm curious, just on a very personal basis, what does it feel like to have that experience where the party you supported won't even say the name of your company or invite you there?

**Elon Musk** - 12:00

They should be celebrating the work you're doing. Yeah, I mean, it definitely feels like this is not right. The issue here is that the Democrat party is overly, overly controlled by the unions and by the trial lawyers, particularly the class action lawyers. And generally, if you'll see something that is not in the interest of the people, on the Democrat side, it's going to come because of the unions, which is just another form of monopoly, and the trial lawyers. That's where actions will be happening from the Democrat side. They're not in the interest of the people. And then, to be fair, on the Republican side, if you say, where is something not ideal happening, it's because of corporate evil and religious zealotry.

**Elon Musk** - 12:53

That's generally where the bad things will be coming from on the Republican side that are not representative of the people. In the case of Biden, he is simply too much captured by the unions, which was not the case with Obama. So in the case of Obama, you could have, you know, he was sort of quite reasonable. And I think he took more of a view that, you know, obviously you need to take the concerns into account, but there are bigger issues at stake. And unfortu... that. Elon, I have a Tesla question.

Greetings 👋 Ask me anything!                    ✕

**David Sacks** - 13:27

 **steno.ai**

**Contact us**          **Sign in**

the setup is this. It said, since you went public, Tesla's up 22,000%, 11 quarters of sequential profitability, so hitting on all cylinders, but the public analyst, But analysts when they put out their projections, okay and It's one of the most enormous bans for any company in America. The price targets for Tesla, despite all of this success, some have it at $200, some have it at $1,600. It's all over the place. You tweeted a couple months ago, Tesla's not a company. It's like six companies inside of a company.

▶ **David Sacks / Elon Musk** - 14:20

You've had to build this. Yeah, maybe more. Yeah, maybe more. Can you just explain to people all these companies inside this super company, just so folks have a sense of what had to be done to get here? Okay. I mean, this question requires thought, and I'll probably be leaving out quite a few things.

▶ **Elon Musk** - 14:34

But if you look at, say, what does a typical car company do? What they do is they assemble vehicles. and they send them to dealers, and they manage the supply chain. They might make the engine, or typically will make the engine, but most of the parts are made by suppliers, and a lot of the actual technology development is done by suppliers, and most of the vehicle software is done by suppliers. So the actual amount of real work done by car companies, what you think of sort of like a GM or Ford, is not actually that much. They don't do sales. They don't do service. In the case of Tesla, for example, we do our own sales and service. We don't have dealerships. Then in Tesla also has, by far, the biggest network of superchargers, the electric equivalent of gas stations. We built an entire global supercharger network, which is still the most advanced and, by far, the best way to charge your car when traveling long distance or if you live in a city and don't have the ability to charge your car because of street parking or an apartment.

▶ **Elon Musk** - 15:50

Greetings 👋 Ask me anything!                                                   ✕

The whole supercharger network, we developed the supercharger network. We deployed it. I think we have 15,000 superchargers globally. You can travel anywhere in America right now with the Tesla supercharger network. Then, in terms of vertical integration, we make the battery pack, the power electronics, the drive unit. We're

 steno.ai

Contact us     Sign in

▶ **Elon Musk** - 16:22

We actually make so much of the car internally. We're vertically integrated, not necessarily because we think that there's some religious reason to be vertically integrated, but because the pace at which we needed to move was just much faster than the supply chain could move. And to the degree that you inherit the legacy supply chain, you inherit the legacy constraints, including their speed, cost, and technology. Then Tesla is as much a software company as it is a hardware company. The software that runs in Tesla operates the car, operates the screen, does the charging. All of that stuff is developed by Tesla. We have a Tesla OS in the car.

▶ **Elon Musk** - 17:04

When you I could go on for a long time. And then, very importantly, Tesla has built an autopilot AI team from scratch that is the best real-world AI team on Earth. And if anyone else has got a better one, I'd like to see it demonstrated in a car. The full self-driving beta at this point can very often take you with zero interventions across the Bay Area from San Jose to Marin. So, through complex traffic, it's really quite sophisticated. I'd invite anyone to join the beta or look at the videos of those who are in the beta.

▶ **Elon Musk** - 17:43

We've got like 100,000 people in the beta, so it's not tiny. We'll be expanding that to probably a million people or a million, I don't know, on that order by the end of the year. It's a You had the slide. We also built a chip team because there wasn't hardware that we could run the frigging AI on. We couldn't just fill the trunk with a whole bunch of GPUs. They would have taken a trunk full of GPUs that would have been very expensive and take massive amount of power and cooling just to be able to do what the Tesla designed full self-driving computer can do. We started a chip team from scratch, designed it.

Greetings 🐧 Ask me anything!                    ✕

▶ **Elon Musk** - 18:26





Contact us     Sign in

also designing a dojo supercomputer to be able to process all the video that's coming in from billions of miles of data. Just the way that it's critical to compete with Google because they have so much data and they have all these people doing searches all the time and humanity is training it. The same is true of Tesla. You really need billions of miles, ultimately tens of billions of miles of training data combined with a vast training computer and then optimized inference hardware in the car and state-of-the-art AI and training and specialized software across the board to be able to achieve a full self-driving solution. I just want, when he opened Tesla Gigafactory, remember this six or seven years ago?

**David Sacks** - 19:16

I'll just tell the audience a story quickly, Elon. He puts a slide up there and he says, guys, we're not actually building a factory, we're building a machine that makes machines. And he puts the layout of the factory, and it looks like a chip. And it was basically like how you would actually lay out a microchip if you were, or you know, you were like a layout engineer. It was the craziest thing I'd ever seen. I was like, that was when I first got it. You know, you walk on 10 and you see what's happening.

**Jason Calacanis / Elon Musk** - 19:40

And you have an insurance company now, you're doing insurance for Tesla owners. And an Uber competitor. Right, and eventually a RoboTaxi Uber competitor, RIP. Insurance is not quite significant. And now are you okay? I'm okay. The car insurance thing is a bigger deal than it may seem.

**Elon Musk** - 20:00

Greetings 👋 Ask me anything!          ✕





insurance. So the car insurance industry is incredibly inefficient because they're just, first of all, you've got like so many sort of middle entities. You've got from an insurance agent all the way to the final sort of reinsurer. There's like a half a dozen companies each taking a cut. And then the It's all very statistical. Even if you're a very good driver, you could be 20 years old and a great driver, but it's all statistical, so you either can't get insurance or it's extremely expensive. But Tesla allows for real-time insurance based on how you actually drive the car.

▶ **Elon Musk / Jason Calacanis** - 20:45

If you drive the car in a safer way, you actually have lower insurance. Our insurance is based on how you actually drive, not how Historically, people that fit your demographic have drive. And then you can close the loop around your insurance rate by simply driving better and looking at your score and lowering your insurance in real time. And people do it. It actually promotes safer driving. I actually have had this experience because in my household, two people drive my car, and one of them has a 93 score and the other one does not. They have like a 60 score. And you may have met this other person, but I've been trying to work with her on the aggressive turns and stops in advance.

▶ **Jason Calacanis / Elon Musk** - 21:33

of our insurance bill, which we're hoping will go down at some point. The one question, is this Twitter deal going to get closed, do you think? What are the chances here? Well, I mean, it really depends on a lot of factors here. I'm still waiting for some sort of logical explanation for the number of fake or spam accounts on Twitter, and Twitter is refusing to tell us. You know, this just seems like a strange thing. Wait, sorry, are they refusing to tell you or you don't think they really know?

▶ **Chapter 3 - Navigating the Roller Coaster: From Crisis to Triumph**

Greetings 👋 Ask me anything!

▶ **Elon Musk** - 22:11

I mean, there's a good chance they may just have no idea. They claim that they do



**Contact us**    **Sign in**

home, and, um... Double, double, toilet roll.

▶ **Elon Musk** - 22:41

And then suddenly, it comes to you in a dream. I don't know. But there should be some, you know, objective way to set the thing, because this is a material public statement. It's a threshold issue, yeah. It's a material adverse misstatement. If they in fact have been vociferously claiming less than 5% of fake or spam accounts, but in fact it is four or five times that number, or perhaps 10 times that number, This is a big deal. It seems like if you said, OK, I agree to buy your house.

▶ **Elon Musk** - 23:21

You say the house has less than 5% termites. That's an acceptable number. But if it turns out it is 90% termites, that's not OK. It's not the same house. This house is made mostly of termites. Two months leave, and literally your house will disappear because it's mostly made in two months. So that would obviously just not be appropriate.

▶ **Elon Musk** - 23:45

So in making the Twitter offer, I was obviously reliant upon the truth and accuracy of their public filings. And if those filings are not accurate, it's simply not. You can't pay the same price for something that is much worse than they claimed. And, you know, they say, Elon, life's a negotiation. So at a different price, it might be a totally viable deal, correct? I mean, that I mean, it's not out of the question. But I really would, you know, this is, you know, the more the more questions I asked, the more I the more my concerns grow.

▶ **Elon Musk** - 24:30

Greetings 👋 Ask me anything!                    ✕

So At the end of the day, acquiring has to be fixable and with a reasonable timefram and without revenues collapsing along the way and all that sort of stuff. I really need see how these things are being calculated and it can't be some deep mystery that is



**Contact us**    **Sign in**

brand advertising as opposed to specific purchase advertising. This is a big deal because brand advertising is not a purchase that results from that. It's basically how much mindshare… Basically, if you're a big company, how often do they hear your name?

▶ **Elon Musk** - 25:27

It's as opposed to something where you can directly measure the outcome. So that means that they're somewhat going on faith. And if that faith is undermined or reduced because of the reality of the situation coming to the fore, then Tesla's revenue or Twitter's revenue will be significantly impaired. And that's a major problem. Elon, did you have a chance to ask these questions during your negotiation? Like I said, I was reliant upon their public filings.

▶ **Elon Musk** - 26:03

This is normal for a public company. If you make a formal filing, that is what investors are relying on, whether they are making an acquisition offer or simply buying some shares. So the accuracy of these filings is important whether you're buying one share or the whole company. And so if these filings are inaccurate, if they're sort of potentially blatant, it's a big… Do you have a sense of why this has been such a persistent problem for twitter do they not have the technical capabilities to solve the bot problem or is it more of like just a underprioritize the issue or been unwilling to because potentially the ramifications for ad revenue. I don't know. It's sort of speculative at this point. So the worst interpretation would be that they don't want to look too closely at the thing because they might not like the answer.

▶ **Elon Musk** - 27:06

That'd be the worst interpretation. I'm not sure what the b[...] least bad interpretation would be maybe they thought it w[...]

Greetings 🤖 Ask me anything!

were doing it was wrong and they didn't realize they were m[...] paying enough attention. It does seem as though it should be a lot easier to get rid of the bots and spam and trolls. We're not trying to split the atom here. We're not trying get to the moon, okay? We're just trying to… limit the amount of obviously scammy accounts. If it's like a Bitcoin giveaway, you know, probably it's a spammer, you know,

 **steno.ai**

Contact us    Sign in

▶ **Jason Calacanis** - 27:51

Wait, you're not giving away a hundred Bitcoins? I just sent you ten each. If you send me two Bitcoin, I'll send you one back. All right. That's my. What if I send you 20? Actually, I thought one of the interesting things that came up in your product roadmap, or I guess this was released and people covered it, was the possibility of Twitter becoming kind of a super app with payments included, perhaps even Doge or something.

▶ **Jason Calacanis / Elon Musk** - 28:23

This seems to me, based on your work with David at PayPal, like a pretty brilliant idea. what's the vision there in terms of if you were able to buy it, you know, perhaps at the right price? What would it look like if, you know, I could add Jason to add Elon Musk, you know, 10 bucks or something if you know, we were splitting a check or something? Sure, well, For those that have used WeChat, I think WeChat is actually a good model. If you're in China, you kind of live on WeChat. It does everything. It's sort of like Twitter plus PayPal plus a whole bunch of other things and all rolled into one with actually a great interface.

▶ **Elon Musk** - 29:01

It's really an excellent app. We don't have anything like that outside of China. I think such an app would be really useful and just like the utility of sort of a spam-free thing where you can make comments, you can post videos, you can I think it's important for content creators to have a revenue share. Now, this does not need to be done on Twitter. It could be done from something that's created from scratch. It could be something new. But I think this thing needs to exist, whether it is converting Twitter to be the sort of all-encompassing app that, like I said, everything from Digital Town Square where important ideas are debated maximally trusted and inclusive. and at a point where you have a high-trust situation, then paymen~~t~~ Greetings 👋 Ask me ✕ can make a lot of sense. You just want something that's i~~s~~ anything! people love using.

Greetings 👋 Ask me anything!

▶ **Elon Musk / Jason Calacanis** - 30:13



Contact us    Sign in

need to happen somehow. Well, it's interesting you bring that up, because the price of Twitter is pretty high, and you've built a couple of companies, and some engineers like to come work for you, and you've now gone through the intellectual exercise of studying all this. If you're looking at the two choices now, fixing Twitter, given all these problems, and maybe just starting your own version, which one are you leaning towards? Because I have watched you build a couple of companies, and the products have turned out pretty good. So is it easier for someone like you to just start from scratch? It's certainly my default inclination is to start things from scratch. I'm not really... I don't buy things.

**Elon Musk** - 30:59

There's still this sort of... SpaceX was started from scratch. In the case of Tesla, it was like five people. There's still this guy, Marc Eberhard, who's the worst guy I've ever worked with, who tries to claim like sole credit essentially for creating Tesla. And if he's so damn great, why didn't he just go create another car company when he was fired? But anyway, so- Well, I mean, that's a pretty good story. I mean- Yeah. I remember- I mean, no, but I remember having this conversation with you.

**Jason Calacanis** - 31:37

We were having a conversation about the Roadster. I think I can tell the story. I said, how's it going, pal? And you said, well, I got one problem. It turns out the Roadster parts and putting it together cost $190,000. And I said, I gave you $150,000 for number 16. So if you make $2,000 of these, you're going to lose $80 million.

**Elon Musk** - 31:55

And you were like, yeah, or double that. I mean, they basically, the parts of the car cost more than they were selling it for when you were starting +
no, no, I got involved. Well, before that, yes. When Twitter v
nothing but a piece of paper. Let me be crystal clear. Crys

Greetings 👋 Ask me anything!



**Elon Musk** - 32:18

          **Contact us**    **Sign in**

struggle based on the AC Propulsion T0. And when I asked AC Propulsion if it was okay to do that, they said, well, there's also some others who want to create an EV company, but have not created one yet. Would you like to join forces with them?" I said, okay, well, we'll do that. That was a huge mistake.

▶ **Elon Musk** - 32:48

JV and I should have just started the car company ourselves. Instead, we teamed up with Eberhard Toppening and Wright. Big mistake. The actual moral error here was me trying to have my cake and eat it too, which is like, I just want to work on the technology and the product and have someone else be the CEO and run the business operations because I just like working on technology and product and design. Also, I was doing SpaceX at the time and our office was blowing up. I always wanted to do an electric car company. This is how I can have my cake and eat it too.

▶ **Elon Musk** - 33:24

That was a huge mistake and, fundamentally, a moral error. In the end, I had to friggin' be CEO and I didn't want to be, basically. But it's either that or the company's going to die. So we started with really just nothing. And the T-Zero prototype from AC Propulsion, that's the precursor to Tesla. To be one half second clear, once again, when we created Tesla, when I joined, there were no employees, there was no intellectual property, there was no prototype, there was no nothing. to be crystal fucking clear.

▶ **Elon Musk** - 34:07

And it almost bankrupted you. I mean, that sent you to the cliff of insolvency. Yes, we were on the ragged edge of bankruptcy so many times it was ridiculous. 2008 was one of the worst years where basically the You know, GM and Ford, GM and Chrysler, Ford almost went bankrupt. And, you know, trying to raise money for a startup electric car company in 2008 while GM was going bankrupt was diffi    Greetings 🐵 Ask me
know, people were angry that I even asked them for mone    anything!                    ✕



▶ **Elon Musk** - 34:53

 steno.ai

**Contact us**      **Sign in**

2008 was a subset of the existing investors which included people like Antonio Gracias, and Steve Jovitson, and a few other key people, Ira Aaron Price, who I hold a debt of gratitude to this day. I put in all the money I had left. Everything. Literally everything. I didn't even have a house.

▶ **Elon Musk / Jason Calacanis** - 35:28

This is my ex-wife at the house. I was staying actually in Jeff Skoll's spare bedroom. The subset of the investors would say, okay, they're putting as much as I put in, so I put in everything. Then we closed that round 6pm, Christmas Eve, 2008. It was the last hour of the last day that was possible because after that, people were breaking for the holidays and we would have bounced payroll two days after Christmas. It was a pretty... That's doorstep. I mean, it was an incredible moment in time and people also forget at the time that the first two rockets SpaceX sent up didn't exactly make it to orbit. The first three, right? Yeah, the first three. And I remember having dinner with you at that time and I asked you, hey, how's it going? I heard Gawker says you got four weeks of payroll left.

▶ **Jason Calacanis / Elon Musk** - 36:22

And you said, that's not true. And I said, thank God. And you said, we have two. Both SpaceX and Tesla in 2008, if we'd simply paid our suppliers on time, we would have gone bankrupt immediately. Tell us actually. It was a pretty crazy moment in time, because I also remember asking you, we were having dinner at BOA, and I said, well, certainly there's got to be some good news.

▶ **Jason Calacanis** - 36:51

And you took out your BlackBerry to date the conversation. I don't remember it. Oh, yeah. And you said, don't tell anybody, Jake. I said, no problem. And you showed me the clay version of the Model S. Yeah, beautiful car I'd ever se  Greetings 🐵 Ask me
it's stunning.                                                           anything!                    ✕



▶ **Jason Calacanis** - 37:07



Contact us    Sign in

was yesterday. I said, if you make that car for 50,000, you'll change the fucking world. And you did it. And it was a little more than 50,000. But yeah.

**Jason Calacanis** - 37:24

Let's ask about spaces. Okay, well let's ask about spaces, but I want to ask one more personal question. Has life gotten easier for you as these companies have hit scale, or has the complexity made life even more challenging? Because those early days, it was just fighting to survive. Nobody knew who you were, you were anonymous. And it was really just about the work.

**Jason Calacanis** - 37:45

And now, let's face it, you're the world's most famous guy. And everybody's watching everything you do. But these companies are also very big. So what's life like for you today? Are you enjoying what you're doing every day? Well, I mean, it's somewhat of a roller coaster.

**Elon Musk** - 38:00

So there are like good days and bad days. And there's always a crisis issues. And, you know, like sort of, you know, knock on wood, like we're not like facing, you know, death in the face. Like it's definitely like quite stressful when like, you know, death is like trying to eat your face off. And like the foam is like, you know, just kidding. And like, yeah, right there, you know.

**Elon Musk** - 38:28

Greetings 👋 Ask me anything!    ✕




steno.ai                                                    **Contact us**    **Sign in**

reserves, so it's not like we're staring death in the face. We can sort of see it over in the horizon, so I don't want to get complacent or entitled. But if it's not just sort of foaming at the mouth, gnashing, trying to eat your face off on a daily basis. We've moved on from that point and hopefully never return. But there are a lot of issues that need to be… If you're a CEO of a company, the chore level is high.

▶ **Elon Musk** - 39:08

If you don't do your chores, then the company goes to hell. I hate doing chores, frankly. Who does? That's the real… There's a whole bunch of personnel issues, legal issues, and things that I don't find enjoyable to work on.

## Chapter 4 - Unveiling the Future: Space Exploration, Alien Quest, and Fusion Energy

▶ **Elon Musk** - 39:28

But if I don't work on them, the company suffers. It's more like, just the sheer volume of work is insane. And then I go add to it with Twitter or something like that. Yeah. Like an extra processor. Yeah. I mean, I have a habit of biting off more than I can chew and then just sitting there with like chipmunk cheeks. Tell us a little bit about where we are at SpaceX. You fund the ability to go to Mars, but then also commercially still build a conventional space business domestically.

▶ **Elon Musk** - 40:10

I think this Russia thing was probably really good for SpaceX. If you want to just tell us a little bit about that. Sure. I mean, the goal of SpaceX is that enables life to become multi-planetary. and make hu civilization, which I think is a very exciting, inspiring thing. things that I think just makes kids be excited about the future. And we need things that are inspiring and exciting and make the future seem like it's going to be better than the past.

Greetings 🎃 Ask me anything!    ✕



 steno.ai

**Contact us**    **Sign in**

Life can't just be about solving one miserable problem after another. It's got to be like, what's inspiring and exciting? And I think that a future where we are a space-faring civilization is one that we can all get excited about. And we can go out there and find out what's out there in the universe, and what's the meaning of life, and where are the aliens, and hopefully they're friendly, and that kind of thing. But it's interesting, I do get asked about the aliens question a lot, and I've not seen any evidence of aliens. And I'll be the first to tweet about it or whatever if I see some. I mean, you'll tell us if you find them. I will tell you. I will definitely tell you if there's aliens. know, I think it would be quite helpful for, you know, like, like, if we found aliens, like probably SpaceX will get a ton more revenue because people like, oh, man, aliens, we've got to upgrade our space technology pronto. Because what if you're unfriendly?

▶ **Elon Musk** - 41:50

You know, it's like, you know, that is the idea that you build basically the ability to do orbital cargo, take all those profits, launch Starlink, take all those profits and move it all into building something that can get to Mars? Is that the kind of rough Yeah, pretty much. If it was like a three-slide PowerPoint, it would be pretty much as you described, which is develop rockets that are capable of taking satellites to orbit and crew to the space station, basically servicing government commercial space launch needs, and then build a global communication system in space that obviously it does a lot of good for Earth, but by providing internet connectivity to the least served, because a satellite system is really great for remote locations and countryside or remote islands or places where someone's trying to cut off their internet. As a prelude to a war, we take them system like in Star Wars. Yeah. Yeah, so it's like, you know, so it can be pretty, pretty helpful. Like, I think, like, a strong link basically, I think, is a sort of forceful grid in its own right, by providing connectivity to the least served where they've got either no connection or a very expensive or poor connection, you know. We're connecting a lot of schools, remote schools in Brazil right now. I'm actually going to be headed there to sort of kick things off. But they've got a lot of schools that have no connectivity at all. In a modern age, how do you learn with no connectivity?

▶ **Elon Musk** - 43:37

Greetings 👋 Ask me anything!    ✕

I mean, you get, I guess, old textbooks and stuff, but you're at a huge disadvantage i you have no digital connectivity. So I think there's just a lot of good that Starlink can do just by itself. But then the revenue generated from Starlink is what can enable the



**Contact us**    **Sign in**

some pretty epic telescopes on the moon that would enable us to learn more about the nature of the universe and figure out what's going on and maybe detect those aliens. Do you think that there's enough profit in those businesses to fund all this?

▶ **Elon Musk** - 44:29

Or do you need Wall Street and other investors to come share the load with you? Is going to Mars a partnership with the government? Does it need to partner with governments to get there? Well, I think technically it does not need to partner with governments, but of course government support would be helpful. It's going to be very expensive to build a self-sustaining city on Mars. In order for us to become multi-planetary in a way that's meaningful, the key threshold is, at which point does the city become self-sustaining such that if the ships from Earth stop coming for any reason, And it could be any reason, could be World War III, or it could be just, you know, civilization subsided and just gradually got decrepit or something. But if the ships stop coming, if the resupply ships from Earth stop coming to Mars for any reason, does the city still survive?

▶ **Elon Musk** - 45:30

And that's like really a large base of resources that are needed on Mars. You can't be missing any one critical ingredient. And you can think of this like there are these various great filters that perhaps stop civilizations. And one of the great filters is will we become a multi-planet species or not? Will humanity be one of those? species that passes the great vulture of going beyond one planet and being a multi-planet species. This is certainly something we will have to do at some point because the sun is expanding and will eventually boil the oceans and destroy all life on Earth.

▶ **Elon Musk** - 46:07

If you care about life on Earth, you should really care abo    Greetings 🐵 Ask me
planetary and ultimately multi-stellar because otherwise,    anything!
signing the death warrant for all life as we know it. It's inevitable. And then there's als
the various things that killed the dinosaurs. I mean, if you look at the fossil record,
there have been five major extinctions that are sort of on the order of 80% to 90% of
all creatures on Earth dying for a wide range of reasons. And then humans can also,

 **steno.ai**                                    **Contact us**    **Sign in**

characterize it potentially as, which will come first, World War III or life becoming multi-planetary on Mars? Sorry, I was going to shift, but when you think about the importance of going to Mars versus solving critical energy and climate change problems here on Earth, obviously the effort with Tesla is related to sustainable energy.

▶ **Speaker 2** - 47:24

And I think going back to probably the 1950s, there were engineering designs around plasma fusion or fusion-based systems that have evolved to these plasma systems, to these tokamak systems. And every decade, it's like, hey, next decade, we're going to have it. What's your point of view? on where plasma fusion systems are. Are we going to have fusion energy this century, this decade? And does it create limitless energy where the electricity production goes up by 10,000 fold and the price of electricity drops by 10,000 fold? And then what does that world on Earth look like if that happens?

▶ **Speaker 2 / Elon Musk** - 47:59

So I guess the question is like, is that technology real? When does it happen and what happens to the world here when and if that happens? answer that question, but let me point out what the actual issue is. If the question is, is it possible to solve fusion energy, 100% yes, definitely, definitely, definitely, definitely, for sure. Really just using a tokamak style, which is basically a donut ring with with electromagnets that control the plasma. The way to solve that is simply scale up the tokamak.

▶ **Elon Musk** - 48:36

Fusion is very much a scale-based thing. You want to minimize your surface-to-volume ratio. As you scale up, tokamak, you reduce your surface volume ratio, which means the volume you have relative to the surface, you c      Greetings 🐕 Ask me
in the center that's relatively far away from the walls and      anything!
my mind, a question as to whether fusion can work, but there is a question as to
whether it is economically viable. and whether it is competitive with alternatives. I thi
the economic viability of fusion is a much bigger question.



Contact us    Sign in

And I think the answer probably is that fusion is not competitive economically. I think that is, I would say it's probably not competitive economically by an order of magnitude. Where does it break? Is it a materials breakdown or where does it break down economically? Well, so you can't just... use normal hydrogen.

## ▶ Chapter 5 - Unleashing the Potential: Fusion, Energy, and Gigafactories

**▶ Elon Musk** - 49:49

You need to use deuterium and tritium, unusual forms of hydrogen. Helium-3. There are some other types of fusion that could be used. There's not a lot of this raw material. It's quite difficult to get the raw material. First, you have to get the raw material. That's expensive raw material. It's not just about generating the energy.

**▶ Elon Musk** - 50:20

You've got to turn that energy into usable electricity. You can't just have a hot thing. The hot thing has to translate to usable electricity. So I think you've got a cost of fuel issue, which is very significant. You've got a whole bunch of knockdowns from when you generate the heat to when you actually convert that into electricity. You've got some very difficult maintenance issues with a fusion reactor. So, and that should be then compared to alternatives. The sustainable energy alternatives that I think are overwhelmingly more competitive are solar energy, wind, geothermal, hydro, some tidal energy, but it's really primarily solar and wind.

**▶ Elon Musk / Speaker 2** - 51:16

Now, you can really say, like, why bother creating fusion o  Greetings 🦾 Ask me
gigantic fusion reactor in the sky that just works with zero maintenance? And it shows
up every day. It's pretty consistent. Yeah. But Elon, can we scale to 1,000x or 100x our
electricity production here using solar and other renewable sources? Yes. The amou
of surface area you need to power the United States is remarkably tiny. You need



Case 3:22-cv-05937-CRB    Document 59-1    Filed 03/26/24    Page 342 of 473

 steno.ai

▶ **Elon Musk / Speaker 2** - 51:53

It doesn't need to be in one place in the United States to power the United States. It's like a little corner of Texas or Utah, the entire country. And then if you, you could basically power, you probably 10X, just with solar alone, without displacing anyone's home, power an economy 10 times the size of the United States, in the United States, on land. If you extend that to water, because earth is 70% water, I mean, you could say, okay, now we could probably have civilization that is a hundred times as energy intensive as we currently have it. So what does that look like with the last part of my question, which is a world where energy costs are say let's a hundred times cheaper than they are today and we have a hundred times more energy production capacity. What changes about civilization? What do we do differently and what do we see? change most dramatically?

▶ **Elon Musk** - 52:51

Currently, because of generally low birth rates almost worldwide, civilization is not headed to have a population that is an order of magnitude greater than where we're currently. We're currently headed towards a population decline. This is almost everywhere in the world. It basically seems as though as soon as you have urbanization and education beyond a certain level and income beyond a certain level, birth rates plummet. As countries get wealthier, their birth rates plummet. It's somewhat counterintuitive because people will say, well, it's too expensive to have a baby. Nope.

▶ **Elon Musk** - 53:34

The wealthier you are, the fewer kids you have. The more educated you are, the fewer kids you have. It's the inverse. I'm not sure who would use all that energy unless there's a significant change in the birth rate or we have a very robot-oriented economy. That's also possible. you know, four wheeled robots in form of co    Greetings 🫐 Ask me robots, then you can certainly see that there'd be perhap    anything! magnitude more energy. But it's not coming from the hun..... ....... ............ major changes on the human birth rate level.

 steno.ai

Contact us    Sign in

This, by the way, is, I think, the biggest single threat to civilization right now. Why do you think, societally, people just make those decisions when they become more affluent? Is it that they just become more selfish, or there's more things for them to do, and they have more money to spend on themselves, and they say, you know what? I don't want to have a large family. I want to go to Coachella. Yeah, well, there is this like weird like mind virusy thing where some people are think like having fewer kids is is like better for the environment.

**Elon Musk** - 54:53

Yeah, it's crazy. Total nonsense. The environment is gonna be fine. They're gonna be fine. Even if we if we doubled the size of the humans. This is and I know a lot about environmental stuff. So, you know, We can't have civilization just dwindle into nothing. Japan's a leading indicator here. Japan's population declined by 600,000 people last year. They have the lowest birth rate in history. It's pretty bad.

**Elon Musk** - 55:31

I think So this one element of it is a lot of people just think that having kids is somehow bad for the environment. I want to be clear, it's not. It's essential for maintaining civilization that we at least maintain our numbers. We don't necessarily need to grow dramatically, but at least let's not gradually dwindle away until civilization ends with us all in adult diapers and in a whimper. Like we don't want civilization to end in adult diapers with a whimper. That would suck. Bleak. Bleak and sad. Well, I mean, you and I have had this conversation.

**Jason Calacanis** - 56:05

I mean, in Japan, I had two people tell me when I was there  ~~ill~~  ~~d thi  little~~   t   bring humans into the world. I mean, people have gotten    Greetings 🤖 Ask me    kind of crazy. The world's great. Life's awesome. Yes.    anything!    ✕



**Elon Musk** - 56:21

 **steno.ai**                                    **Contact us**      **Sign in**

world. I'm like, have you read history? Because let me tell you, it was way worse back then. Okay. Yeah. Now's a good time.

▶ **Jason Calacanis / Elon Musk** - 56:33

Now's a good time to be bored. Hey, you know, listen, I know you're super busy, but I wanted to ask you about the move to Texas, because I've been thinking about it, Austin. California, I don't know, some senator told you to go fuck yourself, and like, you know, like, we don't need you here. Yeah, I think there's been a couple senators who said that, actually. It seems to be turning into a bit of a trend, but how has building the Tesla Gigafactory, which I got to see in Austin a couple of weeks ago, and it was one of the most inspiring things I've ever seen, I mean, I don't know how many months it took to build there, but how long did it take to build that dreadnought, and then what would have taken to build that in California under Gavin Newsom? We built the Giga Texas, which is the biggest factory in North America, I think possibly the biggest factory in the world. It's three times the size of the Pentagon, to give you a sense of scale.

▶ **Elon Musk / Jason Calacanis** - 57:30

This is frigging big. It's so big, it's weird. I was trying to find you in it. I was trying to drive around, and it took me about 45 minutes to find you. No, you can't find someone in the building. You have to call them on their cell phone and say, where are you? The building is just under a mile long and we're actually going to extend it.

▶ **Elon Musk** - 57:54

Greetings 👋 Ask me anything!                                        ✕




steno.ai

**Contact us**     **Sign in**

ridiculously big. When you think about it, for a manufacturing situation, the two things that really define manufacturing competitiveness are economies of scale and technology. If you've sort of maximized your ace level on technology and you maximize your ace level on scale, this is obviously going to be the most competitive situation. That's why they're so freaking giant. and GigaTexas will go all the way from cell raw materials, like basically railcars of cell raw materials coming in and then forming the battery cell, then the battery pack, building the motor, casting. We also have introduced a major innovation, which is to cast the entire a front third and rear third of the car as a single piece.

▶ **Elon Musk** - 58:54

I got this idea from toys, actually, because I was like, how do they make toys? Those are cheap. They just cast them. I was like, well, can you build a casting machine that big? And they're like, well, no one ever has. I'm like, are we breaking physics? Like, no.

▶ **Elon Musk** - 59:06

Well, let's just ask them. And there were six major casting machine suppliers in the world, and five of them said no, and the sixth said maybe. I'm like, I'll take that as a yes. Well, I mean, you wanted to do this for the Model 3, but it was just too soon, huh? And now it's almost there. Actually, this partly comes from the Model 3, which is actually a fantastic car in many ways. But we were rightly criticized for an inefficient design for the front and rear body.

▶ **Elon Musk** - 59:35

Like Sandy Munro, who I think is really excellent from an engineering standpoint and really a very fair critic. He pistol whupped us for the design of the battery. He ripped it apart and piece by piece told you why you suck. And then he did the why and told you why you were awesome. He took it apart and told us exac   Greetings 🐙 Ask me was correct. And then I was like, well, that's pretty embarr   anything! complimentary of other parts of the car, but not the body design.

▶ **Elon Musk** - 1:00:12

 **steno.ai**                    **Contact us**   **Sign in**

body to make. It's made out of 120 different pieces with dissimilar metals that are joined, and you've got galvanic corrosion challenges. It's very difficult to make. To a single-piece casting, that's one piece. 120 pieces went down to one. It's huge. The Model Y body shop, especially the new one where we cast both the front and rear, is 60% smaller than the Model 3 body shop. It's gigantic.

▶  - 1:00:41

There's a lot of innovations at Tesla besides the stuff that is obvious. To be fair to Gavin Newsom, if you If you had a gun to Gavin's head and said, we need to start building this factory in California right now, he couldn't do it because there are so many regulatory agencies and so many litigators in California that want to stop you from doing anything that even if you're the governor of the state, you cannot get it done.

## Chapter 6 - The Future of California, Economic Predictions, and Immigration Policy

▶ **Elon Musk** - 1:01:21

So, something's got to be done to, you know, because California used to be the land of opportunity. And it's a beautiful state and I loved living there. I still spend a lot of time in California, even though every time I go there I get the Literally, every day I go there, I get the Jesus tax out of me. The sheer cost per day of me going and working in California today boggles the mind, but I still do it. But California has gone from a land of opportunity to the land of sort of taxes, over regulation and litigation.

▶ **Elon Musk / Jason Calacanis** - 1:01:58

Greetings 🦔 Ask me anything!                                          ✕

And this is not a good situation. And really, there's got to be like a serious cleaning out of the pipes in California. How many months was it to get the giga Austin done? too year and a half, two years? Yeah, 1818 months to build something three times the size of the Pentagon. And you just basically the answer to how many months it would take

 **steno.ai**

Contact us    Sign in

▶ **Speaker 2** - 1:02:21

Yeah. Elon, this begs a good question, which is... I'm not exaggerating. Can you just keep signing paperwork? We have one more forum for you. What's a better model for government? All governments tend to increase in complexity.

▶ **Speaker 2** - 1:02:41

Dictatorship. Capacity. Is the dictatorship the right model? How do we solve this? Let's say you go to Mars, or let's say you have to fix California. Is California permanently broken? Is there a way to fix it?

▶ **Elon Musk** - 1:02:54

Or how do you set up a better model so that you don't end up having this special interest complexity situation that eventually kills the population? I mean, I think ultimately with California, the people of California just have to get fed up and demand change. That's the thing that really has to happen. And there's got to be an above zero percent chance of the Republicans winning in California. If it's just the Democrats every time, it's got to be. And this is like occasionally, the thing is that right now, plus the level of gerrymandering, which is basically just treating the people like sheep, and it's terrible.

▶ **Elon Musk** - 1:03:39

that's gone on in California is outrageous. So California, the Dems have a supermajority in the House and Senate in California and the governor and everything. And so how responsive is any political party going to be to [ ] guaranteed to win? It's a one party state. And so I'm not s [ ] Greetings 🫱 Ask me sort of elect the Republicans every time. But if it's never, y [ ] anything! a one party state. They will no longer be responsive to people and will only be responsive to those that funded their political campaigns.

 **steno**.ai

**Contact us**    **Sign in**

Clip Elon saying that 30 seconds on TV over and over. Go ahead, Sax. Elon, shifting gears to the economy, we saw this surprise report of negative 1.4% GDP growth in Q1. Interest rates have been rising. That increased the cost to the consumer of getting loans, things like that. We've had a stock market correction, really a crash in a lot of growth stocks, software stocks.

▶ **Speaker 1 / Elon Musk** - 1:04:38

From where you sit and the data that you see, where do you think the economy is headed right now? Do you think we're in a recession or is it just a risk? How do you assess our current economic situation? Well, predicting economic macroeconomics is always difficult and one should assign probabilities to these things. But ironically, I did last year, people asked me what I think about the economy. I said, well, I think we might enter a recession in approximately spring of 2022.

▶ **Elon Musk** - 1:05:09

Called it, nailed it. Yeah. So now the thing is that recessions are not necessarily a bad thing. I've now been through a few of them. And what tends to happen is if you have a boom that goes on for too long, you get misallocation of capital. It starts raining money on fools, basically. It's like any dumb thing gets money. And I'm sure you've seen a few of those. At some point, it gets just out of control and you just have a misallocation of human capital where people are doing things that are silly and not useful to their fellow human beings. Then there needs to be sort of an economic enema, if you will, to have everyone sort of shift uncomfortably in their seats. I'm sorry, it's just I'm visualizing it.

▶ **Elon Musk** - 1:06:06

The economic enema. I mean, listen, it's got alliteration. T    Greetings 🐥 Ask me
shall pass. Eventually, the economic enema does its job.    anything!    ✕
will. Yes. And sort of the bullshit companies go bankrupt and the ones that are doing useful products are prosperous. But there's certainly a lesson here that if one is making useful product and has a company that makes sense, make sure you're not running things too close to the edge from a capital standpoint that you've got some

 steno.ai

**Contact us**   **Sign in**

of 2000?

▶ **Elon Musk** - 1:07:02

The demand was so high, we had people like VCs just literally, without even a term sheet, wiring money into our account. We'll send the term sheet later. They literally would like sleuth out our bank account number and wire money in. And we're like, where'd this come from? And it's like, oh, so it was like, there was literally fire hosing money in March of 2000. And then in April, 2000, the market went into free fall. And it went from money, raising money was trivial to even good companies could not raise money in a month.

▶ **Elon Musk** - 1:07:44

So it's just important to bear in mind that PayPal almost went bankrupt in 2000. We came close. Thankfully, we'd raised that $100 million in March 2000, without which we would be game over, basically. We kind of saw it coming. We got the ex-Confinity merger done in three weeks and raised $100 million because we were all like, uh-oh, we see this coming to an end pretty soon. Then a month later, it was like a nightmare, basically. Anyway, it's just important to make sure if you're a healthy company, you've got some capital to get through things.

▶ **Elon Musk** - 1:08:26

Then what's your costs? If it is a recession, which more likely than not, it is a recession, I'm not saying it is, but it probably is, then just watch your cash flow and get positive cash flow as soon as you can. But I think we probably are in a recession, and that that recession will get worse. But these things pass, and then there will be boom times gain. So it'll probably be some tough going for, I don't know, a year. Maybe 12 to 18 months is usually the amount of time that takes for a cor    Greetings 🫢 Ask me anything!                                              ✕

▶ **Speaker 1** - 1:09:16





Contact us        Sign in

like it started. You know, what started as a slowdown earlier this year now seems like, I mean, technically, I guess we need two quarters of negative growth to be in a recession, but it feels like we're in one. It feels like it started. You know, the growth stock, the software businesses that we invest in are sort of the canaries in the coal mine, and there's a lot of dead canaries.

▶ **Elon Musk** - 1:09:41

Not dead, but... You're having a hard time breathing? Yeah. I'm not dead yet! It's not dead, it's just napping. It's napping. Wake up, little birdie! Wake up! It's fine! It's just fine. It's just stunned. It got stunned for a brief moment, and it'll be fine. It sort of reminds me of the parrot, the Pet Shop sketch with the parrot with Monty Python. Yes, Monty Python.

▶ **Jason Calacanis** - 1:10:16

This parrot is pining for the fjords. Hey, Elon, a lot has been talked about as we wrap here, and you've been incredibly gracious giving us so much time. Thank you for that. A lot of talk about American exceptionalism over the last couple of years waning, and maybe this country had seen its best days. We see the work you're doing, and other people in this great country are doing, and the debates we're having about the future. China's doing pretty fantastic, Russia's on the ropes. But it does seem like America is still producing some of the greatest companies the world has ever seen, some of the greatest innovations.

▶ **Jason Calacanis** - 1:11:06

What are your thoughts on America and our future and what we need to keep this country and this beacon of hope that You know, four of the five of us were not born here. You know, two of you came from South Africa. No, three of you. Three of you came from South Africa. One of you from Canada. I don't    Greetings 🐥 Ask me    ✕
the list. Oh, from Sri Lanka.                                                         anything!

▶ **Jason Calacanis** - 1:11:15



Canada too. Yeah, I know. It seems like that's the way. Canada is a gateway. It is a gateway. Well, I'm hinting at the answer here, but it does seem like our immigration policy is absolutely insane, and maybe we need to keep collecting some of the great individuals that I get to share the stage with here and yourself. We need to keep bringing great people to this country. Why can't we get that in our heads that not immigration, it's talent recruitment? No, absolutely.

▶ **Elon Musk** - 1:11:51

I think it's incredibly important that the United States be like the destination for the world's best talent. I mean, you can think of this like like like a pro sports team. If you want to win the league and you know, you want the best players on your team. Now, there are obviously a lot of very talented people born in the United States. But if you can add a few aces from from outside the country to the team, you're going to win the league. And here's the thing, those aces actually want to work for your team.

▶ **Elon Musk** - 1:12:23

They don't want to compete against you. They want to be on Team America. And so it's like we have to like fight them off to not be on Team America. That's the crazy thing. And so it's like if you have some aces that are the difference between winning and losing, we should be like really recruiting them, like you'd recruit like a star basketball player or football player, that's what we should be doing. Active recruiting.

▶ **Elon Musk** - 1:12:51

Just like if you're a company that wants to succeed, you actively recruit the best talent. That's the way to win. If that stops happening, America will stop winning. We have two administrations in a row, Biden and Trump, who don't want to let the greatest minds, the most talented people into this country. It's absolutely insane. I mean, I think the reality is like, actually, anyone who wants to work hard an    Greetings 🌍 Ask me the United States. And it's not just people who are sort of    anything! just anyone with a strong work ethic you know, if they're coming from Mexico or if they're coming from, you know, Europe or China, wherever it's just if they're like going to come here and crank hard and and contribute more than they take.



Contact us    Sign in

Hell yeah. I mean, that's just it's a no brainer. Have you been disappointed in the similarities between Biden and Trump on this? Like, maybe you could have expected it from Trump, because that was the rhetoric he needed to use to get elected. But it's not as if Biden has flipped the script and said, OK, we're going to go 180 degrees in the other direction. He's kind of kept it the same, which has been really surprising, actually. Man, it's hard to tell what Biden's doing, to be totally frank.

▶ **Elon Musk** - 1:14:12

Yeah. It's weekend at Bernie's. The real president is whoever controls the teleprompter. The path to power is the path to the teleprompter because then he just reads the teleprompter. I do feel like if somebody would accidentally lean on the teleprompter, it's going to be like Anchorman. It's going to be like QQQ ASDF123 type of thing. I mean, in fairness to Biden, he hasn't been napping as much as he needs to.

▶ **Elon Musk** - 1:14:50

But it's just it's hard to see our job that are getting done. You know, I mean, this administration just it doesn't seem to get a lot done. Like and, you know, whatever, like the Trump administration leaving Trump aside, there were a lot of people in the administration who were effective at getting things done. So This administration seems just to not have the drive to just get shit done. That's my impression. We definitely need to fix immigration policy.

▶ **Elon Musk / David Sacks** - 1:15:30

We had COVID, which was an issue. And so that was one reason to, I guess, clamp down on it. But now we've moved on. And so let's just make sure we're getting top talent in the United States. And really, I'd say broadly, it's their ass off and contribute more than they take to the ec           Greetings 🐵 Ask me necessarily going to make for a stronger, better society in           anything!
Jeff Bezos' tweet back and forth with Biden, where Biden, I think, was talking about inflation, but then he correlated that to taxing corporations, and Bezos said this is misinformation and disinformation, et cetera, et cetera.



 steno.ai

**Contact us**     **Sign in**

What did you think about that whole exchange, then, back and forth? I mean, the obvious reason for inflation is that the government printed a zillion amount of more money than it had, obviously.

## ▶ Chapter 7 - Insights from China and the Future Economy

▶ **Elon Musk** - 1:16:30

So it's like the government can't just have issue checks for an excessive revenue without there being inflation. Velocity of money held constant. So unless there's something that would change with velocity of money, but if federal government writes checks, they never bounce. So that is effectively creation of more dollars. And if there are more dollars created, then the increase in the goods and services output of the economy, then you have inflation.

▶ **Elon Musk** - 1:16:53

Again, velocity of money held constant. So, This is very basic. This is not super complicated. If the government could just issue massive amounts of money and deficits didn't matter, then why don't we just make the deficit 100 times bigger? The answer is you can't, because it will basically turn the dollar into something that is worthless. Various countries have tried this experiment multiple times. It's not like, oh, I wonder what happens if this is done.

▶ **Elon Musk** - 1:17:32

Greetings 🐢 Ask me anything!     ✕

Have you seen Venezuela? The poor people of Venezuela roughshod by their government. So, obviously, you can't simply create money. The true economy is very important. The true economy is the output of goods and services. It's not money. It's literally, what is the output of goods and services?



 steno.ai

**Contact us**    **Sign in**

Money is simply a way for us to, or anything that you call money, is a way for us to conveniently exchange goods and services without having to engage in barter, and also to shift obligations in time. Those are the two reasons that you have money, this thing called money. It's really a database. Money is an information system for labor allocation, and for exchange of goods and services, and for translating in time. And the quality of that information is a function of, it's like, basically, you can apply information theory to money. And I think it helps explain why one money system is, why one action is better than another. And so, just like a an internet connection, you'd want something that's high bandwidth, low latency and jitter, and is not dropping packets, does not have a lot of errors in the system.

▶ **Elon Musk** - 1:18:51

The same is true of money. Really, like you said, what did PayPal really do? It helped improve the bandwidth, the speed at which money could move. Instead of mailing checks back and forth, which amazingly that was what people did in 2000, you could now do real-time exchange of money and now you could ship your goods immediately instead of mailing a check and waiting for the bank to clear the check. So, The ultimate thing with PayPal, or if it was in the x.com, less niche payments and more broad financial would be to simply disintermediate all the heterogeneous COBOL databases out there running on mainframes doing batch processing and have a single real-time system that was secure and not batch processing. It would just be, from an information standpoint, more efficient. And eventually, all the batch processing COBOL mainframes operated by the banks would cease to exist.

▶ **Jason Calacanis** - 1:20:01

You've spent more time and built more in China than almost anybody. I mean, Apple would be the only company I could think of that's probably got a bigger footprint, but I'm not certain of that. What have you learned about China that you didn't know before you opened the factories there and started delivering cars there? what should we know about China? You know, as Americans, how should our relationship with it? Because we haven't spent time th

Greetings 👋 Ask me anything!    ✕



▶ **Elon Musk** - 1:20:28



**steno.ai**                                    **Contact us**    **Sign in**

China that compete vigorously within China. And so, um, Perhaps most important is that there's just a tremendous number of hardworking, smart people in China who want to get ahead and get things done. They're not complacent. They're not entitled.

▶ **Elon Musk** - 1:21:02

They want to get things done, and they want to make a better life for themselves. What we're going to see with China, for the first time that anyone can remember who is alive, is an economy that is twice the size of the US, possibly three times the size of the US. It's going to be very weird living in that world. We better stop the infighting in the US and stop punching ourselves in the face, because there's way too much of America punching itself in the damn face. It's just dumb. And think about, hey, we've got to be competitive here.

▶ **Elon Musk / David Sacks** - 1:21:39

And there's a new kid on the block that's going to be two to three times our size. We better step up our game and stop infighting. Do you think it's easier to stop infighting once we're beaten, or do you think that there's a way folks here can actually just get their political and commercial act together? Or does it not happen until we've realized we've lost? Or do we need a war? I sure hope we don't need a war. But there will be certainly An economic competition that I think will blow people away when they realize just how competitive they have to be to be competitive with companies in China.

▶ **Elon Musk** - 1:22:25

Greetings 👋 Ask me anything!                                    ✕





Contact us    Sign in

your Tesla China employees work some meaningful percentage more or harder than your Tesla non-China employees? Do you find like it's two different companies basically? Well, I mean, I think Tesla is somewhat, Tesla is sort of pretty far out there in terms of work ethic anywhere in the world. So the Tesla work ethic in the U.S. I think is substantially greater than any other car company or any large manufacturing company that I'm aware of. So, you know, Tesla does have a strong work ethic in the U.S. But to be totally frank, the work ethic is exceeded on balance by the Tesla China team.

**Elon Musk / David Sacks** - 1:23:27

That is, I think, objectively true. So that's not to say there aren't lots of hardworking people at Tesla US. There certainly are. But if you say on average, the work ethic in China is higher. It's just we're calling it like it is. What about if you're an American CEO? How do you deal with, do you think, just the need for managing all these political factions inside of a company?

**David Sacks** - 1:23:52

You probably saw all the sturm und drang related to Disney and what happened to them and what's continuing to happen to them on both sides between their employees as well as the governments, et cetera. Do you have any advice or what do you tell young CEOs that you hang out with about how to deal with that, how to make those decisions, where you land in the spectrum of dealing with all of this stuff? the non-work issues that are related to now going to work every day. I'm not sure I entirely understand what you mean. Whether it's the need for political correctness or the need for having political points of view and having to bring that and balance that in the workplace, how do you deal with that? How do you give advice to other folks about having to deal with it? Look, I think the point of a company is to produce useful products and services for your fellow human beings.

**Elon Musk** - 1:24:44

Greetings 👋 Ask me anything!    ✕



 steno.ai

Contact us   Sign in

company. I'd say politics and other stuff should... Let's not lose sight of why companies should exist. So I got it. I got it. I'm actually late for work on the rocket, guys. Yeah. We're going to go ahead and let you get to Mars and I'll see you soon. Thank you.

▶ **Speaker 1** - 1:25:31

to the fans and they've just gone crazy with it. What? You owe me a fee. You owe me a fee. Fee? What? That's gonna be a- When did you get merch?

Greetings 🙂 Ask me anything!            ✕



EXHIBIT 13

1  **COTCHETT, PITRE & MCCARTHY, LLP**
   Joseph W. Cotchett (SBN 36324)
2  *jcotchett@cpmlegal.com*
   Mark C. Molumphy (SBN 168009)
3  *mmolumphy@cpmlegal.com*
   Anne Marie Murphy (SBN 202540)
4  *ammurphy@cpmlegal.com*
   Tyson C. Redenbarger (SBN 294424)
5  *tredenbarger@cpmlegal.com*
   Julia Q. Peng (SBN 318396)
6  *jpeng@cpmlegal.com*
   San Francisco Airport Office Center
7  840 Malcolm Road, Suite 200
   Burlingame, California 94010
8  Telephone:  (650) 697-6000

9  **BOTTINI & BOTTINI, INC.**
   Francis A. Bottini, Jr. (SBN: 175783)
10 *fbottini@bottinilaw.com*
   Anne B. Beste (SBN 326881)
11 *abeste@bottinilaw.com*
   Albert Y. Chang (SBN 296065)
12 *achang@bottinilaw.com*
   Yury A. Kolesnikov (SBN 271173)
13 *ykolesnikov@bottinilaw.com*
   Nicholas H. Woltering (SBN 337193)
14 nwoltering@bottinilaw.com
   7817 Ivanhoe Avenue, Suite 102
15 La Jolla, California  92037
   Telephone:  (858) 914-2001

16
17 *Counsel for Plaintiff*

17              **UNITED STATES DISTRICT COURT**

18              **NORTHERN DISTRICT OF CALIFORNIA**

19

| | |
|---|---|
| 20  **WILLIAM HERESNIAK**, on behalf of himself and all others similarly situated,<br>21<br>22                                        Plaintiff,<br>23                        vs.<br>24  **ELON R. MUSK and TWITTER, INC.**,<br>25                                        Defendants, | Case No.:<br><br>**Class Action**<br><br>**COMPLAINT FOR**<br>**(1) VIOLATION OF THE**<br>**CALIFORNIA CORPORATIONS**<br>**CODE; AND**<br>**(2) DECLARATORY AND**<br>**INJUNCTIVE RELIEF**<br><br>DEMAND FOR JURY TRIAL |

26
27
28

## **TABLE OF CONTENTS**

I.     INTRODUCTION AND SUMMARY OF THE ACTION ................................................ 1

II.    JURISDICTION AND VENUE .................................................................................... 9

III.   INTRADISTRICT ASSIGNMENT ............................................................................. 9

IV.   THE PARTIES .............................................................................................................. 9

V.    CLASS ACTION ALLEGATIONS ........................................................................... 10

VI.   SUBSTANTIVE ALLEGATIONS ............................................................................. 11

    A.    Background of the Musk Buyout of Twitter ................................................... 11

    B.    Musk's Failure to Timely Disclose His 9+% Stake in Twitter, Failure to Disclose He Had Been Invited to Join the Twitter Board, and Failure to Disclose He Intended to Make an Offer to Acquire Twitter, and Contray to the Law ..................................... 13

    C.    After Unexpectedly Announcing He Would Not Join Its Board, Musk Discloses an Intent to Buy Twitter, and Threatens to Go Hostile Through a Tender Offer if Twitter's Board Does Not Acquiesce ........................................................................... 18

    D.    Musk Finances the Proposed Buyout in Part by Pledging Billions of Dollars of His Tesla Stock as Collateral for a Loan From Morgan Stanley ...................................... 20

    E.    As Tesla's Stock Plunges in the 30 Days After Announcement of the Buyout, Threatening a Margin Call and a Forced Sale of Musk's Tesla Stock, Musk Begins to Make False Statements and Engage in Market Manipulation of Twitter's Stock ..... 24

        1.    Friday May 13, 2022 Tweet .................................................................. 25

        2.    Musk's May 14, 2022 Tweet ................................................................ 26

        3.    Musk's May 16, 2022 Statement .......................................................... 28

        4.    Musk's May 17, 2022 Tweet ................................................................ 29

        5.    Musk's May 21, 2022 Tweets ............................................................... 30

VII.  CAUSES OF ACTION ............................................................................................... 33

    FIRST CAUSE OF ACTION
    Cal. Corp. Code §§ 25400 and 25500 ................................................................... 33

    SECOND CAUSE OF ACTION
    Cal. Corp. Code §§ 25401 and 25501 ................................................................... 34

i

Class Action Complaint for Violations of the California Corporations Code

THIRD CAUSE OF ACTION
For Declaratory and Injunctive Relief ...................................................................... 34

FOURTH CAUSE OF ACTION
For Violation of Cal. Corp. Code § 25402 and 25502.5 ........................................ 35

FIFTH CAUSE OF ACTION
For Unjust Enrichment ............................................................................................. 35

VIII.  **PRAYER FOR RELIEF** .............................................................................................. **36**

IX.  **JURY TRIAL DEMAND** .............................................................................................. **37**

Class Action Complaint for Violations of the California Corporations Code

Plaintiff alleges the following (a) upon personal knowledge with respect to the matters pertaining to Plaintiff; and (b) upon information and belief with respect to all other matters, based upon, among other things, the investigations undertaken by Plaintiff's counsel.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## I. INTRODUCTION AND SUMMARY OF THE ACTION

1. Plaintiff brings this class action on behalf of all stockholders of Twitter, Inc., a San Francisco based company, who have been harmed by the actions of Defendant Elon R. Musk.  Plaintiff asserts claims against Defendant Musk for violations of California Corporations Code §§ 25400, 25401, 25500, and 25501 and against Defendant Twitter, Inc. for declaratory, injunctive relief, and unjust enrichment.

2. Defendant Twitter, Inc., headquartered in San Francisco, operates a social media platform that allows its users to send and receive "tweets."  Defendant Musk is a prolific user of Twitter and one of its most-followed members, with 90 million followers, making Musk's Twitter account the eighth most popular account on Twitter.

3. On **April 25, 2022**, Twitter, Inc. announced that it had agreed to sell itself to Elon Musk for $54.20 per share, or approximately $44 billion (the "Buyout" or "Proposed Buyout").  Musk negotiated the Twitter Buyout over the weekend of April 23-24, 2022 without carrying out any due diligence. The Buyout is only conditioned on approval of Twitter's shareholders at a meeting to be scheduled this summer, regulatory approval, and closing of the Buyout by October 24, 2022.

4. Before agreeing to buy Twitter for $44 billion, Musk, one of the world's richest individuals valued at $276 billion according to the Bloomberg Billionaires Index, and a sophisticated businessman with a phalanx of lawyers and investment bankers, according to the press, specifically agreed to waive detailed due diligence as a condition of the merger agreement.  At the time, Musk was well aware that Twitter had a certain amount of "fake accounts" and accounts controlled by "bots" and had in fact settled a lawsuit based on the fake accounts for millions of dollars.  Musk had tweeted about that issue at Twitter several times in the past, prior to making his offer to acquire Twitter with full knowledge of the bots.

Class Action Complaint for Violations of the California Corporations Code

5.      Musk and his team were also well aware of a ***$809.5 million settlement*** Twitter entered into ***in September 2021,*** in a securities fraud class action alleging Twitter overstated its user numbers and growth rate -- *In re Twitter Inc. Securities Litigation*, 16-cv-05314, U.S. District Court, Northern District of California (San Francisco).  All the documents from that case were publicly available to Musk, including a website (www.twittersecuritieslitigation.com) containing, among other things, the Court's order denying Twitter's motion for summary judgment.  *See* **Exhibit A** (April 17, 2020 Order Denying Motion for Summary Judgment, at p. 16)(holding that Twitter's <u>false statements</u> about its Daily Active Users (DAUs) and Monthly Active Users (MAUs) were material because "Twitter has publicly stated that its success and financial performance depend, at least in part, on the size and engagement of its user base.").

6.      Musk believed he was obtaining Twitter at a sale price, since Twitter's stock price had decreased significantly in the months before he made his offer, declining from $71.69 on July 23, 2021 to just $32.42 on March 7, 2022.  After Musk agreed to buy Twitter for $54.20, the stock market experienced a decline.  The market decline, however, did not affect Twitter's stock price.  After the announcement of the Buyout, stock consistently traded close to the Buyout price, and around $50 per share.  The small delta between its trading price and the $54.20 buyout price was typical of the trading prices of companies who have agreed to be acquired, characterized by a small discount for the time value of money and a relatively small risk that the deal will not go through.

7.      Musk had a unique and multi-billion-dollar problem.  Musk pledged his ***Tesla*** stock as collateral for a $12.5 billion loan to finance the buyout of Twitter, however ***Tesla's shares have declined by over 37%*** since the announcement of the Buyout, as reflected below:

Class Action Complaint for Violations of the California Corporations Code

8.     Because Tesla's stock is worth much less now than when Musk agreed to buy Twitter, Musk is at risk of a margin call or a requirement to put up more cash.  Musk quickly acted to attempt to mitigate these personal risks to himself by engaging in unlawful conduct that moved the price of Twitter's stock down.  Musk proceeded to make statements, send tweets, and engage in conduct designed to create doubt about the deal and drive Twitter's stock down substantially in order to create leverage that Musk hoped to use to either back out of the purchase or re-negotiate the buyout price by as much as 25% which, if accomplished, would result in an $11 billion reduction in the Buyout consideration.  As detailed herein, Musk's conduct was and continues to be illegal, in violation of the California Corporations Code, and contrary to the contractual terms he agreed to in the deal.

9.     Musk's market manipulation worked -- ***Twitter has lost $8 billion in valuation*** since the Buyout was announced.  As subsequently disclosed, Musk first started purchasing Twitter shares on January 31, 2022.  Musk thereafter exceeded the 5% threshold, requiring him to file a Form 13G with the SEC.  Musk did underline not timely file the Form 13G; failing to do so benefitted Musk because he was able to continue to buy Twitter shares at depressed prices.  When Musk belatedly filed the Form 13G, Twitter's shares increased substantially, rising 27% after he filed the 13G.

Class Action Complaint for Violations of the California Corporations Code

10. ***Musk benefitted himself by approximately $156 million*** by failing to timely file a Form 13G.[1] By delaying his disclosure of his stake in Twitter, Musk engaged in market manipulation and bought Twitter stock at an artificially low price, in violation of the California Corporations Code.

11. Musk's disregard for securities laws demonstrates how one can flaunt the law and the tax code to build their wealth at the expense of the other Americans. Musk's insider trading profits may come with a slap on the wrist in the form of a fine from the SEC but will probably be limited to hundreds of thousands of dollars, according to legal and security experts.[2]

12. When Musk eventually filed his Form 13G on April 4, 2022, it was materially misleading. He did not disclose his intent to join the Twitter Board and he failed to disclose that he was contemplating buying Twitter. Both disclosures would have caused Twitter's stock to increase more than it did when his filing was made. Musk was later forced to file an amended Form 13G to comply with the law. As Tesla shares cratered by almost 30% in April and May 2022, Musk began to make disparaging comments about Twitter in an effort to drive its stock price down further.

13. On **May 13, 2022**, at 5:44 a.m. (*i.e.*, before the stock market opened), Musk issued a tweet which stated that the buyout was "temporarily on hold:"



Elon Musk ✔
@elonmusk

Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users

14. Musk's tweet (and public statement) was misleading and constituted an effort to manipulate the market for Twitter shares as he knew all about the fake accounts. The statement was false because the buyout was not, in fact, "temporarily on hold." There is nothing in the buyout contract that allows Musk to put the deal "temporarily on hold." Moreover, Musk's statement was misleading because it stated or implied that Musk's obligation to consummate the buyout was

---

[1] *See* Reed Albergotti, "Elon Musk Delayed Filing a Form and Made $156 Million," The Washington Post, April 6, 2022.

[2] *Id.*

1  conditioned on his satisfaction with due diligence to determine whether "spam/fake accounts do indeed

2  represent less than 5% of users."  This was false because Musk had <u>specifically waived detailed due</u>

3  <u>diligence</u> as a condition precedent to his obligations under the buyout contract.  Thus, Musk had and has

4  no right to cancel the buyout based on any results from due diligence concerning the number of

5  spam/fake accounts at Twitter.  Musk then continued issuing false and disparaging tweets about Twitter

6  in an effort to drive its stock price down further.

7       15.     Musk's false and misleading tweets had the desired effect, as they caused Twitters' stock

8  to decline in the days following the tweets, in stark contrast to the Nasdaq index, which  increased, as

9  reflected in the following chart:



21      16.     On **May 17, 2022**, Musk doubled down on his "Friday the 13th" tweet, issuing another

22  tweet stating that the deal "cannot go forward" while claiming almost 20% of accounts were fake.

Class Action Complaint for Violations of the California Corporations Code

17.     Musk's wrongful conduct has not only substantially harmed Twitter's shareholders by causing Twitter's stock to crater by approximately 25%, but it has also substantially harmed Twitter's employees.  As reported by the Wall Street Journal on May 21, 2022:

> *In one 24-hour period this month, Twitter Inc.'s chief executive fired two widely liked senior executives and announced a hiring freeze, while billionaire Elon Musk suddenly said he was putting "on hold" an acquisition plan that could lead to a wholesale revamp of the social-media company*.

> It is a tricky time to work at Twitter. Far beyond the usual uncertainty at an acquisition target, *Mr. Musk's $44 billion takeover deal has left employees bewildered about what their jobs are and will be, as well as how to keep operating a platform with around 229 million daily users* while its would-be owner uses it to publicly assail the company for everything from its free-speech policies to its business model.

> Internal conversations and Slack channels are awash in distress and anger over the criticism, while *company leaders who themselves have no way to know the outcome have responded with repeated staff meetings to try to soothe the angst and encourage people to press forward,* according to current and former staffers and internal communications viewed by The Wall Street Journal.

> *"I expect the 'chaos tax' and ups and downs to continue," Jay Sullivan, Twitter's new head of product, wrote on May 13* in an internal message to thousands of employees that was viewed by the Journal.

> Whatever the fate of the deal, many *current and former employees say the company has been irrevocably shaped by the five weeks since Mr. Musk publicly disclosed his unsolicited bid to buy Twitter,* one of the world's most influential social-media platforms. Some employees have left. Many more say they are looking for new jobs. Others are hunkering down to await an uncertain fate under *Mr. Musk,* who *recently tweeted an image of cartoon excrement at the current CEO*.

> *On May 12, Mr. Agrawal told employees the company was pausing hiring and looking to cut costs, and that two senior executives*—Bruce Falck, general manager of revenue, and Kayvon Beykpour, general manager of consumer—*were leaving. Mr. Beykpour tweeted he was on paternity leave when he got the news*.

> *The next day, Mr. Musk tweeted that the deal was "on hold"* until he could get more clarification from the company about how pervasive bots were on the platform. *That rattled already wobbly investor confidence that the deal will happen at the price Mr. Musk agreed to—if at all. Twitter shares are down more than 25% since late April*. [3]

---

[3] *See* Deepa Seetharaman & Sarah Needleman, "Twitter Employees Face 'Chaos Tax'," THE WALL STREET JOURNAL, May 21, 2022.

18.     Musk's false statements and market manipulation have created "chaos" at Twitter's headquarters in San Francisco:



TECH

## Elon Musk's Planned Twitter Takeover Creates a 'Chaos'

Deal has left employees bewildered about what their jobs are and will be

Twitter, which is based in San Francisco, has held companywide meetings in recent weeks to address employee questions about the takeover.
PHOTO: LAURA MORTON FOR THE WALL STREET JOURNAL

19.     Musk has also bullied current Twitter employees and stated that he would stop censoring hate speech:

> Among those most concerned are staff responsible for moderating content and developing tools that minimize abuse and hate speech on the platform, current and former employees say. ***Mr. Musk has repeatedly said Twitter's limits on expression are too great and that he wants to allow almost all speech on the platform*** that isn't illegal. Mr. Musk's complaints echo those of others, including some conservative lawmakers who have criticized efforts at content moderation, saying they are subjective and can lead to bias.
>
> ***Some current employees say they view Mr. Musk's behavior on the platform, particularly his targeting of Ms. Gadde, as an example of the type of online bullying*** they have been tasked with minimizing.[4]

---

[4] *Id.*

Class Action Complaint for Violations of the California Corporations Code

20.     Musk has been accused of using Twitter to foster "dogpiling," in which he encouraged his users to harass someone else, such as the case of Vernon Unsworth, a British diver who had spent days assisting the rescue of a group of Thai boys trapped in a flooded cave.  After Musk offered a miniscule submarine to the rescue divers, Unsworth told the media that Musk's idea was just a useless public relations stunt.  Musk then took to Twitter, where (in tweets that he later deleted) he baselessly accused Unsworth of being a "pedo guy," or pedophile.  The tweets prompted hundreds of Musk fans to pile on to the diver with abusive, humiliating attacks.[5]

21.     Musk's market manipulation of Twitter's stock has also encouraged other market participants to short Twitter's stock, including Hindenburg.  After Musk began disparaging Twitter and his own buyout, Hindenburg shorted Twitter.  On May 17, 2022, Hindenburg closed its short position for a large profit.[6]

22.     On **May 18, 2022**, Musk announced he would switch parties and become a Republican, calling the Democrats the "party of division & hate" to further excite the media of his conduct.



---

[5] *See* Billy Perrigo, "Twitter Employees Have Spent Years Trying to Make the Platform Safer. Elon Musk Could Undermine All That," TIME, Apr. 26, 2022.

[6] *See* Joshua Fineman, "Hindenburg Research Closes Twitter Short Position," SEEKING ALPHA, May 17, 2022.

## II.    JURISDICTION AND VENUE

23.    This Court has jurisdiction as the Defendants are located in and/or conduct business in California, including, but not limited to, the conduct here at issue, and because they have sufficient minimum contacts with California to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

24.    This Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332, as this is a class action where at least one of the members of the Class is a citizen of a state different from at least one of the defendants, and the matter in controversy exceeds the sum or value of $5,000,000.

25.    Venue is proper in this judicial district under 28 U.S.C. §1391, because: (1) one or more defendants reside in this District; and (2) a substantial part of the events or omissions giving rise to the claims occurred in this District.  Twitter is headquartered in San Francisco, California at 1355 Market Street, Suite 900.  Musk's wrongful conduct took place in substantial part and have an effect in San Francisco, California, including his use of Twitter tweets to make false statements and engage in market manipulation of Twitter stock.

## III.    INTRADISTRICT ASSIGNMENT

26.    A substantial part of the events or omissions which give rise to the claims in this action occurred in the county of San Francisco, and as such this action is properly assigned to the San Francisco division of this Court.

## IV.    THE PARTIES

27.    Plaintiff William Heresniak is a current shareholder of Twitter, Inc. and has owned Twitter stock at all relevant times.  Plaintiff is a resident and citizen of Virginia.

28.    Defendant Twitter, Inc. is a Delaware corporation headquartered in San Francisco, California.  Twitter is a citizen of California and Delaware.

29.    Defendant Elon R. Musk is an individual who currently owns approximately 9.2% of Twitter's stock.  On April 25, 2022, Musk announced a definitive agreement to buy Twitter for $54.20 per share in cash.  Upon information and belief, Musk is a citizen and resident of Texas.

Class Action Complaint for Violations of the California Corporations Code

# V.    CLASS ACTION ALLEGATIONS

30.    Plaintiff brings this action as a class action, pursuant to F.R.C.P. 23, on behalf of all stockholders of Twitter, Inc. who have been harmed and/or are threatened with harm by Defendants' unlawful conduct in connection with Musk's proposed buyout of Twitter.  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, or affiliated with, any of the Defendants and their successors in interest (the "Class").

31.    This action is properly maintainable as a class action because:

(a)    The Class is so numerous that joinder of all members is impracticable.  There are millions of shares of the Company's common stock outstanding owned by hundreds, if not thousands, of stockholders;

(b)    There are questions of law and fact which are common to the Class including, *inter alia*, the following:  (i) whether Musk made false and misleading statements; (ii) whether Musk has and continues to engage in conduct in an effort to manipulate the market for Twitter stock; (iii) whether Musk created a false or misleading appearance with respect to the market for Twitter stock; (iv) whether Musk engaged in conduct designed to raise or depress the price of Twitter stock for the purpose of inducing the purchase or sale of Twitter stock by others; (v) whether Musk purchased or sold Twitter stock based on material, non-public information; and (vi) the extent of damage sustained by Class members.

(c)    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature;

(d)    The claims of Plaintiff are typical of the claims of other members of the Class and Plaintiff has the same interests as the other members of the Class.  Plaintiff will fairly and adequately represent the Class; and

(e)    Defendants have acted in a manner which affects Plaintiff and all members of the Class alike, thereby making class treatment appropriate.

The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual

members of the Class which would, as a practical matter, be dispositive of the interests of other members not parties to the or substantially impair or impede their ability to protect their interests.

## VI.     SUBSTANTIVE ALLEGATIONS

### A.     Background of the Musk Buyout of Twitter

32.     Elon Musk is an active user of the Twitter platform with close to 90 million followers, making him one of Twitter's most popular accounts.

33.     Musk has violated SEC rules related to going-private transactions before.  He issued false tweets in the past claiming he was going to take his company, Tesla, Inc., private, and that he had already secured financing.  The SEC sued Musk, and he was forced to settle the case and agree to a consent decree dated September 29, 2018, as amended April 26, 2019.  The settlement and consent decree required Musk to pay a $20 million fine, give up his role as Tesla's chairman, and refrain from issuing tweets related to Tesla without the pre-approval of a "Securities Counsel" and Tesla's Disclosure Controls Committee.  Musk later demanded that his law firm, Cooley LLP, fire a former SEC lawyer who had worked on the SEC case and later joined Cooley, or else Cooley would lose Musk's business.[7]

34.     Musk has been sued by Tesla shareholders.  On April 1, 2022, the United States District Court for the Northern District of California issued an order granting in part Plaintiffs' Motion for Summary Judgment and holding that Musk's tweets regarding his intent to take Tesla private were false and misleading and that Musk knew or recklessly disregarded the falsity of the tweets.  *See In re Tesla, Inc. Sec. Litig.*, Case No. 18-cv-04685 (N.D. Cal.), Docket No. 387.[8]

---

[7] *See* Rebecca Elliott, "Elon Musk's Tesla Asked Law Firm to Fire Associate Hired From SEC," THE WALL STREET JOURNAL, Jan. 15, 2022.

[8] Musk continues to flaunt court and governmental findings and orders.  Musk gave a TED Talk in Vancouver on April 14, 2022 during which he emphatically proclaimed in reference to his August 7, 2018 Tesla tweets, inter alia, that "funding was actually secured – I want to be clear about that – in fact that gives me a good opportunity to clarify that – and funding was indeed secured" before going on to refer to the SEC's San Francisco office as "bastards" and claiming that he settled with the agency only because they had a "gun to [his] child's head."  See https://www.ted.com/talks/elon_musk_elon _musk_talks_twitter_tesla_and_how_his_brain_works_live_at_ted2022.

---

11

Class Action Complaint for Violations of the California Corporations Code

35.     On **May 12, 2022**, it was announced that the SEC was again investigating Musk, this time for his failure to timely file the Form 13D regarding his more than 5% stake in Twitter.  In addition to violating SEC rules, Musk's false tweets and his wrongful conduct constitute a violation of various provisions of the California Corporations Code designed to protect investors.

36.     As disclosed by Twitter in its Proxy Statement filed on May 17, 2022 regarding the Buyout, Musk Tweeted comments regarding Twitter's business, the Twitter platform and functionality, and Twitter's content moderation policies.

37.     On **March 26, 2022**, Musk called Jack Dorsey (Twitter's founder) in California to discuss the future direction of social media, including the benefits of open social protocols.  Dorsey had previously communicated his views on these topics to the Twitter Board and publicly.  Dorsey lives in the Sea Cliff neighborhood of San Francisco and his communications with Musk were made to and from California.

38.     Also on **March 26, 2022**, Musk contacted Egon Durban, one of Twitter's directors, to set up a discussion between Musk and Durban.  Musk and Durban subsequently spoke on March 26, 2022 and March 27, 2022 ***and discussed the potential of Musk joining the Twitter Board, as well as the fact that Musk had purchased a significant stake of more than five percent of Twitter's common stock***.[9]  Durban informed Bret Taylor, the chairperson of the Twitter Board,[10] Martha Lane Fox, one of Twitter's directors and the chairperson of Twitter's Nominating and Corporate Governance Committee (the "NomGov Committee"), and Parag Agrawal, Twitter's chief executive officer, of Musk's communication.  Durban, Taylor, Agrawal and Lane Fox discussed Musk's communications and determined (1) that Durban would connect Musk with Taylor, Agrawal and Lane Fox, and they would also discuss with Musk his potential interest in joining the Twitter Board; (2) to call meetings of the NomGov Committee and of the Twitter Board to discuss Musk's communications and potential interest in joining the Twitter Board; and (3) that Lane Fox would inform each member of the Twitter Board in

_____

[9] *See* May 17, 2022 Proxy Statement at 42.

[10] Taylor, in addition to being a Twitter director, is the Co-CEO of Salesforce.com and lives in the San Francisco Bay Area.  His communications with Musk were disseminated from and to California.

advance of the Twitter Board meeting of Musk's communications. Lane Fox subsequently informed the members of the Twitter Board of Musk's initial communications.

**B. Musk's Failure to Timely Disclose His 9+% Stake in Twitter, Failure to Disclose He Had Been Invited to Join the Twitter Board, and Failure to Disclose He Intended to Make an Offer to Acquire Twitter, and Contray to the Law**

39. Despite the fact that Twitter has admitted that Musk already owned 5% of Twitter's stock on or before March 26, 2022, Musk failed to file a Schedule 13D with the SEC, as he was required to do. Musk belatedly filed a Schedule 13G on April 4, 2022, at least 10 days after his stake surpassed the trigger point for disclosure. Musk has not publicly explained why he did not file the form in a timely manner.

40. Moreover, Musk's April 4, 2022 filing was false and misleading because it was improperly filed on Form 13G, not 13D. Form 13G is only to be used by passive investors, and thus Musk was required to use Form 13D. Musk's 13G filing failed to disclose that he had been offered a position on Twitter's Board and that he was interested in buying Twitter.

41. On **May 11, 2022**, the Wall Street Journal reported that the SEC was investigating Musk over his failure to timely disclose his 9.2% stake in Twitter.[11] ***Musk likely saved more than $143 million by not reporting that his trades had crossed the 5% threshold***, according to Daniel Taylor, a University of Pennsylvania accounting professor, since the share price could have been higher had the market known of Musk's growing stake.

42. Because Musk had acquired more than 5% of Twitter's stock, he was required to file a Schedule 13D with the SEC within 10 days. Musk's Twitter holdings surpassed 5% on March 14, 2022, securities filings show, meaning he should have disclosed his stake by March 24, 2022 under SEC rules.

43. After March 24, Musk purchased roughly $513 million of stock at prices between $38.20 and $40.31 a share, according to a regulatory filing. The total buying spree made him Twitter's largest individual shareholder with 9.2% of its shares.

---

[11] *See* Dave Michaels, "Elon Musk's Belated Disclosure of Twitter Stake Triggers Regulators' Probes," The Wall Street Journal, May 11, 2022.

44.     Based on Twitter's closing price of $49.97 on April 4, the day Musk disclosed his stake, he likely saved more than $143 million on those trades, Taylor estimated.

45.     On **March 27, 2022**, Musk, Taylor and Agrawal discussed Musk's interest in Twitter and potentially joining the Twitter Board.  As part of that discussion, Musk stated that he was considering various options with respect to his ownership, including potentially joining the Twitter Board, seeking to take Twitter private or starting a competitor to Twitter.

46.      On **March 30, 2022**, Lane Fox and Musk discussed his potential interest in joining the Twitter Board and the benefits that Musk believed he could potentially bring to Twitter as a Twitter director.

47.     On **March 31, 2022**, Agrawal and Taylor met with Musk in California to discuss Twitter's business and Musk's potential interest in joining the Twitter Board.  At the meeting, Musk reiterated his interest in potentially joining the Twitter Board to help improve Twitter's business as a director of Twitter, and that he was also considering the possibility of taking Twitter private or starting a competitor to Twitter.

48.     On **April 2, 2022**, the NomGov Committee met in California, with Taylor, members of Twitter management and a representative of Wilson Sonsini Goodrich & Rosati, Professional Corporation, Twitter's outside legal counsel reporting to the Twitter Board ("Wilson Sonsini"), in attendance.  Durban, Taylor, Agrawal, and Lane Fox each updated the NomGov Committee on their discussions with Musk.  After considering, among other things, Musk's interest in Twitter's business, his statement that he is one of Twitter's substantial stockholders, his active use of the Twitter platform, his technical expertise in areas critical to Twitter's products and technology, and the perspectives that he could bring to the Twitter Board, the NomGov Committee determined to recommend that the Twitter Board consider inviting Musk to join the Twitter Board, subject to completion of customary onboarding procedures, such as a background check and completing and signing a director onboarding questionnaire.

49.     Upon information and belief, Musk completed the director questionnaire and returned it to Twitter in California.

50.     Also on **April 2, 2022**, at the direction of Taylor and the NomGov Committee, Twitter requested that J.P. Morgan attend the scheduled meeting of the Twitter Board in California to assist Twitter in reviewing Musk's purported purchase of a significant stake in Twitter's common stock, Musk's potential appointment to the Twitter Board and related matters.

51.     On **April 3, 2022**, the Twitter Board met in California, with members of Twitter management and representatives of each of Wilson Sonsini and J.P. Morgan in attendance. Durban, Taylor, Agrawal, and Lane Fox each updated the Twitter Board on their discussions with Musk. The NomGov Committee reported on its discussions at its meeting the previous day and provided its recommendation that the Twitter Board consider inviting Musk to join the Twitter Board. In evaluating the NomGov Committee's recommendation, the Twitter Board considered, among other things, Musk's qualifications, business expertise, knowledge of Twitter's business and user base and technical expertise in areas critical to Twitter's products and technology.

52.     At the meeting, Dorsey informed the Twitter Board that he and Musk were friends, and Durban informed the Twitter Board that he had worked on unrelated matters with Musk in the past. At this and other meetings of the Twitter Board in California relating to Musk joining the Twitter Board, Musk's acquisition proposal and the merger, the Twitter Board regularly met in executive session of independent directors. ***The Twitter Board determined to invite Musk to join the Twitter Board***, subject to his completion of a background check and other customary onboarding procedures. In connection with Musk joining the Twitter Board, ***it was the desire of the Twitter Board that Musk enter into a cooperation agreement that included "standstill" provisions that, among other things, would limit his public statements regarding Twitter***, including the making of unsolicited public proposals to acquire Twitter (but not private proposals) without the prior consent of the Twitter Board.

53.     Following the meeting, at the direction of the Twitter Board, ***Lane Fox called Musk to invite him to join the Twitter Board***, subject to completion of customary onboarding procedures. Lane Fox also noted the desire of the Twitter Board that Musk enter into a cooperation agreement. Following that discussion, representatives of Twitter sent a copy of Twitter's customary director onboarding questionnaire to representatives of Musk.

54.     As noted *supra*, on April 4, 2022, Musk publicly disclosed his ownership of

15

approximately 9.2 percent of Twitter common stock. Musk's Schedule 13G did not disclose his intent to join the Twitter Board and also failed to disclose that he was contemplating buying Twitter. Both disclosures would have caused Twitter's stock to increase more than it did when his filing was made. Musk was later forced to file an amended disclosure form on Schedule 13D on April 5, 2022.

55. Musk benefitted himself ***by approximately $156 million*** by failing to timely file the Form 13G.[12] By delaying his disclosure of his stake in Twitter, Musk engaged in market manipulation and bought Twitter stock at an artificially low price. Musk was 11 days late in publicly declaring he had amassed a large stake in Twitter. Musk became a 5% stockholder on March 14, 2022, according to the SEC filings, but failed to file his Form 13G until April 4, 2022

56. Between March 14 and April 4, 2022, Musk continued to buy Twitter stock at the price of around $39 per share, bringing his total stake to 9.2 percent. After his disclosure, Twitter's share price rose roughly 30 percent and then traded at above $50 per share until Musk began disparaging Twitter.

57. Musk saved about $156 million, according to David Kass, a finance professor at University of Maryland's business school, who stated "I really don't know what's going through his mind. Was he ignorant or knowledgeable that he was violating securities law?" "Whoever was handling the trades for Musk should have known," Kass said.[13]

58. Musk's disregard for securities laws demonstrates how billionaires can skirt the law and the tax code to build their wealth at the expense of the average American.

59. On **April 4, 2022**, representatives of Twitter in California provided Musk with a draft of a cooperation agreement that provided for Musk's appointment to the Twitter Board and included customary "standstill" provisions. For example, for so long as Musk were to serve on the Twitter Board and for 90 days thereafter, Musk agreed to refrain from, either alone or as a member of a group, becoming the beneficial owner of more than 14.9 percent of Twitter common stock.

---

[12] *See* Reed Albergotti, "Elon Musk Delayed Filing a Form and Made $156 Million," The Washington Post, April 6, 2022.

[13] *Id.*

60.     Also on **April 4, 2022**, Twitter sent Musk a draft of a letter agreement providing that Twitter would appoint Musk to the Twitter Board to serve as a Class II director with a term expiring at Twitter's 2024 Annual Meeting of Stockholders.  Twitter requested, but Musk refused, to agree to a customary "cooperation agreement" limiting his public statements about Twitter.  Musk did, however, agree at Twitter's request to limit his purchase of additional Twitter stock to no more than 14.9% ***so long as he was a Twitter director***.

61.     On **April 5, 2022**, Twitter and Musk issued a joint announcement from California disclosing the entry into the letter agreement. Musk and Agrawal tweeted the following:



62.     Over the next three days, Agrawal and Musk continued to discuss Twitter's business and products ***in anticipation of Musk joining the Twitter Board***.  Later that day, Musk called Dorsey in San Francisco to ask Dorsey for his perspectives on Twitter in connection with the announcement of Musk joining the Twitter Board.

63.     On **April 8, 2022**, Lane Fox informed the Twitter Board of the satisfactory completion of Musk's background check.   Taylor informed the Twitter Board of his expectation that Musk's appointment to the Twitter Board would be effective on April 9, 2022.

64.     On **April 9, 2022**, before Musk's appointment to the Twitter Board became effective, Musk notified Taylor and Agrawal in San Francisco that he would not be joining the Twitter Board and would be making an offer to take Twitter private.

65.     On **April 10, 2022**, Twitter issued an announcement from California that Musk had decided not to join its Board.

**C.      After Unexpectedly Announcing He Would Not Join Its Board, Musk Discloses an Intent to Buy Twitter, and Threatens to Go Hostile Through a Tender Offer if Twitter's Board Does Not Acquiesce**

66.     On **April 13, 2022**, Musk delivered to Twitter's Chairman Bret Taylor in California a non-binding proposal to acquire Twitter, the full text of which is reproduced below. Musk also called Taylor in California to re-iterate that Musk's proposal represented his best and final offer to acquire Twitter and referred Taylor to Musk's public disclosure of the proposal scheduled for the next day for additional details with respect to the proposal.

*Bret Taylor*

*Chairman of the Board,*

*I invested in Twitter as I believe in its potential to be the platform for free speech around the globe, and I believe free speech is a societal imperative for a functioning democracy. However, since making my investment I now realize the company will neither thrive nor serve this societal imperative in its current form. Twitter needs to be transformed as a private company.*

*As a result, I am offering to buy 100% of Twitter for $54.20 per share in cash, a 54% premium over the day before I began investing in Twitter and a 38% premium over the day before my investment was publicly announced. My offer is my best and final offer and if it is not accepted, I would need to reconsider my position as a shareholder.*

*Twitter has extraordinary potential. I will unlock it.*

*/s/ Elon Musk*
*Elon Musk*

67.     Two aspects of Musk's letter are noteworthy.  First, Musk made one and only one offer. He refused to negotiate and simply put the $54.20 per share offer to the Twitter Board as a "take it or leave it" offer.  Second, Musk threatened to sell his Twitter stock if the Twitter Board did not accept his ultimatum.  As will be shown infra, Musk also waived due diligence; he was in a hurry to acquire Twitter, claimed he knew everything he needed to know about Twitter, and did not condition his offer on his satisfaction with any due diligence.

68.     On **April 14, 2022**, Musk publicly disclosed his acquisition proposal.

69.     On **April 15, 2022**, the Twitter Board responded to Musk's takeover attempt by defensively adopting a shareholder rights plan or "poison pill," pursuant to which Musk's acquisition of greater than 15% of Twitter's outstanding common stock would trigger a right for the Company's other stockholders to acquire additional stock at a considerable discount.

70.     Twitter's CEO, Dorsey, took the highly unusual step of criticizing the Board for this. "On April 16, Jack Dorsey . . . tweeted that the board had been the 'consistent dysfunction of the company.'  When asked by a Twitter user whether he was allowed to say that, Dorsey responded, 'no.'"[14]

71.     In response to Twitter's adoption of a poison pill, Musk began laying the groundwork for a hostile tender offer to acquire Twitter over the Board's objection.  He threatened a tender offer in a series of tweets, posting "Love me tender" on April 16, 2022 and "_____ is the Night" on April 19, 2022 (an apparent allusion to the F. Scott Fitzgerald novel Tender is the Night).

72.     Musk also filed an amended Schedule 13D/A on April 21, 2022, which stated that Musk was "exploring whether to commence a tender offer" and that he had secured commitment letters from a group of lenders, led by Morgan Stanley, to provide approximately $46.5 billion to finance his acquisition of Twitter.

73.     Musk then spoke directly with Taylor on Saturday April 23, 2022 and "threatened to take his offer directly to Twitter's shareholders."

74.     The following day, Sunday **April 24, 2022**, the Twitter Board capitulated in the face of Musk's threats and accepted his initial, "best and final" offer to purchase all Twitter's outstanding common stock for $54.20 per share.

75.     On **April 25, 2022**, Twitter approved entry into a definitive agreement to be acquired by an entity wholly-owned by Musk for $54.20 per share in cash, in a transaction valued at approximately $44 billion (the "Proposed Buyout").  The Board's agreement to the Proposed Buyout was announced

---

[14] *See* Lauren Hirsch and Mike Isaac, "How Twitter's Board Went From Fighting Elon Musk to Accepting Him," NEW YORK TIMES (April 30, 2022) (available at: https://www.nytimes.com/2022/04/30/technology/twitter-board-elon-musk.html).

via a Form 8-K filed by Twitter that same day. The documentation for the Proposed Buyout was negotiated and signed in substantial part in California.

76. On **May 5, 2022**, Twitter and Musk entered into a confidentiality agreement with respect to Twitter sharing non-public information with Parent, Musk and their representatives, including pursuant to the terms of the merger agreement. Prior to entry into the merger agreement, ***Musk did not ask to enter into a confidentiality agreement or seek from Twitter any non-public information regarding Twitter***. Further, Musk's obligation to complete the Buyout is not conditioned on his satisfaction with any due diligence.

**D.      Musk Finances the Proposed Buyout in Part by Pledging Billions of Dollars of His Tesla Stock as Collateral for a Loan From Morgan Stanley**

77. Musk is financing his purchase of Twitter through the following: (1) $21 billion in cash; (2) $25.5 billion in financing. As explained below, both the cash component and $12.5 billion of the debt financing are linked to Musk's Tesla shares and the value of those Tesla shares.

78. With respect to the cash component, at the time the Proposed Buyout was announced on April 25, 2022, Musk was expected to sell about 20 million shares of his Tesla stock to provide such cash. That was predicated on Tesla stock having a value at the time of close to $1,000 per share.

79. Indeed, while Tesla stock was still trading around $1,000 per share, Musk initially acted quickly after the Proposed Buyout was announced to sell some of his Tesla shares to raise the cash component. In the three days after announcement of the deal, Musk sold roughly $8.5 billion worth of shares in Tesla to help fund the purchase.

80. Musk reported the sale of 9.6 million Tesla shares in filings with the Securities and Exchange Commission on April 28-29, 2022. The trades were made at prices ranging from $822.68 to $999.13 a share. But then Musk stopped selling Tesla shares as its price began to decline. Further, the decline did not abate, and instead got worse.

81. With respect to the debt financing, Morgan Stanley arranged tens of billions of dollars to finance Musk's buyout of Twitter, and is the largest single lender facilitating the deal. Musk has received commitment letters to provide, in addition to a $21 billion contribution of his own cash, an aggregate of approximately $25.5 billion in financing as follows: (i) a debt commitment letter dated

April 20, 2022, from Morgan Stanley and certain other financial institutions to provide $13 billion in financing to Musk via a $6.5 billion senior secured term loan facility (the "Term Loan Facility"), a $500 million senior secured revolving facility (the "Revolving Facility"), a $3 billion senior secured bridge loan facility (the "Secured Bridge Facility") and a $3 billion senior unsecured bridge loan facility (the "Unsecured Bridge Facility"); and (ii) a separate debt commitment letter dated April 20, 2022 from Morgan Stanley and certain other financial institutions pursuant to which they committed to provide Musk with $12.5 billion in margin loans. The chart below depicts Musk's financing package:



82.     There are several problems with this financing scenario which provide Musk with a strong motive to make false statements about Twitter and engage in market manipulation.

83.     According to Tesla's regulatory filings, Musk had already pledged about half of his 173 million shares of Tesla stock to fund other ventures and activities. He has now pledged an additional 40 percent to secure the new loans to buy Twitter. That leaves only 10 percent of his Tesla shares available as collateral. Because Tesla's policies allow major shareholders to borrow only 25 percent of the value of each share that is pledged, that would appear to limit further borrowing against his Tesla shares to less than $5 billion.  As noted by Tesla's Amended Form 10-K filed May 2, 2022:

> In order to mitigate the risk of forced sales of pledged shares, ***the Board has a policy that limits pledging of Tesla stock by our directors and executive officers. Pursuant to this policy,***

***directors and executive officers may pledge their stock*** (exclusive of options, warrants, restricted stock units or other rights to purchase stock) as collateral for loans and investments, ***provided that the maximum aggregate loan or investment amount collateralized by such pledged stock does not exceed twenty-five percent (25%) of the total value of the pledged stock***.[15]

84. As Musk is well aware, the Twitter financing is in major peril since the value of the collateral — Tesla stock (TSLA) — needs to remain at or near the $1,000 per share it was trading at when the deal was announced. Yet that has not happened, as Tesla stock dropped by over 35% since the announcement of the Buyout, as shown in the following chart:



85. If Tesla's stock falls below $750, Musk could violate Tesla's own leverage ratio. Since it has now done so, Musk appears to be in violation of Tesla's stock pledging policy.

---

[15] Tesla Form 10-K/A, filed May 2, 2022, at p. 21.

86. Should Tesla stock fall below $600, Morgan Stanley and other banks could demand that Musk post additional collateral, requiring him to quickly sell some of his Tesla shares, which Musk does not want to do at current prices.

87. Tesla's annual report also warned of the potential consequences of Musk's personal loans on its stock, stating:

> *If Elon Musk were forced to sell shares of our common stock that he has pledged to secure certain personal loan obligations, such sales could cause our stock price to decline*.

> Certain banking institutions have made extensions of credit to Elon Musk, our Chief Executive Officer, a portion of which was used to purchase shares of common stock in certain of our public offerings and private placements at the same prices offered to third-party participants in such offerings and placements. We are not a party to these loans, which are partially secured by pledges of a portion of the Tesla common stock currently owned by Mr. Musk. *If the price of our common stock were to decline substantially, Mr. Musk may be forced by one or more of the banking institutions to sell shares of Tesla common stock to satisfy his loan obligations* if he could not do so through other means. Any such sales could cause the price of our common stock to decline further.[16]

88. The following chart from Tesla's Form 10-K/A filed May 2, 2022 sets forth Musk's current ownership of Tesla stock:

| Beneficial Owner Name | Shares Beneficially Owned | Percentage of Shares Beneficially Owned |
|---|---|---|
| **5% Stockholders** | | |
| Elon Musk(1) | 231,715,206 | 21.2% |
| The Vanguard Group(2) | 62,448,572 | 6.0% |
| Blackrock, Inc.(3) | 52,918,395 | 5.1% |
| **Named Executive Officers & Directors** | | |
| Elon Musk(1) | 231,715,206 | 21.2% |
| Zachary J. Kirkhorn(4) | 635,271 | * |
| Andrew Baglino(5) | 257,383 | * |
| Robyn Denholm(6) | 654,159 | * |
| Ira Ehrenpreis(7) | 560,335 | * |
| Lawrence J. Ellison(8) | 15,270,141 | 1.5% |
| Hiromichi Mizuno(9) | 117,230 | * |
| James Murdoch(10) | 475,765 | * |
| Kimbal Musk(11) | 683,490 | * |
| Kathleen Wilson-Thompson(12) | 260,139 | * |
| All current executive officers and directors as a group (10 persons)(13) | 250,629,119 | 22.9% |

---

[16] *See* Tesla's Form 10-K, filed Feb. 7, 2022, at p. 27.

89.     Tesla's Form 10-K/A also reveals the number of Tesla shares Musk has pledged for personal debts, including the Twitter Buyout: "[Musk's shares include] 92,331,125 shares pledged as collateral to secure certain personal indebtedness."[17]

**E.      As Tesla's Stock Plunges in the 30 Days After Announcement of the Buyout, Threatening a Margin Call and a Forced Sale of Musk's Tesla Stock, Musk Begins to Make False Statements and Engage in Market Manipulation of Twitter's Stock**

90.     Between April 25, 2022, when the Proposed Buyout was announced, and May 12, 2022, Tesla's stock declined by 27%.  The substantial decline in Tesla's stock threatened a margin call on Musk's Tesla stock which was pledged as collateral for his $12.5 billion loan from Morgan Stanley and other banks.  In addition, according to his financing plan, Musk has not only pledged his Tesla stock for the $12.5 billion loan from Morgan Stanley and other banks, but will have to sell $21 billion worth of Tesla stock, about 20 million shares, to fund the cash part of the deal.  With Tesla stock now entering a bear market, selling millions of shares is equivalent to having to book a huge loss. Musk thus has a strong motivation to attempt to delay the Proposed Buyout in the hope that Tesla shares will rebound in value before he is forced to sell them.  It has also been reported that due to his strong aversion to selling more Tesla shares at current depressed valuations, Musk is also looking at funding the Twitter buyout by selling some shares of SpaceX through a private placement.[18]  However, the current stock market decline has made it difficult for Musk to do so at attractive valuations.

91.     In response to these problems and the plunging value of Tesla stock, Musk promptly acted to disparage Twitter in a false and baseless manner, and in violation of both the non-disparagement and non-disclosure clauses of his contract with Twitter.  In doing so, Musk hoped to drive down Twitter's stock price and then use that as a pretext to attempt to re-negotiate the Buyout

---

[17] *See* Tesla Form 10-K/A, filed May 2, 2022, at p. 23.

[18] *See, e.g.*, Sissi Cao, "As Tesla Stock Falters, Elon Musk is Considering Selling SpaceX Shares to Fund His Twitter Deal," The Observer, May 18, 2022 ("Elon Musk appears to be hesitating over his $44 billion acquisition of Twitter as a key funding source, his ownership in Tesla, quickly loses value.").

price.[19]  He also began to baselessly state that the Proposed Buyout was "temporarily on hold" in an effort to buy more time and avoid having to sell Tesla stock at depressed prices.  Musk did so predominantly by using his Twitter account, which he established when he was a California citizen. Twitter is headquartered in San Francisco and Musk's tweets were disseminated from San Francisco, California.

92.  Beginning on Friday, May 13, 2022, and continuing to the present, Musk has disseminated the following false statements:

**1.  Friday May 13, 2022 Tweet**

93.  On Friday, May 13, 2022 ("Friday the 13th"), at 5:44 a.m. (*i.e.*, before the stock market opened), Musk issued a tweet which stated that the buyout was "temporarily on hold:"



94.  Musk's statement was false and misleading and constituted an effort to manipulate the market for Twitter shares.  The statement was false because the Buyout was not, in fact, "temporarily on hold."  Vijaya Gadde, Twitter's top lawyer, has stated that here is nothing in the buyout contract that

---

[19] The Buyout agreement is also atypical in that it does not have a standstill agreement.  Thus, Musk could presumably also be buying additional Twitter shares at the depressed prices caused by his market manipulation.

allows Musk to put the deal "temporarily on hold." Moreover, Musk's statement was misleading because it stated or implied that Musk's obligation to consummate the Buyout was conditioned on his satisfaction with due diligence to determine whether "spam/fake accounts do indeed represent less than 5% of users." Musk had specifically waived detailed due diligence as a condition precedent to his obligations under the Buyout contract. Thus, Musk has no right to cancel the Buyout based on any results from due diligence concerning the number of fake accounts at Twitter.

95.     In response to this Tweet, Twitter's stock price declined. Later the same day, Musk issued the following Tweet:



96.     In response to a question about why he was using a sample of 100 Twitter users, Musk replied:

**2.     Musk's May 14, 2022 Tweet**

97.     Musk had allegedly obtained non-public information about the process Twitter uses to investigate duplicate and fake accounts from Twitter as part of the Proposed Buyout diligence. Musk

1  sent a tweet on Saturday, May 14, 2022, disclosing that he had received a call from Twitter's lawyers

2  advising him that he had violated the terms of the Non-Disclosure Agreement ("NDA"):

3

4  

5

6

7

8

9  98.    Musk's supposed concern about the number of bots and fake accounts in Twitter would

10  appear to be  pretextual, given the fact that Musk has known about the issue for long before he offered

11  to acquire Twitter.

12  99.    For example, Musk and his lawyers were well aware of a *$809.5 million settlement*

13  Twitter had been forced to enter into *in September 2021, just hours before trial was set to begin* in a

14  securities fraud class action alleging Twitter overstated its user numbers and growth rate -- *In re Twitter*

15  *Inc. Securities Litigation*, 16-cv-05314, U.S. District Court, Northern District of California (San

16  Francisco).  All the documents from that case were publicly available to Musk, including a website

17  (www.twittersecuritieslitigation.com) containing, among other things, the Court's order denying

18  Twitter's motion for summary judgment.  *See* **Exhibit A** (April 17, 2020 Order Denying Motion for

19  Summary Judgment, at p. 16)(holding that Twitter's false statements about its Daily Active Users

20  (DAUs) and Monthly Active Users (MAUs) were material because "Twitter has publicly stated that its

21  success and financial performance depend, at least in part, on the size and engagement of its user

22  base.").

23  100.    Moreover, Twitter's SEC filings have long disclosed that there are duplicate and fake

24  accounts on Twitter.  For example's Twitter's 2021 Annual Report disclosed that:

25       The numbers of mDAU presented in this Annual Report on Form 10-K are based on internal
         company data. While these numbers are based on what we believe to be reasonable estimates
26       for the applicable period of measurement, there are inherent challenges in measuring usage and
         engagement across our large number of total accounts around the world. Furthermore, our
27       metrics may be impacted by our information quality efforts, which are our overall efforts to
         reduce malicious activity on the service, inclusive of spam, malicious automation, and fake
28       accounts. For example, *there are a number of false or spam accounts in existence on our*

27

*platform. We have performed an internal review of a sample of accounts and estimate that the average of false or spam accounts during the fourth quarter of 2020 represented fewer than 5% of our mDAU during the quarter.* The false or spam accounts for a period represents the average of false or spam accounts in the samples during each monthly analysis period during the quarter. *In making this determination, we applied significant judgment, so our estimation of false or spam accounts may not accurately represent the actual number of such accounts, and the actual number of false or spam accounts could be higher than we have estimated.*[20]

101.    In addition, news reports and blog posts as far back as 2017 had regularly reported that "It has been extensively reported that incidences of spamming by bots and fake accounts on Twitter have been increasing."[21]

102.    In fact, as noted sarcastically by one of his Twitter followers, getting rid of the bots and fake accounts was one of Musk's stated reasons for wanting to buy Twitter:



**3.    Musk's May 16, 2022 Statement**

103.    On May 16, 2022, Musk stated during the All In tech conference in Miami that fake and spam accounts make up at least 20% of Twitter's users.

---

[20] See Form 10-K, filed 2/17/21, at p. 5.

[21] *See* Ankit Singh, Identifying Fake Accounts and Twitter Bots using Artificial Intelligence," May 31, 2017, available at https://blog.paralleldots.com/research/identifying-fake-accounts-twitter-bots-using-artificialintelligence/#:~:text=It%20has%20been%20extensively%20reported%20that%20incidences%20of,and%20opinions%2C%20creating%20confusions%20and%20potentially%2C%20spreading%20rumors.

104.    Twitter's CEO Parag Agrawal attempted to respond to Musk with the following tweet:



105.    In response, Musk tweeted a poop emoji to Agrawal:



106.    Musk later the same day tweeted the following follow-up comment, stating that information about the number of fake accounts was "fundamental to the financial health of Twitter":



**4.    Musk's May 17, 2022 Tweet**

107.    On May 17, 2022, Musk doubled down on his "Friday the 13th" tweet and May 16th statement and issued another tweet stating that the actual number of fake accounts at Twitter could be

29

"much higher" than 20% and that the deal "cannot go forward"



108.    In response to this Tweet, Twitter's stock price declined.

109.    The same day (May 17, 2022), Musk invited the SEC to investigate Twitter.

**5.    Musk's May 21, 2022 Tweets**

110.    On May 21, Musk suggested in a series of tweets that he could be seeking to reduce the price of the Buyout by up to 25% of the original agreed-upon price. Replying to a tweet from Ion Miles Chong, saying "If 25% of the users are bots then the Twitter acquisition deal should cost 25% less," Musk replied:  "Absolutely."

111.    If the Buyout price is reduced by 25%, that would amount to an $11 billion reduction in proceeds to the Class.

112.    "I'm worried that Twitter has a disincentive to reduce spam, as it reduces perceived daily users," Musk also tweeted on May 21, and asked whether Twitter had gotten back to him on the bots number discrepancy, he added: "No, they still refuse to explain how they calculate that 5% of daily users are fake/spam! Very suspicious."

113.    Musk's false and misleading tweets and disparagement of Twitter had the desired effect, as they caused Twitters' stock to decline substantially in the days following the tweets, erasing over $8 billion in market capitalization, reflected in the following chart:

Class Action Complaint for Violations of the California Corporations Code



114. Musk's false and disparaging statements have caused the spread between the $54.20 Buyout price and Twitter's stock price to exceed $15 per share, which is highly unusual:

115. Unfortunately for Musk, Tesla's stock price also continued its decline. On Friday, May 20, 2022, Tesla stock closed at $635.07. That represented an even further deterioration of Tesla's stock since the Proposed Buyout was announced – *a 35% drop in Tesla's stock price*. As noted by the Washington Post:

> *Tesla's stock — and Elon Musk's wealth — took a huge hit Friday, continuing a downward spiral and possibly imperiling the billionaire's deal to buy Twitter*.

> *Shares of the electric car company*, from which much of Musk's wealth comes, *sank more than 10 percent during trading Friday, falling at one point to about $636 per share. That's about a 35 percent drop from its price on the day Musk's deal to buy Twitter* was announced.

> The downturn of Tesla's stock could have more than just a superficial impact on Musk's wealth.

> Tesla's value dropped Tuesday by more than double the cost of Twitter
> Musk has taken out extensive personal loans that are heavily tied to the value of Tesla's stock. At times, he has put down as much as 50 percent of his Tesla shares as collateral to back them. *As the company's share price approaches $600, Musk enters dangerous territory with lenders — where they could seek some of his equity to ease their confidence in his ability to pay*, according to analysts. [22]

116. On **May 25, 2022**, Twitter held its Annual Meeting. At the meeting, shareholders of Twitter voted against re-electing Egon Durban, an ally to Musk, as a director to the board. Durban, the co-head of private equity firm Silver Lake, had partnered with Musk when he sought to take Tesla ((TSLA) - Get Tesla Inc Report), the electric carmaker, private as its CEO.

117. Also on **May 25, 2022**, Musk filed an Amended Form 13D. The Amended 13D confirmed the incredible pressure that Musk's margin loan had been exerting on him. The filing disclosed that he let the $12.5 billion margin loan from Morgan Stanley and other banks, for which he had pledged his Tesla stock as collateral, expire on May 24, 2022. The Amended Form 13D states that Musk intends to replace the $12.5 billion loan with "equity financing" but does not state where Musk will obtain such equity financing or what form it will take.

---

[22] *See* Rachel Lerman, "Tesla's Stock Price Plummets as Twitter Deal Hangs in the Balance," THE WASHINGTON POST, May 20, 2022.

## VII. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Cal. Corp. Code §§ 25400 and 25500

**(Against Defendant Musk)**

118. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, except for the causes of action.

119. Defendant Musk violated Corp. Code Section 25400(d) directly and/or indirectly, in this State, for the purpose of inducing the purchase or sale of Twitter securities by others, engaged in manipulative transactions and/or made or materially participated in making the statements alleged in this complaint, each of which contained false or misleading statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Defendant was aware that the relevant statements and omissions were false and misleading and that the relevant transactions were manipulative.

120. Defendant Musk purchased or offered to purchase Twitter securities and/or willfully participated in the relevant manipulative transactions for the purpose of inducing the purchase or sale of Twitter securities by others. After purchasing over 9% of Twitter's shares, and entering into a contract to purchase the remaining stock of Twitter he does not already own for $54.20 per share, Defendant Musk has willfully participated in making statements that were false and misleading, or that omitted material facts necessary to make the statements made not false or misleading. Musk knew such statements were false and misleading as detailed herein.

121. Through such conduct, Defendant Musk also violated Corp. Code Section 25400(b) by effecting, alone or with one or more other persons, a series of transactions in Twitter securities creating actual or apparent active trading in such securities or raising or depressing the price of such securities, for the purpose of inducing the purchase or sale of such securities by others.

122. Through the conduct alleged herein, Defendant Musk also violated Corp. Code Section 25400(c). Musk was and is a person purchasing or offering to purchase Twitter securities. Musk also induced the purchase or sale of Twitter securities by circulating or disseminating information to the effect that the price of Twitter securities is or is likely to fall because of market operations of any one or

33

more persons conducted for the purpose of depressing the price of Twitter securities.

123.    As a result of Defendant's misconduct, plaintiff and the other members of the Class have suffered damages and been harmed. The fair market value of Twitter securities has been adversely affected by Musk's false statements and wrongful conduct.

124.    As a direct and proximate result of defendants' violation of law described herein, plaintiff and members of the Class have been damaged.

### SECOND CAUSE OF ACTION

### Cal. Corp. Code §§ 25401 and 25501

### (Against Defendant Musk)

125.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein, except for the causes of action.

126.    This claim is brought on behalf of those Class members who Defendant Musk has purchased or offered to purchase their Twitter securities.

127.    Defendant Musk offered to purchase and/or purchased securities from plaintiff and members of the Class in and from this state by means of written and oral communications that included untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which the statements were made, not misleading.

128.    Defendant Musk failed to exercise reasonable care to ensure the truth and accuracy of such statements, and plaintiff had no knowledge of the falsity of such statements.

129.    As a direct and proximate result of Defendant's violations of law described herein, plaintiff and members of the Class have been damaged.

### THIRD CAUSE OF ACTION

### For Declaratory and Injunctive Relief

### (Against Defendant Twitter, Inc. and Musk)

130.    Plaintiff seeks declaratory and injunctive relief against Defendants pertaining to Defendant Musk's outstanding and current offer to buy the Twitter stock of Plaintiff and the Class for $54.20.

131.    A justiciable, present controversy exists between the parties.  Defendant Musk signed a binding contract to buy Plaintiff's stock for $54.20.  But Defendant Musk thereafter publicly stated that the Buyout is "temporarily on hold" and "cannot go forward" until certain conditions are met.

132.    The conditions Musk that has stated must be met before the Buyout can go forward do not appear to be part of the contract he signed with Twitter, Inc.  Plaintiff thus seeks a declaration concerning these facts and issues and the parties' respective rights and obligations.  Plaintiff also seeks appropriate injunctive relief to be determined by the Court.

## FOURTH CAUSE OF ACTION

### For Violation of Cal. Corp. Code § 25402 and 25502.5

### (Against Defendants Musk and Twitter, Inc.)

133.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, except for the causes of action.

134.    As a result of the conduct alleged herein, Defendant Musk purchased Twitter securities in this state at a time when he knew material information about Twitter which he knew would significantly affect the market price of Twitter securities and which was not generally available to the public, and which he knew was not intended to be so available.

135.    Plaintiff seeks a declaratory judgment that Musk has violated Section 25402 and that Defendant Twitter has an obligation to investigate Musk's conduct and take appropriate action. Plaintiff does not seek any damages on behalf of Twitter and this claim is not brought as a derivative claim.

## FIFTH CAUSE OF ACTION

### For Unjust Enrichment

### (Against Defendant Musk)

136.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein, except for the causes of action.

137.    Through the conduct alleged herein, Defendant Musk has been unjustly enriched.

138.    As a matter of equity, Musk should not be allowed to retain the monies and benefits he unjustly acquired through his false statements, market manipulation, and other improper conduct.

139. As a matter of equity, Musk should be ordered to disgorge his unjust monies and profits and all interest and interest earned from such monies and benefits.

### VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, pray for the following judgment and relief:

A.   Certifying this action as a class action and certifying Plaintiff as the Class representative and their counsel as Class counsel;

B.   Directing that Defendant Musk account to Plaintiff and the other members of the Class for all damages caused to them, and account for all profits and any special benefits obtained as a result of his unlawful conduct;

C.   Declaratory and injunctive relief from Twitter and Musk;

D.   Awarding punitive damages at the maximum amount permitted by law;

E.   Awarding Plaintiff and the other members of the Class compensatory damages;

F.   Awarding Plaintiff and the other members of the Class declaratory, equitable and injunctiverelief;

G.   Awarding Plaintiff and the other members of the Class pre-judgment and post judgment interest,

H.   Awarding Plaintiff the costs and disbursements of this action, including a reasonable allowance for the fees and expenses of attorneys and experts; and

I.   Granting Plaintiff and the other members of the Class such other and further relief as may be just and proper.

///

1

## IX.   JURY TRIAL DEMAND

2        Plaintiff demands a trial by jury on all claims and issues so triable.

3   Dated: May 25, 2022                    Respectfully submitted,

4                                          **BOTTINI & BOTTINI, INC.**

5                                          */s/ Francis A. Bottini, Jr.*
                                                Francis A. Bottini, Jr.
6
7                                          Francis A. Bottini, Jr. (SBN 175783)
                                           Anne B. Beste (SBN 326881)
8                                          Albert Y. Chang (SBN 296065)
                                           Yury A. Kolesnikov (SBN 271173)
9                                          Nicholas H. Woltering (SBN 337193)
                                           7817 Ivanhoe Avenue, Suite 102
10                                         La Jolla, California  92037
                                           Telephone:    (858) 914-2001
11                                         Facsimile:    (858) 914-2002

12                                         **COTCHETT, PITRE & MCCARTHY, LLP**

13                                         */s/ Anne Marie Murphy*
14                                              Anne Marie Murphy

15                                         Joseph W. Cotchett (SBN 36324)
                                           Mark C. Molumphy (SBN 168009)
16                                         Anne Marie Murphy (SBN 202540)
                                           Tyson C. Redenbarger (SBN 294424)
17                                         Julia Q. Peng (SBN 318396)
                                           San Francisco Airport Office Center
18                                         840 Malcolm Road, Suite 200
                                           Burlingame, California 94010
19                                         Telephone:    (650) 697-6000

20                                         *Counsel for Plaintiff*

21
22
23
24
25
26
27
28

37

Class Action Complaint for Violations of the California Corporations Code

# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re TWITTER, INC. SECURITIES LITIGATION | Case No. 16-cv-05314-JST |
| _____ | **ORDER DENYING MOTION FOR SUMMARY JUDGMENT** |
| This Document Relates to: | ECF No. 314-4 |
| ALL ACTIONS | |

In this securities class action, Defendants move for summary judgment as to both claims in the operative complaint. The Court will deny the motion.[1]

## I. BACKGROUND AND PROCEDURAL HISTORY

This is a securities class action against Twitter, Inc., a social media company, and two of its officers, Richard Costolo and Anthony Noto, for alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934. Costolo was the Chief Executive Officer ("CEO") of Twitter until July 1, 2015. Noto was Twitter's Chief Financial Officer ("CFO") during all relevant times.

The gravamen of the operative complaint, ECF No. 81, is that Defendants made misleading statements that caused the price of Twitter stock to trade at artificially high prices during the Class Period, which ranges from February 6, 2015, to July 28, 2015. Plaintiffs allege that Defendants misled investors during the Class Period by making public statements that did not reflect the actual state of Twitter's user engagement, which is relevant to evaluating Twitter's

---

[1] The parties' motions to exclude certain expert testimony under Federal Rule of Evidence 702 will be resolved in a separate order.

United States District Court
Northern District of California

potential user growth and financial performance. Plaintiffs aver that Defendants omitted

information from the challenged statements that would have provided investors with the necessary

context to evaluate Twitter as an investment. This included information pertaining to Twitter's

daily active users ("DAU") and the ratio of DAU to monthly active users ("MAU")

("DAU/MAU"), which are metrics that measure user engagement or frequency of use. Plaintiffs

allege that persons who purchased Twitter stock during the Class Period suffered economic losses

when the price of Twitter stock declined as a result of two sets of corrective disclosures that

revealed the problems with user engagement, and potentially with user growth, that the challenged

statements had concealed.

On October 16, 2017, the Court granted in part and denied in part Defendants' motion to

dismiss.[2] ECF No. 113. In relevant part, the Court denied the motion as to the theory that

Defendants' omission of information about DAU and DAU/MAU rendered Defendants'

statements about user growth and user engagement misleading.[3] *Id.* at 24-28. The Court also

denied the motion with respect to the theory that Defendants' affirmative statements about

DAU/MAU and ad engagement were misleading. *Id.* at 30-32.

On July 17, 2018, the Court granted the motion for class certification under Rules 23(a)

and (b)(3) filed by Lead Plaintiff KBC Asset Management NV ("KBC"). The Court certified the

following class: "all persons and entities that, during the period from February 6, 2015, through

July 28, 2015, inclusive [], purchased or otherwise acquired shares of the publicly traded common

stock of Twitter, Inc. [], and were damaged thereby."[4] ECF No. 181 at 16. In the same order, the

---

[2] The Court granted the motion with respect to the theory that Defendants made misleading statements about MAU trends by failing to disclose that such trends were based on low-quality users. ECF No. 113 at 32-34.

[3] Defendants argue that Plaintiffs have changed "the theory of their case" by proceeding at summary judgment based on the "untested theory" that Defendants' statements were misleading by virtue of Defendants' omission of DAU/MAU information from such statements. ECF No. 396-4 at 1-2 & n.2. The Court disagrees. One of the theories that survived Defendants' motion to dismiss was the theory that Defendants' statements about MAU growth were misleading because Defendants failed to disclose "companion DAU data" and information that the "DAU to MAU ratio" was declining. *See* ECF No. 113 at 24-26.

[4] Excluded from the Class are Defendants; members of the Individual Defendants' immediate families; Twitter's subsidiaries and affiliates; any person who is or was an officer or director of Twitter during the Class Period; any entity in which any Defendant has a controlling interest; and

Court appointed KBC and National Elevator Industry Pension Fund as co-class representatives, and the law firms Motley Rice LLC and Robbins Geller Rudman & Dowd LLP as co-class counsel. *Id.* at 16-17.

Defendants' present motion for summary judgment follows.

## II.     REQUESTS FOR JUDICIAL NOTICE

Before turning to the substance of Defendants' motion for summary judgment, the Court first addresses the parties' requests for judicial notice.

"The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  The Court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).

First, Defendants request that the Court take judicial notice of certain documents that fall within the following categories: (1) analyst reports; (2) Defendants' filings with the Securities and Exchange Commission ("SEC"); (3) four "tweets" by the "verified Selerity Twitter account"; and (4) Twitter's press releases, metrics and financials published on Twitter's website, and transcripts of Twitter's earnings calls.  ECF No. 355.

Plaintiffs oppose the request (1) to the extent that Defendants ask the Court to take notice of the truth of the matters asserted in the documents at issue; and (2) to the extent that Defendants request that the Court take judicial notice of the four tweets, which Plaintiffs argue were published by a private non-party and therefore do not have the indicia of accuracy required for judicial notice.  *See* ECF No. 399.

Because their authenticity and accuracy is not disputed, the Court will take judicial notice of the analyst reports; Defendants' filings with the SEC; and Twitter's press releases, publicly disseminated metrics and financials, and transcripts of earnings calls.  Courts routinely take

---

the legal representatives, heirs, successors and assigns of any such excluded person or entity.  ECF No. 181 at 16 n.7.

United States District Court
Northern District of California

judicial notice of these types of documents to determine what information was available to the market.  *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (holding that the district court properly took judicial notice of publicly available financial documents and SEC filings); *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2009) (holding that courts "may take judicial notice of publications introduced to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true") (citation and internal quotation marks omitted).  Because the truth of the matters asserted in these documents is subject to reasonable dispute, however, the Court takes judicial notice only of the statements contained therein, but not for the purpose of determining the truth of those statements.  *Shaev v. Baker*, No. 16-CV-05541-JST, 2017 WL 1735573, at *7 (N.D. Cal. May 4, 2017) (citing *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1254 (N.D. Cal. 2008)).

With regard to the disputed tweets, the Court agrees with those courts that have held that "judicial notice is proper because the existence of the publicly-available articles and tweets cannot reasonably be questioned."  *See, e.g.*, *Unsworth v. Musk*, No. 19-MC-80224-JSC, 2019 WL 5550060, at *4 (N.D. Cal. Oct. 28, 2019) (citing *Von Saher*, 592 F.3d at 960); *Olson v. California*, No. 19-CV-10956-DMG (RAOx), 2020 WL 905572, at *4 (C.D. Cal. Feb. 10, 2020) (taking judicial notice of tweets referred to in the complaint and moving papers on the ground that "those documents' existence cannot reasonably be disputed") (citation omitted).  The Court takes judicial notice of the tweets solely "to indicate what was in the public realm at the time," but not for the purpose of determining whether the contents of those tweets "were in fact true."  *Von Saher*, 592 F.3d at 960 (citation and internal quotation marks omitted).

Second, Plaintiffs request that the Court take judicial notice of documents that fall within the following categories: (1) analyst reports; (2) news articles; (3) and SEC filings.  Plaintiffs request that the Court take judicial notice of the existence and content of these documents, but not for the truth of the matters asserted therein.  ECF No. 369.  Defendants do not oppose Plaintiffs' request.  ECF No. 400.

Because their authenticity and accuracy is not disputed, and because, as noted above,

courts routinely take judicial notice of these types of documents, the Court will take judicial notice of the analyst reports, news articles, and SEC filings cited by Plaintiffs, but not for the truth of the matters asserted therein.

## III.    UNDISPUTED FACTS

### A.    Before the Class Period

Twitter has publicly stated that its success and financial performance depend, at least in part, on the size and engagement of its user base.  *See, e.g.*, ECF No. 370-5 at 26 (Twitter's November 4, 2013, Amended Form S-1 Registration Statement stating that "[t]he size of our user base and our users' level of engagement are critical to our success" and "[o]ur financial performance has been and will continue to be significantly determined by our success in growing the number of users and increasing their overall level of engagement on our platform as well as the number of ad engagements").  User growth depends in part on user engagement, because users who are more engaged are less likely to "churn" (i.e., stop using the platform).  *See* ECF No. 362-6 at 4, 10 (Akash Garg, a senior member of Twitter's growth team, testifying during his deposition that more engaged users are less likely to churn and that daily active use "is certainly a prerequisite for healthy MAU growth").

When Twitter first became a public company, it disclosed "Key Metrics" that it used to measure user growth and user engagement.  ECF No. 370-5 at 75-76.  These included MAU (monthly active users), "a measure of the size of [Twitter's] active user base," and Timeline Views and Timeline Views per MAU, "measures of user engagement."  *Id.*

In 2014, Twitter established a Metrics Task Force to evaluate all of Twitter's metrics and decide what metrics it would use internally and externally.  ECF No. 362-10 at 2.  In September 2014, the Metrics Task Force decided to stop reporting Timeline Views and worked on finding a replacement metric.  ECF No. 362-11 at 8-9.

On November 12, 2014, Twitter held an "Analyst Day," during which management discussed products, strategy, and new services.  *See generally* ECF No. 371-2 (Transcript of Analyst Day).  At that event, Twitter announced its "operational goal of building the world's largest daily audience."  *Id.* at 5, 6, 8.  A Twitter representative stated that, although Twitter

5

previously had not "focused on DAU . . . if we're going to be the largest daily audience in the world, that has to change." *Id.* at 105.

At Analyst Day, Noto presented a "financial overview," during which he discussed eight "major growth drivers" for revenue, which included both DAU and DAU/MAU. *Id.* at 91, 94, 96. With respect to DAU/MAU, Noto stated that the "year-to-date DAU to MAU ratio for our top 20 markets" is 48%. *Id.* at 91. Noto described DAU/MAU as a "frequency" metric and the "best way to quantify the impact of engagement." *Id.* at 94. Noto also stated that the top 20 markets "account for 80% of our users and 90% of our revenue," and that Twitter could generate an additional $500 million in annual revenue by increasing its DAU/MAU from 48% to 51%. *Id.* With respect to MAU, Noto stated that Twitter was positioned to "grow [MAU] by 2x," from 284 million, *id.* at 91, to over 550 million in the intermediate term, *id.* at 96. Noto also announced that Twitter would no longer disclose Timeline Views because that measure had become "less and less relevant of a metric." *Id.* at 109.

After Analyst Day, internal Twitter emails state that dashboards for DAU, DAU/MAU, and MAU would be created to provide daily updates of those metrics for Noto and others, and that regular meetings would be held to discuss metrics, including DAU/MAU. *See, e.g.*, ECF No. 362-23 (email stating that metrics dashboard for Noto would include DAU/MAU); ECF No. 363-19 (email stating that CFO dashboard would be updated daily); ECF No. 362-24 (email to Noto and others attaching detailed user metrics slides); ECF No. 363-20 (email stating that weekly meetings to discuss user retention and related metrics, which included DAU/MAU, would be held); ECF No. 363-21 (email to Noto and others containing "Monthly Metrics Review" for Q1 2015, including DAU/MAU trends).

Before earnings calls with investors, internal "earnings binders" with "detailed information about financial and operational performance in the quarter" would be prepared and distributed to top executives, including Noto. ECF No. 371-15 at 4-5 (Krista Bessinger deposition testimony). The binders contained detailed information and analysis about DAU, MAU, DAU/MAU. *See generally* ECF Nos. 362-15 and 362-38 (earnings binders for Q4 2014 and Q1 2015).

/ / /

United States District Court
Northern District of California

6

United States District Court
Northern District of California

**B.      During the Class Period**

On February 5, 2015, Twitter issued a press release and held its quarterly earnings call with investors and analysts to report results for the fourth quarter of 2014 (Q4 2014). ECF No. 371-18. The earnings binder for this earnings call stated that Twitter's DAU/MAU for its top 20 markets had fallen to 44.4%. ECF No. 362-15 at 178. The binder also included "Key Takeaways on Users," which stated that "DAUs growth continues to stall" and "DAU/MAU continues to trend lower." *Id.* at 171. A separate chart in the earnings binder showed that DAU/MAU had declined throughout 2014 in all of Twitter's top 5 markets and 19 of its top 20 markets. *Id.* at 80-81.

During the February 5 earnings call, Noto stated that Twitter's more mature markets had a "very high DAU to MAU, 50% plus" and a lower rate in emerging markets, and that they "all migrate up to a higher rate over time." ECF No. 371-18 at 9. Twitter also disclosed average MAUs of 288 million for Q4 2014, which meant that its net MAU additions during Q4 amounted to only 4 million, which was less than expected. *Id.* at 7. Noto stated, however, that "[t]he user numbers we saw in January, again, indicate that our MAU trend is already turned around." *Id.* at 2.

After the earnings call, analysts reported that Twitter's "[e]ngagement is improving," ECF No. 371-21 at 2, "slower MAU growth is more than offset by improvements in engagement," ECF No. 371-22 at 2, and "MAU Growth about to Pick Up as Engagement Rate Improves," ECF No. 371-23 at 2.

On April 28, 2015, Twitter made disclosures with respect to its performance in Q1 2015. It disclosed that its MAU was 302 million, up from 288 million in the previous quarter. ECF No. 371-27 at 3. Twitter also revealed that it would be reducing its revenue guidance for the rest of FY2015. *Id.* at 4. During the earnings call on April 28, Noto stated that the trend for MAU growth for Q2 2015 was "not similar to Q1" and MAU "visibility is actually limited." ECF No. 371-28 at 12. Noto also stated that DAU to MAU ratios in the quarter were "similar" by market relative to Analyst Day. *Id.* at 20. The earnings binder prepared before the April 28 earnings call, however, stated that that DAU/MAU for the top 20 markets had fallen to 44.3% from the 48%

1    reported at Analyst Day.  ECF No. 362-38 at 139.

2         Twitter's stock price declined on April 28 and April 29, 2015.  ECF No. 352-10 ¶¶ 137-

3    141.

4         On July 28, 2015, Twitter issued results for Q2 2015 and held an earnings call, during

5    which Noto revealed that Twitter's DAU/MAU for the top 20 markets had fallen to 44%, and that

6    Twitter did "not expect to see sustained meaningful growth in MAUs" for "a considerable period

7    of time."  ECF No. 371-32 at 7.

8         Twitter's stock price declined for several days following the July 28, 2015, earnings call.

9    ECF No. 352-10 ¶¶ 142-151.

10   **IV.    JURISDICTION**

11        The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

12   **V.     LEGAL STANDARD**

13        Summary judgment is properly granted when no genuine and disputed issues of material

14   fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant

15   is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477

16   U.S. 317, 322-23 (1986).

17        Material facts that would preclude entry of summary judgment are those which, under

18   applicable substantive law, may affect the outcome of the case.  The substantive law will identify

19   which facts are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

20        Where the moving party does not bear the burden of proof on an issue at trial, the moving

21   party may discharge its burden of production by either of two methods:  the moving party may

22   produce evidence negating an essential element of the non-moving party's case, or, after suitable

23   discovery, the moving party may show that the non-moving party does not have enough evidence

24   of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

25   *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000).

26        If the moving party discharges its burden by showing an absence of evidence to support an

27   essential element of a claim or defense, it is not required to produce evidence showing the absence

28   of a material fact on such issues, or to support its motion with evidence negating the non-moving

United States District Court
Northern District of California

8

party's claim.  *Id.*; *see also Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."  *Bhan*, 929 F.2d at 1409.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The court is not required "to scour the record in search of a genuine issue of triable fact," *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citations omitted), and it may limit its review to the documents submitted for purposes of summary judgment and those parts of the record specifically referenced therein.  *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001).  "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the non-moving party must introduce some significant probative evidence tending to support the complaint."  *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and internal quotation marks omitted).

## VI.    DISCUSSION

### A.    Section 10(b) and Rule 10-b5 claim

The Securities and Exchange Act of 1934 "was designed to protect investors against manipulation of stock prices."  *Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988).  The Supreme Court "repeatedly has described the fundamental purpose of the Act as implementing a philosophy of full disclosure."  *Id.* (citations and internal quotation marks omitted).

Section 10(b) of the Securities Exchange Act of 1934 declares it unlawful to "use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary."  15 U.S.C. § 78j(b).  There is an "implied [ ] private cause of action" in Section 10(b).  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011).

"SEC Rule 10b-5 implements [Section 10(b)] by making it unlawful to . . . 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading.'"  *Id.* (quoting 17 C.F.R. § 240.10b–5).

9

1    "Thus, to prevail on a claim for violations of either Section 10(b) or Rule 10b-5, a plaintiff

2    must prove six elements: '(1) a material misrepresentation or omission by the defendant; (2)

3    scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a

4    security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss

5    causation.'" *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051-52 (9th Cir. 2014) (quoting

6    *Matrixx Initiatives*, 563 U.S. at 37-38).

7         Defendants move for summary judgment, arguing that Plaintiffs do not have evidence to

8    establish any of the following elements for a claim under § 10(b) and Rule 10b-5: (1) that

9    Defendants made a false or misleading statement during the Class Period; (2) that Defendants

10   acted with scienter; and (3) that Defendants' alleged fraud was a substantial cause of the Twitter

11   stock-price declines on April 28 and 29 and from July 29 to August 3, 2015.

12        After carefully reviewing the evidence cited by the parties, the Court concludes that

13   Plaintiffs have shown that genuine disputes of material fact preclude the entry of summary

14   judgment in Defendants' favor.

15                    **1.    Material misrepresentation or omission**

16        The first element of a claim under § 10(b) and Rule 10b-5 requires a plaintiff to show that

17   the defendant made a statement that was "*misleading* as to a *material* fact." *Basic*, 485 U.S. at

18   238 (emphasis in the original).  This materiality requirement is satisfied when there is "a

19   substantial likelihood that the disclosure of the omitted fact would have been viewed by the

20   reasonable investor as having significantly altered the total mix of information made available."

21   *Id.* at 231-232 (citation and internal quotation marks omitted).  In other words, "materiality

22   depends on the significance the reasonable investor would place on the withheld or misrepresented

23   information." *Id.* at 240.  The determination of materiality requires a "fact-specific inquiry." *Id.*

24        The purpose of the materiality requirement is "to filter out essentially useless information

25   that a reasonable investor would not consider significant, even as part of a larger mix of factors to

26   consider in making his investment decision." *Basic*, 485 U.S. at 234 (citations and internal

27   quotation marks omitted).  Thus, the "securities laws do not create an affirmative duty to disclose

28   any and all material information.  Instead, companies can control what they have to disclose under

United States District Court
Northern District of California

10

these provisions by controlling what they say to the market.  But once defendants cho[o]se to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016) (internal citations and quotation marks omitted) (alterations in the original).

"In considering whether summary judgment on the issue is appropriate, [courts] must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality.  The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.  Only if the established omissions are so obviously important to an investor that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved as a matter of law by summary judgment." *TSC Indus., Inc. v. Northway, Inc*., 426 U.S. 438, 450 (1976) (citation and internal quotation marks omitted). [5]

Here, Plaintiffs "may defeat summary judgment only by showing a genuine issue of fact with regard to a particular statement by the defendant corporation or its insiders." *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991), *as amended on denial of reh'g* (Dec. 6, 1991) (citation and internal quotation marks omitted).  Plaintiffs can do so by "demonstrat[ing] that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression." *Id.*

Plaintiffs argue that a genuine dispute exists with respect to whether three statements that Defendants made on February 5, 2015, and one statement they made on April 28, 2015, were misleading.  The Court examines each challenged statement, in turn.

/ / /

---

[5] The materiality standards set forth in *TSC Industries* were "adopt[ed], for the § 10(b) and Rule 10b-5 context" by the Supreme Court in *Basic Inc*., 485 U.S. at 249.

United States District Court
Northern District of California

### a. February 5, 2015, challenged statements

On February 5, 2015, during the earnings call for Q4 2014, Noto stated that "[i]n our more mature markets, we have very high DAU to MAU, 50% plus."[6] ECF No. 371-18 at 9. Plaintiffs argue that this statement was misleading because Defendants failed to disclose that the data in the Q4 2014 earnings binder showed that Twitter's DAU/MAU for its top 20 markets had declined to 44.4% from the 48% that Defendants reported at Analyst Day. *See* ECF No. 362-15 at 178.

The Court concludes that Plaintiffs have shown that a genuine dispute exists as to whether this challenged statement was misleading. At Analyst Day, Noto stated that the "year-to-date DAU to MAU ratio for our top 20 markets" is 48%. ECF No. 371-2 at 91. Noto also stated that the top 20 markets "account for 80% of our users and 90% of our revenue." *Id.* at 94. Further, Noto stated that there was a relationship between DAU/MAU and revenue, namely that an increase of 3% from 48% to 51% in the DAU/MAU for the top 20 markets would lead to an increase in revenue of $500 million per year. *Id.* In light of these Analyst Day statements, an investor reasonably could have interpreted Noto's February 5 "50% plus" statement, which referred to "mature" markets, as being about the DAU/MAU of the top 20 markets, because the top 20 markets had the vast majority of Twitter's users and accounted for the vast majority of Twitter's revenue. Further, in the absence of a disclosure of the then-current DAU/MAU for the top 20 markets (44.4%), the "50% plus" statement could have suggested to a reasonable investor, falsely, that the DAU/MAU for the top 20 markets had actually *increased* since Analyst Day (48%). In light of the relationship between DAU/MAU and revenue disclosed at Analyst Day, this suggested positive trend in DAU/MAU could have impacted a reasonable investor's assessment of Twitter. Based on the foregoing, a reasonable jury could conclude that the disclosure of the omitted DAU/MAU data for the top 20 markets (which showed a *downward* trend in DAU/MAU)

---

[6] The statement in question is in the following portion of the earnings call: "Additionally, on the consumer side, many companies use DAU to MAU. And while that is a long term goal of ours to become a daily product, today we have great variance in DAU to MAU across geographies. In our more mature markets we have very high DAU to MAU, 50% plus, and in emerging markets we have very low DAU to MAU at 20% range. They all migrate up to a higher rate over time." ECF No. 371-18 at 9.

United States District Court
Northern District of California

would have been perceived by a reasonable investor as having altered the total mix of information available with respect to Twitter, because that omitted data was relevant to evaluating Twitter's future potential revenue. *Schueneman*, 840 F.3d at 705-06 ("[O]nce defendants cho[o]se to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.") (citation and internal quotation marks omitted).

None of Defendants' arguments warrants a different conclusion. First, Defendants argue that the Court already rejected any claims premised on alleged fraud arising from the "50% plus" statement. ECF No. 396-4 at 9. Defendants misread the Court's prior rulings, however. In its order granting in part and denying in part Defendants' motion to dismiss, the Court *denied* the motion with respect to the theory that the February 5 "50% plus" statement was misleading in the absence of disclosures of specific data showing that user engagement was in fact "flat or declining." *See* ECF No. 113 at 27-28. In other words, the Court found that the omission of specific information regarding user engagement metrics raised the inference that the February 5 "50% plus" statement was misleading. *Id.* Accordingly, the Court's prior rulings do not preclude Plaintiffs from challenging at this juncture the "50% plus" statement on the basis that the statement is misleading in the absence of user engagement disclosures, which would include DAU/MAU data.

Defendants next argue that the "50% plus" statement was accurate and, therefore, not misleading as a matter of law. Defendants point to facts showing that three out of the top 20 markets had a DAU/MAU of 50% or higher. *See* ECF No. 314 at 24-25. While Defendants are correct that three[7] out of the top 20 markets had a DAU/MAU of 50% or more, that does not mean that the challenged statement is not misleading as a matter of law. A reasonable jury could conclude that the "50% plus" statement, which did not specify the "mature" markets it referred to[8],

---

[7] The earnings binder states that one of Twitter's top 20 markets, Japan, had a DAU/MAU above 50%, and two other top 20 markets, Spain and Saudi Arabia, had a DAU/MAU at exactly 50%. ECF No. 362-15 at 80-81. The remaining 17 of the top 20 markets had a DAU/MAU at below 50%. *Id.*

[8] Defendants argue that Noto testified at his deposition that by "mature markets" he meant those

1  was misleading in light of Defendant's omission of (1) the declining DAU/MAU trend across all

2  top 20 markets, which, as mentioned above, accounted for the vast majority of Twitter's users and

3  revenue, ECF No. 362-15 at 178; (2) the fact that 17 out the top 20 markets had a DAU/MAU of

4  *less* than 50%, *id.*; and (3) the fact that 19 out of the top 20 markets had a DAU/MAU that had

5  fallen over the prior year, ECF No. 362-15 at 80-81.

6          The second statement that Plaintiffs challenge as misleading is the following:

7                  In our more mature markets we have very high DAU to MAU, 50%
                   plus, and in emerging markets we have very low DAU to MAU at
8                  20% range.  *They all migrate up to a higher rate over time.*

9  ECF No. 371-18 at 9.  Plaintiffs contend that "they all migrate up to a higher rate over time" was

10 misleading because the Q4 2014 earnings binder shows that, over the prior four quarters, the

11 DAU/MAU had fallen in 19 of Twitter's top 20 markets and it declined from 42% to 38% for the

12 "Rest of the World" collectively.  ECF No. 362-15 at 80-81.  Further, the DAU/MAU for

13 emerging markets had declined throughout 2014.  ECF No. 363-9 at 6.

14         The Court concludes that Plaintiffs have shown that a genuine dispute exists with respect

15 to whether the challenged statement is misleading.  As Plaintiffs point out, the Q4 2014 earnings

16 binder shows various declining trends that contradict the positive trend conveyed by the statement

17 "they all migrate up over time."  The binder shows a declining trend for DAU/MAU of the top 20

18 markets collectively, a declining trend for 19 of the top 20 markets individually, and a declining

19 trend for the DAU/MAU for the rest of the world, collectively.  ECF No. 362-15 at 80-81.

20 Further, Twitter data shows that DAU/MAU had declined for emerging markets throughout 2014.

21 ECF No. 363-9 at 6.  A reasonable jury could conclude that a disclosure of these omitted

22 downward trends would have altered the total mix of information available in the eyes of a

23 reasonable investor, because, as discussed above, Twitter had previously disclosed the existence of

24 a relationship between DAU/MAU and revenue.

25         Defendants suggest that the "they all migrate up" statement refers exclusively to emerging

27 individual markets that had a DAU/MAU of 50% or more.  *See* ECF No. 348-12 at 325-27.  This
   testimony does not alter the conclusion that a genuine dispute exists as to whether the challenged
28 statement was misleading.

14

United States District Court
Northern District of California

United States District Court
Northern District of California

1    markets, and not mature markets, and argue that the statement is accurate because Twitter data

2    shows that emerging markets' DAU/MAU "typically" or "generally" migrated up over time.  *See*

3    ECF No. 314-4 at 25.  This is insufficient to show that the challenged statement is not misleading

4    as a matter of law.  A reasonable jury could interpret the statement in question as referring to the

5    DAU/MAU of mature markets *or* to the DAU/MAU of emerging markets, or *both* (particularly

6    given that the statement expressly referred to "all" markets).  Defendants have not even tried to

7    show how or why "they all migrate up" would not be misleading to the extent that a reasonable

8    investor interpreted it as referring to the DAU/MAU of more mature markets, which, as noted

9    above, were overwhelmingly migrating down, not up.  Further, with respect to emerging markets,

10   Defendants state only that emerging markets "generally" migrate up over time, but Defendants do

11   not explain how this notion squares with the downward trends discussed above for markets outside

12   of the top 20.

13        The third statement that Plaintiffs challenge as misleading is one that Costolo made after

14   disclosing that the number net MAUs for Q4 2014 was 4 million, which was lower than expected:

>    Importantly, I want to highlight that the user numbers we saw in
>    January of this year indicate that *our MAU trend has already turned
>    around*, and our Q1 trend is likely to be back in the range of
>    absolute net adds that we saw during the first three quarters of 2014.

18   ECF No. 371-18 at 5 (emphasis added).

19        Plaintiffs argue that "our MAU trend has already turned around" suggested a positive trend

20   in MAU growth and was misleading because Defendants omitted the declining DAU/MAU trends

21   discussed above.

22        The Court agrees.  Because it was made after disclosing lower-than-expected MAU growth

23   for Q4 2014, a reasonable jury could conclude that the challenged statement suggested a recovery

24   from disappointing MAU growth in Q4 2014 and an upward trend in MAU growth.  A reasonable

25   jury could further conclude that Defendants' omission of the declining DAU/MAU trends

26   discussed above, which cut against the notion of positive MAU growth, rendered the challenged

27   statement misleading, because the disclosure of the omitted declining DAU/MAU trends would

28   have altered the total mix of available information in the eyes of a reasonable investor.

United States District Court
Northern District of California

Twitter has publicly stated that its success and financial performance depend, at least in part, on the size and engagement of its user base. *See, e.g.*, ECF No. 370-5 at 26 (Twitter's November 4, 2013, Amended Form S-1 Registration Statement stating that "[t]he size of our user base and our users' level of engagement are critical to our success" and "[o]ur financial performance has been and will continue to be significantly determined by our success in growing the number of users and increasing their overall level of engagement on our platform as well as the number of ad engagements"). User growth depends in part on user engagement, because users who are more engaged are less likely to "churn" (i.e., stop using the platform). *See* ECF No. 362-6 at 4, 10 (Akash Garg, a senior member of Twitter's growth team, testifying during his deposition that more engaged users are less likely to churn and that daily active use "is certainly a prerequisite for healthy MAU growth"); ECF No. 413-21 at 2 (email from Costolo to Twitter's board stating that "[w]e simply won't be able to grow the business at the pace we'd like if we don't start adding more healthy users to the platform who use us on a more regular basis in the way our healthiest core users do, almost daily"). Market participants wrote about the existence of a relationship between user engagement, user growth, and Twitter's performance. *See, e.g.*, ECF No. 372-4 at 5 (analyst report stating that "retaining and engaging existing users is also extremely important to Twitter's future growth"); ECF No. 437-1 at 31-33. Based on the foregoing, a reasonable jury could conclude that declining trends in user engagement, as shown by DAU/MAU, which Noto touted as the "best way to quantify the impact of engagement," ECF No. 371-2 at 94, would have been material to a reasonable investor, because such declining trends suggested that Twitter's future user growth and financial performance would stall or decline.

Defendants argue that the challenged statement was not misleading because the MAU numbers that Defendants reported during the February 5 earnings call were accurate. *See* ECF No. 314-4 at 20-21. This argument is unavailing because Plaintiffs are not challenging the accuracy of the MAU numbers reported; instead, they challenge the phrase "our MAU trend has already turned around." As discussed above, a reasonable jury could find that, based on the context in which it was made, the challenged statement conveyed a positive MAU trend, and that, in order to avoid misleading investors, Defendants were required to disclose the declining DAU/MAU trends

16

discussed above, which cut against the implied positive MAU trend.  *See Schueneman*, 840 F.3d 698 at 705-706 (""[O]nce defendants cho[o]se to tout' positive information to the market, 'they [were] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cut[] against the positive information.").  Further, even if the MAU numbers reported on February 5 were accurate, as Defendants contend, that would not preclude a finding that a statement containing or surrounded by the accurate MAU numbers was misleading.  *In re Convergent*, 948 F.2d at 512 ("Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.  For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.").

Defendants next argue that Plaintiffs cannot show that the challenged statement suggested a positive trend in MAU growth, because Twitter had disclosed a declining trend in MAU growth in its Form 10-K for fiscal year 2014, and because some analysts reported that Twitter's MAU growth was declining.  *See* ECF No. 354-1 at 8 (10-K); ECF No. 344-5 (BMO report); ECF No. 344-6 (Wunderlich report); ECF No. 344-7 (Stifel report).  This argument is not persuasive because it fails to acknowledge that Noto uttered the challenged statement after discussing lower-than-expected MAU growth for Q4 2014; based on that context, the phrase "turned around" could be reasonably interpreted as suggesting a *positive* MAU trend. [9]  Further, at least some analysts interpreted the challenged statement as "suggest[ing] that MAU will grow" over the next quarter.  *See* ECF No. 371-23 at 2 (FB analyst report dated February 7, 2015, produced by Defendants in litigation).

Defendants next contend that the omission of the declining DAU/MAU trends did not render the challenged statement misleading, because churn was not increasing during the Class

---

[9] This distinguishes the facts here from the facts in the cases upon which Defendants rely to support the proposition that the challenged statement is not actionable.  *See, e.g.*, *Reinschmidt v. Zillow, Inc.*, No. C12-2084 RSM, 2014 WL 5343668, at *1 (W.D. Wash. Oct. 20, 2014) (dismissing a Section 10(b) claim because the plaintiff failed to allege any affirmative statement by the defendant that could be interpreted as misleading in light of the defendants' other disclosures); *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 195-97 (D. Conn. 2014) (same); *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1055-58 (N.D. Cal. 2019) (same).

United States District Court
Northern District of California

1  Period.  Defendants argue that, without proof of an actual increase in churn, Plaintiffs' materiality

2  theory falls apart, because declining DAU/MAU would not have rendered MAU growth

3  implausible if the DAU/MAU decline was not accompanied by increased churn.  *See* ECF No.

4  396-4 at 11-12.  This argument misses the point.  Plaintiffs need not show an actual increase in

5  churn in order to show that a genuine dispute for the jury exists with respect to whether the

6  challenged statement was misleading.[10]  Plaintiffs' materiality theory requires only that relevant

7  market participants have understood that there was a relationship between user engagement and

8  Twitter's user growth and financial success.  Plaintiffs have pointed to evidence from which a

9  reasonable jury could conclude that market participants understood this relationship.  *See, e.g.*,

10  ECF No. 370-5 at 26; ECF No. 372-4 at 5; ECF No. 437-1 at 31-33.

11  Finally, Defendants point to the phrase that came after the challenged statement, namely

12  that "our Q1 trend is likely to be back in the range of absolute net adds that we saw during the first

13  three quarters of 2014," and argue that such language is forward-looking and brings the challenged

14  statement within the safe harbor provision of the Private Securities Litigation Reform Act

15  ("PSLRA"), 15 U.S.C. § 78u-5(c)(1)(A)(i).  The Court disagrees.

16  "The PSLRA's safe harbor is designed to protect companies and their officials from suit

17  when optimistic projections of growth in revenues and earnings are not borne out by events.  But

18  the safe harbor is not designed to protect companies and their officials when they knowingly make

19  a materially false or misleading statement about current or past facts.  Nor is the safe harbor

20  designed to protect them when they make a materially false or misleading statement about current

21  or past facts, and combine that statement with a forward-looking statement*." In re Quality Sys.,*

22  *Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017).

23  Here, the aspect of the statement that Defendants challenge is the statement that "our MAU

24  trend has already turned around," which is not forward-looking.  Defendants have not cited any

25  authority showing that language similar to "has already turned around" has been interpreted as

26

27  _____
   [10] Plaintiffs have nevertheless pointed to evidence showing that the churn rate increased during the
   relevant time period. *See, e.g.*, ECF No. 367-17 at 27 (showing that churn rate increased from
28  .77% to .80% from January to July 2015).

18

forward-looking by any court. Further, the fact that "has already turned around" was followed by a forecast of future growth does not convert the challenged statement into a forward-looking statement. *See id.* at 1141 ("We hold that a defendant may not transform non-forward-looking statements into forward-looking statements that are protected by the safe harbor provisions of the PSLRA by combining non-forward-looking statements about past or current facts with forward-looking statements about projected revenues and earnings.").

In sum, a genuine dispute exists with respect to whether three statements made by Defendants during the February 5, 2015, earnings call were misleading.

### b. April 28, 2015, challenged statement

During an earnings call for Q1 2015 held on April 28, 2015, Noto stated in response to a question about engagement:

> In terms of engagement metrics, there's a lot of different metrics that we look at internally. There's not one metric for engagement. And so I can give you a sense of some of them and quite frankly, we would like to be able to give you more visibility on this, but there's just a number of different measurements. DAU is one measurement of engagement. We talked about that at Analyst Day. It's a measurement that is dependent by market and you could have a mix shift so that could be a little bit misleading, but *DAU to MAU ratios in the quarter were similar to what they were by market relative to Analyst Day.*

ECF No. 371-28 at 20 (emphasis added).

Plaintiffs argue that the statement "DAU to MAU ratios in the quarter were similar to what they were by market relative to Analyst Day" is misleading because, according to the earnings binder for Q1 2015, the DAU/MAU for the top 20 markets had fallen to 44.3%, from 48% at Analyst Day, and "continue[d] to go down at a linear pace." ECF No. 362-38 at 139. Plaintiffs also note that, from Q3 2014 through Q1 2015, DAU/MAU had fallen in 15 of Twitter's top 20 markets, including all of its top 5 markets. *Id.* at 69-79.

Defendants do not dispute that the DAU/MAU ratios just described declined since Analyst Day. Defendants argue, however, that Noto's use of the word "similar" in the challenged statement was not misleading as a matter of law because any declines in DAU/MAU since Analyst

1  Day were not significant.[11]  *See* ECF No. 314-4 at 25-26.

2       The Court concludes that a genuine dispute exists with respect to whether the challenged

3  statement was misleading.  Plaintiffs argue, and Defendants do not dispute, that the only

4  DAU/MAU ratio reported at Analyst Day was the one for the top 20 markets, collectively, which

5  was 48% at that time.  As a result, a reasonable jury could conclude that Noto's April 28

6  comparison of DAU/MAU relative to Analyst Day necessarily referred to the DAU/MAU of the

7  top 20 markets.  A reasonable jury could further conclude that, in the eyes of a reasonable

8  investor, the DAU/MAU as of April 28 was not "similar" to the 48% DAU/MAU reported at

9  Analyst Day, and that the disclosure of the omitted DAU/MAU for the top 20 markets of 44.3%

10  would have altered the total mix of information available.  This is so because, per Defendants'

11  own statements at Analyst Day, an increase in the DAU/MAU ratio from 48% to 51% (an increase

12  of 3%) could generate an additional $500 million in annual revenue.  ECF No. 371-2 at 94.  In

13  light of that disclosed relationship between DAU/MAU and revenue, a jury could conclude that a

14  reasonable investor would consider a decline of 3.7% in the DAU/MAU ratio to be significant.

15              **2.      Scienter**

16       "To establish liability under § 10(b) and Rule 10b–5, a private plaintiff must prove that the

17  defendant acted with scienter[.]"  *Matrixx Initiatives*, 563 U.S. at 48 (citation and internal

18  quotation marks omitted).  Scienter is "a mental state that not only covers "intent to deceive,

19  manipulate, or defraud," but also "deliberate recklessness[.]"  *Schueneman*, 840 F.3d at 705

20  (internal citations omitted).  "[D]eliberate recklessness is an extreme departure from the standards

21  of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to

22  the defendant or is so obvious that the actor must have been aware of it."  *Id.* (citation and internal

23  quotation marks omitted).  "Scienter can be established by direct or circumstantial evidence."

24  *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996) (citation omitted).

25

26  _____

27  [11] The authorities upon which Defendants rely for the proposition that the DAU/MAU declines
   were not significant enough to be actionable are inapposite.  In none of the cited cases did the
   plaintiff challenge, like Plaintiffs do here, a statement by the defendant indicating that the current

28  level of a particular metric was similar to a level previously disclosed by the defendant.

United States District Court
Northern District of California

"Generally, scienter should not be resolved by summary judgment." *Id.* at 1489-90.

> Cases where intent is a primary issue generally are inappropriate for summary judgment unless all reasonable inferences that could be drawn from the evidence defeat the plaintiff's claim. . . . However, in opposing a motion for summary judgment the plaintiff must present significant probative evidence relevant to the issue of intent, e.g. the time, place or nature of the alleged fraudulent activities; mere conclusory allegations are insufficient to require the motion for summary judgment be denied.

*Id.* (citation and internal quotation marks omitted). "Thus, summary judgment on the scienter issue is appropriate *only* where there is no rational basis in the record for concluding that any of the challenged statements was made with requisite scienter." *Id.* at 1490 (citation and internal quotation marks omitted) (emphasis in the original).

Plaintiffs contend that a genuine dispute exists with respect to whether Defendants acted with scienter when making each of the challenged statements. Plaintiffs point to evidence showing that Defendants were aware of the declining DAU/MAU trends discussed above and that such trends would have been material to investors.

The Court concludes that a genuine dispute exists as to whether Defendants acted with scienter in making the challenged statements.[12] As discussed above, Defendants failed to disclose declining trends in DAU/MAU when making the challenged statements. Plaintiffs have pointed to sufficient evidence based on which a reasonable jury could conclude that Defendants were aware of such declining DAU/MAU trends. *See, e.g.*, ECF Nos. 362-15 and 362-38 (earnings binders for Q4 2014 and Q1 2015, which were disseminated to Noto and top executives before earnings calls and contained detailed information about DAU/MAU); ECF No. 362-23 (email stating that metrics dashboard for Noto would include DAU/MAU); ECF No. 363-19 (email stating that CFO dashboard would be updated daily); ECF No. 362-24 (email to Noto and others attaching detailed user metrics slides); ECF No. 363-20 (email stating that weekly meetings to discuss user retention

---

[12] Because a genuine dispute exists as to whether Costolo and Noto acted with scienter, the same is true as to Twitter. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) ("The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b–5 when those senior officials were acting within the scope of their apparent authority.").

1    and related metrics, which included DAU/MAU, would be held); ECF No. 363-21 (email to Noto

2    and others containing "Monthly Metrics Review" for Q1 2015, including DAU/MAU trends); *see*

3    *also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir.

4    2004) ("The most direct way to show both that a statement was false when made and that the party

5    making the statement knew that it was false is via contemporaneous reports or data, available to

6    the party, which contradict the statement.").

7           Additionally, Plaintiffs have pointed to evidence from which a reasonable jury could

8    conclude that Defendants should have known that the omitted DAU/MAU information would

9    have been material to investors.  Per Defendants' own statements at Analyst Day, the market was

10   aware that an increase in the DAU/MAU ratio from 48% to 51% (an increase of 3%) could

11   generate an additional $500 million in annual revenue.  ECF No. 371-2 at 94.  In light of that

12   disclosure, and Defendants' awareness of the DAU/MAU declining trends, a reasonable jury could

13   conclude that Defendants should have known that the market would attach significance to the

14   omitted DAU/MAU information, and that the danger of misleading investors by omitting such

15   information from the challenged statements was "obvious."  *See S.E.C. v. Platforms Wireless Int'l*

16   *Corp.*, 617 F.3d 1072, 1094 (9th Cir. 2010) ("When the defendant is aware of the facts that made

17   the statement misleading, he cannot ignore the facts and plead ignorance of the risk.") (citation

18   and internal quotation marks omitted).

19          Defendants argue that Plaintiffs have not pointed to evidence showing that they intended to

20   mislead investors.  This argument is unavailing, because deliberative recklessness is sufficient to

21   find scienter.  Based on the evidence discussed above, a reasonable jury could conclude that

22   Defendants were, at the very least, deliberatively reckless in failing to disclose the declining

23   DAU/MAU trends, and thus acted with the requisite scienter.

24          Defendants next argue that their failure to disclose DAU/MAU information was justified

25   because Twitter was not ready to disclose it.  As support, Defendants point to evidence of internal

26   debate at Twitter about which user metrics to disclose after Twitter stopped disclosing Timeline

27   Views, as well as "quality control" issues with respect to DAU.  *See* ECF No. 314-4 at 27-28; ECF

28   No. 396-4 at 15.  This argument is unpersuasive because it ignores that Defendants *did* disclose

United States District Court
Northern District of California

1    specific DAU/MAU data at Analyst Day, as discussed above.  *See, e.g.*, ECF No. 371-2 at 91

2    (Noto states at Analyst Day that the "year-to-date DAU to MAU ratio for our top 20 markets" is

3    48%).  In light of the Analyst Day disclosure, a reasonable jury could find that Defendants'

4    omission of DAU/MAU information on February 5 and April 28 was not justified on the basis that

5    Twitter was not ready to disclose that kind of data.

6        Defendants also attempt to justify their failure to disclose DAU/MAU data on the ground

7    that disclosing it would have been inconsistent with Twitter's "total audience" strategy, which

8    aimed to increase Twitter's "reach," as opposed to user engagement (or "frequency").[13]  *See* ECF

9    No. 314-4 at 26-27.  Plaintiffs have pointed to evidence that contradicts this argument.  At Analyst

10   Day, Defendants repeatedly mentioned their goal of building the largest "daily audience" and the

11   need to grow their base of "healthy" users who were more engaged and used Twitter more

12   frequently.  ECF No. 371-2 at 5, 20.  Further, Noto described DAU/MAU as a "major growth

13   driver" of revenue, ECF No. 371-2 at 91, and as a "frequency" metric and the "best way to

14   quantify the impact of engagement," *id.* at 94.  Noto also disclosed DAU/MAU at Analyst Day

15   (48%).  *Id.*  Based on this evidence, a reasonable jury could conclude that the disclosure of

16   DAU/MAU, a "frequency" metric, would not have been inconsistent with Twitter's corporate

17   strategies.

18       Defendants also argue that they did not believe the challenge statements to be misleading.

19   But that self-serving assertion is unavailing.  As the Ninth Circuit has noted, "[i]f such a self-

20   serving assertion could be viewed as controlling, there would never be a successful prosecution or

21   claim for fraud."  *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1095 (9th Cir. 2010).

22   As discussed above, there is sufficient evidence for a jury to conclude that Defendants acted with

23   scienter.

24

25   [13] In that vein, Defendants also argue that Twitter's goal was for "DAU/MAU to decline" and not
     increase.  ECF No. 396-4 at 16.  The relevance of this argument is unclear.  In any event, the
26   record contradicts Defendants' assertion; it shows that Twitter experienced a declining trend in
     DAU/MAU and its goal was to flatten (i.e., slow or stop) the DAU/MAU decline and to increase
27   both DAU and MAU.  *See, e.g.*, ECF No. 356-12 at 3, 6 (presentation titled "Audience Goals
     2015" stating that goals were to increase DAU and MAU year-over-year and to "target[] flat
28   DAU/MAU," which was the best-case scenario for DAU/MAU in light of its declining trends).

United States District Court
Northern District of California

Defendants next argue that their actions are inconsistent with scienter because they disclosed "bad news" with respect to other metrics, such as decreases in ad engagements, and because Twitter has acted in an "honest and candid manner" with respect to its required S-1 disclosures and in communications with the SEC.[14]  ECF No. No. 314-4 at 28.  These arguments ignore the evidence discussed above, which supports a finding of scienter.  It is for the jury to weigh that evidence against the evidence to which Defendants now point, which is, at best, tangential to the challenged statements and issues in this litigation

Finally, Defendants argue that Costolo and Noto's lack of sales of Twitter stock during the Class Period is inconsistent with scienter.  But the absence of stock sales by Costolo and Noto is insufficient to show a lack of scienter as a matter of law.  *See No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period. . . . In other words, the lack of stock sales by a defendant is not dispositive as to scienter.").

### 3.  Loss causation

The Securities Exchange Act of 1934 defines "loss causation" "as the plaintiff's 'burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.'"  *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 2741, 204 L. Ed. 2d 1131 (2019) (quoting 15 U.S.C. § 78u-4(b)(4)).  "This inquiry requires no more than the familiar test for proximate cause.  To prove loss causation, plaintiffs need only show a causal connection between the fraud and the loss, by tracing the loss back to the very facts about which the defendant lied[.]  Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss."  *Id*. (internal citations and

---

[14] The fact that the SEC failed to take any adverse action with respect to Twitter's written disclosures has no bearing on the question of whether the challenged statements here were misleading.  *See* 15 U.S.C. § 78z (providing that action or inaction by the SEC shall not be "deemed a finding by such authority that [a] statement or report is true and accurate on its face or that it is not false or misleading").

United States District Court
Northern District of California

quotation marks omitted). "[L]oss causation is a 'context-dependent' inquiry as there are an 'infinite variety' of ways for a tort to cause a loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). "Because loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Id.*

"A plaintiff is not required to show that a misrepresentation was the sole reason for the investment's decline in value in order to establish loss causation." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005) (citation and internal quotation marks omitted). "[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement but will play a role in determining recoverable damages." *Id.* (citation and internal quotation marks omitted).

Here, the parties do not dispute that two sets of declines of Twitter's stock price occurred; the first on April 28 and April 29, 2015, and the second from July 29 through August 3, 2015.

The parties disagree that a genuine dispute exists as to whether the declines have a causal link to the challenged statements. The Court addresses each set of declines, in turn.

### a. April 28 and April 29 declines

On April 28, 2015, Twitter made disclosures with respect to its performance in Q1 2015. It disclosed that its MAU was 302 million, up from 288 million in the previous quarter. ECF No. 371-27 at 3. Twitter also revealed that it would be reducing its revenue guidance for the rest of FY2015. *Id.* at 4. During an earnings call on April 28, Defendants stated that, although Twitter had met its MAU projections for 1Q 2015, there were some "headwinds" and Twitter's "visibility is actually limited as it relates to Q2 MAU," MAU is off to a "slow start" and "the trend [in MAU growth] is not similar to Q1." ECF No. 371-28 at 12.

Plaintiffs contend that a genuine dispute exists with respect to whether the declines of Twitter's stock price on April 28, 2015, and April 29, 2015, were caused by partial revelations on April 28 of the problems with user growth that the challenged statements had concealed. Plaintiffs argue that the challenged statements, which are discussed in more detail above, concealed problems with user engagement and user growth, and that the April 28 disclosures regarding

25

revised FY 2015 revenue guidance and poor MAU visibility constituted a partial disclosure of such problems, which, in turn, caused the price of Twitter stock to decline. The April 28 disclosures partially revealed problems with respect to user growth by announcing that there were some "headwinds" with respect to MAU. That said, Defendants' statement on April 28 that DAU/MAU was "similar" to what it was on Analyst Day served to keep concealed problems with user engagement, as well as the potential impact that such problems could have on user growth and revenue.

Plaintiffs contend that the analysis conducted by their expert, Dr. Steven Feinstein, shows that $8.97 of the decline on April 28 and all $3.96 of the decline on April 29 were caused by the April 28 disclosures regarding reduced MAU visibility and reduced revenue guidance, because such disclosures dissipated some of the price inflation that had been created by the challenged statements. *See, e.g.*, ECF No. 352-10 ¶¶ 8-12, 120-137, 140-141. Plaintiffs also point to analyst reports published after the April 28 disclosures, in which analysts stated that they had reduced their revenue estimates for Twitter because of concerns about weaker engagement, lack disclosure of engagement metrics, and audience growth issues. *See, e.g.*, ECF No. 372-9 at 2 (Morgan Stanley report dated April 29, 2015, stating that "[w]e are cutting our revenue estimates by 6% for the full year [2015] on lower user and weaker engagement assumptions"); ECF No. 372-10 (Rosenblatt report dated April 29, 2015, stating that "[u]ser growth lackluster at best in the near term" and "[l]ack of 'usage' metrics (TLVs discontinued) suggests audience growth issues" as "key reasons for our rating downgrade on the stock"). Plaintiffs further point to internal Twitter documents showing that Twitter's revenue estimates for FY2015 were based in part on metrics such as DAU/MAU. *See, e.g.*, ECF No. 363-26 at 2 (email written by Jeff Dejelo stating FY2015 revenue guidance and noting that the "bottom-end of the range" is based on the "metrics driven model" and further noting that one reason for that estimate is that "DAU growth is relatively flat consistent with historicals"); ECF No. 363-27 at 26-27 (identifying MAU and DAU/MAU as inputs to the "Revenue Metrics Model" and "DAU/MAU declining" as one of the "Key Risks" with respect to FY2015 revenue); ECF No. 371-25 at 9 (Jeff Dejelo deposition testimony

confirming that DAU/MAU was a factor in calculating revenue for FY2015 based on revenue metrics model).[15]

The Court concludes that there is a genuine dispute with respect to whether a causal connection exists between the Twitter stock-price declines of April 28 and 29 and the challenged statements of February 5 and April 28, which are discussed at length in the previous section. Based on Dr. Feinstein's analysis and opinions, and the other evidence cited above, a reasonable jury could conclude (1) that the April 28 disclosures about MAU growth and revenue guidance constituted partially corrective disclosures that revealed, to some extent, problems with user growth that the challenged statements of February 5 and April 28 had concealed, and (2) that market participants reacted accordingly based on market perception of a connection between user growth, user engagement, and revenue. Based on this evidence, a reasonable jury could conclude that the stock declines of April 28 and 29 were proximately caused by the challenged statements of February 5 and April 28.

Defendants have not shown that the issue of loss causation can be resolved as a matter of law with respect to the stock declines of April 28 and April 29. Defendants argue that Dr. Feinstein's opinions are unreliable and therefore are insufficient to preclude the entry of summary judgment because Dr. Feinstein failed to explain his methodology, failed to consider confounding variables, and assumed causal connections.[16] The Court concluded in a separate order, however, that Dr. Feinstein's opinions are not subject to exclusion based on these arguments. *See* ECF No. 421. Further, Dr. Feinstein did consider confounding factors and excluded the impact of factors unrelated to the challenged statements from his stock-price decline estimates.[17] *See, e.g.*, ECF

---

[15] Defendants point to other portions of Dejelo's deposition testimony where Dejelo testified that he did not recall using DAU/MAU to estimate revenue. ECF No. 396-4 at 22. Defendants do not dispute, however, that the portions of Dejelo's deposition testimony cited by Plaintiffs show that Dejelo admitted that DAU/MAU was a factor in calculating revenue based on the metrics model.

[16] Defendants make the same arguments with respect to Dr. Feinstein's opinion that the Twitter stock-price declines from July 29 to August 3 were caused by the challenged statements. The Court rejects those arguments for the same reasons stated in this paragraph.

[17] Defendants argue that Dr. Feinstein was incorrect in attributing $2.54 of the decline on April 28 to Defendants' alleged fraud. ECF No. 314-4 at 34. The question of how much of the decline can be attributed to the challenged statements, as opposed to other factors, is a factual question for the jury. *See In re Daou Sys., Inc.*, 411 F.3d at 1025 ("[A]s long as the misrepresentation is one

United States District Court
Northern District of California

United States District Court
Northern District of California

No. 352-10 ¶¶ 120-137.  It is for the jury to weigh Dr. Feinstein's opinions.

Defendants next argue that the revised revenue guidance[18] was caused by matters unrelated to problems with user growth and user engagement, such as issues relating to advertising revenue, and for that reason, Plaintiffs cannot establish a causal connection between the challenged statements and the stock-price declines of April 28 and 29.  ECF No. 314-4 at 32-33.  To survive summary judgement, however, Plaintiffs need only point to evidence supporting a reasonable finding that the challenged statements were *one* substantial cause for the stock-price declines.  *In re Daou Sys., Inc.*, 411 F.3d at 1025 ( "[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement but will play a role in determining recoverable damages.") (citation and internal quotation marks omitted).  Plaintiffs have done that by pointing to the evidence discussed above.

### b.    July 29 through August 3 declines

On July 28, 2015, Twitter issued results for Q2 2015 and held an earnings call.  ECF No. 272-15.  During that call, Noto revealed that Twitter's DAU/MAU ratio for the top 20 markets had fallen to 44% from the 48% reported at Analyst Day, and that Twitter did "not expect to see sustained meaningful growth in MAUs" for "a considerable period of time."  ECF No. 371-32 at 7.

The Court concludes that Plaintiffs have shown that a genuine dispute exists as to whether the declines of Twitter's stock price from July 29 to August 3, 2015, were caused by the challenged statements.  Plaintiff point to the testimony of Dr. Feinstein, who concluded that Twitter's stock suffered a company-specific decline of $5.40 per share on July 29 and a decline of $7.41 from July 29 to August 3, 2015.  *See, e.g.*, ECF No. 352-10 ¶¶ 8-12, 142-151.  Dr. Feinstein

---

[18] substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement but will play a role in determining recoverable damages.").

[18] Defendants argue, in passing, that Plaintiffs' theory of loss causation with respect to the April 28 disclosures was not alleged in the operative complaint.  The Court disagrees.  The operative complaint expressly refers to the revised revenue guidance for FY 2015 as one of the disclosures that caused the price of Twitter stock to decline.  *See, e.g.*, ECF No. 81 ¶¶ 135-36.

further concluded that a causal connection exists between these declines and the challenged statements, because the July 28 disclosures revealed problems with user engagement and user growth that the challenged statements had concealed. *Id.* Plaintiffs also point to analyst reports stating that the problems with user engagement and user growth revealed on July 28 affected their evaluation of Twitter as an investment. *See, e.g.*, ECF No. 371-33 at 2, 4 (RBC Capital Markets Report of July 29, 2015, stating that "[u]ser growth is vanishing and engagement is declining" and that "the takeaway here appears to be that both [u]ser growth AND [e]ngagement have hit walls"); ECF No. 372-16 at 2 (SunTrust report of July 29, 2015, stating that "Users, Daily Engagement, and Ad Demand Disappoint"); *see also* ECF No. 437-1 at 102-05.

Defendants argue that Plaintiffs cannot establish loss causation because the corrective disclosures on July 28 were the materialization of a previously-disclosed risk, namely the disclosure on April 28 that Twitter was experiencing MAU "headwinds," that the company was "off to a slow start in April," and that visibility as to MAU is "limited." ECF No. 314-4 at 33-34. This argument is unpersuasive because it does not take into account that the July 28 disclosures revealed, for the first time, a decline in DAU/MAU; DAU/MAU declines were not disclosed on April 28. As discussed above, Plaintiffs have pointed to sufficient evidence for a reasonable jury to conclude that the declining trend in DAU/MAU, as well as the impact that that declining trend could have on user growth and revenue, were concealed by the challenged statements of February 5 and April 28. Accordingly, a genuine dispute exists as to whether the declines following the July 28 disclosures were caused by the disclosure of the DAU/MAU declining trends and the potential impact of such trends on user growth and revenue that the challenged statements had concealed.[19] *See Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 500 (S.D.N.Y. 2018)

---

[19] This distinguishes the facts here from those in the cases upon which Defendants rely for the proposition that they are entitled to summary judgment on the issue of loss causation. *See, e.g.*, *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, Cal., 730 F.3d 1111, 1121 (9th Cir. 2013) (affirming summary judgment in favor of defendant on § 10(b) claim because plaintiff failed to establish any link between loss and the alleged fraud); *Nguyen*, 297 F. Supp. at 491 (dismissing securities fraud claim because plaintiff failed to allege sufficient facts to suggest that defendants had concealed a risk of loss); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1409 (9th Cir. 1996) (dismissing securities fraud claim because plaintiffs' own allegations conceded that losses could have been caused by factors other than the alleged fraud).

United States District Court
Northern District of California

1 ("[W]here the alleged misstatement conceals a condition or event which then occurs and causes

2 the plaintiff's loss, a plaintiff may plead that it is the materialization of the undisclosed condition

3 or event that causes the loss.").

4 Defendants next argue that Plaintiffs cannot claim any damages for stock-price declines

5 after July 29 because Twitter did not make any new disclosures after July 28. ECF No. 314-4 at

6 34. However, the question of which losses can be attributed to the July 28 disclosures is a "fact-

7 specific inquiry" for the jury. *See No. 84 Employer-Teamster*, 320 F.3d at 934 (holding that there

8 is no "bright-line rule assuming that the stock price will instantly react" to corrective disclosures

9 and noting that such a determination is "fact-specific").

**B.    Section 20(a) claim**

11 "Section 20(a) of the Securities Exchange Act of 1934 provides for liability of a

12 'controlling person.'" *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014)

13 (quoting 15 U.S.C. § 78t(a)). "To establish a cause of action under this provision, a plaintiff must

14 first prove a primary violation of underlying federal securities laws, such as Section 10(b) or Rule

15 10b–5, and then show that the defendant exercised actual power over the primary violator." *Id.*

16 (citation omitted).

17 Defendants argue that Plaintiffs' claim under § 20(a) fails because it is "entirely derivative

18 of their 10(b) and 10b5 claims." ECF No. 314-4 at 29 n.23.

19 Because the Court has concluded that Defendants have not shown that they are entitled to

20 summary judgment with respect to the § 10(b) claim, Defendants' summary judgment motion with

21 respect to the § 20(a) claim likewise fails.

**VII.    CONCLUSION**

23 For the reasons stated above, the Court denies Defendants' motion for summary judgment.

24 Within seven days of the date this order is filed, any party may move to seal any portion of this

25 order by filing an administrative motion to seal that complies with applicable local rules and this

26 Court's standing orders. The moving party must identify with specificity (by page number and

27 line number) the portions of the order it seeks to seal, and it must demonstrate compelling reasons

28 for sealing each portion. *See Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir.

United States District Court
Northern District of California

2006) (holding that "compelling reasons" standard applies to judicial records related to a

dispositive motion even if the motion or its attachments were previously filed under seal).

**IT IS SO ORDERED.**

Dated: April 17, 2020



_____
JON S. TIGAR
United States District Judge

EXHIBIT 14



SUBSCRIBE

TECH   SOCIAL MEDIA

# Elon Musk Wants to Rid Twitter of 'Spam Bots.' Nearly Half His Followers Are Fake

**3 MINUTE READ**

BY **MEGAN MCCLUSKEY**   

APRIL 28, 2022 3:29 PM EDT

One of Elon Musk's top priorities for Twitter following his $44 billion deal to buy the social media company is cracking down on so-called "spam bots." One problem with that plan: It would cut his own following nearly in half, according to Twitter auditing tool SparkToro.

Spam bots are the "single most annoying problem" on Twitter, Musk tweeted earlier this month. He later affirmed his commitment to weeding out fake accounts in a statement he gave announcing his deal with Twitter on Monday.



SUBSCRIBE

**Watch more from TIME**

"I also want to make Twitter better than ever by enhancing the product with new features, making the algorithms open source to increase trust, defeating the spam bots, and authenticating all humans," he said. "Twitter has tremendous potential—I look forward to working with the company and the community of users to unlock it."

Spam bots on Twitter are automated accounts that mimic the activity of real people on the site, but are programmed to engage in malicious activity ranging from spreading misinformation to promoting money-making schemes. Musk has specifically called out bots that promote crypto-based scams on Twitter, complaining in a live TED interview on April 14 that "they make the product much worse."

# TIME

SUBSCRIBE

**Read More:** *What Elon Musk Really Believes*

While Twitter already has policies in place intended to combat spam bots, security remains a persistent challenge for the platform. Musk has vowed to solve the problem by authenticating "all real humans" on the site, but hasn't elaborated on how he plans to accomplish that.

Meanwhile, Musk's own follower count is significantly boosted by fake accounts. Of Musk's current 87.9 million followers, SparkToro estimates that roughly 48% are fake—i.e., accounts that are "unreachable and will not see the account's tweets (either because they're spam, bots, propaganda, etc. or because they're no longer active on Twitter)."

Musk has nearly 7% more fake followers than the median 41% that accounts with a similar sized followings have, SparkToro reports. By analyzing more than 25 factors correlated with spam, bots, and low quality accounts, the auditing tool found that accounts that are on an unusually small number of lists, accounts that have no url or a non-resolving url in their profile, and accounts that have a suspiciously small number of followers were some of the most frequently observed traits of a sample of 2,000 random accounts from the most recent 100,000 accounts that followed Musk.

Even so, those stats aren't outside the norm for prominent Twitter personalities like Musk. Microsoft founder Bill Gates and former President Barack Obama, for instance, boast fake follower percentages of 46% and 44% for their respective followings of 58.4 million and 131.7 million, while celebrities like Kim Kardashian (72.2 million followers) and Cristiano Ronaldo (99.5 million followers) land at approximately 45% and 43%.

SparkToro's tool can no longer access data for former President Donald Trump, but it estimated in 2018 that 61% of his 54.8 million followers at the time were

TIME

SUBSCRIBE

Like many of Musk's high-minded goals for Twitter, exterminating spam bots won't be easy, and one of the best indicators of his success may be a considerable drop in his own follower count.

## MORE MUST-READS FROM TIME

- **Biden's Campaign** Is In Trouble. Will the Turnaround Plan Work?
- Why We're **Spending So Much Money** Now
- The **Financial Influencers** Women Actually Want to Listen To
- **Breaker Sunny Choi** Is Heading to Paris
- The **UAE Is on a Mission** to Become an AI Power
- Why TV Can't Stop Making **Silly Shows About Lady Journalists**
- The Case for **Wearing Shoes in the House**
- Want Weekly Recs on What to Watch, Read, and More? Sign Up for **Worth Your Time**

**WRITE TO MEGAN MCCLUSKEY AT** MEGAN.MCCLUSKEY@TIME.COM

**Buying Nvidia in 2024? Wall Street Legend Issues Urgent A.I. Stock Warning**
Chaikin Analytics | Sponsored

**'Never Going Back to Prime'—Why 20,000 Users Prefer This Shopping Secret**
This simple trick can save tons of money on Amazon, but most Prime members are ignoring it.
Online Shopping Tools | Sponsored

**4 Men Charged in Moscow Concert Hall Terror Attack**
TIME

Elon Musk's Twitter Followers Fake



**Don't Pay $179/Year for Amazon Prime - Use This Trick Instead**

This simple trick can save tons of money on Amazon, but most Prime members are ignoring it.

Online Shopping Tools | Sponsored

**Heart Surgeon Begs Americans: "Stop Doing This To Your Blueberries"**

The top 3 common foods that you would have never guessed were the cause of your fatigue.

Gundry MD | Sponsored    Watch Now

**Superhuman at 70? New MIT Discovery Is Changing How We Age**

Here's how an MIT scientist's discovery is helping thousands of people live their best lives in their 70s, 80s, and beyond.

Advanced Bionutritionals | Sponsored    Read More

**Here's What A Walk-In Shower Should Cost**

West Shore Home Baths Quotes | Sponsored    Learn More

**MD: Building Muscle After 60 Comes Down To This 1 Thing**

primenutritionsecrets.com | Sponsored

**King Charles III 'Frustrated' By Speed of His Recovery**

TIME

**Trump Speaks Out On Kate Middleton Amid 'Rough Period'**

TIME



SUBSCRIBE

## 7 Ways to Retire Comfortably With $500k

How long will your portfolio last in retirement? For those with a $500k portfolio, get this guide and ongoing insights.

**Fisher Investments** | Sponsored

Learn More

## 12 "Ridiculous" Benefits Seniors Are Entitled To In March That Have Republicans Furious

Seniors on SS are now entitled to these "extra" benefits throughout 2024. Tap to read more

**YourPennySaver** | Sponsored

Learn More

## "Never Going Back to Prime"—Why 20,000 Users Prefer This Shopping Secret

This simple trick can save tons of money on Amazon, but most Prime members are ignoring it.

**Coupon Code Finder** | Sponsored

Learn More

## Harry and Meghan Learned Kate's Cancer Diagnosis on TV

**TIME**

## Singapore Orders Israel Embassy to Delete 'Inappropriate' Social Media Post

**TIME**

## How Long Does $1 Million Last After 60?

For those with a $500k+ portfolio, download The Definitive Guide to Retirement Income to learn ways to grow your wealth.

**Fisher Investments** | Sponsored

Learn More



   

# TIME

SUBSCRIBE

| | |
|---|---|
| Politics | Science |
| World | History |
| Health | Sports |
| Business | Magazine |
| Tech | The TIME Vault |
| Personal Finance by TIME Stamped | TIME For Kids |
| Shopping by TIME Stamped | TIME CO2 |
| Future of Work by Charter | Coupons |
| | |
| TIME Edge | Press Room |
| Video | TIME Studios |
| Masthead | U.S. & Canada Customer Care |
| Newsletters | Global Help Center |
| Subscribe | Contact the Editors |
| Subscriber Benefits | Reprints and Permissions |
| Give a Gift | Site Map |
| Shop the TIME Store | Media Kit |
| Careers | Supplied Partner Content |
| Modern Slavery Statement | About Us |

© 2024 TIME USA, LLC. All Rights Reserved. Use of this site constitutes acceptance of our Terms of Service, Privacy Policy (Your Privacy Rights) and Do Not Sell or Share My Personal Information.

TIME may receive compensation for some links to products and services on this website. Offers may be subject to change without notice.

EXHIBIT 15



**PEER-REVIEWED JOURNAL ON THE INTERNET**

# Down the bot hole: Actionable insights from a one-year analysis of bot activity on Twitter
### by Luca Luceri, Felipe Cardoso, and Silvia Giordano

## Abstract

Social media represent persuasive tools that have been progressively weaponized to affect beliefs, spread manipulative narratives, and sow conflicts along divergent factions. Software-controlled accounts (*i.e.*, bots) are one of the main actors associated with manipulation campaigns, especially in a political context. Uncovering the strategies behind bots' activities is of paramount importance to detect and curb such campaigns. In this paper, we present a long term (one year) analysis of bots activity on Twitter in the run-up to the 2018 U.S. midterm elections. We identify different classes of accounts based on their nature (human vs. bot) and engagement within the online discussion and we observe that hyperactive bots played a pivotal role in the dissemination of conspiratorial narratives, while dominating the political debate in the year before the election. Our analysis, in advance of the U.S. 2020 presidential election, reveals both alarming findings of human susceptibility to bots and actionable insights that can contribute to curbing coordinated campaigns.

## Contents

Introduction
Research questions
Data and methodology
Results and analysis
Discussion and conclusion

---

**Introduction**

False narratives, fake accounts, low-credibility news sources, state-sponsored operators, conspiracy theories, hate and inflammatory messages: The online ecosystem landscape appears loaded with threats and malicious entities disposed to undermine the integrity of social media discussions. Among those, bots (*i.e.*, automated and software controlled accounts; Ferrara, Varol, Davis, *et al.*, 2016; Cresci, 2020) and trolls (*i.e.*, human operators often state-sponsored; Zannettou, *et al.*, 2019a; Luceri, *et al.*, 2020; Badawy, *et al.*, 2019; Jamieson, 2018; Woolley and Howard, 2018; Zelenkauskaite and Niezgoda, 2017) have been recognized as the main responsible actors for manipulation and misinformation operations in diverse contexts (Ferrara, 2015), ranging from finance (Nizzoli, *et al.*, 2020; Cresci, *et al.*, 2018; Tardelli, *et al.*, 2020) to public health (Ferrara, 2020; Yang, *et al.*, 2020b), in which the rise of infodemics (*i.e.*, the widespread diffusion of unverified information and conspiracy theories) during the Covid-19 outbreak represents the latest milestone of the misinformation age (Zarocostas, 2020; Ferrara, Cresci, *et al.*, 2020). Moreover, the abusive behavior of these malicious actors received enormous resonance in the political domain (Luceri, *et al.*, 2019a; Bessi and Ferrara, 2016; Metaxas and Mustafaraj, 2012; Kollanyi, *et al.*, 2016; Allcott and Gentzkow, 2017; Badawy, *et al.*, 2018; Gerber and Zavisca, 2016; Zannettou, *et al.*, 2019b; Luceri, *et al.*, 2019b; Badawy, *et al.*, 2019), where the abuse of social platforms threatened the effective fulfillment of the democratic process, other than creating worldwide concerns for the integrity of voting events (Stella, *et al.*, 2019; Broniatowski, *et al.*, 2018; Stewart, *et al.*, 2018; Ratkiewicz, *et al.*, 2011; Ferrara, 2017; Howard, *et al.*, 2017; Shu, *et al.*, 2017; Stella, *et al.*, 2018; Bovet and Makse, 2019; Grinberg, *et al.*, 2019; Scheufele and Krause, 2019; Ruck, *et al.*, 2019).

In such a context, recent findings showed that most of the political messages shared on Twitter are published by a small set of hyperactive accounts (Yang, *et al.*, 2020a; Hughes and Asheer, 2019). Yang, *et al.*, (2020a) observed that hyperactive users are more likely to publish low-credibility narratives (*i.e.*, stories created by unreliable or

hyperpartisan sources; Shao, *et al.*, 2018; Pennycook and Rand 2019; Bovet and Makse, 2019; Grinberg, *et al.*, 2019) with respect to ordinary users and they tend to exhibit suspicious behaviors, often linked to automated and fake accounts. In this regard, Ferrara, Chang, *et al.* (2020) recognized how a set of conspiracy bots pushed a relevant portion of low-credibility information (*e.g.*, QAnon conspiracy theories) within the 2020 U.S. presidential election debate on Twitter. From this perspective, it follows that, by flooding social platforms with content of questionable accuracy, hyperactive accounts can both manipulate organic users, by affecting and influencing their opinions, but also the platform mechanisms and its engagement metrics, *e.g.*, trending topics and feed ranking algorithms (Yang, *et al.*, 2020a). Such vulnerabilities, along with the relentless presence of inauthentic entities, highlight the need for intervention to prevent a distortion of online discussions and a manipulation of public opinion.

Therefore, developing computational tools to detect deceptive and orchestrated campaigns has been the main goal of the agenda initiated by the research community to purge online platforms. However, this represents a challenging task (Ferrara, Varol, Menczer, *et al.*, 2016; Chen and Subramanian, 2018; Varol, Ferrara, Menczer, *et al.*, 2017). Nevertheless, in the last few years, researchers have offered several approaches to identify bots (Varol, Ferrara, Davis, *et al.*, 2017; Yang, *et al.*, 2019; Cresci, *et al.*, 2019; Mazza, *et al.*, 2019; Sayyadiharikandeh, *et al.*, 2020; Cresci, *et al.*, 2020; Chavoshi, *et al.*, 2016; Subrahmanian, *et al.*, 2016; Chen and Subramanian, 2018), while solutions for unveiling the activity of trolls have been recently proposed (Luceri, *et al.*, 2020; Addawood, *et al.*, 2019; Im, *et al.*, 2019). Other studies have focused on the detection of collective and inauthentic behaviors of malicious accounts to uncover coordinated campaigns (Sharma, *et al.*, 2020; Nizzoli, *et al.*, 2020; Pacheco, *et al.*, 2020) and suspicious content diffusion (Hui, *et al.*, 2020; Giglietto, *et al.*, 2020; Zannettou, *et al.*, 2020). However, social media abuse persists and the online ecosystem still presents a mix of organic and malicious users (Luceri, *et al.*, 2019b; Im, *et al.*, 2019), where the former class still demonstrates a moderate capability to identify the latter (Yan, *et al.*, 2020). This also calls for a clear understanding of users' susceptibility to content shared by malicious accounts and their interplay with them.

---

### Research questions

In light of these considerations, more research is needed to uncover the strategies behind the activities of malicious actors on social media in order to curb the abuse of online platforms, as well as to investigate the downstream effects of users' exposure to and interaction with malicious accounts for appraising the impact of their deceptive activity.

Along these research directions, in this paper, we inspect the activity of bot and human accounts on Twitter during the year approaching the 2018 U.S. midterm elections, which were held on 6 November 2018. To the best of our knowledge, this work represents the first attempt to study users, and in particular bots, temporal activity over an extended period of time (one year). It is worth noting that previous studies already analyzed the online discussion related to the 2018 U.S. midterm elections (Luceri, *et al.*, 2019a; Deb, *et al.*, 2019; Jones-Jang, *et al.*, 2020; Trielli and Diakopoulos; 2020). However, our work advances previous efforts by offering an observational analysis of bots' (and humans') activity during the whole year preceding the election, which represents an unparalleled opportunity to explore the strategies developed to both inject automated accounts into the debate over time and program their sharing activities while avoiding detection. We focus on the sharing activities that Twitter users can employ to create content (*i.e.*, original tweets), re-share others' tweets (*i.e.*, retweets), and respond to others' tweets (*i.e.*, reply). We investigate how and to what extent bots used such digital weapons (Cardoso, *et al.*, 2020) over time to identify cues that can empower the identification of bot accounts and, accordingly, contribute to the detection of orchestrated campaigns.

More specifically, this paper aims at answering the following research questions (RQs):

- *RQ1*: How did bots perform their sharing activities over time? We explore the temporal dynamics of bots operations by examining the volume of published content during the year and, in particular, as the election approached.

- *RQ2*: When did bots enter into the midterm debates over the year? The rationale is to understand how bots were strategically injected into the online conversation to perform their deceptive activity while avoiding detection.

- *RQ3*: Did hyperactive accounts play a pivotal role in broadcasting political messages? We aim to investigate the nature of hyperactive accounts, monitor their appearance in the midterm discussion, and shed light on their activity.

- *RQ4*: How did bot accounts engage and interact with human users? We explore the interactions, in terms of retweets and replies, between humans and bots, and we measure the centrality within online discussions of both classes of accounts.

In the remainder of this paper, we detail the methodology used to respond to these *RQs*, which includes data collection and bot detection, account classification to distinguish hyperactive and ordinary users, and the k-core decomposition to analyze user interaction and centrality within the social network. Finally, we present our analysis and corresponding findings.

■ ────────────────────────────────

**Data and methodology**

In this section, we present Twitter data collected to perform our analysis and methodologies followed to gather the set of data and detect bot accounts. Then, we detail the proposed approach to distinguish classes of accounts based on their engagement in the midterm debate. Finally, we describe the technique used to measure the centrality of the accounts within the Twitter conversation.

*Data collection and bot detection*

To perform our analysis, we leverage the dataset gathered by researchers of George Washington University (Wrubel, *et al.*, 2019). The authors collected Twitter messages (*i.e.*, tweets) for one year (from December 2017 to December 2018) by using midterm elections-related keywords and hashtags. Based on Twitter's developer policy, the authors (Wrubel, *et al.*, 2019) were allowed to publicly share only the tweet IDs of the collected tweets. Given the released tweet IDs, a process referred to as hydration was necessary to recover complete tweet information. The hydration process uses the Twitter API to obtain the entire tweet object from the corresponding tweet ID. Only 74 percent of the released 171,248,476 tweet IDs were still available online at the time we performed the hydration process (December 2019) and, as a consequence, we were able to gather only this subset of tweets.

We then considered narrowing the analysis to the tweets published by a set of accounts studied in our previous works (Luceri, *et al.*, 2019b; Deb, *et al.*, 2019) to enable comparison and validate previous findings. The rationale behind the idea of using a new dataset was to extend the analysis to a broader observation window (*i.e.*, one year and 171M tweets) with respect to previous studies (Luceri, *et al.*, 2019b; Deb, *et al.*, 2019), which both examined the online discussion (2.6M tweets) in the month before the election. Notice that both datasets were collected by using the same mechanism (via the Twitter API) and similar trending keywords. Moreover, from the set of 997k users analyzed in (Luceri, *et al.*, 2019b; Deb, *et al.*, 2019), we found 943k accounts in the collected dataset that were responsible for the creation of the majority of the collected tweets. Specifically, more than 98M tweets (over the 126M collected) were shared by the set of 943k accounts. It should also be noted that a consistent subset of such users (62 percent), responsible for almost 80 percent of the collected tweets, was active at the time of this writing (mid-October 2020) in debates related to the U.S. 2020 presidential election (Chen, *et al.*, 2020). The interested reader can find further details in the Appendix.

Given that the set of 943k accounts was analyzed in previous efforts, we relied on account classification (bot vs. human) that we performed and validated in Luceri, *et al.* (2019b) and Deb, *et al.* (2019). The account classification was performed by means of Botometer [1], a machine learning-based tool developed by Indiana University (Davis, *et al.*, 2016; Varol, Ferrara, Davis, *et al.*, 2017). Botometer outputs a bot score: the lower the score, the higher the probability that the user is human. Besides using the bot score to classify the accounts, we further analyzed the status of such accounts, *i.e.*, active, suspended, or deleted by leveraging the Twitter API. In Table 1, we show the statistics of the final dataset under analysis.

| Table 1: Accounts and tweet statistics. | | | | | | |
|---|---|---|---|---|---|---|
| | **All** | | **Bots** | **Humans** | | **Suspended** | **Deleted** |
| **Accounts** | 943,126 | | 184,545 | 758,581 | | 38,164 | 30,688 |
| **Account percentage** | | | 19.57% | 80.43% | | 4.05% | 3.25% |

3/25/24, 2:59 PM
Case 3:22-cv-05937-CRB Document 59-1 Filed 03/26/24 Page 443 of 473
Bots and coordinated behavior: Insights from the 2020 U.S. election analysis · First Monday

| | | | | | |
|---|---|---|---|---|---|
| **Tweets** | 98,123,612 | 42,386,269 | 55,737,343 | 9,645,522 | 2,828,963 |
| **Tweet percentage** | | 43.2% | 56.8% | 9.83% | 2.88% |

Specifically, Table 1 details the number of accounts and shared tweets for each class of users. The percentage of bots (around 20 percent) and human accounts (around 80 percent) is in line with previous works (Luceri, *et al.*, 2019b; Deb, *et al.*, 2019). The majority of users are still active (around 93 percent) at the time of this writing (mid-October 2020), while a small fraction deleted their account (around three percent) or have been suspended by Twitter (around four percent). It is out of the scope of this paper to characterize the suspended accounts. However, an evaluation about the correlation between account suspension and the likelihood of automation is provided to the interested reader in the Appendix.

### Engagement-based account classification

To better understand how both human and bot accounts acted over time, we analyze their behavior according to their engagement within the midterm debate. In particular, we consider the frequency and duration of their activity during the observation period by identifying, for each account, the following parameters:

- *first tweet*: the first time the account shared a tweet within our dataset;
- *last tweet*: the last time the account shared a tweet within our dataset;
- *tweets count*: the number of tweets shared by the account within our dataset;
- *active days*: the number of days between the last and first tweet;
- *daily tweet frequency*: the average number of tweets shared by the account during the active days time window, computed as:

$$\text{daily tweets frequency} = \frac{\text{tweets count}}{\text{active days}}$$

Based on the *active days* and *daily tweets frequency* parameters, we propose to classify the accounts into two categories: hyperactive and ordinary accounts. User categorization has already been explored in previous studies (Brandtzæg, 2010; Graham and Wright, 2014; Zelenkauskaite and Balduccini, 2017). For example, Zelenkauskaite and Balduccini (2017) classified users according to the frequency and topic variety of their comments in a news portal. Differently from such existing efforts, we neither consider the specific typology of the user (*e.g.*, agenda-setters or superposters as in Graham and Wright, 2014) nor the discussed topic, while we classified users based only on the frequency and lifespan of their online activity. The rationale was to discern users whose activity was continual and repeated (hyperactive) to those less involved (ordinary). To distinguish these two classes of accounts (based on the active days and daily tweets frequency parameters), we identified a threshold for each considered parameter that allows to opportunely separate hyperactive users from ordinary ones. The procedure to select these thresholds is detailed in the Appendix to provide the reader with a smooth presentation and interpretation of the results.

According to the selected filtering parameters, hyperactive accounts represent less than nine percent of the accounts in our dataset and cover about 70 percent of collected tweets. It is worth noting that bots cover about 38 percent of the hyperactive accounts, which represents a noticeable increase of automated accounts with respect to the percentage related to the full set of accounts (80 percent humans vs. 20 percent bots), other than indicating a robust presence of bots within an online conversation. This is in line with previous findings (Yang, *et al.*, 2020a) and is further confirmed in Figure 1, which depicts the bot score distribution for hyperactive and ordinary accounts.

3/25/24, 2:59 PM    Slowly but (un)surely: The strategic roll-out of bots and their network-embeddedness analysis · Project · bot · Twitter

Case 3:22-cv-05937-CRB  Document 59-1  Filed 03/26/24  Page 444 of 473



**Figure 1:** Bot score distributions comparison between hyperactive and ordinary accounts.

From Figure 1, it can be noticed that the two classes of accounts exhibit significantly different distributions, as also demonstrated by a Mann‑Whitney rank test ($p$-value < 0.001). On the one hand, most of the probability mass in the distribution related to ordinary accounts is in the range [0,0.14], suggesting that the majority of ordinary accounts are humans. On the other hand, in the distribution related to hyperactive accounts, we can notice how these users are more likely to have higher bot scores with respect to ordinary accounts, indicating a more relevant presence of automated (software‑controlled) users within the set of hyperactive accounts.

### *k-core decomposition*

To evaluate the centrality (or embeddedness) of the accounts within the Twitter conversation, we employ the $k$-core decomposition technique. The $k$-core decomposition aims to determine the set of nodes deeply embedded in a graph by recursively pruning nodes with degrees less than $k$. Formally, the $k$-core is a subgraph of the original graph in which every node has a degree equal to or greater than a given value $k$. The $k$-core decomposition assigns a core number to each node, which is the largest value $k$ of a $k$-core containing that node. The higher the core number $k$ is, the more embedded the node is in the network.

### Results and analysis

In this section, we present our analysis and corresponding results on the temporal and behavioral dynamics of bot and human activity over the whole year preceding the 2018 U.S. midterm elections. We focus on investigating bots sharing activities over time with the objective of understanding how such accounts have been strategically injected in the online discussion related to the midterm as the election approached. Then, we consider the distinction between hyperactive and ordinary accounts to identify peculiar and distinctive behaviors between these two classes of accounts by also considering their nature (bot vs. human). Finally, we observe the volume of interactions between bots and humans, and their embeddedness within the social network.

### *RQ1: Bots activity over the midterm year*

In [Figure 2a](#), we show the number of tweets shared by human and bot accounts per each week of the observation period. It could be noticed that the human population shared more tweets than bots over the whole year. However, this could be expected given that, as shown in [Table 1](#), human accounts represent the largest portion (80 percent) of the accounts of the collected dataset and shared more content (about 57 percent of tweets) with respect to the bot population (about 20 percent of the accounts and 43 percent of tweets). As a consequence, bots were more active (in terms of tweets generated per account) than humans during the whole period. On average, a bot shared three times the number of tweets published by a human user (218 vs. 70 tweets/account), which is consistent with bots' purpose of flooding online platforms with a high volume of tweets (Bessi and Ferrara, 2016).



**Figure 2:** Sharing activities over time of bot and human accounts.

Interestingly, bots followed a similar temporal pattern of human users over the whole year, suggesting that bots strategically attempted to mimic human sharing activity since the beginning of the online conversation related to midterm elections. As expected, the content shared by both classes of accounts increased as the election approached, and a spike of activity was noticeable during election week.

To better examine how bots performed their activity over time, we disentangle the shared messages in original tweets, retweets, and replies. In Table 2, we show the number of shared messages for each category of tweet and class of accounts over the observation period.

| Table 2: Sharing activities of bot and human accounts. | | |
|---|---|---|
| | **Bots** | **Humans** |
| **Accounts** | 184,545 | 758,581 |
| **Original tweets** | 5,677,142 (14%) | 9,635,364 (18%) |
| **Retweets** | 32,746,675 (81%) | 39,427,132 (74%) |
| **Replies** | 1,849,625 (5%) | 3,876,595 (8%) |

Retweeting is the most used operation for both humans (74 percent of the time) and bots (81 percent of the time). As expected, bots heavily relied on the retweet action as it represents a simpler operation for automated accounts with respect to the creation of an original tweet or a reply, which requires the usage of more sophisticated techniques based on natural language processing and understanding (Ferrara, 2019).

Figure 2 also portrays the number of original tweets, replies, and retweets shared weekly by humans and bots over the year approaching the midterm elections. Interestingly, also in the disentangled sharing activities, bots followed a similar temporal pattern of human users over the whole year. Indeed, the number of tweets shared by humans and bots over time positively correlate (p > 0.97, *p*-value < 0.001) for each kind of activity (*i.e.*, original tweets, retweets, and replies). Although original tweets and replies require to develop advanced AI techniques on software-controlled accounts, the volume of such activities performed by bots approaches the volume of human activities (see also Table 1), especially if we consider the number of messages published per each account. This suggests that more sophisticated bots operated along with less advanced spam bots (Ferrara, 2019). Also, similarly to Figure 2a, the content shared by both classes of accounts increased as the election approached, and a spike of activity was noticeable during election week. Finally, it is worth noting how bots started emulating every kind of human sharing activity since the beginning of the year, further confirming how detecting coordinated campaigns is a challenging task, even when users are monitored over an extended observation window.

### RQ2: Bots injection within the midterm debate

To have a more comprehensive understanding of how both human and bot online activities evolve over time, in Figure 3a, we depict the number of human and bot accounts engaged in the debate every week of the observation period. In a given week, we denote as engaged an account that shared at least one tweet during the week under analysis.

3/25/24, 2:59 PM     Characterizing Bot Detection Anomalous Tweets from Humans and Bots analysis of bot projected on Twitter

Case 3:22-cv-05937-CRB   Document 59-1   Filed 03/26/24   Page 447 of 473



**Figure 3:** Engaged and new accounts within the midterm debate.

It should be noticed that the number of engaged bots per week was almost steady and slowly increases over time, while human users engagement was less regular. This controlled engagement of bots might suggest a coordinated effort to simultaneously avoid the detection of automated accounts, while infiltrating them into the political discussion.

To shed light on this finding, we observe the number of new accounts that joined the conversation related to the midterm elections during the observation window. We define an account as new when it participates for the first time in the midterm debate. In Figure 3b, we display the number of new accounts for each week of the period under analysis. Once again, bot temporal pattern showed a stationary trend, where an almost constant number of new accounts entered into the conversation each week. As we mentioned before, this controlled, and supposedly scheduled, activity appeared a more cautious approach for injecting bots within the online discussion to allegedly avoid their detection. Moreover, we noticed that a significant number of accounts (34 percent of the accounts within our dataset) joined the midterm conversation since the end of 2017 and beginning of 2018 (first two weeks of February), as it can be observed from two peaks in the left side of Figure 3b. Interestingly, this subset of accounts was responsible for 80 percent of the collected tweets, suggesting that such users played a central role within the Twitter discussion. This holds true both for human (28 percent of the accounts) and bot (six percent of the accounts) users. It is worth, and mostly alarming, noting that 60k of such accounts were bots that have persisted online during the whole year generating around 34.2 million tweets (35 percent of the tweets) with an average rate of 570 tweets per account. It should be considered that this subset of 60k bots represented a relevant fraction (about 33 percent) of the bot accounts that participated in the midterm discussion and most of them (44k accounts) were actively involved in the 2020 U.S. presidential election debate at the time of this writing (mid-October 2020). Also, we observed that the 260k human accounts that appeared in the early stage of the year (28 percent of the accounts) shared 44.9 million tweets (45 percent of the tweets) with an average rate of 173 tweets per account, which is about 3.3 times lower than the tweet fabrication rate for bots.

A similar trend of appearance can be observed in the time around election day. Specifically, from the first week of October to the week after the election in November, we observed a peak corresponding to a new set of accounts (11.6 percent of the total users) that joined the conversation. Among such accounts, we recognized 85k human users and 24.6k bots, which were responsible for creating 210k and 158k tweets during the aforementioned period, respectively. The ratio between the sharing rate of bots (6.4 tweets/account) and humans (2.5 tweets/account) was lower than the one observed with the set of accounts that joined the conversation since the beginning of the year (3.3 vs 2.5), which allegedly indicates a more cautious strategy adopted by bots for sharing content in a relatively short time window (if compared to the whole year).

To characterize the behavior of bot accounts that participated in the midterm debate, in Table 3, we compare the sharing activities of those that joined the conversation since the beginning of the year (from now on referred to as *old*

How to slither bot into conversation, bots from neighborhoods or analysis of projects of four sides

*bots*) with those that appeared during the election period (from now on referred to as *election bots*).

| Table 3: Sharing activities of *old bots* and *election bots*. | | |
|---|---|---|
| | **Old bots** | **Election bots** |
| **Tweets** | 34,197,174 | 158,708 |
| **Original tweets** | 13% | 25% |
| **Retweets** | 83% | 70% |
| **Replies** | 4% | 5% |

Both classes of bots used the retweet as their main sharing activity. However, it can be observed a relevant difference in the propensity of re-sharing and producing original tweets between *old bots* and *election bots*. Indeed, election bots significantly created more original content (*t*-test results: $t(4,708,912)=118.2$, $p<0.001$), while re-sharing significantly fewer posts with respect to old bots (*t*-test results: $t(28,213,616)=121.1$, $p<0.001$), which might suggest the deployment of different strategies between the two classes of bot accounts based on their lifetime within the midterm debate.

Notice that all the other bots (*i.e.*, the ones injected between the end of February and the end of September) exhibited a hybrid behavior between the two considered classes of accounts, with a distribution of shared activities between old and election bots. This further highlights that an increasing number of bots created with a purpose of sharing original content had been strategically injected in the online conversation as the election approached.

To further investigate the nature of the analyzed bot accounts, we examined their creation date (by inspecting tweet metadata). In <ins>Figure 4</ins>, we display the date of the creation of bot and human accounts.



**Figure 4:** Account creation time.

We observed how the number of created bots within our dataset increased as the election approached. It stands out how in 2009 (similarly to Yang, *et al.*, 2020a), 2017, and right before the midterm elections, an elevated number of bots had been created. It was particularly concerning to note how these bots persisted online over time, allegedly participating in diverse social and political discussions. From the superimposed illustration of Figure 4, it can be appreciated how the bot accounts created from July 2018 to November 2018 (month of midterm elections) outnumbered the accounts created by humans in the same time window, which highlights that a conspicuous number of bots might have been purposely created for infiltrating into the discourse related to the midterm elections. More specifically, about 10 percent of bot accounts were created from July to November 2018, whereas 80 percent of them were created before the beginning of 2018. The remaining fraction (10 percent) was created in the first six months of 2018.

Finally, we considered the account age, computed as the time difference between the date of the first tweet of the account in our dataset and its creation date. Figure 5 illustrates the distribution of account age, measured in days, for both humans and bots. It can be appreciated how the account age for bots (average account age = 1,963.8 days) was significantly lower ($p<0.001$) with respect to human accounts (average account age = 1,313.3 days). The median account age for bots was around 994 days, whereas for humans was about 2,108 days. This result indicates that bots shared midterm-related content closer to their creation date if compared to human accounts, which further suggests that some bots might have been specifically designed to operate in the midterm debate.

Crowed the bot through the Authentic Insights from a year-long analysis of suspected bot activity on Twitter



**Figure 5:** Account age.

### RQ3: Hyperactive accounts behavior

Based on the engagement-based accounts classification described in the Data and methodology section, we classified users in hyperactive and ordinary accounts.

For ordinary accounts, it should be noticed that, from this set of users, we filtered out accounts that shared only one tweet during the observational window, as we want to consider these users distinctly and analyze them in contrast to hyperactive ones. Overall, we observed that 74 percent of the accounts were classified as ordinary accounts, nine percent of the accounts were classified as hyperactive accounts, and 17 percent of the accounts shared only one tweet during the whole year (see the Appendix for further details). Ordinary accounts were responsible for about 28 percent of the tweets and the proportion between bots and humans within this set of users was consistent with the full set of accounts. A similar accounts distribution was also noticed for users that shared only one tweet, publishing a negligible volume of messages.

Hyperactive users, while representing a tiny fraction of the accounts (about 83.7k), were responsible for about 72 percent of the collected tweets (about 70.7M messages). With 31.8k accounts, bots represented about 38 percent of the hyperactive accounts and published more tweets (38 percent of the collected tweets) than hyperactive humans (62 percent of the hyperactive accounts and 34 percent of collected tweets) despite the latter set of users outnumbering automated accounts, which further highlights the prevalence of bots in online discussion.

Alarmingly, we noticed that hyperactive accounts were involved in the vast majority (90 percent) of the 1.6 million tweets related to the QAnon conspiracy theory [2] that we identified within our dataset (see the Appendix for more details). This result supports the finding of Yang, *et al.* (2020a), related to the low-credibility information spreading carried out by hyperactive accounts. Moreover, hyperactive bots dominated the broadcasting of such conspiratorial narratives by pushing 62 percent of the content related to the QAnon theories. It was, therefore, a cause of concern

noting that the vast majority of hyperactive bots (22.5k accounts) were participating in the 2020 U.S. presidential election debate (Chen, *et al.*, 2020) at the time of this writing.

To investigate the behavior of hyperactive accounts, we examined their activity pattern over the whole observation window. Figure 6a portrays their weekly activity. While in Figure 2 we have noticed that humans generated more tweets than bots in every week, in Figure 6a, we recognize a different trend, where hyperactive bots produced more tweets than hyperactive humans over the whole year.



**Figure 6:** Tweets shared by hyperactive and ordinary accounts.

In Figure 6b, we display the number of tweets shared weekly by ordinary accounts. Differently from Figure 6a, the gap between the number of shared tweets by ordinary bots and ordinary humans was remarkable, with the former class of accounts that shared about five times fewer tweets with respect to the latter class. The interested reader is referred to the Appendix for detailed trends and volumes of disentangled sharing activities (*i.e.*, original tweets, retweets, and replies) for both hyperactive and ordinary users.

Next, we evaluate how the appearance and engagement of the accounts within both classes evolved over time. In Figure 7a, we show the number of engaged accounts within the hyperactive class for each week of the year. We recall that an account is considered engaged in a certain week if it produced at least one tweet in that week.

**Figure 7:** Engaged and new accounts in the midterm debate within the hyperactive accounts class.

Here, the most noticeable difference with respect to Figure 3a (where all accounts were considered) is related to the activity of hyperactive humans. In fact, as shown in Figure 7a, human activity has a progressive growth over time and a similar pattern to bot activity. This might suggest that the irregular spikes of activity in Figure 3a was mainly caused by ordinary accounts. For what pertains to bots, their weekly activity appeared similar to Figure 5a, which might indicate that bot activity was scheduled similarly for hyperactive and ordinary bot accounts.

In Figure 7b, we show the number of new hyperactive accounts that appeared in Twitter discussion for each week of the year. As discussed before, an account is considered new when it appears in the midterm-related conversation for the first time over the observation window. Also in Figure 7b, bot and human hyperactive accounts tended to have similar temporal patterns in their appearance within the political discussion. This finding, related to hyperactive accounts, was in contrast to what we noticed in Figure 3b (where all accounts were considered), which further confirms that different temporal patterns between humans and bots (in both Figure 3a and Figure 3b) were mainly due to ordinary accounts activity. Interestingly, and similarly to Figure 3b, in Figure 7b, an almost constant number of new hyperactive bot accounts joined the conversation for each week of the observation period, except for the time window around the election, when the number of new hyperactive bot accounts increased significantly.

We also notice that the majority of hyperactive accounts appeared since the end of 2017 (specifically, from December 2017 to February 2018). Such a subset of users (about five percent of the accounts) created about 60 percent of the collected tweets. This is consistent with the findings reported earlier. In particular, here, we recognize that hyperactive accounts were mainly responsible for tweets created by users that joined the midterm debate one year before the election. Indeed, of the 79M tweets created by such users, 59M were shared by hyperactive accounts, which, thus, represent the most prolific tweet fabricators. Among these accounts, bots played a relevant role by broadcasting almost one-third of the collected tweets. Indeed, 30.6M tweets were created by 19k bot accounts, which means that two percent of the accounts in our dataset were bots that shared about 31 percent of the collected tweets. This finding becomes even more concerning when considering the pivotal role of the majority of these accounts in the diffusion of narratives related to the QAnon conspiracy theory (14k accounts) and their involvement in the 2020 U.S. presidential election debate (16k accounts).

Next, we replicate the same evaluation for ordinary accounts. In Figure 8a, we display the number of engaged ordinary accounts for each week of the observation period.



**Figure 8:** Engaged and new accounts in the midterm debate within the ordinary accounts class.

Similarly to Figure 3a (where all the accounts were considered), human accounts presented an irregular pattern (with peaks and valleys) of engagement if compared to the trend of bots, which presented a more controlled and stationary pattern. The ordinary humans pattern was different from the one observed for hyperactive humans (see Figure 7a), confirming that the non-stationary pattern in Figure 3a was mainly caused by ordinary human accounts.

In Figure 8b, we depict the number of new ordinary accounts that appeared in the Twitter discussion for each week of the year. Similarly to Figure 3b and Figure 7b, bots entered into the debate at a constant and lower rate with respect to human accounts. Also, the majority of ordinary accounts joined the discussion at the beginning of 2018 and during the election month. Interestingly, by disentangling the shared tweets, we noticed different activity patterns among the bots injected from December 2017 to the first two weeks of February 2018 (*old bots*) and those appearing the month around the election day (*election bots*). In Table 4, we detail how these two classes of accounts distributed their sharing activities.

| Table 4: Sharing activities of ordinary bot accounts. | | |
|---|---|---|
| | **Old bots** | **Election bots** |
| **Tweets** | 3,553,531 | 37,713 |
| **Original tweets** | 16% | 37% |
| **Retweets** | 80% | 58% |
| **Replies** | 4% | 5% |

The main difference was related to the creation of original content and the usage of retweets, similarly to Table 3 (where all accounts were considered). Here, the discrepancy between old and election bots is even more pronounced, with election bots that performed re-sharing activities only 58 percent of the time, while sharing original tweets 37 percent of the time. This result further confirms the different approaches used by old and election bots and highlights their diverse operational tasks.

To further examine the different behavior between hyperactive and ordinary bots, in Figure 9, we compare the activity of such classes of accounts. In particular, Figure 9a depicts the number of engaged bots for each week of the year. The engagement of hyperactive bot accounts presents a more steady pattern, with an increasing number of accounts progressively engaged as the election approached, as compared to the trend of ordinary bots, which presents a less stationary pattern of engagement and a more pronounced growth in the month prior to the election.

3/25/24, 2:59 PM
Case 3:22-cv-05937-CRB Document 59-1 Filed 03/26/24 Page 454 of 473
How are bots clogging the elections? A study of bots and automated accounts through the Italian... in the analysis of projects and of water



**Figure 9:** Engaged and new bots within the midterm debate.

This is also reflected in Figure 9b, which displays the number of new bots accounts that joined the midterm discussion over the year. From Figure 9b, we can observe how a significant number of bots were active in the conversation since the beginning of the year and new bots were weekly injected over the months preceding the election. A small and constant number of hyperactive bots joined the conversation weekly, while a larger set of ordinary bots were injected over the year and especially during the election week.

### RQ4: Interactions and embeddedness of bot and human accounts

We now explore the interactions between human and bot accounts. In particular, we examine the interplay in terms of retweets (re-sharing of other users' content) and replies (respond to other users' content) exchanged between these two classes of accounts over the whole period of observation. We also investigate the embeddedness of both bots and humans within the social network with the objective of measuring their centrality in online discussion.

Figure 10 shows the interactions in terms of retweets and replies between the two classes of accounts, where each edge reports the volume of interactions (in terms of percentage) between each group. The source of the edge represents the user that re-shared (*i.e.*, retweeted) the tweet of a target user. Node size is proportional to the percentage of accounts in each group for the considered sharing activity, while edge size is proportional to the percentage of interactions between each group.

Case 3:22-cv-05937-CRB Document 59-1 Filed 03/26/24 Page 455 of 473



**Figure 10:** Retweet and reply interactions between humans and bots.

On the one hand, we observed that human content was more re-shared (59 percent of the retweets) than bot-generated content (41 percent of the retweets). Interestingly, bots equally distributed their retweets towards human- and bot-generated content, which might indicate a strategy operated by bots to engage humans and possibly gain their endorsement (Luceri, *et al.*, 2019a). It is important to note that more than one over three human retweets is a re-share of content produced by bots.

On the other hand, we recognize that humans performed the majority of replies and only a small percentage of those (around 12 percent) were in response to bot-generated content, which is aligned with the findings of Bessi and Ferrara (2016) related to the 2016 U.S. presidential election. Bots, in turn, focused their replies on interactions with humans, which appears in contrast with the 2016 pattern (Bessi and Ferrara, 2016), where bots interacted with other bot accounts more than with human users. We hypothesize that bots have become increasingly advanced to initiate conversations with humans (Luceri, *et al.*, 2019b), but allegedly not sufficiently sophisticated to convincingly involve humans in their discussion. Indeed, bots received much less interaction (in terms of reply) from humans with respect to retweet interaction.

Next, we explored the embeddedness of both bots and humans within the social network by also considering (i) the extent of their sharing activity (hyperactive vs. ordinary accounts); and, (ii) the time of their appearance within the midterm debate. We recall that we identified an account as *old* if it shared the first midterm-related tweet by the first two weeks of February 2018. Otherwise, we here denote an account as *recent*. As detailed before, this choice was motivated by the evidence that a significant number of accounts joined the Twitter conversation in the early stages of the midterm debate (see Figure 3b) and, in turn, generated a disproportionate volume of tweets as compared to recent ones.

To perform such analysis, in Figure 11, we depict the *k*-core decomposition of the retweet network for the two classes of accounts (bots and humans). A retweet network is a directed weighted graph that represents the retweet interactions

How much bot talk? Automated bots, the 2018 U.S. Midterm elections, and the effect of bot-driven tweets

between users, where nodes represent users and edges represent retweets among them. We extracted the *k*-cores from the retweet network by varying *k* in the range between 0 and 500 (no variations can be observed after this value). Figure 11 displays the percentage of hyperactive vs. ordinary (resp. old vs. recent) users as a function of *k*, *i.e.*, for every *k*-core we compute the proportion of accounts of each group within the accounts in the *k*-core.



**Figure 11:** *k*-core decomposition of the retweet network for bot and human accounts.

From [Figure 11a](#), we note that the fraction of hyperactive bots increases with *k*, while the percentages related to ordinary accounts drop with *k*. It appears evident that hyperactive users, and in particular bot accounts, populate the most central position within the retweet network. To the contrary, within the ordinary accounts set, human users appear to hold a more central position within the retweet network with respect to bot accounts.

[Figure 11b](#) depicts the *k*-core decomposition of recent and old accounts. It can be noticed that old bots represent the group of accounts most embedded within the retweet network, which indicates that they were more deeply connected with respect to old humans and recent accounts. Interestingly, we observe that, as *k* grows, the fraction of humans drops, whereas the percentage of recent bots remains almost steady. This suggests that a fraction of recent bots populate the most central area of the social network, which, in turn, shows their capability of infiltrating online discussions and rapidly gaining trust and reputation even in a relatively short time window.

To validate our findings, we repeated the evaluation related to the *k*-core decomposition (in [Figure 11](#)) for every week of the observation window (by considering the users involved in the discussion until the week under analysis) with no significant changes in results.

---

### Discussion and conclusion

Bots represent one of the most recognized threats to the integrity of social media. The understanding of how bot accounts operate in social platforms and infiltrate into crucial discussions is of pivotal importance to enable prompt and precautionary detection of coordinated campaigns. Further, it is also fundamental measuring and controlling the extent of bot interactions with organic users to assess the impact of their manipulation attempts.

Along these research directions, in this paper, we examined how bots strategically performed their online activity over time during the year approaching the 2018 U.S. Midterm elections, as well as the effects of their interplay with human users.

We observed how bots reproduced human activity patterns for every sharing activity (*i.e.*, original tweet, retweet, and reply) since the year before the election and we recognized their propensity of flooding online platforms with retweets.

This is also in line with previous findings (Luceri, *et al.*, 2019b), further confirming that retweets have been employed as the favorite digital weapon of bots to resonate messages and create an illusion of consensus within an online community (Ferrara, Varol, Davis, *et al.*, 2016).

However, as the election day approached, an increasing number of bots were strategically injected into the online conversation with the purpose of sharing original content.

Interestingly, we discovered that a significant fraction of bots (about one-third of the identified automated accounts) started pushing midterm-related content even one year before the election, generating a conspicuous volume of tweets (34.2 million) over the whole observation period. Alarmingly, this group of prolific tweet fabricators encompassed a small set of hyperactive bots (19k accounts) that acted continuously and broadcasting 30.6M tweets and most of them (16k accounts) were also operating in the 2020 U.S. presidential debate, at the time of this writing. This finding becomes even more concerning when considering that such hyperactive accounts promoted a vast majority of conspiratorial narratives related to the QAnon movement, similarly to conspiracy bots identified in Ferrara, Chang, *et al.* (2020).

Further, we noticed that bots entered into the midterm debate at a more regular and lower rate with respect to human accounts. Specifically, a constant number of bot accounts were injected and participated in the midterm conversation every week of the year, suggesting the implementation of a scheduled and cautious strategy to infiltrate bots within online discussion, attempting to avoid detection. Besides these bots, a relevant fraction of automated accounts were created a few months prior to the election (similarly to Ferrara, 2020) and participated in the related discussion, which might indicate that such accounts had been purposely injected for operating during the midterm elections debate. Interestingly, these bots generated significantly more original content, while decreasing usage of the retweet, with respect to older bot accounts. This was particularly evident for bot accounts with a moderate engagement in the midterm debate (*i.e.*, ordinary accounts), which suggests that different operational tasks were deployed between more recent and less recent bot accounts, also based on their degree of engagement within the conversation (*i.e.*, hyperactive vs. ordinary accounts).

Finally, bots resulted to be more deeply connected in the social network with respect to humans, especially the hyperactive and less recent ones. A fraction of more recent bot accounts were capable of infiltrating the online discussion to the extent to rapidly gain trust, standing in a central position in the social network in a relatively short time window. In terms of interactions, bots equally distributed their retweets towards human- and bot-generated content, while their replies were more focused on the interplay with humans. For what pertains to human accounts, it is alarming noting that one over three human retweets was a re-share of content produced by bots. Such indiscriminate re-sharing, which allegedly occurred because of human ineptitude in recognizing inaccurate sources of information, represents a complex issue that might have dramatic repercussions in the spread of misinformation (Bessi and Ferrara, 2016; Shao, *et al.*, 2018; Vosoughi, *et al.*, 2018) and further highlights the need for intervention and regulation. However, our results also reveal that bots received less interaction from humans in terms of replies (if compared to retweets), which might represent an encouraging finding when considering user awareness of and response to the activity of malicious entities on social media.

Concluding, our study confirms how the detection of manipulation campaigns is a complex and challenging task, even when suspected malicious accounts are monitored over an extended observation window. Indeed, we have shown that a pivotal set of bots mimicked human sharing activities by emulating the volume and temporal patterns of their narratives several months before the voting event while dominating the debate and infiltrating the most influential areas of the social network. These results should be a cause of concern when considering the persuasive power of social media, especially in the political context.

However, our analysis revealed novel patterns (*e.g.*, the increasing injection of bots aimed at creating original content as the election approached) and actionable insights (*e.g.*, hyperactive bot accounts started their sharing activity one year before the election and were responsible for fueling conspiratorial narratives) that can empower the identification of malicious entities and, accordingly, contribute to the detection of coordinated campaigns. These findings, and corresponding analysis, will be validated in our future work by encompassing both other discussions on future voting events as well as social conversations on diverse contexts (*e.g.*, public health). As we neither focused on the spread of misinformation nor on the content shared by the examined accounts, with the only exception related to the conversations about the QAnon conspiracy theories, these aspects will be investigated in our next studies. **FM**

**About the authors**

**Luca Luceri** is a PostDoctoral researcher at the University of Applied Sciences and Arts of Southern Switzerland (SUPSI) in Manno, Switzerland.
To whom correspondence should be addressed: luca [dot] luceri [at] supsi [dot] ch

**Felipe Cardoso** is a researcher at the University of Applied Sciences and Arts of Southern Switzerland (SUPSI) in Manno, Switzerland.
E-mail: felipe [dot] cardoso [at] supsi [dot] ch

**Silvia Giordano** is a Professor at the University of Applied Sciences and Arts of Southern Switzerland (SUPSI) in Manno, Switzerland.
E-mail: silvia [dot] giordano [at] supsi [dot] ch

**Acknowledgments**

The authors are funded by the European Institute of Innovation & Technology via the project Virtual Machina, and by the Swiss National Science Foundation via the project *Late teenagers Online Information Search* (*LOIS*). The authors are grateful to Emilio Ferrara's team at USC for releasing the Twitter 2020 U.S. presidential election dataset, and to Goran Muric (USC) for his support with the dataset, and to *First Monday's* anonymous reviewers for their very useful comments.

**Notes**

1. https://botometer.iuni.iu.edu/.

2. https://www.bbc.com/news/53498434.

**References**

A. Addawood, A. Badawy, K. Lerman, and E. Ferrara, 2019. "Linguistic cues to deception: Identifying political trolls on social media," *Proceedings of the International AAAI Conference on Web and Social Media*, volume 13, pp. 15–25, and at https://ojs.aaai.org/index.php/ICWSM/article/view/3205, accessed 11 February 2021.

H. Allcott and M. Gentzkow, 2017. "Social media and fake news in the 2016 election," *Journal of Economic Perspectives*, volume 31, number 2, pp. 211–236.
doi: https://doi.org/10.1257/jep.31.2.211, accessed 11 February 2021.

A. Badawy, E. Ferrara, and K. Lerman, 2018. "Analyzing the digital traces of political manipulation: The 2016 Russian interference Twitter campaign," *ASONAM '18: Proceedings of the 2018 IEEE/ACM International Conference on Advances in Social Networks Analysis and Mining*, pp. 258–265.

A. Badawy, A. Addawood, K. Lerman, and E. Ferrara, 2019. "Characterizing the 2016 Russian IRA influence campaign," *Social Network Analysis and Mining*, volume 9, article number 31.
doi: https://doi.org/10.1007/s13278-019-0578-6, accessed 11 February 2021.

A. Bessi and E. Ferrara, 2016. "Social bots distort the 2016 US presidential election online discussion," *First Monday*, volume 21, number 11, at https://firstmonday.org/article/view/7090/5653, accessed 11 February 2021.
doi: https://doi.org/10.5210/fm.v21i11.7090, accessed 11 February 2021.

A. Bovet and H.A. Makse, 2019.. "Influence of fake news in Twitter during the 2016 US presidential election," *Nature Communications*, volume 10, article number 7 (2 January), at https://www.nature.com/articles/s41467-018-07761-2, accessed 11 February 2021.
doi: https://doi.org/10.1038/s41467-018-07761-2, accessed 11 February 2021.

P.B. Brandtzæg, 2010. "Towards a unified media-user typology (MUT): A meta-analysis and review of the research literature on media-user typologies," *Computers in Human Behavior*, volume 26, number 5, pp. 940–956.
doi: https://doi.org/10.1016/j.chb.2010.02.008, accessed 11 February 2021.

D.A. Broniatowski, A.M. Jamison, S. Qi, L. AlKulaib, T. Chen, A. Benton, S.C. Quinn, and M. Dredze, 2018. "Weaponized health communication: Twitter bots and Russian trolls amplify the vaccine debate," *American Journal of Public Health*, volume 108, number 10, pp. 1,378–1,384.
doi: https://doi.org/10.2105/AJPH.2018.304567, accessed 11 February 2021.

F. Cardoso, L. Luceri, and S. Giordano, 2020. "Digital weapons in social media manipulation campaigns," *Workshop Proceedings of the 14th International AAAI Conference on Web and Social Media*, at http://workshop-proceedings.icwsm.org/pdf/2020_32.pdf, accessed 11 February 2021.

3/25/24, 2:59 PM
Case 3:22-cv-05937-CRB Document 59-1 Filed 03/26/24 Page 459 of 473
How is COVID-19 conspiracy and misinformation spread by Twitter bots? Twitter bots

N. Chavoshi, H. Hamooni, and A. Mueen, 2016. "Debot: Twitter bot detection via warped correlation," *2016 IEEE 16th International Conference on Data Mining (ICDM)*, pp. 817–822.
doi: https://doi.org/10.1109/ICDM.2016.0096, accessed 11 February 2021.

E. Chen, A. Deb, and E. Ferrara, 2020. "#election2020: The first public Twitter dataset on the 2020 US presidential election," *arXiv*:2010.00600 (1 October), at https://arxiv.org/abs/2010.00600, accessed 11 February 2021.

Z. Chen and D. Subramanian, 2018. "An unsupervised approach to detect spam campaigns that use botnets on Twitter," >*arXiv*:1804.05232 (14 April), at https://arxiv.org/abs/1804.05232, accessed 11 February 2021.

S. Cresci, 2020. "A decade of social bot detection," *Communications of the ACM*, volume 63, number 10, pp. 72–83.
doi: https://doi.org/10.1145/3409116, accessed 11 February 2021.

S. Cresci, M. Petrocchi, A. Spognardi, and S. Tognazzi, 2019. "Better safe than sorry: An adversarial approach to improve social bot detection," *WebSci '19: Proceedings of the 10th ACM Conference on Web Science*, pp. 47–56.
doi: https://doi.org/10.1145/3292522.3326030, accessed 11 February 2021.

S. Cresci, R. Di Pietro, M. Petrocchi, A. Spognardi, and M. Tesconi, 2020. "Emergent properties, models, and laws of behavioral similarities within groups of Twitter users," *Computer Communications*, volume 150, pp. 47–61.
doi: https://doi.org/10.1016/j.comcom.2019.10.019, accessed 11 February 2021.

S. Cresci, F. Lillo, D. Regoli, S. Tardelli, and M. Tesconi, 2018. "$FAKE: Evidence of spam and bot activity in stock microblogs on Twitter," *Twelfth International AAAI conference on Web and Social Media*, at https://www.aaai.org/Library/ICWSM/icwsm18contents.php, accessed 11 February 2021.

C.A. Davis, O. Varol, E. Ferrara, A. Flammini, and F. Menczer, 2016. "BotOrNot: A system to evaluate social bots," *WWW '16 Companion: Proceedings of the 25th International Conference Companion on World Wide Web*, pp. 273–274.
doi: https://doi.org/10.1145/2872518.2889302, accessed 11 February 2021.

A. Deb, L. Luceri, A. Badawy, and E. Ferrara, 2019. "Perils and challenges of social media and election manipulation analysis: The 2018 US midterms," *WWW '19: Companion Proceedings of The 2019 World Wide Web Conference*, pp. 237–247.
doi: https://doi.org/10.1145/3308560.3316486, accessed 11 February 2021.

E. Ferrara, 2020. "What types of COVID-19 conspiracies are populated by Twitter bots?" *First Monday*, volume 25, number 6, at https://firstmonday.org/article/view/10633/9548, accessed 11 February 2021.
doi: http://dx.doi.org/10.5210/fm.v25i6.10633, accessed 11 February 2021.

E. Ferrara, 2019. "The history of digital spam," *Communications of the ACM*, volume 62,number 8, pp. 82–91.
doi: https://doi.org/10.1145/3299768, accessed 11 February 2021.

E. Ferrara, 2017. "Disinformation and social bot operations in the run up to the 2017 French presidential election," *First Monday*, volume 22, number 8, at https://firstmonday.org/article/view/8005/6516, accessed 11 February 2021.
doi: https://doi.org/10.5210/fm.v22i8.8005, accessed 11 February 2021.

E. Ferrara, 2015. "'Manipulation and abuse on social media' by Emilio Ferrara with Ching-man Au Yeung as coordinator," *ACM SIGWEB Newsletter*, article number 4.
doi: https://doi.org/10.1145/2749279.2749283, accessed 11 February 2021.

E. Ferrara, S. Cresci, and L. Luceri, 2020. "Misinformation, manipulation, and abuse on social media in the era of COVID-19," *Journal of Computational Social Science*, volume 3, number 2, pp. 271–277.
doi: https://doi.org/10.1007/s42001-020-00094-5, accessed 11 February 2021.

E. Ferrara, H. Chang, E. Chen, G. Muric, and J. Patel, 2020. "Characterizing social media manipulation in the 2020 U.S. presidential election," *First Monday*, volume 25, number 11, at https://firstmonday.org/article/view/11431/9993, accessed 11 February 2021.
doi: https://doi.org/10.5210/fm.v25i11.11431, accessed 11 February 2021.

E. Ferrara, O. Varol, F. Menczer, and A. Flammini, 2016. "Detection of promoted social media campaigns," *Tenth International AAAI Conference on Web and Social Media*, pp. 563–566, and at https://www.aaai.org/Library/ICWSM/icwsm16contents.php, accessed 11 February 2021.

E. Ferrara, O. Varol, C. Davis, F. Menczer, and A. Flammini, 2016. "The rise of social bots," *Communications of the ACM*, volume 59, number 7, pp. 96–104.

doi: https://doi.org/10.1145/2818717, accessed 11 February 2021.

T.P. Gerber and J. Zavisca, 2016. "Does Russian propaganda work?" *Washington Quarterly*, 39, 2, pp. 79–98.
doi: https://doi.org/10.1080/0163660X.2016.1204398, accessed 11 February 2021.

F. Giglietto, N. Righetti, L. Rossi, and G. Marino, 2020. "Coordinated link sharing behavior as a signal to surface sources of problematic information on Facebook," *SMSociety'20: International Conference on Social Media and Society*, pp. 85–91.
doi: https://doi.org/10.1145/3400806.3400817, accessed 11 February 2021.

T. Graham and S. Wright, 2014. "Discursive equality and everyday talk online: The impact of 'superparticipants'," *Journal of Computer-Mediated Communication*, volume 19, number 3, pp. 625–642.
doi: https://doi.org/10.1111/jcc4.12016, accessed 11 February 2021.

N. Grinberg, K. Joseph, L. Friedland, B. Swire-Thompson, and D. Lazer, 2019. "Fake news on Twitter during the 2016 U.S. presidential election," *Science*, volume 363, number 6425 (25 January), pp. 374–378.
doi: https://doi.org/10.1126/science.aau2706, accessed 11 February 2021.

P.N. Howard, G. Bolsover, B. Kollanyi, S. Bradshaw, and L.-M. Neudert, 2017. "Junk news and bots during the U.S. election: What were Michigan voters sharing over Twitter?" *Oxford Project on Computational Propaganda, Data Memo*, 2017.1, at https://comprop.oii.ox.ac.uk/research/posts/junk-news-and-bots-during-the-u-s-election-what-were-michigan-voters-sharing-over-twitter/, accessed 11 February 2021.

A. Hughes and N. Asheer, 2019. "National politics on Twitter: Small share of U.S. adults produce majority of tweets," Pew Research Center (23 October), at https://www.pewresearch.org/politics/wp-content/uploads/sites/4/2019/10/PDL_10.23.19_politics.twitter_FULLREPORT.pdf, accessed 11 February 2021.

P.-M. Hui, K.-C. Yang, C. Torres-Lugo, and F. Menczer, 2020. "BotSlayer: DIY real-time influence campaign detection," *Proceedings of the International AAAI Conference on Web and Social Media*, volume 14, pp. 980–982, and at https://ojs.aaai.org/index.php/ICWSM/article/view/7370, accessed 11 February 2021.

J. Im, E. Chandrasekharan, J. Sargent, P. Lighthammer, T. Denby, A. Bhargava, L. Hemphill, D. Jurgens, and E. Gilbert, 2019. "Still out there: Modeling and identifying Russian troll accounts on Twitter," *arXiv*:1901.11162 (31 January), at https://arxiv.org/abs/1901.11162, accessed 11 February 2021.

K.H. Jamieson, 2018. *Cyberwar: how Russian hackers and trolls helped elect a president: what we don't, can't, and do know*. New York: Oxford University Press.

S.M. Jones-Jang, D.H Kim, and K. Kenski, 2020. "Perceptions of mis-or disinformation exposure predict political cynicism: Evidence from a two-wave survey during the 2018 US midterm elections," *New Media & Society* (20 July).
doi: https://doi.org/10.1177/1461444820943878, accessed 11 February 2021.

B. Kollanyi, P.N. Howard, and S. Woolley, 2016. "Bots and automation over Twitter during the U.S. election," *Oxford Project on Computational Propaganda, Data Memo*, 2016.4, at https://comprop.oii.ox.ac.uk/research/posts/bots-and-automation-over-twitter-during-the-u-s-election/, accessed 11 February 2021.

L. Luceri, S. Giordano, and E. Ferrara, 2020. "Detecting troll behavior via inverse reinforcement learning: A case study of Russian trolls in the 2016 US election," *Proceedings of the International Conference of Web and Social Media*, volume 14, at https://ojs.aaai.org/index.php/ICWSM/article/view/7311, accessed 11 February 2021.

L. Luceri, A. Deb, A. Badawy, and E. Ferrara, 2019a. "Red bots do it better: Comparative analysis of social bot partisan behavior," *WWW '19: Companion Proceedings of the 2019 World Wide Web Conference*, pp. 1,007–1,012.
doi: https://doi.org/10.1145/3308560.3316735, accessed 11 February 2021.

L. Luceri, A. Deb, S. Giordano, and E. Ferrara, 2019b. "Evolution of bot and human behavior during elections," *First Monday*, volume 24, number 9, at https://firstmonday.org/article/view/10213/8073, accessed 11 February 2021.
doi: https://doi.org/10.5210/fm.v24i9.10213, accessed 11 February 2021.

M. Mazza, S. Cresci, M. Avvenuti, W. Quattrociocchi, and M. Tesconi, 2019. "RTbust: exploiting temporal patterns for botnet detection on Twitter," *WebSci '19: Proceedings of the 10th ACM Conference on Web Science*, pp. 183–192.
doi: https://doi.org/10.1145/3292522.3326015, accessed 11 February 2021.

P.T. Metaxas and E. Mustafaraj, 2012. "Social media and the elections," *Science*, volume 338, number 6106 (26 October), pp. 472–473.
doi: https://doi.org/10.1126/science.1230456, accessed 11 February 2021.

L. Nizzoli, S. Tardelli, M. Avvenuti, S. Cresci, M. Tesconi, and E. Ferrara, 2020. "Charting the landscape of online cryptocurrency manipulation," *arXiv*:2001.10289 (28 January), at https://arxiv.org/abs/2001.10289, accessed 11 February 2021.

D. Pacheco, P.-M. Hui, C. Torres-Lugo, B.T. Truong, A. Flammini, and F. Menczer, 2020. "Uncovering coordinated networks on social media," *arXiv*:2001.05658 (16 January), at https://arxiv.org/abs/2001.05658, accessed 11 February 2021.

G. Pennycook and D.G. Rand, 2019. "Fighting misinformation on social media using crowdsourced judgments of news source quality," *Proceedings of the National Academy of Sciences*, volume 116, number 7 (12 February), pp. 2,521–2,526.
doi: https://doi.org/10.1073/pnas.1806781116, accessed 11 February 2021.

J. Ratkiewicz, M.D. Conover, M. Meiss, B. Goncalves, A. Flammini, and F.M. Menczer, 2011. "Detecting and tracking political abuse in social media," *Proceedings of the International Conference of Web and Social Media*, volume 11, pp. 297–304, at https://www.aaai.org/Library/ICWSM/icwsm11contents.php, accessed 11 February 2021.

D.J. Ruck, N.M. Rice, J. Borycz, and R.A. Bentley, 2019. "Internet Research Agency Twitter activity predicted 2016 U.S. election polls," *First Monday*, volume 24, number 7, at https://firstmonday.org/article/view/10107/8049, accessed 11 February 2021..
doi: https://doi.org/10.5210/fm.v24i7.10107, accessed 11 February 2021.

M. Sayyadiharikandeh, O. Varol, K.-C. Yang, A. Flammini, and F. Menczer, 2020. "Detection of novel social bots by ensembles of specialized classifiers," *arXiv*:2006.06867 (14 August), at https://arxiv.org/abs/2006.06867, accessed 11 February 2021.

D.A. Scheufele and N.M. Krause, 2019. "Science audiences, misinformation, and fake news," *Proceedings of the National Academy of Sciences*, volume 116, number 16 (16 April), pp. 7,662–7,669.
doi: https://doi.org/10.1073/pnas.1805871115, accessed 11 February 2021.

C. Shao, G.L. Ciampaglia, O. Varol, K.-C. Yang, A. Flammini, and F. Menczer, 2018. "The spread of low-credibility content by social bots," *Nature Communications*, volume 9, article number 4787 (20 November), at https://www.nature.com/articles/s41467-018-06930-7, accessed 11 February 2021.
doi: https://doi.org/10.1038/s41467-018-06930-7, accessed 11 February 2021.

K. Sharma, E. Ferrara, and Y. Liu, 2020. "Identifying coordinated accounts in disinformation campaigns," *arXiv*:2008.11308 (25 August), at https://arxiv.org/abs/2008.11308, accessed 11 February 2021.

K. Shu, A. Sliva, S. Wang, J. Tang, and H. Liu, 2017. "Fake news detection on social media: A data mining perspective," *ACM SIGKDD Explorations Newsletter*, volume 19, number 1, pp. 22–36.
doi: https://doi.org/10.1145/3137597.3137600, accessed 11 February 2021.

M. Stella, M. Cristoforetti, and M. De Domenico, 2019. "Influence of augmented humans in online interactions during voting events," *PloS ONE*, volume 14, number 5, e0214210.
doi: https://doi.org/10.1371/journal.pone.0214210, accessed 11 February 2021.

M. Stella, E. Ferrara, and M. De Domenico, 2018. "Bots increase exposure to negative and inflammatory content in online social systems," *Proceedings of the National Academy of Sciences*, volume 115, number 49 (20 November), pp. 12,435–12,440.
doi: https://doi.org/10.1073/pnas.1803470115, accessed 11 February 2021.

L.G. Stewart, A. Arif, and K. Starbird, 2018. "Examining trolls and polarization with a retweet network," *Proceedings of WSDM Workshop on Misinformation and Misbehavior Mining on the Web*, at https://faculty.washington.edu/kstarbi/examining-trolls-polarization.pdf, accessed 11 February 2021.

V.S. Subrahmanian, A. Azaria, S. Durst, V. Kagan, A. Galstyan, K. Lerman, L. Zhu, E. Ferrara, A. Flammini, F. Menczer, A. Stevens, A. Dekhtyar, S. Gao, T. Hogg, F. Kooti, Y. Liu, O. Varol, P. Shiralkar, V. Vydiswaran, Q. Mei, and Tim Hwang, 2016. "The DARPA Twitter bot challenge," *arXiv*:1601.05140 (21 April), at https://arxiv.org/abs/1601.05140, accessed 11 February 2021.

S. Tardelli, M. Avvenuti, M. Tesconi, and S. Cresci, 2020. "Characterizing social bots spreading financial disinformation," In: G. Meiselwitz (editor). *Social computing and social media. Design, ethics, user behavior, and social network analysis. HCII 2020. Lecture Notes in Computer Science*, volume 12194. Cham, Switzerland: Springer,

pp. 376–392.
doi: https://doi.org/10.1007/978-3-030-49570-1_26, accessed 11 February 2021.

D. Trielli and N. Diakopoulos, 2020. "Partisan search behavior and Google results in the 2018 U.S. midterm elections," *Information, Communication & Society* (18 May).
doi: https://doi.org/10.1080/1369118X.2020.1764605, accessed 11 February 2021.

O. Varol, E. Ferrara, F. Menczer, and A. Flammini, 2017. "Early detection of promoted campaigns on social media," *EPJ Data Science*, volume 6, article number 13, at
https://epjdatascience.springeropen.com/articles/10.1140/epjds/s13688-017-0111-y, accessed 11 February 2021.
doi: https://doi.org/10.1140/epjds/s13688-017-0111-y, accessed 11 February 2021.

O. Varol, E. Ferrara, C.A. Davis, F. Menczer, and A. Flammini, 2017. "Online human-bot interactions: Detection, estimation, and characterization," *International AAAI Conference on Web and Social Media*, pp. 280–289, and at
https://www.aaai.org/Library/ICWSM/icwsm17contents.php, accessed 11 February 2021.

S. Vosoughi, D. Roy, and S. Aral, 2018. "The spread of true and false news online," *Science*, volume 359, number 6380 (9 March), pp. 1,146–1,151.
doi: https://doi.org/10.1126/science.aap9559, accessed 11 February 2021.

S.C. Woolley and P.N. Howard, 2018. *Computational propaganda: Political parties, politicians, and political manipulation on social media*. New York: Oxford University Press.
doi: https://doi.org/10.1093/oso/9780190931407.001.0001, accessed 11 February 2021.

L. Wrubel, J. Littman, and D. Kerchner, 2019. "2018 U.S. congressional election tweet ids," *Harvard Dataverse*.
doi: https://doi.org/10.7910/DVN/AEZPLU, accessed 11 February 2021.

H.Y. Yan, K.-C. Yang, F. Menczer, and J. Shanahan, 2020. "Asymmetrical perceptions of partisan political bots," *New Media & Society* (16 July).
doi: https://doi.org/10.1177/1461444820942744, accessed 11 February 2021.

K.-C. Yang, P.-M. Hui, and F. Menczer, 2020a. "How Twitter data sampling biases U.S. voter behavior characterizations," *arXiv*:2006.01447 (2 June), at https://arxiv.org/abs/2006.01447, accessed 11 February 2021.

K.-C. Yang, C. Torres-Lugo, and F. Menczer, 2020b. "Prevalence of low-credibility information on Twitter during the COVID-19 outbreak," *arXiv*:2004.14484 (8 June), at https://arxiv.org/abs/2004.14484, accessed 11 February 2021.

K.-C. Yang, O. Varol, C.A. Davis, E. Ferrara, A. Flammini, and F. Menczer, 2019. "Arming the public with artificial intelligence to counter social bots," *Human Behavior and Emerging Technologies*, volume 1, number 1, pp. 48–61.
doi: https://doi.org/10.1002/hbe2.115, accessed 11 February 2021.

S. Zannettou, B. Bradlyn, E., De Cristofaro, G., Stringhini, J., Blackburn. "Characterizing the use of images in state-sponsored information warfare operations by Russian trolls on Twitter," *Proceedings of the Fourteenth International AAAI Conference on Web and Social Media*, at https://ojs.aaai.org/index.php/ICWSM/article/view/7342/7196, accessed 11 February 2021.

S. Zannettou, T. Caulfield, E. De Cristofaro, M. Sirivianos, G. Stringhini, and J. Blackburn, 2019a. "Disinformation warfare: Understanding state-sponsored trolls on Twitter and their influence on the Web," *WWW '19: Companion Proceedings of The 2019 World Wide Web Conference*, pp. 218–226.
doi: https://doi.org/10.1145/3308560.3316495, accessed 11 February 2021.

S. Zannettou, T. Caulfield, W. Setzer, M. Sirivianos, G. Stringhini, and J. Blackburn, 2019b. "Who let the trolls out? Towards understanding state-sponsored trolls," *WebSci '19: Proceedings of the 10th ACM Conference on Web Science*, pp. 353–362.
doi: https://doi.org/10.1145/3292522.3326016, accessed 11 February 2021.

J. Zarocostas, 2020. "How to fight an infodemic," *Lancet*, volume 395, number 10225 (29 February), p. 676.
doi: https://doi.org/10.1016/S0140-6736(20)30461-X, accessed 11 February 2021.

A. Zelenkauskaite and B. Niezgoda, 2017. "'Stop Kremlin trolls:' Ideological trolling as calling out, rebuttal, and reactions on online news portal commenting," *First Monday*, volume 22, number 5, at
https://firstmonday.org/article/view/7795/6225, accessed 11 February 2021..
doi: https://doi.org/10.5210/fm.v22i5.7795, accessed 11 February 2021.

3/25/24, 2:59 PM ‌ 'Information warfare' and online news commenting: Analyzing forces of social influence through location-based commenting user typology

A. Zelenkauskaite and M. Balduccini, 2017. "'Information warfare' and online news commenting: Analyzing forces of social influence through location-based commenting user typology," *Social Media + Society* (17 July). doi: https://doi.org/10.1177/2056305117718468, accessed 11 February 2021.

**Appendix**

*Account classification*

In this section, we describe the procedure followed to classify hyperactive and ordinary accounts based on active days and daily tweets frequency parameters (see section *Engagement-based account classification* for further details). To accomplish this task, we needed to identify a threshold for each considered parameter that permits a separation of hyperactive users from ordinary ones. More specifically, we observed how ordinary (resp. hyperactive) accounts were filtered out (resp. selected) from the whole set of accounts by varying these thresholds.

In Figure 12, we show how the percentage of retained accounts decreased as the filtering parameters (*i.e.*, active days and tweets frequency) increased.



**Figure 12:** Percentage of accounts that persisted to filtering based on active days and tweet frequency parameters.

In particular, in the left panel of Figure 12, we show the percentage of accounts that persist to such a filtering as a function of the filtering parameters. In the right panel of Figure 12, we only focus on the two-dimensional relation between the percentage of accounts and the tweet frequency parameter. Every dot in the figure indicates a combination of the filtering parameters, while its color represents the percentage of accounts that persist to filtering. Two facts are worth noting. First, the active days parameter does not significantly affect the percentage of filtered accounts, except for the first gap (from 100 percent to 80 percent of the accounts), where the accounts active only one day were filtered out. At a fixed tweet frequency, the percentage of filtered accounts does not vary by increasing the active days parameter (dots appear to be aligned). Second, the tweet frequency parameter highly affected the percentage of filtered accounts: as this parameter increased, the percentage of accounts decreased. The most noticeable gap can be appreciated when the tweet frequency parameter value equaled 0.2 tweets/day, which resulted in a filtering of almost 70 percent of the accounts.

In Figure 13, the same evaluation was performed by considering the percentage of tweets that persisted to account filtering (based on the same set of parameters).



**Figure 13:** Percentage of tweets that persisted to account filtering, based on the active days and tweet frequency parameters.

In Figure 13, the parameter that affected most of the percentage of filtered tweets was tweet frequency. However, in Figure 13, the percentage of tweets decreased more gradually by increasing the tweet frequency parameter if compared to the percentage of account reduction (Figure 12). Interestingly, with a tweet frequency of 0.2 tweets/day, more than 70 percent of accounts were filtered out but more than 90 percent of tweets were retained, suggesting that a small percentage of accounts was responsible for a huge amount of tweets, consistent with previous findings (Hughes and Asheer, 2019; Zelenkauskaite and Balduccini, 2017). Given the above observations, we classify as hyperactive accounts that satisfy the following conditions:

- active days ≥ 1
- daily tweets frequency ≥ 1

We consider these parameters as (i) for the active days parameter the most noticeable variation in the percentage of filtered accounts can be appreciated when this parameter was greater than 0; and, (ii) a tweet frequency of one corresponded to the knee of the curve in the account distribution (Figure 12), which can be viewed as a conservative choice to discriminate the two classes of accounts (hyperactive vs. ordinary), as no significant difference would occur in the classification by further increasing this threshold, *i.e.*, the percentage of accounts does not significantly vary by increasing the tweet frequency parameter.

### Accounts involved in both 2018 and 2020 debates

Here we provide detailed information about the accounts that were analyzed in this paper and were also involved, at the time of this writing (mid-October 2020), in the 2020 U.S. presidential election debate on Twitter.

We refer to this subset of accounts as *users 2018 & 2020*, while we denote the whole set of accounts analyzed in this paper as *users 2018*.

To attain the set of users engaged in the 2020 U.S. presidential election debate, we leveraged the Twitter dataset collected by Chen, *et al.* (2020). Among the set of users involved in the more recent debate, we spotted only those that were analyzed in our paper and, accordingly, identify 582,349 *users 2018 & 2020*. In Table 5, we detail the statistics of such users and compare them with the *users 2018*, whereas Table 6 shows further details related to *old users 2018 & 2020*.

| | All | Bots | Humans | Hyperactive | Ordinary | Old | Recent |
|---|---|---|---|---|---|---|---|
| **Table 5: *Users 2018 & 2020* and *users 2018* statistics.** | | | | | | | |
| ***Users 2018 & 2020*** | 582k | 93k | 489k | 60k | 467k | 251k | 331k |
| ***(Users 2018)*** | (943k) | (184k) | (759k) | (84k) | (698k) | (322k) | (621k) |
| ***Tweets by users 2018 & 2020*** | 77M | 33M | 44M | 56M | 21M | 64M | 13M |
| ***(Tweets by users 2018)*** | (98M) | (42M) | (56M) | (71M) | (27M) | (79M) | (19M) |

| Table 6: *Old users 2018 & 2020* statistics. | Old hyperactive | Old ordinary |
|---|---|---|
| ***(Accounts 2018 & 2020*** ***(Accounts 2018)*** | 42k (51k) | 207k (266k) |
| ***Bots 2018 & 2020*** ***(Bots 2018)*** | 16k (19k) | 28k (40k) |
| ***Humans 2018 & 2020*** ***(Humans 2018)*** | 26k (32k) | 179k (226k) |

***Hyperactive accounts***

Table 7 summarizes the properties related to both hyperactive bot and human accounts and the volume of their shared tweets.

| Table 7: Properties of hyperactive accounts. | Value | % (% within hyperactive accounts) |
|---|---|---|
| **Total accounts** | 83,701 | 8.87% (100%) |
| **Bot accounts** | 31,772 | 3.37% (37.96%) |
| **Human accounts** | 51,929 | 5.51% (62.04%) |
| **Total tweets** | 70,737,005 | 72.09% (100%) |
| **Bot tweets** | 37,169,582 | 37.88% (52.55%) |

How are bot accounts and their tweets from news analysis of affection of world

| Human tweets | 33,567,423 | 34.21% (47.45%) |
|---|---|---|

[Figure 14](#) displays the sharing activities of hyperactive accounts over the observation period.



**Figure 14:** Weekly sharing activities for hyperactive accounts.

***Ordinary accounts***

[Table 8](#) summarizes the properties related to both ordinary bot and human accounts and the volume of their shared tweets.

| Table 8: Properties of ordinary accounts. | | |
|---|---|---|
| | **Value** | **% (% within ordinary accounts)** |
| **Total accounts** | 698,427 | 74.05% (100.0%) |
| **Bot accounts** | 118,503 | 12.56% (16.97%) |

| Human accounts | 579,924 | 61.49% (83.03%) |
| Total tweets | 27,225,609 | 27.75% (100.0%) |
| Bot tweets | 5,182,417 | 5.28% (19.04%) |
| Human tweets | 22,043,192 | 22.46% (80.96%) |

Figure 15 displays the sharing activities of ordinary accounts over the observation period.



**Figure 15:** Weekly sharing activities for ordinary accounts.

Table 9 summarizes the properties related to accounts that shared only one tweet.

| Table 9: Properties of accounts that shared only one tweet. | | |
| --- | --- | --- |
| | **Value** | **% (% within one-tweet accounts)** |
| **Total accounts** | 160,998 | 17.07% (100.0%) |

| Bot accounts | 34,270 | 3.63% (21.29%) |
|---|---|---|
| Human accounts | 126,728 | 13.43% (78.71%) |
| | | |
| Total tweets | 160,998 | 0.16% (100.0%) |
| Bot tweets | 34,270 | 0.03% (21.29%) |
| Human tweets | 126,728 | 0.13% (78.71%) |

*Suspended accounts*

Here, we examine the correlation between account suspension and bot scores. Following the methodology proposed by Ferrara (2020), we leveraged the annotations of verified and suspended accounts and compared their bot scores. In Figure 16, we depict the bot score distributions of 38k suspended accounts and 22.7k verified accounts within our dataset.



**Figure 16:** Distribution of bot scores for verified and suspended accounts.

We observe two different distributions, as statistically confirmed by the Mann-Whitney rank test (*p*-value<0.001). Indeed, bot scores of the suspended accounts were more widely distributed with respect to those of the verified accounts, which had about 80 percent of the users with a bot score lower than 0.15. To the contrary, more than half of the suspended accounts presented bots scores higher than 0.15. It should be noticed that account suspension from Twitter may occur for several reasons, not only related to the degree of automation of the account. Therefore, it was expected to also have suspended accounts with low bot scores. However, it can be noted how thousands of suspended accounts reflect a high level of automation (*i.e.*, high bot scores), while the number of verified accounts dropped as the

Down the bot hole: Actionable insights from a one-year analysis of bot activity on Twitter

bot score increased. This, besides confirming a correlation between account suspension and the likelihood of automation, supports the account classification performed via Botometer (Ferrara, 2020).

### QAnon tweets

The keywords used to gather tweets related to QAnon are listed as follows:
#qanon, #8kun, #qpatriots, #q, #qarmy, #qanon2018, #qanon2019, #qwarriors, #thegreatawakening, #wwg1wga, #hollywoodanon, #qteam, #qanons, #qclearance, #qbaby, #pedogate, #pizzagate, #darktolight, #wakeupamerica, #thecollectiveq, #thestorm

---

### Editorial history

Received 28 October 2020; revised 9 February 2021; accepted 9 February 2021.

---



To the extent possible under law, this work is dedicated to the public domain.

Down the bot hole: Actionable insights from a one-year analysis of bot activity on Twitter
by Luca Luceri, Felipe Cardoso, and Silvia Giordano.
*First Monday*, Volume 26, Number 3 - 1 March 2021
https://firstmonday.org/ojs/index.php/fm/article/download/11441/10079
doi: http://dx.doi.org/10.5210/fm.v26i3.11441

EXHIBIT 16





