QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice*)
alexspiro@quinnemanuel.com
Jesse A. Bernstein (*pro hac vice*)
Jessebernstein@quinnemanuel.com
Jonathan E. Feder (*pro hac vice* forthcoming)
jonathanfeder@quinnemanuel.com
51 Madison Ave 22nd floor
New York, NY 10010
Telephone:     (212) 849-7000
Facsimile:     (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Joseph C. Sarles (Bar No. 254750)
josephsarles@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100

*Attorneys for Defendant Elon Musk*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | CASE NO. 3:22-CV-05937-CRB<br><br>**DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS UNDER FED. R. CIV. P. 12(c)**<br><br>Judge:          Hon. Charles R. Breyer<br><br>Hearing Date:  May 10, 2024<br>Time:          10:00 a.m.<br>Courtroom:     6, 17th Floor |

1

## <u>TABLE OF CONTENTS</u>

2

3   SUMMARY OF ARGUMENT ............................................................................1

4   ARGUMENT ..................................................................................................3

5   A.   Law-Of-The-Case Doctrine Does Not Bar The Motion........................................3

6   B.   Countervailing Statements Demonstrate The Market Could Not Have Been Misled...........4

7   C.   Truth-On-The Market Defense Is Available And Availing ...................................7

8        1.   Truth-On-The-Market Defense Is Not Fact-Intensive Here Because It Is
             Pled On The Face Of Plaintiffs' Amended Complaint. ..............................7
9
         2.   The Detailed, Unambiguous Truth Was Either In The Public Merger
10            Agreement Or It Was Not; Either Way, Plaintiffs Fail To State A Claim. ...............8

11  D.   Plaintiffs Also Fail To Plead Scienter And Loss Causation Because Either The
        Truth Was Contemporaneously Known Or It Became Known Long Before October
12      2022. ...........................................................................................11

13       1.   Plaintiffs' Argument That The Merger Agreement Is Unclear Negates
             Scienter ...........................................................................................11
14
         2.   Defendant's Statements About Pausing The Deal Could Not Have Caused
15            Loss. ...........................................................................................12

16       3.   Defendant's May 16 and 17 Statements About Percentage Of Spam
             Accounts Could Not Have Been Misleading Or Made With Scienter
17            Because He Disclosed The Basis Of His Statement. ..............................13

18       4.   Defendant's May 16 and May 17 Statements About Percentage Of Spam
             Accounts Could Not Have Caused Investor Losses................................14
19
    CONCLUSION ..............................................................................................15
20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## Cases

*In re Anthem*,
    2016 WL 3029783 (N.D. Cal. May 27, 2016) .......................................................... 4

*In re Apple iPhone Antitrust Litig.*,
    846 F.3d 313 (9th Cir. 2010)................................................................................. 3

*Braun v. Eagle Rock Energy Partners, L.P.*,
    223 F. Supp. 3d 644 (S.D. Tex. 2016) ................................................................ 10

*Bricklayers & Trowel v. Credit Suisse*,
    853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd,* 752 F.3d 82 (1st Cir. 2014) ............................. 13

*Brown v. Alexander*,
    2016 WL 829071 (N.D. Cal. Mar. 3, 2016) ............................................................ 4

*Chavez v. U.S.*,
    683 F.3d 1102 (9th Cir. 2012)................................................................................ 8

*Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*,
    660 F.3d 1170 (9th Cir. 2011), *aff'd*, 568 U.S. 455 (2013) ..................................... 6

*Davidson v. Apple, Inc.*,
    2019 WL 6251180 (N.D. Cal. Nov. 22, 2019).......................................................... 4

*Dura Pharmaceuticals v. Broudo*,
    544 U.S. 336 (2005) ....................................................................................... 3, 15

*Ferraro Family v. Corcept Therap.*,
    2021 WL 3748325 (N.D. Cal. Aug. 24, 2021)....................................................... 10

*Guangyi Xu v. ChinaCache Int'l*,
    2017 WL 114401 (C.D. Cal. Jan. 9, 2017)............................................................ 13

*Hall v. L.A.*,
    697 F.3d 1059 (9th Cir. 2012)................................................................................ 4

*Heliotrope Gen. v. Ford Motor*,
    189 F.3d 971 (9th Cir. 1999)................................................................................. 6

*Hernandez v. San Jose*,
    241 F. Supp. 3d 959 (N.D. Cal. 2017) ................................................................... 3

*Herring v. Teradyne, Inc.*,
    2008 WL 11337851 (S.D. Cal. Aug. 29, 2008) ...................................................... 6

*In re Infonet Servs. Corp. Sec. Litig.*,
    310 F. Supp. 2d 1080 (C.D. Cal. 2003) ........................................................ 8

*In re Kalobios Pharms., Inc. Sec. Litig.*,
    258 F. Supp. 3d 999 (N.D. Cal. 2017) .......................................................... 7

*Metzler Inv. v. Corinthian Colleges*,
    540 F.3d 1049 (9th Cir. 2008) ..................................................................... 11

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) .................................................................... 13

*Mulligan v. Impax Labs.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ........................................................... 13

*In re Packaged Seafood Prod. Antitrust Litig.*,
    277 F. Supp. 3d 1167 (S.D. Cal. 2017) ......................................................... 3

*Padnes v. Scios Nova, Inc.*,
    1996 WL 539711 (N.D. Cal. Sept. 18, 1996) ............................................... 7

*In re PetSmart, Inc. Sec. Litig.*,
    61 F.Supp. 2d 982 (D. Ariz. 1999) ........................................................... 6, 8

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
    845 F.3d 1268 (9th Cir. 2017) ....................................................................... 5

*Schneider v. Dep't of Corr.*,
    151 F.3d 1194 (9th Cir. 1998) ....................................................................... 9

*Schramm v. Montage Health*,
    2018 WL 1156894 (N.D. Cal. Mar. 5, 2018) ............................................... 9

*Starr ex rel. Est. of Sampson v. Georgeson S'holder, Inc.*,
    412 F.3d 103 (2d Cir. 2005) .......................................................................... 6

*In re Syntex Corp. Secs. Litig.*,
    95 F.3d 922 (9th Cir. 1996) ......................................................................... 13

*Teamsters Loc. v. Bombardier, Inc.*,
    2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006), *aff'd*, 546 F.3d 196 (2d Cir. 2008) .................... 7

*U.S. v. Cote*,
    51 F.3d 178 (9th Cir. 1995) ........................................................................... 4

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) ........................................................ 14

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) ................................................................... 6

-iii-

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009)................................................................................................. 12

**<u>Rules</u>**

Fed. R. Civ. P. 12 .................................................................................................................. 3, 4

DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS
UNDER FED. R. CIV. P. 12(c)

1

**SUMMARY OF ARGUMENT**

2     Having partially prevailed past the motion to dismiss and having opted not to amend,

3 Plaintiffs now ask the Court to ignore *both* the Amended Complaint (Dkt. 31, "Am. Compl.") and

4 this Court's motion to dismiss decision (Dkt. 36, "MTD Op.").  *See* Plaintiffs' Opposition to

5 Defendant's Motion for Judgment on the Pleadings (Dkt. 62) (hereinafter, "Opp.").  The reason is

6 clear: they demonstrate that Defendant is entitled to judgment on the pleadings.

7     Defendant's motion (Dkt. 59, "Op. Br.") demonstrated that based on Plaintiffs' own pleading

8 theory, endorsed by the motion to dismiss decision, countervailing statements prevented a

9 reasonable investor from drawing the two alleged false inferences that remain after this Court's

10 partial dismissal:  (i) that Twitter was legally obligated to provide bot data and (ii) that Twitter's

11 internal data was the source of Defendant's public statement that he believed 20% of active users

12 could be fake or spam accounts.

13     Plaintiffs respond that the Court has already ruled on this argument.  Wrong.  In footnote 8

14 of the Court's order (Dkt. 48, hereinafter "MTD Op.") granting in part and denying in part

15 Defendant's motion to dismiss, the Court identified an issue not briefed at the motion to dismiss

16 stage:  whether "a specific disclosure . . . would prevent a reasonable investor from being misled by

17 Defendant's tweet—i.e., a countervailing statement that the deal will close even if Twitter fails to

18 provide him the bot data he requests."  (MTD Op. 20 n. 8.)  Thus, it is appropriate for this Court to

19 evaluate the countervailing statements that demonstrate that no reasonable investor would have been

20 misled.  And here, it is particularly appropriate—regardless of whether described as a "truth-on-the-

21 market-defense"—because it is Plaintiffs' ***own allegations*** that demonstrate the countervailing

22 statements.

23     Specifically, it is Plaintiffs' own allegations that the public Merger Agreement contains no

24 right to bot data as a condition to closing.  Indeed, Plaintiffs plead that the very provisions Musk

25 publicly identified as the basis for his information rights do not provide Musk with those rights.

26 Plaintiffs additionally plead that the April 21, 2022 public Amended Schedule 13D made clear that

27 Twitter was not obligated to provide bot data.  They needed to make these allegations to establish

28 falsity and scienter at the motion to dismiss stage.  And the Court's motion to dismiss decision

-1-

hinged on these allegations.  But, accepting these allegations as true, the market knew that Defendant did not have the right to the bot data he requested and therefore judgment on the pleadings must be granted.

Notably, Plaintiffs do not dispute that Wall Street analysts, journalists, and Plaintiffs' own counsel knew—as of the time of Defendant's allegedly misleading statements—precisely what the public merger agreement entitled Musk to receive from Twitter and what it did not.  Plaintiffs' only response is that Defendant previously denied that he was not entitled to the bot data and that the public merger agreement was somehow too confusing for the "average" investor to understand.  But regardless of Defendant's "vigorous" and sustained denial of Plaintiffs' pleadings, the Amended Complaint's allegations must be accepted as true for purposes of testing whether Plaintiffs state a claim upon which relief may be granted.  Because Plaintiffs plead that both the Merger Agreement and the April 21, 2022 Amended Schedule 13D make clear that there is no bot data condition to closing, Plaintiffs' own pleadings (accepted as true for these purposes only) establish countervailing statements available to the market.  And because Plaintiffs plead an "efficient market[] . . . covered by multiple analysts," the "reasonable investor" would not draw a false inference from a tweet as to the "true legal rights and obligations" clearly ascertainable from the publicly-filed Merger Agreement.  Indeed, while Plaintiffs now argue that the Merger Agreement was too confusing for the reasonable investor to understand, this is contrary to Plaintiffs' own allegations that Defendant was clearly—by virtue of the public merger agreement and related public filings—not entitled to due diligence, including the information he demanded.

Moreover, accepting Plaintiffs' newfound *complex merger agreement* theory undermines the scienter allegations they relied upon at the motion to dismiss stage.  Simply put, if the Merger Agreement was highly complex such that it was not clear whether Musk was entitled to the information he was requesting, then Musk was not severely reckless in believing he was entitled to such information.  Plaintiffs cannot have it both ways: either the Merger Agreement was clear, and the efficient market was able to assess Musk's rights under the Merger Agreement or the Merger Agreement was unclear and Musk himself may have misunderstood his rights.  Indeed, Plaintiffs do

1    not point to a single piece of information that Musk had concerning his rights under the Merger

2    Agreement that the broader market did not also have.

3          Finally, Plaintiffs have no serious response to Defendant's argument that, to the extent there

4    was any ambiguity at the time of Musk's statements, such ambiguity was cured prior to Plaintiffs'

5    "corrective disclosure" event, including through Musk's termination letter that identified the

6    specific provisions he claimed entitled him to the information he requested.  Nor do Plaintiffs

7    provide any response at all to Defendant's argument that the "direct causal relationship theory" of

8    loss causation is inconsistent with the Supreme Court's ruling in *Dura Pharmaceuticals v. Broudo*,

9    544 U.S. 336, 342, 346 (2005).

10         Although Plaintiffs apparently believe it is time for them to have a chance to "develop" a

11   claim through broad discovery (Opp. 14), the foregoing demonstrates this case should be dismissed

12   in its entirety.[1]

13                                     **ARGUMENT**

14         **A.      Law-Of-The-Case Doctrine Does Not Bar The Motion.**

15         Plaintiff's primary argument (Opp. 8) is that the "Court has already ruled on the issues raised

16   here" and so, "the Court should deny Defendant's motion based on the law-of-the-case doctrine."

17   (Opp. 8.)  But the Court decidedly did *not* rule on the issues raised here.  A Rule 12(c) motion is a

18   proper vehicle to raise Plaintiffs' failure to state a claim, raising issues not previously briefed but

19   well-ripened in light of the Court's order on Defendant's motion to dismiss.  *In re Apple iPhone*

20   *Antitrust Litig.*, 846 F.3d 313, 318 (9th Cir. 2010) ("If a failure-to-state-a-claim defense under Rule

21   12(b)(6) was not asserted in the first motion to dismiss under Rule 12, Rule 12(h)(2) tells us that it

22   can be raised . . . in a post-answer motion under Rule 12(c)"); *see also In re Packaged Seafood Prod.*

23   *Antitrust Litig.*, 277 F. Supp. 3d 1167, 1174 (S.D. Cal. 2017) (holding that party may subsequently

24   raise a previously-omitted argument "in a post-answer motion under 12(c)"); *Hernandez v. San Jose*,

---

[1]  Defendant brings this motion to vindicate his rights, not to delay discovery; Plaintiffs' insistence otherwise (Opp. iv) is misplaced and irrelevant to this motion, which should dispose of Plaintiffs' case for failure to state a claim.

241 F. Supp. 3d 959, 984 (N.D. Cal. 2017)  ("[A] party that seeks to assert a defense pertaining to a failure to state a claim that was available but omitted from an earlier Rule 12 motion can only do so in a pleading, a Rule 12(c) motion, or at trial."); *In re Anthem*, 2016 WL 3029783, at *44 (N.D. Cal. May 27, 2016) (same).   Here, Defendant's motion expressly raises *only* issues that were not previously briefed.  Law of the case is not an obstacle.  *Brown v. Alexander*, 2016 WL 829071, at *7 (N.D. Cal. Mar. 3, 2016) ("The [law of the case] doctrine 'acts as a bar only when the issue in question was actually considered and decided by the first court.'" (quoting *U.S. v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995))).

And regardless, law-of-the-case doctrine is not inflexible; it is far more important for a Court to consider a plaintiff's failure to state a claim than to adhere to law-of-the-case principles meant to promote efficiency, but which would do just the opposite where their application would prevent early dismissal of deficient claims.  *Davidson v. Apple, Inc.*, 2019 WL 6251180 at *26 (N.D. Cal. Nov. 22, 2019) ("Application of the law of the case doctrine is discretionary." (citing *Hall v. L.A.*, 697 F.3d 1059, 1067 (9th Cir. 2012))).

## B.    Countervailing Statements Demonstrate The Market Could Not Have Been Misled.

Plaintiffs attempt to reframe Defendant's motion as being brought under the truth-on-the-market doctrine.  As if wishing it away, Plaintiffs relegate Defendant's primary argument to a footnote (Opp. 9 n.2).  In footnote 2 (Opp. 9 n.2), Plaintiffs state:  "This is not a case where plaintiff 'fail[s] to explain how the [alleged] misstatements are misleading in light of known contemporaneous countervailing statements.' . . . Musk's reliance on *Padnes* and *Guangyi Xu* is misplaced."  Beyond merely stating "[t]his is not a case where . . ." Plaintiffs do not tell us how or why, because they cannot.  In fact, this *is* that case: as explained in Defendant's opening brief, the challenged statements were not capable of misleading because known countervailing statements would have made the alleged misleading inference implausible.  (Op. Br. 6-11.)

Plaintiffs plead (MTD Op. 14; Opp. 1) that the Merger Agreement did not contain a right to bot data and that the April 21, 2022 Schedule 13D disclosed that due diligence was waived. Plaintiffs fail to explain how a statement by Defendant could be interpreted as stating a legal truth

about a right to bot data under the Merger Agreement when the Merger Agreement was available to the public and, according to Plaintiffs (*e.g.*, MTD Op. 14; Opp. 1), clearly did not contain a right to bot data.  Plaintiffs' only answer (Opp. 9 n.3) to this comes in their next footnote asserting that "a reasonable investor" might not have "understood the true legal rights and obligations of the parties . . . under the Merger Agreement."  Put another way, Plaintiffs argue (Opp. 11) that "experienced and skilled professionals in the field would know that Musk's tweets were false" (*i.e.*, they would not have drawn the false inference) but to "a reasonable investor" "the issue" would have been "confusing."  Yet, Plaintiffs do not explain what special information was available to "experienced and skilled professionals" that would not have been equally available or otherwise have become known to the market.  Plaintiffs do not, for example, explain why their own counsel was able to assert on May 25, 2022 that Musk's statements were untrue because "nothing in the buyout contract [] allows Musk to put the deal 'temporarily on hold.' . . . Musk had specifically waived detailed due diligence as a condition precedent to his obligations under the buyout contract.  Thus, Musk had and has no right to cancel the buyout based on any results from due diligence concerning the number of spam/fake accounts at Twitter."  (Op. Br. Ex. 13 at ¶ 14 (emphasis omitted).)  Nor do Plaintiffs explain how lead Plaintiffs here—each of whom claims to have ***substantial experience in finance and investments*** (Dkt. 8-5 at 1)—could have been misled.

Obviously, Musk's rights to bot data were either *clear* under the Merger Agreement, as Plaintiffs plead and argue, or they were not.  Having survived the motion to dismiss by arguing that the Merger Agreement is public and clear and that the market was sophisticated and efficient (*see* MTD Op. 18, 20, 39), Plaintiffs now want (Opp. 11) a middle ground where reasonable investors were "confused" and only a select elite—Plaintiffs' counsel, Mr. Musk, Bloomberg columnists, Wells Fargo analysts, along with sophisticated and experienced investors—could discern that the Merger Agreement did not contain a right to the bot data.  This is untenable.

It is also inconsistent with black-letter law.  A representation is not materially misleading unless it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information ***made available***," *Retail Wholesale v. Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017) (emphasis added), which includes "all information 'reasonably available

1   to the shareholders,' including 'data sent to shareholders by a company,'" *Starr v. Georgeson*
2   *S'holder*, 412 F.3d 103, 110 (2d Cir. 2005).  There is no exception to this rule for the black-and-
3   white text of a publicly-disclosed merger agreement.

4            Moreover, Plaintiffs' apparent attempt (Opp. 11-12) to redefine their class to exclude
5   sophisticated investors—such as themselves—is also inconsistent with the efficient market
6   hypothesis they relied upon to survive Defendant's motion to dismiss and plead reliance.  The
7   efficient market theory, as pled by Plaintiffs (Am. Compl. ¶ 182), assumes a market saturated with
8   sophisticated investors and incorporating information from analysts, including experienced and
9   skilled professionals in the field.  *Herring v. Teradyne, Inc.*, 2008 WL 11337851, at *4 (S.D. Cal.
10  Aug. 29, 2008) ("[W]hen information that would tend to affect the stock price already is disclosed
11  in analyst reports, such information would 'already be reflected in the stock's price.'").  Under the
12  efficient market hypothesis, then, the market price upon which Plaintiffs allege they relied
13  incorporated all public information like the contents of the Merger Agreement and analyst reports
14  interpreting the Merger Agreement.  *Conn. Ret. v. Amgen Inc.*, 660 F.3d 1170, 1173 (9th Cir. 2011)
15  (holding that fraud-on-the-market presumption is based on theory that "[t]he price of a stock traded
16  in an efficient market fully reflects all publicly available information about the company and its
17  business"), *aff'd*, 568 U.S. 455 (2013); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267 (S.D.N.Y.
18  2003) ("[P]ublicly available information . . . reflected in the price of Worldcom's securities . . .
19  included Grubman's analyst reports."); *In re PetSmart, Inc. Sec. Litig.*, 61 F.Supp. 2d 982, 996 (D.
20  Ariz. 1999) ("As a matter of law, the price of [a] stock cannot be overinflated based on an omission
21  if the market was otherwise aware of the information . . . [from] a published report by industry
22  analysts.").

23           Thus, regardless of whether any particular investor reviewed the Merger Agreement or
24  understood its contents, the market price already reflected an accurate understanding of the Merger
25  Agreement, and therefore, any alleged misstatements could not have materially misled the market.
26  *See Heliotrope Gen. v. Ford Motor*, 189 F.3d 971, 981 (9th Cir. 1999) (granting judgment on the
27  pleadings in part because, "to the extent plaintiff alleges that he formed a misunderstanding of the
28  material facts surrounding the issuance of the Shares . . . plaintiff's misunderstanding is not a

-6-

reasonable one in light of the" prospectus issued by the defendant); *Padnes v. Scios Nova, Inc.*, 1996 WL 539711, at *7 (N.D. Cal. Sept. 18, 1996) (granting motion to dismiss where market had "assimilated the reports" that contained the true, countervailing information); *see also Amgen*, 660 F.3d at 1173 ("Anyone who buys stock at the prevailing market price is presumed to have relied on that price—and, by extension, each piece of publicly available information it reflects—as a measure of the stock's value, even if the investor never saw that information.").

Indeed, to accept Plaintiffs' argument to the contrary is to accept that there was a massive arbitrage opportunity for "experienced and skilled professionals" that persisted for approximately five months, which is entirely inconsistent with the efficient market Plaintiffs pleaded.  *See Teamsters Loc. v. Bombardier, Inc.*, 2006 WL 2161887, at *7 (S.D.N.Y. Aug. 1, 2006) ("Market makers and arbitrageurs contribute to market efficiency by 'reacting swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level.'"), *aff'd*, 546 F.3d 196 (2d Cir. 2008); *see also Amgen*, 660 F.3d at 1173 ("If the stock price did not reflect a piece of publicly available information, the logic goes, then investors would have a strong incentive to buy the stock (if the information were positive) or sell it (if negative); in an efficient market, that activity would drive the stock price up or down until it fully reflected the information.").

**C.    Truth-On-The Market Defense Is Available And Availing**

**1.    Truth-On-The-Market Defense Is Not Fact-Intensive Here Because It Is Pled On The Face Of Plaintiffs' Amended Complaint.**

Defendant's alternative truth-on-the-market defense also mandates judgment on the pleadings here.  Although truth-on-the-market defenses are often fact-intensive, they are not *per se* precluded at the pleading stage.  *See, e.g.*, *In re Kalobios Pharms., Inc. Sec. Litig.*, 258 F. Supp. 3d 999, 1011 (N.D. Cal. 2017) (granting motion to dismiss based on truth-on-the-market defense). Here, Plaintiffs, by their own pleadings, fail to state a claim because, among other things, they plead the "truth" available to the market.  Thus, Plaintiffs' desired "inference" and resulting market drop is implausible given the authoritative and credible countervailing statements that Plaintiffs themselves plead were public and available to the market.  (Op. Br. 7-8.)  That is not a "fact-intensive inquiry" requiring weighing hundreds of public sources; it is a failure to state a claim on the face of

Plaintiffs' pleading (with Plaintiffs' allegations accepted as true). *Cf. In re PetSmart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 996 (D. Ariz. 1999) ("Ordinarily, the 'truth on the market' defense involves a fact-intensive inquiry to determine whether the information from third-party sources was sufficient to cure the effect of the original misstatement or omission. But here, it is not even clear that plaintiffs have pleaded an omission.").

Plaintiffs point (Opp. 11-12) to Defendant's position. Irrelevant. On a motion for judgment on the pleadings, Plaintiffs' allegations are accepted as true. *Chavez v. U.S.*, 683 F.3d 1102, 1108 (9th Cir. 2012) ("'Judgment on the pleadings is properly granted when [, accepting all factual allegations in the complaint as true,] . . . the moving party is entitled to judgment as a matter of law.'" (brackets in original)).

Plaintiffs plead (MTD Op. 20, 24-25; Am. Compl. 21, 82, 112, 149, 155) that the Merger Agreement and April 21, 2022 disclosure contained unmistakable waivers of due diligence such that neither Musk nor the market could reasonably believe otherwise. They thus plead scienter while also rendering the supposed false inference wholly implausible; just as Musk could not have been mistaken that due diligence was waived in the Merger Agreement, neither could the market. *See In re Infonet Servs. Corp. Sec. Litig.*, 310 F. Supp. 2d 1080, 1092–93 (C.D. Cal. 2003) ("[M]isleading . . . statements made []in less formal press releases and interviews" are not actionable if they are offset by accurate statements in "formal documents of considerable legal weight" such as registration statements.). *See also* Op. Br. 9-11. Plaintiffs run circles (Opp. 8-13) around this pleading defect but cannot escape its mandated effect: dismissal.

**2.    The Detailed, Unambiguous Truth Was Either In The Public Merger Agreement Or It Was Not; Either Way, Plaintiffs Fail To State A Claim.**

Seeking to shift attention from their successful framing of their pleadings to partially survive Defendant's motion to dismiss, Plaintiffs argue that "Musk has not pointed to anything specific in the Merger Agreement disclosing in black and white 'that the deal will close even if Twitter fails to provide him the bot data he requests.'" (Opp. 9.) But it is Plaintiffs' pleading that matters most at this stage and Plaintiffs plead just that: that the Merger Agreement, in black and white, contains *nothing* that obligated Twitter to provide the bot data that Musk requested (and that, therefore, it

1    was misleading for Musk to allegedly imply that Twitter was obligated to provide bot data).  To the

2    extent that Defendant must prove a negative, Plaintiffs plead it—nothing in the Merger Agreement

3    required Twitter to provide the bot data (Opp. 10; MTD Op. 18; Am. Compl. 149).  And, moreover,

4    Plaintiffs also successfully argued that the specific provisions that Musk identified in his termination

5    letter did not provide him the right to that information.  *See* MTD Op. 20.  Thus, accepting Plaintiffs'

6    theory, the market need not even review the whole Merger Agreement to assess what information

7    Twitter needed to provide Defendant in order for the deal to close.  Instead, they needed to review

8    discrete, specifically-identified provisions that Plaintiffs argued clearly did not entitle him to the bot

9    data he requested.

10        Now, Plaintiffs wish (Opp. 9) to replead in an opposition brief.  This is not permitted.

11   *Schramm v. Montage Health*, 2018 WL 1156894, at *3 (N.D. Cal. Mar. 5, 2018) ("[A] plaintiff may

12   not amend her complaint by way of a brief in opposition to a motion to dismiss." (citing *Schneider*

13   *v. Dep't of Corr.*, 151 F.3d 1194, 1197 (9th Cir. 1998))).

14        Even if it were properly pled, Plaintiffs' new desired pleading (Opp. 9) is that "Musk was

15   entitled to some information necessary to close the Merger under the Merger Agreement, but not

16   the type of due diligence he was demanding or that was reflected in his misleading statements."

17   Yet, Plaintiffs plead that it was clear that Defendant was definitely *not* entitled to due diligence

18   (MTD Op. 20; Am. Compl. 29, 77, 112, 149, n. 37) and that the bot data was clearly due diligence

19   (MTD Op. 20; Am. Compl. 155), not "information necessary to close the Merger under the Merger

20   Agreement" (Opp. 1, 9).  But according to Plaintiffs (Opp. 10), "Musk has provided no evidence

21   that a reasonable investor knew how to discern the difference between due diligence and the

22   information rights under the Merger Agreement."  Defendant does not need to prove the negative;

23   Plaintiffs affirmatively pleaded exactly this:

24   •   Defendant publicly waived due diligence in the April 21, 2022 Amended Schedule 13D.

25       (Am. Compl. 82; Opp. 1.)

26   •   The publicly-disclosed Merger Agreement was clear that Defendant only could terminate if

27       Twitter did not provide information necessary to closing; Twitter had no obligation to

28       provide due diligence as a condition to closing.  (MTD Op. 31 ("Even if he truly believed

-9-                                   Case No. 3:22-CV-05937-CRB

DEFENDANT ELON R. MUSK'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

1    that Twitter had the contractual obligation to provide . . . bot data . . . it was at least

2    deliberately reckless to not investigate that obligation with respect to the Merger

3    Agreement."); Am. Compl. 139.)

4    •    The bot data that Musk was requesting was clearly due diligence, not information necessary

5    for closing.  (MTD Op. 20; Am. Compl. 155.)

6    Plaintiffs also concede (Opp. 11) that deal participants, analysts, securities litigators, and

7    sophisticated and experienced investors knew, understood, and publicly explained those three points

8    and so could not have been misled by Defendant's challenged statements.  Accepting all that as true,

9    a reasonable investor would not have been "confused and misled" (Opp. 10) as to Twitter's

10   obligations to provide bot data under the Merger Agreement.  *See Braun v. Eagle Rock*, 223 F. Supp.

11   3d 644, 652 (S.D. Tex. 2016) ("It is an investor's responsibility to combine available facts in order

12   to derive estimates about a security's value.").

13   Plaintiffs' citation to *Va. Bankshares* and *Gerstle* are inapposite.  Both *Gerstle* and *Va.*

14   *Bankshares* stand for the unremarkable proposition that certain highly-complex public data may

15   need to be analyzed before a discernible fact can be publicly incorporated by the market into the

16   company's stock price.   To invoke this exception to the rule that all public information is

17   incorporated into a company's stock price in an efficient market, "a plaintiff must plead with

18   particularly facts plausibly explaining why the information was not yet reflected in the company's

19   stock price."  *Ferraro Family v. Corcept Therap.*, 2021 WL 3748325, at *26 (N.D. Cal. Aug. 24,

20   2021).  Plaintiffs here have not done so; the Amended Complaint does not contain a single allegation

21   that investors would not have been able to interpret legal rights and obligations under a merger

22   agreement.  Moreover, even accepting Plaintiffs' new (Opp. 12) *complex merger agreement* theory,

23   "[Plaintiffs] need[] to allege particular facts plausibly suggesting that other market participants had

24   not done the same analysis." *Id.*  They do not, nor can they.  *See* Op. Br. 3, 5, 9; Op. Br. Exs. 9 at 3

25   and 11.

26   Defendant is not "talking out of both sides of his mouth" (Opp. 11), it is Plaintiffs that are

27   simultaneously asking (Opp. 10-11) the Court to accept their allegations as true and to accept that

28   they also might be wrong (because Defendant might be right that he was entitled to the bot data as

DEFENDANT ELON R. MUSK'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

1   information necessary for closing).  Defendant is, as he must, accepting Plaintiff's allegations as

2   true—that is not "talking out of both sides of his mouth" (Opp. 11) it is holding Plaintiffs to their

3   pleading burden under the PSLRA and the federal rules.[2]

4        Finally, Plaintiffs misrepresent (Opp. 12-13) the truth-on-the-market defense.  Where, as

5   here, the truth was pre-existing in the market (which it was, if Plaintiffs' allegations are accepted as

6   true), the alleged stock price drop could not have been due to a misconception of that truth.  And it

7   is not Defendant's burden to explain why the stock price dropped after his statements, it is Plaintiff's

8   burden to prove the market was misled.  *See Metzler Inv. v. Corinthian Colleges*, 540 F.3d 1049,

9   1062 (9th Cir. 2008) ("A plaintiff's complaint must . . . alleg[e] . . . that the drop in defendant's

10  stock price was causally related to the defendant's financial misstatement[s].'").  Because the truth

11  was already known, the market *could not* have been misled and Plaintiffs fail to state a securities

12  fraud claim.[3]

13      **D.      Plaintiffs Also Fail To Plead Scienter And Loss Causation Because Either The
                 Truth Was Contemporaneously Known Or It Became Known Long Before**
14               **October 2022.**

15          **1.      Plaintiffs' Argument That The Merger Agreement Is Unclear Negates
                     Scienter**
16

17      Plaintiffs now seek (Opp. 5, 10-11) to back away from the pleadings they pushed to

18  overcome Defendant's motion to dismiss and to instead rely on *Defendant's position* that the Merger

19  Agreement could be interpreted to provide Defendant the right to the bot data he requested.  But

20  Defendant's argument was rejected by this Court.  (MTD Op. 10.)  Plaintiffs cannot have it both

21  ways—they prevailed past the motion to dismiss on the assumption of truth afforded to their

22  allegation that the Merger Agreement clearly does not provide access to bot data.  If, instead,

23  Defendant's position is to be credited at this stage because "he and his team of lawyers vehemently

24

25  [2]   Plaintiffs also reference Defendant's popularity (Opp. 10) but cite no legal theory under which
26  that would alter the market's ability to incorporate Twitter's legal rights and obligations contained
    in the Merger Agreement.

27  [3]   That said, there are a myriad of non-fraud reasons for the stock drop and for its subsequent
28  recovery.  *See, e.g.*, Op. Br. 3-4; Op. Br. Ex. 10.

and vigorously" believed that the Merger Agreement did provide the right to bot data (Opp. 10), then Plaintiffs fail to adequately plead that Defendant intended to mislead or that he was objectively wrong. *See supra* 8.

Plaintiffs' only response (Opp. 13) to the conundrum created by their own pleadings is that Defendant was more knowledgeable about the Merger Agreement than the "average investor." In other words, Defendant knew the true interpretation of the—now apparently unclear—Merger Agreement. But Plaintiffs do not point to even a single Merger Agreement fact uniquely in Defendant's knowledge. Nor do they explain how their lawyers, a Bloomberg columnist, a Wells Fargo expert, and others could have become aware of facts uniquely in Defendant's possession. And, if the Merger Agreement was indeed ambiguous—as Plaintiffs are now forced to argue (Opp. 10) in a last-ditch attempt to evade dismissal—it would hardly be deliberately reckless for Defendant to believe the contract interpretation that a "team of lawyers" (Opp. 10) pursued in litigation. *Zucco Partners v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (holding that deliberate recklessness is "extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."). Indeed, Plaintiffs do not even attempt to explain (and they certainly do not plead) why it would be reckless for Defendant to believe he was entitled to the bot data he requested in light of Plaintiffs' newfound views regarding the lack of clarity in the Merger Agreement.

### 2. Defendant's Statements About Pausing The Deal Could Not Have Caused Loss.

Plaintiffs make no serious attempt to refute Defendant's showing (Op. Br. 12-13) that, to the extent there was any ambiguity regarding Defendant's statements, such ambiguity was cured prior to the alleged "corrective disclosure," thereby defeating loss causation. Plaintiffs do not, for example, point to any information concerning the Merger Agreement that was not revealed prior to the alleged "corrective disclosure." Instead, Plaintiffs attempt (Opp. 13-14) to shift the burden of proving loss causation to Defendant. Specifically, Plaintiffs argue (Opp. 12-13) that Defendants must prove that Twitter's stock price increased upon the information that cured any potential ambiguity in order to show that the information was reflected in Twitter's stock price. But the

1   "unrefuted evidence that the alleged corrective disclosure was 'already reflected in the stock's price'

2   during the class period" (Opp. 13) is inherent in Plaintiffs' efficient market theory (Am. Compl.

3   182). Under Plaintiffs' efficient market theory, all information available to the market, including

4   the "true legal rights and obligations . . . under the Merger Agreement" (Opp. 9 n.3) and including

5   market analysts' reports regarding those rights, was known and reflected in the stock's price. *See*

6   *supra* 6-7.

7          Plaintiffs "cannot contend that the market is efficient for purposes of reliance and then cast

8   the theory aside when it no longer suits their needs for purposes of loss causation. Either the market

9   is efficient or it is not." *Meyer v. Greene*, 710 F.3d 1189, 1198–99 (11th Cir. 2013) ("The efficient

10  market theory, however, is a Delphic sword: it cuts both ways."). Simply put, "Plaintiffs may not

11  at the same time presume an efficient market to prove reliance and an inefficient market to prove

12  loss causation. They may not have their cake and eat it too." *Bricklayers & Trowel v. Credit Suisse*,

13  853 F. Supp. 2d 181, 190 (D. Mass. 2012), *aff'd,* 752 F.3d 82 (1st Cir. 2014).

14                 **3.     Defendant's May 16 and 17 Statements About Percentage Of Spam
                           Accounts Could Not Have Been Misleading Or Made With Scienter**
15                         **Because He Disclosed The Basis Of His Statement.**

16         Although Plaintiffs challenge (Opp. 13) the accuracy of a statement Defendant made at the

17  All-In Summit (MTD Op. 7-8, 22-24), Plaintiffs now claim that the Court should ignore the full

18  context of the statement. But it is black-letter securities law that courts must assess the ***entire***

19  ***statement*** referenced in a pleading. *Mulligan v. Impax Labs.*, 36 F. Supp. 3d 942, 961 (N.D. Cal.

20  2014) ("The Court must view allegedly false statements 'in full and in context at the time it was

21  made.'" (quoting *In re Syntex Corp. Secs. Litig.,* 95 F.3d 922, 929 (9th Cir. 1996))); *Guangyi Xu v.*

22  *ChinaCache Int'l*, 2017 WL 114401, at *5 (C.D. Cal. Jan. 9, 2017) ("A court evaluates defendants'

23  alleged false statements in the context in which they were made, especially in regard to

24  contemporaneous qualifying or clarifying language."). Defendant's *full* statement leaves no

25  question that his estimate regarding the number of bots was *not* based on data he received from

26  Twitter, contrary to the theory Plaintiffs have advanced here (MTD Op. 21, 22). Indeed, Defendant

27  explicitly disclosed that he tried "calling people" at Twitter, but had not "got[ten] a response." (Op.

28  Br. Ex. 12 at 1.) Thus, Defendant explained, his estimate was based on "outside firms [that] have

done analysis of Twitter and looked at the sort of daily users."  (Op. Br. Ex. 12 at 2.)  Plaintiffs, notably, do not dispute that such studies were public at the time.  Instead, Plaintiffs argue (Opp. 14) that this should be judged as a "materiality" or "truth on the market" defense, but it is none of those—taken in its full context, the statement is simply not misleading.  *See* Op. Br. 13-15.

Moreover, even assuming Defendant's statement regarding the number of bots on Twitter could be misleading, it is absurd to suggest that Defendant intended to mislead investors into believing he was basing his statement on information Twitter provided him at the same time that he also disclosed the information did not come from Twitter.  *See* Op. Br. 13-14; *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 818 (N.D. Cal. 2019) ("The disclosure of the FTC investigation . . . undermines the inference that Defendants acted with scienter to conceal FTC violations.").  Plaintiffs did not respond to this argument and therefore waived any response.[4]

### 4.  Defendant's May 16 and May 17 Statements About Percentage Of Spam Accounts Could Not Have Caused Investor Losses.

Finally, Plaintiffs' "sophistry" argument (Opp. 15) is confusing and irreconcilable with its pleadings.  Their reference (Opp. 15) to the termination letter as a source of misstatements is misplaced after this Court's order granting Defendant's motion to dismiss those allegations.  (MTD Op. 27-28.)  Beyond that, Plaintiffs appear (Opp. 15) to misunderstand or misconstrue Defendant's argument (Op. Br. 15) that "on July 8, 2022 . . . Plaintiffs were aware that Twitter had refused to provide the bot data."  Whether or not "Twitter turned over some information to Musk" (Opp. 15), as Plaintiffs now assert, the July 8, 2022 letter was clear on the only relevant point:  that Twitter was refusing to provide the bot data.  *See* MTD Op. 10 ("Defendant also refuted Twitter's characterization of [the information rights in] Sections 6.4 and 6.11 of the Merger Agreement.");  Am. Compl. Ex. A at 5 (following a list of information Twitter refused to provide with the assertion that "Twitter has not provided information that Mr. Musk has requested for nearly two months").  And Plaintiffs' assertion (Opp. 15) that "it was anybody's guess" what information Twitter refused

---

[4]  Plaintiffs similarly waived any response to Defendants' argument that "[b]ecause . . . the May 13, 2022 Tweet was not capable of misleading . . . the May 16 and 17, 2022 statements could not have misled."  (Op. Br. 13.)

1   to provide is belied by the eight-page July 8, 2022 letter, attached in full as Exhibit A to the Amended

2   Complaint and listing in five numbered paragraphs spanning two pages exactly what information

3   Twitter was asked for, what it provided, and what it refused to provide (Am. Compl. Ex. A at 3-4).

4   Finally, if any doubt was left as to Twitter's position, it could not have lasted long: "The next day,

5   Twitter sued Defendant in Delaware Chancery Court" (MTD Op. 10).

6       Absent a coherent opposition, Defendant's argument that Twitter's position was known at

7   least by July 8, 2022 (Op. Br. 15) should be deemed conceded and judgment on the pleadings entered

8   for Defendant because Plaintiffs fail to plead loss causation (Op. Br. 15).

9       Finally, Plaintiffs argue that this Court upheld a direct causal relationship theory (Opp. 14)

10  but do not dispute that *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336, 342 & 346 (2005) renders

11  that theory untenable as they would have it applied here.  *See* Op. Br. 15.  That argument too is

12  conceded and judgment should be entered for Defendant because Plaintiffs fail to plead loss

13  causation.  *See* Op. Br. 15.

14                          **<u>CONCLUSION</u>**

15      Defendant respectfully requests that the Court grant his Motion for Judgment on the

16  Pleadings and dismiss Plaintiffs' Amended Complaint with prejudice.

17

18  DATED:  April 16, 2024                QUINN EMANUEL URQUHART &
                                          SULLIVAN, LLP

19

20                              By   */s/ Michael T. Lifrak*
                                     _____
21                                   Alex Spiro
                                     Michael T. Lifrak
22                                   Joseph C. Sarles
                                     Jesse A. Bernstein
23                                   Alex Bergjans
                                     Jonathan E. Feder
24

25                                   *Attorneys for Elon Musk*

26

27

28

DEFENDANT ELON R. MUSK'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on this the 16th day of April, 2024.

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By  /s/ Alex Bergjans
    Alex Spiro
    Michael T. Lifrak
    Joseph C. Sarles
    Jesse A. Bernstein
    Alex Bergjans
    Jonathan E. Feder

    *Attorneys for Elon Musk*

1

## **ATTESTATION**

2          Pursuant to Civil L.R. 5-1,  I attest under penalty of perjury that concurrence in the filing

3     of this document has been obtained from the other signatory herein.

4

5                                                    By */s/ Alex Bergjans*
                                                     Alex Spiro
6                                                    Michael T. Lifrak
                                                     Joseph C. Sarles
7                                                    Alex Bergjans
                                                     Jonathan E. Feder
8
9                                                    *Attorneys for Defendant Elon Musk*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28