**COTCHETT, PITRE & McCARTHY, LLP**
Joseph W. Cotchett (SBN 36324)
*jcotchett@cpmlegal.com*
Mark C. Molumphy (SBN 168009)
*mmolumphy@cpmlegal.com*
Tyson C. Redenbarger (SBN 294424)
*tredenbarger@cpmlegal.com*
Gia Jung (SBN 340160)
*gjung@cpmlegal.com*
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
*fbottini@bottinilaw.com*
Albert Y. Chang (SBN 296065)
*achang@bottinilaw.com*
Aaron P. Arnzen (SBN 218272)
*aarnzen@bottinilaw.com*
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002

*Lead Counsel for Lead Plaintiffs Steve Garrett, Nancy Price,*
*John Garrett, Brian Belgrave and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **GIUSEPPE PAMPENA, individually and on behalf of all others similarly situated,** | CASE NO.: 22-cv-05937-CRB |
| Plaintiff, | **PLAINTIFF'S NOTICE OF MOTION AND MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| vs. | |
| **ELON MUSK,** | |
| Defendant. | Date: August 2, 2024 |
| | Time: 10:00 a.m. |
| | Courtroom: 6, 17th Floor |
| | Judge: Honorable Charles R. Breyer |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF CONTENTS</u>

**Page**

NOTICE OF MOTION AND MOTION ...................................................................v

MEMORANDUM OF POINTS AND AUTHORITIES.....................................1

I.    STATEMENT OF ISSUES TO BE DECIDED ..........................................1

II.   SUMMARY OF ARGUMENT .....................................................................1

III.  STATEMENT OF FACTS AND PROCEDURAL HISTORY ................2

IV.  THE PROPOSED CLASS REPRESENTATIVES ..................................4

V.   ARGUMENT .................................................................................................5

     A.    THE STANDARDS FOR CLASS CERTIFICATION .............................5

     B.    THIS CASE MEETS THE REQUIREMENTS OF RULE 23(A)..........................6

          1.    The Class Is Sufficiently Numerous ..........................................6

          2.    Questions of Law and Fact Are Common to the Class.......................6

          3.    Plaintiffs' Claims are Typical of the Class ........................................7

          4.    Plaintiffs Will Fairly and Adequately Protect the Interests of the Class ..........8

     C.    THE PROPOSED CLASS MEETS THE REQUIREMENTS OF RULE 23(B)(3)........................10

          1.    Common Questions of Law and Fact Predominate .........................10

          2.    Class Members' Reliance on Defendants' Fraudulent Misrepresentations and Omissions Is Presumed ..................................................11

               a.    Twitter's Average Trading Volume Provides Strong Indicia of Market Efficiency ..........................................12

               b.    Analyst Coverage of Twitter Provides Strong Indicia of Market Efficiency ..........................................13

               c.    Market Makers Provide Strong Indicia of Market Efficiency ...............13

               d.    Twitter's Eligibility to File Forms S-3 Registration Statements Provide Strong Indicia of Market Efficiency ..........................................14

e.    Twitter's Price Reaction to New Material Information Demonstrates
        Market Efficiency ....................................................................................14

3.    Twitter Will Be Unable to Rebut the Presumption of Reliance with Evidence
        of the Absence of Price Impact.............................................................16

4.    The Event Study Methodology Is Capable of Measuring Damages on a Class-
        wide Basis ................................................................................................17

5.    A Class Action Is Superior to Other Available Methods for the Efficient
        Adjudication of This Case .......................................................................18

VI.    CONCLUSION ...................................................................................................**19**

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**CASES**

4

*Affiliated Ute Citizens v. United States*
  406 U.S. 128 (1972)...................................................................................15

*Amchem Prods., Inc. v. Windsor*
  521 U.S. 591 (1997)...........................................................................5, 10, 11

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*
  568 U.S. 455 (2013)......................................................................5, 10, 11, 17

*Armstrong v. Davis*
  275 F.3d 849 (9th Cir. 2001) ..........................................................................7

*Basic Inc. v. Levinson*
  485 U.S. 224 (1988)..............................................................................10, 11, 16

*Brown v. China Integrated Energy, Inc.*
  2015 WL 12720322 (C.D. Cal. Feb. 17, 2015)..............................................13

*Cammer v. Bloom*
  711 F. Supp. 1264 (D.N.J. 1989) .........................................................12, 13, 14

*City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*
  270 F.R.D. 247 (D.S.C. 2010) ......................................................................13

*City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*
  2018 U.S. Dist. LEXIS 175573 (N.D. Cal. 2018) .......................................8, 17

*Conn. Ret. Plans & Tr. Funds v. Amgen Inc.*
  660 F.3d 1170 (9th Cir. 2011) ........................................................................5

*Di Donato v. INSYS Therapeutics, Inc.*
  333 F.R.D. 427 (D. Ariz. 2019) .............................................................12, 14, 15

*Dickey v. Advanced Micro Devices, Inc.*
  2019 U.S. Dist. LEXIS 8740 (N.D. Cal. Jan. 17, 2019) ................................7

*Erica P. John Fund, Inc. v. Halliburton Co.*
  563 U.S. 804 (2011) ..............................................................................8, 11, 16

*Escott v. Barchris Constr. Corp.*
  340 F.2d 731 (2d Cir. 1965)...........................................................................18

*Green v. Wolf Corp.*
  406 F.2d 291 (2d Cir. 1968)...........................................................................18

*Halliburton Co. v. Erica P. John Fund, Inc.*
  573 U.S. 258 (2014) .......................................................................11, 16, 17

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Hanlon v. Chrysler Corp.*
   150 F.3d 1011 (9th Cir. 1998) ..........................................................................6, 7

*Hanon v. Dataproducts Corp.*
   976 F.2d 497 (9th Cir. 1992) ...............................................................................8

*Hatamian v. Advanced Micro Devices, Inc.*
   2016 U.S. Dist. LEXIS 34150 (N.D. Cal. 2016) ...........................................6, 16

*In re Apple Inc. Sec. Litig.*
   2023 U.S. Dist. LEXIS 58603 (N.D. Cal. Mar. 28, 2023).....................................15

*In re Banc of Cal. Sec. Litig.*
   326 F.R.D. 640 (C.D. Cal. 2018) ...................................................................11, 17

*In re Cooper Cos. Sec. Litig.*
   254 F.R.D. 628 (C.D. Cal. 2009) .....................................................................2, 6

*In re Countrywide Fin. Corp. Sec. Litig.*
   273 F.R.D. 586 (C.D. Cal. 2009) .......................................................................13

*In re Diamond Foods, Inc., Sec. Litig.*
   295 F.R.D. 240 (N.D. Cal. 2013)...............................................................5, 14, 17

*In re Dynex Corp., Inc. Sec. Litig.*
   2011 WL 781215 (S.D.N.Y. Mar. 7, 2011) ........................................................13

*In re Fibrogen, Inc.*
   2024 U.S. Dist. LEXIS 25384 (N.D. Cal. Feb. 13, 2024) ...................................15

*In re LendingClub Sec. Litig.*
   282 F. Supp. 3d 1171 (N.D. Cal. 2017) ...............................................6, 8, 9, 17

*In re LTV Sec. Litig.*
   88 F.R.D. 134 (N.D. Tex. 1980) .........................................................................12

*In re Merck & Co., Sec. Derivative & ERISA Litig.*
   2013 U.S. Dist. LEXIS 13511 (D.N.J. Jan. 30, 2013) ........................................15

*In re NYSE Specialists Sec. Litig.*
   260 F.R.D. 55 (S.D.N.Y. 2009)........................................................................2, 18

*In re Petrobras Sec. Litig.*
   312 F.R.D. 354 (S.D.N.Y. 2016) ........................................................................10

*In re SanDisk LLC Sec. Litig.*
   2018 U.S. Dist. LEXIS 157177 (N.D. Cal. Sept. 4, 2018) .................................17

*In re Scientific-Atlanta, Inc. Sec. Litig.*
   571 F. Supp. 2d 1315 (N.D. Ga. 2007) ..............................................................15

*In re Silver Wheaton Corp. Sec. Litig.*
   2017 WL 2039171 (C.D. Cal. May 11, 2017) ......................................................8

*In re Smith Barney Transfer Agent Litig.*
    290 F.R.D. 42 (S.D.N.Y. 2013) ................................................................................16

*In re Twitter Inc. Sec. Litig.*
    326 F.R.D. 619 (N.D. Cal. 2018) ...............................................................................7

*Kennedy v. Tallant*
    710 F.2d 711 (11th Cir. 1983) ..................................................................................18

*Krogman v. Sterritt*
    202 F.R.D. 467 (N.D. Tex. 2001) .......................................................................13, 14

*Luna v. Marvell Tech. Grp., Ltd.*
    2017 WL 4865559 (N.D. Cal. Oct. 27, 2017) ..........................................................6, 7

*Parra v. Bashas', Inc.*
    536 F.3d 975 (9th Cir. 2008) ......................................................................................6

*Rodriguez v. Hayes*
    591 F.3d 1105 (9th Cir. 2010) ....................................................................................8

*Rougier v. Applied Optoelectronics, Inc.*
    2019 U.S. Dist. LEXIS 198919 (S.D. Tex. Nov. 13, 2019)........................................15

*SEB Inv. Mgmt. AB v. Symantec Corp.*
    335 F.R.D. 276 (N.D. Cal. 2020)......................................................................6, 16, 17

*Tyson Foods, Inc. v. Bouaphakeo*
    577 U.S. 442 (2016) ..................................................................................................10

*Villanueva v. Liberty Acquisitions Servicing, LLC*
    319 F.R.D. 307 (D. Or. 2017)....................................................................................10

*Vinh Nguyen v. Radient Pharm. Corp.*
    287 F.R.D. 563 (C.D. Cal. 2012)...............................................................................13

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*
    325 F.R.D. 280 (D. Minn. 2018)................................................................................16

*Waggoner v. Barclays PLC*
    875 F.3d 79 (2d Cir. 2017).................................................................................14, 16

*Wang v. Chinese Daily News, Inc.*
    737 F.3d 538 (9th Cir. 2013) .....................................................................................10

*Wong v. Arlo Techs.*
    2021 U.S. Dist. LEXIS 58514 (N.D. Cal. Mar. 25, 2021)...........................................8

**RULES**

17 C.F.R. §240.10b-5...........................................................................................................1

Fed. R. Civ. P. 23 ................................................................................................... passim

## NOTICE OF MOTION AND MOTION

TO:     ALL PARTIES AND THEIR COUNSEL OF RECORD

PLEASE TAKE NOTICE that on August 2, 2024, at 10:00 a.m., before the Honorable Charles R. Breyer, United States District Judge, at the United States District Court, Northern District of California, Courtroom 6 – 17th Floor, 450 Golden Gate Avenue, San Francisco, California, 94102, Lead Plaintiffs Steve Garrett, Nancy Price, John Garrett, and Brian Belgrave ("Plaintiffs") will bring this Motion pursuant to Federal Rule of Civil Procedure 23 for class certification, appointment of class representatives and appointment of class counsel.  This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities in Support Thereof, the Declaration of Mark C. Molumphy ("Molumphy Decl."), the Report on Market Efficiency of David I. Tabak, Ph.D. ("Tabak Report") attached as Exhibit 1 to the Molumphy Decl., the Joint Declaration of Steve Garrett, Nancy Price, John Garrett, Brian Belgrave (*see* Dkt. No. 8-5.), the [Proposed] Order filed herewith, and any additional materials and arguments that may be submitted by Plaintiffs in further support of this Motion, the pleadings and filings herein and such other evidence, written or oral, as may be presented.

Dated:  May 24, 2024

Respectfully submitted,

**COTCHETT, PITRE & McCARTHY, LLP**
Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
Tyson C. Redenbarger (SBN 294424)
Gia Jung (SBN 340160)

  */s/ Mark C. Molumphy*
      MARK C. MOLUMPHY

San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000

**BOTTINI &BOTTINI, INC**.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Aaron P. Arnzen (SBN 218272)

 *Francis A. Bottini, Jr.*
FRANCIS A. BOTTINI, JR.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002

*Attorneys for Lead Plaintiffs Steve Garrett, Nancy Price, John Garrett, Brian Belgrave and the Proposed Class*

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   STATEMENT OF ISSUES TO BE DECIDED

1. Should the Court Certify the Class as defined herein?

2. Should the Court appoint Plaintiffs as Class Representatives?

3. Should the Court appoint Cotchett Pitre & McCarthy LLP and Bottini & Bottini, Inc. as Class Counsel?

### II.   SUMMARY OF ARGUMENT

Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), Plaintiffs hereby move the Court for certification of a class of sellers of Twitter securities (the "Class") to pursue claims under §10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, against Defendant Elon Musk.  The Class that Plaintiffs seek to be certified is defined as:

> All persons and entities who sold the publicly traded stock or call options, or purchased the put options, of Twitter, Inc. during the period from May 13, 2022 through October 4, 2022, both dates inclusive (the "Class Period"), and who suffered damages by Defendant's alleged violations of §10(b) and of the Exchange Act.[1]

Plaintiffs also respectfully move this Court for an order appointing Plaintiffs as Class Representatives and, pursuant to Fed. R. Civ. P. 23(g), appointing Cotchett Pitre & McCarthy LLP and Bottini & Bottini, Inc. as Class Counsel.

This case is perfectly suited for class certification.   First, the Class is numerous as Twitter had approximately 796 million shares outstanding during the Class Period, and on average, more than 60.6 million Twitter shares traded weekly throughout the Class Period.  Second, the questions of law and fact are common to the Class—*i.e*, did Musk issue false and misleading statements that caused Class Members to sell their shares and suffer damages?  Third, the Class Representatives' claims—that

---

[1] Excluded from the Class are Defendant Musk, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendant has or had a controlling interest.  *See* First Amended Complaint, Dkt. No. 31, ¶176.

Musk violated the Exchange Act—and the defenses to those claims, are typical.  Fourth, the Class Representatives and Class Counsel have, and will continue to, fairly and adequately protect the interests of the Class.  Fifth, the questions of law and fact in this case predominate over any individual questions, and a class action is obviously superior to other available methods for fairly and efficiently adjudicating the controversy.  *See* Fed. R. Civ. P. 23(a), 23(b)(3).

Indeed "'[c]ourts have long recognized that [c]lass actions are a particularly appropriate and desirable means to resolve claims based on the securities laws'" and "securities cases 'easily satisfy the superiority requirement of Rule 23.'"  *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 80 (S.D.N.Y. 2009) (alterations in original); *see In re Cooper Cos. Sec. Litig.*, 254 F.R.D. 628, 632 (C.D. Cal. 2009) ("As the Ninth Circuit has so aptly stated, securities fraud cases fit Rule 23 'like a glove.'"). This case is no different; a class action is superior to any other method of resolving the claims at issue and the Court should, therefore, certify the Class, appoint Plaintiffs as Class Representatives, and pursuant appoint Cotchett Pitre & McCarthy LLP and Bottini & Bottini, Inc. as Class Counsel.

## III.   STATEMENT OF FACTS AND PROCEDURAL HISTORY

This action was filed on October 10, 2022. Dkt. No. 1.  By Order dated April 24, 2023, the Court appointed Plaintiffs as the Lead Plaintiffs pursuant to the PSLRA and appointed Cotchett Pitre & McCarthy LLP and Bottini & Bottini, Inc. as Lead Counsel for Plaintiffs.  Dkt. No. 30.   Plaintiffs filed the operative First Amended Complaint ("FAC") on June 8, 2023. Dkt. No. 31.  Defendant Musk filed a motion to dismiss the FAC on July 10, 2023. Dkt. No. 34.  The Court granted in part and denied in part Defendant's motion to dismiss by order dated December 11, 2023.  Dkt. No. 48.  Plaintiffs have not yet received any discovery in the case.

The FAC alleges that on April 13, 2022, Musk made an offer to buy Twitter at $54.20 per share.  ¶76.[2]  On April 21, 2022, Musk confirmed he had waived due diligence when he filed an Amended Schedule 13D which stated that his acquisition proposal was no longer subject to the completion of financing and business due diligence.  ¶82.

On April 25, 2022, Twitter agreed to be acquired by Musk, in a transaction valued at

---

[2] All "¶_" citations refer to Plaintiffs' First Amended Complaint, Dkt. No. 31.

approximately $44 billion.  ¶85.  However, soon thereafter, the stock market declined and Tesla stock, which Musk had pledged as collateral, began to decline.  ¶25.  Musk was therefore at risk of a margin call or a requirement to put up more cash.  ¶26.  Faced with these significant risks, which amounted to billions of dollars, Musk proceeded to make false statements, send misleading tweets, and engage in conduct designed to create unfounded uncertainty and drive Twitter's stock down.  ¶26.  Musk did this to create leverage to try to either back out of the purchase or renegotiate the buyout price.  ¶26.

For example, on May 13, 2022, Musk tweeted a statement that the buyout was "***temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users.***"  ¶111.  This statement was false as there was no legal or factual basis to put the deal on hold.  ¶112.  In response to this tweet, Twitter's stock price dropped substantially, falling 9.67% from the previous day's close of $45.08 on an extraordinarily high volume of 101.62 million shares to close at $40.72.  On the next trading day, the stock declined another 8.18%, resulting in a combined decline of 17.85% over two trading days.  ¶113.

On May 16, 2022, to create further doubt about the Merger, Musk stated that ***fake and spam accounts make up at least 20% of Twitter's users***.  ¶120.  The statements caused Twitter's stock to decline 8.18% to close at $37.39 on volume of 52.2 million shares.  ¶124.  On May 17, 2022, Musk tweeted that ***the actual number of fake accounts at Twitter could be "much higher" than 20% and that the deal "cannot go forward."***  ¶125.  The same day, Twitter caused Musk's tweet to be filed with the SEC on Schedule 14A as a supplemental proxy solicitation.  That filing stated that "X Holdings I, Inc., X Holdings II, Inc. and Elon Musk, the filing persons hereunder, may also be deemed to be participants in the solicitation of proxies from Twitter's stockholders in connection with the Transaction."  ¶126.  Also on May 17, 2022, Musk invited the SEC to investigate Twitter.  ¶127.

On May 21, 2022, Musk stated, ***"I'm worried that Twitter has a disincentive to reduce spam"*** and that ***"they [Twitter] still refuse to explain how they calculate that 5% of daily users are fake/spam! Very suspicious."***  ¶130.  Twitter's stock declined by 6.67%, closing at $35.76.  ¶131.

On July 8, 2022, Musk issued a statement that he was terminating the Merger.  ¶140.  In his announcement, Musk falsely, and baselessly, stated that Twitter had breached several provisions of

the Merger Agreement, that "***Twitter has not complied with its contractual obligations***," and that ***the information "is necessary to consummate the transactions contemplated by the Merger Agreement because it is needed to ensure Twitter's satisfaction of the conditions to closing***." ¶140.  The letter caused Twitter stock to drop 11.3% from $38.79 on July 7, 20,22 to $32.65 on Monday, July 11, 2022, on an unusually heavy volume of over 67 million shares traded.  ¶142.

On July 12, 2022, Twitter sued Musk in Delaware Chancery Court seeking specific performance.  ¶143.  On August 29, 2022 and September 9, 2022**,** Musk sent two more termination letters to Twitter that contained false statements.  ¶¶144, 147.

On September 13, 2022, Twitter's stockholders met and approved the buyout.  ¶150.  On October 4, 2022, two weeks before the Delaware trial was set to begin, Musk shocked the market by announcing that he intended to go through with the Merger at the initial price of $54.20.  ¶151.

On April 12, 2023, in an interview with the BBC, Musk admitted that he made false statements about the Merger to drive Twitter's stock down because he did not want to pay the price he had agreed to (¶10) and that he agreed to complete the buyout at the full $54.20 price in order to avoid the trial in Delaware because he knew he was going to lose.  ¶166.

## IV.    THE PROPOSED CLASS REPRESENTATIVES

On April 24, 2023, Plaintiffs Steve Garrett, Nancy Price, John Garrett, and Brian Belgrave were appointed Lead Plaintiffs under the Private Securities Litigation Reform Act of 1995.  Dkt. No. 30.  Plaintiffs are individual investors who suffered large financial losses from selling Twitter stock at artificially depressed prices during the Class Period.  As they attested to at the Lead Plaintiff stage, each of the Plaintiffs has substantial experience in finance and investments:

- Brian Belgrave holds a bachelor's degree in accounting from the University of Oregon.  A business owner, Mr. Belgrave has decades of experience in investing in the stock market.

- Steve Garrett is a commercial pilot with over 35 years of experience investing in the stock market.

- John Garrett has over 50 years of experience in investing in the stock market.

- Nancy Price (John Garrett's domestic partner of over 30 years) also has years of experience investing with Mr. Garrett in the stock market.

*See* Plaintiffs' Joint Declaration, Dkt. Nos. 8-5.  Plaintiffs collectively sold 28,389 shares of Twitter common stock during the Class Period at artificially deflated prices and suffered losses of over $558,000.  *See* Dkt. No. 8-4.  Plaintiffs have vigorously pursued the claims in this litigation on behalf of the putative Class and will continue to do so.

## V.   ARGUMENT

### A.   The Standards for Class Certification

To certify a class action under Rule 23, the Court must find, by a preponderance of the evidence, that the prerequisites under Rule 23(a), as well as one requirement under Rule 23(b)—here, Rule 23(b)(3)—are satisfied.  *See* Fed. R. Civ. P. 23; *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615 (1997).  Under Rule 23(a), a court may certify a class if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  Rule 23(b)(3) requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

The inquiry at the class certification stage is not concerned with whether the plaintiff will ultimately prevail on the merits, but rather the requirements of Rule 23.  *See Conn. Ret. Plans & Tr. Funds v. Amgen Inc*., 660 F.3d 1170, 1175 (9th Cir. 2011), aff'd, 568 U.S. 455 (2013).  Questions regarding the merits "'may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'"  *In re Diamond Foods, Inc., Sec. Litig*., 295 F.R.D. 240, 245 (N.D. Cal. 2013) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Fund*s, 568 U.S. 455, 466 (2013)).

For the reasons set forth herein, the requirements of Rule 23(a) and (b)(3) are satisfied because the Class of sellers of Twitter securities (common stock and options) is sufficiently numerous,

Plaintiffs are more than adequate representatives and their claims are common to the Class, proposed Class Counsel is well-qualified, common questions of law and fact predominate and a class action is superior to alternative methods for fair and efficient adjudication.

## B.   This Case Meets the Requirements of Rule 23(a)

### 1.   The Class Is Sufficiently Numerous

In the Ninth Circuit, courts routinely hold that numerosity is satisfied when the class contains 40 members.  *See Hatamian v. Advanced Micro Devices, Inc.,* 2016 U.S. Dist. LEXIS 34150, at *11 (N.D. Cal. 2016); *In re Cooper Cos. Sec. Litig.*, 254 F.R.D. 628, 634 (C.D. Cal. 2009).  This low threshold is readily cleared in securities cases where the defendant company has millions of shares of stock outstanding or traded during the class period. *See SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 283 (N.D. Cal. 2020) (600,000 shares outstanding); *Hatamian*, 2016 U.S. Dist. LEXIS 34150, at *11 (700 million shares outstanding); *Cooper*, 254 F.R.D. at 634 (36 million shares outstanding).

Here, Twitter shares were traded on the NYSE during the Class Period and the Company had approximately <u>796 million shares</u> outstanding shortly before the start of the Class Period.[3]  Over 1,100 institutions owned over 537 million Twitter shares as of March 31, 2022, the last calendar quarter-end before the start of the Class Period.  Tabak Report, ¶24.  On average, more than 60.6 million Twitter shares traded weekly throughout the Class Period.  *Id.*, ¶17.  From these facts, it is readily apparent that there are thousands of members of the Class—far more than needed to satisfy the numerosity requirement.  *See Luna v. Marvell Tech. Grp., Ltd*., 2017 WL 4865559, at *6 (N.D. Cal. Oct. 27, 2017) (500 million shares traded during the class period satisfies numerosity).

### 2.   Questions of Law and Fact Are Common to the Class

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Commonality does not mandate that all class members make identical claims and arguments.  *See In re LendingClub Sec. Litig.*, 282 F. Supp. 3d 1171, 1179 (N.D. Cal. 2017).  "'So long as there is even a single common question, a would-be class can satisfy the commonality

---

[3] *See* Twitter Form 10-K filed Feb.16, 2022 at p. 61.

requirement of Rule 23(a)(2).'"  *Id.*; *see also Parra v. Bashas', Inc.*, 536 F.3d 975, 978 (9th Cir. 2008) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)).

Virtually all of the questions of law or fact at issue are common between Plaintiffs and all others in the proposed Class, including, for example: (i) whether Musk's May 13, 2022 tweet that "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users" contained material misrepresentations and omissions concerning the status of the Merger and the Parties' obligations under the Merger Agreement; (ii) whether Musk's May 16, 2022 statements that fake and spam accounts made up at least 20% of Twitter's users were false and misleading; (iii) whether Defendant's May 17, 2022 tweet that the number of fake accounts on Twitter could be "much higher" than 20% and that the deal "cannot move forward" were false and misleading; (iv) whether the alleged misrepresentations and omissions were material and were made with scienter; and (v) whether Defendant's misrepresentations and omissions caused Class members' damages.  *See e.g.*, 17 C.F.R. §240.10b-5.  Each of these is a common question, which class-wide proceedings will "'generate common answers apt to drive resolution of the litigation.'"  *Dickey v. Advanced Micro Devices, Inc.*, 2019 U.S. Dist. LEXIS 8740, at *7 (N.D. Cal. Jan. 17, 2019) (emphasis in original); *see also In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 619, 626 (N.D. Cal. 2018) (finding commonality satisfied where "'investors were [allegedly] defrauded by the same misleading statements over the same period of time, and suffered similar losses as a result'") (quoting *Luna*, 2017 WL 4865559, at *2).

Because absent class members would have to prove nearly identical facts and address nearly identical legal issues if they pursued their claims individually, the proposed Class satisfies the commonality requirement of Rule 23(a)(2).

### 3.     Plaintiffs' Claims are Typical of the Class

Rule 23(a)(3) requires a showing that "the claims or defenses of the representative parties are typical of the claims and defenses of the class." Fed. R. Civ. P. 23(a)(3).  That standard is "permissive" and class members' claims "need not be substantially identical."  *Hanlon*, 150 F.3d at 1020; *see also Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001).  "'The test of typicality is whether other

members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Dickey*, 2019 U.S. Dist. LEXIS 8740, at * 9 (quoting *Hanon v. Dataproducts Corp*., 976 F.2d 497, 508 (9th Cir. 1992)).  Typicality is thus "'satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Id*. at *10 (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010)).

Plaintiffs' claims are typical of, if not identical to, claims of the absent class members, and proof of these claims will be based on similar evidence and legal theories.  For example, Plaintiffs allege that Musk violated the Exchange Act by misrepresenting or omitting material facts concerning the Twitter merger and the Merger Agreement.  ¶¶111-127.  Like the absent class members, Plaintiffs sold Twitter securities during the Class Period at artificially deflated prices.  *See* Dkt. Nos. 8-4, 8-5. Like the absent Class members, Plaintiffs are presumed—by virtue of their sale of Twitter stock in an efficient market—to have relied upon Musk's misrepresentations and omissions.  *See Erica P. John Fund, Inc. v. Halliburton Co*., 563 U.S. 804, 811 (2011) ("*Halliburton I*").  Like all other Class members, Plaintiffs were injured when the price of Twitter stock increased on the disclosure of the true facts previously concealed by the alleged fraud.  *Wong v. Arlo Techs*., 2021 U.S. Dist. LEXIS 58514, at *14 (N.D. Cal. Mar. 25, 2021) ("Lead Plaintiff's claims are typical, if not identical, to those of the class because he purchased or acquired Arlo stocks at (allegedly) artificially inflated prices during the relevant time period and suffered accompanying losses."); *In re Silver Wheaton Corp. Sec. Litig*., 2017 WL 2039171, at *7 (C.D. Cal. May 11, 2017) (plaintiffs were typical because "like all members of the proposed [c]lass, plaintiffs purchased Silver Wheaton common stock during the [c]lass [p]eriod and were allegedly damaged by the same misstatements and omissions").

### 4.    Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a) requires plaintiffs to establish that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "'To determine whether a plaintiff will adequately serve the class, courts consider two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs

and their counsel prosecute the action vigorously on behalf of the class?'" *City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc*., 2018 U.S. Dist. LEXIS 175573, at *10 (N.D. Cal. 2018) (*quoting LendingClub*, 282 F. Supp. 3d at 1182).

Here none of the Plaintiffs are antagonistic to, or in conflict with, the interests of the proposed Class members.  Plaintiffs sold Twitter securities during the Class Period and sustained losses as a result of the same alleged material misrepresentations and omissions as absent Class members. Plaintiffs have also proven their willingness and ability to take an active role in, and control of, the litigation to protect the interests of the absent Class members.  *See* Dkt. No. 8-5.  Plaintiffs: (i) understand the responsibilities of serving as class representatives in a securities class action; (ii) have reviewed key pleadings in this action; (iii) intend to continue supervising and monitoring the progress of this litigation; and (iv) intend to continue working with Lead Counsel to maximize the recovery to the Class.  *Id*.  Plaintiffs have a substantial financial stake in this case and have already demonstrated, and will continue to demonstrate, their adequacy through their involved participation.

Plaintiffs have also retained attorneys with considerable experience in securities class actions and complex litigation, demonstrating that they and their counsel will continue to zealously and competently represent the interests of all Class members.  Indeed,  Cotchett Pitre & McCarthy LLP and Bottini & Bottini, Inc have served as class counsel in scores of class actions throughout the United States and some of the most significant federal securities class actions recovering millions for defrauded investors, including *In re Yahoo! Inc. Shareholder Litig*., Case No. 17-CV-307054 (Superior Court for the State of California, County of Santa Clara); *Chicago Laborers Pension Fund v. Alibaba Group Holding Ltd*., Case No. CIV535692 (Superior Court for the State of California, County of San Mateo);  *In re LendingClub Sec. Litig*., 2018 U.S. Dist. LEXIS 163500, at *24 (N.D. Cal. Sep. 24, 2018).  *See* Dkt. Nos. 8-6, 8-7.

The prerequisite of Rule 23(a)(4) and the requirement of Rule 23(g) are satisfied, and Plaintiffs' choice of counsel should be appointed as Class Counsel pursuant to Rule 23(g).

### C.   The Proposed Class Meets the Requirements of Rule 23(b)(3)

In addition to meeting the prerequisites of Rule 23(a), a class action must also satisfy at least one of the three conditions imposed by Rule 23(b).  Rule 23(b)(3) authorizes certification where: (i) "the questions of law or fact common to class members predominate over any questions affecting only individual members;" and (ii) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  This action satisfies Rule 23(b)(3) because "the interests of the class members are aligned and the same alleged misconduct underlies their claims" and the thousands of members who comprise the Class "have a minimal interest in controlling the course of the litigation; there are significant efficiency gains to be reaped from concentrating the litigation in a single forum; and the likely difficulties in managing the class action are readily surmountable." *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 363 (S.D.N.Y. 2016), vacated in part on other grounds, 862 F.3d 250 (2d Cir. 2017).

### 1.   Common Questions of Law and Fact Predominate

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623; *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542 (9th Cir. 2013).  This inquiry is satisfied where "questions of law or fact common to the class will 'predominate over any questions affecting only individual members' as the litigation progresses." *Amgen*, 568 U.S. at 467 (emphasis in original).  As the Supreme Court held, "[p]redominance is a test readily met in certain cases alleging . . . securities [claims]." *Amchem*, 521 U.S. at 625; *see also Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  Indeed, the Supreme Court has recently confirmed that when:

> "[O]ne or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453-54 (2016).  Thus, a plaintiff "need not establish that there are no individual issues, only that the class issues predominate and that a class action is superior." *Villanueva v. Liberty Acquisitions Servicing, LLC*, 319 F.R.D. 307, 332 (D. Or. 2017).

1    Here, there can be no reasonable dispute that questions of law and fact common to every Class

2    member predominate, including: (i) whether Musk issued false and misleading statements and

3    omissions; (ii) whether Musk acted with scienter; (iii) whether Twitter securities traded at artificially

4    deflated prices; and (iv) whether investors suffered damages as the truth was revealed.  All of these

5    issues are subject to common proof.  *See Amgen*, 568 U.S. at 460-61.  Moreover, the Supreme Court

6    has clearly found that materiality and loss causation are "'common questio[ns]' for purposes of Rule

7    23(b)(3)" because "failure of proof" of any of these elements "would end the case" for all putative

8    class members.  *Id.* at 459-60, 467; *Halliburton I*, 563 U.S. at 813 (plaintiffs are not required to "show

9    loss causation as a condition of obtaining class certification"); *Halliburton Co. v. Erica P. John Fund,*

10   *Inc.*, 573 U.S. 258, 282 (2014) ("*Halliburton II*").

11   These numerous common questions are sufficient to demonstrate that the predominance

12   standard of Rule 23(b)(3) is satisfied, as they easily predominate over any perceived or potential

13   individual issues.  *Amchem*, 521 U.S. at 625; *see In re Banc of Cal. Sec. Litig.*, 326 F.R.D. 640, 651-

14   52 (C.D. Cal. 2018) ("It's well settled that 'the presence of individualized damages cannot, by itself,

15   defeat class certification under Rule 23(b)(3).'") (citation omitted).

### 2.  Class Members' Reliance on Defendants' Fraudulent Misrepresentations and Omissions Is Presumed

16   Plaintiffs have invoked the fraud-on-the-market presumption of reliance.  *See Basic*, 485 U.S.

17

18   at 246.  "The fraud-on-the-market premise is that the price of a security traded in an efficient market

19   will reflect all publicly available information about a company; accordingly, a buyer of the security

20   may be presumed to have relied on that information in purchasing the security."  *Amgen*, 568 U.S. at

21   458; *see Halliburton II*, 573 U.S. at 272 ("Even the foremost critics of the efficient-capital-markets

22   hypothesis acknowledge that public information generally affects stock prices.").

23   In order to invoke the presumption, a class representative need merely establish that the alleged

24   misrepresentations were public, that the relevant shares traded in an efficient market, and that the class

25   representative sold shares "'between the time the misrepresentations were made and the time the truth

26   was revealed.'"  *Halliburton I*, 563 U.S. at 811; *Halliburton II*, 573 U.S. at 268; *Amgen*, 568 U.S. at

27

28   472.  Individual class members need not prove they actually relied upon the alleged misrepresentations,

as "anyone who buys or sells the stock at the market price may be considered to have relied on those misstatements." *Halliburton II*, 573 U.S. at 263.  Nor do they need to establish loss causation or materiality to invoke the presumption.  *Halliburton I*, 563 U.S. at 812-13; *Halliburton II*, 573 U.S. at 265.  Here, Plaintiffs have established the prerequisites to invoking the presumption.  The alleged misrepresentations were all made publicly between May 13, 2022 and May 17, 2022, and Plaintiffs sold Twitter securities after such statements and during the Class Period.  Dkt. No. 8-4.

Further, as detailed in the Tabak Report, Twitter securities traded in an efficient market.  Tabak Report, ¶¶12-56.  In considering whether a stock is traded in an efficient market, courts have generally considered five factors enunciated by the court in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989): (1) whether the stock trades at a high weekly volume; (2) whether securities analysts follow and report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file United States Securities and Exchange Commission ("SEC") Registration Statement Forms S-3; and (5) whether there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Id.*

While the *Cammer* court identified five factors that have been widely adopted as indicia of market efficiency, in cases where it is undisputed that a company's shares trade on an open and developed exchange like the NYSE, a *Cammer* analysis is not required.  Indeed, the fact that Twitter was widely traded on the NYSE prior to and during the Class Period supports a finding of market efficiency.  *See, e.g., In re LTV Sec. Litig.*, 88 F.R.D. 134, 144 (N.D. Tex. 1980) ("The prices of stocks of larger corporations, such as those listed on the New York Stock Exchange, seem especially efficient.").  And even if a *Cammer* factor analysis is performed, direct evidence of price impact under *Cammer* factor five is not necessary where, like here, strong indicia of market efficiency exists. *See Di Donato v. INSYS Therapeutics, Inc*., 333 F.R.D. 427, 438 (D. Ariz. 2019).  Nevertheless, analysis of each *Cammer* factor indicates that the market for Twitter securities was efficient.

### a.   Twitter's Average Trading Volume Provides Strong Indicia of Market Efficiency

"Turnover measured by average weekly trading of two percent or more of the outstanding

shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption." *Cammer*, 711 F. Supp. at 1286.  During the Class Period, the average weekly trading volume of Twitter common stock was approximately 60.6 million shares, nearly 7.93% of the total shares outstanding.  Tabak Report, ¶17.  Thus, Twitter securities exceed the benchmark commonly used by courts as an indication that trading transpired in an efficient market.  *In re Dynex Corp., Inc. Sec. Litig.*, 2011 WL 781215, at *4 (S.D.N.Y. Mar. 7, 2011) ("There is a substantial presumption of market efficiency where 1% of the average outstanding balance is traded, *i.e.* a 1% weekly turnover rate.").

### b.   Analyst Coverage of Twitter Provides Strong Indicia of Market Efficiency

Significant industry analyst coverage supports a finding of market efficiency as it demonstrates that the security in question is closely reviewed by investment professionals who make, buy or sell recommendations to investors.  *Krogman v. Sterritt*, 202 F.R.D. 467, 475 (N.D. Tex. 2001); *Cammer*, 711 F. Supp. at 1286.  Here, at least 15 separate analyst firms covered Twitter during the Class Period and accordingly issued reports on the Company.  Tabak Report, ¶¶20-21; *see City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 270 F.R.D. 247, 256 (D.S.C. 2010) (coverage by six analysts sufficient).  Thus, Twitter's significant analyst coverage also supports market efficiency.  *See also Brown v. China Integrated Energy, Inc.*, 2015 WL 12720322, at *17 (C.D. Cal. Feb. 17, 2015).

### c.   Market Makers Provide Strong Indicia of Market Efficiency

Market makers "'help[] establish a market for securities by reporting bid-and-asked quotations . . . and . . . stand[] ready to buy or sell at these publicly quoted prices.'"  *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 613-14 (C.D. Cal. 2009).  Here, Twitter common stock was traded on the NYSE, "which is widely regarded as one of the most open, developed, and efficient exchanges in the world."  *See* Tabak Report, ¶22.  In addition to being traded on the NYSE, 202 market makers traded Twitter shares on the Nasdaq stock exchange during the Class Period, increasing the efficiency of the stock.  *Id.  See also Vinh Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 572-73 (C.D. Cal. 2012) (finding stock trading on New York Stock Exchange through designated market

1   makers sufficient to support market efficiency).  These facts further support the conclusion that the

2   market for Twitter securities was efficient during the Class Period.

####    d.    Twitter's Eligibility to File Forms S-3 Registration Statements Provide Strong Indicia of Market Efficiency

The SEC only permits the use of a Form S-3 Registration Statement by issuers whose securities are presumed to be actively traded and widely followed, as demonstrated by a history of making the required SEC filings and a market capitalization of more than $75 million.  17 C.F.R. §239.13.  The market capitalization and float of Twitter shares exceeded $22 billion (*i.e.*, approximately 300 times the $75 million requirement) throughout the Class Period.  Tabak Report, ¶29.  During the Class Period, Twitter was eligible to raise capital pursuant to a Form S-3 Registration Statement.  *Id.*

####    e.    Twitter's Price Reaction to New Material Information Demonstrates Market Efficiency

Evidence that the price of a security regularly reacts to unexpected corporate events or the issuance of financial releases about the issuer is strong evidence of an efficient market.  *See Cammer*, 711 F. Supp. at 1287.  While such evidence is not always required in cases where other indicia of market efficiency are apparent (*see, e.g.*, *Waggoner v. Barclays PLC,* 875 F.3d 79, 99 (2d Cir. 2017)), Dr. Tabak conducted an event study and a series of statistical analyses to determine whether Twitter securities reacted to unexpected material information.  Tabak Report, ¶¶31-43.  Indeed, Dr. Tabak's event study analysis establishes that there is a consistent cause-and-effect relationship between the disclosure of material information and Twitter stock price, thus further supporting a finding of market efficiency.  *Id.*, ¶¶35-43.  Event studies such as the one performed by Dr. Tabak are regularly accepted by courts to demonstrate market efficiency under *Cammer* factor five.  *See, e.g.*, *Diamond Foods*, 295 F.R.D. at 249-50.

In addition to the *Cammer* factors, which all demonstrate an efficient market for Twitter securities, courts also rely on the *Krogman* factors in considering whether there is an efficient market. *See Di Donato*, 333 F.R.D. at 438 (citing *Krogman*, 202 F.R.D. at 474).  These include a company's market capitalization, the bid-ask spread and the percentage of stock not held by insiders (the float). *Id.*; *Krogman*, 202 F.R.D. at 474.  Here, these factors further support a finding that Twitter securities

traded in an efficient market.  As identified above, during the Class Period, Twitter's average market capitalization and float exceeded $24 billion.  Tabak Report, ¶45.  Twitter's minimum market capitalization on July 11, 2022 exceeded the market capitalization of more than 90.17% of the members of the Russell 3000 Index, which is composed of 3,000 of the largest stocks traded in the United States.  *Id.*  Further, Twitter's bid-ask spread "averaged 0.04% of the same-day's closing price over the Class Period, with a median figure of 0.03%.  These low figures indicate that, on average, it would be profitable (in expectation) for investors to trade in Twitter shares if they felt that it was mispriced by as little as the sum of trading costs (*e.g.*, commissions) plus 0.04%.  This low level of the bid-ask spread supports a finding that arbitrageurs would have an incentive to trade on any perceived mispricing, and therefore would have an incentive to undertake the activities that lead to a stock trading in an efficient market, supporting a finding of market efficiency."  Tabak Report, ¶48. Each of these facts supports a finding that the market for Twitter shares was efficient.  *See Di Donato*, 333 F.R.D. at 441 (market efficiency demonstrated by $2.2 billion market cap, public float of 87.2% and bid-ask range of 0.12% to 0.36%).

The proposed Class here also includes all persons who sold Twitter call options or purchased Twitter put options during the Class Period.  Tabak Report, ¶57.  Dr. Tabak also analyzed the efficiency of such Twitter securities during the Class Period.  Dr. Tabak reviewed the put-call parity condition for Twitter's publicly-traded options and concluded that like Twitter common stock, they too traded in an efficient market during the Class Period.  Tabak Report, ¶¶57-70.  Even absent a thorough expert analysis like Dr. Tabak conducted here, courts have concluded that the efficiency of options "is essentially settled" such that "academics rarely, if ever, test this matter anymore." *In re Apple Inc. Sec. Litig.*, 2023 U.S. Dist. LEXIS 58603, at *5 (N.D. Cal. Mar. 28, 2023); *In re Fibrogen, Inc.*, 2024 U.S. Dist. LEXIS 25384, at *5 (N.D. Cal. Feb. 13, 2024) (certifying a settlement class that included options holders).  Courts also routinely determine that "a finding of market efficiency for common stock also applies to options, because the price for the option is derivative of the price of the stock." *Rougier v. Applied Optoelectronics, Inc.*, 2019 U.S. Dist. LEXIS 198919, at *41 (S.D. Tex. Nov. 13, 2019); *see In re Merck & Co., Sec. Derivative & ERISA Litig.*, 2013 U.S. Dist. LEXIS 13511,

at *60 (D.N.J. Jan. 30, 2013) (same); *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1329 (N.D. Ga. 2007) (collecting cases).

Moreover, because the FAC alleges material omissions, Plaintiffs and the proposed Class are also entitled to the presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972) (claims "involving primarily a failure to disclose, [by persons with a duty to disclose,] positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material."); *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42 (S.D.N.Y. 2013). For example, here, the FAC specifically alleges that Defendant Musk "omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading" (¶188), thus entitling Plaintiffs and the proposed Class to the *Affiliated Ute* presumption.  *See W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc*., 325 F.R.D. 280, 290 (D. Minn. 2018) (finding presumption applicable where §10(b) claims focused on concealment).

For all the reasons set forth above, and in light of the evidence set forth in the Tabak Report and exhibits attached thereto, it cannot be credibly disputed that the market for Twitter securities was efficient throughout the Class Period, and, in any event, Plaintiffs and the Class are entitled to the presumption of reliance under *Affiliated Ute*.

### 3.   Twitter Will Be Unable to Rebut the Presumption of Reliance with Evidence of the Absence of Price Impact

In *Halliburton II*, the Supreme Court reaffirmed the fraud-on-the-market presumption from *Basic* and held that defendants may attempt to rebut the presumption at the class-certification stage with direct evidence of the absence of price impact.  *Halliburton II*, 573 U.S. at 280-83.  "Price impact" simply refers to "whether the alleged misrepresentations affected the market price."  *Halliburton I*, 563 U.S. at 814.  To rebut the presumption, defendants must show that there is "no link between plaintiffs' decision to trade at the market price and the alleged misrepresentations or omissions." *SEB*, 335 F.R.D. at 283.  Indeed, "[d]efendants must introduce evidence showing the alleged 'misrepresentation[s] in fact did not lead to a distortion of price or that an individual plaintiff traded or would have traded despite his knowing the statement was false.'"  *Hatamian*, 2016 U.S. Dist. LEXIS 34150, at *18 (quoting *Basic*, 485 U.S. at 248) (some alteration in original).  Even where the

1    alleged misrepresentations "'merely maintain inflation already extant in a company's stock price, but

2    do not add to that inflation' . . . lack of [stock] price movement on the dates of the alleged

3    misrepresentations does not rebut the *Basic* presumption." *Waggoner*, 875 F.3d at 103-104; *Hatamian*,

4    2016 U.S. Dist. LEXIS 34150, at *21.   While defendants are permitted to rebut the presumption by

5    establishing a lack of price impact, plaintiffs are not required to prove price impact or loss causation

6    at class certification.   *Halliburton I*, 563 U.S. at 813; *Halliburton II*, 573 U.S. at 275-76, 281-85.

7    Indeed, adjudicating specific reasons for stock price declines (or price increases) treads into the merits

8    issue of loss causation.   *Id.*; *Amgen*, 568 U.S. at 475.

9    Here, the facts and evidence overwhelmingly demonstrate the applicability of the presumption

10    of reliance and the futility of any attempt to rebut the presumption with evidence of a lack of price

11    impact.   The evidence here establishes not only that the presumption of reliance applies, but also that

12    Twitter's stock price increased by 22% in one day when the relevant truth (*i.e.*, corrective information)

13    was revealed.   ¶175; *Halliburton II*, 573 U.S. at 278-81.

### 4.    The Event Study Methodology Is Capable of Measuring Damages on a Class-wide Basis

16    Proof of damages is not a prerequisite to class certification.   *See LendingClub*, 282 F. Supp.

17    3d at 1184.   Nor does the calculation of damages present individual issues capable of predominating

18    over common ones.   *Banc of Cal.*, 326 F.R.D. at 651.   Plaintiffs intend to prove damages and economic

19    loss through the "out-of-pocket" method of damages.   The out-of-pocket method is a widely accepted

20    method of measuring damages in Exchange Act cases.   *City of Miami*, 2018 U.S. Dist. LEXIS 175573,

21    at *8 ("Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs'

22    theory of liability under Section 10(b) of the Securities Exchange Act, making it the standard method

23    for calculating damages in virtually every Section 10(b), class action.") (citing *In re SanDisk LLC Sec.*

24    *Litig.*, 2018 U.S. Dist. LEXIS 157177, at *2 (N.D. Cal. Sept. 4, 2018)).

25    As set forth in the Tabak Report, the event study methodology is capable of calculating

26    damages on a class-wide basis, consistent with Plaintiffs' theory of the case.   *See* Tabak Report, ¶¶71-

27    75.   The event-study methodology is a widely accepted method for evaluating market efficiency,

28    materiality, and damages.   *See City of Miami*, 2018 U.S. Dist. LEXIS 175573, at *7; *Diamond Foods*,

295 F.R.D. at 251 (because plaintiff's expert stated that "damages 'will be calculated using an event study analysis similar to the event study analysis' regarding market efficiency," that is sufficient); *SEB*, 335 F.R.D. at 288 ("event study to determine the price inflation attributable to the alleged fraud, is widely accepted for calculating damages of a class of stockholders"). Plaintiffs have plainly shown that damages can be calculated on a class-wide basis.

### 5.     A Class Action Is Superior to Other Available Methods for the Efficient Adjudication of This Case

Finally, Rule 23(b)(3) requires that the class action vehicle be superior to any other method of adjudication. Fed. R. Civ. P. 23(b)(3). To determine whether a class action is superior, the courts consider four factors: (i) class members' individual interests in controlling the prosecution of separate actions; (ii) whether other litigation has already commenced; (iii) the desirability of concentrating claims in one forum; and (iv) the difficulties likely to be encountered in managing a class action. *Id*.

Each of the factors enumerated in Rule 23(b)(3) weighs in favor of class certification in this case. First, there is no indication that any member of the Class would control the prosecution of these claims individually; given the prohibitive costs required for the prosecution of a complex securities fraud case, very few Class members could prosecute these claims on an individual basis, nor would it be economically prudent for them to do so. *Green v. Wolf Corp*., 406 F.2d 291, 296 (2d Cir. 1968). In any event, any individual who may so desire will have the opportunity to opt out of the Class. Second, counsel is unaware of any other litigation against Defendant Musk asserting these claims. Third, the concentration of this litigation in one forum is desirable to avoid inconsistent adjudications. Fourth, this case presents no unusual difficulties in the management or notification of Class members. Moreover, class action treatment promotes fairness and efficiency. "Separate actions by each of the class members would be repetitive, wasteful, and an extraordinary burden on the courts." *Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983); *see also e.g., Escott v. Barchris Constr. Corp*., 340 F.2d 731, 733 (2d Cir. 1965).

For these reasons, "securities cases 'easily satisfy the superiority requirement of Rule 23.'" *In re NYSE Specialists Sec. Litig*., 260 F.R.D. 55, 80 (S.D.N.Y. 2009) (alterations in original); *see Cooper*, 254 F.R.D. at 632 ("As the Ninth Circuit has so aptly stated, securities fraud cases fit Rule 23 'like a

1   glove.'").  This case is no different—a class action is superior to any other method of resolving the

2   claims at issue.

3   **VI.      CONCLUSION**

4          For the reasons addressed above, Plaintiffs request that the Court: (i) certify this action as a

5   Class action (ii) appoint Plaintiffs as Class Representatives; and (iii) appoint Cotchett Pitre &

6   McCarthy LLP and Bottini & Bottini, Inc. as Class Counsel.

7

8    Dated:  May 24, 2024                          Respectfully submitted,

     **COTCHETT, PITRE & MCCARTHY, LLP**
9                                                  Joseph W. Cotchett (SBN 36324)
                                                   Mark C. Molumphy (SBN 168009)
10                                                 Tyson C. Redenbarger (SBN 294424)
                                                   Gia Jung (SBN 340160)
11
                                                    */s/ Mark C. Molumphy*
12                                                     MARK C. MOLUMPHY

13                                                 San Francisco Airport Office Center
                                                   840 Malcolm Road, Suite 200
14                                                 Burlingame, California 94010
                                                   Telephone: (650) 697-6000
15
                                                   **BOTTINI & BOTTINI, INC**.
16                                                 Francis A. Bottini, Jr. (SBN 175783)
                                                   Albert Y. Chang (SBN 296065)
17                                                 Aaron P. Arnzen (SBN 218272)

18                                                  */s/ Francis A. Bottini, Jr.*
19                                                     FRANCIS A. BOTTINI, JR.

20                                                 7817 Ivanhoe Avenue, Suite 102
                                                   La Jolla, California 92037
21                                                 Telephone: (858) 914-2001
                                                   Facsimile: (858) 914-2002
22
                                                   *Attorneys for Lead Plaintiffs Steve Garrett, Nancy*
23                                                 *Price, John Garrett, Brian Belgrave and the*
                                                   *Proposed Class*
24

25

26

27

28

---

Pltfs' Motion To Certify Class, Appoint Class Representatives, and Appoint Class Counsel;          19
Case No.: 3:22-cv-05937-CRB

1

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

2

I, Mark C. Molumphy, attest that concurrence in the filing of this document has been

3

obtained from the other signatory.  I declare under penalty of perjury under the laws of the United

4

States of America that the foregoing is true and correct.

5

Executed this 24th day of May 2024, at Burlingame, California.

6

7

*/s/ Mark C. Molumphy*

8

Mark C. Molumphy

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28