QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice*)
alexspiro@quinnemanuel.com
Jesse A. Bernstein (*pro hac vice*)
Jessebernstein@quinnemanuel.com
Jonathan E. Feder (*pro hac vice*)
jonathanfeder@quinnemanuel.com
51 Madison Ave 22nd floor
New York, New York 10010
Telephone:     (212) 849-7000
Facsimile:     (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Joseph C. Sarles (Bar No. 254750)
josephsarles@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100

Nathan Archibald (*pro hac vice*)
nathanarchibald@quinnemanuel.com
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84121
Telephone:     (801) 515-7300
Facsimile:     (801) 515-7400

*Attorneys for Defendant Elon Musk*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated, | CASE NO. 3:22-CV-05937-CRB |
| Plaintiff, | **DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| vs. | Judge:          Hon. Charles R. Breyer |
| ELON R. MUSK, | Hearing Date:  September 27, 2024 |
| Defendant. | Time:          10:00 a.m. |
| | Courtroom:     6, 17th Floor |

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ..................................................................................................v

STATEMENT OF ISSUES TO BE DECIDED.....................................................................1

RELEVANT FACTS ..............................................................................................................1

      A.     Plaintiffs' Allegations And Theory ..........................................................1

      B.     Sophisticated Investors Could And Did Evaluate Mr. Musk's Rights Under The Public Merger Agreement Prior To And During The Proposed Class Period .....................................................................................................2

      C.     Mr. Musk's Alleged Misstatements Did Not Impact Twitter's Share Price .............6

      D.     The Lead Plaintiffs Were Not Misled By Mr. Musk's Alleged Misstatements ...........................................................................................................8

ARGUMENT ..........................................................................................................................8

I.     PLAINTIFFS' PROPOSED CLASS IS BARRED BY RULE 23(b)(3) FOR FAILURE TO ESTABLISH PREDOMINANCE ...........................................................8

      A.     *Basic*'s Fraud-On-The-Market Presumption Does Not Apply Here .........................9

            1.     Plaintiffs' Theory Of Liability Is Incompatible With An Efficient Market ...........................................................................................9

            2.     *Basic* Is Rebutted Because The Alleged Misrepresentations Did Not Impact Price..........................................................................................12

      B.     This Action Requires Individualized Inquiries Of Investor Knowledge.................16

      C.     The *Affiliated Ute* Presumption Does Not Apply Here ...........................................18

II.    PLAINTIFFS CLASS DEFINITION AND DAMAGES MODEL FAIL RULE 23...........18

      A.     Plaintiffs' Proposed Class is Overbroad And Unworkable .....................................18

      B.     Plaintiffs' Damages Model Does Not Comply With *Comcast* ................................19

III.   THE LEAD PLAINTIFFS ARE ATYPICAL AND INADEQUATE...............................19

CONCLUSION ......................................................................................................................20

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page**

3

### <u>Cases</u>

4

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128, 153 (1972) ...................................................................... vii, 9, 18

5

6

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ..................................................................................... vi, 9

7

*Arenson v. Broadcom Corp.*,
  2004 WL 3253646 (C.D. Cal. Dec. 6, 2004) .......................................... viii, 19

8

9

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ................................................................................ *Passim*

10

*Beaty v. Ford Motor Co.*,
  2021 WL 3109661 (W.D. Wash. July 22, 2021) ............................................. 19

11

12

*Binder v. Gillespie*,
  184 F.3d 1059 (9th Cir. 1999) ......................................................................... 18

13

14

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
  2016 WL 4585753 (N.D. Cal. Sept. 2, 2016) .................................................. 10

15

*Bowerman v. Field Asset Servs., Inc.*,
  60 F.4th 459 (9th Cir. 2023) ............................................................................ 17

16

17

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.*,
  141 F.R.D. 144 (N.D. Cal. 1991) .................................................................... 20

18

19

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ................................................ 12

20

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) ................................................. 12

21

22

*Comcast Corporation v. Behrend*,
  569 U.S. 27 (2013) .................................................................................. viii, 19

23

24

*Connecticut Ret. Plans & Tr. Funds v. Amgen Inc.*,
  660 F.3d 1170 (9th Cir. 2011) ................................................... vii, 12, 13, 14, 15

25

*DZ Rsrv. v. Meta Platforms, Inc.*,
  96 F.4th 1223 (9th Cir. 2024) .......................................................................... 16

26

27

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  309 F.R.D. 251 (N.D. Tex. 2015) .................................................................... 13

28

*In re Finisar Corp. Corp. Sec. Litig.*,
    2017 WL 6026244 (N.D. Cal. Dec. 5, 2017) ............................................................... vii, 12, 15

*Freeman v. Laventhol & Horwath*,
    915 F.2d 193 (6th Cir. 1990) ........................................................................................ 11

*In re Genesisintermedia, Inc. Sec. Litig.*,
    2007 WL 1953475 (C.D. Cal. June 28, 2007) ............................................................ 10

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
    594 U.S. 113 (2021) ............................................................................................... 12, 13

*Halliburton Co. v. Erica P. John Fund, Inc.*
    573 U.S. 258 (2014) ....................................... vi, vii, viii, 10, 11, 12, 16, 19, 20

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ...................................................................................... 19

*Howard v. Liquidity Servs. Inc.*,
    322 F.R.D. 103 (D.D.C. 2017) ................................................................................... 20

*IBEW Loc. 98 Pension Fund v. Best Buy Co.*,
    818 F.3d 775 (8th Cir. 2016) ...................................................................................... 13

*In re Initial Pub. Offerings Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006) ................................................................ vi, vii, 9, 11, 12, 16, 17

*In re Kosmos Energy Ltd. Sec. Litig.*,
    299 F.R.D. 133 (N.D. Tex. 2014) .............................................................................. 17

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
    2020 WL 5026553 (D. Del. Aug. 25, 2020) ............................................................. 18

*Mandalevy v. BofI Holding, Inc.*,
    2018 WL 3032588 (S.D. Cal. June 19, 2018) ............................................................ 10

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
    2013 WL 396117 (D.N.J. Jan. 30, 2013) ................................................................... 19

*In re Moody's Corp. Sec. Litig.*,
    274 F.R.D. 480 (S.D.N.Y. 2011)........................................................................... vii, 12

*New Jersey Carpenters Health Fund v. Rali Series 2006-QO1 Tr.*,
    477 F. App'x 809 (2d Cir. 2012) ............................................................................... 16

*New Jersey Carpenters Health Fund v. Residential Capital, LLC*,
    272 F.R.D. 160 (S.D.N.Y. 2011).............................................................................. 16

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ............................................................................... viii, 19

*In re Prudential Ins. Co. of Am. Sales Practices Litig.,*
    975 F. Supp. 584 (D.N.J. 1996) ........................................................ 18

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869,*
    725 F.3d 244 (D.C. Cir. 2013) ......................................................... 19

*Roots Partnership v. Lands' End. Inc.*
    965 F.2d 1411 (7th Cir. 1992) ......................................................... 12

*In re Storage Technology Corp. Securities Litigation,*
    113 F.R.D. 113 (D. Colo. 1986) ....................................................... 20

*Teamsters Loc. v. Bombardier, Inc.,*
    2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006) ................................... 14

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Liab.*
    *Litig.,*
    2 F.4th 1199 (9th Cir. 2021) ............................................................ 18

*Zimmerman v. Bell,*
    800 F.2d 386 (4th Cir. 1986) ........................................................... 17

### Rules/Other Authorities

Fed. R. Civ. P. 10b-5 ............................................................ viii, viii, 8

Fed. R. Civ. P. 23 ............................................................ 16, 18, 19

Fed. R. Civ. P. 23(b) ................................................................... 9

Fed. R. Civ. P. (b)(3) ............................................ vii, 1, 8, 17, 19

## SUMMARY OF ARGUMENT

Plaintiffs seek to certify a securities class action alleging that Elon Musk misrepresented his rights and obligations under a publicly filed Merger Agreement, that Mr. Musk misrepresented that he obtained internal Twitter data suggesting that twenty percent of Twitter's users were bots, and that Twitter's share price dropped and remained artificially deflated for more than five months in response to these alleged misrepresentations.

But Plaintiffs' proposed class must be denied because individual issues predominate over common ones. Although they plead—and the Court has accepted—that certain reasonable shareholders may have been unable to decipher Mr. Musk's rights under the public Merger Agreement and thus were confused and misled by Mr. Musk's statements, they also plead that the alleged falsity of Mr. Musk's statements is decipherable within the four corners of the Merger Agreement. Indeed, Plaintiffs concede that *some* "skilled and experienced professionals" *did understand* Mr. Musk's rights and obligations before the class period began and could evaluate the accuracy of his statements within the hours and days after they were published. To that end, Plaintiffs' own lawyers filed a federal complaint on May 24, 2022 alleging—based only on information made available to the market weeks before the proposed class period started—that Mr. Musk's May 13 Tweet was false for *the exact same reasons* alleged in this action.

Plaintiffs have therefore alleged that *two different classes of investors existed*: those, like counsel (and indeed certain Lead Plaintiffs), who could and did understand the terms and conditions of the Merger Agreement and those who purportedly could not. (Declaration of Alex Bergjans ("Bergjans"), Ex. 7 (Dkt. 1, *Heresniak v. Musk et. al*, 3:22-cv-03074-CRB ("*Heresniak* Complaint")), ███████████████████████████████[1]. By drawing this distinction, Plaintiffs have both pleaded themselves out of the *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) presumption of class-wide reliance and independently injected the need for individualized inquiries of each Twitter shareholder's knowledge of Mr. Musk's rights during the class period to determine who was able to understand the terms of the Merger Agreement, who ████████████did not

---

[1]    Unless otherwise indicated, all Exhibit citations are to the Declaration of Alex Bergjans.

1    react to Mr. Musk's statements, and who was purportedly misled.

2        At the threshold, Plaintiffs' class cannot be certified because individual issues of reliance

3    predominate in this case.  Issues of reliance are inherently individualized and preclude certification

4    of securities class actions unless the Plaintiff can establish *Basic*'s fraud-on-the-market

5    presumption. *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 462-63 (2013).

6    Plaintiffs seek to invoke *Basic* here but their motion has two fundamental flaws.

7        ***First***, to establish the presumption under *Basic*, Plaintiffs must prove that Twitter's stock

8    traded in an efficient market.  *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573

9    U.S. 258, 277-78 (2014).  But ***Plaintiffs' theory depends on an inefficient market***.  Plaintiffs

10   alleged and conceded—as they must—that the Merger Agreement and Mr. Musk's waiver of due

11   diligence was public and that skilled, experienced, and sophisticated market participants possessed

12   sufficient information to evaluate Mr. Musk's rights and obligations under the Merger Agreement

13   to assess the accuracy of his alleged misstatements.  But under the efficient market hypothesis, ***it is***

14   ***these same*** sophisticated investors who set the market price of Twitter's stock based on their

15   knowledge and evaluation of material information.  (Ex. 6, Deposition of David Tabak ("Tabak

16   Dep.") 38:11-20.)  Although, as Plaintiffs argued and the Court concluded, these sophisticated

17   market participants' knowledge may have been irrelevant to determining falsity, it is most probative

18   to assess price impact and whether Twitter traded on an efficient market under *Basic*.  (Dkt. 76-1,

19   Tabak Report ("Tabak") ¶¶ 18-28; Ex. 5, Expert Report of Dr. Atanu Saha ("Saha") ¶¶ 26, 42.

20       Plaintiffs' concession that sophisticated investors—and any "experienced and skilled

21   professionals" such as "experienced securities litigators" (Dkt. 62 at 11)—could accurately decipher

22   the public Merger Agreement is directly at odds with Plaintiffs' claim that the market price was

23   distorted by any misunderstanding regarding Mr. Musk's rights under the agreement.  That is

24   because the efficient market hypothesis assumes Twitter's stock price reflects sophisticated

25   investors' knowledge.  Plaintiffs' theory of liability is thus the "very antithesis of an efficient

26   market" and forecloses their ability to avail themselves of *Basic*'s fraud on the market presumption.

27   *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 43 (2d Cir. 2006), *decision clarified on denial*

28   *of reh'g sub nom. In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70 (2d Cir. 2007) ("*In re IPO*").

1    ***Second***, even if Plaintiffs could invoke *Basic*, the record establishes that Mr. Musk's

2    misrepresentations had no impact on Twitter's stock price and rebuts the presumption. *Halliburton*

3    *II*, 573 U.S. at 268 (*Basic's* presumption is rebutted by "evidence that the asserted misrepresentation

4    (or its correction) did not affect the market price of the defendant's stock.").   Here, although

5    Plaintiffs have contended—and the Court has accepted—that certain investors may have not been

6    able to assess Mr. Musk's rights and obligations under the Merger Agreement, there is no dispute

7    that sophisticated investors can and did analyze the four corners of the Merger Agreement.   And

8    there is similarly no dispute that it is those sophisticated investors whose knowledge establishes the

9    market price of Twitter's stock.   (*See* Saha, ¶¶ 28, 31 ("A central tenet of the [efficient market

10   hypothesis] is that stock prices react to new public information, and do not react to information

11   already known to the market."); Tabak Dep. 101:2-6 (noting that "if the information is already made

12   public, the market is already aware of that information and it's integrated into the stock price").)

13   Thus, Mr. Musk's alleged misrepresentations could not have impacted Twitter's price because any

14   statement describing his rights was not new but was integrated into Twitter's stock price when the

15   Merger Agreement was made public in April 2022—and only "new" information can impact stock

16   price. *Connecticut Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1173-74 (9th Cir. 2011).

17       The remaining statements on May 16 and 17 did not impact the stock price either.   There

18   was no statistically significant drop in Twitter's price following their publication. *In re Finisar*

19   *Corp. Sec. Litig.*, 2017 WL 6026244, at *9 (N.D. Cal. Dec. 5, 2017); *In re Moody's Corp. Sec. Litig.*,

20   274 F.R.D. 480, 493 (S.D.N.Y. 2011) ("[T]here is no period . . . where the alleged misrepresentation

21   caused a statistically significant increase in the price").   Moreover, the information they contained—

22   that outside analysts found 20 percent of Twitter's users were bots and a "reiteration" of Mr. Musk's

23   May 13 Tweet—was not new to the market and could not have impacted the price.    Nor can

24   Plaintiffs' establish class-wide presumption under *Affiliated Ute Citizens of Utah v. United States*

25   because their claims arise from misrepresentations, not omissions.  406 U.S. 128, 153 (1972).

26       Regardless of reliance, Plaintiffs' proposed class independently fails under Rule 23(b)(3)

27   because individual issues of ***knowledge*** predominate over common ones.   Showing lack of

28   knowledge is a necessary element of Plaintiffs' 10b-5 claim. *See In re IPO.*, 471 F.3d at 43 (Section

10b-5 plaintiffs must "allege and prove they traded in ignorance of the fact that the price was affected by the alleged manipulation."); *Basic*, 485 U.S. at 249 (the presumption of reliance does not apply to a plaintiff who "believed" that the misrepresentations "were false . . . but sold his shares nevertheless because of unrelated concerns").  Plaintiffs' theory of the case asserts that some investors—like Plaintiffs' counsel—knew and could evaluate Mr. Musk's rights under the Merger Agreement and determine whether his statements were accurate and others could not.  It thus necessitates individualized inquiries to distinguish between the two, foreclosing certification.

Setting aside these fundamental and irreparable defects, Plaintiffs' class definition is improperly overbroad.  It includes a great number of class members who profited from the alleged deflation by buying stock during the class period.  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 n.14 (9th Cir. 2022) (en banc).  Plaintiffs' proposed damages model also runs afoul of *Comcast Corporation v. Behrend*, 569 U.S. 27 (2013) by failing to exclude from the purported calculation of damages gains earned by class members who benefitted from the alleged deflation.  *Arenson v. Broadcom Corp.*, 2004 WL 3253646, at *2 (C.D. Cal. Dec. 6, 2004).

Finally, ███████████████████████████████████ ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████ █████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

The facts of this case and Plaintiffs' theory of liability are fundamentally incompatible with *Basic*'s fraud-on-the-market presumption and necessitate an individualized analysis of investor knowledge.  This case is not appropriate for class-wide resolution.  The motion should be denied.

1

## STATEMENT OF ISSUES TO BE DECIDED

2      (1) Whether the Court can certify the proposed class under Rule 23(b)(3) where Plaintiffs

3  allege that sophisticated investors had sufficient information to evaluate the accuracy of the alleged

4  misstatements during the class period and thus individualized issues of reliance and knowledge

5  predominate over common issues.

6      (2) Whether the Court can certify the proposed class that includes a great number of investors

7  who profited from and were not injured by the alleged misrepresentations.

8      (3) Whether the Court can certify the proposed class when Lead Plaintiffs are atypical and

9  inadequate.

10

## RELEVANT FACTS

11  **A.      Plaintiffs' Allegations And Theory**

12      On April 25, 2022, Mr. Musk entered into and filed with the SEC a Merger Agreement to

13  acquire Twitter and take it private for $54.20 a share.  On April 21, 2022, Mr. Musk filed with the

14  SEC a notice that he agreed to waive all business due diligence in connection with his offer.

15  Plaintiffs allege that Mr. Musk later made three statements that purportedly misrepresented the

16  amount of bot or spam accounts on Twitter's platform and his rights under the Merger Agreement:

17      ***May 13 Tweet***:  Plaintiffs allege that Mr. Musk's May 13 Tweet that "Twitter deal [is]

18  temporarily on hold pending details supporting calculation that spam accounts do indeed represent

19  less than 5% of users" was false and misleading by misrepresenting his rights and obligations under

20  the Merger Agreement, including by stating he had the right to place the merger on hold and that

21  his "obligation to consummate the Buyout was conditioned on his satisfaction with due diligence"

22  to determine the number of fake accounts on Twitter's platform.  (FAC ¶¶ 111-112, 120.)

23      ***May 16 All In Summit***: Plaintiffs allege that Mr. Musk falsely stated at the May 16, 2022

24  All In Summit that "fake and spam accounts make up at least 20% of Twitter's users."  The Court

25  held that this alleged misstatement was actionable because "the complaint plausibly alleges that the

26  statement misled the investing public to believe that Defendant received—and was basing his

27  statement on—bot user data from Twitter, which was not the case." (Dkt. 48 at 23.)

28      ***May 17 Tweet***: On May 17, 2022, Mr. Musk tweeted "20% fake/spam accounts, while 4

times what Twitter claims, could be much higher.  My offer was based on Twitter's SEC filings being accurate.  Yesterday, Twitter's CEO publicly refused to show proof of <5%.  This deal cannot move forward until he does."  The Court held this tweet was a "reiteration" of the May 13 Tweet and May 16 statement and thus actionable for the same reasons as those. (Dkt. 48 at 25.)

Plaintiffs allege that each of these alleged misrepresentations caused Twitter's share price to become artificially deflated from May 13 through October 4, 2022, when Mr. Musk announced that he "intends to proceed to closing of the transaction contemplated by the April 25, 2022 Merger Agreement, on the terms and subject to the conditions set forth therein."  Plaintiffs allege that the October 4 announcement was a corrective disclosure of the alleged misrepresentations and that prior to that announcement, market participants lacked the necessary information to determine whether Mr. Musk's alleged statements were true or false.  (FAC ¶ 167; *see* Ex. 18.)

As discussed *infra* pp. 10-11, in their Opposition to Mr. Musk's Motion for Judgment on the Pleadings, Plaintiffs conceded that "experienced and skilled professionals," "experienced securities litigators," and other "sophisticated part[ies]" had sufficient public information—through the April 21, 2022 disclosure and the public Merger Agreement—to evaluate Mr. Musk's rights and obligations in the transaction prior to the May 13 Tweet and well before the alleged corrective disclosure on October 4, 2022.  (Dkt. 62 at 10-12.)  Plaintiffs asserted that although these "sophisticated," "experienced and skilled" market participants "were able to decipher the Merger Agreement" to determine the veracity of Mr. Musk's statements, other "reasonable investors" were "confused and misled by the mix of information available at the time."  (*Id.*.)  Thus, to avoid dismissal, Plaintiffs sought to differentiate a class of "confused . . . reasonable investors" from these sophisticated investors and market participants.

**B.    Sophisticated Investors Could And Did Evaluate Mr. Musk's Rights Under The Public Merger Agreement Prior To And During The Proposed Class Period**

Plaintiffs are seeking class certification under the *Basic* presumption of class-wide reliance, which arises from the premise that the price of stock traded in an efficient market fully reflects all publicly available information about the company and its business. (FAC ¶ 182; Dkt. 76 at 11; Tabak, ¶ 9; Saha, ¶ 23.)  Under the efficient market hypothesis, when new information about a

company is made public, that information is rapidly absorbed by the market and is integrated into the company's stock price. (*See* Tabak Dep. 60:2-10.) As Plaintiffs' expert Dr. David Tabak explains, under the efficient market hypothesis, there is no distinction between "sophisticated" investors and the market as a whole. (*Id.* 38:11-25.) The "whole theory of market efficiency" is that sophisticated investors—who have financial incentive to conduct (or retain specialists to conduct) rigorous research and analysis of a company and its transactions—set the market price of a security. (*Id.* 38:11-20 ("[T]he people who don't pay attention are able to rely on those who do to set the prices.").)

***Sophisticated Investors Evaluated Mr. Musk's Rights Under The Merger Agreement Before And During The Class Period***: Before Mr. Musk's May 13, 2022 Tweet, the market—through the sophisticated investors who set Twitter's share price—possessed the information necessary to evaluate Mr. Musk's rights under the Merger Agreement. On April 21, 2022, Mr. Musk publicly disclosed through an SEC filing that his offer was not subject to due diligence. According to Dr. Tabak, the market rapidly absorbed that fact and integrated it into Twitter's share price. (Tabak Dep. 103:13-104:6.) Twitter's share price reflected that information during the entire proposed class period. (*Id.*) Similarly, on April 25, 2022, Mr. Musk and Twitter publicly disclosed the Merger Agreement, including the provisions governing Mr. Musk's information rights (Section 6.4), the conditions to close (Article VII), and the parties' termination rights (Article VIII). (*Id.* 107:21-111:21.) Large, sophisticated institutional investors who followed the news of the transaction closely and set the market for Twitter securities by engaging in arbitrage and trading on this news (*id.* 72:5-16) had access to and the financial incentive to hire experienced lawyers to analyze the terms of the Merger Agreement and Mr. Musk's rights and obligations therein. (*Id.* 70:17-71:10; Saha, ¶ 43.) These investors also had access to analyst reports that provided further evaluation of Mr. Musk's rights under the Merger Agreement, which were rapidly digested by these investors and integrated into Twitter's share price after their publication. (Tabak Dep. 64:12-65:2.)

Thus, according to Dr. Tabak, these sophisticated investors had the ability to understand ***both*** Mr. Musk's rights and obligations under the Merger Agreement and their interplay with the law governing the agreement shortly after it was made public on April 25, 2022. (*Id.* 51:22-20.)

This information—the terms of the Merger Agreement, the content of analyst reports, and the sophisticated investors' evaluation of Mr. Musk's rights and obligations under the Merger Agreement, was all rapidly absorbed by the market and integrated into Twitter's share from the disclosure of the Merger Agreement on April 25, 2022 (well before Mr. Musk's first alleged misrepresentation) through the end of the proposed class period.  (*Id.* at 107:21-111:21.)

The public record is consistent with Plaintiffs' expert's opinion that sophisticated market participants—including analysts and investors—had information sufficient to evaluate Mr. Musk's rights and obligations under the Merger Agreement prior to and throughout the proposed class period.   Within hours of Mr. Musk's May 13 Tweet, experts and analysts published articles analyzing the terms of the public Merger Agreement and evaluating Mr. Musk's rights to information, to put the deal on "hold," and to terminate.  In *Bloomberg*, Matt Levine published an article on May 13 that walked through the terms of the Merger Agreement and analyzed, whether under those terms and Delaware law, Mr. Musk had the rights to the bot information he sought or to pause or terminate the deal.  (Ex. 8.)  Dr. Tabak agreed that the market, through the sophisticated investors who follow *Bloomberg* and Mr. Levine, would rapidly absorb Mr. Levine's analysis (as well as all of the underlying facts and information supporting Mr. Levine's analysis), evaluate it, and incorporate, as appropriate, that analysis into the Twitter stock price.  (Tabak Dep. 111:22-120:3.)  *Barron's* also published an article on May 13 that contained analysis from a professor of corporate law at Boston College analyzing Mr. Musk's rights under the public Merger Agreement and evaluating the likelihood that Mr. Musk could terminate the deal under Delaware law.  (Saha, ¶ 43; Ex. 13.)  And in the trading days immediately following Mr. Musk's Tweet, multiple analysts analyzed the public Merger Agreement, the extent of Mr. Musk's information and termination rights provided by the Merger Agreement, and provided evaluations of Mr. Musk's ability to obtain the information he sought or terminate the deal.  (*Id.*, ¶¶ 44-45; Exs. 14-15.)  Analysts continued to evaluate Mr. Musk's rights and obligations under the public Merger Agreement throughout the proposed class period and offered opinions about the strength of Mr. Musk's various legal positions based on this evaluation of publicly available information. (Saha, ¶¶ 52-54; Exs. 16-17.)  Based on publicly available information, the vast majority of analysts recommended that shareholders "hold"

their Twitter shares during the entire class period and the average percentage of analysts recommending that shareholders sell their Twitter stock declined from 11.1 percent before the class period to 7.3 percent during the class period.  (*Id.*, ¶¶ 55-56.)

Other market participants had the ability to evaluate and reach conclusions as to Mr. Musk's rights and obligations based on the public Merger Agreement and Mr. Musk's public disclosures regarding due diligence during the class period.  Notably, on May 24, 2022—just eleven days into the proposed class period—Plaintiffs' counsel filed a complaint in *Heresniak v. Musk*, a separate shareholder class action alleging the May 13 Tweet was false for the very same reasons Plaintiffs allege in this case—based only on an analysis and evaluation of the public Merger Agreement and Mr. Musk's disclosure that he waived due diligence.  (*Compare* FAC, ¶ 112 *with* Ex 7, ¶ 94.)  Dr. Tabak agreed that these allegations, as well as the analysis and information supporting them, were publicly known, absorbed by the market, and integrated into Twitter's share price during the class period.  (Tabak Dep. 120:5-125:6.)

In fact, Plaintiffs in this case have conceded that there was sufficient public information available prior to and during the class period to allow "experienced securities litigators" to "decipher the Merger Agreement" and evaluate Mr. Musk's rights and obligations therein and for other "financial professionals" to conclude the Merger Agreement was "all pretty buttoned-up." (Dkt. 62 at 11.)  Plaintiffs similarly conceded that Mr. Musk's rights and obligations under the public Merger Agreement would have been "clear to a sophisticated party" from the face of the contract.  (*Id.* at 12.)  As Dr. Tabak explained in deposition, the "whole theory of market efficiency is that" these sophisticated institutional investors who are in "a better position to decipher a complicated transaction . . . than a retail investor" set the price of a security and allow "the people who don't pay attention" to "rely" on that price when buying and selling stock.  (Tabak Dep. 37:3-38:25.)

***Sophisticated Investors Could Evaluate Whether Mr. Musk's Bot Estimate Was Based On Data From Twitter:***  Sophisticated investors also had publicly available information to evaluate the other alleged misrepresentation in this case: that Mr. Musk's estimate that 20% of Twitter users were bots arose from "bot user data from Twitter." (Dkt. 48 at 23.)  On May 16, 2022, before Mr. Musk participated in the All In Summit, Twitter's CEO, Parag Gupta, responded to Mr. Musk's

statements regarding bot activity with posts of his own stating "this specific [spam] estimation [cannot] be performed externally, given the critical need to use both public and private information (which we can't share)." (FAC, ¶ 121.)  At approximately 2:17 PM E.T., Mr. Musk appeared at the All-In Summit where he explained that Twitter had not yet responded to his request for bot information and informed him it did ***not*** know the number of bots, but that a "quite smart outside firms" had done the analysis and estimated it was 20%.  (Bergjans, ¶ 9, Ex. 9 at 1-2.)[2]  According to Dr. Tabak, under the efficient market hypothesis, all of this publicly available information would have been known to sophisticated market participants and rapidly absorbed into Twitter's share price.  (Tabak Dep. 51:22-52:20.)

**C.     Mr. Musk's Alleged Misstatements Did Not Impact Twitter's Share Price**

Plaintiffs allege that each of Mr. Musk's alleged misstatements caused Twitter's share price to become artificially deflated.  But market data from May 16 and May 17 show that there was no statistically significant price response to Mr. Musk's statements on either of those days.  Additionally, although there was a statistically significant drop in Twitter's stock following Mr. Musk's May 13 Tweet, an analysis conducted by Defendant's expert Dr. Atanu Saha shows that any stock price reaction could not have been in response to information concerning Mr. Musk's rights and obligations under the Merger Agreement.

***No Statistically Significant Response To May 16 Statement***:  Twitter's share price on May 16, 2022 closed 8.5 percent lower than the closing price on the previous trading day, May 13, 2022.  (Saha, ¶ 36.)  However, based on Twitter's intraday trading data, the vast majority of that price drop occurred ***before*** Mr. Musk made his allegedly misleading statement at the All In Summit.  When Mr. Musk made his statement estimating the prevalence of bots on Twitter's platform at 2:17 p.m. E.T., the price of Twitter's stock ***had already fallen 8.1 percent*** from the May 13 closing price. (*Id.*)  Twitter's share price only fell 0.4 percent in the remaining 103 minutes from Mr. Musk's statement through the close of the trading day.  (*Id.*)  The 0.4 percent drop that occurred following

---

[2]  In March 2021, outside researchers for an industry publication estimated that bots represented 19.57% of accounts on Twitter's platform.  (Saha, ¶ 38.)  An efficient market would have rapidly incorporated this research into Twitter's share price shortly after its publication and the price would have continued to reflect this information as of May 2022. (*See* Tabak Dep. 60:2-10.)

1    Mr. Musk's statement was not statistically significant.  (*Id.*)  In fact, the Nasdaq 100 fell by a greater

2    amount—0.8 percent—during that same time period. (*Id.*, ¶ 37.)  Adjusting for market movement,

3    Twitter's share price actually ***rose*** that trading day after Mr. Musk's alleged misstatement.  (*Id.*)

4            ***No Statistically Significant Response To May 17 Tweet***:  Mr. Musk published the May 17

5    Tweet before the markets opened that day.  But the price of Twitter's stock on May 17, 2022 rose

6    during trading that day and closed 2.5 percent higher than its closing price on May 16, 2022.  (Saha,

7    ¶ 33, Exhibit 1.)  Twitter's stock price rise on May 17 was consistent with the market's movement,

8    which rose 2.6 percent that same day.  (*Id.*, ¶ 34.)  Twitter's stock movement in response to Mr.

9    Musk's May 16 Tweet was therefore not statistically significant. (*Id.*, ¶ 34; Tabak Dep. 90:23-25

10   (conceding no statistically significant price movement on May 17, 2022).)

11           ***The Price Movement On May 13 Was Not In Response To Any Information Concerning***

12   ***Mr. Musk's Rights And Obligations Under The Merger Agreement***:    As Plaintiffs' expert

13   explained, under the efficient market hypothesis, stock prices only respond to "new" information.

14   (Tabak Dep. 101:2-6.)  As of May 13, 2022, Mr. Musk's rights and obligations under the public

15   Merger Agreement had already been disclosed to the market for weeks; what information Mr. Musk

16   had the right to obtain and under what circumstances Mr. Musk was permitted to terminate his

17   acquisition or delay closing under the Merger Agreement was already known to the market and

18   integrated into Twitter's share price. (*Id.* 107:21-111:21.)  As was Mr. Musk's waiver of business

19   due diligence.  (*Id.* 103:13-104:6.)  Even if retail investors were not fully aware of Twitter and Mr.

20   Musk's respective obligations under the Merger Agreement, sophisticated institutional investors

21   would have known of them and, under the efficient market hypothesis, Twitter's share price would

22   have reflected that information well before May 13, 2022 "via the trades and commentaries of

23   institutional investors." (Saha, ¶ 42; *see also* Tabak Dep. 107:21-111:21.)

24           Thus, according to Dr. Saha's analysis and consistent with Dr. Tabak's opinion (Tabak,

25   ¶ 10), the price drop on May 13 following Mr. Musk's Tweet "could not have been in response to

26   information about Twitter's obligations per the [M]erger [A]greement since that was not new

27   information." (Saha, ¶ 42.)   Instead, the market did not respond to Mr. Musk's purported

28   representation about the terms of the public Merger Agreement—since the sophisticated investors

1  already knew the contents of the Merger Agreement and the market had already priced in that

2  information—but "merely reflected uncertainty about the prospects of the deal closing," including

3  whether and how Twitter would respond to Mr. Musk, "whether it would walk away from the deal"

4  and collect the one billion dollar termination fee, "close at a lower price," or "litigate" to enforce

5  the public Merger Agreement's specific performance clause.  (*Id.*, ¶ 43.)

6        **D.**    **The Lead Plaintiffs Were Not Misled By Mr. Musk's Alleged Misstatements**

7

8

9

10

11

12

13

14

15

16

17

18

19

20                            **ARGUMENT**

21  **I.**    **PLAINTIFFS' PROPOSED CLASS IS BARRED BY RULE 23(b)(3) FOR FAILURE
        TO ESTABLISH PREDOMINANCE**

22

23        Reliance on a false or misleading statement, an essential element under Rule 10b-5, is

24  inherently an individual question.  However, in *Basic*, the Supreme Court established the fraud-on-

25  the-market theory which creates a rebuttable presumption of class-wide reliance provided the

26  alleged misrepresentation impacted the price of a security traded in an "efficient market.  485 U.S.

27  at 246.  "Absent the fraud-on-the-market theory," the reliance element would "ordinarily preclude

28  certification of a class action" for lack of predominance "because individual reliance issues would

1    overwhelm questions common to the class." *Amgen*, 568 U.S. at 462-63.

2         *Basic*'s fraud-on-the-market theory does not apply here and Plaintiffs' proposed class—

3    which includes **both** sophisticated investors who could "decipher" the public Merger Agreement

4    and evaluate the accuracy of Mr. Musk's statements and those who could not and were allegedly

5    "confused and misled" by them—fails because individual questions of reliance predominate. ***First***,

6    Plaintiffs cannot invoke *Basic* because their theory that Twitter's price was deflated for five months

7    even though sophisticated market participants could understand the Merger Agreement assumes an

8    ***inefficient*** market. ***Second***, the evidence shows the misrepresentations did not impact the price of

9    Twitter stock, rebutting *Basic*'s presumption even if it did apply. ***Third***, independent of whether

10   Twitter's stock price was impacted by the alleged misrepresentations, Rule 23(b) cannot be satisfied

11   because individual inquiries are required to determine which investors understood Mr. Musk's rights

12   (and could not have been defrauded) and which ones did not. ***Fourth***, this is a misrepresentation-

13   based case so the *Affiliated Ute* presumption cannot apply.

14        **A.    *Basic*'s Fraud-On-The-Market Presumption Does Not Apply Here**

15             1.   Plaintiffs' Theory Of Liability Is Incompatible With An Efficient Market

16        At its core, Plaintiffs' motion for class certification must fail because they cannot avail

17   themselves of the *Basic* presumption of class-wide reliance since their own theories of falsity and

18   loss causation are fundamentally incompatible with and "indicate the very antithesis of an efficient

19   market"—the economic theory upon which *Basic* is premised. *In re IPO*, 471 F.3d at 43 (affirming

20   denial of class certification based on fraud-on-the-market where plaintiffs pleaded widespread

21   knowledge among market participants of information necessary to determine whether the alleged

22   misrepresentations were false). Plaintiffs do not allege a fraud-on-the-market, but only a fraud on

23   that segment of the market **confused** by and unable to "decipher" public information. They concede

24   that the sophisticated investors who set the market price in an efficient market did understand Mr.

25   Musk's rights under the Merger Agreement. (Dkt. 62, at 10-11.) Plaintiffs cannot have it both

26   ways; because their theories of falsity and loss causation are irreconcilable with the efficient market

27   hypothesis, they are barred from certification under *Basic*. *In re IPO*, 471 F.3d at 43.

28        The fraud-on-the-market doctrine requires that a plaintiff prove that the securities at issue

1  "traded in an efficient market," *Halliburton II*, 573 U.S. at 277-78, and is thus "based on the efficient

2  markets hypothesis," *In re Genesisintermedia Sec. Litig.*, 2007 WL 1953475, at *5 (C.D. Cal. June

3  28, 2007), *aff'd*, 573 F.3d 931 (9th Cir. 2009), which "posits that the price of a stock rapidly

4  incorporates all publicly available information." (Tabak, ¶ 9.)   Crucially, the efficient market

5  hypothesis recognizes that certain market participants—like retail investors—have less knowledge

6  and are paying less attention to information in the market than more sophisticated participants—like

7  large institutional investors.  (Tabak Dep. 37:18-38:10.)   But it assumes that the sophisticated

8  "information-hungry" market participants seek all public information about a publicly traded

9  company, rapidly perform the specialized and labor intensive work of digesting complex

10  information, and then incorporate that information into the market price of the company's stock by

11  actively and continuously trading.  *Mandalevy v. BofI Holding*, 2018 WL 3032588, at *13 (S.D.

12  Cal. June 19, 2018); (Tabak Dep. 36:24-37:16, 40:2-17, 47:3-19, 49:16-19; Saha, ¶¶ 26, 42.)

13  As Dr. Tabak explained, "the **whole theory of market efficiency** is that people who don't

14  pay attention"—*i.e.*, the less sophisticated investors—"are able to rely on those who do"—*i.e.*,

15  "experienced and skilled professionals in the field"—"to set the prices" of securities. (Tabak Dep.

16  38:11-20.)  So long as "the sophisticated entities" have "knowledge or understanding of public

17  information," that information "is fully integrated into the price of a security." *Id.* at 39:11-40:7

18  ("[S]ophisticated players . . . use buying and selling pressure to reach one market price that reflects

19  the market's understanding of the information."); *Bonanno v. Cellular Biomedicine Grp.*, 2016 WL

20  4585753, at *5 (N.D. Cal. Sept. 2, 2016) ("One presumes that all public information is incorporated

21  into the market price no matter how far flung it may be.").

22  This is where Plaintiffs' fundamental and fatal defect arises.  Plaintiffs' lawsuit is based on

23  the theory that Mr. Musk made misrepresentations about his rights and obligations under the public

24  Merger Agreement starting May 13, 2022 and that the information necessary to judge the accuracy

25  of those statements was not revealed to the market until October 4, 2022.  But Plaintiffs have

26  conceded that "experienced and skilled professionals in the field," "sophisticated part[ies]," and

27  **Plaintiffs' own counsel** possessed sufficient information to "decipher the Merger Agreement" to

28  determine what Mr. Musk's rights under that public document were and "know [whether] Musk's

tweets were false" prior to May 13 and certainly before the October 4 corrective disclosure and end of the proposed class period.  (Dkt. 62 at 10-12.)  Indeed, there is little dispute that these "experienced and skilled professionals" had sufficient public information to determine what Musk's rights and obligations were prior to his May 13 Tweet.  (Tabak Dep. 45:5-46:20; 101:24-103:24; 108:5-111:10; Saha, ¶ 42.)  Plaintiffs' counsel's own allegations in the *Heresniak* Complaint—based only on the Merger Agreement and April 21 disclosure—confirm that.  (Ex. 7.)

Plaintiffs have tried to draw a distinction between the "reasonable investor" who would be confused and misled and the sophisticated investors who could "decipher" the public Merger Agreement.  (Dkt. 62 at 10-11 ("[T]he test is not whether experienced and skilled professionals in the field would know that Musk's tweets were false—instead, the test is what a reasonable investor would think.").)  Although the Court agreed with Plaintiffs and decided that a reasonable investor may nonetheless have been misled and that the knowledge of sophisticated parties was not relevant to that inquiry, on the issue of whether any alleged misrepresentation was incorporated into Twitter's stock price—and in turn whether Plaintiffs can rely on the fraud-on-the-market doctrine—it is the opposite.  Both experts agree that to determine whether stock price was affected by an alleged misstatement—*i.e.*, price impact, which is the focus of the first three elements of *Basic* class-wide reliance, *see Halliburton II*, 573 U.S. at 278—the relevant market participant to analyze is not the "reasonable investor" but the sophisticated investors who drive share prices.  (Tabak Dep. 39:11-40:7; Tabak, ¶ 23; Saha, ¶ 42.)  So although Plaintiffs previously evaded dismissal on the basis that only sophisticated investors fully understood the terms of the Merger Agreement (Dkt. 62 at 11; Exs. 7, 8, 13), this fact is now directly relevant to price impact for *Basic* and unique knowledge for the predominance analysis.  *In re IPO*, 471 F.3d at 43.

Plaintiffs' theory that the market price remained artificially affected by the alleged misrepresentations despite the ability of sophisticated investors to "decipher" the Merger Agreement is thus in irreconcilable tension with *Basic* and the efficient market hypothesis.  *Freeman v. Laventhol & Horwath*, 915 F.2d 193 (6th Cir. 1990) ("An inefficient market, by definition, does *not* incorporate into its price all the information about the security."). Where, as here, a plaintiff's theory "myopically . . . ignor[es] . . . information already available to the market" it thereby "contradict[s]

1   the efficient-market hypothesis upon which [plaintiff] premises [its] lawsuit." *Roots Partnership v.*

2   *Lands' End. Inc.*, 965 F.2d 1411, 1420 (7th Cir. 1992).  Plaintiffs cannot obtain certification under

3   *Basic*'s presumption.  The proposed class should be denied.  *In re IPO*, 471 F.3d at 43.

4              2.    *Basic* Is Rebutted Because The Alleged Misrepresentations Did Not Impact Price

5              Even if Plaintiffs could establish an efficient market to invoke *Basic*, their proposed class

6   still fails because, in an efficient market, the alleged ***misrepresentations*** could not impact Twitter's

7   stock price. Any presumption of reliance is thus rebutted.  "*Basic* itself 'made clear that the

8   presumption was just that, and could be rebutted by appropriate evidence,' including evidence that

9   the asserted misrepresentation (or its correction) did not affect the market price of the defendant's

10  stock." *Halliburton II*, 573 U.S. at 268; *Basic*, 485 U.S. at 248 ("Any showing that severs the link

11  between the alleged misrepresentation and either the price received (or paid) by the plaintiff . . . will

12  be sufficient to rebut the presumption of reliance.").  Defendant bears the burden to prove a lack of

13  price impact by a preponderance of the evidence, but in assessing price impact, a district court's

14  inquiry should be flexible and holistic. *Goldman Sachs Grp. v. Arkansas Tchr. Ret. Sys.*, 594 U.S.

15  113, 122 (2021).

16             The presumption is rebutted by (1) "showing that the market was already aware of the truth

17  behind the defendant's supposed falsehoods and thus that those falsehoods did not affect the market

18  price," *Amgen Inc.*, 660 F.3d at 1173-74 (9th Cir. 2011); *In re Chicago Bridge & Iron Co. N.V. Sec.*

19  *Litig.*, 2020 WL 1329354, at *6 (S.D.N.Y. Mar. 23, 2020) ("an inquiry into . . . newness, is

20  appropriate at the class certification stage"), and (2) where it can be shown that there is no

21  statistically significant "front-end" impact on days of the fraud.  *In re Finisar Corp.*, 2017 WL

22  6026244, at *9; *In re Moody's Corp.,*, 274 F.R.D. at 493 (denying certification; "there is no period

23  . . . where the alleged misrepresentation caused a statistically significant increase in the price").[3]

24             The preponderance of the evidence establishes that Mr. Musk's alleged ***misrepresentations***

25

26  _____

27  [3]    Plaintiffs cite a "price maintenance" case to suggest that certification can proceed even if
    Defendant demonstrates there was no statistically significant price change. (Dkt 76 at 16.) But this
    is not a "price maintenance" case.  Plaintiffs allege that Musk altered the status quo by his

28  misstatements and caused Twitter's stock to drop—not that any statements maintained deflation
    already in the stock.  (FAC ¶¶ 113, 124.)  *In re Chicago Bridge*, 2019 WL 5287980, at *18 n.12.

did not impact Twitter's stock price.  The factual content of the alleged misrepresentations—Mr. Musk's rights under the public Merger Agreement and contention that outside analysts estimated that 20% of Twitter's users were bots—was not "new" to the market, in particular to the sophisticated investors who establish the market price of Twitter stock.  And there was no statistically significant price reaction to Mr. Musk's statements on May 16 and 17.

***May 13 Tweet***:  Plaintiffs allege that Mr. Musk's May 13 Tweet misrepresented his rights to information and "put on hold" the transaction under the Merger Agreement.  Under *Basic*, Mr. Musk's ***misrepresentation***—what rights existed under the Merger Agreement—must be new to have a price impact.  *Amgen Inc.*, 660 F.3d at 1173-74; *see also* Saha, ¶¶ 28-31; Tabak Dep. 101:2-6.  Here, as discussed *supra* pp. 3-5, both parties' experts agree that all of Mr. Musk's rights under the Merger Agreement—including his rights to information and diligence—were publicly known, absorbed, and integrated into Twitter's stock price well before May 13.  (Tabak Dep. 105:18-24; 108:5-111:10.)  Reports published on May 13 confirm that sophisticated market participants already had sufficient information to determine what rights Mr. Musk did or did not have.  "Twitter's price decline on May 13, 2022, could not have been in response to information about Twitter's obligations per the Merger Agreement since that was not new information."  (Saha, ¶ 42.)

For that reason, Plaintiffs cannot simply point to the price drop as sufficient evidence of price impact since the alleged misrepresentation concerned Mr. Musk's rights under an agreement that was already known to and understood by sophisticated investors.  *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 263 (N.D. Tex. 2015) (finding no price impact despite stock price decline because any news related to the alleged misrepresentation had "already impounded in the market price of the stock"); *IBEW Loc. 98 Pension Fund v. Best Buy Co*., 818 F.3d 775, 782 (8th Cir. 2016) (finding no price impact because the misrepresentations did not reflect new information). Instead, the evidence points to a more compelling "common sense" explanation for the price drop. *Goldman*, 594 U.S. at 122.  As Dr. Saha explains, the market did not react to Mr. Musk's representation about the terms of the Merger Agreement, but responded to the fact that Mr. Musk's tweet about his dissatisfaction with Twitter's bot information injected "uncertainty about the prospects of the deal closing," Mr. Musk's potential future actions, and Twitter's response "e.g.,

1  whether it would walk away from the deal, close at a lower price, or litigate."  (Saha, ¶ 43.)  The

2  Court itself acknowledged the market reacted to the "enormous uncertainty" created by the Tweet.

3  (Ex. 10, 6/21/2024 Hr'ing Tr. at 12:4-20; 19:25-20:15 ("The problem isn't just rights and

4  obligations.  It's the problem of intentions . . . So I thought the uncertainty that he created was you

5  didn't know what he was going to do next. You just didn't know.").)  It is more logical that the

6  market reacted to this "new" information than any statement about an agreement it already had

7  absorbed weeks before.

8          Indeed, to hold that the price drop on May 13 was attributable to Mr. Musk's alleged

9  misstatement about his rights under the Merger Agreement and that the share price remained

10  artificially depressed until October 4, 2022 would require the Court to conclude that there was a

11  massive arbitrage opportunity for "experienced and skilled professionals" and securities lawyers

12  that persisted for approximately five months, which is entirely inconsistent with the efficient market.

13  *See Teamsters Loc. v. Bombardier, Inc*., 2006 WL 2161887, at *7 (S.D.N.Y. Aug. 1, 2006) ("Market

14  makers and arbitrageurs contribute to market efficiency by 'reacting swiftly to company news and

15  reported financial results by buying or selling stock and driving it to a changed price level.'").

16          Plaintiffs have conceded that sophisticated market participants—including their own counsel

17  who filed a Complaint on May 24, 2022 outlining the same allegations of falsity asserted in this

18  case—were able to decipher Mr. Musk's contractual rights within hours and days after the May 13

19  Tweet.  Had the share price fallen in response to any misunderstanding of Mr. Musk's obligations

20  under the Merger Agreement, the efficient market hypothesis dictates that that it would have

21  recovered within one or two trading days of these sophisticated institutional investors and

22  arbitrageurs learning facts to correct that misunderstanding (including the allegations published in

23  the *Heresniak* Complaint).  (Tabak Dep. 73:2-21.)  That the share price allegedly remained deflated

24  for five months leaves only two explanations: either the price drop was not caused by the alleged

25  misrepresentation or sophisticated investors failed to exploit a clear arbitrage opportunity.  Both

26  doom Plaintiffs' motion.  *Amgen Inc.*, 660 F.3d at 1173 ("If the stock price did not reflect a piece of

27  publicly available information, the logic goes, then investors would have a strong incentive to buy

28  the stock (if the information were positive) or sell it (if negative); in an efficient market, that activity

1   would drive the stock price up or down until it fully reflected the information.").

2        That the market reacted to uncertainty—and not any misrepresentation about Mr. Musk's

3   rights under the public Merger Agreement—also provides a more compelling explanation for the

4   stock's performance during the class period and the price increase in response to the so-called

5   "corrective disclosure" on October 4, 2022.  After a sharp decline following Mr. Musk's notice of

6   termination in July 2022—which is not an actionable misrepresentation (*see* Dkt. 48 at 35-36)—

7   Twitter's stock price rebounded by more than 26 percent from July 12 through October 3, even

8   though the Nasdaq composite fell by nearly five percent over that same time period. (Saha, ¶ 48.)

9   This increase corresponded with news and analyst reports about Mr. Musk's lawsuit with Twitter

10  that indicated the acquisition was likely to "successfully close" and that drawn out litigation was

11  unlikely, *i.e.*, a decrease in uncertainty.  (Saha, ¶¶ 50-56.)  Furthermore, the fact that the October 4

12  announcement made no reference to Mr. Musk's rights under the Merger Agreement but simply

13  stated that he "intend[ed] to proceed to closing" of his acquisition provides further support that the

14  corresponding stock price jump was a market reaction to the resolution of the uncertainty and not a

15  correction of any misstatement about his information rights under the public Merger Agreement.

16        ***May 16, 2022.***  The *Basic* presumption is also rebutted as to Mr. Musk's statement that

17  outside analysts estimated that 20 percent of Twitter's accounts were bots.  (Saha, ¶¶ 38-39, Ex. 12.)

18  As an initial matter, Twitter's share price only fell 0.4 percent after Mr. Musk made that statement,

19  less than the 0.8 percent drop experienced by the market over the same time period, and far less than

20  the more than 8 percent fall Plaintiffs erroneously attribute to it.  (*Id.*, ¶¶ 36-37.)  This drop was not

21  statistically significant and cannot show price impact. *Id.*; *In re Finisar Corp.,* 2017 WL 6026244,

22  at *9.  The lack of price impact is unsurprising.  The information conveyed—the estimation of

23  outside analysts and the fact that Twitter had not provided him the bot data he sought—was not

24  "new"—another fact that proves lack of price impact. *Amgen Inc.*, 660 F.3d at 1173-74.

25        ***May 17, 2022.***  On May 17, 2022, there was *no* price decrease consistent with Plaintiffs'

26  theory of this case.  Instead, the price increased.  (*See* Saha, ¶ 34; Ex. 7; Tabak Dep. 90:10-18.)

27  Both experts agreed the reaction was not statistically significant.  *Id.*  This lack of price impact is

28  consistent with the Court's Order that the May 17, 2022 Tweet was merely a "reiteration" of past

1   statements and thus not "new."  (Dkt. 48 at 25.)

2   **B.      This Action Requires Individualized Inquiries Of Investor Knowledge**

3       Plaintiffs' concession that some sophisticated investors had sufficient information to

4   "decipher" Mr. Musk's rights under the public Merger Agreement creates further predominance

5   issues, precluding class certification.  Under Rule 23, "plaintiffs must prove that there are questions

6   of law or fact common to class members that can be determined *in one stroke*, in order to prove that

7   such common questions predominate over individualized ones."  *DZ Rsrv. v. Meta Platforms*, 96

8   F.4th 1223, 1233 (9th Cir. 2024).  Plaintiffs fall far short of this standard where their theory of this

9   case requires the Court to distinguish between shareholders who were **confused** from those who

10  were **knowledgeable**.   Axiomatically, individual issues will dominate in a shareholder action

11  centered on investors alleged to have differing levels of awareness regarding purportedly misleading

12  public information.  *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D.

13  160, 170 (S.D.N.Y. 2011), *aff'd*, 477 F. App'x 809 (2d Cir. 2012).

14      "There is no dispute that a section 10(b) claimant must allege and prove that the claimant

15  traded in ignorance of the fact that the price was affected by the alleged manipulation."  *In re IPO*,

16  471 F.3d at 43; *Halliburton II*, 573 U.S. at 269 ("presumption of reliance would not apply" where

17  "a plaintiff would have bought or sold the stock even had he been aware that the stock's price was

18  tainted by fraud").

19      Thus, to establish a claim here, an individual shareholder must show that she traded without

20  knowledge of Mr. Musk's rights under the public Merger Agreement.  As Plaintiffs plead in their

21  complaint, Mr. Musk's May 13 Tweet was misleading because "there was nothing in the [Merger

22  Agreement] that allowed Musk to put the deal ""temporarily on hold""—a conclusion reached after

23  reading the public Merger Agreement—and because it "stated or implied that Musk's obligation to

24  consummate the buyout was conditioned on his satisfaction with due diligence"—a right he publicly

25  disclosed he waived.  (FAC, ¶ 112.)  Although Mr. Musk's obligations under the Merger Agreement

26  may have been difficult for some in the market to understand, it is undisputed that it was not

27  impossible **for all** market participants to decipher it.  Certain analysts were able to evaluate Mr.

28  Musk's contractual obligations within hours of the Tweet and Plaintiffs' counsel themselves, within

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

days of the Tweet and based on a review of the public documents, alleged that Mr. Musk did not have the rights allegedly misrepresented.  The Court itself acknowledged that the truth or falsity of Mr. Musk's Tweet could be gleaned within the four corners of the Merger Agreement, (Dkt. 48 at 31 (noting Mr. Musk would have known his May 13 Tweet was misleading had he "investigat[ed] that obligation with respect to the Merger Agreement before making his statements")), and analyzed that document in ruling that Plaintiffs plausibly alleged falsity in this case (*id.* at 19-20).

Accordingly, as in *In re IPO*, Plaintiffs have alleged that there was **some** "widespread knowledge" among market participants as to Mr. Musk's actual rights and obligations under the public Merger Agreement and waiver of diligence. 471 F.3d at 43-44; FAC, ¶ 85, 112. ███████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████        ████████████████████████████████

██████████████████  Plaintiffs' allegations and admissions that some market participants could and did understand Mr. Musk's rights based on public information and other others did not "precipitate[s] individual inquiries as to the knowledge [or lack thereof] of each member of the class" and precludes Plaintiffs from satisfying Rule 23(b)(3)'s predominance requirement.  *In re IPO*, 471 F.3d at 44.  Courts regularly deny certification in securities class actions where plaintiffs allege, or there is evidence of, differing awareness of the accuracy of the alleged fraud for lack of predominance. *Id.*; *Zimmerman v. Bell*, 800 F.2d 386, 390 (4th Cir. 1986) (affirming denial of class certification in action alleging failure to disclose material facts because much of the information allegedly omitted was publicly disclosed); *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 151 (N.D. Tex. 2014) (allegations that class members "differed in their level of sophistication, and thus, in their ability to glean from the newly disclosed information" required individualized knowledge inquiries and prevented certification).  This is the exact situation here; the only way to untangle who was *confused* from who was *knowledgeable* involve thousands of "mini-trials," foreclosing any notion that predominance is satisfied.  *Bowerman v. Field Asset Servs.*, 60 F.4th 459, 470 (9th Cir. 2023).  The motion should be denied for this reason too.

C.     The *Affiliated Ute* Presumption Does Not Apply Here

Plaintiffs are not entitled to the *Affiliated Ute* presumption of reliance either.  (Dkt. 76 at 15.)  This presumption only applies in fraud cases that "primarily" involve omissions.  *Affiliated Ute*, 406 U.S. at 153; *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999); *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Liab. Litig.*, 2 F.4th 1199, 1206 (9th Cir. 2021).  Plaintiffs' falsity' claim alleges a mix of misrepresentation and omission theories.  (*See e.g.*, FAC, ¶ 10.)  In such cases, courts determine whether the omission theories stand alone or do little more than "explain why Defendants' statements were false"; if the latter, as here, *Affiliated Ute* does not apply.  *Lord Abbett Affiliated Fund v. Navient Corp.,* 2020 WL 5026553, at *5 (D. Del. Aug. 25, 2020); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F. Supp. 584, 606 n.18 (D.N.J. 1996) (*Affiliate Ute* not applicable where "omissions . . . were really only the converse of affirmative misrepresentations").  The gist of this case is that Mr. Musk made misrepresentations about his rights under the Merger Agreement and the source of his estimate of Twitter bot traffic. (Dkt. 48 at 20, 23; FAC, ¶ 149.)  Thus, any purported omissions are "simply the inverse of the affirmative misrepresentations."  *See In re Volkswagen.*, 2 F.4th at 1208.  *Affiliated Ute* does not apply here.

II.     **PLAINTIFFS' CLASS DEFINITION AND DAMAGES MODEL FAIL RULE 23**

A.     **Plaintiffs' Proposed Class Is Overbroad And Unworkable**

Plaintiffs' motion for class certification should also be denied because it is definitionally overbroad and includes a number of class members who ***profited*** from the alleged deflation and thus did not suffer harm.  Plaintiffs' class definition is not limited only to those who bought Twitter stock before May 13 and sold during the class period, but also includes those who bought after the stock was deflated (provided they also sold in the class period).  Since Plaintiffs' price deflation theory concludes that anyone who sold shares at a deflated price was harmed, it follows that anyone who purchased deflated shares could have profited from the lower price.  Even Dr. Tabak concedes these shareholders "have no claim," yet they still fall within this overbroad class definition. (Tabak Dep. 147:8-14.)  Because Twitter's price rebounded substantially during the class period, a great number of potential class members likely achieved higher gains than they would have but/for the alleged deflation. (Saha, ¶¶ 59-61).  Forty-two percent of institutional shareholders increased their holdings

during the class period, *id.*, ¶ 79, and every Lead Plaintiff bought shares at an allegedly deflated price during the class period too, (Dkt. 8-3).  The class thus includes a great number of uninjured members, requiring the Court to "consider whether the possible presence of uninjured class members means that the class definition is fatally overbroad."  *Olean*, 31 F.4th at 669 n.14.

Plaintiffs attempt to avoid this issue by defining the class to cover only those shareholders "who suffered damage."  But these circular "fail-safe" class definitions are improper and should be rejected here.  *Id.*; *In re Merck & Co. Sec., Derivative & ERISA Litig.*, 2013 WL 396117, at *15 (D.N.J. Jan. 30, 2013) (class of "investors who 'were damaged' by their Class Period transaction in Merck common stock or options" denied for "impos[ing] a merits determination on class membership.").  The proposed class cannot be certified as defined.

**B.**      **Plaintiffs' Damages Model Does Not Comply With *Comcast***

*Comcast* mandates that Rule 23(b)(3) can only be met by a damages methodology that is both measurable on a class-wide basis and consistent with Plaintiffs' theory of liability.  569 U.S. at 34-35.  Plaintiffs' damages model does not satisfy this standard as it does not net out potential profits gained by class members who bought at deflated prices during the class period.  Tabak, ¶ 73; Tabak Dep. 147:8-14, 149:13-17; *see* Saha, ¶¶ 21(h), 57-59; *Arenson*, 2004 WL 3253646, at *2. Failing to do so creates "windfall," *Beaty v. Ford Motor Co*., 2021 WL 3109661, at *13 (W.D. Wash. July 22, 2021), and impermissible "false positive" recoveries barred by *Comcast*, *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 253 (D.C. Cir. 2013).

**III.      THE LEAD PLAINTIFFS ARE ATYPICAL AND INADEQUATE**

Finally, the Court should deny class certification because the Lead Plaintiffs are atypical and inadequate class representatives in violation of Rule 23.

*First*, ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████     ████████
████████████████████████████████████     ████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

1  ███████████████████████████████████████████████

2  ███████████████████████████████████████████████

3  ███████████████████████████████████████████████

4  ███████████████████████████████████████████████

5  ███████████████████████████████████████████████

6  ███████████████████████████████████████████████

7  ███████████████████████████████████████████████

8  ███████████████████████████████████████████████

9  ███████████████████████████████████████████████

10 ███████████████████████████████████████████████

11 ███████████████████████████████████████████████

12 ███████████████████████████████████████████████

13 ███████████████████████████████████████████████

14 ███████████████████████████████████████████████

15 ███████████████████████████████████████████████

16 ████████████████████

17 *Second*, █████████████████████████████████████

18 ███████████████████████████████████████████████

19 ███████████████████████████████████████████████

20 ████████████████  █████████████████████████████

21 ███████████████████████████████████████████████

22 ███████████████████████████████████████████████

23 ███████████████████████████████████████████████

24 ███████████████████████████████████████████████

25 ██████████████████████████████

26                    **<u>CONCLUSION</u>**

27      For the foregoing reasons, Defendant respectfully requests that the Court deny Plaintiffs'

28 Motion for Class Certification.

DATED:  September 2, 2024

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By_____/s/ Jesse A. Bernstein_____
Alex Spiro
Michael T. Lifrak
Joseph C. Sarles
Jesse A. Bernstein
*Attorneys for Defendant Elon Musk*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on this the 2nd day of September, 2024.

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By _/s/ Alex Bergjans_
    Alex Spiro
    Michael T. Lifrak
    Joseph C. Sarles
    Jesse A. Bernstein

    *Attorneys for Defendant Elon Musk*

1

## <u>ATTESTATION</u>

2      Pursuant to Civil L.R. 5-1,  I attest under penalty of perjury that concurrence in the filing of

3  this document has been obtained from the other signatory herein.

4

5                                      By <u>/s/ Alex Bergjans</u>
                                          Alex Bergjans
6
                                        *Attorneys for Defendant Elon Musk*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28