# EXHIBIT 5
# (Redacted)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GIUSEPPE PAMPENA, individually and on behalf of all others similarly situated,<br><br><br>          *Plaintiff*,<br><br>v.<br><br>ELON MUSK,<br><br>          *Defendant.* | CASE NO.: 22-CV-05937-CRB |

EXPERT REPORT OF ATANU SAHA, PH.D.

August 26, 2024

HIGHLY CONFIDENTIAL

Privileged and Confidential

## TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................................3

        A.     QUALIFICATIONS ........................................................................................... 3

        B.     FACTUAL BACKGROUND AND KEY ALLEGATIONS.................................................. 4

          1.   FACTUAL BACKGROUND ................................................................................ 4

          2.   PLAINTIFFS' KEY ALLEGATIONS RELATED TO CLASS DEFINITION AND DAMAGES ...................... 5

        C.     ASSIGNMENT AND MATERIALS RELIED ON ..................................................... 7

        D.     SUMMARY OF CONCLUSIONS ....................................................................... 8

II.    CLASS CERTIFICATION ANALYSIS...................................................................... 13

        A.     ALLEGED MISREPRESENTATIONS CLAIMS AND THEIR PRICE IMPACT.................................... 13

          1.   THE EFFICIENT MARKET HYPOTHESIS AND ITS IMPLICATIONS ............................................. 13

          2.   SHARE PRICES DO NOT REACT TO ALREADY KNOWN PUBLIC INFORMATION ......................... 15

          3.   TWITTER'S PRICE MOVEMENT ON ALLEGED MISREPRESENTATION DAYS............................. 17

          4.   TWITTER'S PRICE REBOUND IN LINE WITH SUBDUED SHORT INTEREST ............................... 26

          5.   TWITTER'S PRICE REBOUND IS CONSISTENT WITH ANALYST COMMENTARIES........................ 27

        B.     FLAWS IN PLAINTIFFS' DEFINITION OF PURPORTED CLASS: ILLUSTRATIVE EXAMPLES ............. 30

        C.     FLAWS IN PLAINTIFFS' DEFINITION OF PURPORTED CLASS: SHAREHOLDERS DATA ................ 39

        D.     THE PURPORTED CLASS CREATES THE DISTINCT POSSIBILITY OF INTRA-CLASS CONFLICTS.... 43

        E.     DAMAGES METHODOLOGY IS INAPPLICABLE TO SHORT SELLING AND OPTION TRADES .......... 44

        F.     LEAD PLAINTIFFS' TRANSACTIONS EXEMPLIFY THE PROBLEMS WITH PC DEFINITION ............ 45

          1.   LEAD PLAINTIFFS CONTINUED TO PURCHASE THROUGHOUT THE PC PERIOD ........................ 46

          2.   LEAD PLAINTIFFS DID NOT TRADE IN OPTIONS AT ISSUE .................................................. 51

III.   SUMMARY OF CONCLUSIONS ........................................................................... 52

APPENDIX A: Curriculum Vitae ........................................................................................ A-1

APPENDIX B: Information Relied On.................................................................................. B-1

APPENDIX C: Appendix Tables......................................................................................... C-1

Privileged and Confidential

## I.    INTRODUCTION

### A.    QUALIFICATIONS

1.    I am a Partner at StoneTurn, an international economic research and consulting firm. I have nearly 30 years of experience in the application of economics and finance to complex business issues. I have provided expert testimony and consulting analysis in numerous matters, including those involving the technology sector in general and internet companies in particular. I have also provided expert testimony on damages in various securities litigation matters by applying event studies and other approaches. My testimony has been accepted in various State and Federal Courts across the country, as well as Delaware Chancery, AAA proceedings, and international arbitration venues.

2.    I have served as an expert in prior engagements for both plaintiffs and defendants, wherein I have undertaken economic analyses in a wide range of settings. In the past, I have conducted class certification analyses and provided expert testimony in class action disputes in securities litigation and antitrust matters. In addition, I have assessed damage claims in numerous prior matters involving voluminous transaction-level data.

3.    I have co-authored several scholarly studies regarding event study analysis and on hedge funds, mutual funds, and their investment strategies. One of my studies on event study analysis has been cited by the Court of Appeals for the Eleventh Circuit.

4.    I am the author of nearly 50 peer-reviewed journal articles on a wide range of topics and my financial research has been cited in scores of publications, including *The Wall Street Journal, The Economist,* and *The New York Times*. I am a recipient of the Graham and Dodd Award, which recognizes excellence in financial research.

5.    Before joining StoneTurn, I held senior positions at several economic consulting firms, including Analysis Group and Compass Lexecon. Earlier in my career, I cofounded Data Science Partners, an economic consulting firm specializing in financial analysis and data analytics. Additionally, I was a tenure-track professor for four years at Texas A&M University, where I taught Ph.D.-level courses in econometrics and applied economics. I hold a Ph.D. from the University of California, Davis, with applied economics and econometrics as my fields of specialization.

Privileged and Confidential

6.    My curriculum vitae, including a list of cases in which I have testified as an expert witness at trial or by deposition, is attached as Appendix A to this report.

### B.    FACTUAL BACKGROUND AND KEY ALLEGATIONS

#### 1.    FACTUAL BACKGROUND

7.    Plaintiffs brought this class action against Elon Musk ("Musk" or "Defendant") on behalf of stockholders of Twitter, Inc. ("Twitter"), who sold shares of Twitter between May and October 2022 and allegedly suffered harm.[1]

8.    During the period at issue, Twitter was a publicly traded company that operated an eponymous social media platform with hundreds of millions of users. Twitter was headquartered in San Francisco, CA, and first issued publicly traded shares in November 2013.[2]

9.    On April 13, 2022, Musk offered to buy Twitter, Inc. at "$54.20 per share," representing a 32% premium over the prior 30-day average trading price.[3] On April 25, 2022, X Holdings I, Inc. and X Holdings II, Inc. (collectively the "Musk Parties") and Twitter signed an Agreement and Plan of Merger ("Merger Agreement") for $44 billion, or $54.20 per share (the "Buyout Price").[4] The Merger Agreement was publicly filed with the SEC that day.[5] Musk closed the transaction at the Buyout Price on October 28, 2022;[6] Twitter's shares were consequently

---

[1] First Amended Class Action Complaint (the "Complaint"), p. 3.

[2] Twitter's 10-K filing for FY ended December 31, 2013, available at
https://www.sec.gov/Archives/edgar/data/1418091/000095012314003031/twtr-10k_20131231.htm.

[3] See Amendment No. 2 to Schedule 13D/A, Twitter Inc., SEC, April 13, 2022; see also "Elon Musk Agrees to Buy Twitter," The New York Times, April 25, 2022.

[4] See Exhibit 1 of Declaration of Alex Bergjans in Support of Defendant Elon Musk's Motion to Dismiss the First Amended Complaint, Form 8-K, Twitter, Inc., April 25, 2022.

[5] Ibid.

[6] See Kurt Wagner, Ed Hammond, and Katie Roof, "Musk Completes $44 Billion Twitter Deal, Ending Months of Enmity," Bloomberg, October 27, 2022 (after close).

Privileged and Confidential

suspended from trading and delisted from the New York Stock Exchange on October 28, 2022, and November 8, 2022, respectively.[7]

10.    From May 2022 through October 2022, Musk made a series of tweets related to the deal and submitted termination letters (collectively the "conduct at issue").[8] Plaintiffs allege that Musk's conduct at issue contained "materially false and misleading statements and omissions" to depress the price of Twitter securities.[9] Plaintiffs claim that "many Twitter stockholders" sold "at depressed prices," thereby incurring damages.[10]

## 2. PLAINTIFFS' KEY ALLEGATIONS RELATED TO CLASS DEFINITION AND DAMAGES

11.    The class that Plaintiffs seek to be certified is defined as (the "Plaintiffs' Purported Class Definition"):

> "All persons and entities who sold the publicly traded stock or call options, or purchased the put options, of Twitter, Inc. during the period from May 13, 2022 through October 4, 2022, both dates inclusive (the "Class Period"), and **who suffered damages** by Defendant's alleged violations of §10(b) and of the Exchange Act."[11]

12.    In May 2022, Mr. Musk issued public statements about the prevalence of "spam" or "bot" accounts on Twitter's platform. Plaintiffs allege that on three dates, May 13, May 16, and May 17, 2022, Musk issued statements containing material misrepresentations.[12] I understand that the Court ruled at the motion to dismiss stage that

---

[7] See Kate Conger and Lauren Hirsch, "Elon Musk Completes $44 Billion Deal to Own Twitter," The New York Times, October 27, 2022. See also, "Notification of Removal from Listing and Registration of the Stated Securities," SEC, October 7, 2022.

[8] See the Complaint, pp. 3-4.

[9] Ibid, p.5.

[10] Ibid, p. 11.

[11] See Plaintiffs' Notice of Motion and Motion to Certify Class, Appoint Class Representatives, and Appoint Class Counsel; Memorandum of Points and Authorities In Support Thereof (the "Motion"), p. 1. (emphasis added). Per the Motion, footnote 1, the purported class excludes "Defendant Musk, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendant has or had a controlling interest."

[12] See the Complaint, pp. 32--37.

Privileged and Confidential

certain statements issued by Musk on these dates plausibly contained misrepresentations in connection with Musk's rights per the Merger Agreement.[13] The Plaintiffs allege that the misrepresentations **caused a decrease in Twitter's share price.**[14]

13.    The Plaintiffs' Motion to Certify Class specifies four lead plaintiffs in the suit: Steve Garrett, Nancy Price, John Garrett, and Brian Belgrave (collectively the "Lead Plaintiffs"). The Motion describes the Lead Plaintiffs as "individual investors who suffered large financial losses from selling Twitter stock at artificially depressed prices during the Class Period."[15] The Motion claims the Lead Plaintiffs are "more than adequate representatives and their claims are common to the class."[16]

14.    To calculate damages suffered by the purported class members, the Plaintiffs' Motion to Certify Class proposes the use of "event study methodology," which it asserts is "capable of calculating damages on a class-wide basis, consistent with Plaintiffs' theory of the case."[17]

15.    Dr. David Tabak, the Plaintiffs' expert, proposes his damages methodology as follows in his expert report (the "Tabak Report"):[18]

> "Damages in this matter for an investor who held a long position before the start of the Class Period and sold their shares during the Class Period is the amount of deflation at the time of sale. For an investor who opened a short position during the Class Period, damages would be the deflation at the time of sale less any deflation when they cover their short position (which would be zero if that did not occur before the end of the Class Period). For investors who opened a short position during the Class Period and then closed that position during the Class Period,

---

[13] Order Granting in Part and Denying in Part Defendant's Motion to Dismiss (the "Order"), pp. 20, 23.

[14] See the Motion, p. 10.

[15] Ibid, p. 4.

[16] Ibid, p. 6.

[17] See the Motion, p. 17.

[18] See the Expert Report of David I. Tabak, Ph.D., para. 73.

Privileged and Confidential

the starting point for their damages is deflation at the time of sale less deflation at the time of purchase."

16.    In his report, Dr. Tabak cites the definition of the purported class from the Complaint as "all persons and entities who sold the publicly traded securities of Twitter, Inc. in a five-month period from May 13, 2022, to October 4, 2022, both dates inclusive (the 'Class Period')." [19] It is notable, however, while Plaintiffs' Motion to Certify Class defines the purported class as those "who **suffered damages** by Defendant's alleged violations of 10(b) and of the Exchange Act," [20] Dr Tabak's definition does not include the words "suffered damages."

## C.    ASSIGNMENT AND MATERIALS RELIED ON

17.    I was asked by Quinn Emanuel Urquhart & Sullivan, LLP ("Counsel"), representing Defendant Musk, to conduct an economic analysis related to class certification issues in this matter. Specifically, I was asked by Counsel to:

- examine the movement of Twitter prices over the purported class period; I have also been asked to focus on May 13, May 16, and May 17, 2022, and determine whether the price movements on those days can be attributed to the conduct at issue, *i.e.*, whether there is "price impact" associated with the alleged misrepresentations on those dates;

- determine whether the purported class has been appropriately defined by the Plaintiffs;

- determine whether the damages methodology proposed by the Plaintiffs' expert, Dr. Tabak, is capable of measuring damages on a class-wide basis. [21]

18.    StoneTurn is being compensated for my time and that of others who have assisted me. My current billing rate is $925 per hour. StoneTurn's compensation is not

---

[19] See the Tabak Report, p. 1.

[20] See the Motion, p. 1. (emphasis added).

[21] See the Tabak Report, pp. 33-35.

Privileged and Confidential

dependent on the opinions expressed in this report, my testimony, or the outcome of this matter.

19.    In performing my analysis for this report, I have relied on: (i) my education, training, and professional experience; (ii) the parties' pleadings and information obtained through discovery to date; and (iii) information obtained through independent research on publicly available documents. The materials that I relied upon in forming my opinions are listed in Appendix B of this report, which is a subset of the materials made available to me that I considered.

20.    If additional information becomes available in this case, I reserve the right to modify or supplement my report accordingly and to respond to or rebut any expert opinion, argument, or additional documents offered by Plaintiffs.

## D.    SUMMARY OF CONCLUSIONS

21.    Based on my review of the evidence in this matter, I conclude that the purported class ("PC"), as defined by the Plaintiffs, is fatally flawed.

a)  Based on my review of the Plaintiffs' class action Complaint, Class Certification Motion, and the Court's rulings, I understand that it is alleged Musk's tweets and statements on May 13, May 16, and May 17, 2022, contained misrepresentations, which caused Twitter share prices to fall. I have undertaken a detailed examination of Twitter prices on each of these days. I have concluded that a causal connection between Musk's alleged misrepresentations and the price movement of Twitter stock prices does not exist, *i.e,* there is no "price impact."

b)  My data analysis shows that on May 17, Twitter's share price did not fall but increased 2.5% relative to the closing price on May 16. Thus, Twitter's price movement on May 17, 2022, is inconsistent with the alleged conduct at issue.

c)  On May 16, 2022, Plaintiffs allege that "Musk stated publicly during the All In Summit, a tech conference in Miami, that fake and spam accounts make up at least 20% of Twitter's users." Musk made this statement at 2:17 PM on that day. While Twitter's share price at the end of trading on May 16 was 8.5% lower than the closing price on the previous trading day, May 13, my analysis of intra-day price data shows that 8.1% of the total 8.5% price drop occurred **before** Musk's statement. The change in Twitter's price during the 103 minutes after Musk's statement at 2:17 PM through market close

8

Privileged and Confidential

at 4:00 PM is only -0.4%. This change is not statistically significant and is fully explained by the movement of the Nasdaq 100 index during those 103 minutes. As noted earlier, Twitter's share prices rose the next day. Thus, Twitter's price movement after Musk's statement on May 16, 2022, cannot be causally linked to Musk's statements on that day, that is, there is no price impact of the alleged misrepresentation.

d) Twitter's price drop on May 13, 2022, is statistically significant. On that day, Mr. Musk tweeted: "Twitter deal temporarily on hold pending details supporting calculation that spam accounts do indeed represent less than 5% of users." Regarding this statement, the Court ruled: "[b]ecause Twitter did not have an obligation to provide this data to Defendant under the terms of the Merger Agreement, Defendant's representation that Twitter did have this obligation in order for the deal to close was false." However, it is undisputed that, on April 21, 2022, Musk publicly disclosed through an SEC filing that his offer was not subject to due diligence, and on April 25, 18 days before May 13, the terms of the Merger Agreement were disclosed to the market via an SEC filing, which is a public document available to all investors. My review of analysts' commentaries and press articles shows that institutional investors—who play a critical role in driving market prices of stocks—were aware of the terms of the Merger Agreement well before May 13, 2022. Thus, the Merger terms, which contained information about Musk's rights and Twitter's obligations under those terms, were **not new** information to the market on May 13. Since, in an efficient market, all publicly available information in the recent past is fully reflected in share prices, and share prices react to **new** information, the information about the Merger Terms in Musk's tweet cannot be causally linked to Twitter's price reaction on May 13, 2022. Based on my review of various analysts' commentaries, possible reasons for the decline of Twitter's share prices on May 13 include uncertainty around the likelihood of the deal's consummation and its final terms, including the deal's closing price, if consummated.

e) During the PC period, Twitter share prices experienced a statistically significant drop on July 11 and August 23, 2022. Yet, the Court has ruled that there are no allegations of misrepresentation on July 11. I also demonstrate that the price drop on August 23 was entirely unrelated to any of Plaintiffs' allegations. These examples show that Twitter share prices can experience a significant fall without a causal link to any alleged

9

Privileged and Confidential

misrepresentation. In other words, the market's perception of deal likelihood—and the corresponding impact on Twitter's stock price—can be and were impacted by issues unrelated to Twitter's obligations under the Merger Agreement.

f) After July 11, 2022, Twitter share prices rebounded through the remainder of the PC period. Twitter share prices gained nearly 27% between July 12 and October 3, 2022. By contrast, the Nasdaq Composite Index fell 5% over the same period. This pattern of movement of Twitter share prices is consistent with declining short interest (a lower short interest reflects a bullish view) in Twitter shares and also with analysts' commentaries. Importantly, a vast majority of analysts did not downgrade Twitter stock to a "sell" rating between early May and mid-July 2022; instead, they largely maintained their "hold" rating on Twitter's stock before and throughout the PC period. Thus, the analyst communities' recommendations are inconsistent with the alleged misrepresentations.

g) The PC, as defined, includes a large number of Twitter shareholders who potentially suffered no damages. Furthermore, the PC, as defined, precludes measurement of harm, if any, on a class-wide basis. There is no common class-wide methodology to determine whether a particular shareholder was harmed without an individualized inquiry into his or her trading records.

h) The Plaintiffs argue that the purported class members suffered damages by selling Twitter shares at "artificially depressed prices" during the PC period. The Plaintiffs' proposed method of computing class-wide damages considers **only** the amount of deflation at the time of the **sale** of Twitter shares bought **before** the start of the PC period. This approach is flawed as it does not consider the possibility that the same shareholder who sold Twitter shares during the PC period could have also **bought** shares **during** the PC period and thus bought them at "artificially depressed prices," thereby enjoying a gain. This creates two problems for the PC definition. First, since the gains of shareholders who bought during the PC period could be larger than their losses by selling at allegedly depressed prices, there exists a segment of PC members who potentially suffered no damages. And my data analysis shows that a substantial segment of shareholders falls in this category. In fact, Dr. Tabak admits in his deposition testimony that he provides no method to calculate damages for "those who also made purchases of stock during the class period" because these individuals

10

Privileged and Confidential

"have no claim." Second, to determine whether a shareholder suffered damages, one must compute the purported deflation amounts at the time of sale and at the time of purchase as well as the quantities of Twitter shares bought and sold by the shareholder. To complicate matters further, a shareholder can be both a seller and buyer of Twitter stock on any given day. Thus, based on the Plaintiffs' PC definition, it is impossible to measure a shareholder's harm, if any, using a class-wide method without an individualized inquiry into the trading records of each PC member. Specifically, there is no shortcut or plug-and-play method of computing class-wide damages: a detailed analysis of each trader's trades, including the examination of the quantities, prices, trade types, trade dates, and the assumed amount of alleged price deflation in Twitter's stock, are necessary to quantify a PC member's harm, if any.

i) My analysis of institutional shareholders' holdings data demonstrates that numerous shareholders bought Twitter shares during the PC period. The data analysis shows that more than 40% institutional shareholders who sold during the PC period also bought Twitter shares at allegedly depressed prices and therefore potentially gained. Furthermore, the total number of Twitter shares of all investors with buys as a percentage of all Twitter investors' (with one or more sell transactions) shares increased from 43% in May to 64% in October of 2022. Although I used data on institutional shareholders' monthly change in holdings as a proxy to quantify buys and sales, one would have to rely on individuals' transaction records to measure PC members' harm, if any.

j) My analyses and conclusions related to Twitter stock trades also apply to the Twitter option trades. The Plaintiffs' class definition includes individuals who bought Twitter put options or sold call options during the PC period ("options at issue"). As with Twitter stocks, the Plaintiffs' PC definition for options at issue is fundamentally flawed. This definition does not consider the possibility that individuals who suffered losses by buying Twitter put options at allegedly inflated prices could have also bought call options at allegedly deflated prices and thus enjoyed gains. Similarly, individuals who sold call options at allegedly deflated prices could have also bought Twitter call options (at different strike prices or different expiration dates) at allegedly depressed prices or sold put options at allegedly inflated prices; both these trades would result in gains for the individuals. Thus, the purported losses of individuals who traded in options at issue

11

Privileged and Confidential

need to be offset against these individuals' gains who also bought Twitter call options and/or sold put options. This creates the distinct possibility of the existence of a sizeable segment of PC members who traded in options at issue but did not suffer any damages. Furthermore, the computation of but-for gains or losses of options is far more complex than for stocks as it requires detailed information on the option transactions, which is only available in the option traders' trading records. Therefore, based on the PC definition, it is impossible to measure a Twitter option trader's harm, if any, using a common class-wide method without an individualized inquiry into the trading records of each PC who traded in options at issue.

k)  To the extent the PC includes shareholders who potentially benefited from the conduct at issue, the Plaintiffs' class definition creates the distinct possibility of intra-class conflicts: the interests of PC members who benefited conflict with those who presumably did not. Specifically, the interest of stock and option traders who sold at allegedly depressed prices and purportedly suffered harm are in conflict with those who bought at allegedly depressed prices from the sellers and thereby enjoyed potential gains.

l)  I have also examined the Lead Plaintiffs' Twitter trading records produced to date in this matter. **All** of the Lead Plaintiffs for whom complete transactions were produced did, in fact, **buy** Twitter shares during the PC period. Thus, as discussed above, damages cannot be computed for the Lead Plaintiffs using a class-wide formula; one has to determine their gains or losses using their individual transaction records.

m)  The Lead Plaintiffs are not representative of the PC as it relates to Twitter option traders. As noted earlier, the Plaintiffs' PC definition includes individuals who bought Twitter put options or sold call options during the PC period. My review of the trading records for the only Lead Plaintiff who traded Twitter options indicates that he neither bought a put option nor sold a call option during the PC period. Therefore, he is neither typical nor representative of the PC of option traders as defined by the Plaintiffs.

Privileged and Confidential

## II.    CLASS CERTIFICATION ANALYSIS

### A.    ALLEGED MISREPRESENTATIONS CLAIMS AND THEIR PRICE IMPACT

22.    In this section of the report, I examine the price movement of Twitter's stock over the PC period. I focus on three dates: May 13, May 16, and May 17, 2022. Musk is alleged to have made misrepresentations on each of these days, causing Twitter share prices to fall. I also examine Twitter's share price movement on July 11, 2022, and its rebound from that date through the end of the PC period. I begin, however, by discussing the implications of the efficient market hypothesis, with a special emphasis on how information is reflected in the market prices of securities.

### 1.    THE EFFICIENT MARKET HYPOTHESIS AND ITS IMPLICATIONS

23.    The Efficient Market Hypothesis (EMH) remains a foundational finance theory, emphasizing information's role in determining stock prices. Under the EMH, financial markets are "informationally efficient," resulting in market prices that incorporate all available information.[22]  There are three forms of efficiency under the EMH, the "weak form," the "semi-strong form," and the "strong form."   The semi-strong form, which Dr. Tabak considers applicable in this case,[23] posits that: "[A]ll publicly available information regarding the prospects of a firm must be reflected already in the stock price."[24]

24.    In his deposition, Dr. Tabak defines publicly available information as "anything that is readily available at low cost to the public," such as "statements by companies, executives, [or] the FTC," a "public filing, for example, including the terms of a merger agreement," and the law that governs a particular contract, like a merger agreement.[25]

25.    Numerous empirical studies offer strong support for the rapid reaction of market prices to new information. Patell and Wolfson (1984) analyze a sample of "large,

---

[22] See Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," The Journal of Finance, Vol. 25 (2), December 1969, pp. 383-417.

[23] See Deposition of Dr. Tabak, p. 32. See also the Tabak Report, p. 7.

[24] Zvi Bodie, Alex Kane and Alan Marcus, Investments, Tenth Ed., McGraw-Hill Education, 2014, p. 354.

[25] Deposition of Dr. Tabak, pp. 44-47.

Privileged and Confidential

actively traded, and closely watched" firms[26] and find that the "the largest portion of the price response occurs in the first five to fifteen minutes after the disclosure."[27] Subsequent studies lend further support for rapid price response and convergence to market efficiency within "10 – 15 minutes" for U.S. stocks listed on the New York Stock Exchange,[28] as Twitter was during the period at issue. Dr. Tabak, in his deposition, clearly stated that all public information would be fully reflected in Twitter's stock prices within one or two days.[29]

26.     The literature regarding efficient markets also examines which market participants effectuate price responses to publicly available information. Ben-Rephael et al. (2017) find that **institutional investors** respond "more quickly to major news events, lead[] retail attention, and facilitate[] permanent price adjustment," and are "**crucial in facilitating the incorporation of new information into asset prices**."[30] Ben-Rephael et al. (2022) focuses on 8-K filings, which are disclosures of material information required by the SEC within four days of a triggering event, finding again that institutional investors are the source of "significant abnormal attention" and "significant price discovery" in advance of retail investor attention.[31] Echoing this very literature, Dr. Tabak even states in his deposition that **institutional investors are "in a better position to decipher a complicated transaction or news than a retail investor."**[32] As a result, "the sophisticated players . . . ultimately use buying

---

[26] See James Patell and Mark Wolfson, "The intraday speed of adjustment of stock prices to earnings and dividend announcements," Journal of Financial Economics, Vol. 13 (2), 1984, pp. 223-252.

[27] See Ibid.

[28] Nuttawat Visaltanachoti and Ting Yang, "Speed of convergence to market efficiency for NYSE-listed foreign stocks," Journal of Banking & Finance, Vol. 34 (3), 2010, pp. 594-605.

[29] Deposition of Dr. Tabak, p. 34.

[30] Azi Ben-Rephael, Zhi Da, and Ryan D. Israelsen, "It Depends on Where You Search: Institutional Investor Attention and Underreaction to News," The Review of Financial Studies, Vol. 30 (9), September 2017, pp. 3009–3047. (emphasis added).

[31] Azi Ben-Rephael, Zhi Da, Peter D. Easton, and Ryan D. Israelsen, "Who Pays Attention to SEC Form 8-K?," The Accounting Review, Vol. 97 (5), September 2022, pp. 59–88.

[32] Deposition of Dr. Tabak, p. 37. (emphasis added).

Privileged and Confidential

and selling pressures to reach one market price that reflects the market's understanding of the information."[33]

27.     Four salient points regarding Twitter's stock prices follow from the foregoing discussion: (a) since Twitter traded in an efficient market, all public information was readily reflected in Twitter's stock prices; (b) public information includes not only Twitter's announcements but also its SEC filings; (c) public information was reflected in Twitter stock prices within a few hours and certainly within a few days; and (d) institutional investors respond more quickly to new information than retail investors, and institutional investors play a crucial role "in facilitating the incorporation of new information into asset prices."[34]

## 2.  SHARE PRICES DO NOT REACT TO ALREADY KNOWN PUBLIC INFORMATION

28.     A central tenet of the EMH is that stock prices react to **new** public information, and do not react to information already known to the market. According to the semi-strong of EMH, **any new public information** is rapidly and accurately incorporated into stock prices. This means that as soon as news is released—whether it's an earnings report, a change in management, or macroeconomic data—the stock price adjusts to reflect this **new** information.[35] For example, if a company announces higher-than-expected earnings, the stock price will quickly rise as investors buy shares in anticipation of higher future profits. Conversely, if a company announces a product recall, the stock price will likely fall as investors sell shares due to expected future losses. The speed and accuracy with which stock prices adjust to **new information** are central to the semi-strong form of the EMH.[36]

---

[33] Deposition of Dr. Tabak, p. 40.

[34] Azi Ben-Rephael, Zhi Da, and Ryan D. Israelsen, "It Depends on Where You Search: Institutional Investor Attention and Underreaction to News," The Review of Financial Studies, Vol. 30 (9), September 2017, pp. 3009–3047.

[35] See Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," The Journal of Finance, Vol. 25 (2), December 1969, pp. 383-417. See also Zvi Bodie, Alex Kane and Alan Marcus, Investments, Tenth Ed., McGraw-Hill Education, 2014, pp. 353-361.

[36] See Aswath Damodaran, "Chapter 6: Market Efficiency – Definition, Tests and Evidence," in Investment Valuation, 3rd Ed. See also Alexandra Gabriela Titan, "The Efficient Market Hypothesis: review of specialized literature and empirical research," Procedia Economics and Finance, Vol. 32, 2015, pp. 442-449.

Privileged and Confidential

29.    Relying on this basic concept of the EMH, other studies have posited that firm-specific stock price movements not explained by general market changes, must reflect material new information. For example, one study notes: "event studies only measure the movement of a **stock price in response to the release of unanticipated, material information**."[37] Or that "the definition of immaterial information . . . **is that it is already known** or . . . does not have a statistically significant effect on stock price in an efficient market."[38]

30.    In context, what Dr. Tabak and his coauthor, Dr. Dunbar, wrote in 1999 regarding the implications of an efficient market is relevant. They wrote:

> "[T]he semi-strong version of the Efficient Market Hypothesis, which states that stock prices in an actively traded security reflect all publicly available information and **respond quickly to new information**; and, second, the price of an efficiently traded stock is equal to the present discounted value of the future stream of free cash flow. Consequently, the stock price impacts of an event can reveal the effects of the event on future cash flows if the following conditions are present:
>
> 1. The event is a well-defined news item.
>
> 2. The time that the news reaches the market is known.
>
> 3. **There is no reason to believe that the market anticipated the news.**
>
> 4. It is possible to isolate the effect of the news from market, industry, and other firm-specific factors simultaneously affecting the firm's stock price."[39]

31.    In this matter, Dr. Tabak has concluded that Twitter traded in a semi-strong, efficient market.[40]  Thus, according to Dr. Tabak's own writing cited above, Twitter's share

---

[37] Jill Fisch, Jonah Gelbach and Jonathan Klick, "The Logic and Limits of Event Studies in Securities Fraud Litigation," Texas Law Review, Vol. 96 (553), p. 556, https://archive.law.upenn.edu/live/files/8942-96texlrev553pdf. (emphasis added).

[38] Frederick C. Dunbar and Dana Heller, "Fraud on the Market Meets Behavioral Finance," Delaware Journal of Corporate Law, Vol. 455, p. 509. (emphasis added).

[39] David Tabak and Federick Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," NERA, Working Paper #34, April 1999.

[40] See Deposition of Dr. Tabak, p. 30. See also the Tabak Report, p. 7.

Privileged and Confidential

price can react to information only if "there is no reason to believe that the market anticipated the news." [41] As a result, if a piece of news or information is not new (that is, it was already publicly known and therefore fully anticipated), then Twitter's stock price response to that information cannot be material or statistically significant.

### 3. TWITTER'S PRICE MOVEMENT ON ALLEGED MISREPRESENTATION DAYS

32.    Based on my review of the Plaintiffs' class action Complaint, Class Certification Motion, and the Court's rulings, I understand that it is alleged Musk's tweets and statements on May 13, May 16, and May 17, 2022, contained misrepresentations, which caused Twitter share prices to fall. In what follows, I undertake a detailed examination of Twitter prices on each of these days.

33.    The relevant data on the price movement of Twitter and the Nasdaq Index (proxied by the Exchange Traded Fund ("ETF"), QQQ) on these three days are shown in Exhibit 1 below.

---

[41] David Tabak and Federick Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," NERA, Working Paper #34, April 1999.

17

Privileged and Confidential

### Exhibit 1. Twitter vs. Market Stock Price Movements During Alleged Misrepresentations

| Panel A: Percent Change from May 13th Close to May 16th Close | | TWTR | QQQ |
|---|---|---|---|
| A | Price as of Close May 13th | $40.72 | $301.94 |
| B | Price as of Close May 16th | $37.39 | $298.44 |
| C | **Percent Change Close-to-Close [ ln(B/A) ]** | **-8.5%** | **-1.2%** |
| | | | |
| **Panel B: Percent Change from May 13th Close to May 16th Open** | | | |
| D | Price as of 9:30 AM May 16th | $39.18 | $300.02 |
| E | Percent Change from Prior Day's Close [ ln(D/A) ] | -3.9% | -0.6% |
| | | | |
| **Panel C: Percent Change from Open to 2:17 PM and After on May 16th** | | | |
| F | Price as of 2:17 PM May 16th | $37.53 | $300.83 |
| G | Percent Change From Open to 2:17 PM May 16th [ ln(F/D) ] | -4.3% | 0.3% |
| H | **Percent Change from 2:17 PM May 16th to Close [ C - (E+G) ]** | **-0.4%** | **-0.8%** |
| | | | |
| **Panel D: Percent Change from May 16th Close to May 17th Close** | | | |
| I | Price as of Close May 17th | $38.32 | $306.17 |
| J | **May 17th Percent Change [ ln(I/B) ]** | **2.5%** | **2.6%** |

Note: The percent changes are log-returns and not arithmetic returns.

#### May 17, 2022

34.    It is evident from Panel D of this exhibit that on May 17, Twitter's share price did not fall but increased 2.5% relative to the closing price on May 16. Additionally, this rise is consistent with the market's movement. Thus, Twitter's price movement on May 17, 2022, is inconsistent with the alleged conduct at issue.

#### May 16, 2022

35.    On May 16, 2022, Plaintiffs allege that "Musk stated publicly during the All In Summit, a tech conference in Miami, that fake and spam accounts make up at least 20% of

18

Privileged and Confidential

Twitter's users."[42] Musk made this statement at approximately 2:17 PM on that day.[43]  It is well established in the academic literature that prices respond rapidly (often within ten minutes) to new information in an efficient market. [44] The literature also establishes that when attempting to assess the price impact of a disclosure event during a trading day, close-to-close price change data can obscure relevant impacts or incorrectly attribute and overestimate the price impact of an event.[45] Thus, to assess the impact of Musk's statement, one must examine intra-day data on Twitter stock prices, depicted in Exhibit 2.

36.    While Twitter's share price at the end of trading on May 16 was 8.5% lower than the closing price on the previous trading day, May 13, my analysis of intra-day price data shows that 8.1% of the total 8.5% price drop occurred **before** Musk's statement (see Exhibit 1). The change in Twitter's price during the 103 minutes **after Musk's statement** at 2:17 PM through market close at 4 PM is only -0.4%. This change is not statistically significant and is fully explained by the movement of the Nasdaq 100 index during those 103 minutes (see Exhibit 5).[46]

37.    If one accepts the Plaintiffs' allegation regarding the content of Musk's statements on May 16, 2022, at the tech conference, one would expect Twitter's share price to fall significantly after those statements. Yet, it is evident from Exhibit 1, Nasdaq 100's fall between 2:17 PM and 4 PM was far more pronounced than Twitter's (-0.8% vs. -0.4%). Adjusting for the market movement, Twitter's share prices actually rose after Musk's statement on that day. As noted earlier, Twitter's share prices also rose the next day. Thus, Twitter's price movement after Musk's statement on May 16, 2022, cannot be causally linked

---

[42] See the Complaint, p. 4.

[43] See Williams, W. [@wiqd], https://x.com/wiqd/status/1526265635902214145.

[44] Nuttawat Visaltanachoti and Ting Yang, "Speed of convergence to market efficiency for NYSE-listed foreign stocks," Journal of Banking & Finance, Vol. 34 (3), 2010, pp. 594-605.

[45] Charles River Associates, "Price impact of disclosures before, during, or after a trading day: Implications for event studies," August 2014. See also, Atanu Saha and Alex Rinaudo, "An intraday event study methodology for determining loss causation," The Journal of Financial Perspectives, July 2014, Vol. 2 (2), pp. 161-173. They note: "With the advent of high frequency trading, proliferation of social media, and increasing prominence of 24/7 financial news channels, the speed with which the market reacts to new information has markedly increased in recent years."

[46] Refer to Appendix C2 where I find that the -0.4% drop in Twitter's share price is not statistically significant.

Privileged and Confidential

to the alleged misrepresentations by Musk on that day. In other words, I conclude there is no price impact of the alleged misrepresentation on that day.

**Exhibit 2. Twitter's Minute-by-Minute Stock Prices During Market Hours: May 13 - May 17, 2022**



38.     A possible key reason for the lack of Twitter's price response to Musk's May 16 statement that "fake and spam accounts make up at least 20% of Twitter's users" is that this statement did not convey **new** information to the market. [47] For example, an industry publication in March 2021 estimated that bots represented 19.57% of accounts and 43.20% of tweets on the Twitter platform. The study also noted that these estimates were in line with previous research:

---

[47] See the Complaint, p. 4.

Privileged and Confidential

"In Table 1, we show the statistics of the final dataset under analysis.

| Table 1: Accounts and tweet statistics. | | | | | |
|---|---|---|---|---|---|
| | **All** | **Bots** | **Humans** | **Suspended** | **Deleted** |
| **Accounts** | 943,126 | 184,545 | 758,581 | 38,164 | 30,688 |
| **Account percentage** | | 19.57% | 80.43% | 4.05% | 3.25% |
| | | | | | |
| **Tweets** | 98,123,612 | 42,386,269 | 55,737,343 | 9,645,522 | 2,828,963 |
| **Tweet percentage** | | 43.2% | 56.8% | 9.83% | 2.88% |

Specifically, Table 1 details the number of accounts and shared tweets for each class of users. The percentage of bots (around 20 percent) and human accounts (around 80 percent) is in line with previous works (Luceri, et al., 2019b; Deb, et al., 2019)."[48]

39.    Similarly, an article in the TIME magazine dated April 28, 2022, cited analysis conducted on Mr. Musk's own follower count, finding that "roughly 48% are fake" which is "nearly 7% more fake followers than the median 41% that accounts with a similar sized followings have."[49]

40.    These analyses, conducted by third parties with results publicly known before May 16, appear to be consistent with the actual content of Mr. Musk's statements during the tech summit on that day. This likely explains the lack of a statistically significant negative price response to Musk's May 16, 2022 statement.

### May 13, 2022

41.    Twitter's price drop on May 13, 2022, is statistically significant. On that day, Mr. Musk tweeted: "Twitter deal temporarily on hold pending details supporting calculation

---

[48] Luca Luceri, Felipe Cardoso, and Silvia Giordano, "Down the bot hole: Actionable insight from a one-year analysis of bot activity on Twitter," First Monday, Vol. 26, March 1, 2021, available at https://firstmonday.org/ojs/index.php/fm/article/download/11441/10079.

[49] Megan McCluskey, "Elon Musk Wants to Rid Twitter of 'Spam Bots.' Nearly Half His Followers are Fake," TIME, April 28, 2022, available at https://time.com/6171726/elon-musk-fake-followers/.

Privileged and Confidential

that spam accounts do indeed represent less than 5% of users."[50] Regarding this statement, the Court ruled: "[b]ecause Twitter did not have an obligation to provide this data to Defendant under the terms of the Merger Agreement, Defendant's representation that Twitter did have this obligation in order for the deal to close was false."[51] However, it is undisputed that, on April 21, 2022, Musk publicly disclosed through an SEC filing that his offer was not subject to due diligence,[52] and on April 25, 2022, 18 days before May 13, 2022, the terms of the Merger Agreement were disclosed to the market via an SEC filing,[53] which is a public document available to all investors.

42.    As discussed in the preceding subsection on market efficiency, a company's SEC filing is public information (a fact that Dr. Tabak does not dispute) and thus, these SEC filings, including the terms of the merger agreement would have certainly been known to institutional investors. It is also well established in the academic literature (which I cited in the preceding subsection) that institutional investors' response to major news events "leads retail attention, and facilitates permanent price adjustment" and is "crucial in facilitating the incorporation of new information into asset prices."[54]  Also, according to Dr. Tabak, institutional investors are "in a better position to decipher a complicated transaction or news than a retail investor."[55] Thus, even if retail investors were not fully aware of Twitter's obligations per the merger agreement, Twitter's share prices would have reflected that information well before May 13, 2022, via the trades and commentaries of institutional investors, since they are "crucial in facilitating the incorporation of new information into asset

[50] See the Complaint, p. 3.

[51] See the Order, p. 20.

[52] See the Motion, p. 2.

[53] See SEC Form 8-K filed by Twitter, Inc on April 25, 2022 (Exhibit 1 of Declaration of Alex Bergjans in Support of Defendant Elon Musk's Motion to Dismiss the First Amended Complaint).

[54] Azi Ben-Rephael, Zhi Da, and Ryan D. Israelsen, "It Depends on Where You Search: Institutional Investor Attention and Underreaction to News," The Review of Financial Studies, Vol. 30 (9), September 2017, pp. 3009–3047.

[55] Deposition of Dr. Tabak, p. 37.

Privileged and Confidential

prices."[56] Simply put, Twitter's price decline on May 13, 2022, could not have been in response to information about Twitter's obligations per the merger agreement since **that was not new information**. And as discussed earlier, in an efficient market, stock prices do not respond to already-known, public information. Therefore, the causal link between the alleged misrepresentation and the price decline on May 13, 2022, does not exist; and thus, I conclude there is no price impact of the alleged misrepresentations on May 13, 2022.

43.    That, however, begs the question: what caused Twitter's share price drop on that day? It is highly likely that the market's response to Musk's tweet merely reflected uncertainty about the prospects of the deal closing, including the terms of the deal (i.e., whether the deal would close at a lower price and when). And what Twitter's response might be, e.g., whether it would walk away from the deal, close at a lower price, or litigate. It is well established in the academic literature that markets abhor uncertainty, particularly in the context of the pending closure of a merger.[57] Thus, it is highly plausible that the uncertainty regarding the deal caused Twitter share prices to drop on May 13, 2022. Various analyst commentaries and news reports after Musk's tweet on May 13 support this hypothesis. For example, mere hours after Musk's tweet on May 13, 2022, a Barron's article observed that Brian Quinn, a professor of corporate law at Boston College Law School, stated that Musk would need to prove that the revelation about bots had a 'material adverse effect' on the firm to walk away from the deal.[58] As a result, Musk's claims are "a lot of bravado . . . but they tend not to be strong," meaning that Quinn anticipates, at most, a renegotiation of price downward, "but not by a whole lot."[59]

---

[56] Azi Ben-Rephael, Zhi Da, and Ryan D. Israelsen, "It Depends on Where You Search: Institutional Investor Attention and Underreaction to News," The Review of Financial Studies, Vol. 30 (9), September 2017, pp. 3009–3047.

[57] See for example, Tong et. al, "The Effects of Economic Uncertainty on Financial Volatility: A Comprehensive Investigation," Journal of Empirical Finance, Vol. 73, September 2023, pp. 369-389. Dante Amengual and Dacheng Xiu, "Resolution of Policy Uncertainty and Declines in Volatility," Journal of Econometrics, 2018, Vol. 203, pp. 297-315. Huseyin Gulen and Mihai Ion, "Policy Uncertainty and Corporate Investment," The Review of Financial Studies, Vol. 29, March 2016, pp. 523-564.

[58] Connor Smith, "Corporate Law Expert Says Musk Can't Just Walk Away from Twitter Deal," Barron's, May 13, 2022.

[59] Ibid.

Privileged and Confidential

44.    On May 16 (which is the next trading day after May 13, 2022), a Bloomberg analyst wrote: "[W]e believe the agreement limits Musk's ability to walk away based on a new disclosure over bots and changes in daily active users" and that risks from lower user and top-line growth expectations "coupled with the lack of a competing offer, **could force Twitter's board to accept a lower bid from Musk.**"[60]  That same day, he also wrote: "**there's now over a 40% chance the deal fails . . .** but we think the odds are still high for it to close at a lower price."[61]

45.    On May 18, 2022, Matthew Schettenhelm from Bloomberg Intelligence revealed the market's awareness of the merger terms by stating that "Twitter is in a strong legal position if Elon Musk attempts to walk away" and that the agreement's "specific performance" clause prevents Musk from walking away "simply by paying its $1 billion termination fee." Yet Mr. Schettenhelm gave Twitter **only a 60% chance of winning "a court order forcing Musk to complete the deal.**"[62] Thus, it is highly plausible that the reasons for the decline of Twitter's share prices on May 13 include uncertainty around the likelihood of the deal's consummation due to a variety of reasons, including the likelihood that a court would order specific performance, and what the deal's final terms would be, including the deal's closing price, if consummated. However, none of these reasons are attributable to the alleged misrepresentation in Musk's tweet about Twitter's obligations per the Merger Agreement.

46.    The fact that Twitter's price decline is not necessarily associated with an alleged misrepresentation is evident from Twitter's prices on July 11 and August 23, 2022. On July 11, Twitter's share price experienced a statistically significant drop.[63] Yet, the Court has ruled that there are no misrepresentations on that day.[64] August 23 similarly showed a statistically

---

[60] Mandeep Singh, "Twitter Subscriptions Maybe, But Not 1 Billion DAUs React," Bloomberg, May 16, 2022. (emphasis added).

[61] Mandeep Singh, "Musk May Seek Twitter Value Closer to Snap Amid Deal Hold React," Bloomberg Intelligence, May 16, 2022. (emphasis added).

[62] Matthew Schettenhelm, "If Musk Tries Walk Away on M&A, Twitter Has Strong Hand to Play," Bloomberg Intelligence, May 18, 2022. (emphasis added).

[63] See Appendix C1 which contains the results of my replication of Dr. Tabak's event study analysis.

[64] See the Order, pp. 26-28.

Privileged and Confidential

significant decline in Twitter's price.[65] This date, however, does not coincide with any alleged misrepresentation. The price drop on August 23, 2022, appears to be associated with Twitter's former head of security, Peiter Zatko, disclosing "84 pages of disclosures and supporting documents" relating to Twitter's top executive violating the Federal Trade Commission Act and SEC regulations.[66] These two dates clearly show that Twitter's share prices can experience a significant fall without a causal link to any alleged misrepresentation.

47.      Additionally, Dr. Tabak's own review of Dow Jones articles from May 13, 2022, shows that Musk's alleged misrepresentation was not the only Twitter-related news on that day.[67] In fact, Twitter simultaneously announced a hiring freeze which garnered commentary from analysts.[68] Dr. Tabak's report makes no attempt nor proposes any method to disentangle the impact of Musk's tweets and hiring freeze news on Twitter's prices on May 13, 2022.

48.      While Twitter share prices generally declined between the onset of the PC period through July 11, 2022, they rebounded strongly afterward, reflecting investors' bullish sentiment about the stock. As Exhibit 3 below shows, Twitter share prices gained nearly 27% between July 12 and October 3, 2022. By contrast, the Nasdaq Composite Index fell 5% over this period.

---

[65] See Appendix C1.

[66] Andrew Chow, Vera Bergengruen, and Billy Perrigo, "'Egregious Deficiencies,' Bots, and Foreign Agents: The Biggest Allegations from the Twitter Whistleblower," Time, August 23, 2022.

[67] Refer to Exhibit 2 of Dr. Tabak's report.

[68] Refer to the headlines in Exhibit 2 of Dr. Tabak's report at 2:23 AM, 5:30 AM, 10:41 AM, and 10:50 AM on May 13, 2022. The topic of Twitter's hiring freeze continues to be featured in headlines through May 16.

Privileged and Confidential

### Exhibit 3. Cumulative Returns for Twitter Stock

| Start Date | End Date | Twitter | NASDAQ Composite Index | NASDAQ CTA Internet Index |
|---|---|---|---|---|
| 5/13/22 | 7/11/22 | -32.3% | 0.0% | -1.1% |
| 7/12/22 | 10/3/22 | 26.5% | -5.0% | -4.8% |

4. TWITTER'S PRICE REBOUND IN LINE WITH SUBDUED SHORT INTEREST

49.     This pattern of movement of Twitter share prices is consistent with declining short interest (a higher short interest reflects a bearish, or pessimistic, view) in Twitter shares. Exhibit 4 shows that the short interest for Twitter's stock, normalized by daily trading volume, trended downwards after July, reflecting a declining bearish sentiment about Twitter's stock.

### Exhibit 4. Twitter Stock's Short Interest Ratio During Purported Class Period



Privileged and Confidential

### 5. TWITTER'S PRICE REBOUND IS CONSISTENT WITH ANALYST COMMENTARIES

50.    Analysts from several banks covered Musk's proposed acquisition of Twitter. From the initial announcement of the deal in April 2022 to its closing in October, a significant segment of the analyst community assigned a high likelihood to Musk's inability to walk away from the deal.

51.    As early as April 14, 2022, days before Twitter agreed to sell the company to Musk for $54.20 per share, Deutsche Bank analysts Benjamin Black and Ishant Goel noted that they would ". . . take this bid seriously."[69] Also, Brian Fitzgerald and Robert Coolbirth of Wells Fargo echoed the validity of Musk's initial offer; on April 18, 2022, they wrote, "Musk's current understanding of TWTR business dynamics and whether his instincts regarding TWTR strategy may be compelling to the BoD and other shareholders who might consider equity rollover in a go-private scenario."[70]

52.    Matthew Schettenhelm from Bloomberg Intelligence wrote on May 18, 2022, "Musk can only avoid consummating the deal if a Twitter misrepresentation on that issue has a so-called material adverse effect. **That's highly unlikely.**[71] Mr. Schettenhelm continued to address the likelihood of Musk's ability to walk away from the deal, writing on June 6, 2022, "We **doubt that Musk's concerns about fake accounts will give him legal grounds to terminate the deal.** Even threatening an extended court fight looks shaky because this court acts fast."[72] Mr. Schettenhelm reiterated this message on July 8, 2022, writing that, "the July 7 news report that Elon Musk can't verify Twitter's data on "bot" accounts and may take "drastic action" **doesn't alter our view that Twitter's legal position is strong if Musk tries to walk away from the M&A deal."**[73]

---

[69] Benjamin Black and Ishant Goel, "Goes All In," Deutsche Bank, April 14, 2022.

[70] Brian Fitzgerald and Robert Coolbirth, "TWTR: Caught Between and Rock and a Hard Case," Wells Fargo, April 18, 2022.

[71] Matthew Schettenhelm, "If Musk Tries to Walk Away on M&A, Twitter Has Strong Hand to Play," Bloomberg Intelligence, May 18, 2022. (emphasis added).

[72] Matthew Schettenhelm, "Twitter M&A Hand Still Strong Despite Musk's New Please for Access," Bloomberg Intelligence, June 6, 2022. (emphasis added).

[73] Matthew Schettenhelm, "Twitter M&A Stance Strong Even If Musk Can't Verify 'Bot' Counts," Bloomberg Intelligence, July 8, 2022. (emphasis added).

Privileged and Confidential

53.    In a similar vein, Wells Fargo analysts Fitzgerald and Coolbirth wrote on September 23, 2022, that they **". . . came away with continued conviction that the acquisition of TWTR by Elon Musk will successfully close . . ."**[74]

54.    Reporters expressed similar sentiments in the financial press. For example, on July 22, 2022, the New York Times commented:

> "During the deal-making, no other potential buyer emerged as a white knight alternative to Musk, making his offer the best that Twitter is likely to get.
>
> Twitter's trump card is a "specific performance clause" that gives the company the right to sue Musk and force him to complete or pay for the deal, so long as the debt financing he has corralled remains intact. Forced acquisitions have happened before: In 2001, Tyson Foods tried to back out of an acquisition of the meatpacker IBP, pointing to IBP's financial troubles and accounting irregularities. A Delaware court vice chancellor ruled that Tyson had to complete the acquisition."[75]

55.    These sentiments expressed by Wall Street analysts and the financial press are also reflected in the aggregate data on analysts' ratings for Twitter's stock. Exhibit 5A depicts 'Buy', 'Sell' and 'Hold' recommendations made by analysts covering Twitter. A vast majority of analysts maintained a 'Hold' recommendation over the entire PC period. A 'Hold' recommendation during this period when the Twitter stock was trading at a price significantly below the proposed deal price likely reflects the analyst community's confidence regarding the Twitter deal succeeding. Musk's tweets and other news events during the PC period did not materially change this overall analysts' view and recommendations.

---

[74] Brian Fitzgerald and Robert Coolbirth, "TWTR: Not Budging for Mudge; Continued Conviction on Deal Close Post Update Call w/ Chancery Court Expert," Wells Fargo, September 23, 2022. (emphasis added).

[75] Lauren Hirsch and Kate Conger, "What's Next in the Elon Musk-Twitter Saga? A Court Battle," The New York Times, July 9, 2022.

Privileged and Confidential



**Exhibit 5A. Twitter Stock Analyst Recommendations**

56.    Exhibit 5B confirms that analysts covering Twitter did not become more bearish and did not issue more sale ratings during the purported class period. Between January 3, 2022, and May 12, 2022, before the PC period, the average percentage of analysts who issued a "Sell" rating for the Twitter stock was 11.1 percent. During the PC period between May 13, 2022, and October 4, 2022, this percentage **declined** to 7.3%, with most analysts issuing a neutral hold rating.

29

Privileged and Confidential

### Exhibit 5B. Percent of Analysts who Issued "Sell" Rating for Twitter

| Start Date | End Date | Percent [1] |
|---|---|---|
| 1/3/22 | 5/12/22 | 11.1% |
| 5/13/22 | 10/4/22 | 7.3% |
| | **Difference** | **3.8%** |

Note:
[1] The underlying analyst ratings data for the Twitter stock are sourced from Bloomberg.   From 1/3/2022 through 10/4/2022, there was a range of 27 to 40 analysts who issued ratings for the Twitter stock.

### B.  FLAWS IN PLAINTIFFS' DEFINITION OF PURPORTED CLASS: ILLUSTRATIVE EXAMPLES

57.     In this section, I conduct an economic analysis to determine whether the Plaintiffs' definition of the purported class is appropriate for class certification. While this analysis is undertaken through the lens of an economist, to the extent the analysis of the purported class definition involves certain legal concepts, I adopt them as necessary without providing any legal opinions.

58.     The Plaintiffs argue that the purported class members suffered damages by selling Twitter shares at allegedly depressed prices during the PC period. The Plaintiffs' proposed method of computing class-wide damages considers **only** the amount of deflation at the time of the **sale** of Twitter shares. This approach is flawed as it does not consider the possibility that the same shareholder who sold Twitter shares during the PC period could have also bought shares and thus bought them at allegedly depressed prices during the same period, thereby enjoying a gain. In fact, Dr. Tabak admits in his deposition testimony that he provides no method to calculate damages for "those who also made purchases of stock during the class period" because these individuals "have no claim." [76] As a result, purchase transactions are entirely "excluded" from his analysis.[77]

---

[76] Deposition of Dr. Tabak, pp. 147, 149.

[77] Deposition of Dr. Tabak, p. 148.

Privileged and Confidential

59.     The existence of purchase transactions creates two problems for the PC definition. First, since the gains of shareholders who bought during the PC period could be larger than their losses by selling at allegedly depressed prices, there exists a segment of PC members who potentially suffered no damages. And my analysis shows that a substantial segment of Twitter shareholders falls in this category. Second, to determine whether a shareholder suffered damages, one must compute the purported deflation amounts at the time of sale and at the time of purchase as well as the quantities of Twitter shares bought and sold by the shareholder. Thus, one cannot measure a shareholder's harm, if any, using a class-wide method without an individualized inquiry into the trading records of each PC member.

60.     I clarify these two problems with the PC definition using two illustrative examples in this subsection. In the next subsection, I demonstrate the existence of these problems using actual data on institutional investors' holdings of Twitter shares.

61.     Exhibit 6A below shows Twitter's actual common stock share prices from April 1, 2022, to October 27, 2022, the last date Twitter shares traded as a public company. The period between May 13, 2022, and October 4, 2022, is defined by the Plaintiffs as the PC period. As is evident from this exhibit, Twitter's share prices declined initially from the beginning of the PC period through mid-July but rebounded significantly afterward during the period leading up to Musk's announcement on October 4, 2022.[78] Even excluding the jump on October 4, 2022, Twitter's share price trended upwards since mid-July, erasing most of the decline before July 12, 2022.

---

[78] See Bloomberg article, "Musk Proposes to Proceed With Twitter Deal at $54.20 a Share," October 4, 2022.

Privileged and Confidential

### Exhibit 6A. Twitter Actual and Illustrated But-For Share Prices



62.     Also shown in Exhibit 6A is an illustrative but-for price line between May 13, 2022, and October 4, 2022, the PC period. For this section, I am assuming the Plaintiffs' arguments to be true, that is, the conduct at issue **caused** Twitter share prices to be artificially depressed. I understand the Defendant has disputed this claim.[79] The illustrative but-for prices in Exhibit 6A depict Twitter's share prices that would have prevailed, assuming the absence of the alleged conduct at issue during the PC period.

63.     To date, neither Dr. Tabak nor the Plaintiffs have presented any details on how they would estimate the but-for prices. In fact, in this matter, it is wholly unclear how one would construct a but-for price line. For example, in a typical securities class action lawsuit, the Plaintiffs' expert often creates a but-for price line using the daily returns of an industry

---

[79] See Defendant's Motion to Dismiss the First Amended Complaint, pp. 11-16.

Privileged and Confidential

index. In this case, if one were to create a but-for price line using an industry index by forecasting Twitter prices from the start of the PC period, it would not converge to $52.00, which is the Twitter price at the end of the PC period (October 4, 2022). Conversely, if one were to backcast using an industry index starting from the October 4, 2022 price of $52, the but-for price line will not converge to $40.72, the price at the start of the PC period. Neither backcasting nor forecasting using an industry index can produce a meaningful but-for price line for Twitter during the PC period.

64.    I have thus used a simple straight line connecting the prices on May 12, 2022, and October 4, 2022, as an illustration for the but-for prices. Under the assumption that the dashed redline Exhibit 6A is the but-for price line, the difference between the actual and the but-for price on any given day is the alleged price deflation on that day during the PC period.

65.    I consider two alternative scenarios to illustrate the possibility that a PC member did not suffer any damages. Exhibit 6B illustrates the first scenario where an investor has only two transactions in Twitter's stock during the PC period: I assume the investor sold 100 shares on June 15, 2022 (and thus is a member of the PC), and she bought 100 shares on August 31, 2022. Based on the Plaintiffs' expert's proposed damages methodology, this investor suffers a loss due to the alleged price deflation associated with the sale transaction, and the per-share loss is the difference between the actual price ($37.99) and the but-for price ($46.69) on the date of the sale. This difference is $8.70. However, this investor also gains from the alleged price deflation when she bought shares at an allegedly depressed price on August 31, 2022. Since the investor has only one buy transaction and no subsequent sales, I assume this investor receives $54.20 per share, the Buyout Price. The investor's per share gain is the difference between $54.20 and the price she bought at ($38.75). This difference is $15.45. Thus, in this example, while the investor suffers a loss of $8.70, her gain of $15.45 exceeds her losses by $6.75. As this example shows, it is possible for a PC member to suffer no damages depending on the amount of alleged deflation at the time of sale and at the time of purchase.

33

Privileged and Confidential

### Exhibit 6B. Illustration of An Investor's Potential Gains or Losses – An Equal Number of Sell and Buy Shares



66.    In the preceding example, the investor did not suffer any damages—in fact enjoyed a net gain—because the amount of alleged deflation at the time of sale was less than the amount of alleged deflation at the time of purchase. In the next example, I assume that is not the case. Exhibit 6C illustrates this scenario. I assume the investor sold 100 Twitter shares on July 11, 2022 and bought 300 shares on August 15, 2022. As before, according to the Plaintiffs' methodology, the investor's per-share loss is the amount of alleged deflation at the time of sale, which is $15.16, the difference between the actual and but-for prices on July 11, 2022. For the purchase transaction, the investor's per-share gain is the difference between the Buyout Price of $54.20 (since the investor is assumed not to sell any shares after the purchase) and the purchase price of $44.50 on August 15, 2022. This difference is $9.70,

34

Privileged and Confidential

lower than the per-share loss of $15.16 at the time of sale. However, because the investor bought 300 shares and sold only 100 shares, the investor's total gains exceed the total loss.

### Exhibit 6C. Illustration of An Investor's Gains or Losses – Different Number of Sell and Buy Shares



67.    Exhibit 6D summarizes my above findings under the two illustrative scenarios. Panel A shows a net gain of $675 for the first scenario with an equal number of shares in the sale and buy transactions, while Panel B shows a net gain of $1,394.

68.    My conclusions from the two illustrative examples above do not depend on the order of the buy and sale transactions as long as they occur within the purported class period. Under the two illustrative examples, the buy transaction is assumed to occur after the sale transaction. However, the key point from these examples can hold even if the buy transaction preceded the sale transaction as long as the shares sold were bought after the start of the purported class period. In that case, the shareholder would have potentially gained from the

35

Privileged and Confidential

purchase at an allegedly depressed price. If the gain from the buy transaction is larger than the loss from the sale as a result of the alleged price deflation, the shareholder would have realized a net gain and suffered no damages.

### Exhibit 6D. Illustration of An Investor's Gains or Losses

*Panel A: Assuming an Equal Number of Shares for Sell and Buy Transactions*

| Date | Trade Type | Number of Shares | Actual Price | But-For Price[1] | Alleged Per Share Deflation | Alleged Total Gain/Loss |
|---|---|---|---|---|---|---|
| 6/15/22 | Sell | 100 | $37.99 | $46.69 | $8.70 | -$870 |
| 8/31/22 | Buy | 100 | $38.75 | $54.20 | $15.45 | $1,545 |
| | | | | | Net Gain | $675 |

*Panel B: Assuming a Different Number of Shares for Sell and Buy Transactions*

| Date | Trade Type | Number of Shares | Actual Price | But-For Price[1] | Alleged Per Share Deflation | Alleged Total Price Deflation |
|---|---|---|---|---|---|---|
| 7/11/22 | Sell | 100 | $32.65 | $47.81 | $15.16 | -$1,516 |
| 8/15/22 | Buy | 300 | $44.50 | $54.20 | $9.70 | $2,910 |
| | | | | | Net Gain | $1,394 |

Notes:

[1] But-For Price for the sell transaction is calculated by using the linearly interpolated price between 5/12/2022 and 10/4/2022 for that date.

[2] But-For Price for the buy transaction for that date is calculated by applying Twitter's buyout price of $54.20.

69.      It is worth noting from these two illustrative examples and the discussion above that zero damages for a PC member are always possible if there are purchase transactions in Twitter shares during the PC period. To measure harm, if any, one would need to consider the potential gains from the buy transactions and the purported losses from the sale transactions due to the allegedly depressed prices. Equally important, as the second scenario illustrates, what matters is not only the potential gains or losses **per share** but also the **number of shares** in each buy and sale transaction. Furthermore, unlike in the illustrative examples, Twitter shareholders (including the Lead Plaintiffs) could have multiple buy and sale transactions at different points in time and, thus, at different prices. To complicate matters further, a shareholder may have multiple buy and sell transactions **on the same day**. This is particularly true for large institutional shareholders with proprietary trading desks, hedge funds engaged

36

Privileged and Confidential

in high-frequency trading, and retail day traders. Therefore, one would have to rely on the transaction records of individual shareholders to quantify harm, if any. This reality is not lost on Dr. Tabak, who even states that quantifying an individual's damages would likely require consideration for "all of the individual's transactions."[80]

70.    It is important to note that there are no short-cut or plug-and-play methods to compute PC-wide damages. For example, it would be erroneous to assume that to compute aggregate damages, one could simply add up all the buys and sells of Twitter shareholders during the PC period to arrive at the aggregate number of net shares sold and then multiply these shares by an estimate of average deflation per share. I illustrate the problems with this aggregate approach to computing damages in Exhibit 6E below.

---

[80] Deposition of Dr. Tabak, pp. 149-150.

Privileged and Confidential

### Exhibit 6E. Illustration of the Problems With the "Aggregate" Method

| Date | Trade Type | Number of Shares | Actual Price | But-For Price [1] | Alleged Price Deflation |
|---|---|---|---|---|---|
| 6/15/2022 | Sell | 100 | $37.99 | $46.69 | $8.70 |
| 8/31/2022 | Buy | 100 | $38.75 | $54.20 | $15.45 |
| 7/11/2022 | Sell | 100 | $32.65 | $47.81 | $15.16 |
| 8/15/2022 | Buy | 300 | $44.50 | $54.20 | $9.70 |
| Average | | | | | $12.25 |
| Total Net Shares/Gains | | 200 | | | $2,450 |
| Total Gains From Exhibit 1D | | | | | $2,070 |
| Error % | | | | | 18% |

Notes:

[1] But-For Price for the sell transaction is calculated by using the linearly interpolated price between 5/12/2022 and 10/4/2022 for that date. But-For Price for the buy transaction for that date is calculated by applying Twitter's buyout price of $54.20.

71.    In Exhibit 6E, I have aggregated the four transactions of the two hypothetical investors' trades shown in Exhibit 6D. For each trade, the alleged price deflation is shown in the last column. The average price deflation is $12.25. The total number of shares across the four buy-and-sell trades is a net buy of 200 shares. Thus, the total aggregate gain is $2,450 (equal to the average deflation of $12.25 multiplied by net 200 shares bought). However, we know from Exhibit 1D that the total gain across the two investors' trades is $2,070. Thus, it is evident that this "aggregate" method produces a substantial error; in this simple example, with only four transactions, it is 18%. This error rate could be substantially higher if one were to aggregate thousands, if not millions, of buy-sell transactions (with different prices and quantities) over the approximately five-month PC period.

72.    Up to this point, using the two illustrative examples, I have shown the possibility of zero damages for PC members. In the next sub-section of the report, using monthly data on institutional shareholders' holdings, I demonstrate that this is not an abstract possibility but

38

Privileged and Confidential

is indeed a reality: numerous shareholders bought Twitter shares during the PC period at allegedly depressed prices, and thus potentially gained.

### C.  FLAWS IN PLAINTIFFS' DEFINITION OF PURPORTED CLASS: SHAREHOLDERS DATA

73.    Stock holdings data are available for institutional investors when they disclose large holdings to meet regulatory filing requirements. Examples of such requirements with the SEC include Form 13D, when an investor acquires more than 5% of a stock, and Form 13-F for any investor with $100 million or more in equities. [81] However, due to the lack of transaction details, the reporting lag, and the non-synchronous timing of investors' filings, institutional holdings data are not as accurate as shareholders' trading records, which contain precise timing and details of each buy or sale transaction. Importantly, the holdings data for institutional investors are available only at an irregular frequency and often have reporting lags of days, weeks, or even months compared to actual transactions.

74.    Despite the data limitations in this sub-section I conduct an analysis using institutional shareholders' Twitter holdings data as a proxy for shareholders' transactional data. Using this data, I define a shareholder's buy transaction when a positive change (i.e., an increase in the number of Twitter shares held) in an investor's Twitter holdings is observed from one month to the next. Similarly, I define a sale transaction when a reduction in the number of shares held is observed from one month to the next. I assume these buy and sale transactions occur at each month-end. By contrast, when no change in the number of Twitter shares held between two consecutive months is observed, I assume neither a buy nor a sale transaction has occurred. As I described above, this is a proxy for shareholders' buy and sale transactions; however, in the absence of detailed trading records of Twitter shareholders, which are not publicly available, I do not have an alternative to using institutional investors' month-end holding data for my analysis in this report. [82]

75.    It is important to underscore that my analysis of institutional shareholders' buy and sale transactions is only a crude and imprecise approximation of their actual transactions and their losses or gains. In the absence of trading records, this analysis rests on several

---

[81] See Bloomberg Security Ownership Help Page. See also "Exchange Act Sections 13(d) and 13(g) and Regulation 13D-G Beneficial Ownership Reporting," SEC, October 7, 2022.

[82] I note that Dr. Tabak, the Plaintiffs' expert, has also relied on quarter-end shareholding data in his report.

Privileged and Confidential

assumptions. For example, I have assumed that a buy or a sell transaction can be proxied by a change in an institution's Twitter holdings from one month to the next. This assumes no transactions occurred within any given month. For some institutional investors, this is an erroneous assumption, particularly for those who undertake not only intra-month but also high-frequency intra-day trades. In sum, the analysis in this subsection of this report does not suggest that the institutional holdings data could be used in lieu of each PC member's trading records for the quantification of damages.

76.    I begin my analysis by categorizing the total number of Twitter common stock shares. Exhibit 7 shows Twitter's total number of outstanding shares, net of insider holdings, is 631 million, which is the stock's float. I also find that institutional holdings, net of insider shares, are 588 million as of the end of May 2022. Thus, institutional holdings constitute more than 93% of all Twitter shareholdings (net of insiders).

77.    Among institutional holdings of 588 million shares, a total of 144 million shares belongs to investors who did not change their size of holdings between May and October. These shareholders, commonly viewed as the "buy-and-hold" investors, cannot be part of the PC, as the Plaintiffs define.[83] Excluding those buy-and-hold shareholders, I identify those who sold Twitter shares in one or more months during the PC period. These shareholders are potentially a part of the PC as defined by the Plaintiffs. I estimate that approximately 444 million Twitter shares fall into this category, constituting 58% of the outstanding shares.

---

[83] Again, to accurately characterize these investors as "buy-and-hold," one would have to rely on their individual transaction records as month-end holdings data lose intra-month trade details.

Privileged and Confidential

**Exhibit 7. Summary of Twitter Common Stock Shares at Issue**

| | Share Description | Number of Shares as of May 2022 (Millions)[1] | Percent of Outstanding Shares |
|---|---|---|---|
| [A] | Outstanding | 764.2 | |
| [B] | Insiders | 133.6 | 17% |
| [C] = [A] - [B] | Float (Outstanding Net of Insiders) | 630.6 | 83% |
| [D] | Institutional Holdings Net of Insiders | 588.1 | 77% |
| [E] | Buy and Hold | 144.3 | 19% |
| [F] = [D] - [E] | Sold Between May and October | 443.8 | 58% |

Notes:

[1] The underlying shareholder holdings data for the Twitter stock are sourced from Bloomberg.

78.    Exhibit 8A below lists the monthly holdings for the top 30 shareholders who reduced their monthly holdings at least once (i.e., had one or more sale transactions) during the PC period. These top 30 shareholders are ranked based on the size of their Twitter holdings as of April 2022. In Exhibit 8A, I have highlighted the shareholders who **increased** their Twitter holdings (i.e., engaged in a buy transaction) at least once between May and October. The highlighted rows of Exhibit 8A show that among the PC members, there indeed are many Twitter shareholders who bought shares during the PC period. Consistent with the illustrative examples discussed earlier, these shareholders potentially gained since they benefited from the allegedly depressed prices for their Twitter share purchases. Exhibit 8A shows that, in total, 11 out of the top 30 shareholders potentially benefited by purchasing Twitter shares during the PC period. Notably, the total number of Twitter shares for these investors with buys as a percentage of all top 30 investors' shares increased from 44% in May to 60% in October, reflecting a bullish sentiment for Twitter among these investors.

41

Privileged and Confidential

## Exhibit 8A. Top 30 Twitter Shareholders Who Had Sales and Purchases

| No. | Shareholder Name [2] | Number of Shares [1] | | | | | | | Buy Trade Between May and October |
|---|---|---|---|---|---|---|---|---|---|
| | | April | May | June | July | August | September | October | |
| 1 | Vanguard Group Inc/The | 82,403,665 | 82,403,665 | 71,650,185 | 71,650,185 | 71,650,185 | 72,042,654 | 72,042,654 | Yes |
| 2 | State Street Corp | 36,499,270 | 36,499,270 | 32,742,284 | 32,742,284 | 32,742,284 | 29,665,489 | 29,665,489 | |
| 3 | Aristotle Capital Management LLC | 20,362,076 | 20,362,076 | 23,574 | 23,574 | 23,574 | 17,154 | 17,154 | |
| 4 | FMR LLC | 17,629,727 | 17,629,727 | 22,364,131 | 22,364,131 | 22,364,131 | 18,393,704 | 18,393,704 | Yes |
| 5 | ClearBridge Investments LLC | 16,965,782 | 16,965,782 | 9,290,104 | 9,290,104 | 9,290,104 | 7,376,256 | 7,376,256 | |
| 6 | Geode Capital Management LLC | 14,975,584 | 14,975,584 | 14,477,576 | 14,477,576 | 14,477,576 | 13,406,709 | 13,406,709 | |
| 7 | Elliott Investment Management LP | 10,000,000 | 10,000,000 | 0 | 0 | 0 | 0 | 0 | |
| 8 | Teachers Insurance & Annuity Association of America | 8,561,262 | 8,561,262 | 7,399,915 | 7,399,915 | 7,399,915 | 5,398,642 | 5,398,642 | |
| 9 | Northern Trust Corp | 8,412,675 | 8,412,675 | 7,935,169 | 7,935,169 | 7,935,169 | 7,152,585 | 7,152,585 | |
| 10 | JPMorgan Chase & Co | 7,235,137 | 7,235,137 | 3,523,268 | 3,523,268 | 3,523,268 | 4,109,489 | 4,109,489 | Yes |
| 11 | SRS Investment Management LLC | 7,155,661 | 7,155,661 | 125,226 | 125,226 | 125,226 | 125,226 | 125,226 | |
| 12 | Capital Group Cos Inc/The | 7,043,151 | 7,043,151 | 0 | 0 | 0 | 0 | 0 | |
| 13 | Sumitomo Mitsui Trust Holdings Inc | 6,863,819 | 6,863,819 | 2,857,103 | 2,857,103 | 2,857,103 | 2,301,328 | 2,301,328 | |
| 14 | Bank of America Corp | 6,552,508 | 6,552,508 | 2,294,741 | 2,294,741 | 2,294,741 | 1,982,648 | 1,982,648 | |
| 15 | Goldman Sachs Group Inc/The | 6,309,987 | 6,309,987 | 2,118,214 | 2,118,214 | 2,118,214 | 1,294,025 | 1,086,483 | |
| 16 | Bank of Montreal | 6,023,753 | 6,023,753 | 3,609,199 | 3,609,199 | 3,609,199 | 3,221,411 | 3,221,411 | |
| 17 | Bank of New York Mellon Corp/The | 5,578,975 | 5,591,475 | 5,660,073 | 5,647,573 | 5,647,573 | 5,096,644 | 5,096,644 | Yes |
| 18 | BNP Paribas SA | 5,467,188 | 5,472,668 | 3,163,452 | 3,170,325 | 3,192,167 | 1,013,944 | 1,005,481 | Yes |
| 19 | Legal & General Group PLC | 5,021,167 | 5,021,167 | 5,093,922 | 5,093,922 | 5,093,922 | 4,566,276 | 4,566,276 | Yes |
| 20 | DE Shaw & Co LP | 4,632,189 | 4,632,189 | 932,716 | 932,716 | 932,716 | 6,079,256 | 6,079,256 | Yes |
| 21 | Grace Partners of DuPage LP | 4,143,411 | 4,108,153 | 3,003,457 | 3,003,457 | 3,003,457 | 2,541,257 | 2,512,116 | |
| 22 | UBS AG | 4,041,687 | 4,041,687 | 9,306,593 | 9,306,593 | 9,303,093 | 8,968,071 | 8,968,071 | Yes |
| 23 | Charles Schwab Corp/The | 4,019,057 | 4,019,057 | 3,902,043 | 3,902,043 | 3,902,043 | 3,543,389 | 3,543,389 | |
| 24 | Thrivent Financial for Lutherans | 3,992,488 | 3,992,488 | 3,161,611 | 3,161,611 | 3,161,611 | 1,911,333 | 1,911,333 | |
| 25 | Barclays PLC | 3,923,320 | 3,923,320 | 3,629,335 | 3,629,335 | 3,629,335 | 2,359,030 | 2,359,030 | |
| 26 | Invesco Ltd | 3,773,449 | 3,773,449 | 3,023,172 | 3,023,172 | 3,023,172 | 2,748,055 | 2,748,055 | |
| 27 | Schweizerische Nationalbank | 3,463,392 | 3,463,392 | 3,472,992 | 3,472,992 | 3,472,992 | 2,814,992 | 2,814,992 | Yes |
| 28 | Two Sigma Investments LP | 2,938,431 | 2,938,431 | 0 | 0 | 0 | 8,400 | 8,400 | Yes |
| 29 | State of California | 2,874,152 | 2,874,152 | 2,752,334 | 2,752,334 | 2,752,334 | 2,840,699 | 2,840,699 | Yes |
| 30 | Renaissance Technologies LLC | 2,683,196 | 2,683,196 | 2,517,696 | 2,517,696 | 2,517,696 | 247,796 | 247,796 | |
| | **With Buys** | | 141,303,690 | 127,919,666 | 127,914,039 | 127,932,381 | 125,934,129 | 125,925,666 | |
| | **Total** | 319,528,881 | 230,030,085 | 230,024,458 | 230,042,800 | 211,226,462 | 210,981,316 | | |
| | **Percent** | 44% | 56% | 56% | 56% | 60% | 60% | | |

| | Number of Shareholders |
|---|---|
| With Buys | 11 |
| Total | 30 |
| Percent | 37% |

Notes:

[1] The underlying shareholder holdings data for the Twitter stock are sourced from Bloomberg. Top 30 shareholders are ranked by holdings as of April 2022.

[2] Each of the top 30 shareholders had at least a monthly sale transaction between May and October 2022.

79.    Exhibit 8B extends the analysis to all shareholders who had at least one sell transaction between May 2022 and October 2022. Among these 1,007 shareholders who are potentially part of the PC, 426 shareholders, or 42% of the total, increased their holdings (i.e., had a buy transaction) in at least one of those months. Similar to the findings in Exhibit 8A, the total number of Twitter shares for all investors with buys as a percentage of all investors' shares (with at least one sell transaction) increased from 43% in May to 64% in October. Also, the total number of shares of shareholders with at least one sale transaction declined by more than 30% between May and October 2022 while the float stayed virtually constant around 630 million during the same period. These findings again confirm the bullish market sentiment for Twitter stock during this period.

42

Privileged and Confidential

## Exhibit 8B. Percent of All Twitter Shareholders Who Had Sales and Purchases

| | Number of Shares[1] | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | May | June | July | August | September | October |
| With Buys | 192,915,942 | 195,730,835 | 197,244,832 | 198,554,395 | 189,301,705 | 184,901,244 |
| Total[2] | 443,755,407 | 328,741,872 | 329,474,741 | 330,739,084 | 297,049,030 | 290,207,160 |
| Percent | 43% | 60% | 60% | 60% | 64% | 64% |

| | Number of Shareholders |
| --- | --- |
| With Buys | 426 |
| Total[2] | 1,007 |
| Percent | 42% |

Notes:
[1] The underlying shareholder holdings data for the Twitter stock are sourced from Bloomberg.
[2] Each of the shareholders in this exhibit had at least a monthly sale transaction between May and October 2022.

80.     From the above analysis, I conclude that the PC includes many Twitter shareholders who potentially did not suffer any damages and thus cannot be part of the PC. Furthermore, to measure harm, if any, one would have to undertake an individualized inquiry into Twitter stock transaction records for any PC member. Based on the Plaintiffs' PC definition, a common class-wide methodology for computing damages does not exist. For these reasons, I conclude that the PC of sellers of Twitter stock, as defined by the Plaintiffs, is fatally flawed.

### D.  THE PURPORTED CLASS CREATES THE DISTINCT POSSIBILITY OF INTRA-CLASS CONFLICTS

81.     "Intra-class conflicts" may arise when class members seek conflicting remedies, or some class members actually benefit from the challenged conduct. I understand that courts have denied class certification in matters where fundamental intra-class conflicts are or can be present.[84]

---

[84] Caroline Gentry, "A Primer on Class Certification Under Federal Rule 23," Corporate Counsel CLE Seminar, ABA Section of Litigation, February 2014, p. 5.

Privileged and Confidential

82.    To the extent the PC has shareholders who potentially benefited from the Twitter trades, the Plaintiffs' class definition creates the distinct possibility of intra-class conflicts since the interests of investors who benefitted are in conflict with those who presumably did not. Specifically, each Twitter shareholder who bought Twitter shares at allegedly depressed prices, thereby enjoying a potential benefit, must have bought from one or more shareholders who sold Twitter shares, thereby incurring a loss. This clearly demonstrates that the interest of buyers of Twitter shares during the PC period is in conflict with the sellers of shares.

### E.  DAMAGES METHODOLOGY IS INAPPLICABLE TO SHORT SELLING AND OPTION TRADES

83.    My above analyses and conclusions related to long Twitter stock trades also apply to the trades of investors who shorted Twitter stock and traded in Twitter options. However, there are no publicly available option trades and short selling data similar to institutional stock holdings data.

84.    The Plaintiffs' class definition includes individuals who bought Twitter put options or sold call options during the PC period. As with Twitter stocks, the Plaintiffs' PC definition for options at issue is fundamentally flawed. This definition does not consider the possibility that individuals who suffered losses by buying Twitter put options at allegedly inflated prices could have also bought call options at allegedly deflated prices and thus enjoyed gains. Similarly, individuals who sold call options at allegedly deflated prices could have also bought call options (at different strike prices or for different expiration dates) at allegedly depressed prices or sold put options at allegedly inflated prices; both these trades would result in gains for the individuals. This is particularly true because Twitter share prices rebounded strongly after falling between early May and mid-July 2022. Thus, the purported losses of individuals who traded in options at issue need to be offset against gains from their Twitter call options purchases and/or put option sales.

85.    In Appendix C3 and C4, I provide two concrete examples of individuals who traded in options at issue during the PC period but did not suffer any harm; instead, they enjoyed gains. Thus, the Plaintiffs' PC definition, as it pertains to Twitter options, creates the distinct possibility of the existence of a sizeable segment of PC members who traded in

Privileged and Confidential

options at issue, and yet did not suffer any damages. Therefore, the Plaintiffs' PC definition of option traders is fatally flawed.

86.    Furthermore, as is evident from the examples in Appendix C3 and C4, for the quantification of the potential gains or losses for options at issue, one must collect data on option-specific parameters such as the long/short exposure, strike, option type (call or put), trade dates, assignments, and expirations. Valuation of options also requires information on implied volatility, which is a key input. To make matters worse, the implied volatilities based on actual and but-for Twitter prices would differ.[85] Thus, the computation of but-for gains or losses of options is far more complex than for stocks, and it requires detailed information on the option transactions, which is only available in an option trader's trading records. Therefore, based on the PC definition, it is impossible to measure a Twitter option trader's harm, if any, using a class-wide methodology without an individualized inquiry into the trading records of each PC who traded in options at issue.

## F.  LEAD PLAINTIFFS' TRANSACTIONS EXEMPLIFY THE PROBLEMS WITH PC DEFINITION

87.    I have reviewed the deposition testimonies and transaction records of the Lead Plaintiffs that have been produced to date. I conclude from my review and analysis that the Lead Plaintiffs' trading behavior exemplifies the problems of the PC definition for the following three key reasons:

- All Lead Plaintiffs not only sold but also bought Twitter stock throughout the PC period, thereby enjoying gains due to purchases at allegedly depressed prices.

- Since their gains need to be offset against their losses when they sold Twitter shares, quantifying their damages, if any, requires their transaction records. Thus, based on the Plaintiffs' PC definition, one cannot measure their damages using a common class-wide methodology without individualized inquiries.

---

[85] Dr. Tabak errs by stating that one should use the actual volatility of the underlying stock in the option-pricing formula to estimate the actual and but-for option price. See the Tabak Report, Footnote 54. This approach is fundamentally flawed because the standard option valuation approach should be based on the implied volatility of the underlying stock, which cannot be directly observed and has to be "implied" from the observed option prices. See John Hull, "Options, Futures, and Other Derivatives," Eighth Edition, Prentice Hall, pp. 318-319. In addition, implied volatility should be derived differently for the actual and but-for prices of the underlying stock as volatility depends on the levels and changes of the underlying stock prices.

Privileged and Confidential



Privileged and Confidential



47

Privileged and Confidential



■    ███████████████████████████████████████████
████████████

_____

■ ████████████████████████████████████████

Privileged and Confidential



Privileged and Confidential



Privileged and Confidential



Privileged and Confidential



## III.    SUMMARY OF CONCLUSIONS

96.    Based on my analysis of Twitter's share prices on May 13, May 16, and May 17, 2022, I have concluded that these days' price movements cannot be causally linked to Musk's alleged misrepresentations.

97.    Based on my analysis of Twitter shareholders' holdings data, I have concluded that a sizeable segment of the PC members likely suffered no damages. Consistent with the data on institutional shareholders' trading data, ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████

98.    The PC, as defined by the Plaintiffs, includes many shareholders who likely suffered no damages or did not suffer damages due to the alleged conduct at issue. Furthermore, the PC definition creates intra-class conflicts for buyers and sellers and precludes measurement of harm, if any, using a common class-wide method. In sum, the proposed class, as defined by the Plaintiffs, is fatally flawed.

Respectfully Submitted,

Atanu Saha, Ph.D.

August 26, 2024

---

92 See the Motion, p. 1.

Privileged and Confidential


# APPENDIX A: Curriculum Vitae



# Atanu Saha
## Ph.D.

### Partner

**Los Angeles**
6420 Wilshire Blvd
Suite 880
Los Angeles, CA 90048

T:  +1 213 459 1830
E: asaha@stoneturn.com

**New York**
17 State Street
2nd Floor
New York, NY 10004

T:  +1 212 430 3400

Atanu Saha, a Partner with StoneTurn, has over 25 years of experience in the application of economics and finance to complex business issues. He has served as an expert witness in numerous prior matters and provided testimony in disputes related to patent infringement, antitrust, market manipulation, securities, valuation of investment portfolios and contract dispute damages.

An expert witness in matters involving a wide range of issues, Dr. Saha's research has been cited by the U.S. Court of Appeals for the 11th Circuit. He applies considerable expertise in the energy, financial services, technology, and healthcare sectors, as well as a specialization in data analytics, to assist clients across a range of industries with data-driven insights.

Earlier in his career, he co-founded Data Science Partners, as well as held senior positions at other consulting firms, including Analysis Group, Alix Partners and Compass Lexecon. In addition, Dr. Saha was a tenure-track professor at Texas A&M University where he taught Ph.D.-level courses in econometrics and applied economics.

Dr. Saha is the author of numerous refereed journal articles, monographs and book chapters and his research has been cited in various publications, including *The Wall Street Journal*, *The Economist* and *The New York Times*. He is the recipient of the prestigious Graham and Dodd Award for financial research.

### Education

Ph.D., University of California—Davis

M.A., University of Alberta, Canada

### Practice Areas

Litigation Advisory

    Antitrust

    Securities and Finance

    Business Disputes

    Competition & Class Actions

    Expert Testimony

    Intellectual Property

Valuation Advisory

Data Analytics

A-2

## PREVIOUS EXPERIENCE

- Managing Director, Econ One Research, Inc. (2018-2020)
- Co-Founder and Chairman, Data Science Partners (2015-2018)
- Executive Vice President, Compass Lexecon (2009-2015)
- Managing Director, Alix Partners (2006-2009)
- Managing Principal, Analysis Group, Inc. (1998-2006)
- Sr. Economist, Micronomics (1995-1998)
- Faculty Member, Texas A&M University (1991-1995)

## ACCOLADES

- Recipient, Graham and Dodd Award, "Best Perspectives Paper 2005" for "Hedge Funds: Risk and Return," with B. Malkiel, Financial Analysts Journal, December 2005, 80-88.

## TESTIMONIAL EXPERIENCE

### Securities Pricing and Valuation

- *County of Orange v. McGraw-Hill Companies, Inc., d/b/a Standard & Poors* — Expert witness and testimony for the defendant, Standard & Poors. Assignment included evaluation of the investment strategy implemented by Orange County in its investment pool and the estimation of damages, if any, caused by the allegedly erroneous S&P ratings of Orange County's debt.
- *Granite Partners et al. v. DLJ and ML et al.* — Expert witness and testimony to evaluate damages suffered by the Askin Funds (Granite Partners, Granite Corporation and Quartz Hedge Funds) as a result of the liquidation of assets composed of CMOs.
- *EMC Corporation v. Joanna T. Karwowksa* — Expert report and testimony regarding the valuation of Employee Stock Options (ESOs).
- *Amado Lopez v. Lehman Brothers et al.* — Arbitration before NASD Panel; testimony regarding the valuation of bonds.
- *Olson v. Halvorsen et al.* — Expert witness and testimony regarding fair value of Viking Global, a hedge fund, and rebuttal damage analysis.
- *Amaranth Natural Gas Commodities Litigation* — Expert analyses and testimony regarding class certification and merits issues in natural gas futures price manipulation claim.
- *Platinum and Palladium Commodities Litigation* — Expert analysis of platinum and palladium prices in response to commodity and futures price manipulation claims.
- *IRS v. Presidio Advisory Services et al.* — Expert witness and testimony regarding 'economic substance' of certain investment strategies.
- *SEC v. Hedge Fund* — Expert rebuttal analysis of SEC's allegations regarding certain trading practices of a hedge fund.
- *SEC v. optionsXpress, Inc* — Expert analysis and testimony on behalf of Charles Schwab regarding options transactions and Reg SHO issues.
- *Street Retail Inc., et al. v. Vornado Realty Trust, et al.* — Expert analysis and testimony on behalf of Vornado regarding

A-3

valuation of real estate assets.

- *MKP Master Fund v. Salomon Smith Barney (SSB)* — Analysis of damages arising from the liquidation of the portfolio which occurred as a result of the margin calls faced by the hedge fund from its prime broker, SSB.

- *Eagle Cayman Fund v. Salomon Smith Barney* — Analysis of damages arising from the liquidation of the portfolio when the hedge fund failed meet the margin calls by SSB.

- *Global Gaming Philippines v. Enrique Razon, Jr. et al.* — Testimony on the analysis of damages arising from the interference of sale of stocks of a casino company.

- *United States of America v. James Velissaris* –Analysis of the fair value of variance swaps held by Infinity Q, hedge fund and mutual fund, managed by Mr. Velissaris.

## Securities Pricing and Securities Class Action Matters

- *Charles Fargo, et al. v. Joseph McCartney, et al.* — Expert witness and testimony for counsel for the defendant, Osicom Technologies, in a Rule 10b-5 litigation.

- *Towers Securities Litigation* — Expert analysis and testimony; event study analysis of Tower's share prices in a Rule 10b-5 class action litigation; rebuttal damage analysis.

- *Greenfield Online Securities Litigation* — Expert analysis regarding damage exposure in a Rule 10b- 5 matter.

- *Jabil Circuits Option Backdating Inquiry* — Expert analysis on behalf of the Special Committee investigating whether the stock options granted to the executives of the firm were backdated.

- *Robert Bains, et al. v. Moores, et al.* — Expert rebuttal analysis of damages arising from the fall of Peregrine's share prices and event study analysis of Peregrine's stock price movement.

- *WorldCom Securities Litigation* — Analysis on behalf of defendant Citi Bank; event-study analysis of the impact, if any, of securities analysts' reports on the share prices of WorldCom in a Rule 10b-5 litigation.

- *Freddie Mac Securities Litigation* — Analysis on behalf of defendant Freddie Mac; event-study analysis and estimation of potential damages exposure in a Rule 10b-5 litigation.

- *Ahold Securities Litigation* — Analysis on behalf of defendant Ahold; event-study analysis and estimation of potential damages exposure in a Rule 10b-5 litigation.

- *Global Crossing Securities Litigation* — Analysis on behalf of defendant Citi Bank; event-study analysis of the impact, if any, of securities analysts' reports on the share prices of Global Crossing in a Rule 10b-5 litigation.

- *Bank of America Securities Litigation* — Analysis on behalf of defendant Bank of America; event-study analysis of the impact, if any, of alleged corrective disclosures in a Rule 10b-5 litigation.

- *DeMarco v. Lehman Brothers* — Analysis on behalf of defendant Lehman Brothers; event-study analysis of the impact, if any, of securities analysts' reports on the share prices of RealNetworks in a Rule 10b-5 litigation. Class certification was denied by Judge Rakoff of SDNY.

- *Madoff Litigation* — Expert analysis on behalf of Securities Investor Protection Corporation (SIPC) Trustee for the liquidation of Bernie L. Madoff Investment Securities. Data analyses to examine whether Madoff's investment returns were 'too good to be true.'

- *The International Projects Development v. Oxbo Carbon & Minerals, et al.* — Expert rebuttal report and damages analysis in an ICC Arbitration matter.

- *Polkomtel S.A. v. SiCap AG* — Expert analysis and testimony in an ICC Arbitration matter.

- Expert testimony at an arbitration on behalf of an interdealer broker regarding breach of contract and damage analyses; the dispute centered around intellectual property issues arising from migration of key personnel.

A-4

- *SEC v. Thomas Fisher, et al.* — Expert analysis of damages resulting from alleged inflation of Nicor stock prices.

- *IRS v.* Renaissance Technologies — Expert reports regarding the economic implications of certain option contracts.

- *Kathryn Hyland et al. on behalf of all others similarly situated v. Navient Corporation* — Expert report and quantification of damages suffered by student loan borrowers, who borrowed under the PSLF program.

- *United States v. Petit & Taylor, (S.D.N.Y.)*—Expert reports and quantification of investor losses for the purposes of the sentencing hearing.

- *Silvaco, Inc. v. Ole Christian Andersen*—Expert report, deposition, and trial testimony regarding the quantification of damages related to a breach of contract claim.

- *Spotlight Ticket Management, Inc. v. Stubhub, Inc.,* Expert report, deposition, and trial testimony regarding the quantification of damages related to a breach of contract claim.

- *Highfields Capital Management et al. v. Perrigo Co. PLC. et al.,* Expert report regarding the quantification of damages related to alleged misrepresentation and omissions in securities litigation matter.

- *John McCraner et al. vs. Wells Fargo & Co.,* Expert report and testimony regarding class certification issues.

## ERISA Litigation

- *Freddie Mac ERISA Litigation* — Expert analysis on behalf of defendant Freddie Mac. Comparative performance analysis of the retirement portfolio of Freddie Mac's employees. Rebuttal analysis of class action claims.

- *NUI ERISA Litigation* — Expert analysis on behalf of NUI. Rebuttal analysis of class action plaintiffs' damage claim.

- *The Southern Company ERISA Litigation* — Expert analysis on behalf of The Southern Company. Rebuttal damage analysis based on individual employee's investment decisions.

- *Bank of America ERISA Litigation* — Analysis on behalf of Bank of America. Rebuttal analysis of class action claims.

- *Citi ERISA Litigation* — Analysis of behalf of Citi. Expert rebuttal report and testimony regarding class action claims.

## Antitrust and Damage Analysis

- *Arthur Garabedian v. Los Angeles SMSA et al.* — Expert report and testimony regarding pricing conditions in the cellular communications industry. The class action lawsuit involved price fixing charges against LA Cellular and AirTouch.

- *Michael A. Lobatz, M.D. v. Airtouch Cellular Company and U.S. West Cellular of California, Inc.* — Expert analysis to evaluate the joint settlement between plaintiff class and AirTouch and US West.

- *Beer Antitrust Litigation* — Expert report and testimony regarding pricing conditions in the beer industry. Econometric analysis of beer prices charged by Anheuser Busch to its distributors.

- *Industrial Ferrosilicon Antitrust Litigation* — Expert report regarding the pricing conditions in the international ferrosilicon market. The litigation involved price-fixing allegations.

- *EMC Corporation v. Mann and Karrat* — Expert report and testimony based on economic analysis to determine whether or not the memory storage products of EMC and StorageApps compete in the same product market. The dispute stemmed from migration of key personnel.

- *EMC Corporation v. D. Kempel* — Expert report determining whether or not the products of EMC and SANgate Systems compete in the same product market. The dispute stemmed from migration of key personnel.

- *Liebel-Flarsheim Co. v. Medrad, Inc.* — Expert report and testimony regarding "Kodak-type" issues in the fore and after markets for power injectors.

- *In Re: Broiler Chicken Antitrust Litigation* — Expert report regarding damages calculation in a case involving price-fixing allegations.

- *In Kennedy, Dunfee et al. v. Health First et al.* — Expert report and testimony regarding damages calculation in a case involving allegations of exclusionary conduct.

## Pharmaceutical & Intellectual Property Litigation

- *Warfarin Sodium Antitrust Litigation* — Expert report regarding pricing conditions and potential consumer savings in the market for Coumadin and its generic substitute.

- *Cardizem CD Antitrust Litigation* — Expert reports and testimony regarding pricing conditions, drug substitution rates and consumer savings in the market for brand name and generic pharmaceutical drugs.

- *Lorazepam and Clorazepate Antitrust Litigation* — Expert reports and testimony regarding the economic damages as resulting from vertical supply agreements between a generic manufacturer of two pharmaceutical products and an active ingredient supplier for these products.

- *Vitamin Antitrust Litigation* — Expert analysis regarding the pricing conditions in the market for vitamin C. The litigation involved price-fixing allegations.

- *Medicis Pharmaceutical Corporation v. Actavis Mid Atlantic LLC* — Expert analysis and testimony regarding damages to brand franchise due to early generic entry. The dispute centered around infringement of various patents.

- *Robert Bishop, et al. v. Kowa Pharmaceuticals America, Inc.* — Expert analysis regarding valuation of a privately held pharmaceutical firm.

- *Pharmaceutical Product Development, LLC v. TVM Life Science Ventures VI, L.P., et al.* — Expert analysis regarding valuation of privately held pharmaceutical firm.

- *Janssen Biotech et al. v. Celltrion and Hospira.* — Expert analysis and testimony on behalf of Pfizer regarding the entry of biosimilar substitute for the biologic drug Remicade in the U.S. market. The dispute centered around claims and counterclaims of infringement of various patents.

- *Genentech and City of Hope et al. v. Sandoz.* — Expert analysis on behalf of Sandoz (Novartis) regarding the entry of biosimilar substitute for the biologic drug Rituxan in the U.S. market. The dispute centered around claims and counterclaims of infringement of various patents.

- *Pfizer v. Teva.* — Expert analysis on behalf of Teva regarding commercial success and nexus issues related to multiple patents related to extended release version of Xeljanz XR.

- *PhRMA v. Robert P. David, Director of the California Office of Statewide Health Planning and Development.* -- Expert analysis on behalf of CA AG's office regarding the economic implications of SB17, and difference between WAC and transaction prices.

- *BH Smile, Inc. / Dr. William Dorfman, D.D.S. .* — Expert report regarding adequate sample size for the examination of product defect.

- *Enciris Technologies v. Med X Change,* Expert report in an AAA arbitration on behalf of **Med X Change**, a major surgical microscope manufacturer in a breach of contract dispute; damage analysis related to loss of first mover advantages.

- *Shareholder Representative Services LLC v. Medidata Solutions Inc.* -- Expert report and testimony on behalf of Medidata re damages allegedly suffered by the plaintiff in a contract dispute related to clinical trial software products.

A-6

- *Fresenius Kabi USA v. Custopharm Inc..* -- Expert report on behalf of Custopharm regarding allegations of market share erosion, price erosion and irreparable harm as result of Custopharm's entry into the market for injectable Levothyroxine.
- *PeriRx v. UCLA* — Expert declaration regarding the value of a new technology for early detection of diabetes. The dispute revolved around an alleged breach of contract which resulted in loss of a first-mover advantage.
- *United States of America ex rel. Peter Huesman v. Professional Compounding Centers of America.* ---Expert report and testimony on the relationship between AWP and pharmacy markups over cost.
- *Janssen Pharmaceuticals Inc. v. Emergent BioSolutions et al.* ---Expert report and testimony in a breach of contract dispute related to manufacturing of Covid-19 vaccine drug substance.
- *Northside Hospital, Inc. v. Cigna Healthcare of Georgia, Inc., et al.* ---Expert report and testimony in a breach of contract dispute related to the administration of specialty drugs.

# PUBLICATIONS

## Refereed Publications

- "Estimating Brands' Pay-off from Pay-For-Delay Deals," with Y. Xu, *Journal of Industry, Competition and Trade*, July 2023.
- "The 'Generic Competition Paradox' Revisited," with Yong Xu, *International Journal of the Economics of Business*, March 2021.
- "A Market Signal-Based Alternative to Buy and Hold Investing," with Y. Xu, *Journal of Investment Management,* 19(3), 2021, 81-98.
- "Pharmaceutical Industry's Changing Market Dynamics," with H. Roberts, *International Journal of the Economics of Business*, 27(2), 2020, 159-175.
- "Mutual Fund Returns and Their Characteristics: A Simple Approach to Selecting Better Performing Actively-Managed Funds," with B. Malkiel, *Journal of Investing,* 29(3) April 2020, 63-75.
- "The Rise of Dominant Firms: The Role of Chance," with A. Havenner, *Open Economics*, 2, 2019: 76-91.
- "Are Actively Mutual Funds Per Se Imprudent Choices for 401(k) Plans?" with H. Roberts, *The Journal of Retirement*, 7, Summer 2019, 58-77.
- "Has the VIX Been Manipulated?" with B. Malkiel and A. Rinaudo, *Journal of Asset Management* 20(1), February 2019, 1-14.
- "Option Writing: Using VIX to Improve Returns," with B. Malkiel and A. Rinaudo, *The Journal of Derivatives*, December 2018, 38-49.
- "Actively Managed versus Passive Mutual Funds: A Race of Two Portfolios," with A. Rinaudo, *The Journal of Financial Transformation* 46, November 2017, 193-206.
- "Downside Risk Protection of Retirement Assets: A New Approach," with A. Rinaudo, *The Journal of Financial Transformation* 45, March 2017, 111-120.

- "A Tale of Two Anomalies: Higher Returns of Low-Risk Stocks and Return Seasonality," with C. Fiore, *The Financial Review* 50(2), 2015, 257-273.
- "An Intraday Event Study Methodology for Determining Loss Causation," with A. Rinaudo, *The Journal of Financial Perspectives* 2(2), July 2014, 161-172.
- "Calculating Damages in ERISA Litigation," with A. Ferrell, *The Journal of Financial Perspectives* 1(2), 2013, 93-103.
- "Valuation of Cash Flows with Time-Varying Cessation Risk," with B. Malkiel, *Journal of Business Valuation and Economic Loss Analysis*, 7(1), 2012.
- "Detecting Price Artificiality and Manipulation in Futures Markets: An Application to Amaranth," with H. Petersen, *Journal of Derivatives and Hedge Funds*, 18, 2012, 254-271.
- "Forward-Casting 10b-5 Damages: A Comparison to Other Methods," with A. Ferrell, *Journal of Corporation Law*, 37(2), Winter 2012, 365-387.
- "DCF Valuation with Cash Flow Cessation Risk," with B. Malkiel, *Journal of Applied Finance*, 1, 2012, 175-185.
- "Securities Litigation and the Housing Market," with A. Ferrell, *Journal of Corporation Law*, Fall 2009, 92-122.
- "The Clustering of Extreme Movements: Stock Prices and the Weather," with B. Malkiel and A. Grecu, *The Journal of Investment Management*, 2009, 20-35.
- "The Loss Causation Requirement for Rule 10b-5 Causes-of-Action: The Implication of Dura Pharmaceuticals v. Broudo," with A. Ferrell, *The Business Lawyer*, November 2007.
- "Why Do Hedge Funds Stop Reporting Their Performance?" with A. Grecu and B. Malkiel, *Journal of Portfolio Management*, Fall 2007, 119-126.
- "To Bundle or Not To Bundle: Firms' Choices Under Pure Bundling," with G. Hubbard and J. Lee, *International Journal of the Economics of Business*, February 2007, 59-83.
- "Complementary Goods: Prices and Consumer Welfare Under Duopoly and Monopoly," with A. Girnius and O. Andriychenko, *International Journal of the Economics of Business*, November 2006, 373-386.
- "Generic Competition in the U.S. Pharmaceutical Industry," with H. Grabowski, H. Birnbaum, P. Greenberg, and O. Bizan, *International Journal of the Economics of Business*, April 2006, 15-38.
- "Hedge Funds: Risk and Return," with B. Malkiel, *Financial Analysts Journal*, December 2005, 80-88. Recipient of the Graham and Dodd "Best Perspectives Paper" Award, 2005.
- "Predicting the Price Effect of Mergers with Polynomial Logit Demand," with P. Simon, *International Journal of the Economics of Business*, Antitrust Special Issue, 7, 2000, 149-157.
- "The Economics of Crime and Punishment: An Analysis of Optimal Penalty," with G. Poole, *Economics Letters*, 68, 2000, 191-196.
- "A New Approach to Estimating Damages in Mass Torts," with L. Hilton, *International Journal of the Economics of Business*, 7, 2000, 27-46.
- "He Came, He Saw, [and] He Waited: An Empirical Analysis of Inertia in Technology Adoption," with D. Dong, *Applied Economics*, 30, 1998, 893-905.
- "Refutable Implications of the Firm Model Under Risk," with R. Shumway, *Applied Economics*, 30, 1998, 441–448.
- "Risk Preference Estimation in the Nonlinear Mean Standard Deviation Approach," *Economic Inquiry*, 35, 1997, 770–782.

A-8

- "Estimating Nested Count Data Models," with D. Dong, *Oxford Bulletin of Economics and Statistics*, 59, 1997, 423–430.
- "Expo-Power: A Flexible Hazard Function for Duration Data Models," with L. Hilton, *Economics Letters*, 54, July 1997, 227–233.
- "Stochastic Production Function Estimation: Small Sample Properties of ML versus FGLS," with A. Havenner and H. Talpaz, *Applied Economics*, 29, 1997, 459–469.
- "Calculating Marginal Effects in Models for Zero Expenditures in Household Budgets Using a Heckman- type Correction," with O. Capps and P. Byrne, *Applied Economics*, 4, 1997, 181–185.
- "Calculating Marginal Effects in Dichotomous-Continuous Models," with O. Capps and P. Byrne, *Applied Economics Letters*, 4, 1997, 181–185.
- "The Economics and Econometrics of Damage Control," with C.R. Shumway and A. Havenner, *American Journal of Agricultural Economics*, 79, 1997, 773–785.
- "Analysis of Food Away from Home Expenditure Patterns for US Households, 1982–1989," with P. Byrne and O. Capps, *American Journal of Agricultural Economics*, 78, 1996, 614–627.
- "The Role of Information in Technology Adoption: The Case for rbST in the California Dairy Industry," with C. Klotz and L. J. Butler, *Review of Agricultural Economics*, 17, 1995, 287–298.
- "Production and Savings Under Uncertainty," with R. Innes and R. Pope, *International Review of Economics and Finance*, 2, 1994, 365–375.
- "A Two-Season Agricultural Household Model of Storage and Savings Under Uncertainty," *Journal of Development Economics*, 45, 1994, 245–269.
- "Adoption of Emerging Technologies Under Uncertainty," with A. Love and R. Schwart, Jr., *American Journal of Agricultural Economics*, 76, 1994, 836–846.
- "A Household Model of On-farm Storage Under Price Risk," with J. Stroud, *American Journal of Agricultural Economics*, 76, 1994, 522–534.
- "Joint Estimation of Risk Preference and Production Technology Using the Expo-Power Utility Function," with R. Shumway and H. Talpaz, *American Journal of Agricultural Economics*, 76, 1994, 173–184.
- "Compensated Optimal Response Under Uncertainty in Agricultural Household Models," *Agricultural Economics*, 11, 1994, 111–123.
- "Expo-Power Utility: A Flexible Form for Absolute and Relative Risk Aversion," *American Journal of Agricultural Economics*, 75, 1993, 905–913.

## Monographs, Books and Other Publications

- "How The Commercial Real Estate Slump May Weigh on Banks," with Y. Xu, *Law360*, August 28, 2023.
- "A Convergence of Factors Hurts SVB Securities Class Action," with N. Walia, *Law360*, April 20, 2023.
- "A Method to Measure Pay-for-Delay Drug's Financial Impact," with N. Walia, and Y. Xu, *Law360*, Feb 23, 2023.
- "Archegos Fallout is a Wake-Up Call For Banks," with J. Copeland and Y. Xu, *Law360*, May 2021.
- "What Really Caused Carnival's COVID-19 Stock Drop?" with Yong Xu, *Law360*, November 2020.

A-10

- "Will Recession Strike in 2020?" with B. Malkiel, *The Wall Street Journal*, December 2019.
- "What an Economic Analysis Reveals About ERISA Litigation," with A. Rinaudo, *Law 360*, February 2019.
- "Conditional Option Writing: Using VIX to Improve Returns," with A. Rinaudo and B. Malkiel, *Seeking Alpha*, October 2018.
- "Commentary: Inclusion of High-Fee Funds not Necessarily a Breach of Fiduciary Duty," with A. Rinaudo, *Pensions & Investments*, May 2018, 12.
- "Are Traditional Valuation Models Flawed? An Illustrative Example: Valuing a Hedge Fund," with B. Malkiel, *ValueWalk*, March 2018.
- "Hedge Funds Today: Caveat Emptor," with B. Malkiel, *The Wall Street Journal*, July 2005.
- "The Projected Effects of rbST and MOET on World Dairy Markets," with L. Jarvis. Chapter in *The Potential Effect of Two New Biotechnologies on the World Dairy Industries*, Westview Press, 1996.

Privileged and Confidential

## APPENDIX B: Information Relied On

### Case Documents:

Declaration of Alex Bergjans in Support of Defendant Elon Musk's Motion to Dismiss the First Amended Complaint, July 10, 2023. (Exhibit 1. Twitter Inc. Form 8-K, April 25, 2022)

Declaration of Mark C. Molumphy in Support of Plaintiffs' Motion to Certify Class, Appoint Class Representatives, and Appoint Class Counsel, Case No. 22-cv-05937-CRB, United States District Court, Northern District Court of California, San Francisco Division, August 2, 2024. (Exhibit 1. Expert Report of David I. Tabak, Ph.D.)

Defendant Elon Musk's Motion to Dismiss the First Amended Complaint, Case No. 22-cv-05937-CRB, United States District Court, Northern District Court of California, San Francisco Division, September 22, 2023.

First Amended Class Action Complaint for Violations of the Federal Securities Law, Case No. 22-cv-05937-CRB, United States District Court, Northern District Court of California, San Francisco Division, June 8, 2023.

Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, Case No. 22-cv-05937-CRB, United States District Court, Northern District Court of California, San Francisco Division, December 11, 2023.

Plaintiff's Notice of Motion and Motion to Certify Class, Appoint Class Representatives, and Appoint Class Counsel; Memorandum of Points and Authorities in Support Thereof, Case No. 22-cv-05937-CRB, United States District Court, Northern District Court of California, San Francisco Division, August 2, 2024.

### Case Depositions:

Deposition of John Garrett, Volume 1, July 9, 2024.

Deposition of Dr. David Tabak, August 9, 2024.

Privileged and Confidential

**Data and Documents Provided by Counsel:**

BELGRAVE-000001 to BELGRAVE-0000053.

JGARRETT-000001 to JGARRETT-000043.

PRICE-000001 to PRICE-000013.

S_GARRETT-000001 to SGARRETT-000002.

S_GARRETT-000006 to S_GARRETT-000027.

**Press Releases and Company Filings:**

Amendment No. 2 to Schedule 13D/A, Twitter Inc., *SEC*, April 13, 2022, https://www.sec.gov/Archives/edgar/data/1418091/000110465922045641/tm2212748d1_sc13da.htm.

"Notification of Removal from Listing and Registration of the Stated Securities," *SEC*, https://www.sec.gov/Archives/edgar/data/876661/000087666122000890/0000876661-22-000890.txt

Twitter's 10-K filing for FY ended December 31, 2013, SEC, https://www.sec.gov/Archives/edgar/data/1418091/000095012314003031/twtr-10k_20131231.htm.

**Academic Literature:**

A. Craig MacKinlay, "Event Studies in Economics and Finance." Journal of Economic Literature, Vol. 35(1), March 1997.

Alexandra Gabriela Titan, "The Efficient Market Hypothesis: review of specialized literature and empirical research," Procedia Economics and Finance, Vol. 32, 2015, pp. 442-449.

Aswath Damodaran, *Investment Valuation*, 3rd Ed., 2012, Wiley Finance.

Privileged and Confidential

Atanu Saha and Alex Rinaudo, "An intraday event study methodology for determining loss causation," The Journal of Financial Perspectives, Vol. 2(2), July 2014, pp. 161-173.

Azi Ben-Rephael, Zhi Da, and Ryan D. Israelsen, "It Depends on Where You Search: Institutional Investor Attention and Underreaction to News," The Review of Financial Studies, Vol. 30(9), September 2017, pp. 3009–3047.

Azi Ben-Rephael, Zhi Da, Peter D. Easton, and Ryan D. Israelsen, "Who Pays Attention to SEC Form 8-K?. The Accounting Review," Vol. 97(5), September 2022, pp. 59–88.

Caroline Gentry, "A Primer on Class Certification Under Federal Rule 23," Corporate Counsel CLE Seminar, ABA Section of Litigation, February 2014.

Charles River Associates, "Price impact of disclosures before, during, or after a trading day: Implications for event studies," August 2014, https://media.crai.com/sites/default/files/publications/FM-Insights-Intraday-Trading-August-2014.pdf.

Dante Amengual and Dacheng Xiu, "Resolution of Policy Uncertainty and Declines in Volatility," Journal of Econometrics, 2018, Vol. 203, pp. 297-315.

David Tabak and Federick Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," NERA, Working Paper #34, April 1999.

Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," The Journal of Finance, Vol. 25 (2), December 1969, pp. 383-417.

Frederick C. Dunbar and Dana Heller, "Fraud on the Market Meets Behavioral Finance," Delaware Journal of Corporate Law, Vol. 455.

Huseyin Gulen and Mihai Ion, "Policy Uncertainty and Corporate Investment," The Review of Financial Studies, Vol. 29, March 2016, pp. 523-564.

James Patell and Mark Wolfson, "The intraday speed of adjustment of stock prices to earnings and dividend announcements," Journal of Financial Economics, Vol. 13(2), 1984, pp. 223-252.

Privileged and Confidential

Jill Fisch, Jonah Gelbach and Jonathan Klick, "The Logic and Limits of Event Studies in Securities Fraud Litigation," Texas Law Review, Vol. 96 (553).

John Hull, "Options, Futures, and Other Derivatives," Eighth Edition, 2012, Prentice Hall.

Nuttawat Visaltanachoti and Ting Yang, "Speed of convergence to market efficiency for NYSE-listed foreign stocks," Journal of Banking & Finance, Vol. 34(3), 2010, pp. 594-605.

Tong et. al, "The Effects of Economic Uncertainty on Financial Volatility: A Comprehensive Investigation," Journal of Empirical Finance, Vol. 73, September 2023, pp. 369-389.

Zvi Bodie, Alex Kane, and Alan J. Marcus, *Investments*, Tenth Ed., McGraw-Hill Education, 2014.


**Other:**

Andrew Chow, Vera Bergengruen, and Billy Perrigo, "'Egregious Deficiencies,' Bots, and Foreign Agents: The Biggest Allegations from the Twitter Whistleblower," Time, August 23, 2022, https://time.com/6207996/twitter-whistleblower-allegations/.

Benjamin Black and Ishant Goel, "Goes All In," *Deutsche Bank*, April 14, 2022.

Bloomberg – Twitter Stock Price and Shareholder Data.

Bloomberg Security Ownership Help Page.

Brian Fitzgerald and Robert Coolbirth, "Bots or Not, Musk Agrees to Close Transaction," *Wells Fargo*, October 5, 2022.

Brian Fitzgerald and Robert Coolbirth, "TWTR: Caught Between and Rock and a Hard Case," *Wells Fargo*, April 18, 2022.

Brian Fitzgerald and Robert Coolbirth, "TWTR: Not Budging for Mudge; Continued Conviction on Deal Close Post Update Call w/ Chancery Court Expert," *Wells Fargo*, September 23, 2022.

Privileged and Confidential

Connor Smith, "Corporate Law Expert Says Musk Can't Just Walk Away from Twitter Deal," Barron's, May 13, 2022, https://www.barrons.com/articles/expert-musk-walk-twitter-deal-51652470871.

"Elon Musk Agrees to Buy Twitter," The New York Times, April 25, 2022, https://www.nytimes.com/2022/04/25/technology/musk-twitter-sale.html.

"Exchange Act Sections 13(d) and 13(g) and Regulation 13D-G Beneficial Ownership Reporting," SEC, October 7, 2022, https://www.sec.gov/divisions/corpfin/guidance/reg13d-interp.htm.

Jef Feeley and Ed Hammond, "Musk Proposes to Proceed With Twitter Deal at $54.20 a Share," Bloomberg, October 4, 2022.

Kate Conger and Lauren Hirsch, "Elon Musk Completes $44 Billion Deal to Own Twitter," The New York Times, October 27, 2022, https://www.nytimes.com/2022/10/27/technology/elon-musk-twitter-deal-complete.html.

Kurt Wagner, Ed Hammond, and Katie Roof, "Musk Completes $44 Billion Twitter Deal, Ending Months of Enmity," Bloomberg, October 27, 2022

Lauren Hirsch and Kate Conger, "What's Next in the Elon Musk-Twitter Saga? A Court Battle," The New York Times, July 9, 2022, https://www.nytimes.com/2022/07/09/technology/twitter-elon-musk-lawsuit.html.

Luca Luceri, Felipe Cardoso, and Silvia Giordano, "Down the bot hole: Actionable insights from one-year analysis of bot activity on Twitter," First Monday, Vol. 26, March 1, 2021, https://firstmonday.org/ojs/index.php/fm/article/download/11441/10079.

Mandeep Singh, "Bloomberg Musk May Seek Twitter Value Closer to Snap Amid Deal Hold React," May 16, 2022.

Mandeep Singh, "Bloomberg Twitter Subscriptions Maybe, But Not 1 Billion DAUs React," Bloomberg, May 16, 2022.

Privileged and Confidential

Matthew Schettenhelm, "If Musk Tries to Walk Away on M&A, Twitter Has Strong Hand to Play," *Bloomberg Intelligence*, May 18, 2022.

Matthew Schettenhelm, "Twitter M&A Hand Still Strong Despite Musk's New Please for Access," *Bloomberg Intelligence*, June 6, 2022.

Matthew Schettenhelm, "Twitter M&A Stance Strong Even If Musk Can't Verify 'Bot' Counts," *Bloomberg Intelligence*, July 8, 2022.

Megan McCluskey, "Elon Musk Wants to Rid Twitter of 'Spam Bots.' Nearly Half His Followers are Fake," TIME, April 28, 2022, https://time.com/6171726/elon-musk-fake-followers/.

Polygon IO, Twitter Intraday Data

Williams, W. [@wiqd], May 16, 2022, 2:17 PM EST, ".@elonmusk Says bot army mus be at least 20% on @Twitter #allinsummit," https://x.com/wiqd/status/1526265635902214145.

Privileged and Confidential

## APPENDIX C: Appendix Tables

**Appendix C1. Statistically Significant Abnormal Returns in Twitter Stock Price during the PC Period**

|  | Date | Twitter Price | Abnormal Return |
|---|---|---|---|
| 1 | Friday, May 13, 2022 | $40.72 | -13.2% |
| 2 | Monday, May 16, 2022 | $37.39 | -6.6% |
| 3 | Monday, July 11, 2022 | $32.65 | -8.0% |
| 4 | Wednesday, July 13, 2022 | $36.75 | 8.0% |
| 5 | Tuesday, August 23, 2022 | $39.86 | -6.6% |
| 6 | Tuesday, October 4, 2022 | $52.00 | 17.1% |

The table in Appendix C1 contains the results of my replication of Dr. Tabak's event study analysis. Based on my analysis, six dates within the PC period are associated with a statistically significant change in Twitter's share price, controlling for changes in the market index; however, two of these six dates (July 11 and August 23, 2022) are not associated with any alleged misrepresentation.

Privileged and Confidential

## Appendix C2. Statistical Significance Test for Intra-day Returns After Event on May 16, 2022

| | Category | Value |
|---|---|---|
| [A] | Twitter Cumulative Log-Returns on 5/16/22, 2:18 P.M - 4:00 P.M. | -0.38% |
| [B] | Standard Deviation during Clean Period, 2:18 P.M. - 4:00 P.M. | 0.0007 |
| [C] | Number of Minutes between 2:18 P.M. and 4:00 P.M. | 103 |
| [D] = [A] / ([B] * √[C]) T-statistics for Returns on 5/16/22, 2:18 P.M - 4:00 P.M. | | -0.58 |

I have relied on A. Craig MacKinlay, "Event Studies in Economics and Finance." Journal of Economic Literature, Vol. 35(1), March 1997, pp. 13-39, for the methodology of intra-day returns' statistical test.  I have undertaken the test using two different approaches.

The results of the first approach are in the Table above.  It contains the results of my analysis of the statistical significance of Twitter's price movement on 5/16/2022 following Musk's alleged misrepresentation at approximately 2:17 P.M. through the close of trading hours at 4:00 P.M. on the same day. I use minute-by-minute trading data to calculate the standard deviation of Twitter's per-minute log-returns over a clean period, defined as the five trading days from 3/28/2022 through 4/1/2022 and limited to the same time period, 2:18 P.M. through 4:00 P.M. To derive the t-statistic, I divide the sum of Twitter's per-minute cumulative log-returns during the relevant time period on 5/16/2022 by the product of the clean period's standard deviation of returns and the square root of 103 (i.e., the number of minutes between 2:18 P.M. and 4:00 P.M.).

The 103-minute log-returns' t-statistics for May 16, 2022, following Musk's alleged misrepresentation, are found to be -0.58, which is negative but not statistically significant.

In the second approach, I have undertaken an analysis of the cumulative abnormal return (CAR) between 2:18 P.M. and 4 P.M. on May 16, 2022, and tested its statistical significance. Specifically: (a) I regress the (per-minute) log-returns of Twitter on the (per-minute) log-returns of QQQ for the five trading days within the clean period of 3/28/2022 and 4/1/2022; (b) using the estimated coefficients from this regression, I predict Twitter's returns for the 103 minutes between 2:18 PM and 4:00 PM on May 16, 2022; (c) I calculate the

Privileged and Confidential

difference between actual and the predicted Twitter returns, which are the residual or abnormal returns; (d) finally, I divide the sum of the abnormal returns over the 103 minutes (i.e., CAR) by the product of the square root of 103 and the root mean squared error from the clean-period regression in the first step to derive the t-statistics.

The 103-minute CAR's t-statistics for May 16, 2022 are found to be 0.46, which is positive but not statistically significant.

I adopt a similar approach for May 17, 2022, but use all 390-trading day minutes to compute the CAR. The t-statistics for the May 17 CAR are found to be 1.37, which is positive but not significant.

C-3

Privileged and Confidential

**Appendix C3 and C4**

In these two Appendices, I provide two concrete examples illustrating the situation where option traders who traded the options at issue by buying the put option or selling the call option would have potentially gained. Under this scenario, as long as the option trader also purchased a call option during the purported class period, he or she would likely have gained as a result of the alleged price deflation. The potential gain is derived from the allegedly lower call option price as it becomes cheaper for the option trader to bet on the upside of the Twitter stock. In this case, the potential gain from the long call option could be larger than the alleged out-of-pocket damages for the long put option, resulting in net gains or no damages for the option trader. Therefore, the purported class definition related to options at issue is fatally flawed because it includes those who potentially gained from the alleged conduct at issue and to quantify harm, if any, for option traders, one would have to rely on individual inquiry into the option trading records.

Appendix C3 illustrates the scenario where the option trader who bought a put option also bought another call option during the purported class period. Appendix C4 shows another scenario where the option trader who sold a call option also bought additional call options during the purported class period. In each scenario, I demonstrate that the option trader would have achieved net gain or no loss at inception or at expiration. To derive this finding, I rely on the standard Black Scholes option valuation model where it values an option based on the inputs of implied volatility, a risk-free rate, and contract-specific parameters such as the call/put type, strike price, and time to expiration.

I mentioned in Footnote 85 that Dr. Tabak errs by stating that one should use the actual volatility of the underlying stock to estimate the actual and but-for option price. For Appendix C3 and C4 I relied on the implied volatility rather than actual volatility in the Black-Scholes option pricing model. In addition, the implied volatility should be derived differently based on the actual and but-for prices of the underlying stock as volatility depends on the levels and changes of the underlying stock prices. For the illustrative purpose, I followed Dr. Tabak's approach by using the same volatility input for the valuation of the actual and but-for option prices.

Appendix C3 shows that the option trader would have gained $106.29 for both the long put and long call options at inception and would have gained $971.12 at expiration as

C-4

Privileged and Confidential

the option trader would have benefited from a larger payoff for the call option at expiration as a result of the higher but-for price versus the strike price.

**Appendix C3. Illustration of An Investor's Gains or Losses for Long Put Option Trades Based on Plaintiffs' Expert's and Plaintiffs' Damages Methodology**

| Trade Date | Trade Type | Option Type | Strike | Expiration Date | Number of Option Contracts | Volatility[1] | Risk Free Rate[2] | Actual Share Price | But-For Share Price | Actual Option Value | But-For Option Value | Gains/Losses (But-For - Actual) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/11/22 | Buy | Put | 33 | 9/16/22 | 1 | 72% | 2.00% | $32.65 | $47.81 | $414.20 | $66.80 | -$347.40 |
| 8/15/22 | Buy | Call | 40 | 9/16/22 | 1 | 45% | 2.54% | $44.50 | $49.55 | $523.03 | $976.72 | $453.69 |
| | | | | | | | | | | | Net | **$106.29** |

**At Expiration**

| Trade Date | Trade Type | Option Type | Strike | Expiration Date | Number of Option Contracts | Volatility[1] | Risk Free Rate[2] | Actual Share Price | But-For Share Price | Actual Option Value | But-For Option Value | Gains/Losses (But-For - Actual) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/16/22 | Buy | Put | 33 | 9/16/22 | 1 | | | $41.45 | $51.16 | $0.00 | $0.00 | $0.00 |
| 9/16/22 | Buy | Call | 40 | 9/16/22 | 1 | | | $41.45 | $51.16 | $145.00 | $1,116.12 | $971.12 |
| | | | | | | | | | | | Net | **$971.12** |

Notes:
[1] The volatility input is sourced from the support file for the Tabak Report (TABAK-00000514.)
[2] The other data inputs are sourced from Bloomberg. The risk free rate is proxied using the yields of the three-month U.S. Treasury bills.

Appendix C4 shows that the option trader would have gained $192.86 for both the short call and long call options at inception and would have gained $1,942.24 at expiration. Similar to Appendix C3, the option trader would have benefited from a larger payoff for the call option at expiration as a result of the higher but-for price versus the strike price.

Privileged and Confidential

## Appendix C4. Illustration of An Investor's Gains or Losses for Short Call Option Trades Based on Plaintiffs' Expert's and Plaintiffs' Damages Methodology

| Trade Date | Trade Type | Option Type | Strike | Expiration Date | Number of Option Contracts | Volatility [1] | Risk Free Rate [2] | Actual Share Price | But-For Share Price | Actual Option Value | But-For Option Value | Gains/Losses (But-For - Actual) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7/11/2022 | Sell | Call | 33 | 9/16/2022 | 1 | 72% | 2.00% | $32.65 | $47.81 | -$391.29 | -$1,559.49 | -$1,168.21 |
| 8/15/2022 | Buy | Call | 40 | 9/16/2022 | 3 | 45% | 2.54% | $44.50 | $49.55 | $1,569.10 | $2,930.17 | $1,361.07 |
| | | | | | | | | | | | Net | $192.86 |
| **At Expiration** | | | | | | | | | | | | |
| 9/16/2022 | Sell | Call | 33 | 9/16/2022 | 1 | | | $41.45 | $51.16 | -$845.00 | -$1,816.12 | -$971.12 |
| 9/16/2022 | Buy | Call | 40 | 9/16/2022 | 3 | | | $41.45 | $51.16 | $435.00 | $3,348.36 | $2,913.36 |
| | | | | | | | | | | | Net | $1,942.24 |

Notes:

[1] The volatility input is sourced from the support file for the Tabak Report (TABAK-00000514.)

[2] The other data inputs are sourced from Bloomberg.  The risk free rate is proxied using the yields of the three-month U.S. Treasury bills.

C-6