**COTCHETT, PITRE & McCARTHY, LLP**
Joseph W. Cotchett (SBN 36324)
*jcotchett@cpmlegal.com*
Mark C. Molumphy (SBN 168009)
*mmolumphy@cpmlegal.com*
Tyson C. Redenbarger (SBN 294424)
*tredenbarger@cpmlegal.com*
Gia Jung (SBN 340160)
*gjung@cpmlegal.com*
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
*fbottini@bottinilaw.com*
Albert Y. Chang (SBN 296065)
*achang@bottinilaw.com*
Aaron P. Arnzen (SBN 218272)
*aarnzen@bottinilaw.com*
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile:  (858) 914-2002

*Lead Counsel for Lead Plaintiffs Steve Garrett, Nancy Price,*
 *John Garrett, Brian Belgrave and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **GIUSEPPE PAMPENA, individually and on behalf of all others similarly situated,**<br><br>Plaintiff,<br><br>vs.<br><br>**ELON MUSK,**<br><br>Defendant. | Case No. 22-cv-5937-CRB<br><br>**LEAD PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF MOTION TO CERTIFY CLASS, APPOINT CLASS REPRESENTATIVES, AND APPOINT CLASS COUNSEL**<br><br>Date:          September 27, 2024<br>Time:          10:00 a.m.<br>Courtroom: 6, 17th Floor<br>Judge:        Honorable Charles R. Breyer |

# **TABLE OF CONTENTS**

I.   SUMMARY OF ARGUMENT ................................................................ v

II.  ARGUMENT ...........................................................................................1

     A.   The Proposed Class Satisfies Rule 23(b)(3) as Common Questions of Law and Fact Predominate ........................................................................1

          1.   Plaintiffs Are Entitled to a Presumption of Reliance ..............................1

          2.   Defendant Has Failed to Rebut the Fraud-on-the-Market Presumption with Evidence of the Absence of Price Impact .........................................*2*

               a.   Musk's Purported Evidence of Lack of Price Impact Is a Procedurally Improper and Factually Incorrect Truth-on-the-Market Defense ..............................................................................*2*

               b.   Plaintiffs Never Conceded That Institutional Investors Were Not Misled ..........................................................................................7

               c.   Musk's Improper Loss-Causation Arguments Cannot Be Resolved at Class Certification .....................................................................8

          3.   Plaintiffs Are Entitled to the Affiliated Ute Presumption .......................9

          4.   Plaintiffs' Damages Methodology Is Capable of Calculating Damages for All Putative Class Members ..............................................................11

     B.   Plaintiffs Are Adequate Class Representatives Under Rule 23(a)(4) ..............13

III. CONCLUSION .....................................................................................15

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**CASES**

4

*Affiliated Ute Citizens of Utah v. United States*
5
    406 U.S. 128 (1972)...........................................................................................................11

6

*Aguilar v. Int'l Longshoremen's Union Local No. 10*
7
    966 F.2d 443 (9th Cir. 1992) .............................................................................................8

8

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*
    568 U.S. 455 (2013)........................................................................................................3, 4
9

*Basic Inc. v. Levinson*
    485 U.S. 224 (1988)........................................................................................................3, 4
10

*Blackie v. Barrack*
11
    524 F.2d 891 (9th Cir. 1975) ...........................................................................................12

12

*Brokop v. Farmland Partners Inc.*
    2021 WL 4913970 (D. Colo. Sep. 30, 2021) ..................................................................12
13

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.*
14
    141 F.R.D. 144 (N.D. Cal. Dec. 9, 1991) .......................................................................17

15

*City of Mia. Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*
    2018 WL 4931543 (N.D. Cal. Oct. 11, 2018)................................................................13
16

*Comcast Corp. v. Behrend*
17
    569 U.S. 27 (2013) ..........................................................................................................13

18

*Cooper v. Thoratec Corp.*
    2018 WL 2117337 (N.D. Cal. May 8, 2018) .................................................................13
19

*Dickey v. Advanced Micro Devices, Inc.*
20
    2019 WL 251488 (N.D. Cal. Jan. 17, 2019) ..................................................................16

21

*DZ Reserve v. Meta Platforms, Inc.*
    96 F.4th 1223 (9th Cir. 2024) .........................................................................................15
22

*Epstein v. MCA, Inc.*
23
    50 F.3d 644 (9th Cir. 1995) ...............................................................................................2

24

*Erica P. John Fund, Inc. v.  Halliburton Co.*
    563 U.S. 804 (2011)........................................................................................................10
25

*FindWhat Investor Grp. v. FindWhat.com*
26
    658 F.3d 1282 (11th Cir. 2011) .........................................................................................8

27

*Gable v. Nat'l Broad. Co.*
    727 F. Supp. 2d 815 (C.D. Cal. 2010) ..............................................................................8

28

*Glickenhaus & Co. v. Household Int'l, Inc.*
    787 F. 3d 408 (7th Cir. 2020) ...................................................................8

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*
    594 U.S. 113 (2021) .....................................................................3, 4, 8

*Grodzitsky v. Am. Honda Motor Co.*
    957 F.3d 979 (9th Cir. 2020) ...................................................................8

*Halliburton Co. v. Erica P. John Fund, Inc.*
    573 U.S. 258 (2014)...................................................................3, 4

*Hanon v. Dataproducts Corp.*
    976 F.2d 497 (9th Cir. 1992) ...................................................................16

*Hatamian v. Advanced Micro Devices, Inc.*
    2016 WL 1042502 (N.D. Cal. Mar. 16, 2016) ...................................................10, 13

*Hoxworth v. Blinder, Robinson & Co.*
    903 F.2d 186 (3d Cir. 1990) ...................................................................12

*In re Allstate Corp. Sec. Litig.*
    966 F.3d 595 (7th Cir. 2020) ...................................................................8

*In re Apple Sec. Litig.*
    2022 WL 354785 (N.D. Cal. Feb. 4, 2022) ...................................................3, 7

*In re Bofi Holding, Inc. Sec. Litig.*
    2021 WL 3742924 (S.D. Cal. Aug. 24, 2021) ...................................................14

*In re Cooper Companies Inc. Sec. Litig.*
    254 F.R.D. 628 (C.D. Cal. 2009) ...................................................................2

*In re Deepwater Horizon*
    739 F.3d 790 (5th Cir. 2014) ...................................................................14

*In re Diamond Foods, Inc.*
    295 F.R.D. 240 (N.D. Cal. 2013) ...................................................................4, 14

*In re eHealth, Inc. Sec. Litig.*
    2023 WL 6390593 (N.D. Cal. Sept. 28, 2023) ...................................................................7

*In re FirstEnergy Corp. Sec. Litig.*
    2023 WL 2709373 (S.D. Ohio Mar. 30, 2023) ...................................................................12

*In re Magma Design Automation Sec. Litig.*
    2007 WL 2344992 (N.D. Cal. Aug. 16, 2007) ...................................................................2

*In re Providian Fin. Corp. Sec. Litig.*
    2004 WL 5684494 (N.D. Cal. Jan. 15, 2004) ...................................................................4

*In re Storage Tech. Corp. Sec. Litig.*
    113 F.R.D. 113 (D. Colo. Nov. 8, 1986) ...................................................................17

*In re Vivendi, S.A. Sec. Litig.*
838 F.3d 223 (2d Cir. 2016)......................................................................................8

*In re Volkswagen "Clean Diesel" Mkt'g, Sales Practices, & Prods. Liab. Litig.*
2 F.4th 1199 (9th Cir. 2021) .................................................................................12

*Lawrence E. Jaffe Pension Plan Household, Int'l, Inc.*
No. 02 C 5893 (N.D. Ill. Mar. 23, 2009) ...........................................................14

*Levya v. Medline Indus., Inc.*
716 F.3d 510 (9th Cir. 2013) .................................................................................14

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*
2020 WL 5026553 (D. Del. Aug. 25, 2020) .......................................................12

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*
975 F. Supp. 584 (D.N.J. 1996) ............................................................................12

*Roach v. T.L. Cannon Corp.*
778 F.3d 401 (2d Cir. 2015)..................................................................................14

**RULES**

FED. R. CIV. P. 26...................................................................................................*passim*

**OTHER AUTHORITIES**

Marge S. Thorsen, *et al.*, *Rediscovering the Economics of Loss Causation*
6 J. BUS. & SEC. L. 93 (2006).............................................................................14

## I.   SUMMARY OF ARGUMENT

The Court should grant Plaintiffs' motion for class certification because the proposed class satisfies all requirements of Rule 23 of the Federal Rules of Civil Procedure.  Indeed, Defendant Elon Musk does not challenge most of these requirements and concedes that the markets for Twitter stock and options were efficient.

Rather, Musk asserts that his false statements – literally made while he was offering to purchase Twitter – somehow did not impact the price of Twitter stock or options.  However, Musk bears the burden of proving that there was no price impact, and his arguments run counter to law and logic.  For example, while Musk's own expert concedes that Musk's May 13, 2022 statements caused Twitter's stock to decline at a statistically significant level, Musk claims that it was the "uncertainty" created by his statements, not the statements, that caused the decline.  Musk conveniently ignores the fact that any uncertainty in the market was a result of Musk's false statements.  Similarly, Musk's argument that future tweets did not result in appreciable market declines fails under the inflation-maintenance theory, which holds that misstatements that maintain an artificial stock price (like Musk's May 16 and 17, 2022 tweets) have the same price impact as misstatements that initially caused the artificial inflation or deflation.

Nor is there any merit to Musk's argument that some investors must have known the truth since the merger agreement was publicly filed and thus the market could not have been misled by his misstatements and omissions.  This is the third time Musk has advanced this defective argument; the Court rejected it at both the motion-to-dismiss stage and in response to Musk's recent motion for judgment on the pleadings.  *See* Dkt. No. 89 at 5 ("[Musk] does not point to a specific disclosure in the Merger Agreement that would prevent a reasonable investor from being misled by Defendant's tweet—*i.e.*, a countervailing statement that the deal will close even if Twitter fails to provide him with the bot data he requests").  Musk's repetition of this argument is also rebutted by his own expert's report, which shows that several of Twitter's top institutional  shareholders engaged in a massive sell-off of their Twitter stock during the class period in response to Musk's May 13, 2022 statement.  If such sophisticated investors allegedly knew the truth, they would never have sold most or all of their

1    holdings and given up the chance to receive a much higher $54.20 for their stock just months later.

2    Musk also argues that Plaintiffs have failed to establish that a common methodology to

3    calculate damages exists.  This is incorrect since, as explained below, Plaintiffs' expert report sets forth

4    a viable method—the "out of pocket" measure of damages which is the gold standard in securities

5    fraud cases.  Musk merely speculates that there may be some investors who bought shares in addition

6    to selling shares, and that some investors may have profited.  But, as Plaintiffs' expert explains, that is

7    true in every class action, and Plaintiffs' proposed methodology can and would incorporate the out-of-

8    pocket damages limitation under the Private Securities Litigation Reform Act of 1995 ("PSLRA").

9    Predictably, Musk also attacks the Lead Plaintiffs individually, asserting that they are

10   unknowledgeable about the claims in this case.  That assertion is false.  The evidence, including

11   deposition testimony by each of the Lead Plaintiffs, demonstrates that they are adequate and typical

12   representatives of the proposed class, are knowledgeable, and have actively participated in all aspects

13   of the case.

14   In the final analysis, this matter is perfectly suited for class certification.  "As the Ninth Circuit

15   has so aptly stated, securities fraud cases fit Rule 23 'like a glove.'"  *In re Cooper Companies Inc. Sec.*

16   *Litig.*, 254 F.R.D. 628, 632 (C.D. Cal. 2009) (quoting *Epstein v. MCA, Inc.*, 50 F.3d 644, 668 (9th Cir.

17   1995)).  As this Court found in *In re Magma Design Automation Sec. Litig.*, Plaintiffs "easily satisfy

18   the requirements of Rule 23"—"[a]s in almost all lawsuits by shareholders of public companies."  *See*

19   2007 WL 2344992, at *1 (N.D. Cal. Aug. 16, 2007) (Breyer, J.).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.     ARGUMENT

**A.     The Proposed Class Satisfies Rule 23(b)(3) as Common Questions of Law and Fact Predominate**

Plaintiffs have properly invoked the fraud-on-the-market presumption of reliance under *Basic Inc. v. Levinson,* 485 U.S. 224, 244–47 (1988).  Musk cannot prove an absence of price impact, *i.e.*, that his misrepresentations did not impact the stock price, and thus fails to rebut the presumption. *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 281–82 (2014).

**1.     Plaintiffs Are Entitled to a Presumption of Reliance**

"The fraud-on-the-market premise is that the price of a security traded in an efficient market will reflect all publicly available information about a company; accordingly, a buyer of the security may be presumed to have relied on that information in purchasing the security."  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 568 U.S. 455, 458 (2013).  Plaintiffs have successfully invoked the fraud-on-the-market premise by demonstrating (1) Musk's false Tweets were public, (2) Plaintiffs traded in the stock after Musk made those misrepresentations and before the truth was revealed, and (3) that Twitter stock traded in an efficient market.  *See Halliburton II*, 573 U.S. at 280; Dkt. No. 8-4; Tabak Report ¶ 56 (the "evidence strongly supports a finding of market efficiency").

Defendants **do not challenge** market efficiency for Twitter's stock and options, and their expert Dr. Atanu Saha concedes as much.  *See* Dkt. No. 99-6 ("Saha Report"), ¶ 27 ("Twitter traded in an efficient market").  Plaintiffs are therefore entitled to a "presumption of reliance," "which holds that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations."  *In re Apple Sec. Litig.*, 2022 WL 354785, at *6 (N.D. Cal. Feb. 4, 2022) (quotation omitted); *see also Halliburton II*, 573 U.S. at 276 (plaintiff satisfies the burden of demonstrating predominance by proving "publicity, materiality, market efficiency, and market timing").  Musk bears the burden of rebutting predominance through a "showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price."  *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 594 U.S. 113, 118 (2021).  As discussed below, Musk has failed to do so.

2.  **Defendant Has Failed to Rebut the Fraud-on-the-Market Presumption with Evidence of the Absence of Price Impact**

The fraud-on-the-market presumption can "be rebutted by appropriate evidence," including evidence that the asserted misrepresentation (or its correction) did not affect the market price of the subject stock. *Halliburton II*, 573 U.S. at 279–80. To rebut the presumption, a defendant must establish by a ***preponderance of the evidence*** that the misrepresentations "did not affect the stock's market price." *Goldman*, 594 U.S. at 125. Musk therefore bears the burden of proving that the misrepresentation "***in fact*** did not lead to a distortion of price." *Id.* (quoting *Basic*, 485 U.S. at 248) (emphasis in original). Instead of meeting his burden, Musk asserts factually wrong and legally improper arguments purporting to show that the challenged statements "could not have" affected Twitter's stock price. Opp. at vii, 12. Because Musk fails to carry his burden, his arguments must fail. *See In re Providian Fin. Corp. Sec. Litig.*, 2004 WL 5684494, at **2-3 (N.D. Cal. Jan. 15, 2004) (Breyer, J.) (certifying class and rejecting challenges to the fraud-on-the-market theory).

a.  **Musk's Purported Evidence of Lack of Price Impact Is a Procedurally Improper and Factually Incorrect Truth-on-the-Market Defense**

The Supreme Court has clearly held that "truth-on-the-market," a materiality-based defense to securities claims, cannot be decided at class certification. *Amgen,* 568 U.S. at 481–82 (proof that "news of the [truth] credibly entered the market and dissipated the effects of [prior] misstatements" is reserved for trial) (quoting *Basic*, 485 U.S. at 248–49 & n.29) (alterations in original). Accordingly, courts routinely reject truth-on-the-market defenses at class certification because "proof of a 'truth on the market' defense to rebut the presumption of reliance is 'a matter for trial.'" *In re Diamond Foods, Inc.,* 295 F.R.D. 240, 250 (N.D. Cal. 2013) (quoting *Basic*, 485 U.S. at 249 n.29). Nonetheless, Musk repeatedly advances this premature merits-based argument. *See*, *e.g.*, Opp. at 13 ("all of Mr. Musk's rights under the Merger Agreement—including his rights to information and diligence—were publicly known, absorbed, and integrated into Twitter's stock price well before May 13"); *id.* at 15 ("the information conveyed [in the May 16 tweet]—the estimation of outside analysts and the fact that Twitter had not provided him the bot data he sought—was not 'new'—another fact that proves lack of price impact"); *id.* at 15–16 ("the May 17, 2022 Tweet was merely a 'reiteration' of past statements

1    and thus not 'new'"). Wrong on the law, Musk's arguments must be rejected.

2            Unable to establish the lack of price impact, Musk argues that there is "a more compelling

3    explanation for the stock's performance during the class period"—that the stock declined due to

4    "uncertainty" about the merger closing. Opp. at 15. This argument is meritless. ***The uncertainty***

5    ***about the merger closing was directly caused by Musk's false statements***. Musk essentially argues

6    that he lied, but that sophisticated shareholders should have known he was lying and should not have

7    placed any weight or reliance on his false statements because the "truth" was discernible based on a

8    legally-informed review of the merger agreement. But if that were true, Twitter's stock would not

9    have decreased significantly, as it indisputably did. Musk's own expert admits that there was a

10   "statistically significant" decrease in Twitter's stock price in response to Musk's May 13, 2022 tweet.

11   Saha Report, ¶ 9 ("Twitter's price drop on May 13, 2022, is statistically significant"). Thus, Musk

12   concedes price impact. *See* Opp. at 14. *See also* Def.'s Ex. 10 (6/21/2024 Hr'g Tr. at 12:4–20; 19:25–

13   20:15, where this Court noted that Musk's statements created the uncertainty: "So I thought the

14   uncertainty that he created was you didn't know what he was going to do next. You just didn't know.").

15   Because Musk fails to establish by a preponderance of the evidence that his statements did not cause

16   the price decline, he fails to carry his burden to show a complete lack of price impact. *Goldman*, 594

17   U.S. at 117.

18           Even if Musk's merits arguments were considered, they are directly contradicted by the

19   evidence. In fact, Musk's own expert provides more than sufficient evidence of price impact. Dr.

20   Saha performed an evidentiary review of trading by the "sophisticated institutional investors" who

21   owned "588 million [shares] as of the end of May 2022 … constitut[ing] more than 93% of all Twitter

22   shareholdings (net of insiders)." Saha Report ¶ 76. If Musk's argument were valid, those investors

23   would have never sold any significant amount of their Twitter stock during the Class Period, when it

24   was trading in the $30s and $40s, because doing so would have precluded them from receiving the

25   higher $54.20 merger price within just a couple of months. Yet that is exactly what happened. As Dr.

26   Saha's evidence demonstrates, several large institutional investors sold their entire position shortly

27   after Musk's May 13, 2022 Tweet. For example, Elliott Investment Management LP, which owned 10

28

million Twitter shares in May 2022, sold them all later that month and reported owning zero shares in June 2022.  Saha Report at 42 (Ex. 8A).  Elliott did not buy any Twitter shares thereafter and continued to own zero Twitter shares in October 2022.  *Id.*  The same is true with respect to The Capital Group Companies and Two Sigma Investments, which both sold 100% of their Twitter shares in May 2022, reported zero shares in June, and never bought another share.  *Id.*  Several other institutional investors sold highly material quantities of their Twitter stock in response to Musk's May 13, 2022 Tweet.  For example, Vanguard sold 10,753,480 shares, representing 13% of its holdings, in May 2022; Aristotle Capital Management LLC sold 20,338,502 shares, almost its entire position of 20,362,076 shares; Clearbridge Investments sold over 45% of its holdings in May—7,675,678 shares; JP Morgan Chase sold over 51% of its holdings—3,711,869 shares; SRS Investment Management LLC sold 7,030,435 shares, representing over 98% of its holdings; Sumitomo Mitsui Trust Holdings, Inc. sold 4,006,716 shares, or over 58% of its holdings; Bank of America sold 4,257,767 shares, or 65% of its holdings; Goldman Sachs sold 4,191,773 shares, or 66% of its holdings; Bank of Montreal sold 40% of its stake—2,414,554 shares; BNP Paribas sold 42% of its stake—2,309,216 shares; and DE Shaw & Co. sold 3,699,473 shares—80% of its holdings.  *Id.*

These massive sell-offs by institutional investors in response to Musk's May 13, 2022 Tweet are inconsistent with Musk's argument that investors could not have been deceived by his false statements and fully understood all the relevant "true facts" due to their access to the merger agreement.  Indeed, Dr. Saha estimates that, after excluding insider transactions, ***443.8 million shares of Twitter stock were sold during the Class Period***.  Saha Report at 41 & Ex. 7.  Dr. Saha's data reveals that, overall, institutional investors' holdings in Twitter ***decreased by 34%*** from 319,528,881 shares in May 2022 to 210,981,316 shares in October 2022.  *Id.*  This refutes Dr. Saha's claim that there was a "bullish sentiment" for Twitter stock during the Class Period.

Nor is there any merit to Musk's argument that "a vast majority of analysts did not downgrade Twitter stock to a 'sell' rating between early May and mid-July 2022; instead, they largely maintained their 'hold' rating on Twitter's stock before and throughout the PC period."  Saha Report ¶ 21(f).  As Dr. Tabak explains, this argument makes no sense: "[I]f the market, including analysts, was misled by

Mr. Musk, it would have treated Twitter just like any other company, meaning that … analysts would have no particular reason to downgrade the stock, because their views of the value of the stock would be similar to those of buyers and sellers the market, who Lead Plaintiffs allege were also misled by Mr. Musk's alleged misrepresentations. " Molumphy Reply Decl. Ex: 2 (Expert Reply Report of David Tabak, Ph.D. ("Tabak Rebuttal Report") ¶ 12.).

In addition, Dr. Tabak refutes Dr. Saha's contention that there could be no price impact based on Musk's statements since the market allegedly knew all the true facts about the merger. As Dr. Tabak notes, "[t]he Saha Report's statement that 'on April 21, 2022, Musk publicly disclosed through an SEC filing that his offer was not subject to due diligence' *does not explain why the market should have believed that that statement by Mr*. *Musk rendered his May 13*, *2022 tweet false*, *especially in light of the potential that Mr*. *Musk might be entitled to certain data in order to close the merger or to obtain financing*." Tabak Rebuttal Report ¶ 10 (emphasis added).

Thus, Musk's arguments are factually wrong. The truth was not known to investors, and the facts confirm Plaintiffs' allegations, as well as the Court's prior conclusions in this case:

> At the motion hearing, Defendant argued that because the Merger Agreement was publicly filed with the SEC, Defendant's tweets could not have been misleading as to Twitter's obligation under the Merger Agreement. However, Defendant does not point to a specific disclosure in the Merger Agreement that would prevent a reasonable investor from being misled by Defendant's tweet — *i.e*., a countervailing statement that the deal will close even if Twitter fails to provide him with the bot data he requests.

Dkt. No. 89 at 5 (citing *In re eHealth, Inc. Sec. Litig*., 2023 WL 6390593 (N.D. Cal. Sept. 28, 2023)).

Finally, Musk attempts to negate price impact as to two of his three false statements. While, as noted *supra*, Musk concedes that the May 13, 2022 false statement caused a "statistically significant" decrease in Twitter's stock price (Saha Report ¶ 9), he claims that the May 16 and May 17, 2022 false statements did not result in a material decline in Twitter's stock price. Opp. at 6–7. This argument is meritless. Plaintiffs can demonstrate price impact through Twitter's stock price movement after the October 4, 2022 corrective disclosure, as previously recognized by the Court. Dkt. No. 48 at 36–37; *see also Apple*, 2022 WL 354785, at *7 ("[t]he best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive impact on the share price is equal to the additive

1   inverse of the truth's negative effect").  Moreover, Musk does not challenge the materiality of the

2   October 4, 2022 corrective disclosure, and his expert acknowledges there was a material price impact

3   on that date.  Saha Report at Appendix C-1 (stating that there was a 17.1% statistically significant

4   price movement in Twitter shares on October 4, 2022).

5           In addition, as to both the May 16 and May 17, 2022 statements, Musk completely ignores the

6   fact that Plaintiffs can show price impact through the "inflation maintenance" theory.  "'[T]he

7   securities laws prohibit corporate representatives from knowingly peddling material

8   misrepresentations to the public—regardless of whether the statements introduce a new falsehood to

9   the market or merely confirm misinformation already in the marketplace.'"  *In re Allstate Corp. Sec.*

10  *Litig.*, 966 F.3d 595, 612 n.5 (7th Cir. 2020) (quoting *FindWhat Investor Grp. v. FindWhat.com*, 658

11  F.3d 1282, 1290 (11th Cir. 2011)).  Under this theory, "price impact is the amount of price inflation

12  maintained by an alleged misrepresentation—in other words, the amount that the stock's price would

13  have fallen 'without the false statement.'"  *Goldman*, 594 U.S. at 123 (quoting *Glickenhaus & Co. v.*

14  *Household Int'l, Inc.*, 787 F. 3d 408, 415 (7th Cir. 2020)); *see also In re Vivendi, S.A. Sec. Litig.*, 838

15  F.3d 223, 256 (2d Cir. 2016) ("statements that merely maintain inflation already extant in a company's

16  stock price, but do not add to that inflation, nonetheless affect a company's stock price").  In his

17  rebuttal report, Dr. Tabak explains that the "price maintenance" theory supports the fact that Musk's

18  false statements had a price impact even if the stock did not decline materially the day of the statement.

19  Tabak Rebuttal Report ¶¶ 8–9 (Twitter's stock movement on May 16, 2022 was "consistent with a

20  price-maintenance theory and does not indicate a lack of price impact of the alleged

21  misrepresentation").[1]

22

23          [1] Plaintiffs further object to the use of Mr. Saha's report as evidence.  *See* Local Rule 7-3(c).  Specifically, Plaintiffs object to Dr. Saha's report as improper and unreliable expert opinion under Rule 702 because Dr. Saha improperly opines on legal issues, his conclusions are unsupported, and many are premised on speculation.  *See Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 984–85 (9th Cir. 2020) (expert testimony may be excluded if it is unreliable or irrelevant); *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 835 (C.D. Cal. 2010) ("'an expert may not state his or her opinion as to legal standards, nor may he or she state legal conclusions drawn by applying the law to the facts'") (citing, *inter alia*, *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992)).  Plaintiffs have concurrently filed a *Daubert* motion as to Dr. Saha's report and refer the Court to that motion for further discussion.

24

25

26

27

28

1

**b.      Plaintiffs Never Conceded That Institutional Investors Were Not Misled**

2

In an attempt to defeat predominance, Musk concocts a straw-man argument.  He asserts that

3

Plaintiffs took a position that is incompatible with the efficient-market hypothesis:

4

> Plaintiffs' theory that the market price remained artificially affected by the alleged
> misrepresentations despite the ability of sophisticated investors to "decipher" the
> Merger Agreement is thus in irreconcilable tension with *Basic* and the efficient market
> hypothesis.

5

6

Opp. at 11.  According to Musk, Plaintiffs have argued that sophisticated actors—the ones with an

7

outsized influence on stock price—knew the unvarnished truth about his obligations concerning the

8

merger based on their research efforts and tenacity; less sophisticated investors, in contrast, were

9

fooled.  Opp. at 10–11.  But Plaintiffs never made this argument.

10

Instead, in opposing Musk's Rule 12(c) motion, Plaintiffs merely pointed out that for purposes

11

of a truth-on-the-market defense, it is important to consider average investors instead of "experienced

12

and skilled professionals."  Dkt. No. 62 at 11:14–18 ("[N]ot every mixture with the true will neutralize

13

the deceptive.  If it would take a financial analyst to spot the tension between the one and the other,

14

whatever is misleading will remain materially so, and liability should follow.").  Plaintiffs then

15

distinguished average investors from others, including Musk himself.  Specifically, Plaintiffs argued

16

that Musk was "a sophisticated party to the multi-billion dollar merger" and had every reason to know

17

what the Merger Agreement meant given, *inter alia*, that he is "surrounded by highly skilled lawyers,

18

financiers, and business executives."  *Id.* at 10:10–20.

19

Musk repeatedly mischaracterizes Plaintiffs' arguments by cobbling together phrases from

20

Plaintiffs' briefing.  For example, Musk claims that "Plaintiffs similarly conceded that Mr. Musk's

21

rights and obligations under the public Merger Agreement would have been 'clear to a sophisticated

22

party' from the face of the contract."  Opp. at 5:18–19.  Not true.  The one and only time that Plaintiffs

23

used the phrase "sophisticated party" was to describe ***Musk himself***, who did know the truth.  Dkt.

24

No. 62 at 12:14–16 ("just because [the truth] was clear to a ***sophisticated party*** to the multibillion-

25

dollar merger, ***i.e.***, ***Musk***, it would not have been evident to a reasonable investor") (emphases added).

26

To be clear, Plaintiffs' position has always been that while different opinions existed in the market, ***no***

27

***one*** in the market knew the truth besides Musk and those on his team.  *See* Dkt. No. 62 at iv. ("none

28

of [Musk's] proffered documents show that a reasonable investor would be able to decipher when Musk could back out of the deal, and what information Twitter had and did not have an obligation to produce to Musk prior to the merger").[2]  Thus, Plaintiffs' actual arguments (*id.* at 9–13) refute Musk's tortured re-characterization of them.

### c.      Musk's Improper Loss-Causation Arguments Cannot Be Resolved at Class Certification

Loss causation cannot be decided at class certification.  *Erica P. John Fund, Inc. v. Halliburton Co.* (*Halliburton I*)*,* 563 U.S. 804, 812–13 (2011).  Nevertheless, Defendant contends that he meets his burden by essentially arguing that Plaintiffs have not proved loss causation:

> [T]he fact that the October 4 announcement made no reference to Mr. Musk's rights under the Merger Agreement but simply stated that he "intend[ed] to proceed to closing" of his acquisition provides further support that the corresponding stock price jump was a market reaction to the resolution of the uncertainty and not a correction of any misstatement about his information rights under the public Merger Agreement.

Opp. at 15; *see also id.* at 2 (arguing that investors had sufficient information to discern the truth "well before the alleged corrective disclosure on October 4, 2022").  These are classic challenges to loss causation that cannot be decided at class certification.  *See Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *9 (N.D. Cal. Mar. 16, 2016) (rejecting nearly identical arguments as "nothing more than an attack on loss causation, or [p]laintiffs' ability to 'show that a misrepresentation that affected the integrity of the market price ***also*** caused a subsequent economic loss'") (quoting *Halliburton I,* 563 U.S. at 812) (emphasis in original).

Musk's insistence that fraud-related losses be disaggregated from contemporaneously disclosed non-fraud factors is precisely what the Supreme Court has prohibited at class certification: "The fact that a subsequent loss may have been caused by factors other than the revelation of a misrepresentation has nothing to do with whether an investor relied on the misrepresentation in the first place, either directly or presumptively through the fraud-on-the-market theory."  *Halliburton I,* 563 U.S. at 813.  This is because "loss causation has no logical connection to the facts necessary to

---

[2] *See also*, *e.g.*, Dkt. No. 62 at 10:5–7 ("Musk has provided no evidence that a reasonable investor knew how to discern the difference between due diligence and the information rights under the Merger Agreement"); *id.* at 11:25–12:1 ("Musk's own citations to analysts' opinions and finance articles show the uncertainty, speculation, and inconsistent information in the market.").

1    establish the efficient market predicate to the fraud-on-the-market theory." *Id*.

2         As to the October 4, 2022 corrective disclosure, Musk also repeats his argument that since "the

3    October 4 announcement made no reference to Mr. Musk's rights under the Merger Agreement" (Opp.

4    at 15), the statistically significant increase in Twitter's price that day could have only been caused by

5    dissipation of the "uncertainty" and not by revelation of the truth.

6         Musk's arguments are plainly improper challenges to loss causation.  The Court has already,

7    on two separate occasions, considered and upheld Plaintiffs' loss-causation allegations.  The Court has

8    specifically held that Plaintiffs have adequately alleged loss causation based on the October 4, 2022

9    corrective disclosure.[3]  Specifically, the Court rejected Musk's argument that the October 4, 2022

10   corrective disclosure did not reveal the falsity of any prior misstatement:

11           Plaintiffs have plausibly alleged that when Defendant announced that he would move
             forward with the deal—after a public battle with Twitter about the Merger Agreement
12           and absent any apparent resolution around his due diligence requests—the market
             reasonably reacted to the 'truth' that Twitter never had the obligation to provide the
13           bot-account information to Defendant.

14   Dkt. No. 48 at 36.  Thus, Musk again attempts to re-litigate issues already decided.  Musk's violation

15   of the law-of-the-case doctrine cannot carry his burden to rebut the fraud-on-the-market presumption.

16       **3.    Plaintiffs Are Entitled to the *Affiliated Ute* Presumption**

17        Defendant also fails to provide any credible challenge to the *Affiliated Ute* presumption of

18   reliance that applies given the material omissions at issue.  *See Affiliated Ute Citizens of Utah v. United*

19   *States,* 406 U.S. 128, 153 (1972); *see, e.g.*, Dkt. No. 31 ¶ 187 (Musk "failed to disclose material facts

20   necessary in order to make the statements made, in light of the circumstances under which they were

21   made, not misleading").  In finding that Musk's May 13, 2022 tweet was false, for example, the Court

22   reasoned that "a reasonable investor could have plausibly understood that Twitter was obligated to

23   provide [Musk] with the requested information for the deal to close."  Dkt. No. 48 at 19.  This

24   misrepresentation is plainly separate and distinct from the omission Plaintiffs allege in the Complaint:

25   "[Musk's] statements that the Merger was terminated were false, misleading, and failed to disclose

26       _____

27        [3] Dkt. No. 48 at 35–36; *see also* Dkt. No. 89 at 5 ("[T]he Court was fully aware of the
     provisions of the Merger Agreement …, and the Court determined that those provisions were not
     sufficient countervailing statements … [T]he Court thoroughly considered whether Plaintiffs plausibly
28   alleged loss causation for Musk's material misstatements and decided they did so.").

that Musk simply wanted to renegotiate a better deal." Dkt. No. 31 ¶ 171. Because Plaintiffs' claims of omissions are at least as strong as their claims of affirmative misrepresentations, and "can be … cast in cast in omission or non-disclosure terms," the *Affiliated Ute* presumption of reliance applies here. *See Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975).

*Volkswagen* does not change this conclusion. That summary judgment decision (not class certification) involved a complaint that contained "more than nine pages of affirmative misrepresentations made by [defendant] and relied upon by [p]laintiff." *See In re Volkswagen "Clean Diesel" Mkt'g, Sales Practices, & Prods. Liab. Litig.*, 2 F.4th 1199, 1206 (9th Cir. 2021). The court found that the single purported omission—that defendant failed to disclose its secret use of test-defeating devices—was "simply the inverse of the affirmative misrepresentations … about environmental compliance and financial liabilities." *Id*. at 1208. This finding stands in stark contrast to the difference between Musk's affirmative misrepresentations of deal termination and fake-account numbers and the omissions surrounding his desire to renegotiate the deal. *See* Dkt. No. 31 ¶ 171. These facts render inapposite the other two cases from district courts in the Third Circuit cited by Musk. *Lord* involved a complaint where "[t]he only time [p]laintiffs[] … allege[] that [d]efendants 'failed to disclose' certain information is to explain why the affirmative misstatements satisfy the falsity element required." *Lord Abbett Affiliated Fund, Inc. v. Navient Corp*., 2020 WL 5026553, at *5 (D. Del. Aug. 25, 2020). And *Prudential*'s citation to the *Affiliated Ute* presumption is dicta. *See In re Prudential Ins. Co. of Am. Sales Practices Litig*., 975 F. Supp. 584, 606 n.18 (D.N.J. 1996).[4] Indeed, under similar circumstances, district courts have, post-*Volkswagen*, rejected similar "misrepresentation-versus-omission" arguments and granted class certification based on the *Affiliated Ute* presumption. *See*, *e.g*., *In re FirstEnergy Corp. Sec. Litig*., 2023 WL 2709373, at *19-24 (S.D. Ohio Mar. 30, 2023); *Brokop v. Farmland Partners Inc*., 2021 WL 4913970 , at *6 n.8 (D. Colo. Sep. 30, 2021).

---

[4] In any event, neither *Lord* nor *Prudential* cites the Third Circuit's controlling precedent, *Hoxworth v. Blinder, Robinson & Co*., 903 F.2d 186, 202 (3d Cir. 1990), which permits application of the *Affiliated Ute* presumption in "mixed" cases—which involve both misrepresentations and omissions. Musk's reliance on *Lord* and *Prudential* is thus misplaced.

1

2

3

4

5

Regardless, Plaintiffs have pleaded and established reliance.  For example, Mr. Belgrave testified at deposition that he relied on both Musk's misrepresentations and his omissions:  "I relied on what [Musk] is saying there, like he wants out of the deal *or he wants a lower price*."  Molumphy Reply Decl. Ex. 3 (Belgrave Dep. Tr.) at 176:25–177:2 (emphasis added).  In light of such evidence of actual reliance, Musk's argument based on the *Affiliated Ute* presumption must be rejected.

6

7

>        **4.**     **Plaintiffs' Damages Methodology Is Capable of Calculating Damages for All Putative Class Members**

8

9

10

11

12

13

14

15

16

17

Plaintiffs and Dr. Tabak have proffered a viable, widely accepted and generally applied methodology for measuring per share damages common to all class members.  *See* Tabak Report ¶¶ 71–75.  The "out-of-pocket" and "event study" methodologies measure the artificial deflation on each day during the Class Period that can be used to appropriately calculate per-share damages.  *See id*. ¶ 75.  "Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act, making it the standard method for calculating damages in virtually every Section 10(b) class action."  *City of Mia. Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.,* 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018); *see also Cooper v. Thoratec Corp.,* 2018 WL 2117337, at *7 (N.D. Cal. May 8, 2018) ("'[t]he event study method is an accepted method for the evaluation of materiality damages to a class of stockholders'"); *Hatamian*, 2016 WL 1042502, at *8 (same).

18

19

20

21

22

23

24

25

26

27

Defendants misread *Comcast Corp. v. Behrend,* 569 U.S. 27 (2013), and its progeny, to advance the widely rejected argument that Plaintiffs must show a classwide method for calculating damages to establish predominance, and that "Plaintiffs' damages model does not satisfy this standard as it does not net out potential profits gained by class members who bought at deflated prices during the class period."  Opp. at 19.  *Comcast* "should not be read to require, as a prerequisite to certification, that damages attributable to a classwide injury be measurable 'on a classwide basis.'"  569 U.S. at 41 (Ginsburg, J., dissenting) (citing to the majority opinion's "acknowledg[ement of the] Court's dependence on the absence of contest on the matter").  Accordingly, "[t]he Ninth Circuit reads *Comcast* to demand only that plaintiffs 'be able to show that their damages stemmed from the defendant's actions that created the legal liability.'"  *Hatamian,* 2016 WL 1042502, at *8 (citing *Levya*

28

1  *v. Medline Indus.,* Inc., 716 F.3d 510, 514 (9th Cir. 2013) (citing *Comcast*, 569 U.S. at 38)).[5]  Courts

2  in this District have "declined to adopt" the interpretation of *Comcast* advanced by Musk here.

3  *Hatamian,* 2016 WL 1042502, at *8 (declining to "decide whether, as defendant claims, *Comcast*

4  requires that class certification be denied absent affirmative evidence that damages are susceptible of

5  measurement across the entire class") (quoting *Diamond Foods*, 295 F.R.D. at 251).  "The ultimate

6  question … is whether 'damages could feasibly and efficiently be calculated once the common liability

7  questions are adjudicated'"—a showing Plaintiffs easily meet here.  *Id*.

8          Musk also incorrectly contends that Plaintiffs' damages model would create "windfalls" and

9  "false positives."  Opp. at 19.  This argument is baseless.  Dr. Tabak's out-of-pocket methodology

10  includes an event study and available valuation tools to allow calculation of classwide damages

11  stemming from alleged misrepresentations and omissions.  The event study methodology for assessing

12  damages "is '[t]he gold standard, which is accepted by both courts and economists.'"  *Lawrence E.*

13  *Jaffe Pension Plan Household, Int'l, Inc.,* No. 02 C 5893, slip op. at 2 (N.D. Ill. Mar. 23, 2009)

14  (quoting Marge S. Thorsen, *et al*., *Rediscovering the Economics of Loss Causation*, 6 J. Bus. & Sec.

15  L. 93, 99 (2006)); *see also FindWhat*, 658 F.3d at 1313 & n.31 ("event studies are a common method

16  … used routinely in the academic literature to determine whether the release of particular information

17  has a significant effect on a company's stock price") (internal quotations omitted).

18          Musk's expert, Dr. Saha, does nothing to undermine the fact that Plaintiffs propose a damages

19  methodology consistent with their theory of liability, as well as *Comcast* and numerous decisions

20  certifying §10(b) claims.  *In re Bofi Holding, Inc. Sec. Litig*., 2021 WL 3742924, at **6-10 (S.D. Cal.

21  Aug. 24, 2021) (certifying class over identical objections to plaintiff's out-of-pocket or event study

22  damages model).  Defendant and Dr. Saha merely argue that *potential* gains by class members should

23  be factored into any eventual payment to class members, and that plaintiff's methodology supposedly

24  ignores *potential* purchases by class members.  Dr. Tabak notes that this is untrue and that "my

25  damages analysis would consider sales and purchases by the same class member in calculating

26

27          [5] *See also*, *e.g.*, *Roach v. T.L. Cannon Corp.,* 778 F.3d 401, 407 (2d Cir. 2015) ("'the [*Comcast*]
    Court did not hold that proponents of class certification must rely upon a classwide damages model to

28  demonstrate predominance'"); *In re Deepwater Horizon*, 739 F.3d 790, 817 (5th Cir. 2014) (same).

damages." Tabak Rebuttal Report ¶ 17. Dr. Tabak also notes that a consideration of purchases and potential gains is always considered in securities class actions and is typically addressed in the plan of allocation at the settlement stage. Tabak Rebuttal Report ¶ 13.

Finally, Musk misrepresents that Dr. Tabak testified that class members who bought stock during the Class Period "ha[ve] no claim," and that their inclusion in the class creates alleged conflicts. Opp. at 18. Dr. Tabak clarified at his deposition that all he meant was that if a class member only had purchases, but no sales, that they would not be included in the Class since the Class requires a class member to have sold some Twitter stock. Dkt. No. 99-7, Ex. 6 to Bergjans Decl. at Tr. 156:2-7 (Q: "So is it fair to say what you meant was buying stock alone wouldn't qualify you for membership in the class if you didn't have any other transactions? A: Yes. If I did not say that, then I misspoke. That is what I meant."); *see also* Tabak Rebuttal Report at ¶¶ 13-14.

## B.    Plaintiffs Are Adequate Class Representatives Under Rule 23(a)(4)

Musk claims that Lead Plaintiffs are inadequate because they (1) bought Twitter stock in addition to selling Twitter stock, (2) allegedly did not rely on Musk's false statements, and (3) allegedly are not sufficiently familiar with the legal intricacies of the case. Opp. at 20. These arguments fail.

Plaintiffs are typical and adequate class representatives. Each Plaintiff reacted to Musk's conduct throughout the class period and ultimately sold their Twitter stock at a loss due to Musk's repeated misstatements. They are informed and active, each with a thorough understanding of the case and its allegations. *DZ Reserve v. Meta Platforms, Inc.*, 96 F.4th 1223, 1238 (9th Cir. 2024).

Musk's argument that Plaintiffs did not sell any securities in reliance on Musk's misrepresentations and are thus subject to unique defenses is meritless. Each Plaintiff relied on Musk's misstatements, and on the market price of Twitter stock, in selling their stock and testified thereto. *See* Molumphy Reply Decl. ¶¶ 4–7, Exs. 3–6.

Additionally, there is no danger that Plaintiffs would be "preoccupied with unique defenses." *DZ Reserve*, 96 F.4th at 1238. As shown in the testimony below, Plaintiffs clearly relied on Musk's misstatements and incurred losses, and thus have claims factually and legally similar to those of the putative class. "Under the permissive standards of Rule 23(a)(3), the claims need only be reasonably

co-extensive with those of absent class members, rather than substantially identical." *Dickey v. Advanced Micro Devices, Inc.*, 2019 WL 251488, at *4 (N.D. Cal. Jan. 17, 2019) (quotations omitted). Further, the Ninth Circuit has "emphasize[d] that the defense of non-reliance is not a basis for denial of class certification and reliance is more appropriately considered at the merits stage." *DZ*, 96 F.4th at 1239 (quotations omitted).

Moreover, Defendants' cherry-picked responses to confusing questions do not raise credibility issues that would rise to the level that it is "predictable that a major focus of the litigation will be on a defense unique" to Plaintiffs. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992).

Rather, Plaintiffs are knowledgeable of the facts and theory of the case. Specifically, each Plaintiff understands the underlying legal basis of this action, that they are suing Elon Musk, and is mindful of their duty to represent class members:

- **Brian Belgrave**: "Well, I sold shares of Twitter, as did many other individuals, and that's who we represent. We sold our shares at a loss, at an artificially reduced price based on Mr. Musk's false and misleading texts." Molumphy Reply Decl. ¶ 4, Ex. 3, Belgrave Dep. Tr. 57:15-19
- **Brian Belgrave:** "I relied on what [Musk] is saying there, like he wants out of the deal or he want a lower price." *Id.* 176:25–177:2; *see also* 149:5–12; 187:5–14.
- **John Garrett**: "Well, [Musk] – he made all of us believe that he was going to buy the shares at 54.20, and look what he did. And it turned out at one point that he wasn't going to buy the company, so I sold." Molumphy Reply Decl. ¶ 5, Ex. 4, J. Garrett Dep. Tr. 103:7–10; *see also* 224:9–23.
- **John Garrett**: "I need to do the utmost possible to help them [the class] recover…losses due to the sales of Twitter from May to October '22." *Id.* 217:16–20.
- **Nancy Price**: "Basically…he [Musk] lied about not getting enough info in order to complete the deal. He also said that he was going to renege on it, but my understanding is he didn't have that right to renege on the deal." Molumphy Reply Decl. ¶ 6, Ex. 5, Price Dep. Tr. 55:19-23; *see also* 24:6–12.
- **Nancy Price**: "The members [of the class] are all who sold Twitter shares between May and October of 2022." *Id.* 30:6–7.
- **Steve Garrett**: "Well, it's my understanding it's a lawsuit that concerns fraudulent statements made by Elon Musk concerning his transaction on Twitter stock." Molumphy Reply Decl. ¶ 7, Ex. 6, S. Garrett Dep. Tr. 27:18–20.
- **Steve Garrett**: "Q: Did you do anything when you heard that Mr. Musk was terminating the deal, trading wise?" "A: I exited my position in Twitter." *Id.* 28:15–23.

What's more, the cases cited by Defendants for this argument demonstrate that Plaintiffs are well-informed and active participants in this case. "[C]ourts have refused to allow a person to

represent a class when, for example, she appeared unaware of even the most material aspects of [her] action ... [not knowing] why these particular defendants are being sued ... [and having] no conception of the class of people she purportedly represents." *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 153–54 (N.D. Cal. Dec. 9, 1991) (citations omitted). In *Burkhalter*, that plaintiff at deposition was unable to identify some of the defendants, was unclear of who the class would be, and had no understanding of the pricing policies for his own firm or industry. 141 F.R.D. at 154. Similarly, in *In re Storage Tech. Corp. Sec. Litig.*, five plaintiffs altogether failed to appear for their depositions, others were current or former employees of the defendant, and another did not know why she was suing. 113 F.R.D. 113, 118 (D. Colo. Nov. 8, 1986). None of these issues are present here. Further, in *Storage*, the court found that another plaintiff was an adequate class representative where "[a]lthough he did not know the specific misrepresentations in the complaint, he understands the underlying legal basis of this action," who the defendants were, and understood their duty to represent class members. *Id.* at 119.

Plaintiffs are adequate and typical representatives of the proposed class, prepared, and take seriously their responsibilities.

## III.    CONCLUSION

For the reasons set forth above and in Plaintiffs' motion, the Court should (1) certify this action as a class action, (2) appoint Plaintiffs as Class Representatives, and (3) appoint Cotchett Pitre & McCarthy LLP and Bottini & Bottini, Inc. as Class Counsel.

Dated: September 16, 2024

Respectfully submitted,

**COTCHETT, PITRE & MCCARTHY, LLP**
Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
Tyson C. Redenbarger (SBN 294424)
Gia Jung (SBN 340160)

 */S/ Mark C. Molumphy*
 MARK C. MOLUMPHY

San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000

**BOTTINI & BOTTINI, INC**.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Aaron P. Arnzen (SBN 218272)

 */s/ Francis A. Bottini, Jr.*
    FRANCIS A. BOTTINI, JR.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002

*Attorneys for Lead Plaintiffs Steve Garrett, Nancy Price, John Garrett, Brian Belgrave and the Proposed Class*

### ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

I, Mark C. Molumphy, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 16th day of September 2024, at Burlingame, California.

 */s/Mark C. Molumphy*
    Mark C. Molumphy