IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, et al., | Case No.  22-cv-05937-CRB |
| Plaintiffs, | |
| v. | **ORDER GRANTING CLASS CERTIFICATION** |
| ELON MUSK, | |
| Defendant. | |

Lead Plaintiffs Steve Garrett, Nancy Price, John Garrett, and Brian Belgrave bring this securities class action against Defendant Elon Musk, alleging that Musk violated Section 10(b) of the Securities Exchange Act of 1934, as well as Rule 10b-5, by making multiple misstatements to artificially depress the price of Twitter stock.  Lead Plaintiffs now move for certification of a class defined as follows:

> All persons and entities who sold the publicly traded stock or call options, or purchased the put options, of Twitter, Inc. during the period from May 13, 2022 through October 4, 2022, both dates inclusive (the "Class Period"), and who suffered damages by Defendant's alleged violations of § 10(b) and of the Exchange Act.

Lead Plaintiffs move to appoint themselves as class representatives and to appoint Cotchett Pitre & McCarthy LLP and Bottini & Bottini, Inc. as class counsel.  The Court **GRANTS** Plaintiffs' motion **EXCEPT** as to the appointment of Steve Garrett as class representative.

## I.      BACKGROUND

### A.      Factual History

The Court has already described the facts giving rise to this lawsuit on multiple occasions.  See Order Granting in Part & Denying in Part Mot. to Dismiss (dkt. 48), 705 F.

United States District Court
Northern District of California

Supp. 3d 1018 (N.D. Cal. 2023); Order Denying J. on the Pleadings (dkt. 89), 2024 WL 3678002 (N.D. Cal. Aug. 5, 2024).  In this order, the Court repeats only those facts necessary to resolve the motion at hand.

In April 2022, Twitter entered an agreement (the "Merger Agreement") to be acquired by an entity wholly owned by Musk for $54.20 per share.  First Am. Compl. (dkt. 31) ¶ 85.  In the following weeks, Musk made several tweets and public comments about the agreement.  Plaintiffs allege that the following were misstatements:

- Musk tweeted on May 13, 2022: "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users."  Id. ¶ 111.

- Musk said at a tech conference on May 16, 2022 that fake and spam accounts make up at least 20% of Twitter's users.  Id. ¶ 120.

- Musk tweeted on May 17, 2022: "20% fake/spam accounts, while 4 times what Twitter claims, could be *much* higher.  My offer was based on Twitter's SEC filings being accurate.  Yesterday, Twitter's CEO publicly refused to show proof of <5%.  This deal cannot move forward until he does."  Id. ¶ 125.

After these statements, Twitter's stock declined from $45.08 per share (its value on May 12, 2022) to $35.76 per share (its value on May 24).  Id. ¶¶ 113, 131.

On October 4, 2022, Musk publicly announced that he had informed Twitter that he intended to go through with the Merger Agreement at the initial offer price.  Id. ¶ 41.  By the close of the next day, Twitter's stock had risen to $51.30 per share.  Id.

**B.    Lead Plaintiffs**

The Court appointed Steve Garrett, Nancy Price, John Garrett, and Brian Belgrave as Lead Plaintiffs under the Private Securities Litigation Reform Act of 1995.  See Order Denying/Granting Mot. to Appoint Lead Pl. & Lead Counsel (dkt. 30), 2023 WL 3082341 (Apr. 24, 2023).  Lead Plaintiffs are individual investors who collectively sold 28,389 shares of Twitter common stock during the Class Period (May 13 to October 4, 2022) and allegedly suffered financial losses of over $500,000.  See Summary Loss Chart (dkt. 8-4).

2

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Brian Belgrave** is a business owner with a bachelor's degree in accounting from the University of Oregon and with "decades" of experience investing in the stock market. Joint Decl. (dkt. 8-5) at 1.  Belgrave bought Twitter stock in the immediate aftermath of Musk's statements in May 2022 because he still "thought" and "hoped" that Musk's purchase of Twitter would close.  Belgrave Dep. Tr. (dkt. 99-4) at 82:2–16, 181:2–7.  Belgrave did not, however, believe that Musk's statements in May 2022 were false.  Id. at 178:25–179:1.  And as the value of Twitter's stock continued to drop, Belgrave became worried that the deal would not go through and sold his shares.  Id. at 119:24–120:1, 151:1–8.

**Steve Garrett** is a commercial pilot with over 35 years of experience investing in the stock market.  Joint Decl. at 1.  Much like Belgrave, Steve bought Twitter stock in mid-May because he "believed" that the deal would close.  S. Garrett Dep. Tr. (dkt. 99-5) at 61:15–18.  He then sold his shares in July after Musk stated that he was "terminating" the deal.  Id. at 31:3–6.  In his deposition, Steve did not indicate familiarity with Musk's statements from May 2022, and he did not state that he relied on those statements when he sold his shares.  See id. at 30:25–31:16.

**John Garrett** has over 50 years of experience investing in the stock market.  Joint Decl. at 1.  He "traded on the information that … [Musk] was going to buy the shares [in Twitter] for $54.20."  J. Garrett Dep. Tr. (dkt. 102-5) at 102:8–10.  And when "it turned out … that [Musk] wasn't going to buy the company," John sold his shares in Twitter.  Id. at 103:7–10.

**Nancy Price**, John Garrett's domestic partner of over 30 years, "also has years of experience investing with [John] Garrett in the stock market."  Joint Decl. at 1.  At her deposition, Price testified that her awareness of Musk's statements largely comes from conversations she had with John Garrett.  See Price Dep. Tr. (dkt. 99-3) at 67:7–14, 68:13–69:17, 74:18–23.  She repeatedly expressed uncertainty as to what John told her about Musk's statements, id. at 67:18 (Musk's statements were "probably from television"); when he told her Musk had lied, id. at 69:15–16 ("I would imagine it was perhaps May of

'22"); and what he did after finding out that Musk had lied, id. at 72:16–17 ("I think he probably sold Twitter stock").

## II.   LEGAL STANDARD

Rule 23 of the Federal Rules of Civil Procedure, which governs class actions, requires that the Court find by a preponderance of the evidence that the requirements of Rule 23(a), as well as one of three possible requirements under Rule 23(b), are met.  See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 615 (1997).  The Rule 23(a) requirements are that (1) "the class is so numerous that joinder of all members is impracticable," (2) "there are questions of law or fact common to the class," (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class," and (4) "the representative parties will fairly and adequately protect the interests of the class." Plaintiffs seek certification under Rule 23(b)(3), which requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  At the class certification stage, the Court considers the merits of Plaintiffs' case "only to the extent [] that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  In re Diamond Foods, Inc. Sec. Litig., 295 F.R.D. 240, 245 (N.D. Cal. 2013) (quoting Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 466 (2013)).

## III.   DISCUSSION

Musk does not appear to contest that Plaintiffs satisfy the first two Rule 23(a) requirements—numerosity and commonality.  Rather, he focuses his arguments on the latter two requirements—typicality and adequacy—as well as Rule 23(b)(3)'s requirement that common questions of fact and law predominate.  He also challenges the class definition as overbroad, asserting that it includes class members who did not suffer harm.

### A.   Predominance of Common Questions

Musk's primary argument against class certification is that common questions do not predominate over individual questions and, as a result, a class action is not superior to

1    other available methods.  Musk contends that whether class members relied on his

2    allegedly misleading statements is "inherently" an individual question, specifically arguing

3    that "sophisticated" investors could have immediately realized the falsity of his statements

4    such that they would not rely on those statements.  Opp. (dkt. 99) at 8–9.

5         Plaintiffs do not intend to prove individual reliance, however.  Instead, they assert

6    that they are entitled to a presumption of reliance under the fraud-on-the-market doctrine,

7    which the Supreme Court blessed in <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 244–47 (1988).

8    <u>See</u> Mot. (dkt. 76) at 11.  In <u>Basic</u>, the Court held that "if a market is shown to be efficient,

9    courts may presume that investors who traded securities in that market relied on public,

10   material misrepresentations regarding those securities." <u>Amgen</u>, 568 U.S. at 462 (citing

11   <u>Basic</u>, 485 U.S. at 245–47).  The <u>Basic</u> presumption is rebuttable, however: "Any showing

12   that severs the link between the alleged misrepresentation and either the price received (or

13   paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to

14   rebut the presumption of reliance."  <u>Basic</u>, 485 U.S. at 248.  So, for example, if "the

15   'market makers' were privy to the truth," if the truth "credibly entered the market and

16   dissipated the effects of the misstatements," or if individual plaintiffs would have traded

17   how they did "without relying on the integrity of the market," the <u>Basic</u> presumption

18   would be rebutted.  <u>Id.</u> at 248–49.[1]

19        Musk argues that Plaintiffs cannot rely on <u>Basic</u>'s presumption for three reasons.

20   First, Musk asserts that <u>Basic</u> does not apply out of the gate because Plaintiffs' argument

21   rests on the market for Twitter shares being inefficient.  Second, Musk argues that the

22   <u>Basic</u> presumption would be rebutted by evidence that his alleged misrepresentations did

23   not impact the value of Twitter shares.  Third, Musk argues that, even if the <u>Basic</u>

24   presumption applies and is not rebutted at the class level, Rule 23(b)(3) is not satisfied

25   because the individual question (whether individual investors relied on Musk's statements)

26   _____

27   [1] The parties also dispute whether a different presumption of reliance applies under
     <u>Affiliated Ute Citizens v. United States</u>, 406 U.S. 128 (1972).  Because the Court holds
28   that Plaintiffs are entitled to a presumption of reliance under <u>Basic</u>, the Court need not
     reach whether a presumption would also exist under <u>Affiliated Ute</u>.

5

United States District Court
Northern District of California

predominates over any common questions.

### 1.   <u>Basic</u>'s requirement of an efficient market is satisfied.

Musk's argument regarding an efficient market is somewhat unusual in that he does not appear to contest that Twitter is an efficient market in fact; instead, he argues that Plaintiffs' "own theories of falsity and loss causation are fundamentally incompatible with" an efficient market. Opp. at 9. That is because, as Musk puts it, Plaintiffs allege that some segment of the market was misled by Musk's statements but that sophisticated investors were not misled. <u>Id.</u> Indeed, Musk states that Plaintiffs "conceded" that sophisticated investors were not misled. <u>Id.</u> at 10–11 (citing Pl.'s Opp. to Mot. for J. on the Pleadings (dkt. 62) at 10–12). So, Musk's argument goes, if sophisticated investors knew that Musk's statements were false but the market reacted to Musk's statements anyway, then the market must be inefficient because it failed to take into account all the relevant information. <u>Id.</u>

Musk's argument proves too much. To start, Plaintiffs never conceded that sophisticated investors were not misled by Musk's tweets. <u>See</u> Pl.'s Opp. to Mot. for J. on the Pleadings at 11 ("[T]he test is not whether experienced and skilled professionals in the field would know that Musk's tweets were false"); <u>see also</u> <u>id.</u> (pointing out that "Musk's own citations to analysts' opinions and finance articles show the uncertainty, speculation, and inconsistent information in the market"). Moreover, even if Musk is correct that some hypothetical sophisticated investor "knew" that Musk's statements were untrue (though Musk does not identify any such investor) that does not change the calculus. An efficient market presumes that all publicly available <u>information</u>—not investors' "comments" on, or their "aggregation" or "summary" of, that information—is reflected in the stock price. <u>See</u> <u>Bonanno v. Cellular Biomedicine Grp., Inc.</u>, 2016 WL 4585753, at *4–5 (N.D. Cal. Sept. 2, 2016). And as the Court has already held, the publicly available information in this case (namely, the Merger Agreement) does not clearly showcase the falsity of Musk's statements. MTD Order at 20 n.8, 23–25. In other words, Plaintiffs' theory of the case accounts for the Merger Agreement in their efficient market hypothesis. Their theory is

United States District Court
Northern District of California

1

simply that Musk's statements were misleading—even to sophisticated investors and even

2

in light of the Merger Agreement—and that his statements affected Twitter's stock price as

3

a result.  That Musk contests whether his statements were misleading when considered

4

alongside the Merger Agreement does not change Plaintiffs' facially viable theory.[2]

5

Because Plaintiffs adequately allege an efficient market, and Musk does not contest

6

the other prerequisites to establish the <u>Basic</u> presumption of reliance at the class

7

certification stage,[3] the <u>Basic</u> presumption of reliance applies.

8

**2.      There is insufficient evidence to rebut the <u>Basic</u> presumption.**

9

Musk next contends that the <u>Basic</u> presumption is rebutted by evidence that Musk's

10

alleged misrepresentations did not impact Twitter's stock price.  His argument on this front

11

takes two forms: (1) that the market was already aware of the truth behind his statements,

12

and (2) that his statements did not impact the market.  Opp. at 12.

13

Both points are premature.  As to the first, a "truth-on-the-market" defense like

14

Musk's "is a matter for trial," not for class certification.  <u>Amgen</u>, 568 U.S. at 481–82; <u>see</u>

15

<u>also</u> <u>In re Diamond Foods</u>, 295 F.R.D. at 250.  As to the second, the Supreme Court has

16

explained that disputes about loss causation "ha[ve] nothing to do with whether an investor

17

relied on the misrepresentation in the first place, either directly or presumptively through

18

the fraud-on-the-market theory [i.e., the <u>Basic</u> presumption]."  <u>Halliburton I</u>, 563 U.S. at

19

813.

20

To be sure, the Court cannot "ignore a defendant's direct, more salient evidence

21

showing that [an] alleged misrepresentation did not actually affect the stock's market

22

price."  <u>Halliburton Co. v. Erica P. John Fund, Inc.</u> (<u>Halliburton II</u>), 573 U.S. 258, 282

23

(2014).  Musk does not provide such evidence.  He concedes that Twitter's stock price

24

25

---

[2] Musk also suggests that Plaintiffs' efficient market hypothesis fails because "<u>Plaintiffs'</u>
<u>own counsel</u> possessed sufficient information" to assert claims against Musk.  Opp. at 10
(emphasis in original).  The Court rejects this view, which, if adopted, would have the
perverse effect of penalizing plaintiffs and their lawyers for enforcing the securities laws.
[3] Namely, that his alleged misstatements were public and that the class members sold
shares after he made his statements but before he corrected them.  <u>Erica P. John Fund, Inc.</u>
<u>v. Halliburton Co.</u> (<u>Halliburton I</u>), 563 U.S. 804, 811 (2011).

26

27

28

1    dropped on May 13, the day of his first allegedly misleading statement, but he argues that

2    any decrease in value is due to the "uncertainty" created by his statement.  Opp. at 13.

3    That is a distinction without a difference: the Court is aware of no authority that would

4    suggest one degree of separation defeats the causal link between allegedly misleading

5    statements and their impact on the market.  Plus, there is more evidence that Musk's

6    statements affected the Twitter's stock price.  His own expert witness identified over a

7    dozen institutional investors who sold Twitter stock when shares were well under the

8    $54.20 merger price.  Saha Rpt. (dkt. 99-6) at 42.[4]  And as the Court has already explained,

9    the fact that Twitter's stock price rose after Musk's October 4, 2022 correction of his

10   allegedly misleading statements is evidence that the statements themselves had an impact

11   on Twitter's stock price.  MTD Order at 35–37.

12        Musk's rebuttal evidence is insufficient to rebut the Basic presumption at this stage,

13   so class-wide reliance is presumed.

### 3.    The Basic presumption satisfies Rule 23(b)(3).

15        Musk also argues that, even if Plaintiffs are entitled to the Basic presumption and

16   the presumption is not rebutted, individual inquiries into individual class members'

17   reliance on Musk's allegedly misleading statements predominate over common questions

18   of law and fact.  Opp. at 16.  This argument is not viable from the start.  Once a plaintiff

19   proves that the Basic presumption applies, the predominance requirement of Rule 23(b)(3)

20   is met.  See Halliburton II, 573 U.S. at 276; see also Amgen, 568 U.S. at 462–63 ("Absent

21   the fraud-on-the-market theory, the requirement that Rule 10b-5 plaintiffs establish

22   reliance would ordinarily preclude certification of a class action seeking money damages

23   because individual reliance issues would overwhelm questions common to the class.");

24   Hanon v. Dataproducts Corp., 976 F.2d 497, 509 (9th Cir. 1992) ("the defense of non-

25   reliance is not a basis for denial of class certification").  The Court's determination that the

26   Basic presumption of reliance applies therefore means that Plaintiffs satisfy Rule 23(b)(3).

27   _____

28   [4] Certification of the class moots Plaintiffs' pending motion to strike Dr. Saha's report.
     This does not preclude Plaintiffs from raising future Daubert challenges as to Dr. Saha.

8

1        **B.      Typicality of Lead Plaintiffs' Claims**

2            Musk's first argument under Rule 23(a) is that Lead Plaintiffs' claims are atypical

3   because Lead Plaintiffs did not rely on Musk's alleged misstatements when trading Twitter

4   stock.  This, Musk contends, opens Lead Plaintiffs up to unique defenses and makes them

5   improper class representatives.  Opp. at 19–20.

6            This challenge to the typicality of Lead Plaintiffs' claims is in large part the same as

7   the challenge to the <u>Basic</u> presumption, just targeted specifically at Lead Plaintiffs.  To that

8   extent—i.e., to the extent that Musk argues that Lead Plaintiffs were sophisticated enough

9   to not be misled by Musk's statements—his argument fails.  "Sophisticated investors are as

10  entitled to rely on the fraud-on-the-market theory as anyone else."  <u>Hanon</u>, 976 F.2d at

11  506.

12           In any case, Musk's assertion that Lead Plaintiffs were aware at the time that his

13  statements were false is not supported by their deposition testimony.  Aside from a few

14  stray quotes suggesting that some Lead Plaintiffs "believed the deal would close" even

15  after Musk's allegedly misleading statements, <u>e.g.</u>, Belgrave Dep. Tr. (dkt. 99-4) at 181:7,

16  three of the four Lead Plaintiffs indicated that Musk's statements and their impact on the

17  market caused them to sell Twitter stock.  <u>See, e.g.</u>, <u>id.</u> at 179:24–25 ("Like I say, it's

18  everything that [Musk] said which led me to sell."); Price Dep. Tr. (dkt. 102-6) at 24:6–12

19  (describing John Garrett's decision to sell Twitter shares when he became "worried that

20  this [the deal] wouldn't come to fruition").

21           The evidence does, however, preclude Steve Garrett from establishing reliance on

22  any of Musk's allegedly misleading statements.  Steve testified that he sold his shares in

23  July 2022 because Musk said that he was terminating the deal, and he ruled out any other

24  reason for doing so.  S. Garrett Dep. Tr. (dkt. 99-5) at 30:25–31:6 ("Q: Are there any other

25  statements that Mr. Musk made that caused you to enter or exit positions, to buy or sell

26  Twitter stock or options?  A: Nothing that sticks out.  It was a pretty firm statement that he

27  made that he is terminating the deal.  The word 'terminated' is a pretty strongly worded

28  statement.").  Steve's specific identification of something other than the integrity of the

1    market (and, of course, other than Musk's allegedly misleading statements) that caused

2    him to sell Twitter stock "severs" any causal chain linking his decision to Musk's

3    statements and rebuts the presumption that he relied on Musk's statements.  See Basic, 485

4    U.S. at 248.  He therefore is not an appropriate class representative.

### C.    Adequacy of Lead Plaintiffs

6            Musk further contends that Lead Plaintiffs are inadequate class representatives

7    "because they are so unfamiliar with the basic facts, theory, and elements of their claims

8    that 'there is no sense that there is an actual party behind the prosecution of the action.'"

9    Opp. at 20 (cleaned up) (citation omitted).  In particular, Musk argues that Price is

10   "ignorant of the contents of [] Musk's statements" and that Belgrave and John Garrett are

11   "ignorant of … why the statements at issue were purportedly misleading." Id.

12           Musk is correct that Price expressed limited familiarity with his allegedly

13   misleading statements.  That said, it is too much to say that she lacks any familiarity with

14   those statements.  She knew, for example, that Musk complained about not receiving

15   "information" related to "the percentage of [] something" and that "bots" were involved

16   (though she did not know what Twitter bots are).  Price Dep. Tr. (dkt. 99-3) at 70:6–7,

17   70:25–71:4, 71:8–11.  That is not a problem: courts can approve class representatives even

18   when the prospective representatives do "not know the specific misrepresentations alleged

19   in the complaint." In re Storage Tech. Corp. Sec. Litig., 113 F.R.D. 113, 119 (D. Colo.

20   1986).  The more important inquiry is whether the prospective class representative

21   "understands the underlying legal basis of [their] action" and their "duty to represent class

22   members." Id.  Price clearly meets these criteria.  See Price Dep. Tr. (dkt. 102-6) at 30:6–

23   7 (describing the class), 55:19–23 (describing the underlying legal basis of the action).

24   She is therefore an adequate class representative.

25           As for Belgrave and John Garrett's testimony, Musk mischaracterizes it.  Both show

26   at least some basic understanding of why Musk's statements were allegedly misleading:

27   Belgrave explained that Musk's statement that "the deal cannot move forward" was

28   misleading because Musk waived due diligence and so did not have the right to stop the

United States District Court
Northern District of California

1   deal.  Belgrave Dep. Tr. (dkt. 102-4) at 177:15–24.  And John Garrett testified that Musk's

2   statements suggesting that the deal "was on and off" and that "he wasn't going to buy the

3   company" were misleading because Musk "was going to keep his commitment to pay all

4   existing shareholders [$]54.20."  J. Garrett Dep. Tr. (dkt. 99-2) at 106:5–6; J. Garrett Dep.

5   Tr. (dkt. 102-5) at 103:2–10.  Belgrave and Garrett's testimony describes, if in simplified

6   terms, Plaintiffs' legal theory as to what makes Musk's statements misleading.  That is

7   enough.  See Koenig v. Benson, 117 F.R.D. 330, 337 (E.D.N.Y. 1987) ("named plaintiffs

8   require only a basic knowledge of the facts"); see also, e.g., In re Storage Tech., 113

9   F.R.D. at 119 (approving class representatives when they understood "the underlying legal

10  basis of [the] action" and were "familiar with … the subject of the alleged

11  misrepresentations").  Belgrave and John Garrett are thus adequate class representatives.[5]

12      **D.      Class Definition**

13      Musk's final challenge is to the definition of the class as overbroad.  Musk argues

14  that the class definition includes some investors who made money—and perhaps even

15  made a net profit—as a result of Twitter's lower stock price during the Class Period.  Opp.

16  at 18–19.  Relatedly, Musk argues that Plaintiffs' damages model runs afoul of Comcast

17  Corp. v. Behrend, 569 U.S. 27 (2013), because it does not net out potential earnings by

18  class members who bought Twitter stock during the Class Period.

19      As to the class definition, "fortuitous non-injury to a subset of class members does

20  not necessarily defeat certification of the entire class," and it is appropriate to wait until the

21  damages phase of the litigation to "winnow out those non-injured members" at that time.

22  Ruiz Torres v. Mercer Canyons, Inc., 835 F.3d 1125, 1137 (9th Cir. 2016).  Musk does not

23  offer any evidence to suggest that there is such "a great number of members" who were not

24  harmed that "the class definition is fatally overbroad."  See Olean Wholesale Grocery

25  Coop., Inc. v. Bumble Bee Foods LLC, 31 F.4th 651, 669 n.14 (9th Cir. 2022) (en banc).

26  Nor does he explain in any detail why individualized questions about damages would

27  _____

28  [5] Musk does not challenge the adequacy of class counsel.  See Amchem, 521 U.S. at 626
    n.20 ("The adequacy heading also factors in competency and conflicts of class counsel.").

1   "render [the] adjudication unmanageable." Id. at 669 n.13 (citation omitted).[6]

2        Musk's challenge to Plaintiffs' damages model also fails.  Musk argues that

3   Comcast requires Plaintiffs' damages model to be capable of class-wide measurement.

4   Opp. at 19.  But "[t]he Ninth Circuit reads Comcast to demand only that plaintiffs 'be able

5   to show that their damages stemmed from the defendant's actions that created the legal

6   liability.'"  Hatamian v. Advanced Micro Devices, Inc., 2016 WL 1042502, at *8 (N.D.

7   Cal. Mar. 16, 2016) (quoting Leyva v. Medline Indus., Inc., 716 F.3d 510, 514 (9th Cir.

8   2013)).  Other circuits reach the same outcome.  See id. (collecting cases).  The damages

9   model is appropriate so long as "damages could feasibly and efficiently be calculated once

10  the common liability questions are adjudicated."  Leyva, 716 F.3d at 514.  Musk offers no

11  argument to the contrary.

## IV.    CONCLUSION

13       For the foregoing reasons, the Court **CERTIFIES** the following class in this action:

> All persons and entities who sold the publicly traded stock or
> call options, or purchased the put options, of Twitter, Inc.
> during the period from May 13, 2022 through October 4, 2022,
> both dates inclusive, and who suffered damages by
> Defendant's alleged violations of § 10(b) and of the Exchange
> Act.

The Court **APPOINTS** Cotchett Pitre & McCarthy LLP and Bottini & Bottini, Inc. as

class counsel and Nancy Price, John Garrett, and Brian Belgrave as class representatives.

20       **IT IS SO ORDERED.**

21       Dated: September 27, 2024



CHARLES R. BREYER
United States District Judge

_____

[6] Musk is correct that, in some circumstances, an investor who made money by buying and selling Twitter stock during the class period might not have been injured at all if they made a net profit.  That said, the calculations necessary to determine if an investor was injured are identical to those necessary to determine how much an investor was damaged.  In other words, the class will "rely on the same body of common evidence to establish the common issue," see Olean Wholesale Grocery, 31 F.4th at 670 n.14, even if some investors are ultimately excluded from the class on the basis that they suffered no injury.

*United States District Court*
*Northern District of California*