QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice* )
alexspiro@quinnemanuel.com
Jesse A. Bernstein (*pro hac vice*)
Jessebernstein@quinnemanuel.com
Jonathan E. Feder (*pro hac vice*)
jonathanfeder@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, NY 10016
Telephone:     (212) 849-7000
Facsimile:     (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Joseph C. Sarles (Bar No. 254750)
josephsarles@quinnemanuel.com
Stephen A. Broome (Bar No. 314605)
stephenbroome@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100

Nathan Archibald (*pro hac vice*)
nathanarchibald@quinnemanuel.com
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84121
Telephone:     (801) 515-7300
Facsimile:     (801) 515-7400

*Attorneys for Defendant Elon Musk*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | CASE NO. 3:22-CV-05937-CRB<br><br>**DECLARATION OF ALEX SPIRO IN SUPPORT OF MOTION TO QUASH SUBPOENA AND FOR A PROTECTIVE ORDER**<br><br>Judge:  Hon. Charles R. Breyer<br><br>Magistrate Judge:  Hon. Donna M. Ryu<br><br>**REDACTED FOR PUBLIC FILING** |

I, Alex Spiro, declare as follows:

1.      I am admitted *pro hac vice* to practice in this Court and am a partner at Quinn Emanuel Urquhart & Sullivan, LLP, attorneys for Defendant Elon R. Musk in this action.  I have personal knowledge of the facts set forth herein and if called as a witness, I could and would competently testify thereto.  I make this declaration in support of my own Motion to Quash Subpoena and for a Protective Order.

2.      I have represented Mr. Musk since 2019.  I have served as his lead trial counsel in many publicly filed cases during the course of our attorney-client relationship.  I have also served as lead trial counsel in numerous cases for Mr. Musk's companies.

3.      The Securities and Exchange Commission ("SEC") investigated Mr. Musk about matters related to his acquisition of Twitter, including the three statements that give rise to Plaintiffs' action.  Notably, despite having much of the same information as Plaintiffs do of my involvement in Mr. Musk's acquisition and associated events, the SEC did not interview me in connection with its investigation.

4.      As part of this long-standing attorney-client relationship, I have provided Mr. Musk with a variety of legal advice on different matters, including his acquisition of Twitter and the eventual litigation that arose from it, *Twitter v. Musk*, Del. Ch. No 2022-0613-KSJM ("Delaware Action").

5.      In my capacity his lawyer, I was one member of a large team of professionals that advised Mr. Musk in connection with the Twitter Merger, which included Jared Birchall (the head of Mr. Musk's home office), a team of investment bankers from Morgan Stanley, a team of lawyers from McDermott Will & Emery (who handled Mr. Musk's various disclosures to the SEC in April 2022), a team of lawyers from Skadden, Arps, Slate, Meagher & Flom LLP (who served as deal counsel, drafted and negotiated the Merger Agreement, handled post-signing due diligence, and authored a number of letters to Twitter concerning the Merger, including the various termination letters), Bob Swan (who briefly served essentially as an interim CFO during the post-signing due diligence period), Antonio Gracias (who took over from Mr. Swan), and various data science experts from the firms CounterAction, Halo, and Cyabra.

6.      After Twitter filed the Delaware Action, I served as lead trial counsel on behalf of the Musk Defendants and was supported by a team of lawyers from Quinn Emanuel.  Skadden was also counsel of record in that case.

7.      I serve as lead trial counsel in this action and have since Mr. Musk made his first appearance.

8.      I have no unique, non-privileged knowledge, information, or evidence to give in this case.  Mr. Musk will not offer me as a witness at trial.

9.      On March 5, 2025, Plaintiffs made the highly unusual decision to attempt to depose me in this case when they gave notice of my subpoena for deposition ("Subpoena).  Plaintiffs did not offer any basis for seeking my testimony at that time.

10.     On March 20, 2025, Plaintiffs filed a letter with this Court that articulated—to the best of my knowledge, for the first time—an explanation of the need for my deposition that contained a list of topics about which they want me to testify.  Dkt. 146.

11.     I have reviewed Plaintiffs' letter and the identified topics.  As explained in detail below, I do not have any unique, non-privileged knowledge about any of the topics Plaintiffs listed in their March 20, 2025 Letter and, in fact, lack personal knowledge concerning a number of the issues identified:

          a.      **Musk's pre-acquisition of Twitter shares and SEC disclosures:**  I was not involved in Mr. Musk's decision to purchase Twitter stock before he made an offer to acquire the company.  I am not a transactional or disclosure attorney.  Although I had communications with Twitter personnel relating to Mr. Musk's April 5, 2022 13D disclosure (which were produced in the Delaware Action), I did not author or file it with the SEC.  Mr. Musk's attorneys at the law firm McDermott Will & Emery did, which is a matter of public record.  A true and correct copy of Mr. Musk's April 4, 2022 Schedule 13D, as pulled from the SEC's public EDGAR website, is attached hereto as **Exhibit 1**.

          b.      **Negotiations relating to the Merger Agreement:**  I did not draft the Merger Agreement or participate in the negotiations with Twitter relating to it.  It is my understanding that Mike Ringler, then a Mergers and Acquisitions partner at Skadden and members of his team, drafted

the Merger Agreement.  I also understand that Mr. Ringler and his team negotiated the Merger Agreement with, among others, Twitter's transactional lawyers Martin Korman from the law firm Wilson Sonsini Goodrich & Rosati and Alan Klein from the law firm Simpson Thacher & Bartlett and their respective teams.

c.    **Recruitment of investors and syndication documents:**  During the course of Mr. Musk's acquisition of Twitter, individuals contacted me from time to time expressing their interest in investing with Mr. Musk and I referred them to Mr. Musk's team of bankers at Morgan Stanley.  An example of such communication, an email chain between me and Thomas Park, is attached hereto as **Exhibit 2**.  However, Mr. Musk's team at Morgan Stanley was ultimately responsible for recruiting potential investors.  I did not prepare any syndication documents.  I understand that Morgan Stanley retained the law firm Davis Polk & Wardwell to prepare documents related to financing and debt syndication and that lawyers from that firm worked with their counterparts at Skadden on those issues.

d.    **Morgan Stanley's role as Musk's lead banker on the deal:**  I did not have any involvement in hiring Morgan Stanley as the banker on the Merger.  It is my understanding that Mr. Musk and Morgan Stanley have their own long-standing relationship, which I understand pre-dates my representation of Mr. Musk.  In connection with the Merger, Mr. Musk had a team of bankers from Morgan Stanley working for him, which included Anthony Armstrong, Michael Grimes, Rick Polhemus, and Kate Claassen, all of whom were deposed in the Delaware Action.

e.    **Meetings and communications with Twitter on outstanding deal issues:**  It is unclear which communications or outstanding deal issues Plaintiffs are seeking evidence about through this topic.  But to the extent I had communications with Twitter personnel, the other participants in those communications (from Twitter and Mr. Musk's team) would also possess information about these interactions.

f.    **Retaining third-party data experts to review Twitter's information:**  In connection with the post-signing due diligence investigation into the veracity of Twitter's disclosures concerning the number of spam/fake accounts that made up its monetizable daily active users ("mDAU"), Mr. Musk's team retained data experts from three outside firms, CounterAction,

Cyabra, and Halo (engaged through Guidepost Solutions LLC).  Skadden retained these firms on May 20, 19, and June 12, 2022 respectively, after the Alleged Misstatements giving rise to this case were made.   True and correct copies of their engagement letters are attached hereto **as Exhibits 3-5**.  I did not personally oversee or supervise the work performed by the data experts; other members of Mr. Musk's team did.

       g.    **Musk's communications with Twitter to terminate the deal:**  Mike Ringler of Skadden authored and sent on Mr. Musk's behalf termination letters to Twitter on July 8, 2022, August 29, 2022, and September 9, 2022.   True and correct copies of these letters are attached hereto as **Exhibits 6-8**.  I did not author these letters.  I did not sign or send them either; Mr. Ringler did.  I was copied on them along with, among others, Mr. Musk and Twitter's lawyers Wilson Sonsini and Simpson Thacher.

       h.    **Post-termination efforts to renegotiate the purchase price of Twitter:**  At some point in the fall of 2022—after the Delaware Action commenced and before the scheduled trial date—although I do not recall the exact date, I (and I believe Mr. Ringler) took part in settlement discussions with Twitter's counsel.  I believe (but cannot recall with any specificity) that William Savitt, Twitter's lead trial counsel, Mr. Korman of Wilson Sonsini, Mr. Klein of Simpson Thacher (and perhaps others) participated in the discussions.

       i.    **My alleged communications with Mr. Musk concerning the May 13 Tweet:**  I cannot comment on whether or not these alleged communications occurred because, if they occurred at all, they were confidential communications between myself and Mr. Musk relating to legal advice.

       j.    **My purported role at Twitter's headquarters after Mr. Musk's acquisition:**  Prior to and after the Merger closed, I continued to represent Mr. Musk as his attorney and (post-closing) also represented Twitter.  A number of individuals were involved in personnel and operational decisions at Twitter after the Merger closed, including Mr. Musk, Mr. Birchall, and many other Twitter employees.

       12.    Mr. Musk was scheduled to be deposed today, April 3, 2025, in Washington, D.C. This morning, before the deposition, I arrived to transport Mr. Musk to the deposition location.  Mr.

DECLARATION OF ALEX SPIRO

1    Musk ████████████████████████████████    My team notified opposing counsel

2    shortly thereafter.  We have offered to reimburse Plaintiffs' counsel for all reasonable expenses

3    relating to the deposition and to reschedule it for the earliest mutually agreeable date.

4           I declare under penalty of perjury under the laws of the United States of America that the

5    foregoing is true and correct to the best of my knowledge.

6           Executed on this 3rd day of April, 2025 in Washington, D.C.

7

8

9                            By         */s/ Alex Spiro*

                                 Alex Spiro

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ALEX SPIRO

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on April 3, 2025.

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By  /s/ Alex Bergjans
      Alex Spiro
      Jesse A. Bernstein
      Jonathan Feder
      Michael T. Lifrak
      Joseph C. Sarles
      Stephen Broome
      Alex Bergjans
      Nathan Archibald

      *Attorneys for Defendant Elon Musk*

1

## **ATTESTATION**

2

Pursuant to Civil L.R. 5-1, I attest under penalty of perjury that concurrence in the filing of

3

this document has been obtained from the other signatory herein.

4

5

By _/s/ Alex Bergjans_

6

Alex Bergjans

7

*Attorneys for Defendant Elon Musk*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

SCHEDULE 13D
Under the Securities Exchange Act of 1934
(Amendment No. 1 to Schedule 13G)

---

Twitter Inc.

(Name of Issuer)

---

Common Stock

(Title of Class of Securities)

---

90184L102

(Cusip Number)

---

John Lutz
Heidi Steele
McDermott Will & Emery LLP
444 West Lake Street, Suite 4000
Chicago, IL 60657
(312) 984-3624

(Name, Address and Telephone Number of Person
Authorized to Receive Notices and Communications)

---

April 4, 2022

(Date of Event Which Requires Filing of this Statement)

---

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of Rule 13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box. ☒

*The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the act (however, see the Notes).

SCHEDULE 13D

CUSIP No. <u>90184L102</u>

| 1 | Name of Reporting Person:                     I.R.S. Identification Nos. of Above Person (entities only):<br><br>Elon R. Musk |
|---|---|
| 2 | Check the Appropriate Box if a Member of a Group (See Instructions):<br>       (a) ☐<br>       (b) ☐ |
| 3 | SEC Use Only: |
| 4 | Source of Funds (See Instruction):<br><br>OO |
| 5 | Check if Disclosure of Legal Proceedings is Required Pursuant to Items 2(d) or 2(e): ☒ |
| 6 | Citizenship or Place of Organization:<br><br>USA |

| | | | |
|---|---|---|---|
| Number of Shares<br>Beneficially<br>Owned by<br>Each<br>Reporting<br>Person With | 7 | Sole Voting Power:<br><br>73,115,038 | |
| | 8 | Shared Voting Power:<br><br>-- | |
| | 9 | Sole Dispositive Power:<br><br>73,115,038 | |
| | 10 | Shared Dispositive Power:<br><br>-- | |

| 11 | Aggregate Amount Beneficially Owned by Each Reporting Person:<br><br>73,115,038 |
|---|---|
| 12 | Check if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions) ☐ |
| 13 | Percent of Class Represented by Amount in Row (11):<br><br>9.1%[1] |
| 14 | Type of Reporting Person (See Instructions):<br><br>IN |

[1] Based on 800,641,166 shares of Common Stock outstanding as of February 10, 2022 as reported in the Issuer's Annual Report on Form 10-K for the year ended December 31, 2021.

SCHEDULE 13D

**Item 1.    Security and Issuer.**

Elon Musk (the "Reporting Person") previously filed a Schedule 13G on April 4, 2022 (the "Schedule 13G"). This Schedule 13D (this "Schedule 13D") relates to the common stock (the "Common Stock") of Twitter Inc., a Delaware corporation (the "Issuer" or "Registrant"), and amends the Schedule 13G.  The address of the principal executive offices of the Issuer is 1355 Market Street, Suite 900, San Francisco, CA 94103; its telephone number is (415) 222-9670.

**Item 2.    Identity and Background.**

(a)    This Schedule 13D is being filed by Elon Musk (the "Reporting Person").

(b)    The principal business address for the Reporting Person is 2110 Ranch Road 620 S. #341886, Austin, TX 78734.

(c)    The principal occupation of the Reporting Person is serving as the Technoking and Chief Executive Officer of Tesla, Inc., the business address of which is 1 Tesla Road, Austin, Texas 78725. On April 4, 2022, the Reporting Person entered into a letter agreement with the Issuer in which the Issuer agreed to appoint the Reporting Person to the Board of Directors of Issuer, subject to certain onboarding procedures.

(d)    The Reporting Person has not been convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors) during the last five years.

(e)    During the last five years, the Reporting Person has not been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction and as a result of such proceeding was or is subject to a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws or finding any violation with respect to such laws, except for proceedings initiated by the Securities and Exchange Commission, and related settlement with the Securities and Exchange Commission filed with the U.S. District Court for the Southern District of New York on September 29, 2018 and further amended on April 26, 2019, with respect to Reporting Person's statement on August 7, 2018 that he was considering taking Tesla private.

(f)    The Reporting Person is a citizen of the United States.

**Item 3. Source and Amount of Funds or Other Consideration.**

The Reporting Person used cash to make the purchases of Common Stock listed on Schedule I hereto.

**Item 4.    Purpose of Transaction.**

On April 4, 2022, the Reporting Person and the Issuer entered into a letter agreement (the "Agreement") which provides that: (i) the Issuer will appoint the Reporting Person to the Issuer's Board of Directors (the "Board") to serve as a Class II director with a term expiring at the Issuer's 2024 Annual Meeting of Stockholders; and (ii) for so long as the Reporting Person is serving on the Board and for 90 days thereafter, the Reporting Person will not, either alone or as a member of a group, become the beneficial owner of more than 14.9% of the Issuer's common stock outstanding at such time, including for these purposes economic exposure through derivative securities, swaps, or hedging transactions. The foregoing summary of the Agreement does not purport to be complete and is subject to, and qualified in its entirety by, the full text of the Agreement, which is filed as Exhibit A and incorporated herein by reference.

The Reporting Person holds the Common Stock of the Issuer for investment purposes. Depending on the factors discussed herein, the Reporting Person may, from time to time, acquire additional shares of Common Stock and/or retain and/or sell all or a portion of the shares of Common Stock held by the Reporting Person in the open market or in privately negotiated transactions, and/or may distribute the Common Stock held by the Reporting Person to other entities. Any actions the Reporting Person might undertake will be dependent upon the Reporting Person's review of numerous factors, including, among other things, the price levels of the Common Stock, general market and economic conditions, ongoing evaluation of the Issuer's business, financial condition, operations and prospects, the relative attractiveness of alternative business and investment opportunities, investor's need for liquidity, and other future developments. Any future acquisitions of Common Stock will be subject to the Company's policies, including its insider trading policy, as applicable.

Except as set forth above, the Reporting Person has no present plans or intentions which would result in or relate to any of the transactions described in subparagraphs (a) through (j) of Item 4 of Schedule 13D.

**Item 5. Interests in Securities of the Issuer**

(a,b) For information regarding beneficial ownership, see the information presented on the cover page of this Schedule 13D. The Common Stock beneficial owned by the Reporting Person is held by the Elon Musk Revocable Trust dated July 22, 2003 for which Elon Musk is the sole Trustee.

(c) Schedule I sets forth the transactions in the Common Stock effected by the Reporting Person during the past 60 days.

(d) Not applicable

(e) Not applicable

**Item 6. Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer.**

On April 4, 2022, the Reporting Person and the Issuer entered the Agreement described in Item 4 above. The Agreement is filed as Exhibit A hereto and incorporated by herein reference.

**Item 7. Exhibits**

EXHIBIT A          Letter Agreement, dated as of April 4, 2022, among Twitter, Inc. and Elon Musk (incorporated  herein by reference to Exhibit 10.1 to the Current Report on Form 8-K filed by the Issuer with the Securities and Exchange Commission on April 5, 2022).

**SIGNATURE**

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Date: April 5, 2022

By: /s/ Elon Musk
    Elon Musk

**SCHEDULE I**

The following table lists all transactions completed by the Reporting Person in the Common Stock since January 31, 2022, which were all completed through open market purchases.

| Date | Shares bought | Price |
|---|---|---|
| 1/31/2022 | 620,083 | $36.828 |
| 2/1/2022 | 542,496 | $37.549 |
| 2/2/2022 | 850,373 | $36.748 |
| 2/3/2022 | 3,649,957 | $34.391 |
| 2/4/2022 | 1,070,429 | $36.184 |
| 2/7/2022 | 4,839,507 | $36.515 |
| 2/8/2022 | 730,000 | $35.733 |
| 2/9/2022 | 638,283 | $36.886 |
| 2/10/2022 | 2,604,907 | $36.642 |
| 2/11/2022 | 1,291,432 | $36.523 |
| 2/14/2022 | 958,849 | $35.92 |
| 2/15/2022 | 371,075 | $36.511 |
| 2/16/2022 | 655,000 | $35.814 |
| 2/17/2022 | 731,581 | $35.891 |
| 2/18/2022 | 1,331,040 | $34.506 |
| 2/22/2022 | 1,256,751 | $33.231 |
| 2/23/2022 | 1,063,170 | $32.806 |
| 2/24/2022 | 838,793 | $33.765 |
| 2/25/2022 | 695,849 | $34.784 |
| 2/28/2022 | 1,025,518 | $35.320 |
| 3/1/2022 | 897,656 | $35.326 |
| 3/2/2022 | 992,785 | $34.575 |
| 3/3/2022 | 1,211,426 | $33.971 |
| 3/4/2022 | 1,016,259 | $33.376 |
| 3/7/2022 | 1,779,530 | $33.067 |
| 3/8/2022 | 2,228,858 | $33.769 |
| 3/9/2022 | 1,005,125 | $34.154 |
| 3/10/2022 | 1,228,833 | $33.932 |
| 3/11/2022 | 2,927,000 | $33.238 |
| 3/14/2022 | 2,770,284 | $33.082 |
| 3/15/2022 | 1,966,000 | $33.791 |
| 3/16/2022 | 2,978,376 | $34.992 |
| 3/17/2022 | 1,500,000 | $37.089 |
| 3/18/2022 | 2,858,340 | $38.252 |
| 3/21/2022 | 1,942,482 | $37.280 |
| 3/22/2022 | 2,476,000 | $38.542 |
| 3/23/2022 | 2,502,140 | $38.149 |
| 3/24/2022 | 1,926,764 | $38.675 |
| 3/25/2022 | 3,491,274 | $38.202 |
| 3/28/2022 | 2,603,779 | $38.772 |
| 3/29/2022 | 2,875,934 | $40.301 |
| 3/31/2022 | 2,000,000 | $38.818 |
| 4/1/2022 | 2,171,100 | $39.341 |

# EXHIBIT 2

# (Filed Under Seal)

# EXHIBIT 3

# (Filed Under Seal)

# EXHIBIT 4

# (Filed Under Seal)

# EXHIBIT 5

# (Filed Under Seal)

# EXHIBIT 6

EX-99.P 2 tm2220599d1_ex99-p.htm EXHIBIT 99.P

**Exhibit P**

### SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

525 UNIVERSITY AVENUE
PALO ALTO, CALIFORNIA 94301

_____

TEL: (650) 470-4500
FAX: (650) 470-4570
www.skadden.com

July 8, 2022

Twitter, Inc.
1355 Market Street, Suite 900
San Francisco, CA 94103
Attn: Vijaya Gadde, Chief Legal Officer

Dear Ms. Gadde:

We refer to (i) the Agreement and Plan of Merger by and among X Holdings I, Inc., X Holdings II, Inc. and Twitter, Inc. dated as of April 25, 2022 (the "Merger Agreement") and (ii) our letter to you dated as of June 6, 2022 (the "June 6 Letter"). As further described below, Mr. Musk is terminating the Merger Agreement because Twitter is in material breach of multiple provisions of that Agreement, appears to have made false and misleading representations upon which Mr. Musk relied when entering into the Merger Agreement, and is likely to suffer a Company Material Adverse Effect (as that term is defined in the Merger Agreement).

While Section 6.4 of the Merger Agreement requires Twitter to provide Mr. Musk and his advisors all data and information that Mr. Musk requests "for any reasonable business purpose related to the consummation of the transaction," Twitter has not complied with its contractual obligations. For nearly two months, Mr. Musk has sought the data and information necessary to "make an independent assessment of the prevalence of fake or spam accounts on Twitter's platform" (our letter to you dated May 25, 2022 (the "May 25 Letter")). This information is fundamental to Twitter's business and financial performance and is necessary to consummate the transactions contemplated by the Merger Agreement because it is needed to ensure Twitter's satisfaction of the conditions to closing, to facilitate Mr. Musk's financing and financial planning for the transaction, and to engage in transition planning for the business. Twitter has failed or refused to provide this information. Sometimes Twitter has ignored Mr. Musk's requests, sometimes it has rejected them for reasons that appear to be unjustified, and sometimes it has claimed to comply while giving Mr. Musk incomplete or unusable information.

1

Mr. Musk and his financial advisors at Morgan Stanley have been requesting critical information from Twitter as far back as May 9, 2022—and repeatedly since then—on the relationship between Twitter's disclosed mDAU figures and the prevalence of false or spam accounts on the platform. If there were ever any doubt as to the nature of these information requests, the May 25 Letter made clear that Mr. Musk's goal was to understand how many of Twitter's claimed mDAUs were, in fact, fake or spam accounts. That letter noted that "Items 1.03 to 1.13 of the diligence request list contain high-priority requests for enterprise data and other information intended to enable Mr. Musk and his advisors to make an independent assessment of the prevalence of fake or spam accounts on Twitter's platform…" The letter then provided Twitter with a detailed list of requests to this effect.

Since then, Mr. Musk has provided numerous additional follow-up requests, all aimed at filling the gaps in the incomplete information that Twitter provided in response to his broad requests for information relating to Twitter's reported mDAU counts and reported estimates of false and spam accounts.[1] For example, in our letter to you dated June 29, 2022 (the "June 29 Letter"), we referenced Mr. Musk's request in the May 25 Letter for "information that would allow him 'to make an independent assessment of the prevalence of fake or spam accounts on Twitter's platform.'" Because Twitter, by its own admission, provided only incomplete data that was not sufficient to perform such an independent assessment,[2] the June 29 Letter "endeavored to be *even more* specific, and to reduce the burden of the [original] request," by identifying a specific subset of high priority information, responsive to Mr. Musk's prior requests, for Twitter to immediately make available.

---

[1] Mr. Musk sought the same information in letters dated June 6, 2022, June 17, 2022, and June 29, 2022. In each of these letters, Mr. Musk referenced his information rights under Section 6.4 of the Merger Agreement. Twitter has thus been on notice of the information sought by Mr. Musk—and the contractual bases for these requests—for two months. For the past month, Mr. Musk has been clear that he views Twitter's non-responsiveness as a material breach of the Merger Agreement giving him the right to terminate the Merger Agreement if uncured. *See* June 6, 2022 (explaining that Twitter was "refusing to comply with its obligations under the Merger Agreement"). Thus, Mr. Musk has been clear about his requests, his right to seek such information, and his view regarding Twitter's material breach of the Merger Agreement.

[2] *See* your letter to us dated June 20, 2022 (noting that the information Twitter was agreeing to provide was "insufficient to perform the spam analysis that [Mr. Musk] purport[s] to wish to do.").

2

Notwithstanding these repeated requests over the past two months, Twitter has still failed to provide much of the data and information responsive to Mr. Musk's repeated requests, including, but not limited to:

1. *Information related to Twitter's process for auditing the inclusion of spam and fake accounts in mDAU.* Twitter has still not provided much of the information specifically requested by Mr. Musk in Sections 1.01-1.03 of the May 19 diligence request list that is necessary for him to make an assessment of the prevalence of false or spam accounts on its website. As recently as the June 29 Letter, Mr. Musk reiterated this long-standing request for information related to Twitter's sampling process for detecting fake accounts. The June 29 Letter identified specific data necessary to enable Mr. Musk to independently verify Twitter's representations regarding the number of mDAU on its platform—including, but not limited to (1) daily global mDAU data since October 1, 2020; (2) information regarding the sampling population for mDAU, including whether the mDAU population used for auditing spam and false accounts is the same mDAU population used for quarterly reporting; (3) outputs of each step of the sampling process for each day during the weeks of January 30, 2022 and June 19, 2022; (4) documentation or other guidance provided to contractor agents used for auditing mDAU samples; (5) information regarding the user interface of Twitter's ADAP tool and any internal tools used by the contractor agents; and (6) mDAU audit sampling information, including anonymized information identifying the contractor agents and Quality Analyst that reviewed each sampled account, the designation given by each contractor agent and Quality Analyst, and the current status of any accounts labelled "compromised." A subsequent request along these lines should not have been necessary, as this information should have been provided in response to Mr. Musk's original diligence request. Yet, to date, Twitter has not provided any of this information.

2. *Information related to Twitter's process for identifying and suspending spam and fake accounts.* In addition to information regarding Twitter's mDAU audits, the June 29 Letter also reiterated requests for data specifically identified in Sections 1.04-1.05 of the May 19 diligence request list regarding Twitter's methodology and performance data relating to identification and suspension of spam and false accounts, including, but not limited to, information regarding account suspensions, including information sufficient to identify daily numbers of account suspensions since October 2020 and numbers of account suspensions for each of Twitter's internal reasons for suspension. In addition, during the June 30, 2022 call, Twitter's representatives indicated for the first time that the workflow and processes for detecting spam and false accounts in the mDAU population is different and separate from the workflow and processes for identifying and suspending accounts in violation of Twitter's policies. On that call, Twitter indicated that it would not be willing to provide information regarding the methodologies employed to identify and suspend such accounts.

3

3. *Daily measures of mDAU for the past eight (8) quarters*. On June 17, 2022 (the "June 17 Letter") Mr. Musk reiterated his request for "access to the sample set used and calculations performed, as well as any related reports or analysis, to support Twitter's representation that fewer than 5% of its mDAUs are false or spam account." To that end, Mr. Musk requested that Twitter provide "daily measures of mDAU for the previous eight quarters, and through the present." This information is derivative of the information Mr. Musk first sought in Sections 1.01-1.03 of the May 19 diligence request list. Although Twitter has provided certain summary data regarding the mDAU calculations, Twitter has not provided the complete daily measures as requested.

4. *Board materials related to Twitter's mDAU calculations*. In the June 17 Letter, Mr. Musk requested a variety of board materials and communications related to Twitter's mDAU metric, its calculation of the number of spam and false accounts, its disclosure of the mDAU metric, and the company's disclosure of the number of spam accounts on the platform. Twitter has provided an incomplete data set in response to this request, and has not provided information sufficient to enable Mr. Musk to make an independent assessment of Twitter's board and management's understanding of its mDAU metric.

5. *Materials related to Twitter's financial condition*. Mr. Musk is entitled, under Section 6.4 of the Merger Agreement to "all information concerning the business … of the Company … for any reasonable business purpose related to the consummation of the transactions" and under Section 6.11 of the Merger Agreement, to information "reasonably requested" in connection with his efforts to secure the debt financing necessary to consummate the transaction. To that end, Mr. Musk requested on June 17 a variety of board materials, including a working, bottoms-up financial model for 2022, a budget for 2022, an updated draft plan or budget, and a *working* copy of Goldman Sachs' valuation model underlying its fairness opinion. Twitter has provided only a pdf copy of Goldman Sachs' final Board presentation.

4

In short, Twitter has not provided information that Mr. Musk has requested for nearly two months notwithstanding his repeated, detailed clarifications intended to simplify Twitter's identification, collection, and disclosure of the most relevant information sought in Mr. Musk's original requests.

While Twitter has provided some information, that information has come with strings attached, use limitations or other artificial formatting features, which has rendered some of the information minimally useful to Mr. Musk and his advisors. For example, when Twitter finally provided access to the eight developer "APIs" first explicitly requested by Mr. Musk in the May 25 Letter, those APIs contained a rate limit lower than what Twitter provides to its largest enterprise customers. Twitter only offered to provide Mr. Musk with the same level of access as some of its *customers* after we explained that throttling the rate limit prevented Mr. Musk and his advisors from performing the analysis that he wished to conduct in any reasonable period of time.

Additionally, those APIs contained an artificial "cap" on the number of queries that Mr. Musk and his team can run regardless of the rate limit—an issue that initially prevented Mr. Musk and his advisors from completing an analysis of the data in any reasonable period of time. Mr. Musk raised this issue as soon as he became aware of it, in the first paragraph of the June 29 Letter: "we have just been informed by our data experts that Twitter has placed an artificial cap on the number of searches our experts can perform with this data, which is now preventing Mr. Musk and his team from doing their analysis." That cap was not removed until July 6, after Mr. Musk demanded its removal for a second time.

Based on the foregoing refusal to provide information that Mr. Musk has been requesting since May 9, 2022, Twitter is in breach of Sections 6.4 and 6.11 of the Merger Agreement.

Despite public speculation on this point, Mr. Musk did not waive his right to review Twitter's data and information simply because he chose not to seek this data and information before entering into the Merger Agreement. In fact, he negotiated access and information rights within the Merger Agreement precisely so that he could review data and information that is important to Twitter's business before financing and completing the transaction.

5

As Twitter has been on notice of its breach since at least June 6, 2022, any cure period afforded to Twitter under the Merger Agreement has now lapsed. Accordingly, Mr. Musk hereby exercises X Holdings I, Inc.'s right to terminate the Merger Agreement and abandon the transaction contemplated thereby, and this letter constitutes formal notice of X Holding I, Inc.'s termination of the Merger Agreement pursuant to Section 8.1(d)(i) thereof.

In addition to the foregoing, Twitter is in breach of the Merger Agreement because the Merger Agreement appears to contain materially inaccurate representations. Specifically, in the Merger Agreement, Twitter represented that no documents that Twitter filed with the U.S. Securities and Exchange Commission since January 1, 2022, included any "untrue statement of a material fact" (Section 4.6(a)). Twitter has repeatedly made statements in such filings regarding the portion of its mDAUs that are false or spam, including statements that: "We have performed an internal review of a sample of accounts and estimate that the average of false or spam accounts during the first quarter of 2022 represented fewer than 5% of our mDAU during the quarter," and "After we determine an account is spam, malicious automation, or fake, we stop counting it in our mDAU, or other related metrics." Mr. Musk relied on this representation in the Merger Agreement (and Twitter's numerous public statements regarding false and spam accounts in its publicly filed SEC documents) when agreeing to enter into the Merger Agreement. Mr. Musk has the right to seek rescission of the Merger Agreement in the event these material representations are determined to be false.

Although Twitter has not yet provided complete information to Mr. Musk that would enable him to do a complete and comprehensive review of spam and fake accounts on Twitter's platform, he has been able to partially and preliminarily analyze the accuracy of Twitter's disclosure regarding its mDAU. While this analysis remains ongoing, all indications suggest that several of Twitter's public disclosures regarding its mDAUs are either false or materially misleading. *First*, although Twitter has consistently represented in securities filings that "fewer than 5%" of its mDAU are false or spam accounts, based on the information provided by Twitter to date, it appears that Twitter is dramatically understating the proportion of spam and false accounts represented in its mDAU count. Preliminary analysis by Mr. Musk's advisors of the information provided by Twitter to date causes Mr. Musk to strongly believe that the proportion of false and spam accounts included in the reported mDAU count is wildly higher than 5%. *Second*, Twitter's disclosure that it ceases to count fake or spam users in its mDAU when it determines that those users are fake appears to be false. Instead, we understand, based on Twitter's representations during a June 30, 2022 call with us, that Twitter includes accounts that have been suspended—and thus are known to be fake or spam—in its quarterly mDAU count even when it is aware that the suspended accounts were included in mDAU for that quarter. *Last*, Twitter has represented that it is "continually seeking to improve our ability to estimate the total number of spam accounts and eliminate them from the calculation of our mDAU…" But, Twitter's process for calculating its mDAU, and the percentage of mDAU comprised of non-monetizable spam accounts, appears to be arbitrary and ad hoc. Disclosing that Twitter has a reasoned process for calculating mDAU when the opposite is true would be false and misleading.

6

Twitter's representation in the Merger Agreement regarding the accuracy of its SEC disclosures relating to false and spam accounts may have also caused, or is reasonably likely to result in, a Company Material Adverse Effect, which may form an additional basis for terminating the Merger Agreement. While Mr. Musk and his advisors continue to investigate the exact nature and extent of this event, Mr. Musk has reason to believe that the true number of false or spam accounts on Twitter's platform is substantially higher than the amount of less than 5% represented by Twitter in its SEC filings. Twitter's true mDAU count is a key component of the company's business, given that approximately 90% of its revenue comes from advertisements. For this reason, to the extent that Twitter has underrepresented the number of false or spam accounts on its platform, that may constitute a Company Material Adverse Effect under Section 7.2(b)(i) of the Merger Agreement. Mr. Musk is also examining the company's recent financial performance and revised outlook, and is considering whether the company's declining business prospects and financial outlook constitute a Company Material Adverse Effect giving Mr. Musk a separate and distinct basis for terminating the Merger Agreement.

Finally, Twitter also did not comply with its obligations under Section 6.1 of the Merger Agreement to seek and obtain consent before deviating from its obligation to conduct its business in the ordinary course and "preserve substantially intact the material components of its current business organization." Twitter's conduct in firing two key, high-ranking employees, its Revenue Product Lead and the General Manager of Consumer, as well as announcing on July 7 that it was laying off a third of its talent acquisition team, implicates the ordinary course provision. Twitter has also instituted a general hiring freeze which extends even to reconsideration of outstanding job offers. Moreover, three executives have resigned from Twitter since the Merger Agreement was signed: the Head of Data Science, the Vice President of Twitter Service, and a Vice President of Product Management for Health, Conversation, and Growth. The Company has not received Parent's consent for changes in the conduct of its business, including for the specific changes listed above. The Company's actions therefore constitute a material breach of Section 6.1 of the Merger Agreement.

7

Accordingly, for all of these reasons, Mr. Musk hereby exercises X Holdings I, Inc.'s right to terminate the Merger Agreement and abandon the transaction contemplated thereby, and this letter constitutes formal notice of X Holding I, Inc.'s termination of the Merger Agreement pursuant to Section 8.1(d)(i) thereof.

Sincerely,

/s/ Mike Ringler
Mike Ringler
Skadden, Arps, Slate, Meagher & Flom LLP

cc:
Katherine A. Martin, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Martin W. Korman, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Douglas K. Schnell, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Remi P Korenblit, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Alan Klein, Simpson Thacher & Bartlett LLP
Anthony F. Vernace, Simpson Thacher & Bartlett LLP
Katherine M. Krause, Simpson Thacher & Bartlett LLP

Elon Musk
Alex Spiro, Quinn Emanuel Urquhart & Sullivan, LLP
Andrew Rossman, Quinn Emanuel Urquhart & Sullivan, LLP

8

# EXHIBIT 7

Case 3:22-cv-05937-CRB   Document 162-1   Filed 04/03/25   Page 31 of 40

EX-99.Q 2 tm2224790d1_ex99-q.htm EXHIBIT 99.Q

**Exhibit Q**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 UNIVERSITY AVENUE
PALO ALTO, CALIFORNIA 94301

———————————

TEL: (650) 470-4500
FAX: (650) 470-4570
www.skadden.com

August 29, 2022

Twitter, Inc.
1355 Market Street, Suite 900
San Francisco, CA 94103
Attn: Vijaya Gadde, Chief Legal Officer

Dear Ms. Gadde:

      We write on behalf of X Holdings I, Inc. and X Holdings II, Inc. (the "Musk Parties") to provide an additional notice of termination of the Agreement and Plan of Merger by and among the Musk Parties and Twitter, Inc. ("Twitter") dated as of April 25, 2022 (the "Merger Agreement"). On July 8, 2022, the Musk Parties terminated the Merger Agreement (the "July 8 Termination Notice") on certain bases. Since that time, Twitter has challenged the validity of the July 8 Termination Notice and contends that the Merger Agreement remains in force, a position that the Musk Parties are contesting. Allegations regarding certain facts, known to Twitter prior to and as of July 8, 2022, but undisclosed to the Musk Parties prior to and at that time, have since come to light that provide additional and distinct bases to terminate the Merger Agreement. Although the Musk Parties believe this termination notice is not legally necessary to terminate the Merger Agreement because they have already validly terminated it pursuant to the July 8 Termination Notice, the Musk Parties are delivering this additional termination notice in the event that the July 8 Termination Notice is determined to be invalid for any reason.

1

———————————————————————————————————————

On August 23, 2022, the Washington Post published a whistleblower report to Congress, the SEC, FTC, and DOJ filed by Peiter "Mudge" Zatko, Twitter's former chief security officer, on July 6, 2022 (the "Zatko Complaint"). The Zatko Complaint alleges far-reaching misconduct at Twitter—all of which was disclosed to Twitter's directors and senior executives, including Parag Agrawal—that is likely to have severe consequences for Twitter's business. For example, Mr. Zatko alleges that:

- Twitter is in material noncompliance with both its obligations under a 2011 FTC consent decree and its general obligations under data privacy, unfair trade practice, and consumer protection laws and regulations;

- Twitter is uniquely vulnerable to systemic disruption resulting from data center failures or malicious actors, a fact which Twitter leadership (including its CEO) have ignored and sought to obfuscate;

- Twitter's platform is built in significant part on the misappropriation and infringement of third party intellectual property; and

- Twitter acquiesced to demands made by the Indian government that its agents be hired by Twitter and given access to Twitter user information.

These allegations, if true, demonstrate that Twitter has breached the following provisions of the Merger Agreement, thereby giving the Musk Parties the right to terminate the Merger Agreement pursuant to its terms as more fully described below.

<u>Section 4.5      Permits; Compliance With Laws</u>. In the Merger Agreement, Twitter represented, *inter alia*, that it was in compliance with all applicable laws. That representation was apparently false when made on the date of the Merger Agreement and as of the date of the July 8 Termination Notice, and continues to be inaccurate. The Zatko Complaint alleges that Twitter has been violating a consent decree it entered into with the FTC in 2011. That consent decree required Twitter to establish and maintain "a comprehensive information security plan" to ensure that its users' personal data was sufficiently protected from disclosure. Mr. Zatko's statements purport to reveal that Twitter has not been, and perhaps never will be, in compliance with that decree. Twitter has already paid a fine of $150 million for violating an aspect of that decree, and Facebook recently paid *$5 billion* for similar user data violations. In addition, the Zatko Complaint alleges that Twitter has repeatedly violated the 2011 FTC consent decree (by going well beyond the violations settled in Twitter's recent $150 million settlement), in addition to breaching a slew of other data privacy, unfair trade practice, cybersecurity, and consumer protection laws and regulations that Twitter must comply with, including but not limited to Twitter granting agents of the Indian government access to confidential user data. These violations would have material, if not existential, consequences to Twitter's business, constituting a Company Material Adverse Effect as defined in the Merger Agreement.

2

        <u>Section 4.6     Company SEC Documents; Financial Statements</u>. In the Merger Agreement, Twitter also represented, *inter alia*, that no documents it filed with the SEC since January 1, 2022, "contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary to make the statements therein . . . not misleading." That representation was apparently false when made on the date of the Merger Agreement and as of the date of the July 8 Termination Notice, and continues to be inaccurate. The Zatko Complaint alleges that Twitter's SEC filings contained untrue statements of material fact or omitted to state material facts necessary to make the statements therein not misleading. For example, Twitter's 2021 10-K, dated February 16, 2022, states that "concerns related to . . . privacy, data protection, safety, [and] cybersecurity" "could potentially negatively affect mDAU growth and engagement," while omitting the significant privacy, data protection, safety, [and] cybersecurity risks Mr. Zatko alerted the board of prior to the filing of the 10-K, including those facts outlined above. Similarly, Twitter's representation in its 2021 10-K that Twitter "strive[s] to comply with applicable laws and regulations relating to privacy, data protection, and cybersecurity" was materially misleading if, in reality, Twitter was ignoring Mr. Zatko's warnings that the company was in violation of privacy, data protection, and cybersecurity laws and regulations.

        Twitter's material misrepresentations and/or omissions in the Merger Agreement and Twitter's 2021 10-K regarding these serious allegations also constitute fraud in the inducement, giving the Musk Parties the right to recission.

        <u>Section 4.8     Disclosure Controls and Procedures</u>. In the Merger Agreement, Twitter also represented, *inter alia*, that it had disclosed "any fraud to the Knowledge of the Company, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting." That representation was apparently false when made on the date of the Merger Agreement and as of the date of the July 8 Termination Notice, and continues to be inaccurate. One component of the Zatko Complaint is that Twitter's CEO, Parag Agrawal, knowingly presented false and misleading reports to Twitter's Board of Directors in order to cover up flagrant vulnerabilities in Twitter's security and data protection infrastructure. Twitter was made aware of precisely that in an internal report prepared by Mr. Zatko in February 2022. Twitter was obligated to disclose Mr. Agrawal's conduct "whether or not material" (although it was clearly material), and failed to do so.

3

Section 4.11.    Litigation. In the Merger Agreement, Twitter represented, *inter alia*, that there were no threatened or pending lawsuits or Government investigations that would constitute a Company Material Adverse Effect (within the meaning of the Merger Agreement). It is likely the case—given the extensive information withheld from the Musk Parties detailed in the Zatko Complaint— that the representations set forth in Section 4.11 will be false as of the date of any potential closing of the transactions contemplated by the Merger Agreement, resulting in a failure of the closing condition set forth in Section 7.2(b). Indeed, Twitter is now facing multiple Congressional inquiries: the Senate Judiciary Committee has announced a full Committee hearing, the House Energy and Commerce Committee announced that it is "assessing next steps," and multiple US Senators have publicly called for the FTC and DOJ to open investigations.         *See*        https://www.washingtonpost.com/technology/2022/08/24/twitter-whistleblower-senate-hearing; https://www.washingtonpost.com/technology/2022/08/23/twitter-whistleblower-congress-investigation. The data privacy authorities of Ireland and France are also investigating the claims in the Zatko Complaint. https://techcrunch.com/2022/08/24/twitter-whistleblower-security-eu/. It is likely that the SEC, FTC, and DOJ, as well as additional foreign regulators are not far behind. Twitter will also now face a myriad of civil lawsuits, asserting claims pursuant to various privacy and cybersecurity laws, state consumer protection laws, false advertising laws, intellectual property theft and misappropriation and common law claims, such as unjust enrichment, fraud, and breach of contract. Many of these civil claims are likely to be asserted as class action claims that could threaten the viability of the platform. This still-rolling litigation avalanche brings with it billions of dollars of potential damages, fines, and penalties, to say nothing of the significant reputational and operational harm that comes in parallel, clearly constituting a Company Material Adverse Effect under the terms of the Merger Agreement.

Section 4.14.    Intellectual Property. In the Merger Agreement, Twitter represented, *inter alia*, that it was not infringing the intellectual property of others (the "Non-Infringement Rep") and that it was in compliance with all applicable data privacy and protection requirements (the "Data Privacy Rep"). Both representations were apparently false when made on the date of the Merger Agreement and as of the date of the July 8 Termination Notice, and both continue to be inaccurate. As revealed by the Zatko Complaint, Twitter apparently never acquired the rights to Twitter's core machine learning models, which the Musk Parties understand to be fundamental to the Twitter platform itself. That infringement threatens not just significant monetary damages, but the potential for injunctive relief that would threaten Twitter's ongoing business as currently operated. Either alone would be a Company Material Adverse Effect under the terms of the Merger Agreement. Similarly, the Zatko Complaint lays out widespread, egregious violations of the data privacy protections that a company like Twitter is expected—and, indeed, legally required—to have in place. This would be a gross violation of trust by the Twitter platform that will have legal and commercial consequences, and which also gives rise to a Company Material Adverse Effect under the terms of the Merger Agreement.

4

        <u>Section 7.2.</u>    <u>Conditions to the Obligations of Parent and Acquisition Sub</u>. Finally, in the Merger Agreement, Twitter represented, *inter alia*, that it had not and would not (prior to closing) experience a Company Material Adverse Effect (within the meaning of the Merger Agreement). The breaches and consequences described above, individually and collectively, suggest that Twitter has in fact already experienced a Company Material Adverse Effect under the terms of the Merger Agreement, the full extent of which remains to be seen.

        The facts supporting these breaches, which were withheld from the Musk Parties but known to Twitter as of the date of the Merger Agreement and at the time of the July 8 Termination Notice, provided additional bases to terminate the Merger Agreement as of that date and provide additional bases to terminate the Merger Agreement today if the Musk Parties' termination of the Merger Agreement pursuant to the July 8 Termination Notice is determined to be invalid for any reason. This also provides a basis for recission. Because these facts were known to Twitter and withheld from the Musk Parties, and because Twitter has since taken the position that the Merger Agreement remains in effect, the Musk Parties hereby provide this additional notice of termination of the Merger Agreement effective as of July 8, 2022 pursuant to Section 8.1(d)(i) thereof on the basis of the facts set forth above. For the avoidance of doubt, these bases are in addition to, and not in lieu of, the bases for termination identified in the July 8 Termination Notice.

5

---

Sincerely,

/s/ Mike Ringler
_____
Mike Ringler
Skadden, Arps, Slate, Meagher & Flom LLP

cc:
Katherine A. Martin, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Martin W. Korman, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Douglas K. Schnell, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Remi P Korenblit, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Alan Klein, Simpson Thacher & Bartlett LLP
Anthony F. Vernace, Simpson Thacher & Bartlett LLP
Katherine M. Krause, Simpson Thacher & Bartlett LLP


Elon Musk
Alex Spiro, Quinn Emanuel Urquhart & Sullivan, LLP
Andrew Rossman, Quinn Emanuel Urquhart & Sullivan, LLP

6
_____

# EXHIBIT 8

EX-99.R 2 tm2225585d1_ex99-r.htm EXHIBIT 99.R

**Exhibit 99.R**

S<small>KADDEN</small>, A<small>RPS</small>, S<small>LATE</small>, M<small>EAGHER</small> & F<small>LOM</small> LLP

525 UNIVERSITY AVENUE

PALO ALTO, CALIFORNIA 94301

————

TEL: (650) 470-4500

FAX: (650) 470-4570

www.skadden.com

September 9, 2022

Twitter, Inc.

1355 Market Street, Suite 900

San Francisco, CA 94103

Attn: Vijaya Gadde, Chief Legal Officer

Dear Ms. Gadde:

We write on behalf of X Holdings I, Inc. and X Holdings II, Inc. (the "Musk Parties") to provide an additional notice of termination of the Agreement and Plan of Merger by and among the Musk Parties and Twitter, Inc. ("Twitter") dated as of April 25, 2022 (the "Merger Agreement"). On July 8, 2022, the Musk Parties terminated the Merger Agreement (the "July 8 Termination Notice") on certain bases. Although the Merger Agreement was properly terminated on that date, on August 29, 2022 the Musk Parties sent a separate letter informing Twitter of additional facts that would independently justify termination of that Agreement (the "August 29 Termination Notice"). In the time that has elapsed since that letter was sent, additional facts have come to light that reveal that Twitter has further breached its obligations under the Merger Agreement. Although the Musk Parties believe this termination notice is not legally necessary to terminate the Merger Agreement because they have already validly terminated it pursuant to the July 8 termination notice, the Musk Parties are delivering this additional termination notice in the event that the July 8 Termination Notice or, alternatively, the August 29 Termination Notice is determined to be invalid for any reason.

In Section 6.1(e) the Merger Agreement, Twitter covenanted that between signing and closing it would not "except as required pursuant to existing Company Benefit Plans . . . grant or provide any severance or termination payments or benefits to any Company Service Provider other than the payment of severance amounts or benefits in the ordinary course of business consistent with past practice and subject to the execution and non-revocation of a release of claims in favor of the Company and its Subsidiaries." The definition of "Company Service Provider" includes Twitter's former employees. Under Section 7.2(a) of the Merger Agreement, Defendants are not obligated to close if Twitter has not "performed or complied, in all material respects, with its obligations required under this Agreement."

1

On June 28, 2022, Twitter entered into a separation agreement with Peiter Zatko under which Twitter made severance payments to Zatko and his counsel totaling $7.75 million. Twitter did not seek Defendants' consent under Section 6.1(e) before making this payment nor was this payment disclosed to Defendants. In fact, Defendants only learned of this payment when Twitter filed the separation agreement with the court on September 3, 2022. This severance payment violated Section 6.1(e) and cannot be cured. Defendants are thus not required to close under Section 7.2(a) and have an additional basis to terminate the Merger Agreement if the Musk Parties' termination of the Merger Agreement pursuant to the July 8 Termination Notice and the August 29 Termination Notice is determined to be invalid for any reason. Because Twitter has taken the position that the Merger Agreement remains in effect, the Musk Parties hereby provide this additional notice of termination of the Merger Agreement pursuant to Section 8.1(d)(i) thereof on the basis of the facts set forth above. For the avoidance of doubt, these bases are in addition to, and not in lieu of, the bases for termination identified in the July 8 Termination Notice and the August 29 Termination Notice.

Sincerely,

/s/ Mike Ringler

Mike Ringler
Skadden, Arps, Slate, Meagher & Flom LLP

2

cc:
Katherine A. Martin, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Martin W. Korman, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Douglas K. Schnell, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Remi P Korenblit, Wilson Sonsini Goodrich & Rosati, Professional Corporation
Alan Klein, Simpson Thacher & Bartlett LLP
Anthony F. Vernace, Simpson Thacher & Bartlett LLP
Katherine M. Krause, Simpson Thacher & Bartlett LLP

Elon Musk
Alex Spiro, Quinn Emanuel Urquhart & Sullivan, LLP
Andrew Rossman, Quinn Emanuel Urquhart & Sullivan, LLP

3