# EXHIBIT 1

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice* forthcoming)
alexspiro@quinnemanuel.com
Jesse Bernstein (*admitted pro hac vice*)
jessebernstein@quinnemanuel.com
51 Madison Ave 22nd floor
New York, NY 10010
Telephone:     (212) 849-7000
Facsimile:     (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Joseph C. Sarles (Bar No. 254750)
josephsarles@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100

*Attorneys for Defendant Elon Musk*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | CASE NO. 3:22-CV-05937-CRB<br><br>**DEFENDANT ELON MUSK'S INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. PROC. 26** |

1    Defendant Elon Musk ("Defendant") submits these Initial Disclosures as required by Rule

2    26(a)(1) of the Federal Rules of Civil Procedure.  These disclosures are based on Defendant's

3    reasonable inquiries to date and the information reasonably available to Defendant at this time.

4    Defendant's investigation is ongoing, and discovery in this case is in its early stages.

5    Consequently, these disclosures are neither intended as, nor shall in any way be deemed, an admission

6    or representation that further disclosures will not be necessary.  Defendant anticipates that, as this case

7    proceeds, further information may be discovered, or its significance better understood.  Defendant

8    may modify, amend, and/or supplement these disclosures to the extent necessary to provide additional

9    or corrective information that has not otherwise been made known during the course of discovery or

10    otherwise made known or available during the case.  These disclosures are given without prejudice to

11    Defendant's right to use or rely on at any time, including trial, subsequently discovered information,

12    or any information omitted from this disclosure by inadvertence, mistake, or otherwise.  These

13    disclosures are made solely for the purpose of this case.

14    Defendant does not represent that he has identified every witness who he may use to support

15    his claims or defenses.  Rather, these disclosures represent a good-faith effort by Defendant to identify

16    information presently available to him that falls within the scope of Rule 26(a)(1).  As such, these

17    disclosures do not include information that may be used solely for impeachment purposes.

18    Defendant makes these disclosures without in any way waiving: (1) the right to object to the

19    competency, relevancy, materiality, or admissibility of particular information, or any other proper

20    ground; (2) any privilege or immunity, including the attorney-client privilege or the work product

21    doctrine; (3) the right to object to the use of any such information, for any purpose, in whole or in part,

22    in any subsequent proceeding in this case or any other case; and (4) the right to object on any and all

23    grounds, at any time, to any witness, discovery request or proceeding involving or relating to the

24    subject matter of these disclosures.

25    **A.    Individuals Likely to Have Discoverable Information**

26    Defendant provides the following list which includes individuals who are likely to have

27    discoverable information that Defendant may use to support his defenses.  Defendant is represented by

28    and should only be contacted through the Defendant's outside counsel at Quinn Emanuel Urquhart &

Sullivan, LLP, 865 S. Figueroa Street, 10th Floor, Los Angeles, California 90017, Telephone: (213) 443-3000.

| Name and Title | Knowledge |
|---|---|
| Elon Musk (Defendant) | Mr. Musk has knowledge concerning at least the following:<br>• The negotiation, execution, and/or implementation of the Merger Agreement;<br>• Mr. Musk's actions and statements regarding the Merger Agreement. |
| Jared Birchall (Managing Director of Mr. Musk's Family Office) | Mr. Birchall has knowledge concerning at least the following:<br>• The negotiation, execution, and/or implementation of the Merger Agreement. |
| Skadden, Arps, Slate, Meagher & Flom LLP (Mr. Musk's Outside Deal Counsel) | Skadden Arps has knowledge concerning at least the following:<br>• The negotiation, execution, and/or implementation of the Merger Agreement. |
| Morgan Stanley & Co LLC | Morgan Stanley has knowledge concerning at least the following:<br>• The negotiation, execution, and/or implementation of the Merger Agreement. |
| McDermott Will & Emery LLP (Mr. Musk's Outside Legal Counsel) | McDermott has knowledge concerning at least the following:<br>• Mr. Musk's April 5, 2022 Schedule 13D |

The following individuals and entities are believed to be affiliated with, or formerly affiliated with pre-merger Twitter Inc. (herein "Twitter") and are believed by Mr. Musk to have knowledge relevant to Mr. Musk's defenses. Additional individuals are named in the Appendix.

| Name and Contact Information (if known) | Title / Role | Knowledge |
|---|---|---|
| Jack Dorsey | Former Director, Twitter. | Mr. Dorsey is likely to have knowledge regarding the negotiation, execution, and/or implementation of the Merger Agreement. |
| Egon Durban | Former Director, Twitter. | Mr. Durban is likely to have knowledge regarding the negotiation, execution, and/or implementation of the Merger Agreement. |

| Bret Taylor | Former Independent Board Chair, Twitter. | Mr. Taylor is likely to have knowledge regarding the negotiation, execution, and/or implementation of the Merger Agreement. |
|---|---|---|
| Parag Agrawal | Former CEO and Director, Twitter. | Mr. Agrawal is likely to have knowledge regarding the negotiation, execution, and/or implementation of the Merger Agreement. |
| Mimi Alemayehou | Former Director, Twitter | Ms. Alemayehou is likely to have knowledge regarding the negotiation, execution, and/or implementation of the Merger Agreement. |
| Martha Lane Fox | Former Director, Twitter | Ms. Fox is likely to have knowledge regarding the negotiation, execution, and/or implementation of the Merger Agreement. |
| Omid Kordestani | Former Director, Twitter | Mr. Kordestani is likely to have knowledge regarding the negotiation, execution, and/or implementation of the Merger Agreement. |
| Dr. Fei-Fei Li | Former Director, Twitter | Dr. Li is likely to have knowledge regarding the negotiation, execution, and/or implementation of the Merger Agreement. |
| Patrick Pichette | Former Director, Twitter | Mr. Pichette is likely to have knowledge regarding the negotiation, execution, and/or implementation of the Merger Agreement. |
| David Rosenblatt | Former Director, Twitter | Mr. Rosenblatt is likely to have knowledge regarding the negotiation, execution, and/or implementation of the Merger Agreement. |
| Robert Zoellick | Former Director, Twitter | Mr. Zoellick is likely to have knowledge regarding the negotiation, execution, and/or implementation of the Merger Agreement. |
| Goldman Sachs & Co. LLC | Advisor to Twitter regarding merger | Goldman Sachs is likely to have knowledge relating to the negotiation and execution of the Merger Agreement. |

| J.P. Morgan Securities LLC | Advisor to Twitter regarding merger | J.P. Morgan is likely to have knowledge relating to the negotiation and execution of the Merger Agreement. |
|---|---|---|
| Wilson Sonsini Goodrich & Rosati, PC | Outside legal counsel to Twitter regarding Merger Agreement | Wilson Sonsini is likely to have knowledge relating to the negotiation and execution of the Merger Agreement. |
| Vijaya Gadde | Former Head of Legal, Policy and Trust, Twitter | Ms. Gadde is likely to have knowledge regarding the negotiation, execution, and/or implementation of the Merger Agreement. |
| Sean Edgett | Former General Counsel, Twitter | Mr. Edgett is likely to have knowledge regarding the negotiation, execution, and/or implementation of the Merger Agreement. |
| Kayvon Beykpour | Former Head of Product, Twitter | Mr. Beykpour is likely to have knowledge regarding the Twitter platform, including platform manipulation, spam, and the number of monetizable Daily Active Users ("mDAU") and how that number is calculated and verified. |
| Corey Fabish | Former Twitter employee | Mr. Fabish is likely to have knowledge relating to spam on Twitter. |
| Emmy Anargyros | Former Twitter employee | Ms. Anargyros is likely to have knowledge relating to Twitter's mDAU and how that number was calculated and verified. |
| Julianna Hayes | Former Vice President, Sales Finance at Twitter | Ms. Hayes is likely to have knowledge relating to Twitter's sales and revenue. |
| Kevin Cope | Former, Deputy General Counsel, Twitter | Mr. Cope is likely to have knowledge relating to Twitter's disclosure policy and its compliance with that policy. |
| Krista Bessinger | Former Vice President, Investor Relations, Twitter | Ms. Bessinger is likely to have knowledge relating to Twitter's management of investor relations and disclosure of information relevant to investors. |
| Manish Chabria | Former Senior Director, FP&A, Twitter | Mr. Chabria is likely to have knowledge relating to Twitter's financial planning and analysis |

| | | activities regarding Twitter's financial health. |
|---|---|---|
| Stacey Conti | Former M&A Integration, Twitter | Ms. Conti is likely to have knowledge relating to Twitter's merger integration processes. |
| Todd Doughty | Former Senior Data Science Manager, Twitter | Mr. Doughty is likely to have knowledge regarding how Twitter calculates mDAU. |
| Will Smythe | Former Senior Director, Twitter | Mr. Smythe is likely to have knowledge regarding Twitter's revenue and how it is calculated and reported. |
| Robert Kaiden | Former Chief Accounting Officer, Twitter | Mr. Kaiden is likely to have knowledge regarding Twitter's accounting practices and disclosure of financial information. |
| Yoel Roth | Former Head of Safety & Integrity, Twitter | Mr. Roth is likely to have information regarding platform manipulation, user identity, and spam on Twitter. |
| Peiter Zatko | Former Head of Security, Twitter | Mr. Zatko is likely to have knowledge regarding Twitter's compliance with SEC and FTC regulations; Twitter's handling of spam, security, user information; Twitter's mDAU. |

The following individuals and entities are believed to be affiliated with, or formerly affiliated with, plaintiffs and are believed by Mr. Musk to have knowledge relevant to the Mr. Musk's defenses:

| Name and Contact Information (if known) | Title / Role | Knowledge |
|---|---|---|
| Giuseppe Pampena | Name Plaintiff | Is likely to have knowledge related to his purchase and/or sale of Twitter securities and class certification issues. |
| Steve Garrett | Lead Plaintiff | Is likely to have knowledge related to his purchase and/or sale of Twitter securities and class certification issues. |
| Nancy Price | Lead Plaintiff | Is likely to have knowledge related to her purchase and/or sale of Twitter securities and class |

| | | certification issues. |
|---|---|---|
| John Garrett | Lead Plaintiff | Is likely to have knowledge related to his purchase and/or sale of Twitter securities and class certification issues. |
| Brian Belgrave | Lead Plaintiff | Is likely to have knowledge related to his purchase and/or sale of Twitter securities and class certification issues. |
| All witnesses identified by Plaintiff in its Rule 26 Disclosures | | As identified by Plaintiff. |

**B.**    **Documents in Mr. Musk's Possession, Custody, or Control that May Support Their Defenses**

Defendant may be in possession, custody or control of the following exemplary categories of documents that Defendant may use to support his defenses:

- Documents regarding Mr. Musk's negotiation, execution, and/or implementation of the Merger Agreement;

- Documents, data and information relating to calculation of bot or spam accounts;

- Documents previously produced or obtained in discovery in the Delaware Action. Defendant outlines in the following Appendix discovery served, depositions conducted and subpoenas served in the Delaware Action. Defendant does not concede, but rather expressly reserves as to any Delaware Action discovery the right to dispute or object to the use of any such information, for any purpose, in whole or in part, in any subsequent proceeding in this case or any other case, including to dispute or object to the competency, relevancy, materiality, or admissibility of any such information or witness, including as to privilege or immunity, and the right to object on any and all grounds, at any time, to any witness discovery request or proceeding involving or relating to the subject matter of the Delaware Action discovery.

**C.**    **Computation of Any Category of Damages Claimed by the Disclosing Party**

1    Defendant contends that plaintiffs and the putative class are not entitled to an award of any

2    damages and note that plaintiffs have not yet provided any computation of damages. Defendant will

3    respond to any allegation of damages at the appropriate stage of these proceedings.

4    **D.**    **Applicable Insurance Agreements**

5    At this time, Defendant is unaware of any applicable insurance agreements.

6    **E.**    **Reservation of Rights**

7    In providing these initial disclosures Defendant does not waive any objections, defenses or

8    applicable privilege. Defendant reserves the right to identify additional individuals with discoverable

9    information and/or additional documents that they may use to support their defenses. Defendant will

10   supplement these disclosures to the extent required by the Federal Rules of Civil Procedure and the

11   Civil Local Rules.

12

13   DATED: March 13, 2024            QUINN EMANUEL URQUHART &
                                      SULLIVAN, LLP

14

15

16   By_____*/s/ Joseph C. Sarles*_____
                Alex Spiro

17              Michael T. Lifrak
                Joseph C. Sarles

18              Jesse Bernstein
                Alex Bergjans

19
                *Attorneys for Elon Musk*

20

21

22

23

24

25

26

27

28

DEFENDANT ELON MUSK'S DISCLOSURES PURSUANT TO FED. R. CIV. PROC. 26

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on this March 13, 2024.

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By  */s/ Joseph C. Sarles*
    Alex Spiro
    Michael T. Lifrak
    Joseph C. Sarles
    Jesse Bernstein
    Alex Bergjans

    *Attorneys for Elon Musk*

## Appendix: Discovery in Delaware Action

| ROG | Resp. | Interrogatories Served by Twitter |
|-----|-------|-----------------------------------|
| ROG 1<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22<br><br>Supp<br>8-12-22<br><br>2nd Supp<br>8-25-22<br><br>3rd Supp<br>8-31-22 | Identify all Persons with knowledge concerning, information relevant to, and/or possession, custody, or control over Documents or Communications relating to any of the allegations in the Complaint and/or any of the claims or arguments in the July 8, 2022 Letter, and, as applicable, describe the general subject matter of each such Person's relevant knowledge or information or the general subject matter of the relevant Documents or Communications in their possession, custody, or control. |
| ROG 2<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22<br><br>Supp<br>8-12-22<br><br>2nd Supp<br>8-31-22 | Identify all Persons with knowledge concerning, information relevant to, and/or possession, custody, or control over Documents or Communications relating to Your efforts to arrange, obtain, syndicate, and/or consummate the Debt Financing or the Equity Financing, including without limitation (i) any law firm, financial advisor, or other institution engaged to advise or assist You in connection with the Debt Financing or the Equity Financing; (ii) any other Person that worked on Your behalf and/or represented Your interests in connection with the Debt Financing or the Equity Financing; (iii) any actual or potential provider of the Debt Financing; (iv) any law firm, financial advisor, or other institution engaged to advise or assist any actual or potential provider of the Debt Financing; (v) any actual or potential coinvestor in the Equity Financing; and (vi) any law firm, financial advisor, or other institution engaged to advise or assist any actual or potential co-investor in the Equity Financing, and, as applicable, describe the general subject matter of each such Person's relevant knowledge or information or the general subject matter of the relevant Documents or Communications in their possession, custody, or control. |
| ROG 3<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22<br><br>Supp<br>8-12-22<br><br>2nd Supp<br>8-19-22<br><br>3rd Supp<br>8-31-22 | Identify all Persons with knowledge concerning any review or assessment conducted by You or on Your behalf (including without limitation any review or assessment conducted by or at the direction of Defendants' Advisors), whether before or after the date of the Merger Agreement, relating to (1) the prevalence of false or spam accounts or bots on the Twitter platform; or (2) Twitter's API or "firehose" data, including without limitation all experts, consultants, advisors, or other service providers that You and/or Defendants' Advisors contacted, consulted, or retained in connection with any such review or assessment. |
| ROG 4<br><br>Set 2<br>7-29-22 | R&O<br>8-5-22 | Identify all information that You obtained after executing the Merger Agreement that formed a basis for the Tweet sent by Equity Investor on May 13, 2022, in which Equity Investor stated, "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users," including but not limited to all information that supports, refutes, or otherwise relates to the accuracy of such Tweet. |
| ROG 5<br><br>Set 2<br>7-29-22 | R&O<br>8-5-22 | Identify all information that You obtained after executing the Merger Agreement that formed a basis for the Tweet sent by Equity Investor on May 17, 2022, in which Equity Investor stated, "20% fake/spam accounts, while 4 times what Twitter claims, could be *much* higher," including but not limited to all information that supports, refutes, or otherwise relates to the accuracy of such Tweet. |

| ROG | Resp. | Interrogatories Served by Twitter |
|---|---|---|
| ROG 6<br><br>Set 2<br>7-29-22 | R&O<br>8-5-22 | Identify all information that formed a basis for the statement made by Equity Investor, as set forth in the Tweet that Equity Investor sent on May 16, 2022 (reproduced at Paragraph 79 of the Complaint), as later clarified by Equity Investor in a Tweet sent on July 13, 2022, that Parag Agrawal's statements regarding Twitter's efforts to fight spam on its platform, as set forth in Parag Agrawal's Tweets sent on May 16, 2022 (partially reproduced at Paragraph 78 of the Complaint), were "BS," including but not limited to all information that supports, refutes, or otherwise relates to the accuracy of such statement by Equity Investor. |
| ROG 7<br><br>Set 2<br>7-29-22 | R&O<br>8-5-22<br><br>Supp<br>8-12-22 | State Your understanding of how many false or spam accounts existed on the Twitter platform as of July 8, 2022, in absolute terms and as a percentage of Twitter's mDAU, and describe all of Your bases for that understanding as of that date. |
| ROG 8<br><br>Set 2<br>7-29-22 | R&O<br>8-5-22 | Describe in detail all efforts undertaken by You and/or Defendants' Advisors, on or after May 13, 2022, to obtain, syndicate, arrange, finalize, and/or consummate the Debt Financing, close the Merger, and/or cause all of the conditions for closing the Merger to be satisfied. |
| ROG 9<br><br>Set 2<br>7-29-22 | R&O<br>8-5-22 | Describe in detail all reasons why You determined that Bob Swan should "depart the deal proceedings" on or about June 23, 2022, including by describing the disconnect in "wavelength" between You and Bob Swan, as described in Paragraph 110 of the Complaint. |
| ROG 10<br><br>Set 2<br>7-29-22 | R&O<br>8-5-22 | Describe in detail all of the reasons why You declined to provide the consents to Twitter's requests under the Merger Agreement described in paragraphs 119 through 122 of the Complaint, including without limitation all of the reasons why You initially provided, but thereafter withdrew, any such consent. |
| ROG 11<br><br>Set 2<br>7-29-22 | R&O<br>8-5-22 | Identify any meeting of the board of directors of Tesla, Inc., Space Exploration Technologies Corp., or any other company affiliated with Equity Investor, in which Equity Investor invests, or for which Equity Investor serves as a director and/or officer, or any committee of any such board of directors, at which the Merger, the Merger Agreement, the Debt Financing, the Equity Financing, the Financing Commitments, Equity Investor's Tweets about Twitter or the Merger, and/or the sale or potential sale by Equity Investor of Tesla, Inc. securities to fund or potentially fund the Merger were discussed, and, for each such meeting, describe the pertinent discussion. |
| ROG 12<br><br>Set 2<br>7-29-22 | R&O<br>8-5-22<br><br>Supp<br>8-12-22 | Identify all Persons with whom You communicated about the April 4, 2022 Letter Agreement, the April 13, 2022 Proposal, the April 24, 2022 Offer, any other potential acquisition or strategic transaction involving Twitter, the Merger, the Merger Agreement, the Limited Guarantee, the June 6, 2022 Letter, the July 8, 2022 Letter, any financing with respect to any of the foregoing or any transaction contemplated thereby (including but not limited to the Debt Financing, the Equity Financing, and/or the Financing Commitments), and/or Your potential or purported termination of the Merger Agreement, and, as to |

| ROG | Resp. | Interrogatories Served by Twitter |
|-----|-------|-----------------------------------|
| | | each such Person, Identify all forms of communication that You used to discuss any one or more of the foregoing subjects. |
| ROG 13<br><br>Set 2<br>7-29-22 | R&O<br>8-5-22<br><br>Supp<br>8-12-22<br><br>2nd Supp<br>9-23-22 | Identify with particularity "all statement[s] of material fact" in documents that Twitter has filed with the SEC since January 1, 2022 that You contend were "untrue" or "misleading," including without limitation those that You contend allegedly contained representations that "fewer than 5%" of its mDAU are false or spam accounts, and describe in detail Your bases for such contentions. |
| ROG 14<br><br>Set 2<br>7-29-22 | R&O<br>8-5-22 | Describe in detail the "preliminary analysis by Mr. Musk's advisors" and the results thereof described in the final paragraph of page 6 of your July 8 letter. |
| ROG 15<br><br>Set 2<br>7-29-22 | R&O<br>8-5-22 | Identify all Communications by You and/or Defendants' Advisors, or on Your behalf, with any Governmental Authority, including without limitation the SEC and the BEIS, concerning (i) the Merger; (ii) the Merger Agreement; (iii) the Proxy Statement; or (iv) Twitter. |
| ROG 16<br><br>Set 2<br>7-29-22 | R&O<br>8-5-22<br><br>Supp<br>8-12-22 | Identify all Persons who were provided copies of, or otherwise received access to, any information provided to You by Twitter pursuant to Sections 6.4 or 6.11 of the Merger Agreement or otherwise subsequent to the execution of the Merger Agreement. |
| ROG 17<br><br>Set 2<br>7-29-22 | R&O<br>8-5-22 | Identify all Persons who were involved in or otherwise privy to discussions relating to the conception, negotiation, and/or execution of the Merger Agreement or any other potential transaction between You and Twitter, or involving You and Twitter and/or shares Twitter's stock, that You contemplated or considered. |
| ROG 18<br><br>Set 3<br>8-4-22 | R&O<br>8-11-22 | Describe in detail all of the ways that Antonio Gracias allegedly "dove in to the financing as soon as he was brought on" to replace Bob Swan, as referenced in Paragraph 198 of the Counterclaim. |
| ROG 19<br><br>Set 3<br>8-4-22 | R&O<br>8-11-22 | Identify all instances in which Equity Investor, whether acting directly or through an affiliated entity, declined to engage in due diligence in connection with an investment in, acquisition of, or other transaction involving a corporation or other legal entity in circumstances where the size of the investment or the price paid was equal to or greater than $50 million. |
| ROG 20<br><br>Set 3 | R&O<br>8-11-22 | For the period of April 25, 2022 through July 8, 2022, Identify with particularity all information that Defendants requested pursuant to Section 6.4 and/or Section 6.11 of the Merger Agreement that You claim that Twitter did not provide, |

| ROG | Resp. | Interrogatories Served by Twitter |
|---|---|---|
| 8-4-22 | | including by Identifying in each case the Person that made the request; the date the request was made; the purpose or purposes of the request; and all information that was provided by Twitter in response to the request. |
| ROG 21<br><br>Set 3<br>8-4-22 | R&O<br>8-11-22 | State whether, at any time between January 1, 2022 and July 8, 2022, You, Defendants' Advisors, and/or any other Person acting on Your behalf communicated with Steve Jurvetson, Jason Calacanis, Joe Lonsdale, David Sacks, and/or Keith Rabois about the Merger, the Merger Agreement, the possibility that You could attempt to renegotiate or purport to terminate the Merger Agreement, the prevalence of false or spam accounts or bots on the Twitter platform, or any interview or media appearance by one or more of the foregoing Persons relating to any of these subjects, and, for each such Person, Identify all forms of responsive Communications; all participants in such responsive Communications; and the subject matters of such responsive Communications. |
| ROG 22<br><br>Set 4<br>9-16-22 | R&O<br>9-23-22 | State "yes" or "no" whether, during the period January 1, 2022 through August 22, 2022, any of Elon R. Musk; Jared Birchall; any lawyer of Skadden, Arps, Slate, Meagher & Flom LLP that did any work relating to Twitter for any of Defendants; any lawyer of Quinn Emanuel Urquhart & Sullivan LLP that did any work relating to Twitter for any of Defendants; or any employee of Morgan Stanley that did any work relating to Twitter for any of Defendants had knowledge, whether directly or indirectly obtained from Zatko or any other source, of any criticisms, allegations, opinions, or views relating to Twitter that were made or held by Zatko, or were attributed to Zatko, during the period November 1, 2020 through August 22, 2020. |

| ROG | Resp. | Interrogatories Served by Mr. Musk |
|---|---|---|
| ROG 1<br><br>Set 1<br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | Identify and describe in detail Your method for calculating mDAU for a given day, including in your response an explanation of all factors or criteria used to determine whether a given account will or will not be counted in mDAU, which factors or criteria cause accounts that see no ads to be included within mDAU, and an identification of all Persons involved in the calculation process. |
| ROG 2<br><br>Set 1<br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | Describe Twitter's account suspension practices, including in your response (i) a description of the machine learning or automated processes employed in those practices, (ii) a description of the algorithm(s) employed by each such machine learning or automated process to detect spam or false accounts, (iii) the extent and frequency of use of each such machine learning or automated process, and (iv) how frequently an account (including accounts that appear within mDAU at least once during a quarter) is analyzed to determine whether it meets any of Twitter's criteria for suspension (*e.g.*, daily, weekly, every time the account tweets, etc.). |
| ROG 3<br><br>Set 1<br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | Identify how frequently Twitter accounts are suspended for different reasons, including within your response the different reasons an account may be suspended other than because it qualifies as a false or spam account and the proportion of total suspended accounts where the reason for suspension is that the account is a false or spam account. |

| ROG | Resp. | Interrogatories Served by Mr. Musk |
|---|---|---|
| ROG 4<br><br>Set 1 (Rev) 7-29-22 | R&O 8-5-22 | Describe in detail the July 7, 2022 briefing at Twitter referenced here: https://www.reuters.com/technology/twitter-says-it-removes-over-1-million-spamaccounts- each-day-2022-07-07/. Your response should include at least the following information: (i) an identification of all persons who participated or were otherwise involved in the briefing; (ii) a description of the statements made by You or Your representatives at the briefing; (iii) the factual bases for the statements made by You or Your representatives at the briefing, including all factual bases for Your statement that Twitter removes more than 1 million spam accounts per day. |
| ROG 5<br><br>Set 1 (Rev) 7-29-22 | R&O 8-5-22 | Describe all information, guidance, instructions, or training provided or made available to Twitter's human labelers, Quality Analysts, and full-time Twitter inhouse staff involved in the mDAU Audit or who are otherwise responsible for reviewing suspected spam or false accounts on Twitter, including in your response an explanation of how those involved in the mDAU Audit are directed to use private information, such as IP addresses and any mismatch between stated location and geolocation, in their analysis. |
| ROG 6<br><br>Set 1 (Rev) 7-29-22 | R&O 8-5-22 | For all accounts counted in mDAU that take no actions visible on the Twitter Firehose, describe all data that Twitter retains related to such accounts, including the time frame for which such data is retained. |
| ROG 7<br><br>Set 1 (Rev) 7-29-22 | R&O 8-5-22 | Describe any process or workflow used by Twitter to detect or identify false or spam accounts or their effects, other than the mDAU Audit and the suspension workflow, including in your response any process or workflow used to assess the extent to which revenue, mDAU engagement, or ad engagement were impacted by spam or false accounts, how Twitter uses information generated by any such processes and workflows, and what actions Twitter takes with respect to false or spam accounts or their effects as identified by such processes or workflows. |
| ROG 8<br><br>Set 1 (Rev) 7-29-22 | R&O 8-5-22<br><br>Supp 8-26-22 | Identify all Persons involved or that have previously been involved in evaluating the number of false or spam accounts on Twitter's platform (including in the mDAU Audit and any suspension workflow(s)), including any outside vendors, contractor agents, or consultants, including in your response a brief description of each Person's role and the timeframe during which each Person held that role. |
| ROG 9<br><br>Set 1 (Rev) 7-29-22 | R&O 8-5-22 | Describe in detail all business metrics or performance indicators that You have employed either internally or externally to track the financial and operational performance of Twitter, or the performance of advertisements on Twitter, and identify all forecasts, projections, or pro forma estimates of those metrics and indicators. |
| ROG 10<br><br>Set 1 (Rev) 7-29-22 | R&O 8-5-22 | Identify and describe in detail the reasons for any weakness in or decline in Twitter's Q2 2022 financial results and currently expected Q3 2022 financial results. |
| ROG 11<br><br>Set 1 (Rev) | R&O 8-5-22 | Identify and describe in detail all of Twitter's analysis, justification, and support for its public contentions that mDAU growth drives its revenue growth, including Twitter's statements in its 2021 10-K that "Our advertising revenue growth is primarily driven by increases in mDAU . . ." and "mDAU, and its related growth, is the best way to measure our success against our objectives and |

| ROG | Resp. | Interrogatories Served by Mr. Musk |
|---|---|---|
| 7-29-22 | | to show the size of our audience and engagement." |
| ROG 12 Set 1 (Rev) 7-29-22 | R&O 8-5-22 | Identify all individuals You believe to have knowledge relevant to the Action and/or the Merger and, separately for each individual, the nature of such knowledge. |
| ROG 13 Set 1 (Rev) 7-29-22 | R&O 8-5-22 | Identify and describe in detail the reasons why Twitter sued the Indian government for judicial review of certain blocking orders, after having largely complied with the 2021 Information Technology Rules until June 2022, and why Twitter did not inform or seek Defendants' consent prior to initiating that lawsuit. |
| ROG 14 Set 1 (Rev) 7-29-22 | R&O 8-5-22 | Identify each resignation or voluntary departure of any Twitter employee since January 1, 2022 whose total compensation, including salary, bonus, and equity compensation, falls within the top 20% of compensation at Twitter. For each resignation or voluntary departure, describe in detail: (a) the Person's name and position and (b) any information regarding the reason for the resignation or voluntary departure. |
| ROG 15 Set 1 (Rev) 7-29-22 | R&O 8-5-22 | Identify and describe in detail every change Twitter has made regarding employee retention, compensation, benefits, job structure, or treatment since January 1, 2022, including the Persons involved in making each decision. |
| ROG 16 Set 1 (Rev) 7-29-22 | R&O 8-5-22 | Identify and describe in detail any data collection methods, resultant data sets, and any analysis Twitter uses to serve targeted ads to each user, including, but not limited to, any policies or algorithms, and how, if at all, Twitter uses these methods and analysis to ensure that ads are served only to real, monetizable users that are not false or spam accounts. |
| ROG 17 Set 1 (Rev) 7-29-22 | R&O 8-5-22 | Identify and describe how You determined that there had been an overstatement in the number of mDAU from Q1 2019 through Q4 2021. |
| ROG 18 Set 1 (Rev) 7-29-22 | R&O 8-5-22 | Identify and describe any remedial measures taken by Twitter in response to the determination that there had been an overstatement in the number of mDAU from Q1 2019 through Q4 2021. |
| ROG 19 Set 1 (Rev) 7-29-22 | R&O 8-5-22 | Identify all Documents and Communications supporting Your disclosure on page 5 of Twitter's 2021 Form 10-K that "In making this determination, we applied significant judgment, so our estimation of false or spam accounts may not accurately represent the actual number of such accounts, and the actual number of false or spam accounts could be higher than we have estimated." |

| ROG | Resp. | Interrogatories Served by Mr. Musk |
|---|---|---|
| ROG 20<br><br>Set 1<br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | Identify all Documents and Communications supporting Your disclosure on page 5 of Twitter's 2021 Form 10-K that "We are continually seeking to improve our ability to estimate the total number of spam accounts and eliminate them from the calculation of our mDAU, and have made improvements in our spam detection capabilities that have resulted in the suspension of a large number of spam, malicious automation, and fake accounts. We intend to continue to make such improvements." |
| ROG 21<br><br>Set 1<br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | Identify all Documents and Communications supporting Your disclosure on page 5 of Twitter's 2021 Form 10-K that "We have performed an internal review of a sample of accounts and estimate that the average of false or spam accounts during the fourth quarter of 2021 represented fewer than 5% of our mDAU during the quarter." |
| ROG 22<br><br>Set 1<br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | Identify and describe in detail all of Twitter's analysis, justification, and support for Your disclosure on page 15 of Twitter's 2021 Form 10-K that "New or existing competitors may draw people towards their products or services and away from ours [...] which could decrease mDAU growth or engagement and negatively affect our business." |
| ROG 1<br><br>Set 2<br>8-12-22 | R&O<br>8-19-22 | Describe, in detail, Your reasons for excluding Too Young to Tell ("TYTT") accounts from mDAU spam audits, and any estimates of their potential effect on the number of spam and false accounts on your website if they were to be included in mDAU spam audits, and any reasons for Your failure to disclose the existence of TYTT accounts in your audit and classification process to Defendants, both before and after termination of the Merger Agreement. |
| ROG 2<br><br>Set 2<br>8-12-22 | R&O<br>8-19-22 | Identify each of Twitter's engagement metrics assessed by the Board or Twitter management for each quarter of 2021, and explain in detail whether those metrics indicate Twitter's engagement had increased or decreased in the relevant quarter. |
| ROG 1<br><br>Set 3<br>9-1-22 |  | Identify the respective dates on which (1) Twitter and (2) its representatives or agents became aware of Mr. Zatko's intent to file a Whistleblower Complaint with any government or government agency, and the respective dates on which Twitter and its representatives or agents became aware of the actual filing of the Zatko FTC/SEC/DOJ Complaint. |
| ROG 2<br><br>Set 3<br>9-1-22 |  | Identify the circumstances relating to Twitter's awareness of the Zatko Twitter Presentation, including the dates when Twitter and its agents or representatives first became aware of the Zatko Twitter Presentation, and the actions Twitter has taken in response, including any internal investigation that was conducted and/or any remedial actions taken to remedy the issues raised and all persons involved in such investigation. |
| ROG 3<br><br>Set 3<br>9-1-22 |  | Identify the circumstances relating to Twitter's awareness of the Report on Platform Integrity, including the dates when Twitter and its agents or representatives first became aware of the Report on Platform Integrity, the actions Twitter has taken in response, including any internal investigation that was conducted and/or any remedial actions taken to remedy the issues raised and |

| ROG | Resp. | Interrogatories Served by Mr. Musk |
|---|---|---|
| | | all persons involved in such investigation, and the law firm(s) responsible for applying the "Privileged and Confidential / Attorney Work Product" label to the Report on Platform Integrity. |
| ROG 4<br><br>Set 3<br>9-1-22 | | Identify all measures taken by Twitter to comply with the FTC Consent Order, including policies and procedures Twitter has implemented in response to the FTC Consent Order, all analyses or audits conducted by, for, or on behalf of Twitter to assess its compliance with the FTC Consent Order, and all notices of noncompliance and Twitter's responses to such notices. |
| ROG 5<br><br>Set 3<br>9-1-22 | | Identify all notices of security breaches Twitter has received since 2011, including but not limited to any incident that may have resulted in unauthorized access to data, applications, networks or devices of Twitter or its users, and identify remedial actions Twitter took in response to such notice, including any investigation undertaken and the results of such investigation. |
| ROG 6<br><br>Set 3<br>9-1-22 | | Identify circumstances relating to Twitter's acquisition and use of training materials and data sets for its machine learning models as referenced in Paragraphs 70 and 71 of the Zatko FTC/SEC/DOJ Complaint, including the source of such training materials and data sets, the ownership of such training materials and data sets to the best of Twitter's knowledge, notices Twitter has received regarding the need for a license to use such training materials and data sets, communications with a government or government agency regarding its use of such training materials and data sets, attempts to obtain a license, and reasons for failure to obtain a license. |
| ROG 7<br><br>Set 3<br>9-1-22 | | Identify the date on which Twitter was first contacted by any government or governmental agency (including foreign or domestic), including but not limited to the United States Department of Justice, the United States Securities Exchange Commission, or the United States Federal Trade Commission, regarding the allegations in the Zatko FTC/SEC/DOJ Complaint. |
| ROG 8<br><br>Set 3<br>9-1-22 | | Identify any code names used at Twitter to refer to the Zatko FTC/SEC/DOJ Complaint, the Zatko Twitter Presentation, or the Report on Platform Integrity, or any investigation regarding allegations Zatko raised regarding Twitter. |
| ROG 9<br><br>Set 3<br>9-1-22 | | Identify all investigations conducted regarding the allegations in the Zatko FTC/SEC/DOJ Complaint, including the names of Twitter employees, outside law firms, and/or outside consultants involved in those investigations. |
| ROG 10<br><br>Set 3<br>9-1-22 | | Identify all actual and threatened litigation, regulatory actions, or investigations by government agencies against Twitter as of April 25, 2022 and as of the present regarding the allegations in the Zatko FTC/SEC/DOJ Complaint, the Zatko Twitter Presentation, and/or the Report on Platform Integrity. |
| ROG 11<br><br>Set 3<br>9-1-22 | | Identify each Whistleblower Complaint against Twitter regarding its (1) audience or engagement metrics, including mDAU; (2) cybersecurity hacks or breaches; (3) compliance with any applicable law or regulation, including the FTC Consent Order; (4) security, cybersecurity, of software development procedures and practices; (5) use or misuse of user data, (6) false or spam |

| ROG | Resp. | Interrogatories Served by Mr. Musk |
|---|---|---|
| | | accounts on Twitter or (7) compliance or non-compliance with any software or data license, including when 917414-WILSR01A – MSW such complaint was filed, what the allegations were, what Twitter did in response to such complaint, and the outcome of such complaint. |
| ROG 12<br><br>Set 3<br>9-1-22 | | Identify each person involved in creating "Assessments" for Twitter, as that term is defined in the FTC Consent Order, including any Twitter employee and third party involved in the preparation of such Assessment for or on behalf of Twitter, as well as any Twitter employee or representative responsible for interfacing with any third party in relation to such Assessment. |

| RFP | Resp. | Requests for Production Served by Twitter |
|---|---|---|
| RFP 1<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications relating to the April 4, 2022 Letter Agreement, the April 13, 2022 Proposal, the April 24, 2022 Offer, any other potential acquisition or other strategic transaction involving Twitter, the Merger, the Merger Agreement, the Limited Guarantee, the June 6, 2022 Letter, and/or the July 8, 2022 Letter, and any financing with respect to any of the foregoing or any transaction contemplated thereby (including but not limited to the Debt Financing, the Equity Financing, and/or the Financing Commitments), including without limitation (i) all Communications with Defendants' advisors, the Lenders, or the Co-Investors concerning these subjects; and (ii) all Documents created by Defendants' Advisors, the Lenders, or the Co-Investors concerning these subjects. |
| RFP 2<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Communications with Defendants' Advisors, the Lenders, or the Co-Investors concerning Twitter, and all Documents created by Defendants' Advisors, the Lenders, or the Co-Investors concerning Twitter. |
| RFP 3<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications relating to efforts to syndicate and/or arrange, document, negotiate the terms of, or consummate the Debt Financing and close the Merger, including those concerning the status of or expected timeline for such efforts. Documents responsive to this Request shall include, without limitation: (i) closing checklists (and drafts thereof) for any aspect of the Debt Financing; (ii) timelines (and drafts thereof) for the arrangement, negotiation, execution, and/or consummation of the Debt Financing; (iii) agendas, presentations, decks, and other materials (and drafts thereof) related to any organizational calls, lender meetings, drafting sessions, or due diligence sessions concerning the Debt Financing, and any notes, recordings, or transcriptions of any calls or meetings related to the Debt Financing; (iv) drafts of definitive agreements and ancillary and closing documents (and all schedules and exhibits thereto) related to the Debt Financing; (v) offering memoranda, confidential information memoranda, and lender presentations (and drafts thereof) related to the Debt Financing; and (vi) ratings agency presentations (and drafts thereof) related to the Debt Financing. |
| RFP 4<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications relating to efforts to solicit Co-Investors, arrange or negotiate equity co-investments, and/or arrange, document, negotiate, or consummate the Equity Financing, including those concerning the status of or expected timeline for such efforts. Documents responsive to this Request shall include, without limitation: (i) closing checklists (and drafts thereof) for any aspect of the Equity Financing; (ii) timelines (and drafts thereof) for the |

| RFP | Resp. | Requests for Production Served by Twitter |
|-----|-------|-------------------------------------------|
| | | arrangement, negotiation, execution, and/or consummation of the Equity Financing; (iii) presentations, decks, and other materials (and drafts thereof) related to any organizational calls, meetings, or due diligence sessions concerning the Equity Financing, and any notes, recordings, or transcriptions of any calls or meetings related to the Equity Financing; (iv) drafts of definitive agreements and ancillary documents related to the Equity Financing; (v) pitch books (and drafts thereof) related to the Equity Financing; and (vi) offering memoranda, confidential information memoranda, and lender presentations (and drafts thereof) related to the Equity Financing. |
| RFP 5<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications concerning (i) the reduction of the amount of the Margin Loan Commitment, including without limitation those relating to the reasons for reducing the amount of the Margin Loan Commitment; and (ii) the subsequent termination of the Margin Loan Commitment, including without limitation those relating to the reasons for terminating the Margin Loan Commitment. |
| RFP 6<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications concerning any potential tender offer for some or all of Twitter's shares, including without limitation (i) all Communications with Defendants' Advisors, the Lenders, the Co-Investors, or potential co-investors in the potential tender offer concerning these subjects; (ii) all Documents created by Defendants' Advisors, the Lenders, the Co-Investors, or potential co-investors in the potential tender offer concerning these subjects; and (iii) all Documents and Communications relating to the debt commitment letter, dated April 20, 2022, attached as Exhibit C to Amendment No. 3 to Schedule 13D, filed by Equity Investor with the SEC on April 21, 2022. |
| RFP 7<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications concerning Defendants' requests or potential requests for information pursuant to Section 6.4 and/or Section 6.11 of the Merger Agreement and any information provided by Twitter, or on Twitter's behalf, in response to any such request for information, including without limitation (i) all Documents created by Defendants' Advisors, the Lenders, or the Co-Investors concerning such information requests or potential requests; (ii) all Communications with the Lenders or the Co-Investors concerning such information requests or potential requests; (iii) all Documents and Communications related to any analyses, audits, or investigations performed by or at the direction of You and/or Defendants' Advisors, the Lenders, or the Co-Investors, or of which You are aware, relating to Twitter's API or "firehose" data provided to Defendants; (iv) all Documents and Communications related to any analyses, audits, or investigations performed by or at the direction of You and/or Defendants' Advisors, the Lenders, or the Co- Investors, or of which You are aware, relating to any other information provided by Twitter, or on Twitter's behalf, in response to any information request by You or on Your behalf; and (v) all Documents and Communications concerning Equity Investor's Tweet, dated May 13, 2022, purporting to disclose information obtained from Twitter pursuant to an information request, as alleged in Paragraph 75 of the Complaint. |
| RFP 8<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications concerning any request made by Twitter, or on Twitter's behalf, seeking Defendants' consent pursuant to Section 6.1 of the Merger Agreement with respect to (i) the implementation of employee retention programs; (ii) the termination of a revolving credit facility; (iii) an application for a money transmitter license; or (iv) any other proposed course of action, corporate policy, or other decision related to the conduct of Twitter's business. Documents responsive to this Request shall include, without limitation: (x) Documents and Communications related to Defendants' assessment of and/or decision whether or not to provide their consent and/or whether or not the |

| RFP | Resp. | Requests for Production Served by Twitter |
|---|---|---|
| | | proposed course of action, corporate policy, or other decision was commercially reasonable under the circumstances; (y) all Communications with Defendants' Advisors, the Lenders, or the Co-Investors concerning each consent request; and (z) all Documents created by Defendants' Advisors, the Lenders, or the Co-Investors concerning each consent request. |
| RFP 9<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications concerning the number of false or spam accounts or bots on the Twitter platform and/or the disclosures in Twitter's SEC filings discussed in Paragraphs 64 and 66 of the Complaint, including without limitation (i) all Documents and Communications related to any analyses, audits, or investigations performed or conducted by or at the direction of You and/or Defendants' Advisors, or of which You are aware, relating to these subjects, whether performed or conducted prior or subsequent to the execution of the Merger Agreement; (ii) all Documents and Communications related to any analyses, audits, or investigations that You and/or Defendants' Advisors considered undertaking, or that You and/or Defendants' Advisors considered having others undertake on Your or their behalf, relating to these subjects; and (iii) all Documents and Communications related to Your decision to execute the Merger Agreement without further due diligence on these subjects. |
| RFP 10<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Communications with any media representative or media outlet regarding the Merger, the Merger Agreement, the Debt Financing, the Equity Financing, the Financing Commitments, the number of false or spam accounts or bots on the Twitter platform, the disclosures in Twitter's SEC filings discussed in Paragraphs 64 and 66 of the Complaint, the June 6, 2022 Letter, and/or the July 8, 2022 Letter, including without limitation all Documents and Communications concerning the following articles: (i) *Musk Says Twitter Deal at Lower Price Is "Not Out of the Question,"* BLOOMBERG (May 16, 2022); (ii) *Elon Musk Says Twitter Deal Can't Move Forward Without Clarity on Fake Accounts,* WALL ST. J. (May 17, 2022); (iii) *Exclusive – Musk's Twitter Deal Threats Put New Financing on Ice – Sources,* REUTERS NEWS (June 7, 2022); (iv) *Elon Musk Interview in Full: On Dogecoin, Trump, Twitter, Tesla, and Recession,* BLOOMBERG (June 21, 2022); and (v) *Elon Musk's Deal to Buy Twitter Is in Peril,* WASH. POST (July 7, 2022), and all Documents and Communications related to such Communications. This Request includes, without limitation, all Communications made by You and/or Defendants' Advisors, the Lenders, or the Co-Investors, or of which you are aware, with the author(s) (or any of their colleagues) of the enumerated articles or any other stories, articles, media commentary, or the like concerning the subject matters listed in the Request. |
| RFP 11<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications concerning Equity Investor's acquisitions of, and other transactions concerning, shares of Twitter common stock, including without limitation: (i) all Documents and Communications related to the purpose of or rationale for such acquisitions; (ii) all Documents and Communications related to Equity Investor's plans or proposals with respect to Twitter and Equity Investor's holdings of Twitter stock, whether or not such plans or proposals remain in contemplation today; and (iii) Documents sufficient to identify all transactions, including purchases, sales, and derivatives, involving Twitter's common stock by Equity Investor and/or any affiliate of Equity Investor on or after January 1, 2022 and continuing to the present day. |
| RFP 12<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications concerning Equity Investor's potential membership on the Twitter Board, including without limitation (i) all Communications with any past or present officer or director of Twitter, or with Defendants' Advisors, regarding such potential membership; (ii) all Documents and Communications relating to the April 4, 2022 Letter Agreement; and (iii) all Documents and Communications relating to Equity Investor's declination of an |

DEFENDANT ELON MUSK'S DISCLOSURES PURSUANT TO FED. R. CIV. PROC. 26

| RFP | Resp. | Requests for Production Served by Twitter |
|---|---|---|
| | | invitation to join the Twitter Board. |
| RFP 13<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications comprising or concerning any Tweets, Twitter Direct Messages, text messages, instant messages, messages on social media messaging platforms, or the like by Equity Investor that relate to (i) the Merger; (ii) the Merger Agreement; (iii) the Debt Financing; (iv) the Equity Financing; (v) the Financing Commitments; (vi) any potential acquisition or other strategic transaction involving Twitter other than the Merger; (vii) any tender offer for some or all of Twitter's shares; (viii) the possibility of Equity Investor starting a competitor to Twitter; (ix) the prevalence of bots and/or false or spam accounts on the Twitter platform and/or the disclosures in Twitter's SEC filings discussed in Paragraphs 64 and 66 of the Complaint; (x) any of Twitter's current or former officers, directors, employees, or other representatives; (xi) Your intentions with respect to closing and/or Your efforts to close the Merger; (xii) the June 6, 2022 Letter, the July 8, 2022 Letter, and/or Equity Investor's decision to purport to terminate the Merger; or (xiii) possible litigation related to the Merger or the Merger Agreement. |
| RFP 14<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications concerning Equity Investor's determination, as disclosed in Amendment No. 2 to Schedule 13D, filed by Equity Investor with the SEC on April 21, 2022, that the April 13, 2022 Proposal was "no longer subject to financing as a result of the Reporting Person's receipt of the financing commitments . . . and is no longer subject to business due diligence." |
| RFP 15<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications concerning (i) Equity Investor's assertion, in a Tweet dated May 15, 2022, that "[t]here is some chance" that the percentage of bots and/or false or spam accounts "might be over 90% of daily active users"; and (ii) Equity Investor's assertion, in a Tweet dated May 17, 2022, that "20% fake/spam accounts, while 4 times what Twitter claims, could be much higher," including without limitation all Documents in Your possession, in the possession of Defendants' Advisors, or of which You are aware, that supported these claims. |
| RFP 16<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications relating to the effects or potential effects of changes in the price of Tesla, Inc. common stock on (i) the Merger; (ii) the Debt Financing; (iii) the Equity Financing; (iv) the Financing Commitments; and/or (v) Your intentions with respect to closing and/or efforts to close the Merger. |
| RFP 17<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications concerning Equity Investor's (i) efforts to ensure that he had the financial capacity to pay and perform his obligations in respect of the Equity Financing, including without limitation those relating to the status of or expected timeline for such efforts; and (ii) intended or expected sources of cash to fund his obligations in respect of the Equity Financing. |
| RFP 18<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Communications with any Governmental Authority, including without limitation the SEC and BEIS, concerning (i) the Merger; (ii) the Merger Agreement; (iii) the Proxy Statement; or (iv) Twitter, and all Documents and Communications relating to such Communications. |
| RFP 19<br><br>Set 1 | R&O<br>8-5-22 | All Documents and Communications concerning Your purported termination of the Merger Agreement, including without limitation those related to (i) any consideration of whether and on what grounds to purport to terminate the Merger Agreement; (ii) any consideration of potentially renegotiating the |

| RFP | Resp. | Requests for Production Served by Twitter |
|---|---|---|
| 7-23-22 | | Merger Agreement; (iii) all Documents and Communications related to the preparation of the June 6, 2022 Letter; and (iv) all Documents and Communications related to the preparation of the July 8, 2022 Letter. |
| RFP 20<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications concerning Your contention in the July 8, 2022 Letter that Twitter is "likely to suffer a Company Material Adverse Effect," including without limitation any valuations, forecasts, projections, estimates, or other analyses relating to whether Twitter is likely to suffer a Company Material Adverse Effect. |
| RFP 21<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All forecasts, projections, estimates, or other analyses created by You, Defendants' Advisors, the Lenders, or the Co-Investors, or on Your or their behalf, relating to Twitter's current or future performance, financial condition, or value, including without limitation any projections of Twitter's revenues, EBITDA, earnings, and cash flows, and all Documents and Communications concerning such forecasts, projections, estimates, or analyses. |
| RFP 22<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications relating to any investment, involvement, potential investment, or potential involvement by Equity Investor, any affiliate of Equity Investor, any Co-Investor, and/or any other Person acting in concert with Equity Investor, either directly or indirectly, in any competitor to Twitter, whether or not such competitor is presently in existence. |
| RFP 23<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications concerning Your strategic or business plans for Twitter, including without limitation (i) all drafts or iterations of any plans to address issues relating to false or spam accounts on the Twitter platform; (ii) all drafts or iterations of any plans relating to employee retention programs or incentives; and (iii) all drafts or iterations of any plans relating to potential changes to the size and/or composition of Twitter's workforce. |
| RFP 24<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications concerning the actual or potential hiring and/or termination of Twitter employees, including without limitation those relating to (i) any Communications with Twitter on the subject; or (ii) Equity Investor's comments at the all-hands meeting with Twitter employees held on June 16, 2022. |
| RFP 25<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications relating to the termination of Bob Swan and/or the cessation of Bob Swan's involvement on Your behalf in connection with the Merger and the Debt Financing. |
| RFP 26<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications relating to the actual or potential engagement or involvement of Antonio Gracias to act on Your behalf in connection with the Merger and the Debt Financing, including without limitation any summary or introductory information or briefing materials provided to Mr. Gracias. |

| RFP | Resp. | Requests for Production Served by Twitter |
|---|---|---|
| RFP 27<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All audio or video recordings of any Communications with Twitter, any current or former employee, officer, or executive of Twitter, any current or former member of the Twitter Board, or any advisor, attorney, agent, or representative of Twitter. |
| RFP 28<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications concerning X Holdings I, Inc., X Holdings II, Inc., and/or X Holdings III, LLC, including without limitation (i) Documents sufficient to show the identity of all Persons that currently serve, or have in the past served, as directors, officers, or members of one or more of these entities; and (ii) all Documents and Communications relating to any investment or potential investment in one or more of these entities and/or any other affiliate of Equity Investor. |
| RFP 29<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications received from third parties in connection with this Action (whether through subpoena, request, agreement, or otherwise). |
| RFP 30<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents You intend to rely upon at trial, or at any deposition or hearing in this Action. |
| RFP 31<br><br>Set 1<br>7-23-22 | R&O<br>8-5-22 | All Documents and Communications identified in response to Plaintiff's First Set of Interrogatories. |
| RFP 32<br><br>Set 2<br>8-4-22 | R&O<br>8-11-22 | All Documents and Communications relating to Your use of the "Botometer" tool described in Paragraph 116 and Footnote 16 of the Counterclaim. |
| RFP 33<br><br>Set 2<br>8-4-22 | R&O<br>8-11-22 | All Documents and Communications regarding the financial model allegedly prepared by Morgan Stanley as described in Paragraphs 34 and 166 of the Counterclaim and, to the extent different than that financial model, the valuations allegedly prepared by Morgan Stanley as described in Paragraph 78 of the Counterclaim. This Request includes without limitation (i) the referenced financial model (and all drafts thereof); (ii) the referenced valuations (and all drafts thereof); (iii) all Communications with any one or more of Defendants' Advisors, any one or more of the Lenders, any one or more of the Co-Investors, and/or any other Person regarding the referenced financial model and/or the referenced valuations; and (iv) all Documents and Communications evidencing or discussing whether or not Equity Investor personally received, reviewed, and/or discussed the referenced financial model prior to April 25, 2022. |
| RFP 34<br><br>Set 2<br>8-4-22 | R&O<br>8-11-22 | All Documents and Communications regarding the "additional business models" that Defendants allegedly considered as a means to "unlock Twitter's true value," as described in Paragraph 39 of the Counterclaim, including without limitation the "subscription-based model" referenced in that same Paragraph. This Request includes without limitation all Documents and Communications concerning (i) the projected or anticipated value of Twitter based on such business models; and (ii) the relevance of mDAU to such business models. |
| RFP 35<br><br> | R&O<br>8-11-22 | All Documents and Communications supporting, refuting, or otherwise relating to the allegation in Paragraph 40 of the Counterclaim that Equity Investor |

| RFP | Resp. | Requests for Production Served by Twitter |
|---|---|---|
| Set 2 8-4-22 | | "understood that each mDAU represented an active Twitter user who could potentially be convinced to pay a nominal monthly subscription fee." |
| RFP 36 Set 2 8-4-22 | R&O 8-11-22 | All analyst reports and news articles referenced in the Counterclaim, including without limitation (i) the analyst reports that allegedly focus on Twitter's mDAU as described in Paragraphs 135 and 167 of the Counterclaim; and (ii) the "recent public reporting suggest[ing] that Twitter has faced various investigations by the Indian government, requests to moderate content, and requests to block certain accounts" as described in Paragraph 182 of the Counterclaim. |
| RFP 37 Set 2 8-4-22 | R&O 8-11-22 | All Documents and Communications relating to Twitter's litigation with the Indian government and/or any content-removal orders issued to Twitter by the Indian government, as discussed in Paragraphs 18 and 181 through 185 of the Counterclaim. |
| RFP 38 Set 2 8-4-22 | R&O 8-11-22 | All Documents and Communications relating to Defendants' allegations that Twitter made "key decisions outside the ordinary course without consulting the Musk Parties," as discussed in Paragraphs 186 through 195 of the Counterclaim. |
| RFP 39 Set 2 8-4-22 | R&O 8-11-22 | All Documents and Communications concerning Defendants' review, prior to executing the Merger Agreement, of each of the allegedly false and misleading statements discussed at Paragraphs 109 through 149 of the Counterclaim. |
| RFP 40 Set 2 8-4-22 | R&O 8-11-22 | For the period of January 1, 2022 through April 25, 2022, all Documents and Communications relating to Defendants' and/or Defendants' Advisors reliance on Twitter's representations in its SEC filings, as alleged in Paragraph 27 of the Counterclaim. |
| RFP 41 Set 2 8-4-22 | R&O 8-11-22 | For the period of January 1, 2022 through April 25, 2022, all Documents and Communications relating to Defendants' and/or Defendants' Advisors' beliefs about the number and/or prevalence of false or spam accounts or bots on the Twitter platform. This Request includes, without limitation, all Documents and Communications that support, refute, or otherwise relate to the allegations set forth in Paragraphs 212 and 213 of the Counterclaim that "[a]t the time of the Merger Agreement, Defendants/Counterclaim-Plaintiffs did not know the false or misleading statements or omissions" and "[h]ad Defendants/Counterclaim-Plaintiffs known about the false or misleading statements and omissions, they would not have entered into the Merger Agreement." |
| RFP 42 Set 2 | R&O 8-11-22 | All Documents and Communications related to Twitter's mDAU recast in April 2022, as discussed in Paragraphs 9 and 79 through 81 of the Counterclaim. |

| RFP | Resp. | Requests for Production Served by Twitter |
|-----|-------|-------------------------------------------|
| 8-4-22 | | |
| RFP 43<br><br>Set 2<br>8-4-22 | R&O<br>8-11-22 | All Documents and Communications related to Equity Investor's alleged belief that "due diligence processes can be costly and inefficient," as set forth in Paragraph 60 of the Counterclaim. |
| RFP 44<br><br>Set 2<br>8-4-22 | R&O<br>8-11-22 | All Documents and Communications related to Defendants' alleged assumption that Twitter "rel[ied] on automation, artificial intelligence, and machine learning" to count false or spam accounts, as described in Paragraph 83 of the Counterclaim, including without limitation (i) all Documents and Communications concerning the bases for this assumption; and (ii) Documents sufficient to identify the date on which Defendants first formed this assumption. |
| RFP 45<br><br>Set 2<br>8-4-22 | R&O<br>8-11-22 | All Documents and Communications related to the "stratification" or potential stratification of Twitter's mDAU, as that term is used in Paragraph 141 of the Counterclaim, whether performed before or after the execution of the Merger Agreement. |
| RFP 46<br><br>Set 2<br>8-4-22 | R&O<br>8-11-22 | All Documents and Communications related to the allegation that "nearly a third of Twitter's mDAU in fact see no ads and appear to generate no revenue at all," as set forth in Paragraph 138 of the Counterclaim. |
| RFP 47<br><br>Set 2<br>8-4-22 | R&O<br>8-11-22 | All Documents and Communications related to the allegation that "mDAU growth is not occurring among high-value users," as set forth in Paragraph 142 of the Counterclaim. |
| RFP 48<br><br>Set 2<br>8-4-22 | R&O<br>8-11-22 | Without limitation as to time, all Documents and Communications quoted from or otherwise explicitly referenced in the Counterclaim. |
| RFP 49<br><br>Set 3<br>9-21-22 | R&O<br>9-29-22 | All Communications from December 1, 2021 through August 22, 2022 between Peiter Zatko or anyone acting on his behalf, on the one hand, and any of Defendants, any lawyer of Skadden that did any work relating to Twitter for any of Defendants, or any lawyer of Quinn Emanuel that did any work relating to Twitter for any of Defendants, on the other, and any Documents reflecting, referring to, or summarizing such Communications. |

| RFP | Resp. | Requests for Production Served by Twitter |
|---|---|---|
| RFP 50<br><br>Set 3<br>9-21-22 | R&O<br>9-29-22 | All Communications sent or received by any of Defendants, any lawyer of Skadden that did any work relating to Twitter for any of Defendants, or any lawyer of Quinn Emanuel that did any work relating to Twitter for any of Defendants, from December 1, 2021 through August 22, 2022 that relate to Peiter Zatko or his July 6, 2022 complaint, including any of the allegations contained therein. |

| RFP | Resp. | Requests for Production Served by Mr. Musk |
|---|---|---|
| RFP 1<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | Ongoing access to the Firehose, consistent with the level of access You have granted Defendants since June 22, 2022, and to Your Enterprise APIs, consistent with the level of access You have granted Defendants since July 6, 2022. |
| RFP 2<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | ESI including historical replays of the period from January 1, 2020, through present, including all content that would have been available to a subscriber at the time, without redaction or rate limits, for the following data feeds: the Twitter Firehose showing all public Tweets and their likes; the Compliance Firehose API; the Follow, search, and get users API; and the Account Activity API |
| RFP 3<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | ESI sufficient to uniquely identify, by "id" and "id_str" property, every account You counted in mDAU for each day of 2020 through present (in connection with representations made in Your SEC filings), including the date each such account was so counted, and ESI sufficient to identify for each such account on each day so counted at least the following information: the IP address(es) associated with the account when it logged in or was otherwise authenticated and accessed Twitter, the date the account was created, the self-reported geo-location of the account user, the Twitter-determined geo-location of the account user, the account's device signature, the account's access software with version number, the account's operating system, any information associated with the account's telecom provider, the account's browser header(s), the volume of direct messages sent from and received by the account, and timestamps corresponding to the beginning and end of each session during which the account was logged in or otherwise accessed Twitter. |
| RFP 4<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | Documents and ESI sufficient to show, separately for each day from January 1, 2020 through present, for each account You counted in mDAU on each day (with each such subject account uniquely identified by "id" and "id_str"), the following information:<br>a. The total number of clicks by the subject account on each of the following: hashtags, links, avatars, usernames, and Tweet expansions;<br>b. The number of unique tweets and the number of unique accounts for which the subject account performed each of the interactions in item (a);<br>c. The number of unique tweets and the number of unique accounts for which the subject account played the entire duration of a video;<br><br>d. The number of unique tweets and the number of unique accounts for which the subject account played a video for less than its entire duration; |

| RFP | Resp. | Requests for Production Served by Mr. Musk |
|-----|-------|---------------------------------------------|
| | | e. The number of times the subject account triggered each of the following events: get_newer; spotlight_view; |
| | | f. The number of times the subject account triggered each of the following events: long_dwell_view; video_content_play_from_tap; video_content_short_form_complete; video_content_view_threshold; video_content_playback_start; long_dwell_view; view_details; video_session; |
| | | g. The number of unique tweets, the number of unique ads, and the number of unique accounts for which each event in (f) was triggered by the subject account; |
| | | h. The number of tweets rendered to the subject account; |
| | | i. The duration of each client_event scroll event where the subject account was viewing its home timeline; |
| | | j. The duration of each client_event scroll event where the subject account was viewing a different account's timeline; |
| | | k. The number of unique account timelines viewed by the subject account for which a client_event scroll event was recorded for the subject account; |
| | | l. All activity recorded for the subject account across all devices, including but not limited to all data reflecting or relating to ad impressions served, video watches, and clickstream; |
| | | m. All activity or other information stored by Twitter relating to the subject account, including but not limited to demographics, languages, locations, interests, activity on other social media platforms, websites, or apps, and Terms of Service violations. |
| RFP 5 (Rev) 7-29-22 | R&O 8-5-22 | All Documents and Communications relating to the Merger, whether created before or after the Merger Agreement's execution, including, without limitation, Documents and Communications relating to (a) any meetings at which the Merger was discussed or considered, any financial analyses, fairness analyses, and fairness opinions relating to the Merger, the consideration of any alternative to the Merger, and the negotiation of the Merger Agreement; (b) Board Materials, including any board of directors meeting minutes, committee meeting minutes, and any agendas, resolutions, and presentation materials concerning the Merger or the Merger Agreement; (c) financing the Merger, including but not limited to all documents and communications regarding Twitter's and Defendants' requests for information regarding financing, the materials provided in response to the foregoing requests for information, and the Debt Commitment Letters, the Equity Commitment Letter, and the Limited Guaranty, including all Exhibits thereto and documents incorporated therein; (d) the consummation of the Merger, including, without limitation, any acts or omissions of any party or third party in advance of closing, or any fact or circumstance that could prevent or impair or delay the consummation of the Merger (including without limitation any contemplation of any such impairment or delay, regardless of materiality); and (e) all Documents and Communications prepared by, concerning, sent to or received from Goldman Sachs or J.P. Morgan regarding the proposed Merger, including all Documents and Communications reflecting, referring to, or relating to, including a working copy of, any valuation model underlying the Fairness Opinions. |
| RFP 6 (Rev) 7-29-22 | R&O 8-5-22 | All Documents and Communications referring or relating to Defendants or any current or former employees or agents of Defendants, including, but not limited to, all Documents and Communications regarding (a) any reaction to Musk's purported acquisition of Twitter; (b) the termination notice served by Defendants on July 8, 2022; (c) Musk's "tweets" and public statements regarding the Merger Agreement; (d) Twitter's communications with Bob Swan and Antonio Gracias; |

| RFP | Resp. | Requests for Production Served by Mr. Musk |
|---|---|---|
| | | (e) all Documents and Communications from management to employees about the Merger or Defendants, (f) All Documents and Communications regarding any requests for consent that you have made to Defendants or have contemplated making under Section 6.1 of the Merger Agreement, and (g) all Documents and Communication among management regarding the Merger or Defendants. |
| RFP 7<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All Documents and Communications relating to any information requests sent after the signing of the Merger Agreement, including but not limited to (a) Documents already produced to Defendants; (b) all Documents and Communications regarding whether and which documents to provide to Defendants in response to Defendants' requests; (c) all Documents made available to Defendants by Twitter in connection with Defendants' evaluation of the Merger, including, but not limited to, Documents made available through the due diligence data room; (all [sic] Documents made available to Defendants pursuant to information requests; and (e) all Documents considered but not made available to Defendants pursuant to information requests. |
| RFP 8<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All Documents and Communications reflecting, referring to, or relating to the impact or effect of false or spam accounts or other adverse facts or circumstances on your business and operations, including, without limitation (a) Documents sufficient to show the impact of false or spam accounts on advertising operations and advertising revenue; (b) all Documents and Communications sent to or received from Wall Street analysts, credit analysts, investors (both equity and debt), potential or actual advertising customers, or strategic partners, from January 1, 2018, to present; (c) all Documents and Communications regarding the relationship between mDAU or false and spam accounts, on the one hand, and revenue, on the other hand, from January 1, 2018, to present; and (d) all Documents and Communications reflecting, referring to, or relating to sensitivity analyses showing impact of changes in mDAU on revenue and value. |
| RFP 9<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All Documents and Communications regarding changes to hiring, recruitment, or staffing that have been adopted since the signing of the Merger Agreement, including all Documents and Communications regarding (a) any hiring "freezes" that have been instituted from January 1, 2020, to present; (b) the "retention plan" referred to in paragraphs 115-121 of Your Complaint; and (c) any actual or contemplated termination, furloughing, resignation, or other departure of Your personnel, including, without limitation, any Documents or Communications reflecting any bases and rationales for terminations. |
| RFP 10<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | Documents sufficient to show the organizational structure of Twitter and its divisions, including the current positions of all executives plus all employees responsible for mDAU calculations, spam identification and auditing, and user suspensions within Twitter, and the reporting structure of all such positions. |
| RFP 11<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | Documents sufficient to identify Twitter's competitors or industry peers, the basis for such identification, and any business result achieved or action taken by such competitors or peers in response to false or spam accounts or other adverse circumstances affecting their business, and all Documents and Communications regarding analyses (whether prepared internally or by third parties) that compare Twitter to competitors or industry peers, including all Documents and Communications reflecting, referring to, or relating to any analysis or evaluation of Your competitors or industry peers with respect to financial performance, advertising revenues, and spam/false accounts/mDAU. |

| RFP | Resp. | Requests for Production Served by Mr. Musk |
|-----|-------|---------------------------------------------|
| RFP 12<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All Documents and Communications reflecting, referring to, or relating to Your use of mDAU as a "Key Metric," as noted in Your SEC filings, including all documents and communications reflecting, referring, or relating to the relationship between mDAU and Your present or future revenue or EBITDA. |
| RFP 13<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All Documents and Communications regarding lawsuits or investigations involving false or spam accounts or calculation of mDAU or total users/accounts, including all Documents and Communications regarding (a) *Shenwick v. Twitter, Inc.*, Case No.16-cv-05314-JST, *Solak v. Twitter, Inc.*, C.A. No. 2022-0491-KSJM, or any other pending or threatened legal action regarding Your userbase metrics, including but not limited to mDAU, or false or spam accounts on Twitter for the period beginning January 1, 2021, through the present; and (b) any communications, actions, or inquiries from any state or federal regulators, including, without limitation, all Documents or Communications regarding FTC and SEC investigations or complaints regarding false or spam accounts, all state and federal civil investigative demands, and all inquiries or document requests, formal or informal, from any governmental authority regarding investigations into spam accounts. |
| RFP 14<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | Without limitation as to time, all Documents and Communications regarding the Complaint, including, but not limited to, all Documents and Communications (a) You read, consulted, reviewed, or relied upon in preparing the Complaint, including all documents that form the basis for any of Your contentions in the Complaint; (b) You intend to rely on or introduce at any hearing, deposition, trial or other proceeding in this Action; (c) produced to Twitter by a third party in connection with this litigation, including but not limited to, Documents and Communications produced in response to any subpoena; (d) referring or relating to any alleged damages, hardship, harm, or injury that could be suffered by any party in connection with the allegations in the Complaint; and (e) relied on or identified in Your response to the Interrogatories. |
| RFP 15<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All Documents and Communications reflecting, referring to, or relating to Twitter's ability or inability to operate in the ordinary course of business since January 2022, including all Documents and Communications regarding (a) any changes contemplated or made to any aspect of Your strategy, business, or operations, including without limitation Documents sufficient to identify the ordinary course of business or past custom and practice with respect to any such change, including, but not limited to, any Documents or Communications reflecting any deviations from product development or product deployment timelines or roadmaps; and (b) the ability or inability of Twitter's finance, accounting, human resources, engineering, product development, information technology, operations, legal, sales, marketing, research and development, and purchasing departments to operate in the ordinary course of business since January 2022. |
| RFP 16<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | Any Documents or Communications regarding human resources policies, information technology policies, data or privacy practices, or other corporate policies or practices since January 2022, including Documents and Communications (a) reflecting any changes to Twitter's human resources policies, information technology policies, data or privacy practices, or any other corporate policies or practices since January 2022; (b) regarding Twitter or its personnel's failure to comply with human resources policies, information technology policies, data or privacy practices, or other corporate policies or |

| RFP | Resp. | Requests for Production Served by Mr. Musk |
|---|---|---|
| | | practices since January 2022; and (c) any changes to compensation or compensation plan. |
| RFP 17<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All Documents and Communications reflecting, referring to, or relating to Twitter's sampling process and methodology for the mDAU Audit, including but not limited to (a) Documents or Communications sufficient to identify the population from which accounts are sampled for the mDAU Audit, and whether said population is the same population used for computing the mDAU number provided in Your quarterly reports, since January 2019; and (b) Documents and Communications sufficient to identify (i) Twitter-proprietary internal tool(s) used to code sample accounts, (ii) any changes to said methodology between January 1, 2020, and December 31, 2021, and further including all guidance, instructions, criteria, or best practices provided to Twitter's human labelers (including contractor agents hired by Twitter's outsourced vendors), Quality Analyst team, and/or in- house Twitter full time staff, in order to direct or instruct them in reviewing accounts and determining labels since January 2019, and (iii) the date(s) that each such guidance, instructions, criteria, or best practices were in use if not plain on the face of the documents. |
| RFP 18<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All Documents, Communications, and ESI since January 2019 reflecting, referring to, or relating to the results of each monthly mDAU Audit, including Documents, Communications, and ESI sufficient to identify (1) the "id" and "id_str" for each sampled account; (2) the date each account was sampled; (3) the creation date of each sampled account; (4) the date of each sampled account's last activity, log-in, or authentication; (5) the geo-location of each sampled account; (6) the self-reported location of each sampled account; (7) the location where each sampled account was created; (8) the human labeler(s), Quality Analyst(s), and/or in-house Twitter full time staff that reviewed each sampled account; (9) the designation given to each sampled account by each human labeler; (10) the designation given to each sampled account by each Quality Analyst; (11) the final designation given to each sampled account followed [sic] review by in-house Twitter full time staff, and (12) for each sampled account, each instance where the account was suspended after the date it was sampled for the mDAU Audit, include the date of each such suspension, the duration of each such suspension, and the reason(s) for each such suspension. |
| RFP 19<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All Documents and Communications reflecting, referring to, or relating to the human labelers, Quality Analysts, and/or in-house Twitter full time staff involved in the mDAU Audit for the purpose of determining whether a sampled account is false or spam, including but not limited to (a) all Documents and Communications reflecting, referring to, or relating to all information provided or made available to human labelers employed for the mDAU Audit; (b) the "private data" such as "IP address, phone number, geolocation, client/browser signatures, what the account does when it is active, etc.)" referred to in Your letter to Defendants dated June 20, 2022; (c) all Documents and Communications regarding the contractor agents and the outsourced vendors from which they are hired, including but not limited to (i) documents describing minimum qualifications for the human labelers; (ii) documents describing any testing or other criteria used to select human labelers; (iii) all feedback or other documents discussing the outsourced vendors' performance(s); (iv) documents regarding the outsourced vendors' compensation structure; (v) documents regarding changes in outsourced vendors; and (vi) all notes, records, and related Documents or Communications from Twitter employees who reviewed the human labelers' determinations. |

| RFP | Resp. | Requests for Production Served by Mr. Musk |
|---|---|---|
| RFP 20<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All Documents and Communications reflecting, referring to, or relating to Twitter's monitoring or detection of mismatch between the geolocations of login IP addresses of accounts and the stated location of the account. |
| RFP 21<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All Documents and Communications supporting, refuting, or otherwise relating to Twitter's representation on page 5 of its 2021 Form 10-K that "We have performed an internal review of a sample of accounts and estimate that the average of false or spam accounts during the fourth quarter of 2021 represented fewer than 5% of our mDAU during the quarter." |
| RFP 22<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | Documents, Communications, and ESI sufficient to identify (a) complete daily measures of mDAU for each day from January 1, 2020, to present, (b) for each day's mDAU measurement from January 1, 2020, to present (i) the number of accounts counted in that day's mDAU that tweeted, retweeted, replied to, or commented on a tweet; (ii) the number of accounts counted in that day's mDAU that did not perform the foregoing tweet actions but did favorite a tweet; (iii) the number of accounts counted in that day's mDAU that took none of the foregoing actions; and (c) each day from January 1, 2020, to present, (i) the number of accounts that tweeted, retweeted, replied to a tweet, commented on a tweet, or favorited a tweet, but were not counted in the mDAU measurement for the day on which such action was taken, and (ii) all reasons why such accounts were excluded from the mDAU. |
| RFP 23<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All Documents and Communications relating to Twitter Analytics regarding mDAU, churn, retention, spam, growth, and monetizability, including Documents or Communications defining any of these terms. |
| RFP 24<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | Communications, including e-mails, text messages, and other electronic communications, to and from Twitter management concerning (i) Twitter's mDAU metric, including calculation of that metric; (ii) spam accounts on Twitter, including calculation of the number of spam accounts; (iii) Twitter's disclosure of mDAU metric; and (iv) Twitter's disclosure of the number of spam accounts on the website. |
| RFP 25<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All Documents and Communications reflecting, referring to, or relating to user reports of spam or false accounts. |
| RFP 26<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All Documents or Communications reflecting, referring to, or relating to the April 28 mDAU restatement to the SEC, including but not limited to discussions of the need for that restatement, discovery of the issue underlying the restatement, communications with the SEC regarding the restatement, and whether or not to inform any of the Defendants about the restatement prior to it being issued. |

| RFP | Resp. | Requests for Production Served by Mr. Musk |
|---|---|---|
| | | |
| RFP 27 (Rev) 7-29-22 | R&O 8-5-22 | All Documents and Communications reflecting, referring to, or relating to Your use of any other user metric other than mDAU, including but not limited to, daily active users, monthly active users, daily user engagement, monthly user engagement, or advertisement engagements. |
| RFP 28 (Rev) 7-29-22 | R&O 8-5-22 | All Documents and Communications regarding any requests for consent that you have made or have contemplated making under Section 6.1 of the Merger Agreement. |
| RFP 29 (Rev) 7-29-22 | R&O 8-5-22 | Documents and Communications relating to Twitter's internal analyses of account suspensions, including Documents and Communications sufficient to show the frequency or rate at which accounts are suspended, changes to the frequency or rate of suspensions over time, the suspension reasons that Twitter uses to label or otherwise categorize or organize suspension data, the ages of suspended accounts, the duration accounts are inactive when they are suspended, the ad impressions served to suspended accounts, and performance metrics or KPIs that Twitter measures or tracks relating to suspensions and changes to those metrics or KPIs over time. |
| RFP 30 (Rev) 7-29-22 | R&O 8-5-22 | All Documents and Communications describing any process or workflow, other than the mDAU Audit and the suspension workflow, that Twitter uses to detect and label accounts as spam or false. |
| RFP 31 (Rev) 7-29-22 | R&O 8-5-22 | All Documents and Communications, including all alerts, reports, investigations, policies, procedures, and actions taken, reflecting, referring to, or relating to fraudulent or other unlawful schemes which occur on Twitter and the parties that generate it, including organized crime, bot farms, compromised account conspiracies, foreign actor opinion manipulation, and fraudulent financial schemes including but not limited to: cryptocurrency schemes; penny-stock schemes; phishing attacks; confidence, romance, or seduction schemes; and malware or viruses. |
| RFP 32 (Rev) 7-29-22 | R&O 8-5-22 | All Documents and Communications reflecting, referring to, or relating to Your policies and procedures regarding spam or malicious accounts, and any changes in Your policies and procedures regarding spam or malicious accounts, including but not limited to Your suspension of spam or malicious accounts. |
| RFP 33 (Rev) 7-29-22 | R&O 8-5-22 | All Documents or Communications reflecting, referring to, or relating to any machine learning or other automated tool(s) or process(es) used to detect spam and false accounts for platform integrity and authenticity, including in connection with suspension workflow(s), including documents describing Your testing, evaluation, and/or selection of any such machine learning or other automated tool(s) or process(es), the development of those tools or processes, |

| RFP | Resp. | Requests for Production Served by Mr. Musk |
|-----|-------|---------------------------------------------|
| | | the methodology or algorithm employed by those tools and processes to detect spam and false accounts, the frequency and extent to which those tools and processes are used, and the costs associated with operating those tools or processes. |
| RFP 34<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All Documents and Communications reflecting, referring to, or relating to Twitter's suspension of accounts including but not limited to (a) Twitter's decision not to employ in the mDAU Audit the machine learning or other automated tool(s) used to detect spam and false accounts for suspension; (b) how later suspensions are addressed in mDAU counts, including documents sufficient to determine (i) whether the mDAU population from which Twitter randomly samples selections of mDAU for human evaluation is the exact same mDAU population used to calculate average mDAU for purposes of quarter-end reporting; (ii) how each of these two mDAU populations address accounts that have, in the days or weeks since the day in question, been suspended as of the time of sample review or the end of the quarter; and (iii) the differences, if any, that exist between the two populations; (c) Documents and Communications sufficient to determine the number of accounts suspended each day from January 1, 2020 to present, including (i) the number of suspended accounts previously included in any mDAU figure used to calculate quarter-end average mDAU; (ii) the number of accounts suspended each day for each of Twitter's internal reasons for suspension; (iii) the average and median number of days accounts suspended on each day were registered prior to suspension; (iv) the average and median number of days accounts suspended on each day were included in mDAU prior to suspension; (v) for suspended accounts included in mDAU at least once prior to suspension, the average and median number of days the accounts were registered prior to suspension; and (vi) the number of accounts suspended on each day that were later unsuspended; and (d) all Documents and Communications reflecting, referring to, or relating to the workflow and processes for identifying and suspending accounts in violation of Twitter's policies, including the methodologies employed to identify and suspend such accounts. |
| RFP 35<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All Documents and Communications supporting, refuting, or otherwise relating to Twitter's statement that it removes more than 1 million spam accounts per day, as reported by Reuters on July 7, 2022. [FN: https://www.reuters.com/technology/twitter-says-it-removes-over-1-million-spam-accounts-each-day-2022-07-07/] |
| RFP 36<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All of Your Board Materials and Communications to, from, and among the Board members and the chief executive officer and the chief financial officer, related to (i) Twitter's mDAU metric, including calculation of that metric; (ii) spam accounts on Twitter, including calculation of the number of spam accounts; (iii) Twitter's disclosure of mDAU metric; and (iv) Twitter's disclosure of the number of spam accounts on the website. |
| RFP 37<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | Documents sufficient to show, since January 1, 2020, on a daily basis, the number of accounts counted in the mDAU measurement for that day that were not served any ad impressions on the same day. |

| RFP | Resp. | Requests for Production Served by Mr. Musk |
|---|---|---|
| RFP 38 (Rev) 7-29-22 | R&O 8-5-22 | All Documents and Communications reflecting, referring to, or relating to (a) how Twitter analyzes and communicates performance metrics, including, but not limited to, the number of expected impressions, to advertisers; and (b) sufficient to show how Twitter calculates each of the performance metrics that is [sic] displays or makes available the advertisers, including, but not limited to, the "audience estimate" metric, including documents sufficient to show how each such performance metric is calculated. |
| RFP 39 (Rev) 7-29-22 | R&O 8-5-22 | All Documents, Communications, and ESI reflecting, referring to, or relating to KPIs and Twitter Analytics, including, but not limited to (a) Documents, Communications, and ESI regarding the following KPIs: engagement, performance, growth, and TOI; (b) Documents sufficient to show how these KPIs and [sic] calculated; and (c) all APIs related to KPIs and Twitter Analytics. |
| RFP 40 (Rev) 7-29-22 | R&O 8-5-22 | All communications with media or press about the deal agreement, termination, litigation, or the Defendants or their agents. |
| RFP 41 (Rev) 7-29-22 | R&O 8-5-22 | Documents and ESI sufficient to determine, for each ad campaign launched on or after January 1, 2020: (a) information regarding the advertiser, including the location, sector, and size of the advertiser; (b) information regarding the campaign, including the start and end dates, budget, targets, and result types of the campaign and associated ad groups; (c) results and daily spending for the campaign, including type of results, results rate, cost per result, number of results, total spending, and cost per impression; (d) the following outcome measurements for the campaign, as described at https://business.twitter.com/en/advertising/measurement.html: Audience Measurement, Incremental Reach, Viewability, Brand Lift, Website Attribution, Mobile App Measurement, Location Measurement, Buy-Through Rate, TV Tune- In, Sales Impact, and Marketing Mix Modeling; (e) any bulk discounts or direct sales provided to large agencies or brands that impact advertising revenue; and (f) information tracked or estimated by Twitter regarding whether and how much the advertiser advertises on other platforms or media. |
| RFP 42 (Rev) 7-29-22 | R&O 8-5-22 | Documents and Communications describing the methodology employed by Twitter in determining each of the following outcome measurements, as described at https://business.twitter.com/en/advertising/measurement.html: Audience Measurement, Incremental Reach, Viewability, Brand Lift, Website Attribution, Mobile App Measurement, Location Measurement, Buy-Through Rate, TV Tune-In, Sales Impact, and Marketing Mix Modeling. |
| RFP 43 (Rev) 7-29-22 | R&O 8-5-22 | Documents sufficient to identify how Twitter determines which ad impressions to deliver to a particular user, including, but not limited to all data collection, reports and analyses regarding use of targeted advertising at Twitter. |
| RFP 44 (Rev) 7-29-22 | R&O 8-5-22 | All Documents and Communications relating to complaints by advertisers about being charged for spam, false, or bot impressions or actions. |
| RFP 45 | R&O 8-5-22 | All Documents relating to studies commissioned by Twitter regarding the effectiveness of advertising, including but not limited to "Conversation as a |

| RFP | Resp. | Requests for Production Served by Mr. Musk |
|---|---|---|
| (Rev) 7-29-22 | | Superpower Study" commissioned by Twitter and conducted by Bovitz in the U.S. in 2021. |
| RFP 46 (Rev) 7-29-22 | R&O 8-5-22 | All Documents and Communications regarding Your strategic response to Apple Tracking Transparency framework ("ATT"), referenced here https://developer.apple.com/documentation/apptrackingtransparency, including, but not limited to, internal reports, analyses or forecasts relating to ATT's expected impact on revenue, advertising effectiveness, utility of mDAU as a Key Metric, or ability to detect false or spam accounts. |
| RFP 47 (Rev) 7-29-22 | R&O 8-5-22 | Documents and Communications sufficient to show all criteria used by Twitter to determine which accounts are counted in and which accounts are excluded from Twitter's mDAU count on each day, and how each such criterion affects whether or not an account will be counted in a given day's mDAU count. |
| RFP 48 (Rev) 7-29-22 | R&O 8-5-22 | All Documents and Communications relating to Twitter's inclusion of accounts that are not served or rendered any ads on a given day in the mDAU count for that day, including (a) Documents and Communications sufficient to show which factors or criteria used to compute the daily mDAU resulted in each such account's inclusion in the mDAU count, (b) all Documents and Communications reflecting Twitter's knowledge or awareness that its mDAU count includes accounts that were not served or rendered any ads on one or more days when said accounts were included in the mDAU count; (c) all Documents and Communications relating to Twitter's reason(s) or justification(s) for including accounts that are not served or rendered any ads in the mDAU count; (d) Documents and Communications sufficient to show the reason(s) for Twitter's decision to make accounts ineligible for ads during their first seven days on the platform; and (e) Documents and Communications sufficient to show all reasons why an account that Twitter counts in its mDAU count for a given day may not be served or rendered any ads on that day, and the proportion or number of accounts that were counted in mDAU but not served or rendered any ads for each such reason. |
| RFP 49 (Rev) 7-29-22 | R&O 8-5-22 | All Documents and Communications from 2017 to present reflecting, referring to, or relating to any financial statements, performance, or projections generated by Twitter or any third party regarding Your business, including without limitation reflecting, referring to, or relating to (i) any assumptions, facts, inputs, performance indicators, forecasts or models relating to the foregoing, (ii) the ability of Twitter or any party or third party to forecast or project Twitter's future financial condition and results, (iii) the accuracy or inaccuracy of such forecasts and projections as compared to actual results, including all Documents concerning or referring to any revision of earnings guidance and forecasts for Twitter or any of its business segments; and (iv) any decision not to forecast or project Twitter's future financial conditions and results. |
| RFP 50 (Rev) 7-29-22 | R&O 8-5-22 | All Documents and Communications from 2017 to present regarding key performance and operational indicators used by Twitter, or that Twitter considered using to evaluate its performance, including but not limited to inputs and performance indicators used to generate projections and including projections and models prepared for investors (equity and debt), strategic partners, employee compensation, or financial reporting or tax purposes. |

| RFP | Resp. | Requests for Production Served by Mr. Musk |
|---|---|---|
| RFP 51 (Rev) 7-29-22 | R&O 8-5-22 | Documents sufficient to detail Twitter's financial performance including financial statements and detail regarding how Twitter calculated, on a quarterly basis from 2017 to present, (a) the amount of sales, revenues, costs, expenses, earnings, income, EBITDA, adjusted EBITDA, Non- GAAP Net Income, cash flow, and key operational or performance metrics of Twitter presented in Twitter's audited financial statements. |
| RFP 52 (Rev) 7-29-22 | R&O 8-5-22 | All Documents and Communications regarding your request to terminate your revolving credit facility, including but not limited to (a) credit agreements supporting such facility, (b) any draws or considerations to draw any revolving lines of credit, (c) the fees supposedly incurred on a monthly basis for the revolving credit facility. |
| RFP 53 (Rev) 7-29-22 | R&O 8-5-22 | All Documents and Communications relating to the July 7 briefing at Twitter referenced here https://www.reuters.com/technology/twitter- says-itremoves-over-1-million-spam-accounts-each-day-2022-07-07/, including any talking points, notes, or internal communications about the briefing. |
| RFP 54 (Rev) 7-29-22 | R&O 8-5-22 | All Documents and Communications reflecting, referring to, or relating to any analysis of the value or valuation of Twitter in whole or in part, or of the value of its stock, its business (in whole or in part), assets, or subsidiaries, including but not limited to any valuations performed by underwriters and/or banking institutions for purposes of negotiating or consummating a merger or acquisition of Twitter. |
| RFP 55 (Rev) 7-29-22 | R&O 8-5-22 | Documents sufficient to show Twitter's (i) working, bottoms- up financial and operating models and (ii) approved plan and/or budget, including models underlying the approved plan and/or budget for 2022 and 2023. |
| RFP 56 (Rev) 7-29-22 | R&O 8-5-22 | Documents, Communications, and ESI sufficient to determine revenue associated with each different type of Twitter ad engagement in Q4 2021. |
| RFP 57 (Rev) 7-29-22 | R&O 8-5-22 | All Documents and Communications from February 2021 through present reflecting, referring to, or relating to Your decision to sue the Indian government in the Karnataka High Court to seek judicial review of government "blocking orders" issued pursuant to the 2000 Information Technology Act, including, but not limited to, any Documents or Communications discussing the financial impact on Twitter of (i) litigating the lawsuit in the High Court and (ii) any potential outcomes. |
| RFP 58 (Rev) 7-29-22 | R&O 8-5-22 | All Documents and Communications relating, referring or reflecting any internal deliberation regarding whether to notify Defendants of Your decision to sue the Indian government in the Karnataka High Court. |
| RFP 59 (Rev) 7-29-22 | R&O 8-5-22 | All Documents and Communications used to analyze user growth and/or conclude that Twitter experienced a "25% increase" in users that visited the website daily and a "35% increase in daily signups" in Q4 2021, as referenced here https://s22.q4cdn.com/826641620/files/doc_multimedia/JPM- High-Yield-2022-Transcript.pdf. |

| RFP | Resp. | Requests for Production Served by Mr. Musk |
|---|---|---|
| RFP 60<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All Documents and Communications relating to Your goal to reach 315 million mDAU by the end of 2023, referenced here https://s22.q4cdn.com/826641620/files/doc_multimedia/JPM-High-Yield-2022-Transcript.pdf, including, but not limited to, all strategic plans, internal memoranda, analyses, product specifications documents and projections, discussing feasibility, obstacles and potential product improvements or innovations. |
| RFP 61<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All Documents reflecting business plans or analyses for achieving mDAU targets. |
| RFP 62<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All Documents and Communications relating to the resignation offered by Board member Egon Durban, and Your decision to retain Mr. Durban as a member of the Board, as referenced here https://www.sec.gov/ix?doc=/Archives/edgar/data/1418091/000119312522161795/ d340224d8k.htm, including, but not limited to, Communications with International Shareholder Services regarding Mr. Durban's Board membership. |
| RFP 63<br><br>(Rev)<br>7-29-22 | R&O<br>8-5-22 | All Documents and Communications reflecting or relating to aggregate data collected about the demographics of new users of Twitter. |
| RFP 1<br><br>Set 2<br>(Rev)<br>8-12-22 | R&O<br>8-19-22 | All Documents and Communications relating to the "Too Young to Tell" ("TYTT") category of accounts, as referenced in the Twitter internal training presentation entitled "Spam Evaluation Training" (Bates ID TWTR_000029515, at  TWTR_000029605  to  TWTR_000029608),  including, without limitation, Documents and Communications relating to (a) the role of TYTT accounts in Your classification and audit process; (b) the internal decision not to include TYTT accounts in mDAU spam audits; and (c) the decision not to disclose to Defendants the existence of the TYTT category of accounts. |
| RFP 2<br><br>Set 2<br>(Rev)<br>8-12-22 | R&O<br>8-19-22 | All Documents and Communications reflecting, referring to, or relating to Project Cypress. |
| RFP 3<br><br>Set 2<br>(Rev)<br>8-12-22 | R&O<br>8-19-22 | All Documents, Communications, and ESI reflecting, referring to, or relating to user active minutes per mDAU ("UAM/mDAU") and daily tweet impressions per mDAU. |
| RFP 4<br><br>Set 2<br>(Rev)<br>8-12-22 | R&O<br>8-19-22 | ESI sufficient to show deciles for UAM for all mDAU accounts since January 1, 2021 by country. |
| RFP 5<br><br>Set 2 | R&O<br>8-19-22 | ESI sufficient to show the number of mDAU accounts since January 1, 2021 that were subject to tweet level Visibility Filtering, account level Visibility Filtering, or Downranking, as well as deciles for UAM for all such accounts, by country. |

| RFP | Resp. | Requests for Production Served by Mr. Musk |
|---|---|---|
| (Rev) 8-12-22 | | |
| RFP 6<br><br>Set 2<br>(Rev)<br>8-12-22 | R&O<br>8-19-22 | All Document, Communications, and ESI supporting your contention [sic] supporting your denial of "the allegations of Paragraph 138 [of Defendants' Counterclaims] to the extent they imply that the internal data provided to Musk demonstrates that more than 65 million accounts counted in mDAU in Q1 2022 did not see any ads in that quarter." |
| RFP 7<br><br>Set 2<br>(Rev)<br>8-12-22 | R&O<br>8-19-22 | All Documents referring to, relating to, or reflecting Your internal policies, procedures, and guidelines related to use of Twitter email addresses by Directors, officers, and employees, including all policies and procedures for independent/outside Board directors for use of non-Twitter email accounts. |
| RFP 8<br><br>Set 2<br>(Rev)<br>8-12-22 | R&O<br>8-19-22 | All Documents and Communications relating to the DICE survey platform. |
| RFP 9<br><br>Set 2<br>(Rev)<br>8-12-22 | R&O<br>8-19-22 | All Documents and Communications relating to Visibility Filtering, including training data, model performances, and tradeoff frameworks, and all Documents and Communications relating to "Loopbird." |
| RFP 10<br><br>Set 2<br>(Rev)<br>8-12-22 | R&O<br>8-19-22 | ESI sufficient to show the portion of accounts counted in mDAU each day in Q4 2021 that had any interactions with the platform that were subject to a Spam flag. |
| RFP 11<br><br>Set 2<br>(Rev)<br>8-12-22 | R&O<br>8-19-22 | All Documents and Communications relating to any audit(s) that identified a possible product surface not properly integrated with automated or human driven moderation or enforcement for spam, artificial amplification, and abusive interactions. |
| RFP 12<br><br>Set 2<br>(Rev)<br>8-12-22 | R&O<br>8-19-22 | All Documents and Communications relating to any instance in which ROPO3 or any predecessor framework has been relaxed or waived. |
| RFP 13<br><br>Set 2<br>(Rev)<br>8-12-22 | R&O<br>8-19-22 | Documents and Communications sufficient to explain the implementation and operation of the 3 Health levers described in Twitter's Quarterly Narrative Q1 2021: "1) Reducing prevalence of and customers' exposure to unhealthy content & behaviors, 2) Improving our response to customers when they ask for support, and 3) Providing product mechanisms for customers to protect themselves against unwanted content and behaviors." |

| RFP | Resp. | Requests for Production Served by Mr. Musk |
|---|---|---|
| RFP 14<br><br>Set 2<br>(Rev)<br>8-12-22 | R&O<br>8-19-22 | All Documents, Communications, and ESI reflecting, referring to, or relating to red team exercises regarding spam or Health reviews. |
| RFP 15<br><br>Set 2<br>(Rev)<br>8-12-22 | R&O<br>8-19-22 | All Documents and Communications relating to Twitter's funding for the area of "Fake Engagement." |
| RFP 1<br><br>Set 4<br>9-1-22 | | All Documents and Communications regarding the Zatko FTC/SEC/DOJ Complaint. |
| RFP 2<br><br>Set 4<br>9-1-22 | | All Documents and Communications regarding the Zatko Twitter Presentation. |
| RFP 3<br><br>Set 4<br>9-1-22 | | All Documents and Communications regarding the Report on Platform Integrity. |
| RFP 4<br><br>Set 4<br>9-1-22 | | All Documents and Communications regarding any actions taken by Twitter in response to the Zatko FTC /SEC/DOJ Complaint, including any internal investigation that was conducted and/or any remedial actions taken to remedy the issues raised. |
| RFP 5<br><br>Set 4<br>9-1-22 | | All Documents and Communications regarding any actions taken by Twitter in response to Zatko's Twitter Presentation, including any internal investigation that was conducted and/or any remedial actions taken to remedy the issues raised. |
| RFP 6<br><br>Set 4<br>9-1-22 | | All Documents and Communications regarding any actions taken by Twitter in response to the Report on Platform Integrity, including any internal investigation that was conducted and/or any remedial actions taken to remedy the issues raised. |
| RFP 7<br><br>Set 4<br>9-1-22 | | All Documents and Communications referenced in the Zatko FTC/SEC/DOJ Complaint. |
| RFP 8<br><br>Set 4<br>9-1-22 | | All Documents and Communications referenced in the Zatko Twitter Presentation. |

| RFP | Resp. | Requests for Production Served by Mr. Musk |
|---|---|---|
| RFP 9<br><br>Set 4<br>9-1-22 | | All Documents and Communications referenced in the Report on Platform Integrity. |
| RFP 10<br><br>Set 4<br>9-1-22 | | All Communications between Zatko and Parag Agrawal, Twitter's board or directors, Jisha Dymond, Sean Edgett, Vijaya Gadde, or Ned Segal regarding security vulnerabilities at Twitter. |
| RFP 11<br><br>Set 4<br>9-1-22 | | All Documents and Communications presented to Parag Agrawal, Twitter's board or directors, Jisha Dymond, Sean Edgett, Vijaya Gadde, or Ned Segal by Twitter's Information Security group. |
| RFP 12<br><br>Set 4<br>9-1-22 | | All board materials, including meeting minutes and presentations, concerning the matters raised in the Zatko FTC/SEC/DOJ Complaint. |
| RFP 13<br><br>Set 4<br>9-1-22 | | All board materials, including meeting minutes and presentations, concerning the matters raised in the Zatko Twitter Presentation. |
| RFP 14<br><br>Set 4<br>9-1-22 | | All board materials, including meeting minutes and presentations, concerning the matters raised in the Report on the Report on Platform Integrity. |
| RFP 15<br><br>Set 4<br>9-1-22 | | Documents sufficient to show when Twitter learned of the Zatko FTC/SEC/DOJ Complaint. |
| RFP 16<br><br>Set 4<br>9-1-22 | | Any "Assessment" prepared by, for, or on behalf of Twitter, as that term is defined in the FTC Consent Order. |
| RFP 17<br><br>Set 4<br>9-1-22 | | All Documents and Communications relating to the preparation of any Assessment, including Documents sufficient to show questions from third parties for Twitter in preparing such Assessment and Twitter's responses to such questions, as well as Documents and Communications cited in or relied on by Twitter's responses. |
| RFP 18<br><br>Set 4<br>9-1-22 | | Documents sufficient to show all policies and procedures implemented by Twitter to comply with the FTC Consent Order and all analyses conducted by Twitter to assess their compliance with the FTC Consent Order and policies and procedures therein. |
| RFP 19<br><br>Set 4 | | Documents sufficient to show all threatened litigation (whether private or related to government action), regulatory action, or enforcement actions against Twitter relating to the FTC Consent Order. |

| RFP | Resp. | Requests for Production Served by Mr. Musk |
|---|---|---|
| 9-1-22 | | |
| RFP 20<br><br>Set 4<br>9-1-22 | | Documents sufficient to show all threatened litigation (whether private or related to government action), regulatory action, or enforcement actions against Twitter regarding its (1) audience or engagement metrics, including mDAU; (2) cybersecurity hacks or breaches; (3) compliance with any applicable law or regulation, including the FTC Consent Order; (4) security, cybersecurity, privacy or software development procedures and practices; (5) use or misuse of user data, (6) false or spam accounts on Twitter or (7) compliance or non-compliance with any software or data license. |
| RFP 21<br><br>Set 4<br>9-1-22 | | Documents sufficient to show all Whistleblower Complaints that Twitter is aware of regarding its (1) audience or engagement metrics, including mDAU; (2) cybersecurity hacks or breaches; (3) compliance with any applicable law or regulation, including the FTC Consent Order; (4) security, cybersecurity, privacy or software development procedures and practices; (5) use or misuse of user data, (6) false or spam accounts on Twitter or (7) compliance or non-compliance with any software or data license. |
| RFP 22<br><br>Set 4<br>9-1-22 | | Documents sufficient to show Twitter's policies and procedures regarding its security practices, including but not limited to, any policies and procedures regarding access controls and/or permission for accessing sensitive user data, production systems, and code bases. |
| RFP 23<br><br>Set 4<br>9-1-22 | | All analyses, memos, or reports regarding Twitter's compliance or non-compliance with its policies and procedures regarding its security practices. |
| RFP 24<br><br>Set 4<br>9-1-22 | | Documents sufficient to show Twitter's policies and procedures regarding its cybersecurity practices, including but not limited to, any policies and procedures regarding investigation and remediation of cybersecurity breaches and/or steps taken to mitigate cybersecurity threats, hacks, or other unauthorized access to data or systems. |
| RFP 25<br><br>Set 4<br>9-1-22 | | All analyses, memos, or reports regarding Twitter's compliance or non-compliance with its policies and procedures regarding its cybersecurity practices. |
| RFP 26<br><br>Set 4<br>9-1-22 | | Documents sufficient to show Twitter's policies and procedures regarding its software development practices, including but not limited to any policies and procedures regarding code development, code testing, and code deployment. |
| RFP 27<br><br>Set 4<br>9-1-22 | | All analyses, memos, or reports regarding Twitter's compliance or non-compliance with its policies and procedures regarding its software development practices. |
| RFP 28<br><br>Set 4<br>9-1-22 | | All analyses, memos, or reports concerning Twitter's potential or actual infringement on any third party's intellectual property. |

DEFENDANT ELON MUSK'S DISCLOSURES PURSUANT TO FED. R. CIV. PROC. 26

| RFP | Resp. | Requests for Production Served by Mr. Musk |
|---|---|---|
| RFP 29<br><br>Set 4<br>9-1-22 | | All analyses, memos, or reports concerning the vulnerability of Twitter's data centers to outages or shutdowns. |
| RFP 30<br><br>Set 4<br>9-1-22 | | All Documents and Communications regarding Twitter's compliance or non-compliance with any software or data license or Twitter's infringement on any copyright or patent of any third party related to its machine learning algorithms or training data. |
| RFP 31<br><br>Set 4<br>9-1-22 | | Documents sufficient to show all cybersecurity or breach incidents for Twitter between January 1, 2021 to present, including the impact of those incidents (including which data or systems were compromised), the cause(s) of those incidents, analyses done by Twitter regarding those incidents, and steps taken by Twitter to remediate and prevent future cybersecurity incidents. |
| RFP 32<br><br>Set 4<br>9-1-22 | | All Documents and Communications regarding Zatko's performance reviews. |
| RFP 33<br><br>Set 4<br>9-1-22 | | All Documents and Communications regarding Twitter's employment of any agent or representative of a foreign government, including any member of such government's military, intelligence or security services, or national or state level police services. |
| RFP 34<br><br>Set 4<br>9-1-22 | | Documents sufficient to show Twitter's document retention policies. |
| RFP 35<br><br>Set 4<br>9-1-22 | | All demands or threats of litigation made by Zatko against Twitter between October 1, 2021 and present. |
| RFP 36<br><br>Set 4<br>9-1-22 | | Documents sufficient to show all communications between Zatko and investors (or prospective investors) in Twitter and/or equity analysts of Twitter. |

DEFENDANT ELON MUSK'S DISCLOSURES PURSUANT TO FED. R. CIV. PROC. 26

| RFI | Resp. | Request for Inspection Served by Musk |
|-----|-------|----------------------------------------|
| RFI 1 | R&O 9-19-22 | Direct, real-time access to the ADAP review system, providing the same level(s) of access granted to human labelers, Quality Analysts, and/or inhouse Twitter full time staff who perform labeling or review tasks in connection with the mDAU audit (access under each level of access should be provided if those levels differ between human labelers, Quality Analysts, and in-house Twitter full time staff), and displaying all of the data (whether that data is stored or displayed in realtime) that is displayed or otherwise accessible to the human labelers, Quality Analysts, and in-house Twitter full time staff when they access the system. |

DEFENDANT ELON MUSK'S DISCLOSURES PURSUANT TO FED. R. CIV. PROC. 26

| 30(b)(6) | Delaware Action Depositions | Date |
|---|---|---|
| N | Agrawal, Parag | 2022.10.03 |
| Y | Anargyros, Emmy [Twitter] | 2022.09.02 |
| N | Armstrong, Anthony | 2022.09.22 |
| N | Berger, David | 2022.09.29 |
| N | Bessinger, Krista | 2022.09.01 |
| Y | Birchall, Jared [XHI and XHII] | 2022.09.21 |
| N | Brahmy, Dan | 2022.09.30 |
| N | Brand, Dalana | 2022.09.22 |
| Y | Caggiano, Marco [JPM] | 2022.10.03 |
| N | Chabria, Manish | 2022.09.06 |
| N | Claassen, Kate | 2022.09.16 |
| N | Conti, Stacey | 2022.09.02 |
| N | Cope, Kevin | 2022.09.09 |
| N | Dilworth, Timothy | 2022.10.04 |
| N | Dorsey, Jack | 2022.09.20 |
| Y | Doughty, William [Twitter] | 2022.08.31 |
| N | Durban, Egon | 2022.09.27 |
| N | Dweck, John | 2022.09.16 |
| Y | Earls, Andrew [Morgan Stanley] | 2022.09.22 |
| N | Edgett, Sean | 2022.09.23 |
| N | Faibish, Corey | 2022.08.31 |
| N | Falck, Bruce | 2022.10.04 |
| N | Gadde, Vijaya | 2022.10.04 |
| N | Gracias, Antonio | 2022.09.22 |
| N | Grimes, Michael | 2022.09.15 |

| 30(b)(6) | Delaware Action Depositions | Date |
|:---:|---|:---:|
| N | Hayes, Julianna | 2022.09.02 |
| Y | Hazan, Jeremy [Barclays Bank] | 2022.10.06 |
| N | Kaiden, Robert | 2022.09.15 |
| N | Kieran, Damien | 2022.09.27 |
| N | Knowlton, Richard | 2022.09.30 |
| N | Korman, Marty | 2022.09.22 |
| N | Neuhaus, Jon | 2022.09.14 |
| N | O'Malley, Patrick | 2022.08.30 |
| N | Polhemus, Rick | 2022.09.21 |
| N | Roth, Yoel | 2022.09.17 |
| N | Sacks, David | 2022.09.14 |
| N | Salen, Kristina | 2022.08.31 |
| N | Segal, Ned | 2022.09.28 |
| N | Sheftel, Brad | 2022.09.23 |
| Y | Silverstein, Stefani [Goldman Sachs] | 2022.09.21 |
| N | Smythe, Will | 2022.09.08 |
| N | Spencer, Richard | 2022.09.16 |
| N | Swan, Robert | 2022.09.12 |
| N | Taylor, Bret | 2022.09.27 |
| N | Zatko, Peiter | 2022.09.29 |

| 30(b)(6) Deponents | 30(b)(6) Topics |
|---|---|
| Anargyros, Emmy [Twitter] | *Second Notice to Twitter dated 2022.08.05:*<br><br>1. Identification and description of any systems, databases, files, and types of Documents maintained by Twitter relating to its calculation or analysis of spam and false accounts, including internal reporting, presentations, and summaries provided to Your Board of Directors and management.<br><br>2. Identification and description of any systems, databases, files, and types of Documents maintained by Twitter relating to its calculation or analysis of mDAU, including internal reporting, presentations, and summaries provided to Your Board of Directors and management.<br><br>3. Identification and description of any systems, databases, files, and types of Documents maintained by Twitter relating to its calculation or analysis of user statistics and user engagement, including internal reporting, presentations, and summaries provided to Your Board of Directors and management.<br><br>4. Identification and description of any systems, databases, files, and types of Documents maintained by Twitter relating to its calculation or analysis of revenue growth, including internal reporting, presentations, and summaries provided to Your Board of Directors and management.<br><br>5. Identification and description of Your business operations policies and procedures regarding:<br>    a.  Your identification of and response to spam and false accounts;<br>    b.  Product development and implementation and research and development priorities relating to spam and false accounts;<br>    c.  Your information technology, information security, and incident response relating to spam and false accounts;<br>    d.  Your maintenance, support, and customer service functions relating to spam and false accounts; and<br>    e.  Your professional services and implementation or installation services relating to spam and false accounts.<br><br>6. Identification and description of Twitter's human resources policies and procedures regarding:<br>    a.  Terminations and      performance reviews of executive-level employees;<br>    b.  Hiring freezes;<br>    c.  Recruitment; and<br>    d.  Methods for contracting for, giving feedback to, paying, and selecting employees, vendors, and contractors for spam and false account sampling.<br><br>7. Identification and description of Your user data retention policies and procedures regarding:<br>    a.  Your process for collecting any and all data and information from users;<br>    b.  Your process for storing and accessing any such user data and information;<br>    c.  Metrics measured, documented, analyzed, or considered by You in the ordinary course of business to analyze any such user data and information; and<br>    d.  Reports created in the ordinary course of business to analyze user data and information, including any aggregate reports regarding user demographics.<br><br>8. Identification and description of Your customer and sales policies and procedures regarding:<br>    a.  Pricing, discounts, payment, and other contractual terms with |

| 30(b)(6) Deponents | 30(b)(6) Topics |
|---|---|
|  | advertising customers;<br>  b.  Sales objectives, targets, estimates, incentives, or commissions; and<br>  c.  Customer satisfaction or product or service issues or complaints.<br>9. Identification and description of Your accounting and financial planning and analysis policies and procedures regarding:<br>  a.  Financial forecasting or projections (including of annual recurring revenue, total revenue, and earnings);<br>  b.  Tracking of Your financial performance;<br>  c.  Advertising; and<br>  d.  Preparing Your financial statements for submission to regulatory authorities or for earnings calls (including revenue recognition and cost allocation).<br>10. Identification and description of Your human resources metrics and reports regarding:<br>  a.  Reports created in the ordinary course of business to measure performance of employees; and<br>  b.  Metrics measured, documented, analyzed, or considered by You in the ordinary course of business to measure performance of employees.<br>11. Explanation of how You determined key performance indicators ("KPIs"), what else you considered in determining Your KPIs, and how You use KPIs in the ordinary course of business.<br>12. Identification and description of Your accounting and financial planning metrics and reports regarding:<br>  a.  KPIs or other metrics measured, documented, analyzed, or considered by You in the ordinary course of business;<br>  b.  Any reports generated by You including any KPI or other metrics in the ordinary course of business;<br>  c.  Any reports, analysis, or benchmarking of Your business against competitors or industry peers;<br>  d.  Financial reports created in the ordinary course of business; and<br>  e.  Financial metrics measured, documented, analyzed, or considered by You in the ordinary course of business.<br>13. Identification and description of Your business operations metrics and reports regarding:<br>  a.  Product development or engineering progress reports created in the ordinary course of business;<br>  b.  Metrics measured, documented, analyzed, or considered by You to measure product development or engineering in the ordinary course of business;<br>  c.  Reports created in the ordinary course of business to measure product installations;<br>  d.  Metrics measured, documented, analyzed, or considered by You in the ordinary course of business to measure product installations.<br>14. Identification of Your personnel involved with generating, tracking, measuring, and/or maintaining any of the documents, practices, metrics, reports, or analysis listed in Topics 1 through 13, including the person's job title, role within Twitter's organization structure, and any direct reports.<br>15. Twitter's organizational structure at every point in time between January 1, 2017 and present; all Twitter departments in existence between January 1, 2017 and present and the purpose and leadership of such departments; the identification of all departments, subdepartments, and employees who (a) are involved in developing, measuring, monitoring, and managing KPIs, (b) are involved in Twitter's efforts to estimate the prevalence of false and spam |

| 30(b)(6) Deponents | 30(b)(6) Topics |
|---|---|
| | Twitter accounts among mDAU, and (c) are primarily responsible for the technology used in the suspension workflow to detect false and spam Twitter accounts, and the reporting structure within such departments and subdepartments. |
| | 16. Twitter's policies, practices, software, hardware, and systems relating to the storage, management, retention, and destruction of Documents and Communications. |
| | 17. Twitter's efforts to ensure that Documents relating to the Discovery Requests and/or the Complaint were properly preserved, including any related litigation hold or document preservation letters or notices. |
| | 18. Twitter's efforts to retrieve text messages, instant messages, and other non-email Communications. |
| Birchall, Jared [XHI and XHIII] | *Notice to **XHI** dated 2022.08.11:* |
| | 1. The April 4, 2022 Letter Agreement, the April 13, 2022 Proposal, the April 24, 2022 Offer, any consideration by Defendants of any other potential acquisition or other strategic transaction involving Twitter, the Merger, the Merger Agreement, the Limited Guarantee, the June 6, 2022 Letter, and the July 8, 2022 Letter, and any financing with respect to any of the foregoing or any transaction contemplated thereby (including but not limited to the Debt Financing, the Equity Financing, and/or the Financing Commitments). |
| | 2. All efforts to syndicate and/or arrange, document, negotiate the terms of, or consummate the Debt Financing and close the Merger, including the status of or expected timeline for such efforts. |
| | 3. All efforts to solicit Co-Investors, arrange or negotiate equity co-investments, and/or arrange, document, syndicate, or consummate the Equity Financing, including those concerning the status of or expected timeline for such efforts. |
| | 4. All efforts undertaken by Defendants or Defendants' Advisors, on or after May 13, 2022, to obtain, syndicate, arrange, finalize, and/or consummate the Debt Financing, close the Merger, and/or cause all of the conditions for closing the Merger to be satisfied. |
| | 5. The Margin Loan Commitment, including without limitation (i) the reduction of the amount of the Margin Loan Commitment and reasons for such reduction; and (ii) the subsequent termination of the Margin Loan Commitment and reasons for such termination. |
| | 6. Any potential tender offer by or on behalf of Defendants for some or all of Twitter's shares, including without limitation Defendants' negotiation of the debt commitment letter, dated April 20, 2022, attached as Exhibit C to Amendment No. 3 to Schedule 13D, filed by Equity Investor with the SEC on April 21, 2022. |
| | 7. Defendants' requests or potential requests for information pursuant to Section 6.4 and/or Section 6.11 of the Merger Agreement and any information provided by Twitter, or on Twitter's behalf, in response to any such request for information, including without limitation any analyses, audits, or investigations performed by or at the direction of You and/or Defendants' Advisors, the Lenders, or the Co-Investors, relating to Twitter's API or "firehose" data provided to Defendants or any other information provided by Twitter, or on Twitter's behalf, in response to any information request by You or on Your behalf. |
| | 8. Any request made by Twitter, or on Twitter's behalf, seeking Defendants' consent pursuant to Section 6.1 of the Merger Agreement with respect to (i) the implementation of employee retention programs; (ii) the termination of a revolving credit facility; (iii) an application for a money transmitter license; or |

| 30(b)(6) Deponents | 30(b)(6) Topics |
|---|---|
|  | (iv) any other proposed course of action, corporate policy, or other decision related to the conduct of Twitter's business, including Defendants' assessment of and/or decision whether or not to provide their consent and/or whether or not the proposed course of action, corporate policy, or other decision was commercially reasonable under the circumstances, including all of the reasons Defendants declined to provide consents to Twitter's requests under the Merger Agreement described in paragraphs 119 through 122 of the Complaint, including without limitation all of the reasons why You initially provided, but thereafter withdrew, any such consent. |

9. False or spam accounts or bots on the Twitter platform and the disclosures in Twitter's SEC filings discussed in Paragraphs 64 and 66 of the Complaint, including without limitation (i) any analyses, audits, or investigations performed or conducted by or at the direction of You and/or Defendants' Advisors, or of which You are aware, relating to these subjects, whether performed or conducted prior or subsequent to the execution of the Merger Agreement; (ii) any analyses, audits, or investigations that You and/or Defendants' Advisors considered undertaking, or that You and/or Defendants' Advisors considered having others undertake on Your or their behalf, relating to these subjects; and (iii) Your decision to execute the Merger Agreement without further due diligence on these subjects.

10. The effects or potential effects of changes in the price of Tesla common stock on (i) the Merger; (ii) the Debt Financing; (iii) the Equity Financing; (iv) the Financing Commitments; and/or (v) Your intentions with respect to closing and/or efforts to close the Merger, and Defendants' knowledge and consideration of such topics.

11. Any Communications between (a) Defendants or Defendants' Advisors and (b) any Governmental Authority, concerning (i) the Merger; (ii) the Merger Agreement; (iii) the Proxy Statement; or (iv) Twitter, including the purpose of such Communications, the nature and substance of such Communications, and at whose request such Communications were made.

12. Defendants' purported termination of the Merger Agreement, including without limitation (i) any consideration of whether and on what grounds to purport to terminate the Merger Agreement; (ii) any consideration of potentially renegotiating the Merger Agreement; (iii) the preparation of the June 6, 2022 Letter; and (iv) the preparation of the July 8, 2022 Letter.

13. Defendants' contention in the July 8, 2022 Letter that Twitter is "likely to suffer a Company Material Adverse Effect," including without limitation any valuations, forecasts, projections, estimates, or other analyses relating to whether Twitter is likely to suffer a Company Material Adverse Effect.

14. Forecasts, projections, estimates, or other analyses created by Defendants, Defendants' Advisors, the Lenders, or the Co-Investors, or on Your or their behalf, relating to Twitter's current or future performance, financial condition, or value, including without limitation any projections of Twitter's revenues, EBITDA, earnings, and cash flows, and all Documents and Communications concerning such forecasts, projections, estimates, or analyses.

15. Any plans or potential plans made or considered by Defendants to create or develop a social media platform and/or alternative or competitor to Twitter, including without limitation any plans or potential plans concerning X.com, and including without limitation the origin, history, and timeline of such plans, and all other Persons involved in such plans or with whom Equity Investor has discussed such plans.

16. Your strategic or business plans for Twitter, including without limitation

| 30(b)(6) Deponents | 30(b)(6) Topics |
|---|---|
| | (i) all plans to address issues relating to false or spam accounts on the Twitter platform; (ii) all plans relating to employee retention programs or incentives; and (iii) all plans relating to potential changes to the size and/or composition of Twitter's workforce. |
| | 17. The engagement, the work, and the termination of Bob Swan and/or the cessation of Bob Swan's involvement on Defendants' behalf in connection with the Merger and the Debt Financing, including the reasons that Defendants determined that Bob Swan should "depart the deal proceedings" on or about June 23, 2022, including due to the disconnect in "wavelength" between You and Bob Swan, as described in Paragraph 110 of the Complaint. |
| | 18. The actual or potential engagement or involvement of Antonio Gracias to act on Defendants' behalf in connection with the Merger and the Debt Financing and the work Antonio Gracias performed in that capacity, including all of the ways that Antonio Gracias allegedly "dove in to the financing as soon as he was brought on" to replace Bob Swan, as referenced in Paragraph 198 of the Counterclaim. |
| | 19. The directors, officers, employees, and owners of X Holdings I, Inc., X Holdings II, Inc., and X Holdings III, LLC, and the relationships between them and Equity Investor. |
| | 20. Defendants' and Defendants' Advisors' use of the "Botometer" tool described in Paragraph 116 and Footnote 16 of the Counterclaim. |
| | 21. The engagement of the Data Scientists, including without limitation (i) the identification of all Data Scientists and when they were engaged; (ii) the scope and purpose of any such engagement; (iii) how such Data Scientists came to be engaged; (iv) the nature of any agreements, arrangements, or understandings between the Data Scientists and Defendants or Defendants' Advisors. |
| | 22. All Persons that Defendants or Defendants' Advisors communicated with about a potential engagement as a Data Scientist that were not engaged as a Data Scientist, including without limitation (i) the identification of all such Persons; (ii) the timeline during which such potential engagement was considered; and (iii) all reasons such engagement did not take place. |
| | 23. All work performed by the Data Scientists, including without limitation (i) the instructions received by the Data Scientists; (ii) the scope of the Data Scientists' work; (iii) the timeline of the Data Scientists' work; (iv) a description of the work performed by each individual working as or for a Data Scientist; (v) the findings, conclusions, and results of such work. |
| | 24. The financial model allegedly prepared by Morgan Stanley as described in Paragraphs 34 and 166 of the Counterclaim and, to the extent different than the financial model, the valuations allegedly prepared by Morgan Stanley as described in Paragraph 78 of the Counterclaim, including the extent to which Defendants received, reviewed, or discussed the referenced model prior to April 25, 2022, and the extent to which Defendants relied upon the referenced model. |
| | 25. Any "additional business models" that Defendants allegedly considered as a means to "unlock Twitter's true value," as described in Paragraph 39 of the Counterclaim, including without limitation the "subscription-based model" referenced in that same Paragraph, the projected or anticipated value of Twitter based on such business models, and the relevance of mDAU to such business models. |
| | 26. Defendants' knowledge of Twitter's litigation with the Indian government and/or any content-removal orders issued to Twitter by the Indian government, as discussed in Paragraphs 18 and 181 through 185 of the Counterclaim, including without limitation when Defendants became aware of such litigation |

| 30(b)(6) Deponents | 30(b)(6) Topics |
|---|---|
| | and/or content-removal orders and who made them aware of such orders. |
| | 27. All "key decisions" that Twitter allegedly made "outside the ordinary course without consulting the Musk Parties," as alleged in Paragraphs 186 through 195 of the Counterclaim. |
| | 28. The extent to which Defendants undertook any review, prior to executing the Merger Agreement, of each of the allegedly false and misleading statements discussed at Paragraphs 109 through 149 of the Counterclaim. |
| | 29. The reliance of Defendants and/or Defendants' Advisors on Twitter's representations in its SEC filings, as alleged in Paragraph 27 of the Counterclaim. |
| | 30. Defendants' beliefs about the number and/or prevalence of false or spam accounts or bots on the Twitter platform, including all bases for such beliefs and Defendants' allegations set forth in Paragraphs 212 and 213 of the Counterclaim that "[a]t the time of the Merger Agreement, Defendants/Counterclaim-Plaintiffs did not know the false or misleading statements or omissions" and "[h]ad Defendants/Counterclaim-Plaintiffs known about the false or misleading statements and omissions, they would not have entered into the Merger Agreement." |
| | 31. Defendants' bases for contending that "statement[s] of material fact" in documents that Twitter has filed with the SEC since January 1, 2022 were "untrue" or "misleading," including statements that Defendants contend contained representations that "fewer than 5%" of Twitter's mDAU are false or spam accounts. |
| | 32. Defendants' understanding of Twitter's mDAU recast in April 2022, as discussed in Paragraphs 9 and 79 through 81 of the Counterclaim. |
| | 33. The "preliminary analysis by Mr. Musk's advisors" and the results thereof described in the final paragraph of page 6 of Defendants' July 8 letter. |
| | 34. Defendants' alleged belief that "due diligence processes can be costly and inefficient," as set forth in Paragraph 60 of the Counterclaim. |
| | 35. Defendants' alleged assumption that Twitter "rel[ied] on automation, artificial intelligence, and machine learning" to count false or spam accounts, as described in Paragraph 83 of the Counterclaim. |
| | 36. Defendants' understanding of the "stratification" or potential stratification of Twitter's mDAU, as that term is used in Paragraph 141 of the Counterclaim, whether performed before or after the execution of the Merger Agreement. |
| | 37. Defendants' allegation that "nearly a third of Twitter's mDAU in fact see no ads and appear to generate no revenue at all," as set forth in Paragraph 138 of the Counterclaim. |
| | 38. Defendants' knowledge and understanding of their allegation that "mDAU growth is not occurring among high-value users," as set forth in Paragraph 142 of the Counterclaim. |
| | 39. All allegations in Defendants' Counterclaim. |
| | 40. Defendants' understanding of how many false or spam accounts existed on the Twitter platform as of July 8, 2022, in absolute terms and as a percentage of Twitter's mDAU, and all their bases for that understanding as of that date. |
| | 41. Defendants' policies, practices, software, hardware, and systems relating to the storage, management, retention, and destruction of Documents and Communications. |
| | 42. Defendants' efforts to ensure that Documents relating to the discovery requests in this Action and/or the Complaint were properly preserved, including any related litigation hold or document preservation letters or notices. |
| | 43. Defendants' efforts to retrieve text messages, instant messages, and other |

| 30(b)(6) Deponents | 30(b)(6) Topics |
|---|---|
| | non-email Communications.<br> 44. Any sales of Tesla stock by Equity Investor from April 1, 2022 through the present, including the purpose of any such sale, any potential use of the proceeds of such sale considered by Defendants, and any relationship between such sale and the Merger.<br> 45. The identity, role, and nature of the work of any personnel of Tesla or Space Exploration Technologies Corp. who worked on, analyzed, or assisted in any capacity with the Merger, the Debt Financing, the Equity Financing, any potential investment by a Co-Investor, the Margin Loan Commitment, any potential tender offer involving Twitter, Defendants' purported termination of the Merger Agreement, or the Action.<br> 46. All information contained in Defendants' Interrogatory Responses, including all sources of such information and Defendants' process of ascertaining and providing such information.<br><br>*Notice to **XHIII** dated 2022.08.11:*<br> 1. The April 4, 2022 Letter Agreement, the April 13, 2022 Proposal, the April 24, 2022 Offer, any consideration by Defendants of any other potential acquisition or other strategic transaction involving Twitter, the Merger, the Merger Agreement, the Limited Guarantee, the June 6, 2022 Letter, and the July 8, 2022 Letter, and any financing with respect to any of the foregoing or any transaction contemplated thereby (including but not limited to the Debt Financing, the Equity Financing, and/or the Financing Commitments).<br> 2. All efforts to syndicate and/or arrange, document, negotiate the terms of, or consummate the Debt Financing and close the Merger, including the status of or expected timeline for such efforts.<br> 3. All efforts to solicit Co-Investors, arrange or negotiate equity co-investments, and/or arrange, document, syndicate, or consummate the Equity Financing, including those concerning the status of or expected timeline for such efforts.<br> 4. All efforts undertaken by Defendants or Defendants' Advisors, on or after May 13, 2022, to obtain, syndicate, arrange, finalize, and/or consummate the Debt Financing, close the Merger, and/or cause all of the conditions for closing the Merger to be satisfied.<br> 5. The Margin Loan Commitment, including without limitation (i) the reduction of the amount of the Margin Loan Commitment and reasons for such reduction; and (ii) the subsequent termination of the Margin Loan Commitment and reasons for such termination.<br> 6. Any potential tender offer by or on behalf of Defendants for some or all of Twitter's shares, including without limitation Defendants' negotiation of the debt commitment letter, dated April 20, 2022, attached as Exhibit C to Amendment No. 3 to Schedule 13D, filed by Equity Investor with the SEC on April 21, 2022.<br> 7. Defendants' requests or potential requests for information pursuant to Section 6.4 and/or Section 6.11 of the Merger Agreement and any information provided by Twitter, or on Twitter's behalf, in response to any such request for information, including without limitation any analyses, audits, or investigations performed by or at the direction of You and/or Defendants' Advisors, the Lenders, or the Co-Investors, relating to Twitter's API or "firehose" data provided to Defendants or any other information provided by Twitter, or on Twitter's behalf, in response to any information request by You or on Your behalf.<br> 8. Any request made by Twitter, or on Twitter's behalf, seeking Defendants' |

| 30(b)(6) Deponents | 30(b)(6) Topics |
|---|---|
| | consent pursuant to Section 6.1 of the Merger Agreement with respect to (i) the implementation of employee retention programs; (ii) the termination of a revolving credit facility; (iii) an application for a money transmitter license; or (iv) any other proposed course of action, corporate policy, or other decision related to the conduct of Twitter's business, including Defendants' assessment of and/or decision whether or not to provide their consent and/or whether or not the proposed course of action, corporate policy, or other decision was commercially reasonable under the circumstances, including all of the reasons Defendants declined to provide consents to Twitter's requests under the Merger Agreement described in paragraphs 119 through 122 of the Complaint, including without limitation all of the reasons why You initially provided, but thereafter withdrew, any such consent. |
| | 9. False or spam accounts or bots on the Twitter platform and the disclosures in Twitter's SEC filings discussed in Paragraphs 64 and 66 of the Complaint, including without limitation (i) any analyses, audits, or investigations performed or conducted by or at the direction of You and/or Defendants' Advisors, or of which You are aware, relating to these subjects, whether performed or conducted prior or subsequent to the execution of the Merger Agreement; (ii) any analyses, audits, or investigations that You and/or Defendants' Advisors considered undertaking, or that You and/or Defendants' Advisors considered having others undertake on Your or their behalf, relating to these subjects; and (iii) Your decision to execute the Merger Agreement without further due diligence on these subjects. |
| | 10. The effects or potential effects of changes in the price of Tesla common stock on (i) the Merger; (ii) the Debt Financing; (iii) the Equity Financing; (iv) the Financing Commitments; and/or (v) Your intentions with respect to closing and/or efforts to close the Merger, and Defendants' knowledge and consideration of such topics. |
| | 11. Any Communications between (a) Defendants or Defendants' Advisors and (b) any Governmental Authority, concerning (i) the Merger; (ii) the Merger Agreement; (iii) the Proxy Statement; or (iv) Twitter, including the purpose of such Communications, the nature and substance of such Communications, and at whose request such Communications were made. |
| | 12. Defendants' purported termination of the Merger Agreement, including without limitation (i) any consideration of whether and on what grounds to purport to terminate the Merger Agreement; (ii) any consideration of potentially renegotiating the Merger Agreement; (iii) the preparation of the June 6, 2022 Letter; and (iv) the preparation of the July 8, 2022 Letter. |
| | 13. Defendants' contention in the July 8, 2022 Letter that Twitter is "likely to suffer a Company Material Adverse Effect," including without limitation any valuations, forecasts, projections, estimates, or other analyses relating to whether Twitter is likely to suffer a Company Material Adverse Effect. |
| | 14. Forecasts, projections, estimates, or other analyses created by Defendants, Defendants' Advisors, the Lenders, or the Co-Investors, or on Your or their behalf, relating to Twitter's current or future performance, financial condition, or value, including without limitation any projections of Twitter's revenues, EBITDA, earnings, and cash flows, and all Documents and Communications concerning such forecasts, projections, estimates, or analyses. |
| | 15. Any plans or potential plans made or considered by Defendants to create or develop a social media platform and/or alternative or competitor to Twitter, including without limitation any plans or potential plans concerning X.com, and including without limitation the origin, history, and timeline of such plans, |

| 30(b)(6) Deponents | 30(b)(6) Topics |
|---|---|
| | and all other Persons involved in such plans or with whom Equity Investor has discussed such plans. |
| | 16. Your strategic or business plans for Twitter, including without limitation (i) all plans to address issues relating to false or spam accounts on the Twitter platform; (ii) all plans relating to employee retention programs or incentives; and (iii) all plans relating to potential changes to the size and/or composition of Twitter's workforce. |
| | 17. The engagement, the work, and the termination of Bob Swan and/or the cessation of Bob Swan's involvement on Defendants' behalf in connection with the Merger and the Debt Financing, including the reasons that Defendants determined that Bob Swan should "depart the deal proceedings" on or about June 23, 2022, including due to the disconnect in "wavelength" between You and Bob Swan, as described in Paragraph 110 of the Complaint. |
| | 18. The actual or potential engagement or involvement of Antonio Gracias to act on Defendants' behalf in connection with the Merger and the Debt Financing and the work Antonio Gracias performed in that capacity, including all of the ways that Antonio Gracias allegedly "dove in to the financing as soon as he was brought on" to replace Bob Swan, as referenced in Paragraph 198 of the Counterclaim. |
| | 19. The directors, officers, employees, and owners of X Holdings I, Inc., X Holdings II, Inc., and X Holdings III, LLC, and the relationships between them and Equity Investor. |
| | 20. Defendants' and Defendants' Advisors' use of the "Botometer" tool described in Paragraph 116 and Footnote 16 of the Counterclaim. |
| | 21. The engagement of the Data Scientists, including without limitation (i) the identification of all Data Scientists and when they were engaged; (ii) the scope and purpose of any such engagement; (iii) how such Data Scientists came to be engaged; (iv) the nature of any agreements, arrangements, or understandings between the Data Scientists and Defendants or Defendants' Advisors. |
| | 22. All Persons that Defendants or Defendants' Advisors communicated with about a potential engagement as a Data Scientist that were not engaged as a Data Scientist, including without limitation (i) the identification of all such Persons; (ii) the timeline during which such potential engagement was considered; and (iii) all reasons such engagement did not take place. |
| | 23. All work performed by the Data Scientists, including without limitation (i) the instructions received by the Data Scientists; (ii) the scope of the Data Scientists' work; (iii) the timeline of the Data Scientists' work; (iv) a description of the work performed by each individual working as or for a Data Scientist; (v) the findings, conclusions, and results of such work. |
| | 24. The financial model allegedly prepared by Morgan Stanley as described in Paragraphs 34 and 166 of the Counterclaim and, to the extent different than the financial model, the valuations allegedly prepared by Morgan Stanley as described in Paragraph 78 of the Counterclaim, including the extent to which Defendants received, reviewed, or discussed the referenced model prior to April 25, 2022, and the extent to which Defendants relied upon the referenced model. |
| | 25. Any "additional business models" that Defendants allegedly considered as a means to "unlock Twitter's true value," as described in Paragraph 39 of the Counterclaim, including without limitation the "subscription-based model" referenced in that same Paragraph, the projected or anticipated value of Twitter based on such business models, and the relevance of mDAU to such business models. |
| | 26. Defendants' knowledge of Twitter's litigation with the Indian government |

| 30(b)(6) Deponents | 30(b)(6) Topics |
|---|---|
| | and/or any content-removal orders issued to Twitter by the Indian government, as discussed in Paragraphs 18 and 181 through 185 of the Counterclaim, including without limitation when Defendants became aware of such litigation and/or content-removal orders and who made them aware of such orders. |
| | 27. All "key decisions" that Twitter allegedly made "outside the ordinary course without consulting the Musk Parties," as alleged in Paragraphs 186 through 195 of the Counterclaim. |
| | 28. The extent to which Defendants undertook any review, prior to executing the Merger Agreement, of each of the allegedly false and misleading statements discussed at Paragraphs 109 through 149 of the Counterclaim. |
| | 29. The reliance of Defendants and/or Defendants' Advisors on Twitter's representations in its SEC filings, as alleged in Paragraph 27 of the Counterclaim. |
| | 30. Defendants' beliefs about the number and/or prevalence of false or spam accounts or bots on the Twitter platform, including all bases for such beliefs and Defendants' allegations set forth in Paragraphs 212 and 213 of the Counterclaim that "[a]t the time of the Merger Agreement, Defendants/Counterclaim-Plaintiffs did not know the false or misleading statements or omissions" and "[h]ad Defendants/Counterclaim-Plaintiffs known about the false or misleading statements and omissions, they would not have entered into the Merger Agreement." |
| | 31. Defendants' bases for contending that "statement[s] of material fact" in documents that Twitter has filed with the SEC since January 1, 2022 were "untrue" or "misleading," including statements that Defendants contend contained representations that "fewer than 5%" of Twitter's mDAU are false or spam accounts. |
| | 32. Defendants' understanding of Twitter's mDAU recast in April 2022, as discussed in Paragraphs 9 and 79 through 81 of the Counterclaim. |
| | 33. The "preliminary analysis by Mr. Musk's advisors" and the results thereof described in the final paragraph of page 6 of Defendants' July 8 letter. |
| | 34. Defendants' alleged belief that "due diligence processes can be costly and inefficient," as set forth in Paragraph 60 of the Counterclaim. |
| | 35. Defendants' alleged assumption that Twitter "rel[ied] on automation, artificial intelligence, and machine learning" to count false or spam accounts, as described in Paragraph 83 of the Counterclaim. |
| | 36. Defendants' understanding of the "stratification" or potential stratification of Twitter's mDAU, as that term is used in Paragraph 141 of the Counterclaim, whether performed before or after the execution of the Merger Agreement. |
| | 37. Defendants' allegation that "nearly a third of Twitter's mDAU in fact see no ads and appear to generate no revenue at all," as set forth in Paragraph 138 of the Counterclaim. |
| | 38. Defendants' knowledge and understanding of their allegation that "mDAU growth is not occurring among high-value users," as set forth in Paragraph 142 of the Counterclaim. |
| | 39. All allegations in Defendants' Counterclaim. |
| | 40. Defendants' understanding of how many false or spam accounts existed on the Twitter platform as of July 8, 2022, in absolute terms and as a percentage of Twitter's mDAU, and all their bases for that understanding as of that date. |
| | 41. Defendants' policies, practices, software, hardware, and systems relating to the storage, management, retention, and destruction of Documents and Communications. |
| | 42. Defendants' efforts to ensure that Documents relating to the discovery requests in this Action and/or the Complaint were properly preserved, |

| 30(b)(6) Deponents | 30(b)(6) Topics |
|---|---|
| | including any related litigation hold or document preservation letters or notices. |
| | 43. Defendants' efforts to retrieve text messages, instant messages, and other non-email Communications. |
| | 44. Any sales of Tesla stock by Equity Investor from April 1, 2022 through the present, including the purpose of any such sale, any potential use of the proceeds of such sale considered by Defendants, and any relationship between such sale and the Merger. |
| | 45. The identity, role, and nature of the work of any personnel of Tesla or Space Exploration Technologies Corp. who worked on, analyzed, or assisted in any capacity with the Merger, the Debt Financing, the Equity Financing, any potential investment by a Co-Investor, the Margin Loan Commitment, any potential tender offer involving Twitter, Defendants' purported termination of the Merger Agreement, or the Action. |
| | 46. All information contained in Defendants' Interrogatory Responses, including all sources of such information and Defendants' process of ascertaining and providing such information. |
| Caggiano, Marco [JPM] | |
| Doughty, William [Twitter] | *Second Notice to Twitter dated 2022.08.05:*<br>1. Identification and description of any systems, databases, files, and types of Documents maintained by Twitter relating to its calculation or analysis of spam and false accounts, including internal reporting, presentations, and summaries provided to Your Board of Directors and management.<br>2. Identification and description of any systems, databases, files, and types of Documents maintained by Twitter relating to its calculation or analysis of mDAU, including internal reporting, presentations, and summaries provided to Your Board of Directors and management.<br>3. Identification and description of any systems, databases, files, and types of Documents maintained by Twitter relating to its calculation or analysis of user statistics and user engagement, including internal reporting, presentations, and summaries provided to Your Board of Directors and management.<br>4. Identification and description of any systems, databases, files, and types of Documents maintained by Twitter relating to its calculation or analysis of revenue growth, including internal reporting, presentations, and summaries provided to Your Board of Directors and management.<br>5. Identification and description of Your business operations policies and procedures regarding:<br>   a. Your identification of and response to spam and false accounts;<br>   b. Product development and implementation and research and development priorities relating to spam and false accounts;<br>   c. Your information technology, information security, and incident response relating to spam and false accounts;<br>   d. Your maintenance, support, and customer service functions relating to spam and false accounts; and<br>   e. Your professional services and implementation or installation services relating to spam and false accounts.<br>6. Identification and description of Twitter's human resources policies and procedures regarding:<br>   a. Terminations and      performance reviews of executive-level employees;<br>   b. Hiring freezes; |

| 30(b)(6) Deponents | 30(b)(6) Topics |
|---|---|
| | c. Recruitment; and |
| | d. Methods for contracting for, giving feedback to, paying, and selecting employees, vendors, and contractors for spam and false account sampling. |
| | 7. Identification and description of Your user data retention policies and procedures regarding: |
| |    a. Your process for collecting any and all data and information from users; |
| |    b. Your process for storing and accessing any such user data and information; |
| |    c. Metrics measured, documented, analyzed, or considered by You in the ordinary course of business to analyze any such user data and information; and |
| |    d. Reports created in the ordinary course of business to analyze user data and information, including any aggregate reports regarding user demographics. |
| | 8. Identification and description of Your customer and sales policies and procedures regarding: |
| |    a. Pricing, discounts, payment, and other contractual terms with advertising customers; |
| |    b. Sales objectives, targets, estimates, incentives, or commissions; and |
| |    c. Customer satisfaction or product or service issues or complaints. |
| | 9. Identification and description of Your accounting and financial planning and analysis policies and procedures regarding: |
| |    a. Financial forecasting or projections (including of annual recurring revenue, total revenue, and earnings); |
| |    b. Tracking of Your financial performance; |
| |    c. Advertising; and |
| |    d. Preparing Your financial statements for submission to regulatory authorities or for earnings calls (including revenue recognition and cost allocation). |
| | 10. Identification and description of Your human resources metrics and reports regarding: |
| |    a. Reports created in the ordinary course of business to measure performance of employees; and |
| |    b. Metrics measured, documented, analyzed, or considered by You in the ordinary course of business to measure performance of employees. |
| | 11. Explanation of how You determined key performance indicators ("KPIs"), what else you considered in determining Your KPIs, and how You use KPIs in the ordinary course of business. |
| | 12. Identification and description of Your accounting and financial planning metrics and reports regarding: |
| |    a. KPIs or other metrics measured, documented, analyzed, or considered by You in the ordinary course of business; |
| |    b. Any reports generated by You including any KPI or other metrics in the ordinary course of business; |
| |    c. Any reports, analysis, or benchmarking of Your business against competitors or industry peers; |
| |    d. Financial reports created in the ordinary course of business; and |
| |    e. Financial metrics measured, documented, analyzed, or considered by You in the ordinary course of business. |
| | 13. Identification and description of Your business operations metrics and reports regarding: |

| 30(b)(6) Deponents | 30(b)(6) Topics |
|---|---|
| | a. Product development or engineering progress reports created in the ordinary course of business;<br>b. Metrics measured, documented, analyzed, or considered by You to measure product development or engineering in the ordinary course of business;<br>c. Reports created in the ordinary course of business to measure product installations;<br>d. Metrics measured, documented, analyzed, or considered by You in the ordinary course of business to measure product installations.<br>14. Identification of Your personnel involved with generating, tracking, measuring, and/or maintaining any of the documents, practices, metrics, reports, or analysis listed in Topics 1 through 13, including the person's job title, role within Twitter's organization structure, and any direct reports.<br>15. Twitter's organizational structure at every point in time between January 1, 2017 and present; all Twitter departments in existence between January 1, 2017 and present and the purpose and leadership of such departments; and the identification of all departments, subdepartments, and employees who (a) are involved in developing, measuring, monitoring, and managing KPIs, (b) are involved in Twitter's efforts to estimate the prevalence of false and spam Twitter accounts among mDAU, and (c) are primarily responsible for the technology used in the suspension workflow to detect false and spam Twitter accounts, and the reporting structure within such departments and subdepartments.<br>16. Twitter's policies, practices, software, hardware, and systems relating to the storage, management, retention, and destruction of Documents and Communications.<br>17. Twitter's efforts to ensure that Documents relating to the Discovery Requests and/or the Complaint were properly preserved, including any related litigation hold or document preservation letters or notices.<br>18. Twitter's efforts to retrieve text messages, instant messages, and other non-email Communications. |
| Earls, Andrew [Morgan Stanley] | *Subpoena to Morgan Stanley dated 2022.08.19:*<br>1. The April 4, 2022 Letter Agreement, the April 13, 2022 Proposal, the April 24, 2022 Offer, any consideration by Defendants of any other potential acquisition or other strategic transaction involving Twitter, the Merger, the Merger Agreement, the Limited Guarantee, the June 6, 2022 Letter, and the July 8, 2022 Letter, and any financing with respect to any of the foregoing or any transaction contemplated thereby (including but not limited to the Debt Financing, the Equity Financing, and/or the Financing Commitments).<br>2. All efforts—whether undertaken or contemplated but not undertaken— to syndicate and/or arrange, document, negotiate the terms of, or consummate the Debt Financing and close the Merger, including the status of or expected timeline for such efforts.<br>3. The "Summary of Conditions" listed on Exhibit E to the Debt Commitment Letter, including but not limited to, the satisfaction or status of all conditions listed therein, as well as any drafts of the same or other conditions that were considered or proposed by You, Defendants, Defendants' Advisors, any other Lenders, or Co-Investors and any Communications regarding such conditions between April 1, 2022 and July 8, 2022.<br>4. All efforts to solicit Co-Investors, arrange or negotiate equity co-investments, and/or arrange, document, syndicate, or consummate the Equity Financing, including those concerning the status of or expected timeline for such efforts. |

Case No. 3:22-CV-05937-CRB
DEFENDANT ELON MUSK'S DISCLOSURES PURSUANT TO FED. R. CIV. PROC. 26

| 30(b)(6) Deponents | 30(b)(6) Topics |
|---|---|
| | 5. All efforts undertaken by You, Defendants, any other Lenders and/or Defendants' Advisors to obtain, syndicate, arrange, finalize, and/or consummate the Debt Financing, close the Merger, and/or cause all of the conditions for closing the Merger to be satisfied. |
| | 6. Any and all work and services that You, including Your affiliates, performed from January 1, 2022 through July 8, 2022 in relation to bond offerings for Twitter, including without limitation to Twitter's intention to issue and/or issuance of Senior Unsecured Notes in February 2022, including without limitation the extent to which You considered mDAU, ad engagements, and/or other metrics relating to users in connection with such bond offerings. |
| | 7. The Margin Loan Commitment, including without limitation (i) the reduction of the amount of the Margin Loan Commitment and reasons for such reduction; and (ii) the subsequent termination of the Margin Loan Commitment and reasons for such termination. |
| | 8. Any potential tender offer by or on behalf of Defendants for some or all of Twitter's shares, including without limitation Defendants' negotiation of the debt commitment letter, dated April 20, 2022, attached as Exhibit C to Amendment No. 3 to Schedule 13D, filed by Equity Investor with the SEC on April 21, 2022. |
| | 9. Your, Defendants', Defendants' Advisors', and/or any other Lenders' requests or potential requests for information pursuant to Section 6.4 and/or Section 6.11 of the Merger Agreement, including requests contained in the Diligence Tracker, and any information provided by Twitter, or on Twitter's behalf, in response to any such request for information, including without limitation any analyses, audits, or investigations performed by or at the direction of You, Defendants, Defendants' Advisors, any other Lenders, or the Co-Investors, relating to Twitter's API or "firehose" data provided to Defendants or any other information provided by Twitter, or on Twitter's behalf, in response to any information request by You or on Your behalf, or by Defendants or on their behalf. |
| | 10. False or spam accounts or bots on the Twitter platform, including without limitation (i) in relation to the disclosures in Twitter's SEC filings discussed in Paragraphs 64 and 66 of the Complaint; (ii) any analyses, audits, or investigations performed or conducted by or at the direction of You, Defendants, Defendants' Advisors, any other Lenders, and/or the Co-Investors, or of which You are aware, relating to these subjects, whether performed or conducted prior or subsequent to the execution of the Merger Agreement; (iii) any analyses, audits, or investigations that You, Defendants, Defendants' Advisors, any other Lenders, and/or the Co-Investors considered undertaking, or that You, Defendants, Defendants' Advisors, any other Lenders, and/or the Co-Investors considered having others undertake on Your or their behalf, relating to these subjects; (iv) Defendants' decision to execute the Merger Agreement without further due diligence on these subjects; and (v) Your decision to execute the Debt Commitment Letter and/or the Margin Commitment Letter without due diligence on these subjects. |
| | 11. The effects or potential effects of changes in the price of Tesla common stock on (i) the Merger; (ii) the Debt Financing; (iii) the Equity Financing; (iv) the Financing Commitments; and/or (v) Your knowledge of Defendants' intentions with respect to closing and/or efforts to close the Merger, and Defendants' knowledge and consideration of such topics. |
| | 12. Any Communications between (a) You, Defendants, any other Lenders, |

| 30(b)(6) Deponents | 30(b)(6) Topics |
|---|---|
| | and/or Defendants' Advisors and (b) any Governmental Authority, concerning (i) the Merger; (ii) the Merger Agreement; (iii) the Proxy Statement; or (iv) Twitter, including the purpose of such Communications, the nature and substance of such Communications, and at whose request such Communications were made. |
| | 13. Your knowledge of Defendants' purported termination of the Merger Agreement, including without limitation (i) any consideration of whether and on what grounds to purport to terminate the Merger Agreement; (ii) any consideration of potentially renegotiating the Merger Agreement; (iii) the preparation of the June 6, 2022 Letter; and (iv) the preparation of the July 8, 2022 Letter. |
| | 14. Your knowledge and assessment of Defendants' contention in the July 8, 2022 Letter that Twitter is "likely to suffer a Company Material Adverse Effect," including without limitation any valuations, forecasts, projections, estimates, or other analyses relating to whether Twitter is likely to suffer a Company Material Adverse Effect. |
| | 15. Forecasts, projections, estimates, or other analyses created or relied upon by You, Defendants, Defendants' Advisors, any other Lenders, and/or the Co-Investors, or on Your or their behalf, relating to Twitter's current or future performance, financial condition, or value, including without limitation any projections of Twitter's revenues, EBITDA, earnings, and cash flows, and all Documents and Communications concerning such forecasts, projections, estimates, or analyses. |
| | 16. Your knowledge of any plans or potential plans made or considered by Defendants to create or develop a social media platform and/or alternative or competitor to Twitter, including without limitation any plans or potential plans concerning X.com, and including without limitation the origin, history, and timeline of such plans, and all other Persons involved in such plans or with whom Equity Investor has discussed such plans. |
| | 17. Your knowledge of Defendants' strategic or business plans for Twitter, including without limitation (i) all plans to address issues relating to false or spam accounts or bots on the Twitter platform; (ii) all plans relating to employee retention programs or incentives; and (iii) all plans relating to potential changes to the size and/or composition of Twitter's workforce. |
| | 18. Your knowledge of the engagement, the work, and the termination of Bob Swan and/or AH Capital Management L.L.C., and/or the cessation of Bob Swan's and/or AH Capital Management L.L.C.'s involvement on Defendants' behalf in connection with the Merger and the Debt Financing, including Your knowledge of the reasons that Defendants determined that Bob Swan should "depart the deal proceedings" on or about June 23, 2022, including due to the disconnect in "wavelength" between Defendants and Bob Swan, as described in Paragraph 110 of the Complaint. |
| | 19. Your knowledge of the actual or potential engagement or involvement of Antonio Gracias, Brad Sheftel, and/or Valor Equity Partners LP to act on Defendants' behalf in connection with the Merger and the Debt Financing and the work Antonio Gracias, Brad Sheftel, and/or Valor Equity Partners LP performed in that capacity, including Your knowledge of all of the ways that Antonio Gracias allegedly "dove in to the financing as soon as he was brought on" to replace Bob Swan, as referenced in Paragraph 198 of the Counterclaim. |
| | 20. Your, Defendants', Defendants' Advisors', and/or any other Lenders' use of the "Botometer" tool described in Paragraph 116 and Footnote 16 of the Counterclaim. |
| | 21. Your knowledge of the engagement of the Data Scientists, including |

| 30(b)(6) Deponents | 30(b)(6) Topics |
|---|---|
| | without limitation (i) the identification of all Data Scientists and when they were engaged; (ii) the scope and purpose of any such engagement; (iii) how such Data Scientists came to be engaged; and (iv) the nature of any agreements, arrangements, or understandings between the Data Scientists and Defendants or Defendants' Advisors.
22. Your knowledge of all Persons that Defendants or Defendants' Advisors communicated with about a potential engagement as a Data Scientist that were not engaged as a Data Scientist, including without limitation (i) the identification of all such Persons; (ii) the timeline during which such potential engagement was considered; and (iii) all reasons such engagement did not take place.
23. Your knowledge of all work performed by the Data Scientists, including without limitation (i) the instructions received by the Data Scientists; (ii) the scope of the Data Scientists' work; (iii) the timeline of the Data Scientists' work; (iv) a description of the work performed by each individual working as or for a Data Scientist; and (v) the findings, conclusions, and results of such work.
24. The financial model allegedly prepared by Morgan Stanley as described in Paragraphs 34 and 166 of the Counterclaim and, to the extent different than the financial model, the valuations allegedly prepared by Morgan Stanley as described in Paragraph 78 of the Counterclaim, including the extent to which You and/or any other Lender received, reviewed, or discussed the referenced model, and the extent to which You and/or any other Lender relied upon the referenced model.
25. Your knowledge of any "additional business models" that Defendants allegedly considered as a means to "unlock Twitter's true value," as described in Paragraph 39 of the Counterclaim, including without limitation the "subscription-based model" referenced in that same Paragraph, the projected or anticipated value of Twitter based on such business models, and the relevance of mDAU to such business models.
26. Your and/or Defendants' knowledge of Twitter's litigation with the Indian government and/or any content-removal orders issued to Twitter by the Indian government, as discussed in Paragraphs 18 and 181 through 185 of the Counterclaim, including without limitation when You and/or Defendants became aware of such litigation and/or content-removal orders and who made them aware of such orders.
27. Your and/or Defendants' knowledge of the class action lawsuit against Twitter in the U.S. District Court for the Northern District of California, In re Twitter Inc. Securities Litigation, No. 3:16-cv-05312-JST (N.D. Cal.), including without limitation (i) when You and/or Defendants became aware of such litigation; and (ii) all Communications and discussions between and among You, Defendants, Defendants' Advisors, and/or any other Lenders regarding that litigation.
28. Your knowledge of any Communications with any media representative or media outlet regarding the Merger, the Merger Agreement, the Debt Financing, the Equity Financing, the Financing Commitments, the number of false or spam accounts or bots on the Twitter platform, the disclosures in Twitter's SEC filings discussed in Paragraphs 64 and 66 of the Complaint, the June 6, 2022 Letter, and/or the July 8, 2022 Letter. This topic includes, without limitation, Your knowledge of any Communications made by You, Defendants, any one or more of Defendants' Advisors, any other Lenders, and/or the Co-Investors, or of which You are aware, with the author(s) (or any of their colleagues) of the enumerated articles or any other stories, articles, |

| 30(b)(6) Deponents | 30(b)(6) Topics |
|---|---|
| | media commentary, or the like concerning the subject matters listed in this topic. |
| | 29. The extent to which You, Defendants, Defendants' Advisors, and/or any other Lenders undertook any review, prior to the execution of the Merger Agreement, of each of the allegedly false and misleading statements discussed in Paragraphs 109 through 149 of the Counterclaim. |
| | 30. Any reliance by You, Defendants, Defendants' Advisors, and/or any other Lenders on Twitter's representations in its SEC filings, as alleged in Paragraph 27 of the Counterclaim. |
| | 31. Your knowledge of the bases underlying Defendants' beliefs about the number and/or prevalence of false or spam accounts or bots on the Twitter platform, including all bases for such beliefs and Defendants' allegations set forth in Paragraphs 212 and 213 of the Counterclaim that "[a]t the time of the Merger Agreement, Defendants/Counterclaim-Plaintiffs did not know the false or misleading statements or omissions" and "[h]ad Defendants/Counterclaim-Plaintiffs known about the false or misleading statements and omissions, they would not have entered into the Merger Agreement." |
| | 32. Your knowledge of Defendants' bases for contending that "statement[s] of material fact" in documents that Twitter has filed with the SEC since January 1, 2022 were "untrue" or "misleading," including (i) statements that Defendants contend contained representations that "fewer than 5%" of Twitter's mDAU are false or spam accounts or bots; (ii) Defendants' contention that Twitter failed to disclose that engagement among certain users and its mDAU was decreasing; and (iii) Twitter's representations during a call with Defendants on or around July 1, 2022, regarding the inclusion of suspended accounts in its quarterly mDAU count. |
| | 33. Your knowledge of Defendants' understanding of Twitter's mDAU recast in April 2022, as discussed in Paragraphs 9 and 79 through 81 of the Counterclaim. |
| | 34. The earliest calendar date You anticipated potential litigation regarding the Merger Agreement, and the facts You rely on for Your contention that You first anticipated litigation on that date. |
| | 35. Your policies, practices, software, hardware, and systems relating to the storage, management, retention, and destruction of Documents and Communications. |
| | 36. Your efforts to ensure that Documents relating to the discovery requests in this Action and/or the Complaint were properly preserved, including any related litigation hold or document preservation letters or notices. |
| | 37. Your efforts to retrieve text messages, instant messages, recordings, handwritten notes and other hard copy documents, and other non-email Communications. |
| | 38. Your knowledge of any sales of Tesla stock by Equity Investor from April 1, 2022 through the present, including the purpose of any such sale, any potential use of the proceeds of such sale considered by You or Defendants, and any relationship between such sale and the Merger. |
| | 39. Your knowledge of the identity, role, and nature of the work of any personnel of Tesla or Space Exploration Technologies Corp. who worked on, analyzed, or assisted in any capacity with the Merger, the Debt Financing, the Equity Financing, any potential investment by a Co-Investor, the Margin Loan Commitment, any potential tender offer involving Twitter, any potential investment or involvement by any Person acting in concert with Equity Investor, either directly or indirectly, in any competitor or potential competitor to Twitter or consideration of developing a competitor or potential competitor |

DEFENDANT ELON MUSK'S DISCLOSURES PURSUANT TO FED. R. CIV. PROC. 26

| 30(b)(6) Deponents | 30(b)(6) Topics |
|---|---|
| | to Twitter, Defendants' purported termination of the Merger Agreement, or the Action.<br>40. The nature, subject matter, and authenticity of any Documents produced in response to Twitter's subpoena to You dated July 26, 2022. |
| Hazan, Jeremy [Barclays Bank] | |
| Silverstein, Stefani [Goldman Sachs] | *Subpoena to Goldman Sachs dated 2022.08.03:*<br>1. Twitter and Your retention by Twitter.<br>2. The Merger, the Merger Agreement, the transaction contemplated by the Merger Agreement, and Your activities in relation to the Merger.<br>3. Your analysis of Twitter's financial condition, performance, and operations, including any forecasts, model(s), or valuation(s) of Twitter.<br>4. Your Fairness Opinion, including but not limited to (a) any assumptions, facts, inputs, performance indicators, forecasts, and models relating to the Fairness Opinion; (b) all analyses performed in connection therewith, including Your pub!ic trading comparables analysis, basis for choosing the comparable companies analyzed as part of such trading comparables analysis, and discounted cash flow analysis; and (c) Documents You read, consulted, reviewed, or relied upon in preparing the Fairness Opinion.<br>5. Your discussions with Twitter about the Merger; the Merger Agreement; the associated debt financing, including the Debt Commitment Letter, Equity Commitment Letter, and Limited Guarantee; the conditions to consummate the Merger; Defendants; potential purchasers; and the economic impact of mDAU or false or spam Twitter accounts and Twitter's financial condition, performance, and operations.<br>6. Any analysis of the value or valuation of Twitter in whole or in part, or of the value of its stock, its business (in whole or in part), assets, or subsidiaries, including but not limited to any valuations performed other than the Fairness Opinion for purposes of negotiating or consummating a merger or acquisition of Twitter.<br>7. Any diligence performed regarding Defendants, Twitter, and any potential financing for the transaction contemplated by the Merger Agreement, including the Debt Commitment Letter, Equity Commitment Letter, and Limited Guarantee.<br>8. Any Documents and Communications exchanged with Twitter or Defendants.<br>9. Your discussions with or about potential purchasers of Twitter other than Defendants.<br>1 0. Individuals or entities, other than Defendants, that You considered contacting or actually contacted concerning an acquisition involving Twitter.<br>11. Any Communications between You and J.P. Morgan and between You and Allen & Co. regarding the Merger, Merger Agreement, Defendants, Twitter, or this Action.<br>12. Any Communications between You and Simpson Thacher and between You and Wilson Sonsini regarding the Merger, Merger Agreement, Defendants, Twitter, or this Action.<br>13. Code names used to discuss the Merger or the Merger Agreement.<br>14. Your Communications regarding this Action.<br>15. The Documents You produced in response to the Requests contained in Schedule A. |

| Musk Defendants Subpoenas (Entities) | Date Served | Date Response |
|---|---|---|
| 1stdibs.com, Inc. | 8/22/2022 | 8/30/2022 |
| Allen & Company LLC | 8/1/2022 | 8/26/2022 |
| Ballard Spahr | 08/24/2022 | 9/8/2022 |
| BofA Securities, Inc. | 8/26/2022 | 9/9/2022 |
| Cognizant Technology Solutions Corporation | 8/8/2022 | 8/24/2022 |
| Concentrix Solutions Corporation | 8/1/2022 | 8/22/2022 |
| Contour Asset Management LLC | 8/19/2022 | 9/7/2022 |
| D. E. Shaw & Co., L.P. | 8/19/2022 | 9/9/2022 |
| Discord | 8/19/2022 | |
| DoubleVerify Inc. | 8/17/2022 | n/a |
| Goldman Sachs | 8/2/2022 | 8/16/2022 |
| Holocene Advisors, LP | 8/19/2022 | 8/26/2022 |
| Innodata, Inc. | 8/1/2022 | 8/15/2022 |
| Integral Ad Science, Inc. | 8/17/2022 | 8/26/2022 |
| Joele Frank | 8/12/2022 | 8/18/2022 |
| JP Morgan | 8/1/2022 | 8/16/2022 |
| PwC | 8/18/2022 | 8/24/2022 |
| Salesforce, Inc. (Taylor) | 8/17/2022 | 8/24/2022 |
| Silver Lake Partners V DE (AIV), L.P. Silver Lake Group LLC | 8/5/2022 | 8/16/2022 |
| Simpson Thacher | 8/3/2022 | 8/23/2022 |
| Spyglass Capital Management LLC | 8/19/2022 | |
| TaskUs Holdings, Inc. TaskUs USA, LLC | 8/1/2022 | 8/15/2022 |
| Wachtell | 8/17/2022 | 9/6/2022 |
| Wells Fargo Securities, LLC | 8/25/2022 | 9/9/2022 |

| Musk Defendants Subpoenas (Entities) | Date Served | Date Response |
|---|---|---|
| Wilson Sonsini Goodrich & Rosati | | 8/19/2022 |

| Musk Defendants Subpoenas (Individuals) | Date Served | Date Response |
|---|---|---|
| Rinki Sethi | | |
| Kayvon Beykpour | | |
| Bruce Falck | | |
| Rich Sullivan | | |
| Jack Dorsey | | 8/31/2022 |
| Dantley Davis | | |
| Lakshmi Shankar | | 8/29/2022 |
| Del Harvey | | |
| Matthew Derella | | |
| Mike Montano | | |
| Peiter Zatko | | 9/12/2022 |
| Rob Bishop | | 8/29/2022 |

| Twitter Subpoenas | Date Served | Date Response |
|---|---|---|
| A.M. Management and Consulting LLC | | |
| AH Capital Management, LLC | | 8/14/2022 |
| Aliya Capital Partners, LLC | | 9/2/2022 |
| Antonio Gracias | | |
| BAM Trading Services inc. (d/b/a Binance US) | | |
| BAMCO, Inc. | | 8/19/2022 |
| Bandera Partners LLC | | 8/16/2022 8/22/2022 |
| Bank of America, N.A | | 8/9/2022 |
| Barclays Bank PLC | | 8/9/2022 |

| Twitter Subpoenas | Date Served | Date Response |
|---|---|---|
| Benefit Street Cre Finance LLC | | |
| Benefit Street Partners LLC | | 8/23/2022 |
| BNP Paribas Securities Corp.<br>BNP Paribas USA, Inc. | | 9/6/2022 |
| Bob Swan | | |
| BofA Securities, Inc. | | 8/9/2022 |
| Brookfield Asset Management (US) Inc. | | 8/16/2022 |
| Brookfield Asset Management LLC | | 8/16/2022 |
| Canadian Imperial Bank of Commerce<br>CIBC Capital Corporation<br>CIBC Inc. | | |
| Citibank, N.A. | | 8/19/2022 |
| CounterAction | | 8/30/2022 |
| Credit Suisse AG, Cayman Islands Branch | | 8/15/2022<br>9/6/2022 |
| Cyabra Strategy Inc. | | 8/30/2022 |
| David O. Sacks | | 8/22/2022<br>9/2/2022<br>9/5/2022 |
| Davis Polk & Wardwell LLP | | 9/6/2022 |
| Deutsche Bank AG, London Branch | | 8/9/2022 |
| DFJ Growth IV Partners, LLC | | 8/15/2022 |
| Eden Global Partners GP LLC | | |
| Eight Partners VC, LLC | | |
| Factorial Funds LLC | | |
| FGS Global, Inc. | | |
| Fidelity Management & Research Company LLC | | |
| Guidepost | | 8/30/2022 |
| Honeycomb Asset Management LP | | |

| Twitter Subpoenas | Date Served | Date Response |
|---|---|---|
| J. Safra Asset Management, LLC | | |
| Joe Lonsdale | | 8/22/2022 |
| Kenneth Griffin | | 8/19/2022 |
| Key Wealth Advisors LLC | | 8/13/2022 |
| Kristina Salen | | |
| Lawrence Ellison, Lawrence Investments LLP | | |
| Lawrence Investments LLC | | |
| Lawrence J. Ellison, Trustee of Lawrence J. Ellison Revocable Trust | | |
| Linda Ye and Robin Ren Family Foundation | | 8/19/2022 |
| LITANI Ventures, LLC | | 8/15/2022 |
| Manhattan Venture Partners LLC | | |
| Marc Andreessen | | |
| McDermott Will & Emery LLP | | 9/10/2022 |
| Mirae Asset USA LLC | | |
| Mizuho Bank, Ltd | | 8/9/2022 |
| Morgan Stanley & Co. LLC | | 8/15/2022 |
| Morgan Stanley Senior Funding, Inc. | | 8/15/2022 |
| MUFG Bank, Ltd | | 8/9/2022 |
| MUFG Securities Americas Inc. | | |
| Patrick O'Malley III | | 8/19/2022 |
| Philip B. Simon | | |
| Quinn Emanuel Urquhart & Sullivan, LLP | | |
| RBC Capital Markets Holdings USA | | |
| Santo Lira | | |
| SC CDA1 LLC | | |

| Twitter Subpoenas | Date Served | Date Response |
|---|---|---|
| Section 32, LLC | | 8/26/2022 |
| Sequoia Capital Fund, L.P. | | |
| Sequoia Capital Operations LLC | | |
| SG Americas, Inc. | | 8/9/2022 |
| Skadden | | 8/31/2022 9/4/2022 |
| Space Exploration Technologies Corp. | | |
| SpaceX | | 8/18/2022 9/10/2022 |
| Steve Jurvetson | 8/2/2022 | |
| Strauss Capital LLC | | |
| Tesla | | 8/18/2022 |
| The Founders Fund Growth II Management, LLC | | |
| Tomales Bay Capital, LP | | 8/18/2022 |
| ToSomeone, Inc. | | |
| Tresser Blvd 402 LLC | | 8/19/2022 |
| Tru Arrow Technology Partners I, LP | | 8/19/2022 |
| Valor Equity Partners L.P. | | 8/19/2022 8/29/2022 8/29/2022 |
| VY Capital Holdings LP | | |
| Witkoff Capital LLC | 7/28/2022 | 8/23/2022 |
| Digital Rush 15 LLC | | |
| Sacks.Com LLC | | |
| Craft Ventures Management, LP | | |
| WKB Capital, LLC | | |