UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>ELON MUSK,<br><br>　　　　Defendant. | Case No. 22-cv-05937-CRB   (DMR)<br><br>**ORDER ON REQUESTS FOR ADMISSION**<br><br>Re: Dkt. Nos. 207, 208 |

Plaintiffs initially challenged 92 requests for admission ("RFAs") [Docket Nos. 129, 169], and Defendant contested 233 RFAs [Docket Nos. 136, 172]. On April 25, 2025, Plaintiffs filed a unilateral letter stating they were withdrawing their motion to compel responses to all but seven RFAs. [Docket No. 199.] The court ordered the parties to meet and confer, [Docket No. 200], and the parties refined their disputes and significantly narrowed them. Defendant now moves to compel further responses to 24 RFAs. [Docket No. 207 (Def. JDL).] Plaintiffs move to compel further responses to seven RFAs. [Docket No. 208 (Plf. JDL).]

This matter is suitable for determination without oral argument. Civ. L.R. 7-1(b). For the reasons stated below, the court grants the motions in part and denies them in part.

**I.　BACKGROUND**

This is a securities class action. Plaintiffs allege that on April 25, 2022, Twitter and an entity wholly-owned by Defendant Elon Musk entered into an agreement (the "Merger Agreement") for the acquisition of Twitter at $54.20 per share. [Docket No. 48 (Order on MTD) at 2]. According to Plaintiffs, Musk then made several misrepresentations to "artificially depress the price of Twitter stock and to pressure Twitter to lower the price Defendant would have to pay to acquire it." *Id.* at 1.

### A. Legal Standards for Securities Fraud

"Plaintiffs alleging securities fraud under Section 10(b) must plead the following elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misrepresentation; (5) economic loss; and (6) loss causation (a causal connection between the material misrepresentation and the economic loss)." Order on MTD 17 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005); *Loos v. Immersion Corp.*, 762 F.3d 880, 886–87 (9th Cir. 2014)). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Order on MTD 28. "To demonstrate scienter, the defendant must have contemporaneously made 'false or misleading statements either intentionally or with deliberate recklessness.'" *Id.* at 29 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009)).

### B. Judge Breyer's Order on the Motion to Dismiss

On July 10, 2023, Defendant moved to dismiss Plaintiff's first amended complaint (FAC) for failure to state a claim. [Docket No. 34 (FAC).] The Honorable Charles R. Breyer granted the motion in part and denied it in part. In so doing, the court analyzed each of the alleged misstatements to determine whether Plaintiffs met the pleading standard to state a securities fraud claim.

The court held that, as alleged, Defendant's statements on May 13, 16, and 17, 2022 met the "material misrepresentation" standard. Order on MTD at 20, 23-25. Specifically, Defendant's May 13 tweet suggested that "the Twitter deal was on hold—and would not close—until Twitter provided information supporting its bot calculations. Or, put another way, a reasonable investor could have plausibly understood that Twitter was obligated to provide Defendant with the requested information for the deal to close." *Id.* at 19. "Because Plaintiffs have plausibly alleged that Twitter did not have that obligation, Defendant's statement that the deal was on hold pending details from Twitter about its bot calculations was materially misleading to reasonable investors." *Id.* at 20. Defendant's May 16 statement and tweets stated that 20% of Twitter's users were bots; the court held that Plaintiffs plausibly alleged the investing public was misled to believe Defendant had received this information from Twitter, when in fact he had not. *Id.* at 23. Defendant's May 17 tweet suggested that the percentage of Twitter bots could be higher than 20%

2

and that the deal could not move forward without proof from Twitter that the bots were less than 5%. The court held that Plaintiffs sufficiently pleaded these statements were false, for the same reasons stated above. *Id.* at 24-25.

With respect to Defendant's letters sent to Twitter on July 8, August 29, and September 9, 2022 terminating the Merger Agreement, the court held that they did not support a securities fraud claim because Plaintiffs had not sufficiently pleaded that the letters were false. *Id.* at 27. "Plaintiffs do not adequately specify which statements within the various letters are misleading or state the reason or reasons why they are." *Id.* (citing the PSLRA standard).

The court then analyzed scienter regarding the May 13, 16, and 17 statements. Specifically, the court examined the allegations that: "(a) Defendant 'personally negotiated' the Merger and therefore had actual knowledge of the falsity of the statements; (b) Defendant had a motive to depress Twitter stock; (c) Defendant's actions and ultimate settlement in the Delaware action are evidence of scienter; and (d) Defendant's dismissal of his financing lead is evidence of scienter." *Id.* at 29. The court found that Plaintiffs' allegations, "when viewed holistically, give rise to a strong inference of scienter." *Id.* at 30.

## II.     LEGAL STANDARDS

A party may serve on any other party a written request to admit the truth of any nonprivileged matter that is relevant to any party's claim or defense relating to (1) facts, (2) the application of law to fact, or opinions about either, or (3) the genuineness of any described documents. Fed. R. Civ. P. 36(a); *see also* Fed. R. Civ. P. 26(b)(1). "While the party seeking to compel discovery has the burden of establishing that its request satisfies relevancy requirements, the party opposing discovery bears the burden of showing that discovery should not be allowed, and of clarifying, explaining, and supporting its objections with competent evidence." *Lofton v. Verizon Wireless (VAW) LLC*, 308 F.R.D. 276, 281 (N.D. Cal. 2015) (citing *La. Pac. Corp. v. Money Mkt. 1 Inst'l Inv. Dealer,* 285 F.R.D. 481, 485 (N.D. Cal. 2012)).

It is well-established that "[t]he purpose of Rule 36(a) is to expedite trial by establishing certain material facts as true and thus narrowing the range of issues for trial." *Asea, Inc. v. S. Pac. Transp. Co*., 669 F.2d 1242, 1245 (9th Cir. 1981); *see also* Advisory Comm. Note to 1970

1  Amendment to Fed. R. Civ. P. 36 ("Rule 36 serves two vital purposes, both of which are designed
2  to reduce trial time. Admissions are sought, first to facilitate proof with respect to issues that
3  cannot be eliminated from the case, and secondly, to narrow the issues by eliminating those that
4  can be."). Accordingly, "there is general agreement that requests for admission are not to be
5  treated as substitutes for discovery processes to uncover evidence, and that they may not be
6  applied to controverted legal issues lying at the heart of the case. Their purpose is to eliminate
7  from the trial matters as to which there is no genuine dispute." *People of State of Cal. v. The Jules
8  Fribourg*, 19 F.R.D. 432, 436 (N.D. Cal. 1955). Rule 36(a) "is not to be used in an effort to
9  'harass the other side' or in the hope that a party's adversary will simply concede essential
10 elements." *Conlon v. United States*, 474 F.3d 616, 622 (9th Cir. 2007) (citing *Perez v. Miami-
11 Dade County,* 297 F.3d 1255, 1268 (11th Cir. 2002)).

## III. DEFENDANT'S REQUESTS FOR ADMISSION (JDL 207)

Defendant seeks to compel further responses to RFA Nos. 35-38, 45-46, 49-50, 61-64, 221-222, 230-231, 234-235, 238-239, and 242-245. Def. JDL. Plaintiffs object that the requests are duplicative, overbroad, and improper.

### C. Interpretation of the Merger Agreement (Def. RFAs 35-38, 45-46, 49-50, 61-64, 230-231, 234-235, 238-239, 242-245)

Most of Defendant's disputed RFAs seek admissions about Plaintiffs' interpretation of the Merger Agreement. These RFAs fall into two groups. The first group asks whether the Merger Agreement is "ambiguous" or "decipherable" on certain issues. For example, RFA 35 states: "Admit that the Merger Agreement is ambiguous as to whether Twitter was required to provide Bot Data as a condition to closing under the Merger Agreement." [Docket No. 207-1.] RFA 36 states the opposite: "Admit that the Merger Agreement is not ambiguous as to whether Twitter was required to provide Bot Data as a condition to closing under the Merger Agreement." *Id.* RFAs 37-38, 45-46, 49-50, and 61-64 ask similarly paired questions, either seeking admissions about whether the Merger Agreement is or is not "ambiguous," or is or is not "decipherable."

The second group of disputed RFAs about the Merger Agreement (230-231, 234-235, 238-239, and 242-245) asks Plaintiffs to admit or deny specific interpretations of the Merger

4

1    Agreement related to Sections 6.4 and 6.11.  For example, RFA 230 states: "Admit that the
2    Merger Agreement required Twitter to comply with Section 6.4 of the Merger Agreement from
3    April 25, 2022 through the Closing Date."  RFA 238 states: "Admit that had Twitter breached
4    Section 6.4 of the Merger Agreement prior to the Closing Date, it would not have performed or
5    complied in all material respects, with its obligations required under the Merger Agreement to be
6    performed or complied with by Twitter on or prior to the Closing Date."

Plaintiffs object to all of these RFAs for a variety of reasons, including that the RFAs call for legal conclusions, that Plaintiffs had no control or authority over the Merger Agreement, that the terms used in the RFAs such as "decipherable" are vague and ambiguous, and that the RFAs are premature because discovery (including expert discovery) is ongoing related to the requests.

Whether it is appropriate to use an RFA to seek an admission about a party's interpretation of a contract provision depends on the circumstances.  *See AETC II Privatized Hous., LLC v. United States*, No. 22-345C, 2025 WL 1416633, at *3 (Fed. Cl. May 15, 2025) (collecting cases).  Here, the court is guided by the reasoning in *James v. UMG Recordings, Inc.*, No. C 11-1613 SI (MEJ), 2013 WL 5402045, at *1-2 (N.D. Cal. Sept. 26, 2013), which distinguished between requests for admission as to the meaning of specific terms in a party's own contract, and those seeking the interpretation of a disputed provision of a contract going to the heart of the case. In *James*, the defendant asked the plaintiff to admit or deny that Music Downloads and Ringtones as defined in the plaintiff's complaint were "phonograph records" within the meaning of the plaintiff's own contract.  *Id.* at 1.  The court held that this was a permissible RFA because it asked the plaintiff "to admit its interpretation of the terms of its own contract, not to admit to [the defendant's] interpretation."  *Id.* at 2.  The court distinguished the *James* case from *GEM Acquisitionco, LLC v. Sorenson Grp. Holdings, LLC,* 2010 WL 1340562 (N.D. Cal. April 5, 2010).  In *Sorenson*, the plaintiff alleged that the defendant breached an agreement between the parties to acquire a loan portfolio by using an affiliate to make the acquisition.  The plaintiff propounded RFAs seeking admissions that the defendant had used an "Affiliate . . . as defined in the [parties'] Agreement" to acquire the portfolio.  *Sorenson Grp. Holdings*, 2010 WL 1340562, at *3.  The court found that this improperly called for a legal conclusion, because "[Plaintiff] is

United States District Court
Northern District of California

essentially asking [Defendant] to admit [Plaintiff's] interpretation of a disputed provision of the parties' contract: specifically, that [Defendant] acquired the portfolio in violation of the contract." *Id.*

Here, RFAs 230-231, 234-235, 238-239, and 242-245 do not ask about specific terms in Plaintiffs' own contract. Rather, they ask Plaintiffs to admit or deny different interpretations of the Merger Agreement; for example, to admit or deny if Twitter would have been in breach of the Merger Agreement if it withheld certain information. The court finds that these RFAs are improper because what the Merger Agreement did or did not require Defendant and Twitter to do is hotly disputed and central to Plaintiffs' theory of securities fraud. "Issues obviously subject to dispute should be resolved at trial, not in a discovery motion [to compel a response to an RFA]." *Stokes v. Interline Brands Inc*, No. C-12-05527 JSW (DMR), 2013 WL 6056886, at *2 (N.D. Cal. Nov. 14, 2013) (citing *Perez,* 297 F.3d at 1269). Defendant argues that he is merely attempting to "pin down Plaintiffs' position regarding the clarify of the Merger Agreement." Def. JDL 2. The court finds that these RFAs go beyond that and apply to "controverted legal issues lying at the heart of the case." *See Jules Fribourg*, 19 F.R.D. at 436. The RFAs do not serve the purpose of eliminating from trial matters as to which there is no genuine dispute. They are particularly inappropriate here because Plaintiffs were not a party to the Merger Agreement and cannot speak, at least as percipient drafters, to "the intent of the parties to [the] contract and what they understood the contract to mean." *See Disability Rts. Council v. Wash. Metro. Area*, 234 F.R.D. 1, 3 (D.D.C. 2006). The court finds that these RFAs are impermissible.

RFAs 61-64 ask whether the Merger Agreement was "decipherable" as to Defendant's rights. Defendant does not explain what he means by "decipherable," other than by pointing to one of Plaintiffs' briefs from last year which used the word "decipher" two times. Def. JDL 3; [Docket No. 62]. Plaintiffs' brief did not use "decipher" as a legal term, and the brief does not elucidate Defendant's use of the term "decipherable" in his RFAs. Generally, if the parties are unable to agree with the exact wording of an RFA, they should agree to an alternate wording or stipulation. *See Marchand v. Mercy Med. Ctr.*, 22 F.3d 933, 938 (9th Cir. 1994) (citing *Milgram Food Stores, Inc. v. United States,* 558 F. Supp. 629, 636 (W.D. Mo. 1983)). No such attempt

6

appears to have been made here.  The parties shall meet and confer to reach an agreement on the meaning of the terms in RFAs 61-64 or on an alternative phrasing.

        The court finds that RFAs 35-38, 45-46, and 49-50 are permissible because they ask whether the Merger Agreement was "ambiguous" as to Defendant's rights according to Plaintiffs' own understanding of the contract.  There appears to be no genuine dispute about this.  Plaintiffs already stated in response to Defendant's Interrogatory No. 4 that they "do not believe that any provisions in the Merger Agreement were ambiguous," a position which they reiterated in the joint discovery letter.  Def. JDL 3.  As such, Plaintiffs cannot credibly claim they lack information sufficient to admit or deny that the Merger Agreement was ambiguous as to Defendant's rights.  *See Sorenson Grp. Holdings*, 2010 WL 1340562, at *2.  Plaintiffs may in good faith add qualifications to explain the surrounding context of their answers; but first they must answer the RFAs as written.  *See Tesla, Inc. v. Cao*, No. 19-CV-01463-VC (KAW), 2020 WL 8515010, at *1 (N.D. Cal. Dec. 10, 2020) (citing Fed. R. Civ. P. 36(a)(4)).

        Defendant's motion to compel a response to RFAs 35-38, 45-46, and 49-50 is granted.  Defendant's motion to compel a response to RFAs 230-231, 234-235, 238-239, and 242-245 is denied.  The parties shall meet and confer on the terms used in RFAs 61-64.

        **D.**    **SparkToro Blog Post (Def. RFAs 221-222)**

        Defendant's RFA 221 states: "Admit that on May 15, 2022, SparkToro published a post available at https://sparktoro.com/blog/sparktoro-followerwonk-joint-twitter-analysis-19-42-ofactiveaccounts-are-fake-or-spam/, which is attached hereto as Exhibit 2."  [Docket No. 207-1.]  RFA 222 states the opposite: "Admit that on May 15, 2022, SparkToro did not publish a post available at https://sparktoro.com/blog/sparktoro-followerwonk-joint-twitter-analysis-19-42-ofactiveaccounts-are-fake-or-spam/, which is attached hereto as Exhibit 2."  *Id.*  Plaintiffs objected on the basis of lack of personal knowledge, noting that the referenced link "results in a message '404. Oops! That page can't be found.'"  *Id.*

        "[A] party may not refuse to admit or deny a request for admission based upon a lack of personal knowledge if the information relevant to the request is reasonably available to him."  *Asea, Inc. v. S. Pac. Transp. Co.*, 669 F.2d 1242, 1245 (9th Cir. 1981).  A "reasonable inquiry is

7

limited to persons and documents within the responding party's control, such as its employees, partners, and corporate affiliates; it does not require the responding party to interview or subpoena records from third parties . . . or force it to admit or deny facts testified to by a third party as to which the responding party has no personal knowledge." *Unicolors, Inc. v. Kohl's Dep't Stores, Inc.*, No. CV 17-4073-GW (PLAX), 2018 WL 5274584, at *7 (C.D. Cal. Mar. 6, 2018) (citations omitted).

Defendant asserts that Plaintiffs demonstrably have access to the SparkToro article because Plaintiffs attached it to their own discovery requests. Def. JDL 3. During meet and confer, Defendant located the internet archive version of the article which indicated that the article was published on May 15, 2022 and sent it to Plaintiffs. Defendant argues that Plaintiffs could have conducted a reasonable inquiry and discovered enough information to answer the RFAs. Defendant's arguments lack merit. The link in the RFAs is broken. Defendant made no attempt to amend the RFAs to provide Plaintiffs with a functional link. Furthermore, having access to a third party's article and an archived version of the article does not mean Plaintiffs are in a position to verify that the third party published the article on a particular date, which is what the RFA asks.

Defendant's motion to compel a response to RFAs 221-222 is denied.

### IV.    PLAINTIFFS' REQUESTS FOR ADMISSION (JDL 208)

Plaintiffs seek to compel a response to RFAs 229, 383-386, and 388-389. Plf. JDL. Defendant refuses on the basis that the RFAs are not relevant or are improper. *Id.*

#### A.    Twitter's Content Moderation After Acquisition (Plf. RFA 229)

Plaintiffs' RFA 229 states: "Admit that, since October 26, 2022, Elon Musk personally has made decisions about content moderation on the Twitter Platform." [Docket No. 208-1.]

Defendant argues that Twitter's post-class period content moderation activities, and Defendant's alleged involvement in them, are irrelevant to the elements of Plaintiffs' securities fraud claims. Plf. JDL 3-4. Plaintiffs asserts that the RFA is relevant because they expect Defendant to testify that he bought Twitter to "advance free speech." *Id.* at 2. To rebut this expected motive testimony, Plaintiffs seek evidence to support that after Defendant acquired Twitter, he banned or suspended Twitter accounts that did not match his own political beliefs. *Id.*

8

At this stage, it is not clear whether particular evidence about Defendant's motives for buying Twitter will be admissible. However, information "need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1). Defendant cites *Graf v. United States*, No. CR 04-00492 MMM, 2015 WL 13708666, at *15 (C.D. Cal. Dec. 15, 2015), to argue that a "witness may not be . . . impeached by contradiction upon a collateral matter." Plf. JDL 3-4. The court finds that *Graf* is distinguishable. *Graf* was about admissibility at trial, not about relevance at the discovery stage, and the "collateral matter" in *Graf* was more attenuated.

Here, Plaintiffs assert that Defendant might testify about his motives for purchasing Twitter at trial, and Defendant does not dispute this. In addition, Defendant's motives for purchasing Twitter could go toward Defendant's state of mind during his alleged later attempts to back out of the purchase or renegotiate it. In such circumstances, evidence that would tend to contradict Defendant's testimony about his motives could go to Defendant's credibility as a witness on a material fact. This would not be a collateral matter. The response to the RFA might not ultimately be admissible, but under the broad scope of Rule 26(b), it is relevant and discoverable. Plaintiffs' motion to compel a response to RFA 229 is granted.

### B.     Renegotiating the Price (Plf. RFAs 383-384)

Plaintiffs' RFA 383 states: "Admit that Elon Musk never publicly stated that he wanted to renegotiate the price of the Twitter deal after May 11, 2022 but before October 4, 2022." [Docket No. 208-2.] Plaintiffs' RFA 384 states: "Admit that Elon Musk never publicly stated that he wanted to pay a lower price than $54.20 per Twitter share after May 11, 2022 but before October 4, 2022." *Id.* Defendant objects that these RFAs are not relevant.

Plaintiffs argue that these RFAs "go to the heart of Plaintiffs' theory—that Musk made misstatements and engaged in a fraudulent scheme in an attempt to renegotiate the price of the Twitter deal." Plf. JDL 2-3. Defendant asserts that because there is no allegation that Defendant made any misrepresentations concerning a desire to renegotiate the price of Twitter, the RFAs are irrelevant. *Id.* at 4.

Defendant interprets relevance too narrowly. Even though Plaintiffs do not allege that Defendant made a misrepresentation about renegotiating the price of Twitter, Plaintiffs do allege

9

that Defendant made other misrepresentations as part of a secret scheme to pressure Twitter into lowering the price of the deal. Defendant's public statements (or lack thereof) about renegotiating the Twitter price are thus relevant to Plaintiffs' overall theory of liability. If no public statements on this topic were made, the responses to the RFAs could lend support to Plaintiffs' argument that Defendant was enacting a secret scheme to try to renegotiate the price. Plaintiffs' motion to compel a response to RFAs 383-384 is granted.

### C. Calculation of Spam Accounts (Plf. RFAs 385-386)

Plaintiffs' RFA 385 states: "Admit that, as of June 25, 2022, Twitter had provided Elon Musk, or his advisors, with an explanation of Twitter's methodology for calculating the number of spam or fake accounts as a percentage of mDAU." [Docket No. 208-2.] Plaintiffs' RFA 386 states: "Admit that, as of June 25, 2022, Twitter had provided Elon Musk, or his advisors, with some of the data Elon Musk had requested in order to calculate the number of spam or fake accounts as a percentage of mDAU." *Id.* Defendant objects that the RFAs are "not drafted in a way to elicit a meaningful response from Defendant." *Id.*

Defendant provides no authority for his assertion that he can simply refuse to answer an RFA if the answer would give "misleading impressions." JDL 4. Defendant takes issue with describing Twitter's explanation of its bot calculation as a "methodology" because of how allegedly "laughable" the explanation was. *Id.* This is not a reason to refuse to answer the RFAs. Defendant may in good faith admit to only part of the RFA, or add a qualification to his answer to explain the surrounding context. *See Tesla*, 2020 WL 8515010, at *1 (citing Fed. R. Civ. P. 36(a)(4)). But he must first answer the RFA as written. *See id.*

Plaintiffs' motion to compel a response to RFAs 385-386 is granted.

### D. Advice of Counsel Defense (Plf. RFAs 388-389)

Plaintiffs' RFA 388 states: "Admit that you are not asserting any defense based on advice of counsel, reliance on counsel, presence of counsel, or involvement of counsel in this case." [Docket No. 208-2.] Plaintiffs' RFA 389 states: "Admit you are not relying on, or intend to use, the presence, involvement or advice of counsel as evidence of your good faith, lack of intent, or state of mind in this case." *Id.* Defendant objects on the basis that the RFAs are overbroad, as it is

10

1  not clear whether they encompass Defendant relying on the testimony of lawyers other than legal
2  advice to Defendant (such as deposition testimony of a lawyer acting as a witness).  Plf. JDL 4.
3  Plaintiffs assert that they simply want to confirm whether Defendant will rely on the
4  advice of counsel defense.  Plf. JDL 3.  Defendant states that he is willing to confirm that he will
5  not rely on the advice of counsel defense, and that he is willing to meet and confer with Plaintiffs
6  to clarify the scope of the RFAs, but that Plaintiffs have not been open to that discussion.  *Id.* at 4.
7  The court finds that the wording of the RFAs is ambiguous.  Plaintiffs have not explained
8  why they cannot amend their RFAs to clearly state what they seek to confirm.  The court orders
9  the parties to meet and confer on language regarding the advice of counsel defense.  Plaintiffs
10 shall then amend the RFAs and Defendant shall answer them.

## V.     CONCLUSION

The court grants Defendant's motion to compel a response to Def. RFAs 35-38, 45-46, and 49-50.  Plaintiffs shall respond to these RFAs by **July 21, 2025.**  The court denies Defendant's motion to compel a response to Def. RFAs 221-222, 230-231, 234-235, 238-239, and 242-245.  The court orders the parties to meet and confer on Def. RFAs 61-64; any amended RFAs shall be served by **July 21, 2025**, and Plaintiffs shall answer them by **July 28, 2025**.

The court grants Plaintiffs' motion to compel a response to Plf. RFAs 229 and 383-386.  Defendant shall respond to these RFAs by **July 21, 2025.**  The court orders the parties to meet and confer on Plf. RFAs 388-389; Plaintiffs shall serve amended RFAs by **July 21, 2025** and Defendant shall answer them by **July 28, 2025**.

**IT IS SO ORDERED.**

Dated: June 30, 2025

_____
Donna M. Ryu
Chief Magistrate Judge

11