QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice*)
alexspiro@quinnemanuel.com
Jesse A. Bernstein (*pro hac vice*)
Jessebernstein@quinnemanuel.com
Jonathan E. Feder (*pro hac vice*)
jonathanfeder@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, NY 10016
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Joseph C. Sarles (Bar No. 254750)
josephsarles@quinnemanuel.com
Stephen A. Broome (Bar No. 314605)
stephenbroome@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*Attorneys for Defendant Elon Musk*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | CASE NO. 3:22-CV-05937-CRB<br><br>**DECLARATION OF ALEX SPIRO IN RESPONSE TO THE COURT'S ORDER FOR SUPPLEMENTAL BRIEFING ON DISCOVERY DISPUTES [Dkt. 217]**<br><br>**[REDACTED SUBJECT TO ADMINISTRATIVE SEALING MOTION]**<br><br>Judge: Hon. Charles R. Breyer<br><br>Magistrate Judge: Hon. Donna M. Ryu |

I, Alex Spiro, declare as follows:

1. I am admitted *pro hac vice* to practice in this Court and am a partner at Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), attorneys for Defendant Elon R. Musk in this action. I have personal knowledge of the facts set forth herein and if called as a witness, I could and would competently testify thereto.

2. On June 26, 2025, the Court issued an Order for Supplemental Briefing on Discovery Disputes (Dkt. 216, "Supplemental Order"). In its Supplemental Order, the Court instructed me to file a (1) "detailed declaration about the alleged May 13 communications with [Mr.] Musk" concerning two Tweets Mr. Musk posted that day and (2) "submit a detailed declaration that supports each aspect of the assertion of privilege" over certain data requests sent to Twitter on or around May 17, 2022. I submit this declaration and provide the following testimony in response to the Supplemental Order.

3. On July 3, 2025, Plaintiffs filed a letter to the Court representing that they considered me a "necessary witness with material information" and intended to call me as a witness at trial and move to disqualify me as counsel "both if they obtain [my] deposition testimony and if they do not." Dkt. 219.

4. On July 6, 2025, after learning Plaintiffs' position, we sent Plaintiffs an email offering to make me available for a 45 minute deposition on three of the four topics Plaintiffs identified in their Opposition to the Motion to Quash: (1) my alleged communications with Musk and with Morgan Stanley relating to the two at-issue tweets Musk sent on May 13, 2022; (2) my alleged selection of third-party data analysts Musk retained to evaluate Twitter's percentage of spam accounts; and (3) my purported involvement in preparing data requests sent to Twitter on May 17, 2022. The offer was subject to certain conditions primarily aimed at ensuring that my agreement to be deposed would not be construed as a waiver of attorney-client privilege or work product and would not be used offensively in any motion practice arising from Plaintiffs' attempt to disqualify me as counsel. A true and correct copy of that email is attached hereto as **Exhibit 1**.

5. My colleagues met and conferred with Plaintiffs counsel on July 8, 2025 concerning our proposal. The parties did not reach an agreement. *See* **Exhibit 1**.

**Communications With Mr. Musk Concerning The May 13 Tweets**

6. The Court ordered me to provide the following information concerning my May 13, 2022 communications with Mr. Musk about his May 13 Tweet: "(a) whether he communicated with Musk about the May 13 tweets, (b) the form of each communication (i.e., by email, text, phone, in person, etc.), (c) the attorney and client involved, (d) all persons present during each communication (i.e., who could hear what was being said, who was copied on an email, etc.), (e) all persons or entities known to have been informed of the substance of each communication, (f) the date, time, and duration of each communication with as much specificity as possible, and (g) factual details providing the context of each communication to support any claim that its primary purpose was to provide confidential legal advice as opposed to business advice."

7. To the best of my recollection, on May 13, 2022, I had a single telephone call with Mr. Musk concerning his Tweet "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users."  I believe that our conversation occurred at some point between 5:44 a.m. ET, when Mr. Musk posted the first Tweet, and 7:50 a.m. ET, when Mr. Musk posted the second Tweet—"Still committed to acquisition."  I believe that the conversation was only a few minutes long.

8. As of May 13, 2022, I was in an attorney-client relationship with Mr. Musk and I was actively representing him in connection with the Twitter Merger (as well as other matters).  In that capacity, I was advising him on a number of legal issues relating to the Merger, including his rights and obligations under the Merger Agreement, issues concerning Twitter's SEC disclosures and calculation of spam accounts, his rights to information concerning Twitter's calculation of spam accounts, the various remedies available to him under the Merger Agreement, and litigation options and strategies should they be necessary.  As part of my representation of Mr. Musk, I also represented Jared Birchall in his capacity as Mr. Musk's employee, the head of Mr. Musk's family office, and one of Mr. Musk's lead representatives in the Merger

9. To the best of my knowledge, the only people present for this conversation were myself and Mr. Musk.  I was alone and understood that Mr. Musk was alone as well.

10. During this conversation, I had confidential communications with Mr. Musk about ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. I regard this conversation to be a privileged attorney-client communication.

11. Later that morning, I had two brief conversations with Anthony Armstrong and Michael Grimes, two of Mr. Musk's investment bankers from Morgan Stanley retained to represent Mr. Musk's interest during the Merger, about my communication with Mr. Musk.

12. At the time, Morgan Stanley was Mr. Musk's primary point of contact with Twitter in the post-signing due diligence process and responsible for making information requests on Mr. Musk's behalf, including his request for information concerning "[h]ow [Twitter] estimate[s] that fewer than 5% of mDAU are spam accounts?", a "[u]ser database containing key metrics including . . . number of users," and a "user data dump." Attached hereto as **Exhibit 3** is a true and correct copy of Exhibit 29 to the deposition of Kate Claassen, another Morgan Stanley executive representing Mr. Musk's interests in the Merger. The Exhibit contains some of Morgan Stanley's communications regarding Mr. Musk's information requests.

13. To perform its critical role in connection with the Merger, including spearheading the diligence process on Mr. Musk's behalf, the Morgan Stanley team needed to have confidential communications with me and Mr. Musk's deal lawyers from Skadden to obtain legal advice relating to Mr. Musk's rights and obligations under the Merger Agreement. Additionally, because Morgan Stanley was responsible for securing financing for the Merger and leading the due diligence, Mr. Musk's deal lawyers and I relied on Morgan Stanley to provide us with information and analysis that was necessary for us render legal advice to Mr. Musk relating to the Merger.

14. On the morning of May 13, 2022, at some point after the phone call with Mr. Musk described above in paragraphs 7-10, I had a phone call with Mr. Armstrong. To the best of my recollection, the call lasted no more than a few minutes and I conveyed the following information to Mr. Armstrong about my call with Mr. Musk: (1) I spoke to Mr. Musk after he sent the first

1  Tweet, and (2) consistent with the second Tweet, which he sent after our conversation, Mr. Musk
2  remained committed to the acquisition so long as he got the information Twitter agreed to provide.

3      15.    I also spoke to Mr. Grimes that morning.  Again, this conversation was brief—no
4  more than a few minutes.  To the best of my recollection, I conveyed the same information to Mr.
5  Grimes that I did to Mr. Armstrong: that I spoke to Mr. Musk after he sent the first Tweet and that
6  he remained committed to the acquisition,  I have reviewed Mr. Grimes' deposition testimony and
7  I understand that he testified that I ███████████████████████████████████████████████
8  ████████████████████████████████████████████████████████████████████████████████
9  ████████████████████████████████████████████████████████████████████████████████
10 ███

11     16.    ████████████████████████████████████████████████████
12 ████████████████████████████████████████████████████████████████████████████████
13 ███  But I have no recollection or reason to believe that I shared any confidential legal advice
14 that I gave to Mr. Musk with Mr. Grimes on that call.  This is based on my best recollection, the
15 specific context of that call, and my practice of not sharing—with extremely limited exceptions
16 involving Mr. Birchall or other lawyers representing Mr. Musk in litigation—the details of my
17 confidential communications with Mr. Musk.

18     17.    In addition to my conversations with Messrs. Armstrong and Grimes, I believe that I
19 communicated  with Jared Birchall about my May 13, 2022  conversation with Mr. Musk.  I do not
20 recall precisely when I spoke to Mr. Birchall, the length of our communication, or the specific details
21 of that conversation.  As noted above, Mr. Birchall is Mr. Musk's employee, the head of his family
22 office, and served as his representative in connection with the Merger negotiations.  For all intents
23 and purposes, Mr. Birchall served as Mr. Musk's agent in the Merger when Mr. Musk was not
24 handling the matter personally.  In that capacity, I had an attorney-client relationship with Mr.
25 Birchall.

26     18.    Finally, I have had communications with other lawyers at Quinn Emanuel concerning
27 my conversation with Mr. Musk, including in connection with my Motion to Quash and this
28 declaration, as part of our firm's representation of him.

19. Beyond the above identified persons, I have not disclosed the substance of my May 13, 2022 conversation with Mr. Musk to any other person.

**May 17, 2022 Data Requests**

20. The Court also seeks additional information concerning certain draft data requests that I forwarded to Mike Ringler on May 16, 2022 and that Mr. Ringler sent to Twitter the following day.

21. I had very little involvement with the data requests. I did not come up with the idea for them nor did I draft them. Moreover, I was involved with the data requests only in my capacity as legal counsel to Mr. Musk and his team and passed a draft of them along to Mr. Ringler for internal discussion.

22. My only communication concerning the draft data requests that Plaintiffs identified is an email exchange with Mr. Ringler, Mr. Musk's lead deal counsel for the Twitter Merger. Mr. Ringler, like myself, was in an attorney-client relationship with Mr. Musk to provide legal advice and services in connection with the Merger. The only communications I had with Mr. Ringler regarding the draft data requests were confidential and concerned legal advice and strategy concerning Mr. Musk's rights under the Merger Agreement.

23. I am not asserting work product privilege over the final data requests themselves—as Plaintiffs note, they were ultimately sent to Twitter. Nor am I claiming work product over my thought process when they were drafted, as I did not draft them. I do, however, assert that certain of my opinions and thought processes relating to the draft requests are protected work product.

24. As of May 16, 2022—when the draft requests were circulated internally among Mr. Musk's team—Twitter had yet to provide a written explanation of how it calculated that spam accounts made up less than 5% of its mDAU or raw data supporting its calculation, despite promising Mr. Musk that it would do so at the first integration meeting on May 6. Attached hereto as **Exhibits 4 and 5** are true and correct copies of relevant deposition testimony from Ms. Claassen and Mr. Armstrong. ████████████████████████████
████████████████████████████████████████████
████████████████████████████████████ **Ex. 5** at 279:2-280:20.

1  █████████████████████████████████████████████████████████████
2  █████████████████████████████████████████████████████████████
3  ████████████████████████████████████ *Id.* at 303:14-304:20.

4      25.  Under the Merger Agreement, Mr. Musk was entitled to information from Twitter for integration planning, to confirm that Twitter's representations and warranties were accurate, and to assist with financing. In May 2022, Mr. Musk and his team were attempting to exercise those rights to obtain information necessary to satisfy conditions to close the Merger—including by sending the data requests on May 17. But if Twitter failed to comply with its various contractual obligations, Mr. Musk had certain remedies under the Merger Agreement, the exercise of which could lead to litigation. Based on the facts as of May 16—including Twitter's failure to produce the information Mr. Musk requested and the publication of the Sparktoro analysis—I was aware of the prospect of litigation. While data requests were not prepared exclusively for litigation, I certainly had thought processes and formed opinions relating to Mr. Musk's rights to the data he requested in anticipation of potential litigation (*e.g.*, if there was to be a dispute over the scope of the requests and/or Mr. Musk's rights to the requested information).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on this 8th day of July, 2025 in Miami, Florida.

By     */s/ Alex Spiro*
       Alex Spiro

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on July 8, 2025.

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By /s/ Alex Bergjans
Alex Spiro
Jesse A. Bernstein
Jonathan Feder
Michael T. Lifrak
Joseph C. Sarles
Stephen Broome
Alex Bergjans
Nathan Archibald

*Attorneys for Defendant Elon Musk*

**ATTESTATION**

Pursuant to Civil L.R. 5-1, I attest under penalty of perjury that concurrence in the filing of this document has been obtained from the other signatory herein.

By /s/ Alex Bergjans
Alex Bergjans

*Attorneys for Defendant Elon Musk*