QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice* )
alexspiro@quinnemanuel.com
Jesse A. Bernstein (*pro hac vice*)
Jessebernstein@quinnemanuel.com
Jonathan E. Feder (*pro hac vice*)
jonathanfeder@quinnemanuel.com
Stephanie Kelemen (*pro hac vice*)
stephaniekelemen@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, NY 10016
Telephone:      (212) 849-7000
Facsimile:      (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Stephen A. Broome (Bar No. 314605)
stephenbroome@quinnemanuel.com
Joseph C. Sarles (Bar No. 254750)
josephsarles@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:      (213) 443-3000
Facsimile:      (213) 443-3100

*Attorneys for Defendant Elon Musk*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | Case No. 3:22-CV-005937-CRB<br><br>**DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF ADAM BADAWI**<br><br>Judge:  Hon. Charles R. Breyer<br><br>Magistrate Judge:  Hon. Donna M. Ryu<br><br>Hearing Date:    October 31, 2025<br>Time:                10:00 AM<br>Courtroom:        6, 17th Floor |

**TABLE OF CONTENTS**

Page

NOTICE OF MOTION AND MOTION ...................................................................................1

STATEMENT OF ISSUES TO BE DECIDED (CIVIL L.R. 7-4(A)(3)).......................................1

SUMMARY OF ARGUMENT ..............................................................................................1

BACKGROUND..................................................................................................................3

      A.      The Merger Agreement and Plaintiffs' Allegations.....................................................3

      B.      Professor Badawi's Opinions .......................................................................4

ARGUMENT .....................................................................................................................5

I.      BADAWI'S OPINIONS ABOUT MUSK'S RIGHTS UNDER THE "UNAMBIGUOUS" MA ARE INADMISSIBLE LEGAL CONCLUSIONS AND PAROL EVIDENCE.........................................................................5

      A.      Badawi's Improper Legal Opinions Should Be Excluded .........................................5

      B.      Badawi's Opinion that the MA Is "Seller-Friendly" Is Legal Opinion and Irrelevant .....................................................................................................7

      C.      Badawi's Remaining "Custom and Practice" Evidence Should Be Excluded..........8

II.      BADAWI  CONDUCTED NO INDEPENDENT ANALYSIS AND HAS NO RELIABLE BASIS TO OPINE THAT THE MA IS "SELLER-FRIENDLY" ....................9

      A.      The Court Should Exclude Badawi's Opinions Based On The Coates Report..........9

      B.      The Court Should Exclude Badawi's "Empirical Judgment" That The MA Was "Seller-Friendly" As Untestable And Unreliable..........................................12

III.      BADAWI'S REMAINING OPINIONS ARE NOT PROPER SUBJECTS OF EXPERT TESTIMONY.........................................................................................14

      A.      Badawi Cannot Opine About Imaginary Provisions In Musk's Confidentiality Agreement With Twitter ...............................................................14

      B.      Badawi Cannot Testify About Musk's Or The Market's State Of Mind.................14

      C.      Plaintiffs Cannot Use Badawi To Present A Narrative Of The Facts ......................16

CONCLUSION .................................................................................................................16

DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF ADAM BADAWI

## **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*AB Stable VIII LLC v. Maps Hotels & Resorts One LLC.*,
    2020 WL 7024929 (Del. Ch. Nov. 30, 2020)........................................................................ 7, 8

*Arista Networks, Inc. v. Cisco Sys. Inc.*,
    2018 WL 8949299 (N.D. Cal. June 15, 2018) ................................................................... 14, 15

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
    613 F. Supp. 3d 1308 (S.D. Cal. 2020) ...................................................................... 2, 5, 6, 15

*Bona Fide Conglomerate, Inc. v. SourceAmerca*,
    2019 WL 1369007 (S.D. Cal. Mar. 26, 2019)........................................................................... 5

*Carrow v. Arnold,*
    2006 WL 3289582 (Del. Ch. Oct. 31, 2006), *aff'd*,
    933 A.2d 1249 (Del. 2007)......................................................................................................... 8

*In re ConAgra Foods, Inc.*,
    302 F.R.D. 537 (C.D. Cal. 2014) ............................................................................................ 10

*Corbrus, LLC v. 8th Bridge Cap., Inc.*,
    2022 WL 4239055 (C.D. Cal. Sept. 13, 2022)...................................................................... 8, 9

*Crescenta Valley Water Dist. v. Exxon Mobile Corp.*,
    2013 WL 12120533 (C.D. Cal. Mar. 14, 2013) ...................................................................... 10

*Exelon Generation Acquisitions, LLC v. Deere & Co.*,
    176 A.3d 1262 (Del. 2017)......................................................................................................... 8

*Fosmire v. Progressive Max Ins. Co.*,
    277 F.R.D. 625 (W.D. Wash. 2011)............................................................................... 2, 10, 11

*Fujifilm Corp. v. Motorola Mobility LLC*,
    2015 WL 757575 (N.D. Cal. Feb. 20, 2015)........................................................................... 16

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ................................................................................................................. 13

*Gold v. Lumber Liquidators, Inc.*,
    323 F.R.D. 280 (N.D. Cal. 2017) ................................................................................... 3, 14, 15

*Hangarter v. Provident Life & Acc. Ins. Co.*,
    373 F.3d 998 (9th Cir. 2004)...................................................................................................... 7

*Highland Capital Mgmt., L.P. v. Schneider*,
    379 F.Supp. 2d 461 (S.D.N.Y. 2005) ...................................................................................... 16

DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF ADAM BADAWI

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
    252 F. Supp. 2d 1005 (C.D. Cal. 2003), *aff'd sub nom. Mortensen v. Snavely*,
    145 F. App'x 218 (9th Cir. 2005) ................................................................................. 9, 10, 12

*In re NFL's "Sunday Ticket" Antitrust Litig.*,
    2024 WL 2075942 (C.D. Cal. May 7, 2024) ........................................................................ 16

*King v. DePuy Orthopaedics Inc.*,
    2023 WL 8009790 (D. Ariz. Nov. 17, 2023) ........................................................................ 11

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ................................................................................................................ 12

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008) ................................................................................................... 14

*McCoy v. DePuy Orthopaedics, Inc.*,
    2024 WL 1705952 (S.D. Cal. Apr. 19, 2024) ....................................................................... 10

*Monroe v. Zimmer U.S. Inc.*,
    766 F. Supp. 2d 1012 (E.D. Cal. 2011) ................................................................................. 14

*In re Paraquat Prods. Liab. Litig.*,
    730 F. Supp. 3d 793 (S.D. Ill. 2024) ..................................................................................... 12

*PMI Mortg. Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*,
    291 F. App'x 40 (9th Cir. 2008) ........................................................................................... 2, 6

*In re Ready-Mixed Concrete Antitrust Litig.*,
    261 F.R.D. 154 (S.D. Ind. 2009) ........................................................................................... 12

*Sassano v. CIBC World Markets Corp.*,
    948 A.2d 453 (Del. Ch. 2008) .................................................................................................. 8

*Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*,
    206 A.3d 836 (Del. 2019) ..................................................................................................... 2, 8

*Synergy Hematology-Oncology Med. Assocs. Inc. v. Abbott Labs., Inc.*,
    2023 WL 3319218 (C.D. Cal. Mar. 15, 2023) ........................................................................ 6

*Tokio Marine & Fire Ins. Co. v. Norfolk & W. Ry. Co.*,
    172 F.3d 44 (4th Cir. 1999) .................................................................................................... 10

*In re Twitter, Inc. Sec. Litig.*,
    2020 WL 9073168 (N.D. Cal. Apr. 20, 2020) ......................................................................... 3

*U.S. Postal Serv. v. Jamke*,
    2017 WL 131991 (E.D. Cal. Jan. 12, 2017) ............................................................................ 7

*United States v. Redlightning,*
624 F.3d 1090 (9th Cir. 2010) ........................................................................................ 12

*USI Ins. Servs. LLC v. Alliant Ins. Servs. Inc.,*
2025 WL 1767988 (D. Ariz. June 26, 2025) ................................................................. 13

**<u>Rules</u>**

Fed. R. Evid. 104 ............................................................................................................ 16

Fed. R. Evid. 702 ........................................................................................................ 1, 10

Fed. R. Evid. 703 ............................................................................................................ 10

DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF ADAM BADAWI

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on October 31, 2025 at 10:00 a.m., before The Honorable Charles R. Breyer, United States District Court, San Francisco Courthouse, Courtroom 6, 17th Floor, at 450 Golden Gate Avenue, San Francisco, CA, Defendant Elon R. Musk will move for an order pursuant to Federal Rules of Evidence 702 and 403 excluding all the opinions of Professor Adam Badawi because they (1) interpret what Plaintiffs contend is an unambiguous Merger Agreement and thus constitute improper legal conclusions and inadmissible parol evidence, Ex. 209, Expert Report of Adam Badawi ("Badawi Rp't") ¶¶ 11-69,78-79, 90-100; (2) parrot without verification an expert report prepared in another action by an expert who will not testify and otherwise lack foundation, *id.* ¶¶ 50-69; (3) are speculative, describe Musk's and various market participants' states of mind, and narrate otherwise admissible evidence about which he Badawi lacks personal knowledge, *id.* ¶¶ 41-50; 70-91.  This Motion is based on this Notice of Motion and Motion; Defendant's Memorandum of Points and Authorities, incorporated herein; the Declaration of Jesse Bernstein and accompanying exhibits ("Ex."); and other matters before the Court.

**STATEMENT OF ISSUES TO BE DECIDED (CIVIL L.R. 7-4(a)(3))**

Whether Plaintiffs have met their burden to prove that Badawi's opinions are admissible under Federal Rules of Evidence 702 and 403 where he: (1) interprets the terms of the unambiguous Merger Agreement and concludes that Musk misstated and/or breached them, (2) opines that Musk had "buyer's remorse" and other market participants suffered from "uncertainty," and (3) narrates record evidence in a manner helpful to Plaintiffs.

**SUMMARY OF ARGUMENT**

Plaintiffs accuse Musk of lying about his rights under what they contend is an unambiguous Merger Agreement ("MA") with Twitter.  Specifically, they allege he falsely tweeted that the MA entitled him to delay closing the transaction until he received information relating to Twitter's calculation of the prevalence of spam and bot accounts on its platform.  To support their case, Plaintiffs retained Professor Adam Badawi—a Berkeley law professor who teaches contracts and corporations—to offer opinions on merger and acquisition "custom and practice."  But Badawi's

DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF ADAM BADAWI

testimony suffers from three fatal flaws that require its exclusion in its entirety under Federal Rules of Evidence 702 and 403.

*First*, Badawi improperly interprets the MA under the guise of offering "custom and practice" testimony. Despite claiming otherwise, Badawi repeatedly offers legal conclusions about what the MA means—opining that Musk "had no right [under the MA] to terminate" based on Twitter's failure to provide information, that Musk claimed rights that "were at odds with the Merger Agreement," and that the MA must be construed narrowly because it purportedly is "seller-friendly." "Unless a contract is deemed ambiguous or there is a term of the contract that requires an expert's explanation, it is improper for an expert to interpret or construe a contract in his opinion." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1320-22 (S.D. Cal. 2020); *see also PMI Mortg. Ins. Co. v. Am. Int'l Specialty Lines Ins. Co*., 291 F. App'x 40, 41 (9th Cir. 2008) ("The expert testimony proffered . . . went to the interpretation of the underlying settlement agreement, a contract, an ultimate question of law upon which the opinion of an expert may not be given."). Moreover, under Delaware law—which governs this integrated contract—courts must interpret unambiguous agreements "without resort to extrinsic evidence." *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019). Since Plaintiffs assert the MA is unambiguous, Badawi's interpretation of the MA in light of "custom and practice" is both inadmissible legal opinion and extrinsic evidence barred by the parol evidence rule.

*Second*, Badawi's "custom and practice" and "seller-friendly" opinions lack any reliable foundation. While claiming to compare the MA to "contemporaneous deals for U.S. public targets," Badawi identified no other merger agreement in his analysis. Instead, he wholesale adopted *conclusions* from Professor John Coates' expert report—prepared for Twitter's litigation against Musk—without any independent verification. Badawi did not read the 85 merger agreements Coates analyzed, never confirmed Coates accurately characterized their terms, and didn't even have access to Coates' underlying data when Badawi wrote his own report. Courts prohibit experts from "parroting" other litigation experts' work "without independent verification." *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 630 (W.D. Wash. 2011). Further, there is no way to test these opinions because they are mere *ipse dixit* without citation to the merger agreement from any

other "contemporaneous deal[]," just the work Coates—who is not subject to cross examination here—purportedly performed.

*Third*, Badawi's remaining opinions exceed the bounds of proper expert testimony. He speculates that a hypothetical (but non-existent) provision in Musk's confidentiality agreement might have expanded or restricted his information rights; offers impermissible state-of-mind opinions about Musk's "buyer's remorse" and the sincerity of his reasons for wanting information about bots; makes unsupported claims that Musk generated market "uncertainty;" and narrates factual evidence rather than providing specialized expertise. These opinions are well outside his expertise as a law professor, and courts routinely exclude such testimony as unhelpful speculation. *Gold v. Lumber Liquidators, Inc.*, 323 F.R.D. 280, 294 (N.D. Cal. 2017) ("Courts routinely exclude expert testimony as to intent, motive, or state of mind as issues better left to a jury."); *In re Twitter, Inc. Sec. Litig.*, 2020 WL 9073168, at *3 (N.D. Cal. Apr. 20, 2020) (excluding expert testimony "because it constitutes improper testimony on Defendants' state of mind" and "determination of motive, intent, and state of mind is for the jury alone").

Badawi's testimony improperly usurps the Court's role in interpreting contracts and the jury's role in assessing evidence, while offering irrelevant, confusing, and prejudicial conclusions unsupported by reliable methodology. The Court should exclude his opinions in their entirety.

## BACKGROUND

### A.     The Merger Agreement and Plaintiffs' Allegations

In April 2022, Musk executed the MA with Twitter to acquire the company. Ex. 219 ("MA"). The fully integrated MA contained information covenants obligating Twitter to give Musk "reasonable access . . . to the properties, books and records of the Company" and "all information concerning the business, properties and personnel of the Company . . . for any reasonable business purpose related to the consummation of the transactions contemplated by this Agreement," subject to limited exceptions for competitive harm and legal compliance. *Id.* §§ 6.4, 9.6. Twitter also warranted that its recent SEC filings did not contain material misstatements, including with respect to its representations that Twitter estimated that false or spam accounts "continued to represent fewer than 5% of our [Monetizable Daily Active Users]." § 4.6; Ex. 220 at 37.

Under Section 7.2, Musk had no obligation to close unless he was "satisf[ied]" that Twitter materially complied with its obligations and its representations and warranties remained true and correct at closing (unless a misstatement "would not have a Company Material Adverse Effect."). MA § 7.2(a). Plaintiffs contend that all provisions of the MA are unambiguous. Ex. B (Pls.' Resp. to Interrogatory No. 4).

On May 13, 2022, Musk tweeted "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users." Dkt. 31 ("FAC"), ¶ 111. On May 17, 2022, Musk tweeted that his "offer was based on Twitter's SEC filings being accurate" and "[t]his deal cannot move forward until" Twitter "shows proof of <5%." *Id.* ¶ 125. Plaintiffs allege these statements were false because Twitter had no obligation to provide the requested information. *Id.* ¶ 149.

### B.    Professor Badawi's Opinions

Plaintiffs proffer Adam Badawi, a Berkeley law professor, as an expert on "customs and practices of M&A negotiations and agreements." Badawi Rp't ¶ 9. Badawi offers three categories of opinions: (1) Musk misrepresented his rights under the MA and "had no right to terminate" based on Twitter's failure to provide information, *id.* ¶¶ 50-69, 92-100; (2) Musk "took actions that created uncertainty" in the market, *id.* ¶¶ 76-98, and "the factual record suggests" Musk had "buyer's remorse," Ex. A, Adam Badawi Deposition Transcript ("Dep.") at 119:11-21; Badawi Rp't ¶¶ 71-75; and (3) the MA was "seller-friendly" compared to other merger agreements, *id.* ¶¶ 50-69.

To support these opinions, Badawi relied primarily on an expert report Professor John Coates prepared for Twitter in its 2022 litigation against Musk ("Coates Report"). *See generally* Report (citing Coates Report sixteen times); ¶¶ 62-65 (exclusively citing Coates report for conclusion the MA's "Access to Information Covenant" was "seller-friendly"). Aside from the MA, Badawi did not read the 86 merger agreements Coates analyzed, did not verify Coates' characterizations of the agreements, and did not have access to Coates' underlying data when he authored his own report. Dep. at 135:1-13, 140:7-15, 142:7-15.

## ARGUMENT

### I.  BADAWI'S OPINIONS ABOUT MUSK'S RIGHTS UNDER THE "UNAMBIGUOUS" MA ARE INADMISSIBLE LEGAL CONCLUSIONS AND PAROL EVIDENCE

#### A.  Badawi's Improper Legal Opinions Should Be Excluded

The Court should preclude Badawi from offering opinions that interpret the MA. "Unless a contract is deemed ambiguous or there is a term of the contract that requires an expert's explanation, it is improper for an expert to interpret or construe a contract in his opinion." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1320-22 (S.D. Cal. 2020) (excluding opinion on how industry participants would interpret contract "in practice"), *aff'd*, 9 F.4th 1102 (9th Cir. 2021); *see also Bona Fide Conglomerate, Inc. v. SourceAmerca*, 2019 WL 1369007, at *3 (S.D. Cal. Mar. 26, 2019) ("[A]n expert may not be allowed to opine on the meaning and import of disputed [contractual] terms.").

In his report and deposition testimony, Badawi blatantly engages in contract interpretation. For example, he offers the following opinions:

(1)  Musk violated the securities laws by amassing Twitter stock without complying with SEC disclosure requirements (an issue that is not even relevant here since this conduct is not alleged to have caused Plaintiffs' losses).  Badawi Rp't ¶ 42.

(2)  Musk "had no right to terminate the Merger due to a failure [by Twitter] to provide information about fake accounts," and the MA "did not contain a covenant allowing the buyer access to information to verify [Twitter's] representations and warranties."  Badawi Rp't at p. 47; ¶ 92.

(3)  Despite Section 7.2's plain language stating that Musk is not required to close unless he is "satisf[ied]" that Twitter's representations and warranties were true and correct, this contractual language purportedly "falls far short of any requirement to 'prove' that any disclosures were correct." *Id.*

(4)  The description of Musk's rights in his lawyer's July 8, 2022 Termination Letter was "not a correct description of his rights under the MA." *Id.* ¶ 96.

(5)  Musk "claim[ed] rights that were at odds with the MA," and "there was no basis for Musk's assertions." *Id.* ¶ 100.

(6)   Musk's tweets "likely violated section 6.8 of the agreement," and Musk was "in breach of the [MA] and unable to exercise [his] right to terminate for any breach by the seller." *Id.* ¶ 88.

(7)   There would be an "extraordinarily high bar" to show an MAE under Section 7.2(b). *Id.* ¶¶ 65-66.

(8)   The MA's definition of MAE contains "broad carve outs" (though admittedly none that apply in this case). *Id.* ¶¶ 67-69; Dep. at 168:9-21.

In each of these opinions, Badawi interpreted and construed the disputed MA terms—including Sections 6.4, 7.2, 6.8, and 8.1—and "opine[d] on [their] meaning and import": describing whether they gave Musk broad or restricted rights and spelling out what information and termination rights Musk had (or did not have) under the MA.   Such opinions are inadmissible.  *See Synergy Hematology-Oncology Med. Assocs. Inc. v. Abbott Labs., Inc.*, 2023 WL 3319218, at *4 (C.D. Cal. Mar. 15, 2023) (excluding expert opinions because "[i]n breach of contract cases, the expert may not be allowed to opine on the meaning and import of disputed terms.") (citing *PMI Mortg. Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 291 F. App'x 40, 41 (9th Cir. 2008) ("The expert testimony proffered . . . went to the interpretation of the underlying settlement agreement, a contract, an ultimate question of law upon which the opinion of an expert may not be given.").

Badawi claims he is not offering legal analysis but is instead opining on the "customs and practices" of M&A agreements.  Although there may be situations where "custom and practice" is an appropriate subject of expert testimony, that label cannot be used as a fig leaf to present inadmissible legal opinions.  *Aya Healthcare Servs.*, 613 F. Supp. 3d at 1322, is instructive.  There the court excluded an industry expert offering opinions on how certain contract terms would be understood by industry participants and how the contracts would operate in practice.  *Id.* at 1320-21.  The court looked past the expert's characterization of her opinion as relating only to "industry practices" and excluded her testimony as inadmissible legal opinion.  *Id.* at 1321-22. The Court should do the same here.

**B.      Badawi's Opinion that the MA Is "Seller-Friendly" Is Legal Opinion and Irrelevant**

Badawi's opinion that various terms of the MA were "seller-friendly" is also legal opinion. According to Badawi, in a "seller-friendly" merger agreement, a buyer's rights will typically "be much more restricted" than in a "buyer-friendly" agreement. *E.g.*, Badawi Rp't ¶¶ 21-22. Determining whether a contract right is "restricted" or "broad" is, of course, a question of contract interpretation: one reads the contract and decides whether the language provides a party with more or less rights, or broader or narrower rights.  To characterize a contract term as "restricted" or "broad" is to imbue it with specific legal meaning and "requires an expert to make conclusions of law" as to the spectrum of rights the term grants to a party.  *U.S. Postal Serv. v. Jamke*, 2017 WL 131991, at \*5 (E.D. Cal. Jan. 12, 2017) (citing *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004)).  This is "not an appropriate subject for expert testimony."  *Id.*

Moreover, whether the allegedly unambiguous MA is "seller-friendly" or "buyer-friendly" has no relevance to any issue in dispute.  Either Musk had a right to bot data under the MA (as Twitter agreed), or he did not (as Plaintiffs contend); either Musk could terminate the deal if he determined that Twitter's estimate of bots as a percentage of mDAU (a "Key Metric") was based on a patently unreliable method,  overstated by 400%, and thus an MAE, or he could not.  In interpreting an unambiguous agreement, labeling the MA or various provisions of it "seller-friendly" or "buyer-friendly" is irrelevant, unhelpful, and confusing.

Badawi claims that the MA's terms are "seller-friendly" as a matter of "custom and practice."  Badawi Rp't ¶ 50.  By this he means that they fall toward the "seller-friendly" end of the "continuum" between "seller-friendly" and "buyer-friendly."  Dep. at 142:23-143:7.  It is unclear how that is relevant to any issue in the case.  The only plausible purpose of assigning these vague labels is to characterize the disputed terms in the MA as more "restricted," which is impermissible legal opinion.  Indeed, when asked how his opinion that the MA is "seller-friendly" was relevant, Badawi responded that it "could be useful" for "interpreting provisions" of the MA."  Dep. at 147:18-148:8. He offered no other explanation.  *Id*.  Although Badawi asserts that "Delaware courts routinely use . . . studies of whether something is buyer-friendly or prevalent or market to help them

understand what terms mean,"[1] Dep. at 144:8-11, he provides no explanation for how this could assist a lay juror—as opposed a Chancery Court judge—understand any of the disputed contract terms at issue here. After all, Musk undisputedly had rights to information and remedies under the MA, and those rights and remedies are determined by their plain language. Where the MA falls on the "continuum" of buyer- and seller-friendly rights puts the cart before the horse: one needs to interpret the rights before labelling them.[2]

**C.    Badawi's Remaining "Custom and Practice" Evidence Should Be Excluded**

Plaintiffs have repeatedly asserted that the MA is "unambiguous." Exs. B (Pls. Resp. to Interrogatory No. 4 ); C (Pls. Resp. to RFAs). And it is undisputed that the MA was fully integrated. MA § 9.6. "When the contract is clear and unambiguous," courts applying Delaware law are required to "give effect to the plain-meaning of the contract's terms and provisions, without resort to extrinsic evidence." *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp*., 206 A.3d 836, 846 (Del. 2019) (emphasis added). "Industry usage" is extrinsic evidence and inadmissible to interpret an unambiguous, integrated contract under the parol evidence rule. *See Sassano v. CIBC World Markets Corp*., 948 A.2d 453, 468 n.86 (Del. Ch. 2008) ("[P]arol evidence such as industry usage [cannot] be used to create ambiguity."); *Carrow v. Arnold*, 2006 WL 3289582, at *5 (Del. Ch. Oct. 31, 2006), aff'd, 933 A.2d 1249 (Del. 2007) ("Because it is a final, integrated contract, the parol evidence rule bars the admission" of extrinsic evidence.); *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1273 (Del. 2017) (finding lower court erred in considering extrinsic evidence where the "Agreement [was] unambiguous in its terms relevant to the case.").

---

[1] In the only example of this analysis Badawi cites, *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*., 2020 WL 7024929, at *63 (Del. Ch. Nov. 30, 2020) (cited at Dep. 143:12-144:11), the court did not in fact rely on any expert testimony characterizing a term as buyer- or seller-friendly. 2020 WL 7024929, at *63 (Del. Ch. Nov. 30, 2020). Instead, the experts conducted a survey to determine whether the term "pandemic" was separately enumerated from the terms "natural disasters" or "calamities" in certain transaction agreements. *Id.*

[2] For example, telling the jury that Section 6.4 is "seller-friendly" provides no insight into whether it entitled Musk to the spam and bot information he requested. Instead, as Badawi testified, answering that question requires an understanding of "what information is required for consummation of the transaction" and expertise "on things like mDAU and bots," *id*. 221:7-223:7—explanation and expertise Badawi does not provide. *Id.* at 116:10-24.

DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF ADAM BADAWI

Indeed, "custom and usage" evidence relating to the meaning of contract terms is only ever admissible "to clarify language with a specialized meaning." *Corbrus, LLC v. 8th Bridge Cap., Inc.*, 2022 WL 4239055, at \*20 (C.D. Cal. Sept. 13, 2022). Because Plaintiffs have stated under oath that none of the MA's terms are ambiguous, Ex. B, there is no language that needs to be clarified. And because Badawi testified he is not interpreting the MA, his opinions do not give any language "specialized meaning." An opinion that simply categorizes contract language based the fact that it purportedly falls on the "seller-friendly . . . end[] of the continuum," Dep. at 142:21-143:10, does "not aid interpretation of the contract by clarifying the specialized meaning of a term that the jury would not have understood on its own" and is therefore inadmissible. *Corbrus*, 2022 WL 4239055, at \*20 (excluding opinion that contract language was "unusual").

The parol evidence rule thus bars all of Badawi's opinions relating to the MA, including his "Introduction to Mergers and Acquisitions" (which describes the M&A "customs and practice"), Badawi Rp't ¶¶ 12-40; his opinions interpreting the MA *based* on "customs and practice" and the purported "seller/buyer-friendly" dichotomy (which is also based on "custom and practice"), *id.* ¶¶ 50-69, 78-81, 83, 86-88; and his opinions that, *in light of* "custom and practice," Musk misrepresented his rights under the MA, *id.* ¶¶ 90-100.

## II.   BADAWI CONDUCTED NO INDEPENDENT ANALYSIS AND HAS NO RELIABLE BASIS TO OPINE THAT THE MA IS "SELLER-FRIENDLY"

### A.   The Court Should Exclude Badawi's Opinions Based On The Coates Report

To form his opinion that the MA is more "seller-friendly" than one would customarily find in a typical public company merger, Badawi did not identify, rely on, or analyze any other merger agreement. Report, Appendix B. Instead, he primarily based his opinions on the Coates Report, an expert report commissioned by Twitter for the purpose of asserting claims against Musk in the Delaware Action. Because the Federal Rules "do not permit an expert to rely upon excerpts from opinions developed by another expert for the purposes of litigation," *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1012 (C.D. Cal. 2003), *aff'd sub nom. Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005), the Court should exclude all of Badawi's opinions that rely on the Coates Report and preclude him from referencing the report at trial.

Although experts may rely on hearsay to form their opinions, courts in this Circuit draw the line at reports authored by other experts in litigation. *Id.* Unlike treatises or academic articles, expert reports prepared solely for litigation "do not bear independent indicia of reliability," *id.*, and are not "facts or data . . . of a type reasonably relied upon by experts in the field," *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 630 (W.D. Wash. 2011) (*citing* Fed.R.Evid. 702&703). Thus, relying on reports prepared by absent experts raises "serious reliability questions." *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 556 (C.D. Cal. 2014) ("An expert's sole or primary reliance on the opinions of other experts raises serious reliability questions."); *Crescenta Valley Water Dist. v. Exxon Mobile Corp.*, 2013 WL 12120533, *2 n. 4 (C.D. Cal. Mar. 14, 2013) (excluding report as unreliable because it is "insufficient for an expert to simply rely on or parrot another expert's report prepared solely for litigation"); *In re Imperial Credit Indus.*, 252 F. Supp. at 1012 (hearsay documents like medical records "bear independent indicia of reliability, unlike an opinion which is generated solely for the purposes of litigation"). Parroting of expert reports also causes a foundation concern that the underlying report is inadmissible hearsay. *Id.* at 1013 (*citing Tokio Marine & Fire Ins. Co. v. Norfolk & W. Ry. Co.*, 172 F.3d 44 (4th Cir. 1999) ("[O]ne expert may not give the opinion of another expert who does not testify. . . The hearsay quality of a report may not be cured merely by having another expert testify that he agrees with its conclusions")). Thus, testimony based on an absent expert's report prepared for litigation is inadmissible "without independent verification of the underlying expert's work." *Fosmire*, 277 F.R.D. at 630.

Badawi's use of the Coates Report falls squarely into this prohibited category. It is undisputed that Professor Coates was hired by Musk's adversary "in a very contentious litigation" to author a report advocating a narrower interpretation of the MA. Badawi Dep. at 136:6-10. And unlike other expert opinions prepared for litigation, Coates and his report were not even scrutinized by the litigants or the court in the Delaware Action. The Chancery Court did not qualify Coates as an expert in the case or determine that his report was reliable. Bernstein Decl. ¶ 2.

Badawi did not independently test, verify, or investigate the Coates Report's methods and conclusions either. Dep. at 135:1-142:15; *see McCoy v. DePuy Orthopaedics, Inc.*, 2024 WL 1705952, at *16 (S.D. Cal. Apr. 19, 2024) ("[A]n expert witness cannot parrot the opinions of other

experts without independently investigating the evidence."). Badawi did not read the 85 merger agreements Professor Coates collected and analyzed to form his opinions. Dep. at 135:1-13.[3] Badawi attempted to excuse this oversight by explaining, "I don't know if Professor Coates read them himself"—but that only makes Badawi's failure to check the work even *more inexcusable* because it renders the Coates Report *less reliable*. *Id.* Badawi did not speak to Coates—or anyone who worked for him—about the analysis contained in the Coates Report. *Id.* at 137:17-21. He did not independently confirm that Coates' sample was a fair representation of MAs during the relevant time frame or check to see whether Coates actually identified all of the mergers that fit within his criteria. *Id.* at 141:20-142:6. He did not check Coates' work to confirm that he accurately characterized, described, and coded the various merger agreement provisions in his sample. *Id.* 142:7-142:15. Badawi claimed he had "no reason to doubt" the Coates Report was accurate—but that is because he did not check. *Id.* at 135:1-10.

The only thing Badawi did to "make sure [the Coates Report] was accurate" was to check the Excel formulas in Coates' back-up spreadsheet to confirm they calculated percentages accurately—without confirming whether the inputs themselves were correct. Dep. at 141:9-19. Double-checking Coates' Excel formulas, while assuming without verifying that the underlying analysis is accurate, hardly satisfies Badawi's obligation to "independently investigat[e]" and "independent[ly] verify[]" Coates' work. *Fosmire,* 277 F.R.D. at 630.

Worse, Badawi adopted Coates' opinions as his own and before he even conducted this superficial check. Dep. at 140:7-15. He did not have access to Coates' spreadsheet and back-up data until *after* he served his report. *Id.* That means he did not consult any of Coates' back-up data to form his opinions. *Fosmire,* 277 F.R.D. at 629 (excluding report where there was "nothing in the record to indicate" that expert "even ha[d] access to" the other report's "underlying data").

In short, Badawi merely "accept[ed] the opinions of" Coates "as true and regurgitat[ed]" what the Coates Report said. *See King v. DePuy Orthopaedics Inc.*, 2023 WL 8009790, at *6 (D.

---

[3] Badawi claimed "I believe I looked up some of" the merger agreements whose information rights provisions Coates analyzed, but he did not identify any in his Report or deposition. Dep. 138:11-139:1; *see* Report, Appendix B.

Ariz. Nov. 17, 2023) (excluding opinions based on other experts' reports). Those opinions are not the product of reliable—or *any*—analysis. Having failed to retain Coates on their own, Plaintiffs are attempting to use Badawi as a conduit to read into evidence the contents the hearsay Coates Report contains while depriving Defendant the ability to cross-examine Coates about his work. This is patently prejudicial, and prohibited. *See In re Imperial Credit Indus.*, 252 F. Supp. at 1012.

**B.    The Court Should Exclude Badawi's "Empirical Judgment" That The MA Was "Seller-Friendly" As Untestable And Unreliable**

The purpose of *Daubert*'s gatekeeping function is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Thus, an expert purporting to offer an *empirical* opinion must rely on *empirical data* to support it. *United States v. Redlightning*, 624 F.3d 1090, 1112 (9th Cir. 2010); *see also In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 165 (S.D. Ind. 2009) ("An expert's opinions must be based on the evidence in the case, and, if he bases his opinions on empirical assumptions, those assumptions must be supported by evidence.").

Badawi's analysis does not even satisfy his own standards for determining an agreement is "seller-friendly," and is thus unreliable and inadmissible. *In re Paraquat Prods. Liab. Litig.*, 730 F. Supp. 3d 793, 839 (S.D. Ill. 2024) ("The expert must also 'reliably apply her chosen methodology on her way to reaching a conclusion.'") (cleaned up). According to Badawi, one can only determine where a MA lies on the "buyer-friendly"/"seller friendly" continuum "in reference to what is going on in these other [merger] agreements." Dep. at 133:3-12. That requires "collect[ing]" and analyzing "a large number of agreements." *Id*. But Badawi did not collect and analyze a "large number of agreements" to render the opinions in his report. His Report identifies *no other agreement* that he compared to the MA, and he could not identify any specific agreement in deposition either. Badawi Rp't at Appendix B; *see also* Dep. at 139:18-140:6 ("Q. None of those other merger agreements are included in your reliance materials in Appendix B, right? A. No."). Because Badawi's "empirical judgment" that the MA is "seller-friendly" was not based on any comparison to any specific merger agreement, it cannot credibly be described as "empirical" at all.

Badawi attempted to rescue his opinion by claiming it was based on his experience reviewing "thousands of merger agreements over the years in the course of my scholarly work and in my teaching." Dep. at 139:2-17. But even an expert proffering an opinion based on his "experience and judgment" cannot "indiscriminately include[] every transaction from his career without explaining how the various factors impacted" his analysis. *USI Ins. Servs. LLC v. Alliant Ins. Servs. Inc.*, 2025 WL 1767988, at *3–4 (D. Ariz. June 26, 2025).

That is what Badawi does here. In paragraphs 50-69 of his Report, Badawi argues that specific terms of the MA are "seller-friendly," but beyond citing Prof. Coates' Report, Badawi provides no comparison to other agreements from which to draw his conclusions. For example, he opines that a "specific performance clause is one of the most seller-friendly provisions there is," but provides no data indicating how many public merger agreements contain them. Badawi Rpt. ¶¶ 53-54. If the vast majority of merger agreements include specific performance clauses, the fact that the MA contained one hardly makes the agreement more "seller-friendly" than others. Similarly, Badawi claims that the MA has a smaller number of closing conditions and is thus "seller-friendly" but does not identify how many closing conditions appear in a typical merger agreement and does not compare the MA's language to any other agreements. *Id.* ¶¶ 55-61. The same is true of his opinion concerning so-called "diligence conditions." He notes that those conditions are "very buyer-friendly" but does not point to a *single agreement* that contains one. *Id.* ¶ 60.

So the court and jury must rely solely on Badawi's bare assertion that the MA falls on the "seller-friendly" end of the spectrum of the various unidentified agreements he has read in his career. But without identifying the agreements Badawi has read and the specific terms they contain, "the Court is left with no basis to determine whether he reliably" compared those agreements to the terms of the MA to reach his conclusion. *USI Ins. Servs. LLC*, 2025 WL 1767988, at *3. For the same reason, Musk cannot effectively cross-examine Badawi. His opinions thus amount to little more than *ipse dixit* based on Badawi's memory of some unidentified corpus of agreements he encountered in his studies. *See id.* (*citing Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (noting courts are not required to admit expert opinion evidence based on mere *ipse dixit* of the expert).

## III. BADAWI'S REMAINING OPINIONS ARE NOT PROPER SUBJECTS OF EXPERT TESTIMONY

### A. Badawi Cannot Opine About Imaginary Provisions In Musk's Confidentiality Agreement With Twitter

At paragraph 79 of his report, Badawi notes that Musk and Twitter executed a confidentiality agreement and speculates that "[t]he terms of that agreement could have expanded or restricted the information rights of the parties." Report ¶ 79. This is rank conjecture and contradicted by the confidentiality itself agreement, which contains no such terms. Ex. D (Musk-Pampena-0023104).[4] Nor would one reasonably expect a confidentiality agreement to "expand or restrict" a party's substantive rights to information under a MA. Dep. 177:16-23 ("Q. Have you seen any evidence that . . . anybody who is . . . following the transaction at the time thought that Musk's information rights under the MA were impacted . . . expanded, or restricted by the confidentiality agreement? A. Not that I recall."). "[E]xpert testimony should be excluded if it is speculative or conjectural" and its admission "is an abuse of discretion." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008); *see also Monroe v. Zimmer U.S. Inc.*, 766 F. Supp. 2d 1012, 1032 (E.D. Cal. 2011) (similar). Badawi's speculative opinions about terms that do not exist in the confidentiality agreement are inadmissible.

### B. Badawi Cannot Testify About Musk's Or The Market's State Of Mind

Badawi opines that Musk "created uncertainty" in the market, Badawi Rp't ¶¶ 76-91; suffered from "buyer's remorse," *id.* ¶¶ 71-75; and suggests that Musk's concerns about spam were pretextual given public knowledge of spam issues on Twitter's platform, *id.* ¶¶ 85-87. Each of these is an impermissible state of mind opinion and should be excluded. *Gold v. Lumber Liquidators, Inc.*, 323 F.R.D. 280, 294 (N.D. Cal. 2017) ("Courts routinely exclude expert testimony as to intent, motive, or state of mind as issues better left to a jury.").

Badawi is not permitted to offer any opinion as to what the "people who are following what happened in this deal" thought or subjectively believed after learning about Musk's statements.

---

[4] Badawi testified that "I don't know what the [confidentiality] agreement said." Dep. at 177:4-10. But he cited it in his Report. Badawi Rp't. ¶ 79, n. 122.

*Arista Networks, Inc. v. Cisco Sys. Inc.*, 2018 WL 8949299, at \*3 (N.D. Cal. June 15, 2018) ("Experts may not speculate about the state of mind . . . of others"). Uncertainty and confusion are states of mind; Badawi is simply speculating about thought processes of a massive population. If Badawi is opining about the market's reaction to the statements, his testimony lacks foundation. Badawi notes that Twitter's stock price fell on the same day Musk made certain statements (Badawi Rp't ¶¶ 77, 89), but he is not an economist or loss causation expert; he conducted no event study or statistical analysis. Badawi summarized analyst reports and claims that analysts "were confused and perplexed" by Musk's tweets. *Id.* ¶ 82. But he is not a market analyst. Nor is he a survey expert, and he did not conduct a survey. He has no expertise and his summary of a handful of self-selected analyst reports and stock price reactions amounts to little more than "vouching for fact evidence rather than providing expert opinions." *Arista*, 2018 WL 8949299, at \*3. He cannot simply sum up fact evidence that the jury is capable of understanding itself. *Aya Healthcare Servs.*, 613 F. Supp. 3d at 1323 (excluding opinion that "simply provid[es] a narrative of [plaintiff's] theory of the case"). Badawi also speculates that Musk's confidentiality agreement with Twitter "could have expanded or restricted the information rights of the parties" and that the public could have been confused as to whether it did so. Badawi Rp't ¶ 79. But it is undisputed that the confidentiality agreement did not amend Musk's information rights, Ex. D, and Badawi cites no evidence of any public speculation that it did. Badawi Rp't ¶ 79.

These same principles bar Badawi's testimony about Musk's state of mind. By opining Musk had "buyer's remorse," Badawi is just ascribing an emotion to describe Musk's testimony that he believes he overpaid for the company. And by suggesting that this so-called buyer's remorse led Musk to make the statements at issue, Badawi is offering impermissible motive and intent evidence. Through these opinions he is acting "as a mere conduit" to give labels to evidence the jury can assess for itself. *Arista*, 2018 WL 8949299, at \*3.

Badawi's opinion that "Musk's expression of apparent concern about fake and spam accounts should be understood in terms of the then-available public information about the topic" is a veiled attempt to tell the jury that Musk knew about the bot problem all along and thus his requests for bot information were pre-textual—which experts are not allowed to do. *In re NFL's "Sunday*

*Ticket" Antitrust Litig.*, 2024 WL 2075942, at \*5 (C.D. Cal. May 7, 2024) ("The Court notes that it would be improper for [an expert] to argue that the rationale may be pretextual.")

### C.     Plaintiffs Cannot Use Badawi To Present A Narrative Of The Facts

Finally, the Court should exclude Badawi's factual narrative of the events in this case. Badawi cannot testify about Tesla's stock decline (which is based solely on Plaintiffs' allegations in the FAC), the lack of other bidders to purchase Twitter before Musk executed the MA (which could not have caused so-called "buyer's remorse" given there is no evidence Musk expected other bidders), market analyst reactions, Twitter's stock price decline, the negotiation of the MA, or the correspondence between Musk's team and Twitter regarding his information requests.  Badawi Rp't ¶¶ 41-49, 76-91, 93-95.  This timeline "simply rehashes otherwise admissible evidence about which the expert has no personal knowledge" and is inadmissible.  *See Fujifilm Corp. v. Motorola Mobility LLC*, 2015 WL 757575, at \*27 (N.D. Cal. Feb. 20, 2015) (quoting *Highland Capital Mgmt., L.P. v. Schneider*, 379 F.Supp. 2d 461, 469 (S.D.N.Y. 2005)).

## CONCLUSION

Defendant respectfully requests that the Court grant this motion to exclude the opinions of Adam Badawi, or, in the alternative, hold a Rule 104 hearing to determine their admissibility.

DATED:  August 15, 2025

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By      */s/ Stephen A. Broome*
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Jesse A. Bernstein

*Attorneys for Defendant Elon Musk*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on this the 15th day of August, 2025.

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By _/s/ Stephen A. Broome_
    Alex Spiro
    Michael T. Lifrak
    Stephen A. Broome
    Jesse A. Bernstein


*Attorneys for Defendant Elon Musk*

DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF ADAM BADAWI

## ATTESTATION

Pursuant to Civil L.R. 5-1, I attest under penalty of perjury that concurrence in the filing of this document has been obtained from the other signatories herein.

By  /s/ Alex Bergjans
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Jesse A. Bernstein

*Attorneys for Defendant Elon Musk*