# EXHIBIT A



**Planet Depos**
*We Make It Happen™*

# Transcript of Adam Badawi, Ph.D.

**Date:** July 17, 2025
**Case:** Pampena -v- Musk

**Planet Depos**

**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com

**www.planetdepos.com**

**Michigan #8598 | Nevada #089F | New Mexico #566**

**WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

------------------------------- x

GIUSEPPE PAMPENA, individually   :

and on behalf of all others      :

similarly situated, et al.,      : Civil Action No.

            Plaintiffs       : 3:22-cv-05937

      vs                         :

ELON MUSK,                       :

          Defendant        :

------------------------------- x


REMOTELY CONDUCTED VIDEOTAPED DEPOSITION OF

ADAM BADAWI, PHD

THURSDAY, JULY 17, 2025

12:29 P.M. EDT



JOB NO.: 591601

PAGES: 1 - 269

REPORTED BY: KARISA EKENSEAIR, CCR RPR RMR RDR

CA CSR #14546

DEPOSITION OF ADAM BADAWI, PHD, CONDUCTED VIA ZOOM VIDEOCONFERENCE.

Pursuant to notice, before Karisa J. Ekenseair, Certified Shorthand Reporter in and for the States of Arkansas, Oklahoma, Missouri, Illinois, Tennessee, Georgia, New Mexico, Washington, and California; National Registered Professional Reporter; National Registered Merit Reporter; National Registered Diplomate Reporter; Notary Public.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS (VIA ZOOM):

MARK MOLUMPHY, ESQUIRE

CAROLINE YUEN, ESQUIRE

GIA JUNG, ESQUIRE

COTCHETT, PITRE & McCARTHY, LLP

840 MALCOLM ROAD, SUITE 200

BURLINGAME, CALIFORNIA 94010

650-697-6000

-AND-

AARON P. ARNZEN, ESQUIRE

BOTTINI & BOTTINI, INC.

7818 INVANHOE AVENUE, SUITE 102

LA JOLLA, CALIFORNIA 92037

858-914-2001


ON BEHALF OF THE DEFENDANT (VIA ZOOM):

STEPHEN BROOME, ESQUIRE

ALEX BERGJANS, ESQUIRE

JONATHAN FEDER, ESQUIRE

EMILY COUTURE, ESQUIRE

QUINN EMANUEL URQUHART & SULLIVAN, LLP

865 S. FIGUEROA STREET, 10TH FLOOR

LOS ANGELES, CALIFORNIA 90017

213-443-3000

A P P E A R A N C E S   C O N T I N U E D

ALSO PRESENT:

    MICHAELA FRATES, COTCHETT, PITRE & McCARTHY

    KELLI WELCH, VIDEOGRAPHER

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                    5

T A B L E   O F   C O N T E N T S

                                               PAGE

STYLE AND NUMBER.......................    1

APPEARANCES............................    3


WITNESS:    ADAM BADAWI

EXAMINATION BY MR. BROOME.............10

EXAMINATION BY MR. MOLUMPHY...........253

FURTHER EXAMINATION BY MR. BROOME.....256

FURTHER EXAMINATION BY MR. MOLUMPHY...266

FURTHER EXAMINATION BY MR. BROOME.....266


CERTIFICATE OF REPORTER............. 268


                    EXHIBITS

              (ATTACHED TO TRANSCRIPT)

NUMBER          DESCRIPTION                PAGE

EXHIBIT 209   EXPERT REPORT OF ADAM

              BADAWI, MAY 28, 2025,

              CONFIDENTIAL..................11

EXHIBIT 210   LINKEDIN PROFILE..............18

EXHIBIT 211   UNITED STATES SECURITIES

              AND EXCHANGE COMMISSION

              AMENDMENT NO. 3 TO SCHEDULE

              13D, DATED APRIL 20, 2022.....46

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                     6

                        EXHIBITS

                  (ATTACHED TO TRANSCRIPT)

 NUMBER          DESCRIPTION                    PAGE

EXHIBIT 212   E-MAIL CHAIN, SUBJECT

              CONFIDENTIAL: PROJECT

              TUNDRA DATA ROOM, BATES

              NUMBER

              MUSK-PAMPENA-00294201

              THROUGH 294225,

              CONFIDENTIAL.................55

EXHIBIT 213   E-MAIL CHAIN, SUBJECT

              POTENTIAL DISCUSSION

              TOPICS, BATES NUMBER

              MUSK-PAMPENA-0468340

              THROUGH 468342,

              CONFIDENTIAL.................67

EXHIBIT 214   E-MAIL MEETING INVITE,

              DATED MAY 13,  2022, BATES

              NUMBER MUSK-PAMPENA 1010977...70

EXHIBIT 215   E-MAIL MEETING INVITE,

              DATED MAY 21, 2022, BATES

              NUMBER MUSK-PAMPENA-0360309...72

 ///

 ///

 ///

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                    7

EXHIBITS

(ATTACHED TO TRANSCRIPT)

NUMBER          DESCRIPTION                    PAGE

EXHIBIT 216   E-MAIL MEETING INVITE,

              DATED MAY 26, 2022, BATES

              NUMBER MUSK-PAMPENA-0360316

              THROUGH 360318,

              CONFIDENTIAL.................72

EXHIBIT 217   E-MAIL MEETING INVITE,

              DATED JUNE 13, 2022, BATES

              NUMBER MUSK-PAMPENA-0897541

              THROUGH 897542,

              CONFIDENTIAL.................73

EXHIBIT 218   E-MAIL MEETING INVITE,

              DATED JULY 1, 2022, BATES

              NUMBER MUSK-PAMPENA-0360329

              THROUGH 360330,

              CONFIDENTIAL.................74

EXHIBIT 219   UNITED STATES SECURITIES

              AND EXCHANGE COMMISSION,

              FORM 8-K, MERGER AGREEMENT....96

EXHIBIT 220   UNITED STATES SECURITIES

              AND EXCHANGE COMMISSION FOR

              10-K.........................99

///

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                    8

                        EXHIBITS

                 (ATTACHED TO TRANSCRIPT)

  NUMBER           DESCRIPTION                    PAGE

EXHIBIT 221   TRANSCRIPT OF THE

              DEPOSITION OF MICHAEL S.

              RINGLER HAD MARCH 25, 2025....107

EXHIBIT 222   E-MAIL CHAIN, SUBJECT

              LETTER AND MERGER

              AGREEMENT, BATES NUMBER

              MUSK-PAMPENA-0676494

              THROUGH 676495,

              CONFIDENTIAL.................158

P R O C E E D I N G S

THE VIDEOGRAPHER:  Here begins Media No.1 in the videotaped deposition of Adam Badawi in the matter of Pampena v. Musk in the United States District Court, Northern District of California, Case Number 3-22-CV-05937-CRB.

Today's date is July 17, 2025.  The time on the video monitor is 12:29 p.m. Eastern time.  The remote videographer today is Kelli Welch, representing Planet Depos.  All parties of this video deposition are attending remotely.

Would counsel please voice-identify themselves and state whom they represent.

MR. BROOME:  Steven Broome representing Elon Musk.  And I've got a couple colleagues joining me here.  I'll let them introduce themselves.

MR. BERGJANS:  Good morning.  Alex Bergjans from Quinn Emanuel, also representing Elon Musk.

MS. COUTURE:  Emily Couture, also representing Elon Musk.

MR. MOLUMPHY:  And Mark Molumphy -- Molumphy, representing the plaintiffs.

MR. ARNZEN:  Aaron Arnzen for Plaintiffs.

THE VIDEOGRAPHER:  The court reporter today is Karisa Ekenseair, representing Planet Depos.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                    10

I apologize, did I miss a --                                    12:30:15

MR. YUEN:  Yeah.  Caroline Yuen for                             12:30:19

Plaintiffs.  Sorry.                                             12:30:22

THE VIDEOGRAPHER:  Thank you.                                   12:30:22

MS. FRATES:  And Michaela Frates for                            12:30:22

Plaintiffs.                                                     12:30:26

MS. JUNG:  And Gia Jung, Cotchett Pitre &                       12:30:26

McCarthy, for Plaintiffs.                                       12:30:37

THE VIDEOGRAPHER:  Very good.  I will now                       12:30:38

pass it to our court reporter to swear in the                  12:30:39

witness.                                                        12:30:41

THE REPORTER:  My name is Karisa Ekenseair.                     12:30:42

I am a California Certified Shorthand Reporter,

License Number 14546.

Would the witness please raise their right

hand and be sworn.

ADAM BADAWI

of lawful age, being first duly sworn, deposes and

says in reply to the questions propounded as

follows:

EXAMINATION                                                     12:31:02

BY MR. BROOME:                                                  12:31:02

Q   Good morning, Professor Badawi.                             12:31:04

A   Good morning.                                               12:31:07

Q   You've been deposed before, yes?                            12:31:08

Transcript of Adam Badawi, Ph.D.

Conducted on July 17, 2025    11

A    Yes.

Q    You've been -- you're familiar with the -- the rules of the road?

A    Yes.

Q    All right.  And did you spend some time preparing with counsel for your deposition today?

A    I did.

Q    If you have any questions about the process during today's deposition, you know, feel free to ask me or your counsel.

A    Will do.

Q    You've issued a report, an expert report, in this case, yes?

A    Yes.

Q    And I'm going to give you a copy of that report right now.

    MR. BROOME:  Alex, what are we marking that as?  Is that going to be --

    MR. BERGJANS:  209.

    MR. BROOME:  209.  Okay.  So we'll mark as Exhibit 209 Professor Badawi's expert report.

    (Exhibit 209 marked for identification.)

    MR. BERGJANS:  And that's been sent to the chat.

Q    Do you have a copy of the report there,

12:31:10
12:31:11
12:31:14
12:31:15
12:31:16
12:31:19
12:31:23
12:31:23
12:31:29
12:31:32
12:31:34
12:31:35
12:31:46
12:31:48
12:31:48
12:31:50
12:31:52
12:31:58
12:32:01
12:32:02
12:32:04
12:32:09
12:32:10
12:32:12
12:32:21

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                    12

Mr. -- or Professor Badawi?

    A    Yes, I do.

    Q    Great.  And this is the report that you --
that you've served in this case?

    A    It is.

    Q    Great.  Did you prepare this report
yourself?

    A    I did.

    Q    Did you have any assistance?

    A    I had a research assistant.  I refer to that
in my report.  I received some input from counsel,
but I wrote it myself.

    Q    Okay.  When you wrote your report, did you
have a copy of Professor Coates' expert report from
the Twitter vs. Musk case in Delaware?

    A    I did.

    Q    Okay.  And did you rely on that report in
preparing your report?

    A    In the portions cited in my report, I did,
yes.

    Q    Okay.  But not in the -- unless you've cited
Professor Coates, you're -- you're not relying on
his report for any of the other statements or
opinions in your report?

    A    They may have informed some of my thinking

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

13

on the -- the report, and I may reference other parts of the port -- report today, but -- so that's how I would -- I would answer.

Q   Okay.  Have you read the Complaint in this case?

A   I've read the First Amended Complaint.

Q   Have you read any of the legal briefs that the parties have filed?

A   I read some of them.  I don't recall exactly.  I occasionally check the docket and will see what's been filed, and have read some of that, but...

Q   What about any of the decisions rendered by the Court in this case; have you read any of those?

A   Yes, I have.

Q   Which ones?

A   The motion to dismiss.  I believe there was a motion on class cert, I think, but the -- I spent the most time with the motion to dismiss.

Q   All right.  And do you have an understanding as to which statements by Mr. Musk are at issue in this case?

A   I do.

Q   And -- and what is your understanding?

A   The -- it's the statements that are reviewed

14

in the motion to dismiss.  There's a section there where it goes through -- that goes through the tweets by Mr. Musk.  There's some -- I believe there's a statement at a -- at a conference that is at issue.  I believe the termination letter, some of the language there is at issue.  I don't have exact recall of every single statement, but that's my general understanding of the statements that were at issue.

Q   Okay.  Is it your understanding that the Court concluded that the -- the July 8th termination notice by Mr. Musk's team is still at issue in this case?

MR. MOLUMPHY:  Object to the extent it calls for a legal conclusion.

A   It -- at -- at least my recollection is that the district court did not conclude that they are still an issue, but the case is still live.  Who knows what could happen later.

Q   All right.  All right.  And -- and so just -- just so we're all on the same page, you're familiar with Mr. Musk's tweet on May 13th, 2022, in which he indicated that he wanted information about bots or spam and was putting the deal on hold until he got that information?  I'm -- I'm summarizing,

obviously.  I'm not -- not going to hold you to what --

A   Yeah, I -- I'm familiar with the tweet, yes.

Q   Yeah, okay.

And then there's -- I think you mentioned the -- May 16th, there's the statement at the All-In Summit?

A   Yes.

Q   And then the May 17th, there was another -- another tweet about the deal not moving forward until he -- Mr. Musk received information about bots and spam?

A   Yeah.  I'm just going to check the table of contents in my report because I think I've got the dates there.  Where is it?  I don't have that.

I've got May 14th, May 16th -- that's the statement -- May 17th tweet, and the letters.  Those are the ones that I -- I've referred to in my report.

Q   Okay.  I -- I think you said May 14th.  Did you mean May 13th?

A   I believe so.

Q   Okay.

A   Referring to the -- the "on hold" tweet.

Q   Do you -- are you offering an opinion in

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

16

this case on whether any of the statements at --
Mr. Musk's statements at issue are true or false?

A    I -- I view that as largely for the Court to
decide, right, whether or not those are misleading,
or potentially the jury to decide.  So I -- I -- I
don't view it as my role as an expert to say whether
or not those are true or false.

Q    Do you have an opinion in this case as to
whether Mr. Musk knew his statements at issue in
this case were true or false?

A    To my mind, that goes to scienter, which is
a legal issue in this case.  And so I -- I -- I
don't know what Mr. Musk was thinking, and it's not
my role so say what he was thinking.

Q    Do you have an opinion on whether Mr. Musk
intended for his state -- statements -- well,
withdrawn.

Do you have an opinion on whether Mr. Musk
intended to mislead shareholders or investors?

A    I would re -- reiterate my answer with
respect to that going to scienter, a legal issue
that's not -- I -- I wasn't asked to opine on.

Q    Fair.  Do you have an opinion on whether
Mr. Musk's statements at issue in this case caused
investors any losses?

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                    17

A    I was not asked to opine on -- on what investors did in -- in reaction to -- to the tweets.

Q    Do you have an opinion on whether investors relied on Musk's statements at issue in this case?

A    I was not asked to opine on reliance.

Q    Are you providing any legal opinions in this case?

A    I don't believe I am.

Q    Do you intend to tell the Court or the jury how the merger agreement at issue in this case should be interpreted?

A    I intend to discuss the custom and practice of merger agreements generally, individual provisions in the agreement, but I don't intend to tell them what the merger agreement means outside of discussing custom and practice.

Q    Do you have a -- an opinion as to whether the merger agreement at issue in this case is ambiguous or unambiguous?

A    Insofar as that is a legal question, I -- I don't have an opinion on the ambiguity of it.  It's -- it's a large -- it's a very long document, right, so it would -- it's hard to say in a general sense whether or not I have an opinion on that.

Q    Do you have an opinion as to whether

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                    18

any -- there are any specific provisions in the

merger agreement that are ambiguous?                    12:39:39

A    To -- to understand that kind of requires

understanding what facts are being brought to bear

with respect to those provisions.  So kind of

without knowing what those facts are, it's difficult

to answer that question.

Q    We will mark --

MR. BROOME:  Let's take Tab 1, Alex.  We'll

mark, as 210, your LinkedIn page.

(Exhibit 210 marked for identification.)

Q    Do you have a copy of it there as well,

Professor Badawi?

A    It's -- I think it just popped up.

MR. BERGJANS:  And all exhibits are uploaded

to the chat so they can be accessed by clicking on

them in the chat as well.

A    I can read it.  It's -- it's right on the

border, but I can read it.

Q    Okay.  Is this an accurate copy of your

LinkedIn page?

A    I can't see the whole thing.  All it has is

my experience at this point.  It's not showing up as

kind of a --

Q    Fair.  Fair.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

19

Is this a -- is this an accurate reflection of the -- the experience section, I guess, of your LinkedIn page?

A    It would appear to be.

Q    Okay.  And does it appear to be up to date?

A    It does.

I haven't include -- so my -- my academic CV would include things like being a visiting professor and so on.  And I haven't included those.

But of the kind of major positions I've had, I would say it's accurate.

Q    Okay.  And you graduated from UC Berkeley in 2004, UC Berkeley law school?

A    I got my law degree in 2003, and my PhD was in 2004.

Q    Okay.  Got it.  And then immediately after law school, did you clerk for the 10th Circuit?

A    I did.

Q    Okay.  And then immediately after clerking for the 10th Circuit, did you then go on to be a junior associate at Munger, Tolles & Olson in San Francisco?

A    Yes.  I was an associate there.  It wasn't immediately.  There were a couple months in between, but, yes, that was my next job.

12:41:29
12:41:36
12:41:38
12:41:38
12:41:40
12:41:43
12:41:46
12:41:49
12:41:53
12:41:54
12:41:58
12:41:59
12:42:05
12:42:08
12:42:11
12:42:12
12:42:14
12:42:18
12:42:18
12:42:20
12:42:24
12:42:28
12:42:28
12:42:32
12:42:34

Q   Right.  And then -- and then you stayed there as an associate at Munger, Tolles & Olson for two years and five months; is that right?

A   That's correct.

Q   And were you a litigation associate?

A   Yes.

Q   You say -- this is going to Exhibit 209, which is your expert report.

In paragraph 7, you say that you served as counsel to multiple special committees of the boards of publically listed companies?

A   That's correct.

Q   And did you do that under -- on your own or under the leadership of a partner who was advising those committees?

A   I did it under the leadership of a partner.

Q   You also say that you worked for and with several deal teams during your time in practice.

Were you personally responsible for structuring those deals?

A   I was not.

Q   Were you personally responsible for structuring any diligence surrounding those deals?

A   I did not structure it.

Q   Okay.  And were you -- was the -- was the

12:42:36
12:42:39
12:42:43
12:42:45
12:42:45
12:42:50
12:42:50
12:42:58
12:43:00
12:43:03
12:43:07
12:43:09
12:43:09
12:43:12
12:43:18
12:43:18
12:43:20
12:43:24
12:43:26
12:43:29
12:43:30
12:43:31
12:43:33
12:43:36
12:43:38

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                    21

process essentially that you were -- you were an                    12:43:42
associate and you were assigned by a partner to                    12:43:44
review documents and information and perform tasks                    12:43:47
relating to the deals?                    12:43:51

A    It was a little bit more complicated than                    12:43:53
that.                    12:43:56

There was a case I worked on for about a                    12:43:56
year where a contract was coming to an end.  And                    12:43:59
there was kind of a simultaneous strategy of                    12:44:02
potentially pursuing litigation related to the                    12:44:05
contract or renewing the contract.  And so I was                    12:44:07
working with the deal team quite a bit, advising.                    12:44:11

And they asked me to help them with                    12:44:17
diligence because I knew some of the facts about the                    12:44:19
case.  So it was a -- I worked with the diligence                    12:44:22
team because I knew the record.                    12:44:24

Q    Okay.  How many diligence teams have you                    12:44:26
worked with in -- in your -- well, let me start with                    12:44:28
at Munger.                    12:44:31

How many -- how many different, you know,                    12:44:32
diligence projects did you work on -- no.                    12:44:37
Withdrawn.  I'll ask a different question.                    12:44:41

For how many deals did you work on due                    12:44:43
diligence during your time at Munger?                    12:44:48

A    It would have been one or two.                    12:44:52

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                22

Q   All right.  And then after Munger, you went off to Chicago Law School to work as a fellow and lecturer; is that right?

A   That's correct.

Q   And that was about two years?

A   Yes.

Q   And what was your focus there?

A   I taught legal writing to the first-year students at the University of Chicago.  And then the fellowship was basically designed to prepare you to go on the academic market.

So I developed my scholarly research, wrote some articles, published some articles, and then went on the academic job market.

Q   Okay.  And what -- what was -- you know, just sort of high-level general description, what were the -- what was the nature of the articles or -- or your research at that time?

A   Commercial and financial contracting.

Q   Would that include merger agreements?

A   At the time, I don't believe I was writing about mergers.  That came a little bit later.

Q   All right.  And when did that come about?

A   That basically -- so I -- I had my first academic, or tenured track, appointment at

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                          23

Washington University in St. Louis.  I started 12:46:05
teaching in my first year, the Business Associations 12:46:08
class.  And part of that was teaching the big merger 12:46:11
cases. 12:46:14

And right around that time, I started 12:46:15
writing in that area. 12:46:18

Q   Okay.  All right.  So that was going to be 12:46:19
my next question. 12:46:22

After you left Chicago, you went to 12:46:23
Washington University for seven years? 12:46:25

A   Yes. 12:46:27

Q   Okay.  And -- and your -- what was your 12:46:27
focus there?  I mean, we just touched on -- you said 12:46:29
you started by teaching Business Associations. 12:46:32

Did you teach Business Associations 12:46:36
throughout the -- your tenure there? 12:46:38

A   Yes. 12:46:40

Q   And -- and did you have any other major 12:46:40
focuses while you were there? 12:46:43

A   I also taught Contracts. 12:46:44

Q   And what about in terms of your scholarly 12:46:46
research and writing? 12:46:49

A   It was largely on financial and commercial 12:46:51
contracting. 12:46:55

Q   And -- and would that include merger 12:46:57

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

24

agreements at that time?

A    It would include merger cases.  I think I eventually started writing about merger agreements themselves.

I also wrote some on corporate governance.

Q    And when did you start focusing on merger agreements?

A    I -- I want to say it was probably in the 2013, 2014 area.  It's when -- I have an article on first-drafter advantage in M&A agreements.  That took several years to write.  And so I think we started working on that '14, '15, something like that.

Q    All right.  And after -- after Washington University, you came back to your alma mater, Berkeley, in July 2017; is that right?

A    That's right.

Q    And you've been -- you've been teaching at Berkeley as a law professor since then?

A    Yes.  I -- I visited at Columbia last fall, but my permanent position has been at Berkeley.

Q    Exciting time to be at Columbia.

A    No comment.

Q    How many mergers or acquisitions have you worked on personally in your career?

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                           25

A    The -- so that deal that I spoke of was -- it was a joint venture rather than a merger.

When I -- I was a summer associate and worked on -- I mean, this goes years back.  But I don't know if anyone recalls Oracle bought PeopleSoft.

But before PeopleSoft was purchased by Oracle, they were -- they purchased another company.  And so I worked on the diligence team.  It was -- I can't remember the name of the company they were buying.

But I worked for PeopleSoft on their diligence team on a -- on a merger.

Q    Okay.  Have you worked on any other mergers?

A    Not that I recall.

Q    And when you -- and you worked on this diligence team, you were a, what, third or fourth-year associate at Munger, Tolles & Olson?

A    No.  I was a summer associate at Gibson Dunn.

Q    So that was before your -- your stint at Munger?

A    Yes.

Q    All right.  So aside from the work you did as a summer associate at Gibson Dunn, you've never

12:48:27
12:48:33
12:48:36
12:48:38
12:48:41
12:48:45
12:48:46
12:48:49
12:48:54
12:48:57
12:48:58
12:48:58
12:49:00
12:49:03
12:49:07
12:49:09
12:49:11
12:49:14
12:49:18
12:49:22
12:49:22
12:49:26
12:49:27
12:49:27
12:49:31

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                26

worked on any mergers or acquisitions; is that right?

   A   Not that I recall.

   Q   Okay.  Have you ever litigated any busted deal cases?

      Do you know what I mean by that term, "busted deal"?

   A   Yes.

   Q   Okay.  Have you ever litigated any busted deal cases?

   A   Not that I recall.

   Q   Have you ever litigated any case where the parties disputed the terms of a merger agreement?

   A   Not that I recall.

   Q   Your report states at paragraph 2 that your research uses text analysis to analyze the content of corporate disclosures in litigation.

      Is that -- what do you mean by "text analysis"?  Is this, like, some sort of machine learning?

   A   Yeah.  It's -- it's basically a type of machine learning.

   Q   Okay.  Did you use text analysis in preparing your report for this case?

   A   I did not.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                              27

Q   Did you apply text analysis to any of the
disclosures or documents at issue in this case?    12:50:49 12:50:55

A   I have a project that has analyzed every
single public disclosure since the project started.
And so it may have included these disclosures in it.    12:50:56 12:51:04 12:51:07

But I didn't use any of that analysis for
the preparation of my expert report.    12:51:10 12:51:16

Q   Have you ever made any public comments about
the Twitter merger or litigation?    12:51:18 12:51:21

A   Yes.    12:51:22

Q   Can you describe those for me, or were they
frequent or infrequent?    12:51:22 12:51:27

A   I spoke quite a few times to journalists
around the time of the Twitter deal.    12:51:28 12:51:32

I did -- I -- Berkeley will put on things
like webinars, things like that.  I think I did one
or two of those.    12:51:36 12:51:40 12:51:43

We -- we had a -- a public forum, I think,
after -- I think it was the -- the fall after
everything had wrapped up in the Twitter case or the
Twitter deal had closed, where I did a public forum
with Ann Lipton, who is another corporate law
professor.    12:51:45 12:51:51 12:51:52 12:51:55 12:51:59 12:52:02

So I -- I made public comments.  I can't
recall all the ones that I made.    12:52:03 12:52:06

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

28

Q    Did you -- when you were making public comments, did you have any e-mails or text communications with reporters about the merger or the litigation?

A    My recollection is that almost all of it was over the phone or by Zoom.  I don't -- I -- you know, I may have said, I'll call you at this particular time, or something along those lines, but I don't -- I don't recall drafting e-mails to reporters that were substantive.  I may have.  I just don't recall.

Q    Okay.  Did you -- did any of the courses that you teach at -- you were at Berkeley at the time, right, in -- in 2022?

A    Yes.

Q    Did any of the courses you teach touch on the Twitter merger?

A    Yes.  I believe I taught Mergers and Acquisitions both in the spring of 2022 and the fall of 2022, so we had quite a bit of discussion about the Twitter case.

Q    Okay.  And did you have, like, any -- do you have any materials that you provided to the class or, you know, were you teaching from a casebook?  Is there any -- anything that would reflect the content

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

29

that you were teaching to your students about the

Twitter merger?

A    I -- I use the docu- -- the primary

documents themselves quite a bit, so I -- I

believe -- so at Berkeley, our course management

site is called bCourses, and I had a folder that was

Twitter materials, but I didn't draft anything to go

in there.  It was kind of, here's the merger

agreement, here's the complaint, things of that

nature.

Q    Okay.  And -- and is that -- on the bCourses

folder, would that material still be accessible to

you?

A    I don't know the archiving practices there.

Q    Okay.  All right.  We may follow up about

that.

Did you have -- at that time the -- in

-- well, withdrawn.

In -- in 2022, did you have communications

with any other law professors about the Twitter

merger or the litigation?

A    Yes.

Q    And did you -- were any of those

communications in writing?

A    There -- there may have been some e-mails.

Again, some of those may have been kind of logistics, do you want to be on this panel or do you want to do a webinar of that sort, and maybe kind of this is what we'll talk about.  That's my recollection.  But I don't recall precisely.  It's been three years.

Q   All right.  You have a copy of your report in front of you, right?

A   I do.

Q   Yeah.  Okay.  Good.

All right.  So at paragraph 9, you say you're assigned to provide four opinions, and those are the customs and practice of M&A negotiations and agreements; how buyer- or seller-friendly specific terms in the merger agreement were -- were relative to contemporaneous deals for U.S. public targets; whether Mr. Musk's actions were consistent with the customary behavior of a remorseful buyer; and how Mr. Musk's attempt to terminate the merger agreement compare with the custom -- with the customary behavior of buyers who seek to terminate similar transactions.

Do you see that?

A   I do.

Q   And -- and those are the four opinions that

you're offering in this case?

A    That's -- that's what I was asked to opine on.  Yes.

Q    And is that what you're, indeed, opining on?

A    I think my opinions speak for themselves.  I mean, I summarize my opinions more generally at paragraph 11, so that's a -- a better description of the opinions that I offer.

Q    All right.  So the counsel asked you to provide four opinions, and -- and they're described there in paragraph 9, but you're saying that -- that those are not necessarily the opinions that you're actually offering in this case?

MR. MOLUMPHY:  Objection; misstates the evidence.

A    I -- I -- I would just refer to my report, kind of what I would -- it states what I was asked to opine on, and then paragraph 11 provides an overview of my opinions.

Q    Okay.  Did -- did Plaintiffs' counsel provide you with any assumptions to rely on in forming your opinions?

A    Not -- no.

Q    Did Plaintiffs' counsel make any factual representations that you relied on to form your

opinions in this case?

A   Not that I recall.  They -- they supplied the record, and I looked at the record.

Q   Okay.  And -- and your report contains all of the opinions that you presently intend to offer in this case, right?

A   As my opinion states, kind of I reserve the right to revise my opinion if different facts come to light or -- or things of that nature.  It reflects my opinion at the time I submitted the report.

Q   Right.  I'm just -- I'm -- I'm trying to move the -- the timeline just a little bit farther forward.

Sitting here today, does your report contain all of the opinions that you presently intend to offer in this case?

A   That I presently intend to offer, yes.

Q   Okay.  Appendix B of your report lists all of the documents you considered and/or relied on in forming your opinion; is that right?

A   Yes.

Q   And this is a complete list of every document you reviewed and relied on in forming your opinions; it's not missing anything?

Transcript of Adam Badawi, Ph.D.

Conducted on July 17, 2025

33

A   It is a complete list of what I relied on at the time I submitted my report, yes.

Q   Okay.  And is it a -- okay.

Have you reviewed anything since submitting your report that affects any of the opinions that you're offering in this case?

A   I looked at some of the materials that were cited in Professor Rock's -- Rock's rebuttal report, and I didn't cross-reference to see -- at -- some of those depositions may have been taken after my report was submitted.  So I did look at some materials that might not appear in that appendix.

Q   Okay. And -- and any -- can you remember any of the materials that you reviewed that might not appear --

A   I --

Q   -- on your -- your list?

A   I believe I looked at the Savitt deposition, and I -- I can't remember if that was before or after -- or if that was available to me before or after the report.

Q   Okay.  Anything else?

A   Not that I specifically recall.

Q   All right.  There's a list of 17 deposition transcripts from this case in your Appendix B.  Were

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                                    34

you -- were you -- in preparing your report, were          12:59:23
you given just these 17 transcripts or were you            12:59:26
given all of the deposition transcripts from this          12:59:28
case and the Delaware action?                              12:59:32

    A    I don't recall.                                   12:59:34

    Q    Do you recall, you know, why -- why this          12:59:38
list of 17, as opposed to a broader list?                  12:59:44
You -- were these the ones that were just provided         12:59:48
to you by -- by counsel?  Did -- did you ask any           12:59:49
questions about other depositions?                         12:59:53

        MR. MOLUMPHY:  Objection; compound.                12:59:54

    A    I -- I believe I asked kind of was there          12:59:56
someone who testified as to this particular issue.         13:00:02
I don't recall exactly what it was.  And I was given       13:00:06
a list of -- or a group of depositions, and I think        13:00:12
I may have asked for some more.  And so I                  13:00:15
don't -- these are the ones that I read.  I don't          13:00:18
recall the exact process of -- of how the list was         13:00:21
compiled and the amount of input I gave to it.             13:00:23

    Q    Are there any transcripts that                    13:00:26
you -- deposition transcripts that you wanted to           13:00:29
review but didn't get the opportunity to review?           13:00:30

    A    Not that I recall.                                13:00:33

    Q    Do you know who Martin Korman is?                 13:00:34

    A    I've heard the name.                              13:00:38

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                                    35

Q   He was the -- the lead deal lawyer for the merger on Twitter's side.

Does that reflect -- does that refresh your recollection?

A   That sounds correct.

Q   He's a lawyer at Wilson Sonsini.

Would you agree that he has more experience handling mergers than you do?

A   I don't -- I don't know Mr. Korman and I don't know his precise experience.  Given the description you've given me, I would suspect that he has worked on more deals than I have.

Q   Okay.  And what about Mike Ringler; do you know who he is?

A   Yes.

Q   And who is he?

A   I believe he was the lead lawyer at Skadden who was working for Mr. Musk and his entities on the deal.

Q   And same question:  Do you agree that Mr. Ringler has more M&A experience than -- sorry, more experience handling mergers and acquisitions than you do?

A   That is probably correct, although I don't know Mr. Ringler personally and don't know his

13:00:42
13:00:45
13:00:46
13:00:49
13:00:49
13:00:50
13:00:55
13:00:59
13:01:00
13:01:06
13:01:09
13:01:12
13:01:15
13:01:18
13:01:19
13:01:19
13:01:20
13:01:23
13:01:26
13:01:27
13:01:30
13:01:33
13:01:36
13:01:37
13:01:41

precise experience.

Q   You reviewed his transcript, correct?

A   I did.

Q   Did you review the whole thing or only portions?

A   I believe my recollection is I read it pretty thoroughly.

Q   What about the deposition of Martin Korman; did you read -- review his deposition transcript?

A   I -- I believe that I did.  I -- I think I spent more time with the Ringler one, but I -- I believe that I did.

MR. BROOME:  Just to the court reporter: I'm getting a fair amount of background noise from -- on my end.  It's not bothering me.  I just want to make sure it's not bothering anyone else.

MR. MOLUMPHY:  We can hear you fine.

MR. BROOME:  Great.

Q   Did you review -- when -- when you're reviewing the deposition transcripts, did you also review the exhibits or just the transcripts themselves?

A   I reviewed at least -- I reviewed the exhibits like -- at least -- if it was a topic that seemed of interest or relevant to -- to -- to my

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

37

opinions, I reviewed the exhibits.

Q   All right.  Are you familiar with Stacey Conti?

A   Again, the name sounds familiar, but I don't recall precisely.

Q   She managed Twitter's -- the -- the post-signing diligence process in -- in the merger transaction.

Does that refresh your recollection?

A   I don't -- I don't know what post-signing diligence process means.  I -- I would -- I'm not sure I understand what the term means, but if it means this was a person who was responsible for kind of post signing, dealing with some aspect of the deal, that sounds familiar.

Q   Okay.  Did you -- do you know if you reviewed her transcript?

A   I -- I believe I may have.  I don't have a specific recollection.

Q   In your appendix, you list the other documents that you produced in this case.  Just in terms of, like, collecting that information, did -- did you have access to all of the discovery from this case or were you provided a set?

A   I believe I was given a set of kind of

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

38

documents that were likely to be relevant, and then

if there was anything else that I wanted, I -- it

was made available to me.

Q   Okay.  All right.  In your report, you have
a lot of opinions about what is customary or typical
in the -- in M&A practice, correct?

A   Yes.

Q   And what -- what is your understanding as to
how that is -- is relevant in this -- in the -- in
this case?

A   I -- I'm not sure it's my job to say how
it's relevant.  I was asked to provide opinions that
may then be informative -- well, let me revise,
right.

May be relevant because it can help either
the Court or the jury put into context the -- the --
what happened in this case.

Q   Okay.  In your opinion, was -- was this
transaction a customary or typical M&A deal?

A   I mean, I think that's too general a
question to be able to say whether it is.

I think what I view myself as an expert on
is what the custom and practice is in a general
sense in mergers and acquisitions.

If you're going to ask about a specific

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                                     39

deal, I think you have to ask about a specific

aspect of a specific deal or something along those

lines to be able to say something like that.

Q   Okay.  Well, in this deal, was -- can

you -- what was -- as far as you're concerned or

your -- your opinion, was everything that happened

sort of customary and typical, or were there aspects

of the way this transaction proceeded that were

atypical?

A   As I explain in my report, Mr. Musk's

decision to waive due diligence was not customary.

Q   Okay.  Anything else?

A   The -- I mean, the -- the -- my opinions

about what is buyer-friendly and seller-friendly,

there I'm putting it kind of within the customs,

where would I place this deal.

So I would say as customarily understood,

this is a seller-friendly agreement.

Q   Okay.  As a general proposition, would you

agree that -- that in every -- well, let me back up.

As a general proposition, would you agree

that every -- every merger and acquisition

transaction is -- is different?  There's unique

aspects to each?

A   I would say -- I mean, naturally, there's

going to be some differences, right.  The parties in almost every merger are going to be different than the parties in any other merger.

Q   These are not -- M&A is usually not cookie-cutter transactions?

A   I -- I don't think I agree with that. The -- the agreements themselves are pretty standardized.

Naturally, there are things that need to be negotiated.  There are kind of touch points.

But there's quite a bit of standardization across M&A agreements, at least in my experience with having looked at hundreds and probably thousands of these agreements.

Q   Okay.  All right.  And as a general proposition, in an M&A deal, the parties might follow, you know, certain customs and practices in M&A deals.  And they may deviate from others, depending on the deal.

Would you agree with that as a general proposition?

A   In a very general sense, I suppose that that's correct.

Without specifics, it's hard to say kind of what they're doing is customary or outside of

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

41

custom.

Q   At paragraph 13 -- we'll talk a little bit about due diligence here.

At paragraph 13, you say buyers will customarily carry out due diligence.

Do you see that?

A   Yes.

Q   But it's not always the case that buyers carry out due diligence, right?

A   In -- it is not the case that in 100 percent of transactions, they -- well, it could -- the -- that they do due diligence prior to signing is almost universally the case.  But occasionally, they don't do it.

Q   Okay.  For example, in a hostile takeover, a -- a buyer might not conduct due diligence, right?

A   I -- I'm not sure I agree just because it's so difficult to do a hostile takeover.

As I explain in my report, kind of with the advent of the poison pill, you have to go through the board of directors these days.  And so that can give you -- and it has to be an agreed-upon deal.

So hostile takeovers don't really happen anymore.  So I don't really know what to say about hostile takeovers because they're not really a thing

13:08:03
13:08:03
13:08:23
13:08:24
13:08:28
13:08:30
13:08:31
13:08:35
13:08:37
13:08:40
13:08:44
13:08:49
13:08:56
13:09:00
13:09:00
13:09:03
13:09:06
13:09:10
13:09:12
13:09:15
13:09:18
13:09:20
13:09:23
13:09:27
13:09:30

anymore.

Q   What about in a situation where the buyer -- or the seller is resistant to selling and the buyer offers to forgo due diligence in order to entice the buyer?

That situation arises from time to time, correct?

A   It has happened.

Q   All right.  And then you say that buyers conduct presigning due diligence to prepare for post-closing integration of the target into the buyer.

Do you see that?

MR. MOLUMPHY:  What paragraph are you at?

THE WITNESS:  It's next sentence, I think.

Q   Yep, paragraph 13, I think.

A   Yeah.

As I said, I think you put in "presigning" there.  But...

Q   Oh, I'm sorry.

A   Just a -- due diligence allows the buyer to -- it's a -- I agree with that sentence, as written.

Q   Okay.  And I guess that sort of goes to my -- my follow-up question, which is that buyers

can do integration planning or integration diligence before and after signing the merger agreement, correct?

A    I mean, I'm not sure I would call -- I'm not sure if it's typically referred to as "integration diligence," right.

At least, as I usually understand the term, "diligence" is what you do prior to it.  And it's -- afterwards, any sort of information exchange is governed by the agreement.

And so you adhere with the agreement and exchange information as the agreement allows.

Q    I see.  So when you use the term "due diligence" in your report, you're referring to the investigation the buyer does before signing the merger agreement; is that accurate?

A    I would say, customarily, that's how people refer to due diligence.  And I think, generally, that's how I refer to it in the report.

After the agreement has been signed, it's the agreement itself that governs the exchange of information.

If those information rights are extremely permissive, that sort of information exchange would look -- might look something like diligence that

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

44

occurs before signing.

Q   How would you define "due diligence"?

A   Due -- at least as I customarily understand the term in M&A, it is the investigation that you do into a company, usually with the agreement of the company, usually with the confidentiality agreement in place, to exchange information where you have it -- the -- the buyer is able to ask for anything under the sun that they wish for.

And the seller can provide it or not before they make the decision to sign the deal.

Q   I see.  Okay.

So there's a -- a temporal or, like, a -- yeah, I guess a temporal restriction in your definition, that it occurs pre-signing?

A   I think that's the way the term's most commonly understood, right.  I think you occasionally will see references to things like post-signing diligence.

A lot of that discussion gets -- then gets bound up into what are the information rights under the agreement.

Q   All right.  So if a buyer announces that he's foregoing due diligence, you would understand to mean that he is foregoing only the pre-signing

13:11:44
13:11:45
13:11:47
13:11:50
13:11:53
13:11:56
13:12:00
13:12:04
13:12:07
13:12:09
13:12:12
13:12:14
13:12:16
13:12:19
13:12:23
13:12:27
13:12:30
13:12:34
13:12:36
13:12:38
13:12:41
13:12:44
13:12:44
13:12:48
13:12:51

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

45

investigation of the business?

A    I mean, the term that gets used in this case is "waiving" due diligence.

And as I -- the customary understanding of that term is that you are not going to conduct the pre-signing investigation into the company.

Q    Okay.  Right.  But -- but the -- saying you're "waiving due diligence" means you're waiving a pre-signing investigation into the company?

MR. MOLUMPHY:  Objection to form.

A    The -- my customary understanding or -- I think most M&A lawyers would understand the term "waiving due diligence" to say, "I'm not conducting pre-signing due diligence."

Q    Got it.  And that -- that would be the customary understanding?

A    I believe so, yes.

Q    Okay.  And is it your understanding that -- that Mr. Musk publicly announced that he was, quote, waiving, due diligence?

A    I don't recall a specific statement that he publicly stated he was waiving due diligence.

I recall kind of the offer he made to Twitter stipulated that he would not be conducting due diligence -- the due diligence, as I described

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

46

it, right, which is you ask the company for a bunch

of nonpublic information, and they provide it.

MR. BROOME:  Let's -- let's mark -- Alex,

let's mark -- what one are we at here -- Tab 23,

which will be Exhibit 211.

(Exhibit 211 marked for identification.)

Q   And you should have a link to the actual

document there, Professor Badawi, in the chat, if

you want to review the entire thing.

But I'm going to go down to Item -- well,

first of all, you reviewed this document, correct?

A   I just want to catch the date of what it is.

I believe so, yes.

Q   Yeah.  This is the 13D that Mr. Musk's team

filed in connection with -- well, this is before the

merger agreement was signed, but I think this is

April 20th, 2022.

And if you look down at Item 4, Purpose of

the Transaction, do you see there in the -- let's

see -- one, two -- I guess third or second

paragraph, however you want to read it, it says,

"The Proposal was (and remains)...".

Do you see that paragraph?

A   Yes.

Q   All right.  You see in the second sentence,

13:14:23
13:14:26
13:14:33
13:14:36
13:14:43
13:14:46
13:15:14
13:15:16
13:15:17
13:15:19
13:15:19
13:15:22
13:15:26
13:15:27
13:15:32
13:15:36
13:15:39
13:15:40
13:15:43
13:15:51
13:15:55
13:15:57
13:15:59
13:16:01
13:16:09

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

47

it says, "At the time of delivery, the Proposal was also subject to the completion of financing and business due diligence, but it is no longer subject to financing as a result of the report -- Reporting Person's receipt of financing commitments described below and is no longer subject to the business due diligence [as read]."

Do you see that?

A   Yes.

Q   All right.  And they -- they don't use the term "waiver" there, right?

A   I don't see the term "waiver."

Q   Are you -- are you aware of any other document, aside from Plaintiffs' Complaint and -- and briefs, in -- in which anyone on Mr. Musk's side used the phrase "waiving due diligence"?

A   Could you rephrase the question and -- with respect to the time frame?

Q   Sure.  Yeah.

Are you aware of any other -- any other document in -- in which anyone on Mr. Musk's team used the phrase "waiving due diligence"?

A   I'm trying to remember if Mr. Musk used it in his deposition.  I don't know if that would be responsive to what you're asking.  But I -- I don't

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

48

recall any document at the time stating "waiving due diligence," although I would want to see the -- I think the letter -- I don't recall the precise text in the letter, and it may have been phrased somewhat differently than that.

Q   Okay.

A   That's my recollection.

Q   But when -- when you referred to the concept earlier of -- of Musk waiving due diligence, is this essentially what -- is this what you were referring to?

A   Could you explain what "this" is?

Q   The -- this 13D, this statement in the 13D where it says the offer is no longer subject to business due diligence.

A   That added to my understanding of what he meant to waive by due diligence.

Q   Okay.  So -- so what -- what was your understanding of his waiver of due diligence based on before you read this document?

A   Because everyone I was talking to, everything I -- not everything, but many of the things that I read referred to Mr. Musk waiving due diligence.  That was the language that those of us who were talking about this case used.

Q   I see.  I see.  Okay.

So -- but for Musk -- for Musk to actually waive due diligence, he would need to do it officially and in writing, correct?

MR. MOLUMPHY:  Objection; vague.  Object to form.

A   I don't know what "officially waive due diligence" means.  I've been referring to the kind of customary understanding of that term, which I explained early.

Q   How does one indicate to the other side that they are waiving due diligence, that a -- that a merger agreement is not conditioned on due diligence?

A   When you say that you're -- a deal is not subject to business due diligence, I think people in my world understand that.  Or if you say you're waiving due diligence, that's how people understand it.

Q   Okay.  And your understanding is that when -- when Musk's side says in this 13D that the proposal is no longer subject to business due diligence, that means that they agree not to conduct due diligence before signing the merger agreement, correct?

A    I think that's fair.                              13:19:49

Q    It's -- it's certainly not suggesting that       13:19:51
Mr. Musk is foregoing a right to seek information       13:20:03
from Twitter after signing the merger agreement,        13:20:11
correct?                                                13:20:16

A    The -- that would depend on the nature --         13:20:16
the -- the terms in the merger agreement.               13:20:18

Q    Right.  So if a term in the merger agreement      13:20:20
entitles Musk to seek information, then that term       13:20:23
would govern, right?                                    13:20:27

A    I mean, it would depend on a bunch of             13:20:29
things.  It would depend on the rights to seek          13:20:31
information, the rights to decline a request with       13:20:33
respect to it.                                          13:20:39

I think the reason there's a difference is       13:20:40
because before you sign, you can -- as I said, you      13:20:42
can ask for everything under the sun, whereas           13:20:46
typically it's much more circumscribed after            13:20:49
signing, in a way that people wouldn't recognize it     13:20:52
as diligence in the way that people typically talk      13:20:55
about the term.                                          13:20:58

Q    Sure.  So -- but all those rights, Musk's         13:20:58
right to seek information -- we're talking in the        13:21:01
post-signing period -- Musk's right to seek             13:21:05
information and Twitter's right to object to            13:21:07

information requests, those are all set forth in the merger agreement itself, correct?

A   Yes.  The information -- the -- the merger agreement governs the exchange of information, or at least provides the baseline for the exchange of information.

Q   Okay.  And those rights are not impacted by anything that the parties said before signing the merger agreement, correct?

MR. MOLUMPHY:  Objection, form.

A   I'm -- I don't think I agree with that.

Q   Okay.  Explain.

A   There's a section in the Coates report that kind of says, look, there's a bit of a get -- push and pull here, right.  If you say like, I'm not going to engage in much business diligence, often, customarily, you'll ask for more information rights in the merger agreement precisely because you didn't conclude -- you didn't do much diligence.

On the contrary, if you engaged in expansive pre-signing due diligence, the other party will feel often more comfortable asking for more constrained information rights in the merger agreement.

Q   Right.  But, ultimately, the -- the rights are there in the merger agreement, right?

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                52

A    The merger agreement governs the exchange of -- or provides the baseline for the exchange of information after the signing.

Q    Agreed.  But -- but when you're -- if -- if there is a dispute about whether, for example -- you know, we'll -- I'll use Section 6.4.  You would agree that Section 6.4 entitles Musk to make information requests to Twitter, right?  We'll get into what information he can seek and, you know, how Twitter can, you know, respond and -- and -- and limit information.

But would you agree that Section 6.4 of the merger agreement entitles Musk to make information requests to Twitter?

A    I think it provides some ability to provide -- to request information.

Q    Okay.  And when interpreting that provision, would you agree that you -- the parties would, you know, first just look to the plain language of the -- of the provision and it wouldn't -- you know, that -- that provision doesn't need to be interpreted based on anything the parties said before signing the merger agreement?

MR. MOLUMPHY:  Objection as to form.

A    I want to be careful about saying I'm

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                                    53

interpreting the merger agreement.  But that's -- I said at the outset I'm -- it's not my job to do that, right.

So I think I would customarily say the parties in this sort of situation will look to the merger agreement to figure out what information rights are -- are permitted.

Q   Right.  And -- and you understand that the merger agreement contains an integration clause, right?

A   I -- I -- yes.

Q   Okay.  And an integration clause -- and the integration provides that the terms of the merger agreement say what they say and they're -- they're not -- they're not to be interpreted based on what people already said before the merger agreement --

MR. MOLUMPHY:  Object as to form.

Q   -- is that correct?

MR. MOLUMPHY:  Object as to form.

A   I -- again, I don't want to interpret what a merger clause means.  Customarily a merger agreement would include a merger clause and then would be on --

Q   And -- sorry.  I think you said "a merger clause."  Do you -- do you mean customary --

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                                    54

A    The integration -- sorry.  I -- sometimes those are referred to as merger clauses, which is not a great way --

Q    Right.

A    -- to refer to them in a merger agreement.

And so -- but then it would be up to the Court to decide what to do about that, right.  And that can depend on things like it is ambiguous or is it extrinsic, is there extrinsic evidence that may bear on this and so forth.

Q    Okay.  At paragraph 14 of your report -- feel free to take time to read it -- you say that when conducting due diligence, quote, "professionals will typically have access to a physical or virtual data room that has the diligence materials that the target makes available."

Do you see that?

A    Yes.

Q    And -- and that -- that can happen both before or after the signing of the merger agreement, correct?

A    I mean, because it is so common that -- I mean, it's almost universal that people will conduct due diligence, that you have a data room and it's -- it -- it was available before -- before and it

will -- is available after.

Q   Okay.  And in this case, Twitter provided a data room to Mr. Musk's team after the merger agreement was signed, correct?

A   I -- I don't have a specific recollection as to that.

Q   Okay.

MR. BROOME:  Alex, let's mark Tab 11 as Exhibit 212.

(Exhibit 212 marked for identification.)

Q   Before, actually, we get to this exhibit, Professor Badawi, do you know one way or the other whether Mr. Musk's team did, indeed, conduct due diligence of Twitter after signing the merger agreement?

MR. MOLUMPHY:  Vague.

A   So I don't know what you mean by "team," right.  So as -- as the 13D you showed said that there was still financial and tax due diligence to be done, right, which would be expected when there's a financing transaction or there's complicated tax matters -- so it wouldn't surprise me if the -- if there was a diligence structure set up for those specific tasks.

Q   Well, the 13D says it's no longer subject to

financing as a result of the reporting person's receipt of the financing commitments.

A    The -- I'd have to -- I don't have the 13D in front of me.  I have the -- there may have been kind of not the due diligence you associate with kind of, M&A lawyer-type of due diligence being done.  And so if a data room were set up for those purposes, that wouldn't surprise me.

Q    Okay.  But you don't know, right?

A    I don't have a specific recollection.

Q    Have you been -- have you seen any documents in which the parties indicated that they were conducting due diligence after -- after the merger agreement was signed?

A    I don't quite know what you mean by due diligence, right, because there's different types of due diligence.  And so there -- there were obviously documents about exchange of information under the merger agreement.  You could -- that's not what I traditionally understand as due diligence.  And so it's difficult for me to answer the question at that --

Q    Well -- well, putting aside the -- putting aside the sort of temporal limitation, you know, the -- the -- you know, you indicated that due

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

57

diligence, in your understanding, is conducted before signing the merger agreement. Due diligence broadly refers to an exchange of information, review of information about the company's business, right, at a very high level?

MR. MOLUMPHY: Objection; vague.

A   I mean, it's used in different contexts for -- when it's done in -- for different purposes.

Q   Okay. Do you know whether Mr. Musk's team conducted due diligence relating to bots and spam accounts after the merger agreement was signed?

MR. MOLUMPHY: Objection, form.

A   I -- I think that there was some exchange of information under the terms of the merger agreement, right, which, again, I don't customarily regard as diligence, right. I view it as the exchange of information under the merger agreement. And so -- and there was some debate about that. Twitter has said they went above and beyond what was required under the merger agreement to provide information.

So I'm aware of that exchange of information.

Q   Okay. So -- all right. Well, whether we call it "due diligence" or an "exchange of information" or "review of information," your

understanding is that Musk requested information
about bots, spam, fake accounts.

        And, at least initially, Twitter provided
information about bots, spam, and fake accounts,
correct?

        MR. MOLUMPHY:  Objection, form.

    A    The record suggests that those requests were
made and that Twitter responded to some of them.

    Q    Right.  And that Twitter responded -- and at
that point, the parties' rights and obligations were
governed by the -- sorry, withdrawn.

        At that point in time, the parties' rights
and obligations with respect to exchanging
information were governed by the merger agreement,
correct?

    A    I would say the -- I would say they set a
baseline for what they are, right.  Parties are free
to provide more information than they are required
to under the merger agreement.

        My understanding is that Twitter has stated
that that's what they were doing.  So it would
provide a -- a baseline for that exchange of
information.

    Q    Okay.  All right.  So we looked at -- we
were going to look at Exhibit 212.

Do you have that in front of you?                                    13:31:11

Did Plaintiffs' counsel provide you with                             13:31:25

this document?                                                       13:31:27

A   I -- all I see is the top of an e-mail, so                       13:31:29

it's hard to know.                                                   13:31:31

Q   Oh, you should have access to the e-mail                        13:31:32

itself.                                                              13:31:36

MR. BERGJANS:  In addition to the screen                             13:31:41

share, Mr. Badawi, there's a -- in the chat, the                     13:31:43

full document itself has been shared.                                13:31:46

THE WITNESS:  Okay.  I -- I don't -- we're                           13:31:47

sharing a computer, so I'm -- I have it -- I have                    13:31:49

the body of the e-mail in front of me, at least the                  13:31:52

first e-mail.                                                        13:31:55

Whoops.  Sorry.  This is all...                                      13:32:04

MR. MOLUMPHY:  It's a 25-page document.                              13:32:04

So do you want him to scroll down all                                13:32:06

25 pages?                                                            13:32:09

MR. BROOME:  Well, no.  I want him to have                           13:32:09

access to the document.  And --                                      13:32:11

THE WITNESS:  Okay.  I have access to the                            13:32:12

document.  It's scrolling very slowly, but I do have                  13:32:14

access to it.                                                        13:32:17

MR. BROOME:  Mark, can we maybe get him his                          13:32:18

own -- a computer just for purposes of reviewing                     13:32:21

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

60

documents so that -- I don't want any -- I don't
want him to have trouble reviewing the documents.

MR. MOLUMPHY:  No.  He has that -- he has a
laptop in front of him now.

MR. BROOME:  Got it.  Okay.  Great.

MR. MOLUMPHY:  Can I just -- Steven, could
you just take one second?

MR. BROOME:  Sure.

(Off-the-record discussion.)

THE WITNESS:  Okay.  I have access to it.

Q    Before -- when you were preparing your
report, were you aware of the project Tundra Data
Room that Twitter created for purposes of this
transaction?

A    I -- I believe I saw reference to it.

Q    Okay.  And so then when you were preparing
your report, you were aware that Twitter set up a
data -- data room for Musk's team to conduct due
diligence -- well, I'll withdraw that.

When you were preparing your report, you
were aware that Musk's team prepared a data room
that contained information responsive to Musk's
requests?

MR. MOLUMPHY:  Objection --

A    I -- so if I'm looking here, I see a bunch

of what appear to be bankers on this e-mail, right.

So I -- my -- my assumption is that most of this was related to the financing.  And so I didn't -- I don't recall seeing anything -- that this was about dealing with kind of what M&A people -- M&A lawyers would refer to as "due diligence."

Q   Okay.  So do you see the -- well, it's not just -- it's not just bankers, right?  I mean, you got the lawyers; you got people from Twitter?

A   I mean, I see Mike Ringler.  If this was something where a -- lawyers were doing a lot of due diligence, I'd expect to see a bunch of associates on an e-mail.  So I don't --

Q   Do you now -- sorry, go ahead.

A   So I -- I don't -- again, this -- this looks to me like it's something related to financing rather than, you know, again, M -- the -- the type of M&A due diligence that lawyers would do.

Q   Do you know who Adeeb Sahar is?

A   It appears to be a lawyer at Skadden.

Q   Yeah.  He is the associate at Skadden, right?

A   I don't have personal knowledge of that.

Q   And this e-mail is sent from Jennifer Zheng

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                          62

at Twitter to Adeeb Sahar, correct --

A    It appears to be.

Q    -- at Skadden?  Yeah.

And then the others are all cc'd?

A    Yes.

Q    Yeah.  Okay.  And then -- and then Jennifer
Zheng at Twitter says, "Team-Please find the
following added to Tundra Box Data Room and here is
an updated Tundra Data Room Index."

And then she lists two documents that were
just added that concern "User Metrics Supplemental."

Do you see that?

A    Yes.

Q    And you've never reviewed those documents
before, I take it?

A    The -- you mean the -- the user metrics
themselves?

Q    Right.

A    I -- I don't believe so.

Q    Do you have -- did you review any other
documents that were in the data room or -- well, let
me -- let me make that a little bit easier for you.

Did you get a list of the contents of the
data room?

A    I may have come across it at some point, but

13:35:50
13:35:52
13:35:53
13:35:54
13:35:56
13:35:56
13:36:00
13:36:03
13:36:05
13:36:09
13:36:11
13:36:15
13:36:16
13:36:16
13:36:21
13:36:22
13:36:25
13:36:26
13:36:27
13:36:30
13:36:34
13:36:36
13:36:39
13:36:42
13:36:45

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

63

I don't -- I don't -- I don't have a specific recollection.

I reviewed probably thousands of pages in this case.

Q    When you said earlier that you would expect the data room to contain mostly information relating to the financing, you were speculating, correct?

A    I -- I read some of the -- the deposition with one of the main bankers kind of discussing all the stuff that was done with the financing.

So it's based on kind of my understanding of what the bankers were doing in this case.

Q    Which banker?

A    It was the -- what's her name?  Give me a moment.

I believe it was the Kate Claassen deposition.

Q    Did you -- are you aware one way or the other whether the data room contained information in response to the Musk's team's requests for information regarding Twitter's mDAU?

A    I'm -- I'm not aware.

But if there was an existing data room, I wouldn't be surprised if kind of additional -- if some information came in, it would be included in

13:36:48
13:36:50
13:36:51
13:36:54
13:36:54
13:36:56
13:36:59
13:37:03
13:37:12
13:37:16
13:37:18
13:37:20
13:37:23
13:37:24
13:37:37
13:37:38
13:37:53
13:37:53
13:37:55
13:37:59
13:38:02
13:38:09
13:38:10
13:38:14
13:38:17

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                    64

the data room.

Q   Okay.  And are you aware one way or the other where -- whether Twitter put into the data room information responsive to Musk's requests about bots, spam, and fake accounts?

A   So I -- I don't know the process.

So I -- you know, I'd want to see a chain of custody.  Like, what were the requests that were made?  How did Twitter respond?  What was provided?  Where did it go, right?

Like, that's a long chain of custody.  I haven't seen that chain of custody.

Q   I asked a -- a simpler question.

Are you aware one way or the other whether Twitter put into the data room information responsive to Musk's requests about bots, spam, and fake accounts?

A   I'm not aware one way or the other.

Q   Okay.

MR. MOLUMPHY:  We've been going about an hour.  You can let us know it's a good time, Steve.

MR. BROOME:  Yeah.  This is fine.

You want to take a break?

MR. MOLUMPHY:  Five minutes, stretch-our-legs break?

13:38:20
13:38:21
13:38:24
13:38:27
13:38:43
13:38:48
13:38:52
13:38:55
13:38:58
13:39:01
13:39:03
13:39:06
13:39:08
13:39:12
13:39:13
13:39:15
13:39:19
13:39:20
13:39:23
13:39:26
13:39:28
13:39:31
13:39:32
13:39:33
13:39:36

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

65

MR. BROOME:  Whatever you guys want.

THE VIDEOGRAPHER:  We're going off the -- apologies.

We're going off the record at 1:39 p.m.

(Whereupon a break was had.)

THE VIDEOGRAPHER:  We're back on the record at 1:51.

BY MR. BROOME:

Q   Professor Badawi, I want to direct your attention to paragraph 20 of your report.

And there you write, "The second use of nonpublic information is for the much more limited purpose of covering any investigation that occurs between signing and closing."

Do you see that?

A   Yes.

Q   All right.  And -- and in the -- in the transaction that's at issue in this case, Musk's team did a lot of that, right?

A   I -- I don't know exactly what you mean by saying "a lot of that."

Q   They did a lot of -- they -- they requested nonpublic information from Twitter and reviewed it in the period between signing and closing?

A   I don't have personal knowledge of what work

was done.  I don't know that Mr. Musk was doing much work with respect to that information.

So it's hard for me to characterize in a general way the amount of work that was being done.

Q   So is it -- are you saying that you don't know whether the Musk team -- well, let me -- withdrawn.

Are -- do you know what -- do you know what information the Musk team requested in the period between signing and closing?

A   I -- I know that there were some requests related to the mDAU issue.

Q   Okay.

A   I'm not sure I know every single information request that went through, but I certainly saw the ones, at least some of the ones, related to mDAU.

Q   And you understand that Twitter responded by providing a significant amount of information in response to Musk's requests, correct?

A   I'm not sure I would characterize it as -- I don't know what a "significant amount" of information is when you're dealing with mDAU, which is a huge potential amount of information.

I know that they went above and beyond the -- what they said were their obligations under

13:52:39
13:52:44
13:52:47
13:52:50
13:52:55
13:52:56
13:53:00
13:53:01
13:53:04
13:53:08
13:53:10
13:53:14
13:53:17
13:53:17
13:53:20
13:53:23
13:53:26
13:53:29
13:53:31
13:53:33
13:53:36
13:53:37
13:53:40
13:53:43
13:53:47

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

67

the agreement to provide information.

Q   How do you know that they went above and beyond their obligations under the merger agreement?

A   That's not what I said.

What I said is Twitter stated that they went above and beyond.

There's a section of my report where I cite that language in the first amended complaint.

Q   All right.  Are you aware that Musk's team had multiple meetings with Twitter, the Twitter team, that the parties described as "diligence meetings"?

A   I know there were meetings.

I -- I don't recall who, if anyone, described those as "diligence meetings."

MR. BROOME:  Alex, let's mark Exhibit 4 -- sorry, Tab 4.  It's going to be Exhibit 213.

(Exhibit 213 marked for identification.)

A   Okay.  I've got it.

Q   Okay.  Have you seen this document before?

A   I may have, but I don't have a specific recollection.

Q   Oh, okay.  Here we go.

All right.  You see on May 6th at 8:58 a.m. -- May 6th, 2022, at 8:58 a.m., Anthony

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                    68

Armstrong at Morgan Stanley sends an e-mail to Sam    13:56:36

Britton at Goldman Sachs?    13:56:39

    A    Yes.    13:56:42

    Q    Okay.  And Anthony Armstrong from Morgan    13:56:42

Stanley, he -- he represent -- he was the banker for    13:56:45

Musk's side, right?    13:56:49

    A    I -- that sounds correct.    13:56:50

    Q    And Sam Britton was the banker on Twitter's    13:56:52

side, right?    13:56:55

    A    I believe that's correct.    13:56:56

    Q    All right.  And Armstrong writes, "Hi, Sam.    13:56:57

With all the qualifiers we discussed live, please    13:57:00

see below.  Look" -- "look forward to seeing you all    13:57:04

later today.  And will let you know on back-end    13:57:08

timing if/when I get info."    13:57:10

        Do you see that?    13:57:12

    A    Yes.    13:57:13

    Q    And then underneath that, he has, "Potential    13:57:13

topics that E might want to address."    13:57:15

        Do you see that?    13:57:17

    A    Yes.    13:57:18

    Q    And then there's a -- it says "May 6    13:57:20

Discussion Topics."    13:57:23

        You see that?    13:57:23

    A    Yes.    13:57:24

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

69

Q    And then, you know, under the -- there's various categories.  The first category is, "1.  How many users are verified and what is the verification process?  How many verified users are in each category that you identify" etcetera.  "How do you estimate that fewer than 5 percent of mDAU are false or spam accounts?"

Do you see that?

A    Yes.

Q    And are -- are you aware that there was indeed a meeting between Musk's -- Musk's team, including Mr. Musk himself, and Twitter's team on May 6, 2022?

A    From this document, that would appear to be something that happened.  I don't have personal test -- I don't recall personal testimony from people who participated in the meeting.

Q    Other than seeing this document, were you aware of this May -- May 6 meeting?

A    There may have been reference to it in -- in a deposition, but I -- I don't have a specific rec- -- recollection.

Q    Okay.  And do you have an opinion one way or another -- well, withdrawn.  Let me start again.

At this point in time on May 6, 2022, the

13:57:24
13:57:27
13:57:29
13:57:32
13:57:35
13:57:38
13:57:42
13:57:43
13:57:45
13:57:45
13:57:50
13:57:55
13:57:59
13:58:01
13:58:05
13:58:06
13:58:08
13:58:10
13:58:12
13:58:13
13:58:15
13:58:18
13:58:18
13:58:48
13:58:51

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

70

parties' rights and obligations to request and                13:58:54

provide information were governed by the merger               13:58:58

agreement, correct?                                           13:59:02

    A    As I've said before, that's at the baseline          13:59:04

for the exchange of information with respect to               13:59:08

consummation of the transaction.                              13:59:11

    Q    Right.  Yeah.                                         13:59:12

         And I'm speaking about rights and                    13:59:13

obligations, legal rights, legal obligations.  I'm            13:59:15

not -- not referring to any other -- you know, what           13:59:18

they produce voluntarily or, you know, out of the             13:59:21

kindness of their heart.  I'm just -- I'm just                13:59:25

asking about the rights -- rights and obligations.            13:59:27

         Those would be governed by the merger                13:59:29

agreement, correct?                                           13:59:33

         MR. MOLUMPHY:  Object to the extent it calls         13:59:33

for a legal conclusion.                                       13:59:35

    A    So I -- I would say customarily that's how           13:59:36

it would be understood.                                       13:59:39

    Q    Okay.  Moving on to the next one.                    13:59:40

         MR. BROOME:  Alex, let's look at Tab 5.  And         13:59:53

we'll mark Tab 5 at Exhibit 214.                              13:59:55

         (Exhibit 214 marked for identification.)             14:00:00

         MR. BERGJANS:  Sorry, I'm running into a             14:00:24

little bit of a tech issue.  Emily, are you able to           14:00:25

put Tab 5 in the chat?  I'm unable.    14:00:28

        MS. COUTURE:  Yes.  One second.    14:00:33

    Q    Just while we're waiting for the exhibit,    14:00:35
Professor Badawi, the -- you understand that the --    14:00:37
that Mr. Musk was planning to acquire Twitter into a    14:00:43
company called X, X Holdings?    14:00:52

    A    The -- that -- from looking at the merger    14:00:55
agreement, that appeared to be the structure.    14:00:58

    Q    Right.    14:01:00

    A    Okay.  I have the -- I believe I have the    14:01:08
exhibit.    14:01:10

        Okay.  I have it.    14:01:16

    Q    All right.  Have you seen this document    14:01:17
before?    14:01:19

    A    I don't have a specific recollection of    14:01:20
seeing it.    14:01:23

    Q    Okay.  And do you see that it's a calendar    14:01:24
invite for a meeting -- a meeting on May 13th, 2022,    14:01:28
titled "X Diligence with T"?    14:01:31

    A    Yes.    14:01:36

    Q    That -- and that would indicate that there    14:01:36
was a diligence meeting between X, which was    14:01:39
Mr. Musk's side, and -- and T, which is presumably    14:01:45
Twitter, right?    14:01:49

        MR. MOLUMPHY:  Objection, form.    14:01:49

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                    72

A    That strikes me as a reasonable inference.

Q    All right.  And that that diligence meeting was going to be regarding Twitter's financials and its users, right?

A    That's what the subject -- the subject line says "financials and users."

Q    All right.

MR. BROOME:  We'll mark Tab 6, which will be Exhibit 215.

(Exhibit 215 marked for identification.)

Q    Let me know when you have it.

A    I have it.

Q    Okay.  And have you seen this document before?

A    Not that I recall.

Q    All right.  This is a -- a calendar invite for a meeting between Twitter and -- and Mr. Musk's team from May 21st, 2022, titled "Diligence Session," correct?

A    That's what the subject line says.

Q    Okay.  And let's look at Tab 7, which we'll mark as Exhibit 216.

(Exhibit 216 marked for identification.)

Q    Let me know when you have it.

A    I have it.

14:01:50
14:01:58
14:02:00
14:02:03
14:02:04
14:02:07
14:02:10
14:02:18
14:02:22
14:02:23
14:02:42
14:02:44
14:02:45
14:02:48
14:02:48
14:02:51
14:02:56
14:03:01
14:03:06
14:03:06
14:03:09
14:03:22
14:03:24
14:03:43
14:03:44

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

73

Q   Okay.  And this is a calendar invite for a meeting between the Twitter and Musk teams, and the subject line is "Diligence Session (follow-up)."

Do you see that?

A   That's what the subject line says.

Q   And -- and I forget if I asked you this or not.

Have you seen this document before?

A   Not that I recall.

Q   Okay.

MR. BROOME:  Let's look at Tab 8, which will be Exhibit 217.

(Exhibit 217 marked for identification.)

Q   Let me know when you have it.

A   I have it.

Q   And this is a -- this is a calendar invite for another meeting between the Musk and Twitter teams concerning diligence session user metrics, right?

A   Yes.  The subject line says "Diligence Session" and then in parentheses "User Metrics."

Q   Okay.  And -- and then have you seen this document before?

A   I -- I opened some of the exhibits in the Claassen -- or at least most of the exhibits in the

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

74

Claassen depo, so I -- I don't know -- I may have seen it, but I don't have a specific recollection.

MR. BROOME:  We'll mark -- let's do Tab 9, Alex.  It's going to be 28 -- Exhibit 218.

(Exhibit 218 marked for identification.)

Q    Let me know when you have it.

A    I have it.

Q    All right.  And this a -- another meeting invite for a meeting between X and Twitter concerning Diligence Call:  User Metrics Follow-Up.

Do you see that?  And that -- sorry. that -- and that meeting was for July -- well, let me break this down.

This is a calendar invite for a meeting scheduled for Friday, July 1st, correct?

A    It appears to be.

Q    And -- and the meeting was concerning a Diligence Call, User Metrics Follow-Up, correct?

MR. MOLUMPHY:  Object, document speaks for itself; calls for speculation.

A    The subject line says "Updated invitation: User Call: User Metrics Follow-Up @ Friday, July 1st."

Q    Okay.  Have you seen this document before?

A    I would reiterate my answer with respect to

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

75

the Claassen deposition:  I opened some of those exhibits, but I don't have a specific recollection.

Q   All right.  And this is -- if you look here, you can see the required attendees include some folks from Twitter, some folks from Goldman Sachs, looks like a lawyer from Wilson Sonsini, and some lawyers from Skadden, Simpson Thacher, and Quinn Emanuel.

Do you see that?

A   Yes.

Q   Nobody from Morgan Stanley on this one, right?

A   I'm just checking the guest list.

I don't see a Morgan Stanley invitee on the -- as I would infer from the e-mails.

Q   Okay.  When you -- when you wrote your report, were you aware that the parties conducted what they described as due diligence meetings in the post-signing period?

MR. MOLUMPHY:  Objection, misstates the evidence.

A   I -- I would not necessarily call these due diligence in the sense -- I -- so let me back up.

I don't know what the precise content and purpose of these meetings was, right, so I don't

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                    76

know whether they relate to the customary

understanding of what I call due diligence -- M&A

due diligence or not.

   Q  Are you drawing a distinction between

diligence and due diligence?

   A  I think, you know, the -- the term

"diligence" is used among different professionals in

different sorts of ways, right.  So I think in M&A,

when you talk about due diligence, the customary

understanding, that is the investigation that you do

before signing an agreement.

   Q  Okay.  Well, this is -- this -- this e-mail

has a whole bunch of M&A practitioners on it, right?

   A  I -- I don't know the specific specialty of

the lawyers on this e-mail.

   Q  Well, Martin Korman?

   A  So with respect to Mr. Ringler and

Mr. Korman, they -- my understanding is that they're

M&A attorneys.

   Q  Right.  And -- and -- and certainly the

folks who are -- the folks who are, you know,

participating in these meetings, they -- they

understood them to be diligence meetings, right?  I

mean, that's --

      MR. MOLUMPHY:  Vague.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

77

Q   -- isn't that -- isn't that pretty clear from the documents themselves?

A   I --

MR. MOLUMPHY:   Calls -- excuse me.   Calls for speculation; calls -- calls for speculation.

A   I don't know how these people understood the meeting.

Q   And -- and I guess your -- your position would be you don't know if these are -- well, is your position that you don't know whether -- whether these were accurately described as diligence meetings or not because you don't know what was discussed in them?

A   I -- I don't know what was discussed, what the purpose of the meeting was, or how the people understood the -- what the meeting was about.

Q   Is it your view that based on custom and practice, these were not accurately described as diligence calls?

MR. MOLUMPHY:   Objection, vague.

A   Again, I -- part of the problem is that I don't know what was being discussed and what the purpose was for, right.

I'm unable, just from a subject line, to call something a "diligence call," to say whether or

not this is about the traditional M&A -- or the     14:11:28

customary M&A due diligence that I describe in my     14:11:32

report, which, again, I -- I understand and M&A     14:11:35

practitioners understand is the due diligence you     14:11:43

conduct prior to signing an agreement.     14:11:45

Q    I'm sorry.  Say that -- say the last -- can     14:11:55

you clarify the last part that you said?     14:12:00

You said, "I understand and M&A     14:12:01

practitioners understand is the due diligence you     14:12:02

conduct prior to signing an agreement."     14:12:06

Are you saying that M&A practitioners     14:12:08

understand that due diligence is the investigation     14:12:11

that you conduct prior to signing an agreement?     14:12:13

A    My understanding is that when most M&A     14:12:15

practitioners use that term -- when they say "due     14:12:18

diligence," that is shorthand for the diligence that     14:12:21

you conduct prior to the signing of an     14:12:24

investigation.     14:12:27

Q    Okay.  Well, you're not an M&A practitioner,     14:12:29

right?  You wouldn't describe yourself that way?     14:12:37

A    I'm not.     14:12:40

Q    Okay.  And aside from, I think, the one deal     14:12:41

we discussed when -- when you were an associate at     14:12:45

Munger, Tolles, you haven't actually worked on any     14:12:48

M&A deals, right?     14:12:54

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

79

A    I don't believe so.  I mean, I'd have to -- "worked on" could mean a lot of things.

But I was not an attorney -- as an attorney, I did not, other than the ones I've listed, work on M&A deals.

Q    Other than the one you listed, right?

A    I said it may have been one or two, I believe.

Q    Okay.  And, presumably, you've reviewed a lot of merger agreements in your -- you know, your time as a professor --

A    Yes.

Q    -- in your research?

But in your report, you talk a lot about, you know, customs and practice and what the parties would understand and what the practitioners understand.

If you -- you know, a lot of the sort of customs and practice that go into executing a -- or sorry, closing a merger are not evident from the merger agreement itself; would you agree?

A    The -- I would say that the customary understanding of terms and language that M&A lawyers will use in their conversations or in their work, they don't -- naturally, there's a difference

14:13:05
14:13:10
14:13:12
14:13:15
14:13:19
14:13:20
14:13:22
14:13:24
14:13:24
14:13:28
14:13:33
14:13:35
14:13:35
14:13:39
14:13:44
14:13:46
14:13:48
14:13:49
14:13:54
14:13:58
14:14:04
14:14:06
14:14:12
14:14:15
14:14:20

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

80

between the words people use when they speak and the words people put in agreements.

Q   Right.  So since you've -- since you've not -- since you're not an M&A practitioner, you wouldn't necessarily know -- or sorry -- you don't know what goes -- what the customs and practices are beyond what is included in the merger agreement itself, right?

A   I disagree with that.

MR. MOLUMPHY:  Object to the form.

Q   Can you -- can you explain your disagreement?

A   Yes.  I view myself as immersed in the M&A community, not as a practitioner, but as someone who has very frequent conversations with practitioners.

I organize an M&A forum every -- every spring with one of the preeminent M&A lawyers in the field.

And so I have conversations with them all the time.  And through that, I learn the jargon.  I read a lot of the practitioner literature, which will use that jargon on some occasions.

I have lots of conversations with M&A academics who are -- who, like me, are immersed in the language and customs of M&A, even though we are

no longer directly practicing.

And so those are all sources from which I can learn the customary understanding of how M&A -- M&A lawyers use language.

Q    Okay.  Well, when -- I think you said earlier that your understanding is that when most M&A practitioners use the term "diligence," they mean -- they mean the investigation you conduct pre-signing.

You'd agree that Martin Korman and Mike Ringler are leading M&A practitioners, or among the leading M&A practitioners?

A    I believe I used the term "due diligence."

Q    I'm sorry.  So you're -- you're drawing a distinction between -- I guess this comes back to a question I asked earlier.

Are you drawing a distinction between "due diligence" and "diligence"?

A    My understanding, right -- so I'm not an investment banker.  I'm not an expert with respect to the customs and practices of the use of -- of the use of the word "diligence" in investment banking.

But I have heard references to "diligence" in investment banking that are different from the way I would understand that term in M&A.

So the term I'm most -- I hear lawyers use the term "due diligence." And, customarily, that refers to the investigation that is done prior to signing a merger agreement.

Q   Okay. So you think that when -- when Ringler and Korman were copied on all these -- these diligence calls, they were, like, What are they talking about, diligence? We've already signed the merger agreement.

MR. MOLUMPHY: Objection, improper hypothetical; vague.

A   I -- I don't know what they thought.

Q   Okay. All right. Do you have any personal experience engaging in the customs and practices that you're opining on in your report?

A   I don't -- I don't know what you mean by "engaging."

Q   Well, in your report, you refer to a number of customs and practices, right, in the M&A community?

A   Yes.

Q   Have you engaged -- well, let's take the customs.

Have you personally engaged in those customs?

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                                       83

A    I mean, part of those customs are using -- I think using the language that lawyers customarily engage in.

And so I have plenty of conversations with M&A lawyers where we use that customary language to refer to M&A deals.

Q    Okay.

A    I have plenty of conversations with other experts in M&A in the academic field, where we use that customary language to discuss deals, right.

That's what kind of customary language is about.  It's about having a common language that you can use to discuss sometimes technical topics.

Q    I see.  Okay.  So the -- right.  Okay.

So the customs and practice that you're opining on really relate to how language is understood.

Is that -- is that what you're saying?

MR. MOLUMPHY:  Vague.

A    That's part of it, yeah.

But it's not an exclusive -- that's not my exclusive use of "custom and practice."

Q    What are the other -- other uses?

A    Well, as I explain in my report, this would customarily be understood as a seller-friendly

agreement, right.

And that's based on, not just knowing the customary language; it's based on knowing the customary terms in an M&A agreement.

Q    Terms are just language, aren't they?

A    Well, to understand that -- whether something is buyer-friendly or seller-friendly, you can't just look at one agreement, right, and look at the language in one agreement.

You have to look at things at scale, right, which is -- what I do in my work is look across thousands of agreements and say, okay, where do these -- in terms of the custom and practice in the field, where does this fall?

Q    Let's look at paragraph 20 of your report.

And there you say, quote, "...it is critical for the parties to be satisfied with their investigations at the time of signing the acquisition agreement."

Do you see that?

A    I do.  It's not me who's saying that. That's the leading M&A treatise that says that.

Q    Okay.  Let -- let's say that the buyer is satisfied with his investigation at the time of signing the acquisition agreement.

But then, after signing, the buyer learns that one of the representations and warranties in the agreement is materially false or inaccurate, or he learns something that suggests that a representation or warranty is material -- materially false or inaccurate.

In your experience, that -- that would not be a typical or customary occurrence, right?

A    I mean, there's a lot bound up in there, right, because it kind of depends what the language of the representation says.  These are typically qualified.

And so what it means -- you know, I would want to know more about that, right.

So it's -- it's hard to answer something that is pitched at a relatively general level rather than a specific one.

Q    Well, is it -- is it customary in M&A for the buyer to learn post signing that representations and warranties are materially false?

A    It -- so it -- it -- you -- it can happen that you learn that -- I mean, I'm not sure I would say "materially false" because usually the rep and warranty itself will use materiality language, right.

So I would say kind of that there's a -- you can learn that the -- there may be a problem bringing down that rep and warranty to close.

Q   Well, I mean, is it -- is it typical that -- in M&A that buyers learn that representations and warranties are false?

A   It's -- I'm not sure if I would say it's "typical," right.

So that depends on knowing the universe of deals that are out there and how often someone learns and -- that a rep and warranty may be false, right.

Is it something that happens?  It happens, right.  The precise frequency, I think, is hard for anyone to know because it's hard to -- it's not -- that's not public information, and no one is doing all the deals.

Q   Okay. All right. But you -- you would know -- I mean, in your experience, would you -- in your experience, based on all the deals that you've been exposed to, does it happen more often than not or less often than not or less often than -- you know -- well, withdrawn.

In your experience, looking at all the deals that you've been exposed to, is it typical that

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

87

buyers learn something indicating that the reps and

warranties in the merger agreement are false or

inaccurate?

A    I don't -- it's just hard to know whether

something is typical in that case.

I mean, the -- it is certainly true that

most deals close, right, and most deals close -- if

there were a problem with reps and warranties that

might pose a problem, right, to closing.  It doesn't

have to, right.  You could find that a rep and

warranty is not correct and still close.

But it suggests that it may not be something

that happens often.

Q    How many M&A deals do you think that you've

been exposed to, that you've looked at, read their

agreements, you know, understood the -- well, you

know, studied the transaction?  Ballpark, like,

hundreds?  Thousands?

A    Can you -- I'm not trying to be pedantic,

but kind of with that framing, can -- can you state

what the question is?

Q    Oh, sorry.  I'm not sure I -- I understand

which question.

But the -- the question to you was:  How

many M&A deals do you think you -- you have studied?

Ballpark figure.

A   I mean, if "studied" means look at the agreements or read an opinion about -- that was produced about the deal, I would say probably thousands, if -- if it's just reading the agreement. Now, of course, just reading the agreement, I don't know what happened with respect to the reps and warranties.

Q   Okay.  And can you identify any transactions, aside from this one, in which after signing the merger agreement, a party raised concerns that the reps and warranties were false or inaccurate?

A   There are certainly cases where that occurs, right, where the -- the obligation to close turns on whether or not a rep and warranty is true and correct.  Now -- and, again, that is -- it's not enough to just say it's false, because then you have to look at the bring-down con -- condition that says, well, how false do they have to be, right.

And so as I explained in my report, if you say they have to amount to an MAE, that's an exceptionally high bar, right.  So you could say that a rep and warranty is false, right, but if the -- the falsity does not rise to the level of a

material adverse effect, you still have to close.

Q   Yeah.  But that's not the question I'm asking, respectfully.

The question is, how many times -- well, I'll just read the question back.

The -- the question was:  Can you identify any transactions, aside from this one, in which after signing the merger agreement a party raised concerns that the reps and warranties were false or accurate [sic]?

A   I have read cases in which that occurred. And, again, just where it's raise -- raising concerns meaning kind of an allegation.

Now, again, I'm not trying to be pedantic. I'm just trying to be precise, right.  Like just saying that something is false is -- you can raise a concern that something is false but that doesn't necessarily get you out of your obligation to close because --

Q   I understand that.  Totally understand.

A   It -- if you --

Q   Sorry, I can -- can -- can you identify any -- any specific transactions in -- in which that occurred?

A   I'm trying to think.  I believe the Akorn

case was a case where the -- that, ultimately, the case turned on a rep and warranty --

Q    Okay.

A    -- I believe, incorrect -- I believe.

And I -- I'm trying to think of others. I've certainly seen others, but I -- their precise names don't spring to mind.

Q    Okay.  But they -- they -- they wouldn't be in the thousands, right?

A    The -- where the case got litigated and made it to the point where there was a written opinion?

Q    No.  Just -- just of your experience, all of the merger and acquisition transactions that you've been exposed to, whether it's studying the merger agreement or an opinion, how -- like just, you know, ballpark figure, how -- in how many of those cases did the -- did a party raise concerns that the reps and warranties were materially false or inaccurate?

A    It's hard for me to estimate.  Again, I'm not trying to be pedantic.  It's just a hard thing to do, because, for example -- I mean, there are -- there are probably tens of thousands of mergers and acquisitions that occur.  Most of them are exceptionally small.  A lot of them are private.  A lot of those involve subsequent claims that the

reps and act -- warranties are inaccurate.  In fact, that's what a lot of private M&A litigation is about.

And so I would -- it's -- it's not infrequent across the entire universe of transactions.

Q   Right.  But it would be a -- a small percentage of the transactions in which you've -- you've been exposed to, correct?

A   I -- I don't -- again, it's hard to know this stuff because a lot of this is private information, right.  So --

Q   I'm -- I'm only asking you what you know.

A   Okay.  It happens.  It's difficult to -- to estimate, with much precision, how often.

Q   It wouldn't be typical?  It doesn't have the -- let me -- let me withdraw that.

It doesn't happen the majority of the time?

A   You're asking me to speculate kind of what -- I don't know the numerator and I don't know the denominator, right, so it --

Q   Okay.  No, that's fine.  If you don't know, you don't know.  That's perfectly -- that's fine.  I understand.

Are you saying you don't know the answer to

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

92

that question?

A   I -- I'm not saying I don't know.  I'm just say -- you asked me if it's a majority, right, and that has a precise numerical definition, right. In order to give a precise numerical answer, I need precise numbers, and I don't have precise numbers.

Q   Okay.  So you don't know if it's -- if -- if the scenario that I just described occurs a majority of the time or less than a majority of the time?

A   I -- I don't have precise numbers.  I don't think anyone has precise numbers, right.

I'll leave it there.

Q   Okay.  In paragraph 22 you -- you write, "In a seller-friendly merger agreement, the bring-down condition will severely restrict the buyer's ability to escape the deal even if information emerges that is at odds with the seller's representations, including those about its public filings.  This type of bring-down condition will only be breached if the failure of the representations to be true and correct, either individually or collectively, amount to a 'material adverse effect,' (MAE)."

Do you see that?

A   Yes.

Q   Do you have an opinion on the following:

Assume that Twitter's mDAU was --

MR. BROOME:  And just for -- just for the court reporter's benefit here, when I say "mDAU," it's small m, capital D, capital A, capital U.

Q   So with that, Professor Badawi, do you have an opinion on the following:  Assume that Twitter's mDAU was not less than 5 percent as estimated in its 10-K and 10-Q -- or -- and 10-Q that are referenced in the merger agreement, but it was actually in excess of 20 percent.

Do you have an opinion as to whether that would be an MAE?

MR. MOLUMPHY:  Object, incomplete hypothetical; misstates the evidence; vague.

A   Yeah, so I would say, you know, there's a lot that goes into mDAU and how it -- how it's defined, right.  And so I don't -- I don't know what exactly that means.

But I think that's asking me to speculate about a legal conclusion, and I -- I -- that's not my job, to kind of come to legal conclusions.

Q   Okay.  No, I just -- that's fine.  I just want to make sure you don't have an opinion one way or the -- one way or the other on that.

And I'm going to ask you a similar question,

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                           94

phrased a little bit differently:  Do you have an opinion as to if -- whether -- if Twitter misstated the prevalence of bot, spam, fake accounts as a percentage of mDAU by 400 percent, whether that would be an MAE?

    MR. MOLUMPHY:  Same objections.  Also object to the extent it calls for a legal conclusion.

    A    Again, there's a lot bound up in that, right.  MDAU is a complex topic that I don't think -- I mean, as this case shows, right, it's hard to -- to say -- to characterize it in a sentence or two.  At the -- in addition, it would ask me to speculate about a legal conclusion, which it's not my role to do.

    Q    Okay.  I'm going to try this just with a little more detail.  Fine if you come to the same answer.

    But you do understand that in -- in Twitter's 2021 10-K and its 2022 10-Q, it contained a -- those documents contained representations about Twitter's mDAU, right?

    A    I mean, I -- I wouldn't call them rep- -- I would say statements about mDAU.

    Q    Statements, sure, about Twitter's mDAU.

    And -- and -- and those were -- and -- and

you understand that Twitter described its mDAU as a key metric, right?

A    I -- I -- I believe so.  I mean, I have to go back to the -- to those documents to get the precise wording that they used, but that is -- as a general description, that sounds correct.

Q    Okay.  And you also understand that in those documents, Twitter stated that it estimated that the percent of bots, spam, or fake accounts was less than 5 percent of mDAU, right?

MR. MOLUMPHY:  Object to the extent -- extent it misstates the evidence.

Go ahead.

A    Yeah, I would have to look at those precise documents to -- to know for sure.

Q    Okay.

A    But if -- if that's your represent -- I'll accept your representation for the purposes of any hypothetical.

Q    Okay.  And you also understand that the merger -- in the merger agreement, Twitter represented and warranted that its 2021 10-K and 2022 10-Q were accurate, right?

A    I want to be careful about not kind of coming to a legal conclusion about what anything in

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

96

the merger agreement is -- is stating.

I can say the agreement contains a customary kind of 10b-5 representation.

Q   Okay.  Would it help -- would it be helpful to look at the merger agreement itself?  Can do that.

A   It -- it sort of depends on the question that you're going to ask.

Q   Yeah.

A   But I'm happy to if it would facilitate things.

MR. BROOME:  Alex, can we mark the merger agreement as Exhibit 219?

(Exhibit 219 marked for identification.)

A   It hasn't come through on the -- oh, is that -- is it 18 here?

Q   Yeah, it will be Tab 18, marked as Exhibit 219.  Yeah.

A   I got it.  Is there a page you wanted to go to?

Q   Yeah.

A   Bet it's going to be 25.

MR. BERGJANS:  25, so 39 of 9- -- 95 in the PDF.

MR. BROOME:  Now my computer is freezing.

Hold on.

A   I've got it.

Q   Okay.  Yeah, if we look at Section 4.6(b) on page 25 --

A   Yeah.

Q   -- do you see there it says, "The consolidated financial statements (including all restated" -- "all related notes) of the Company included in the Company SEC Documents fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries as at the respective dates thereof and its consolidated statements of operations and consolidated statements of cash flows for the respective periods then ended," etcetera, etcetera.

All right.  Yeah, you see that -- you see that provision?

A   I do.

Q   Okay.  That is a representation and warranty that Twitter was making to Mr. Musk, correct?

A   I mean, that -- that would be my understanding of -- of what they are saying.

Q   Okay.  Now, if after signing the merger agreement, Mr. Musk learned that -- or -- or came into information indicating to him that, in fact, a

key metric in Twitter's consolidated financial statements was materially misstated, you would expect the buyer in that situation to ask for information from the seller about that representation, right?

MR. MOLUMPHY:  Objection, form.

A   If this is post signing, that would depend on the information rights.

Q   Because post -- and are you saying that because post signing, the parties' rights and obligations to information about the business are governed by the merger agreement?

A   As I said before, they set the baseline for the exchange of information.

Q   Okay.  So in that hypothetical, then, you would -- you would expect the buyer to conduct an investigation, right?

MR. MOLUMPHY:  Vague; calls for speculation.

A   It would depend on the rights and obligations under the merger agreement.

Q   Well, let's assume the rights and obligations under the merger agreement are those set forth in this merger agreement.

In my hypothetical, would you expect the buyer to conduct an investigation?

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                                    99

MR. MOLUMPHY:  Objection, form.                    14:40:57

A    So -- and so I -- I just want to flag a        14:40:59

couple things.                                      14:41:05

Q    Okay.                                          14:41:05

A    Because we're -- it's -- so I'm not sure       14:41:06

that the mDAU was in the financial statements, as   14:41:07

opposed to in the discussions elsewhere in the SEC  14:41:11

forms, which would be governed by 4.6(a), as opposed 14:41:15

to (b).  I'll leave it to you to clarify that.      14:41:20

And then I'm trying to understand                   14:41:22

the -- from the -- if you could restate the hypo    14:41:24

with respect to how the information was obtained or  14:41:27

learned, that -- that would be helpful.             14:41:29

Q    Okay.  Well, let's take a look at the 10-K.    14:41:30

MR. BROOME:  Alex, let's mark, as                   14:41:35

Exhibit 220, Tab 17.                                14:41:37

(Exhibit 220 marked for identification.)            14:41:39

Q    Let me know when you have the 10-K,            14:41:50

Professor Badawi.                                   14:41:54

A    Got it.                                         14:42:05

Q    If you go to page 6 of the PDF, the --         14:42:06

page 6 of the actual document too.                  14:42:09

Let me know when you're there.                      14:42:14

A    Six, yes.                                       14:42:15

Q    And, actually, you might be right.  It might   14:42:20

100

be governed by 4.6(a) and not (b).

Anyway, on page 6 here, you see the "Note Regarding Key Metrics"?

A   You mean the footnote at the bottom of the page?

Q   No, at the very top of the page, the --

A   I think I got it.  Yeah.  Yeah.

Q   "Note Regarding Key Metrics."

And then there is a note there to the financial statements that describes Twitter's mDAU.

Do you see that?

MR. MOLUMPHY:  What paragraph?

Q   Well, the whole thing, but...

A   I see the general references to mDAU in the note.

Q   Yeah.  And then it says in the third paragraph about -- one, two, three, four, five -- six lines down, "We have performed an internal review of a sample of accounts and estimate that the average of false or spam accounts during the fourth quarter of 2021 represented fewer than 5 percent of our mDAU during the quarter."

Do you see that?

A   Yes.

Q   All right.  So now if -- if post signing,

14:42:25
14:42:28
14:42:31
14:42:35
14:42:38
14:42:39
14:42:41
14:42:42
14:42:45
14:42:47
14:42:51
14:42:52
14:42:54
14:42:56
14:43:00
14:43:00
14:43:04
14:43:09
14:43:13
14:43:15
14:43:18
14:43:21
14:43:22
14:43:23
14:43:24

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

101

Mr.- -- post signing of the merger agreement, Mr. Musk came into -- into information that indicated to him that Twitter's -- that the percent of mDAU that was comprised of false or spam accounts was actually more like 20 percent, would you expect a buyer in that situation to conduct an investigation?

MR. MOLUMPHY: Improper hypothetical; beyond the scope.

A    It would depend both on the information rights under the agreement and the -- the broader rights with respect to the bring-down provision and conditions to closing.

Q    Use -- use the rights that are set forth in this agreement.

MR. MOLUMPHY: Same objection.

A    Again, we're -- I don't want to touch on kind of the interpretation here.

But it -- at least as I understand the customary -- the customary use of the language in this agreement, right, you can only request information related to consummation of the transaction.

And so, you know, I can't speculate on what Mr. Musk or his lawyers would -- how they would

14:43:31
14:43:33
14:43:37
14:43:42
14:43:47
14:43:51
14:43:55
14:43:57
14:44:00
14:44:00
14:44:02
14:44:05
14:44:08
14:44:09
14:44:14
14:44:19
14:44:19
14:44:23
14:44:25
14:44:31
14:44:34
14:44:36
14:44:37
14:44:38
14:44:43

characterize the request.

It's all -- Twitter can deny any requests -- or sorry.  Your question was about Mr. Musk.

So I -- I don't -- it would depend, and it would depend on legal calls, legal judgment, business judgment as well.  So it's hard to speculate.

Q   Okay.  So with respect to the scenario I just described, you don't have an opinion one way or the another?

A   I do not have an opinion whether Mr. Musk would have been likely to conduct an investigation.

Q   Right.  And -- and let me phrase it slightly differently.

Based on customs -- what you understand to be the, you know, customs in the M&A industry in the scenario I just described, you don't have an opinion on whether a buyer in that scenario would conduct an investigation?

A   It would depend on the language in the merger transaction, right, and that language -- and the due diligence investigation that had been done prior to signing.  So -- and that's going to vary in every deal.

So it's hard to speculate on what general practice would be when it varies under the circumstances.

Q   Okay.  So in the -- I mean, I was -- I'm just asking about customarily.

But you're saying that you would need -- in order to answer my question as to whether a buyer in that situation would customarily conduct an investigation, you would need to know the specifics of the agreement and what was being said amongst the party and the lawyers and what kind of investigation was done beforehand.

So, ultimately, there basically is no custom or practice that can answer that question; is that your view?

MR. MOLUMPHY:  Objection, form.

A   No.  I would need to know, is this a seller-friendly agreement, buyer-friendly agreement?  Those --

Q   Well, who cares if it's seller-friendly or buyer-friendly?  Doesn't it -- it's what -- the words on page matter, right?  I mean, it doesn't matter if it's buyer-friendly or seller-friendly.

You need to know what the actual info- -- what the words say in the agreement, right?

A    I would -- if you give me the agreement, I can understand if it's buyer-friendly or seller-friendly, right?

Q    It's Exhibit 219.

MR. MOLUMPHY:  Want to pull it up?

THE WITNESS:  That's that merger agreement?

MR. MOLUMPHY:  Yeah.

THE WITNESS:  Give me a sec.

A    Okay.  We're a bit far down the road here.

So with respect to Exhibit 219 and -- can you -- can you state what you're asking?

Q    Yeah.  Buyer -- buyer learns post signing that one of the reps and warranties, in his view, may be materially false.

Would you expect -- as a matter of custom and practice, would you expect the buyer to conduct an investigation into that rep and warranty?

MR. MOLUMPHY:  Beyond the scope; improper hypothetical.

Q    I mean, if it is beyond the scope, that's fine.  You can just say, "I don't have an opinion on that."

A    It depends.

Q    On?

A    The -- the language in the remainder of the

agreement.

Q   You've got the agreement in front of you.

What else?

A   The -- the nature of the potential disagreement between the buyer and the seller, the business --

Q   I just described it.

A   If you could let me answer my questions, I would appreciate it.

It would depend on the business circumstances of the parties, right.

So there are legal rights and there's business judgment, and those can be different things.  So it's -- it's hard to speculate.

Q   Okay.  Is -- in your opinion, is confirming the bring-down conditions related to the consummation of the merger agreement, customarily?

A   When you say "consummation," do you mean "closing"?

Q   Yeah.

A   Yes.  Customarily, you will go through the bring-down process to check the reps and warranties for their truth and accuracy prior to closing.

Q   Okay.  So -- so that would be a customary process.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

106

And now, let's say, you know, you're, not -- you're the buyer and you're not satisfied that the seller's reps and warranties are accurate. You're -- in fact, you're concerned that they're materially inaccurate.

What would you expect the buyer to do in that situation?

MR. MOLUMPHY:  Object, improper hypothetical; beyond the scope.

A    It would depend on what the bring-down condition says, right, because just having something -- a rep and warranty be false is not enough to -- to get you out of the bring-down condition, right.

It needs to be false -- at least in some merger agreements, including this one -- to the extent that it would cause a material adverse effect.

Q    Right.  Well, let's say the buyer doesn't know because he doesn't have all information.

Wouldn't you expect a buyer in that situation -- like, let's assume the buyer thinks it might be a material adverse effect.

Wouldn't you expect the buyer in that situation to conduct an investigation before

closing?

MR. MOLUMPHY:  Same objections.

A    They may or may not conduct an investigation.  I don't know exactly what that means, right.

That could be outside the deal process; that could be within the deal process.  They might conduct an investigation of some sort.

MR. BROOME:  Do you guys want to take a break?  We've been going for a little over an hour.

MR. MOLUMPHY:  Sure.

THE VIDEOGRAPHER:  Apologies, Counsel.

We're going off the record at 2:50.

(Whereupon a break was had.)

THE VIDEOGRAPHER:  We're back on the record at 3:45.

MR. BROOME:  Let's mark Tab 3 as Exhibit 221, please.

(Exhibit 221 marked for identification.)

BY MR. BROOME:

Q    Professor Badawi, let me know when you have the exhibit in front of you.

A    I've got it.

Q    Okay.  And this is the deposition transcript of Mike Ringler.

I think you said you reviewed this before or parts of this before?

A    Yes.

Q    Okay.  If you could turn to page 36, please. And you see at line 4 -- you see Mr. Ringler is asked about the Schedule 13 that was filed by Mr. Musk on April 20th?

Do you see that?

A    Yes.

Q    Okay.  And then at line 11, Plaintiffs' counsel asked Mr. Ringler, "What did you understand that Mr. Musk was foregoing by, I will call it, a waiver of business due diligence?"

And Mr. Ringler responds that he didn't require business due diligence prior to signing a merger agreement.

Do you agree with that?

A    Agree with -- sorry.

MR. MOLUMPHY:  Vague.

Agree that the question was asked and answered or agree with Mr. Musk's response?

MR. BROOME:  Agree with Mr. Musk's response.

MR. MOLUMPHY:  Mr. -- Mr. Ringler's response.  Okay.

Objection.  Vague.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

109

A    I'm just going to re-read it.

Q    Yeah.

A    I mean, I agree his response is that he --
he didn't -- that Mr. Ringler believed that he
didn't require business due diligence prior to the
merger agreement.

Q    Right.  And -- and do you agree with --
do -- do you agree with the answer itself, the
content of the answer, that by filing the Schedule
13 and forgoing business due diligence as, you know,
whatever it says in -- in the Schedule 13, that all
he was doing there was agreeing that he didn't
require business due diligence prior to signing the
merger agreement?

A    It -- I mean, it's complicated insofar as
kind of -- as I've said, the customary understanding
against -- among most M&A lawyers would be that if
you say you're waiving due -- due -- a waiver of due
diligence, you're waiving your ability to do a
pre-signing investigation, right.  That's the
customary understanding.

Q    Okay.

A    I mean -- and, again, that depends on kind
of, you know, as I said -- and the Coates report
explains this -- maybe you would do a very little

15:47:26
15:47:29
15:47:42
15:47:44
15:47:46
15:47:48
15:47:48
15:47:51
15:47:52
15:47:56
15:48:04
15:48:07
15:48:10
15:48:13
15:48:16
15:48:23
15:48:28
15:48:32
15:48:38
15:48:41
15:48:43
15:48:44
15:48:48
15:48:50
15:48:55

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

110

bit of due diligence.  And if you bargained for extremely expansive information rights, right, you could do something that looks like something that resembles pre-signing due diligence after signing.

Q   Okay.  Let's look at page 65.

A   Okay.  I'm there.

Q   Okay.  And if you look at lines 6 through 17, please.

A   Okay.  Give me a moment, please.

Q   Yeah.  Just -- if you read those and let me know when you're done.

A   Okay.

Q   Okay.  Do you see in -- in paragraph -- or I'm sorry, in line 15, Mr. Ringler says, "There's nowhere in this agreement that that phrase is used." And the -- and that -- by "that phrase," he's referring to "the right to conduct business due diligence."

Do you see that?

MR. MOLUMPHY:  Calls for speculation.

MR. BROOME:  Spec- -- what calls for speculation?

MR. MOLUMPHY:  What Mr. Ringler meant by that.

MR. BROOME:  Well, okay.  I'll just -- I'll

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

111

just -- I'll just repeat the question, then.

Q   At page -- at line 12 Mr. Redenbarger says, "Is there anywhere in here that -- that it's explicit that Mr. Musk has the right to conduct business due diligence?"

And Mr. Ringler responds, "There is nowhere in this agreement that that phrase is used, but there is nowhere in any public company merger agreement that that phrase is used."

Do you agree that it seems that the phrase that Mr. Ringler is referring to there is "the right to conduct business due diligence"?

MR. MOLUMPHY:  Calls for speculation.

A   So I -- I -- I can't speak to every other public merger agreement because that's millions and millions of words.

With respect to the Twitter agreement, like, is there something -- is the phrase -- you know, is there a statement, "I have the right to conduct business due diligence," does that appear in the agreement?  I don't recall that exact phrasing being used.

Q   Yeah.  Well, I -- let me be a little more direct about what my question is.

Mr. Ringler, at least as I understand his

testimony here, is saying that public company merger

agreements don't use the phrase "business due

diligence."

     Do you agree with that premise?

A  I -- I -- I don't, right.  There -- there

are -- there are thousands of these things.  I can't

say whether or not they use that phrase or not.  I

mean, it certainly --

Q  Well, I would -- sorry.

A  -- that some agreement somewhere used that

phrase.

Q  It wouldn't be typical, right?

A  It -- the -- the statement that I see is

nowhere in any public merger agreement that that

phrase is used, and I -- I just can't -- it's

impossible for me to know without reviewing every

single public company merger agreement.

Q  Well, that -- that -- I mean, let's -- yeah,

let -- let's -- instead of, you know, no

company -- no agreement anywhere in the world, let's

just talk about, you know, what would be custom and

typical.

     It would not be customary or typical for a

public company merger agreement to use the phrase

"business due diligence," right?

A    They -- they may not -- I mean, again, the exact quote, "business due diligence," and in what way it's used, I don't think that exact phrase is something that I think is customary -- customarily used.

Q    Okay.  And I mean --

A    The --

Q    Sorry.  Go ahead.

A    That said, as I explain in my report, the -- you do sometimes see a diligence condition, right, which allows the buyer to walk away if diligence has not been completed to its satisfaction, which is a very powerful right, right.  And so that is something that you see, although it's relatively infrequent.  And it was not present in this case.

Q    And -- and -- and the -- the -- the fact that it would not be typical or customary for a public company merger agreement to use the phrase "business due -- "business due diligence," would be consistent with your testimony earlier that your understanding of business due diligence is something that you conduct before signing a merger agreement, right?

A    I'm not sure I necessarily follow the connection between them.  You -- you could --

so -- and -- and, you know, I've said customarily that's the understanding.  There are some outliers, right.

And the example I just gave of you put a diligence condition in the agreement, that's going to allow you to conduct relatively expansive investigations after signing, right.  And so that would look -- that's -- that's diligent -- due diligence that would look like pre-signing due diligence, right.

And so -- and, again, kind of business due diligence is more expansive than what is necessarily related to the M&A agreement, right.  You might be doing business due diligence for integration purposes, right.  Kind of you -- you've got to keep talking about what's going to happen if we close this merger and our two sides integrate, right.

And so I think that would be considered kind of business due diligence, but not M&A due diligence in the sense that it's necessary for the closing of the transaction under the agreements.

Q   All right.  Okay.  Do you have an opinion on whether, under the merger agreement at issue in this case, Musk was entitled to the information described in his May 13th tweet; in other words, the details

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                                    115

supporting calculation that spam/fake accounts do,               15:56:37

indeed, represent less than 5 percent of users?                  15:56:42

    MR. MOLUMPHY:  Objection, vague; beyond the           15:56:45

scope.  Also, I think you should show him the tweet              15:56:49

if you're going to refer him to it.                             15:56:52

  Q  Well, you have your report there, Mr. -- or              15:56:54

Professor Badawi?                                               15:56:58

  A  Yeah.                                                   15:57:00

  Q  It's in your report, right?  It's                       15:57:00

paragraph 77, if you want to refer to it.                       15:57:04

  A  Yeah.  I've got it .                                    15:57:06

  Q  And if it is, indeed, beyond the scope of             15:57:16

your test -- your expert report, then that would --             15:57:21

that's really the question I'm getting at, is do you            15:57:24

have an opinion one way or the other as to whether              15:57:27

Mr. Musk was entitled to the information described              15:57:28

in his May 13th tweet.                                         15:57:30

  A  I -- insofar as that requires me to                   15:57:32

interpret the merger agreement, right, and also, I             15:57:44

think, would require me to know information about              15:57:47

the communications and requests and whatever other            15:57:50

interactions there may have been between the                  15:57:54

parties, right -- but the -- so at -- at least as I           15:57:57

understand the circumstances, right, that he                  15:58:06

was -- again, it -- it just depends on -- so -- the           15:58:14

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

116

meaning of the merger agreement, which I don't want to interpret, and the facts and circumstances that arose. I want to be very careful about not offering a legal opinion about that particular topic.

Q   Well, I -- I just want to know if you have an opinion on that topic. If your -- if your response is, no, I don't, because that would be a legal opinion, fine.

A   Yeah. It --

Q   I want to know one way or the other: Do you have an opinion on whether he was entitled to the information described in his May 13th tweet under the terms of the merger agreement?

A   No, insofar as that's a legal conclusion, I do not have an opinion.

Q   Do you believe it is a legal conclusion?

A   I mean, I think it requires understanding the rights -- interpreting the -- the contract. I'd have to say, what are the information rights. And it requires knowing the communications that transpired between the parties that might bear on those legal rights. It's the application of those facts to the interpretation -- the legal interpretation of the -- of the agreement.

Q   Okay. So you don't have an opinion -- you

don't have an opinion on that topic then; is
that -- is that fair?

A   I don't have a legal opinion on the topic,
yes.

Q   Do you have a -- a nonlegal opinion on the
topic?

A   I -- I think -- I don't -- I don't have an
opinion on the topic.

Q   Okay.

A   I don't have -- I think -- yeah.
That's correct.

Q   Okay.  Great.  Okay.  Let's move on.
Okay.  Let's talk about buyer's remorse.
Do you have some -- well, actually, sorry.
Let me come back to the -- let me come back to the
information in May -- the May 13th tweet.
Your -- you say you don't have an opinion on
that because it would require interpreting the
provision, and it would -- it would require some
amount of analysis of the sort of, I guess, the
facts.  Is that -- is that your view -- the
circumstance -- I think you said the
"circumstances"?

A   Well, the reason I'm saying this is because
there are certain information rights that the

15:59:19
15:59:21
15:59:22
15:59:25
15:59:25
15:59:27
15:59:29
15:59:37
15:59:38
15:59:38
15:59:41
15:59:41
16:00:23
16:00:26
16:00:32
16:00:41
16:00:42
16:00:45
16:00:49
16:00:53
16:00:59
16:01:05
16:01:07
16:01:08
16:01:11

contract has; there are certain responses that

Twitter is allowed to respond to, right.

And those -- including things like Twitter's business judgment, right. So I don't know Twitter's business judgment, right. So I need to know information about Twitter's business judgment and whether or not they're entitled to reject any request, right. Is it necessary for the consummation of the transaction, right.

That requires facts and circumstances that -- that I don't know all of.

Q   Okay. And you said that in order to answer that question, you would need to know Twitter's business judgment. So that -- that would be -- right. Okay. You'd need to know Twitter's business judgment.

So that would basically require you, in order to answer that question, get inside Twitter's head and figure out, you know, do they think that this -- providing this information would create a competitive risk for them or something like that; is that fair?

A   I mean, as I understood it -- I mean, I want to avoid -- let me stop.

They -- they could say "no" to competitive

information in case the deal didn't go through.    16:02:37
Mr. Musk could be considered someone who, if the    16:02:40
deal doesn't close, might be a competitor.    16:02:43

But, again, this is highly speculative    16:02:48
because I --    16:02:51

Q   You just don't have an opinion on it?   Okay.    16:02:54
All right.    16:03:03

All right.   So let's talk about buyer's    16:03:03
remorse.   You have some opinions about buyer's    16:03:17
remorse in your report.    16:03:20

Are you offering an opinion that Mr. Musk    16:03:22
experienced buyer's remorse after signing the merger    16:03:24
agreement?    16:03:29

A   I am not -- I mean, Mr. Musk testified that    16:03:29
he thought he overpaid, which is a classic -- that    16:03:36
is the most classic case of buyer's remorse.    16:03:41

I can't -- I don't know if he -- so that --    16:03:44
the factual record suggests that he has buyer's    16:03:50
remorse.   And that is one that customarily fits into    16:03:53
the customary understanding of buyer's remorse.    16:03:58

That is how I would characterize my opinion.    16:04:00

Q   Well, you could overpay for something but    16:04:01
still be glad that you bought it, right?    16:04:03

A   I mean, if you're trying to get out of a    16:04:06
transaction, that suggests that -- that -- you could    16:04:15

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                    120

overpay for something and still, I suppose, be -- I

mean, you could still experience buyer's remorse,

right.

You can say, "I bought this, but I overpaid

for it," right.  That seems to be buyer's remorse.

Q   Okay.  Well, let me just be very direct in

my question.

Are you offering an expert opinion that

Mr. Musk experienced buyer's remorse?

A   I'm -- I'm not comfortable speculating on

his direct psychological state.

So I'm not offering an opinion that -- to my

knowledge, that Mr. Musk experienced buyer's

remorse.

Q   Right.  Remorse is an emotion, right?

A   It -- I mean, at least as I'm using it in my

report, right, it is with respect to corporate

actors experiencing remorse after entering into an

M&A transaction, right.

A corporate actor -- a corporation is an

entity that is run by people, a collective of

people, so it -- at least in the M&A context, I

wouldn't call it an emotional reaction.

Q   Well, but we're not talking about a

corporation.

We're talking about Mr. Musk, right?                    16:05:26

A    Again, my opinion is --                    16:05:28

Q    Is your opinion that -- sorry.                    16:05:31

Go ahead.                    16:05:33

A    My opinion is with respect to the custom and                    16:05:33
practice in mergers and acquisitions, right, where                    16:05:38
in the context of some deals, you see buyers trying                    16:05:42
to back out in a way that is customarily referred to                    16:05:46
as "buyer's remorse."  In the vast majority of                    16:05:49
cases, that is a corporation that is the buyer that                    16:05:52
is run by a board of directors and has executives.                    16:05:55

And so to say that it's an emotion is not                    16:05:58
something that I would -- I would say because we're                    16:06:01
dealing with a collective enterprise.  And we're                    16:06:04
also -- we're dealing with business transactions,                    16:06:08
right, where people are kind of making calculations.                    16:06:11

You know, if you're making an emotional                    16:06:14
purchase like a boat or a house or a piece of                    16:06:17
jewelry or something like that, you don't hire an                    16:06:20
investment bank to value what that is, right.                    16:06:23

And so I think people experience buyer's --                    16:06:25
if your investment banker comes to you and says,                    16:06:28
you've way overpaid for this, you might experience                    16:06:32
buyer's remorse in an analytic sense of, wow, I'm                    16:06:33
overpaying for something that other people think                    16:06:36

doesn't have that value.

Q    It's still an emotion, though, right?

I mean, even if you're talking about a corporation, it's a feeling that -- that you wish you hadn't paid for it.

Isn't that the definition of "buyer's remorse"?

A    It is -- I mean, I think it's more commonly expressed in attempts to get out of the deal, right.

Q    Is that what Mr. Musk was doing in May of 2022?

A    I -- I don't know his precise intent.

It could be that he was trying to say that this deal was not going to close, right; that -- that something had happened and that warrants that I don't get to close to deal, so I'm not going to close.

Q    Did he say that in -- in May 2022; is -- to your knowledge?

A    I mean, that -- my understanding, the Court's interpretation of -- of some of the tweets is that's how the Court understood it.  It's not -- you know, that's the Court's job.

Q    What's your understanding of the tweets? Did he say, "I'm not going to close"?

16:06:39
16:06:40
16:06:42
16:06:44
16:06:46
16:06:48
16:06:51
16:06:51
16:06:59
16:07:02
16:07:06
16:07:06
16:07:09
16:07:11
16:07:15
16:07:17
16:07:19
16:07:19
16:07:24
16:07:24
16:07:29
16:07:30
16:07:34
16:07:36
16:07:38

A    I mean, it is -- one could look at those tweets and understand them as the -- something has happened, right, that allows me not to close, so I'm not going to close.

Q    The tweet says -- at least the one at 5:44 a.m. says, "Twitter deal temporarily on hold" -- "temporarily on hold pending details supporting calculation that spam fake accounts do indeed represent less than 5 percent of users."

That's your understanding, right?

A    Of the tweet, yes.

Q    Yeah.  And then you understand that, shortly thereafter and before the markets opened, he followed that up with another tweet that said, "still committed to the acquisition," right?

A    I believe that's correct.

Q    And your -- your read of those tweets is that he was saying he wasn't going to close?

A    I'm saying that -- that was the Court -- my reading of -- the Court's interpretation of the tweet was along --

Q    Well, what's your -- put aside the Court's interpretation of the tweet.

What's Professor Badawi -- because that's on a motion to dismiss, and that's giving Plaintiffs

16:07:41
16:07:46
16:07:53
16:07:57
16:07:58
16:08:08
16:08:11
16:08:16
16:08:19
16:08:21
16:08:23
16:08:24
16:08:27
16:08:30
16:08:34
16:08:36
16:08:39
16:08:43
16:08:46
16:08:50
16:08:52
16:08:54
16:08:57
16:08:58
16:09:00

the benefit of every doubt.

So let's focus on Professor Badawi's interpretation of the tweets.

MR. MOLUMPHY:  Object to the extent it's outside the scope.

A    I don't want to want give -- I'm worried that that requests a legal conclusion with respect to what a reasonable investor might understand those tweets.

And so it's not my job to put myself in the shoes of a reasonable investor or try and understand it.  I mean, I would like -- perhaps I'm a reasonable investor, perhaps I'm not; however, that is a legal question.

And so insofar as it's not my job to opine what a -- whether or not that was a misstatement, I'm going to leave that be.

Q    Well, putting aside whether it's a misstatement, I'm just asking for your under -- whether you read those tweets as saying that he's not going to close.

I mean, let's assume you are a reasonable investor.

A    It depends on information that is not public to me, right; it depends on potential communications

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

125

that happened between Elon Musk and Twitter that
I -- I can't observe.

So I -- without knowing that, it's -- it's
difficult to -- to know.

Q   Okay.

MR. MOLUMPHY:  Object to the extent it calls
for a legal conclusion; outside the scope.

Q   So if I ask you at trial how you understand
what Mr. Musk meant with respect to his tweets, you
would say, I can't answer that because it calls for
a legal conclusion, and I don't want to give a legal
conclusion?

MR. MOLUMPHY:  Object to the extent it goes
outside the scope.

A   Sorry, could you -- I just want to be
precise.

Could you repeat what exactly you're asking?

Q   If I ask you at trial, what did
Mr. Musk -- what is your understanding of what
Mr. Musk meant by these tweets -- by this tweet, the
May 13th tweet and the follow-up tweet, "still
committed to acquisition" -- you would say, "I can't
answer that; it calls for a legal conclusion, and I
don't want to give a legal conclusion" or something
to that effect?

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

126

MR. MOLUMPHY:  Misstates the testimony; beyond the scope.

A    If you're -- so my understanding, at least my best guess, would be that something has happened, right.  Some request, information has come by -- I don't know what it is because it's -- it might not be visible to me -- that gives Mr. Musk potential grounds not to close.  And so he's not going to close.

Q    Okay.  Have you done any research into buyer's remorse before this case?

A    I've done -- so I -- I understand buyer's remorse, in the context of the custom and practice of M&A, to mean when a -- an M&A buyer wants to get out of a deal.  That is described sometimes as "buyer's remorse," right, in the context of M&A, right.

Does that apply to -- I don't know.  I might have buyer's remorse over some purchase I make in my personal life.  Those are different things.

But with respect to M&A I've studied, busted deals, where I would say, again, in -- in the language of M&A scholars, practitioners, you would say, oh, this is a class of cases where -- where parties have buyer's remorse.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

127

Q   Have you published any papers on buyer's remorse?

A   I published a number of papers on merger litigation, right, which has to do with busted deals, right, and situations where people are trying to get out of it.

I can't recall one way or another if I precisely used the term "buyer's remorse."

Q   Using your definition or understanding of the term "buyer's remorse," do you believe that Mr. Musk experienced buyer's remorse with respect to the Twitter transaction?

A   There are indications that Mr. Musk experienced buyer's remorse, as I would understand the customary use of that term in M&A transactions.

The -- the classic case is where someone says they overpaid.  Mr. Musk testified that he overpaid for Twitter.  So it looks to fit into that customary class of buyer's remorse.

Q   At what point in time do you believe Mr. Musk may -- may have begun experiencing buyer's remorse?

A   I -- you know, I can't pin it down to a precise day and second, right.  He -- he testified that he overpaid for Twitter.  I don't know when he

came to that realization.  I don't recall testimony about when exactly he -- he thought about that.  So I -- to what I recall, I can't specify a -- a precise moment.

Q   So for all you know, he might have only begun experiencing buyer's remorse after he closed on the transaction and began running the company?

A   I -- that -- that wouldn't be consistent with the record, given an attempt to terminate the deal.  I mean, usually attempts to terminate or to set the stage for termination are customarily situations where you -- that would suggest that a buyer regrets his purchase.

Q   When did he attempt to terminate the transaction?

MR. MOLUMPHY:  Vague.

A   Formally, I believe it was in July.

Q   What about informally?

A   It was, I said, setting the stage for an attempt to termination -- to terminate.  I would -- the -- the tweets that are at issue here are arguably part of setting the stage for an attempt to terminate.

Q   Is that your expert opinion, that the tweets in May were an attempt to set the stage for

termination?

A    I -- I -- I haven't offered an opinion on -- my opinion on buyer's remorse is, this case is -- an attempt to get out of the deal is consistent with the class of cases where M&A practitioners describe people as having buyer's remorse.

Q    Okay.  Were there any indications in May -- on May -- as of May 13th, 2022, that Mr. Musk was trying to get out of the deal?

A    I mean, I would say tweeting that a deal is on hold, you know, suggests an attempt -- a potential -- potential attempt to get out of the deal.

Q    A -- a -- tweeting the deal is on hold pending details, and then following that up with "still committed to acquisition," that -- your testimony is that's an indicator that he was trying to get out of the deal?

A    It -- it is -- yeah, it's potential.

Q    Isn't it the opposite?  I mean, "still committed to acquisition," isn't that the exact opposite of an intent to get out of the deal?

A    I mean, the -- it doesn't -- you've said the deal is on hold, whatever that means, and -- and so

that second tweet doesn't negate anything about the first tweet.

Q   Right.  It doesn't have to negate it. He's -- he's saying, clearly, "still committed to acquisition."

Is there anything about that tweet, even in combination with the first tweet, in -- that, in your opinion, is indicating an intent to get out of the deal?

MR. MOLUMPHY:  Objection, vague; mischaracterizes the evidence.

A   Again, the first tweet says deal's on hold, right.  And the -- could imply a great things, many of which are not negated by saying still committed to the deal.

Q   Okay.  You describe the merger agreement as seller-friendly, correct?

A   I say that within the custom and practice of M&A, this agreement would be considered seller-friendly.

Q   Would you be able to characterize the merger agreement as seller-friendly without reading the terms of the merger agreement?

A   Among the things that would be necessary to come to that conclusion would be reading the terms

of the merger agreement.

Q   Right.  So in order to characterize an agreement as seller or buyer-friendly, you need to interpret the terms of the agreement; is that fair?

A   I'm not sure that -- I'm not sure I would use the word "interpret," right.  Kind of -- interpret, to me, has -- you have to apply facts to it -- you have to read the language, apply facts to it, and come to a legal conclusion about what that means, right.  Can you read -- can you read a great many number of merger agreements, right, figure out kind of where the buyer -- the ends of the buyer-friendly continuum is for a term and where seller-friendly continuum is for a term, and read a term and place it somewhere on that continuum?  I think you can do that.

Q   And your -- your testimony is that in order to conduct that analysis, you don't have to interpret the terms of the agreement?

A   We -- you just have to -- to read it, right.  Like kind of -- like if -- let's say we're talking about the size of the termination fee, right.  You could say, well, you know, depending on what type of termination fee it is, you see -- the highest you see is 5 percent, right, and the lowest you see is

Transcript of Adam Badawi, Ph.D.

Conducted on July 17, 2025

132

1 percent, right.  And so you could say -- it's this

termination fee that the seller is going to pay.

You could say, well, 5 percent is at the high end,

right, and so that's pretty buyer-friendly.  The

1 percent is at the low end, and so that's pretty

seller-friendly.

     And I guess you're interpreting the number

that you see, right.  But I -- that doesn't -- in

terms of kind of my understanding of the word --

what the word "interpret" means," that's not --

you're not really interpreting.

Q   Okay.  Well, in order to characterize as

a -- an agreement or a provision as buyer or

seller-friendly, I think we agree you would have to

read the language of the agreement or provision,

correct?

A   Among other things, yes.

Q   Yeah.  And you would need to understand what

that language means, right?

A   Sure.  You need to read it and understand

it.

Q   Okay.  And what are the other things that

you would need to know to in order to characterize

the agreement as buyer or seller-friendly?

A   You need to know what appears in other

16:20:53
16:20:58
16:21:02
16:21:05
16:21:05
16:21:09
16:21:10
16:21:12
16:21:15
16:21:18
16:21:19
16:21:20
16:21:25
16:21:28
16:21:31
16:21:33
16:21:33
16:21:35
16:21:36
16:21:38
16:21:44
16:21:45
16:21:50
16:21:53
16:21:54

agreements, right.

Q   Okay.

A   And so if you're going to characterize -- I don't think it would be possible, if there were just one merger agreement in the world, to be able to look at it and say this is buyer-friendly or this is seller-friendly, right.  That's in reference to what is going on in these other agreements, right.

So to form, for example, an empirical example about some -- whether or not a term is buyer-friendly or seller-friendly, right, you would need to collect a large number of agreements.  I've read the Coates report, which does that, right. I've looked at the -- the methodology he used to collect that information.  I've looked at the underlying data that he's used.  And that would be an example of what else you would need in order to come to a conclusion that any particular term in any particular agreement is more or less buyer-friendly than the other agreements you see out there.

Q   So are you offering an empirical judgment?

A   I'm offering an empirical judgment for two reasons, right.  One is I'm an empirical scholar. I've published many peer-reviewed empirical articles, right.  I teach classes on empirical

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

134

methods, right.  And so insofar as I've looked at the Coates report to understand its methodology, I've seen the spread -- underlying spreadsheets to see how they were coded and to make sure that the conclusions that were draw -- drawn with respect to that data are sound.  That -- that's one empirical basis I have for saying -- for making my conclusions about buyer-friendly and seller-friendly.

Another one is I've read thousands of merger agreements over the years.  I've studied individual clauses, right.  So I -- I -- I, myself, have a -- a -- an empirically grounded sense of where the continuum is -- lies and what's seller-friendly and what's buyer-friendly.

Q   All right.  So which -- which merger agreements did you compare the merger agreement at issue in this case to in order to reach your empirical judgment?

A   So as I said, I've seen the underlying data of the Coates study, which listed each one and characterized them.  So I'm -- and so all 86 agreements that are in there, right, I -- I've seen how each of those provisions that were in there were coded, and so that's a basis for concluding that this -- this agreement is seller -- seller-friendly.

Q    Did you read the -- all of the merger agreements that Professor Coates read?

A    My -- well, I don't know this for sure, but I know that was prepared with the assistance of Cornerstone.  So I -- I don't know if Professor Coates read them himself.  But I have no reason to doubt the coding.  I've looked at the coding schema that was used, and given my experience with Cornerstone, I see no reason to doubt that that -- that would be incorrectly coded.

Q    My question was, did you read the agreements --

A    I did not.

Q    -- that Mr. Coates -- okay.

And you understand that -- that Cornerstone is not an expert in this case, not being offered as an expert in this case?

A    I understand that.

Q    You understand that Professor Coates is not being offered as an expert in this case?

A    I do.

Q    You understand that Professor Coates is -- was not qualified as an expert in the Delaware litigation?

MR. MOLUMPHY:  Vague.

16:24:27
16:24:31
16:24:35
16:24:38
16:24:42
16:24:44
16:24:49
16:24:53
16:24:56
16:24:58
16:25:00
16:25:02
16:25:03
16:25:04
16:25:05
16:25:10
16:25:13
16:25:14
16:25:15
16:25:17
16:25:19
16:25:20
16:25:22
16:25:24
16:25:27

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

A    I -- I don't know -- I don't have direct knowledge of what his status was --

Q    He's certainly not going to be qualified as an expert in this case, right?

A    I -- I suppose not.

Q    Right.  So -- and you understand that when Professor Coates prepare -- prepared his report, he was hired by Twitter to be their expert in a very contentious litigation, right?

A    I do.

Q    He did not prepare that analysis for an academic paper, right?

A    Well, there's a grand tradition of academics using their expert reports as a basis of academic articles called double-dipping.  And so I don't know; he may use that information -- he may have thought, I can write an academic article about this. I don't -- so it's --

Q    That's not -- Professor Badawi, that's not why he wrote the report, right?

A    I -- I don't know exactly why he wrote the report.  I certainly know of experts who select cases because they think they can double-dip.

Q    Well, his -- his report was about the merger agreement in the -- in the Twitter litigation,

right, at issue in that litigation between Musk and Twitter?

A    Yes.

Q    You think he might have been -- I mean, to the extent you're suggesting maybe he had already planned to write an academic article, you'd just be speculating, right?

A    Yeah.  I would say there's a custom and practice of people using expert reports to -- as the basis of academic articles.

And certain professors, and I would place Professor Coates among them, have so much choice among the cases that they make, that that might be driving part of their motivation.  But that part of it is speculation.

Q    Have you talked to Professor Coates about his analysis?

A    Not the Twitter analysis.

Q    Have you talked to anybody at Cornerstone about their analysis?

A    No.

Q    Do you understand that Professor Coates did not want his report cited in this case?

A    I don't -- I don't know his wants and desires.

MR. MOLUMPHY:  Yeah.  Object to the extent it calls for speculation.

Q    Do you understand that Cornerstone moved to quash the subpoena for his report?

A    I -- I saw some of the back-and-forth on this.

I -- I don't recall seeing that Cornerstone moved to quash, but I -- if the -- if there's an entry in the docket that says that, then -- then they did.

Q    Did you look at any -- in conducting your -- in conducting your analysis about whether provisions of the merger agreement at issue in this case were seller-friendly, did you look at any other specific merger agreement for purposes of that analysis?

MR. MOLUMPHY:  Vague.

A    I believe that I did, right, with respect to information rights.  I called up some other merger agreements to see what they were.  It was in conjunction with looking at the Coates report's analysis of information rights.

And so I believe I looked up some of the -- he had kind of a categorization of them.  So I wanted to look more specifically at the language

of what he was doing with his categorization.

Q    Putting aside the analysis of merger agreements that Professor Coates conducted, did you review any other merger agreements for purposes of your analysis that the merger agreement at this -- in this case is seller-friendly?

A    I -- as I said earlier, part of the basis of my analysis, apart from the Coates report, is just my experience, having reviewed thousands of merger agreements over the years in the course of my scholarly work and in my teaching.

And so that was part of the basis for understanding what the continuum of buyer and seller-friendly is.

And so the answer to your question is, yes, it's part of my career-long experience at examining merger agreements.

Q    None of those other merger agreements are included in your reliance materials in Appendix B, right?

A    No.  I -- I don't believe I listed all the merger agreements that I've read in my life.

Q    Or any of them, right?

A    And, again, I may have -- I mean, for example, like, I cite -- some of the cases I cite,

right, are disputes about merger agreements.  And so I've read the merger agreements insofar as they're the basis.

But it -- when you read the cases, you read the merger agreement or at least the relevant parts of the merger agreement.

Q    You did not get the spreadsheet, Professor Coates's spreadsheet, until after you wrote this report, right?

A    That's correct.

Q    Okay.  So the analysis reflected in Professor Coates' spreadsheet does -- was not -- you did not consult that in forming any of the opinions in your report, fair?

A    I -- that's correct.

Q    Okay.  So did you conduct -- did you -- I mean, did -- would you say you conducted an empirical analysis in order to reach the conclusions you offer about this agreement being seller-friendly?

MR. MOLUMPHY:  Asked and answered.

A    I -- so I did not conduct an empirical analysis of the sort Professor Coates did.

I read Professor Coates' report, I read the methodology, and I read the description of the data

and the conclusions that came from it.

I subsequently had an opportunity to examine the spreadsheet, which confirmed my initial impressions that the methodology was sound and the data source was appropriate.

Q    All right.  Did you test any of Professor Coates' research?

A    Can you explain what you mean by "test"?

Q    Did you -- I mean, he conducted an empirical analysis.

Did you re-perform that analysis yourself to make sure it was accurate?

A    I checked the Excel formulas to make sure that the calculations that were purported to be done were being done correctly.  And so I don't -- I don't know if you -- if that's considered testing.

But I did go through the Excel spreadsheet to make sure that it was doing what it purported to do.

Q    Did you confirm that the sample was fair and representative?

A    I -- so I looked at the -- I mean, so that was information that was in the report, right, and so those criteria -- which I think were deals, public targets -- public U.S. targets over

$5 billion within the last two years or something                16:34:25

like that.  Those criteria struck me as appropriate              16:34:27

comparators.                                                     16:34:31

        I didn't -- I didn't run those filters to                16:34:33

see if the same ones would come back, but I have no              16:34:35

reason to doubt that they would.                                 16:34:38

    Q    Did you do anything to confirm that                     16:34:40

Professor Coates accurately characterized and                    16:34:46

described the mergers that occurred during the time              16:34:51

period?                                                          16:34:54

    A    I'm trying to think if I went back to any of            16:34:57

the merger agreements themselves.                                16:35:01

        I may have done one or two, but I -- I don't             16:35:02

have specific recollections of kind of going into a              16:35:08

cell and making sure it was coded correctly.                     16:35:10

    Q    Is "seller-friendly" a -- a legal term?                 16:35:15

        MR. MOLUMPHY:  Vague.                                    16:35:33

    A    I'm not sure what "legal term" means, right.            16:35:34

I don't know what you mean by "legal term."                      16:35:42

    Q    Yeah.  Fair.                                            16:35:44

        Does "seller-friendly" have a -- a set                   16:35:46

definition in M&A parlance?                                      16:35:50

    A    I think it has a customary definition or                16:35:56

understanding, right, which is -- there's a                      16:35:59

continuum out there of -- of where certain terms                16:36:02

fall, right.

There's -- there's one end; there's the other end, right.  One end is seller-friendly; one end is buyer-friendly.  And a deal term that falls closer to the ends of the continuum will be characterized appropriately as buyer-friendly or seller-friendly.

That's certainly the way I use it.  This is the way I've seen courts use it; it's the way I've seen other experts use it.

It's -- that's customary understanding.

Q    All right.  Referring -- calling a term in a merger agreement "buyer-friendly" or "seller-friendly" doesn't have any effect on how to interpret the term, though, right?

A    I'm not sure I agree with that.  I -- I mean, I'll give you an example, right.

So the AB Stable case was about the meaning of the term "calamity" and whether or not a pandemic was a calamity, right.

And so you might think, if it had no meaning, right, you know, a Court can just interpret that term.  It would do just that; it would just interpret the term.

But that's not what they do in these sorts

of cases, right.

They call on experts, like -- not just like Professor Coates, Professor Coates, in that case, and another professor and have them do this kind of buyer friendly/seller friendly sort of answer to help them understand the context in which that term is used.

So a -- Delaware courts routinely use kind of studies of whether something is buyer-friendly or prevalent or market to help them understand what terms mean.

Q   So in that case, did the -- did the term "calamity" -- in the AB Stable case, did the term "calamity," the meaning of that term, turned on -- was different depending on whether the Court viewed it as buyer-friendly or seller-friendly?

A   The Court used the expert evidence to help it understand the meaning of the term.

I'm not sure I would say that the -- the meaning "turned" on what the experts thought about it, but it certainly aided the Court in interpreting the understanding of that term.

Q   Are there -- I mean, I understand what you were doing -- I understood what you were doing in this section of your report as reading the terms;

getting an understanding of them; and then describing them as buyer or seller-friendly and, in most cases, seller-friendly, if not all cases.

Is -- is that what you were doing?

A   I think it's part of the broader account in my report, right.

So I am offering the opinion that it is extremely rare to, in the phrase -- and the phrase as I understand it, waive due diligence before you go into signing, right.

And if you do that, right, then it is common to bargain for expansive buyer-friendly information rights after signing so that you can make up for some of that diligence that you didn't do on the back end, right.

That's not what happened here, right.  We saw a waiver of due diligence, and then we see extremely seller-friendly information rights that constrict the amount of information that you're allowed to give.

So in the custom and practice, that's a relatively rare thing, right.  So seeing that this is a seller-friendly term helps to understand that entire account.

Q   So do you believe that your opinion, as to

whether a term in the merger agreement at issue in this case is buyer-friendly or seller-friendly, should affect the Court's interpretation of those terms?

MR. MOLUMPHY:  Vague.

A    I -- I'm not -- I'm not sure which terms the Court is going to actually interpret and if they're going to interpret -- if they need to interpret any of the ones that I've opined on.

It might be helpful for them to under -- for the Court to understand where this falls along the continuum.

But I -- I don't -- I can't speak for what the Court is likely to do.

Q    Are you offering -- let's take Section 6.4 of the merger agreement, information rights.

Are you offering your opinion that that -- well, first of all, you are offering an opinion that that -- that term is a seller-friendly information rights provision, right?

A    I am.

Q    Okay.  And in -- in your -- does that opinion affect how that provision should be interpreted?

A    It --

MR. MOLUMPHY:  Vague.

A   It is not for me to say how the Court should interpret the term.

Q   Okay.

A   As I said, in the AB Stable case, and others, I have seen cases where opining on where a term falls in the continuum can be helpful to a court in interpreting a term.

But it -- I'm not -- I am not telling the court to use this in interpreting the term.

Q   And what are you offering it for, then?

MR. MOLUMPHY:  Object to the extent you're asking for a legal conclusion.

A   That within the custom and practice of mergers and acquisitions, right, the -- that term, along with others in the agreement, would customarily be considered seller-friendly.

Q   Why is that -- how is that -- how -- do you -- do you have an understanding as to how that would be relevant in -- to any of the issues in this case?

MR. MOLUMPHY:  No, that -- now I'm objecting to the extent you're asking for attorney work product or attorney-client communications, which I direct you not to provide.  If you can answer that

question without revealing, or have an understanding of what the Court may do, you can go ahead and answer.

A    I would just reiterate, right, I've seen instances where courts have used that information in interpreting provisions.  Should they choose to do so here, my opinion could be useful for -- for that purpose.

Q    You teach Contracts, right, contracts law?

A    That's correct.

Q    And you're familiar with the parol evidence rule?

A    More than I would like to be, yes.

Q    And there's a -- a term in contract law, "custom and usage."  You're familiar with that?

A    Yes.

Q    And the parol evidence rule would bar evidence of custom and usage unless the agreement or the contract is ambiguous; is that your understanding?

A    It depends.

Q    Is there a scenario in which evidence of custom and usage can be presented where -- to -- for purposes of interpreting a provision that is not ambiguous?

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

149

MR. MOLUMPHY:  Objection to the extent you're asking for a legal conclusion; beyond the scope of his report.

A    It depends.

Q    What's the scenario?

MR. MOLUMPHY:  Same objections.

A    I don't know what state we're in, but states vary -- famously, states vary with respect to parol evidence.  They also vary with respect to how appropriate it is to use trade usage terms.  The UCC, for example, is quite permissive when it comes to the admission of trade usage.

So there's a great -- without kind of specific facts and specific law, it's hard for me to speculate.

Q    This contract is not governed by the UCC, right?

MR. MOLUMPHY:  Objection, legal conclusion; beyond the scope.

A    It is not.

Q    In paragraph -- let's go back to your report.  I want to focus on paragraph 28.

A    28?

Q    Yeah.

A    Yes.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

150

Q   There's a sentence there that reads, "As explained above, seller-friendly merger agreements generally limit the buyer's post-signing information rights and the buyer's ability to escape the deal even if the target's public filings turn out to be incorrect."

Do you see that?

A   Yes.

Q   And you say "generally."  Are you offering an opinion that the merger agreement at issue in this case falls into that situation?

A   Insofar as that calls for a legal conclusion, I'm not going to say anything about what the merger agreement here says.

Q   Okay.

A   What I'm saying is, customarily, right, if you have highly constricted information rights where it's difficult to get information that a representation might even potentially be wrong, that's one barrier.

Another barrier is even if you find information that says that a rep and warranty is false, if during the bring-down provision, the -- the bring-down process, you have to show that it meets an MAE.  Customarily, that makes it very

difficult to get out of a deal, right.

And this agreement had both limited information rights and required any falsity of a rep and warranty to amount to an MAE.

Q   What if a buyer learns that the -- the -- a company's financial statements, public statements, are fraudulent?  Still very difficult to get out of the deal?

MR. MOLUMPHY:  Incomplete hypothetical; vague.

A   Hypothetically, right, it -- it would depend.  But it -- if they were able to get that information and it amounted to -- the deviants -- the deviation between the statement and the representation amounted to an MAE, which is almost impossible to show, right, it would be possible, right.  And there could also be language about fraud somewhere in the agreement, but -- but that's -- that's -- I don't know if that's part of your hypothetical.

Q   At paragraph 35, you say that, "Nearly all merger agreements will have a Material Adverse Effect condition that allows the buyer to refuse to close the transaction if anything happens between signing and closing that would have a material

adverse effect on the business."

Do you see that?

A   Yes.

Q   All right.  And then later in that same paragraph, you also say "the typical MAE condition already tilts heavily in favor of the seller."

See that?

A   Yes.

Q   Does that then mean that all merger agreements are seller -- seller-friendly if they have an MAE provision, which you say most of them do?

A   The -- so saying that a merger agreement as a whole is seller-friendly, right, is a composite judgment based on a great number of terms, right.  I would say as a baseline, most MAE provisions are pretty seller-friendly.  There's some variation between them, but because it's so hard to show an MAE, it is -- it is, in general, a relatively seller-friendly provision as commonly drafted.

Q   All right.  And in paragraph 40, you write, "An agreement alone, no matter how seller-friendly it may be, can never provide complete certainty that a deal will close.  While parties can ask a court to enforce merger" -- I'm sorry.  Let me get -- I got

ahead of you there.  I'll wait until you're there.    16:48:54

A    Okay.    16:48:56

Q    At paragraph 40 of your report.    16:48:57

A    I got it.    16:48:59

Q    Okay.  And there you write, "An agreement    16:48:59
alone, no matter how friendly" -- "seller-friendly    16:49:02
it may be, can never provide complete certainty that    16:49:04
a deal will close.  While parties can ask a court to    16:49:07
enforce merger provisions and even order the buyers    16:49:11
to close, that determination is in the equitable    16:49:14
discretion of the court, rather than in the hands of    16:49:17
the buyer and seller."    16:49:20

Do you see that?    16:49:21

A    Yes.    16:49:22

Q    So in virtually every acquisition or merger,    16:49:22
there is some degree of uncertainty that the deal    16:49:28
will close.    16:49:30

Is that your opinion?    16:49:31

A    I mean, I -- I would read those two    16:49:33
sentences together, like kind of the -- you can    16:49:38
assure a lot, but when a -- and even with respect to    16:49:41
specific performance, if you contract for specific    16:49:45
performance, right, clearly so, at least in    16:49:50
Delaware, right -- Delaware has developed a pretty    16:49:53
long and clean track record of awarding specific    16:49:57

154

performance where the parties clearly ask for it, right.

And so I would say -- I forgot exactly how you phrased it, right. You can never have complete certainty, right. But if you -- if you include a specific performance provision and that's the deal -- and that's the only thing that's standing between you and getting the deal to close, at least in Delaware you've got a very good shot that they're going to work.

Q   Okay. And that -- what you just -- what you just described there, the -- the sort of dynamic with respect to specific performance in Delaware, that's publicly known, right?

A   Yes. It is publicly known that if you clearly request specific performance in Delaware, you're likely to get it. Highly likely.

Q   Is it also publicly known -- sorry.

Is the -- the difficulty in proving an MAE in Delaware also publicly known?

A   I would say -- I mean, if it's -- if that means known by the public, I would say no, because no one cares about it. But among people who care about M&E -- MAE provisions and study or -- or converse in M&A, I would say it is known that

Delaware rarely lets people get out of deals on the basis of an MAE.

Q    And -- and would that group also include merger arbitrageurs?

MR. MOLUMPHY:  Vague.

A    I don't know.  I haven't offered any opinion on merger arbs.

Q    Okay.  All right.  So no matter -- would you agree with this:  That no matter how seller-friendly a merger agreement is, there's always a risk that a buyer will choose not to close, even if the closing conditions are met?

A    I mean, it -- it sort of -- it depends, right, on what the -- the remedies are in the merger agreement.

Q    Right.  A buyer might decide it's more efficient to breach the merger agreement and deal with the consequences?

MR. MOLUMPHY:  Improper hypothetical.

A    Again, kind -- kind of depends on the circumstances, right.  If the damages are extremely low and you can walk away easily, you might choose to.  The Court's going to make -- if the Court is going to hold your feet to the fire, that's a much different situation.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

156

Q    Okay.  Specific performance is an equitable remedy, yes?

A    Yes.

Q    And it requires a court order, yeah?

A    Generally -- I mean, insofar as you're asking me to opine on legal issues, I mean, I will do so, but with the caveat that, like, it's not my role to opine on legal issues.  But, yes --

Q    That's your understanding?

A    -- specific performance -- specific -- specific performance requires a court order.

Q    Okay.

MR. MOLUMPHY:  And I'll -- I'll object on legal conclusion; outside the scope.

Q    So even if a merger agreement that contains a specific performance remedy -- even -- even in a merger agreement that contains a specific performance remedy, that does not guarantee that a deal will close if the closing conditions are met; is that -- is that fair?

MR. MOLUMPHY:  Objection, calls for speculation; outside the scope.

A    I mean, in all -- for all practical reasons, if the closing conditions are met and you've got a clear specific performance -- a remedy and you're

16:52:49
16:52:53
16:52:54
16:52:54
16:53:00
16:53:03
16:53:08
16:53:11
16:53:13
16:53:13
16:53:15
16:53:17
16:53:18
16:53:19
16:53:22
16:53:24
16:53:26
16:53:28
16:53:32
16:53:36
16:53:39
16:53:40
16:53:42
16:53:47
16:53:49

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

157

going to Delaware, I don't -- that deal is

probably -- is going to close, right, practically

speaking of the way things work.  There's got to be

some reason why the Court wouldn't order specific

performance, and that hypothetical doesn't supply

one.

Q   Right, but my question is not whether it

probably will close.

My question is whether there's -- whether

there is a guarantee that it will close.

There's no guarantee, right?

A   I mean, I don't know what a guarantee

would -- would be.

Q   Meaning the chances of -- of closing

or -- or a court ordering specific performance are

not 100 percent?

A   If you're coming with clean hands and it's

clear and -- functionally, it's 100 percent.

Q   Okay.  Let's look at paragraph 48.

A   Yeah.

Q   And there you say, "His counsel sent a draft

agreement, emphasized that the offer did not depend

on any due diligence, and stated that the proposed

contract was a, quote, 'lean-in draft intended to

make this easy on all to get the deal done ASAP.'"

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

158

Do you see that?

A    Yes.

Q    And then you cite a document, and we'll pull that one up.

MR. BROOME:   I think it's -- Alex, it's Tab 16.

(Exhibit 222 marked for identification.)

Q    Let me know when you have it.

A    Got it.

Q    All right.  Is this the document you intended to cite?  It has the same Bates stamp, I think.

A    Let me double-check.

Q    And it has the "lean-in draft" language.

A    Yes, I believe so.

Q    Okay.  You write that "his counsel sent a draft agreement."

This is -- appears to be from Anthony Armstrong at Morgan Stanley.

And that was not Musk's counsel, right?

A    It would appear not to be.

Q    Okay.  And then you wrote that, "he emphasized the offer did not depend on any due diligence."

Where are you seeing that?

MR. MOLUMPHY:  Do you have access to the attachment to him?

A    Sorry.  Yeah.  I -- so I -- I don't recall if I also meant to cite that there may have been an e-mail with the -- that included counsel.

I -- I may have --

Q    Okay.

A    -- not cited that.

Q    I just want to make sure we're -- that we're not -- you're not aware of a document that we're not aware of.

But it -- it doesn't make -- at least, his counsel doesn't make any -- emphasize that the offer is not dependent on due diligence in this document, right?

A    Yeah.  I would -- that's fair.

Q    Okay.  And it doesn't attach the merger agreement, it doesn't look like; is that fair?

A    Yeah.  They say they're going to forward it.

Q    Right.  Okay.

And do you have an understanding what a lean-in draft is?

A    Again, I would just be -- so it would be a draft -- so, usually, in the custom and practice of M&A, if you're taking the pen, meaning that you send

160

the first draft, you send a draft that kind of tilts

most of the -- the -- the terms in your favor.

I -- I would expect a lean-in draft to be

one that doesn't do that, right, that gives the

party terms that are considered favorable to it in

the first instance.

Q   Okay.  Have you heard that term before

seeing this e-mail?

A   I -- I think I -- I -- I think I may have,

but I don't -- I don't -- I can't cite a specific

use of that term that I've used.

But reading the term, I had a -- I made an

informed guess about what they meant.

Q   Okay.  Let's look at paragraph 64 -- and by

the way, are you doing okay?  Anybody want to take a

break?  I'm sort of moving on to something else.

A   A quick one would be helpful just to --

Q   Yeah.

THE VIDEOGRAPHER:  We're going off the

record at 5:00 o'clock.

(Whereupon a break was had.)

THE VIDEOGRAPHER:  We're back on the record

at 5:24.

BY MR. BROOME:

Q   Okay.  Professor Badawi, I want to focus you

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                    161

back on the merger agreement and specifically        17:24:44

Section 6.4.                                         17:24:48

        Let me know when you have it.                17:24:51

    A   Yeah.                                        17:24:52

        Do you recall which exhibit it was?         17:25:07

    Q   Yes.  That was Exhibit 219.                  17:25:10

    A   In terms of the attachments?                17:25:10

    Q   The tab would be 18.                         17:25:12

    A   Okay.  Thank you.                            17:25:13

        And what page would you like?  It's 6.2?    17:25:23

        Do you what page that is?                    17:25:26

    Q   6.4.                                         17:25:26

    A   6.4, sorry.                                  17:25:28

        Do you have a page?                          17:25:34

    Q   Oh, no, I don't, actually.  I'm not looking 17:25:35

at the --                                            17:25:38

    A   Okay.                                        17:25:39

    Q   I'm looking at an outline here.  So -- but I 17:25:39

just want to -- I just want to discuss the language. 17:25:41

    A   Yeah.  I've got it.                          17:25:44

    Q   All right.                                   17:25:45

        And at the very end there, "...for any       17:25:46

reasonable business purpose related to the           17:25:53

consummation of the transactions contemplated by     17:25:55

this Agreement..."                                   17:25:57

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                                    162

A    Yes, right there at the end.  Got it.                   17:25:59

Q    Yeah.  Yeah.                                            17:26:01

Are -- are you offering an opinion in this                   17:26:02

case that the Musk team's requests for information           17:26:05

relating to spam, bot, or fake accounts were not for        17:26:11

a reasonable business purpose related to the                 17:26:16

consummation of the transactions contemplated by the        17:26:19

agreement?                                                   17:26:22

A    I mean, insofar as that's asking me to draw             17:26:25

a legal conclusion, I -- I'm not offering an opinion         17:26:28

on the legal interpretation of -- of that language.          17:26:33

Q    Are you offering any other opinion on                   17:26:36

whether Musk was -- I guess, let me withdraw that.           17:26:40

Is it your view that to answer that -- that                  17:26:44

question would be to provide a legal opinion?                17:26:49

MR. MOLUMPHY:  Objection, calls for legal                    17:26:53

conclusion.                                                  17:26:57

A    I mean, it would require a bunch of facts               17:26:59

and then applying those facts to that language and           17:27:02

interpreting the language in light of those facts.           17:27:04

And, to me, that's a legal conclusion.                       17:27:06

And so -- and I wasn't asked to do that.                     17:27:08

Q    Okay.  So you're not offering an opinion as            17:27:11

to whether Musk's requests for information from              17:27:13

Twitter relating to its spam bots and fake accounts         17:27:17

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

163

fall within that language at the end of 6.4 for any reasonable business purpose related to the consummation of the transactions contemplated by this agreement?

A   Yes, I believe that's correct.  I'm not offering an legal conclusion with respect to what you've asked.

Q   Yeah.  I just -- I know you're not offering a legal conclusion, and we can agree or disagree as to whether that would be a legal conclusion.

I just want to know if you have -- if you're offering an opinion on that subject in this case?

A   I've offered an opinion on that language, which is that that is seller-friendly -- and within the custom and practice of M&A, that is seller-friendly language.

The Coates report says that that provision is 93 percent less buyer-friendly than the rest of the agreements in his sample.

So that's the opinion that I've offered on that language.

Q   And that's the only opinion?

You're not -- I just want to make sure I have a clear answer here.

That as to -- as to whether Musk's

17:27:23
17:27:29
17:27:30
17:27:34
17:27:36
17:27:38
17:27:40
17:27:41
17:27:43
17:27:46
17:27:48
17:27:51
17:27:55
17:27:58
17:28:01
17:28:04
17:28:08
17:28:10
17:28:18
17:28:20
17:28:23
17:28:24
17:28:25
17:28:28
17:28:29

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

164

information requests regarding spam and fake

accounts fall within the parameters of that

language, you're not offering an opinion?

A    Whether --

Q    Whether Musk's -- sorry.  Yeah.  Let

me -- let me restate it.

You're not offering an opinion as to whether

Musk's information or requests for -- this is

hard -- let me withdraw that and start again.

You're -- Mr. Musk made certain information

requests to Twitter regarding the percent of mDAU

comprised of spam, fake, or bot accounts.

And you're not offering an opinion as to

whether those requests were for a reasonable

business purpose related to the consummation of the

merger agreement, fair?

A    I'm sorry I'm taking time.  I'm just trying

to think through the -- the whole of my opinion.

MR. MOLUMPHY:  I'll object to the extent it

misstates the testimony and calls for him to compare

what you said against what's in his report.

A    I believe that's correct.

Q    Are you aware of whether any -- do you know

whether any Delaware court has construed this

language?

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

165

And by "this language," I mean "reasonable business purpose related to the consummation of the transaction."

A    As I said in my report, the Akorn case did involve a claim about access to information rights. I don't recall which provision within the access to information rights it was done.

And "construe" can mean a number of things, right.  Do they discuss it?  Is it the basis of the holding?  I'm not sure.

So it's possible, but I -- sitting here today, I can't say one way or the other whether or not a Delaware court has interpreted that language.

Q    Okay.  I'm told my last question was not very clear, so let me ask it slightly differently. I apologize for the repetition.

But you are not offering an opinion on whether Musk's requests for details supporting Twitter's calculation that spam/fake accounts do, indeed, represent less than 5 percent of users was not for a reasonable business purpose relating to the consummation of the transaction?

MR. MOLUMPHY:  Vague.

A    So that requires some speculation about what exactly the requests were and Twitter's mindset.

17:31:24
17:31:26
17:31:28
17:31:36
17:31:41
17:31:44
17:31:46
17:31:47
17:31:50
17:31:53
17:31:54
17:31:56
17:31:57
17:32:01
17:32:04
17:32:06
17:32:09
17:32:11
17:32:14
17:32:18
17:32:21
17:32:26
17:32:34
17:32:34
17:32:40

166

And without knowledge of those facts, I -- I don't believe I'm offering -- without precise knowledge of those facts, I don't believe I'm offering an opinion.

Q   Okay.  Have you in your -- in preparing your report, have you seen any evidence or information that as of May 13th, 2022, Twitter declined any information requests that Mr. Musk made for data concerning its calculation of spam or bots?

A   I don't recall one way or the other.

Q   Okay.  And same question as of May 17th, '22:  Have you -- have you seen any information or evidence indicating that as of May 17th, 2022, Twitter declined any information requests from Mr. Musk regarding data concerning its calculation of spam or bots?

A   I don't recall one way or the other.

Q   Okay. Let me -- sorry.  We're sort of getting to the point of the deposition where I'm trying to skip over stuff that you've answered.

I'm -- we talked a lot about Section 6.4.

You don't render any -- any opinions with respect to 6 point -- Section 6.11 of the merger agreement, correct?

A   Give me a moment, please.

17:32:45
17:32:50
17:32:53
17:32:55
17:33:03
17:33:33
17:33:37
17:33:41
17:33:45
17:33:56
17:33:58
17:34:03
17:34:05
17:34:09
17:34:11
17:34:15
17:34:18
17:34:46
17:34:50
17:34:54
17:35:18
17:35:27
17:35:33
17:35:38
17:35:39

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

167

MR. MOLUMPHY:  What exhibit is it again?    17:35:47

MR. BROOME:  Sorry.  The merger agreement.    17:35:50

MR. MOLUMPHY:  Yeah.    17:35:52

MR. BROOME:  The merger agreement is    17:35:53
Exhibit 219, Tab 18.    17:35:57

MR. MOLUMPHY:  Thank you.    17:36:01

And which paragraph were you -- section were    17:36:06
you referring to?    17:36:08

MR. BROOME:  I -- the question was, we've    17:36:10
talked a lot about Section 6.4 and that -- the --    17:36:12
and I asked him to confirm that he's not rendered    17:36:15
any opinions with respect to Section 6.11.    17:36:17

MR. MOLUMPHY:  Thank you.    17:36:21

Q   And I can represent to you that I control-F    17:36:22
for 6.11 and it doesn't come up in your report.    17:36:27

A   I mean, I remember reading it and -- I --    17:36:37
I'll accept your representation.  I forget if I said    17:36:41
anything with respect to -- to financing going on,    17:36:44
but, I mean, I'll say this much:  I'll accept your    17:36:49
representation that I don't reference 6.11 in my    17:36:56
report expressly.    17:37:00

Q   Oh, I'm sorry.  I -- I misspoke.  Footnote    17:37:01
94.    17:37:05

A   Okay.  That --    17:37:07

Q   But I don't think you're rendering any    17:37:07

opinions on it.  Let me just double-check that.

Yeah.  All right.  Let me just --

MR. MOLUMPHY:  6.4?

A    That 94 -- yeah, so I say, "The Merger Agreement also provides for information sharing related to financing."

So I reference it, but I don't -- I don't think I discuss it.

Q    Okay.  All right.  Let's turn to paragraphs 67 to 69 of your report, where you discuss carve-outs and the definitions -- the definition of MAE.

A    Yes.

Q    And you note there the definition of MAE includes nine carve-outs?

A    Yes.

Q    But you don't suggest that the -- any of the carve-outs apply to Twitter's representations regarding its -- the percent of mDAU comprised of bots or spam, right?

A    I don't believe that I do.

Q    Paragraph 78, you say, "Nothing in the merger agreement stated that the deal would close if Twitter failed to supply him with information about fake and spam accounts."

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                    169

Do you see that?

A    78?

MR. MOLUMPHY:  What line are you at, Steve?

MR. BROOME:  Paragraph 78.

A    I think that's in the heading.

Q    Right.  Yeah.  I'm sorry, that's, yeah, in the heading.

A    Okay.

MR. MOLUMPHY:  Is there -- sorry, is there a question pending?

MR. BROOME:  No.

MR. MOLUMPHY:  Okay.

MR. BROOME:  Not yet.  Getting there.

MR. MOLUMPHY:  Sorry.

MR. BROOME:  Reformulating.

Q    Yeah, okay.  I guess I just wanted to -- I think you stated this in the report, but the -- the -- I guess I just want to confirm that it wouldn't be custom or practice to include such specific -- statements about such specific information in a merger agreement, right?

MR. MOLUMPHY:  Vague.

A    I -- I would just refer to the sentence in paragraph 78 where I say, "In my experience, it is not the practice or custom in merger agreements to

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

170

list specific types of information which, if a
seller fails to provide them, provide a right to
terminate the agreement."

Q   Yeah.  And you stand by that, right?

A   The sentence speaks for itself.

Q   Yeah.  That's why I get paid the big bucks,
confirm what you wrote.

All right.  Let's see.  All right.  Let's go
paragraph 79 of your report.

A   Yes.

Q   And there you write, "The parties also
executed a confidentiality agreement.  The terms of
that agreement could have expanded or restricted the
information rights of the parties.  Given the
non-public nature of the document, it would not be
possible for the investing public to know whether
that agreement affected the claims in Mr. Musk's
tweet."

Do you see that?

A   Yes.

Q   All right.  And -- and the merger agreement
itself contained a confidentiality clause, right?
It's set forth in Section 6.4?

A   I believe that's correct.  Let me just --

Q   Or maybe, rather, it says that the parties

will -- it -- it indicates the parties will enter into a customary confidentiality agreement --

A    Yes.

Q    -- to govern any information obtained pursuant to 6.4.

But the -- the merger agreement doesn't suggest that the scope of information the buyer is entitled to would be affected by the confidentiality agreement, does it?

A    I -- I -- I mean, I think I -- I'm -- as you said, this has -- I say -- the sentence is, "The parties also executed a confidentiality agreement." This is part of the broader point that I'm making in that paragraph, right, which is that there's lots of stuff that was not public that you need to know to be able to understand the information rights, right. And this is just one example of the things that were not public.

I -- I don't know -- so insofar as the merger agreement itself doesn't specify what's going to be in the confidentiality agreement, I think that's correct, right.  But we haven't -- I haven't seen that confidentiality agreement, or at least it wasn't public at the time, and so it's hard to know what -- it could have -- it could have provided more

information about what the information rights meant

or -- is the general point that I'm making.

Q    Well, I mean, a -- is it customary for a
confidentiality agreement to expand or restrict
information rights that are stated in a merger
agreement?

A    It could provide more detail on them, right.
It could explain the terms.  It could say, this is
the information that we think is responsive to this,
right.  It would -- there's some -- the -- the --
the language in the 6.4 and -- is -- you know,
the -- it doesn't define the universe of information
that -- that can be requested, right.

As I said before, you're not going to list
everything that you have to provide.  And so you
might, in a confidentiality agreement, provide a
little bit more detail than you do in a merger
agreement or -- or a lot more detail.

Q    Well, if that were the case, then wouldn't
the confidentiality agreement have a substantive
effect on the buyers' and sellers' rights?

MR. MOLUMPHY:  Objection to the extent it
calls for a legal conclusion.

A    Again, I don't know what it said in this
case, and I don't know -- I mean, it -- it could

have had what -- what some might construe as a

substantive effect on it, given the way it kind of

colors the understanding of the terms in the merger

agreement.

Q    But -- but in your experience, I mean,

you've seen -- like it is, indeed, customary for

buyers and sellers to enter into confidentiality

agreements covering any information that's exchanged

between them, right?

A    Yes.  Usually that's done as part of the due

diligence process, right; you enter into a

confidentiality agreement.  I don't know what custom

and practice is when you don't engage in pre-signing

due diligence, because it's so rare, right.  It's

hard to say what custom and practice is in

situations that almost never happen.

And so I -- that particular type of

agreement where you've waived due diligence with

the -- with respect to what happened before signing,

I don't know what those agreements typically say

because there's so few of them.

Q    Well, hold on.  Section 6.4 -- Section 6.4

provides some information rights, right?

A    Yes.

Q    And that's a customary provision, correct?

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

174

A    Yes.

Q    Okay.  And it is customary for any information to be exchanged under those merger agreement provisions to be covered by a confidentiality agreement, right?

A    Yes.

Q    Okay.  Now -- and you have reviewed, I assume -- but tell me if I'm wrong -- many confidentiality agreements governing those types of provisions that we see in Section 6.4, right?

A    The -- the issue is that confidentiality agreements are usually signed before the merger agreement, right.  So you're not going to talk about the information rights because you haven't agreed to any information rights, right.  So insofar as you're agreeing to a confidentiality agreement after you've agreed to the information rights, that's -- where you haven't done due diligence at the outset, that's a somewhat unique situation.

Q    I see.  So this is -- this is a -- this is -- this deal is atypical in that sense, then?

A    The confidentiality agreement that they entered into after -- I mean, so this -- this deal is atypical in the sense that it's rare to waive due diligence before you sign an agreement, right.  And

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

175

it's -- and in that situation where you agree to information rights, usually you agree to expansive information rights rather than constricted seller-friendly information rights as you did here, right.  So I agree that this deal is atypical with respect to that.

Also, the confidentiality agreement is also atypical because it was entered into after the signing of the agreement.

Q    Would -- would it be typical or atypical for a confidentiality agreement to expand or restrict rights that are set forth in a merger agreement?

MR. MOLUMPHY:  Objection, vague.

A    Again, usually the confidentiality agreement is signed before the -- I mean, there may be cases where you enter into an additional confidentiality agreement even though you signed one in order to do due diligence, right.  But it is -- as I said, this is a somewhat unique situation where you've already agreed to the information in the provision rights and you're agreeing to something else which may provide more detail with respect to those information rights.

Q    Have you ever seen a confidentiality agreement that expanded or restricted rights set

17:48:09
17:48:12
17:48:14
17:48:16
17:48:18
17:48:21
17:48:22
17:48:25
17:48:29
17:48:32
17:48:38
17:48:42
17:48:46
17:48:47
17:48:50
17:48:55
17:48:58
17:49:01
17:49:06
17:49:10
17:49:13
17:49:16
17:49:18
17:49:19
17:49:20

forth in a merger agreement?

A    The -- the confidentiality --
confidentiality agreements I've seen are generally
the ones that are signed pre-signing, when those
information rights don't exist, right.

So I -- I don't know that there -- that
those types of confidentiality agreements are
generally available.  I -- I don't recall -- I -- I
don't recall having seen one that fits this
scenario, to waive due diligence, constricted
information rights, and a post-signing
confidentiality agreement entered into.

Q    Does the merger agreement in this case give
any indication that the -- the scope of information
the buyer is entitled to is expanded or restricted
by the confidentiality agreement?

A    I don't recall seeing anything in the merger
agreement that says one way or another whether
they're going to expand or contract the -- the --
the rights.  Doesn't preclude that possibility.

I -- that is, I don't see anything that says
that there are limitations on what the
confidentiality agreement can do, right.  If this is
an agreement between the parties, you can modify
anything that's in -- that -- that you've agreed to.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                          177

Q   The parties jointly agreed to the confidentiality agreement, right?

A   I would assume so.

Q   Right.  So to the extent the existence of the confidentiality agreement created any uncertainty about Musk's rights, that -- that's not something that's attributable solely to Musk, right?

MR. MOLUMPHY:  Vague.

A   I don't know.  I -- I don't know what the agreement said.  I don't know how it was negotiated.

Q   Okay.

A   Again, this is part of a broader point that that is just one piece of information among many possible pieces of information that were not public at the time; that bore on the information rights.

Q   Have you seen any evidence that any -- anybody thought that -- that anybody who is, you know, following this transaction at the time thought that Musk's information rights under -- under the merger agreement were impacted, you know, expanded, or restricted by the confidentiality agreement?

A   Not that I recall.

Q   And you were commenting on the Twitter transaction as it was happening in real time, right?

A    Yes.

Q    And did you speculate or -- or well, withdrawn.

Did you comment publicly that perhaps Musk's information rights could be expanded or restricted under the confidentiality agreement?

A    I may have said something about -- kind of there's stuff going on in the background here that is not public, right, which would include the confidentiality agreement.

But I -- I don't recall if I specifically referred to it.

Q    If -- if the -- if the parties entered into a confidentiality agreement that expanded or restricted the buyer's right to information, would that trigger a reporting obligation for Musk and Twitter, such that they would need to alert the market to the change in the -- that term of the agreement?

MR. MOLUMPHY:  Objection, calls for legal conclusion.

A    Not necessarily.

Q    And can you explain that answer?

A    Well, there's plenty of information, even material information, that doesn't get disclosed to

the markets, right, so the disclosure schedule is   17:54:31

something that is generally kept private.   17:54:33

Negotiations between the parties are   17:54:36

generally kept private.  And you have to -- a party   17:54:38

has to believe that this materially affects their   17:54:43

rights.  And it could be that something expands or   17:54:46

contracts the rights or changes the way it gets   17:54:50

colored in some way.   17:54:53

And the parties -- there's multiple   17:54:54

situations.  The parties could believe it doesn't   17:54:57

quite rise to the level of being material, right, or   17:54:59

they could believe that it is material and not   17:55:03

disclose it.   17:55:05

Q   And let's go to paragraph 83 of your report.   17:55:22

A   Yes.   17:55:35

Q   And there you write, "I am not aware of any   17:55:38

evidence indicating that Mr. Musk ever corrected the   17:55:41

confusion and uncertainty created by his May 13th,   17:55:43

2022, tweet and subsequent tweets (including his   17:55:47

May 17th, 2022, tweet) by issuing an unequivocal   17:55:50

statement indicating that he would go through with   17:55:54

the purchase of Twitter even if he did not receive   17:55:56

the information he had requested from Twitter and   17:55:59

fake or spam accounts."   17:56:01

Do you see that?   17:56:02

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

180

A    Yes.

Q    Is it your opinion that he should have issued such a tweet or a corrective disclosure?

A    I --

MR. MOLUMPHY:  Objection, calls for a legal conclusion; beyond the scope.

A    I have no opinion on what Mr. Musk should have done.

Q    And what is -- isn't that the implication of your statement here?

A    I'm just -- the statement speaks for itself.

I'm not aware of evidence that he ever corrected the confusion and uncertainty by issuing the statement, by issuing a correction that he would go through with the Twitter transaction if he did not receive the information that he requested from Twitter in fake or spam bots.

So I view this as a description statement --

Q    Okay.

A    -- right.  It describes my understanding.

It has no normative content with respect to what Mr. Musk should or should not have done.

Q    All right.  So it's not -- it's not an expert opinion that you're offering there?

A    It is opinion -- I mean, it relates to --

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

181

to -- it is a statement about my understanding of

the record that relates to the broader opinion that

I'm expressing in this section.

Q   Which -- which opinion -- what -- how does

it relate to your opinion?

A   All right.  So my opinion is that there

could have been nonpublic information out there,

right, that the public was not aware of; that bore

on information rights, right, and insofar as there

was -- a public statement might have changed

that -- that opinion, right.

But it doesn't matter what the public

information -- the nonpublic information is, right,

because I'm correcting the -- the record, for

example.  But I'm -- so that's the opinion.

And I'm just saying, in the record, there's

nothing that -- that I've seen that would rebut that

opinion.

Q   I'm sorry.  Okay.  So -- I'm sorry -- this

relates to your opinion that there could be

nonpublic information out there that bore on Musk's

rights?

A   Yes.

Q   How?

MR. MOLUMPHY:  Vague; it's overbroad; asked

and answered.

A   I would just refer to the -- paragraph 79 and 80 and 81, right, which explain that process.

Q   Okay.

A   I'm sorry, not 81.  It is the -- it's largely -- it's -- 79 is where I articulate the part about nonpublic information.

Q   Yeah.  I see that.  Right.

You say at the end of 79, "To determine the potential for termination, one would need to know, inter alia, the precise information requested by the buyer, the seller's basis for a refusal to provide information, the content of the communications between the parties, and whether the buyer is potentially in breach" -- "material breach of any of its obligations," right?

A   Yes.

Q   Okay.  And, customarily, the public would not, in a -- in a dispute like this, the public would not have all of that information, right?

A   Yes.  There would be nonpublic information that would bear on information rights.

Q   Right.  And so Musk tweeted his concern, right, that -- that he wanted -- he -- he was not going to move forward until he got this information

about spam and fake accounts.

Is it your opinion that the -- that the market would then have been better off not knowing about that concern?

MR. MOLUMPHY:  Objection, beyond the scope; vague.

A  I -- I have no opinion about the propriety of what the market should or should not know.

Q  Okay.  Were you investing in Twitter at the time, at the time of this transaction?

A  No.

Q  Let's look at paragraph 88 -- I'm sorry, 87.

A  Okay.

Q  You write, Mr. Musk -- "In short, Mr. Musk testified that he was well aware of concerns regarding fake and spam accounts on Twitter before he signed the Merger Agreement."

How is that relevant to your opinions?

A  So the -- you give me a moment to reacquaint myself of this section as well.

Q  Sure.

A  Yeah.  I -- I mean, I would relate it to the -- to what I express in paragraph 86, right, where I say, you know, he "waived due diligence."

So -- the -- it's relevant insofar as, if

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

184

you waive due diligence, you are largely going to have to rely on public filings in order to do that.

And he testified that he was aware of those public filings.

Q    Yeah, but 87 doesn't relate to public filings.

It relates to concerns regarding fake and spam accounts on Twitter?

A    Before he signed the agreement.

Q    Okay.

A    So I would assume he was aware of public information about that.

So I assume, perhaps incorrectly, that some of that information came from public filings because that was some of the more detailed information about that.  But I don't know that for sure.

Q    Okay.  And then you write in paragraph 88, "Mr. Musk's disparaging tweets about the Company likely violated Section 6.8 of the agreement that prohibits disparaging public announcements."

How is that not a legal opinion?

MR. MOLUMPHY:  Objection, vague.

A    I would -- the -- I would say the -- the -- it violates the customary understanding of the language that you see in Section 6.8.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

185

Q    So 6 -- Section 6.8 has plain language, right?

A    Yeah.

Q    And you're not relying on that for this opinion?

A    I -- I'm relying on what people in the M&A world customarily understand "disparaging language" to mean.

Q    Well, and you're relying on your interpretation of Section 6.8, aren't you?

A    Well, I'm explaining that that is the customary understanding of the language in 6.8, right.

If -- if I didn't expressly say that here, it was -- I meant to imply it.

Q    All right.  So you understand that the plaintiffs in this -- in this case have -- have taken the position that the merger agreement is not ambiguous.

Do you understand that?

MR. MOLUMPHY:  Objection to the extent it misstates the evidence; calls for a legal conclusion; beyond the scope.

A    I don't -- you would have to show me where they've taken that position for me to be able to

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

186

answer that question in a conclusive way.

Q   Which disparaging tweets were you referring to when you said that his tweets "likely violated Section 6.8"?

A   I think I'm referring to the May 14th tweet, that that's part of that section.

I believe there were others at the time.

I don't -- I don't have the complete record of the tweets here.  So -- and I'm happy to offer an opinion on whether a specific tweet would customarily be considered disparaging.

Q   Are you offering an opinion that a tweet would be considered customarily disparaging, or are you offering an opinion that section -- on how Section 6.8 would customarily be interpreted?

A   It is, I mean, both, right.  Kind of there's a customary understanding of what "disparaging" means.  That typically gets reduced to contractual -- not what it means.

That you shouldn't make disparaging statements, that typically gets reduced to contractual language, like the one that I -- I have referenced, right.

And then there's also an understanding of what it means to say something in the context of a

deal that's disparaging.

Q   So you're an expert in what constitutes disparaging or not disparaging?

A   I -- I would say I have an awareness of -- so the -- the problem -- the reason people customarily include prohibitions on making disparaging -- saying things are disparaging is because it could be construed as an attempt to lower the value of the target, right, make the value of the target seem worse because you're saying something bad about it, right.  So those are the sorts of disparaging things that you might say.

So I -- I have a general understanding of when someone's saying something that's consistent with that -- with that sort of thing.

Q   Are you offering an opinion as to whether that was a -- those tweets were a material breach of Section 6.8?

A   I'm not offering a legal conclusion about whether or not those were a material breach.

Q   What about an opinion as to whether the -- in the M&A world, people would consider that to be, as a matter of custom and practice, a material breach?

A   As a -- as a matter of custom and practice,

I think they would be considered disparaging and a material breach.

Q   So you're comfortable opining on whether an event or certain conduct constitutes a material breach of the merger agreement so long as you frame it as a matter of custom and practice and not as a legal opinion?

MR. MOLUMPHY:  Misstates testimony.

A   So there's a custom and practice of including restrictions on making disparaging statements in merger agreements, right, and there's typical language that is consistent with that custom and practice, right.  And the language in this agreement reflects that custom and practice, right.  There's also custom and practice with respect to what sorts of statements you are -- those -- that language is designed to prevent, right.

And so within that understanding, these are the sorts of the statements that that sort of language is customarily designed to prevent.

MR. MOLUMPHY:  Let us know when it's a good time to take a break.

MR. BROOME:  Yeah.  Let's take a break.

THE VIDEOGRAPHER:  We're going off the record at 6:12.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

189

(Whereupon a break was had.)

THE VIDEOGRAPHER:  We're back on the record at 6:32.

BY MR. BROOME:

Q   Professor Badawi, in Section 6 of your report, which begins at paragraph 76 --

A   Yes.

Q   -- the Section 6 is titled "Musk Took Actions That Created Uncertainty and Then Purported to Terminate the Deal."

How is that within your area of expertise?

A   Insofar as I have expertise in kind of what transpires in M&A transactions, right.  And as I've explained in my report, right, there's -- there are customary situations where there is buyer's remorse. Those buyers sometimes seek to fit -- seek to create uncertainty about the deal.  The actions of Mr. Musk fit within those customary understandings of creating that uncertainty.

Q   Are you an expert on the stock market?

A   I don't know exactly what that means. There's a lot of different aspects of the stock market, some of which I --

Q   You -- go on.

A   -- some of which I know well, some of which

18:12:12
18:32:07
18:32:18
18:32:20
18:32:23
18:32:26
18:32:37
18:32:37
18:32:40
18:32:42
18:32:44
18:32:55
18:33:01
18:33:06
18:33:12
18:33:14
18:33:17
18:33:20
18:33:23
18:33:27
18:33:34
18:33:38
18:33:42
18:33:42
18:33:44

I might not necessarily be an expert.

Q   I mean, are you -- are you an expert on any -- well, what experts would you -- sorry.

What aspects of the -- of the stock market would you be an expert in?

A   I would say I -- I have some expertise on the way kind of information release and M&A transactions tends to affect stock prices, things like merger -- like knowing, you know, the -- the way stocks try -- trade in mergers, I have some expertise on.  But like kind of deep expertise on options pricing is not something that I would claim expertise on.

Q   Okay.  Have you ever, like, written or published anything on information released in M&A transactions?

A   I wrote a paper on better and worse law firms in M&A deals, right.  So these are M&A deals where there's a -- litigation results, and so, basically, the name of the law firm gets released.  And so that would -- and then we did an event study on stock prices to understand is -- if better -- if you have a better law firm bringing the deal or kind of -- on the plaintiff's side, what effect does that have on the stock price of the target in between

signing and closing.

Q    Okay.  Well, this -- this section of your report is about the actions that Musk took that created uncertainty.  I -- I assume when we say "uncertainty," you mean uncertainty in the stock market, right?

A    It's un -- it would be understood as uncertain in the custom and practice of M&A transactions, right.  I don't believe I offer any express opinions on kind of stock price movements with respect to Mr. Musk's actions.

Q    Okay.  I want to make sure I understand.

When you write "Musk took actions that created uncertainty," uncertainty for whom?

A    The -- I would place that in the broader context of -- and, right -- this is just -- this is a subject heading, right, not part of the argumentation.  But the -- the broader arc of my report is to say -- or at least parts of it, right -- buyer's remorse is something that happens in M&A deals customarily, right.  These are the situations that -- that create that.  Sometimes those parties who -- who are experiencing buyer's remorse will seek to create uncertainty by making, for example, disparaging remarks and so on, right.

And so Mr. Musk's actions are consistent with that arc of someone who customarily has buyer's remorse, right. Customarily, parties who are -- have remorse about an M&A transaction engage in certain actions. This is consistent with those actions.

Q   Okay. So you're -- you're suggesting, then, in this -- in this section of your report that Mr. Musk was trying to create uncertainty in the stock market in order to lower the price of Twitter?

A   I -- I'm not speculating about his motive. I'm saying it's consistent with the customary arc that I just laid out.

Q   Right. I mean, that's -- that's kind of -- that's the takeaway, right, like the -- when you read this section, the -- it -- if a -- if you give this testimony at trial, the jury is going to think you're saying -- well, withdrawn. Withdrawn. I'll make that argument to the judge.

You just said that -- I asked you -- you were opining on the uncertainty that Musk created for -- in the market. You said, "I don't believe I offer any express opinions on kind of stock price movements with respect to Mr. Musk's" -- I assume you meant statements.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

193

But you do, don't you?  I mean, right in the next paragraph:  "By the end of that trading day, the price of Twitter stock had declined 9.67 percent from the previous day's closing price."

Are you telling me that you're not drawing a connection between Twitter's statements and the -- and the stock price drop?

A   I -- so I -- I -- I'm stating facts that are in the record, right.  My understanding is that there are other experts in this case who are opining on the meaning, the magnitude of those stock price drops, right, which is not the role that I'm playing in this case.

Q   Okay.  So that's not expert opinion there; that's -- you're just stating facts in the record?

A   Yes.

Q   And when you -- when you -- and in Section 6, where you -- when you write that Musk took actions that created uncertainty and then purported to terminate the deal, are you just stating facts in the record?

A   No.

Q   That's an expert opinion?

A   It's my expert upon, as I was previously explaining, right, that there's customarily buyer's

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

194

remorse, customary actions that are taken by parties that have buyer's remorse, and Mr. Musk's actions are consistent with that customary -- those customary actions.

Q   But that's -- that's -- but then you take it a step further and you say that those customary actions create an uncertainty for -- for investors, right?

A   The -- I -- I'm not sure I expressly say that the uncertainty had a connection with the investors.

Q   But isn't that -- isn't that what you're implying when you -- when you draw the connection? I mean, literally you have one sentence that says, you know, he issued this tweet, and the end of the day, the stock price dropped, under a heading that said "Musk Took Actions That Created Uncertainty."

That's not -- that's not just you opining that his actions are consistent with a remorseful buyer.  That's you opining that his actions caused the stock price to drop; is it not?

A   I -- I don't see in the -- that sentence where I say that.

Q   No, but that's the implication, right?

MR. MOLUMPHY:  Objection, vague; asked and

answered.

A    I -- I would just say that that -- I'm stating a fact in that -- in the record.

Q    Okay.  So I never got an answer to my question, uncertainty for whom.  You have a section heading there that says "Musk Took Actions That Created Uncertainty."

Uncertainty for whom?

MR. MOLUMPHY:  Asked and answered.

MR. BROOME:  Nope.

A    I'm going to -- I'd like to take a look to see if I make other references to uncertainty or I kind of -- this is -- that's a subject heading rather than part of the argumentation.  So if you'll give me --

Q    Sure.

A    So I would -- I mean, I think the better explanation of what I'm saying is -- relates back to paragraph 83, right, where I say, look, there was uncertainty that was out there, right.  And I think I started to say by people who are following this deal, right -- about potential nonpublic information that was -- that may or may not have been -- about communications that may or may not have been transpiring between the parties.  And then I say,

you know, he could have corrected that uncertainty, 18:43:10

but he -- I see that he didn't, right. 18:43:14

So it's two people who are following the 18:43:16

sale, right. He could have -- there was information 18:43:20

that was out there that people didn't know. He 18:43:23

could have corrected it, but he didn't. 18:43:26

Q   Well, who does the uncertain -- for whom 18:43:27

does the uncertainty matter? 18:43:30

A   The -- the people who did not have access to 18:43:32

that nonpublic information. 18:43:35

Q   Right. But it only -- it only matters to 18:43:36

them if they're shareholders or potential 18:43:40

shareholders, right? 18:43:43

MR. MOLUMPHY:  Objection; vague. 18:43:44

A   Again, I -- I -- I was not asked to opine, 18:43:48

right, on kind of the reactions of shareholders with 18:43:52

respect to this.  I'm just saying for people who are 18:43:56

following what happened in this deal, there was 18:43:59

nonpublic information, there were comments made 18:44:01

about that information that created uncertainty, and 18:44:05

that uncertainty was not corrected. 18:44:07

Q   Okay.  So in the heading there where you 18:44:10

write "Musk" -- and you wrote this heading, right? 18:44:16

A   I believe so, yes. 18:44:19

Q   All right.  When you write, "Musk Took 18:44:20

Actions That Created Uncertainty And Then Purported To Terminate The Deal," you were not -- the uncertainty you were referring to there is not necessarily for investors or the market.

Is that your -- is that your testimony?

MR. MOLUMPHY:  Misstates testimony.

A    It could be.  I wasn't asked to -- specifically to opine on how investors would respond to this information with respect to their trade.

Q    And you don't have anybody specific in mind there or any category of people -- any specific category of people in mind when you wrote that it created an uncertainty?

A    I -- I don't think I specifically said who would experience the uncertainty.

I think what I meant are anyone who didn't have access to nonpublic information.

Q    Let's go to paragraph 85.

A    Yes.

Q    You write Mr. Musk's expression of apparent concern with fake and spam accounts should be understood in terms of the then-available public information about the topic.

Do you see that?

A    Yes.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

198

Q   Does this relate to custom and practice in M&A?

A   Insofar as that -- insofar as there's nonpublic -- customarily, there's going to be public and nonpublic information, right.

It should be understood with regard to that custom of supplying some information and supplying -- and not -- not releasing everything that matters with respect to the -- to information rights and the sharing of information.

Q   Okay.  And then -- okay.  So you write, "In September 2021, Twitter entered into an $809.5 million class action settlement in a securities class action alleging that Twitter, in part due to bots, overstated its user numbers and growth rates."

Do you see that?

A   Yes.

Q   And for this statement, you cite a Time Magazine online article.

Do you see that?

A   Yes.

Q   Does that article say anything about bots?

A   I don't recall.

Q   Did you read the complaint in that case?

A    I may have at some point, but I don't specifically recall.

Q    Is it in your reliance materials?

A    I mean, I -- I -- I'm not sure if it is, right.  I -- I remember following that case when it occurred --

Q    Did you --

A    -- and I may have read the complaint at that time.

But I don't --

Q    Go ahead.  Sorry.

A    But I -- I don't know if it appears in my reliance materials.  It may be part of my background knowledge.

Q    Did that lawsuit have anything to do with mDAU?

A    My recollection is that it did.

Q    Okay.  Did it have anything to do with Twitter's disclosure that spam accounts represent less than 5 percent of Twitter's mDAU?

A    I -- I don't recall one way or the other.

Q    Did it have anything to do with the method that Twitter used to calculate spam and -- and fake accounts as a percentage of mDAU?

A    I don't recall one way or the other.

18:47:48
18:47:51
18:47:51
18:47:55
18:48:03
18:48:09
18:48:09
18:48:09
18:48:11
18:48:11
18:48:12
18:48:13
18:48:17
18:48:21
18:48:21
18:48:23
18:48:28
18:48:29
18:48:33
18:48:36
18:48:38
18:48:41
18:48:43
18:48:47
18:48:50

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

200

Q    To your knowledge, did Twitter ever make public its method for calculating spam as a percentage of mDAU?

A    I mean, some of the -- I believe it was -- the 10-Q that we went over earlier, right, did say something about the method.  It was very circumscribe, right.  It was saying it was only based on a sample of particular users.

But that would appear to be responsive to your question.

Q    Well, it didn't describe the method itself, right?

A    I mean, it --

MR. MOLUMPHY:  Vague.

A    It -- it described something about the method, right.  It said, we took a sample.  That's saying something about the method, right.  So...

Q    Okay.

A    It didn't provide a ton -- at least, that one statement did not provide perhaps the entire method, but it did say something about the method.

Q    Does that -- aside from that statement in the 10-K, did -- are you aware of any other public information indicating how Twitter calculated spam as a percentage of mDAU?

18:48:52
18:48:55
18:48:58
18:49:02
18:49:09
18:49:12
18:49:14
18:49:17
18:49:20
18:49:25
18:49:26
18:49:28
18:49:28
18:49:30
18:49:31
18:49:34
18:49:38
18:49:40
18:49:41
18:49:43
18:49:46
18:49:49
18:49:52
18:49:59
18:50:01

A    I mean, I think mDAU was discussed multiple times in multiple 10-Qs and 10-Ks.

I don't know if that language was varying over time.  So I -- I can't say one way or the other.

Q    And anything other -- anything beyond the statements that Twitter included in its 10-Ks and 10-Qs?

A    Sorry.  I'm just trying to clarify the question.

Are you asking, did they say something, or am I aware of something they said?

Q    Are you aware of any public statement or information released by Twitter concerning how it calculates spam as a percentage of mDAU beyond what Twitter said in its 10-K and 10-Q -- or 10-Ks and 10-Qs?

A    I don't specifically recall, right.

There may have been something on analyst calls, for example, or earnings calls that discussed mDAU and that I may have come across at some point.

So I -- I can't recall everything that I've seen about discussions of mDAU and the method of calculating it.

Q    Okay.  All right.  Let's go down to

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

202

paragraph 89.

A   Okay.

Q   And there you're -- you refer to the "May 16th, 2022, 20 Percent Statements and Tweets."

Do you see that?

A   Yes.

Q   Have you reviewed a transcript of what Mr. Musk actually said at that conference?

A   I believe that I did.

Q   Okay.  Let's provide that.

MR. BROOME:  Alex, that will be --

MR. BERGJANS:  Tab 24.

MR. BROOME:  Tab 24, and that's going to be Exhibit 222.

A   I've got it.

Which page?

Q   You're ahead of me.  Give me a second to catch up.

MR. BERGJANS:  Apologies.  We have a certified transcript in here.

MR. BROOME:  Alex, are we waiting for a different transcript, or are we ready to go?

MR. BERGJANS:  Let me pull the certified transcript.  Sorry.  Give me --

MR. BROOME:  Okay.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

203

MR. BERGJANS:  This is marked as Exhibit 78.

THE WITNESS:  Okay.

Q   Okay.  You got it?

A   I have the -- Exhibit 78.

Q   All right.  You see the paragraph where he refers to the 20 percent estimate?

I think it's probably on page 2 or -- I don't know.  I'm looking at a different document.

A   Page 6, I think.

Q   Yeah.  Yeah.

A   Yes.

Q   You -- you reviewed this transcript in preparing your report?

A   I -- I think I looked at the other one, but --

Q   Okay.

A   -- I --

Q   I -- I don't really care which one -- which one you look at, but I just have one question.

Do you see anywhere in this transcript where Mr. Musk suggests that he got the 20 percent figure from Twitter or from information that Twitter provided to him?

MR. MOLUMPHY:  Objection; vague.

A   I would say, at least in this paragraph,

18:54:02
18:54:49
18:54:51
18:54:52
18:54:54
18:54:59
18:55:03
18:55:06
18:55:10
18:55:11
18:55:13
18:55:13
18:55:15
18:55:16
18:55:19
18:55:19
18:55:19
18:55:20
18:55:23
18:55:25
18:55:28
18:55:33
18:55:39
18:55:40
18:55:51

right, the --

MR. MOLUMPHY:  Also, calls for speculation.

A    This paragraph does not state that he got that information from Twitter.

Q    Okay.  And then one paragraph 89, you conclude that paragraph by saying, "At the close of trading that day, Twitter stock declined 8.18 percent."

Do you see that?

A    Yeah.

Q    Are you aware that that decline occurred before Musk appeared at the All-In Summit?

A    I -- I don't know the precise kind of moment-by-moment stock price movements on that day.

Q    Okay.  Why did you include that piece of information at the end of that paragraph?

A    It was to -- to -- it's a fact related to that, right.

Q    Well, how does it relate, though?  That's kind of my point.

Like, how does that fact relate to -- if you don't know that the stock declined after he made the tweet -- or sorry, after he made the statement, then how does it relate to his statement, in your -- in your opinion?

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                    205

A    Again, I don't -- I don't make any argumentation with respect to that, right.

I'm just providing a chronology of what happened that day.

Q    That's all you're doing in this section?

A    With respect to that sentence, that is a factual statement about what happened that day.

Q    Yeah.  But -- right.  We -- we're heading towards a jury trial, right, Professor Badawi?

Don't you think it's going to suggest to the jury that the -- that the stock declined in response to Mr. -- tweets when you say Musk made this -- or sorry, the statement when you say, Musk made this statement and then the stock declined that day?

MR. MOLUMPHY:  Is there -- what's the question?

Q    Yeah.  I thought I asked a question.  Hold on.  Let me look.

Don't you think it's going to suggest to the jury that there's a connection between Musk's statement and your -- your statement that the stock declined that day?

MR. MOLUMPHY:  Calls for speculation.

A    I mean --

Q    Go ahead.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

206

A    I don't know what it's going to suggest to a jury, right. I don't make any argumentation with respect to that sentence.

Q    To the best of your knowledge, is there any connection between Musk's statement that day -- sorry, any sort of correlation or causation between Musk's statement that day and the stock decline?

A    There could have been, but I was not asked to opine on the relation between the custom and practice of M&A, the -- how the actions in this case fit that, and how that may relate to causation.

And for that reason, I didn't say anything about it.

Q    Okay. Well, how does anything in this paragraph relate to custom and practice?

A    Right. Well, as part of your -- like, all of these are attempts to characterize facts related -- surrounding that tweet, right. And so the -- the argumentation appears in the following paragraph, right. So these are all just factual statements laying the groundwork for stating my opinion, right, so I -- I think we should focus on what I draw out of these facts.

Q    Right.

But how the stock moves on any given day

isn't relevant to any of your opinions, is it?

A    I mean, I -- I'm stating -- like, I'm setting the stage for -- for my opinion -- my -- which I articulate in paragraph 90.  Paragraph --

Q    Which of your -- okay.  Well -- and the opinion --

MR. MOLUMPHY:  Did you finish your answer there?

Q    Yeah, sorry.  Getting ahead of myself.

A    Right.  So, like, it is a common approach in expert reports to kind of lay the factual background before you explain your opinion, right.  There's judgment calls about do I -- how many facts do I include.  These are the facts I chose to include.

In paragraph 90, then I explain the -- what I -- what I draw with respect to those tweets.

Q    How does the Twitter stock decline on May 16th, 2022, relate to your opinion in paragraph 90?

A    It's -- it's part of the -- right.  Again, I'm trying to provide context for that -- for what I've put in paragraph 90.  Is it expressly tied to anything that I conclude in paragraph 90?  I'm not sure that it is.

Q    All right.  Now let's go to paragraph 90.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

208

You say in the second sentence, "The Merger

Agreement provided some of those rights to Mr. Musk

for business purposes related to the transaction.

Had Mr. Musk exercised those rights, his doing so

would likely not be apparent to the investing public

because a private request for information is

unlikely to be deemed material."

        See that?

    A    Yes.

    Q    So this is -- right.  And so this goes back

to something we discussed before.  A private

request -- a -- sorry.  A private request for

information -- information requested under a merger

agreement, generally speaking, it's -- it's -- it's

never going to be apparent to the investing public,

right?

    A    I don't know about never, right.

    Q    Or rarely?

    A    It -- if it raised to the level of

materiality, you -- you might release it.

    Q    I see.  But here in this situation,

Mr. Musk's exercise of his rights was apparent to

the public because he tweeted about it, right?

        MR. MOLUMPHY:  Vague.

    A    So I refer you back to paragraph --

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                                209

MR. MOLUMPHY:  Calls for speculation.

A    -- paragraph 79, right, where I explain that there's plenty of information about requests under the information rights -- responses to those requests that might not become public.

Q    But the fact that Musk had requested information from Twitter about spam, bots, fake accounts, the public was aware of that, right?

MR. MOLUMPHY:  Vague, calls for speculation.

A    I -- I'm -- I'm not sure I can say that based on the factual -- my -- based on my recollection of the factual record.

Q    Okay.  Okay.  Let's go to paragraph 22 -- or, sorry, 92.  And then the heading there --

MR. MOLUMPHY:  -- us.

MR. BROOME:  Sorry?

MR. MOLUMPHY:  What paragraph, Steve?

MR. BROOME:  92.

MR. MOLUMPHY:  92.  I thought we were starting over.  92, not 22.

MR. BROOME:  Back to the beginning.

MR. MOLUMPHY:  Yeah.

MR. BROOME:  That was just my -- the introduction to my outline.  Now we'll get into it.

A    Yes.  I'm at 92.

210

Q    Okay.  And there you write -- in this -- in the heading, that says, "Mr. Musk Had No Right to Terminate the Merger Agreement Due to Failure to Provide Information About Fake Accounts."

Do you see that?

A    Is that on -- is this on page 47 or 48?

Q    It is on 47.  It's in the heading.

A    Okay.

Q    Paragraph 92.

A    I see that.

Q    Okay.  And there, is it -- is it your testimony that this is not a legal opinion; this is your opinion based on applying custom and practice to Mr. Musk's information requests?

A    I mean, you -- it's a subject heading, right.  So you can't put all the kind -- like, that's just giving you an indication of what's to come, right.  I don't think the way that is phrased there appears in that sentence -- in that -- in that paragraph, right.

And so, you know, it is a high-level summary of what is about to come in that para- -- or in this section.

Q    Well, okay.  Well, let me ask the question slightly differently.

Transcript of Adam Badawi, Ph.D.

Conducted on July 17, 2025

211

Is it your expert opinion that Mr. Musk had no right to terminate the merger due to a failure to provide information about favor -- fake accounts?

A   I -- I would use the customary -- caveats that I've used before.  The customary understanding of the -- both the information rights and the bring-down provision, right, combined with the customary understanding of what Mr. Musk did, would, in the practice of M&A, not be considered an ability to terminate -- would not provide a right to terminate the agreement.

Q   What do you mean by the customary understanding of what Mr. Musk did?  I mean, how many -- how many merger agreements have you, you know, analyzed or how many -- how many merger transactions have you analyzed where somebody asked for information about fake accounts?

A   I -- I --

Q   Zero, right?

A   Well, I've looked at this one.

Q   Okay.  Sorry.  Beyond this one?

A   Not others that I recall.

Q   So then what do you mean by the customary practice of what Mr. Musk did?

A   The -- right.  So it doesn't necessarily

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                           212

have to be about bots, right.  It could be                19:08:08
requesting information to which you are not --            19:08:11
the -- the lawyers believe you're not entitled to or      19:08:14
the -- the lawyers believe that, under the contract,      19:08:16
you're not entitled to.                                   19:08:19
    Q   Okay.  Well, I thought I asked you this           19:08:20
earlier.  I said -- I asked you if you had an             19:08:23
opinion on whether Mr. -- Mr. Musk was entitled to       19:08:26
the information that he requested, and you said you       19:08:28
didn't have an opinion on that.                           19:08:33
    A   Is there a question?                              19:08:41
    Q   Yeah.  I mean, do you stand by that or...         19:08:42
    A   Yes, I stand by my previous testimony.            19:08:46
    Q   Okay.  So you don't have an opinion on            19:08:49
whether he's entitled to the information, but your        19:08:54
opinion is that if -- if Twitter didn't provide the       19:08:57
information, Musk could not terminate?                     19:09:02
    A   Sorry.  Double negative there, so I'm trying       19:09:08
to sort that out.                                         19:09:11
        The -- if, right, the -- I mean, just --          19:09:12
    Q   So I guess let me try and rephrase it.            19:09:16
        You don't have an opinion as to whether           19:09:18
Musk -- actually, withdrawn.                              19:09:22
        And I think you said this before, that you        19:09:24
didn't actually look at -- in preparing your report       19:09:26

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                                    213

and your testimony in this case, you did not look at
the specific information requests that Musk made or
Twitter's responses to those requests; is that
right?

    A    I certainly saw some of them, right.  I've
seen the termination letters.  I've seen the -- the
Complaint that detailed some of the information
requests that were made.  So I -- I have seen some
of that information.

    Q    Okay.  But you didn't study the whole record
of the back-and-forth between Musk's -- the Musk
team and the Twitter team about the information
requests?

    A    I mean, I -- I've seen a lot of the
back-and-forth.  I'm not sure that all the
back-and-forth was publicly disclosed, right, so
there could be stuff that --

    Q    Okay.  Yeah, you're in -- you've got a
lot -- it's not about whether it's publicly
disclosed.  You've got access to the full record in
this case, right?

    A    Well -- I -- I believe I have access to -- I
do have access to the full record here, so I may
have seen some additional things that were not
public.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

214

Q   Are your opinions in this case based exclusively on what was publicly available at the time of the transaction?

A   No.

Q   Okay.  All right.  So back to my -- my original question, which was:  You don't have an opinion on whether Musk was entitled to the information he requested?  You said you stand by that testimony?

A   That's my --

Q   Nevertheless -- oh, I'm sorry, say again.

A   I stand by my previous testimony.

Q   Okay.  Your --

A   I just -- I don't know if the way you characterized it is exactly what I said, but I stand by my previous testimony and -- and -- through the questions and answers that we had.

Q   Okay.  Well, just for sake of clarity, do you have an opinion on whether Musk was entitled to the information he requested about bots, spam, and fake accounts that --

A   I -- I -- we -- we had some back-and-forth about that where I stated my opinion.  We can re- -- I would want to go back to the transcript to see what I agreed to if you're going to try and get

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

215

me to agree to something more.

Q   Do we need to go back to the transcript or -- or do you --

A   I -- I'm comfortable with the -- the transcript.  Like I -- what I said -- I don't have exact recollection, given that we're --

Q   Yeah.  Well, it's not a memory test.  It's not a memory test.

I mean, just tell me -- I'll -- I'll just ask you the question again, and you can tell me what the -- what the limitations are.

MR. MOLUMPHY:  I think he just did.

MR. BROOME:  No.

MR. MOLUMPHY:  Then it is a memory test.  You're asking him to repeat an opinion that he already provided three hours ago.

MR. BROOME:  I'm just asking the question again so that we don't have to go digging through the transcript.

Q   Do you have an opinion on whether Mr. Musk was entitled under the merger agreement to the information he requested about spam and fake accounts?

A   Insofar as that is the question that was asked earlier and I -- it captures the substance of

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                    216

the question that was asked earlier, I -- I would      19:12:42

reiterate my answer to that question.      19:12:46

    Q    Which is?      19:12:50

    A    Which is -- I believe it was, "I believe      19:12:50

so."      19:12:56

    Q    You believe you do have an opinion?      19:12:56

    A    Sorry.  Like, I believe I don't have an      19:12:58

opinion on it.      19:13:01

    Q    Okay.  Thank you.      19:13:02

        All right.  And so then --      19:13:03

    A    As a legal -- like, as a legal matter.      19:13:13

    Q    Now, if Mr. Musk requested information      19:13:23

pursuant to Section 6.4 and Twitter said, pound      19:13:35

sand, we're not giving you anything, and -- and      19:13:45

didn't cite any reasons, just said, we're not giving      19:13:50

you any information, would Mr. Musk still be      19:13:53

required to close?      19:13:57

        MR. MOLUMPHY:  Objection, improper      19:13:59

hypothetical.      19:14:00

    A    It would depend, right.  It would depend on      19:14:05

the information requested; it would depend on the      19:14:10

underlying reasoning for saying, pound sand.      19:14:15

        I just -- I can't answer that question.  And      19:14:18

insofar as asking me to kind of ask a -- answer a      19:14:21

legal question about interpretation of the document,      19:14:25

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                           217

that's not my role.

Q   Okay.  But you would agree that Twitter's material compliance with Section 6.4 was a condition to closing, right?

In other words --

MR. MOLUMPHY:  Object to --

Q   In other words, if Twitter materially breached any provisions of the merger agreement, including Section 6.4, Mr. Musk would not be required to close, correct, assuming he was also in compliance at the time?

MR. MOLUMPHY:  Object to the extent it calls for a legal conclusion.

A   So I can say kind of the -- the customary understanding of language -- like, lots of merger agreements include a condition that says you have to be in material compliance.

Q   Right.

A   And so, customarily, that means if you are not in compliance or there's been a material breach, right -- and, again, it's going to vary depending on the merger agreement.  But that could potentially provide a basis not to close.

Q   Okay.  So as -- as a matter of custom and practice, if -- if Twitter materially breached

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

218

Musk's information rights under 6.4, that could lead to a situation where Musk would not need to close?

MR. MOLUMPHY:  Objection, calls for a legal conclusion; also improper -- incomplete hypothetical.

MR. BROOME:  Oh, no.  I framed it as a matter of custom and practice.

MR. MOLUMPHY:  I know, but you left out some stuff in the hypothetical.

Q   Is that fair -- is that a fair description?

I can repeat the question, if you want.

Do you want me to repeat the question?

A   With respect to kind of Twitter itself, right, kind of that's -- that might be a legal conclusion.

Kind of -- parties like Twitter, right, who have agreements that are customarily like this, where there's a material breach of a -- a covenant, right, that could potentially provide a basis for refusing to close.

And they have opportunities to cure and so on, right, but it would depend on the language.

Q   Okay.  Let's look at paragraph 96.

A   Yes.

Q   There you write, "The assertions by Mr. Musk

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

219

that Twitter breached its obligations are not consistent with the terms of the Merger Agreement. Mr. Musk's claim that the information access covenant required Twitter to give him all information about the company 'for any reasonable business purpose relating to the consummation of the transactions' is not a correct description of his rights under the Merger Agreement. As detailed above, sellers will leverage" -- "limit," etcetera, etcetera.

In those first two sentences there, are you not just reading the plain language of the contract and applying it to the facts of the case?

A    I mean, as I -- in the subject heading, I do say, these are the "customary understanding" of those rights.

Q    I see. So now the custom -- now the heading is important?

A    I believe they should be read in conjunction with each other.

Q    Got it. All right. So when you say, "The assertions by Mr. Musk that Twitter breached its obligations are not consistent with the terms of the merger agreement," that's as a matter of -- you meant as a matter of custom and practice, not as a

matter of just reading the plain language of the contract?

A    The -- the customary understanding of that language, yes.

Q    Do you need to be an expert in M&A to understand the merger agreement and -- and know what the customary understanding of that -- of all the language in the merger agreement is in order to understand it?

A    I believe so.

Q    So in order to understand the merger agreement, you would need to have reviewed hundreds of merger agreements and -- and have -- have knowledge as to what is custom and practice with respect to the meaning of merger agreement language?

A    I think at least for parts of the merger agreement.

But, I mean, there's a reason, for example, why these cases tend to get litigated in Delaware, right.  The judiciary there has expertise with respect to -- to what it means.

And when they need it, they call for expert testimony on the meaning of terms, or they receive expert testimony.

Q    Okay.  Let's take a look at -- yeah.

Does that -- what you just -- what you just explained, does that apply to Section 6.4 of the merger agreement at issue in this case?

A   I would think so, insofar as it's helpful to understand on the continuum where it falls with respect to buyer-friendly or seller-friendly.

Q   Okay.  So, I mean, I'm -- I'm not an M&A lawyer, and I have not read probably more than 20 merger agreements in my life.

Are you saying that I would not have the expertise to understand Section 6.4?

MR. MOLUMPHY:  Misstates testimony.

A   I -- at least my understanding of how the parties want the merger contracts interpreted, generally -- give -- you know, they go to Delaware; they go to judges who have expertise in interpreting these merger agreements.

Those judges will sometimes rely on expert testimony to understand what those mean, including is this a buyer-friendly term; is this a seller-friendly term.

Where there's -- what some of these terms, it's not exactly clear what they mean.  You have to look at all the facts in this case to understand that.  You have to understand what the continuum of

possibilities are.

And so I -- I think the parties want that type of expertise in the interpretation of the agreement.

Q    And that applies to Section 6.4, do you think?

A    I think it could, yes.

MR. MOLUMPHY:  Vague, outside the scope.

Q    And would that -- and would you say the same thing with respect to information about bots and spam that -- that analyzing -- or sorry.

Understanding whether, in this case, Musk was entitled to data from Twitter concerning fake accounts, one would need to be an expert in M&A custom and practice?

MR. MOLUMPHY:  Misstates testimony; beyond the scope.

A    I mean, I think it would require multiple types of expertise, right.  It could require M&A expertise with respect to things like, what does it mean for consummation of the transaction, right?

That -- that's -- you might want to know from an M&A expert, customarily, what information is required for consummation of the transaction.

When it comes to kind of business purpose

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                           223

with respect to these sorts of -- or -- or rejection
of these requests, you might want more specific
information from an expert on things like mDAU and
bots and things like that.

But I think getting input from experts
would -- could be something that could be helpful to
understanding Section 6.4.

Q   Okay.  Let's go to -- okay.

Staying on 96 -- you still have the merger
agreement -- I'm sorry, your report in front of you?

A   I do.

Q   All right.  Continuing on in that paragraph,
you write, "As detailed above, sellers will
leverage" -- "sellers with leverage will limit a
buyer's ability to obtain information between
signing and closing.  The Merger Agreement does that
by subjecting Mr. Musk's requests for information to
Twitter's 'reasonable judgment'...'"

Do you see that?

A   Yes.

Q   "...and by prohibiting Mr. Musk's access to
'competitive information.'"

Do you see these -- do you see that?

A   Yes.

Q   "Mr. Musk's letter omits these

seller-friendly qualifiers in the access to information covenant and, in so doing, mischaracterizes his information rights."

Are you opining that those are two separate limitations on Musk's information rights: Twitter -- Twitter's reasonable judgment and competitive information?

A    So my recollection is that there are a number of reasons Twitter could refuse to supply information.  I believe all of them were subject to their reasonable judgment.

And one of those reasons was because it could be competitive information.

Q    Right.  But -- but Twitter could not simply exercise reasonable in judgment -- its reasonable judgment and refuse to provide information unless one of the other reasons was also satisfied, right?

I mean, again, let me -- let me give you -- make this a little bit easier for you because, again, it's not a memory test.

Let's go to -- if you have the merger agreement in front of you -- front of you there?

A    I think that I do.

Q    Tab 18.

A    18, yeah.

And this is 6.2?

Q   6.4.

A   6.4, sorry.

Q   That's going to be paragraph 40 -- sorry, page 43.

A   I got it.

Q   Okay.  So you see at the very end of that -- at the very end -- end of 6.4 after it describes Musk's information rights, it says, "...provided, however, that nothing herein shall require the" -- and then it goes on to the next page -- "Company or any of its Subsidiaries to disclose any information to Parent or Acquisition Sub if such disclosure would, in the reasonable judgment of the Company, (i) cause significant competitive harm to the Company or its Subsidiaries if the transactions contemplated by this Agreement are not consummated, (ii) violate applicable Law or the provisions of any agreement to which the company or any of its Subsidiaries is a party, or (iii) jeopardize any attorney-client or legal privilege."

Do you see that?

A   Yes.

Q   Okay.  So Twitter can only exercise its reasonable judgment to refuse to provide information

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

226

if conditions 1, 2, or 3 is -- is satisfied, right?

A   I would say that is the customary understanding of that language.

Q   Okay.  All right.  And, to your knowledge, did -- at any point in time, did Twitter ever invoke any of those provisions as a basis to withhold information that Musk requested?

MR. MOLUMPHY:  Vague.

A   I mean, I -- I would say they did so implicitly by saying they went above and beyond what they were required to do by -- in supplying the information that they did.

I don't have a recollection of them expressly following on those rights, although they may have articulated some of those claims in the litigation.  I just don't recall.

Q   Well, going above and beyond could apply to lots of things, right?

It doesn't necessarily mean they implicitly found that providing the information to Musk would lead to significant competitive harm, right?

A   To me, that suggests that they provided information that they were not legally required to.

Q   Sure.

A   That -- that -- that clause describes their

rights to refuse to supply information.  So as I said, it's implicit.  We don't know exactly what they were doing, but it would be consistent with saying, we don't think we have to supply this, here's the language that says we don't have to supply this, and yet we did supply it.

Q    Are you aware of any instance in which Twitter specifically cited that language as a basis for withholding information?

A    I -- I don't specifically recall if they did or didn't.

MR. BROOME:  Okay.  Let's go off the record for a minute.  I'm -- I'm pretty close to done, Mark.  Probably maybe another 30 max.

THE VIDEOGRAPHER:  We're going off the record at 7:31.

(Whereupon a break was had.)

THE VIDEOGRAPHER:  We're back on the record at 7:50.

BY MR. BROOME:

Q    Professor Badawi, I just want to go back to something we covered earlier.  I asked you a question, "So in order to understand the merger agreement, you would've" -- "would need to have reviewed" -- I'm sorry, let me go back one more

question.

I asked you, "Do you need to be an expert in M&A to understand the merger agreement and" -- "and know what the custom" -- "customary understanding of all the language in the merger agreement is in order to understand it?"

And you said, "I believe so."

Do you recall that?

A   Are you reading?

MR. MOLUMPHY:  Objection.

Q   I'm reading -- I'm reading from the transcript.

A   If that's what the transcript says, that's what I presume I said.

Q   Okay.  You stand by that, right?

A   Yeah.  I mean, I might -- so, I mean, I think in most cases, right, if you're trying to under -- like if you're trying to understand what a merger agreement means, right, you should just go ask your lawyer, right, ask your attorney, What do you think this requires?  And I think that would probably have cover the vast majority of cases, right.  So go to your lawyer, ask what -- what -- what they think it means.

Q   Well, any lawyer, or does it need to be

somebody who's versed in Delaware M&A law?

A   I think you should go to your deal lawyer. Customarily, you would go to your deal lawyer and ask, what does this require?

Q   Okay.  So your view is that -- that, you know, the average individual would not necessarily have an understanding of this merger agreement?

A   Yeah.  I -- it -- it's hard to say what the average individual person understands it as, right. This -- it's not my expertise what the average person understands it as.

If -- if you're someone who is in a deal, you would customarily -- and -- and you're trying to understand what your obligations are, customarily you would go to your lawyer and say, what should I do?

Q   Okay.  So I -- I'm just -- like, if -- yeah. I -- by average individual, I mean somebody who is not a -- not an attorney, not skilled.

Are you saying that, like, the average juror, for example, could not pick up this agreement and understand its meaning and apply it to the facts of this case without hearing from an expert in M&A law?

MR. MOLUMPHY:  Objection; vague.

A    I mean, it -- it would depend, right.  Like there -- some parts of merger agreements, I think a layperson might be able to understand, right.  I think some parts, it would require kind of interaction with, say, a deal attorney to help understand what the agreement is doing.

Q    What about Section 6.4?

A    I think in Section 6.4 it would -- customarily you would consult with your attorney to understand what your obligations are -- what your rights and obligations are.  Yes.

Q    Okay.  But let's -- let's think about this from the perspective of the jurors who may ultimately try this case.

Do they need -- can -- can they look at this agreement and apply it to the fact -- sorry.  Can they look at Section 6.4 and apply it to the facts of this case, or -- or do they need your assistance or the assistance of an expert in M&A custom and practice?

A    I mean, I -- it's very hard for me to speculate about an average juror.

Q    All right.  Let's go to paragraph 100 of your report.

Actually, before we move on, so just going

19:53:44
19:53:47
19:53:51
19:53:55
19:53:59
19:54:04
19:54:05
19:54:09
19:54:16
19:54:18
19:54:22
19:54:24
19:54:30
19:54:33
19:54:35
19:54:38
19:54:40
19:54:44
19:54:46
19:54:48
19:54:49
19:54:52
19:55:00
19:55:07
19:55:12

back to that, you're saying it's possible that your average juror could understand Section 6.4 without hearing from an expert in custom and practice in M&A transactions, but it's possible they might not understand Section 6.4?

MR. MOLUMPHY:  Vague and ambiguous.

A    I wouldn't speculate one way or the other about the average juror.  That's just not something I --

Q    Okay.

A    -- is -- that is within my expertise or I've been asked to opine on.

Q    All right.  Okay.  So paragraph 100 of your report.  And I'm -- you write, "Mr. Musk sought to terminate or renegotiate his acquisition of Twitter. He publicly claimed that the deal was 'on hold' while he investigated the number of spam and fake accounts on Twitter.  No provision in the Merger Agreement stated that he could refuse to close if Twitter declined to produce information about spam and fake accounts and, customarily, merger agreements would not contain such a provision."

Do you see that?

A    Yes.

Q    I want to -- I'm very focused on the

sentence, "No provision in the Merger Agreement stated that he could refuse to close if Twitter declined to produce information about spam and fake accounts."

Do -- do you mean to be so specific here that literally no provision in the merger agreement stated, quote, "Musk can refuse to close if Twitter does not produce information about spam and fake accounts," or do you know -- sorry, go ahead.

A    If you want to complete the question, that might help me on --

Q    The -- I was just going to give you two alternatives and then maybe it's somewhere in the middle.  I don't know.

Or do you mean that neither Section 6.4, 6.11, or any other provision in the merger agreement entitled Musk to ask for this type of information and not to close if he didn't receive it?

A    I -- I --

MR. MOLUMPHY:  Vague.

THE WITNESS:  Go ahead.

A    I meant here to refer to -- there's a section of this -- of my report that says there's no specific provision here that says you're entitled to this type of information.  And typically, you

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

233

wouldn't, in a merger agreement, list the specific types of information that you're entitled to.  And then I say customarily, that's not how it's done.

Q   Right.  So -- so you say, "No provision in the Merger Agreement stated that he could refuse to close if Twitter declined to produce" the specific information he requested and, customarily, you wouldn't expect a provision like that, right?

A   Yes.

Q   Okay.  So you're not saying that -- you're not saying that if Musk didn't get the information he requested, he couldn't refuse to close.  You're just saying that there's no provision in the merger agreement that specifically referenced spam and fake accounts?

MR. MOLUMPHY:  Vague.

A   Yes, that's what I'm saying.

Q   Okay.  Okay.  "In addition, I am unaware of any public statement by Mr. Musk that he would go through with the merger even if Twitter did not provide him" -- I'm sorry.  I'm in the -- I just -- I'm in the same paragraph.  I think I moved on to the next sentence.  Is that right?  Yeah.

A   I believe so, yes.

Q   Yeah.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

234

"In addition, I am unaware of any public statement by Mr. Musk that he would go through with the merger even if Twitter did not provide him with the information he had demanded about fake/spam" and -- "accounts."

Do you see that?

A    Yeah.

Q    Why would he issue such a public statement if -- if -- if Twitter didn't provide the information that he requested?

MR. MOLUMPHY:  Objection; speculation.

A    Yeah.  I -- I don't know why.

Q    I guess I'm just asking like what's -- what's the point of your statement there?  How is it relevant to your opinions if -- I mean, are you just merely commenting that --

A    I mean, we --

Q    Go ahead.

A    I made this argument earlier in my report. We went through it.  You asked me to clarify what I was saying, which -- which I did.

So this is just -- it's a concluding paragraph where I'm just reiterating points that I had made earlier in the report.  It's -- it -- what I'm trying to say is, insofar as I discuss -- I'm

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

235

just trying to say the same thing that I said earlier in my report with respect to, I'm aware of no statement that he would go through with the merger even if they did not provide him with the information.

Q    Okay.  And then -- but then you conclude: "This pattern of claiming rights that were at odds with the Merger Agreement created confusion and uncertainty and continued through his attempts to terminate the" -- "that agreement."

You see that?

A    Yes.

Q    Well, is it your position that -- that Musk's -- I mean, we've been through this, but what -- what -- how did Musk claim rights that were at odds with the merger agreement?

A    The --

MR. MOLUMPHY:  Overbroad.

Go ahead.

A    I'd say that they -- he claimed rights that were at odds with the customary understanding of the merger agreement in the way that I -- I explained earlier in my report.

Q    Can you give me an example?  What -- what rights did he claim that were at odds with the

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

236

merger agreement?

A   The -- so the -- insofar as there were potential -- I'm trying to think -- give me a moment so I can see --

A   Sure.

Q   -- the precise things that I was referring to.

I mean, the -- I think our discussion around the "on hold" tweet would be an example of -- of that.

Q   I'm not sure what you mean.  How -- he tweeted that the deal -- deal was on hold pending -- pending details about bots and spam accounts.

How is that at odds with the merger agreement?

A   Well, it was -- again, there could have been information that he requested, nonpublic -- like, again, we -- we've discussed there's nonpublic information that is out there that he requested.  I have not seen evidence that that information would have customarily provided a basis for termination.

And so that's how I would explain that sentence.

Q   I'm not following you.  He doesn't mention

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                    237

termination in his -- in his May 13th tweet.
What -- what about his May -- when you say "the
pattern of claiming rights," are -- what are you
referring to specifically there?

Are you referring to the three statements
that -- at issue:  The May 13th, the May 16th, and
the May 17th statements?

MR. MOLUMPHY:  Compound; plus asked and
answered because he did answer your question before.

You may not like the answer, but he gave you
an answer.

A    Sorry, could you repeat the question?

Q    When you say, "this pattern of claiming
rights," which -- which -- which statements by Musk
or claims by Musk are you referring to?

Are you referring to his May 13th tweet, his
May 16th statement at the conference, and his
May 17th tweet?

A    I -- as I -- as I believe we discussed -- I
forget the exact way that we phrased this, right,
but there's the -- as the Court characterized it,
right, he is suggesting that he had rights to
information that weren't being provided and that he
was not going to close prior to that.

Q    I see.

Transcript of Adam Badawi, Ph.D.

Conducted on July 17, 2025

238

Okay.  So you're just using the Court's interpretation from the motion to dismiss decision?

A   I -- again, I would reference back to our -- the discussion we had about that tweet.

Q   But I -- is that what you're referring to in this sentence?  That's the question I'm asking.

I'm asking whether you are referring or his statements of May -- on May 13th, May 16th, and May 17th when you refer to the "pattern of claiming rights"?

A   The -- it was those and potentially others as well.

Q   Okay.  And they were at odds with the merger agreement, you're saying, because he wasn't entitled to terminate the agreement if he didn't get the information he requested?

A   At odds with the customary understanding of -- of what those would be.

Q   There's no reference to "customary understanding" in this -- in this paragraph, right?

A   I didn't -- there is in the next sentence, right.  Kind of -- again, "given the prevailing custom and practice in mergers and acquisitions," which is, in my view, kind of meant to help clarify the previous sentence.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

239

Q   And when you say there was no basis for Mr. Musk's assertion, are you referring solely to the concept of termination, or are you referring to the request for information themselves?

MR. MOLUMPHY:  Vague.

A   Sorry, can you repeat the two things that -- it would be the request for information, and what was the other one?

MR. MOLUMPHY:  Why don't you restate the question.

Q   What assertions are you referring to when you say there was no basis for Mr. Musk's assertions?

A   The -- the -- the communication -- again, the -- the communications I discuss in my report, right, the tweets and some of the other statements.

Q   Okay.  Well, we -- right.

One -- the May 13th tweet talks about him wanting information about fake accounts, right?

MR. MOLUMPHY:  Misstates the testimony.

MR. BROOME:  I'm not asking -- I didn't say anything about his testimony.  I'm -- we're talking about the May 13th tweet.

Q   Does it say something about -- does it -- the May 13th tweet refers to Musk's desire for

20:05:55
20:06:02
20:06:05
20:06:07
20:06:12
20:06:13
20:06:21
20:06:24
20:06:26
20:06:28
20:06:28
20:06:31
20:06:34
20:06:37
20:06:44
20:06:48
20:06:50
20:06:57
20:06:59
20:07:07
20:07:09
20:07:11
20:07:14
20:07:15
20:07:18

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

240

information about fake accounts, correct?

A    I mean, it -- it could be interpreted in different -- I'm not -- I'm not quite exactly sure what it meant with respect to his desire for information.

Q    Well, I mean, you've got an opinion here, an expert opinion, that says there's no basis for Mr. Musk's assertions.

Is it your opinion that there's -- there -- that all -- all of the assertion -- none of the assertions in the May 13th, May 16th, and May 17th statements had any basis, in your expert opinion?

A    Again, this is qualified by saying "given the custom and practice in mergers and acquisitions."

Q    Right.

A    Right.  So within the customary understanding of the rights in an agreement, right, I did not see a basis for those assertions.

Q    Right.  But before I asked you whether Musk was entitled to information.

And you said you're not an express -- information he requested, and you said you're not -- you're not opining on that?

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

241

A    I said I'm not offering a legal opinion with respect to --

Q    No.  I -- I asked if you had any opinion on whether he was entitled to that as a matter of custom and practice, and you said "no."

MR. MOLUMPHY:  Hopefully, the court reporter got his response because you interrupted him.

A    That's -- I -- so I believe I said I'm not offering a legal opinion with respect to his right to request information.

Q    Right, you did.

And then I -- then I followed up, and I said, Do you have any opinion as to whether -- well, I'll just ask it again because I think we've got -- we may need to go back and correct it.

But are you offering any opinion as to whether Mr. Musk was entitled to the information about spam and fake accounts that he had requested?

A    I -- I'm not offering a legal opinion --

Q    I know.

Are you offering any opinion?

A    I would carve out that it's just hard kind of within the custom and practice of how those rights are understood, right.

It is -- it is, I suppose -- a person in

20:08:41
20:08:45
20:08:45
20:08:48
20:08:48
20:08:52
20:08:53
20:09:00
20:09:02
20:09:05
20:09:06
20:09:07
20:09:10
20:09:12
20:09:14
20:09:17
20:09:19
20:09:22
20:09:31
20:09:36
20:09:38
20:10:01
20:10:04
20:10:07
20:10:08

Transcript of Adam Badawi, Ph.D.

Conducted on July 17, 2025

242

Mr. Musk's position, right, that makes that sort of request, the customary understanding of those -- there could be a situation where there would be no obligation to provide that information.

Q    But it's not your testimony that he wasn't entitled to that information, either as a legal matter or as a matter of -- of custom and practice, right?

A    I mean, I -- again, I -- I want to be careful about making any conclusion about Mr. Musk, right.

Kind of in the custom and practice of understanding those rights, there are situations where parties will not be entitled to that information.

Q    Wait.  So you want to be careful about -- and rendering any opinion about Mr. Musk, but the -- your concluding paragraph here says there's no basis for Mr. Musk's assertions?

MR. MOLUMPHY:  Okay.  Now you're just misstating his testimony.  Seems like we're just going in a circle here.

MR. BROOME:  Question stands.

MR. MOLUMPHY:  Well, vague and ambiguous.

A    Could you repeat the question, please?

20:10:15
20:10:21
20:10:25
20:10:30
20:10:35
20:10:38
20:10:40
20:10:45
20:10:45
20:10:52
20:10:54
20:10:55
20:10:56
20:10:58
20:11:01
20:11:01
20:11:03
20:11:05
20:11:09
20:11:11
20:11:13
20:11:18
20:11:21
20:11:24
20:11:27

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                     243

Q   You said, I want to be very careful about making any statements about Mr. Musk.

Let me -- let me just get the exact -- your exact testimony:  "I want to be very careful about making any conclusion about Mr. Musk."

But in your conclusion of your report, you say, "In my opinion, giving prevailing custom and practice in mergers and acquisitions, there was no basis for Mr. Musk's assertions," right?

A   That is what the sentence says.

Q   That's a conclusion about Mr. Musk and his rights under the merger agreement, right?

A   I don't read it that way.

Q   You're -- in that -- in this paragraph here, you're not opining on Mr. Musk's rights under the merger agreement?

A   I'm saying -- again, it's qualified by "given custom and practice in merger" -- "in mergers and acquisitions," right.

So I'm saying this is rooted in custom and practice.  It's not a statement about legal rights.

Q   Why does that matter?  It is a statement about legal rights.

You say right here that Mr. Musk's right -- he was claiming rights that were at odds

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

244

with the merger agreement.

A    And as I said, that's -- I understand that as the customary understanding of the merger agreement.

Q    That doesn't matter, though, right?

You're still concluding that the rights that Musk claimed were at odds with this merger agreement at issue in this case.

Is that not your conclusion?

And then you say --

A    I --

Q    Sorry, go ahead.

MR. MOLUMPHY:  Wait.  Wait.

Can he answer that one?

A    Right.

I'm not -- I do not say, In my opinion, given the prevailing custom and practice in merger and acquisitions, there was no legal basis for Mr. Musk's assertions.

I'm not -- the word "legal" is not there.

Q    I didn't use the word "legal."

MR. MOLUMPHY:  Do you want to just read the sentence that you used so there's no confusion about what your opinion is?

A    "In my opinions, given the prevailing custom

and practice in mergers and acquisitions, there was no basis for Mr. Musk's assertions."

Q   Do you have any opinion as to whether Mr. Musk was entitled to the information that he claimed under the merger agreement?

MR. MOLUMPHY:  Asked and answered.

Q   Whether it's a legal opinion or any other kind of opinion?

A   So I -- this is the beginning of my answer: I have no legal opinion.

With respect to custom and practice, right, the customary understanding of that seller-friendly provision, right, there -- again, this would be dependent on lots of facts that depend on the -- the nature of the request, conversations that Twitter would have had about that.

But I -- there is -- it is possible that a person in Mr. Musk's position could have -- under the customary understanding of that agreement, would have not been entitled to the information.

Q   Okay.  It's possible.

But that's not what you said in your report, right?

In your report, you said that he claimed rights that were at odds with the merger agreement.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

246

You didn't say he claimed rights that were possibly at odds with the merger agreement, depending on all these other variables.

A    Right.  It --

Q    Do you want to correct -- I guess, let me state it this way:  Do you want to correct your report?

MR. MOLUMPHY:  First, I object to the extent you're suggesting that there's a discrepancy between his testimony and the report.

And I also think it's unfair that you're asking him to go through a 50-page report and asking to correct something.

So that's unfair; improper; and also mischaracterizes his prior testimony.

A    No.

Q    "No," you don't want to correct your report?

A    I do not.

Q    Your -- your testimony is that Mr. Musk claimed rights that were at odds with the merger agreement?

A    I -- I've explained what I meant by that, right.  So my testimony explaining that report explains the -- what I'm intending to convey there.

Q    So your testimony is that Mr. Musk claimed

20:15:39
20:15:42
20:15:45
20:15:50
20:15:51
20:15:53
20:15:55
20:15:57
20:15:59
20:16:03
20:16:06
20:16:08
20:16:12
20:16:13
20:16:18
20:16:21
20:16:23
20:16:26
20:16:27
20:16:30
20:16:33
20:16:33
20:16:37
20:16:41
20:16:45

rights that were at odds with the merger agreement as interpreted by custom and practice?

A   Again, I would under -- explain it in the way that I just did, right.  Kind of there is -- there's the customary understanding of that merger agreement, right.

Given some of the understandings of that -- of what transpired that we discussed today, there's a possibility that someone in Mr. Musk's position would have not been entitled to that information.

But, again, it depends.

Q   But -- so why -- but why do you say -- why do you say that he claimed rights -- I mean, you say definitively, right, that he did, in fact, claim rights that were at odds with the merger agreement.

Why didn't you -- why didn't you caveat it with what you just said now, which is that it was possible that his claims were at odds with the merger agreement as understood by custom and practice, etcetera?

MR. MOLUMPHY:  Objection.  You're asking why he didn't do something in his last response?  Because you've asked him that question five times now.  You're not asking --

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

248

MR. BROOME:  I'm not getting a clear answer.
I'll keep asking it until I get a clear answer.

MR. MOLUMPHY:  Okay.  Well, I'm instructing
you not to answer.  You've already asked -- answered
that question.

This is ridiculous.  It's harassment at this
point.

MR. BROOME:  I'm sorry, did you say you're
instructing him not to answer?

MR. MOLUMPHY:  I'm instructing him not to
answer.  That's harassing.  You're harassing him at
this point.  He's given you an answer five times to
that question.

MR. BROOME:  It -- he said that --

MR. MOLUMPHY:  I'll let you answer --

MR. BROOME:  He's changing his testimony.
There's daylight between -- there's significant
daylight between the testimony he just gave and the
sentence in this report that I am asking him about,
and I'm trying to figure out how they can be
reconciled.

And you're telling him -- you're telling me
that you're not going to -- you're not going to let
me ask him how -- how those two very different
statements can be recon- -- reconciled.

20:17:54
20:17:56
20:18:00
20:18:01
20:18:04
20:18:04
20:18:07
20:18:07
20:18:09
20:18:11
20:18:12
20:18:14
20:18:15
20:18:15
20:18:15
20:18:16
20:18:17
20:18:19
20:18:22
20:18:25
20:18:28
20:18:29
20:18:30
20:18:31
20:18:35

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

249

MR. MOLUMPHY:  First of all, it's not daylight.

Second, you haven't established that there's any difference.

Third, he already answered your question, is he going to change anything in his report.

MR. BROOME:  That's fine if you want to instruct him not to answer.

Q   Are you going to follow your -- the -- your lawyer --

MR. MOLUMPHY:  I'll give you -- I'll give you one more chance to ask the question.

MR. BROOME:  I mean, I'm fine taking it up with Judge Breyer or Judge Ryu, whatever you want. Up to you, Mark.

MR. MOLUMPHY:  I just said I'll give you one more chance to ask a proper question that hasn't already been asked.

Q   Okay.  Professor Badawi, you said -- I'm asking you -- I am asking you about this sentence in your report that says, "This pattern of claiming rights that were at odds with the Merger Agreement created confusion and uncertainty," etcetera.

I asked you if your opinion is that Musk claimed rights that were at odds with the customary

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

250

understanding of this merger agreement.  And you said --

MR. MOLUMPHY:  Why don't you just ask him that question.

MR. BROOME:  I did, and he gave me this question about, well, it's possible that -- he gave me this answer that it was possible that somebody in Musk's position would not be entitled to the information, which is very different from saying that he asked -- he claimed rights that were at odds with the merger agreement.

MR. MOLUMPHY:  Okay.

Q    I mean, am I -- does that -- do you see those as the same, Professor Badawi?  It's possible that he wouldn't be entitled to the information; you think that's the same thing as saying that he - he claimed rights that were at odds with the -- the merger agreement?

A    As I stated before, I view that sentence as qualified by the language in the next sentence that says "given prevailing custom and practice in mergers and acquisitions."

Q    Where do you say that it was possible, as opposed to definitively there was no basis for Mr. Musk's assertions?

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

251

A    Again, that's within the custom and practice in -- in mergers and acquisitions.

Q    What custom and practice -- what -- what custom and practice are you referring to that explains that -- that difference there?

A    It would be the customary understanding of the language, right, and the understanding of someone -- of the -- what someone in Mr. Musk's position may have been intending.

Q    You understand there's a difference between "it's possible that" and "it is, in fact, that" -- "it is a fact that," right?

A    I -- I'm not asserting the facts about anything.

Q    Okay.  So in -- in that -- in those last two sentences there, you're not asserting any -- any facts?  That's your testimony?

MR. MOLUMPHY:  Vague.

A    I'm -- I'm explaining my opinion.

Q    So it's not a fact that Musk claimed right -- rights that were at odds with the customary understanding of the merger agreement, right?

MR. MOLUMPHY:  Misstates testimony.

A    Right.  I -- I was asked to give opinions, and I say "in my opinion."

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                              252

Q    Is it your opinion that he claimed rights

that were at odds with the merger agreement, the

customary understanding of it?

        MR. MOLUMPHY:  Asked and answered.

    A    Again, I would --

    Q    Let me rephrase the question because --

I'll -- I'll do it this way.

        Is it your opinion that he claimed rights

that were, in fact, at odds with the customary

understanding of the merger agreement, or is it --

or is it your opinion that he claimed rights that

possibly were at odds with the customary

understanding of the merger agreement?

    A    I think there is a -- you know, it's not for

me to decide facts here, but there's a reading of

the facts where there would be no basis.

        MR. BROOME:  Okay.  I think we're -- we're

done, subject to any redirect.

        MR. MOLUMPHY:  Okay.  Let me -- can I

just -- we go off for two minutes, let me go through

my notes?

        MR. BROOME:  Of course.

        THE VIDEOGRAPHER:  We're going off the

record at 8:24.

            (Whereupon a break was had.)

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

253

THE VIDEOGRAPHER: We're back on the record at 8:31.

EXAMINATION

BY MR. MOLUMPHY:

Q  Professor -- Professor Badawi, good afternoon. I just had a few follow-up questions.

In your report, you have an Exhibit B which lists documents that you considered, which includes a number of deposition transcripts. You were asked about Mr. Korman's deposition transcript, which is not listed under transcripts, but there is a reference under "Miscellaneous" to Musk-Pampena-0241260, and that is the first page of Mr. Korman's deposition transcript.

Does that refresh your memory that you did, in fact, review Mr. Korman's deposition transcript?

A  Yes, it does.

Q  And did you review the entirety or just that first page?

A  I reviewed the entirety.

Q  The list also includes Mr. Musk's deposition, but I believe it only refers to the transcript on July 12th. He was actually deposed for two days in -- which I believe were on May 7, according to the transcript, and then again on

254

May 19th.  So the July 12th is from 2022.

In this case, he was deposed on May 7th, 2025, and May 19th, 2025.

Did you review both days of Mr. Musk's transcript?

A   I did.

Q   Okay.  And did you include references to both days in your report?

A   I believe so, yes.

Q   Okay.  In the event that the second day of Mr. Musk's deposition transcript is not included in the list of documents that you considered, is that a mistake?

A   Yes.

Q   Just a couple follow-up questions on Mr. Broome's questions.

You were asked about how an average juror would understand the merger agreement or 6.4 and whether that required a merger and acquisition expert.

Do you have -- are you rendering any opinion in this case about how an average juror could understand Section 6.4 and whether or not an average juror would need a merger and acquisition expert to help understand it?

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

255

A   No.

Q   Did you answer that question about average jurors to the best of your ability?

A   Yes.

Q   Have you had a chance to consider that question before today?

A   No.

Q   And then, finally, Mr. Broome spent the end of the hour talking about the last couple sentences of your report and the sentence reading, "This pattern of claiming rights that were at odds with the Merger Agreement created confusion and uncertainty and continued through his attempts to terminate that agreement."

And I believe the first time he asked you that question, and he asked for examples, he referred to the May 13th tweet.

Do you remember that?

A   I do.

Q   And why was the May 13th tweet cited?

A   Because I think it's -- it's consistent with the pattern claiming rights that were at odds with the merger agreement.

Q   And why was that?

A   Because it suggested a -- a -- rights to

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

256

information, right, that ultimately -- at least I've seen no evidence that it had a factual basis.

Q   All right.  Did you see anything in your analysis of the merger agreement that permitted Mr. Musk to put the deal on hold if he did not receive that information?

A   I did not.

MR. MOLUMPHY:  All right.  I have no further questions.

FURTHER EXAMINATION

BY MR. BROOME:

Q   Professor Badawi, I want to follow up on the question that Mr. Molumphy just asked you about the May 13th tweet.

A   Yes.

Q   And I asked you earlier -- I'm reading from the transcript, "Do you have an opinion on whether he was entitled to the information described in his May" -- "May 13th tweet under the terms of the merger agreement?"

You said, "No, insofar as that's a legal conclusion, I do not have an opinion."

I said, "Do you believe it is a legal conclusion?"

You gave a response.

I then said, "Okay.  So you don't have an opinion -- you don't have an opinion on that topic, then; is that fair?"

You then said, "I don't have a legal opinion on that topic, yes."

I said, "Do you have a nonlegal opinion on the topic?"

And you said, "I don't have an opinion on the topic."

Do you want to change your testimony?

A    I -- with respect to -- I think the May 13th tweet is consistent with the pattern of claiming rights that were at odds with the merger agreement.

Q    Was the -- in -- I can't believe we're going back to this.

But is it your opinion that Mr. Musk was not entitled to the information that he described in the May 13th tweet?

Are you offering an opinion on that topic?

A    I -- I'm not offering a legal conclusion on that topic, but, yes, I am.

Q    Okay.  So earlier, when I asked you if you were offering a nonlegal opinion on the topic or any opinion on the topic and you said, "I don't have an opinion on the topic," why did you say that?

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

258

MR. MOLUMPHY:  Vague and ambiguous; misstates testimony.

A    I think because, I mean, we dug into it much more deeply, right.

I -- my recollection is that that was not in conjunction with the -- the conclusion, right.

And so as I thought about that after you asked me repeatedly about what the specific meaning of those last couple sentences was, I think I do have a nonlegal opinion.

Q    Well, you and I spent about ten minutes going over your conclusion and how -- and I suggested it was inconsistent with your earlier testimony.

And Mr. Molumphy was sitting there, saying, objection, asked and answered; there's no inconsistency.

And then you took a break with Mr. Molumphy. And you came back, and Mr. Molumphy asked you essentially the same question.  And now -- and now you've given a different answer.

Did Mr. Molumphy tell you to change your answer?

A    No.

Q    Well, how come you're giving a different

Transcript of Adam Badawi, Ph.D.

Conducted on July 17, 2025                                      259

answer in response to the question than when I asked     20:38:38

it?     20:38:42

MR. MOLUMPHY:  Objection, misstates     20:38:42

testimony.     20:38:44

A   It was late in the day.  There was a lot     20:38:44

of -- like, we sliced and diced that in multiple     20:38:47

ways.     20:38:49

I initially discussed the May 13th tweet.  I     20:38:49

don't recall what -- so that whole colloquy that we     20:38:52

went through was, I don't know, 25 or 30 minutes.     20:38:55

I mentioned the May 13th tweet.  And I     20:38:57

believe -- I believe I eventually came to the point     20:39:03

where there was -- saying that -- that there is a     20:39:05

possibility -- or sorry, that -- that that was     20:39:09

relevant to that sentence, right.     20:39:13

Q   Is there a --     20:39:16

A   And then we dropped May 13th.     20:39:16

Q   Is it your opinion that the information Musk     20:39:18

requested in his May 13th tweet was information that     20:39:21

he was not entitled to under the merger agreement?     20:39:28

MR. MOLUMPHY:  Objection to the extent it     20:39:34

misstates facts.     20:39:35

A   Sorry.  I just want to be very precise.     20:39:38

Could you just repeat the question?     20:39:41

Q   Is it your opinion in this case, your expert     20:39:42

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

260

opinion, that Mr. Musk was not entitled to the information that he described in his May 13th tweet?

A   I -- I think there's -- yes.  I think there's a -- the -- the way I read it is that, at least -- yes.  The way I read it, that's correct.

Q   The way you read what?

A   The tweet.

Q   The way you read the tweet, he -- you're saying --

A   In conjunction --

MR. MOLUMPHY:  Go ahead, finish.

A   In conjunction with the customary understanding of the language in the merger agreement.

Q   And that's not based on a plain reading of the merger agreement.

That's based on your customary -- your understanding of how that agreement would be customarily understood my M&A practitioners?

MR. MOLUMPHY:  Vague.

A   Yes, how it would be customarily understood in the custom and practice of M&A.

Q   I thought you said that in order to understand whether Mr. Musk had a right to the information, you'd need to know more facts.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025

261

Like, you'd need to know exactly what the information requests were, what Twitter's responses were, etcetera; is that true?

A   You might need to know those things to understand his rights.

Q   Well, do you need to know them in order to know whether his -- his -- the information he requested was at odds with the merger agreement?

A   I -- I haven't seen evidence in the record that would suggest that the request -- that he was entitled to those requests under the customary understanding of language.

Q   Do you have all the information you need to render the opinion that he -- that his information requests were at odds with the merger agreement, or would you need to see more information?

A   I -- I have access to the information in the record.

There may be -- there may have been conversations that didn't make it into the record. I don't know.

But based on what I've seen.

Q   Okay.  So based on the materials that are -- based on what you've seen, all of the materials that you considered in your opinions are

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                    262

listed in your Exhibit B but for the few straggler

items that Mr. Molumphy just covered in the

redirect, correct?

   A  Correct.

   Q  Okay.  So you have all the information.

     Was Musk entitled to the information that he

described in his May 13th tweet or not?

   A  I --

   Q  Do you not know?

   A  I -- I don't -- I have not seen evidence

that he was -- that would lead me to conclude that

he's entitled to the information.

   Q  Have you seen evidence that would lead you

to conclude that he was not entitled to it?

   A  I mean, it -- it's hard to prove a negative,

right.

     What would be the -- the way I would

understand it is, has he asserted -- is there

evidence that he has asserted a right that he's

entitled to the information?  I have not seen

evidence that he asserted a right that he's entitled

to that information as it's customarily

understood -- as that language is customarily

understood.

   Q  He -- he made a request for information

20:42:21
20:42:26
20:42:28
20:42:28
20:42:28
20:42:33
20:42:35
20:42:40
20:42:42
20:42:43
20:42:49
20:42:53
20:42:54
20:42:56
20:42:59
20:42:59
20:43:12
20:43:14
20:43:17
20:43:19
20:43:21
20:43:24
20:43:26
20:43:28
20:43:28

under rule Section 6.4.  Sorry.

He made a request for information under Section 6.4, information concerning bots and fake accounts.

Have you seen any information or evidence in this case indicating that he was not entitled to that information under Section 6.4?

A    The customary understanding, at least my customary understanding, of the information rights was that Twitter had expansive abilities to refuse -- to provide that information, right, and --

Q    Did they exercise those expansive abilities to refuse to provide information in May or June 2022?

A    I -- I don't think it matters if they did or didn't.

They had the right to refuse.

Q    Right.

A    And I haven't seen evidence that -- that there was not a basis to refuse.

Q    But they didn't refuse, did they, not in May or June?

MR. MOLUMPHY:  Misstates testimony.

MR. BROOME:  I'm not talking about his testimony.

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                    264

Q   They didn't refuse --

MR. MOLUMPHY:   I'm talking about all the testimony in this case.

Lacks facts; lacks foundation; improper hypothetical.

Q   They didn't refuse to provide the information in May or June, did they?

A   I -- I don't recall one way or the other from the record.

Q   As of May 13th -- as of May 2022, did Twitter exercise its rights to decline to provide information that Musk requested?

A   I -- I don't recall if they exercised those rights or not.

Q   I want to come back to my question because you didn't answer it.

For -- have you seen any evidence that would lead you to the conclusion that Mr. Musk was not entitled to the information that he described in his May 13th tweet?

A   Sorry.  It's late in the day, and it's a double negative.

So have I -- can you just repeat it?  I'm sorry to make you do that.  But I --

Q   Have you seen any evidence that would lead

Transcript of Adam Badawi, Ph.D.

Conducted on July 17, 2025

265

you to the conclusion that -- that Mr. Musk was not

entitled to information described in his May 13th

tweet?

A   I mean, I haven't seen evidence that he was

entitled to the information.

Q   Have you seen evidence that he was not

entitled to it?

MR. MOLUMPHY:  Beyond the scope.

A   I mean, I -- I don't -- I -- I can't recall

seeing specific evidence that he was not entitled to

it.

Q   Are you aware of any evidence that Twitter

informed Musk that it was exercising its rights to

decline under the -- sorry, withdrawn.  I'll say

this again.

Are you aware of any evidence that Twitter

informed Musk that it was exercising its rights to

decline to provide information that Musk requested

in May or June of 2022?

A   Sorry.  I lost the thread.  I'm really sorry

to make you repeat.  But I lost --

Q   Okay.

A   -- the initial part of question.

Q   Are you aware of any evidence that Twitter

informed Musk that it was exercising its rights to

decline to provide information to Musk that Musk requested in May or June of 2022?

A   And you're saying -- decline -- was exercising its rights under the agreement to decline?

Q   Correct.

A   I'm not aware of evidence one way or the other.

MR. BROOME:  No further questions, unless Mr. Molumphy has further questions.

FURTHER EXAMINATION

BY MR. MOLUMPHY:

Q   Have you seen any evidence indicating that Mr. Musk had the right to put the deal on hold in May of 2022 pending his receipt of that information?

A   No.

MR. MOLUMPHY:  No questions.

FURTHER EXAMINATION

BY MR. BROOME:

Q   Professor Badawi, what does "on hold" mean, in your understanding?

MR. MOLUMPHY:  Asked and answered.

A   I -- I -- I don't know what "on hold" means, right -- well, let me back up.  Right.

The -- the way I understood that -- what --

Transcript of Adam Badawi, Ph.D.
Conducted on July 17, 2025                267

what I understood that to mean was I'm                    20:48:23

requesting -- I've requested information, I'm not         20:48:28

getting a satisfactory response, and I'm not closing      20:48:31

until I do.                                               20:48:35

        MR. BROOME:  Okay.  No further questions.         20:48:37

        THE VIDEOGRAPHER:  This marks the end of          20:48:44

the --                                                    20:48:46

        MR. MOLUMPHY:  No questions.                      20:48:46

        THE VIDEOGRAPHER:  Pardon?                        20:48:47

        MR. MOLUMPHY:  No questions.                      20:48:47

        THE VIDEOGRAPHER:  This marks the end of the      20:48:47

deposition of Professor Adam Badawi.                      20:48:48

        We're going off the record.  The time is          20:48:50

8:48 p.m. Eastern time.                                   20:48:51

    (Whereupon the proceedings were concluded at

                8:48 p.m. EDT)

CERTIFICATE OF REPORTER


I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of California, being empowered to administer oaths and affirmations remotely pursuant to Section 2093(b) of the Code of Civil Procedure, do hereby certify:


That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.


I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.


Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review

of the transcript was not requested.


          IN WITNESS WHEREOF, I have this date

subscribed my name.

DATED: 17th of July, 2025



_____

   Karisa Ekenseair, CSR No. 14546