# EXHIBIT 1

# EXHIBIT 1

# THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  | Case No. 22-cv-05937-CRB |
|---|---|
| **GIUSEPPE PAMPENA, individually and on behalf of all others similarly situated,**<br><br>        Plaintiff,<br><br>vs.<br><br>**ELON MUSK,**<br><br>        Defendant. | |

## EXPERT REBUTTAL REPORT OF KENNETH M. LEHN

### July 2, 2025

**Table of Contents**

I.      Qualifications ................................................................................................. 3

II.     Introduction and Summary of Conclusions ..................................................... 4

        A.      Background ..................................................................................... 4

        B.      Plaintiffs' Allegations .................................................................... 6

        C.      Court Order .................................................................................... 8

        D.      Tabak Report .................................................................................. 9

        E.      Badawi Report .............................................................................. 13

        F.      Assignment and Summary of Conclusions .................................... 13

III.    Dr. Tabak's Damages Methodology Is Fundamentally Flawed, Unscientific, and
        Unreliable ...................................................................................................... 18

        A.      Dr. Tabak Fails to Disaggregate the Effect of the Alleged
                Misrepresentation from the Effect of Information That Plaintiffs Allege
                Is True ......................................................................................... 18

                i.      *Analysts Did Not Infer that Mr. Musk Has a Right to Information
                        on Bots Under the Merger Agreement* ................................... 19

                ii.     *Analysts Did Not Infer that Mr. Musk Instructed His Team to
                        Stop Work on the Deal* ........................................................ 20

                iii.    *Analysts Inferred That Mr. Musk Was Getting Apprehensive
                        About the Deal* ..................................................................... 21

                iv.     *Disclosures Related to Mr. Musk's Rights to Bot/Spam
                        Information Did Not Elicit a Stock Price Reaction While
                        Information Related to Deal Termination Did* ......................... 23

                v.      *Disclosures Related to the Progress of the Merger Did Not Elicit
                        a Stock Price Reaction While Information Related to Deal
                        Termination Did* ................................................................... 25

                vi.     *Summary* ............................................................................. 27

        B.      Dr. Tabak's Merger Discount Damages Methodology Has No Scientific
                Basis and Is Fundamentally Flawed and Unreliable .......................... 28

                i.      *Dr. Tabak's Calculation That 45.7% of the Merger Discount
                        Attributable to the Alleged Misrepresentation Is Unscientific and
                        Unreliable* ........................................................................... 28

                ii.     *Dr. Tabak's Assumption That a Constant Percent of the Merger
                        Discount Is Attributable to the Alleged Misrepresentation Is
                        Flawed and Unreliable* ......................................................... 29

|  |  | a) | Dr. Tabak Fails to Disaggregate the Effect of Market and Industry Effects on the Merger Discount | 29 |

|  |  | b) | Analyst Commentary Shows That the Merger Discount Changed During the Class Period for Reasons Other Than the Alleged Misrepresentation | 31 |

|  |  | c) | July 8, 2022 | 35 |

|  | C. |  | Dr. Tabak's Assumption That Mr. Musk's October 4, 2022 Announcement Corrected the Alleged Misrepresentation Is Flawed and Unreliable | 40 |

|  | D. |  | Dr. Tabak's Use of a Two-Day Event Window to Estimate the Effect of Mr. Musk's May 13 Tweet on Twitter's Stock Price Is Unscientific and Unreliable | 42 |

|  | E. |  | Dr. Tabak's Analysis of the Alleged Deflation and Inflation in the Respective Prices of Twitter's Call and Put Options Is Flawed and Unreliable | 43 |

| IV. |  |  | Professor Badawi Does Not Establish That Investors Were Not Able to Determine the Potential for Merger Termination | 45 |

I.    **QUALIFICATIONS**

1.    I am Professor Emeritus of Finance at the University of Pittsburgh and Senior Consultant at Compass Lexecon. I held the Samuel A. McCullough Chair in Finance at the University of Pittsburgh from 1999-2020. In addition to the University of Pittsburgh, I have held faculty positions at Washington University, UCLA, and Georgetown University. During my academic career, I taught undergraduate and graduate level courses in finance, including courses on mergers and acquisitions ("M&A"), business valuation, and corporate governance. I have published more than 50 scholarly papers, primarily in the field of corporate finance. I have served on the editorial boards of several scholarly journals and am a founding editor of the *Journal of Corporate Finance*.

2.    I was Deputy Chief Economist (1984-1985) and Chief Economist (1987-1991) of the Securities and Exchange Commission ("SEC"). During my tenure at the SEC, I worked extensively on issues related to M&A, including analyses of how the stock prices of companies react to the release of information about M&A and various takeover tactics. Since leaving the SEC, I have been retained as an expert witness more than 100 times to opine on various topics, including materiality, loss causation, and damages, often in matters involving M&A.

3.    I received a B.A. in economics from Waynesburg College in 1975, an M.A. in economics from Miami University in 1976, and a Ph.D. in economics from Washington University in 1981. My curriculum vitae, which lists my publications and testimony, is attached hereto as **Appendix A**.

4.    I have been assisted by Compass Lexecon's professional staff. I am being compensated at a rate of $1,500 per hour. I also expect to receive compensation from Compass Lexecon for my work in this matter. My compensation is not contingent on the opinions that I offer or the outcome of this case.

5.    **Appendix B** lists materials that I have relied upon in forming my opinions in this matter.

## II.    INTRODUCTION AND SUMMARY OF CONCLUSIONS

### A.  Background

6.      As of December 31, 2021, Twitter, Inc. ("Twitter," "TWTR," or the "Company") was "a global platform for public self-expression and conversation in real time."[1] As of the same date, Elon Musk ("Mr. Musk") was Chief Executive Officer ("CEO") of Space Exploration Technologies Corp. ("SpaceX") and Tesla, Inc. ("Tesla" or "TSLA").[2]

7.      On April 25, 2022, Twitter announced that it had entered into a merger agreement (the "Merger Agreement") with X Holdings I, Inc. and X Holdings II, Inc., two entities owned by Mr. Musk.[3] Pursuant to the terms of the Merger Agreement, each issued and outstanding Twitter common share would be canceled and converted into the right to receive $54.20 in cash without interest.[4] The total value of the merger consideration was approximately $44 billion.[5]

8.      As of the date of the Merger Agreement, Mr. Musk expected to finance the transaction with (i) $21 billion of equity financing and (ii) $25.5 billion of debt financing, consisting of a $6.5 billion senior secured term loan facility, a $500 million senior secured revolving loan facility, a $3 billion senior secured bridge loan facility, a $3 billion senior unsecured bridge loan facility, and a commitment letter from financial institutions whereby they would provide Mr. Musk with $12.5 billion in margin loans.[6] The mix of equity and debt financing subsequently changed. On May 5, 2022, Twitter announced that Mr. Musk received additional equity investment commitments, which allowed him to reduce the margin loans from $12.5 billion to $6.25 billion.[7] On May 25, 2022, Twitter further announced that Mr. Musk allowed the margin loan commitments to expire and increased the pledged equity financing from $27.25 billion to $33.5 billion.[8]

---

[1]    Twitter, Inc., Form 10-K, for the fiscal year ended December 31, 2021, at 6.
[2]    Tesla, Inc., Form 10-K, for the fiscal year ended December 31, 2021, at 20.
[3]    "Elon Musk to Acquire Twitter," *PR Newswire*, April 25, 2022 at 2:50 p.m. ET; Twitter, Inc., Form 8-K, April 25, 2022 at 4:44 p.m. ET.
[4]    Twitter, Inc., Form 8-K, April 25, 2022 at 4:44 p.m. ET.
[5]    "Elon Musk to Acquire Twitter," *PR Newswire*, April 25, 2022 at 2:50 p.m. ET.
[6]    Twitter, Inc., Amendment No. 4 to Schedule 13D, including Exhibits F-J, April 25, 2022.
[7]    Twitter, Inc., Amendment No. 6 to Schedule 13D, May 5, 2022 at 6:10 a.m. ET.
[8]    Twitter, Inc., Amendment No. 7 to Schedule 13D, May 25, 2022 at 4:28 p.m. ET.

9.      On May 13, 2022, at 5:44 a.m. ET, Mr. Musk tweeted that the transaction was "temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users."[9] ("May 13 Tweet"). Shortly thereafter, at 7:50 a.m. ET, before market open, Mr. Musk tweeted that he was "[s]till committed to [the] acquisition."[10] At 9:47 p.m. ET, Mr. Musk tweeted that his team will "do a random sample of 100 followers … and see what [we] discover…"[11] In response to a question about the size of the sample, at 10:39 p.m. ET, Mr. Musk replied that he "picked 100 as the sample size number, because that is what Twitter use[d] to calculate <5% fake/spam/duplicate."[12] Twitter's stock price closed at $40.72 on this day, representing a 9.7% decline from the prior day close of $45.08.[13]

10.      In the afternoon of May 16, 2022, at a technology conference, Mr. Musk stated that he estimated that "fake users make up at least 20% of all Twitter accounts."[14] On the same day, Mr. Musk also tweeted that the number of fake accounts was "fundamental to the financial health of Twitter."[15] Twitter's closing stock price declined by 8.2% on this day, from $40.72 on the prior day to $37.39 on May 16, 2022.[16]

11.      On May 17, 2022, Mr. Musk tweeted that "20% fake/spam accounts, while 4 times what Twitter claims, could be *much* higher. My offer was based on Twitter's SEC filings being accurate. Yesterday, Twitter's CEO publicly refused to show proof of <5%. This deal cannot move forward until he does."[17] Twitter's closing stock price increased by 2.5% on this day, from $37.39 on the prior day to $38.32 on May 17, 2022.[18]

---

[9]     Elon Musk Twitter feed, May 13, 2022 at 5:44 a.m. ET, available at https://x.com/elonmusk/status/1525049369552048129.

[10]    Elon Musk Twitter feed, May 13, 2022 at 7:50 a.m. ET, available at https://x.com/elonmusk/status/1525080945274998785.

[11]    Elon Musk Twitter feed, May 13, 2022 at 9:47 p.m. ET, available at https://x.com/elonmusk/status/1525291586669531137.

[12]    Elon Musk Twitter feed, May 13, 2022 at 10:39 p.m. ET, available at https://x.com/elonmusk/status/1525304736538312707.

[13]    Bloomberg, L.P.

[14]    *See, e.g.,* "15:24 EDT Musk says lower pricedTwitterdeal 'not out of question,' Bloomberg...," *Theflyonthewall.com*, May 16, 2022 at 3:24 p.m. ET.

[15]    Elon Musk Twitter feed, May 16, 2022 at 1:17 p.m. ET, available at https://x.com/elonmusk/status/1526250477456965634?lang=en.

[16]    Bloomberg, L.P.

[17]    Elon Musk Twitter feed, May 17, 2022 at 3:32 a.m. ET, available at https://x.com/elonmusk/status/1526465624326782976.

[18]    Bloomberg, L.P.

12.      On July 8, 2022, after market close, Mr. Musk issued a statement that he was exercising his right to terminate the Merger Agreement "because Twitter is in material breach of multiple provisions of that Agreement."[19] (the "July 8 Termination Letter"). Twitter's closing stock price declined by 11.3% after the release of this information, from $36.81 on July 8, 2022 to $32.65 on July 11, 2022 (*i.e.*, the first trading day following the release of the information).[20]

13.      On October 4, 2022, Twitter filed an amended Schedule 13D which disclosed that Mr. Musk had notified the Company that he intended to proceed to "closing … the transaction contemplated by the April 25, 2022 Merger Agreement,"[21] at the initial price of $54.20 in cash per share. Twitter's closing stock price increased by 22.2% upon the release of this information, from $42.54 on the prior day to $52.00 on October 4, 2022.[22]

### B.  Plaintiffs' Allegations

14.      On October 10, 2022, Giuseppe Pampena filed this lawsuit.[23] On April 24, 2023, the Court appointed Brian Belgrave, Steve Garrett, John Garrett, and Nancy Price as lead plaintiffs ("Plaintiffs").[24] On June 8, 2023, Plaintiffs filed the First Amended Complaint on behalf of all persons and entities (the "Class") who (i) sold Twitter stock or Twitter call options or (ii) purchased Twitter put options during the period of May 13, 2022 through October 4,

---

[19]  Twitter, Inc., Amendment No. 9 to Schedule 13D, Exhibit P, July 8, 2022 at 5:14 p.m. ET. *See also, e.g.,* "Musk Scraps Twitter Bid; Nasdaq Leads Week of Market Gains," *WSJ Podcasts*, July 8, 2022 at 5:12 p.m. ET.

[20]  Bloomberg, L.P.

[21]  Twitter Inc., Amendment No. 12 to Schedule 13D, October 4, 2022 at 3:06 p.m. ET. *See also, e.g.*, "Twitter stock surges on report Elon Musk proposes buying the company again at full price," *CNN*, October 4, 2022 at 12:18 p.m. ET.

[22]  Bloomberg, L.P.

[23]  Complaint, *Pampena, et al. v. Musk,* United States District Court, Northern District of California, San Francisco Division, C.A. No. 22-cv-05937-TLT, filed on October 10, 2022.

[24]  Order Appointing Lead Plaintiff and Lead Counsel, *Pampena, et al. v. Musk,* United States District Court, Northern District of California, San Francisco Division, C.A. No. 22-cv-05937-CRB, filed on April 24, 2023.

2022 (the "Class Period").[25] Plaintiffs claim that the Class suffered economic losses because of the alleged misrepresentations made by Mr. Musk.[26]

15.    Plaintiffs allege that Mr. Musk's tweet on May 13, 2022 stating that the transaction was "temporarily on hold" was false "because (1) the Merger was not on hold: contrary to the suggestion in Musk's tweet, Twitter had not agreed to any deferral of the Buyout; and (2) nothing in the merger agreement allowed Musk to put the Buyout on hold, particularly since he had already agreed to buy Twitter without conducting due diligence and agreed to a 'seller friendly' merger agreement that did not make any due diligence a condition of the Merger."[27]

16.    Plaintiffs further allege that Mr. Musk "continued to disparage Twitter and made false statements that caused the price of Twitter stock to tank."[28] According to the Complaint, Mr. Musk made additional alleged false statements on May 14, 2022, May 16, 2022, May 17, 2022, May 21, 2022, July 8, 2022, July 29, 2022, and September 9, 2022.[29] Plaintiffs allege that these false statements were "carefully calculated to drive down the price of Twitter stock" to allow Mr. Musk to renegotiate the Merger price or delay the Merger.[30] Plaintiffs claim that as a result of the allegedly false and misleading statements, "shareholders sold [Twitter stock] and Twitter's stock declined to as low as $32.65" causing "Plaintiffs and the class [to] suffer[] economic loss in violation of federal securities laws."[31]

17.    Plaintiffs claim that the "truth" about the alleged misrepresentations was revealed publicly on October 4, 2022 when Mr. Musk disclosed that he intended to proceed with the Merger Agreement as it was originally contemplated at the initial offer price of $54.20

---

[25]    First Amended Class Action Complaint, *Pampena, et al. v. Musk,* United States District Court, Northern District of California, San Francisco Division, C.A. No. 22-cv-05937-CRB, filed June 8, 2023 ("Complaint"), ¶ 1 & Order Granting Class Certification, *Pampena, et al. v. Musk,* filed September 27, 2024, at 12.

[26]    Complaint, ¶ 10.

[27]    Complaint, ¶ 4.

[28]    Complaint, ¶ 4.

[29]    Complaint, § VII.

[30]    Complaint, ¶¶ 1 & 10.  I understand that the Court found the alleged misrepresentations on the following days were not misleading: May 14, 2022, May 21, 2022, May 25, 2022, May 31, 2022, July 8, 2022, August 29, 2022, and September 9, 2022. Complaint § VII; Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, *Pampena, et al. v. Musk,* United States District Court, Northern District of California, C.A. No. 22-cv-05937-CRB, filed December 11, 2023 ("MTD Order"), at 39.

[31]    Complaint, ¶¶ 9-10.

per share.[32] The Complaint states that "[f]orced to face the lack of merit of his baseless contention that Twitter had breached multiple provisions of the Merger Agreement and that there had allegedly been a material adverse effect, Musk essentially acknowledged that he had been bluffing all along."[33]

### C. Court Order

18.     On December 11, 2023, the Court issued an order in which it granted in part and denied in part Defendant's motion to dismiss. The Court denied "Defendant's motion to dismiss Plaintiffs' claims to the extent they are predicated on the May 13 Tweet that the deal was 'temporarily on hold,' the May 16 statement that fake and spam accounts make up at least 20% of Twitter's users, and the May 17 tweet."[34] The Court granted "Defendant's motion with respect to Plaintiffs' claims to the extent they are predicated on all other challenged statements."[35] My understanding is that, based on the MTD Order, the remaining challenged statements in this matter are the alleged misrepresentations made on May 13, 2022, May 16, 2022, and May 17, 2022.

19.     I also understand that the Court defined the specific misrepresentation that Mr. Musk allegedly made on May 13, 2022. The Court stated that to "determine what reasonable investors would—and did—plausibly understand from Defendant's statement, it is necessary to look at the exact phrasing that Defendant used. The May 13 Tweet reads as follows: 'Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users.'"[36] The Court went on to say that the "'calculation' that Defendant is referring to, from the perspective of a reasonable investor, is Twitter's calculation of bot accounts. And specifically, Twitter's calculation underlying its SEC filings, in which the company averred that its false or spam accounts represented fewer than 5% of the company's mDAU [monetizable Daily Active Users]—the same number Defendant mentions in the tweet."[37] The Court further stated that a reasonable

---

[32]   Complaint, ¶ 167.
[33]   Complaint, ¶ 167.
[34]   MTD Order, at 39.
[35]   MTD Order, at 39.
[36]   MTD Order, at 18.
[37]   MTD Order, at 18-19.

investor would have understood that (i) "Defendant was waiting for details <u>from Twitter</u> supporting Twitter's calculation,"[38] (emphasis in original) (ii) "Defendant was waiting for details from the party he was actively working to close the deal with,"[39] and (iii) plausibly, Defendant's "statement that the deal was on hold 'pending' this information from Twitter to mean that, absent the provision of such information, the deal would not close."[40]

20.    The Court crystallized the alleged misrepresentation made by Mr. Musk on May 13, 2022, stating that "Defendant represented to a reasonable investor that the Twitter deal was on hold—and would not close—until Twitter provided information supporting its bot calculations."[41] The Court further stated that "put another way, a reasonable investor could have plausibly understood that Twitter was obligated to provide Defendant with the requested information for the deal to close."[42]

21.    The Court also concluded that "a reasonable investor would find Twitter not complying with its contractual obligations—particularly, its contractual obligation to provide details about its bot calculations—to be material to their investing decision-making"[43] because "it might suggest to the market that Twitter was refusing to provide the information because it had something to hide regarding the amount of fake/spam accounts that made up its mDAU."[44]

### D.  Tabak Report

22.    On May 2, 2025, Plaintiffs submitted the expert report of David I. Tabak, Ph.D. ("Tabak Report"). Dr. Tabak states that he was asked (i) "to calculate the deflation in Twitter's stock and call options and the inflation in Twitter's put options over the Class Period"[45] and (ii) "to calculate damages under Rule 10b-5(b) and also under Rule 10b-5(a) and (c)."[46] For his damages analysis under Rule 10b-5(a) and (c), Dr. Tabak states that he was "asked by

---

[38]    MTD Order, at 19.
[39]    MTD Order, at 19.
[40]    MTD Order, at 19.
[41]    MTD Order, at 19.
[42]    MTD Order, at 19.
[43]    MTD Order, at 21.
[44]    MTD Order, at 21.
[45]    Expert Report of David I. Tabak, Ph.D., May 2, 2025, ¶ 2.
[46]    Tabak Report, ¶ 13.

counsel … to consider not only the misrepresentations that survived the MTD Order, but also to consider Mr. Musk's July 8, 2022 termination letter."[47]

23.     In his analysis of 10b-5(b) damages, Dr. Tabak estimates the initial alleged deflation in Twitter's stock price as follows. He starts with an analysis of "the three misrepresentations that survived the MTD Order (i.e., 'the May 13 tweet that the deal was 'temporarily on hold,' the May 16 statement that fake and spam accounts make up at least 20% of Twitter's users, and the May 17 tweet')."[48] For this analysis he uses the same event study model that he presented in his class certification report in this case.[49]

24.     Dr. Tabak finds that following the May 13 Tweet, Twitter's residual return on May 13, 2022 was negative 14% and statistically significant.[50]

25.     Dr. Tabak finds that Twitter's residual return on May 16, 2022 was negative 7% and statistically significant.[51] He states that because Mr. Musk's May 16, 2022 alleged misstatement at the technology conference was made during trading hours and Twitter's stock price increased from the open on May 16, 2022 to the close on May 16, 2022, "there is little evidence of the economic importance of any announcement made during the trading day on May 16 and, for purposes of [his] damages analysis, [he does] not consider this statement to be an independent source of loss."[52] However, he claims to follow his "standard practice of continuing the event window (i.e., the period over which the price reaction is measured) to include all consecutive trading days with a statistically significant price movement."[53] Based on this reasoning, Dr. Tabak concludes that it took two trading days, May 13, 2022 and May 16, 2022, for the May 13 Tweet to be reflected in Twitter's stock price.[54] He claims that the

---

[47]  Tabak Report, ¶ 13.
[48]  Tabak Report, ¶ 15.
[49]  Tabak Report, ¶ 15. Dr. Tabak's event study methodology uses a two-factor model with the NASDAQ Composite Index to control for market effects and the NASDAQ CTA Internet Index to control for industry effects. *See* Expert Report of David I. Tabak, Ph.D., May 24, 2024 ("Tabak Class Cert Report"), ¶ 42.
[50]  Tabak Report Exhibit 4a.
[51]  Tabak Report Exhibit 4a.
[52]  Tabak Report, ¶ 17.
[53]  Tabak Report, ¶ 18.
[54]  Notably, Dr. Tabak does not analyze information that was disclosed between May 13 market close and May 16 market open. He simply assumes that "May 16 can be attributed to a continuing reaction to the May 13 tweet…," ignoring, for example, a tweet made by Mr. Musk on May 15, 2022, stating that "[t]here is some chance it might be over 90% of daily active users, which is the

alleged deflation in Twitter's stock price associated with the May 13 Tweet "can be split to be the one-day reaction [of] $5.94 as of May 13 and then the full two-day reaction of $8.52 as of May 16."[55]

26.     Dr. Tabak finds that Twitter's residual return on May 17, 2022 was positive 0.31% and not statistically significant.[56] Based on this result, he "do[es] not include the May 17 price movement in [his] damages analysis."[57]

27.     Thus, Dr. Tabak concludes that the May 13 Tweet is the only alleged misrepresentation that survived the MTD Order that caused damage to Plaintiffs.

28.     For his analysis of 10b-5(a) and (c) damages, Dr. Tabak also incorporates the purported reaction of Twitter's stock price to the release of the July 8 Termination Letter. Dr. Tabak finds that Twitter's residual return on July 11, 2022, following the release of the July 8 Termination Letter, which occurred after market close on July 8, 2022, was negative 8% and statistically significant. Based on this analysis, Dr. Tabak's initial measure of deflation is (i) $5.94 on May 13, (ii) $8.52 from May 16, 2022 through July 8, 2022, and (iii) $11.45 ($8.52 plus $2.93) from July 11, 2022 to October 3, 2022.[58]

29.     Dr. Tabak finds that his estimate of the residual increase in Twitter's stock price on October 4, 2022 is less than the sum of his estimate of residual price declines associated with the May 13 Tweet and the July 8 Termination Letter.[59] He concludes that the "amount of deflation in Twitter's stock price was varying over time."[60] To "account for this variation," he purports to split the merger discount, *i.e.*, the difference between the merger consideration of $54.20 per share and Twitter's stock price at a given time ("Merger Discount"), into a discount that is "unrelated to the misrepresentation, and … related to the misrepresentation."[61] ("Merger Discount Damages Methodology").

---

metric that matters to advertisers…." *See* Elon Musk Twitter feed, May 15, 2022 at 2:39 a.m. ET, available at https://x.com/elonmusk/status/1525727450872926209.

[55]  Tabak Report, ¶ 18.

[56]  Tabak event study replication.

[57]  Tabak Report, ¶ 16.

[58]  Tabak Report, ¶ 19. It appears that Dr. Tabak has a typographical error in this sentence, as his Exhibit 6(b), which shows daily deflation under rule 10b-5(a) and (c) extends to October 3, 2022, *i.e.*, beyond July 8, 2022.

[59]  Tabak Report, ¶ 20.

[60]  Tabak Report, ¶ 20.

[61]  Tabak Report, ¶¶ 21-22.

30.     To calculate the purported splits in the Merger Discount, Dr. Tabak takes the difference between the merger consideration of $54.20 per share and Twitter's stock price on May 12, 2022 of $45.08, or $9.12, *i.e.*, the Merger Discount that existed on the day immediately prior to the May 13 Tweet, and divides it by $16.81 (the difference between the merger consideration of $54.20 per share and Twitter's stock price on May 16, 2022 of $37.39). This purportedly results in 54.3% "of the discount to merger-offer price … unrelated to the misrepresentation, and the remainder, or 45.7%, … related to the misrepresentation."[62]

31.     Dr. Tabak makes an adjustment for the only day during the Class Period on which his event study analysis purports to find a statistically significant residual return unrelated to news about the proposed Merger – *i.e.*, August 23, 2022.[63] He calculates the change in the percentage of the Merger Discount that is related to the alleged misrepresentation in the May 13 Tweet as follows. Dr. Tabak first calculates 45.7% of the Merger Discount on August 22, 2022, or $5.12 (45.7% of the total Merger Discount on that date of $11.19), which he assumes is the deflation per share on August 22, 2022. "Assuming that the artificial deflation stays the same," he then calculates the Merger Discount on August 23, 2022 of $14.33 and assumes that $5.12 out of $14.33, or 35.7%, of the Merger Discount is related to the alleged misrepresentation in the May 13 Tweet from August 23, 2022 onwards.[64]

32.     Dr. Tabak concludes that the portion of the Merger Discount that is related to the alleged misrepresentation in the May 13 Tweet is (i) 45.7% from May 13 to August 22, 2022; (ii) 35.7% from August 23, 2022 to October 3, 2022; and (iii) 0% from October 4, 2022 onwards.[65]

33.     Dr. Tabak asserts that the above methodology also is applicable to his analysis of 10b-5(a) and (c) damages, which includes an additional calculation for July 8, 2022.[66] Based on this adjustment, Dr. Tabak concludes that the portion of the Merger Discount that is related to the alleged misrepresentation in the May 13 Tweet is (i) 45.7% from May 13 to July 8,

---

[62]     Tabak Report, ¶ 22.
[63]     Tabak Report, ¶ 23.
[64]     Tabak Report, ¶ 23.
[65]     Tabak Report, ¶ 24 & Exhibit 5b.
[66]     Tabak Report, ¶¶ 26-27.

2022; (ii) 50.5% from July 11, 2022 to August 22, 2022; (iii) 39.4% from August 23, 2022 to October 3, 2022; and (iv) 0% from October 4, 2022 onwards.[67]

34.    Dr. Tabak also purports to estimate the deflation in the prices of Twitter's call options and the inflation in the prices of Twitter's put options by using "'implied volatility' [to] calculate the effect of the deflation in Twitter's stock price on each option."[68]

### E.  Badawi Report

35.    On May 28, 2025, Plaintiffs submitted the expert report of Adam Badawi ("Badawi Report"). Among other things, Professor Badawi claims that "[t]o determine the potential for termination, one would need to know, *inter alia*, the precise information requested by the buyer, the seller's basis for a refusal to provide information, the content of the communications between the parties, and whether the buyer is potentially in material breach of any of its obligations. The parties also executed a confidentiality agreement. The terms of that agreement could have expanded or restricted the information rights of the parties. Given the non-public nature of the document, it would not be possible for the investing public to know whether that agreement affected the claims in Mr. Musk's tweet."[69] (emphasis in original). In addition, Professor Badawi claims that, even though "[s]tock analysts were following the Twitter transaction closely and were presumably aware of all, or nearly all, of the public information about the deal," "[s]ome analysts were confused and perplexed by the tweet" on May 13.[70]

### F.  Assignment and Summary of Conclusions

36.    I have been asked by Quinn Emanuel Urquhart & Sullivan, LLP, counsel for Mr. Musk ("Counsel"), to review and respond to the Tabak Report. I also have been asked to review and respond to the Badawi Report's conclusions about the ability of investors to determine the potential for the Merger termination without knowledge of the non-public documents and communications between the parties.

---

[67]    Tabak Report Exhibit 6b.
[68]    Tabak Report, ¶ 28.
[69]    Expert Report of Adam Badawi, May 28, 2025, ¶ 79. (Footnotes omitted).
[70]    Badawi Report, ¶ 82.

37.    Based on my review and analysis, as well as my expertise and experience, I have concluded that Dr. Tabak's estimates of the alleged deflation in the prices of Twitter's stock and call options and his estimates of the alleged inflation in the prices of Twitter's put options are fundamentally flawed, unscientific, and unreliable. My conclusion is based on several considerations.

38.    First, Dr. Tabak provides no reliable basis for concluding that 45.7% of the Merger Discount is attributable to the alleged misrepresentation. He simply assumes this to be the case. Plaintiffs allege that the May 13 Tweet falsely conveyed to the market that the deal was on hold because Twitter had not yet complied with a contractual obligation to provide Mr. Musk with details about its bot/spam accounts calculations. Even if the market interpreted Mr. Musk's tweet as conveying that the deal was on hold because Twitter had not yet complied with a contractual obligation to provide him with details about its bot/spam accounts calculations, which is not apparent from analyst commentary, analyst commentary does indicate that market participants understood the May 13 Tweet to convey other pieces of information. Most notably, the market interpreted the May 13 Tweet as conveying that Mr. Musk was getting "cold feet" about proceeding with the Merger, which, I understand Plaintiffs allege was the true state of affairs.[71] Similarly, the market interpreted the May 13 Tweet as conveying a greater likelihood that the transaction would be delayed in order for the parties to respond to and resolve Mr. Musk's concerns, as well as an increased probability that Twitter may pursue legal remedies to close the Merger, which I do not understand Plaintiffs to be asserting was untrue.

39.    Dr. Tabak does nothing to disaggregate the effect of information that I understand Plaintiffs claim is true, namely that Mr. Musk was getting "cold feet" and that the transaction might be delayed, from the effect of the alleged misrepresentation. A reliable analysis of the alleged deflation/inflation that entered the prices of Twitter's securities on this day necessarily must disentangle the effects of the pieces of the non-fraudulent and allegedly fraudulent information on Twitter's securities prices on this day. If some (or all) of the change in Twitter's stock price was caused by information that I understand Plaintiffs claim is true,

---

[71]    Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1-12), March 17, 2025, at No. 10 ("Defendant got cold feet and wanted to back out of or renegotiate the deal.").

then it is inappropriate to ascribe the entire residual decline in Twitter's stock price on this day to the alleged misrepresentation, as Dr. Tabak does. Analyst commentary is consistent with the conclusion that market participants were reacting to information other than the alleged misrepresentation, including the possibility that Mr. Musk was getting "cold feet" and that Mr. Musk's concerns could delay closing.

40.    It is not surprising that Twitter's stock price would decline if investors understood that Mr. Musk was getting "cold feet." As analysts following the Merger noted, historically M&A "transactions headed toward litigation have resulted in settlements via price cuts" because "re-trade has been viewed preferably to pursuing litigation based on closing certainty and the distraction and protracted nature of litigation."[72] The mere fact that a buyer signals apprehension or "cold feet" about a pending deal—whatever the merits of the concern—increases the risk that the transaction is "headed toward litigation" and termination. This in turn increases the risk that the seller may cut the price or simply walk away in exchange for a break-up fee to avoid the costs, both direct and indirect, of a lawsuit. For example, Jefferies explained that "[g]iven the potential downside" to Twitter stock "in a no-deal scenario, we believe the Board will be incentivized to negotiate a deal, even if below the initial $54.20 bid price."[73] Thus, some investors and market participants recognized the possibility that Twitter could seek to avoid the expense and uncertainty of a legal dispute (even if it had a high probability of prevailing) by agreeing, in response to Mr. Musk's concerns and purported "cold feet," to a lower price.[74]

41.    Dr. Tabak makes the same error as mentioned above when calculating that the July 8 Termination Letter caused Twitter's stock to deflate by $2.93 per share. Again, Dr. Tabak fails to disentangle the amount of purported deflation caused by the market's reaction to truthful information—*i.e.*, the fact that Mr. Musk delivered a letter to Twitter purporting to terminate the Merger—from the deflation caused by any alleged misrepresentation or fraud (which Dr. Tabak does not identify in any event). If the news that Mr. Musk transmitted the July 8 Termination Letter to Twitter, as opposed to any purported misrepresentations contained in the Letter, caused any of the stock's decline on July 11, a

---

[72]    "Musk Cancels Twitter Deal; Legal Battle Coming Up," MKM Partners, July 11, 2022, at 1.

[73]    "Looking for a Scapegoat; Lower Bid to Come?," Jefferies, May 16, 2022, at 1.

[74]    *See, e.g.*, *id.*

reliable loss causation and damages calculation would account for that. Dr. Tabak's analysis does not. Dr. Tabak does not even take the threshold step of identifying any purported misrepresentations in the July 8 Termination Letter or any portion of the letter that Plaintiffs contend is fraudulent. In other words, Dr. Tabak's analysis does not reliably estimate the impact caused by any alleged fraud or scheme because he does not even identify what the fraud was. The July 8 Termination Letter calculation is unreliable and incomplete at nearly every step of the analysis.

42.     Second, Dr. Tabak's calculation that 45.7% of the Merger Discount is attributable to the alleged misrepresentation does not disaggregate the effect of the two pieces of information Plaintiffs claim were falsely conveyed by the May 13 Tweet: "(1) the Merger was not on hold: contrary to the suggestion in Musk's tweet, Twitter had not agreed to any deferral of the Buyout; and (2) nothing in the merger agreement allowed Musk to put the Buyout on hold, particularly since he had already agreed to buy Twitter without conducting due diligence and agreed to a 'seller friendly' merger agreement that did not make any due diligence a condition of the Merger."[75] If one piece of information is not determined to be false, Dr. Tabak provides no reliable methodology for determining deflation caused by the false information.

43.     Third, Dr. Tabak provides no reliable basis for his assumption that a constant percent of the daily Merger Discount (45.7% from May 13, 2022 through August 22, 2022 and 35.7% from August 23, 2022 through October 3, 2022) is attributable to the alleged misrepresentation, rather than market and industry factors or other information about the deal. He ignores that a multitude of factors affect the daily Merger Discount, which makes it implausible that a constant percentage of the daily Merger Discount, if any, during the relevant period is attributable to the alleged misrepresentation.

44.     Fourth, Dr. Tabak's depiction of Mr. Musk's announcement on October 4, 2022 that he would proceed with the Merger on the original terms of the Merger Agreement, including the payment of $54.20 per share, as corrective of the alleged misrepresentation is, as a matter of economics, fundamentally flawed. A review of analyst commentary released around the time of this announcement reveals no evidence to support the conclusion that the

---

[75]     Complaint, ¶ 4.

announcement was viewed by market participants as corrective of the alleged misrepresentation.

45.     Fifth, Dr. Tabak's use of a two-day event window to estimate the effect of Mr. Musk's May 13 Tweet on Twitter's stock price is inconsistent with his opinion that the market for Twitter stock was efficient. There is no scientific basis to conclude that if the market for a security is efficient then it can take multiple days for the market to reflect newly released information. Dr. Tabak's use of a two-day event window also is inconsistent with the tests for market efficiency that he conducted in his class certification report, in which he used one-day, not two-day, event windows.

46.     Sixth, Dr. Tabak's analysis of the alleged deflation in the price of Twitter's call options and the alleged inflation in the price of Twitter's put options is flawed and unreliable, principally because it relies on his flawed estimates of the alleged deflation in Twitter's stock price.

47.     In my opinion, Professor Badawi has not established that the disclosure of the alleged "non-public information" would have changed the market's assessment of the probability that the transaction would be completed under the terms of the Merger Agreement. Dr. Tabak's event study analysis shows that there was no statistically significant residual change in Twitter's stock price when the "non-public" information was revealed to the market. Additionally, Professor Badawi's claims that some analysts, and by implication, the market, were "confused and perplexed" is inconsistent with the large presence of merger arbitrage investors. This implies that there were sophisticated investors in Twitter who had the ability and economic incentive to understand or seek clarity on any potentially confusing information. Given the substantial investments these entities made, there is no reliable economic basis to assume that these institutions did not have the ability and economic incentive to uncover value-relevant information.

48.     I elaborate on the bases for my conclusions in the remainder of this report.

### III.    DR. TABAK'S DAMAGES METHODOLOGY IS FUNDAMENTALLY FLAWED, UNSCIENTIFIC, AND UNRELIABLE

49.    Dr. Tabak's analyses of the alleged deflation in the prices of Twitter's stock and call options and the alleged inflation in the price of Twitter's put options are fundamentally flawed, unscientific, and unreliable for several reasons, each of which I discuss in turn.[76]

### A.    Dr. Tabak Fails to Disaggregate the Effect of the Alleged Misrepresentation from the Effect of Information That Plaintiffs Allege Is True

50.    Plaintiffs allege that the May 13 Tweet was false "because (1) the Merger was not on hold: contrary to the suggestion in Musk's tweet, Twitter had not agreed to any deferral of the Buyout; and (2) nothing in the merger agreement allowed Musk to put the Buyout on hold, particularly since he had already agreed to buy Twitter without conducting due diligence and agreed to a 'seller friendly' merger agreement that did not make any due diligence a condition of the Merger."[77] Moreover, as I explained above, the Court found that the alleged misrepresentation is that "a reasonable investor could have plausibly understood that Twitter was obligated to provide Defendant with the requested information for the deal to close."[78]

51.    Dr. Tabak provides no reliable basis for concluding that 45.7% of the Merger Discount is attributable to the alleged misrepresentation. Dr. Tabak does not disaggregate the effect of information that, I understand Plaintiffs claim is true (*i.e.*, that Mr. Musk was getting "cold feet" or that there was an increased risk of delay) from the effect of the alleged misrepresentation. A reliable analysis of the alleged deflation/inflation that entered the prices of Twitter's securities necessarily must disentangle the effects of the allegedly false and the unchallenged pieces of information on Twitter's stock price on this day.[79] Insofar that some, or all, of the change in Twitter's stock price was caused by information that, I understand

---

[76]    Because Dr. Tabak's Rule 10b-5(a) and (c) damages calculations are based on the same methodology as his Rule 10b-5(b) damages calculations, the criticisms in the sections that follow are equally applicable to Dr. Tabak's Rule 10b-5(a) and (c) damages calculations.

[77]    Complaint, ¶ 4.

[78]    MTD Order, at 19.

[79]    Dr. Tabak acknowledged in his class certification deposition that "the market would have known about Section 6.4 [of the Merger Agreement, which outlines Mr. Musk's rights to information and] would have known what it said, and would have incorporated its view of that into the price." *See* Deposition of David Tabak, August 9, 2024, 109:2-7.

Plaintiffs claim is true, then it is not appropriate to ascribe the entire decline in Twitter's stock price on this day to the alleged misrepresentation, as Dr. Tabak does.

52.     To discern the extent to which a security price reacts to the release of one piece of information versus another (or others), it is common practice to review analyst commentary to assess the relative importance that market participants assign to the multiple pieces of information. Notably, Dr. Tabak has not done this. In fact, he does not cite a single analyst report, which, in my experience, is highly unusual for an expert witness who is estimating the amount of inflation (or deflation) that entered a security price because of an alleged misrepresentation.

53.     In contrast to Dr. Tabak, I did review analyst commentary[80] that discussed the May 13 Tweet. The commentary reveals two important points. First, analysts did not express concern—and typically did not even mention—the information Plaintiffs claim is false. There is no evidence that analysts expressed concern (or understood from the May 13 Tweet) that Mr. Musk to had instructed his team to stop working on the deal or that the Merger Agreement gave him the legal right to the information he desired. Second, analysts inferred from the tweet that, for various reasons, Mr. Musk was getting cold feet about proceeding with the transaction under the terms of the Merger Agreement, which, I understand, Plaintiffs claim was the truth. Other analysts believed that Mr. Musk's stated concerns may result in a delay in closing, which is what ultimately occurred. I summarize salient commentary on each of these points.

> i.    *Analysts Did Not Infer that Mr. Musk Has a Right to Information on Bots Under the Merger Agreement*

54.     As an initial matter, analyst commentary indicates that the market was not reacting to a belief or a concern that the May 13 Tweet suggested Mr. Musk had contractual rights to walk away from the deal if Twitter did not provide the information on bots/spam accounts.

---

[80]    I reviewed Twitter analyst reports from April 25, 2022 to October 10, 2022 available through LSEG, Capital IQ, and FactSet.

55.     For example, in a May 13, 2022 report, Morningstar stated that "Musk will have difficulties exiting the deal even if Twitter cannot support its claim about the proportion of spam users."[81]

56.     On May 13, 2022, Matt Levine, an opinion columnist at *Bloomberg* and an experienced M&A lawyer and investment banker,[82] explained that "'[t]emporarily on hold' is not a thing… [Mr. Musk] can't just put [the deal] 'on hold'… That contract does not allow Musk to walk away if it turns out that 'spam/fake accounts' represent more than 5% of Twitter users."[83]

57.     On May 16, 2022, Jefferies stated that "[w]e have looked back historically and found that TWTR has repeatedly disclosed that fake accounts make up ≤5% of mDAUs making us question the validity of Musk's concerns."[84]

58.     On May 16, 2022, Wedbush stated that "[t]he bot issue at the end of the day was known by the New York City cab driver and feels more to us like the 'dog ate the homework' excuse to bail on the Twitter deal or talk down a lower price."[85]

   *ii.     Analysts Did Not Infer that Mr. Musk Instructed His Team to Stop Work on the Deal*

59.     Analyst commentary also demonstrates that the market was not reacting to a belief that Mr. Musk's statement that the deal was "on hold" meant that Mr. Musk's team was not "continu[ing] to work with Twitter on closing the deal."[86]

60.     For example, on May 13, 2022, Citi stated that "[e]arlier this morning, Elon Musk tweeted that the Twitter acquisition was 'temporarily on hold' as he reviews and confirms that spam/false accounts on Twitter are less than 5% of mDAUs given the company has noted the 5% could be higher based on how it calculates this metric, a disclosure Twitter

---

[81] "Twitter: Musk Tweets Doubts About Twitter Deal but Says He Remains Committed," Morningstar, May 13, 2022, at 1.

[82] Matt Levine, *Bloomberg*, available at https://www.bloomberg.com/opinion/authors/ARbTQlRLRjE/matthew-s-levine.

[83] "Elon Musk Trolls Twitter," *Bloomberg Opinion*, May 13, 2022 at 12:40 p.m. ET, at 1.

[84] "Twitter: Looking for a Scapegoat; Lower Bid to Come?" Jefferies, May 16, 2022, at 1.

[85] "Tesla: Twitter and Musk Thoughts: Bot Issue Likely Excuse for Lower Price or Walk Away," Wedbush, May 16, 2022, at 1.

[86] Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories, (Nos. 1-12), March 17, 2025, at Nos. 7-9.

has suggested is the case per our review of filings back to 2019."[87] Citi further stated, "[w]hile we believe this review likely delays the acquisition, we would be surprised if there are any material changes to the deal structure as a result of spam/false DAUs,"[88] and went on to include excerpts concerning the 5% number from Twitter's 10-Qs and 10-Ks going back to 2019.[89]

### iii.    Analysts Inferred That Mr. Musk Was Getting Apprehensive About the Deal

61.    Analyst commentary indicates that market participants assumed, based on the May 13 Tweet, that Mr. Musk was apprehensive about proceeding with the transaction because of (i) a sharp decline in Tesla's stock price, (ii) a large decline in both market and industry indices since the deal was announced, and (iii) financing challenges that Mr. Musk faced. I understand that Plaintiffs are alleging this assumption was in fact true as of May 13.

62.    In a report issued on May 13, 2022, Truist stated that it is "[h]ard to know whether Mr. Musk is using this move as a negotiating tactic to get the price down considering the 24% drop in peers' valuation … since the offer was announced … or as a way to get out of the deal altogether. The S&P 500 is also down ~13% over the same period."[90] It further stated that "[t]he stock is now trading at a 24% discount to the offer price … if the deal were to fall through, we see the base case for TWTR trading in the high $20s/low $30s given the $39/share price pre-offer, and the 24% sell-off in the peer group since then."[91]

63.    On May 13, 2022, Wedbush stated "now the Street will view this deal as 1) likely falling apart, 2) Musk negotiating for a lower deal price, or 3) Musk simply walking away from the deal with a $1 billion breakup fee."[92] Wedbush elaborated, stating that "with the nature of Tesla shares being used as leverage for Musk in the deal, the massive sell-off seen in Tesla and the overhang created by this deal has turned into a life of its own. … If Musk does

---

[87]   "Twitter: Twitter Acquisition 'temporarily on hold' as Musk Reviews Spam / False Accounts," Citi, May 13, 2022, at 1.
[88]   *Id.*
[89]   *Id.*
[90]   "Twitter: Musk Puts The Twitter Deal on Pause; Will He Try to Renegotiate or Walk Away?" Truist, May 13, 2022, at 1.
[91]   *Id.*
[92]   "Tesla: In a Circus Show Move Musk Says Twitter Deal on Hold Pending Diligence," Wedbush, May 13, 2022, at 1.

decide to still go down the deal path a clear renegotiation is likely on the table… Many will view this as Musk using this Twitter filing/spam accounts as a way to get out of this deal in a vastly changing market."[93]

64.     In a report released on May 16, 2022, Jefferies stated that "[w]e believe Elon Musk's intentions to explore a bid below $54.20 are more based on the recent market sell-off (COMP down 25% YTD) than the % of fake accounts on TWTR."[94] Jefferies further stated that "Elon Musk's recent comments suggest he is trying to negotiate a lower offer price. We believe that Musk is using his investigation into the % of fake TWTR accounts as an excuse to pay below $54.20/share. In reality, the NASDAQ COMP is down 25% YTD and Elon Musk realizes that he may be overpaying for the asset."[95]

65.     On May 16, 2022, Wedbush stated that "[o]ur view is while Musk is committed to the deal the massive pressure on Tesla's stock since the deal, a changing stock market/risk environment the last month, and a number of other financing factors (equity financing) has caused Musk to get 'cold feet' on the Twitter deal with the bot issue not a new issue and likely more of a scapegoat to push for a lower price."[96] It went on to say that "the stark reality for Twitter is that no other strategic/financial bidder will come near this deal and Musk knows that; which is why in a changing market and with Tesla losing ~$300 billion of market cap since the deal we view the $44 billion Twitter deal as having less than a 50% to get done as of today."[97]

66.     On May 16, 2022, CFRA also commented: "Musk has placed the deal on hold to find greater clarification on the status of bots/fake accounts on the Twitter platform, but we think it is likely a ploy to gain leverage/options in reducing his offer price."[98]

---

[93]   *Id.*
[94]   "Twitter: Looking for a Scapegoat; Lower Bid to Come?" Jefferies, May 16, 2022, at 1.
[95]   *Id.*
[96]   "Tesla: Musk Giving More Indication Getting 'Cold Feet' on Twitter Deal Due to Bots," Wedbush, May 16, 2022, at 1.
[97]   *Id.*
[98]   "Twitter, Inc.," CFRA, May 16, 2022, at 1.

iv.    *Disclosures Related to Mr. Musk's Rights to Bot/Spam Information Did Not Elicit a Stock Price Reaction While Information Related to Deal Termination Did*

67.    Dr. Tabak's analysis of the May 13 Tweet is further undermined by the fact that, based on his own event study analysis, Twitter's stock price did not react significantly to disclosures involving Mr. Musk's rights to information about Twitter's bot/spam accounts. If investors thought that these disclosures were important for Twitter's valuation, then one would expect to see a statistically significant residual change in Twitter's stock price when such information was publicly released. This is not the case.

68.    I understand that on May 25, 2022, Plaintiffs' counsel in this action filed a class action lawsuit in the Northern District of California alleging, as it does in this lawsuit, that the May 13 Tweet was "misleading because it stated or implied that Musk's obligation to consummate the Buyout was conditioned on his satisfaction with due diligence to determine whether 'spam/fake accounts do indeed represent less than 5% of users.' Musk had specifically waived detailed due diligence as a condition precedent to his obligations under the Buyout contract. Thus, Musk has no right to cancel the Buyout based on any results from due diligence concerning the number of fake accounts at Twitter."[99, 100] Dr. Tabak's event study analysis finds a residual increase of $1.13 in Twitter's stock price on May 26, 2022, which is not statistically significant.[101]

69.    On June 6, 2022, before market open, Twitter disclosed a letter it received from Mr. Musk's counsel regarding the bot information. It stated, among other things: "Twitter's latest offer to simply provide additional details regarding the company's own testing methodologies, whether through written materials or verbal explanations, is tantamount to

---

[99]    Class Action Complaint, *William Heresniak, et al. v. Elon R. Musk and Twitter, Inc.*, United States District Court, Northern District of California, No. 3:22-cv-03074, filed May 25, 2022, ¶ 94.

[100]    "Cotchett Pitre & McCarthy and Bottini & Bottini File Lawsuit on Behalf of Twitter Shareholders Alleging Elon Musk's Conduct Deflated Twitter's Stock In Attempted Buyout Of The Company," *Business Wire*, May 26, 2022 at 1:59 p.m. ET. *See also*, "Twitter shareholders sue Elon Musk and Twitter over chaotic deal," *CNBC*, May 26, 2022 at 4:39 p.m. ET.

[101]    Tabak event study replication. Dr. Tabak's event study analysis finds a two-day residual increase of $1.02 in Twitter's stock price, which is not statistically significant.

refusing Mr. Musk's data requests."[102] Dr. Tabak's event study analysis finds a residual decline of $1.12 in Twitter's stock price on this date, which is not statistically significant.[103]

70.     On July 15, 2022, Wells Fargo held an expert call with Professor Robert Miller, and published a report on July 18, 2022 stating that the acquisition of Twitter by Elon Musk will successfully close. Specifically, Professor Miller noted that his view was "that the 'showcase argument' in play between Musk/TWTR will hinge on Mr. Musk's information rights as specified in the merger agreement."[104] Professor Miller noted what he viewed as "the atypical (and unusually seller-friendly language) in the agreement, which specifies that Mr. Musk is entitled to information requests relevant only to deal consummation, rather than the typical/broader right of information requests 'for any reasonable purpose', inclusive of ongoing due diligence."[105] He opined that "[w]hile the Court of Chancery has not previously ruled on an information covenant similar to the one at issue here, Mr. Musk appears unlikely to prevail in his argument that TWTR has breached the information covenant, per Prof. Miller."[106] Dr. Tabak's event study analysis finds a residual increase of $0.11 in Twitter's stock price on July 18, 2022, which is not statistically significant.[107]

71.     After market close on July 26, 2022, Twitter filed a definitive proxy statement with the SEC that attached the history of disclosures and communications between Mr. Musk

---

[102]  Twitter, Inc., Exhibit 99-O, June 6, 2022 at 8:52 a.m. ET, at 1.

[103]  Tabak event study replication. Dr. Tabak's event study analysis finds a two-day residual decline of $0.99 in Twitter's stock price, which is not statistically significant.

[104]  "TWTR: All Sales Final? Increased Conviction on Deal Close Post Chancery Court Expert Call," Wells Fargo, July 18, 2022, at 1. Similarly, Rosenblatt Securities commented on July 14, 2022: "We reviewed new, more detailed disclosures in Twitter's lawsuit against Elon Musk, and our former skepticism about Twitter has been flipped. We had formerly seen meaningful risk (based largely on Musk's assertions and also a history of mDAU restatements), that Twitter was being evasive in disclosure of its spam bot calculations. That lead [*sic*] us to assume that Musk had leverage to extract a meaningful concession to avoid discovery damaging to Twitter in a court process. But Twitter's disclosure of very detailed efforts to explain its spam bot calculations to Musk, and Musk's reluctance to engage, largely ends our skepticism about Twitter, and instead makes us skeptical about Musk." *See* "TWTR: It's Happy Hour, and Musk is Buying; Upgrade to BUY, $52 PT," Rosenblatt Securities, July 14, 2022, at 1. Dr. Tabak's event study analysis finds a residual increase of $0.41 in Twitter's stock price on July 14, 2022, which is not statistically significant. *See* Tabak event study replication. Dr. Tabak's event study analysis finds a two-day residual increase of $0.91 in Twitter's stock price, which is not statistically significant.

[105]  "TWTR: All Sales Final? Increased Conviction on Deal Close Post Chancery Court Expert Call," Wells Fargo, July 18, 2022, at 1.

[106]  *Id.*

[107]  Tabak event study replication. Dr. Tabak's event study analysis finds a two-day residual increase of $0.05 in Twitter's stock price, which is not statistically significant.

and Twitter related to the Merger, including the information requests about bot/spam accounts.[108] Dr. Tabak's event study analysis finds a residual decline of $1.31 in Twitter's stock price on July 27, 2022, which is not statistically significant.[109]

72.    On September 23, 2022 Wells Fargo issued another report after its second call with Professor Miller and stated that "[d]espite an array of new developments in the TWTR vs. Musk saga since our first call with Prof. Miller in July, we came away with continued conviction that the acquisition of TWTR by Elon Musk will successfully close, given 1) Prof. Miller's view that Musk's counterclaim consists of four likely losing arguments and 2) Prof. Miller's confidence in the Court's ability and willingness to compel Mr. Musk and the Musk parties to specifically perform the acquisition."[110] Dr. Tabak's event study analysis finds a residual increase of $0.66 in Twitter's stock price on this date, which is not statistically significant.[111]

73.    In contrast, when Mr. Musk filed the July 8 Termination Letter Dr. Tabak's event study analysis finds a statistically significant residual decline of $2.93 in Twitter's stock's price.[112] These results support the conclusion that the residual decline in Twitter's stock price following the May 13 Tweet was caused by investor concerns that Mr. Musk was getting cold feet about the transaction and/or that there would be a delay in closing rather than a concern about the alleged misrepresentation.

     *v.*   *Disclosures Related to the Progress of the Merger Did Not Elicit a Stock Price Reaction While Information Related to Deal Termination Did*

74.    To the extent that investors believed that "on hold" meant that Mr. Musk was stopping work on the deal or that Twitter had agreed to stop the deal, as I understand Plaintiffs allege, and to the extent such information was value-relevant, the market would have reacted to information that Mr. Musk was still working on the deal during the Class Period. However,

---

[108]    Twitter, Inc., Schedule 14A, July 26, 2022 at 5:07 p.m. ET.

[109]    Tabak event study replication. Dr. Tabak's event study analysis finds a two-day residual decline of $0.29 in Twitter's stock price, which is not statistically significant.

[110]    "TWTR: Not Budging for Mudge; Continued Conviction on Deal Close Post Update Call w/Chancery Court Expert," Wells Fargo, September 23, 2022.

[111]    Tabak event study replication. Dr. Tabak's event study analysis finds a two-day residual increase of $0.80 in Twitter's stock price, which is not statistically significant.

[112]    Tabak event study replication.

there is no evidence of the market reacting to such information. Dr. Tabak does not address Mr. Musk's May 13 Tweet stating that he was "still committed to the acquisition," which was posted shortly after the May 13 Tweet.[113] Additionally, Dr. Tabak does not account for other disclosures throughout the Class Period indicating that Mr. Musk's team was actively working on closing the deal up until the July 8 Termination Letter.

75.    For example, on May 19, 2022, it was widely reported that Twitter's general counsel, Vijaya Gadde, informed Twitter employees at an all-hands conference that the deal was moving forward and there was "no such thing as a deal being on hold."[114] Dr. Tabak's event study analysis finds a residual decline in Twitter's stock price of $0.36 on this day, which is not statistically significant.[115]

76.    After market close on May 25, 2022, Mr. Musk publicly filed with the SEC an Amended Schedule 13D regarding his ongoing efforts to finance the Merger.[116] Specifically, Mr. Musk disclosed that he "allowed the remainder of the margin loan commitments contemplated by the Margin Loan Commitment Letter to expire" on May 24, 2022 but that he issued an Amended Equity Commitment Letter on that same day in which he "committed to provide an additional $6.25 billion in equity financing."[117] Mr. Musk also communicated that he was actively "seeking . . . additional financing commitments to fund" the Merger and was "having, and will continue to have discussions with certain existing holders . . . regarding the possibility" of rolling over equity following the Merger's closing.[118] The press reported that the "disclosure . . .signaled Musk is working to complete the deal."[119] Dr. Tabak's event study analysis finds a residual increase of $1.13 in Twitter's stock price on May 26, 2022, which is not statistically significant.[120]

---

[113]    Elon Musk Twitter feed, May 13, 2022 at 7:50 a.m. ET, available at https://x.com/elonmusk/status/1525080945274998785.

[114]    "Twitter Deal Is Proceeding, Not 'On Hold,' Executives Tell Staff," *Bloomberg*, May 19, 2022 at 1:19 p.m. ET. *See also* "13:09 EDTTwitter executives say deal with Musk proceeding as expected,…" *Theflyonethewall.com*, May 19, 2022 at 1:09 p.m. ET.

[115]    Tabak event study replication. Dr. Tabak's event study analysis finds a two-day residual increase of $0.52 in Twitter's stock price, which is not statistically significant.

[116]    Twitter, Inc., Amendment No. 7 to Schedule 13D, May 25, 2022 at 4:28 p.m. ET.

[117]    *Id.*

[118]    *Id.*

[119]    "Musk pledges more equity to fund Twitter deal, scraps margin loan," *Reuters*, May 26, 2022 at 1:46 p.m. ET.

[120]    Tabak event study replication. Dr. Tabak's event study analysis finds a two-day residual increase of $1.02 in Twitter's stock price, which is not statistically significant.

77.    On June 7, 2022, after market close, Twitter disclosed communications between the SEC and Skadden, Arps, Slate, Meagher & Flom LLP (Mr. Musk's counsel), where Mr. Musk's counsel confirmed that "[d]espite Mr. Musk's desire to obtain information to evaluate the potential spam and fake accounts, there was no material change to Mr. Musk's plans and proposals regarding the proposed transaction at such time."[121] Dr. Tabak's event study analysis finds a residual decline in Twitter's stock price of $0.57 on June 8, 2022, which is not statistically significant.[122]

78.    Additionally, on June 16, 2022 Mr. Musk attended an all-hands meeting with Twitter employees to discuss his plans for the company after the close of the Merger, including topics such as his vision for the product and views on remote work.[123] Dr. Tabak's event study analysis finds a residual increase in Twitter's stock price of $0.60 on this day, which is not statistically significant.[124]

79.    In contrast, as noted above, when Mr. Musk filed the termination letter on July 8, 2022, Dr. Tabak's event study analysis finds a statistically significant residual decline of $2.93 in Twitter's stock's price.[125] These results support the conclusion that the residual decline in Twitter's stock price following the May 13 Tweet was not caused by any alleged misrepresentation regarding the deal's status, but because the market reacted to new information on July 8 that Mr. Musk's team purported to terminate the Merger.

      *vi.    Summary*

80.    Based on the foregoing analysis, I conclude that Dr. Tabak has no reliable basis to attribute any, let alone all, of the residual decline in Twitter's stock price on May 13, 2022 and May 16, 2022 to the alleged misrepresentation. Additionally, Dr. Tabak has done no analysis to separate the effects of the alleged misrepresentation regarding the deal being "on hold" from the alleged misrepresentation regarding Mr. Musk's information rights under the

---

[121]    Twitter, Inc., CORRESP 1, June 7, 2022 at 9:05 p.m. ET, at 2.

[122]    Tabak event study replication. Dr. Tabak's event study analysis finds a two-day residual decline of $0.15 in Twitter's stock price, which is not statistically significant.

[123]    "Elon Musk Answers Questions From Twitter Employees Amid Takeover Saga -- WSJ," *The Wall Street Journal*, June 16, 2022 at 12:50 p.m. ET.

[124]    Tabak event study replication. Dr. Tabak's event study analysis finds a two-day residual increase of $0.33 in Twitter's stock price, which is not statistically significant.

[125]    Tabak event study replication.

Merger Agreement. To the extent it is determined that only one is false, Dr. Tabak's analysis does not provide the deflation attributable to only that statement.

### B. Dr. Tabak's Merger Discount Damages Methodology Has No Scientific Basis and Is Fundamentally Flawed and Unreliable

81.    Dr. Tabak concocts a methodology, which I refer to as the Merger Discount Damages Methodology, to estimate alleged deflation/inflation in Twitter's securities prices and damages. He cites no professional literature as support for this methodology, nor am I aware of any such literature. Simply put, the methodology that he has created solely for the purpose of this litigation has no scientific basis. It is simplistic, ad-hoc, and unreliable. Specifically, it suffers from two fatal flaws that render Dr. Tabak's analysis unreliable. I discuss each flaw in turn.

> i.    *Dr. Tabak's Calculation That 45.7% of the Merger Discount Attributable to the Alleged Misrepresentation Is Unscientific and Unreliable*

82.    As discussed above, Dr. Tabak notes that Twitter's stock was trading at a Merger Discount of $9.12 at market close on May 12, 2022, *i.e.*, the day immediately prior to the May 13 Tweet. As also discussed previously, Dr. Tabak assumes that it took two trading days, May 13, 2022 and May 16, 2022, for the May 13 Tweet to be fully reflected in Twitter's stock price. Dr. Tabak finds that the Merger Discount on May 16, 2022 was $16.81, representing an increase of $7.69 from May 12, 2022. He assumes, with no analysis, that this entire increase in the Merger Discount was caused by the alleged misrepresentation. Based on this assumption, he concludes that 45.7% of the Merger Discount on May 16, 2022 (*i.e.*, $7.69/$16.81) can be attributed to the alleged misrepresentation.

83.    As discussed in the previous section, there is no reliable basis to assume any, let alone all, of the increase in the Merger Discount from May 12, 2022 to May 16, 2022 can be attributed to the alleged misrepresentation. Instead, the evidence presented in the previous section supports the conclusion that this increase in the Merger Discount can be attributed to the market's concern that Mr. Musk was getting cold feet about the transaction and that any closing may be delayed. A hypothetical "but for" tweet on May 13 demonstrates the absurdity of Dr. Tabak's assumption. Specifically, Dr. Tabak's analysis inherently assumes that had

Mr. Musk simply tweeted that he was getting cold feet on May 13, which is what I understand Plaintiffs allege is the true state of affairs, Twitter's stock would not have reacted at all.

84.     Given that Dr. Tabak's assumption that 45.7% of the Merger Discount is attributable to the alleged misrepresentation plays a critical role in his damages analysis, his failure to provide a reliable basis for this assumption renders his entire damages analysis unreliable.

> ii.    *Dr. Tabak's Assumption That a Constant Percent of the Merger Discount Is Attributable to the Alleged Misrepresentation Is Flawed and Unreliable*

### a)     Dr. Tabak Fails to Disaggregate the Effect of Market and Industry Effects on the Merger Discount

85.     Dr. Tabak assumes that the percentage of the Merger Discount that is attributable to the alleged misrepresentation remains (i) a constant 45.7% from May 13 to August 22, 2022 and (ii) a constant 35.7% from August 23 to October 3, 2022.[126] Here again, Dr. Tabak provides no reliable basis for these assumptions.

86.     Academic literature finds that merger discounts vary over time for multiple reasons related to the market's assessment of the possibility that the deal may fall through and the standalone value of the target company. That is, the target's stock price following a merger announcement is equal to the probability of merger completion multiplied by the merger consideration plus the probability of merger failure (*i.e.*, one minus the probability of merger completion) multiplied by the target's standalone value.[127] Thus, any change in the probability of merger completion or the target's standalone value would cause a change in the merger discount). For example, Lhabitant (2006) observes: "there is a lot of activity going on between the companies involved, the regulators and the market. The arbitrage spread varies

---

[126]   Tabak Report, ¶ 24 & Exhibit 5b. For section 10b-5(a) and (c), the constant assumed percentage split is (i) 45.7%/54.3% from May 13 to July 8, 2022, (ii) 50.5%/49.5% from July 11 to August 22, 2022, and (iii) 39.4%/60.6% from August 23 to October 3, 2022. *See* Tabak Report Exhibit 6b.

[127]   *See, e.g.*, Larcker, D.F. and Lys, T., 1987, "An Empirical Analysis of the Incentives to Engage in Costly Information Acquisition," *Journal of Financial Economics*, Vol. 18, 111-126, at 113 ("For a firm undergoing a reorganization, we assume that the stock price is only a function of the probability of success, offer price, and price that will prevail if the reorganization is unsuccessful. That is, the market price, P, for a firm involved in a reorganization can be expressed as $P = (1 - \varphi)P_{NS} + \varphi P_S$, where $P_{NS}$ is the price of the firm if the reorganization is not successful, $P_S$ is the price of the firm if the reorganization is successful, and $\varphi$ is the market's assessment of the probability of a successful reorganization.")

continuously during this process, as a function of market expectations but also news and rumours."[128] Given that news affecting both the likelihood of the merger being completed and the standalone value of the company is released regularly from the time that a merger is announced until it is completed or abandoned (*see* **Exhibit 1**), it is simplistic and unscientific for Dr. Tabak to assume that a constant percentage of a changing Merger Discount over an almost five-month period can be attributed to the alleged misrepresentation.

87.    Importantly, a target's standalone value can change everyday due to market, industry, and firm-specific factors. Dr. Tabak, however, does not control for market, industry, and firm-specific factors unrelated to the alleged misrepresentation in his Merger Discount Damages Methodology. Any change in these factors would cause a change in the Merger Discount that is unrelated to the alleged misrepresentation and, therefore, result in a change in the percentage of the Merger Discount that is unrelated to the alleged misrepresentation. For example, if Twitter's standalone value declines due to market and industry factors, the Merger Discount would increase and Dr. Tabak's methodology would allocate 45.7% of that increase in the Merger Discount to the alleged misrepresentation when the entirety of the increase in the Merger Discount is unrelated to the alleged misrepresentation. Under the above scenario, because the increase in the Merger Discount should be entirely allocated to the portion unrelated to the alleged misrepresentation, the percentage attributable to the alleged misrepresentation would decrease. Since market and industry factors (as well as firm-specific factors) impact Twitter stock on each day, it is implausible for the percentage of the Merger Discount attributable to the alleged misrepresentation to remain a constant 45.7% from May 13 to August 22, 2022 and 35.7% from August 23 to October 3, 2022.

88.    To illustrate that factors other than the alleged misrepresentation were affecting the Merger Discount throughout the Class Period, I first review analyst commentary around several dates on which the Merger Discount changed.[129] I then examine the change in the Merger Discount on July 11, 2022, the first trading day following the release of the Termination Letter, to further illustrate the fallacy of Dr. Tabak's assumption that a constant

---

[128]    Lhabitant, F-S., 2006, *Handbook of Hedge Funds*, Wiley & Sons, Chapter 11, at 259-260.

[129]    Because Dr. Tabak's Merger Discount is not accounting for market or industry factors, I do not analyze whether the analyst or market commentary and the change in the Merger Discount are directionally consistent.

percentage of the Merger Discount can be attributed to the alleged misrepresentation during the Class Period.

> **b)** **Analyst Commentary Shows That the Merger Discount Changed During the Class Period for Reasons Other Than the Alleged Misrepresentation**

*May 23, 2022*

89.     On May 23, 2022 the Merger Discount increased by 2.7% from $15.91 on May 20, 2022 to 16.34 on May 23, 2022.[130] On this day, Wedbush commented: "Shareholder meeting will go on as Musk deal hangs in the balance. As Twitter's Board has discussed, the Musk deal at $54.20 is the agreed upon price and will not be renegotiated. However in reality, we believe at this point $54.20 is out the window at its ultimately [*sic*] if Musk tries to walk and pay the $1 billion breakup fee (will be fought in the courts by Twitter Board) or seeks a lower price based on reduced DAU's/spam account dynamic. We believe its [*sic*] currently a 60% chance that Musk tries to walk and use this spam account issue as the scapegoat to get out of the deal and a 40% chance Twitter's Board and Musk come to a new deal price over the coming weeks."[131]

*June 21, 2022*

90.     On June 21, 2022, Rosenblatt Securities slashed its Twitter price target to $33 stating that this "deal is still likely to move forward, but that Musk will have leverage to substantially rework the deal price. This might be an ugly, tortured road that could create substantial share volatility in the interim."[132] On the same date, Mr. Musk stated that three issues need resolving before Twitter deal is finalized. (*See* **Exhibit** 1). The Merger Discount decreased by 6.9% from $16.42 on June 17, 2022 to $15.29 on June 21, 2022.[133]

---

[130]   Bloomberg, L.P.
[131]   "Expect More Fireworks Heading into Twitter Shareholder Meeting Later This Week," Wedbush, May 23, 2022, at 1. (emphasis removed).
[132]   "TWTR: We Now Assume the Musk Deal Price is Cut to $33," Rosenblatt Securities, June 21, 2022, at 1. (emphasis removed).
[133]   Bloomberg, L.P.

*July 13, 2022*

91.    On July 13, 2022, the Merger Discount decreased by 13.4% from $20.14 on July 12, 2022 to $17.45 on July 13, 2022.[134] On this day, Wedbush stated that "[w]hile we assign fair value for Twitter as $30, the stock is now factoring in some significant chance that Musk will ultimately have to pay Twitter a settlement well north of $1 billion and in a possible scenario ultimately still have to buy the company at the agreed upon price at $54.20."[135]

*August 10, 2022*

92.    On August 10, 2022, the Merger Discount decreased by 14.1% from $11.37 on August 9, 2022 to $9.77 on August 10, 2022.[136] On this date, Wedbush wrote:

> "Last night in a filing Musk sold another $7 billion of Tesla stock and then later tweeted this sale was the final sale and done 'in the (hopefully unlikely) event that Twitter forces this deal to close and some equity partners don't come through, it is important to avoid an emergency sale of Tesla stock'. We note in May Musk lined up the equity financing for the Twitter deal from a number of major financial partners. In late April Musk said no further TSLA sales planned, however the situation has dramatically changed in our opinion heading into Delaware Court this October with the odds stacked against Musk winning in the eyes of the Street and his back against the wall. With the chances of a Twitter deal now more likely in our opinion and the Street seeing through this poker move by Musk, we are raising our price target from $30 (fair value fundamentally speaking) to $50 reflecting the higher chances the deal now ultimately closes. We can also see Musk trying to resolve this powder keg situation before the Twitter deal officially heads to court in October. At a minimum (4 scenarios below), we see Twitter getting a massive settlement from Musk in the $5 billion to $10 billion range that is starting to be factored into the stock."[137]

---

[134]  Bloomberg, L.P.
[135]  "Twitter Stock Up as Street Views Suit as 'Very Strong' Heading into Delaware," Wedbush, July 13, 2022, at 1. (emphasis removed).
[136]  Bloomberg, L.P.
[137]  "Musk Selling More Stock-Writing on Wall Deal Could Be in the Cards; PT To $50," Wedbush, August 10, 2022, at 1. (emphasis removed).

*August 30, 2022*

93.    On August 30, 2022 the Merger Discount increased by 5.1% from $14.16 on August 29, 2022 to $14.88 on August 30, 2022.[138] On this date Wedbush wrote:

> "Up until the Zatko development, the Street was factoring in Twitter to have a clear win in the Delaware Courts in October. There are a range of possibilities that can come from the Delaware court including settlement, breakup fee paid, deal enforced, and a myriad of other outcomes. For now Twitter's stock will continue to trade on deal odds as the long and ugly courtroom battle now begins to play out in Delaware courts. … We also believe with the Zatko situation being a potential Pandora's box situation for Twitter that the two sides could come to the negotiating table before the trial begins to try to resolve the Twitter $44 billion deal between Musk and the Twitter Board. We continue to believe a likely scenario is Musk still buying Twitter at a lower renegotiated price in the $50 range (our price target) and taking a brutal Game of Thrones battle in Delaware for both sides off the table before it kicks off. We maintain our NEUTRAL rating and $50 price target."[139]

*September 12, 2022*

94.    On September 12, 2022 the Merger Discount increased by 6.5% from $12.01 on September 9, 2022 to $12.79 on September 12, 2022.[140] On this date, Wedbush provided the following commentary:

> "Tomorrow will be a major day for Twitter as the company formally holds a shareholder vote on the embattled Musk $44 billion deal for the company at $54.20 per share. Shareholders are expected to overwhelming [*sic*] approve the deal ahead of the October 17th trial that kicks off between Twitter and Musk in Delaware Chancery Court. The shareholder approval expected tomorrow formally sets the stage for the Game of Thrones Battle between Musk and Twitter in the Delaware Courts with the *high possibility* in our opinion that some form of negotiation likely takes place ahead of this date. Once both parties step into court its a high risk/high reward scenario for both parties with the major X variable now being the Zatko whistleblower claims. … We maintain our NEUTRAL rating and $50 price target which is based on our view of the deal likely being done at this lowered price point."[141]

---

[138]   Bloomberg, L.P.

[139]   "Zatko Whistleblower Situation Adds Complexity To Twitter Case; Eyes on Delaware," Wedbush, August 30, 2022, at 1. (emphasis removed).

[140]   Bloomberg, L.P.

[141]   "Twitter: Big Day Ahead for Twitter: Shareholder Vote on Musk Deal; Zatko Heads to Senate," Wedbush, September 12, 2022, at 1.

95.    Separately, Dr. Tabak's assumption that the percentage of the Merger Discount attributable to the alleged misrepresentation was constant for extended sub-periods of the Class Period, implies that even when information about the strength of Mr. Musk's claims is publicly revealed, the Merger Discount percentage related to the alleged misrepresentation remains the same. This makes no sense.

96.    For example, as noted *supra* ¶ 70, on July 15, 2022, Wells Fargo held an expert call with Professor Robert Miller, and published a report on July 18, 2022 stating that the acquisition of Twitter by Elon Musk will successfully close because, based on his legal analysis, Twitter was likely to prevail in litigation.[142] One might expect that when this information was revealed, the alleged portion of the Merger Discount related to the alleged misrepresentation would *decrease*. In fact, although on July 18, 2022 the Merger Discount decreased by 4.1% from $16.46 on July 15, 2022 to $15.79 on July 18, 2022,[143] the percentage attributable to the alleged misrepresentation remained constant. Dr. Tabak simply assumes— without any analysis whatsoever—that this information would not have altered the percentage attributable to the alleged misrepresentation.

97.    Similarly, as noted *supra* ¶ 72, on September 23, 2022 Wells Fargo issued another report after their second call with Professor Miller and stated that "[d]espite an array of new developments in the TWTR vs. Musk saga since our first call with Prof. Miller in July, we came away with continued conviction that the acquisition of TWTR by Elon Musk will successfully close, given 1) Prof. Miller's view that Musk's counterclaim consists of four likely losing arguments and 2) Prof. Miller's confidence in the Court's ability and willingness to compel Mr. Musk and the Musk parties to specifically perform the acquisition."[144] On this date, the Merger Discount decreased by 1.4% from $12.80 on September 22, 2022 to $12.62 on September 23, 2022.[145]

---

[142]  "TWTR: All Sales Final? Increased Conviction on Deal Close Post Chancery Court Expert Call," Wells Fargo, July 18, 2022, at 1.

[143]  Bloomberg, L.P.

[144]  "TWTR: Not Budging for Mudge; Continued Conviction on Deal Close Post Update Call w/Chancery Court Expert," Wells Fargo, September 23, 2022, at 1.

[145]  Bloomberg, L.P.

### c)    July 8, 2022

98.     For his analysis of 10b-5(a) and (c) damages, Dr. Tabak inexplicably incorporates the purported reaction of Twitter's stock price to the release of the July 8 Termination Letter. His analysis is flawed in multiple respects. At the outset, Dr. Tabak does not even explain what misrepresentations were allegedly contained in the July 8 Termination Letter and ignores the Court's findings that the information disclosed in this letter was not misleading. In its MTD Order, the Court stated that it was not convinced that the July 8 Termination letter "create[ed] an impression of a state of affairs that differs in a material way from the one that actually exist[ed]."[146] Dr. Tabak's treatment of the July 8 Termination Letter further illustrates the fallacy of Dr. Tabak's assumption that a constant percentage of the Merger Discount is attributable to the alleged misrepresentation. Dr. Tabak offers no explanation how any alleged misrepresentation was associated with the July 8 Termination Letter.

99.     Because Dr. Tabak does not identify any purported misrepresentation associated with the July 8 Termination Letter, it follows that his analysis does not disentangle the market's reaction to news about the Merger termination, which is not a misrepresentation, from any purported misrepresentation or fraud contained in the letter. The failure to disaggregate this information renders Dr. Tabak's calculation that some alleged fraud relating to the July 8 Termination Letter caused Twitter's stock to become deflated by $2.93 unreliable since there is no way to distinguish the reduction caused by the alleged fraud from other factors.

100.     This analytical error is particularly striking because, as reflected in analyst reports published immediately following the July 8 Termination Letter's public disclosure, the market appeared to react primarily to the fact that Mr. Musk sent a termination letter and that litigation was likely, not the representations or arguments made in the letter itself, some of which did not relate to the May 13 Tweet in any event (*e.g.*, Mr. Musk's argument that Twitter violated Section 6.1 by terminating certain employees):[147]

> "We cut our 12-month target price to $33 from $44, as we now see an 80% probability that TWTR will remain public (standalone value of $26 at 23x '23 P/E [price-to-earnings]) and 20% chance it gets taken out at lower revised price. In a 13D filing on Friday afternoon, Musk announced that he is terminating the

---

[146]    MTD Order, at 28.
[147]    Twitter, Inc., Amendment No. 9 to Schedule 13D, Exhibit P, July 8, 2022 at 5:14 p.m. ET, at 7.

Twitter deal. We are not surprised by the move, as it is the logical next step in the process, with the fate of the two sides to now be determined in a prolonged legal battle. With Musk officially walking away from the deal, we think business prospects and stock valuation are in a precarious situation. TWTR will now need to go at it as a standalone company and contend with an uncertain advertising market, a damaged employee base, and concerns about the status of fake accounts/strategic direction."[148]

"On Friday after the close, Elon Musk's X Holdings II, Inc., announced it was terminating its Merger Agreement with Twitter based on allegations of material breaches of multiple provisions. … While this may be yet another negotiating tactic to lower the price, given a worsening macro environment, a hiring freeze, recent layoffs, and reorganization at Twitter, fundamentally we believe the operating environment at Twitter is increasingly challenged. We maintain our Neutral/High Risk rating given the continued potential of a transaction, but lower our TP [target price] to $36 to be more in-line with peers."[149]

"Elon Musk terminated the merger agreement, claiming TWTR has breached its obligation under the contract by refusing to provide requested data. Twitter intends to take legal actions to enforce the agreement at $54.20 per share. We believe Mr. Musk has been looking to renegotiate the deal, and the most reasonable scenario is for both sides to negotiate a new price reflecting slowing fundamentals or a settlement for Mr. Musk to walk away. Maintain Neutral, but lower our PT [price target] from $54 to $35 based 11x FY24 EBITDA [earnings before interest, taxes, depreciation, and amortization], at the bottom of its historical range of 11-18x, which we believe reflects industry's compressed multiples; our PT before the bid was $46, based on 15x FY24 EBITDA."[150]

"Where can TWTR shares go? … Effectively, applying comparable 'low teens' EBITDA multiple on TWTR's current consensus estimates, TWTR shares would likely find support around $24 to $26 per share, if investors start to assign a greater probability that this merger will not happen. However, we'd note that there's a potential breakup fee along with incremental legal expenses, and we'd assign a non-zero probability of a deal being renegotiated at a lower price. Just for context, $1bn in cash implies $1.25 per share in value for TWTR."[151]

"Estimate Twitter Standalone Value of $22-$40/share. Based on our bear/bull analysis, we estimate a standalone value for Twitter of $22-40/share and $30 at

---

[148]   "Twitter, Inc.," CFRA, July 11, 2022, at 1.

[149]   "Twitter Acquisition Terminated Over Allegations Concerning Fake and Spam Accounts, Among Other Things," Citi, July 11, 2022, at 1.

[150]   "Musk Terminates Deal; Renegotiation Likely," Mizuho, July 11, 2022, at 1. (emphasis removed).

[151]   "Musk Cancels Twitter Deal; Legal Battle Coming Up," MKM Partners, July 11, 2022. (emphasis removed).

midpoint (12x our 2023 EBITDA estimate of $1.95B or 5x EV/gross profits)."[152]

"Elon Musk's disclosure post-close of a letter to Twitter's board 'terminating' his acquisition agreement, and reports over the weekend that Twitter will sue Musk this week to force the deal, are precisely the kind of 'ugly, tortured road' we predicted June 21 when reducing our Twitter PT to a Street low $33. We retain this PT, along with a Neutral rating. … Our belief is that Musk/Twitter will recognize this and eventually agree to a revised deal that splits the difference. … We assume Twitter is taken private at $33, midway between Elon Musk's $54.20 agreed deal price and where TWTR could be trading absent a deal, based on performance of social media peers. We assume Musk has leverage to compel TWTR to move substantially lower, but that he wants to complete a deal."[153]

101.    Dr. Tabak's analysis does not account for how news of the termination and reports that Twitter would file a lawsuit in response impacted Twitter's stock price on July 11, 2022 and is thus incomplete, superficial, and unreliable.

102.    In addition to its independent unreliability, Dr. Tabak's treatment of the July 8 Termination Letter further illustrates the fallacy of Dr. Tabak's assumption about the constant Merger Discount attributable to the alleged May 13 misrepresentation.

103.    Following the release of the Termination Letter after market close on July 8, 2022, Twitter's closing stock price declined by $4.16, from $36.81 on July 8, 2022 to $32.65 on July 11, 2022.[154] Accordingly, the Merger Discount increased by $4.16 following the release of the Termination Letter. The specific increase in the Merger Discount associated with the release of the Termination Letter cannot be attributed, however, to market reaction to an alleged misrepresentation made nearly two months prior nor does Dr. Tabak even attempt to tie the Merger Discount increase to the May 13 Tweet. Yet, Dr. Tabak's Merger Discount Damages Methodology attributes 45.7% of this increase in the Merger Discount, or $1.90 (*i.e.*, 0.457 times $4.16) to the alleged May 13 misrepresentation. This illustrates that Dr. Tabak's assumption that a constant percentage of the Merger Discount can be attributed to the alleged May 13 misrepresentation on each day of the Class Period is unscientific and absurd. It further renders his damages analysis unreliable.

---

[152]    "Elon Musk Terminates Twitter Deal; Twitter to Pursue Legal Action to Enforce Deal," Raymond James, July 11, 2022, at 1. (emphasis removed).

[153]    "TWTR: It's Getting Ugly With Musk," Rosenblatt Securities, July 11, 2022, at 1-2. (emphasis removed).

[154]    Bloomberg, L.P.

104.     Dr. Tabak's conclusion that the May 13 alleged misrepresentation is responsible for 45.7% of the Merger Discount on July 11, 2022 is inconsistent with analyst commentary after Mr. Musk disclosed the July 8 Termination Letter. After the Letter's release post-market close, the Merger Discount increased by 23.9% from $17.39 on July 8, 2022 to $21.55 on July 11, 2022.[155] As noted above, various analysts discussed the negative implications of the Termination Letter for Twitter's stock price and, hence, the Merger Discount—not any purported misrepresentation made on May 13.

105.     Wedbush stated: "[i]n a 13D filing after the close Elon Musk in a filing is terminating the merger agreement with Twitter because of a material breach of multiple provisions of the agreement and Twitter appears to have made false and misleading misrepresentations. … Twitter's stock on a standalone basis will now likely trade in the $25-$30 range when the stock opens on Monday with no deal likely. … From the beginning this was always a head scratcher to go after Twitter at a $44 billion price tag for Musk and never made much sense to the Street, now it ends (for now) in a Twilight Zone ending with Twitter's Board back against the wall and many on the Street scratching their head around what is next. We maintain our NEUTRAL on Twitter."[156]

106.     Citi commented: "[o]n Friday after the close, Elon Musk's X Holdings II, Inc., announced it was terminating its Merger Agreement with Twitter based on allegations of material breaches of multiple provisions. … While this may be yet another negotiating tactic to lower the price, given a worsening macro environment, a hiring freeze, recent layoffs, and reorganization at Twitter, fundamentally we believe the operating environment at Twitter is increasingly challenged. We maintain our Neutral/High Risk rating given the continued potential of a transaction, but lower our TP to $36 to be more in-line with peers."[157]

107.     Mizuho stated: "Elon Musk terminated the merger agreement, claiming TWTR has breached its obligation under the contract by refusing to provide requested data. Twitter intends to take legal actions to enforce the agreement at $54.20 per share. We believe Mr.

---

[155]   Bloomberg, L.P.; Twitter, Inc., Amendment No. 9 to Schedule 13D, July 8, 2022 at 5:14 p.m. ET; "Musk Scraps Twitter Bid; Nasdaq Leads Week of Market Gains," *WSJ Podcasts*, July 8, 2022 at 5:12 p.m. ET.

[156]   "Musk Formally Terminates Twitter Deal with 13D Filing," Wedbush, July 8, 2022, at 1. (emphasis removed).

[157]   "Twitter Acquisition Terminated Over Allegations Concerning Fake and Spam Accounts, Among Other Things," Citi, July 11, 2022, at 1.

Musk has been looking to renegotiate the deal, and the most reasonable scenario is for both sides to negotiate a new price reflecting slowing fundamentals or a settlement for Mr. Musk to walk away. Maintain Neutral, but lower our PT from $54 to $35 based 11x FY24 EBITDA, at the bottom of its historical range of 11-18x, which we believe reflects industry's compressed multiples; our PT before the bid was $46, based on 15x FY24 EBITDA."[158]

108.     MKM Partners analyzed: "Where can TWTR shares go? … Effectively, applying comparable 'low teens' EBITDA multiple on TWTR's current consensus estimates, TWTR shares would likely find support around $24 to $26 per share, if investors start to assign a greater probability that this merger will not happen. However, we'd note that there's a potential breakup fee along with incremental legal expenses, and we'd assign a non-zero probability of a deal being renegotiated at a lower price. Just for context, $1bn in cash implies $1.25 per share in value for TWTR."[159]

109.     Raymond James provided an estimate of the standalone value: "Estimate Twitter Standalone Value of $22-$40/share. Based on our bear/bull analysis, we estimate a standalone value for Twitter of $22-40/share and $30 at midpoint (12x our 2023 EBITDA estimate of $1.95B or 5x EV/gross profits)."[160]

110.     Rosenblatt Securities commented: "Elon Musk's disclosure post-close of a letter to Twitter's board 'terminating' his acquisition agreement, and reports over the weekend that Twitter will sue Musk this week to force the deal, are precisely the kind of 'ugly, tortured road' we predicted June 21 when reducing our Twitter PT to a Street low $33. We retain this PT, along with a Neutral rating. … Our belief is that Musk/Twitter will recognize this and eventually agree to a revised deal that splits the difference. … We assume Twitter is taken private at $33, midway between Elon Musk's $54.20 agreed deal price and where TWTR could be trading absent a deal, based on performance of social media peers. We assume Musk has leverage to compel TWTR to move substantially lower, but that he wants to complete a deal."[161]

---

[158]  "Musk Terminates Deal; Renegotiation Likely," Mizuho, July 11, 2022, at 1. (emphasis removed).

[159]  "Musk Cancels Twitter Deal; Legal Battle Coming Up," MKM Partners, July 11, 2022, at 1. (emphasis removed).

[160]  "Elon Musk Terminates Twitter Deal; Twitter to Pursue Legal Action to Enforce Deal," Raymond James, July 11, 2022, at 1. (emphasis removed).

[161]  "TWTR: It's Getting Ugly With Musk," Rosenblatt Securities, July 11, 2022, at 1-2. (emphasis removed).

111.    Separately, the fact that Dr. Tabak treats the impact of the July 8 Termination Letter differently in his two damages analyses further undermines his assumption that the Merger Discount remained constant throughout the Class Period. In his 10b-5(b) analysis, Dr. Tabak keeps the percentage of the daily Merger Discount before and after July 8, 2022 at 45.7%, but in his 10b-5(a) and (c) analysis he increases the daily Merger Discount related to the alleged misrepresentation from 45.7% on July 8, 2022 to 50.5% on July 11, 2022. Dr. Tabak's 10b-5(a) and (c) analysis implies that he is treating the July 8 Termination Letter as containing value-relevant information related to the alleged misrepresentation despite the Court's ruling to the contrary and even though he does not account for it at all in his 10b-5(b) analysis.[162]

### C. Dr. Tabak's Assumption That Mr. Musk's October 4, 2022 Announcement Corrected the Alleged Misrepresentation Is Flawed and Unreliable

112.    Dr. Tabak assumes that the disclosure on October 4, 2022 that Mr. Musk had notified Twitter that he intended to proceed with the deal contemplated by the April 25, 2022 Merger Agreement corrected the alleged misrepresentation.

113.    As a matter of economics, there is no reliable basis to conclude that the October 4, 2022 disclosure corrected the alleged misrepresentation. Nothing in the disclosure plausibly revealed the truth about the alleged misrepresentation. Furthermore, analyst commentary released shortly after the October 4, 2022 disclosure does not indicate that market participants learned the truth about the alleged misrepresentation. Instead, the commentary was largely descriptive, noting that it appeared the deal would proceed at $54.20 per share, without

---

[162] Even assuming that the July 8 Termination Letter is value-relevant, it must be value-relevant regardless of which damages analysis it is applied to. Taking Dr. Tabak's instruction from Plaintiff's counsel, the only issue is whether it is related or unrelated to the alleged misrepresentation. Thus, if the July 8 Termination Letter provided the market with value-relevant information that was related to the alleged misrepresentation, then one would expect that the daily Merger Discount related to the alleged misrepresentation in Dr. Tabak's 10b-5(b) analysis would also increase following the July 8 Termination Letter. Conversely, if the July 8 Termination Letter provided the market with value-relevant information unrelated to the alleged misrepresentation, then one would expect that the daily Merger Discount related to the alleged misrepresentation in Dr. Tabak's 10b-5(b) analysis would decrease following the July 8 Termination Letter. Yet, inexplicably, Dr. Tabak keeps the daily Merger Discount constant in his 10b-5(b) analysis.

indicating that Mr. Musk's change of heart somehow indicated that he had previously been engaged in a misrepresentation.

114.    For example, analysts provided the following commentary following the disclosure on October 4, 2022:

> "Ultimately, we will not know why Elon elected to change course ahead of trial, though we speculate that there are details of the negotiation or legal process that he preferred remain private (including deposition.)."[163]

> "We are somewhat shocked that Musk didn't look to at least settle at a slight discount, but it prevents a potentially ugly court battle. We think Musk likely realized that the odds of a victory were slim to none, and steering away from an ugly court battle helps prevent doing any further harm to TWTR (an asset he would ultimately be forced to own)."[164]

> "As we mentioned in our July note, we think there are various reasons why Musk came back to the table and stuck with his original offer as he and his legal team likely saw the upcoming court battles against the firm unwinnable and/or very costly. … We did think that the firm had a strong case against Musk mainly due to the difficulty that we assumed Musk and his legal team had regarding the spam user count dispute as they would have to display in detail their complete findings and the process behind it in court, which we deemed was a heavy burden. Plus, in our view, Twitter likely had a solid argument that its various operational decisions represent an ordinary course of business."[165]

> "This is an abrupt and surprising turn of events considering that Mr. Musk has spent months being critical of everything Twitter, from the leadership team and how they managed the business to the platform's ability to guard against bots. In fact, he has been trying to walk away from the deal pending his team's analysis supporting the company's claim that spam/fake accounts do indeed represent less than 5% of users. We believe this decision is likely driven by Mr. Musk and his team coming to the realization that their case had a very low probability of success given their decision early on to wave any due diligence."[166]

> "The soap opera now comes to an end with Musk owning Twitter at the original $44 billion price tag after this rollercoaster ride since April. We continue to believe Musk saw the writing on the wall and knew his chances of a victory in

---

[163]   "Leaving the Nest," Baird, October 4, 2022, at 1.

[164]   "Twitter, Inc.," CFRA, October 4, 2022, at 1.

[165]   "Elon Musk Reportedly Ready to Close the $54.20 per Share Acquisition of Twitter," Morningstar, October 4, 2022, at 1-2.

[166]   "In Surprising Pivot Musk Agrees to Acquire TWTR on Original Terms; End of Saga," Truist, October 4, 2022, at 1.

Delaware were slim to none with the best path accepting the current deal and move forward."[167]

"Head-faked by the whistleblower. We had fully expected Musk's bot claims to fall flat. But our previous $37 PT assumed that the whistleblower's complaints would be problematic for Twitter and give Musk leverage to negotiate a substantial hair cut to the deal price. In reality, this didn't happen, reflecting the strength of Twitter's seller-friendly contract."[168]

### D.  Dr. Tabak's Use of a Two-Day Event Window to Estimate the Effect of Mr. Musk's May 13 Tweet on Twitter's Stock Price Is Unscientific and Unreliable

115.    Dr. Tabak uses a two-day event window to measure the alleged deflation that entered Twitter's stock price following the May 13 Tweet, which he claims is his "standard practice."[169] This is inconsistent with his conclusions at the class certification stage of this case that the market for Twitter stock during the Class Period was efficient.[170] It is widely recognized that if the market for a security is efficient, then new information will quickly be reflected in the security price, typically within one trading day.[171] The May 13 Tweet occurred before market open on May 13, 2022.[172] If the market for Twitter stock is efficient, as Dr. Tabak opines it is, there is no reliable basis to assume that it would have taken two full trading days for this information to be reflected in Twitter's stock price.

116.    Dr. Tabak acknowledged that a one-day event window is appropriate if the market for a security is efficient in his class certification report. He also uses a one-day event window to analyze Twitter's stock price reaction to the release of the Termination Letter on July 8, 2022. His analysis shows that, while there was a negative and statistically significant price reaction on July 11, 2022, there were positive and significant price reactions on July 12

---

[167]  "Raising Price Target to Deal Price; $44 Billion Deal Set to Close," Wedbush, October 4, 2022, at 1.

[168]  "TWTR: PT Upped For a Done Deal," Rosenblatt Securities, October 5, 2022, at 1.

[169]  Tabak Report, ¶ 18.

[170]  Tabak Class Cert Report.

[171]  *See, e.g.*, Patel, J.M. and Wolfson, M.A., 1984, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcement," *Journal of Financial Economics,* Vol. 13, 223-252, at 249 ("the price reaction to earnings and dividend announcements begins very quickly.  The reaction is evident in the first pair of price changes (i.e., within at most a few minutes) of the appearance of the news release on Broad Tape monitors … the largest portion of the price response occurs in the first five to fifteen minutes after the disclosure.").

[172]  *See supra* ¶ 9.

and 13, 2022 (as denoted by asterisks in Dr. Tabak's Exhibit 4a). If Dr. Tabak had followed his purported "standard practice," these three consecutive statistically significant price changes would have changed his *negative* $2.93 price impact following the July 8 Termination Letter to a *positive* $1.52; *i.e.*, the opposite conclusion. Thus, Dr. Tabak's July 8, 2022 analysis is inconsistent with his purported "standard practice."

### E.  Dr. Tabak's Analysis of the Alleged Deflation and Inflation in the Respective Prices of Twitter's Call and Put Options Is Flawed and Unreliable

117.    Dr. Tabak estimates the alleged deflation/inflation in Twitter's option prices as follows. He estimates deflation for call options with open interest on at least one day during the Class Period and for put options he only considers those with open interest on October 4, 2022.[173] He then assumes for each such option the first date for his estimate of alleged deflation is the first day with reported data (even if the reported volume and open interest are zero).[174] Then, regardless of whether there is subsequent reported data for such option, he estimates deflation daily through the earlier of the date of option's expiration or the end of the Class Period.

118.    To estimate the daily deflation for each option, Dr. Tabak takes the difference between a hypothetical "actual" option price (*i.e.*, he does not use the actual traded price of the option) and a "but-for" option price.[175] To calculate both of these option prices, he uses the Black-Scholes formula.[176] The Black-Scholes formula requires five inputs: (i) the underlying stock price, (ii) the volatility of the underlying stock, (iii) the strike or exercise price of the option, (iv) the time to maturity of the option, and (v) the risk-free rate.[177] For the underlying stock price, Dr. Tabak uses the actual Twitter stock price to calculate a hypothetical actual option price and the actual Twitter stock price plus his calculated alleged deflation per share to calculate the but-for option price. For the volatility, he assumes that, for each day, all Twitter

---

[173]  Tabak Report Exhibit 7, Notes and Sources.

[174]  TABAK-00003022.py. *See* functions: get_damaged_options() and calc_option_inflation_deflation().

[175]  Tabak Report, ¶ 28. To estimate the daily inflation for each option, Dr. Tabak takes the difference between a "but-for" option price and a hypothetical "actual" option price.

[176]  Tabak Report, ¶ 28 n. 18.

[177]  *See, e.g.,* Bodie, Z., Kane, A., and A. Marcus, 2014, *Investments,* 10th ed., McGraw-Hill, at 737-738.

options have the same implied volatility based on "the implied volatility of near-the-money options as provided by FactSet Research Systems Inc."[178] For the strike or exercise price and time to maturity of each option contract, he uses the actual values from each option contract. For the risk free rate, he uses market yields on U.S. Treasuries of various maturities, and he linearly interpolates the rates of the two U.S. Treasuries with the closest maturities to estimate the risk-free rate for each option.

119.    As an initial matter, because Dr. Tabak's option damages are based on the deflation in Twitter's common stock, my criticisms of his analysis of the alleged deflation in Twitter's stock price also affect the reliability of Dr. Tabak's option damages calculations. Moreover, Dr. Tabak's option damages methodology suffers from several other flaws.

120.    First, Dr. Tabak does not provide a reliable basis or cite to any academic literature establishing that his methodology can be used to reliably estimate alleged deflation/inflation in traded options.

121.    Second, without explanation, for most of Twitter's options, Dr. Tabak ignores each option's actual implied volatility but instead uses the implied volatility of other Twitter options. Assuming hypothetically that Dr. Tabak's methodology can be used to reliably estimate alleged deflation/inflation in the prices of Twitter's options, his use of the implied volatility of a set of Twitter options and not each option's actual implied volatility is inappropriate. For example, on May 13, 2022, there was a Twitter call option with a strike price of $55 and maturity date of January 20, 2023 that had volume of 20,079 and open interest of 108,017.[179] This option had an implied volatility reported in Dr. Tabak's backup of 25%, which is lower than Dr. Tabak's assumed implied volatility of 63%.[180] Using the 25% implied volatility and keeping the rest of Dr. Tabak's methodology the same results in alleged deflation per share of $1.09, which is 60% lower than Dr. Tabak's estimated deflation per share of $2.70 on that day for that option.

122.    Third, Dr. Tabak does not rely on the Twitter options' actual prices but instead he concocts a hypothetical "actual" price that he uses to calculate the purported deflation in

---

[178]  Tabak Report, ¶ 28 n. 18.
[179]  TABAK-00003017.csv.
[180]  TABAK-00003017.csv; TABAK-00003014.csv.

Twitter options. Thus, his option damages is not tethered to the actual option prices Twitter option holders paid.

123.    Fourth, Dr. Tabak manufactures hypothetical "actual" option prices on days when the options do not trade.[181] He does not demonstrate that these are reliable measures of the prices of those options on those days.

## IV.    PROFESSOR BADAWI DOES NOT ESTABLISH THAT INVESTORS WERE NOT ABLE TO DETERMINE THE POTENTIAL FOR MERGER TERMINATION

124.    Professor Badawi claims that "[t]o determine the potential for termination, one would need to know, *inter alia*, the precise information requested by the buyer, the seller's basis for a refusal to provide information, the content of the communications between the parties, and whether the buyer is potentially in material breach of any of its obligations. The parties also executed a confidentiality agreement. The terms of that agreement could have expanded or restricted the information rights of the parties. Given the non-public nature of the document, it would not be possible for the investing public to know whether that agreement affected the claims in Mr. Musk's tweet."[182] Professor Badawi, however, has not established that, even if there was non-public information, the disclosure of such information would have altered the total mix of information available to investors following the May 13 Tweet. Therefore, Professor Badawi has not established that such non-public information would have affected Twitter's stock price.

125.    For example, as explained in Section III.A.iv., throughout the Class Period, Twitter disclosed various communications with Mr. Musk, including all of the communications on July 26, 2022. As shown in that section, there was no statistically significant price reaction to these disclosures, which indicates that the disclosure of this information did not impact investors' ability to determine the potential for merger termination or assess the claims in the May 13 Tweet.

---

[181]    *See, e.g.*, Twitter call option with strike price of $33 and expiration date of January 17, 2025 that shows zero volume and zero open interest in columns T and U of TABAK-00003027.xlsx from September 12, 2022 through September 30, 2022, yet Dr. Tabak calculates deflation for this option and on those dates per column BKJ of TABAK-00003028.xlsx tabs "B Call" and "AC Call."

[182]    Badawi Report, ¶ 79. (Footnotes omitted).

126.     In addition, Professor Badawi claims that, even though "[s]tock analysts were following the Twitter transaction closely and were presumably aware of all, or nearly all, of the public information about the deal," "[s]ome analysts were confused and perplexed by the tweet" on May 13.[183] This is rank speculation. Professor Badawi assumes that these stock analysts chose to remain "confused and perplexed" and decided not to seek clarification about the information they were confused about.

127.     Separately, to the extent there was value-relevant information that would have affected investment decisions, the fact that the Twitter Merger attracted many merger arbitrage investors implies that there were sophisticated investors in Twitter who have the ability and economic incentive to understand or seek clarity on potentially confusing information.[184] One investment strategy employed by merger arbitrageurs is to profit from the reduction in the Merger Discount from the time they made their investment until the time they exited their investment.[185]

128.     I examined the presence of merger arbitrageurs after Twitter's Merger announcement and found that institutional investors who focused on merger arbitrage invested hundreds of millions of dollars in Twitter stock after the Merger announcement.[186] For example, Farallon Capital Management LLC, a hedge fund whose investment strategy "seeks to capture the spread between the current and projected values of securities of companies involved in a merger or acquisition,"[187] increased holdings of Twitter from 0 to 7,325,000 shares (or ~$274 million) between March 31 and June 30, 2022 and further increased its

---

[183]  Badawi Report, ¶ 82.

[184]  Merger arbitrage firms assess various information about the deal, including: "The second stage of our research is to participate in the management conference calls; review the Wall Street research, SEC filings and the merger agreement. In our review of the merger agreement, we look for any unusual conditions to the merger such as due diligence, financing, business or regulatory conditions. We are basically looking for solid merger agreements with minimal conditions. We also examine regulatory issues that could affect the timing or the ultimate approval of the transactions. We have very good outside antitrust counsel and we have an in-house lawyer to look at any legal issue that may affect the outcome of a transaction. Generally, the focus of our research is to eliminate deals that are riskier and have a lower probability of being completed." *See* Pedersen, L., 2015, *Efficiently Inefficient*, Princeton University Press, Chapter 16, at 296.

[185]  *Id*., at 297 ("The typical closure of the trade is simply that the merger is completed and the merger arbitrage earns the deal spread.").

[186]  Out of top 50 institutional investors that increased their holdings from 0 Twitter shares as of March 31, 2022 to above 100,000 Twitter shares as of June 30, 2022, 29 firms engaged in merger arbitrage.

[187]  Farallon Capital website, available at https://www.faralloncapital.com/core-strategies.

holdings to 7,755,000 shares (or ~$340 million) as of September 30, 2022.[188] **Exhibit 2** shows that there were at least 29 institutions engaged in merger arbitrage investing a total of ~53 million shares (or ~$2 billion as of June 30, 2022).[189] Given such substantial investments, there is no reliable economic basis to assume that these institutions had no ability and economic incentive to uncover value-relevant information.

Kenneth M. Lehn

July 2, 2025

---

[188]  ~$274 million = $37.39 Twitter stock price on June 30, 2022 x 7,325,000 shares; ~$340 million = $43.84 Twitter stock price on September 30, 2022 x 7,755,000 shares. Bloomberg, L.P.

[189]  ~$2 bn = $37.39 Twitter stock price on June 30, 2022 x 53 million shares. Bloomberg, L.P.

**July 2, 2025**

**Appendix A**
**Kenneth Lehn**
**Curriculum Vitae**

Kenneth Lehn
5061 5th Ave.
Pittsburgh, PA 15232
e-mail: lehn@katz.pitt.edu
412-779-2127

**Education**

Ph.D., Washington University, 1981 (Economics)
M.A., Miami University, 1976 (Economics).
B.A., Waynesburg College, 1975 (Economics).

**Employment**

Samuel A. Mccullough Professor Emeritus of Finance (2020-present), Samuel A. McCullough Professor of Finance (1999-2020), and Professor of Finance (1991-1999), Joseph M. Katz Graduate School of Business and College of Business Administration.

Affiliated Professor of Law, School of Law, University of Pittsburgh, September 1997-2020.

Senior Consultant, Compass Lexecon, 2009-present.

Director, Center for Research on Contracts and the Structure of Enterprise, University of Pittsburgh, 1991-2001.

Chief Economist, U.S. Securities and Exchange Commission, June 1987-July 1991.

Adjunct Professor of Law, Georgetown University, 1990-1991.

Assistant Professor of Business and Public Policy, School of Business Administration, Washington University, 1981-1987.

Research Associate, Center for the Study of American Business, Washington University, 1986-1987.

Visiting Assistant Professor of Economics, University of California, Los Angeles, 1986.
Deputy Chief Economist, U.S. Securities and Exchange Commission, 1984-1985.

Instructor of Economics, Miami University, 1976-1977

**Courses Taught**

Corporate Finance (MBA)
Applied Corporate Finance (MBA)
Valuation (MBA)
Creating Value through Restructuring (MBA)
Organization of Securities Markets (Undergraduate)
Business and Public Policy (Undergraduate, MBA, Executive)
Corporate Governance (Doctoral)
Finance for Lawyers (Law)

**Teaching Awards**

MBA Teacher of the Year (Pittsburgh), nine times.
MBA Teacher of the Year (Washington U.), 1987.
Undergraduate Teacher of the Year (Washington U.), 1981.

**Publications**

**Books**

*Modernizing U.S. securities regulation: economic and legal perspectives*, ed. with Robert W. Kamphuis, Jr., Homewood, Ill.: Business-One Irwin, 1993.

**Published Papers**

"Corporate governance and corporate agility," *Journal of Corporate Finance*, February 2021.

"Financing investment spikes in the years surrounding World War I," with Leonce Bargeron and David Denis, *Journal of Financial Economics*, November 2018, 215-236.

"Corporate governance, agility, and survival," *International Journal of Economics and Business*, February 2018, 65-72.

"Limited liability and share transferability: an analysis of California firms, 1920-1940," with Leonce Bargeron, *Journal of Corporate Finance*. June 2017, 451-468.

"Employee-management trust and M&A activity," with Leonce Bargeron and Jared Smith, *Journal of Corporate Finance*, December 2015, 389-406.

"Disagreement and the informativeness of stock returns: the case of acquisition announcements," with Leonce L. Bargeron, Sara B. Moeller, and Frederik P. Schlingemann, *Journal of Corporate Finance*, April 2014, 155-172.

"Financing the business firm," with Leonce Bargeron in *The Oxford Handbook in Managerial Economics*, edited by William Shughart and Christopher Thomas, Oxford University Press, 2013.

"Sarbanes-Oxley and corporate risk-taking," with Leonce Bargeron and Chad Zutter, *Journal of Accounting and Economics*, February 2010, 34-52.

"Determinants of the size and structure of corporate boards: 1935-2000," with Sukesh Patro and Mengxin Zhao, *Financial Management*, Winter 2009, 747-780.  Received Pearson/Prentice-Hall Award for second best paper published in *Financial Management* during 2008-2010.

"The subprime crisis and systemic risk: evidence from U.S. securities markets," with Leonce Bargeron and Mehmet Yalin, *Globalization and Systemic Risk*, edited by Douglas D. Evanoff, David S. Hoelscher, and George G. Kaufman, World Scientific Publishing, 2009, 299-312.

"The CISG: perspectives from an economist," *The CISG and the business lawyer*, edited by Ronald Brand, Harry Flechtner, and Mark Walter, Oxford University Press, 2007, 261-265.

"Governance indexes and valuation: which causes which?," with Sukesh Patro and Mengxin Zhao, *Journal of Corporate Finance* 13 (December 2007), 907-928.

 "The rise of the private equity market," with Thomas Boulton and Steven Segal, *New financial instruments and institutions: opportunities and policy challenges*, edited by Yasuyuki Fuchita and Robert Litan, Brookings Institution Press, 2007, 141-161.

"CEO turnover after acquisitions: are bad bidders fired?," with Mengxin Zhao, *Journal of Finance* (August 2006), 1759-1811. Reprinted in *Mergers and acquisitions*, ed. by J. Harold Mulherin, Edward Elgar Publishing, 2012.

"Corporate governance in the deregulated telecommunications industry," *Telecommunications Policy* (May-June 2002), 225-242.

"Growth opportunities and corporate debt policy: the case of the U.S. defense industry, 1980-1995," with Vidhan Goyal and Stanko Racic, *Journal of Financial Economics* (April 2002), 35-59.

"Decentralization, incentives, and value creation: the case of JLG Industries," with Heidi E. Treml, *Journal of Applied Corporate Finance* (Fall 2000), 60-70.  Reprinted in Donald H. Chew and Stuart L. Gillan, *Corporate governance at the crossroads*, McGraw-Hill Irwin, 2005.

3

"Workforce integration and the dissipation of value in mergers: the case of USAir's acquisition of Piedmont Aviation," with Stacey Kole, *Mergers and productivity*, edited by Steven Kaplan, National Bureau of Economic Research, University of Chicago Press, 2000, 239-279.

"Comment on 'Financial regulatory structure and the resolution of conflicting goals' by Larry D. wall and Robert A. Eisenbeis," *Journal of Financial Services Research,* (September/December 1999), 247-248.

"Some observations on Henry Manne's contributions to financial economics," *Case Western Law Review*, (Winter 1999), 263-268.

"Deregulation and the adaptation of governance structures: the case of the U.S. airline industry," with Stacey Kole, *Journal of Financial Economics* (April 1999), 79-118.  Won Second Jensen Prize for Corporate Finance and Organizations in 1999 *JFE* Best Paper Contest.  Reprinted in J. Harold Mulherin, *Mergers and corporate governance*, Edward Elgar Publishing, 2004.

"The causes and consequences of accounting fraud," with Mason Gerety, *Managerial and Decision Economics* (November-December 1997), 587-599.

"Antitrust franchise relocation in professional sports: an economic analysis of the *Raiders* case," with Michael Sykuta, *Antitrust Bulletin* (Fall 1997), 541-564.

"EVA, accounting profits, and CEO turnover," with Anil Makhija, *Journal of Applied Corporate Finance*, (Summer 1997), 90-97.

"Investor behavior in mass privatization: the case of the Czech voucher scheme," with Archana Hingorani and Anil Makhija, *Journal of Financial Economics* (1997), 349-396.  Reprinted in Diane Denis and John McConnell, *Governance: an international perspective*, Edward Elgar Publishing Ltd., forthcoming 2005.

"Deregulation, the evolution of governance structure, and survival," with Stacey Kole, *American Economic Review Papers and Proceedings* (May 1997), 421-425.

"EVA and MVA as performance measures and signals for strategic change," with Anil Makhija, *Strategy and Leadership* (May/June 1996), 34-38.

"The effect of entry in the local telephone market on the equity values of the Regional Bell Operating Companies," with Kevin Green, *Managerial and Decision Economics*, (July--August 1995), 469-477.

"The SEC's Market 2000 Report," with Corinne Bronfman and Robert A. Schwartz, 19 *Journal of Corporation Law*, 3 (Spring 1994), 523-551.  Modified versions are published in *Financial*

*Review* (published by Ministry of Finance in Japan), Summer 1994, and "U.S. Securities Markets Regulation: Regulatory Structure," in Benn Steil, ed., *International financial market regulation*, (New York: John Wiley and Sons), 1994, 37-74.

"The market for marketplaces: reflections on the SEC's Market 2000 Report," in Robert A. Schwartz, editor, *Global equity markets: technological, competitive and regulatory challenges*, Irwin Professional, 1994.

"Regulation of going private transactions," with Jeffry Davis in *Modernizing U.S. securities regulation: economic and legal perspectives*, Kenneth Lehn and Robert W. Kamphuis, Jr., eds., Homewood, Ill.: Business-One Irwin, 1993.

"Information asymmetries, Rule 13e-3, and premiums in going private transactions," with Jeffry Davis, 70 *Washington University Law Quarterly*, (l992), 587-6ll.

"Contractual resolution of bondholder-stockholder conflicts in leveraged buyouts," with Annette Poulsen, *Journal of Law and Economics*, (October l99l), 645-674.  Reprinted in Roberta Romano, *Foundations of corporate law*, Oxford University Press, 1993.

"Institutional ownership of equity: effects on stock market liquidity and corporate long-term investments," with Jonathan Jones and J. Harold Mulherin, in Arnold W. Sametz, ed., *Institutional investors: challenges and responsibilities*, (Homewood, Ill.: Dow-Jones Irwin), 1991, 115-127.

"The case for indexing," in *The effect of index investment policies on corporate governance*, 1991 Annual Colloquium on Corporate Law and Social Policy, University of Toledo Law School, 1991.

"Comment on 'Globalization of financial markets' by Clifford W. Smith, Jr.," in 34 *Carnegie-Rochester Conference Series on Public Policy* (Spring 1991), 97-103.

"Securities regulation during the Reagan Administration: corporate takeovers and the 1987 stock market crash," with Jeffry Davis, in Anandi P. Sahu and Ronald L. Tracy, eds., *The economic legacy of the Reagan years: euphoria or chaos?*, (New York: Praeger Publishers), 1991, 129-140.

"Comment on 'The record of LBO performance' by William Long and David Ravenscraft," in Arnold W. Sametz, ed., *The battle for corporate control*, (Homewood, Ill.: Dow-Jones Irwin), 1991, 547-553.

"The choice between dual class recapitalizations and going private transactions," with Jeffry Netter and Annette Poulsen, 27 *Journal of Financial Economics*, (October 1990), 557-580.

Reprinted in J. Harold Mulherin, *Mergers and corporate governance*, Edward Elgar Publishing, 2004.

"Do bad bidders become good targets?," with Mark L. Mitchell, 98 *Journal of Political Economy* (April 1990), 372-398; reprinted, with some modifications, in 3 *Journal of Applied Corporate Finance* (Summer 1990), 60-69; Donald H. Chew, Jr., ed., *The new corporate finance: where theory meets practice*, New York: McGraw-Hill, 1993, 52-61; Michael J. Brennan, ed., *Empirical corporate finance*, Edward Elgar, 2000; and J. Harold Mulherin, *Mergers and corporate governance*, Edward Elgar Publishing, 2004.

"The economics of event risk: the case of bondholders in leveraged buyouts," with Annette Poulsen, 15 *Journal of Corporation Law* (Winter 1990), 199-217.

 "The view from the SEC," in *Proceedings of the 1989 Annual Conference of the Garn Institute of Finance*, University of Utah, 1990, 167-170.

"Public policy towards corporate restructuring," 25 *Business Economics* (April 1990), 26-31.

"Commentary on 'An economic analysis of the Brady Report' by David Haddock," in Gerald P. Dwyer, Jr. and Rik W. Hafer, eds., *The stock market: bubbles, volatility, and chaos*, (Boston, Mass.: Kluwer Academic Publishers), 1990, 197-201.

"View from Washington on leveraged buyouts," in Edward I. Altman, ed., *The high yield debt market*, (Homewood, Ill.: Dow-Jones Irwin), 1990, 154-160.

"Free cash flow and stockholder gains in going private transactions," with Annette Poulsen, 44 *Journal of Finance* (July 1989), 771-787.

"Comment on 'The danger of regulatory overreaction to the October 1987 crash' by Lawrence Harris," 7 *Cornell Law Review* (July 1989), 948-952.

"Leveraged buyouts: wealth created or wealth redistributed?" with Annette Poulsen, in Murray L. Weidenbaum and Kenneth Chilton, eds., *Public policy towards corporate takeovers* (New Brunswick, N.J.: Transaction Publishers), 1988, 46-62.

"Majority-minority relationships -- an economic perspective," 13 *Canada-U.S. Law Journal* (1988), 135-141.

"The economics of leveraged takeovers," with David Blackwell and Wayne Marr, 65 *Washington University Law Quarterly* (1987), 163-191.

"The structure of corporate ownership: causes and consequences," with Harold Demsetz, 93 *Journal of Political Economy* (December 1985), 1155-1177.

"Information asymmetries in baseball's free agent market," *Economic Inquiry* (January 1984), 37-44; reprinted in Brian Goff and Robert D. Tollison, eds., *Sportometrics*, Texas A&M University Press, 1990, 253-261.

"Property rights, risk-sharing, and player disability in major league baseball," 25 *Journal of Law and Economics* (October 1982), 343-356; reprinted in Brian Goff and Robert D. Tollison, eds., *Sportometrics*, Texas A&M University Press, 1990, 35-58.

**Other Articles**

"Private insecurities," *The Wall Street Journal*, February 15, 2006.

"How to clean up after corporate scandals," *The Pittsburgh Post-Gazette*, October 6, 2002.

"Soaring labor costs may ground airline merger," *The Wall Street Journal*, May 25, 2000, A26.

"Some observations on the Shad-Johnson accord and SEC-CFTC jurisdiction disputes," in Charles W. Smithson, *Managing financial risk: a guide to derivative products, financial engineering, and value maximization*, McGraw-Hill, 1998.

"Hostile takeovers: some empirical observations," *Corporations, Securities and Antitrust News* (Fall 1996), 1, 10-11.

 "The lessons of Marriott," *The Wall Street Journal*, March 11, 1993.

"A Coase for rejoicing," *The Wall Street Journal*, October 17, 1991.

"Agency evaluates bust-up takeovers," with Mark Mitchell, *National Law Journal* (November 6, 1989), S1, S3-S4; reprinted in the *New York Law Journal* (December 4, 1989).

"Market correction of bad acquisitions," with Mark Mitchell, 3 *Institutional Investor: Global Capital Markets Forum* (April 1989), 53.

"Are takeovers hostile to economic performance?," with John Pound and Gregg Jarrell, *Regulation* (September-October 1986).

"Takeovers don't crimp long-term planning," with Gregg Jarrell, *The Wall Street Journal*, May 1, 1985.

**Policy Reports**

"Institutional ownership, tender offers, and long-term investments," with Gregg Jarrell and Wayne Marr, Office of the Chief Economist, U.S. Securities and Exchange Commission, April 19, 1985.

"Noninvestment grade debt as a source of tender offer financing," Office of the Chief Economist, U.S. Securities and Exchange Commission, 1986.

"The post-offering price performance of closed-end funds," with Kathleen Weiss and David Malmquist, Office of Economic Analysis, U.S. Securities and Exchange Commission, 1989.

"Estimating the value of federal deposit insurance," with William C. Dale, Jeffry L. Davis, David Malmquist, and Hank McMillan, Office of Economic Analysis, U.S. Securities and Exchange Commission, 1991.

Letter to Jonathan Katz, Secretary, U.S. Securities and Exchange Commission, on Regulation of Credit Rating Agencies, December 5, 1994.

Testimony concerning disclosure of accounting policies for derivatives and disclosures of quantitative and qualitative information about market risk inherent in market risk sensitive instruments, Subcommittee on Securities, U.S. Senate Committee on Banking, Housing and Urban Affairs, 105th Congress, 1st Session, March 4, 1997.

**Consulting**

Retained by counsel for various firms and government agencies, including Akin Gump; Arnold & Porter; Arthur Cox; Australian Taxation Office; Baker Botts; Barber & Bartz; Bartlit Beck; Bass, Berry & Sims; Bryan Cave; Buchanan Ingersoll; Cadwalader, Wickersham & Taft; Clifford Chance; Cooley; Cornell & Gollub; Covington & Burling; Cravath, Swaine and Moore; Crowell & Moring; Davis Graham & Stubbs; Davis Polk & Wardwell; Dechert; DLA Piper; Dorsey & Whitney; Gibson, Dunn, & Crutcher; Fried, Frank, Harris, Shriver & Jacobson; Fulbright & Jaworski; Heller Ehrman; Hogan & Hartson;  Howrey, Hughes Hubbard & Reed; Irell & Manella; Jenner & Block; Jones Day; Keker & Van Nest; King & Spalding; Kirkland & Ellis; K&L Gates; Kramer Levin Naftalis & Frankel; Latham & Watkins; Lowenstein Sandler; Maples Group; Mayer Brown; McDermott, Will, & Emery; McGuireWoods; Milbank, Tweed, Hadley & McCoy; Morgan, Lewis, & Bockius; Morris, Nichols Arsht & Tunnel; Morrison & Foerster; Nossaman; O'Melveny & Myers; Orrick; Paul, Weiss, & Rifkind; Pepper Hamilton; Perkins Coie; Pillsbury Winthrop Shaw & Pitman; Pisanelli Bice; Potter Anderson Corroon; Proskauer & Rose; Quarles & Brady; Quinn Emanuel; Reed Smith; Richards, Layton & Finger; Segal McCambridge Singer & Mahoney; Shearman & Sterling; Sheppard Mullin Richter; Shook,

Hardy & Bacon; Sidley; Simpson Thacher, & Bartlett; Skadden, Arps, Slate, Meagher, & Flom; Steptoe & Johnson; Sullivan & Cromwell; U.S. Securities and Exchange Commission; U.S. Department of Justice; Wachtell, Lipton, Rosen & Katz; Weil Gotshal; Williams & Connolly; Willkie Farr & Gallagher; WilmerHale; Wilson Sonsini; and Winston & Strawn.

Retained as Independent Distribution Consultant for Pilgrim Baxter & Associates, Federated Investors, Hartford Financial, Wachovia Corp. and GAMCO.

**Expert Witness Testimony**

City of Birmingham Relief and Retirement System and Ohio Carpenters Pension Fund, Individually and On Behalf of All Others Similarly Situated, v. Acadia Pharmaceuticals Inc., Stephen R. Davis, and Srdjan (Serge) R. Stankovic, U.S. District Court, Southern District of California, Civ. No:21-CV-00762-WQH-NLS, deposition testimony, Coral Gables, FL, May 29, 2025.

General Motors LLC, General Motors Company v. Alphons Iacobelli, FCA US LLC, Fiat Chrysler Automobiles NV, Jerome Durden, State of Michigan, Circuit Court for the County of Wayne, Civil Action No. 20-011998-CB, deposition testimony, New York, N.Y., October 3, 2024.

Securities and Exchange Commission v. Brian K. Hutchinson, U.S. District Court, District of Columbia, Case No. 22-CV-2296, deposition testimony, Washington, DC, September 26, 2024.

In re EQT Corporation Securities Litigation, U.S. District Court, Western District of Pennsylvania, Master File No. 2:19-cv-00754-MPK, deposition testimony (via Zoom), New York, N.Y., May 30, 2024.

Mayuko Holwill, Individually and on Behalf of All Others Similarly Situated against Abbvie Inc., Richard A. Gonzalez and William J. Chase, U.S. District Court, Northern District of Illinois, Case No. 1:18-cv-06790, deposition testimony (via Zoom), Washington, D.C., March 22, 2024.

In Re Qualcomm Incorporated Securities Litigation, U.S. District Court, Southern District of California, Case No. 3:17-cv-00121-JO-MSB, deposition testimony, San Francisco, CA, February 15, 2024.

Allegheny County Employees Retirement System, et al. v. Energy Transfer LP, et al., U.S. District Court, Eastern District of Pennsylvania, Case No. 2:20-cv-00200-GAM, deposition testimony, New York, N.Y., December 22, 2023.

In re EQT Corporation Securities Litigation, U.S. District Court, Western District of Pennsylvania, Master File No. 2:19-cv-00754-MPK, deposition testimony (via Zoom), New York, N.Y., November 6, 2023.

UpHealth Holding, Inc., vs. Glocal Healthcare Systems Private Limited, Dr. Syed Sabahat Azim, Richa Sana Azin, Gautam Chowdhury, M. Damodaran, and Kimberlite Social Infra Private Limited, International Chamber of Commerce International Court of Arbitration, Case No. 27329/PDP, trial testimony, Pittsburgh, PA (via Zoom), September 9, 2023

UpHealth Holding, Inc., vs. Glocal Healthcare Systems Private Limited, Dr. Syed Sabahat Azim, Richa Sana Azin, Gautam Chowdhury, M. Damodaran, and Kimberlite Social Infra Private Limited, International Chamber of Commerce International Court of Arbitration, Case No. 27329/PDP, trial testimony, Chicago, ILL, August 1, 2023.

HBK Master Fund L.P. and HBK Merger Strategies Master Fund L.P., Petitioners v. Pivotal Software, Inc., Respondent, Delaware Court of Chancery, C.A. No. 2020-0440-KSJM, trial testimony, Wilmington, DE, July 12, 2022.

Louisiana Sheriffs Pension & Relief Fund, individually and on behalf of all others similarly situated v. Cardinal Health, Inc., et al., U.S. District Court of Ohio, Eastern Division, Case No. 2:19-cv-3347, deposition testimony (via Zoom), Pittsburgh, PA, July 1, 2022.

In the Matter of the Companies Law (2018 Revision) and in the Matter of FGL Holdings, Grand Court of the Cayman Islands, Financial Services Division, Cause No. FSD 184 of 2020 (RPJ), trial testimony, Georgetown, Grand Cayman Island, May 27, 30, and 31, 2022 and June 1, 2022.

HBK Master Fund L.P. and HBK Merger Strategies Master Fund L.P. v. Pivotal Software, Inc., Delaware Court of Chancery, C.A. No. 2020-0165-KSJM; and In Re: Pivotal Software, Inc. Stockholders' Litigation, Delaware Court of Chancery C.A. No. 2020-0440-KSJM, deposition testimony (via Zoom), Pittsburgh, PA, April 19, 2022.

Nantahala Capital Partners II Limited Partnership, on behalf of itself and all other similarly situated stockholders of QAD Inc., v. QAD Inc., Pamela M. Lopker, Anton Chilton, Scott J. Adelson, Kathleen M. Crusco, Peter R. Van Cuylenberg, Thoma Bravo, LLC, Thoma Bravo, LP, Project Quick Ultimate Parent, LP, Project Quick Parent, LLC, and Project Quick Merger Sub Inc., Delaware Court of Chancery, C.A. No. 2021-0573-PAF, deposition testimony (via Zoom), Pittsburgh, PA, September 24, 2021.

Mayuko Holwill, Individually and on Behalf of All Others Similarly Situated against Abbvie Inc., Richard A. Gonzalez and William J. Chase, U.S. District Court, Northern District of Illinois, Case No. 1:18-cv-06790, deposition testimony (via Zoom), Pittsburgh, Pa., August 26, 2021.

10

Melvyn Klein v. H.I.G. Capital, LLC, et al., Delaware Court of Chancery, C.A. No. 2017-0862-AGB, deposition testimony (via Zoom), New York, N.Y., July 30, 2021.

In re EQT Corporation Securities Litigation, U.S. District Court, Western District of Pennsylvania, Master File No. 2:19-cv-00754-MPK, deposition testimony (via Zoom), Pittsburgh, Pa., July 26, 2021.

Budicak, Inc., Blue Marlin Arbitrage, LLC, and Prime Trading, LLC, individually and on behalf of others similarly situated v. Lansing Trade Group, LLC, Cascade Commodity Consulting, LLC, and John Does Nos. 6-10, U.S. District Court, District of Kansas, Case No. 2:19-cv-02449, deposition (via Zoom), Pittsburgh, Pa., June 21, 2021.

Anthem, Inc. against Express Scripts, Inc., U.S. District Court, Southern District of New York, Civil Action No. 16 Civ. 2048, deposition (via Zoom), Pittsburgh, Pa., April 16, 2021.

Peggy Roif Rotstain, et al., on behalf of themselves and all others similarly situated, and The Official Stanford Investors Committee v. Trustmark National Bank, HSBC Bank PLC, The Toronto-Dominion Bank, Independent Bank F/K/A Bank of Houston, SG Private Banking (Suisse) S.A., and Blaise Friedli, U.S. District Court, Northern District of Texas, Dallas Division, Case No. 3:09-CV-02384-N-BQ, deposition testimony (via Zoom), Pittsburgh, Pa., February 4, 2021.

Simon Property Group, Inc. and Simon Property Group, L.P. vs. Taubman Centers, Inc. and Taubman Realty Group, Inc., State of Michigan, Circuit Court for the 6th Judicial Circuit, Oakland County, 2020-181675.CB, deposition testimony (via vTestify), Pittsburgh, Pa., October 30, 2020.

Robert Conklin, Thomas Edlund, Darren Kinney, and Joshua Rhodes, all individually and for their respective individual account damages on behalf of the DST Systems, Inc. 401 (k) Profit Sharing Plan, v. DST Systems, American Arbitration Association, AA Case Nos.: 01-19-0001-8717, 01-19-0001-8736, 01-19-0001-964, and 01-19-0001-9375, respectively, arbitration testimony (via Zoom), Pittsburgh, Pa., September 18, 2020. Additional testimony, both live and taped (via Zoom), provided in related arbitration hearings on the following dates: September 24, 2020, October 2, 2020, October 9, 2020, October 16, 2020, October 23, 2020, October 29, 2020, November 5, 2020, November 12, 2020, November 20, 2020, December 4, 2020, December 11, 2020, December 18, 2020, January 8, 2021, January 14, 2021, January 21, 2021, January 28, 2021, February 4, 2021, February 11, 2021, February 18, 2021, February 26, 2021, March 4, 2021, March 12, 2021, March 18, 2021, March 25, 2021, April 1, 2021, April 8, 2021, April 15, 2021, April 22, 2021, April 29, 2021, May 6, 2021, May 13, 2021, May 20, 2021, May 27, 2021, June 10, 2021, June 18, 2021, June 24, 2021, July 1, 2021, July 15, 2021, July 22, 2021, July 29,

2021, August 5, 2021, August 12, 2021, August 19, 2021, August 26, 2021, September 2, 2021, and September 16, 2021.

Carrie Scheufele, Jeffrey Scheufele, and Nicholas Oram, individually and on behalf of all others similarly situated vs. Tableau Software, Inc., Christian Chabot and Thomas Walker, U.S. District Court, Southern District of New York, Civil No. 1:17-cv-05753-JGK, deposition testimony (via Zoom), Pittsburgh, Pa., July 30, 2020.

Peggy Leineke v. DST Systems, Inc. et al., Joint Submission for Arbitration dated August 6, 2018, American Arbitration Association, deposition testimony (via Zoom), New York, N.Y., June 30, 2020.

Adam S. Levy on behalf of himself and all others similarly situated v. Thomas Gutierrez, Richard Gaynor, Raja Bal, J. Michael Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman Sachs & Co., Canaccord Genuity Inc., and Apple Inc., U.S. District Court, District of New Hampshire, No. 1:14-cv-00443-JL, deposition testimony, New York, N.Y., September 9, 2019.

Channel Medsystems, Inc. v. Boston Scientific Corporation and NXT Merger Corporation, Delaware Court of Chancery, C.A. No. 2018-0673-AGB, trial testimony, Wilmington, Del., April 18, 2019.

Channel Medsystems, Inc. v. Boston Scientific Corporation and NXT Merger Corporation, Delaware Court of Chancery, C.A. No. 2018-0673-AGB, deposition testimony, New York, N.Y., March 29, 2019.

Oklahoma Law Enforcement Retirement System, Individually and On Behalf of all Others Similarly Situated v. Adeptus Health, Inc., et al., U.S. District Court. Eastern District of Texas, Sherman Division, Civil Action No. 4:17-CV-00449, deposition testimony, New York, N.Y., March 12, 2019.

Adam S. Levy on behalf of himself and all others similarly situated v. Thomas Gutierrez, Richard Gaynor, Raja Bal, J. Michael Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman Sachs & Co., Canaccord Genuity Inc., and Apple Inc., U.S. District Court, District of New Hampshire, No. 1:14-cv-00443-JL, deposition testimony, New York, N.Y., February 1, 2019.

The Mangrove Partners Master Fund, LTD., v. Calamos Asset Management, Inc., Delaware Court of Chancery, 2017-0139, deposition testimony, New York, N,Y., December 21, 2018.

The Colonial Bancgroup, Inc. and Kevin O'Halloran v. PriceWaterhoueCoopers, LLP and Crowe Horvath, LL, U.S. District Court, Middle District of Alabama, Northern Division, Case No. 2:11-cv-00746-WKW; and Federal Deposit Insurance Corporation as Receiver for Colonial Bank v. PriceWaterhouseCoopers, LLP and Crowe Horvath, LLP, U.S. District Court, Middle District of Alabama, Northern Division, Case No. 2:12-cv-00957-WKW; trial testimony, March 22, 2018.

Wynn Resorts, Limited vs. Kazuo Okada, Aruze USA, and Universal Entertainment Corp., District Court, Clark County, Nevada, Case No. A-12-656710 – B, Dept. No. XI, deposition testimony, Las Vegas, Nevada, January 19, 2018.

Guardian Protection Services, Inc. f/k/a Armstrong-Guardian, Inc. v. Emil Parent and Lawrence Cersosimo as Trustees of the 1993 Irrevocable Trust for Russell L. Cersosimo, and Russell L. Cersosimo, as Trustee of the 2008 Irrevocable Trust for Russell L. Cersosimo, Court of Common Pleas of Allegheny County, Pennsylvania, Civil Division, No. GD-16-021536, Code: 020 – In Equity, hearing testimony, Pittsburgh, Pa., March 24, 2017.

In re: Declaration of Trust, dated December 21, 1964, FBO Carol Lynn Farmer, Superior Court of California, County of Orange, Central Justice Center, Case No. 30-2015-00784792-PR-TR-CJC, deposition testimony, Costa Mesa, Cal., November 8, 2016.

The Colonial Bancgroup, Inc. and Kevin O'Halloran v. PriceWaterhouseCoopers, LLP and Crowe Horwath, LLP, U.S. District Court, Middle District of Alabama, Northern Division, Case No. 2:11-cv-00746-WKW; and Federal Deposit Insurance Corporation as Receiver for Colonial Bank v. PriceWaterhouseCoopers, LLP and Crowe Horwath, LLP, U.S. District Court, Middle District of Alabama, Northern Division, Case No. 2:12-cv-00957-WKW; deposition testimony, New York, N.Y., October 4, 2016.

Chrome Systems, Inc. v. Autodata Solutions, Inc., et al., JAMS Reference No. 1340012931, arbitration testimony, Chicago, Ill., September 16, 2016.

Chrome Systems, Inc. v. Autodata Solutions, Inc., et al., JAMS Reference No. 1340012931, deposition testimony, New York, N.Y., September 7, 2016.

Move, Inc., et al. vs. Zillow, Inc., et al., Superior Court of the State of Washington for King County, No. 14-2-07669-0 SEA, deposition testimony, Philadelphia, Pa., April 18, 2016.

St. Denis J. Villere & Company, et al. v. Epiq Systems International, et al., Circuit Court of Jackson County, Missouri at Kansas City, Case No. 1516-CV26509, deposition testimony, New York, N.Y., March 28, 2016.

13

Chrome Systems, Inc. v. Autodata Solutions, Inc., et al., Court of Chancery of the State of Delaware, C.A. No 11808-VCG, deposition testimony, New York, N.Y., February 24, 2016.

Assured Guaranty (UK) LTD vs. J.P. Morgan Investment Management, Inc., Index 603755/2008 and Ambac Assurance UK Limited vs. J.P. Morgan Investment Management, Inc., Index 650259/2009, Supreme Court of the State of New York, County of New York, deposition testimony, New York, N.Y., January 8, 2016.

Frank J. Fosbre, Jr., et al., vs. Las Vegas Sands Corp., et al., U.S. District Court, District of Nevada, Case No. 2:10-cv-00765-APG-GWF (Consolidated), deposition testimony, Chicago, Ill., December 21, 2015.

Assured Guaranty (UK) LTD vs. J.P. Morgan Investment Management, Inc., Index 603755/2008 and Ambac Assurance UK Limited vs. J.P. Morgan Investment Management, Inc., Index 650259/2009, Supreme Court of the State of New York, County of New York, deposition testimony, New York, N.Y., November 24, 2015.

Richard Thorpe, et al., v. Walter Investment Management Corp., et al., U.S. District Court, Southern District of Florida, Case No.: 14-cv-20880-UU, deposition testimony, New York, N.Y., November 11, 2015.

Peggy Roif Rotstain, et al. and the Official Stanford Investors Committee against Trustmark National Bank, et al., U.S. District Court, Northern District of Texas, Dallas Division, Case No. 3:09-CV-02384-N, deposition testimony, New York, N.Y., October 14, 2015.

In Re HP Securities Litigation, U.S. District Court, Northern District of California, San Francisco Division, Master File No. c-12-5980-CRB, deposition testimony, New York, N.Y., January 19, 2015.

Mary K. Jones, et al. v. Pfizer, Inc., et al., U.S. District Court, Southern District of New York, No. 10-cv-3864 (AKH), deposition testimony, New York, NY, October 2014.

In Re: Activision Blizzard, Inc. Stockholder Litigation, Court of Chancery of the State of Delaware, Consolidated C.A. No. 8885-VCL, deposition testimony, New York, NY, October 2014.

Sue Ann Hamm, In Re the Marriage of, v. Harold Hamm, District Court Of Oklahoma County, State Of Oklahoma, FD-2012-2048, trial testimony, Oklahoma City, OK, September 2014.

In Re: Adelphia Communications Corporation Securities and Derivative Litigation, relating to Island Partners, et al. v. Deloitte & Touche LLP, U.S. District Court, Southern District of New York,  05-CV-2770, deposition testimony, Philadelphia, PA, September 2014.

In Re: Lehman Brothers Securities and Erisa Litigation, U.S. District Court, Southern District of New York, 09-MD-2017 (LAK), deposition testimony, New York, N.Y., June 2014.

Sue Ann Hamm, In Re the Marriage of, v. Harold Hamm, District Court Of Oklahoma County, State Of Oklahoma, FD-2012-2048, deposition testimony, Oklahoma City, OK, June 2014. Sandalwood Debt Fund A, Sandalwood Debt Fund B, and Hudson Investment Partners v. BDO USA LLP and BDO Seidman LLP, Superior Court of New Jersey, Law Division, Essex County, Docket No. L-9016-11, deposition testimony, Short Hills, N.J., April 2014.

Bettina M. Whyte, as Trustee of the Semgroup Litigation Trust, vs. PriceWaterhouseCoopers, LLP, District Court In and For Tulsa County, State of Oklahoma, Case No. CJ-2010-04042, Daubert hearing, Tulsa, OK, January 2014.

Louis Pagnotti, Inc., et al. vs. Deloitte and Touche, LLP, Court of Common Pleas of Luzerne County, 104-CV-04967-JMF, deposition testimony, New York, N.Y., October 2013.

Securities and Exchange Commission vs. Life Partners, Inc., et al., United States District Court for the Western District of Texas, Austin Division, 1-12-CV-00033-JRN, deposition testimony, New York, N.Y., August 2013.

Bettina M. Whyte, as Trustee of the Semgroup Litigation Trust, vs. PriceWaterhouseCoopers, LLP, District Court In and For Tulsa County, State of Oklahoma, CJ-2010-04042, deposition testimony, July 2013.

Raymond M. Pfeil, et al. v. State Street Bank & Trust Company, United States District Court Eastern District Of Michigan, Southern Division, 2:09-CV-12229-DPH-VMM, deposition testimony, New York, N.Y., March 2013.

CMMF, LLC v. J. P. Morgan Investment Management, Inc. and Ted C. Ufferfilge, Supreme Court Of The State Of New York, County Of New York, 09-601924, trial testimony, New York, N.Y., January 2013.

CMMF, LLC v. J. P. Morgan Investment Management, Inc. and Ted C. Ufferfilge, Supreme Court Of The State Of New York, County Of New York, 09-601924, deposition testimony, New York, N.Y., September 2012.

In Re Refco Securities Litigation, United States District Court Southern District of New York, 07-MD-1902 (GEL), deposition testimony, New York, N.Y., September 2012.

Securities and Exchange Commission v. Michael W. Perry and A. Scott Keys, United States District Court Central District Of California, 11-1309-R (JCx), deposition testimony, Washington, D.C., May 2012.

Lissa Rohlik vs. I-Flow Corporation, United States District Court, Eastern District of North Carolina (Southern Division), 7:10-CV-00173-FL, deposition testimony, Pittsburgh, Pa., May 2012.

City of Livonia Employees' Retirement System, et al. vs. Wyeth et al., United States District Court Southern District Of New York, 07-CV-10329-RJS, deposition testimony, New York, N.Y., February 2012.

In Re Delphi Financial Group Shareholder Litigation, Court of Chancery of the State of Delaware, 7144-VCG, deposition testimony, Wilmington, Delaware, February 2012.

Alaska Electrical Pension Fund et al. v. Pharmacia Corporation et al., United States District Court, District of New Jersey, 03-1519 (AET), deposition testimony, New York, N.Y., October 2011.

Securities and Exchange Commission v. Rajnish Das and Stormy Dean, United States District Court for The District Of Nebraska, 8:10-CV-00102, deposition testimony, Denver, Col., July 2011.

Securities and Exchange Commission v. Lisa Berry, United States District Court, Northern District of California, San Jose Division, C07-04431 RMW, deposition testimony, San Francisco, Ca., May 2011.

Joel Krieger, et al., v. Wesco Financial Corporation, et al, Court of Chancery of the State of Delaware, 6176-VCL, deposition testimony, New York, N.Y., April 2011.

Eric Silverman, et al.,v. Motorola, Inc., et al., United States District Court for the Northern District of Illinois, Eastern Division, 07-C-04507, deposition testimony, Washington, D.C., January 2011.

NACCO Industries Inc., et al. v. Applica Inc., et al., United States District Court Northern District of Ohio, CA-2541-VCL, deposition testimony, New York, N.Y., December 2010.

In Re Le-Nature's Inc. Commercial Litigation, United States Judicial Panel on Multidistrict Litigation, MDL 2021, arbitration testimony, Pittsburgh, Pa., December 2010.

Securities and Exchange Commission v. Raj Sabhlok and Michael Pattison, United States District Court, Northern District of California, San Francisco Division, C-08-4238 EMC, trial testimony, San Francisco, Ca., September 2010.

Securities and Exchange Commission v. Angelo Mozilo, David Sambol and Eric Sieracki, United States District Court, Central District of California, CV09-03394 JFW (MANx), deposition testimony, Chicago, Ill., July 2010.

In Re Le-Nature's Inc. Commercial Litigation, United States Judicial Panel on Multidistrict Litigation, MDL 2021deposition testimony, New York, N.Y., June 2010.

In Re John Q. Hammons Hotels Inc. Shareholder Litigation, Court of Chancery of the State of Delaware, 758-CC, trial testimony, Georgetown, Del., June 2010.

In Re John Q. Hammons Hotels Inc. Shareholder Litigation, Court of Chancery of the State of Delaware, 758-CC, deposition testimony, New York, N.Y., April 2010.

Securities and Exchange Commission v. Raj Sabhlok and Michael Pattison, United States District Court, Northern District of California, San Francisco Division, C-08-4238 EMC, deposition testimony, San Francisco, Ca., December 2009.

LDK Solar Securities Litigation, U.S. District Court, Northern District of California, C-07-05182-WHA, deposition testimony, San Francisco, Ca., December 2009.

Makor Issues & Rights Ltd. v. Tellabs, U.S. District Court, Northern District of Illinois, No. 04-1683, deposition testimony, Chicago, Ill., October 2009.

David Rogers et al. v. Baxter International, Inc., et al., United States District Court, Northern District Of Illinois, Eastern Division, 06-3241, deposition testimony, Chicago, Ill., September 2009.

Mainstay High Yield Corporate Bond Fund v. Heartland Partners et al., United States District Court Eastern District of Michigan, 07-10542, deposition testimony, New York, N.Y., September 2009.

In Re Metropolitan Securities Litigation, United States District Court, Eastern District of Washington, CV-04-25-FVS, deposition testimony, New York, N.Y., September 2009.

27001 Partnership, et al. v. BT Securities Corporation, et al., Circuit Court Of The State Of Alabama, In And For The County Of Jefferson, CV-04-7487-JLB, deposition testimony, New York, N.Y., August 2009.

Securities and Exchange Commission v. Biovail Corporation et al., United States District Court, Southern District of New York, CIV-02979 (LAK), deposition testimony, New York, N.Y., July 2009.

Eric Silverman, et al., Motorola, Inc., et al., United States District Court for the Northern District of Illinois, Eastern Division, 07-C-04507, deposition testimony, Washington, D.C., June 2009.

Brieger, et al. v. Tellabs, Inc. et al., United States District Court, Northern District of Illinois, Eastern Division, 06-C-1882, trial testimony, Chicago, Ill., May 2009.

DVI Inc. Securities Litigation, United States District Court, Eastern District of Pennsylvania, 03-CV-5336, deposition testimony, Philadelphia, Pa., February 2009.

Brieger, et al. v. Tellabs, Inc. et al., United States District Court, Northern District of Illinois, Eastern Division, 06-C-1882, deposition testimony, Chicago, Ill., January 2009.

Kingsway Financial Services, Inc., et al. v. PriceWaterhouseCoopers, et al., United States District Court, Southern District of New York, 03-C-5560 RMB (HBP), deposition testimony, New York, N.Y., January 2009.

In re: Dollar General Corporation Securities Litigation, Sixth Circuit Court for Davidson County, Tennessee, Master Docket No. 07MD1 (Consolidated Action), deposition testimony, New York, N.Y., October 2008.

In re: Dollar General Corporation Securities Litigation, Sixth Circuit Court for Davidson County, Tennessee, Master Docket No. 07MD1 (Consolidated Action), deposition testimony, New York, N.Y., September 2008.

In re: Delphi Corporation Securities, Derivative & ERISA Litigation, United States District Court, Eastern District of Michigan, Southern Division, MDL No. 1725 05-CV-70882-DT, deposition testimony, Chicago, Ill., May 1, 2008.

In re: Xcelera.com, Inc. Securities Litigation, United States District Court, District of Massachusetts, Daubert hearing to exclude testimony of Scott Hakala, Boston, Mass., April 2008.

In re: Vivendi Universal, S.A. Securities Litigation, United States District Court, Southern District of New York, No. 02 Civ 5571 (RJH/HBP), deposition testimony, New York, N.Y., April 18, 2008.

18

In re: HealthSouth Corporation Securities Litigation, United States District Court, Northern Alabama, Southern Division, Master File No. CV-03-BE-1500-S, In re: HealthSouth Corporation Stockholder Litigation, Consolidated Case No. CV-03-BE-1501-S, In re: HealthSouth Corporation Bondholder Litigation, deposition testimony, New York, N.Y., April 14, 2008.

In re: Apollo Group, Inc. Securities Litigation, United States District Court, District of Arizona, 2-04-cv-2147-JAT, trial testimony, Phoenix, Ariz., January 2008.

In re: Schering-Plough Corporation Securities Litigation, United States District Court, District of New Jersey, Master File No. 01-CV-0829 (KSH/MP), deposition testimony, Roseland, N.J., September 14, 2007.

In re: Xcelera.com, Inc. Securities Litigation, United States District Court, District of Massachusetts, Civil Action No. 00-CV-11649-RWZ, deposition testimony, Boston, Mass., August 2007.

In re: Omnicom Group, Inc. Securities Litigation, United States District Court, Southern District of New York, No. 02-CV-4483 (RCC), deposition testimony, New York, N.Y., May 4, 2007.

Janet Baker et al. v. Dexia S.A. and Dexia Bank Belgium, United States District Court, District of Massachusetts, deposition testimony, Pittsburgh, Pa., April 2007.

Ohio Public Employees' Retirement System, et al. vs. Richard D. Parsons, R.E. "Ted Turner," et al., Franklin County Common Pleas Court, Columbus, Ohio, Case No. 03CVH07-7932, United States District Court, Southern District of New York, In re AOL Time Warner, Inc. Securities and ERISA Litigation, MDL Docket No. 1500 (SWK), The Consolidated Opt-Out Action, Master File No. 06 Civ. 0695 (SWK), deposition testimony, New York, N.Y., March 30, 2007.

In re: Cardinal Health, Inc. Securities Litigation, United States District Court, Southern District of Ohio, Eastern Division, No. C2-04-00575 (ALM), mediation testimony, Dallas, Tex., March 2007.

In re: Apollo Group, Inc. Securities Litigation, United States District Court, District of Arizona, 2-04-cv-2147-JAT, deposition testimony, Pittsburgh, PA, February 7, 2007.

In re: Sprint Corporation Shareholders Litigation, District Court of Johnson County, Kansas Civil Court department, Case No. 04 CV 01714, deposition testimony, New York, N.Y., January 15, 2007.

In re: Curtis v. Northern Life Insurance Company, King County Superior Court, State of Washington, No. 01-2-18578-1 SEA, deposition testimony, Pittsburgh, Pa., July 2006.

19

Howard Yue vs. New Focus, Inc., et al. and New Focus, Inc. vs. Howard Yue, Superior Court of California, County of Santa Clara, Case No. CV808031, deposition testimony, Palo Alto, Ca., June 29, 2005.

Daniel McCabe, Russell E. McCabe, and David Motovidlak v. Ernst & Young, LLP, et al., United States District Court, District of New Jersey, No. Civ. 01-5747 (WHW), deposition testimony, New York, N.Y., April 2005.

Securities and Exchange Commission v. David C. Guenthner and Jay M. Samuelson, United States District Court, District of Nebraska, No. 8:02CV10, deposition testimony, Omaha, Neb., April 2005.

Fyffes PLC and DCC PLC, S&L Investments Limited, James Flavin, and Lotus Green Limited, The High Court, Dublin, Ireland, Case No. 1183P/2002, trial testimony, Dublin, Ireland, February 22, 2005.

Oracle Corporation and Pepper Acquisition Corp.  v. Peoplesoft, et al., Delaware Chancery Court, New Castle County, Civil Action No. 20377, trial testimony, Wilmington, Del., October 7, 2004.

Oracle Corporation and Pepper Acquisition Corp. v. v. Peoplesoft, et al., Delaware Chancery Court, New Castle County, Civil Action No. 20377, deposition testimony, Wilmington, Del., September 24, 2004.

Sensormatic Electronics Corporation vs. First National Bank of Pennsylvania, Winner & Bagnara, Inc., and James E. Winner, Jr., United States District Court, Western District of Pennsylvania, Civil Action No. 99-756, deposition testimony, Sharon, Pa., June 2, 2004.

Securities and Exchange Commission v. Michael J. Rivers and Thomas E. Hall, United States District Court, District of Minnesota, 02-4213-JRT/FLN, trial testimony, Minneapolis, Minn., May 2004.

Corporacion Durango, S.A. de C.V., as assignee of Durango Paper Company v. HG Estate, LLC and St. Mary's Railroad Corporation, United States District Court, Southern District of New York, No. 02 CIV 10059 (CSH), arbitration testimony, New York, N.Y., April 2004.

In re: AT&T Corp. Securities Litigation, United States District Court, District of New Jersey, MDL No. 1399 Consolidated CA No. 01-1883, deposition testimony, Pittsburgh, Pa., March 10, 2004.

Austern Trust Dated 7/11/94, Barry Austern and Susan L. Austern Trustees, derivatively on behalf of DPL, Inc. vs. Peter H. Forster, Court of Common Pleas of Hamilton County, Ohio, deposition testimony, Cincinnati, Ohio, September 24, 2003.

MCI/Worldcom bankruptcy, deposition testimony, New York, N.Y., September 2003.

Securities and Exchange Commission v. Robert J. Prevett, et al., United States District Court, Northern District of California, Civil Action No. C-01-21069-PVT, trial testimony, San Jose, Ca., July 2003.

Internal Revenue Service v. Estate of Josephine Thompson, United States Tax Court, Docket No. 4939-02, trial testimony, New York, N.Y., June 2003.

In re: Telecorp PCS Incorporated Shareholders Litigation, Delaware Chancery Court, New Castle County, CA No. 19260-NC, deposition testimony, New York, N.Y., April 4, 2003.

Securities and Exchange Commission v. Jack Lau, et al., United States District Court, Northern District of California, Civil Action No. C-01-21067-PVT, trial testimony, San Jose, Ca., March 2003.

Sylvia Allen, as personal representative of the estate of James Allen vs. R.J. Reynolds Tobacco Company and Philip Morris Incorporated, United States District Court, Southern District of Florida, No. 01-4319-CIV-KING/O'Sullivan, deposition testimony, Miami, Fl., December 6, 2002.

Zoffanies Pty Limited v. Commissioner of Taxation (Australia), tribunal testimony, Sydney, Australia, August 2002.

United States v. Robert Prevett, United States District Court, Northern District of California, trial testimony, San Jose, Ca., November 2002.

United States v. Frank Dubone, et al., United States District Court, Western District of Pa., trial testimony, May 2002.

United States vs. Atul Bhagat, United States District Court, Northern District of California, trial testimony, San Jose, Ca., March 2002.

Consolidated Edison, Inc. against Northeast Utilities, Inc., Civil Action No.: 01-CIV1893 (JGK) (HP), deposition testimony, New York, N.Y., February 28, 2002.

Robert K. Bell, et al., v. Fore Systems, et al., United States District Court, Western District of Pennsylvania, Civil Action No. 97-1265, deposition testimony, Pittsburgh, Pa., June 2001.

21

Beder, et al. v. Cleveland Browns, Inc., et al., Court of Common Pleas of Ohio, Cuyahoga County, No. CV-297862, deposition testimony, Cleveland, Ohio, January 2001.

Kohler Company v. Sogen International Fund, Inc., Sheboygan County Circuit Court, Wisconsin, deposition testimony, Milwaukee, Wisc., October 1999.

The Common Fund for Nonprofit Organizations v. KPMG Peat Marwick LLP, et al., United States District Court, Southern District of New York, No. 96 CIV 0255 (MGC), deposition testimony, Washington, D.C., January 1999.

Securities and Exchange Commission v. Jacob Y. Terner, et al., United States District Court, Central District of California, Civil Action No. 97-4812 GHK (JGx), trial testimony, Los Angeles, Ca., July 1998.

Securities and Exchange Commission v. Jacob Y. Terner, et al., United States District Court, Central District of California, Civil Action No. 97-4812 GHK (JGx), deposition testimony, Los Angeles, Ca., June 1998.

Securities and Exchange Commission v. Harold Fitzgerald Lenfest and Marguerite Lenfest, United States District Court, Eastern District of Pennsylvania, Civil Action No. 95-CV-7597 JCH, deposition testimony, Philadelphia, Pa., February 1998.

United States v. Mark Aronds, United States District Court, Eastern District of Michigan, trial testimony, Detroit, Mich., December 1997.

Retirement System of Alabama, et al., v. James River, et al., Circuit Court of the State of Alabama, deposition testimony, Richmond, Va., March 1997.

Securities and Exchange Commission v. Shahryar Soroosh, United States District Court, Northern District of California, No. C-96-3933-VRW, trial testimony, San Francisco, Ca., February 1997.

Securities and Exchange Commission v. Shahryar Soroosh, United States District Court, Northern District of California, No. C-96-3933-VRW, deposition testimony, January 1997.

Securities and Exchange Commission vs. Michael P. Angelos and G. Gregory Russell, United States District Court, District of Maryland, Civil Action No. B-96-834, deposition testimony, Baltimore, Md., November 22, 1996.

Securities and Exchange Commission vs. S. Jay Goldinger, Bert R. Cohen, Andrew E. Gerald, Harvey M. Rosen, and Ronald A. Weinstein, United States District Court, Central District of

California, No. 91-3445-JWI (GHXx), deposition testimony, Los Angeles, Ca., February 22, 1995.

H Enterprises International v. General Electric Capital Corporation, et al., United States District Court, District of Minnesota, Fourth Division, CIV No. 4-91-679, deposition testimony, Minneapolis, Minn., 1994.

Exxon Valdez Oil Spill Litigation, deposition testimony, Anchorage, Ak., 1993.

The Procter & Gamble Company v. Mafco Holdings, Inc., et al., American Arbitration Association Commercial Tribunal, arbitration testimony, New York, N.Y., November 1992.

Carter Hawley Hale bankruptcy, deposition testimony, Los Angeles, Ca., 1991.

**Board and Committee Memberships**

Economist Intelligence Unit, Advisory Board, 2015–2016.
NASD ATC Advisory Committee, 2006-2007.
Shadow Financial Regulatory Committee, 2003-2007.
Allegheny Institute, 2005-2014.
Aristech Receivables, 1998-2001.
Weirton Receivables, 1993-2001.
Borden Receivables, 1994-1996.
Carbide/Graphite Group Receivables, 1993-1996.
Economic Advisory Board, The Nasdaq Stock Market, 1996-1998.
Academic Advisory Council, Turnaround Management Association, 2000–present.
Advisory Board, Mobot Inc., 2000.

**Journal and Other Refereeing**

*American Economic Review*, *Economic Inquiry*, *Economic Journal*, *Financial Management*, *Harvard Business School Press*, *Irwin Publishing*, *Journal of Accounting, Auditing and Finance*, *Journal of Business*, *Journal of Comparative Economics*, *Journal of Corporate Finance*, *Journal of Economics and Management Strategy*, *Journal of Finance*, *Journal of Financial Economics*, *Journal of Financial and Quantitative Analysis*, *Journal of Law and Economics*, *Journal of Law, Economics, and Organization*, *Journal of Managerial Accounting Research*, *Journal of Political Economy*, *Management and Decision Economics*, *National Research Council Canada*, *National Science Foundation*, *Quarterly Journal of Economics*, *Rand Journal of Economics*, *The Accounting Review*, *The Financial Review*, *University of Chicago Press*.

## University Service

Committee on Business School Centers (chair), 2011-2012.
Dean Search Committee for Katz School of Business, 2005-2006.
Promotion and Tenure Committee, Katz Graduate School of Business, 2004-2006., 2008-2010, 2019-2020.
Distinguished Faculty Committee, 2003-2005.
Executive Committee, Katz Graduate School of Business, 1994-1995 (co-chair); 1998-2001 (co-chair, 2000); 2008-2011; 2013-2015.
Appeals Panel for Grievance over Denial of Tenure (chair), 1999.
Steering Committee for University's Reaccreditation with Middle States Association, 1999.
Promotion and Tenure Committee, Katz Graduate School of Business, 1999-2001.
Dean Search Committee for Katz Graduate School of Business, 1995.
Internal Review Committee for Economics Department (chair), 1994.
Faculty Appointment Committee, Katz Graduate School of Business, 1993-1994.
MBA Curriculum Committee, Katz Graduate School of Business, 1993.
Retirement Subcommittee, 1992-1993.
Doctoral Policy Committee, Katz Graduate School of Business, 1991-1993; 2003-2005.

## Other Professional Service

Founding Editor, *Journal of Corporate Finance*, 1992-2001.
Associate Editor, Investment Management and Financial Innovations, 2004-2006.
Associate Editor, *Journal of Financial Research*, 1999-2005.
Associate Editor, *The Financial Review*, 1998-2003.
Associate Editor, *Asia-Pacific Journal of Accounting & Economics*, 2000-2003.
Associate Editor, *International Journal of the Economics of Business Economics*, 1994-2000.
Associate Editor, *Pacific-Basin Finance Journal*, 1992-1996.
Editorial Board, *Investment Management and Financial Innovations*, 2004-2006.
Advisory Board, *Financial Economics Network*, 1994-2020.
Advisory Board, *Journal of Financial Abstracts*, 1994-2020.
Advisory Board, *Corporate, Securities, and Finance Law Abstracts*, 1996-2020.
Advisory Board, *The Financier*, 1994-2003.
Advisory Board, *The Arbitrageur*, 1998-2003.
Program Committee, 1992, 1993 Pacific Basin Conferences.
Program Committee, 1992 Western Finance Association Meetings.
Program Committee, 1992, 1996, 2007 Financial Management Association Meetings.

## Seminar and Conference Presentations

AEI-Brookings Joint Center for Regulatory Studies, Allegheny County Bankruptcy Symposium, American Appraisal Association, American Economic Association, American Enterprise

Institute, American Finance Association, American Management Association, American Society of Appraisers, Arizona State University, Baruch College, Boston College, California Polytechnic University, Canadian Law and Economics Association, Clemson University, Columbia University, U.S. Department of Justice, DePaul University, Drexel University, Duquesne University, European Financial Management Association Conference, Federal Reserve Bank of Atlanta, Federal Reserve Bank of Chicago, Federal Reserve Bank of New York, Federal Reserve Bank of San Francisco, George Mason University, Georgetown University, Georgia Institute of Technology, Hanken School of Economics, Harvard University, Hofstra University, Indiana University, Kent State University, Massachusetts Institute of Technology, Michigan State University, National Bureau of Economic Research, Networks Financial Institute, North Carolina State University, Northeastern University, Northwestern University, Oberlin College, Ohio State University, Ohio University, Paris Financial Management Conference, Pennsylvania State University, Professional Liability and Underwriting Society, Purdue University, Queens University, Southern Methodist University, Texas A&M University, Tulane University, U.S. Chamber of Commerce, U.S. Department of Justice, U.S. Federal Trade Commission, U.S. Securities and Exchange Commission University of California (Los Angeles), University of California (Santa Barbara), University of Chicago, University of Delaware, University of Florida, University of Illinois, University of Kansas, University of Maryland, University of Michigan, University of Missouri, University of Missouri (St. Louis), University of North Carolina, University of Notre Dame, University of Oregon, University of Pennsylvania, University of Rhode Island, University of Rochester, University of South Carolina, University of Southern California, University of Texas, University of Texas (Dallas), University of Utah, University of Virginia, Washington University (St. Louis), World Finance Conference.

**Appendix B**
**Materials Relied Upon**

## I.    Legal Documents

1. Class Action Complaint, *William Heresniak, et al. v. Elon R. Musk and Twitter, Inc.*, United States District Court, Northern District of California, No. 3:22-cv-03074, filed May 25, 2022

2. Complaint, *Pampena, et al. v. Musk*, United States District Court, Northern District of California, San Francisco Division, C.A. No. 22-cv-05937-TLT, filed on October 10, 2022

3. Order Appointing Lead Plaintiff and Lead Counsel, *Pampena, et al. v. Musk*, United States District Court, Northern District of California, San Francisco Division, C.A. No. 22-cv-05937-CRB, filed on April 24, 2023

4. First Amended Class Action Complaint, *Pampena, et al. v. Musk,* United States District Court, Northern District of California, San Francisco Division, C.A. No. 22-cv-05937-CRB, filed June 8, 2023

5. Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, *Pampena, et al. v. Musk,* United States District Court, Northern District of California, C.A. No. 22-cv-05937-CRB, filed December 11, 2023

6. Order Granting Class Certification, *Pampena, et al. v. Musk,* filed September 27, 2024

7. Plaintiffs' Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Nos. 1-12), March 17, 2025

## II.    Expert Reports & Depositions

8. Expert Report of David I. Tabak, Ph.D., May 24, 2024

9. Deposition of David Tabak, August 9, 2024

10. Expert Report of David I. Tabak, Ph.D., May 2, 2025 and Backup Materials

11. Expert Report of Adam Badawi, May 28, 2025

## III.    SEC Filings

12. Tesla, Inc., Form 10-K, for the fiscal year ended December 31, 2021

13. Twitter, Inc., Form 10-K, for the fiscal year ended December 31, 2021

14. Twitter, Inc., Amendment No. 4 to Schedule 13D, including Exhibits F-J, April 25, 2022

15. Twitter, Inc., Form 8-K, April 25, 2022

16. Twitter, Inc., Amendment No. 6 to Schedule 13D, May 5, 2022

17. Twitter, Inc., Amendment No. 7 to Schedule 13D, May 25, 2022

18. Twitter, Inc., Exhibit 99-O, June 6, 2022

19. Twitter, Inc., CORRESP 1, June 7, 2022

20. Twitter, Inc., Amendment No. 9 to Schedule 13D, Exhibit P, July 8, 2022

21. Twitter, Inc., Schedule 14A, July 26, 2022

22. Twitter, Inc., Amendment No. 11 to Schedule 13D, Exhibit 99, September 9, 2022

23. Twitter Inc., Amendment No. 12 to Schedule 13D, October 4, 2022

## IV.     Academic Literature

24. Bodie, Z., Kane, A., and Marcus, A.J., 2014, *Investments,* 10th ed., McGraw-Hill

25. Larcker, D.F. and Lys, T., 1987, "An Empirical Analysis of the Incentives to Engage in Costly Information Acquisition," *Journal of Financial Economics*, Vol. 18, 111-126

26. Lhabitant, F-S., 2006, *Handbook of Hedge Funds*, Wiley & Sons

27. Patel, J.M. and Wolfson, M.A., 1984, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcement," *Journal of Financial Economics,* Vol. 13, 223-252

28. Pedersen, L., 2015, *Efficiently Inefficient*, Princeton University Press

## V.     Analyst Reports

29. "Twitter: Twitter Acquisition 'temporarily on hold' as Musk Reviews Spam / False Accounts," Citi, May 13, 2022

30. "Twitter: Musk Tweets Doubts About Twitter Deal but Says He Remains Committed," Morningstar, May 13, 2022

31. "Twitter: Musk Puts The Twitter Deal on Pause; Will He Try to Renegotiate or Walk Away?" Truist, May 13, 2022

32. "Tesla: In a Circus Show Move Musk Says Twitter Deal on Hold Pending Diligence," Wedbush, May 13, 2022

33. "Twitter, Inc.," CFRA, May 16, 2022

34. "Twitter: Looking for a Scapegoat; Lower Bid to Come?" Jefferies, May 16, 2022

35. "Tesla: Musk Giving More Indication Getting 'Cold Feet' on Twitter Deal Due to Bots," Wedbush, May 16, 2022

36. "Tesla: Twitter and Musk Thoughts: Bot Issue Likely Excuse for Lower Price or Walk Away," Wedbush, May 16, 2022

37. "Expect More Fireworks Heading into Twitter Shareholder Meeting Later This Week," Wedbush, May 23, 2022

38. "TWTR: We Now Assume the Musk Deal Price is Cut to $33," Rosenblatt Securities, June 21, 2022

39. "Musk Formally Terminates Twitter Deal with 13D Filing," Wedbush, July 8, 2022

40. "Twitter, Inc.," CFRA, July 11, 2022

41. "Twitter Acquisition Terminated Over Allegations Concerning Fake and Spam Accounts, Among Other Things," Citi, July 11, 2022

42. "Musk Terminates Deal; Renegotiation Likely," Mizuho, July 11, 2022

43. "Musk Cancels Twitter Deal; Legal Battle Coming Up," MKM Partners, July 11, 2022

44. "Elon Musk Terminates Twitter Deal; Twitter to Pursue Legal Action to Enforce Deal," Raymond James, July 11, 2022

45. "TWTR: It's Getting Ugly With Musk," Rosenblatt Securities, July 11, 2022

46. "Twitter Stock Up as Street Views Suit as 'Very Strong' Heading into Delaware," Wedbush, July 13, 2022

47. "TWTR: It's Happy Hour, and Musk is Buying; Upgrade to BUY, $52 PT," Rosenblatt Securities, July 14, 2022

48. "TWTR: All Sales Final? Increased Conviction on Deal Close Post Chancery Court Expert Call," Wells Fargo, July 18, 2022

49. "Musk Selling More Stock-Writing on Wall Deal Could Be in the Cards; PT To $50," Wedbush, August 10, 2022

50. "Zatko Whistleblower Situation Adds Complexity To Twitter Case; Eyes on Delaware," Wedbush, August 30, 2022

51. "Twitter: Big Day Ahead for Twitter: Shareholder Vote on Musk Deal; Zatko Heads to Senate," Wedbush, September 12, 2022

52. "TWTR: Not Budging for Mudge; Continued Conviction on Deal Close Post Update Call w/Chancery Court Expert," Wells Fargo, September 23, 2022

53. "Leaving the Nest," Baird, October 4, 2022

54. "Twitter, Inc.," CFRA, October 4, 2022

55. "Elon Musk Reportedly Ready to Close the $54.20 per Share Acquisition of Twitter," Morningstar, October 4, 2022

56. "In Surprising Pivot Musk Agrees to Acquire TWTR on Original Terms; End of Saga," Truist, October 4, 2022

57. "Raising Price Target to Deal Price; $44 Billion Deal Set to Close," Wedbush, October 4, 2022

58. "TWTR: PT Upped For a Done Deal," Rosenblatt Securities, October 5, 2022

## VI.    News Articles

59. "Elon Musk to Acquire Twitter," *PR Newswire*, April 25, 2022

60. "Elon Musk Trolls Twitter," *Bloomberg Opinion*, May 13, 2022

3

61. "15:24 EDT Musk says lower pricedTwitterdeal 'not out of question,' Bloomberg...," *Theflyonthewall.com*, May 16, 2022

62. "Twitter Strikes Back, Says It Will Enforce Agreement With Elon Musk," *Barron's Online*, May 18, 2022

63. "13:09 EDTTwitter executives say deal with Musk proceeding as expected,…" *Theflyonethewall.com*, May 19, 2022

64. "Twitter Deal Is Proceeding, Not 'On Hold,' Executives Tell Staff," *Bloomberg*, May 19, 2022

65. "Cotchett Pitre & McCarthy and Bottini & Bottini File Lawsuit on Behalf of Twitter Shareholders Alleging Elon Musk's Conduct Deflated Twitter's Stock In Attempted Buyout Of The Company," *Business Wire*, May 26, 2022

66. "Twitter shareholders sue Elon Musk and Twitter over chaotic deal," *CNBC*, May 26, 2022

67. "Musk pledges more equity to fund Twitter deal, scraps margin loan," *Reuters*, May 26, 2022

68. "Twitter Says Regulatory Waiting Period for Musk's Acquisition Bid has Expired," *Barron's Online*, June 3, 2022

69. "Twitter Plans to Supply Musk With Internal Data: Report," *Barron's Online*, June 8, 2022

70. "Elon Musk Answers Questions From Twitter Employees Amid Takeover Saga -- WSJ," *The Wall Street Journal*, June 16, 2022

71. "Elon Musk Says Three Issues Need Resolving Before Twitter Deal Can Be Finalized; Tesla CEO says shareholder approval, debt financing and answers to spam and fake accounts are needed to complete acquisition," *The Wall Street Journal*, June 21, 2022

72. "Twitter Lays off Third of Talent Team – 2nd Update," *Dow Jones Institutional News*, July 7, 2022

73. "Musk Scraps Twitter Bid; Nasdaq Leads Week of Market Gains," *WSJ Podcasts*, July 8, 2022

74. "Hindenburg goes long on Twitter, bets against Musk," *Reuters.com*, July 13, 2022

75. "Judge grants twitter fast-trial to decide fate of $44bn Elon Musk deal," *Financial Times*, July 19, 2022

76. "Twitter's earnings falter as it fights with Elon Musk," *The New York Times*, July 22, 2022

77. "Elon Musk Alleges Twitter Fraud in Countersuit Filed in Delaware," *The Wall Street Journal*, August 4, 2022

78. "Elon Musk sells $7bn of Tesla stock ahead of court fight with Twitter," *Financial Times*, August 9, 2022

79. "Whistle-Blower Spam Claims Pose Challenge for Twitter," *The New York Times*, August 23, 2022

80. "Twitter must give Elon Musk more data on fake users, judge rules," *Financial Times*, August 25, 2022

81. "Elon Musk Sends Letter to Twitter With Added Reasons Why He Can Cancel Buyout," *Barron's Online*, August 30, 2022

82. "Twitter stock surges on report Elon Musk proposes buying the company again at full price," *CNN*, October 4, 2022

## VII.    Websites

83. Alpine Associates Management, Strategy, https://www.alpineassociatesmanagement.com/strategy

84. Amundi Tiedemann Arbitrage Strategy UCITS, https://thehedgefundjournal.com/amundi-tiedemann-arbitrage-strategy-ucits/

85. AQR Diversified Arbitrage Fund - About, https://funds.aqr.com/funds/aqr-diversified-arbitrage-fund#about

86. aum13f.com - Pentwater Capital Management LP, https://aum13f.com/firm/pentwater-capital-management-lp

87. Boussard Gavaudan - Investment Approach, https://boussard-gavaudan.com/en/p/23/investment-approach

88. "Bun fight" over top staff at defunct Hong Kong hedge fund as juniors are left behind, https://www.efinancialcareers.com/news/bun-fight-over-top-staff-at-defunct-hong-kong-hedge-fund-as-juniors-are-left-behind

89. Davidson Kempner Capital Management LP - Approach, https://www.davidsonkempner.com/approach

90. Farallon Capital website, available at https://www.faralloncapital.com/core-strategies

91. Gabelli & Company Investment Advisers, Inc., https://gabelli.com/ticker/gmani/#:~:text=Description%20of%20Strategy,engaging%20in%20risk%20arbitrage%20strategies

92. Grantham, Mayo, Van Otterloo & Co. LLC - Business Practice Brochure, https://www.gmo.com/globalassets/documents---manually-loaded/documents/legalcompliance-footer/gmopart2adv4113finalforpdf.pdf

93. HBK Investments LP - Portfolio, https://www.hbk.com/#portfolio

94. Hotchkis & Wiley Capital Management LLC - Value Opportunities Fund, https://www.hwcm.com/funds/value-opportunities-fund/

95. J.P. Morgan Access Multi-Strategy Fund, L.L.C. Form N-2 filed May 24, 2012, https://www.sec.gov/Archives/edgar/data/1286410/000119312512246717/d357057dposami.htm

96. Kryger Capital Ltd. - Shareholder Rights, https://krygercapital.com/shareholderrights.html

97. Matt Levine, *Bloomberg*, available at
https://www.bloomberg.com/opinion/authors/ARbTQlRLRjE/matthew-s-levine

98. Magnetar Financial LLC - Systematic Investing, https://www.magnetar.com/what-we-do/systematic-investing

99. Elon Musk Twitter feed, May 13, 2022 at 5:44 a.m. ET, available at
https://x.com/elonmusk/status/1525049369552048129

100. Elon Musk Twitter feed, May 13, 2022 at 7:50 a.m. ET, available at
https://x.com/elonmusk/status/1525080945274998785

101. Elon Musk Twitter feed, May 13, 2022 at 9:47 p.m. ET, available at
https://x.com/elonmusk/status/1525291586669531137

102. Elon Musk Twitter feed, May 13, 2022 at 10:39 p.m. ET, available at
https://x.com/elonmusk/status/1525304736538312707

103. Elon Musk Twitter feed, May 15, 2022 at 2:39 a.m. ET, available at
https://x.com/elonmusk/status/1525727450872926209

104. Elon Musk Twitter feed, May 16, 2022 at 1:17 p.m. ET, available at
https://x.com/elonmusk/status/1526250477456965634?lang=en

105. Elon Musk Twitter feed, May 17, 2022 at 3:32 a.m. ET, available at
https://x.com/elonmusk/status/1526465624326782976

106. Picton Mahoney Asset Management - Arbitrage Strategy,
https://www.pictoninvestments.com/en/products/arbitrage-strategy

107. Preqin.com - Beryl Capital Management, https://www.preqin.com/data/profile/fund-manager/beryl-capital-management/237698

108. Preqin.com - Cowen Investment Management,
https://www.preqin.com/data/profile/fund-manager/cowen-investment-management/152338

109. Preqin.com - Mason Capital Management LLC,
https://www.preqin.com/data/profile/fund-manager/mason-capital-management/15507

110. Risks and rewards: How Maso Capital's pioneering Asia-Pacific event driven focus is
paying off, https://www.hedgeweek.com/risks-and-rewards-how-maso-capitals-pioneering-asia-pacific-event-driven-focus/

111. Sand Grove Capital Management Selects Hub, https://www.hub.com/news/sand-grove-capital-management-selects-hub

112. Sec.gov - Carlson Capital Cease and Desist,
https://www.sec.gov/files/litigation/admin/2010/34-62982.pdf

113. Sculptor Capital LP - Multi-Strategy, https://www.sculptor.com/what-we-do/multi-strategy

114. Taconic Capital Advisors LP - Event Driven Approach,
https://taconiccap.com/investment-approach/event-driven/

115. Trium Capital - Felix Lo, https://trium-capital.com/team/felix-lo/

116. UBS.com - UBS O'Connor,
https://www.ubs.com/us/en/assetmanagement/capabilities/hedge-funds/oconnor.html

117. Virtus Investment Partners - The Merger Fund, https://www.virtus.com/products/the-merger-fund?_gl=1*iwsdh0*_ga*OTQ0MjUxNTI4LjE3NDkyMzM2MzI.*_ga_4K1BK3TX3H*czE3NDkyMzM2MzEkbzEkZzEkdDE3NDkyMzM2NDYkajQ1JGwwJGgw#shareclass.I/period.quarterly

118. Water Island Capital LLC - Strategies, https://waterislandcapital.com/strategies

119. whalewisdom.com - Melqart Asset Management,
https://whalewisdom.com/filer/melqart-asset-management-uk-ltd-2

## VIII.   Data Sources

120. Bloomberg, L.P.

121. Capital IQ

122. FactSet

123. LSEG

*All other materials cited in the report and exhibits.*



**Exhibit 1**
**Twitter, Inc.**
**Merger Discount**
**May 13, 2022 - October 4, 2022**

Sources: Bloomberg L.P.; Factiva; SEC filings.

**Exhibit 2**
**Institutional Investors with Holdings in Twitter, Inc.**
**Q1 - Q3 2022**

| | Institution Name | Q1 Holdings | Q2 Holdings | Q3 Holdings | Investor Type | Business Description | Merger Arbitrage Strategy | Relevant Quote (if applicable) |
|---|---|---|---|---|---|---|---|---|
| [1] | AQR Arbitrage LLC | 0 | 477,568 | 497,887 | Hedge Fund Manager | AQR Arbitrage LLC (AQR) is SEC-registered investment advisor and hedge fund manager headquartered in Greenwich, Connecticut. The firm was founded as CNH Partners LLC in 2001 through a joint venture between CNH Capital Management LLC and AQR Capital Management LLC. They were renamed AQR Arbitrage LLC in 2022. AQR provides investment management services to institutional clients which include investment companies and pooled investment vehicles. Additionally, the firm provides advisory and sub-advisory services to AQR Sponsored Funds and AQR Mutual Funds. | X | Provides diversified exposure to merger arbitrage, convertible arbitrage, and a range of corporate event-driven strategies that have low correlation to one another. |
| [2] | Alpine Associates Management, Inc. | 0 | 807,000 | 1,143,180 | Hedge Fund Manager | Alpine Associates Management, Inc. (Alpine) is an independent, SEC-registered investment advisor and hedge fund manager headquartered in Palm Beach, Florida. The firm was founded in 1976 as Eckert Corp. Alpine provides advice to the Alpine Funds, which are pooled investment vehicles. Investors in the Alpine Funds may include high net-worth individuals, corporations, partnerships, trusts, endowments, foundations, estates, pension and profit-sharing plans and other institutions. | X | |
| [3] | Alpine Global Management LLC | 0 | 195,113 | 244,913 | Investment Adviser | Alpine Global Management LLC (Alpine Global) is an independent investment management firm headquartered in New York City. The firm was founded by Charles M. Kim in 2008 as Alpine Partners VI LLC and changes their name to Alpine Global Management LLC in 2016. Alpine Global provides investment advisory and management services to various clients. | | |
| [4] | Athos Capital Ltd. | 0 | 107,994 | 97,994 | Hedge Fund Manager | Athos Capital Ltd. is an independent alternative investment manager headquartered in Hong Kong. The firm was founded by Matthew Moskey, Erik Senko and Fred Schulte-Hillen in 2011. Athos Capital manages uncorrelated alternative investment products for institutional investors. | | |
| [5] | Berry Street Capital Management LLP | 0 | 725,000 | 612,500 | Hedge Fund Manager | Berry Street Capital Management LLP (Berry Street Capital) is an independent alternative investment management firm headquartered in London, UK. The firm was founded by Orkun Kilic in 2019. Berry Street Capital runs an event driven equity strategy with a focus on hard catalyst situations. | | |
| [6] | Beryl Capital Management LLC | 0 | 1,615,286 | 2,833,735 | Hedge Fund Manager | Beryl Capital Management LLC (Beryl) is an independent, SEC-registered investment advisor amd hedge fund manager headquartered in Redondo Beach, California. The firm was founded by David Witkin in 2013. Beryl serves as the investment adviser to investment funds and separately managed accounts. | X | |
| [7] | Boussard & Gavaudan Investment Management LLP | 0 | 155,427 | 0 | Hedge Fund Manager | Boussard & Gavaudan Investment Management LLP (BGIM) is the alternative investment management subsidiary of Boussard & Gavaudan Partners Ltd. in Great Britain. The firm was co-founded by Emmanuel Boussard and Emmanuel Gavaudan in 2013. Headquartered in London, BGIM manages several alternative investment and mutual funds. Their flagship hedge fund established in Ireland is BG Master Fund ICAV. BGIM is a signatory to the United Nations Principles for Responsible Investment (UNPRI). | X | |

**Exhibit 2**
**Institutional Investors with Holdings in Twitter, Inc.**
**Q1 - Q3 2022**

| Institution Name | Q1 Holdings | Q2 Holdings | Q3 Holdings | Investor Type | Business Description | Merger Arbitrage Strategy | Relevant Quote (if applicable) |
|---|---|---|---|---|---|---|---|
| [8]  CMT Asset Management llc | 0 | 256,231 | 227,169 | Hedge Fund Manager | CMT Asset Management LLC (CMTAM) is a SEC-registered investment advisor and hedge fund manager headquartered in Chicago, Illinois. The firm was formed in 2017 as part of a trading and investments complex founded in 1997 by Scott A. Casto and Jan-Dirk Lueders. They are a wholly owned subsidiary of CMT Digital Holding LLC. CMTAM is the investment manager for private investment funds offered to sophisticated investors which includes institutions, high net-worth individuals and family offices. |  |  |
| [9]  Capfi Delen Asset Management NV | 0 | 271,914 | 448,210 | Investment Adviser | Capfi Delen Asset Management NV (Cadelam) is an asset management firm headquartered in Antwerp, Belgium. The firm was founded in 1982 as Capital & Finance Asset Management. In 2007, they merged with Delen Private Bank NV, and the fund management activities of Capital & Finance Asset Management were incorporated into Capfi Delen Asset Management (Cadelam). The firm is ultimately held by Ackermanns & van Haaren NV (EBR: ACKB, ADR: AVHNY). Cadelam manages the UCIs ('undertakings for collective investment', or investment funds) which are mainly promoted by Delen Private Bank. |  |  |
| [10]  Carlson Capital LP | 0 | 630,000 | 1,017,500 | Hedge Fund Manager | Carlson Capital LP is an independent, SEC-registered investment advisor and alternative asset management firm headquartered in Dallas, Texas. The firm was founded by Clinton Carlson in 1993. Carlson Capital provides discretionary investment advisory services to privately-offered pooled investment vehicles and certain managed accounts. | X | CCLP makes investment decisions through strategies that are run by one or more portfolio managers supported by analysts and traders. During the relevant period, the firm's strategies included Relative Value Arbitrage ("Relative Value") and Risk Arbitrage, among others. |
| [11]  Cowen Investment Advisors LLC | 0 | 164,268 | 126,833 | Hedge Fund Manager | Cowen Investment Advisors LLC dba (Ramius Advisors) is a hedge fund manager headquartered in New York City. The firm was founded in 1997 as Ramius Advisors LLC. In May 2017, they changed their legal name to Cowen Investment Advisors LLC and continues to do business as Ramius Advisors LLC. The firm is a subsidiary of Cowen Investment Management LLC, ultimately owned by The Toronto-Dominion Bank (TSX: TD) in Canada. Cowen Investment Advisors provides discretionary investment management services to private funds, UCITS funds, and to registered investment companies. | X | Cowen Investments is a fund manager that invests in various sectors, including private equity, private debt, infrastructure, natural resources, and hedge funds. Affiliated with Cowen Inc., the firm operates a series of investment funds focusing on healthcare, life sciences, sustainable energy, and other growth sectors. Its hedge fund division actively invests in cryptocurrencies, while the infrastructure and natural resources sectors target sustainable energy projects across the Europe, United States. Additionally, the firm engages in strategies such as merger arbitrage, activism, and healthcare royalty investments. |
| [12]  Davidson Kempner Capital Management LP | 0 | 658,437 | 3,022,558 | Hedge Fund Manager | Davidson Kempner Capital Management LLC (DKCM) is an independent, SEC-registered investment advisor and hedge fund management firm headquartered in New York City. The firm was founded in 1983 by Marvin Davidson and Thomas Kempner Sr. DKCM provides investment advice and investment management services to private investment funds. | X |  |

**Exhibit 2**
**Institutional Investors with Holdings in Twitter, Inc.**
**Q1 - Q3 2022**

| Institution Name | Q1 Holdings | Q2 Holdings | Q3 Holdings | Investor Type | Business Description | Merger Arbitrage Strategy | Relevant Quote (if applicable) |
|---|---|---|---|---|---|---|---|
| [13] Dimensional Fund Advisors LP | 0 | 1,375,446 | 1,336,357 | Investment Adviser | Dimensional Fund Advisors LP (Dimensional) is a SEC-registered investment advisor headquartered in Austin, Texas. The firm was founded by David Booth in 1981 and is a subsidiary of Dimensional Holdings LLC, which is wholly-owned by Dimensional Holdings, Inc. Dimensional primarily manages securities and other assets for institutional investors. They also manage securities and other assets for high-net-worth individuals and clients of independent financial advisors. The firm is the investment adviser to various SEC-registered investment companies which represent separate funds in aggregate, such as mutual funds and exchange-traded funds. | | |
| [14] EHP Funds, Inc. | 0 | 223,273 | 0 | Hedge Fund Manager | EHP Funds, Inc. is an independent, Canadian alternative investment manager headquartered in Toronto, Onatrio. The firm was co-founded by Jason C. Mann and Ian K. Fairbrother in 2010. EHP Funds manages a family of prospectus-offered "Liquid Alt" funds. | | The Funds may use cash borrowing as a more flexible and cost-efficient means of providing additional leverage for investment strategies such as merger arbitrage strategies where the use of derivative instruments to provide the same level of exposure may not be practical. |
| [15] EdgeHill Partners | 0 | 217,700 | 217,700 | Hedge Fund Manager | EdgeHill Partners is an independent alternative investment manager headquartered in Toronto, Canada. The firm was founded by Brad White, Ian Fairbrother, Jason Mann and Malcolm Smith. They manage traditional private hedge funds for ultra-high net-worth clients. | | |
| [16] Ergoteles LLC | 0 | 598,069 | 106,668 | Hedge Fund Manager | Ergoteles LLC is an independent, SEC-registered investment advisor and hedge fund management firm headquartered in New York City. The firm was founded by Michael Bos, Mark Mancini and Amit Manwani in 2012. Ergoteles provides investment advisory services to pooled investment vehicles via a managed account agreement. The limited partners and shareholders of such pooled investment vehicles may include individuals, private funds, non-profits, pension plans, sovereign wealth funds and others. | | |
| [17] FIL Investments International | 0 | 2,669,367 | 0 | Investment Adviser | FIL Investments International (FILII) is an asset management firm headquartered in Tadworth, UK. The firm was founded in 1979 and is a subsidiary of FIL Holdings (UK) Ltd., which is ultimately held by FIL Ltd. in Bermuda. FILII provides investment advisory and management services to their clients. | | |
| [18] Farallon Capital Management LLC | 0 | 7,325,000 | 7,755,000 | Hedge Fund Manager | Farallon Capital Management LLC (Farallon) is a SEC-registered investment advisor and hedge fund manager headquartered in San Francisco, California. The firm was founded in 1986 and is a wholly-owned subsidiary of Farallon Capital Management LP. Farallon provides administrative services and discretionary investment management services to private investment funds, the securities of which are offered to investors on a private placement basis; and to separately managed accounts for institutions such as endowments, foundations, charitable organizations and state and municipal government entities. | X | |
| [19] Freemont Management SA | 0 | 338,149 | 348,975 | Investment Adviser | Part of Haldor Foundation, Freemont Management SA is a Swiss company that provides investment advice. The company is based in Lutry, Switzerland. The company was founded in 1994. Patrick Brunet has been the CEO of the company since 2007. | | |

**Exhibit 2**
**Institutional Investors with Holdings in Twitter, Inc.**
**Q1 - Q3 2022**

| Institution Name | Q1 Holdings | Q2 Holdings | Q3 Holdings | Investor Type | Business Description | Merger Arbitrage Strategy | Relevant Quote (if applicable) |
|---|---|---|---|---|---|---|---|
| [20] Gabelli & Company Investment Advisers, Inc. | 0 | 290,800 | 340,615 | Hedge Fund Manager | Gabelli & Company Investment Advisers, Inc. (GCIA) is a SEC-registered investment advisor and hedge fund manager headquartered in Greenwich, Connecticut. The firm was founded in 1985 and was formerly known as Gabelli Securities, Inc. They are a wholly owned subsidiary of Associated Capital Group, Inc. (NYSE: AC), ultimately held by GAMCO Investors, Inc. GCIA acts as an investment adviser, either directly or on a sub-advisory basis, to private investment partnerships, offshore pooled investment vehicles, and separately managed accounts (SMAs). | X | The investment objective of GAMCO Merger Arbitrage is to invest in announced equity merger and acquisition transactions and maintain a diversified portfolio of transactions. The Merger Arbitrage Fund seeks to achieve long term capital growth by engaging in risk arbitrage strategies. |
| [21] Grantham, Mayo, Van Otterloo & Co. LLC | 0 | 331,960 | 0 | Investment Adviser | Grantham, Mayo, Van Otterloo & Co. (dba GMO) is a privately-held, SEC-registered global investment management firm headquartered in Boston, Massachusetts. GMO was founded was founded in 1977 and provides investment advice to a wide variety of clients. | X | In practice, the Strategy's portfolio generally includes a heavy focus on merger arbitrage transactions, supplemented by other opportunities that exhibit similar risk, return and time horizon characteristics. |
| [22] Greenwich Wealth Management LLC | 0 | 233,264 | 232,410 | Private Banking/Wealth M | Greenwich Wealth Management LLC (GWM) is an independent, SEC-registered investment advisor and wealth management firm headquartered in Greenwich, Connecticut. The firm was founded by Michael J. Freeburg in 2006. GWM provides investment supervisory services to high net-worth individuals, families, trusts, estates, endowments, charitable organizations, corporations, defined benefit/contribution plans and profit-sharing plans. | | |
| [23] HBK Investments LP | 0 | 1,773,212 | 1,733,105 | Hedge Fund Manager | HBK Investments LP, do-business-as HBK Capital Management (HBK), is a SEC-registered investment advisor and hedge fund manager headquartered in Dallas, Texas. The firm was founded in 1991 and is a subsidiary of HBK Partners II LP. HBK provides discretionary investment management services and related administrative services to their funds, which are private investment funds offered only to sophisticated investors with substantial resources. | X | Merger arbitrage, special situations and equity intercapitalization investments across the globe, including the U.S., Europe and emerging markets. |
| [24] HRT Financial LP (US) | 0 | 3,018,283 | 3,634,747 | Broker | HRT Financial LP (US) is based in New York, NY. Part of HRT Capital LLC, HRT Financial LP (US) is a company that provides brokerage services. The CEO of the company is Adam Seth Nunes. | | |
| [25] Hotchkis & Wiley Capital Management LLC | 0 | 187,300 | 197,700 | Mutual Fund Manager | Hotchkis & Wiley Capital Management LLC (Hotchkis & Wiley) is a SEC-registered investment advisor and mutual fund manager headquartered in Los Angeles, California. The firm was founded in 2001 and is a subsidiary of HWCap Holdings LLC. They manage separate accounts for institutional clients and mutual funds for institutional and individual clients. Hotchkis & Wiley is a signatory to the United Nations-supported Principles for Responsible Investment (UNPRI). | X | Value Opportunities is a dynamic Fund that holds 45-75 undervalued issuers representing our best ideas across the market cap spectrum. While the majority of the portfolio is expected to be invested in equities, the Fund also invests opportunistically in special situations such as bonds, preferred stock and merger arbitrage. |
| [26] Ibercaja Gestion SGIIC SA | 0 | 598,311 | 599,663 | Investment Adviser | Ibercaja Gestion SGIIC SA is the asset management subsidiary of Ibercaja Banco SA, ultimately held by Fundacion Bancaria Ibercaja in Spain. Founded in 1988, the firm was formerly known as Gescazar and changed their name to Ibercaja Gestión in 2002. Headquartered in Zaragoza, Ibercaja Gestion manages mutual funds and OEICs for individual and institutional investors. Their flagship fund is Ibercaja Bolsa Europa, FI. | | |

**Exhibit 2**
**Institutional Investors with Holdings in Twitter, Inc.**
**Q1 - Q3 2022**

| Institution Name | Q1 Holdings | Q2 Holdings | Q3 Holdings | Investor Type | Business Description | Merger Arbitrage Strategy | Relevant Quote (if applicable) |
|---|---|---|---|---|---|---|---|
| [27] JAT Capital Management LP | 0 | 112,700 | 75,000 | Hedge Fund Manager | JAT Capital Management LP (JAT Capital) is an independent registered investment advisor and hedge fund manager headquartered in Greenwich, Connecticut. The firm was founded by John Thaler in 2020 as Hampton Road Capital Management LP and became JAT Capital Management LP in 2022. JAT Capital provides discretionary investment advice to private funds and separately managed accounts. Investors in the Funds are generally pension plans, endowments, other institutional investors and high net worth individuals. | | |
| [28] JPMorgan Private Investments, Inc. | 0 | 996,291 | 909,329 | Investment Adviser | JPMorgan Private Investments, Inc. (JPMPI) is a SEC-registered investment advisor headquartered in New York City. The firm was founded in 1991 and is a wholly-owned subsidiary of JPMorgan Chase Holdings LLC, ultimately held by JPMorgan Chase and Co. (NYSE: JPM). JPMPI provides advisory services to open-end and closed-end Registered Investment Companies (RICs); private investment funds organized as limited partnerships, limited liability companies, or offshore companies; and various wrap fee programs offered through an affiliate, JPMorgan Securities LLC (JPMS). | X | Strategies employed by the Fund may include long/short equities, relative value, opportunistic/macro, distressed securities, merger arbitrage/event driven, short selling and multi-strategy. |
| [29] Kepos Capital LP | 0 | 250,000 | 150,000 | Hedge Fund Manager | Kepos Capital LP is an independent, SEC-registered investment advisor and hedge fund manager headquartered in New York City. The firm was founded in 2010 by Adrien Vesval, Giorgio De Santis, Mark Carhart, Bob Litterman and Matthew DesChamps. Kepos Capital provides investment advice to alternative investment funds and, on a case by case basis, may offer customized managed accounts for institutions and benefit plans. | | |
| [30] Kryger Capital Ltd. | 0 | 524,874 | 253,427 | Hedge Fund Manager | Part of Kryger Capital LLC, Kryger Capital Ltd. is a British company that provides investment advice. The company is based in London, UK. | X | The Firm manages a global event-driven strategy, achieved through transactions including, but not limited to merger arbitrage, special purpose acquisition companies and other significant corporate events. |
| [31] LMR Partners LLP | 0 | 447,160 | 662,468 | Hedge Fund Manager | LMR Partners LLP is an independent alternative investment management firm which was founded in 2009 by Ben Levine, Andrew Manuel and Stefan Renold. Headquartered in London, the firm manages the LMR funds for sophisticated clients. | X | He also spent 2 years at LMR Partners, where he managed the firm's Global Merger Arbitrage and Event portfolio. |
| [32] Magnetar Financial LLC | 0 | 128,227 | 83,540 | Hedge Fund Manager | Magnetar Financial LLC is a SEC-registered investment advisor and hedge fund firm headquartered in Evanston, Illinois. The firm was founded by Alec Litowitz and Ross Laser in 2005 and is a subsidiary of Magnetar Capital Partners LP. Magnetar Financial serves as the investment manager for, and provides discretionary and may at times provide non-discretionary investment advisory services to, several private investment funds and separately managed accounts. Investors in the funds and clients for managed accounts may include pension plans, foundations, funds of funds, other institutional investors and high net-worth individuals. | X | |
| [33] Maso Capital Partners Ltd. | 0 | 200,000 | 0 | Hedge Fund Manager | Maso Capital Partners Ltd. (Maso Capital) is an independent, Asia focused multi-asset class investment firm headquartered in Hong Kong. The firm was founded by Manoj Jain and Sohit Khurana in 2012. Maso Capital provides asset management services for sophisticated, wealthy investors. | X | "Whether its merger arbitrage, capital markets, even the idea of a SPAC, or appraisal rights – we have been among the first ones to do it. When we started the firm, we wanted to investigate and develop a lot of things that we could potentially do in the region." |

**Exhibit 2**
**Institutional Investors with Holdings in Twitter, Inc.**
**Q1 - Q3 2022**

| Institution Name | Q1 Holdings | Q2 Holdings | Q3 Holdings | Investor Type | Business Description | Merger Arbitrage Strategy | Relevant Quote (if applicable) |
|---|---|---|---|---|---|---|---|
| [34] Mason Capital Management LLC | 0 | 606,000 | 1,871,000 | Hedge Fund Manager | Mason Capital Management LLC (Mason) is an independent, SEC-registered investment advisor and hedge fund manager headquartered in New York City. The firm was founded by Kenneth Garschina and Michael Martino in 2000 as Amagansett Capital Management LLC. Mason provides investment management services on a discretionary basis to privately offered investment vehicles, and from time to time may also provide investment management services to one or more separately managed accounts. | X | Established in July 2000, Mason Capital Management is a New York-based event driven hedge fund manager founded by Michael E. Martino and Kenneth M. Garschina. The firm seeks to generate attractive capital appreciation, uncorrelated to equity or debt markets, through investments in risk/merger arbitrage, distressed securities, and special situation opportunities. |
| [35] Melqart Asset Management (UK) Ltd. | 0 | 1,555,711 | 1,700,970 | Hedge Fund Manager | Melqart Asset Management (UK) Ltd. (Melqart UK) is an alternative investment management firm headquartered in London, UK. The firm was founded by Michel Massoud in 2015 and is a subsidiary of Melqart Asset Management LP in Cayman Islands. Melqart UK provides investment management services to various funds that pursue investment strategies that involve investing in a wide range of securities and instruments without limitation in various jurisdictions. | X | The Firm employs a multi-asset class approach, dynamically allocating investments across three main sub-strategies: merger arbitrage, special situations equity, and sub-investment grade credit |
| [36] Moore Capital Management LP | 0 | 250,000 | 130,000 | Hedge Fund Manager | Moore Capital Management LP (Moore Capital) is a SEC-registered investment advisor and hedge fund manager headquartered in New York City. The firm was founded by Louis Bacon in 1989 and is a subsidiary of Moore Capital Advisors LLC, ultimately held by MCM Group Holdings, Inc. Moore Capital provides investment management services on a discretionary basis to US and non-US privately-offered investment funds sponsored by Moore Group. | | |
| [37] Operadora Inbursa de Fondos de Inversion SA de CV | 0 | 1,655,001 | 1,417,501 | Investment Adviser | Operadora Inbursa de Fondos de Inversión SA de CV (Inbursa) is the investment advisory subsidiary of Grupo Financiero Inbursa SA de CV (MX: GFINBURO, ADR: GPFOY) in Mexico. The firm was established in 1995 and is headquartered in Mexico City. Inbursa provides investment advisory services to individuals and institutional investors. | | |
| [38] Pentwater Capital Management LP | 0 | 18,083,000 | 23,399,700 | Hedge Fund Manager | Pentwater Capital Management LP (Pentwater) is an independent, SEC-registered investment advisor and hedge fund manager headquartered in Naples, Florida. The firm was founded by Matthew C. Halbower in 2007. Pentwater serves as an investment adviser or trading manager for private investment funds and separately managed accounts. | X | |
| [39] Picton Mahoney Asset Management | 0 | 235,000 | 50,000 | Hedge Fund Manager | Picton Mahoney Asset Management (Picton Mahoney) is a hedge fund manager headquartered in Toronto, Ontario. The firm was founded by David Picton, Michael Kuan and Michael Kimmel in 2004 and provides investment solutions to institutional, retail and high net-worth investors in Canada and around the world. | X | A unique portfolio diversifier providing alpha from three distinct sources: merger arbitrage, SPAC arbitrage, and convertible arbitrage. |
| [40] Regal Funds Management Pty Ltd. | 0 | 877,432 | 0 | Hedge Fund Manager | Regal Funds Management Pty Ltd. (Regal) is a specialist alternatives investment manager headquartered in Sydney, Australia. The firm was founded by Andrew and Philip King in 2004 and is a subsidiary of Regal Partners Ltd. Regal manages a number of alternative investment strategies and performs investment management and investment advisory services to a number of Australian Unit Trusts and Cayman Island Companies. Their clients are institutional investors, family offices and high net-worth individuals. | | |

**Exhibit 2**
**Institutional Investors with Holdings in Twitter, Inc.**
**Q1 - Q3 2022**

| Institution Name | Q1 Holdings | Q2 Holdings | Q3 Holdings | Investor Type | Business Description | Merger Arbitrage Strategy | Relevant Quote (if applicable) |
|---|---|---|---|---|---|---|---|
| [41] Sand Grove Capital Management LLP | 0 | 483,720 | 2,086,006 | Hedge Fund Manager | Sand Grove Capital Management LLP (Sand Grove) is an independent alternative investment manager headquartered in London, UK. The firm was founded by Simon Davies in 2014. Sand Grove provides investment advisory services for individual and institutional investors. | X | Sand Grove was founded in 2014 and manages $1.2bn in a range of event driven offshore funds and a UCITS, focusing on merger arbitrage for large institutional investors. |
| [42] Sculptor Capital LP | 0 | 2,093,703 | 1,710,000 | Hedge Fund Manager | Sculptor Capital LP is a SEC-registered investment advisor and hedge fund manager headquartered in New York City. Formerly known as OZ Management LP, the firm was founded by Daniel Och in 1994. They are directly owned by Calder Holdco I LP and indirectly owned by Rithm Capital Corp. (NYSE: RITM). Sculptor Capital provides portfolio management services to private funds, CLOs, and/or CBOs, as well as to SMAs for institutional clients, which may include financial institutions, public and private pension funds, sovereign wealth funds, endowments, and foundations. | X | |
| [43] Segantii Capital Management Ltd. | 0 | 7,300,000 | 7,732,921 | Hedge Fund Manager | Segantii Capital Management Ltd. (Segantii) is an institutional asset management firm headquartered in Hong Kong. The firm was founded by Simon Sadler in 2007 and is a subsidiary of Segantii Capital Management (Cayman) Ltd. in Cayman Islands. Segantii manages the Segantii Asia-Pacific Equity Multi-Strategy Fund. Investors in the fund include high-net worth individuals, family offices and fund-of-funds. | X | For the moment, Narvir Sidhu, a Segantii portfolio manager who is thought to trade event driven and merger arbitrage strategies has just joined Balyasny in London. |
| [44] Steamboat Capital Partners LLC | 0 | 300,000 | 600,000 | Hedge Fund Manager | Steamboat Capital Partners LLC (Steamboat) is a SEC-registered investment advisor and hedge fund manager headquartered in New York City. The firm was founded by Parsa Kiai in 2012 and is owned by Steamboat Capital Partners Trust, a trust formed for estate planning purposes. Steamboat provides investment advisory services to private investment funds. | | |
| [45] TIG Advisors LLC | 0 | 280,858 | 1,928,410 | Hedge Fund Manager | TIG Advisors LLC is a SEC-registered investment advisor and hedge fund manager headquartered in New York City. The firm was founded by Carl Tiedemann, III in 2006 and is wholly-owned by TIG Trinity Management LLC. TIG Advisors provides discretionary investment advisory services to clients who consists of pooled investment vehicles intended for institutional investors and other sophisticated investors and separately managed accounts. | X | Today TIG is the only pure merger arbitrage manager on the Amundi platform. |
| [46] Taconic Capital Advisors LP | 0 | 1,150,000 | 2,679,250 | Hedge Fund Manager | Taconic Capital Advisors LLC (Taconic) is an independent, SEC-registered investment advisor and hedge fund manager headquartered in New York City. The firm was founded by Kenneth D. Brody and Frank P. Brosens in 1999. TCA provides investment advice on a discretionary basis to onshore and offshore private investment funds that are offered to high net worth, financially sophisticated, individual and institutional investors that may include banks or thrift institutions, investment companies, pension and profit-sharing plans, government plans, trusts, estates or other business entities. | X | |
| [47] UBS O'Connor LLC | 0 | 2,840,112 | 3,238,528 | Hedge Fund Manager | UBS O'Connor LLC is a registered investment advisor and hedge fund manager headquartered in Chicago, Illinois. The firm was founded in 2000 and is a subsidiary of UBS Asset Management (Americas) Inc., ultimately owned by UBS Group AG (SIX, NYSE: UBS) in Switzerland. UBS O'Connor primarily provides discretionary and non-discretionary investment advisory services to various types of pooled investment vehicles, (which may or may not be exempt from registration), pension or profit-sharing plans, and institutional separately managed accounts. | X | Focused on investments in merger arbitrage, capital structure arbitrage, and special purpose acquisition companies. |

**Exhibit 2**
**Institutional Investors with Holdings in Twitter, Inc.**
**Q1 - Q3 2022**

| Institution Name | Q1 Holdings | Q2 Holdings | Q3 Holdings | Investor Type | Business Description | Merger Arbitrage Strategy | Relevant Quote (if applicable) |
|---|---|---|---|---|---|---|---|
| [48] Water Island Capital LLC | 0 | 743,099 | 1,110,363 | Hedge Fund Manager | Water Island Capital LLC (Water Island Capital) is a SEC-registered investment advisor and hedge fund manager headquartered in New York City. The firm was founded by John Orrico in 2000 and is owned by Water Island Capital Partners LP. They provide investment advisory services for both institutional and retail clients through registered investment companies (including mutual funds and an ETF), other pooled investment vehicles (hedge funds or private funds), and separately managed accounts. | X | |
| [49] Westchester Capital Management LLC | 0 | 1,026,574 | 1,091,446 | Investment Adviser | Westchester Capital Management LLC (Westchester) is a SEC-registered investment advisor headquartered in Valhalla, New York. The firm was founded by Roy Behren and Michael Shannon in 2010 as the successor to Westchester Capital Management, Inc., a hedge fund manager that was originally formed in 1980 by William Green. In 2021, the firm was acquired by Virtus Investment Partners, Inc. (NASDAQ: VRTS). Westchester provides investment advice to registered investment companies. Their flagship fund is The Merger Fund®, which was launched in 1989. | X | Merger arbitrage strategies have historically provided attractive absolute returns with lower volatility and minimal correlation relative to traditional stock and bond strategies, making for a powerful portfolio diversifier. |
| [50] Whitebox Advisors LLC | 0 | 209,184 | 183,590 | Hedge Fund Manager | Whitebox Advisors LLC (Whitebox) is an independent, SEC-registered investment advisor and alternative asset manager headquartered in Minneapolis, Minnesota. Founded in 1999, Whitebox manages and advises private investment funds. They also offers advisory services to separately managed accounts. | | |
| **Total** | | **53,110,587** | | | | **29** | |

Sources:
Factset financial data and analytics.
[1]: AQR Diversified Arbitrage Fund - About, "https://funds.aqr.com/funds/aqr-diversified-arbitrage-fund#about"
[2]: Alpine Associates Management, Strategy, "https://www.alpineassociatesmanagement.com/strategy"
[6]: Preqin.com - Beryl Capital Management, "https://www.preqin.com/data/profile/fund-manager/beryl-capital-management/237698"
[7]: Boussard Gavaudan - Investment Approach, "https://boussard-gavaudan.com/en/p/23/investment-approach"
[10]: Sec.gov - Carlson Capital Cease and Desist, "https://www.sec.gov/files/litigation/admin/2010/34-62982.pdf"
[11]: Preqin.com - Cowen Investment Management, "https://www.preqin.com/data/profile/fund-manager/cowen-investment-management/152338"
[12]: Davidson Kempner Capital Management LP - Approach, "https://www.davidsonkempner.com/approach"
[18]: Farallon Capital Management LLC - Core Strategies, "https://www.faralloncapital.com/core-strategies"
[20]: Gabelli & Company Investment Advisers, Inc., "https://gabelli.com/ticker/gmani/#:~:text=Description%20of%20Strategy,engaging%20in%20risk%20arbitrage%20strategies."
[21]: Grantham, Mayo, Van Otterloo & Co. LLC - Business Practice Brochure, "https://www.gmo.com/globalassets/documents---manually-loaded/documents/legalcompliance-footer/gmopart2adv4113finalforpdf.pdf"
[23]: HBK Investments LP - Portfolio, "https://www.hbk.com/#portfolio"
[25]: Hotchkis & Wiley Capital Management LLC - Value Opportunities Fund, "https://www.hwcm.com/funds/value-opportunities-fund/"
[28]: J.P. Morgan Access Multi-Strategy Fund, L.L.C. Form N-2 filed May 24, 2012, "https://www.sec.gov/Archives/edgar/data/1286410/000119312512246717/d357057dposami.htm"
[30]: Kryger Capital Ltd. - Shareholder Rights, "https://krygercapital.com/shareholderrights.html"
[31]: Trium Capital - Felix Lo, "https://trium-capital.com/team/felix-lo/"
[32]: Magnetar Financial LLC - Systematic Investing, "https://www.magnetar.com/what-we-do/systematic-investing"
[33]: Risks and rewards: How Maso Capital's pioneering Asia-Pacific event driven focus is paying off, "https://www.hedgeweek.com/risks-and-rewards-how-maso-capitals-pioneering-asia-pacific-event-driven-focus/"
[34]: Preqin.com - Mason Capital Management LLC, "https://www.preqin.com/data/profile/fund-manager/mason-capital-management/15507"
[35]: whalewisdom.com - Melqart Asset Management, "https://whalewisdom.com/filer/melqart-asset-management-uk-ltd-2"
[38]: aum13f.com - Pentwater Capital Management LP, "https://aum13f.com/firm/pentwater-capital-management-lp"
[39]: Picton Mahoney Asset Management - Arbitrage Strategy, "https://www.pictoninvestments.com/en/products/arbitrage-strategy"
[41]: Sand Grove Capital Management Selects Hub, "https://www.hub.com/news/sand-grove-capital-management-selects-hub"
[42]: Sculptor Capital LP - Multi-Strategy, "https://www.sculptor.com/what-we-do/multi-strategy/"
[43]: "Bun fight" over top staff at defunct Hong Kong hedge fund as juniors are left behind, "https://www.efinancialcareers.com/news/bun-fight-over-top-staff-at-defunct-hong-kong-hedge-fund-as-juniors-are-left-behind"
[45]: Amundi Tiedemann Arbitrage Strategy UCITS, "https://thehedgefundjournal.com/amundi-tiedemann-arbitrage-strategy-ucits/"

**Exhibit 2**
**Institutional Investors with Holdings in Twitter, Inc.**
**Q1 - Q3 2022**

[46]: Taconic Capital Advisors LP - Event Driven Approach, "https://taconiccap.com/investment-approach/event-driven/"
[47]: UBS.com - UBS O'Connor, "https://www.ubs.com/us/en/assetmanagement/capabilities/hedge-funds/oconnor.html"
[48]: Water Island Capital LLC - Strategies, "https://waterislandcapital.com/strategies"
[49]: Virtus Investment Partners - The Merger Fund, "https://www.virtus.com/products/the-merger-fund?_gl=1*iwsdh0*_ga*OTQ0MjUxNTI4LjE3NDkyMzM2MzI.*_ga_4K1BK3TX3H*czE3NDkyMzM2MzEkbzEkZzEkdDE3NDkyMzM2NDYkajQ1JGwwJGgw#shareclass.I/period.quarterly"

Notes: Limited to institutions that increased holdings from zero to more than 100,000 shares between Q1 and Q2 2022. Totals only include institutions that make use of merger arbitrage strategies.