# EXHIBIT 2

EXHIBIT 2

# Deposition Transcript

Case Number: 3:22-CV-05937-CRB
Date: July 30, 2025

In the matter of:

# GIUSEPPE PAMPENA v ELON R. MUSK

# Kenneth M. Lehn

**CERTIFIED COPY**

Reported by:
Kelly J. Lawton



Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

1                UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF CALIFORNIA

2                Case No. 3:22-CV-05937-CRB

3

    GIUSEPPE PAMPENA,

4        Plaintiff,

5

6   vs.

7

    ELON MUSK,

8        Defendant.

9

10

11        VIDEO DEPOSITION OF KENNETH M. LEHN

12          Taken on Behalf of the Plaintiff

13

14

    DATE TAKEN:    WEDNESDAY, JULY 30, 2025

15
    TIME:          8:01 A.M. - 1:13 P.M.

16
    PLACE:         REMOTE VIA STENO CONNECT

17

18

19

20

21  Examination of the witness stenographically taken
                      before:

22
               Kelly J. Lawton

23        Registered Professional Reporter
             Certified Court Reporter

24           Licensed Court Reporter

25

08:12:14  1    specific requests around key dates.

08:12:16  2          So they review the universe of reports that

08:12:19  3    emerge from the search, and then they send to me the

08:12:23  4    ones that are responsive to my specific requests,

08:12:26  5    which, of course, is a subset of the universe that

08:12:28  6    they -- they examined.

08:12:30  7      Q.    Got it.

08:12:31  8          In -- in total, that included 183 reports

08:12:36  9    over 1700 pages.

08:12:40  10          So did you review all of those?

08:12:43  11      A.    I reviewed --

08:12:45  12          MS. KELEMEN:  Objection.

08:12:46  13          THE WITNESS:  I'm sorry.

08:12:47  14          MR. ARNZEN:  May I know the basis for the

08:12:49  15      objection so that I might consider curing?

08:12:51  16          MS. KELEMEN:  Yeah.  Compound.

08:12:54  17          MR. ARNZEN:  Oh, okay.

08:12:55  18    BY MR. ARNZEN:

08:12:56  19      Q.    You may answer.

08:12:56  20      A.    I reviewed the ones that are cited in my

08:12:59  21    report.

08:13:01  22          I don't recall offhand if I might have

08:13:03  23    reviewed others as well, but I certainly did review

08:13:06  24    the ones that are cited in my report.

08:13:10  25      Q.    Okay.  Did you review the entirety of the --

| | | |
|---|---|---|
| 08:13:12 | 1 | of the reports and news articles that are cited in |
| 08:13:15 | 2 | your report? |
| 08:13:16 | 3 | A.   The ones that are cited, yes. |
| 08:13:19 | 4 | The ones that are not cited, I don't recall |
| 08:13:21 | 5 | if I reviewed all of them.  My recollection is I |
| 08:13:25 | 6 | reviewed some, but I don't think I reviewed the |
| 08:13:28 | 7 | universe of reports that were released during that |
| 08:13:31 | 8 | time period. |
| 08:13:32 | 9 | Q.   Okay.  And Compass Lexecon, are those people |
| 08:13:39 | 10 | that assist you with some tasks along the way in |
| 08:13:43 | 11 | forming your opinions? |
| 08:13:44 | 12 | A.   That's correct. |
| 08:13:44 | 13 | Q.   Okay.  Did the people at Compass Lexecon |
| 08:13:47 | 14 | read all of the reports in their entirety? |
| 08:13:50 | 15 | A.   I can't speak for what they did. |
| 08:13:52 | 16 | I think that's their normal protocol, but I |
| 08:13:54 | 17 | don't have firsthand knowledge of precisely whether |
| 08:13:58 | 18 | or not they read all the reports in their entirety. |
| 08:14:03 | 19 | Q.   How many people at Compass Lexecon were |
| 08:14:06 | 20 | working on that aspect, identifying the portions |
| 08:14:07 | 21 | that you should read? |
| 08:14:08 | 22 | A.   Well, there were four people that I |
| 08:14:12 | 23 | interacted with in -- in developing my report and |
| 08:14:20 | 24 | preparing for today. |
| 08:14:21 | 25 | There may have been some other people |

KENNETH M. LEHN                                    JOB NO. 1870654
JULY 30, 2025

```
08:14:23   1    working under their direction, so I really don't
08:14:26   2    have an exact count.
08:14:27   3          But I know the four people that I've worked
08:14:29   4    with, you know, certainly would have reviewed some,
08:14:32   5    if not all, of the analyst reports.
08:14:33   6       Q.   Okay.  And the folks working under the
08:14:39   7    people that you had contact with, do you know who
08:14:42   8    they are?
08:14:42   9       A.   I do not.
08:14:43  10       Q.   Do you know what instructions you gave to
08:14:46  11    Compass Lexecon in order to identify the reports
08:14:48  12    that you should review?
08:14:51  13       A.   In a general sense?  Yes.
08:14:53  14          There, obviously, are some key dates that
08:14:57  15    are highlighted in my report.  And, typically, when
08:15:02  16    I highlight dates in a case involving loss,
08:15:06  17    causation, and damages, I want to see the analyst
08:15:10  18    reports surround those dates.
08:15:12  19          So I would have directed them to provide me
08:15:16  20    with the analyst reports that were released around
08:15:19  21    those key dates.
08:15:19  22       Q.   Did they create any written summaries of
08:15:22  23    their work for you, or did they just supply you with
08:15:25  24    the reports themselves?
08:15:27  25       A.   I don't know.
```

08:15:28  1          I certainly did not receive the written

08:15:30  2   summary.

08:15:31  3          But whether or not they did that for their

08:15:33  4   own purposes, I don't know.

08:15:36  5      Q.   Okay.  Your report states in several

08:15:42  6   instances that analysts did not react to certain

08:15:45  7   information.  Fair?

08:15:47  8      A.   Fair.

08:15:47  9      Q.   If you didn't read all of the reports, how

08:15:52 10   did you determine what was not in the reports?

08:15:57 11      A.   I'm sorry.  Can you repeat that?

08:15:59 12      Q.   Sure.

08:16:00 13          If you didn't read all of the reports, how

08:16:03 14   can you determine what was not in the reports?

08:16:07 15      A.   Well, to my knowledge, I read the reports

08:16:10 16   that were released around the key dates.

08:16:14 17          So insofar as that there were other reports

08:16:16 18   released on other dates that I didn't review -- and

08:16:20 19   certainly, in my experience in securities

08:16:23 20   litigation -- and I never want to say never -- but

08:16:26 21   it's really the reports that are released around the

08:16:28 22   key events that are most important in determining

08:16:33 23   what the market was reacting to when key information

08:16:36 24   was released to the market.

08:16:40 25      Q.   So, Dr. Lehn, you made a number of

08:24:22  1   information that I understand Plaintiffs claim was

08:24:26  2   the true state of affairs; namely, that he was

08:24:30  3   developing cold feet about the transaction and --

08:24:34  4       Q.   I realize that you're -- we're going to get

08:24:36  5   into a discussion about there are different

08:24:39  6   inferences.

08:24:39  7            I'm just talking about the tweet from which

08:24:41  8   the inferences are drawn, is it fair to say that

08:24:44  9   would be a great way to disrupt the market, if that

08:24:47  10  was Mr. Musk's intent?

08:24:49  11      A.   But that's what I was getting at.

08:24:51  12           MS. KELEMEN:   Objection.

08:24:52  13           THE WITNESS:   Insofar that the market

08:24:55  14      inferred from the tweet something that was true

08:24:59  15      and acknowledged by Plaintiffs, as I understand,

08:25:02  16      to be true, to say that that was disruptive is --

08:25:07  17      that wouldn't be the word I would use.

08:25:09  18  BY MR. ARNZEN:

08:25:11  19      Q.   Okay.  Replace that with "a significant

08:25:14  20  impact on the market."

08:25:16  21           If Musk was trying to create a significant

08:25:18  22  impact on the market, he picked a good way to do it

08:25:21  23  through this 5/13 tweet, didn't he?

08:25:24  24           MS. KELEMEN:   Object to form.

08:25:25  25           THE WITNESS:   Well, but, again, insofar that

08:25:27  1       a truthful inference was drawn from the tweet,

08:25:33  2       that kind of makes prices more -- I mean, they're

08:25:38  3       basically reflecting the true state of affairs.

08:25:42  4           So, you know, I wouldn't want to leave any

08:25:45  5       impression that there was something nefarious

08:25:49  6       about tweeting something that the market

08:25:53  7       inferred -- from which the market inferred a

08:25:56  8       truthful state of affairs.

08:25:57  9   BY MR. ARNZEN:

08:25:58  10      Q.    True statements can disrupt markets, right?

08:26:02  11      A.    Well, again, I go back to I'm not sure what

08:26:04  12  you mean by "disrupt."

08:26:05  13          I mean, true statements in an efficient

08:26:07  14  market will cause prices to reflect more

08:26:10  15  information, which enhances the integrity of the

08:26:13  16  prices.

08:26:15  17          And from everything I've seen here, that's

08:26:19  18  what was going on with the May 13th tweet, when you

08:26:21  19  look at the analyst commentary.

08:26:23  20          It wasn't -- there's no evidence, based on

08:26:27  21  the analyst commentary, that the analysts were

08:26:30  22  somehow fooled by the alleged misrepresentation.

08:26:35  23          The very strong theme that comes from a

08:26:37  24  review of the analyst commentary is that the market

08:26:40  25  was reacting to concerns about apprehensions

| | | |
|---|---|---|
| 08:26:44 | 1 | Mr. Musk was developing about proceeding with the |
| 08:26:46 | 2 | deal at $54.20. |
| 08:26:52 | 3 | And, again, I don't view that as disruptive. |
| 08:26:55 | 4 | I view that as conveyed information to the market |
| 08:26:57 | 5 | that, if anything, enhances the integrity of the |
| 08:27:00 | 6 | price. |
| 08:27:00 | 7 | Q.    Did you make any other assessments, besides |
| 08:27:05 | 8 | the ones that are set forth here in numerettes i |
| 08:27:12 | 9 | through v about what analysts inferred in response |
| 08:27:14 | 10 | to the May 13th tweet? |
| 08:27:18 | 11 | And by "the May 13th tweet," just to be |
| 08:27:20 | 12 | clear, I'm -- I'm talking about the one where |
| 08:27:24 | 13 | Mr. Musk tweeted that the deal was temporarily on |
| 08:27:27 | 14 | hold, pending details supporting the spam and bot |
| 08:27:31 | 15 | calculation. |
| 08:27:31 | 16 | A.    Correct. |
| 08:27:32 | 17 | No, that's the extent of the work that I did |
| 08:27:34 | 18 | with respect to analyst commentary.  It's all |
| 08:27:36 | 19 | reflected in Roman Numerals I through V. |
| 08:27:40 | 20 | Q.    Great. |
| 08:27:41 | 21 | So -- and just to put parameters around your |
| 08:27:45 | 22 | opinions, based on the 5/13 tweet, did you form an |
| 08:27:48 | 23 | expert opinion about whether analysts made |
| 08:27:51 | 24 | inferences about whether the deal was, in fact, on |
| 08:27:54 | 25 | hold? |

08:27:56  1       A.    I'm sorry.  Can you repeat the question?

08:27:59  2       Q.    Sure.

08:27:59  3             Based on the 5/13 tweet, did you form an

08:28:03  4    expert opinion about whether analysts made

08:28:05  5    inferences about whether the deal was on -- in fact,

08:28:10  6    on hold?

08:28:13  7             MS. KELEMEN:  Objection.

08:28:15  8             MR. ARNZEN:  May I know the basis for the

08:28:16  9       objection?

08:28:17 10             MS. KELEMEN:  Vague and ambiguous.

08:28:24 11             THE WITNESS:  Again, I don't want to wade

08:28:28 12       until legal issues.  I don't know if the phrase

08:28:30 13       "on hold" has certain legal connotations.

08:28:33 14             Certainly, again, a review of the analyst

08:28:36 15       commentary makes it clear that the analysts

08:28:41 16       inferred that there was some likelihood that

08:28:45 17       Mr. Musk might walk away from the deal, either

08:28:48 18       with or without paying a breakup fee, or he may

08:28:53 19       be attempting to renegotiate the deal.

08:28:56 20             Whether or not -- how that affects an

08:29:00 21       inference with respect to "on hold" and what that

08:29:02 22       might mean legally, I -- I don't have an opinion

08:29:05 23       on that.

08:29:05 24    BY MR. ARNZEN:

08:29:06 25       Q.    So you did not form such an opinion?

08:39:06  1    reacted to the extent to which Twitter had complied

08:39:09  2    with Musk's demands for information about fake and

08:39:13  3    spam accounts on its platform?

08:39:15  4            MS. KELEMEN:  Same objection.

08:39:18  5            THE WITNESS:  I don't believe so, no.

08:39:20  6    BY MR. ARNZEN:

08:39:20  7        Q.   And, finally, did you discern the extent to

08:39:26  8    which analysts reacted to whether Musk had nonpublic

08:39:27  9    information about Twitter that formed the basis for

08:39:30  10   his statements?

08:39:32  11           MS. KELEMEN:  Objection.

08:39:33  12           THE WITNESS:  No.

08:39:34  13   BY MR. ARNZEN:

08:39:35  14       Q.   Okay.  That's all about -- all those

08:39:37  15   questions concern the May 13th, 2022, tweet,

08:39:41  16   correct?

08:39:44  17       A.   Well, those are your questions, so I'm not

08:39:46  18   sure whether the context --

08:39:48  19       Q.   Understood.

08:39:48  20           Did you understand all those questions to

08:39:52  21   concern the May 13th, 2022, tweet?

08:39:55  22       A.   Not -- not really.

08:39:56  23           I thought they were just open-ended

08:39:58  24   questions.

08:39:59  25       Q.   Okay.  Fair enough.

08:40:00  1          Did you make any specific assessments about

08:40:02  2   what analysts inferred in response to Mr. Musk's

08:40:05  3   statements at the May 16th All-In Summit?

08:40:14  4      A.   That was -- again, I was responding to

08:40:27  5   Dr. Tabak, and Dr. Tabak's conclusion was that the

08:40:30  6   statements on May 16th were, I think he put it as,

08:40:34  7   they're not an independent source of loss, or words

08:40:37  8   to that effect.

08:40:38  9          So given that I was responding to him and

08:40:41 10   given that he was dismissive of those statements

08:40:45 11   having any discernible impact on Twitter stock

08:40:48 12   price, that was not something that I focused on.

08:40:51 13      Q.   Got it.

08:40:51 14          Is that the same answer, if I ask the

08:40:54 15   question with respect to the May 17th tweet by

08:40:59 16   Mr. Musk that's at issue in this case?

08:41:00 17      A.   Correct.

08:41:01 18      Q.   Okay.  Now, at Pages 8 and 9 of your report,

08:41:06 19   Dr. Lehn, you describe the Court's order on

08:41:11 20   Mr. Musk's motion to dismiss; is that right?

08:41:16 21      A.   Correct.

08:41:19 22      Q.   And if I could ask you, if you have it

08:41:22 23   before you, to turn to Paragraph 19.

08:41:23 24          You state, quote:  I also understand that

08:41:26 25   the Court defined the specific misrepresentation

08:41:28  1    that Mr. Musk allegedly made on May 13th, 2022, end

08:41:33  2    quote.

08:41:34  3        A.    Correct.

08:41:34  4        Q.    And then you quote from several portions of

08:41:37  5    the order.  That's Paragraphs 19 through 21.  Fair?

08:41:41  6        A.    Correct.

08:41:42  7        Q.    How, if at all, did the Court's order and

08:41:46  8    how it described Plaintiffs' claims on the May 13th

08:41:50  9    tweet impact your analysis?

08:41:53 10        A.    Well, with the caveat that I am not an

08:41:58 11    attorney -- you know, I'm not here to interpret

08:42:04 12    specifically, personally, how the Court order

08:42:12 13    circumscribed the alleged misrepresentation.

08:42:13 14        But this is my understanding, from reading

08:42:17 15    the Court order and then from counsel, and I thought

08:42:22 16    it was appropriate, because I do think -- in

08:42:24 17    Paragraph 20, I say that the Court crystallized the

08:42:29 18    alleged misrepresentation.  And I thought that

08:42:32 19    crystallization was very helpful to me, as I was to

08:42:35 20    review analyst commentary around the May 13th tweet.

08:42:40 21        It's also my understanding that Plaintiffs

08:42:44 22    have alleged that, one, the deal was not on hold,

08:42:48 23    and, two, that Mr. Musk did not have the right to

08:42:53 24    put the deal on hold if Twitter did not -- chose not

08:42:57 25    to provide him with certain data.

08:42:59  1          So I'm addressing all of that.

08:43:01  2          But I think, as a reference point, the Court

08:43:04  3    order was my starting point.

08:43:06  4      Q.   Did you use the Court order to hone-in on

08:43:10  5    what portions of analyst reports were relevant?

08:43:14  6      A.   Among other things, yes.

08:43:16  7      Q.   Did you use the Court's order to help put

08:43:20  8    parameters around what is allegedly false about the

08:43:23  9    May 13th tweet?

08:43:24 10      A.   Among other things, yes.

08:43:27 11      Q.   Did the Court's order effectively

08:43:31 12    circumscribe the way in which Plaintiffs can argue

08:43:34 13    or prove that the May 13th tweet is false, as far as

08:43:38 14    you understand it?

08:43:39 15          MS. KELEMEN:  Objection.

08:43:40 16          THE WITNESS:  That goes beyond my expertise.

08:43:42 17    BY MR. ARNZEN:

08:43:43 18      Q.   Did it play a role, the Court's order, in

08:43:45 19    your efforts to determine what portions of analyst

08:43:48 20    reports were relevant to your opinion?

08:43:50 21          MS. KELEMEN:  Objection.

08:43:52 22          THE WITNESS:  It played a role.

08:43:53 23          But, again, I also describe Plaintiffs'

08:43:57 24      allegations in my report.

08:43:59 25          And I'm looking at both my understanding of

08:44:02  1      how the Court order crystallized the alleged

08:44:05  2      misrepresentation, as well as Plaintiffs'

08:44:08  3      allegations, as reflected in the previous section

08:44:11  4      of my report.

08:44:12  5  BY MR. ARNZEN:

08:44:14  6      Q.   Okay.   Imagine a scenario where the Court's

08:44:17  7  order picked one aspect of falsity with respect to

08:44:20  8  the May 13th tweet, but there are other alleged

08:44:23  9  basis for falsity in the complaint.

08:44:26 10          Did you understand that your job should be

08:44:29 11  to look for inferences as to the first category of

08:44:34 12  falsity; in other words, the one described by the

08:44:38 13  Court in its order?  Or did you just -- or did you

08:44:40 14  look at all basis for falsity, as alleged in the

08:44:43 15  complaint?

08:44:44 16          MS. KELEMEN:   Objection.

08:44:46 17          THE WITNESS:   Again, when you say "all

08:44:49 18      bases," I don't know what all bases are.

08:44:52 19          But I do look at both the Court order and my

08:44:55 20      understanding of Plaintiffs' allegation, as

08:44:58 21      described in my report.  So I look at -- I look

08:45:00 22      at both.

08:45:01 23  BY MR. ARNZEN:

08:45:01 24      Q.   Did you identify the portions of the

08:45:03 25  complaint -- the first amended complaint in this

08:45:06    1    case that described why, in Plaintiffs' view, the

08:45:10    2    May 13th tweet is false?

08:45:12    3        A.   Yes, I did.

08:45:18    4            MR. ARNZEN:   Now, I want to mark the

08:45:24    5        May 13th tweet and just have a look at it.

            6    BY MR. ARNZEN:

08:45:41    7        Q.   And I'll put that on the screen, Dr. Lehn,

08:45:44    8    just so -- do you see that before you?

08:45:54    9            MS. KELEMEN:   I believe we're getting, like,

08:45:57    10       an expand message.

08:45:58    11           MR. ARNZEN:   Is that better?

08:45:59    12           MS. KELEMEN:   It's pretty small.

08:46:02    13           MR. ARNZEN:   Apologies.

08:46:04    14           Let me try to shape this up here.

08:46:18    15           THE VIDEOGRAPHER:   And, Mr. Arnzen, if you

08:46:21    16       click the "maximize" button in the upper-right

08:46:22    17       corner, it should fix it for you.

08:46:27    18           MR. ARNZEN:   Now I goofed somehow.

08:46:37    19   BY MR. ARNZEN:

08:46:38    20       Q.   I guess -- so instead of this, I'll perfect

08:46:41    21   this off the record, Dr. Lehn.

08:46:43    22           In the meantime, are you -- you've seen the

08:46:45    23   5/13 tweet?

08:46:46    24       A.   I have, yes.

08:46:46    25       Q.   And it reads:   "Twitter deal temporarily on

KENNETH M. LEHN
JULY 30, 2025

JOB NO. 1870654

| | | |
|---|---|---|
| 08:46:50 | 1 | hold pending details supporting calculation that |
| 08:46:53 | 2 | spam/bank accounts [sic] do, indeed, represent less |
| 08:46:59 | 3 | than 5 percent of users." |
| 08:47:01 | 4 | Right? |
| 08:47:01 | 5 | A.   Correct. |
| 08:47:01 | 6 | Q.   The tweet, itself, does not expressly |
| 08:47:06 | 7 | mention cold feet, right? |
| 08:47:08 | 8 | A.   Correct. |
| 08:47:09 | 9 | Q.   It does not expressly mention apprehension |
| 08:47:14 | 10 | about the transaction on the part of Mr. Musk? |
| 08:47:16 | 11 | A.   And by "expressly" -- |
| | 12 | MS. KELEMEN:  Objection. |
| 08:47:18 | 13 | A.   -- you mean literally doesn't say those |
| 08:47:22 | 14 | words? |
| 08:47:22 | 15 | Q.   Yes, sir. |
| 08:47:23 | 16 | A.   Correct. |
| 08:47:23 | 17 | Q.   Same meaning of "expressly."  It doesn't |
| 08:47:27 | 18 | expressly mention Twitter's stock price or its |
| 08:47:31 | 19 | recent performance? |
| 08:47:32 | 20 | MS. KELEMEN:  Objection. |
| 08:47:32 | 21 | MR. ARNZEN:  I'm sorry.  Tesla stock -- |
| 08:47:34 | 22 | Tesla stock price or its recent performance. |
| 08:47:37 | 23 | THE WITNESS:  Correct. |
| 08:47:38 | 24 | MR. ARNZEN:  And I'm sorry, what's the basis |
| 08:47:40 | 25 | for the objection, please? |

KENNETH M. LEHN                                    JOB NO. 1870654
JULY 30, 2025

| | | |
|---|---|---|
| 08:47:41 | 1 | MS. KELEMEN:  Vague and ambiguous. |
| 08:47:45 | 2 | BY MR. ARNZEN: |
| 08:47:45 | 3 | Q.   Does the tweet expressly mention a sharp |
| 08:47:48 | 4 | decline in Tesla stock price? |
| 08:47:52 | 5 | A.   No. |
| 08:47:53 | 6 | Q.   Does it expressly mention market and |
| 08:47:56 | 7 | industry indices or their recent direction? |
| 08:47:58 | 8 | A.   No. |
| 08:47:58 | 9 | Q.   Does it expressly mention any instruction |
| 08:48:02 | 10 | from Mr. Musk to his team to either stop or continue |
| 08:48:06 | 11 | working on the deal? |
| 08:48:07 | 12 | A.   No. |
| 08:48:07 | 13 | MS. KELEMEN:  Objection. |
| 08:48:07 | 14 | BY MR. ARNZEN: |
| 08:48:09 | 15 | Q.   Does it expressly mention deal termination? |
| 08:48:12 | 16 | MS. KELEMEN:  Objection. |
| 08:48:13 | 17 | THE WITNESS:  No. |
| | 18 | BY MR. ARNZEN: |
| 08:48:14 | 19 | Q.   Did you assess how the market analysts -- |
| 08:48:16 | 20 | how the market analysts reacted to the expressed |
| 08:48:18 | 21 | content of this tweet, as opposed to inferences |
| 08:48:22 | 22 | drawn therefrom? |
| 08:48:24 | 23 | A.   I'm not sure I understand the question. |
| 08:48:27 | 24 | Q.   No problem. |
| 08:48:27 | 25 | Did you assess how market analysts reacted |

08:48:31  1    to the express contents of this tweet?

08:48:33  2        A.    Well, I think I did.

08:48:34  3            You know, they referenced the tweet in their

08:48:38  4    reports, and they provide the inference that they

08:48:43  5    drew from the tweet.

08:48:44  6            And all the questions you asked about, no

08:48:47  7    mention of cold feet, et cetera, is irrelevant,

08:48:49  8    because certainly, that was conveyed by the tweet,

08:48:53  9    as reflected in the analyst commentary.

08:48:55 10            And that's frequently the case in securities

08:49:00 11    disclosures, that the market will react to the

08:49:03 12    information being conveyed, regardless of what the

08:49:06 13    specific words in, in this case, the tweet were.

08:49:08 14        Q.    You've written a number of expert reports in

08:49:13 15    securities fraud class-actions, correct?

08:49:15 16        A.    Correct.

08:49:15 17        Q.    Have you ever done what you did here before;

08:49:18 18    in other words, you determined the inferences that

08:49:22 19    the market takes from a statement and then determine

08:49:26 20    whether or not those inferences are the same ones

08:49:32 21    that Defendant -- or, Plaintiffs claim are false

08:49:35 22    about the statement itself?

08:49:36 23            MS. KELEMEN:  Objection.

08:49:39 24            THE WITNESS:  I'm sure I have.

08:49:40 25            I mean, as a matter of fact, in a general

08:49:42  1      sense, that's pretty standard protocol, is to

08:49:46  2      look at the key disclosures in the matter,

08:49:49  3      whether they be affirmative -- alleged

08:49:54  4      affirmative misrepresentations or whether they be

08:49:58  5      alleged corrected disclosures, and then review

08:50:01  6      the analyst commentary to get a sense of how

08:50:06  7      market participants were interpreting the

08:50:09  8      information that was disclosed.

08:50:10  9          And rarely are you going to see a one-to-one

08:50:14  10      relationship between the specific words in a

08:50:16  11      disclosure and the commentary.

08:50:18  12          But it's the inference that they're drawing

08:50:20  13      from those words that is critical.

08:50:22  14          And, again, it's a glaring omission on the

08:50:26  15      part of Dr. Tabak that he did not look at a

08:50:30  16      single analyst report.

08:50:31  17          And, again, I have no idea how one can draw

08:50:33  18      a conclusion about loss causation unless you

08:50:35  19      attempt to understand how the market was reacting

08:50:38  20      to the key disclosure in this case.

08:50:42  21  BY MR. ARNZEN:

08:50:42  22      Q.   Isn't it true that your opinions usually

08:50:48  23  conclude that the false statement alleged by the

08:50:55  24  Plaintiffs was only a partial cause of stock

08:50:59  25  movement, but there were other unrelated statements

```
08:51:02  1    or announcements or developments at the company that
08:51:07  2    created other price movement?
08:51:09  3          MS. KELEMEN:   Objection.
08:51:11  4          THE WITNESS:   I'm going to have to go back
08:51:14  5      and review.
08:51:15  6          I mean, I think it's fair to say that that
08:51:19  7      is often the conclusion that I've reached in
08:51:21  8      securities cases, yes.
08:51:22  9    BY MR. ARNZEN:
08:51:22 10      Q.    Okay.  You wrote an expert opinion in a case
08:51:26 11    involving AbbVie, A-b-b-V-i-e, fair?
08:51:32 12      A.    Yes.
08:51:32 13      Q.    Did that involve two different -- a
08:51:33 14    comparison between the stocks reaction to two
08:51:36 15    different statements or inferences -- different
08:51:40 16    stock -- the stock reactions to different inferences
08:51:44 17    drawn from the same statement?
08:51:46 18      A.    Well, it's been awhile since I worked on
08:51:50 19    AbbVie, and most of my energy was directed towards
08:51:56 20    preparing for this deposition, not the AbbVie, so I
08:51:59 21    don't recall specifically as I sit here.
08:52:01 22      Q.    Same answer with respect to a case involving
08:52:03 23    Acadia, you just don't recall?
08:52:05 24      A.    I mean, again, I recall the general contours
08:52:11 25    of the case, but in terms of specific questions, I
```

KENNETH M. LEHN
JULY 30, 2025

JOB NO. 1870654

```
08:52:13  1   would have to go back and refresh my memory.
08:52:15  2      Q.   And, again, my question was whether or not
08:52:18  3   you were comparing two different bits of information
08:52:21  4   from two different statements, or whether you were
08:52:23  5   comparing inferences drawn from the same statements
08:52:26  6   and stock -- the stock's reaction to those dynamics?
08:52:29  7      A.   Yes, I don't recall, as I sit here.  I would
08:52:31  8   have to go back and refresh my memory.
08:52:33  9      Q.   Same with respect to a case involving
08:52:37 10   Adeptus, A-d-e-p-t-u-s?
08:52:40 11      A.   Correct.
08:52:40 12           That's even further back in time.
08:52:42 13      Q.   Same with respect to cases involving
08:52:45 14   Cardinal Energy Transfer, EQT, Hewlett-Packard, or
08:52:58 15   HP?
08:52:59 16      A.   Yes, that would be the answer to all those.
08:53:00 17      Q.   Same with respect to a case involving the
08:53:02 18   collapse of Lehman, the brokerage house?
08:53:06 19      A.   Correct.
08:53:07 20      Q.   Same with respect to your reports involving
08:53:10 21   Pfizer and Qualcomm?
08:53:14 22      A.   Correct.
08:53:14 23      Q.   Did you ask Mr. Musk what he meant by the
08:53:21 24   phrase "temporarily on hold"?
08:53:23 25      A.   No.
```

08:53:24  1    Q.   Did you review his deposition testimony in

08:53:28  2  this case to see if he testified about what he meant

08:53:32  3  by "temporarily on hold"?

08:53:34  4    A.   I did not.

08:53:36  5    Q.   Did you review his investigative testimony

08:53:42  6  before the SEC to see if he testified about what he

08:53:43  7  meant by "temporarily on hold"?

08:53:48  8    A.   No.

08:53:49  9    Q.   Did you review the testimony of Mr. Musk,

08:53:53 10  either in this case or the SEC investigation at all?

08:53:57 11    A.   I don't believe so, no.

08:53:59 12    Q.   Have you gained an understanding about his

08:54:02 13  testimony at his deposition and investigative

08:54:05 14  testimony on this point?

08:54:07 15    A.   No.

08:54:07 16    Q.   Would it be at least slightly relevant to

08:54:10 17  your opinions to know what Mr. Musk meant by "on

08:54:13 18  hold"?

08:54:14 19         MS. KELEMEN:  Objection.

08:54:15 20         THE WITNESS:  I don't see how it would be,

08:54:17 21     because, again, what one is interested in, in

08:54:22 22     cases of loss, causation, and damages in a

08:54:26 23     securities case, is, you know, whether or not the

08:54:29 24     alleged misrepresentation was the cause of a

08:54:32 25     stock price decline.  And that's based on public

11:06:19  1          A.    Which ones?   The -- when I was working

11:06:23  2    there?

11:06:23  3          Q.    For SEC.

11:06:26  4                Yeah, the complaints that were filed in the

11:06:27  5    SEC enforcement actions that you worked on from time

11:06:30  6    to time?

11:06:30  7          A.    We typically, as I recall, would get

11:06:33  8    involved prior to the filing of a complaint.

11:06:37  9                So we would be engaged by enforcement to do

11:06:40  10   some work, and, you know, for example, provide them

11:06:44  11   with information as to whether certain information

11:06:48  12   was material.   And once we did that, our role sort

11:06:54  13   of subsided.

11:06:54  14               And so I'm not sure I actually did formally

11:06:56  15   read the complaints of the cases that we worked on

11:07:00  16   for the SEC.

11:07:01  17         Q.    Okay.   By "factual allegations" in the

11:07:02  18   following question I mean the following, that some

11:07:05  19   event took place or some statement was made at a

11:07:10  20   particular time.

11:07:12  21               That's what I mean by "factual allegations."

11:07:14  22               Are you aware of any factual allegations in

11:07:17  23   the complaint, described in your Paragraph 68, that

11:07:21  24   the market was unaware of as of May 13th, 2022?

11:07:28  25         A.    Again, I'd have to go back and look,

| | | |
|---|---|---|
| 11:07:35 | 1 | Mr. Arnzen, but -- it's been a while since I've |
| 11:07:39 | 2 | actually looked at the complaint, and I would want |
| 11:07:41 | 3 | to go through that more thoroughly. |
| 11:07:45 | 4 | But the allegation of wrongdoing, I think, |
| 11:07:47 | 5 | was new information to the market as of May 25th. |
| 11:07:51 | 6 | Q.   Okay.   Paragraph 70 of your report refers to |
| 11:08:04 | 7 | a July 18, 2022, Wells Fargo analyst report, the |
| 11:08:11 | 8 | interim reports on a discussion with |
| 11:08:16 | 9 | Professor Miller on July 15. |
| 11:08:18 | 10 | Do you see that? |
| 11:08:19 | 11 | A.   I do. |
| 11:08:20 | 12 | Q.   Okay.   So the underlying report is by Wells |
| 11:08:29 | 13 | Fargo, and it consists of their take on publically |
| 11:08:31 | 14 | available information about the merger by |
| 11:08:36 | 15 | Professor Wilson [sic], right? |
| 11:08:39 | 16 | A.   That's correct. |
| 11:08:40 | 17 | Q.   Okay.   The report, itself, has a link to the |
| 11:08:47 | 18 | actual audio of the discussion with |
| 11:08:56 | 19 | Professor Miller. |
| 11:08:56 | 20 | Are you aware of that? |
| 11:08:57 | 21 | A.   I'm aware of the link.  I actually did not |
| 11:08:58 | 22 | click the link, so I don't -- I've never listened to |
| 11:08:59 | 23 | the audio, no. |
| 11:09:00 | 24 | Q.   Okay.   Are you -- do you know whether or not |
| 11:09:02 | 25 | the folks at Compass Lexecon, who assisted you, |

| | | |
|---|---|---|
| 11:09:07 | 1 | listened to the audio at the link? |
| 11:09:09 | 2 | A.   I don't know. |
| 11:09:10 | 3 | I didn't ask them to, but I don't know if |
| 11:09:12 | 4 | they took it upon themselves to do so.  If so, |
| 11:09:16 | 5 | they -- you know, I'm unaware of that. |
| 11:09:19 | 6 | Q.   Okay.  Now, Professor Miller's take on the |
| 11:09:26 | 7 | situation was not informed by any access to |
| 11:09:30 | 8 | nonpublic information about the progress of the |
| 11:09:33 | 9 | deal; is that right? |
| 11:09:35 | 10 | A.   I think that's correct. |
| 11:09:38 | 11 | I can't be absolutely sure, but I believe |
| 11:09:40 | 12 | that to be the case. |
| 11:09:41 | 13 | Q.   You don't know that Professor Miller had |
| 11:09:45 | 14 | some access to nonpublic information, do you? |
| 11:09:48 | 15 | A.   I don't. |
| 11:09:49 | 16 | Q.   The second sentence of the report indicates |
| 11:09:53 | 17 | that the Wells Fargo analyst, quote, came away from |
| 11:09:56 | 18 | the call with incremental conviction that the |
| 11:10:03 | 19 | acquisition of Twitter by Elon Musk will |
| 11:10:05 | 20 | successfully close, end quote. |
| 11:10:08 | 21 | Do you remember that statement? |
| 11:10:09 | 22 | A.   I do. |
| 11:10:09 | 23 | Q.   Okay.  What did you take the phrase |
| 11:10:14 | 24 | "incremental" to mean in that sentence? |
| 11:10:16 | 25 | A.   That it enhanced their conviction with |

11:10:20  1    respect to that issue.

11:10:21  2        Q.    And they had a previous conviction that was

11:10:23  3    in the same direction, correct?

11:10:25  4        A.    Apparently.  That's what I would infer.

11:10:29  5        Q.    Could it be that Professor Miller's

11:10:32  6    presentation -- I'm sorry.

11:10:35  7            Could it be that before Professor Miller's

11:10:44  8    presentation, that market participants already held

11:10:45  9    views similar to those expressed during the

11:10:47 10    presentation?

11:10:47 11        A.    It is possible.

11:10:49 12            But, again, that would also be inconsistent

11:10:51 13    with the inference Dr. Tabak draws from the May 13th

11:10:57 14    tweet, because if it's already in the market, then

11:11:00 15    that would indicate, by concurring with Mr. Miller,

11:11:03 16    the market has come to a judgment that Mr. Musk had

11:11:08 17    no such information rights.

11:11:10 18        Q.    I'm sorry.  My question was with respect to

11:11:12 19    whether or not folks in the market had views that

11:11:15 20    were similar to Professor Miller's presentation

11:11:20 21    before the presentation itself, not before the

11:11:22 22    tweet.

11:11:23 23        A.    That's my point, though, is that subsequent

11:11:26 24    to the tweet but prior to the release of this

11:11:29 25    analyst report, if you're claiming that the market

12:11:33  1    so...

12:11:35  2        Q.    Yeah, but do you think that the market was

12:11:37  3    react -- or was reacting in some sense to that

12:11:41  4    second part; in other words, Wedbush's belief that

12:11:44  5    there's a 60 percent chance that Musk walks?

12:11:48  6        A.    I'm not affirmatively saying that.

12:11:50  7              But I'm saying it's something that Dr. Tabak

12:11:53  8    definitely should have investigated, rather than

12:11:54  9    simplistically assume a constant percentage of the

12:11:57 10    merger discount.

12:11:58 11        Q.    So do you have any reason to believe that

12:12:00 12    the market was reacting to that sentence that -- the

12:12:04 13    second sentence that -- about Wedbush's belief of a

12:12:08 14    60 percent chance of merger failure?

12:12:10 15        A.    It might well have.

12:12:11 16              But, again, that's -- it's his model, and

12:12:14 17    it's a flawed model.

12:12:16 18              But within the context of that flawed model,

12:12:20 19    this is something he should have investigated, and

12:12:20 20    he did not.

12:12:21 21        Q.    And you didn't investigate whether there is

12:12:25 22    empirical evidence to indicate that the market moved

12:12:26 23    because of that belief that's articulated by Wedbush

12:12:31 24    on May 23rd, 2022, right?

12:12:35 25        A.    I wasn't asked to affirmatively.

| | | |
|---|---|---|
| 12:12:36 | 1 | And, again, I think there are flaws with his |
| 12:12:37 | 2 | basic model, that this is just something he's made |
| 12:12:40 | 3 | up, and -- but in the content of that, he didn't |
| 12:12:43 | 4 | look at it, and I'm not offering an affirmative |
| 12:12:46 | 5 | opinion on that. |
| 12:12:47 | 6 | Q.   Paragraph 90 of your report talks about a |
| 12:12:52 | 7 | Rosenblatt Securities analyst report, and there's |
| 12:12:55 | 8 | one other thing. |
| 12:12:56 | 9 | Do you see that the reference to Rosenblatt? |
| 12:12:59 | 10 | A.   I do. |
| 12:12:59 | 11 | Q.   Are you suggesting that the merger discount |
| 12:13:02 | 12 | changed because of what Rosenblatt was opining in |
| 12:13:06 | 13 | this analyst report? |
| 12:13:07 | 14 | A.   Again, it's the same answer:  I'm not |
| 12:13:16 | 15 | affirmatively claiming that. |
| 12:13:17 | 16 | But this is a day in which you get a fairly |
| 12:13:20 | 17 | large change in the merger discount, and this is |
| 12:13:23 | 18 | something, again, that Dr. Tabak should have |
| 12:13:27 | 19 | investigated, rather than simplistically assume a |
| 12:13:28 | 20 | constant percentage of the merger discount. |
| 12:13:31 | 21 | Q.   The paragraph also references a statement by |
| 12:13:38 | 22 | Mr. Musk about three things that needed to happen |
| 12:13:40 | 23 | for the deal to proceed.  Fair? |
| 12:13:43 | 24 | A.   Correct. |
| 12:13:45 | 25 | Q.   And that's taken -- are you aware about |

12:13:48   1   whether or not that's taken from an interview?

12:13:52   2       A.   I don't recall offhand.

12:13:54   3       Q.   Are you aware that there's a video, an

12:13:57   4   online video, on YouTube that -- or maybe not on

12:14:01   5   YouTube -- an online video of that interview?

12:14:06   6       A.   Not offhand, no.

12:14:07   7       Q.   So I take it that you didn't watch the video

12:14:10   8   itself?

12:14:10   9       A.   Correct.

12:14:10   10       Q.   Do you know what the three things are that

12:14:16   11   Mr. Musk talked about?

12:14:16   12       A.   Not as I sit here, no.

12:14:18   13       Q.   Do you know if any of the three things that

12:14:21   14   Mr. Musk talked about were news to the market, or

12:14:22   15   were they continuing concerns that the market had

12:14:24   16   already?

12:14:25   17       A.   I don't know.

12:14:26   18       Q.   Paragraph 91 of your report talks about

12:14:31   19   Wedbush again.

12:14:33   20       This one is on -- a report on July 13.

12:14:37   21   Fair?

12:14:37   22       A.   Correct.

12:14:38   23       Q.   Are you suggesting that there's empirical

12:14:43   24   evidence -- do you know of any evidence indicating

12:14:45   25   that the market was reacting to the opinions of

12:14:48  1    Wedbush as articulated in that report?

12:14:52  2        A.   No.  But, again, I'm not affirmatively

12:14:56  3    offering it.

          4             But it's something that he should have

          5    looked at.

12:14:58  6             Here's a day where you get a 13.4 percent

12:15:01  7    decline in the merger discount, which is a big

12:15:05  8    effect, and, again, he's assuming constant

12:15:09  9    percentage throughout.

12:15:10 10        Q.   Are you aware that the day before, after

12:15:12 11    market, is the day that Twitter filed its complaint

12:15:16 12    against Mr. Musk?

12:15:17 13        A.   I didn't recall the date exactly, no.

12:15:20 14        Q.   Do you -- do you have an opinion about

12:15:23 15    whether that complaint affected or did not affect

12:15:25 16    the market's estimate of the chances of merger

12:15:29 17    completion?

12:15:29 18        A.   I don't.

12:15:30 19        Q.   Paragraph 92 also refers to a Wedbush

12:15:36 20    analyst report.

12:15:40 21             Are you suggesting that the merger discount

12:15:43 22    changed because of the opinions expressed by that

12:15:46 23    analyst in that report?

12:15:47 24        A.   Same answer.  This is another big change in

12:15:50 25    the merger discount, 14.1 percent.

1              CERTIFICATE OF REPORTER OATH

2

3    STATE OF FLORIDA

4    COUNTY OF PINELLAS

5            I, Kelly J. Lawton, Registered Professional

6    Reporter, Licensed Court Reporter, and Certified

7    Court Reporter, hereby certify that the witness

8    named herein was duly sworn.

9            WITNESS my hand this 6th day of August,

10   2025.

11

12

13

14   _____

15        KELLY J. LAWTON, RPR, LCR, CCR

16

17

18

19

20

21

22

23

24

25

1                CERTIFICATE OF REPORTER

2    STATE OF FLORIDA

3    COUNTY OF PINELLAS

4          I, Kelly J. Lawton, Registered Professional

5    Reporter, Licensed Court Reporter, and Certified

6    Court Reporter, do hereby certify that I was

7    authorized to and did stenographically report the

8    examination of the witness named herein; that a

9    review of the transcript was not requested; and that

10   the foregoing transcript is a true record of my

11   stenographic notes.

12         I FURTHER CERTIFY that I am not a relative,

13   employee, or attorney, or counsel for any of the

14   parties, nor am I a relative or employee of any of

15   the parties' attorney or counsel connected with the

16   action, nor am I financially interested in the

17   outcome of this action.

18         DATED THIS 6th day of August, 2025, Pinellas

19   County, Florida.

20   _____

21

22   KELLY J. LAWTON, RPR, LCR, CCR

23

24

25