**COTCHETT, PITRE & MCCARTHY, LLP**
Joseph W. Cotchett (SBN 36324)
*jcotchett@cpmlegal.com*
Mark C. Molumphy (SBN 168009)
*mmolumphy@cpmlegal.com*
Tyson C. Redenbarger (SBN 294424)
*tredenbarger@cpmlegal.com*
Elle D. Lewis (SBN 238329)
*elewis@cpmlegal.com*
Gia Jung (SBN 340160)
*gjung@cpmlegal.com*
Carolyn A. Yuen (354388)
*cyuen@cpmlegal.com*
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN: 175783)
*fbottini@bottinilaw.com*
Albert Y. Chang (SBN 296065)
*achang@bottinilaw.com*
Aaron Arnzen (SBN 218272)
*aarnzen@bottinilaw.com*
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001

*Lead Counsel for Lead Plaintiffs and the Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| GIUSEPPE PAMPENA, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> ELON R. MUSK, <br><br> Defendant. | Case No. 3:22-cv-05937-CRB <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE OPINION OF EDWARD ROCK** <br><br> Date:       October 31, 2025 <br> Time:      10:00 a.m. <br> Courtroom:   6, 17th Floor <br> Judge:      Hon. Charles R. Breyer |

Case No: 3:22-CV-05937-CRB

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT on October 31, 2025, at 10:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Charles R. Breyer, United States District Judge, located at 450 Golden Gate Avenue, Courtroom 6, 17th Floor, San Francisco, California 94102, Lead Plaintiffs Nancy Price, John Garrett, and Brian Belgrave ("Plaintiffs") will and hereby do move the Court to exclude portions of Defendant Elon Musk's expert opinions contained in the report of Professor Edward Baron Rock ("Prof. Rock") dated July 2, 2025 (the "Report" or "Rock Report") pursuant to Federal Rules of Civil Procedure 26(a)(2)(D)(ii) and 37(c)(1), Federal Rule of Evidence 702 ("Rule 702"), and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ("*Daubert I*").  This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Rock Report, and the reports by Plaintiffs' experts Professor Adam Badawi ("Prof. Badawi") and Professor Emily Strauss ("Prof. Strauss").

For the reasons stated in the Memorandum of Points and Authorities, Plaintiffs respectfully request that the Court strike and exclude certain opinions in the Rock Report.

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ............................................................................................................ 1

II.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND .................................... 2

        A.      The Claims ..........................................................................................................2

        B.      Expert Reports at Issue........................................................................................4

III.    LEGAL STANDARD ...................................................................................................... 4

IV.     ARGUMENT .................................................................................................................. 5

        A.      Prof. Rock Does Not Rebut Any of Prof. Strauss' Opinions (Section V) ...................5

        B.      Prof. Rock Improperly Tries to Opine on Issues Meant for the Court or Jury (Section
                VI. A, B, C and D) ...............................................................................................6

                1.      Legal Conclusions.................................................................................... 6

                2.      Musk's State of Mind................................................................................ 7

        C.      Prof. Rock's Report Includes Untimely and Irrelevant Opinions On Subject Matters
                Not Covered by Prof. Badawi (Sections VI.E, F, and G) ...........................................9

        D.      The Portions of Prof. Rock's Opinions that Should be Excluded Based on the
                Arguments Herein ...............................................................................................11

V.      CONCLUSION............................................................................................................ 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
738 F.3d 960 (9th Cir. 2013)...................................................................................... 8, 11

*In re Alphabet, Inc. Sec. Litig.*
(9th Cir. 2021) 1 F.4th 687 ............................................................................................ 8

*In re Apple Inc. Sec. Litig.*,
2023 WL 4556765 (N.D. Cal. July 17, 2023)................................................................. 4

*Apple, Inc. v. Samsung Elec. Co., Ltd.*,
2012 WL 2571332 (N.D. Cal. June 30, 2012) ............................................................... 9

*Beech Aircraft Corp. v. U. S.*,
51 F.3d 834 (9th Cir. 1995)............................................................................................ 8

*Blue Bottle Coffee, LLC v. Liao*,
2023 WL 6850573 (N.D. Cal. Oct. 16, 2023)................................................................. 5

*Brown v. Google, LLC*,
2022 WL 17961497 (N.D. Cal., Dec. 12, 2022) ......................................................... 7, 8

*Daubert v. Merrell Dow Pharms, Inc.*,
43 F.3d 1311 (9th Cir. 1995)....................................................................................... 4, 9

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011).......................................................................................... 5

*Grodzitsky v. Am. Honda Motor Co.*,
957 F.3d 979 (9th Cir. 2020).......................................................................................... 4

*Kumho Tire Co., Ltd. v. Carmichael*,
526 U.S. 137 (1999)..................................................................................................... 4, 5

*McHugh v. United Serv. Auto. Ass'n*,
164 F.3d 451 (9th Cir. 1999).......................................................................................... 7

*Nash-Perry v. City of Bakersfield*,
2022 WL 3357516 (E.D. Cal. Aug. 15, 2022) ............................................................... 8

*S.E.C. v. Todd*,
642 F. 3d 1207 (9th Cir. 2011)....................................................................................... 8

*Sterling Sav. Bank v. Poulsen*,
2013 WL 3945989 (N.D. Cal. July 29, 2013)................................................................. 8

*U. S. v. Valencia-Lopez*,
  971 F.3d 891 (9th Cir. 2020)..................................................................................... 5

**Statutes**

Securities Act ............................................................................................................. 6

**Other Authorities**

Federal Rule of Evidence 702 .......................................................................... 1, 4, 5, 9

Federal Rule of Civil Procedure 26(a)(1)........................................................................ 1

Federal Rule of Civil Procedure 26(a)(2)(B)(i) and (D)(ii) ........................................... 5

Federal Rule of Civil Procedure 26(a)(2)(D)(ii) ....................................................... 1, 9

Federal Rule of Civil Procedure 26(a)(2)(D) ................................................................ 4

Federal Rule of Civil Procedure 37(c)(1)................................................................. 1, 5

Restatement (Second) of Contracts.............................................................................. 10

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE OPINION OF
EDWARD ROCK

**ISSUE PRESENTED**

Whether portions of the Rock Report and opinions of Prof. Rock should be excluded from use in this case under Federal Rules of Civil Procedure 26(a)(2)(D)(ii) and 37(c)(1), Rule 702 and *Daubert I*.

## I.    INTRODUCTION

Musk decided not to disclose any experts pursuant to Federal Rule of Civil Procedure 26(a)(1).  Rather, Musk waited until after Plaintiffs disclosed their experts and then disclosed two *rebuttal* experts, including Prof. Rock, a corporate governance professor at New York University School of Law, pursuant to Federal Rule of Civil Procedure 26(a)(2)(D)(ii) – which permits rebuttal testimony "solely to contradict or rebut evidence on the same subject mater" covered by Plaintiffs' experts.

Unfortunately, while Prof. Rock framed his opinions as "Responses" to two of Plaintiffs' experts, Professors Badawi and Strauss, his Report included inappropriate and unsupported conclusions going far afield from what Plaintiffs' experts covered.  These opinions should be excluded by the Court.

*First*, Prof. Rock offered *no opinions* in rebuttal to <u>Prof. Strauss</u>, Plaintiff's securities market expert.  Indeed, Prof. Rock's section addressing Prof. Strauss is contained in a single page and six paragraphs of his Report, where he concludes that he is "prepared to testify" on topics covered by Prof. Strauss "to the extent that she is permitted to testify."  Report §5, ¶¶19-24.  That is improper.  Rule 26 required Prof. Rock to include all opinions and basis in his Report.  Failing to do so, the Court should exclude the entirety of this section.

*Second*, while Prof. Rock offers some rebuttal to <u>Prof. Badawi's</u> opinions about industry standards and customs for due diligence in mergers and acquisitions, Sections IV and VI.A, B, C and D are littered with improper opinions about the "legal significance" of Musk's actions, the "legal meaning" of the merger terms, what anyone reading the merger agreement "would understand," the "truthfulness" of Musk's May 13th tweet, and even Musk's "sincerity" in tweeting that he was putting the deal on hold.  These opinions invade the purview of the Court and jury.

***Finally***, the entire second half of the Rock Report – Sections IV.E, F, and G – injects new theories and arguments into the case without rebutting anything that Prof. Badawi opined in his Report. Prof. Rock's wide-ranging opinions about Musk's ability to unilaterally terminate the merger under the "Efficient Breach" theory, the unlikelihood of obtaining specific performance in Delaware courts, the history of broken merger deals, and "merger arbitrage" opportunities available to corporate law professors – all supposedly to show that merger deals are inherently uncertain – fail to rebut anything Prof. Badawi opined about, are irrelevant to any claims or defenses in this case, and will confuse rather than help the trier of fact.

## II. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A. The Claims

The First Amended Complaint ("FAC") alleges that, on April 13, 2022, after initially accepting and then rejecting an offer to join Twitter's Board, Musk made an unsolicited "best and final" offer to buy Twitter at $54.20 per share. FAC ¶ 76.[1] Twitter did not accept.

About a week later, on April 21, 2022, Musk decided to sweeten his offer by making it, in his own words, more "seller friendly," including, as relevant to the expert opinions offered here, his agreement to waive due diligence. Musk's financial advisors testified that this sudden change was intentional, referred to internally as the "jujitsu" strategy to save this material change until the very end for maximum bargaining effect. Musk also filed an Amended Schedule 13D with the SEC confirming that his new acquisition proposal was no longer subject to the completion of financing and business due diligence. *Id.* ¶ 82.

Just days later, on April 24, 2022, Musk sent Twitter's Board a proposed merger agreement, along with a cover letter noting that the agreement is "seller friendly." *Id.* ¶ 84. Twitter and Musk signed the merger agreement the next day, on April 25, 2022, in a transaction valued at approximately $44 billion. *Id.* ¶ 85.

However, soon thereafter, faced with financial risks, Musk proceeded to make false statements, send misleading tweets, and engage in conduct designed to create unfounded uncertainty

---

[1] All "FAC ¶_" citations refer to Plaintiffs' First Amended Complaint, ECF 31.

and drive Twitter's stock down. *Id.* ¶ 26. Musk did this to create leverage to either back out of the purchase or renegotiate the buyout price. *Id.*

Specifically, on May 13, 2022, Musk tweeted a statement that the buyout was "***temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users.***" *Id.* ¶ 111. This statement was false and misleading, as there was no legal or factual basis to put the deal on hold, the deal wasn't on hold, and Musk had already decided to perform his own independent analysis. *Id.* ¶ 112. In response to this tweet, Twitter's stock price dropped substantially, falling 9.67% from the previous day's close of $45.08 on an extraordinarily high volume of 101.62 million shares to close at $40.72. On the next trading day, the stock declined another 8.18%, resulting in a combined decline of 17.85% over two trading days. *Id.* ¶ 113.

On May 16, 2022, to create further doubt about the Merger, Musk stated that ***fake and spam accounts make up at least 20% of Twitter's users***. *Id.* ¶ 120. The statements caused Twitter's stock to decline 8.18% to close at $37.39 on volume of 52.2 million shares. *Id.* ¶ 124. On May 17, 2022, Musk tweeted that ***the actual number of fake accounts at Twitter could be "much higher" than 20% and that the deal "cannot go forward."*** *Id.* ¶ 125.

On July 8, 2022, Musk issued a statement that he was terminating the Merger. *Id.* ¶ 140. In his announcement, Musk falsely and baselessly stated that Twitter had breached several provisions of the Merger Agreement, that "***Twitter has not complied with its contractual obligations***," and that ***the information "is necessary to consummate the transactions contemplated by the Merger Agreement because it is needed to ensure Twitter's satisfaction of the conditions to closing***." *Id.* ¶ 140. The letter caused Twitter stock to drop 11.3% from $38.79 on July 7, 2022 to $32.65 on Monday, July 11, 2022, on heavy volume of over 67 million shares traded. *Id.* ¶ 142.

On July 12, 2022, Twitter sued Musk in Delaware Chancery Court, seeking specific performance. *Id.* ¶ 143. On October 4, 2022, two weeks before the Delaware trial was set to begin, Musk shocked the market by announcing that he intended to go through with the Merger at the initial price of $54.20. *Id.* ¶ 151. On April 12, 2023, in an interview with the BBC, Musk admitted that he made false statements about the Merger to drive Twitter's stock down because he did not want to pay the price he had agreed to (*Id.* ¶ 10) and that he completed the buyout at the full $54.20 price in

order to avoid the trial in Delaware because he knew he was going to lose.  *Id.* ¶ 166.

### B.    Expert Reports at Issue

On May 28, 2025, Plaintiffs timely disclosed their experts and served their expert reports. FRCP 26(a)(2)(D); Order Modifying Schedule, ECF 215.  Plaintiffs disclosed Professor Badawi, a professor at UC Berkeley School of Law, who provided a report opining on customs and practices in the mergers and acquisitions industry, including the common usage of terms in the Musk/Twitter negotiations, SEC filings, and merger agreement.  Plaintiffs also disclosed Professor Strauss, a professor at UC Law San Francisco, who provided a report opining on the securities market.

Conversely, Musk failed to proffer any experts by the initial disclosure deadline. Rather, Musk waited until the rebuttal deadline, July 2, 2025, and disclosed two rebuttal experts, Prof. Rock and Dr. Lehn.[2]  Prof. Rock's Report included separate sections addressing Prof. Badawi (Sections I-IV, VI-VII) and Prof. Strauss (Section V).  The Rock and Badawi Reports are attached as Exhibits 1 and 2 to the Declaration of Mark C. Molumphy, filed herewith.

### III.    LEGAL STANDARD

Expert testimony is only admissible if: (1) the witness is sufficiently "qualified as an expert [;]" (2) "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (3) "the testimony is based on sufficient facts or data;" (4) "the testimony is the product of reliable principles and methods;" and (5) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  FED. R. EVID. 702; *see e.g., In re Apple Inc. Sec. Litig.*, 2023 WL 4556765, at *1 (N.D. Cal. July 17, 2023).

Pursuant to Rule 702, expert testimony may be excluded if it is unreliable or irrelevant.  *See Daubert I*, 509 U.S. at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–49 (1999); *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 984–85 (9th Cir. 2020).  The Court must "exclude proffered scientific evidence under Rules 702 and 403 unless [the court is] convinced that it speaks clearly and directly to an issue in dispute in the case."  *Daubert v. Merrell Dow Pharms, Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995) ("*Daubert II*").  Further, the Court "must act as a

---

[2] Dr. Lehn only rebutted Plaintiffs' damages expert, Dr. Tabak, and his opinions are addressed in a separate motion to exclude.

'gatekeeper' to exclude junk science that does not meet [Rule 702's] reliability standards." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (*citing Kumho Tire*, 526 U.S. at 145, 147–49); *see also U. S. v. Valencia-Lopez*, 971 F.3d 891, 897–98 (9th Cir. 2020) ("[B]efore admitting expert testimony, the district court must perform a gatekeeping role to ensure that the testimony is both relevant and reliable.") (cleaned up; citations, internal quotations omitted).

As the party offering Prof. Rock's opinions, Musk bears the burden of establishing by a preponderance of the evidence that those opinions meet the admissibility standards of Rule 702. *See Blue Bottle Coffee, LLC v. Liao*, 2023 WL 6850573, at *4 (N.D. Cal. Oct. 16, 2023). Further, having only designated rebuttal witnesses, Musk was required to comply with Federal Rule of Civil Procedure 26(a)(2)(B)(i) and (D)(ii), including the timely production of a written report containing a "complete statement of all opinions the witness will express and the basis and reasons for them." As explained below, Musk has failed to meet his burden.

## IV.    ARGUMENT

### A.    Prof. Rock Does Not Rebut Any of Prof. Strauss' Opinions (Section V)

While Prof. Rock includes Section V of his Report entitled "Responses to Professor Strauss," he offers no actual opinions rebutting Plaintiffs' securities market expert, Prof. Strauss. Rather, Prof. Rock states that he is "prepared to testify" on the topics covered by Prof. Strauss' Report "to the extent she is permitted to testify and if I believe that her testimony is in need of elaboration or correction." Rock Report, ¶ 21.[3]

Rule 26(a) required more. To the extent Prof. Rock intended to offer rebuttal opinions at trial, he was required to state them clearly in his report, as well as the basis and reasons for them. FRCP 26(a)(2)(B)(i) and (D)(ii). He did neither. Accordingly, the Court should strike Section V (Paragraphs 19-24) in its entirety. *See* FRCP 37(c)(1) (party not allowed to use information at trial if not provided as required by Rule 26(a)).

---

[3] At Paragraph 23 and 24, Prof. Rock does criticize Prof. Strauss for failing to explain her choice of Twitter and Tesla for her analysis despite their obvious relevance (and reference in the pleadings), and supposedly "ignoring" the impact of positive or negative information on investors' valuation of stock. Prof. Rock does not elaborate, identify the positive or negative information he is referring to, nor provide any basis or supporting authority. These are not admissible opinions.

**B.      Prof. Rock Improperly Tries to Opine on Issues Meant for the Court or Jury (Section VI. A, B, C and D)**

As noted above, Prof. Rock is a corporate governance professor at NYU.  Like Prof. Badawi, Prof. Rock appears to have experience and specialized knowledge about industry customs and practices in mergers and acquisitions.  The portion of the Rock Report that actually tries to rebut Prof. Badawi's opinions is found in Sections IV and VI.C, where Prof. Rock opines that, contrary to what Musk disclosed to Twitter and in SEC filings, the negotiations and merger terms cannot be viewed as "seller friendly" to Twitter and, in any event, Musk did not actually waive due diligence in the Twitter merger transaction because he had "information rights" under the merger agreement that were akin to due diligence and exchanged information after the deal was signed that was "a customary part of M&A."  *See* Report, ¶¶ 18(a), 39-40, 45-47.  Plaintiffs do not seek to exclude these opinions at this stage and will instead address them through cross-examination at trial.[4]

However, as discussed below, literally everything else in Sections IV, V and VI should be excluded.

**1.      Legal Conclusions**

Section IV.A of the Rock Report is entitled, "Introduction: Some Key Features of Mergers and Acquisitions Practice."  Prof. Rock initially concedes that merger agreements "are among the most complex agreements negotiated by sophisticated parties" where "customary practice" and "market terms" play a very specific role.  Report ¶¶ 25-26.  However, he then makes an entirely legal argument, as an attorney, not an expert, that any opinion by Prof. Badawi about "customary" M&A practices or the meaning of M&A terms is "irrelevant" because "it is the agreed term that controls . . . future disputes."  *Id.* at 28.

Similarly, in Section IV.B of his Report, Prof. Rock initially concedes that "seller friendly" is "certainly a term that is used in M&A discussions" and "a term that people in M&A use to describe specific terms and merger agreements as a whole."  *See* Report at ¶¶ 32, 37.  He also admits that "due diligence" is a "term of art" in M&A that describes the "in-depth examination and analysis of

---

[4] Plaintiffs move to exclude other improper opinions included in Sections VI.C for the same reasons, including Paragraphs 41-44 (comparing "due diligence" defense asserted in Securities Act claims to due diligence in the "M&A context," and offering the purely legal conclusion that it "does not have any determinate legal meaning" here).

a business that a prospective buyer or investor will make **before** ultimately agreeing to buy a company or invest." *Id.* at ¶¶ 40, 44 (emphasis added). Nonetheless, conveniently, he advances the wholly legal opinion that – regardless of the importance of these terms in this case and Musk's own use of such terms in negotiations with Twitter and SEC filings – the concepts of waiving due diligence and other seller friendly terms in a merger deal somehow have "no determinate meaning and, generally speaking, no legal significance." *Id.* ¶¶ 32, 37, 44. These legal opinions are improper.[5]

"In general, an expert may only testify as to scientific, technical, or other specialized knowledge that will assist the trier of fact to understand the evidence or determine a fact in issue and may not testify as to legal conclusions." *Brown v. Google, LLC*, 2022 WL 17961497, at *12 (N.D. Cal., Dec. 12, 2022) (citations, internal quotations omitted); *see also McHugh v. United Serv. Auto. Ass'n*, 164 F.3d 451, 454 (9th Cir. 1999). Here, Prof. Rock's legal conclusions that customary terms used in M&A deals have "no determinate meaning" and "no legal significance" should be excluded.

### 2. Musk's State of Mind

Throughout his Report – including Sections IV ("Summary") and VI ("Analysis"), Prof. Rock attempts to interject his personal opinions about the facts of the case, including Musk's state of mind, the truth of his tweets, and what investors would have understood. These are improper opinions and unrelated to his expertise.

For example, at Paragraph 17, Prof. Rock states:

"As I will explain in detail below, I see no reason in the record to think that Mr. Musk's **apparently sincere statement** that 'Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users' was **other than truthful** and informative and well within his rights under the merger agreement."

(Emphasis added.) Putting aside Prof. Rock barely even reviewed "the record" before issuing his Report, his opinion on the "sincerity" of Musk's tweet and whether or not it was "truthful" is not the

---

[5] Prof. Rock also opined in his Summary (but not elsewhere) that Prof. Badawi's description of terms as "seller friendly" lacked any "empirical basis." Report ¶¶ 18(b)-(c). Yet, at deposition, Prof. Rock admitted that he did not even read the empirical studies cited in the Badawi Report, including the Coates study cited throughought. Rock Deposition Transcript ("Rock Depo."), Molumphy Decl., Ex. C at 78:12-22, 79:17-25.

proper province of a corporate governance expert.[6]  Similar statements are littered throughout the Report.

At Paragraphs 51 through 55, Prof. Rock provides a series of opinions describing why, "to my eyes" the subject May 13 tweet "was not misleading."  For example, Prof. Rock opines that everyone "operated under the assumption he was entitled to such information" and "there was no dispute that he was entitled to information."  Report at 51.  Prof. Rock then gives his opinion on "the most natural reading of Mr. Musk's tweets" to "my eyes."  *Id.* at 52.  In addition to grossly misstating the facts, his opinion about the truth or falsity of Musk's tweets, their "most natural reading," and what they really "indicate" to investors is beyond his expertise and the role of an expert.

Expert opinion is not permitted on issues that are the sole purview of the trier of fact—such opinions must be excluded.  *See Sterling Sav. Bank v. Poulsen*, 2013 WL 3945989, at *9 (N.D. Cal. July 29, 2013) ("trial court properly excluded the testimony because it did not concern a proper subject for expert testimony" where the subject was within the purview "of the trier of fact") *quoting Beech Aircraft Corp. v. U. S.*, 51 F.3d 834, 842 (9th Cir. 1995); *see also, e.g.*, *Nash-Perry v. City of Bakersfield*, 2022 WL 3357516, at *13 (E.D. Cal. Aug. 15, 2022) ("resolving factual matters is not within the purview of an expert but [is] instead the precise roles assigned to the jury").

State of mind, motive, intent, and falsity are just such questions of fact, traditionally reserved for determination by a jury.  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) ("Allowing an expert to testify as to a party's state of mind substitutes the opinion of the expert for the judgment of the jury."); *S.E.C. v. Todd*, 642 F. 3d 1207, 1220 (9th Cir. 2011) ("Generally, whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact.") (internal citations and quotations omitted).  Likewise, materiality is a question of fact traditionally determined by a jury.  *See In re Alphabet, Inc. Sec. Litig.* (9th Cir. 2021) 1 F.4th 687, 699; *see also* ND Cal. Model Jury Instruction 18.3  Securities—Misrepresentations  or  Omissions—Materiality  (jury  "must  decide  whether

---

[6] Prof. Rock review of the factual record consisted of reading three depositions and six documents, all chosen by Musk's counsel.  He didn't even read Musk deposition, explaining: "I was not informed by anybody that there was stuff in it that would be relevant to my report."  *See* Report, Appendix A; Rock Depo., Molumphy Decl., Ex C at ¶¶ 23:4-24:2, 29:6-13.

something was material based on the circumstances as they existed at the time of the statement or omission").

Additionally, Prof. Rock's conclusions are factually incorrect, unsupported by any reliable evidence identified in the Report[7], and will not aid the jury. Jurors and the Court can easily read Musk's tweets and conclude for themselves whether his statements were misleading. The Court should exclude these opinions.

### C. Prof. Rock's Report Includes Untimely and Irrelevant Opinions On Subject Matters Not Covered by Prof. Badawi (Sections VI.E, F, and G)

A rebuttal expert should only respond to opinions raised by the other party; the rebuttal witness is not permitted to offer opinions on new subject matters not addressed by their adversary. FRCP 26(a)(2)(D)(ii) (permitting rebuttal expert testimony "solely to contradict or rebut evidence on the same subject matter" identified by the other expert).

Further, under Rule 702, irrelevant expert opinion must be excluded. *See Daubert I*, 509 U.S. at 589. The relevance prong of Rule 702 looks to whether an opinion "fits" the issue to be decided since "[e]xpert testimony which does not relate to any issue in the case is not relevant." *Id.* at 591. To gauge relevancy, the court must decide whether the expert's opinions are sufficiently tied to the facts of the case, such that they will aid the jury in resolving a factual dispute. *Id.* (citation omitted). Further, expert testimony must be "relevant to the task at hand" and "logically advance[] a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315. Expert opinions that are "contrary to the law" are irrelevant and excluded under Rule 702. *See Apple, Inc. v. Samsung Elec. Co., Ltd.,* 2012 WL 2571332, at *6 (N.D. Cal. June 30, 2012) ("expert opinions that are 'contrary to the law' and therefore not helpful to the jury" should be excluded under Rule 702).

As discussed below, Sections VI.E, F, and G of the Rock Report attempt to inject new opinions on matters far afield from Prof. Badawi's Report. They are untimely and irrelevant and should be excluded.

In Section VI.E, Prof. Rock provides an opinion on the economic concept of "Efficient Breach," seemingly cut and paste from a report in another case having nothing to do with this one.

---

[7] Prof. Rock cited no evidence in support of his opinions at Paragraph 51 and 55.

As best as can be determined, Prof. Rock opines that, even if Musk didn't have the <u>right</u> to terminate the merger agreement or to put the deal on hold (as he claimed in his tweets), he still had the <u>power</u> to breach the agreement and then live with the legal consequences. What that has to do with this case is a mystery and, in any event, is an unreliable legal opinion that does not rebut any opinion raised by Prof. Badawi in his report.

Prof. Rock then attempts to parlay this "Efficient Breach" concept into an opinion on the likelihood of Twitter obtaining specific performance in the event of breach. In support of this opinion, again not the subject of anything in Prof. Badawi's report, Prof. Rock wants to take the jury down the path of Delaware case law and the Restatement (Second) of Contracts. The sum and substance of this journey, according to Prof. Rock, is his opinion that "specific performance was rare" and "depends sensitively on which judge is assigned to the case." Report at ¶¶ 76-81, Exhibit 1. Prof. Rock concludes this subject by also opining on the uncertain remedy of damages to Twitter and its shareholders. As with his Efficient Breach opinion, Prof. Rock's opinions on the likelihood of obtaining certain legal remedies in Delaware courts are not rebuttal opinions at all, and in any event, unreliable legal opinions and unhelpful to a jury. Section VI.E should be excluded.

Similarly, in Section VI.F, Prof. Rock opines that merger deals fail to close for a number of different reasons. Report ¶90. In support, Prof. Rock attaches a Table of 14 other deals that did not close during the same time period. Report, Ex. 2. Apparently relying on his prior opinions, Prof. Rock concludes that "any competent reader" of the merger agreement would conclude that the Twitter deal may not close and, if it didn't, it would also be uncertain that Twitter would obtain specific performance or full damages. *Id*. ¶ 98. Once again, these opinions do not rebut Prof. Badawi and have nothing to do with the disputed claims or defenses in this case. They should be excluded.

Finally, in Section VI. G, Prof. Rock provides an opinion on "merger arbitrage," concluding that corporate law professors closely followed the Twitter deal yet were supposedly conflicted in their commentary and social media posts about whether the deal would close. Report ¶¶ 99, 103-108. Rock also notes that some of his professorial acquaintances invested based on the belief that the deal would close, while others did not invest at all. *Id*. ¶¶ 100-102.

These ruminations are not opinions at all. Indeed, other than perhaps supporting the unremarkable notion that Musk's false tweets about Twitter caused market uncertainty, it is hard to fathom the relevance of any of this discussion, even assuming they are opinions, and none are supported by reliable facts or data. Badawi certainly did not opine on merger arbitrage or law professor investor patterns, and the Court should not permit Prof. Rock to introduce such evidence at trial. *Alaska Rent-A-Car, Inc.*, *supra*, 738 F.3d. at 969 (trial court should screen the jury from "unreliable nonsense opinions").

For these same reasons, the Court should reject Prof. Rock's attempt to backdoor these "uncertainty" opinions in the Summary to his Report. In Section VII, Prof. Rock concludes that "Mr. Musk's tweet provided valuable information to the market" (Report ¶ 110), that "Mr. Musk informed the market of the current state of the transaction" (*Id.* ¶ 111), that Musk's tweets "allowed the market to update its expectations" (*Id.* at ¶ 112), and "Any information that allows the market to update those expectations is valuable to investors" (*Id.* at ¶ 113). Given Musk's role in creating uncertainty through his tweets, his experts should not be allowed to opine that the market would find his tweets valuable in explaining that same uncertainty.

### D.    The Portions of Prof. Rock's Opinions that Should be Excluded

The following portions of Prof. Rock's Report and opinions should be excluded pursuant to the arguments set forth herein:

**Section IV – SUMMARY**

- Paragraph 17 ("I see no reason in the record to think that Mr. Musk's apparently sincere statement that 'Twitter deal temporarily on hold …' was other than truthful and informative and well within his rights under the merger agreement.")
- Paragraph 18(b)-(h)

**Section V – RESPONSES TO PROFESSOR STRAUSS**

- Paragraphs 19-24

**Section VI – ANALYSIS**

- Paragraph 26 (entire paragraph following the first sentence)
- Paragraphs 27-30

- Paragraph 32 ("…it has no determinate meaning and, generally speaking, no legal significance.")
- Paragraph 37
- Paragraphs 41-46
- Paragraphs 48-55
- Paragraphs 56-66
- Paragraphs 67-89, and Exhbit 1
- Paragraphs 90-98, and Exhibit 2
- Paragraphs 99-108

**Section VII -- CONCLUSION**

- Paragraphs 109-113

## V.    CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court exclude Prof. Rock's opinions.

Dated: August 15, 2025

Respectfully submitted,
**COTCHETT, PITRE & MCCARTHY, LLP**
Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
Tyson C. Redenbarger (SBN 294424)
Elle D. Lewis (SBN 238329)
Gia Jung (SBN 340160)
Carolyn A. Yuen (354388)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000

*/s/ Mark C. Molumphy*
      Mark C. Molumphy

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN: 175783)
Albert Y. Chang (SBN 296065)
Aaron Arnzen (SBN 218272)

*/s/ Francis A. Bottini, Jr.*
      Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001

Case No: 3:22-CV-05937-CRB

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Mark C. Molumphy, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of August 2025, at Burlingame, California.

> */s/ Mark C. Molumphy*
> Mark C. Molumphy