# EXHIBIT A

**Expert Report of Professor Edward Rock**

**July 2, 2025**

**TABLE OF CONTENTS**

I.    QUALIFICATIONS ................................................................................................ 3

II.   CASE OVERVIEW .............................................................................................. 5

III.  PROFESSOR BADAWI'S CONCLUSIONS .................................................... 6

IV.   SUMMARY OF MY RESPONSES TO PROFESSOR BADAWI ...................................... 7

V.    RESPONSES TO PROFESSOR STRAUSS ...................................................... 10

VI.   ANALYSIS.......................................................................................................... 11

    B.    What is a "Seller Friendly" Merger Agreement?............................................. 12

    C.    Mr. Musk did not "waive" due diligence........................................................ 14

    D.    Whether, at the time of the May tweets, Mr. Musk had a "right" to terminate the merger is a complex, premature and open question .............................................. 18

    E.    Whether or not Mr. Musk had the right to terminate the merger agreement in May 2022, he had the power to do so. .................................................................. 20

    F.    Deals Often Fail to Close.................................................................................. 25

    G.    Experts were uncertain whether the merger would close ................................ 27

VII.  CONCLUSION..................................................................................................... 30

Exhibits:

       1. Chart of Specific Performance Transactions

       2. Chart of "Busted Deal" Transactions

Appendices:

       A. Documents Considered

       B. Curriculum Vitae

       C. Prior Testimony

## I.    QUALIFICATIONS

1.    I am the Martin Lipton Professor of Law at New York University School of Law.  I am the founder and co-director of the Institute for Corporate Governance and Finance.  The Institute organizes programs and convenes discussions of key participants in corporate governance with a particular focus on the relationship among and between stockholders and boards of directors.

2.    From January 1989 until the end of June 2016, I taught at the University of Pennsylvania Law School, where I was the Saul A. Fox Distinguished Professor of Business Law and, from 1998 to 2010, co-director of the Institute for Law and Economics, and, from 2006-2008, Associate Dean for Academic Affairs.  I also held a secondary appointment as Professor of Business Economics and Public Policy at the Wharton School.

3.    I am a Fellow of the American College of Governance Counsel, a Fellow of the European Corporate Governance Institute, and a Life Member of the American Law Institute.

4.    I am the Reporter for the American Law Institute's Restatement of the Law, Corporate Governance.  Restatements "are primarily addressed to courts.  They aim at clear formulations of common law and its statutory elements or variations and reflect the law as it presently stands or might appropriately be stated by a court."[1]  This is the first time that the ALI has approved a "Restatement of the Law, Corporate Governance."  The Reporter of an ALI project is the "quarterback" who structures the project, recruits associate reporters, prepares drafts, and then presents those drafts to the project's Advisers and Members Consultative Group, to the ALI Council, and to the ALI membership.

5.    In 1983, I received my law degree, magna cum laude, from the University of Pennsylvania Law School, where I was a member of the University of Pennsylvania Law Review.  After

---

[1] Frequently Asked Questions, A.L.I. (last visited June 30, 2025, 12:56 PM), https://www.ali.org/faq .

graduating, I practiced with Fine, Kaplan and Black in Philadelphia for five years.  In practice, I specialized in antitrust, corporate, and securities law.

6.	Since entering teaching in 1989, I have regularly taught the basic Corporations course, and the advanced course on Mergers and Acquisitions.  I have also regularly taught seminars on Corporations, Corporate Governance, and Law and Economics and have taught Securities Regulation and the first year Contracts course.

7.	I have published widely.  Fifteen of my academic articles have been selected by scholars in the field as being among the "top ten" articles published in corporate and securities law in their respective years, among the 400+ articles that are published each year.

8.	My work has been relied upon by the Delaware Court of Chancery.  For example, in *Williams Companies Stockholder Litigation*, 2021 WL 754593, at *38-40 (Del. Ch. Feb. 26, 2021), *aff'd*, 264 A.3d 641 (Del. 2021), then-Vice Chancellor McCormick adopted the analysis of "acting in concert" provisions in shareholder rights plans that Professor Kahan and I proposed in Marcel Kahan & Edward Rock, *Anti-Activist Poison Pills*, 99 B.U. L. Rev. 915 (2019).

9.	As part of my research and teaching, I keep abreast of developments in corporate law, mergers and acquisitions, corporate governance, antitrust, and securities regulation by reading cases, academic journals, trade publications, and other relevant materials.  I also frequently participate in programs and panels on corporate governance.

10.	I am being compensated for my work in this matter at my current hourly rate for legal consulting work of $1,800.  None of my compensation in this matter is in any way contingent or based on the content of my opinion in this or any other matter or the outcome of this or any other matter.  My work on this matter is ongoing, and I may review additional materials or conduct further analysis, including but not limited to analyzing any additional expert reports or testimony offered in this litigation.  I reserve the right to update, refine, or revise my opinion.

11.     A copy of my Curriculum Vitae, including a list of my publications, is attached as Appendix A.

## II.    CASE OVERVIEW

12.     As I understand this matter, Lead Plaintiffs Steve Garrett, Nancy Price, John Garrett, and Brian Belgrave allege that Elon Musk violated Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, by tweeting multiple misstatements to artificially depress the price of Twitter stock and to pressure Twitter to lower the price Mr. Musk would have to pay to acquire it.  MTD Opinion at p. 1.

13.     Mr. Musk entered into a merger agreement with Twitter on April 25, 2022 ("Merger Agreement").

14.     I understand that, following the court's December 11, 2023 Motion to Dismiss Ruling, the tweets relevant to this matter are, as far as I can tell, the following:

> a. On May 13, 2022, at 5:44 a.m. EST, Mr. Musk tweeted "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users."  At 7:50 a.m. EST, before the markets opened, Mr. Musk replied to his own tweet stating "Still committed to acquisition."
>
> b. On May 14, 2022, Mr. Musk tweeted that "Twitter legal just called to complain that I violated their NDA by revealing the bot check sample size is 100!"
>
> c. On May 16, Mr. Musk appeared at the "All In Summit" technology conference in Miami. There he stated that "it seems beyond reasonable for twitter to claim that the number of . . . [bots] . . . [is] five percent . . .  I think it's some number that is probably at least four or five times that, . . . [my] estimate would be probably 20."  Parag Agrawal, then CEO of Twitter, responded with a series of tweets, explaining Twitter's method for calculating spam and fake accounts and stating that this estimate cannot be done solely on the basis of public information.  Mr. Musk responded with a poop emoji. Mr. Musk

later tweeted "So how do advertisers know what they're getting for their money? This is fundamental to the financial health of Twitter."

d. On May 17, 2022, Mr. Musk tweeted that the actual number of spam and bot accounts could be "*much* higher" than 20%.  He also claimed that the deal could not go forward until Twitter's CEO showed proof of a bot estimate of less than 5% because his offer was based on "Twitter's SEC filings being accurate.

e. However, I am informed that Plaintiffs concede that the May 16 and May 17 tweets had no statistically significant impact on Twitter's stock price.

## III.    PROFESSOR BADAWI'S CONCLUSIONS

15.     Professor Badawi concludes his report as follows:  "Mr. Musk sought to terminate or renegotiate his acquisition of Twitter. He publicly claimed that the deal was 'on hold' while he investigated the number of spam and fake accounts on Twitter. No provision in the Merger Agreement stated that he could refuse to close if Twitter declined to produce information about spam and fake accounts and, customarily, merger agreements would not contain such a provision. In addition, I am unaware of any public statement by Mr. Musk that he would go through with the merger even if Twitter did not provide him with the information he had demanded about fake/spam accounts and bots. This pattern of claiming rights that were at odds with the Merger Agreement created confusion and uncertainty and continued through his attempts to terminate that agreement. In my opinion, given prevailing custom and practice in mergers and acquisitions, there was no basis for Mr. Musk's assertions."  ¶ 100.

16.     In reaching this conclusion, Professor Badawi summarizes his opinions as follows:

   a.    It is customarily rare for an acquiror of a public company to waive due diligence because doing so entails a substantial risk;

b.    A seller-friendly agreement for the acquisition of a public company will customarily contain provisions that make it extremely difficult to terminate the deal on the basis of information learned after the signing of the agreement, but before the closing of the transaction;

c.    The Twitter Merger Agreement contained terms, including those relating to information requests by the buyer and the buyer's ability to terminate the transaction on the basis of that information, that are regarded as highly favorable to the seller under prevailing mergers and acquisitions custom and practice;

d.    Acquirors experiencing buyer's remorse will sometimes use tactics like delay and/or litigation to try to escape the deal or to extract price concessions from sellers;

e.    The conditions after the signing of the Merger Agreement created the customary conditions for buyer's remorse;

f.    As is customary, nothing in the Merger Agreement expressly stated that the deal would close even if Twitter did not accede to Mr. Musk's information demands, including those about the alleged number of "bots" on Twitter;

g.    In a customary merger transaction, there is a significant amount of information that is not public that could give the buyer a basis to terminate the transaction; and

h.    An agreement alone cannot guarantee that a deal will close because several contingencies, such as government approval and a court's willingness to enforce the agreement, are beyond the control of the buyer and the seller.

## IV.    SUMMARY OF MY RESPONSES TO PROFESSOR BADAWI

17.     I disagree with Prof. Badawi's conclusion and many of the opinions summarized above that he claims lead to that conclusion.  As I will explain in detail below, I see no reason in the record to think that Mr. Musk's apparently sincere statement that "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users" was other than truthful and informative and well within his rights under the merger agreement.

18.     As to his opinions that lead to this conclusion, the following is a summary of my responses to Prof. Badawi's summary of his opinions, discussed in greater detail below:

a.     Badawi ¶ (1):  Mr. Musk did not "waive due diligence."  There is a fundamental difference between not conducting "due diligence" prior to signing a merger agreement and waiving the right to information as a condition of closing the merger.  While Mr. Musk did not insist on a full "due diligence" investigation prior to signing the merger agreement, the merger agreement makes crystal clear in § 6.4 that he explicitly contracted for the right to information.  Moreover, although Mr. Musk did not require extensive information before signing the merger agreement, the merger agreement does condition the closing of the transaction on Twitter providing the information he was entitled to under § 6.4.  See § 7.2.

b.     Badawi ¶ (2): There is no common or customary definition of a "seller friendly" agreement.  Rather, "seller friendly" refers to where on a continuum different provisions fall. Accordingly, there is no empirical basis for Badawi's opinion.

c.     Badawi ¶ (3):  The Twitter Merger Agreement gave Mr. Musk a right to information.  I am not aware of any reliable empirical basis for concluding that the information provisions in that merger agreement were "regarded as highly favorable to the seller."

d.    Badawi ¶ (4) The potential for "Buyer's Remorse"  -- the phenomenon in which a buyer of an asset subsequently regrets having agreed to buy the asset – is a feature of any sale agreement and is well-known to anyone who follows transactions.  In heavily negotiated contracts like a merger agreement, parties negotiate protections that cover "buyer's remorse" and other risks that can delay or prevent consummation of the transaction.

e.    Badawi ¶ (5): Buyers sometimes regret their agreement to purchase any asset – a company, a house, or whatever.  When or why they ultimately regret their agreement, and how that regret affects their behavior, is a matter of psychology that is well beyond my expertise or Prof. Badawi's expertise.  There are no "customary conditions" for buyer's remorse.

f.    Badawi ¶ (6):  The merger agreement §6.4 imposed an obligation on Twitter to provide Mr. Musk with "all information concerning the business, properties and personnel of the Company and its Subsidiaries as may reasonably be requested in writing, in each case, for any reasonable business purpose related to the consummation of the transactions contemplated by this Agreement."  Section 7.2(a) (Conditions to the Obligations of Parent and Acquisition Sub) explicitly makes consummation conditional on " (a) the Company shall have performed or complied, in all material respects, with its obligations required under this Agreement to be performed or complied with by the Company on or prior to the Closing Date;" which includes Section 6.4's obligation to provide information.  I agree with Prof. Badawi that there is nothing in the Merger Agreement that "expressly stated that the deal would close even if Twitter did not accede to Mr. Musk's information demands."  Indeed, given that Mr. Musk had a right under § 6.4 to information, and that compliance with Section 6 covenants was a condition to closing, I would expect a merger agreement that intended that "the deal would close even if Twitter did not accede to Mr. Musk's information demands" would have an explicit exception in Section 7.2(a) to the effect that the transaction would close even if Twitter

did not provide Mr. Musk with the information to which he was entitled.  Section 7.2(a) does not contain any such exception.

g.    Badawi ¶ (7): Merger agreements are publicly available and any amendments to those agreements must likewise be disclosed.  Any other agreements that materially vary the merger agreement's provisions, including the obligation to close, must likewise be disclosed.  While there is often material information contained in the disclosure schedules or disclosure letters that is not disclosed to the market (e.g., exposure from major litigation), the existence and subject matter of the schedules or letters is disclosed.

h. Badawi ¶ (8):  As the market knows from numerous busted-deals, no agreement can guarantee that a deal will close. In addition to required regulatory approval and disputes over whether the counter party has complied with its obligations under an agreement, a contractual party always has the power, if not the right, to breach a contract and to absorb the consequences of that breach.  Because damages and specific performance in broken-deal cases are uncertain, deals often fail to close or are renegotiated at a lower price. This risk is known

## V.    RESPONSES TO PROFESSOR STRAUSS

19.    I have reviewed the May 28, 2025 expert report of Professor Emily Strauss.

20.    The report provides general background on public companies and public capital markets including, among other things, types of investors, the role of the Securities and Exchange Commission and a high-level overview of the types of disclosures that SEC-registered companies must make.

21.    Professor Strauss' report largely restates basic facts and principles.  I am prepared to testify on these topics to the extent that she is permitted to testify and if I believe that her testimony is in need of elaboration or correction.

22.    Professor Strauss testifies in her report about the fluctuation of stock prices.  She states that "The market price of a stock is determined by the interaction of supply and demand.  Positive news—such as an increase in revenue, a new product launch, or an acquisition—can drive increased demand and elevate the stock price. Negative developments—such as poor earnings; or litigation risk—may lead to a decline in price as investors reduce their holdings, creating excess supply. Below are line charts illustrating the fluctuations of several stocks over a multimonth period"  Strauss Report at p. 6 (footnotes omitted).

23.    Professor Strauss then produces stock price charts for Twitter and Tesla.  While it is true that stock prices fluctuate, Professor Strauss provides no explanation for her choice of Twitter and Tesla, or why their stock price fluctuations are relevant.

24.    More importantly, her assertion that the way that stock prices change is through the simple mechanisms of supply and demand as investors reduce their holdings in response to negative news or increase their holdings in response to positive news is incorrect and incomplete. Professor Strauss' analysis ignores the impact of positive or negative information on investors' valuation of stock whether or not they buy or sell.

## VI.    ANALYSIS

### A.  Introduction: Some key features of Mergers and Acquisitions Practice

25.    Merger agreements are among the most complex agreements negotiated by sophisticated parties.  They are the polar opposite of consumer contracts and, unlike consumer contracts, come very close to the stylized "contract" of contract law and practice.  Skilled counsel typically negotiate the material terms of a merger agreement.

26.    In this practice context, "customary practice" and "market terms" play a very specific role. In the face to face negotiations among the lawyers responsible for drafting the merger agreement, a seller's lawyer seeking to convince a buyer's lawyer to agree to a particular term (and vice

11

versa) will often claim that the preferred term is "customary" or "market." In the social context of a negotiation, these claims are thought to be persuasive.

27.    Sometimes the claim that a term is "customary" or "market" will be supported with facts about other deals, sometimes not. Sometimes the claim will be correct, sometimes not.

28.    Whether or not the argument is made and, if made, is accurate, ultimately the two sides agree to a term that may or may not be the terms that one side or the other claims is "customary" or "market." It is the agreed term that controls future discussions and disputes, not the negotiating claims about what is and is not market. As in any other negotiation, the only uniform "custom" is that the ultimate agreed upon term supersedes the negotiating positions. Indeed, to assure that, the Twitter merger agreement, like most merger agreements, contains an "integration" provision. § 9.6.

29.    As in any other face to face negotiation, the final negotiated terms of a merger agreement will be determined by a variety of factors including bargaining power, skill, experience and persuasiveness.

30.    As a result, and contrary to Professor Badawi's report, whether particular terms are "customary" or "market" is of no use in determining what parties to a particular merger agreed to. For this reason, most of Professor Badawi's discussion of "M & A market practice" is irrelevant and misleading.

## B.  What is a "Seller Friendly" Merger Agreement?

31.    Professor Badawi makes much of his claim that the Twitter merger agreement is "seller friendly." See, e.g., Badawi report at ¶¶ 50-69.

32.    While the term "seller friendly" is certainly a term that is used in M & A discussions and press coverage, it has no determinate meaning and, generally speaking, no legal significance.

33.     As discussed above, merger agreements are heavily negotiated bespoke contracts.  In the negotiation of specific provisions, the lawyers for the buyer and the lawyers for the seller meet to hash out particular provisions.  Often, the buyer's lawyer will arrive with one set of terms that he or she favors while the seller's lawyer will arrive with terms that he or she favors.

34.     As an example, consider the scope of the non-disclosure provision in the merger agreement in which a firm is seeking to acquire a competing firm.

35.     Generally speaking, the seller's lawyer will push for broad restrictions because, the seller's lawyer will argue, much of the information is competitively sensitive and, in the event that the merger is not consummated, the seller wants assurance that the buyer will not use the information in any way that might injure the prospective seller.  By contrast, the buyer's lawyer will prefer an NDA that is narrow in scope and duration because the buyer's lawyer will wish to preserve the buyer's freedom of action and, in particular, avoid litigation in the event that the transaction is not consummated.

36.     The negotiation will typically end up somewhere between the two opening positions. If the ultimate term ends up closer to the buyer's position, the provision will be viewed as "buyer friendly."  If the ultimate negotiated term ends up closer to the seller's position, the provision will be termed "seller friendly."  When all of the negotiated provisions are taken into account, one might say that the merger agreement overall is "buyer friendly" or "seller friendly."[2]

37.     While this is a term that people in M & A use to describe specific terms and merger agreements as a whole, it does not have any determinate meaning.  More importantly, no one would think that whether one might legitimately say that a term or agreement is buyer or seller friendly would have any effect on the interpretation of that term or agreement.  Given the uncertainties in any transaction, a term that, ex ante, was viewed as "seller friendly" may turn out, ex post, to work to the buyer's advantage and vice versa.

_____

[2] *See* Savitt Dep. 58:3–58:22.

13

38.     Continuing with my NDA example, if there is a dispute over whether a buyer has complied with the NDA, the lawyers will pull out the merger agreement and argue over the meaning of the NDA provision and how it applies to the particular question at issue.  In that discussion, arguing that the provision is "seller friendly" or "buyer friendly" will be beside the point.  Rather, the focus will be on the negotiated provision in the merger agreement and the scope of the party's duty to keep information confidential.

### C.  Mr. Musk did not "waive" due diligence

39.     A major theme of Professor Badawi's report is that Mr. Musk somehow "waived" his rights to due diligence.  This claim is both confused and unfounded.

40.     The term "due diligence" as used in M & A is a term of art that has little if any precise or technical meaning.  It is, rather, a catch all way of discussing the "in-depth examination and analysis of a business" that a prospective buyer or investor will make before ultimately agreeing to buy a company or invest.[3]

41.     The term itself comes from the law governing liability for misleading registration statements under the Securities Act of 1933. In particular, a variety of actors (other than the issuer) can escape liability under Section 11 for misrepresentations if they "had, after reasonable investigation, reasonable ground to believe and did believe ... that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading."[4]

42.     This defense to strict liability under Section 11 has come to be known as the "due diligence" defense.  As part of the underwriting process, efforts are made to conduct "due diligence" and to

---

[3] Lou R. Kling et al., NEGOTIATED ACQUISITIONS OF COMPANIES, SUBSIDIARIES, AND DIVISIONS, § 8.02[1] (L. J. Press, 2024).

[4] Securities Act of 1933 § 11, 15 U.S.C. § 77k.

memorialize the efforts made in order to support a defense to litigation in the event that it turns out that the registration statement was misleading.

43.     There is a jurisprudence in securities regulation that has developed on what constitutes "due diligence" and what a defendant needs to show in order to carry its burden under Section 11(b).

44.     Because of the important role that "due diligence" plays in the context of securities litigation, and because it is a resonant phrase, it has made it into M & A and into popular culture. In this regard, see, for example, a recent Yahoo Sports article entitled "Knicks continue to conduct due diligence on [Head Coaching] search but have been rejected by several teams."[5]  In M & A, it is used with the same, general meaning to refer to investigations that a potential buyer or investor will make prior to closing a transaction or investing in a company.[6]  In the M & A context, in contrast to the securities fraud context, the phrase does not have any determinate legal meaning.

45.     Whatever exact meaning Prof. Badawi attaches to it, Mr. Musk did not "waive" due diligence. Section 6.4 makes clear that Musk had the right to "all information concerning the business, properties and personnel of the Company and its Subsidiaries as may reasonably be requested in writing, in each case, for any reasonable business purpose related to the consummation of the transactions contemplated by this Agreement."[7]

46.     Section 7.2 then makes clear that Mr. Musk's obligation to consummate the merger was conditional on Twitter fulfilling its obligations under the merger including complying with the information rights set forth in § 6.4.

---

[5] Dylan Backer, *Knicks continue to conduct due diligence on HC search but have been rejected by several teams*, YAHOO! SPORTS (June 12, 2025), https://sports.yahoo.com/article/knicks-continue-conduct-due-diligence-155838488.html.

[6] Kling et al., *supra* note 3, at § 8.02. For a recent discussion of "due diligence" in the private equity context, *see* Aran & Packen, *Due Diligence Dilemma*, U. ILL. L. REV. (forthcoming 2025).

[7] *See, e.g.*, Savitt Dep. 12:14 –13:23, 14:5–14:22.

47.     While it is true that Mr. Musk did not insist on detailed information about the company *before* entering into the Merger Agreement, that is common in hostile or semi hostile transactions.[8]

48.     Whether a buyer conducts pre-signing due diligence or not, buyers of public companies rely on the accuracy of S.E.C. filings.  Accordingly, it is customary in public company transactions for the buyer, as here, to require a "representation and warranty" that the S.E.C. filings are accurate.  Merger Agreement § 4.2(a).[9]

49.     Not making the offer *contingent* on due diligence does not mean that one waives one's right to conduct due diligence.  Indeed, nearly every merger agreement provides rights to information between signing and closing, whether or not due diligence was conducted before the signing.[10]

50.     As of the time of the tweets, Mr. Musk had the right to seek information and not to close until Twitter complied with its obligation to provide information.  In fact, Mr. Musk sought information under §6.4, Twitter provided information under §6.4, the parties held numerous meetings when they talked about this information and these meetings were called "due diligence" meetings.[11]

---

[8] *See, e.g.*, Ringler Dep. 28:21–29:3.

[9] Kling et al., *supra* note 3, at §§ 16.01, 16.03[1].  *See also* §11.04[16][e] ("An extremely important representation in acquisitions involving public companies is that they have made all filings required by the Securities Act of 1933, the Securities Exchange Act of 1934, as amended, and the Sarbanes-Oxley Act of 2002, and that such filings did not contain a material misstatement or omit to state a material fact required to make the statements therein not misleading. This representation, which is one of the cornerstones of 'bare bones' merger agreements is discussed elsewhere.")

[10] Savitt Dep. 126:2–12.

[11] Korman Dep. 181:20–182:3; 225:19–22; 228:21–25; 238:1–7; Twitter v. Musk Complaint (Taylor Ex. 104) at ¶¶ 73, 74, 84, 86, 118.  See also, the following emails setting up diligence meetings:  Musk-Pampena 0360309, 0360317, 0622932, 0897451, 0360329.

51.     The best evidence that the May 13th tweet was not misleading is that Mr. Musk did, in fact, have the right to investigate bots.  Everyone on both sides of the transaction operated under the assumption he was entitled to such information. Later there was a dispute over how much information he was entitled to, but there was no dispute that he was entitled to information.

52.     To my eyes, the most natural reading of Mr. Musk's tweets in May 2022 is what he actually said, namely, that the "Twitter deal [is] temporarily on hold."  This does not even address the question of legal rights or the right to terminate.  As the parties to a merger agreement are working to consummate it – consistent with bilateral obligations under § 6.3 to "use their respective reasonable best efforts to consummate" the transaction – it is common and appropriate for one party to say to the other, "I don't believe you have met the conditions to closing.  Something has come up and we want you to deal with it.  There are a variety of things that you haven't done but you need to do.  Until you do them, we're not ready to close."

53.     Indeed, this sort of back and forth is a customary part of M & A.  It is part of the required reasonable best efforts and, here, as detailed above, Twitter reacted to Mr. Musk's request for more information by providing more information, as one would expect.  It was, as Twitter's lawyer Martin Korman explained, a "dialogue": "We engaged in dialogue. We sent writings, and we extended ourselves constructively to satisfy the information requests that buyer rightfully made under 6.4 and 6.11, and we complied with those requests to the best of the company's ability, in my observation."[12]

54.     Importantly, as far as I can tell, Twitter did not respond to Mr. Musk's requests for information by saying "you waived due diligence and so we do not have to give you any information!"

55.     In reviewing the tweets, I do not find any tweet in May 2022 in which Mr. Musk claimed the right to, or threatened to, terminate the transaction because of a failure by Twitter to provide information on bots.  Rather, the tweets indicate that he is asking for information as provided for in the merger agreement.

---

[12] Korman Dep. 238:1–7.

D. **Whether, at the time of the May tweets, Mr. Musk had a "right" to terminate the merger is a complex, premature and open question**

56.        As far as I can tell from my review of the record, Mr. Musk did not try to terminate the Twitter merger agreement in May 2022.  Rather, Mr. Musk terminated the Merger Agreement in a letter subsequently disclosed on July 8, 2022.

57.        Had Mr. Musk sought to terminate the Merger Agreement in May 2022, it is a complex and speculative legal question whether he would have had the right to do so.  At one extreme, had Twitter announced that it would not provide Mr. Musk with any information at all, despite his clear right to information under § 6.4, Mr. Musk could certainly have made the argument that this constituted a material breach of Twitter's obligations under the Merger Agreement and that in light of Section 7.2, it relieved Mr. Musk of any further obligations under the Merger Agreement.

58.        A closer question would arise if Twitter had provided incomplete information in response to Mr. Musk's information requests and refused to provide any additional information.  Here the question would be whether the refusal was a material breach.

59.        Because Mr. Musk did not seek to terminate the Merger Agreement in May 2022, these issues were never litigated.  Resolving whether Mr. Musk had a right to terminate the Merger Agreement in May 2022 – a hypothetical question – would have involved substantial and uncertain litigation and ultimately would have depended on a variety of legal and factual issues that would be developed in the litigation.  I have no opinion on how such a hypothetical and speculative case would have been decided.

60.        What is certain is that, in May 2022, Mr. Musk had the right to request information and had the ability, under the merger agreement and pursuant to industry custom and practice, to seek information and to delay closing until he received that information.  This is an example of a more general custom and practice in M & A:  the representations and warranties, covenants and other

18

agreements are largely enforced through a refusal to close rather than through judicial adjudication. This is why nearly all the representations and warranties, covenants and other agreements in a public company deal (and many private company deals) do not survive closing. Merger Agreement Section 9.1 (Non-Survival of Representations, Warranties and Agreements).

61.     Professor Badawi argues that Mr. Musk's rights to terminate the publicly disclosed and widely available Merger Agreement for failure to provide information were somehow unclear. He maintains this despite the fact that § 6.4 requires Twitter to provide information and § 7.2 allows Mr. Musk not to close if Twitter does not provide the information it is required to under § 6.4.

62.     The basis of Prof. Badawi's argument is that somehow there might have been undisclosed confidentiality agreements that would be material to an investor:

> Additionally, the buyer's right to terminate may be unavailable if the buyer is in material breach of its obligations. If a dispute of this sort materializes before closing, the agreement, by itself, would not be enough to assess the risk that the dispute would lead to deal termination. To determine the potential for termination, one would need to know, inter alia, the precise information requested by the buyer, the seller's basis for a refusal to provide information, the content of the communications between the parties, and whether the buyer is potentially in material breach of any of its obligations. The parties also executed a confidentiality agreement. The terms of that agreement could have expanded or restricted the information rights of the parties. Given the non-public nature of the document, it would not be possible for the investing public to know whether that agreement affected the claims in Mr. Musk's tweet. Badawi report at ¶79.

63.     This argument makes no sense. The Merger Agreement contains a confidentiality agreement in § 6.4: "Each of Parent and Acquisition Sub agrees that it will not, and will cause its Representatives not to, use any information obtained pursuant to this Section 6.4 (or otherwise pursuant to this Agreement) for any competitive or other purpose unrelated to the consummation

19

of the transactions contemplated by this Agreement. . . Prior to any disclosure, the Company and Parent shall enter into a customary confidentiality agreement with respect to any information obtained pursuant to this Section 6.4 (or otherwise pursuant to this Agreement)."

64.    Prof. Badawi seems to suggest that the terms of the "customary confidentiality agreement" that would be entered into prior to the disclosure of Twitter information to Mr. Musk would somehow affect a reasonable investor's evaluation of the likelihood of consummation because without knowing the terms of the confidentiality agreement actually executed, investors could not evaluate the likelihood of closing.

65.    This is speculative in the extreme.  First, Professor Badawi's argument requires one to assume that an investor, in evaluating the likelihood of closing, would, under any circumstances, be able to evaluate whether a party has satisfied a covenant that requires it to disclose company information.  To do so, that investor would have to know what information had been disclosed, information that by the terms of the Merger Agreement was confidential.  Second, in making this determination, this investor would have to develop a judgment as to whether the information complied with the obligations under the Merger Agreement.  Third, that evaluation (which no investor would ever make) would have to be materially affected by significant but undisclosed terms of the confidentiality agreement executed and the extent to which that agreement somehow changed the core confidentiality obligation imposed by § 6.4.

66.    Everyone reading the Merger Agreement would understand that (a) Twitter had an obligation to disclose information, (b) there could be a dispute over whether Twitter fulfilled that obligation, and (c) such a dispute could delay or prevent consummation of the transaction.  It is hard to imagine a situation in which the precise terms of the NDA would be material to this evaluation.

**E.  Whether or not Mr. Musk had the right to terminate the merger agreement in May 2022, he had the power to do so.**

20

67.      As discussed above, the Merger Agreement is a sophisticated, heavily negotiated, bespoke contract.  For all of that, it is still just a contract and contractual parties always have the power to terminate a contract subject to whatever legal consequences would follow.

68.      Indeed, there is rich Law & Economics literature on "Efficient Breach" that typically makes an appearance in the first year Contracts course.  It addresses whether, and under what circumstance, breaching a contract is economically efficient and whether such a breach may or may not increase social welfare.[13]

69.      The concern that a party to the Merger Agreement might choose not to consummate the transaction is so obvious and well-known that every merger agreement will include contractual provisions that govern various eventualities.  In the Twitter Merger Agreement, §§ 8.1, 8.2 and 8.3 address termination.  When a termination of a merger agreement complies with agreed upon termination provisions, then there is no breach of contract, but those terms do not exhaust the possibilities.  There is always the possibility that a contracting party will breach the agreement and terminate outside of the contracted-for process.

70.      When that happens, the question is what remedies are available.  As of the time of the tweets, the available remedies for a breach of the Merger Agreement were quite uncertain.  This

---

[13] Here is a partial list of important articles on Efficient Breach from an interesting article by Avery Katz, *Virtue Ethics and Efficient Breach*, 45 SUFFOLK L. REV. 777 n. 1, 4 (2012): RICHARD POSNER, ECONOMIC ANALYSIS OF LAW 55–59 (Little Brown and Company, 1973); Robert L. Birmingham, *Breach of Contract, Damage Measures, and Economic Efficiency*, 24 RUTGERS L. REV. 273 (1970); Robert L. Birmingham, *Legal and Moral Duty in Game Theory: Common Law Contract and Chinese Analogies*, 18 BUFF. L. REV. 99 (1969); Robert Cooter & Melvin Aron Eisenberg, *Damages for Breach of Contract*, 73 CALIF. L. REV. 1432 (1985); Charles J. Goetz & Robert E. Scott, *Liquidated Damages, Penalties and the Just Compensation Principle: Some Notes on an Enforcement Model and a Theory of Efficient Breach*, 77 COLUM. L. REV. 554 (1977); Steven Shavell, *Contracts*, *in* THE NEW PALGRAVE DICTIONARY OF ECONOMICS AND THE LAW 436, 439 (Peter Newman ed., 1998); Barry E. Adler, *Efficient Breach Theory Through the Looking Glass*, 83 N.Y.U. L. REV. 1679 (2008); Richard R.W. Brooks, *The Efficient Performance Hypothesis*, 116 YALE L.J. 568 (2006); Melvin A. Eisenberg, Actual and Virtual Specific Performance, the Theory of Efficient Breach, and the Indifference Principle in Contract Law, 93 CALIF. L. REV. 975 (2005); Gregory Klass, To Perform or Pay Damages, 98 VA. L. REV. 143 (2012); Jody S. Kraus, A Critique of the Efficient Performance Hypothesis, 116 YALE L.J. ONLINE 423 (2007); Jody S. Kraus, *The Correspondence of Contract and Promise*, 109 COLUM. L. REV. 1603 (2009); Daniel Markovits & Alan Schwartz, *The Myth of Efficient Breach: New Defenses of the Expectation Interest*, 97 VA. L. REV. 1939 (2011); Steven Shavell, *Is Breach of Contract Immoral?*, 56 EMORY L.J. 439, 439 (2006); Steven Shavell, *Specific Performance Versus Damages for Breach of Contract: An Economic Analysis*, 84 TEX. L. REV. 831, 867 (2006); Seana Shiffrin, *Could Breach of Contract Be Immoral?*, 107 MICH. L. REV. 1551 (2009); Seana Valentine Shiffrin, *Must I Mean What You Think I Should Have Said?*, 98 VA. L. REV. 159 (2012); Steve Thel & Peter Siegelman, *Wilfulness Versus Expectation: A Promisor Based Defense of Willful Breach Doctrine*, 107 MICH. L. REV. 1517 (2009).

is true both with regard to the availability of specific performance as well as the magnitude of damages.[14]

71.    While Section 9.9 of the merger agreement provides that specific performance would be the presumptive remedy, it is beyond the power of a contract to mandate specific performance. That is because specific performance is an equitable remedy at the discretion of the court and a contract cannot override the court's discretion.

72.    The classical treatment of specific performance is restated in Restatement (Second) of Contracts §§ 357-369 (1981).  As the Restatement discusses in its introductory note, there is a long history to the equitable remedy of specific performance and the conditions under which a court, in its discretion, will grant it.  In particular, a key issue is whether money damages will be sufficient:

> Specific performance and injunction are alternatives to the award of damages as means of enforcing contracts. Specific performance is by definition limited to the enforcement of contract duties. The remedy of injunction is used in many fields of law, but is dealt with here in connection with contracts only. The general availability of these remedies in contract cases is affirmed in § 357. The power of the court to shape the remedy is stressed in § 358. These remedies originated in courts of equity, and their use is within the discretion of the court and is subject to a number of limitations that are dealt with in §§ 359- 69. The most significant is the rule that specific performance or an injunction will not be granted if damages are an adequate remedy (§ 359). This rule, the product of the historical division of jurisdiction between law and equity, has been preserved under the Uniform Commercial Code. See Uniform Commercial Code § 2-716(1) and Official Comment; Introductory Note to this Chapter. Nevertheless, there has been an increasing disposition to find that damages are not adequate and the commentary to the Code reflects this "more liberal attitude." Comment 1 to Uniform Commercial Code § 2-716. Courts have been increasingly willing to order performance in a wide variety of cases involving output and requirements contracts, contracts for the sale of a business or of an interest in a business represented by shares of stock, and covenants not to compete. Factors that bear on the adequacy of damages are listed in § 360. Other limitations on the availability of such equitable relief go to such matters as the need for

---

[14] For a detailed discussion of the general problem of remedies when a buyer fails to close, *see* KLING ET AL., *supra* note 3, at § 15A.03.

certainty of terms (§ 362) and for security as to the completion of the agreed exchange (§ 363), and to the impact of unfairness (§ 364), of public policy (§ 365) and of difficulty of enforcement of the decree (§ 366).

73.    A party seeking specific performance must also prove its entitlement to that remedy by clear and convincing evidence, and it must have "clean hands" to be entitled to this equitable remedy.  The remedy must also be workable.  As a review of Delaware cases shows, Delaware courts have refused to grant specific performance on that basis.[15]

74.    With regard to specific performance of merger agreements, many have thought that it is largely unavailable because, at its heart, these are business disputes that, at the end of the day, are about money.  Indeed, the fact that merger agreements so often contain a variety of provisions governing the payment of termination fees by a non-closing seller and reverse termination fees by a non-closing buyer is evidence that monetary remedies are generally sufficient.

75.    In addition, as the Restatement makes clear, "public policy" considerations inform whether a court will exercise its discretion to order specific performance.  As of the time of the tweets, arguments were made that, as a matter of public policy, Mr. Musk should not be allowed to acquire Twitter because, it was argued, he would not be an appropriate owner of a critical forum for public debate.[16]

76.    In the period prior to the Twitter deal, specific performance was rare.

77.    To get a better sense of how people who follow M & A would appraise the likelihood of specific performance of the Twitter merger agreement, I have tried to collect two sets of cases

---

[15] 26 Cap. Acquisition Corp. v. Tiger Resort Asia Ltd., 309 A.3d 434, 471 (Del. Ch. 2023) (noting that specific performance can be refused simply because the plaintiff does not come into court with clean hands) (quoting Turchi v. Salaman, 1990 WL 27531, at *8 (Del. Ch. Mar. 14, 1990)); Ryan v. Ocean Twelve, Inc., 316 A.2d 573, 575 (Del. Ch. 1973) (denying specific performance because "it would be inappropriate to grant specific performance… in view of the apparent complexities of the situation" and because "enforcement by the Court under such circumstances would be impractical, and, no doubt, improbable.").

[16] See, e.g., Jeffrey N. Gordon,  The Twitter Board Bears Personal Responsibility for a Bad Outcome in the Twitter Sale, THE CLS BLUE SKY BLOG (May 5, 2022), https://clsbluesky.law.columbia.edu/2022/05/05/the-twitter-board-bears-personal-responsibility-for-a-bad-outcome-in-the-twitter-sale/ .

from the last twenty years:  cases between 2005 and May 2022 in which specific performance was granted; and cases between 2005 and May 2022 in which specific performance was asked for and not granted.

78.      I chose 2005 as the cut off because it covers the "living memory" of most of the relevant audience and, more importantly, it is early enough to capture the full period of the 2007-08 financial crisis when many deals fell apart.

79.      Exhibit 1 Table 1 presents cases in which specific performance was granted in whole or in part and the judge who granted it.

80.      Exhibit 1 Table 2 includes cases since 2005 in which specific performance was requested and not granted and the judge who denied it.

81.      This brief history confirms two pieces of conventional wisdom:  specific performance is rare; and whether you have a chance for specific performance depends sensitively on which judge is assigned to the case.

82.      In an important article written and published after the Twitter deal closed, Chancellor Kathaleen McCormick of the Delaware Court of Chancery argued that, despite the rareness of the remedy, specific performance should be the default remedy in broken deal cases.[17]

83.      In retrospect, the assignment of the Twitter v. Musk case to Chancellor McCormick when it was filed on July 12, 2022 was a "good draw" for Twitter.

84.      But as of the time of the tweets in May 2022, specific performance had rarely been granted and there was substantial uncertainty over whether Twitter would be able to convince whichever member of the Court of Chancery was assigned to the case to order Mr. Musk to close.

---

[17] McCormick & Erikson, *Delaware's Approach To Specific Performance In M&A Litigation*, 20 N.Y.U . J. L. & Bus. 7 (2023).

85.     Damages would likewise be uncertain.  As with any contract, the suing party has the burden of proving damages.  In the case of a buyer breaching a merger agreement, the relevant damages are the damages suffered by the target company because of the breach.

86.     What provable damages would Twitter suffer had the merger agreement been terminated? The damages would include professional fees that had been incurred in connection with the merger. Beyond that, if Twitter could prove that some employees left Twitter because of the impending merger and that losing those employees damaged Twitter, it could, in principle, collect for that.  It is hard to imagine that the provable monetary damages would amount to much.

87.     What about the loss that the Twitter shareholders would care most about, namely, the loss opportunity to sell their shares for $54.20 per share?  But the Twitter shareholders were not parties to the merger agreement, and the loss of the merger premium is not an item of damages suffered by Twitter.

88.     For the Twitter shareholders to be entitled to the "lost merger premium," they would have to be third party beneficiaries of the merger agreement and they were not.  Section 9.7 explicitly excludes third party beneficiaries:  "Subject to Section 9.13 [Debt Financing Source Related Parties], this Agreement is not intended to and shall not confer upon any Person other than the parties hereto any rights or remedies hereunder."

89.     The difficulty of proving such damages is one of the reasons why most merger agreements have detailed liquidated damages clauses.  The fact that the Twitter agreement's $1 billion liquidated damages clause (Section 8.3) is sharply limited means that it would be unlikely to apply but could have provided a ballpark of estimated damages.  In the context of the merger, a $1 billion termination fee would have been trivial (around $1.25 per share).

**F.  Deals Often Fail to Close**

25

90.    However "bullet proof" a merger agreement, it is a well-known fact about the world that mergers fail to close or are renegotiated in an appreciable number of cases.  This can be because of regulatory factors (e.g., opposition from the DOJ Antitrust Division), financing factors (e.g., sharp increase in interest rates), buyer's remorse (e.g., concluding that the company is worth more than the seller has agreed to pay or because of a higher competing offer) and seller's remorse.

91.    Exhibit 2 Tables 1 and 2 provide some market evidence of this conventional wisdom.  Table 1 lists deals between 2005 and 2025 that closed after a buyer's threat not to close.  This covers both the broken deals from the 2008 financial crisis and the broken deals from the pandemic period. As is clear, in these transactions, the merger price was often renegotiated downwards.

92.    Exhibit 2 Table 2 lists deals for the same period that did not close at all (14 total deals).

93.    The inevitable uncertainty of deal consummation leads transactional lawyers to contract over those possibilities.  Large sections of the merger agreement address termination directly and often quantify the damages owed in various scenarios in which the deal does not close.

94.    First, merger agreements universally include a "best efforts" or "reasonable best efforts" clause that will typically require both sides to cooperate in seeking regulatory approval.

95.    Second, The termination fee provisions are often an effort to estimate the hard to measure damages from a failure to consummate.  Standard termination fees cover, inter alia, the situation in which a higher topping bid is preferred by shareholders.  Reverse Termination Fees address the situation in which a buyer fails to close, sometimes because of regulatory prohibitions (e.g., the DOJ Antitrust Division indicates its opposition to a merger and its intention to seek to enjoin it), sometimes due to a buyer's inability or unwillingness to secure financing, and sometime due to buyer's remorse.

96.    In most mergers, the buyer pays a premium over the pre-merger market price.  When, for whatever reason, a merger fails to close, the company's stock price typically is less than the pre-

26

merger market price. Accordingly, the major "loss" to target shareholders if a buyer decides not to close is the "lost merger premium."  Merger agreements sometimes include the "lost merger premium" as an item of damages in the event of non-consummation.  At the time of the tweets, such provisions were enforceable if properly drafted (since then, the DGCL has been amended to make clear that such provisions are generally enforceable).[18]

97.      The Twitter Musk deal presented all these uncertainties.  The termination fee was limited and capped at $1 billion.  There was no provision covering lost merger premium.  Specific performance was at the discretion of the court. Finally, Twitter would have had substantial difficulties in establishing damages that, in any event, would not have been close to the lost merger premium.

98.      When all of these factors are put together, any competent reader of the merger agreement would conclude that:

    a.  There was a non-trivial possibility that the merger would not close.

    b.  In the event that it did not close, it was uncertain whether a court would order specific performance.

    c.  In the event that the court did not order specific performance, provable damages would not come close to making up for the lost merger premium.

### G.  Experts were uncertain whether the merger would close

99.      Because Twitter, Musk and the Twitter merger were all so high profile, the corporate law professoriate followed the deal closely.  Professors of corporate law were unsure what the outcome would be.  In May 2022, when questions began to be raised about whether the deal would close, and, if so, whether it would close at $54.20 per share, there was an obvious investment opportunity: if one was sure the merger would be consummated as provided for in the

---

[18] Crispo v. Musk, 304 A.3d 567 (Del Ch. 2023).  In the 2024 "market practice amendments," the Delaware legislature amended the DGCL to explicitly permit "lost merger premium" damage clauses. DEL. CODE ANN. tit. 8 §261(a) (West 2024).

merger agreement, buying shares at the then market price – around $38 a share – would be a safe and very profitable investment.

100.    With a closing date set in the merger agreement of no later than October 24, 2022, there was an opportunity for a very quick profit of $16.20 per share, a 42% return over less than six months.

101.    On the other hand, if one thought there was a significant likelihood of the deal not closing and the stock dropping to around $20 per share, with damages effectively capped at $1 billion (or about $1.25 per share), then the risk of loss ($38-$21.25 = $16.75) was also significant.

102.    My understanding is that some in the academy were certain it would close and invested heavily and made significant profits (for a law professor), some were certain but with doubts, invested and made smaller profits, and some (like me) did not invest at all.

103.    This same uncertainty is reflected in corporate law academics' media commentary, blog entries, and social media posts.

104.    Thus, e.g., Zohar Goshen (Columbia Law School) had doubts about a specific performance remedy:

> I see the main issue is that even if Twitter wins in terms of the arguments and should get the specific performance against Musk, I see enforcement becoming a major, major issue. We don't have any precedent in which a court ordered someone to close such a big deal, $44 billion. And no one knows what will happen if Musk just said, you know what? Regardless of that, I'm not closing.[19]

105.    Goshen's Columbia colleague, Eric Talley, posted extensively and developed a complex flow chart that shows all the different potential outcomes:

---

[19] *Law professor evaluates Elon Musk's arguments against Twitter*, YAHOO! FINANCE VIDEO (July 11, 2022), https://finance.yahoo.com/video/law-professor-evaluates-elon-musk-160439575.html.



106.     By contrast Todd Henderson (Chicago) and J.B. Heaton (Heaton Henderson LLC) were quite certain that Mr. Musk would not be required to close and could just walk away from the deal:[20]

a. "Twitter has sued Elon Musk, seeking to compel him to buy the company for $54.20 a share. Many observers think the company will prevail, or that Mr. Musk is likely at least to pay the $1 billion breakup fee. They're wrong. He is likely to walk away largely unscathed, a belief reflected in Twitter's stock price."

b. "Although litigation is always uncertain, it is hard to imagine a court would force the purchase of a $44 billion corporation."

c. "The issue of the $1 billion breakup fee remains. Courts will be much more likely to make Musk pay to walk away than force him to walk down the aisle. But it isn't clear he will have to pay that much. Breakup fees are supposed to reflect damages caused by a breach of contract. They aren't supposed to act as a penalty. Given that Twitter isn't obviously worse off by $1 billion—if at all—a court might balk at imposing such a high fee."

---

[20] Heaton & Henderson, *Twitter's Lawsuit Against Elon Musk Looks like a* Loser, WALL ST. J. OP. (July 13, 2022), https://www.wsj.com/opinion/twitters-lawsuit-against-elon-musk-looks-like-a-loser.

107.    Joseph Grundfest (Stanford Law) concisely captured what I subjectively would say was the academic consensus: "Nobody's going to be a winner here. And the question simply is how much money, at this point, will flow from Elon Musk to Twitter to make this go away?"

108.    While some academics correctly predicted that the Twitter deal would close at $54.20 per share (and made some money on that prediction), even this expert community had very low confidence in any specific outcome.  As with much in M & A, the outcome was very uncertain. This is why merger arbitrage is a difficult but potentially profitable business and why, with the benefit of hindsight, Eric Talley was sorry that he had not had the courage of his convictions:



## VII.    CONCLUSION

109.    In May 2022, around the time of the tweets at the center of this litigation, it was objectively uncertain whether the merger would close for the reasons outline above.

110.    Given that inevitable (and well-known) deal uncertainty, Mr. Musk's tweet provided valuable information to the market.

111.    In tweeting "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users," Mr. Musk informed the market of the current state of the transaction.

112.    Whether this was because of "buyer's remorse" or because there were serious and legitimate questions about Twitter's willingness to provide him with the information he was entitled to under Section 6.4 of the merger agreement, the tweet (assuming it reflected Mr. Musk's actual view at the time) allowed the market to update its expectations on the likelihood that the deal would eventually close.

113.    Because even the most "seller friendly" merger agreement cannot eliminate the possibility that a deal will not close, there is always uncertainty in the market.  Any information that allows the market to update those expectations is valuable to investors.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 2nd day of July, 2025 in Manhattan, New York.

_____

Edward Rock

Exhibits:
1. Chart of Specific Performance Transactions
2. Chart of "Busted Deal" Transactions

31

Appendices:

    A. Documents Considered

    B. Curriculum Vitae

    C. Prior Testimony

**Exhibit 1. Empirical Sample of Specific Performance Transactions**

*Panel A: Cases in which Specific Performance was Granted*

| Year | Case | Specific Performance? | Judge |
|------|------|------------------------|-------|
| 2006 | *Gildor v. Optical Solutions, Inc.*, 2006 WL 4782348 (Del. Ch. June 5, 2006) | Granted | Strine |
| 2019 | *Channel Medsystems, Inc. v. Bos. Sci. Corp.*, No. CV 2018-0673-AGB, 2019 WL 6896462 (Del. Ch. Dec. 18, 2019), judgment entered, (Del. Ch. 2019) | Granted | Bouchard |
| 2021 | *Snow Phipps Grp., LLC v. Kcake Acquisition, Inc.*, No. CV 2020-0282-KSJM, 2021 WL 1714202 (Del. Ch. Apr. 30, 2021) | Granted | McCormick |
| 2021 | *Bardy Diagnostics, Inc. v. Hill-Rom, Inc.*, No. CV 2021-0175-JRS, 2021 WL 2886188 (Del. Ch. July 9, 2021 | Granted | Slights |
| 2022 | *Level 4 Yoga, LLC v. CorePower Yoga, LLC*, No. CV 2020-0249-JRS, 2022 WL 601862 (Del. Ch. Mar. 1, 2022), judgment entered, (Del. Ch. 2022), *aff'd*, 287 A.3d 226 (Del. 2022) | Granted | Slights |
| 2025 | *Desktop Metal, Inc. v. Nano Dimension Ltd.*, No. 2024-1303-KSJM, 2025 WL 904521 (Del. Ch. Mar. 24, 2025) | Granted | McCormick |

**Panel B: Cases in which Specific Performance was Denied**

| Year | Case | Specific Performance? | Judge |
|------|------|----------------------|-------|
| 2007 | *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810 (Del. Ch. 2007) | Denied | Chandler |
| 2014 | *Cooper Tire & Rubber Co. v. Apollo (Mauritius) Hldgs. Pvt. Ltd.*, 2014 WL 5654305 (Del. Ch. Oct. 31, 2014) | Denied | Glasscock |
| 2016 | *Williams Companies, Inc. v. Energy Transfer Equity, L.P.*, No. CV 12168-VCG, 2016 WL 3576682 (Del. Ch. June 24, 2016), *aff'd*, 159 A.3d 264 (Del. 2017) | Denied | Glasscock |
| 2018 | *Akorn, Inc. v. Fresenius Kabi AG*, No. CV 2018-0300-JTL, 2018 WL 4719347 (Del. Ch. Oct. 1, 2018), aff'd, 198 A.3d 724 (Del. 2018) | Denied | Laster |
| 2020 | *Realogy Holdings Corp. v. SIRVA Worldwide*, No. CV 2020-0311-MTZ, 2020 WL 4559519 (Del. Ch. Aug. 7, 2020) | Denied | Zurn |
| 2020 | *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, No. CV 2020-0310-JTL, 2020 WL 7024929 (Del. Ch. Nov. 30, 2020), judgment entered, (Del. Ch. 2021), and *aff'd*, 268 A.3d 198 (Del. 2021) | Denied | Laster |
| 2023 | *26 Cap. Acquisition Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434 (Del. Ch. 2023) | Denied | Laster |
| 2024 | *S'holder Representative Servs. LLC v. Renesas Elecs. Corp.*, No. 2023-1106-EMD, 2024 WL 5192070 (Del. Ch. Dec. 3, 2024) | Denied | Davis |

*Panel C: Cases in which Specific Performance was partial\**

| Year | Case | Specific Performance? | Judge |
|------|------|----------------------|-------|
| 2008 | *Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*, 965 A.2d 715 (Del. Ch. 2008) | Partial | Lamb |

**Exhibit 2. Empirical Sample of "Busted Deal" Transactions**

*Panel A: Completed Transactions*

| Party 1 | Party 2 | Public/ Private | Deal Outcome | Deal Outcome Date | % Change in Seller Value |
|---------|---------|-----------------|--------------|-------------------|--------------------------|
| Channel Medsystems, Inc. | Boston Scientific Corp. | Private | $275 million offer value. Chancery found no MAC and that Buyer was not entitled to terminate agreement. Completed at original value. | 12/18/2019 | 0.0% |
| Snow Phipps Group, LLC | KCAKE Acquisition, Inc. | Private | Yes $550 million offer value. Chancery found no MAC, granted specific performance, and ordered Buyer to close. Completed at original value. | 4/30/2021 | 0.0% |
| Bardy Diagnostics | Hill-Rom | Foreign | $375 million offer value. Chancery found no MAC and granted specific performance. Completed at original value. | 7/9/2021 | 0.0% |
| Level 4 Yoga, LLC | CorePower Yoga LLC | Private | $29.5 million offer value. Chancery found no MAC, that Seller had not breached a covenant, and ordered Buyer to close. | 3/31/2022 | 0.0% |

36

| | | | Completed at original value. | | |
|---|---|---|---|---|---|
| Accredited Home Lenders Holding Co | Lone Star Fund V US LP et al | Public | $15.10/share original offer value. Transaction settled and completed at $11.75/share. | 10/12/2007 | -22.2% |
| Dow Chemical | Rohm & Haas Co. | Public | $78.00/share original offer. Transaction settled and completed at original price plus interest at approximately $78.94/share. | 4/1/2009 | 1.2% |
| Yahoo! | Verizon | Public | $4.8 billion original offer value. Transaction settled and completed at price reduced by approximately $350 million. | 6/13/2017 | -7.3% |
| Simon Prop. Grp | Taubman Ctrs. | Public | $3.6 billion original offer value ($52.50/share). Transaction settled and completed at $43.00/share. | 12/29/2020 | -18.1% |
| Tiffany & Co. | LVMH Moet Hennessy-Louis Vuitton SE | Public | $16.2 billion original offer value ($135.00/share). Transaction settled and | 1/7/2021 | -2.6% |

| | | | completed at $131.50/share. | | |
|---|---|---|---|---|---|
| WeWork/Adam | SoftBank | Private | Neumann Softbank purchased roughly half the number of shares originally agreed upon. Transaction settled and completed on undisclosed terms. | 2/26/2021 | N/A |
| Cornerstone OnDemand, Inc. | Saba Software | Private | Cornerstone OnDemand closed its acquisition of Saba Software. Total transaction value decreased from $1.4B to $1.3B ($100M decrease). | 4/22/2020 | -7.14% |
| Advent International Corp | Forescout Technologies | Public | Forescout, a cybersecurity company, sued Advent after the PE firm pulled out of a deal to buy them for $1.9 Billion. Transaction settled: initial deal was for $33/share, new deal is for $29/share | 7/15/2020 | -12.9% |

*Panel B: Terminated Transactions*

| Party 1 | Party 2 | Public/ Private | Deal Outcome | Deal Outcome Date | % Change in Seller Value |
|---|---|---|---|---|---|
| Frontier Oil Corp. | Holly Corp. | Public | $172.5 million offer value (mixed offer worth approximately $28.96/share). Chancery found no MAC and awarded $1 of nominal damages. Terminated. Holly price increased to $34.27/share. | 4/29/2005 | 18.3% |
| Genesco, Inc. | The Finish Line Inc. & Headwind, Inc. | Public | $1.5 billion offer value ($54.50/share). TN Chancery found no MAC and ordered Buyer specific performance. Parties subsequently settled and terminated. Genesco stock price dropped to $24.77. | 3/3/2008 - | -54.6% |
| Hexion Specialty Chemicals, Inc. | Huntsman Corp., | Public | $28.00/share offer value. Chancery found no MAC and that Buyer had breached agreement. Parties subsequently settled and terminated agreement. | 12/14/2008 | -89.4% |

| | | | Huntsman price dropped to $2.98/share. | | |
|---|---|---|---|---|---|
| Cooper Tire & Rubber Co. | Apollo (Mauritius) Holdings Pvt. Ltd. | Public | $2.5 billion offer value ($35.00/share). Chancery found that Buyer could terminate because Seller breached a covenant and condition. Terminated. Cooper price dropped to $24.20/share. | 12/30/2013 | -30.9% |
| Akorn, Inc. | Fresenius Kabi AG | Public | $4.3 billion offer value ($34.00/share). Chancery found that Buyer could terminate due to MAC. Terminated. Akorn price dropped to $5.36/share. | 10/1/2018 | -84.2% |
| Boeing | Embraer | Public | Boeing $4.2 billion venture estimated value. Terminated by Boeing, with arbitration brough by Embraer against Boeing pending. | 4/25/2020 | N/A |
| AB Stable VII LLC | MAPS Hotels & Resorts | Private | $5.8 billion offer value. Chancery found no MAC, but that Buyer could terminate because Seller breached a covenant and condition. Terminated. | 12/8/2021 | N/A |
| Williams Cos. | Energy Transfer Equity L.P | Public | $33 billion offer value (mixed offer worth approximately $43.50/share). | 6/29/2016 (termination) | -40.4% |

| | | | Chancery found that Buyer was entitled to terminate merger upon failure of a condition but must pay $410 million fee. Terminated. Williams price dropped to $25.92/share. | 12/30/2021 (final Del. decision) - | |
|---|---|---|---|---|---|
| OpticalTel / HControl Holdings LLC | Antin Infrastructure Partners S.A.S. | Private | $230 million offer value. Chancery found Seller breach of representation allowing Buyer to back out of agreement. Terminated. | 5/29/2023 | N/A |
| Universal Entertainment | 26 Capital | Public | $2.5 billion deal. On 9/7/2023 Chancery said SPAC merger didn't need to be completed because 26 Capital engaged in improper conduct and forcing the deal to close might violate a Philippine court order. | 9/7/2023 | N/A |
| Kroger | Albertsons | Public | Kroger planned to buy Albertsons in a $20B deal. Albertsons terminated and filed lawsuit alleging that Kroger didn't do enough to | TBD | TBD |

| | | | | | |
|---|---|---|---|---|---|
| | | | seek regulatory approval. Litigation ongoing. | | |
| SLM Corp. | J.C. Flowers II LP, et al | Public | $25.0 billion original offer value ($60.00/share). Transaction settled and terminated including Seller debt refinancing. SLM stock price dropped to $20.45. | 1/28/2008 | -65.9% |
| GIC Private Ltd. | AmEx Global Business Travel | Private | PE firms GIC Private and Carlyle planned to acquire AmEx Global Business Travel in a $5B deal. Matter settled (confidential) with buyer terminating. | 2/9/2021 | N/A |
| Sycamore Partners | L Brands Inc. (owner of Victoria's Secret) | Public | Sycamore attempted to terminate their deal to buy L Brands, claiming target suffered an MAE due to COVID. $525 million offer value for 55% stake. In settlement, parties mutually agreed to drop lawsuits and terminate the deal. Stock closed at $12.04 on 5/4/2020 (down from $23.65 on 2/24/2020). | 5/4/2020 | -49.09% |

**Appendix A – Documents Considered**

**Case Documents:**

- *Giuseppe Pampena v. Elon R. Musk*, 3:22-cv-05937-TLT, Docket No. 1 (N.D. Cal. filed Oct. 10, 2022)

- *Giuseppe Pampena v. Elon R. Musk*, 3:22-cv-05937-CRB, Docket No. 48 (N.D. Cal. filed Dec. 23, 2023)

- *Giuseppe Pampena v. Elon R. Musk*, 3:22-cv-05937-CRB, Docket No. 34-1 at 105 (N.D. Cal. filed July 10, 2023)

- *Giuseppe Pampena v. Elon R. Musk*, 3:22-cv-05937-CRB, Docket No. 114 (N.D. Cal. filed Oct. 29, 2024)

- *Giuseppe Pampena v. Elon R. Musk*, 3:22-cv-05937-CRB, Docket No. 114, Exhibit A (N.D. Cal. filed Oct. 29, 2024)

**Expert Reports:**

- Adam Badawi, Expert Report, *Giuseppe Pampena v. Elon R. Musk*, N.D. Cal., May 28, 2025

- Emily Strauss, Expert Report, *Giuseppe Pampena v. Elon R. Musk*, N.D. Cal., May 28, 2025

**Documentary Evidence:**

- Confidentiality Agreement dated May 5, 2022 (MUSK-XHOLDINGS_00023104)
- Calendar Invite: Meeting on May 21, 2022 (MUSK-PAMPENA-0360309)
- Calendar Invite: Meeting on May 26, 2022 (MUSK-PAMPENA-0360316)
- Email from Gordon Graft to Adeeb Sahar (MUSK-PAMPENA-0622932)
- Calendar Invite: Meeting on June 13, 2022 (MUSK-PAMPENA-0897451)
- Calendar Invite: Meeting on July 1, 2022 (MUSK-PAMPENA-0360329)

**Other Supporting Documents:**

- *Twitter, Inc. v. Elon R. Musk, X Holdings I, Inc., and X Holdings II, Inc.*, 2022-0613, Complaint (Del. Ch. filed Jul. 12, 2022)

- Martin Korman, Deposition Transcript, Sept. 22, 2022
- Michael Ringler, Deposition Transcript, March 25, 2025
- William Savitt, Deposition Transcript, May 19, 2025

*All other sources cited herein.*

**Appendix B- Curriculum Vitae**

(6/30/2025)

**Edward B. Rock**

New York University School of Law
40 Washington Square South
New York, NY 10012
212-998-6363
email:  edward.rock@nyu.edu

**Employment**

| | |
|---|---|
| January 2018 - | Martin Lipton Professor of Law, New York University School of Law |
| July 2016 - | Professor of Law, New York University School of Law<br>Founder and Co-Director, Institute for Corporate Governance and Finance |
| October 2024 - | Distinguished Fellow, Faculty of Law, Hebrew University of Jerusalem |
| June 2020 – | Visiting Professor, Tel Aviv University Faculty of Law |
| October 2019 - | Fellow, European Corporate Governance Institute |
| January 2019 - | Reporter, Restatement of the Law, Corporate Governance, American Law Institute |
| September 2017 - | Fellow, American College of Governance Counsel |
| 2001 – 2015 | Saul A. Fox Distinguished Professor of Business Law<br>University of Pennsylvania Law School<br><br>Professor of Business Economics and Public Policy (secondary)<br>The Wharton School<br>University of Pennsylvania |
| 2012 - 2015 | Senior Advisor to the President and Provost<br>Director, Open Course Initiatives<br>University of Pennsylvania |

45

| | |
|---|---|
| Fall 2011 | Visiting Professor of Law, NYU School of Law |
| 1993 – 2015 | Professor of Law, University of Pennsylvania Law School. |
| 1993 – | Member, American Law Institute. |
| 1998 – 2010 | Co-Director, Institute for Law and Economics |
| 2006 – 2008 | Associate Dean for Academic Affairs. |
| Fall, 2005 | Lady Davis Fellow and Visiting Professor of Law, Hebrew University of Jerusalem. |
| Spring, 2000 | Visiting Professor of Law, Columbia University Law School, New York. |
| 1995-97 | Fulbright Scholar and Visiting Professor of Law, The Hebrew University of Jerusalem, Israel. |
| June, 1994 | Visiting Professor, International Banking and Capital Markets Law, Institut für Arbeits-, Wirtschafts- und Zivil Recht, Johann Wolfgang Goethe - Universität, Frankfurt am Main, Germany. |
| 1989-93 | Assistant Professor of Law, University of Pennsylvania Law School. |
| 1988 | Partner, Fine, Kaplan and Black, Philadelphia, Pa.  (Specializing in complex antitrust, corporate and securities litigation.) |
| 1983-1987 | Associate, Fine, Kaplan and Black, Philadelphia, Pa. |

**Education**

J.D., <u>magna cum laude</u>, University of Pennsylvania Law School, 1983.
> Associate Editor (1981-82) and Editor (1982-83), University of Pennsylvania Law Review.

B.A., <u>first class honours</u>, University of Oxford, 1980.  Philosophy and Politics.  Domus Scholar, 1979-80.

B.S., <u>cum laude</u>, Yale University, 1977.  Physics and Mathematics (minor in Philosophy).

**Scholarly Interests**

Research:  Corporations, Corporate Governance, Securities Regulation.

Courses Taught: Corporations, Mergers & Acquisitions, Regulation of Financial Institutions, Corporate Governance, Antitrust, Securities Regulation.

**Teaching Awards**

Gorman Award for Teaching Excellence (May 2013)

**Publications**

1. Explicit and Implicit Bundling in Shareholder Voting on Cleansing Acts (with Marcel Kahan), -- J. Corp. L. – (forthcoming 2025).

2. The Cleansing Effect of Shareholder Approval in a World of Common Ownership (with Marcel Kahan), -- Bus. Lawyer – (forthcoming 2025).

3. Institutional Investors in Corporate Governance in The Oxford Handbook of Corporate Law and Governance (2d edition) (2025).

4. Corporate Purpose: The US Discussion and the Restatement of the Law of Corporate Governance in The Public Corporation (Klaus Hopt and Jens-Hinrich Binder, eds) (OUP 2025).

5. Corporate Governance Welfarism (with Marcel Kahan), 15 J. Legal Analysis 108 (2023).

6. The ALI's Restatement of the Law of Corporate Governance: A Reply to Professor Bainbridge 78 Bus. Law. 451 (2023).

7. Does Common Ownership Explain Higher Oligopolistic Profits? (with Daniel Rubinfeld), in Intersections Between Corporate and Antitrust Law (Marco Corradi & Julian Nowag, eds.)(Cambridge University Press 2023), pp. 252-64.

8. Systemic Stewardship with Tradeoffs,  (with Marcel Kahan), 48 J. Corp. L. 497 (2023)

9.  Easterbrook and Fischel on Corporate Purpose, 1 U. Chi. B. L. Rev. 397 (2022).

10. Business Purpose and the Objective of the Corporation in Research Handbook on Corporate Purpose and Personhood (Elizabeth Pollman and Robert Thompson, eds.)(Elgar 2021), pp. 27-46.

11. Validation Capital, 99 Texas L. Rev. 1247 (2021).

12. For Whom is the Corporation Managed in 2020?:  The Debate Over Corporate Purpose,  76 Bus. Law. 363 (2021).

13. Index Funds and Corporate Governance: Let Shareholders be Shareholders (with Marcel Kahan), 100 B.U. L. Rev. 1753 (2020) (winner of the 2021 Investments & Wealth Institute (IWI) Governance Insight Award and selected as one of the "Top 10 Corporate and Securities Articles of 2020").

14. Antitrust and Coordinated Effects (with Daniel Rubinfeld), 83 Antitrust L. J. 201 (2020)

15. Antitrust for Institutional Investors (with Daniel Rubinfeld), 82 Antitrust L. J. 221 (2018) (winner of 2018 "Antitrust Writing Award." http://awards.concurrences.com/articles-awards/academic-articles-awards/ and selected as one of the "Top 10 Corporate and Securities Articles of 2018").

16. Anti-Activist Poison Pills (with Marcel Kahan), 99 B.U. L. Rev. 915 (2019).

17. Majority of Minority Approval in a World of Active Shareholders in The Law and Finance of Related Party Transactions (Luca Enriques and Tobias Tröger, eds.,)(Cambridge University Press 2019), pp. 105-135.

18. Does Majority Voting Improve Board Accountability?, (with Stephen Choi, Jill Fisch and Marcel Kahan), 83 U. Chi. L. Rev. 1119 (2016) (selected as one of the "Top 10 Corporate and Securities Articles of 2017").

19. Institutional Investors in Corporate Governance, The Oxford Handbook of Corporate Law and Governance 363-86 (2018).
    (available online at: http://www.oxfordhandbooks.com/view/10.1093/oxfordhb/9780198743682.001.0001/oxfordhb-9780198743682-e-23?p=emailAurJkIJ/sC7G2&d=/10.1093/oxfordhb/9780198743682.001.0001/oxfordhb-9780198743682-e-23 )

20. Corporate Law and the Legacy of American Legal Realism, 163 U. Pa. L. Rev. 2019 (2015).

21. Symbolic Corporate Governance Politics (with Marcel Kahan), 94 B.U. L. Rev. 1997 (2014)

(selected as one of the "The Top 10 Corporate and Securities Articles of 2015").

22. Adapting to the New Shareholder-Centric Reality, 161 U. Pa. L. Rev. 1907 (2013), (selected as one of the "The Top 10 Corporate and Securities Articles of 2013" and described in Kathryn J. Kennedy, "Notable Employee Benefits Articles of 2013," 143 Tax Notes 1308, 1313 (2013))

23. Shareholder Eugenics in the Public Corporation, 97 Cornell L. Rev. 849 (2012), (selected as one of the "Top 10 Corporate and Securities Articles of 2012" and reprinted in 54 Corporate Practice Commentator 607 (2012)).

24. The Insignificance of Proxy Access (with Marcel Kahan), 97 Va. L. Rev. 1347 (2011) (selected as one of the "Top 10 Corporate and Securities Articles of 2011")

25. When the Government is the Controlling Shareholder (with Marcel Kahan), 89 Texas L. Rev. 1293 (2011) (selected as one of the "Top 10 Corporate and Securities Articles of 2011")

26. When the Government is the Controlling Shareholder: Implications for Delaware (with Marcel Kahan), 35 Del. J. Corp. L. 409 (2010)

27. Embattled CEOs (with Marcel Kahan), 88 Texas L. Rev. 987 (2010) (selected as one of the "Top 10 Corporate and Securities Articles of 2010" and reprinted in 52 Corporate Practice Commentator 559 (2010))

28. The Anatomy of Corporate Law (second edition) (with Kraakman, Armour, Davies, Enriques, Hansmann, Hertig, Hopt, and Kanda) (Oxford University Press: 2009)

29. How to Prevent Hard Cases from Making Bad Law:  Bear Stearns, Delaware and the Strategic Use of Comity (with Marcel Kahan), 58 Emory L. J. 713 (2009) (selected as one of the "Top 10 Corporate and Securities Articles of 2009" and reprinted in Corporate Practice Commentator).

30. Hedge Fund Activism in the Enforcement of Bond Covenants, 103 Nw. U. L. Rev.281 (2009) (with Marcel Kahan)

31. The General Counsel of a Nonprofit Enterprise: Some Questions, 46 Houston L. Rev. 17 (2009)

32. On Improving Shareholder Voting, in Rationality in Company Law: Essays in Honour of DD Prentice (John Armour & Jenny Payne, eds.) (Hart: 2009) (with Marcel Kahan).

33. The Hanging Chads of Corporate Voting, 96 Geo. L. J. 1227 (2008) (with Marcel Kahan), (selected as one of the "Top 10 Corporate and Securities Articles of 2008" and reprinted in 50 Corporate Practice Commentator 531 (2008)).

34. Corporate Taxation and International Charter Competition, 106 Mich. L. Rev. 1229 (2008) (with Mitchell Kane).

35. Hedge Funds in Corporate Governance and Corporate Control, 155 U. Pa. L. Rev. 1021 (2007) (with Marcel Kahan) (winner of the 2007 De Brauw Prize for the best 2006 paper in the ECGI Law Working Paper series and selected as one of the "Top 10 Corporate and Securities Articles of 2007").

36. Corporate Flight, 36 Mishpatim 161 (2006) (in Hebrew)

37. The Corporate Form as a Solution to a Discursive Dilemma, Journal of Institutional and Theoretical Economics, 162(1), 57--71 (2006).

38. Symbiotic Federalism and the Structure of Corporate Law (with Marcel Kahan), 58 Vanderbilt L. Rev. 1573 (2005), (selected as one of the "Top 10 Corporate and Securities Articles of 2006" and reprinted in 48 Corporate Practice Commentator 359 (2006)).

39. A New Player in the Boardroom: The Emergence of the Independent Directors' Counsel (with Geoffrey C. Hazard), 59 Business Lawyer 1389 (2004).

40. The Anatomy of Corporate Law: A Comparative and Functional Approach (with Reinier Kraakman, Paul Davies, Henry Hansmann, Gerard Hertig, Klaus Hopt, Hideki Kanda) (Oxford U. Press 2004).

41. Introduction (with Michael Wachter), Symposium, Corporate Control Transactions, 152 U. Pa. L. Rev. 463 (2003).

42. Corporate Constitutionalism: Antitakeover Charter Provisions as Precommitment (with Marcel Kahan), 152 U. Pa. L. Rev. 473 (2003).

43. Coming to America?: Venture Capital, Corporate Identity and U.S. Securities Law, in Global Markets, Domestic Institutions (Curtis Milhaupt, ed., Columbia University Press, 2003), 476-506.

44. How I Learned to Stop Worrying and Love the Pill:  Adaptive Responses to Takeover Law (with Marcel Kahan), 69 U. Chi. L. Rev. 871 (2002) (selected as one of the "Top 10 Corporate and Securities Articles of 2002" and reprinted in the *Corporate Practice Commentator*).

45. Dangerous Liaisons: Trust Law, Corporate Law and Inter-doctrinal Legal Transplants (with Michael Wachter),  96 Nw. U. L. Rev. 651 (2002).

46. Meeting by Signals, Playing by Norms: Complementary Accounts of Non-Legal Cooperation

in Institutions (with Michael Wachter), 36 U. Rich. L. Rev. 423 (2002) (Symposium on Eric Posner, Law and Social Norms)).

47. Securities Regulation as Lobster Trap: A Credible Commitment Theory of Mandatory Disclosure, 23 Cardozo L. Rev. 675 (2002).

48. Greenhorns, Yankees and Cosmopolitans: Venture Capital, IPOs, Foreign Firms & U.S. Markets, 2 Theoretical Inquiries in Law 711 (2001). Reprinted in Venture Capital Contracting and the Valuation of High Technology Firms (Joseph A. McCahery and Luc Renneboog, editors)(Oxford University Press, 2004).

49. Introduction (with Michael Wachter), Symposium, Norms & Corporate Law, 149 U. Pa. L. Rev. 1607 (2001)

50. Islands of Conscious Power:  Law, Norms and the Self-Governing Corporation (with Michael Wachter), Symposium, Norms & Corporate Law, 149 U. Pa. L. Rev. 1619 (2001)

51. Encountering the Scarlet Woman of Wall Street: Speculative Comments at the End of the Century, 2 Theoretical Inquiries in Law 237 (2000).

52. Corporate Law as a Facilitator of Self Governance  (with Michael Wachter), 34 Georgia L. Rev. 529 (2000).

53. Waiting for the Omelet to Set: Match-Specific Assets and Minority Oppression in the Close Corporation (with Michael Wachter), in Concentrated Corporate Ownership, (NBER/University of Chicago Press, 2000, Randall Morck, editor) and 24 J. Corp. L. 913 (1999).  Reprinted in 42 The Corporate Practice Commentator 1 (2000).  Reprinted in The Governance of Close Corporations and Partnerships: US and European Perspectives (Joseph A. McCahery, Theo Raaijmakers and Erik P.M. Vermeulen, editors) (Oxford University Press, 2004).

54. Tailored Claims and Governance:  The Fit Between Employees and Shareholders (with Michael Wachter), Employees & Corporate Governance, (Margaret Blair and Mark Roe, eds.) (Brookings Institution: 1999).

55. Asset Restructuring and Union Bargaining (with Michael Wachter),   New Palgrave Dictionary of Law and Economics, pp. 98-107 (1998).

56. Collective Bargaining over Asset Restructuring (with Michael Wachter), 1 U. Pa. J. Lab. & Emp. L. 201 (1998).

57. Saints and Sinners: How Does Delaware Corporate Law Work?, 44 U.C.L.A. L. Rev. 1009 (1997)( selected as one of the "Top 10 Corporate and Securities Articles of 1998").

58. America's Shifting Fascination with Comparative Corporate Governance, 74 Wash. U. L. Q. 367 (1996).

59. The Enforceability of Norms and the Employment Relationship, 144 U. Pa. L. Rev. 1913-1952 (1996) (with Michael Wachter).

60. Foxes and Hen Houses?:  Personal Trading by Mutual Fund Managers, 73 Wash. U. L. Q. 1601-1642 (1995).  Reprinted in 38 Corporate Practice Commentator 85 (1996).

61. America's Fascination with German Corporate Governance, 40 Die Aktiengesellschaft 7/1995, 291.

62. Controlling the Dark Side of Relational Investing, 15 Cardozo L. Rev. 987-1031 (1994)(selected as one of the "Top 10 Corporate and Securities Articles of 1994").

63. Labor Law Successorship: A Corporate Law Approach (with Michael Wachter), 92 Mich. L. Rev. 203-260 (1993).

64. Book Review (Louis Lowenstein, Sense and Nonsense in Corporate Finance), 17 J. Corp. L. 605-614 (1992).

65. Corporate Law Through An Antitrust Lens, 92 Colum. L. Rev. 497-561 (1992).

66. The Logic and (Uncertain) Significance of Institutional Shareholder Activism, 79 Geo. L. J. 445-506 (1991).  Reprinted in the 1992 Securities Law Review.

67. Antitrust and the Market for Corporate Control, 77 Calif. L. Rev. 1365-1428 (1989).


**Invited Presentations (partial list)**

"Corporate Purpose: The US Discussion and the Restatement of the Law of Corporate Governance,"  The Public Corporation and Its Environment: How 'Public" Is It?, Tuebingen, Germany (June 23-24, 2022)

"Draft Restatement of Corporate Governance Section 2.01" (BYU Deals Conference, March 5, 2020).

"For whom is the corporation managed in 2020? The debate over corporate purpose" (Center for Contract and Economic Organization, Columbia Law School, January 27, 2020)

"Draft Restatement of Corporate Governance Section 2.01" (NYU ICGF Roundtable, December 6, 2018).

"Antitrust for Institutional Investors" (Israel Law and Economics Association, December 17, 2017; YLS Center for the Study of Corporate Law's Weil Gotshal & Manges Roundtable, April 6, 2018)

"MOM Approval in a World of Active Shareholders", (BYU Deals Conference, March 2, 2018; Law & Finance of Related Party Transactions conference, Frankfurt, Germany, October 20-21, 2018)

"Anti-Activist Poison Pills" (Boston University Law School, March 3, 2016); Stanford Law School, October 28, 2015).

Panelist, "Law Professors as Expert Witnesses," Widener Institute of Delaware Corporate and Business Law (April 24, 2015)

Commentator on Eric Talley, "Corporate Inversions and the Unbundling of Regulatory Competition" at Yale Law School Roundtable (March 27, 2015)

Panelist, "Hedge Funds," Midwest Finance Association, Chicago, Ill. (March 6, 2015)

"Corporate Law Doctrine and the Legacy of American Legal Realism," U. Pa. L. Rev. Symposium (October 24-25, 2014)

"Institutional Investors," Authors' Conference, "Oxford Handbook of Corporate Law and Governance" (Columbia Law School, March 21-22, 2014)

"Symbolic Corporate Governance Politics": Israeli Law and Economics Conference (December 16, 2013; Tel Aviv University); University of Western Ontario (March 27, 2014); Penn/NYU Law and Finance Conference (February 28, 2014).

"Adapting to the New Shareholder-Centric Reality: Implications for Directors," Corporate Governance Roundtable on "The Role of the Board of Directors in the 21st Century," Ross Parsons Centre of Commercial, Corporate and Taxation Law, University of Sydney Law School, September 13, 2013.

"Embattled CEOs", Distinguished Speaker Address, Ross Parsons Centre of Commercial, Corporate and Taxation Law, University of Sydney Law School, September 12, 2013.

"Adapting to the New Shareholder-Centric Reality", University of Saskatchewan College of Law, March 26, 2012.

"Shareholder Eugenics in the Public Corporation," Columbia Law School, November 30,

53

2011.

"Shareholder Eugenics in the Public Corporation,"  NYU Law School, October 3, 2011.

"When the Government is the Controlling Shareholder," Yale Law School, February 3, 2011.

"Ethics in the New Reality," IdeasLab, Davos World Economic Forum, January 28, 2011.

"When the Government is the Controlling Shareholder," Hebrew University Conference in Memory of Stephen Goldstein, December 15, 2010.

"Taking Politics as Markets (Too) Seriously," Tel Aviv Faculty of Law, December 13, 2010.

"When the Government is the Controlling Shareholder," Stanford Law and Economics Workshop, November 11, 2010.

"When the Government is the Controlling Shareholder," Harvard Law and Economics Workshop, November 9, 2010.

"Antitrust through a Corporate Law Lens,"  Berkeley Law and Economics Workshop, March 8, 2010.

"When the Government is the Controlling Shareholder," 2010 Penn/NYU Law and Finance Conference, February 26, 2010.

"When the Government is the Controlling Shareholder: Implications for Delaware," 2009 Francis G. Pileggi Distinguished Lecture in Law, Wilmington, Delaware, October 9, 2009.

"The Hanging Chads of Corporate Voting," Seminar, U.S. Securities Exchange Commission, September 15, 2009.

Summer School, "The Anatomy of Corporate Law," University of Tokyo, August 2009.

 "Tenured Voting Common: A Reassessment" (with Toni Rembe): presented at the Rock Center for Corporate Governance, April 30, 2009.

"On Improving Shareholder Voting,"  presented at the Leet Symposium on "Institutional Investors in Corporate Governance: Heroes or Villians," April 17, 2009

"The Embattled CEO," presented at the Harvard/Sloan Foundation Corporate Governance Research Conference, March 27, 2009.

"On Improving Shareholder Voting," presented at Festschrift for Prof. DD Prentice, Oxford University, February 6, 2009.

"Picking Your Shareholders," presented at Columbia Law School "Deals" Roundtable, November 14, 2008.

"The General Counsel of a Nonprofit Enterprise: Some Questions," presented as comment on Geoff Hazard's talk at the Frankel Symposium, Univ. of Houston Law Center, November 7, 2008.

"Hedge Fund Activism in the Enforcement of Bond Covenants," ILE/Oxford Roundtable, Oxford, England, June 6, 2008.

"The Hanging Chads of Corporate Voting," University of Toronto Law Faculty, Law and Economics Workshop, April 2, 2008.

"Hedge Fund Activism in the Enforcement of Bond Covenants," Vanderbilt/Amsterdam conference on hedge funds, Sardinia, Italy, March 20-21, 2008.

"The Hanging Chads of Corporate Voting," Northwestern U. Law School Law and Economics workshop, January 28, 2008.

"The Hanging Chads of Corporate Voting," Amsterdam Center for Law & Economics conference on "Activist Investors, Hedge Funds and Corporate Governance," March 8-9, 2007.

"Hedge Funds in Corporate Governance and Corporate Control," Tel Aviv University Law Faculty Law and Economics Workshop, March 23, 2006.

"Taxes and Charter Competition", Joint Conference Georgetown-Sloan/Anton Philips Fund on International Markets and Corporate Governance, October 28-29, 2005.

"The Corporate Form as a Solution to a Discursive Dilemma", presented at the Max Planck Institute for Research on Collective Goods conference on "Interacting with a Corporate Actor" at Kloster-Irsee, June 2 - 4, 2005.

"Our Corporate Federalism and the Shape of Delaware Corporate Law" USC/UCLA Roundtable, March 19, 2004.

"Corporate Constitutionalism: Antitakeover Charter Provisions as Pre-Commitment," University of Michigan Law School Law and Economics Workshop, February 13, 2003.

"Coming to America," Stanford Law School International Conference on "Cross-Listing of Emerging Market Companies on Foreign Exchanges," November 22-23, 2002.

"Coming to America," Columbia U. Law School Conference on "Global Markets, Domestic Institutions: Corporate Law and Governance in a New Era of Cross-Border Deals," April 5-6, 2002.

"How I learned to Stop Worrying and Love the Pill", Vanderbilt U. Law School Law & Business Conference, March 22, 2002.

"How I learned to Stop Worrying and Love the Pill", Tel Aviv Univ. Law School, March 12, 2002.

"Coming to America," Cambridge University Roundtable on Venture Capital, March 8, 2002.

"How I learned to Stop Worrying and Love the Pill", Cambridge University Law Faculty Workshop, March 5, 2002.

"How I learned to Stop Worrying and Love the Pill", University of Chicago Law Review Symposium, February 8-9, 2002

Invited Commentator, Conference on The Role of Judges in Corporate and Securities Law, University of Michigan Law School, April 20-21, 2001 (comment on Lyman Johnson, "Loyalty Discourse in Corporate Law").

"Islands of Conscious Power," Harvard Law School, March 20, 2001.

"Islands of Conscious Power," Vanderbilt Law School, January 29, 2001.

"Greenhorns, Yankees and Cosmopolitans: Venture Capital, IPOs, Foreign Firms & U.S. Markets." Conference on Protecting Investors in a Global Economy, Tel Aviv University, June 27-28, 2000.

"Islands of Conscious Power," University of Cincinnati Law School, May 1, 2000.

"Islands of Conscious Power," Columbia Law School, April 10, 2000.

"Islands of Conscious Power," Boalt Hall (University of California at Berkeley), March 13, 2000.

"Teaching Corporate Law as Self Governing Norms," University of Georgia Law School, October 15, 1999.

"Waiting for the Omelet to Set: Match-Specific Assets and Minority Oppression in the Close Corporation," University of Colorado School of Law, March 1999.

"Securities Regulation as Lobster Trap: A Credible Commitment Theory of Mandatory Disclosure," NYU, November 1998.

"Mandatory Disclosure as Credible Commitment," Stanford Law School Law and Economics seminar, March, 1998.

"Tailored Claims and Governance:  The Fit Between Employees and Shareholders," presented at Columbia Law School's November 1996 conference on Employees and Corporate Governance (invited paper).  Commentator:  Jonathan Macey.

"Tailored Claims and Governance:  The Fit Between Employees and Shareholders," presented at the May 1997 meeting of the American Association of Law and Economics, Toronto, Ontario.

"Tailored Claims and Governance:  The Fit Between Employees and Shareholders," presented at Faculty Seminar, Hebrew University, October 1996.

"The Enforceability of Norms and the Employment Relationship," Faculty Seminar, University of Haifa Law Faculty, March 13, 1996.

"Saints and Sinners:  The Peculiar Mechanisms of Delaware Corporate Law," Faculty Seminar, Hebrew University of Jerusalem, January 11, 1996.

"Personal Trading, Insider Trading and Mandatory Rules," Seminar, The Securities Authority of the State of Israel, June 21, 1994.

"America's Fascination with German Corporate Governance," Faculty Seminar, Hebrew University Faculty of Law, June 20, 1994.

"The U.S. Department of Justice's 1992 Merger Guidelines,"  Seminar, The Antitrust Authority of the State of Israel, June 19, 1994.

"Personal Trading, Insider Trading and Mandatory Rules," Faculty Seminar, University of Haifa Faculty of Law, June 15, 1994.

"America's Fascination with German Corporate Governance," Lecture, Johann Wolfgang Goethe - Universität, Frankfurt am Main, Germany, June 7, 1994.

Lectures on U.S. Shareholder Litigation, Johann Wolfgang Goethe - Universität, Frankfurt am Main, Germany, June, 6-13, 1994.

Presentation on relational investing to the Finance, Corporate Governance, and Social Responsibility Committees of the Board of Directors, TIAA-CREF, July 9, 1993.

"Controlling the Dark Side of Relational Investing," Invited Presenter, Conference on Relational Investing, Columbia University Center for Law and Economic Studies, May 7, 1993.

"Labor Law Successorship, A Corporate Law Approach," Yale Law School's Law, Economics and Organization Workshop, April 15, 1993

Speaker, Wharton Senior Advanced Management Course, Antitrust Issues in Transnational Mergers, April 13, 1992

Invited Presenter, Section on Business Associations, American Association of Law Schools, Annual Meeting, January 5, 1992 (Institutional Investors and Corporate Governance).

Invited Presenter, Conflicts and Confidentiality: Trouble at Upper Black Eddy (University of Pennsylvania Law School Center on Professionalism materials), Section of Business Law, American Bar Association, August 12, 1991.

Invited Commentator, Conference on the Future of Corporate Governance, Columbia University Center for Law and Economic Studies, May 10 - 11, 1991 (comment on John Coffee, Liquidity versus Control, 91 Colum. L. Rev. 1277 (1991)).

"The Logic and (Uncertain) Significance of Institutional Shareholder Activism," Faculty Workshop, University of Pennsylvania Law School Legal Studies Seminar, January 28, 1991.

"The Logic and (Uncertain) Significance of Institutional Shareholder Activism," Faculty Workshop, University of Miami School of Law, December 11, 1990.

Co-chair, The Berger Program on Complex Litigation, November 16, 1990 (Issues in Parallel Civil and Criminal Litigation)

The Law and Economics of Corporate Law, a one day presentation to justices of the Delaware Supreme Court and the Chancellor and Vice-Chancellors of the Delaware Chancery Court, February 2, 1990 (w/ Michael Wachter)

Comment on Heidi Hurd, <u>Challenging Authority</u> (100 Yale L. J. 1611 (1991)). University of Pennsylvania Law School Legal Studies Seminar, December 1, 1989.

Presentation on the Racketeer Influenced and Corrupt Organizations Act, Wharton Board of Overseers, April 6, 1989.

"Antitrust and the Market for Corporate Control," University of Pennsylvania Ad Hoc seminar, March 27, 1989.

**Bar Memberships**

Pennsylvania (inactive); United States District Court (E.D. Pa.); United States Court of Appeals (3d Cir.).

**Appendix C- Prior Testimony:  2020-present**

In the following matters, I provided a report, was deposed as an expert, and testified:

*The Resource Group v. Chishti* (JAMS arbitration 2024)

*Kellner v. AIM Immunotech, Inc.* C.A. No. 2023-0879-LWW

*In re CVR Refining, LP Unitholder Litigation, C.A. No. 2019-0062-KSJM* (Del. Chan. 2021)

In the following matters, I provided a report and testified:

*Nano Dimensions v. Stratasys* (Economic Court, Tel Aviv, Israel, 2023)

*Confidential Arbitration* (2021)

In the following matters, I provided a report and was deposed as an expert (but did not testify at trial):

*In re: Juul Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation,* Case No. 19-md-02913-WHO (USDC, N.D.Ca.) (2022)

*VTX Communications, LLC v. AT&T* (S.D. Texas 2022)