# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>    Defendant. | **CASE NO. 3:22-CV-05937-CRB** |

**EXPERT REPORT OF ADAM BADAWI**

MAY 28, 2025

**CONFIDENTIAL**

1

I.    **BACKGROUND AND QUALIFICATIONS**

1.    I am a Professor of Law at the University of California Berkeley School of Law ("Berkeley").  I joined the Berkeley faculty in 2017 after seven years on the faculty at Washington University School of Law (St. Louis).  At Berkeley, I teach Business Associations, Mergers & Acquisitions, Contracts, and seminars related to these subjects.  I have published widely on corporate governance and securities law topics.  My articles on these subjects have appeared in law reviews, including Michigan Law Review, California Law Review, Washington University Law Review, The Yale Journal on Regulation, the Harvard Business Law Review, and the Journal of Corporation Law, among others.  My work has also appeared in peer-reviewed journals, including the Journal of Law and Economics, the Journal of Law, Economics & Organization, the American Law and Economics Review, and the Journal of Empirical Legal Studies.  I have had multiple articles selected for inclusion in Corporate Commentator's list of the top ten corporate law articles of the year, which is determined by a vote of corporate law academics.

2.    My research often uses text analysis to analyze the content of corporate disclosures and litigation.[1]  This work has included analysis of securities prospectuses, annual and quarterly reports, and securities class action complaints.  My research has been cited multiple times by the Delaware Court of Chancery, the leading business court in the

---

[1] Text analysis is the use of machine learning and computation to classify and find patterns in large amounts of language.  I have performed text analysis on hundreds of millions of words contained in S-1 registration statements, proxy statements, 10-K annual reports, and 10-Q quarterly filings.  Building and tuning text analysis models requires with human reading and coding of these texts and I have spent hundreds of hours doing so.

United States, and in United States Securities and Exchange Commission ("SEC") comment letters.[2]

3.    I have published two books on corporate law.  The first, an edited volume, is a book on Corporate Law and Economics that appears in Edward Elgar Publishing's Encyclopedia of Law and Economics (2023).  The second is a casebook, Business Associations: Cases and Materials (2nd ed. 2023) (co-authored with Anthony J. Casey).

4.    I often present my work at the invitation of other law schools.  In recent years, I have presented at Yale Law School, the University of Chicago Law School, New York University Law School, Columbia University Law School, Northwestern Law School, University of Southern California Gould School of Law, the University of Amsterdam, and ETH Zurich, among others.

5.    I have had multiple papers accepted for presentation at the two most competitive conferences for corporate law: the Annual Meeting of the American Association of Law and Economics and the Conference on Empirical Legal Studies.  For the last several years, I have been the co-host, along with Ethan Klingsberg of Freshfields LLP, of the Berkeley Spring Mergers & Acquisitions Forum, which is a conference that brings together leading judges, government officials, academics, and practitioners to

---

[2] See, e.g., In re El Paso Pipeline Partners L.P. Derivative Litig., 132 A.3d 67, 130 n.79 (Del. Ch. 2015), reversed sub nom. El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff, 152 A.3d 1248 (Del. 2016); In re Dell Techs. Inc. Class v. S'holders Litig., 300 A.3d 679, 728 (2023); SEC, Comment Letter on SEC Statement, Jill E. Fisch, File No. cll12-8911728-244385 (2021); SEC, Comment Letter on SEC Statement, George S. Georgiev, File No. cll12-8945393-245744 (2021); SEC, Comment Letter on SEC Proposed Rule, George S. Georgiev, File No. 4-787 (2022).

discuss current topics in mergers and acquisitions practice, including the latest trends in due diligence.

6.    I have engaged in extensive service to the profession.  In 2024, I was elected as a director of the American Law and Economics Association by its members.  I am currently serving a three-year term in that position.  I am a past Co-President of the Society of Empirical Legal Studies, and I served on the editorial board for the International Review of Law and Economics.  I have served on the program committees for both the Annual Meeting of the American Association of Law and Economics and the Conference on Empirical Legal Studies.  I also frequently referee papers for the top peer-reviewed journals in Law and Economics, including the Journal of Law and Economics, the Journal of Law, Economics & Organizations, the Journal of Legal Studies, and the American Law and Economics Review.

7.    Prior to entering the legal academy, I was an attorney in the San Francisco office of Munger, Tolles & Olson.  I worked on corporate fiduciary litigation, complex commercial litigation, and served as counsel to multiple special committees of the boards of publicly listed companies.  Those committees conducted investigations into alleged wrongdoing, and I drafted reports that summarized the results of those investigations.  I also advised those committees on whether and how to disclose those results in their public filings.  In addition, I worked for and with several deal teams during my time in practice.  As part of that work, I performed due diligence in merger transactions and I advised due diligence teams in acquisitions, including an acquisition of a facility that manufactured biologic pharmaceuticals licensed by the FDA.

8.      A current copy of my curriculum vitae is attached as Appendix A.  I have written expert reports on securities and corporate matters and have had my testimony taken in depositions and in arbitration hearings as an expert.  A list of my previous expert engagements and testimony appears in Appendix A.

## II.    ASSIGNMENT

9.      I have been asked by Plaintiffs to opine on the acquisition of Twitter, Inc. ("Twitter") by Elon Musk ("Mr. Musk") through X Holdings I, Inc. and X Holdings II, Inc., which are entities controlled by Mr. Musk. These parties entered into an Agreement and Plan of Merger (the "Merger Agreement") in April 2022. Specifically, I have been asked to opine on:

A.  the customs and practice of M&A negotiations and agreements;

B.   how buyer or seller-friendly specific terms in the Merger Agreement were relative to contemporaneous deals for U.S. public targets;

C.  whether Mr. Musk's actions were consistent with the customary behavior of a remorseful buyer; and

D.  how Mr. Musk's attempt to terminate the Merger Agreement compare with the customary behavior of buyers who seek to terminate similar transactions.

10.     I am being compensated at my standard billing rate of $1,200 per hour.  I have been assisted by a research assistant, who worked under my direction.  My compensation in this matter is not based on the content of my opinions or the outcome of this matter.  My work in this case is ongoing, and I reserve the right to modify or supplement my opinions if I become aware of additional information, facts, or contentions

5

of the parties or witnesses, including any reports or opinions offered by Defendant's proposed experts, and I reserve the right to respond at trial to the opinions of the Defendant's proposed experts.

## III.    SUMMARY OF OPINIONS

11.    It is my expert opinion that: (1) it is customarily rare for an acquiror of a public company to waive due diligence because doing so entails a substantial risk; (2) a seller-friendly agreement for the acquisition of a public company will customarily contain provisions that make it extremely difficult to terminate the deal on the basis of information learned after the signing of the agreement, but before the closing of the transaction; (3) the Twitter Merger Agreement contained terms, including those relating to information requests by the buyer and the buyer's ability to terminate the transaction on the basis of that information, that are regarded as highly favorable to the seller under prevailing mergers and acquisitions custom and practice; (4) acquirors experiencing buyer's remorse will sometimes use tactics like delay and/or litigation to try to escape the deal or to extract price concessions from sellers; (5) the conditions after the signing of the Merger Agreement created the customary conditions for buyer's remorse; (6) as is customary, nothing in the Merger Agreement expressly stated that the deal would close even if Twitter did not accede to Mr. Musk's information demands, including those about the alleged number of "bots" on Twitter; (7) in a customary merger transaction, there is a significant amount of information that is not public that could give the buyer a basis to terminate the transaction; and (8) an agreement alone cannot guarantee that a deal will close because several

6

contingencies, such as government approval and a court's willingness to enforce the agreement, are beyond the control of the buyer and the seller.

## IV.   INTRODUCTION TO MERGERS AND ACQUISITIONS

12.     When one company seeks to acquire another, there are several deal structures that can achieve that outcome, with each bringing a variety of costs and benefits.  Mergers are a popular way to facilitate these acquisitions because they are legally simple and have lower transaction costs than other types of structures.[3]  Completing a merger of a public target company, as Twitter was, generally requires a vote of the target's shareholders.[4]  The buyer may also need to secure regulatory approvals under antitrust and other laws.[5]  The approvals required for a merger are not guaranteed, and there is some risk that general economic conditions or financial hardship would lead a buyer to sour on the deal and seek to walk away from the transaction.  To address these risks, parties will customarily enter into an agreement that provides not only the basic business terms but also has extensive provisions that cover the many contingencies that can arise between the signing of the deal and its closing.[6]  These provisions address the obligations of the parties before closing, detail the conditions that must be met before the transaction can be completed, and explain

---

[3] See Lou R. Kling, Eileen T. Nugent & Brandon Van Dyke, Negotiated Acquisitions of Companies, Subsidiaries and Divisions § 1.02 (Law Journal Press) (2024) (hereinafter Kling, Nugent & Van Dyke) (explaining that mergers are a creature of state statutes and allows the purchaser to acquire all the assets and liabilities of the target).
[4] Id. at § 2.03(2) ("The general rule is that … the shareholders of [the target corporation] in a merger must approve the transaction.")
[5] Id. at § 1.04(c)(i) (reviewing the typical regulatory approvals required in a merger).
[6] Id. at § 1.05 (calling the merger agreement the "cornerstone" of the transaction).

the circumstances that will allow one or both of the parties to terminate the deal, among other matters.

### A. The Role of Due Diligence

13.    Before a buyer enters into a merger transaction, it will customarily carry out a "due diligence" investigation. There are many reasons for conducting this due diligence.[7] For example, due diligence allows the buyer to better plan the transaction and prepare for post-closing integration of the target into the buyer. Due diligence also allows the buyer to confirm its beliefs about the target by investigating its assets, liabilities, and the truth of any statements the target has made. Due diligence can proceed in a number of ways, but it is common for a buyer to receive non-public information about the seller *prior* to signing a merger agreement.[8] This information can include management reports and projections, technical information, litigation reports, and board materials, among other types of information.

14.    While compositions vary, it is common to include lawyers, bankers, and auditors on a diligence team. These professionals will typically have access to a physical or virtual "data room" that has the diligence materials that the target makes available.[9] Most diligence takes place pursuant to a non-disclosure agreement that requires parties to keep this information confidential and dictates that information can only be used for the

---

[7] Claire A. Hill, Brian Quinn, and Steven Davidoff Solomon's Mergers and Acquisitions: Law, Theory, and Practice, 3d. 3rd Edition. West Academic Publishing (2023) (hereinafter, HQS), at 345-46.

[8] "Although a large number of target company materials are available publicly, there is usually a significant amount of information that remains confidential or inaccessible" *Id.* at 348.

[9] *Id.* at 347.

purposes of a potential transaction.[10]   The diligence team will often go through the information with a set of checklists that provides a framework for conducting due diligence into the target's structure, finances, material contracts, intellectual property, pending or threatened litigation, tax structure, and other topics that are important to a potential buyer. If this due diligence raises any questions or concerns, the diligence team will typically work with the target to answer those questions and to address any informational deficiencies.

15.     The due diligence memo and the disclosure letter are two important documents that diligence teams customarily produce.   The due diligence memo summarizes the findings from the investigation of the target.[11]   It typically includes an executive summary that provides an overview of the transaction, highlights any red flags or potential deal breakers, and provides recommendations about how to address those problems, such as through a price adjustment.[12]   The disclosure letter lists material assets and risks, such as pending or threatened litigation, material contracts, and intellectual property owned by the target.   This disclosure letter works in conjunction with the representations and warranties in the merger agreement, which are statements about the target that are true and correct at deal signing.   Those representations and warranties will be "brought down"—or tested—at closing to ensure that they remain sufficiently

---

[10] *Id.* at 314.

[11] *Id.* at 352.

[12] "If a due diligence finding affects the valuation of the target company, the buyer can adjust the merger consideration." *Id.* at 351.

accurate.[13]  If the disclosure letter lists a piece of information, such as a pending lawsuit against the target, that piece of information cannot be used to escape closing the transaction.  A typical litigation representation will thus provide that, except for cases and actions listed in the disclosure letter, there is no material litigation pending or threatened against the target.[14]

## B.  Diligence in Private and Public Transactions

16.    There are substantial differences in the due diligence investigations of private targets and public targets.  The lack of public disclosures for private targets and the frequent use of auditors outside the Big 4 accounting firms means that due diligence for private companies can often require more intense diligence of the target's finances.[15]  At the same time, buyers of private companies will typically have more flexibility to address a mismatch between what the buyer thought it was buying and what it received.  Private companies usually have a small number of shareholders, which means that the buyer can hold those shareholders liable for any breach of the representations and warranties.[16] Buyers customarily do this by putting part of the purchase price into escrow.  The buyer can then make claims against this escrow account if it discovers a liability that was not disclosed or discovered during the due diligence process.  The ability to get compensation

---

[13] *See infra* at §IV.B., discussing that most public target merger agreements contain seller-friendly language that makes it very difficult for a buyer to escape a transaction even if there is a substantial variance between the representations and reality at closing.

[14] HQS at 351.

[15] *Id.* at 444.

[16] *Id.* at 444-45.

for any liabilities that a buyer discovers after closing takes some pressure off of the search for those liabilities prior to signing a private merger agreement.

17.    In contrast, risk allocation when purchasing public company targets is typically all done before closing.[17]  Public companies can have millions of individual shareholders and that means that seeking recourse from them after closing is functionally impossible.[18]  For that reason, it is critical that buyers of public targets discover as much information as they need to make the purchase decision during the pre-signing due diligence investigation and prior to closing, when the representations and warranties will be brought down.[19]  The public nature of the target does provide some assistance in the due diligence process.  Securities laws require public companies to file quarterly and annual reports that disclose material financial, operational, and other information to investors.[20]  The public company accountants that vouch for the financials in public disclosures also help ensure the reliability of information in public disclosures.[21]  These mechanisms contribute to the reliability of these disclosures, which aids due diligence investigations into public company targets, at least to a point.

---

[17] *Id.* at 443.

[18] *Id.* at 444.

[19] "As a result, completing a thorough due diligence investigation is of critical importance since the buyer cannot recover losses after closing." *Id.* at 346. *See also* Kling, Nugent & Van Dyke § 8.01 ("it is obvious that the Buyer will need to conduct a great deal of due diligence in transactions where indemnification is limited or nonexistent [as is the case in public target mergers]."

[20] *Id.* at 345.

[21] "[T]he company's accounting firm, for instance, is named in its public filings, and has legal obligations itself." *Id.* at 444.

18.     A customary due diligence investigation of a public target will begin with the public disclosures of that company.  The buyer will typically seek to supplement that information with the non-public information that the target makes available.[22] The representations and warranties in the agreement will typically bind the seller to this information through financial reports[23] and 10b-5 representations.[24] The financial reports representation will usually state that all of the financial statements in the target's SEC filings were prepared in accordance with Generally Accepted Accounting Principles (GAAP) in all material respects and present an accurate financial picture of the company. The 10b-5 representation typically provides that all of the information in the target's SEC filings do not contain an untrue statement or omit any material fact that would be required to make the statements not misleading.[25]

19.     Buyers of public companies will use non-public information for two primary purposes.  The first is to add to its general understanding of the target's business, finances, and structure during the pre-signing due diligence investigation.[26] Not all the information that may be important to a potential buyer will appear in the target's public disclosures. For example, a target may disclose its investments in research and development and provide some information about its future plans in its quarterly statements and annual

---

[22] *Id.* at 348-349.
[23] *Id.* at 349
[24] "The 10b–5 representation is a relatively common representation given by sellers in public transactions." *Id.* at 384.
[25] Unlike the legal standard for 10b-5 cases, the customary 10b-5 representation does not contain any scienter requirement. That is, a buyer can typically refuse to close if there is a violation of this representation without having to prove any intent to deceive by the target.
[26] "Some information is difficult to learn from just reading documents." HQS at 348.

12

reports.  However, a potential buyer would typically want much more information about the operational details of those plans and the projections for their success.  Diligence that goes beyond public filings may also uncover concerns and liabilities that have not been disclosed.

20.    The second use of non-public information is for the much more limited purpose of covering any investigation that occurs between signing and closing.  As a leading treatise emphasizes, in most cases, buyers "essentially complete[] their due diligence" when they finalize the merger agreement.[27]  Any continuing investigation will tend to be limited to business and integration issues and this process will not add to any rights or obligations, which the parties fix in the agreement.[28]  "***Hence, it is critical for the parties to be satisfied with their investigations at the time of signing the acquisition agreement.***"[29]

21.    The merger agreement will specify the buyer's post-signing information rights and the process for the exchange of that information.  This language typically appears in the "Access to Information" covenant and is customarily a point of negotiation between the buyer and the target.  When these terms are buyer-friendly, these information rights will be robust and allow the buyer to conduct extensive post-signing due diligence.  If the buyer has substantial negotiating leverage, it may also be able to negotiate a diligence condition that allows it to avoid closing if the buyer is not satisfied by what it learns through

---

[27] Kling, Nugent & Van Dyke § 1.04(b).
[28] *Id*. at n. 9. (explaining that the buyer may also use information to verify the seller's representations when they are brought down to closing).
[29] Id.

a post-signing investigation.  If these terms are seller-friendly, these rights will be much more restricted.  In a seller-friendly situation, a buyer will typically only be able to access information that is necessary to close the merger, the seller will have broad discretion to deny information requests, and the buyer will have less ability to escape closing on the basis of that information.[30]

22.     In a seller-friendly merger agreement, the bring-down condition will severely restrict the buyer's ability to escape the deal even if information emerges that is at odds with the seller's representations, including those about its public filings.  This type of bring-down condition will only be breached if the failure of the representations to be true and correct, either individually or collectively, amount to a "material adverse effect" (MAE).[31]  As explained below, this is an extremely high bar because it is very difficult to show that a breach of the bring-down provision reaches that level.[32]  The difficulty of escaping a deal on the basis of information learned after signing places even more importance on the pre-signing due diligence process investigation that a buyer performs.

### C.     What It Means to Waive Due Diligence

23.     When the buyer of a public target waives its opportunity to perform due diligence, that buyer typically relies on public information, and any other information it

---

[30] A seller-friendly agreement will not have a diligence condition and the bring-down condition will only be met if the failure of the seller's representations to be true causes an MAE. *See* ¶21.

[31] "A bring down condition that qualifies representations as being true to the extent the deviation does not result in a material adverse effect places the risk with the buyer. Bring down conditions qualified by MAEs are common in transactions involving public company sellers." HQS at 404

[32] "The buyer will have the most difficulty being excused from closing if what is required is that the breach, together with other breaches, constitutes a material adverse effect" *Id.* at 406.; *see also Akorn*, *infra*.

may have, when making the decision to acquire the target.[33]   Given the importance of understanding the target's business and the risks to it, it is not surprising that waiving due diligence is extremely rare.[34]  Accordingly, waiving due diligence can create conditions for buyer's remorse because, if the buyer later determines it wants more information, the buyer will have few or no options for recourse.[35]

24.    Waiving due diligence creates the potential for the buyer to later want to try to get out of the contract, which means that buyers will only skip diligence in a handful of situations.  One is where the buyer knows the seller's business extremely well.[36]  For example, if the parties are in the same industry and have worked together closely through several joint ventures, the buyer may believe it has a strong command of the seller's business.  That knowledge limits the risk associated with waiving due diligence and the

---

[33] "[A] buyer considering a hostile takeover can conduct a due diligence review entirely from public sources and proceed without the cooperation of the target…" HQS at 345.

[34] Cf Kling, Nugent & Van Dyke § 8.01 ("As a basic rule, the Buyer can never do too much due diligence: even in situations where nothing particularly troublesome about the business has been uncovered, the increased knowledge about the business gained by virtue of the process puts the Buyer in a better position to negotiate (or renegotiate) the purchase price and to tailor the appropriate representations and warranties in the acquisition agreement.")

[35] "In general, a 'blind' bid, without the ability to conduct due diligence, is subject to the well-known 'lemons problem,' in which the bidder has likely overpaid when the target accepts the offer." Guhan Subramanian, *Bargaining in the Shadow of Takeover Defenses*, 113 Yale L.J. 621, 649 (2003). See also Kling, Nugent & Van Dyke § 8.01 ("While no technique totally eliminates the risk of unknown liabilities resulting in significant losses after the closing, it is the due diligence process that affords the Buyer the opportunity to minimize this risk as much as possible with respect to known and preexisting aspects of the business.")

[36] *See* Expert Report of John C. Coates in Twitter Inc. v. Elon Musk, et al (hereinafter Coates). Professor Coates conducted a study of 86 merger agreements signed in the two years prior to the Twitter acquisition that involved public U.S targets. *Id.* at 35-36. The buyer waived due diligence in only one of those deals and that merger involved a target that the CEO of the buyer, Warren Buffet, had closely observed for sixty years. *Id.* at 19 (citing "Berkshire Hathaway to Acquire Alleghany Corporation for $848.02 Per Share in $11.6 Billion Transaction," Business Wire, March 21, 2022).

time saved by skipping the process can make it less likely that a third party will also make a bid for the seller.

25.     Another context where a buyer may forego due diligence is a hostile transaction.[37]  When the target is unwilling to entertain a transaction, that naturally means that it will not allow the aspiring buyer to conduct due diligence.  The buyer may then make a hostile tender offer to the shareholders, which, if successful, would begin an acquisition process without any diligence.  But, since the advent of the shareholders' rights plan— more commonly referred to as the "poison pill"—it has become virtually impossible to acquire a company through a hostile tender offer.[38]  These days, a hostile tender offer is usually used as a negotiating tactic to bring the would-be target to the table.  If the target is willing to bargain, the seller can then use the waiver of the right to perform due diligence as a condition of moving forward.

26.     A buyer may also waive due diligence when there is competition among potential purchasers.[39]  A willingness to skip the time and expense associated with diligence can make a bid more attractive to a seller who has several bids before it.  That

---

[37] HQS at 345.

[38] The poison pill was developed in the 1980s to stymie hostile tender offers. *See* Marcel Kahan and Edward B. Rock, *How I Learned to Stop Worrying and Love the Pill: Adaptive Responses to Takeover Law*, 69 University of Chicago Law Review 871, 875-78 (2002) (reviewing the development and effectiveness of the pill). This pill will set an ownership threshold—typically in the 10 percent to 20 percent range—that triggers the plan if any single person or entity acquires an ownership amount that exceeds that threshold. Once triggered, the plan allows every other shareholder to acquire additional shares of the target at an attractive discount. A hostile tender offer to acquire a controlling share of the target would, if successful, trigger the plan and result in the immediate dilution of the offeror. For this reason, the pill is a highly effective deterrent to hostile tender offers.

[39] Guhan Subramanian, Dealmaking: The New Strategy of Negotiauctions 32-33 (2d ed. 2020).

same dynamic may be at play when a potential seller is reluctant to enter a transaction. An offer that includes a willingness to limit or eliminate any due diligence may make the seller more inclined to accept the deal. Sellers who have this leverage may also be able to limit the ability of the buyer to conduct any post-signing investigation of the seller and may be able to restrict or eliminate the buyer's ability to escape the deal if the buyer is not satisfied with the post-signing information it receives.

### D. Buyer's Remorse in Merger Transactions

27.    A leading reason for buyer's remorse is the buyer coming to the belief, after signing, that it is overpaying for what it is receiving. Buyer's remorse can also occur when an economy-wide or buyer-specific crisis occurs between signing and closing. This section details several reasons why buyers experience pre-closing remorse and explains the customary reactions to that remorse.

28.    When a buyer learns new information about the seller after signing, that can lead to a belief that the buyer is overpaying. The buyer's options at that point will depend on the rights it has negotiated in the merger agreement. A buyer-friendly agreement may allow the buyer to walk away by paying the target a modest termination fee.[40] That type of contract may also provide the buyer with the flexibility to escape the transaction if the new information is not consistent with the representations and warranties that the parties negotiated. The buyers' options will be more limited in seller-friendly contracts, which

---

[40] "[A] buyer who is unwilling to proceed at the original purchase price can use a plausible MAC claim, together with the reverse break-up fee provision, to either renegotiate the purchase price or exit at a cost below the fee." Reverse Break-Up Fees and Specific Performance, Practical Law Practice Note 8-386-5095

will customarily contain a right to specific performance.[41]  That right allows the seller to seek a court order that forces the buyer to close the transaction.  And, as explained above, seller-friendly merger agreements generally limit the buyer's post-signing information rights and the buyer's ability to escape the deal *even if* the target's public filings turn out to be incorrect.[42]

29.    A lack of interest from other potential bidders may trigger buyer's remorse. If the target runs an auction for itself, a winning buyer may experience some regret if it learns that its bid was much higher than any others or if it comes out that there was only one bidder.[43]  When a target sells itself through a one-on-one negotiation with a buyer, the so-called *Revlon* duties of the selling board will generally require it to conduct a post-signing market check.[44]  The merger agreement will provide the rights and restrictions that govern the target's ability to test the market for a higher bid.  The agreement will customarily require the target to provide any information about third party bids to the

---

[41] Most public company deals include a right to seek specific performance. Am. Bar Ass'n, Mergers & Acquisitions Comm., *2024 ABA Deal Points Study*, Tableau Public, https://public.tableau.com/app/profile/aba.deal.points/viz/2024ABADealPointsStudy/Home#1 (last visited May 10, 2025).

[42] "[A] buyer's principal escape hatch in response to adverse post-signing diligence discoveries or breaches of representations is proving the occurrence of an MAE … a very high burden." Abbe L. Dienstag, Alan R. Friedman, Adi Herman & Ernest S. Wechsler, *Once More Unto the (Material) Breach: Twitter Sues Elon Musk to Enforce Agreement*, Kramer Levin (July 13, 2022), https://www.kramerlevin.com/en/perspectives-search/once-more-unto-the-material-breach-twitter-sues-elon-musk-to-enforce-agreement.html.

[43] The potential for overbidding has been called "the winner's curse." This phenomenon has been identified as one of the reasons why buyers in M&A transactions often underperform after significant acquisitions. *See* Tingting Liu, Tao Shu & Jasmine Wang, *Valuation Disagreement in Mergers and Acquisitions*, available at: https://papers.ssrn.com/sol3/Papers.cfm?abstract_id=3954130 (finding empirical support for the winner's curse in the M&A market).

[44] HQS at 678.

original buyer and will often allow the target to match any bid that emerges.[45]    This structure means that the buyer will acquire a substantial amount of information about the post-signing market for the target.  If no other bidders emerge during this process, that can also lead a buyer to believe that it may be overpaying for the target.

30.    A reversal of the buyer's fortunes can also lead to remorse.  That reversal can be the product of global or national events or it can be a predicament that is specific to the buyer.  The most recent example of a global economic crisis, the Covid-19 pandemic, produced several instances where buyers who signed pre-crisis deals sought to get out of those deals prior to a post-crisis closing.[46]  Sometimes it is only the buyer or the buyer's industry that experiences a predicament.  That can happen when, for example, the buyer experiences an unexpected downturn in its business, if there is a government investigation into alleged wrongdoing by the buyer, or if the buyer becomes involved in high-stakes litigation, such as a challenge to a key piece of the buyer's intellectual property.  If these circumstances happen prior to closing a signed deal, the buyer's regret may lead to an attempt to escape or alter the merger.

**E.  Remorseful Buyer's Options Largely Depend on the Merger Agreement**

31.    A remorseful buyer has a choice of tactics.  Those tactics will customarily depend on the buyer's ultimate goals and rights of the buyer and the target in the merger

---

[45] "[I]n combination, information rights and matching rights put the initial bidder in a very good position in any post-signing bidding contest." *Id.* at 400.

[46] *See, e.g.*, the dispute between Tiffany and LVMH, Tiffany & Co. v. LVMH Moët Hennessy-Louis Vuitton SE, et al., C.A. No. 2020-0768-JRS (Del. Ch. Sept. 9, 2020) and AB Stable VIII LLC v. MAPS Hotels & Resorts One LLC, No. 71, 2021, 2021 WL 5832875 (Del. Dec. 8, 2021).

19

agreement. Some buyers may still be willing to purchase the target if they can negotiate a lower price, while others may be unwilling to acquire the target for any amount. The buyer, will, of course, have an easier time obtaining its desired result when the merger agreement's terms favor the buyer.

32.    If, for example, in a buyer-friendly agreement, the buyer has the right to walk away by paying a low reverse termination fee, it can threaten to do just that unless the seller makes a concession on price.[47] Where the buyer has negotiated favorable representations and warranties, the discovery of undisclosed negative information, such as a government investigation or the potential invalidity of an important patent, can give the buyer a right to walk away from the transaction. The buyer can use that right as leverage to negotiate its desired outcome.[48]

33.    A seller-friendly agreement limits the options available to a remorseful buyer. A seller's right to ask for specific performance will usually mean that the buyer cannot pay a modest fee and walk away without a reason. Rather, the buyer must find a justification to exit the agreement and, when that agreement contains the types of closing conditions that customarily favor the seller, that will be difficult to do. For that reason, it is worth reviewing the closing conditions and additional contract terms that favor the seller.

34.    Nearly all merger agreements will have a Material Adverse Effect ("MAE") condition that allows the buyer to refuse to close the transaction if anything happens

---

[47] The fee that a seller pays to a buyer if it sells itself to another party or if the shareholder vote fails is customarily referred to as a "termination fee." The fee that a buyer pays to a seller if it terminates the deal is customarily referred to as a "reverse termination fee."
[48] *See supra*, Reverse Break-Up Fees and Specific Performance.

between signing and closing that would have a material adverse effect on the business.[49] An MAE provision will typically define an MAE as anything that would have a "material adverse effect on the business, financial conditions or results of the Company" and customarily includes "carve outs," which are events and circumstances that are excluded from the determination of whether an MAE has occurred. Common carve outs include exclusions for industry-specific and economy-wide changes. While a longer list of exclusions is indicative of a seller-friendly deal, the reality is that the typical MAE condition already tilts heavily in favor of the seller. In Delaware, which is the leading jurisdiction for American corporate law, only once has a buyer's attempt to escape a deal under the MAE provision been successful. That case involved a pharmaceutical company that submitted false data to its primary regulator, the Food and Drug Administration ("FDA"), during the approval process for pharmaceutical products.[50]

35.    One of the most seller-friendly terms in an agreement is an bringdown condition for the seller's representations and warranties that requires a showing of an MAE.[51] This condition will be satisfied as long as the failure of the representations to be accurate, including representations about the target's public disclosures, does not amount

---

[49] "The MAE clause is thus the key element of the merger agreement dictating when and if a buyer has a right to refuse to close the transaction." HQS at 420.

[50] See Akorn, Inc. v. Fresenius Kabi AG, 198 A.3d 724 (2018). See also, Delaware Supreme Court Upholds Rare Ruling that Material Adverse Event Allowed Purchaser to Negate Merger, O'Melveny, December 20, 2018, available: https://www.omm.com/insights/alerts-publications/delaware-supreme-court-upholds-rare-ruling-that-material-adverse-event-allowed-purchaser-to-negate-merger/.

[51] Stephen L. Sepinuck, *Case Law Matters*, Bus. L. Today (Aug. 2022), https://www.americanbar.org/groups/business_law/resources/business-law-today/2022-august/case-law-matters/.

to a Material Adverse Effect. As explained above, that standard is so high that Delaware courts have found that conditions warranted the finding of an MAE only *once* in their history. The difficulty of meeting that standard means that even wide divergence between a target's representations and reality generally will not allow the buyer to escape the deal. In a buyer-friendly agreement, in contrast, the bring-down condition will require the seller's representations to be true in "all material respects." This language would allow a buyer to terminate even when a relatively unimportant representation is incorrect in a material way.[52]

36.    The lack of a financing condition also indicates a seller-friendly deal.[53] A buyer who needs to borrow money to finance its purchase of the seller will customarily want to condition its obligation to close on its ability to finance the transaction. When a seller has leverage in negotiations, it will typically omit this financing condition, which means that the buyer must close regardless of whether its financing is available or not.

37.    Seller-friendly agreements will omit any diligence condition.[54] This omission is typically evident in a buyer's representation that it is relying on its own

---

[52] *See* https://www.theventurealley.com/2010/07/understanding-the-bring-down-condition-in-public-company-mergers/ (explaining the difference between the "in all material respects" and MAE formulations of the bring-down conditions and explaining a shift toward the seller-friendly MAE language in public target merger agreements).

[53] "[N]o-penalty financing outs became increasingly rare in acquisition agreements. However, they remain a viable option for buyers in the context of distressed-asset sales or other circumstances in which the buyer has most of the negotiating leverage." Reverse Break-Up Fees and Specific Performance, Practical Law Practice Note 8-386-5095

[54] See Kling, Nugent & Van Dyke § 14.10 ("An extremely important, although relatively rare, condition is one giving the Buyer the right to refuse to close based on the results of its post-signing investigation of the Sellers or the Company" and noting that public companies are especially "loathe to agree to a due diligence condition.")

independent investigation of the seller and on its independent review and analysis of the seller's covenants.

38.    In addition to a specific performance right and the closing conditions listed above, several other provisions can indicate that an agreement is seller-friendly.  One of those is a covenant that obligates a buyer to make "best efforts" to consummate the transaction, including any financing commitments.[55]  A very seller-friendly version of this language will include a "hell-or-high-water" provision that requires the buyer to do everything necessary to close the financing commitments specified in the merger agreement.

39.    Seller-friendly agreements also limit the termination rights of buyers.  They can do so by requiring notice and an opportunity to cure[56] if the seller is not in compliance with any of its closing conditions and prohibiting a buyer from terminating if that buyer has materially breached its obligations under the agreement.[57]

40.    Despite a remorseful buyer's desire to escape, an agreement that contains seller-friendly provisions will make it difficult to do so.  In this situation, the seller can usually parry the buyer's claim of breach, or even an attempt to litigate the claim of breach, by citing the seller-friendly language in the agreement.  But it is important to emphasize

---

[55] HQS  at 392.

[56] "Most agreements provide a cure period." Roger A. Cooper & Mark E. McDonald, Cleary Gottlieb Steen & Hamilton LLP, *Navigating M&A Transactions with an Eye Towards Post-Closing Dispute Resolution*, Lexology (Apr. 16, 2024), https://www.lexology.com/library/detail.aspx?g=ead518fe-31ef-4882-abce-d5fa571015e0.

[57] "[I]n order to terminate a transaction agreement, the terminating party cannot itself be in material breach of the agreement." *Dienstag et al.*

that an agreement alone, no matter how seller-friendly it may be, can never provide complete certainty that a deal will close. While parties can ask a court to enforce merger provisions and even to order the buyer to close, that determination is in the equitable discretion of the court, rather than in the hands of the buyer and seller.

## V.    THE TWITTER TRANSACTION

41.    This section explains Mr. Musk's initial interest in Twitter and the process that led to the negotiation and signing of the Merger Agreement. It also explains that the Merger Agreement contained many of the provisions that are customarily considered seller-friendly.

### A.  Elon Musk Takes a Position in Twitter

42.    Before Mr. Musk acquired Twitter, he was a prolific user of its service. Beginning in January 2022, Musk started to accumulate Twitter stock.[58] As of March 14, 2022 he had purchased roughly 5 percent of Twitter's outstanding shares, although he did not disclose that fact publicly, as SEC regulations require.[59] Mr. Musk continued to acquire stock and, as of April 1, 2022, owned about 9.1% of Twitter's stock. He had still not complied with his disclosure obligations and did not do so until April 4, 2022. In response to that announcement, the price of Twitter's stock jumped 27% higher.[60]

43.    Mr. Musk allegedly discussed three strategies for his interest in Twitter. He could join the board, he could take Twitter private, or he could form a competitor.[61] Mr.

---

[58] Musk-Pampena-0238983.
[59] See *SEC v. Musk*, Case No. 25-cv-105, US Dist. Court, DC.
[60] Id. at ¶¶37-42.
[61] Musk-Pampena-0030517.

Musk and Twitter initially took the first approach.  The board invited Mr. Musk to become a Twitter director on April 3, which he accepted, and that agreement was announced to the public on April 5.[62]

### B.  Mr. Musk Makes an Offer for Twitter and Waives Due Diligence

44.    Mr. Musk then reneged on that acceptance on April 9.  Four days later, on April 13, Mr. Musk made an unsolicited offer for Twitter in a letter, which stated:[63]

> I am offering to buy 100% of Twitter for $54.20 per share in cash, a 54% premium over the day before I began investing in Twitter and a 38% premium over the day before my investment was publicly announced. My offer is my best and final offer and if it is not accepted, I would need to reconsider my position as a shareholder.

45.    The next day, Mr. Musk publicly announced this offer and explained that it was conditioned on customary business due diligence and his ability to obtain financing.[64] Also on that day, the Twitter board met with its financial advisor, Goldman Sachs, to discuss the proposal.  The board decided to implement a poison pill to insulate its shareholders from coercive or otherwise unfair takeover tactics.  The adoption and announcement of that plan took place on April 14.[65]

---

[62] See *SEC v. Musk*, Case No. 25-cv-105, US Dist. Court, DC, ¶43.
[63] Musk-Pampena-0018097.
[64] Musk-Pampena-0527029.
[65] See Twitter Form 8-K, filed April 15, 2022, available at
https://www.sec.gov/Archives/edgar/data/1418091/000119312522107462/d296740d8k.htm.

46.    In the meantime, Mr. Musk worked to secure financing for the offer.  As of April 20, he had committed $21 billion in equity financing and arranged for $25.5 billion of debt financing that was secured by $12.5 billion of Mr. Musk's Tesla stock.[66]

47.    On April 21, Mr. Musk announced that his bid was "no longer subject to financing" as a result of the financing commitments and was "no longer subject to business due diligence."[67]

48.    On Sunday, April 24, 2022, Musk sent a letter to the Twitter board reiterating that his offer of $54.20/share was "best and final."  He said he would propose a "seller friendly" merger agreement that he wanted signed quickly.[68]  His counsel sent a draft agreement, emphasized that the offer did not depend on any due diligence, and stated that the proposed contract was "a lean-in draft intended to make this easy on all to get the deal done asap."[69]

49.    The parties negotiated throughout the night.  Twitter insisted on including terms that would make the agreement more favorable to it.[70] The next day, the Twitter board met to discuss the agreement.  After Goldman Sachs and J.P. Morgan presented their opinions that the price was fair, the board approved the Merger Agreement and recommended that Twitter shareholders vote in favor of the merger.[71]

---

[66] Musk-Pampena-0358142.
[67] Id.
[68] Musk-Pampena-0001445.
[69] Musk-Pampena-0676494.
[70] Musk-Pampena-0241260, p. 28-39.
[71] See Definitive Proxy Statement, filed July 26, 2022, at pp. 56-57.

### C. The Merger Agreement Is Very Seller-Friendly

50.     In my opinion, the Merger Agreement contains terms, individually and in the aggregate, that are customarily considered extremely friendly to the seller.  This section will discuss those terms in relation to custom and practice.

51.     When a buyer and a seller negotiate a merger agreement, many of the terms are not subject to any meaningful negotiation.  For example, the mechanics of canceling the shares of the target and converting them into the right to receive the merger consideration, are almost always the same (in cash transactions) and there is nothing to negotiate.  The same is true of the vote of the target's shareholders.  That vote is typically required by law, and when it is, the success of that vote will always appear as a closing condition.

52.     Other provisions in a merger agreement will customarily be subject to negotiation.  How those negotiations turn out will usually depend on whether the buyer or the seller has more leverage.[72]  Buyers will seek an agreement that gives them the flexibility to walk away from the transaction as easily and as cheaply as possible.  Sellers, alternatively, will favor a contract that commits the buyer to close the transaction under nearly all circumstances if the seller so desires.[73]

### 1. Robust Specific Performance Rights are Seller-Friendly

53.     A specific performance clause is one of the most seller-friendly provisions there is.  This provision allows the seller to seek a court order that, if granted, would force

---

[72] *See Coates* at ¶31 f.n. 40.

[73] "There is a greater risk to the target if the deal fails." *Coates* at ¶72.

the buyer to close the transaction.  The Merger Agreement contains this language: "the parties hereto acknowledge and agree that the parties hereto shall be entitled to an injunction, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms provisions hereof."[74]

54.     As practitioners have noted, seller-friendly specific performance clauses will provide for specific performance as long as debt financing is available and will not limit the seller's remedies to a reverse termination fee.[75]  The Merger Agreement provides that "the Company shall be entitled to specific performance … to enforce the Equity Investor's obligation to fund the Equity Financing directly, and to consummate the Closing if and for so long as" several conditions have been met, including that "the Debt Financing…has been funded or will be funded at the Closing."[76]  This provision also states that "[n]otwithstanding anything herein to the contrary, including the availability of the Parent Termination Fee or other monetary damages, remedy or award, it is hereby acknowledged and agreed that the Company shall be entitled to specific performance."[77]

### 2.  Seller-Friendly Closing Conditions

55.     The number of closing conditions is an indication of whether a merger agreement is buyer-friendly or seller-friendly.  Buyers will generally prefer a larger number of conditions because a problem with any one of them can provide an argument for refusing

---

[74] Merger Agreement Sec. 9.9(a).

[75] Latham & Watkins, LLP, Deal Certainty at 31, available at: https://www.lw.com/admin/Upload/Documents/OilAndGasMandA/General%20Concepts/Consolidated_Deal_Certainty_to_Going_Private_Transactions.pdf.

[76] Id. at 9.9(b).

[77] Id. at 9.9(b).

to close the transaction if the buyer has changed its mind.  Sellers, in contrast, prefer a small number of conditions because that will limit a buyer's ability to refuse to close.[78]

56.    The Merger Agreement lists three conditions that apply to each party: (1) approval of the merger by the Twitter stockholders; (2) the expiration of required waiting periods under the antitrust laws; and (3) the absence of a government order prohibiting the merger.[79]  If those conditions have been satisfied, the Merger Agreement obligates the Parent (Mr. Musk and his entities) to close the transaction as long as: (1) Twitter "has "performed or complied, in all material respects, with its obligations required under this Agreement"; (2) the bring-down condition has been met; and (3) no Company Material Adverse Effect has occurred and is continuing.[80]

57.    These provisions contain language that renders them seller-friendly, but before discussing that language, it is important to note the customarily buyer-friendly conditions that are absent from the Merger Agreement.

58.    The Merger Agreement does not have a financing condition.  A buyer who is borrowing part of the purchase price will customarily seek to include a condition that it is only required to close if it obtains that financing.[81]  Without that language, a buyer will

---

[78] Coates ¶11(d)(ii); *id.* at ¶31 ("Buyers prefer to have the ability to delay or terminate a deal based on a wider array of risk realizations or information discoveries ... [s]ellers, by contrast, have the opposite preferences.").

[79] Merger Agreement, Sec. 7.1

[80] Id. at Sec. 7.2.

[81] "The merger agreement also generally includes cooperation covenants typically subject to efforts standards and other qualifications to cause the closing of the merger and all related transactions, including, if applicable, financing to occur." Public Mergers: Overview, Practical Law Practice Note Overview 4-382-2164.

be obligated to close the transaction for the full purchase price even if its financing fails to materialize.[82]

59.    Parties often do not want to leave any doubt when they choose not to include a financing condition.  The Merger Agreement removes any doubt on this point by stating "that it is not a condition to the Closing or to any of its obligations under this Agreement that the Equity Investor, Parent, Acquisition Sub and/or any of their respective Affiliates obtain any financing."[83]

60.    The Merger Agreement also does not include a diligence condition.  A diligence condition requires that the buyer be satisfied with the diligence it has conducted on the seller at the time of closing.  A very buyer-friendly diligence condition will allow a buyer to determine the adequacy of its diligence using its "sole discretion."[84]  Sellers may seek to limit these conditions to specific areas of diligence or require that the buyer only be "reasonably satisfied" with the diligence.[85]  A seller-friendly agreement will not only omit this provision, but it will also have the buyer represent that it is satisfied with its diligence and the truth of the seller's representations and warranties.  This structure will

---

[82] "In the past, buyers often negotiated a "financing out" in the acquisition agreement allowing them to walk away from the deal if they were unable to obtain financing and complete the acquisition." Acquisition Finance: Overview, Practical Law Practice Note Overview 1-382-8186.

[83] Id. at Sec. 5.4. See also Sec. 6.10(f) ("Parent acknowledges and agrees that neither the obtaining of the Financing or any alternative financing, nor the completion of any issuance of securities contemplated by the Financing or any alternative financing (including the Alternative Financing), is a condition to the Closing.").

[84] "Sellers generally object to this closing condition because they cannot control whether the condition is satisfied." Purchase Agreement: Due Diligence Condition, Practical Law Standard Clauses w-001-0169.

[85] "[I]nformation revealed during due diligence that raises concerns can be addressed with specific, tailored reps or other provisions in a contract." *Coates* at ¶40.

still obligate a buyer to close even if a representation turns out not to be correct as long as that misrepresentation does not rise to the level of an MAE.

61.     In addition to having no diligence condition, the Merger Agreement states that Mr. Musk and his entities "conducted, to its satisfaction, its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) or assets of the Company and its Subsidiaries,"[86] and that, in deciding to enter into the agreement, "relied solely on the results of its own independent review and analysis and the covenants, representations and warranties of the Company"[87] in the Merger Agreement.  The parties also acknowledge that they were not relying on "any express or implied representation or warranty, or the accuracy or the completeness of the representations and warranties" in the Merger Agreement "other than those expressly given solely by the Company in Article IV."[88]

### 3. Seller-Friendly Agreements Have Limited Information Rights and Narrow Bring-Down Conditions

62.     The bring-down condition customarily works in conjunction with the information rights in the agreement.  Information rights allow a buyer to make requests of the seller for two potential purposes.  The first is to learn more about the seller's business as the buyer prepares to integrate the seller's operations into its own.[89]  In practice, these types of rights are common because of the near-universal need for business information as

---

[86] Id. at Sec. 5.11.
[87] Id.
[88] Id.
[89] "[N]arrow or "tight" covenants are those that limit access to information solely to post-closing planning or integration purposes ..." *Coates* at ¶95(b).

closing approaches.  The second purpose of information rights is to allow the buyer to conduct its bring-down investigation.  Here, there is much more variation in the structure and scope of these information rights depending on whether the agreement is buyer or seller friendly.[90]

63.    In a buyer-friendly agreement, the purchaser will have expansive rights to request information, there will be harsh consequences for a seller's failure to comply, and the buyer will be able to escape the deal if there are even minor variations between the information it receives and the seller's representations when they are brought down to closing.[91]  Seller-friendly agreements limit the information rights to business purposes, give the seller broad discretion to refuse to supply information, allow the seller to cure any alleged deficiencies in supplying information, and will not allow the buyer to use an alleged failure to comply with the information covenant to terminate the transaction if the buyer is in material breach of any of its obligations under the agreement.[92]

64.    The Merger Agreement gives Mr. Musk "reasonable access" to information about Twitter's "business, properties and personnel."[93]  That information must be used for a "reasonable ***business purpose related to the consummation of the transactions*** contemplated by this Agreement."[94]  The Merger Agreement also allows Twitter to decline

---

[90] *See Coates* at ¶95(a)-(f) (citing relevant language from the sample of merger agreements he collected).

[91] *Coates at* ¶95(f) (citing relevant language from the sample of merger agreements he collected).

[92] *Coates* at ¶95(a) (citing relevant language from the sample of merger agreements he collected).

[93] Merger Agreement at Sec. 6.4.

[94] Id. at Sec. 6.4 (emphasis added). The Merger Agreement also provides for information sharing related to financing. See id. at 6.10-11.

an information request if in its "reasonable judgment" supplying the information would "(i) cause significant competitive harm to the Company or its Subsidiaries if the transactions contemplated by this Agreement are not consummated, (ii) violate applicable Law [or contract to which it is a party], or (iii) jeopardize [] attorney-client [] privilege."[95] It is a condition to closing that Twitter shall have "performed or complied, in all material respects, with its obligations required under [the Agreement by the Closing Date]."[96] The termination provision provides that failure to comply with this closing condition can provide the basis for termination, although only if that failure "is not capable of being cured, or is not cured, by the Company on or before the earlier of (x) the Termination Date and (y) the date that is thirty (30) calendar days following [notice of breach]." Mr. Musk may not exercise this termination right if he "is then in material breach of any of [his] representations, warranties, covenants or agreements hereunder."[97]

65.    The bring-down condition itself will also vary depending on how buyer-friendly or seller-friendly it is.[98] A buyer-friendly bring-down condition will let buyers terminate the deal if, at closing, any representation is not entirely true or not true in all material respects. Seller-friendly agreements tie the bring-down condition to the definition of a company MAE.[99] That is, the failure of representations to be true must amount to a

---

[95] Id.

[96] Id. at Sec. 7.2(a).

[97] Id. at Sec. 8.1(d)(i).

[98] "[T]he bring-down condition specifies the extent to which compliance with reps and covenants acts as a closing condition." *Coates* at ¶83.

[99] "MAE clauses also are commonly used to qualify reps, so that many reps can be true even if some fact was not disclosed that would otherwise be called for by the rep, but which would not result in an MAE." *Coates* at ¶54.

company MAE.  As noted above, this is an extraordinarily high bar.  Despite decades of cases where buyers have tried to show an MAE[100], only once has a Delaware court held that the changed circumstances of the seller warranted a finding of an MAE.[101]

66.    The bring-down provision in the Merger Agreement requires any inaccuracies to cause an MAE: "each of the representations and warranties of the Company contained in this Agreement … shall be true and correct as of the Closing Date … except for such failures to be true and correct as would not have a Company Material Adverse Effect."[102]

### 4.    Seller-Friendly MAE Definitions Have Expansive Carve Outs

67.    MAE definitions are customarily subject to negotiation in merger transactions.  In general terms, the MAE specifies when a buyer is allowed to escape a deal because of a dire shock to the seller's business.  The definition of an MAE typically begins

---

[100] See In re IBP, S'holders Litig., 789 A.2d 14, 71 (Del. Ch. 2001); see also Channel Medsystems v. Boston Scientific, 2019 WL 6896462 (Del. Ch. 2019); Snow Phipps Group, LLC v. KCAKE Acquisition, Inc., 2021 WL 1714202 (Del. Ch. 2021); AB Stable VIII LLC v. MAPS Hotels and Resorts One LLC, 2020 WL 7024929 (Del. Ch. 2020). (all declining to find an MAE that would permit a buyer to terminate the deal).

[101] "[W]hile a court is left to decide what constitutes an MAE, there are few cases on the subject and only a single instance in which a Delaware court has found an MAE permitting a buyer to walk away from a transaction." *HQS* at 421; *see also* Gail Weinstein, Philip Richter & Steven Epstein, *Court of Chancery Finds Pandemic Was Not an MAE—Snow Phipps*, Harv. L. Sch. F. on Corp. Governance (May 20, 2021), https://corpgov.law.harvard.edu/2021/05/20/court-of-chancery-finds-pandemic-was-not-an-mae-snow-phipps/; Steven M. Haas, *Delaware Chancery Rejects a Buyer's MAE Claim—Again*, Hunton Andrews Kurth (Dec. 1, 2022), https://www.hunton.com/insights/legal/delaware-chancery-rejects-a-buyers-mae-claim-again; *compare* Benjamin L. Stulberg, Randi C. Lesnick, Robert S. Faxon & Andrew M. Levine, *Delaware Chancery Court Finally Finds an MAE*, Jones Day (Oct. 2018), https://www.jonesday.com/en/insights/2018/10/delaware-chancery-court-finally-finds-an-mae.

[102] Id. at Sec. 7.2(b)(i). The Merger Agreement specifies that Section 4.2(a) and Section 4.2(b) "shall be shall be true and correct in all material respects as of the Closing Date." Id. at sec 7.2(b)(ii). Both of these provisions are part of the Capitalization representation.

by stating that an MAE is a change, event, or circumstance that has produced or can be expected to produce a material adverse effect on the business, financial conditions, or operations of the company.[103] The language will then exclude certain events from the definition of an MAE. In practice, the negotiations of an MAE definition are about the number and type of these carve outs.[104] Buyers will typically push for as few carve outs as possible because having fewer carve outs will make it easier to show that an MAE has occurred.[105] Sellers, in contrast, want as many carve outs as possible and want those carve outs to be as broad as possible because that gives them a wider ability to claim that there has not been an MAE.

68.    The MAE definition in the Merger Agreement begins by stating that a Company MAE "means any change, event, effect or circumstance which, individually or in the aggregate, has resulted in or would reasonably be expected to result in a material adverse effect on the business, financial condition or results of operations of the Company and its Subsidiaries."[106] The definition has nine carve outs:

- "any condition, change, effect or circumstance generally affecting any of the industries or markets in Company or its Subsidiaries operate";
- "any change in any Law or GAAP (or changes in interpretations of any Law or GAAP)"
- "general economic, regulatory or political conditions (or changes therein) or conditions (or changes therein) in the financial, credit or securities markets … in the United States or any other country or region in the world";

---

[103] "The first part of the definition provides the buyer with what might seem like fairly broad protection against residual risks that might appear between signing and closing." *HQS* at 418.
[104] Coates at ¶87.
[105] "By identifying certain adverse events and excluding them from the definition of MAE, the risk of such events occurring is shifted from the buyer to the seller." *HQS* at 419.
[106] Id. at p. 5.

- "any acts of God, force majeure events, natural disasters, terrorism, cyberattack, data breach, armed hostilities, sabotage, war or any escalation or worsening of any of the foregoing";
- "any epidemics, pandemics or contagious disease outbreaks (including COVID-19) and any political or social conditions, including civil unrest, protests and public demonstrations";
- "the negotiation, execution, announcement, performance, consummation or existence of this Agreement or the transactions contemplated by this Agreement, including [] by reason of the identity of Elon Musk";
- "any action taken pursuant to the terms of this Agreement or with the consent or at the direction of Parent or Acquisition Sub";
- "Any changes in the market price or trading volume of the Company Common Stock, any failure by the Company or its Subsidiaries to meet internal, analysts' or other earnings estimates or financial projections or forecasts for any period, any changes in credit ratings and any changes in any analysts' recommendations or ratings with respect to the Company or any of its Subsidiaries"; and
- "any matter disclosed in the Company SEC Documents filed by the Company prior to the date of this Agreement (other than any disclosures set forth under the headings 'Risk Factors' or 'Forward-Looking Statements')."

69.    As a matter of custom and practice, the foregoing represent numerous and broad carve outs.[107]

### D. Tesla's Stock Price Dives, Making the Deal More Expensive for Mr. Musk

70.    Mr. Musk financed the deal using a combination of debt and equity. This structure made the deal sensitive to the price of Tesla stock because a decrease in stock price could require Mr. Musk to post more shares as loan collateral and would obligate him to sell more shares to fund the equity commitment. The Plaintiffs have alleged that Tesla's stock price dropped shortly after Mr. Musk signed the Merger Agreement.[108] The resulting

---

[107] *See* Coates at ¶¶ 86-93 (identifying the singling out of Mr. Musk and the exclusion of cyberattacks data breaches as more seller-friendly that the average agreements in his sample and noting that the Merger Agreement was the *only* agreement in the sample that did not include a disproportionality exception to the exclusions).
[108] FAC at ¶¶25-26, 90-106.

36

need to use more of his personal wealth to fund the deal made the transaction more expensive for Mr. Musk.

### E. No Alternative Bids Emerge, Creating Conditions for Buyer's Remorse

71.    It is customary for merger agreements to provide a process for the seller to evaluate a higher bid that emerges after signing, but before closing.  Doing so helps the board of the seller comply with its *Revlon* obligation to get the highest price reasonably available to shareholders and it can also serve as a way to validate the price being paid. The most common structure in public company mergers is to prohibit the seller from soliciting any competing bids, while allowing the seller to receive information about a bid if the seller's advisors believe it would be a breach of the selling board's fiduciary duties to not receive that information.

72.    The Merger Agreement directs Twitter's "directors, executive officers and Subsidiaries not to … solicit, initiate, knowingly encourage or knowingly facilitate, whether publicly or otherwise, any substantive discussion, offer or request that constitutes, or would reasonably be expected to lead to, a Competing Proposal."[109]  Although, "the Company … may engage in negotiations or discussions with… any Person … making such Competing Proposal … if the Company Board determines in good faith (after consultation with its legal counsel and financial advisors) that such Competing Proposal either constitutes a Superior Proposal or would reasonably be expected to result in a Superior Proposal."[110]

---

[109] Id. at Sec. 6.5(a).
[110] Id. at Sec. 6.5(c).

73.    The Merger Agreement also requires Twitter to alert Mr. Musk to any competing bids.  The Merger Agreement obligates Twitter to inform Mr. Musk of any competing proposal within one business day and to provide notice of "(i) the identity of the Person making such Competing Proposal or request; and (ii) the material terms and conditions of any such Competing Proposal."[111]  As long as Twitter complied with this obligation, Mr. Musk would have known about any competing bid for the company.

74.    I am not aware of evidence that any alternative bids emerged post-signing. Commentary at the time suggested that any "competing bid from private equity would be at least 15-20% lower than Musk's $44 billion offer."[112]  Analysts attributed the lack of interest to a significant decline in the technology sector[113] shortly after the parties signed the Merger Agreement and to a general consensus, with the benefit of hindsight and given the recent changes in market conditions, that Mr. Musk had agreed to pay a high a price for Twitter shortly before a market downturn.[114]

---

[111] Id. at §6.5(b).

[112] Jeran Wittenstein, Fortune, "Twitter Shares Sink After Musk Says He's Ending Acquisition Bid in 'Disaster Scenario' for the Social Media Platform," July 9, 2022, available: https://fortune.com/2022/07/09/twitter-shares-sink-after-musk-says-hes-ending-acquisition-bid-in-disaster-scenario-for-the-social-media-platform"

[113]"Across the tech industry, companies are cutting staff and spending or slowing hiring." Michael Morris, Curry Baker, Charles Wilber, Jackson Taylor, Taylor Manley, *Daily MIC: Elon Musk Tweets Twitter Deal is on Hold; "The Ultimatum" Tops Nielsen's Weekly Streaming Chart; AMC+ To Launch on Orange Spain*, Guggenheim Sec. Rsch. (May 13, 2022).

[114] "Completing the deal was a victory for Twitter's board. When Mr. Musk agreed to pay $54.20 a share for the company in April, Twitter faced criticism for accepting a price that was too low. But, as the global economy faltered in the ensuing months and Twitter's stock fell, the deal price appeared to be a win for shareholders, and the board sought to force Mr. Musk to abide by the agreement." https://www.nytimes.com/2022/10/27/technology/elon-musk-twitter-deal-complete.html

75.     The combination of the deal becoming more expensive for Mr. Musk, the lack of any competing interest, and Mr. Musk's belief that, in hindsight and given the market downturn since he made his offer, [115] he may have overpaid for Twitter created, in my opinion, classic conditions for buyer's remorse.[116]  As explained above, buyers in those situations will customarily look for any reason they can find to exit or renegotiate the deal. That includes making publicly disparaging comments about the deal, alleging a right to terminate, and litigating the obligation to close the deal.

## VI.    MUSK TOOK ACTIONS THAT CREATED UNCERTAINTY AND THEN PURPORTED TO TERMINATE THE DEAL

76.     In the period after signing and before closing, Mr. Musk created uncertainty about the deal before eventually purporting to terminate it.  His statements about these attempts are the subject of this lawsuit.  This section reviews each of those statements and puts them into the context of custom and practice in merger transactions.

### A. May 13, 2022 "On Hold" Tweet

77.     On May 13, 2022, at 5:44 a.m. EST, Mr. Musk tweeted "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users."[117]  By the end of that trading day, the price of Twitter stock had declined 9.67% from the previous day's closing price.[118]

---

[115]"Well, obviously, I overpaid for the company, like, by a lot." Musk Transcript, 94:6-7.

[116] Irrespective of market conditions of changes in Musk's financing situation, he and his financial advisors decided that $54.20 was a fair price based on in depth analysis conducted by Musk's investment bankers at Morgan Stanley.  See MUSK-PAMPENA-0678025.

[117] FAC, ¶ 111.

[118] Id.

### 1. As Is Customary, Nothing in the Merger Agreement Stated That the Deal Would Close If Twitter Failed to Supply Him with Information About Fake and Spam Accounts

78.    As explained above, it is customary in merger agreements for the information rights to work in conjunction with the representations and warranties of the seller and the bring-down condition.  The typical structure of a merger agreement will specify the types of information the buyer can request, which the buyer, if entitled to that information, may use for integration purposes and to verify the representations during the bring-down process.  In my experience, it is not the practice and custom in merger agreements to list specific types of information which, if a seller fails to provide them, provide a right to terminate the agreement.[119]  I do not recall ever seeing such language in a merger agreement and that language is not present in the Merger Agreement.

79.    The custom and practice of information rights in merger agreements means that the consequences for providing, or failing to provide, information will not be evident from the merger agreement alone.  As detailed earlier, merger agreements customarily specify the buyer's information rights in the "Access to Information" covenant.[120]  The

---

[119] A seller's violation of the access to information covenant could potentially warrant a buyer's termination if that violation breaches the covenant compliance condition. That condition requires a party to have performed all of its obligations under the agreement by the time of closing. But it would be quite odd for these circumstances to occur because sellers generally want to close and will have strong incentives to provide information that facilitates closing. Indeed, I am not aware of any case where a buyer has successfully terminated a deal due to a failure to comply with an access to information covenant. *Cf. Akorn*, *supra* (although there were assertions that the seller had not complied with the information access covenant, the buyer was ultimately able to terminate due to a failure of the general MAE condition, the bring-down condition, and a failure to comply with the ordinary course covenant, which produced a breach of the covenant compliance condition).

[120] *See Coates* at ¶59.

covenant compliance condition can allow any failure to comply with this covenant to form a basis for termination, but the termination provisions will typically allow the seller to cure any alleged defects.  Additionally, the buyer's right to terminate may be unavailable if the buyer is in material breach of its obligations.  If a dispute of this sort materializes before closing, the agreement, by itself, would not be enough to assess the risk that the dispute would lead to deal termination.  To determine the potential for termination, one would need to know, *inter alia*, the precise information requested by the buyer, the seller's basis for a refusal to provide information, the content of the communications between the parties, and whether the buyer is potentially in material breach of any of its obligations.[121]  The parties also executed a confidentiality agreement.[122]   The terms of that agreement could have expanded or restricted the information rights of the parties.  Given the non-public nature of the document, it would not be possible for the investing public to know whether that agreement affected the claims in Mr. Musk's tweet.

### 2. Parties Can Mutually Agree to Delay a Deal, But They Did Not Do So Here

80.     While pausing or delaying a deal is not a regular occurrence in merger transactions, it can and does occur.  Perhaps the most common reason for delaying a merger is a mutual agreement by the parties to extend the "drop-dead date," after which any party

---

[121] Communications about an information dispute could trigger reporting obligations if they are material, but just because parties are supposed to report information does not mean that they will necessarily do so.

[122] . Musk-Pampena-0023104.

can walk away, usually without consequence.[123]  Buyers and sellers will sometimes agree to these extensions if regulatory approval is taking longer than expected or if financing proves more complex than anticipated.  The parties may also agree to amend a merger agreement to provide more time and, as part of that amendment, the parties can alter financial and other substantive terms[124], including those related to information rights.

81.    Mr. Musk and Twitter could have agreed to extend the "drop-dead date" under the Merger Agreement.  They also could have agreed to amend the Merger Agreement to give Mr. Musk broader rights to information about spam and fake accounts, to give Mr. Musk more time to analyze that information, and to provide harsher consequences for any failure by Twitter to provide that information. I am not aware of any evidence indicating that Mr. Musk and Twitter reached any sort of agreement to extend the drop-dead date or to amend the Merger Agreement prior to Mr. Musk's May 13, 2022 tweet.[125]

---

[123] Microsoft's acquisition of Activision Blizzard is an example of extending the drop-dead date. On July 19, 2023, the parties announced that, the day prior, they had entered into an agreement to extend to the drop-dead date. *See* *https://www.sec.gov/ix?doc=/Archives/edgar/data/0000718877/000110465923082205/tm2321522d1_8k.htm*

[124] In the LVMH acquisition of Tiffany & Co. in 2019, the parties agreed to a reduced price as part of a litigation settlement. *See* Sarah White & Silvia Aloisi, "LVMH and Tiffany end luxury battle, cut price on $16 billion takeover," Reuters (Oct. 29, 2020)  In Waste Management's acquisition of Advanced Disposal Services, the parties agreed to postpone the acquisition to a later quarter due to the pandemic and eventually agreed to a reduced price. *See* Cole Rosengren, "Advanced Disposal shareholders approve amended terms for $4.6B sale to Waste Management," Wastedive, August 26, 2020.

[125] Twitter Delaware Complaint; *see also* Ringler Transcript at p. 245:1-12.

### 3. Some Analysts React with Confusion

82.    Stock analysts were following the Twitter transaction closely and were presumably aware of all, or nearly all, of the public information about the deal. Some analysts were confused and perplexed by the tweet.[126] A Wedbush report on Tesla shares—the value of which was tied, in part, to the Twitter transaction—titled its report "In a Circus Show Move Musk Says Twitter Deal on Hold Pending Diligence."[127] The May 13 report opined that Mr. Musk's tweet would turn the deal "into a Friday the 13th horror show as now the Street will view this deal as 1) likely falling apart, 2) Musk negotiating for a lower deal price, or 3) Musk simply walking away from the deal with a $1 billion breakup fee."[128] The report also stated that, "Many will view this as Musk using this Twitter filing/spam accounts as a way to get out of this deal in a vastly changing market."[129] A May 13 Guggenheim bulletin reported: "Elon Musk said his deal to buy Twitter Inc. was on hold pending details on the amount of fake accounts on the social-media platform, prompting a

---

[126] Analysts were not the only specialists who had strong reactions to the tweet. James Boland, Twitter's expert on leveraged financing in the Delaware litigation called the tweet "extraordinary" because it could imperil the syndication of the debt Mr. Musk planned to use to fund the deal. Expert Report of James Boland, Twitter, Inc. v. Musk et al. (hereinafter Boland), at ¶34. Mr. Boland also notes that Mr. Musk's own advisor considered the tweet "an adverse event for syndication." *Id.* at ¶34 (quoting deposition of Andrew Earls).

[127] Daniel Ives, John Katsingris, *In a Circus Show Move Musk Says Twitter Deal on Hold Pending Diligence*, Wedbush Securities Company Report (May 13, 2022).

[128] *Id.; see also* David Goldman, Chris Isidore & Clare Duffy, *Elon Musk says Twitter deal 'temporarily on hold'*, CNN (May 13, 2022, 10:01 AM EDT), https://www.cnn.com/2022/05/13/tech/twitter-deal-on-hold-elon-musk (quoting Dan Ives, Managing Director of Equity Research at Wedbush Securities) (describing the situation as a "'circus show' that is 'setting a disconcerting tone for the deal and Musk's leadership style for Twitter'").

[129] Id.

sharp slide in the company's shares in premarket trade."[130]  It also stated that "[s]ome investors saw the pause in the acquisition as a potential sign that the deal may not go ahead."[131]

83.    I am not aware of any evidence indicating that Mr. Musk ever corrected the confusion and uncertainty created by his May 13, 2022 tweet and subsequent tweets (including his May 17, 2022 tweet) by issuing an unequivocal statement indicating that he would go through with the purchase of Twitter even if he did not receive the information he had requested from Twitter and fake or spam accounts.

### B.  May 14, 2022 NDA Tweet

84.    On May 14, 2022, Mr. Musk tweeted that Twitter legal "called to complain that [he] violated their NDA by revealing the bot check sample size."[132]

#### 1.  Mr. Musk Expresses Purported Concern About Fake and Spam Accounts, Despite Widespread Public Information about Such Accounts on Twitter

85.    Mr. Musk's expression of apparent concern about fake and spam accounts should be understood in terms of the then-available public information about the topic.  In September 2021, Twitter entered into a $809.5 million class action settlement in a securities class action alleging that Twitter, in part due to bots, overstated its user numbers and

---

[130] Guggenheim Securities, "Daily MIC: Elon Musk Tweets Twitter Deal Is on Hold," May 13, 2022.
[131] *Id.* Mr. Boland agreed with this characterization. *See* Boland at ¶ 34 ("publicly announcing that an M&A transaction is "on hold" could create uncertainty that the transaction will actually close").
[132] FAC, ¶ 115.

growth rates.[133]  Twitter's public filings also disclosed information about bots.  The 2021 Annual Report disclosed that Twitter's samples produced an estimate that less than 5 percent of mDAU (monetizable daily active users) were false or spam accounts, but also noted that Twitter "applied significant judgment, so our estimation of false or spam accounts may not accurately represent the actual number of such accounts, and the actual number of false or spam accounts could be higher than we have estimated."[134] Discussion of fake and spam accounts on Twitter were also a regular topic of discussion in news reports and online postings.

86.    It is important to recall that Mr. Musk waived due diligence in this transaction.  That meant that his only source of information at the time he entered into the agreement to acquire Twitter was information that was publicly available or that Mr. Musk and his advisors had otherwise acquired.  The custom and practice of merger transactions in cases where a buyer foregoes the opportunity to perform a pre-signing due diligence investigation is for the buyer to familiarize itself with the public disclosures of the target and other relevant public information about the target.

87.    In short, Mr. Musk testified that he was well aware of concerns regarding fake and spam accounts on Twitter before he signed the Merger Agreement.[135]

88.    As mentioned previously, it is customary for merger agreements to prevent one party from claiming a breach of the agreement if that party is itself in breach.  Section

---

[133] See https://time.com/6099976/twitter-class-action-lawsuit/.
[134] FAC, ¶ 118.
[135] Musk Transcript 88:12-23; 168:18-170:2.

8.1(d) of the Merger Agreement has such a condition, removing the buyer's right to terminate based on breach of the seller if the buyer is also in breach of the agreement. Here, Mr. Musk's disparaging tweets about the Company likely violated section 6.8 of the agreement that prohibits disparaging public announcements. Mr. Musk and the buyer therefore would be in breach of the agreement and unable to exercise their right to terminate for any breach by the seller.

### C. May 16, 2022 "20%" Statements and Tweets

89.    On May 16, Mr. Musk appeared at the "All In Summit" technology conference in Miami. There he stated that fake and spam accounts make up at least 20% of Twitter's users.[136] Parag Agrawal, then CEO of Twitter, responded with a series of tweets, explaining Twitter's method for calculating spam and fake accounts and stating that this estimate cannot be done solely on the basis of public information.[137] Mr. Musk responded with a poop emoji.[138] Mr. Musk later tweeted "So how do advertisers know what they're getting for their money? This is fundamental to the financial health of Twitter."[139] At the close of trading that day, Twitter stock declined 8.18%.[140]

90.    As explained above, even the most seller-friendly agreements will provide some limited information rights to the buyer.[141] The Merger Agreement provided some of

---

[136] Musk-Pampena-0700654.
[137] Plaintiffs-000221.
[138] Musk-Pampena-0318063.
[139] FAC ¶ 123.
[140] Id. ¶ 124.
[141] See supra §IV.B.

those rights to Mr. Musk for business purposes related to the transaction.[142]  Had Mr. Musk exercised those rights, his doing so would likely not be apparent to the investing public because a private request for information is unlikely to be deemed material.

### D. May 17, 2022 "*Much* Higher" Tweet

91.    On May 17, 2022, Mr. Musk tweeted that the actual number of spam and bot accounts could be "*much* higher" than 20%.[143]  He also claimed that the deal could not go forward until Twitter's CEO showed proof of a bot estimate of less than 5% because his offer was based on "Twitter's SEC filings being accurate."[144]

> **1.    It Remained the Case That Mr. Musk Had No Right to Terminate the Merger Due to a Failure to Provide Information About Fake Accounts**

92.    Mr. Musk's claim that Twitter had to prove that its SEC filings were correct is at odds with the seller-friendly nature of the deal process and the Merger Agreement.  As noted, Mr. Musk waived due diligence investigation.  That would customarily provide an opportunity to refuse to proceed with a deal unless Twitter could provide any information about the spam or fake accounts that Mr. Musk requested.  But he chose not to conduct that investigation.  He also entered into a merger agreement that would be considered, in the custom and practice of mergers and acquisitions, extremely friendly to the seller.[145]  It contained no diligence provision, which would allow a buyer to terminate the transaction

---

[142] "[T]he Merger Agreement contains a more seller-friendly Access to Information Covenant than 93.0% of the Sample, limiting requests to only those that are related to the **consummation** of the transaction ..." *Coates* at ¶11(d)(iv).
[143] FAC ¶ 125.
[144] Id.
[145] See supra §V.C.

if it were unsatisfied with what it discovered prior to closing. It also did not contain a covenant allowing the buyer access to information to verify the representations and warranties.[146] While it did contain a representation that certain SEC filings were true and correct, the bring-down condition required any failure of SEC statements to be true to amount to an MAE.[147] That provision requires any deviation to be very large and falls far short of any requirement to "prove" that any disclosures were correct. And, it is worth noting, that no merger agreement I am aware of has had a provision that would require affirmative proof of any statement as a condition to closing.

### E. Letters To Twitter and Notices of Termination

93.    Mr. Musk's attorneys sent multiple requests to Twitter asserting rights to user data and sent three letters purporting to terminate the Merger Agreement on July 8, 2022, August 29, 2022, and September 9, 2022.[148] The letters demanded information about fake and spam accounts and sought to compel Twitter to "apply more rigorous computer-aided and third-party testing to determine the prevalence of fake or spam accounts on its platform with greater certainty" and asserted that Twitter's explanation of its methodology was "inadequate."[149]

94.    On June 1, 2022, Twitter's attorneys characterized Mr. Musk's information requests as "well beyond the bounds of what the parties agreed to under the merger

---

[146] *Coates* at ¶97; *see also Id.* at f.n. 113.
[147] See supra §V.C.4.
[148] FAC ¶¶ 136-40.
[149] Id.

agreement."[150]  A letter sent by Twitter's attorneys several weeks later cited Section 6.4 of the Merger Agreement (the access to information covenant), noting that it only obligated Twitter to provide "reasonable access" to information for any "reasonable business purpose related to the consummation of the transactions."[151]

95.     On July 8, 2022, Mr. Musk sent a termination letter to Twitter that was publicly filed with the SEC.[152]  That letter asserted that Twitter had failed to provide spam and bot data that was "necessary to consummate the transactions contemplated by the Merger Agreement because it is needed to ensure Twitter's satisfaction of the conditions to closing."  It also alleged a breach of the Merger Agreement because Twitter's representations were materially inaccurate and were likely to amount to an MAE.  The letter additionally asserted that the access to information covenant entitled Mr. Musk to "all information concerning the business … of the Company … for any reasonable business purpose related to the consummation of the transactions."[153]  Subsequent termination letters asserted that information from a whistleblower report showed sufficient misconduct at Twitter to permit Mr. Musk to terminate and claimed that a severance payment to Twitter's former chief security officer also allowed Mr. Musk to terminate.[154]

---

[150] Id. ¶ 137.
[151] Id. ¶ 139.
[152] Id. ¶ 140.
[153] Id.
[154] Id. ¶¶ 144, 147.

49

### 1.    Mr. Musk and His Lawyers Assert Merger Rights That Diverge from the Customary Understandings of Those Rights

96.    The assertions by Mr. Musk that Twitter breached its obligations are not consistent with the terms of the Merger Agreement. Mr. Musk's claim that the information access covenant required Twitter to give him all information about the company "for any reasonable business purpose related to the consummation of the transactions" is not a correct description of his rights under the Merger Agreement. As detailed above, sellers with leverage will limit a buyer's ability to obtain information between signing and closing. The Merger Agreement does that by subjecting Mr. Musk's requests for information to Twitter's "reasonable judgment" and by prohibiting Mr. Musk's access to "competitive information."[155] Mr. Musk's letter omits these seller-friendly qualifiers in the access to information covenant and, in so doing, mischaracterizes his information rights.

97.    Mr. Musk's communications suggest that a materially false representation would provide grounds to terminate the deal. But this claim is also in contrast to the seller-friendly terms in the Merger Agreement. As previously discussed, seller-friendly bring-down conditions will only allow termination if the failure of representations to be true, either individually or in the aggregate, amounts to an MAE. The Merger Agreement contained this language.[156]

98.    A comparison of the letters and the Merger Agreement would not, however, inform an outsider about Mr. Musk's right to obtain information and the consequences of

---

[155] See supra §V.C.3.
[156] See supra §V.C.4.

not providing it.  Those determinations are likely to turn, in part, on Twitter's exercise of its reasonable judgment and whether the requested information is competitive in nature. The communications from Mr. Musk's attorneys omit any mention of these factors and thus present an incomplete and inaccurate picture of Mr. Musk's ability to request information from Twitter and any potential consequences for its failure to do so.

## VII.  CONCLUSION

99.    A leading mergers and acquisitions treatise explains that "[w]hile no technique totally eliminates the risk of unknown liabilities resulting in significant losses after the closing, it is the due diligence process that afford the Buyer the opportunity to minimize this risk as much as possible."[157]  A buyer that waives that opportunity takes on that risk of the unknown.  When coupled with a seller-friendly merger agreement, which, in my opinion the Merger Agreement was, a buyer is left with few options to conduct a meaningful investigation of the seller and to terminate the deal.  Waiving due diligence and agreeing to a seller-friendly agreement create classic conditions for buyer's remorse and, in my opinion, those conditions were present in this case.

100.    Mr. Musk sought to terminate or renegotiate his acquisition of Twitter.  He publicly claimed that the deal was "on hold" while he investigated the number of spam and fake accounts on Twitter.  No provision in the Merger Agreement stated that he could refuse to close if Twitter declined to produce information about spam and fake accounts and, customarily, merger agreements would not contain such a provision. In addition, I am

---

[157] Kling, Nugent & Van Dyke, at § 8.01.

unaware of any public statement by Mr. Musk that he would go through with the merger even if Twitter did not provide him with the information he had demanded about fake/spam accounts and bots.  This pattern of claiming rights that were at odds with the Merger Agreement created confusion and uncertainty and continued through his attempts to terminate that agreement.  In my opinion, given prevailing custom and practice in mergers and acquisitions, there was no basis for Mr. Musk's assertions.

Adam Badawi
May 28, 2025

## Appendix A

### Adam B. Badawi

UC Berkeley School of Law • 792 Simon Hall, Berkeley, CA • abadawi@berkeley.edu • 510-643-6116

---

**ACADEMIC APPOINTMENTS**

*UC Berkeley School of Law*
  Professor of Law, July 2017 – present
*Washington University in St. Louis School of Law*
  Professor of Law, July 2015 – June 2017
  Associate Professor of Law, July 2010 – June 2015
*Columbia Law School*
  Visiting Professor of Law, September 2024
*University of Amsterdam, Center for Law and Economics*
  Visiting Scholar, August 2019 – October 2019
*Northwestern Pritzker School of Law*
  Visiting Professor of Law, January 2017 – May 2017
*Erasmus School of Law, Rotterdam, NL*
  Distinguished International Visitor, March 2014 – April 2014
*Queensland University School of Law, Brisbane, AUS* Visiting
  Instructor, August 2012
*University of Chicago Law School*
  Bigelow Fellow and Lecturer in Law, June 2008 – June 2010

**ARTICLES**

*ESG Overperformance? Assessing the Use of ESG Targets in Executive Compensation Plans* (with Robert Bartlett) (forthcoming, BUSINESS LAWYER).

*Loopholes in Complex Contracts* (with Kenneth Ayotte) (forthcoming, AMERICAN LAW AND ECONOMICS REVIEW).

*Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A* (with Matthew Cain and Steven Davidoff Solomon) 66 THE JOURNAL OF LAW & ECONOMICS 535 (2023) (peer-reviewed) (selected as one of the top ten corporate and securities articles of 2023 by Corporate Practice Commentator).

*How Informative is the Text of Securities Complaints?*, 39 JOURNAL OF LAW, ECONOMICS, AND ORGANIZATION 801 (2023) (peer-reviewed).

*Social Good and Litigation Risk* (with Frank Partnoy), 12 HARVARD LAW BUSINESS REVIEW 315 (2022) (solicited symposium contribution).

*Debt Contract Terms and Creditor Control,* 4 JOURNAL OF LAW, FINANCE & ACCOUNTING 1 (2019) (peer-reviewed).

*Is There a First-Drafter Advantage in M & A?* (with Elisabeth de Fontenay), 107 CALIFORNIA LAW REVIEW 1119 (2019) (selected as one of the top ten corporate and securities articles of 2019 by Corporate Practice Commentator).

*The Shareholder Wealth Effects of Delaware Litigation* (with Daniel Chen), 19 AMERICAN LAW AND ECONOMICS REVIEW 287 (2017) (peer-reviewed).

*Does the Quality of the Plaintiffs' Law Firm Matter in Deal Litigation?* 41 THE JOURNAL OF CORPORATION LAW 359 (2015) (with David Webber) (selected for presentation at the 2015 Harvard/Stanford/Yale Junior Faculty Forum).

*Appellate Lawmaking in a Judicial Hierarchy*, THE JOURNAL OF LAW & ECONOMICS (with Scott Baker) (2015) (peer-reviewed).

*Lobbying, Pandering, and Information in the Firm*, 38 SEATTLE UNIVERSITY LAW REVIEW 215 (2014) (solicited symposium contribution).

*The Fannie and Freddie Bailouts Through the Corporate Lens*, 10 NYU JOURNAL OF LAW AND BUSINESS 443 (with Anthony Casey) (2014) (solicited symposium contribution).

*Influence Costs and the Scope of Board Authority*, 39 THE JOURNAL OF CORPORATION LAW 675 (2014) (reviewed by Robert Rosen, JOTWELL (April 1, 2016), available at http://corp.jotwell.com/whydirectors-dont-direct/).

*Rationality's Reach*, 112 MICHIGAN LAW REVIEW 993 (2014) (review of Oren Bar-Gill's SEDUCTION BY CONTRACT).

*Merger Class Actions in Delaware and the Symptoms of Multijurisdictional Litigation*, 90 WASHINGTON UNIVERSITY LAW REVIEW 965 (2013) (solicited symposium contribution).

*Self-Help and the Rules of Engagement*, 29 YALE JOURNAL ON REGULATION 1 (2012).

*Relational Governance and Contract Damages: Evidence from Franchising*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 743 (2010) (peer-reviewed).

*Harm, Ambiguity, and the Regulation of Illegal Contracts*, 17 GEORGE MASON LAW REVIEW 483 (2010).

*The Attributes of Transactions and the Limits of the New Formalism*, 6 BERKELEY BUSINESS LAW JOURNAL 1 (2009).

Comment, *Unceasing Animosities and the Public Tranquility: Political Market Failure and the Scope of the Commerce Power*, 91 CALIFORNIA LAW REVIEW 1331 (2003).

### BOOKS AND BOOK CHAPTERS

ENCYCLOPEDIA OF LAW AND ECONOMICS, CORPORATE LAW (editor), Edward Elgar Publishing, 2023.

The Business Judgment Rule, in ENCYCLOPEDIA OF LAW AND ECONOMICS, CORPORATE LAW, Edward Elgar Publishing (Adam B. Badawi, ed.), 2023.

BUSINESS ASSOCIATIONS: CASES AND MATERIALS (with Anthony Casey) (second edition), 2023.

Reference Networks and Civil Codes, in LAW AS DATA: COMPUTATION, TEXT, AND THE FUTURE OF LEGAL ANALYSIS (with Giuseppe Dari-Mattiacci) (Michael Livermore & Daniel Rockmore, eds.) (2019).

Fighting Frivolous Litigation in a Multijurisdictional World, in RESEARCH HANDBOOK ON REPRESENTATIVE SHAREHOLDER LITIGATION 110 (Sean Griffith, Jessica Erickson, David H. Webber & Verity Winship eds., 2018).

### WORKS-IN-PROGRESS

*Contractual Complexity in Debt Agreements: The Case of EBITDA* (with Scott Dyreng, Elisabeth de Fontenay, and Robert Hills).

*Fact and Opinion in Financial Disclosures* (with Andrew Baker).

*The Value of M&A Drafting* (with Elisabeth de Fontenay and Julian Nyarko).

*Price Discipline for Non-Price Loan Terms* (with Vincent S.J. Buccola and Gregory Nini).

*Defensive Contract Language* (with George Batta).

*ESG Performance Incentives and Bankruptcy Risk*.

*Lawyers, Law Firms, and the Production of Legal Information.*

### GRANTS

Principal Investigator, National Science Foundation Grant SMA 14-19967, *Coding Legal Structures* (total $124,949).

### PRESENTATIONS

**2025**  *Defensive Contract Language*, European Society for Empirical Legal Studies Conference, Capitole University of Toulouse, June 2025 (scheduled).
*ESG Overperformance? Assessing the Use of ESG Targets in Executive Compensation Plans*, Global Corporate Governance Conference, Imperial College, London, June 2025 (scheduled).
*Defensive Contract Language*, Annual Meeting of the American Law and Economics Association, NYU Law School, May 2025.
*ESG Overperformance? Assessing the Use of ESG Targets in Executive Compensation Plans*, Weil, Gotshal & Manges, Yale Law School, April 2025.
*Defensive Contract Language*, BYU Winter Deals Conference, March, 2025.
*ESG Performance Incentives and Bankruptcy Risk*, ESG and Bankruptcy Conference, Heinrich Heine University, Dusseldorf, March 2025

**2024**  *ESG Overperformance? Assessing the Use of ESG Targets in Executive Compensation Plans*, Conference on Empirical Legal Studies, Emory Law School, November 2024.
*Price Discipline for Non-Price Loan Terms*, Northwestern Law School Law and Economics Workshop, November 2024.
*Price Discipline for Non-Price Loan Terms*, University of Amsterdam Center for Law and Economics, October 2024.
*Price Discipline for Non-Price Loan Terms*, Columbia Law School, September 2024.
*Fact and Opinion in Financial Disclosures*, Mapping and Governing the Online World Conference, Ascona, Switzerland, June 2024.
*Price Discipline for Non-Price Loan Terms*, Annual Meeting of the American Law and Economics Association, University of Michigan, May 2024.
*Price Discipline for Non-Price Loan Terms*, Sokol Colloquium, University of Virginia, March 2024.
*Price Discipline for Non-Price Loan Terms*, Cardozo Faculty Workshop, March 2024.
*Price Discipline for Non-Price Loan Terms*, BYU Winter Deals Conference, March 2024.

**2023**  *Loopholes in Complex Contracts,* NYU School of Law, Law and Economics Workshop, November 2023.
*Social Good and Litigation Risk*, Oxford University Conference on Reputation, September 2023.
*Loopholes in Complex Contracts,* Annual Meeting of American Law and Economics Association, June 2023.
Commentor, *How Deals Die?*, Vanderbilt Law & Business Conference, April 2023.
*The Uses and Potential Abuses of AI in Law and Economics Research*, Seoul National University Faculty of Law, March 2023.
Commentor, *Shareholder Litigation and Corporate Culture*, NYU/Penn Law and Finance Workshop, University of Pennsylvania March 2023.
*The Value of M&A Drafting*, Berkeley Law Faculty Workshop, February 2023.

**2022**  *The Value of M&A Drafting*, Enterprise Law Workshop, Hitotsubashi University, Tokyo, November 2022.
*Strategies to Promote Effective Workouts,* Asian Development Bank, December 2022.

3

*The Value of M&A Drafting*, Conference on Empirical Legal Studies, November 2022.

*The Value of M&A Drafting*, Annual Meeting of the American Law and Economics Association, August 2022.

*Loopholes in Complex Contracts,* Columbia Bob Scott Conference, April 2022.

*Loopholes in Complex Contracts*, BYU Winter Deals Conference, March 2022.

*Social Good and Litigation Risk*, Annual Meeting of the Institute of Law, Economics, and Politics, January 2022.

**2021**    *Evolutionary Learning in Complex Contracts*, USC Faculty Workshop, December 2021.

*Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A*, Corporate Law Academic Webinar, November 2021.

*Evolutionary Learning in Complex Contracts*, Georgetown Law and Economics Workshop, October 2021.

*Evolutionary Learning in Complex Contracts*, George Mason Faculty Workshop, October 2021.

*What is Legal Similarity and How Do We Measure It?*, Annual Meeting of the American Law and Economics Association, October 2021.

*What is Legal Similarity and How Do We Measure It?*, Online Workshop on the Computational Analysis of Law, April 2021.

**2020**    *How Informative Is the Text of Securities Complaints?*, University of Toronto Law and Economics Workshop, October 2020.

*How Informative Is the Text of Securities Complaints?*, Corporate Law Academic Webinar, February 2020.

*How Informative Is the Text of Securities Complaints?*, Text Analysis in Law Conference, February 2020, UC Berkeley.

*How Informative Is the Text of Securities Complaints?*, BYU Deals Conference, March 2020, Park City, UT.

*How Informative Is the Text of Securities Complaints?*, Corporate Law Academic Online Workshop, July 2020, online.

**2019**    *Contractual Complexity in Debt Agreements: The Case of EBITDA*, Conference on Empirical Legal Studies, November 2019, Claremont College, CA.

*How Informative Is the Text of Securities Complaints?*, Text as Data Conference, October 2019, University of Zurich.

*Contractual Complexity in Debt Agreements: The Case of EBITDA*, ETH Zurich Ad Hoc Seminar, October 2019.

*How Informative Is the Text of Securities Complaints?*, University of Amsterdam Center for Law & Economics, October 2019.

*How Informative Is the Text of Securities Complaints?*, Max Planck Law & Economics Workshop, October 2019, Bonn, GER.

*How Informative Is the Text of Securities Complaints?*, Erasmus University Law & Economics Workshop, October 2019, Rotterdam, NL.

*How Informative Is the Text of Securities Complaints?*, SNU-Berkeley Conference, May 2019, Seoul National University.

*Contractual Complexity in Debt Agreements: The Case of EBITDA*, Annual Meeting of the American Law and Economics Association, May 2019, NYU Law School.

*How Informative Is the Text of Securities Complaints?*, Vanderbilt Law & Business Conference, May 2019, Vanderbilt Law School.

*Contractual Complexity in Debt Agreements: The Case of EBITDA*, BYU Deals Conference, March 2019, Park City, UT.

**2018**    *Is There a First-Drafter Advantage in M&A Agreements?*, Annual Meeting of the Canadian Law and Economics Association, September 2018, University of Toronto Law School.

*Lawyers, Law Firms, and the Production of Legal Information*, Conference on Empirical Legal Studies in Europe, June 2018, KU Leuven, Belgium.

4

*Lawyers, Law Firms, and the Production of Legal Information*, Annual Meeting of the American Law and Economics Association, May 2018, Boston University Law School.

*Is There a First-Drafter Advantage in M&A Agreements?*, UC Berkeley Faculty Workshop, April 2018, Berkeley, CA.

*Lawyers, Law Firms, and the Production of Legal Information*, BYU Winter Deals Conference, February 2018, Park City, UT.

**2017**    *Debt Contract Terms and Creditor Control*, Journal of Law, Finance & Accounting Annual Conference, November 2017, London Business School.

*Lawyers, Law Firms, and the Production of Legal Information*, Shareholder Litigation Conference, October 2017, UCLA School of Law.

*Lawyers, Law Firms, and the Production of Legal Information*, Center for the Study of Law and Society, October 2017, UC Berkeley.

*Lawyers, Law Firms, and the Production of Legal Knowledge*, CEAR Law and Finance Conference, May 2017, Georgia State University.

*Reference Networks and Legal Origin*, Complexity & the Law Workshop, February 2017, University of Michigan.

*Debt Contract Terms and Creditor Control*, Faculty Workshop, February 2017, Northwestern Pritzker School of Law.

*Debt Contract Terms and Creditor Control*, Law and Economics Workshop Series, February 2017, BYU Law School.

*Debt Contract Terms and Creditor Control*, Law and Economics Workshop Series, February 2017, Columbia Law School.

**2016**    *Entity Ownership and the Theory of the Firm,* Junior Business Law Conference, July 2016, University of Colorado School of Law.

*Debt Contract Terms and Creditor Control*, Conference on Empirical Legal Studies in Europe, June 2016, University of Amsterdam.

*Debt Contract Terms and Creditor Control*, Annual Meeting of the American Law and Economics Association, May 2016, Harvard Law School.

*Debt Contract Terms and Creditor Control*, Business Law Seminar, March 2016, UC Berkeley School of Law, Law, Economics, and Business Workshop.

*Debt Contract Terms and Creditor Control*, Business Law Seminar, February 2016, University of Chicago Law School.

*Legal Structures,* Digging into Data Challenge 3 Conference, January 2016, Glasgow, Scotland.

**2015**    *Debt Contract Terms and Creditor Control*, Corporate and Securities Litigation Conference, October 2015, Boston University School of Law.

*Debt Contract Terms and Creditor Control*, Junior Business Law Conference, July 2015, University of Colorado School of Law.

*Debt Contract Terms and Creditor Control*, Faculty Workshop Series, July 2015, Washington University in St. Louis School of Law

*Deal Litigation, Law Firm Quality, and Firm Value*, Harvard/Stanford/Yale Junior Faculty Forum, June 2015, Harvard Law School.

*Deal Litigation, Law Firm Quality, and Firm Value*, National Business Law Scholars Conference, June 2015, Seton Hall School of Law.

*Deal Litigation, Law Firm Quality, and Firm Value*, Faculty Workshop, February 2015, Notre Dame Law School.

*Appellate Lawmaking in a Judicial Hierarchy*, Amsterdam Center for Law & Economics Winter Meeting, January 2015, University of Amsterdam.

**2014**   *Deal Litigation, Law Firm Quality, and Firm Value*, Conference on Empirical Legal Studies, November 2014, University of California, Berkeley, School of Law.

*Deal Litigation, Law Firm Quality, and Firm Value*, Annual Meeting of the Canadian Law and Economics Association, September 2014, University of Toronto Law School.

*Covenant Thresholds and the Agency Costs of Debt*, Creditors and Corporate Governance Conference, September 2014, University of Chicago Law School.

*Deal Litigation, Law Firm Quality, and Firm Value*, Junior Business Law Conference, July 2014, University of Colorado School of Law.

*Lobbying and Pandering in the Boardroom*, Sixth Annual Berle Symposium, June 2014, Seattle University School of Law.

*The Shareholder Wealth Effects of Delaware Litigation*, National Business Law Scholars Conference, June 2014, Loyola Law School (Los Angeles).

Discussant, *Notre Dame Roundtable on Property Law*, May 2014, Notre Dame Law School.

*The Shareholder Wealth Effects of Delaware Litigation*, Annual Meeting of the American Law and Economics Association, May 2014, University of Chicago Law School.

Discussant, The Future of Law and Economics, March 2014, Maastricht University School of Law.

**2013**   *Influence Costs and the Scope of Board Authority*, Annual Meeting of the Midwestern Law and Economics Association, October 2013, University of Illinois School of Law.

*The Fannie and Freddie Bailouts Through the Corporate Lens*, NYU Journal of Law and Business Roundtable on The Future of Fannie and Freddie, September 2013, NYU School of Law.

*Influence Costs and the Scope of Board Authority*, Junior Business Law Conference, July 2013, University of Colorado School of Law.

*A Strategic Model of the Standard of Review*, Faculty Workshop, June 2013, Washington University School of Law.

*A Strategic Model of the Standard of Review*, Annual Meeting of the American Law and Economics Association, May 2013, Vanderbilt Law School.

*Reputation and the Law of Waiver*, Faculty Workshop, April 2013, Saint Louis University School of Law.

*Merger Class Actions in Delaware and the Symptoms of Multijurisdictional Litigation*, Faculty Workshop, Faculty Workshop, January 2013, Washington University School of Law.

Discussant, Roundtable on Foundational Principles of Contract Law, January 2013, UC Berkeley School of Law.

**2012**   *A Strategic Model of the Standard of Review*, Annual Meeting of the Midwestern Law and Economics Association, October 2012, Washington University School of Law.

*The Shareholder Wealth Effects of Delaware Litigation*, Junior Business Law Conference, July 2012, University of Colorado School of Law.

*Merger Class Actions in Delaware and the Symptoms of Multijurisdictional Litigation*, Institute for Law and Economic Policy Conference, April 2012.

*Reputation and the Law of Waiver*, Faculty Workshop, March 2012, Cornell Law School.

*Reputation and the Law of Waiver*, Faculty Workshop, February 2012, University of Illinois College of Law.

*Reputation and the Law of Waiver*, Faculty Workshop, February 2012, University of Missouri Law School.

**2011**   *Reputation and the Law of Waiver*, Conference on Theoretical Law & Economics, November 2011, Washington University School of Law.

*Probabilistic Interpretation and Contract*, September 2011, Annual Meeting of the Midwestern Law and Economics Association, Indiana University School of Law.

*Self-Help and the Rules of Engagement*, Annual Meeting of the Southeastern Association of Law Schools, August 2011.

*Probabilistic Interpretation and Contract*, Summer Workshop Series, June 2011, Washington University School of Law.

*Self-Help and the Rules of Engagement*, Annual Meeting of the American Law and Economics Association, May 2011, Columbia Law School.

Discussant, AALS Annual Meeting: Contracts Section, January 2011.

**2010**   *Self-Help and the Rules of Engagement*, Junior Faculty Forum, December 2010, Washington University School of Law.

*Self-Help and the Rules of Engagement*, Annual Meeting of the Midwestern Law and Economics Association, October 2010, University of Colorado School of Law.

*Relational Governance and Contract Damages: Evidence from Franchising*, Annual Meeting of the American Law and Economics Association, May 2010, Princeton University.

**2009**   *Relational Governance and Contract Damages: Evidence from Franchising*, Conference on Empirical Legal Studies, November 2009, USC Law School.

*Relational Governance and Contract Damages: Evidence from Franchising*, Work-in-Progress Seminar, September 2009, University of Chicago Law School.

*Harm, Ambiguity, and the Regulation of Illegal Contracts*, Annual Meeting of the American Law and Economics Association, May 2009, University of San Diego Law School.

*Harm, Ambiguity, and the Regulation of Illegal Contracts*, Law and Economics Colloquium, April 2009, Northwestern School of Law.

## COURSES TAUGHT

Contracts, Corporations, Contract Law Seminar, Corporate Law Seminar, Mergers & Acquisitions, U.S. Corporate Law, Empirical Methods for Lawyers.

## PROFESSIONAL SERVICE

Associate Editor: International Review of Law and Economics (2015-2021).

Referee: American Law and Economics Review, International Review of Law and Economics, Journal of Empirical Legal Studies, The Journal of Law and Economics, Journal of Law, Economics & Organization, Journal of Legal Studies, National Science Foundation.

Board of Directors: American Law and Economics Association (2024-present); Society for Empirical Research in Law (Co-President 2015, Director 2016).

Program Committee: Conference on Empirical Legal Studies (2023).

Area Organizer: Annual Meeting of the American Law and Economics Association (2017; 2023).

Executive Committee: AALS Law and Social Science Section (2011-14).

UC Berkeley Law: Academic Placement Committee (2020-21); Faculty Appointments Committee (2018-19, 2023-25), Clerkship Committee (2017-18).

Washington University School of Law: Institutional Profile Committee (2014-16, Chair (2015-16)), Appointments Committee (2012-13; 2016), Clerkship Advisor (2011-12), Law Review Advisor (2014-16), Faculty Advisor for Arab Students Association (2014-2016) and WashU Out West (student club for West Coast affiliates) (2015-2016).

## EXPERT ENGAGEMENTS

Franchi v. SmileDirectClub, Inc. et al., U.S. District Court for the Middle District of Tennessee (2025) (rebuttal report filed on behalf of plaintiff class; deposition pending).

Advanced Cell Diagnostics, Inc. v. Molecular Instruments, Inc., High Court of Justice, Business and Property Courts of England and Wales (2024) (expert report prepared on behalf of plaintiff).

In re Alta Mesa Resources, Inc. Securities Litigation, U.S. District Court for the Southern District of Texas (2023) (rebuttal report filed on behalf of plaintiff class; deposition taken).

Veil piercing matter on behalf of a Fortune 100 company (2023).

The Doctors Company, An Interinsurance Exchange et al. v. Weather Storm Capital, LLC et al.,California Superior Court, San Francisco) (2023, deposition taken).

Corporate governance matter in San Francisco Superior Court on behalf of a Fortune 500 company (2021-22, expert report prepared on behalf of defendants).

Shareholder agreement dispute in a private arbitration (March 2020, testimony provided for the defense).

Narloch et al. v. NSH Management of California, Inc. et al.(2019, CA Sup. Ct., Contra Costa County) (expert report prepared for plaintiffs).

Veil piercing matter in Santa Cruz County Superior Court (2019, engaged by defendant).

Veil piercing matter in an employment class action in the Southern District of California (2018, consulting services for plaintiff class).

St. J. Villere et al. v. Epiq Systems, Inc. et al. (MO Circuit Court) (2016, expert report filed on behalf of defendants; deposition taken).

## OTHER LEGAL EMPLOYMENT

*Attorney, Munger, Tolles & Olson LLP, San Francisco, CA*
    November 2005- March 2008
*Law Clerk to the Hon. Michael W. McConnell, Tenth Circuit Court of Appeals, Salt Lake City, UT*
    August 2004- August 2005
*Summer Associate, Gibson, Dunn & Crutcher LLP, San Francisco, CA*
    May 2003- August 2003
*Summer Associate, Munger, Tolles & Olson LLP, Los Angeles, CA*
    July 2002- August 2002
*Summer Associate, Heller, Ehrman, White & McAuliffe, San Francisco, CA*
    May 2002- July 2002; August 2003

## EDUCATION

*University of California, Berkeley, Jurisprudence and Social Policy Program*
    Ph.D., May 2004
    Dissertation: Essays on Legal and Extra-Legal Ordering
    Outstanding Graduate Student Instructor Award, Fall 2001
*Boalt Hall School of Law, University of California, Berkeley*
    J.D., May 2003
    *Honors*:  Six American Jurisprudence Awards and one Prosser Prize, Order of the Coif
*University of California, Berkeley*
    B.A. with Distinction, 1996

**Appendix B** – *documents considered and or relied on.*

*Articles*

1.  Lou R. Kling, Eileen T. Nugent & Brandon Van Dyke, Negotiated Acquisitions of Companies, Subsidiaries and Divisions § 1.02 (Law Journal Press) (2024).
2.  Guhan Subramanian, Bargaining in the Shadow of Takeover Defenses, 113 Yale L.J. 621, 649 (2003).
3.  "Berkshire Hathaway to Acquire Alleghany Corporation for $848.02 Per Share in $11.6 Billion Transaction," Business Wire, March 21, 2022).
4.  Marcel Kahan and Edward B. Rock, How I Learned to Stop Worrying and Love the Pill: Adaptive Responses to Takeover Law, 69 University of Chicago Law Review 871, 875-78 (2002).
5.  Abbe L. Dienstag, Alan R. Friedman, Adi Herman & Ernest S. Wechsler, Once More Unto the (Material) Breach: Twitter Sues Elon Musk to Enforce Agreement, Kramer Levin (July 13, 2022), https://www.kramerlevin.com/en/perspectives-search/once-more-unto-the-material-breach-twitter-sues-elon-musk-to-enforce-agreement.html.
6.  Tingting Liu, Tao Shu & Jasmine Wang, Valuation Disagreement in Mergers and Acquisitions, available at: https://papers.ssrn.com/sol3/Papers.cfm?abstract_id=3954130.
7.  Delaware Supreme Court Upholds Rare Ruling that Material Adverse Event Allowed Purchaser to Negate Merger, O'Melveny, December 20, 2018, available: https://www.omm.com/insights/alerts-publications/delaware-supreme-court-upholds-rare-ruling-that-material-adverse-event-allowed-purchaser-to-negate-merger/.
8.  Stephen L. Sepinuck, Case Law Matters, Bus. L. Today (Aug. 2022), https://www.americanbar.org/groups/business_law/resources/business-law-today/2022-august/case-law-matters/.
9.  https://www.theventurealley.com/2010/07/understanding-the-bring-down-condition-in-public-company-mergers/.
10. Roger A. Cooper & Mark E. McDonald, Cleary Gottlieb Steen & Hamilton LLP, Navigating M&A Transactions with an Eye Towards Post-Closing Dispute Resolution, Lexology (Apr. 16, 2024), https://www.lexology.com/library/detail.aspx?g=ead518fe-31ef-4882-abce-d5fa571015e0.
11. Gail Weinstein, Philip Richter & Steven Epstein, Court of Chancery Finds Pandemic Was Not an MAE—Snow Phipps, Harv. L. Sch. F. on Corp. Governance (May 20, 2021), https://corpgov.law.harvard.edu/2021/05/20/court-of-chancery-finds-pandemic-was-not-an-mae-snow-phipps/.
12. Steven M. Haas, Delaware Chancery Rejects a Buyer's MAE Claim—Again, Hunton Andrews Kurth (Dec. 1, 2022), https://www.hunton.com/insights/legal/delaware-chancery-rejects-a-buyers-mae-claim-again.
13. Benjamin L. Stulberg, Randi C. Lesnick, Robert S. Faxon & Andrew M. Levine, Delaware Chancery Court Finally Finds an MAE, Jones Day (Oct. 2018),

https://www.jonesday.com/en/insights/2018/10/delaware-chancery-court-finally-finds-an-mae.

14. Jeran Wittenstein, Fortune, "Twitter Shares Sink After Musk Says He's Ending Acquisition Bid in 'Disaster Scenario' for the Social Media Platform," July 9, 2022, available: https://fortune.com/2022/07/09/twitter-shares-sink-after-musk-says-hes-ending-acquisition-bid-in-disaster-scenario-for-the-social-media-platform.

15. https://www.nytimes.com/2022/10/27/technology/elon-musk-twitter-deal-complete.html.

16. Cole Rosengren, "Advanced Disposal shareholders approve amended terms for $4.6B sale to Waste Management," Wastedive, August 26, 2020.

17. David Goldman, Chris Isidore & Clare Duffy, Elon Musk says Twitter deal 'temporarily on hold', CNN (May 13, 2022, 10:01 AM EDT), https://www.cnn.com/2022/05/13/tech/twitter-deal-on-hold-elon-musk.

18. https://time.com/6099976/twitter-class-action-lawsuit/.

19. Matt Levine, Elon Trolls Twitter, Bloomberg (May 13, 2022), https://www.bloomberg.com/opinion/articles/2022-05-13/elon-musk-trolIs-twitter.

20. Kurt Wagner and Maxwell Adler, Elon Musk's Twitter Deal is Proceeding, Not "On Hold, "Executives Tell Staff, Bloomberg (May 19, 2022), https://www.bloomberg.com/news/articles/2022-05-19/twitter-deal-is-proceeding-not-on-hold-executives-tell-staff.

21. Molly Schuetz and Robert Burnson, Time, "Twitter Agrees to Pay $809.5 Million Settlement in Shareholder Class Action Lawsuit," September 20, 2021, available at https://time.com/6099976/twitter-class-action-lawsuit/

*Books*

1. Claire A. Hill, Brian Quinn, and Steven Davidoff Solomon's Mergers and Acquisitions: Law, Theory, and Practice, 3d. 3rd Edition. West Academic Publishing (2023).

2. Guhan Subramanian, Dealmaking: The New Strategy of Negotiations 32-33 (2d ed. 2020).

*Cases*

1. El Paso Pipeline Partners L.P. Derivative Litig., 132 A.3d 67, 130 n.79 (Del. Ch. 2015).

2. El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff, 152 A.3d 1248 (Del. 2016).

3. Dell Techs. Inc. Class v. S'holders Litig., 300 A.3d 679, 728 (2023).

4. Tiffany & Co. v. LVMH Moët Hennessy-Louis Vuitton SE, et al., C.A. No. 2020-0768-JRS (Del. Ch. Sept. 9, 2020).

5. AB Stable VIII LLC v. MAPS Hotels & Resorts One LLC, No. 71, 2021, 2021 WL 5832875 (Del. Dec. 8, 2021).

6. Akorn, Inc. v. Fresenius Kabi AG, 198 A.3d 724 (2018).

7. SEC v. Musk, Case No. 25-cv-105, US Dist. Court, DC. Complaint (ECF 1)

8. IBP, S'holders Litig., 789 A.2d 14, 71 (Del. Ch. 2001).

9. Channel Medsystems v. Boston Scientific, 2019 WL 6896462 (Del. Ch. 2019).

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>        Defendant. | **CASE NO. 3:22-CV-05937-CRB** |

**EXPERT REPORT OF ADAM BADAWI**

MAY 28, 2025

**CONFIDENTIAL**

1

## I.    BACKGROUND AND QUALIFICATIONS

1.    I am a Professor of Law at the University of California Berkeley School of Law ("Berkeley").  I joined the Berkeley faculty in 2017 after seven years on the faculty at Washington University School of Law (St. Louis).  At Berkeley, I teach Business Associations, Mergers & Acquisitions, Contracts, and seminars related to these subjects.  I have published widely on corporate governance and securities law topics.  My articles on these subjects have appeared in law reviews, including Michigan Law Review, California Law Review, Washington University Law Review, The Yale Journal on Regulation, the Harvard Business Law Review, and the Journal of Corporation Law, among others.  My work has also appeared in peer-reviewed journals, including the Journal of Law and Economics, the Journal of Law, Economics & Organization, the American Law and Economics Review, and the Journal of Empirical Legal Studies.  I have had multiple articles selected for inclusion in Corporate Commentator's list of the top ten corporate law articles of the year, which is determined by a vote of corporate law academics.

2.    My research often uses text analysis to analyze the content of corporate disclosures and litigation.[1]  This work has included analysis of securities prospectuses, annual and quarterly reports, and securities class action complaints.  My research has been cited multiple times by the Delaware Court of Chancery, the leading business court in the

---

[1] Text analysis is the use of machine learning and computation to classify and find patterns in large amounts of language.  I have performed text analysis on hundreds of millions of words contained in S-1 registration statements, proxy statements, 10-K annual reports, and 10-Q quarterly filings.  Building and tuning text analysis models requires with human reading and coding of these texts and I have spent hundreds of hours doing so.

United States, and in United States Securities and Exchange Commission ("SEC") comment letters.[2]

3.      I have published two books on corporate law.  The first, an edited volume, is a book on Corporate Law and Economics that appears in Edward Elgar Publishing's Encyclopedia of Law and Economics (2023).  The second is a casebook, Business Associations: Cases and Materials (2nd ed. 2023) (co-authored with Anthony J. Casey).

4.      I often present my work at the invitation of other law schools.  In recent years, I have presented at Yale Law School, the University of Chicago Law School, New York University Law School, Columbia University Law School, Northwestern Law School, University of Southern California Gould School of Law, the University of Amsterdam, and ETH Zurich, among others.

5.      I have had multiple papers accepted for presentation at the two most competitive conferences for corporate law: the Annual Meeting of the American Association of Law and Economics and the Conference on Empirical Legal Studies.  For the last several years, I have been the co-host, along with Ethan Klingsberg of Freshfields LLP, of the Berkeley Spring Mergers & Acquisitions Forum, which is a conference that brings together leading judges, government officials, academics, and practitioners to

---

[2] See, e.g., In re El Paso Pipeline Partners L.P. Derivative Litig., 132 A.3d 67, 130 n.79 (Del. Ch. 2015), reversed sub nom. El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff, 152 A.3d 1248 (Del. 2016); In re Dell Techs. Inc. Class v. S'holders Litig., 300 A.3d 679, 728 (2023); SEC, Comment Letter on SEC Statement, Jill E. Fisch, File No. cll12-8911728-244385 (2021); SEC, Comment Letter on SEC Statement, George S. Georgiev, File No. cll12-8945393-245744 (2021); SEC, Comment Letter on SEC Proposed Rule, George S. Georgiev, File No. 4-787 (2022).

3

discuss current topics in mergers and acquisitions practice, including the latest trends in due diligence.

6.    I have engaged in extensive service to the profession. In 2024, I was elected as a director of the American Law and Economics Association by its members. I am currently serving a three-year term in that position. I am a past Co-President of the Society of Empirical Legal Studies, and I served on the editorial board for the International Review of Law and Economics. I have served on the program committees for both the Annual Meeting of the American Association of Law and Economics and the Conference on Empirical Legal Studies. I also frequently referee papers for the top peer-reviewed journals in Law and Economics, including the Journal of Law and Economics, the Journal of Law, Economics & Organizations, the Journal of Legal Studies, and the American Law and Economics Review.

7.    Prior to entering the legal academy, I was an attorney in the San Francisco office of Munger, Tolles & Olson. I worked on corporate fiduciary litigation, complex commercial litigation, and served as counsel to multiple special committees of the boards of publicly listed companies. Those committees conducted investigations into alleged wrongdoing, and I drafted reports that summarized the results of those investigations. I also advised those committees on whether and how to disclose those results in their public filings. In addition, I worked for and with several deal teams during my time in practice. As part of that work, I performed due diligence in merger transactions and I advised due diligence teams in acquisitions, including an acquisition of a facility that manufactured biologic pharmaceuticals licensed by the FDA.

8.      A current copy of my curriculum vitae is attached as Appendix A.  I have written expert reports on securities and corporate matters and have had my testimony taken in depositions and in arbitration hearings as an expert.  A list of my previous expert engagements and testimony appears in Appendix A.

## II.    ASSIGNMENT

9.      I have been asked by Plaintiffs to opine on the acquisition of Twitter, Inc. ("Twitter") by Elon Musk ("Mr. Musk") through X Holdings I, Inc. and X Holdings II, Inc., which are entities controlled by Mr. Musk. These parties entered into an Agreement and Plan of Merger (the "Merger Agreement") in April 2022. Specifically, I have been asked to opine on:

A.  the customs and practice of M&A negotiations and agreements;

B.   how buyer or seller-friendly specific terms in the Merger Agreement were relative to contemporaneous deals for U.S. public targets;

C.  whether Mr. Musk's actions were consistent with the customary behavior of a remorseful buyer; and

D.  how Mr. Musk's attempt to terminate the Merger Agreement compare with the customary behavior of buyers who seek to terminate similar transactions.

10.      I am being compensated at my standard billing rate of $1,200 per hour.  I have been assisted by a research assistant, who worked under my direction.  My compensation in this matter is not based on the content of my opinions or the outcome of this matter.  My work in this case is ongoing, and I reserve the right to modify or supplement my opinions if I become aware of additional information, facts, or contentions

5

of the parties or witnesses, including any reports or opinions offered by Defendant's proposed experts, and I reserve the right to respond at trial to the opinions of the Defendant's proposed experts.

### III.   SUMMARY OF OPINIONS

11.    It is my expert opinion that: (1) it is customarily rare for an acquiror of a public company to waive due diligence because doing so entails a substantial risk; (2) a seller-friendly agreement for the acquisition of a public company will customarily contain provisions that make it extremely difficult to terminate the deal on the basis of information learned after the signing of the agreement, but before the closing of the transaction; (3) the Twitter Merger Agreement contained terms, including those relating to information requests by the buyer and the buyer's ability to terminate the transaction on the basis of that information, that are regarded as highly favorable to the seller under prevailing mergers and acquisitions custom and practice; (4) acquirors experiencing buyer's remorse will sometimes use tactics like delay and/or litigation to try to escape the deal or to extract price concessions from sellers; (5) the conditions after the signing of the Merger Agreement created the customary conditions for buyer's remorse; (6) as is customary, nothing in the Merger Agreement expressly stated that the deal would close even if Twitter did not accede to Mr. Musk's information demands, including those about the alleged number of "bots" on Twitter; (7) in a customary merger transaction, there is a significant amount of information that is not public that could give the buyer a basis to terminate the transaction; and (8) an agreement alone cannot guarantee that a deal will close because several

contingencies, such as government approval and a court's willingness to enforce the agreement, are beyond the control of the buyer and the seller.

### IV.    INTRODUCTION TO MERGERS AND ACQUISITIONS

12.    When one company seeks to acquire another, there are several deal structures that can achieve that outcome, with each bringing a variety of costs and benefits. Mergers are a popular way to facilitate these acquisitions because they are legally simple and have lower transaction costs than other types of structures.[3] Completing a merger of a public target company, as Twitter was, generally requires a vote of the target's shareholders.[4] The buyer may also need to secure regulatory approvals under antitrust and other laws.[5] The approvals required for a merger are not guaranteed, and there is some risk that general economic conditions or financial hardship would lead a buyer to sour on the deal and seek to walk away from the transaction. To address these risks, parties will customarily enter into an agreement that provides not only the basic business terms but also has extensive provisions that cover the many contingencies that can arise between the signing of the deal and its closing.[6] These provisions address the obligations of the parties before closing, detail the conditions that must be met before the transaction can be completed, and explain

---

[3] See Lou R. Kling, Eileen T. Nugent & Brandon Van Dyke, Negotiated Acquisitions of Companies, Subsidiaries and Divisions § 1.02 (Law Journal Press) (2024) (hereinafter Kling, Nugent & Van Dyke) (explaining that mergers are a creature of state statutes and allows the purchaser to acquire all the assets and liabilities of the target).
[4] *Id*. at § 2.03(2) ("The general rule is that … the shareholders of [the target corporation] in a merger must approve the transaction.")
[5] *Id*. at § 1.04(c)(i) (reviewing the typical regulatory approvals required in a merger).
[6] *Id*. at § 1.05 (calling the merger agreement the "cornerstone" of the transaction).

the circumstances that will allow one or both of the parties to terminate the deal, among other matters.

## A. The Role of Due Diligence

13.    Before a buyer enters into a merger transaction, it will customarily carry out a "due diligence" investigation. There are many reasons for conducting this due diligence.[7] For example, due diligence allows the buyer to better plan the transaction and prepare for post-closing integration of the target into the buyer. Due diligence also allows the buyer to confirm its beliefs about the target by investigating its assets, liabilities, and the truth of any statements the target has made. Due diligence can proceed in a number of ways, but it is common for a buyer to receive non-public information about the seller *prior* to signing a merger agreement.[8] This information can include management reports and projections, technical information, litigation reports, and board materials, among other types of information.

14.    While compositions vary, it is common to include lawyers, bankers, and auditors on a diligence team. These professionals will typically have access to a physical or virtual "data room" that has the diligence materials that the target makes available.[9] Most diligence takes place pursuant to a non-disclosure agreement that requires parties to keep this information confidential and dictates that information can only be used for the

---

[7] Claire A. Hill, Brian Quinn, and Steven Davidoff Solomon's Mergers and Acquisitions: Law, Theory, and Practice, 3d. 3rd Edition. West Academic Publishing (2023) (hereinafter, HQS), at 345-46.

[8] "Although a large number of target company materials are available publicly, there is usually a significant amount of information that remains confidential or inaccessible" *Id.* at 348.

[9] *Id.* at 347.

purposes of a potential transaction.[10]    The diligence team will often go through the information with a set of checklists that provides a framework for conducting due diligence into the target's structure, finances, material contracts, intellectual property, pending or threatened litigation, tax structure, and other topics that are important to a potential buyer. If this due diligence raises any questions or concerns, the diligence team will typically work with the target to answer those questions and to address any informational deficiencies.

15.    The due diligence memo and the disclosure letter are two important documents that diligence teams customarily produce.    The due diligence memo summarizes the findings from the investigation of the target.[11]    It typically includes an executive summary that provides an overview of the transaction, highlights any red flags or potential deal breakers, and provides recommendations about how to address those problems, such as through a price adjustment.[12]    The disclosure letter lists material assets and risks, such as pending or threatened litigation, material contracts, and intellectual property owned by the target.    This disclosure letter works in conjunction with the representations and warranties in the merger agreement, which are statements about the target that are true and correct at deal signing.    Those representations and warranties will be "brought down"—or tested—at closing to ensure that they remain sufficiently

---

[10] *Id.* at 314.

[11] *Id.* at 352.

[12] "If a due diligence finding affects the valuation of the target company, the buyer can adjust the merger consideration." *Id.* at 351.

accurate.[13]  If the disclosure letter lists a piece of information, such as a pending lawsuit against the target, that piece of information cannot be used to escape closing the transaction.  A typical litigation representation will thus provide that, except for cases and actions listed in the disclosure letter, there is no material litigation pending or threatened against the target.[14]

### B. Diligence in Private and Public Transactions

16.    There are substantial differences in the due diligence investigations of private targets and public targets.  The lack of public disclosures for private targets and the frequent use of auditors outside the Big 4 accounting firms means that due diligence for private companies can often require more intense diligence of the target's finances.[15]  At the same time, buyers of private companies will typically have more flexibility to address a mismatch between what the buyer thought it was buying and what it received.  Private companies usually have a small number of shareholders, which means that the buyer can hold those shareholders liable for any breach of the representations and warranties.[16]  Buyers customarily do this by putting part of the purchase price into escrow.  The buyer can then make claims against this escrow account if it discovers a liability that was not disclosed or discovered during the due diligence process.  The ability to get compensation

---

[13] *See infra* at §IV.B., discussing that most public target merger agreements contain seller-friendly language that makes it very difficult for a buyer to escape a transaction even if there is a substantial variance between the representations and reality at closing.

[14] HQS at 351.

[15] *Id.* at 444.

[16] *Id.* at 444-45.

for any liabilities that a buyer discovers after closing takes some pressure off of the search for those liabilities prior to signing a private merger agreement.

17.    In contrast, risk allocation when purchasing public company targets is typically all done before closing.[17]  Public companies can have millions of individual shareholders and that means that seeking recourse from them after closing is functionally impossible.[18]  For that reason, it is critical that buyers of public targets discover as much information as they need to make the purchase decision during the pre-signing due diligence investigation and prior to closing, when the representations and warranties will be brought down.[19]  The public nature of the target does provide some assistance in the due diligence process.  Securities laws require public companies to file quarterly and annual reports that disclose material financial, operational, and other information to investors.[20]  The public company accountants that vouch for the financials in public disclosures also help ensure the reliability of information in public disclosures.[21]  These mechanisms contribute to the reliability of these disclosures, which aids due diligence investigations into public company targets, at least to a point.

---

[17] *Id.* at 443.

[18] *Id.* at 444.

[19] "As a result, completing a thorough due diligence investigation is of critical importance since the buyer cannot recover losses after closing." *Id.* at 346. *See also* Kling, Nugent & Van Dyke § 8.01 ("it is obvious that the Buyer will need to conduct a great deal of due diligence in transactions where indemnification is limited or nonexistent [as is the case in public target mergers]."

[20] *Id.* at 345.

[21] "[T]he company's accounting firm, for instance, is named in its public filings, and has legal obligations itself." *Id.* at 444.

18.    A customary due diligence investigation of a public target will begin with the public disclosures of that company.  The buyer will typically seek to supplement that information with the non-public information that the target makes available.[22]  The representations and warranties in the agreement will typically bind the seller to this information through financial reports[23] and 10b-5 representations.[24] The financial reports representation will usually state that all of the financial statements in the target's SEC filings were prepared in accordance with Generally Accepted Accounting Principles (GAAP) in all material respects and present an accurate financial picture of the company. The 10b-5 representation typically provides that all of the information in the target's SEC filings do not contain an untrue statement or omit any material fact that would be required to make the statements not misleading.[25]

19.    Buyers of public companies will use non-public information for two primary purposes.  The first is to add to its general understanding of the target's business, finances, and structure during the pre-signing due diligence investigation.[26]  Not all the information that may be important to a potential buyer will appear in the target's public disclosures. For example, a target may disclose its investments in research and development and provide some information about its future plans in its quarterly statements and annual

---

[22] *Id.* at 348-349.

[23] *Id.* at 349

[24] "The 10b–5 representation is a relatively common representation given by sellers in public transactions." *Id.* at 384.

[25] Unlike the legal standard for 10b-5 cases, the customary 10b-5 representation does not contain any scienter requirement. That is, a buyer can typically refuse to close if there is a violation of this representation without having to prove any intent to deceive by the target.

[26] "Some information is difficult to learn from just reading documents." HQS at 348.

reports.  However, a potential buyer would typically want much more information about the operational details of those plans and the projections for their success.  Diligence that goes beyond public filings may also uncover concerns and liabilities that have not been disclosed.

20.    The second use of non-public information is for the much more limited purpose of covering any investigation that occurs between signing and closing.  As a leading treatise emphasizes, in most cases, buyers "essentially complete[] their due diligence" when they finalize the merger agreement.[27]  Any continuing investigation will tend to be limited to business and integration issues and this process will not add to any rights or obligations, which the parties fix in the agreement.[28]  "***Hence, it is critical for the parties to be satisfied with their investigations at the time of signing the acquisition agreement.***"[29]

21.    The merger agreement will specify the buyer's post-signing information rights and the process for the exchange of that information.  This language typically appears in the "Access to Information" covenant and is customarily a point of negotiation between the buyer and the target.  When these terms are buyer-friendly, these information rights will be robust and allow the buyer to conduct extensive post-signing due diligence.  If the buyer has substantial negotiating leverage, it may also be able to negotiate a diligence condition that allows it to avoid closing if the buyer is not satisfied by what it learns through

---

[27] Kling, Nugent & Van Dyke § 1.04(b).

[28] *Id*. at n. 9. (explaining that the buyer may also use information to verify the seller's representations when they are brought down to closing).

[29] Id.

a post-signing investigation.  If these terms are seller-friendly, these rights will be much more restricted.  In a seller-friendly situation, a buyer will typically only be able to access information that is necessary to close the merger, the seller will have broad discretion to deny information requests, and the buyer will have less ability to escape closing on the basis of that information.[30]

22.    In a seller-friendly merger agreement, the bring-down condition will severely restrict the buyer's ability to escape the deal even if information emerges that is at odds with the seller's representations, including those about its public filings.  This type of bring-down condition will only be breached if the failure of the representations to be true and correct, either individually or collectively, amount to a "material adverse effect" (MAE).[31] As explained below, this is an extremely high bar because it is very difficult to show that a breach of the bring-down provision reaches that level.[32]  The difficulty of escaping a deal on the basis of information learned after signing places even more importance on the pre-signing due diligence process investigation that a buyer performs.

### C.    What It Means to Waive Due Diligence

23.    When the buyer of a public target waives its opportunity to perform due diligence, that buyer typically relies on public information, and any other information it

---

[30] A seller-friendly agreement will not have a diligence condition and the bring-down condition will only be met if the failure of the seller's representations to be true causes an MAE. *See* ¶21.
[31] "A bring down condition that qualifies representations as being true to the extent the deviation does not result in a material adverse effect places the risk with the buyer. Bring down conditions qualified by MAEs are common in transactions involving public company sellers." HQS at 404
[32] "The buyer will have the most difficulty being excused from closing if what is required is that the breach, together with other breaches, constitutes a material adverse effect" *Id.* at 406.; *see also Akorn*, *infra*.

may have, when making the decision to acquire the target.[33]   Given the importance of understanding the target's business and the risks to it, it is not surprising that waiving due diligence is extremely rare.[34]   Accordingly, waiving due diligence can create conditions for buyer's remorse because, if the buyer later determines it wants more information, the buyer will have few or no options for recourse.[35]

24.     Waiving due diligence creates the potential for the buyer to later want to try to get out of the contract, which means that buyers will only skip diligence in a handful of situations.   One is where the buyer knows the seller's business extremely well.[36]   For example, if the parties are in the same industry and have worked together closely through several joint ventures, the buyer may believe it has a strong command of the seller's business.   That knowledge limits the risk associated with waiving due diligence and the

---

[33] "[A] buyer considering a hostile takeover can conduct a due diligence review entirely from public sources and proceed without the cooperation of the target…" HQS at 345.

[34] Cf Kling, Nugent & Van Dyke § 8.01 ("As a basic rule, the Buyer can never do too much due diligence: even in situations where nothing particularly troublesome about the business has been uncovered, the increased knowledge about the business gained by virtue of the process puts the Buyer in a better position to negotiate (or renegotiate) the purchase price and to tailor the appropriate representations and warranties in the acquisition agreement.")

[35] "In general, a 'blind' bid, without the ability to conduct due diligence, is subject to the well-known 'lemons problem,' in which the bidder has likely overpaid when the target accepts the offer." Guhan Subramanian, *Bargaining in the Shadow of Takeover Defenses*, 113 Yale L.J. 621, 649 (2003). See also Kling, Nugent & Van Dyke § 8.01 ("While no technique totally eliminates the risk of unknown liabilities resulting in significant losses after the closing, it is the due diligence process that affords the Buyer the opportunity to minimize this risk as much as possible with respect to known and preexisting aspects of the business.")

[36] *See* Expert Report of John C. Coates in Twitter Inc. v. Elon Musk, et al (hereinafter Coates). Professor Coates conducted a study of 86 merger agreements signed in the two years prior to the Twitter acquisition that involved public U.S targets. *Id.* at 35-36. The buyer waived due diligence in only one of those deals and that merger involved a target that the CEO of the buyer, Warren Buffet, had closely observed for sixty years. *Id.* at 19 (citing "Berkshire Hathaway to Acquire Alleghany Corporation for $848.02 Per Share in $11.6 Billion Transaction," Business Wire, March 21, 2022).

time saved by skipping the process can make it less likely that a third party will also make a bid for the seller.

25.     Another context where a buyer may forego due diligence is a hostile transaction.[37]  When the target is unwilling to entertain a transaction, that naturally means that it will not allow the aspiring buyer to conduct due diligence.  The buyer may then make a hostile tender offer to the shareholders, which, if successful, would begin an acquisition process without any diligence.  But, since the advent of the shareholders' rights plan— more commonly referred to as the "poison pill"—it has become virtually impossible to acquire a company through a hostile tender offer.[38]  These days, a hostile tender offer is usually used as a negotiating tactic to bring the would-be target to the table.  If the target is willing to bargain, the seller can then use the waiver of the right to perform due diligence as a condition of moving forward.

26.     A buyer may also waive due diligence when there is competition among potential purchasers.[39]  A willingness to skip the time and expense associated with diligence can make a bid more attractive to a seller who has several bids before it.  That

---

[37] HQS at 345.

[38] The poison pill was developed in the 1980s to stymie hostile tender offers. *See* Marcel Kahan and Edward B. Rock, *How I Learned to Stop Worrying and Love the Pill: Adaptive Responses to Takeover Law*, 69 University of Chicago Law Review 871, 875-78 (2002) (reviewing the development and effectiveness of the pill). This pill will set an ownership threshold—typically in the 10 percent to 20 percent range—that triggers the plan if any single person or entity acquires an ownership amount that exceeds that threshold. Once triggered, the plan allows every other shareholder to acquire additional shares of the target at an attractive discount. A hostile tender offer to acquire a controlling share of the target would, if successful, trigger the plan and result in the immediate dilution of the offeror. For this reason, the pill is a highly effective deterrent to hostile tender offers.

[39] Guhan Subramanian, Dealmaking: The New Strategy of Negotiauctions 32-33 (2d ed. 2020).

16

same dynamic may be at play when a potential seller is reluctant to enter a transaction. An

offer that includes a willingness to limit or eliminate any due diligence may make the seller

more inclined to accept the deal. Sellers who have this leverage may also be able to limit

the ability of the buyer to conduct any post-signing investigation of the seller and may be

able to restrict or eliminate the buyer's ability to escape the deal if the buyer is not satisfied

with the post-signing information it receives.

### D. Buyer's Remorse in Merger Transactions

27.    A leading reason for buyer's remorse is the buyer coming to the belief, after

signing, that it is overpaying for what it is receiving. Buyer's remorse can also occur when

an economy-wide or buyer-specific crisis occurs between signing and closing. This section

details several reasons why buyers experience pre-closing remorse and explains the

customary reactions to that remorse.

28.    When a buyer learns new information about the seller after signing, that can

lead to a belief that the buyer is overpaying. The buyer's options at that point will depend

on the rights it has negotiated in the merger agreement. A buyer-friendly agreement may

allow the buyer to walk away by paying the target a modest termination fee.[40] That type

of contract may also provide the buyer with the flexibility to escape the transaction if the

new information is not consistent with the representations and warranties that the parties

negotiated. The buyers' options will be more limited in seller-friendly contracts, which

---

[40] "[A] buyer who is unwilling to proceed at the original purchase price can use a plausible MAC claim, together with the reverse break-up fee provision, to either renegotiate the purchase price or exit at a cost below the fee." Reverse Break-Up Fees and Specific Performance, Practical Law Practice Note 8-386-5095

will customarily contain a right to specific performance.[41]  That right allows the seller to seek a court order that forces the buyer to close the transaction.  And, as explained above, seller-friendly merger agreements generally limit the buyer's post-signing information rights and the buyer's ability to escape the deal *even if* the target's public filings turn out to be incorrect.[42]

29.    A lack of interest from other potential bidders may trigger buyer's remorse. If the target runs an auction for itself, a winning buyer may experience some regret if it learns that its bid was much higher than any others or if it comes out that there was only one bidder.[43]  When a target sells itself through a one-on-one negotiation with a buyer, the so-called *Revlon* duties of the selling board will generally require it to conduct a post-signing market check.[44]  The merger agreement will provide the rights and restrictions that govern the target's ability to test the market for a higher bid.  The agreement will customarily require the target to provide any information about third party bids to the

---

[41] Most public company deals include a right to seek specific performance. Am. Bar Ass'n, Mergers & Acquisitions Comm., *2024 ABA Deal Points Study*, Tableau Public, https://public.tableau.com/app/profile/aba.deal.points/viz/2024ABADealPointsStudy/Home#1 (last visited May 10, 2025).

[42] "[A] buyer's principal escape hatch in response to adverse post-signing diligence discoveries or breaches of representations is proving the occurrence of an MAE … a very high burden." Abbe L. Dienstag, Alan R. Friedman, Adi Herman & Ernest S. Wechsler, *Once More Unto the (Material) Breach: Twitter Sues Elon Musk to Enforce Agreement*, Kramer Levin (July 13, 2022), https://www.kramerlevin.com/en/perspectives-search/once-more-unto-the-material-breach-twitter-sues-elon-musk-to-enforce-agreement.html.

[43] The potential for overbidding has been called "the winner's curse." This phenomenon has been identified as one of the reasons why buyers in M&A transactions often underperform after significant acquisitions. *See* Tingting Liu, Tao Shu & Jasmine Wang, *Valuation Disagreement in Mergers and Acquisitions*, available at: https://papers.ssrn.com/sol3/Papers.cfm?abstract_id=3954130 (finding empirical support for the winner's curse in the M&A market).

[44] HQS at 678.

18

original buyer and will often allow the target to match any bid that emerges.[45]  This structure means that the buyer will acquire a substantial amount of information about the post-signing market for the target.  If no other bidders emerge during this process, that can also lead a buyer to believe that it may be overpaying for the target.

30.     A reversal of the buyer's fortunes can also lead to remorse.  That reversal can be the product of global or national events or it can be a predicament that is specific to the buyer.  The most recent example of a global economic crisis, the Covid-19 pandemic, produced several instances where buyers who signed pre-crisis deals sought to get out of those deals prior to a post-crisis closing.[46]  Sometimes it is only the buyer or the buyer's industry that experiences a predicament.  That can happen when, for example, the buyer experiences an unexpected downturn in its business, if there is a government investigation into alleged wrongdoing by the buyer, or if the buyer becomes involved in high-stakes litigation, such as a challenge to a key piece of the buyer's intellectual property.  If these circumstances happen prior to closing a signed deal, the buyer's regret may lead to an attempt to escape or alter the merger.

### E.  Remorseful Buyer's Options Largely Depend on the Merger Agreement

31.     A remorseful buyer has a choice of tactics.  Those tactics will customarily depend on the buyer's ultimate goals and rights of the buyer and the target in the merger

---

[45] "[I]n combination, information rights and matching rights put the initial bidder in a very good position in any post-signing bidding contest." *Id.* at 400.

[46] *See, e.g.*, the dispute between Tiffany and LVMH, Tiffany & Co. v. LVMH Moët Hennessy-Louis Vuitton SE, et al., C.A. No. 2020-0768-JRS (Del. Ch. Sept. 9, 2020) and AB Stable VIII LLC v. MAPS Hotels & Resorts One LLC, No. 71, 2021, 2021 WL 5832875 (Del. Dec. 8, 2021).

agreement. Some buyers may still be willing to purchase the target if they can negotiate a lower price, while others may be unwilling to acquire the target for any amount. The buyer, will, of course, have an easier time obtaining its desired result when the merger agreement's terms favor the buyer.

32.    If, for example, in a buyer-friendly agreement, the buyer has the right to walk away by paying a low reverse termination fee, it can threaten to do just that unless the seller makes a concession on price.[47] Where the buyer has negotiated favorable representations and warranties, the discovery of undisclosed negative information, such as a government investigation or the potential invalidity of an important patent, can give the buyer a right to walk away from the transaction. The buyer can use that right as leverage to negotiate its desired outcome.[48]

33.    A seller-friendly agreement limits the options available to a remorseful buyer. A seller's right to ask for specific performance will usually mean that the buyer cannot pay a modest fee and walk away without a reason. Rather, the buyer must find a justification to exit the agreement and, when that agreement contains the types of closing conditions that customarily favor the seller, that will be difficult to do. For that reason, it is worth reviewing the closing conditions and additional contract terms that favor the seller.

34.    Nearly all merger agreements will have a Material Adverse Effect ("MAE") condition that allows the buyer to refuse to close the transaction if anything happens

---

[47] The fee that a seller pays to a buyer if it sells itself to another party or if the shareholder vote fails is customarily referred to as a "termination fee." The fee that a buyer pays to a seller if it terminates the deal is customarily referred to as a "reverse termination fee."
[48] *See supra*, Reverse Break-Up Fees and Specific Performance.

20

between signing and closing that would have a material adverse effect on the business.[49]

An MAE provision will typically define an MAE as anything that would have a "material adverse effect on the business, financial conditions or results of the Company" and customarily includes "carve outs," which are events and circumstances that are excluded from the determination of whether an MAE has occurred. Common carve outs include exclusions for industry-specific and economy-wide changes. While a longer list of exclusions is indicative of a seller-friendly deal, the reality is that the typical MAE condition already tilts heavily in favor of the seller. In Delaware, which is the leading jurisdiction for American corporate law, only once has a buyer's attempt to escape a deal under the MAE provision been successful. That case involved a pharmaceutical company that submitted false data to its primary regulator, the Food and Drug Administration ("FDA"), during the approval process for pharmaceutical products.[50]

35. One of the most seller-friendly terms in an agreement is an bringdown condition for the seller's representations and warranties that requires a showing of an MAE.[51] This condition will be satisfied as long as the failure of the representations to be accurate, including representations about the target's public disclosures, does not amount

---

[49] "The MAE clause is thus the key element of the merger agreement dictating when and if a buyer has a right to refuse to close the transaction." HQS at 420.

[50] See Akorn, Inc. v. Fresenius Kabi AG, 198 A.3d 724 (2018). See also, Delaware Supreme Court Upholds Rare Ruling that Material Adverse Event Allowed Purchaser to Negate Merger, O'Melveny, December 20, 2018, available: https://www.omm.com/insights/alerts-publications/delaware-supreme-court-upholds-rare-ruling-that-material-adverse-event-allowed-purchaser-to-negate-merger/.

[51] Stephen L. Sepinuck, *Case Law Matters*, Bus. L. Today (Aug. 2022), https://www.americanbar.org/groups/business_law/resources/business-law-today/2022-august/case-law-matters/.

21

to a Material Adverse Effect.  As explained above, that standard is so high that Delaware courts have found that conditions warranted the finding of an MAE only ***once*** in their history.  The difficulty of meeting that standard means that even wide divergence between a target's representations and reality generally will not allow the buyer to escape the deal.  In a buyer-friendly agreement, in contrast, the bring-down condition will require the seller's representations to be true in "all material respects."  This language would allow a buyer to terminate even when a relatively unimportant representation is incorrect in a material way.[52]

36.    The lack of a financing condition also indicates a seller-friendly deal.[53]  A buyer who needs to borrow money to finance its purchase of the seller will customarily want to condition its obligation to close on its ability to finance the transaction.  When a seller has leverage in negotiations, it will typically omit this financing condition, which means that the buyer must close regardless of whether its financing is available or not.

37.    Seller-friendly agreements will omit any diligence condition.[54]  This omission is typically evident in a buyer's representation that it is relying on its own

---

[52] *See* https://www.theventurealley.com/2010/07/understanding-the-bring-down-condition-in-public-company-mergers/ (explaining the difference between the "in all material respects" and MAE formulations of the bring-down conditions and explaining a shift toward the seller-friendly MAE language in public target merger agreements).

[53] "[N]o-penalty financing outs became increasingly rare in acquisition agreements. However, they remain a viable option for buyers in the context of distressed-asset sales or other circumstances in which the buyer has most of the negotiating leverage." Reverse Break-Up Fees and Specific Performance, Practical Law Practice Note 8-386-5095

[54] See Kling, Nugent & Van Dyke § 14.10 ("An extremely important, although relatively rare, condition is one giving the Buyer the right to refuse to close based on the results of its post-signing investigation of the Sellers or the Company" and noting that public companies are especially "loathe to agree to a due diligence condition.")

independent investigation of the seller and on its independent review and analysis of the seller's covenants.

38.    In addition to a specific performance right and the closing conditions listed above, several other provisions can indicate that an agreement is seller-friendly.  One of those is a covenant that obligates a buyer to make "best efforts" to consummate the transaction, including any financing commitments.[55]  A very seller-friendly version of this language will include a "hell-or-high-water" provision that requires the buyer to do everything necessary to close the financing commitments specified in the merger agreement.

39.    Seller-friendly agreements also limit the termination rights of buyers.  They can do so by requiring notice and an opportunity to cure[56] if the seller is not in compliance with any of its closing conditions and prohibiting a buyer from terminating if that buyer has materially breached its obligations under the agreement.[57]

40.    Despite a remorseful buyer's desire to escape, an agreement that contains seller-friendly provisions will make it difficult to do so.  In this situation, the seller can usually parry the buyer's claim of breach, or even an attempt to litigate the claim of breach, by citing the seller-friendly language in the agreement.  But it is important to emphasize

---

[55] HQS  at 392.

[56] "Most agreements provide a cure period." Roger A. Cooper & Mark E. McDonald, Cleary Gottlieb Steen & Hamilton LLP, *Navigating M&A Transactions with an Eye Towards Post-Closing Dispute Resolution*, Lexology (Apr. 16, 2024), https://www.lexology.com/library/detail.aspx?g=ead518fe-31ef-4882-abce-d5fa571015e0.

[57] "[I]n order to terminate a transaction agreement, the terminating party cannot itself be in material breach of the agreement." *Dienstag et al.*

that an agreement alone, no matter how seller-friendly it may be, can never provide complete certainty that a deal will close. While parties can ask a court to enforce merger provisions and even to order the buyer to close, that determination is in the equitable discretion of the court, rather than in the hands of the buyer and seller.

## V.    THE TWITTER TRANSACTION

41.    This section explains Mr. Musk's initial interest in Twitter and the process that led to the negotiation and signing of the Merger Agreement. It also explains that the Merger Agreement contained many of the provisions that are customarily considered seller-friendly.

### A. Elon Musk Takes a Position in Twitter

42.    Before Mr. Musk acquired Twitter, he was a prolific user of its service. Beginning in January 2022, Musk started to accumulate Twitter stock.[58] As of March 14, 2022 he had purchased roughly 5 percent of Twitter's outstanding shares, although he did not disclose that fact publicly, as SEC regulations require.[59] Mr. Musk continued to acquire stock and, as of April 1, 2022, owned about 9.1% of Twitter's stock. He had still not complied with his disclosure obligations and did not do so until April 4, 2022. In response to that announcement, the price of Twitter's stock jumped 27% higher.[60]

43.    Mr. Musk allegedly discussed three strategies for his interest in Twitter. He could join the board, he could take Twitter private, or he could form a competitor.[61] Mr.

---

[58] Musk-Pampena-0238983.
[59] See *SEC v. Musk*, Case No. 25-cv-105, US Dist. Court, DC.
[60] Id. at ¶¶37-42.
[61] Musk-Pampena-0030517.

Musk and Twitter initially took the first approach.  The board invited Mr. Musk to become a Twitter director on April 3, which he accepted, and that agreement was announced to the public on April 5.[62]

### B.  Mr. Musk Makes an Offer for Twitter and Waives Due Diligence

44.      Mr. Musk then reneged on that acceptance on April 9.  Four days later, on April 13, Mr. Musk made an unsolicited offer for Twitter in a letter, which stated:[63]

> I am offering to buy 100% of Twitter for $54.20 per share in cash, a 54% premium over the day before I began investing in Twitter and a 38% premium over the day before my investment was publicly announced. My offer is my best and final offer and if it is not accepted, I would need to reconsider my position as a shareholder.

45.      The next day, Mr. Musk publicly announced this offer and explained that it was conditioned on customary business due diligence and his ability to obtain financing.[64] Also on that day, the Twitter board met with its financial advisor, Goldman Sachs, to discuss the proposal.  The board decided to implement a poison pill to insulate its shareholders from coercive or otherwise unfair takeover tactics.  The adoption and announcement of that plan took place on April 14.[65]

---

[62] See *SEC v. Musk*, Case No. 25-cv-105, US Dist. Court, DC, ¶43.
[63] Musk-Pampena-0018097.
[64] Musk-Pampena-0527029.
[65] See Twitter Form 8-K, filed April 15, 2022, available at
https://www.sec.gov/Archives/edgar/data/1418091/000119312522107462/d296740d8k.htm.

46.    In the meantime, Mr. Musk worked to secure financing for the offer.  As of April 20, he had committed $21 billion in equity financing and arranged for $25.5 billion of debt financing that was secured by $12.5 billion of Mr. Musk's Tesla stock.[66]

47.    On April 21, Mr. Musk announced that his bid was "no longer subject to financing" as a result of the financing commitments and was "no longer subject to business due diligence."[67]

48.    On Sunday, April 24, 2022, Musk sent a letter to the Twitter board reiterating that his offer of $54.20/share was "best and final."  He said he would propose a "seller friendly" merger agreement that he wanted signed quickly.[68]  His counsel sent a draft agreement, emphasized that the offer did not depend on any due diligence, and stated that the proposed contract was "a lean-in draft intended to make this easy on all to get the deal done asap."[69]

49.    The parties negotiated throughout the night.  Twitter insisted on including terms that would make the agreement more favorable to it.[70] The next day, the Twitter board met to discuss the agreement.  After Goldman Sachs and J.P. Morgan presented their opinions that the price was fair, the board approved the Merger Agreement and recommended that Twitter shareholders vote in favor of the merger.[71]

---

[66] Musk-Pampena-0358142.
[67] *Id.*
[68] Musk-Pampena-0001445.
[69] Musk-Pampena-0676494.
[70] Musk-Pampena-0241260, p. 28-39.
[71] *See* Definitive Proxy Statement, filed July 26, 2022, at pp. 56-57.

### C.  The Merger Agreement Is Very Seller-Friendly

50.    In my opinion, the Merger Agreement contains terms, individually and in the aggregate, that are customarily considered extremely friendly to the seller.  This section will discuss those terms in relation to custom and practice.

51.    When a buyer and a seller negotiate a merger agreement, many of the terms are not subject to any meaningful negotiation.  For example, the mechanics of canceling the shares of the target and converting them into the right to receive the merger consideration, are almost always the same (in cash transactions) and there is nothing to negotiate.  The same is true of the vote of the target's shareholders.  That vote is typically required by law, and when it is, the success of that vote will always appear as a closing condition.

52.    Other provisions in a merger agreement will customarily be subject to negotiation.  How those negotiations turn out will usually depend on whether the buyer or the seller has more leverage.[72]  Buyers will seek an agreement that gives them the flexibility to walk away from the transaction as easily and as cheaply as possible.  Sellers, alternatively, will favor a contract that commits the buyer to close the transaction under nearly all circumstances if the seller so desires.[73]

### 1.  Robust Specific Performance Rights are Seller-Friendly

53.    A specific performance clause is one of the most seller-friendly provisions there is.  This provision allows the seller to seek a court order that, if granted, would force

---

[72] *See Coates* at ¶31 f.n. 40.

[73] "There is a greater risk to the target if the deal fails." *Coates* at ¶72.

the buyer to close the transaction.  The Merger Agreement contains this language: "the parties hereto acknowledge and agree that the parties hereto shall be entitled to an injunction, specific performance and other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms provisions hereof."[74]

54.    As practitioners have noted, seller-friendly specific performance clauses will provide for specific performance as long as debt financing is available and will not limit the seller's remedies to a reverse termination fee.[75]  The Merger Agreement provides that "the Company shall be entitled to specific performance … to enforce the Equity Investor's obligation to fund the Equity Financing directly, and to consummate the Closing if and for so long as" several conditions have been met, including that "the Debt Financing…has been funded or will be funded at the Closing."[76]  This provision also states that "[n]otwithstanding anything herein to the contrary, including the availability of the Parent Termination Fee or other monetary damages, remedy or award, it is hereby acknowledged and agreed that the Company shall be entitled to specific performance."[77]

### 2.  Seller-Friendly Closing Conditions

55.    The number of closing conditions is an indication of whether a merger agreement is buyer-friendly or seller-friendly.  Buyers will generally prefer a larger number of conditions because a problem with any one of them can provide an argument for refusing

---

[74] Merger Agreement Sec. 9.9(a).

[75] Latham & Watkins, LLP, Deal Certainty at 31, available at:
https://www.lw.com/admin/Upload/Documents/OilAndGasMandA/General%20Concepts/Consol idated_Deal_Certainty_to_Going_Private_Transactions.pdf.

[76] Id. at 9.9(b).

[77] Id. at 9.9(b).

to close the transaction if the buyer has changed its mind.  Sellers, in contrast, prefer a small number of conditions because that will limit a buyer's ability to refuse to close.[78]

56.     The Merger Agreement lists three conditions that apply to each party: (1) approval of the merger by the Twitter stockholders; (2) the expiration of required waiting periods under the antitrust laws; and (3) the absence of a government order prohibiting the merger.[79]  If those conditions have been satisfied, the Merger Agreement obligates the Parent (Mr. Musk and his entities) to close the transaction as long as: (1) Twitter "has "performed or complied, in all material respects, with its obligations required under this Agreement"; (2) the bring-down condition has been met; and (3) no Company Material Adverse Effect has occurred and is continuing.[80]

57.     These provisions contain language that renders them seller-friendly, but before discussing that language, it is important to note the customarily buyer-friendly conditions that are absent from the Merger Agreement.

58.     The Merger Agreement does not have a financing condition.  A buyer who is borrowing part of the purchase price will customarily seek to include a condition that it is only required to close if it obtains that financing.[81]  Without that language, a buyer will

---

[78] Coates ¶11(d)(ii); *id.* at ¶31 ("Buyers prefer to have the ability to delay or terminate a deal based on a wider array of risk realizations or information discoveries ... [s]ellers, by contrast, have the opposite preferences.").

[79] Merger Agreement, Sec. 7.1

[80] Id. at Sec. 7.2.

[81] "The merger agreement also generally includes cooperation covenants typically subject to efforts standards and other qualifications to cause the closing of the merger and all related transactions, including, if applicable, financing to occur." Public Mergers: Overview, Practical Law Practice Note Overview 4-382-2164.

29

be obligated to close the transaction for the full purchase price even if its financing fails to materialize.[82]

59.    Parties often do not want to leave any doubt when they choose not to include a financing condition.  The Merger Agreement removes any doubt on this point by stating "that it is not a condition to the Closing or to any of its obligations under this Agreement that the Equity Investor, Parent, Acquisition Sub and/or any of their respective Affiliates obtain any financing."[83]

60.    The Merger Agreement also does not include a diligence condition.  A diligence condition requires that the buyer be satisfied with the diligence it has conducted on the seller at the time of closing.  A very buyer-friendly diligence condition will allow a buyer to determine the adequacy of its diligence using its "sole discretion."[84]  Sellers may seek to limit these conditions to specific areas of diligence or require that the buyer only be "reasonably satisfied" with the diligence.[85]  A seller-friendly agreement will not only omit this provision, but it will also have the buyer represent that it is satisfied with its diligence and the truth of the seller's representations and warranties.  This structure will

---

[82] "In the past, buyers often negotiated a "financing out" in the acquisition agreement allowing them to walk away from the deal if they were unable to obtain financing and complete the acquisition." Acquisition Finance: Overview, Practical Law Practice Note Overview 1-382-8186.

[83] Id. at Sec. 5.4. See also Sec. 6.10(f) ("Parent acknowledges and agrees that neither the obtaining of the Financing or any alternative financing, nor the completion of any issuance of securities contemplated by the Financing or any alternative financing (including the Alternative Financing), is a condition to the Closing.").

[84] "Sellers generally object to this closing condition because they cannot control whether the condition is satisfied." Purchase Agreement: Due Diligence Condition, Practical Law Standard Clauses w-001-0169.

[85] "[I]nformation revealed during due diligence that raises concerns can be addressed with specific, tailored reps or other provisions in a contract." *Coates* at ¶40.

still obligate a buyer to close even if a representation turns out not to be correct as long as that misrepresentation does not rise to the level of an MAE.

61.    In addition to having no diligence condition, the Merger Agreement states that Mr. Musk and his entities "conducted, to its satisfaction, its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) or assets of the Company and its Subsidiaries,"[86] and that, in deciding to enter into the agreement, "relied solely on the results of its own independent review and analysis and the covenants, representations and warranties of the Company"[87] in the Merger Agreement.  The parties also acknowledge that they were not relying on "any express or implied representation or warranty, or the accuracy or the completeness of the representations and warranties" in the Merger Agreement "other than those expressly given solely by the Company in Article IV."[88]

### 3. Seller-Friendly Agreements Have Limited Information Rights and Narrow Bring-Down Conditions

62.    The bring-down condition customarily works in conjunction with the information rights in the agreement.  Information rights allow a buyer to make requests of the seller for two potential purposes.  The first is to learn more about the seller's business as the buyer prepares to integrate the seller's operations into its own.[89]  In practice, these types of rights are common because of the near-universal need for business information as

---

[86] Id. at Sec. 5.11.
[87] Id.
[88] Id.
[89] "[N]arrow or "tight" covenants are those that limit access to information solely to post-closing planning or integration purposes ..." *Coates* at ¶95(b).

closing approaches.  The second purpose of information rights is to allow the buyer to conduct its bring-down investigation.  Here, there is much more variation in the structure and scope of these information rights depending on whether the agreement is buyer or seller friendly.[90]

63.    In a buyer-friendly agreement, the purchaser will have expansive rights to request information, there will be harsh consequences for a seller's failure to comply, and the buyer will be able to escape the deal if there are even minor variations between the information it receives and the seller's representations when they are brought down to closing.[91]  Seller-friendly agreements limit the information rights to business purposes, give the seller broad discretion to refuse to supply information, allow the seller to cure any alleged deficiencies in supplying information, and will not allow the buyer to use an alleged failure to comply with the information covenant to terminate the transaction if the buyer is in material breach of any of its obligations under the agreement.[92]

64.    The Merger Agreement gives Mr. Musk "reasonable access" to information about Twitter's "business, properties and personnel."[93]  That information must be used for a "reasonable ***business purpose related to the consummation of the transactions*** contemplated by this Agreement."[94]  The Merger Agreement also allows Twitter to decline

---

[90] *See Coates* at ¶95(a)-(f) (citing relevant language from the sample of merger agreements he collected).

[91] *Coates at* ¶95(f) (citing relevant language from the sample of merger agreements he collected).

[92] *Coates* at ¶95(a) (citing relevant language from the sample of merger agreements he collected).

[93] Merger Agreement at Sec. 6.4.

[94] Id. at Sec. 6.4 (emphasis added). The Merger Agreement also provides for information sharing related to financing. See id. at 6.10-11.

an information request if in its "reasonable judgment" supplying the information would "(i) cause significant competitive harm to the Company or its Subsidiaries if the transactions contemplated by this Agreement are not consummated, (ii) violate applicable Law [or contract to which it is a party], or (iii) jeopardize [] attorney-client [] privilege."[95] It is a condition to closing that Twitter shall have "performed or complied, in all material respects, with its obligations required under [the Agreement by the Closing Date]."[96] The termination provision provides that failure to comply with this closing condition can provide the basis for termination, although only if that failure "is not capable of being cured, or is not cured, by the Company on or before the earlier of (x) the Termination Date and (y) the date that is thirty (30) calendar days following [notice of breach]." Mr. Musk may not exercise this termination right if he "is then in material breach of any of [his] representations, warranties, covenants or agreements hereunder."[97]

65.     The bring-down condition itself will also vary depending on how buyer-friendly or seller-friendly it is.[98] A buyer-friendly bring-down condition will let buyers terminate the deal if, at closing, any representation is not entirely true or not true in all material respects. Seller-friendly agreements tie the bring-down condition to the definition of a company MAE.[99] That is, the failure of representations to be true must amount to a

---

[95] Id.
[96] Id. at Sec. 7.2(a).
[97] Id. at Sec. 8.1(d)(i).
[98] "[T]he bring-down condition specifies the extent to which compliance with reps and covenants acts as a closing condition." *Coates* at ¶83.
[99] "MAE clauses also are commonly used to qualify reps, so that many reps can be true even if some fact was not disclosed that would otherwise be called for by the rep, but which would not result in an MAE." *Coates* at ¶54.

33

company MAE.  As noted above, this is an extraordinarily high bar.  Despite decades of cases where buyers have tried to show an MAE[100], only once has a Delaware court held that the changed circumstances of the seller warranted a finding of an MAE.[101]

66.    The bring-down provision in the Merger Agreement requires any inaccuracies to cause an MAE: "each of the representations and warranties of the Company contained in this Agreement … shall be true and correct as of the Closing Date … except for such failures to be true and correct as would not have a Company Material Adverse Effect."[102]

### 4.  Seller-Friendly MAE Definitions Have Expansive Carve Outs

67.    MAE definitions are customarily subject to negotiation in merger transactions.  In general terms, the MAE specifies when a buyer is allowed to escape a deal because of a dire shock to the seller's business.  The definition of an MAE typically begins

---

[100] See In re IBP, S'holders Litig., 789 A.2d 14, 71 (Del. Ch. 2001); see also Channel Medsystems v. Boston Scientific, 2019 WL 6896462 (Del. Ch. 2019); Snow Phipps Group, LLC v. KCAKE Acquisition, Inc., 2021 WL 1714202 (Del. Ch. 2021); AB Stable VIII LLC v. MAPS Hotels and Resorts One LLC, 2020 WL 7024929 (Del. Ch. 2020). (all declining to find an MAE that would permit a buyer to terminate the deal).

[101] "[W]hile a court is left to decide what constitutes an MAE, there are few cases on the subject and only a single instance in which a Delaware court has found an MAE permitting a buyer to walk away from a transaction." *HQS* at 421; *see also* Gail Weinstein, Philip Richter & Steven Epstein, *Court of Chancery Finds Pandemic Was Not an MAE—Snow Phipps*, Harv. L. Sch. F. on Corp. Governance (May 20, 2021), https://corpgov.law.harvard.edu/2021/05/20/court-of-chancery-finds-pandemic-was-not-an-mae-snow-phipps/; Steven M. Haas, *Delaware Chancery Rejects a Buyer's MAE Claim—Again*, Hunton Andrews Kurth (Dec. 1, 2022), https://www.hunton.com/insights/legal/delaware-chancery-rejects-a-buyers-mae-claim-again; *compare* Benjamin L. Stulberg, Randi C. Lesnick, Robert S. Faxon & Andrew M. Levine, *Delaware Chancery Court Finally Finds an MAE*, Jones Day (Oct. 2018), https://www.jonesday.com/en/insights/2018/10/delaware-chancery-court-finally-finds-an-mae.

[102] Id. at Sec. 7.2(b)(i). The Merger Agreement specifies that Section 4.2(a) and Section 4.2(b) "shall be shall be true and correct in all material respects as of the Closing Date." Id. at sec 7.2(b)(ii). Both of these provisions are part of the Capitalization representation.

34

by stating that an MAE is a change, event, or circumstance that has produced or can be expected to produce a material adverse effect on the business, financial conditions, or operations of the company.[103]   The language will then exclude certain events from the definition of an MAE.   In practice, the negotiations of an MAE definition are about the number and type of these carve outs.[104]   Buyers will typically push for as few carve outs as possible because having fewer carve outs will make it easier to show that an MAE has occurred.[105]   Sellers, in contrast, want as many carve outs as possible and want those carve outs to be as broad as possible because that gives them a wider ability to claim that there has not been an MAE.

68.    The MAE definition in the Merger Agreement begins by stating that a Company MAE "means any change, event, effect or circumstance which, individually or in the aggregate, has resulted in or would reasonably be expected to result in a material adverse effect on the business, financial condition or results of operations of the Company and its Subsidiaries."[106]   The definition has nine carve outs:

- "any condition, change, effect or circumstance generally affecting any of the industries or markets in Company or its Subsidiaries operate";
- "any change in any Law or GAAP (or changes in interpretations of any Law or GAAP)"
- "general economic, regulatory or political conditions (or changes therein) or conditions (or changes therein) in the financial, credit or securities markets … in the United States or any other country or region in the world";

---

[103] "The first part of the definition provides the buyer with what might seem like fairly broad protection against residual risks that might appear between signing and closing." *HQS* at 418.
[104] Coates at ¶87.
[105] "By identifying certain adverse events and excluding them from the definition of MAE, the risk of such events occurring is shifted from the buyer to the seller." *HQS* at 419.
[106] Id. at p. 5.

35

- "any acts of God, force majeure events, natural disasters, terrorism, cyberattack, data breach, armed hostilities, sabotage, war or any escalation or worsening of any of the foregoing";
- "any epidemics, pandemics or contagious disease outbreaks (including COVID-19) and any political or social conditions, including civil unrest, protests and public demonstrations";
- "the negotiation, execution, announcement, performance, consummation or existence of this Agreement or the transactions contemplated by this Agreement, including [] by reason of the identity of Elon Musk";
- "any action taken pursuant to the terms of this Agreement or with the consent or at the direction of Parent or Acquisition Sub";
- "Any changes in the market price or trading volume of the Company Common Stock, any failure by the Company or its Subsidiaries to meet internal, analysts' or other earnings estimates or financial projections or forecasts for any period, any changes in credit ratings and any changes in any analysts' recommendations or ratings with respect to the Company or any of its Subsidiaries"; and
- "any matter disclosed in the Company SEC Documents filed by the Company prior to the date of this Agreement (other than any disclosures set forth under the headings 'Risk Factors' or 'Forward-Looking Statements')."

69.    As a matter of custom and practice, the foregoing represent numerous and broad carve outs.[107]

### D. Tesla's Stock Price Dives, Making the Deal More Expensive for Mr. Musk

70.    Mr. Musk financed the deal using a combination of debt and equity.  This structure made the deal sensitive to the price of Tesla stock because a decrease in stock price could require Mr. Musk to post more shares as loan collateral and would obligate him to sell more shares to fund the equity commitment.  The Plaintiffs have alleged that Tesla's stock price dropped shortly after Mr. Musk signed the Merger Agreement.[108]  The resulting

---

[107] *See* Coates at ¶¶ 86-93 (identifying the singling out of Mr. Musk and the exclusion of cyberattacks data breaches as more seller-friendly that the average agreements in his sample and noting that the Merger Agreement was the *only* agreement in the sample that did not include a disproportionality exception to the exclusions).
[108] FAC at ¶¶25-26, 90-106.

36

need to use more of his personal wealth to fund the deal made the transaction more expensive for Mr. Musk.

### E. No Alternative Bids Emerge, Creating Conditions for Buyer's Remorse

71.    It is customary for merger agreements to provide a process for the seller to evaluate a higher bid that emerges after signing, but before closing.  Doing so helps the board of the seller comply with its *Revlon* obligation to get the highest price reasonably available to shareholders and it can also serve as a way to validate the price being paid. The most common structure in public company mergers is to prohibit the seller from soliciting any competing bids, while allowing the seller to receive information about a bid if the seller's advisors believe it would be a breach of the selling board's fiduciary duties to not receive that information.

72.    The Merger Agreement directs Twitter's "directors, executive officers and Subsidiaries not to … solicit, initiate, knowingly encourage or knowingly facilitate, whether publicly or otherwise, any substantive discussion, offer or request that constitutes, or would reasonably be expected to lead to, a Competing Proposal."[109]  Although, "the Company … may engage in negotiations or discussions with… any Person … making such Competing Proposal … if the Company Board determines in good faith (after consultation with its legal counsel and financial advisors) that such Competing Proposal either constitutes a Superior Proposal or would reasonably be expected to result in a Superior Proposal."[110]

---

[109] Id. at Sec. 6.5(a).
[110] Id. at Sec. 6.5(c).

73.    The Merger Agreement also requires Twitter to alert Mr. Musk to any competing bids. The Merger Agreement obligates Twitter to inform Mr. Musk of any competing proposal within one business day and to provide notice of "(i) the identity of the Person making such Competing Proposal or request; and (ii) the material terms and conditions of any such Competing Proposal."[111]  As long as Twitter complied with this obligation, Mr. Musk would have known about any competing bid for the company.

74.    I am not aware of evidence that any alternative bids emerged post-signing. Commentary at the time suggested that any "competing bid from private equity would be at least 15-20% lower than Musk's $44 billion offer."[112]  Analysts attributed the lack of interest to a significant decline in the technology sector[113] shortly after the parties signed the Merger Agreement and to a general consensus, with the benefit of hindsight and given the recent changes in market conditions, that Mr. Musk had agreed to pay a high a price for Twitter shortly before a market downturn.[114]

---

[111] Id. at §6.5(b).

[112] Jeran Wittenstein, Fortune, "Twitter Shares Sink After Musk Says He's Ending Acquisition Bid in 'Disaster Scenario' for the Social Media Platform," July 9, 2022, available: https://fortune.com/2022/07/09/twitter-shares-sink-after-musk-says-hes-ending-acquisition-bid-in-disaster-scenario-for-the-social-media-platform"

[113]"Across the tech industry, companies are cutting staff and spending or slowing hiring." Michael Morris, Curry Baker, Charles Wilber, Jackson Taylor, Taylor Manley, *Daily MIC: Elon Musk Tweets Twitter Deal is on Hold; "The Ultimatum" Tops Nielsen's Weekly Streaming Chart; AMC+ To Launch on Orange Spain*, Guggenheim Sec. Rsch. (May 13, 2022).

[114] "Completing the deal was a victory for Twitter's board. When Mr. Musk agreed to pay $54.20 a share for the company in April, Twitter faced criticism for accepting a price that was too low. But, as the global economy faltered in the ensuing months and Twitter's stock fell, the deal price appeared to be a win for shareholders, and the board sought to force Mr. Musk to abide by the agreement." https://www.nytimes.com/2022/10/27/technology/elon-musk-twitter-deal-complete.html

75.      The combination of the deal becoming more expensive for Mr. Musk, the lack of any competing interest, and Mr. Musk's belief that, in hindsight and given the market downturn since he made his offer, [115] he may have overpaid for Twitter created, in my opinion, classic conditions for buyer's remorse.[116]  As explained above, buyers in those situations will customarily look for any reason they can find to exit or renegotiate the deal. That includes making publicly disparaging comments about the deal, alleging a right to terminate, and litigating the obligation to close the deal.

## VI.    MUSK TOOK ACTIONS THAT CREATED UNCERTAINTY AND THEN PURPORTED TO TERMINATE THE DEAL

76.      In the period after signing and before closing, Mr. Musk created uncertainty about the deal before eventually purporting to terminate it.  His statements about these attempts are the subject of this lawsuit.  This section reviews each of those statements and puts them into the context of custom and practice in merger transactions.

### A. May 13, 2022 "On Hold" Tweet

77.      On May 13, 2022, at 5:44 a.m. EST, Mr. Musk tweeted "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users."[117]  By the end of that trading day, the price of Twitter stock had declined 9.67% from the previous day's closing price.[118]

---

[115]"Well, obviously, I overpaid for the company, like, by a lot." Musk Transcript, 94:6-7.
[116] Irrespective of market conditions of changes in Musk's financing situation, he and his financial advisors decided that $54.20 was a fair price based on in depth analysis conducted by Musk's investment bankers at Morgan Stanley.  See MUSK-PAMPENA-0678025.
[117] FAC, ¶ 111.
[118] Id.

**1. As Is Customary, Nothing in the Merger Agreement Stated That the Deal Would Close If Twitter Failed to Supply Him with Information About Fake and Spam Accounts**

78.    As explained above, it is customary in merger agreements for the information rights to work in conjunction with the representations and warranties of the seller and the bring-down condition. The typical structure of a merger agreement will specify the types of information the buyer can request, which the buyer, if entitled to that information, may use for integration purposes and to verify the representations during the bring-down process. In my experience, it is not the practice and custom in merger agreements to list specific types of information which, if a seller fails to provide them, provide a right to terminate the agreement.[119]  I do not recall ever seeing such language in a merger agreement and that language is not present in the Merger Agreement.

79.    The custom and practice of information rights in merger agreements means that the consequences for providing, or failing to provide, information will not be evident from the merger agreement alone. As detailed earlier, merger agreements customarily specify the buyer's information rights in the "Access to Information" covenant.[120]  The

---

[119] A seller's violation of the access to information covenant could potentially warrant a buyer's termination if that violation breaches the covenant compliance condition. That condition requires a party to have performed all of its obligations under the agreement by the time of closing. But it would be quite odd for these circumstances to occur because sellers generally want to close and will have strong incentives to provide information that facilitates closing. Indeed, I am not aware of any case where a buyer has successfully terminated a deal due to a failure to comply with an access to information covenant. *Cf. Akorn*, *supra* (although there were assertions that the seller had not complied with the information access covenant, the buyer was ultimately able to terminate due to a failure of the general MAE condition, the bring-down condition, and a failure to comply with the ordinary course covenant, which produced a breach of the covenant compliance condition).

[120] *See Coates* at ¶59.

40

covenant compliance condition can allow any failure to comply with this covenant to form a basis for termination, but the termination provisions will typically allow the seller to cure any alleged defects. Additionally, the buyer's right to terminate may be unavailable if the buyer is in material breach of its obligations. If a dispute of this sort materializes before closing, the agreement, by itself, would not be enough to assess the risk that the dispute would lead to deal termination. To determine the potential for termination, one would need to know, *inter alia*, the precise information requested by the buyer, the seller's basis for a refusal to provide information, the content of the communications between the parties, and whether the buyer is potentially in material breach of any of its obligations.[121] The parties also executed a confidentiality agreement.[122] The terms of that agreement could have expanded or restricted the information rights of the parties. Given the non-public nature of the document, it would not be possible for the investing public to know whether that agreement affected the claims in Mr. Musk's tweet.

### 2. Parties Can Mutually Agree to Delay a Deal, But They Did Not Do So Here

80. While pausing or delaying a deal is not a regular occurrence in merger transactions, it can and does occur. Perhaps the most common reason for delaying a merger is a mutual agreement by the parties to extend the "drop-dead date," after which any party

---

[121] Communications about an information dispute could trigger reporting obligations if they are material, but just because parties are supposed to report information does not mean that they will necessarily do so.

[122] . Musk-Pampena-0023104.

can walk away, usually without consequence.[123]  Buyers and sellers will sometimes agree to these extensions if regulatory approval is taking longer than expected or if financing proves more complex than anticipated.  The parties may also agree to amend a merger agreement to provide more time and, as part of that amendment, the parties can alter financial and other substantive terms[124], including those related to information rights.

81.    Mr. Musk and Twitter could have agreed to extend the "drop-dead date" under the Merger Agreement.  They also could have agreed to amend the Merger Agreement to give Mr. Musk broader rights to information about spam and fake accounts, to give Mr. Musk more time to analyze that information, and to provide harsher consequences for any failure by Twitter to provide that information. I am not aware of any evidence indicating that Mr. Musk and Twitter reached any sort of agreement to extend the drop-dead date or to amend the Merger Agreement prior to Mr. Musk's May 13, 2022 tweet.[125]

---

[123] Microsoft's acquisition of Activision Blizzard is an example of extending the drop-dead date. On July 19, 2023, the parties announced that, the day prior, they had entered into an agreement to extend to the drop-dead date. *See* *https://www.sec.gov/ix?doc=/Archives/edgar/data/0000718877/000110465923082205/tm232152 2d1_8k.htm*
[124] In the LVMH acquisition of Tiffany & Co. in 2019, the parties agreed to a reduced price as part of a litigation settlement. *See* Sarah White & Silvia Aloisi, "LVMH and Tiffany end luxury battle, cut price on $16 billion takeover," Reuters (Oct. 29, 2020)  In Waste Management's acquisition of Advanced Disposal Services, the parties agreed to postpone the acquisition to a later quarter due to the pandemic and eventually agreed to a reduced price. *See* Cole Rosengren, "Advanced Disposal shareholders approve amended terms for $4.6B sale to Waste Management," Wastedive, August 26, 2020.
[125] Twitter Delaware Complaint; *see also* Ringler Transcript at p. 245:1-12.

### 3. Some Analysts React with Confusion

82.     Stock analysts were following the Twitter transaction closely and were presumably aware of all, or nearly all, of the public information about the deal.  Some analysts were confused and perplexed by the tweet.[126]  A Wedbush report on Tesla shares—the value of which was tied, in part, to the Twitter transaction—titled its report "In a Circus Show Move Musk Says Twitter Deal on Hold Pending Diligence."[127]  The May 13 report opined that Mr. Musk's tweet would turn the deal "into a Friday the 13th horror show as now the Street will view this deal as 1) likely falling apart, 2) Musk negotiating for a lower deal price, or 3) Musk simply walking away from the deal with a $1 billion breakup fee."[128]  The report also stated that, "Many will view this as Musk using this Twitter filing/spam accounts as a way to get out of this deal in a vastly changing market."[129]  A May 13 Guggenheim bulletin reported: "Elon Musk said his deal to buy Twitter Inc. was on hold pending details on the amount of fake accounts on the social-media platform, prompting a

---

[126] Analysts were not the only specialists who had strong reactions to the tweet. James Boland, Twitter's expert on leveraged financing in the Delaware litigation called the tweet "extraordinary" because it could imperil the syndication of the debt Mr. Musk planned to use to fund the deal. Expert Report of James Boland, Twitter, Inc. v. Musk et al. (hereinafter Boland), at ¶34. Mr. Boland also notes that Mr. Musk's own advisor considered the tweet "an adverse event for syndication." *Id.* at ¶34 (quoting deposition of Andrew Earls).

[127] Daniel Ives, John Katsingris, *In a Circus Show Move Musk Says Twitter Deal on Hold Pending Diligence*, Wedbush Securities Company Report (May 13, 2022).

[128] *Id.; see also* David Goldman, Chris Isidore & Clare Duffy, *Elon Musk says Twitter deal 'temporarily on hold'*, CNN (May 13, 2022, 10:01 AM EDT), https://www.cnn.com/2022/05/13/tech/twitter-deal-on-hold-elon-musk (quoting Dan Ives, Managing Director of Equity Research at Wedbush Securities) (describing the situation as a "'circus show' that is 'setting a disconcerting tone for the deal and Musk's leadership style for Twitter'").

[129] Id.

sharp slide in the company's shares in premarket trade."[130]  It also stated that "[s]ome investors saw the pause in the acquisition as a potential sign that the deal may not go ahead."[131]

83.    I am not aware of any evidence indicating that Mr. Musk ever corrected the confusion and uncertainty created by his May 13, 2022 tweet and subsequent tweets (including his May 17, 2022 tweet) by issuing an unequivocal statement indicating that he would go through with the purchase of Twitter even if he did not receive the information he had requested from Twitter and fake or spam accounts.

### B.  May 14, 2022 NDA Tweet

84.    On May 14, 2022, Mr. Musk tweeted that Twitter legal "called to complain that [he] violated their NDA by revealing the bot check sample size."[132]

### 1.   Mr. Musk Expresses Purported Concern About Fake and Spam Accounts, Despite Widespread Public Information about Such Accounts on Twitter

85.    Mr. Musk's expression of apparent concern about fake and spam accounts should be understood in terms of the then-available public information about the topic.  In September 2021, Twitter entered into a $809.5 million class action settlement in a securities class action alleging that Twitter, in part due to bots, overstated its user numbers and

---

[130] Guggenheim Securities, "Daily MIC: Elon Musk Tweets Twitter Deal Is on Hold," May 13, 2022.

[131] *Id.* Mr. Boland agreed with this characterization. *See* Boland at ¶ 34 ("publicly announcing that an M&A transaction is "on hold" could create uncertainty that the transaction will actually close").

[132] FAC, ¶ 115.

growth rates.[133] Twitter's public filings also disclosed information about bots. The 2021 Annual Report disclosed that Twitter's samples produced an estimate that less than 5 percent of mDAU (monetizable daily active users) were false or spam accounts, but also noted that Twitter "applied significant judgment, so our estimation of false or spam accounts may not accurately represent the actual number of such accounts, and the actual number of false or spam accounts could be higher than we have estimated."[134] Discussion of fake and spam accounts on Twitter were also a regular topic of discussion in news reports and online postings.

86.    It is important to recall that Mr. Musk waived due diligence in this transaction. That meant that his only source of information at the time he entered into the agreement to acquire Twitter was information that was publicly available or that Mr. Musk and his advisors had otherwise acquired. The custom and practice of merger transactions in cases where a buyer foregoes the opportunity to perform a pre-signing due diligence investigation is for the buyer to familiarize itself with the public disclosures of the target and other relevant public information about the target.

87.    In short, Mr. Musk testified that he was well aware of concerns regarding fake and spam accounts on Twitter before he signed the Merger Agreement.[135]

88.    As mentioned previously, it is customary for merger agreements to prevent one party from claiming a breach of the agreement if that party is itself in breach. Section

---

[133] See https://time.com/6099976/twitter-class-action-lawsuit/.
[134] FAC, ¶ 118.
[135] Musk Transcript 88:12-23; 168:18-170:2.

8.1(d) of the Merger Agreement has such a condition, removing the buyer's right to terminate based on breach of the seller if the buyer is also in breach of the agreement. Here, Mr. Musk's disparaging tweets about the Company likely violated section 6.8 of the agreement that prohibits disparaging public announcements. Mr. Musk and the buyer therefore would be in breach of the agreement and unable to exercise their right to terminate for any breach by the seller.

### C. May 16, 2022 "20%" Statements and Tweets

89.    On May 16, Mr. Musk appeared at the "All In Summit" technology conference in Miami. There he stated that fake and spam accounts make up at least 20% of Twitter's users.[136] Parag Agrawal, then CEO of Twitter, responded with a series of tweets, explaining Twitter's method for calculating spam and fake accounts and stating that this estimate cannot be done solely on the basis of public information.[137] Mr. Musk responded with a poop emoji.[138] Mr. Musk later tweeted "So how do advertisers know what they're getting for their money? This is fundamental to the financial health of Twitter."[139] At the close of trading that day, Twitter stock declined 8.18%.[140]

90.    As explained above, even the most seller-friendly agreements will provide some limited information rights to the buyer.[141] The Merger Agreement provided some of

---

[136] Musk-Pampena-0700654.
[137] Plaintiffs-000221.
[138] Musk-Pampena-0318063.
[139] FAC ¶ 123.
[140] Id. ¶ 124.
[141] See supra §IV.B.

those rights to Mr. Musk for business purposes related to the transaction.[142]  Had Mr. Musk

exercised those rights, his doing so would likely not be apparent to the investing public

because a private request for information is unlikely to be deemed material.

### D. May 17, 2022 "*Much* Higher" Tweet

91.    On May 17, 2022, Mr. Musk tweeted that the actual number of spam and bot

accounts could be "*much* higher" than 20%.[143]  He also claimed that the deal could not

go forward until Twitter's CEO showed proof of a bot estimate of less than 5% because his

offer was based on "Twitter's SEC filings being accurate."[144]

#### 1.    It Remained the Case That Mr. Musk Had No Right to Terminate the Merger Due to a Failure to Provide Information About Fake Accounts

92.    Mr. Musk's claim that Twitter had to prove that its SEC filings were correct

is at odds with the seller-friendly nature of the deal process and the Merger Agreement.  As

noted, Mr. Musk waived due diligence investigation.  That would customarily provide an

opportunity to refuse to proceed with a deal unless Twitter could provide any information

about the spam or fake accounts that Mr. Musk requested.  But he chose not to conduct that

investigation.  He also entered into a merger agreement that would be considered, in the

custom and practice of mergers and acquisitions, extremely friendly to the seller.[145]  It

contained no diligence provision, which would allow a buyer to terminate the transaction

---

[142] "[T]he Merger Agreement contains a more seller-friendly Access to Information Covenant than 93.0% of the Sample, limiting requests to only those that are related to the **consummation** of the transaction ..." *Coates* at ¶11(d)(iv).
[143] FAC ¶ 125.
[144] Id.
[145] See supra §V.C.

if it were unsatisfied with what it discovered prior to closing. It also did not contain a covenant allowing the buyer access to information to verify the representations and warranties.[146] While it did contain a representation that certain SEC filings were true and correct, the bring-down condition required any failure of SEC statements to be true to amount to an MAE.[147] That provision requires any deviation to be very large and falls far short of any requirement to "prove" that any disclosures were correct. And, it is worth noting, that no merger agreement I am aware of has had a provision that would require affirmative proof of any statement as a condition to closing.

### E. Letters To Twitter and Notices of Termination

93.    Mr. Musk's attorneys sent multiple requests to Twitter asserting rights to user data and sent three letters purporting to terminate the Merger Agreement on July 8, 2022, August 29, 2022, and September 9, 2022.[148] The letters demanded information about fake and spam accounts and sought to compel Twitter to "apply more rigorous computer-aided and third-party testing to determine the prevalence of fake or spam accounts on its platform with greater certainty" and asserted that Twitter's explanation of its methodology was "inadequate."[149]

94.    On June 1, 2022, Twitter's attorneys characterized Mr. Musk's information requests as "well beyond the bounds of what the parties agreed to under the merger

---

[146] *Coates* at ¶97; *see also Id.* at f.n. 113.
[147] See supra §V.C.4.
[148] FAC ¶¶ 136-40.
[149] Id.

agreement."[150]  A letter sent by Twitter's attorneys several weeks later cited Section 6.4 of the Merger Agreement (the access to information covenant), noting that it only obligated Twitter to provide "reasonable access" to information for any "reasonable business purpose related to the consummation of the transactions."[151]

95.    On July 8, 2022, Mr. Musk sent a termination letter to Twitter that was publicly filed with the SEC.[152]  That letter asserted that Twitter had failed to provide spam and bot data that was "necessary to consummate the transactions contemplated by the Merger Agreement because it is needed to ensure Twitter's satisfaction of the conditions to closing."  It also alleged a breach of the Merger Agreement because Twitter's representations were materially inaccurate and were likely to amount to an MAE.  The letter additionally asserted that the access to information covenant entitled Mr. Musk to "all information concerning the business … of the Company … for any reasonable business purpose related to the consummation of the transactions."[153]  Subsequent termination letters asserted that information from a whistleblower report showed sufficient misconduct at Twitter to permit Mr. Musk to terminate and claimed that a severance payment to Twitter's former chief security officer also allowed Mr. Musk to terminate.[154]

---

[150] Id. ¶ 137.
[151] Id. ¶ 139.
[152] Id. ¶ 140.
[153] Id.
[154] Id. ¶¶ 144, 147.

### 1.    Mr. Musk and His Lawyers Assert Merger Rights That Diverge from the Customary Understandings of Those Rights

96.    The assertions by Mr. Musk that Twitter breached its obligations are not consistent with the terms of the Merger Agreement.  Mr. Musk's claim that the information access covenant required Twitter to give him all information about the company "for any reasonable business purpose related to the consummation of the transactions" is not a correct description of his rights under the Merger Agreement.  As detailed above, sellers with leverage will limit a buyer's ability to obtain information between signing and closing.  The Merger Agreement does that by subjecting Mr. Musk's requests for information to Twitter's "reasonable judgment" and by prohibiting Mr. Musk's access to "competitive information."[155]  Mr. Musk's letter omits these seller-friendly qualifiers in the access to information covenant and, in so doing, mischaracterizes his information rights.

97.    Mr. Musk's communications suggest that a materially false representation would provide grounds to terminate the deal.  But this claim is also in contrast to the seller-friendly terms in the Merger Agreement.  As previously discussed, seller-friendly bring-down conditions will only allow termination if the failure of representations to be true, either individually or in the aggregate, amounts to an MAE.  The Merger Agreement contained this language.[156]

98.    A comparison of the letters and the Merger Agreement would not, however, inform an outsider about Mr. Musk's right to obtain information and the consequences of

---

[155] See supra §V.C.3.
[156] See supra §V.C.4.

not providing it.  Those determinations are likely to turn, in part, on Twitter's exercise of its reasonable judgment and whether the requested information is competitive in nature. The communications from Mr. Musk's attorneys omit any mention of these factors and thus present an incomplete and inaccurate picture of Mr. Musk's ability to request information from Twitter and any potential consequences for its failure to do so.

## VII.   CONCLUSION

99.    A leading mergers and acquisitions treatise explains that "[w]hile no technique totally eliminates the risk of unknown liabilities resulting in significant losses after the closing, it is the due diligence process that afford the Buyer the opportunity to minimize this risk as much as possible."[157]  A buyer that waives that opportunity takes on that risk of the unknown.  When coupled with a seller-friendly merger agreement, which, in my opinion the Merger Agreement was, a buyer is left with few options to conduct a meaningful investigation of the seller and to terminate the deal.  Waiving due diligence and agreeing to a seller-friendly agreement create classic conditions for buyer's remorse and, in my opinion, those conditions were present in this case.

100.    Mr. Musk sought to terminate or renegotiate his acquisition of Twitter.  He publicly claimed that the deal was "on hold" while he investigated the number of spam and fake accounts on Twitter.  No provision in the Merger Agreement stated that he could refuse to close if Twitter declined to produce information about spam and fake accounts and, customarily, merger agreements would not contain such a provision. In addition, I am

---

[157] Kling, Nugent & Van Dyke, at § 8.01.

unaware of any public statement by Mr. Musk that he would go through with the merger even if Twitter did not provide him with the information he had demanded about fake/spam accounts and bots. This pattern of claiming rights that were at odds with the Merger Agreement created confusion and uncertainty and continued through his attempts to terminate that agreement. In my opinion, given prevailing custom and practice in mergers and acquisitions, there was no basis for Mr. Musk's assertions.

Adam Badawi
May 28, 2025

## **Appendix A**

# Adam B. Badawi

UC Berkeley School of Law • 792 Simon Hall, Berkeley, CA • abadawi@berkeley.edu • 510-643-6116

**ACADEMIC APPOINTMENTS**

*UC Berkeley School of Law*

Professor of Law, July 2017 – present

*Washington University in St. Louis School of Law*

Professor of Law, July 2015 – June 2017

Associate Professor of Law, July 2010 – June 2015

*Columbia Law School*

Visiting Professor of Law, September 2024

*University of Amsterdam, Center for Law and Economics*

Visiting Scholar, August 2019 – October 2019

*Northwestern Pritzker School of Law*

Visiting Professor of Law, January 2017 – May 2017

*Erasmus School of Law, Rotterdam, NL*

Distinguished International Visitor, March 2014 – April 2014

*Queensland University School of Law, Brisbane, AUS* Visiting

Instructor, August 2012

*University of Chicago Law School*

Bigelow Fellow and Lecturer in Law, June 2008 – June 2010

**ARTICLES**

*ESG Overperformance? Assessing the Use of ESG Targets in Executive Compensation Plans* (with Robert Bartlett) (forthcoming, BUSINESS LAWYER).

*Loopholes in Complex Contracts* (with Kenneth Ayotte) (forthcoming, AMERICAN LAW AND ECONOMICS REVIEW).

*Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A* (with Matthew Cain and Steven Davidoff Solomon) 66 THE JOURNAL OF LAW & ECONOMICS 535 (2023) (peer-reviewed) (selected as one of the top ten corporate and securities articles of 2023 by Corporate Practice Commentator).

*How Informative is the Text of Securities Complaints?*, 39 JOURNAL OF LAW, ECONOMICS, AND ORGANIZATION 801 (2023) (peer-reviewed).

*Social Good and Litigation Risk* (with Frank Partnoy), 12 HARVARD LAW BUSINESS REVIEW 315 (2022) (solicited symposium contribution).

*Debt Contract Terms and Creditor Control,* 4 JOURNAL OF LAW, FINANCE & ACCOUNTING 1 (2019) (peer-reviewed).

*Is There a First-Drafter Advantage in M & A?* (with Elisabeth de Fontenay), 107 CALIFORNIA LAW REVIEW 1119 (2019) (selected as one of the top ten corporate and securities articles of 2019 by Corporate Practice Commentator).

*The Shareholder Wealth Effects of Delaware Litigation* (with Daniel Chen), 19 AMERICAN LAW AND ECONOMICS REVIEW 287 (2017) (peer-reviewed).

*Does the Quality of the Plaintiffs' Law Firm Matter in Deal Litigation?* 41 THE JOURNAL OF CORPORATION LAW 359 (2015) (with David Webber) (selected for presentation at the 2015 Harvard/Stanford/Yale Junior Faculty Forum).

*Appellate Lawmaking in a Judicial Hierarchy*, THE JOURNAL OF LAW & ECONOMICS (with Scott Baker) (2015) (peer-reviewed).

*Lobbying, Pandering, and Information in the Firm*, 38 SEATTLE UNIVERSITY LAW REVIEW 215 (2014) (solicited symposium contribution).

*The Fannie and Freddie Bailouts Through the Corporate Lens*, 10 NYU JOURNAL OF LAW AND BUSINESS 443 (with Anthony Casey) (2014) (solicited symposium contribution).

*Influence Costs and the Scope of Board Authority*, 39 THE JOURNAL OF CORPORATION LAW 675 (2014) (reviewed by Robert Rosen, JOTWELL (April 1, 2016), available at http://corp.jotwell.com/whydirectors-dont-direct/).

*Rationality's Reach*, 112 MICHIGAN LAW REVIEW 993 (2014) (review of Oren Bar-Gill's SEDUCTION BY CONTRACT).

*Merger Class Actions in Delaware and the Symptoms of Multijurisdictional Litigation*, 90 WASHINGTON UNIVERSITY LAW REVIEW 965 (2013) (solicited symposium contribution).

*Self-Help and the Rules of Engagement*, 29 YALE JOURNAL ON REGULATION 1 (2012).

*Relational Governance and Contract Damages: Evidence from Franchising*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 743 (2010) (peer-reviewed).

*Harm, Ambiguity, and the Regulation of Illegal Contracts*, 17 GEORGE MASON LAW REVIEW 483 (2010).

*The Attributes of Transactions and the Limits of the New Formalism*, 6 BERKELEY BUSINESS LAW JOURNAL 1 (2009).

Comment, *Unceasing Animosities and the Public Tranquility: Political Market Failure and the Scope of the Commerce Power*, 91 CALIFORNIA LAW REVIEW 1331 (2003).

## BOOKS AND BOOK CHAPTERS

ENCYCLOPEDIA OF LAW AND ECONOMICS, CORPORATE LAW (editor), Edward Elgar Publishing, 2023.

The Business Judgment Rule, in ENCYCLOPEDIA OF LAW AND ECONOMICS, CORPORATE LAW, Edward Elgar Publishing (Adam B. Badawi, ed.), 2023.

BUSINESS ASSOCIATIONS: CASES AND MATERIALS (with Anthony Casey) (second edition), 2023.

Reference Networks and Civil Codes, in LAW AS DATA: COMPUTATION, TEXT, AND THE FUTURE OF LEGAL ANALYSIS (with Giuseppe Dari-Mattiacci) (Michael Livermore & Daniel Rockmore, eds.) (2019).

Fighting Frivolous Litigation in a Multijurisdictional World, in RESEARCH HANDBOOK ON REPRESENTATIVE SHAREHOLDER LITIGATION 110 (Sean Griffith, Jessica Erickson, David H. Webber & Verity Winship eds., 2018).

## WORKS-IN-PROGRESS

*Contractual Complexity in Debt Agreements: The Case of EBITDA* (with Scott Dyreng, Elisabeth de Fontenay, and Robert Hills).

*Fact and Opinion in Financial Disclosures* (with Andrew Baker).

*The Value of M&A Drafting* (with Elisabeth de Fontenay and Julian Nyarko).

*Price Discipline for Non-Price Loan Terms* (with Vincent S.J. Buccola and Gregory Nini).

*Defensive Contract Language* (with George Batta).

*ESG Performance Incentives and Bankruptcy Risk.*

*Lawyers, Law Firms, and the Production of Legal Information.*

**GRANTS**

Principal Investigator*,* National Science Foundation Grant SMA 14-19967, *Coding Legal Structures* (total $124,949).

**PRESENTATIONS**

2025     *Defensive Contract Language*, European Society for Empirical Legal Studies Conference, Capitole University of Toulouse, June 2025 (scheduled).
*ESG Overperformance? Assessing the Use of ESG Targets in Executive Compensation Plans*, Global Corporate Governance Conference, Imperial College, London, June 2025 (scheduled).
*Defensive Contract Language*, Annual Meeting of the American Law and Economics Association, NYU Law School, May 2025.
*ESG Overperformance? Assessing the Use of ESG Targets in Executive Compensation Plans*, Weil, Gotshal & Manges, Yale Law School, April 2025.
*Defensive Contract Language*, BYU Winter Deals Conference, March, 2025.
*ESG Performance Incentives and Bankruptcy Risk*, ESG and Bankruptcy Conference, Heinrich Heine University, Dusseldorf, March 2025

2024     *ESG Overperformance? Assessing the Use of ESG Targets in Executive Compensation Plans*, Conference on Empirical Legal Studies, Emory Law School, November 2024.
*Price Discipline for Non-Price Loan Terms*, Northwestern Law School Law and Economics Workshop, November 2024.
*Price Discipline for Non-Price Loan Terms*, University of Amsterdam Center for Law and Economics, October 2024.
*Price Discipline for Non-Price Loan Terms*, Columbia Law School, September 2024.
F*act and Opinion in Financial Disclosures*, Mapping and Governing the Online World Conference, Ascona, Switzerland, June 2024.
*Price Discipline for Non-Price Loan Terms*, Annual Meeting of the American Law and Economics Association, University of Michigan, May 2024.
*Price Discipline for Non-Price Loan Terms*, Sokol Colloquium, University of Virginia, March 2024.
*Price Discipline for Non-Price Loan Terms*, Cardozo Faculty Workshop, March 2024.
*Price Discipline for Non-Price Loan Terms*, BYU Winter Deals Conference, March 2024.

2023     *Loopholes in Complex Contracts,* NYU School of Law, Law and Economics Workshop, November 2023.
*Social Good and Litigation Risk*, Oxford University Conference on Reputation, September 2023.
*Loopholes in Complex Contracts,* Annual Meeting of American Law and Economics Association, June 2023.
Commentor, *How Deals Die?*, Vanderbilt Law & Business Conference, April 2023.
*The Uses and Potential Abuses of AI in Law and Economics Research*, Seoul National University Faculty of Law, March 2023.
Commentor, *Shareholder Litigation and Corporate Culture*, NYU/Penn Law and Finance Workshop, University of Pennsylvania March 2023.
*The Value of M&A Drafting*, Berkeley Law Faculty Workshop, February 2023.

2022     *The Value of M&A Drafting*, Enterprise Law Workshop, Hitotsubashi University, Tokyo, November 2022.
*Strategies to Promote Effective Workouts,* Asian Development Bank, December 2022.

*The Value of M&A Drafting*, Conference on Empirical Legal Studies, November 2022.

*The Value of M&A Drafting*, Annual Meeting of the American Law and Economics Association, August 2022.

*Loopholes in Complex Contracts,* Columbia Bob Scott Conference, April 2022.

*Loopholes in Complex Contracts*, BYU Winter Deals Conference, March 2022.

*Social Good and Litigation Risk*, Annual Meeting of the Institute of Law, Economics, and Politics, January 2022.

**2021**    *Evolutionary Learning in Complex Contracts*, USC Faculty Workshop, December 2021.

*Does Voluntary Financial Disclosure Matter? The Case of Fairness Opinions in M&A*, Corporate Law Academic Webinar, November 2021.

*Evolutionary Learning in Complex Contracts*, Georgetown Law and Economics Workshop, October 2021.

*Evolutionary Learning in Complex Contracts*, George Mason Faculty Workshop, October 2021.

*What is Legal Similarity and How Do We Measure It?*, Annual Meeting of the American Law and Economics Association, October 2021.

*What is Legal Similarity and How Do We Measure It?*, Online Workshop on the Computational Analysis of Law, April 2021.

**2020**    *How Informative Is the Text of Securities Complaints?*, University of Toronto Law and Economics Workshop, October 2020.

*How Informative Is the Text of Securities Complaints?*, Corporate Law Academic Webinar, February 2020.

*How Informative Is the Text of Securities Complaints?*, Text Analysis in Law Conference, February 2020, UC Berkeley.

*How Informative Is the Text of Securities Complaints?*, BYU Deals Conference, March 2020, Park City, UT.

*How Informative Is the Text of Securities Complaints?*, Corporate Law Academic Online Workshop, July 2020, online.

**2019**    *Contractual Complexity in Debt Agreements: The Case of EBITDA*, Conference on Empirical Legal Studies, November 2019, Claremont College, CA.

*How Informative Is the Text of Securities Complaints?*, Text as Data Conference, October 2019, University of Zurich.

*Contractual Complexity in Debt Agreements: The Case of EBITDA*, ETH Zurich Ad Hoc Seminar, October 2019.

*How Informative Is the Text of Securities Complaints?*, University of Amsterdam Center for Law & Economics, October 2019.

*How Informative Is the Text of Securities Complaints?*, Max Planck Law & Economics Workshop, October 2019, Bonn, GER.

*How Informative Is the Text of Securities Complaints?*, Erasmus University Law & Economics Workshop, October 2019, Rotterdam, NL.

*How Informative Is the Text of Securities Complaints?*, SNU-Berkeley Conference, May 2019, Seoul National University.

*Contractual Complexity in Debt Agreements: The Case of EBITDA*, Annual Meeting of the American Law and Economics Association, May 2019, NYU Law School.

*How Informative Is the Text of Securities Complaints?*, Vanderbilt Law & Business Conference, May 2019, Vanderbilt Law School.

*Contractual Complexity in Debt Agreements: The Case of EBITDA*, BYU Deals Conference, March 2019, Park City, UT.

**2018**    *Is There a First-Drafter Advantage in M&A Agreements?*, Annual Meeting of the Canadian Law and Economics Association, September 2018, University of Toronto Law School.

*Lawyers, Law Firms, and the Production of Legal Information*, Conference on Empirical Legal Studies in Europe, June 2018, KU Leuven, Belgium.

*Lawyers, Law Firms, and the Production of Legal Information*, Annual Meeting of the American Law and Economics Association, May 2018, Boston University Law School.

*Is There a First-Drafter Advantage in M & A Agreements?*, UC Berkeley Faculty Workshop, April 2018, Berkeley, CA.

*Lawyers, Law Firms, and the Production of Legal Information*, BYU Winter Deals Conference, February 2018, Park City, UT.

**2017**    *Debt Contract Terms and Creditor Control*, Journal of Law, Finance & Accounting Annual Conference, November 2017, London Business School.

*Lawyers, Law Firms, and the Production of Legal Information*, Shareholder Litigation Conference, October 2017, UCLA School of Law.

*Lawyers, Law Firms, and the Production of Legal Information*, Center for the Study of Law and Society, October 2017, UC Berkeley.

*Lawyers, Law Firms, and the Production of Legal Knowledge*, CEAR Law and Finance Conference, May 2017, Georgia State University.

*Reference Networks and Legal Origin*, Complexity & the Law Workshop, February 2017, University of Michigan.

*Debt Contract Terms and Creditor Control*, Faculty Workshop, February 2017, Northwestern Pritzker School of Law.

*Debt Contract Terms and Creditor Control*, Law and Economics Workshop Series, February 2017, BYU Law School.

*Debt Contract Terms and Creditor Control*, Law and Economics Workshop Series, February 2017, Columbia Law School.

**2016**    *Entity Ownership and the Theory of the Firm,* Junior Business Law Conference, July 2016, University of Colorado School of Law.

*Debt Contract Terms and Creditor Control*, Conference on Empirical Legal Studies in Europe, June 2016, University of Amsterdam.

*Debt Contract Terms and Creditor Control*, Annual Meeting of the American Law and Economics Association, May 2016, Harvard Law School.

*Debt Contract Terms and Creditor Control*, Business Law Seminar, March 2016, UC Berkeley School of Law, Law, Economics, and Business Workshop.

*Debt Contract Terms and Creditor Control*, Business Law Seminar, February 2016, University of Chicago Law School.

*Legal Structures,* Digging into Data Challenge 3 Conference, January 2016, Glasgow, Scotland.

**2015**    *Debt Contract Terms and Creditor Control*, Corporate and Securities Litigation Conference, October 2015, Boston University School of Law.

*Debt Contract Terms and Creditor Control*, Junior Business Law Conference, July 2015, University of Colorado School of Law.

*Debt Contract Terms and Creditor Control*, Faculty Workshop Series, July 2015, Washington University in St. Louis School of Law

*Deal Litigation, Law Firm Quality, and Firm Value*, Harvard/Stanford/Yale Junior Faculty Forum, June 2015, Harvard Law School.

*Deal Litigation, Law Firm Quality, and Firm Value*, National Business Law Scholars Conference, June 2015, Seton Hall School of Law.

*Deal Litigation, Law Firm Quality, and Firm Value*, Faculty Workshop, February 2015, Notre Dame Law School.

*Appellate Lawmaking in a Judicial Hierarchy*, Amsterdam Center for Law & Economics Winter Meeting, January 2015, University of Amsterdam.

**2014**  *Deal Litigation, Law Firm Quality, and Firm Value*, Conference on Empirical Legal Studies, November 2014, University of California, Berkeley, School of Law.

*Deal Litigation, Law Firm Quality, and Firm Value*, Annual Meeting of the Canadian Law and Economics Association, September 2014, University of Toronto Law School.

*Covenant Thresholds and the Agency Costs of Debt*, Creditors and Corporate Governance Conference, September 2014, University of Chicago Law School.

*Deal Litigation, Law Firm Quality, and Firm Value*, Junior Business Law Conference, July 2014, University of Colorado School of Law.

*Lobbying and Pandering in the Boardroom*, Sixth Annual Berle Symposium, June 2014, Seattle University School of Law.

*The Shareholder Wealth Effects of Delaware Litigation*, National Business Law Scholars Conference, June 2014, Loyola Law School (Los Angeles).

Discussant, *Notre Dame Roundtable on Property Law*, May 2014, Notre Dame Law School.

*The Shareholder Wealth Effects of Delaware Litigation*, Annual Meeting of the American Law and Economics Association, May 2014, University of Chicago Law School.

Discussant, The Future of Law and Economics, March 2014, Maastricht University School of Law.

**2013**  *Influence Costs and the Scope of Board Authority*, Annual Meeting of the Midwestern Law and Economics Association, October 2013, University of Illinois School of Law.

*The Fannie and Freddie Bailouts Through the Corporate Lens*, NYU Journal of Law and Business Roundtable on The Future of Fannie and Freddie, September 2013, NYU School of Law.

*Influence Costs and the Scope of Board Authority*, Junior Business Law Conference, July 2013, University of Colorado School of Law.

*A Strategic Model of the Standard of Review*, Faculty Workshop, June 2013, Washington University School of Law.

*A Strategic Model of the Standard of Review*, Annual Meeting of the American Law and Economics Association, May 2013, Vanderbilt Law School.

*Reputation and the Law of Waiver*, Faculty Workshop, April 2013, Saint Louis University School of Law.

*Merger Class Actions in Delaware and the Symptoms of Multijurisdictional Litigation*, Faculty Workshop, Faculty Workshop, January 2013, Washington University School of Law.

Discussant, Roundtable on Foundational Principles of Contract Law, January 2013, UC Berkeley School of Law.

**2012**  *A Strategic Model of the Standard of Review*, Annual Meeting of the Midwestern Law and Economics Association, October 2012, Washington University School of Law.

*The Shareholder Wealth Effects of Delaware Litigation*, Junior Business Law Conference, July 2012, University of Colorado School of Law.

*Merger Class Actions in Delaware and the Symptoms of Multijurisdictional Litigation*, Institute for Law and Economic Policy Conference, April 2012.

*Reputation and the Law of Waiver*, Faculty Workshop, March 2012, Cornell Law School.

*Reputation and the Law of Waiver*, Faculty Workshop, February 2012, University of Illinois College of Law.

*Reputation and the Law of Waiver*, Faculty Workshop, February 2012, University of Missouri Law School.

**2011**  *Reputation and the Law of Waiver*, Conference on Theoretical Law & Economics, November 2011, Washington University School of Law.

*Probabilistic Interpretation and Contract*, September 2011, Annual Meeting of the Midwestern Law and Economics Association, Indiana University School of Law.

*Self-Help and the Rules of Engagement*, Annual Meeting of the Southeastern Association of Law Schools, August 2011.

*Probabilistic Interpretation and Contract*, Summer Workshop Series, June 2011, Washington University School of Law.

*Self-Help and the Rules of Engagement*, Annual Meeting of the American Law and Economics Association, May 2011, Columbia Law School.

Discussant, AALS Annual Meeting: Contracts Section, January 2011.

**2010**   *Self-Help and the Rules of Engagement*, Junior Faculty Forum, December 2010, Washington University School of Law.

*Self-Help and the Rules of Engagement*, Annual Meeting of the Midwestern Law and Economics Association, October 2010, University of Colorado School of Law.

*Relational Governance and Contract Damages: Evidence from Franchising*, Annual Meeting of the American Law and Economics Association, May 2010, Princeton University.

**2009**   *Relational Governance and Contract Damages: Evidence from Franchising*, Conference on Empirical Legal Studies, November 2009, USC Law School.

*Relational Governance and Contract Damages: Evidence from Franchising*, Work-in-Progress Seminar, September 2009, University of Chicago Law School.

*Harm, Ambiguity, and the Regulation of Illegal Contracts*, Annual Meeting of the American Law and Economics Association, May 2009, University of San Diego Law School.

*Harm, Ambiguity, and the Regulation of Illegal Contracts*, Law and Economics Colloquium, April 2009, Northwestern School of Law.

## COURSES TAUGHT

Contracts, Corporations, Contract Law Seminar, Corporate Law Seminar, Mergers & Acquisitions, U.S. Corporate Law, Empirical Methods for Lawyers.

## PROFESSIONAL SERVICE

Associate Editor: International Review of Law and Economics (2015-2021).

Referee: American Law and Economics Review, International Review of Law and Economics, Journal of Empirical Legal Studies, The Journal of Law and Economics, Journal of Law, Economics & Organization, Journal of Legal Studies, National Science Foundation.

Board of Directors: American Law and Economics Association (2024-present); Society for Empirical Research in Law (Co-President 2015, Director 2016).

Program Committee: Conference on Empirical Legal Studies (2023).

Area Organizer: Annual Meeting of the American Law and Economics Association (2017; 2023).

Executive Committee: AALS Law and Social Science Section (2011-14).

UC Berkeley Law: Academic Placement Committee (2020-21); Faculty Appointments Committee (2018-19, 2023-25), Clerkship Committee (2017-18).

Washington University School of Law: Institutional Profile Committee (2014-16, Chair (2015-16)), Appointments Committee (2012-13; 2016), Clerkship Advisor (2011-12), Law Review Advisor (2014-16), Faculty Advisor for Arab Students Association (2014-2016) and WashU Out West (student club for West Coast affiliates) (2015-2016).

## EXPERT ENGAGEMENTS

Franchi v. SmileDirectClub, Inc. et al., U.S. District Court for the Middle District of Tennessee (2025) (rebuttal report filed on behalf of plaintiff class; deposition pending).

Advanced Cell Diagnostics, Inc. v. Molecular Instruments, Inc., High Court of Justice, Business and Property Courts of England and Wales (2024) (expert report prepared on behalf of plaintiff).

In re Alta Mesa Resources, Inc. Securities Litigation, U.S. District Court for the Southern District of Texas (2023) (rebuttal report filed on behalf of plaintiff class; deposition taken).

Veil piercing matter on behalf of a Fortune 100 company (2023).

The Doctors Company, An Interinsurance Exchange et al. v. Weather Storm Capital, LLC et al.,California Superior Court, San Francisco) (2023, deposition taken).

Corporate governance matter in San Francisco Superior Court on behalf of a Fortune 500 company (2021-22, expert report prepared on behalf of defendants).

Shareholder agreement dispute in a private arbitration (March 2020, testimony provided for the defense).

Narloch et al. v. NSH Management of California, Inc. et al.(2019, CA Sup. Ct., Contra Costa County) (expert report prepared for plaintiffs).

Veil piercing matter in Santa Cruz County Superior Court (2019, engaged by defendant).

Veil piercing matter in an employment class action in the Southern District of California (2018, consulting services for plaintiff class).

St. J. Villere et al. v. Epiq Systems, Inc. et al. (MO Circuit Court) (2016, expert report filed on behalf of defendants; deposition taken).

## OTHER LEGAL EMPLOYMENT

*Attorney, Munger, Tolles & Olson LLP, San Francisco, CA*
    November 2005- March 2008
*Law Clerk to the Hon. Michael W. McConnell, Tenth Circuit Court of Appeals, Salt Lake City, UT*
    August 2004- August 2005
*Summer Associate, Gibson, Dunn & Crutcher LLP, San Francisco, CA*
    May 2003- August 2003
*Summer Associate, Munger, Tolles & Olson LLP, Los Angeles, CA*
    July 2002- August 2002
*Summer Associate, Heller, Ehrman, White & McAuliffe, San Francisco, CA*
    May 2002- July 2002; August 2003

## EDUCATION

*University of California, Berkeley, Jurisprudence and Social Policy Program*
    Ph.D., May 2004
    Dissertation: Essays on Legal and Extra-Legal Ordering
    Outstanding Graduate Student Instructor Award, Fall 2001
*Boalt Hall School of Law, University of California, Berkeley*
    J.D., May 2003
    *Honors*:  Six American Jurisprudence Awards and one Prosser Prize, Order of the Coif
*University of California, Berkeley*
    B.A. with Distinction, 1996

**Appendix B** – *documents considered and or relied on.*

*Articles*

1. Lou R. Kling, Eileen T. Nugent & Brandon Van Dyke, Negotiated Acquisitions of Companies, Subsidiaries and Divisions § 1.02 (Law Journal Press) (2024).
2. Guhan Subramanian, Bargaining in the Shadow of Takeover Defenses, 113 Yale L.J. 621, 649 (2003).
3. "Berkshire Hathaway to Acquire Alleghany Corporation for $848.02 Per Share in $11.6 Billion Transaction," Business Wire, March 21, 2022).
4. Marcel Kahan and Edward B. Rock, How I Learned to Stop Worrying and Love the Pill: Adaptive Responses to Takeover Law, 69 University of Chicago Law Review 871, 875-78 (2002).
5. Abbe L. Dienstag, Alan R. Friedman, Adi Herman & Ernest S. Wechsler, Once More Unto the (Material) Breach: Twitter Sues Elon Musk to Enforce Agreement, Kramer Levin (July 13, 2022), https://www.kramerlevin.com/en/perspectives-search/once-more-unto-the-material-breach-twitter-sues-elon-musk-to-enforce-agreement.html.
6. Tingting Liu, Tao Shu & Jasmine Wang, Valuation Disagreement in Mergers and Acquisitions, available at: https://papers.ssrn.com/sol3/Papers.cfm?abstract_id=3954130.
7. Delaware Supreme Court Upholds Rare Ruling that Material Adverse Event Allowed Purchaser to Negate Merger, O'Melveny, December 20, 2018, available: https://www.omm.com/insights/alerts-publications/delaware-supreme-court-upholds-rare-ruling-that-material-adverse-event-allowed-purchaser-to-negate-merger/.
8. Stephen L. Sepinuck, Case Law Matters, Bus. L. Today (Aug. 2022), https://www.americanbar.org/groups/business_law/resources/business-law-today/2022-august/case-law-matters/.
9. https://www.theventurealley.com/2010/07/understanding-the-bring-down-condition-in-public-company-mergers/.
10. Roger A. Cooper & Mark E. McDonald, Cleary Gottlieb Steen & Hamilton LLP, Navigating M&A Transactions with an Eye Towards Post-Closing Dispute Resolution, Lexology (Apr. 16, 2024), https://www.lexology.com/library/detail.aspx?g=ead518fe-31ef-4882-abce-d5fa571015e0.
11. Gail Weinstein, Philip Richter & Steven Epstein, Court of Chancery Finds Pandemic Was Not an MAE—Snow Phipps, Harv. L. Sch. F. on Corp. Governance (May 20, 2021), https://corpgov.law.harvard.edu/2021/05/20/court-of-chancery-finds-pandemic-was-not-an-mae-snow-phipps/.
12. Steven M. Haas, Delaware Chancery Rejects a Buyer's MAE Claim—Again, Hunton Andrews Kurth (Dec. 1, 2022), https://www.hunton.com/insights/legal/delaware-chancery-rejects-a-buyers-mae-claim-again.
13. Benjamin L. Stulberg, Randi C. Lesnick, Robert S. Faxon & Andrew M. Levine, Delaware Chancery Court Finally Finds an MAE, Jones Day (Oct. 2018),

https://www.jonesday.com/en/insights/2018/10/delaware-chancery-court-finally-finds-an-mae.

14. Jeran Wittenstein, Fortune, "Twitter Shares Sink After Musk Says He's Ending Acquisition Bid in 'Disaster Scenario' for the Social Media Platform," July 9, 2022, available: https://fortune.com/2022/07/09/twitter-shares-sink-after-musk-says-hes-ending-acquisition-bid-in-disaster-scenario-for-the-social-media-platform.

15. https://www.nytimes.com/2022/10/27/technology/elon-musk-twitter-deal-complete.html.

16. Cole Rosengren, "Advanced Disposal shareholders approve amended terms for $4.6B sale to Waste Management," Wastedive, August 26, 2020.

17. David Goldman, Chris Isidore & Clare Duffy, Elon Musk says Twitter deal 'temporarily on hold', CNN (May 13, 2022, 10:01 AM EDT), https://www.cnn.com/2022/05/13/tech/twitter-deal-on-hold-elon-musk.

18. https://time.com/6099976/twitter-class-action-lawsuit/.

19. Matt Levine, Elon Trolls Twitter, Bloomberg (May 13, 2022), https://www.bloomberg.com/opinion/articles/2022-05-13/elon-musk-trolIs-twitter.

20. Kurt Wagner and Maxwell Adler, Elon Musk's Twitter Deal is Proceeding, Not "On Hold, "Executives Tell Staff, Bloomberg (May 19, 2022), https://www.bloomberg.com/news/articles/2022-05-19/twitter-deal-is-proceeding-not-on-hold-executives-tell-staff.

21. Molly Schuetz and Robert Burnson, Time, "Twitter Agrees to Pay $809.5 Million Settlement in Shareholder Class Action Lawsuit," September 20, 2021, available at https://time.com/6099976/twitter-class-action-lawsuit/

*Books*

1. Claire A. Hill, Brian Quinn, and Steven Davidoff Solomon's Mergers and Acquisitions: Law, Theory, and Practice, 3d. 3rd Edition. West Academic Publishing (2023).

2. Guhan Subramanian, Dealmaking: The New Strategy of Negotiations 32-33 (2d ed. 2020).

*Cases*

1. El Paso Pipeline Partners L.P. Derivative Litig., 132 A.3d 67, 130 n.79 (Del. Ch. 2015).

2. El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff, 152 A.3d 1248 (Del. 2016).

3. Dell Techs. Inc. Class v. S'holders Litig., 300 A.3d 679, 728 (2023).

4. Tiffany & Co. v. LVMH Moët Hennessy-Louis Vuitton SE, et al., C.A. No. 2020-0768-JRS (Del. Ch. Sept. 9, 2020).

5. AB Stable VIII LLC v. MAPS Hotels & Resorts One LLC, No. 71, 2021, 2021 WL 5832875 (Del. Dec. 8, 2021).

6. Akorn, Inc. v. Fresenius Kabi AG, 198 A.3d 724 (2018).

7. SEC v. Musk, Case No. 25-cv-105, US Dist. Court, DC. Complaint (ECF 1)

8. IBP, S'holders Litig., 789 A.2d 14, 71 (Del. Ch. 2001).

9. Channel Medsystems v. Boston Scientific, 2019 WL 6896462 (Del. Ch. 2019).

10. Snow Phipps Group, LLC v. KCAKE Acquisition, Inc., 2021 WL 1714202 (Del. Ch. 2021).
11. AB Stable VIII LLC v. MAPS Hotels and Resorts One LLC, 2020 WL 7024929 (Del. Ch. 2020).

*Transcripts*
1. May 7, 2025, May 19, 2025, and July 12, 2022 Elon Musk Deposition Transcripts (OKFF-Pampena-00000001)
2. September 16, 2022 Kate Classen Deposition Transcript (MUSK-PAMPENA-0027605)
3. September 20, 2022 Jack Dorsey Deposition Transcript (MUSK-PAMPENA-0240240)
4. September 21, 2022 Jared John Birchall Deposition Transcript (MUSK-PAMPENA-0238377)
5. September 22, 2022 Martin Korman Deposition Transcript (MUSK-PAMPENA-0241260)
6. September 27, 2022 Bret Taylor Deposition Transcript (MUSK-PAMPENA-0688419)
7. September 27, 2022 Egon Durban Deposition Transcript (MUSK-PAMPENA-0240725)
8. September 28, 2022 Ned Segal Deposition Transcript (MUSK-PAMPENA-0686965)
9. October 2, 2022 Expert Report of James Boland (MUSK-PAMPENA-1022267)
10. October 3, 2022 Parag Agrawal Deposition Transcript (MUSK-PAMPENA-0674416)
11. January 31, 2025 Yoel Roth Deposition Transcript
12. March 20, 2025 Daniel Zwarn Deposition Transcript
13. March 25, 2025 Mike Ringler Deposition Rough Transcript
14. March 25, 2025 Mike Ringler Deposition Transcript Files
15. March 31, 2025 Leslie Lippai Deposition Transcript
16. April 3, 2025 Statement for the Record Transcript
17. July 10, 2023 Defendant Elon Musk's Motion to Dismiss the First Amended Complaint (ECF 34)
18. August 9, 2024 David Tabak Deposition Transcript

*Miscellaneous*

1. SEC, Comment Letter on SEC Statement, Jill E. Fisch, File No. cll12-8911728-244385 (2021).
2. SEC, Comment Letter on SEC Statement, George S. Georgiev, File No. cll12-8945393-245744 (2021).
3. SEC, Comment Letter on SEC Proposed Rule, George S. Georgiev, File No. 4-787 (2022).
4. Expert Report of John C. Coates in Twitter Inc. v. Elon Musk, et al.
5. Reverse Break-Up Fees and Specific Performance, Practical Law Practice Note 8-386-5095.
6. Am. Bar Ass'n, Mergers & Acquisitions Comm., *2024 ABA Deal Points Study*, Tableau Public, https://public.tableau.com/app/profile/aba.deal.points/viz/2024ABADealPointsStudy/Home#1.
7. Musk-Pampena-0238983.
8. Musk-Pampena-0030517.
9. Musk-Pampena-0018097.
10. Musk-Pampena-0527029.
11. Twitter Form 8-K, filed April 15, 2022, available at https://www.sec.gov/Archives/edgar/data/1418091/000119312522107462/d296740d8k.htm.
12. Musk-Pampena-0001445.

13. Musk-Pampena-0676494.

14. Musk-Pampena-0241260.

15. Definitive Proxy Statement filed July 26, 2022.

16. Latham & Watkins, LLP, Deal Certainty at 31, available at: https://www.lw.com/admin/Upload/Documents/OilAndGasMandA/General%20Concepts/Consolidated_Deal_Certainty_to_Going_Private_Transactions.pdf.

17. Merger Agreement.

18. Public Mergers: Overview, Practical Law Practice Note Overview 4-382-2164.

19. Acquisition Finance: Overview, Practical Law Practice Note Overview 1-382-8186.

20. Purchase Agreement: Due Diligence Condition, Practical Law Standard Clauses w-001-0169.

21. First Amended Complaint, 3:22-cv-05937-CRB Document 31.

22. Michael Morris, Curry Baker, Charles Wilber, Jackson Taylor, Taylor Manley, Daily MIC: Elon Musk Tweets Twitter Deal is on Hold.

23. "The Ultimatum" Tops Nielsen's Weekly Streaming Chart.

24. AMC+ To Launch on Orange Spain, Guggenheim Sec. Rsch. (May 13, 2022).

25. MUSK-PAMPENA-0678025.

26. https://www.sec.gov/ix?doc=/Archives/edgar/data/0000718877/000110465923082205/tm2321522d1_8k.htm.

27. Twitter Delaware Complaint.

28. Expert Report of James Boland, Twitter, Inc. v. Musk et al.

29. Daniel Ives, John Katsingris, In a Circus Show Move Musk Says Twitter Deal on Hold Pending Diligence, Wedbush Securities Company Report (May 13, 2022).

30. Guggenheim Securities, "Daily MIC: Elon Musk Tweets Twitter Deal Is on Hold," May 13, 2022.

31. Musk-Pampena-0700654.

32. Plaintiffs-000221.

33. Musk-Pampena-0318063.

34. MUSK-PAMPENA-0678025.

35. (2022-04-21) Amendment No. 3 to Schedule 13D.

36. (2022-05-18) Background of the Merger section from Proxy Statement.

37. (2022-06-02) SEC letter to Musk re TWITTER, INC. SC 13D Letter, File No. 005-87919.

38. MUSK-PAMPENA-0298738.

39. (2022-07-22) WSGR letter to SEC, File No. 001-36164.

40. (2023-12-11) Order re Motion to Dismiss, 3:22-cv-05937-CRB Document 48.

41. (2024-03-08) Answer to First Amended Complaint, 3:22-cv-05937-CRB Document 58.

42. (2024-08-05) Order denying MJOP, 3:22-cv-05937-CRB Document 89.

43. (2024-09-27) Order Granting Class Certification (Lexis published version).

44. (2024-09-27) Order Granting Class Certification, 3:22-cv-05937-CRB Document 106.

45. 2022-05-02-TWTR.N^J22-EVERCORE ISI-Can Elon Musk Save Twitter-96459558.

46. 2022-05-02-TWTR.N^J22-Roth Capital Partner-1Q Recap + Acquisition Developments (Break-up Fee, TSLA sale...-96460286.

47. 2022-05-05-TSLA.OQ-Wedbush Securities I-Sequel to the Soap Opera-Ellison, Others Now Helping.

48. 2022-05-05-TWTR.N^J22-Barclays-Twitter, Inc. Rating Suspended-96528878.

49. 2022-05-13-Guggenheim Securities-Daily MIC Elon Musk Tweets Twitter Deal Is on Hold; "The Ultimatum" Tops Nielsen's Weekly Streaming Chart; AMC+ To Launch on Orange Spain-96653006.

50. 2022-05-13-TSLA.OQ-Wedbush Securities I-In a Circus Show Move Musk Says Twitter Deal on Hold Pending Diligence-96651849.

51. 2022-05-13-TWTR.N^J22-Jefferies-Unpacking Musk's Ambitious Targets-96657810.

52. 2022-05-13-TWTR.N^J22-Truist Securities-Musk Puts the Twitter Deal on Pause; Will He Try to Renegotiate or Walk Away?-96655732

53. 2022-05-16-TSLA.OQ-Wedbush Securities I- Musk Giving More Indication Getting "Cold Feet" on Twitter Deal Due to Bots-96700055.

54. 2022-05-16-TSLA.OQ-Wedbush Securities I- Twitter and Musk Thoughts: Bot Issue Likely Excuse for Lower Price or Walk Away-96695294.

55. 2022-05-16-TWTR.N^J22-Jefferies-Looking for a Scapegoat; Lower Bid to Come-96702271.

56. 2022-05-17-TSLA.OQ-Wedbush Securities I-Musk Says Twitter _Cannot Move Forward Until Clarity on Bot Fiasco-96708845.

57. 2022-05-18-TWTR.N^J22-Susquehanna Financia-More on the VIX; Bear Market Bounce Hedges, WDC and TWTR Tra...-96726080.

58. 2022-05-23-TSLA.OQ-Wedbush Securities I-Expect More Fireworks Heading into Twitter Shareholder Meeting-96795753.

59. 2022-06-08-Guggenheim Securities-Daily MIC: TWTR Sets Ambitious Internal Goals for

60. mDAU Growth, Deal Faces Financing Pushback; Publicis Lowers 2022 Global Ad Spend Forecast to 8%-97017391.

61. 2022-06-14-Guggenheim Securities-Daily MIC 'Stranger Things,' 'Peaky Blinders' Help NFLX Dominate TWTR Conversation; GroupM Sees U.S. Traditional TV Ad Revenue Dipping 0.4% in 2022-97091942.

62. 2022-06-15-TSLA.OQ-Wedbush Securities I-Musk Set to Hold _All-Hands Meeting_ With Twitter Employees Tomorrow-97108532.

63. 2022-06-22-Barclays-Data Science High Frequency Indicators Twitter Mention...-97191746.

64. 2022-06-22-TSLA.OQ-Wedbush Securities I-Street Focused on What the Ultimate Price is for Twitter? Time Ticking-97192685.

65. 2022-06-28-Guggenheim Securities-Daily MIC Comparing the Leading Ad-Supported Streamers- Sub Mix, ARPU; NFLX Looks to Asia to Boost Sub Growth; 'Stranger Things' Tops TWTR Engagement-97255063.

66. 2022-06-29-UBER.N-Wedbush Securities I-Assuming Coverage of TWTR, UBER, LYFT-97271619.
67. 2022-06-30-TWTR.N^J22-Susquehanna Financia-Trading Callout Positioning for a TWTR Recut; BAC Short-Term Options...-97287175.
68. 2022-07-01-Guggenheim Securities-Daily MIC META Braces for Fierce Headwinds, Slower 2H Growth; TikTok WW Ad Revs to Surpass TWTR, SNAP, PINS; 8 Ways NFLX Can Reimagine Advertising-97304340.
69. 2022-07-07-TWTR.N^J22-Wedbush Securities I-Reflecting Uncertainty of Musk Deal and Price Negotiation; P.T to $43-97395988.
70. 2022-07-08-Guggenheim Securities-Daily MIC TWTR Defends Spam Accounting Amid Musk Takeover; "Stranger Things" Again Tops NLSN SVOD Rankings, Holds 3 of Top 5 Streaming Weeks Ever-97407016.
71. 2022-07-08-TWTR.N^J22-Wedbush Securities I-Musk Formally Terminates Twitter Deal with 13D Filing-97415102.
72. 2022-07-08-Vector Casa de Bolsa-Empresas Internacionales Las acciones de Twitter bajan-9742735.
73. 2022-07-09-TWTR.N^J22-Wedbush Securities I-Code Red Situation at Twitter; Lowering Price Target to $30 on Deal Collapsing-97427661.
74. 2022-07-10-TWTR.N^J22-Jefferies-Painful Breakup, Stock Trapped in Short-Term-97425344.
75. 2022-07-10-TWTR.N^J22-Truist Securities-TWTRs Nightmare Scenario Playing out with Musk Looking to Terminate the Deal-97426140.
76. 2022-07-11-Deutsche Bank-e-Manual Transmission Manheim used price index, Musk ends Twitter bid & Giga Berlin downtime-97434690.
77. 2022-07-11-Guggenheim Securities-Daily MIC TWTR, Musk Set for Unprecedented Legal Battle Over Deal Collapse; GOOG/L Offers Concessions To Head Off Potential US Ad-Tech Antitrust Suit-97436648.
78. 2022-07-11-TWTR.N^J22-Citizens JMP-Were Headed to Court Mr. Musk Seeks to Terminate the Twitter Acquisition-97429705.
79. 2022-07-11-TWTR.N^J22-Roth Capital Partner-Musk Cancels Twitter Deal; Legal Battle Coming Up-97434880.
80. 2022-07-11-TWTR.N^J22-The Benchmark Company-Compromise at $37 or Southbound to $27; Maintain Hold-97434445.
81. 2022-07-11-TWTR.N^J22-Wedbush Securities I-Advisor Call Diving Deeper into Legal Next Steps for Twitter and Musk in Court-97439379.
82. 2022-07-11-TWTR.N^J22-Wedbush Securities I-Now What's Next for Twitter and Musk Saga Major Legal Battle Ahead-97434823.
83. 2022-07-12-TWTR.N^J22-Piper Sandler Company-Failure to Launch Recasting Thesis Following Termination Notice-97454115.

84. 2022-07-12-TWTR.N^J22-Wedbush Securities I-Ann Lipton Advisor Call Today Discussing Twitter and Musk Legal Dynamics-97448722.

85. 2022-07-12-TWTR.N^J22-Wedbush Securities I-Twitter Launches Suit Against Musk Around $44 Billion Deal; Now it Begins-9745191.

86. 2022-07-13-TWTR.N^J22-Wedbush Securities I-Twitter Stock Up as Street Views Suit as _Very Strong_ Heading into Delaware-97462682.

87. 2022-07-15-TWTR.N^J22-Wedbush Securities I-Walking Through 4 Scenarios in Twitter/Musk Legal Battle; TWTR Upper Hand-97490363.

88. 2022-07-18-TWTR.N^J22-Wells Fargo Securities-TWTR All Sales Final Increased Conviction on Deal Close Post Chancery Court Expert Call-97518242.

89. 2022-07-19-Barclays-UK Fashion Retail Returns Fees Muted response on Twitter-97533065.

90. 2022-07-20-TWTR.N^J22-Jefferies-Invite Expert Call to Discuss the Twitter vs Elon Musk Lawssuit-97543098.

91. 2022-07-22-SPT.OQ-Cantor Fitzgerald-SPT - What is read through from TWTR/SNAP? - 97598981.

92. 2022-07-22-TWTR.N^J22-BMO Capital Markets-Coverage Discontinued-97599831.

93. 2022-07-22-TWTR.N^J22-Canaccord Genuity-Q2 advertising revenue growth slows; Twitter vs. Musk headed to Delaware Court in October-97598751.

94. 2022-07-22-TWTR.N^J22-Citizens JMP-2Q22 Results Model Update-97598620.

95. 2022-07-22-TWTR.N^J22-EVERCORE ISI-Quick Tweet on Q2 Results and Read-Thru-97592902.

96. 2022-07-22-TWTR.N^J22-Guggenheim Securities-TWTR – NEUTRAL – 2Q Revenue Declines YY; Ad Revenue Further Decelerates-97598453.

97. 2022-07-22-TWTR.N^J22-Piper Sandler Compan-2Q22 Model Update Results Miss Expectations, Negative Read for Digital Ads-97599417.

98. 2022-07-22-TWTR.N^J22-Roth Capital Partner-Negative Fundamental First Pass On 2Q Earnings + Latest Thoughts on Musk vs. Twitter-97592454.

99. 2022-07-22-TWTR.N^J22-Susquehanna Financia-Earnings Volatility and (Another) TWTR Trading Callout-97591100.

100. 2022-07-22-TWTR.N^J22-TD Cowen-TWTR 2Q22 Review Results Were Light, Hurt by FX; Trial Set for October-97603810.

101. 2022-07-22-TWTR.N^J22-Truist Securities-First Look TWTR 2Q22 Results Disappoint on Macro Weakness/Acquisition Debacle-97592398.

102. 2022-07-24-TWTR.N^J22-Jefferies-Q2 Earnings Legal Expert Recaps; Expect Significant Challenges Ahead-97622628.

103. 2022-07-28-TWTR.N^J22-EVERCORE ISI-Quick Tweet on Estimates Update-97706910.

104. 2022-07-29-TWTR.N^J22-Wells Fargo Securities-TWTR Model Update Post 2Q Earnings; Maintain Equal Weight, $54.20 PT-97731760.

105.    2022-09-02-Guggenheim Securities-Daily MIC _Lightyear_ Debuts in Top 3 of NLSN SVOD Rankings; CMCSA Looks to Cut Up to $1Bn From TV Networks Budgets; TWTR to Test Edit Button Feature-98185572.

106.    2022-09-23-SPT.OQ-Piper Sandler Company-Salesforce Adopts Sprout Social in September Fortune 500 Twitter Analysis-98434531.

107.    2022-10-05-TSLA.OQ-Deutsche Bank-e-Manual Transmission Tesla 3Q deliveries update, US monthly sales recap, Musk Twitter deal-98575876.

108.    2022-10-06-Guggenheim Securities-Daily MIC Musk, TWTR at Odds Over Agreement Terms; VZIO Doubles Upfront Ad Commitments to $200M; META to Shrink Some Offices to Adapt to Hybrid Work-98595144.

109.    2022-10-06-Societe Generale-Index Watch 6 Oct 2022 updates incl. AIB Group, BBVA, Ferguson, Hitachi Metals, Mastec, Nielsen Holdings, Rentokil Initial, Suzuken/Aichi Japan, Swedish Match, Twitter-98596586.

110.    2022-10-07-Deutsche Bank-e-Manual Transmission Twitter update, Uber/Motional deal, Honda production cuts/EV unveil-98614427.

111.    2022-10-07-JPMorgan Econ FI-Colombia Markets react to Petro's itchy Twitter finger-98617194.

112.    2022-10-12-PYPL.OQ-Jefferies-Twitter Scrape of Backlash to Misinformation Policy; Appears Well-98693530.

113.    2022-10-17-TSLA.OQ-Deutsche Bank-e-Manual Transmission Tesla Giga Berlin Musk/Twitter takeover update, Lincoln EV dealer-98763337.

114.    2022-10-26-JPMorgan-Portfolio Trading Research -US Index Update-98919786.

115.    2022-10-26-TSLA.OQ-Deutsche Bank-e-Manual Transmission Tesla hiring in Canada Twitter takeover update, Mobileye IPO pricing-98905243.

116.    2022-10-27-ACGL.OQ-Wells Fargo Securities-ACGL Move Over #TWTR; ACGL Joins SP 500 + Conference Call Roundup-98946000.

117.    2022-10-27-JPMorgan-US Index Update-98944879.

118.    2022-10-28-Guggenheim Securities-Daily MIC 3Q22 Social, Digital Earnings Wrap Up 4Q Outlook; Traditional Video Subscriber Loss Acceleration Continues; Musk Buys Twitter, Fires CEO-98964186.

119.    2022-10-28-Guggenheim Securities-TWTR - Termination of Coverage-98972649.

120.    2022-10-28-Wells Fargo Securities-Short-term Tidbit Twitter Deal a Reminder on Leveraged Loan Exposure-98965612.

121.    2022-10-28-Wells Fargo Securities-TWTR Dropping Coverage-98972721.

122.    2022-10-31-Dawson James Securities-Strategy – Let This Sink In - Two Additional Markers A Tech Collapse & Twitter Takeover-99018899.

123.    2022-10-31-Deutsche Bank-e-Manual Transmission Lear EV award with GM, Tesla Model Y Europe sales & Musk/Twitter deal-99004166.

124.    2022-04-04 Musk Schedule 13G.

125.    2022-04-05 Musk Schedule 13D.

126.    2022-04-14 Musk Schedule 13D.

127.    2022-04-25 [DKT 34-1 Ex 1] Merger Agreement.

128.    2022-04-25 Letter from Musk (MUSK-PAMPENA-0001445).

129.    2022-05-13 (deal on hold tweet thread prod by def) [DKT 34-1, Page 105].

130.    2022-05-13 Tweet-deal on hold 1 (PLAINTIFFS-000214)

131.    2022-05-16 Agrawal Tweet, https://twitter.com/paraga/status/15262375895349534722/3.

132.    2022-05-17 Tweet, https://x.com/BertelSchmitt/status/1526487509299232768.

133.    2022-05-17 Tweet [inviting SEC to investigate Twitter],
https://x.com/elonmusk/status/1526602003362750466.

134.    2022-07-10 Tweet - laugh meme Twitter has to provide bot data (PLAINTIFFS-000227).

135.    2022-07-12 Twitter, Inc., v. Elon R. Musk Complaint.

136.    2022.10.03 Skadden letter to Twitter counsel,
https://www.sec.gov/Archives/edgar/data/1494730/000110465922105787/tm2227435d1_ex99-S.htm.

137.    2024-03-26 All in Summit Transcript [DKT 59-1].

138.    April 15, 2022 Twitter Inc. 8-K.

139.    July 12, 2022 Twitter, Inc. v. Elon Musk, et al. Verified Complaint.

140.    March 10, 2025 Defendant's Responses to Plaintiffs' Second Set of Requests for Admissions.

141.    Attachment 30 PLAINTIFFS-000220.

142.    Attachment 61 Tesla Stock Price.

143.    MUSK-PAMPENA-0001445.

144.    MUSK-PAMPENA-0018097.

145.    MUSK-PAMPENA-0030517.

146.    MUSK-PAMPENA-0238983.

147.    MUSK-PAMPENA-0241260.

148.    MUSK-PAMPENA-0358142.

149.    MUSK-PAMPENA-0318063.

150.    MUSK-PAMPENA-0527029.

151.    MUSK-PAMPENA-0676494.

152.    MUSK-PAMPENA-0700654.

153.    MUSK-PAMPENA-0360182.

154.    MUSK-PAMPENA-0366954.

155.    MUSK-PAMPENA-0367187.

156.    MUSK-PAMPENA-0413648.

157.    April 25, 2022 SASMF Draft Agreement and Plan of Merger.

158.    MUSK-PAMPENA-0413918.

159.    MUSK-PAMPENA-0000264.

160.    MUSK-PAMPENA-0020796.

161.    MUSK-PAMPENA-0147160.

162.    MUSK-PAMPENA-0023905.

163.    MUSK-PAMPENA-0023983.

164.    MUSK-PAMPENA-0000947.

165.    MUSK-PAMPENA-0000754.

166.    MUSK-PAMPENA-0000672.

167.    Redline Index.

168.    MUSK-PAMPENA-0023104.

13. Musk-Pampena-0676494.

14. Musk-Pampena-0241260.

15. Definitive Proxy Statement filed July 26, 2022.

16. Latham & Watkins, LLP, Deal Certainty at 31, available at: https://www.lw.com/admin/Upload/Documents/OilAndGasMandA/General%20Concepts/Consolidated_Deal_Certainty_to_Going_Private_Transactions.pdf.

17. Merger Agreement.

18. Public Mergers: Overview, Practical Law Practice Note Overview 4-382-2164.

19. Acquisition Finance: Overview, Practical Law Practice Note Overview 1-382-8186.

20. Purchase Agreement: Due Diligence Condition, Practical Law Standard Clauses w-001-0169.

21. First Amended Complaint, 3:22-cv-05937-CRB Document 31.

22. Michael Morris, Curry Baker, Charles Wilber, Jackson Taylor, Taylor Manley, Daily MIC: Elon Musk Tweets Twitter Deal is on Hold.

23. "The Ultimatum" Tops Nielsen's Weekly Streaming Chart.

24. AMC+ To Launch on Orange Spain, Guggenheim Sec. Rsch. (May 13, 2022).

25. MUSK-PAMPENA-0678025.

26. https://www.sec.gov/ix?doc=/Archives/edgar/data/0000718877/000110465923082205/tm2321522d1_8k.htm.

27. Twitter Delaware Complaint.

28. Expert Report of James Boland, Twitter, Inc. v. Musk et al.

29. Daniel Ives, John Katsingris, In a Circus Show Move Musk Says Twitter Deal on Hold Pending Diligence, Wedbush Securities Company Report (May 13, 2022).

30. Guggenheim Securities, "Daily MIC: Elon Musk Tweets Twitter Deal Is on Hold," May 13, 2022.

31. Musk-Pampena-0700654.

32. Plaintiffs-000221.

33. Musk-Pampena-0318063.

34. MUSK-PAMPENA-0678025.

35. (2022-04-21) Amendment No. 3 to Schedule 13D.

36. (2022-05-18) Background of the Merger section from Proxy Statement.

37. (2022-06-02) SEC letter to Musk re TWITTER, INC. SC 13D Letter, File No. 005-87919.

38. MUSK-PAMPENA-0298738.

39. (2022-07-22) WSGR letter to SEC, File No. 001-36164.

40. (2023-12-11) Order re Motion to Dismiss, 3:22-cv-05937-CRB Document 48.

41. (2024-03-08) Answer to First Amended Complaint, 3:22-cv-05937-CRB Document 58.

42. (2024-08-05) Order denying MJOP, 3:22-cv-05937-CRB Document 89.

43. (2024-09-27) Order Granting Class Certification (Lexis published version).

44. (2024-09-27) Order Granting Class Certification, 3:22-cv-05937-CRB Document 106.

45. 2022-05-02-TWTR.N^J22-EVERCORE ISI-Can Elon Musk Save Twitter-96459558.

46. 2022-05-02-TWTR.N^J22-Roth Capital Partner-1Q Recap + Acquisition Developments (Break-up Fee, TSLA sale...-96460286.

47. 2022-05-05-TSLA.OQ-Wedbush Securities I-Sequel to the Soap Opera-Ellison, Others Now Helping.

48. 2022-05-05-TWTR.N^J22-Barclays-Twitter, Inc. Rating Suspended-96528878.

49. 2022-05-13-Guggenheim Securities-Daily MIC Elon Musk Tweets Twitter Deal Is on Hold; "The Ultimatum" Tops Nielsen's Weekly Streaming Chart; AMC+ To Launch on Orange Spain-96653006.

50. 2022-05-13-TSLA.OQ-Wedbush Securities I-In a Circus Show Move Musk Says Twitter Deal on Hold Pending Diligence-96651849.

51. 2022-05-13-TWTR.N^J22-Jefferies-Unpacking Musk's Ambitious Targets-96657810.

52. 2022-05-13-TWTR.N^J22-Truist Securities-Musk Puts the Twitter Deal on Pause; Will He Try to Renegotiate or Walk Away?-96655732

53. 2022-05-16-TSLA.OQ-Wedbush Securities I- Musk Giving More Indication Getting "Cold Feet" on Twitter Deal Due to Bots-96700055.

54. 2022-05-16-TSLA.OQ-Wedbush Securities I- Twitter and Musk Thoughts: Bot Issue Likely Excuse for Lower Price or Walk Away-96695294.

55. 2022-05-16-TWTR.N^J22-Jefferies-Looking for a Scapegoat; Lower Bid to Come-96702271.

56. 2022-05-17-TSLA.OQ-Wedbush Securities I-Musk Says Twitter _Cannot Move Forward Until Clarity on Bot Fiasco-96708845.

57. 2022-05-18-TWTR.N^J22-Susquehanna Financia-More on the VIX; Bear Market Bounce Hedges, WDC and TWTR Tra...-96726080.

58. 2022-05-23-TSLA.OQ-Wedbush Securities I-Expect More Fireworks Heading into Twitter Shareholder Meeting-96795753.

59. 2022-06-08-Guggenheim Securities-Daily MIC: TWTR Sets Ambitious Internal Goals for

60. mDAU Growth, Deal Faces Financing Pushback; Publicis Lowers 2022 Global Ad Spend Forecast to 8%-97017391.

61. 2022-06-14-Guggenheim Securities-Daily MIC 'Stranger Things,' 'Peaky Blinders' Help NFLX Dominate TWTR Conversation; GroupM Sees U.S. Traditional TV Ad Revenue Dipping 0.4% in 2022-97091942.

62. 2022-06-15-TSLA.OQ-Wedbush Securities I-Musk Set to Hold _All-Hands Meeting_ With Twitter Employees Tomorrow-97108532.

63. 2022-06-22-Barclays-Data Science High Frequency Indicators Twitter Mention...-97191746.

64. 2022-06-22-TSLA.OQ-Wedbush Securities I-Street Focused on What the Ultimate Price is for Twitter? Time Ticking-97192685.

65. 2022-06-28-Guggenheim Securities-Daily MIC Comparing the Leading Ad-Supported Streamers- Sub Mix, ARPU; NFLX Looks to Asia to Boost Sub Growth; 'Stranger Things' Tops TWTR Engagement-97255063.

66. 2022-06-29-UBER.N-Wedbush Securities I-Assuming Coverage of TWTR, UBER, LYFT-97271619.
67. 2022-06-30-TWTR.N^J22-Susquehanna Financia-Trading Callout Positioning for a TWTR Recut; BAC Short-Term Options...-97287175.
68. 2022-07-01-Guggenheim Securities-Daily MIC META Braces for Fierce Headwinds, Slower 2H Growth; TikTok WW Ad Revs to Surpass TWTR, SNAP, PINS; 8 Ways NFLX Can Reimagine Advertising-97304340.
69. 2022-07-07-TWTR.N^J22-Wedbush Securities I-Reflecting Uncertainty of Musk Deal and Price Negotiation; P.T to $43-97395988.
70. 2022-07-08-Guggenheim Securities-Daily MIC TWTR Defends Spam Accounting Amid Musk Takeover; "Stranger Things" Again Tops NLSN SVOD Rankings, Holds 3 of Top 5 Streaming Weeks Ever-97407016.
71. 2022-07-08-TWTR.N^J22-Wedbush Securities I-Musk Formally Terminates Twitter Deal with 13D Filing-97415102.
72. 2022-07-08-Vector Casa de Bolsa-Empresas Internacionales Las acciones de Twitter bajan-9742735.
73. 2022-07-09-TWTR.N^J22-Wedbush Securities I-Code Red Situation at Twitter; Lowering Price Target to $30 on Deal Collapsing-97427661.
74. 2022-07-10-TWTR.N^J22-Jefferies-Painful Breakup, Stock Trapped in Short-Term-97425344.
75. 2022-07-10-TWTR.N^J22-Truist Securities-TWTRs Nightmare Scenario Playing out with Musk Looking to Terminate the Deal-97426140.
76. 2022-07-11-Deutsche Bank-e-Manual Transmission Manheim used price index, Musk ends Twitter bid & Giga Berlin downtime-97434690.
77. 2022-07-11-Guggenheim Securities-Daily MIC TWTR, Musk Set for Unprecedented Legal Battle Over Deal Collapse; GOOG/L Offers Concessions To Head Off Potential US Ad-Tech Antitrust Suit-97436648.
78. 2022-07-11-TWTR.N^J22-Citizens JMP-Were Headed to Court Mr. Musk Seeks to Terminate the Twitter Acquisition-97429705.
79. 2022-07-11-TWTR.N^J22-Roth Capital Partner-Musk Cancels Twitter Deal; Legal Battle Coming Up-97434880.
80. 2022-07-11-TWTR.N^J22-The Benchmark Company-Compromise at $37 or Southbound to $27; Maintain Hold-97434445.
81. 2022-07-11-TWTR.N^J22-Wedbush Securities I-Advisor Call Diving Deeper into Legal Next Steps for Twitter and Musk in Court-97439379.
82. 2022-07-11-TWTR.N^J22-Wedbush Securities I-Now What's Next for Twitter and Musk Saga Major Legal Battle Ahead-97434823.
83. 2022-07-12-TWTR.N^J22-Piper Sandler Company-Failure to Launch Recasting Thesis Following Termination Notice-97454115.

84. 2022-07-12-TWTR.N^J22-Wedbush Securities I-Ann Lipton Advisor Call Today Discussing Twitter and Musk Legal Dynamics-97448722.

85. 2022-07-12-TWTR.N^J22-Wedbush Securities I-Twitter Launches Suit Against Musk Around $44 Billion Deal; Now it Begins-9745191.

86. 2022-07-13-TWTR.N^J22-Wedbush Securities I-Twitter Stock Up as Street Views Suit as _Very Strong_ Heading into Delaware-97462682.

87. 2022-07-15-TWTR.N^J22-Wedbush Securities I-Walking Through 4 Scenarios in Twitter/Musk Legal Battle; TWTR Upper Hand-97490363.

88. 2022-07-18-TWTR.N^J22-Wells Fargo Securities-TWTR All Sales Final Increased Conviction on Deal Close Post Chancery Court Expert Call-97518242.

89. 2022-07-19-Barclays-UK Fashion Retail Returns Fees Muted response on Twitter-97533065.

90. 2022-07-20-TWTR.N^J22-Jefferies-Invite Expert Call to Discuss the Twitter vs Elon Musk Lawssuit-97543098.

91. 2022-07-22-SPT.OQ-Cantor Fitzgerald-SPT - What is read through from TWTR/SNAP? - 97598981.

92. 2022-07-22-TWTR.N^J22-BMO Capital Markets-Coverage Discontinued-97599831.

93. 2022-07-22-TWTR.N^J22-Canaccord Genuity-Q2 advertising revenue growth slows; Twitter vs. Musk headed to Delaware Court in October-97598751.

94. 2022-07-22-TWTR.N^J22-Citizens JMP-2Q22 Results Model Update-97598620.

95. 2022-07-22-TWTR.N^J22-EVERCORE ISI-Quick Tweet on Q2 Results and Read-Thru-97592902.

96. 2022-07-22-TWTR.N^J22-Guggenheim Securities-TWTR – NEUTRAL – 2Q Revenue Declines YY; Ad Revenue Further Decelerates-97598453.

97. 2022-07-22-TWTR.N^J22-Piper Sandler Compan-2Q22 Model Update Results Miss Expectations, Negative Read for Digital Ads-97599417.

98. 2022-07-22-TWTR.N^J22-Roth Capital Partner-Negative Fundamental First Pass On 2Q Earnings + Latest Thoughts on Musk vs. Twitter-97592454.

99. 2022-07-22-TWTR.N^J22-Susquehanna Financia-Earnings Volatility and (Another) TWTR Trading Callout-97591100.

100. 2022-07-22-TWTR.N^J22-TD Cowen-TWTR 2Q22 Review Results Were Light, Hurt by FX; Trial Set for October-97603810.

101. 2022-07-22-TWTR.N^J22-Truist Securities-First Look TWTR 2Q22 Results Disappoint on Macro Weakness/Acquisition Debacle-97592398.

102. 2022-07-24-TWTR.N^J22-Jefferies-Q2 Earnings Legal Expert Recaps; Expect Significant Challenges Ahead-97622628.

103. 2022-07-28-TWTR.N^J22-EVERCORE ISI-Quick Tweet on Estimates Update-97706910.

104. 2022-07-29-TWTR.N^J22-Wells Fargo Securities-TWTR Model Update Post 2Q Earnings; Maintain Equal Weight, $54.20 PT-97731760.

105. 2022-09-02-Guggenheim Securities-Daily MIC _Lightyear_ Debuts in Top 3 of NLSN SVOD Rankings; CMCSA Looks to Cut Up to $1Bn From TV Networks Budgets; TWTR to Test Edit Button Feature-98185572.

106. 2022-09-23-SPT.OQ-Piper Sandler Company-Salesforce Adopts Sprout Social in September Fortune 500 Twitter Analysis-98434531.

107. 2022-10-05-TSLA.OQ-Deutsche Bank-e-Manual Transmission Tesla 3Q deliveries update, US monthly sales recap, Musk Twitter deal-98575876.

108. 2022-10-06-Guggenheim Securities-Daily MIC Musk, TWTR at Odds Over Agreement Terms; VZIO Doubles Upfront Ad Commitments to $200M; META to Shrink Some Offices to Adapt to Hybrid Work-98595144.

109. 2022-10-06-Societe Generale-Index Watch 6 Oct 2022 updates incl. AIB Group, BBVA, Ferguson, Hitachi Metals, Mastec, Nielsen Holdings, Rentokil Initial, Suzuken/Aichi Japan, Swedish Match, Twitter-98596586.

110. 2022-10-07-Deutsche Bank-e-Manual Transmission Twitter update, Uber/Motional deal, Honda production cuts/EV unveil-98614427.

111. 2022-10-07-JPMorgan Econ FI-Colombia Markets react to Petro's itchy Twitter finger-98617194.

112. 2022-10-12-PYPL.OQ-Jefferies-Twitter Scrape of Backlash to Misinformation Policy; Appears Well-98693530.

113. 2022-10-17-TSLA.OQ-Deutsche Bank-e-Manual Transmission Tesla Giga Berlin Musk/Twitter takeover update, Lincoln EV dealer-98763337.

114. 2022-10-26-JPMorgan-Portfolio Trading Research -US Index Update-98919786.

115. 2022-10-26-TSLA.OQ-Deutsche Bank-e-Manual Transmission Tesla hiring in Canada Twitter takeover update, Mobileye IPO pricing-98905243.

116. 2022-10-27-ACGL.OQ-Wells Fargo Securities-ACGL Move Over #TWTR; ACGL Joins SP 500 + Conference Call Roundup-98946000.

117. 2022-10-27-JPMorgan-US Index Update-98944879.

118. 2022-10-28-Guggenheim Securities-Daily MIC 3Q22 Social, Digital Earnings Wrap Up 4Q Outlook; Traditional Video Subscriber Loss Acceleration Continues; Musk Buys Twitter, Fires CEO-98964186.

119. 2022-10-28-Guggenheim Securities-TWTR - Termination of Coverage-98972649.

120. 2022-10-28-Wells Fargo Securities-Short-term Tidbit Twitter Deal a Reminder on Leveraged Loan Exposure-98965612.

121. 2022-10-28-Wells Fargo Securities-TWTR Dropping Coverage-98972721.

122. 2022-10-31-Dawson James Securities-Strategy – Let This Sink In - Two Additional Markers A Tech Collapse & Twitter Takeover-99018899.

123. 2022-10-31-Deutsche Bank-e-Manual Transmission Lear EV award with GM, Tesla Model Y Europe sales & Musk/Twitter deal-99004166.

124. 2022-04-04 Musk Schedule 13G.

125. 2022-04-05 Musk Schedule 13D.

126.    2022-04-14 Musk Schedule 13D.

127.    2022-04-25 [DKT 34-1 Ex 1] Merger Agreement.

128.    2022-04-25 Letter from Musk (MUSK-PAMPENA-0001445).

129.    2022-05-13 (deal on hold tweet thread prod by def) [DKT 34-1, Page 105].

130.    2022-05-13 Tweet-deal on hold 1 (PLAINTIFFS-000214)

131.    2022-05-16 Agrawal Tweet, https://twitter.com/paraga/status/15262375895349534722/3.

132.    2022-05-17 Tweet, https://x.com/BertelSchmitt/status/1526487509299232768.

133.    2022-05-17 Tweet [inviting SEC to investigate Twitter], https://x.com/elonmusk/status/1526602003362750466.

134.    2022-07-10 Tweet - laugh meme Twitter has to provide bot data (PLAINTIFFS-000227).

135.    2022-07-12 Twitter, Inc., v. Elon R. Musk Complaint.

136.    2022.10.03 Skadden letter to Twitter counsel, https://www.sec.gov/Archives/edgar/data/1494730/000110465922105787/tm2227435d1_ex99-S.htm.

137.    2024-03-26 All in Summit Transcript [DKT 59-1].

138.    April 15, 2022 Twitter Inc. 8-K.

139.    July 12, 2022 Twitter, Inc. v. Elon Musk, et al. Verified Complaint.

140.    March 10, 2025 Defendant's Responses to Plaintiffs' Second Set of Requests for Admissions.

141.    Attachment 30 PLAINTIFFS-000220.

142.    Attachment 61 Tesla Stock Price.

143.    MUSK-PAMPENA-0001445.

144.    MUSK-PAMPENA-0018097.

145.    MUSK-PAMPENA-0030517.

146.    MUSK-PAMPENA-0238983.

147.    MUSK-PAMPENA-0241260.

148.    MUSK-PAMPENA-0358142.

149.    MUSK-PAMPENA-0318063.

150.    MUSK-PAMPENA-0527029.

151.    MUSK-PAMPENA-0676494.

152.    MUSK-PAMPENA-0700654.

153.    MUSK-PAMPENA-0360182.

154.    MUSK-PAMPENA-0366954.

155.    MUSK-PAMPENA-0367187.

156.    MUSK-PAMPENA-0413648.

157.    April 25, 2022 SASMF Draft Agreement and Plan of Merger.

158.    MUSK-PAMPENA-0413918.

159.    MUSK-PAMPENA-0000264.

160.    MUSK-PAMPENA-0020796.

161.    MUSK-PAMPENA-0147160.

162.    MUSK-PAMPENA-0023905.

163.    MUSK-PAMPENA-0023983.

164.    MUSK-PAMPENA-0000947.

165.    MUSK-PAMPENA-0000754.

166.    MUSK-PAMPENA-0000672.

167.    Redline Index.

168.    MUSK-PAMPENA-0023104.