# EXHIBIT A



**Planet Depos**
We Make It *Happen*™

# Transcript of Emily Strauss

**Date:** July 22, 2025
**Case:** Pampena, et al. -v- Musk

**Planet Depos**

**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com

**www.planetdepos.com**

Michigan #8598 | Nevada #089F | New Mexico #566

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

------------------------------- x

GIUSEPPE PAMPENA, individually   :

and on behalf of all others      :

similarly situated, et al.,      : Civil Action No.

           Plaintiffs       : 3:22-cv-05937

     vs                         :

ELON MUSK,                       :

         Defendant         :

------------------------------- x


REMOTELY CONDUCTED VIDEOTAPED DEPOSITION OF

EMILY STRAUSS

TUESDAY, JULY 22, 2025

1:04 P.M. EDT


JOB NO.: 591603

PAGES: 1 - 144

REPORTED BY: KARISA EKENSEAIR, CCR RPR RMR RDR

CA CSR #14546

DEPOSITION OF EMILY STRAUSS, CONDUCTED VIA ZOOM VIDEOCONFERENCE.

Pursuant to notice, before Karisa J. Ekenseair, Certified Shorthand Reporter in and for the States of Arkansas, Oklahoma, Missouri, Illinois, Tennessee, Georgia, New Mexico, Washington, and California; National Registered Professional Reporter; National Registered Merit Reporter; National Registered Diplomate Reporter; Notary Public.

                    A P P E A R A N C E S

    ON BEHALF OF THE PLAINTIFFS (VIA ZOOM):

          TYSON REDENBARGER, ESQUIRE

          JOSEPH COTCHETT, ESQUIRE

          BREANNA HUYNH, ESQUIRE

          COTCHETT, PITRE & McCARTHY, LLP

          840 MALCOLM ROAD, SUITE 200

          BURLINGAME, CALIFORNIA 94010

          650-697-6000

          -AND-

          AARON P. ARNZEN, ESQUIRE

          BOTTINI & BOTTINI, INC.

          7818 INVANHOE AVENUE, SUITE 102

          LA JOLLA, CALIFORNIA 92037

          858-914-2001

    ON BEHALF OF THE DEFENDANT (VIA ZOOM):

          ALEX BERGJANS, ESQUIRE

          JON COLLIER, ESQUIRE

          QUINN EMANUEL URQUHART & SULLIVAN, LLP

          865 S. FIGUEROA STREET, 10TH FLOOR

          LOS ANGELES, CALIFORNIA 90017

          213-443-3000

 ALSO PRESENT:

          BRI STANLEY, QUINN EMANUEL

          KOLLIN CASAREZ, VIDEOGRAPHER

Transcript of Emily Strauss
Conducted on July 22, 2025                    4

T A B L E   O F   C O N T E N T S

                                              PAGE

STYLE AND NUMBER...................... 1

APPEARANCES........................... 3


WITNESS:    EMILY STRAUSS

EXAMINATION BY MR. BERGJANS.......... 6

EXAMINATION BY BY MR. REDENBARGER.... 137

FURTHER EXAMINATION BY MR. BERGJANS.. 141


CERTIFICATE OF REPORTER............. 144


                    EXHIBITS

                (ATTACHED TO TRANSCRIPT)

NUMBER          DESCRIPTION                  PAGE

EXHIBIT 223   EXPERT REPORT OF EMILY

              STRAUSS, MAY 28, 2025.........15

EXHIBIT 224   GUIDELINES FOR CIVIL JURY

              TRIALS BEFORE JUDGE CHARLES

              R. BREYER....................18

P R O C E E D I N G S                                    12:54:20

THE VIDEOGRAPHER:  Here begins Media Number          13:03:50

1 in the videotaped deposition of Emily Strauss in      13:03:53

the matter of Giuseppe Pampena, on behalf of himself    13:03:57

and all others similarly situated, versus Elon R.       13:04:01

Musk in the United States District Court, Northern      13:04:08

District of California, Case Number                     13:04:11

3:22-CV-05937-CRB.                                      13:04:20

Today's date is July 22, 2025.  The time on             13:04:21

the video monitor is 1:04 Eastern time.  The remote     13:04:26

videographer today is Kollin Casarez, representing      13:04:31

Planet Depos.  All parties of this video deposition     13:04:34

are attending remotely.                                 13:04:37

Would counsel please voice-identify                     13:04:39

themselves and state whom they represent.               13:04:40

MR. BERGJANS:  Good morning.  This is Alex              13:04:42

Bergjans from Quinn Emanuel, attorney for Elon Musk.    13:04:45

I'm joined by my colleague Jon Collier.                 13:04:47

MR. REDENBARGER:  Good morning.  Tyson                  13:04:50

Redenbarger of Cotchett Pitre & McCarthy, along with    13:04:53

Joseph Cotchett, here on behalf of plaintiffs.          13:04:57

MR. ARNZEN:  And Aaron Arnzen for Plaintiffs            13:05:05

also.                                                   13:05:07

THE VIDEOGRAPHER:  The court reporter today             13:05:07

is Karisa Ekenseair, representing Planet Depos.  The    13:05:08

witness will now be sworn.                              13:05:11

THE REPORTER:  My name is Karisa Ekenseair.   13:05:13
I am a California Certified Shorthand Reporter,
License Number 14546.

Would the witness please raise their right
hand and be sworn.

EMILY STRAUSS

of lawful age, being first duly sworn, deposes and
says in reply to the questions propounded as
follows:

EXAMINATION                                13:05:35

BY MR. BERGJANS:                                       13:05:35

Q   Good morning, Professor Strauss.               13:05:37

A   Morning.                                         13:05:39

Q   My name is Alex Bergjans.  I just introduced   13:05:41
myself, but I'm an attorney for Mr. Musk in this      13:05:46
case.                                                 13:05:48

Before we get started, I just want to know,    13:05:48
have you ever been deposed before?                    13:05:52

A   No.                                             13:05:52

Q   Okay.  So I'm just going to very quickly go    13:05:53
over the ground rules.  I'm sure that your -- you     13:05:55
know, the counsel for Plaintiffs let you know, but I  13:05:56
just want to make sure it's all said for the record.  13:06:00

First, do you understand that you're under     13:06:03

Transcript of Emily Strauss
Conducted on July 22, 2025                    7

oath in this deposition?

A   Yes.

Q   And this is the same oath that you'd give in a court of law?

A   Yes.

Q   Okay.  Great.  And first things first: Because we're doing this over Zoom, and this would be the case in any deposition, it's important that we don't talk over each other.  It will make the court reporter's life impossible.  So if I promise to let you -- endeavor to let you finish your answers before asking a question, will you promise to let me finish my question before beginning answering?

A   Sure.

Q   Okay.  Great.  If there are any questions I ask that you don't understand, please let me know and I'll try to rephrase them, re-ask them.  But do understand that if you don't ask me for any clarification, I'm going to assume that you understood the question that I asked.

A   Yes.

Q   Okay.  Great.

Is there any reason you cannot give your best testimony today?

Transcript of Emily Strauss
Conducted on July 22, 2025                                    8

A    No.

Q    Okay.  This is not a marathon.  It's not a memory test.  You can take breaks whenever you want. Just let me know and I'm happy to go off record and take a break.  But the one condition I do have is that we not take breaks while a question is pending.

Do you understand that?

A    Yes.

Q    Okay.  Great.  What do you understand this case is about?

A    My understanding of the allegations in this case is that Plaintiffs allege that Mr. Musk made various misstatements and engaged in a course of conduct designed to depress Twitter's stock price.

Q    And what's that based on, your understanding?

A    Reading the Complaint, reading some of the filings in this lawsuit.

Q    What filings have you read in this lawsuit besides the Complaint?

A    I've read the briefing on the motion to dismiss and the opinion on the motion to dismiss.

Q    Okay.  And those were not listed in your report.

Do you intend to rely on the briefing on the

motion to dismiss or the opinion on the motion to dismiss in any opinions you're going to give in this case?

A   No.

Q   Okay.  Have you read or reviewed any other document from this case?

A   What's listed in my report.

Q   And that -- that's it?

A   Relating to this, yes.

Q   You haven't read any depositions in this case?

A   No.

Q   With the exception of the, I think, couple of documents listed in your report, you haven't reviewed any documents exchanged in discovery; for instance, communications between Twitter or anyone from Mr. Musk's team?

A   No.

Q   Okay.  And besides what you understand from the Complaint or the allegations in the Complaint and the motion to dismiss briefing, is there anything else you know about this case?

MR. REDENBARGER:  Objection, form.

A   That's a very broad question.  I understand the -- the allegations to be those that I have

described.

Q    And do you understand what alleged misstatements are at issue in this case?

A    The misstatements that I understand are at issue are the misstatements -- the alleged misstatements on May 13th and 16th and 17th.

Q    Anything else?

A    I understand that Plaintiffs have a scheme liability allegation.

Q    And what do you understand that allegation to be?

MR. REDENBARGER:  Objection, form.

Go ahead.

A    I understand that the plaintiffs allege that Mr. Musk engaged in a course of conduct, including various misstatements and actions intended to depress Twitter's stock price.

Q    And what actions and misstatements do you understand are included in that course of conduct?

MR. REDENBARGER:  Object to form.

Go ahead.

A    I -- I understand it to be a long-running series of actions and misstatements, including those that are at issue in this lawsuit, as well as other actions that were deceptive and -- and designed to

depress the stock price.

Q    Anything more specific?

A    I understand -- and this is not part of my report.  This is based just on my understanding of the case, right --

Q    Sure.

A    -- that in addition to the misstatements that are at issue, Plaintiffs allege that Mr. Musk -- Mr. Musk's general conduct in -- in acting as if he were going to back out of the merger, including things like termination letters, was -- was part of the scheme designed to depress the stock price.

And, again, this is not part of my report.

Q    Got it.  And you reviewed the Court's motion to dismiss order, including the portions of the order that dismissed the claims based on the termination letters?

A    I did, yes.

Q    Okay.  Did you follow the Twitter merger back in 2022?

A    In the press, yes.

Q    Did you make any public comment about it?

A    No.

Q    Did you publish anything about it?

13:10:28
13:10:30
13:10:31
13:10:34
13:10:37
13:10:38
13:10:39
13:10:41
13:10:45
13:10:51
13:10:54
13:10:57
13:11:01
13:11:02
13:11:04
13:11:06
13:11:08
13:11:14
13:11:15
13:11:15
13:11:17
13:11:18
13:11:20
13:11:23
13:11:23

A    No.

Q    Do you have an X account, formerly Twitter?

A    No, no.

Q    Do you use any social media to make -- and I'm not asking about, you know, personal Instagrams or anything like that, but any social media to share or make any comments related to your work as a law professor?

A    I don't.

Q    Did you or have you taught anything related to the Twitter transaction and/or litigation in any of the courses you teach as a law professor?

A    I use it as an example when we talk about Unical and hostile takeovers.  Students are interested.

Q    And that's in your Business Associations class?

A    Yes.

Q    Have you prepared any course materials related to that?

A    I have maybe two slides that I prepared long before I got in this law -- involved in this lawsuit.

Q    Understood.  And what -- do you still have those two slides?

13

A    Somewhere.

Q    And what are on those two slides, to the best you can remember?

A    It's mostly just a chronology of the -- the time leading up to the merger, the -- the -- I'm sorry, I'm really reaching in my memory here.

Q    Oh, sure.  If you don't know, you know, you can tell me.

A    Sure.  It's -- I mean, I'll give you to the best I can recollect.

It's -- it's the time leading up to when Mr. Musk disclosed his stock ownership, some of the statements that he made, the fact that the board implemented a poison pill, and the -- some of the statements that Mr. Musk made suggesting the possibility of a hostile tender offer.

Q    And that's it?

A    I believe so; again, from memory.  I didn't prepare on this.

Q    No.  Understood.  And -- and when you teach -- you know, when you teach that in -- in your class, are your lectures or classes recorded?

A    Yes.

Q    Do you know if -- and this is only at UCSF or did you also teach this at Berkeley?

13:12:30
13:12:32
13:12:35
13:12:36
13:12:45
13:12:51
13:12:53
13:12:56
13:12:56
13:12:58
13:13:00
13:13:03
13:13:07
13:13:10
13:13:13
13:13:16
13:13:20
13:13:22
13:13:26
13:13:27
13:13:30
13:13:35
13:13:38
13:13:39
13:13:43

Transcript of Emily Strauss
Conducted on July 22, 2025                              14

A   I taught this at Berkeley.

Q   Do you know if these recordings were retained?

A   I don't.

Q   Okay.  Did you exchange any messages about the Twitter merger with any other law professors or practitioners?

MR. REDENBARGER:  Objection; beyond the scope.

Go ahead.

A   Not that I can recall.

Q   Okay.  How did you come to be engaged in this case?

A   I was approached by counsel in this case around November of 2024, I believe.

Q   Did you have any pre-existing relationship with any of the law firms in this case?

A   No.

Q   Did you have -- do you know who Professor Adam Badawi is?

A   I do.  Yes.

Q   Do you have a pre-existing relationship with him prior to being engaged in this case?

A   I -- I knew him.  We are -- you know, we are in the same sort of professional circles.  So we've

Transcript of Emily Strauss
Conducted on July 22, 2025

15

met and spoken, yeah.

Q   Have you two discussed the Twitter merger together at any point?

A   No.

Q   Have you two discussed your engagement in this case at any point?

A   We've discussed that we were engaged but not beyond that.

Q   And when Plaintiffs' counsel first reached out to you, what did they -- what type of opinion did they ask you to render in this case?

MR. REDENBARGER:   Just object to the extent it calls for attorney-client privilege.

But you can answer that.

A   They asked me to basically educate the jury on the basics of capital market, sort of teach the jury a Securities 101 class.

Q   Okay.  And you issued a report in this case, correct?

A   I did.

Q   And that's -- I know that you have a printed copy.  It's also in the link, and we're going to mark that as Exhibit 223.

(Exhibit 223 marked for identification.)

A   Okay.

13:14:46
13:14:47
13:14:51
13:14:51
13:14:51
13:14:55
13:14:55
13:14:59
13:14:59
13:15:02
13:15:07
13:15:09
13:15:10
13:15:13
13:15:15
13:15:17
13:15:21
13:15:23
13:15:28
13:15:28
13:15:28
13:15:32
13:15:35
13:15:37
13:15:38

Transcript of Emily Strauss
Conducted on July 22, 2025                          16

Q    When you have your report in front of you?

A    Okay.  I'll use my hard copy.

Q    Perfect.  And you authored this report?

A    Yes.

Q    Did you have any assistance preparing this report?

A    I drafted it.  We had a paralegal cite-check it.

Q    Did you get any edits from Plaintiffs' counsel?

A    Yes.

Q    What were the nature of those edits?

MR. REDENBARGER:  Objection; calls for attorney-client privilege.

You don't have to answer that.  Don't. Those are privileged.

Q    Okay.  Did Plaintiffs' counsel provide you with -- beyond the providing you with the Complaint and the motion to dismiss briefing and opinion, did Plaintiffs' counsel provide you with any other facts about this case that you relied on in forming your opinion?

MR. REDENBARGER:  Objection to the extent it calls for attorney-client privilege.

But you can answer that as well.

Transcript of Emily Strauss
Conducted on July 22, 2025                              17

A    They offered to provide me with anything that I needed to write this opinion.

Q    And -- and did you take them up on their offer?

A    I made some charts with some data that came from authenticated documents procured in discovery.

Q    And is that it?

A    Yeah.

Q    Did Plaintiffs' counsel provide you with any assumptions that you relied on in putting together this report?

A    No.

Q    This report, Exhibit 223, it contains all of the opinions you intend to offer at trial in this case, right?

A    Yes.

Q    And within this report, the footnotes and your reliance materials at the end which we'll get to, this includes all of the evidence you intend to rely on to support your opinions in this case?

A    Yes.

Q    It includes all of the sources, legal, academic or otherwise, you intend to rely on to support your opinions?

A    Yes.

Q   It includes all of the charts, slides, pictures, illustrations, that you'll present at trial?

A   Yes.

Q   Okay.  I'm going to show you what we'll mark as Exhibit 225.

THE REPORTER:  Are we skipping 224 for now?

MR. BERGJANS:  I'm sorry.  224.  My apologies.

(Exhibit 224 marked for identification.)

MR. REDENBARGER:  Alex, are you going to share screen, or should she download it?

MR. BERGJANS:  Yeah.  I'm opening it right now.

MR. REDENBARGER:  Okay.

Q   I'm showing you what's been marked as 224. And if you look at the top, this is the Guidelines for Civil Jury Trials before Judge Charles Breyer.

Do you see that?

A   Yes.

Q   Okay.  And zoom out a bit so it's more readable.  Can you read this if I wasn't scrolling --

A   When you stop, I'll -- I'll expand it, and then I will be able to.

13:17:50
13:17:54
13:17:57
13:17:57
13:17:58
13:18:04
13:18:12
13:18:12
13:18:14
13:18:19
13:18:23
13:18:25
13:18:27
13:18:29
13:18:30
13:18:42
13:18:46
13:18:49
13:18:53
13:18:54
13:18:55
13:19:01
13:19:03
13:19:04
13:19:07

Transcript of Emily Strauss
Conducted on July 22, 2025                    19

Q    Okay.  Great.

MR. REDENBARGER:  You can expand it up here.

Alex, if -- since you're sharing, once you get to the right section, can you expand it?  It's pretty small.

A    It's pretty small right now.

Q    How is this?

A    A little more would be great.  Sorry.  Not good eyes.

MR. REDENBARGER:  There you go.

Q    No problem.

A    Thank you.

Q    Good enough?  Okay, great.

So I'm showing you on page 6, Section F; it says, Expert Witness -- Expert Witnesses.

Do you see this?

A    Uh-huh.

Q    And it states, "...at trial, the direct testimony of experts will be limited to the matters disclosed in their reports.  Omitted material may not ordinarily be added on direct examination.  This means the reports must be complete and sufficiently detailed."

Do you see that?

A    Yes.

Q   And it says:  Illustrative animations, diagrams, charts and models may be used on direct examination only if they were part of the expert's report, with the exception of simple drawings and tabulations that plainly illustrate what is in the report, which can be drawn by the witness at trial or otherwise shown to the jury.

Do you see that?

A   Yes.

Q   Okay.  And you understand these are the rules that are governing the scope of your expert opinion in this case?

A   Yes.

Q   Okay.  At your report on page 3 -- I can -- I'll close this.

The middle of page 3, right:  "I reserve the right to modify or extend my opinions and testimony in response to new information or arguments raised by the Defendant(s) or other experts."

Do you see that?

A   I do.

Q   Do you have any additional testimony that you intend to offer at trial not contained in this report?

A   I don't.

13:19:56
13:20:00
13:20:03
13:20:05
13:20:06
13:20:08
13:20:11
13:20:13
13:20:13
13:20:13
13:20:15
13:20:19
13:20:20
13:20:20
13:20:32
13:20:34
13:20:35
13:20:37
13:20:40
13:20:45
13:20:45
13:20:45
13:20:47
13:20:50
13:20:50

Q   You haven't issued a supplemental report, correct?

A   No.

Q   And if you decide to modify or extend your opinions beyond that which is covered in the report, at minimum, you'll issue a supplemental report to explain those opinions?

A   Seems reasonable.

Q   And you'll agree to be deposed on those opinions?

A   Yes.

Q   Okay.  You list on the -- on that page and starting a little bit on the page before, at the bottom of page 2 --

A   Uh-huh.

Q   -- you list, by my count, six topics you'll be testifying about?

A   Yes.

Q   And these are all general topics about the securities markets, investors, and securities regulations, this securities reg 101 class you were asked to teach?

A   Yes.

Q   You're not offering any opinions about Elon Musk, correct?

A    No.

Q    Not offering any opinions about Twitter, right?

A    No.

Q    Not offering any opinions about Tesla?

A    No.

Q    Not offering any opinions about the specific facts in this case?

A    No.

Q    And not offering any opinions about the allegations in this case, right?

A    Correct.

Q    For instance, you're not offering an opinion that Mr. Musk made any materially misleading statement, right?

A    I am not.

Q    And you're not offering any opinion that Mr. Musk acted with scienter, correct?

A    Correct.

Q    You're not offering any opinion that anything Mr. Musk did or said caused any price reaction in any security, right?

A    That's correct.

Q    Nothing he did or said caused any stock price to go up or down; you're not offering that

opinion, right?

A    I am not.

Q    You're not offering any opinions regarding loss causation?

A    Correct.

Q    You're not offering any opinion that any shareholder suffered any damage, correct?

A    That's correct.

Q    You're not offering any opinion that Mr. Musk violated any securities law, right?

A    That's correct.

Q    That he violated any securities regulation, correct?

A    Correct.

Q    You're not offering any opinion about why Twitter stock moves on any given day, right?

A    That's correct.

Q    You're not offering any opinion why Twitter stock moves on any given moment, right?

A    I am not.

Q    You're not offering any opinion about the movements of Tesla stock?

A    No.

Q    You're not offering any opinion about how Elon Musk affects the price of any stock, correct?

13:22:27
13:22:28
13:22:29
13:22:31
13:22:31
13:22:32
13:22:34
13:22:36
13:22:36
13:22:39
13:22:42
13:22:43
13:22:47
13:22:47
13:22:47
13:22:51
13:22:56
13:22:56
13:23:00
13:23:02
13:23:03
13:23:05
13:23:06
13:23:07
13:23:10

Transcript of Emily Strauss
Conducted on July 22, 2025                          24

A    That's correct.                              13:23:13

Q    Is it fair to say that you're just really    13:23:14
providing background in this case?                13:23:22

MR. REDENBARGER:  Objection, form.           13:23:24

Go ahead.                                    13:23:25

A    I'm providing education and context for the 13:23:26
jury.                                             13:23:28

Q    Okay.  You're -- and an explanation of      13:23:29
certain background facts and concepts; is that fair? 13:23:33

MR. REDENBARGER:  Objection, form.           13:23:36

A    Yeah.  That's fair.                          13:23:37

Q    Information somebody can glean from a        13:23:39
textbook; is that -- is that right?               13:23:42

MR. REDENBARGER:  Objection, form.           13:23:44

Go ahead.                                    13:23:45

A    Perhaps some of it, but I think perhaps jury 13:23:46
members may not.                                  13:23:49

Q    What I'm trying to say is, it's -- it's      13:23:50
stuff that's available in a textbook; it's available 13:23:55
publicly; it's -- that's the type of opinion that 13:23:57
you're offering?                                  13:23:59

A    It is generally available.                   13:24:00

Q    You're not providing any specific analysis  13:24:01
in this case, right, applying --                  13:24:04

A    Not of the facts, no.                         13:24:06

Transcript of Emily Strauss
Conducted on July 22, 2025                              25

Q   No.

Are you offering any information that's beyond the reach of a layperson?

MR. REDENBARGER:  Objection, form; calls for a legal conclusion.

But go ahead.

A   I believe that many people don't know this.

Q   Understood.  But people can understand if they, you know, picked up a textbook and read it?

MR. REDENBARGER:  Calls for speculation.

A   I think it depends on the person.

Q   Are you offering anything that you would not teach in a beginner securities law course?

A   I -- I don't believe so.

Q   Okay.  And your testimony is based on your expertise as a law professor; is that right?

A   Yes.

Q   Is it based -- is there any other basis for your expertise?

A   I worked in practice at Sullivan & Cromwell prior to entering academia.

Q   So actually, yeah, let's talk about your background, including your work at Sullivan & Cromwell.

If you want to turn to -- I believe it's

13:24:08
13:24:11
13:24:13
13:24:16
13:24:16
13:24:20
13:24:20
13:24:23
13:24:25
13:24:28
13:24:30
13:24:33
13:24:35
13:24:39
13:24:45
13:24:50
13:24:53
13:24:53
13:24:55
13:24:57
13:25:01
13:25:04
13:25:06
13:25:09
13:25:11

page 22 of your report, Exhibit A, your CV?    13:25:12

A    Yes.    13:25:17

Q    Okay.  First question:  Have you ever    13:25:17
testified as an expert before?    13:25:20

A    No.    13:25:22

Q    Have you ever prepared a report as an expert    13:25:23
before?    13:25:28

A    No.    13:25:28

Q    Have you ever been engaged in litigation as    13:25:28
an expert before?    13:25:31

A    No.    13:25:32

Q    You're currently an associate professor at    13:25:33
UC San Francisco; is that right?    13:25:37

A    Yes.    13:25:39

Q    And that's a tenure track position?    13:25:40

A    It is.    13:25:42

Q    And you've held that job for two years?    13:25:43

A    Yes.    13:25:46

Q    And what courses do you teach at UC San    13:25:46
Francisco?    13:25:52

A    At UC Law San Francisco, currently I teach    13:25:52
Business Associations and Contracts and a securities    13:25:56
litigation class.    13:25:59

Q    And what's the focus of your research as a    13:26:00
law professor?    13:26:06

A    Mostly shareholder and securities litigation.

Q    And prior to that, you were a -- and -- and shareholder and securities litigation.

Anything that's more specific that you focus on within that?

A    Focus on a lot of things within that.

Q    Do you focus -- do -- does any of your research or have you been published on anything related to merger litigation?

A    Tangentially.  That's --

Q    What do you mean, "tangentially"?

A    I mean, I -- I did a paper on SPAC litigation, which involves a lot of merger litigation.

Q    Anything related to public company -- any articles about public company mergers?

A    No.  No.

Q    Any articles about public company mergers that move a public company private?

A    No, not to the best -- not -- I mean, as I sit here recalling my -- my work, I don't think I've written anything about that.

Q    Okay.  And prior to joining the faculty at UC Law San Francisco, you were a visiting professor

13:26:08
13:26:10
13:26:14
13:26:16
13:26:19
13:26:20
13:26:21
13:26:25
13:26:28
13:26:30
13:26:32
13:26:35
13:26:37
13:26:40
13:26:42
13:26:42
13:26:47
13:26:49
13:26:53
13:26:57
13:27:01
13:27:06
13:27:10
13:27:11
13:27:14

Transcript of Emily Strauss
Conducted on July 22, 2025                28

at Berkeley; is that right?

    A    For one semester, yes.

    Q    And what is a visiting professor?

    A    People do visiting professorships for all
kinds of reasons, to -- sometimes there's a teaching
need, to experience another place.  It's -- it's --
it's very common.

    Q    And you were at Berkeley during the pendency
of the Twitter merger and litigation; is that right?

    A    At the tail end of it.  I think I was at
Duke for the beginning of it.

    Q    Obviously, December, so yeah, when the --
during the litigation and through the end of the
litigation?

    A    Pardon me?  I'm sorry.

    Q    Oh.  August and -- August through December,
so during the middle of the litigation through the
end of it?

    A    Sure.  Yeah, I was at Berkeley.

    Q    And we discussed this a little bit earlier,
but did you discuss the Twitter merger with any of
your colleagues at Berkeley while you were there?

    A    Not --

         MR. REDENBARGER:  Objection, form; scope.

    A    Not to the best of my recollection.

Q   And then prior to and, I guess, at the same time that you were a visiting professor, looking at your CV, at Berkeley, you were a lecturing fellow at Duke; is that right?

A   Yeah.

Q   And what is a lecturing fellow?

A   It's a -- I mean, at Duke -- I don't -- I don't know if it's sort of common across institutions, but it's kind of the name of someone who teaches doctrinal classes or nonclinical classes but is not a tenure track professor.  It's kind of a catchall, I would say.

Q   And it's, like, an opportunity for people interested in joining legal academia, to get experience and publish and all that sort of stuff?

A   It can be.  I mean, it was for me, but I don't think that necessarily goes with the title at Duke.

Q   Okay.  And before going into academia, you were a junior associate at Sullivan & Cromwell; is that right?

A   Yes.

Q   All right.  And I think that's listed -- two, three, four pages down your resume, under Professional Experience; is that right?

Transcript of Emily Strauss
Conducted on July 22, 2025                                    30

A    Probably.  Yeah.

Q    Okay.  And so you worked as a practicing lawyer at Sullivan & Cromwell in Manhattan for about a year and a half; is that right?

A    Yeah.

Q    Did you work on any mergers?

A    No.

Q    Did you work on any merger-related litigation?

A    Not that I can recall sitting here. Certainly wasn't a big part of my practice.

Q    Okay.  Did you work on any initial public offerings?

A    No.  I was a litigator, not a transactional attorney.

Q    Any -- any litigation related to initial public offerings?

A    No.

Q    Okay.  And so, yeah, you were a litigator, not a transactional attorney, so you didn't work on deals; is that right?

A    Yes.

Q    And as a litigation associate, it says that you were engaged in complex civil litigation and -- and criminal and regulatory investigations.

"Substantive areas of law included securities litigation."

        Am I reading that right?

    A    Yes.

    Q    And what type of securities cases did you work on?

    A    Mostly fallout from the mortgage crisis.

    Q    So like RMBS cases?

    A    Yeah.

    Q    And did you work on any public company 10b-5 cases?

    A    I mean, some of the RMBS cases were initially 10b-5 cases.  Those claims tended to fall out pretty fast or were resolved by the time I got to them.

    Q    Beyond the RMBS cases, did you work on any other type of securities litigation while -- in your year and a half at Sullivan & Cromwell?

    A    Only in the most sort of tangential way. Usually some kind of regulatory investigation that I was working on gave rise to a shareholder lawsuit at some other point, but I usually didn't work on the two of them together.

    Q    Okay.  And you -- you weren't a litigator defending the shareholder lawsuit that arose from

Transcript of Emily Strauss
Conducted on July 22, 2025                              32

the regulatory investigation?

     A    Not -- no.

     Q    You mentioned you're a litigator, not a transactional attorney, so fair to say you never worked as disclosure counsel for any company?

     A    Yes.

     Q    You never provided any advice on filing a 10-K?

     A    No.

     Q    Never provided any advice on preparing a 10-K?

     A    No.

     Q    Never provided any advice on preparing a 13D?

     A    No.

     Q    Did you have any litigation on any cases related to 13D while at Sullivan & Cromwell?

     A    No.

     Q    Did you work on any other SEC disclosures while a litigator at Sullivan & Cromwell?

     A    No.

     Q    As a junior associate, all of your work was under the leadership of an engagement partner, correct?

     A    Yeah.

Q   Okay.  And likely under the supervision of other associates?   13:32:38 / 13:32:41

A   Sometimes.   13:32:42

Q   In your year and a half at Sullivan & Cromwell as a junior litigation associate, did you ever take a deposition?   13:32:44 / 13:32:48 / 13:32:52

A   No.   13:32:53

Q   Did you ever argue anything in court?   13:32:53

A   No.   13:32:56

Q   Did any of your cases go to trial where you -- when you were at Sullivan & Cromwell?   13:32:56 / 13:33:00

A   No.   13:33:03

Q   And then before working at Sullivan & Cromwell, you did a fellowship at Ropes & Gray -- related to Ropes & Gray for Lawyers Without Borders; is that right?   13:33:03 / 13:33:09 / 13:33:12 / 13:33:16

A   Yes.   13:33:16

Q   And what type of work did you do for Lawyers Without Borders?   13:33:17 / 13:33:19

A   All kinds of stuff.  They had various projects sort of all over the world, and I kind of did whatever needed to be done for various of those projects.   13:33:21 / 13:33:23 / 13:33:26 / 13:33:30

Q   Were any of them related to securities laws or --   13:33:30 / 13:33:34

A    No --                                          13:33:35

Q    -- corporation --                             13:33:35

A    Well, very, very -- in a very attenuated      13:33:36
way.  There was some bribery issues, but...         13:33:39

Q    But no U.S.-filed cases?                       13:33:41

A    No.                                            13:33:44

Q    Okay.  So turning back to the meat of your     13:33:45
report, I'd like to turn to page 4.                 13:33:54

A    Okay.                                          13:34:01

Q    And the first section is, "What is a Stock?"   13:34:01

     Do you see that?                               13:34:15

A    Yes.                                           13:34:15

Q    And this section -- and you know, please       13:34:16
correct me if I'm wrong, but is it fair to say it   13:34:19
gives a securities law 101 basic overview of what a 13:34:21
stock is?                                           13:34:27

A    Yes.                                           13:34:28

Q    And just a, you know, very basic explanation   13:34:28
of rights and other matters related to stock        13:34:34
ownership?                                          13:34:42

A    Yes.                                           13:34:43

Q    You write that -- at the bottom, a -- if an    13:34:45
investor bought ten shares of Twitter stock in 2022, 13:34:53
she could vote for its board of directors and for or 13:34:58
against major corporate decisions.                  13:35:00

Do you see that?

A    Uh-huh.

Q    Can you describe the basic process by which a shareholder votes for a board of -- a member of the board of directors or a major corporate decision?

A    Well, most shareholders vote by proxy at an annual shareholder meeting or in advance of it.

That's a very broad question.

Q    Sure.  So let's talk about the proxy process.

When somebody is voting by proxy prior to that annual shareholder meeting, is it true that companies issue proxy statements?

A    Yes.

Q    And the proxy statements contain information material to the shareholders' decisions, who to vote for --

A    They can.

Q    And are all shareholders sent proxy statements?

A    They should be.

Q    Okay.  And they're -- by being sent these proxy statements, they're put on notice of the information disclosed in that proxy statement,

right?

A    Yes.

Q    And are proxy statements also made public?

A    Yes.

Q    And any information contained in the proxy statement is shared with the market more generally, not just to the specific shareholders of a company, right?

MR. REDENBARGER:  Objection, form.

Go ahead.

A    Well, they're made public.  They're filed publicly with the SEC.

Q    So anyone in the market can go pull up the proxy statements from the SEC from EDGAR?

A    Yeah.

Q    And EDGAR is the SEC's website where one can get company information?

A    Sure is.

Q    Something I'm sure you spend a lot of time on?

A    Yep.

Q    And I take it you didn't review any of the proxy statements issued in connection with the Twitter merger; is that right?

A    I did not.

Q   Okay.  And you're not offering any opinions based on any of those proxy statements, right?

A   I am not.

Q   Okay.  The next paragraph, you state, "Shareholders range from the titans of Wall Street to the average American."

Do you see that paragraph?

A   I do.

Q   And the purpose of this paragraph is to generally describe the identities, like, the type of people or entities that own -- that own stock; is that right?

A   Very generally.  It doesn't describe all of them.

Q   Sure.  And did you do anything personally to investigate or confirm these estimates, or are they just pulled from the sources?

A   No.  These are just pulled from the sources. They're -- they're examples.

Q   They're examples.

You say, "...37 percent of U.S. equities, by some estimates, are held by households."

Do you see that?

A   Yes.

Q   Does that refer just to retail investors?

13:36:45
13:36:48
13:36:51
13:36:51
13:36:59
13:37:03
13:37:04
13:37:05
13:37:06
13:37:08
13:37:11
13:37:16
13:37:16
13:37:21
13:37:21
13:37:24
13:37:27
13:37:29
13:37:32
13:37:32
13:37:34
13:37:37
13:37:39
13:37:39
13:37:39

A    By some estimates.                                13:37:42

Q    By some estimates?  Does it refer to any          13:37:44
U.S. household, any individual?                         13:37:47

A    It just refers to households.                     13:37:50

Q    So I guess my question is:  Would stock           13:37:54
owned by my client, Elon Musk, be included in that     13:37:57
37 percent?                                             13:38:02

A    I don't know.  In a definition of                 13:38:02
"household," it certainly could.                        13:38:06

Q    So stock owned by billionaires are included       13:38:08
within that 37 percent of households, that U.S.        13:38:12
equities that are held by households; is that right?   13:38:17

A    Perhaps.                                          13:38:20

Q    I guess what I'm trying to say -- there's no      13:38:21
distinction; you're not making a distinction that      13:38:23
within that 37 percent, we're only talking about,      13:38:25
you know, mom-and-pop middle-class folks.  It could    13:38:27
extend to the richest people in the world, right?      13:38:31

A    It could.                                         13:38:34

Q    All right.  And do you know, of that              13:38:35
37 percent of U.S. equities held by households, what   13:38:38
percentage of that is held by billionaires?            13:38:43

A    I don't.                                          13:38:47

Q    What percentage of that is held by                13:38:47
centimillionaires?                                     13:38:51

Transcript of Emily Strauss
Conducted on July 22, 2025                                    39

A     I don't.                                          13:38:52

Q     Okay.  And then the -- you have an                13:38:53

additional 11.6 percent are held by pension plans,       13:38:57

and then 23 percent held by mutual funds, life           13:39:01

insurance companies.                                     13:39:06

      Do you see that?                                   13:39:06

A     I do.                                              13:39:07

Q     So these numbers add up to 71.6.                   13:39:07

      Do you know who owns the rest of the stock?        13:39:11

A     Presumably, other large institutional             13:39:16

investors.                                               13:39:20

Q     Large institutional.  Sometimes company           13:39:21

insiders?                                                13:39:23

A     Perhaps.                                           13:39:24

Q     Would they be counted as households, or           13:39:24

would they be counted in this separate category          13:39:27

within this group that you've laid out?                  13:39:28

A     I suppose it depends on the form in which         13:39:30

they own the stock.                                      13:39:32

Q     Okay.  Have you conducted any investigation       13:39:33

to determine who owned Twitter stock in May through      13:39:36

October 2022?                                            13:39:41

A     No.                                                13:39:42

Q     Do you know what percentage of Twitter            13:39:42

shareholders were retail investors?                      13:39:47

Transcript of Emily Strauss
Conducted on July 22, 2025

40

A    No.

Q    Do you know what percentage were pension funds?

A    No.

Q    What percentage were corporate insiders?

A    No.

Q    Do you know who held the largest position in Twitter at the start of the class period?

A    No.

Q    Do you know whether or not that was Mr. Musk?

A    I don't.

Q    You're not trying to suggest here that there is a similar breakdown of ownership of 37 percent held by households, 11.6 percent held by pension funds -- you're not suggesting there's a similar breakdown in ownership of Twitter stock, right?

        MR. REDENBARGER:  Objection, form.

        Go ahead.

A    No.  I don't have the facts to say that.

Q    Right.  So you don't -- you don't know whether Twitter was 90 percent owned by large institutions and wealthy individuals and only 10 percent owned by retail investors for instance?

A    I don't.

Q   You don't know if 12 percent of Twitter's share -- shares were owned by pension plans or, you know, less than a percent were held by pension plans, right?

A   Right.

Q   And you're not trying to suggest to the jury that this breakdown you provide generally applies to Twitter, right?

A   No.

Q   Okay.  You would agree that this information of how stocks are generally owned is not necessarily that helpful to the jury without providing a similar breakdown for Twitter, right, because the jury is considering Twitter?

MR. REDENBARGER:  Objection, form.

Go ahead.

A   I don't think I agree with that.  I think from the perspective of a Securities 101 class, it just goes to illustrate that normal households are impacted by stock price movement.

Q   Understood.  But you're not making any -- you're not offering any opinion or providing any illustration as to whether or not normal households were impacted by Twitter stock price movement, right?

13:40:46
13:40:49
13:40:52
13:40:56
13:40:56
13:40:56
13:41:00
13:41:04
13:41:05
13:41:05
13:41:16
13:41:22
13:41:24
13:41:24
13:41:25
13:41:26
13:41:27
13:41:29
13:41:33
13:41:37
13:41:39
13:41:41
13:41:43
13:41:47
13:41:50

Transcript of Emily Strauss
Conducted on July 22, 2025                              42

A    No, no.

Q    Did you think to provide a similar breakdown for Twitter?

MR. REDENBARGER:  Objection, form.

A    My report is not specifically about Twitter.

Q    Okay.  The next page -- and by the way, we're about 40 minutes.  I was thinking about doing another 20 before break.  Is that okay with you or --

A    Yeah.

Q    Great.

The next page, page 5, the section B is, "What is a Public Company?"

Do you see that?

A    I do.

Q    And it primarily discusses the -- the process through which a private company becomes public, correct?

A    Yes.

Q    Okay.  Are you aware of any facts or allegations in this case that are related to any initial public offering?

A    No.

Q    And initial public offering, it's often shortened to be IPO, right?

13:41:51
13:41:51
13:41:55
13:41:55
13:41:57
13:42:00
13:42:06
13:42:09
13:42:12
13:42:12
13:42:12
13:42:13
13:42:17
13:42:19
13:42:20
13:42:20
13:42:28
13:42:32
13:42:33
13:42:33
13:42:37
13:42:42
13:42:44
13:42:44
13:42:49

Transcript of Emily Strauss
Conducted on July 22, 2025                    43

A    Yeah.

Q    So if I use "IPO," you'll understand what I'm referring to?

A    I'm okay.  Yes.

Q    Are there any IPO disclosures at issue in this case?

A    No.

Q    And you're not offering any opinion about Twitter's IPO, right?

A    I am not.

Q    You're not offering any opinion about the accuracy of any of its disclosures in its IPO, correct?

A    Correct.

Q    Right.  Because the Twitter IPO, I think, happened, like, nine years before the events in this case?

A    Yes.

Q    Is that right?  Yes.

Do you have any knowledge whether or not Twitter used -- even used the same engagement metrics in its -- well, let me step back.

The registration statement that one files in connection with an IPO, that's referred as to an S-1; is that right?

A    Usually.

Q    And you understand that Twitter filed an S-1 in connection with this IPO?

A    Yes.

Q    Okay.  Do you have any knowledge whether Twitter even used the same engagement metrics in its 2013 S-1 as it did in its 2021 10-K?

MR. REDENBARGER:  Objection, form; beyond the scope.

A    I don't.

MR. REDENBARGER:  Go ahead.

A    I don't.

Q    Okay.  Or whether it used the same engagement metrics in its 2022 10-Q as it did in its 2013 S-1?

A    I don't.

Q    Do you know what mDAU is?

A    I believe so, yes.

Q    And what is that?

A    Monetizable daily active users.

Q    And that's an internal Twitter metric; is that your understanding?

A    It is.

Q    Do you know whether that metric existed in 2013, when Twitter filed its S-1?

A    I'm sorry, one more time.

Q    Sorry.

Do you know whether or not that metric existed in 2013, when Twitter filed its S-1?

A    I do not.

Q    Is there a reason you included an I- -- a section about the IPO process in your report if it's not something at issue in this case?

A    Just to illustrate the IPO process that when firms go public.

Q    So your next section is "What is the Stock Market?"  That's Section C --

A    Yeah.

Q    -- and it looks like it's pages -- bottom of page 5 through -- through page 7; is that right?

A    Yes.

Q    Okay.  At the top of page 6, you write that, "Stock prices in public companies generally fluctuate throughout the day."

Do you see that?

A    Yes.

Q    And, again, you're not offering any opinion on the cause of any specific stock price movement or fluctuation, right?

A    Right.

Q   You're -- this paragraph also mentions or discusses various market participants, journalistic outlets like Bloomberg, Google Finance, and analysts, right?

A   Yes.

Q   Do you know what the efficient market hypothesis is?

A   I know what it is.

Q   What -- what is it?

MR. REDENBARGER:  Objection, beyond the scope.

But go ahead.

A   It's the idea that public information is incorporated to the price of securities.

Q   And one of the ways that public information is incorporated in the price of securities, what -- these -- strike that.

These market participants, the journalists, the securities analysts, they -- they play a role in that, right, in the public information becoming incorporated into the stock price?

MR. REDENBARGER:  Objection, beyond the scope.

Go ahead.

A   I don't discuss that in my report, but they

13:45:26
13:45:30
13:45:35
13:45:41
13:45:41
13:45:41
13:45:49
13:45:50
13:45:51
13:45:53
13:45:55
13:45:55
13:45:56
13:46:00
13:46:03
13:46:06
13:46:08
13:46:10
13:46:14
13:46:18
13:46:20
13:46:22
13:46:24
13:46:24
13:46:24

can.

Q   Okay.  And market participants, you know,
investors, will follow, I think as you note, some of
these journalistic outlets and securities analysts
in making invest decisions?

MR. REDENBARGER:  Objection, calls for
speculation; scope.

Go ahead.

A   I don't believe, actually, that I say that
in my report necessarily, but --

Q   Well, you say, "Securities analysts also
provide information to investing public by
researching and circulating information about
specific firms or industries," right?

A   Sure.

Q   And you also write that, "Information or
news affecting public companies may be promulgated
by the company itself...by influential individuals,
or by journalistic out-" -- "outlets," right?

A   Yes.

Q   And that information is promulgated or that
information is provided to the investing public so
that the investors can make decisions -- so that
folks can make decisions about their investments,
right?  Or that's one way that that information is

used, correct?

A    That's one way that information can be used.

Q    Okay.  And under the efficient market hypothesis, the stock price of a publicly traded stock reflects all public information known about the stock; is that right?  Is that your understanding?

MR. REDENBARGER:  Objection; beyond the scope.

Go ahead.

A    Under the efficient market hypothesis, yes.

Q    Okay.  And the journalists and analysts that you discuss, would you agree that some of them have a fair amount of influence in the market?

A    Yes, some of them can.  It depends on -- I mean, this is context -specific, obviously.

Q    No, understood.

Some analysts or reporters are considered particularly credible, right, on certain -- on certain issues that they're, you know, focused on, right?

A    Yes.

Q    For instance, Matt Levine of Bloomberg is considered a particularly credible and influential commentator on legal issues related to the market,

right?

MR. REDENBARGER:  Objection, form; beyond the scope.

A    He's very fun to read.  I would say that he's -- I -- I would agree that he is influential in some circles and on certain issues, yeah.

Q    His -- you know, his -- his analysis about legal issues, for instance, are taken seriously by market participants, right?

MR. REDENBARGER:  Object --

A    Well, he always caveat --

MR. REDENBARGER:  Hold -- hold on.

Objection, beyond the scope; speculation.

Go ahead.

A    He always caveats them by saying "this is not legal advice."

Q    Understood.  He caveats them by saying "this is not legal advice," but he's putting information out there that people digest and can consider in making their investment decisions, right?

MR. REDENBARGER:  Objection, beyond the scope --

A    He --

MR. REDENBARGER:  -- speculation.

Go ahead.

| 13:48:24 |
| 13:48:24 |
| 13:48:26 |
| 13:48:26 |
| 13:48:30 |
| 13:48:37 |
| 13:48:40 |
| 13:48:43 |
| 13:48:46 |
| 13:48:47 |
| 13:48:48 |
| 13:48:49 |
| 13:48:50 |
| 13:48:52 |
| 13:48:52 |
| 13:48:58 |
| 13:49:00 |
| 13:49:01 |
| 13:49:02 |
| 13:49:05 |
| 13:49:07 |
| 13:49:07 |
| 13:49:07 |
| 13:49:09 |
| 13:49:09 |

A    He puts his opinion out there on his thoughts, and people can consider it.

Q    And -- and you respect his opinions.  You read Matt Levine; is that right?

A    I read Matt Levine.

Q    I think one of your law review articles is literally a play -- the title is a play on one of his, you know, most well-known sayings.

A    Sure is.

Q    And so when he weighs on a -- weighs in on a legal issue, some folks in the market will pay attention to -- to that analysis; is that right?

MR. REDENBARGER:  Objection, speculation; scope.

A    This isn't part of my report and this isn't anything that I, you know, have thought through before sitting here.

I think that, as I said, you know, he is influential among certain circles.  People do read him.  Whether they always agree with his analysis is up to them.

Q    Okay.  You discuss in the next paragraph that positive news can increase stock -- positive news about a company can increase stock price and that negative news can decrease stock price; is that

right?

A   Yes.

Q   And, again, to be clear, you're not opining that a company's stock price only reacts to company-specific information; is that right?

MR. REDENBARGER:  Objection, form.

A   That's correct.

Q   Right.  Stocks and -- can rise and fall for whatever reason, almost seemingly at random, right?

MR. REDENBARGER:  Objection, form.

A   They can rise and fall for a lot of reasons.

Q   They can rise and fall based on the strength and weakness of, you know, the general economy, right?

A   They can.

Q   Or some industry-wide news?

A   They can.

Q   You're not offering the opinion that because a stock's price -- a stock price rises on the same day as some positive news about the company, that that news necessarily caused the rise, right?

MR. REDENBARGER:  Objection, legal conclusion; beyond the scope.

Go ahead.

A   I'm not opining that.

Q   Okay.  You're not -- similarly, you're not offering the opinion that because a stock's price might fall on the same day as some negative news about the company, that the news -- that necessarily caused the company's stock price to fall, right?

MR. REDENBARGER:  Objection, beyond the scope.

Go ahead.

A   I'm not opining that.

Q   You're not an economist?

A   No.

Q   And you're not a statistician, right?

A   No.

Q   And you're not offering any opinion on the cause of any stock price movement, correct?

A   I am not.

Q   Okay.  You state in that paragraph that stock prices are based on supply and demand.

Do you see that?

A   Yes.

Q   Have you studied whether the supply of a stock is limited?

MR. REDENBARGER:  Objection, form.

A   Well, limited in what sense?

Q   I guess my question is:  Have you studied

13:51:15
13:51:16
13:51:21
13:51:24
13:51:26
13:51:29
13:51:29
13:51:30
13:51:31
13:51:33
13:51:35
13:51:35
13:51:39
13:51:39
13:51:42
13:51:44
13:51:45
13:51:49
13:51:53
13:51:54
13:51:56
13:52:00
13:52:01
13:52:04
13:52:06

what happens when the supply of a stock or -- you know, is increased through, let's say, derivatives, through options, for instance?    13:52:11 13:52:13 13:52:18

A    Have I --    13:52:18

Q    I --    13:52:18

A    Not -- no, not for this report.    13:52:19

Q    Okay.  If more exposure to a stock becomes available, will that cause the stock price to decline?    13:52:21 13:52:26 13:52:31

MR. REDENBARGER:  Objection, scope.    13:52:31

A    I think it depends on a lot of other things.    13:52:32

Q    Okay.  Would it be fair to say that a stock price reflects the market-wide perception of the underlying company's intrinsic value?    13:52:34 13:52:36 13:52:39

A    I think it -- it can depend, as you note, on a lot of other things.    13:52:46 13:52:52

Q    So even if supply is changed, the stock will continue to adjust so as to reflect the market's perception of the intrinsic value of a share of that company, right?    13:52:53 13:52:58 13:53:02 13:53:06

MR. REDENBARGER:  Objection, form; beyond the scope.    13:53:07 13:53:09

A    I'm sorry.  Can you repeat the question?    13:53:09

Q    Sure.  So if a -- if a company released -- let's say there's a stock split or    13:53:10 13:53:12

Transcript of Emily Strauss
Conducted on July 22, 2025                    54

something, company releases more -- more supply.

That supply that's -- the stock will adjust to

reflect whatever the market thinks the intrinsic

value of the company is, right?

    MR. REDENBARGER:  Objection, form; beyond

the scope.

    A    I don't get into this for the purposes of my

report.  I would say that, you know, many, many

factors can go into stock pricing.

    Q    Okay.  So it's not just determined by the

interaction of supply and demand.  There are other

factors, right?

    A    I guess I would say that supply and demand

very broadly determine stock price, and investors'

beliefs about value in many instances drive supply

and demand.

    Q    You then state, "Below" -- "Below are line

charts illustrating the fluctuations of several

stocks over a month" -- "multimonth period."

    A    Sure.

    Q    And then those line charts are on page 7,

right?

    A    Yes.

    Q    You showed two stocks; is that right?

    A    Yes.

Q   Is two "several"?

A   I'm sorry?

Q   Is two -- isn't the definition of "several" literally more than two?

A   Oh, perhaps.

Q   Did you choose these stocks, or did Plaintiffs' counsel ask you to put these two stocks in your report?

A   I was asked by Plaintiffs' counsel to include these particular stocks.

Q   And you weren't restrained from including more stocks in your report, correct?

A   No.

Q   Okay.  Are these two stocks representative of any segment of the stock market?

        MR. REDENBARGER:  Objection, form; scope.

A   Well, they're just meant to illustrate how stock prices fluctuate.

Q   You don't intend to provide any opinion about the fluctuation of Twitter or Tesla stock prices, correct?

A   Correct.

Q   And so to be -- so just to be clear, what do these two charts have to do with your opinion? They're just illustrations of how stock prices

fluctuate?

A    Yes.

Q    Okay.  You're not suggesting that there's any correlation in the movement of these stock prices, right?

A    No.

Q    You're not offering any opinion about the movement of these stocks, right?

A    No.

Q    You're not offering any opinion that there's any connection between the price of Twitter stock and the price of Tesla stock, right?

A    I'm not.

Q    You don't intend to provide any opinion about the similarities between Tesla and Twitter, correct?

A    Correct.

Q    The dates below, did you choose those dates?

A    I was asked by counsel to use those dates.

Q    You're asked by -- do you know why counsel asked you to choose those dates?

MR. REDENBARGER:  I'll object to the extent it calls for attorney-client privilege.

But go ahead.

THE WITNESS:  Okay.

Transcript of Emily Strauss
Conducted on July 22, 2025                    57

A    My understanding is that these dates encompass the disclosure of Mr. Musk's stake in Twitter and the alleged misstatements in this lawsuit.

Q    Are you offering any opinions about the disclosure of Mr. Musk's stake in Twitter?

A    No.

Q    Are you -- to your knowledge, are Plaintiffs alleging that any shareholder suffered any loss due to the disclosure of Mr. Musk's stake in Twitter?

MR. REDENBARGER:  Objection, scope; form.

A    Not to my knowledge.

Q    Okay.  So did you personally create these charts?

A    Yeah.

Q    Okay.  And so the purpose of including these charts in your report is because Plaintiffs asked you to put a chart -- two charts in your report showing the price of Tesla and Twitter's stock prices from Mr. Musk's disclosure of his -- of his ownership or stake in Twitter through May 31st, 2022; is that right?

MR. REDENBARGER:  Objection, form; misstates testimony.

A    Well, the broader purpose is to include an

exemplar of -- of the fluctuation of stock prices. Those kinds of things are typically depicted in line-chart form.  I thought it would be helpful to have an example.  Plaintiffs' counsel asked me to use these stocks in this time period.

Q    Right.  But you could have used any stock, right?  You could have used Amazon and Microsoft?

A    I could, yes.

Q    Okay.  And so the reason you choose those stocks, though, is because Plaintiffs' counsel asked you to?

A    Yes.

Q    Okay.  And you're -- there's no commentary in your report.  You're not offering any opinions or commentary about the -- the price movements of any of those stocks, right?

A    Right.

Q    You have nothing to say or don't intend to say anything at trial about the price movement in two these charts, except to say, here are two stocks; is that right?

A    Yes.

Q    And then, Appendix C at the end of your report, there are more charts of Twitter's stock price; is that right?

13:57:28
13:57:33
13:57:35
13:57:37
13:57:40
13:57:41
13:57:43
13:57:44
13:57:44
13:57:47
13:57:49
13:57:49
13:57:49
13:57:53
13:57:55
13:57:58
13:57:59
13:58:00
13:58:04
13:58:08
13:58:13
13:58:14
13:58:15
13:58:18
13:58:22

Transcript of Emily Strauss
Conducted on July 22, 2025                    59

A    Yes.

Q    The last two pages.

What do these charts have to do with your opinion?

A    They're just further exemplars of how stock prices move.  These cover a shorter time period.

Q    Right.  And you were asked by Plaintiffs to include these shorter time periods as well?

A    Yes.

Q    Okay.  And again, this isn't connected to any commentary or any opinion that you're providing in your report, correct?

A    Correct.

Q    So for instance, the jury doesn't need to see these four figures to get the point that stock prices fluctuate, right?

MR. REDENBARGER:  Objection, speculation; form.

A    I mean, they -- they are examples if that's what you're asking.  Other examples serve the purpose.  Is that what you're saying?

Q    Well, I'm just -- I'm just -- I'm just asking.  Yeah.

Do other examples serve the purpose?

A    They could.

Q    If you were teaching just a regular
Securities 101 class at -- at UC Law SF, absent
being instructed by Plaintiffs to include something
like this in a lecture, would you have included
these sort of stock -- these charts?

MR. REDENBARGER:  Objection, form; beyond
the scope.

Go ahead.

A    It's possible.  I -- I do include, you know,
graphical depictions of things like this.

Q    You're not offering any opinion about any of
the stock prices in these charts, right?

A    Correct.

Q    You're not offering any opinion on the stock
price movements in Figure 1 through 4 in Appendix C,
correct?

A    Correct.

Q    You are not offering any opinion that any of
the stock price movement reflected in any of these
figures was caused by any action or statement
Mr. Musk took, right?

A    That's correct.

Q    Okay.  If you're not offering that opinion,
why did you choose the dates in Figure 1?

A    I understand -- I was asked by counsel to

choose these dates, and I understand they're
relevant dates in this lawsuit.

Q   Okay.  What is relevant about Figure 1?

MR. REDENBARGER:  Objection, beyond the
scope.

Go ahead.

A   Well, Figure 1, I understand, depicts the
stock price jump when Mr. Musk disclosed his
ownership in Twitter.

Q   And you're not offering the opinion that the
stock price jumped in response to Mr. Musk
disclosing his ownership, right?

A   No.

Q   You agree that one looking at this chart
might think that you're offering that opinion,
right?

MR. REDENBARGER:  Objection, speculation;
form.

A   I mean, I think the chart is introduced by
saying stock prices fluctuate.  I don't -- I don't
offer any -- I don't offer any elaboration on that.

Q   But you're -- you've picked a specific date,
right?

A   I was asked to, yes.

Q   So Plaintiffs picked a specific date, asked

Transcript of Emily Strauss
Conducted on July 22, 2025                    62

you to include a specific date, right?

A    Uh-huh.

Q    To capture a specific stock movement, right?

A    Yes.

Q    Presumably, to illustrate or suggest to the
jury that the stock moved in reaction to something
that happened on a specific date, right?

MR. REDENBARGER:  Objection, speculation;
beyond the scope.

A    That's beyond what's in the report.

Q    So if it's beyond what's in the report, why
is it included in the report?

MR. REDENBARGER:  Objection, asked and
answered.

A    It's an example of stock price movement.

Q    Okay.  And again, this could be illustrated
with, literally, any other stock, right?

A    It could be illustrated with other stocks.

Q    It could be illustrated with Twitter stock
on any other date range, right?

A    It could, that stock prices move.

Q    Is there a reason why you didn't include
stock price charts for the entire length of the
class period?

A    I was asked by counsel to choose -- to use

Transcript of Emily Strauss
Conducted on July 22, 2025                    63

these specific dates.

Q    Okay.  And again, you didn't perform an event study to determine any causation related to any of the stock movement, right?

A    I did not.

Q    Okay.  And you understand, at least as to Figure 1, the March 30th through April 6th date range is not even within the class period in this case, right?

A    I do.

Q    Okay.

MR. BERGJANS:  I think this is a good time for a break if that works for you all.

MR. REDENBARGER:  That's fine.

MR. BERGJANS:  Whatever -- whatever you guys need.

MR. REDENBARGER:  Yeah, sounds good.  Five minutes is good.

THE VIDEOGRAPHER:  Perfect.  Please stand by.  We're going off the record.  The time is 2:03.

(Whereupon a break was had.)

THE VIDEOGRAPHER:  We are now back on the record.  The time is 2:13.

BY MR. BERGJANS:

Q    Hi, Professor Strauss.

Transcript of Emily Strauss
Conducted on July 22, 2025                                64

A    Hi.                                                      14:13:18

Q    I'd like to turn to page 8 of your report.              14:13:19

A    Okay.                                                    14:13:23

Q    And Section E, "What is an Option?"                     14:13:28

A    Sure.                                                    14:13:32

Q    Have you ever traded options?                           14:13:32

A    No.                                                      14:13:34

Q    Have you published any articles about                   14:13:35
options?                                                     14:13:38

A    No.                                                      14:13:39

Q    Did you -- at Sullivan & Cromwell, were you             14:13:40
involved in any litigation relating to options?             14:13:46

A    No.                                                      14:13:49

Q    Okay.  Do you have any expertise in options             14:13:49
trading?                                                     14:13:54

     MR. REDENBARGER:  Objection, form.                      14:13:55

     Go ahead.                                                14:13:56

A    Well, as a securities law professor, I have             14:13:57
that kind of expertise.  I don't have personal,             14:14:04
practical expertise in trading them.                         14:14:07

Q    And -- understood.                                       14:14:09

     And no specific research related to options             14:14:10
either?                                                      14:14:13

A    Not specifically.                                        14:14:13

Q    Okay.  And the only testimony you intend to             14:14:15

provide about options is this explainer, correct?

A    Yes.

Q    Okay.  And this -- I think it looks like this was primarily taken from a financial regulation book and some of these online sources; is that right?

A    Those are the sources I cite.

Q    Okay.  Options is a way that people can short stock, correct?  Options trading is the method by which someone can short stock, correct?

A    They can.

MR. REDENBARGER:  Scope.

A    They can.

Q    And can you explain what short selling is?  You mentioned it in your -- later on in your report.

A    Short selling is, loosely, a way of betting that the stock price will go down.

Q    Okay.  And so people -- so when you're purchasing a stock, just a regular stock, you're principally betting that -- you're going long and you're principally betting that a stock will rise, right, so at some point you'll sell it, make a profit?

MR. REDENBARGER:  Objection, form.

Q    Just regular stock, not options.

Transcript of Emily Strauss
Conducted on July 22, 2025

66

A    That's -- I'm sorry, I missed the tail end
of that.

Q    Oh.  Just regular stock, not options.

A    Yes.

Q    Okay.  And then in certain circumstances,
somebody can purchase an option and make a bet that
the company's stock will go down, right?

A    That would be a put option; yes.

Q    Okay.  And when somebody is trading options,
will you -- would you agree that trading options can
be higher-risk trades?

A    It's beyond the scope of my report, but
it -- it can be.  They can be high risk.

Q    Right.  Someone can bet on a short and the
stock price keeps increasing, and their losses could
potentially be unlimited, right?

        MR. REDENBARGER:  Objection, scope.

A    It's beyond the scope of my report, but yes.

Q    Okay.  And are you familiar with jury
instructions in securities -- securities class
actions?

A    Not any specific ones off the top of my
head, but as a general matter.

Q    Are you aware that in jury instructions for
securities class actions, the Court will provide the

Transcript of Emily Strauss
Conducted on July 22, 2025                              67

jury with an explanation of what an option is?

A    I'm aware that that can be done.

Q    Okay.  And is -- is there anything that you provide in this -- in this section about options that could not otherwise just be provided within the jury instruction?

MR. REDENBARGER:  Objection, form.

A    I mean, I think the takeaway from this section is that, generally, this is what an option is, and sometimes option holders can be damaged in the same way as holders of the underlying stock.

Q    Is -- is there any other takeaway besides that?

A    Those are the key takeaways.  It's a general report.

Q    And -- and that's something that the Court could instruct, that this is what an option is and that, just like other stock, there -- someone can be damaged, an options trader can be damaged as a result of something that violates 10b-5, right?

MR. REDENBARGER:  Objection, form; beyond the scope.

A    I'm not familiar with specific jury instructions and whether they do that.  I don't know.

Q    Okay.  The next section, Section F on page 9 is titled "What is a Board of Directors?"

A    Yes.

Q    And correct me if I'm wrong, but the purpose of this section is to just give a general background about public company board of -- boards of directors and their various responsibilities and duties; is that right?

A    Very generally, yes.

Q    Okay.  You're not offering any opinion in this case beyond this general explanation of -- relating to boards of directors beyond this general explanation of what a board of director is -- board of directors is?

A    It's meant to be a general explanation of what a board of directors is.

Q    You're not offering any opinion about Twitter's board of directors?

A    Not specifically, no.

Q    Okay.  You're not offering any opinion about how Twitter's board of directors perform their role?

A    No.

Q    You're not offering any opinion about whether Twitter's board -- whether Twitter's directors complied with their duties?

14:17:53
14:17:59
14:18:04
14:18:05
14:18:09
14:18:12
14:18:16
14:18:24
14:18:24
14:18:24
14:18:27
14:18:31
14:18:35
14:18:37
14:18:38
14:18:41
14:18:45
14:18:47
14:18:48
14:18:50
14:18:52
14:18:56
14:18:56
14:18:58
14:19:02

Transcript of Emily Strauss
Conducted on July 22, 2025                    69

A    I am not.

Q    You're not offering any opinion as to whether Twitter's directors complied with the law, right?

A    I am not.

Q    And your opinions about how a board of directors manages a company, they're not informed by how Twitter's board actually operated, correct?

A    Correct.

Q    They're not informed by how and to what extent Twitter's board was actually involved in the management of the company?

A    That's correct.

Q    Are you aware that certain members of Twitter's board thought that the board's responsibility should be limited to picking a CEO?

A    I'm sorry?

Q    Are you aware that certain members of Twitter's board thought that the board's responsibility should be limited to picking a CEO?

MR. REDENBARGER:    Objection to form; beyond the scope.

Go ahead.

A    No.

Q    Okay.  You're not offering any opinion as to

whether Twitter's board -- sorry.  Strike that.

You're not offering any opinion as to whether your general explanation of how a Twitter -- how a board of directors operates was consistent in any way with how Twitter's board of directors actually operated, correct?

MR. REDENBARGER:  Objection, form.

Go ahead.

A    If I understand your question, I believe that's correct.

Q    Okay.  Is -- what about my question did you not understand?  I -- I appreciate my --

A    That's okay.  I just want to make sure I got it right.

I -- this is not -- my report does not opine on whether Twitter's board members fulfilled their obligations as board members.

Q    Okay.  You write on page 9 that "the board has a duty to oversee the company's compliance with applicable laws and regulatory obligations."

Do you see that?

A    Yes.

Q    And which laws -- and this is a broad question, I -- I recognize this.

A    Okay.

Q   But -- but which laws and regulatory obligations were you referring to in -- in that sentence?

A   It can be virtually any laws and regulations under the scope of corporate law.

Q   Does that include laws relating to securities fraud?

A   Yes.

Q   Okay.  And it's true, isn't it, that under certain circumstances, individual board members can be held individually liable for fraud that occur -- securities fraud that occurs on their watch?

A   That's correct, yeah.

Q   Like a Section 20 claim, for instance?

A   Yeah.  That's correct.

Q   And officers as well, correct?

A   Control persons, yes.

Q   And individual board members can also be liable for violating their fiduciary to the company and its shareholders, right?

A   They can.

Q   Through, for instance, you know, derivative -- a derivative lawsuit?

A   Yeah.

14:21:09
14:21:11
14:21:14
14:21:14
14:21:18
14:21:22
14:21:26
14:21:27
14:21:27
14:21:32
14:21:35
14:21:39
14:21:40
14:21:41
14:21:42
14:21:44
14:21:45
14:21:48
14:21:50
14:21:59
14:22:03
14:22:05
14:22:06
14:22:07
14:22:09

Transcript of Emily Strauss
Conducted on July 22, 2025

72

Q   So if a shareholder learned that a board
member or officer permitted a fraud to occur on his
or her watch, it would not be unreasonable for that
shareholder to pursue claims against the board,
correct -- or pursue claims against that director,
correct?

MR. REDENBARGER:  Objection; scope; form.

A   That's very broad, but in general, yeah.  I
agree.

Q   And then same question with fiduciary
duties:  If -- if a shareholder learned that a
director violated their fiduciary duty of, let's
say, loyalty to the company, it would not be
unreasonable for a shareholder to pursue claims
against that director?

MR. REDENBARGER:  Objection, form.

A   That's generally correct.

Q   And it would not be unreasonable for that
shareholder to communicate to the board of directors
or a specific director that they may have claims
they're considering pursuing, correct?

MR. REDENBARGER:  Objection, form; scope.

Go ahead.

A   Correct.

Q   A shareholder could send a demand letter,

Transcript of Emily Strauss
Conducted on July 22, 2025                              73

for instance, right?

A    A shareholder could.

Q    A shareholder counsel could communicate to the directors' counsel, We have these potential claims against you -- against your client, right?

A    That's correct.

Q    And that wouldn't be unreasonable, would it?

MR. REDENBARGER:  Objection, form.

A    That's correct.

Q    And it wouldn't necessarily be unusual either, right?

A    No, it wouldn't.

Q    Particularly if they're already involved in litigation, right?

MR. REDENBARGER:  Objection, form; speculation.

A    It's possible.  This is not within my report.

Q    Understood.  Well, I'm just asking because you -- you mentioned the board's various duties of company compliance, so that's just a follow-up on that.

Okay.  So the next section, Section III of your report on page 10 --

A    Uh-huh.

Transcript of Emily Strauss
Conducted on July 22, 2025                    74

Q   -- is "Regulation of The Securities Markets."

So to start, every opinion about the regulations securities markets that you intend to testify about and give at trial are confined to the four corners of your report, correct?

A   Yes.

Q   And you're just providing, I think, again, the securities regulation 101, a background primer of securities regulations; is that right?

A   That's correct.

Q   You're not applying any of this background to any facts in this case, right?

A   I'm not.

Q   You're not offering any opinion as to whether or not anyone complied or did not comply with securities laws?

A   That's correct.

Q   You're not offering any opinion as to whether any actions in this case is even within the ambit of securities regulations, right?

A   Any -- any of the actions within this case fall within the ambit of securities regulation? I'm -- I'm not giving any opinions as to the facts of this case.

Transcript of Emily Strauss
Conducted on July 22, 2025

75

Q   Okay.  You're not offering any opinion as to whether any action or statement -- actions taken in this case was consistent or inconsistent with securities laws, correct?

A   That's correct.

Q   Nor are you offering any opinion that any statement made in this case was consistent or inconsistent with securities laws; is that right?

A   That's correct.  Yes.

Q   Okay.  And again, just to clarify and put a bow on it, you're not offering any opinion as to whether any action Mr. Musk took was consistent or inconsistent with securities laws, right?

A   That's correct.  It's a nice bow.

Q   So you go into a brief history of securities laws starting on page 11.

A   Uh-huh.

Q   And it starts with a discussion of the stock market crash in 1929 and the Great Depression that followed, correct?

A   Yes.

Q   Are you an historian?

A   I am not.

Q   Have you ever conducted any research on the Great Depression?

14:25:15
14:25:18
14:25:23
14:25:26
14:25:27
14:25:28
14:25:32
14:25:34
14:25:36
14:25:37
14:25:42
14:25:46
14:25:49
14:25:51
14:25:54
14:26:04
14:26:09
14:26:09
14:26:14
14:26:20
14:26:21
14:26:22
14:26:24
14:26:24
14:26:27

A    No.

Q    Have you ever conducted any research on the crash of the 1929?

A    Not beyond what I teach in my financial regulation class.

Q    Do you rely on the Barr and Cox books in your financial regulations class?

A    Yes.

Q    And so, is it fair to say in this section, you're essentially summarizing about five pages of Barr and a few pages of Cox?

A    Yeah.

Q    And you're not -- not offering any independent expertise beyond the summary of these two textbooks to render this opinion, correct?

    MR. REDENBARGER:  Objection, form.

A    I would say that the purpose of this section of the report is to establish context for the securities laws.

Q    Okay.  But the opinions and explanations and everything that include -- included in this section is just taken from those textbooks, right?

A    Describing the events, largely, you know, that -- that can be found in these textbooks.

Q    Okay.

So on page 12, there's a paragraph that discusses some of the lead-up to the crash of 1929, including banks using uninsured deposits to fund speculative investments, small-time retailers buying high-risk securities using margin loans.

Do you see that?

A    I do.

Q    You're not suggesting there's any connection between these specific events that led to the stock market crash in 1929 and any of the facts in this case, right?

MR. REDENBARGER:  Objection, scope.

Go ahead.

A    No.

Q    You're not offering any opinion that people were purchasing Twitter stock with uninsured bank deposits?

A    No.

MR. REDENBARGER:  Form.

Q    Being ruined because they were buying on margin?

A    No.

Q    And on page 14 of your report, there are a couple pictures?

A    Yes.

Q   I think 54 looks like it's a picture of people gathering outside of New York Stock Exchange after the crash of 1929; is that right?

A   Yes.

Q   And 55 -- or it's Footnote 55 -- is a bread line?

A   Sure.

Q   What do these pictures have to do with your opinion in this case?

A   They're meant to provide context for how the securities laws came to be passed and to illustrate the stakes of securities fraud.  Potentially, they were -- you know, securities fraud was responsible at least in part for the Great Depression.  The -- the stakes are high.

Q   There were other causes of the Great Depression as well, right, not just securities fraud?

A   Sure.

Q   And so this is just illustrating what happened in the Great Depression; is that right?

A   Well, not completely.

Q   What sort of -- what am I -- what am I missing?

A   Well, many other things happened in the

14:29:02
14:29:07
14:29:10
14:29:14
14:29:15
14:29:24
14:29:24
14:29:24
14:29:27
14:29:29
14:29:32
14:29:35
14:29:40
14:29:43
14:29:45
14:29:45
14:29:48
14:29:49
14:29:49
14:29:50
14:29:55
14:29:58
14:30:02
14:30:04
14:30:05

Great Depression.  This is meant to be context for why the securities laws were passed.

Q    There's no suggestion in your report or any suggestion in this case that any of the facts or allegations in this -- related to this case caused any stock market crash, right?

MR. REDENBARGER:  Objection to the form; beyond the scope.

A    That's my understanding.

Q    No -- no bread lines emerged --

A    No.

Q    -- following the events of this case, right?

A    Not to my knowledge.

Q    And so beyond providing an illustration for the context around when the securities laws were passed, these pictures and the explanation of the 1929 stock market crash otherwise have no connection to this case, correct?

MR. REDENBARGER:  Objection, form.

A    I would say that my report is intended to provide the jury with a lesson in Securities 101, and this is something I would include in such a lesson, historical context for the regime.

Q    And why is it necessary for the jury -- in your understanding, why is it necessary for the jury

to have an understanding of Securities 101, the

Great Depression, in order to determine the elements

of any of the claims in this case?

MR. REDENBARGER:  Objection, form.

A    Well, if I understand your question

correctly, I would say that my report is intended to

educate the jury and to provide context on capital

markets and the governance of them.  I believe that

the historical background does provide some context.

And again, it's intended to be a general report.

Q    Okay.  Understood.

Does anything written on pages 11 through 16

and a half, right before "Required Disclosures" in

your report, make it more probable that Mr. Musk's

statements were inaccurate, materially inaccurate?

MR. REDENBARGER:  Objection, form; scope.

A    Whether Mr. Musk's statements were

inaccurate is outside the scope of my report.

Q    Okay.  And same question:  Do any of

the -- any of the content in pages 11 through 16 of

your report for required disclosures make it more

probable or inform the jury -- strike that.

Any of the content in pages 11 through 16 of

your report make it more probable that Mr. Musk

acted with scienter in connection with any of the

statements he made giving rise to this case?

MR. REDENBARGER:  Objection, form; beyond the scope.

A    Whether Mr. Musk acted with scienter is not within the scope of my report.

Q    So looking at page 15, starting at the top of page -- the top of the page --

A    Uh-huh.

Q    -- at investigation into the stock market practices that contributed to the crash, you write: "For example, witnesses alleged that securities were sold to investors without adequate information about the purpose of the offering or" -- "financial condition of the issuer."

Do you see that?

A    Yes.

Q    Are any such allegations made in this case to your knowledge?

A    No.  To my knowledge, Plaintiffs are not alleging that.

Q    And then the next sentence:  "Additional testimony suggested that corporate insiders were granted investment opportunities that were not made available to the general public."

Any allegations related to this type of

practice made in this case?

MR. REDENBARGER:  Objection, form.

Go ahead.

A   I don't understand there to be any.

Q   Okay.  And then the next paragraph is --
discusses practices that manipulated stock prices.

Do you see that?

A   Uh-huh.

Q   And one -- you write:  "One such tactic was
the collusion of wealthy groups of investors who
traded large pools of stock to manipulate prices."

Are there any such allegations of similar
practices in this case?

MR. REDENBARGER:  Objection, form.

A   I don't understand there to be any
allegations of collusion of wealthy groups to
manipulate a stock price.

Q   Similarly, are there any allegations that a
so-called bear raid occurred in this case?

A   I don't understand there to be any
allegations of collusive market manipulation in this
case.

Q   There -- are there any allegations of wash
sales in this case?

A   I don't understand there to be any.

Q   Are there any allegations that during the class period, Mr. Musk bought stock at artificially reduced prices?   14:35:32 14:35:36 14:35:42

MR. REDENBARGER:  Objection, form.

A   I don't understand there to be.

Q   Okay.  So page 16, you discuss that the federal securities regulation regime adopted a disclosure-based report over a merit-based regime; is that right?

A   Yes.  Our regime is disclosure based.

Q   And can you describe just what a merit-based regime is, how -- how that would differ from a disclosure-based regime, in a little bit more detail?

A   Sure.  I think a merit-based regime, which we have never had, is one in which public regulators decide which companies are worthy, for qualitative reasons, of going public.

Q   And so instead of adopting that regime, the federal securities laws require detail disclosures and transparency so people can make decisions purchasing stock; is that right?

A   Yes.

Q   And is the theory behind that, that the market and investors benefit from getting more

information from insiders about the performance of

the company to make their investment decisions?

A   That's correct.

Q   That more transparency is better for the

investor and market at large?

A   In general.

Q   And that's -- that's the theory that

animates our securities regulation regime; is that

right?

A   That's correct; that firms are obligated to

disclose certain information, and investors make

their own decisions.

Q   Okay.  So the next section is "Required

Disclosures," and you write that, "Required

disclosures are filed with the SEC, and are made

publicly available through the SEC's online

database."

Do you see that?

A   I know that I wrote that.

Q   It's page 16, second-to-last paragraph --

second-to-last sentence of that -- that --

A   Yes.  Yes.  I'm with you.

Q   And the online database, that's that EDGAR

database we were discussing earlier?

A   Yes.

Q   And when information is filed with the SEC and published on EDGAR, it's -- is that made publicly available essentially immediately?

A   When it's published on EDGAR, it is.

Q   So the next paragraph discusses the Form 10-K, which you describe as "the most comprehensive annual filing that public companies must submit."

    Do you see that?

A   Uh-huh.

Q   You'd agree that the 10-K is a very important document?

A   I would.

Q   It provides the most complete information about a company, its performance, and its potential risk factors to the market?

A   Yes.

Q   Companies spend a lot of time working on their 10-K, don't they?

A   They do.

Q   Lots of lawyers, company employees, auditors, accountants all involved in putting together this document?

A   And various pieces of it, yes.

Q   And is it fair to say that investors understand the amount of time and effort that

14:38:23
14:38:27
14:38:30
14:38:32
14:38:35
14:38:43
14:38:46
14:38:49
14:38:49
14:38:50
14:38:55
14:38:55
14:38:56
14:39:02
14:39:08
14:39:10
14:39:11
14:39:15
14:39:16
14:39:17
14:39:20
14:39:22
14:39:23
14:39:25
14:39:28

companies put into these 10-Ks; they have some sort of understanding?

MR. REDENBARGER: Objection, form; speculation.

Go ahead.

A    I can't really speak to what investors at large understand about 10-Ks, but they do require a lot of time to put together.

Q    Would you agree that the process of putting together the 10-K and the understanding of the process of putting together the 10-K helps increase the reliability of the document?

MR. REDENBARGER: Objection, form.

A    I think that that's the intention, yes.

Q    To -- to give investors confidence in the accuracy of the report?

A    I think that, in general, that is the intention.

Q    And, again, this isn't that document -- this is a document that a people spend a lot of time putting together; it's not something that's fired off like an e-mail or a text, right? Lots of time is spent --

A    It is not. It is not. Sorry.

Q    No, no, no. No problem. I apologize for

talking over you.  I'll -- I'll try to get better.      14:40:28

A    Me too.      14:40:31

Q    And so investors -- let me -- one of the      14:40:32
purposes of the 10-K is for investors to rely on the      14:40:37
accuracy of the disclosures made in them to make      14:40:41
trades and other investment decisions; is that      14:40:44
right?      14:40:48

A    Yes.  It's put out there with the intent      14:40:48
that it inform investors.  That's --      14:40:51

Q    To --      14:40:51

A    -- the reason we have them.      14:40:54

Q    To provide investors with enough information      14:40:55
about the performance of the company to make      14:40:58
educated investment decisions?      14:41:00

A    That's fair.      14:41:04

Q    And is it fair to say -- and I'm talking      14:41:05
about all of the, you know, exchanges, all the      14:41:11
public companies.      14:41:14

Fair to say that investors make trillions of      14:41:15
dollars in trades in investments based in part on      14:41:22
information provided in 10-Ks?      14:41:25

MR. REDENBARGER:  Objection to form; scope.      14:41:26

A    Based on that and other things.      14:41:28

Q    When 10-Ks are released in the market, that      14:41:30
tends to be a heavy trading volume day, doesn't it?      14:41:37

10-K reports.

MR. REDENBARGER: Objection.

Q    Sorry.

A    Sure.  Yes.

Q    And -- and traders are -- you know, investors are making trading decisions and trading billions and, over the course of a year, trillions of dollars following the release of these reports, right?

A    Based on the report and the information in them and what other people say about the information in them.

Q    There's nothing unreasonable about investors -- institutional investors, any investor -- making high-value investment decisions based on the accuracy of information contained in 10-Ks, right?

MR. REDENBARGER:  Objection, form; scope.

Go ahead.

A    In general, that's reasonable.

Q    There's nothing irresponsible about making multibillion-dollar investment decisions based on the accuracy of representations contained in a public company's 10-K, correct?

MR. REDENBARGER:  Objection; scope; form.

A    What investors do in response to 10-Ks is not within my report, but in general, I would say that's correct.

Q    In your -- in your report, you discuss financial statements being audited, "...statements must comply with Generally Accepted Accounting Principles (GAAP)."

10-Ks also include non-GAAP information, right?

A    They do.

Q    They include disclosures about a company's operations; is that right?

A    Yes.

Q    Risk factors -- for instance, cybersecurity risks -- and other metrics that aren't checked by GAAP auditors, right?

A    That's correct.

Q    And -- and that information, non-GAAP information, that can be material to investors as well, right?

MR. REDENBARGER:  Objection; scope.

A    It can be.

Q    How exposed a company is to a cyberattack, for instance, could have a material impact on the, you know, safety or risks associated with investing

in that company, right?

A    It could.

Q    I mean, you're aware, for instance, of --
speaking as a securities law professor, you're aware
of litigation relating to misrepresentations made
about risk factors in a 10-K, right?

A    Yes, that's correct.

Q    Facebook case, the Alphabet case, those are
all fairly well-known?

A    Yes.

Q    And so a company's nonfinancial
representations, the risk factors in the 10-K, they
have to be accurate as well, just like regular
financial statements, right?

        MR. REDENBARGER:  Objection, form.

        Go ahead.

A    They -- they -- they have to be free of
material misstatements and omissions.

Q    They have to be based and backed by some
sort of reasonable base -- reasonable basis, right?

        MR. REDENBARGER:  Objection, form.

A    I mean, they -- they have to have some
reasonable basis.

Q    Backed by some reliable investigation?

        MR. REDENBARGER:  Objection, form.

A    They have to have some reasonable basis.

Q    Well, for instance, a company who represents in its 10-K, We have very little risk of cyberattack, and it turns out that the company didn't actually look and investigate whether or not there were any risks of cyberattack, that could be a material misrepresentation, right?

MR. REDENBARGER:  Objection, form; improper hypothetical.

Go ahead.

A    It -- this isn't within my report, but if they didn't actually look, that could.

Q    Or if their investigation wasn't particularly rigorous, if, you know, they did a very, you know, cursory look for cyberattack risk, for instance?

MR. REDENBARGER:  Objection, form; scope.

A    Again, not within my report.  But if they misrepresented somehow the -- the quality or the methods of their investigation.

Q    So, for instance, let's say that a company, when they're actually guarding against cyberattack -- potential cyberattack, has a method of looking out for potential hackers, they apply that -- they're guarding against -- they apply that

method in operation when they're trying to prevent attacks from happening, but when they're making their representations about the risk of cyberattack in their 10-K, they rely on a far less rigorous method, a far -- you know, a laxer method.

That could potentially create issues of material misrepresentations, right?

MR. REDENBARGER:  Objection, scope; form; legal conclusion; and improper hypothetical.

A    Well, let me repeat back to you what I understand you to be asking.

You're -- and, again, not within my report, right.  But your hypothetical, off the top of my head, is that the company is exercising some method to be on guard against cyberattacks and discloses in its 10-K, not that method, but a different method.

Is that what I'm hearing?

Q    Or discloses results based on a far more lax method when it's assessing its risks.

MR. REDENBARGER:  Same objections.

A    If the company does not -- I mean, in -- in theory, yes, if -- if I'm -- if I'm understanding your hypothetical correctly.

Q    And in the event that the risk factor representation is materially misleading, that could

Transcript of Emily Strauss
Conducted on July 22, 2025                      93

give rise to a claim under the -- a claim for fraud

under the securities laws, right?

A    The -- the risk factor -- I'm sorry?

Q    If -- if --

A    The risk factor what is materially

misleading?

Q    The -- a disclosure about a risk factor --

A    Okay.

Q    -- is materially misleading, that could be

securities fraud under the securities laws, right?

A    Yes.

Q    Okay.  And it is a major problem if a

company makes a material misrepresentation its -- in

its 10-K, correct?

        MR. REDENBARGER:  Objection, form.

A    If a company makes a material

misrepresentation or omission in its 10-K that --

yeah, that's -- that could potentially be securities

fraud.

Q    Are particular officers of the company

required to sign a 10-K or a 10-Q?

A    Various.

Q    And what is the -- when somebody signs a

10-K or 10-Q, what are they representing?  What is

the significance of signing it?

A    They are authorizing it, and they are saying that it's true.

Q    They're certifying the accuracy of the statements?

A    Yeah.

Q    That they don't contain any material misstatements or omissions?

MR. REDENBARGER:  Objection, form; beyond the scope.

A    They're -- they're authorizing the statement as true.

Q    That the statement's based on some sort of -- that their representations are based on some sort of reasonable basis?

A    Yeah.

MR. REDENBARGER:  Objection, form.

THE WITNESS:  Sorry.

Q    Would it be a concern if the signatory to the 10-K is unable to explain the basis for a representation in the 10-K?

MR. REDENBARGER:  Objection, form; beyond the scope.

A    This isn't within my report.

Q    But I'm just asking.  As a securities law professor, somebody with expertise in securities

regulations, hypothetically, if, let's say, a CEO signs a 10-K, has the earnings call or the -- you know, the call associated with the 10-K, is asked questions about representations made in the 10-K and is unable to provide an explanation for the basis of that representation, that can spook investors, right?

MR. REDENBARGER:  Objection, form; beyond the scope; incomplete and improper hypothetical.

Go ahead.

A    It could.  It would depend on what those representations consist of and what the CEO was able to say about them.

Q    If the CEO is unable to explain the basis for a representation made in the 10-K, one might expect shareholders and enterprising plaintiff's law firm to try to investigate some of those representations, potentially be on notice of a -- a potential claim based on those representations, right?

MR. REDENBARGER:  Objection, form; scope; improper hypothetical; incomplete.

A    Again, I think it depends a lot on what the -- what the statements are and what the context is.

Q    Understanding it depends on the context and the statements, there are situations where, if a person who signs a 10-K --

A    Uh-huh.

Q    -- is unable to explain the basis for representation in the 10-K, that investors may reasonably respond by looking into whether or not the statement the CEO is unable to explain is materially inaccurate?

MR. REDENBARGER:  Objection, form; scope; improper and incomplete hypothetical.

A    Again, it's beyond my report, and it's very context-dependent.  But I would say perhaps there are instances in which that's correct.

Q    Okay.  You've had a discussion.  I think we briefly mentioned this about GAAP.  And when I say, "GAAP," I mean, generally accepted accounting principles --

A    Sure.

Q    -- and audits in that paragraph, right?

A    Uh-huh.

Q    Are you aware of any issues in this case concerning GAAP audits?

A    That's beyond my report.  I don't -- I haven't opined on that.

Q   Okay.  Are you aware of any allegations or issues in this case concerning whether an opinion was qualified or unqualified?

MR. REDENBARGER:  Objection, form; beyond the scope.

A   I'm not.  And it's beyond my report.

Q   Okay.  So I -- I guess my question, then, is:  Is there a reason why you included a discussion of GAAP accounting principles in your report if you're unaware of any allegations or issues in this case that are related to allegations that, you know, someone or some company didn't follow -- didn't follow GAAP?

MR. REDENBARGER:  Objection, form; misstates testimony.

Go ahead.

A   I would include that in a Securities 101 class.  I would include the fact that financial statements in disclosures such as 10-Ks are required to be audited.

Q   But non-GAAP metrics --

A   Uh-huh.

Q   -- are not required to be audited, correct?

A   That's correct.

Q   So for instance, are you aware of whether or

not one way or the other mDAU is a GAAP metric?

MR. REDENBARGER:  Objection to scope.

Go ahead.

A   It's beyond my report.  But my understanding is that it's not.

Q   Okay.  So a clean audit from an auditor that a 10-K complies with GAAP would not provide any information as to whether -- would not provide any information relevant to mDAU, right?

MR. REDENBARGER:  Objection, beyond the scope.

A   Again, not in my report.  But my understanding is that it would not capture that.

Q   And you also discuss 10-Q in the next paragraph; is that right?

A   Yes.

Q   And without belaboring the point and going through all of this again, do the same requirements that -- about material accuracy, about the accuracy and a reasonable basis for representations made in a 10-K, those also apply to 10-Qs?

A   It has to be free of material misrepresentations and omissions.

Q   And -- and the primary difference between a 10-K is one is quarterly; is that right?

14:53:33
14:53:38
14:53:40
14:53:41
14:53:44
14:53:45
14:53:53
14:53:58
14:54:00
14:54:02
14:54:04
14:54:04
14:54:07
14:54:12
14:54:19
14:54:20
14:54:20
14:54:23
14:54:25
14:54:30
14:54:35
14:54:38
14:54:40
14:54:41
14:54:43

A    Yeah.    14:54:45

Q    And two, because it's quarterly, the    14:54:46
financial statements aren't necessarily audited; is    14:54:49
that right?    14:54:52

A    Yes.    14:54:52

Q    And investors are aware that those financial    14:54:52
statements aren't audited and to take those numbers    14:54:55
with the appropriate grain of salt given the lack of    14:55:00
audit, right?    14:55:04

MR. REDENBARGER:  Objection, scope;    14:55:05
speculation.    14:55:06

Go ahead.    14:55:07

A    I can't say what all investors are aware of,    14:55:07
but it's generally known that 10-Q financial    14:55:10
statements are not audited.    14:55:14

Q    So turning to the next -- next paragraph,    14:55:15
8-K, just to be clear, this paragraph, that's the    14:55:19
extent of your opinion about disclosure obligations    14:55:28
under Form 8-K?    14:55:32

A    Yes.    14:55:34

Q    And you're offering the opinion that    14:55:36
following certain material events, a company is    14:55:42
required to file an 8-K under the securities    14:55:45
law -- a public company, I should say, is required    14:55:48
the file the 8-K under certain -- under    14:55:50

the securities regulations?     14:55:51

A   Yes.     14:55:53

Q   You're not offering any opinion as to     14:55:54
whether Mr. Musk was required to file any 8-K in     14:56:00
connection with this case, right?     14:56:03

MR. REDENBARGER:  Objection, beyond the     14:56:04
scope.     14:56:06

A   No.     14:56:06

Q   And -- and he wouldn't be required to file     14:56:06
an 8-K because he's -- he, himself, is not a public     14:56:09
company, right?     14:56:13

MR. REDENBARGER:  Objection, beyond the     14:56:13
scope; legal conclusion.     14:56:15

A   This isn't part of my report.     14:56:16

Q   Okay.     14:56:18

A   And I agree that he was not a public     14:56:18
company.     14:56:21

Q   Okay.  You're not offering any opinion that     14:56:21
either Twitter or Mr. Musk or any party in     14:56:25
this -- or any -- and I'm using "party in this case"     14:56:30
to refer to actors in the case, not literal, you     14:56:33
know, parties, plaintiff or defendant.     14:56:38

You're not offering any opinion that Twitter     14:56:40
or any other entity or person involved in the     14:56:43
Twitter merger was required to and failed to file a     14:56:47

Form 8-K in this case, right?

MR. REDENBARGER:  Objection, beyond the scope.

A    I am not.

Q    That's not in your report, right?

A    Correct.

Q    And to the extent that there was any failure to file a Form 8-K associated with the Twitter merger, that failure would be Twitter's, the public company, right?

MR. REDENBARGER:  Objection, speculation; incomplete hypothetical; scope.

A    That's beyond the scope and it's not -- I'm not opining on -- on the obligations of Twitter to file a Form 8-K.

Q    Understood.  But if you have Mr. Musk and his private merger entities and Twitter, a public company, and there was some sort of failure to file an 8-K, whose responsibility -- on whose shoulders would the responsibility to file that 8-K fall under the law?

MR. REDENBARGER:  Objection, calls for a legal conclusion; scope.

A    A public company is obligated to file a Form 8-K upon the occurrence of certain material events.

Transcript of Emily Strauss
Conducted on July 22, 2025                    102

Q    And actually, Tyson brought up a good point. He's been objecting for legal conclusion -- to -- because I'm asking questions that call for legal conclusions.

Your opinion about what is required, like whether an 8-K is required, that's -- that is a summary of the law regarding 8-Ks, right?

A    This is meant to educate the jury.  This is a high-level discussion of when 8-Ks are required.

Q    Right.  So you're telling the jury that the law requires or a regulation requires that the 8-K be filed that is -- you know, in response to a certain event at a certain time, right?

A    I am telling the jury that public companies have various obligations, among them, filing an 8-K.

Q    And you're not providing any other opinion beyond public companies have an -- they have various obligations among them -- strike that.

I'm talking about 8-K specifically.

A    Uh-huh.

Q    You're not offering any opinion about 8-Ks beyond, under certain circumstances, and here are the circumstances, a public company is required to file an 8-K, right?

MR. REDENBARGER:  Objection, form.

Go ahead.

A    Yes.  Under some circumstances, here are some example circumstances, not exhaustive circumstances, a company is required to file an 8-K.

Q    So it's an explanation of essentially what the regulation and the law is regarding 8-Ks, right?

MR. REDENBARGER:  Objection, form.

A    It's a way of educating the jury about the requirements of public companies and the securities regime.

Q    What the law requires public companies to do in the securities regime?

MR. REDENBARGER:  Objection, form.

A    Under some circumstances, what public companies are required to do.

Q    Okay.  Under the law?

MR. REDENBARGER:  Objection, form; asked and answered.

A    If they -- if they -- if a material event occurs, then they need to file a Form 8-K.

Q    Okay.  So -- and is there a reason why you don't want to answer that they're required to file a Form 8-K under -- under the law?

MR. REDENBARGER:  Objection; asked and answered.

A    Firms are required to file Form 8-Ks under our securities regime under certain circumstances.    15:00:11 15:00:17

Q    And the circumstances are laid out by statute and regulation, right?    15:00:19 15:00:26

A    The statute and regulation, yes.    15:00:27

Q    You write that they are -- in general, a company must file a Form 8-K within four business days of an event that a reasonable investor would consider important or material.    15:00:28 15:00:31 15:00:36 15:00:38

    Do you see that?    15:00:39

A    Yes.    15:00:40

Q    Okay.  So first question:  You're not opining on the definition of material, correct?    15:00:40 15:00:42

A    I am not.    15:00:46

Q    Okay.  And so you will not offer any explanation or any legal definition of what material means, correct?    15:00:46 15:00:53 15:00:59

A    No.    15:01:00

    MR. REDENBARGER:  Objection, form.    15:01:01

A    Sorry.  No.    15:01:01

    MR. REDENBARGER:  Objection --    15:01:02

Q    So when you say a --    15:01:03

    MR. REDENBARGER:  Objection.  Hold on. Sorry.  Let me just -- form -- form objection only.    15:01:04 15:01:05

    Go ahead.    15:01:08

Q   So when you say within four days of an event that a reasonable investor would consider important or material, you are not suggesting that something that a reasonable investor would consider important is the definition of material, correct?

MR. REDENBARGER:  Objection, form.

A   I'm not opining as to the definition of material.

Q   Okay.  So to avoid potential jury confusion, you could say that the company must file an 8-Q [sic] within four business days of an event that is material, correct?

MR. REDENBARGER:  Objection, form; improper hypothetical; beyond the scope.

A   One could.  I mean, some -- some 8-K events are laid out by statute.

Q   But the example that you're using in the sentence isn't something that's laid out by statute, right?  You're using the business --

A   Ah, okay.

Yes, you could say that.

Q   All right.  So an announcement of a merger, does that trigger an 8-K?

A   Yes.

Q   Okay.  Execution of a merger agreement --

15:01:09
15:01:12
15:01:15
15:01:24
15:01:27
15:01:29
15:01:29
15:01:32
15:01:32
15:01:42
15:01:45
15:01:49
15:01:49
15:01:51
15:01:53
15:01:57
15:01:58
15:02:01
15:02:04
15:02:06
15:02:07
15:02:09
15:02:14
15:02:17
15:02:17

we've negotiated, we've signed a merger agreement, does that trigger an 8-K?

MR. REDENBARGER:  Objection; scope.

A    It's beyond my opinion, but yes.

Q    What about a side deal related to a merger agreement?  Let's say the execution of a standard confidentiality agree- -- confidentiality agreement before exchanging nonpublic information; would that typically trigger an 8-K?

MR. REDENBARGER:  Objection, form; beyond the scope.

A    It -- it is beyond the scope of my report. Is the question whether that is material for the purposes of filing an 8-K?

Q    Yeah.  I mean, as a securities law professor, would you -- in what you study, is the execution of a standard confidentiality agreement in connection with a merger something that would trigger an 8-K?

MR. REDENBARGER:  Objection, beyond the scope; legal conclusion; hypothetical.

Go ahead.

A    I would say that it's probably context-dependent.

Q    Okay.  So let's -- let's add some context.

If the side agreement, the confidentiality agreement, expanded or restricted certain rights under the merger agreement -- so let's say -- and we'll just use this example.  No need to hide the ball.

Let's say the merger agreement provided certain information rights.  If the parties to the merger agreement signed a confidentiality agreement that expanded or restricted the acquirer's information rights, would that agreement be disclosed in an 8-K, typically?

MR. REDENBARGER:  Objection, form; beyond the scope; incomplete hypothetical.

A   Okay.  It's -- it's not in my report.  But, again, let me repeat back to you what I understand you to be asking.

You're asking me, if we've got two parties who have -- who are -- who are in the process of doing their diligence on a merger agreement, part of the merger agreement says that there are particular information rights, right?

Q   So let me just change the hypothetical a little bit or clarify.

The merger agreement is already signed --

A   Okay.  Sorry.  You -- you --

Q   The merger -- the merger --                      15:04:45

A   -- blinked out a minute there.                   15:04:47

Q   Sorry about that.                                15:04:47

    The merger agreement has already been signed     15:04:48
in this hypothetical.                                15:04:50

A   Okay.  Okay.                                      15:04:51

Q   And the merger agreement has already been        15:04:51
made public under an 8-K filing.                     15:04:53

A   Okay.  Under an 8-K, it's public.                15:04:55

Q   And post public filing of the 8-K and the        15:04:57
merger agreement, the parties execute a              15:05:00
confidentiality agreement.                           15:05:03

    Are you following?                               15:05:04

A   Okay.  Yes.                                      15:05:05

Q   And in that confidentiality agreement, the       15:05:06
parties bargain to change the scope of the           15:05:09
acquirer's information rights.                        15:05:16

A   Okay.                                            15:05:17

Q   Would that confidentiality agreement be          15:05:18
filed -- would that change -- would that -- would --  15:05:22
would executing that confidentiality agreement that  15:05:25
changes the scopes of rights under a publicly filed  15:05:29
merger agreement, would that trigger an obligation   15:05:32
under 8-K?                                            15:05:34

    MR. REDENBARGER:  Objection to form; beyond       15:05:35

the scope; incomplete and improper hypothetical.

Go ahead.

A    Okay.  My understanding -- under my
understanding of the question, I would say that it
would probably depend on what those changes were.

Q    Okay.  If the changes were material such
that they changed a -- changed the acquirer's rights
to information, would that be required to be
disclosed under 8-K?

MR. REDENBARGER:  Objection, beyond the
scope; incomplete hypothetical.

A    I -- again, I would have to say it depends
on -- it depends on the change, on what the
information at issue is.

Q    Okay.  Under --

A    I --

Q    Oh, sorry.  Go ahead.

A    I was going to say maybe we could take a
break soon but I'll let you finish.

Q    Okay.  Actually, no, I'm -- let's - I'm
happy to take a break right now.

A    Okay.

MR. BERGJANS:  If that would be good for
you.

And, honestly, Tyson, maybe ten minutes left

at the most.

15:06:52

MR. REDENBARGER:  I was going to ask whether we should take lunch or not, but -- okay.  Great. We'll just take a quick break and we'll be back in five.

MR. BERGJANS:  All right.  Great.  Thanks.

THE VIDEOGRAPHER:  Please stand by.  We are going off the record.  The time is 3:07.

(Whereupon a break was had.)

THE VIDEOGRAPHER:  We are now back on the record.  The time is 3:16.

BY MR. BERGJANS:

Q   Welcome back, Professor Strauss.

A   Thank you.

Q   I would like to go back to the excitement of the 8-K discussion.

A   Okay.

Q   And maybe ask it a little bit of a different way.

A   Okay.

Q   Under the 8-K regime, a material change to an already publicly filed merger agreement would trigger an obligation to file a -- an 8-K documenting that change, would it not?

MR. REDENBARGER:  Objection, scope;

incomplete hypothetical. — 15:17:19

Go ahead. — 15:17:21

A    If it was material. — 15:17:21

Q    Okay.  And so if -- if there was a material change in an acquirer's information rights under an already public merger agreement made in a side confidentiality agreement, 8-K -- the 8-K rule would require that confidentiality agreement to be publicly filed; is that right? — 15:17:24 / 15:17:35 / 15:17:44 / 15:17:50 / 15:17:56 / 15:18:00

MR. REDENBARGER:  Objection, beyond the scope; incomplete hypothetical. — 15:18:01 / 15:18:04

Go ahead. — 15:18:07

A    I -- you're stipulating in advance that it's material? — 15:18:07 / 15:18:11

Q    Sure. — 15:18:12

A    Yeah. — 15:18:13

Q    As a securities law expert and somebody that studies these transactions, is it your opinion that anyone would expect that some sort of material change to a public merger agreement had been made between the parties in the absence of an 8-K publicizing that material change? — 15:18:17 / 15:18:25 / 15:18:38 / 15:18:43 / 15:18:47 / 15:18:55

MR. REDENBARGER:  Objection, form; beyond the scope; improper or incomplete hypothetical. — 15:18:57 / 15:19:00

A    I'm -- I'm really sorry, I'm going to need — 15:19:05

112

you to say that again.

Q   Let me -- I can rephrase it.

So one of the purposes of the 8-K is to inform investors of material -- material information regarding certain events, right?

A   Sure.

Q   And one of those events is -- is the merger, right?

A   Yes.

Q   And -- and some material information related to that merger may be somebody's -- an acquirer's rights in that period between executing the merger agreement and closing, right?

MR. REDENBARGER:  Objection, scope; incomplete hypothetical.

Go ahead.

A   It -- it could be.  Are you referring -- yeah, it could be.

Q   Correct.  And one of the purposes of the 8-K regime or one of the benefits of the 8-K regime is investors don't have to guess or speculate whether any material change to the merger agreement has occurred behind the scenes, because any such change is required to be disclosed under rule 8-K, right?

MR. REDENBARGER:  Objection, beyond the

scope; incomplete hypothetical.

A    It's generally true that material events need to be disclosed within 8-K.

Q    And the purpose of 8-K is to require public companies to disclose material events to -- in part, to inform investors when they're making investment decisions, right?

A    Yes.

Q    And the existence of this regime allows investors -- gives investors confidence to understand the different material change has been made, that material change would be in -- to a merger agreement, for instance, has been made, that material change will be disclosed in a Form 8-K, right?

MR. REDENBARGER:  Objection, form; speculation.

Go ahead.

A    This seems -- I mean, you're -- you're asking me to speculate on what investors would -- would expect; is that correct?

Q    Well, I guess I'm asking you about the purpose of the 8-K --

A    Okay.

Q    One of the things -- one of the opinions

you're offering is context for why these regulations are set up this way.

And is it -- is it not -- is it -- isn't it true that one of the purposes of the 8-K rule is to give investors confidence that if there's been any material change to, let's say, the rights under a merger agreement, that material change would be publicly disclosed pursuant to 8-K?

MR. REDENBARGER:  Objection, form.

A    I would agree that the purpose of the 8-K disclosure is to keep investors abreast of important events in the life of the firm so it can inform their investment decisions.

Q    Okay.  And are you aware -- strike that.

And so it follows, if an investor understands that the merger -- that a merger is operating under the rules of 8-K --

A    Uh-huh.

Q    -- the investor would not expect that some material change has been made to a merger agreement if an 8-K announcing that change has not been filed; isn't that fair?

MR. REDENBARGER:  Objection, form; speculation; incomplete hypothetical.

A    I -- yes.  But again, you're stipulating in

advance that this is material. And I don't opine on materiality. I don't have this in my report. And I -- I would say that materiality itself is a -- is a complicated and subjective call. But yeah, I would say that.

Q Absolutely. I've read TSC as well.

So I guess my followup is: You're not aware of -- you know -- and again, when you're studying this stuff, you're not aware of speculating, oh, some material change hasn't happened, or some material change to a public merger agreement has taken place, but they're hiding that or they're not disclosing that material change through an 8-K, and trading based on that speculation?

MR. REDENBARGER: Objection, form; calls for speculation; beyond the scope.

A I'm sorry, you're going to have to bring me through that one again.

Q Sure. I mean, in your -- you know, you study these as a securities law professor.

Are you aware of a phenomenon in which investors speculate -- you know, knowing what we know about the Form 8-K rules -- in which investors speculate and trade off speculation that some material change has been made to the terms of a

public merger agreement when no corresponding 8-K

has been filed indicating that a material change to

that merger agreement has occurred?

        MR. REDENBARGER:  Objection, beyond the

scope; incomplete; hypothetical form.

    A    I -- again, beyond the report.  But I'm not

aware of this.

    Q    Okay.  So the next paragraph in your report

is -- relates to 13D disclosure.

    A    Yes.

    Q    And so is it correct that this paragraph

essentially describes the law's disclosure

obligations under 13D?

    A    Yes.

    Q    And so what you're doing is you're taking

this regulation and you're explaining what it

requires under the law, right?

    A    In this particular paragraph, I'm explaining

where the Schedule 13D filing is and when someone is

required to file one.  The general purpose is to

explain more broadly in, you know, in markets,

right, that certain individuals or entities can have

significant stakes and that those have to be

disclosed.

    Q    Understood.  But the specific opinion that

any person or group that acquires more than 5 percent of a company's voting securities must file the -- file a 13D within five business days of crossing that threshold, that is an explanation of what a legal requirement is, right?

A   That's an explanation of what shareholders are obligated to do under 13D.

Q   Under the law?

A   Under 13D.

Q   And 13D is a regulation promulgated pursuant to the securities laws, right?

A   It is.

Q   Okay.  And similarly, the -- the next sentence, the -- "If there's a material change in ownership - typically understood to mean approximately a 1 percent shift - an amendment to the 13D must be filed."

Do you see that?

A   Uh-huh.

Q   That's also an explanation of what the requirement under 13D is, a disclosure requirement under 13D?

A   Under 13D, yes.

Q   A disclosure requirement mandated by law?

A   Under 13D which is a regulatory requirement.

Q   Okay.  And then the next sentence explains a change in the law.  W.

Hen did that change in the law occur?

A   Well, after Mr. Musk's filings.

Q   Okay.

A   Recently.

Are you there?

Q   Okay.  Yeah, I'm there.

So this -- this change, the two-business-day change, that also occurred after -- after the class period?

A   After -- yes.

Q   Okay.  So both the five-business-day requirement and the two-business-day requirement, those both postdate the events giving rise to this litigation; is that right?

MR. REDENBARGER:  Objection, beyond the scope; misstates testimony.

Go ahead.

A   They are -- they are something that I would say in the Securities 101 class, that's meant to provide general context about the securities regime.

Q   I understood.  But my question was:  The requirements to submit something within two days, that postdates, let's say, October 2022?

Transcript of Emily Strauss
Conducted on July 22, 2025

119

A    Yes.

Q    And the requirement that something be filed within five -- that the 13D when you cross the 5 percent threshold, that postdates October 2022?

A    Yes.

Q    Okay.  And you're not offering any opinion whether or not any person in this case is required to file a 13D at any point; is that right?

A    That's correct.

Q    You are not seeking to apply this opinion to anything Mr. Musk did or didn't do in this case, right?

A    No.

Q    And you're aware that the issue -- I guess let me ask this question:  Are you aware whether or not Mr. Musk acquired any stock in Twitter after the announcement of the merger agreement on April 25th, 2022?

A    I am not.

Q    Okay.  Are you aware of whether or not Mr. Musk acquired any securities in Twitter after May -- between May 12th, 2022, and October 5th, 2022?

A    I am not.

Q    Okay.  You're not aware of any -- of

Transcript of Emily Strauss
Conducted on July 22, 2025

120

Mr. Musk acquiring any securities in Twitter during

the class period in this case, which is

May 13th, 2022, through October 4th, 2022?

    A    That's correct.

    Q    Okay.  Are you aware whether there's any

claim for damages in this case related to any

purported violation of 13D?

    A    I am not.  I -- I don't -- I don't

understand there to be.

    Q    Okay.  You -- there is no claim for damages

for any violation of 13D; is that right?

        MR. REDENBARGER:  Objection, beyond the

scope.

        Go ahead.

    A    That's my understanding.

    Q    You would agree that if the jury needs to be

instructed about what 13D requires, that's the

responsibility of the court, right?

    A    If -- if that is at issue in the lawsuit,

then, yes, if that's the -- if that's what the claim

is being brought under, I understand that the judge

would -- would instruct the -- the jury.

        MR. REDENBARGER:  And just belated, beyond

the scope.

        Go ahead.

Q   If it's not at issue in the lawsuit -- if
13D is not at issue in the lawsuit, is there any
reason for the jury to be informed about
requirements of the 13D?

MR. REDENBARGER:  Objection, form; beyond
the scope; hypothetical.

Go ahead.

A   The report is meant to generally educate the
jury about capital markets and stocks and stock
ownership and what -- how -- how that regime
functions generally both within and beyond the
securities laws.

Q   You would agree that you -- you wouldn't
want your opinion in this case to confuse the jury,
right?

A   No.

Q   You wouldn't want your opinion in this case
to mislead the jury into thinking that something was
at issue, some event was at issue or caused damage
to shareholders when it's not an allegation in this
case, right?

MR. REDENBARGER:  Objection, form.

A   I don't believe my report does that.

Q   I'm just asking generally.

A   Generally, I would not.  And I don't make

any such statements in the report.

Q   You -- you don't think it's a possibility that the jurors might be confused and think that there is a claim based on 13D, given this paragraph and the image in Figure 1 showing the rise in Twitter's stock price following Mr. Musk's disclosure of his ownership in Twitter?

MR. REDENBARGER:  Objection, form; beyond the scope; improper hypothetical.

Go ahead.

A   I don't.  I don't think there's anything that I say that implicates -- that would cause confusion.

Q   You don't think that the Figure 1 showing the rise in stock price after Mr. Musk makes the 13D disclosure would create confusion for the jury if 13D --

MR. REDENBARGER:  Objection, form.

Q   -- isn't an issue in this case?

MR. REDENBARGER:  Objection, form; beyond the scope; improper hypothetical.

A   I don't state in the report that that was what happened on that day in connection with that stock.

Q   I understand that you don't state it in the

report, but you include the information, don't you?

MR. REDENBARGER:  Objection, form.

A    I include a graphical chart showing stock price movement, but I don't narrate it.

Q    And you offer an explanation of what the regulatory requirements are under 13D, right?

A    That's correct.

Q    And, I mean, jurors are smart, right?  They can put two and two together; you agree with that?

MR. REDENBARGER:  Objection, hypothetical; beyond the scope.

A    I -- I think that jurors are smart.  I don't think I say anything in this report that's misleading.

Q    Well, if 13D is not a claim for damages in this case and there's a suggestion in this report that 13 -- that Mr. Musk may have violated 13D by explaining the -- by explaining the -- let me strike that.

13D is not an issue in this case, right?

A    Right.

Q    And you agree that describing the requirements of a filing that is not an issue in this case but that Plaintiffs have alleged Mr. Musk violated -- you agree that that could confuse the

| 15:32:48 |
| 15:32:52 |
| 15:32:52 |
| 15:32:56 |
| 15:33:00 |
| 15:33:02 |
| 15:33:05 |
| 15:33:06 |
| 15:33:10 |
| 15:33:15 |
| 15:33:17 |
| 15:33:19 |
| 15:33:24 |
| 15:33:26 |
| 15:33:27 |
| 15:33:34 |
| 15:33:38 |
| 15:33:45 |
| 15:33:48 |
| 15:33:48 |
| 15:33:52 |
| 15:33:52 |
| 15:33:57 |
| 15:34:01 |
| 15:34:04 |

jury into thinking that Mr. Musk -- into thinking

that they have to decide an issue as to whether

Mr. Musk violated 13D in his disclosure of his

holding at Twitter?

    MR. REDENBARGER:  Objection, form; beyond

the scope; legal conclusion; incomplete

hypothetical.

  A  I'm sorry, I -- I understand your question

to be saying that Plaintiffs have alleged that

Mr. Musk made some misrepresentation in connection

with a 13D filing, and I don't understand that to be

an issue in this case.

  Q  Okay.  So you understand that there's no

reason for any discussion of Mr. Musk's -- you --

you don't understand that there's any -- you -- it's

your understanding that there -- that

this -- anything related to Mr. Musk's filing of the

13D is not at issue in this case, right?

    MR. REDENBARGER:  Objection, form.

  A  I -- I do not understand there to be any

allegations related to Mr. Musk's 13D filing in this

case.

  Q  So it's not necessarily helpful for the jury

to learn information relating to the regulations

around the 13D -- you'd agree with that -- if it's

not an issue in this case?

     MR. REDENBARGER:  Objection, form; beyond the scope.

     Go ahead.

  A   This is a general report that is intended to educate the jury about various aspects of the capital markets, and 13D is one of those.

  Q   But you didn't educate the jury on every SEC rule, did you?

  A   No.

  Q   You chose --

  A   That would be a very long report.

  Q   No, understood.

     You chose 13D, right?

  A   Yes.

  Q   And there's a reason -- and there's a reason you chose 13D, isn't it -- isn't there, the same reason why you have that chart in the back of your report?

     MR. REDENBARGER:  Objection, form.

  A   I mean, I also discuss 10-Qs.  That's not an issue necessarily in this case.

  Q   10-Q is at issue.  Twitter issued a 10-Q in 2022 after the merger agreement, right?

  A   That's correct.

Q   All right.  And Twitter also issued a 10-K, and that was one of the bases for Mr. Musk's worries and concerns about Twitter's disclosures regarding bot data, right?

        MR. REDENBARGER:  Objection, form; beyond the scope.

    A   Sure.

    Q   And Twitter published its merger agreement in an 8-K, right?  And so that would be relevant to this case because one of the issues is the public nature of the merger agreement, right?

    A   Sure.

    Q   And so that's why I'm asking.  13D seems out of place if, as you agree, 13 -- there are no claims related to 13D.  13D is not at issue.

        MR. REDENBARGER:  Objection, form; beyond the scope.

        Go ahead.

    A   Again, I would just say that this is intended to be a general report that's meant to educate jurors about various aspects of the securities regime.  I don't understand 13D to be at issue here.

    Q   Okay.  Did Plaintiffs' counsel ask you to include 13D in this report?

A    I believe so.

Q    Okay.  So next -- next section, the public enforcement -- "Enforcing the Securities Law. Public Enforcement:  The SEC," that's at pages 19 and 20 of your report.

A    Uh-huh.

Q    So this part of your opinion just generally describes the role of the SEC in securities enforcement; is that right?

A    Yes.

Q    You're not applying any of this information to any facts in this case, right?

A    Correct.

Q    And to your knowledge, is there any SEC enforcement action, any SEC enforcement -- strike that.

To your knowledge, is there any SEC enforcement action connected to this -- sorry, strike that.

To your knowledge, is there any issue in this case relating to an SEC enforcement action?

MR. REDENBARGER:  Objection, form.

A    Not with -- I mean, no.

Q    You're not aware of any facts in this case concerning SEC enforcement, correct?

MR. REDENBARGER:  Objection, form -- I'm
sorry -- and beyond the scope.

Go ahead.

A    Not in -- not among the allegations in this
case.

Q    Okay.  And so the purpose of this section is
to explain to the jury what the -- how the SEC
enforces securities laws, but to the best of your
knowledge, there is no issue in this case relating
to how the SEC enforces securities laws, right?

MR. REDENBARGER:  Objection, form; beyond
the scope.

Go ahead.

A    Again, the report is meant to be general
background.  Yeah.

Q    Okay.  Does the jury need to know anything
about how the SEC enforces securities laws in order
to determine whether or not Mr. Musk violated Rule
10b-5?

MR. REDENBARGER:  Objection, form; beyond
the scope.

A    The purpose of this section of the report is
just to say that the SEC is the governmental body
responsible for promulgating and enforcing the
securities laws, and I mention that there's a

complementary private right of action.

Q   Understood.  So I understand promulgation. We discussed the -- you know, we discussed certain securities rules.

But, again, my question is:  Does the jury need to know anything about SEC enforcement in order to determine whether or not Mr. Musk violated Rule 10b-5 in this case?

MR. REDENBARGER:  Objection, form; beyond the scope.

A   I think that, in general, it's helpful to -- for the jury to know what the SEC does, that they are the main architect and enforcer of the securities laws.

Q   Okay.  And then the -- at the bottom of 19 through 20, there's a reference to the Bernie Madoff Ponzi scheme --

A   Sure.

Q   -- and his prosecution.

Why the reference to Madoff?

A   Just to illustrate that there can be criminal liability under the securities laws.

Q   And why does the jury need to know there can be criminal liability under the securities laws?

MR. REDENBARGER:  Objection, form; scope.

A    Again, it's a general report and this particular section of it talks what about the SEC does.  The SEC does mostly does civil enforcement, but criminal liability is also a possibility.

Q    Does Mr. Madoff and his Ponzi scheme specifically have any connection to any of the facts of this case that you're aware of?

A    No.

Q    Okay.  Any allegation of a Ponzi scheme in this case?

A    No.

Q    To your -- to the best of your knowledge, Mr. Musk isn't accused of running a Ponzi scheme here, is he?

A    No.

Q    And then the last section is "Private Enforcement."  And, again, this is the extent of your opinion regarding private lawsuits under the securities laws; is that right?

A    For the purposes of this report, yes.

Q    Okay.  And you are not applying any of this background to any facts in this case, correct?

A    No.

Q    You note -- well, sorry.  I guess my question -- I have a quick question, which is:  This

is a private right of action, this is -- this is a

private enforcement of Section 10b-5, this case,

right?

A   Yes.

Q   And so the -- you know, kind of as a

consequence of just showing up for jury duty and

getting called into the venire, the jury is going to

know that there exists a private right of action for

10b-5, right?

MR. REDENBARGER:  Objection, form; beyond

the scope.

A   They may come in and have no idea what rule

10b-5 is.  It's --

Q   Well, but the Court is going to instruct

them, right, that this is a 10b-5 --

A   The Court is, yes.

Q   Okay.  And the -- the -- the issue of

whether or not there's an implied right of action

under Rule 10b-5, to the extent it's at issue in

this case at all, it's a pure legal question, right?

MR. REDENBARGER:  Objection, form; beyond

the scope; legal conclusion.

Go ahead.

A   Sorry, is the question about whether there

is a private right of action?

Q   My -- my question is, the statement about there -- the federal -- you have at the bottom of page 20, "Federal courts recognized an implied private right of action under Rule 10b-5 relatively early, and the Supreme Court has on multiple occasions affirmed it, say" -- "stating, 'the existence of the applied remedy is simply beyond peradventure."

Do you see that?

A   Yes.

Q   And -- and my question is, the existence of the implied -- the existence of a private right of action under 10b-5, that is just a pure question of law, an issue of law, right?  Whether or not one exists.

A   Whether or not one exists?

MR. REDENBARGER:  Objection, beyond the scope; calls for a legal conclusion.

Go ahead.

A   I mean, I -- I --

MR. BERGJANS:  You know, I'm -- is anyone else not hearing Ms. Strauss -- or Professor Strauss?  Sorry.  My apologies.

MR. REDENBARGER:  Can you hear us?

THE WITNESS:  Should I talk -- can you hear

133

me?  Can you hear me?

THE REPORTER:  I can hear you.

MR. BERGJANS:  Is there --

THE VIDEOGRAPHER:  I can hear you as well.

MR. BERGJANS:  Okay.  I think there might be an issue.  Let me check my audio.

THE VIDEOGRAPHER:  Counsel, would you like to go off the record?

MR. REDENBARGER:  Alex may not be able to hear us.

THE REPORTER:  He can't hear.  Let's go off the record.

THE VIDEOGRAPHER:  Okay.  Perfect.  Please stand by.  We are going off the record.  The time is 3:44.

(Whereupon a break was had.)

THE VIDEOGRAPHER:  We are now back on the record.  The time the 3:52.

BY MR. BERGJANS:

Q   Okay.  Great.  Before the technical snafu, I was asking a question.  I think it should be straightforward, and I apologize for the way, perhaps, I was framing it.

The issue of federal courts recognizing an implied right of -- right of action under 10b-5,

that is just an issue of law, right?  It's just
that's what the law, the current state of the law
is, right?

MR. REDENBARGER:  Objection, form; calls for
a legal conclusion.

Go ahead.

A    It's correct that currently, federal courts
recognize an implied right of action under 10b-5.

Q    And what you're saying -- what you're --
this opinion right there, that -- that statement is
just an explanation of what the law is, right?

MR. REDENBARGER:  Objection, form.

A    It's -- it's a representation of what courts
hold with respect to rule 10b-5.

Q    What -- what the current state of the law
is?

MR. REDENBARGER:  Objection, form.

A    What courts hold with respect to rule 10b-5,
that it --

Q    Sorry, my apologies.

A    That -- that it is a private right of
action.

Q    Which -- again, I'm -- I'm not trying to be
difficult.  But if -- if the Supreme Court has said
that 10b-5 is a private right of action, that's the

law, right, that 10b-5 is a private right of action, right?

A    That's -- yes.

Q    Okay.  And just confirming, just to again put a button on this, none of the opinions you're -- you are not applying any of the opinions you're offering in this case, any of the content of your report to any facts at issue in this case, correct?

A    That's correct.

Q    And you are not suggesting that the jury should apply any of the opinions or statements contained in your report or that you'll testify about to the facts of this, correct?

MR. REDENBARGER:  Objection, form.

Go ahead.

A    My report does not relate to the fact -- does not offer any opinions about the facts of this case.

Q    Okay.  And just ask -- again, you're not suggesting that the jury should apply any of the opinions or statements contained in your report to the facts of this case, correct?

MR. REDENBARGER:  Objection, form; beyond the scope.

Transcript of Emily Strauss
Conducted on July 22, 2025

136

A   It's intended to be context.

Q   Okay.  But not for something the jury -- to apply the -- again, my question is:  You're not -- and this is kind of just a yes-or-no question.

You're not suggesting that the jury should apply any of the opinions or statements contained in your report to the facts of this case, correct?

MR. REDENBARGER:  Objection, form; beyond the scope; incomplete hypothetical.

A   I'm not telling them how to decide.

Q   And -- and it's not your intention that they shall --

A   No, it's not.

Q   -- that they shouldn't -- okay.

And just, I just want to finish the question, and I apologize, just to clean up the record.

It's not your intention that they'll apply any of the opinions or statements made in your report to the facts of this case?

MR. REDENBARGER:  Objection, form; beyond the scope.

Go ahead.

A   It's my intention that they use this report as context to inform what they hear about during the

rest of the lawsuit.

Q    But you are not -- it is not your intention that the jury should, for instance, apply any opinion you give about what a 13D requirement is to the facts of this case, right?

MR. REDENBARGER:  Objection, form; beyond the scope; beyond the scope of her report.  It's a -- it's a legal conclusion.

Go ahead.

A    I guess it's not.

Q    Okay.

MR. BERGJANS:  That's all the questions I have.  Thank you so much for your time, Professor Strauss.  I really appreciate it.

THE WITNESS:  You're welcome.

MR. REDENBARGER:  Alex, I have a couple questions.

MR. BERGJANS:  Sure.  And I'll reserve the right for redirect.

MR. REDENBARGER:  Okay.  And I can -- just give me 20 seconds here to pull up my notes.

MR. BERGJANS:  Okay.

(Off-the-record discussion.)

EXAMINATION BY

BY MR. REDENBARGER:

Q   Okay.  Ms. Strauss, just a couple questions here.  On page 3 and -- 2 and 3 of your report, there's six bullet points that describe what you expect to testify regarding.

Do you see that?

A   I do.

Q   Okay.  Are those six topics specific or limited to mergers only?

A   No.

Q   They're -- are they -- would you consider them broader?

A   I would.

Q   Okay.  In what way are they broader?

A   Well, they talk about sort of the general structure and characteristics of the securities markets and the companies that trade on them, different kinds of terminology that might be useful.

Q   Okay.  And is your expected testimony limited to just the securities laws and regulations?

A   No, it's not.  It involves all of those things that are in the bulleted points that you -- that you and I just mentioned.

Q   Okay.  It also -- your expected testimony also will cover the securities markets in general?

A   That's correct.

15:56:56
15:56:59
15:57:03
15:57:08
15:57:10
15:57:10
15:57:11
15:57:15
15:57:17
15:57:18
15:57:21
15:57:22
15:57:22
15:57:25
15:57:28
15:57:32
15:57:34
15:57:39
15:57:45
15:57:49
15:57:54
15:57:58
15:58:00
15:58:03
15:58:06

139

Q   Earlier today, you were asked about options briefly?   15:58:10 15:58:13

A   I was.   15:58:13

Q   And I believe there was some back and forth about options being used -- I forget the context, exactly, of what the option was.  But isn't it true that options can be used to hedge against risks in addition to just simply invest in the stock market?   15:58:14 15:58:16 15:58:29 15:58:31 15:58:36

A   Yes.   15:58:39

MR. BERGJANS:  Objection, leading.   15:58:40

Q   Okay.  What's an example of that?   15:58:41

A   Buying an option to hedge?   15:58:43

Q   Yeah?   15:58:45

A   I mean, if you buy a put option.   15:58:45

Q   All right.  So there was also some discussion regarding a 13D, if you recall?   15:58:49 15:58:53

A   I do.   15:58:56

Q   Okay.  Are you aware of whether a 13D as a factual matter has any relevance to this case?   15:58:56 15:59:01

A   I believe it has some relevance in the -- in the sort of broad story of, you know, the facts of what happened here.   15:59:04 15:59:08 15:59:12

Q   Okay.  And what -- what are those facts if you're aware?   15:59:13 15:59:17

A   The broad story or --   15:59:18

Q    Yes.

A    Okay.

MR. BERGJANS:  Objection, vague.

A    Well, the -- the facts as I'm aware of them are that Mr. Musk took on a significant ownership stake in Twitter and became interested in taking it private, and that that transaction is -- you know, forms the basis of the -- the allegations at issue here.

Q    Okay.  And you're aware that Mr. Musk at some point filed a 13D?

A    Yes.

MR. BERGJANS:  Objection, leading.

Q    Counsel asked you several questions about whether a 13D, essentially, was relevant to any of the issues in this case.  Is there a reason why you included the 13D discussion in your report?

A    I think as with the rest of my report, the idea is to give the jury some context and some terminology for the story, for the facts that they will hear argued in this case.  And a 13D is -- is relevant to that.

MR. REDENBARGER:  I don't have any further questions.

MR. BERGJANS:  I -- just a couple brief

Transcript of Emily Strauss
Conducted on July 22, 2025

141

questions, Professor Strauss.

FURTHER EXAMINATION

BY MR. BERGJANS:

Q   Did you consult with Mr. Redenbarger about your redirect before he asked you questions?

A   No.

Q   Okay.  And --

A   He said that he was going to give me a redirect.

Q   I apologize.  On the break -- we had a brief break before I asked questions, starting at 12:45. Did you and Mr. Redenbarger discuss your testimony during a redirect on that break?

A   We discussed that he was going to redirect me.

Q   And did you discuss the content of that testimony?

A   No.

Q   Okay.  You didn't go through any questions he was going to ask?

A   No.

Q   Okay.  Regarding the 13D, you testified earlier that Plaintiffs asked you include -- to include that in your report.

Do you stand by that testimony?

16:00:36
16:00:36
16:00:39
16:00:39
16:00:42
16:00:44
16:00:45
16:00:48
16:00:50
16:00:50
16:00:53
16:00:59
16:01:02
16:01:04
16:01:07
16:01:08
16:01:14
16:01:14
16:01:14
16:01:16
16:01:17
16:01:17
16:01:20
16:01:22
16:01:24

A    I do.                                                    16:01:25

Q    Okay.                                                    16:01:26

MR. BERGJANS:  No further questions.  And                    16:01:27
again, thank you so much for your time today.                16:01:28

THE WITNESS:  Thanks.                                        16:01:31

THE VIDEOGRAPHER:  If there's nothing                        16:01:33
further, please stand by, and I'll read us off the           16:01:34
video record.                                                16:01:37

This marks the end of the deposition of                      16:01:38
Professor Emily Strauss.  We are going off the               16:01:41
record.  The time is 4:01.  Thank you, everybody.            16:01:42

(Whereupon the proceedings were concluded at

4:01 p.m. EDT)

CERTIFICATE OF REPORTER


     I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of California, being empowered to administer oaths and affirmations remotely pursuant to Section 2093(b) of the Code of Civil Procedure, do hereby certify:


     That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.


     I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.


     Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review

of the transcript was not requested.


      IN WITNESS WHEREOF, I have this date
subscribed my name.

DATED: 22nd of July, 2025

_____

    Karisa Ekenseair, CSR No. 14546