# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>        Defendant. | **CASE NO. 3:22-CV-05937-CRB** |

**EXPERT REPORT OF EMILY STRAUSS**

MAY 28, 2025

**EXHIBIT**

**Strauss Ex. 223**

exhibitsticker.com

1

## I.    INTRODUCTION AND EXECUTIVE SUMMARY

I am an Associate Professor at the University of California College of the Law San Francisco (formerly UC Hastings). I have served on the UC Law San Francisco faculty since July 2023. Prior to that, I was a member of the faculty at Duke University School of Law, beginning in 2016. Before becoming a law professor, I practiced law as an attorney at Sullivan & Cromwell LLP in New York. As an attorney, I concentrated on securities and business dispute litigation and regulatory investigations.

My teaching and research focus on corporate and securities law. I have taught courses including Business Associations, Securities Litigation and Enforcement, and Financial Regulation, and have published multiple legal articles in these areas. My curriculum vitae is attached as Exhibit A.

Class counsel Cotchett, Pitre & McCarthy and Bottini & Bottini have retained me to provide expert testimony for the jury about general principles surrounding the stock market, public companies, and securities regulations relevant to this case. I am compensated for my work at the rate of $600 per hour.

My opinions are based on my experience, academic research and expertise in the public securities markets, developed during my time at UC Law San Francisco and Duke and as a practicing attorney. I hold a J.D. from Boston University and a B.A. in Economics from the College of William and Mary. I believe my experience qualifies me to render expert testimony on the subjects requested by Counsel.

Based on my expertise, I expect to testify regarding:

- The structure of the securities markets;

2

- The characteristics and general background of companies traded on public markets;

- Common securities industry terminology;

- Types of investors, from individuals to funds that manage retirement accounts for various professionals (teachers, nurses, etc.);

- The role of the U.S. Securities and Exchange Commission ("SEC") in regulating public companies; and

- The disclosure obligations of SEC-registered public companies.

I have reviewed the Complaint in this matter. A complete list of materials I reviewed is attached as Exhibit B.

This report summarizes the testimony I will offer at trial. I reserve the right to modify or extend my opinions and testimony in response to new information or arguments raised by the Defendant or other experts.

## II.    PUBLIC MARKETS AND PUBLIC COMPANIES

This section provides foundational background on public securities markets and the companies that trade on them. I first explain the nature of the financial instruments that represent ownership in companies—specifically, common stock. I then describe what it means to be a public company, summarize how firms become publicly traded, and describe stock options.

### A.    What is a Stock?

A share of stock represents a partial ownership interest in a corporation.[1] It is a form of security that confers both financial and governance rights.[2] Stockholders may be entitled to a share of corporate profits if distributed as dividends, and to residual assets in the event of liquidation, after the company's debts have been satisfied.[3] The extent of these entitlements is proportional to the number of shares held.[4] Most shares also confer one vote per share on matters requiring shareholder approval.[5] These typically include elections for the board of directors and approval of significant corporate transactions.[6] An individual who owns stock in a corporation is referred to as a shareholder or stockholder. If, for example, an individual investor bought ten shares of Twitter stock in 2022, she could vote for its board of directors and for or against other major corporate decisions, and would remain a Twitter shareholder until she decided to sell the stock.

Shareholders range from the titans of Wall Street to the average American. About 37% of U.S. equities, by some estimates, are held by households.[7] An additional 11.6% are held by public and private pension plans, including funds that manage the retirement accounts for individuals like teachers, nurses, firefighters and the like. A further 23% are held by mutual funds

---

[1] See William T. Allen et al., Commentaries and Cases on the Law of Business Organization, 6th ed. (2021), 170-171.

[2] *Id.*

[3] See *id.*; Stephen J. Choi & A.C. Pritchard, Securities Regulation: Cases and Analysis, 6th ed. (2024), 3-5.

[4] *Id.*

[5] *Id.*

[6] See Allen et al., *supra* note 1, at 189.

[7] See James D. Cox et al., Securities Regulation: Cases and Materials, 10th ed. (2022), 86.

and life insurance companies, which are also common vehicles for family retirement and savings.[8]

### B. What is a Public Company?

A public company is one whose securities are registered with the SEC and may be purchased or sold by members of the general public. The most common pathway to attaining public status is through an initial public offering (IPO). To conduct an IPO, the firm must file a truthful and accurate registration statement with the SEC that provides extensive information about its business operations, financial condition, future prospects, and the securities it is offering.[9] The diligence and review involved in the registration process are typically rigorous and generally take months to complete.[10] Twitter, for example, went public on November 7, 2013, with an offering price of $26 per share.[11] On the New York Stock Exchange, Twitter shares began trading at $45.10, representing a 73% increase from the offering price.[12]

### C. What is the Stock Market?

Securities are typically traded in two types of markets: centralized exchanges and over-the-counter (OTC) markets.[13] Exchanges such as the New York Stock Exchange (NYSE) and NASDAQ are platforms for the trading of publicly listed securities [14] and provide centralized price information.

---

[8] *Id*. at 86-87.
[9] See *id.* at 131-135.
[10] *Id.* at 138.
[11] Telis Demos et al., Twitter IPO:  Relief, Riches, and a $25 Million Finish, WALL ST. J. Nov. 7, 2022.
[12] *Id.*
[13] Cox et al., *supra* note 9, at 3.
[14] *Id.*

Stock prices in public companies generally fluctuate throughout the day.[15] Most stock is traded during the "trading day," which is usually 9:30am-4:00pm Eastern Time on weekdays.[16] Real-time price data is available from numerous public and private financial information services, such as Yahoo Finance, Google Finance, MarketWatch, Bloomberg, or the websites of major exchanges like the NYSE and NASDAQ. Information or news affecting public companies may be promulgated by the company itself (e.g., through a press release or SEC filing), by influential individuals, or by journalistic outlets. Securities analysts also provide information to the investing public by researching and circulating information about specific firms or industries.[17]

The market price of a stock is determined by the interaction of supply and demand. Positive news—such as an increase in revenue, a new product launch, or an acquisition—can drive increased demand and elevate the stock price. Negative developments—such as poor earnings; or litigation risk—may lead to a decline in price as investors reduce their holdings, creating excess supply.[18] Below are line charts illustrating the fluctuations of several stocks over a multimonth period:[19]

---

[15] See, e.g., Choi & Pritchard, *supra* note 3, at 32-36 (discussing the efficient market hypothesis and the idea that for widely followed and actively traded securities, market price reflects publicly available information).

[16] See, e.g., NYSE, Holidays and Trading Hours, https://www.nyse.com/markets/hours-calendars ("Core trading session:  9:30am-4:00pm ET"); NASDAQ Stock Market Holidays and Trading Hours, https://www.nasdaq.com/market-activity/stock-market-holiday-schedule ("Opens: 9:30 am Eastern Time Zone
Closes: 4:00 pm Eastern Time Zone").

[17] See Choi & Pritchard, *supra* note 3, at 25-26.

[18] See *id.*; Cox et al., *supra* note 9.

[19] Further examples of stock price fluctuations across multiple days are included in Exhibit C.





### D.    Buying and Selling in the Stock Market

Public company shares are generally held in brokerage accounts and traded through intermediaries[20] such as Charles Schwab, Fidelity, JPMorgan, E*TRADE, or Robinhood. Shareholders in public companies typically purchase stock with the expectation that the company's value will increase, allowing them to sell their shares at a higher price than they paid. This is the primary mechanism by which shareholders earn returns, as public companies are not required to distribute profits via dividends.[21] However, investors who sell at a lower stock price may suffer a loss.

### E.    What is an Option?

An option is a type of derivative security that gives its holder the right—but not the obligation—to buy or sell an underlying stock at a specified price, known as the strike price, within a defined period.[22] There are two primary types of options: a call option, which gives the right to purchase the stock, and a put option, which gives the right to sell.[23]

Options are commonly traded on public exchanges[24] or in over-the-counter markets.[25] Their value is influenced by several factors, including the price of the underlying stock, time

---

[20] See Cox et al., *supra* note 9 at 3 ("The trading of a security begins with a customer instructing her representative, a broker, to purchase or sell a security…").

[21] See Choi & Pritchard, *supra* note 3, at 3-4.

[22] Michael S. Barr et al., Financial Regulation:  Law and Policy, 3rd ed. (2021), at 1247-48.

[23] *Id.*

[24] See, e.g., NYSE Options Markets, https://www.nyse.com/options.

[25] See Int'l Swaps & Derivatives Ass'n, Overview of OTC Equity Derivatives Markets: Use Cases and Recent Developments 2 (Jan. 2024), https://www.isda.org/a/1IhgE/Overview-of-OTC-Equity-Derivatives-Markets-Use-Cases-and-Recent-Developments.pdf.

remaining until expiration, and market volatility.[26] Option holders do not have an ownership interest in the company whose stock underlies the option. However, like shareholders, they may gain or lose money depending on how the stock price moves relative to the strike price of the option.[27]

### F.    What is a Board of Directors?

The board of directors is responsible for determining the company's overall business direction[28] and for initiating or approving significant corporate actions, including mergers, acquisitions, and structural changes.[29] While the board delegates the management of day-to-day operations to executive officers (e.g., CEO, CFO), the board retains ultimate authority over the company's strategic trajectory.[30] In addition to this directional role, the board has a duty to oversee the company's compliance with applicable laws and regulatory obligations.[31] In fulfilling

---

[26] See Options Price Behavior, Options Clearing Corp., https://www.optionseducation.org/referencelibrary/faq/option-price-behavior.

[27] Barr et al., *supra* note 22, at 1247 ("An options contract is a derivative because it derives its value from the varying value of the underlying asset in relation to the strike price.").

[28] See FINRA, Get On Board: Understanding the Role of Corporate Directors ("In general, the role of the board is to provide high-level oversight of corporate activities and performance.").

[29] See generally *id.*; Allen et al., *supra* note 1, at 111-113.

[30] *Id.  See also* Allen et al., *supra* note 1 at 284 ("The board authorizes only the most significant corporate acts or transactions: mergers, changes in capital structure, fundamental changes in business, etc.  The lesser decisions [] are made by officers and employees within the interior of the organization…").

[31] See Allen et al., *supra* note 1, 284 ("In general, boards of public companies have a particular obligation to monitor their firm's financial performance, the integrity of its financial reporting, its compliance with the law, its management compensation, and its succession planning.").

its duties, the board has a fiduciary duty to act in the best interests of the company and its shareholders.[32] This duty encompasses both a duty of care and a duty of loyalty.[33]

### III.    REGULATION OF THE SECURITIES MARKETS

The markets for securities—particularly public securities—are subject to extensive regulation. The primary regulatory authority is the SEC, an independent federal agency. The SEC's mission is to "protect investors," "maintain fair, orderly, and efficient markets," and "facilitate capital formation."[34]

These goals are closely linked. If investors cannot trust information about public companies, including their financial condition or performance, they will be reluctant to invest. This lack of trust would undermine the ability of companies to raise capital—capital they need to operate, innovate, and deliver goods and services.[35] In short, market integrity is a prerequisite for investor participation and, thus, for capital formation at scale.[36]

---

[32] See *id.* 309 ("a corporate director, officer, or controlling shareholder [must] exercise her institutional power over corporate processes or property (including information) in a good-faith attempt to advance the interests of the company.").

[33] *Id.* at 259 (generally summarizing distinctions between the duty of loyalty and the duty of care).

[34] U.S. Securities & Exchange Commission, Mission, https://www.sec.gov/about/mission (last visited May 4, 2025).

[35] *Id.* ("As we continue to monitor the activities of more than 28,000 entities in the securities industry, we remain dedicated to the interests of long-term investors who are entrusting their hard-earned savings to our securities markets to fund home purchases, college educations, and other important life events.").

[36] See D.C. Langevoort, Selling Hope, Selling Risk: Corporations, Wall Street, and the Dilemmas of Investor Protection 2-3 (2016) ("Investing is a choice; people can do different things with their money.  If people choose not to invest (or invest less), the capital markets – and the financial community – will suffer.  Given the inevitability and repeated salien examples of opportunism, the level of investment should vary based on how confident investors feel that they will not be exploited when parting with their hard-earned money.")

Securities are also regulated in order to protect investors. However, they are regulated differently from most consumer goods for several important reasons. First, unlike a car or appliance, the quality of a share of stock generally cannot be personally evaluated in advance—there is no opportunity to "test drive" an investment. Second, the consequences of poor investment decisions in securities can be far more severe. A consumer who overspends on a car may still be able to resell it; an individual investor who puts their savings into a stock that collapses may suffer irreparable financial harm.[37] Finally, most investors rely on the same types of information—primarily public updates concerning financial performance and future outlook—to evaluate potential investments.[38] Because individual shareholders often lack the ability to obtain this information directly, the federal government imposes disclosure obligations on public companies to ensure that public investors are adequately informed.[39]

This section outlines the legal and regulatory framework governing the public securities markets in the United States. It addresses the history and purpose of the securities laws, the role of the Securities and Exchange Commission (SEC) as the principal regulator, and some of the disclosures that the SEC requires.

**A.      A Brief History of the Securities Laws**

For nearly a century, the foundation of the modern capital markets regulatory framework has been the Securities Act of 1933 and the Securities Exchange Act of 1934. Both statutes were

---

[37] See, e.g., Cox et al., *supra* note 9, at 1 ("Unlike cars and other tangible products, securities are not inherently valuable.").

[38] See, e.g., Choi & Pritchard, *supra* note 3, at 17-22 (explaining how most investors make valuation decisions).

[39] See *id.* at 26-30 (summarizing arguments supporting mandatory disclosure).

11

enacted in response to the economic crisis triggered by the Great Depression, itself precipitated by the catastrophic crash of the stock market in 1929.[40]

In the early 20th century, Americans increasingly invested in securities, spurred by industrial expansion under figures such as Rockefeller and Vanderbilt and the wartime financing efforts of World War I, which introduced ordinary citizens to investment through "liberty bonds."[41] During the 1920s, the U.S. economy grew rapidly; this economic growth was accompanied by widespread expansion and speculation in securities markets.[42] This included banks using uninsured deposits to fund speculative investments, and small-time retail investors buying high-risk securities they could not afford using margin loans from selling brokers.[43] The expansion of the stock market at this time was driven by a speculative bubble, rather than by market fundamentals.[44] Some 55% of all personal savings were used to buy securities, which was "something of a national pastime."[45] At the time, regulation of securities transactions was limited to state-level "blue sky laws," named for their aim of preventing "financial pirates [from] sell[ing] citizens everything … but the clear blue sky."[46] These laws were widely regarded as ineffective.[47]

---

[40] See Cox et al., *supra* note 9, at 5 ("[I]t was the Great Depression and market collapse in October 1929 that provided the political momentum for congressional action that would over the course of a decade produce a collection of acts known as the federal securities laws.").

[41] Barr et al., *supra* note 22, at 455.

[42] *Id.* at 51.

[43] *Id.* at 51.

[44] Cox et al., *supra* note 9, at 7.

[45] *Id.*

[46] Barr et al., *supra* note 22, at 456.

[47] *Id.*

As the decade closed, the overvaluation of the stock market became clear,[48] stock prices began to slip, and brokers began to demand repayment of their loans.[49] Investors, short of cash to meet these obligations, engaged in fire sales of stock, putting downward pressure on prices.[50] The market collapsed in October 1929—on what became known as "Black Tuesday" and "Black Thursday"—as investors attempted en masse to liquidate overvalued shares.[51] On Black Thursday, total stock market losses totaled roughly $9 billion, a single-day record.[52] The crash marked the beginning of the Great Depression. Consumer confidence collapsed, production slowed, unemployment soared, and the agricultural sector was ravaged by drought. By 1930, public faith in the banking system had eroded, leading to widespread bank failures.[53] The ensuing economic downturn is widely considered the most severe in U.S. history and persisted until the mobilization for World War II helped stimulate recovery.

---

[48] *Id.* at 51 (noting that roughly $50 billion of new securities were sold in the decade following World War I, and that approximately half were ultimately near or completely valueless).

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.* at 51-52.





[54] Pacific & Atlantic Photos, Inc., Crowd of People Gather Outside the New York Stock Exchange Following the Crash of 1929 (1929), Library of Congress, https://www.loc.gov/item/99471695/.

[55] Unknown photographer, Bread Line Beside the Brooklyn Bridge Approach, digital file from intermediary roll film, Farm Security Administration/Office of War Information Collection, Library of Congress, https://www.loc.gov/resource/fsa.8e01560/.

In 1932, in the aftermath of the stock market crash, Franklin Delano Roosevelt was elected President. One of his early initiatives was to launch a congressional investigation into the stock market practices that contributed to the crash.[56] These hearings revealed widespread abuses. For example, witnesses alleged that securities were sold to investors without adequate information about the purpose of the offering or the financial condition of the issuer.[57] Additional testimony suggested that corporate insiders were granted investment opportunities that were not made available to the general public.[58]

The hearings also described practices that manipulated stock prices.[59] One such tactic was the collusion of wealthy groups of investors who traded large pools of stock to manipulate prices.[60] Another was the so-called "bear raid," in which securities firms allegedly collaborated to drive down the price of a stock.[61] This was accomplished through techniques such as short-selling (betting the price would fall) or executing "wash sales"—illusory transactions where a security was sold and then repurchased solely to give the impression of declining demand.[62] These actions created a false perception of market weakness, prompting panic selling by others, which further depressed the price.[63] The perpetrators could then buy the stock at artificially reduced prices.[64]

---

[56] Barr et al., *supra* note 22, at 52.
[57] *Id.*
[58] *Id.* at 458.
[59] *Id.*
[60] *Id.* at 51.  See also Cox et al., *supra* note 9 at 8 (noting that "the bull market of the 1920s was they heyday of the crooked stock pools.").
[61] Barr et al., *supra* note 22, at 458.
[62] *Id.*
[63] *Id.*
[64] *Id.*

15

The crash and the exposure of these practices persuaded policymakers that federal regulation of securities markets was necessary.[65] Rather than adopting a merit-based regime—where regulators screen securities offerings based on qualitative judgments—Congress chose a disclosure-based approach.[66] Under this system, companies are required to make detailed disclosures, and investors are free to decide for themselves whether to buy or sell based on that information. This framework was intended to curb abusive practices by ensuring transparency. As Justice Louis Brandeis famously observed, "[p]ublicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman."[67]

### B.     Required Disclosures

The Securities and Exchange Act of 1934 (also called the 1934 Act or the Exchange Act) governs the periodic and event-driven disclosures that public companies are required to make.[68] Some disclosures must be filed on a regular basis—annually or quarterly—while others are triggered by specific material events.[69] Required disclosures are filed with the SEC, and are made publicly available through the SEC's online database.[70] This section describes the primary categories of required disclosures.

---

[65] *Id.*
[66] *Id.*
[67] *Id.*, quoting Louis Brandeis, Other People's Money, (1914).
[68] Choi & Pritchard, *supra* note 3, at 37-38.
[69] *Id.*
[70] *Id.*

The Form 10-K is the most comprehensive annual filing that public companies must submit.[71] Typically filed in February or March following the close of the fiscal year, the 10-K provides a detailed overview of the company's business, financial performance, and risks.[72] It includes information on operations, material properties, ongoing legal proceedings, securities outstanding, and management's discussion and analysis of financial results.[73] The 10-K also contains audited financial statements, including an income statement, balance sheet, statement of cash flows, and statement of stockholders' equity.[74] These statements must comply with Generally Accepted Accounting Principles (GAAP) and are subject to independent audit.[75] The auditor's report is a critical component of the 10-K. Most auditors issue an "unqualified opinion" affirming that the financials are presented fairly in accordance with GAAP; a failure to obtain such an opinion may serve as a warning to investors.[76]

If the 10-K can be analogized to a yearly "report card," the Form 10-Q functions as a "progress report" to update investors on the company's status over the course of the year.[77] Companies file 10-Qs in each of the first three quarters that do not include a 10-K.[78] The 10-Q is more limited in scope, focusing on interim financial results and significant developments from the quarter. It includes financial statements, but these are not audited.[79]

---

[71] See Cox et al., *supra* note 9, at 10.

[72] Securities & Exchange Commission, Office of Inv. Educ. & Advoc., *Investor Bulletin: How to Read a 10-K*, https://www.sec.gov/files/reada10k.pdf.

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] Securities & Exchange Commission, Investor.gov, *Form 10-Q*, https://www.investor.gov/introduction-investing/investing-basics/glossary/form-10-q.

[78] *Id.*

[79] See Cox et al., *supra* note 9, at 10.

The Form 8-K is an episodic filing that companies must submit following the occurrence of certain material events.[80] Its purpose is to ensure that investors receive timely information relevant to their investment decisions.[81] In general, a company must file an 8-K within four business days of an event that a reasonable investor would consider important, or "material."[82] Examples of important events include mergers or acquisitions, changes in key management, shifts in control, bankruptcy filings, delistings, restructurings, and the incurrence or acceleration of significant financial obligations.[83]

Certain individuals or entities with significant stakes in a public company are also subject to regulation and disclosure obligations. One important example is the Schedule 13D filing. Any person or group that acquires more than 5% of a company's voting securities must file a 13D within five business days of crossing that threshold (reduced from ten business days in February 2024).[84] If there is a material change in ownership—typically understood to mean approximately a 1% shift—an amendment to the 13D must be filed.[85] Previously, such amendments were required "promptly"; they must now be submitted within two business days.[86]

---

[80] See Choi & Pritchard, *supra* note 3, at 203-206.

[81] *Id.* at 203 (noting that the requirement to file an 8-K "comes the closest to requiring 'real-time' disclosure" of the mandatory filings).

[82] *Id.*

[83] See *id.*, 203-206.

[84] Securities & Exchange Commission, Investor.gov, *Schedules 13D and 13G*, https://www.investor.gov/introduction-investing/investing-basics/glossary/schedules-13d-and-13g.

[85] See Events Triggering a Schedule 13D or 13G Filing Chart, Practical Law Checklist 3-500-9635.

[86] *Id.*

### C.    Enforcing the Securities Laws

#### 1.    Public Enforcement: The SEC

The Exchange Act of 1934 also created the SEC,[87] an independent federal agency responsible for overseeing the securities markets.[88] The SEC is governed by a bipartisan commission consisting of five members—the Chair and four commissioners—who are appointed by the President and confirmed by the Senate.[89] As noted above, the SEC's mission is to "protect investors," "maintain fair, orderly, and efficient markets," and "facilitate capital formation."[90] In a disclosure-based regulatory regime, the SEC not only promulgates rules requiring timely and accurate public disclosures, but seeks to enforce compliance when violations occur. Its central role is to ensure that investors receive reliable information that enables them to make informed investment decisions on an equal footing.

The SEC investigates and brings civil enforcement actions when violations of the securities laws occur. Such an action may be brought for virtually any violation of the securities laws, whether against individuals or entities.[91]  In federal court, the SEC may, among other remedies, seek civil monetary penalties or disgorgement, and obtain corporate governance reforms or injunctive relief.[92] In cases involving potential criminal conduct, the SEC may refer violations to the Department of Justice for criminal prosecution.[93] For example, in 2008, the SEC

---

[87] Cox et al., *supra* note 9, at 8.
[88] *Id.* at 14.
[89] *Id.*
[90] U.S. Securities & Exchange Commission, Mission, *supra* note 34.
[91] Choi & Pritchard, *supra* note 3, at 878.
[92] *Id.* at 920.
[93] *Id.* at 969.

19

filed a civil enforcement action against Bernard Madoff and his firm for operating a $50 billion Ponzi scheme.[94] Madoff was later sentenced to 150 years in prison.[95]  However, the SEC's Division of Enforcement does not take action to address all violations of the securities laws and regulations for various reasons.

### 2.    Private Enforcement:  Private Lawsuits under the Securities Laws

To help balance the possibility that the SEC may lack the incentives[96] or resources to pursue all misconduct within the capital markets, the securities regime includes private rights of action, particularly for fraud. Indeed, the SEC has called private rights of action a "necessary supplement" to its own enforcement efforts.[97] The securities antifraud workhorse most used in private actions is Rule 10b-5, promulgated under Section 10(b) of the 1934 Securities and Exchange Act.[98] Federal courts recognized an implied private right of action under Rule 10b-5

---

[94] *Id.* at 879.
[95] *Id.*  at 969.
[96] *Id.* at 878-79.
[97] *Id.* at 249.
[98] *Id.*

relatively early,[99] and the Supreme Court has on multiple occasions affirmed it,[100] stating, "the existence of this implied remedy is simply beyond peradventure."[101]

## IV.    CONCLUSION

The federal securities regulatory regime is complex, but its underlying purpose has remained constant: to protect investors by ensuring that all market participants have access to the information they need to make informed investment decisions. At its core, the system is designed to promote transparency, maintain a level playing field across the capital markets, deter misconduct, prevent market manipulation, and hold violators accountable.

_____
Emily Strauss
May 28, 2025

---

[99] See Kardon v. Nat'l Gypsum Co., 69 F. Supp. 512, 513 (E.D. Pa. 1946) (finding a private right of action under Rule 10b-5 because "[t]he violation of a legislative enactment by doing a prohibited act, or by failing to do a required act, makes the actor liable for an invasion of an interest of another if; (a) the intent of the enactment is exclusively or in part to protect an interest of the other as an individual; and (b) the interest invaded is one which the enactment is intended to protect.").

[100] See, e.g., Superintendent of Insurance v. Bankers Life & Cas. Co., 404 U.S. 6, 13, n. 9 (1971); Ernst & Ernst v. Hochfelder, 425 U.S. 185, 196, 96 S. Ct. 1375, 1382, 47 L. Ed. 2d 668 (1976) ("Although s 10(b) does not by its terms create an express civil remedy for its violation, and there is no indication that Congress, or the Commission when adopting Rule 10b-5,15 contemplated such a remedy, the existence of a private cause of action for violations of the statute and the Rule is now well established."); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 737 (1975) ("When we deal with private actions under Rule 10b-5, we deal with a judicial oak which has grown from little more than a legislative acorn.").

[101] Herman & MacLean v. Huddleston, 459 U.S. 375, 380, 103 S. Ct. 683, 686, 74 L. Ed. 2d 548 (1983).

**Exhibit A**

**EMILY N. STRAUSS**

720.393.0105    200 McAllister St, San Francisco, CA 94102    straussemily@uclawsf.edu

## ACADEMIC POSITIONS

***UC Law San Francisco (formerly UC Hastings)**, San Francisco, CA*
Associate Professor, July 2023 – Present

***UC Berkeley School of Law**, Berkeley CA*
Visiting Professor, August 2022 – December 2022

***Duke University School of Law**, Durham, NC*
Lecturing Fellow, July 2016 – June 2023

## PUBLICATIONS

***Corporate Law and the End of Injunctions***, 77 ALA. L. REV. (forthcoming)
Preliminary injunctions have motivated some of the crown jewels of Delaware jurisprudence. But over the last decade, preliminary injunctions of major transactions have been increasingly difficult for both judicial and pragmatic reasons. The remaining ground for which preliminary injunctions remain readily available – proxy fraud – nonetheless remains fertile ground for nuisance lawsuits.
This paper queries the utility of such injunctions, which entail all the holdup problems of preliminary injunctions generallybut do not improve shareholder bargaining power. Proxy fraud claims for damages, by contrast, can reallocate transaction surplus to shareholders, and likely provide better deterrence to managers and a stronger signal of misconduct to shareholders. Accordingly, this article suggests eliminating preliminary injunctions for proxy fraud claims in favor of damages claims after the fact.

***Standing and Snitches (Essay)***, 79 BUS. LAW. 665 (2024)
The SEC's whistleblower program, established in the Dodd-Frank Act and building on Sarbanes-Oxley, purports to preempt state attorney-client privilege laws.  Though this provision is likely unconstitutional and gave rise to outcry by the legal community upon the enactment of Sarbanes-Oxley, it has garnered remarkably little attention in the last ten years, and in twenty years, has not produced serious legal challenge. In this Essay, I argue that because of the secrecy shrouding the SEC whistleblower program, establishing standing to challenge the SEC's purported preemption of attorney client privilege is often prohibitively difficult.  I assess various paths litigants could take to establish standing for such a lawsuit.

***Climate Change and Shareholder Lawsuits***, 20 N.Y.U. J.L. & BUS. 95 (2023); featured in the CLS Blue Sky Blog.
In light of the new SEC rule for mandatory climate-related disclosures, this paper assesses whether shareholder litigation relating to the accuracy of firms' climate-related disclosures is likely to serve as effective enforcement.  To answer this largely overlooked question, I examine the climate-related lawsuits to date that shareholders have brought against firms that made voluntary climate-related disclosures, creating a novel typology illustrating where such lawsuits are likely to arise.  I find that the dominant types of climate-related shareholder litigation have been either (a) "event-driven" lawsuits that piggy-back off information produced in a regulatory action, or (b) lawsuits that follow detailed reports of inaccuracies by short-sellers who seek to make profits off the diminution in firm value. The analysis of existing cases suggests that although some inaccuracies in climate risk disclosures may be adequately or even excessively litigated, others that do not directly affect the firm's bottom line – such as greenhouse gas disclosures – might slip through the cracks.

***Mutiny for a Bounty** (with Joseph A. Grundfest)*, 66 ARIZ. L. REV. 191 (2024).
This project assesses the SEC's whistleblower rules, under which attorneys may collect monetary awards for privileged information disclosed to the SEC without client consent.  The SEC claims that its rules preempt state attorney-client privilege rules, and its logic could be extended to cover other types of

**EMILY N. STRAUSS**
720.393.0105    200 McAllister St, San Francisco, CA 94102    straussemily@uclawsf.edu

privilege, such as the physician/therapist-patient privilege or the priest-penitent privilege. The article questions the legal basis for such preemption and the policy underlying it.

***Suing SPACs***, 96 S. CAL. L. REV. 553 (2023); republication forthcoming in the Corporate Practice Commentator; featured in Bloomberg's Money Stuff.
This article examines the dramatic spike in litigation arising out of the recent SPAC boom. A key rationale for SPACs is to avoid the risk of securities litigation associated with the IPO process, by going public through an acquisition by a public company. Paradoxically, however, these SPACs attract a great deal of merger litigation. This paper is the first comprehensive analysis of SPAC litigation. The key finding is that various measures that proxy for the quality of SPACs, primarily redemption rates, do not appear to be positively related to the likelihood that a SPAC will be sued by investors. The article assesses potential explanations for this finding, and argues that much of the merger litigation arising from SPACs to date – particularly lawsuits brought before the merger closes – has been unmeritorious. The article further explores lawsuits arising after the merger as a more promising means of curbing misconduct by SPAC managers.

***Is Everything Securities Fraud?***, 12 U.C. IRVINE L. REV. 1331 (2022); republished in the Securities Law Review; included in the Top Ten Corporate and Securities Law Articles of 2023; featured in Bloomberg's Money Stuff, Reuters, the Business Scholarship Podcast, and the Investor Chronicle.
When a publicly traded company violates laws and regulations that are designed to protect third parties (e.g., environmental laws), the firm's shareholders often sue under the federal securities laws, on the grounds that the firm failed to appropriately disclose the risks of the violation.  This article is the first comprehensive study documenting the characteristics and prevalence of securities lawsuits based on harm to non-shareholder victims. These lawsuits are referred to as "event-driven" lawsuits, because they typically follow news about some catastrophic event (e.g., an oil spill).  I find that roughly 16.5% of securities class actions are "event-driven" cases, and that these lawsuits are less likely to be dismissed and settle for higher amounts than other securities class actions.  Although these cases have characteristics commonly used as proxies for merit, I argue that they are not necessarily desirable, and may under some circumstances encourage greater risk-taking.

***Crisis Construction in Contract Boilerplate***, 82 LAW & CONTEMP. PROBS. 163 (2019); featured in JOTWELL (Journal of Things We Like Lots) and Credit Slips (A Discussion on Credit, Finance, and Bankruptcy).
This article explores cases that emerged in the aftermath of the 2007-2009 financial crisis in which courts engaged in what I term "crisis construction:" interpreting contractual language in light of concurrent economic turmoil. Despite the plain language of contracts functionally barring recovery for fraudulent loans, in the aftermath of the crisis, court after court gave trustees of mortgage-backed securities the leverage to salvage billions of dollars in settlements from the sponsors who had sold the shoddy loans. These cases reassured investors that sponsors would be forced to stand behind their contracts, and thus potentially stabilized the market for these instruments. Crisis construction highlights law's ability to function as a macroeconomic tool in mitigating crisis conditions.

***Note, Easing Out the FCPA Facilitation Payment Exception***, 93 B.U. L. REV. 235 (2013).
This note argues that Congress should eliminate the facilitation payment exception to the Foreign Corrupt Practices Act, which allows for "grease payments" to officials to perform the tasks that are part of their duties.  Global regulatory trends are evolving against such payments, and many firms bar them as they might expose the firm to liability under extraterritorial anti-bribery regimes.  However, demands for such payments are often flatly extortionate, and US firms face higher risk of enforcement actions than issuers in other jurisdictions. I argue that the SEC and DOJ should issue guidance mitigating penalties for payments made under extortionate circumstances.

**EMILY N. STRAUSS**

720.393.0105    200 McAllister St, San Francisco, CA 94102    straussemily@uclawsf.edu

## WORKS IN PROGRESS

*IPO Gatekeeper Liability*.

Classic commentaries have argued that liability frameworks are essential to ensure that gatekeepers perform this role where reputational discipline alone is insufficient. IPOs represent a uniquely demanding context for gatekeeping: information asymmetries between issuers and investors are at their highest, and the statutory liability regime is unusually rigid. Yet, using a dataset of over 3,800 IPOs from 1997 to 2019, this study finds that gatekeeper liability under the Securities Act is largely theoretical.  Settlements paid by underwriters and auditors are exceedingly rare, even in IPOs with indicia of inadequate gatekeeping. Despite the limited role of monetary liability, the IPO process appears to function relatively well: financial restatements and bankruptcies among newly public firms are uncommon. I suggest that reputational pressures, reinforced by professional norms among lawyers that treat Securities Act liability as real and consequential, help sustain gatekeeper diligence even in the absence of meaningful monetary exposure.

## TEACHING INTERESTS

*Primary:*  Business Associations, Securities Litigation and Enforcement, Securities Regulation, Financial Institutions, Contracts

*Secondary:* Corporate Finance, Mergers and Acquisitions, Civil Procedure

## COURSES TAUGHT

**Contracts** *(Spring 2025 – Present):*  Large 1L lecture course in the foundations of contract law, including formation, terms, defenses and damages.

**Business Associations** *(Spring 2022 – Present):*  Large lecture course on the foundations of corporate law, including the organization, governance, and financing of corporations and other business forms (4 credits).

**Securities Litigation and Enforcement** *(Spring 2019 – Present):*  Seminar reviewing the general statutory and regulatory frameworks governing securities litigation and enforcement, and introducing students to the skills frequently used in this practice (2 credits) (concurrently co-taught with Andrew Verstein at Wake Forest University School of Law Spring 2019).

**Big Bank Regulation** *(Fall 2018 – Present):*  Lecture class reviewing basic principles of bank regulation, the role of large banks, their business dynamics and the risks they create (4 credits).

**Legal Analysis, Research and Writing** *(Fall 2016 – Spring 2021):*  Mandatory two-semester class for first-year law students (4 credits).

## REFEREE SERVICE

American Law and Economics Review
Northwestern University Law Review (empirical edition)

## PRESENTATIONS

NYU Law and Finance Speaker Series
University of Pennsylvania ILE Junior Scholars Workshop (9 papers accepted)

**EMILY N. STRAUSS**

720.393.0105    200 McAllister St, San Francisco, CA 94102    straussemily@uclawsf.edu

Conference on Empirical Legal Studies, Emory School of Law, University of Toronto Faculty of Law
University of Texas Business Law Workshop
Corporate Law Conference, University of Athens
Climate and Debt (Professors Quinn Curtis and Mitu Gulati), University of Virginia School of Law
(virtual)
Corporate Law at a Crossroads (commentator), University of Wisconsin
Conference Honoring *The Essential Role of Securities Regulation*, Fordham University School of Law
and Columbia Law School
UC Berkeley Law, Accounting, and Business Workshop
Vanderbilt Law and Business Workshop
American Law & Economics Association Annual Meeting, Columbia Law School
Corporate Governance (Professors Assaf Hamdani and Kobi Kastiel), Tel Aviv University
Securities Regulation (Professor Joe Grundfest), Stanford Law School (virtual)
Securities Regulation (Professor Da Lin), University of Richmond (virtual)
BYU Deals Conference, Park City
National Business Law Scholars Conference
Conference on Contractual Black Holes, Duke University School of Law
AALS Annual Meeting, Washington DC
SEALS Annual Meeting (forthcoming)

## MEDIA

Financial Climate Podcast, *Corporate and Securities Law Expert Emily Strauss on the Potential and
Limitations of Climate-Related Shareholder Lawsuits,* Nov. 22, 2023 https://www.financialclimate.fm/

Andrew Ramonas, *ESG Enforcement Emerges as Risk for Oil Firms, Bitcoin Miners*, Bloomberg, July 10,
2023, https://news.bloomberglaw.com/esg/esg-enforcement-emerges-as-risk-for-oil-firms-bitcoin-miners

Berkeley Boosts, Conversations on Civil Justice:  Climate Change Litigation, September 16, 2022,
https://executive.law.berkeley.edu/boosts/conversations-on-civil-justice-climate-change-litigation/

Business Law Podcast, *Emily Strauss on Everything as Securities Fraud,* Feb. 4, 2021,
https://andrewkjennings.com/2021/02/04/emily-strauss-on-everything-as-securities-fraud/

## EDUCATION

Boston University School of Law, Boston, MA
J.D., *magna cum laude*, May 2013
GPA:           3.87 (Class rank: 5/278)
Honors:        Dean's Awards in Securities Regulation and Trusts and Estates, Albert Pettoruto Prize
               *Boston University Law Review*, Note Development Editor; Legal Writing Fellow

Boston University, College of Arts and Sciences, Boston, MA
M.A. in International Relations, May 2013

College of William and Mary, Williamsburg, VA
B.A. with high honors in English Literature and Economics, May 2006

**EMILY N. STRAUSS**

720.393.0105    200 McAllister St, San Francisco, CA 94102    straussemily@uclawsf.edu

**PROFESSIONAL EXPERIENCE**

Sullivan & Cromwell LLP, New York, NY
*Litigation Associate*, November 2014 – June 2016
Engaged in complex civil litigation and criminal and regulatory investigations.  Substantive areas of law include securities litigation and fraud, bribery, antitrust, and employment investigations.  Responsibilities include researching and drafting expert reports and briefing for dispositive motions, drafting and responding to discovery requests, preparing for and attending depositions and witness interviews, conducting targeted investigatory reviews, and preparing materials for settlement.

Ropes & Gray Fellowship: Lawyers Without Borders, New Haven, CT
*Special Counsel*, October 2013 – October 2014

Ropes & Gray LLP, Boston, MA
*Summer Associate*, May 2012 – July 2012 (offer extended)

Office of the Massachusetts Attorney General, Boston, MA
*Intern*, Enterprise and Major Crimes Division of Criminal Bureau, June 2011 – May 2012

Changsha No. 1 High School, Changsha, China
*English Teacher*, August 2009 – July 2010

Peace Corps, Belel, Cameroon
*Education Volunteer*, June 2006 – June 2008

**LANGUAGES:**  French

**Exhibit B**

*Articles*

1.  Telis Demos et al., Twitter IPO:  Relief, Riches, and a $25 Million Finish, WALL ST. J. Nov. 7, 2022.
2.  Events Triggering a Schedule 13D or 13G Filing Chart, Practical Law Checklist 3-500-9635.
3.  Int'l Swaps & Derivatives Ass'n, Overview of OTC Equity Derivatives Markets: Use Cases and Recent Developments 2 (Jan. 2024), https://www.isda.org/a/1IhgE/Overview-of-OTC-Equity-Derivatives-Markets-Use-Cases-and-Recent-Developments.pdf.
4.  Options Price Behavior, Options Clearing Corp., https://www.optionseducation.org/referencelibrary/faq/option-price-behavior.
5.  Securities & Exchange Commission, Office of Inv. Educ. & Advoc., *Investor Bulletin: How to Read a 10-K*, https://www.sec.gov/files/reada10k.pdf.
6.  Securities & Exchange Commission, Investor.gov, *Form 10-Q*, https://www.investor.gov/introduction-investing/investing-basics/glossary/form-10-q.
7.  Securities & Exchange Commission, Mission, https://www.sec.gov/about/mission (last visited May 4, 2025).
8.  Securities & Exchange Commission, Investor.gov, *Schedules 13D and 13G*, https://www.investor.gov/introduction-investing/investing-basics/glossary/schedules-13d-and-13g

*Books*

1.  William T. Allen et al., Commentaries and Cases on the Law of Business Organization, 6th ed. (2021).
2.  Michael S. Barr et al., Financial Regulation:  Law and Policy, 3rd ed. (2021).
3.  Louis Brandeis, Other People's Money, (1914).
4.  Stephen J. Choi & A.C. Pritchard, Securities Regulation: Cases and Analysis, 6th ed. (2024).
5.  James D. Cox et al., Securities Regulation:  Cases and Materials, 10th ed. (2022).
6.  D.C. Langevoort, Selling Hope, Selling Risk: Corporations, Wall Street, and the Dilemmas of Investor Protection 2-3 (2016).

*Cases*

1.  Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 737 (1975).
2.  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 196, 96 S. Ct. 1375, 1382, 47 L. Ed. 2d 668 (1976).
3.  Herman & MacLean v. Huddleston, 459 U.S. 375, 380, 103 S. Ct. 683, 686, 74 L. Ed. 2d 548 (1983).
4.  In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959 (Del. Ch. 1996).
5.  Kardon v. Nat'l Gypsum Co., 69 F. Supp. 512, 513 (E.D. Pa. 1946).
6.  Superintendent of Insurance v. Bankers Life & Cas. Co., 404 U.S. 6, 13, n. 9 (1971).

*Miscellaneous*

1. Exhibit 60, Twitter Stock Price chart, authenticated in Defendant's responses to Plaintiffs' Request for Admission, Set Two, Request 246.
2. Exhibit 61, Tesla Stock Price chart, authenticated in Defendant's responses to Plaintiffs' Request for Admission, Set Two, Request 247.
3. NYSE, Holidays and Trading Hours, https://www.nyse.com/markets/hours-calendars.
4. NYSE Options Markets, https://www.nyse.com/options.
5. NASDAQ Stock Market Holidays and Trading Hours
6. Pacific & Atlantic Photos, Inc., Crowd of People Gather Outside the New York Stock Exchange Following the Crash of 1929 (1929), Library of Congress, https://www.loc.gov/item/99471695/.
7. Mary Jo White, Chair, SEC, Speech at the Twentieth Annual Stanford Directors' College: *A Few Things Directors Should Know About the SEC* (June 23, 2014), https://www.sec.gov/news/speech/2014-spch062314mjw.
8. Unknown photographer, Bread Line Beside the Brooklyn Bridge Approach, digital file from intermediary roll film, Farm Security Administration/Office of War Information Collection, Library of Congress, https://www.loc.gov/resource/fsa.8e01560/.

**Exhibit C**

*Figure 1*



*Figure 2*



*Figure 3*



*Figure 4*

