QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice* )
alexspiro@quinnemanuel.com
Jesse A. Bernstein (*pro hac vice*)
Jessebernstein@quinnemanuel.com
Jonathan E. Feder (*pro hac vice*)
jonathanfeder@quinnemanuel.com
Stephanie Kelemen (*pro hac vice*)
stephaniekelemen@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, NY 10016
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Joseph C. Sarles (Bar No. 254750)
josephsarles@quinnemanuel.com
Stephen A. Broome (Bar No. 314605)
stephenbroome@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

*Attorneys for Defendant Elon Musk*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br> vs.<br><br>ELON R. MUSK,<br><br>    Defendant. | Case No. 3:22-CV-005937-CRB<br><br>**DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF DAVID I. TABAK**<br><br>Judge:  Hon. Charles R. Breyer<br><br>Magistrate Judge:  Hon. Donna M. Ryu<br>Hearing Date:    October 31, 2025<br>Time:        10:00 a.m.<br>Courtroom:    6, 17th Floor |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ........................................................................................1

STATEMENT OF ISSUES TO BE DECIDED (CIVIL L.R. 7-4(A)(3)) ...................................1

SUMMARY OF THE ARGUMENT ..........................................................................................1

FACTUAL BACKGROUND .....................................................................................................2

ARGUMENT ..............................................................................................................................6

I.    DR. TABAK'S METHODOLOGY IS UNRELIABLE BECAUSE IT DOES NOT
      ISOLATE THE STOCK PRICE MOVEMENT CAUSED BY THE ALLEGED FRAUD ...........6

      A.    Dr. Tabak's Measure Of Damages Is Not Calculated By An Event Study And
            Fails To Account For Market And Industry Factors...........................................................6

      B.    Dr. Tabak Includes The Effects Of Unrelated Company-Specific Information In
            His Calculation Of Stock Decline Resulting From The Alleged Fraud..............................9

      C.    Dr. Tabak Fails To Separate Any Loss Caused By Alleged False Statements From
            Information Plaintiffs Claim Is True................................................................................10

II.   DR. TABAK'S METHODOLOGY IS UNRELIABLE BECAUSE HE IDENTIFIES NO
      CORRECTIVE DISCLOSURE...............................................................................................12

      A.    Dr. Tabak Does Not Opine That The October 4 Letter Was A Corrective
            Disclosure ......................................................................................................................12

      B.    Dr. Tabak Wrongly Assumes The July 8 Termination Letter Did Not Negate The
            Alleged False Statements ...............................................................................................15

III.  THE COURT SHOULD EXCLUDE DR. TABAK'S REMAINING OPINIONS.....................16

CONCLUSION..........................................................................................................................17

## TABLE OF AUTHORITIES

**Page**

### Cases

*In re AGS, Inc. Sec. Litig.*,
  2024 WL 581124 (D. Nev. Feb. 12, 2024), *aff'd sub nom. Oklahoma Police Pension & Ret. Sys. v. PlayAGS, Inc.*, 2025 WL 927296 (9th Cir. Mar. 27, 2025) ..............................16

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  11 F.4th 138 (2d Cir. 2021) ........................................................................................11

*Baker v. SeaWorld Ent., Inc.*,
  423 F. Supp. 3d 878 (S.D. Cal. 2019)...........................................................................7

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) ..................................................................................2, 12

*In re Diamond Foods, Inc., Sec. Litig.*,
  295 F.R.D. 240 (N.D. Cal. 2013)..................................................................................7

*In re Dothill Sys. Corp. Sec. Litig.*,
  2009 WL 734296 (S.D. Cal. Mar. 18, 2009) ...............................................................12

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S. 336 (2005)..............................................................................2, 12, 13, 14, 15

*In re FibroGen Sec. Litig.*,
  2024 WL 1064665 (N.D. Cal. Mar. 11, 2024)..............................................................12

*Glickenhaus & Co. v. Household Int'l, Inc.*,
  787 F.3d 408 (7th Cir. 2015) .......................................................................................11

*Hamilton v. State Farm Fire & Cas. Co.*,
  270 F.3d 778 (9th Cir. 2001) .......................................................................................13

*In re Imperial Credit Industries, Inc. Sec. Litig.*,
  252 F. Supp. 2d (C.D. Cal. 2003) ..............................................................................7, 9

*Kang v. PayPal Holdings, Inc.*,
  620 F. Supp. 3d 884 (N.D. Cal. 2022) (Breyer, J)......................................................17

*In re N. Telecom Ltd. Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000).......................................................................7, 8

*In re Novatel Wireless Sec. Litig.*,
  2013 WL 12144150 (S.D. Cal. Oct. 25, 2013) ..............................................................7

*Nuveen Municipal High Income Opportunity Fund v. City of Alameda*,
  730 F.3d 1111 (9th Cir. 2013) .......................................................................1, 9, 10, 13

*In re Omnicom Grp., Inc. Sec. Litig.*,
    541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) ..........................2, 12

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d at 512 ...........................................................................................................14

*In re Oracle Securities Litigation*,
    829 F. Supp. 1176 (N.D. Cal. 1993) .....................................................................1, 7, 9

*REMEC Inc. Securities Litigation*,
    702 F. Supp. 2d 1202 (S.D. Cal. 2010)..................................................................1, 10

*In re Sci. Atlanta, Inc. Sec. Litig.*,
    754 F. Supp. 2d 1339 (N.D. Ga. 2010), *aff'd sub nom. Phillips v. Sci.-Atlanta, Inc.*,
    489 F. App'x 339 (11th Cir. 2012.).....................................................................10, 11

*In re Tesla, Inc. Sec. Litig.*,
    2022 WL 7374936 (N.D. Cal. Oct. 13, 2022)...........................................................10

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)......................................................................................11

*Williams Sec. Litig.-WCG Subclass,*
    558 F.3d 1130 (10th Cir. 2009) .................................................................................14

## Statutes / Rules

CIVIL L.R. 7-4(a)(3) ..............................................................................................................1

FED. R. CIV. P. 5(b).............................................................................................................18

Fed. R. Evid. 702 ...................................................................................................................1

Rule 104................................................................................................................................2, 17

DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF DAVID I. TABAK

### NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on October 31, 2025 at 10:00 a.m., before The Honorable Charles R. Breyer, United States District Court, San Francisco Courthouse, Courtroom 6, 17th Floor, at 450 Golden Gate Avenue, San Francisco, CA, Defendant Elon R. Musk ("Defendant" or "Mr. Musk") will move for an order entering judgment on an order excluding the opinion of David I. Tabak, Ph.D., Plaintiffs' loss causation and damages expert, as unreliable under Fed. R. Evid. 702. This Motion is based on this Notice of Motion and Motion; Defendant's Memorandum of Points and Authorities, incorporated herein; the Declaration of Alex Bergjans ("Bergjans Decl.") and accompanying exhibits ("Ex."); and other matters before the Court.

### STATEMENT OF ISSUES TO BE DECIDED (CIVIL L.R. 7-4(a)(3))

Whether Plaintiffs have met their burden of proof demonstrating that Dr. David I. Tabak's opinion on loss causation and damages is sufficiently reliable to be admissible under Federal Rule of Evidence 702.

### SUMMARY OF THE ARGUMENT

The Court should exclude the unreliable expert opinion of David I. Tabak, Ph.D., Plaintiffs' loss causation and damages expert, on which Plaintiffs base an unsubstantiated and dramatically overstated claim for damages-per-share. Dr. Tabak's methodology exhibits three fatal flaws. First, he abandons event study methodology, calculating damages using raw price movements without controlling for market and industry factors, thereby violating *Nuveen Municipal High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1123 (9th Cir. 2013) (requiring experts to "reasonably distinguish" fraud impacts from "other economic factors") and *In re Oracle Securities Litigation*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993) (excluding expert who "intentionally included" non-fraud price declines). Second, his two-day window mechanically attributes Twitter's May 16 decline to the May 13 tweet without examining intervening developments—including material information that came out on May 15th—constituting impermissible *ipse dixit* reasoning under *REMEC Inc. Securities Litigation*, 702 F. Supp. 2d 1202, 1273-75 (S.D. Cal. 2010). Third, he fails to disaggregate the impact of the alleged fraud from the impact of information Plaintiffs claim was true, conflating the effect of *all* information into supposed fraud damages.

DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF DAVID I. TABAK

Dr. Tabak also dooms Plaintiffs on loss causation. Plaintiffs "plead[ed] loss causation under a corrective disclosure theory." Dkt. 48 (MTD Order) at 35. To establish the "causal connection" between the alleged fraud and the deflated stock price under this theory, Plaintiffs must show that when the alleged fraud was "corrected" and revealed to the market, Twitter's stock price increased. *Id.*; *In re BofI Holding, Inc. Sec. Litig.,* 977 F.3d 781, 789 (9th Cir. 2020) (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005)). Plaintiffs claim Mr. Musk's October 4 letter announcing his intention to close the merger was the corrective disclosure that establishes loss causation in this case. Dkt. 48 at 35. But to be "corrective," the disclosure must actually "reveal the falsity of the alleged misstatements." *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010). Fatally, Dr. Tabak admits that he ***does not opine*** that the October 4 Letter was a corrective disclosure ***at all***. To the contrary, it fails to satisfy Dr. Tabak's own standards of what a disclosure would have to convey to be correct Mr. Musk's alleged misstatements. Dr. Tabak's opinion is thus unreliable—and Plaintiffs' entire theory fails—for failing to satisfy *Dura Pharmaceuticals*' requirement to show a price reaction to the alleged misstatement and revelation of the truth. *Dura Pharmaceuticals*, 544 U.S. at 347.

Additionally, Dr. Tabak's post-July 8 damages rest on the untenable assumption that May 13 deflation persisted after Mr. Musk's Termination Letter without analyzing whether termination alone would have caused identical price movements—violating *Dura Pharmaceuticals*, 544 U.S. at 342-43 (recognizing intervening "firm-specific facts" may break causal chain). He also ignores corrective disclosures confirming the deal remained on track, which should have eliminated any residual deflation to the extent investors interpreted the May 13 Tweet to mean Mr. Musk was ceasing all work on the deal, as Plaintiffs' allege. Given these foundational flaws in Dr. Tabak's model, the Court should exclude his testimony, or alternatively, hold a Rule 104 hearing prior to trial to consider its admissibility.

## FACTUAL BACKGROUND

Plaintiffs proffered Dr. David Tabak as an expert on loss causation and damages. Dr. Tabak opines that alleged misrepresentations contained in Mr. Musk's May 13 Tweet—"Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of

DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF DAVID I. TABAK

users"—caused Twitter's stock price to fall and remain artificially deflated until the "October 24, 2022 alleged corrective disclosure." Ex. 243[1] (Tabak Supplemental Report[2]) ¶¶ 16-20.

Dr. Tabak performed his analysis in two different steps: (1) to determine loss causation, he conducted an event study that removed the impact of "market" and "industry" effects to create "predicted" results for Twitter's stock during the Class Period and (2) to calculate damages he threw out the results of his event study (*Id.* at ¶ 23 n. 13) and instead applies a novel and unprecedented "constant percentage" methodology to create the amount of artificial deflation attributable to the May 13 Tweet. *Id.* ¶ 22.

***Dr. Tabak's Loss Causation Analysis***:  Plaintiffs are pursuing a "corrective disclosure" theory of loss causation: that Mr. Musk's alleged misstatements caused Twitter's stock to become deflated and that Twitter's stock price increased once the market learned the truth.  Dkt. 31 ¶¶ 167, 175.  Consistent with that theory, Dr. Tabak's loss causation analysis examines—as it must—both the alleged fraud and the alleged corrective disclosure.  Tabak Rp't ¶¶ 17-20.

On the front end, Dr. Tabak performed an event study of Twitter's stock price during the Class Period and found that Twitter had statistically significant price drops on May 13 and May 16—but no statistically significant price drop on May 17.  *Id.* ¶¶ 17-18.  Dr. Tabak thus concluded that Mr. Musk's alleged misstatement on May 17 ("20% fake/spam accounts, while 4 times what Twitter claims, could be *much* higher.  My offer was based on Twitter's SEC filings being accurate.  Yesterday, Twitter's CEO publicly refused to show proof of <5%.  This deal cannot move forward until he does") was not an independent source of loss and attributed no damages to it.  *Id.* ¶ 17.  Dr. Tabak similarly concluded that the May 16 alleged misstatement—Mr. Musk's statements at the "All In Conference"—was not an "independent source of loss" as he had no statistical evidence that the statement made during the trading day had any "economic importance."  *Id.* ¶ 18.

Using his event study, Dr. Tabak concluded that the alleged misrepresentations contained in the May 13 Tweet caused a statistically significant drop in Twitter's stock price.  But he then opined that the

---

[1]  Deposition exhibits are marked with numbers (*e.g.*, 1-500); new exhibits in support of this motion are marked with letters (*e.g.*, A-Z).  All cited exhibits are to the Bergjans Declaration.

[2]  On July 18, 2022, Dr. Tabak submitted a Supplemental Report ("Tabak Rp't") correcting an error he discovered during his first deposition.  The Supplemental Report contains the entirety of Dr. Tabak's opinions.

DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF DAVID I. TABAK

alleged misrepresentations contained in the Tweet (sent before the trading day on May 13) caused ***100%*** of Twitter's two-day $8.52 price drop on ***both*** May 13 ***and*** May 16. Tabak Rp't ¶ 23 n. 13. In reaching his conclusion the alleged misrepresentation caused every cent of Twitter's stock price reduction over a two day period, Dr. Tabak rejected his own event study which found that some of Twitter's stock price movement on May 13, for instance, was caused by other market and industry factors. Tabak Rp't Ex. 4a.

Dr. Tabak also did not disaggregate how much of this deflation was caused by the truthful information the Tweet conveyed. Ex. A (Tabak Dep.) 86:1-87:5. For example, market analysts interpreted the May 13 Tweet as communicating that Mr. Musk was getting "cold feet" about the deal—a fact that Plaintiffs allege was the true state of affairs. Ex. 238 (Plaintiffs' Supplemental Responses to Defendant's First Set of Interrogatories), at No. 10. Dr. Tabak admitted that he did nothing to isolate how much Twitter's stock price fell on the allegedly true news that Mr. Musk was getting cold feet versus how much it fell in response to the alleged misrepresentations about his rights under the Merger Agreement. Tabak Dep. 86:1-87:4.

Dr. Tabak's opinion that misrepresentations in the May 13 Tweet caused Twitter's stock price to fall on May 16 failed to disaggregate or account for how other merger related Tweets and news may have also effected Twitter's price. For example, Mr. Musk tweeted on May 15 that the amount of bots on Twitter could be "over 90% of daily active users." Ex. 207 at 1. Dr. Tabak did not consider whether and how much this Tweet influenced Twitter's stock price decline on May 16. Tabak Dep. 113:4-16. Also on May 15, an independent data analytics firm SparkToro published a well-publicized study finding that around 20% of Twitter's active accounts were fake or spam. Ex. 206. Dr. Tabak did not consider how the market's reaction to the SparkToro study impacted Twitter's stock price the following day. Tabak Dep. 105:15-22. In fact, Dr. Tabak's opinion eschewed some of the most basic tools loss causation experts use for disaggregation. He did not rely on a single analyst report—an apparent unprecedented deviation of the generally accepted methods for determining loss causation and damages in securities cases. Ex. C (Lehn Dep.) 29:16-31:3; *see also* Tabak Dep. 165:24-166:1, 178:11-25.

On the back end, Plaintiffs contend that Mr. Musk's October 4 announcement that he would proceed to close the merger ("October 4 Letter") was a corrective disclosure that revealed the truth to the market, curing the alleged false statements contained in Mr. Musk's Tweet. Tabak Rp't ¶ 20. According

to Dr. Tabak, any corrective disclosure of the alleged misstatements in Mr. Musk's May 13 Tweet needed to include: (1) a statement that the deal was not on hold, (2) a statement that Twitter did not breach any obligations, and (3) a statement that Mr. Musk had no reason to doubt the 5% number. Tabak Dep. 24:1-15. But the October 4 Letter Plaintiffs contend was the corrective disclosure instead said:

> Musk Parties intend to proceed to closing of the transaction contemplated by the April 25, 2022 Merger Agreement, on the terms and subject to the conditions set forth therein and pending receipt of the proceeds of the debt financing contemplated thereby, provided that the Delaware Chancery Court enter an immediate stay of the action, *Twitter vs. Musk, et al.* (C.A. No. 202-0613-KSJM) (the "Action") and adjourn the trial and all other proceedings related thereto pending such closing or further order of the Court.

Ex. 191 (Oct. 4, 2022 Amend. No. 12 to 13D) at 5.

No statement that the deal was not "on hold" in May, no admission that Twitter did not breach any obligations, no reference to bots. *Compare id. with* Tabak Dep. 24:1–15. Indeed, Dr. Tabak—Plaintiffs' paid expert—***refused to opine that the October 4 Letter was a corrective disclosure at all***. Tabak Dep. 168:6-13.

**Dr. Tabak's Damages Analysis**:  After using an event study to determine loss causation, Dr. Tabak abandoned it to calculate artificial deflation (i.e., damages) during the class period. The price of a given stock can move for many reasons—broader economic trends in the market, industry factors, etc.—so experts conducting damages analyses conduct event studies to control for and remove the impact of these other non-fraud influences on a stock's price. Tabak Rp't Ex. 3 fn. 2-6.

But when calculating damages in this case, Dr. Tabak ignored his own event study. Instead, he took Twitter's raw price decline of $7.69 on May 13 and May 16 and opined that the entire drop was damages caused by Mr. Musk's Tweet. In other words, he ignored and refused to discount from his damages calculation any other market or industry factor that could have contributed to the stock price decline. He did the same for every single day of the Class Period.

Dr. Tabak invented a novel and seemingly unprecedented "constant percentage" method of calculating damages. Before Mr. Musk's May 13 Tweet, Twitter traded at $45.08—ten dollars lower than the $54.20 merger price. Tabak Rp't ¶ 22. Dr. Tabak refers to this difference as the merger discount. (*Id.*) Dr. Tabak compared the so-called merger discount on May 12 and May 16 (based on his assumption that Twitter's entire price drop on May 16 was caused by the May 13 Tweet as well), divided the $9.12

DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF DAVID I. TABAK

"discount" on May 12 by the $16.81 "discount" on May 16, and concluded that 45.7% of the discount is attributable to the alleged misrepresentation. *Id.* He then mechanically applied this percentage as a constant across the entire Class Period—taking the difference between Twitter's stock price and $54.20 and multiplying it by 0.457 to calculate deflation—except for adjustments made on August 23 and July 8 to account for statistically significant stock movements that Dr. Tabak concedes were not attributable to the alleged fraud. *Id.* at ¶¶ 23-24.

In both his initial calculation of his "constant percentage" and in its application throughout the Class Period, Dr. Tabak did not attempt to isolate the stock price decrease caused by any other factors— allegedly true statements in Mr. Musk's Tweet, stock-specific information unrelated to the alleged fraud from May 13-16, and broader market and industry news and trends—to determine damages. As a result, he claims that Mr. Musk's alleged misrepresentation caused Twitter's stock to become deflated in a range between $8.44 and $2.98, depending on the day. He cannot explain why this variation is so wide or why the deflation jumps in real terms months after the alleged misstatement.

Dr. Tabak did not offer any scientific or statistical explanation for rejecting his own event study and deviating from accepted principles and methods for calculating damages. Instead, he claims he was being "conservative," noting that his event study's adjusted stock decline for May 13-16 ($8.52) is greater than the raw, unadjusted stock decline in his damages analysis ($7.69). Tabak Rp't ¶ 23 fn. 13. But that is only a product of Dr. Tabak's decision to claim the alleged misrepresentations were responsible for Twitter's price decline over two days. His event study's adjusted stock price decline of $5.94 on May 13 is less than the $6.17 raw, unadjusted price decline.

## ARGUMENT

### I.    DR. TABAK'S METHODOLOGY IS UNRELIABLE BECAUSE IT DOES NOT ISOLATE THE STOCK PRICE MOVEMENT CAUSED BY THE ALLEGED FRAUD

#### A.    Dr. Tabak's Measure Of Damages Is Not Calculated By An Event Study And Fails To Account For Market And Industry Factors

One of the foundational rules of any securities fraud loss causation and damages analysis is that an expert cannot just point to a raw, unadjusted stock price change and attribute all of it to fraud. An event study—which isolates stock price movement attributable to an alleged misstatement from other confounding factors, like truthful company-specific news or other market events—is the standard and

"often necessary" method to analyze loss causation and damages attributable to the fraud. *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 248 (N.D. Cal. 2013) ("The most common empirical test for a causal connection is an event study, which attempts to calculate the effect of an event on the value of the stock of a company."); *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 899 (S.D. Cal. 2019) ("The use of an event study is often necessary to provide an evidentiary basis for a reasonable jury to determine the existence of loss causation and damages") (citations omitted).

On the other hand, using the raw stock price drop rather than an event study to compute damages risks conflating market and industry factors with the misstatement's effect and is presumptively unreliable. *In re Novatel Wireless Sec. Litig.*, 2013 WL 12144150, at *5 (S.D. Cal. Oct. 25, 2013) ("The absence of an event study for damages, in particular, will result in summary judgment in favor of defendants."); *In re Imperial Credit Industries, Inc. Sec. Litig.*, 252 F. Supp. 2d, 1005, 1015 (C.D. Cal. 2003) ("The importance and centrality of the event study methodology in determining damages in securities cases— and the propriety of rejecting expert damages reports which do not use such a methodology—has been conceded by plaintiffs in other securities fraud cases."); *see also In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993) ("Use of an event study or similar analysis is necessary more accurately to isolate [sic] the influences of information specific to [the company] which defendants allegedly have distorted"); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 460 (S.D.N.Y. 2000) (finding expert's testimony "fatally deficient in that he did not perform an event study or similar analysis to remove the effects on stock price of market and industry information").

Stunningly, Dr. Tabak's analysis does just that. Tabak Dep. 134:3-13. Although Dr. Tabak uses an event study to identify statistically significant movements in Twitter's stock price, he does not use the May 13 abnormal return from that study to calculate loss. Instead, when quantifying how much stock price decline the May 13 alleged misrepresentation caused, he dispenses with any analysis at all. He credits the entire raw, unadjusted stock price decline over two days to Mr. Musk's alleged misstatement. Tabak Rp't ¶ 22, fn. 13. To be clear: Dr. Tabak notes that Twitter's price fell from $45.08 on May 12 to $37.39 on May 16, a drop of $7.69, and concludes that the alleged misstatement ***caused the entire $7.69 drop***. *Id.* He does this despite knowing that his own event study found that at least a portion of Twitter's

stock price decline on May 13 was caused by market and industry factors.  *Id.* at Ex. 4a, Ex. 5b-SUPP (raw stock price drop of $6.17 compared to stock price drop of $5.94 in event study).

Dr. Tabak then takes this method and applies it to every day of the Class Period.  Instead of using his event study to determine how much of Twitter's stock price is augmented by the alleged fraud compared to other factors, Dr. Tabak just takes $54.20, subtracts the raw stock price, and then multiplies that number by 0.457.  *Id.* ¶ 22, Ex. 5a-SUPP.  So for each day in the Class Period after May 16, Dr. Tabak's model is "fatally deficient in that he did not perform an event study or similar analysis to remove the effects on stock price of market and industry information" to isolate how much economic loss is attributed to the alleged misrepresentations alone.  *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d at 460.  This approach is not a statistical analysis based on some recognized scientific method or principle; it is superficial elementary school arithmetic designed to goose a high damages award.

Dr. Tabak attempts to justify his arbitrary rejection of his own event study as an attempt to be "conservative."  Tabak Rp't ¶ 22, fn. 13.  But this is only true when the raw stock price decline under Tabak's methodology ($7.69) is compared to the *two-day* (May 13-16) event study amount of $8.52.  *Id.* at Ex. 4a, Ex. 5b-SUPP.  As noted above, if only the *one-day* May 13 event study amount ($5.94) is considered, then the event study amount is actually *less* than the $6.17 under Tabak's chosen methodology. *Id.*  Thus, Tabak's "conservatism" argument fails to justify his decision to use bare stock price decline to compute damages rather than his event study.  Furthermore, Dr. Tabak not only fails to justify his calculation of deflation on all days after May 16 without using an event study, he opines that his inclusion of the effects of market and industry factors on those days is *by design*.[3]  Tabak Dep. 134:11-13, 138:23-139:15.  By intentionally including price declines he knows to be attributable to other market and industry factors in his damages calculation, Dr. Tabak has presented an opinion that is unreliable as a matter of law.  *See In re Oracle Sec. Litig.*, 829 F. Supp. at 1181 (expert's analysis unreliable where it "fail[ed] to

---

[3]  Dr. Tabak claims that his decision to award more damages to a class member who happened to sell on a day when the NASDAQ was lower is justified since, according to him, the industry and market effects had a larger impact on Twitter's stock due because the alleged misstatements supposedly increased the risk the merger would not close.  Tabak Dep. 138:23-139:15; 142:2-10.  He did nothing to test that hypothesis (which is absent from his report).  *Id.*  144:6-14.  And his untested assumption ignores that market changes and industry effects could themselves impact the likelihood of the merger closing.

DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF DAVID I. TABAK

distinguish between the fraud-related and non-fraud related influences on the stock's price behavior."); *In re Imperial Credit Industries, Inc. Sec. Litig.*, 252 F. Supp. 2d, at 1014-15 ("A proper measure of damages in the securities context thus requires elimination of that portion of the price decline or price difference which is unrelated to the alleged wrong.").

**B.      Dr. Tabak Includes The Effects Of Unrelated Company-Specific Information In His Calculation Of Stock Decline Resulting From The Alleged Fraud**

Dr. Tabak's decision to attribute Twitter's entire stock drop over two trading days—which sandwiched a weekend that generated Twitter-merger related news—to alleged misstatements made in the May 13 Tweet lacks a sound scientific basis and is contrary to Ninth Circuit law.

Dr. Tabak admits that Twitter's securities trade in an efficient market and, accordingly, information like the May 13 Tweet is "rapidly" reflected in the stock price. Tabak Dep. 104:8-14. Consistent with this assumption, experts typically employ a one-day window to examine the price impact new information may have on a stock. Lehn Dep. 165:19-168:8. Here, Dr. Tabak deviates from this standard practice and uses a two-day trading window to gauge the price reaction to Mr. Musk's May 13 Tweet. Tabak Rp't ¶ 20. He claims his departure from the generally accepted method is justified because his event study observed a statistically significant price decline on both May 13 and May 16, and his standard practice is to continue the window through the last trading day with a statistically significant price movement. Tabak Dep. 195:17-196:21.

But Dr. Tabak's approach is based a faulty assumption that he did not even bother to test: that no new, critical or material stock-specific information became public over the weekend between the close of trading on May 13 and the market's open on May 16 that could have caused the statistically significant price reaction on the second day. His approach is contrary to law. "Because there are a tangle of factors" that may affect stock price, "evidence that certain misrepresented risks are responsible for a loss must reasonably distinguish the impact of those risks from other economic factors." *Nuveen,* 730 F.3d at 1123.

Dr. Tabak made no attempt to distinguish the impact of *any news* released between the close of trading on May 13 and the opening bell on May 16. He did not consider that either Mr. Musk's May 15 Tweet that bots may account for "over 90% of daily active users" on Twitter or SparkToro's same-day publication of its detailed study showing that around 20% of Twitter's active accounts were fake or spam

could have had a material impact on Twitter's stock price on May 16. Tabak Dep. 109:3–110:6; 105:1–106:7. Dr. Tabak did not consider these events because **he did not even know they existed until his deposition**. Tabak Dep. 105:15-22. Nor did he apparently consider whether the market reacted to Mr. Musk's after hours Tweet on May 13 that Twitter used a 100-user sample to calculate spam (information that Twitter contended had not previously been made public). *See* Ex. D.

It might be one thing if Dr. Tabak studied these events and ruled out their price impact. *See In re Tesla, Inc. Sec. Litig.*, 2022 WL 7374936, at *10 (N.D. Cal. Oct. 13, 2022) (declining to exclude where expert examined "approximately 2,400 articles published during the Class Period to identify" and rule out any company-specific information that could impact stock price). But here, he just assumed—based on no research or analysis—that Mr. Musk's May 13 Tweet alone caused the entire May 16 stock price drop. There can be no argument that Dr. Tabak did anything to "reasonably distinguish the impact" of the alleged fraud "from other economic factors." *See Nuveen*, 730 F.3d at 1123. His use of the two-day window is thus fatally unreliable. *See REMEC*, 702 F. Supp. 2d at 1273-75 (excluding damages expert who failed to disaggregate between inflation caused by misrepresentation as opposed to other information).

This error infects every cent of damage in Dr. Tabak's model. Dr. Tabak calculated his "constant percentage" of deflation based on the assumption that alleged misrepresentations made in the May 13 Tweet caused all stock price decline on May 16 and applied that number throughout the Class Period. Accordingly this methodology provides no avenue for the jury to eliminate the statistically significant stock price movement on May 16 from damages **on any day during the Class Period** if it concludes that the decline on this date was not attributable to the May 13 Tweet. This error alone dooms Dr. Tabak's entire model and opinion. *See REMEC*, 702 F. Supp. 2d at 1273-75.

## C. Dr. Tabak Fails To Separate Any Loss Caused By Alleged False Statements From Information Plaintiffs Claim Is True

Dr. Tabak's methodology suffers from another glaring disaggregation flaw. Dr. Tabak is required to "disentangle the effect of" the allegedly fraudulent information contained in the May 13 Tweet from any truthful information it also conveyed. *In re Sci. Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1379 (N.D. Ga. 2010), *aff'd sub nom*. *Phillips v. Sci.-Atlanta, Inc.*, 489 F. App'x 339 (11th Cir. 2012). Here, analysts interpreted Mr. Musk's Tweet as a statement that he was getting "cold feet" about the deal—

which is exactly what Plaintiffs contend was the true state of affairs as of May 13.  Ex. 238 at No. 10; Tabak Dep. 17:2-17, 33:20-34:1.  But Dr. Tabak admitted that he did not calculate or attempt to disaggregate the price impact of the Tweet's allegedly true message that Mr. Musk was apprehensive about closing from its alleged false statement that Mr. Musk had a right to spam information.[4]  Tabak Dep. 86:1-87:4.  Thus, his analysis "provides no method by which a jury can determine how much, if any, of Plaintiffs' loss is attributable to" Mr. Musk's allegedly truthful statement versus his allegedly untruthful statement.  *In re Sci. Atlanta*, 754 F. Supp. 2d at 1379.

As a result, Dr. Tabak's model does not even try to answer relevant question: what the stock price would have been had Mr. Musk disclosed on May 13th what Plaintiffs contend is the truth about the status of the deal.  *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 417 (7th Cir. 2015) ("The amount of inflation caused by a false statement is the difference between the stock price after the false statement and what it *would have been* had the statement reflected the truth. What the model measures is the effect the truth would have had on the price.") (emphasis in the original); *In re Vivendi, S.A. Sec. Litig.,* 838 F.3d 223, 258 (2d Cir. 2016) ("[T]he proper question for purposes of our inquiry into price impact is not what might have happened had a company remained silent, but what would have happened if it had spoken truthfully."); *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 11 F.4th 138, 141 n.3 (2d Cir. 2021) ("[P]rice inflation is measured by what would have happened if the defendant had told the truth.").

Dr. Tabak did not even take the first step in this analysis.  He has no opinion on what a fully corrective statement would have been on May 13.  Tabak Dep. 28:22-29:23.  Dr. Tabak simply assumes the market was reacting only to the alleged false information contained in the May 13 Tweet.  *Id.*  But he offers no foundation for his opinion on *what* part of the Tweet the market reacted to—Mr. Musk's cold feet or an allegedly false description of his rights.  In what may be a first in a securities class action, Dr. Tabak does not cite to a single analyst report to support his opinions (*Id.* 178:1-15) even though he concedes they are often useful for things such as "additional disaggregation."  *Id.* 178:22-23.  Without engaging in the necessary qualitative analysis to identify what information the market focused on, he

---

[4]  In its Motion to Dismiss Order, the Court found that the alleged "misrepresentation" in the May 13th tweet was Mr. Musk's claim that he was entitled to Twitter's bot calculation information. (Order Granting in Part and Denying in Part Mot. To Dismiss at 20.)

DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF DAVID I. TABAK

cannot offer a reliable opinion on what Twitter's but-for stock price would have been if Mr. Musk made a completely truthful statement. His analysis implicitly admits this flaw since it assumes (by crediting the entire two-day stock drop to Mr. Musk's alleged misstatement) that Twitter's stock price have been the same on May 16 as it was at the close on May 12 had Mr. Musk truthfully tweeted "I have cold feet about the Merger"—an absurd position contradicted by the weight of the evidence.

## II.    DR. TABAK'S METHODOLOGY IS UNRELIABLE BECAUSE HE IDENTIFIES NO CORRECTIVE DISCLOSURE

### A.    Dr. Tabak Does Not Opine That The October 4 Letter Was A Corrective Disclosure

As the Court recognized, Plaintiffs "plead[ed] loss causation under a corrective disclosure theory" and to "support [] the causal connection between the misstatements and depressed nature of the prices, Plaintiffs allege[d] that when Defendant's 'prior misrepresentations and fraudulent conduct" were disclosed to the market on October 4, 2022, the price of Twitter securities thereafter 'increased precipitously." Dkt. 48 at 35. Plaintiffs repeated this theory *31 times* in their responses to Mr. Musk's contention interrogatories. Ex. 238; Ex. E.

Thus, "[t]o establish loss causation" under their pleaded theory, Plaintiffs must show that after purchasing securities "the truth became known" in a corrective disclosure. *In re BofI Holding, Inc. Sec. Litig.,* 977 F.3d 781, 789 (9th Cir. 2020) (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005)). And in order to be "corrective" and satisfy *Dura Pharmaceuticals*, the disclosure must actually "reveal the falsity of the alleged misstatements." *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010); *see also In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *13 (N.D. Cal. Mar. 11, 2024) (agreeing with defendants that the allegedly corrective disclosure "fails both because it is not 'corrective' and because it is not 'new'"); *In re Dothill Sys. Corp. Sec. Litig.*, 2009 WL 734296, at *14 (S.D. Cal. Mar. 18, 2009) ("A disclosing event which does not actually disclose the falsity of the alleged misrepresentations is inadequate.").

Here is Plaintiffs' problem: Dr. Tabak's opinion and loss causation model ignores their theory altogether. Although Plaintiffs pleaded that the October 4 Letter was a corrective disclosure, Dr. Tabak testified that "I have not done an independent analysis, nor am I giving an independent opinion" as to

DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF DAVID I. TABAK

"whether the October 4th, 2022, statement is corrective of the May 13th tweet." Tabak Dep. 168:6-13. Indeed, Dr. Tabak identifies *no corrective disclosure at all*.

For good reason. By Dr. Tabak's own account, any statement correcting the alleged May 13 misstatement must contain three critical components: (1) a statement that the deal was not on hold—although Dr. Tabak does not define "on hold" or offer any opinion as to what the market interpreted that phrase to mean, Tabak Dep. 13:24-14:5; (2) a statement that Twitter did not breach any obligations; and (3) a statement that Mr. Musk had no reason to doubt the 5% number. Tabak Dep. 24:1-15. He admitted that the October 4 Letter did not include two of his three components: it did not state Mr. Musk was not entitled to the bots information or that the proportion of bots was less than 5 percent. Tabak Dep. 166:13-18. The Court should therefore exclude Dr. Tabak's loss causation opinion because it does not show loss causation under the law and Plaintiffs' own theory.

Acknowledging that there is no factual basis for Plaintiffs' "corrective disclosure" theory, Dr. Tabak instead argues that in a seller's case Plaintiff need not prove that the revelation of the fraud caused its loss. Tabak Rp't ¶ 11. But the Court relied on Plaintiffs' "corrective disclosure" arguments in denying Mr. Musk's motion to dismiss, so Plaintiffs are estopped from changing theories. *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001). Dr. Tabak is also wrong as a matter of law. While it may be the case under a deflation theory that sellers suffered a loss before the revelation of the fraud, *Dura Pharmaceuticals* holds that proving loss causation requires that a plaintiff not only show a price reaction to the alleged fraud but a corresponding reaction when the truth is revealed. 544 U.S. at 347. That makes sense. Under *Dura Pharmaceuticals*, if a stock allegedly becomes artificially inflated by fraud but its price collapses for reasons unrelated to the fraud, a plaintiff has no claim because it is those unrelated reasons that caused the harm. *Id.* The same logic applies in a seller's case: if a depressed stock rises for reasons unrelated to the fraud then it is those unrelated reasons that caused the deflation and harm—not the alleged misrepresentation. *Id.*

And *Nuveen*—the case Dr. Tabak cites to support his contention that he need not show a back-end reaction to the revelation of fraud (Tabak Rp't ¶ 11 (quoting MTD Order))—expressly rejected the loss causation theory Dr. Tabak advances. *Nuveen*, 730 F.3d at 1121 ("We have consistently rejected loss causation arguments like Nuveen's—that a defendant's fraud caused plaintiffs a loss because it 'induced

them to buy the shares'—because the argument 'renders the concept of loss causation meaningless by collapsing it into transaction causation.'").

Were that not enough, Dr. Tabak's opinion is also unreliable because he ignores that the alleged truth revealed in the October 4 Letter—that the deal was not "on hold"—had already been revealed months before. "A plaintiff cannot simply state that the market had learned the truth by a certain date and, because the learning was a gradual process, attribute all prior losses to the revelation of the fraud." *Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1138 (10th Cir. 2009). Here, Dr. Tabak admits that statements by Twitter's Chief Legal Officer, Mr. Musk (and his lawyers), and Plaintiffs' counsel that the deal was proceeding did not cause a statistically significant stock reaction. Tabak Dep. 60:10-21. As Dr. Tabak acknowledges, that indicates that that the market did not view the revelations that the deal was proceeding (and not, in fact, halted in its tracks) as material or new information. *See, e.g.*, Tabak Dep. 56:9-13. Although he opines that "on hold" was a misstatement that caused economic loss and needed to be corrected, Dr. Tabak has no opinion why these disclosures were immaterial to investors. *Id.* 59:3-9.

This exposes the results-oriented incoherence of his opinion that the market reaction to the October 4 letter was a response to the revelation that the deal was not, in fact, on hold on May 13 and proves this alleged misstatement caused loss. If the market did not view these earlier statements that the deal was not on hold as material, why would the October 4 disclosure be any different? Dr. Tabak provides no answer. Because Dr. Tabak does not account for these pre-October 4 disclosures and instead "attribute[s] all prior losses to the [purported] revelation of the fraud" on October 4, his loss causation opinion in fundamentally flawed and unreliable. *Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130 at 1138. After all, a statement that merely repeats information already known to the market cannot be a "corrective disclosure" that establishes loss. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d at 512.

In sum, Dr. Tabak confirms that Plaintiffs' theory of corrective disclosure is convoluted and misguided. Dr. Tabak provides no basis for Plaintiffs to show that the October 4 Letter remediates the alleged falsehood in the May 13 Tweet while earlier events and information such as the "still committed" Tweet and publicly accessible Merger Agreement would not. By his own admission, he does not establish that the "truth became known" when Plaintiffs claim it did. *Dura Pharmaceuticals*, 544 U.S. at 347.

**B.    Dr. Tabak Wrongly Assumes The July 8 Termination Letter Did Not Negate The Alleged False Statements**

The Supreme Court recognized in *Dura Pharmaceuticals* that "the logical link between the [augmented] share purchase price and any later economic loss is not invariably strong" and "that the price of a security impacted by fraud may reflect, not the earlier misrepresentation, but changed economic circumstances, ***changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events***, which taken separately or together account for some or all of that lower price." *Dura Pharmaceuticals*, 544 U.S. at 342-343. "[T]he longer the time between purchase and sale, the more likely that this is so, *i.e.,* the more likely that other factors caused the loss." *Id.* at 343.

The logic of *Dura* applies with equal force to deflation-based seller actions, as demonstrated by the following hypothetical: Consider Company Y, whose stock trades amid rumors that it is in talks to be acquired by Company X. On Day 1, Company Y states that it is not being acquired by Company X and falsely denies any acquisition talks, causing its stock to decline. Investors sell at the deflated price. On Day 2, Company X announces its acquisition of Company Z, rendering any Company Y acquisition virtually impossible. Company Y's stock experiences no reaction because the market already assumed no deal existed. On Day 3, Company X confirms it had pursued both targets before selecting Company Z— proving Company Y's Day 1 denial of acquisition talks was fraudulent. Yet this corrective disclosure generates no stock movement because intervening events rendered the misrepresentation economically irrelevant. Critically, Day 1 sellers can now repurchase Company Y stock at precisely their sale price, suffering no economic loss despite full revelation of the fraud. This scenario illustrates the inverse application of *Dura*'s principles: just as intervening events can break the causal chain between inflated purchase prices and subsequent losses in buyer actions, they can equally sever the nexus between deflated sale prices and alleged damages in seller actions.

In this case, there was a significant Twitter-specific event that impacted Twitter's share price between May 13 and October 4 and may have broken the causal chain between any alleged May 13 misrepresentation and Twitter's stock price: Mr. Musk's July 8 Termination. But Dr. Tabak conducted no analysis to rule out that the Termination alone caused Twitter's post-July 8 stock price swoon. Indeed, Dr. Tabak admits that he has no opinion regarding whether Twitter's stock would have fallen to the exact

-15-                                                        Case No. 3:22-cv-05937-CRB
DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF DAVID I. TABAK

same level it fell to following the July 8 Termination Letter *regardless* of whether Mr. Musk ever made any alleged misrepresentation.  Dep. 158:4-10; 37:5-16.

Dr. Tabak admits that if Twitter's stock would have fallen to the same price once Mr. Musk terminated the deal, whether or not he made the May 13 Tweet, then his model wrongly awards damages to all investors who sold Twitter stock after July 8.  Ex. B (Tabak Dep. Vol. II) 15:10-16:6.  But Dr. Tabak has no basis for concluding that was not the case.  His failure to consider any analyst reports prevents him from concluding that the market layered the effects of the May 13 Tweet on top of its assessment of the July 8 Termination Letter's impact on the likelihood the deal would close.  Dr. Tabak's post-July 8 damages opinions rest on the assumption that investors, on the one hand, were skeptical after reading the July 8 Termination Letter that Mr. Musk could actually terminate the deal, but, on the other, gave the deal a higher chance of failing after July 8 because of Mr. Musk's two-month-old Tweet (and not the fact that he actually purported to terminate).  That is illogical and pure *ipse dixit*.  Without considering—and offering a reliable basis to reject—that Twitter's post-termination stock price would not have been any different had Mr. Musk never tweeted on May 13, he provides no reliable basis for his deflation figures and damages after July 8.

## III.    THE COURT SHOULD EXCLUDE DR. TABAK'S REMAINING OPINIONS

In addition to the above, Dr. Tabak purported to calculate damages caused by the July 8 Termination Letter under Plaintiff's purported "scheme liability" claim and damages suffered by options holders.  The Court should exclude both.

*First*, as discussed in Defendant's Motion for Summary Judgment, Plaintiffs cannot pursue any claim based on the July 8 Termination Letter because (1) Plaintiffs did not plead scheme liability and (2) the Court expressly dismissed "Plaintiffs' claims to the extent they are predicated on all other challenged statements"—including the July 8 Termination Letter.  Dkt. 48 at 39, 27-28 (noting that while "Plaintiffs also generally allege that Defendant's motive in sending letters requesting data was to create uncertainty and the requests were a 'ruse' . . . Plaintiffs do not point to an objectively verifiable affirmative statement or misleading omission"); *see also In re AGS, Inc. Sec. Litig.*, 2024 WL 581124, at *5 (D. Nev. Feb. 12, 2024), *aff'd sub nom. Oklahoma Police Pension & Ret. Sys. v. PlayAGS, Inc.*, 2025 WL 927296 (9th Cir. Mar. 27, 2025) ("Logically then, if a plaintiff's scheme liability claim is based on the same alleged set of

facts as its misrepresentation claim, and the court finds that those facts do not sufficiently allege fraud (with the requisite scienter) to sustain the misrepresentation claim, the scheme liability claim necessarily fails."); *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 902 (N.D. Cal. 2022) (Breyer, J.) (similar).

*Second*, Dr. Tabak's options damages are derived from the same flawed methodology supporting his stock price loss causation and damages opinions. Tabak Rp't ¶ 28. They are therefore unreliable and inadmissible for the same reasons.

## CONCLUSION

Defendant respectfully requests that the Court grant this motion to exclude the opinions of Dr. David I. Tabak, or, in the alternative, hold a Rule 104 hearing to determine their admissibility.

DATED:  August 15, 2025

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  /s/ Jesse A. Bernstein
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Jesse A. Bernstein

*Attorneys for Defendant Elon Musk*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on this the 15th day of August, 2025.

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By  /s/ Alex Bergjans
    Alex Spiro
    Michael T. Lifrak
    Stephen A. Broome
    Jesse A. Bernstein

    *Attorneys for Defendant Elon Musk*

DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF DAVID I. TABAK

## ATTESTATION

Pursuant to Civil L.R. 5-1, I attest under penalty of perjury that concurrence in the filing of this document has been obtained from the other signatories herein.

By  /s/ Alex Bergjans
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Jesse A. Bernstein

*Attorneys for Defendant Elon Musk*

DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF DAVID I. TABAK