# EXHIBIT 238

K. Lehn
07.30.25

**Exhibit 238**

Kelly J. Lawton

**COTCHETT, PITRE & MCCARTHY, LLP**
Joseph W. Cotchett (SBN 36324)
jcotchett@cpmlegal.com
Mark C. Molumphy (SBN 168009)
mmolumphy@cpmlegal.com
Tyson C. Redenbarger (SBN 294424)
tredenbarger@cpmlegal.com
Elle D. Lewis (SBN 238329)
elewis@cpmlegal.com
Gia Jung (SBN 340160)
gjung@cpmlegal.com
Caroline A. Yuen (SBN 354388)
cyuen@cpmlegal.com
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN: 175783)
fbottini@bottinilaw.com
Albert Y. Chang (SBN 296065)
achang@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001

*Lead Counsel for Plaintiffs and the Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>      vs.<br><br>ELON R. MUSK,<br><br>        Defendant. | **CASE NO. 3:22-CV-05937-CRB**<br><br>**PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST SET OF INTERROGATORIES (NOS. 1-12)** |

**PROPOUNDING PARTY:**        **ELON MUSK**

**RESPONDING PARTY:**        **PLAINTIFFS**

**SET NUMBER:**        **ONE**

Case No: 3:22-CV-05937-CRB

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

Pursuant to Federal Rule of Civil Procedure ("FRCP") 36, and the Local Rules of the United States District Court for the Northern District of California, Plaintiffs, Brian Belgrave, John Garrett, and Nancy Price, hereby respond to Interrogatories, Set One, propounded by Defendant Elon Musk, as follows:

## PRELIMINARY STATEMENT

All of the responses contained herein are based only upon such information and documents which are presently available and specifically known to this responding party who disclosed only those contentions and documents which presently occurred to such responding party. It is anticipated that further discovery, independent investigation, legal research, and analysis may supply additional facts, add meaning to the new facts, as well as establish new factual conclusions, legal conclusions, and legal contentions, all of which may lead to substantial additions to, changes in, and variations from the contentions and disclosures herein set forth.

The following responses are given without prejudice to the responding party's right to produce evidence of any subsequently discovered facts or documents which this responding party may later discover or recall. The responding party accordingly reserves the right to change any and all responses herein as additional facts or documents are ascertained and/or recalled and analyses thereof are made.

Plaintiffs incorporate by reference each and every general objection set forth into each and every specific response. From time to time, a specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response shall not be interpreted as a waiver of any general objection to that response.

The responses contained herein are made in a good faith effort to supply as much factual information as is presently known, but should in no way be to the prejudice of this party in relation to further discovery, research, investigation or analysis.

1                                                                    Case No: 3:22-CV-05937-CRB

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

## GENERAL OBJECTIONS APPLICABLE TO ALL INTERROGATORIES

Plaintiffs generally objects to the Interrogatories on the following grounds, each of which is expressly incorporated by reference in the responses to the individual interrogatories below. All individual responses set forth herein are subject to and without waiver of any of these General Objections:

1.      Plaintiffs object to the Interrogatories to the extent that they purport to impose any obligations upon Plaintiffs that are not imposed by law, or are otherwise inconsistent with the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Northern District of California, and any other applicable law.

2.      Plaintiffs object to the Interrogatories to the extent they seek information that is beyond the scope of permissible discovery.

3.      Plaintiffs object to the Interrogatories to the extent they seek information that can be found in the pleadings and other court filings.

4.      Plaintiffs object to the Interrogatories to the extent they seek communications, information and/or documents protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, protection, immunity, or doctrine.  Plaintiffs hereby assert all applicable privileges and protections, and exclude privileges information from their responses to the Interrogatories.  Any disclosure or such privileged information is inadvertent and is not intended to waive those privileges, doctrines, and protections.

5.      Plaintiffs object to each Definition and Instruction to the extent each imposes on Plaintiffs any obligation beyond what is required by the Federal Rules of Civil Procedure, the Local Rules of the Northern District of California, and any other applicable law.

6.      Plaintiffs object to the Interrogatories to the extent that they are overbroad, unduly burdensome and oppressive in that they would require a search for information that would be of little or no benefit with respect to the issues or controversies in this Action, such that the value of the information would be far outweighed by the burden of obtaining them.

Case No: 3:22-CV-05937-CRB

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

7.     Plaintiffs object to the Interrogatories to the extent they call for a legal conclusion, a legal argument, or are invasive of the attorney work product doctrine.

8.     By responding to the Interrogatories, Plaintiffs do not concede the relevancy, materiality, or admissibility as evidence of any of the information sought.

9.     No objection, limitation, response, or lack thereof made in these Objections and Responses is intended as an admission by Plaintiffs as to the existence or non-existence of information responsive to the Interrogatories.

10.     Plaintiffs object to the Interrogatories and to each and every instruction, definition, and request therein to the extent that they call for the production of information readily available through public sources, or form sources that are more convenient, less burdensome or less expensive.

11.     Plaintiffs' objections are provided without prejudice to its right to produce evidence of any subsequently discovered facts or any facts that it may later recall, and with express rights to revise, correct, supplement, or clarify any objections or responses set forth herein at a later time.

12.     The failure of Plaintiffs to make a specific objection to a particular Interrogatory is not, and shall not be construed as, an admission that responsive information exists. Likewise, any statement herein that Plaintiffs will provide information in response to an individual Interrogatory does not mean that Plaintiffs in fact has any such information, or that any such information exists. Rather, any such statement reflects the intention of Plaintiffs, subject to their objections, to conduct a reasonable search for responsive information.

13.     In providing information in response to the Interrogatories, Plaintiffs do not in any way waive, or intend to waive, but rather intends to preserve and is preserving:

a.     all objections as to competency, relevancy, materiality, authenticity, or admissibility of any Interrogatory, responses or their subject matter;

3                     Case No: 3:22-CV-05937-CRB
PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

b.      all objections as to vagueness, ambiguity, or other infirmity in the form of the Interrogatories, any objections based on the undue burden imposed by the Interrogatories and each individual request contained therein;

c.      all rights to object on any ground to the use of any of the information or its subject matter in any subsequent proceedings, including the trial of this or any other action;

d.      all rights to object on any ground to any further interrogatories or other discovery requests involving or related to the subject matter of any Interrogatory;

e.      all rights to revise, correct, supplement, or clarify any of the responses set forth herein at a later time; and

f.      any and all privileges and rights under applicable law, including but not limited to, the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Northern District of California, other statutes, guidelines and common law.

14.      Plaintiffs object to the Interrogatories to the extent they request that Plaintiff generate or create documents that did not previously exist (*e.g.*, lists, charts, etc.).

15.       Plaintiffs reserve the right to amend, modify, and supplement these responses should additional discovery warrant such amendment, modification or supplementation.

16.      The inadvertent production or revelation of privileged or otherwise protected information shall not be deemed to waive the privilege or protection with respect to such documents or information or any other documents or information.

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

1.      Plaintiffs object to the Interrogatories' Definitions and Instructions to the extent they (i) impose on Plaintiffs conditions and obligations that exceed or are inconsistent with those set forth in the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Northern District of California, or any other applicable statutes, rules, or laws; (ii) depart from the customary meaning of any term or provide definitions that are inaccurate; or (iii) are based on premises that are misleading, inaccurate, or incomplete.

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST SET OF INTERROGATORIES (NOS. 1-12)

2.    Plaintiffs object to the Interrogatories' Definitions and Instructions to the extent they incorporate purported facts.  Plaintiffs do not adopt or confirm the accuracy of any purported facts incorporated in the Definitions and Instructions.

3.    Plaintiffs object to the definitions of "Concerning" and "identify" on the grounds that they are overbroad, vague, ambiguous, unduly burdensome, and not proportional to the needs of the case, and to the extent that those definitions purport to impose obligations on Plaintiffs that exceed or are inconsistent with those set forth in the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Northern District of California, or any other applicable statutes, rules, or laws.  Plaintiffs further object to the extent the definitions purport to require Plaintiffs to produce irrelevant information or information unknown to Plaintiffs.

4.    Plaintiffs object to all Instructions (whether or not repeated for emphasis) to the extent they purport to impose obligations on the Plaintiffs that exceed or are inconsistent with those set forth in the Federal Rules, the Local Rules, or any other applicable statutes, rules, or laws.

### SPECIFIC RESPONSES AND OBJECTIONS TO INTERROGATORIES

Subject to and without waiver of the foregoing General Objections and Objections to Definitions and Instructions, which are incorporated into each response below whether or not repeated for emphasis, and the specific objections set forth below, and expressly stating that their responses are subject to all such objections, Plaintiffs respond to each specific Interrogatory as follows.

**INTERROGATORY NO. 1:**

Describe in detail—including by identifying specific provisions of the Merger Agreement and any other public documents—all reasons why the Merger Agreement did not give Defendant the right to the Bot Data as a condition to closing the Merger.

5                    Case No: 3:22-CV-05937-CRB
PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

**RESPONSE TO INTERROGATORY NO. 1:**

In addition to the General Objections listed above, Plaintiffs object to this Interrogatory on the grounds that it is overbroad, vague, ambiguous, and unduly burdensome and imposes obligations and burdens beyond those permitted by the Federal Rules of Civil Procedure and the Local Rules of the Northern District of California. Plaintiffs also object to this Interrogatory because it seeks communications, information and/or documents protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, protection, immunity, or doctrine. Plaintiffs further object to this Interrogatory because it calls for Plaintiffs to make a legal conclusion. Plaintiffs also object to this Interrogatory on the grounds that it contains compound, conjunctive, or disjunctive questions. Plaintiffs object to this Interrogatory because it seeks information in the possession of, is known to, or is otherwise equally available to Defendant. Plaintiffs object to this Interrogatory to the extent that it requires a compilation, summary, or analysis of documents or information. Creating such a compilation or summary would require undue effort and is beyond the scope of standard discovery requests. This Response is based on information currently known and available to Plaintiffs—discovery is ongoing and Plaintiffs reserve the right to amend or supplement this Response as additional discovery and depositions occur in this Action, including the deposition of Defendant.

Subject to and without waiving the foregoing objections, the Merger Agreement did not give Defendant the right to the Bot Data he requested as a condition to closing the Merger because, among other things, Defendant expressly waived due diligence as a condition to consummation of the Merger. As a result, the Merger Agreement contains no such condition and thus Musk was not entitled to due diligence regarding Bot Data, nor did he have the right to condition closing of the Merger on his receipt of Bot Data or his satisfaction with any information regarding Bot Data. *See, e.g.*, Article VII of the Merger Agreement. Moreover, Paragraph 6.4 of the Merger Agreement only afforded Musk reasonable access to information necessary to the consummation of the transactions contemplated by the Merger Agreement, and Musk did not need Bot Data to consummate the

Case No: 3:22-CV-05937-CRB
PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

Merger. Section 6.4 of the Merger Agreement also stated that Twitter was not required to disclose any information to Musk if such disclosure would, in the reasonable judgment of Twitter, (i) cause significant competitive harm to Twitter or its Subsidiaries. Paragraph 6.4 also stated "No investigation or access permitted pursuant to this Section 6.4 shall affect or be deemed to modify any representation or warranty made by the Company hereunder." Since Musk had waived due diligence and since the Company had made no representations about Bot Data in Section IV, Musk could not use Section 6.4 as a pretext to check the alleged accuracy of representations Twitter had not made in the Merger Agreement.

Musk expressly acknowledged in paragraph 4.25 of the Merger Agreement that "Except for the representations and warranties expressly set forth in this Article IV, neither the Company nor any other Person makes or has made any representation or warranty of any kind whatsoever, express or implied, at Law or in equity, with respect to the Company or any of its Subsidiaries or their respective business, operations, assets, liabilities, conditions (financial or otherwise),notwithstanding the delivery or disclosure to Parent and the Acquisition Sub or any of their Affiliates or Representatives of any documentation, forecasts or other information with respect to any one or more of the foregoing. Without limiting the generality of the foregoing, neither the Company nor any other Person makes or has made any express or implied representation or warranty to Parent, Acquisition Sub or any of their respective Representatives with respect to (a) any financial projection, forecast, estimate or budget relating to the Company, any of its Subsidiaries or their respective businesses or,(b) except for the representations and warranties made by the Company in this Article IV, any oral or written information presented to Parent, Acquisition Sub or any of their respective Representatives in the course of their due diligence investigation of the Company, the negotiation of this Agreement or the course of the Merger, or the accuracy or completeness thereof." No representations or warranties were provided to Musk in Section IV of the Merger Agreement regarding Bot Data.

7                                              Case No: 3:22-CV-05937-CRB

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

The Merger Agreement further provided in Article VII the conditions for the closing of the Merger.  None of those conditions were related in any way to Bot Data or Musk's access to Bot Data.  In addition, neither due diligence nor the receipt of adequate financing for the Merger were conditions to Musk's obligation under Article VII to consummate the Merger.  Thus, any claim by Musk that he needed Bot Data to obtain financing so he could close the Merger was false and pretextual; since the Merger was not subject to a financing contingency, Musk was obligated to consummate the Merger whether or not he obtained any financing.  In addition to the fact that Musk's receipt of financing was not a condition to consummation of the Merger, Musk had already received commitments regarding funding of the Merger prior to the announcement of the Merger Agreement.  For example, the Form 8-K filed by Twitter on April 26, 2022, to which the Merger Agreement was attached, stated: "Pursuant to an equity commitment letter dated April 25, 2022, and subject to the terms thereof, Mr. Musk committed to provide Parent, at the effective time of the Merger, with an equity contribution of up to approximately $21 billion. Pursuant to a debt commitment letter dated April 25, 2022, and subject to the terms and conditions set forth therein, the commitment parties party thereto committed to provide to Acquisition Sub, at the effective time of the Merger, debt financing of approximately $13 billion. Pursuant to a margin loan commitment letter dated April 25, 2022, and subject to the terms and conditions set forth therein, the commitment parties party thereto committed to provide to X Holdings III, LLC, a Delaware limited liability company wholly owned by Mr. Musk, at the effective time of the Merger, margin loan financing of approximately $12.5 billion, the proceeds of which will be distributed or otherwise made available to Acquisition Sub."

Contrary to the terms of the Merger Agreement, Defendant made false statements and sought to obtain and analyze Bot Data as a pretext for terminating the Merger.  Twitter was not required to prepare or provide financial information other than the financial information provided to the U.S. Securities and Exchange Commission ("SEC"), nor provide any other information that was not available to the Company without undue effort or expense; Defendant's ability to obtain

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

financing did not void or otherwise diminish Defendant's obligation to consummate the Merger; as noted *supra*, as of the time the Merger Agreement was signed, Defendant had already secured debt commitments that, together with his personal equity commitment, were sufficient to fund the Merger; the Bot Data sought by Defendant was not reasonably related to consummation of the Merger; Twitter was not obligated to comply with Defendant's requests for Bot Data because, in the exercise of Twitter's reasonable judgment, it determined that compliance could cause significant competitive harm to the company; Twitter was not obligated to comply with Defendant's requests for Bot Data because, in the exercise of Twitter's reasonable judgment, it determined that doing so could violate applicable law, including privacy laws; Defendant had, or was reasonably likely to, use information he requested for competitive purposes or other purposes unrelated to the consummation of the Merger; the information that Defendant requested would not allow for accurate and reliable calculations of bots. Plaintiffs further refer Defendant to the allegations in Plaintiffs' First Amended Complaint ("FAC"), the allegations in the Verified Complaint filed by Twitter, Inc. in Delaware, Case No 2022-0613-KSJM (the "Delaware Action"), Twitter's Answer to Defendants' Counterclaims in the Delaware Action, and Twitter's Answer to Defendants' Amended Counterclaims in the Delaware Action.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

Plaintiffs object that the term "Bot Data" is not used or defined in the Merger Agreement. Plaintiffs further object that Defendant's definition of "Bot Data" is vague and ambiguous. Subject to and without waiving any prior objections above, following the parties' meet and confers concerning these responses, Plaintiffs further respond that, in addition to the above-identified passages, paragraphs, sections, and articles of the Merger Agreement and April 26, 2022 Form-8K, Plaintiffs also identify the following sections of the Merger Agreement as describing reasons why the Merger Agreement did not give Defendant the right to the Bot Data as a condition to closing the Merger: §6.10, §9.9, Preamble, §7.1, §7.2, §4.6, Article 1, §5.4, §5.11, §6.3, §6.11, §6.4, §6.1, §6.8, §8.1, and §2.2. In addition, Plaintiffs note that on April 21, 2022, Musk filed Amendment

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

No. 3 to Schedule 13D with the SEC in which Musk represented that "At the time of delivery, the Proposal was also subject to the completion of financing and business due diligence, but it is no longer subject to financing as a result of the Reporting Person's receipt of the financing commitments described below and is no longer subject to business due diligence." Four days later, on April 25, 2022, Musk entered into a merger agreement with Twitter. Because Musk explicitly waived due diligence, as he acknowledged in his April 21, 2022 Amendment No. 3 to Schedule 13D, the Merger Agreement contains no provision entitling Musk to due diligence and no condition that the closing of the Merger was conditioned on the completion of any non-existent due diligence of Musk's satisfaction with any non-existent due diligence.

**INTERROGATORY NO. 2:**

Identify all provisions of the Merger Agreement—and any other public SEC filings available as of May 13, 2022—that Defendant could have reviewed that would have revealed that Twitter did not have a contractual obligation to provide Bot Data to Defendant.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to the General Objections listed above, Plaintiffs object to this Interrogatory on the grounds that it is overbroad, vague, ambiguous, and unduly burdensome and imposes obligations and burdens beyond those permitted by the Federal Rules of Civil Procedure and the Local Rules of the Northern District of California. Plaintiffs also object to this Interrogatory because it seeks communications, information and/or documents protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, protection, immunity, or doctrine. Plaintiffs further object to this Interrogatory because it calls for Plaintiffs to make a legal conclusion. Plaintiffs also object to this Interrogatory on the grounds that it seeks information in the possession of, is known to, or is otherwise equally available to Defendant. Plaintiffs object to this Interrogatory to the extent that it requires a compilation, summary, or analysis of documents or information. Creating such a compilation or summary would require undue effort and is beyond the scope of standard discovery requests. This Response is based on

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

information currently known and available to Plaintiffs—discovery is ongoing and Plaintiffs reserve the right to amend or supplement this Response as additional discovery and depositions occur in this Action, including the deposition of Defendant.

Subject to and without waiving the foregoing objections, Plaintiffs incorporate herein their response to Interrogatory No. 1 above, which notes, among other things, that Musk could have reviewed the Form 8-K filed by Twitter on April 26, 2022, including the Merger Agreement attached thereto, including Articles IV, VI, and VII of the Merger Agreement.  Defendant could also have reviewed, among other things, (1) Twitter's annual reports as filed on Forms 10-K and 10-Q for the fiscal periods ended March 31, 2017 onward, including those portions of such reports that address DAU, MDAU, spam, bots, false accounts, and other account, user and engagement metrics; (2) the entirety of the Merger Agreement, which provides the parties' various obligations and the consequences of complying and failing to comply with the agreement; (3) the specific provisions of the Merger Agreement that are cited in the Verified Complaint filed by Twitter in the Delaware Action, Twitter's Answer to Defendants' Counterclaims in the Delaware Action, and Twitter's Answer to Defendants' Amended Counterclaims in the Delaware Action.  Plaintiffs further refer Defendant to the allegations in the FAC, the allegations in the Verified Complaint filed by Twitter in the Delaware Action, Twitter's Answer to Defendants' Counterclaims in the Delaware Action, and Twitter's Answer to Defendants' Amended Counterclaims in the Delaware Action.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

Plaintiffs object that the term "Bot Data" is not used or defined in the Merger Agreement. Plaintiffs further object that Defendant's definition of "Bot Data" is vague and ambiguous.  Subject to and without waiving any prior objections above, following the parties' meet and confers concerning these responses, Plaintiffs further respond that Musk could have reviewed the Form 8-K filed by Twitter on April 26, 2022, including the Merger Agreement attached thereto, including Articles IV, VI, and VII of the Merger Agreement.  Defendant could also have reviewed, among other things, (1) Twitter's annual reports as filed on Forms 10-K and 10-Q for the fiscal periods

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

ended March 31, 2017 onward, including those portions of such reports that address DAU, MDAU, spam, bots, false accounts, and other account, user and engagement metrics; (2) the Merger Agreement, which provides the parties' various obligations and the consequences of complying and failing to comply with the agreement including §6.10, §9.9, Preamble, §7.1, §7.2, §4.6, Article 1, §5.4, §5.11, §6.3, §6.11, §6.4, §6.1, §6.8, §8.1, and §2.2; and (3) the specific provisions of the Merger Agreement that are cited in the Verified Complaint filed by Twitter in the Delaware Action at paragraphs 33, 35-36, 41-54, 85, 105, 110, 112, 115, 126, 129, 137-138, 145. Plaintiffs further refer Defendant to the allegations in the FAC at paragraphs 21-23, 29, 77, 88, 112-119, 138, 149, 155, 162-165 the allegations in the Verified Complaint filed by Twitter in the Delaware Action at paragraphs 1, 4, 8-11, 32-33, 35-54, 85, 63-102, 105, 110, 112, 115, 126-131, 137-138, 145, and Twitter's Answer to Defendants' Counterclaims in the Delaware Action at pages 2-10, 12-18, 23-25, 30-35, 37-104, 116-117, 119-125. In addition, Plaintiffs note that Musk could have reviewed the April 21, 2022 Amendment No. 3 to Schedule 13D that he filed and signed with the SEC in which he represented that "At the time of delivery, the Proposal was also subject to the completion of financing and business due diligence, but it is no longer subject to financing as a result of the Reporting Person's receipt of the financing commitments described below and is no longer subject to business due diligence."

**INTERROGATORY NO. 3:**

Identify all reasons why the Merger Agreement, Twitter's 2022 proxy statements regarding the Merger, and the April 21, 2022 Amended Schedule 13D, as identified in Paragraphs 82 and 112 of the FAC, did not sufficiently inform investors what the conditions to closing the Merger were, including whether Twitter had an obligation to provide Bot Data as a condition to closing the Merger.

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to the General Objections listed above, Plaintiffs object to this Interrogatory on the grounds that it is overbroad, vague, ambiguous, and unduly burdensome and imposes obligations and burdens beyond those permitted by the Federal Rules of Civil Procedure and the Local Rules of the Northern District of California. Plaintiffs also object to this Interrogatory because it seeks communications, information and/or documents protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, protection, immunity, or doctrine. Plaintiffs further object to this Interrogatory because it calls for Plaintiffs to make a legal conclusion. Plaintiffs also object to this Interrogatory on the grounds that it contains compound, conjunctive, or disjunctive questions. Plaintiffs object to this Interrogatory because it seeks information in the possession of, is known to, or is otherwise equally available to Defendant. Plaintiffs object to this Interrogatory to the extent that it requires a compilation, summary, or analysis of documents or information. Creating such a compilation or summary would require undue effort and is beyond the scope of standard discovery requests. This Response is based on information currently known and available to Plaintiffs—discovery is ongoing and Plaintiffs reserve the right to amend or supplement this Response as additional discovery and depositions occur in this Action, including the deposition of Defendant.

Subject to and without waiving the foregoing objections, the Merger Agreement, Twitter's 2022 proxy statements regarding the Merger, and the April 21, 2022 Amended Schedule 13D (the "Subject Documents," for purposes of this response), were not sufficient to dispel the false statements made by Musk because none of them contained a countervailing statement that the Merger would close even if Musk did not receive the Bot Data he had requested or even if Musk or his advisors did not agree with the Bot Data or thought it was inaccurate. Musk has argued at least twice that the information available in the market was legally sufficient to advise investors of the true state of affairs and his argument has been rejected at least twice by the Court. Most recently,

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

in the order denying Musk's Motion for Judgment on the Pleadings, the Court stated that it had rejected Musk's argument in response to Musk's initial motion to dismiss, noting:

> At the motion hearing, Defendant argued that because the Merger Agreement was publicly filed with the SEC, Defendant's tweets could not have been misleading as to Twitter's obligation under the Merger Agreement. However, Defendant does not point to a specific disclosure in the Merger Agreement that would prevent a reasonable investor from being misled by Defendant's tweet—i.e., a countervailing statement that the deal will close even if Twitter fails to provide him with the bot data he requests. *See, e.g. In re eHealth, Inc. Sec. Litig.*, No. 20-CV02395-JST, 2023 WL 6390593, at *5 (N.D. Cal. Sept. 28, 2023) (finding that although the defendants referenced SEC filings on the calls in which the alleged misstatements were made, nothing in the filings directly addressed the specific issue about which reasonable investors would be misled).

*See* Order at 20 n.8. See Dkt. No. 89 at p. 5.

The Court specifically noted that "At that time, the Court was fully aware of the provisions of the Merger Agreement that Musk now points to, and the Court determined that those provisions were not sufficient countervailing statements." *Id.* The Court then went on to reject Musk's argument a second time, denying Musk's motion for judgment on the pleadings. *Id.* at 5-6.

Defendant, whose statements are unusually persuasive and widely published, injected significant uncertainty and confusion surrounding the Subject Documents and the Merger by and through his false and misleading statements and fraudulent scheme, as alleged in the FAC; the Subject Documents did not contain a specific disclosure or provision that would prevent a reasonable investor from being misled by Defendant's false and misleading statements and fraudulent scheme; any information that was countervailing to Defendant's false and misleading statements and fraudulent scheme was not provided to the market, during the class period, with sufficient intensity and credibility to dispel Musk's false statements; and, during the class period, investors had access to Defendants' submissions in the Delaware Action, in which Defendant reiterated the false statement that Twitter had an obligation to provide Bot Data as a condition to closing the Merger. For example, Defendant stated in his Verified Amended Counterclaims, Answer, and affirmative defenses to Twitter's Complaint that "Twitter has breached its information

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

sharing obligations under the Merger Agreement by failing to reasonably respond to the Musk Parties' information requests." Plaintiffs incorporate by reference herein all portions of the Subject Statements upon which Defendant purported to rely in taking this position. Plaintiffs further refer Defendant to the allegations in Plaintiffs' FAC, the allegations in the Verified Complaint filed by Twitter in the Delaware Action, Defendants' verified counterclaims, answer, and affirmative defenses in the Delaware Action, Defendants' amended verified amended counterclaims, answer, and affirmative defenses in the Delaware Action, Twitter's Answer to Defendants' Counterclaims in the Delaware Action, Twitter's Answer to Defendants' Amended Counterclaims in the Delaware Action, and Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant Elon Musk's Motion for Judgment on the Pleadings in this Action.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

Plaintiffs object that the term "Bot Data" is not used or defined in the Merger Agreement. Plaintiffs further object that Defendant's definition of "Bot Data" is vague and ambiguous. Subject to and without waiving any prior objections above, following the parties' meet and confers concerning these responses, Plaintiffs further respond that Musk's false and misleading statements to the market mislead investors and made it unclear to outsiders how the merger provisions applied to the facts as they existed during the class period (which facts were only known to Twitter, Musk, and their respective advisors). Plaintiffs further refer Defendant to the allegations in the FAC at paragraphs 21-23, 29, 77, 88, 112-119, 138, 149, 155, 162-165 the allegations in the Verified Complaint filed by Twitter in the Delaware Action at paragraphs 1, 4, 8-11, 32-33, 35-54, 85, 63-102, 105, 110, 112, 115, 126-131, 137-138, 145, and Twitter's Answer to Defendants' Counterclaims in the Delaware Action at pages 2-10, 12-18, 23-25, 30-35, 37-104, 116-117, 119-125.

**INTERROGATORY NO. 4.**

If you contend that any provision in the Merger Agreement is ambiguous, identify each such provision and state all facts and reasons in support of that contention.

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

**RESPONSE TO INTERROGATORY NO. 4.**

In addition to the General Objections listed above, Plaintiffs object to this Interrogatory on the grounds that it is overbroad, vague, ambiguous, and unduly burdensome and imposes obligations and burdens beyond those permitted by the Federal Rules of Civil Procedure and the Local Rules of the Northern District of California. Plaintiffs also object to this Interrogatory because it seeks communications, information and/or documents protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, protection, immunity, or doctrine. Plaintiffs further object to this Interrogatory because it calls for Plaintiffs to make a legal conclusion. Plaintiffs also object to this Interrogatory on the grounds that it contains compound, conjunctive, or disjunctive questions. Plaintiffs object to this Interrogatory because it seeks information in the possession of, is known to, or is otherwise equally available to Defendant. Plaintiffs object to this Interrogatory to the extent that it requires a compilation, summary, or analysis of documents or information. Creating such a compilation or summary would require undue effort and is beyond the scope of standard discovery requests. This Response is based on information currently known and available to Plaintiffs—discovery is ongoing and Plaintiffs reserve the right to amend or supplement this Response as additional discovery and depositions occur in this Action, including the deposition of Defendant.

Subject to and without waiving the foregoing objections, Plaintiffs respond that while they do not believe that any provisions in the Merger Agreement were ambiguous, Defendants' false and misleading statements and fraudulent scheme misled investors and the market regarding the portions of the Merger Agreement referenced in the responses to Interrogatories 1 and 2, for the reasons set forth in response to Interrogatory 3. Plaintiffs further refer Defendant to the allegations in Plaintiffs' FAC, the allegations in the Verified Complaint filed by Twitter in the Delaware Action, Defendants' verified counterclaims, answer, and affirmative defenses in the Delaware Action, Defendants' amended verified amended counterclaims, answer, and affirmative defenses in the Delaware Action, Twitter's Answer to Defendants' Counterclaims in the Delaware Action,

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

Twitter's Answer to Defendants' Amended Counterclaims in the Delaware Action, and Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant Elon Musk's Motion for Judgment on the Pleadings in this Action.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:**

Subject to and without waiving any of the prior objections above, following the parties' meet and confers concerning these responses, Plaintiffs further respond that Musk's false and misleading statements to the market mislead investors and made it unclear how the terms of the Merger Agreement applied to the facts as they existed during the class period (which facts were only known to Twitter, Musk, and their respective advisors). Even sophisticated analysts at the time were confused about the merger terms based on Musk's false statements and tweets. For example, Wedbush Securities issued a report on May 13, 2022 which stated in part: "In a bizarre tweet this morning Elon Musk said the Twitter deal temporarily is on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users (in a filing by Twitter last week). The implications of this tweet will send this Twitter circus show into a Friday the 13th horror show as now the Street will view this deal as 1) likely falling apart, 2) Musk negotiating for a lower deal price, or 3) Musk simply walking away from the deal with a $1 billion breakup fee."

**INTERROGATORY NO. 5.**

Describe in detail the non-privileged circumstances of your retention of counsel in connection with this action, including any solicitation to represent you by any attorney representing you in this action and the fee structure under which your counsel is being compensated in connection with this action.

**RESPONSE TO INTERROGATORY NO. 5.**

In addition to the General Objections listed above, Plaintiffs object to this Interrogatory on the grounds that it is overbroad, vague, ambiguous, and unduly burdensome and imposes obligations and burdens beyond those permitted by the Federal Rules of Civil Procedure and the

Local Rules of the Northern District of California. Plaintiffs also object to this Interrogatory because it seeks communications, information and/or documents protected by the attorney-client privilege, the attorney work product doctrine, Cal. Bus. & Prof. Code Section 6068, 6149, or any other applicable privilege, protection, immunity, or doctrine.  Plaintiffs also object to this Interrogatory on the grounds that it contains compound, conjunctive, or disjunctive questions.

Subject to and without waiving the foregoing objections, Plaintiffs respond that they contacted and retained their counsel at Bottini & Bottini, Inc. and Cotchett Pitre & McCarthy LLP after reviewing a PSLRA-mandated notice discussing the pendency of this action and their right to participate in and seek lead plaintiff appointment in the action.  Without waiving any applicable privileges, Plaintiffs' counsel's compensation will be determined by the Court.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

Without waiving any applicable privileges, Plaintiffs further object to this Interrogatory in that it inquires into matters protected from disclosure by the attorney-client privilege.  Subject to and without waiving any prior objections above, following the parties' meet and confers concerning these responses, Plaintiffs further respond that on October 11, 2022, Cotchett, Pitre & McCarthy and Bottini & Bottini, Inc. issued a PSLRA-required notice advising class members of the pendency of the action and their rights to participate in the action, including the right to move for lead plaintiff appointment.   This notice was posted to national news sites such as Business Wire and Globe Newswire as required by the PSLRA.  Plaintiffs saw such notice and contacted Bottini & Bottini for more information before ultimately signing a retention agreement with Cotchett, Pitre & McCarthy and Bottini & Bottini, Inc.  Plaintiffs are being represented on a contingency fee basis, with any fees subject to approval by the Court.

**INTERROGATORY NO. 6.**

Identify every statement made by Defendant you contend is false and/or misleading or contains a false and/or misleading omission of material fact, that you contend is actionable under the federal securities law following the Court's Motion to Dismiss Order, ECF No. 48.

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

**RESPONSE TO INTERROGATORY NO. 6.**

In addition to the General Objections listed above, Plaintiffs object to this Interrogatory on the grounds that it is compound, overbroad, vague, ambiguous, and unduly burdensome and imposes obligations and burdens beyond those permitted by the Federal Rules of Civil Procedure and the Local Rules of the Northern District of California. Plaintiffs also object to this Interrogatory because it seeks communications, information and/or documents protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, protection, immunity, or doctrine. Plaintiffs further object to this Interrogatory because it calls for Plaintiffs to make a legal conclusion. Plaintiffs also object to this Interrogatory on the grounds that it contains compound, conjunctive, or disjunctive questions. Plaintiffs object to this Interrogatory because it seeks information in the possession of, is known to, or is otherwise equally available to Defendant. Plaintiffs object to this Interrogatory to the extent that it requires a compilation, summary, or analysis of documents or information. Creating such a compilation or summary would require undue effort and is beyond the scope of standard discovery requests. This Response is based on information currently known and available to Plaintiffs—discovery is ongoing and Plaintiffs reserve the right to amend or supplement this Response as additional discovery and depositions occur in this Action, including the deposition of Defendant.

Plaintiffs refer Defendant to the allegations in FAC. Plaintiffs also specifically refer Defendant to the Court's Order on Defendant's Motion to Dismiss ("Order"), ECF No. 48, as well as ¶¶ 111-147 of the FAC in this Action. The May 13, 2022 Tweet (FAC ¶111), the May 16, 2022 Statement (FAC ¶120), and the May 17, 2022 Tweet (FAC ¶125), per the Court's Order, are actionable under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(b) thereunder. All other false and misleading statements and actions identified in the FAC are actionable under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(a) and (c) thereunder.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

Plaintiffs further object on the basis of the Work Product Doctrine, as the Interrogatory seeks to discover the mental impressions and/or trial strategy of Plaintiffs' experts and/or attorneys, including but not limited to the selection of documents, summaries, and reasoning. Fed. Rule. Civ. Pro. 26(b)(3).  Subject to and without waiver of any of the prior objections above, please see attached chart for Plaintiffs' responses to this Interrogatory.

**INTERROGATORY NO. 7.**

For each and every statement you identify in Interrogatory No. 6, explain why you contend it is false and/or misleading or contains a false and/or misleading omission of material fact and identify all facts supporting that contention, including identification of the material fact you contend was misleadingly omitted; when and how you became aware of each fact supporting that contention; and when and how you contend class members became aware of each fact supporting that contention.

**RESPONSE TO INTERROGATORY NO. 7.**

In addition to the General Objections listed above, Plaintiffs object to this Interrogatory on the grounds that it is compound, overbroad, vague, ambiguous, and unduly burdensome and imposes obligations and burdens beyond those permitted by the Federal Rules of Civil Procedure and the Local Rules of the Northern District of California. Plaintiffs also object to this Interrogatory because it seeks communications, information and/or documents protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, protection, immunity, or doctrine.  Plaintiffs also object to this Interrogatory on the grounds that it contains compound, conjunctive, or disjunctive questions.  Plaintiffs object to this Interrogatory because it seeks information in the possession of, is known to, or is otherwise equally available to Defendant. Plaintiffs object to this Interrogatory to the extent that it requires a compilation, summary, or analysis of documents or information.  Creating such a compilation or summary would require undue effort and is beyond the scope of standard discovery requests.  This Response is based on

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

information currently known and available to Plaintiffs—discovery is ongoing and Plaintiffs reserve the right to amend or supplement this Response as additional discovery and depositions occur in this Action, including the deposition of Defendant.

Subject to and without waiving the foregoing objections, Defendant's statements are false and/or misleading or contain false and/or misleading omissions because Defendant made them in order to attempt to avoid his obligations under Merger Agreement, renegotiate the terms of the Merger Agreement, and artificially deflate the price of Twitter stock before he completed the purchase, all by misrepresenting the terms of the Merger Agreement, his rights thereunder, and Twitter's obligations,  among other things.  *See* Response to Interrogatory Nos. 1-3.  Plaintiffs became aware of the facts supporting these contentions as a result of Musk's reversal and statement that he would close the Merger at the initial price of $54.20 on or about October 4, 2022, subsequent statements by Musk and others, and through consultation with their attorneys.  Plaintiffs continue to uncover additional proof of Defendants' deception through discovery obtained in this Action. Plaintiffs further refer Defendant to the allegations in the FAC, the allegations in the Verified Complaint filed by Twitter in the Delaware Action, Twitter's Answer to Defendants' Counterclaims in the Delaware Action, and Twitter's Answer to Defendants' Amended Counterclaims in the Delaware Action.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:**

Plaintiffs further object on the basis of the Work Product Doctrine, as the Interrogatory seeks to discover the mental impressions and/or trial strategy of Plaintiffs' experts and/or attorneys, including but not limited to the selection of documents, summaries, and reasoning. Fed. Rule. Civ. Pro. 26(b)(3).  Subject to and without waiver of any of the prior objections above, please see attached chart for Plaintiffs' responses to this Interrogatory.

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

**INTERROGATORY NO. 8.**

For each and every statement you identify in Interrogatory No. 6, and each fact supporting your contention that it is false and/or misleading or contains a false and/or misleading omission of material fact, identify each non-public fact supporting that contention.

**RESPONSE TO INTERROGATORY NO. 8.**

In addition to the General Objections listed above, Plaintiffs object to this Interrogatory on the grounds that it is compound, overbroad, vague, ambiguous, and unduly burdensome and imposes obligations and burdens beyond those permitted by the Federal Rules of Civil Procedure and the Local Rules of the Northern District of California. Plaintiffs also object to this Interrogatory because it seeks communications, information and/or documents protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, protection, immunity, or doctrine.  Plaintiffs also object to this Interrogatory on the grounds that it contains compound, conjunctive, or disjunctive questions.  Plaintiffs object to this Interrogatory because it seeks information in the possession of, is known to, or is otherwise equally available to Defendant. Plaintiffs object to this Interrogatory to the extent that it requires a compilation, summary, or analysis of documents or information.  Creating such a compilation or summary would require undue effort and is beyond the scope of standard discovery requests.  Any non-public facts have been produced in discovery in this Action and are equally available to Defendant.  Plaintiffs further object that discovery is ongoing and Plaintiffs reserve the right to amend or supplement this Response as additional discovery and depositions occur in this Action, including the deposition of Defendant.  Plaintiffs refer Defendant to the allegations in the FAC, the allegations in the Verified Complaint filed by Twitter in the Delaware Action, Twitter's Answer to Defendants' Counterclaims in the Delaware Action, and Twitter's Answer to Defendants' Amended Counterclaims in the Delaware Action.

Subject to and without waiving the foregoing objections, non-public information included facts revealing that Musk's statements for putting the merger on hold and for terminating it were

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

pretextual, as disclosed in the Walter Isaacson biography, including that Musk's misstatements were made for the purpose of undermining and renegotiating the deal.

For example, in Isaacson's biography on Musk, which was based on "unprecedented access" to Musk as well as extensive interviews with Musk and his attorney Alex Spiro, Isaacson writes that the statements in Musk's termination letter were a mere "pretext for trying to withdraw from the deal." Musk wanted out of the deal because "advertising was collapsing and the economy declining."

Musk also admitted in a text message on July 8, 2022 to Adeo Ressi, in response to complements on the termination letter: "Haha indeed, although they [Twitter's board] do have a decent chance of forcing the deal through."

When Musk made his false statements in May 2022, he had not yet requested the Bot Data from Twitter, had not hired the experts that would be able to support his contentions regarding the Bot Data, did not have the right to put the deal on hold, had not informed Twitter that the deal was purportedly "on hold," and Twitter never agreed nor implied that the deal was on hold. Musk's experts were never able to prove, when applying Twitter's methodology, that Twitter's calculation that 5% of mDAU were bots was inaccurate. Twitter complied with Musk's requests for information and acted in good faith, despite Musk's repeated misstatements that Twitter was not giving him any information. Musk conceded to a non-party that he thought it was likely that Twitter would win the Delaware action. Musk later revealed that he had made statements about terminating the Merger because he did not want to pay the $44 billion had agreed to and was attempting to negotiate a lower price.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

Plaintiffs further object on the basis of the Work Product Doctrine, as the Interrogatory seeks to discover the mental impressions and/or trial strategy of Plaintiffs' experts and/or attorneys, including but not limited to the selection of documents, summaries, and reasoning. Fed. Rule. Civ.

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

Pro. 26(b)(3). Subject to and without waiver of any of the prior objections above, please see attached chart for Plaintiffs' responses to this Interrogatory.

**INTERROGATORY NO. 9.**

For each and every statement you identify in Interrogatory No. 6, explain why you contend it was materially misleading, and identify all facts supporting that contention, including when and how you became aware of each fact supporting that contention, and when and how you contend class members became aware of each fact supporting that contention.

**RESPONSE TO INTERROGATORY NO. 9.**

In addition to the General Objections listed above, Plaintiffs object to this Interrogatory on the grounds that it is compound, overbroad, vague, ambiguous, and unduly burdensome and imposes obligations and burdens beyond those permitted by the Federal Rules of Civil Procedure and the Local Rules of the Northern District of California. Plaintiffs also object to this Interrogatory because it seeks communications, information and/or documents protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, protection, immunity, or doctrine. Plaintiffs also object to this Interrogatory on the grounds that it contains compound, conjunctive, or disjunctive questions. Plaintiffs object to this Interrogatory because it seeks information in the possession of, is known to, or is otherwise equally available to Defendant. Plaintiffs object to this Interrogatory to the extent that it requires a compilation, summary, or analysis of documents or information. Creating such a compilation or summary would require undue effort and is beyond the scope of standard discovery requests. Plaintiffs further object to this Interrogatory as duplicative of Interrogatory 7. This Response is based on information currently known and available to Plaintiffs—discovery is ongoing and Plaintiffs reserve the right to amend or supplement this Response as additional discovery and depositions occur in this Action, including the deposition of Defendant.

Subject to and without waiving the foregoing objections, Defendant's statements were false and/or misleading or contained false and/or misleading omissions of material fact because

Defendant made them to in order to wrongfully avoid his obligations under the Merger Agreement, renegotiate the terms of the Merger Agreement, and artificially depress the price of Twitter stock before he completed the Merger, all by misrepresenting the terms of the Merger Agreement, his rights thereunder, and Twitter's obligations under the Merger Agreement, among other things. Plaintiffs became aware of the facts supporting these contentions as a result of Musk's reversal and statement that he would close the Merger at the initial price of $54.20 on or about October 4, 2022, subsequent statements by Musk and others, and through their consultations with counsel. Plaintiffs continue to uncover additional proof of Defendants' deception through discovery obtained in this Action. Plaintiffs further refer Defendant to the allegations in the FAC, the allegations in the Verified Complaint filed by Twitter in the Delaware Action, Twitter's Answer to Defendants' Counterclaims in the Delaware Action, and Twitter's Answer to Defendants' Amended Counterclaims in the Delaware Action.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

Plaintiffs further object on the basis of the Work Product Doctrine, as the Interrogatory seeks to discover the mental impressions and/or trial strategy of Plaintiffs' experts and/or attorneys, including but not limited to the selection of documents, summaries, and reasoning. Fed. Rule. Civ. Pro. 26(b)(3). Subject to and without waiver of any of the prior objections above, please see attached chart for Plaintiffs' responses to this Interrogatory.

**INTERROGATORY NO. 10.**

For each and every statement you identify in Interrogatory No. 6, identify all facts and reasons supporting your contention that Defendant made each statement with scienter.

**RESPONSE TO INTERROGATORY NO. 10.**

In addition to the General Objections listed above, Plaintiffs object to this Interrogatory on the grounds that it is compound, overbroad, vague, ambiguous, and unduly burdensome and imposes obligations and burdens beyond those permitted by the Federal Rules of Civil Procedure and the Local Rules of the Northern District of California. Plaintiffs also object to this Interrogatory

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST SET OF INTERROGATORIES (NOS. 1-12)

because it seeks communications, information and/or documents protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, protection, immunity, or doctrine. Plaintiffs also object to this Interrogatory on the grounds that it contains compound, conjunctive, or disjunctive questions. Plaintiffs object to this Interrogatory because it seeks information in the possession of, is known to, or is otherwise equally available to Defendant. Plaintiffs object to this Interrogatory to the extent that it requires a compilation, summary, or analysis of documents or information. Creating such a compilation or summary would require undue effort and is beyond the scope of standard discovery requests. This Response is based on information currently known and available to Plaintiffs—discovery is ongoing and Plaintiffs reserve the right to amend or supplement this Response as additional discovery and depositions occur in this Action, including the deposition of Defendant.

Subject to and without waiving the foregoing objections, Defendant's scienter is evident from the fact that Defendant made his statements and omissions in order to avoid his obligations under Merger Agreement, renegotiate the terms of the Merger Agreement, and artificially deflate the price of Twitter stock before he completed the Merger, all by misrepresenting the terms of the Merger Agreement, his rights thereunder, and Twitter's obligations, data, and actions, among other things. Plaintiffs became aware of the facts supporting these contentions through their consultations with counsel Plaintiffs continue to uncover additional proof of Defendants' deception through discovery obtained in this Action. Plaintiffs further refer Defendant to the allegations in Plaintiffs' First Amended Complaint and the allegations in the Delaware Verified Complaint filed by Twitter in the Delaware Action. Among other reasons, Defendant possessed scienter because: (a) Defendant "personally negotiated" the Merger and therefore had actual knowledge of the falsity of the statements; (b) Defendant had a motive to depress Twitter stock; (c) Defendant's actions and ultimate settlement in the Delaware action are evidence of scienter; and (d) Defendant's dismissal of his financing lead is evidence of scienter. *See* FAC ¶¶ 152–55. Defendant was heavily involved in the Merger Agreement process—tweeting about a potential tender offer, see FAC ¶ 80, and

26    Case No: 3:22-CV-05937-CRB
PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

directly calling Twitter's executives during the bidding process, *see id*. ¶ 83. In addition, Defendant tweeted prior to the Merger Agreement, on April 14, 2022, that "[i]f our Twitter bid succeeds, we will defeat the spam bots or die trying!," *id*. ¶ 78, indicating that he was aware of the issue with "spam bots," before entering into the Merger Agreement. *See id.* ¶ 116. Defendant sent a letter to Twitter on April 24, 2022 which stated that the Merger Agreement was "seller friendly." *Id*. ¶ 84. Defendant consistently tweeted nearly real-time updates about the Merger Agreement, "touting" his "intimate knowledge" of the deal. Even if he truly believed that Twitter had the contractual obligation to provide details about the company's spam and bot data, Musk was at least deliberately reckless for not investigating that obligation with respect to the Merger Agreement before making his statements.

Musk also had the motive and opportunity to commit fraud to get out of the Merger Agreement because of the large price decline of Tesla stock and the realization that he had greatly overpaid for Twitter by agreeing to buy it shortly before a significant market decline. *See* FAC ¶ 154. Musk experienced financial pressure immediately after signing the Merger Agreement. Between April 25, 2022, when the Merger Agreement was announced, and May 12, 2022, Tesla's stock declined by 27%, which threatened a margin call on the stock Musk had pledged as collateral to fund the Merger.

Musk also made comments in an April 11, 2023, interview with the BBC, in which he admitted he had made statements about terminating the Merger because he didn't want to pay the $44 billion.

> **Interviewer**: So you were still trying to get out of it and then you were just advised by lawyers, "Look, you're going to have to buy this."
> **[Defendant]**: Yes.
> **Interviewer**: Interesting. So you didn't actually want to purchase it even when you said you were go-
> **[Defendant]**: Well not at that price. I think the analogy is pretty close. Let's say there's a warehouse full of goods. They say less than 5% of what's in the warehouse is broken. Then you walk into warehouse and say, "Actually it's 25%." So you might still want to buy what's in that warehouse, but probably at a lower price. You're not buying the stuff that's broken.

27                                        Case No: 3:22-CV-05937-CRB
PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

The transcript of this interview with the BBC on April 11, 2023, was submitted by Musk in support of his original motion to dismiss. *See* Bergjans Decl., Ex. 7.

Defendant's scienter is also demonstrated by his baseless positions advanced in the Delaware Action, during which he stated that he was entitled to due diligence, despite having actual knowledge that he had waived due diligence. FAC ¶ 155.  During the course of litigating the Delaware Action, Musk attempted to shield from discovery analyses that data scientists he hired conducted, and refused to make a fulsome production of documents.  Defendant ultimately agreed to the original merger price he offered, thus suggesting that Musk did not have confidence in the positions he was asserting in Delaware.  Musk's scienter is also suggested by his dismissal of Bob Swan—the financing lead for the Merger—in June 2020.  Since Musk was claiming that he needed Bot Data to secure his financing for the Merger, Musk would have replaced Swan immediately (which he did not do) if he truly needed the Bot Data to secure financing for the Merger.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:**

Plaintiffs further object on the basis of the Work Product Doctrine, as the Interrogatory seeks to discover the mental impressions and/or trial strategy of Plaintiffs' experts and/or attorneys, including but not limited to the selection of documents, summaries, and reasoning. Fed. Rule. Civ. Pro. 26(b)(3).  Subject to and without waiver of any of the prior objections above, please see attached chart for Plaintiffs' responses to this Interrogatory.

**INTERROGATORY NO. 11.**

Identify all purported corrective disclosures that you contend revealed the alleged falsity of the statements identified in Interrogatory No. 6 and identify all facts in support of that contention.

**RESPONSE TO INTERROGATORY NO. 11.**

In addition to the General Objections listed above, Plaintiffs object to this Interrogatory on the grounds that it is overbroad, vague, ambiguous, and unduly burdensome and imposes obligations and burdens beyond those permitted by the Federal Rules of Civil Procedure and the Local Rules of the Northern District of California. Plaintiffs also object to this Interrogatory

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

because it seeks communications, information and/or documents protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, protection, immunity, or doctrine. Plaintiffs also object to this Interrogatory on the grounds that it contains compound, conjunctive, or disjunctive questions. Plaintiffs object to this Interrogatory because it seeks information in the possession of, is known to, or is otherwise equally available to Defendant. Plaintiffs object to this Interrogatory to the extent that it requires a compilation, summary, or analysis of documents or information. Creating such a compilation or summary would require undue effort and is beyond the scope of standard discovery requests. This Response is based on information currently known and available to Plaintiffs—discovery is ongoing and Plaintiffs reserve the right to amend or supplement this Response as additional discovery and depositions occur in this Action, including the deposition of Defendant.

Subject to and without waiving the foregoing objections, Plaintiffs refer Defendant to the allegations in Plaintiffs' FAC and the allegations in the Verified Complaint filed by Twitter in the Delaware Action. Plaintiffs point to the Court's Motion to Dismiss Order ("Order"), ECF No. 48. Musk made a corrective disclosure on or about October 4, 2022. See FAC, ¶¶167-175.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11:**

Plaintiffs further object on the basis of the Work Product Doctrine, as the Interrogatory seeks to discover the mental impressions and/or trial strategy of Plaintiffs' experts and/or attorneys, including but not limited to the selection of documents, summaries, and reasoning. Fed. Rule. Civ. Pro. 26(b)(3). Subject to and without waiver of any of the prior objections above, please see attached chart for Plaintiffs' responses to this Interrogatory.

**INTERROGATORY NO. 12.**

Identify all new information that was not previously publicly disclosed contained in each purported corrective disclosure identified in Interrogatory No. 11 and identify all reasons in support of your contention that this new information revealed the alleged falsity of the statements identified in Interrogatory No. 6.

29                    Case No: 3:22-CV-05937-CRB

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

**RESPONSE TO INTERROGATORY NO. 12.**

In addition to the General Objections listed above, Plaintiffs object to this Interrogatory on the grounds that it is overbroad, vague, ambiguous, and unduly burdensome and imposes obligations and burdens beyond those permitted by the Federal Rules of Civil Procedure and the Local Rules of the Northern District of California. Plaintiffs also object to this Interrogatory because it seeks communications, information and/or documents protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege, protection, immunity, or doctrine. Plaintiffs also object to this Interrogatory on the grounds that it contains compound, conjunctive, or disjunctive questions. Plaintiffs object to this Interrogatory because it seeks information in the possession of, is known to, or is otherwise equally available to Defendant. Plaintiffs object to this Interrogatory to the extent that it requires a compilation, summary, or analysis of documents or information. Creating such a compilation or summary would require undue effort and is beyond the scope of standard discovery requests. This Response is based on information currently known and available to Plaintiffs—discovery is ongoing and Plaintiffs reserve the right to amend or supplement this Response as additional discovery and depositions occur in this Action, including the deposition of Defendant.

Subject to and without waiving the foregoing objections, Musk's announcement on October 4, 2022 provided new information to the market about Musk's abrupt about-face less than two weeks before the October 17, 2022 Delaware Chancery action was set to begin. Forced to face the lack of merit of his baseless contention that Twitter had breached multiple provisions of the Merger Agreement and that there had allegedly been a material adverse effect, Musk essentially acknowledged that he had been bluffing all along. Musk capitulated and announced he would honor the Merger Agreement on the original terms and at the original $54.20 price. In response, Twitter's stock immediately jumped by over 15% before trading in the stock was halted by the New York Stock Exchange. When trading resumed later in the day, the stock increased another 7%, eventually closing up over 22% in one day. Subsequent news articles revealed that

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

Musk had, in fact, been using his false statements about Twitter's alleged breaches of the Merger Agreement to try to negotiate a lower price for the Merger. When Twitter rejected Musk's requests to lower the deal price and called his bluff, "Musk caught Twitter off guard by sending its lawyers a two-sentence letter proposing to move forward on the original terms."[1]

As the Court previously held in denying Musk's motion to dismiss, "Plaintiffs have plausibly alleged that when Defendant announced that he would move forward with the deal—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his due diligence requests—the market reasonably reacted to the 'truth' that Twitter never had the obligation to provide the bot-account information to Defendant. Dkt. No. 48, at p. 36.

The direct causation between Defendant's false statements and Plaintiffs' losses also constitutes evidence of loss causation. See Dkt. No. 48, at p. 37. Plaintiffs further refer Defendant to the allegations in the FAC, the allegations in the Verified Complaint filed by Twitter in the Delaware Action, Twitter's Answer to Defendants' Counterclaims in the Delaware Action, and Twitter's Answer to Defendants' Amended Counterclaims in the Delaware Action.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12:**

Plaintiffs further object on the basis of the Work Product Doctrine, as the Interrogatory seeks to discover the mental impressions and/or trial strategy of Plaintiffs' experts and/or attorneys, including but not limited to the selection of documents, summaries, and reasoning. Fed. Rule. Civ. Pro. 26(b)(3). Subject to and without waiver of any of the prior objections above, please see attached chart for Plaintiffs' responses to this Interrogatory.

Dated: March 17, 2025

**COTCHETT, PITRE & McCARTHY, LLP**
By: /s/ *Tyson C. Redenbarger*
TYSON C. REDENBARGER
*Lead Counsel for Plaintiffs and the Class*

---

[1] *See, e.g.*, Cara Lombardo, "Elon Musk and Twitter at Odds Over Terms of Agreement to Close Deal," THE WALL STREET JOURNAL, Oct. 6, 2022.

31                                                        Case No: 3:22-CV-05937-CRB
PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)

Confidential

Subject to and without waiving any objections, Plaintiffs respond as follows to Interrogatories 6-12:  Plaintiffs incorporate by reference the answers to each interrogatory 6-12, in each response below.

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| 1. | **May 13, 2022 Tweet**<br><br>"Twitter Deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users" | Contrary to Defendant's tweet and unbeknownst to the public, the Twitter deal was not on hold.  Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold," and in fact Musk had not even told his advisors anything about the merger allegedly being on hold.  Defendant's statement was also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal. His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, though Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less. Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal.  Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and | Defendant's statement was made intentionally or recklessly, for several reasons.  First, Musk had actual knowledge that the merger was not on hold because he had no contractual right to put the deal on hold and had not even spoken to Twitter or obtained Twitter's permission to put the deal on hold before he issued his tweet.  In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.  Second, Musk had a motive to commit fraud since his financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do. Given these financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal and knew that issuing the May 13, 2022 tweet would cause Twitter's stock price to decline, which he hoped would give him leverage.<br><br>On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information which Twitter agreed it would provide.  Defendant at no point mentioned the deal was on hold or would not move forward until | October 4, 2022: when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold, or at least not legally on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally, Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying. Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's internal and/ or non-public information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information and internal Twitter information supported the accuracy of the number of spam/fake accounts.   Although not required to do so under the merger agreement, Twitter provided Musk with supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Defendant's statement was false and misleading, so much so that after the post was made, Defendant was told he needed to clarify his statements, including advice from his lawyer, Alex Spiro, that | Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.<br><br>Defendant then made the statement knowing the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing it would influence the price of Twitter shares.  The same day, Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result. Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.<br><br>Defendant was aware from past incidents that his public activity could influence the stock market.  In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make unfounded statement publicly demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares. | let alone was 20% or higher.  Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | it was legally perilous for him to make statements like his May 13th tweet.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price.  This disclosure caused Twitter's stock to increase more than 22% and came on the eve of trial of a public battle with Twitter about the Merger Agreement and without any apparent resolution around Musk's claims for due diligence.   Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of the falsity of Defendant's statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty.  Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware | | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | case.   This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | | |
| 2. | **May 16, 2022** Statements during an All In Summit, which included Defendant's statements that fake and spam accounts make up at least 20% of Twitter's users; Twitter was refusing to provide information; and Twitter's public filings were not accurate. | These statements are false and misleading, including the context in which they were made, because they imply that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.  Internally, Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights. Meanwhile, Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested._Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform._Moreover, Defendant knew as early as July 11, 2018 that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted, which did not contain any right to due diligence.  In fact, Musk filed a 13D on April 21, 2022 in which he stated that his offer was no longer subject to due diligence. Further, Twitter's estimate regarding spam accounts as a | Defendant's statement was made intentionally or recklessly, for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in revenue.  Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues versus the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was causing financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do. Given these financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal._On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying. Twitter's methodology was robust and had repeatedly resulted in an estimate of less than 5% of mDAU. Defendant's statements also falsely implied that he was in possession of Twitter's internal information that refuted Twitter's spam estimate, when in fact, Musk was not in possession of such information and internal information supports that fact Defendant also falsely and implied that Twitter had refused to provide data or explain how it estimated spam as a percentage of mDAU. To the contrary, Twitter had agreed to provide the information and provided it just days later, also offering to continue providing information and data.<br><br>Defendant later testified that he had no particular basis for claiming 20%. In fact, Defendant admitted that "[i]t is simply unknowable based on the lack of information provided to us."<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded | asked for additional information which Twitter agreed it would provide. Defendant at no point mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers, ways in which he could scheme to renegotiate a lower purchase price.<br><br>Defendant then made the statement knowing that only three days prior, he had tweeted that the deal was on hold when the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing it would influence the price of Twitter shares. The same day, Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result. Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously. As time continued to go by, Defendant knew that his statements were causing Twitter's stock price to decline, and Defendant refused to make any corrections. Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement. | let alone was 20% or higher. Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with the information he requested, despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>This statement comes three days after Defendant tweeted that the deal was on hold. The public would reasonably assume that the deal continued to be on hold or in jeopardy, when in reality, behind the scenes, Defendant's team of lawyers and bankers was working diligently to close the deal.<br><br>Defendant's statement misled the public since the public would reasonably assume that Defendant possessed internal or non-public information that enabled him to know that the % of spam accounts is more than what Twitter estimates.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty. Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case.   This statement was material as it called into | Defendant was aware from past incidents that his public activity could influence the stock market.  In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make this unfounded statement public, demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares. | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | | |
| 3. | **May 17, 2022 Tweet** "@Teslarati 20% fake/spam accounts, while 4 times what Twitter claims, could be *much* higher. My offer was based on Twitter's SEC filings being accurate. Yesterday, Twitter's CEO publicly refused to show proof of <5%. This deal cannot move forward until he does." | Contrary to Defendant's tweet and unbeknownst to the public, the Twitter deal was not on hold and was still moving forward. Defendant had no right to unilaterally put deal on hold and Twitter did not agree to put deal on hold. Defendant nor his team had not informed Twitter that the deal "cannot move forward." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition. Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.  Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal. Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.  Twitter continued to fully cooperate and | Defendant's statement was made intentionally or recklessly, for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in revenue.  Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would own.  Meanwhile, a potentially serious conflict between Russia and Ukraine was causing financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do. Given these financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver. | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights. Defendant's statement also implies that he was in possession of internal information that refuted Twitter's spam estimate, when in fact, Musk was not in possession of such information and internal information support that fact—in fact, the opposite was true. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions, and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.

Moreover, Defendant knew since as early as July 11, 2018, that there were fake and spam accounts on Twitter. Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted. Further, Twitter's estimate regarding spam accounts as a percentage of mDAU, including its SEC filings, were accurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying. Twitter's methodology was robust and had repeatedly resulted in an estimate of less than 5% of mDAU. Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this | On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU. Defendant asked for additional information which Twitter agreed it would provide. Defendant at no point mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.

Defendant then made the statement knowing the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing it would influence the price of Twitter shares. The same day, Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result. Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously. As time continued to go by, Defendant knew that his statements were causing Twitter's stock price to decline, and Defendant refused to make any corrections. Defendant's own lawyers also warned him that his statements were misleading and would create | higher. Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Twitter's CEO never publicly refused to show proof of Twitter's spam percentage.  To the contrary, Mr. Agrawal publicly shared that Twitter had provided Musk with an overview of the estimation process and looked forward to continuing the conversation with him.  Mr. Agrawal further invited Defendant on multiple occasions to meet with him so that he could explain and demonstrate how Twitter estimated spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data. Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's spam estimate, when in fact, Musk was not in possession of such information.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded | legal issues, yet he never made an attempt to correct any statement.<br><br>Defendant was aware from past incidents that his public activity could influence the stock market.  In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make this unfounded statement public, demonstrates his intent (and or recklessness) to manipulate the price of Twitter shares. | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | 5%, let alone was 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with the information he requested, despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.  Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty.  Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case.  Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses.  This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | | |
| 4. | **May 13, 2022, 18:47 Tweet** - "To find out, my team will do a random sample of 100 followers of @twitter. I invite others to repeat the | Defendant's tweet falsely continues to imply that the deal is conditional upon satisfaction of due diligence and that Twitter's spam estimates were inaccurate.  Defendant's statement also falsely implies that Twitter's total sample size is 100 users.  Twitter's method of calculating the spam percentage of mDAU was based on the review of 100 mDAUs every day.  The review of 100 per day becomes statistically significant over the course of a | Defendant's statements were made intentionally or recklessly for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| same process and see what they discover…" | month, and, at the end of the month, the sample size becomes approximate, 3,000 users, which equates to 9,000 users over the course of a quarter, not just 100.<br><br>Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold. Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal. His lawyers and bankers continued to meet with Twitter and make progress on the acquisition. Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less. Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal. Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing. Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived | paying a large premium on the company. Meanwhile, Twitter, like some of its peers, was facing a decline in revenue. Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe. Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal. Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do. Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU. Defendant asked for additional information, which Twitter agreed it would provide. Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.<br><br>Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had | and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher. Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | detailed due diligence.  Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions, and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's | agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false impression of the state of the merger.  In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter never refused to show proof of Twitter's spam percentage. To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam. Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher. Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support. Throughout, Twitter was cooperative | scenes, Defendant's team continued to work to close the deal.<br><br>Defendant was aware from past incidents that his public activity could influence the stock market. In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market. Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares. | |

Page 13 of 120

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty. Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case. Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses. This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | | |
| 5. | **May 13, 2022, 19:41 Tweet** – "The bots are angry at being counted [laugh-cry emoji]" | Defendant's tweet falsely continues to imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate. In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.<br><br>Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold. Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had | Defendant's statements were made intentionally or recklessly for several reasons. First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter. The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company. Meanwhile, Twitter, like some of its peers, was facing a decline in revenue. Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal.  Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, | that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do.  Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.<br><br>On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price. | market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher.  Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | answered questions, and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter. Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted. Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying. Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU. Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. | Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares. Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result. Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously. Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock. Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement. Defendant admitted to a friend his position was unsupported and Twitter would prevail. Defendant's statements also gave a false impression of the state of the merger. In particular, | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.

Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty. Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case.  Plaintiffs have since learned of additional facts through discovery that support their contentions, which are | Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else.  . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."

Defendant was aware from past incidents that his public activity could influence the stock market.  In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares. | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | identified in these responses.  This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | | |
| 6. | **May 14, 2022, 16:15 Tweet** - "Twitter legal just called to complain that I violated their NDA by revealing the bot check sample size is 100! This actually happened" | Defendant's tweet falsely continues to imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate.  In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.<br><br>Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold.  Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal.  Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards | Defendant's statements were made intentionally or recklessly for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in revenue.  Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do.  Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | closing.  Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage.  To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data. | Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.<br><br>On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.<br><br>Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger | let alone was 20% or higher.  Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably | agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false impression of the state of the merger.  In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers | |

Confidential

|  | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
|  |  | reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.

Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty.  Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case.  Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses.  This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else. . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."

Defendant was aware from past incidents that his public activity could influence the stock market.  In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares. |  |
| 7. | **May 14, 2022, 23:23** | Defendant's tweet falsely continues to imply that the deal is conditional upon satisfaction of due diligence and that Twitter's | Defendant's statements were made intentionally or recklessly for several reasons.  First, Defendant's | October 4, 2022 - when Defendant announced |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| **Tweet** – "@PPathole Exactly. I have yet to see *any* analysis that has fake/spam/duplicates at <5%." | spam estimates were inaccurate.  In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.<br><br>Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold.  Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal. Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to | financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in revenue.  Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do.  Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.<br><br>On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant | that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher.  Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage.  To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his | asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.<br><br>Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading | breach of the Merger Agreement, lacked support. |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that | statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false impression of the state of the merger.  In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else. . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal." | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | Twitter had "refused" to provide information and thus was in breach, lacked support. Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty. Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case. Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses. This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | Defendant was aware from past incidents that his public activity could influence the stock market. In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market. Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares. | |
| 8. | **May 14, 2022, 23:39 Tweet:**<br>In response to another user who tweeted "Guarantee is 25%+" Defendant tweeted back: "@BLKMDL3 @PPathole T There is | Defendant's tweet falsely continues to imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate. In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.<br><br>Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold. Defendant had no right | Defendant's statements were made intentionally or recklessly for several reasons. First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter. The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company. Meanwhile, Twitter, like some of its peers, was facing a decline in | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| some chance it might be over 90% of daily active users, which is the metric that matters to advertisers. Very odd that the most popular tweets of all time were only liked by ~2% of daily active users." | to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal. Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal.

Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.  Twitter provided supporting details concerning its | revenue.  Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do.  Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.

In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.

On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price. | claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher.  Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage.  To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be | Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data. | impression of the state of the merger.  In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else. . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."<br><br>Defendant was aware from past incidents that his public activity could influence the stock market.  In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares. | |

Page 28 of 120

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty. Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case.  Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses.  This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | | |
| 9. | **May 16, 2022, 10:03 Tweet** - In response to Agrawal tweets, Defendant tweeted "[poop emoji]" | Defendant's statements falsely continues to imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate.  In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.<br><br>Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold.  Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial | Defendant's statements were made intentionally or recklessly for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in revenue.  Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal. Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.  Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to | second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do.  Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.<br><br>On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.<br><br>Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had | information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher.  Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage. To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam. Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter. Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted. Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying. Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU. Defendant's statement also implies that he was in possession of Twitter's | created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result. Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously. Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock. Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement. Defendant admitted to a friend his position was unsupported and Twitter would prevail. Defendant's statements also gave a false impression of the state of the merger. In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed | |

Page 31 of 120

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed | prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else. . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."<br><br>Defendant was aware from past incidents that his public activity could influence the stock market.  In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares. | |

Confidential

|  | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
|  |  | that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty. Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case.  Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses.  This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. |  |  |
| 10. | **May 16, 2022, 10:17 Tweet** – "@paraga So how do advertisers know what they're getting for their money? This is fundamental to the financial health of Twitter." | Defendant's statements falsely continue to imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate.  In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.  Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold.  Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his | Defendant's statements were made intentionally or recklessly for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in revenue.  Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do.  Given these economic and financial difficulties, | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal. Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing. Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence. Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights. Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage. To the contrary, Mr. Agarwal invited Defendant on | Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.<br><br>On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU. Defendant asked for additional information, which Twitter agreed it would provide. Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.<br><br>Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares. Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result. Reporters and journalists contacted Defendant to tell him he had created | also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher. Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. | confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false impression of the state of the merger.  In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, | |

Confidential

|  | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
|  |  | Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher. Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support. Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty. | which he hoped would help him try to get out of the merger or negotiate a lower price. In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else. . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."<br><br>Defendant was aware from past incidents that his public activity could influence the stock market. In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market. Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares. |  |
| 11. | **May 17, 2022, 09:34 Tweet Chain**: | Defendant's statements falsely continue to imply that the deal is conditional upon satisfaction due diligence and that Twitter's | Defendant's statements were made intentionally or recklessly for several reasons. First, Defendant's | October 4, 2022 - when Defendant announced |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| Defendant: "Twitter claims that >95% of daily active users are real, unique humans. Does anyone have that experience?"<br><br>@EvaFoxU: "The SEC should investigate whether the Twitter claims are true. If it turns out that Twitter lied in the official filing, then serious consequences and complete distrust of investors can await it."<br><br>Defendant: "Hello @SECGov, anyone home?" | spam estimates were inaccurate.  In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.<br><br>Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold.  Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal.  Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to | financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in revenue.  Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do.  Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.<br><br>On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant | that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher.  Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.   Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.

Twitter never refused to show proof of Twitter's spam percentage.  To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.

Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and | asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.

Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading | breach of the Merger Agreement, lacked support. |

Page 38 of 120

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded | statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false impression of the state of the merger.  In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else.  . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal." | |

Confidential

|  | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
|  |  | 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty.  Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case.  Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses.  This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | Defendant was aware from past incidents that his public activity could influence the stock market.  In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares. |  |
| 12. | **May 19, 2022, 10:56** Tweet of a meme of two astronauts with one labelled "Elon" and the text "Wait it's all bots?" and | Defendant's statements falsely continue to imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate.  In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward. | Defendant's statements were made intentionally or recklessly for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| another astronaut standing behind him with a gun pointed to "Elon" and the text "Always has been". | Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold.  Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal.  Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal.

Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's | share appear to be a high price, i.e., that Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in revenue.  Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do.  Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.

In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.

On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the | the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher.  Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Page 41 of 120

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
|  | team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.   Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage.  To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees | meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.<br><br>Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an |  |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in | attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false impression of the state of the merger.  In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else.  . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."<br><br>Defendant was aware from past incidents that his public activity could influence the stock market.  In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make his unfounded | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty. Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case.  Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses.  This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares. | |
| 13. | **May 21, 2022, 07:38** In response to another user who asked whether Twitter had told Musk anything new regarding the number of daily users, Defendant tweeted "No, they still refuse | Defendant's statements falsely continue to imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate.  In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.<br><br>Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold.  Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to | Defendant's statements were made intentionally or recklessly for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in revenue.  Around April 29, 2022, Morgan Stanley | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | to explain how they calculate that 5% of daily users are fake/spam! Very suspicious." | put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal. Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.   Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding | provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do. Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.<br><br>On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price. | diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher.  Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | 5%. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage. To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam. Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter. Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted. Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no | Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares. Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result. Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously. Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock. Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement. Defendant admitted to a friend his position was unsupported and Twitter would prevail. Defendant's statements also gave a false impression of the state of the merger. In particular, | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data. | Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else.  . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."<br><br>Defendant was aware from past incidents that his public activity could influence the stock market.  In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares. | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty. Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case.  Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses.  This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | | |
| 14. | **May 21, 2022, 10:31 Tweet** – "I'm worried that Twitter has a disincentive to reduce spam, as it reduces perceived daily users" | Defendant's statements falsely continue to imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate.  In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.<br><br>Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold.  Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter | Defendant's statements were made intentionally or recklessly for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in revenue.  Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal.  Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal.

Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.   Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to | financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do.  Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.

In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.

On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.

Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers | the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher.  Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage.  To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's | confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false impression of the state of the merger.  In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher. Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support. Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed | amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet. Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price. In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else. . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."<br><br>Defendant was aware from past incidents that his public activity could influence the stock market. In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market. Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares. | |

Confidential

|  | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
|  |  | that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty. Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case. Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses. This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. |  |  |
| 15. | **July 8, 2022 Termination Letter**<br><br>The termination letter included false and or misleading statements and omissions concerning (i) whether Twitter had complied with its contractual obligations; (ii) that Twitter failed and refused to provide data and information including information relating to the number of fake or spam accounts; (iii) that Twitter made | Defendant's statements falsely continue to imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate. In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.<br>Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold. Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal. His lawyers and bankers continued to meet with Twitter and make progress on the acquisition. Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less. Meanwhile, Defendant and his team continued to obtain equity investment commitments and | Defendant's statements were made intentionally or recklessly for several reasons. First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter. The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company. Meanwhile, Twitter, like some of its peers, was facing a decline in revenue. Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe. Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal. Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do. Given these economic and financial difficulties, | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| false and inaccurate SEC disclosures; and (iv) that the company suffered an MAE. | Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal. Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.   Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions, and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage.  To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and | Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.<br><br>On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.<br><br>Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists contacted Defendant to tell him he had created | also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher.  Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. | confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false impression of the state of the merger.  In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher. Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support. Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.

Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty. Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case. Plaintiffs have since learned of additional facts through discovery that support their contentions, which are | which he hoped would help him try to get out of the merger or negotiate a lower price. In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else. . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."

Defendant was aware from past incidents that his public activity could influence the stock market. In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market. Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares.

Defendant admitted that his Tweets were not conducive to the acquisition, but never retracted any or told the public he continued to work to close the deal behind closed doors. Defendant continued to want to create a illusion of leverage from which he could perhaps negotiate from despite the pending lawsuit against him. Defendant attempted to engage in settlement talks. | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | identified in these responses.  This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | | |
| 16. | **July 10, 2022** Tweet of a meme showing 4 photos of Defendant laughing on the right, accompanied by 4 pieces of text reading "They said I couldn't buy Twitter"; "Then they wouldn't disclose bot info"; "Now they want to force me to buy Twitter in court"; "Now they have to disclose bot info in court." | Defendant's statements falsely continue to express and imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate.  In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.<br><br>Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold.  Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal. Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards | Defendant's statements were made intentionally or recklessly for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in revenue.  Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do.  Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver. | |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | closing.  Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.   Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage.  To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data. | On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.<br><br>Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter. Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted. Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying. Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU. Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution | merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock. Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement. Defendant admitted to a friend his position was unsupported and Twitter would prevail. Defendant's statements also gave a false impression of the state of the merger. In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet. Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price. In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty.  Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case.  Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses.  This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | headlines like everyone else. . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."<br><br>Defendant was aware from past incidents that his public activity could influence the stock market.  In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares.<br><br>Defendant admitted that his Tweets were not conducive to the acquisition, but never retracted any or told the public he continued to work to close the deal behind closed doors.  Defendant continued to want to create a illusion of leverage from which he could perhaps negotiate from despite the pending lawsuit against him.  Defendant attempted to engage in settlement talks. | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| 17. | **July 13, 2022, 14:42** Defendant tweeted clarifying that his tweet of a poop emoji on May 16 meant "bs". "@shacknews [poop emoji] = bs" | Defendant's statements falsely continue to express and imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate.  In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.<br><br>Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold.  Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal. Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal. | Defendant's statements were made intentionally or recklessly for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in revenue.  Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do. Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.<br><br>On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher.  Defendant's capitulation also revealed that his |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.  Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.  Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage.  To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also | financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.<br><br>Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, | litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal | that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false impression of the state of the merger.  In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else. . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal." | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.

Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty.  Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case.  Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses.  This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | Defendant was aware from past incidents that his public activity could influence the stock market.  In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares.

Defendant admitted that his Tweets were not conducive to the acquisition, but never retracted any or told the public he continued to work to close the deal behind closed doors.  Defendant continued to want to create a illusion of leverage from which he could perhaps negotiate from despite the pending lawsuit against him.  Defendant attempted to engage in settlement talks. | |
| 18. | July 22, 2022, 06:18 In response to another user who claimed that Twitter | Defendant's statements falsely continue to express and imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate.  In connection with other statements and tweets, Defendant continues to | Defendant's statements were made intentionally or recklessly for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire | October 4, 2022 - when Defendant announced that he would move forward with the deal at |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | blames Musk for missing earnings, Defendant tweeted back "I'm rubber, they're glue" | disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.<br><br>Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold. Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal. His lawyers and bankers continued to meet with Twitter and make progress on the acquisition. Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less. Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal. Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing. Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence. Twitter continued to fully cooperate and | Twitter. The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company. Meanwhile, Twitter, like some of its peers, was facing a decline in revenue. Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe. Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal. Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do. Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.<br><br>On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU. Defendant asked for additional information, which Twitter agreed it would provide. Defendant never mentioned the deal | $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher. Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.   Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage.  To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his | was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.<br><br>Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers | Agreement, lacked support. |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that | also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false impression of the state of the merger.  In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else. . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."<br><br>Defendant was aware from past incidents that his public activity could influence the stock market. In particular, Defendant knew his statements and actions relating to | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | Twitter had "refused" to provide information and thus was in breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty.  Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case.  Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses.  This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares.<br><br>Defendant admitted that his Tweets were not conducive to the acquisition, but never retracted any or told the public he continued to work to close the deal behind closed doors.  Defendant continued to want to create a illusion of leverage from which he could perhaps negotiate from despite the pending lawsuit against him.  Defendant attempted to engage in settlement talks. | |
| 19. | **July 30, 2022, 06:51 Tweet**: "Interaction with almost all twitter accounts seem to be much lower in recent weeks & days. Accurate?" | Defendant's aspersions and disparaging remarks regarding Twitter's business were meant to further his scheme to drive down the price of shares.  These statements, read in context, falsely continue to express and imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate.  In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward. | Defendant continued to want to create a position of strength from which he could perhaps negotiate from despite the pending lawsuit against him: Defendant's statements were made intentionally or recklessly for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold.  Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal. Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal.

Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's | share appear to be a high price, i.e., that Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in revenue.  Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do.  Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.

In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.

On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the | claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher.  Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.  Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.

Twitter never refused to show proof of Twitter's spam percentage.  To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.

Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees | meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.

Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an | |

Page 69 of 120

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in | attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false impression of the state of the merger.  In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else. . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."<br><br>Defendant was aware from past incidents that his public activity could influence the stock market.  In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make his unfounded | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty.  Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case.  Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses.  This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares.<br><br>Defendant admitted that his Tweets were not conducive to the acquisition, but never retracted any or told the public he continued to work to close the deal behind closed doors.  Defendant continued to want to create a illusion of leverage from which he could perhaps negotiate from despite the pending lawsuit against him.  Defendant attempted to engage in settlement talks. | |
| 20. | August 6, 2022, 00:50 In response to another user's tweet about Twitter's SEC filings and information about spam and fake accounts (based on Defendant's counterclaim suit), | Defendant's statements falsely continue to express and imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate.  In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.  Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold.  Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had | Defendant's statements were made intentionally or recklessly for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in revenue.  Around April 29, 2022, Morgan Stanley | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | Defendant tweeted "Good summary of the problem. If Twitter simply provides their method of sampling 100 accounts and how they're confirmed to be real, the deal should proceed on original terms. However, if it turns out that their SEC filings are materially false, then it should not." | informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal.  Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal.

Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.   Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%.  Twitter provided supporting details concerning its 5% | provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do.  Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.

In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.

On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price. | diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher.  Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions, and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage.  To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be | Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false impression of the state of the merger.  In particular, | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data. | Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else.  . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."<br><br>Defendant was aware from past incidents that his public activity could influence the stock market.  In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares. | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty. Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case. Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses. This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | Defendant admitted that his Tweets were not conducive to the acquisition, but never retracted any or told the public he continued to work to close the deal behind closed doors. Defendant continued to want to create a illusion of leverage from which he could perhaps negotiate from despite the pending lawsuit against him. Defendant attempted to engage in settlement talks. | |
| 21. | August 6, 2022, 09:15 Tweet: "I hereby challenge @paraga to a public debate about the Twitter bot percentage. Let him prove to the public that Twitter has <5% fake or spam daily users!" | Defendant's aspersions and disparaging remarks regarding Twitter's business and its employees were meant to further his scheme to drive down the price of shares. These statements, read in context, falsely continue to express and imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate. In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.<br><br>Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold. Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the | Defendant's statements were made intentionally or recklessly for several reasons. First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter. The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company. Meanwhile, Twitter, like some of its peers, was facing a decline in revenue. Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe. Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal.  Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal.  Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.   Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, | second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do.  Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.  In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.  On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.  Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had | information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher.  Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage.  To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an | created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false impression of the state of the merger.  In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | estimate that spam was less than 5% of mDAU. Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher. Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support. Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post- | prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet. Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price. In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else. . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."<br><br>Defendant was aware from past incidents that his public activity could influence the stock market. In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market. Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares.<br><br>Defendant admitted that his Tweets were not conducive to the acquisition, but never retracted any or told the public he continued to work to close the deal behind closed doors. Defendant continued to want to create a illusion of leverage from which he could perhaps negotiate from despite the pending lawsuit against him. Defendant attempted to engage in settlement talks. | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty. Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case. Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses. This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | | |
| 22. | **August 6, 2022, 09:18; August 7, 2022, 11:36** Tweet of a poll: "Less than 5% of Twitter daily users are fake/spam" with two options to select "Yes [3 robot emojis]" and "Lmaooo no". The results were 64.9% "Lmaooo no", to which Defendant responded "Twitter has spoken …" | Defendant's aspersions and disparaging remarks regarding Twitter's business were meant to further his scheme to drive down the price of shares. These statements, read in context, falsely continue to express and imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate. In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.<br><br>Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold. Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on | Defendant's statements were made intentionally or recklessly for several reasons. First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter. The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company. Meanwhile, Twitter, like some of its peers, was facing a decline in revenue. Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe. Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal. Musk was also forced | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal. Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.  Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing | to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do. Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.<br><br>On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.<br><br>Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the | Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher.  Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage. To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam. Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter. Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted. Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying. Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU. Defendant's | acquisition and that the stock price was significantly depressed as a result. Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously. Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock. Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement. Defendant admitted to a friend his position was unsupported and Twitter would prevail. Defendant's statements also gave a false impression of the state of the merger. In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which | spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else.  . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."<br><br>Defendant was aware from past incidents that his public activity could influence the stock market.  In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares.<br><br>Defendant admitted that his Tweets were not conducive to the acquisition, but never retracted any or told the public he continued to work to close the deal behind closed doors.  Defendant continued to want to create a illusion of leverage from which he could perhaps negotiate from despite the pending lawsuit against him.  Defendant attempted to engage in settlement talks. | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty. Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case.  Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses.  This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | | |
| 23. | August 12, 2022, 21:26 **Tweet**: "Ahem @twitter" with screenshot of what appear to be tweets from a spam account. | Defendant's aspersions and disparaging remarks regarding Twitter's business were meant to further his scheme to drive down the price of shares.  These statements, read in context, falsely continue to express and imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate.  In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.

Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold.  Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial | Defendant's statements were made intentionally or recklessly for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in revenue.  Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do. | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal. Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.   Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to | Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.<br><br>On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.<br><br>Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists | Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher.  Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage. To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam. Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter. Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted. Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying. Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU. Defendant's statement also implies that he was in possession of Twitter's | contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously. Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock. Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement. Defendant admitted to a friend his position was unsupported and Twitter would prevail. Defendant's statements also gave a false impression of the state of the merger. In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet. Musk knew his tweet was false and made it | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed | with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else. . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."<br><br>Defendant was aware from past incidents that his public activity could influence the stock market.  In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares.<br><br>Defendant admitted that his Tweets were not conducive to the acquisition, but never retracted any or told the public he continued to work to close the deal behind closed doors.  Defendant continued to want to create a illusion of leverage from which he could perhaps negotiate from despite the pending lawsuit against him. Defendant attempted to engage in settlement talks. | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty. Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case. Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses. This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | | |
| 24. | August 18, 2022, 13:19 In response to another user's tweets about how Twitter independently audits advertisements on its platform, Defendant tweeted "Those are the questions that Twitter is doing everything possible to avoid answering…" | Defendant's statements falsely continue to express and imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate. In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward. Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold. Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal. His lawyers and bankers continued to meet with Twitter and make progress on the acquisition. Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less. Meanwhile, Defendant and his | Defendant's statements were made intentionally or recklessly for several reasons. First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter. The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company. Meanwhile, Twitter, like some of its peers, was facing a decline in revenue. Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe. Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal. Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do. | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal. Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing. Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence. Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights. Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage. To the contrary, Mr. Agarwal invited Defendant on | Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.<br><br>On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU. Defendant asked for additional information, which Twitter agreed it would provide. Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.<br><br>Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares. Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result. Reporters and journalists | Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher. Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. | contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false impression of the state of the merger.  In particular, Defendant led the public to believe the deal was in serious jeopardy or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty. Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case.  Plaintiffs have since learned of additional facts | with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else. . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."<br><br>Defendant was aware from past incidents that his public activity could influence the stock market.  In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares.<br><br>Defendant admitted that his Tweets were not conducive to the acquisition, but never retracted any or told the public he continued to work to close the deal behind closed doors.  Defendant continued to want to create a illusion of leverage from which he could perhaps negotiate from despite the pending lawsuit against him. Defendant attempted to engage in settlement talks. | |

Confidential

|  | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
|  |  | through discovery that support their contentions, which are identified in these responses.  This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. |  |  |
| 25. | August 23, 2022, 08:54 Responding to now unavailable post, Defendant tweeted "Yet another 'verified' [robot emoji]" | Defendant's aspersions and disparaging remarks regarding Twitter's business were meant to further his scheme to drive down the price of shares.  These statements, read in context, falsely continue to express and imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate.  In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.

Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold.  Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal. | Defendant's statements were made intentionally or recklessly for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in revenue.  Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do.  Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.

In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.   Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage.  To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, | Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.<br><br>On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.<br><br>Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger | let alone was 20% or higher.  Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant | agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false impression of the state of the merger.  In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers | |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher. Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support. Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty. Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case. Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses. This statement was material as it | "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else. . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."<br><br>Defendant was aware from past incidents that his public activity could influence the stock market. In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market. Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares.<br><br>Defendant admitted that his Tweets were not conducive to the acquisition, but never retracted any or told the public he continued to work to close the deal behind closed doors. Defendant continued to want to create a illusion of leverage from which he could perhaps negotiate from despite the pending lawsuit against him. Defendant attempted to engage in settlement talks. | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | | |
| 26. | **August 21, 2022, 21:05, 21:09** **Tweet:** "Sure sounds higher than 5%!" with a link to an article in The Australian (behind paywall). **Replying to himself via tweet:** "On a $/bot basis, this deal is awesome" | Defendant's aspersions and disparaging remarks regarding Twitter's business were meant to further his scheme to drive down the price of shares.  These statements, read in context, falsely continue to express and imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate.  In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.<br><br>Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold.  Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal.  Contrary to what Defendant was telling the public, Defendant's | Defendant's statements were made intentionally or recklessly for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in revenue.  Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do.  Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver. | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.   Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage.  To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including | On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.<br><br>Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the | higher.  Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with | merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false impression of the state of the merger.  In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the | |

Page 97 of 120

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher. Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support. Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty. Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case. Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses. This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | headlines like everyone else. . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."<br><br>Defendant was aware from past incidents that his public activity could influence the stock market. In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market. Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares.<br><br>Defendant admitted that his Tweets were not conducive to the acquisition, but never retracted any or told the public he continued to work to close the deal behind closed doors. Defendant continued to want to create a illusion of leverage from which he could perhaps negotiate from despite the pending lawsuit against him. Defendant attempted to engage in settlement talks. | |

Page 98 of 120

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | | | |
| 27. | September 8, 2022, 21:15 In response to another user appearing to tweet about bots following their account, Defendant tweeted back "Bot block party" | Defendant's aspersions and disparaging remarks regarding Twitter's business were meant to further his scheme to drive down the price of shares.  These statements, read in context, falsely continue to express and imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate.  In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.<br><br>Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold.  Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal. Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards | Defendant's statements were made intentionally or recklessly for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in revenue.  Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do. Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver. | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher.  Defendant's capitulation also |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | closing.  Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.   Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage.  To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data. | On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.<br><br>Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its | revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Throughout September Defendant was on the phone to his attorneys 3 to 4 times a day regarding the Twitter lawsuit.  Eventually, towards the end of September, his advisers convinced him that his positions were unsupported (they always had been) | employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false impression of the state of the merger.  In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else. . . feels like renegotiating | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | and that they would lose the Twitter lawsuit if they took it to trial and convinced him to capitulate.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher. Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support. Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty. Reporting also revealed that Defendant's legal contentions were | tactics on price given how the markets have rolled since announcement of the deal."<br><br>Defendant was aware from past incidents that his public activity could influence the stock market. In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market. Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares.<br><br>Defendant admitted that his Tweets were not conducive to the acquisition, but never retracted any or told the public he continued to work to close the deal behind closed doors. Defendant continued to want to create a illusion of leverage from which he could perhaps negotiate from despite the pending lawsuit against him. Defendant attempted to engage in settlement talks. | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | false and that he was told by his lawyers that he would lose the Delaware case.  Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses.  This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | | |
| 28. | September 20, 2022, 18:26 In response to another user Tweeting about Twitter's statements regarding account suspension "Seems strange that CEO @parag would state $TWTR suspends over 500,000 accounts per day but @Twitter is claiming it suspends over 1,000,000 accounts per day in its lawsuit v. @elonmusk", Defendant tweets back "Curiouser and curiouser…" | Defendant's aspersions and disparaging remarks regarding Twitter's business and its employees were meant to further his scheme to drive down the price of shares.  These statements, read in context, falsely continue to express and imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate.  In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.

Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold.  Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his | Defendant's statements were made intentionally or recklessly for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in revenue.  Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do.  Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal. | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal. Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing. Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence. Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights. Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage. To the contrary, Mr. Agarwal invited Defendant on | In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.<br><br>On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU. Defendant asked for additional information, which Twitter agreed it would provide. Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.<br><br>Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares. Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result. Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously. Defendant | of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher. Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. | continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false impression of the state of the merger.  In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | Throughout September Defendant was on the phone to his attorneys 3 to 4 times a day regarding the Twitter lawsuit. Eventually, towards the end of September, his advisers convinced him that his positions were unsupported (they always had been) and that they would lose the Twitter lawsuit if they took it to trial and convinced him to capitulate.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post- | spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else. . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."<br><br>Defendant was aware from past incidents that his public activity could influence the stock market.  In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares.<br><br>Defendant admitted that his Tweets were not conducive to the acquisition, but never retracted any or told the public he continued to work to close the deal behind closed doors.  Defendant continued to want to create a illusion of leverage from which he could perhaps negotiate from despite the pending lawsuit against him.  Defendant attempted to engage in settlement talks. | |

Confidential

|  | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
|  |  | merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty. Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case.  Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses.  This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition.  Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence. |  |  |
| 29. | September 20, 2022, 19:58 and 20:05 In response to a now deleted Tweet, Defendant tweeted: "what's going on", another user replied "I think they've been muting our replies for awhile from your fans" to which Defendant tweeted back "Seems that way @Twitter @paraga" | Defendant's aspersions and disparaging remarks regarding Twitter's business and its employees were meant to further his scheme to drive down the price of shares.  These statements, read in context, falsely continue to express and imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate.  In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.<br><br>Throughout September Defendant was on the phone to his attorneys 3 to 4 times a day regarding the Twitter lawsuit. Eventually, towards the end of September, his advisers convinced him that his positions were unsupported (they always had been) | Defendant's statements were made intentionally or recklessly for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in revenue.  Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | and that they would lose the Twitter lawsuit if they took it to trial and convinced him to capitulate.<br><br>Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold.  Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal.  Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal.<br><br>Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and | financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do.  Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.<br><br>On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.<br><br>Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers | the spam account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher.  Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.   Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage.  To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his | confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false impression of the state of the merger.  In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that | amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else.  . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."<br><br>Defendant was aware from past incidents that his public activity could influence the stock market.  In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares.<br><br>Defendant admitted that his Tweets were not conducive to the acquisition, but never retracted any or told the public he continued to work to close the deal behind closed doors.  Defendant continued to want to create a illusion of leverage from which he could perhaps | |

Confidential

|  | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
|  |  | Twitter had "refused" to provide information and thus was in breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty.  Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case.  Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses.  This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | negotiate from despite the pending lawsuit against him.  Defendant attempted to engage in settlement talks. |  |
| 30. | September 22, 2022, 10:39<br>In response to another user that tweeted tagging Twitter and Agrawal questioning how hard it could be to detect | Defendant's aspersions and disparaging remarks regarding Twitter's business were meant to further his scheme to drive down the price of shares.  These statements, read in context, falsely continue to express and imply that the deal is conditional upon satisfaction due diligence and that Twitter's spam estimates were inaccurate.  In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward. | Defendant's statements were made intentionally or recklessly for several reasons.  First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter.  The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company.  Meanwhile, Twitter, like some of its peers, was facing a decline in | October 4, 2022 - when Defendant announced that he would move forward with the deal at $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| spam, Defendant tweeted "Yup (sigh)" | Throughout September Defendant was on the phone to his attorneys 3 to 4 times a day regarding the Twitter lawsuit. Eventually, towards the end of September, his advisers convinced him that his positions were unsupported (they always had been) and that they would lose the Twitter lawsuit if they took it to trial and convinced him to capitulate.<br><br>Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold.  Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal.  His lawyers and bankers continued to meet with Twitter and make progress on the acquisition.  Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less.   Meanwhile, Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal. Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal. | revenue.  Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe.  Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal.  Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do.  Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.<br><br>On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price. | claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher.  Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger Agreement, lacked support. |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.  Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.  Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.<br><br>Twitter never refused to show proof of Twitter's spam percentage.  To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also | Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted. Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying. Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU. Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data.<br><br>Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal | impression of the state of the merger. In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet. Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price. In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else. . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."<br><br>Defendant was aware from past incidents that his public activity could influence the stock market. In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market. Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares. | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty.  Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case.  Plaintiffs have since learned of additional facts through discovery that support their contentions, which are identified in these responses.  This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | Defendant admitted that his Tweets were not conducive to the acquisition, but never retracted any or told the public he continued to work to close the deal behind closed doors.  Defendant continued to want to create a illusion of leverage from which he could perhaps negotiate from despite the pending lawsuit against him.  Defendant attempted to engage in settlement talks. | |
| 31. | October 3, 2022 09:15, 09:44, and 09:58 | Defendant's aspersions and disparaging remarks regarding Twitter's business were meant to further his scheme to drive down the price of shares.  These statements, read in context, falsely continue to express and imply that the deal is conditional | Defendant was piggy-backing off of political issues to further his own agenda with respect to the Twitter lawsuit. | October 4, 2022 - when Defendant announced that he would move forward with the deal at |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| Tweet about the Russia-Ukraine war offering a suggestion for peace and starting a poll to see whether twitter users agree. The result of the poll disagreed with Musk's suggestion. Tweet commenting on his first tweet "The bot attack on this poll is strong!" One commenter on that tweet then commented "Wonder how many bots were activated to turn around the original result", to which Musk responded "Indeed. Biggest bot attack I've ever seen." | upon satisfaction due diligence and that Twitter's spam estimates were inaccurate. In connection with other statements and tweets, Defendant continues to disparage Twitter and imply the deal was on hold, even though the deal was not on hold and was still moving forward.<br><br>Defendant was noticed and scheduled to be deposed in the Twitter lawsuit on September 29, 2022 but did not appear.<br><br>Throughout September Defendant was on the phone to his attorneys 3 to 4 times a day regarding the Twitter lawsuit. Eventually, towards the end of September, his advisers convinced him that his positions were unsupported (they always had been) and that they would lose the Twitter lawsuit if they took it to trial and convinced him to capitulate.<br><br>Contrary to Defendant's statements and unbeknownst to the public, the Twitter deal was not on hold. Defendant had no right to unilaterally put the deal on hold and Twitter did not agree to put the deal on hold. Neither Defendant nor his team had informed Twitter that the "deal was on hold." Defendant's statement is also false because he never took any steps to put the deal on hold, instead instructing his team to continue working on the deal. His lawyers and bankers continued to meet with Twitter and make progress on the acquisition. Defendant's financial advisers also continued in-depth discussions about acquiring Twitter, thought Defendant and his team began secretly discussing ways in which he might be able to renegotiate and acquire the company for less. Meanwhile, Defendant and his team continued to obtain equity investment commitments and | Defendant was noticed and scheduled to be deposed in the Twitter lawsuit on September 29, 2022 but did not appear. This is likely due to the fact that he knew he had a weak legal position.<br><br>Defendant's statements were made intentionally or recklessly for several reasons. First, Defendant's financial position, including his equity stake in Tesla, declined significantly following his agreement to acquire Twitter. The broader financial markets also declined, making Defendant's decision to buy Twitter at $54.20 a share appear to be a high price, i.e., that Defendant was paying a large premium on the company. Meanwhile, Twitter, like some of its peers, was facing a decline in revenue. Around April 29, 2022, Morgan Stanley provided Defendant with a projection that indicated that Twitter would have profitability issues based on its projected revenues and the interest payments Defendant would owe. Meanwhile, a potentially serious conflict between Russia and Ukraine was also causing financial markets to decline and giving Defendant second thoughts about the deal. Musk was also forced to sell more of his Tesla shares to pay for the merger due to its declining value, which he did not want to do. Given these economic and financial difficulties, Defendant got cold feet and wanted to back out of or renegotiate the deal.<br><br>In addition, Musk had actual knowledge that he had waived due diligence, because Musk filed an | $54.20—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims concerning due diligence requests—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam account information to Defendant and the deal had not been on hold. Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone was 20% or higher. Defendant's capitulation also revealed that his litigation position, e.g., that Twitter was in breach of the Merger |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal. Contrary to what Defendant was telling the public, Defendant's financial advisers and equity investors were reassured that there were no changes and Defendant was still working towards closing.  Defendant and his team also continued to work with Twitter on closing the deal.

Additionally, the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to "spam/fake accounts" when in fact Defendant had waived detailed due diligence.   Twitter continued to fully cooperate and respond to Defendant's requests and provide information and data Defendant requested. Meanwhile, internally Defendant's team conceded that the deal was not conditional on detailed due diligence and the deal did not have traditional information sharing rights.   Defendant's statements also falsely states, or implies that Twitter does not have supporting analysis regarding 5%.  Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. Twitter also explained, answered questions, and provided new information, in an ongoing dialog, explaining in detail how it devoted significant resources to improving its platform and addressing issues related to verified users, false and spam accounts, mDAU, and more.

Twitter never refused to show proof of Twitter's spam percentage.  To the contrary, Mr. Agarwal invited Defendant on multiple occasions to meet with him so that he could explain and | Amendment No. 3 to Schedule 13D on April 21, 2022 noting such waiver.

On May 6, 2022, Defendant attended a meeting with Twitter, in which Twitter provided Defendant with its financial information and explained its methodology for estimating spam as a percentage of mDAU.  Defendant asked for additional information, which Twitter agreed it would provide.  Defendant never mentioned the deal was on hold or would not move forward until Twitter provided any information. After Defendant left the meeting, he quickly began discussing with various bankers and advisers ways in which he could scheme to renegotiate a lower purchase price.

Defendant then made a series of statements—knowing that the deal was not on hold, knowing that Twitter had agreed to provide him the information he requested, and knowing that the statements would influence the price of Twitter shares.  Defendant's financial advisers confirmed for Defendant that his statements had created massive amounts of uncertainty about the acquisition and that the stock price was significantly depressed as a result.  Reporters and journalists contacted Defendant to tell him he had created confusion and uncertainty and asked if he wanted to clarify his statements, but Defendant ignored those inquiries or responded facetiously.  Defendant continued to make false and misleading statements about the deal, Twitter's obligations under the merger | Agreement, lacked support. |

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | show him how Twitter estimate spam.  Twitter was cooperative and forthcoming when Defendant made requests for information, providing Defendant with the information he requested, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.<br><br>Moreover, Defendant knew, since as early as July 11, 2018, that there were fake and spam accounts on Twitter.  Defendant also pledged to fix the spam problem when he decided to purchase the company by way of a seller friendly merger agreement that he proposed and drafted.  Despite publicly feigning surprise and concern about spam, Defendant had long known that spam/fake accounts were an issue for Twitter. In fact, Defendant made his offer in spite of this and communicated with Twitter employees and board members concerning his plans to improve spam on the platform.<br><br>Further, Twitter's estimate regarding spam accounts as a percentage of mDAU was not inaccurate and Defendant had no proof otherwise, let alone proof suggesting that spam may be higher or that Twitter or its CEO was lying.  Twitter's methodology was robust and had repeatedly resulted in an estimate that spam was less than 5% of mDAU.  Defendant's statement also implies that he was in possession of Twitter's internal information that refuted Twitter's public spam estimate, when in fact, Musk was not in possession of such information. Twitter provided supporting details concerning its 5% number, offered to continue providing information and data, and did provide information and data. | agreement, whether Twitter was cooperating and providing information, Defendant's rights under the merger agreement, disparaging Twitter and its employees, purporting to terminate the deal, all while knowing that his statements were false and misleading, that his real undisclosed intentions were to renegotiate a lower price and that his false and misleading statements and omissions were negatively manipulating the price of Twitter's stock.  Defendant's own lawyers also warned him that his statements were misleading and would create legal issues, yet he never made an attempt to correct any statement.  Defendant admitted to a friend his position was unsupported and Twitter would prevail.  Defendant's statements also gave a false impression of the state of the merger.  In particular, Defendant led the public to believe the deal was in serious jeopardy and or terminated, while behind the scenes, Defendant's team continued to work to close the deal. Musk's knowledge that the merger was not in fact "on hold" is reflected by the fact that no amendment to the merger agreement had been signed prior to Musk's May 13, 2022 tweet and Musk had not spoken to Twitter or his own advisors prior to issuing the tweet.  Musk knew his tweet was false and made it with the intent to drive down Twitter's stock price, which he hoped would help him try to get out of the merger or negotiate a lower price.  In an email the same day, a banker from Bank of America stated that he had spoken to Musk's bankers at Morgan Stanley about Musk's tweet and that the Morgan Stanley bankers | |

Confidential

| | Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|---|
| | | Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions when Defendant announced on October 4, 2022, that he would move forward with the deal at the original price—after a public battle with Twitter about the Merger Agreement and absent any apparent resolution around his claims for due diligence—the market reasonably reacted to the "truth" that Twitter never had the obligation to provide the spam-account information to Defendant and the deal had not been on hold.  Defendant's capitulation also revealed that he had no basis, and no proof, that Twitter's estimation of the number of spam or false accounts on the platform exceeded 5%, let alone were 20% or higher.  Defendant's capitulation also revealed that his assertions and litigation positions, e.g., that Twitter had "refused" to provide information and thus was in breach, lacked support.  Throughout, Twitter was cooperative and forthcoming, providing Defendant with information he requested despite not being obliged to do so, including the methodology by which Twitter estimated the number of spam accounts as a percentage of mDAU and the underlying data.

Additionally, Plaintiffs and the class became aware of Defendant's false and misleading statements and omissions through post-merger reporting, interviews, and Defendant's biography, which were published after the merger closed, and which confirmed that Defendant's false and misleading statements were pretextual, false, unsupported, and meant to cause uncertainty.  Reporting also revealed that Defendant's legal contentions were false and that he was told by his lawyers that he would lose the Delaware case.  Plaintiffs have since learned of additional facts through discovery that support their contentions, which are | "have very little color to add – did not have any inkling regarding the tweet this morning and are reacting to the headlines like everyone else.  . . feels like renegotiating tactics on price given how the markets have rolled since announcement of the deal."

Defendant was aware from past incidents that his public activity could influence the stock market.  In particular, Defendant knew his statements and actions relating to his acquisition of Twitter shares would influence the stock market.  Thus, his decision to make his unfounded statements public demonstrates his intent (and/or recklessness) to manipulate the price of Twitter shares.

Defendant admitted that his Tweets were not conducive to the acquisition, but never retracted any or told the public he continued to work to close the deal behind closed doors.  Defendant continued to want to create a illusion of leverage from which he could perhaps negotiate from despite the pending lawsuit against him. Defendant attempted to engage in settlement talks. | |

Page 119 of 120

Confidential

| Interrogatory 6 | Interrogatories 7, 8, 9 | Interrogatory 10 | Interrogatories 11-12 |
|---|---|---|---|
| | identified in these responses.  This statement was material as it called into question whether the deal would close, and Defendant admitted this statement was material in his SEC deposition. | | |

## **VERIFICATION**

*PAMPENA V. MUSK.,* CASE NO. 3:22-CV-05937-CRB

I, Brian Belgrave, hereby state and declare as follows:

I have read the foregoing Plaintiffs' Supplemental Responses and Objections to Defendant Elon R. Musk's First Set of Interrogatories (NOS. 1-12).  As to those matters within my personal knowledge, I verify that the contents and representations made as to me are true and accurate; as to other matters, on information and belief, I verify that the contents thereof are true and accurate.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Portland, Oregon on this 17th day of March, 2025.



DocuSigned by:

Brian Belgrave

5E2DFA7432D84BF...

BRIAN BELGRAVE

**VERIFICATION**

## **VERIFICATION**

*PAMPENA V. MUSK.,* CASE NO. 3:22-CV-05937-CRB

I, John Garrett, hereby state and declare as follows:

I have read the foregoing Plaintiffs' Supplemental Responses and Objections to Defendant Elon R. Musk's First Set of Interrogatories (NOS. 1-12).  As to those matters within my personal knowledge, I verify that the contents and representations made as to me are true and accurate; as to other matters, on information and belief, I verify that the contents thereof are true and accurate.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Belleville, Ontario Canada on this 16th day of March, 2025.



Signed by:

John Garrett

604971A6FDE247F

JOHN GARRETT

**VERIFICATION**

## **VERIFICATION**

*PAMPENA V. MUSK.,* CASE NO. 3:22-CV-05937-CRB

I, Nancy Price, hereby state and declare as follows:

I have read the foregoing Plaintiffs' Supplemental Responses and Objections to Defendant Elon R. Musk's First Set of Interrogatories (NOS. 1-12).  As to those matters within my personal knowledge, I verify that the contents and representations made as to me are true and accurate; as to other matters, on information and belief, I verify that the contents thereof are true and accurate.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Belleville, Ontario Candada on this 16th day of March, 2025.



Signed by:

604971A6FDEC47F...

NANCY PRICE

**VERIFICATION**

## PROOF OF SERVICE

I am employed in the County of San Mateo. I am over the age of 18 years and not a party to this action. My business address is the Law Offices of Cotchett, Pitre & McCarthy, LLP, San Francisco Airport Office Center, 840 Malcolm Road, Burlingame, California, 94010. On this day, I served the following document(s) in the manner described below:

**PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST SET OF INTERROGATORIES (NOS. 1-12)**

✓    **VIA E-MAIL:** My e-mail address is zagudelo@cpmlegal.com. I am readily familiar with this firm's practice for causing documents to be served by e-mail. Following that practice, I caused the aforementioned document(s) to be emailed to the addressee(s) specified below.

| | |
|---|---|
| Alex Spiro (*pro hac vice forthcoming*)<br>Jesse A. Bernstein (*pro hac vice*)<br>Johnathan E. Feder (*pro hac vice*)<br>**QUINN EMANUEL URQUHART &<br>SULLIVAN, LLP**<br>51 Madison Ave 22nd floor<br>New York, NY 10010<br>Telephone:(212) 849-7000<br>Facsimile:(212) 849-7100<br>Email: alexspiro@quinnemanuel.com<br>jessebernstein@quinnemanuel.com<br>jonathanfeder@quinnemanuel.com | **ATTORNEYS FOR DEFENDANT ELON MUSK** |
| Michael T. Lifrak<br>Joseph C. Sarles<br>Alex Bergjans<br>**QUINN EMANUEL URQUHART &<br>SULLIVAN, LLP**<br>865 S. Figueroa Street, 10th Floor<br>Los Angeles, California 90017<br>Telephone:(213) 443-3000<br>Facsimile:(213) 443-3100<br>Email: michaellifrak@quinnemanuel.com<br>josephsarles@quinnemanuel.com<br>alexbergjans@quinnemanuel.com | **ATTORNEYS FOR DEFENDANT ELON MUSK** |

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST SET OF INTERROGATORIES (NOS. 1-12)

| Nathan Archibald (*pro hac vice*)<br>**QUINN EMANUEL URQUHART &**<br>**SULLIVAN, LLP**<br>nathanarchibald@quinnemanuel.com<br>2755 E. Cottonwood Parkway, Suite 430<br>Salt Lake City, Utah 84121<br>Telephone: (801) 515-7300<br>Facsimile: (801) 515-7400 | **ATTORNEYS FOR DEFENDANT ELON**<br>**MUSK** |
| --- | --- |

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.  Executed at Burlingame, California, on March 17, 2025.

_____
ZYRES AGUDELO

Case No: 3:22-CV-05937-CRB

PLAINTIFFS' SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES (NOS. 1-12)