# EXHIBIT A



## Transcript of David Tabak, Ph.D.

**Date:** July 16, 2025
**Case:** Pampena -v- Musk

**Planet Depos**

**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com

**www.planetdepos.com**

Michigan #8598 | Nevada #089F | New Mexico #566

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

------------------------------- x

GIUSEPPE PAMPENA, individually    :

and on behalf of all others       :

similarly situated, et al.,       : Civil Action No.

            Plaintiffs       : 3:22-cv-05937

       vs                         :

ELON MUSK,                        :

         Defendant          :

------------------------------- x

REMOTELY CONDUCTED VIDEOTAPED DEPOSITION OF

DAVID TABAK, PHD

WEDNESDAY, JULY 16, 2025

11:01 A.M. EDT

JOB NO.: 591600

PAGES: 1 - 212

REPORTED BY: KARISA EKENSEAIR, CCR RPR RMR RDR

CA CSR #14546

DEPOSITION OF DAVID TABAK, PHD, CONDUCTED VIA
ZOOM VIDEOCONFERENCE.

Pursuant to notice, before Karisa J. Ekenseair, Certified Shorthand Reporter in and for the States of Arkansas, Oklahoma, Missouri, Illinois, Tennessee, Georgia, New Mexico, Washington, and California; National Registered Professional Reporter; National Registered Merit Reporter; National Registered Diplomate Reporter; Notary Public.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                    3

                    A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS (VIA ZOOM):

     AARON P. ARNZEN, ESQUIRE

     FRANK BOTTINI, ESQUIRE

     BOTTINI & BOTTINI, INC.

     7818 INVANHOE AVENUE, SUITE 102

     LA JOLLA, CALIFORNIA 92037

     858-914-2001

     -AND-

     CAROLINE YUEN, ESQUIRE

     GIA JUNG, ESQUIRE

     COTCHETT, PITRE & McCARTHY, LLP

     840 MALCOLM ROAD, SUITE 200

     BURLINGAME, CALIFORNIA 94010

     650-697-6000


ON BEHALF OF THE DEFENDANT (VIA ZOOM):

     JESSE BERNSTEIN, ESQUIRE

     STEPHANIE KELEMEN, ESQUIRE

     JONATHAN FEDER, ESQUIRE

     QUINN EMANUEL URQUHART & SULLIVAN, LLP

     865 S. FIGUEROA STREET, 10TH FLOOR

     LOS ANGELES, CALIFORNIA 90017

     213-443-3000

A P P E A R A N C E S   C O N T I N U E D


ALSO PRESENT:

    XANTHI GKOUGKOUSI, COMPASS LEXICON

    KOLLIN CASAREZ, VIDEOGRAPHER

T A B L E   O F   C O N T E N T S

                                                    PAGE

STYLE AND NUMBER........................    1

APPEARANCES.............................    3


WITNESS:    DAVID TABAK

EXAMINATION BY MR. BERNSTEIN...........9

EXAMINATION BY MR. ARNZEN..............172

FURTHER EXAMINATION BY MR. BERNSTEIN...200


CERTIFICATE OF REPORTER.............  212


                        EXHIBITS

                (ATTACHED TO TRANSCRIPT)

 NUMBER          DESCRIPTION                  PAGE

EXHIBIT 200   EXPERT REPORT OF DAVID I.

              TABAK, PH.D...................10

EXHIBIT 201   BLOOMBERG ARTICLE, TWITTER

              DEAL IS PROCEEDING, NOT 'ON

              HOLD,' EXECUTIVES TELL

              STAFF, PUBLISHED MAY 19.......43

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                                    6

                          EXHIBITS

                   (ATTACHED TO TRANSCRIPT)

   NUMBER          DESCRIPTION                    PAGE

EXHIBIT 202   UNITED STATES SECURITIES

              AND EXCHANGE COMMISSION

              AMENDMENT NO. 7 TO SCHEDULE

              13D, DATED MAY 24, 2022.......46

EXHIBIT 203   COMPLAINT FOR

              (1) VIOLATION OF THE

              CALIFORNIA CORPORATIONS

              CODE; AND

              (2) DECLARATORY AND

              INJUNCTIVE RELIEF.............49

EXHIBIT 204   CNBC ARTICLE, TWITTER

              SHAREHOLDERS SUE ELON MUSK

              AND TWITTER OVER CHAOTIC

              DEAL, PUBLISHED MAY 26,

              2022........................52

EXHIBIT 205   SKADDEN, ARPS, SLATE,

              MEAGHER & FLOM LLP LETTER

              DATED JUNE 7M 2022............54

///

///

///

///

EXHIBITS

(ATTACHED TO TRANSCRIPT)

NUMBER          DESCRIPTION                    PAGE

EXHIBIT 206  SPARKTORO & FOLLOWERWONK

JOINT TWITTER ANALYSIS:

19.2 % OF ACTIVE ACCOUNTS

ARE FAKE OR SPAM PUBLISHED

MAY 15, 2022.................105

EXHIBIT 207  TWEET THREAD DATED MAY 15,

2022........................108

EXHIBIT 208  EXPERT REBUTTAL REPORT OF

KENNETH M. LEHN, JULY 2,

2025........................203

P R O C E E D I N G S    11:00:26

THE VIDEOGRAPHER:  Here begins Media No. 1    11:00:26

in the videotaped deposition of David Tabak in the    11:00:30

matter of Giuseppe Pampena versus Elon R. Musk in    11:00:35

the United States District Court, Northern District    11:00:45

of California, Case Number 3:22-CV-05937-CRB.    11:00:48

Today's date is July 16, 2025.  The time on    11:00:58

the video monitor is 11:01 Eastern.    11:01:03

The remote videographer today is Kollin    11:01:06

Casarez representing Planet Depos.  All parties of    11:01:11

this video deposition are attending remotely.    11:01:13

Would counsel please voice-identify    11:01:16

themselves and state whom they report.    11:01:19

MR. ARNZEN:  Sure.  Aaron Arnzen for lead    11:01:22

plaintiffs in this case.  I'm joined on the    11:01:23

plaintiffs' side by Frank Bottini and Caroline Yuen,    11:01:24

Y-U-E-N.    11:01:27

MR. BERNSTEIN:  Jesse Bernstein, Quinn    11:01:30

Emanuel Urquhart & Sullivan, on behalf of Defendant    11:01:36

Elon Musk.  I'm joined by my colleagues Stephanie    11:01:37

Kelemen and Jonathan Feder from Quinn Emanuel, and    11:01:43

one of our Compass Lexecon colleagues as well.    11:01:45

THE VIDEOGRAPHER:  Perfect.    11:01:51

The court reporter today is Karisa    11:01:53

Ekenseair, representing Planet Depos.    11:01:55

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                    9

The witness will now be sworn.                      11:01:57

THE REPORTER:  Good morning.  My name is            11:02:00
Karisa Ekenseair.  I'm a California Certified
Shorthand Reporter, License Number 14546.

Would the witness please raise their right
hand and be sworn.

DAVID TABAK

of lawful age, being first duly sworn, deposes and
says in reply to the questions propounded as
follows:

EXAMINATION                          11:02:19

BY MR. BERNSTEIN:                                    11:02:19

Q   Good morning, Dr. Tabak.                     11:02:24

A   Good morning, Mr. Bernstein.                 11:02:26

Q   How are you?                                 11:02:29

A   I'm fine.  Thank you.                        11:02:30

Q   Did I pronounce your name correctly?         11:02:31

A   No.  It's two short As, accent on the first  11:02:33
syllable, Tabak.  But not a problem.                 11:02:39

Q   Tabak.                                       11:02:40

A   There you go.                                11:02:41

Q   Okay.  Dr. Tabak.  And I apologize in        11:02:42
advance if I veer off of that throughout the day.    11:02:44

A   I'm sure you probably heard your last name   11:02:47
pronounced Bernstein and Bernstein.                  11:02:50

Transcript of David Tabak, Ph.D.

Conducted on July 16, 2025

10

Q   I have, that is true.  And I don't take offense to it, so I hope you won't take offense to it if I -- if I get yours wrong.

A   I will not.

Q   You understand that you are under oath?

A   Yes.

Q   You understand that's the same oath that you would take if -- when this case goes to trial --

A   I believe so.

Q   -- in a court --

I know you've been deposed many times before, so we'll -- we'll short-circuit some of the -- the rules here.

The most important one is just that, particularly because we're doing this by Zoom, you wait until I finish my question to start providing your answer, and I will do my best to wait until you finish your answer before I start my next question; is that fair?

A   It's fair.  I will also do my best.

Q   Is there any reason you can't give truthful testimony today?

A   No.

Q   You have submitted three reports in this case, correct?

11:02:53
11:02:57
11:03:00
11:03:02
11:03:03
11:03:08
11:03:08
11:03:11
11:03:15
11:03:16
11:03:16
11:03:24
11:03:27
11:03:29
11:03:33
11:03:37
11:03:40
11:03:43
11:03:47
11:03:47
11:03:51
11:04:00
11:04:00
11:04:01
11:04:12

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

11

A    I believe that's correct, yes.

Q    Why don't we go ahead and mark as Exhibit 1 Tab 1, Dr. Tabak's expert report dated May 7th, 2025.

MR. ARNZEN:  Mr. Bernstein, I hate to interrupt.  I apologize.  We've been consecutively numbering these.  I wonder if you might start at 200.  Would you object to that?

MR. BERNSTEIN:  I would not object to it at all.

MR. ARNZEN:  Thank you.

MR. BERNSTEIN:  You will probably have to jump in and remind me throughout the deposition what number we're up to.  I have a very bad track record even when I'm starting from 1.  So if I'm starting from 200, it increases the likelihood of mistakes significantly, but I will do my best.

So why don't we mark as Exhibit 200, Tab 1, Dr. Tabak's expert report dated May 2nd, 2025.

(Exhibit 200 marked for identification.)

A    THE WITNESS:  And Mr. Bernstein, if it's okay with you, I'll just point out I have a copy of my report and Dr. Lehn's report.  They're clean, no underlining, no highlighting, no markings whatsoever -- if that's okay with you.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

12

Q    Yeah.  That's -- that's absolutely fine.
And it was actually going to be my next question,
was whether you have that in front of you, because I
think it will make things a bit easier.  So I
appreciate that.

Other than your report, do you have any
other -- other than your report and Dr. Lehn's
report, do you have any other materials in front of
you?

A    I have a blank piece of paper and a couple
of pens, and that's it.

Q    Okay.  Thank you.

While we're getting that uploaded, between
your damages report, your class certification
report, and your class certification rebuttal
report, do those contain all the opinions that you
intend to provide in this case?

A    They contain all of those that I had as of
the date of my damages report.  Dr. Lehn -- it's
L-E-H-N -- submitted a rebuttal report afterwards,
and I've reviewed that, and I have opinions in
response to what is in the Lehn rebuttal report.

Q    Okay.  I'm sure we will walk through those
today.

So other than what's in your three reports

11:05:29
11:05:30
11:05:33
11:05:35
11:05:38
11:05:38
11:05:40
11:05:46
11:05:48
11:05:48
11:05:52
11:06:14
11:06:14
11:06:15
11:06:17
11:06:20
11:06:23
11:06:24
11:06:27
11:06:31
11:06:35
11:06:38
11:06:43
11:06:48
11:06:49

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                13

and your responses to Dr. Lehn's reports, you have no other opinions you intend to offer, correct?

A   As of today, that is certainly correct.

Q   And Exhibit 200 that is now on the screen and, I believe, you have in front of you as well, that is your damages report in this case, correct?

A   Correct.

Q   And for purposes of this report, you are assuming that a finder of fact will determine that defendants made false or misleading statements, correct?

A   Certainly that is true for the 10b-5(a) claim.  An addition for the (a) and (c) claim would be that they engaged -- or defendant -- sorry, he -- engaged in some sort of actions that led to scheme liability.

Q   You're not opining that Mr. Musk actually made any false statement, correct?

A   That is correct.

Q   And you're not opining that Mr. Musk engaged in any conduct that would give rise to scheme liability under 10b-5(a) or 10b-5(c), correct?

A   That is correct.

Q   You're not opining on the proper interpretation of any particular representation that

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                14

Mr. Musk made that's at issue in this case, correct?

A    That is correct.  I'm -- sometimes may opine on what I've seen in analysts reports, for example, that Dr. Lehn has, but I'm not going to opine on what the proper interpretation is.

Q    And in your damages report, you did not opine in any way on even what analysts interpreted any of Mr. Musk's statements to mean, correct?

A    I believe that is correct.

Q    You're also not opining in whether Mr. Musk had any particular intent or state of mind in making the statements or taking any actions during the class period, correct?

A    Correct.  I'm not opining on those issues.

Q    Do you offer an opinion regarding what Twitter's stock price would have been had Mr. Musk tweeted out all of the information Plaintiffs allege was omitted from his tweet and rendered it misleading?

A    Well, first, I want to be careful.  When you say "omitted" -- and since they aren't just saying there was omissions, they were saying that certain statements were -- were false -- so if you want to put "omitted" or "misrepresented," if I can recharacterize the question that way, I would say,

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

15

yes, I measure the artificial deflation in Twitter's

stock price. And, therefore, if you add that back

in to the actual price, that is what we would call

the alleged true value or what the stock price would

have been had Mr. Musk made correct statements.

Q    So then is it your opinion that if Mr. Musk

had made correct statements on May 13th, 2022,

Twitter's stock price would not have moved at all?

MR. ARNZEN:  Object to form.

A    That is my baseline.  I think it's actually

potentially conservative because you can argue that

the correct statements would actually have increased

the stock price.  But I'm -- but my baseline

assumption is that the stock price would not have

moved but for any market or industry effects.

Q    So is your opinion that if Mr. Musk had

merely tweeted out, "I am getting cold feet about

this deal," Twitter stock wouldn't have moved; and

perhaps you're being conservative because maybe if

he had tweeted out, "I am getting cold feet," the

stock price would have gone up?  Is that your

opinion?

MR. ARNZEN:  Objection.

A    No -- no, Mr. Bernstein.  That is not a --

in my view, a correct interpretation of what should

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

16

have been tweeted out.

My understanding -- and I'm not giving a legal opinion -- is that I'm supposed to base my analysis on a correction of what is alleged to be incorrect.  So, for example, if Mr. Musk tweeted, "The deal is on hold," a correct statement may be, "The deal is not on hold," or "The deal is moving forward."  If an incorrect statement is, basically, Twitter must give me this information on bots, a correct statement would be Twitter is -- you know, has not breached any obligation to give me data on bots.

What you're suggesting when you talk about cold feet is something that was not mentioned in his actual tweets.  So it's, in some sense, a very different statement, as opposed to a correction of what he actually tweeted, against a correct -- an alleged correction, if it's allegedly false and/or misleading.

Q   Okay.  Are you offering an opinion as to what Twitter stock would have done if Mr. Musk had tweeted out that he was getting cold feet about the deal?

A   No, I'm not, because I don't see the relevance of that, as that is not a correction to

the allegedly false nature of what he tweeted.

Q    You understand that the plaintiffs allege that Mr. Musk's tweets were -- were misleading, in part, because Mr. Musk was concealing the fact that he was simply getting cold feet about the deal, correct?

MR. ARNZEN:  Object to form.

A    I think when you say "in part," that is, you know, something that follow -- that goes into their argument.  You might think of it as a subtext, but is certainly not anywhere in the text of his tweet.

So that is -- you know, you asked earlier about how people interpreted his tweets.  I agree that may be part of how some people interpreted his tweets -- but it is not relevant, in my view, for the assessment of damages when we want to figure out what he should have tweeted.

Q    Just sticking on a tweet that just says, "I am getting cold feet,"  you are not opining regarding what Twitter stock would have done had that been the full and complete tweet, correct?

A    Again, with the caveat that it is -- I don't see the relevance for damages analysis.

That is correct, that I am not opining on that question.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

18

Q   Do you offer any opinion regarding what Twitter stock price would have been had Mr. Musk added to his tweet, "To clarify, Twitter has not agreed to put the deal on hold and my team is continuing to work towards closing.  However, I do not intend to voluntarily close, absent litigation, if I do not get the information I am requesting whether or not I have a legal right to it?"

MR. ARNZEN:  Object to form.

A   Can you repeat that statement since it was a bit long, Mr. Bernstein?

Q   Sure.

Imagine as a follow-up to Mr. Musk's tweet, he said, "To clarify, Twitter has not agreed to put the deal on hold, and my team is continuing to work towards closing.  However, I do not intend to voluntarily close, absent litigation, if I do not get information I am requesting whether or not I have a legal right to that information"?

MR. ARNZEN:  Same objection.

A   Well, I think two things.

So you're saying he did make the allegedly false tweet on May 13th and then corrected it.  That may have led to some confusion in the market.

But putting that aside, I think that -- you

11:13:46
11:13:48
11:13:54
11:13:58
11:14:00
11:14:03
11:14:06
11:14:09
11:14:12
11:14:13
11:14:16
11:14:18
11:14:21
11:14:23
11:14:28
11:14:32
11:14:37
11:14:40
11:14:44
11:14:47
11:14:48
11:14:52
11:14:54
11:14:57
11:15:01

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                    19

know, I don't have the wording that you said exactly
in front of me.

But I think that is basically is a fair
representation of what I am analyzing over here.  At
least he had said that with -- you know, with enough
emphasis to correct the allegedly misleading tweet
on May 13th.

Q   So it's your opinion that if -- that if he
had made that follow-up with enough force, Twitter
stock price would not have reacted other than for
industry and market effects; is that right?

MR. ARNZEN:  Object to form.

A   I think that's fair.  Yes.

Q   What analysis did you do to come to that
conclusion?

A   Well, you just asked me about this now,
Mr. Bernstein, so I didn't have much time to do
analysis.

But I think if I understood you correctly,
you're basically saying, What if he had tweeted
something that had corrected, what do -- do
Plaintiffs allege is misleading about his tweet?

So if you're asking me, basically, if he
corrected the tweet and they balance out because
there was, you know, a decent enough amount of

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                      20

intensity in the correction to balance the tweet, then, by definition, the stock price shouldn't move but for market and industry effects.

Q   Under my hypothetical, investors may still view Mr. Musk as getting cold feet, correct?

MR. ARNZEN:  Object to form.

A   They may, and they may have viewed that before his tweet as well.

Q   Is it your opinion that they did view it before his tweet?

MR. ARNZEN:  Same objection.

A   To some degree, yes.

Q   To the same degree that they would view it when he says, "I'm not going to close voluntarily if I don't get the information I'm requesting whether or not I have a legal right to it"?

MR. ARNZEN:  Same objection.

A   You're asking a very particular statement over there.  I really can't say that over here.  If you're basically saying that he is adding in information that does more than correct the tweet, the false tweet, that may have a different effect.

But my understanding is the damages analysis that he's supposed to correct the false tweet.  And I'm not doing an analysis of what if he corrects the

false tweet and adds in additional information.

Q   Well, would you agree that part of the correction would be him disclosing, or under Plaintiffs' theory, that he was getting cold feet about the deal?

MR. ARNZEN:  Form.

A   No, not necessarily.  Because put it this way:  He never actually said, "I am getting cold feet" or "I am not" -- either "I am getting cold feet" or "I am not getting cold feet" in the tweet.

That is, at best, a subtext that Dr. Lehn is reading into it.  If it's a subtext that he's -- that one is reading into the tweet, then it can be a subtext from the correction too.

You're basically asking for a correction that moves subtext up into text, which is different than what I would view as a proper correction.

Q   Okay.  So you agree that with the correction we discussed, there could be subtext of "Musk is getting cold feet," correct?

MR. ARNZEN:  I object to the form -- the form of the question.

A   There could be subtext "Musk is getting cold feet" in the correction or in the original tweet or where?

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                            22

Q   In -- in a full, corrective tweet, as you would describe it, would you agree that investors could nonetheless interpret that as Musk conveying that he was getting cold feet?

MR. ARNZEN:   Form.

A   In the corrective tweet?

Q   Yes.

A   Well, as you described it, you added in more than what's in the tweet.  You added in something about "I will not proceed unless forced to do so through litigation."

So because that is different than what he said -- he did not mention litigation in the May 13th tweet at issue here.  You've added something in.

And, of course, if you add something into the correction that is not in the original tweet, you can get a different interpretation.

Q   Does the original tweet actually say anything about Musk's legal rights?

MR. ARNZEN:   Form.

A   I don't believe he used the word "legal" or anything like that in the original tweet.

Q   Does the original tweet reference anything about the merger agreement?

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                                    23

MR. ARNZEN:  Form.                                    11:19:47

A    No, the merger agreement is not mentioned        11:19:48
explicitly in the original tweet.                     11:19:51

Q    If the market were to interpret a fully          11:19:53
corrective tweet, however you would define            11:20:18
that -- withdrawn.  Let me just make sure I           11:20:23
understand something.                                 11:20:26

Is it your opinion that if Mr. Musk had put           11:20:26
out a fully corrective tweet, the market would not    11:20:34
have interpreted it as Mr. Musk having cold feet      11:20:38
about the transaction?                                11:20:43

MR. ARNZEN:  Form.                                    11:20:44

A    You're talking about the corrective tweet?       11:20:44

Q    Corrective tweet, correct.                       11:20:48

A    Well, put it this way:  If the corrective        11:20:50
tweet was something like, "The deal is not on hold;   11:20:56
Twitter has not breached any data obligations to      11:20:58
me," that itself does not sound like anything         11:21:01
dealing with cold feet.                               11:21:04

Q    That tweet that you just described, is it        11:21:07
your understanding that would have been the true      11:21:52
state of affairs?                                     11:21:54

Are you assume -- for purposes of your                11:21:56
analysis, are you assuming that that was the true     11:21:57
state of affairs?                                     11:22:00

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                                    24

A    That the deal is not on hold and that Twitter has not breached any obligations to -- to provide Musk with data or that add in that -- Musk has no reason to believe that the 5 percent figure on bots is incorrect?

MR. ARNZEN:  And I'll add an objection to form; vague and ambiguous.

A    I think those things are what go into the tweet, not adding in a -- the correct -- the alleged or potential corrective tweet, not adding in additional statements about whether or not Mr. Musk has cold feet or whether or not he will be -- would only go through the deal if forced to by litigation.

That is doing more than correcting the tweet at issue.  It is adding in additional statements.

Q    Well, the tweet talks about information that Mr. Musk wants, correct?

A    Correct.

Q    And Mr. Musk did actually ask for information, correct?

MR. ARNZEN:  Object to form.

A    It's my understanding he did ask for information.

Q    And so wouldn't the truthful, corrective tweet be:  I had asked for this information; I don't

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                      25

know whether they'll give it to me, and I -- and

perhaps they don't have a legal obligation to, but

this is information that's important to me?

        MR. ARNZEN:  Form.

    A    Sorry.  You've ignored the part at the

beginning, where he says, "The deal is on hold

pending this information."  And again, I'm not going

to go into -- I'm not providing an opinion on what

the correct interpretation of the tweet was.

        But I believe that the Court did in an order

on the motion to dismiss saying that, read

together -- the, you know -- again, whatever the

Court said is correct, this is just my recollection,

that that meant that Mr. Musk was giving

interpretation or providing the market with an idea

that Twitter was not upholding its obligations to

provide certain data.

    Q    Right.  And if you -- so then wouldn't the

corrective information to that be that:  They

haven't given it to me; I want it, but they're not

breaching their obligation?

        MR. ARNZEN:  Form.

    Q    You seem to want to take out the fact that

he requested it, that he wants it, and that it's

important to him.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                     26

A    I'm sorry, so what's the question at the end of the day there?

Q    The question is:  If he included the information about -- about the fact that he -- he wanted this information, he was requesting this information, are you saying that the market would not have interpreted that to suggest that Musk might be getting cold feet about the deal?

MR. ARNZEN:  Dr. Tabak, I apologize for interrupting.  Just give me just a second to object, if I need to.  I don't want to cut off and interrupt my colleague, Mr. Bernstein.  I just want to have a chance to object before you start answering.  Okay?

So object to form on this one.

THE WITNESS:  I will do my best.

A    And then, I guess, can you either restate the question, Mr. Bernstein, or have it read back? Because I lost it.

Q    Let me -- let me go through something else for a second.

You agree you are not offering opinion regarding what Twitter's stock price would have been had Mr. Musk tweeted that he was getting cold feet about the Twitter deal, right?

A    Correct.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025      27

Q   And you're not opining that Twitter's stock price would have been any different than it was on May 13th had Mr. Musk simply tweeted, "I'm getting cold feet about this deal"?

MR. ARNZEN:  Object to form.

A   I'm not opining on what would have happened if Mr. Musk had simply tweeted, "I'm getting cold feet about this deal."

Q   And you're not opining on what Twitter's stock price would have been had Mr. Musk added to his tweet that he was looking for ways to renegotiate the price of the deal?

MR. ARNZEN:  Object to form.

A   That is also correct.

Q   You're not opining on what Twitter's stock would have done if that's all Mr. Musk had said, that he was looking for ways to renegotiate the price of the deal, correct?

MR. ARNZEN:  Object to form.

A   That is correct.

Q   You're not opining about what Twitter's stock price would have been had Mr. Musk added to his tweet that regardless of whether he had any legal right to the information he was requesting, he would force Twitter to litigate unless they gave him

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                    28

the information?

MR. ARNZEN:  Same objection.

A   Correct.  Because I don't understand that to be part of the assignment of measuring damages.  So, of course, I don't opine on that.

Q   And so you would not be telling the jury that the world would be any different had Mr. Musk tweeted out that regardless of whether he had any legal right to the information he was requesting from Twitter, he would force Twitter to litigate unless they gave him that information, correct?

MR. ARNZEN:  Form.

A   I am not planning to.  I do not plan to be asked that question.  If you ask that question and the judge tells me to answer, of course I will answer, but that's not part of my plan.

Q   And if you were forced to answer it, what would the answer be?

A   Let me hear the question again, the specifics on this alternative statement you'd like to have added.

Q   You cannot tell the jury that Twitter's -- would have done anything different than it did in the real world if Mr. Musk had simply tweeted out that regardless of whether he had any legal right to

11:26:58
11:26:58
11:26:59
11:27:03
11:27:06
11:27:07
11:27:23
11:27:30
11:27:35
11:27:38
11:27:43
11:27:45
11:27:46
11:27:54
11:27:56
11:28:00
11:28:03
11:28:06
11:28:07
11:28:10
11:28:14
11:28:16
11:28:23
11:28:25
11:28:33

the information he was requesting from Twitter, he would force Twitter to litigate unless they gave him that information?

MR. ARNZEN:  Form.

A    So what I would say is I cannot answer that because all I have done is consider the corrective tweet to the actual tweet that the transaction was, quote, "temporarily on hold pending details supporting calculations that the spam/fake accounts do, indeed, represent less than 5 percent of users," end quote.  And since that hypothetical doesn't even sound like the actual tweet, it is one that I have not considered in my damages analysis and, therefore, do not have an opinion on what would have happened to the stock price.

Q    So you could not tell the jury that the stock price would be any different under that hypothetical tweet than it was under the actual tweet, right?

MR. ARNZEN:  Form.

A    Since I haven't analyzed it, I would not -- I would say I cannot provide an opinion on that at this point.

Q    You said at the beginning that you have certain new opinions that are responses to

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

30

Dr. Lehn's report, right?

A    Correct.

Q    And Dr. Lehn -- one of his criticisms of your report is that you did not isolate for the impact from the market interpreting Musk's tweets in a manner that's actually consistent with Plaintiffs' allegations.

Do you understand that?

MR. ARNZEN:  Form.

A    I -- that's not exactly the way he put it, but I understand what you're saying there.

Q    And is the back-and-forth we've just had for the past maybe half hour the response that you have to Dr. Lehn; in short, that he is creating a corrective tweet that wouldn't actually be corrective?

A    That would be --

MR. ARNZEN:  Form.

THE WITNESS:  Sorry.  Go on, if you're not finished.

A    Okay.  That would only -- I think only be part of it, because you asked specific questions. If you'd like, I can give you a better answer that I think would be a response to Dr. Lehn on that point.

Q    Yeah, why don't you give me your response to

Dr. Lehn on that point.

A    So the primary thing over there is that I just, you know, put into the record a little bit ago the actual tweet that -- on May 13th, 2022, is -- that is at issue.  And the things that Dr. Lehn is bringing up is particularly the "cold feet" issue. What's clear is that that is not part of the text of the May 13th tweet.  It is, at best, a subtext that Dr. Lehn is reading into there and trying to support with some analyst reports.

The problem is, you can't -- you can't say that that was said independently, anything about cold feet.  It is a natural consequence -- in fact, it has to be a consequence, of the actual statements made by Mr. Musk in his tweet.  So if those statements are improper, that is something that flows out of it.  It is not some form of confounding or other news.  It is part and parcel of the statements in the tweet.

And, again, I'm not going to give a legal opinion, but I do take guidance from another case involving Mr. Musk out in California, involving Tesla, where he put out a tweet stating two things: One, that he intended to take Tesla private at $420 a share; and, two, that he had secured funding.

11:31:50
11:31:51
11:31:54
11:31:57
11:32:00
11:32:04
11:32:07
11:32:10
11:32:14
11:32:17
11:32:19
11:32:23
11:32:26
11:32:30
11:32:33
11:32:36
11:32:37
11:32:40
11:32:47
11:32:48
11:32:51
11:32:57
11:33:00
11:33:03
11:33:06

And my understanding in that case is that Plaintiffs' expert argued that those were -- I think the phrase he used was "an interwoven bundle" and could not be separated out.  But I should say that the -- Mr. Musk intending to take Tesla private at $420 a share was deemed to be correct, that he had secured funding, was part of the allegations.

So Plaintiffs' expert there, Mr. Harzmark, H-A-R -- or Dr. Harzmark -- excuse me -- H-A-R-Z-M-A-R-K, said they were, I believe, an interwoven bundle.  And the Court said that he could at least proceed to trial on that theory for reasons including that both statements were part of the same tweet and Mr. Musk intended for them to be read together.

Well, here, the part that Dr. Lehn would like me to remove kind of has to be part of other stuff because it's not even in the text.  So he would like me to somehow remove something that is literally impossible to remove without, you know -- and just leave the false parts or allegedly false parts of the tweet because the parties asked me to remove doesn't even exist over there.

So I think that these -- that what he's asking for just doesn't make any sense.

11:33:09
11:33:13
11:33:16
11:33:19
11:33:23
11:33:27
11:33:31
11:33:33
11:33:37
11:33:40
11:33:43
11:33:47
11:33:50
11:33:52
11:33:55
11:33:55
11:33:58
11:34:02
11:34:05
11:34:08
11:34:12
11:34:15
11:34:18
11:34:20
11:34:23

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

33

Q   Okay.  Is that -- is -- is that -- are you done?

A   That is for the primary thing.  I mean, he -- I can go through, you know, if you want in more detail what he says about analyst reports and so forth, but that is the high-level overview response to that claim by Dr. Lehn.

Q   Okay.  So let me break that down a little bit.

You're not disputing that the market did interpret Mr. Musk's tweet to suggest he was getting cold feet about the deal, correct?

MR. ARNZEN:  Form.

A   Well, put it this way:  The market, I believe, already believed he was getting cold feet.  This may have added to it.  I'm not going to dispute that it may have added to that.  But that's -- even that's unclear if the market already believed that Mr. Musk was getting cold feet.

Q   So you're saying it's unclear.  I guess I -- I'm asking you:  Are you disputing that the market was interpreting Mr. Musk's tweet as suggesting a heightened level of buyer's remorse or cold feet?

MR. ARNZEN:  Object to form.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                    34

A    No, I'm not disputing that.

Q    Are you disputing that that heightened buyer's remorse or cold feet contributed to Twitter's stock decline on May 13th?

MR. ARNZEN:  Form.

A    Well, I think it contributed to it because Mr. Musk was presenting an avenue through which he could attempt to get out of the deal due to his original and any higher level of cold feet.

Q    But you don't dispute that, even aside from the avenue, the heightened level of cold feet contributed to Twitter's stock price decline on May 13th?

MR. ARNZEN:  Form.

A    So you're basically asking if the subtext itself contributed to the decline.  I suppose that's possible, but since the subtext is only there because of the text, it is a result of what Plaintiffs allege is a false and misleading statement.

Q    You don't dispute that, regardless of whether it's a result of the tweet, the market's interpretation of the tweet as suggesting a heightened level of buyer's remorse did contribute to Twitter's stock decline on May 13th.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                                   35

You don't dispute that, right?

MR. ARNZEN:  Form.

A    Well -- sorry.  Putting aside the introduction of regardless of whether it's the tweet -- I mean, it has to be due to the tweet, because I don't know where it else it would have come from.  So what you're basically saying is that that tweet may have created several avenues through which it affected the stock price.  I do not dispute that the tweet may have created several avenues through which it affected the stock price.

Q    And one of which, you would agree, is what you would describe as the subtext that there is heightened cold feet or buyer's remorse by Mr. Musk, right?

MR. ARNZEN:  Form.

A    I haven't -- I haven't analyzed that to compare, for example, how often cold feet was mentioned before versus after.  So it is a possibility, but Dr. Lehn mentioned -- has a few quotes there on cold feet afterwards, but he doesn't compare, for example, to how often one may have seen the phrase "cold feet" or similar phrases beforehand.  So he actually hasn't shown necessarily that there's a heightened level of cold feet.  It

may be, it may not be, but he hasn't shown it.

Q   And you haven't done any analysis to show
that it wasn't a heightened level of cold feet,
correct?

A   Also correct.

Q   And you haven't done any analysis to
calculate the amount of the decline on May 13th and
May 16th that was the result of investors perceiving
Mr. Musk as having a heightened level of cold feet
or buyer's remorse, correct?

MR. ARNZEN:  Form.

A   Of course not, because, again, that all
flows from the tweet that is alleged to be false and
misleading.  So I do not believe it -- that that
should affect my damages analysis.

Q   So if the jury were to be instructed or the
jury were to decide that any amount of stock price
decline due to the market perceiving Mr. Musk as
having cold feet would need to be deducted from
damages, you have not done the analysis to allow
them to do that calculation, correct?

MR. ARNZEN:  Form.

A   I have not performed such an analysis.

Q   You also haven't done an analysis on what
Twitter's stock price would have done following the

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                          37

July 8th termination letter if Mr. Musk had never tweeted on May 13th, correct?

          MR. ARNZEN:  Form.

     A    I've not done that particular analysis.

     Q    Do you have an opinion one way or another regarding whether Twitter's stock price would have fallen to the exact level it did following the July 8th termination letter had Mr. Musk never tweeted on May 13th?

     A    I would have to think that through.  So sitting here right now, I don't have an opinion.

     Q    So you haven't -- you haven't offered that opinion in any of your reports and it's not one of the opinions that you have developed in response to Dr. Lehn's report, correct?

     A    Correct.

     Q    You also don't offer any opinion regarding what Twitter's stock price would have been had Mr. Musk's July 8th termination letter terminated solely on the basis of Section 6.1 of the merger agreement that's the Ordinary Course provision, correct?

          MR. ARNZEN:  Form.

     A    Correct.

     Q    You understand that if Mr. Musk --

withdrawn.

You understand that even if Mr. Musk didn't have the information rights that Plaintiffs allege he was conveying to the market that he had, analysts still understood that busted deal litigations typically end in reduced prices, right?

MR. ARNZEN:  Form.

A    That busted deal litigations typically end in reduced prices.  Well, what do you mean by busted deal litigation --

Q    Sure.  Similar to the -- the Twitter v. Musk case, where you have two merger parties and the -- the seller -- withdrawn.

Where you have two -- two parties to a merger agreement and the buyer decides they -- they don't want to buy it anymore, they walk away, and the seller sues for specific performance.

A    Yeah.  I would have to check -- I just have to check offhand whether they believed it was -- since you said "typically" was a reduced price or whether there is a breakup fee paid and so forth.

Certainly, reduced price is a possibility, but "typically" tends to mean more than 50 percent. So before I say more than -- that analysts believe it's more than 50 percent, I would want to carefully

review analyst reports before using such a state -- using such a word.

Q   You're aware that there were commentators who believe that special performance wouldn't be awarded regardless of Musk's legal right to terminate the merger agreement?

A   I'm aware that some commentators said that, yes.

MR. ARNZEN:  And I apologize.

I'll add an objection to form.

Q   That other commentators noted that even if a specific performance were awarded, it was unclear what would happen if Mr. Musk simply refused to purchase, despite a court order?

A   Maybe I just don't recall that offhand.

Q   Do you dispute that those would be legitimate concerns of market participants regardless of whether Musk had these information rights or did not have these information rights?

A   I'm not going to go back through all of your questions.

But I'll simply say that investors can have concerns about what happens when the parties to a merger deal disagree.

Q   Regardless of whether Mr. Musk had

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

40

information rights, didn't have information rights, whether bots were 5 percent or more than 5 percent, investors could have legitimate concerns that a lawsuit, regardless of the merits, may not result in a closing or may result in a closing at a lower price, correct?

MR. ARNZEN:  Form.

A    I think that as a general rule, that's fair. Yes.

Q    So going back to one of my earlier hypotheticals, if Mr. Musk tweeted out that he was requesting this information from Twitter, but they had no legal obligation to provide it, but regardless of whether they had that obligation or not, he was going to force them to sue in order to close the deal, you would expect a stock price decline, right?

A    Well, since you've added in something --

MR. ARNZEN:  Excuse me, Dr. Tabak.

Form; incomplete hypothetical.

A    Well, since you've added in something new, that he's going to force them to sue, I assume that may be relevant and material to the market.

And, if so, that additional information that you've added into this hypothetical can have an

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                     41

effect on Twitter's stock price.

Q   Okay.  So now let's move that hypothetical from May 13 to July 8.

July 8, you agree, by providing the termination letter, Mr. Musk is conveying to the market, regardless of my rights, I am not closing without them suing me, right?

MR. ARNZEN:  Same objections.

A   I want to look at the particulars of the termination letter, but I think that's probably reasonable.

Q   So regardless of whether there's anything misleading in the July 8 termination letter, you would agree it would be expected that a termination letter would result in a stock price decline, right?

MR. ARNZEN:  Same objections.

A   Well, first of all, when you say "anything misleading," I'm not base -- you know, I'm not basing any analysis on there being something misleading in that letter, to be clear.

So putting that aside, if the general question is, could a termination letter have an effect on a stock price, the answer is yes.

Q   You would expect the termination letter in this case -- withdrawn.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                    42

You said you're not assuming there's anything misleading in the termination letter.

What are you assuming as it relates to the termination letter in your damages analysis?

A    So, to be clear, that's not in the 10b-5(b) damages, only in the 10b-5(a) and (c) damages, which, you know, I think generally refer to as "scheme liability," which means using things like a scheme or a business practice in order to affect the market price.

I'm assuming that Plaintiffs will at least attempt -- attempt to prove and if -- at least attempt to prove that the termination letter itself was part of a scheme and, therefore, should not have been issued.

Q    You would agree, regardless of whether it was part of a scheme or not part of a scheme, it would be expected that a termination letter that was issued on July 8th would result in a stock price decline, right?

MR. ARNZEN:  Object to the form.

A    If it hadn't been previewed before, then yes.

Q    When we were walking through some of the hypothetical tweets, you responded a number of times

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                    43

that that would not be, in your view, corrective to

the actual May 13th tweet, right?

A   Right.  Generally, because you were adding

in additional information in those tweets.

Q   And in Dr. Lehn's report, he points out that

there were a number of pieces of information that

came out between May 13th and October 4th that did

directly address, for example, whether the deal was

on hold, correct?

A   I think that he talks about various things

happening in the deal.  You can treat it that way.

Sure.

Q   Well, why don't we turn and mark, as

Exhibit 201, Tab 16.

(Exhibit 201 marked for identification.)

MR. BERNSTEIN:  We'll get that up on the

screen.

Q   You understand that one of the reasons that

Plaintiffs allege the tweet was misleading is

because Twitter had not agreed to put the deal on

hold, correct?

A   That is my understanding.

Q   So a corrective disclosure to that would be,

Twitter has not agreed to put the deal on hold,

correct?

MR. ARNZEN:  Object to form.

A    I mean, I'm not going to get into the particulars.

The answer would be, "the deal is not on hold" is the most direct response to "the deal is on hold."

Q    You're aware -- this is Exhibit 201 -- that in Bloomberg on May 19th, it was published that Vijaya Gadde, who was Twitter's top lawyer, had told people there's, "no such thing as a deal being on hold," right?

A    Correct.

Q    And you did not identify any statistically significant stock reaction to this piece of information, correct?

A    Correct.

Q    You understand that the plaintiffs -- plaintiffs' lawyers in this case actually relied on this quote to allege that Mr. Musk's May 13th tweet was false and misleading, correct?

MR. ARNZEN:  Object to form.

A    I don't recall specifically.  If it's -- if they've alleged that, I'll take your word for it, Mr. Bernstein.

Q    And, nonetheless, you did not see a

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                                45

statistically significant stock reaction to this piece of information, correct?

A   To this May 19th article, I did not.

Q   You -- you are also aware that Plaintiffs allege the "deal on hold" language was misleading because Mr. Musk continued to seek to obtain equity financing for the deal, correct?

A   Again, I don't remember the specifics of why they alleged that that language was misleading.

If you say they alleged that, I will take your word for it.

Q   Well, do you agree that Mr. Musk continuing to seek financing commitments for the deal following the May 13th tweet is inconsistent with the deal being on hold?

MR. ARNZEN:   Form.

A   Not necessarily.  I mean, that can be a contingency plan.  So it's not necessarily inconsistent.

Q   So if Plaintiffs allege that is one of the reasons why the statement is misleading, you would say, I don't -- I don't totally endorse that allegation?

A   No.

MR. ARNZEN:   Form.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

46

A   I'm not -- as we discussed at the beginning -- you asked me whether I'm going to testify on falsity, essentially, and the answer is I'm not testifying on falsity.

Q   Turn to Tab 18.

MR. BERNSTEIN:  Mark that as Exhibit 202.

(Exhibit 202 marked for identification.)

Q   See that this is Amendment No. 7 to Schedule 13D, filed on May 24th, 2022?

A   I do see that.

Q   If we turn to page 3 of this document --

A   Is there any chance we can make this bigger?

Q   I'm sure we can.

We're going to be focusing on the last paragraph, but you should obviously feel free to read as much of it as you would like.

Do you see in the last paragraph, it talks about, "The reporting person (on behalf of himself and Parent) is seeking and the Reporting Person (directly or indirectly through Parent) may receive additional financing commitments to fund portions of total Merger Consideration, which commitments, subject to the terms of the Merger Agreement and the May 24 Equity Commitment Letter, may replace portions of the financing commitments previously

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

47

reported by the Reporting Person in connection with the Merger Agreement and the Merger contemplated thereby, including portions of the Reporting Person's May 24 Equity Commitment Letter described herein."

Q   Do you see that?

A   I do see that.

Q   And while that's mouthful, do you understand that to say that Mr. Musk is seeking to receive additional financing commitments for the merger consideration?

MR. ARNZEN:   Form.

A   Well, additional but as replacement, I believe, if I've read this correctly.  So replacing one financing portion with another, if I'm reading this correctly.

Q   Right.  You understand it would be, Mr. Musk had committed to fund the equity, and he is seeking to find people to take portions of -- of the amount that he had committed, right?

A   That is my understanding.

Q   And the next sentence says, "In addition, the Reporting Person (on behalf of himself and Parent) is having, and will continue to have, discussions with certain existing holders of Common

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

48

Stock (including Jack Dorsey) regarding the

possibility of contributing such shares of Common

Stock to Parent, at or immediately prior to the

closing of the Merger...", and then it goes on from

there.

A    I see that.

Q    And, again, it was wordy, and we can all

blame corporate attorneys for how these are written.

But what it says is he's talking to existing

holders of Twitter to see if they would roll over

their stock into the new -- the post-merger entity,

right?

A    Assuming that "Parent" will be the surviving

entity, I think that's correct.

But I'll agree with you it's wordy.

Q    Now, despite this information about Mr. Musk

continuing to seek equity investments from investors

and talking to existing holders about rolling over

their shares, you didn't see any statistically

significant reaction to this piece of information,

correct?

A    Remind me again of the date of this

document.

Q    Why don't we go to the top.

Do you see it says, May 24th, 2022?

11:58:40
11:58:44
11:58:45
11:58:48
11:58:50
11:58:56
11:58:56
11:59:06
11:59:08
11:59:12
11:59:15
11:59:26
11:59:26
11:59:32
11:59:33
11:59:37
11:59:44
11:59:49
11:59:57
12:00:01
12:00:03
12:00:03
12:00:06
12:00:08
12:00:17

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

49

A    Yeah.  I'm pretty sure I did not see a statistically significant movement on that date.

Q    You understand that Plaintiffs' counsel in this case filed a lawsuit in May 2022 against Mr. Musk, alleging that his May 13th tweet was false and misleading?

MR. ARNZEN:  Object to form; relevance.

A    I will take your word on the fact it's May 22nd; but, yes, I'm aware of that lawsuit.

Q    I -- I -- to be clear, I didn't -- I may have misspoken.  I didn't intend to say May 22nd.  I said May 2022.

A    Okay.

MR. BERNSTEIN:  And why don't we actually -- because I think the date might matter, why don't we pull it up.  We'll mark it as Exhibit 203.  It's Tab 19.

(Exhibit 203 marked for identification.)

MR. ARNZEN:  Mr. Bernstein, to minimize the amount I interrupt here, I wonder if I could just make a standing objection to form and relevance as to questions on this lawsuit.

MR. BERNSTEIN:  Sure.

MR. ARNZEN:  Thank you.

And I apologize.  I'm reading the real time.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                                    50

I just want to make sure the objection is stated as to form and relevance.  Thank you.

Q   While we're -- we're bringing that up, Doctor, do you agree that a public lawsuit would be part of the total mix of information that investors might consider?

A   You said "public"?  So, yes, the fact of that as well as anything that is publicly available.

Q   Do you see here this was filed on May 25th, 2022?

A   I do see that.

Q   And if we scroll down a little bit just so you could see the caption, this is the COMPLAINT that you're aware of that the plaintiffs' counsel in this case filed against Mr. Musk, alleging that he had made materially false and misleading statements in his May 13th tweet?

A   That is my understanding, yes.

Q   And this lawsuit received press coverage, correct?

A   I just can't say one way or the other.  I don't recall.

Q   By the way, if -- would you expect if a -- if a lawsuit contained material and new information regarding the merger, that it would have a

Transcript of David Tabak, Ph.D.

Conducted on July 16, 2025                                    51

statistically significant stock reaction?

A    So material and new, meaning stuff that was not public before, it -- probably, although the question, of course, is where that material information comes from before discovery.

So that's an interesting question.  If you ask me to assume that it has material new information, it may have an effect, although I think in most cases when you've got kind of just, here, an investor suing, people do not tend to think that it has new material information.  I mean, people have said that, you know, almost any stock -- they've perhaps -- perhaps some in jest, perhaps not, but almost any stock price decline does result in a securities fraud suit a bit later on, based on public information.

Q    So if you didn't see a stock reaction, would it be fair to conclude that either the market didn't view the information as material or didn't view the information as new?

MR. ARNZEN:  Object to form.

A    I think that's probably true.  I never want to rule out there might not be another possibility, but those are the two that jump to mind.

MR. BERNSTEIN:  So let's move to

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                    52

Exhibit 204, Tab 20.

          (Exhibit 204 marked for identification.)

          MR. ARNZEN:  Mr. Bernstein, I see that it's been an hour.  I'm not calling for a break now, but I wonder if we could make sure to take one soon.

          MR. BERNSTEIN:  Yeah.  I think it's totally up to the witness.  I would think within ten minutes I'll be done with -- with -- not the deposition, with this -- sorry to get people's hope up.

          THE WITNESS:  That's a material difference, but ten minutes is fine with me.

     Q   Scroll through this.  Do you see that this is an article discussing the lawsuit we were just looking at?

     A   Yes.  As well as a lot of discussion of Twitter's share price.

     Q   Following the publish of this article, you did not see a statistically significant reaction, true?

     A   I -- I would have to check and compare the dates.  But if you tell me that, I will accept your representation.

     Q   I don't want you to accept my representation.  Why don't we go to the top.  We can look at the date of the article and then you can

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                53

confirm.

A   Article came out after market on May 26th, so it would be May 27th.  You'd have to show me information about what dates I did and did not find statistically significant, since I have not memorized them all.

Q   Well, isn't it right that the only dates you found statistically significant after May 13th and May 16th are -- are July 8 and August 23rd?

A   Did you say "after May 13th"?

Q   Yeah.

A   What about May 14th?

Q   I believe the market was closed on May 14th.

A   Then May 16th.

Q   Yeah.  I said May 13th and May 16th.

A   Oh, sorry.  I misheard you.

Q   No worries.

So after -- let's day, after May 16th, the only dates that you found statistically significant were July 8th and August 23rd?

A   And not including October, the end of the class period?  I believe --

Q   Sure.  Include -- and -- and October.

A   Sorry.  Experts tend to be finicky.

Q   No, that's fine.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                54

A    I believe that's correct.

Q    This was -- this was a long way of getting to May 27th was not one of the days you found statistically significant, correct?

A    I believe that's correct.

Q    Okay.  On June 7th, you're aware that Mr. Musk's lawyers wrote that despite Mr. Musk's desire to obtain information to evaluate the potential spam and fake accounts, there was no material change to Mr. Musk's plans and proposals regarding the proposed transaction at such time?

A    I remember a statement like that.  I will take your word on the date.

MR. ARNZEN:  Object to form.

MR. BERNSTEIN:  Why don't we go to Exhibit 205, which is Tab 33.

Q    Because, again, I don't want you to take my word on the dates.

A    Okay.

Let me -- just give me one second to kill my landline.

(Exhibit 205 marked for identification.)

MR. ARNZEN:  Mr. Bernstein, while he's doing that, did we have a 204?  My notes just missed it maybe.

Transcript of David Tabak, Ph.D.

Conducted on July 16, 2025                    55

MR. BERNSTEIN:  I think 204 was the CNBC article we just put up.

MR. ARNZEN:  Oh, 10-4.  Thank you.

Q   Do you see the date on the top of this correspondence?

A   I see June 7th, 2022.

Q   And if we scroll down just a little bit further.  And do you see that right under the bold, we have the quote I had read to you, Mr. Musk --

A   I see the words there.  I assume that they match up with what you had read before.  They sound similar, but I can't say word for -- I trust you if you say they're word for word the same.

Q   Well, why don't we just go -- make it -- make it clean.

Do you see that it says, "Despite Mr. Musk's desire to obtain information to evaluate the potential spam and fake accounts, there is no material change to Mr. Musk's plans and proposals regarding the proposed transaction at such time"?

A   I see those words, yes.

Q   And following the publishing of this, you did not observe a statistically significant reaction, correct?

A   When was this published?  I see when the

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

56

letter is written, but --

Q    If -- if you assume it's June 7 --

A    So if I assume the letter became public on June 7th?

Q    Correct.

A    Then based on what we said before, there was no statistically significant price decline on that date.

Q    And as we discussed, that would mean that either the market didn't view this as material or didn't view it as new information?

MR. ARNZEN:   Form.

A    That's correct.

Q    You, in your report, opine that the fact that there was a significantly significant increase following the October 4th news provided additional evidence of the economic importance of the alleged misrepresentations, right?

A    I believe I said words to that effect, yes.

Q    Okay.  Wouldn't the lack of statistically significant reactions to the information we had just walked through, the -- the Vijaya Gadde quote, the Musk equity financing disclosure, Plaintiffs' counsel's lawsuit in this case, the press coverage about the lawsuit, the June 7th SEC filing saying

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                    57

there were no material changes to Mr. Musk's plans and proposals regarding the transaction, doesn't that provide evidence of the lack of economic importance of the alleged misrepresentation?

MR. ARNZEN:   Form.

A    Well, I think you're going to try to make that argument, but the problem is that you haven't shown these really are material new information to the market.

So, for example, as we said about the other lawsuit that was filed, I believe it was filed and the plaintiff was a shareholder.  Don't -- don't see any evidence that there was any discovery engaged in, so what -- you know, you asked me to assume that that lawsuit -- that the Complaint, I guess, had new material information in it.  Well, you ask the assumption, and then you get a certain conclusion.

So for all of these, the question is whether these are different than what the market would expect in what is essentially either a litigation or quasi-litigation between two parties where they each put forth various positions.  You haven't shown to me that these are -- that these should be expected to be material.

Q    So just so I'm clear on your answer then,

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                    58

the documents we just walked through, you would not expect any of them to be material to investors in evaluating whether the deal was actually on hold, correct?

A    That's not what I said, Mr. Bernstein.  I said you haven't shown that.  So you've just walked me through some documents.  I haven't, you know, spent a lot of time considering them.

But, for example, take the Twitter, I believe was -- well, I don't remember -- some form of executive or lawyer saying the deal is not on hold.  Not terribly surprising that when you have litigation or potential litigation, the two sides don't agree on things.  That might not be considered a material piece of information to the market.  I don't know without doing further investigation.

Q    Are -- you are aware that Plaintiffs allege that one of the reasons that the deal on hold was misleading is because Twitter had not agreed to it, correct?

A    One of the reasons, yes.

Q    So that reason, then, you're saying, is actually -- you're not sure it's even material?

A    Well, again --

Q    Is that right?

A    That is -- kind of you're asking me on whether that matters for falsity.

Q    I'm asking you whether it's material, whether it would be material to investors that Twitter had not agreed to put the deal on hold. That's my question.

Do you have an opinion one way or another?

A    I do not have an opinion because that's more going to falsity.

Q    Well, again, I think it -- it goes to materiality, right?

A    Materiality of what?

Q    Well, you understand that materiality is the difference between what is stated and the actual state of affairs?

A    I'm not going to give a legal opinion, but I'm willing to work with that.  Sure.

Q    And Plaintiffs allege that it was materially misleading because the actual state of affairs were, among other things, that Twitter had not agreed to put the deal on hold, right?

A    I believe that's part of the allegations.

Q    And we see that when Twitter came out and said, "We didn't agree to put the deal on hold," we don't have a statistically significant stock

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                    60

reduction, correct?

MR. ARNZEN:  Form.

A    Well, when you say "came out," I thought that was an internal meeting.  I would, you know, would really have to take a look at what the market thought before and after.

I will agree that that -- when that was published, that did not create a statistically significant movement in Twitter's stock price.

Q    And you've analyzed this time period pretty extensively.

And you're aware that Twitter had come out multiple times and said, "The deal isn't on hold; we're going forward, and we're going to enforce the deal," right?

A    I've seen them say that in various ways, yes.

Q    And you never observed a statistically significant stock reaction to that information coming out, right?

A    I don't recall seeing any.

Q    And so wouldn't that be economic evidence that it was not material to investors whether Twitter had or had not agreed to putting the deal on hold?

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                    61

MR. ARNZEN:  Form.

A    Again, you would have to take a look at even how they -- what investors thought after May 13th at that time to see -- and see whether any of that information was new.

And you say "various times."  Obviously, it's not clear that repeating a statement by Twitter should have a statistically significant effect on the stock price.

Q    Let me ask you this:  Do you have an opinion one way or another regarding whether it would have been material to investors -- or whether it was material to investors that Twitter had not agreed to put the deal on hold?

A    I'm not providing an opinion on that question.

MR. BERNSTEIN:  Why don't we take a break now since I lied and we went, I think, 20 minutes instead of 10 minutes.

THE WITNESS:  Sure.

Do we get breakout rooms, or...

MR. BERNSTEIN:  I -- that's above my pay grade.

THE VIDEOGRAPHER:  Please stand by.

We are going off the record.  The time is

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                    62

12:19.

(Whereupon a break was had.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 12:52.

BY MR. BERNSTEIN:

Q   Welcome back, Dr. Tabak.

Before the break, we had been walking through some pieces of information that became public between May 16th and July 8th.

Do you remember walking through a few pieces of information?

A   I do.

Q   And we saw that none of those had a statistically significant stock reaction in response, correct?

A   Correct.

Q   And so it's your opinion that none of those were corrective, correct?

A   At least they -- you know, they didn't have a statistically significant effect on the stock price.

If you're asking about anything legal, I'm not going to offer a legal opinion.

But they didn't change market views.

Q   Well, did they -- I want to focus on

Transcript of David Tabak, Ph.D.

Conducted on July 16, 2025                    63

"corrective" for a second.

I mean, did they reveal in any way Mr. Musk's tweet to be misleading as Plaintiffs allege it to be?

MR. ARNZEN:  Object to form.

A    That -- put it this way:  There's a difference between "material" and "misleading."

They certainly could have revealed something to be misleading if that issue was itself not material unless combined with other issues, for example.

Q    So the -- the pieces of information we looked at, you think, could have revealed, to some extent, the misleading nature of Mr. Musk's tweets?

A    I think that is --

MR. ARNZEN:  Objection to form.

A    -- possible, yes.

Q    And what would a fully -- I think we spoke about this at the beginning.

What would a fully corrective tweet have looked like, you know, immediately after May 13th?

A    Well --

MR. ARNZEN:  Object to form.

A    Was -- that was not my assignment.

But one thing could have easily been, the

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

64

deal is not on hold because Twitter is not required
to give me certain information about bots.

Q   Did you look for any information between
May 13th -- withdrawn.

Anything else beyond what you just said?

MR. ARNZEN:  Objection.

A   I'm sure there're various ways one can state
it, but I think that's a reasonable way of stating
it.

Q   Are there any other ways that you -- you can
think of right now?

I'd like to get all of your opinions as to
what would have been corrective to Mr. Musk's tweet.

MR. ARNZEN:  Form; scope.

A   I think the -- the main thing would have
been something like -- it could have been, I have no
reason to believe that Twitter has not supplied me
with the information it is required to supply me,
something of that nature.

Q   Did you look for any information between
May 13th and October 4th that did disclose that the
deal wasn't on hold, that Mr. Musk didn't have the
basis to believe that he was entitled to this
information or to doubt the 5 percent figure?

A   I looked, and I saw conflicting pieces of

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

65

information.  There were analysts who seemed to think the deal was going forward.

There were others that said -- at least one that said, you know, Mr. Musk has put the deal on hold.

There was certainly disputes about whether or not the -- Mr. Musk was entitled to that information or whether that was going to be a hotly litigated issue that was basically a showcase argument.

Q   Did you -- what I'm asking is:  Did you look for any information that would have provided investors with the answer to whether the deal was actually on hold, whether Mr. Musk was entitled to the information he was requesting, and whether he had reason to doubt the 5 percent figure?

A   So the answer is:  I did look for information, and I saw information in both directions.

I can give you some examples, if you like.

Q   Why don't we hold off on the examples for a second.

The information that we looked at before the break included the Vijaya Gadde interview, May 25th SEC disclosure about getting additional equity

Transcript of David Tabak, Ph.D.

Conducted on July 16, 2025

66

financing, June 7th letter about no material changes to the plans, Plaintiffs' counsel's lawsuit.

You would say none of those were sufficiently corrective, correct?

A    Put it this way:  They provided one set of views.  There is -- there was also conflicting information out there.

So, you know, very clear, for example, on the bots issue, there were people debating whether or not Mr. Musk would ultimately, or should ultimately, have access to that data or not.

Q    Now, one of the arguments -- withdrawn.

What is your understanding as to why Plaintiffs allege Mr. Musk was not entitled to that information?

MR. ARNZEN:  Object to form.

A    Well, I mean, ultimately, it's a legal argument, so I'm not going to give a legal opinion.

But my understanding is, basically, they say he was not entitled to that under the merger agreement because, essentially, it was very seller-friendly.  And he had given up certain, or a large amount of, due diligence rights.

Q    So focusing on that, the merger agreement was public as of May 13, correct?

A    That is my understanding, yes.

Q    And all of the terms would have already been incorporated into Twitter's stock price, correct?

MR. ARNZEN:   Object --

A    The public's understanding of that, yes.

Q    And so it's your opinion, then, that despite the merger agreement being public, the market wasn't able -- that wasn't sufficiently corrective to confirm whether Mr. Musk had these information rights or not; that's your opinion?

A    I think it's fair to say, that the market was uncertain about that.

Q    So just to be clear, you think the merger agreement was not sufficiently corrective to convey to the market whether Mr. Musk had these information rights, correct?

A    Well, put it this way:  The market definitely had conflicting opinions over there.

To be -- put it clear, Dr. Lehn even should have known that because he quotes an analyst as saying that those rights would be a showcase argument or showcase debate.

But it used the word "showcase," not in the section where he actually talks about, you know, what the market thought about that issue, but

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                68

somewhere else.

So you can look through, for example, Dr. Lehn's rebuttal report and see that the market had differing opinions on a lot of these issues.

Q   Whether something's a showcase argument at a trial doesn't mean that you don't know what the outcome is going to be, right?

MR. ARNZEN:   Form.

A   Well, I think if you call something a "showcase" argument -- rather than it's a slam dunk, that one side is going to win -- that does kind of suggest that it is -- that the -- that analyst did not know which way the outcome would be.

They didn't say, It's clear what -- one side will win.  They said, "Here's a showcase argument."

Q   So coming back to -- you agree, you're opining that the merger agreement was insufficiently clear to inform investors regarding whether Mr. Musk had these rights or not?

A   No, I am not opining on the merger agreement.  That would be some type of legal opinion.

I'm opining on what the -- how market participants reacted.  And they had conflicting views afterwards.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                69

I'm certainly not going to opine on the clarity or lack or clarity of the merger agreement.

Q   Okay.  So you are not offering an opinion as to whether the merger agreement was sufficient to provide investors with the information to determine whether Mr. Musk had these information rights or not --

A   Correct.

Q   -- correct?

A   Correct, because that would be some sort of legal opinion about the merger agreement.

        (Reporter clarification.)

Q   Are you able to explain how it's consistent with the efficient market hypothesis that the reason Mr. Musk's statement was false is because the merger agreement didn't provide him with certain rights, but the merger agreement and all of its terms and conditions were already public?

        MR. ARNZEN:  Form.

A   Sure.  The efficient market doesn't mean that it can analyze things perfectly.  You can't toss out an unsolved mathematical equation out there and say the efficient market would get it right.

All the market can do is aggregate the best views of the people out there.  They can make

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                                    70

interpretations.  For example, if Mr. Musk is                      13:03:12

saying, "I am" -- you know, "I should get                          13:03:14

these -- this data," essentially, saying, "I have                  13:03:17

the rights to them," it might say -- you know,                     13:03:20

presumably he thinks that.                                         13:03:23

It will weigh that information.  So it will                  13:03:25

weigh the merger agreement; it will weigh his                      13:03:27

statement and ask, does he have a reason to state                  13:03:30

that?  It will weigh everything else, and it will                  13:03:34

come to a conclusion.                                              13:03:37

Q    Under the efficient market analysis, if the             13:03:40

merger agreement were sufficiently clear as to what                13:03:42

rights Mr. Musk had under the merger agreement, why                13:03:47

would you expect any price reaction to Mr. Musk                    13:03:52

allegedly misstating what his rights under that                    13:03:59

public agreement were?                                             13:04:02

MR. ARNZEN:  Form.                                           13:04:02

A    The question would be whether the market                13:04:03

thinks that he has some basis for that.  They may                  13:04:07

think that -- first of all, he didn't even reference              13:04:11

the merger agreement, although obviously that's the                13:04:15

first thing people would look at.  But they may                    13:04:17

think he -- for whatever reason, whether it's inside              13:04:21

the merger agreement, outside the merger agreement,                13:04:23

that he has some basis.                                            13:04:25

Q   Did you see any analyst talking about his rights outside the merger agreement?

A   Not specifically, but many of them just said "his rights."  I don't think -- many of them simply did not reference any particular document.

Q   So sticking with the merger agreement for a second, can you explain to me, if the merger agreement is sufficiently clear as to what rights Mr. Musk has in connection with the merger --

A   Uh-huh.

Q   -- how, consistent with the efficient market hypothesis, would there be a price reaction to Mr. Musk allegedly misstating what those rights were?

MR. ARNZEN:  Form.

A   The answer is that he would have to give the impression that he actually has certain rights, and that will boil down to whether people -- whether people participating in the market believe him or not.

Q   If the merger agreement were sufficiently clear that he doesn't have the right he says he has, wouldn't you expect there to be no price reaction?

A   If it's sufficiently clear and he is not sufficiently persuasive, then we would not expect to

13:04:33
13:04:36
13:04:37
13:04:41
13:04:44
13:04:51
13:04:54
13:04:59
13:05:03
13:05:07
13:05:07
13:05:13
13:05:16
13:05:19
13:05:19
13:05:20
13:05:24
13:05:27
13:05:30
13:05:32
13:05:36
13:05:39
13:05:44
13:05:51
13:05:54

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                72

see a significant price reaction.

Q   Would you agree that either the merger
agreement wasn't sufficiently clear or the price
reaction we -- you observed on May 13th was due to
perhaps the implication of his tweets; for example,
the fact that he may have been getting cold feet?

MR. ARNZEN:  Form.

A   I'm sorry, can you state the question again?
Because I want to -- I believe I heard the word
"perhaps" in there.

Q   Sure.  Given your testimony that the merger
agreement were sufficiently clear as to whether
Mr. Musk had the rights he was claiming he had or
not, you would not expect a price reaction --
that -- that was your testimony, right?

A   If it's sufficiently clear and if he did not
give the market reason to believe that, you know,
they were wrong in their interpretation or he had
some reason whatsoever to get the data.

Q   And you agree that Mr. Musk didn't even
mention the merger agreement in his tweet?

A   He did not mention it.

Q   He didn't say, The merger agreement may say
this, but I actually do still have the right to it,
right?

A    He did not say that explicitly.

Q    In fact, he didn't even say he had the right to the information, correct?

A    He did not use those words; you are correct.

Q    So given that we saw a price reaction to his tweet, do you agree that either the merger agreement was not sufficiently clear as to Mr. Musk's information rights or the market was reacting to the implication of Mr. Musk requesting the information, regardless of whether he had the right to it?

MR. ARNZEN:   Form.

A    I think you're also excluding the possibility that they gave credence to the idea that he had some reason to have the data.  I know you keep saying, well, the merger agreement is sufficiently clear.  That may be clear on its face to market participants, but they may still think if he's saying this, he must have some argument or some basis.

Q    Did you see any analyst saying, despite what the merger agreement says, we think he must have some basis?

A    Well, again, there was the one who referred to this as the showcase argument.  Now, that -- that -- without exactly quoting a -- or -- or

13:07:32
13:07:34
13:07:37
13:07:38
13:07:41
13:07:46
13:07:51
13:07:57
13:08:08
13:08:12
13:08:15
13:08:16
13:08:22
13:08:25
13:08:28
13:08:30
13:08:33
13:08:37
13:08:41
13:08:41
13:08:44
13:08:46
13:08:47
13:08:50
13:08:54

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                                  74

quoting or referencing a law professor who disagreed, but said it would be an argument to be made.

Q    Now, that argument could be because the merger agreement was not sufficiently clear, right?

A    You can make all kinds of reasons to make an argument.

Q    So let me -- let me try it a different way.

Would you agree, then, that if we do see a price reaction, it means either the merger agreement was not sufficiently clear as to what Mr. Musk's rights were, the market was reacting to the implication of Mr. Musk wanting this information whether or not he had a right to it, or that the market interpreted Mr. Musk's tweet to mean even though the merger agreement says I don't have the rights, I -- I do?

MR. ARNZEN:   Form.

A    Putting aside the exact wording, I think that's right.  I mean, there may -- one thought hard enough, maybe there's another argument out there, but I don't see any at the moment.

Q    Okay.  So focusing on those three for a second, you agree we did receive analyst reports talking about the underlying implication of the

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                          75

tweet, including cold feet or buyer's remorse,
correct?

A   I'm not sure if that's the underlying
implication, but there are some who did mention
buyer's remorse and cold feet.

Q   You did not see any analyst, though, saying,
Although it is clear that Mr. Musk does not have
these rights under the merger agreement, given that
he's saying he does, we -- we're taking him at his
word?

You didn't see anything like that, correct?

A   I didn't see anything like that in
substance.  What I did see is them basically saying,
we'll have to see how this plays out.

Q   And how it plays out could include whether
Twitter would be able to obtain specific performance
even if it was right, under the law or under the
merger agreement, right?

MR. ARNZEN:  Object to form.

A   Yes, that is a possibility.

Q   You're aware that Twitter filed a lawsuit
against Mr. Musk to enforce the merger agreement,
correct?

A   That is my recollection, yes.

Q   And you did not observe a statistically

Transcript of David Tabak, Ph.D.

Conducted on July 16, 2025                76

significant stock price reaction following that

lawsuit, correct?

    A    I believe that's correct.

    Q    And so Twitter's lawsuit conveying its views

of the merger agreement and the negotiation history,

you would say that was also not sufficiently

corrective for investors, right?

    A    Well, first of all, I think by the time of

the lawsuit, people had understood Twitter's views.

So I'm not sure how much enough information was

there.

    Q    Okay.  So that -- that's -- that's a fair

point.

        Twitter had been conveying its views for

months before the lawsuit was initiated, right?

    A    I believe so.

    Q    And you did not observe a single

statistically significant stock reaction to Twitter

conveying its views regarding its rights and

Mr. Musk's obligations under the merger agreement,

correct?

    A    Correct.

    Q    You're not offering an opinion as to --

well, withdrawn.

        So is it your opinion that Twitter conveying

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                         77

its views regarding the merger agreement was not                  13:13:51

sufficiently corrective for investors?                            13:13:55

    A   I think that's fair, yes.                                 13:14:04

    Q   Why?                                                      13:14:05

    A   Because I believe investors still thought,               13:14:11

based on Mr. Musk's tweet, that he had some                       13:14:14

probability of success in being able to get out of               13:14:18

the lawsuit that Plaintiffs allege was not                        13:14:22

justified.                                                        13:14:30

        Sorry, getting out of the merger, not out of             13:14:37

the lawsuit, if I said "lawsuit."                                 13:14:40

    Q   What analysis did you do to determine that               13:14:45

it was any impression Mr. Musk gave to the market                 13:14:55

that led them to still be misled, as opposed to the              13:15:01

market understanding the likelihood of Mr. Musk                   13:15:12

prevailing on his claim but still being concerned                 13:15:18

about the risk that a court would not order specific             13:15:23

performance?                                                      13:15:26

        MR. ARNZEN:   Form.                                       13:15:30

    A   Sorry, can you just repeat the question?                 13:15:30

    Q   Sure.  What analysis did you do to determine             13:15:36

that investors were still misled as to Mr. Musk's                13:15:42

rights under the merger agreement despite Twitter's              13:15:46

lawsuit and Twitter conveying its position regarding             13:15:51

Mr. Musk's rights?                                               13:15:56

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                78

MR. ARNZEN:   Form.

A    Well, again, I'm just tracing this all back to his May 13th tweet that is alleged to be false and/or misleading.  All of this comes back to his tweet and even the possibilities of what would happen in a lawsuit, if Plaintiffs are right that that tweet is false and misleading go back -- go back to that tweet.

Q    Well, but why wouldn't -- withdrawn.

Do you dispute that Twitter conveying its views, in conjunction with the merger agreement being public, could have been sufficient to fully inform investors regarding what Mr. -- Mr. Musk's rights were under the merger agreement?

A    Put it this way:  That -- that still leaves out the third item we talked about, that Mr. Musk was implying that he had certain rights under the merger agreement and the market may have believed he had a basis for that.  Nothing has corrected his -- the idea that he may have a basis for his tweet.

Q    What analysis did you do to determine that investors did, in fact, understand Mr. Musk to have certain rights under the merger agreement that Plaintiffs claim he did not have?

Transcript of David Tabak, Ph.D.

Conducted on July 16, 2025                    79

A    Well, I did not do that because your -- in some sense that is going much more to falsity about what rights he did or did not have.  What you'll see in the analyst commentary is people saying they don't know how it's going to play out, and all of that is because of his tweet, ultimately.

Q    Well, isn't it also because of the chance that a court would not order specific performance, regardless of the merits of Mr. Musk's position?

MR. ARNZEN:  Sorry.  I meant to interject an objection before the last question.  And I will do so with respect to this question too, both as to form.

A    I'm sorry, so what's the question or --

Q    Okay.  You -- you -- you -- just before this, you testified that what you'll see in the analyst commentary is people say they don't know how it's going to play out and all that is because of his tweet, ultimately, right?

A    Correct.

Q    And I'm asking how you know it's because of the tweet, as opposed to because of just the risk that in a lawsuit, a court may not order specific performance, regardless of the merits of Mr. Musk's claim?

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

80

MR. ARNZEN:  Form.

A   Well, first of all, I don't know if I've seen any analyst commentary on that.  There may be some, but I don't recall any saying the courts may get it wrong or something of that nature.  There may be, but your -- again, this all comes back to the fact that he opened the door to all of that with this tweet.

Q   Well, you testified earlier that there were three items that would be corrective of his tweet, right?

A   Yes.

Q   Are you saying that even if it was fully corrective, that nonetheless, the deflation would exist because of the uncertain nature of litigation?

A   No.  If it was fully corrected, then, you know, once you've corrected everything, there cannot be any more fraud on the market, is my understanding.

Q   Right.  But you agree that even if it was fully corrective, it is possible that there would still be a merger discount, perhaps the exact same merger discount that was observed, because of the risk that a court would not order specific performance even if it found that Mr. Musk did not

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                81

validly terminate; it would instead award a
billion-dollar breakup fee or some form of damages?

          MR. ARNZEN:  Form.

    A    I'm sorry, what's the question?  I might
have missed it.  There may...

    Q    Do you dispute that, even if Mr. Musk's
tweet had been fully corrected prior to
October 2022, it is possible that the same merger
discount would have existed because of the market's
perception that there was a risk that the Court
would not order specific performance, even though
Mr. Musk's claims did not have merit?

          MR. ARNZEN:  Form.

    A    I don't see any basis for that.

    Q    Did you do any analysis to determine if that
were to be the case?

    A    I reviewed analyst reports, and, basically,
they talked about this as a dispute.

          So I understand you're trying to create some
different analysis over here, but I did see that
featured prominently in the analyst reports.  And,
again -- well, I will just leave it at that.

    Q    You're aware that there was a Wall Street
Journal editorial about how, regardless of the
merits of Mr. Musk's claim, the Court was unlikely

13:20:59
13:21:05
13:21:08
13:21:09
13:21:13
13:21:16
13:21:21
13:21:29
13:21:33
13:21:39
13:21:43
13:21:46
13:21:49
13:21:51
13:21:57
13:22:02
13:22:04
13:22:08
13:22:11
13:22:15
13:22:24
13:22:28
13:22:29
13:22:32
13:22:33

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                    82

to order specific performance because specific performance is only appropriate where there's no other remedy, correct?

MR. ARNZEN:  Form.

A    That's familiar, but I can't say I remember that for certain.

Q    Okay.  So if the market adopted that view, that specific performance was highly unlikely because, despite Mr. Musk allegedly not having a meritorious case, there were other appropriate remedies like a breakup fee, do you have any basis to suggest that there would not be a similar merger discount to the one that was observed?

MR. ARNZEN:  Form.

A    I would want to think about that a little bit more.  But you're just, you know, asking me this.  I have not given that particular question any thought on why it should be the exact same merger premium does seem -- or merger discount, excuse me, does seem to be a bit unusual.

Q    Well, if the market doesn't think there's any chance the Court is going to award specific performance regardless of the merits of the case, then don't the merits of case become largely irrelevant?

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

83

MR. ARNZEN: Form.

A    That's true, but that would be in contrast to various analyst reports talking about the merits of the case.

Q    You would agree, at least, that given the risk that a court might not order specific performance regardless of the merits of Mr. Musk's claim, that there would be some merger discount incorporated because of that, regardless of any analysis regarding Mr. Musk's -- the merits of Mr. Musk's claim?

MR. ARNZEN: Form.

A    Put it this way:  To the extent that there was, that discount appeared with Mr. Musk's May 13th tweet that is alleged to basically be completely false.

So you're trying to say that -- you're trying to take this interwoven bundle of something that one might pull out of a false tweet and say we shouldn't count that.  I don't know if that's proper legally.

But the -- merger discount appeared because of -- or the, you know, 45 percent of that merger discount is because of the allegedly false tweet.

And you're trying to say, what if there's

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

84

some subtext in there that is truthful?  But I don't see how you separate that out as a logical matter from the text of the tweet that is allegedly false.

Q   One way to isolate it out would be to observe how the stock reacts when there is corrective information regarding the allegedly false portions of the tweet, right?

A   If that is new information, if the market didn't already assume that this was a dispute between Mr. Musk and Twitter.

Q   Okay.  So in order for this analysis to be right, the market would need to assume, as of May 13th, that there already was a dispute between Twitter and Mr. Musk?

MR. ARNZEN:   Form.

A   I don't think that is the only way.

But I do think, given what was going on there, it would be fair to say that the market understood that Twitter and Mr. Musk were not on the same page on everything.

Q   And you mentioned "interwoven bundle," which I believe is a phrase you're -- you're borrowing from Dr. Harzmark in the -- in the Littleton case, correct?

A   If "Littleton" is the correct name of the

13:25:51
13:25:55
13:25:59
13:26:02
13:26:05
13:26:08
13:26:12
13:26:14
13:26:17
13:26:21
13:26:25
13:26:31
13:26:35
13:26:38
13:26:40
13:26:41
13:26:45
13:26:48
13:26:53
13:26:56
13:27:01
13:27:05
13:27:07
13:27:11
13:27:11

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                    85

Tesla case, going private case, yes.

Q   Do you know how that case turned out?

A   I do.

MR. ARNZEN:  Objection, relevance; form.

MR. BERNSTEIN:  I'll -- I'll withdraw it.

A   I'll just say I hope most experts in securities litigation paid a little attention to it.

Q   I would hope so too.

So going to the interwoven bundle, you agree you didn't attempt to unbundle any potentially truthful portions that are conveyed by the tweet from any untruthful portions that are conveyed from the tweet, correct?

MR. ARNZEN:  Form.

A   Well, again, you're using the word "conveyed" because you're asking, again, about subtext over there.

So, no, because he made the tweet and the tweet is or isn't, so to speak, you can't say, I would like to pull -- you know, if he should not have made that statement, for example, I don't think you can say what would have happened if he only made only the truthful part or the not-truthful part.

There was a statement made.  It has a certain effect.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                    86

Q    I'm asking you:  You cannot unbundle the effect from the truthful portion from the allegedly false portion?

MR. ARNZEN:  Objection to form.

A    What's the truthful portion of the tweet?

Q    The -- the plaintiffs in this case, you understand, allege that Mr. Musk was getting cold feet?

A    Yes.  But the tweet said -- did not say, "I am getting cold feet," and, therefore, that's the truthful portion of the tweet.

Q    It's a truthful portion -- it would be a truthful portion, according to Plaintiffs' theory, of what was conveyed by the tweet, correct?

A    Okay.

MR. ARNZEN:  Form.

A    So it's not -- sorry.

So it's not of the tweet; it's what was conveyed by the tweet.

Q    Correct.

A    The problem is that if the tweet is false, I think it isn't an interwoven bundle, to use that phrase.

You can't -- you know, the but-for world, the alternative -- I don't see how you get the

alternative tweet that just conveys only the false or only the true part.

Q   And so you haven't done that, correct?

A   Correct.  Because I don't believe it's appropriate for this type of damages analysis.

Q   Well, let me ask you a hypothetical:  If a company says that it earned $100 of revenue, but it really only earned $99 of revenue, are you saying that you aren't going to evaluate the difference between 100 versus 99?

You're just going to look at the effect of someone saying 100?

A   Of course --

Q   $99 of revenue is true, right?

A   Of course I would look at the difference there.

So the question is:  What is the difference between the actual May 13th tweet, "deal is on hold pending data on the 5 percent bot issue, you know, the -- what -- for example, we have Dr. Lehn saying as well, consider a truthful tweet, "I'm getting cold feet."

That's not changing the number 100 to the number 199.  That is adding in a completely new sentence that was never there before.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                    88

I mean, I -- I really like that example, Mr. Bernstein, because changing "100" to "99" is a very clean example of how you go from an actually, allegedly false tweet to a truthful one.  You replace basically, as little as possible, a wrong number or data point with a true one.

Adding in a statement of "I'm getting cold feet" does not qualify under that metric.

Q   Let's go through what the true tweet would have been then.

You agree that Mr. Musk did request certain information from Twitter?

A   My understanding is, yes, he had requested that -- certain information.

Q   And so would you be willing to assume it was truthful to Mr. Musk -- for Mr. Musk to say:  I've requested the data, and I want the data, but I'm not legally entitled to it?

MR. ARNZEN:  Form --

A   That may have been --

MR. ARNZEN:  -- incomplete hypothetical.

A   -- truthful -- may have been truthful, but it doesn't -- you know, it doesn't match up the way "99" matches up to "100" with "deal is on hold pending receipt of data."

Q   So if it said:  The deal is not on hold
pending the receipt of this data that I have
requested but am not entitled to --

A   I'm not sure what it means to -- wait.
So "deal is not on hold pending receipt" is
kind of a weird phrasing.

Q   "Deal is not on hold, but I am waiting for
data that I have requested but am not entitled to,"
would that be a corrective statement?

MR. ARNZEN:  Form.

A   Probably.  I mean, I want to think it
through, but it sounds right.

Q   And would the market have reacted to that
statement?

MR. ARNZEN:  Form.

Q   Do you have an opinion on that?

MR. ARNZEN:  Incomplete hypothetical.

A   Well --

MR. ARNZEN:  Mr. Tabak, give me a second
to -- to interject.  Okay?

Q   Do you have an opinion on whether the market
would have reacted to that statement?

A   So it's "deal is not on hold, but I have
requested information that I'm not entitled to"?  Is
that --

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                90

Q   Yes.

A   If anything -- well, saying, "deal not on hold" probably would have been a slight positive. "I've requested information that I'm not entitled to," I don't know if the market would have cared about that.

But "deal not on hold" sounds positive. My guess is probably minimal reaction but possibly a slight positive.

Q   So are you eliminating the possibility that the market would have perceived that tweet as suggesting that Mr. Musk was getting a heightened level of buyer's remorse?

MR. ARNZEN:  Form.

A   Well, I don't know what the basis of it is.

If it starts by saying, "deal not on hold," that would sound like saying, well, even if he's got buyer's remorse, he knows he can't do anything with it.

Q   And so what if he said, "Deal not on hold, but I have requested information from Twitter regarding its spam calculation and would be willing to sue to get it regardless of whether I'm entitled to it"?

MR. ARNZEN:  Form; incomplete hypothetical.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                    91

A    I don't know if it's incomplete.

But the problem I see is that it's -- again, you're trying to add in a different statement, compared to what he actually said.

You know, again, I love your example of replacing "100" with "99."  It's an apples-to-apples things.

Now you're trying to replace an apple with kind of a fruit basket and adding in a couple of other things in there.

Q    You agree that the reason that the Court found that it was misleading added in certain things too, correct?

A    Wait.  The Court did not say, here -- I don't believe the Court added in things.  The Court interpreted what he said.

I don't believe the -- did the Court actually say, Here is what the alternative tweet should have been?

Q    No, no, no.

I mean, the Court, in doing its interpretation of what the statement plausibly meant, did add in language that wasn't there, right?

A    That's because the --

MR. ARNZEN:  Form.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                    92

A    That's -- well, I'm -- I can't say, "That's because" because that would be saying why the Court did something.  I can't say why the Court did something.

I best say, "my understanding."  My understanding is that the Court did not attempt to create an alternative tweet but, instead, attempted to explain how the market reacted to the actual tweet.

Q    And the Court's analysis, to your understanding, added in language that wasn't there, for example, "The deal will not close unless I get this information because I'm entitled to it under the merger agreement."

That was the Court's reasoning.

That's not in the actual tweet, right?

A    Okay.  But there's a different -- when you say "added in," the Court did not say, I'm assuming the tweet said this or the tweet did not say this.  It interpreted it.  And if you want to take, you know, a direct change to the actual tweet and interpret it, that, I think would be allowable.

But you keep asking me to change the actual tweet in the but-for world to include new language, as opposed to saying here is, you know, a very clean

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                                    93

99-to-100 or 100-to-99 conversion and now let's interpret it.  You are repeatedly asking me to add that language into the tweet itself, the but-for tweet itself, as opposed to an interpretation.  So that's very different than what the Court did.

Q    You agree, though, that the tweet implies -- withdrawn.

You understand that Plaintiffs are alleging that the tweet implied certain false information, right?

A    That is my understanding.  We wouldn't --

Q    And your --

A    -- have this otherwise.

Q    And your understanding is that the tweet also implied something that Plaintiffs are not disputing was true, which is that Mr. Musk did ask for information, right?

MR. ARNZEN:  Form.

A    That's my understanding.

Q    And it also implied another thing that was true, which was that Mr. Musk was willing to go to litigation if he did not obtain that data, right?

MR. ARNZEN:  Form.

A    I mean, it doesn't say that.  I assume one can interpret it that way.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

94

Q   In fact, you -- you've mentioned that the analyst did interpret it that way to some extent, because they were talking about whether this would lead to litigation and whether there would be a dispute and what would happen if it went to the courts, right?

MR. ARNZEN:  Form.

A   Certainly some analysts said that, yes.

Q   And you can't unbundle the fact -- the effect of the portion of the -- the tweet that Plaintiffs allege conveyed false information from the portion that conveyed the truthful information, including that he had requested the information and was willing to go to litigation if he didn't obtain it, right?

A   Well, again, you're asking to unbundle something by, you know, not looking at what, alternatively, he should have said unless -- when you go there, you keep adding in additional things into the statement.

Q   Well, I don't think I am adding additional things now.  Because you -- you -- we just talked about the fact that analysts did interpret Mr. Musk's tweet as saying that he was willing to potentially go to court if he wasn't able to get

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                                    95

that information willingly from Twitter, right?

        MR. ARNZEN:  Form.

    A    Right.  But maybe I should -- maybe I'm not being clear.

        I have no problem if you take a but-for tweet and start thinking how might analysts interpret that.  But, repeatedly, you've said something like, you know, what if the but-for was, "I will go to litigation."  That is not, in my view, the way you handle the but-for tweet.  It may be an interpretation of some but-for tweet, but you keep trying to put that into the actual but-for tweet.

    Q    Well, before we go back to an alternative tweet or a but-for tweet, you have not unbundled the effect of any truthful information that was conveyed to the market from Mr. Musk's tweet from any allegedly false information that was conveyed to the market from Mr. Musk's tweet, correct?

        MR. ARNZEN:  Form.

    A    Correct, because it's one tweet and you're asking me to unbundle some type of subtext there.

    Q    Understood.  Would a tweet that says, "I'm not putting the deal on hold, but I have requested this bot data information from Twitter because I am concerned about the accuracy of Twitter's SEC

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                96

filings; I don't believe I have a legal right to

this information, however," would that be a

corrective tweet?

A    A -- a but-for tweet or a later corrective

tweet?

Q    A but-for tweet.  Would you accept that as a

acceptable but-for tweet?

A    No.  Let me --

MR. ARNZEN:  Form; incomplete hypothetical.

A    No.  Let me read the actual tweet again.

Says the transaction was, quote, "temporarily on

hold pending details supporting calculation of that

spam/fake accounts do, indeed, represent less than

5 percent of users," end quote.

Says nothing about SEC filings in there.

You keep -- again, not -- you know, apples to

oranges; apples to a little fruit basket.

Q    Okay.

A    You keep trying to add in additional

statements that do not -- you know, that explain

things in a way that, one, is, at best, interpreting

from the actual tweet.

Q    How about, "I still currently intend to

close the transaction, but I have requested

supporting calculations for spam and fake accounts

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

97

representing less than 5 percent of users, so that I can understand my rights"?

A   Oh, so good until you added in the phrase "so I can understand my rights."

Q   Okay.  Right.  So take it -- take it -- take out that.  Let's -- let's do exactly that.

"I still currently -- currently intend to close the transaction, but I have requested supporting calculations for spam and fake accounts representing less than 5 percent of users"?

A   Yes, I think that is a valid but-for tweet.

Q   And your view is --

MR. ARNZEN:  And sorry -- I'm sorry, Mr. Bernstein.  Form.

Mr. Tabak, really, please, pause.

THE WITNESS:  I'm sorry.

Q   Your opinion is that if Mr. Musk had tweeted that, the market would not have interpreted him as having potentially a higher level of buyer's remorse?

MR. ARNZEN:  Form.

A   Not -- put it this way:  Even if they had, if he started with saying "deal not on hold," they would have interpreted -- even -- if any -- I could also see it being a positive because they could say,

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                                    98

look, he had -- everyone knew he had some form of
cold feet before, but now he's saying that he can't
put the deal on hold.

Q   Do you have an opinion as to what the market
understood Mr. Musk to actually be requesting?

MR. ARNZEN:  Form.

A   Very broadly.  You know, the claim was that
the daily average users or the monetizable daily
average users would -- everyone knew had some degree
of spam.  Twitter had said it was 5 percent or less,
and he was requesting data to help him calculate
that.  Sometimes some -- you know, the broad -- the
biggest data sometimes referred to as kind of the
firehose from Twitter.

Q   The -- the tweet does not mention the
firehose, correct?

A   Correct.

Q   What if Mr. Musk had just tweeted out, "I am
asking for details supporting the calculation of
spam and fake accounts," nothing else?

MR. ARNZEN:  Form.

A   And the question is, what if --

Q   Is that -- is that an appropriate but-for
tweet?

A   No.

Q   Why not?

MR. ARNZEN:   Form.

A   Because you've ignored the -- the first part of the tweet that Plaintiffs allege to be false, which is "deal on hold, pending."

Q   But did the -- is it your understanding that the market believed the deal to be on hold prior to May 13th?

A   They -- no, not on hold.

Q   Okay.  And -- and so wouldn't not saying anything be an appropriate but-for tweet?

A   Ab -- No.  Consider a case where, for example, a -- you know, a company has -- a pharmaceutical company is developing a drug, it fails a test, and the -- the company says it has passed the test, you know, the clinical trial.  My understanding is -- and I'm not going to give a legal opinion, but basically the rule is once you speak, you must speak truthfully.  So having chosen to speak, you can't say the alternative is not to have spoken.

I'll put it this way:  It might work in some legal frameworks.  And, again, I'm not giving a legal opinion, but my general understanding is once someone has chosen to speak, the rule is you -- they

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

100

must speak truthfully and you have to replace it with the correct information.

Q   So in your world, the but-for tweet must provide information -- withdrawn.

MR. BERNSTEIN:  I think I'm about to shift to another topic, so if you want to take a break -- I think we've been going almost exactly an hour.  So if you want to take a break now, we can, or we can keep going.  The next portion is 20, 30 minutes, probably.

MR. ARNZEN:  I wonder if I can ask for a quick break, just a restroom break.

MR. BERNSTEIN:  Absolutely.  Want to say ten minutes, be back at 2:00 p.m.?

MR. ARNZEN:  I think five is fine. Whatever -- whatever works for the group.

THE WITNESS:  Either -- either way.

MR. ARNZEN:  Is five okay with you, Mr. Tabak -- Tabak?  Thank you.

That okay with you, Mr. Bernstein?

MR. BERNSTEIN:  Of course.

THE VIDEOGRAPHER:  Perfect.  Please stand by.

We are going off the record.  The time is 1:50.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

101

(Whereupon a break was had.)

THE VIDEOGRAPHER: We are now back on the record. The time is 1:58.

BY MR. BERNSTEIN:

Q   Welcome back.

A   Thank you.

Q   Your understanding is that the Court found that only three statements survived the motion to dismiss under Rule 10b-5(b), correct?

A   Correct.

Q   Those three statements were the May 13 tweet that we've been discussing at length, May 16 statement at an All-In conference, and a May 17 tweet, correct?

A   Correct.

Q   You concluded that the May 16 tweet was not an independent source of loss, correct?

A   Correct.

Q   Does that mean, then, that the May 16 tweet did not contain any material or new information?

MR. ARNZEN: Form.

A   I'm sorry, did you say the May 16th tweet?

Q   Sorry. Withdrawn.

The May 16th statement at the All-In conference that you determined was not an

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

independent source of loss, is it your opinion that the statement did not contain new material information?

A    I don't know if it did or did not.

Q    You don't have an opinion one way or another?

A    Correct.

Q    You also concluded that the May 17th price statement following the May 17th tweet was not statistically significant, right?

A    Correct.  That is correct.

Q    And, therefore, you excluded the May 17 tweet from your damages analysis?

A    Also correct.

Q    And so you're not claiming any damages resulted from the May 16 All-In conference or the May 17th statement, correct?

A    Well, the -- I said the May 16th statement is not an independent source of loss because -- because the price reaction could have continued from May 13th to May 16th, or it could -- that could have added to the May 16th price reaction.

Q    Are you saying you don't know whether it was the May 16th tweet or the May 13th tweet --

A    Let me just see exactly how I wrote that, to

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

103

be clear.

Yeah, you're right.  I mean, the way I treat it, I think it's fair to say, I'm just not having any damages, I believe, from the May 16th statement.

Q   Because you said there was little evidence of the economic importance of any announcements made during the trading day on May 16th, right?

A   Correct.

Q   And among the statements made during the trading day on May 16th was the All-In conference statement that the Court held survived the motion to dismiss, correct?

A   Correct.

Q   So just to go full circle on it, your opinion is that that May 16th All-In conference statement -- withdrawn.

You -- your opinion is that there's little evidence of any economic importance of the May 16 All-In conference statement, correct?

A   That is correct.

Q   Did you analyze why that would be the case?

A   Not in great detail since I was already excluding it from my damages analysis.

Q   Are you aware of -- withdrawn.

So for purposes of the 10b-5(b) damages,

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

104

your only source of damages is from the May 13

tweet, correct?

A    That is correct.

Q    But you opined that it took until May 16 for

the market to fully incorporate the effects of the

May 13 tweet, correct?

A    That is correct.

Q    Despite the fact that at class

certification, you opined that Twitter's stock would

rapidly incorporate the effects of new information,

correct?

MR. ARNZEN:    Form.

A    The "despite" there is improper.    That is

not at all inconsistent.

Q    Okay.  So for purposes of -- withdrawn.

So you say they're not inconsistent because

it could have taken the market from May 13 through

May 16 to fully incorporate the effects of the

May 13 tweet, correct?

A    Correct.

Q    You're aware that there was other

information that came out between May 13 and May 16

concerning Twitter and bot information, right?

A    At least statements made about those issues,

yes.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

105

Q    Are you aware of the publication of the SparkToro report on May 15th, 2022?

A    I don't recall offhand.

MR. BERNSTEIN:  Let's mark, as 206, Tab 12, SparkToro report, published on May 15th, 2022.

(Exhibit 206 marked for identification.)

MR. ARNZEN:  Mr. Bernstein, if you'll agree that it will suffice, I'll just make a standing objection on relevance, foundation, and form as to questions on this.

MR. BERNSTEIN:  Sure.

MR. ARNZEN:  And authenticity.  Sorry.

Q    Are you familiar with this document?

A    I do not recall seeing this document.

Q    So you're not aware that on May 15th, 2022, there was a report published on the Internet by SparkToro and Followerwonk that analyzed Twitter's users and came to the conclusion that approximately 20 percent of Twitter's active accounts were fake or spam?

A    I've not seen this before, so I wasn't -- certainly not aware of it before now.

Q    If spam and fake accounts represented four times as many -- withdrawn.

Because you weren't aware of it, you didn't

do any analysis to determine whether Twitter's stock price on May 16th was reacting to this news, correct?

A    Not directly, but I didn't see this referenced in analyst reports.  So I was going -- you know, looking at what I saw analysts responding to.

Q    And if you didn't see something in an analyst report, is it your opinion that the market would not have been reacting to that information?

A    I think it makes it less likely, particularly at a point like this, where there was a lot of news and analyst reports.

Q    But if the market was learning that fake and spam accounts represented four times as many of Twitter's users as Twitter represented, do you agree that could have negatively affected Twitter's stock price?

A    Well, so you said, "if it learned," as opposed to if whoever or whatever SparkToro and Followerwonk are make a representation.  So first of all, there's a difference there.

And again, it would be very interesting, given Mr. Musk's tweet about 5 percent, that no -- that I don't recall any analyst talking about a --

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

107

you know, evidence of another figure coming out.

So I would want to look at that.  I mean, you're saying what if the market learned this?  I'd be interested in knowing why there was -- I didn't see any.

Perhaps there's some minimal amount of commentary on it.

Q    But you are not eliminating the possibility that Twitter's stock price would have reacted negatively if investors learned of this analysis, right?

MR. ARNZEN:  Object to form.

A    If investors learned of this analysis -- well, first of all, I haven't heard of SparkToro and Followerwonk.  Maybe they are more well known than I know of.

But at the moment, I don't see, you know, what the -- you know, whether -- I don't see any -- I didn't or at least don't recall any analyst commentary on them.

So I would want to see actual evidence that the market considered -- what is this, a web page did you say?

Q    It was posted online, yeah.

A    There are a lot of things on the Internet.

14:07:52
14:07:56
14:07:58
14:08:03
14:08:05
14:08:07
14:08:09
14:08:10
14:08:16
14:08:20
14:08:26
14:08:26
14:08:28
14:08:32
14:08:38
14:08:43
14:08:46
14:08:48
14:08:51
14:08:54
14:08:55
14:08:59
14:09:03
14:09:04
14:09:07

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

108

I would love to see that people were actually following something on the Internet and it affected the market, yet somehow no analyst was talking about it, as far as I know.

Q   You agree that although there's a lot of information on the Internet, not every piece of information on the Internet gets the attention of the New York Post, for example?

A   That is true.

Q   And not every piece of information the Internet gets the attention of Business Insider?

MR. ARNZEN:   Form.

A   Also, true.

Q   A piece of information from the Internet that's getting the attention of the New York Post and Business Insider is more likely than a piece of information not getting that attention to be in the eyes of -- of investors, right?

MR. ARNZEN:   Form.

A   Sure.  Just like if it's not in analyst reports, it's less likely to be in the eyes of investors.

MR. BERNSTEIN:   Turn to Tab 13, which we'll mark as Exhibit 207.  207.

(Exhibit 207 marked for identification.)

Q   Do you understand as we're --

A   Hold on.  It's not appeared yet.

Q   All right.  Well, as we're pulling it up, you understand that on May 15th, Mr. Musk tweeted that there's some chance that Twitter's -- that 90 percent of Twitter's daily active uses might be bots or spam?

A   Can we just make this bigger?  If you want to refer me to something in particular, I --

Q   Sure.  You see that May 15th tweet at 2:39 a.m.?

    It says, "There's some chance it might be over 90 percent of daily active users, which is the metric that matters to advertisers.  Very odd that the most popular tweets of all time were only liked by 2 percent of daily active users."

A   I see that tweet.

Q   And this tweet occurred after the SparkToro report was published and before -- withdrawn.

    This tweet was published before market opened on May 16th, correct?

A   It's a May 15th tweet, so yes.

Q   All right.  And you didn't do any analysis to determine whether the market's reaction on May 16th was caused by this new information rather

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

110

than the May 13th tweet, right?

A    Well, this information being Mr. Musk's opinion?

Q    Yes, correct.

A    Again, I looked at analyst reports.  I didn't see them referencing this opinion.

Q    And are you discounting it in some way because it's Mr. Musk's opinion?

A    Well, you said, "information," which people often think of as fact.  I'm not saying whether it's Mr. Musk's opinion or other, but this is just -- you know, it is not a -- you know, a hard fact.

Q    Going back to the May 13th tweet for just one moment, you said that at that time, it was reasonable for investors to assume that there would be disagreements between Mr. Musk and Twitter concerning whether he actually had the right to this information, whether the deal actually was on hold, right?

A    Yes.

Q    And so though -- therefore, an investor would interpret what Mr. Musk was saying as his opinion, correct?

A    I think people would always interpret what Mr. Musk is saying as Mr. Musk's opinion.

14:11:56
14:11:58
14:12:01
14:12:04
14:12:10
14:12:14
14:12:16
14:12:21
14:12:23
14:12:25
14:12:29
14:12:32
14:12:37
14:12:53
14:12:56
14:12:59
14:13:00
14:13:03
14:13:05
14:13:05
14:13:06
14:13:11
14:13:15
14:13:16
14:13:21

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

111

Q   Well, not necessarily as a fact?

MR. ARNZEN:  Form.

A   If something says -- put it this way:  I think that's a fair statement, that they're interpreting this as his opinion.

Q   Continuing with this tweet -- and I apologize because I may have literally asked this exact question already, but I lost my train of thought.

Did you do any analysis to determine whether this tweet was causing any of the price reaction on May 16th?

A   Again, what I said is I looked at analyst reports and what they were referring to.

And I didn't see a lot, if any, analyst reports referring to this tweet.

Q   Is it your opinion that, looking at this tweet, it is of little -- that there's little evidence of the economic importance of it?

A   I don't -- I don't see any evidence of the economic importance of this tweet.

Q   So as of May 15th, if Mr. Musk is conveying his belief that over 90 percent of daily active users may be -- may be spam or fake accounts, you don't view that as having economic importance to

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

112

Twitter investors, correct?

A    Well, what I said is I don't see any evidence of it yet.  I haven't seen analysts -- maybe there's one or two, but I certainly haven't seen analysts referring to this regularly.  So I'm always open to looking at evidence.

But just, you know, a statement by him with no evidence supporting it, not clear that there's a basis for saying there's substantial economic evidence in favor of the that being important to the investors.

Q    One reason that just -- withdrawn.

Is it your opinion that if -- if the analysts are not talking about a particular a tweet by Mr. Musk, that itself is -- shows a lack of evidence of economic importance?

A    It doesn't necessarily -- I think the phrase "lack of evidence," but I think it is evidence against economic importance, particularly a time when they are focused on his May 13th tweet.  So they're paying attention to what he is tweeting.

Q    So you think because the analysts didn't talk about it, it did not have economic importance, that Mr. Musk was of the opinion that Twitter's user base might be over 90 percent spam or fake accounts?

MR. ARNZEN:  Form.

A    I didn't -- I think you dropped the -- the phrase that said "evidence of."

Q    Okay.  So you have no opinion one way or the other whether Mr. Musk's May 15 tweet had economic importance to Twitter?

A    At the moment, I haven't seen any evidence in favor of that.  Mr. Musk made --

Q    Let me --

A    -- a lot of tweets over here.  This one is, you know, clearly a bit -- you know, it sounds speculative.  There is some chance it might be.  He hasn't provided any supporting evidence.  I haven't seen analysts comments on it.  I think I need more in order to start moving to that view that it did have economic importance to investors.

Q    But -- but if it were true that 20 percent or 40 percent or 90 percent of Twitter's spam -- Twitter's accounts were spam or fake accounts, that would affect the likelihood of the deal closing, right?

MR. ARNZEN:  Form.

A    So assuming that that gave him the right to back out of the deal, then if it would have had an -- if it would have affected the likelihood of

14:16:30
14:16:31
14:16:33
14:16:39
14:16:41
14:16:47
14:16:49
14:16:52
14:16:54
14:16:55
14:16:59
14:17:03
14:17:06
14:17:08
14:17:12
14:17:16
14:17:17
14:17:21
14:17:25
14:17:28
14:17:35
14:17:36
14:17:38
14:17:41
14:17:45

Transcript of David Tabak, Ph.D.

Conducted on July 16, 2025

114

the deal closing in a material way, we would --
first of all, expect to see analysts commenting on
that, since they're commenting right now on the
May 13th tweet.

So you're right, if there were -- if there
were a strong basis to believe that over 90 percent
of daily active users were, in fact, spam or bots,
we would expect that to have an effect of the
likelihood of the deal closing and on analysts
commenting on that.

Q   And the same would be true of Mr. Musk's
May 16 statement at the All-In conference where he
mentioned the 20 percent figure, which you found
there was little evidence of economic importance
for, right?

A   Same answer.

Q   Do you have any opinion regarding why the
market didn't negatively react to this information?

MR. ARNZEN:  Form.

A   Well, first of all, he had already kind of
expressed the opinion that the number of -- you
know, the percentage of tweets that were fake or
spam was over 5 percent, so this is just giving a
particular number to it.  The 5 percent figure is an
important benchmark because that's what Twitter had

Transcript of David Tabak, Ph.D.

Conducted on July 16, 2025

115

said before.  Twenty --

Q  Why -- sorry, continue.  I didn't mean to cut you off.  I thought you were --

A  Fair enough.  No, it happens.

It's not clear that 20 percent is substantially different than greater than 5 percent, in terms of the deal closing.

Q  When did Mr. Musk express the skepticism or imply that they were more than 5 percent?

MR. ARNZEN:  Form.

A  I think the May 13th tweet implicitly expresses that skepticism.

Q  You said "implicitly"?

A  Yes.

Q  Certainly not explicit, correct?

A  That is correct.

Q  Okay.  And what -- did you do any analysis to determine how much of the market reaction was due to that implication that he thought there might be more than 5 percent?

A  Well, put it this way:  I think that that really matters because it goes back to the question of whether he was entitled to data in order to try to confirm or dispute or refute that figure, which is an allegation in this case.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

116

Q   I didn't -- and so, I guess, how much -- I mean, so you would say a significant portion of the market reaction on May 13th was due to the implication that Musk believed that more than 5 percent might be due to -- might -- withdrawn.

Is it your opinion that a significant portion of the market reaction on May 13 was due to the implication that Mr. Musk believed that more than 5 percent of Twitter's active users were fake or spam accounts?

MR. ARNZEN:  Form.

A   Not independently; only because he was asking for the data or claimed he -- or said the deal was on hold pending receiving the data on that.

If he just said, for example, you know, I think the percentage of fake or spam users is greater than 5 percent but it wasn't going to affect the deal, then I don't think we would see any real reaction.

Q   But if he said, I think it might be greater than 5 percent and so I'm asking for additional information to confirm that, would you expect a negative market reaction?

MR. ARNZEN:  Form.

A   It's not clear if he's just asking and,

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

117

therefore, not implying that Twitter was required to give that information. I want to think about that.

But given what was known about the deal, it's not clear if he just says he's asking and not -- you know, doesn't have a right to that data, that that would matter to the market.

Q  Is your opinion, then, the reason Mr. Musk's tweet was material to investors is because it implied that he had the right to the information?

A  So, first, we're now back, just to be clear, the May 13th tweet, as opposed to the tweet on the screen?

Q  Correct.

A  Put it this way: Material to investors because it supported the ability -- the possibility that the deal would be on hold and ultimately canceled; and that, in turn, depended on his right or -- or lack of right to get information from Twitter and that there -- and also that Twitter was allegedly then withholding information that he may have had the right to.

Q  But the mere fact or the mere suggestion that fake and spam accounts might be over 5 percent, you're saying that never had an independent negative effect on Twitter's stock; not on May 13, May 16, or

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

118

May 17?

MR. ARNZEN: Form.

A    Not independent absent his -- or -- claim or argument that that may prevent the deal from going through.

Put it this way: Again, if the but-for tweet is, "THE deal is not on hold, you know, and also I -- I'm interested in this 5 percent figure," it's not -- I think "the deal is not on hold" would outweigh any concerns he's had about the 5 percent figure, particularly if he didn't claim to have any way of actually verifying that 5 percent figure.

Q    What analysis did you do to support what you just said?

A    Well, you've just asked me about this for the first time here, so I have not done prior analysis.

But the point is, if he's basically saying, "There's something I don't like about the deal, but I have to go through with it," that is -- should not have an effect on the market price.

Q    You would agree that if he said, "I might terminate because of this, I might purport to terminate," that would have a material impact, correct?

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

119

MR. ARNZEN:  Form; incomplete hypothetical.

A    Well, again, it's not a -- you know, it's not a -- you know, a proper -- proper but-for tweet relative to what he actually said.  So again, you're adding in a new thing over there.  And, of course, if you add in a new thing that has material implications, it can have an effect on the stock price.

Q    And you agree that Mr. Musk conveying to investors that he may force Twitter to litigate whether the deal should be closed or not, that would have a material impact on Twitter's stock price, right?

MR. ARNZEN:  Objection to form.

A    It can.

Q    Do you have any reason to believe it wouldn't have?

MR. ARNZEN:  Same objection.

A    As of the time -- you mean as of the time of the May 13th tweet, as opposed to later, once the market already believed that?

Q    Correct.

A    I think it likely would have had some effect on the price.  But, again, as we talked about earlier with that whole price of "interwoven

Transcript of David Tabak, Ph.D.

Conducted on July 16, 2025

120

bundle," the but -- you know, you can't just add that into a but-for tweet.

Q   You're saying you can't do it from a legal -- in a legal way?  An economic way?  What's your -- can you cite me to a document or some -- some treatise that says that you can't do that, an economic treatise, a legal treatise?  You keep saying it can't be done or you can't do it, and I'm trying to understand why.

A   Fair -- fair enough.  Obviously, you can create that scenario.  And I'm also not going to give a legal opinion.  This is just how -- if you want to say this is how I view damages, that's fine, is that the standard idea in doing damages is the but-for world is supposed to be kind of the simple reversal of whatever was wrong, not you get to add in all kinds of other things in there.

Q   In your view, the correct measure of damages is not the difference between what was said and the actual state of affairs that existed at the time; is that right?

A   I think that is quite unfair.  It's the difference between what was said and what should have been said, and what should have been said should have been truthful.

Q   I'm asking, are you saying that it is not -- I understand your articulation.  I'm asking if that's different than the difference between what was said and how that was interpreted by the market, as compared to what the actual state of affairs was that existed at the time and how that would have been interpreted by the market.

MR. ARNZEN:  Form.

A   I think -- put it this way:  I think you're getting -- getting into the question of could -- well, the actual -- obviously what should have been said has to be a reflection -- should have been a reflection of the actual state of affairs in general.  The but-for statement in general cannot be false.

So you're just asking whether the but-for statement should include additional factors in there.  But, you know, put it this way:  Let's take your example of the company that announces earnings of 100 when they're actually 99.  They may not have actually announced, and, by the way, we're also signing a new contract that's going to increase our earnings by a lot more in the future.

Look, the way you correct the but-for -- the incorrect statement of earnings of 100 is to say

Transcript of David Tabak, Ph.D.

Conducted on July 16, 2025

122

it's earnings of 99 and not say, and what else can we add in there that also happens to be true.

Q    The difference here, though, you would agree, is that whether Musk would force Twitter to file a lawsuit, for example, if he didn't get that information, is inherently connected to the subject matter of the tweet, right?

A    So we're going to call that an interwoven bundle, I think.

But put -- put it this way:  There are lots of things connected -- inherently connected to the tweet, and sometimes you're asking me to just say, well, let's pull some of them out, and now you're asking me to put some of them in.  At least the way I do damages is to say, let us simply correct that alleged misrepresentation, not to add in something that is inherently there.  If it's inherently there, then it can be inherently there in the corrected version of the tweet, rather than explicitly there.

Q    Okay.  So to make it a truly but-for tweet, then, you would want to have a -- the but-for tweet convey the same implicit information that the actual tweet did; obviously all truthful, though.  All the truthful implicit information that was conveyed in the false tweet, you would want that to be conveyed

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

123

in the truthful tweet in order to compare the actual
effect of the false statement as opposed to the
truthful statement, right?

MR. ARNZEN:  Form.

A   Well, putting aside whether that's a legal
issue, the way I view it is, simply correct the
false statement, and whatever comes out of that,
comes out of that.

Q   And just to go back to -- to mine, I guess,
when -- as you were doing your analysis, do you view
what you just described as differently than
comparing the allegedly false statement and any
information it conveyed, to a -- a truthful
statement that conveys the full state of affairs
on -- on the issue?

MR. ARNZEN:  Form.

A   Well, the problem is you're -- you're -- you
aren't saying compare a false statement to a
similarly phrased truthful statement that is just
true.  You're saying, but the truthful statement has
to also convey something else, the full state, you
know, of affairs.  It's not that the false statement
conveyed the full state of affairs, whether true or
false.

So you're not doing an apples-to-apples

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

124

comparison. You're insisting --

Q    But that's --

A    Let me finish.

You're insisting that the but-for statement contains something additional.

Q    That's fair.

You would agree that to do an apples to apples, any truthful information that was conveyed from the allegedly false tweet would need to be conveyed in the but-for tweet; otherwise, you're not comparing apples to apples if that truthful, conveyed information had some negative effect on stock price, right?

MR. ARNZEN:  Form.

A    Again, I'm not going to give a legal opinion.

But I would say no.  The answer is you have to replace the false information with correct information kind of on a one-to-one basis.  And whatever comes out of that, comes out of that.

Q    Okay.  So for purposes of your analysis, you did not -- your opinions are not premised on the notion that the but-for tweet should convey the same truthful information that was conveyed by the allegedly false tweet?

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

125

MR. ARNZEN:  Form.

A    I think that the -- that is not a good way of phrasing what my opinion is because you're putting in a negative.

I would say my affirmative view is that the but-for tweet should basically be the same as the allegedly false tweet but replacing the false information with truthful information.

And then whatever the market gets out of either tweet is what the market gets out of either tweet.

Q    But you -- you would -- therefore, it's not relevant to you -- it's not necessary for purposes of your analysis -- to ensure that any truthful information that was implied from the false -- the allegedly false tweet also be implied by the truthful tweet, the but-for tweet, correct?

A    I think put it this way:  If the argument is that false tweet should not have been made or not have been made as stated, then my view is you do not try to figure out what was implied and so forth. You try to figure out what should have actually been done and see what flows from that.

Q    And so you, in your opinion, did not do anything to ensure that any truthful information

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

126

conveyed by the allegedly false tweet would have been conveyed by any but-for tweet, correct?

MR. ARNZEN:  Form.

A    Of course not because, again, my view is to replace the false information with true information.

In other words, to ask, what should have been done if, you know, nothing was done improperly in the but-for world.

Q    And you would do that even if the truthful tweet would then omit truthful information that was conveyed by the allegedly false tweet, right?

A    Well, first of all -- okay.  You've got --

MR. ARNZEN:  Form.

A    One is "conveyed," and other is "omit."

If you want to say the false tweet conveyed information, and the truthful tweet did not convey that information, that might be a little fairer, but you can't change the verbs on me.

Q    That's fair.  I'll do it exactly the way that you suggested.

When doing your analysis, you would create a but-for tweet even if that but-for tweet did not convey truthful information that was conveyed by the allegedly false tweet, correct?

A    Only --

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

127

MR. ARNZEN: Form.

A    Sorry.

Only if that but-for tweet did correct all of the actual false information in that false tweet and did nothing else.

I wouldn't, for example, eliminate truthful information that was explicit in the false tweet. I would keep -- you know, if there was something that was actually a true statement in the -- as part of the false tweet, I would not say, well, drop that because all I'm doing is correcting information.

Q    Did you do anything to disaggregate the effects of "deal on hold" versus the implication that Mr. Musk was suggesting he had a legal right to the bot information?

A    No.  I treated them as whatever phrases we've been using, "interwoven bundle" and so forth.

Q    Okay.  And so what would you do if the jury determines that, for example, "deal on hold," it was apparent within days that the deal was not literally on hold?

A    Well, let's take -- start with an easier example.

If it was apparent immediately that the deal was not on hold, that would have no effect on the

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

128

stock price.  So the entire decline would have to be

from the other portion that is alleged to be false.

Now, if you're going to say "a few days later," well, then we would want to look at whenever we think that that happened and ask, okay, was there a statistically significant stock price increase at the point when the market recognized that the deal was not on hold?  And I think, as you've tried to argue earlier, we don't see that.

So put it this way:  If the market recognized that at some point a few days later, I would look to the price reaction there and say, that portion of the deflation that disappeared when the market recognized that would no longer continue past the point when the market recognized that issue.

Q   So as soon as the market realized that the deal was not literally on hold, it -- if we don't see a statistically significant price movement, you're saying -- you can conclude that all of the price reaction on May 13th was due to the other portion; is that fair?

MR. ARNZEN:  Form.

A   Well, the -- I think we're talking about three different portions before:  The deal on hold, the -- well, we talked about, I guess, the merger

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

129

agreement, and other reasons why Mr. Musk was implying that he had rights to the data.

So put it this way:  If one of them is clearly shown to be wrong or -- put it this way -- is not to be believed anymore and there is no statistically significant price reaction, that means that it did not have a material -- did not count for a substantial portion of any of the change in the stock price following May 13th.

Q   And you're right.  We had looked through some pieces of information that had come out and the -- the reaction to it.

Do you have an opinion one way or the other whether the "deal on hold" portion of the tweet contributed to any of the price decline on May 13th?

MR. ARNZEN:  Form.

A   I have not attempted to separate out between different allegations.  So right now, I'm not providing an opinion on that.

Q   What if the jury determines that one portion of the tweet is true?

What would the jury have to do then in order to calculate how much of the -- the deflation was caused by the untrue portion versus the true portion?

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

130

A    I think they would have to ask whether that requires a disaggregation, which I don't believe -- the jury probably would not have data to do that -- or whether, essentially, either one of the two would carry the entire deflation.

Q    You haven't -- sorry.

Did I cut you off?

A    No.

Q    You -- you haven't done any analysis that would allow them to disaggregate one way or another, correct?

A    Between the two portions of the text of the tweet, no, I have not.

Q    And you are not offering the opinion that one or the other would carry the entire deflation even if one were true and one were not true, right?

A    I haven't thought about it.

Put it this way:  My understanding -- and I would want to go back and check the exact language of the order in the motion to dismiss -- is that the Court spoke about the question of whether Twitter was upholding its obligations.

So if that's the case, the question is whether having just one or other portion of the tweet be deemed true -- well, one portion be deemed

true and the other portion be deemed false, would

still lead the market to that conclusion.

Q    Understood that that's what you might need

to do to figure it out one way or the other.

But you haven't done that analysis, correct?

A    I have not done that analysis.

But I could, you know, basically say that

that is what one would have to consider, whether the

market would -- would get the same interpretation of

whether Twitter had obligations that it was not

meeting if only one of those two portions was deemed

false.

Q    I think you just summarized the -- sort of

the Court's reasoning behind finding the May 13

tweet survived the motion to dismiss.

And is it correct that your understanding is

that it ultimately boils down to whether Twitter had

obligations to Mr. Musk that it was not meeting?

MR. ARNZEN:  Form.

A    Again, obviously, I will defer to any

reading or re-reading of the Court's opinion, but

that is my recollection.

Q    And does your analysis depend on -- in any

way on a particular reading of Mr. Musk's tweets?

A    My analysis does -- does not.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

132

The Court has already determined that, and I am not, you know, changing that in any way, shape, or form.

Q    So your analysis assumes that what the tweet conveyed was that Twitter was not upholding its obligations under the merger agreement, right?

A    Again --

MR. ARNZEN:    Form.

A    -- if that's the correct summary of what the Court said, then, yes, I'm trying to be consistent with what the Court ruled or held.  I'm not sure which one is the correct verb.

Q    Sitting here now, you can't say one way or another whether it was one portion of the tweet versus a different portion of the tweet that caused Twitter's stock price reaction, right?

A    Correct.  I have not done that analysis.

Q    Your measure of damages is a constant percentage of the merger discount, right?

A    That is correct.

Q    And the merger discount is the difference between the purchase price of the -- withdrawn.

The merger discount is the difference between the merger price and the current price of the stock?

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

133

A    That is correct.

Q    And here, the merger price was 54.20?

A    That is correct.

Q    So on any given day, your deflation is the difference -- withdrawn.

On any given day, the merger discount is the difference between 54.20 and the stock price on that day?

A    That is correct.

Q    Your methodology involves taking a constant percentage of that merger discount and attributing it to the May 13th tweet, correct?

A    Correct.  And I'm sorry.

You said -- what date did you say of the tweet?

Q    13th, May 13th.

A    Yes, correct.

Q    You -- you've first looked at the merger discount prior to the May 13th tweet?

A    Also, correct.

Q    And then you looked at how much the merger discount changed after the May 13th tweet, right?

A    Correct.

Q    And that was just the difference in stock price from before May 13 through market close on

14:47:43
14:47:44
14:47:49
14:47:49
14:48:06
14:48:07
14:48:12
14:48:17
14:48:17
14:48:21
14:48:28
14:48:32
14:48:36
14:48:40
14:48:42
14:48:42
14:48:44
14:48:45
14:48:49
14:48:51
14:48:52
14:48:55
14:48:58
14:48:59
14:49:05

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

134

May 16, correct?

A    Also, correct.

Q    You didn't take, in actually calculating your merger discount -- withdrawn.

In actually calculating your -- the constant percentage, you didn't take the figure from your event study.

You actually -- you used the raw difference in stock price, right?

A    Yes.

Q    So there was no adjustment made to take into account market and industry factors, right?

A    Correct.

Q    And then you took that change and calculated it as a percentage of the total merger discount that existed as of close on May 16, right?

A    Correct.

Q    And that percentage is the amount of deflation you attribute to the May 13th tweet, right?

A    That percentage times the merger discount, yes.

Q    And you apply constant percentage rather than a constant dollar deflation, correct?

A    Correct.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

135

Q    Why did you do that?

A    Because it's the correct thing to do.

So if you give me a little bit of time over here, let me explain what Dr. Lehn gets wrong in his -- or one of the things he gets wrong, for example, on page 29 of his report, where he has a subsection saying, "Dr. Tabak fails to disaggregate the effect of market and industry effects on the merger discount."

And what he says over here is just completely wrong.  And I'll tell you where in particular -- in paragraph 87 -- and then I'll explain it.

You see -- one, two, three -- six lines in, the last word is "for," F-O-R.  And he says, quote, "For example, if Twitter's standalone value declines due to market and industry factors, the Merger Discount would increase, and Dr. Tabak's methodology would allocate 45.7 percent of that increase in the Merger Discount to the alleged misrepresentation when the entirety of the increase in the Merger Discount is unrelated to the alleged misrepresentation.  Under the above scenario, because the increase in the Merger Discount should be entirely allocated to the portion unrelated to

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

136

the alleged misrepresentation, the percentage attributable to the alleged misrepresentation would decrease," end quote.

Now -- so let me explain why he's just wrong on this. And I will give you a hypothetical, some numbers, and I suppose Ms. Gkouagkousi is going to check me on this at some point.

But let's start with a simple example. I am going to buy a company at $100 a share. Initially, Point in Time A, the standalone value is 80, but I -- and I tell the market, here's the way this deal works: I'm going to go on a live stream or TV. I will flip a fair coin. If it's heads, we go through the deal; I pay 100. If it's tails, I get to walk away and the -- you know, get the standalone value of 80. Everyone agrees on the standalone value.

If it's a fair coin, the price should be 90. But suppose I lied, and rather than being able to walk away if the coin is tails, I actually have to flip the coin twice and get tails twice in order to be able to walk away. In that case, there's only a 25 percent chance that I can walk away from this deal.

So with a stock -- with a stated merger price of 100 and a true value or standalone value of

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

137

80, the stock will trade at 95.  Hope we're okay there.

Let's move on to point B, market and industry effects.  The market goes down.  The standalone value of the company drops -- drops from 80 to 76 all because of market and industry effects.  What is the actual price in the market?  Well, I still got that -- people believe I'm going to flip the coin once.  If the price I'm paying if I can't walk away is 100 and if the standalone value is 76, then the market price is 88.

But the truth is, again, I have to get two tails; I have to flip it twice.  So the true price should be 94.

So look at what happened.  Originally, the price is 90, but it should be 95.  There was a $5 deflation because of my lie.  Now, once market and industry effects come in and the standalone value drops from 80 to 76, now the difference is between the 88 that the market is at and the 94 that it should be at, or $6.  So the deflation has moved from $5 to $6 solely because of market and industry effects.

So what Dr. Lehn says in paragraph 87 there is just wrong.  It is wrong, misleading, confusing,

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

138

and so forth.  Now, you can create a model, no
doubt, where you can put this all on market and
industry effects, but that's only because you would
have to explicitly put something into the model in
order the keep the merger discount percentage
constant.

Over here, what's very clear is I basically
said there's a 50 percent chance I can walk away,
only have to get tails once.  Instead, it's really
25 percent because I have to get tails twice.

So there's a 25 percentage point difference
over there.  And that's why, originally, when we're
talking about difference between my $100 merger
price and an $80 standalone, that's 5; but when
we're talking about the difference between my $100
offer and a $76 standalone, the merger discount in
total is 24, but the fraud effect is 6.  It goes
from 5 to 6 simply because of market and industry
effects.  And Dr. Lehn just has this completely
wrong.

Q   Are you done?

A   I'm done.

Q   So you agree that both in your hypothetical
and in your actual model, there are investors who
will get higher damages under your model simply

because the market and industry indices went down, correct?

A    Well, because they went down and pulled the standalone value of the -- Twitter down, yes, or reflected a change in the standalone value of Twitter.

Q    So there are -- there are shareholders who will be getting larger damages because the NASDAQ happened to have declined on a given day, correct?

A    Happened to have declined what?

Q    On -- on any given day.

A    Because it was lower at the point when they made their sale decision, which Plaintiffs will argue is in reliance on the allegedly false information in the May 13th tweets.

Q    Let's -- let's maybe go to a particular example.  Turn to Exhibit 5-B of your damages report.

A    Oh, of my damages report --

MR. ARNZEN:  Which is --

A    5-B.  Give me a second.  I'm --

MR. BERNSTEIN:  I was just going to say, for the record, it's Exhibit 200.

A    Ah, okay.  I am there.

Q    Go to page 1 of that report.

Transcript of David Tabak, Ph.D.

Conducted on July 16, 2025

140

A    Okay.

Q    Sorry, more precisely, if you go to page 1 of Exhibit 5-B.

A    That's how I interpreted you.

Q    It was implicit.

Do you see that on May 24th, someone who sold, according to your model, would have $8.44 in damages?

A    I do see that.

Q    Whereas just a day earlier, someone who sold on May 23rd would have had only $7.47 of damages, correct?

A    I see that as well.

Q    Now, you agree there was no new information concerning the merger that is responsible for that change, correct?

A    There is no info -- no independent information.  The effect over there is market influences acting on the effect of the alleged fraud.

Q    But you agree that the change from 7.47 to 8.44 is only occurring because the market and industry was down on that day, correct?

A    And that there was already an alleged fraud in place on the percentage likelihood of the merger

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

141

going through.

Q   And so let's -- I want to work off of that, the -- the -- that the -- it's the alleged fraud in place that's affecting the -- the deflation figures.

The -- is the basis for that an assumption that the market and industry factors had a different impact on Twitter's standalone value than it would have absent the alleged misrepresentation?

A   No.  I mean, I know that maybe I went a little quickly with the example that I gave, but I said that the standalone value went from 80 at the first point in time to 76 at the second point in time.  I made no assumption there that the fact of the -- of, you know, there being a potential merger or any misrepresentation mattered.  In fact, it's pretty explicitly the opposite; it's that that's the standalone value, what happens if the potential merger disappears.

Q   Well, and I think I ask my question poorly, so I appreciate the -- the response you gave.

Is -- are you assuming that the amount of weight that Twitter's stock price is being -- withdrawn.

The standalone value is relevant in the no-deal scenario, correct?

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

142

A    Correct.

Q    And so your assumption is that because there is an alleged misrepresentation impacting investors' perception as to how likely a deal is going to occur, the value that is being placed on the standalone value of the company is different than it otherwise would have been, right?

MR. ARNZEN:    Form.

A    Yes.    I think that's a fair way of putting it.

Q    And did you do any analysis to test whether that was true?

A    To test whether -- basic -- well, that is kind of the whole point of all of the analysis here, is that -- is basically say -- you know, that's the whole allegation, that he's -- that Mr. Musk is making it more likely that he will be able to walk away from the deal than otherwise.

Q    Did you do any analysis to test whether the amount of weight investors were putting on standalone value and, by extension, the amount of weight that would be put on any changes in market and industry factor was any different before the May 13th tweet versus after the May 13th tweet?

A    Well, that is -- you're talking about

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

143

essentially the effect of the May 13th tweet.

Q    Throughout --

A    The stock price went down by a statistically significant amount over there.

Q    After May 16th, I'm asking whether you did any analysis to determine whether the market and industry effects are having more of an impact than they were having pre May 13th.

A    Sure.  And the answer is yes.

For example, if you look at my Exhibit 5-B, page 2 of 3, you will see, as you noted earlier, there was a statistically significant change in the stock price on August 23rd, and you will see that the 45.7 figure goes to 35.7 because I saw an event, unrelated to the allegations, that caused that change.

Now, in contrast, you'll see Dr. Lehn has a listing of a bunch of events that he says, you know, may have mattered, but notably, he does not look at statistical significance for those events in that section, whereas he had in an earlier section.  So what he's done is basically say, I see some news over here; I'm going to assume it has an event.

What I've done is say, let's use the standard test for whether something has an effect:

15:04:16
15:04:20
15:04:22
15:04:24
15:04:25
15:04:29
15:04:40
15:04:57
15:05:01
15:05:04
15:05:08
15:05:12
15:05:14
15:05:19
15:05:25
15:05:28
15:05:29
15:05:34
15:05:38
15:05:41
15:05:45
15:05:48
15:05:51
15:05:54
15:05:58

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

144

Is there a statistically significant price movement? I find one on August 23rd, 2022, that should not be related to the allegations, and therefore, as you see, I drop the percent related to the allegations here from 45 percent to 35 percent.

Q    My -- my question was a little different.  I was focused on changes in Twitter's value solely from market and industry effects.  And I'm asking whether you did any analysis to observe whether there was a change in how much the market and industry effects were impacting Twitter's stock pre May 13 and how they were impacting stock post May 13.

A    No, I did not do that analysis.

MR. BERNSTEIN:  We've been going, I think, just about over an hour.  So if it makes sense to take a five, ten-minute break now, we can do that.

MR. ARNZEN:  Sounds fine to me.

THE VIDEOGRAPHER:  Perfect.  Please stand by.

We are going off the record.  The time is 3:08.

(Whereupon a break was had.)

THE VIDEOGRAPHER:  We are now back on the record.  The time is 3:16.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

145

BY MR. BERNSTEIN:

Q   Before the break, we were talking about your constant merger discount --

A   Percentage.

Q   -- methodology -- constant -- constant merger percentage methodology, right?

Do you recall that?

A   I -- I put "percentage" after "constant," but fine.

Constant percentage merger discount methodology.

Q   Okay.  What is the basis for your constant percentage merger discount methodology?

Does it come from academic literature?  Did you use it in prior cases, or is this the first time --

A   Well, first of all, Dr. Lehn says there's no literature like this.  But this is simply the constant percentage method that is used frequently in securities fraud cases.

But rather than starting at zero for stock price and saying by how much is it inflated, typically we take a percentage of the actual price, here we're starting at the merger offer price of 54.20 and taking a look at the percentage of the way

down.

So first of all, this is nothing different than the constant percentage method applied.  Rather than zero on the way up normally, this is 54.20 on the way down.

Second, over here, this is theoretically -- this theoretically makes sense.  I went through that example over there.  If there is a market or industry effect that affects the standalone value but not the allegations, you should get the constant percentage figures that I have over here.

So when Dr. Lehn says that's wrong, he is actually just wrong.  The only way you don't get what I have is if you explicitly try to build into a model an idea that it shouldn't be a percentage.

So this is -- would be the standard baseline, if you thought it through.  Anything else would be an adjustment.

Q   In the standard constant percentage cases, aren't damages still limited by the amount of decline on the actual corrective disclosure date?

A   They are.  But, first of all, that doesn't make -- looking at the corrective disclosure date wouldn't make any sense here in terms of limiting damages.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

147

You want me -- if you like, I can explain.

Q   Let me ask a few more questions and then happy to get your explanation.

Here under your analysis, there are people who are getting higher damages than the amount the stock actually fell on the day of the May 13th tweet and higher damages than the amount that the stock actually went up on the date of the October 4th tweet -- October 4th statement, correct?

A   I believe that to be the case.  Yes.

Q   And -- and that is -- the difference between the person on May 13th or the person on October 3rd is the impact of market and industry factors affecting the stock price, correct?

A   Affecting the stock price because of the allegations, not affecting the stock price by itself.

Q   Well, the market and industry factors would affect the stock regardless, correct?

A   Yes.  But you said that is "because of."

It's not -- it has to be interacting with the alleged fraud.  That's the reason that you get a difference in the deflation amount.

Q   And other than assuming there's a constant percentage, what is your basis for assuming that the

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

148

market and industry factors are interacting with the alleged fraud?

A   Well, put it this way:  If you don't assume a constant percentage, the question is:  Why?  And you have to explicitly put something in there in order to create that anything other than the constant percentage.  The constant percentage is just what comes out of it.

It's also logical.  If Mr. Musk is basically affecting the probability that the deal will go through versus not go through, then that difference in the two probabilities; in other words, the probability that the deal will go through truthfully and allegedly falsely -- is a constant -- is a percentage.

Q   Just -- withdrawn.

I had asked you:  Other than assuming there's a constant percentage, what was your basis for assuming that the fact -- the market and industry factors were interacting with the alleged fraud?

And you gave me a long answer there, but I'm not sure what in it is responsive to my question.

A   Okay.  Let me try again.

So I actually thought through how this would

149

work, which is where I got that model that I explained about the $100 offer price, the 80 versus the 76.

If you think about it from a theoretical basis, what we first know is that people often -- analysts clearly were talking about, here's what would happen under different scenarios; here is a standalone value of the company; here is 54.20, for example.

And then they talked about weighting those. So people were weighting the two things over there.

Now, once you realize that, you build out that simple model that I did. It is clear that the baseline model will be a constant percentage other than on days such as that date in August where there is outside news having some statistically significant effect. And that's why I changed that percentage from 45.7 to 35.7.

So it's based on building up the same type of damages model that people have done whether it's constant dollar or constant percentage. Just basically going down from 54.20 rather than up from zero.

Q    So it sounds like you gave me a theoretical answer about why it would -- why you thought it made

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

150

sense.

I'm asking:  What did you do to test whether the market and industry factors were interacting with the fraud, the alleged fraud, in the way that you assume in your model?

A    Put it this way:  I don't know if there really is a good way to test that in the same way that you don't test whether there's a constant dollar or constant percentage inflation in a typical securities fraud case when you argue that the stock price is inflated.

You look at what makes sense logically. Over here, it absolutely makes sense logically that this should be a constant percentage in between relevant dates.

Q    So just to come back to my question of what you did to test whether the market industry factors were interacting with the alleged fraud in the way you assume, am I correct that the answer is:  You didn't test that because you're not aware of a good way to test that?

A    I would say I examined it theoretically because we don't have corrective disclosures on every day, you cannot actually observe the true value.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

151

So it -- I don't know that there is necessarily a good test for this empirically.

Q   Couldn't you look at how much the market and industry factors were impacting Twitter's stock price pre alleged fraudulent statement and post alleged fraudulent statement?

A   You could try that.  You would have to assume -- well, first of all, there is going to be a difference before and after those statements, if the fraud is having an effect.

So then you -- the question would be:  Can you see whether that difference corresponds to some percentage or something like that?

One could try that, but don't forget, if you ever looked at, you know, rolling regressions, there are changes in the absence of any fraud.

Q   You said that there would be differences if the fraud was having an effect, correct?

A   Yes.

Q   Okay.  Did you observe any differences in the way the market and industry factors were impacting Twitter's stock price to support your conclusion that the alleged fraud was having any effect?

A   No.  First of all, the period that you'd

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

152

possibly be looking at is from May to October, so a    15:25:15

little under five months.  You wouldn't have much    15:25:20

data on that anyway for running regressions.    15:25:23

They're typically run on periods of at least six    15:25:26

months.    15:25:29

So I don't -- you know, I would question --    15:25:29

it might be possible.  I mean, obviously, you could    15:25:34

run some type of analysis, but there would be a lot    15:25:37

of questions about whether you had enough power to    15:25:41

detect anything in that time period.    15:25:44

Q    Whether there was enough power or not, you    15:25:46

didn't do any such analysis, correct?    15:25:50

A    Just like one doesn't do that when one    15:25:52

assumes a constant dollar or constant percentage    15:25:56

inflation.    15:25:58

Q    With a constant dollar or constant    15:26:00

percentage inflation in an ordinary case, you don't    15:26:06

have investors getting awarded damages due to a    15:26:09

change in the market and industry factors, right?    15:26:16

MR. ARNZEN:  Form.    15:26:20

A    Typically, you do not because of the Supreme    15:26:21

Court's Dura, D-U-R-A, case.    15:26:27

Q    You would agree with me that it's atypical    15:26:28

here that someone is getting more damages because    15:26:31

the NASDAQ happened to have gone down by 3 or 4    15:26:36

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

153

percent on a day, right?

A    Only because seller classes are atypical.

And I think that what you're trying to bring over from purchaser classes -- for example, you asked about how the corrective disclosure may matter.  That clearly cannot matter here, and I'd be happy to explain that to you.

Q    Well, I think that's in your report.  And I don't know if you were trying to give a legal opinion.

Isn't it in your report where you say that -- the idea of Dura not really applying because, unlike in Dura where you have a stock that you could immediately sell for the same value of cash that you bought it for, here, you've already sold the stock?

A    First of all, I'm not attempting to give a legal opinion.  So I think you said that, and it may have misspoken.

I'm trying to explain how to interpret that for a damages purpose.

Q    And for damages purposes, wouldn't you agree that at the moment you sell, you have the cash sufficient to immediately -- the equal value of the stock at that moment in time?

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

154

A   The market -- the -- if by "value" there, you mean the "market price," as opposed to a true value --

Q   Right.

A   -- sure.

Q   Okay.  And so if the stock were to continue to go down for unrelated reasons -- withdrawn.

I don't want to get too down -- too far down the line of pure legal analysis.  We'll --

A   No.  I actually --

Q   -- have to allow the Court to resolve that one.

A   Well, I would have preferred if you'd gone down that road a little more because I think that was an interesting question you were about to ask.

Q   For purposes of your 10b-5(b) class, you only made one adjustment to your constant percentage discount, correct?

A   Correct.

Q   And that's on August 23rd, 2022?

A   That is correct.

Q   And you made that adjustment because there was a statistically significant decline in Twitter's stock price on August 23rd?

A   That is also correct.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

155

Q   And you understood that the August 23rd news was not an alleged false statement that could serve as a basis for the 10b-5(b) damages, right?    15:29:13 15:29:18 15:29:21

A   That is my understanding, yes.    15:29:26

Q   And you understood that you need to separate out any stock price reaction caused by anything other than the alleged false statements that can serve as the basis for a 10b-5(b) damages, right?    15:29:28 15:29:31 15:29:34 15:29:37

A   Yes.    15:29:43

Q   And you understand that the July 8th termination letter is not serving as a basis for 10b-5(b) damages, right?    15:29:43 15:29:45 15:29:48

A   Also, correct.    15:29:51

Q   There was a statistically significant stock price decline on July 8th after the termination letter became public, right?    15:29:51 15:29:55 15:29:59

A   Yes.    15:30:01

Q   And you did not, though, make any adjustments to your constant percentage discount to account for the termination letter under your 10b-5(b) damages, right?    15:30:02 15:30:05 15:30:09 15:30:12

A   You make a good point, Mr. Bernstein.    15:30:19

Q   The good point I'm making is that you should have deducted the July 8th decline from your 10b-5(b) damages, right?    15:30:40 15:30:44 15:30:53

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

156

A    Let me think about that because the August one was unrelated to the allegation.

The question is this one that is not fraudulent but relates to the allegations -- or not -- not a misrepresentation.

Just want to check on one thing before I answer.

So August 23rd, that dealt with news that was clearly unrelated to the allegations.

I will look back at this, but I may send you a revised version at some point to account for this fact.

Q    Sitting here right now, you're not able to offer an opinion that the July 8th termination letter should have been included in the 10b-5(b) damages, correct?

A    Well, it certainly should not be included as a misrepresentation in the 10b-5(b) damages, based on the court's order.

Give me a second.  Yeah.  I will take a look at this, but may send you a revised version if that seems appropriate.

Q    Are you -- just so I understand, you unable -- sitting here right now, are you unable to tell me whether the damages or the stock declined

from the July 8 termination letter should have been 15:34:18
included or should have been excluded from the 15:34:23
10b-5(b) damages? 15:34:26

A   I think what you're asking doesn't make a 15:34:27
difference, whether the 45.7 percent should have 15:34:30
changed on that date. 15:34:35

I see what you're saying, but I do want to 15:34:36
think it through again before, you know, making a 15:34:38
statement and then saying, oh, no, no, I forgot that 15:34:40
there was a reason for that. 15:34:43

Q   Understood. 15:34:44

But I'm just asking, sitting here right now, 15:34:44
you're unable to give me a reason that it should be 15:34:47
included or should be excluded, right? 15:34:51

I promise this isn't a trick. 15:34:55

A   I cannot give you a definitive answer.  I 15:34:58
want to think it through before giving you a 15:35:00
definitive answer. 15:35:03

Q   Okay.  Understood. 15:35:04

MR. BERNSTEIN:  We will reserve the right to 15:35:06
call Dr. Tabak back to discuss this further. 15:35:12

Q   Did you do any analysis -- while we're on 15:35:33
the July 8th letter, did you do any analysis to 15:35:39
determine whether Twitter's stock price would have 15:35:49
fallen to the exact same price level that it did if 15:35:57

Mr. Musk had only issued the termination letter and not -- not issued the May 13 tweet?

A   No.

Q   You don't dispute that it's possible that even if Mr. Musk had never issued the May 13 tweet, if he had then issued the exact same termination letter on July 8th, Twitter's stock price would have gone to the exact same level that it ultimately did?

MR. ARNZEN:  Object to form.

A   I haven't considered that.

Q   Okay.  If the July 8th letter would have had the same -- would've resulted in Twitter's stock going to the exact same place it did following the July 8th termination letter, regardless of whether Mr. Musk issued the May 13th tweet or issued what you would describe as a fully accurate tweet on May 13th, what implications does that have for deflation following the July 8th termination letter?

MR. ARNZEN:  Form.

A   Well, you're asking me to assume almost a conclusion over there.  You're saying that if after the July 8th letter it didn't matter whether or not the May 13th tweet was made.  I believe that's essentially the hypothetical you're asking me to do.

So, obviously, if you give a hypothetical

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

159

that says assume that the May 13th tweet doesn't matter at a certain point, then of course there can be no deflation from something that you're asking me to assume does not matter.

Q   And you haven't considered whether the July 8th termination letter would have rendered the May 13th tweet moot or irrelevant, right?

A   Well, put it this way:  At the end of the day, you've got at least one analyst report in October saying we think Mr. Musk has now come to the conclusion that this lawsuit -- you know, he doesn't have a basis for this lawsuit.  So, you know, there's certainly analysts there who essentially think of it as effectively the October correcting May, even though he -- they don't believe Mr. Musk admitted that.  So I'm not sure that the basis for your assumption there is correct.

Q   This analyst's report is not cited anywhere in your report, correct?

A   No.  It's actually cited in Dr. Lehn's report.

Q   And you said it said that Mr. Musk had come to the conclusion that the lawsuit was without merit, right?

A   Well, why don't -- rather than assume that,

let's see where he talks about October.

Yeah.  It's paragraph 114.  It's the fourth entry there and ends with, quote, "We believe this decision is likely driven by Mr. Musk and his team coming to the realization that their case had a very low probability of success given their decision early on to wave [sic] any due diligence," end quote.

Q    That's not saying the May 13 tweet was untrue.  That's talking about the actual litigation, right?

MR. ARNZEN:  Object to form.

A    It -- well, it's talking about, yes, his -- his decision following October 4th, and it's talking about why he had that decision that ultimately thinks that the litigation had a low probability of success, which, again, in that litigation, was based effectively on the -- the argument he made in the May 13th tweet that Twitter had an obligation to give him certain data.

Q    You would agree that the termination letter, the lawsuit, everything that follows would happen independently of the May 13th tweet?  It didn't depend on the May 13th tweet, true?

MR. ARNZEN:  Form.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

161

A    They -- in other words, that could have been done without the May 13th tweet?  Is that what you're asking?

Q    Yes.

A    Yes, termination letter could have been done without the May 13th tweet.

Q    And what I had asked earlier, before we got into this analyst report, was whether you had considered if the July 8th termination letter would have rendered the May 13th tweet moot or irrelevant in the eyes of the market.

MR. ARNZEN:  Form.

Q    The question is just whether you considered it as part of your analysis.

A    I -- I have not considered that particular question in that form.

Q    Because you haven't considered that, you necessarily have not considered whether the merger discount following the July 8th termination letter is actually due to the termination letter, as opposed to the May 13th tweet, right?

A    Well, you're asking me to, again, assume that the -- there's a possibility that the May 13th tweet is irrelevant.  So, of course, you know, you're basically, you know, asking me to assume that

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

162

conclusion and ask whether I've considered that.   15:43:06

And the answer is no; if I haven't considered the   15:43:09

question about whether the May 13th tweet is   15:43:11

irrelevant, I've not considered the implications of   15:43:14

that directly.   15:43:18

Q   Would you agree that there was significant   15:43:31

amount of information regarding the merger and the   15:43:33

parties' positions about the dispute between   15:43:40

May 16th and July 8th?   15:43:44

A   I'd say a large amount, yes.   15:43:48

Q   And yet your analysis is that none of the   15:43:51

information that came out altered the market's   15:43:59

overall belief as to the probability of the merger   15:44:03

closing; is that right?   15:44:11

MR. ARNZEN:   Form.   15:44:13

A   Not by an observable amount, because none of   15:44:15

the price moves were statistically significant.   15:44:19

Q   Does the lack of statistical significance   15:44:21

give you any pause regarding the conclusion that the   15:44:28

price reaction on May 13 was due to an   15:44:38

interpretation as to Musk's rights, as opposed to   15:44:48

simply an interpretation that all wasn't fine and   15:44:54

well between the merger parties?   15:44:57

MR. ARNZEN:   Form.   15:45:00

A   I don't follow that.   15:45:01

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

163

Q  Well, we're seeing an abundance of information coming out regarding the parties' positions and their arguments, and you're not observing any -- you're not observing any statistical significance.  And would you agree that one reason you might not see statistical significance as you're getting more information about the parties' positions is because what the market is actually reacting to on May 13 is merely the fact that there is a dispute between the two counterparties?

MR. ARNZEN:  Form.

A  What -- market would react just be based on how likely it is that there will be different outcomes.  The fact that you don't see statistically significant results may mean that what the parties are saying is, unsurprisingly, stuff that's in their own interests and not new or material.

Each side says, We think we're -- I think I'm right.  That should not necessarily cause a large movement in the stock price.

Q  Wouldn't you expect to see a movement in the stock price as people are evaluating the specific legal arguments that both sides are putting forward?

MR. ARNZEN:  Form.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

164

A     It depends whether one of -- you know, they are particular strong legal arguments depending -- relative to what the market expects.  If they're basically putting forth legal arguments that are not particularly different from what the market expects, then no.

Q     So then your -- your belief as to -- for example, as Twitter is putting out its legal positions, your explanation for why there would not be statistically significant movement in the stock price is because whatever their positions are, the market already either knows it or expects it or it's not material for some reason?

A     I mean, not -- not fully, but basically, that they would be in the range that the market would expect.

Q     Would you agree that another potential explanation would be that the market's core concern is simply the fact of a dispute and it is putting less weight on the likely outcome of an actual fully litigated case?

MR. ARNZEN:  Form.

A     I have seen no reason to believe that. We've got analysts, for example, that, you know, bring in an expert to try to say which side is going

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

165

to win and so forth.  It just doesn't seem
consistent with the data I've seen.

Q   We also have analysts that say that parties
often seek to avoid the litigation and resolve with
a settlement in order to avoid the distracting and
protractive nature of -- of a lawsuit, right?

MR. ARNZEN:  Form.

A   Sure.

Q   And so the market, you agree, could have
been just simply pricing in, regardless of whether
Mr. Musk has a strong claim or weak claim, Twitter
is probably going to want to just resolve this
without the need for protracted litigation, and,
therefore, who is right and who is wrong is of less
import than the fact that there's a dispute?

MR. ARNZEN:  Object to form.

A   I think that's just speculative, since
analysts did focus a lot of time on trying to figure
out who was right and who was wrong.

Q   And these analysts that you're talking
about, none of them are cited in your report,
correct?

A   That is correct.

Q   Because you didn't cite any analysts in your
report, correct?

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                  166

A    I believe that's the case.                    15:49:48

Q    At the -- withdrawn.                          15:49:51

I had asked you earlier what would be a            15:50:22

corrective statement regarding the May 13th tweet, 15:50:27

in -- in your view.                                15:50:34

Do you recall that?                                15:50:35

A    Yes.                                          15:50:36

Q    The only corrective disclosure you point to   15:50:36

in this case is the October 4th, 2022, disclosure  15:50:44

that Mr. Musk was agreeing to complete the deal at 15:50:50

the original terms, correct?                       15:50:53

A    Correct.                                       15:50:55

Q    Did Mr. Musk say that he wasn't entitled to   15:50:55

the information that he was requesting as of May 13? 15:51:06

A    No, he did not.                               15:51:11

Q    Did Mr. Musk say that the percentage of spam  15:51:13

and fake accounts was not in excess of 5 percent?  15:51:23

A    He did not.                                   15:51:28

Q    Can you explain to me why the October 4th,    15:51:34

2022, statement is more corrective than some of the 15:51:37

other statements we've looked at earlier, the      15:51:44

June 7th SEC filing that the deal was proceeding as 15:51:50

originally planned?                                15:52:00

A    Well, again, for example, the -- the deal     15:52:01

proceeding is -- you can think of as conditional on 15:52:04

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

167

Twitter, you know, not -- as Mr. Musk not having a way to back out.  In October, he basically said either he doesn't have a way to back out or he was not going to back out.  As we discussed earlier, one analyst thought of that as his team telling him, okay, you really do not have a leg to stand on in this case.

So it's basically giving up any potential to try to force Twitter to turn over data, as opposed to all the others that were basically, you know, ongoing disputes and talking about how they were moving forward but still effectively claiming that Twitter was required to turn data over to Mr. Musk.

Q   Do you know whether he got that data in litigation?

A   I thought -- he may have gotten some at some point, but I don't know the details there.

Q   So are you -- your opinion is that the October 4th, 2022, statement is actually corrective of the May 13 tweet?

A   I actually really don't have much of an opinion there because that is not relevant to the damages analysis.

Q   So you don't have an opinion one way or another as to whether the October 4th, 2022,

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

168

statement is corrective of the May 13th tweet?

A    I know that the Court ruled on that.  I'm not going to get -- you know, dispute with the court.  But because this is a seller class, that is not relevant to the damages analysis.

Q    I just want an answer to my question.

You don't have an opinion one way or the other as to whether the October 4th, 2022, statement is corrective of the May 13th tweet, correct?

A    Look, I rely on what the Court's saying, that it can be corrective, but I have not done an independent analysis, nor am I giving an independent opinion on that.

Q    So the answer to my question is you don't have an opinion one way or the other, right?

A    I am not providing an independent opinion on that.  Yes.

Q    Do you have an opinion one way or another as to whether you would have seen the exact same price movements from July 8th through October 4th whether or not Mr. Musk had tweeted on May 13th?

MR. ARNZEN:  Form.

A    I think that's effectively implicit in my deflation analysis.  I haven't seen a reason to change that.  So I think that is the case.

Transcript of David Tabak, Ph.D.

Conducted on July 16, 2025

169

Q    Just so I understand that.  You think it is the case that whether or not Mr. Musk had tweeted on May 13th, we would have seen the exact same price movement from July 8th through October 4th?

A    I mean, exactly, within rounding, or something like that, but I don't see any reason for a material difference.

MR. ARNZEN:  Form.

MR. BERNSTEIN:  I believe we've been going just about one hour again, and I am almost done, I believe.  So why don't we take another five-minute break.  Let's actually make it ten minutes just so that I can be extra sure and try to get everyone back to wherever they want to be that isn't this for the rest of the day.

MR. ARNZEN:  No problem.

Mr. Bernstein, just a second with Dr. Tabak. I will probably have some questions after Mr. Bernstein's questioning.  I may call Dr. Tabak for further use of a calculator.  So if you don't have one with you --

THE WITNESS:  I have a phone.

MR. ARNZEN:  That will work.  Thank you.

THE VIDEOGRAPHER:  Perfect.  Please stand by.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

170

We are going off the record.  The time is 3:57.

(Whereupon a break was had.)

THE VIDEOGRAPHER:  We are now back on the record.  The time is 4:09.

BY MR. BERNSTEIN:

Q   Dr. Tabak, you are being compensated for your work on this matter, correct?

A   My firm, NERA, N-E-R-A, is being compensated.

Q   And do you have a revenue-sharing agreement with NERA?  Is that -- you get a percentage of whatever NERA is paid for this matter?

A   It's not a fixed percentage, but it's kind of -- roughly, they take what comes in from various projects, take out costs overall for the firm, and then with some adjustments return that back to people.

Q   So the -- at a -- it's fair to say that you will be getting some percentage of the amount that NERA collects for this matter, correct?

A   Most likely.

Q   And your billing rate is 1250 an hour, correct?

A   That is correct.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

171

Q    And there are other individuals at NERA working at your direction?    16:10:04 16:10:07

A    Correct.    16:10:09

Q    And they bill out for their time as well?    16:10:10

A    They do.    16:10:13

Q    The formula that you had sort of given a high-level description of, does it include the amount of billings that NERA gets from individuals working at your direction?    16:10:15 16:10:24 16:10:27 16:10:32

A    Yes.  Less their costs of, you know, salary, benefits, and so forth.    16:10:34 16:10:38

Q    And do you know the approximate amount that you have billed to this matter to date?    16:10:39 16:10:45

A    I haven't looked, so I don't recall.    16:10:48

Q    Do you know if it's over 500,000?    16:10:51

A    I just don't recall.    16:10:55

Q    Do you --    16:10:56

A    We've gone through class cert.    16:10:57

Q    Do you know if it's over a million?    16:11:03

A    I don't recall.    16:11:05

Q    Over 2 million?    16:11:06

A    I really doubt it, but I just don't know.    16:11:07

Q    Over 3 million?    16:11:09

A    Again, highly unlikely, but I just don't know specifically.    16:11:11 16:11:14

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

172

Q   I assume you would know with certainty that it's not over 100 million, right?

A   I would know that.  That is certainly not true.

Q   So I'm trying to figure out where exactly the line is.

So how about 5 million?

A   I doubt it's 3 million, and I even think it's unlikely it's 2 million, but I just don't know.

Q   And I'm asking for the total for both you and your team members.

A   I understand the question.  I just don't really track those.

MR. BERNSTEIN:  With that, I will turn over the witness.

Thank you, Dr. Tabak.

THE WITNESS:  Thank you, Mr. Bernstein.

EXAMINATION

BY MR. ARNZEN:

Q   Thank you, Dr. Tabak.  I just have some follow-up questions.

I want to start with a question about the hypotheticals posed by Mr. Bernstein.  And I'd like to explore whether or not your testimony, that you considered the tweets in question to be an

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

173

interwoven bundle impacted your ability to answer

hypothetical questions that attempted to tease out

various portions of the statements at issue in the

case.

A    Is there a question?

Q    Yeah.  I'd like to explore -- I'd like your

answer on whether or not your testimony that you

considered the tweets in question to be a interwoven

bundle impacted your ability to answer a

hypothetical question that attempted to tease out

various portions of the statements at issue in the

case.

A    Obviously, I could answer.  But if the

hypothetical was how does one attempt to tease

things out that I viewed as completely

interconnected, that affected the answers being

as -- meaning that I would not consider trying to

tease those out.

Q    Did you have time to read the entirety of

the documents that Mr. Bernstein presented to you in

asking his hypothetical questions?

MR. BERNSTEIN:  Objection to form.

A    Some documents, definitely not.  There may

have been some that were short, and I did read.  But

depends on the length of the document and what was

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

174

shown to me.

Q   Did you have time -- sorry.  Thank you.

Did you have time to consider answers in light of all the other information that is available to you generally but not necessarily in the room with you?

MR. BERNSTEIN:  Objection to form.

A   I did not have access to anything other than -- other than what was shown on the screen, my report and Dr. Lehn's report.  So I did not review other documents in providing any answers.

Q   Did you the nevertheless do your best in light of the new information and sometimes long, involved, and multifaceted hypotheticals, to answer them correctly?

MR. BERNSTEIN:  Objection to form.

A   Yes.  I did my best to answer them correctly.

Q   I'd like to turn to the May 13th tweet.

There are some questions about whether there was an implicit or explicit statement.  For those purposes, I'd like to show you what's been previously marked in this case as Exhibit 10.

Do you have that tweet before you, Dr. Tabak?

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

175

A    I see the tweet.

Q    Okay.  Is it fair to say that Mr. Musk is responding to a reuters.com -- or what purports to be a reuters.com headline that -- that is followed by the sentence, Twitter estimated in a filing on Monday that false or spam accounts represented fewer than 5 percent of MDAU?

A    Yes.

Q    We used the word "interwoven bundle" today during your testimony.

Can you describe what you mean?

A    I mean, basically, that portions of what are interwoven cannot really be separated out into saying just look at one versus the other, but they should be considered as a whole.

Q    And does that description apply to the May 13th tweet, in your estimation?

A    In my estimation, it does.

Q    How about the May 16 statement at the All-In conference?

A    Well, again, because --

MR. BERNSTEIN:  Object to form.

A    -- I did not really consider that as part of my damages analysis, I -- are you asking whether I'm combining May 13th and -- and the statement or

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

176

that's -- whether that statement itself is some sort of interwoven bundle?

Q   Did you consider whether or not the May 16th statement at the All-In conference constituted an interwoven bundle of information?

A   16th statement or May 15th statement?

Q   There's a May 16th statement at the All-In conference alleged in the complaint.

If the answer is no, I'm fine.  I just wanted to know --

A   No, I did not consider that.

Q   You were asked by Mr. Bernstein what if a portion of a tweet is true.  And I just want to make sure that we understand whether or not you were answering in terms of the 10b-5(b) claim as to misstatements and omissions or whether that also applied to a scheme liability claim, if you know.

MR. BERNSTEIN:  Objection to form.

A   I guess I -- I was not distinguishing between the two in answering that.

Q   Okay.  If a statement is technically true but part of a misleading scheme, could you consider the impact of the entire statement for your damage analysis?

MR. BERNSTEIN:  Objection to form.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

177

A    To the extent that requires legal conclusion, I won't answer that, but my understanding is yes.

Q    Refer to the -- something -- a term and see if you're heard it before.

Have you heard about the -- heard of the inflation maintenance theory?

A    Yes.

Q    What is it?

A    It's basically that the amount of inflation in a stock price typically is not increased by a new misrepresentation but is simply kept constant.

Q    Have you ruled out the possibility that Mr. Musk's statements and actions after the May 13th tweet maintain the inflate -- or deflation, in this case, of Twitter's stock price?

MR. BERNSTEIN:  Objection to form.

A    No.  I've not ruled that out, no.

Q    Mr. Bernstein asked you about SparkToro.  Do you know anything about a SparkToro blog post that tried to estimate aspects of Twitter's user base?

A    Only what was shown to me on the screen here.

Q    Do you know who authored it?

A    I do not know.

16:17:30
16:17:32
16:17:35
16:17:37
16:17:41
16:17:42
16:17:44
16:17:46
16:17:46
16:17:47
16:17:51
16:17:56
16:18:00
16:18:03
16:18:06
16:18:11
16:18:13
16:18:14
16:18:17
16:18:22
16:18:27
16:18:32
16:18:36
16:18:36
16:18:38

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

178

Q    The method used?

A    I do not know.

Q    The data used?

A    I do not know.

Q    Whether it was different or the same as Twitter's analysis of its user base?

A    I do not know.

Q    That's okay.  Neither did Mr. Musk.

Why did --

MR. BERNSTEIN:  Objection, move to strike.

Q    Why did you -- why did you not cite analyst reports in your analyst -- I'm sorry.

In your expert report, why did you not cite analyst reports?

A    I did not feel it was necessary.

Q    And why not?  Was -- did -- did your conclusions reached and opinions that you -- that you came up with, did they not depend on analyst reports?

MR. BERNSTEIN:  Objection to form.

A    They ultimately did not depend on analyst reports.  Analyst reports are often useful for things such as additional disaggregation, getting data, but I did not feel that those were necessary for my analysis here.

Transcript of David Tabak, Ph.D.

Conducted on July 16, 2025

179

Q   You offered to give an example of an -- what you describe, I think, as -- not quoting, but paraphrasing, your observation that there were analysts that went both ways on whether or not Mr. Musk had obligations under the merger agreement in one sense or another; is that fair?

Did you -- did you offer --

A   At least --

Q   Did you offer an example, is the question.

A   At -- did I -- I'm sorry, can you restate the question?

Q   Sure.  Did you offer to give an example of a -- of an analyst that was going in a different direction than perhaps some other analysts were?

A   Yes.  Or at least stating that it was uncertain, as opposed to stating, as I guess Mr. Bernstein tried to imply, that it was clear that Mr. Musk did not have -- that, sorry, Twitter did not have those obligations.

Q   Right.  Do you still have that example in mind?

A   It's in Dr. Lehn's report.  I could find it.

Q   We'll pass on that.

I'd like to ask you about a series of exhibits that Mr. Bernstein showed you that were

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

180

201 -- I believe Exhibits 201 to 205.  These were

Ms. Gadde's statement to Twitter employees that

there's no such thing, as "the deal is on hold on

May 24th," amendment to the 13D, and

other -- another lawsuit, not this one, against --

concerning the Twitter acquisition, and a June 7th

Skadden letter.

    Do you remember testimony about those?

  A  Generally, yes.

  Q  Did you determine that there was, in fact,

new and material information that was conveyed to

the market in any of those?

  A  No.  I did not see any new -- anything I

would characterize as new and material information.

  Q  For information to be called corrective, do

investors generally have to credit it?

  A  Putting aside a legal issue about whether

it's corrective, from the economic standpoint, for

it -- be -- to correct a market impression, at least

some investors must credit and cause a movement in

the market price.

  Q  And the extent to which that sort of

investigation is credited depend to some extent on

whether the source is, for example, a primary

source, like Mr. Musk, or a secondary source, like

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

181

from litigants who don't yet have discovery?

A    Of course.

MR. BERNSTEIN:  Objection to form.

A    It does depend on the source of information.

Q    Did you determine whether or not the July 8th, 2022, termination letter was false or not?

A    I did not.

Q    Did you determine whether it was misleading?

A    I did not.

Q    Is that your job?

A    I do not believe it to be my job.

Q    Okay.  Were you asked to determine the impacts on the market for Twitter securities if the July 8th termination letter was determined by the jury to be part of the scheme?

A    I was.

Q    You were asked questions about what would be apparent from the merger agreement and whether it was, quote, "sufficiently corrective," end quote, or not.

Do you remember those questions?

A    Generally, yes.

Q    Are you an expert on lawsuits or specific performance in Delaware?

MR. BERNSTEIN:  Objection to form.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

182

A    No.

Q    Are you an expert in what kind of evidence is required to prevail in busted deal litigation in Delaware?

A    I am not.

Q    If the jury is presented with the question and determines that the October 4th, 2022, announcement by Mr. Musk that he would pay full price for the deal is indeed corrective, have you determined whether the stock price reaction was statistically significant to that corrective disclosure?

A    I have, and the --

Q    Is it?

A    -- answer is yes.

Q    Okay.  I want to talk through, Dr. Tabak, the constant percentage merger discount methodology for a moment.

I understood you to indicate that you'd like to think about whether to reconsider the impact of the July 8 termination letter on your damages analysis; is that right?

A    On the 10b-5(b) analysis, yes.

Q    Good.  Would your reconsideration impact the damages numbers from May 13th through July 8 as of

Transcript of David Tabak, Ph.D.

Conducted on July 16, 2025

183

the time that the announcement was made?

A    It would have no impact on those figures.

Q    It would just have an impact after July 8th?

A    If my -- if reconsideration leads to a change, yes.

Q    Okay.  There was some discussion about whether or not the market would move -- the industry factors would impact the market in a different way or not if there were an underlying fraud that was impacting the market.

Do you remember those questions?

A    I do.

Q    Okay.  Just for -- as -- as simple as you can make it, why would the existence of a fraudulent scheme or the impact of fraudulent statements make the -- make the market react differently to industry factors?

A    Differently than if there were no fraudulent scheme, is the question?

Q    Yes, sir.  Yes, sir.

A    If the -- basically, if the scheme makes it more likely that the merger will fall apart, then the market would rely more on standalone value than on the 54.20.

Q    Got it.

16:24:19
16:24:21
16:24:25
16:24:28
16:24:31
16:24:32
16:24:38
16:24:42
16:24:44
16:24:50
16:24:51
16:24:52
16:24:53
16:24:56
16:25:02
16:25:07
16:25:13
16:25:14
16:25:17
16:25:18
16:25:19
16:25:27
16:25:32
16:25:35
16:25:39

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

184

Your constant percentage merger discount methodology, is that simply a variation on standard analyses of damages in securities fraud cases?

MR. BERNSTEIN: Objection to form.

A    Yes.  Yes.  As I said, it's basically a constant percentage methodology, but rather than from working up from 0, it's working down from $54.20.

Q    And with respect to practice and studies that would support such an approach, in the general sense, are there some?

A    Certainly a lot of practice in approaching that.  In terms of studies, I don't know if anyone has studied what the actual inflation or deflation in a stock price would be because you don't really have the data to perform that study, since you never, in some sense, have -- have the but-for true value exposed in a clear way during a class period.

Q    Dr. Tabak, you were asked questions about -- well, there was part of a question that was posed, if the stock were to continue to go down for unrelated reasons after someone sold their stock and realized losses here.

Do you remember that -- the -- the question that I'm referring to or the partial question?

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

185

A    I remember the partial question because I even said I thought it would be nice if he -- if it were actually asked, yes.

Q    Okay.  Well, I'm -- I'm asking it.

How would -- what were you going to say in response to the -- the series of questions that appeared to be coming on that?

A    Well, basically, the question appeared to be something in the form of what happens if the NASDAQ or the market declines after someone sells and what happens to their damages, and the answer is nothing. They've sold their Twitter stock.  They've got cash. At that point, doesn't matter what happens to the market or what effect the market has on Twitter stock.

Q    Dr. Tabak, returning to the July 8th termination letter and your calculation of damages for purposes of the 10b-5(b) misstatement and omissions claim, did you see -- so you spotted what might be a potential area for clarification, fair?

A    Yes.

Q    Okay.  What -- did you spot that -- and -- and did you -- let me start with this:  Did you review a rebuttal report that was produced by the defense in this case that concerned your report?

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

186

A   I did.

Q   Was this issue raised in that report?

A   I don't think in the same way, but something was mentioned in that report, yes.

Q   Okay.  Now, I -- I wonder if I'm going out on a limb in asking you to describe if a correction were needed, and I know we're catching you off guard.  Not assuming that you need a correction, but if you did and it was your best -- you had to give your best guess on what it would be, how would you do it?  What would you do to correct the report?

A   Well, similar to how later on --

MR. BERNSTEIN:  Objection; form.

A   Similar to how later on my percentage deflation -- percentage of the merger premium that relates to deflation drops from 45.7 percent to 35.7, at that earlier point there would be a drop in the percentage of merger premium that is related to the deflation -- essentially have three numbers: 45.7, a lower number, and then a third lower number.

Q   Okay.  If you determine that that correction is necessary, are you prepared to make it when and if trial comes along or if a supplemental report is appropriate and allowed?

A   I am prepared to make it according to

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

187

whatever is appropriate, whatever timing or venue is appropriate.

Q   Good.  Now, here's -- here's the out-on-a-limb part.  Is this possible to do on the fly with a calculator?

I think it's a pretty simple calculation that's just kind of a percentage --

A   I --

Q   -- but that's just me and I'm not the expert.

A   I think so.

Q   Okay.  And if -- if you don't mind walking us through that.  Because, you know, I'm just guessing it may just be a -- you subtract one number from another and use the difference to adjust the percentage.

A   Yes.  It may require paper to keep track of some numbers, unfortunately.

Q   Feel free.

A   Let me check something.

Q   I encourage you to write legibly, just in case.

A   You know what?  I would rather not attempt this right now because I'm not sure that I'm going to --

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

188

Q   Okay.

A   Give me one second just to try one thing.

You know what?  I'm not sure that I'm going to get it correctly if I try it on the fly, so I'm not going to do that.

Q   Let's not do it then, but we will follow up with you.

Now, one more series of questions, Dr. Tabak, and that is with respect to the rebuttal report that you testified about briefly earlier.

Have you reviewed that report?

A   You mean the Lehn report?

Q   I do -- L-E-H-N?

A   Yes.

Q   Good.  And did you have an -- and you've reviewed it in detail?

A   Yes.

Q   Did you have reactions to it?

A   I did.

Q   Did you think that Dr. Lehn was correct in all aspects of his report?

A   No.

Q   Are there certain aspects of that report that are either outright wrong or not well-taken in your view?

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

189

A    Yes.

Q    Okay.  Let's have you identify those, if we could, if you have it before you.  And if you -- if you can think about as you page through from front to back if there's an issue that you'd like to make sure the record reflects your disagreement on.

A    Sure.  I'm not going to give you everything because I'll kind of go through some of the highlights, and I will not start -- he has a lot of introduction that often overlaps with what's later on.  So I'm not going to go there.  But I'm going to start on page 18 and just look through it because that's when he really starts with this.

So page 18, he's got a subsection where -- basically, this is a whole bit where he says that one should disaggregate, in his view, material that is apparently true in the tweets.  But, again, as we've talked about, a lot of that is just subtext.  So I don't see how that can be disaggregated.

I'll give you one on --

Q    And that was with respect to paragraph 18, you said?

A    Starting on page 18.

Q    Oh, page -- page 18.  Sorry.

A    That's where he really -- the stuff before

that is background and summary.  So I'm not going to repeat -- you know, the stuff in the summary is repeated later on.

Q   Yes, sir.

A   So, for example -- I'll just give some examples in some other things.

On page 19, he's got a little subheader i, "Analysts Did Not Infer that Mr. Musk Has a Right to Information on Bots Under the Merger Agreement." And one of the interesting things is the first example he has is on paragraph 55 on the following page, and he says, "For example, in a May 13th, 2022, report, Morningstar stated that, 'Musk will have difficulties exiting the deal even if Twitter cannot support its claim about the proportion of spam users.'"

That basically says that Morningstar believed there would be two levels of difficulty in Musk exiting the deal:  One if Twitter can support the claim; one if Twitter cannot support the claim.

So that seems to contradict Dr. Lehn's argument that analysts did not infer that Musk has a right to information.  If anything, Morningstar is saying that that information can affect the level of difficulty that Mr. Musk will have exiting the deal.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

Just give another example of a quote that I think is interesting, over here. On page 20, we'll start with first the subheader, which is Romanette ii. It's, Analysts Did Not Infer that Mr. Musk has Instructed His Team to Stop Work on the Deal, end quote.

That's not quite what was said in the tweet, which is that the deal is on hold. And it turns out that later on, in paragraph 66, Dr. Lehn quotes an analyst saying, "Musk has placed the deal on hold," and then that quote continues.

So while what he says in Romanette ii might be technically true, it's replacing the actual wording of the tweet with alternative wording.

Let me continue. I won't go through all the details here, but you'll see, starting on page 23, in Footnote 101, for example, he talks about my event study analysis and finding a two-day residual increase. And you'll see things like that.

In Footnote 103, he talks about a two-day residual decline that's not statistically significant. I promise you I'll get back to why the statistical significant -- this two-day stuff is important over there, but I won't go through all of this.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                    192

Q   And just for the record, Dr. Tabak, let me                16:36:22
just interject a question from time to time.                   16:36:24
Hopefully -- the full-on narrative.                            16:36:29
        Okay.  Did you have further concerns about            16:36:29
the report?                                                    16:36:31
    A   Yes, I did.  Okay.                                     16:36:31
        We mentioned a discussion of, you know, the           16:36:34
constant percentage merger methodology.  So I won't           16:36:38
repeat that.                                                   16:36:43
        But then, again, I think I mentioned this.            16:36:44
Starting on page 31, we go through a list of things           16:36:47
that Dr. Lehn says should have affected the merger            16:36:56
discount -- that may have affected it, yet this time          16:37:01
we don't have any footnotes relating to statistical           16:37:07
significance.                                                  16:37:10
        So when he wanted to say that things didn't          16:37:11
matter, he points out a lack of statistical                    16:37:14
significance.  When Dr. Lehn wants to say things do           16:37:16
matter, turns out that he does not mention                     16:37:20
statistical significance.                                      16:37:22
    Q   And --                                                 16:37:24
    A   So I think we've discussed the merger                  16:37:25
premium issue before.                                          16:37:28
    Q   Any further issues?                                    16:37:30
    A   Yes.  Why don't we turn -- I think the last           16:37:34

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

193

one I should bring up is on page 42 of his report
and paragraph 115.

So paragraph 115 starts as, "Dr. Tabak uses
a two-day event window to measure the alleged
deflation that entered Twitter's stock price
following the May 13th tweet, which he claims is --
is his" -- sorry -- "standard practice."

And then a Footnote 169 that leads to Tabak
Report paragraph 118.

I want to be very clear on this.  That is a
misrepresentation of my report, and it really does
infect a lot of what Dr. Lehn does.  So --

Q   How is that so?

A    Well, if we start by looking at paragraph 18
of my report that he's quoting, on page 7, the
sentence that is going to carry over says, "Here, I
follow my standard practice of continuing the event
window (i.e. the period over which the price
reaction is measured) to include all consecutive
trading days with a statistically significant price
movement," and then a Footnote 11.  And that ends
the quote.

And just to be clear, Footnote 11 cites an
academic literature -- sorry, academic article that
says, "In this paper, we follow a rule that if the

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

194

daily abnormal return on a subsequent trading day a is statistically significant, then we assume that the market is continuing to incorporate information," and the quote continues.

So first of all, very clear, what I said is not I assume a two-day window. I said I continue the event window through all days with a statistically significant return.

So now if we return to Dr. Lehn's report, again, paragraph 115, and he says I use a two-day window, which he says I claim is my standard practice.

So the first question is: Is that maybe just kind of a typo or misstatement? He really means I continue through all days that are statistically significant, and that happens to be two days here.

I don't think so, because as I pointed out earlier, we had all those footnotes where Dr. Lehn used a two-day event window.

Now, he doesn't believe in that, he makes clear. So assuming that he's not attempting to mislead the reader by presenting something he disagrees with no reason, seems what he was trying to do is say what I might do under my standard

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                                    195

practice; and it's absolutely not to always use a

two-day window, as he implies here.

But we can see this in addition if we

continue in paragraph 115 of Dr. Lehn's report.

First, he says, "This is inconsistent with

his conclusions at that class certification stage of

this case that the market for Twitter stock during

the Class Period was efficient."

First of all, that's wrong because what I'm

doing in the merits report is trying to determine

the complete price reaction to a news announcement.

The class cert stage, I was simply asking, does a

stock price move in response to an announcement?  I

don't need the complete amount.  I just have to

answer a yes-no question on whether it moved on the

first day.

Q    You're answering different questions, in

other words?

A    Right.  Now let me go to the next sentence

in paragraph 115 of Dr. Lehn's report.

"It is widely recognized that if the market

for a security is efficient, then new information

will quickly be reflected in the security price,

typically within one trading day."  And then he

cites an academic article.

Here's the problem with this:  If he believes that I'm always using two-day event windows, that statement might be a good refutation of my analysis because always using two-day event windows is not the same as typically within one trading day.  But that's not what I'm doing.

My standard practice, as made very clear, is to start -- look if the first day has a statistically significant movement.  And then, if so, look at the next day, which means I only sometimes have a price reaction more than one day, which is completely consistent with a statement that price reactions are typically accounted for within one trading day.

So put it this way:  His description of the academic literature or an article in that supports what I actually do, as does the academic article I cited.  So both the academic articles that the two experts have put forth support what I've done.  His description doesn't support what he claimed I've done, but that's wrong, as we said.

Q   Dr. Tabak, he also complains that you violate your own rule as to a movement on July 11 --

A   Can -- can I finish before --

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

197

Q    Yeah.  Yeah.

A    He then continues at the end paragraph 115. "If the market for Twitter stock is efficient, as Dr. Tabak opines it is, there is no reliable basis to assume that it would have taken two full trading days for this information to be reflected in Twitter's stock price."

First of all, that doesn't even accord with what he just said two sentences ago, that news is reflected in the security price "typically within one trading day."  "Typically within one trading day" certainly allows for the possibility of taking two trading days, particularly when you see a statistically significant price movement on the second trading day.

Now, I think you had a question for me.

Q    I apologize.  I didn't mean to interrupt you.

Yeah.  He also asserts, paraphrasing, that you broke your own rule on -- with respect to the price movements on July 11 and July 12.

Did you have a response to that?

A    Yes.  So first of all -- there's two things. First of all, after saying that I use a two-day event window as my standard practice in

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

198

paragraph 115, now in paragraph 116, Dr. Lehn

recognizes -- as you'll see if this carries over --

and, by the way, it's July 13th, that it can take

three days under my rule.

So, you know, it says that under my

purported standard practice, these three consecutive

statistically significant price changes would have

had a certain effect.  So if it could be three days,

it certainly can't be two is my standard practice.

So he's contradicted himself there.

But secondly, if you take a look back at my

Exhibit 4A, which he cites over here, he ignores the

fact that on the second day of those three, the

price movement is only statistically significant at

the 10 percent significance level, not the standard

5 percent level.  And, in fact, if you look in my

class cert report that Dr. Lehn just cited over

here, it's very clear that I use the 5 percent

significant level as the determination.

So you asked me my major thoughts on

Dr. Lehn, those are the major thoughts I have.

Q    Dr. Lehn asserted that you made an

inadequate effort to disaggregate the effects of

Musk's alleged false statement from the true part of

his statements; is that right?

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

199

A    Yes, he makes that assertion.

Q    Did you or did you not, in your efforts with respect to this case, actually make an effort to disaggregate the effects of miss -- Musk's alleged misstatements from other factors that may have had a significant impact on Twitter's stock price during the class period?

MR. BERNSTEIN:  Objection to form.

A    Yes.  You can see, for example, we've got the August 23rd statement and so forth.

So, basically, you know, what he's talking about actually is May 13th and saying I should have disaggregated out the, quote, cold feet interpretation that the market had.  But, again, that -- the words "cold feet" are not in his -- in Mr. Musk's tweet, so he's asking me to disaggregate out subtext from text, which I don't understand to be relevant or to make sense in this context.

Q    Very well.

MR. ARNZEN:  I think I'm finished with my questions.

Mr. Bernstein, I realize we may have a difference of opinion about our rights to, but to the extent we have a right to, then we'll reserve those rights to amend, supplement, or clarify Dr.

Transcript of David Tabak, Ph.D.

Conducted on July 16, 2025

200

Tabak's report, allowing, of course, for your further follow-up questioning and whatever other procedures you think are appropriate.

MR. BERNSTEIN:  I think you are correct that we probably will -- or if there's a -- a good potential that there may be a difference of opinion as to whether there's a right to do it, but I don't think now is the -- the right time to debate it and hold everyone up.

I do have some additional questions, though, here.

MR. ARNZEN:  Yes, sir.  Yes, sir.

MR. BERNSTEIN:  I will be very quick, though.

FURTHER EXAMINATION

BY MR. BERNSTEIN:

Q   Dr. Tabak, you were asked whether you had sufficient time to read the entirety of documents that I showed you during my questioning.

Do you remember being asked that?

A   I do.

Q   I never told you you couldn't review additional pieces of information in a document or we wouldn't scroll down, right?

A   You never told me I couldn't ask to review

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

201

additional information in a document; that is
correct.

Q   Did you ever ask to see additional
information?

A   I -- a couple of times I may have asked to
go back and take a look at a date or something like
that, I think.

Q   And -- and when you asked, did we comply and
show you the document?

A   You -- when I asked, you showed me the part
of the document, such as the date, that I asked for.

Q   You were asked whether a technically true
statement can still contribute to damages under a
scheme liability theory, and you testified that
you -- your understanding is that it could?

A   I believe that's correct.

Q   And that understanding -- when you say it's
an understanding, is that just an assumption that
you've been provided by counsel?

A   Well, I've also worked on some scheme
liability cases, but assumption provided by counsel,
but not inconsistent with what I've seen before.

Q   The -- the other scheme cases that you've
seen before, have they just been a series of alleged
misrepresentations?

16:47:19
16:47:21
16:47:21
16:47:25
16:47:27
16:47:29
16:47:33
16:47:35
16:47:38
16:47:39
16:47:42
16:47:45
16:47:54
16:48:01
16:48:03
16:48:04
16:48:05
16:48:08
16:48:10
16:48:12
16:48:15
16:48:18
16:48:20
16:48:27
16:48:31

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

202

MR. ARNZEN:  Object to form.

A    I mean, first of all, I can't remember all of them, but that may be the case.

Q    Okay.  On the Morningstar report that you referenced, you said that although Dr. Lehn noted that the analyst reports were not focused on Mr. Musk's information rights, you said that the Morningstar report noted that Musk will have difficulties exiting the deal even if Twitter cannot support its claim about the proportion of spam users.

A    Yeah.  And can you remind me where?

Q    Page 19.

A    Page 19 of Dr. Lehn.

Q    Paragraph 55.

A    Page 20 --

Q    In fact, since we have it -- just to make a good record, we should probably mark this, which I don't believe we've done yet.

A    No, no, I -- oh.

Q    No, I mean as an exhibit.  We haven't marked it as an exhibit yet.  So we've been referring to it, but we haven't marked it as an exhibit.

MR. BERNSTEIN:  Just for good order, why don't we mark it as Exhibit 207?

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

203

A    And just to clarify -- because you keep saying "this", you mean Dr. Lehn's rebuttal report?

Q    Dr. Lehn's report.

MR. BERNSTEIN:  Let's mark Dr. Lehn's rebuttal report as Exhibit 208.

(Exhibit 208 marked for identification.)

Q    If I can refer you to page 19, paragraph 55.

A    Page 20, page 55.

Q    I'll -- I'll take your word for it.  I'm going off the -- the live -- either way.

Paragraph 55, whatever page it's on.

A    There we go.  19 at the top, then a -- then a page break, then paragraph 55.

Q    And it says, "Musk will have difficulties exiting the deal even if Twitter cannot support its claim about the proportion of spam users."

Do you see that?

A    I do.

Q    You seem to suggest that was somehow inconsistent with Dr. Lehn's observation that analysts were not focused on whether Mr. Musk had a legal right to that information, right?

A    I say it's at least intentioned with it, because they're certainly saying here that there's a question of whether Twitter can or cannot support

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

204

its claim.  Yes.

Q   But it -- it's not saying that the question is whether Mr. Musk has a right to the information.

A   Sure.  But put it this way:  The section this is under, the little romanette i, says, "Analysts Did Not Infer that Mr. Musk Has a Right to Information on Bots Under the Merger Agreement." It's also not saying that he didn't.  It doesn't refer to Mr. Musk's rights one way or the other.

So to the extent that it's not referring to that, I think what you're saying is that this is an irrelevant quote that Dr. Lehn shouldn't have put in.

Q   I -- I would disagree with that characterization.

But I think we can agree on one thing, which is you agree this analyst report is not focused on whether Mr. Musk has a right or not, under the merger agreement, to the information he's requesting, correct?

A   I agree with that absolutely, which is why it doesn't belong under romanette i.

Q   Well, if analysts had inferred that Mr. Musk had a right to the information, wouldn't you expect analysts to say Mr. Musk has a right to this

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

205

information --

A    But -- go ahead, sorry.

Q    And if -- if he's not provided it, he -- that may be a breach?

MR. ARNZEN:   Form.

A    First of all, that doesn't address the question of -- as you pointed out correctly, the Morningstar report does not address this one way or the other.  So, you know, that is part of what I was addressing.

Secondly, it does talk about two different difficulties involving exiting the deal.  Now you're asking a different question, would we have expected analysts to say that.  Well, you know what, we could expect analysts to say he does have a right.  We could expect analysts to say he doesn't have a right to -- if an analyst says nothing, to assume that that goes one way does seem to be putting a bit of a finger on the scale.

Q    Well, the only finger on the scale that it's putting is that the market was not reacting to a belief one way or the other on whether Mr. Musk had a contractual right to the information, because that's not what they're focused on.  They're not inferring whether he had a right.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

206

A    Well, first of all --

MR. ARNZEN:  Objection; form.

A    -- you can't say if they're inferring that or not from a one-sentence -- one sentence over here.  They may be inferring it or not somewhere else in that report.  All we're -- all I think we've agreed upon is, that one sentence doesn't say one way or the other whether Morningstar believes that Mr. Musk did or did not have a right to the bot data.

Q    Moving on.

You were asked about price maintenance theory and whether you ruled out, in your mind, whether price maintenance theory could make sense here.

Do you remember being asked that?

A    I do.

Q    And you said you hadn't ruled it out?

A    Correct.

Q    But you're not -- you've offered three reports in this case.  You're not opining that there is a price maintenance theory applicable here, right?

A    Well, first of all, two reports wouldn't -- I guess probably generally wouldn't -- but, no, I'm

16:54:31
16:54:32
16:54:33
16:54:35
16:54:37
16:54:40
16:54:43
16:54:47
16:54:49
16:54:52
16:54:54
16:54:55
16:54:57
16:55:03
16:55:06
16:55:07
16:55:08
16:55:09
16:55:11
16:55:12
16:55:15
16:55:19
16:55:27
16:55:27
16:55:30

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

207

not offering that opinion.

Q   You were asked about Ms. Gadde's quote that was reported in Bloomberg, May 25th SEC filing, and June 7th SEC filing.

Do you remember that?

A   I -- generally.  Don't remember the exact dates, but yes.

Q   And -- and you were asked whether you had determined that that information was new and material.

Do you remember that?

A   I believe so.

Q   And your answer, so that -- I want to confirm it, is that none of that information was new and material, correct?

MR. ARNZEN:  Objection to form.

A   In the sense that it did not have an effect on the Twitter stock price.

Q   Is there a different -- a different way in which you would say it was new and material?

A   I'm not going to answer if that -- if you're thinking of material, for example, as a legal question.  I'm talking about effects on stock prices and what one would interpret from them.  If material is a legal issue, I'm not addressing that.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                                    208

Q    And how about material just from an economic perspective?

A    Since it did not have a statistically significant effect on the stock price, we would say did not have an important economic import -- it didn't have economic importance to the market.

Q    One of the criticisms that you -- you offered of Dr. Lehn's report is that he was replacing the actual wording of the tweet with alternative wording, correct?

A    Well, not just any alternative wording, but alternative wording that did not basically go, as in your example, turning the number 100 into the number 99, but adding an addition -- adding an additional statement about cold feet and, in fact, dropping the rest of the information in the tweet.

Q    Is your opinion, then, based on the idea that the only proper but-for formulation of "deal on hold" is "deal not on hold," as opposed to it being "I won't close"?

MR. ARNZEN:  Object to form; scope.

A    To the extent that's a legal conclusion, I won't answer that.  But from an economic point of view and that's, you know, obviously only the first part of the tweet, the answer is, yes, the opposite

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

209

of "deal on hold" is "deal not on hold."

Q    Wouldn't the more truthful statement -- if Mr. Musk is not going to close the deal absent getting this information without litigation, the more truthful correction of "deal on hold" is "deal won't close," right?

A    That would be -- that --

MR. ARNZEN:  Excuse me, Dr. Tabak.

Object to form.  This goes beyond the scope of my examination.

Q    You can answer.

A    So the opposite of "deal on hold" is "deal not on hold," not "deal won't close."

Q    But would -- would -- you wouldn't -- for purposes of your damages, you wouldn't want to make the but-for disclosure something that itself would be potentially misleading, right?

A    That is correct.

Q    You wouldn't want something --

MR. ARNZEN:  Object to the form and scope.

Q    You wouldn't want something that would potentially create artifical inflation, making the stock even higher than it would be if the truth was disclosed, right?

MR. ARNZEN:  Same objection.

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025

210

A    Also correct.

MR. BERNSTEIN:  I have no further questions, with the same reservation regarding any additional analyses or corrections that are made to Dr. Tabak's report, including reserving the right to oppose the ability to provide an updated report at this point.

MR. ARNZEN:  I -- I don't have any questions at this time either.  Thank you.

THE VIDEOGRAPHER:  Perfect.  If there's nothing further, I'm going to take us off the video record.

This marks the end of the deposition of David Tabak.  We're going off the record.  The time is 5:02.

(Whereupon the proceedings concluded at

5:02 p.m. EDT)

Transcript of David Tabak, Ph.D.
Conducted on July 16, 2025                                      211

CERTIFICATE OF REPORTER

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of California, being empowered to administer oaths and affirmations remotely pursuant to Section 2093(b) of the Code of Civil Procedure, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review

of the transcript was not requested.


        IN WITNESS WHEREOF, I have this date

subscribed my name.

DATED: 17th of July, 2025


_____

    Karisa Ekenseair, CSR No. 14546