# EXHIBIT B



# Transcript of David Tabak, Ph.D.

**Date:** August 1, 2025
**Case:** Pampena, et al. -v- Musk

**Planet Depos**

**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com

**www.planetdepos.com**

Michigan #8598 | Nevada #089F | New Mexico #566

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

------------------------------- x

GIUSEPPE PAMPENA, individually   :

and on behalf of all others      :

similarly situated, et al.,      : Civil Action No.

Plaintiffs          : 3:22-cv-05937

vs                       :

ELON MUSK,                       :

Defendant          :

------------------------------- x


VIDEOTAPED DEPOSITION OF DAVID TABAK, Ph.D.

CONDUCTED VIRTUALLY

FRIDAY, AUGUST 1, 2025

11:59 a.m. EST


Job No.:  594143

Pages 1 - 30

Reported by:  APRIL REID, RPR, CRR (Stenographer)

A P P E A R A N C E S


ON BEHALF OF THE PLAINTIFFS:

AARON P. ARNZEN, ESQ.

FRANK BOTTINI, ESQ.

BOTTINI & BOTTINI, INC.

7817 Ivanhoe Avenue

Suite 102

La Jolla, CA  92037

(858) 914-2001

and

GIA JUNG, ESQ.

MARK MOLUMPHY, ESQ.

COTCHETT PITRE & MCCARTHY, LLP

840 Malcolm Road

Suite 200

Burlingame, CA

(650) 697-6000

Transcript of David Tabak, Ph.D.
Conducted on August 1, 2025                    3

A P P E A R A N C E S  cont'd


ON BEHALF OF THE DEFENDANT:

STEPHANIE KELEMEN, ESQ.

ALEX BERGJANS, ESQ.

QUINN EMANUEL URQUHART & SULLIVAN, LLP

865 Figueroa Street

Tenth Floor

Los Angeles, CA  90017

(213)  443-3000

and

JESSE BERNSTEIN, ESQ.

QUINN EMANUEL URQUHART & SULLIVAN, LLP

295 5th Avenue

New York, NY  10016

(212) 849-7000


ALSO PRESENT:

PARKER SIMPSON, Videographer

I N D E X

DAVID TABAK, PH.D.                              PAGE

Examination by Ms. Kelemen                         6

Examination by Mr. Arnzen                          26


                   E X H I B I T S

NUMBER                    DESCRIPTION              PAGE

Exhibit 243     Supplemental report of Dr.          8

                David Tabak

Transcript of David Tabak, Ph.D.
Conducted on August 1, 2025                    5

P R O C E E D I N G S

THE VIDEOGRAPHER:  Here begins the
Videotaped Deposition of Dr. David Tabak in
the matter of Giuseppe Pampena, individually
and on behalf of others similarly situated,
et al., vs. Elon Musk, in the United States
District Court, for the Northern District of
California, Civil Action No. 3:22-cv-05937.

Today's date is 8/01/2025.  The time on
the video monitor is 11:59 Eastern time.

The remote videographer for today is
Parker Simpson, representing Planet Depos.

All parties of this video deposition are
attending remotely.

Would counsel please voice-identify
themselves and state whom they represent.

MS. KELEMEN:  My name is Stephanie
Kelemen, on behalf of defendant, Elon Musk,
and I'm here with my colleagues, Jesse
Bernstein and Alex Bergjans.

MR. ARNZEN:  This is Aaron Arnzen on
behalf of the plaintiffs.  I'm joined --
defending the deposition.  I'm joined by my
colleagues, Frank Bottini and Gia Jung.

THE VIDEOGRAPHER:  All right.  The court

reporter today is April Reid, representing

Planet Depos.

     The witness will now be sworn.

     THE STENOGRAPHER:  Sir, if I may please

get you to raise your right hand.

     THE WITNESS:  (Complies.)

     THE STENOGRAPHER:  Do you swear or

affirm that the testimony you're about to

give will be the truth, the whole truth, and

nothing but the truth?

     THE WITNESS:  I do.

     THE STENOGRAPHER:  Thank you.

THEREUPON:

     DAVID TABAK, PH.D.

     being first duly sworn or affirmed to

testify to the truth, the whole truth, and

nothing but the truth, was examined and

testified as follows:

     THE COURT REPORTER:  We may begin.

     EXAMINATION

BY MS. KELEMEN:

    Q.  Good morning, Dr. Tabak.  Am I saying

your name correctly?

    A.  Yes.

    Q.  Great.

Transcript of David Tabak, Ph.D.
Conducted on August 1, 2025                    7

I assume, you remember all the ground rules of how this works from last time.

A.    I think generally, yes.

Q.    And you understand that you're under oath today?

A.    I was just sworn in, so yes.

Q.    Any reason why you can't give truthful testimony today?

A.    No.

Q.    Do you have any materials in front of you?

A.    I do.

I have unmarked copies of my damages report, Dr. Lehn's rebuttal report, and the redline supplemental report, but there are no other -- there are no markings on those printouts.

Q.    Since your last deposition, you've now submitted a supplemental report in this case; is that correct?

A.    That is correct.

Q.    I'm going to go ahead and mark that as Exhibit 243 which I believe we left off at 242 in our last deposition.

          (Exhibit 243 was marked for
          identification and is attached to the

transcript.)

Q.   Dr. Tabak, in your original analysis before you submitted your supplemental report, you did not make any adjustments for the July 8th termination letter in your calculation of 10b-5(b) damages; is that correct?

A.   That is correct.

Q.   Meaning, that the decline in Twitter's stock price following the July 8th termination letter was included in your damages figure in your original analysis?

A.   No.  Only a portion of that was; the percentage that we've been calling the merger discount percentage as of that point in time.

Q.   Some portion of the decline following the July 8th termination letter was included in your damages figure from your original port -- report; correct?

A.   That is correct.

Q.   And you've now submitted a supplemental report where you've adjusted your damages figure to remove all of the effects of the July 8th termination letter; correct?

A.   Correct.

Q.   And the reason why you've supplemented

12:01:47
12:01:54
12:01:56
12:01:58
12:02:01
12:02:04
12:02:06
12:02:08
12:02:11
12:02:13
12:02:15
12:02:17
12:02:20
12:02:22
12:02:26
12:02:29
12:02:32
12:02:36
12:02:37
12:02:39
12:02:40
12:02:43
12:02:46
12:02:48
12:02:51

Transcript of David Tabak, Ph.D.
Conducted on August 1, 2025                    9

your report is because you understand that the

July 8th termination letter is not directly caused

by the May 13th, the May 16th, or the May 17th

alleged misstatements; is that correct?

A.   Well, it is partially that and partially

also because previously I was thinking of it as

related to the allegations, so that it was more of

a price maintenance issue there, but based on the

discussion I had with counsel for defendants in

the deposition, I agreed that it makes more sense

to treat it as a completely separate piece of news

or -- or event.

Q.   So your opinion now is that the July 8th

termination letter is not -- the decline caused by

the July 8th termination letter is not directly

caused by the May 13th, the May 16th, or the May

17th alleged misstatements; correct?

A.   Well, I never thought that that decline

was caused by those statements.

The decline's, obviously, caused by the

new information.  But as I said previously, I

thought of that as related because it was

expanding upon the idea of why Mr. Musk believed

he had a right to certain information and the

ability, in his view, to put the deal on hold,

Transcript of David Tabak, Ph.D.
Conducted on August 1, 2025

making it more of a price maintenance issue.

But now I think that it's more appropriate to treat it as a separate event that is not allegation related for purposes of the 10b-5(b) claim.

Q.   Your opinion in your supplemental report is that the decline following the July 8th termination letter is not related to the alleged misstatements?

A.   Well, it depends what you mean by "related."

Obviously, they -- it does deal with the question of whether Mr. Musk had rights to certain data.  But I think of it as an independent statement and event.

Q.   And what if by "related" you mean directly caused by, is it your opinion that the July 8th letter -- that the decline following the July 8th letter is not caused by the alleged misstatements?

A.   I think that's fair, yes.

Q.   And because it was -- the decline following the July 8th letter was not caused by any of the alleged misstatements, it was an error to include any declines from the July 8th

Transcript of David Tabak, Ph.D.

Conducted on August 1, 2025                              11

termination letter in your 10b-5(b) damages;                 12:05:27

correct?                                                     12:05:31

A.   I view it that way now, but I think                     12:05:32

that -- you know, as I said earlier, I was doing             12:05:34

it before as price maintenance because there is a            12:05:37

relationship between the topics and was expanding            12:05:40

on that.  So, you know, as I said, I've mentioned            12:05:43

price maintenance in class certification and it              12:05:47

made sense.                                                  12:05:50

But I agree with you now that it makes                       12:05:51

more sense to treat the July 8th termination                 12:05:54

letter as an independent event for purposes of the           12:05:57

damages analysis and, therefore, not to include             12:05:58

any portion of that decline in the 10b-5(b)                  12:06:01

damages analysis.                                            12:06:04

Q.   Your opinion, sitting here today, is                    12:06:06

that it was an error to include the declines due             12:06:08

to the July 8th termination letter in 10b-5(b)               12:06:11

damages; correct?                                            12:06:15

A.   Yes.  That's fair.                                       12:06:16

Q.   According to your calculations, the July                12:06:20

8th termination letter caused a statistically                12:06:22

significant decline in Twitter stock price;                  12:06:26

correct?                                                     12:06:28

A.   Correct.                                                 12:06:29

Transcript of David Tabak, Ph.D.
Conducted on August 1, 2025          12

Q.   And you would agree that -- that that stock price -- that statistically stock price -- let me start over.

You would agree that that statistically significant stock price decline following the July 8th termination letter was not directly caused by any allegedly misleading statements in this case; correct?

A.   Any remaining allegedly misleading statements following the court's order, correct.

Q.   And you're also not opining that it was -- that the statistically significant stock decline following the July 8th termination was indirectly caused by the alleged tweets; correct?

A.   I mean, while they deal with the same subject matter, I think that is a fair way of putting it.

Q.   And, in fact, you don't dispute that if Mr. Musk had never even made any of the allegedly misleading statements in this case, that Twitter's stock price may have gone to the exact same place as it did following the July 8th termination letter; true?

MR. ARNZEN:   Objection, scope of the -- scope of the supplemental report.

Transcript of David Tabak, Ph.D.

Conducted on August 1, 2025                    13

A.    I mean, that is assuming in some sense that the July 8th termination letter makes the prior alleged misrepresentations null and void.  I think you'd have to show that to make that argument or that claim.

Q.    Have you done any analysis to determine whether the July 8th letter made any of the prior misstatements null and void?

A.    I have not done the analysis, but nor have I seen, for example, any analyst saying something like that.

Q.    Sitting here today, you're not disputing that it's possible that Twitter stock would have gone to the same price following the July 8th termination letter had Mr. Musk never tweeted any of the alleged misstatements?

A.    I have not done any analysis of that.

It's interesting to think that that would make other statements null and void, but I would be happy to look at any analysis that someone provides on that issue.

Q.    So you don't dispute that it's possible that the price would have gone to the same place following the July 8th letter if Mr. Musk had never made any of the alleged misstatements in

12:07:43
12:07:47
12:07:49
12:07:54
12:07:56
12:07:59
12:08:01
12:08:04
12:08:06
12:08:11
12:08:15
12:08:15
12:08:18
12:08:21
12:08:23
12:08:27
12:08:30
12:08:33
12:08:35
12:08:39
12:08:41
12:08:45
12:08:48
12:08:51
12:08:53

this case?

A.   That -- with -- with -- without putting forth any analysis of that, almost anything is possible.  So, yes, that is possible under those circumstances.

Q.   So, in other words, you can't tell the jury that anyone who sold Twitter stock following the July 8th termination letter sold at a lower price than they otherwise would if Mr. Musk never made any of the allegedly misleading statements; correct?

A.   I can say that that depends on an unproven assumption that the July 8th termination letter takes away the effect of the prior misrepresentations.

So I could say it's a possibility, but it's not a prob- -- something that's been shown or demonstrated.

Q.   You can't say, one way or another, whether anyone who sold Twitter stock after the July 8th termination letter sold at a lower price than they would have if Mr. Musk had never made the allegedly misleading statements; correct?

MR. ARNZEN:   I'll make a continuing objection to the scope of the changes to the

12:08:56
12:08:59
12:09:02
12:09:05
12:09:07
12:09:11
12:09:14
12:09:18
12:09:22
12:09:25
12:09:27
12:09:29
12:09:31
12:09:34
12:09:39
12:09:42
12:09:44
12:09:48
12:09:49
12:09:51
12:09:54
12:09:58
12:10:01
12:10:04
12:10:05

supplemental report with respect to this and similar questions.

A.   Put it this way:  The jury can, obviously, ultimately decide either way, but all I'm really saying over here is that the proposition you're putting forth does not yet have any support behind it in terms of analytics.  But the jury can, obviously, decide whatever it likes on that issue.

Q.   But you're not offering any opinions to help the jury decide, one way or another, whether anyone who sold after July 8th sold at a lower price than they would have if Mr. Musk had never made any of the alleged misleading statements?

A.   As I've said, I haven't seen anyone in the analyst community, for example, say that the July 8th statement supercedes the statements in May.  So that is evidence against that.  And I -- the jury can do whatever it wants with the evidence.

Q.   You haven't produced any analysis showing that the price after the July 8th termination letter would have been -- would not have been the same had Mr. Musk never made the allegedly misleading statements; correct?

MR. ARNZEN:  Same objection.

A.   Basically, what you -- you're right, I haven't done that, but neither has anyone else done an analysis, I think, that essentially says that the July 8th letter supercedes all prior statements.

Q.   It's your opinion that the statistically significant price decline following the July 8th letter was caused, in fact, by the July 8th letter; correct?

A.   Correct.

Q.   And we discussed in your last deposition that the July 8th termination letter includes grounds for termination that are unrelated to the issues raised in Mr. Musk's alleged misrepresentations; correct?

MR. ARNZEN:  Scope.

A.   I don't remember the details.  If you say that was in the prior deposition, I will believe you, Ms. Kelemen.

Q.   Do you recall that the July 8th termination letter includes grounds for termination that are unrelated to the issues raised in Mr. Musk's alleged misrepresentations in this case?

Transcript of David Tabak, Ph.D.
Conducted on August 1, 2025                    17

A.    I recall that generally, yes.

Q.    And one such example of a ground stated for termination in the July 8th letter that is not related to Mr. Musk's alleged representations is the section 6.1, Ordinary Course Violation.  Do you recall that?

MR. ARNZEN:  Scope.

A.    I don't recall the -- I mean, I recall the concept of ordinary course.  If you tell me that's section 6.1, I will believe you, Ms. Kelemen.

Q.    Do you recall a basis stated for termination in the termination letter dealing with certain personnel decisions at Twitter?

MR. ARNZEN:  Scope.

A.    I can't be sure, one way or the other. I don't recall, but certainly doesn't -- that doesn't mean it's not in there.

Q.    You didn't do any analysis to determine the extent to which the portions of the termination letter -- let me start over.

You didn't do any analysis to determine the extent to which the portion of the termination letter dealing with bases unrelated to the alleged misstatements contributed to the statistically

Transcript of David Tabak, Ph.D.
Conducted on August 1, 2025

18

significant decline on July 8th; correct?

MR. ARNZEN:  Scope.

A.    That is correct.

Q.    And you also understand that the termination letter references information Mr. Musk received from Twitter after the alleged misstatements; correct?

MR. ARNZEN:  Scope.

A.    That is my recollection.

Q.    You didn't do any analysis to determine the extent to which the portions of the letter referencing information Mr. Musk did receive contributed to the statistically significant stock decline on July 8th; correct?

MR. ARNZEN:  Scope.

A.    Correct.

Q.    So if the jury were to determine that any amount of the decline, due to either bases for termination unrelated to the alleged misstatements or the -- the decline was related to the information Mr. Musk did receive from Twitter, you haven't done any analysis that would allow the jury to remove that from damages; correct?

MR. ARNZEN:  Object to form, scope.

A.    Well, under my supplemental report, none

Transcript of David Tabak, Ph.D.
Conducted on August 1, 2025                19

of that is now included in damages on the 10b-5(b) claim, so there'd be no need to do that.

Q. And you do include the decline -- some portion of the declines following the July 8th termination letter in 10b-5(a) and (c) damages; correct?

A. That is correct.

Q. And you don't do any analysis to enable the jury to remove declines as a result of the information in the July 8th termination letter unrelated to the alleged misstatements from damages; correct?

MR. ARNZEN: Form.

A. Well, assuming that that is appropriate in an (a) or (c) claim, and I'm not going to speak to that legal issue under scheme liability, if it is determined that it should be disaggregated, no, I have not done that to form a disaggregation. And if it's determined that it is not necessary to disaggregate, then there is no need to disaggregate, obviously.

Q. And if the judge or jury were to determine that the termination letter was not part of any alleged scheme, you haven't done any analysis to determine that the stock would not

have been the same price following the termination

letter absent the alleged scheme; correct?

MR. ARNZEN:  Form.

A.   It would be the same answers for -- that
I've given for the 10b-5(b) claim.  I have not
done that analysis, but that assumes that the
termination letter kind of overrides all previous
alleged misrepresentations.

Q.   And you're not opining that the aspects
of the termination we discussed that were
unrelated to the alleged misstatements have no
impact on Twitter's stock; correct?

A.   That is correct.

Q.   All right.  Just give me a moment to --
to look at my notes.

MS. KELEMEN:  Would it be possible to
actually just take a quick, five-minute
break, and I think we can actually wrap this
up really soon.

MR. ARNZEN:  Certainly.

And -- and, Stephanie, I'll tell you
what, can we take ten?  And I'll make sure to
dial my questions into there.  Can we take
ten?  Okay.  Thank you.

THE VIDEOGRAPHER:  Okay.  We're going

12:16:30
12:16:33
12:16:37
12:16:38
12:16:40
12:16:44
12:16:46
12:16:49
12:16:52
12:16:55
12:16:57
12:17:00
12:17:04
12:17:07
12:17:09
12:17:23
12:17:25
12:17:26
12:17:29
12:17:30
12:17:30
12:17:32
12:17:36
12:17:39
12:17:40

off the record.  The time is 12:17.

(Recess in proceedings.)

THE VIDEOGRAPHER:  We are back on the
record.  The time is 12:32.

BY MS. KELEMEN:

Q.   Dr. Tabak, you don't have an opinion as
to what Twitter's stock price would have been
following the July 8th termination letter, absent
the alleged misrepresentations in this case;
correct?

A.   Well, put it this way:  I have -- the
damages analysis of the 10b-5(b) claim assumes
that the effect of the May 13th and 16th and 17th
alleged misrepresentations are still there.  That
is my opinion.

To the extent that there is contrary
information, I'm happy to consider it.

Q.   So you don't have an opinion, one way or
the other, what Twitter's stock price would have
been following the July 8th termination letter,
absent the alleged misrepresentations in this
case; correct?

A.   No.  My opinion is what's stated in the
supplemental report, but I understand your
argument that you think it may be different, and I

12:17:42
12:31:58
12:32:04
12:32:06
12:32:11
12:32:11
12:32:13
12:32:16
12:32:19
12:32:22
12:32:25
12:32:28
12:32:34
12:32:39
12:32:43
12:32:44
12:32:46
12:32:51
12:32:53
12:32:56
12:32:58
12:33:02
12:33:03
12:33:05
12:33:07

Transcript of David Tabak, Ph.D.
Conducted on August 1, 2025                    22

would be willing to consider any information on
that.

Q.   I'm just asking a question as to the
scope of what you are opining on.

A.   The answer is yes.  My opinions, as
stated in the supplement -- I'm sorry.  The answer
is, yes, I have an opinion, and that is the -- the
artificial deflation is shown in the supplemental
report.

Q.   So your opinion is that Twitter's stock
price --

A.   Would have been different by the amount
of artificial deflation shown in my supplemental
damages report.

Q.   What is your basis for concluding that
Twitter's stock price would have been different by
the amount of the artificial deflation in your
report following the July 8th termination letter
if the misrepresentations had never been made?

A.   Well, we spoke about how they are two
independent events over here.  So unless you're
going to say that the July 8th termination letter
somehow overrode and made the three prior alleged
misrepresentations null and void, their effect
would still be there.

Q.   So your analysis assumes that the July 8th letter, in fact, did not override those, but you didn't do any analysis to that effect; correct?

A.   Again, I said I looked at analyst reports.  I didn't see anyone saying it, that the July 8th termination letter overrode anything before, but I have not done any calculations to that effect.

Q.   You don't cite any analyst reports in your supplemental report; correct?

A.   That is true.

Q.   What would have the stock price been on July 12th if Mr. Musk had never made any of the alleged misrepresentations in this case?

A.   Well, the stock price on July 12th, plus the alleged deflation in the 10b-5(b) case.

Q.   So you're assuming -- strike that.

So your opinion is that the July 8th letter would have had no different impact than it did if Mr. Musk had never made the alleged misrepresentations; correct?

A.   No.  Because, first of all, we're dealing with the percentage inflation over here, so there's kind of an interaction effect.

Transcript of David Tabak, Ph.D.
Conducted on August 1, 2025

24

Q.   Could you explain, then, how you're opining that the price would have been the same had Mr. Musk never made the alleged misrepresentations?

A.   I'm sorry.  What -- what are you think -- opining -- what price would have been the same as what?

Q.   Sorry.  That -- sorry.  I'm just trying to look at the realtime and it's not working.

THE STENOGRAPHER:  Counsel, realtime is up and ready.  If we can go off the record, if you'd like, for me to help guide you.

MS. KELEMEN:  Yeah, maybe just for a moment.  Apologies.  I -- I think it's, like, glitching on my end.

THE VIDEOGRAPHER:  Okay.  We're going off the record.  The time is 12:37.

(Off-the-Record Discussion.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 12:41.

BY MS. KELEMEN:

Q.   Am I correct in understanding that your analysis assumes that the termination letter did not in any way nullify any of the alleged misrepresentations in this case?

Transcript of David Tabak, Ph.D.
Conducted on August 1, 2025                          25

MR. ARNZEN:  Excuse me, Dr. Tabak.

I'll object on the scope.

And I think most of these are outside

the scope.  They don't reflect or are not

about the changes reflected in Dr. Tabak's

supplemental report, as indicated by the

redlines and fact changes that we provided

along with his supplemental report.

Q.   You can answer.

A.   That is correct.

Q.   What analysis did you do to reach that

conclusion?

A.   Well, again, I didn't see any commentary

on that, but I have not done any type of

statistical or other analysis.  That is

effectively an assumption, that the

misrepresentations are still misrepresentations at

that point.

Q.   Do you have an opinion, one way or

another, as to whether you would have seen the

exact same price movements from July 8th through

October 4th, whether or not Mr. Musk had tweeted

on May 13th?

A.   Well, when you -- in terms of percentage

price movements, yes, I believe you would have

Transcript of David Tabak, Ph.D.
Conducted on August 1, 2025

26

seen the same percentage price movements.

MR. ARNZEN:  And I apologize, I was on mute.  I will renew my previous objection about the scope of changes to -- reflected in Dr. Tabak's supplemental report.

MS. KELEMEN:  I'll just state for the record that we disagree and that there were -- there was testimony in Mr. Tabak's last deposition that he was reserving answers on some of these questions regarding the July 8th letter.

Great.  And I think that that's all the questions that I have today.  Thank you.

THE WITNESS:  Thank you, Ms. Kelemen.

EXAMINATION

BY MR. ARNZEN:

Q.   Dr. Tabak, good morning.  I have just a couple of follow-up questions for you.

I'll start with this.  You mentioned the price maintenance theory a couple times, and I just want to make sure that I understand your testimony.

In the class certification report that you submitted in 2024, did you -- is that referenced in your damages and loss causation

Transcript of David Tabak, Ph.D.

Conducted on August 1, 2025                27

report that was submitted earlier this year?          12:44:56

MS. KELEMEN:  Objection.                12:44:58

A.    I believe so, but let me just check.            12:45:00

Yeah.  On the first paragraph, I                12:45:03
reference my class certification report and class      12:45:05
certification reply report.                            12:45:08

Q.    Great.                                            12:45:10

And -- so is that true with respect to          12:45:11
your supplemental damages and loss causation           12:45:14
report as well?                                        12:45:18

A.    Yes.  That has been unchanged.              12:45:19

Q.    Okay.  With respect to your class           12:45:21
certification reply report, did that discuss the       12:45:23
applicability of price maintenance to this case?       12:45:26

A.    Yes, it did.                                12:45:31

Q.    And the concept of price maintenance,       12:45:33
did -- did you find that it applied to the May         12:45:35
16th All-In Summit conference statements made by       12:45:38
Mr. Musk?                                              12:45:41

A.    Yes, I did.                                 12:45:44

Q.    Did you also find that it -- it applied,    12:45:45
the price maintenance theory, to the May 17th          12:45:48
tweet at issue in this case?                           12:45:50

A.    I did.                                      12:45:53

Q.    Did you, in fact, raise price               12:45:54

Transcript of David Tabak, Ph.D.
Conducted on August 1, 2025                28

maintenance in response to one of counsel's

questions during your deposition at the class

certification stage?

          MS. KELEMEN:  Objection.

     A.   I believe so.  We can check the

transcript, but I'm pretty sure I did.

     Q.   Do you stand by those opinions?

     A.   I do.

     Q.   I'd like to ask you about your testimony

today about the impact of the July 8th, 2022

termination letter.  Okay?

     A.   Okay.

     Q.   The testimony that you gave today, am I

correct that all of that testimony was in response

to questions that you understood to concern

misstatement liability under 10b-5(b)?

          MS. KELEMEN:  Objection.

     A.   I think unless it was explicitly asked

otherwise, that would be correct.

     Q.   So unless it's specifically referenced,

and "it" being scheme liability under sections

10b-5(a -- (a) and (c), you were not testifying

about scheme liability allegations that are

present here; correct?

     A.   Correct.  Unless it was either

Transcript of David Tabak, Ph.D.
Conducted on August 1, 2025            29

explicitly referenced or I distinguished it in my

answer.

Q.   Very good.

MR. ARNZEN:   I have no further questions

at this time.

THE VIDEOGRAPHER:  Anything further?

MS. KELEMEN:  Sorry.  One moment.

THE VIDEOGRAPHER:  No worries.

MS. KELEMEN:  Okay.  I think that's all

for us today.  Thank you.

THE VIDEOGRAPHER:  Okay.  If there's

nothing further, this concludes the

deposition of Dr. David Tabak.  The time is

12:47.


AND FURTHER THIS DEPONENT SAITH NOT.

SIGNATURE RIGHTS RESERVED.

(Videotaped Deposition concluded at 12:47 p.m.)


* * * * *

STATE OF FLORIDA:

COUNTY OF ORANGE:

I, April Reid, Registered Professional Reporter, Certified Realtime Reporter and Notary Public in and for the State of Florida, and whose commission expires August 22, 2027, do certify that the aforementioned appeared before me, was sworn by me, and was thereupon examined by counsel; and that the foregoing is a true, correct, and full transcript of the testimony adduced.

I further certify that I am neither related to nor associated with any counsel or party to this proceeding, nor otherwise interested in the event thereof.

Given under my hand and notarial seal in Orlando, Florida, this 4th day of August, 2025.

_____

April Reid, RPR, CRR, Notary Public

State of Florida, County of Orange

Commission No. 455787/HH 436060