QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice* )
alexspiro@quinnemanuel.com
Jesse A. Bernstein (*pro hac vice*)
Jessebernstein@quinnemanuel.com
Jonathan E. Feder (*pro hac vice*)
jonathanfeder@quinnemanuel.com
Stephanie Kelemen (*pro hac vice*)
stephaniekelemen@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, NY 10016
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Stephen A. Broome (Bar No. 314605)
stephenbroome@quinnemanuel.com
Joseph C. Sarles (Bar No. 254750)
josephsarles@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

*Attorneys for Defendant Elon Musk*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> ELON R. MUSK, <br><br> Defendant. | Case No. 3:22-CV-005937-CRB <br><br> **DEFENDANT ELON MUSK'S NOTICE OF MOTION AND MOTION TO EXCLUDE THE OPINIONS OF A. CHRISTINE DAVIS** <br><br> Judge:  Hon. Charles R. Breyer <br><br> Magistrate Judge:  Hon. Donna M. Ryu <br><br> Hearing Date:    October 31, 2025 <br> Time:    10:00 a.m. <br> Courtroom:    6, 17th Floor |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on October 31 , 2025, at 10:00 a.m., before The Honorable Charles R. Breyer, United States District Court, San Francisco Courthouse, Courtroom 6, 17th Floor, at 450 Golden Gate Avenue, San Francisco, California, Defendant Elon R. Musk ("Defendant" or "Mr. Musk") will move for an order to exclude the expert opinions of A. Christine Davis.  This Motion is based on this Notice of Motion and Motion; Defendant's Memorandum of Points and Authorities, incorporated herein; the Declaration of Alex Bergjans ("Bergjans Decl."); the Expert Report of A. Christine Davis dated May 28, 2025 attached as Ex. A to the Bergjans Decl. ("Davis Rp't"); the transcript of the July 10, 2025 Deposition of A. Christine Davis attached as Ex. B to the Bergjans Decl. ("Davis Dep."); and other matters before the Court.

## STATEMENT OF ISSUES TO BE DECIDED (CIVIL L.R. 7-4(a)(3))

Whether the expert report and testimony of A. Christine Davis should be excluded under Rule 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

## SUMMARY OF ARGUMENT

Plaintiffs proffer A. Christine Davis CPA to offer a purported expert opinion on the financing of Mr. Musk's 2022 acquisition of Twitter, Inc.  Her assignment: using publicly available Tesla share prices, calculate how many Tesla shares Mr. Musk would need to sell or pledge on selected dates in April and May 2022 to meet his financing commitments.  Her conclusion: because Tesla's stock price was lower in May than it was in April, Mr. Musk would have had to sell more stock in May than he would have had to sell in April to raise the same amount of cash or collateral.  This unremarkable opinion reflects nothing more than basic arithmetic applied to public data.  All common laypeople understand that if something is worth less, you need to sell more of it to make more money.  Davis's testimony falls far short of the specialized knowledge Rule 702 requires and lacks the methodological rigor that *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) demands.  Davis's opinions are also irrelevant to any issue in the case and would confuse the jury for no reason.  The fact that the value of Mr. Musk's Tesla shares went down makes no difference, as Mr. Musk had countless financing options.

Davis's opinion is inadmissible at every step.  ***First***, Davis employed no expert methodology.  She simply collected publicly available data, performed simple division and multiplication, and stated the

obvious—a lower share price requires more shares to raise the same amount of cash or collateral. Courts routinely exclude grade-school arithmetic masquerading as expertise. **Second**, her analysis is irrelevant and unreliable. Davis ignored alternative funding sources, failed to review key financing documents necessary to present a valid opinion, and relied on a single false assumption provided by Plaintiffs' counsel that Mr. Musk's only available source of "cash" was Tesla stock. These sweeping omissions render her opinions speculative and inadmissible under *Daubert*. **Third**, Davis's report is improper expert testimony because its conclusion is irrelevant, would be confusing to the jury, and is prejudicial, as it serves only to narrate and interpret the evidence for the jury—an impermissible role for any expert. To the extent it is even relevant (which it is not), witnesses can be asked about Tesla's stock price, and the jury can draw their own conclusions without the misleading gloss of purported expertise.

The Court should exclude Davis's opinions in their entirety, or at minimum, hold a Rule 104 hearing to determine their admissibility.

### BACKGROUND

On April 25, 2022, Twitter announced it had entered into a definitive agreement to be acquired by an entity wholly owned by Mr. Musk for approximately $44 billion, with Twitter shareholders to receive $54.20 per share. Davis Rp't ¶ 17 (citing Twitter, Inc. Amendment No. 5 to Schedule 13D). Twitter announced that Mr. Musk would acquire the company, and that he had "secured $25.5 billion of fully committed debt and margin loan financing and is providing an approximately $21.0 billion equity commitment." *Id.* ¶ 18 (citing Twitter, Inc. Amendment No. 5 to Schedule 13D).

The announced financing plan included: an **equity contribution** of approximately $21 billion, **debt financing** of approximately $13 billion and, **margin loan financing** from Mr. Musk's Tesla shares of approximately $12.5 billion. *Id.* ¶ 17 (citing Twitter, Inc. Amendment No. 5 to Schedule 13D), *see also* Commitment letters Exhibits H-J attached to Schedule 13D. Noted in Twitter's disclosures, the equity contribution would be funded with cash from Mr. Musk. *Id.* ¶ 27 (citing Twitter, Inc. Amendment No. 3 to Schedule 13D, Date of Event April 20, 2022). On May 5, 2022, Mr. Musk amended the financing plan, increasing the **equity contribution** to $27.25 billion—reflecting new outside equity investments— and decreasing the **margin loan** to $6.25 billion. *Id.* ¶¶ 19-20 (citing Twitter, Inc. Amendment No. 6 to Schedule 13D). At the time, Mr. Musk also held 73,115,038 shares of Twitter. *Id.* ¶ 17 (citing Twitter,

Inc. Amendment No. 5 to Schedule 13D). The financing plan did not describe the proposed source from which Mr. Musk would derive the $21 billion equity contribution. It is not seriously in dispute, however, that Mr. Musk has a personal net worth in the hundreds of billions of dollars (*see* Dkt. 31 at ¶ 22); numerous non-Tesla sources of wealth, such as SpaceX (*id.* at ¶¶ 17, 104); and that as of May 2022, Mr. Musk's non-Tesla assets were worth more than Twitter's total purchase price.[1]

Plaintiffs retained Christine Davis CPA to opine on this financing plan. Specifically, they asked her to analyze the sources of funds for Mr. Musk's purchase of Twitter from April 21 through May 17, 2022, as disclosed in SEC and other regulatory filings; calculate the amount of cash required from Mr. Musk and the equivalent number of TSLA shares at market prices for selected dates; provide observations on Mr. Musk's margin loan financing arrangements; review a Morgan Stanley document dated April 14, 2022 titled "Illustrative Sources & Uses" and compare it to her analysis; quantify TSLA stock sales by Mr. Musk and the related proceeds from April 26, 2022 through December 31, 2022, using SEC Form 4 filings (*see* Davis Rp't ¶ 1).

From the SEC filings, Davis noted:

- As to Mr. Musk's equity contribution—given his existing 73 million Twitter shares—Mr. Musk's outstanding cash commitment was $17.04 billion as of April 21, 2022 (*id.* ¶ 32(a)) and on May 13, 2022, given the intervening addition of new investors, the outstanding cash commitment reduced to $16.15 billion (*id.* ¶ 32(e)).

- Tesla's corporate policy purportedly limited pledges to 25% of shares owned (*id.* ¶ 33 citing Tesla, Inc. Form 10-K/A for Dec. 31, 2021, p. 21), and lender terms required a 20% loan-to-value ratio (*id.* citing Twitter, Inc. Amendment No. 4 to Schedule 13D, Ex. I).

[1]  *See e.g.*, Elon Musk Profile, Forbes, (last visited Aug. 11, 2025), https://www.forbes.com/profile/elon-musk/; Elon Musk's SpaceX Looks to Raise $1.7 Billion in New Funding, CNBC, May 22, 2022, https://www.cnbc.com/2022/05/22/elon-musks-spacex-looks-to-raise-1point7-billion-in-new-funding.html.

DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF A. CHRISTINE DAVIS

- From April 26 through December 12, 2022, Mr. Musk sold approximately 31.4 million pre-stock-split equivalent TSLA shares, generating $22.93 billion in proceeds, based on SEC Form 4 filings (*id.* ¶¶ 39–42).

Davis also opined that Morgan Stanley's April 14, 2022 document did not include any line item for the $16.15 billion cash contribution from Mr. Musk that Davis calculated (*id.* ¶¶ 35–38).

Based on the above, Davis concluded:

- *Opinion 1*: On April 21, the proceeds from the sale of 16.89 million Telsa shares would cover the merger cash requirement; but by May 13, a falling share price meant 22.18 million shares were needed. *Id.* at ¶ 32(a), Sched. 1; Ex. B (Davis Dep.) at 96:18–22.

- *Opinion 2:* 16.01 million shares at the April 21 price would yield $16.15 billion; the same number of shares on May 12, because of the falling share price, would yield only $11.65 billion. Davis Rpt. at ¶ 32(b); Sched. 1; Davis Dep. at 96:23–97:3.

- *Opinion 3:* By May 12, covering the cash requirement would require selling 6 million more shares than on April 21, because of the falling Tesla share price. Davis Rp't at ¶ 32(c), Sched. 1; Davis Dep. at 98:2–16.

- *Opinion 4:* Tesla's declining price between April 21 and May 17 increased the number of shares Musk needed to sell to meet the cash requirement. Davis Rp't at ¶ 32(d), Sched. 1.

- *Opinion 5:* Between April 21 and May 13, the number of Tesla shares Musk needed to sell to meet the cash requirement increased by 5.2 million. Davis Rp't at ¶ 32(e), Sched. 1; Davis Dep. At 100:2–6.

- *Opinion 6:* Assuming a 20% loan to value ratio required by lenders, and a restriction on pledging more than 25% of company stock, at the Tesla stock price on May 12, a loan on that date would have been under-collateralized. Davis Rp't at ¶ 34 Sched. 1; Davis Dep. 101:3–16.

As noted, Plaintiffs instructed Davis to calculate the cash required from Mr. Musk and "the corresponding number of Tesla . . . shares that was equivalent to that cash value to purchase Twitter." Davis Rp't ¶ 1. Plaintiffs' counsel also instructed Davis to assume that this amount would be funded solely through the sale or pledge of Tesla shares. Davis Dep. at 98:9–13. Davis did not explain this assumption or consider other potential funding sources Mr. Musk had available.

**ARGUMENT**

**I.    THE DAVIS REPORT EMPLOYS NO DISCERNIBLE EXPERT METHODOLOGY**

Under *Daubert*, an expert must "testify to . . . scientific knowledge that . . . will assist the trier of fact to understand or determine a fact in issue" which requires "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  509 U.S. at 589, 590, 593; *see* Fed. R. Evid. 702.  Here, there is no "scientific knowledge" or expert "methodology" to assess—only the application of basic arithmetic to a compilation of publicly available data.

***Simple Arithmetic Is Not Expert Analysis.***    Davis did not apply any recognized forensic accounting, financial analysis, or securities valuation methodology.   She simply collected publicly available information—and performed basic arithmetic: dividing cash requirements by share prices, multiplying share holdings by market prices, dividing the number of the agreed loan cap, and comparing numbers to see which is greater.  *See* Davis Report at 19–24, Sched. 1.[2]  Davis's conclusion is nothing more than the answer to a simple math problem.  When asked to distill her findings, Davis agreed her conclusion was simply that "the Tesla shares lost value from April 21 to May 13 . . . so the number of share[s] equivalent to what cash is needed was going up."  *See* Davis Dep. at 91:16–92:2. (Q "So, ultimately, your conclusion is – in your report is that the Tesla shares lost value from April 21st to May 13th, right? A ". . . yes, because . . . shares were going down, so . . . the number of share equivalent to what cash is needed was going up; so there's an inverse relationship").

Such purported "expert" reports are routinely excluded.  *Think20 Labs LLC v. Perkinelmer Health Scis., Inc.*, 2023 WL 9005633, at *4 (C.D. Cal. Nov. 30, 2023) (excluding "opinion [that] is simple arithmetic for which no expertise is required"); *Golden Unicorn Enterprises, Inc. v. Audible, Inc.*, 682 F. Supp. 3d 368, 379 (S.D.N.Y. 2023) ("Courts regularly exclude expert testimony where the expert engages

---

[2]   Davis also opined that the April 2022 Morgan Stanley "Illustrative Sources & Uses" internal presentation provided to her by Plaintiffs' counsel does not contain her same line item of an actual cash requirement for Mr. Musk (Davis Rp't ¶¶ 35–38).  Her critique (*id.* ¶ 36) is meaningless—she does not know who created or reviewed the document in the first place (Davis Dep. 56:14–15; 77:7–12), whether the amounts reflected actual committed funds (78:2–80:2), or if anyone ever saw or relied on it (56:14–15; 77:7–12).  Most telling, she admits she does not know "why . . . it matters" (106:8–12).

DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF A. CHRISTINE DAVIS

in arithmetic, not expert analysis.") (internal quotation marks and citation omitted) (collecting cases); *Advantor Sys. Corp. v. DRS Tech. Servs., Inc.*, 678 F. App'x 839, 860 n.13 (11th Cir. 2017) (affirming order excluding expert opinion as the "testimony 'would not be helpful to a jury' because it merely performed 'simple arithmetic of the numbers' which was 'within the understanding' of a jury"); *In re Novatel Wireless Sec. Litig.*, 2011 WL 5827198, at *4 (S.D. Cal. Nov. 17, 2011) ("Expert testimony is inadmissible if it addresses lay matters which a jury is capable of understanding and deciding without the expert's help.").

As Judge Alsup noted in excluding a similarly deficient expert report:

> [The] problem is that [the expert] brings no specialized knowledge to the table. . . . Here, for example, [the expert] simply adopted the opinions of others and performed grade-school arithmetic counsel can do on an easel. Where is any specialized knowledge? There is none. . . . The rub is that the evidence [the expert] relied on can speak for itself, and his only contribution would be to pile on a misleading facade of expertise.

*Waymo LLC v. Uber Techs., Inc.*, 2017 WL 5148390, at *5 (N.D. Cal. Nov. 6, 2017).

So too here. The Court should not give the "gloss of expert opinion to what are, at their core, factual questions that the jury must decide on their own." *Perfect 10, Inc. v. Giganews, Inc.*, 2014 WL 10894452, at *6 (C.D. Cal. Oct. 31, 2014).

Other witnesses could testify about Tesla's stock price if needed (or the Court could take judicial notice). Plaintiffs do not need to call an expert and waste half a day of trial time to get this fact in front of the jury—all it would take is a single question to one of Mr. Musk's bankers or deal team members. The Court should not allow Plaintiffs to pass off lay observations as the product of specialized expertise. *See In re Novatel Wireless Sec. Litig.*, 2011 WL 5827198, at *4 (excluding proffered expert testimony forming conclusions based on a reading of record evidence because "no specialized or technical knowhow is required to read and draw conclusions" from the documents and testimony cited by the expert); *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989) (expert testimony is inadmissible when it addresses "lay matters which a jury is capable of understanding and deciding without the expert's help").

## II.    THE DAVIS REPORT IS IRRELEVANT AND UNRELIABLE

The Court should also exclude Davis because her opinion is based on an incomplete and inaccurate set of facts cherry-picked by Plaintiffs' counsel. "Reliance on incomplete facts and data will make an

expert's opinion unreliable." *Powell v. Anheuser-Busch Inc.*, 2012 WL 12953439, at *7 (C.D. Cal. Sept. 24, 2012); *see also In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273 (S.D. Cal. 2010) ("Where significant variables that are quantifiable are omitted from a[n] . . . analysis, the study may become so incomplete that it is inadmissible as irrelevant and unreliable."). Courts routinely exclude experts who omit critical facts and rely on incomplete, cherry-picked records. *Smith v. Illinois Dep't of Transportation*, 936 F.3d 554, 558–59 (7th Cir. 2019) (affirming exclusion of expert report that "omitted a substantial set of facts from her analysis, and instead relied only on what appears to be plaintiff-curated records"); *Huey v. United Parcel Serv., Inc.*, 165 F.3d 1084, 1086 (7th Cir. 1999) (same).

Davis purports to analyze the "cash required" for Mr. Musk to "purchase Twitter" and any "potential cash funding shortfall." Davis Rp't at 4; Davis Dep. at 100:21–23. Her analysis rests on a single, untested assumption (provided by counsel) that the cash or margin component *had* to be funded through the sale or pledge of Tesla shares and not another source. Davis Dep. at 98:9–13. Even though Davis admits Mr. Musk had "other sources for funding the transaction" (*id.* at 98:14–16) that she "did not look into" (*id.* at 99:21–25), she did not review any documents concerning Mr. Musk's other businesses, such as SpaceX (*id.* at 46:19–22, 51:19–23), and concedes she has "no insight on how much money he has" (*id.* at 100:8–9), aside from knowing "he is very wealthy" and "that's a widely accepted fact" (*id.* at 111:22–25).

Her omissions are sweeping. Davis did not review—or even request—communications regarding Mr. Musk's financing sources (Davis Dep. at 46:19–47:11), communications with his financial advisors (*id.* at 48:18–22), or Twitter's financing documents (*id.* at 49:9–12). She has "no insight" into whether Mr. Musk had sources of cash other than Tesla stock, such as other investments or SpaceX holdings (*id.* at 65:17–21; 67:10–13), because, in her words, it "didn't occur to her" to explore them (*id.* at 66:13–18; 79:2–6). The same is true for the margin loans she discusses: she did not review underlying bank documents (*id.* at 50:19–25; 70:25–71:5), does not know whether Mr. Musk sought or received a waiver of the 25% pledge cap her report assumes (*id.* at 94:19–25), and does not know whether lenders would have accepted other collateral (*id.* at 95:1–6).

These admitted gaps render her analysis unreliable under *Daubert*. By ignoring alternative funding sources, failing to investigate relevant documents, and basing her conclusions on a single unsupported

assumption, Davis's report is not expert analysis at all—it is speculation built on an incomplete record and should be excluded.

### III. DAVIS'S OPINIONS SHOULD BE EXCLUDED BECAUSE THEY ARE IMPROPER AND PREJUDICIAL

As both her report and deposition make clear, Plaintiffs' purpose is to use Davis to deliver a narrative—interpreting and opining about otherwise admissible facts—to suggest a purported motive for Mr. Musk's May 13 Tweet. Davis Dep. at 36:6–37:23. That is not the role of an expert, and it would be prejudicial to allow it—given it is irrelevant and unreliable to begin with. *See supra* § II; *see also Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*, 2020 WL 4559181, at *1 (S.D. Cal. Aug. 6, 2020) ("Court[s] consider[] factors. . . to determine if expert testimony will assist the trier of fact . . . [including] whether the probative value of the testimony outweighs its prejudicial effect.").

At its core, Davis's report functions as a thinly disguised vehicle for impermissible state-of-mind opinions, and should be excluded on this separate basis. *Gold v. Lumber Liquidators, Inc.*, 323 F.R.D. 280, 294 (N.D. Cal. 2017) ("Courts routinely exclude expert testimony as to intent, motive, or state of mind as issues better left to a jury."). Moreover, an expert cannot serve as a conduit to feed the jury a factual narrative. *See Arista Networks, Inc. v. Cisco Sys. Inc.*, 2018 WL 8949299, at *3 (N.D. Cal. June 15, 2018) (excluding expert testimony as a mere conduit for evidence) (citing *United States v. Freeman*, 498 F.3d 893, 903 (9th Cir. 2007)); *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1322 (S.D. Cal. 2020), *aff'd*, 9 F.4th 1102 (9th Cir. 2021) (excluding expert opinion that "simply provid[ed] a narrative of [Plaintiff's] theory of the case"). Thus, Davis's testimony that "simply rehashes otherwise admissible evidence about which the expert has no personal knowledge" is inadmissible. *Fujifilm Corp. v. Motorola Mobility LLC*, 2015 WL 757575, at *27 (N.D. Cal. Feb. 20, 2015) (quoting *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005)); *see Johns v. Bayer Corp.*, 2013 WL 1498965, at *28 (S.D. Cal. Apr. 10, 2013) (excluding expert testimony that "offer[ed] nothing more than a factual narrative of . . . documents") (citing *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (rejecting expert's narrative "reciting selected regulatory events" because such material, to the extent admissible, "is properly presented through percipient witnesses and documentary evidence")).

Because Davis's opinions are irrelevant, prejudicial, and merely repackage record evidence into Plaintiffs' preferred storyline—without applying any specialized expertise—they will not assist the trier of fact and should be excluded in full under Rule 702.

## CONCLUSION

Mr. Musk respectfully requests that the Court grant this motion to exclude the opinions of A. Christine Davis, or, in the alternative, hold a Rule 104 hearing to determine their admissibility.

DATED:  August 15, 2025                                    QUINN EMANUEL URQUHART & SULLIVAN, LLP


By _____ */s/ Stephen A. Broome* _____
    Alex Spiro
    Michael T. Lifrak
    Stephen A. Broome
    Jesse A. Bernstein

    *Attorneys for Defendant Elon Musk*

DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF A. CHRISTINE DAVIS

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on this the 15th day of August, 2025.

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  /s/ Stephen A. Broome
　　Alex Spiro
　　Michael T. Lifrak
　　Stephen A. Broome
　　Jesse A. Bernstein

*Attorneys for Defendant Elon Musk*

**ATTESTATION**

Pursuant to Civil L.R. 5-1, I attest under penalty of perjury that concurrence in the filing of this document has been obtained from the other signatories herein.

By  /s/ Alex Bergjans
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Jesse A. Bernstein

*Attorneys for Defendant Elon Musk*

Case No. 3:22-cv-05937-CRB
DEFENDANT ELON MUSK'S MOTION TO EXCLUDE THE OPINIONS OF A. CHRISTINE DAVIS