# EXHIBIT B
# (Filed Under Seal)



# Transcript of A. Christine Davis

**Date:** July 10, 2025
**Case:** Pampena -v- Musk

**Planet Depos**

**Phone:** 888.433.3767 | **Email:** transcripts@planetdepos.com

**www.planetdepos.com**

Michigan #8598 | Nevada #089F | New Mexico #566

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

------------------------------- x

GIUSEPPE PAMPENA, individually   :

and on behalf of all others      :

similarly situated, et al.,      : Civil Action No.

            Plaintiffs       : 3:22-cv-05937

      vs                        :

ELON MUSK,                       :

         Defendant         :

------------------------------- x

REMOTELY CONDUCTED VIDEOTAPED DEPOSITION OF

A. CHRISTINE DAVIS

THURSDAY, JULY 10, 2025

9:58 A.M. PDT

JOB NO.: 591598

PAGES: 1 - 115

REPORTED BY: KARISA EKENSEAIR, CCR RPR RMR RDR

CA CSR #14546

DEPOSITION OF A. CHRISTINE DAVIS, CONDUCTED VIA ZOOM VIDEOCONFERENCE.

Pursuant to notice, before Karisa J. Ekenseair, Certified Shorthand Reporter in and for the States of Arkansas, Oklahoma, Missouri, Illinois, Tennessee, Georgia, New Mexico, Washington, and California; National Registered Professional Reporter; National Registered Merit Reporter; National Registered Diplomate Reporter; Notary Public.

Transcript of A. Christine Davis
Conducted on July 10, 2025                    3

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS (VIA ZOOM):

    AARON P. ARNZEN, ESQUIRE

    BOTTINI & BOTTINI, INC.

    7818 INVANHOE AVENUE, SUITE 102

    LA JOLLA, CALIFORNIA 92037

    858-914-2001

    -AND-

    CAROLINE YUEN, ESQUIRE

    COTCHETT, PITRE & McCARTHY, LLP

    840 MALCOLM ROAD, SUITE 200

    BURLINGAME, CALIFORNIA 94010

    650-697-6000

ON BEHALF OF THE DEFENDANT (VIA ZOOM):

    MICHAEL T. LIFRAK, ESQUIRE

    JON COLLIER, ESQUIRE

    JONATHAN FEDER, ESQUIRE

    QUINN EMANUEL URQUHART & SULLIVAN, LLP

    865 S. FIGUEROA STREET, 10TH FLOOR

    LOS ANGELES, CALIFORNIA 90017

    213-443-3000

ALSO PRESENT:

    CHARLOTTE LE BARRON, QUINN EMANUEL

    KELLI WELCH, VIDEOGRAPHER

Transcript of A. Christine Davis
Conducted on July 10, 2025                    4

T A B L E   O F   C O N T E N T S

                                              PAGE

STYLE AND NUMBER......................   1

APPEARANCES...........................   3


WITNESS:   A. CHRISTINE DAVIS

EXAMINATION BY MR. LIFRAK...........  7

EXAMINATION BY MR. ARNZEN..........  107


CERTIFICATE OF REPORTER............  114


                    EXHIBITS

              (ATTACHED TO TRANSCRIPT)

NUMBER          DESCRIPTION                PAGE

EXHIBIT 196   EXPERT REPORT OF A.

              CHRISTINE DAVIS, CPA, CFF,

              CGMA, CVA DATED MAY 28,

              2025, CONFIDENTIAL............14

EXHIBIT 197   MORGAN STANLEY ILLUSTRATIVE

              SOURCES & USES AND PF

              CAPITAL STRUCTURE, PROJECT

              X, APRIL 2022,

              MUSK-PAMPENA-0758662

              THROUGH 758667,

              CONFIDENTIAL..................72

Transcript of A. Christine Davis
Conducted on July 10, 2025                    5

EXHIBITS

(ATTACHED TO TRANSCRIPT)

 NUMBER          DESCRIPTION                    PAGE

EXHIBIT 198   UNITED STATES SECURITIES

              AND EXCHANGE COMMISSION

              AMENDMENT NO. 3 TO SCHEDULE

              13D.........................80

EXHIBIT 199   UNITED STATES SECURITIES

              AND EXCHANGE COMMISSION

              AMENDMENT NO. 6 TO SCHEDULE

              13 DATED MAY 4, 2022..........86

P R O C E E D I N G S    09:58:10

THE VIDEOGRAPHER:  Here begins Media Number 1 in the videotaped deposition of A. Christine Davis in the matter of Pampena v. Musk in the United States District Court, Northern District of California, Case Number 3:22-CV-05937.    09:58:10 09:58:14 09:58:18 09:58:20 09:58:21

Today's date is July 10, 2025.  The time on the video monitor is 9:58 a.m. Pacific Time.  The remote videographer today is Kelli Welch, representing Planet Depos.  All parties of this video deposition are attending remotely.    09:58:26 09:58:29 09:58:34 09:58:36 09:58:38

Would counsel please voice-identify themselves and state whom they represent.    09:58:41 09:58:43

MR. LIFRAK:  Go ahead.    09:58:46

MR. ARNZEN:  Hi, there.  Aaron Arnzen for lead plaintiffs, defending the deposition of Christine Davis.  Also with me with a nonspeaking role is Caroline Yuen, Y-U-E-N, with Cotchett Pitre & McCarthy, also representing lead plaintiffs.    09:58:46 09:58:49 09:58:53 09:58:57 09:59:04

MR. LIFRAK:  Good morning.  It's Michael Lifrak from Quinn Emanuel, representing the defendant.  I'm joined by my colleagues, Jon Collier and Jonathan Feder, as well as Charlotte LeBarron.    09:59:06 09:59:08 09:59:10 09:59:14

THE VIDEOGRAPHER:  The court reporter today is Karisa Ekenseair, representing Planet Depos.    09:59:19 09:59:20

Transcript of A. Christine Davis
Conducted on July 10, 2025                7

The witness will now be sworn.                    09:59:22

THE REPORTER:  Good morning.  My name is          09:59:25
Karisa Ekenseair.  I am a California Certified Court
-- Shorthand Court Reporter, License Number 14546.

Will the witness please raise their right
hand and be sworn.

A. CHRISTINE DAVIS
of lawful age, being first duly sworn, deposes and
says in reply to the questions propounded as
follows:

EXAMINATION                                       09:59:48

BY MR. LIFRAK:                                    09:59:48

Q  All right.  Good morning, Ms. Davis.          09:59:50

A  Good morning, Mr. Lifrak.                      09:59:51

Q  Sorry about that delay.  I promise I'll be    09:59:53
efficient with your time and my questions this      09:59:57
morning.                                            09:59:58

A  No worries.  Thank you so much.               09:59:59

Q  Where are you located for this deposition?    10:00:02

A  I am in Paso Robles, California.              10:00:05

Q  And I assume you're in a room by yourself.   10:00:08

A  Yes.  I am in a closed-off room in private.  10:00:11

Q  Do you have any documents with you today in  10:00:17
the room?                                           10:00:20

A  Yes.                                          10:00:20

Transcript of A. Christine Davis
Conducted on July 10, 2025                    8

Q    What documents do you have?    10:00:20

A    I have my expert report and some supporting    10:00:23
documents that are referenced in my expert report.    10:00:28

Q    Specifically, what supporting documents do    10:00:32
you have with you, just so I know what you -- what    10:00:35
you have with you there?    10:00:38

A    Yeah.  So it's mostly what's referenced in    10:00:39
my footnotes, comprised of the Forms 4 that show    10:00:41
Mr. Musk's sale of Tesla stock.    10:00:51

I have several Twitter SEC filings that I    10:00:55
used to support my conclusions.  I believe they are    10:01:00
amendments -- original through Amendment 6 is what I    10:01:06
referenced in my expert report.    10:01:11

I have -- I believe I have my engagement    10:01:13
letter.    10:01:18

Just looking through my desk here.    10:01:20

Q    Sure, please.    10:01:22

A    I have a couple of the J.P. Morgan documents    10:01:24
that I referenced in my report, and some excerpts of    10:01:27
the exhibits to those Twitter filings as well.    10:01:35

Q    Is there anything that you have with you    10:01:39
that isn't referenced somewhere in your report?    10:01:42

A    I don't believe so.    10:01:45

Q    Okay.  Do you have any notes with you?    10:01:47

A    No notes, just cross-referencing on my    10:01:49

Transcript of A. Christine Davis
Conducted on July 10, 2025                                    9

schedules.

Q    What do you mean by that?

A    As I reviewed my report to prepare for deposition, I essentially just wrote page numbers on my schedules to reference where the discussion is in my report, things like that.

Q    Okay.  Anything more substantive than that?

A    No.

Q    I know you've done this before, in terms of taking your deposition.

But is there anything or any reason that you can't give your best testimony here today?

A    No reason.

Q    Like I said, you've done this before.  You know all the ground rules for a deposition.

I'll -- I'll do my best to make sure I don't talk over you, and I assume you'll do the same. Wait until I'm done with the question, give a chance for an objection, and then -- and then answer the question.  Is that okay?

A    That's perfectly okay.  Thank you.

Q    Great.  Your report in this case was issued in May of 2025; is that right?

A    That's right.

Q    And after that point, did you discuss your

| | 10:01:56 |
| | 10:01:57 |
| | 10:01:58 |
| | 10:02:03 |
| | 10:02:08 |
| | 10:02:11 |
| | 10:02:13 |
| | 10:02:16 |
| | 10:02:17 |
| | 10:02:21 |
| | 10:02:22 |
| | 10:02:26 |
| | 10:02:28 |
| | 10:02:31 |
| | 10:02:35 |
| | 10:02:37 |
| | 10:02:40 |
| | 10:02:43 |
| | 10:02:46 |
| | 10:02:49 |
| | 10:02:50 |
| | 10:02:52 |
| | 10:02:56 |
| | 10:02:59 |
| | 10:03:00 |

deposition -- putting aside the report, which was    10:03:04

done in May, after that, did you discuss your    10:03:07

deposition with anyone other than counsel for the    10:03:12

plaintiff?    10:03:15

    A    No, I did not.    10:03:15

    Q    Since your report was issued in May, could    10:03:16

you describe how you prepared for today, how you    10:03:19

prepared for your deposition?    10:03:22

    A    Yes.  So, essentially, I revisited my file.    10:03:23

I reviewed my report.  I reviewed the supporting    10:03:28

documents that are referenced in my report.  And    10:03:33

then I -- I did have a call with counsel to -- the    10:03:37

usual depo prep before a deposition as well.    10:03:42

    Q    And when did that call take place?    10:03:46

    A    That took place on Monday, and then we had    10:03:49

another call yesterday.    10:03:53

    Q    How long was the call on Monday?  Do you    10:03:55

recall?    10:03:58

    A    I'm thinking.  I believe it was likely an    10:03:58

hour, approximately.    10:04:04

    Q    What -- what about the subsequent --    10:04:07

subsequent call?    10:04:09

    A    That was much more brief, probably a few    10:04:10

minutes, 15 minutes.    10:04:14

    Q    And could you tell us who was on that call    10:04:17

besides yourself -- or both of those calls?

A    For the first call, Mr. Arnzen and Ms. Jung were on the call.  And yesterday's call was not -- I did not -- I don't know who else was with Mr. Arnzen, but I spoke with him only.

Q    In preparing for your deposition, did you review any deposition transcripts or testimony from any witness in the case?

A    No.

Q    By the way, have -- have you worked with any of the lawyers that represent the -- the plaintiffs in this case, before this case?

A    Yes.

Q    On how many occasions?

A    One -- one time.

Q    And what case was that?

A    This was -- I will try to recollect.  It was a long time ago.  I did not give my deposition.  It settled before I -- after I did some analysis.  And it was a case that involved an agricultural-based entity.  It was years ago.  I don't have a full recollection of the facts.

Q    What was the -- the subject matter of your potential expert testimony in that case?

A    It had to do with whether the independent

Transcript of A. Christine Davis
Conducted on July 10, 2025                    12

auditors complied with generally accepted auditing                 10:05:50

standards when they audited the subject entity.                    10:05:58

Q   Where was that case pending, if you recall?                 10:06:02

A   I do not.  I know it's -- it was in the                     10:06:05

state of California.  That's all I recall.                         10:06:08

Q   Do you remember any of the names of the                     10:06:10

parties in that case?                                              10:06:13

A   I do not.  I apologize, I don't remember.                   10:06:14

Q   I don't remember my cases after I'm done                    10:06:22

with them either.                                                  10:06:25

Did you issue a report in that case?  I know                   10:06:25

you said you weren't deposed, but did you issue a                  10:06:30

report?                                                            10:06:34

A   I know that I had -- I must have prepared                   10:06:34

some analyses.  I don't recall issuing a formal                    10:06:38

expert report in the sense that, you know, we have                 10:06:45

seen the submission.  But there was analysis to help               10:06:47

counsel.                                                           10:06:51

Q   In preparing for your deposition today, did                 10:06:54

you consider any documents or information that is                  10:06:58

not listed in Exhibit B to your report, which are                  10:07:01

the -- the -- you know, the materials that you                     10:07:06

considered in forming your opinions?                               10:07:07

A   I don't think so.  Everything I listed in                   10:07:11

Exhibit B, I -- is the extent of what I considered.                10:07:15

Transcript of A. Christine Davis
Conducted on July 10, 2025                                    13

If I think of anything else, I'll let you know, but I believe that was the extent of what I considered.

Q   At any point, even before you issued your expert report, did you consult with any other experts during the preparation of either the report or preparation for your testimony?

A   I did not.

Q   Have you read any of the other expert reports that have been issued in this case on either side?

A   No.

Q   Did you discuss your testimony with anyone internally from Financial Evidence Group?

A   I did -- I did not discuss my testimony.  I do want to say a consultant helped me with preparing the graphs, and that was the extent of her role.

Q   And that was in connection with your report, I assume?

A   Correct.

Q   And did you prepare any new materials since the report, in terms of any graphs, charts, anything like that?

A   No, I did not.

Q   So let's mark your report, which is the expert report of A. Christine Davis dated May 28th,

2025.  And we can mark that as Exhibit 1 to the          10:08:41

deposition.          10:08:43

    Q    And you have a copy of that in front of you?          10:08:45

    A    I do, Counsel.  Thank you.          10:08:49

    Q    So you can refer to that or we can display          10:08:49

-- display it on the screen, whatever is easier.          10:08:53

    A    I can look at my hard copy.          10:08:55

    Q    Okay.          10:08:57

    A    It's fine.  Unless it's helpful to the          10:08:58

others to have it on the screen.          10:08:59

    Q    I think we all have a copy printed out.          10:09:01

    A    Okay.          10:09:03

        MR. ARNZEN:  Mr. Lifrak, I hate to          10:09:04

interrupt.          10:09:08

        MR. LIFRAK:  Sure.  Of course.          10:09:08

        MR. ARNZEN:  We've kind of marked them          10:09:08

consecutively.  I believe the last marked exhibit          10:09:10

was 195.          10:09:13

        MR. LIFRAK:  Okay.  Let's do that.          10:09:14

        MR. ARNZEN:  I don't suppose you're willing          10:09:16

to mark this as 196?          10:09:17

        MR. LIFRAK:  Of course.  Yeah.  So let's          10:09:19

mark your expert report as Exhibit 196.  I don't          10:09:20

want to mess up the numbering.          10:09:23

        (Exhibit 196 marked for identification.)          10:09:26

Transcript of A. Christine Davis
Conducted on July 10, 2025                                    15

MR. LIFRAK:  I come in for the first time and mess everybody's numbering up.  I don't want to do that.

Q    Okay.  So Exhibit 196, your expert report. Let's turn to Exhibit A of your expert report, which is your CV.

A    Yes.  That is separate from my stapled main section.  Let me --

Q    Okay.

A    I should know the contents of my CV, so I don't want to hold you up.

Q    Well, you list your professional credentials.  Is that a complete description of your professional credentials that's Exhibit A to your report?

A    It's complete, yes.

Q    And it says you got your CPA license in California in 1995; is that right?

A    Correct.

Q    And what -- what are the continuing education requirements, if any, to keep up that license?

A    Yes.  So, essentially, it's 80 hours every two years in California, including some ethics-related hours and some -- I -- yeah, it's

Transcript of A. Christine Davis
Conducted on July 10, 2025                    16

ethics hours, I believe, every six years is

required.  But essentially 80 hours for California.

And then New York and the District of

Columbia have slightly different time frames, but

all of them are applicable to the license, meaning

all of the courses I take are counted towards the

three licenses.

Q    You mentioned New York and DC.  You're

licensed also in those states?

A    Yes.

Q    And how did that happen?  Is that something

that you had to take a separate test for, or how

does that work?

A    I believe -- I did not have to take a

separate test, thank -- thankfully.  It was I

received credits for the experience in California,

and I applied for the licenses in those states and

was approved.

Q    You graduated from Golden Gate University in

-- in 1993; is that correct?

A    Correct.

Q    And you have a B -- a BA in accounting?

A    Yes.

Q    And it looks like there are no degrees

beyond that.  Have you -- have you taken any other

coursework with the intent of obtaining a different degree or -- or not?

A   No.  I always felt the certified public accountant license was sufficient for the level of education and expertise I wanted to develop.

And then after that, I also became a certified valuation analyst, so it's -- I have the training and experience valuing businesses, along with the credential called Certified in Financial Forensics, which is issued by the American Institute of Certified Public Accountants.  And then I also have a -- a designation called Chartered Global Management Accountant, also issued by the AICPA.  So that would be the equivalent of post-bachelor's education, if you will.

Q   Okay.  What -- what were the requirements -- specifically, I'm interested in the financial forensics credential.  Could you describe what was -- what was required for that?

A   Yes.  So I -- just to give you some background, I received this in 2008, and I was one of the very first recipients.  I think I'm Number 257 in the whole country.

At the time, the AICPA granted certain people with substantial experience the credential.

Transcript of A. Christine Davis
Conducted on July 10, 2025                    18

And at the time, I already had probably ten years' worth of litigation support and forensic accounting experience.  Today, younger people have to take an exam, but that's -- the extent is they measured and reviewed my experience at the time I applied.

Q   Were there any additional education requirements to get that designation, or was -- it was essentially your experience?

A   You have to be a CPA.  That is the number one rule or requirement, and then followed by applicable forensic accounting experience, number of hours worked.  And so come -- those two combined helped me qualify for the CFF credential, or Certified in Financial Forensics credential.

Q   The next part of your CV, Professional Positions -- you currently work at Financial Evidence Group; is that right?

A   That's correct.

Q   And what is that?

A   Yes.  So it is a CPA firm licensed in California.  I am the founder of the firm.  And the firm specializes in forensic accounting and litigation support services.

Q   And how many employees, approximately, does it have?

A   I don't have any employees.  I am the -- the sole owner, and I do have consultants who are independent contractors.  So I --

Q   You --

A   -- in essence, I -- I'm the only employee, if you will.

Q   You mentioned a consultant that worked with you on some aspects of the report.

So that person was an independent contractor that you had help you?

A   Yes.

Q   What was that person's name?

A   Her name is Sara Nanchanatt.

Q   Right.  Could you spell that, just for the report?

A   Yes.  N-A-N-C-H-A-N-A-T-T.

Q   You mentioned that the -- the company specializes in forensic accounting and litigation support services.

What kind of litigation support services does the company provide?

A   Yes.  So I want to describe it in a way that -- in essence, different kinds of case types.  So mostly I work on economic damages-related cases.  So I would be retained as the expert to estimate or

quantify economic damages arising from, you know, business disputes, partnership disputes, lost profits or personal individual-related economic damages.

I'm also experienced and I have worked on cases that involve accounting issues, whether it be an allegation of accountant law practice or whether there's a question of whether a set of financial statements were prepared in accordance with the prevailing accounting standards. So that would be on the accounting issues type of case.

For litigation support, I have also worked on cases that involve wage and hour disputes. In California, it is a -- it is a prevalent type of claim, and I also have those kinds of cases. I have also testified in punitive damages cases of -- of trial. So, in other words, I want to say, in using my accounting expertise, I have been able to assist in various types of cases.

Q In addition to that litigation support work, do you do work that isn't tied to litigation or a dispute of some kind?

A Yes. Occasionally, there are cases or projects that don't involve litigation.

Q Is that -- is that a small percentage of

10:15:49
10:15:55
10:15:57
10:16:03
10:16:04
10:16:06
10:16:15
10:16:18
10:16:22
10:16:25
10:16:29
10:16:35
10:16:37
10:16:43
10:16:49
10:16:55
10:17:02
10:17:07
10:17:10
10:17:11
10:17:16
10:17:21
10:17:25
10:17:28
10:17:31

your practice, would you say?

A    It's usually -- it's not often, but it's -- it's part of the expectation of a forensic accountant to assist in those kinds of cases, as well, or projects.

Q    And out of the types of cases that -- that you mentioned -- damages, evaluating accounting -- accountants, and wage and hour cases -- would you say that the damages kind of case is the most prevalent in terms of what you testify or get retained in?

A    I want to say, yes, they are more often or more frequently coming through than the other types of cases.  So, yes, I would say damages is a prevalent area in my work.

Q    And in that area, the damages area, can you estimate what percentage of that work you do for plaintiffs versus defendants?

A    Yes.  Let me think.  Last time I checked, I want to say it's about 60 percent plaintiffs, 40 percent defendants or defendant.  That -- that would be my best estimate presently.

Q    You mentioned previously business valuation work in terms of valuing business.  And is that -- is that kind of subsumed within the damages

expertise that -- that you talk about?

A   Yes.  It becomes relevant.

Q   And the 60/40 split that you mentioned, does that carry over kind of to all the types of cases you do?  So we're talking about accounting, accountant malpractice or wage and hour.  Is it relatively consistent among those as well?

A   Probably not.  I want to say -- and I haven't done, you know, a deep dive into the details.  The 60/40 was more like the overall testimony experience.  So if you look in my CV and you counted the underlined parties, I think you'll see a 60/40 split.

In the wage and hour arena, it's mostly defense.  In accountant law practice, it's been defense.  I assist many public agencies in California.  For damages, it's been -- lately, it's more on the plaintiff side.

Q   If we look through, there's a section on your CV entitled "Speeches and Programs," and then -- then there's a section called "Publications."

Do you see those?

A   I don't have my CV in front of me, but I am familiar with --

Q    Okay.

A    -- what you're saying --

Q    And --

A    -- and describing.

Q    -- as far as you know, the CV that was provided for us, those speeches and programs and then -- and the publications, those are accurate and up to date?

A    Yes, they are.

Q    Neither of those sections, from what I can tell, show that you've written or spoken on the topic specifically of securities fraud; is that right?

A    Let's see.  That sounds right.  Yes.

Q    And as far as I can tell, is it correct that there's nothing on your CV in terms of speeches and programs or publications that are specifically about 10b-5 or 10b cases specifically?

A    Yeah, not in the speeches and articles, but I have significant experience in securities litigation matters, as not the testifying expert, but the consultant on the case.

Q    Can you tell us a little bit about that experience that you're referring to?

A    Yes.  So before -- at one point I was at a

firm and there was a senior partner who worked on some relatively large cases, for example, the Sunbeam case versus Arthur Andersen -- or the class case against Arthur Andersen involving Sunbeam.  I worked on a significant portion of that case.

I also assisted significantly in a 10b case involving Countrywide Financial Corp. and a number of other ones, I want to say Adelphia and a number of them.

So to the extent 10b -- when you mentioned it, it came to mind that I -- not that we -- I -- we didn't necessarily focus on the claims, but it had to do with explaining the accounting misstatements in the financial statements.  So it relates to claims involving securities fraud -- or alleged securities fraud.

Q   Right.  So -- so in those cases, were you just consulting for an attorney or were you consulting for kind of the testifying expert?

A   The latter.  I was an employee at the firm and I was one of the primary managers or, at the time, directors assisting the testifying expert on these matters.  So I had the opportunity to work with counsel directly, write significant portions of the expert report, and -- and help -- help the

expert prepare for testimony.

Q    And who do you recall was the testifying expert that you were working with?

A    Yes.  I would say Paul Regan is the primary expert I worked with significantly.  And another partner named Stuart Harden from the same firm was someone I also assisted in a significant way.

Q    And what firm was that?

A    It's called -- a firm called Hemming Morse.

Q    Okay.  And that -- you were there from, looks like, 1997 to 2011?

A    Correct.

Q    And -- and approximately when in that time frame did the experience that you talked about, those several cases, take place, to the best that you can recall?

A    It was throughout that period, was -- it was the majority of my work, which explains why I didn't have an opportunity to testify a lot that -- during that time frame.  I did start testifying on smaller cases, if you will, that I -- to get started, but the majority of the time at Hemming involved securities litigation matters.

Q    Now, Exhibit A to your report, it also lists the cases where you've been an expert witness before

and have either been deposed or -- or testified at    10:24:58

trial, right?    10:25:02

    A    Correct.    10:25:03

    Q    And have any of those where you've actually    10:25:04

testified in deposition or trial been securities    10:25:09

fraud cases, to your recollection?    10:25:12

    A    No, I don't believe so.    10:25:15

    Q    What about cases, you know, where you've    10:25:18

been at Financial Evidence Group but haven't    10:25:23

actually gotten to the point of deposition or trial,    10:25:27

have you been retained as an expert in any    10:25:30

securities fraud case?    10:25:33

    A    I don't recall a case that fits that    10:25:37

description.    10:25:41

    Q    In any of the cases where you've been    10:25:47

retained as an expert witness, have you been asked    10:25:50

to analyze margin loan financing in a corporate    10:25:54

acquisition?    10:25:59

    A    No.    10:26:01

    Q    Do you have any experience, other -- you    10:26:01

know, apart from expert experience on that topic of    10:26:07

analyzing margin loan financing?    10:26:12

    A    I would say, in the course of    10:26:19

understanding --    10:26:21

    Q    Say that again -- I'm sorry.  Go ahead.    10:26:21

Transcript of A. Christine Davis
Conducted on July 10, 2025                                    27

A    To answer your question, Counsel, I -- on margin loan financing, I don't recall a specific case presently where that was the focus of the project.

Q    In any of the cases where you've testified, have you testified about the impact of stock sales on market price?

A    It seems like something that I have done before, but I cannot recall a -- in the context of your question, a specific case that involves that direct question you have.

Q    In any of the cases that -- that are listed where you've testified, have you ever analyzed the financial impact of a public statement on a stock price?

A    I don't think so.

Q    Most of your experience, based on the list, looks like it is primarily, at least numbers-wise, California courts?

A    Mostly California courts.  There are a number of federal cases, as well, venued in California, however, and maybe one or two cases -- I think one might have been an arbitration in Philadelphia; but you're -- you're right, mostly in California.

Transcript of A. Christine Davis
Conducted on July 10, 2025                                  28

Q    And it looks like about half of them get to
a point where you testified at trial or arbitration
hearing?

A    Yes.

Q    And I assume there are also some cases where
you didn't even get -- you may have issued a report
but didn't get to even a deposition.

A    Yes.  Many of that kind, and cases, as well,
where analysis -- I performed analysis and the case
settled before I had a chance to give my deposition.

Q    Do you -- do you have a list of any -- of
that anywhere or --

A    I do not.  Yeah, I -- I wish that I did -- I
kept track, because there's so many.  I mean, I
have -- I started this forensic accounting career in
1997, so I have -- I worked on many, many kinds of
cases.  And, unfortunately, I don't have a list, but
if I had to think about them, I'll probably -- I'll
remember, you know, ones that are memorable, of
course.

Q    Okay.  And obviously you plan to testify at
trial in this matter?

A    Yes.

Q    Has your expert opinion ever been excluded
in a case, to your knowledge?

10:28:06
10:28:08
10:28:11
10:28:12
10:28:14
10:28:18
10:28:21
10:28:23
10:28:26
10:28:30
10:28:35
10:28:36
10:28:38
10:28:41
10:28:45
10:28:50
10:28:56
10:28:59
10:29:03
10:29:07
10:29:07
10:29:10
10:29:12
10:29:14
10:29:20

A   No.

Q   It -- if you look at -- well, I can ask specifically about a case called Steven Rempell and Marcia Rempell v. Robert Theodore Hofmann, O.C. Jones and Sons, Inc.?

A   Yes.

Q   Do you have any recollection of that matter?

A   I do.

Q   And do you know whether there was a motion to exclude your testimony in that case?

A   That one, I clarified that with the attorney, and as a consequence of, I believe, a key witness reversing their testimony, it became necessary to disregard part of my opinions.  But I -- it had nothing to do with, I want to say, a flaw in my work.  It had to do with, because Witness A reversed his testimony, whatever analysis I did here became, essentially, not useful.

Q   And stepping away from that, just generally, have you ever conducted an event study to assess the impact of public statement on -- on stock price?

A   No, I have not.

Q   Do you have any experience on doing an event study, or have you assisted in one in the past?

A   No, I have not assisted in -- in that

aspect.                                                      10:30:56

Q   What expertise, if any, do you believe you            10:30:58
have in federal securities, putting aside the work         10:31:03
that -- that you did at Hemming Morse previously?          10:31:08

A   Yes.  I think my ability to interpret               10:31:13
financial information, that is really -- it's a           10:31:20
significant portion of public filings and where           10:31:26
investors and -- and the public rely on information.      10:31:31
I have the expertise to gather the relevant data          10:31:35
that is useful, as -- like I did here in my               10:31:40
assignment, which is to make a determination of           10:31:44
certain, you know, information and data out there.        10:31:49

The 10b is -- it's a legal -- you know, it's              10:31:51
a legal aspect of things.  As an accountant, I stick      10:31:56
with the accounting rules and how accounting impacts      10:31:59
what investors are reading, what's filed in the SEC       10:32:05
statements.  So to the extent I am using my               10:32:09
accounting expertise, which I have a significant          10:32:12
amount of, I find that my work becomes useful, given      10:32:16
it -- a relevant assignment.                              10:32:23

Q   Do you have any experience in assessing             10:32:26
investor reliance on public statements?                   10:32:31

A   So that's not really accounting related.  So       10:32:40
on its face, I would say no, and I -- I -- I would        10:32:43
say no, but -- it's really not something typically        10:32:48

done by a CPA or an accounting expert.   10:32:52

Q   What about any expertise in determining the   10:32:56
materiality of a -- of a public statement?   10:32:59

A   Yes.  So materiality is a significant factor   10:33:03
in many ways.  It is a term that is defined in audit   10:33:10
and accounting literature, and it's certainly an   10:33:16
important factor in the context that you described.   10:33:21

So I do have significant experience in   10:33:26
evaluating and using the concept of materiality   10:33:34
in -- in discharging my assignment; or when   10:33:40
I -- when I'm assigned to do something and -- and   10:33:43
the question is -- is something material, there are   10:33:46
certain factors that are specifically defined by, as   10:33:53
you know, the SEC.  But also, in accounting   10:33:57
literature, materiality is an issue in auditing -- a   10:33:59
good issue, I should -- I should say, in general.   10:34:04

So I feel comfortable with saying that I   10:34:07
have the experience to assess materiality in -- in   10:34:14
an accounting context.   10:34:18

Q   Have you assessed materiality in any way in   10:34:20
this case, in your view?   10:34:26

A   No.   10:34:28

Q   Have you -- do you have any expertise in   10:34:30
determining the materiality of public statements in   10:34:33
a securities fraud case?   10:34:35

A    I want -- that's an interesting question.  I    10:34:42
don't want to say no, because the way materiality is    10:34:46
defined in accounting literature, it's also kind of    10:34:52
nuanced, and it says to the extent someone would    10:34:54
change their mind because of that element we're    10:34:57
looking at, it could be a material item.    10:35:00

      So I don't want to say no, but I guess I    10:35:03
want to answer it in the right context.  So if you    10:35:06
had an example, I can probably answer more    10:35:09
appropriately or more -- more sufficiently.    10:35:11

Q    Have you ever determined whether or not a    10:35:14
public statement is material in a security fraud    10:35:17
case?    10:35:19

A    A public statement?    10:35:21

Q    Yes.    10:35:23

A    No, in the sense that a public statement is    10:35:24
not numbers.  If it's qualitative, then it's sort of    10:35:27
outside the bounds of accounting.  If a statement    10:35:31
includes numbers, right, I would be comfortable if    10:35:35
I'm asked.  But I -- I just want to make sure that    10:35:44
I'm using the term "materiality" in the right    10:35:46
context.    10:35:49

Q    Right.  And my question isn't whether you'd    10:35:49
be capable of doing that if you're asked.  My    10:35:52
question is whether you have actually done that,    10:35:55

whether you've determined materiality in -- of a

public statement in a securities fraud case.

A    When you say "public statement," you're not

talking about a financial statement?  Are you

talking about, like, a sentence that someone

expresses?

Q    Well, anything.  I'd like to know what

experience you have in a securities fraud case

determining the materiality of any public statement.

A    Right.  So if a public -- so I'll just give

you an example.

In my work at Hemming, the question is

whether financial statements, which were audited by

a Big Four audit firm, let's say, that became part

of a public filing included material misstatements.

So using accounting expertise, I assisted in

quantifying the accounting error.  And then using

the audit work papers, I would compare what the

auditors deemed to be material to the error that we

calculated to be the misstatement.

So in the context of when you say "public

statement," that may include financial statements

and financial information.  So I kind of want to say

yes, but, again, I just want to be cautious that I'm

answering the question correctly.

Q    You are, and I understand the context of it, so thank you.

A    Thank you.

Q    You do -- you have your report in front of you, right?

A    I do.

Q    If you could turn to page 4 of your report, which is Exhibit 196.  It lists the -- the -- your description of what your assignment was in this case; is that right?

A    Yes.  That's correct.

Q    And is this a fair and accurate description of what you were asked to do in this case?

A    It is.

Q    And at any point during your retention, were you asked to do anything else that's not listed here?

A    No.

Q    And at a very high level, your assignment relates to Mr. Musk's financing for the Twitter acquisition; is that -- is that right?

A    That sounds right.  And within the time frame that I set forth here, which is April 21st through May 17th, inclusive.

Q    Right.

And those dates that you mentioned, April 21st to May 17th, were those given to you as -- as part of -- of your assignment or did -- did you come up with that time frame?

A   They were given to me by Plaintiffs' counsel in terms of what time frame I should focus on as I gathered the data or compiled the information to complete my assignment.

Q   Did you have an understanding or do you have an understanding as to why those dates, that time frame, is -- is relevant here?

A   I do.

Q   And what is your understanding?

A   Yes.  So counsel for Plaintiffs asked me to focus on Mr. Musk's financial and funding situation around this time with respect to the agreement to purchase Twitter.  And so, given that understanding, this time frame was the part that I focused on.

Q   And -- and taking a step back, your -- your assignment and the conclusions that you've made, do you have an understanding as to how that is relevant to the issues that are to be decided by a jury in this case?

A   I have some understanding.  It wasn't part of my assignment to -- to answer how my work would

be used, but I -- I understand that Plaintiffs may

argue and use my work in their claims.

    Q    And the understanding that you do have, what
is that understanding as to how your assignment
is -- is relevant to the claims in the case?

    A    Yes.  So, generally speaking, I understand
that Plaintiffs may claim -- may have a -- may claim
there's a motive for the tweets, and I have a
general understanding that my work will be -- is
relevant to that particular aspect of the case.

    Q    Do you have an understanding as to what the
motive that you mention that Plaintiffs claim --
what that is?

    A    Nothing beyond what the complaint states
pretty clearly, nothing really that I analyzed
separate from just looking at the numbers.

    Q    Well, what's your understanding of -- of the
motive that you mention?  What motive are you
referring to?

    A    Yes.  So I -- and, again, in reading the
complaint, I understand that the plaintiffs may
argue that at the time Mr. Musk made his tweets, his
financial condition or situation for funding was
getting to be expensive.  And so, you know, that's
really -- I -- I didn't really do anything more than

just read it. And then I -- in performing my analysis, this is the result of that analysis.

Q And, again, I just wanted your understanding.

And you say that it -- it was getting to be expensive. And so he had a motive, to your understanding, to do what?

A Based on the complaint, my understanding is he would prefer to lower the purchase -- the sale price to him. That's -- that's what I read in the complaint, so that's really all I can share on that aspect.

Q Do you have an opinion one way or another whether the work that you've done in this case supports Plaintiffs' allegation about Mr. Musk's role?

A No, I don't have an opinion. My assignment is to quantify and determine certain amounts set forth in my -- my list of assignments. I don't have an opinion in terms of how you -- you know, the context of what you're describing. It's -- it's not part of my assignment to issue an opinion in that regard.

Q So it's not part of your assignment, and you -- you don't intend to testify at trial that,

you know, I've done this work, and it shows or helps     10:43:13
to prove that Mr. Musk had a motive to try to back       10:43:16
out of the deal or anything like that?                   10:43:19

A    No.  My assignment is exactly what is set           10:43:21
forth here, which is to analyze, calculate,              10:43:25
determine -- I was asked to quantify, and -- and         10:43:29
that's precisely what I did.                             10:43:33

Q    And you weren't asked, for example, to             10:43:35
determine whether his public statements were             10:43:38
truthful or not?                                         10:43:40

A    No.                                                 10:43:41

Q    You weren't asked to analyze whether               10:43:43
Mr. Musk acted with scienter in his statements?          10:43:46

A    Oh, no, no.  This is -- it's exactly what's         10:43:53
listed on page 4.                                        10:43:55

MR. ARNZEN:  Sorry.  I was on mute.  I                   10:43:59
object to that question so far -- calls for legal        10:44:02
conclusion.                                              10:44:05

Q    Right.  And, again, I'm just asking just to        10:44:05
make sure that I understand what you were asked to       10:44:07
do and not asked to do.                                  10:44:10

You weren't asked to assess whether any                  10:44:11
investor relied on Mr. Musk's tweets?                     10:44:14

A    No, I was not asked to -- that's not part of        10:44:19
my assignment.                                           10:44:21

Q   It's not -- not part of your assignment to determine whether Mr. Musk's statements caused any economic harm?

A   That's correct.

Q   You weren't asked to quantify, you know, potential shareholder losses in your report; is that correct?

A   Correct.

Q   And you won't be offering an opinion on -- on any of these issues that are not set forth in -- in the assignment that's in your report; is that fair?

A   That is correct.

Q   You state on page 8 of your report that one of the things that you relied on -- well, you applied your professional judgment.

And my only question on that is, what part of your work required, you know, a judgment call that you can point to that -- that was part of your analysis?

A   Let's see.  I -- I used professional judgment.  I use this phrase as part of this paragraph in general.  But in this particular assignment, everything was supported by documents. In other words, I did not have a gray area, so to

| | 10:44:22 |
| | 10:44:24 |
| | 10:44:27 |
| | 10:44:28 |
| | 10:44:29 |
| | 10:44:32 |
| | 10:44:36 |
| | 10:44:36 |
| | 10:44:37 |
| | 10:44:41 |
| | 10:44:44 |
| | 10:44:48 |
| | 10:44:48 |
| | 10:44:49 |
| | 10:44:56 |
| | 10:44:59 |
| | 10:45:02 |
| | 10:45:06 |
| | 10:45:10 |
| | 10:45:14 |
| | 10:45:15 |
| | 10:45:19 |
| | 10:45:23 |
| | 10:45:27 |
| | 10:45:31 |

speak.  Professional judgment, as you might know,  10:45:35
just really comes in when it's, you know -- I --  10:45:39
I -- based on what I'm seeing, I've seen this happen  10:45:41
before, this is what it is.  10:45:45

Here, in all fairness, you're right, good  10:45:48
question.  I -- the professional judgment I  10:45:52
exercised is determining whether I'm looking at the  10:45:58
right documents, in other words.  But other than  10:46:00
that, I was comfortable with using what I was using,  10:46:02
relying -- I performed all the calculations myself.  10:46:05
And there's nothing that would -- I think in the  10:46:08
context of what you're asking, I don't --  10:46:14
there's -- it doesn't apply in this particular  10:46:17
project.  10:46:20

Q   I was just making sure.  10:46:21

A   Yes.  Thank you.  I -- yes.  I understand.  10:46:22

Q   So, again, Mr. Musk's -- whatever his  10:46:26
motivations may have been, that is beyond the scope  10:46:30
of what you will testify about to the jury?  10:46:33

A   Correct.  10:46:37

Q   Did you primarily draft your own report?  10:46:41

A   I'm sorry.  What is the question, Counsel?  10:46:46

Q   You -- did you write your report?  10:46:48

A   I wrote every word of it, yes.  10:46:49

Q   And you mentioned having a consultant who  10:46:52

did some of the charts.                                    10:46:56

Did -- did you have anyone else help, other     10:46:57
than that limited part of it?                              10:47:01

A    No one helped.                                  10:47:03

Q    Did you discuss your report's conclusion --   10:47:05
the -- the conclusions of your report with anyone          10:47:10
outside of -- of Plaintiffs' counsel?                      10:47:14

A    No.                                             10:47:16

Q    Did you rely on any specific AICPA            10:47:20
guidelines for forensic accounting in preparing your       10:47:25
report?                                                    10:47:29

A    I want to say I always do in any project.     10:47:30
There is only one standard to speak of; it's called        10:47:36
the Statement on Standards and Forensic Services,          10:47:39
which essentially reminds us professionals to ensure       10:47:42
that the conclusions are supported and maintaining,        10:47:49
you know, integrity and ethics in our work.                10:47:56

So I believe I complied with that standard       10:47:59
100 percent.                                               10:48:04

Q    All right.  In your report, you -- you have   10:48:06
a list of the materials that you reviewed.  It's on        10:48:10
page 7 in Exhibit -- Exhibit B as well.                    10:48:14

A    Correct.                                        10:48:18

Q    And is that a -- a complete -- particularly   10:48:18
Exhibit B to your report, which is Exhibit 196, is         10:48:22

that a complete listing of the documents and

information you considered in forming your opinions?

    A   Yes, it is everything I considered.

    Q   Did you at any point review or even look at

any additional communications, such as e-mails or

texts, beyond those referenced in Exhibit B?

    A   No.  No, I did not.

    Q   Did you ever make any alternative

calculations or did you model any different

scenarios other than what's reflected in your

report?

    A   No, I did not.

    Q   Did you review any analyses of Tesla's

operational performance during that period, during

April to May of 2022?

    A   No.  I wasn't asked to do that, and I did

not do that.

    Q   Let me ask generally:  Who chose which

documents that you would consider as part of your

analysis?

    A   So it depends on the section of the report,

but mostly it was I, given the assignment,

determined what source documents I needed.

        For example, for the funding, I went to the

Twitter public -- public filings, as I referenced

throughout my report.  I used the Forms 4 for Mr. Musk.

But in terms of quantifying the sales of Tesla stock, counsel provided the source documents for my discussion of the Morgan Stanley illustrative sources, and I think that's -- and the e-mails related to that.  I think that's -- that's about it.

But for the most part, I used publicly available information for -- to complete my assignment.

Q    For the most part, other than -- primarily the Morgan Stanley -- Stanley -- documents were -- were not public documents, right?  That -- those were provided by counsel?

A    Correct.  Yes.

Q    And counsel decided which of those non-public documents to provide to you?

A    Yes.

Q    Was there anything that you asked to review that -- that is not listed here in Exhibit B?

A    No.

Q    Did you want to review anything else that was not listed, that you didn't receive?

A    Not really.  I felt the -- the majority of the assignment had to do as the funding, which was

readily available.

I did want to say, Counsel -- apologies -- the stock price for -- for Tesla, I used a -- and I listed this in my Exhibit B. I believe it's what's called Exhibit 61, which listed the share prices of Tesla on an unadjusted basis. So that was also from counsel, along with, as you can see from Exhibit B, the Excel file of tweets and the screenshot of the tweets.

But other than that, between what counsel gave me and what I compiled myself based on what I believed to be useful in fulfilling my assignment, it's all there on Exhibit B.

Q   Your report notes -- and I assume this is just standard language that you put in, but -- that you may update your conclusions with new data.

Are you aware -- aware of that phrase?

A   Yes. It's something I usually include because I don't know what might happen next. But in my experience, if there's additional information, it's best to add that caveat. But I -- it's there on a standard -- standardized basis.

Q   Right. Are you planning to update your conclusions with -- with new data?

A   No, not unless counsel requests an update.

Transcript of A. Christine Davis
Conducted on July 10, 2025                                    45

I -- I am not anticipating -- as of today, I'm not aware of anything.

Q   And you were aware during your retention that you could have asked counsel for additional documents if you thought it would be useful for your -- your analysis, right?

A   If I felt that something was useful to me and I did not have it, I would have asked for it.

Q   So, for example, if there were additional documents about Mr. Musk's private financial records, you -- those were available to you if you asked, is your understanding?

A   Generally speaking, I -- my understanding, as an expert, is to -- if I express something that I think is relevant, I would ask for it and then we see if it's available.

Given the limited, narrow scope, I felt I had everything I needed, so I -- you know, I did not ask for anything beyond what I had compiled for my Schedules 1 and 3, I believe.  And Schedule 2 is the J.P. Morgan -- or the Morgan Stanley documents.

Q   Did you review -- other than the complaint, which I -- it sounds like you did review, were there any other court filings or pleadings in the case that you reviewed?

Transcript of A. Christine Davis
Conducted on July 10, 2025                          46

A    I don't think so.

Q    Did you review any media reports or public commentary about the Twitter acquisition as part of your assignment?

A    Not in depth.  I -- I think it was public knowledge at one point, so I kind of heard about the situation, but I didn't deliberately search for any articles for this project.

Q    Did you review any materials that are related to Twitter's spam or fake account data that became part of what was discussed related to the transaction?

A    Sorry.  What is an example or --

Q    Just anything -- any of the data or anything that was published related to the alleged spam or fake account data at Twitter.

A    No, I did not read any specific information on the spam accounts.

Q    Did you review any documents related to Mr. Musk's other businesses, such as SpaceX, during this relevant time frame?

A    No.

Q    Other than what's listed in Exhibit B, did you review any of the non-public communications, such as Mr. Musk's internal e-mails, during this

time frame?

A    No.

Q    Why wouldn't that be something that's relevant to your opinions in terms of what financing sources he had at the time?

A    Based on my assignment, which is, as I set forth here, what was the funding situation, I relied on what was publicly available.  I was not asked to supplement what I had done with non-publicly available information.  I was not -- I was not asked to consider that.

Q    Do you think that non-publicly available information was irrelevant to what you describe as the funding situation at the time?

A    I wouldn't say that.  I can't say it's irrelevant until I see it.  I would trust that counsel would provide me with, you know, what was within my assignment if my work was incomplete. Using publicly available information, to me, was -- was significant because that's what the public was aware of.  So I -- from that perspective, I felt like my work was consistent with what the public knew.

Q    Right.  But as far as you understand, your -- your expert opinions are relevant to

Transcript of A. Christine Davis
Conducted on July 10, 2025

48

Mr. Musk's motives, right?  That's not the public; that's him, correct?

A   Sorry, Counsel.  I -- what -- can you rephrase?

Q   Sure.  Previously, you -- you, I believe, testified that your understanding was that your expert opinions were related to -- were relevant because Mr. Musk's motivations were part of this case, essentially; is that right?

A   I think what I said was my understanding was Plaintiffs would have a claim of motive and my work will be used in that regard.  If that sounds -- yeah, apologies.  I -- I think that's what you said.  I just want to clarify.

Q   I understand.

A   Yeah.

Q   No, I understand.

But at no point during your assignment did you ask to see additional communications that Mr. Musk either had with his financial advisors or anyone else during that time frame?

A   I did not ask for that.

Q   Did you have -- did you believe you had access to that information?  You could've asked.

A   I have not seen any -- I've not come across

a situation where -- I didn't feel like I would not

receive something if I requested it.  And during the

progress of my work, I -- I believe my progress was

responsive to the assignment and, therefore, I was

satisfied with it.

In my work, if counsel says, you know,

please consider this, then I would certainly do

that.  I -- I did not hear that from counsel.

Q    Did you review, as part of your assignment, any internal Twitter documents related to the financing of the acquisition?

A    No.

Q    Did you analyze or review any communication between Mr. Musk and Twitter's management beyond -- I think there's one text message that's cited in your report.

A    No, nothing beyond what is on my Exhibit B.

Q    What about any Morgan Stanley documents beyond the illustrative sources and uses document that you discuss and the other related documents, the e-mails that are listed in Exhibit B?

A    No, nothing else besides what's on Exhibit B.

Q    Did you review any material about what market-wide factors, such as technology sector

trends, that could've affected Tesla's stock price during this period that you looked at?    11:00:27 11:00:32

A   No.  That wasn't in my assignment, so I didn't -- I know I didn't do that.    11:00:33 11:00:38

Q   Did you review any market analyst reports on Tesla's stock during the April/May '22 time frame?    11:00:40 11:00:47

A   No.    11:00:52

Q   Did you review any of Mr. Musk's public statements beyond the tweets that -- that you cite in your report?    11:00:52 11:00:56 11:00:59

A   No, I did not.    11:00:59

Q   Did you review any evidence about what Mr. Musk's financial advisors may have provided him regarding the financing around this time?    11:00:59 11:01:04 11:01:08

A   No.  Outside of what is listed in my Exhibit B, nothing else.    11:01:11 11:01:16

Q   One of the topics that you talk about is the margin loan commitments.    11:01:20 11:01:23

Did you review any -- any of the legal agreements related to those commitments?    11:01:25 11:01:28

A   When you say "legal," I -- nothing beyond the publicly held -- I'm sorry, the publicly available exhibits and attachments that I referenced in my report.  That was the extent of what I relied upon.    11:01:31 11:01:35 11:01:38 11:01:41 11:01:45

Q   Your report -- and we'll get into some of the -- the details of the specific facts and conclusions.

Did you review any material about whether or not the Tesla sales or some of the Tesla sales were -- were planned based on market conditions? Let me -- let me -- that was a bad question.  Let me rephrase that.

Did you analyze whether or not Mr. Musk's shares of sales were preplanned?

A   Were preplanned?  No, I did not.

Q   Did you analyze whether any of Mr. Musk's sales of Tesla stock were base -- were opportunistic based on particular market conditions on certain days?

A   No.  That's certainly beyond the -- the assignment on page 4, but I -- it's -- I did not do that.

Q   Did you review any material about whether Mr. Musk's other business interests, such as SpaceX, for example, affected his financing decisions?

A   No.  That did not play a role in my analysis.

MR. LIFRAK:  We've been going about an hour and we've been together about an hour and a half.

Transcript of A. Christine Davis
Conducted on July 10, 2025                                    52

Is now an okay time for a break for everybody?                11:03:10

THE WITNESS:  I think so.  Yeah.  I'm fine.                    11:03:15

MR. LIFRAK:  How long?  Ten minutes?  Five?                    11:03:18

THE WITNESS:  That sounds fine, yeah.  Ten                     11:03:22
minutes.                                                       11:03:25

MR. LIFRAK:  Why -- yeah, why don't we come                    11:03:26
back at 2:13, around there.                                    11:03:27

THE WITNESS:  Okay.  11:13 here.  Okay.                        11:03:30

THE VIDEOGRAPHER:  We're going off the                         11:03:31
record at 11:03.                                               11:03:33

(Whereupon a break was had.)                                   11:03:34

THE VIDEOGRAPHER:  We're back on the record.                   11:13:52
The time is 11:14.                                             11:14:01

BY MR. LIFRAK:                                                 11:14:03

Q   All right.  Let's take a look at your                      11:14:04
report, the section starting on page 8 called                  11:14:07
"Relevant Background."                                          11:14:10

A   Okay.  I'm there.                                          11:14:13

Q   And just generally speaking, who -- who                    11:14:14
decided what events to include -- to list in this              11:14:17
Relevant Background section?                                   11:14:22

A   After I -- the answer is, I chose them                     11:14:27
primarily after I understood the assignment and the           11:14:30
time frame that I'm focusing on.  I chose the                  11:14:32
certain dates that would coincide with the                     11:14:38

discussion that I intended to explore and -- and explain in my report.

Q   You used the word "primarily," and I just wanted to explore that.

Were there parts of this that -- that -- parts of or aspects of the Relevant Background that other people chose?

A   I'm thinking.  Sorry, Counsel.

Q   Take your time.

A   Yes.  There is one date that I -- that counsel suggested I include.

Q   And which one was that?

A   That is May 16, 2022.

Q   And what aspect -- what happened on May 16, 2022?

A   I -- that is the date of the All-In Summit where Mr. Musk made statements about the spam accounts.

Q   What -- what about the -- the ones that bookend the one you're talking about, the May 13th and May 17th tweets?  Are those events that you decided to include in the chronology?

A   Yes.  I took the liberty of including dates that I understood to be relevant.

Q   Based on -- on what?

A   Based on the assignment, based on my understanding of the issues. Certainly I was provided the May 13th and May 17th tweet images, so it seemed sensible to me to include those dates in the discussion.

Q   So the first two items listed in the chronology for April 9th and then the 14th is Mr. Musk expressing his intent to make an offer to buy Twitter and then him actually sending an offer to do so; is that right?

A   Talking about April 14th?

Q   April 9th and then the 14th, his intent and then an actual offer.

A   So 9th was the intent and then 14th is the actual offer date, based on what I reviewed.

Q   And did you have any understanding whether the April 9th expression of his intention reflected a -- a firm commitment to a specific financing structure?

A   I'm sorry, Counsel. Specific...

Q   Financing structure.

A   Financial structure?

Q   Yes. Financing structure.

Let me -- let me ask it again so it's clear.

A   Yeah.

Q   Did you have an understanding whether the April 9th text message that's referred to in your report reflected a firm commitment to a specific financing structure?

A   No.  The April 9th was an intention to make an offer.  I did not understand it to include a definitive financial plan as of that time.

Q   Okay.  What about the April 14th offer that's part of your chronology; did you understand that to reflect a firm commitment to a specific financing structure?

A   Sorry, Counsel.  When you say "firm commitment," can you add some context, who's making the commitment to whom?

Q   Yeah.  Did -- did Mr. Musk in his April 14th offer commit to a specific structure to finance the deal?

A   Oh, okay.  Let me think.

In my analysis, the -- and sorry if I'm answering it in a long way, but I'm going to go back to what I know based on my work, is the financing breakdown, so to speak, was not really disclosed in any detail, right, until -- until April 21st, according to my own research.

So based on that, my answer is -- is no,

although we have seen -- or I have seen the Morgan Stanley documents that I discuss in my reports dated April 14th, where the intended funding is set forth for this offer.

I'm not sure if I answered that question accurately, but whether it's a commitment is -- I don't know the answer right now. I'd like to think about it. But certainly, the commitment was much more tangible, if you will, by the April 21st announcement.

Q   You mentioned the Morgan Stanley documents.

To your understanding, were those either disclosed to Twitter or public?

A   Let's see. I don't know every -- who else saw that document. But on its face, it was circulated among Morgan Stanley folks or staff. So I have no insight on who else might have seen it. But my understanding from it, it seemed a highly confidential document.

Q   Okay.

A   I could be wrong. I've been just answering your question the best way I can.

Q   And we'll come back to that. I'll show you the document specifically later.

But you mentioned the April 21st

announcement.

Do you have an understanding whether that announcement bound Mr. Musk to a specific financing structure to finance his acquisition or not?

A   I -- I don't know.  All I know is what the public was informed.  So, you know, as I've mentioned, I relied -- I don't know what he was thinking.  I'm looking at publicly available documents, which I essentially interpreted and set forth in my work.  I -- I don't know the answer to that.

Q   You note in your chronology that Twitter accepted his offer on April 25th for a $44 billion price; is that right?

A   Yes.  That's what the -- the publicly available documents inform me as to the -- what's going on.

Q   Do you have an understanding one way or the other whether that April 25th agreement specified a -- a requirement for a particular funding structure?

A   I don't know about requirement.  I mean, the -- there was an evolution.  I think at this point Twitter was persuaded that they would receive this money in whatever way was published publicly.

Twitter published this information, so it reflects their belief at that time.

That's all I can say. It's in the publicly available information. I don't know about whether Mr. Musk was committed to it. That's -- I don't know what -- obviously, I'm not in that position.

Q   You note next that, in sub-bullet -- sub-bullets E and F, that Mr. Musk sold shares on April 26th and then April 28th?

A   Correct.

Q   Do you know one way or the other whether those sales were planned before the April 21st financing announcement that you talked about?

A   I do not. There's no -- the Form F4 or -- sorry, Forms 4, they don't inform you of what the funds are going to be used for or if they were preplanned. I don't know that they were preplanned.

Q   Okay. You next note for May 5th that there was a -- a change in the composition of the financing, and specifically that there was a reduced margin loan and additional equity commitments.

Do you recall that?

A   Correct. Yes.

Q   And why did you view that as relevant to your analysis?

A    It -- it comports with my assignment, which is to explain, to quantify, analyze, summarize, and present the various sources of funds throughout this time period of April 21st to May 17th, inclusive. It's my assignment, number one.

So when that change occurred, it prompted me to spell that out as of the time it became in effect.

Q    Did you see any evidence one way or the other as to whether the changes were unexpected or expected by Mr. Musk?

A    No.  I -- I -- again, I relied on the publicly available documents.  They -- they didn't -- I don't believe they revealed, you know, anything like that.  So the answer is no.

Q    You mention in this chronology of events, as we talked about before, Mr. Musk's tweet on May 13th and then his subsequent tweet on May 17th.  That -- that's part of your chronology of key events?

A    Correct.

Q    Are you going -- do -- have you seen any evidence that these tweets were made because of the Tesla stock price changes that you compute as part of your analysis?

A    No.  The evidence for this is simply the

Transcript of A. Christine Davis
Conducted on July 10, 2025                                    60

tweet.

Q   The evidence for what?

A   For the dates is the images of the tweets that counsel gave me.

Q   Right.  And my question was a little broader than that, and that was whether you've seen any evidence that Mr. Musk made these tweets because of the changes in Tesla's stock price that you referred to in your report.

MR. ARNZEN:  Objection; vague and ambiguous.

Q   You can answer.

A   No.  I -- I did not see evidence to -- to that effect.

Q   Did you review any documents indicating or related to the reasons Mr. Musk may have made those tweets in -- in May of 2022?

A   Did I see documents that might explain why he made those tweets?

Q   Yes.

A   No, I did not.

Q   Did you review, to your recollection, any announcements about the Twitter deal's progress after May 17th?

A   No, I did not.  My -- the time frame I'm looking at or I was analyzing stopped on May 17th.

So I have a general, you know, knowledge of what happened at -- in the end, but nothing specific after May 17th.  I simply did not focus on that.

Q   And, in general, your knowledge is that the Twitter acquisition ultimately was completed at the price that was initially offered, correct?

A   Correct.

Q   Do you know the ultimate financing structure that was used to complete the transaction?

A   I do not.

Q   If you could go to page 10 of your report that talks about -- it's part of the relevant background, but specifically the stock price for Tesla's shares between April 9th and May 17th.

Do you see that?

A   Yes, I do.

Q   And you note that Tesla's stock price declined from, it looks like, $1,025.49 on April 9th to $761.61 on May 17th, 2022, which was an approximately 25.73 percent drop; is that right?

A   Yes.

Q   Are you going to provide any expert testimony about the potential reasons for that drop?

A   No.  I -- it's not in my assignment, and I do not intend to express that in the form of

testimony.

Q    Have you done any work on that issue; namely, the price -- Tesla stock price drop that you describe in your report, have you done any work as to evaluating any reason for that?

A    No.  The reason is not part of my assignment.

Q    On page, 10, there's a graph that describes or shows illustrated -- in an illustrated way the price of Tesla's stock from April 9th to May 17th; is that right?

A    That's correct.

Q    And is this one of the charts that was prepared by your consultant?

A    She helped me prepare this, yes.  I may have started it.  I might have helped -- asked her to approve the appearance of it, but I selected all of the data points.  Some things other people are better at than me, including this.  And it was just more efficient to get someone's help who can do it pretty quickly for me.

But the data points are based on data that I collected.

Q    And if you could look at the next page, the financing composition of the Twitter purchase.

A     Yes.

Q     And you would agree -- and we'll go through some of the specifics, but the financing composition of the Twitter purchase did change over time; is that right?

A     Yes, it changed over time, which is what I -- the evolution is set forth in my Schedule 1.

Q     And that was part of your Assignment 1, essentially, is that -- is that correct, that -- the changes over time?

A     Correct.

Q     And those changes over time and the composition of the financing, what is your understanding as to what -- the relevance of that? Why -- why was that included in the Relevant Background section of your report?

A     Well, the -- the first assignment was to analyze, summarize, and present, for the period April 21st through May 17th, the various sources of funds.  So -- so if the funds did not change, then I would just have one column.  But they did change over time, so part of my assignment was to reflect the changes in the composition.

Q     Okay.  And -- and specifically with the changes to the sources of funds, did you have an

understanding as to how that may be relevant to                    11:31:49

Plaintiffs' claims in the case?                    11:31:55

A    Not immediately, no.  You know, the -- just                    11:31:56

focusing on my assignment, I looked at the source                    11:32:05

documents set forth, the data, and then what I have                    11:32:10

is what the data revealed.                    11:32:12

So I was not really thinking of the claim,                    11:32:14

so to speak.  You know, I did not -- I'm not                    11:32:18

oblivious to what's going on, but focusing on the                    11:32:25

quantification, that's what the data revealed as I                    11:32:27

collected the information.                    11:32:31

Q    You talk in -- in terms of April 25th, the                    11:32:33

financing at that point, the contemplated financing,                    11:32:38

had, looks like, 21 billion in equity, 13 billion in                    11:32:42

debt, 12.5 billion in margin loans, for a total of                    11:32:46

46.5 billion.  Is that -- and I'm looking at page 11                    11:32:52

of -- of your report; is that correct?                    11:32:56

A    Yes.  That's correct.                    11:32:57

Q    Did you do any analysis of whether                    11:32:58

Mr. Musk's Tesla sales on April 26th and 28th were                    11:33:03

necessary to meet that $21 billion equity figure?                    11:33:08

A    I did not do an analysis of whether it's                    11:33:18

necessary, but clearly I included it as part of                    11:33:23

source of funds from him in my analysis, based on                    11:33:27

counsel's -- you know, I have been asked to assume                    11:33:32

Transcript of A. Christine Davis
Conducted on July 10, 2025                           65

that if Mr. Musk were to come up with funds, it would come from the Tesla shares, which is essentially Assignment B.

So I'm -- I don't know about necessity, but it's included in my analysis.

Q    You've mentioned that you were asked to assume that if Mr. Musk were to come up with the funds, it could come from Tesla shares or would come from Tesla's shares?

A    I would say presently, based on my -- what I know, it would be a "would."  I'm not aware of any source of funds in the -- that I've seen in evidence.  So my -- my analysis presently depicts the assumption that Elon -- Mr. Musk's cash funding will come from Tesla share sales.  And I -- I clearly set that forth in my Schedule 1.

Q    Did you believe that Mr. Musk didn't have sources of cash other than Tesla stock, either in other investments or from his SpaceX investments or anything else?

A    No.  I have no insight on that.  I did not make the assumption that he had no other sources. This was something that was part of my assignment and, therefore, again, Item B correlates the -- you know, the translation of cash needed by Mr. Musk

into Tesla shares.

So I'm simply fulfilling the assignment there, and so by definition, my work translates the cash he -- he needs into Tesla shares.

Q   So as part of your assignment, the assumption you were asked to make was that he had no other sources other than Tesla shares; is that correct?

A   Not exactly.  I wasn't told to assume he didn't have any other sources.  I was asked to assume that the source for this analysis would be Tesla shares.

Q   And you were not to consider any other potential sources; is that correct?

A   Not really.  I didn't -- it didn't even occur to me to explore other sources.  I was very focused on the assignment, and that's exactly what I depicted.

Q   Why -- why didn't it occur to you to consider other potential sources when you were aware that he has other investments other than Tesla shares?

A   Because the assignment called for the correlation of the cash -- the funding and the translation of that funding that -- from him into

Tesla shares if they were sold.  So A is what's the        11:36:31

funding; and then B, calculate the amount of cash          11:36:35

required from the defendant and the corresponding          11:36:39

number of Tesla shares.                                    11:36:43

So it's very, very narrow.  I'm just                       11:36:44

following the assignment there.                            11:36:48

Q    But the first assignment was to analyze,              11:36:50

summarize, and present the various sources of funds        11:36:53

for his purchase, right?                                   11:36:56

A    For the purchase of Twitter, yes.                     11:36:58

Q    And did you look into other potential                 11:37:01

sources of funds that Mr. Musk may have?                   11:37:07

A    I did not.                                            11:37:09

Q    Even though the assignment was to analyze,            11:37:11

summarize, and present the various sources of funds        11:37:15

for his purchase?                                          11:37:17

A    Well, the sources of funds in terms of                11:37:18

what's publicly disclosed is -- I should complete          11:37:22

that phrase, right.                                        11:37:25

So I used as -- published and regulatory                   11:37:26

filings.  So what you can see, it would be either          11:37:29

debt or equity financing.  And within -- within            11:37:32

equity financing, what was disclosed was Mr. Musk's        11:37:37

current holdings in Twitter, plus other investors          11:37:42

have put in some money, and then the balance               11:37:49

presumably would come from him personally.

So that is the extent of the deductive reasoning I applied as to what is left for him to cover. And that part, I -- I translated into how many Tesla shares that would be in my Assignment B.

Q   Okay. You note that on May 5th, the margin loan was reduced to 6.25 billion, and then there were additional equity commitments that were secured on that date or announced on that date, correct?

A   Correct.

Q   Did you see any evidence that indicated that that reduction in the margin loan was due to financial constraints on Mr. Musk's part?

A   No. I -- the financial constraint is not anywhere in what -- it's not publicly available, so to speak. So, again, I used the publicly available documents to break this out by date range.

Q   But, again, you had access, if you wanted it, to non-publicly available documents from counsel if you asked for it, right?

A   Yes. I would have included it if I was -- if I was asked to consider those documents.

Q   Well, if you thought you needed documents to do a complete analysis according to your assignment, you would have asked for those documents, right?

A   If I needed -- if I believed that they were necessary in depicting what the public was told, you know, yes. But I feel like the Twitter, you know, public filings were informative. That's what the public was informed was going on. And that was the goal of Assignment A, is to depict what's in the regulatory filings as published.

Q   The next thing that you talk about around May 5th is you note that HRH Prince Alwaleed contributed 1.89 billion in equity via his Twitter shares, and then there was another additional 5.24 billion in equity commitments; is that correct?

A   That's correct.

Q   Did you endeavor to figure out who the other equity investors were in that?

A   Yes. They are actually revealed or disclosed in the filing that I referenced. I just didn't mention their names on -- on my report specifically.

Q   Did you look at any documents in terms of whether Mr. Musk sought additional equity investors beyond those that are cited in your report?

A   Sorry, Counsel. Did I see any other documents that --

Q   Yes.

A    -- are other investors?                                    11:41:04

Q    Or sought, yes.                                            11:41:06

A    No, I did not -- I can't say I saw those --                11:41:07
that evidence.                                                  11:41:11

Q    Did you see any evidence one way or the                    11:41:12
other as to whether Mr. Musk turned down any                    11:41:15
potential investors for the Twitter acquisition?                11:41:19

A    No.  Again, if -- the evidence I relied upon               11:41:22
did not have that information.                                  11:41:27

Q    Again, getting back to the margin loan, you                11:41:35
note that the margin loan was reduced by 50 percent             11:41:39
at some point, right?                                           11:41:43

A    Correct.                                                   11:41:43

Q    Did you do any analysis as to whether                      11:41:43
Mr. Musk could have completed the deal without any              11:41:46
margin loan?                                                    11:41:50

A    When you say "could have completed the                     11:41:51
deal," meaning could have closed the purchase of                11:41:53
Twitter?                                                        11:41:57

Q    Yes.                                                       11:41:59

A    Without a margin loan?                                     11:42:00

Q    Yes.                                                       11:42:02

A    No.  That -- that is not part of -- that was               11:42:02
not part of my assignment.                                      11:42:03

Q    But did you review any communications                      11:42:05

Transcript of A. Christine Davis
Conducted on July 10, 2025                    71

between Mr. Musk and the banks that were potentially
providing that margin loan?

  A   No.   Again, I reviewed the publicly
available documents, which did not have any of those
communications.

  Q   We --

  A   Sorry.  Sorry, Counsel.  Beyond the -- the
Morgan Stanley excerpts we talked about, which
doesn't really have the detail that -- I think, in
your context.

  Q   All right.  Did you do any modeling as to
whether Mr. Musk could have closed the deal just
relying entirely on debt?

  A   No.

  Q   Did you do any modeling as to whether
Mr. Musk could have closed the deal relying entirely
on third-party equity?

  A   No.  I -- yeah.  The last two questions were
not part of my assignment, so the answer is no.

  Q   Let's talk about the -- the Morgan Stanley
document.

      MR. LIFRAK:  I'm not sure any of the -- if
this has been marked before.  I don't want to
double-mark it, Jon -- or, Jon, do we know if this
has been --

MR. COLLIER:  I don't believe it has, Mr. Lifrak.  No.

MR. LIFRAK:  Okay.  Let's -- let's mark that as Exhibit 197, which is the -- a document titled "Illustrative Sources and Uses and PF Capital Structure Project X,"  and ask Jon to display that if he can.

(Exhibit 197 marked for identification.)

MR. COLLIER:  Is everyone seeing the document?

MR. LIFRAK:  Yeah.

MR. ARNZEN:  I am.

Q   And, Ms. Davis, do you see the -- the document on the screen?

A   I do.  And I also have my hard copy in front of me.

Q   Okay.  What is this document?  What's your understanding of what this is?

A

Transcript of A. Christine Davis
Conducted on July 10, 2025    74



Transcript of A. Christine Davis
Conducted on July 10, 2025                    75

11:48:19

11:48:23

11:48:27

11:48:32

11:48:35

11:48:38

11:48:41

11:48:46

11:48:50

11:48:53

11:49:01

11:49:02

11:49:05

11:49:07

11:49:08

11:49:10

11:49:12

11:49:14

11:49:16

11:49:16

11:49:18

11:49:20

11:49:23

11:49:28

11:49:30

Transcript of A. Christine Davis
Conducted on July 10, 2025



A ████████████████████████████████        11:51:15
████████████████████████████████████      11:51:21
████████████████████████████████████      11:51:24
████████████████████████████████████      11:51:29
███████████████████████████████           11:51:36
████████                                   11:51:42
      ████████████████████████████         11:51:42
████████████████████████████████████      11:51:45
███████████████████████████████████       11:51:51
███████████████████████████████████       11:52:00
████████████████████████████████████      11:52:03
██                                         11:52:05
  █  ██████████████████████████████████    11:52:07
████████████████████████████████████      11:52:10
███████████████████████████████████       11:52:14
███████████████████████████████           11:52:19
  █  ████████████████                      11:52:23
  █  ███████████████████████████           11:52:24
███████████████████████████                11:52:26
  █    ██████                              11:52:29
  █  ████████████████████████████████      11:52:30
█████████████████████████████████         11:52:33
████████████████████                       11:52:36
  █  ███████████████████████████           11:52:48
████████████                               11:52:52

11:52:53

11:52:55

11:52:59

11:53:05

11:53:11

11:53:20

11:53:22

11:53:27

11:53:31

11:53:37

11:53:40

11:53:47

11:53:50

11:53:59

11:54:03

11:54:04

11:54:09

11:54:12

11:54:13

11:54:16

11:54:20

11:54:22

11:54:27

11:54:31

11:54:37

Q    Did you do anything to verify whether there were additional sources of funding that were available to Mr. Musk at this time, other than what's in this Morgan Stanley presentation?

A    No.  I think I -- yeah.  I did not.

Transcript of A. Christine Davis
Conducted on July 10, 2025                    80

████████████████████████████████████    11:56:18

████████████████████████████████████    11:56:21

████████████████████████████████████    11:56:32

█████████████    11:56:35

Q   On page 15 of your report, you state that
the various sources of funds for his -- the purchase
of Twitter were published in regulatory filings for
the period April 21st through May 17th; is that
right?

A   Yes.

Q   And so let's take a look at some of those
specifics.

You reviewed the Schedule 13 amendment filed
on April 21st.  That's part of -- of what you looked
at, right?

A   Yes.

Q   And do you have that -- that with you?

A   I believe I do.  I apologize.  I'll have to
reach over here.  I tried to organize the source
documents.  I should have -- I should have it, the
sources for this --

MR. LIFRAK:  We can put it up, Jon.  Why
don't you put that up, and we can mark this
Exhibit 198.

(Exhibit 198 marked for identification.)

Q   And do you recognize this document?          11:57:48

A   So that's Amendment Number 3, so that's      11:57:51
the -- the date of event there, I believe, is      11:57:55
April 20th.                                        11:58:00

Q   Right.                                        11:58:01

A   Yes, I -- I believe I'm looking at the same   11:58:05
document --                                        11:58:07

Q   And that's --                                 11:58:07

A   -- over here.                                 11:58:07

Q   -- something that -- and that's something    11:58:09
that you -- you did analyze as part of your        11:58:09
assignment?                                        11:58:12

A   I -- yes.  I used the information here        11:58:12
and -- and set it forth in my schedule and report. 11:58:17

Q   Okay.  And you -- do you have a paper copy    11:58:24
of that as well, or are you looking at it on the   11:58:31
screen?                                            11:58:34

A   I have -- I have a paper copy.               11:58:34

Q   And this document, this public disclosure,   11:58:38
outlines categories of -- of funding sources; is   11:58:41
that fair?                                          11:58:47

A   Yes.                                          11:58:47

Q   And it says -- one of the things that it     11:58:49
says is, "To finance the proposed transaction or a  11:58:52
potential offer, entities related to the reporting  11:58:56

person have received commitment letters committing to provide an aggregate of approximately $46.5 billion as follows"?

A    I see it.  Yes.

Q    Did you have an understanding as to whether or not this -- this document that we're looking at, Exhibit 198, whether this document mandated that Mr. Musk proceed with a specific finance structure?

MR. ARNZEN:  I'll object to the extent it calls for a legal conclusion.

A    Sorry, Counsel.  What is your question?

Q    Sure.  The question was whether or not you understood this document to bind Mr. Musk to a specific financing structure in his acquisition of Twitter.

A    Yes.  So, again, bind -- you know, legally bound, to be legally bound -- I don't know all of the criteria to be legally bound.

What I can say is this was publicly disclosed.  And a reasonable reader, I would think, would be persuaded that 46.5 million was ready and available; that to finance the proposed transaction, reporting person and entities have received commitment letters.  So someone has committed, right, 46.5 billion.

So I think, to answer your question, I would like to know what "bind" means. But on its face, as a user of this document, as a reader of it, it sounds persuasive that there's money; 46.5 is there; this deal is going to close.

Q   Okay. So one line that is in this document, Exhibit 198, is that "...the Reporting Person reserves the right to withdraw the Proposal or modify its terms at any time including with respect to the amount or form of consideration."

Do you see that?

A   Sorry. Let me -- what --

MR. LIFRAK: Jon, if you can pull that up. I -- hard to see what page it's on, though.

A   Okay. And that would be above Item 6. All right.

Q   Right. It's in the paragraph above Item 6.

A   Okay.

Q   And -- no, it's actually a little bit above that as well, on the page before that I was talking about. That's being highlighted -- show that on the screen now.

A   Right.

Q   And so rather than ask the question which I did before about whether it's binding, let me ask it

this way:  Did you have an understanding whether    12:02:32
Mr. Musk could change the -- the sources of funds to    12:02:35
purchase Twitter at this time?    12:02:40

A    Given what you highlighted, it's reasonable    12:02:45
to agree that, you know, he had the right to change    12:02:49
the structure.  I don't know, though, if the target    12:02:54
company had an expectation, what level of    12:03:01
expectation they had that -- and what -- how    12:03:03
persuasive -- what the impact is of the earlier    12:03:08
section to the conveyance that this is going to    12:03:13
happen.    12:03:17

So I appreciate, you know -- of course, I    12:03:17
can't argue with the reservations that you pointed    12:03:23
out, but binding is probably not for me to define.    12:03:26
But as a professional, someone reading this, the    12:03:30
46.5, it's been committed to; it's spoken for; it's    12:03:39
available.    12:03:50

So I understand, you know, that these    12:03:50
documents always have a caveat, and I can't -- we    12:03:53
can't refute the qualification at the end.    12:03:57

Q    Right.  And, ultimately, the 46.5 billion    12:04:01
was there and the purchase complete -- was    12:04:04
completed, right?    12:04:08

A    Not until much later.  Yes, it was    12:04:13
eventually completed.  The answer is yes.    12:04:20

Q    And the sources of funds and process of the transaction did change over time, right?

A    It did.

Q    And are you opining one way or the other whether that change to the sources of funds constituted some kind of wrongdoing by Mr. Musk?

A    No.  It's not in my assignment to make that opinion.  Again, it's -- I have six -- I had six tasks.  But it's -- the opinion itself as to what all of that meant, it's -- it's not in my assignment.

Q    So -- so, for example, there was later a press release that announced Twitter's acceptance of the deal on April 25th, 2022.

You're aware of that document, right?

A    Yes.  Based upon --

Q    And --

A    Sorry.  Based upon Twitter's understanding of where the funds were coming from.

Q    And did you view that as reflecting a commitment to use particular sources by Mr. Musk?

A    So, presently -- so, again, it's -- what you're asking me was not something I considered because it's not part of my assignment.  But if you want an answer, I do need to think about it.  I'm

not prepared to answer that question because I don't have the evidence I relied upon or the publicly held documents, clearly, I've referenced throughout my report.

Q    Okay.  And as long as you're confirming that it's not something that was part of your assignment and you don't intend to offer an opinion about it, that's kind of what I'm looking for; is that correct?

A    You're correct, yes.

MR. LIFRAK:  We can take that, Jon -- down, Jon.

If we could take a look at the -- the May 4th Schedule 13D, Jon.

Q    And I don't know, Ms. Davis, if you have that.

A    I should have it, yes.

Q    And so we'll mark that as Exhibit 199, which is the 13D amendments from May 4th, 2022.

Do you see that?

A    Yes.  It's Amendment 6, Number 6.

(Exhibit 199 marked for identification.)

Q    And could you describe what this document is?

A    This is something that I referenced in my

work pertain -- and it pertains to the change in

the -- the financing, where it was announced that

half of the margin loans were replaced -- or not

replaced, but have -- margin loans were reduced to a

certain amount, about 50 percent.  And then we have

third-party investors added to the equation.

Q   Are -- are you opining one way or the other

whether it was possible for Mr. Musk to obtain

necessary cash from other sources?

A   From other sources?

Q   Yes.

A   No.  I -- again, I made a determination of

quantifications based on the assignment.  That

opinion is not part of my assignment.

Q   But what was part of your assignment was

observing that the equity commitment -- equity

commitment amount changed after April 21st, right?

The structure changed.

A   Yes, which I did depict in my report.

Q   And you treated Mr. Musk's existing Twitter

shares as equivalent to $3.96 billion in equity,

based on the 54.20-per-share value; is that correct?

A   Correct.

Q   Did you see any evidence one way or the

other whether that valuation was accepted by Twitter

12:07:34
12:07:42
12:07:50
12:07:55
12:07:59
12:08:02
12:08:08
12:08:11
12:08:16
12:08:19
12:08:20
12:08:21
12:08:28
12:08:32
12:08:34
12:08:40
12:08:47
12:08:50
12:08:51
12:08:59
12:09:03
12:09:09
12:09:17
12:09:17
12:09:20

or applied by Twitter in its internal accounting?

A    I did not see internal evidence of acceptance, but I -- based on the publicly available information, it had been agreed upon.  And the valuation came from Mr. Musk.

Q    And you've said several times that -- that the information that you were relying on, apart from the Morgan Stanley documents, was publicly -- largely publicly available information; is that right?

A    Correct.

Q    And it's correct that you won't be offering an opinion as to whether Mr. Musk made any false or misleading statements in those public disclosures related to the funding of the Twitter acquisition?

A    That's correct.

MR. LIFRAK:  You can take that down, Jon. Thank you.

Q    So one of the things that you do in your report is calculating how many Tesla shares would be needed to generate the -- the -- Mr. Musk's, essentially, cash contribution; is that right?

A    Correct.

Q    And you base that on closing stock prices?

A    Yes.

Q   Did you account at all for, you know, the practical difficulty of actually selling what would be the equivalent of tens of millions of dollars of shares on a -- on a trading day?

A   I did think about that.  It is a natural concept that comes to mind.  I did not consider the mechanics and logistical issues regarding that.  My assignment was to quantify the equivalent value in Tesla shares that cash needed.

So the answer is, no, I did not consider that particular issue described.

Q   Did you model the potential impact that the sales by Mr. Musk could have on -- on Tesla's stock price?

A   No, I did not.

Q   Do -- is it correct that you don't have an opinion one way or the other whether Mr. Musk could have raised the same amount of cash at actual executed trade prices?

A   I'm sorry, Counsel.  Could -- could you break that down?  What is -- I --

Q   Well, do you have --

A   When you say "executed" -- sorry.

Q   No.  Go ahead.

A   When you said "executed," are you -- what

12:10:43
12:10:47
12:10:53
12:10:57
12:10:58
12:11:05
12:11:10
12:11:16
12:11:20
12:11:22
12:11:24
12:11:27
12:11:30
12:11:35
12:11:35
12:11:36
12:11:42
12:11:46
12:11:49
12:11:53
12:11:56
12:11:59
12:12:00
12:12:03
12:12:04

does that mean?

Q   Not closing price, but at executed trade price during the trading day.

A   And you're asking me if I considered the impact of --

Q   Yes.

A   No, I did not.  I simply -- as I've said or explained, I simply took the cash needed to be raised and translated it to the equivalent number of shares.

Q   At a closing price on a trading day?

A   Yes.  At the closing price of a trading day that's set forth in each column, correct.

Q   Why did you choose the closing price as -- as the marker for that?

A   I think it was just my default.  I -- we -- I might have discussed it with counsel, but typically the closing price is -- is -- I had no particular reason.  It was what I -- instead of opening, I use closing.

Q   You're not opining as to whether or not Mr. Musk was legally somehow prohibited from selling the number of shares necessary to fund that equity portion, correct?

A   I am not opining -- sorry.  On the equity,

no, I am not opining to that.  Again, whatever's in the report is my conclusion.

Q    And -- and you calculated the share equivalence at -- assuming that Mr. Musk would need to raise that full equity gap in -- in a lump sum, correct?

A    You know, good question.  I -- the way my model is, it's depicted on a daily basis, right. But in reality, I can see a scenario where it might have to be done over a few days.  I'm not -- I don't -- I'm not sure.

But the assignment, once again, was to quantify what are the number of shares equivalent to that cash needed as of a certain time, and so that was the goal of my tabulating the calculations.

Q    So, ultimately, your conclusion is -- in your report is that the Tesla shares lost value from April 21st to May 13th, right?

A    The -- I had a number of conclusions where I talk about -- partly, yes, because the -- the shares were going down, and as a consequence, the number of -- sorry.

The share price was going down, so over time, the number of shares equivalent to what cash is needed was going up; so there's an inverse

Transcript of A. Christine Davis
Conducted on July 10, 2025                                    92

relationship.  And I simply quantified those values                      12:15:00

as of a certain day in my schedule.                                      12:15:06

    Q   Do you know one way or the other whether the                     12:15:12

equity portion was -- was funded by Mr. Musk with or                     12:15:16

without a margin loan?                                                    12:15:21

    A   I'm thinking.                                                     12:15:29

        I have knowledge that the margin loans                           12:15:31

eventually did not become a source of funds.  I                          12:15:36

don't remember where I -- I got that information.                        12:15:40

And I know that as we -- as I show in my Schedule 3,                      12:15:44

Mr. Musk ended up selling 22-point-something billion                     12:15:50

of Tesla shares through the end of December.  But                        12:15:55

that's all I -- I really have insight on, on that.                       12:16:02

    Q   And so the cash gap that you identify as                         12:16:06

of -- I guess it's May 15, that gap                                      12:16:09

was eventually -- eventually filled, to your                             12:16:13

understanding?                                                           12:16:16

    A   When you say "May 15," is that date                              12:16:16

significant to me for some reason or --                                  12:16:21

    Q   Or May 17th.  I --                                               12:16:24

    A   -- did you just choose that date --                              12:16:25

    Q   Sorry.  May 17th.                                                12:16:27

    A   Oh, May 17th.  Okay.                                             12:16:28

        So, yes.  Eventually, the -- the                                 12:16:31

46.5 billion, right, was -- was paid, but                                12:16:36

Transcript of A. Christine Davis
Conducted on July 10, 2025                    93

I -- again, I -- my work stopped on the 17th, so I

don't have insight on the further -- I don't have

specificity on what happened after May 17th.  I did

not do the work after May 17th.

Q   Do you think the events after May 17th

was -- were relevant to the analysis that you were

asked to do?

A   Do I not think it was relevant?

Q   Yeah.

A   Let's see.  Well -- so the assignment I had

to fulfill that was for that time frame through the

17th, it was -- I was asked to quantify the stock

sales made by Mr. Musk in 2022, and I quantified

that.  Other than that, I have no insight in what's

relevant, that I was not asked to do.  So the

assignment is quite narrow, and that's what I was

focusing on.

Q   Okay.  One of the things that you concluded

is that Mr. Musk lacked sufficient Tesla collateral

to support the margin loan on most days between

May 12th and 17th; is that correct?

A   That's correct.

Q   And what was that based on?

A   That was based on -- so I -- if I can just

look at my report.  I explained that on -- on

Transcript of A. Christine Davis
Conducted on July 10, 2025    94

page 28, and I essentially explained the components that I looked at.

And so I used -- in looking at that, I essentially considered the collateral required for the margin loan at the time, considered that there is a -- the required collateral would be this much. And -- and so I set forth in a graph the outcome of that data analysis.

And so it's basically based on the share price of Tesla, as I explained, and based on the publicly available information of what margin loans are at least in play as of those days, and the -- the fact that, based on Tesla's 10-K, there is a cap of 25 percent that can be pledged for debt or margin loan.

So it's based on a few different documents, which, you know, I -- I believe I explained in my report.

Q   And on that last point, the -- the internal policy, the 25 percent, do you know whether Mr. Musk sought or received any -- any waiver of that internal limit?

A   I did not see a waiver in -- at least it wasn't mentioned in the 10-K that I looked at.  So I'm not aware of a waiver for him.

Q    And -- and you're not offering an opinion as to whether lenders would have accepted other collateral other than Tesla shares; is that correct?

A    Yes.  That is certainly something I did not include in -- it was not part of my assignment and I did not look at that.

Q    Did you look at whether any lender denied Mr. Musk the margin loan because he had insufficient collateral or anything like that?

A    No.  I -- that was not -- I didn't see anything to that effect, outside of just the eventual reduction of the margin loan bal -- amount.

Q    And I assume you're not going to opine one way or the other whether Mr. Musk misrepresented any aspect of the -- of the margin loan to the public?

A    Yeah.  That's not part of my assignment, so I won't be testifying to that.

Q    So let's talk about some of your specific conclusions.

On page 20 of your report, Conclusion Number 1, do you see that?

A    I do.

Q    And that's, "The number of TSLA shares that would have fully funded Defendant's cash requirement as of April 21st, 2022 was insufficient to fund the

12:19:57
12:20:01
12:20:04
12:20:08
12:20:13
12:20:16
12:20:17
12:20:23
12:20:28
12:20:29
12:20:31
12:20:37
12:20:41
12:20:44
12:20:47
12:20:50
12:20:52
12:20:59
12:21:02
12:21:04
12:21:11
12:21:12
12:21:12
12:21:15
12:21:19

cash required before the market opened on May 13th, 2022 as shown..." and then there's a chart.

A    Yes.

Q    And all of your assumptions and the methodologies for this are described in your report; is that correct?

A    Yes.  Described in my report and supported by my Schedule 1, which I think has 15 pages.  So the numbers in my conclusions are presented in Schedule 1, and the body of the report itself narrated the conclusions in a much more user-friendly way, I hope.

Q    Yes, definitely.

And you chose to measure that cash requirement in terms of Tesla shares because that's what you were asked to do; is that right?

A    Correct.

Q    And so at least as to Conclusion 1, you're just comparing the value of Tesla shares at -- as of April 21st to May 13th and identifying essentially the shortfall that existed as of May 13th?

A    That's correct.

Q    And then Conclusion Number 2, which is on page 21, you -- you essentially conclude that about 16 million Tesla shares would have funded the cash

requirement on April 21st, but it would be              12:23:07
insufficient as of May 13th; is that correct?          12:23:09

A    That's correct.                                    12:23:15

Q    How -- can you describe how Conclusion            12:23:16
Number -- Number 2 is different than Conclusion        12:23:18
Number 1?  What -- what is the additional or the       12:23:21
different information you're conveying in that?         12:23:24

A    Yeah.  I think that's a good question.            12:23:26
They're very similar, except in Conclusion 1, I        12:23:29
recognize the fact that the funding required was       12:23:35
just slightly higher on April 21st, at 17 billion,     12:23:39
because of the initial funding requirements.           12:23:42

And then in -- the second bar reflects                 12:23:44
what's -- the -- the cash required as of closing on    12:23:48
May 12th, which became slightly lower, to              12:23:56
16.15 billion; whereas Conclusion Number 2 is          12:24:00
comparing, just within the 16.15 billion realm, the    12:24:07
cash required on May -- at the end of May -- closing    12:24:12
of May 12th, and then just simply using the two        12:24:15
different price -- share prices.                        12:24:21

And the conclusion being whereas                       12:24:23
16-point-something million shares were sufficient      12:24:28
for the 16.15 at the 4-21 price, it's -- there's --    12:24:31
there's -- it's short by 4.49 billion if you were to   12:24:37
multiply those same number of shares by the share      12:24:42

price on May -- at the closing of May 12th.

Q     Okay.  On Conclusion Number 3, you conclude that because Tesla's stock had decreased during that period, an additional 6,173,975 shares were needed to be sold to raise the cash funding requirement -- cash -- cash funding required.

Do you see that?

A     Yes.

Q     In making that statement, your assumption is that the cash funding had to be funded through the sale of Tesla shares and not another source; is that correct?

A     That's correct.

Q     But you recognize that there could be other sources for funding the transaction, right?

A     Yes.  We -- I explained that I -- my assignment was to translate the cash flow expected from Mr. Musk into Tesla shares.

Q     And as an expert in the case, do you believe that you're required to test the reasonableness of assumptions that you're asked to make?

A     Here, it is actually pretty straightforward. I did not have to make many assumptions.  Everything is supported.

The assumption I was asked to assume, that

Tesla shares would be used to fund the cash required of the defendant, like I mentioned, it is from counsel and it did not sound unreasonable to me because it's a very real possibility.  And that was the assignment.  You know, how my work is used, it's up to counsel, but when I was given that assumption, I didn't say, That doesn't make any sense, right.  It's Tesla shares.  It's not another car's share.

So I just did not feel -- it seemed reasonable to me, in other words.  I -- I -- there was no reason to question that -- the reasonableness of that assumption.

Q   And so the assumption that Tesla shares would be used to fund the cash required, you made that assumption even though you know, based on -- you could Google it -- that, for example, Mr. Musk's stake in SpaceX is worth hundreds of billions of dollars, right?

MR. ARNZEN:  Objection to the form of question; assumes facts not in evidence.

A   I did not look into the -- his wealth in terms of SpaceX.  Again, it wasn't part of my assignment.  Focus -- just focusing on his Tesla shares, that's -- that's what I did.

Q   I realize that.  But you said that you

believed that was a reasonable assumption to make. And my question is, why didn't you think it was reasonable to take into account that he had hundreds of billions of dollars in additional potential funding?

A    I don't know that he did.  I -- I -- I don't think that information is available outside of, you know, the Tesla shares that I focused on.  I have no insight on how much money he has.

And my assignment was to assume that the Tesla shares would be the source of -- of the -- in my calculations, anyway -- in my assignment, translate the cash from Defendant into Tesla shares, and that's what I did.

Q    And if you look at Conclusion Number 5 on page 24, your conclusion is that, "From April 21st, 2022 through at least May 17th, 2022, the declining TSLA stock price had created a potential cash funding shortfall for" the "Defendant," right?

A    Yes.

Q    And you used the word "potential cash funding shortfall," right?

A    Yes.

Q    You're not opining whether, given Mr. Musk's other assets, that there was an actual cash funding

12:28:06
12:28:08
12:28:11
12:28:15
12:28:18
12:28:18
12:28:22
12:28:26
12:28:32
12:28:34
12:28:37
12:28:40
12:28:45
12:28:48
12:28:51
12:28:56
12:29:01
12:29:06
12:29:10
12:29:11
12:29:12
12:29:16
12:29:17
12:29:17
12:29:21

shortfall, correct?

A    That's correct.

Q    Conclusion Number 6 on page 26 is that, "...before the market opened on May 13 through May 17...Defendant had insufficient collateral in the form of TSLA shares to pledge in relation to the contemplated margin loan amounts, except for May 13, 2022 after the market closed."

Do you see that?

A    I do.

Q    And we talked a little bit about that already.

The -- one of the assumptions in that conclusion is that -- is the 25 percent restriction that you've described at -- at Tesla, correct?

A    Correct.

Q    And you identify that one period, the May 13th after the market closed.

Why -- why did you use that period, May 13th to May 17th?  What is the -- the significance, if any, of that period?

A    Right.  So it is within the period I was analyzing.  And what caught my eye is the -- there was a -- apologies, Counsel.  I'm looking down because I'm looking at my -- my document.

There had always been, generally speaking, a shortfall from the beginning. And speaking of the relevance of the tweet on May 13th, the shortfall disappeared briefly and then it went back down the next day. And so, here, this is an excerpt of something that is part of my analysis. I had a longer chart, but I was asked by counsel to -- based on my analysis from April 21st, I was asked to excerpt this section.

Q   But when you say that you had a longer chart, what are -- what are you referring to?

A   Yeah. So this data on -- on this chart is coming from --

Q   I'm sorry, what chart are you referring to, just so I -- we're on the same page?

A   Yeah. So -- probably can't see it, but this one on page 28 of my report --

Q   Okay. And -- and you had at some point a chart that went beyond this period, beyond the 5-12 to 5-17 period?

A   No. I had -- sorry. I had the -- on my Schedule 1, the quantitative document, the numbers go back to the beginning.

And so when -- when the -- it became notable on May 13th that the surplus -- sorry, the shortfall

12:30:59
12:31:08
12:31:14
12:31:22
12:31:25
12:31:33
12:31:35
12:31:42
12:31:47
12:31:49
12:31:54
12:31:56
12:32:00
12:32:02
12:32:05
12:32:08
12:32:10
12:32:13
12:32:23
12:32:30
12:32:31
12:32:35
12:32:40
12:32:44
12:32:48

was erased after the tweet, this graph depicts that movement.

Q   Okay.  And you said that counsel had asked you to excerpt that.

Could you describe what you're talking about?

A   Yeah.  So on my Schedule 1, which is that long, 15-page quantitative document, the row -- I want to say the -- apologies.

The -- the row number that's relevant is row 24.  So if you were to go to row 24, beginning in -- which is on page 3, you see that based on my methodology, there was a shortfall from the beginning.  It's page 3.  It's Davis page 51 of 79 on the top right.

If you go through all the row 24s in that 15-page document, you'll see that that deficit in -- or shortfall in collateral value was, for the most part, negative in the beginning, and then it became positive when -- on May 5th, on my page 9 of 15.  And then when it became -- it's positive so far.

And now we're going to go to page 10.  If you go to -- it's positive on May 13th --

Q   And by "positive" -- by "positive," what you

mean is, what; that there was a sufficient collateral for margin loan on those days?

A   Yes, according to my methodology.

But if you go to May 12th, which is -- where is the other document here?

On May 12th, it was -- May 11th and 12th, which is page 12 of 15, row 24, it was negative; there was a shortfall.

Q   Okay.

A   And then following the tweet, there's a surplus.  And then it went back down to a deficit once again, or shortfall, on May 16, which is a Monday.

Q   Okay.  And then the -- your final conclusion on page 28 is essentially that ███████████

████████████████████████

█████████████████████████

████████████████████████

█ ████████████████████

███████████████████████

█████████████████████████

████████████████████████

██████████████

█ ████████████████████

███████████████████



Transcript of A. Christine Davis
Conducted on July 10, 2025

106

in your view, why does that matter?

A    Why does it matter?

Q    Yes.

A    I don't know the "why."  Counsel asked me to compare my findings, which is the -- on the right side, to the Morgan Stanley configuration of sources of funds.

MR. LIFRAK:  Let's take a break.  Let's do ten minutes.  I may not have any more questions, or very few.

THE WITNESS:  Okay.  Thank you.

THE VIDEOGRAPHER:  We're going off the record at 12:39.

(Whereupon a break was had.)

THE VIDEOGRAPHER:  We're back on the record at 12:50.

MR. LIFRAK:  Thank you, Ms. Davis.

No further questions.  That's the good news,

so -- so thank you for your time.    12:51:01

THE WITNESS:  Thank you, Counsel.  My    12:51:03
pleasure.    12:51:05

MR. ARNZEN:  Mr. Lifrak, I do have a couple    12:51:05
of follow-up and clarification questions.    12:51:10

MR. LIFRAK:  Sure.    12:51:12

MR. ARNZEN:  Great.    12:51:12

EXAMINATION    12:51:13

BY MR. ARNZEN:    12:51:13

Q    Aaron Arnzen for lead plaintiff.  Good    12:51:16
morning, Ms. Davis.    12:51:19

A    Good morning.  How are you?    12:51:19

Q    Good.    12:51:20

I think you mentioned that you follow AICPA    12:51:21
guidance with respect to your forensic accounting    12:51:25
work; is that true?    12:51:28

A    That is very true, yes.    12:51:29

Q    Tell me, does that guidance change depending    12:51:31
on whether securities frauds claim -- securities    12:51:33
fraud claims are at issue versus other sorts of    12:51:38
claims?    12:51:43

A    No.  The standard applies to all projects.    12:51:44

Q    Do your forensic accounting procedures    12:51:46
change if claims are securities fraud compared to    12:51:49
other types of claims?    12:51:51

A    The procedures in terms of applying the best available methodology, being clear, the fact that conclusions are supported, those do not change.

Q    Do you apply the same skills and practices or different skills and practices to cases whether or not they involve securities fraud?

A    I apply the same skills, expertise, and practices to all cases.

Q    Thank you.

There were some questions with respect to whether you had some work ever analyzing margin loan commitments specifically.

Have you had cases where you've worked and analyzed on forensic accounting issues where debt instruments played an important role in your analysis?

A    Yes.

Q    You testified about relying on your judgment, as stated in your report.

Do you rely on your judgment in choosing your source documents to use in your analysis?

A    Yes.  The professional judgment is based upon my experience and expertise on choosing the best documents available to present the result of my assignment.

Q   You stated that you relied on stock prices as supplied by counsel.

Do you have an understanding that those stock prices for Tesla and Twitter were subject to Defendant's response to a request for admission that was issued during discovery in this case?

A   Yes.  I had a vague recollection of this -- the background for that document.

Q   Overall, do you think you had an adequate basis to answer the questions that were -- or I'm sorry, to opine in the way specifically set forth in your report?

A   Yes.

Q   Okay.  Were you asked to opine on whether Mr. Musk had a motive or not in this case?

A   I was not.

Q   Okay.  Are your opinions the ones that are actually set forth in your report?

A   Yes.

Q   And did you have everything you needed to form those opinions?

A   I did.

Q   Did you need Twitter's internal documents related to the acquisition to form the specific opinions set forth in your report?

A    No, I did not need the internal Twitter documents.                                                    12:54:20 12:54:23

Q    Did you need communications between Mr. Musk and Twitter management to form those opinions?           12:54:23 12:54:26

A    No, not for the tasks that I -- are set forth in my report.                                           12:54:29 12:54:33

Q    What about other documents from Morgan Stanley; did you need any more documents from Morgan Stanley to form the opinions that are set forth in your report?    12:54:34 12:54:37 12:54:43 12:54:45

A    No, I did not.                                                                                         12:54:46

Q    Did you need any information about what factors were impacting Tesla's stock price to form those opinions?    12:54:46 12:54:48 12:54:51

A    No.                                                                                                    12:54:52

Q    Did you need analyst reports concerning Twitter or Tesla to form those opinions?                       12:54:54 12:54:59

A    I did not.                                                                                             12:55:01

Q    Did you need Musk's public statements, beyond his filings and the tweets that you did review, to form your opinions?    12:55:02 12:55:05 12:55:07

A    No, I did not.                                                                                         12:55:08

Q    Did you need the materials, whatever materials Musk's advisors may have provided to him, to form those opinions?    12:55:08 12:55:10 12:55:13

Transcript of A. Christine Davis
Conducted on July 10, 2025

A    No.

Q    Did you need to know whether or not Musk had planned certain sales of his Tesla stock to form those opinions?

A    Sorry, Counsel.  Could you repeat that question?

Q    I apologize.  Yes.

Did you need to know whether Mr. Musk had planned certain sales of his Tesla stock in advance in order to form your opinions?

A    No.

Q    Okay.  You understand they could bring their own expert to answer their questions, correct?

A    Yes, I would think so.  And I believe I -- we would be entitled to the source documents relied upon by that expert as well.

Q    You testified about an assumption that Mr. Musk might use -- would use Tesla shares to fill his commitments to fund the -- the acquisition of Twitter, correct?

A    Correct.

Q    Do you understand that -- whether or not Mr. Musk is very wealthy?

A    I think that's widely accepted fact.

Q    Yeah.  Is he -- he's one of the world's

12:55:14
12:55:15
12:55:18
12:55:21
12:55:21
12:55:24
12:55:24
12:55:26
12:55:28
12:55:33
12:55:34
12:55:34
12:55:37
12:55:41
12:55:47
12:55:50
12:55:52
12:55:55
12:56:01
12:56:04
12:56:05
12:56:06
12:56:08
12:56:12
12:56:15

Transcript of A. Christine Davis
Conducted on July 10, 2025

112

richest men?

A    Yes.

Q    Has lots of assets?

A    I believe -- I won't be surprised.  Yes.

Q    Did you find evidence that he did, indeed, sell billions of dollars worth of Tesla stock throughout 2022?

A    Yes.  It's in my Schedule 3 as well.

Q    Good.  With respect to a Morgan Stanley document that you were questioned about and -- and -- as represented on page 13 of your report, I just want to make sure we're clear.

Q    Now, correct me if I'm wrong, but you testified that you calculated the amount of money and corresponding number of shares Mr. Musk would've had to provide to round out his funding for the $46.5 billion acquisition amount, correct?

A    Yes.  Correct.

Q    Were you trying to determine when or over

how many days or weeks he might actually sell those shares?    12:57:31 12:57:34

   A   No.    12:57:34

   Q   Was that part of your assignment?    12:57:35

   A   It was not.    12:57:37

   Q   You understand that Mr. Musk could get his own expert to answer that question?    12:57:38 12:57:40

   A   Yes.    12:57:42

   Q   Okay.  Finally, if his sales of Tesla pushed down the price of the stock even further, would that mean he would've had to sell even more Tesla shares to round out his portion of the $46.5 billion purchase price?    12:57:42 12:57:47 12:57:52 12:57:55 12:58:00

   A   Yes, that would be the consequence.    12:58:00

      MR. ARNZEN:  Thank you so much, Ms. Davis. I do not have any further questions at this time.    12:58:04 12:58:06

      THE WITNESS:  Thank you, Counsel.    12:58:08

      MR. LIFRAK:  Thank you.    12:58:10

      THE VIDEOGRAPHER:  If there's nothing further, this concludes the deposition of A. Christine Davis.  We're going off the record at 12:58 Pacific Time.    12:58:14 12:58:16 12:58:19 12:58:22

   (Whereupon the proceedings were concluded at    12:58:24

         12:58 p.m. PDT)

CERTIFICATE OF REPORTER

I, the undersigned, a Certified Shorthand Reporter, Licensed by the State of California, being empowered to administer oaths and affirmations remotely pursuant to Section 2093(b) of the Code of Civil Procedure, do hereby certify:

That the foregoing proceedings were taken remotely before me at the time and place herein set forth; that any witness in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any of the parties.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review

of the transcript was not requested.


        IN WITNESS WHEREOF, I have this date

subscribed my name.

DATED: 10th of July, 2025


_____

    Karisa Ekenseair, CSR No. 14546