COTCHETT, PITRE & MCCARTHY, LLP
Joseph W. Cotchett (SBN 36324)
jcotchett@cpmlegal.com
Mark C. Molumphy (SBN 168009)
mmolumphy@cpmlegal.com
Tyson C. Redenbarger (SBN 294424)
tredenbarger@cpmlegal.com
Elle D. Lewis (SBN 238329)
elewis@cpmlegal.com
Gia Jung (SBN 340160)
gjung@cpmlegal.com
Caroline A. Yuen (SBN 354388)
cyuen@cpmlegal.com
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN: 175783)
fbottini@bottinilaw.com
Albert Y. Chang (SBN 296065)
achang@bottinilaw.com
Aaron P. Arnzen (SBN 218272)
aarnzen@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001

*Lead Counsel for Plaintiffs and the Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| GIUSEPPE PAMPENA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | Case No. 22-cv-5937-CRB<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:  October 31, 2025<br>Time:  10:00 a.m.<br>Courtroom: 6, 17th Floor<br>Judge:  Honorable Charles R. Breyer |

**(PUBLIC -REDACTED VERSION)**

Case No. 3:22-CV-5937-CRB

**Table of Contents**

STATEMENT OF ISSUES TO BE DECIDED ...............................................................................i

SUMMARY OF ARGUMENT ...............................................................................................1

STATEMENT OF FACTS ......................................................................................................2

    I.     Musk's Decision to Personally Acquire Twitter.........................................2

    II.    Musk's Long-Time Focus on Twitter's Fake and Spam Accounts ........................3

    III.   Musk's "Jujitsu" Strategy, Waiver of Due Diligence, and "Seller-Friendly" Merger Agreement .............................................................................5

    IV.   Musk Looks for a Pretext to Get Out of the Deal .......................................6

    V.    Musk's May 13th Deal-On-Hold Tweet ..................................................8

    VI.   Musk's May 16 Statement that Fake/Spam Accounts Totaled 20%.....................10

    VII.   Musk's May 17 Tweet Combining Prior Misstatements .................................11

    VIII.  Musk's Purported Termination of the Deal, the Delaware Action, and Musk's Eventual Capitulation..................................................................12

LEGAL STANDARDS .......................................................................................................14

ARGUMENT ...................................................................................................................15

    I.     The Court Should Grant Summary Judgment as to Falsity, Materiality, and Scienter Surrounding Musk's May 13, May 16, and May 17 Statements .............15

        A.    Musk's May 13 Tweet ...............................................................15

            1.    Falsity.......................................................................15

            2.    Scienter ....................................................................16

            3.    Materiality.................................................................19

        B.    Musk's May 16 Statements at the All-In Summit ...................................20

            1.    Falsity.......................................................................20

            2.    Scienter ....................................................................21

            3.    Materiality.................................................................22

        C.    Musk's May 17 Tweet ...............................................................22

        D.    Summary Judgment is Warranted on Class-Wide Reliance ........................23

E.    Summary Judgment is Warranted on Musk's Use of Instrumentalities of Interstate Commerce ...................................................................................25

CONCLUSION.............................................................................................................................26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*
568 U.S. 455 (2013).................................................................................................23

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986).................................................................................................13

*Basic Inc. v. Levinson*
485 U.S. 224 (1988).............................................................................................18, 23

*Berson v. Applied Signal Tech., Inc.*
527 F.3d 982 (9th Cir. 2008) ...........................................................................13, 15, 20

*Brody v. Transitional Hosps. Corp.*
280 F.3d 997 (9th Cir. 2002) ...................................................................................13

*In re Celestica Inc. Sec. Litig.*
2014 WL 4160216 (S.D.N.Y. Aug. 20, 2014)...........................................................24

*Cooper v. Thoratec Corp.*
2018 WL 2117337 (N.D. Cal. May 8, 2018)............................................................21

*Erica P. John Fund, Inc. v. Halliburton Co.*
563 U.S. 804 (2011)................................................................................................23

*Evanston Police Pension Fund v. McKesson Corp.*
411 F. Supp. 3d 580 (N.D. Cal. 2019) ...............................................................17, 18

*Gebhart v. SEC*
595 F.3d 1034 (9th Cir. 2010) ...................................................................... *passim*

*Halliburton Co. v. Erica P. John Fund, Inc.*
573 U.S. 258 (2014)........................................................................................22, 23, 24

*Hatamian v. Advanced Micro Devices, Inc.*
2016 WL 1042502 (N.D. Cal. Mar. 16, 2016)........................................................24

*Hollinger v. Titan Capital Corp.*
914 F.2d 1564 (9th Cir. 1990) .................................................................................17

*In re Infineon Techs. AG Sec. Litig.*
266 F.R.D. 386 (N.D. Cal. 2009)............................................................................24

*In re Intuitive Surgical Sec. Litig.*
2016 WL 7425926 (N.D. Cal. Dec. 22, 2016).........................................................24

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*
403 F.3d 1050 (9th Cir. 2005) ........................................................................................13

*McCrary v. Elations Co. LLC*
2014 WL 12561600 (C.D. Cal. Dec. 8, 2014) ..................................................................24

*Miller v. Thane Int'l, Inc.*
519 F.3d 879 (9th Cir. 2008) ..........................................................................................14

*Ottmann v. Hanger Orthopedic Grp., Inc.*
353 F.3d 338 (4th Cir. 2003) ..........................................................................................13

*Rolf v. Blyth, Eastman Dillon & Co.*
570 F.2d 38 (2d Cir. 1978).............................................................................................17

*S.E.C. v. Platforms Wireless Int'l Corp.*
617 F.3d 1072 (9th Cir. 2010) ..........................................................................13, 15, 20, 21

*SEC v. Beck*
2024 WL 1626280 (C.D. Cal. Mar. 26, 2024).................................................................24

*SEC v. Musk*
N.D. Cal., Case No. 25-cv-00105, ECF 1 .................................................................1, 8

*In re Tesla, Inc. Sec. Litig.*
2022 WL 1497559 (N.D. Cal. Apr. 1, 2022) ...................................................................21

*Twitter, Inc. v. Musk*
2022 WL 3656938 (Del. Ch. Aug. 25, 2022) ..................................................................18

*Twitter, Inc. v. Musk*
2022 WL 5078278 (Del. Ch. Oct. 5, 2022) .....................................................................17

*United States v. Sutcliffe*
505 F.3d 944 (9th Cir. 2007) ..........................................................................................24

*Zucco Partners, LLC v. Digimarc Corp.*
552 F.3d 981 (9th Cir. 2009) ..........................................................................................18

**Court Rules**

FED. R. CIV. P. 56(a) ...............................................................................................................13

FED. R. EVID. 404(b) ..............................................................................................................16

**Other Authorities**

Securities Act Rule 10b-5 ......................................................................................................13

NINTH CIRCUIT MANUAL OF MODEL CIVIL JURY INSTRUCTIONS, No. 18.2...................................13

RESTATEMENT (SECOND) OF TORTS § 526 (1977).............................................................................13

**STATEMENT OF ISSUES TO BE DECIDED**

1.      Whether summary judgment on the elements of falsity and scienter as to Elon Musk's public statements on May 13 and May 17 is warranted where he asserted his acquisition of Twitter was "on hold" and "cannot move forward" unless he received information from Twitter, despite the fact that (i) the operative merger agreement did not give him the right to obtain such information or put the deal on hold, (ii) the deal was not actually on hold, and (iii) he never asked his attorneys, bankers, or advisors if his statements were accurate.

2.      Whether summary judgment on the elements of falsity and scienter as to Musk's public statements on May 16 and May 17 is warranted where Musk asserted that fake and spam accounts make up at least 20% of Twitter's users (300% more than Twitter's estimate) but admitted under oath that "[t]hose are numbers you're just kind of throwing out there" and he had "no particular basis to believe any of those numbers at the time."

3.      Whether summary judgment on the element of materiality is warranted where Musk's May 13 tweet, which falsely claimed the $44 billion deal was on hold, caused Twitter's stock to sink 17.85% over two trading days, and his subsequent two false statements maintained the stock at artificially depressed prices well below the price set forth in the merger agreement.

4.      Whether summary judgment on the element of class-wide reliance is warranted where Plaintiffs have alleged fraud-on-the-market, the evidence establishes the presumption of reliance, and Musk has not rebutted this evidence.

5.      Whether summary judgment on the element of interstate commerce is warranted where Musk published two of his false statements on Twitter, and the other false statement was posted to YouTube.

\*    \*    \*

## SUMMARY OF ARGUMENT

The Federal securities laws prohibited Elon Musk from making materially false statements about Twitter if he "lacked sufficient information for [his] statements." *Gebhart v. SEC*, 595 F.3d 1034, 1042-43 (9th Cir. 2010).[1] Yet, in order to escape from or renegotiate his acquisition of Twitter, Musk did exactly that on three occasions in mid-May 2022.[2] Musk posted tweets that his acquisition of Twitter was "***on hold***" and "cannot move forward" unless he received information from Twitter. But the deal was not on hold, and Musk has since admitted under oath that he did not bother to review the merger agreement or check with his attorneys, bankers, or advisors to see if the tweets were remotely accurate before making the statements. The undisputed evidence shows that Musk knowingly (and very publicly) waived due diligence, signed a "seller-friendly" merger agreement, and knew he did not have rights to the information he demanded or to put the deal on hold.

Musk also asserted in public statements—first at a technology conference and then in a tweet—that fake and spam accounts make up ***at least 20%*** of Twitter's user accounts. But Musk had no basis for that percentage and testified that ████████████████████████████████ ████ and he had ████████████████████████████████████ Musk's false statements had a material impact on Twitter's stock price—the first statement caused Twitter's stock to decline 17.85% over two trading days, and prompted an analyst to opine that "this tweet will send this Twitter circus show into a Friday the 13th horror show." His subsequent two statements maintained the stock at artificially depressed prices well below the merger price.

When he was later sued by Twitter for specific performance, Musk's scienter about the falsity of his statements was amply revealed—he first threatened Twitter's directors on three separate occasions that it would be ████████████████ and that he would ████████████████ if they did not accede to his demands. When that did not work, he capitulated, abandoned all of his claims, and agreed to pay the full merger price.

---

[1] Plaintiffs have alleged also that Musk engaged in a securities fraud scheme under Rule 10b-5(a) and (c) [17 CFR § 240.10b-5(a), (c)], those claims have not been dismissed, and Plaintiffs reserve their right to prove scheme liability at trial. Plaintiffs do not, however, seek summary judgment based on scheme liability through their instant motion.

[2] Unless otherwise noted, all dates referenced herein are in 2022, and all emphasis is added.

Case No. 3:22-CV-5937-CRB

Because Musk's statements were materially false and misleading, and Musk made them with scienter (*i.e.*, he "lacked sufficient information for [his] statements"), Plaintiffs' motion for partial summary judgment should be granted as to the elements of falsity, scienter, and materiality. The evidence is equally strong, and summary judgment is equally warranted, concerning class-wide reliance, since Musk's own expert concedes that ▮▮▮▮▮▮▮▮▮▮ and Musk indisputably made use of interstate commerce.

## STATEMENT OF FACTS

### I.    Musk's Decision to Personally Acquire Twitter

Musk, a long-time and highly influential user of Twitter, Inc.'s eponymous social media platform, secretly bought approximately 9.2% of the company's stock (more than 72 million shares) for $3.96 billion from January 31 through April 1, 2022. Ex.[3] 1 (admitting that ▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 2 (Schedule 13G). ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 3, Musk SEC Tr. at 43:10-44:25;70:6-11 ▮▮▮▮▮▮▮▮▮▮▮▮

Eventually, on April 4, 2022, Musk belatedly disclosed his 9.2% stake in Twitter. Ex. 2. The market for Twitter's stock *jumped 27%* on the disclosure, confirming that Musk's conduct would, and did, disrupt the price of Twitter's stock. Ex. 4 at row 55. Musk violated the federal securities laws—and saved himself many millions of dollars—by failing to disclose his position when it crossed the 5% threshold. *SEC v. Musk*, N.D. Cal., Case No. 25-cv-00105, ECF 1 at ¶ 44.

On April 5, Musk accepted an invitation to join Twitter's board of directors. Ex. 5.[4] On April 9, after disagreements with Twitter's CEO, Parag Agrawal, Musk decided instead to make an offer to

---

[3] "Ex. __" refers to the exhibts attached to the Declaration of Tyson Redenbarger, filed in support of this Motion.

[4] Musk has admitted that ▮▮▮▮▮▮▮▮ he ▮▮▮▮▮▮▮▮▮▮ *See* Ex. 1, response 3.

take Twitter private. Ex. 6.[5] While Musk has stated that he sought to buy Twitter to advance free speech, one of his bankers at Morgan Stanley testified that Musk expected to ████████ his money and asserted the company ████████████████████████████████████████████ ██ Ex. 7, Claassen Tr. at 151.

Two days later, on April 11, Musk met with his bankers and reviewed a range of prices to offer, from $45 to $65 per share. Ex. 8 at 9. Musk decided on a $54.20 offer price, meaning that all Twitter shareholders (save those who rolled their money into Musk's post-merger, private company) would receive $54.20 for each share of stock they held when the transaction closed. As Musk pointed out to Twitter's Chairman, $54.20 represented ████████████████████████████████ ████████████████████████████████████████████████████████████████ Ex. 9. ████████████████████████████████████████████████████████████████ Ex. 28, Grimes Tr. at 59:14-61:11; 64:23-66:2.

Musk conveyed the offer to Twitter on April 13 and publicly disclosed his proposal on April 14. Ex. 10. The offer was initially conditioned upon ████████████████████████ ████████████████████████ Ex. 10 at *031.[6] The same day, April 14, Musk's Morgan Stanley bankers circulated a presentation detailing Musk's anticipated funding for the deal. The bankers anticipated ████████████████████████ to close—the additional money needed to fund the transaction instead was expected to come from debtors and, to a lesser extent, other large investors. Ex. 11 at *663.

**II.    Musk's Long-Time Focus on Twitter's Fake and Spam Accounts**

████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ Ex. 7, Claassen Tr. at 194:12-197:2. Twitter's SEC disclosure itself is heavily qualified, stating that, *e.g.*, "we applied significant judgment, so our estimation of false or spam accounts may not accurately represent the actual number of such accounts, and the actual number of false or spam accounts could

---

[5] Musk's text messages were produced in Excel spreadsheets to Twitter in the Delaware Action, and his deposition testimony authenticated the collection. Ex. 13, Musk Tr. at 50:16-53:14.

[6] "*##" refers to the last digits of the Bates numbers following the MUSK_PAMPENA prefix.

be higher than we have estimated." Ex. 12 at 6.  As one of Musk's bankers testified, ████████ ████████████████████████████████████████████████████████████ ██████ Musk ████████████████████████ and proclaimed ████████████████ Ex. 7, Claassen Tr. at 195:18-196:10.  Musk also testified ████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████ Ex. 13, Musk Tr. at 91:21-92:17.  ████████████ ████████████████████████████████████████████████████████████████████ ████████ Ex. 13, Musk Tr. at 32:21-33:23 (describing complaints to Twitter founder Jack Dorsey about spam).[7]

Spam and fake accounts were also one of the very reasons that Musk wanted to take Twitter private.  As Musk stated in an early-April text message to Twitter's Chairman: ████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████ Ex. 6 at row 339-340; *see also* Ex. 13, Must Tr. at 58:24-59:25 ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ Ex. 19, April 25 Press Release: Elon Musk to Acquire Twitter (Musk quoted: "I also want to make Twitter better by … defeating the spam bots, and authenticating all humans.").  Musk was, therefore, obviously aware of the spam and bot issue on the platform before entering into the merger agreement.

This explains why, before he made his offer, Musk never asked Twitter ████████ ████████████████████████████████████ or the methodology behind its 5% estimate (aside from occasional complaints to Dorsey), and does not recall ████████ ████████████████████████████████████████████████████ Ex. 14, Musk Tr. at 168:4-170:8.

---

[7] Musk frequently tweeted complaints about spam and fake accounts. *See* Ex. 15, July 8, 2011 tweet by @elonmusk ("Lots of fake accounts on Twitter characterized by high following/follower ratio to make it seem like many real people when it isn't."); Ex. 16, February 1, 2020 tweet by @elonmusk ("Troll/bot networks on Twitter are a *dire* problem for adversely affecting public discourse and ripping people off."); Ex. 17, January 21, 2022 tweet by @elonmusk ("Twitter is spending engineering resources on this bs [non-fungible tokens] while crypto scammers are throwing a scambot block party in every thread!?"); Ex. 18, April 21, 2022 tweet by @elonmusk ("If our twitter bid succeeds, we will defeat the spam bots or die trying!").

**III.   Musk's "Jujitsu" Strategy, Waiver of Due Diligence, and "Seller-Friendly" Merger Agreement**

One day after laughing about Twitter's spam disclosure, on April 21, Musk signed and filed with the SEC an amended Schedule 13D announcing that his proposal was ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 20 at *144.  The filing also disclosed that Musk had financing commitments in place to fund the deal, including an equity commitment and $25.5 billion in debt commitments from various lenders. *Id.*  The debt commitments included $12.5 billion in margin loans, the viability of which depended heavily on the value of Musk's Tesla stock. *Id.* at *244.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ Ex. 21, Armstrong Tr. at 47:25-48:6. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 28, Grimes Tr. at 61:16-62:13. ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 28, Grimes Tr. at 64-69.  Indeed, Morgan Stanley suggested that Musk send Twitter a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ Ex. 22 at *880.  "Seller friendly" is a term of art used in the mergers and acquisitions field to refer to some combination of, *inter alia*, limited information rights for the buyer, minimal closing conditions imposed on the seller, and specific performance rights favoring the seller. Ex. 23, Expert Report of Professor Adam Badawi, at 28-36.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ Ex. 13, Musk Tr. at 99:4-13. ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 14, Musk Tr. at 124:15-125:4.

On April 24, Musk followed his bankers' advice and delivered a "seller friendly" merger agreement accompanied by a letter to Twitter's Chairman.  The letter stated ▮▮▮▮▮▮▮▮

███████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████ Ex.

24. █████████████████████████████████████████████████

███████ Ex. 14, Musk Tr. at 163:13-16.

In the event that Twitter rejected his proposal, Musk tweeted about and had his team prepare plans for a $54.20/share tender offer, *i.e.*, an offer made directly to Twitter shareholders with ███████████████████████████████ Ex. 14, Musk Tr. at 148:9-24; Ex. 25 (Barclays' advice on tender offer); *see also* Ex. 26, April 19, 2002 tweet by @elonmusk ("___ is the Night"); Ex. 27, April 16, 2022 tweet by @elonmusk ("Love me tender"). ████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

█████████████████████████████████████████ Ex. 28, Grimes Tr.

at 59-62, 67.

███████████████████████████████████████████████

████████████████████████ Ex. 29, Expert Report of John C. Coates IV, at 16-33.  Twitter negotiated a few more concessions from Musk, and the parties executed the Agreement on April 25.  *See* Ex. 19.

**IV.    Musk Looks for a Pretext to Get Out of the Deal**

On May 6, Musk held his first (and only) in-person meeting with Twitter CEO Agrawal, CFO Ned Segal, and others at Twitter's headquarters in San Francisco.  During the meeting, Musk ████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████ Ex. 14, Musk Tr. at 181:6-182:21 (CEO and CFO said ████████

███████████████████████████████████████████████████████████████████████

█████████████████████████████████████████ Ex. 30 at *173-74.  Musk

███████████████████████████████████████████████████████████████████████

███████████████████████████████████ Ex. 14, Musk Tr. at 183.  Musk also

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████ Ex. 61 at

826-27; Ex. 14, Musk Tr. at 291.

Also around this time, Musk grew alarmed about the impact that global geopolitical conflicts could have on business. On May 8, Musk texted his head banker, Grimes, on the Twitter deal: ████

██████████████████████████████████████████████████████

████████████████████ Ex. 31.

At the same time, Tesla's stock price was on the skids. On May 12, the stock closed at $699.23 per share, down 31.9% from the $1,028.10 closing price on the day before Musk's April 20 offer. Ex. 32 (compare row 1 with row 82). ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████ Exs. 33, 34. Further, Musk hadn't gotten as much traction from co-investors as he anticipated. Ex. 11 at 2; Ex. 35, Davis Report at 28-30. ████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████ Ex.

35, Davis Report at 28-30. ███████████████████████

███████████████████████████████████ Ex. 35, Davis Report at 28-30.

██████████████████████████████████████████████████████

██████████████████████████████ Ex. 14, Musk Tr. at 171:8-172:9.

Without a doubt, Musk wanted to avoid selling more Tesla stock to buy Twitter, in large part because he treasured Tesla and felt he had worked hard to build the car company. Indeed, Musk has compared the prospect of a Tesla bankruptcy to "having a gun to your child's head,"[8] and teared up

---

[8] *See* https://www.youtube.com/watch?v=cdZZpaB2kDM, at 27:50–28:56: "I should say, why do I not have respect for the SEC in that situation. ... The SEC knew that funding was secured but they pursued an active public investigation nonetheless. At the time, Tesla was in a precarious financial situation, and I was told by the banks that if i did not agree to settle with the SEC, then the bank would cease to provide working capital and Tesla would go bankrupt immediately. So *that's like having a gun to your child's head*. So I was forced to concede to the SEC unlawfully—those bastards—and

during an interview when he said about Tesla: "Having a company is almost like having a child, so it's sort of like saying how do you say your child should not have food."[9]  To make matters worse, it was well-known and even disclosed in Tesla's annual report that if Musk were to sell large quantities of Tesla stock, "such sales could cause our stock price to decline," thereby creating a downward spiral. Ex. 36 at 27.  After the acquisition, Musk publicly expressed regret about selling Tesla to buy Twitter, tweeting: "Sucks that I had to sell so much Tesla to do so (sigh)."  Ex. 37.

Ex. 39 at *046.

Ex. 39.  Jared Birchall, head of Musk's family office and advisor to Musk, responded to the email chain by saying

Ex. 38.

## V.    Musk's May 13th Deal-On-Hold Tweet

*By the early morning hours of May 13, Musk was massively motivated to throw a wrench in the deal and began a campaign designed to escape or renegotiate the deal.*  Exs. 39, 40.



---

now it makes it looks like I lied when I did not in fact lie.  I was forced to admit that I lied to save Tesla's life, and that's the only reason."

[9] *See* https://www.youtube.com/watch?v=hokOpy15IUQ, at 2:21–2:26 and 8:27–9:25.

At 2:44 a.m., Musk tweeted: "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users." Ex. 40. Musk's "deal on hold" tweet caused immediate panic that the deal was in jeopardy—including panic within Musk's own camp. For example, Musk's lawyer, Spiro, immediately called Musk in the middle of the night, which led Musk to clarify that he was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 62, ¶¶7-8. ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*, ¶¶14-15.

Musk knew that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 13, Musk Tr. at 31:6-10, Ex. 14, Musk Tr. at 215:6-10. The market reacted very strongly to Musk's tweet (as discussed *infra*), in part due to the unusual circumstances surrounding this acquisition. In particular, it was very unusual for a buyer to make a disruptive ***public*** statement like this instead of communicating directly with one's merger partner. Indeed, a senior banker on Musk's team testified about his reaction to Musk's May 13 tweets and Twitter's response: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ Ex. 28, Grimes Tr. at 224. Moreover, before posting the May 13 tweet, ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 14, Musk Tr. at 217-220, 270-71.

Contrary to Musk's tweet, the deal was not on hold. One of Musk's senior bankers testified about the tweet: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 7, Claassen Tr. at 260. Similarly, Musk's lead deal attorney testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 41, Ringler Tr. at 245) and another one of his bankers testified that when he saw the May 13 tweet, he thought something along the lines of ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 42, Earls Tr. at 206; *see also* Ex. 43, Silverstein Tr. at 346 ▮▮▮▮ ▮▮▮▮▮▮▮ Moreover, Musk ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 14, Musk Tr. at 225-26); ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 14, Musk Tr. at 225-26); ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 21, Armstrong Tr. at 285-86; Ex. 41, Ringler Tr. at 216); and his lead deal attorney never even ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Ex. 41, Ringler Tr. at 247; *see also* Ex. 14, Musk Tr. at 236-39.[10]

The market reacted as expected. A Wedbush securities analyst opined on May 13 that: "The implications of *this tweet will send this Twitter circus show into a Friday the 13th horror show* as now the Street will view this deal as 1) likely falling apart, 2) Musk negotiating for a lower deal price, or 3) Musk simply walking away from the deal with a $1 billion breakup fee." Ex. 45. A Truist analyst similarly summed up the confusion caused by Musk's tweet: ███████████████████

████████████████████████████████████████████████████████

████████████ Ex. 46. ████████████████████████████████

█████████████████████████████████████████ Ex. 44 ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ All told, Twitter's stock dropped by 17.85% over two trading days after Musk posted his "deal on hold" tweet. Ex. 4, row 84.

## VI.   Musk's May 16 Statement that Fake/Spam Accounts Totaled 20%

On May 16, Musk appeared via Zoom at the All-In Summit technology conference in Miami and made the following statement about Twitter's estimate of 5% fake/spam accounts:



Ex. 1 at RFA 134.

████████████████████████████████ He admitted as much under oath during his SEC testimony, which was taken less than two months after Musk made the statement.

████████████████████████████████████████

████████████████████████████

---

[10] *See also* Ex. 14, Musk Tr. at 275:7-9 ███████████████████████████ ████████████████████████████ Ex. 7, Claassen Tr. at 261 ███████████████ ███████████████████████████ Ex. 21, Armstrong Tr. at 286 (regarding May 13 tweets: "From our world, Morgan Stanley's world, nothing has changed. We're marching forward. We're not changing course.").

[REDACTED]

Ex. 3, Musk SEC Tr. at 306-07.

Like Musk's May 13 tweet, this statement disrupted the market for Twitter securities. A Wedbush analyst, for example, opined on the afternoon of May 16 that the "bot issue at the end of the day was known by the New York City cab driver and feels more to us like the 'dog ate the homework' excuse to bail on the Twitter deal or talk down a lower price. *The soap opera will continue this week and keep the popcorn handy as there are likely many more twists and turns ahead* in this Twitter/Musk saga." Ex. 47. As Musk intended, his May 16 statement maintained the artificial deflation of Twitter's stock price and perpetuated the large gap between the $54.20 merger price and the market's May 16 closing price of $37.39. *See* Ex. 4.

## VII.    Musk's May 17 Tweet Combining Prior Misstatements

On May 17, 2022, Musk posted a tweet that effectively combined his May 13 deal-on-hold tweet and his 20% speculation at the May 16 All-In Summit. Ex. 48.



As discussed *supra*, Musk did not have the right to and did not put the deal on hold, and had no more basis for his speculative 20% guess than he had the day prior. Indeed, in responding to an

interrogatory issued in the Delaware Action ████████████████████████████

████████████████████████████████████████████████████████████

████ Ex. 49 at responses no. 4, 5; *see also* Ex. 14, Musk Tr. at 140, 313-14 ███████

██████████████████████

After this tweet, a Wedbush analyst opined: "***If a revised deal does get done by Musk and Twitter, it will likely will be at a much lower price once negotiations take over*** and the diligence happens around Twitter DAU and algorithms hot button issues." Ex. 50. The May 17 tweet also maintained Twitter stock's artificially deflated price, as well as the significant gap between the merger price ($54.20) and market price at close on May 17 ($38.32). *See* Ex. 4.

Musk's May 17 statements were false for another reason. Musk was not actually surprised by fake/spam accounts on Twitter and did not really care about the process used by Twitter to estimate their prevalence. As discussed above, Musk was well aware of fake/spam accounts and even pledged, if his bid succeeded, to "defeat the spam bots or die trying!" Ex. 18. ████████████████

████████████████████████████████████████████████████████████

████████████████████ Ex. 51, Segal Tr. at 349; Ex. 14, Musk Tr. at 286.

Additionally, when Twitter delivered a detailed written explanation of its estimation process on May 21, Musk disregarded it and later testified, ██████████████████████████

██████████████████ Ex. 14, Musk Tr. at 282-85, 288; Ex. 52. Musk's team █████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Ex. 53 ████████████████████████████████████████████████████

Ringler responded: ██████████████████████████████████████ Musk admitted

during testimony ████████████████████████████████████████

████████████ Ex. 14, Musk Tr. at 300:3-5. All told, Musk's purported interest in Twitter's spam calculations was just a pretext for getting out of the deal or renegotiating a lower price.

## VIII. Musk's Purported Termination of the Deal, the Delaware Action, and Musk's Eventual Capitulation

Despite the fact that Twitter employees ████████████████████████████████

███████████████████████████ (Ex. 54, Conti Tr. at 80), ███████████████
███████████████████████████ Ex. 14, Musk Tr. at 307; Ex. 55.  Musk texted a friend the same day that, █████████████████████████████████████████████████████████ ████████████████████████ Ex. 56.  In response to the termination letter, Twitter brought suit in the Delaware Court of Chancery for specific performance.

In July of 2022, Musk was deposed by the SEC and asked about his tweets on May 13 and 17 and why he was attempting to terminate the deal. █████████████████████████████████ ████████████████████████████████████████████████████████████ █████ Ex. 3, Musk SEC Tr. at 271-2 ██████████████████████████████████ ████████████████████████████████████ Yet, Musk testified in this case, and evidence confirms ███████████████████████████████████████████████ █████████ Ex. 14, Musk Tr. at 288-89; Ex. 61. ██████████████████████████ ████████████████████████████████████████████████████████████████ Ex. 39. ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ Ex. 63, Taylor Tr. at 88-91; Ex. 64, Savitt Tr. at 32 ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████ Ex. 57; Ex. 41, Ringler Tr. at 211-213.

*   *   *

## LEGAL STANDARDS

Summary judgment is proper where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is not genuine unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party based upon it." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If a non-moving party's "evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal quotations, citations omitted).

To prevail on their securities fraud claim, Plaintiffs must prove (1) a misrepresentation or omission of a material fact; (2) scienter; (3) causation; (4) reliance; (5) use of the instrumentalities of interstate commerce, and (6) damages. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 403 F.3d 1050, 1055 (9th Cir. 2005) (stating that these are the elements of a Rule 10b-5 claim); NINTH CIRCUIT MANUAL OF MODEL CIVIL JURY INSTRUCTIONS, No. 18.2.

Falsity can be established where a statement "would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). Scienter, in turn, may be proven "by showing that the defendants knew their statements were false, or by showing that defendants were reckless as to the truth or falsity of their statements." *Gebhart v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010); *see also Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 343 (4th Cir. 2003) ("every circuit that has considered the issue has held that scienter may also be established by a showing of recklessness") (gathering authority). Deliberate recklessness encompasses situations in which a defendant is consciously aware that he "lacked sufficient information for [his] statements." *Gebhart*, 595 F.3d at 1044; *see also* RESTATEMENT (SECOND) OF TORTS § 526 (1977) ("A misrepresentation is fraudulent if the maker … does not have the confidence in the accuracy of his representation that he states or implies, or … knows that he does not have the basis for his representation that he states or implies.") (quoted in *Gebhart*, 595 F.3d at 1044). A defendant cannot defeat summary judgment as to scienter by "the mere denial of subjective knowledge of the risk that a statement could be misleading." *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094 (9th Cir. 2010).

## ARGUMENT

**I.    The Court Should Grant Summary Judgment as to Falsity, Materiality, and Scienter Surrounding Musk's May 13, May 16, and May 17 Statements**

**A.    Musk's May 13 Tweet**

**1.    Falsity**

Musk's May 13 deal-on-hold tweet is indisputably false and misleading.  First, the tweet affirmatively states that the deal was "on hold." Ex. 40.  But witness after witness testified that ███ ████████████████ Kate Claassen, a senior Morgan Stanley banker on Musk's team, is the most plain-spoken on this point: ████████████████████████████ Ex. 7, Claassen Tr. at 260-61.  And when asked if she agreed ████████████████████ ███ Claassen reiterated: ████████████████████████████ ████████████████ Ex. 7, Claassen Tr. at 260-61.  ████████████████ ████████ Ex. 21, Armstrong Tr. at 285-86; Ex. 41, Ringler Tr. at 108, 216, 247.  ████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███ Ex. 14, Musk Tr. at 225-228, 236-39.  Similarly, from May 10 onward, Twitter employees ███ ████████████████████████████████████████ Ex. 54, Conti Tr. at 80.  ***There was, therefore, nothing about the deal that was on hold***.  Simply put, Musk's May 13 tweet is factually false.  And even if the tweet were somehow literally true—which is hard to imagine—his statement nevertheless misled the investing public given the surrounding circumstances. *See Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("[S]tatements literally true on their face may nonetheless be misleading when considered in context.").

This false tweet was so alarming that Musk's lawyer, Spiro, immediately called Musk in the middle of the night, which led Musk to follow up with a tweet that he was ████████████████ ████████ Ex. 62, ¶¶7-8.  ████████████████████████ ████████████ *Id.*, ¶¶14-15.  ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

Ex. 14, Musk Tr. at 232:2-4; 229-236

The May 13 statement is also false and misleading because, as this Court has found, upon viewing this tweet, "reasonable investors would have understood that Twitter was obligated to provide Defendant with that information [about fake/spam accounts] under the terms of the deal." ECF 48 at 18.

Ex. 22 at *880; Ex. 28, Grimes Tr. at 64-69, 85, 97-99

What's more, the merger agreement does not state that Twitter was obligated to provide Musk with information about fake/spam accounts, or that Musk had the right to put the deal "on hold" if Twitter did not provide such information. *See* ECF 48, at 20 n.8; Ex. 41, Ringler at 245

Given these facts, there is no genuine dispute that the May 13 tweet created "the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson*, 527 F.3d at 985; *see also Platforms Wireless*, 617 F.3d at 1094-95 (affirming summary judgment: "Considered as a whole, the press release leaves the unmistakable impression that the ARC System exists. By contrast to the true facts, this press release was deceptive, an absolute and unequivocal falsehood.").

### 2. Scienter

The evidence reflecting Musk's state of mind surrounding the May 13 tweet is overwhelming. Musk had been fixated on fake/spam accounts long before he told Twitter's Chairman that eliminating such accounts was a major reason to take the company private and subsequently signed the seller friendly merger agreement. Exs. 16-19.

Ex. 14, Musk Tr. at 181:6-82:21

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████ Ex. 7, Claassen Tr. at 195-97; Ex 14, Musk Tr. at 138, 168-170. ████████████████████████████

██████████████████████████████████████████████ Ex. 14, Musk Tr. at 148:9-24; Exs. 25-27.

Indeed, after Twitter provided a detailed explanation of its methodology for estimating spam and fake accounts, Musk doubled down. Musk even lied to the SEC, claiming Twitter ██████ ██████████████████████████████████████ Ex. 3, Musk SEC Tr. at 271-2. That SEC testimony was categorically false. Musk testified in this case, and evidence confirms, that ████████████████████████████ ██████████████████████ Ex. 14, Musk Tr. at 288-89; Ex. 61 (Musk was aware of the methodology, but believed that it was lax.). Simply put, Musk's purported concern over fake/spam accounts and his unwarranted demands for information (which he received) were a mere pretext.

The truth was that: Musk (1) developed buyer's remorse; (2) grew concerned about geopolitical uncertainty unrelated to the deal; (3) had to reach $16.1 billion deeper into his own pocket to make the deal happen; (4) would have to sell a sizeable chunk of his stock in Tesla—a company he loved like a child; and (5) his stock sales would likely cause Tesla's stock to decline even further. *See* FED. R. EVID. 404(b) (other acts evidence is admissible for various purposes, "such as proving motive").

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████ Ex. 14, Musk Tr., at 270-271; Ex. 60 at 4-5. This alone establishes scienter because Musk was—at the very least—consciously aware that he ██████ ██████████████████████████████ *Gebhart*, 595 F.3d at 1042-43 (evidence of scienter was sufficient where defendants based false statements on representations by a colleague "and conducted no meaningful independent investigation to confirm the truth of their representations" and therefore

"lacked sufficient information for their statements"); *see also* ECF 48 at 31 (denying motion to dismiss as to scienter: "Even if he truly believed that Twitter had the contractual obligation to provide details about the company's spam and bot data—which he argues he did…—it was at least deliberately reckless to not investigate that obligation with the respect to the Merger Agreement before making his statements[.]") (citing *Gebhart* and *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 602 (N.D. Cal. 2019).

Musk's knowledge that his conduct would cause chaos for Twitter's stock price further establishes scienter. Musk publicly posted the tweet to his tens of millions of Twitter followers instead of simply calling Twitter to discuss the issue,[11] refused to take Twitter up on its offer to meet and further discuss Musk's purported concerns, disregarded the very information he was asking for (Twitter's methodology for calculating fake accounts), and did not allow his data scientists to meet with Twitter's engineers and developers. ██████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Ex. 44. Indeed, Musk's personal lawyer, Spiro, immediately called him at the crack of dawn to discuss his reckless ████████████████████████████████████████████████████

████████████████████████████████████ Ex. 62. ¶¶7-8.

████████████████████████████████████████████████████████ Ex. 3, Musk SEC Tr. at 43-47. The upshot: Musk posted his May 13 tweet with deliberate recklessness. *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (reckless conduct "represents 'an extreme departure from the standards of ordinary care to the extent that the defendant must have been aware of it'") (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978).

Musk's scienter is also demonstrated by his conduct after he was sued for specific performance by Twitter in Delaware. In that case, despite normally sending dozens of texts a day, Musk claimed he started primarily using self-deleting Signal messages (which he made no attempt to preserve and failed to produce in the Delaware Action). *See Twitter, Inc. v. Musk*, 2022 WL 5078278, at *5 (Del.

---

[11] ████████████████████████████████████████████████████████ ████████████████████████████████████████████ Ex. 52.

Ch. Oct. 5, 2022).  He also refused to turn over evidence from his data scientists that allegedly backed up his "20% or more" statement about bots, and then lost a motion to compel filed by Twitter.  *Twitter, Inc. v. Musk*, 2022 WL 3656938, at *6 (Del. Ch. Aug. 25, 2022).  ███████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

Exs. 63, 64.  When that did not work, he capitulated and agreed to pay the full merger price.  Musk's tactics are not consistent with a man convinced of the merits of his position.

To be clear, the evidence shows ███████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████  (Ex. 28, Grimes Tr. at 111-

12); ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████  Ex. 14, Musk Tr. at 196; Ex. 44.  Given his central and active role, the falsity of Musk's statement is itself proof of scienter.  *Evanston*, 411 F. Supp. 3d at 601 ("Falsity may itself be indicative of scienter" when combined with management's role "where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.") (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009); *see also* ECF 48 at 30-31 (applying *Evanston* to find scienter was well-pleaded in this case).  When the evidence is considered collectively, a reasonable jury could only find that Musk acted with scienter in posting his May 13 deal-on-hold tweet.

### 3.       Materiality

The May 13 tweet was undoubtedly material because news that the deal was supposedly on hold "significantly altered the total mix of information" available to investors.  *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988) (internal citation, quotation omitted).  If the deal went through, Musk would pay investors the significant premium built into the $54.20/share merger price; if the deal tanked, there would be no premium.  ████████████████████████████████████

████████  Ex. 14, Musk Tr. at 213-14; Ex. 3, Musk SEC T. at 282 ████████████

[text redacted]

The tweet's materiality is further evidenced by May 13 analyst reports (*e.g.*, "this tweet will send this Twitter circus show into a Friday the 13th horror show;" "TWTR is trading at -24% discount to the offer price, which reflects … lack of confidence that the deal will happen") (Ex. 45), the 17.85% drop in Twitter's stock price over the following two trading days (Ex. 4, row 84), and Plaintiffs' and even Musk's expert opinions. Ex. 65, Expert Report of David I. Tabak, ¶ 16 ("the May 13, May 16, July 8, and October 4, 2022 price movements are statistically significantly different from zero"); ECF 99-6, Expert Report of Atanu Saha, ¶ 41 (Musk's expert in opposing class certification: "Twitter's price drop on May 13, 2022, is statistically significant."). The tweet was also material because, as this Court has found, "a reasonable investor would find Twitter not complying with its contractual obligations—particularly, its contractual obligation to provide details about its bot calculations—to be material to their investing decision-making." ECF 48 at 21.

**B.     Musk's May 16 Statements at the All-In Summit**

**1.     Falsity**

The falsity of Musk's May 16 All-In Summit statement is even more straightforward. [text redacted]

[text redacted]

[text redacted]

[text redacted]    Ex. 3, Musk SEC Tr. at 5-6.    [text redacted]

[text redacted]

[text redacted]

[text redacted]

Ex. 3, Musk SEC Tr. at 306-07.

Musk certainly didn't tell the market that he was "just kind of throwing [numbers] out there" or that the number is "simply unknowable." To the contrary, Musk—who already owned billions of dollars worth of Twitter's stock, had personally negotiated the merger and signed the merger

agreement, and had direct access to Twitter's board and executive management—stated that Twitter's estimate was understated and the lowest the number could be was 20%. The truth (*i.e.*, Musk had no factual basis to say 20%) was therefore drastically different than his public representations (the "lowest estimate would be probably 20%"). By contrast to the true facts, the May 16 tweet was deceptive and "an absolute and unequivocal falsehood." *Platforms Wireless*, 617 F.3d at 1094-95.

████████████████████████████████████████████████████████████

████████████████████████████████████████████ Ex. 3, Musk SEC Tr. at 306-307. As this Court has noted, Musk "had tweeted just three days prior that the deal was on hold pending details" from Twitter, "so a reasonable investor could have reasonably concluded that Defendant was later able to make a statement about the percentage of bot users because he had received such information from Twitter." ECF 48 at 23. Musk admitted under oath that he did not base his assertion on information obtained from Twitter (or any other reliable source). A reasonable juror could only find falsity in light of these facts. *Berson*, 527 F.3d at 987.

### 2.     Scienter

The evidence of Musk's scienter surrounding the May 16 All-In Summit statement is similarly overwhelming. Under *Gebhart*, deliberate recklessness can be established where a defendant is consciously aware that he "lacked sufficient information for [his] statements." 595 F.3d at 1042-43. This precisely describes Musk's statement at the All-In Summit. After Musk testified that ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ Ex. 3, Musk SEC Tr. at 306-07. ███████

████████████████████████████████████████████████████████████

████████████████████ *Id*. But that is not what Musk said at the All-In Summit, where he told the investing public that the ***lowest*** the number could be was 20%.

In context, Musk's statements here are even more egregious than those in *Gebhart.* There, the defendants were financial planners who "simply relied on [an annuity salesperson's] representations" about promissory notes that the defendants described and sold to their own clients. 595 F.3d at 1038. Defendants there also "failed to disclose that their statements [to clients] were based on information

provided by [the salesperson] rather than their own, independent investigation." *Id.* at 1039.  The statements, "it later became clear, were false." *Id*.  Under these facts, the Ninth Circuit had no problem affirming the SEC's scienter finding, even where the defendants had *some* basis for their statements to investors.  *Id.* at 1043.  Here, in contrast, Musk admits that he had no basis to support his 20% statement.  "[W]hen a "defendant is aware of the facts that made the statement misleading, 'he cannot ignore the facts and plead ignorance of the risk' of misleading others." *In re Tesla, Inc. Sec. Litig.*, 2022 WL 1497559, at *15 (N.D. Cal. Apr. 1, 2022) (Chen. J.) (quoting *Platforms Wireless*, 617 F.3d at 1094) (finding Musk acted with scienter in making false statements about Tesla).

### 3.    Materiality

Musk's May 16 misrepresentation was certainly material.  First, the statement "suggested that Twitter had significantly more bot users than reported in its most recent SEC filings, a fact which would certainly be material to an investor given the nature of Twitter's business."  ECF 48 at 24.  Second, while there may have been fake/spam account estimates floating around the blogosphere that were dubiously created using various methodologies and secondary data sources, Musk's estimate was unique—and unusually persuasive—in that it appeared to be based on information and data received from Twitter itself.  *Id.*  Additionally, coming from Musk (who is also sophisticated with technology), these statements were more influential given that he was the primary purchaser of Twitter.

Given these facts, it is no surprise that the May 16 tweet prolonged the artificial deflation of Twitter's stock price.  Ex. 4, rows 83-86.  *See, e.g.*, *Cooper v. Thoratec Corp.*, 2018 WL 2117337, at *4 (N.D. Cal. May 8, 2018) ("[T]hat Smith's May 11, 2011 statement did not lead to any significant increase in stock price is entirely consistent with Plaintiff' theory that this misrepresentation prolonged the artificial inflation of Thoratec's stock price.").  Reactions by securities analysts conclusively demonstrate as much, with one well-respected analyst, for example, stating that the "soap opera will continue" and predicting "more twists and turns ahead in this Twitter/Musk saga." Ex. 47.  In addition, an expert found a statistically significant price movement on May 16.  Ex. 58, ¶ 16.

### C.    Musk's May 17 Tweet

As set forth above, Musk falsely stated in a May 17 tweet that (1) Twitter is made up of 20% fake/spam accounts, which Defendant thinks could be higher than 20%, and (2) the deal "cannot move

forward" until Twitter shows proof that fake/spam accounts are less than 5%.  Ex. 48.  This tweet effectively combined his May 13 and May 16 misrepresentations.  ECF 48 at 24-25 (the 20% statement "is a reiteration of Defendant's May 16, 2022 tweet," and the "second statement is materially false or misleading for the same reasons that the May 13, 2022 tweet is materially false and misleading").  Additionally, this post stated that "Yesterday, Twitter's CEO publicly refused to show proof of <5%. This deal cannot move forward until he does."  Ex. 48.  That statement is also false.  CEO Agrawal tweeted the day prior, on May 16, in response to Defendant's '20%' spam or false user claim, that an "mDAU calculation could not be performed externally."  Ex. 59.  Agrawal also stated that "we shared an overview of the estimation process with Elon a week ago and look forward to continuing the conversation with him, and all of you."  Ex. 59.

A reasonable investor would naturally take Musk's May 17 statement as more reason to believe he was basing his 20% estimate on information received from Twitter.  *Id.*  Musk's interrogatory responses in Delaware conclusively show that, in reality, this was untrue.

Ex. 49, responses 4, 5.

Lastly, materiality is further buttressed by the analyst community's reaction to the May 17 tweet—a Wedbush analyst predicted after this tweet that "***[i]f a revised deal does get done by Musk and Twitter, it will likely will be at a much lower price once negotiations take over*** and the diligence happens around Twitter DAU and algorithms hot button issues."  Ex. 50.

In a nutshell, falsity, materiality, and scienter as to the May 17 tweet are every bit as well established as they were for Musk's May 13th and 16th statements.

**D.    Summary Judgment is Warranted on Class-Wide Reliance**

Where, as here, a plaintiff alleges fraud-on-the-market, reliance is established where: "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("*Halliburton II*").  Indeed, the Supreme Court has repeatedly held that "courts may presume

that investors trading in efficient markets indirectly rely on public, material misrepresentations through their 'reliance on the integrity of the price set by the market.'" *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 462 (2013); *see also Basic*, 485 U.S. at 249-50; *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812 (2011) ("*Halliburton I*"); *Halliburton II*, 134 S. Ct. at 2412.  The evidence here conclusively meets each of these criteria.

**Publicly Known –** Musk's misrepresentations were publicly known.  Two of the statements were made by tweet, and Musk admits that he had tens of millions of Twitter followers throughout 2022.  Ex. 1, response 4.  In turn, Musk's statements at the All-In Summit were posted on the All-In Podcast's YouTube channel on May 16, 2022, the video has had 2.5 million views and prompted over 6,000 comments (5,000 of which were posted "3 years ago," according to YouTube), and were referenced in widely distributed reports by analysts from Wedbush and Truist.  *See* Redenbarger Decl. ¶69; Ex. 1 at RFA 134.

**Materiality** – The overwhelming evidence of materiality as to the May 13, May 16, and May 17 statements is discussed *supra*.

**Efficient Market** – The evidence shows that Twitter's stock traded in an efficient market.  Plaintiffs' expert, Dr. David Tabak, opined that the market for Twitter's securities traded in an open, developed, and efficient market during the class period.  Ex. 58, ¶¶12-56.  Dr. Tabak's event study analysis establishes that there is a consistent cause-and-effect relationship between the disclosure of material information and Twitter stock price, thus further supporting a finding of market efficiency.  Ex. 58, ¶¶35-43.  Musk has made no effort to challenge the finding of market efficiency, and his expert expressly concedes that the market for Twitter stock was efficient: "Twitter traded in an efficient market."  ECF 99-6, Expert Report of Dr. Atanu Saha, ¶ 27.

**Stock Trades Between Misrepresentations and Revelation of the Truth** – Lead plaintiffs have each submitted certifications confirming that they traded between May 13, May 16, and May 17, on the one hand, and October 4, on the other.  ECF 8-3.  More importantly, because this is a certified class action, there is no dispute that Class Members transacted in relevant Twitter securities between the time of the misrepresentations and the disclosure of the truth.  By its very definition, only investors who transacted in Twitter securities during the Class Period can be members of the Class.  ECF 106.

**Defendants Have Offered No Evidence to Rebut the Presumption of Classwide Reliance** – The presumption of classwide reliance in a fraud-on-the-market case is rebuttable. *Halliburton II*, 134 S. Ct. at 2416. To rebut the presumption, Defendants must put forth "evidence that an alleged misrepresentation did not actually affect the market price of the stock." *Id*. at 2417; *see also In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *13 (N.D. Cal. Dec. 22, 2016) ("Defendants bear both the burden of production and the burden of persuasion on the issue of price impact."); *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *7 (N.D. Cal. Mar. 16, 2016) (finding that "the burden to show no price impact" rests "on [d]efendants"). Plaintiffs are aware of no evidence rebutting the presumption of classwide reliance. This is not surprising given the undisputed fact that the price of Twitter's stock declined and remained artificially deflated in response to Musk's May 13, 16, and 17 statements.

As Plaintiffs have "put forth unrebutted evidence that [Twitter] securities traded on an efficient market," summary judgment is warranted on class-wide reliance. *In re Celestica Inc. Sec. Litig.*, 2014 WL 4160216, at *12 n.15 (S.D.N.Y. Aug. 20, 2014); *see also McCrary v. Elations Co. LLC*, 2014 WL 12561600, at *4 (C.D. Cal. Dec. 8, 2014) (where "'under the governing law, there can be but one reasonable conclusion as to the [issue],'" summary judgment is appropriate); *In re Infineon Techs. AG Sec. Litig.*, 266 F.R.D. 386, 389 (N.D. Cal. 2009) ("where a rational trier of fact could not find for the nonmoving party based on the record as a whole, there is no 'genuine issue for trial'").

**E.      Summary Judgment is Warranted on Musk's Use of Instrumentalities of Interstate Commerce**

A reasonable jury could only find that Musk's false statements via Twitter and YouTube were conveyed via the instrumentalities of interstate commerce. *See United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007) ("We are therefore in agreement with the Eighth Circuit's conclusion that as both the means to engage in commerce and the method by which transactions occur, the Internet is an instrumentality and channel of interstate commerce.") (cleaned up, citations and quotations omitted); *SEC v. Beck*, 2024 WL 1626280, at *10 (C.D. Cal. Mar. 26, 2024) (defendant "conveyed the misrepresentations and omissions via the instrumentalities of interstate commerce, namely by using websites, email, and Twitter to promote his stock selections and engage with investors").

**CONCLUSION**

For the reasons stated above, Plaintiffs' motion for partial summary judgment should be granted.

Dated: August 15, 2025                    Respectfully submitted,

                                          COTCHETT, PITRE & MCCARTHY, LLP


                                          */s/ Tyson C. Redenbarger*
                                          Tyson C. Redenbarger

                                          Joseph W. Cotchett (SBN 36324)
                                          Mark C. Molumphy (SBN 168009)
                                          Tyson C. Redenbarger (SBN 294424)
                                          Gia Jung (SBN 340160)
                                          Caroline A. Yuen (SBN 354388)

                                          840 Malcolm Road, Suite 200
                                          Burlingame, California 94010
                                          Telephone:  (650) 697-6000
                                          Email:        jcotchett@cpmlegal.com
                                                          mmolumphy@cpmlegal.com
                                                          tredenbarger@cpmlegal.com
                                                          gjung@cpmlegal.com
                                                          cyuen@cpmlegal.com


                                          BOTTINI & BOTTINI, INC.
                                          Francis A. Bottini, Jr. (SBN 175783)
                                          Albert Y. Chang (SBN 296065)
                                          Aaron P. Arnzen (SBN 218272)
                                          7817 Ivanhoe Avenue, Suite 102
                                          La Jolla, California 92037
                                          Telephone:  (858) 914-2001
                                          Email:        fbottini@bottinilaw.com
                                                          achang@bottinilaw.com
                                                          aarnzen@bottinilaw.com

                                          *Lead Counsel for Plaintiffs*