QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice*)
alexspiro@quinnemanuel.com
Jesse A. Bernstein (*pro hac vice*)
Jessebernstein@quinnemanuel.com
Jonathan E. Feder (*pro hac vice*)
jonathanfeder@quinnemanuel.com
296 Fifth Ave., New York, NY 10010
Telephone:     (212) 849-7000
Facsimile:     (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Stephen A. Broome (Bar No. 314605)
stephenbroome@quinnemanuel.com
Joseph C. Sarles (Bar No. 254750)
josephsarles@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100

*Attorneys for Defendant Elon Musk*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | CASE NO. 3:22-CV-05937-CRB<br><br>**DEFENDANT ELON MUSK'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:          Hon. Charles R. Breyer<br><br>Hearing Date:  October 31, 2025<br>Time:           10:00 a.m.<br>Courtroom:     6, 17th Floor<br><br>**FILED UNDER SEAL - REDACTED FOR PUBLIC FILING** |

DEFENDANT ELON MUSK'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ...................................................................................1

STATEMENT OF ISSUES TO BE DECIDED (CIVIL L.R. 7-4(A)(3)) ....................................1

SUMMARY OF THE ARGUMENT .....................................................................................1

FACTUAL BACKGROUND .................................................................................................4

    A.    Musk Makes a Non-Binding Proposal to Buy Twitter and Forgoes *Pre-Signing* Due Diligence Only ..........................................................................................4

    B.    The Merger Agreement Gave Musk the Right to Conduct Due Diligence Post-Signing ...........................................................................................................6

        1.    After the Parties Signed the Merger Agreement, Musk's Information Rights Were Governed by That Agreement, Not the Schedule 13D ...................................6

        2.    Section 6.4 Gave Musk Broad Information Rights that Twitter Was Obligated to "Satisfy" as a Condition to Closing .......................................................6

        3.    Section 6.11 Also Gave Musk Information Rights ...................................................8

    C.    The May 6 "Due Diligence" Meeting: Musk Becomes Concerned Upon Learning Twitter's Executives Are Clueless as to How the Company Calculates mDAU; Twitter Responds By Agreeing to Produce Information to Musk ..........................9

    D.    May 7-13 Due Diligence: Twitter Promises Musk Bot Data But Fails to Produce It ..........................................................................................................10

    E.    The At-Issue Tweets/Statements: Musk Alerts the Market to His Concerns and a Potential Delay in Closing .........................................................................11

        1.    The Events Leading Up to the May 13 Tweet ........................................................11

        2.    The Events Leading Up to the May 16 Statement .................................................12

        3.    The Events Leading Up to the May 17 Tweet ........................................................14

    F.    Twitter Agrees to Provide—and in Fact Provides—Bot Data Under the Merger Agreement ................................................................................................15

    G.    Twitter Fails to Provide Data Necessary to Confirm the Percentage of mDAU Comprised of Bots ....................................................................................18

    H.    Musk Closes the Merger But Never Issues a Corrective Disclosure ...............................20

ARGUMENT ......................................................................................................................21

I.    MUSK IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE UNDISPUTED RECORD PROVES HIS STATEMENTS WERE NOT FALSE ..................................................21

DEFENDANT ELON MUSK'S MOTION FOR SUMMARY JUDGMENT

A.     There Is No Genuine Dispute that Musk's May 13 Tweet Accurately Reflected the Then-Existing State of Affairs, and Thus Was Not False ................................................. 21

     1.     There Is No Genuine Dispute that, as of May 13, Musk Had the Right to Bot Data and to Refuse to Close if Twitter Did Not Provide Any ........................ 21

     2.     There Is No Evidence Any Investor Interpreted "Temporarily On Hold" to Mean All Merger Related Work Stopped or that Any Such Misimpression Was Material ................................................................................................... 24

B.     There Is No Genuine Dispute that Musk's May 16 Statement and May 17 Tweet Reflected the Then-Existing State of Affairs, and Thus Were Not False ......................... 26

II.     MUSK IS ENTITLED TO SUMMARY JUDGMENT BECAUSE HIS STATEMENTS WERE AT MOST NON-ACTIONABLE OPINION ................................................................. 27

III.     MUSK IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE IS NO EVIDENCE OF SCIENTER ................................................................................................... 29

IV.     MUSK IS ENTITLED TO SUMMARY JUDGMENT AS TO PLAINTIFFS' CLAIMS BASED ON THE MAY 16 AND 17 STATEMENTS BECAUSE THEIR EXPERT ADMITS THE STATEMENT AND TWEET DID NOT CAUSE ANY LOSSES ..................... 30

V.     MUSK IS ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFFS FAIL TO SHOW LOSS CAUSATION ................................................................................................... 30

A.     Plaintiffs Fail to Disaggregate the Price Impacts of Information they Allege Was True ................................................................................................................................. 30

B.     Plaintiffs Fail to Disaggregate the Impacts of Market And Industry Effects ................... 31

C.     There Was No Corrective Disclosure ................................................................................ 32

D.     The Same Market Reaction Would Have Occurred After the July 8 Termination Letter ................................................................................................................................. 34

VI.     PLAINTIFFS CANNOT DRESS UP UNACTIONABLE AND DISMISSED ALLEGATIONS AS AN UNPLED SCHEME ......................................................................... 34

CONCLUSION ................................................................................................................................. 36

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re AGS, Inc. Sec. Litig.*,
   2024 WL 581124 (D. Nev. Feb. 12, 2024) ................................................................34, 35

*Akorn v. Fresenius Kabi*,
   2018 WL 4719347 (Del. Ch. Oct. 1, 2018) ...............................................................22, 23

*Berson v. Applied Signal Tech.*,
   527 F.3d 982 (9th Cir. 2008) .............................................................................................21

*Best v. Best*,
   25 So. 2d 723 (Ala. 1946) ..................................................................................................27

*Blue v. Tilray Brands, Inc.*,
   2025 WL 519848 (Del. Ch. Feb. 17, 2025) .......................................................................22

*Brody v. Transitional Hospitals Corp.*,
   280 F.3d 997 (9th Cir. 2002) .............................................................................................21

*Chartis Warrantyguard v. Nat'l Elecs.*,
   2011 WL 336385 (Del. Ch. Jan. 28, 2011).........................................................................22

*Cicone v. URS Corp.*,
   183 Cal. App. 3d 194 (Cal. Ct. App. 1986) .......................................................................27

*Dearborn Heights v. Align Tech.*,
   856 F.3d 605 (9th Cir. 2017) .......................................................................................27, 28

*Dura Pharmaceuticals, Inc. v. Broudo*,
   544 U.S. 336 (2005)..........................................................................................30, 31, 32, 34

*In re Galena Biopharma, Inc. Sec. Litig.*,
   117 F. Supp. 3d 1145 (D. Or. 2015) ..................................................................................34

*Glickenhaus & Co. v. Household Int'l, Inc.*,
   787 F.3d 408 (7th Cir. 2015) .............................................................................................30

*Grigsby v. BofI Holding, Inc.*,
   979 F.3d 1198 (9th Cir. 2020) ...........................................................................................32

*Hagood v. Sonoma County Water*,
   81 F.3d 1465 (9th Cir. 1996) .............................................................................................28

*Hampton v. root9B Techs.*,
   897 F.3d 1291 (10th Cir. 2018) .........................................................................................28

DEFENDANT ELON MUSK'S MOTION FOR SUMMARY JUDGMENT

*Hollinger v. Titan Cap. Corp.*,
914 F.2d 1564 (9th Cir. 1990) ...............................................................................................29

*Hubbard v. BankAtlantic Bancorp, Inc.*,
688 F.3d 713 (11th Cir. 2012) ...............................................................................................31

*Iafrate v. Angelo Iafrate*,
827 F. App'x 543 (6th Cir. 2020) ...........................................................................................28

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
251 F. Supp. 3d 596 (S.D.N.Y. 2017).....................................................................................28

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
398 F. Supp. 3d 549 (N.D. Cal. 2019) ...............................................................................21, 24

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
998 F.3d 397 (9th Cir. 2021) .................................................................................................33

*Kang v. PayPal Holdings, Inc.*,
620 F. Supp. 3d 884 (N.D. Cal. 2022) ....................................................................................34

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) .................................................................................................32

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..................................................................................25

*Manistee Town Ctr. v. City of Glendale*,
227 F.3d 1090 (9th Cir. 2000) ...............................................................................................36

*Mickman v. Am. Int'l*,
2009 WL 2244608 (Del. Ch. July 28, 2009)...........................................................................22

*Miller v. Thane Int'l, Inc.*,
372 F. Supp. 2d 1198 (C.D. Cal. 2005) ..................................................................................25

*In re Netflix, Inc. Sec. Litig.*,
647 F. App'x 813 (9th Cir. 2016) ...........................................................................................21

*Kearney v. Foley & Lardner, LLP*,
590 F.3d 638 (9th Cir. 2009) .................................................................................................36

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
730 F.3d 1111 (9th Cir. 2013) ...............................................................................................30

*Omnicare, Inc. v. Laborers Dist.*,
575 U.S. 175 (2015).......................................................................................4, 27, 28, 35

*In re Omnicom Grp., Inc. Sec. Litig.*,
541 F. Supp. 2d 546 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) ........................................31

DEFENDANT ELON MUSK'S MOTION FOR SUMMARY JUDGMENT

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ....................................................................................29, 30, 31

*Reese v. BP Expl. (Alaska) Inc.*,
643 F.3d 681 (9th Cir. 2011) ................................................................................................35

*In re REMEC Inc. Sec. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010) ........................................................................30, 31

*In re Rigel Pharm., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ..........................................................................................21, 24

*Somerset Commc'ns Grp. v. Wall to Wall Advert., Inc.*,
2015 WL 5007680 (W.D. Wash. Aug. 20, 2015) ...............................................................21

*Stoneridge Invs. Partners, LLC v. Scientific–Atlanta, Inc.*,
552 U.S. 148 (2008).......................................................................................................34, 35

*South Ferry LP v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ................................................................................................29

*In re Tesla Inc., Sec. Litig.*,
2023 WL 4032010 (N.D. Cal. June 14, 2023) .....................................................................25

*United States v. AseraCare, Inc.*,
938 F.3d 1278 (11th Cir. 2019) ............................................................................................28

*In re VeriFon Sec. Litig.*,
11 F.3d 865 (9th Cir. 1993) ..........................................................................................21, 24

*In re Williams Sec. litigation-WCG Subclass*,
558 F.3d 1130 (10th Cir. 2009) ............................................................................................32

*York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*,
738 F. Supp. 3d 1182 (N.D. Cal. 2024) ........................................................................34, 36

**Statutes and Rules**

15 U.S.C. § 78j(b).......................................................................................................................1

Rule 10b-5...........................................................................................................................1, 21, 35

Federal Rule of Civil Procedure 56 ...........................................................................................1

**Other Authorities**

37 C.J.S. Fraud § 96..................................................................................................................27

Am. Jur. 2d of Fraud and Deceit § 97 (2001) .........................................................................27

DEFENDANT ELON MUSK'S MOTION FOR SUMMARY JUDGMENT

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on October 31, 2025, at 10:00 a.m., before The Honorable Charles R. Breyer, United States District Court, San Francisco Courthouse, Courtroom 6, 17th Floor, at 450 Golden Gate Avenue, San Francisco, California, Defendant Elon R. Musk will move, and hereby does move, pursuant to Federal Rule of Civil Procedure 56, for the Court to enter summary judgment on Plaintiffs' sole cause of action for Violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5. This Motion is based on this Notice of Motion and Motion; Defendant's Memorandum of Points and Authorities, incorporated herein; the Declaration of Stephen A. Broome and attached exhibits; and other matters before the Court.

**STATEMENT OF ISSUES TO BE DECIDED (CIVIL L.R. 7-4(a)(3))**

Whether the Court should enter summary judgment on Plaintiffs' sole claim for violation of Section 10(b) and Rule 10b-5(b) of the Securities and Exchange Act of 1934 where the record undisputedly shows that, as a matter of law, Plaintiffs cannot establish that Musk's May 13 Tweet, May 16 Statement, or May 17 Tweet were materially false, made with scienter, or caused any damage.

**SUMMARY OF THE ARGUMENT**

Plaintiffs filed this case on October 10, 2022, claiming that Elon Musk made a series of tweets or statements relating to his 2022 acquisition of Twitter that violated Rule 10b-5(b). The Court dismissed most of those statements as inactionable. Dkt. 48 (MTD Order) at 39. That left Musk's statements on May 13, 16, and 17, 2022. Plaintiffs now concede that the May 16 and 17 statements did not have a statistically significant impact on Twitter's stock price, and thus they are inactionable.

What remains is Plaintiffs' claim that Musk caused Twitter investors substantial trading losses by issuing the following tweets before the market opened on May 13, 2022: "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users" and "Still committed to acquisition." Ex. 10. Because the record overwhelmingly confirms that there is nothing remotely inaccurate about Musk's tweets, this case should be dismissed.

The Court allowed this case to proceed based on the following core allegations and reasoning:

> Plaintiffs have plausibly alleged that Defendant waived due diligence as a condition to the Merger Agreement, see FAC ¶¶ 21, 82, 112, and thus that Twitter had no obligation under

-1-                                         Case No. 3:22-CV-05937-CRB

DEFENDANT ELON MUSK'S MOTION FOR SUMMARY JUDGMENT

the Merger Agreement to provide information supporting its bot calculations. Because Twitter <u>did not</u> have an obligation to provide this data to Defendant under the terms of the Merger Agreement, Defendant's representation that Twitter <u>did</u> have this obligation in order for the deal to close was false. ... Plaintiffs plausibly allege that Defendant's right to data under Sections 6.4 and 6.11 of the Merger Agreement was far more limited than the broad due diligence rights he undisputedly waived prior to his May 13 tweet—and that the information about bot calculations fell into the category of due diligence that Twitter had no obligation to provide.

Dkt. 48 (MTD Order) at 20.

Plaintiffs sold the Court a bill of goods. Discovery disproved *every one* of their core allegations. *First*, Musk did *not* "waive" due diligence. He merely agreed to forego *pre-signing* due diligence as a condition to *entering* the Merger Agreement ("MA")—which is not atypical when dealing with a reluctant seller like Twitter. Plaintiffs' M&A expert, Adam Badawi, admits that Musk's removing of this condition to his offer affected only his "ability to do a *pre-signing* investigation,"[1] and that in the period after signing, Musk's rights to information were governed solely by the MA. Ex. C (Badawi Dep.) at 109:7-21; 51:24-52:3.[2] Plaintiffs' "waiver of due diligence" theory thus conflates pre-signing conditions precedent with post-signing contract rights. The absence of the former has no bearing on the latter.

*Second*, Musk's rights to information under Sections 6.4 and 6.11 were not as limited as Plaintiffs allege. They entitled him to "all information concerning the business ... for any reasonable business purpose related to the consummation of the" the merger. Ex. 30 (MA) at § 6.4. Under Delaware law, such language is construed broadly. *See infra* at 22. Under Section 7.2(b), one "reasonable business purpose" for which Musk could request information (among others discussed below) was to confirm the veracity of Twitter's representations and warranties in Section 4.6, including its representation that its 2021 10-K truthfully and accurately presented Twitter's estimate of bots as a percentage of monetizable daily active users ("mDAU")—a "Key Metric" of Twitter's business—as less than 5%. In due diligence meetings, Musk became increasingly concerned that Twitter's process for estimating the percentage of mDAU comprised of bots was deeply flawed or non-existent. He therefore sought information under

---

[1] All emphases within quotation marks are added unless otherwise noted.

[2] Citations to "Ex.__" refer to the exhibits attached to the Aug. 15, 2025 Declaration of Stephen A. Broome. In accordance with N.D. Cal. LR 30-2, the parties sequentially numbered exhibits used in deposition. To maintain consistency, as required by the Rule, all exhibits cited in this Motion that were used in deposition bear the number they were marked. All other exhibits—including deposition transcripts and documents not used in deposition—are identified with letters.

Sections 6.4 and 6.11 of the MA relating to Twitter's calculations of bots, spam, and fake accounts ("Bot Data"). There is no genuine dispute that Musk had a right to Bot Data—everyone involved in the transaction (including Twitter's lawyers and CEO) agreed he had such rights.

Nor can there be any dispute that, if Twitter refused to provide Bot Data, Musk could refuse to close. Under Section 7.2(a), closing was conditioned on Musk's "satisfaction" that Twitter materially performed all of its obligations under the MA—including its obligations to provide information. And under Section 7.2(b), Musk could refuse to close if he was not "satisf[ied]" that Twitter's representations to the SEC about its mDAU were "true and correct as of the Closing Date."

*Third*, perhaps the best evidence of Twitter's obligation under the MA to provide Musk with Bot Data is the fact that Twitter *agreed* it had such an obligation and purported to act in accordance with it. Twitter set up a "data room" in which it produced Bot Data for Musk's team to examine and the parties conducted numerous "due diligence" meetings on the topic. Twitter's lead M&A lawyer, Martin Korman, testified that ███████████████████████████████████████████████████████████████████████████████ Ex. I (Korman Dep.) at 237:22-238:7. Twitter's CEO, Parag Agrawal, similarly testified that, in response to Musk's requests, "████████████████████████████████████████████████████████████████ Ex. A (Agrawal Dep.) at 372:2-12. There is no evidence that *anyone* involved in the merger believed Musk was not entitled to at least *some* Bot Data under the MA.

*Fourth*, while Plaintiffs contend Musk's tweet falsely claimed the deal was on hold because he did not instruct "pencils down," Plaintiffs' own M&A expert testified that "temporarily on hold" merely conveyed: "I've requested information, I'm not getting a satisfactory response, and I'm not closing until I do." Ex. C (Badawi Dep.), at 267:2:4; *see also* Dkt. 48 (MTD Order) at 19 ("a reasonable investor would have plausibly understood Defendant's statement that the deal was on hold 'pending' this information from Twitter to mean that, absent the provision of such information, the deal would not close"). There is nothing false about that—after Musk's team concluded that Twitter failed to provide the data he requested to support its 5% calculation, he terminated the deal, litigation ensued, and the deal was delayed.

In short, there is no genuine dispute that Musk's tweets were accurate and borne out by subsequent events. He informed the market that he was concerned Twitter's SEC disclosures materially misstated its

DEFENDANT ELON MUSK'S MOTION FOR SUMMARY JUDGMENT

mDAU and that he would not move forward with closing until Twitter materially complied with its obligation to produce information showing otherwise—as was his right under the MA. Twitter agreed to produce information but failed to satisfy Musk that mDAU was reasonably presented. Musk terminated the MA and delayed closing. His tweets were an act of transparency, not fraud. Plaintiffs cannot establish falsity on this record.

Even if the Court were to find Musk's statements were false, they amount to inactionable legal opinion under *Omnicare, Inc. v. Laborers Dist.*, 575 U.S. 175, 176 (2015), unless Plaintiffs show Musk's opinion was not sincerely held. They cannot do so. By May 13, Twitter had *agreed* to provide Musk Bot Data to appease his concerns. *Everyone* involved in the transaction believed Musk had a right to information and was acting accordingly. Plaintiffs cannot prove scienter for similar reasons.

Finally, Plaintiffs fail to show loss causation. They concede Musk's May 16 and 17 statements did not cause *any* statistically significant loss. And their efforts to tie losses to Musk's May 13 tweet fail. Their expert, Dr. Tabak, failed to disaggregate the alleged fraud-related losses from (1) losses caused by what Plaintiffs allege was the *true state of affairs—i.e.*, the market's belief that Musk was getting "cold feet" about the merger—and (2) losses due to mere changes in the market and industry indices. And while Plaintiffs allege that Musk's October 4 statement that he would close the deal at $54.20/share was a "corrective disclosure," their own expert does not endorse that view, and Plaintiffs cannot point to a single investor or analyst who shared it. Nor can Plaintiffs prove that a single cent of Twitter' price decline after Musk publicly disclosed on July 8 that he was terminating the merger—a statement the court dismissed as not misleading—was caused by any alleged fraud in the May 13 Tweet instead of the market's reaction to the termination.

Summary judgment should be granted and Plaintiffs' claims dismissed.

## FACTUAL BACKGROUND

### A. Musk Makes a Non-Binding Proposal to Buy Twitter and Forgoes *Pre-Signing* Due Diligence Only

On April 13, 2022, Musk filed a Schedule 13D confirming he had made a non-binding proposal to purchase Twitter for $44 billion. Ex. 36 (Amendment No. 2 to Schedule 13D) at 3. But Twitter was "a reluctant seller" and adopted a "poison pill" to prevent a hostile takeover. *See* Ex. O (Ringler Dep.) at

28:21-29:23; Ex. AA (poison pill approved April 14 and announced on April 17); Ex. U (Taylor Dep.) at 67:17-22 ███████████████████████████ On April 20, 2022, Musk amended his 13D to sweeten the deal, updating his offer to, *inter alia*, remove the pre-signing business due diligence requirement.  Ex. 37 (Amendment No. 3 to Schedule 13D).

███████████████████████████████████████ Ex. R (Savitt Dep.) at 14:18-19.  Instead, you need to bargain for it.  When a seller is "reluctant," like Twitter was, a buyer may forego pre-signing due diligence because the seller "won't allow you to."  Ex. O (Ringler Dep.) at 28:21-29:32; Ex. 209 (Badawi Rp't) at ¶ 25 ("When the target is unwilling to entertain a transaction, that naturally means that it will not allow the aspiring buyer to conduct due diligence."); Ex. 230 (Rock Rp't) at ¶ 47.  Musk had little need for pre-signing due diligence because, as one of Twitter's most prolific users, he was intimately familiar with the product.  Ex. L (Musk Dep.) at 34:1-24 ("I decided to invest in … Twitter because I used the product.").  In addition, Twitter was a public company that filed detailed, audited financial statements with the SEC.  As Plaintiffs' expert explained:  "The public nature of the target provides some assistance in the due diligence process" because its "quarterly and annual reports [] disclose material financial, operational, and other information," "public company accountants [] vouch for the financials," and "these mechanisms contribute to the reliability of these disclosures [and] aid due diligence investigations."  Ex. 209 (Badawi Rp't) at ¶ 17.  Thus, Musk testified that he "did not feel that we needed to go beyond their publicly stated filings if their publicly stated filings were accurate."  Ex. M (Musk Dep.) at 129:7-23; *id.* at 155:5-22, 157:2-6 ("I assumed that … their public statements were true.").

Contrary to Plaintiffs' refrain that Musk "waived detailed due diligence as a condition precedent to his *obligations under the Buyout contract* [*i.e.*, the MA]," Dkt. 31 (FAC) at ¶ 112, their own expert admitted—and no other witness disagreed—that Musk merely agreed to forego *pre-signing* due diligence.  Ex. C (Badawi Dep.) at 44:23-45:6 ("the customary understanding of that term ['waiving due diligence'] is that you are not going to conduct the *pre-signing investigation* into the company"); *id.* at 49:20-50:1 (agreeing that "when Musk's side says in this 13D that the proposal is no longer subject to business due diligence, that means they agree not to conduct due diligence *before signing* the merger agreement"); Ex. O (Ringler Dep.) at 34:8-36:15, 75:22-77:12; Ex. 230 (Rock Rp't) at ¶ 48.  In other words, Musk did not require due diligence as a condition precedent to *signing* the MA, but that says nothing about his rights to

DEFENDANT ELON MUSK'S MOTION FOR SUMMARY JUDGMENT

information *under* the MA.

On April 25, 2022, Twitter accepted Musk's offer, the parties signed the MA, and publicly filed it with the SEC. Ex. 30 (MA). The MA expressly permitted Musk to tweet about the deal. *See id.* at § 6.8 ("[Musk] shall be permitted to issue Tweets about the Merger ….").

## B. The Merger Agreement Gave Musk the Right to Conduct Due Diligence Post-Signing

### 1. After the Parties Signed the Merger Agreement, Musk's Information Rights Were Governed by That Agreement, Not the Schedule 13D

The MA contains an integration clause providing that the agreement constitutes "the entire agreement, and supersedes all other prior agreements and understandings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof." Ex. 30 (MA) at § 9.6. Asked whether, after signing the MA, Musk's information rights were governed by the Schedule 13D in which he removed the due diligence condition to his offer, or the signed MA, Musk's lead deal lawyer, Michael Ringler, testified: "They're governed by the [MA] exclusively which explicitly supersedes anything that came before, including this 13D." Ex. O (Ringler Dep.) at 269:18-270:2; Ex. C (Badawi Dep.) at 52:17-54:5; Ex. 230 (Rock Rp't) at ¶ 28. Asked how Musk's information rights under the MA "mesh with the fact that Musk decided to forego business due diligence," Ringler responded: "[T]hey are unrelated. As I said before, this agreement stands on its own. ... [T]he fact that he chose to not conduct presigning business due diligence doesn't mean he's not permitted under this contract to conduct it after signing." Ex. O (Ringler Dep.) at 75:10-21. There is no evidence that anyone involved in the merger took a contrary view in May 2022.

### 2. Section 6.4 Gave Musk Broad Information Rights that Twitter Was Obligated to "Satisfy" as a Condition to Closing

Section 6.4 of the MA gave Musk the right to "all information concerning the business, properties and personnel of the Company and its Subsidiaries as may reasonably be requested in writing, in each case, for any reasonable business purpose related to the consummation of the transactions contemplated by this Agreement." Ex. 30 (MA) at § 6.4. Plaintiff's expert opined that "these types of rights are common because of the near-universal need for business information as closing approaches." Ex. 209 (Badawi Rp't) at ¶¶ 31-32. Musk's lawyer, Ringler, agreed, explaining "[i]t's a provision that is intended to give Elon, as the buyer, access to information regarding the selling company that he reasonably requests," and

it is in "[e]very [merger agreement] that I have ever seen." Ex. O (Ringler Dep.) at 240:6-17.

There are many reasons why Musk would need—and be entitled—to request information from Twitter under Section 6.4, including Bot Data. For example, in Section 4.6(a), Twitter represented and warranted that "none of the Company SEC Documents [filed after Jan 1, 2022] at the time it was filed ... *contained any untrue statement of a material fact.*" Ex. 30 (MA) at § 4.6(a). This included Twitter's statements in its 2021 10-K and Q1 2022 10-Q that it estimated bots comprised less than 5% of mDAU (which Twitter described as its "Key Metric").[3] Ex. 9 (Q1 2022 10-Q) at 5, 62; Ex. 63 (2021 10-K) at 5, 24. Under Section 7.2(b)(i), Musk's obligation to "consummate the Merger" was "subject to [his] satisfaction or waiver ... of the following condition[s]": that Twitter's representations and warranties were "true and correct," unless the failure of a representation to be true and correct would not rise to the level of a Company Material Adverse Effect, something neither Musk nor anyone else could possibly have known in May 2022, especially without having access to Twitter's underlying data.[4] Ex. 30 (MA) at § 7.2(b)(i). "[C]onfirming Twitter's representations and warranties [is] a reasonable business purpose related to the consummation of the transaction." Ex. O (Ringler Dep.) at 241:14-18; *see also* Ex. 59 (6/17/22 Ringler Letter to Gadde) ("Musk is entitled to and demands the materials necessary to determine whether the Company's SEC disclosures contain materially misleading information."). Plaintiffs' M&A expert agreed that "check[ing] the reps and warranties for their truth and accuracy prior to closing" is "related to the consummation of the merger agreement." Ex. C (Badawi Dep.) at 105:15-23; Ex. 209 (Badawi Rp't) at ¶ 62 ("[A] purpose of information rights is to allow the buyer to conduct its bring-down investigation"); *id.* at ¶ 78 ("It is customary in merger agreements for the information rights to work in conjunction with the representations and warranties of the seller and the bring-down condition"; buyer may seek information "for integration purposes and to verify the [company's] representations during the bring down process.").

---

[3] If "Twitter had significantly more bot users than reported in its most recent SEC filings that would certainly be material to an investor given the nature of Twitter's business." Dkt. 48 (MTD Order) at 24.

[4] Confirming that the seller's representations and warranties are truthful prior to closing is also referred to as the "bring-down" process and the provision governing that process—here, 7.2(b)(i)—the "bring-down condition." Ex. 209 (Badawi Rp't) at ¶ 15.

DEFENDANT ELON MUSK'S MOTION FOR SUMMARY JUDGMENT

In addition, Musk made clear from the outset that tackling Twitter's bot problem was a top priority. As further explained *infra* at 9-10, following a May 6 "due diligence" meeting with Twitter, Musk was "serious[ly] concerned" that Twitter lacked a rigorous method for identifying bots. Ex. BB. Thus, "[a]s Twitter's prospective owner, Musk [was] clearly entitled to the requested data to enable him to prepare for transitioning Twitter's business ownership ...." Ex. 66 (6/6/22 Ringler Letter to Gadde).

Under Section 7.2(a), Musk's obligation to close was subject to his "satisfaction" that Twitter complied with its obligations under the MA "in all material respects"—including its obligation to provide information under Section 6.4. Ex. 30 (MA) at § 7.2(a). "[I]f Twitter had refused to provide information allowing Musk to confirm the percent of mDAU comprised of bots or fake accounts" Twitter would not "have complied with its obligations under the MA in all material respects." Ex. O (Ringler Dep.) at 241:23-242:6. That is "[b]ecause there was a reasonable basis to ask for the information, and there was an obligation under this provision [6.4] to provide it." *Id.* at 242:9-11. "If Twitter had refused to provide any information confirming the accuracy of its statements in its 10-K about the percent of mDAU comprised of bots or fake accounts," Musk was not "required to purchase Twitter" because that would be "a breach of Twitter's obligations under the [MA] that's material. And that's both a condition to Elon's requirement to close as well as a right to terminate." *Id.* at 243:2-19; *see* Ex. 209 (Badawi Rp't) at 40 n.119 ("A seller's violation of the access to information covenant could potentially warrant a buyer's termination."); Ex. 230 (Rock Rp't) at ¶¶ 45-46, 50 ("Musk had the right ... not to close until Twitter complied with its obligation to provide information.").

Thus, there can be no legitimate dispute that, as of May 2022, Musk was entitled to information to test the accuracy of Twitter's representations about its estimates of bots as a percentage of mDAU, and to delay closing until he got the information he requested.

3.    Section 6.11 Also Gave Musk Information Rights

Section 6.11 required Twitter to "provide any reasonable cooperation reasonably requested by Parent in writing in connection with … debt financing." *See* Ex. 30 (MA) at § 6.11. Twitter's lead lawyer, Korman, testified that this provision gave Musk ███████████████████████████ ██████████████████████████████ Ex. I (Korman Dep.) at 181:17-182:3, 208:11-17.

**C.    The May 6 "Due Diligence" Meeting: Musk Becomes Concerned Upon Learning Twitter's Executives Are Clueless as to How the Company Calculates mDAU; Twitter Responds By Agreeing to Produce Information to Musk**

The parties conducted their first "post-signing diligence session" on May 6, 2022. Ex. 104 (*Twitter v. Musk* Compl.) at ¶ 118. In advance, Musk's bankers at Morgan Stanley circulated an agenda that included the following question: "How do you estimate that fewer than 5% of mDAU are false or spam accounts?" Ex. 213 at –341. As part of the closing process, Morgan Stanley was ███████████████ ███████████████████████████████████████████████ ███████████████████████████████████████ Ex. B (Armstrong Dep.) at 242:1-243:20. Morgan Stanley required ███████████████████████████████████ ████████████████████████. *Id.*; Ex. E (Claassen Dep.) at 219:13-221:12. Twitter and its bankers from Goldman Sachs █████████████████████ █████████████████████ Ex. CC; Ex. B (Armstrong Dep.) at 241:8-242:20.

Going into the meeting, Musk and his team planned to move quickly to close the merger—███████ ████████████████████ Ex. E (Claassen Dep.) at 228:25-229:13. But Twitter was unprepared to move so quickly. At the May 6 meeting, Twitter's lawyers announced that they would be unable to file the preliminary proxy statement until May 16 or 17, a week later than Musk's team had requested and planned for. *Id.* at 229:18-230:13. The shareholder vote and other closing deadlines keyed off the proxy filing. So by missing Musk's deadline, Twitter had already held up the deal by at least a week. *Id.*

Twitter's management team was also unable to provide Musk's team much of the information requested. When Musk requested internal financial information, Twitter passed around a summary financial sheet ██████████████████. Ex. B (Armstrong Dep.) at 248:21-249:15. Musk demanded raw financial data. *Id.* at 250:3-17; Ex. DD. Twitter agreed to provide it. *Id.*

When Musk asked Twitter's executives how the company arrived at its estimate that "fewer than 5% of mDAU are false or spam accounts," they were unable to answer. Ex. M (Musk Dep. Vol. 2) at 140:8-21. They suggested it was based on a human review of a sampling of 100 accounts per day but were unable to provide further details. Ex. B (Armstrong Dep.) at 254:1-255:19. Musk was "stunned" and found it "shocking" that "they could not explain how they arrived at that number." Ex. M (Musk Dep. Vol. 2) at 143:10-24. Musk's banker, Anthony Armstrong, attended the meeting and said at this point his

DEFENDANT ELON MUSK'S MOTION FOR SUMMARY JUDGMENT



" ███████████████████████ Ex. B (Armstrong Dep.) at 255:12-19. ██

██████████████████████████████████████ *Id.* at 255:2-5.

████████████████████████ *Id.* at 255:11-16.

Musk's team asked Twitter to ██████████████ and " █████████████ relating to its bot calculation. *Id.* at 255:17-257:16 (" ████████████████████████

██████████████████████ Ex. E (Claassen Dep.) at 226:4-8 ████████████

████████████████████████ ). Twitter's executives agreed to provide it, promising: " ████████████████████████████████████

██████████████████████████████████████████

██████████████ Ex. E (Claassen Dep.) at 238:21-239:7. Importantly, Twitter did not tell Musk that he had "waived due diligence" and thus had no right to the information under the MA, as Plaintiffs claim. To the contrary, Twitter's top executives represented they would provide Musk with details and data supporting their calculation that bots make up less than 5% of Twitter's mDAU.

Musk concluded the meeting by emphasizing two priorities. First, he wanted information: detailed spreadsheets and granular data. Ex. DD at –948. Second, he wanted to move "as fast as possible"—he was "looking at [his] watch, not the calendar." *Id.* And he wanted Twitter to move with the same urgency; "accelerate if possible" and "plan in hours, not days." *Id.*

Musk left the May 6 meeting with three key takeaways. First, Twitter was holding up the closing. Second, he was "serious[ly] concerned" about Twitter's bot calculation. Ex. BB. Of course, he had long been aware that bots were a problem on Twitter. But at no point before the May 6 meeting did he suspect that Twitter was failing to subject its "Key Metric" to a robust and well-designed testing and measuring process. *See* Ex. M (Musk Dep. Vol. 2) at 143:25-144:18; Ex. BB ("A serious concern coming out of the diligence meeting on Friday was Twitter's publicly stated calculation that only ~5% of active users are bots …. When I asked how they determined it … neither the CEO or CFO knew!"). Third, Twitter had promised to quickly provide him with raw data and details supporting their calculations.

**D.    May 7-13 Due Diligence: Twitter Promises Musk Bot Data But Fails to Produce It**

The next day, May 7, Twitter's deal team wrote to Musk's team to ██████████████

██████████████████████████████████████ Ex. EE  at –950.

Musk's team provided its list, including the unresolved request regarding "How do you estimate that 5% of [active users] are false or spam accounts?" *Id.* at –948. On May 9, that request was added to the "diligence tracker" as request number 1.02. Ex. FF; Ex. 29 at –711.

Later that same day, Musk's bankers followed up with Twitter to ███████████████ ████████████████████ including "█████████ that would ██████████ ████████████████████████████████ Ex. 29 at –710. The next day, May 10, Morgan Stanley pressed Twitter to set up ████████████████ ████████████████████████ with the intention ██████████████████ ██████████ *Id.* at –709. Twitter's banker responded that "████████████████ ███████████████████████.

Also on May 10, Twitter told Musk's team that it was "████████████████ █████ *Id.* at –710. With respect to data supporting its bot calculations, Twitter committed to "████ █████ Ex. B (Armstrong Dep.) at 277:13-278:12; *id.* at 279:2-11.

On May 11, Twitter's team told Morgan Stanley that they "████████████████ and were ████████████████████ *Id.* at 279:7-15. But on May 12, instead of providing the "raw data" and "supporting details" relating to the 5% estimate that was promised, Twitter's team uploaded nothing but ████████████████████████ ████████████████████ *Id.* at 280:3-14. The Morgan Stanley team thought this response was "█████████ and ████████████████████ Twitter essentially gave Musk ████████████████████████. *Id.* at 281:4-21.

That afternoon, Morgan Stanley conveyed to Musk—through Jared Birchall, the head of his family office—that Twitter had not yet provided any of the details supporting its bot calculation like it had promised him the week before. *Id.* at 283:24-284:20. Musk was not happy.

**E.    The At-Issue Tweets/Statements: Musk Alerts the Market to His Concerns and a Potential Delay in Closing**

1.    <u>The Events Leading Up to the May 13 Tweet</u>

As shown above, by May 13, the parties had engaged and were continuing to engage in "due

diligence" meetings; Musk had requested the details of Twitter's bot calculations; and Twitter agreed to produce the information. At no point prior to May 13 did Twitter respond to any of Musk's requests for Bot Data by claiming that Musk had "waived due diligence" or was otherwise not entitled to the information he sought.

But Musk was frustrated that Twitter did not follow through on its promises to produce raw data and other information explaining its bot calculations. A week had passed since the May 6 meeting. Twitter had not only failed to provide additional information but appeared to either be holding it back or concealing the fact it did not exist, and Musk was beginning to suspect Twitter had knowingly or recklessly misstated its mDAU. Ex. M (Musk Dep. Vol. 2) at 197:12-16. In an act of transparency, and consistent with his right under Section 6.8 to tweet about the merger, Musk updated the market on the deal's status, tweeting at 2:44 am PT on May 13: "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users." Ex. 10.

It is undisputed that, at the time Musk posted this tweet, the following were true: (1) Musk was under no obligation to close the merger because numerous conditions to closing were not yet satisfied—*e.g.*, no shareholder vote had been held (the proxy statement had not even been filed), and shareholder approval was a condition to closing under Section 7.1, Ex. 30 (MA) at § 7.1; (2) the merger could not close unless Musk was "satisf[ied]" that Twitter "performed and complied, in all material respects, with its obligations ... under [the Merger] Agreement" (including its obligations under Sections 6.4 and 6.11) and that Twitter's "representations and warranties" were "true and correct" (and that any misstatement would not have an MAE), Ex. 30 (MA) at § 7.2(a); (3) Musk had requested and Twitter had promised to provide raw data and supporting details responsive to the question "How do you estimate that 5% of [active users] are false or spam accounts?," Ex. 213 at –341; (4) Twitter had not yet delivered this information; and (5) Twitter had held up and delayed the closing process by failing to file the proxy statement and delaying production of the requested information.

At 4:50 am PT (*i.e.*, before the market opened), in case there was any doubt, Musk clarified his earlier tweet by replying to it with: "Still committed to acquisition." Ex. 163.

2.    The Events Leading Up to the May 16 Statement

Later on May 13, the parties conducted a second "[d]iligence" session. Ex. 214 ("X Diligence

with T re: financials and users"); Ex. GG at –803; *see also* Ex. 29 at –709-710.  Again, Musk's team pressed Twitter for information ███████████████████████████████ Ex. E (Claassen Dep.) at 267:18-268:18.  At the end of the meeting, Twitter's team represented that getting Musk an answer to this question was ████████████ and promised that " ████████████ ████████████████████████████ *Id.*

Meanwhile, behind the scenes, and in response to Musk's requests and tweet, Twitter was scrambling to pull together "a document that summarizes" how it calculated its 5% estimate.  Ex. 5 at -968.  Twitter instructed its data team to provide information "as fast as humanly possible."  Ex. F (Conti Dep.) at 80:19-81:11.  But the leader of the "team [that] own[ed] the definition of spam"—Yoel Roth—was "not sure we even know" the details of Twitter's bot calculations.  Ex. 7 at –713.  For example, he did not know how Twitter arrived at the 100 account sample:  "the choice of 100 accounts per day was made a long time ago and I have no idea why."  *Id*.  Incredibly, Twitter could not locate a *single document* explaining its methodology for calculating the "Key Metric" in its 10K.

Near midnight on May 13, Twitter's head of M&A directed Roth to create such a document from scratch:  "We just need to document them … write the full 'policy doc' and process and outline what we know."  Ex. 7 at –713.  At least *fifteen* Twitter employees were assigned to urgently slap together a document explaining how Twitter calculated the "Key Metric" disclosed in its SEC filings.  Ex. 12 at -686-687.  On May 14, the Twitter employee tasked with leading the drafting commented:  "woof that doc was a mess."  Ex. 7 at –714.  The drafting process would continue over the next four days, *see* Ex. 5, and Twitter would not deliver the document to Musk's team until May 21.

On May 15, independent third-parties SparkToro and Followerwonk validated Musk's concerns, releasing the results of an investigation sampling 44,058 Twitter accounts over a 90-day period.  *See* Ex. 79 (*SparkToro & Followerwonk Joint Twitter Analysis: 19.42% of Active Accounts Are Fake or Spam*).  Their report concluded that about 20% of the sample were bots—more than four times what Twitter claimed.  *Id.*  The report was shared on Musk's twitter feed.  Ex. XX.

Musk's team at Morgan Stanley also discovered the Sparktoro Report on May 15 and took it very seriously.  Armstrong had already ████████████████████████████████████ ████████████.  Ex. B (Armstrong Dep.) at 304:5-24 ████████████████████████

-13-

DEFENDANT ELON MUSK'S MOTION FOR SUMMARY JUDGMENT

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ After reviewing the Sparktoro Report—which he viewed as ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ from Twitter—Armstrong believed ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Id.* Claassen testified that the Sparktoro Report "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Sparktoro's "▓▓▓▓▓▓ analysis was ▓▓▓▓▓▓▓▓ Ex. E (Claassen Dep.) at 282:2-25. Claassen could not ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Id.* As of May 15, Musk's team was sharing the Sparktoro Report internally and engaged in concerned discussions about its conclusions. *See id.*; *see also e.g.,* Ex. HH.

The following day, May 16, 2022, Musk attended the All-In Summit. The Court previously found Plaintiffs plausibly alleged that "Defendant stated [at the conference] that fake and spam accounts make up at least 20% of Twitter's users" and that "the statement misled the investing public to believe that Defendant received—and was basing his statement on—bot user data from Twitter, which was not the case." Dkt. 48 (MTD Order) at 23. Once again, discovery refutes Plaintiffs' allegations. The transcript of the conference reveals that Musk stated at the outset that Twitter had *not* provided the details he requested: "[W]hat I'm being told [by Twitter] is that [] there's just no way to know the number of bots. It's like as unknowable as the human soul, basically." Ex. 78 (All In Summit Excerpted Transcript) at 4:5-8. The interviewers then asked him, "What do you think it is? ... I mean anecdotally." *Id.* at 6:2-5. Musk responded: "I think it's some number that is probably at least four or five times [Twitter's estimate], … [my] estimate would be probably 20 percent." *Id.* at 6:8-11. He further explained that this was not coming from Twitter, but from "a bunch of quite smart outside firms [that] have done analysis of Twitter and looked at the ... daily users," and from his own anecdotal experience on the platform. *Id.* at 6:11-21. There is no evidence that *anyone* thought Musk's statements were based on data provided by Twitter. Ex. UU (Pls' Resp. to Rog. No. 22) at 38-42.

### 3.    The Events Leading Up to the May 17 Tweet

After Musk's statement at the All-In Summit, Twitter's CEO tried to downplay the impact of the SparkToro analysis, claiming that Twitter did not "believe that this specific estimation can be performed externally, given the critical need to use both public and private information." Dkt. 31 (FAC) at ¶ 121.

-14-

Musk responded with a poop emoji. *Id.* at ¶ 122. He followed up by asking: "How do advertisers know what they're getting for their money? This is fundamental to the financial health of Twitter." *Id.* at ¶ 123.

The following day, May 17, Musk tweeted what he had already stated publicly:

> 20% fake/spam accounts, while 4 times what Twitter claims, could be *much* higher. My offer was based on Twitter's SEC filings being accurate. Yesterday, Twitter's CEO publicly refused to show proof of <5%. This deal cannot move forward until he does.

Ex. 171 (May 17 Tweet). The Court previously found this to be "a reiteration of Defendant's May 16, 2022 [statement]." Dkt. 48 (MTD Order) at 24. There is no evidence that anyone interpreted this tweet to suggest that Musk received evidence from Twitter demonstrating that its 5% estimate was false. To the contrary, Musk expressly stated that Twitter's CEO "*refused* to show proof of <5%" and that Musk was still *waiting* for information from Twitter ("This deal cannot move forward until he does.").

At the pleading stage, the Court found this tweet was misleading "for the same reasons that the May 13, 2022 tweet is materially false or misleading"—*i.e.*, "Plaintiffs plausibly allege that Defendant waived due diligence as a condition to the [MA] ... and thus that Twitter did not have an obligation to provide him with 'proof.'" *Id.* at 25. As demonstrated above, Musk did not "waive" due diligence. And as demonstrated next, Twitter *agreed* it had an obligation to provide Musk "proof."

### F.    Twitter Agrees to Provide—and in Fact Provides—Bot Data Under the Merger Agreement

Plaintiffs' theory that Musk's statements were false because he "waived due diligence" and thus was not entitled to Bot Data cannot be reconciled with the undisputed facts that (1) the parties conducted numerous post-signing "due diligence" meetings in which they discussed Bot Data; (2) the parties' created a "due diligence" tracker that included requests for Bot Data; (3) Twitter provided a "data room" in which it uploaded Bot Data for Musk's team to conduct "due diligence"; and (4) everyone involved in the deal, including Twitter's executives and lawyers, agreed he was entitled to such information.

Indeed, the record is replete with examples of "due diligence" meetings on Bot Data, and Twitter providing Musk with Bot Data "under the merger agreement." For example:

- Twitter designated a specific team to handle Musk's due diligence requests, which it viewed as separate from information provided to help transition business operations. *See* Ex. F (Conti Dep.) at 21:22-22:7, 26:6-27:6, 47:7-48:2, 60:11-60:18.

- The parties conducted "due diligence" meetings in which they discussed Twitter's bot calculations on at least May 6, 13, 21, 26, June 13, June 21, and July 1.  *See* Ex. II (scheduling May 6 Diligence Session); Ex. 214 (scheduling May 13 "X Diligence with T re financials and users"); Ex. 104 (*Twitter v. Musk* Compl.) at ¶¶ 73-74, 84; Ex. 215 (scheduling May 21 "Diligence Session"); Ex. 216 (scheduling May 26 "Diligence Session (follow up)"); Ex. 217 (scheduling June 13 "Diligence Session (User Metrics)"); Ex. JJ (scheduling June 21 call to discuss "spam as a % of DAU"); Ex. 218 (scheduling July 1 "Diligence Call: User Metrics Follow-Up").

- The parties created a "due diligence" tracker that included Musk's request for details supporting Twitter's 5% bot calculation.  *See* Ex. KK ("Diligence Tracker"); Ex. LL (email chain re "Project Tundra Data Room").

- Twitter created a "data room" in which it purported to provide Musk's team with "documentation supporting the calculations Twitter performs to estimate false or spam accounts as a percentage of mDAU" and other information relating to its bot calculations.  *See id.* at –249-250.

- Twitter provided substantial documents and data in a purported effort to satisfy Musk's requests, while making clear that it was producing the information pursuant to the terms of the MA.  *See, e.g.*, Ex. QQ at –475 ("[R]egarding the file [purporting to explain Twitter's bot calculations], [Twitter counsel] Marty/WSGR reiterated that company is sharing with us as *per merger agreement*."); Ex. 49 (May 21, 2022 Email attaching Twitter "False and Spam Accounts Methodology"); Ex. 6; Ex. 52 (May 27, 2022 letter from Korman and Klein to Ringler) ("Twitter intends to continue to work with Mr. Musk and his advisors to help them gain a deeper understanding of the Company's methodology for calculating mDAU" and to "provide information in response to all  *appropriate requests pursuant to the merger agreement*"); Ex. 54 (June 1, 2022 Letter from Korman and Klein to Ringler) ("Twitter is committed to closing the transaction and consistent with that is cooperatively sharing information with Mr. Musk"; "Twitter remains willing to consider the outstanding and other requests for information … [for] purposes and uses of such information consistent with the terms of the merger agreement"); Ex. ZZ (June 16, 2022 Letter from Korman to Ringler) at 1 ("The Company has already provided significant information in response to [Musk's] prior data requests and has complied, and continues to comply, with its obligation under the merger agreement."); *id.* at 2 ("All of this information is being provided subject to the

restrictions set forth in Section 6.4 of the merger agreement"); Ex. MM (June 17, 2022 Email from Korman to Ringler) (Twitter provided "access to thirty days of Historical PowerTrack Archive data"); Ex. NN (June 21, 2022 Email from Korman to Ringler re "Firehose available"); Ex. LL (June 28, 2022 email chain re "Project Tundra Data Room" listing documents uploaded to data room); Ex. OO (July 6, 2022 Email from Korman to Skadden) (raising quota on searches from 100k to 10 million); Ex. AAA (July 14, 2022 letter from Savitt to Ringler) (noting Twitter provided Musk "access to its Enterprise API data … *subject to the terms of the Merger Agreement, including those contained in Sections 6.4 and 6.11.*"); Ex. PP (July 15, 2022 Letter from Korman and Klein to Ringler) at 1, 2 (Twitter "upload[ed] additional documents to the parties' shared data room that are responsive to certain of the information requests" and "will continue to comply with the Merger Agreement and will provide information reasonably requested by Musk *in accordance with its obligations … and protections expressly contained in Section 6.4 of the Merger Agreement.*").

- Twitter's lead lawyer, Martin Korman, testified repeatedly that, in response to Musk's



." Ex. I (Korman Dep.) at 179:25-182:3; *see also id.* at 213:6-215:17 (                                                                                   ); *id.* at 219:16-220:7                                                                                   *id.* at 225:5-22                                                                                   ; *id.* at 236:20-238:7

- Twitter's CEO, Parag Agrawal, similarly agreed that under the MA, Musk had                                   " that entitled him to details "                                   Ex. A (Agrawal Dep.) at 350:3-15. Agrawal further testified that                                                                                   *Id.* at 372:2-12; *id.* at 356:22-357:14

-17-    Case No. 3:22-CV-05937-CRB

██████████████████████.").

• Even after Musk terminated the MA, Twitter provided information "in accordance with its obligations" under the MA. Ex. PP (July 15, 2022 Letter from Korman and Klein to Ringler).

• Even after Twitter sued Musk for specific performance, it acknowledged that "[t]he merger agreement requires the parties to share certain information with one another in the run up to closing" under Sections 6.4, 6.11, and other sections. Ex. 104 (*Twitter v. Musk* Compl.) at ¶¶ 48-50, 71-74, 84, 86.

**G.    Twitter Fails to Provide Data Necessary to Confirm the Percentage of mDAU Comprised of Bots**

On May 21, 2022—weeks after Musk's initial requests and well after the May 13 and 17 tweets—Twitter finally finished creating, and produced to Musk "*as per [the] merger agreement,*" a five-page memo purporting to explain its bot calculation process. Ex. QQ at –475. According to the memo, Twitter collected a sample of 100 eligible accounts per day and sent them to a team of human labelers—employed by an outside contractor, not Twitter—to decide whether the account was "spam," "real user spam," "good," or fell into some other category. Ex. 6. The memo described vague criteria the human labelers were advised to consider when coding for spam and did not include any quantitative metrics or benchmarks for spam—indicating the labeling process was subjective. Twitter's own head of Trust and Safety ████████████████████████████████████████. Ex. Q (Roth Dep.) at 247:8-249:16. Neither Twitter's calculation nor its process was independently verified or audited by Twitter's auditors. Ex. W (Kaiden Dep.) at 88:13-25.

The memo's primitive process for counting spam to report to the SEC was very different than the tools it used to identify and remove spam from its platform—████████████████████████ ███████████████████████████████████. Ex. Q (Roth Dep.) at 67:21-68:22. Jack Dorsey, Twitter's founder and long-time CEO, testified ███████████████████████ ████████████████████████████████████████████████████ ██████████████████████████ Ex. V (Dorsey Dep.) at 111:25-113:12. Musk's data experts "were pretty amazed by" the memo, remarking, "[i]t's how I would design a process if I wanted 2+2 to equal 5" and "WTF." Ex. QQ; Ex. RR. Musk's banker at Morgan Stanley, Claassen, was similarly disappointed with it, noting that while Twitter promised ████████████████ it delivered

just five pages that ███████████████████████████████████████████████████ ██████████████████████████████████████████ Ex. E (Claassen Dep.) at 277:10-281:8.

By that point, Musk had hired three different data science firms (CounterAction, Cyabra, and Halo) to independently assess Twitter's representations and warranties. One preliminary report by CounterAction, completed on May 23, 2022 using publicly available Twitter data (since Twitter had not yet produced any internal data) found a "spam rate of at least 26%." Ex. SS at –834. Their analysis "raise[d] questions about the accuracy of reported active user counts and their implications." *Id.* But in order to "generat[e] [] firm conclusions about current patterns of user activity and the veracity of reported usage figures" CounterAction and the other data scientists "required[d] access to comprehensive and up-to-date data feeds directly from Twitter." *Id.* at –838.

Musk's team relayed these requests to Twitter, and Twitter developed a "pattern" of responding. Ex. O (Ringler Dep.) at 164:3-5. For example, similar to its conduct between the May 6 due diligence meeting and Musk's May 13 tweet, Twitter would agree to provide information, purport to produce it, and then Musk's team would discover the information was deficient. *E.g., id.* at 164:3-167:2; Ex. TT ("They appeared to have pulled a fast one. This is not what we asked for."). Eventually, the parties began to dispute the *scope* of some of Musk's requests and exchanged a series of letters on that topic. In particular, Musk requested that Twitter produce "firehose" data, an internal term used to describe Twitter's real-time stream of all public tweets and associated data. Ex. YY (May 25, 2022 Letter from Ringler to Korman and Klein). Twitter initially refused to provide it, and instead offered to further explain its previous mDAU methodology. Ex. 52 (May 27, 2022 Letter from Korman and Klein to Ringler). Twitter claimed that the "firehose" data was "beyond the bounds" of the MA because it "can be used for many purposes unrelated to consummating the transaction." Ex. 54 (June 1, 2022 Letter from Korman and Klein to Ringler). But Twitter did not deny that the information could also be used for reasonable business purposes "related to" consummating the transaction and it ultimately produced the firehose data to Musk. Ex. ZZ (June 16, 2022 Letter from Korman and Klein to Ringler) at 1-2.

**G.    Musk Terminates the Merger, Litigation Ensues, and Closing Is Delayed**

After nearly two months of trying and failing to obtain the information needed to "make an independent assessment of the prevalence of fake or spam accounts on Twitter's platform" and more than

30-days after giving Twitter notice it was in material breach of the MA's Section 6.4, Musk's lawyers at Skadden sent Twitter a letter on July 8 terminating the merger. Ex. 184 (July 8, 2022 Termination Letter) at –128. The July 8 termination letter asserted that Twitter was in material breach of MA Sections 6.1, 6.4, and 6.11 and noted—based on preliminary analysis—that Musk "strongly believe[d] that the proportion of false and spam accounts included in the reported mDAU count is wildly higher than 5%." *Id.* at –133. The author of the letter, Ringler, testified that he made each of the statements and representations in the letter "in good faith" and "based on his understanding of the merger agreement." Ex. O (Ringler Dep.) at 263:4-15.

### H. Musk Closes the Merger But Never Issues a Corrective Disclosure

Musk and Twitter litigated in the Delaware Court of Chancery, where Twitter sought an order compelling Musk to close the merger. Ex. 104 (*Twitter v. Musk* Compl.). On October 4, 2022, after months of litigation but before the Chancery Court adjudicated either party's claims and positions, Musk publicly filed a letter stating that he "intends to proceed to closing of the transaction contemplated by the April 25, 2022 Merger Agreement, on the terms and subject to the conditions set forth therein and pending receipt of the proceeds of the debt financing contemplated thereby." Ex. 191 ("October 4 Letter"). Twitter's stock rose after the letter became public.

Plaintiffs are pursuing a "corrective disclosure" theory of loss causation, alleging "that when Defendant's prior misrepresentations and fraudulent conduct" were disclosed to the market on October 4, 2022, the price of Twitter securities thereafter "increased precipitously." Dkt. 48 (MTD Order) at 35-36 (citing Dkt. 31 (FAC)). The October 4 Letter makes no reference to the merger being "on hold," Mr. Musk's rights under the Merger Agreement, or any bot estimate. Ex. 191. No witness has testified that the October 4 Letter corrected any alleged misstatement. Ex. D (Belgrave Dep.) at 146:8-19; Ex. G (Garrett Dep. Vol. 1) at 92:8-97:4 Ex. K (Lippai Dep.) at 86:23-87:18. The only analyst deposed agreed it did not, Ex. K (Lippai Dep.) at 86:23-87:18, and Plaintiffs' own "loss causation expert" declined to offer an opinion that the October 4 Letter "is corrective of the May 13th tweet" or any other alleged fraud. Ex. S (Tabak Dep. Vol. 1) at 168:6-13.

# ARGUMENT

## I.    MUSK IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE UNDISPUTED RECORD PROVES HIS STATEMENTS WERE NOT FALSE

### A.    There Is No Genuine Dispute that Musk's May 13 Tweet Accurately Reflected the Then-Existing State of Affairs, and Thus Was Not False

Under Rule 10b-5, a statement is not false unless it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.  *See Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *accord In re Netflix, Inc. Sec. Litig.*, 647 F. App'x 813, 815 (9th Cir. 2016).  Further, "[i]n order to be actionable under the Federal Securities Act, the Ninth Circuit has held that representation must be false 'when made.'"  *Somerset Commc'ns Grp. v. Wall to Wall Advert., Inc.*, 2015 WL 5007680, at *3 (W.D. Wash. Aug. 20, 2015) (quoting *In re VeriFon Sec. Litig.,* 11 F.3d 865, 871 (9th Cir. 1993)); *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012); *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 398 F. Supp. 3d 549, 555 (N.D. Cal. 2019), *aff'd*, 998 F.3d 397 (9th Cir. 2021).

> 1.    <u>There Is No Genuine Dispute that, as of May 13, Musk Had the Right to Bot Data and to Refuse to Close if Twitter Did Not Provide Any</u>

Plaintiffs' M&A expert testified that Musk's May 13 tweet conveyed: "I've requested information, I'm not getting a satisfactory response, and I'm not closing until I do."  Ex. C (Badawi Dep.) at 266:20-267:4.  The Court interpreted it similarly: "a reasonable investor would have plausibly understood Defendant's statement that the deal was on hold 'pending' this information from Twitter to mean that, absent the provision of such information, the deal would not close."  Dkt. 48 (MTD Order) at 19; *see also* Ex. M (Musk Dep.) at 216:1-24.

The Court found that "[g]iven this representation, the falsity question is simple":  "the inquiry is whether Defendant's representation that Twitter was required to provide details about bot numbers 'differed in a material way from the state of affairs that actually existed.'"  Dkt. 48 (MTD Order) at 19 (citing *Berson v. Applied Signal Tech.*, 527 F.3d 982, 987 (9th Cir. 2008)).  "Because Twitter <u>did not</u> have an obligation to provide this data to Defendant under the terms of the [MA], Defendant's representation that Twitter <u>did</u> have this obligation in order for the deal to close was false."  *Id.* at 20 (emphasis in original).

As demonstrated *supra* at Background §§ B and F, discovery has shown beyond any material dispute that Twitter *did* have an obligation to provide Musk Bot Data, under Sections 6.4 and 6.11 of the MA. Plaintiffs contend Section 6.4 is narrow, erroneously claiming that "[t]he information Musk was entitled to under Section 6.4 was information *necessary* to consummate the merger." Dkt. 31 (FAC) at ¶ 156 n.37; Ex. 238 (Pls' Supp. Resp. to Rog. No. 1) ("Paragraph 6.4 of the [MA] only afforded Musk reasonable access to information *necessary* to the consummation of the transactions"); Ex. UU (Pls' Amended Response to Rog 23) (MA entitled Musk only to information that was "reasonably *necessary* to consummate the merger and secure financing"). But that is not what Section 6.4 says. It provides Musk with an exceedingly broad right to Twitter's "properties, books, and records" and "*all* information concerning the business ... for *any* reasonable business purpose **_related to_** the consummation of the" MA.

Delaware courts have interpreted such information provisions expansively. *See, e.g.*, *Akorn v. Fresenius Kabi*, 2018 WL 4719347, at *3, *26, *94 (Del. Ch. Oct. 1, 2018) (holding buyer's "broad requests" to investigate post-signing regulatory compliance concerns were "reasonable" exercise of contractual right to access seller's "officers, employees, agents, properties, books, contracts, and records"); *cf. Chartis Warrantyguard v. Nat'l Elecs.*, 2011 WL 336385, at *7 (Del. Ch. Jan. 28, 2011) ("[C]ontractual references to 'all books and records' are to be construed in 'broad' terms."); *Mickman v. Am. Int'l*, 2009 WL 2244608, at *2 (Del. Ch. July 28, 2009) (similar). Similarly, the term "related to" under Delaware law is extremely broad: "Delaware courts recognize 'relating to' as a 'paradigmatically broad term,' and have described 'relating to' as a far-reaching phrase that permits 'relatively attenuated connections' and that lawyers often use 'when they wish to capture the broadest possible universe." *Blue v. Tilray Brands, Inc.*, 2025 WL 519848, at *4 (Del. Ch. Feb. 17, 2025) (collecting cases).

There is no genuine dispute that Musk's requests for Bot Data were for a "reasonable business purpose" "related to" the consummation of the MA and thus fell easily within Section 6.4. Under Section 7.2(b), Musk's "satisfaction" that Twitter's representations and warranties in Section 4.6 were "true and correct" was a condition to closing.[5] Ex. 30 (MA) at § 7.2(b). That included Twitter's representation and

---

[5] Section 7.2(b) provides an exception for representations and warranties that, if untrue, would not have a "Company Material Adverse Effect," defined as "any change, event, effect, or circumstance which, individually or in the aggregate, has resulted in or would reasonably be expected to result in a material adverse effect on the business, financial condition or results of operations of the Company and its

warranty in Section 4.6 that none of its SEC disclosures—including its calculation of bots as a percentage of mDAU—contained any untrue statement of, or omitted any, material facts. *Id.* Upon learning that Twitter's methodology for calculating bots as a percentage of mDAU was highly suspect—and apparently unexplainable—Musk was well within his rights under the MA to seek information from Twitter and investigate. Indeed, everyone involved in the transaction—including Twitter's lawyers and CEO—*agreed* Musk was entitled to Bot Data under Section 6.4 (and 6.11). *See supra* at 15-17. And Twitter did, in fact, produce Bot Data in response to Musk's requests pursuant to Section 6.4 and 6.11. *Id.*

Delaware courts recognize that the quintessential purpose of an information rights covenant is to allow the buyer to "evaluate [the seller's] contractual compliance and determine whether the conditions to closing were met." *Akorn*, 2018 WL 4719347, at *2 (finding Fresenius properly exercised information rights covenant "for its intended purpose" by investigating whistleblower allegations that raised potential MAE and ordinary course violations capable of justifying termination). That is precisely what Musk did when he asked Twitter to provide information supporting its bot calculations so that he could evaluate whether the closing condition requiring Twitter's SEC filings to be materially truthful was satisfied.

There is no merit to Plaintiffs' contention that the MA needed to include an express "due diligence condition" for Musk to seek the information he requested. Ex. VV ( Pls' Resp. to Rog. No. 1). Certainly Twitter never took that position. *Supra* at 15-17. And neither Ringler nor Twitter's lawyer William Savitt—two titans of the M&A world—███████████████████████████████. Ex. O (Ringler Dep.) at 65:12-17; Ex. R (Savitt Dep.) at 59:7-62:6. Delaware law does not require that an agreement contain the phrase "due diligence" to entitle a buyer to information post-signing, *Akorn*, 2018 WL 4719347, *18 ("Akorn agreed to 'afford to [Fresenius's representatives] reasonable access' to information about its business."), and Plaintiffs' own M&A expert concedes that a "seller's violation of the access to information covenant"—not a due diligence condition—"could potentially warrant a buyer's termination if that violation breaches the covenant compliance condition." Ex. 209 (Badawi Rp't) at ¶ 78 n. 119).

---

Subsidiaries, taken as a whole." Ex. 30 (MA) at 5. At the time of Musk's alleged misstatements in May, he did not yet know whether Twitter's statements in its SEC filings about mDAU were false, let alone whether, if so, the falsity rose to a Company Material Adverse Effect.

Nor is there genuine dispute that, if Twitter had refused to provide any data or further information in response to Musk's requests, Musk would not have been required to close. Section 7.2(a) provides, as a condition to closing, that Musk be "satisf[ied]" that Twitter "complied, in all material respects, with its obligations required under this Agreement." Ex. 30 (MA) at § 7.2(a). That includes Twitter's obligation to provide Musk information in response to his reasonable requests under Sections 6.4 and 6.11. And as explained above, Section 7.2(b) provides, as a condition to closing, that Musk must be "satisf[ied]" that Twitter's representations and warranties are "true and correct," including its representations about the accuracy of its SEC filings. *See* Ex. 209 (Badawi Rp't) at ¶ 56; Ex. 230 (Rock Rp't) at ¶ 18(a).

As of May 13, Musk had received *no* Bot Data from Twitter. *E.g.,* Ex. B (Armstrong Dep.) at 280:3-14. Thus, to the extent his May 13 tweet implied he was entitled to at least *some* Bot Data—and could refuse to close if none were provided—his tweet was true "when made." *In re VeriFon*, 11 F.3d at 871; *In re Rigel*, 697 F.3d at 876; *Irving*, 398 F. Supp. 3d at 555. Likewise true "when made" was Musk's allegedly implied right to walk away if Twitter's 5% calculation could be proven inaccurate and an MAE.

In short, as of May 13, there is no genuine dispute that Musk was entitled to Bot Data from Twitter and to delay closing until he received it. Accordingly, Musk's May 13 tweets gave "the impression of a state of affairs" that was *identical* to "the one that actually exist[ed]," and his tweets were not false.

<p style="padding-left:2em;">2.    <u>There Is No Evidence Any Investor Interpreted "Temporarily On Hold" to Mean All Merger Related Work Stopped or that Any Such Misimpression Was Material</u></p>

The Court rejected Plaintiffs' theory that the May 13 tweet was false because it communicated that the merger was halted or delayed. Dkt. 48 (MTD Order) at 20 ("The question is not whether or not the deal slowed down, but whether Twitter had an obligation to provide the requested information for the deal to close."). Plaintiffs' M&A expert testified that "on hold" conveyed that Musk would not close until he obtained the information he sought, not that Musk issued a "pencils down" instruction. Ex. C (Badawi Dep.) at 266:2-267:4 ("[W]hat I understood ["on hold"] to mean was … I've requested information, I'm not getting a satisfactory response, and I'm not closing until I do"); *see also* Dkt. 48 (MTD Order) at 19 ("[A] reasonable investor would have plausibly understood Defendant's statement that the deal was on hold 'pending' this information from Twitter to mean that, absent the provision of such information, the deal would not close."). Nevertheless, Plaintiffs' interrogatory responses indicate that they will argue the

May 13 tweet falsely conveyed to the market that all workflow on the merger had stopped. Ex. UU (Pls' Further Amended Response to Rog 13) at 15. Aside from being barred by the law of the case doctrine, *see* Dkt. 89 (Order Denying Def's Motion for Judgment on the Pleadings) at 4, this theory fails because there is no evidence that any investor interpreted "temporarily on hold" in that way, let alone that the purported misrepresentation was material.

To support a securities fraud claim, an alleged misstatement must be *materially* false: (1) there must be a "substantial likelihood that a reasonable investor would consider the misrepresented fact important in deciding whether to buy or sell that security," and (2) the "misrepresentation gives a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010, at *7 (N.D. Cal. June 14, 2023) (internal alterations omitted) (citing *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1259 (N.D. Cal. 2000)), *aff'd sub nom. In re Tesla, Inc., Sec. Litig.*, 2024 WL 4688894 (9th Cir. Nov. 6, 2024). There is no evidence that the May 13 tweet gave any investor the impression that all work on the merger had stopped. No analyst report conveyed that impression and the only analyst to testify here—Wedbush—agreed the tweet communicated that Musk "would not voluntarily close the deal based on the bot issue." Ex. K (Lippai Dep.) at 68:19-24. No Plaintiff testified that he/she ███████████████. Ex. D (Belgrave Dep.) at 82:2-16; Ex. H (Garrett Dep. Vol. 2) at 184:17-20.

Even if such evidence existed, there is no evidence that the market would have considered the fact that work on the deal had stopped to be material. To establish a statement is materially false, Plaintiffs must show a statistically significant price reaction to both the statement and the revelation it was untrue. *Miller v. Thane Int'l, Inc.*, 372 F. Supp. 2d 1198, 1209 (C.D. Cal. 2005) ("If a stock trades in an efficient market, a failure of the market to react to the disclosure of news is an indicator that the news is not material."), *rev'd and remanded on other grounds*, 508 F.3d 910 (9th Cir. 2007), *opinion amended and superseded*, 519 F.3d 879 (9th Cir. 2008). Throughout the Class Period, Twitter and Musk made public disclosures that the parties continued to work toward closing. For instance, on May 19, Bloomberg reported that Twitter executives told employees that there "is no such thing as a deal being on hold" and that they were "still engaging with Musk and his team, and working with them 'regularly' throughout the process." Ex. 201 (May 19, 2022 Bloomberg Article). On May 25, Musk announced he changed his

DEFENDANT ELON MUSK'S MOTION FOR SUMMARY JUDGMENT

financing arrangements to purchase the company—communicating that his work on the merger was continuing. Ex. WW (Amendment No. 7 to Schedule 13D). Plaintiffs' expert found no statistically significant price movements in Twitter's stock in response to these disclosures, and acknowledged that the market did not view it as material or new. Ex. S (Tabak Dep. Vol. 1) at 60:12-21; *id.* at 56:9-13.

**B.      There Is No Genuine Dispute that Musk's May 16 Statement and May 17 Tweet Reflected the Then-Existing State of Affairs, and Thus Were Not False**

As explained *infra* at 30, Plaintiffs' expert concedes that Musk's May 16 statement and May 17 tweet did not have a statistically significant impact on Twitter's stock price. Ex. 243 (Tabak Supp. Rp't) at ¶¶ 16-17. Accordingly, the statements are not actionable and summary judgment should be granted as to those statements. To the extent the Court finds otherwise, it should nevertheless grant summary judgment because Musk's May 16 statement and May 17 tweet were fully consistent with the then-existing state of affairs, and thus not false.

At the pleading stage, the Court found Plaintiffs plausibly alleged that "Defendant stated [at the May 16 conference] that fake and spam accounts make up at least 20% of Twitter's users" and that "the statement misled the investing public to believe that Defendant received—and was basing his statement on—bot user data from Twitter, which was not the case." Dkt. 48 (MTD Order) at 23. As demonstrated *supra* at 14, Plaintiffs' allegations are incorrect. The conference transcript shows that Musk made clear he was *not* basing his estimation on information from Twitter (Twitter told him the bot calculation is "as unknowable as the human soul"), but rather on analysis from "outside firms"—*e.g.*, the SparkToro and Followerwonk analysis concluding that bots accounted for nearly 20% of users—and his own "anecdotal" experience. Ex. 78 (All In Summit Excerpted Transcript) at 4:5-6:16. There is no evidence that *anyone* interpreted Musk's May 16 statements at the conference to suggest that he was basing his estimate on information provided by Twitter. Nor is there any evidence indicating that Musk's statements were in any way untrue.

The Court found that Musk's May 17 tweet was false for two reasons. *First*, the Court found that Musk's statement, "20% fake/spam accounts, while 4 times what Twitter claims, could be *much* higher," was a "reiteration of Defendant's May 16" statement and therefore investors might reasonably "infer that Defendant, the next day, tweeted about user data because he actually received evidence from

Twitter 'demonstrating that Twitter's SEC filings were false and that the number of fake accounts exceeded 5%.'" Dkt. 48 (MTD Order) at 24-25 (quoting Dkt. 36 (Pl's Opp. to MTD) at 4). But again, Musk never suggested on May 16 that he had obtained evidence from Twitter, and on May 17, he made explicitly clear that he had *not* received evidence from Twitter, tweeting that Twitter's CEO "*refused* to show proof of <5%" and that Musk was still waiting for information from Twitter ("This deal cannot move forward until he does.").

*Second*, the Court found that Musk's statement, "[t]his deal cannot move forward until" Twitter provides Musk with "proof of 5%," "is materially false or misleading for the same reasons that the May 13, 2022 tweet is materially false or misleading"—namely, "Plaintiffs plausibly allege that Defendant waived due diligence as a condition to the [MA], and thus that Twitter did not have an obligation to provide [Musk] with 'proof' that spam accounts make up less than 5% of users." Dkt. 48 (MTD Order) at 25. As demonstrated *supra* at 7-8, 15-18, the record shows that Musk's May 17 tweet is *not* false or misleading for the same reasons the May 13 tweet is not false or misleading—*i.e.*, Musk did *not* waive due diligence and Twitter *agreed* it was obligated to provide Musk with the data he requested.

## II.    MUSK IS ENTITLED TO SUMMARY JUDGMENT BECAUSE HIS STATEMENTS WERE AT MOST NON-ACTIONABLE OPINION

Even if Musk's statements were not accurate—they were—the statements are at best non-actionable opinion because the record shows Musk sincerely believed he was entitled to the information he requested. "A statement of opinion does not constitute an 'untrue statement of … fact' [even if] the stated opinion ultimately proves incorrect." *Omnicare*, 575 U.S. at 176; *Dearborn Heights v. Align Tech.*, 856 F.3d 605, 616 (9th Cir. 2017) (applying *Omnicare*). This is particularly so with respect to *legal* opinions—*e.g.*, a statement about one's right to information under a contract.[6]

---

[6]    This rule is well-founded. It is common in litigation for parties to make diametrically opposed statements about the meaning of contracts, statutes, or other legal obligations. For example, it is de rigueur for one party to a busted merger case to publicly assert that the merger must close while the other party publicly claims otherwise. If a party's publicly-stated interpretation of its legal rights were actionable in fraud, *every lawsuit would lead to further litigation*. *Omnicare* and its progeny foreclose the absurd result of rendering every party that has ever lost (or even settled) a lawsuit liable for fraud simply because at some point it publicly asserted that it believed it would prevail. Instead, because "a statement of law is merely the expression of an opinion," "[i]t is a generally accepted principle that a misrepresentation as to a matter of law … will not constitute a remediable fraud." 37 C.J.S. Fraud § 96; *accord* Am. Jur. 2d of Fraud and Deceit § 97 (2001) ("It is ... well settled, as a general rule, that fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law."); *Best v. Best*, 25 So. 2d 723, 725 (Ala. 1946) ("a charge of fraud cannot be predicated on an honest error in a statement of the law"). A

*Omnicare* is on all fours with this case. There, the Supreme Court rejected a securities fraud claim premised on a pharmacy services provider's statement that it believed its contractual arrangements were lawful despite mounting evidence indicating otherwise. *See Omnicare*, 575 U.S. at 179-80. The Court reasoned that even if Omnicare's legal position was "ultimately incorrect"—as appeared likely given the Federal Government filed suit against Omnicare alleging that the contracts were illegal kickbacks—it was a statement of opinion and thus not "false" so long as it was "sincerely held." *Id.* at 176; *accord Iafrate v. Angelo Iafrate*, 827 F. App'x 543, 548 (6th Cir. 2020) (a speaker's "subjective interpretation of a contractual provision" does not support a securities fraud claim); *Dearborn Heights*, 856 F.3d at 619 (defendants' statements about their compliance with Generally Accepted Accounting Principles were non-actionable opinion under *Omnicare* because the statements were not matters of objective fact); *Hagood v. Sonoma County Water*, 81 F.3d 1465, 1478 (9th Cir. 1996) ("evidence [that] shows only a *disputed legal issue* [] is not enough to support a reasonable inference" of falsity); *Hampton v. root9B Techs.*, 897 F.3d 1291, 1299 (10th Cir. 2018) ("[P]ure statements of opinion … are not material misstatements unless they inaccurately represent the speakers' beliefs"); *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1297 (11th Cir. 2019) (similar); *Dearborn Heights*, 856 F.3d at 616 (similar). Indeed, even if "there is no reasonable basis for [the speaker's] belief," a statement of opinion is not actionable under *Omnicare* so long as it is genuine. *See Dearborn Heights*, 856 F.3d at 616; *see also, e.g.*, *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 619 (S.D.N.Y. 2017) (similar).

Musk testified that he genuinely believed he had a right under the MA to the Bot Data he requested and to delay the transaction until he received it: "I had—explicitly in the deal, I had document rights. I had the rights to receive documents. And they had not given me the documents. That's in the deal." Ex. M (Musk Dep.) at 217:5-219:6; *see also id.* at 274:5-10 ("Q. Did you believe you had the right to stop the deal pending receipt of that information? A. I believe[d] I had the right … to pause the deal until they deliver[ed] on their obligation to deliver documents."); *id.* at 221:9-11 ("Twitter was obligated to provide me with documents"). There is no evidence indicating that Musk did not genuinely believe he was entitled

sound reason for this is that "everyone is presumed … to know the law and, therefore, cannot in legal contemplation, be deceived by erroneous statements of law." 37 C.J.S. Fraud § 96. Here too, everyone knew the terms of the publicly available Merger Agreement. Musk's purported characterization of his rights thereunder was a "statement regarding that law" and thus "a mere opinion on which one may not rely." *Cicone v. URS Corp.*, 183 Cal. App. 3d 194, 202 (Cal. Ct. App. 1986).

DEFENDANT ELON MUSK'S MOTION FOR SUMMARY JUDGMENT

to Bot Data and to delay the transaction until he received it.[7] The record utterly refutes this notion: it shows that, prior to issuing his May 13 tweet, Musk requested Bot Data and Twitter agreed to provide it. *Supra* at 9-11. The record further shows that everyone involved in the MA understood that Musk had a right to such information under Sections 6.4 and 6.11. *Supra* at 15-17. Indeed, if Musk had understood the MA did *not* give him a right to Bot Data—and there is no evidence of that—he would have been the *only* person involved in the merger with that understanding. Everyone else, including Musk's lawyers and bankers, and Twitter's lawyers and CEO, confirmed that Musk *did* have such rights.[8] *Id.*

## III. MUSK IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE IS NO EVIDENCE OF SCIENTER

To survive summary judgment on scienter, Plaintiffs must raise a triable issue of fact that Musk "engaged in 'knowing' or 'intentional' conduct or acted with 'deliberate recklessness.'" *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (quoting *South Ferry LP v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008)). Deliberate recklessness is "an extreme departure from the standards of ordinary care ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc) (cleaned up).

For the same reasons Plaintiffs cannot prove that Musk's statements were false, or were statements of fact as opposed to non-actionable legal opinion, *supra* at § II, they cannot prove that Musk knew or deliberately and recklessly disregarded that the MA did not give him rights to Bot Data prior to closing. Again, the record overwhelming confirms that everyone involved in the merger agreed that Musk had

---

[7] Plaintiffs M&A expert, Prof. Badawi, contends that interpreting Section 6.4 of the MA is an inherently uncertain and subjective endeavor which can be done only with the input of "multiple types of expertise" including from "an expert in M&A." Ex. C (Badawi Dep.) at 220:5-223:7. Just reviewing "the agreement, by itself, would not be enough" because an expert determination of Musk's rights under the Merger Agreement requires consideration of "the precise information requested by the buyer, the seller's basis for a refusal to provide information, [and] the content of the communications between the parties," Ex. 209 (Badawi Rp't) at ¶ 79, as well as "more specific information from an expert on things like mDAU and bots and things like that" alongside "M&A expertise with respect to things like, what does it mean for consummation of the transaction, … [and] what information is required for consummation of the transaction." Ex. C (Badawi Dep.) at 221:7-223:7.

[8] Plaintiffs tried to get Twitter's lead litigation counsel, William Savitt, to admit that Musk had no right to Bot Data under the MA, but ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." Ex. R (Savitt Dep.) at 93:7-24.

DEFENDANT ELON MUSK'S MOTION FOR SUMMARY JUDGMENT

rights to Bot Data under the MA. Plaintiffs cannot possibly prove scienter on this record.

## IV. MUSK IS ENTITLED TO SUMMARY JUDGMENT AS TO PLAINTIFFS' CLAIMS BASED ON THE MAY 16 AND 17 STATEMENTS BECAUSE THEIR EXPERT ADMITS THE STATEMENT AND TWEET DID NOT CAUSE ANY LOSSES

Plaintiffs' damages expert, Dr. David Tabak, concedes he "do[es] not consider [Musk's May 16] statement to be an independent source of loss" and thus rolls it into the May 13 event window. Ex. 243 (Tabak Supp. Rp't) at ¶ 17. He further concedes that the price movement on May 17 was not "statistically significant" and does not attribute any losses to Musk's tweet that day. *Id.* ¶¶ 16-17; Ex. S (Tabak Dep. Vol. 1) at 103:25-104:3 (acknowledging his "only source of damages is from the May 13 tweet"). Plaintiffs' failure to adduce *any* evidence whatsoever in support of their allegations that Musk's May 16 statements and May 17 tweet caused losses requires dismissal of claims based on those statements. *See, e.g.*, *In re Oracle*, 627 F.3d at 383, 391-95 (affirming summary judgment where plaintiffs had "not developed evidence" that "their losses were caused by the market's reaction to Defendants' alleged fraud, as opposed to [other factors]"); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273-75 (S.D. Cal. 2010) (granting summary judgment on statements for which plaintiff provided no admissible expert analysis linking them to a stock-price decline).

## V. MUSK IS ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFFS FAIL TO SHOW LOSS CAUSATION

Musk is also entitled to summary judgment for the independent reason that Plaintiffs fail to carry their burden to link the May 13 tweet to any recoverable loss. The reasons are many.

### A. Plaintiffs Fail to Disaggregate the Price Impacts of Information they Allege Was True

Plaintiffs "must reasonably distinguish the impact of" the alleged fraud "from other economic factors." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1123 (9th Cir. 2013); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 421 (7th Cir. 2015) ("[T]o prove loss causation, plaintiffs in securities-fraud cases need to isolate the extent to which a decline in stock price is due to fraud-related corrective disclosures and not other factors."). "[O]ther economic factors" that must be isolated include "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 343

(2005).

Here, Plaintiffs made no attempt to disaggregate the impact on Twitter's stock price of the market's perception that Musk was getting "cold feet" about the merger and there would likely be a delay in closing (which there was), which is precisely what Plaintiffs allege was the *true state of affairs*. Ex. 238 (Pls' Response to Rog 10.). Indeed, Plaintiffs expert does not dispute the market perceived Musk as getting cold feet and that this perception contributed to the stock price decline on May 13, 2022. Ex. S (Tabak Dep. Vol. 1) at 33:20-24; 34:20. Nor could he; the evidence is overwhelming.[9] Ex. 233 (Lehn Rp't) at ¶¶ 61-66. Yet, by his own admission, Dr. Tabak did not do "any analysis to calculate the amount of the decline on May 13th and May 16th that was the result of investors perceiving Musk as having a heightened level of cold feet or buyer's remorse." Ex. S (Tabak Dep. Vol. 1) at 36:6-23. Thus, Plaintiffs have "not developed evidence sufficient to permit a reasonable jury to conclude that [plaintiffs'] losses were caused by the market's reaction to the alleged fraud, as opposed to" a perception that the buyer in a $44 billion transaction was getting cold feet. *See In re Oracle*, 627 F.3d at 383; *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 729 (11th Cir. 2012) (granting summary judgment where plaintiff failed "to present evidence that would give a jury some indication, however rough, of how much of the decline in Bancorp's stock price resulted not from the fraud but from the general downturn in the Florida real estate market"); *In re REMEC Inc.*, 702 F. Supp. 2d at 1273-74 (similar); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (similar), *aff'd*, 597 F.3d 501 (2d Cir. 2010).

**B.      Plaintiffs Fail to Disaggregate the Impacts of Market And Industry Effects**

Dr. Tabak also failed to isolate the impact on Twitter's stock from general market and industry factors. Indeed, Dr. Tabak admits that there are shareholders who have higher damages under his model simply because the NASDAQ "was lower at the point when they made their sale decision, which Plaintiffs will argue is in reliance on the allegedly false information in the May 13th tweets." Ex. S (Tabak Dep. Vol. 1) at 138:23-139:15. For example, according to Dr. Tabak, a shareholder who sold on May 24

---

[9]   Plaintiffs' M&A expert, Adam Badawi, admitted that "no matter how seller-friendly [a merger agreement] may be, [it] can never provide complete certainty that a deal will close. While parties can ask a court to enforce merger provisions and even to order the buyer to close, that determination is in the equitable discretion of the court." Ex. 209 (Badawi Rp't) at ¶ 40. Thus, the fact that a buyer is perceived as getting "cold feet" creates deal uncertainty because there is always risk that a court will not find specific performance to be an appropriate remedy.

suffered $8.44 in damages whereas a shareholder who sold one day earlier suffered $7.47 in damages—even though Musk is not alleged to have done anything between May 23 and May 24 to affect Twitter's stock price. Ex. 200 (Tabak Rp't) at Ex. 5-B; Ex. S (Tabak Dep. Vol. 1) at 140:6-13. This is a consequence of Plaintiffs' damages model failing to distinguish between losses caused by the alleged misrepresentations and losses caused by unrelated market forces. *See In re Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130, 1135 (10th Cir. 2009) (affirming grant of summary judgment were plaintiff's expert failed to distinguish "between losses rooted in causes cognizable under loss causation doctrine, on one hand, and, on the other hand, losses attributable to industry-specific stresses, the meltdown in the telecommunications sector, and other negative developments unrelated to the alleged fraud.").

## C.    There Was No Corrective Disclosure

Loss causation requires price movement that follows revelation of the alleged fraud. *Dura*, 544 U.S. at 342-46; *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1204-05 (9th Cir. 2020). Here, the sole "corrective disclosure" alleged by Plaintiffs was not "corrective" in any sense of the word. Musk's October 4, 2022 decision to proceed with the deal revealed nothing about any supposed misstatement in the May 13 tweet. Ex. 233 (Lehn Rp't) at ¶¶ 112-14. Dr. Tabak admits he does not opine otherwise.[10] Ex. S (Tabak Dep. Vol. 1) at 166:8-168:17. Like disclosure of an investigation, a closing decision does not qualify as a corrective event because it does not reveal wrongdoing. *Cf., Loos v. Immersion Corp.*, 762 F.3d 880, 888-90 (9th Cir. 2014). The news that Musk would consummate the merger had no bearing, either directly or by implication, on whether he was entitled to the Bot Data he had already sought and received. Indeed, Plaintiffs have not identified a single analyst or investor that interpreted the October 4 decision as suggesting Musk did not have the information rights he claimed. Ex. 233 (Lehn Rp't) at ¶¶ 112-14.

Further, prior to October 4, the market learned information that was a mirror image of what

---

[10]    Dr. Tabak claims that the existence of a corrective disclosure is irrelevant to his damages analysis because an investor has locked in their losses on the date they sold. Ex. 243 (Tabak Supp. Rp't) at ¶ 10. This is inconsistent with *Dura*, which holds that an investor who buys an inflated stock suffers no harm at the moment of purchase because, at that moment, he owns a stock valued at what he paid; similarly, an investor who sells has cash of equivalent value to the value of the stock they sold. If the revelation of the alleged fraud does not cause the stock to increase/decrease, because, for example, an intervening event rendered the misstatement moot, that investor was not harmed by the alleged misstatement. They can buy/sell the stock at the same price despite having full knowledge of the alleged fraud.

Plaintiffs allege was false, but that information did not cause a statistically significant reaction. For example, Plaintiffs allege that Musk's May 13 tweet was false because "Twitter did not agree to put the deal on hold." Ex. 238 (Pls' Response to Rogs 7-9). But six days later, Twitter's Chief Legal Officer Vijaya Gadde, told the entire company there is "no such thing" as a deal being "on hold" and the deal was moving forward. Ex. 201 (May 19, 2022 Bloomberg Article). Although Gadde's statement was widely reported, Dr. Tabak admitted there was no statistically significant reaction to this news. Ex. S (Tabak Dep. Vol. 1) at 44:7-16.

Plaintiffs also argue the May 13 tweet was false because "Defendant and his team continued to obtain equity investment commitments and Defendant's financial advisers sent out Equity Commitment Letters and term sheet documents to make progress on the deal." Ex. 238 (Pls' Response to Rogs 7-9.) On May 25, however, Musk filed an updated 13D, which disclosed that Musk "is seeking and ... may receive additional financing commitments to fund portions of the total Merger Consideration." Ex. WW (Amendment No. 7 to Schedule 13D). Despite disclosing precisely what Plaintiffs allege rendered Musk's statement false, Twitter's stock price did not react. Ex. S (Tabak Dep. Vol. 1) at 48:24-49:2.

And although Plaintiffs allege the May 13 tweet was false because "Defendant had no right to unilaterally put the deal on hold" and "the statement implied that Defendant's obligation to complete the Twitter acquisition was conditioned upon satisfaction of due diligence to determine numbers related to 'spam/fake accounts' when in fact Defendant had waived detailed due diligence," a lawsuit on May 24, which received extensive media coverage, alleged the exact same thing. Ex. 203 (*Heresniak* Compl.); Ex. 204 (May 26, 2022 CNBC Article). Again, Twitter's stock did not react. *See also* Ex. 233 (Lehn Rp't) at ¶¶ 67-80 (detailing relevant events that resulted in no statistically significant declines). The absence of any statistically significant reaction to these public revelations, which are far more "corrective" of Plaintiffs' falsity theory than the October 4 disclosure, demonstrates that it was *not* the purported falsity that caused any losses. *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 408 (9th Cir. 2021) ("If the purported revelations—'as opposed to some other fact'—really caused the drops, the funds would have been expected to price the stock consistently downward in response to each revelation, rather than subsequently decreasing, maintaining, or even increasing their valuations.").

**D.      The Same Market Reaction Would Have Occurred After the July 8 Termination Letter**

Even if Plaintiffs had properly disaggregated the market effects of Musk's statements, and identified a proper corrective disclosure, summary judgment should still be granted as to all class members who sold after July 8.  Twitter's stock experienced a statistically significant drop following Musk's July 8 termination letter, which the Court held is not actionable.  Critically, Dr. Tabak failed to analyze whether Twitter's stock price would have fallen to the same price following the July 8 termination letter regardless of Musk's May 13 tweet.  Ex. S (Tabak Dep. Vol. 1) at 36:24-37:15, 157:22-158:3.  Thus, Plaintiffs have no basis—and therefore cannot tell the jury—that anyone who sold after July 8 suffered a single penny of loss as a result of Musk's alleged misrepresentations.  *See Dura*, 544 U.S. at 342146.  As a result, summary judgment must be granted as to all class members who sold after July 8, 2022.

**VI.     PLAINTIFFS CANNOT DRESS UP UNACTIONABLE AND DISMISSED ALLEGATIONS AS AN UNPLED SCHEME**

Plaintiffs have indicated in discovery that they intend to prove a scheme liability claim despite the facts that (1) they did not plead it, (2) the Court dismissed, and Plaintiffs have abandoned, many of the alleged misstatements that Plaintiffs contend comprise the scheme, and (3) the remaining misstatement (the May 13 tweet) was not false and did not cause Plaintiffs' losses.

"To allege a claim for scheme liability, a plaintiff must allege the elements of a securities fraud claim."  *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1192 (D. Or. 2015) (*citing Stoneridge Invs. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 158 (2008)).  That is: "(1) a deceptive or manipulative act in furtherance of the alleged scheme; (2) scienter; (3) a connection between the alleged deceptive or manipulative act and the purchase or sale of a security; (4) reliance upon the deceptive or manipulative act; (5) economic loss; and (6) loss causation."  *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP Inc.*, 738 F. Supp. 3d 1182, 1206 (N.D. Cal. 2024).

Plaintiffs identify only two acts that caused loss, both of which they contend are misrepresentations:  the May 13 tweet and the July 8 termination letter.  Ex. 243 (Tabak Supp. Rp't) at ¶¶ 16-17; Dkt. 31 (FAC) at ¶¶ 28-29, 140.  As demonstrated above, there is no evidence supporting Plaintiffs' allegation that these statements are misrepresentations or that they caused Plaintiffs' losses, and thus a scheme liability theory predicated on them necessarily fails.  "Logically … if a plaintiff's scheme

liability claim is based on the same alleged set of facts as its misrepresentation claim, and the court finds that those facts do not sufficiently allege fraud … to sustain the misrepresentation claim, the scheme liability claim necessarily fails." *In re AGS*, 2024 WL 581124, at \*5 (D. Nev. Feb. 12, 2024), *aff'd sub nom. Oklahoma Police Pension & Ret. Sys. v. PlayAGS, Inc.*, 2025 WL 927296 (9th Cir. Mar. 27, 2025); *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 902 (N.D. Cal. 2022) (Breyer, J) (dismissing scheme liability claim where the "alleged scheme consists entirely of (and fails for the same reasons as) the misstatements analyzed above").

The Court already dismissed "Plaintiffs' claims to the extent they are predicated on" any statement other than the May 13 tweet, May 16 statement, and May 17 tweet.  Dkt. 48 (MTD Order) at 39.  The Court specifically held that Plaintiffs failed to plead that the July 8 termination letter was false and actionable. *Id.* at 27-28.  The so-called "scheme" claim is dependent on and arose from the non-actionable representations contained in the letter.  *In re AGS*, 2024 WL 581124, at \*5 ("Contrary to lead plaintiff's contention that its scheme liability claim is somehow independent of its misrepresentation claim, lead plaintiff pleaded only a single cause of action under rule 10b-5.  That cause of action can *either* be construed as a misrepresentation claim *or* a scheme liability claim").  Thus, any claim based on—or damages arising from—the July 8 termination letter should be (and already was) dismissed.  And for the reasons discussed above, Plaintiffs cannot establish that the remaining alleged misstatements were fraudulent as a matter of law, so the related "scheme" claims fall too.

Plaintiffs cannot establish scheme liability as a matter of law in any event.  Even if the Court had not dismissed any July 8 termination letter claim, Plaintiffs would still be unable to show falsity.  As the Court previously recognized, Dkt. 48 (MTD Order) at 27-28, the July 8 termination letter expressed opinions regarding Musk's contractual rights and his ability to terminate the merger.  Under *Omnicare*, Plaintiffs must show that Ringler did not genuinely believe those statements—he testified, unrebutted, that he did.  *Omnicare*, 575 U.S. at 176 (2015); Ex. O (Ringler Dep.) at 263:4-15.  Nor can Plaintiffs claim the termination was actionable; at worst it was a breach of contract, which cannot give rise to liability under the securities laws.  *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691-92 (9th Cir. 2011) ("[T]he breach of a contractual promise of future performance typically does not constitute a misrepresentation that will support an action for fraud.").  Mr. Musk's non-public requests for information and purported

-35-

refusal to resolve his disputes with Twitter, Ex. UU (Pls' Resp to Rog. No. 14), cannot support a "scheme claim" either because there is no evidence any investor relied on these non-public events to make any trade. *Stoneridge Inv. Partners*, 552 U.S. 148, 159 (2008) ("[The defendants'] deceptive acts were not communicated to the public ... [The plaintiff], as a result, cannot show reliance upon any of [the defendants]' actions except in an indirect chain that we find too remote for liability.").

Finally, the Court cannot find Musk liable for fraud for "instigating the Delaware lawsuit" and litigating it. Ex. UU (Pls' Resp to Rog. No. 14). That is protected petitioning conduct immune from liability under the *Noerr-Pennington* doctrine, *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 643-44 (9th Cir. 2009), and Plaintiffs cannot show that Musk's positions were "objectively baseless" and motivated by a subjective intent to act unlawfully. *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1094 (9th Cir. 2000); *see* Dkt. 48 (MTD Order) at 28 ("[T]here was no jury verdict with respect to Defendant's rights, nor have Plaintiffs cited any other legal determinations that would make the statements and legal positions in the letters misleading when made"); Ex. O (Ringler Dep.) at 263:4-15 (positions were taken "in good faith"). Nor can Plaintiffs show that any actions in the lawsuit caused them loss. Ex. S (Tabak Dep. Vol. 1) at 36:6-23; Ex. 243 (Tabak Supp. Rp't) at ¶¶ 16-17; *York Cnty.*, 738 F. Supp. 3d at 1206 (plaintiff must establish loss causation).

## CONCLUSION

Defendant respectfully requests that the Court grant this motion for summary judgment.

DATED:  August 15, 2025                    QUINN EMANUEL URQUHART & SULLIVAN, LLP


By    /s/ Stephen A. Broome
   Alex Spiro
   Michael T. Lifrak
   Stephen A. Broome
   Joseph C. Sarles
   Jesse A. Bernstein
   Alex Bergjans
   Jonathan E. Feder
   Stephanie Kelemen

   *Attorneys for Defendant Elon Musk*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on this the 15th day of August, 2025.

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  /s/ Stephen A. Broome
   Alex Spiro
   Michael T. Lifrak
   Stephen A. Broome
   Jesse A. Bernstein

*Attorneys for Defendant Elon Musk*

DEFENDANT ELON MUSK'S MOTION FOR SUMMARY JUDGMENT

**ATTESTATION**

Pursuant to Civil L.R. 5-1, I attest under penalty of perjury that concurrence in the filing of this document has been obtained from the other signatories herein.

By _/s/ Alex Bergjans_

Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Jesse A. Bernstein

_Attorneys for Defendant Elon Musk_