QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice* )
alexspiro@quinnemanuel.com
Jesse A. Bernstein (*pro hac vice*)
Jessebernstein@quinnemanuel.com
Jonathan E. Feder (*pro hac vice*)
jonathanfeder@quinnemanuel.com
Stephanie Kelemen (*pro hac vice*)
stephaniekelemen@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, NY 10016
Telephone:     (212) 849-7000
Facsimile:     (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Stephen A. Broome (Bar No. 314605)
stephenbroome@quinnemanuel.com
Joseph C. Sarles (Bar No. 254750)
josephsarles@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100

*Attorneys for Defendant Elon Musk*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br>  vs.<br><br>ELON R. MUSK,<br><br>        Defendant. | Case No. 3:22-CV-005937-CRB<br><br>**DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE OPINION OF EDWARD ROCK**<br><br>Judge:  Hon. Charles R. Breyer<br>Hearing Date:     October 31, 2025<br>Time:              10:00 a.m.<br>Courtroom:        6, 17th Floor |

Case No. 3:22-cv-005937-CRB

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE OPINION OF EDWARD ROCK

**TABLE OF CONTENTS**

**Page**

STATEMENT OF ISSUES TO BE DECIDED (CIVIL L.R. 7-4(A)(3)).......................................... 1

SUMMARY OF ARGUMENT .................................................................................................... 1

BACKGROUND ......................................................................................................................... 2

      A.    Professor Strauss's Opinions ................................................................................. 2

      B.    Professor Badawi's Opinions.................................................................................. 3

      C.    Professor Rock's Rebuttal Opinions....................................................................... 4

LEGAL STANDARD .................................................................................................................. 6

ARGUMENT ............................................................................................................................... 6

I.     PROFESSOR ROCK PROPERLY REBUTS PROFESSOR STRAUSS'S OPINIONS ................ 6

II.    PROFESSOR ROCK IS PERMITTED TO RESPOND TO PROFESSOR BADAWI'S IMPROPER LEGAL CONCLUSIONS AND SPECULATION ABOUT MUSK'S STATE OF MIND.......................................................................................................... 7

      A.    If Professor Badawi is Allowed to Offer Legal Conclusions, Professor Rock is Entitled to Rebut Them ......................................................................... 7

      B.    Professor Rock Can Rebut Professor Badawi's Improper State of Mind Opinions.......... 11

      C.    Professor Rock's Remaining Opinions Are Appropriate Rebuttal................................... 15

CONCLUSION.......................................................................................................................... 16

Case No. 3:22-cv-05937-CRB

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE OPINION OF EDWARD ROCK

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*Avila v. Ford Motor Co.*,
2025 WL 2538722 (N.D. Cal. Aug. 22, 2025) ................................................................. 12

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
613 F. Supp. 3d 1308 (S.D. Cal. 2020) ........................................................................ 8

*City of Pomona v. SQM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014) ...................................................................................... 14

*Corbrus, LLC v. 8th Bridge Cap., Inc.*,
2022 WL 4239055 (C.D. Cal. Sept. 13, 2022) ............................................................. 8

*In re High-Tech Employee Antitrust Litig.*,
2014 WL 1351040 (N.D. Cal. Apr. 4, 2014) ................................................................. 6

*Kawasaki Jukogyo Kabushiki Kaisha v. Rorze Corp.*,
782 F. Supp. 3d 836 (N.D. Cal. 2025) ......................................................................... 12

*Kirola v. City & Cty. of S.F.*,
2010 WL 373817 (N.D. Cal. Jan. 26, 2010) ................................................................. 6

*Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*,
523 F.3d 1051 (9th Cir. 2008) ...................................................................................... 10

*Perez v. State Farm Mutual Auto. Ins. Co.*,
2011 WL 8601203 (N.D. Cal. Dec. 7, 2011) ............................................................ 6, 7

*Waymo LLC v. Uber Techs., Inc.*,
2017 WL 5148390 (N.D. Cal. Nov. 6, 2017) ................................................................ 8

**Rules/Statutes**

Federal Rule of Civil Procedure 26 ...................................................................................... 1, 2, 6

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE OPINION OF EDWARD ROCK

**STATEMENT OF ISSUES TO BE DECIDED (CIVIL L.R. 7-4(a)(3))**

Whether the Court should deny Plaintiffs' Motion to Exclude portions of Professor Edward Rock's rebuttal to Plaintiffs' experts Professors Adam Badawi and Emily Strauss because Professor Rock's opinions are reliable, directly responsive to the underlying Badawi and Strauss Reports, and are admissible to the extent that the Court permits Professors Badawi and Strauss to testify in this case?

**SUMMARY OF ARGUMENT[1]**

Plaintiffs' Motion to Exclude Professor Rock's expert opinions ("Mot.") fundamentally misunderstands the purpose and scope of his rebuttal expert testimony.  Defendant Musk designated Professor Rock solely as a rebuttal expert under Federal Rule of Civil Procedure 26(a)(2)(D)(ii) to respond to the improper legal and state of mind opinions advanced by Plaintiffs' experts, Professors Strauss and Badawi.  If the Court excludes the testimony of Professors Strauss and Badawi—as it should for the reasons set forth in Musk's separate Motions to Exclude—then Professor Rock's rebuttal opinions are unnecessary and Musk agrees to withdraw them.

But Plaintiffs cannot have it both ways.  They cannot ask the Court to permit their experts to offer thinly veiled legal conclusions disguised as "custom and practice" or legal "context" testimony while simultaneously seeking to silence the only expert witness capable of exposing those opinions for what they truly are and explaining why they are wrong and misleading.  Professor Badawi's report is replete with legal conclusions about Musk's rights under the Merger Agreement ("MA"), dressed up as purported industry expertise on M&A "custom and practice."[2]  Professor Strauss offers an exceedingly basic "Securities 101" lecture that she admits "does not offer any opinions about the facts of this case," while seeking to opine on prejudicial topics like SEC enforcement actions, and presenting prejudicial stock

---

[1]  Unless indicated otherwise, all cited Exhibits or "Ex." are attached to the accompanying Declaration of Stephen A. Broome.

[2]  *See, e.g.* Ex. A (Badawi Dep.) at 184:17-25 ("Q:  And then you write in paragraph 88 [of your expert report], 'Mr. Musk's disparaging tweets about the Company likely violated Section 6.8 of the [merger] agreement that prohibits disparaging public comments.'  How is that not a legal opinion?  A:  I would – the – I would say the – the – it violates *the customary understanding of the language* that you see in Section 6.8."); *id.* at 187:16-188:2 (Professor Badawi is "not offering a legal conclusion about whether or not [Musk's tweets] were a material breach" of the MA, but he is offering an opinion that "*as a matter of custom and practice* … they would be considered … a material breach.") (emphasis added).

charts with no analytical foundation.

If this Court permits Professors Badawi and Strauss to testify, then Professor Rock must be allowed to provide the necessary rebuttal testimony. Plaintiffs' selective objections to Professor Rock's opinions—while ignoring the problems in their own experts' reports—demonstrate the one-sided nature of their challenge. Professor Rock's testimony directly responds to and rebuts the specific opinions offered by Professors Badawi and Strauss on the same subject matters, exactly as Rule 26(a)(2)(D)(ii) contemplates.

For the reasons set forth below, Plaintiffs' Motion should be denied in its entirety, subject to Musk's offer to withdraw Professor Rock's report if Plaintiffs withdraw the reports of Professors Badawi and Strauss.

## BACKGROUND

### A.     Professor Strauss's Opinions

Plaintiffs proffer Emily Strauss, a UC Law San Francisco associate professor, as a securities law expert. Professor Strauss offers no opinions relating to the evidence or facts of the case. Ex. C (Strauss Dep.) at 74:24-25 ("I'm not giving any opinions as to the facts of this case."). Nor does she intend for the jury to apply any of her opinions to render a verdict on any disputed issue at trial. *Id.* at 135:20-136:1.

Instead, Professor Strauss intends to "sort of teach the jury a Securities 101 class." Ex. C (Strauss Dep.) at 15:9-17. In her proposed "Securities 101" lecture, Professor Strauss intends to educate the jury about basic concepts like "What is a Stock?"; "What is a Public Company?"; "What is the Stock Market"?; "What is an Option?"; and "What is a Board of Directors?" Ex. D (Strauss Rp't) at 4, 5, 8, 9. She also intends to explain federal securities law to the jury (including an explanation of what specific regulations require) and provide background on matters irrelevant to this action (such as the Initial Public Offering process, disclosure requirements under Section 13(d), and SEC Enforcement ). *Id.* at 16-20.

Relevant to this Motion, Professor Strauss opines that "[s]tock prices in public companies generally fluctuate throughout the day" and their price tends to decline on negative news and elevate on positive news, Ex. D (Strauss Rp't) at 6—although she has no expertise in and does not intend to offer any opinion on the cause of any given stock price movement. Ex. C (Strauss Dep.) at 45:22-25. To illustrate this rudimentary point, she includes—at Plaintiffs' counsel's request—charts showing Twitter

and Tesla's stock prices at certain points in 2022. *Id.* at 55:6-10. But Professor Strauss has no explanation for any of the stock movement depicted in her charts and concedes that she could have used the stock price history for any other publicly traded company to make the same point. *Id.* at 55:14-56:17, 58:6-12.

### B.    Professor Badawi's Opinions

Plaintiffs also proffer the testimony of Professor Adam Badawi, a professor at UC Berkeley School of Law specializing in corporate law and empirical legal studies.

Professor Badawi opines that Musk suffered "buyer's remorse" and therefore "sought to terminate or renegotiate his acquisition of Twitter." Ex. B (Badawi Rp't) ¶¶ 99, 100. He concludes that "Musk's actions were consistent with the customary behavior of a remorseful buyer" and that by "waiving due diligence and agreeing to a seller-friendly agreement," Musk "create[d] classic conditions for buyer's remorse" which "were present in this case." *Id.* ¶¶ 9, 99. He contends that acquirers experiencing buyer's remorse "will sometimes use tactics like delay and/or litigation to try to escape the deal or to extract price concessions from sellers," suggesting that is what Musk was up to here. *Id.* ¶ 11(4). Indeed, he testified that "the tweets that are at issue here are arguably part of setting the stage for an attempt to terminate." Ex. A (Badawi Dep.) at 128:14-23; *id.* at 129:8-14.

Professor Badawi asserts that "there was no basis for Mr. Musk's assertions" in his at-issue tweets and statements, and Musk engaged in a "pattern of claiming rights that were at odds with the Merger Agreement." Ex. B (Badawi Rp't) ¶ 100. He claims this "pattern … created confusion and uncertainty and continued through his attempts to terminate that agreement."[3] *Id.*. Professor Badawi repeatedly testified under oath that he is not offering legal opinions or interpreting the MA. But when asked for the tenth time whether he was offering an opinion on whether Musk was "entitled" under the MA "to the information that he described in the May 13th tweet," Professor Badawi finally admitted, "yes, I am"— though only after repeatedly denying it. Ex. A (Badawi Dep.) at 256:12-257:21; *see also id.* at 116:10-117:8 ("I don't have an opinion on the topic"), *id.* at 162:3-163:7, 165:14-166:4, 212:6-13, 214:5-216:8,

---

[3]  When asked, "uncertainty for whom?," Professor Badawi could not give a clear answer. Ex. A (Badawi Dep.) at 191:12-192:13, 195:4-197:17. He refused to agree that he meant uncertainty for investors, claiming "I don't think I specifically said who would experience the uncertainty," and then settled on "I think what I meant are anyone who didn't have access to nonpublic information." *Id.* at 196:25-197:17.

240:21-245:10, 252:1-16. When asked whether his opinion is "that Mr. Musk was not entitled [under the MA] to the information that he described in his May 13 tweet," he replied, "[t]he way I read it, that's correct." *Id.* at 259:25-260:5. Incredibly, Professor Badawi claims that because he is not relying on "a plain reading of the merger agreement," but is instead explaining how the MA "would be *customarily* understood in the custom and practice of M&A," he is not offering legal conclusions. *Id.* at 260:15-22. He refused to accept that whether his interpretation of the MA is based on its plain language or "custom and practice," he is still interpreting a contract and offering legal opinions. *See, e.g., id.* at 235:6-236:24.

In Professor Badawi's view, to understand the MA and Musk's information rights, one would need to be "an expert in M&A" and know the "customary understanding of" its language. *Id.* at 220:5-24. He suggested that even *the Court* could not understand the relevant provisions of the MA without his expertise, testifying that parties that want their "merger contracts interpreted … go to Delaware; they go to judges who have expertise in interpreting those merger agreements," and "those judges will sometimes rely on expert testimony to understand what those [provisions] mean." *Id.* at 221:1-222:4.

Central to Professor Badawi's analysis is his characterization that Musk "waived due diligence" by not conducting an extensive pre-signing investigation into non-public information, which he claims is "customarily rare for an acquirer of a public company" because it "entails a substantial risk." Ex. B (Badawi Rp't) ¶¶ 11, 86. Professor Badawi argues this purported "waiver" is significant because the MA was "seller-friendly," containing terms "regarded as highly favorable to the seller," which would "make it extremely difficult to terminate the deal on the basis of information learned after the signing." *Id.* ¶¶ 11, 21-22, 50-69. Professor Badawi later conceded that when he opines that Musk "waived due diligence *in this transaction*," *id.* ¶ 86, he meant only that Musk decided not to make "*pre*-signing due diligence" a condition to *entering* the MA. Ex. A (Badawi Dep.) at 44:23-45:14, 49:20-50:1.

C.    **Professor Rock's Rebuttal Opinions**

Professor Edward Rock, the Martin Lipton Professor of Law at NYU School of Law and Reporter for the ALI's Restatement of Corporate Governance, submitted a rebuttal report addressing Professor Strauss's and Professor Badawi's opinions.

Professor Rock pushes back on Professor Strauss's "opinion" that stock prices fluctuate due to positive news or negative developments, Ex. D (Strauss Rp't) at 6, explaining that price movement is not

so simple. Pls. Ex. A (Rock Rp't) ¶ 24. He further calls out Professor Strauss for identifying in her report Tesla and Twitter stock prices in 2022 without providing any explanation for why she chose those stocks or that time period. *Id.* ¶ 23.

Professor Rock disputes Professor Badawi's characterization that Musk "waived due diligence" by distinguishing between (1) foregoing the opportunity to conduct pre-signing due diligence (which is common in hostile transactions relating to public companies), and (2) contractually waiving information rights. Professor Rock emphasizes that Section 6.4 of the MA explicitly granted Musk rights to "all information concerning the business, properties and personnel" for any "reasonable business purpose related to the consummation of the transaction," with Section 7.2 making closing conditional on Twitter's compliance with these obligations. Pls. Ex. A (Rock Rp't) ¶¶ 45-46, 49.

Regarding Professor Badawi's characterization of the MA as "seller-friendly" and his opinion that a buyer's rights in a "seller-friendly" merger agreement should be interpreted narrowly, Professor Rock argues that the term "seller-friendly" lacks determinate meaning and legal significance, noting that in merger disputes, "arguing that the provision is 'seller friendly' or 'buyer friendly' will be beside the point"—"what matters is the language of the provision itself." Pls. Ex. A (Rock Rp't) ¶¶ 32, 37-38. Similarly, he contends that Professor Badawi's "custom and practice" opinions are irrelevant once parties agree to specific terms in a merger agreement because "the only uniform 'custom' is that the ultimate agreed upon term supersedes the [parties'] negotiating positions." *Id.* ¶ 28.

In response to Professor Badawi's opinion that Musk's tweets had "no basis" and that Musk "claim[ed] rights at odds with the [MA]," Professor Rock explains that Musk's tweets were fully consistent with his rights under the MA. He notes that "everyone on both sides of the transaction operated under the assumption [Musk] was entitled to such information" and that Twitter engaged with Musk's information requests rather than claiming he had "waived due diligence," with Twitter's own lawyer Martin Korman describing the parties' exchange of information as a "dialogue" where the Twitter team "extended ourselves constructively to satisfy the information requests that [Musk] rightfully made under 6.4." Pls. Ex. A (Rock Rp't) ¶¶ 51-54 (citing Korman Dep. at 238:1–7).

Responding to Professor Badawi's opinion that Musk's tweets "created confusion and uncertainty" by "claiming rights that were at odds with the [MA]," Professor Rock explains that such uncertainty

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE OPINION OF EDWARD ROCK

existed regardless of the parties' legal rights and obligations under the MA because parties always have the power to breach their agreement subject to consequences, citing the concept of efficient breach. Pls. Ex. A (Rock Rp't) ¶¶ 67-69. He presents empirical evidence showing specific performance is historically rare in Delaware courts—contrary to Professor Badawi's testimony that a plaintiff seeking specific performance in Delaware is "highly likely" to get it, Ex. A (Badawi Dep.) at 154:11-17—and documents numerous "busted deals" from 2005-2022 where transactions failed or were renegotiated. Ex. Pls. Ex. A (Rock Rp't) ¶¶ 76-84; *id.* at Exs. 1-2. He notes that damages for breach would be uncertain and unlikely to compensate for lost merger premium. *Id.* ¶¶ 85-89. Given these uncertainties, Professor Rock opines that Musk's alleged misrepresentations did not "create confusion and uncertainty" because uncertainty is inherent and always present in M&A. Rather, Musk "provided valuable information to the market" and "allowed the market to update its expectations" about *legitimate* deal uncertainty. *Id.* ¶¶ 110-113.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 26(a)(2)(D)(ii), rebuttal expert testimony is proper if it is "intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). The Rule does not require a rebuttal expert to engage in a point-for-point refutation of the opposing expert's opinions, but rather permits rebuttal that "addresses the same subject matter that the initial experts address." *Perez v. State Farm Mutual Auto. Ins. Co.*, 2011 WL 8601203, at *8 (N.D. Cal. Dec. 7, 2011); *see also e.g., In re High-Tech Employee Antitrust Litig.*, 2014 WL 1351040, at *13 (N.D. Cal. Apr. 4, 2014) (The "realm of proper rebuttal testimony" includes discussion that was not included in the opening expert's report, when "[s]uch a response … is clearly 'intended solely to contradict or rebut evidence on the same subject matter identified by another party.'"); *Kirola v. City & Cty. of S.F.*, 2010 WL 373817, at *2 (N.D. Cal. Jan. 26, 2010) ("Rebuttal disclosure is not automatically excluded solely because it includes evidence that was absent in the original expert disclosure.").

## ARGUMENT

### I. PROFESSOR ROCK PROPERLY REBUTS PROFESSOR STRAUSS'S OPINIONS

Professor Strauss submitted a "Securities 101" report that she claims is "intended to be context" but admits "does not offer any opinions about the facts of this case." Ex. C (Strauss Dep.) at 15:9-17, 135:4-136:1. The "opinions" she does offer are purely legal, irrelevant, and prejudicial. Dkt. 248 (Musk

Motion to Exclude Strauss Opinions) at 5-13.  Her testimony should be excluded for the reasons explained in Defendant's Motion to Exclude.  *Id.*  In that event, Professor Rock's opinions in rebuttal to Professor Strauss will not be necessary and Musk agrees to withdraw them.

But Plaintiffs' contention that Professor Strauss should be permitted to testify while Professor Rock's opinions should be excluded is meritless.  Plaintiffs contend that Professor Rock "offers no actual opinions rebutting" Professor Strauss.  That is not true.

Professor Strauss opines that stock price is "determined by the  interaction of supply and demand" and that "[p]ositive news … can drive increased demand and elevate the stock price" while "[n]egative developments … may lead to a decline in price as investors reduce their holdings, creating excess supply." Ex. D (Strauss Rp't) at 6.  Then—at Plaintiffs' counsel's request—she produces stock charts for Twitter and Tesla.  Ex. C (Strauss Dep.) at 55:6-10.

Professor Rock responds directly.  He points out that "[w]hile it is true that stock prices fluctuate, Professor Strauss provides no explanation for her choice of Twitter and Tesla, or why their stock price fluctuations are relevant."  Pls. Ex. A (Rock Rp't) ¶ 23.  Professor Rock then rebuts Professor Strauss's opinion by explaining that it is incorrect and incomplete:

> [Professor Strauss's] assertion that the way that stock prices change is through the simple mechanisms of supply and demand as investors reduce their holdings in response to negative news or increase their holdings in response to positive news is incorrect and incomplete. Professor Strauss' analysis ignores the impact of positive or negative information on investors' valuation of stock whether or not they buy or sell.

*Id.* ¶ 24.  Because Professor Rock's rebuttal responds to Professor Strauss's opinion, he should be permitted to offer it at trial to the extent she is permitted to testify.  *See Perez*, 2011 WL 8601203, at *8 .

## II.    PROFESSOR ROCK IS PERMITTED TO RESPOND TO PROFESSOR BADAWI'S IMPROPER LEGAL CONCLUSIONS AND SPECULATION ABOUT MUSK'S STATE OF MIND

### A.    If Professor Badawi is Allowed to Offer Legal Conclusions, Professor Rock is Entitled to Rebut Them

Plaintiffs argue that experts "may not testify as to legal conclusions."  Mot. at 7 (citation omitted). Musk agrees.  The problem is that *Plaintiffs* seek to present Professor Badawi's legal opinions on the meaning of various provisions of the MA as purported "custom and usage" testimony.  Musk moved to

exclude Professor Badawi's report on this basis. Dkt. 245 at 5-8. To the extent the Court allows Professor Badawi to testify, however, Musk is entitled to rebut his testimony through Professor Rock.

As demonstrated in Musk's Motion to Exclude Professor Badawi's Opinions, Professor Badawi engages in blatant contract interpretation through the thin guise of "custom and practice" testimony. Dkt. 245 at 5-6. The Court need only look to Badawi's "conclusion[s]" at Paragraph 100 of his report to see that his "custom and practice" testimony is pure legal opinion. For example, he opines that "*[n]o provision in the [MA] stated that [Musk] could refuse to close if Twitter declined to produce information about spam and fake accounts*, and, customarily, merger agreements would not contain such a provision." Ex. B (Badawi Rp't) ¶ 100. The italicized clause is about as "legal" as an opinion can get—unless he is merely saying that the MA does not contain these precise words, in which case his opinion is irrelevant because a jury can read the MA and determine what it does and does not say. *See Waymo LLC v. Uber Techs., Inc.,* 2017 WL 5148390, at *6 (N.D. Cal. Nov. 6, 2017) (excluding expert opinion as not offering "specialized knowledge" when the documents relied upon spoke for themselves). The non-italicized clause is irrelevant. Plaintiffs contend the MA is unambiguous, so it does not matter what provisions "customary" merger agreements contain. *E.g.*, *Corbrus, LLC v. 8th Bridge Cap., Inc.*, 2022 WL 4239055, at *20 (C.D. Cal. Sept. 13, 2022) (excluding opinion that contract language was "unusual"). This case is not about those agreements; it is about the MA between Musk and Twitter.

Next Professor Badawi opines that Musk engaged in a "pattern of claiming *rights that were at odds with the Merger Agreement*." Ex. B (Badawi Rp't) ¶ 100. And in the final sentence of his report, Professor Badawi concludes: "In my opinion, given prevailing custom and practice in mergers and acquisitions, *there was no basis for Mr. Musk's assertions*." *Id.* Again, it is difficult to imagine opinions more "legal" than these. Professor Badawi argues that Musk claimed *legal* rights "at odds with the Merger Agreement" and that he had "no [*legal*] basis" for his assertions. Sprinkling the words "custom and practice" around legal opinions does not make them any less objectionable. *See e.g.*, *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1320-22 (S.D. Cal. 2020) (testimony regarding how a contract provision impacts those "in practice" excluded as legal conclusion). Whether based on the MA's plain language or an interpretation in light of "custom and practice," it is clear that Professor Badawi's opinions about the MA are legal conclusions.

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE OPINION OF EDWARD ROCK

In the paragraphs of Professor Rock's Report that Plaintiffs challenge, he simply pulls the curtain back to reveal Professor Badawi's opinions for the pure legal conclusions they are and explains why Professor Badawi's "custom and practice" analysis has no role here:

> It is the agreed term that controls future discussions and disputes, not the negotiating claims about what is and is not market [*i.e.* "customary"]. As in any other negotiation, *the only uniform "custom" is that the ultimate agreed upon term supersedes the negotiating positions*. Indeed, to assure that, the Twitter merger agreement, like most merger agreements, contains an "integration" provision. § 9.6.

Pls. Ex. A (Rock Rp't) ¶ 28. If Professor Badawi is permitted to opine that Musk had no legal right under the MA to the information he requested in light of M&A "custom and practice," then Professor Rock must be permitted to rebut that testimony by opining that the "custom and practice" in M&A transactions when there is a dispute over information is to follow the MA's plain, unambiguous language and not to interpret that language based on other agreements or provisions.[4]

Nor is there any merit to Plaintiffs' argument that Professor Rock may not rebut Professor Badawi's testimony that, as a matter of "custom and practice," the MA is "seller-friendly." Ex. A (Badawi Dep.) at 39:4-18. Professor Badawi opines that, in a "seller-friendly" merger agreement, a buyer's rights will typically "be much more restricted" than in a "buyer-friendly" agreement. Ex. B (Badawi Rp't) ¶¶ 21-22; *see also* Ex. A (Badawi Dep.) at 144:23-145:24 ("We saw a waiver of due diligence [by Musk], and then we see extremely seller-friendly information rights that constrict the amount of information that you're allowed to give."). These too are legal conclusions offered to advocate a narrower reading of Musk's information rights under the MA. They would be irrelevant otherwise. As Badawi's testimony makes clear, when he uses "seller-friendly" to describe Musk's information rights, it is a synonym for "restricted" or "constrict[ing] the amount of information." Ex. A (Badawi Dep.) at 144:23-145:24. And when asked how his "seller-friendly" opinions are relevant in this case, the only purpose he could identify was aiding the Court in "interpreting provisions" of the MA. *Id.* at 147:18-148:8. These legal conclusions

---

[4] Here, there was no dispute that Musk was entitled to the information he requested before he sent the at-issue tweets. Indeed, prior to Musk sending his May 13 tweets, he and his team requested the information, and *Twitter's team agreed to provide it*. Musk MSJ at 15-18.

Case No. 3:22-cv-05937-CRB

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE OPINION OF EDWARD ROCK

dressed up as "custom and practice" evidence should be excluded too.[5]  But if the Court admits them, Professor Rock must be permitted to rebut them by explaining, as a matter of custom and practice, the phrase "seller-friendly" "does not have any determinate meaning," and "no one would think that whether one might legitimately say that a term or agreement is buyer or seller friendly would have any effect on the interpretation of that term or agreement."  Pls. Ex. A (Rock Rp't) ¶ 37; *id.* ¶ 38 ("[I]f there is a dispute … the lawyers will pull out the merger agreement and argue over the meaning of the [term] and how it applies to the particular question at issue.  In that discussion, arguing that the provision is 'seller friendly' or 'buyer friendly' will be beside the point.").

Plaintiffs' final argument that Professor Rock should be prevented from opining on the meaning of "due diligence" in the context of M&A transactions fails too.  Plaintiffs—through Professor Badawi— persist with the futile argument that Musk "waived due diligence *in this transaction*."  Ex. B (Badawi Rp't) ¶ 86 (emphasis added).  But there is no dispute that the (fully integrated and unambiguous) MA governed Musk's rights to information from Twitter.  "Due diligence" is neither defined nor mentioned in the MA and Professor Badawi was forced to admit that Musk did *not* "waive[] due diligence *in this transaction*," but merely chose to remove "*pre-signing* due diligence" as a condition to his offer to enter the MA.  *Id.*; Ex. A (Badawi Dep.) at 44:23-45:14.  But since Professor Badawi did not offer that critical concession—which renders the entire concept of "waiving due diligence" irrelevant—in his Report, it is appropriate for Professor Rock to explain his views on what the undefined term "due diligence" means and to offer his rebuttal opinion that "[n]ot making the offer *contingent* on due diligence does not mean

---

[5]  As noted in Musk's Motion to Exclude Professor Badawi's Testimony, suggesting that a term should be interpreted narrowly because it purportedly is "seller-friendly" puts the cart before the horse:  one needs to interpret a term before labelling it buyer- or seller-friendly.  Indeed, Professor Badawi testified that: "to understand … whether something is buyer-friendly or seller-friendly, you can't just look at one agreement …  You have to look at things at scale … which is [] what I do in my work is look across thousands of agreements and say, okay, where do these—in terms of the custom and practice in the field, where does this fall?"  Ex. A (Badawi Dep.) at 84:6-14; *id.* at 131:2-133:20 (in order to "characterize the [MA] as buyer or seller-friendly," you "need to know what is in *other* agreements").  Thus, even if the degree of "seller-friendliness" in the MA is somehow relevant to determining Musk's information rights, then the MA must be ambiguous and *only* people who have reviewed "thousands of [merger] agreements" would be able to opine on its meaning.  But that is contrary to Plaintiffs' litigation position that the MA is *not* ambiguous.  Ex. E (Supp. Resp. to First Set of Interrogatories) at 16.  And it is, quite obviously, not the law.  *See, e.g.*, *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058-59 (9th Cir. 2008) (affirming exclusion of expert testimony on contract interpretation as an improper legal conclusion).

that one waives one's right to conduct due diligence.  Indeed, nearly every merger agreement provides rights to information between signing and closing, whether or not due diligence was conducted before the signing."  Pls. Ex. A (Rock Rp't) ¶ 49 (emphasis in original).

Moreover, Professor Badawi's understanding of the term "due diligence" is clearly at odds with Musk's and Twitter's understanding.  After signing the MA, the Musk and Twitter teams conducted numerous "due diligence" meetings, including on the topic of bots.  Musk MSJ at 15-18.  Confronted with this fact at his deposition, Professor Badawi testified:  "I think, you know, the – the term 'diligence' is used among different professionals in different sorts of ways, right.  So I think in M&A, when you talk about due diligence, the customary understanding, that is the investigation that you do before signing an agreement."  Ex. A (Badawi Dep.) at 75:16-76:11.  He was unable to explain why, if his definition of due diligence is "customary" in M&A, Musk's and Twitter's M&A teams participated in numerous, *post*-signing "due diligence" meetings.  *Id.* at 76:20-78:5.  Despite claiming Musk "waived due diligence," Professor Badawi does not even have a clear understanding of what "due diligence" means—and certainly does not have the understanding that Musk and Twitter shared when they conducted numerous "due diligence" meetings.  Professor Rock is entitled to respond to Professor Badawi's confused opinion by explaining to the jury that the term "due diligence" has "no determinate meaning, and generally speaking, no legal significance" but that to the extent its used in practice, it typically refers to "investigations that a potential buyer … will make prior to *closing* a transaction"—the exact way it was used by Musk and Twitter post-signing.  Pls. Ex. A (Rock Rp't) ¶¶ 32, 37, 44 (emphasis added).

**B.      Professor Rock Can Rebut Professor Badawi's Improper State of Mind Opinions**

Plaintiffs argue that "[s]tate of mind, motive, [and] intent … are reserved for determination by a jury."  Mot. at 8 (citations omitted).  Musk agrees.  But again, *Plaintiffs* created this dispute by seeking to present Professor Badawi's opinions on Musk's state of mind.  Specifically, Professor Badawi opines that "Musk's actions were consistent with the customary behavior of a remorseful buyer," and that by purportedly "[w]aiving due diligence and agreeing to a seller-friendly agreement," Musk "create[d] classic

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE OPINION OF EDWARD ROCK

conditions for buyer's remorse"—clearly implying that Musk suffered buyer's remorse.[6] Ex. B (Badawi Rp't) ¶¶ 9(C), 99; *see Avila v. Ford Motor Co.*, 2025 WL 2538722, at *2 (N.D. Cal. Aug. 22, 2025) (excluding opinion implying a party knew certain information because "any additional interpretation or synthesis that [the expert] might offer" beyond identifying facts in the record "would constitute an impermissible state of mind opinion"). In addition, Professor Badawi opines that Musk issued his tweets in May because "he sought to terminate or renegotiate his acquisition of Twitter." *Id.* ¶ 100; *see also* Ex. A (Badawi Dep.) at 128:14-23 ("the tweets that are at issue here are arguably part of setting the stage for an attempt to terminate"); *id.* at 128:14-129:7 ("my opinion on buyer's remorse is, this case is -- an attempt to get out of the deal"); *id.* at 129:8-14 ("tweeting that a deal is on hold, you know, suggests an attempt – a potential -- potential attempt to get out of the deal"). These are classic state of mind opinions and they should be excluded under Plaintiffs' own cited authority. *See* Mot. at 8; *see also* Dkt. 245 (Musk Motion to Exclude Badawi Opinions) at 14-16. Musk will withdraw Professor Rock's opinions if the Court properly excludes Professor Badawi's. But if the Court permits Professor Badawi's state of mind opinions, Musk is entitled to rebut them through Professor Rock.[7]

Plaintiffs also object to Professor Rock's description of Musk's May 13 tweet as an "apparently sincere statement" and his assertion that he had seen no evidence that the tweet was anything "other than truthful and informative and well within his rights under the merger agreement" as "not the proper province of a corporate governance expert." Mot. at 7. At the same time, they contend that Professor

---

[6] Any suggestion by Plaintiffs that Professor Badawi is not opining that *Musk* had buyer's remorse would not be credible. That clearly is their implication. Indeed, when asked in deposition "do you believe that Mr. Musk experienced buyer's remorse with respect to the Twitter transaction?," he replied, "[t]here are indications that Mr. Musk experienced buyer's remorse, as I would understand the customary use of that term in M&A transactions." Ex. A (Badawi Dep.) at 127:9-15. If Professor Badawi is not suggesting that *Musk* had buyer's remorse, these opinions are irrelevant, confusing to the jury, and prejudicial to Musk.

[7] Professor Badawi explained that when he uses the term "buyer's remorse," he means "attempts to get out of the deal." Ex. A (Badawi Dep.) at 122:2-9; *id.* at 126:10-17. Thus, he could have simply opined that "Musk was attempting to get out of the deal." But Professor Badawi recognized that he cannot opine on "intent," so instead he claims the "conditions" for "buyer's remorse" were present to convey the identical point to the jury. *Id.* This a classic attempt at getting intent testimony in through the back door. *Kawasaki Jukogyo Kabushiki Kaisha v. Rorze Corp.*, 782 F. Supp. 3d 836, 856 (N.D. Cal. 2025) ("The jury is perfectly capable of reviewing relevant evidence and testimony presented by the parties and then drawing its own inferences as to state of mind. Allowing an expert to testify as to a party's state of mind substitutes the opinion of the expert for the judgment of the jury.").

Badawi should be able to speculate that Musk issued the tweet because he "sought to terminate or renegotiate his acquisition of Twitter"—which goes directly to motive.  Plaintiffs also contend that the Court should allow Professor Badawi to suggest that Musk's tweets were *untruthful* because, allegedly: "[n]o provision in the Merger Agreement stated that [Musk] could refuse to close if Twitter declined to produce information about spam and fake accounts"; Musk engaged in a "pattern of claiming rights that were at odds with the Merger Agreement"; and "there was no basis for Mr. Musk's assertions."  Ex. B (Badawi Rp't) ¶¶ 99-100.  Professor Rock's statements are permissible rebuttal, at minimum.[8]

Nor is there any merit to Plaintiffs' challenge to Paragraphs 51-55 of Professor Rock's Report that:

51.  The best evidence that the May 13th tweet was not misleading is that Mr. Musk did, in fact, have the right to investigate bots. Everyone on both sides of the transaction operated under the assumption he was entitled to such information. Later there was a dispute over how much information he was entitled to, but there was no dispute that he was entitled to information.

52. To my eyes, the most natural reading of Mr. Musk's tweets in May 2022 is what he actually said, namely, that the "Twitter deal [is] temporarily on hold." This does not even address the question of legal rights or the right to terminate. As the parties to a merger agreement are working to consummate it – consistent with bilateral obligations under § 6.3 to "use their respective reasonable best efforts to consummate" the transaction – it is common and appropriate for one party to say to the other, "I don't believe you have met the conditions to closing. Something has come up and we want you to deal with it. There are a variety of things that you haven't done but you need to do. Until you do them, we're not ready to close."

53. Indeed, *this sort of back and forth is a customary part of M&A*. It is part of the required reasonable best efforts and, here, as detailed above, Twitter reacted to Mr. Musk's request for more information by providing more information, as one would expect. It was, as Twitter's lawyer Martin Korman explained, a "dialogue": "We engaged in dialogue. We sent writings, and *we extended ourselves constructively to satisfy the information requests that buyer **rightfully** made under 6.4 and 6.11*, and we complied with those requests to the best of the company's ability, in my observation."

54. Importantly, as far as I can tell, Twitter did not respond to Mr. Musk's requests for information by saying "you waived due diligence and so we do not have to give you any information!"

55. In reviewing the tweets, I do not find any tweet in May 2022 in which Mr. Musk claimed the right to, or threatened to, terminate the transaction because of a failure by Twitter to provide information on bots. Rather, the tweets indicate that he is asking for information as provided for in the merger agreement.

Pls. Ex. A (Rock Rp't) ¶¶ 51-55.  This testimony directly and appropriately rebuts Professor Badawi's

---

[8]  Alternatively, the Court could simply strike—or instruct Professor Rock not to mention—the words "apparently sincere" or "truthful" in reference to Musk's tweets.

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE OPINION OF EDWARD ROCK

thinly veiled legal opinion that, in light of "custom and practice," Musk's at-issue tweets and statements "claim[ed] rights that were at odds with the Merger Agreement."  Ex. B (Badawi Rp't) ¶ 100.  It is admissible to the extent that the opinion it responds to is admissible.

Plaintiffs complain that Professor Rock used the phrase "to my eyes," rather than, "in my opinion." Mot. at 8.  That is a distinction without a difference.  Plaintiffs also complain that Professor Rock "grossly misstat[es] the facts" by stating that "everyone 'operated under the assumption Musk was entitled to such information' and 'there was no dispute that he was entitled to information.'"  *Id.*  Tellingly, however, Plaintiffs do not cite any evidence controverting Professor Rock on these points, and as Musk demonstrated in his Motion for Summary Judgment, Professor Rock is correct:  (1) there was no dispute that Musk was entitled to at least some of the information he requested and (2) everyone involved in the merger operated under that assumption.[9]  Musk MSJ at 15-18.  Ultimately, the record speaks for itself, and Plaintiffs' disagreement with the facts only goes to the weight of the opinion and is not a basis for excluding it.  *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) ("A factual dispute is best settled by a battle of the experts before the fact finder, not by judicial fiat.").

Plaintiffs assert that Professor Rock's opinions "about the truth or falsity of Musk's tweets, their 'most natural reading,' and what they really 'indicate' to investors is beyond his expertise and the role of an expert."  Mot at 8.  But these are simply the inverse of Professor Badawi's opinions that Musk's tweets "claim[ed] rights that were at odds with the [MA]" and "had no [legal] basis," and "created confusion and uncertainty."  Ex. B (Badawi Rp't) ¶ 100.  Plaintiffs cannot credibly argue that Professor Badawi (a law professor) is qualified to offer such opinions while Professor Rock (also a law professor) is not.

Finally, Plaintiffs contend that "[j]urors and the Court can easily read Musk's tweets and conclude for themselves whether his statements were misleading."  Mot. at 9.  But Plaintiffs argue—and the Court previously held—that the question of whether Musk's tweets were accurate or misleading turns on whether the MA gave Musk a right to request information about bots from Twitter.  Dkt. 36 (Plaintiffs' Opp. to MTD) at 4-5; Dkt. 48 (MTD Order) at 19-21.  And to prove their position, Plaintiffs offer Professor

---

[9]  Professor Rock acknowledges that, "[l]ater [*i.e.*, after Musk's at-issue statements] there was a dispute over how much information he was entitled to, but there was no dispute that he was entitled to information."  Pls. Ex. A (Rock Rp't) ¶ 51.

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE OPINION OF EDWARD ROCK

Badawi's opinions that Musk's tweets "were at odds with the Merger Agreement." Ex. B (Badawi Rp't) ¶ 100. Plaintiffs cannot eat their cake and have it too.[10]

### C.    Professor Rock's Remaining Opinions Are Appropriate Rebuttal

At the pleading stage, the Court found that Musk's tweets "implie[d]" that he had rights under the MA that he did not have—namely "that Twitter did have an obligation to provide this [bot] data to [Musk] and that [Musk] was able to terminate the deal absent Twitter doing so." Dkt. 48 at 25 (emphasis in original). But a jury could easily find otherwise—particularly given that none of Musk's at-issue tweets or statements mentioned the MA, Musk's rights thereunder, or termination.

In rebutting Professor Badawi's opinion that Musk "had no basis" for his statements, Professor Rock appropriately opines that even if Musk had no *legal* basis for demanding information under the MA, he still had the *power* to terminate the MA if he did not receive the requested information and to live with the consequences of his actions—which would make his tweets accurate. Thus, to show that Musk *did* have at least a non-legal basis for his statements (contrary to Professor Badawi's view), Professor Rock explains:  (1) the concept of efficient breach, (2) the "obvious and well known" risk that a party to a merger agreement will choose not to consummate the transaction (thus necessitating contract terms governing that eventuality); (3) the reality that many merger transactions ultimately do not close; (4) the uncertainty of remedies in the eventuality that a merger does not close; (5) the particular uncertainty that specific performance (an equitable and discretionary remedy) would be awarded given that, when mergers fail to close, specific performance is rarely granted (more often the parties renegotiate the price); and (6) even corporate law professors following the Twitter transaction in real time, reading the MA and weighing the various factors affecting the transaction, were uncertain whether the deal would close.

---

[10]  Plaintiffs' criticism that "Prof. Rock admitted that he did not even read the empirical studies cited in the Badawi Report, including the Coates study cited throughout," is misplaced. Mot. at 7 n. 5. As an initial matter, the "Coates study" is not an independent academic study but, rather, an untested expert report prepared in support of Twitter's position in its litigation against Musk. Dkt. 245 (Musk Motion to Exclude Badawi Opinions) at 4; *see also* Ex. A (Badawi Dep.) at 136:6-10. Moreover, Plaintiffs' criticism falls flat given that *Professor Badawi* did not even read the entirety of Coates' study before serving his report—he read only the summary, but not any of the underlying agreements or data. Ex. A (Badawi Dep.) at 135:1-13. Plaintiffs' criticism that Professor Rock did not read Musk's deposition is similarly meritless. Plaintiffs do not identify any non-cumulative information in Musk's deposition that would be relevant to Professor Rock's opinions.

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE OPINION OF EDWARD ROCK

As Professor Rock appropriately summarizes at Paragraph 98:

When all of these factors are put together, any competent reader of the merger agreement would conclude that:

a. There was a non-trivial possibility that the merger would not close.

b. In the event that it did not close, it was uncertain whether a court would order specific performance.

c. In the event the court did not order specific performance, provable damages would not come close to making up for the lost merger premium.

Pls. Ex. A (Rock Rp't) ¶ 98. Professor Rock explains that *regardless* of Musk's rights under the MA, he had the *power* to terminate and, if that occurred, it was not clear that the merger would go through or that shareholders would be compensated at the merger premium. In this light, it is clear that Musk's tweets not only had a sound "basis"—contrary to Professor Badawi's opinion—they were entirely accurate.[11]

Finally, Plaintiffs challenge Professor Rock's opinions in Section VII of his report that "'Mr. Musk's tweet provided valuable information to the market' (Report ¶ 110), that 'Mr. Musk informed the market of the current state of the transaction' (*Id.* ¶ 111), that Musk's tweets 'allowed the market to update its expectations' (*Id.* ¶ 112), and 'Any information that allows the market to update those expectations is valuable to investors' (*Id.* ¶ 113)." Mot. at 11. All of these opinions directly rebut Professor Badawi's opinion that Musk engaged in a "pattern of claiming rights that were at odds with the Merger Agreement [and] created confusion and uncertainty" in the market. Ex. B (Badawi Rp't) ¶ 100. Thus, whereas Professor Badawi opines that Musk created market uncertainty by publicly claiming information rights he did not have, Professor Rock responds by opining that Musk claimed rights he *did* have and acted transparently by updating the market on the true status of the transaction. To the extent Professor Badawi is allowed testify—and he should not be—Professor Rock must be permitted to respond.

## CONCLUSION

Plaintiffs' Motion should be denied to the extent the Court permits Professors Strauss and Badawi to testify.

---

[11]   There is no merit to Plaintiffs' conclusory and unsupported assertion that Professor Rock's opinions lack "reliable facts or data." Mot. at 11. Professor Rock cites sources for each of his opinions throughout these sections. *See generally* Pls. Ex. A (Rock Rp't). Plaintiffs do not challenge the reliability of any specific source and fail to offer any explanation for their assertion that *all* of his sources are "unreliable."

DATED:  September 12, 2025                    QUINN EMANUEL URQUHART & SULLIVAN, LLP


By _____ /s/ Stephen A. Broome _____
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Jesse A. Bernstein

*Attorneys for Defendant Elon Musk*

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE OPINION OF EDWARD ROCK

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on this the 15th day of August, 2025.

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By  */s/ Alex Bergjans*
    Alex Spiro
    Michael T. Lifrak
    Stephen A. Broome
    Jesse A. Bernstein

    *Attorneys for Defendant Elon Musk*

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE OPINION OF EDWARD ROCK

**ATTESTATION**

Pursuant to Civil L.R. 5-1, I attest under penalty of perjury that concurrence in the filing of this document has been obtained from the other signatories herein.

By _/s/ Alex Bergjans_
    Alex Spiro
    Michael T. Lifrak
    Stephen A. Broome
    Jesse A. Bernstein

    _Attorneys for Defendant Elon Musk_

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE OPINION OF EDWARD ROCK