QUINN EMANUEL URQUHART & SULLIVAN, LLP

Alex Spiro (*pro hac vice*)
alexspiro@quinnemanuel.com
Jesse A. Bernstein (*pro hac vice*)
Jessebernstein@quinnemanuel.com
Jonathan E. Feder (*pro hac vice*)
jonathanfeder@quinnemanuel.com
296 Fifth Ave., New York, NY 10010
Telephone:      (212) 849-7000
Facsimile:      (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Stephen A. Broome (Bar No. 314605)
stephenbroome@quinnemanuel.com
Joseph C. Sarles (Bar No. 254750)
josephsarles@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:      (213) 443-3000
Facsimile:      (213) 443-3100

*Attorneys for Defendant Elon Musk*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | CASE NO. 3:22-CV-05937-CRB<br><br>**DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:          Hon. Charles R. Breyer<br><br>Hearing Date:   October 31, 2025<br>Time:           10:00 a.m.<br>Courtroom:      6, 17th Floor |

**FILED UNDER SEAL: REDACTED FOR PUBLIC FILING**

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES TO BE DECIDED (CIVIL L.R. 7-4(A)(3)) ..................................................1

SUMMARY OF THE ARGUMENT ...........................................................................................................1

FACTUAL BACKGROUND.......................................................................................................................4

ARGUMENT.................................................................................................................................................6

I.      PLAINTIFFS FAIL TO PROVE FALSITY.................................................................................6

        A.      Plaintiffs' Fail to Prove that Musk's May 13 Tweet Was False When Made ....................6

                1.      Plaintiffs Fail to Prove the Market Interpreted Musk's May 13 Tweet as a Description of His Legal Rights Under the Merger Agreement.............................6

                2.      The May 13 Tweet Was Not False Because the MA Gave Musk the Right to Bot Data and to Refuse to Close Until He Received It......................................7

                3.      Musk's Statement that the Deal Was "Temporarily on Hold Pending Details" Was Not False.....................................................................................11

        B.      Plaintiffs' Fail to Prove that Musk's May 16 Statements Were False When Made ..........13

        C.      Plaintiffs' Fail to Prove that Musk's May 17 Tweet Was False When Made ...................15

II.     WHETHER MUSK'S CONCERNS WERE PRETEXTUAL IS IRRELEVANT BECAUSE HIS STATEMENTS WERE TRUE ........................................................................16

III.    PLAINTIFFS FAIL TO PROVE SCIENTER.............................................................................17

        A.      Plaintiffs Cannot Prove Scienter Because Musk's Statements Were Not False................17

        B.      Musk's Statements Were Consistent with the then-Existing State of Affairs and His Contract Rights ...........................................................................................................18

                1.      Musk Read the Merger Agreement Before Tweeting; Musk's *and Twitter's* Advisors Shared His Understanding of His Rights...............................................18

                2.      Musk's 20 Percent Bot Estimate Was Based on Outside Analyses and His Anecdotal Experience ...........................................................................................19

        C.      Musk's Alleged Misstatements Are Inactionable Opinions .............................................19

IV.     PLAINTIFFS FAIL TO PROVE MATERIALITY......................................................................20

        A.      Plaintiffs Do Not Even Attempt to Establish Materiality Under the Correct Test ...........21

        B.      The Lack of a Statistically Significant Stock Reaction to the Revelation of the Alleged Fraud Shows that the Alleged Misstatements Were Not Material.......................23

        C.      Plaintiffs Cannot Prove the May 16 Statement or May 17 Tweet Were Material

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Because They Did Not Cause a Statistically Significant Reaction in the Stock Price ...................................................................................................................................24

V.    PLAINTIFFS FAIL TO PROVE CLASS-WIDE RELIANCE ......................................................26

    A.    Genuine Disputes of Fact Preclude Application of a Reliance Presumption....................26

    B.    There Is Evidence Rebutting the Fraud-on-the-Market Reliance Presumption.................28

CONCLUSION..........................................................................................................................29

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Akorn v. Fresenius Kabi,*
2018 WL 4719347 (Del. Ch. Oct. 1, 2018) ..................................................................8, 9

*In re Allied Cap. Corp. Sec. Litig.,*
2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003)...................................................................21

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,*
568 U.S. 455 (2013)....................................................................................................24, 28

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988)....................................................................................................27, 28

*Blue v. Tilray Brands, Inc.,*
2025 WL 519848 (Del. Ch. Feb. 17, 2025) .........................................................................8

*Brody v. Transitional Hosps. Corp.,*
280 F.3d 997 (9th Cir. 2002) ............................................................................................11

*C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.,*
213 F.3d 474 (9th Cir. 2000) ............................................................................................14

*In re Celestica Inc. Sec. Litig.,*
2014 WL 4160216 (S.D.N.Y. Aug. 20, 2014)...................................................................26

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.,*
2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ..................................................................28

*Christiansen v. Multi-Color Corp.,*
2024 WL 3487734 (D. Del. July 19, 2024) .........................................................................9

*Dearborn Heights v. Align Tech.,*
856 F.3d 605 (9th Cir. 2017) ............................................................................................19

*FindWhat Inv. Grp. v. FindWhat.com,*
658 F.3d 1282 (11th Cir. 2011) ........................................................................................25

*In re Finisar Corp. Sec. Litig.,*
2017 WL 6026244 (N.D. Cal. Dec. 5, 2017).....................................................................28

*Gebhart v. S.E.C.,*
595 F.3d 1034 (9th Cir. 2010) ..........................................................................................19

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.,*
594 U.S. 113 (2021).....................................................................................................25, 26

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

*Halliburton Co. v. Erica P. John Fund*,
573 U.S. 258 (2014)..................................................................................................26, 27, 28

*Hsingching Hsu v. Puma Biotechnology, Inc.*,
2018 WL 4945703 (C.D. Cal. Oct. 5, 2018)...............................................................26

*Iafrate v. Angelo Iafrate*,
827 F. App'x 543 (6th Cir. 2020) ................................................................................20

*In re Infineon Techs. AG Sec. Litig.*,
266 F.R.D. 386 (N.D. Cal. 2009)................................................................................26

*In re Initial Pub. Offerings Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006), *decision clarified on denial of reh'g sub nom. In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70 (2d Cir. 2007) ........................................27

*McCrary v. Elations Co. LLC*,
2014 WL 12561600 (C.D. Cal. Dec. 8, 2014) ............................................................26

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ......................................................................21

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) ......................................................................................17

*Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*,
692 F.3d 983 (9th Cir. 2012) ......................................................................................24

*In re Ocera Therapeutics, Inc. Sec. Litig.*,
2018 WL 7019481 (N.D. Cal. Oct. 16, 2018)............................................................12

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)..............................................................................................19, 20

*In re Oracle Sec. Litig.*,
829 F. Supp. 1176 (N.D. Cal. 1993) ...........................................................................22

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000).................................................................................23, 24

*Pickern v. Pier 1 Imports (U.S.), Inc.*,
457 F.3d 963 (9th Cir. 2006) ......................................................................................24

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
845 F.3d 1268 (9th Cir. 2017) ....................................................................................17

*S.E.C. v. Phan*,
500 F.3d 895 (9th Cir. 2007) .................................................................20, 21, 23, 26

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

*Schueneman v. Arena Pharms., Inc.*,
   2017 WL 1540847 (S.D. Cal. Apr. 28, 2017)......................................................................17

*Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*,
   708 F. Supp. 3d 450 (S.D.N.Y. 2023)..........................................................................7, 11, 14

*Sneed v. Talphera, Inc.*,
   2025 WL 2406424 (9th Cir. Aug. 20, 2025).......................................................................17

*In re Tesla Inc., Sec. Litig.*,
   2023 WL 4032010 (N.D. Cal. June 14, 2023), *aff'd* 2024 WL 4688894 (9th Cir. Nov.
   6, 2024) ..........................................................................................................................4, 21

*In re Tesla, Inc. Sec. Litig.*,
   2022 WL 1497559 (N.D. Cal. Apr. 1, 2022) ......................................................................29

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)...............................................................................................3, 20, 21, 23

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)................................................................................................25

*Washtenaw Cnty. Employees' Ret. Sys. v. Walgreen Co.*,
   2021 WL 5083756 (N.D. Ill. Nov. 2, 2021) ......................................................................17

*Xiaojiao Lu v. Align Tech., Inc.*,
   417 F. Supp. 3d 1266 (N.D. Cal. 2019) .........................................................................12, 14

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ..............................................................................................17

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## STATEMENT OF ISSUES TO BE DECIDED (CIVIL L.R. 7-4(a)(3))

Whether the Court should deny Plaintiffs' Motion for Summary Judgment where Plaintiffs fail to show beyond any dispute of material fact that (1) Defendant Elon Musk's alleged misstatements were materially false, (2) he acted with the requisite scienter, (3) the fraud-on-the-market presumption of reliance applies, or (4) Musk cannot rebut the fraud-on-the-market presumption.

## SUMMARY OF THE ARGUMENT

Plaintiffs' motion for partial summary judgment ("Motion" or "Mot.") is meritless. Plaintiffs apparently believe that if they simply repeat their unsupported allegations forcefully and frequently enough, the Court may accept them as true and excuse their lack of evidentiary support. But as shown in Musk's Motion for Summary Judgment ("Musk MSJ") (Dkt. 255), the evidence contradicting Plaintiffs' allegations is overwhelming, and warrants summary judgment for Musk. At minimum, there are material factual disputes that prevent summary judgment in Plaintiffs' favor. Their Motion should be denied.

Plaintiffs assert Rule 10b-5(b) claims on the theory that Musk falsely tweeted he had legal rights under the Merger Agreement ("MA") to information supporting Twitter's calculation of spam/fake accounts ("Bot Data") as a percentage of Monetizable Daily Active Users ("mDAU") and to delay closing the merger until he received it. Their theory posits that Musk "waived due diligence" and thus lacked the rights he allegedly claimed. As shown in the Musk MSJ, however, Twitter *agreed* to provide the information Musk requested under the MA *before* Musk made his at-issue tweets and statements. And Twitter did, ultimately, produce information in response to Musk's requests. Indeed, *everyone* involved in the merger, including Twitter's lawyers and executives, understood Musk was entitled to the Bot Data he requested. Exs. 214, 215, 216, 217, 218.

Straining to keep their case alive, Plaintiffs advance new theories and assertions refuted by the record. For example, they falsely claim that, "before posting the May 13 tweet, Musk did not review the [MA]" and therefore "lacked sufficient information for his statements." Mot. at 1, 9. In fact, Musk reviewed the MA before signing it (less than three weeks earlier) and understood it gave him rights to the requested documents. Ex. L (Musk Dep. Vol. 2) at 166:24-167:1, 270:21-271:1. Plaintiffs also falsely assert that Musk's May 16 statement that bots could be 20% or more of Twitter's users—which he made clear was based on "outside firms" and his own experience—was false because "*Musk … testified* [to the

-1-                                    Case No. 3:22-CV-05937-CRB

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

SEC] 'those are numbers you're just kind of throwing out there' and he had 'no particular basis to believe any of those numbers at the time.'"[1]  Mot. at  1.  But Plaintiffs misleadingly quote the SEC attorney's *questions* as Musk's *testimony*.  Musk did not agree—he responded "we were simply unable to determine whether it is less than 5 percent, 50 percent, or 90 percent … based on the lack of information provided to us" by Twitter.  Ex. S (Musk SEC Tr.) at 306:23-307:16.  There is nothing untrue about that testimony and it certainly does not show that Musk's May 16 reference to 20% estimates by "outside firms" was false—Plaintiffs do not dispute that is the estimate those firms reached.  Thus, to persuade the Court that Musk made misleading statements, Plaintiffs resort to making misleading statements *themselves*.

*Falsity***:**  Plaintiffs cannot establish beyond any dispute of material fact that Musk's May 13 and 17 tweets were false when made.  To the extent the tweets implied that Musk could delay closing until Twitter responded to his requests for Bot Data, they were accurate.  The undisputed record shows that:

- Musk did not "waive due diligence"; he removed pre-signing diligence as a condition precedent to entering the MA, which governed his information rights thereafter.

- MA §§ 6.4 and 6.11 granted Musk broad rights to all of Twitter's information for "any reasonable business purpose related to the consummation of the" merger.

- The MA required, as conditions to closing, that Musk be "satisf[ied]" that (1) Twitter materially complied with its obligations under the MA, including its obligations to produce information under Section 6.4 and 6.11, and (2) Twitter's representations in its SEC disclosures—including that bots compromise less than 5% of mDAU—were true and correct as of the closing date.

- Twitter acknowledged Musk's rights and *agreed* to provide the requested Bot Data, and then purported to produce a substantial amount of it "per the Merger Agreement."

Recognizing that discovery debunked their core allegation that Musk publicly claimed information rights he purportedly "waived," Plaintiffs pivot to arguing his tweets were false because he said the deal was "temporarily on hold pending details"—albeit "[s]till committed to acquisition"—despite the fact that he did not immediately "instruct anybody to put their pens down." Mot. at 15.  The Court previously rejected this theory.  Dkt. 48 at 20 ("The [falsity] question is not whether or not the deal slowed down, but whether Twitter had an obligation to provide the requested information *for the deal to close*.").  There is no evidence anyone interpreted the tweet to convey that all merger-related work had stopped.  The tweet itself made clear that the delay was "tempora[ry]" while Twitter and Musk's team continued to work to

---

[1]  All emphases are added unless otherwise indicated.

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

obtain the "details supporting calculation" Musk requested.  Indeed, Plaintiffs' M&A expert understood "temporarily on hold" to convey:  "I've requested information, I'm not getting a satisfactory response, and I'm not *closing* until I do."  Ex. C (Badawi Dep.) at 267:2-4.  The Court held that a "reasonable investor" would interpret it the same way.  Dkt. 48 at 19.  The fact that Musk would not *close* until he received the requested information does not imply that all merger-related work had stopped.  And because the record shows that Musk was entitled to delay closing until he received the requested information— and terminated the MA when he did not receive it—his statement was not false.

As for Musk's May 16 statements at the All-In-Summit, the transcript shows he stated that Twitter told him the bot calculation was "unknowable" and never suggested that his 20% estimate was based on information provided by Twitter.  To the contrary, he made clear that he was basing that estimate on "outside firms"—*e.g.*, the SparkToro and Followerwonk report released the day before estimating bots at 20%—and his own anecdotal experience.  Ex. 78 (All In Summit Excerpted Transcript) at 4:5-8, 6:8-21.  Unsurprisingly, Plaintiffs cannot identify *anyone* who interpreted Musk's statement consistent with their made-for-litigation interpretation.

**Scienter**:  Because Musk's statements were not false, he cannot have had fraudulent intent.  *E.g., Sneed v. Talphera, Inc.*, 2025 WL 2406424, at *1 (9th Cir. Aug. 20, 2025).  Further, even if he were incorrect about his rights under the MA, his statements amount to inactionable legal opinion under *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 176 (2015)*.*  As shown above (and *infra* at 18-19), Plaintiffs' assertion that Musk lacked a reasonable basis for his tweets because he "did not bother to review the merger agreement … before making the statements" is a fabrication (he negotiated, read and signed the MA).  It also ignores that, by May 13, Twitter had *agreed* to produce the requested Bot Data—confirming Musk's position that he was entitled to the information, and providing a more-than-reasonable basis for his belief.

**Materiality**:  The Supreme Court has made clear that materiality is "peculiarly [] for the trier of fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).  Plaintiffs' evidence of materiality amounts to no more than their conclusory say-so and the fact that the stock moved in a statistically significant manner following *one* of the three alleged misrepresentations, the May 13 tweet.  But the sole evidence beyond their conclusory statements that the alleged misstatements were "obviously" material,

does not even answer the right question.  The relevant question—which Plaintiffs do not even attempt to answer—is whether the difference between (1) what investors took from the allegedly false statement and (2) what investors would have taken from the true state of affairs, would be viewed as having significantly altered the total mix of information.  *In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010, at \*7 (N.D. Cal. June 14, 2023), *aff'd* 2024 WL 4688894 (9th Cir. Nov. 6, 2024).  Plaintiffs cannot meet this test since they ignore that what investors took from the May 13 tweet was that Musk was getting "cold feet" about the merger, which Plaintiffs contend *was the true state of affairs*.  Under Plaintiffs' theory, to prove materiality they must show that the stock price would have declined less or not at all if, on May 13, Musk had instead tweeted:  "I'm getting cold feet and am considering backing out of the deal."  They do not even attempt to do so.  Moreover, when evidence supposedly revealing the alleged "falsity" of Musk's statements was revealed to the market—*e.g.*, that Twitter was in the process of providing information and the deal was moving forward—there was no stock market reaction, further demonstrating that the difference between the actual state of affairs and the alleged misstatement was not material.  *See  id.* at \*8.

*Reliance*:  Plaintiffs' lack of materiality evidence also dooms their attempt to obtain summary judgment on the element of reliance.  Plaintiffs do not seek to *prove* reliance; instead, they invoke the fraud-on-the-market presumption.  However, a prerequisite to the presumption is evidence that the alleged misstatement was material.  *Halliburton Co. v. Erica P. John Fund*, 573 U.S. 258, 268 (2014).  Here, because materiality turns on disputed facts, reliance does too.  Even if the  presumption applied,  Musk is entitled to rebut it by demonstrating that the alleged misstatements did not impact the stock price, and that the stock price was instead reacting to the market's assessment that Musk was getting "cold feet," which Plaintiffs allege was true.  *Id.* at 269.  Indeed, Plaintiffs implicitly acknowledge that Musk can make that showing by not moving on the element of loss causation, which is the mirror image of price impact.

## FACTUAL BACKGROUND

The relevant facts and evidence necessary for the Court to resolve this Motion are set forth in the Background Section to Musk's MSJ and are hereby incorporated by reference.  Musk MSJ at 4-20.

Plaintiffs' Motion, on the other hand, mischaracterizes the evidence, omits dispositive facts and—in several places—resorts to outright falsehoods.  The following is just a sample of these inaccuracies:

- Plaintiffs assert that, "before posting the May 13 tweet, Musk did not review the merger

-4-                                       Case No. 3:22-CV-05937-CRB

agreement." Mot. at 9; *id*. at 17 ("Musk did not bother to read the merger agreement …to see if the [May 13 tweet] was even remotely accurate."). That is false. *See* Ex. L (Musk Dep. Vol. 2) at 217:25-218:4 ("Q. Did – had you read the agreement, the merger agreement before you issued this tweet? ... The Witness: Yes.").

- Plaintiffs assert that Musk "knew he did not have rights to the information he demanded or to put the deal on hold." Mot. at 1. False again. Musk testified the opposite, Ex. L (Musk Dep. Vol. 2) at 217:5-219:9, and Plaintiffs omit that Musk's legal team *and Twitter* agreed he had these rights too. Musk MSJ at 15-18.

- Plaintiffs state that Musk "had no basis" for his estimate at the All In Summit "that fake and spam accounts make up at least 20% of Twitter's user accounts." Mot. at 1; *see also id*. at 10-11, 20. In fact, Musk stated at the All In Conference that he based his estimate on analysis performed by "outside firms" that concluded that spam accounted for around 20% of Twitter's users. *Compare* Ex. 78 (All In Summit Excerpted Transcript) at 6:8-11 *with* Ex. 79 (SparkToro & Followerwonk Joint Twitter Analysis: 19.42% of Active Accounts Are Fake or Spam).

- Plaintiffs misleadingly characterize an SEC lawyer's deposition questions as if they were Musk's answers, claiming that Musk "admitted under oath" that his 20% bot estimate was "█████████████████████████████████████████████████ Mot. at 1. In fact, the "██████████ were the numbers ███████████████████████████████████), not publicly. The transcript puts the lie to Plaintiffs' characterization:



Q: ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

A: ██████████████████████████████████████████

Q: ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

A: █████████████████████████████████████████████.[3] Ex. S (Musk

---

[2] Earlier in the deposition, Musk used ██████████ as an illustrative example. *See* Ex. S (Musk SEC Tr.) at 303:21 ██████████████████████████████████████████████████████████ The first person in the deposition to reference ██████████ was the SEC attorney. *Id*. at 306:17-20. Musk responded ████████████ ██████████ *Id*. at 307:2-4.

[3] At the All In Summit, Musk began his remarks by stating that Twitter had not provided him with any Bot Data and had instead suggested that the number was "unknowable." Ex. 78 (All In Summit Excerpted Transcript) at 4:5-8.

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

SEC Tr.) at 306:23-307:1.

This testimony is not remotely inconsistent with Musk's May 16 statements that "outside firms" had concluded that bots comprised 20 percent of Twitter users. It is undisputed that is the conclusion those firms reached. But Musk was also trying to do his own, independent calculation. *That* is what he was unable to determine based on the information Twitter provided. Indeed, that was the reason Musk publicly stated he needed the information he was requesting. Ex. L (Musk Dep. Vol. 2) at 143:4-144:7.

- Plaintiffs assert that Alex Spiro, Musk's counsel, "immediately called Musk in the middle of the night" after Musk posted the May 13 tweet. Mot. at 9. That is untrue. Spiro called Musk in the morning. Ex. F (Spiro Dep.) at 16:21-17:18. Plaintiffs cite no evidence indicating where Musk was during the call.

- Plaintiffs accuse Musk of falsely testifying that ▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬ when in fact Twitter provided its methodology on May 21. Mot. at 13. But Musk never stated that Twitter did not provided *any* methodology. He stated: ▬▬▬ ▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬ Pls. Ex. 3, Musk SEC Tr. at 272:5-7. That is true. Incredibly, when Musk made his request in early May, Twitter did not have a document explaining its process for calculating bots as a percentage of mDAU—a "Key Metric" of its financials. *See* Musk MSJ at 9-11, 13, 18-19. On May 21, Twitter provided Musk a document it had whipped up solely for the purpose of responding to Musk's inquiries. *Id.* A Twitter employee who prepared it described it as "a mess." *Id.* at 13. It was little more than a high-level overview, and did not include a method for calculating the 5 percent metric. Musk's data scientists reviewed data Twitter eventually produced weeks and months later and determined that it—and thus Twitter's method—did not support a calculation of less than 5 percent. Ex. P; Ex. V; *see also* Ex. T (Ferrara Rp't) at 22-55, 105-110.

## ARGUMENT

## I.    PLAINTIFFS FAIL TO PROVE FALSITY

Plaintiffs devote much of their brief to explaining why Musk had the motive and desire to exit the merger. But that is irrelevant if his at-issue statements were not false. A statement that is not materially misleading cannot give rise to securities fraud, no matter the defendant's motive. As detailed below and in Musk's MSJ, the May 13 tweet, May 16 statement, and May 17 tweet were accurate and not misleading as a matter of law.

### A.    **Plaintiffs' Fail to Prove that Musk's May 13 Tweet Was False When Made**

1.    Plaintiffs Fail to Prove the Market Interpreted Musk's May 13 Tweet as a Description of His Legal Rights Under the Merger Agreement

At the outset, Plaintiffs cannot establish that Musk's May 13 tweet was false as a matter of law

because they have not shown that their proffered interpretation—that Musk was making a statement about his *legal* rights under the MA—was adopted by the market. *See Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 482 (S.D.N.Y. 2023) (denying plaintiff's motion for summary judgment on falsity where there were conflicting interpretations of the statements at issue).

To meet their burden, Plaintiffs exclusively rely on the Court's Motion to Dismiss Order finding that "reasonable investors would have understood that Twitter was obligated to provide Defendant with that information [about fake/spam accounts] under the terms of the deal." Mot. at 16 (citing Dkt. 48 at 18). But the Court merely found that Plaintiffs' interpretation of Musk's tweet was "plausible," after weighing all inferences in their favor. Dkt. 48 at 18. To prevail on summary judgment, Plaintiffs must prove—with evidence—that their interpretation was the sole interpretation adopted by the market. *Terraform Labs*, 708 F. Supp. 3d at 482. They fail to do so. It is undisputed that Musk's statements did not actually mention his legal rights. Ex. O (Tabak Dep. Vol. 1) at 22:19-23. And, contrary to Plaintiffs' allegations, the evidence shows that investors and analysts interpreted the tweet to mean that Musk had asked for information and was not willing to voluntarily *close* unless he received it—regardless of his rights under the MA. *E.g.*, Ex. J (Lippai Dep.) at 68:19-24; Ex. C (Badawi Dep.) at 266:3-267:4; Ex. H (Garrett Dep. Vol. 2) at 184:17-20; Ex. 233 (Lehn Rp't) ¶¶ 53-73. Plaintiffs' Motion as to falsity may be denied on this basis alone.

2.    <u>The May 13 Tweet Was Not False Because the MA Gave Musk the Right to Bot Data and to Refuse to Close Until He Received It</u>

Plaintiffs argue that the May 13 tweet was false because "Musk did not have the right to the information he demanded." Mot. at 16. In fact, the MA gave Musk broad rights to (1) "*all* information concerning the business ... for *any* reasonable business purpose *related to* the consummation of the" MA, including Bot Data, Ex. 30 (MA) at § 6.4, and (2) to refuse to close if Twitter did not materially comply with that obligation, *id.* at § 7.2. Thus, Plaintiffs cannot establish falsity as a matter of law because, to the extent the May 13 tweet conveyed that Musk was entitled to Bot Data, it was accurate.

Tellingly, Plaintiffs completely ignore the MA—failing to even cite, let alone discuss, its key information rights provisions—and instead argue that Musk had no rights to information because he purportedly "waived due diligence." Mot. at 16. That is incorrect. As Twitter's lead litigation counsel

William Savitt testified, ████████████████████████████████████████████ Ex. K (Savitt Dep.) at 14:18-19.  Due diligence is a condition a potential acquiror may bargain for, not an inherent right that can be waived.  *Id.*  Here, Musk merely agreed to forego *pre-signing* due diligence as a condition to *entering* the MA because Twitter was a reluctant seller and Musk was amenable to relying on Twitter's SEC filings (assuming they were accurate).  Ex. M (Ringler Dep.) at 28:21-29:23; Ex. L (Musk Dep. Vol. 2) at 129:7-23, 155:5-22, 157:2-6  But he bargained for and obtained *post-signing* information rights.  Ex. M (Ringler Dep.) at 34:8-36:15, 75:22-77:12; Ex. 230 (Rock Rp't) ¶ 48.  In a public company merger, due diligence may be conducted in "two stages": "presigning of a merger agreement, and then preclosing of the transaction."  Ex. M (Ringler Dep.) at 26:25-27:3.  A buyer's pre- and post-signing rights are distinct, with the latter governed by the terms of the merger agreement.  Ex. M (Ringler Dep.) at 269:18-270:2; Ex. C (Badawi Dep.) at 44:2-22.

Like they did at the pleading stage, Plaintiffs ask the Court to conflate pre-signing and post-signing diligence and to endorse their view that, because Musk chose not to conduct the former, he had no right to the latter.  Discovery proved this theory untenable.  Plaintiffs' own M&A expert admitted that Musk's amendment of his 13D merely removed the right to conduct a "*pre-signing investigation* into the company" before entering the MA.  Ex. C (Badawi Dep.) at 44:23-45:6; *id.* at 49:20-50:1.  That has no impact on his post-signing information rights under the MA.  The MA's integration clause made clear that it "supersedes all other prior agreements and understandings … with respect to" the merger.  Ex. 30 (MA) at § 9.8; Ex. M (Ringler Dep.) at 269:18-270:2 (The MA "explicitly supersedes anything that came before, including this 13D.").  As of May 2022, the MA alone governed Musk's rights to information.  *Id.*

Under the MA, Twitter *did* have the obligation to provide Musk with Bot Data pursuant to sections 6.4 and 6.11 because Musk had the right to "*all* information concerning the business ... for *any* reasonable business purpose *related to* the consummation of the" MA.  This is a broad provision under Delaware law, which governs the MA.  Delaware courts have held that similar information covenants in merger agreements authorize "broad requests."  *Akorn v. Fresenius Kabi*, 2018 WL 4719347, at *3, *26, *94 (Del. Ch. Oct. 1, 2018).  They also construe the operative term "related to" broadly, describing it "as a far-reaching phrase that permits 'relatively attenuated connections' and that lawyers often use 'when they wish to capture the broadest possible universe.'"  *Blue v. Tilray Brands, Inc.*, 2025 WL 519848, at *4

(Del. Ch. Feb. 17, 2025).

Musk's requests for Bot Data were for a "reasonable business purpose" "related to" the consummation of the MA and thus fell easily within Section 6.4. Under Section 7.2(b), Musk's "satisfaction" that Twitter's representations and warranties in Section 4.6 were "true and correct" was a condition to closing.[4] Ex. 30 (MA) at § 7.2(b). That included Twitter's representation and warranty in Section 4.6 that none of its SEC disclosures—including its calculation that bots comprised less than 5 percent of mDAU—contained any untrue statement of, or omitted any, material facts. *Id.* As both Plaintiffs' M&A expert Professor Badawi and Musk's lead deal attorney Michael Ringler testified, investigating and confirming the veracity of the representations and warranties is a "reasonable business purpose" "related to" the consummation of the merger. Ex. M (Ringler Dep.) at 241:14-18; Ex. C (Badawi Dep.) at 105:15-23. Thus, when Musk posted his May 13 tweet, the MA entitled him to "details supporting calculation that spam/fake accounts do indeed represent less than 5% of users."

Plaintiffs have no evidence or serious argument to the contrary. Incredibly, despite claiming that Musk lied about his rights under the MA, *Plaintiffs do not include the MA as an exhibit to their Motion or discuss any of its provisions*. Instead, they make the fatuous argument that Musk had no right to Bot Data because the term "fake/spam accounts" does not literally appear in the MA. Mot. at 16. Of course, a buyer is not required to identify "such a specific information request" in a merger agreement to be entitled to that information, particularly where, as here, the agreement entitles the buyer to "*all* information." Ex. M (Ringler) at 270:11-271:1. It would be "[u]nheard of" to do so, and unnecessary here because Bot Data is encompassed within the broad information covenant Musk negotiated. *Id.*; *see e.g., Christiansen v. Multi-Color Corp.*, 2024 WL 3487734, at *4-5 (D. Del. July 19, 2024) (contractual term "for any reason" obviated need to separately enumerate the specific reasons encompassed therein); *Akorn*, 2018 WL 4719347, at *3, *26, *94.

---

[4]  Section 7.2(b) provides an exception for representations and warranties that, if untrue, would not have a "Company Material Adverse Effect," defined as "any change, event, effect, or circumstance which, individually or in the aggregate, has resulted in or would reasonably be expected to result in a material adverse effect on the business, financial condition or results of operations of the Company and its Subsidiaries, taken as a whole." Ex. 30 (MA) at 5. At the time of Musk's alleged misstatements in May, he did not yet definitively know whether Twitter's statements in its SEC filings about mDAU were false, let alone whether, if so, the falsity rose to a Company Material Adverse Effect.

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs' allegation that Musk "waived due diligence" and had no right to Bot Data is further belied by Twitter's post-signing conduct and its executives' and lawyer's testimony. Plaintiffs admit that "from May 10 onward, Twitter employees 'were working 24 hours a day' at 'breakneck speed' to provide information to Musk's team." Mot. at 15. These quotes come from Staci Conti's testimony about Twitter's efforts to provide Musk with the *Bot Data* he requested. Pls. Ex. 54 (Conti Dep.) at 80. That makes sense because prior to May 13, Twitter expressly agreed to provide Musk with the Bot Data his team requested—including the "raw data" supporting its "less than 5%" bot calculation. Ex. E (Claassen Dep.) at 226:4-8, 238:21-239:7; Ex. 29. In connection with this promise to comply with its contractual obligations, Twitter set up "due diligence" meetings—both internally and with Musk's team—to discuss providing Bot Data to Musk. Musk MSJ at 15-18; Exs. 214, 215, 216, 217, 218. Twitter made these promises and took these actions because, according to its lawyers and executives, it understood it was obligated to provide Musk with Bot Data under the MA. Twitter's lead deal lawyer testified that Twitter worked ███████████████████████████████████████████" for Bot Data. Ex. I (Korman Dep.) at 236:20-238:7 (emphasis added). Twitter's CEO testified that Musk had ███████████████ that entitled him to details ████████████████████████ ███████████████ Ex. A (Agrawal Dep.) at 350:3-15, and that Twitter was ████████████ █████████████████████████████████████████████████ ██████ *Id.* at 372:2-372:12. Twitter did not claim, as Plaintiffs do, that Musk had no right to the information at issue in the May 13 tweet; rather, it agreed to provide the information ██████████ ██████ Ex. 49 (May 21, 2022 Email attaching Twitter "False and Spam Accounts Methodology").

Plaintiffs' final argument that the MA did not give Musk "the right to put the deal 'on hold' if Twitter did not provide such information," Mot. at 16, is also contradicted by the MA's terms and their own expert's testimony. Under Section 7.2(b), Musk had the right to refuse to close the merger—i.e., put it "on hold"—if he was not "satisf[ied]" that Twitter's representations and warranties about its bot calculation were "true and correct" *or* if Twitter did not materially comply with its obligations to provide information under section 6.4.[5] Lead deal lawyer Ringler, whose team drafted that provision of the MA,

---

[5]   Moreover, even if Musk had no legal right to put the deal "on hold," as a "party to the transaction ... he had the *power* to put the deal on hold." Ex. N (Rock Dep.) at 59:10-24. Thus, Musk's statement could not be false as a matter of law even if the MA did not provide him the right to hold up the deal pending

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

confirmed Musk had those rights, Ex. M (Ringler Dep.) at 243:2-19, and Plaintiffs' expert Professor Badawi conceded that a seller's breach of the information covenant could relieve the buyer of his obligation to close. Ex. 209 (Badawi Rp't) at 40 n.119 ("A seller's violation of the access to information covenant could potentially warrant a buyer's termination."). Plaintiffs' evidence does not prove otherwise. While they falsely suggest that Michael Grimes—who did not draft or negotiate the MA, Ex. G (Grimes Dep.) at 99:11-19—testified that Musk removed all conditions to closing, Mot. at 16, in the very testimony they cite, Grimes said the opposite and explained that, under the MA, "█████████████████ ███████████████████████████████████████████". Pls. Ex. 28 (Grimes Dep.) at 97:15-22.

Far from showing that there is "no genuine dispute that the May 13 tweet 'created an impression of the state of affairs that differs in a material way from the one that actually exists,'" Mot. at 16, the evidence establishes that the May 13 tweet did not misstate Musk's rights under the MA at all.

3.    Musk's Statement that the Deal Was "Temporarily on Hold Pending Details" Was Not False

Plaintiffs also claim the May 13 tweet was false insofar as Musk stated that the merger was "temporarily on hold pending details" because Musk "did not instruct anybody to put their pens down" or to stop all merger-related workflow. Mot. at 15. But to be false, a statement "must affirmatively create" in the mind of the reasonable investor "an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Plaintiffs identify no evidence that the May 13 tweet caused *any investor* to form the misleading "impression" that all work on the deal had stopped, let alone that was the *only* way anyone interpreted the tweet, as they must to win on summary judgment. *Terraform Labs*, 708 F. Supp. 3d at 482.

To the contrary, everyone who has interpreted the May 13 tweet in this case (including the Court) has found that it conveys a different meaning—one that is consistent with the true state of affairs. Plaintiffs' M&A expert testified that Musk's May 13 tweet conveyed: "I've requested information, I'm not getting a satisfactory response, and I'm not *closing* until I do." Ex. C (Badawi Dep.), at 266:20-267:4. The Court interpreted it similarly: "a reasonable investor would have plausibly understood Defendant's

his satisfaction that Twitter's SEC disclosures were truthful and that Twitter materially complied with its obligation to provide him with information relating to those disclosures.

statement that the deal was on hold 'pending' this information from Twitter to mean that, absent the provision of such information, the deal would not *close*." Dkt. 48 at 19; *see also* Ex. L (Musk Dep. Vol. 2) at 216:1-18. And Wedbush, a sell-side analyst, agreed that the tweet communicated that Musk "would not *voluntarily close* the deal based on the bot issue." Ex. J (Lippai Dep.) at 68:19-24. That message was entirely consistent with the true state of affairs at the time. Plaintiffs have no answer to this evidence, which establishes the only reasonable interpretation of Musk's pre-market tweets when they are "viewed properly as a whole." *See Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1276 (N.D. Cal. 2019).

Instead, to make their argument, Plaintiffs isolate two words from the tweets: "on hold." But Plaintiffs cannot establish falsity by "cherry-picking" a few of Musk's words while ignoring the rest of his statement. *Id.* Instead, Plaintiffs "must account for the entirety of [the statements] on which they rely, and not simply invoke selective quoting to make their claims." *Id.* (quoting *In re Ocera Therapeutics, Inc. Sec. Litig.*, 2018 WL 7019481, at *11 (N.D. Cal. Oct. 16, 2018)). Their claim falls apart when they are forced to do so. Musk's pre-market tweets on May 13 stated the deal was "*temporarily* on hold *pending* details supporting calculation that spam/fake accounts do indeed represent less than 5% of users" and that he was "[s]till committed to acquisition." Ex. 163 (emphasis added). The word "temporarily" communicates transitory delay, not a full stop to the financing and other merger-related work that needed to be completed to eventually close the acquisition that Musk stated he was "[s]till committed to" if Twitter satisfied his information requests. And instead of suggesting that both his team and Twitter stopped all work on the merger, the second half of the tweet—"pending details supporting calculation"—indicated that both sides were continuing to work to satisfy Musk's concerns. The Bot Data could not simply be conjured; Twitter had to gather it and Musk's team had to analyze it. Thus, the tweet communicated that closing the deal was "pending" (1) Twitter gathering and providing the details Musk requested and (2) Musk's team analyzing the information to confirm it supported Twitter's representations to the SEC. That was the *exact* state of affairs as of May 13 and the following weeks. *See* Mot. at 15 (noting that Twitter was working at "breakneck speed" to provide information to Musk). The fact that the parties continued to work toward closing is not remotely inconsistent with Musk's tweet.

The evidence Plaintiffs cite, Mot. at 8-9, does not compel a different conclusion. Most witnesses who were asked about the phrase "on hold" stated they did not understand what it meant because it is not

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

an M&A or legal term of art. Pls. Exs. 41 (Ringler Dep.) at 245 ("[O]n hold is not a legal concept of which I'm familiar"), 42 (Earls Dep.) at 206 ███████████████████████ 43 (Silverstein Dep.) at 346 ████████████████████████ That makes sense as Musk's tweet was not making a legal argument, he was merely communicating in lay terms what Professor Badawi and the Court gleaned: "I've requested information, I'm not getting a satisfactory response, and I'm not closing until I do." Ex. C (Badawi Dep.) at 266:20-267:4; Dkt. 48 at 19. Plaintiffs' citation to and description of Kate Claassen's testimony is just another example of cherry picking. They selectively omit Claassen's explanation on page 258 of her deposition—one page before the excerpt attached to Plaintiffs' Motion—that she ████ ███████████████████████████████████████████████████████████████████████████ ████████████████████████████. Ex. E (Classen Dep.) at 258:15-259:4. Reading the two tweets *together*, ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████.[6]

Statistical evidence shows that the market shared this understanding and did not interpret the May 13 tweet to communicate that Musk stopped all merger-related work. On May 19, just days after the tweet, Bloomberg reported that Twitter's top executives told employees the merger was "proceeding" and that they continued to work with Musk's team. Ex. 201. Twitter's stock had no statistically significant reaction to this announcement. That indicates, according to Plaintiffs' damages expert, that the market either failed to view this information as material or "new"—i.e., the market already knew the information conveyed in the story. Ex. O (Tabak Dep. Vol. 1) at 60:12-21; *id.* at 56:9-13. Thus, the absence of a price reaction creates an inference that the market already knew—post-tweet—that Musk's team continued to work with Twitter on the merger because it did not interpret "on hold" to mean "pens down" in the first place. This should come as no surprise; the testimony and analyst reports are in accord. *Infra* at 21-23. Both the quantitative and qualitative evidence refute Plaintiffs' claim and doom their Motion.

**B.**     **Plaintiffs' Fail to Prove that Musk's May 16 Statements Were False When Made**

When interviewed at the May 16 All In Summit, Musk explained that he was attempting to

---

[6]   Claassen testified only ████████████████████████████████████████████████████████ ██████████████████████████████████████████████. Ex. E (Claassen Dep.) at 258:2-261:23.

determine the number of bots on Twitter, but the company had not provided him the information he asked for and instead claimed "there's just no way to know the number of bots. It's like as unknowable as the human soul, basically." Ex. 78 (All In Summit Excerpted Transcript) at 4:5-8. The interviewers asked Musk to guess what the real number was—"What do you think it is? ... I mean anecdotally"—and he answered: "I think it's some number that is probably at least four or five times [Twitter's estimate], … [my] estimate would be probably 20 percent." *Id.* at 6:8-11. He further explained that this was not coming from Twitter, but from "a bunch of quite smart outside firms [that] have done analysis of Twitter and looked at the ... daily users," and from his own anecdotal experience on the platform. *Id.* at 6:11-21. Just one day earlier, Musk's team had been discussing an analysis published by SparkToro and Followerwonk concluding that bots accounted for nearly 20% of Twitter users. *See* Ex. 79. Plaintiffs claim that Musk's statements in this exchange were false as a matter of law because he "had no legitimate basis" for his statements and it "misled the investing public to believe that Musk received information provided by Twitter." Mot at 20-21. Their argument is meritless.

*First*, as with the May 13 tweet, Plaintiffs' motion depends on their interpretation of the May 16 statement—that it communicated that the 20% estimate came from information Twitter provided to Musk—being the *only* reasonable one. *Terraform Labs*, 708 F. Supp. 3d at 482. However, they point to no such evidence; only their say-so and the Court's determination at the pleadings stage that they presented a "plausible" theory of falsity. Summary judgment requires uncontroverted evidence; mere allegations (even if plausible) do not suffice. *E.g., C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.,* 213 F.3d 474, 480 (9th Cir. 2000) ("When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'"). Plaintiffs present no evidence that *anyone* interpreted Musk's May 16 statements in the manner alleged. Ex. Q (Pls' Amended Response to Rog. 22) at 40-42. To the contrary, Plaintiffs *themselves* testified that Musk did "█████████████████████████ ████████████████████████████████. Ex. H (Garrett Dep. Vol. 2) at 158:2-6. So did securities analysts. *See, e.g.*, Ex. J (Lippai Dep.) at 80:19-81:4 (testifying Musk "did not suggest" that "he derived the 20 percent estimate from any inside information he obtained from Twitter").

*Second*, Musk's statement, when read in its entirety, is not false. Plaintiffs misleadingly omit the

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

portions of Musk's May 16 statements that doom their claims. *See Xiaojiao*, 417 F. Supp. 3d at 1276 ("By cherry-picking portions of Defendants' statements and ignoring other portions, Plaintiff asks the Court to make inferences contradicted by the statements viewed properly as a whole."). The full transcript makes clear that Musk never suggested that he based his estimate on information he received from Twitter and, instead, that Twitter had *not* provided him information (the true number was "unknowable"). Ex. 78 (All In Summit Excerpted Transcript) at 4:5-8. His statements were accurate—Plaintiffs concede that Twitter had not provided Musk with the requested Bot Data as of May 16. Mot. at 21. Musk also communicated that his estimate came from his own anecdotal experience and analysis from "outside firms"—*e.g.*, SparkToro's and Followerwonk's May 15 analysis. Ex. 79; Ex. J (Lippai Dep.) at 78:6-25 (Musk's May 16 statement and the Sparktoro analysis "say the same thing").

Plaintiffs now argue that Musk's May 16 statements were false because he purportedly had "no basis" for his 20% estimate—notwithstanding the SparkToro and Followerwonk report. To support their argument, Plaintiffs cite Musk's testimony in an SEC deposition, ██████████████████████ ███████████ Mot. at 20. As demonstrated *supra* at 5-6, however, Plaintiffs blatantly mischaracterize Musk's SEC testimony, quoting the SEC attorneys' questions as if they were Musk's answers, and omitting critical context. Plaintiffs' resort to such tactics speaks volumes about their position.

**C.    Plaintiffs' Fail to Prove that Musk's May 17 Tweet Was False When Made**

As the Court noted in its Motion to Dismiss Order, the May 17 tweet reiterated the messages in the May 13 tweet and May 16 statements. Dkt. 48 at 24-25. Because neither of those statements is false as a matter of law, *supra* Sections I. A-B, the May 17 tweet cannot be false either.

Plaintiffs' additional falsity arguments fail. *First*, Plaintiffs assert that Musk's statement that "Yesterday, Twitter's CEO publicly refused to show proof of <5%" was false because Agrawal *had* shown "proof of <5%." Mot. at 23. That is not supported by the evidence they cite. Although Agrawal tweeted that Twitter had "shared an overview of the estimation process with Elon a week ago," *id.* (citing Pls. Ex. 59 (Agrawal May 16 tweet thread), it is undisputed that Twitter merely provided a high-level (oral) description of its bot auditing process but had not provided any documents or data substantiating its estimate that mDAU comprised less than 5% bots, as it had promised to do. Musk MSJ at 9-15.

*Second*, Plaintiffs rehash their argument that investors believed Musk "was basing his 20%

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

estimate on information received from Twitter." Mot. at 23. But his statement plainly suggests the opposite (Agrawal "refused to show proof") and, not surprisingly, Plaintiffs identify no evidence that *anyone* interpreted Musk's May 17 tweet in the manner they claim—not even themselves. Ex. Q (Pls' Amended Response to Rog. 22).

The May 17 tweet stated that Musk's "offer was based on Twitter's SEC filings being accurate" (which was true, MA § 4.6), that Twitter had thus far refused to show proof substantiating its "<5%" claim (also true, Ex. B (Armstrong Dep.), Ex. F (Spiro Dep.) at 63:25-64:17), and that the deal could not "move forward" until Twitter did (also true, Ex. 30 (MA) at § 7.2; Ex. M (Ringler Dep.) at 238:15-243:19; Ex. N (Rock Dep.) at 59:10-24.). Thus, Plaintiffs cannot prove the May 17 tweet was false.

## II. WHETHER MUSK'S CONCERNS WERE PRETEXTUAL IS IRRELEVANT BECAUSE HIS STATEMENTS WERE TRUE

Plaintiffs spend much of their brief arguing that Musk's at-issue statements were pretextual—an excuse to find a way out of the deal. This is disputed but ultimately irrelevant because, as shown above, Musk's statements were not false.

Discovery showed that Musk's bankers from Morgan Stanley—not Musk himself—first requested Bot Data so that they could build a financial model to sell debt and equity to help finance the acquisition. Ex. E (Claassen Dep.) at 219:13-221:14; Ex. B (Armstrong Dep) at 242:3-243:20. Musk's entire team— including his bankers, lawyers, and data scientists—had genuine concerns about the accuracy and reliability of Twitter's disclosures and grew more suspicious after Twitter repeatedly promised to produce information supporting its <5% calculation but failed to follow through. Musk MSJ at 9-15. Those concerns were well-founded: data scientists found that Twitter materially understated the number of fake accounts on its platform. Ex. P at –834; Ex. V at –705; Ex. 79 (*SparkToro & Followerwonk Joint Twitter Analysis: 19.42% of Active Accounts Are Fake or Spam*); *see also* Ex. T (Ferrara Rp't) at 105-110. Indeed, Musk's bankers ███████████████████████████████████████████████████ ███████████████████████████████████. Ex. B (Armstrong Dep.) at 303:14-304:24. On these facts, a reasonable juror could easily conclude that Musk's statements were not "pretextual" but that they reflected Musk's real and well-founded concerns—shared by his team of top lawyers, bankers, and data scientists—that Twitter defrauded him and its shareholders.

Even if Musk's statements were pretextual, that would be irrelevant.  Plaintiffs must prove that Musk's statements were *false*.  As demonstrated above, the statements were true, and the law is clear that true statements cannot give rise to a Rule 10b-5 claim.  *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275-76 (9th Cir. 2017).

Plaintiffs' reliance on *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008), is misplaced.  There a company seeking shareholder approval of a merger represented to investors that it would seek approval to have its stock listed on the NASDAQ after the merger closed.  *Id.*  The company did in fact seek and obtain approval, but did not ultimately list the stock on the exchange.  *Id.*  The court held that the representation—while literally true—nonetheless mislead shareholders to believe that the company would actually list its stock upon receiving approval.  *Id.* at 886-87.  Investors formed no such misimpression here. The analyst reports Plaintiffs cite show that the market interpreted the alleged misstatements to communicate that the deal may be "falling apart," "Musk negotiating for a lower deal price" and that Musk was looking for "a way to get out of the deal"—but this is exactly what Plaintiffs claim was the *true* state of affairs.  *Compare* Pls. Ex. 45 *with* Mot. at 10.  Unlike in *Miller*, Musk's statements were both "literally true" and communicated what Plaintiffs claim was true.  Accordingly, Plaintiffs' (disputed and unsupported) "pretext" arguments cannot establish falsity as a matter of law.

## III.    PLAINTIFFS FAIL TO PROVE SCIENTER

### A.    Plaintiffs Cannot Prove Scienter Because Musk's Statements Were Not False

To prove scienter, Plaintiffs must prove that Musk "made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 991 (9th Cir. 2009).  As demonstrated *supra* at 6-16, Plaintiffs fail to prove that Musk made false or misleading statements.  It follows that they cannot prove he made false or misleading statements intentionally or with deliberate recklessness.  *See Sneed*, 2025 WL 2406424, at *1 ("The flimsy evidence of falsity necessarily undermines the ability to show scienter."); *Schueneman v. Arena Pharms., Inc.*, 2017 WL 1540847, at *1, n.2 (S.D. Cal. Apr. 28, 2017) (dismissing a complaint where it is "never explain[ed] how … a defendant [could] kn[o]w statements were false if" there were no "false statements in the first instance."); *Washtenaw Cnty. Employees' Ret. Sys. v. Walgreen Co.*, 2021 WL 5083756, at *9 (N.D. Ill. Nov. 2, 2021) ("Because there is a genuine dispute of material fact as to the falsity of [defendant]'s statements, plaintiff's argument

that it has established [defendant]'s intent to deceive as a matter of law fails.").

**B.     Musk's Statements Were Consistent with the then-Existing State of Affairs and His Contract Rights**

Plaintiffs argue that Musk's May 13 and May 17 tweets were deliberately reckless as a matter of law because he purportedly "did not bother to read the merger agreement" before posting his tweets. Mot. at 17-18. They similarly contend that Musk's May 16 statement and May 17 tweet were deliberately reckless because he had "no basis to support his 20% statement." Mot. at 21-22. These arguments misrepresent both the facts of this case and the law. The Court should reject them outright.

**1.     Musk Read the Merger Agreement Before Tweeting; Musk's _and Twitter's_ Advisors Shared His Understanding of His Rights**

Plaintiffs repeatedly claim that Musk did not read the MA before posting his May 13 and 17 tweets. Mot. at 1, 9, 17. That is flat out untrue. Ex. L (Musk Dep. Vol. 2) at 217:25-214:4 ("Q. Did – had you read the agreement, the merger agreement before you issued this tweet? . . . The Witness: Yes."). He read the MA before signing it on April 25, 2022, _id._ at 269:13-271:1, and understood that it gave him rights to the information he was requesting. _Id._ at 217:6-219:9. In the days leading up to the May 13 and May 17 tweets, Musk exercised his information rights to request Bot Data (and other information) and Twitter promised to provide it. Musk MSJ at 15-18. But Twitter had not yet done so by May 13 or even by May 17. Musk MSJ at 9-15. Under the circumstances, and particularly given Twitter's _agreement_ to produce Bot Data, Musk had no reason to doubt his understanding that he was entitled to that information, and his statements were well-founded.

Plaintiffs also claim that Musk was "deliberately reckless" because he did not "check in with his advisors [and] deal attorneys" before sending the tweets. Mot. at 17. He was under no obligation to do so. The MA specifically provided that Musk could tweet about the deal and imposed no requirement that his tweets be vetted by his counsel or advisors. Ex. 30 (MA) at § 6.8. Moreover, the undisputed evidence shows that Musk's counsel and advisors _shared_ his understanding. Ex. M (Ringler Dep.) at 241:14-242:6, 243:6-19; Ex. 59 (6/17/22 Ringler Letter to Gadde); Ex. F (Spiro Dep.) at 24:8-25:15 (Musk's advisors knew that "until we got this information, we couldn't close."), 64:14-65:3. Twitter's top executives and lawyers did too. Ex. I (Korman Dep.) at 236:20-238:7; Ex. A (Agrawal Dep.) at 350:3-15.

Indeed, it is undisputed that, when Musk made the at-issue tweets and statements: (1) he had personally read the MA and understood he had the rights to Bot Data, (2) his attorneys and advisors shared that understanding, (3) Twitter expressly agreed to produce Bot Data to Musk, but (4) Twitter had failed to do so by the promised deadline. On this record, the Court should grant summary judgment *for Musk*.

Plaintiffs rely extensively on *Gebhart v. S.E.C.*, 595 F.3d 1034 (9th Cir. 2010), for the proposition that Musk's purported failure to re-read the MA immediately before sending his tweet, or to have his advisors vet his tweets, somehow establishes fraudulent intent as a matter of law. Mot. at 17-18. But in *Gebhart*, the Ninth Circuit was not reviewing a grant of summary judgment; it was reviewing an SEC administrative decision for "substantial evidence" of scienter, a "deferential" standard requiring the Court to "uphold the [SEC]'s findings" even if they are not supported by a "preponderance of the evidence," so long as they are supported by "more than a mere scintilla" of evidence. *Gebhart*, 595 F.3d at 1043. Plaintiffs' reliance on *Gebhart* is thus woefully misplaced.

> 2.   Musk's 20 Percent Bot Estimate Was Based on Outside Analyses and His Anecdotal Experience

Plaintiffs' argument that Musk's 20% bot estimate was "deliberately reckless," Mot. at 18, also mischaracterizes the record. Unlike the defendants in *Gebhart*, who failed to disclose that they based their "statements on representations by [a third party] and conducted no meaningful independent investigation," 595 F.3d at 1044, Musk expressly disclosed that his 20% estimate was based on "outside firms" and his anecdotal experience, and made clear that he was still *waiting* to do his "independent investigation." *Supra* at 14-15. Plaintiffs have not carried their burden to prove scienter for these alleged misstatements, either.

**C.   Musk's Alleged Misstatements Are Inactionable Opinions**

Even if the Court were to accept Plaintiffs' erroneous factual assertions, summary judgment in their favor must be denied because Musk statements are inactionable opinions. *Omnicare*, 575 U.S. at 176 ("A statement of opinion does not constitute an 'untrue statement of … fact' [even if] the stated opinion ultimately proves incorrect."); *Dearborn Heights v. Align Tech.*, 856 F.3d 605, 616 (9th Cir. 2017) (applying *Omnicare*).

To the extent Musk's May 13 and 17 tweets described his rights under the MA, they would constitute "subjective interpretation of [] contract provision[s]," which cannot support a securities fraud

-19-                                    Case No. 3:22-CV-05937-CRB

claim. *Iafrate v. Angelo Iafrate*, 827 F. App'x 543, 548 (6th Cir. 2020). Under *Omnicare*, Plaintiffs cannot prove scienter based on legal opinions unless they establish the opinions were not "sincerely held." 575 U.S. at 176. Plaintiffs identify no evidence indicating Musk did not sincerely believe that he was entitled to Bot Data under the MA.[7]

Musk's "estimate" that bots "would probably be 20 percent" of Twitter's users is similarly inactionable. At the All In Summit, Musk was asked "What do you *think* [the real spam percentage] is?" and answered "I *think* it's some number that is *probably* at least four or five times that number." Ex. 78 (All In Summit Excerpted Transcript) at 6:2-10 (emphasis added). As the Supreme Court explained in *Omnicare*, when a speaker prefaces a statement with the words "'I believe' (or 'I think')," he "transforms that factual statement into one of opinion." *Omnicare*, 575 U.S. at 183. Thus, Musk's use of the words "I think" when answering the question "admitted th[e] possibility" that "a plaintiff could later prove that opinion erroneous" and precluded "liability for an untrue statement of fact." *Id.* at 184.

## IV.    PLAINTIFFS FAIL TO PROVE MATERIALITY

The Court should also deny Plaintiffs' motion for summary judgment that Musk's alleged misrepresentations were "material." "The determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Indus.*, 426 U.S. at 450; *see also S.E.C. v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) (reversing summary judgment for plaintiff on materiality because "[d]etermining materiality in securities fraud cases should ordinarily be left to the trier of fact," and typically "cannot be determined as a matter of summary judgment because it depends on determining a hypothetical investor's reaction to the alleged misstatement"). "Only if the established omissions are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved as a matter of law by summary judgment." *TSC Indus.*, 426 U.S. at 450. (cleaned up).

A plaintiff seeking summary judgment on materiality thus bears the considerable burden to establish that the difference between the alleged misrepresentation and the truth is "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality." *Id.* Plaintiffs do not

---

[7] Under *Omnicare*, even "reckless" opinions are not actionable. *Omnicare*, 575 U.S. at 183-84.

come close to meeting it.

###### A.    Plaintiffs Do Not Even Attempt to Establish Materiality Under the Correct Test

To establish materiality, Plaintiffs must "prove both that (1) there is a substantial likelihood that a reasonable investor would consider the [misrepresented] fact important in deciding whether to buy or sell that security and (2) the misrepresentation gives a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *In re Tesla, Inc. Sec. Litig*, 2023 WL 4032010, at *7 (internal citations and quotation marks omitted). "'[T]here must be a substantial likelihood that the disclosure of the omitted fact or correction of the misstated fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Id.* (quoting *TSC Indus.*, 425 U.S. at 449); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1259 (N.D. Cal. 2000) (same).

Plaintiffs argue that the "May 13 Tweet was undoubtedly material" because Twitter experienced a statistically significant stock price drop in response to it. Mot. at 19-20. But stock price reaction alone is insufficient, *see In re Allied Cap. Corp. Sec. Litig.*, 2003 WL 1964184, at *6 (S.D.N.Y. Apr. 25, 2003) (drop in stock price alone is insufficient to establish materiality), as it does not answer the relevant question—*i.e.*, whether the difference between (1) the alleged misrepresentations, and (2) the *true* state of affairs, would have been material to investors. *Id.*

As demonstrated above, here there was no difference—Musk's tweets and statements accurately reflected the true state of affairs. But even accepting Plaintiffs' version of the true state of affairs, they cannot establish materiality as a matter of law. Plaintiffs contend the "truth" was that Musk "got cold feet and wanted to back out of or renegotiate the deal." Ex. 238 (Pls' Response to Rog 10). Thus, Plaintiffs must prove that Twitter's stock price would have reacted differently if Musk had simply tweeted the truth that he was getting "cold feet" and looking for a way to back out. *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d at 1259 ("a misstatement or omission cannot be material if its correction or disclosure would only redouble the plaintiff's resolve to enter into the proposed transaction"); *In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010, at *8 (lack of stock price reaction to corrective disclosure "creates the inference" that the initial response to the at-issue statement "stemmed from the market reaction to" the truthful information contained therein and "provides further support for the conclusion that the

[misstatements] were not material"). They have not even attempted to do so.

There is, at minimum, a factual dispute on this issue. Analyst reports from May 13 indicate that the market reacted to the fact that Musk's tweet indicated he had soured on the deal—*i.e.*, they reacted to Plaintiffs' alleged "truth"—and not to any statement he made about his legal rights to Bot Data or to delay the closing. Pls. Exs. 45-46; *see also* Ex 233 (Lehn Rp't) at ¶¶ 50-66. Plaintiffs proffer no empirical evidence that investors sold in response to the alleged fraud as opposed to concerns that Musk was getting "cold feet." Their expert, Dr. Tabak, made no effort to isolate how much Twitter's stock price fell on the allegedly true "cold feet" news versus how much it fell—if at all—in response to the alleged misrepresentations about his rights under the MA. Ex. O (Tabak Dep. Vol. 1) at 86:1-87:5.

Plaintiffs' remaining arguments fare no better. Musk's testimony that he believed his May 13 tweet contained "material information" does not establish that the *alleged misrepresentations* contained therein were material. Musk testified that he sent the tweet to update investors because "the status of the Twitter deal" was material. Pls. Ex. 3 at 282:6-22. Musk does not dispute that his truthful description that he would not voluntarily close the merger without the information he requested was material, but that only hurts Plaintiffs case. Because the truth was material, Plaintiffs have the burden to isolate the truth's effect on Twitter's price from the alleged fraud's impact. *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993) ("Use of an event study or similar analysis is necessary more accurately to isolate the influences of information specific to [the company] which defendants allegedly have distorted"). They have not even tried. Ex. O (Tabak Dep. Vol. 1) at 86:1-87:5.

Plaintiffs also assert that the Court's conclusion in its Motion to Dismiss Order that "a reasonable investor would find Twitter not complying with its contractual obligations … to be material" establishes materiality. Mot. at 20. But the Court was doing nothing more than "[c]onstruing all reasonable inferences in Plaintiffs' favor" to conclude that they "adequately pleaded materiality." Dkt. 48 at 21. It made no factual finding and certainly did not conclude—after construing all inferences in *Musk's favor*, as it must here—that Plaintiffs met their evidentiary burden to prove that the difference between the alleged misrepresentations and the true state of affairs was "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality." *TSC Indus.*, 426 U.S. at 450.

Because Plaintiffs cannot prove that the hypothetical "reasonable investor" sold in reaction to

Musk's alleged misstatement about his contract rights and not in reaction to his allegedly truthful message that he had grown apprehensive about the terms of the merger, the Court cannot grant summary judgment on this element. *See Phan*, 500 F.3d at 908.

**B.      The Lack of a Statistically Significant Stock Reaction to the Revelation of the Alleged Fraud Shows that the Alleged Misstatements Were Not Material**

The market's failure to react to the revelation that the merger was not "on hold"—as Plaintiffs define the phrase—and to various disclosures during the Class Period that both Twitter and Musk continued to work toward closing the deal also defeats Plaintiffs' argument that the alleged misrepresentations contained in the May 13 and May 17 tweets were material as a matter of law. To establish that a statement is materially false, Plaintiffs must show a statistically significant price reaction to both the statement and the revelation it was untrue. *See Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (Alito, J.) ("[I]f a company's disclosure of information has no effect on stock prices, 'it follows that the information disclosed ... was immaterial as a matter of law.'"). They cannot do so here.

Just days after Musk tweeted the deal was "temporarily on hold" and could not "move forward," Bloomberg reported that Twitter executives told employees that there "is no such thing as a deal being on hold" and that they were "still engaging with Musk and his team, and working with them 'regularly' throughout the process." Ex. 201. Dr. Tabak found no statistically significant price reaction to this news and acknowledged that the market did not view it as material or new. Ex. O (Tabak Dep. Vol. 1) at 60:12-21. Less than a week later, on May 25, Musk announced that he changed his financing arrangements to purchase the company—communicating that his work on the merger was continuing. Ex. R (Amendment No. 7 to Schedule 13D). Again, Dr. Tabak found that this news had no effect on Twitter's stock price. Ex. O (Tabak Dep. Vol. 1) at 56:6-13. Nor was there any price reaction to the filing of the Complaint in *Heresniak v. Musk*, which alleged that the same "misstatements" at issue here were false for the very reasons asserted here. Ex. 233 (Lehn Rp't) at ¶ 68. The lack of any statistically significant price reaction to public information that purportedly revealed Musk's statements to be false creates, at minimum, a genuine dispute whether the alleged misrepresentations were material and bars summary judgment. *See In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010, at *8; *Oran*, 226 F.3d at 282.

**C.      Plaintiffs Cannot Prove the May 16 Statement or May 17 Tweet Were Material Because They Did Not Cause a Statistically Significant Reaction in the Stock Price**

Finally, Plaintiffs cannot establish that the May 16 statement and May 17 tweet were material because, as Dr. Tabak admitted, Twitter's stock did not have a statistically significant price reaction to either. Ex. 243 (Tabak Supp. Rp't) at ¶¶ 16-17. Indeed, Dr. Tabak noted that "there is little evidence of the *economic importance of any announcement* made during the trading day on May 16"—including Musk's statement at the All In Summit. *Id.* at ¶ 17. These facts alone preclude summary judgment for Plaintiff on these alleged misrepresentations. *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) ("[I]mmaterial misrepresentations or omissions, by definition, would have no impact on [a company]'s stock price in an efficient market."); *Oran,* 226 F.3d at 282.

In fact, the absence of any statistically significant price movement on May 16 and 17 mandates that the Court grant summary judgment in Musk's favor on those claims. *See Oran*, 226 F.3d at 282; Musk MSJ at 30.

Faced with these claim-dispositive facts, Plaintiffs attempt to amend the FAC at summary judgment, arguing that they are now pursuing a so-called "price maintenance" theory under which the alleged misstatements statements are material because they "prolonged the artificial deflation of Twitter's stock price." Mot. at 22. Plaintiffs' "price maintenance" theory is procedurally barred and without merit.

To start, Plaintiffs did not plead price maintenance and cannot change their case theory on summary judgment. *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (barring plaintiff from pursuing an unpled theory on summary judgment). The FAC alleged that Musk's "false and misleading tweets and disparagement of Twitter … caused Twitter's stock *to decline* substantially in the days following the tweets." FAC at ¶ 132. They specifically alleged that the May 16 statement "*caused Twitter's stock to drop further* … declin[ing] 8.18%." *Id.* at ¶ 124. In fact, the Court explained that allegation was the *only reason* these claims survived Musk's Motion to Dismiss. Dkt. 48 at 37. Plaintiffs are accordingly estopped from adopting a new theory now. *See Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 993 (9th Cir. 2012) ("Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.") (internal citation omitted).

The evidence does not support a price maintenance theory of securities fraud in any event. To bring a price maintenance case, a plaintiff must prove that the alleged false statement contained "confirmatory information" that prolonged a period of artificial deflation or inflation because it matched news the market expected to be announced. *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1314 (11th Cir. 2011). For example, if a car company known for producing safe cars introduces a new model, the market will expect that the new car is also safe. If the company falsely states that its newest model passed all of its safety tests, its shareholders may have a price maintenance claim because the misrepresentation *confirmed* the market's expectations and kept the stock price from declining. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258-59 (2d Cir. 2016). To establish a price maintenance theory here, Plaintiffs must prove that the alleged misstatement "confirmed" the market's preexisting expectations. In other words, they must prove that on or around May 16-17, investors expected that Musk would announce that he received information from Twitter showing that spam accounts constituted 20% of its users. *See id.* Plaintiffs have no evidence that any investor held such an expectation and thus cannot prove that the May 16 statement or May 17 tweet contained any of the "confirmatory information" required to establish a price maintenance theory of fraud. *See FindWhat Inv. Grp.*, 658 F.3d at 1314.[8]

Nor can Plaintiffs prove that Musk's bot estimate caused Twitter's stock to remain deflated. Because price maintenance cases are defined by the lack of an initial price reaction to the alleged misstatement, plaintiffs must prove materiality "indirectly: They point to a negative disclosure about a company and an associated drop [or increase] in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop [or rise] is equal to the amount of inflation [or deflation] maintained by the earlier misrepresentation." *See Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021). "But that final inference—that the back-end price drop equals front-end [deflation]—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Id.* Here, there is no relationship between Musk's

---

[8] Even Dr. Tabak declined to endorse Plaintiffs' May 16 price maintenance theory. At class certification, he opined that "a statistically insignificant price movement in response to a statement that maintains the same overall alleged misrepresentation (i.e., that Mr. Musk was entitled to certain data from Twitter) would be consistent with a price-maintenance theory." Dkt. 102-2 at ¶ 8. Of course, Plaintiffs do not contend the May 16 statement reiterated a prior misrepresentation, they claim an entirely new misstatement.

statement that "outside firms" estimated Twitter's bots at 20% and the alleged corrective disclosure (his October 4 statement that he would close the merger) and thus no proof of price impact.  As the Court recognized in its Motion to Dismiss Order, it is "unclear how the October 4 announcement … is related to or could have corrected, his prior alleged misstatement that bots make up 20% of Twitter's users." Dkt. 48 at 36.  And because Plaintiffs have since abandoned their argument that the May 16-17 statements caused Twitter's stock to decline, they cannot establish that Musk's reference to the 20% bot estimate was material under any theory.  *See id.*; *Goldman Sachs*, 594 U.S. at 123.

## V.   PLAINTIFFS FAIL TO PROVE CLASS-WIDE RELIANCE

Plaintiffs' motion for summary judgment on class-wide reliance should be denied because: (1) genuine disputes of material fact preclude a presumption of class-wide reliance; and (2) Musk's evidence rebuts the presumption.

### A.   Genuine Disputes of Fact Preclude Application of a Reliance Presumption

To invoke the fraud-on-the-market presumption, a plaintiff must prove by a preponderance of the evidence that "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." Mot. at 23 (citing *Halliburton*, 573 U.S. at 268).  Genuine factual disputes prevent Plaintiffs from establishing three of the four *Halliburton* element as a matter of law and preclude summary judgment.[9]

***Plaintiffs Cannot Prove The Misrepresentations Were Material***:  As discussed above, the evidence shows that the alleged misrepresentations were not material or, at minimum, creates a factual dispute.  *Supra* at 20-25.  Accordingly, Plaintiffs cannot establish materiality as a matter of law and this issue—both as an independent element and as part of the fraud-on-the-market analysis—cannot be adjudicated on summary judgment.  *See Phan*, 500 F.3d at 908 ("Determining materiality in securities

---

[9]  Plaintiff's authorities are not to the contrary.  In their sole case granting summary judgment on the issue of reliance, *In re Celestica Inc. Sec. Litig.*, 2014 WL 4160216 (S.D.N.Y. Aug. 20, 2014), "Defendants opposed Plaintiffs' motion [solely] on the basis that the Supreme Court's decision in *Halliburton* … might overrule *Basic* and change the law regarding the fraud on the market presumption," which did not occur. *Id.* at *5 n.3. They did not oppose the motion because the allegedly false information was immaterial or that the market learned the truth before the close of the class period, as Musk does here. *McCrary v. Elations Co. LLC* is not a securities class action. 2014 WL 12561600, at *3 (C.D. Cal. Dec. 8, 2014). And in *In re Infineon Techs. AG Sec. Litig.*, the court denied summary judgment on the narrow issue of whether federal securities laws applied to "foreign purchasers."  266 F.R.D. 386, 390 (N.D. Cal. 2009).

fraud cases 'should ordinarily be left to the trier of fact.'") (internal citation omitted); *see also Hsingching Hsu v. Puma Biotechnology, Inc.*, 2018 WL 4945703, at *5 (C.D. Cal. Oct. 5, 2018) ("This dispute [regarding materiality] prevents the Court from entering summary judgment on the fraud-on-the-market presumption and, thus, the element of reliance for Plaintiffs' 10b-5 claim.").

    ***Musk Is Entitled To Challenge Plaintiffs' Theory Of Market Efficiency At Trial***:  Plaintiffs bear the burden to prove market efficiency and can avail themselves of the fraud-on-the-market presumption only if their theory of reliance is compatible with the efficient market hypothesis.  *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 43 (2d Cir. 2006), *decision clarified on denial of reh'g sub nom. In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70 (2d Cir. 2007) (presumption did not apply where plaintiffs' theory was the "very antithesis of an efficient market").  There is an inherent and irreconcilable contradiction between Plaintiffs' claims that (1) Twitter traded on an efficient market that rapidly incorporated all publicly available information into its price, Dkt. 76-1 Ex. 1 (Tabak Class Rp't) ¶ 9, but (2) the market could not "decipher[]" Musk's rights under the public (and unambiguous) MA until October 4, 2022, Dkt. 62 at 10-11.  Plaintiffs' contradictory theory creates a genuine dispute that can only be resolved at trial.  Ex. 238 (Supp. Resp. to First Set of Interrogatories) at 16; Ex. U (Saha Rp't) at 13-15.

    ***There Is A Genuine Factual Dispute Whether Plaintiffs Can Rely On The Fraud-On-The-Market Presumption For The Entire Class Period***:  Fraud-on-the-market reliance is only presumed for the period between when the "misrepresentations were made and when the truth was revealed." *Halliburton*, 573 U.S. at 268; *see also Basic Inc. v. Levinson*, 485 U.S. 224, 248-49 (1988) ("[I]f ... news of the merger discussions credibly entered the market and dissipated the effects of the misstatements, those who traded Basic shares after the corrective statements would have no direct or indirect connection with the fraud.").  Plaintiffs cannot rely on the integrity of the market—or establish class-wide reliance—for any trades made after the truth was revealed.

    Although Plaintiffs seek the presumption of class-wide reliance for the entire Class Period of May 13 through October 4, 2022, the evidence shows that the market learned what Plaintiffs allege was the "truth" well before October 4.  There is thus a factual dispute as to whether the presumption applies for the entire Class Period.  *See Basic*, 485 U.S. at 248-49.  Plaintiffs claim that, on May 13, Musk duped the market into believing that all merger-related work had stopped.  Mot. at 18.  On May 19, the market

-27-

Case No. 3:22-CV-05937-CRB

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

learned from Twitter's top executives that "is no such thing as a deal being on hold" and that Twitter was continuing to work with Musk's team.  Ex. 201 at 1.  Plaintiffs also claim that Musk lied about his rights under the MA, but it is undisputed that the market learned Musk removed business due diligence as a condition to entering the MA on April 20 and understood Musk's information rights under the MA by April 25.  And by May 25, when Plaintiffs' counsel filed the *Heresniak* Complaint, the market learned the reasons why the May 13 tweet was allegedly false.  *See generally* Ex. 203.  A jury could find that any of these disclosures "dissipated the effects of the misstatements" and conclude that any presumption of class-wide reliance ended in May 2022 (or even before the Class Period started).  *Basic*, 485 U.S. at 248-49.

**B.    There Is Evidence Rebutting the Fraud-on-the-Market Reliance Presumption**

Even if Plaintiffs could establish the elements for the presumption, that would still be insufficient to grant summary judgment on reliance because the presumption is *rebuttable.  Halliburton*, 573 U.S. at 269.  To defeat summary judgment here, Musk need only offer enough evidence to create a genuine dispute as to whether the alleged misrepresentations "actually affect[ed] the market price" of Twitter stock.  *Id.*  Although Plaintiffs claim they are "aware of no evidence rebutting the presumption of classwide reliance," Mot. at 25, they overlook the reams of evidence and analysis undermining their claim that the alleged misrepresentations impacted Twitter's stock price.

Musk can rebut the presumption on the front-end by (1) "showing that the market was already aware of the truth behind [his] supposed falsehoods and thus that those falsehoods did not affect the market price," *Amgen Inc.*, 660 F.3d at 1173-74 (9th Cir. 2011); *see also In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *6 (S.D.N.Y. Mar. 23, 2020)), and (2) showing that there is no statistically significant "front-end" impact on days of the fraud, *see In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *7 (N.D. Cal. Dec. 5, 2017).  As to the May 13 tweet, there is evidence that the market already knew that Musk declined to conduct pre-signing due diligence and understood (and had incorporated into Twitter's stock price) Musk's information rights under the public MA well before Musk posted his tweet.  Ex. D (Tabak Class Dep.) at 105:18-24, 108:5-111:10; Ex. U (Saha Rp't) at 21-23 ("Simply put, Twitter's price decline on May 13, 2022, could not have been in response to information about Twitter's obligations per the merger agreement since **that was not new information**." (emphasis in original)).  As to the May 16-17 statements, Musk can rebut any presumption because those statements

had no statistically significant impact on the stock price. *Supra* at 24-26.

Musk can also rebut the presumption on the back-end. Plaintiffs' expert concedes that Twitter's stock price did not move in response to news that Musk and Twitter continued to work together toward closing and that a lawsuit was filed alleging that Musk's at-issue statements were false. *Supra* at 23-24; *see also In re Tesla, Inc. Sec. Litig.*, 2022 WL 1497559, at *21 (N.D. Cal. Apr. 1, 2022) (denying summary judgment on reliance because there was evidence of "no decline or at least not a significant decline in stock price" in response to "a partial corrective disclosure"). This evidence is sufficient to rebut the reliance presumption and bars summary judgment. *See id.*

## CONCLUSION

Defendant respectfully requests that the Court deny Plaintiffs' motion for summary judgment.

DATED: September 12, 2025                QUINN EMANUEL URQUHART & SULLIVAN, LLP


By          */s/ Stephen A. Broome*
        Alex Spiro
        Michael T. Lifrak
        Stephen A. Broome
        Jesse A. Bernstein

        *Attorneys for Defendant Elon Musk*

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on this the 12th day of September, 2025.

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By  /s/ Stephen A. Broome
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Jesse A. Bernstein

*Attorneys for Defendant Elon Musk*

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## **ATTESTATION**

Pursuant to Civil L.R. 5-1, I attest under penalty of perjury that concurrence in the filing of this document has been obtained from the other signatories herein.

By  /s/ Alex Bergjans
     Alex Spiro
     Michael T. Lifrak
     Stephen A. Broome
     Jesse A. Bernstein

*Attorneys for Defendant Elon Musk*

DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT