COTCHETT, PITRE & MCCARTHY, LLP
Joseph W. Cotchett (SBN 36324)
jcotchett@cpmlegal.com
Mark C. Molumphy (SBN 168009)
mmolumphy@cpmlegal.com
Tyson C. Redenbarger (SBN 294424)
tredenbarger@cpmlegal.com
Elle D. Lewis (SBN 238329)
elewis@cpmlegal.com
Gia Jung (SBN 340160)
gjung@cpmlegal.com
Caroline A. Yuen (SBN 354388)
cyuen@cpmlegal.com
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN: 175783)
fbottini@bottinilaw.com
Albert Y. Chang (SBN 296065)
achang@bottinilaw.com
Aaron P. Arnzen (SBN 218272)
aarnzen@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001

*Lead Counsel for Plaintiffs and the Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| GIUSEPPE PAMPENA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | Case No. 22-cv-5937-CRB<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:     October 31, 2025<br>Time:     10:00 a.m.<br>Courtroom: 6, 17th Floor<br>Judge:    Honorable Charles R. Breyer<br><br>**(REDACTED-VERSION)** |

Case No: 3:22-cv-5937-CRB

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

STATEMENT OF ISSUES TO BE DECIDED ................................................................ vii

SUMMARY OF ARGUMENT ................................................................................... vii

STATEMENT OF FACTS ............................................................................................1

    I.      Musk Waived Due Diligence.................................................................1

    II.     Musk Had Very Limited Rights to Information and Twitter Had the Right to Refuse to Provide Information...............................................................2

    III.    Musk's May 13 Tweet Was False and Misleading..................................3

    IV.    Musk's May 16 Statement that Fake/Spam Accounts Totaled At Least 20%.........5

    V.     Musk's May 17 Tweet Combining Prior Misstatements .........................5

    VI.    Twitter Produced the Information Musk Requested..................................7

    VII.   Musk Capitulates and Pays Full Price While Also Dismissing all his Claims ........9

ARGUMENT .............................................................................................................9

    I.      Musk's May 13 Tweet Was False and Misleading..................................9

        A.    Musk's Was Not *Entitled* to Unilaterally Put the Deal on Hold, Nor Was the Deal on Hold .................................................................9

        B.    Musk Had Extremely Limited Information Rights...................................11

        C.    Musk's May 13 Tweet Was Undisputedly Material ...............................13

    II.     Musk's May 16 Statements and May 17 Tweet Were False ................................15

    III.    Musk's Statements Were Not Mere Opinions ..........................................16

    IV.    There Is Overwhelming Evidence of Musk's Scienter .........................................19

    V.     Musk's Loss Causation Arguments Are Meritless ..............................................22

        A.    Plaintiffs Have Established Loss Causation Related to Musk's May 16 and May 17 Misstatements Under the Price Maintenance Theory............22

        B.    Musk's Arguments About His May 13 Deal-on-Hold Tweet Ignore Both the Language of the Tweet Itself and Basic Tenets of the Efficient Market Hypothesis ....................................................................24

        C.    Plaintiffs' Expert Appropriately Used a Percentage of Merger Discount Method to Calculate Damages ..................................................26

D.    Plaintiffs' Expert Appropriately Establishes Loss Causation Through Direct Causation.................................................................................................27

VI.    Musk's Challenge to the Section 10b and Rule 10b-5 Scheme Claim Is Baseless ...............................................................................................................33

CONCLUSION.................................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Affiliated Ute Citizens v. United States*
406 U.S. 128 (1972).............................................................................................................33

*Akorn, Inc. v. Fresenius Kabi AG*
2018 WL 4719347 (Del. Ch. Oct. 1, 2018), aff'd, 198 A.3d 724 (Del. 2018) ........................13

*In re Allstate Corp. Sec. Litig.*
966 F.3d 595 (7th Cir. 2020) .............................................................................................23

*In re Alphabet Sec. Litig.*
1 F.4th 687 (9th Cir. 2021) ...............................................................................................35

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*
663 F. Supp. 3d 334 (S.D.N.Y. 2023)............................................................................28, 30

*In re Apple Inc. Sec. Litig.*
2022 WL 354785 (N.D. Cal. Feb. 4, 2022) ........................................................................23

*Baker v. SeaWorld Ent., Inc.*
423 F. Supp. 3d 878 (S.D. Cal. 2019)................................................................................27

*Berson v. Applied Signal Technology, Inc.*
527 F.3d 982 (9th Cir. 2008) ........................................................................................11, 16

*Beyene v. Coleman Sec. Servs., Inc.*
854 F.2d 1179 (9th Cir. 1988) ...........................................................................................15

*Blue v. Tilray Brands, Inc.*
2025 WL 519848 (Del. Ch. Feb. 17, 2025) ........................................................................13

*Braden Partners, LP v. Twin City Fire Ins. Co.*
*No*. 2017 WL 63019 (N.D. Cal. Jan. 5, 2017) .....................................................................14

*Brody v. Transitional Hosps. Corp.*
280 F.3d 997 (9th Cir. 2002) .............................................................................................13

*Chartis Warrantyguard v. Nat'l Elecs.*
2011 WL 336385 (Del. Ch. Jan. 28, 2011)..........................................................................13

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*
856 F.3d 605 (9th Cir. 2017) .............................................................................................18

*Dura Pharms., Inc. v. Broudo*
544 U.S. 336 (2005)..................................................................................... *passim*

*In re Eastman Kodak Co. Sec. Litig.*
    632 F. Supp. 3d 169 (WDNY Sept. 27, 2022) ...........................................................................34

*Evanston Police Pension Fund v. McKesson Corp.*
    411 F. Supp. 3d 580 (N.D. Cal. 2019) ...........................................................................20

*FindWhat Investor Grp. v. FindWhat.com*
    658 F.3d 1282 (11th Cir. 2011) ...........................................................................23

*Gebhart v. S.E.C.*
    595 F.3d 1034 (9th Cir. 2010) ...........................................................................20

*Glickenhaus & Co. v. Household Int'l, Inc.*
    787 F. 3d 408 (7th Cir. 2020) ...........................................................................23

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*
    594 U.S. 113 (2021) ...........................................................................23, 25, 26

*Hagood v. Sonoma County Water*
    81 F.3d 1465 (9th Cir. 1996) ...........................................................................18

*Hampton v. root9B Techs.*
    897 F.3d 1291 (10th Cir. 2018) ...........................................................................18

*Hatamian v. Advanced Micro Devices, Inc.*
    2016 WL 1042502 (N.D. Cal. Mar. 16, 2016) ...........................................................................23

*Hollinger v. Titan Capital Corp.*
    914 F.2d 1564 (9th Cir. 1990) ...........................................................................21

*Homyk v. ChemoCentryx, Inc.*
    2025 WL 1547625 (N.D. Cal. May 30, 2025) ...........................................................................27

*In re Intuitive Surgical Sec. Litig.,*
    2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) ...........................................................................17

*In re Inv. Tech. Grp., Inc. Sec. Litig.*
    251 F. Supp. 3d 596 (S.D.N.Y. 2017) ...........................................................................18

*Kange v. PayPal Holdings, Inc.*
    620 F. Supp. 3d 884 (N.D. Cal. 2022) ...........................................................................35

*Lentell v. Merrill Lynch & Co*
    396 F.3d 161(2d Cir. 2005) ...........................................................................28

*Levie v. Sears Roebuck & Co.*
    496 F. Supp. 2d 944 (N.D. Ill. 2007) ...........................................................................30

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*
    416 F.3d 940 (9th Cir. 2005) ...........................................................................28

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT    iv

*Lorenzo v. SEC*
  587 U.S. 71 (2019)............................................................................................34

*McCabe v. Ernst & Young, LLP*
  494 F.3d 418 (3d Cir. 2007)..............................................................................28

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*
  164 F. Supp. 3d 568 (SDNY Feb. 17, 2016)......................................................35

*Mickman v. Am. Int'l*
  2009 WL 2244608 (Del. Ch. July 28, 2009)......................................................13

*Miller v. Thane Int'l, Inc.*
  519 F.3d 879 (9th Cir. 2008) .............................................................................11

*Mineworkers' Pension Scheme v. First Solar Inc.*
  881 F.3d 750 (9th Cir. 2018) .......................................................................27, 28

*In re Novatel Wireless Sec. Litig.*
  2013 WL 12247558 (S.D. Cal. Nov. 19, 2013) ..................................................27

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*
  730 F.3d 1111 (9th Cir. 2013) .....................................................................28, 31

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*
  575 U.S. 175 (2015)....................................................................................17, 18

*In re Oracle Corp. Sec. Litig.*
  627 F.3d 376 (9th Cir. 2010) .............................................................................15

*Pampena v. Musk*
  705 F. Supp. 3d 1018 (N.D. Cal. 2023) .............................................................31

*Peralta v. Dillard*
  744 F.3d 1076 (9th Cir. 2014), *cert. denied*, 574 U.S. 1073 (2015).....................14

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*
  2021 WL 229310 (N.D. Cal. Jan. 21, 2021) ......................................................26

*Rolf v. Blyth, Eastman Dillon & Co.*
  570 F.2d 38 (2d Cir. 1978).................................................................................21

*Sec. & Exch. Comm'n v. Platforms Wireless Int'l Corp.*
  617 F.3d 1072 (9th Cir. 2010) .....................................................................11, 16

*In re Splunk Inc. Sec. Litig.*
  592 F. Supp. 3d 919 (N.D. Cal. 2022) ...............................................................27

*Superintendent of Ins. v. Bankers Life & Cas. Co.*
  404 U.S. 6 (1971)..............................................................................................33

*In re Tesla, Inc. Securities Litigation*
    2022 WL 7374936 (N.D. Cal. Oct. 13, 2022)........................................................24, 25, 27, 32

*Thant v. Rain Oncology Inc.*
    2025 WL 588994 (N.D. Cal. Feb. 24, 2025) ...........................................................................27

*Twitter, Inc. v. Musk*
    2022 WL 3656938 (Del. Ch. Aug. 25, 2022) .......................................................................3, 21

*United States v. AseraCare, Inc.*
    938 F.3d 1278 (11th Cir. 2019) ...............................................................................................18

*In re Vaxart, Inc. Sec. Litig.*
    2025 WL 1869694 (N.D. Cal. July 7, 2025)............................................................................34

*In re VeriFon Sec. Litig.*
    11 F.3d 865 (9th Cir.1993) ......................................................................................................11

*In re Vivendi, S.A. Sec. Litig.*
    838 F.3d 223 (2d Cir. 2016).....................................................................................................23

*Washington v. Lowe's Hiw Inc.*
    2016 WL 845289 (N.D. Cal. Mar. 4, 2016).............................................................................15

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...................................................................................................20

**Statutes**

Exchange Act Section l0(b) ...........................................................................................26, 33, 34,35

PSLRA Subsection (b)(1) ...............................................................................................................35

U.S. Code § 78u-4(b)(1) .................................................................................................................34

**Other Authorities**

17 CFR § 240.10b-5(a), (c)............................................................................................................33

Fed. R. Civ. P. 56(a) .........................................................................................................................9

Fed. R. Evid. 802...........................................................................................................................15

Fed. R. Evid. 901...........................................................................................................................15

**STATEMENT OF ISSUES TO BE DECIDED**

Whether the Court should deny defendant Elon Musk's motion for summary judgment where the record undisputedly shows, beyond any reasonable dispute, that Musk's May 13 Tweet, May 16 Statement, and May 17 Tweet were materially false, made with scienter, and caused Plaintiffs' damages.

Whether the Court should deny Musk's motion as to Plaintiffs' scheme liability claims under SEC Rule 10b-5(a) and (c) as the evidence shows that Musk deceived the market through an integrated, months-long plan to drive down Twitter's stock price by coordinating his false statements with deceptive conduct.

**SUMMARY OF ARGUMENT**

Defendant Elon Musk's Motion for Summary Judgment is meritless. Indeed, as indicated in Plaintiffs' Motion for Partial Summary Judgment (ECF 253), the evidence supporting Musk's liability for securities fraud is overwhelming.

After agreeing to waive due diligence, committing to "seller friendly" deal terms limiting his ability to pull out, and never once asking Twitter for information about its business, Musk changed course after signing the merger agreement and took advantage of his mass following on the platform to issue blatantly false statements to drive down Twitter's stock price. This included Musk's statement that his acquisition of Twitter was "***on hold***" and "***cannot move forward***" unless he received detailed information from Twitter "supporting calculation that spam/fake accounts do indeed represent less than 5% of users." But the truth was far different: the deal was not on hold, and Musk has since admitted under oath ████████████████████████████████ ████████████████████████████████████████. The undisputed evidence also shows that ████████████████████████████████ ████████████████████████████████. The record further establishes that Musk knew he did not have rights to the information he demanded, and his real goal was to escape from or renegotiate the merger price.

Despite this record, Musk moves for summary judgment without citing any evidence or contract terms permitting him to put the deal "on hold," let alone actually doing so. Instead, Musk

attempts to distract the Court by claiming that he had the right to request "bot data." But Musk's claimed contractual right to request "bot data" *is disputed* by everyone other than Musk himself, and thus cannot serve as a basis for summary judgment. Even if Musk had such a right, it would not establish the truth of any of Musk's other statement, including that he had put the deal on hold or that fake and spam accounts made up *at least 20%* of Twitter's users. Indeed, Musk ████████████ ██████████████████████████████████████████████████████████████████████████████████████████████" and he had "████████████████████████████████████████ The Court should deny Musk's motion for these reasons alone.

Unfortunately for Twitter's shareholders, Musk's false statements had their desired effect. The May 13, 2022 Tweet caused Twitter's stock to decline 17.85% over two trading days, and prompted an analyst to opine that "this tweet will send this Twitter circus show into a Friday the 13th horror show." His subsequent two statements maintained the stock's deflated price. Evidence, including deposition testimony, demonstrates that Musk intentionally made these false statements to depress the price of Twitter's stock.

When he was later sued by Twitter for specific performance, Musk's scienter about the falsity of his statements was further revealed—he threatened Twitter's directors on three separate occasions that it would be "like World War III," and that he would "pursue them until the end of time" if they rebuffed his demands. When that did not work, he capitulated, conceded all of his claims, and agreed to pay the full merger price. Moreover, in an April 2023 interview with the BBC, Musk admitted that he made statements about terminating the Merger because he did not want to pay the $44 billion merger price. The Court previously determined that Musk's admission was indicia of a motive and opportunity to lie. *See* ECF No. 48 at 32.

Musk's argument that Plaintiffs' damages expert failed to "disaggregate" certain events is also baseless. Plaintiffs' expert performed a detailed event study, which is a universally accepted manner of eliminating any non-company-specific causes of price declines. Musk's own expert conceded that Twitter's stock declined materially in response to the May 13 tweet, and he failed to offer any alternative cause for the huge price decline other than Musk's false statements. At best, Musk's "disaggregation" argument is an issue that courts routinely hold goes to weight, not admissibility, of

an expert's report.

Finally, Musk's attack on loss causation falls on rocky soil. Citing cases exclusively involving purchaser classes, Musk's arguments are inapposite to this seller class action. Musk's claim that the use of a corrective disclosure is the only way to prove loss causation ignores well-established Ninth Circuit authority, which holds that loss causation can be proven in many ways. Here, Plaintiffs' expert submitted a report which demonstrates loss causation through direct causation, a well-established method to prove loss causation and one that this Court noted in denying Musk's motion to dismiss:

> The Court believes that Plaintiffs have alleged facts supporting a direct causal relationship theory. The Ninth Circuit has 'recognized that loss causation can be established by showing "that the Defendants' misrepresentation was directly related to the actual economic loss [the plaintiff] suffered."

ECF 48, at 37 (quoting *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013) (quoting *Livid Holdings Ltd. v. Salomon Smith Barney, Inc*., 416 F.3d 940, 949 (9th Cir. 2005)).

For these reasons, detailed below, Musk's motion for summary judgment should be denied.

\* \* \*

**STATEMENT OF FACTS**[1]

**I.      Musk Waived Due Diligence**

On April 21, Musk signed and filed with the SEC an amended Schedule 13D announcing that his proposal was "no longer subject to financing" and "*no longer subject to business due diligence*." MSJ Ex.[2] 20 [ECF 253-21] at *144.  The filing also disclosed that Musk had financing commitments in place to fund the deal, including an equity commitment and $25.5 billion in debt commitments from various lenders.  *Id.*  The debt commitments included $12.5 billion in margin loans, the viability of which depended heavily on the value of Musk's Tesla stock.  *Id.* at *244.

Musk's unsolicited offer, the waiver of due diligence, and the fast closing were part of a sophisticated and deliberately crafted strategy that Morgan Stanley bankers referred to as the "█████"
██████.  MSJ Ex. 21 [ECF 253-22], Armstrong Tr. at 47:25-48:6.  According to this ██████
Musk would make an initial offer with a "████████████████████████
██████████████, subject to several contingencies.  MSJ Ex. 28 [ECF 253-29], Grimes Tr. at 61:16-62:13.   Then, ████████████████████████████████
████████████████████████████████████████████
████████████████████████████.  MSJ Ex. 28 [ECF 253-29], Grimes Tr. at 64-69.  Indeed, Morgan Stanley suggested that Musk send Twitter ████████████
████████████████████████████████ MSJ Ex. 22 [ECF 253-21] at *880.  "Seller friendly" is a term of art used in the mergers and acquisitions field to refer to some combination of, *inter alia*, limited information rights for the buyer, minimal closing conditions imposed on the seller, and specific performance rights favoring the seller.  MSJ Ex. 23 [ECF 253-24], Expert Report of Professor Adam Badawi, at 28-36.

Musk testified that ████████████████████████████████████

---

[1] To avoid as much repetition as possible, Plaintiffs incorporate the Statement of Facts from their Motion for Partial Summary Judgment (ECF 253) and recite only some key facts below.

[2] To avoid duplicative filings of the same evidence, and the need for repetitive motions to seal, Plaintiffs refer to exhibits filed in support of Plaintiffs' Motion for Summary Judgement as "MSJ Ex.___; [ECF 253-_]"  *See* ECF 253 et. seq.  If the court prefers, Plaintiffs will re-file the exhibits in support of this motion.

██████████████████████████████████████████████████████████████████████████.” MSJ Ex. 13 [ECF 253-14], Musk Tr. at 99:4-13. Musk also testified ████████████████ ██████████████████████████████. MSJ Ex. 14 [ECF 253-15], Musk Tr. at 124:15-125:4.

## II.      Musk Had Very Limited Rights to Information and Twitter Had the Right to Refuse to Provide Information

The merger agreement gives Musk "reasonable access" to information about Twitter's "business, properties and personnel." *See* Opp. Ex. 1,[3] at § 6.4. That information must be used for a "reasonable ***business purpose related to the consummation of the transactions*** contemplated by this Agreement." *Id*. Similarly, the merger agreement provides limited information sharing related to financing. *Id*. at §§ 6.10-11. These are not unlimited rights. *See* Opp Ex. 10, Letter from Twitter to Musk, ("Sections 6.4 and 6.11 provide limited rights, not a vehicle to conduct the due diligence that was knowingly waived.")

Moreover, the merger agreement allowed Twitter to decline an information request if in its "reasonable judgment" supplying the information would "(i) cause significant competitive harm to the Company or its Subsidiaries if the transactions contemplated by this Agreement are not consummated, (ii) violate applicable Law [or contract to which it is a party], or (iii) jeopardize [] attorney-client [] privilege." Opp. Ex. 1 at § 6.4. In other words, Twitter could use its judgment to decline to give Musk the sensitive information he was requesting—particularly because ████████████████████ ████████████████████████████. Opp Ex. 7, Korman Tr. at 131:10-19.

Any reluctance or refusal by Twitter to provide Musk with information was justified where Musk had repeatedly threatened to start a competitor and had posted public comment disparaging Twitter or falsely claiming spam and fake accounts were higher than Twitter's estimates. *See* MSJ Exs. 40, 48 [ECF 253-41, 49]. Twitter's CFO Ned Segal explained ██████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████ ██████████████████████████████ ████████████████████████████████████████████████████████████████████

---

[3] "Opp. Ex. __" refers to the exhibits attached to the Declaration of Tyson Redenbarger filed in support of this Opposition to Musk's Motion for Summary Judgment.

██████." Opp. Ex. 8, Segal Tr. at 134:24-135:6.

Equally important, Musk did not have any right to put the deal "on hold" and he never put the deal on hold.  One of Musk's senior bankers testified about the May 13 tweet: "████████████████ ████████████████████████" MSJ Ex. 7 [ECF 253-8], Claassen Tr. at 260.  Similarly, Musk's lead deal attorney testified that "█████████████████████████████████████████ ████████████████" (MSJ Ex. 41 [ECF 253-42], Ringler Tr. at 245) and another one of his bankers testified that when he saw the May 13 tweet, he thought something along the lines of "██████████ ████████████." MSJ Ex. 42 [ECF 253-43], Earls Tr. at 206; *see also* MSJ Ex. 43 [ECF 253-44], Silverstein Tr. at 346 ("████████████████████████.").  Moreover, Musk █████████ ████████████████████████ MSJ Ex. 14 [ECF 253-15], Musk Tr. at 225-26); █████████ ████████████████████████████████████████ (*id.*, Musk Tr. at 225-26); ████████████████████████████████████████████ (MSJ Ex. 21 [ECF 253-22], Armstrong Tr. at 285-86; MSJ Ex. 41 [ECF 253-42], Ringler Tr. at 216); and his lead deal attorney never even "████████████████████████████████████████." MSJ Ex. 41 [ECF 253-42], Ringler Tr. at 247; *see also* MSJ Ex. 14 [ECF 253-21], Musk Tr. at 236-39.[4]

## III.    Musk's May 13 Tweet Was False and Misleading

On May 13, 2022 at 2:44 a.m., Musk tweeted: "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users." Ex. 40.  Musk's "deal on hold" tweet caused immediate panic that the deal was in jeopardy—including panic within Musk's own camp.  For example, Musk's lawyer, Alex Spiro, immediately called Musk in the middle of the night, which led Musk to clarify that he was "still committed to the acquisition." MSJ Ex. 62 [ECF 253-63], ¶¶7-8. ████████████████████████ ████████████ *Id.*, ¶¶14-15.

---

[4] *See also* MSJ Ex. 14 [ECF 253-15], Musk Tr. at 275:7-9 ████████████████████████ ████████████████████████████████████████████████████ MSJ Ex. 7 [ECF 253-8], Claassen Tr. at 261 ("████████████████████████████████████████████████"); MSJ Ex. 21 [ECF 253-22], Armstrong Tr. at 286 (regarding May 13 tweets: "████████████████████████ ████████████████████.").

Musk knew that "███████████████████████████████████████████

██████████████████████." MSJ Ex. 13 [ECF 253-14], Musk Tr. at 31:6-10, MSJ Ex. 14 [ECF 253-15], Musk Tr. at 215:6-10. The market reacted so strongly (as discussed *infra*) to Musk's tweet in part due to the unusual circumstances surrounding this acquisition. In particular, it is very unusual for a buyer to make a disruptive *public* statement like this instead of communicating directly with one's merger partner. Indeed, a senior banker on Musk's team testified about his reaction to Musk's May 13 tweets and Twitter's response: "█████████████████████████████████

███████████████████████." MSJ Ex. 28, Grimes Tr. at 224. Moreover, before posting the May 13 tweet, ████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████. MSJ Ex. 14, Musk Tr. at 217-220, 270-71.

Contrary to Musk's tweet, the deal was not on hold. As stated above, none of Musk legal and banking experts ████████████████████████████████████." Musk's lead deal attorney stated, ███████████████████████████████████████████████

███████ MSJ Ex. 41 [ECF 253-42], Ringler Tr. at 245; MSJ Ex. 42 [ECF 253-43], Earls Tr. at 206; MSJ Ex. 43 [ECF 253-44], Silverstein Tr. at 346.

The market reacted as expected. A Wedbush securities analyst opined on May 13 that: "The implications of *this tweet will send this Twitter circus show into a Friday the 13th horror show* as now the Street will view this deal as 1) likely falling apart, 2) Musk negotiating for a lower deal price, or 3) Musk simply walking away from the deal with a $1 billion breakup fee." MSJ Ex. 45 [ECF 253-46]. A Truist analyst similarly summed up the confusion caused by Musk's tweet: "At $41/share intraday, *TWTR is trading at -24% discount to the offer price, which reflects 1) lack of confidence that the deal will happen*" and other concerns. MSJ Ex. 46 [ECF 253-47]. ███████████████

███████████████████████████████████████████████████████████████

██████████ MSJ Ex. 44 [ECF 253-45] ██████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████."). All told,

Twitter's stock dropped by 17.85% over two trading days after Musk posted his "deal on hold" tweet. MSJ Ex. 4 [ECF 253-5], row 84.

**IV.    Musk's May 16 Statement that Fake/Spam Accounts Totaled At Least 20%**

On May 16, Musk appeared via Zoom at the All-In Summit technology conference in Miami and made the following statement about Twitter's estimate of 5% fake/spam accounts:

> I think it's some number that is probably at least four or five times that number, I'd say. If you did the lowest estimate would be probably 20% and this is a bunch of quite smart outside firms [who have] done analysis of Twitter and looked at the daily users.

MSJ Ex. 1 [ECF 253-2] at RFA 134.



MSJ Ex. 3 [ECF 253-4], Musk SEC Tr. at 306-07.

Like Musk's May 13 tweet, this statement disrupted the market for Twitter securities. A Wedbush analyst, for example, opined on the afternoon of May 16 that the "bot issue at the end of the day was known by the New York City cab driver and feels more to us like the 'dog ate the homework' excuse to bail on the Twitter deal or talk down a lower price. ***The soap opera will continue this week and keep the popcorn handy as there are likely many more twists and turns ahead*** in this Twitter/Musk saga." MSJ Ex. 47 [ECF 253-48]. As Musk intended, his May 16 statement maintained the artificial deflation of Twitter's stock price and perpetuated the large gap between the $54.20 merger price and the market's May 16 closing price of $37.39. *See* MSJ Ex. 4 [ECF 253-5].

**V.    Musk's May 17 Tweet Combining Prior Misstatements**

On May 17, 2022, Musk posted a tweet that effectively combined his May 13 deal-on-hold

tweet and his 20% speculation at the May 16 All-In Summit.  MSJ Ex. 48 [ECF 253-49].

As discussed *supra*, Musk did not have the right to and did not put the deal on hold, and had no more basis for his speculative 20% guess than he had the day prior.  Indeed, in responding to an interrogatory issued in the Delaware Action ███████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████  MSJ Ex. 49 [ECF 253-50] at responses no. 4, 5; *see also* MSJ Ex. 14, [ECF 253-15] Musk Tr. at 140, 313-14 (███████████████████████████████████████).

After this tweet, a Wedbush analyst opined: "***If a revised deal does get done by Musk and Twitter, it will likely will be at a much lower price once negotiations take over*** and the diligence happens around Twitter DAU and algorithms hot button issues."  MSJ Ex. 50 [ECF 253-51].  The May 17 tweet also maintained the stock's artificially deflated price, as well as the significant gap between the merger price ($54.20) and market price on May 17 ($38.32).  *See* MSJ Ex. 4 [ECF 253-5].

Musk's May 17 statements were false for another reason.  Musk was not actually surprised by fake/spam accounts on Twitter and did not really care about the process used by Twitter to estimate their prevalence.  As discussed above, Musk was well aware of fake/spam accounts and even pledged, if his bid succeeded, to "defeat the spam bots or die trying!"  MSJ Ex. 18 [ECF 253-19]. ████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████  MSJ Ex. 51 [ECF 253-52], Segal Tr. at 349; MSJ Ex. 14 [ECF 253-15], Musk Tr. at 286.

Additionally, when ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

██████████████████████.” MSJ Ex. 14 [ECF 253-15], Musk Tr. at 282-85, 288; MSJ Ex. 52 [ECF 253-53]. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ MSJ Ex. 53 [ECF 253-54]████████████████████████

████████████████████████████████████████████████████████

████████████████████████ Musk admitted during testimony ████████████████████

████████████████████████████████ MSJ Ex. 14 [ECF 253-15], Musk Tr. 300:3-5. All told, Musk's purported interest in Twitter's spam calculations was just a pretext for getting out of the deal or renegotiating a lower price.

**VI.    Twitter Produced the Information Musk Requested**

Twitter, despite not having the obligation, was cooperative and made good faith efforts to provide Musk with fake/spam account information. *See* MSJ Ex. 54 [ECF 253-55], Conti Tr. at 80 (████████████████████████████████████████████████ ████████████ Musk's motion confirms as much. ECF 255 at 15-17. However, Musk's requests were grossly overbroad and burdensome, and Twitter was concerned about Musk's misuse of its confidential information since Musk had said he might start a competitor. *See* Opp. Ex. 3; Opp. Ex 5.

Despite these valid concerns, Twitter produced the data that Musk had requested, while also repeatedly communicating to Musk and his team that information ***would continue to be produced***. Opp Ex. 3; Opp. Ex. 5 (July 1 letter, fn1: "Your June 29 Letter and prior requests seek information that Twitter does not compile in the ordinary course and that exceeds the scope of Sections 6.4 and 6.11 of the merger agreement. Twitter is nevertheless undertaking to be responsive. Responding to such requests, however, takes time and considerable resources, and the Company will continue to confer with you on a rolling basis.")   Indeed, ████████████████████████████ ████████████████████████████████ MSJ Ex. 14 [ECF 253-15], Musk Tr. at 288-89; MSJ Ex. 52 [ECF 253-53] (██████████████████████); MSJ Ex. 61 [ECF 253-62] (████████████████████████████).

As of July 1, Twitter had complied with Musk's information requests to date or stated in writing that further information was forthcoming. Opp. Ex. 5. Twitter produced this information

despite the fact that Musk was not entitled to any information, and in the face of absurdly overbroad requests and Musk disparaging comments. *See* Opp. Ex. 2. (███████████████████████████████████████████); Opp. Ex. 4 (excessive requests, including five years of emails and text messages from Board members relating to spam accounts).

Undeterred by the truth, or the impact it would have on shareholders, Musk purported to terminate the merger on July 8, falsely claiming that Twitter "failed or refused to provide [the] information" he had requested.   MSJ Ex. 55 [ECF 253-56] at 2.  Musk's motion argues that the termination was valid because in June of 2022 he gave Twitter a 30-day notice to cure.  That point is contrary to the facts because Twitter was not in breach and had been voluntarily providing information, and promising to continue providing information, in good faith.  Even Musk's motion lists all of the information that Twitter provided after the contrived "notice." *See e.g.,* ECF 255 at 15-16 ("Twitter provided substantial document and data in a support effort to satisfy Musk's requests," citing correspondence dated June 16, 17, 21, and July 6, 14, 15.)  Accordingly, the evidence is clear that Musk termination was a farce. ████████████████████████████████████████████████████████████████████████████████████████████████████████████ MSJ Ex. 56 [ECF 253-57].

In July of 2022, *after he sent the July 8 termination letter,* Musk was deposed by the SEC and explained why he was attempting to terminate the deal.  Musk testified ██████████████████████████████████████████████████ MSJ Ex. 3 [ECF 253-4], Musk SEC Tr. at 271-2 ████████████████████████████████████████████████████████") Yet, in *this* case, Musk testified, and evidence confirms that Twitter ███████████████████████████████████████████ MSJ Ex. 14 [ECF 253-15], Musk Tr. at 288-89; MSJ Ex. 52 [ECF 253-53] (methodology provided on May 21, 2022); MSJ Ex. 61 [ECF 253-62] ██████████████████████████████████████).  Additionally, as the evidence confirms, Twitter had provided the information Musk requested and promised to continue compiling and producing further information on a rolling basis.  Opp. Ex. 3; Opp. Ex. 5 ("many of Mr. Musk's requests have gone beyond what is called for under Sections 6.4 and 6.11 of the merger agreement . . . . [regardless] Twitter will continue

to be responsive to all reasonable requests for information.")

**VII.    Musk Capitulates and Pays Full Price While Also Dismissing all his Claims**

Throughout the summer of 2022, and while the Delaware litigation was swiftly moving toward trial, ███████████████████████████████████████████████ MSJ Ex. 39 [ECF 253-40].  Twitter and its board, confident that Musk was bluffing, did not budge. Musk then threatened Twitter's directors that ███████████████████████████████ ████████████ MSJ Ex. 63 [ECF 253-64], Taylor Tr. at 88-91; MSJ Ex. 64 [ECF 253-65], Savitt Tr. at 32 ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████ When that failed, and shortly before the Delaware trial was to commence, Musk capitulated, dismissed all of his claims, and publicly disclosed on October 4 that he would proceed with the merger at the original $54.20 per share price.  MSJ Ex. 57 [ECF 253-58]; *see also* MSJ Ex. 41 [ECF 253-42], Ringler Tr. at 211-213.

At no point during the Delaware litigation or during this case, has Musk produced any evidence that Twitter's spam/fake account estimate of 5% was inaccurate.  Even Musk's experts, who performed *alternative* analysis, never refuted the estimates based on Twitter's methodology.  Indeed, even after owning and controlling Twitter since October 2022, Musk has not provided any evidence that Twitter's spam/fake user estimate, per Twitter's methodology, was inaccurate.  *See* ECF 255 at 19.

**ARGUMENT**

The Court may grant summary judgment only if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The Court must deny Musk's motion because, as discussed below, ample disputed factual issues exist.

**I.    Musk's May 13 Tweet Was False and Misleading**

**A.    Musk's Was Not *Entitled* to Unilaterally Put the Deal on Hold, Nor Was the Deal on Hold**

Musk argues that because he had "some rights to information" that his May 13 "deal on hold" tweet was not false.  ECF 255 at 3.  Musk's argument ignores the fact that Musk stated the deal was

"on hold"—a legal concept and right that did not exist. Musk has not identified any terms in the merger agreement nor cited any authority that supports the false claim that he could unilaterally put the deal on hold. Indeed, he had no such right. *See* MSJ Ex. 41 [ECF 253-42], Ringler Tr. at 245 ███████████████████████████████████████████████████████ MSJ Ex. 42 [ECF 253-43], Earls Tr. at 206 ██████████████████████████."; *see also* MSJ Ex. 43 [ECF 253-44], Silverstein Tr. at 346 ("████████████████████████.").

Additionally, evidence overwhelmingly establishes that the deal was not "on hold." Musk █ ██████████████████████████████ (MSJ Ex. 14 [ECF 253-15], Musk Tr. at 225-26); █ ████████████████████████████████████████████████████████ (*Id.*); ████████████████████████████████████ (MSJ Ex. 21 [ECF 253-22], Armstrong Tr. at 285-86; MSJ Ex. 41 [ECF 253-42], Ringler Tr. at 216); and his lead deal attorney never even ████████████████████████ MSJ Ex. 41 [ECF 253-42], Ringler Tr. at 247; MSJ Ex. 14 [ECF 253-15], Musk Tr. at 236-39. Kate Claassen, a senior Morgan Stanley banker on Musk's team, is the most plain-spoken on this point: ████████ ████████████████████████ MSJ Ex. 7 [ECF 253-8], Claassen Tr. at 260-61. And when asked if she agreed ███████████████████████████████████████████████████████ ████████ *Id.* And by his own admission, ██████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████ MSJ Ex. 14 [ECF 253-15], Musk Tr. at 225-228, 236-39; 275:7-9 ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████). Similarly, from May 10 onward, Twitter employees ██████████████ ████████████████████████████████████ MSJ Ex. 54 [ECF 253-55], Conti Tr. at 80. *There was, therefore, nothing about the deal that was on hold*. Musk ███████████ ████████ Ex. 14 [ECF 253-15], Musk Tr. at 232:2-4; 229-236 ████████████ ████████████████████████████████████████

Simply put, Musk's May 13 tweet was false. And even if the tweet were somehow literally

true—which it was not—his statement nevertheless misled the investing public given the surrounding circumstances. *See Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("[S]tatements literally true on their face may nonetheless be misleading when considered in context."); *Berson*, 527 F.3d at 985; *see also Platforms Wireless*, 617 F.3d at 1094-95 (affirming summary judgment: "Considered as a whole, the press release leaves the unmistakable impression that the ARC System exists. By contrast to the true facts, this press release was deceptive, an absolute and unequivocal falsehood.").

Accordingly, Musk's argument that his May 13 deal "on hold" tweet accurately reflected the then-existing state of affairs is wrong. Musk had no right to put the deal on hold, and the deal was not in fact on hold when he made the statement. *See In re VeriFon Sec. Litig.*, 11 F.3d 865, 871 (9th Cir.1993) (representation must be false "when made.")

### B.    Musk Had Extremely Limited Information Rights

Musk argues at length that he had the right to request some bot information from Twitter. *See* ECF 255 at 21-24. But that right was very restricted. *See* Opp. Ex. 1 at 43. Section 6.4 of the merger agreement limits the purpose of the access to information to "reasonable" requests that are "related to the consummation of the merger." *Id.* For example, Musk could request and receive reasonable information that, at the time the merger closed, would allow him to continue operating the business, *e.g.*, make his payroll, pay vendors, place appropriate ads, obtain payments from advertisers in the normal course of business, ensure the servers that host Twitter's platform continue to run, and direct what was left of Twitter's management team. The merger agreement does not give Musk any express or implied right to conduct broad discovery into Twitter's technical and confidential business.

Moreover, Musk's very restricted information right must be contextualized by the fact that he had previously waived all business due diligence. ████████

████████

████████ MSJ Ex. 21 [ECF 253-22], Armstrong Tr. at 47:25-48:6. ████████

████████

MSJ Ex. 28 [ECF 253-22], Grimes Tr. at 61:16-62:13. ████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████ MSJ Ex. 28 [ECF 253-22], Grimes Tr. at 64-69. Indeed, Morgan Stanley suggested that Musk send Twitter a "████████████████████████████████████████████████ ███████████████ MSJ Ex. 22 [ECF 253-23] at *880. "Seller friendly" is a term of art used in the mergers and acquisitions field to refer to some combination of, *inter alia*, limited information rights for the buyer, minimal closing conditions imposed on the seller, and specific performance rights favoring the seller. MSJ Ex. 23 [ECF 253-24], Expert Report of Professor Adam Badawi, at 28-36.

████████████████████████████████████████████

██████████████████████████████████████████████████

█████████ MSJ Ex. 13 [ECF 253-14], Musk Tr. at 99:4-13. ██████████████████ ███████████████████████████████████ MSJ Ex. 14 [ECF 253-15], Musk Tr. at 124:15-125:4. Musk was, therefore, not entitled to broad business due diligence because he waived it, and the merger agreement was drafted in accordance with the parties' intention.

Musk advances the baseless contention that, because Twitter provided him with information, it shows that Musk was entitled to bot data. But Twitter always disputed Musk's right to such information. Twitter continuously repeated that fact in letters, at meetings, and eventually in the Delaware Chancery Court. *See* Opp. Exs. 3, 5 ("even though many of Mr. Musk's requests have gone beyond what is called for under Sections 6.4 and 6.11 of the merger agreement, Twitter has worked constructively to provide Mr. Musk with the information that he claims he needs to consummate the merger.") The fact that Twitter endeavored to be cooperative, and provided information, is not a concession that Twitter was contractually obligated to provide any information. *Id.* Additionally, the very existence of the Delaware Litigation, where Musk and Twitter litigated whether Musk had the right to obtain certain bot data, is definitive proof that this issue is (at a minimum) disputed. And the fact that Musk ultimately dismissed all of his own claims in Delaware and paid *full price*, is proof that Musk did not have such information rights. *See* MSJ Ex. 57 [ECF 253-58]; MSJ Ex. 41 [ECF 253-42], Ringler Tr. at 211-213.

Finally, even if the Court agrees that Musk had boundless information rights (which he did not), Musk ignores the fact that his statements were nevertheless misleading (*i.e.*, the deal was not on hold) and thus actionable under Section 10(b). *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) ("a statement that is literally true can be misleading and thus actionable under the securities laws"). Musk's citation to Delaware case law interpreting "all books and accounts" clauses are inapposite. *See Chartis Warrantyguard v. Nat'l Elecs.*, 2011 WL 336385 *7 (Del. Ch. Jan. 28, 2011) ("all books and records" found to be "broad" because the parties explicitly carved out only two exceptions); *Mickman v. Am. Int'l*, 2009 WL 2244608, *2 (Del. Ch. July 28, 2009) (contrasting "*all* books and records" which the court held commonly denotes broad access with "narrower inspection access terms, such as 'books and records' or 'books of accounts.'") (emphasis added).

Moreover, in stark contrast to Musk's cases, Section 6.4 of the merger agreement is full of broad limitations including, the request must be related to the "consummation of the transaction" and Twitter could refuse to provide any information that, in Twitter's reasonable judgment, would "cause significant competitive harm" to Twitter. *See* Opp. Ex. 1 at 43-44. Based on the facts in this case, Twitter was well within its rights to refuse all requests for information because ██████████ ████████████████████████████ ████████████████████████████ *See* Opp. Ex. 8, Segal Tr. at 134:24-135:6; Opp. Ex. 7, Korman Tr. at 131:10-19.

Musk's other cited cases are also distinguishable. In *Akorn v. Fresenius Kabi,* the buyer conducted significant due diligence before signing the merger agreement and then also bargained for the **specific** right to information concerning contractual compliance. *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *2 (Del. Ch. Oct. 1, 2018), aff'd, 198 A.3d 724 (Del. 2018). That is obviously not the case here. Here, Musk waived all due diligence and did not negotiate a specific right to investigate "bot data." *See* Opp. Ex. 1 at 43-44; *see also Blue v. Tilray Brands, Inc.,* 2025 WL 519848, at *4 (Del. Ch. Feb. 17, 2025) (interpreting a stipulated settlement.)

### C.    Musk's May 13 Tweet Was Undisputedly Material

Musk argues that his May 13 statement was not material, based on the absurd assertion that "there is no evidence that the market would have considered the fact that work on the deal had stopped

to be material." ECF 255 at 24-25. That statement is plainly untrue.

First, Musk ███████████████████████████████. MSJ Ex. 14 [ECF 253-15], Musk Tr. at 213-14; Ex. 3 [ECF 253-4], Musk SEC Tr. at 282 ████████████████████████████ ██████████████████████████████████

Second, if the deal went through, Musk would pay investors the significant premium built into the $54.20/share merger price; if the deal tanked, there would be no premium. The tweet's materiality is evidenced by May 13 analyst reports (*e.g.*, "this tweet will send this Twitter circus show into a Friday the 13th horror show;" "TWTR is trading at -24% discount to the offer price, which reflects … lack of confidence that the deal will happen") (MSJ Ex. 45 [ECF 253-46]), the 17.85% drop in Twitter's stock price over the following two trading days (MSJ Ex. 4 [ECF 253-5], row 84), and Plaintiffs' and even Musk's expert opinions. MSJ Ex. 58 [ECF 253-59], Expert Report of David I. Tabak, ¶ 16 ("the May 13, May 16, July 8, and October 4, 2022 price movements are statistically significantly different from zero"); ECF 99-6, Expert Report of Atanu Saha, ¶ 41 (Musk's expert in opposing class certification: "Twitter's price drop on May 13, 2022, is statistically significant."). The tweet was also material because, as this Court has found, "a reasonable investor would find Twitter not complying with its contractual obligations—particularly, its contractual obligation to provide details about its bot calculations—to be material to their investing decision-making." ECF 48 at 21.

Musk argues that certain factual issues, such as "the May 13 tweet falsely conveyed to the market that all workflow on the merger had stopped" is barred by the law of the case doctrine. ECF 255 at 24-25. That argument is unsupported by the record and the law. First, the Court did not find nor state that Plaintiffs' case is constrained by the verbatim language in the MTD order. That result would be impractical and unfair, especially given that motions to dismiss are decided without the benefit of discovery. Certainly, given the different standards for motions to dismiss and motions for summary judgment, courts routinely consider issues again at the summary judgment stage. *Braden Partners, LP v. Twin City Fire Ins. Co., No.* 2017 WL 63019, at *6 (N.D. Cal. Jan. 5, 2017) (allowing reconsideration on summary judgment of an argument rejected on motion to dismiss), *citing Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014), *cert. denied*, 574 U.S. 1073 (2015) ("Pretrial rulings, often based on incomplete information, don't bind district judges for the remainder of the case. Given

the nature of such motions, it could not be otherwise.").

Musk's argument that later comments relating to the deal undermine the materiality of the May 13 tweet are likewise unpersuasive. ECF 255 at 25-26. Musk's May 13 tweet was false and misleading because the deal was not on hold, but also because Musk was intentionally disrupting Twitter's stock price in an attempt to renegotiate the price of the deal—which he never disclosed. Ex. 3 [ECF 253-4], Musk SEC Tr. at 43:10-44:25;70:6-11. And Musk never made any public disclosures that he was trying to renegotiate the price. In any event, Musk's desire to renegotiate a lower price is certainly something a reasonable investor would want to know.

## II.    Musk's May 16 Statements and May 17 Tweet Were False

Musk first argues that his May 16 statements during the All In Summit were not false because he based those statements on "outside firms." But that argument is inconsistent with Musk's testimony in the SEC investigation and this case. For example, during his SEC investigative testimony, which was taken less than two months after Musk made the statements, Musk

MSJ Ex. 3 [ECF 253-4], Musk SEC Tr. at 306-07.

Moreover, Musk's interrogatory responses in Delaware conclusively show that, in reality,

MSJ Ex. 49 [ECF 253-15], responses 4, 5.[5]

---

[5] Plaintiffs object to the consideration of the SparkToro Report (cited at ECF 255 at 13, 14, 19, 26) because it is unauthenticated (FED. R. EVID. 901) and inadmissible hearsay (FED. R. EVID. 802). *See Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988) ("only admissible evidence may be considered … on a motion for summary judgment"). As the party "seeking admission of … the evidence at issue," Musk bears "the burden of proof to show its admissibility." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385 (9th Cir. 2010). Musk does not—and cannot—satisfy his burden because he has no means to authenticate this third-party blog post (*e.g.*,

His use of the SparkToro Report is an impermissible attempt to

Musk certainly didn't tell the market that he was ███████████████████ █████████████████████████████. To the contrary, Musk—who already owned billions of dollars worth of Twitter's stock, had personally negotiated the merger and signed the merger agreement, and had direct access to Twitter's board and execute management—stated that Twitter's estimate was understated and the lowest the number could be was 20%. The truth (that Musk had no factual basis to say 20%) was therefore drastically different than his public representations (the "lowest estimate would be probably 20%"). By contrast to the true facts, the May 16 statements and the May 17 tweet were deceptive and "an absolute and unequivocal falsehood." *Platforms Wireless*, 617 F.3d at 1094-95. Moreover, a reasonable juror could only find falsity in light of these facts. *Berson*, 527 F.3d at 987 (falsity established where a statement "would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists") (quotation, citation omitted).

The statements were also false because they misled the investing public to believe that Musk had received information provided by Twitter, ████████████████████ MSJ Ex. 3 [ECF 253-4], Musk SEC Tr. at 306-307. As this Court has noted, Musk "had tweeted just three days prior that the deal was on hold pending details" from Twitter, "so a reasonable investor could have reasonably concluded that Defendant was later able to make a statement about the percentage of bot users because he had received such information from Twitter." ECF 48 at 23. And contrary to Musk's argument, he did falsely state that this information came from Twitter. *See* ECF 255 at 26 ("***Twitter told him*** the bot calculation is 'as unknowable' as the human soul'").

**III. Musk's Statements Were Not Mere Opinions**

In the face of the plethora of evidence demonstrating the falsity of his statements, Musk pivots to arguing that, even if false, his statements were mere opinions. ECF 255 at 27-29. Without evidentiary support, Musk claims that he "sincerely believed he was entitled to the information he requested," and that he could "*delay* the transaction until he received it." *Id*. at 27, 28. Those

revive his efforts—rejected by Magistrate Judge Ryu's June 30, 2025 order (*see* ECF 218 at 7–8)—to establish the authenticity of the SparkToro Report. *See Washington v. Lowe's Hiw Inc*., No. 3:14-CV-02984-CRB, 2016 WL 845289, at *5 (N.D. Cal. Mar. 4, 2016) (Breyer, J.) (striking summary-judgment submission as inadmissible hearsay).

unsupported claims undoubtedly do not warrant summary judgment.

Nor does *Omnicare* support Musk's argument. Even if some of Musk's statements could be considered opinions (which they were not), they are actionable under both prongs of *Omnicare*. In *Omnicare*, plaintiff alleged defendant company committed securities fraud by falsely stating that "***we believe** we are obeying the law*," a belief that later turned out to be wrong. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 179 (2015) (emphasis added). The Supreme Court found that the statement at issue was unactionable opinion because the company included the words "we believe," and it was only *later*—in hindsight—that the company learned that its statement was incorrect. *Id*. at 180. *Omnicare* reasoned that "the import of words like "I think" or "I believe," … "convey some lack of certainty as to the statement's content." *Id*. at 187. However, the Supreme Court held that opinions could be actionable, stating "an unadorned statement of opinion about legal compliance: 'We believe our conduct is lawful'" could be misleadingly incomplete "[i]f the issuer makes that statement without having consulted a lawyer." *Id*. at 188.

Under *Omnicare*, Musk made statements of fact—not opinions. He stated "the deal is temporarily on hold"—which does not contain any language suggesting this was an opinion. MSJ Exs. 1 at RFA 134, 40, 48 [ECF 253-2, 49, 134]. And contrary to Musk's argument, he also did not say that the deal would be "delayed." He said it was "on hold" and "can't move forward." *Id*. These fact statements were false. *See* Sec. IA. *Supra*; *Omnicare*, 575 U.S. at 183 ("a statement of fact ("the coffee is hot") expresses certainty about a thing, whereas a statement of opinion ("I think the coffee is hot") does not.")

Moreover, Musk did not state that he wanted to renegotiate the price of the merger. *See* MSJ Ex. 39 [ECF 253-40] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Such an omission is unlawful. *See Id*. at 192 ("an issuer must as well desist from misleading investors by saying one thing and holding back another."); *see also In re Intuitive Surgical Sec. Litig.*, 2017 WL 4355072, at *3 (N.D. Cal. Sept. 29, 2017) ("opinion statements regarding da Vinci's safety and efficacy" were material under *Omnicare's* second prong "because they omitted numerous material facts.").

Even if the Court were to agree that Musk's statements were opinions, Musk had to have a "sincere" and "genuine" belief that ***he could put the deal on hold*** and was entitled to the bot data. To

hold such a sincere opinion, Musk would have at least reviewed the merger agreement or consulted with his advisors before he made his statements. █████████████████████

███████████████████████████████████████████████████████████

MSJ Ex. 14 [ECF 253-15], Musk Tr., at 270-271; MSJ Ex. 60 [ECF 253-15] at 4-5.  And as explained above, there is no right whatsoever in the merger agreement giving Musk the unilateral right to put the deal "on hold."  *See* Sec. I.A. *supra*; *Omnicare, supra*, 575 U.S. 175, 188 (legal statements can be misleadingly incomplete "[i]f the issuer makes that statement without having consulted a lawyer.")

The other cases cited by Musk support Plaintiffs' position.  In *Dearborn Heights*, the false statements involved estimates of goodwill, which depend on management's *subjective* determination of the 'fair value' of the assets acquired and liabilities assumed.  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017).  Here, it is undisputed and an objective fact that Musk could not, and did not, unilaterally put the deal on hold.  Likewise, it is undisputed and an objective fact that Musk did not have a valid basis to assert that spam and fake accounts made up 20% or more of Twitter's users.  Furthermore, the evidence clearly shows that Musk made false statements ███████████████████████ MSJ Exs. 39, 44 [ECF 253-40, 45].  The other cases cited by Musk are distinguishable as none involved such blatantly illegal conduct.  *See Hagood v. Sonoma County Water*, 81 F.3d 1465, 1478 (9th Cir. 1996) (in qui tam action, evidence did not show a lie, only a disputed unclear issue); *Hampton v. root9B Techs.*, 897 F.3d 1291, 1299 (10th Cir. 2018) (claims dismissed at motion to dismiss stage); *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1281 (11th Cir. 2019) (claims based on a reasonable disagreement between medical experts); *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 616-17 (S.D.N.Y. 2017) (company sufficiently disclosed the true fact of SEC investigation and was not required to provide additional details).

Moreover, the Court already carefully considered and rejected whether Musk's May 13, 16, and 17 statements were opinions.  *See* ECF No. 48 at 26.  The current motion does not offer any new facts or arguments that the statements, which have not changed, are now opinions.  *Cf.* ECF No. 48 at 25-26 (the Court did hold that certain statements made on May 21, 2022 by Musk were opinions and dismissed such statements.)  Simply put, Musk's May 13, 16, and 17 statements were not opinions.

Even if they were opinions, the evidence demonstrates that Musk did not genuinely believe his statements and that he made the statements out of a motive and opportunity to lie and drive down Twitter's stock price because he didn't want to pay the ever-increasing cost to acquire Twitter.  *See* MSJ Ex. 35 [ECF 253-36], Davis Report at 28-30 ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████

Musk's remaining arguments to the contrary hold no water.  Musk argues that "It is common in litigation for parties to make diametrically opposed statements about the meaning of contracts. . . ." ECF 255 at 27, n.6.  But Musk was not "in litigation" on May 13-17 when he made these undisputedly false statements.  Moreover, to accept Musk's absurd argument would mean that any party to a merger agreement could publicly make any false statement about the deal, manipulate the stock price, all without repercussion as long as the statement ostensibly concerned a legal issue.  ECF 255 at 27 fn 6. That argument is meritless, utterly contrary to the purpose of the federal securities laws, and should be rejected.

## IV.    There Is Overwhelming Evidence of Musk's Scienter

Musk argues that there is "no evidence of scienter" because Musk purportedly had rights to "bot data." ECF 255 at 29-30.  This argument, like the others, ignores that Musk's statements were false for other reasons, such as he had no right to unliterally put the deal on hold and no basis to claim spam and fake accounts made up 20% of Twitters users.  It is also disputed that he even had any right to request "bot data." *See* §§ I.A and B *supra*.  Irrespective of Musk's attempts to mischaracterize this case, the evidence of Musk's scienter is overwhelming.

To be clear, the evidence shows not just deliberate recklessness, but also Musk's actual knowledge that his statements were false.  ████████████████████████████████ ██████████████████████████████████████████████ (MSJ Ex. 28 [ECF 253-29], Grimes Tr. at 111-12); █████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████ MSJ Ex. 14 [ECF 253-15], Musk Tr. at 196;

Ex. 44. Given his central and active role, the falsity of Musk's statements, which are inconsistent with the merger agreement, are themselves proof of scienter. *Evanston*, 411 F. Supp. 3d at 601 ("Falsity may itself be indicative of scienter" when combined with management's role "where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.") (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009); *see* ECF 48 at 30-31 (applying *Evanston* to find scienter was well-pleaded in this case).

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████ MSJ Ex. 14 [ECF 253-15], Musk Tr., at 270-271; MSJ Ex. 60 [ECF 253-61] at 4-5. This alone establishes scienter because Musk was—at the very least—consciously aware that he ███████ ███████████████████████████ *Gebhart*, 595 F.3d at 1042-43 (evidence of scienter was sufficient where defendants based false statements on representations by a colleague "and conducted no meaningful independent investigation to confirm the truth of their representations" and therefore "lacked sufficient information for their statements"); *see also* ECF 48 at 31 ("Even if he truly believed that Twitter had the contractual obligation to provide details about the company's spam and bot data— which he argues he did…—it was at least deliberately reckless to not investigate that obligation with the respect to the Merger Agreement before making his statements[.]") (citing *Gebhart* and *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 602 (N.D. Cal. 2019).

Moreover, Musk stated in an April 2023 interview with the BBC that he had made statements about terminating the Merger ***because he did not want to pay the $44 billion merger price***, not out of a genuine desire for bot data. *See* ECF No. 48 at p. 32 (quoting FAC ¶171); Opp. Ex. 9, response to RFAs 215, 216. The Court previously determined that Musk's admission that he did not want to go through with the deal is indicia of a motive and opportunity to lie. *See* ECF No. 48 at 32. And as noted *supra*, ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████ MSJ Ex. 3 [ECF 253-4], Musk SEC Tr. at 306-07.

After Twitter provided a detailed explanation of its methodology for estimating spam and fake accounts, Musk doubled down. ███████████████████████████████████████

██████████████████████████████████████████████ MSJ Ex. 3 [ECF 253-4], Musk SEC Tr. at 271-2. ██████████████████████ Musk testified in this case, and evidence confirms, that ████████████████████████████████████████████████████████████ MSJ Ex. 14 [ECF 253-15], Musk Tr. at 288-89; Ex. 61 (Musk was aware of the methodology, but believed that it was lax.).  Simply put, Musk's purported concern over fake/spam accounts and his unwarranted demands for information (which he received) were a mere pretext.

Musk's knowledge that his conduct would cause chaos for Twitter's stock price further establishes scienter.  Musk publicly posted his statements to tens of millions of Twitter followers instead of simply calling Twitter to discuss the issue,[6] ███████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ MSJ Ex. 44 [ECF 253-45].  Musk did all this while knowing that his activities were "disruptive" to the markets.  MSJ Ex. 3 [ECF 253-4], Musk SEC Tr. at 43-47.  *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (reckless conduct "represents 'an extreme departure from the standards of ordinary care to the extent that the defendant must have been aware of it'") (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978).

Musk's scienter is also demonstrated by his conduct after he was sued for specific performance by Twitter in Delaware.  In that case, Musk refused to turn over evidence from his data scientists that allegedly backed up his "20% or more" statements, and then lost a motion to compel filed by Twitter. *Twitter, Inc. v. Musk*, 2022 WL 3656938, at *6 (Del. Ch. Aug. 25, 2022).  █████████████████████ ████████████████████████████████████████████████████████████

---

[6] ███████████████████████████████████████████████████████████ ██████████████████████████████████████████ MSJ Ex. 52 [ECF 253-53].

███████████████████████████████████████████

████████ MSJ Exs. 63, 64 [ECF 253-64, 65]. When that failed, he capitulated and agreed to pay the full price. Musk's tactics are not consistent with a man convinced of the merits of his position.

## V. Musk's Loss Causation Arguments Are Meritless

### A. Plaintiffs Have Established Loss Causation Related to Musk's May 16 and May 17 Misstatements Under the Price Maintenance Theory

Musk incorrectly claims that Plaintiffs' expert "concedes" that there was no price impact associated with the May 16 and May 17 statements. ECF 255, at 30. This argument ignores the opinions of Dr. Tabak, Plaintiffs' loss causation and damages expert, surrounding the price maintenance theory.

In conducting his analysis, Dr. Tabak first found a statistically significant decline in Twitter's stock price on Friday, May 13, that was caused by Musk's May 13 deal-on-hold tweet. *See* MSJ Ex. 65 [ECF 253-66] Suppl. Tabak Report dated July 18, 2025, ¶ 15. Dr. Tabak also found a statistically significant price decline on Monday, May 16 (*i.e.*, the first trading day after May 13) and, using his "standard practice of continuing the event window … to include all consecutive trading days with a statistically significant price movement," Dr. Tabak concluded that this decline was also caused by the May 13 tweet. *Id.*, ¶ 18. He then observed that Musk appeared at the May 16 All-In Summit during the trading day, and Twitter's stock price did not have a significant movement over the remainder of the day. *Id.*, ¶ 17. Similarly, there was no statistically significant price movement on May 17, the day on which Musk posted another false and misleading tweet. *Id.*, ¶ 16.

But contrary to Musk's argument, this does not show a lack of loss causation. With respect to both the May 16 and May 17 statements, Dr. Tabak concluded that ***the statements helped maintain the price deflation*** caused by Musk's May 13 statement:

> Mr. Musk's May 16, 2022 statement is the second remaining alleged misrepresentation and a statistically insignificant price movement in response to a statement that maintains the same overall alleged misrepresentation (*i.e.*, that Mr. Musk was entitled to certain data from Twitter) would be consistent with a price-maintenance theory and does not indicate a lack of price impact of the alleged misrepresentation.

*See* ECF 102-2, Expert Reply Report of David I. Tabak, Ph.D., at ¶ 8.[7] Dr. Tabak similarly testified

[7] Dr. Tabak's substantive expert report on damages and loss causation at issue here explicitly references his class certification rebuttal report, and he relied on the analysis he conducted at the class

at his deposition that he found the price maintenance theory applicable to the facts here, and that the theory specifically "applied to the May 16 All In Summit conference statements made by Mr. Musk," and "to the May 17 tweet at issue in this case." *See* ECF 249-11, Tabak Depo. (Aug. 1, 2025), at 26:19–28:8.

Courts have repeatedly held that evidence of price maintenance is sufficient to establish loss causation. "[T]he securities laws prohibit corporate representatives from knowingly peddling material misrepresentations to the public—regardless of whether the statements introduce a new falsehood to the market or merely confirm misinformation already in the marketplace." *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 612 n.5 (7th Cir. 2020) (citing *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1290 (11th Cir. 2011)). Indeed, the repetition of a prior misleading statement is actionable even though it merely "maintain[s] the [company's] stock price at an artificially inflated level without also causing the price to increase [or decrease] further." *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *7 (N.D. Cal. Mar. 16, 2016). Under the "inflation maintenance" theory, "price impact is the amount of price inflation maintained by an alleged misrepresentation—in other words, the amount that the stock's price would have fallen 'without the false statement.'" *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 594 U.S. 113, 123 (2021) (quoting *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F. 3d 408, 415 (7th Cir. 2020)); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 256 (2d Cir. 2016) ("statements that merely maintain inflation already extant in a company's stock price, but do not add to that inflation, nonetheless affect a company's stock price"); *In re Apple Inc. Sec. Litig.,* 2022 WL 354785, at *8 (N.D. Cal. Feb. 4, 2022) ("the stock price may even decline after a false statement, but be inflated nonetheless because the price might have fallen even more of the full extent of the bad news were known") (cleaned up).

Here, Twitter's stock price collapsed in response to Musk's May 13 "deal-on-hold" tweet. Musk made substantially similar misleading statements on May 16 and 17. In doing so, Musk maintained the artificial deflation in Twitter's stock price during the Class Period. Given the facts and the law, Musk's attack on the alleged lack of price impact associated with the May 16 and May 17

---

certification stage for purposes of forming the opinions on damages and loss causation. MSJ Ex. 65, [ECF 253-66], ¶¶ 1–2.

statements is meritless.

**B.      Musk's Arguments About His May 13 Deal-on-Hold Tweet Ignore Both the Language of the Tweet Itself and Basic Tenets of the Efficient Market Hypothesis**

Musk argues that Dr. Tabak failed to separate out the impact of false information contained in his tweets from alleged inferences from such tweets that Musk claims was true. *See* ECF 255, at 31. More specifically, Musk claims that the market inferred from his tweet that he had "cold feet" about proceeding with the merger. *Id.* Because that inference was allegedly truthful, the argument goes, Plaintiffs should have segregated out the price impact of the inferences from the impact caused by the untruthful parts of Musk's statement. *Id.*

There are at least three problems with this argument. First, as discussed at length in Plaintiffs' motion to exclude the opinions of Dr. Kenneth Lehn (*see* ECF 246 at 9–12), this approach improperly casts aside the actual language Musk used in his May 13 deal-on-hold tweet. Instead of addressing the language in his actual misstatement, Musk invents various inferences that he speculates the market assumed from his tweet and blames Plaintiffs for not disaggregating the impact those speculative inferences had on the market. This "inferences-only" approach is groundless and has no basis under the securities laws' anti-fraud provisions (which prohibit "false statements of material fact" and "material misrepresentations," as opposed to false inferences). Musk fails to cite a single case supporting an inferences-only approach, and Plaintiffs have been unable to identify any cases brought under the federal securities laws that address (much less approve of) an approach like what Musk advances here.

Second, even if these claimed inferences existed, Musk is liable for them because he admits they would have been the direct product of Musk's false May 13 statements. To establish loss causation, the law does not require Plaintiffs to tease apart related statements, much less inferences imbedded in the same statement, when they are an interwoven bundle. Musk made the exact same argument in a prior case in this District, *In re Tesla, Inc. Securities Litigation*, No. 18-CV-04865-EMC, 2022 WL 7374936 (N.D. Cal. Oct. 13, 2022). The court in *Tesla* rejected Musk's argument on two grounds: (1) plaintiff's expert made an assumption that the true and untrue statements were an interwoven bundle and that such assumption was reasonable and went to the weight of the opinion,

not admissibility; and (2) "[w]hile [plaintiff's expert] did not attempt to disaggregate any price impact from the non-false portions of the August 7 tweet, he did address and disaggregate other potentially confounding variables that could have affected Tesla's stock price." *Id.*, at *38. Here, Tesla's reasoning applies with greater force because Musk's May 13 tweet was entirely false —with no partially true statement in the mix. And even if there were a truthful "inference" that could be deemed part of the statement, Dr. Tabak has testified that he would consider it an interwoven bundle, just as the expert in Tesla did. *See* ECF 249-10, Tabak Depo. (July 16, 2025) at 86:21–87:2 (and Tabak errata sheet) ("I don't see how you get the alternative tweet that just conveys only the false or only the true part."). Dr. Tabak's assumption is eminently reasonable because, in the May 13 tweet, Musk never said "I am getting cold feet." Moreover, just as the expert in *Tesla* did, Dr. Tabak addressed and disaggregated other potentially confounding variables that could have affected Twitter's stock price. *See* MSJ Ex. 65 [ECF 253-66] at 7 & n.10 and Ex. 4b (Tabak 5/2/25 Report). This dooms Musk's meritless suggestion that the "cold feet" inference could have and should have been disaggregated.

Third, Musk fails to grapple with the fact that, under the efficient market hypothesis, the market would only react to the supposedly imbedded inference that Musk suddenly had cold feet if that fact —*i.e*., the cold feet—represented new and material information. *See Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 594 U.S. 113, 118 (2021). The evidence shows that there was information in the market well before May 13 indicating that Musk had cold feet, but none of that information caused Twitter's stock price to decline materially.[8] This dooms Musk's meritless suggestion that the "cold feet" inference could have accounted for the huge stock drop in response to Musk's May 13 tweet. Other information that existed before May 13 included (1) Musk's public statement on May 9 suggesting that he "could create a better platform for less than a billion dollars" (instead of paying $44 billion for Twitter); (2) challenges created by the falling price of Tesla stock (given that Musk was going to, and did, use Tesla stock proceeds to buy Twitter); (3) concerns among market participants that the Twitter deal was too expensive; (4) an increasingly difficult fund-raising environment; and (5)

---

[8] *See also* Plaintiffs' concurrently filed Opposition to Musk's Motion to Exclude Dr. Tabak, and Exhibit 7 filed in support: Reuters, "Elon Musk Probably Won't Buy Twitter," Apr. 27, 2022 (stating "There are good reasons for him to get cold feet. The biggest is Tesla.").

concerns about how poorly Twitter was performing. *See* Opp Ex. 11, K. Lehn Depo., at 107:1–126:16. Because this information was already "in the market" before May 13, and had no material impact of Twitter's stock price, there is no reason to believe that the cold-feet inference would suddenly assume materiality on May 13, and thus no reason for Dr. Tabak to disaggregate this inference from the actual language Musk used in his May 13 tweet. *Goldman Sachs*, 594 U.S. at 118.

### C.    Plaintiffs' Expert Appropriately Used a Percentage of Merger Discount Method to Calculate Damages

Musk complains that Dr. Tabak's analysis would assign different loss numbers to identical transactions on different days. ECF 255, at 31–32. This is a misplaced argument, because the subject portion of Dr. Tabak's report speaks to his damages calculations, and is irrelevant to Musk's loss causation argument. Beyond that, Musk's motion conveniently avoids describing Dr. Tabak's actual methodology, likely because it is economically sensible. Dr. Tabak was careful not to attribute the entire merger discount—*i.e.*, the difference between the $54.20 deal price and the market price, which was deflated throughout the class period—to Musk's misstatements and scheme.[9] Tabak Report at ¶¶ 21–22. Instead, Dr. Tabak (1) calculated the amount by which the merger discount increased on the two days following Musk's false May 13 tweet, and (2) divided that amount by the total merger discount. *Id*. The resulting quotient represents the percentage of the merger discount that can fairly be attributed to Musk's misstatements. *Id.* Dr. Tabak applied this percentage to the merger discount as calculated on each subsequent day of the class period to determine the artificial deflation in Twitter's share price that was caused by Musk's false statements. *Id.*[10]

Dr. Tabak's "constant percentage" deflation methodology has been recognized and accepted by courts in this Circuit and across the country for purposes of constructing an inflation/deflation ribbon and calculating out-of-pocket damages under Section l0(b) of the Exchange Act. *See*, *e.g.*, *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.,* 2021 WL 229310, at *7 (N.D. Cal. Jan. 21, 2021) (determining "how 'inflation per share may have evolved over the class period[]' ... can be

---

[9]  To Musk's benefit, Dr. Tabak's approach decreased his calculated damages amounts.

[10]  Dr. Tabak also made adjustments to account for a couple of days on which there was a statistically significant stock price movement that did not appear to be directly associated with Musk's statements on May 13, 16 or 17. *See* MSJ Ex. 65 [ ECF 253-66] Tabak Report at ¶¶ 23–24. Musk does not take issue with this approach in his motion.

accomplished via ... 'constant percentage inflation''); *Baker v. SeaWorld Ent., Inc.,* 423 F. Supp. 3d 878, 908 (S.D. Cal. 2019) ("constant percentage inflation [is] another commonly utilized theory in securities fraud cases."); *In re Novatel Wireless Sec. Litig.,* 2013 WL 12247558, at *3 (S.D. Cal. Nov. 19, 2013) ("*Novatel II*") (constant percentage model of damages "may properly be presented to a jury"); *Homyk v. ChemoCentryx, Inc.,* 2025 WL 1547625, at *16 (N.D. Cal. May 30, 2025) (finding that "courts regularly find that the constant percentage inflation methodology used by [the expert] is reliable and appropriate").

Musk's related argument about the role of market factors in Tabak's damages calculations (ECF 255, at 31–32) is rebutted in Plaintiffs' opposition to Defendants' *Daubert* motion to exclude Dr. Tabak.  Moreover, Musk's expert, Dr. Lehn, agreed, using a simple hypothetical, that under his own methodology, damages would vary from one day to the next when the "all that changed" between the two days was the "the market price of the product sold by the company."  *See* Opp. Ex. 11, Lehn Depo. at 192:5–194:14.

### D.    Plaintiffs' Expert Appropriately Establishes Loss Causation Through Direct Causation

#### 1.    Plaintiffs' Expert Appropriately Used a Direct Causation Methodology to Establish Loss Causation

Dr. Tabak has demonstrated loss causation through a direct causation methodology, which is particularly well-suited in a seller case like this one and firmly supported by applicable case law.  "The Ninth Circuit has taken a flexible approach to loss causation that recognizes that there are an 'infinite variety of ways for a tort to cause a loss.'"  *In re Tesla, Inc. Sec. Litig.,* 2022 WL 7374936, at *9 (N.D. Cal. 2022) (quoting *Mineworkers' Pension Scheme v. First Solar Inc.,* 881 F.3d 750, 753 (9th Cir. 2018)).  Loss causation "requires no more than the familiar test for proximate cause," and "[t]o prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss." *First Solar Inc.*, 881 F.3d at 753 (citing *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 342 (2005)).[11]  As the

---

[11]  As courts have stressed since *First Solar*, "[t]here are any number of ways that a plaintiff can show loss causation" besides a corrective disclosure. *Thant v. Rain Oncology Inc.,* 2025 WL 588994, at *10 (N.D. Cal. Feb. 24, 2025); *see also In re Splunk Inc. Sec. Litig.,* 592 F. Supp. 3d 919, 950 (N.D. Cal. 2022) (finding loss causation where a stock drop was caused by an earnings miss that, in turn, "was caused by the undisclosed actions regarding which Defendants allegedly misled investors").

Second Circuit explained in *Lentell v. Merrill Lynch & Co.*, "loss causation is established" where "the relationship" between "plaintiff's investment loss and the information misstated or concealed by defendant … is sufficiently direct[.]" 396 F.3d 161, 174 (2d Cir. 2005). "That is because the loss-causation requirement—as with the foreseeability limitation in tort— 'is intended to fix a legal limit on a person's responsibility, even for wrongful acts.'" *Id.* Because "loss causation is a fact-based inquiry" necessarily "affected by circumstances" (*id.*), plaintiffs in a seller class action can establish loss causation by referencing events other than a corrective disclosure. *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 663 F. Supp. 3d 334, 375 (S.D.N.Y. 2023) ("in a non-traditional context such as this [seller class action], the case law does not categorically preclude a plaintiff who cannot point to a corrective disclosure from pleading loss").

Applying a direct causation methodology in this case is also consistent with this Court's analysis in denying in part Musk's motion to dismiss Plaintiffs' complaint.

> The Court believes that Plaintiffs have alleged facts supporting a **direct causal relationship theory**. The Ninth Circuit has "recognized that loss causation can be established by showing 'that the Defendants' misrepresentation was directly related to the actual economic loss [the plaintiff] suffered.'" *Nuveen Mun.*, 730 F.3d at 1120 (quoting *Livid Holdings*, 416 F.3d at 949). "Put another way, a plaintiff can satisfy loss causation by showing that 'the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss.'" *Id.* (quoting McCabe v. Ernst & Young, LLP, 494 F.3d 418, 425 (3d Cir. 2007)); *see Mineworkers'*, 881 F.3d at 753 (quoting *Nuveen Mun.*, 730 F.3d at 1119) ("To prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss, by tracing the loss back to 'the very facts about which the defendant lied.'"

ECF 48, at 37 (emphasis added).

In addition to these flexible standards and the Court's order, analyzing loss causation through a direct causation methodology is particularly appropriate in a "seller case." *See* ECF 106 at 12 (the present class includes, *inter alia*, "[a]ll persons and entities who **sold** the publicly traded stock … of Twitter") (emphasis added). As Dr. Tabak explains, a class member's loss is firmly and finally determined at the moment they sell the stock—which is unlike the standard purchaser case, where no loss is suffered until the truth is revealed and the stock price tumbles. "In a seller class, the economic loss typically comes before the revelation of the alleged fraud." *See* MSJ Ex. 65, [ECF 253-66] Tabak Suppl. Report dated May 2, 2025, at ¶11. "Thus, damages for a seller class are simply the amount of

deflation at the time of their sale." *Id.* at ¶10.

Consider, for example, Lead Plaintiff John Garrett's sales of Twitter stock during the class period. Mr. Garrett sold some of his shares on May 24, 2022, for $34.29 per share, just days after Musk issued his misstatements. *See* Opp. Ex. 12, Garret Tr. at 103:1–10. In doing so, Mr. Garrett relied on Musk's false statements, testifying that Musk stated that "he wasn't going to buy the company, so I sold." *Id.* Mr. Garrett indisputably suffered a loss in an amount corresponding with the degree to which Musk's false statements had artificially deflated Twitter's stock price. His loss was fixed at that point and did not depend on the stock market's reaction to Twitter's stock price when Musk announced his capitulation in the Delaware Action on October 4. Garrett's sales, of course, merely serve as an example—because this is a seller case, all class members who sold their Twitter shares after Musk's false statements satisfy the loss causation standard.

This is the precise logic built into Dr. Tabak's direct causation analysis.

> [I]n a case involving deflation, when an investor first purchases a share and then sells that share at a deflated price, the investor has locked in their loss at the difference between the cash that they received from the sale and the true value (i.e., the amount of cash they should have received) at the moment of sale. Thus, damages for a seller class are simply the amount of deflation at the time of their sale.

*See* MSJ Ex. 65 [ECF 253-66], Suppl Tabak Report dated May 2, 2025, at ¶10.

Musk's motion makes no mention of direct causation whatsoever. Instead, his motion focuses on whether Musk's October 4 capitulation in the Delaware Action constitutes a corrective disclosure, suggesting that if there were no corrective disclosure, Plaintiffs cannot demonstrate loss causation. ECF 255, at 32–33. This is wrong, and ignores the important differences between purchaser and seller cases. In a purchaser class, loss causation and damages can be shown at the end of the class period for a simple and obvious reason—the investor still owns the stock and thus is harmed when the stock experiences a statistically significant drop at the end of the class period. In fact, persons who no longer own the stock at such time ("in and out traders") suffer no harm because they sold during the class period, and thus are unaffected by the stock drop at the end of the class period. *Dura*, 544 U.S. at 342 (if "the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss"). In contrast, as described above, class members in

this case suffered losses at the moment they sold Twitter stock, and nobody has to wait to check the tape after a corrective disclosure to see how the stock reacted.  As the court recognized in *Altimeo Asset Management*, the seller class was damaged because "[b]ut for defendants' fraud, … [the class's] sales would have been at higher prices, or the sellers would have held onto their shares through to the [merger] date and secured [the merger share price]."  663 F. Supp. 3d at 374.  Thus, loss causation can be established in a seller class action without referencing a corrective disclosure.  *See id*. at 377 (distinguishing the loss causation theory in a seller class action from that in a purchaser class action "involving inflated share valuations exposed by a corrective disclosure")

This explains why courts have rejected the claimed need for a corrective disclosure analysis in seller cases.  For example, in *Levie v. Sears Roebuck & Co*., 496 F. Supp. 2d 944 (N.D. Ill. 2007), which was a seller class action involving a merger (like the present case), the court rejected a similar argument from the defendant that some class members could not prove loss causation under *Dura*.

> ***The court agrees with plaintiffs that the rationale behind excluding "in-and-out" traders from a traditional purchaser class, where revelation of the truth results in a decrease in stock price, is not applicable to the instant seller class***. In the traditional purchaser class, any investor who bought and then sold before the revelation lowered the price incurred no injury as a result of the fraud because the stock was artificially high at the time of the sale, as it was at the time of the purchase. In contrast, ***in the instant case, any investor who sold (during the class period) before the fraud was revealed incurred injuries because that investor sold at a price that was artificially lower than the investor should have received***."

*Id.* at 948 (emphasis added).

Given the foregoing, it is unsurprising that Musk fails to cite a single case involving a seller class action in which any court ever excluded an expert for doing what Dr. Tabak does here, nor a single seller case stating that loss causation and damages can only be analyzed by looking at price movements in response to a corrective disclosure.

### 2.    Dr. Tabak Considered the October 4 Corrective Disclosure

Contrary to Musk's contention, there was in fact a corrective disclosure on October 4.  In response to Musk's disclosure that he intended to go through with the merger on the original terms, Twitter's stock increased by $7.27 per share, or over 22%.  Dr. Tabak analyzes this October 4 corrective disclosure and included findings about it in his report, determining that "[t]he fact that there

was a statistically significant increase following this news provides additional evidence of the economic importance of the alleged misrepresentations." *See* MSJ Ex. 65 [ECF 253-66], Suppl Tabak Report dated May 2, 2025, at ¶20.[12] The following chart, as included in Dr. Tabak's report, depicts the dramatic effect of the October 4th disclosure:

**Exhibit 4d**
**Twitter, Inc. (Elon Musk)**
**Twitter Common Stock Intraday VWAP[1]**
**October 4, 2022**

*See* MSJ Ex. 65 [ECF 253-66], Suppl Tabak Report dated May 2, 2025, at Ex. 4d. In sum, evidence exists that Musk's October 4 statement that he would proceed with the merger at $54.20 per share was a corrective disclosure. Dr. Tabak, however, does not premise his ***damages calculation*** on the corrective disclosure and instead utilizes a "direct causation" analysis to establish loss causation and damages because that is a preferred approach in seller cases. Contrary to Musk's argument, Plaintiffs are not "switching theories" nor are they estopped from attempting to prove loss causation at trial through multiple methods, including through either direct causation or a corrective disclosure.[13]

---

[12] Musk misleadingly quotes a statement that Dr. Tabak made at his deposition, arguing that Dr. Tabak has no opinion on whether the October 4th statement is a "corrective disclosure." ECF 255, at 20. Dr. Tabak's testimony was clear that, as all experts should do, he wanted to avoid offering any legal opinions or invading the province of the Court or jury, stating "I know the Court ruled on that" and that "I rely on what the Court's saying, that it can be corrective." *See* ECF 249-10, (Tabak 7/16/25 depo at 168:1-11). Dr. Tabak never testified that the corrective disclosure cannot be used to prove loss causation. Instead, he indicated that "because this is a seller class, that is not relevant to the damages analysis." *Id.* at 168:4-5.

[13] In denying Musk's motion to dismiss, the Court noted: "Plaintiffs have alleged facts supporting a direct causal relationship theory because loss causation can be established by showing 'that the Defendants' misrepresentation was directly related to the actual economic loss [the plaintiff] suffered." *Pampena v. Musk*, 705 F. Supp. 3d 1018, 1052 (N.D. Cal. 2023) (cleaned up) (quoting *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir.

### 3.    Musk's Disaggregation Arguments Are Without Merit

Musk claims that Dr. Tabak's report fails to disaggregate certain factors beyond Musk's cold feet (Musk's feet are discussed *supra*).  ECF 255, at 30-32.  Contrary to Musk's assertion, Dr. Tabak's report clearly disaggregates non-fraud factors, utilizing an event study, constructing a market model that compares Twitter's stock price movement to market indices (*see* Ex. 3 to the Tabak Report), examining news articles and intraday price movements to account for potential effects on Twitter's stock price other than the misrepresentations (*see, e.g.*, 5/2/25 Tabak Report at p. 7 & n.10), and using the event study and market model to "show[] the price reactions (or event studies) for the three misrepresentations that survived the MTD Order."  *See* Ex. MSJ Ex. 65 [ECF 253-66], Suppl Tabak Report dated May 2, 2025, at p. 6 & Ex. 4a.  Dr. Tabak's analysis therefore complies with *Dura* by isolating "other economic factors" such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events."  *Dura*, 544 U.S. at 343; *see also In re Tesla, Inc. Sec. Litig.,* No. 18-CV-04865-EMC, 2022 WL 7374936 (N.D. Cal. Oct. 13, 2022) (rejecting similar disaggregation argument and noting "Dr. Hartzmark engaged in quantitative and qualitative analysis to determine and isolate the Musk Tweets' effect on Tesla's stock price").

Musk also argues that Dr. Tabak did not consider or disaggregate the posting of alleged findings from two obscure companies called SparkToro and Followerwonk.  ECF 255, at 13-14.  Musk breezily asserts that his bankers at Morgan Stanley "discovered" these findings and "took them very seriously."  *Id.*  But claiming that his self-interested agents took these findings seriously is a far cry from proving anyone else gave the SparkToro posting any credence.  In fact, in the news articles that Dr. Tabak turned over as part of his market-efficiency analysis, the first mention of the SparkToro results is on ***May 17***, ***2022***, after the end of Dr. Tabak's event window.  Likewise, none of the analyst reports that Musk's expert Dr. Lehn turned over in the merits stage referred to the SparkToro report. Musk provides no evidence that the posting could or did have had any effect on Twitter's stock price.

2013)).  Plaintiffs only need to establish proof of loss causation to survive summary judgment, not debunk all Musk's contentions about the corrective disclosure.  But his additional arguments about the October 4th disclosure are addressed in Plaintiffs' opposition to the motion exclude Dr. Tabak.

### 4.     Musk's Speculation About What the Market Reaction Would Have Been Without the July 8, 2022 Disclosure Is Unsupported

Musk advances a convoluted argument that no class members who sold Twitter shares after July 8, 2022 suffered any loss and thus that "summary judgment must be granted as to all class members who sold" after that date.  ECF 255, at 34.  This argument is meritless.  The basis of Musk's one-paragraph, throw-away argument is that "Dr. Tabak failed to analyze whether Twitter's stock price would have fallen to the same price following the July 8 termination letter regardless of Musk's May 13 tweet."  *Id.*  But Dr. Tabak is not required to speculate what would have happened had Musk not made his July 8th statement.  He is only required to have a sound loss causation theory, which he does for the reasons noted above.  Musk's wrongful conduct on July 8 is part of Plaintiffs' scheme liability claim.  The Court dismissed the misstatement claim under Rule 10b-5(b) surrounding Musk's July 8 statement because Plaintiffs did not allege with sufficient particularity what in Musk's lengthy termination letter was false.  ECF 48, at 27-28.  Plaintiffs chose not to amend.  Dr. Tabak's supplemental report therefore disaggregates the stock decline caused by Musk's July 8 termination letter by removing any further damages caused by that statement from the Section 10b-5(b) damages.  *See* Ex. MSJ Ex. 65 [ECF 253-66], Suppl Tabak Report dated May 2, 2025, at ¶23 ("I make an adjustment for the termination letter issued on July 8, 2022.").  Dr. Tabak's disaggregation of the July 8th statement therefore satisfies *Dura* and Musk cites no case to the contrary.

### VI.     Musk's Challenge to the Section 10b and Rule 10b-5 Scheme Claim Is Baseless

Rule 10b-5 establishes "scheme liability" by prohibiting the use of "any device, scheme, or artifice to defraud," and "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit[.]"  17 CFR § 240.10b-5(a), (c).  The Supreme Court has determined that Section 10(b) and Rule 10b-5 are expansive and should be broadly construed to effectuate their purpose of preventing fraud.  *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 (1972) ("these proscriptions, by statute and rule, are broad and . . . are obviously meant to be inclusive"); *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 11 n.7 (1971).  The Supreme Court has also held that scheme liability can be based solely on misstatements, independent of misstatement/omission liability under Rule 10b-5(b).  *See Lorenzo v. SEC*, 587 U.S. 71, 78 (2019)

("dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5, as well as the relevant statutory provisions").

Here, Plaintiffs allege—and the evidence shows—that Musk deceived the market through an integrated, months-long plan to drive down Twitter's stock price by coordinating his false statements with deceptive conduct. *See, e.g.*, FAC, ECF 31, ¶¶ 10 (Musk "engaged in a scheme to deceive the market"), ¶174 (same), ¶188. This pattern of deception included Musk's barrage of tweets during the class period; his misleading statements about Twitter at the May 16 All-In Summit; his insistence on going public with his farcical complaints about the deal instead of contacting Twitter directly to hash things out; his letter-writing campaign (which Musk knew would be become public, *see* June 21 Preliminary Proxy Statement) falsely claiming that Twitter refused to provide information that was required under the merger agreement; his letters purportedly terminating the deal with no legal basis to do so; and his defenses and counterclaims in the Delaware Action (which he abandoned when trial became imminent, and which he has directly refuted here through, *e.g.,* his truth-on-the-market defense). *See* ECF 253 at 2-12. This is more than sufficient to establish genuine disputes as to material facts, which precludes summary judgment. *In re Vaxart, Inc. Sec. Litig.,* No. 20-CV-05949-VC, 2025 WL 1869694, at *1 (N.D. Cal. July 7, 2025) ("**Scheme liability.** A reasonable jury could find that the defendants engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of a scheme to defraud.") (emphasis original).

Contrary to Musk's argument (ECF 255 at 35), the Court has not dismissed Plaintiffs' scheme liability allegations. This is true primarily because Musk strategically chose not to challenge these allegations in his motion to dismiss. This is critical for two reasons. First, the Court's order dismissing several of the FAC's alleged misstatements was based on the PSLRA's heightened falsity pleading standard. *See* 15 U.S. Code § 78u-4(b)(1) (establishing falsity pleading requirements for "untrue statement" allegations); ECF 48 at 22:20-25, 214:10-13, 28:23-26 (dismissing alleged statements under falsity pleading requirement). But under its express terms, the PSLRA's heightened falsity pleading requirement is limited to misstatement liability (*i.e.*, "untrue statement" allegations) and does not apply to scheme liability allegations. *See In re Eastman Kodak Co. Sec. Litig.*, 632 F. Supp. 3d 169, 175 (WDNY Sept. 27, 2022) ("claims brought under Rule 10b-5(a) and (c) need not comport

with Subsection (b)(1) of the PSLRA, which requires that a plaintiff set forth each statement alleged to have been misleading, and facts giving rise to this belief….”); *see also Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 577 (SDNY Feb. 17, 2016) (“claims brought under Rule 10b-5(a) and (c) need not comport with Subsection (b)(1) of the PSLRA”) (internal citation, quotation omitted).  Thus, the Court's dismissal of various alleged misstatements under the heightened falsity pleading requirement did not apply to or otherwise impact Plaintiffs' scheme liability allegations.

Second, because Musk did not target the scheme liability allegations in his motion to dismiss or motion for judgment on the pleadings (Musk's briefing on both motions is devoid of the word “scheme” or citations to Rule 10b-5(a) and (c)), this Court was not in position to, did not, and could not, dismiss those allegations.  *See In re Alphabet Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021) (“Because the district court erred in *sua sponte* dismissing [plaintiffs'] claims under Rule 10b-5(a) and (c) when Alphabet had not targeted those claims …, we reverse dismissal of the claims under Section 10(b) and Rule 10b-5(a) and (c) against all defendants and remand to the district court.”)[14]

Musk cites *Kange v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884 (N.D. Cal. 2022) for the proposition that a court may dismiss a scheme liability claim where it is co-terminus with alleged misstatements that were dismissed.  But this entirely misses the point—*PayPal* challenged the scheme liability allegations in its motion to dismiss.  *Id.* at 902.  Here, Musk **did not** target the scheme liability allegations, so the Court could not have dismissed them per *Alphabet*.  Further, Plaintiffs' scheme liability allegations include a much broader range of conduct and statements than the three misstatements that the Court approved at the motion to dismiss stage.

## CONCLUSION

For the reasons stated above, Musk's motion for summary judgment should be denied.

Dated:  September 11, 2025                          Respectfully submitted,

                                                                    COTCHETT, PITRE & MCCARTHY, LLP

                                                                    */s/ Tyson C. Redenbarger*
                                                                    Tyson C. Redenbarger

---

[14]  Plaintiffs have repeatedly cited *Alphabet* in this case, yet Musk has never responded on this issue. Tellingly, Musk fails to cite, much less refute, *Alphabet* in his moving papers.

Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
Tyson C. Redenbarger (SBN 294424)
Gia Jung (SBN 340160)
Caroline A. Yuen (SBN 354388)

840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:   (650) 697-6000
Email:          jcotchett@cpmlegal.com
                   mmolumphy@cpmlegal.com
                   tredenbarger@cpmlegal.com
                   gjung@cpmlegal.com
                   cyuen@cpmlegal.com

BOTTINI & BOTTINI, INC.

 /s/ *Francis A. Bottini, Jr.*
     Francis A. Bottini, Jr.

Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Aaron P. Arnzen (SBN 218272)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:   (858) 914-2001
Email:          fbottini@bottinilaw.com
                   achang@bottinilaw.com
                   aarnzen@bottinilaw.com

*Lead Counsel for Plaintiffs*