**COTCHETT, PITRE & MCCARTHY, LLP**
Joseph W. Cotchett (SBN 36324)
*jcotchett@cpmlegal.com*
Mark C. Molumphy (SBN 168009)
*mmolumphy@cpmlegal.com*
Tyson C. Redenbarger (SBN 294424)
*tredenbarger@cpmlegal.com*
Elle D. Lewis (SBN 238329)
*elewis@cpmlegal.com*
Gia Jung (SBN 340160)
*gjung@cpmlegal.com*
Caroline A. Yuen (SBN 354388)
*cyuen@cpmlegal.com*
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
*fbottini@bottinilaw.com*
Albert Y. Chang (SBN 296065)
*achang@bottinilaw.com*
Aaron P. Arnzen (SBN 218272)
*aarnzen@bottinilaw.com*
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001

*Lead Counsel for Plaintiffs and the Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | Case No. 22-cv-5937-CRB<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF ADAM BADAWI**<br><br>Date:       October 31, 2025<br>Time:      10:00 a.m.<br>Courtroom: 6, 17th Floor<br>Judge:    Hon. Charles R. Breyer<br><br>**(REDACTED-PUBLIC VERSION)** |

Case No: 3:22-CV-05937-CRB

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE
OPINIONS OF ADAM BADAWI

# TABLE OF CONTENTS

**Page**

ISSUE PRESENTED ....................................................................................................................1

SUMMARY OF ARGUMENT .....................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ....................................................................3

I.      The Claims ........................................................................................................................3

II.     Musk and His Team Proposed a "Seller Friendly" Agreement to Buy Twitter,
        Waiving Financial and Business Due Diligence to Ensure Twitter's Approval .....................3

III.    Prof. Badawi's Report ......................................................................................................5

LEGAL STANDARD ....................................................................................................................6

ARGUMENT .................................................................................................................................7

I.      Prof. Badawi's Opinions Are Not Inadmissible Legal Conclusions ........................................7

        A.      Prof. Badawi's Opinions Regarding the M&A Industry and Terms Do Not
                Even Mention, Let Alone Interpret, the Twitter Merger Agreement ..........................7

        B.      Prof. Badawi's Comparative Analysis of M&A Terms, and Whether They
                Are "Seller Friendly" – A Term of Art in the M&A Industry and Used by
                Musk Here – is Relevant, Admissible and Reliable......................................................8

                1.      Prof. Badawi's Comparative Analysis is Relevant to Disputed Issues............8

                2.      Prof. Badawi's Comparative Analysis Does Not Require Him to
                        Interpret the Merger Agreement....................................................................10

                3.      Prof. Badawi's Comparative Analysis is Reliable .........................................11

II.     Prof. Badawi Does Not Testify About State of Mind Nor Improperly Narrate Facts
        Unrelated to His Opinions...............................................................................................14

CONCLUSION .............................................................................................................................15

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF
OPINIONS OF ADAM BADAWI

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*
738 F.3d 960 (9th Cir. 2013) ................................................................................................ 7

*In re Conagra Foods, Inc.*
302 F.R.D. 537 (C.D.Cal. 2014) ......................................................................................... 14

*Daubert v. Merrell Dow Pharms, Inc.*
509 U.S. 579 (1993) ............................................................................................................. 7

*Daubert v. Merrell Dow Pharms, Inc.* (*Daubert II*)
43 F.3d 1311 (9th Cir. 1995) ................................................................................................ 7

*GIC Real Est., Inc. v. ACE Am. Ins. Co.*
2018 WL 5310832 (N.D. Cal. Aug. 20, 2018) .................................................................... 10

*In re Imperial Credit Indus. Sec. Litig.*
252 F.Supp.2d 1005 (C.D.Cal. 2003) .................................................................................. 14

*Kelley as Tr. of BMO Litig. Tr. v. BMO Harris Bank N.A.*
2022 WL 4547022 (D. Minn. Sept. 29, 2022) ..................................................................... 15

*Kennedy v. Collagen Corp.*
161 F.3d 1226 (9th Cir. 1998) ............................................................................................... 7

*King v. Depuy Orthopaedics Inc.*
2023 WL 8009790 (D. Ariz. Nov. 17, 2023) ....................................................................... 13

*Liberty Media Corp. v. Vivendi Universal*
874 F. Supp. 2d 169 (S.D.N.Y. 2012) ............................................................................. 10, 11

*McCoy v. Dupuy Orthopaedics, Inc.*
2024 WL 1705952 (S.D.Cal. 2024) ..................................................................................... 13

*NIC Holding Corp. v. Lukoil Pan Americas, LLC*
2007 WL 1467424 (S.D.N.Y. May 16, 2007) ...................................................................... 10

*Primiano v. Cook*
598 F.3d 558 (9th Cir. 2010) ................................................................................................. 7

*In re Ready-Mixed Concrete Antitrust Litig.*
261 F.R.D. 154 (S.D.Ind. 2009) .......................................................................................... 13

*Sec. & Exch. Comm'n v. Sabhlok*
2010 WL 2944255 (N.D. Cal. July 23, 2010) ................................................................. 1, 10

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE
OPINION OF ADAM BADAWI

*In re Software Toolworks Inc. Sec. Litig.*
    50 F.3d 615 (9th Cir. 1994)............................................................................................... 15

*United States v. Redlightning*
    624 F.3d 1090 (9th Cir. 2010)........................................................................................ 13

*USI Ins. Services LLC vs. Alliant Ins. Services Inc.*
    2025 WL 1767988 (D.Ariz. June 26, 2025)..................................................................... 12


**Other Authorities**

Federal Rule of Evidence 404 ........................................................................................... 15

Federal Rule of Evidence 702 ..................................................................................... 1, 6,7

Federal Rule of Evidence 703 ............................................................................................. 6

Case No: 3:22-CV-05937-CRB

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE
OPINION OF ADAM BADAWI

**ISSUE PRESENTED**

Whether the Court should admit the opinions of Professor Adam Badawi under Federal Rule of Evidence 702, where Prof. Badawi draws from his extensive professional experience in mergers and acquisitions ("M&A") to opine about industry customs and practices for M&A transactions, including due diligence, and whether the Twitter merger agreement in particular contained terms that were seller friendly, consistent with Musk's representations to Twitter and filings with the SEC.

**SUMMARY OF ARGUMENT**

Prof. Badawi's opinions included in his Report and described at his deposition, should be admitted at trial because they are reliable, helpful to the jury, and highly relevant.[1]  Prof. Badawi used his training and experience in M&A transactions to explain industry customs and practices in M&A, including the concepts of financing and business due diligence, as well as the customary purpose and usage of M&A terms by buyers and sellers in merger agreements.  Prof. Badawi also performed a comparative analysis of the Twitter merger agreement to assess *Musk's own claim* that the Twitter merger agreement was "seller friendly" to Twitter.  Specifically, Prof. Badawi used his expertise to review the plain language of the Twitter merger agreement and compare the integrated agreement, and specific terms therein, to merger agreements he has personally reviewed and taught about, as well as merger agreements analyzed in industry literature, studies and empirical reports conducted by others.

Understanding general customs and practices in the M&A industry, and whether this was a seller friendly agreement, as described by Musk, will be extremely helpful to the jury.  First, it will provide the jury with necessary background and context to understand (i) the field of M&A transactions, a specialized business beyond the normal experience of lay jurors; (ii) Musk's representations to Twitter, in revising his initial offer, that the final agreement was "seller friendly" and intended to be easier for Twitter's Board to approve; (iii) Musk's team's continued use of the term "seller friendly" during the merger process and their claim that the merger agreement would

---

[1]  All "Report" citations refer to Prof. Badawi's Report, and all "Depo." citations refer to his deposition, both attached in their entirety to Musk's Motion to Exclude.  *See* ECF 245-2, 245-5.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE
OPINION OF ADAM BADAWI

"effectively remov[e] all conditionality" to closing; and (iv) Musk's representations to Twitter, repeated in SEC filings, that he waived due diligence and financing contingencies. Prof. Badawi's testimony will also allow the jury to better understand Musk's demands for information, soon after the merger agreement was executed and, just as importantly (given Musk's assertions that Twitter committed fraud and hid information), Twitter's responses to those demands. Finally, Prof. Badawi's testimony will give the jury valuable information to reach its own determination whether Musk's tweets claiming that the deal was on hold were true or false.

Musk does not challenge Prof. Badawi's qualifications as an M&A expert. Rather, Musk moves to exclude Prof. Badawi's opinions—in their entirety—based on the false premise that Prof. Badawi's opinions required him to "interpret" the merger agreement and make inadmissible legal conclusions about the meaning of its terms. Quite the contrary, Prof. Badawi intentionally steered clear of any contractual interpretation, which was unnecessary to perform his task because the terms of the agreement are unambiguous. While Prof. Badawi did review the Twitter merger agreement and compared it to other agreements, his opinions are entirely permissible and far different from the type of contract interpretations at issue in Musk's cited cases. And while Prof. Badawi explained certain customary terms in M&A—*e.g.*, specific performance, information rights, and Material Adverse Effect ("MAE") clauses—courts routinely permit expert testimony about the meaning of contractual terms that have specialized meaning, as noted in Musk's own cases.

Finally, Prof. Badawi did not opine on Musk's state of mind nor improperly narrate the facts. Instead, in Section VI, the supposedly objectionable passage, Prof Badawi recounts the tweets at issue and identifies the terms in the merger agreement addressing the parties' options. Notably, unlike Musk's proffered M&A expert, Prof. Badawi did not render any opinions about Musk's state of mind, the meaning of his tweets, nor whether the parties complied or failed to comply with the terms of the merger agreement.

Prof. Badawi's opinions are based on specialized knowledge, reliably supported by years of experience, directly related to the claims and defenses, and would be helpful to the Court and the jury. They should be admitted at trial.

Case No: 3:22-CV-05937-CRB
PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF
OPINION OF ADAM BADAWI

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.    The Claims**

The First Amended Complaint ("FAC") alleges that, on April 13, 2022, Musk made an offer to buy Twitter at $54.20 per share.  FAC ¶ 76.[2]  On April 25, after two weeks of further discussion detailed below, Twitter and Musk signed a merger agreement in a transaction valued at approximately $44 billion.  FAC ¶ 85.  Soon thereafter, faced with mounting financial risks, Musk proceeded to make false statements, send misleading tweets, and engage in conduct designed to create unfounded uncertainty and drive Twitter's stock down.  FAC ¶ 26.  Musk did this to create leverage to either back out of the purchase or renegotiate the buyout price.  FAC ¶ 26.  Musk's false statements included those made on May 13, 16, and 17.  FAC ¶¶ 111, 120, 125.

**II.    Musk and His Team Proposed a "Seller Friendly" Agreement to Buy Twitter, Waiving Financial and Business Due Diligence to Ensure Twitter's Approval**

In April 2022, after secretly accumulating a 9.2% stake in Twitter stock, Musk decided to make an unsolicited offer to purchase Twitter from its public shareholders and take the company private.  MSJ Ex. 6 [ECF 253-7].[3]  Working closely with his bankers, Morgan Stanley, and his personal advisors, Jared Birchall and Alex Spiro, Musk and his team designed a "jujitsu" strategy whereby Musk would hold back key terms in his initial offer and then follow up with a substantially improved offer, removing deal contingencies like financing and business due diligence, with a 24-hour period to close, in order to maximize pressure on Twitter's Board to accept the deal.

On April 13, Musk delivered his initial offer to Twitter's Board, proposing to purchase all outstanding shares for $54.20 per share, which Musk noted was "a 54% premium over the day before I began investing in Twitter and a 38% premium over the day before my investment was publicly announced."  MSJ Ex. 9 [ECF 253-9].  Notably, Musk's initial offer was conditioned upon completing "confirmatory legal, business, regulatory, accounting and tax due diligence"—types of

[2]  All "FAC ¶ _" citations refer to Plaintiffs' June 8, 2023 First Amended Complaint, ECF 31.
[3]  All "MSJ Ex. __ [ECF 253__]" citations refer to exhibits attached to the Declaration of Tyson C. Redenbarger in Support of Plaintiffs' Motion for Partial Summary Judgment ECF 253-1 – 253-66. In the interest of judicial economy, Plaintiffs did not file duplicate copies of exhibits previously submitted by the Parties relating to summary judgment motions and motions to exclude expert reports.

3                          Case No: 3:22-CV-05937-CRB

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF
OPINION OF ADAM BADAWI

due diligence unique to M&A transactions.  MSJ Ex. 10 [ECF 253-11] at *031.[4]  Twitter did not accept the offer.

Over the ensuing week, Musk met with his Morgan Stanley team, as well as Birchall and Spiro, about his next steps.  Morgan Stanley suggested that Musk send Twitter a ███████████ ██████████████████████████████████████████.”  MSJ Ex. 22 [ECF 253-23] at *880.  Both Musk's and Plaintiffs' M&A experts confirmed that "seller friendly" is a term of art in the M&A field, and according to Plaintiffs' expert, refers to some combination of, *inter alia*, limited information rights for the buyer, minimal closing conditions imposed on the seller, and specific performance rights favoring the seller.  Report at ¶¶ 28-36; ECF 247-2, Rock Report at ¶37.

On April 21, just a week after his initial offer, Musk carried out the second step of his jujitsu strategy, filing a Schedule 13D with the SEC and announcing that he had financing in place and that his proposal was "no longer subject" to financing or business due diligence.  MSJ Ex. 20 [ECF 253-21] at *144.  At deposition, Musk admitted that, ██████████████████████ ██████████████████████████████████████████████████████████ ███████████  MSJ Ex. 14 [ECF 253-15] Musk Tr. at 124:15-125:4.  Indeed, prior to signing the deal with Twitter, ██████████████████████████████████████████████████ ████████████████████████████   ████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████  *Id.* at 167:2-168:2.  Musk conceded that he ██████ ██████████████████████████████████████████.  *Id.* at 168:169:1.

On April 24, Musk sent a revised merger agreement to Twitter, removing financing and due diligence contingencies and adding strong deal protections to Twitter, including a specific performance clause and limited information rights.  These terms are commonly used in the M&A industry.  Given Musk's prior statements that he was considering forming a competitor to Twitter, and the obvious harm to Twitter's shareholders if Musk signed but later backed out of a deal, these

---

[4] "*##" refers to the last digits of the Bates numbers following the MUSK_PAMPENA prefix.

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF
OPINION OF ADAM BADAWI

assurances were critical to Twitter's Board's decision to accept the offer. Musk's offer also included a cover letter to Twitter's Chairman that highlighted that the deal was meant to be "seller friendly," and subject to quick approval and execution "before the market opens tomorrow." MSJ Ex. 24 [ECF 253-25]. When asked at deposition what he meant by his cover letter, Musk testified:

███████████████████████████████████████

███████████████████████████████████

MSJ Ex. 14 [ECF 253-15], Musk Tr. at 163:13-16.

The parties executed and announced the merger agreement on April 25. *See* MSJ Ex. 19 [ECF 253-20].

### III.    Prof. Badawi's Report

Plaintiffs engaged Prof. Badawi, a professor at the University of California, Berkeley School of Law, to testify about the complex field of M&A, including relevant customs, practices, and terms of art in the industry relevant to this case, like due diligence and "seller friendly" M&A deals.[5]

Prof. Badawi is qualified to offer M&A opinions. He has extensive experience in corporate transactions, and specifically the M&A field. At Berkeley, he teaches Business Associations, Contracts, and M&A, and his classes have specifically focused on the Musk/Twitter transaction. Report at 1. Prof. Badawi has also published widely on corporate governance and securities law topics and his extensive research—detailed in his Report—has focused on M&A and the content of corporate disclosures. *Id.* at 1-3. Prof. Badawi is the co-host of the Berkeley Spring M&A Forum, a conference that brings together judges, government officials, academics and practitioners to discuss current M&A topics, including trends in due diligence. Report at 5. Prof. Badawi also has a strong empirical study background, serving as a director of the American Law and Economics

---

[5] Musk's own M&A expert, Professor Edward Rock, opined that due diligence was a "term of art" in M&A and covered the "'in-depth examination of analysis of a business' that a prospective buyer or investor will make before ultimately agreeing to buy a company or invest." ECF 247, Rock Report at ¶40 (citing Lou R. Kling et al., *Negotiated Acquisitions of Companies, Subsidiaries, and Divisions*, §8.02[1] (L.J. Press, 2024)). Prof. Rock also opined that the term "seller friendly" is commonly used in M&A transactions to "describe specific terms and merger agreements as a whole." *Id.* at ¶¶32, 37. However, Prof. Rock concluded the terms had "no determinate meaning" and "no legal significance" – inadmissible legal conclusions.

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF
OPINION OF ADAM BADAWI

Association, past Co-President of the Society of Empirical Legal Studies, and reviewer for top peer-reviewed journals in Law and Economics. *Id.* at 6. Prior to teaching, Prof. Badawi was an attorney at Munger, Tolles & Olson, practicing corporate law, including advising on and assisting with diligence in major corporate transactions. *Id.* at 7; *see also* CV, Appx. A to Report, Depo. at 133:22-134:14.

In this matter, Prof. Badawi drew upon his experience, as well as his review of professional articles and empirical studies performed by others, to form his opinions. These opinions, summarized at Paragraph 11 of his Report, generally fall within three buckets. First, Prof. Badawi used his training and experience in M&A transactions to explain industry customs and practices in M&A, including the concept of due diligence. Second, Prof. Badawi opined on customary M&A terms used by buyers and sellers in merger agreements and then performed a comparative analysis of the Twitter merger agreement to determine if the Twitter merger agreement was "seller friendly" to Twitter, as represented by Musk in presenting the deal. While Musk's motion singularly takes issue with Prof. Badawi's reliance on an empirical study performed by Harvard Law Professor John Coates, who evaluated 86 merger agreements during the two years prior to the Twitter acquisition, Prof. Badawi's comparative analysis also drew on his specialized knowledge and experience with merger agreements, industry journals, reports and other literature cited throughout his report, as well as undisputed evidence from the case, including Musk's testimony, SEC filings and the merger agreement, consistent with Federal Rules of Evidence 702 and 703 (and not challenged by Musk). *See* Report, Sections IV and V. Third, Prof. Badawi addressed each of the tweets and termination notices described in the pleadings and compared them to the actual terms in the merger agreement and customary behavior of remorseful buyers or those who seek to terminate similar transactions. *See* Report, Section VI.

## LEGAL STANDARD

Expert testimony is admissible if: (1) the witness is "qualified as an expert;" (2) "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (3) "the testimony is based on sufficient facts or data;" (4) "the testimony

6                                                    Case No: 3:22-CV-05937-CRB

is the product of reliable principles and methods;" and (5) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." FED. R. EVID. 702.

Expert testimony is "relevant" if it fits the facts of the case and logically advances "a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms, Inc.* (*Daubert II*), 43 F.3d 1311, 1315 (9th Cir. 1995). Further, the testimony is "reliable" if the expert's opinion is reliably based in the "knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.,* 738 F.3d 960, 969 (9th Cir. 2013) (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)). The Rule 702 inquiry is flexible and must focus "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595. "[I]t is a matter for the finder of fact to decide what weight to accord the expert's testimony" after it has passed the two-part analysis to determine its admissibility. *Kennedy v. Collagen Corp.,* 161 F.3d 1226, 1230 (9th Cir. 1998). Opposing experts or tests that the factfinder may be confronted with do not preclude admission but rather go to the weight of the evidence. *Id.* at 1230-31. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## ARGUMENT

### I.      Prof. Badawi's Opinions Are Not Inadmissible Legal Conclusions

Musk asks the Court to preclude Prof. Badawi from offering "legal opinions" that "interpret" the terms of the merger agreement, analogizing this case to breach of contract cases where there were disputes about the meaning of ambiguous terms. Musk's argument misses the mark and mischaracterizes Prof. Badawi's opinions.

#### A.      Prof. Badawi's Opinions Regarding the M&A Industry and Terms Do Not Even Mention, Let Alone Interpret, the Twitter Merger Agreement

Prof. Badawi properly opined on industry customs and practices in M&A, including the use and purposes of common M&A deal terms, such as due diligence, information rights, financing conditions, "bring-down" conditions, specific performance rights, and "material adverse effect" or "MAE" clauses in private and public M&A deals. Report, Section IV.

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF
OPINION OF ADAM BADAWI

Prof. Badawi's opinions in Section IV did not require him to interpret the Twitter merger agreement since they all related to M&A deals generally. Indeed, Prof. Badawi **never mentioned the Twitter merger agreement in this section of his Report,** let alone interpreted the terms in the Twitter merger agreement in support of these opinions. Further, since certain of the terms, like due diligence and financing contingencies, were not included in the merger agreement, Prof. Badawi's opinions necessarily did not require him to interpret them in the merger agreement. Accordingly, there is no basis to exclude these opinions.

**B.     Prof. Badawi's Comparative Analysis of M&A Terms, and Whether They Are "Seller Friendly" – A Term of Art in the M&A Industry and Used by Musk Here – is Relevant, Admissible and Reliable**

Prof. Badawi also used his training and experience in M&A transactions, including his personal review of thousands of other merger agreements, to perform a comparative analysis of the Twitter merger agreement to assess *Musk's own claim* that the Twitter transaction was "seller friendly" to Twitter. Here, Prof. Badawi used his expertise to review the plain language of the Twitter merger agreement and compare the integrated agreement, and specific terms therein, to merger agreements he has reviewed and taught about in his own experience and to studies and empirical analysis conducted by others.

Musk challenges Prof. Badawi's opinions that certain M&A deal terms are commonly understood in the industry as "seller friendly" or "buyer friendly," and argues that Prof. Badawi's characterizations are "legal opinions" that have "no relevance to any issue in dispute." ECF 245 at §I.B, p. 7. Musk also asserts that Prof. Badawi lacks a reliable basis for his comparative analysis. *Id*. at §II. Musk's arguments ignore the obvious relevance of "seller friendly" terms in this case, and Prof. Badawi's extensive experience and reliable methods used to draw his conclusions.

**1.     Prof. Badawi's Comparative Analysis is Relevant to Disputed Issues**

Musk asserts that Prof. Badawi's comparative analysis of the terms in the Twitter merger agreement with other M&A public deals, and whether they are "seller friendly" or "buyer friendly," has no relevance to any claims or defenses in this case and, in any event, requires him to engage in contract interpretation. According to Musk, the only purpose for describing a particular term as

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF
OPINION OF ADAM BADAWI

"seller friendly" is to then show the merger agreement as a whole was more restrictive to Musk, which he describes is an impermissible legal opinion. Musk is wrong on all counts.

First, Prof. Badawi's opinions are directly relevant to disputed issues. Indeed, Prof. Badawi performed a comparative analysis of the Twitter merger agreement given *Musk's representation* that the Twitter merger agreement was meant to be "seller friendly" to Twitter, and *Musk's conflicting position* that he both waived "due diligence" rights pre-signing but somehow preserved the right to conduct "due diligence" after signing. In either case, due diligence is a customary term rather than a legal one. Prof. Badawi's opinion that waiving pre-signing due diligence and agreeing to an extremely limited, seller-friendly set of information rights comes nowhere close to the customary meaning of due diligence is thus directly relevant to the claims and defenses in this case.

Understanding general customs and practices in the M&A industry, and whether this was a seller friendly agreement, will also be extremely helpful to the jury to understand the background and context Musk's representations to Twitter, in revising his initial offer, that the newly proposed agreement was "seller friendly" and intended to be easier for Twitter's Board to approve. The evidence will assist the jury in considering Musk's team's continued use of the term, "seller friendly," during the merger process, and the meaning of internal concessions that these "seller friendly" deal terms would "effectively remov[e] all conditionality" to closing. Notably, several key deal terms were removed in the "seller friendly" version sent to Twitter, including due diligence and financing contingencies, while others were added, including specific performance rights, limited information rights, and an MAE clause.

Prof. Badawi's testimony will also allow the jury to better understand Musk's demands for information, soon after the merger agreement was executed and, just as importantly (given Musk's assertions that Twitter committed fraud and hid information), Twitter's responses to those demands. Finally, Prof. Badawi's testimony will give the jury valuable information to reach its own determination whether Musk's tweets claiming that the deal was on hold were true or false. There can be no question that Prof. Badawi's opinions are relevant.

9                                    Case No: 3:22-CV-05937-CRB

### 2. Prof. Badawi's Comparative Analysis Does Not Require Him to Interpret the Merger Agreement

Similarly, Prof. Badawi opinions do not call for legal opinions nor the need to "interpret" the Twitter terms. Rather, Prof. Badawi reviewed the plain language of the Twitter merger agreement and compared the integrated agreement, and specific terms therein, to merger agreements he has reviewed and taught about in his own experience and to studies and empirical analysis conducted by others. Such a comparison is not improper.

Moreover, to the extent Prof. Badawi's opinions touch upon the common meanings and purposes of such terms, courts routinely permit industry experts to testify about terms particular to an industry, even when the parties agree that the terms are unambiguous. For example, in *GIC Real Est., Inc. v. ACE Am. Ins. Co.,* 2018 WL 5310832 (N.D. Cal. Aug. 20, 2018), both sides agreed that the term "real estate manager" had an accepted meaning in the industry and was not ambiguous. *Id.* at *5. However, when plaintiffs proffered an expert's testimony to demonstrate what the accepted meaning in the industry was, the defendant insurer objected and argued that the testimony was inadmissible extrinsic evidence of an unambiguous term and thus an improper opinion on the legal interpretation of contractual terms – the same arguments Musk makes here. *Id.* at *6. The district court allowed the testimony, noting that where contractual terms have a specialized meaning, expert testimony regarding that meaning is helpful and admissible. *See also*, *Sec. & Exch. Comm'n v. Sabhlok,* 2010 WL 2944255, at *2 (N.D. Cal. July 23, 2010) (district court properly admitted expert testimony on contract provisions having a specialized meaning in the railroad industry); *NIC Holding Corp. v. Lukoil Pan Americas, LLC,* 2007 WL 1467424 (S.D.N.Y. May 16, 2007) (allowing both sides to opine on how estimated time of arrival ("ETA") clauses are typically used and understood in petroleum delivery contracts).

In *Liberty Media Corp. v. Vivendi Universal*, 874 F. Supp. 2d 169 (S.D.N.Y. 2012), a corporate merger case, the plaintiff filed a motion in limine to prevent defendant's expert in M&A transactions to opine on the purpose and meaning of a material adverse change ("MAC") clause in the merger agreement (similar to the MAE clause addressed by Prof. Badawi in his Report). The court allowed the expert testimony, finding it necessary given the complexity of issues in a merger

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF OPINION OF ADAM BADAWI

transaction and the fact that MAC clauses in M&A agreements were beyond the average juror's understanding. *Id.* at 175-176.  In doing so, the district court distinguished between expert opinions on the parties' intentions in drafting the MAC clause, which were not allowed, and opinions on the meaning and purpose of MAC clauses, including the MAC in the agreement, finding it probative of the parties' intent. *Id.*

Here, Prof. Badawi explained customary terms that have special meaning in merger agreements, including due diligence, information rights, specific performance, bring-down conditions, and MAE clauses, amongst others.  Prof. Badawi did not try to interpret these clauses, or opine on the parties' intentions in drafting them, but rather highlighted their customary purpose and usage in M&A transactions to assist *the jury* in interpreting the terms in this case.

For these same reasons, Musk's cited cases, where experts were asked to opine on ambiguous terms, are unavailing.  Prof. Badawi did not need to interpret the terms here precisely because they were unambiguous.  Similarly, Musk's argument that Delaware's application of the parole evidence rule bars "extrinsic evidence" to interpret otherwise unambiguous contract terms is applicable here. *See* ECF 245 at §I.C at p. 8-9.  As stated above, Prof. Badawi's opinions about industry customs, and common concepts like due diligence in M&A transactions, are not offered to interpret the Twitter merger agreement, nor to introduce extrinsic evidence to explain otherwise unambiguous terms.  The parole evidence rule does not apply.

### 3.     Prof. Badawi's Comparative Analysis is Reliable

Musk asserts that Prof. Badawi's comparative analysis is unreliable because he only relied upon, but failed to identify, other merger agreements he reviewed during his career.  Musk also falsely suggests that Prof. Badawi only relied on "excerpts" from a report prepared by John Coates, a M&A professor at Harvard Law School, who performed his own study of merger agreements in the two years preceding the Twitter transaction.  The arguments are easily refuted.

First, Prof. Badawi confirmed at deposition that his comparative analysis was based on his professional experience and background, as well as thousands of merger agreements reviewed over his career, including individual merger clauses.  Depo. at 134:9-14.  Prof. Badawi's failure to list

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF
OPINION OF ADAM BADAWI

every merger agreement he has reviewed over his career does not render his opinion unreliable. Musk cites a single case, *USI Ins. Services LLC vs. Alliant Ins. Services Inc.*, 2025 WL 1767988 (D.Ariz. June 26, 2025), which is inapposite. There, USI's insurance industry expert offered an opinion on the typical pricing process used for buying and selling books of business or "BOBs" in the commercial insurance industry, and a second opinion on the specific pricing range of "market multiples" used on BOBs to cover risks in the insurance industry. On this second opinion, the since-retired expert relied on conversations with former partners related to the sale of entire brokerage firms, not BOBs, and then used that formula to opine on specific range of multiples used on BOBs. The district court found the second opinion unreliable, since the expert could not identify other BOB transactions that informed his opinions on BOBs and instead "indiscriminately included every transaction from his career" without explaining how they impacted his analysis of BOBs to arrive a specific multiple range in that case. Even then, the district court held its exclusion was "narrow," and permitted the expert to testify about other general market-based principles. *Id.* Here, Prof. Badawi has not opined on specific ranges, formulas, or economic calculations to inform his opinion, nor included assumptions drawn from unrelated agreements. Rather, he based his opinion on his experience with merger agreements of other private and public corporations, as well as studies discussing their terms.

Musk also criticizes Prof. Badawi for failing to provide comparisons to other agreements, using as an example the fact that Prof. Badawi provided no data about the use of specific performance clauses in merger agreements. ECF 245 at p. 13. But even Musk's representative example is false. Prof. Badawi's Report at Paragraph 28 specifically references data about the use of specific performance clauses from the ABA Deal Points study, which is also cited. That study, along with the Coates Report and Prof. Badawi's research and teaching experience, establish the continuum from buyer friendly to seller friendly for any given term, and provide the empirical basis of his opinions.

Moreover, Prof. Badawi didn't solely rely on "excerpts" of the Coates Report, as Musk contends. Prof. Badawi testified that he read and considered the entire Coates Report. Depo. at

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF
OPINION OF ADAM BADAWI

12:13-13:3.  Prof. Badawi also carefully considered its methodology and criteria for inclusion in the sample of merger agreements, reviewed the merger terms quoted in the Coates Report – and there are many – and evaluated whether the coding was consistent with his understanding of what more restrictive and less restrictive would mean in the custom and practice of M&A.  *Id*. at 133:3-20. These types of assessments are well within Prof. Badawi's expertise, who is an empirical scholar, has published many peer-reviewed empirical articles, is regularly asked to referee empirical articles for peer-reviewed journals, and has served as an associate editor of a peer-reviewed journal.  As Musk notes in his Motion, Prof. Badawi also confirmed at deposition that he reviewed some of the merger agreements cited in the Coates Report (Motion at p. 11 fn 3), which in any event are quoted extensively from the sample of agreements.  Depo. at 138:11-140:6, 142:7-15; Section VI of Coates' Report.

Prof. Badawi's strong foundation for his opinions stands in stark contrast to *all* the cases cited by Musk, which stand for the proposition that experts must base their opinions on reliable methods and evidence and cannot solely rely on another expert's report.  *See e.g.*, *United States v. Redlightning*, 624 F.3d 1090, 1111-1112 (9th Cir. 2010) (affirming exclusion of expert's opinion that defendant's confession was coerced by false promise of leniency as no evidence in record of false promise and expert never even interviewed the defendant); *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 164-65 (S.D.Ind. 2009) (district court denied motion to exclude plaintiff's damages expert who used generally accepted regression analysis at class certification, finding that assumed facts supported by the record); *King v. Depuy Orthopaedics Inc.*, 2023 WL 8009790, *6-7 (D. Ariz. Nov. 17, 2023) (district court excluded opinion of orthopedic surgeon about testing and marketing of hip implant device since he was unqualified on marketing and merely "regurgitated" opinions of other experts, but permitted his opinion on risk of systemic illness from device based on expert's personal experience seeing results of surgeries and review of peer reviewed medical literature); *McCoy v. Dupuy Orthopaedics, Inc.*, 2024 WL 1705952, *12 (S.D.Cal. 2024) (district court denied motion to exclude expert opinion from biomedical engineer with forty years of experience, holding that while one cannot "parrot" another expert they can rely on opinions of others

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF
OPINION OF ADAM BADAWI

if "other evidence" supports their opinions and they conduct their own investigation; district court then found expert did not "rely solely" on other expert's opinions, but "considered additional evidence, such as Plaintiff's medical records, deposition transcripts, expert reports, scientific literature and DePuy's records."); *In re Imperial Credit Indus. Sec. Litig.*, 252 F.Supp.2d 1005, 1010-1011 (C.D.Cal. 2003) (plaintiff failed to submit expert report by residual modeling expert, and instead offered unqualified accounting expert who solely relied on residual modeling expert in another case); *In re Conagra Foods, Inc.*, 302 F.R.D. 537, 555-557 (C.D.Cal. 2014) (district court permitted scientist to opine on genetic engineering of food, but not on survey data since he had no expertise in marketing or consumer reactions and merely relied on surveys of others).

Musk's cases support the reliability of Prof. Badawai's opinion here. There can be no serious dispute that Prof. Badawi's opinions were based on reliable sources and methods, including his extensive background, review of thousands of other merger agreements, and consultation of peer studies of other mergers agreements cited throughout his detailed Report. *See* Report at ¶¶ 1-8, CV, Appx. A, Depo. at 79:9-12, 80:13-81:4, 83:24-84:14, 87:24-88:5, 134:9-14. At best, Musk's criticisms go to the weight to be attributed to Prof. Badawi's opinions rather than their admissibility.

## II. Prof. Badawi Does Not Testify About State of Mind Nor Improperly Narrate Facts Unrelated to His Opinions

Contrary to Musk's motion, Prof. Badawi does not offer opinions about Musk's state of mind. ECF 245, at 14. For example, according to Musk, Prof. Badawi opined that Musk had "buyers remorse," citing paragraphs 71-75 of his Report. ECF 245 at 14. Prof. Badawi gave no such opinion; his Report discusses the conditions that lead to buyer's remorse in M&A deals, including the lack of competing bids, and customary non-solicitation terms used by parties to anticipate and address those conditions, which Prof. Badawi opined were present in the Twitter deal. Musk also claims that Prof. Badawi improperly "suggests" that Musk's concerns for spam were pretextual and that Musk created "uncertainty" in the market from his tweets. However, the referenced paragraphs generally cite to the complaint or evidentiary record, such as Musk's deposition testimony, for this factual background; Prof. Badawi does not render any opinion that Musk did or did not believe what

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF
OPINION OF ADAM BADAWI

he was tweeting or otherwise opine on his state of mind.  Rather, he opines on the underlying facts given the parties' rights under the merger agreement.  Proof of scienter is often a matter of inference from circumstantial evidence (FRE 404(b); *In re Software Toolworks Inc. Sec. Litig.*, 50 F.3d 615, 627 (9th Cir. 1994)), and while "an expert may not offer an opinion as to an entity's or individual's knowledge, intent, motive or other mental state," he or she "may, however, testify about observable underlying facts that might be relevant to determining the mental state of an individual or entity." *Kelley as Tr. of BMO Litig. Tr. v. BMO Harris Bank N.A.*, 2022 WL 4547022, at *10 (D. Minn. Sept. 29, 2022).

Prof. Badawi also did not use his Report to narrate the facts.  Instead, in Section VI, the supposedly objectionable passage, Prof Badawi recounts the tweets at issue and then opines on customary behavior and contractual options in the merger agreement.  Unlike Musk's proffered M&A expert, Prof. Badawi did <u>not</u> render any opinions about Musk's state of mind, the meaning of his tweets, nor whether the parties complied or failed to comply with the terms of the merger agreement.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court deny Musk's motion and admit the opinions of Prof. Badawi.

Dated: September 12, 2025

Respectfully submitted,

**COTCHETT, PITRE & MCCARTHY, LLP**
Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
Tyson C. Redenbarger (SBN 294424)
Elle D. Lewis (SBN 238329)
Gia Jung (SBN 340160)
Caroline A. Yuen (SBN 354388)

*/s/ Tyson C. Redenbarger*
    Tyson C. Redenbarger

San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF
OPINION OF ADAM BADAWI

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Aaron P. Arnzen (SBN 218272)

*/s/ Aaron P. Arnzen*
     Aaron P. Arnzen

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001

16          Case No: 3:22-CV-05937-CRB
PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF
OPINION OF ADAM BADAWI

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Tyson C. Redenbarger, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 12th day of September 2025, at Burlingame, California.

*/s/ Tyson C. Redenbarger*
Tyson C. Redenbarger

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE PORTIONS OF
OPINION OF ADAM BADAWI