**COTCHETT, PITRE & MCCARTHY, LLP**
Joseph W. Cotchett (SBN 36324)
*jcotchett@cpmlegal.com*
Mark C. Molumphy (SBN 168009)
*mmolumphy@cpmlegal.com*
Tyson C. Redenbarger (SBN 294424)
*tredenbarger@cpmlegal.com*
Elle D. Lewis (SBN 238329)
*elewis@cpmlegal.com*
Gia Jung (SBN 340160)
*gjung@cpmlegal.com*
Caroline A. Yuen (SBN 354388)
*cyuen@cpmlegal.com*
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
*fbottini@bottinilaw.com*
Albert Y. Chang (SBN 296065)
*achang@bottinilaw.com*
Aaron P. Arnzen (SBN 218272)
*aarnzen@bottinilaw.com*
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001

*Lead Counsel for Plaintiffs and the Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | Case No. 22-cv-5937-CRB<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE THE OPINIONS OF DR. DAVID I. TABAK**<br><br>Date:     October 31, 2025<br>Time:    10:00 a.m.<br>Courtroom: 6, 17th Floor<br>Judge:   Hon. Charles R. Breyer |

Case No: 3:22-CV-05937-CRB

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE
OPINIONS OF DR. DAVID I. TABAK

## TABLE OF CONTENTS

ISSUE PRESENTED................................................................................................................v

SUMMARY OF ARGUMENT .................................................................................................v

SUMMARY OF DR. TABAK'S EXPERT OPINIONS ..............................................................1

ARGUMENT.............................................................................................................................2

I.    Dr. Tabak Appropriately Utilizes an Out-of-Pocket Damages Model, an Event Study, and a Deflation Ribbon Based on Constant Percentage Deflation ...............2

II.   Dr. Tabak's Model Appropriately Addresses Confounding Information................3

III.  Musk's Attack on Dr. Tabak's Purported Failure to Predicate His Damages Analysis on a Corrective Disclosure Is Meritless.......................................................7

IV.   Musk's Arguments About the July 8th Termination Letter Are Unavailing.........11

V.    Musk's Disaggregation Arguments Are Without Merit .......................................12

VI.   Musk's Requests to Exclude Dr. Tabak's Opinions on the Scheme Liability and Options Damages Are Meritless .......................................................................15

CONCLUSION........................................................................................................................16

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

**TABLE OF AUTHORITIES**

**Cases**

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
   663 F. Supp. 3d 334 (S.D.N.Y. 2023).................................................................. vi, 2, 10

*Baker v. SeaWorld Ent., Inc.*,
   423 F. Supp. 3d 878, 908 (S.D. Cal. 2019).................................................................3

*Bigelow v. RKO Radio Pictures, Inc.*,
   327 U.S. 251,264 (1946).................................................................................7

*City of Pomona v. SQM  N. Am. Corp.*,
   750 F.3d 1036 (9th Cir. 2014) ............................................................................ vii

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)....................................................................... v, viii, 15

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)......................................................................... passim

*Gruber v. Gilbertson*,
   628 F. Supp. 3d 472 (S.D.N.Y. 2022)......................................................................7

*Hayes v. MagnaChip Semiconductor Corp.*,
   2016 WL 7406418 (N.D. Cal. Dec. 22, 2016)..........................................................13

*Homyk v. Chemocentryx*,
   2025 WL 1547625 (N.D. Cal. May 30, 2025)..........................................................14

*In re Alphabet Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) ..............................................................................15

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
   2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019)..............................................................v

*In re Homestore.com, Inc.*,
   2011 WL 291176, at *8 (C.D. Cal. Jan. 25, 2011) ....................................................6

*In re Imperial Credit Indus. Inc. Sec. Litig.*,
   252 F. Supp. 2d 1005 (C.D. Cal. 2003) ...................................................................v

*In re Novatel Wireless Sec. Litig.*,
   2013 WL 12144150, at *10-11 (S.D. Cal. Oct. 25, 2013) .........................................5

*In re Novatel Wireless Sec. Litig.*,
   2013 WL 12247558, at *3 (S.D. Cal. Nov. 19, 2013) ..............................................3

*In re Omnicom Grp., Inc. Sec. Litig.*,
   541 F. Supp. 2d 546 (S.D.N.Y. 2008)....................................................................15

*In re Perrigo Co. Pie Sec. Litig.*,
   2021 WL 3073976, at *1 (S.D.N.Y. July 13, 2021) ................................................15

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

*In re Petrobras Sec. Litig.*,
   312 F.R.D. 354 (S.D.N.Y. 2016) ................................................................................. v, vii

*In re Tesla Sec. Litig.*,
   477 F. Supp. 3d 903 (N.D. Cal. 2020) ............................................................................ vi, 9

*In re Tesla, Inc. Sec. Litig.*,
   2022 WL 7374936 (N.D. Cal. Oct. 13, 2022) ....................................................................12, 15

*In re Twitter, Inc. Sec. Litig.*,
   2020 WL 13863616 (N.D. Cal. Jan. 28, 2020) ...................................................................... vii

*In re Twitter, Inc. Sec. Litig.*,
   2020 WL 4187915, at *16 n.17 (N.D. Cal. Apr. 17, 2020) .......................................................6

*In re Vale S.A. Sec. Litig.*,
   2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) ...........................................................................v

*In re Vivendi, S.A. Sec. Litig.,* 838 F.3d 223 (2d. Cir. 2016) ...........................................................7

*Levie v. Sears Roebuck & Co.*,
   496 F. Supp. 2d 944 (N.D. Ill. 2007) ...........................................................................10, 15

*Lorenzo v. S.E.C.*,
   587 U.S. 71 (2019) ......................................................................................................15

*McIntire v. ChinaMedia Express Holdings, Inc.*,
   38 F. Supp. 3d 415 (S.D.N.Y. 2014) ................................................................................ vii

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) ..........................................................................................10

*Monroe Cnty. Emps' Ret. Sys. v. S. Co.*,
   332 F.R.D. 370 (N.D. Ga. 2019) .......................................................................................v

*Moonbug Ent. Ltd. v. BabyBus (Fujian) Network Tech. Co.*,
   2024 WL 2193323 (N.D. Cal. May 15, 2024) .........................................................................7

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
   730 F.3d 1111 (9th Cir. 2013) .......................................................................................9, 10

*Pampena v. Musk*,
   705 F. Supp. 3d 1018 (N.D. Cal. 2023) ...............................................................................9

*Pampena v. Musk*,
   No. 24-6249, Order (9th Cir. Jan. 24, 2025) ..........................................................................1

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
   2021 WL 229310, at *7 (N.D. Cal. Jan. 21, 2021) ...................................................................3

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010) ........................................................................................ vii

*Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*,
   2005 WL 1366025 (D.N.J. June 8, 2005) ..............................................................................9

iii                    Case No: 3:22-CV-05937-CRB

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

*S.E.C. v. Goldstone,*
    2016 WL 3135651 (D. N.M. May 10, 2016) ................................................................. v

*S.E.C. v. Moshayedi,*
    2013 WL 12129282, at *6 (C.D. Cal. Nov. 20, 2013) ............................................ 15

*Sayce v. Forescout Techs., Inc.,*
    2024 WL 2750003, at *11 (N.D. Cal. May 28, 2024) .............................................. 2

*Smilovits v. First Solar, Inc.,*
    2019 WL 7282026, at *9 (D. Ariz. Dec. 27, 2019) .................................................. 6

*Thant v. Rain Oncology Inc.,*
    2025 WL 588994, at *10 (N.D. Cal. Feb. 24, 2025) ............................................... 10

*Williams v. Gaye,*
    895 F.3d 1106, 1129-30 (9th Cir. 2018) ................................................................... 6

**Statutes**

15 U.S.C. §78j................................................................................................................. 2

**Rules**

FED. R. CIV. P. 23 ............................................................................................................ 1

FED. R. EVID. 702 ............................................................................................... v, vii, 6

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

**ISSUE PRESENTED**

In this seller class action under the Securities Exchange Act of 1934 (the "Exchange Act"), whether the Court should grant defendant Elon Musk's motion (ECF 249) (cited as "Mot.") under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, *Inc.,* 509 U.S. 579 (1993), to exclude portions of the expert opinions (*i.e.*, reports and testimony) of Dr. David Tabak, a leading expert in financial economics whose writings and testimony have been frequently cited by courts across the country presiding over securities-fraud cases.[1]

**SUMMARY OF ARGUMENT**

Dr. Tabak's opinions are relevant, reliable, and based on sound methodologies and assumptions that are routinely used and accepted to assess loss causation and damages in actions brought under the federal securities laws. Nothing about his opinions breaks new ground. Musk raises a host of familiar challenges that have been repeatedly rejected by courts and, at most, provide areas for cross-examination of Dr. Tabak at trial—not a basis to exclude his testimony.

Dr. Tabak prepared a comprehensive market model and event study and, using standard methodologies, demonstrated that defendant Elon Musk's false statements on May 13, 2022 and May 16, 2022 resulted in an abnormal stock decline for Twitter shares of $8.52 per share. Ex. 1 ¶¶14–19 & Ex. 4a.[2] Dr. Tabak accounted for and disaggregated the portion of these stock price declines attributable to general market and industry-wide effects. He further premises his loss causation theory and damages calculations on a ***direct causation*** model, which is a well-accepted method to demonstrate loss causation and is the preferred method in a ***seller class action***.

---

[1] *See*, *e.g.*, *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 369 (S.D.N.Y. 2016) (endorsing a methodology co-proposed by Dr. Tabak); *In re Imperial Credit Indus. Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003) (relying on Dr. Tabak's publication to explain event studies); *In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *12 n.17 (E.D.N.Y. Jan. 11, 2022) (endorsing Dr. Tabak's methodology for "objective" disaggregation); *In re Teva Sec. Litig.*, 2021 WL 872156, at *26 (D. Conn. Mar. 9, 2021) (relying on Dr. Tabak's publication to explain the "[e]mpirical[]" results of abnormal stock returns); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2019 WL 5287980, at *15 n.104 (S.D.N.Y. Oct. 18, 2019), adopted, 2020 WL 1329354 (S.D.N.Y. Mar. 23. 2020) (relying on a peer-reviewed journal article by Dr. Tabak); *Monroe Cnty. Emps' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 392–93 (N.D. Ga. 2019) (crediting another expert's opinion based on his reliance on a paper by Dr. Tabak); *S.E.C. v. Goldstone*, 2016 WL 3135651, at *45 (D. N.M. May 10, 2016) (relying on and quoting at length an article by Dr. Tabak to explain the use of event studies in securities litigation).

[2] "Ex." refers to exhibits to the September 12, 2025 Declaration of Francis A. Bottini, Jr. Unless noted, internal quotation marks, alterations, and citations are omitted, and emphases are added.

Citing only cases involving purchaser class actions, however, Musk claims that Dr. Tabak's economic analysis is "unreliable" since he did not use a corrective disclosure to demonstrate "inflation" at the time of "purchase." Mot. at 12. But this is a seller—not a purchaser—class action which alleges deflation, not inflation. Dr. Tabak did examine the October 4, 2022 corrective disclosure and determined that such disclosure caused a statistically significant $7.27 increase in Twitter's stock price. Ex. 1 ¶20 & Ex. 4a. Dr. Tabak determined that the October 4, 2022 corrective disclosure provides evidence of the *materiality* of the misstatements. *Id.* As Dr. Tabak explains, "in a seller class, the economic loss typically comes ***before*** the revelation of the alleged fraud." Ex. 1 ¶11. Once Plaintiffs sold their Twitter stock, they did not have "ownership of a share that ***at that instant*** possesses equivalent value." *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (emphasis in original). For this reason, tethering a loss causation and damages model to a corrective disclosure is not the best approach in a seller case. Instead, the direct causation model utilized by Dr. Tabak is the standard and preferable approach.

Musk's attack on Dr. Tabak's failure to use a corrective disclosure to prove loss causation is baseless. In *Altimeo Asset Management v. Qihoo 360 Technology Co.*, for example, the court rejected defendant's attack on a plaintiffs' use of direct causation to establish loss causation involving a merger because a seller class action "depart[s] from the common paradigm of a §10(b) case in which insiders fraudulently inflate a stock price, and shareholder loss is occasioned and proven by a corrective disclosure." 663 F. Supp. 3d 334, 375 (S.D.N.Y. 2023); *see also In re Tesla Sec. Litig.*, 477 F. Supp. 3d 903, 933 (N.D. Cal. 2020) (holding that short sellers could prove loss causation, distinguishing typical "long" purchasers from short sellers for loss causation purposes, and noting that short sellers who purchase to cover their position are harmed when they buy, not later).

Nor can Musk challenge Dr. Tabak's impeccable qualifications to serve as an expert witness. Dr. Tabak holds Ph.D. and M.A. degrees in Economics from Harvard University and a B.S. in Physics and Economics from Massachusetts Institute of Technology. Ex. 1 (supplemental report), Ex. 1 (*curriculum vitae*) at 1. While at Harvard, Dr. Tabak taught courses in micro- and macro-economics and American economic policy at the undergraduate and graduate levels and participated in the

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

creation of an undergraduate textbook. *Id.* He has published in his areas of expertise in forums such as *St. John's Law Review* and *Shannon Pratt's Business Valuation Update*, and has published peer-reviewed articles in Litigation Economics Review and the Journal of Forensic Economics. *Id.* His publications have covered topics such as economic analysis of market efficiency and the application of statistics in litigation analyses. *Id.* He has been an invited presenter at the Securities and Exchange Commission and has spoken at forums that provide continuing professional education credits for accountants and valuation professionals. *Id.*

In light of Dr. Tabak's qualifications, Dr. Tabak has appeared as an expert in state and federal courts across the country. *Id.* ***No court has ever found that him unqualified to provide an opinion on loss causation and damages***. Indeed, Dr. Tabak has been approved by numerous federal courts to opine on matters related to securities litigation, including loss causation and damages. *See Teva*, 2021 WL 872156, at *37 ("numerous courts refer to Dr. Tabak as an expert on market efficiency testing in securities cases"); *see also*, *supra*, Issue Presented at 1, n.1. Courts routinely credit Dr. Tabak's advancements in the theory and practice of financial economics. *See*, *e.g.*, *Petrobras*, 312 F.R.D. at 369 (Dr. Tabak a "well-known securities econometric expert[]"); *McIntire v. ChinaMedia Express Holdings, Inc.*, 38 F. Supp. 3d 415, 430 (S.D.N.Y. 2014) (endorsing Dr. Tabak's methodology).

\*    \*    \*

"Rule 702 simply requires that that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony 'fit' the facts of the case." FED. R. EVID. 702 advisory committee's note (2000 Amend.). As the Ninth Circuit has cautioned in *City of Pomona v. SQM North America Corp.*, while trial courts should screen "unreliable nonsense opinions," they should "not exclude opinions merely because they are impeachable." 750 F.3d 1036, 1044 (9th Cir. 2014). Even "'[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.'" *In re Twitter, Inc. Sec. Litig.*, 2020 WL 13863616, at *2 (N.D. Cal. Jan. 28, 2020) (quoting *Primiano v. Cook,* 598 F.3d 558, 564 (9th Cir. 2010)). Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof' remain

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

"the traditional and appropriate means" of challenging expert testimony. *Daubert*, 509 U.S. at 596.

Tested under these rules, Musk's *Daubert* motion must be denied.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

**SUMMARY OF DR. TABAK'S EXPERT OPINIONS**

Dr. Tabak has submitted two expert reports at the merits stage (one opening and one supplemental) (ECF 253-59, 253-66), and one at the class certification stage (ECF 249-9).[3] Exs. 1–3.

In connection with his work on this matter, Dr. Tabak used a statistical market model and performed a standard event study. The market model "is a statistical analysis of the relationship, in this case, between Twitter's stock-price movements and those of a market and an industry index." Ex. 1 ¶14. For his damages analysis, Dr. Tabak used "the results of the event studies on the relevant dates from that market model," showing the price reactions for the three misrepresentations that survived the motion to dismiss. *Id.* ¶15. Based on the results of the event study and market model, Dr. Tabak opined that Twitter's stock suffered statistically significant price declines in response to Musk's May 13, 2022 and May 16, 2022 false statements. Ex. 1 ¶¶14–19 & Ex. 4a. Dr. Tabak then calculated the "abnormal return" for each disclosure date—a calculation that disaggregated and accounted for any portion of Twitter's stock price declines attributable to general market and industry forces. *Id.* at Ex. 4a (calculating a $8.52 cumulative abnormal return in response to the May 13 and May 16 statements). He also thoroughly analyzed the information disclosed on the event dates to evaluate loss causation and assess whether there was any additional "confounding" information that required disaggregation. Ex. 1 ¶18, n.10. Dr. Tabak made an adjustment for the portion of the merger discount that existed before May 13, 2022, attributing 54.3% of the discount to non-fraudulent factors and just 45.7% to the false statements. *Id.* ¶22. He also adjusted for the stock reaction to the July 8, 2022 termination letter and for a decline on August 23, 2022 that related to a whistleblower complaint by Zatko. *Id.* ¶23.

Musk's experts, Dr. Lehn and Dr. Saha, concede or do not contest Dr. Tabak's findings that Twitter's stock experienced statistically significant declines on May 13 and May 16 and a statistically significant increase on October 4, 2022. *See* ECF 99-6, ¶9. Thus, Musk concedes price impact.

---

[3] At class certification, the Court found that Plaintiffs adequately alleged an efficient market and that the *Basic* presumption applied. *Pampena v. Musk*, 2024 WL 4331811 (N.D. Cal. Sept. 27, 2024). Following class certification, Musk filed a Rule 23(f) petition—making many arguments that he repeats in this motion—which the Ninth Circuit rejected. *Pampena v. Musk*, No. 24-6249, Order denying Rule 23(f) petition (9th Cir. Jan. 24, 2025).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

**ARGUMENT**

**I.     Dr. Tabak Appropriately Utilizes an Out-of-Pocket Damages Model, an Event Study, and a Deflation Ribbon Based on Constant Percentage Deflation**

Dr. Tabak's methodology is reliable and proper for a seller class.  In calculating damages, he constructed a standard, out-of-pocket damages model.  "'Courts regularly reaffirm that the out-of-pocket ... method matches plaintiffs' theory of liability under Section 10(b) of the [Exchange Act], making it the standard method for calculating damages in virtually every Section 10(b) class action.'" *Sayce v. Forescout Techs., Inc.,* 2024 WL 2750003, at \*11 (N.D. Cal. May 28, 2024).  Such a model is consistent with the Exchange Act.  Here, "damages for a seller class are simply the amount of deflation at the time of their sale." Ex. 1 ¶10.  As recognized in *Altimeo Asset Management*, the seller class was damaged because "[b]ut for defendants' fraud, … [the class's] sales would have been at higher prices, or the sellers would have held onto their shares through to the [merger] date and secured [the merger share price]."  663 F. Supp. 3d at 374.  The same is true here.

While admitting that Dr. Tabak conducted an event study, Musk wrongly claims that Dr. Tabak failed to factor the event study into his damages analysis.  Mot. at 6–7.  Dr. Tabak's event study properly controlled for market and industry effects on Twitter's stock price—using the NASDAQ Composite Index Return as market index, and the NASDAQ CTA Internet Index Return as industry index, to account for non-fraud related factors.  Ex. 1 at Ex. 4a; *see also* ECF 76-1 ¶42 & Ex. 8b (Dr. Tabak's market efficiency report used an event study and market model to control for both market and industry effects, and considered the effect on the Company's stock of news stories). Applying his event study methodology, Dr. Tabak examined "the results of the event studies on the relevant dates from that market model," showing the price reactions for the three misrepresentations that survived the motion to dismiss. Ex. 1 ¶15.  Based on the event study's results, he opined that Twitter's stock suffered statistically significant stock price declines in response to Musk's May 13 and May 16 false statements. *Id.* ¶¶14–19 & Ex. 4a.  He then ***conservatively*** used a two-day unadjusted price decline of $7.69 ($45.08 close on May 12 less the $37.39 close on May 16) rather than the higher two-day market-adjusted decline of $8.52 over the same period. Ex. 1 at Ex. 4a.  Musk's arguments about having to adjust for market and industry effects are meritless because Dr. Tabak used a conservative

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

measure of deflation that is lower than the decline resulting from the event study.

Musk concedes that his argument about the alleged defects in Dr. Tabak's damages methodology has no merit if Dr. Tabak properly considered the two-day impact of Musk's May 13 statement. Mot. at 8 (agreeing that Dr. Tabak's deflation calculations are lower than the event study's indicated two-day decline). Thus, what remains is Musk's argument that Dr. Tabak should have used one day instead of two days to measure price impact. Dr. Tabak continued the May 13 price reaction through all days with statistically significant returns, which is his standard practice and supported by academic literature. Ex. 1 ¶18. And while Musk relies on Dr. Lehn for the claim that experts "typically" employ a one-day window, the use of the word "typically" concedes that there are exceptions, as demonstrated by Dr. Tabak's standard practice and the academic article he cites. *Id.*, n.11 ("if the daily abnormal return on a subsequent trading day is statistically significant, then we assume that the market is continuing to incorporate information").

Musk also attacks Dr. Tabak for arriving at a "constant percentage" methodology. Mot. at 10. But courts have consistently accepted the "constant percentage" inflation or deflation methodology for constructing an inflation/deflation ribbon and calculating out-of-pocket damages under Section l0(b). *See*, *e.g.*, *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.,* 2021 WL 229310, at *7 (N.D. Cal. Jan. 21, 2021) (determining "how 'inflation per share may have evolved over the class period[]' ... can be accomplished via ... 'constant percentage inflation'"); *Baker v. SeaWorld Ent., Inc.,* 423 F. Supp. 3d 878, 908 (S.D. Cal. 2019) ("constant percentage inflation [is] another commonly utilized theory"); *In re Novatel Wireless Sec. Litig.,* 2013 WL 12247558, at *3 (S.D. Cal. Nov. 19, 2013) (constant percentage model of damages "may properly be presented to a jury"). Dr. Tabak's approach is particularly appropriate here because Musk's false statements at the very beginning of the Class Period caused the deflation, and there were no other statistically significant effects on Twitter's stock price during the Class Period other than on July 8th and August 23rd, which Dr. Tabak already factors into his model. *See* Ex. 1 ¶23.

## II. Dr. Tabak's Model Appropriately Addresses Confounding Information

Musk baselessly claims that Dr. Tabak calculated damages without considering the event study or market or industry factors. *See* Mot. at 7–8. Not so. Dr. Tabak calculated the "abnormal return"

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

for each disclosure date—a calculation that disaggregated any portion of Twitter's stock price declines attributable to market and industry forces; and he conservatively measured deflation. *See* Ex. 1 ¶¶18–20 & n.10 (calculating a $8.52 cumulative abnormal return in response to the May 13 and May 16 statements but including only $7.69 in his measure of deflation). He thoroughly analyzed the information disclosed on the event dates to evaluate loss causation and assess whether there was any additional "confounding" information that required disaggregation. Ex. 1 ¶18, n.10; ECF 76-1, ¶¶31–43.

Dr. Tabak also made an adjustment for the portion of the merger discount that already existed before May 13, 2022, attributing 54.3% of the discount to non-fraudulent factors and just 45.7% to the fraudulent statements. Ex. 1 ¶22. He made an adjustment for the stock reaction to the July 8, 2022 termination letter and for a decline on August 23, 2022 that related to a whistleblower complaint by Zatko. *Id.* ¶23. And he examined "the October 4, 2022 alleged corrective disclosure," which caused Twitter stock to increase by a statistically significant $7.27. *Id.* ¶20 & Ex. 4d. "The fact that there was a statistically significant increase following this news provides additional evidence of the economic importance of the alleged misrepresentations." Ex. 1 ¶20.

The merger offer was at $54.20. As Dr. Tabak explains, on May 12, 2022, the last close before the May 13 misrepresentation, Twitter's stock closed at $45.08, or $9.12 below the merger offer ($54.20 less $45.08). *Id.* ¶22. Following the price response to that misrepresentation, Twitter's stock closed at $37.39 on May 16, or $16.81 below the merger offer. Thus 9.12/16.81, or 54.3% of the discount to the merger-offer price reflects a discount unrelated to the misrepresentation, and the remainder, or 45.7%, is related to the misrepresentation. *Id.* To be conservative, Dr. Tabak assumes for the purposes of his report that given the existence of the potential merger, market and industry effects would have been muted during this time and therefore uses only $7.69 rather than $8.52 to represent the immediate deflationary effects of Mr. Musk's May 13 tweet." *Id.*, n.13, at Ex. 5a-SUPP.

Contrary to Musk's suggestion, in addition to accounting for market-wide and industry-specific effects, Dr. Tabak reviewed news stories he collected at the class certification stage to determine whether there was value-relevant information released close in time to the allegedly false

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

statements that was unrelated to the alleged fraud (*i.e.*, 'confounding' information).   *See* ECF 76-1 ¶¶31–43; *see also* Ex. 4 (list of news articles reviewed by Dr. Tabak).  Dr. Tabak conducted this review for both the May 13 and May 16 stock price declines.   His damages report considers, for example, whether some portion of the decline in response to Musk's May 13 tweet could have been caused by news of a Twitter hiring freeze (Ex. 1 ¶18, n.10):

> Musk's tweet occurred at 5:44 AM on May 13, 2022.  Exhibit 4b shows that between 2:32 AM (when the first news about Twitter halting hiring came out) and 5:44 AM, there was almost no movement in Twitter's stock price.  However, immediately following the 5:44 AM tweet by Mr. Musk, Twitter's stock price dropped precipitously.  This both (1) indicates that Twitter's price movement on May 13 can be attributed to Mr. Musk's tweet and (2) demonstrates that the market for Twitter's stock was active and responding to important news outside of market hours ….
> Given the lack of an intraday price movement from 2:32 AM to 5:44 AM, the time of Mr. Musk's tweet, and that every news headline discussing Twitter's stock-price decline on the morning of May 13 attributed it to Mr. Musk's actions regarding the deal and none of these articles even mentioned the hiring freeze, there was no basis to attribute any of the stock-price decline that day to the hiring freeze.

Dr. Tabak also adjusted his damages calculations to exclude any damages caused by events unrelated to the fraud.  He adjusted for statistically significant price declines on July 8, 2022 and August 23, 2022.  Ex. 1 ¶23.   Aside from market-wide and industry-specific news (which Dr. Tabak accounted for), he found no economic evidence of information unrelated to the Complaint's claims that needed to be disaggregated from the price decline caused by Musk's May 13, 2022 tweet.  *Id*.

As is standard when calculating damages under the Exchange Act, Dr. Tabak then determined the amount of artificial deflation on each date of the Class Period, creating what financial economists call an "inflation ribbon" in a purchaser case and a "deflation ribbon" in the present seller class action. *See* Ex. 1 at Ex. 5b-SUPP (calculations for Section 10b-5(b) claim); *id.* at Ex. 6b (calculations for Section 10b-5(a) and (c) claim).  Dr. Tabak's "deflation ribbon" reflects the amount of artificial deflation in Twitter's stock on each trading day during the Class Period.  *See* Ex. 1 at Ex. 6b; *see also* *In re Novatel Wireless Sec. Litig.,* 2013 WL 12144150, at **10–11 (S.D. Cal. Oct. 25, 2013) (in a purchaser case, this "commonly accepted method" is a "reasonable and logical" approach to assess the artificial inflation in a company's stock price during the class period).  Dr. Tabak also calculated deflation figures for the options that are included in the Class.  *See* Ex. 1 at Ex. 7-SUPP.

In constructing the deflation ribbon, Dr. Tabak took a conservative approach, which Musk

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF DR. DAVID I. TABAK

concedes.  Mot. at 8.  Because this is a merger case, Dr. Tabak assumed that market and industry effects would be lower than normal, and thus allocated a lower percentage decline to the fraud-related factors than that derived from the event study.  Ex. 1 ¶22 n.13 ("assign[ing] only $7.69 to the deflation as of May 16, rather than the $8.52 measured via the event study.")  His conservative calculations assigned only 45.7% of the stock decline to Musk's false statements.  Ex. 1 ¶22.

Courts have held that "conducting an event study that purports to account for confounding information"—as Dr. Tabak has done here—"meets Rule 702's admissibility threshold." *Smilovits v. First Solar, Inc.,* 2019 WL 7282026, at *9 (D. Ariz. Dec. 27, 2019).  In securities class actions, "[t]he question of how much of the decline can be attributed to the challenged statements, as opposed to other factors, is a factual question for the jury." *In re Twitter, Inc. Sec. Litig.,* 2020 WL 4187915, at *16, n.17 (N.D. Cal. Apr. 17, 2020) (Tigar, J.); *see also In re Homestore.com, Inc.,* 2011 WL 291176, at *8 (C.D. Cal. Jan. 25, 2011) (finding reliability because the expert "distinguishes between loss attributable to alleged fraud and loss attributable to non-fraud related news and events").

Without any basis, Musk claims that Dr. Tabak's methodology "provides no avenue for the jury" to award a lower amount, if they disagree with his damages calculations.  Mot. at 10.  In essence, Musk claims that Dr. Tabak must offer day-by-day, statement-by-statement permutations of his damages model that contemplate Plaintiffs will fail to establish liability for some (but not all) of the misstatements at issue on some (but not all) of the days in the Class Period. *Id.*  Musk offers no support for this proposed requirement, and there is none.  In any event, Dr. Tabak's event study and damages methodology are equipped to account for alternative findings by the jury.  For example, if the jury determines that only the May 13 price decline counts as artificial deflation, it can take $40.72 closing price on May 13 and plug that into row D of Tabak Exhibit 5a-SUPP to find an initial deflation of 32.3% rather than 45.7%.

The law recognizes that the jury is perfectly capable of adjusting a damages expert's model to account for its liability findings. *See Williams v. Gaye*, 895 F.3d 1106, 1129–30 (9th Cir. 2018) (upholding jury damages awards based on expert testimony about a "range" of potential recoveries and upholding "jury's choice" to apportion profits of "approximately 40%" though no party argued

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

for that percentage); *Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 489 (S.D.N.Y. 2022) (upholding jury finding of 57% inflation where "the jury accepted some but not all" of expert's disaggregation testimony).  It is "up to the jury to determine how much, if any, of the artificial inflation identified by [the expert] was caused by [defendants'] alleged fraud (and thus by the various statements [they] released in the relevant period), by assessing the alleged misstatements and their connection to the misconception in question."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 255–56 (2d. Cir. 2016) (upholding jury finding where expert presented the "maximum amount" of artificial inflation); *see also Moonbug Entm't Ltd. v. BabyBus (Fujian) Network Tech. Co.*, 2024 WL 2193323, at *16 (N.D. Cal. May 15, 2024) (it is well established that "[i]t is within the province of the jury to award less than all of what the plaintiff seeks," with "'the jury [making] a just and reasonable estimate of the damage based on relevant data'") (quoting *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264 (1946)).

## III. Musk's Attack on Dr. Tabak's Purported Failure to Predicate His Damages Analysis on a Corrective Disclosure Is Meritless

The Class here is comprised of persons who *sold*—not purchased—Twitter securities.  Loss causation works differently in seller class actions because sellers are harmed immediately when they sell.  They no longer own any stock and thus do not need to wait for a corrective disclosure for any harm to materialize.  But by attacking Dr. Tabak for failing to predicate his damages analysis on a corrective disclosure, Musk ignores these fundamental differences. Mot. at 12.  Most of Musk's critiques are predicated on his false assumption that Dr. Tabak uses (or must use) a corrective disclosure model to prove loss causation and damages.  *See* Mot. at 11 (arguing that Dr. Tabak "has no opinion on what a fully corrective statement would have been on May 13").  Musk's argument is also internally inconsistent.  His loss-causation expert, Dr. Lehn, argues that the October 4th disclosure was *not* corrective, yet Musk argues that Plaintiffs' expert should have used such "non-corrective disclosure" to establish loss causation.  Despite this internal inconsistency, Dr. Lehn does not dispute Dr. Tabak's direct causal relationship theory of loss causation in his report.

As explained in *Dura*, a typical purchaser case, "at the moment the [purchase] takes place, the plaintiff has suffered no loss" because "the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value."  544 U.S. at 342 (emphasis in original).  And if "the

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." *Id*.  Once Plaintiffs *sold* their Twitter stock, they did not have "ownership of a share that *at that instant* possesses equivalent value." *Id.* (emphasis in original).  As Dr. Tabak notes, sellers are harmed immediately, with the economic loss coming before the revelation of the fraud.  Ex. 1 ¶11.  For this reason, tethering a loss causation and damages model to a corrective disclosure is not the best approach in a seller case, and certainly is not required by *Dura*.  Musk argues that *Dura* "holds that proving loss causation requires that a plaintiff not only show a price reaction to the alleged fraud but a corresponding reaction when the truth is revealed."  Mot. at 13.  Again, this is only for purchaser class actions; *Dura* expressed no opinion on the requirements for loss causation in a seller class action.  The direct causation model utilized by Dr. Tabak is the preferable approach.

That does not mean a corrective disclosure is irrelevant.  As noted in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, there was in fact a corrective disclosure.  *See* Pls.' Opp. to Mot. for Summary Judgment at 30–34.[4]  Dr. Tabak analyzes the corrective disclosure and determines it resulted in a statistically significant price increase on October 4, 2022, and that "The fact that there was a statistically significant increase following this news provides additional evidence of the economic importance of the alleged misrepresentations."  Ex. 2 ¶20.[5]  Dr. Tabak, however, does not premise his *damages calculation* on the corrective disclosure and instead utilizes a "direct causation" analysis to establish loss causation and damages.

Contrary to Musk's baseless contention (Mot. at 13), Plaintiffs are not "switching theories" nor are they estopped from attempting to prove loss causation at trial through multiple methods, including through either direct causation or a corrective disclosure. Musk's contention that Plaintiffs

---

[4] Musk concedes that his October 4th statement revealed the falsity of at least that portion of his May 13th statement that the deal was on hold. Mot. at 13.  A corrective disclosure need not exactly mirror the false statement, as Musk erroneously contends.

[5] Musk misleadingly quotes a statement that Dr. Tabak made at his deposition, arguing that Dr. Tabak has no opinion on whether the October 4th statements is a "corrective disclosure."  Mot. at 20.  Dr. Tabak's testimony was clear that he wanted to avoid offering any legal opinions or invading the province of the Court or jury, stating "I know the Court ruled on that" and that "I rely on what the Court's saying, that it can be corrective."  Ex. 5 (Tabak Dep.) at 168:1–11. Dr. Tabak never testified that the corrective disclosure cannot be used to prove loss causation.  Instead, he indicated that "because this is a seller class, that is not relevant to the damages analysis." *Id.* at 168:4–5.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

have proceeded exclusively under a "corrective disclosure" theory of loss causation is incorrect. In denying Musk's motion to dismiss, the Court noted: "Plaintiffs have alleged facts supporting a direct causal relationship theory because loss causation can be established by showing 'that the Defendants' misrepresentation was directly related to the actual economic loss [the plaintiff] suffered." *Pampena v. Musk*, 705 F. Supp. 3d 1018, 1052 (N.D. Cal. 2023) (cleaned up) (quoting *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013)).

Musk argues that Dr. Tabak should have measured the artificial deflation in Twitter's stock by looking at how much Twitter's stock increased at the end of the Class Period, when Musk announced on October 4, 2022 that he would go through with the merger at the original price. But as the Court has noted, "'Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss.'" *Id*. As Dr. Tabak explains in his report, "in a seller class, the economic loss typically comes before the revelation of the alleged fraud." Ex. 1 ¶11. In fact, Musk admits that "it may be the case under a deflation theory that sellers suffered a loss before the revelation of the fraud." Mot at p. 13. Courts in this District have similarly found that loss causation can be shown at the time a short seller covers their position in response to a rising stock price caused by false misrepresentations. *See*, *e.g*., *Tesla*, 477 F. Supp. 3d at 933. Notably, in another seller case where Musk is a defendant, he conceded: "Under limited circumstances, a plaintiff can plead loss causation by claiming that shareholders who sold their shares were deprived of the opportunity to sell them for more." *Rasella v. Musk*, No. 22 Civ. 3026, ECF 41, at 20 (S.D.N.Y. Jan. 30, 2023). Here, Twitter's stock price did actually fall on May 13 and May 16, and shareholders were actually deprived of the opportunity to sell them for more.

Because this is a seller case, Plaintiffs were harmed when they sold and the evidence of direct causation (selling in response to Musk's materially false statements) satisfies the loss causation standard, just like the short seller who covered by buying shares in *Tesla*. *See also Rocker Mgmt., L.L.C. v. Lernout & Hauspie Speech Prods. N.V.*, 2005 WL 1366025, at *7 (D.N.J. June 8, 2005) (same). Dr. Tabak's report explains how his direct causation method is consistent with *Dura* in the following hypothetical (*see* Ex. 1 ¶12):

Consider, for example, someone who bought Twitter shares in early May 2022, before

9                              Case No: 3:22-CV-05937-CRB

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

the start of the Class Period, say for $40 per share. Suppose that the May 13, 2022 Musk tweet caused Twitter's share price to decline by $5, from $40 to $35. Next, suppose that the investor sells their shares for $35 before the October 4 corrective disclosure. The investor has lost $5 per share, and, following *Dura*, at that instant, they no longer possess cash of equivalent value to the true value of the shares (*i.e.*, they now possess $35 in cash and no longer have the $40 that they started with). Similarly, if the stock price had risen to $36 before the investor sold, and if that increase was due to a reduction in deflation (*i.e.*, the deflation was now only $4 while the true value remained at $40), then the investor loses $4 in value due to the fraud. Notably, these sales are assumed to occur while the stock price is still deflated, meaning before the corrective disclosure occurs.

Loss causation "requires no more than the familiar test for proximate cause," and "[t]o prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). Because "loss causation is a fact-based inquiry" necessarily "affected by circumstances," plaintiffs in a seller class action can establish loss causation by referencing events other than a corrective disclosure. *See Altimeo Asset Mgmt.*, 663 F. Supp. 3d at 375 (in a seller class action, "the case law does not categorically preclude a plaintiff who cannot point to a corrective disclosure from pleading loss"). "There are any number of ways that a plaintiff can show loss causation" besides a corrective disclosure. *Thant v. Rain Oncology Inc.*, 2025 WL 588994, at *10 (N.D. Cal. Feb. 24, 2025); *see also Levie v. Sears Roebuck & Co.*, 496 F. Supp. 2d 944 (N.D. Ill. 2007) (rejecting a similar argument that some seller class members could not prove loss causation).

Musk baselessly claims that *Nuveen* rejected the type of loss causation argument advanced by Dr. Tabak here. Mot at 13–14. Not so. As the quote from *Nuveen* relied upon by Musk demonstrates, the court rejected only a loss causation theory in a *purchaser* case that relied exclusively on a theory that the plaintiffs would never had bought the stock but for the misrepresentations: *See* 730 F.3d at 1121 ("We have consistently rejected loss causation arguments … that a defendant's fraud caused plaintiffs a loss because it 'induced them to buy the shares'"). Plaintiff in *Nuveen* made no attempt to show that the alleged inflation in the shares was caused by the misstatements. 730 F.3d at 1121. Here, in stark contrast, Dr. Tabak uses a well-accepted direct causation theory to prove loss causation. Further, he uses an event study to eliminate any effects on Twitter's stock that could have been caused by factors other than the misrepresentations. This meets the loss causation standard by providing

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF DR. DAVID I. TABAK

"evidence that certain misrepresented risks are responsible for a loss" and "reasonably distinguish[ing] the impact of those risks from other economic factors." *Id.* at 1123.

Musk's inconsistent and flawed arguments about loss causation are revealed by the hypothetical he uses in his motion. *See* Mot at 15. Musk's hypothetical makes no sense. Let's rewrite Musk's hypothetical using some prices:

> Y's stock trades at $100 as the market believes it may be acquired by X.
> On Day 1, Y denies the rumors "causing its stock to decline" to $80.
> On Day 2, X announces its acquisition of Z, the price remains at $80, and the market understands that this makes an acquisition of Y by X impossible.
> On Day 3, Y announces that it had been pursuing an acquisition of X and of Z, and Y's stock price remains at $80.

Musk claims that "Day 1 sellers can now repurchase Company Y stock at precisely their sale price, suffering no economic loss despite full revelation of the fraud." Not so. Day 1 sellers sold at $80 and can now repurchase shares of Y at $80. However, but for the misstatement, which "caus[ed Y's] stock to decline" to $80, Day 1 sellers would have sold at $100. Even if they later purchased Y at $80, they would have had $20 left over. This debunks the entire loss-causation theory advanced by Musk. Selling at $100 is unambiguously better than selling at $80.

**IV.    Musk's Arguments About the July 8th Termination Letter Are Unavailing**

Musk argues that Dr. Tabak "wrongfully assumed" that the July 8th termination letter "did not negate" Musk's prior false statements. Mot. at 15. Musk further argues that Dr. Tabak failed to review any analyst reports and to analyze whether Twitter's stock price would have fallen to the same price following the termination letter regardless of his May 13 tweet. *Id.* at 16. But Dr. Tabak did review analyst reports. Ex. 5 (Tabak Dep.) at 64:20–25, 65:1–19 ("There were analysts who seemed to think the deal was going forward. There were others that said … Mr. Musk has put the deal on hold."). And he is not required to speculate what would have happened had Musk not made his July 8th statement. He is only required to have a sound loss causation theory, which he does for the reasons noted above. Dr. Tabak's supplemental report disaggregates the stock decline caused by Musk's July 8th letter by removing any damages caused by that statement from the Section 10b-5(b) damages. *See* Ex. 1 ¶23. Dr. Tabak's disaggregation of the July 8th statements satisfies *Dura*, and Musk cites no case to the contrary. Moreover, to the extent the Musk argues at trial that the July 8th statements effectively

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

superseded the May 13 and May 16 misrepresentation in full, the jury should have the benefit of Dr. Tabak's post-July 8 analysis.

**V.     Musk's Disaggregation Arguments Are Without Merit**

To establish loss causation, the law does not require Plaintiffs to tease apart related statements, much less inferences imbedded in the same statement when they are an interwoven bundle, as is Musk's asserted "cold feet" inference. Mot. at 10–12. Musk made the exact same argument in a prior case in this District, *In re Tesla, Inc. Securities Litigation*, 2022 WL 7374936 (N.D. Cal. Oct. 13, 2022). The court in *Tesla* rejected Musk's argument on two grounds:

> (1)    plaintiff's expert made an assumption that the true and untrue statements were an interwoven bundle and that such assumption was reasonable and went to the weight of the opinion, not admissibility; and
>
> (2)    "[w]hile [plaintiff's expert] did not attempt to disaggregate any price impact from the non-false portions of the August 7 tweet, he did address and disaggregate other potentially confounding variables that could have affected Tesla's stock price."

*Id*., at *38. *Tesla*'s reasoning applies here with greater force because Musk's May 13th tweet was entirely false—with no partially true statement in the mix. And even if there were a truthful "inference" that could be deemed part of the statement, Dr. Tabak has testified that he would consider it an interwoven bundle, just as the expert in *Tesla* did. *See* Ex. 5 (Tabak Depo.) at 86:21–87:2 (and Tabak errata sheet) ("I don't see how you get the alternative tweet that just conveys only the false or only the true part."). Dr. Tabak's assumption is eminently reasonable because, in the May 13th tweet, Musk never said "I am getting cold feet." Moreover, just as the expert in *Tesla* did, Dr. Tabak addressed and disaggregated other potentially confounding variables that could have affected Twitter's stock price. *See* Ex. 2 ¶18 & n.10; *see also* Ex. 2 at Ex. 4b. This dooms Musk's meritless suggestion that the "cold feet" inference could have and should have been disaggregated. *See* Decl. ¶8 & Ex. 7.

Contrary to Musk's assertion, Dr. Tabak's report clearly disaggregates additional non-fraud factors. *See*, *supra*, Points I & II. His analysis complies with *Dura* by isolating "other economic factors" such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." 544 U.S. at 343; *see also Tesla*, 2022 WL 7374936, at *9 (rejecting similar disaggregation argument because the expert "engaged in quantitative and qualitative analysis to determine and isolate the Musk Tweets' effect on Tesla's stock price").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

Musk also argues that Dr. Tabak did not consider or disaggregate the posting of alleged findings from two obscure companies called SparkToro and Followerwonk. ECF 255, at 13-14. Musk breezily asserts that his bankers at Morgan Stanley "discovered" these findings and "took them very seriously." *Id.* But claiming that his self-interested agents took these "findings" seriously is a far cry from proving anyone else gave them any credence. In fact, in the news articles that Dr. Tabak turned over as part of his market-efficiency analysis, the first mention of the SparkToro results is on ***May 17, 2022***, after the end of Dr. Tabak's event window. Likewise, none of the analyst reports that Musk's expert Dr. Lehn turned over in the merits stage referred to the SparkToro report. In addition, Musk sent Plaintiffs a RFA that claimed the article was "posted" on May 15, 2022, but the link to the article did not even work. As a result, Magistrate Judge Ryu denied Musk's motion to compel. ECF 218, at 8 ("Defendant's arguments lack merit. The link in the RFAs is broken."). Musk provides no evidence that the posting, if it ever occurred, could have had any effect on Twitter's stock price since it was not allegedly "found" until May 17 at the earliest. *See Hayes v. MagnaChip Semiconductor Corp.,* 2016 WL 7406418, at *7 (N.D. Cal. Dec. 22, 2016) (Tigar, J.) (Even if an expert fails to consider a confounding factor, that goes to the weight of the expert's testimony—not its admissibility).

**Musk 5/15/22 Posting That Bots May Account for 90% of DAUs**. Musk offers no reason why Musk's May 15th tweet was treated as important by the market or added anything to the mix and no evidence it affected the stock price independently of the actionable May 16th statement at the All In Summit. While the May 15 tweet speculates that 90% of Twitter users may be bots, the May 16 statement is that at least 20% of Twitter users are bots. Either figure is above the 5% figure cited by Twitter, and thus Musk was following up on his May 13 tweet in the same way via the May 15 tweet and the May 16 statements by suggesting that either figure would give him the right to terminate the merger. Furthermore, there were only two mentions of the May 15 tweet in Dr. Tabak's news stories and not a single mention of this tweet in Dr. Lehn's analyst reports. The first mention of this tweet in a news story is in a May 15, 2022 story "Elon Musk Says Twitter Lawyers Told Him He Violated NDA—Barrons.com" and the second in a May 16, 2022 story "Twitter's Stock Falls Toward a 7th-straight Loss —MarketWatch." The near-total lack of coverage of the 90% tweet (only two news

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

stories, in which the tweet is not in either headline, and zero analyst reports mentioning the tweet) are indicative of an immaterial news event, almost completely ignored by the news and analysts at a point where they were incredibly focused on what was happening with Twitter.

**Musk's Contention That There Were Earlier Corrective Disclosures**.  Musk argues that statements by Twitter's Chief Legal Officer ("CLO") and Plaintiffs' lawyers prior to the October 4th corrective disclosure that the deal was in fact not on hold constitute prior "corrective disclosures." Mot. at 14.  He argues that since it is undisputed that these prior statements did not have a statistically significant effect on Twitter's stock, the market must not have cared about whether he claimed the deal was not on hold, and that Dr. Tabak allegedly "has no opinion on why these disclosures were immaterial to investors." *Id*.  This is false.  Musk provides no reason why the market would place the same, or any, emphasis on statements by Twitter's CLO or Plaintiffs' lawyers compared to a statement by Musk himself.  Dr. Tabak testified that allegations contained in a plaintiff's complaint seldom contain new material information.  *See* Ex. 5 (Tabak Dep.) at 51 ("in most cases when you've got kind of just, here, an investor suing, people do not tend to think that it has new material information").  It is irrelevant that those statements did not have a material effect on Twitter's stock.

Musk also argues that Dr. Tabak improperly used a constant percentage deflation model, leading to different damages calculations on different days and the alleged improper consideration of market and company-specific information unrelated to the fraud.  Musk's argument is baseless, as a constant percentage deflation method is well-accepted.  *See*, *supra*, Point I; *see also Homyk v. Chemocentryx*, 2025 WL 1547625, at *16 (N.D. Cal. May 30, 2025) (finding that "courts regularly find that the constant percentage inflation methodology used by [an] expert] is reliable and appropriate" and collecting cases and further holding that any arguments regarding different recoveries by different investors "goes to the weight of [the expert's] testimony—not its admissibility").  And his argument also fails because the market and industry effects influence the amount of actual ***deflation at the time*** of a class member's sale.  Thus, in a seller class, these effects are properly included in damages.  His expert Dr. Lehn conceded at deposition that his own damages calculations, using a simplified hypothetical, vary from one day to the next when the "all that changed" was the "the market

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

price of the product sold by the company." Ex. 6 (Lehn Depo.) at 192:5–194:14.

Defendant's authorities do not support his generalized attack on Dr. Tabak's methodology. *In re Williams Sec. Litig.,* 496 F. Supp. 2d 1195, 1267-70 (N.D. Okla. 2007) (proposed damages expert to purchaser class "performed no regression analysis, or even an analysis of statistical significance, to differentiate fraud-related effects from forces unrelated to the fraud" and plaintiffs sought to recover massive damages under a novel "leakage" theory); *In re Omnicom Grp., Inc. Sec. Litig.,* 541 F. Supp. 2d 546 (S.D.N.Y. 2008) (expert "incorrectly identifie[d] several corrective disclosures"); *Tesla,* 2022 WL 7374936, at *11 n.8 (finding defendants' reliance on *Omnicom* "misplaced").

As courts in this District and elsewhere have repeatedly held when faced with these very types of "disaggregation disputes," they are not appropriate for resolution on a Daubert motion, but rather a question for the jury. *See S.E.C. v. Moshayedi*, 2013 WL 12129282, at *6 (C.D. Cal. Nov. 20, 2013) ("Whether he chose the correct factors and gave them the correct weight is for the jury."); *S.E.C. v. Leslie*, 2010 WL 2991038, at *15 (N.D. Cal. July 29, 2010); *Smilovits*, 2019 WL 7282026, at *9; *In re Perrigo Co. Pie Sec. Litig.*, 2021 WL 3073976, at *1 (S.D.N.Y. July 13, 2021).

## VI.    Musk's Requests to Exclude Dr. Tabak's Opinions on the Scheme Liability and Options Damages Are Meritless

Regurgitating an argument from his summary judgment brief, Musk moves to exclude Dr. Tabak's opinions about the effect of the July 8th termination letter on the Rule 10b-5 scheme liability damages. Mot. at 16–17. For the same reasons set forth in Plaintiffs' summary judgment opposition, this argument is meritless. It is simply untrue that Plaintiffs did not plead their scheme liability claim. ECF 31 ¶188. Musk waived all challenges to the scheme liability claim by failing to seek dismissal. Moreover, a scheme liability claim can be supported by either false statements or conduct. *Lorenzo v. S.E.C.*, 587 U.S. 71, 78 (2019); *In re Alphabet Sec. Litig.*, 1 F.4th 687, 709 (9th Cir. 2021).

Musk's perfunctory request to exclude Dr. Tabak's damages on options relies solely on his failed arguments regarding the deflation in Twitter's stock price and thus should be rejected for the reasons discussed in this brief.

/ / /

/ / /

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

## CONCLUSION

For the foregoing reasons, Musk's motion to exclude Dr. Tabak's opinions should be denied.

Dated:  September 12, 2025

Respectfully submitted,

COTCHETT, PITRE & MCCARTHY, LLP

*/s/ Tyson C. Redenbarger*
Tyson C. Redenbarger

Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
Tyson C. Redenbarger (SBN 294424)
Gia Jung (SBN 340160)
Caroline A. Yuen (SBN 354388)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Email:         jcotchett@cpmlegal.com
                   mmolumphy@cpmlegal.com
                   tredenbarger@cpmlegal.com
                   gjung@cpmlegal.com
                   cyuen@cpmlegal.com

Dated:  September 12, 2025

Respectfully submitted,

BOTTINI & BOTTINI, INC.

*s/ Francis A. Bottini, Jr.*
Francis A. Bottini, Jr.

Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Aaron P. Arnzen (SBN 218272)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:  (858) 914-2001
Email:         fbottini@bottinilaw.com
                   achang@bottinilaw.com
                   aarnzen@bottinilaw.com

*Lead Counsel for Plaintiffs*

16                         Case No: 3:22-CV-05937-CRB

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK

**Attestation Pursuant to Civil Local Rule 5-1(i)(3)**

I, Tyson C. Redenbarger, attest that concurrence in the filing of this document has been obtained from the other signatories.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on September 12, 2025, at Burlingame, California.

/s/ Tyson C. Redenbarger
Tyson C. Redenbarger

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF
DR. DAVID I. TABAK