COTCHETT, PITRE & MCCARTHY, LLP
Joseph W. Cotchett (SBN 36324)
*jcotchett@cpmlegal.com*
Mark C. Molumphy (SBN 168009)
*mmolumphy@cpmlegal.com*
Tyson C. Redenbarger (SBN 294424)
*tredenbarger@cpmlegal.com*
Elle D. Lewis (SBN 238329)
*elewis@cpmlegal.com*
Gia Jung (SBN 340160)
*gjung@cpmlegal.com*
Caroline A. Yuen (SBN 354388)
*cyuen@cpmlegal.com*
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN: 175783)
*fbottini@bottinilaw.com*
Albert Y. Chang (SBN 296065)
*achang@bottinilaw.com*
Aaron P. Arnzen (SBN 218272)
*aarnzen@bottinilaw.com*
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001

*Lead Counsel for Plaintiffs and the Class*          (PUBLIC -REDACTED VERSION)

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | CASE NO. 3:22-cv-05937-CRB<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:          October 31, 2025<br>Time:          10:00 a.m.<br>Courtroom: 6, 17th Floor<br>Judge:          Hon. Charles R. Breyer |

**TABLE OF CONTENTS**

**Page**

SUMMARY OF ARGUMENT ..........................................................................................................iv

ARGUMENT ......................................................................................................................................1

I.  Musk's May 13 Tweet Was False and Misleading..............................................................1

II.  Musk's May 16 Statements Were False When Made..........................................................3

III.  Musk's May 17 Tweet Was False........................................................................................4

IV.  Musk's Extremely Limited Information Rights Under the Merger Agreement, Which Did Not Cover the Information He Demanded from Twitter ............................................5

V.  The Court Should Decline Musk's Invitation to Ignore Ninth Circuit Precedent on Scienter ..............................................................................................................................7

VI.  There is Overwhelming Evidence of Musk's Scienter .......................................................7

VII.  Musk's Statements Were Not Mere Opinions ....................................................................9

VIII.  Plaintiffs Established Materiality......................................................................................10

    A.  Musk's Materiality Arguments are Convoluted, Meritless, and Unsupported .......10

    B.  There was no "Revelation" of Musk's Fraud in May 2022 ...................................12

    C.  The May 16 and 17 Statements Were Material and Maintained Twitter's Depressed Stock Price ........................................................................................13

IX.  Summary Judgment is Warranted on Class-Wide Reliance .............................................14

CONCLUSION................................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Akorn, Inc. v. Fresenius Kabi AG*,
   2018 WL 4719347 (Del. Ch. Oct. 1, 2018), aff'd, 198 A.3d 724 (Del. 2018) ......................5, 6

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) ...........................................................................................1, 2

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013)..........................................................................................................13

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)................................................................................... iv, 12, 14

*Berson v. Applied Signal Technology, Inc.*,
   527 F.3d 982 (9th Cir. 2008) ....................................................................................1, 2, 4

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) .......................................................................................4

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ....................................................................................10

*Garbini v. Prot. One, Inc.*,
   49 F. App'x 169 (9th Cir. 2002) ...............................................................................11

*Gebhart v. SEC*,
   595 F.3d 1034 (9th Cir. 2010) ................................................................... iv, 7, 8

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) .................................................................................13

*In re Intuitive Surgical Sec. Litig.*,
   2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) .......................................................9

*In re McKesson HBOC, Inc. Sec. Litig.*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..................................................................11

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ...............................................................................12, 13

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)........................................................................................9, 10

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000).................................................................................12, 13

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) .................................................................................15

*S.E.C. v. Platforms Wireless Int'l Corp.*,
    617 F.3d 1072 (9th Cir. 2010) ...........................................................................................7

*SEC v. Terraform Labs Pte. Ltd.*,
    708 F. Supp. 3d 450 (S.D.N.Y. 2023)...............................................................................2

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)...............................................................................................10, 12

## SUMMARY OF ARGUMENT

Nothing in Musk's opposition brief comes close to undermining the overwhelming—and unusually straightforward—evidence that Musk acted with scienter in making materially false statements about his deal to acquire Twitter. After sifting through Musk's feints and distractions, a number of facts remain undisputed surrounding his May 13 tweet that the deal was on hold, his statement at the May 16 All-In Summit that fake accounts make up 20% or more of Twitter's user base, and his assertions in a May 17 tweet that contained a combination of both of his prior statements. Because Musk's opposition brief does not cast doubt on evidence establishing these critical facts, partial summary judgment as to falsity and scienter is appropriate.

Specifically, Musk's opposition fails to introduce any evidence disputing the following facts, all of which are supported by the evidence contained in Plaintiffs' moving papers:

**The deal was not on hold.** Musk's May 13 tweet declares that the deal was "temporarily on hold." But multiple members of Musk's own team offer unambiguous testimony that the deal was not on hold. Alex Spiro (one of Musk's two field marshals during the acquisition) immediately told Musk's bankers that they should press forward with the deal, and Musk's entire team continued their work. There was nothing about the deal that was on hold, and Musk presents no credible evidence to the contrary.

**Musk had no right to put the deal on hold.** The merger agreement does not contain any provisions that allowed Musk to put the deal on hold. Musk argues that the merger agreement let him ask for information related to consummating the merger, but that does not establish that he could put the deal on hold. The statement is also false because (1) Musk testified that he really wanted the information for an entirely different purpose, *i.e.*, to do his own analysis of fake accounts (the quintessential example of due diligence, which he had wavied), and (2) Musk's (i) right to ask for information and (ii) the right to put the deal on hold are two entirely different things.

**Musk had no factual basis to represent that the deal was on hold.** Musk admitted that he did not review the merger agreement or check with his field marshals (Spiro and Jared Birchall), bankers, lawyers, or any of his other facilitators before tweeting that he had the right to put the deal on hold. Musk's statement was thus completely unmoored in fact or reliable opinion. This

evidence also establishes that Musk "lacked sufficient information for [his] statements," thus establishing scienter. *Gebhart v. SEC*, 595 F.3d 1034, 1044 (9th Cir. 2010).

**Musk had no factual basis to represent that fake and spam accounts represented 20% of Twitter's active users.** Investors had every reason to believe that Musk based his statements on actual information and facts, including information he received from Twitter. Musk's attorneys now argue that he did just that, *i.e.*, that he based his statements on conclusions made by "outside firms." But Musk said just the opposite under oath: ███████████████████████ ███████████████████████████████████████████████ ████████████████████████ Musk knew investors would give credence to his statements based on his access to Twitter, but in reality, he had no basis for his 20% assertion, which proves falsity. As for Musk's state of mind, *Gebhart* is equally applicable to this statement—he "lacked sufficient information" surrounding 20%, and therefore acted with scienter. *Id*.

Evidence that Musk's challenged statements were material is equally overwhelming. The statements sent Twitter stock into a tailspin and maintained it at artificially depressed levels until Musk capitulated and finally agreed to pay full price for Twitter. Based on this record, there is no dispute that a reasonable investor would consider these statements about the merger to have "significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988).

*  *  *

## ARGUMENT

### I.    Musk's May 13 Tweet Was False and Misleading

Musk argues that Plaintiffs have not shown that the market "interpreted" his May 13 tweet as a description of his legal rights and thus that his statement was not false.  ECF 267 at 6-7.  That argument misstates the controlling falsity standard.  Falsity is established where a statement "would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists."  *Berson v. Applied Signal Technology, Inc*., 527 F.3d 982, 987 (9th Cir. 2008).  Courts in the Ninth Circuit apply the objective standard of a "reasonable investor" to determine whether a statement is misleading.  *In re Alphabet, Inc. Sec. Litig*., 1 F.4th 687, 699 (9th Cir. 2021).

Here, Musk's May 13 tweet gave reasonable investors the impression of a state of affairs that differed in a material way from the one that actually existed, *i.e.,* a reasonable investor would believe that Musk could put the deal on hold and that the deal was in fact temporarily on hold until Twitter provided the information Musk said he was entitled to.  Other than self-serving statements that do not constitute admissible evidence, Musk fails to submit any facts disputing Plaintiffs' evidence, which establishes that Musk's statement was false for several reasons:  The deal was not on hold, Musk did not have the right to put it on hold, and Musk had no basis to suggest that Twitter's spam estimates were inaccurate.  *See* MSJ Ex. 14 [ECF 253-15], Musk Tr. at 225-26; MSJ Ex. 41 [ECF 253-42], Ringler Tr. at 245;  MSJ Ex. 3 [ECF 253-4], Musk SEC Tr. at 306-07 (Musk admitted that bot numbers were ██████████████████████ ███████████.[1]

Musk repeatedly argues (in sections I.A.1, I.A.3, I.B., and I.C.) that his statements cannot be false unless Plaintiffs prove how others subjectively interpreted his false statements.  ECF 267 at 7, 11, 14, 15.  That is not the law.  In the Ninth Circuit, courts apply an objective, "reasonable investor" standard to determine falsity.  *See Berson*, *supra*, 527 F.3d at 987; *In re Alphabet, supra,*

---

[1] To avoid duplicative filings of the same evidence, and the need for repetitive motions to seal, Plaintiffs refer to exhibits filed in support of Plaintiffs' Motion for Summary Judgement as "MSJ Ex.___; [ECF 253-_]."  *See* ECF 253 *et. seq.*  If the court prefers, Plaintiffs will re-file the exhibits in support of this motion.

1 F.4th at 699.

Musk cites one out-of-district case in support of his position, *Terraform Labs*. *See* ECF 267 at 7, 11. That case is inapplicable and distinguishable. To begin with, *Terraform* reaffirmed that an objective standard applies. *See SEC v. Terraform Labs Pte. Ltd*., 708 F. Supp. 3d 450, 481 (S.D.N.Y. 2023) (standard is whether " a reasonable investor would have been materially misled"). Second, *Terraform* primarily involved a scheme to manipulate the price of a crypto-asset and sell unregistered securities, not the making of false statements. Finally, while there were some allegations of false statements, the statements challenged were hypertechnical, vague, and subject to multiple interpretations. *Id.* (statements included the following: "Assets (LUNA) and liabilities (UST) maintain parity by the Terra protocol acting as a market maker, inflating the LUNA supply during UST contractions and deflating the LUNA supply during UST expansions"). Aside from *Terraform*, Musk cites no authority to justify straying from Ninth Circuit precedent. ECF 267 at 7. The court should reject this argument, which appears throughout Musk's opposition.

Musk's argument is factually inaccurate, too—there is ample evidence that the market interpreted Musk's deal on hold tweet to mean Musk had in fact put the deal on hold. Plaintiff Brian Belgrave testified that he thought the tweet meant "Mr. Musk ***is putting the whole deal on hold***." Reply Ex 1,[2] Belgrave Tr. at 139:10-22. (emphasis added). And analysts at Wedbush observed that Musk's "bizarre" tweet "now sends this whole deal into a circus show with many questions and no concrete answers as to the path of this deal going forward." MSJ Ex. 45, [ECF 253-46].

Ultimately, the uncontroverted evidence shows that Musk told the public the deal was temporarily on hold while, behind closed doors, his team was told the opposite. *See* MSJ Ex. 7 [ECF 253-8], Claassen Tr. at 260-61 ███████████████████████████ MSJ Ex. 14 [ECF 253-15], Musk Tr. at 225-228, 236-39; 275:7-9 (Musk admitted that ████████ ████████████████████████████████████████████████████ ████████████████████████████████████ )

---

[2] "Reply Ex. __" refers to the exhibits attached to the Declaration of Tyson Redenbarger filed concurrently in support of this Reply.

Musk also argues that Plaintiffs cherry pick the phrase "on hold," and that "pending" completely changes the meaning of "on hold." ECF 267 at 12.[3] Not so. The everyday understanding of "pending" matches Merriam-Webster's definition: "during," or "while awaiting." Thus, the tweet falsely conveyed that the deal was on hold during the time that Musk was awaiting data from Twitter—which is exactly what Plaintiffs have argued, and what the evidence proves. Besides, the FAC and Plaintiffs' motion include the full tweet. *See* ECF 253 at 8.

Musk further argues that his May 13 statement was not false because Twitter's stock did not materially increase on May 19 when Twitter (not Musk) told its employees the deal was moving forward. *See* ECF 267 at 13. But the market already understood Twitter's position, and the May 19 communication to Twitter employees did not in any way convey that Musk had changed his position about the deal being on hold. *See* ECF 267-9. Twitter's May 19 communication thus has no bearing on the falsity of Musk's May 13 tweet.

## II.   Musk's May 16 Statements Were False When Made

Musk argues that his May 16 statements were true because they were based on Musk's experience on Twitter and analysis by some unidentified "outside firms." *See* ECF 267 at 14-15.

First, the May 16 statements were not true. During his SEC investigative testimony, which was taken less than two months after Musk made the statements,



MSJ Ex. 3 [ECF 253-4], Musk SEC Tr. at 306-07. Musk accuses Plaintiffs of misquoting the testimony above, which is simply not true. Musk clearly stated,

*Id.* Musk's interrogatory responses in Delaware likewise prove that

---

[3] Musk's additional arguments attempting to parse his tweet, (*i.e.,* his tweet meant there was a delay, not that the deal was on hold) are not evidence that rebuts the falsity of the tweet and should be rejected.

███████████. MSJ Ex. 49 [ECF 253-15], responses 4, 5.[4]

The May 16 statements were also false because they misled the investing public to believe that Musk had received information provided by Twitter, ███████████████████████ MSJ Ex. 3 [ECF 253-4], Musk SEC Tr. at 306-307. As the evidence shows (and noted by this Court) Musk "had tweeted just three days prior that the deal was on hold pending details" from Twitter, "so a reasonable investor could have reasonably concluded that Defendant was later able to make a statement about the percentage of bot users because he had received such information from Twitter." ECF 48 at 23. Likewise, Musk's statement: "I'm being told is that the – there's just no way to know the number of bots," was false. Just a few days before, Twitter's CEO and CFO offered to provide the data but said "████████████████████████████████ ███████████████████████████████████." *See* MSJ Ex. 14 [ECF 253-15] Musk Tr. at 181:6-182:21.

Taken together, a reasonable juror could only find falsity in light of these facts. *Berson*, 527 F.3d at 987 (falsity established where a statement creates "the impression of a state of affairs" that differs from reality) (quotation, citation omitted); *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) ("a statement that is literally true can be misleading and thus actionable under the securities laws").

## III.    Musk's May 17 Tweet Was False

Musk attempts to rebut the falsity of the May 17 tweet by misquoting and mischaracterizing Plaintiffs' argument. Specifically, Musk incorrectly claims that his statement "Yesterday, Twitter's CEO publicly refused to show proof of <5%" was true because Twitter only provided a "high-level" description of its bot auditing process, but not any documents. ECF 267 at 15. That argument is meritless. CEO Agarwal promised (not refused) to provide data just days before. *See* MSJ Ex. 14 [ECF 253-15], Musk Tr. at 181:6-182:21 (CEO and CFO said on May 6 "████████████████████ ████████████████████████████████████████████████████").

[4] As stated in their opposition to Musk's summary judgment motion, Plaintiffs object to the consideration of the SparkToro report because there is no evidence that Musk saw it before making his statements, and it is unauthenticated and unreliable. *See* ECF 268, at 15 n. 5.

Moreover, Agarwal's May 16 tweet that "we shared an overview of the estimation process with Elon a week ago and *look forward to continuing the conversation with him, and all of you*" is not a refusal to share information. ECF 253 at 23. Musk's opposition confirms this by admitting that Twitter "promised" to provide the data. ECF 267 at 15.

**IV.     Musk's Extremely Limited Information Rights Under the Merger Agreement, Which Did Not Cover the Information He Demanded from Twitter**

Musk argues at length that his statements were not false because he had the right to request "bot information" from Twitter. *See* ECF 267 at 7-11. The evidence shows he had no such rights.

Musk's argument fixates on two provisions in the merger agreement (Sections 6.4 and 6.11) that allowed him to make "reasonable" information requests for the *specific purpose of consummating the merger*. *See* Opp. Ex.[5] 1 at 43 [ECF 268-2]. But the overwhelming evidence shows that Musk sought information from Twitter for purposes of doing exactly the opposite, *i.e.*, to escape the deal and avoid consummating the merger at the agreed-upon price. This is clear from the very nature of Musk's incendiary demands, which call for, *inter alia*, terabytes of "firehose" data surrounding Twitter's entire user base—none of which has anything to do with Musk's ability to make payroll, pay rent, or otherwise keep the Twitter platform running when Musk took over the company. The real reason for these requests is also evident in the undisputed fact that Musk never even showed up at a meeting that Twitter scheduled to provide him with the information he requested and then dodged Twitter's attempts to reschedule. MSJ Ex. 14 [ECF 253-15], Musk Tr. at 183. There was no need since Musk's statements had served their purpose—tanking Twitter's stock.

To support his expansive information rights theory, Musk cites to *Akorn v. Fresenius Kabi*. But this effort is unavailing. In *Akorn*, the buyer conducted significant due diligence before signing the merger agreement and then also bargained for the *specific right to additional information concerning contractual compliance*, which was memorialized in the merger agreement. *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *2 (Del. Ch. Oct. 1, 2018), aff'd, 198 A.3d 724

---

[5] "Opp. Ex" refers to the exhibits attached to Plaintiffs Opposition to Musk's Motion for Summary Judgment, ECF-268.

(Del. 2018). That is obviously not the case here. Here, Musk waived all due diligence and did not negotiate a specific right to investigate "bot data." *See* Opp. Ex. 1 at 43-44 [ECF 268-2].

Additionally, that Twitter endeavored to be cooperative and provided information is not a concession that Twitter was contractually obligated to provide any information. *See* Opp. Exs. 3, 5 ("even though many of Mr. Musk's requests have gone beyond what is called for under Sections 6.4 and 6.11 of the merger agreement, Twitter has worked constructively to provide Mr. Musk with the information that he claims he needs to consummate the merger.") And the fact that Musk ultimately dismissed all of his own claims in Delaware and paid *full price*, is proof that Musk did not have such information rights. *See* MSJ Ex. 57 [ECF 253-58]; MSJ Ex. 41 [ECF 253-42], Ringler Tr. at 211-213.

Musk additionally argues that the May 13 tweet was not false because Musk had the "right" to refuse to close the merger. ECF 267 at 10. This is wrong for two reasons. First, it conflates two distinct issues—putting the deal on hold and refusing to close are not the same. Musk's own lawyers confirmed as much, repeatedly stating that putting a deal on hold is "not a thing." *See* MSJ Ex. 41 [ECF 253-42], Ringler Tr. at 245 ███████████████████████████████████████████████████████████"; MSJ Ex. 42 [ECF 253-43], Earls Tr. at 206 ████████████████████████"; *see also* MSJ Ex. 43 [ECF 253-44], Silverstein Tr. at 346 █████████████████████████████). Second, Musk presents no evidence that he had the right to refuse to close the merger, and certainly not on May 13. In the "seller friendly" merger agreement, Musk's right to "refuse to close" only arises *if* a representation was false *and* it resulted in a Company Material Adverse Effect or "MAE" (among other requirements). As defined, an MAE was an event or circumstance that "would reasonably be expected to result in a material adverse effect on [Twitter's] business, financial condition or results of operations." Opp. Ex. 1 [ECF 268-2] at p.5. However, the MAE "standard is so high that Delaware courts have found that conditions warranted the finding of an MAE *only once* in their history." MSJ Ex. 23 [ECF 253-24] Badawi Report at ¶¶35, 97 (emphasis added). Musk cites no evidence that any MAE existed. This explains why Musk admits that, "[a]t the time of Musk's alleged misstatements in May, he did not yet definitively know whether Twitter's statements in its SEC filings about mDAU were false, let alone whether, if so,

the falsity rose to a Company Material Adverse Effect." ECF 267 at 9, n. 4.

In sum, Musk's May 13 tweet was false because he could not and did not put the deal on hold—and contrary to Musk's arguments, he admits that as of May 13, he did not have the legal right to "refuse to close" because no MAE had been established.[6]

## V.    The Court Should Decline Musk's Invitation to Ignore Ninth Circuit Precedent on Scienter

Musk argues that this Court should ignore *Gebhart v. SEC*, 595 F.3d 1034, 1044 (9th Cir. 2010), because that case decided an appeal of an SEC administrative decision on a more lenient standard of review. But the Ninth Circuit's treatment of scienter in *Gebhart* is unusually robust—it synthesized the relevant statute, the SEC rule promulgated thereunder, a dozen cases (including Supreme Court precedent), and most importantly, decided the correct "legal standard for scienter." *Id.* at 1040. Moreover, *Gebhart*'s discussion of scienter has been cited in 68 cases. *See e.g., S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1093 (9th Cir. 2010) (considering summary judgment, and stating "In *Gebhart* . . . our most recent case to address the issue of reckless scienter, we concluded that scienter requires 'either knowledge of falsity or conscious recklessness.'"). The Court should reject Musk's invitation to ignore *Gebhart*.

## VI.    There is Overwhelming Evidence of Musk's Scienter

Musk argues that he read the merger agreement *when he signed it*, so evidence that he did not re-read it, or check in with his field marshals (Spiro and Birchall), bankers, deal lawyers, or other advisors before posting his May 13 deal-on-hold tweet does not show scienter. ECF 267 at 18. But there is no evidence that: (1) when Musk signed the merger agreement, he carefully read the relevant clauses regarding information rights; (2) he believed, on May 13, that these provisions actually gave him the right to put the deal on hold; or (3) Musk remembered any of these technical contract provisions two weeks later in the middle of the night when he posted his May 13 tweet. This is critical because, according to Musk's own expert "[m]erger agreements are among the most complex agreements" on the legal landscape. ECF 247-2, at ¶ 25. No reasonable juror could find

---

[6] Musk claims even if he did not have the "right" he had the "power" to put the deal on hold. This argument is unsupported by evidence and the law, and should be disregarded.

anything less than aggravated recklessness in light of Musk's abject failure to check on the accuracy of his tweet before posting it to his tens of millions of Twitter followers.

Musk claims that his 20% estimate was not reckless or intentionally false because he references "outside firms" in his May 16 statement. ECF 267 at 19. However, as explained above, ████████████████████████████████████████████████████████ The carefully worded assertion that "*others*" on his team may have reviewed the inadmissible SparkToro report does not establish any basis for **Musk's statements**. Reply Ex. 2, Musk Tr., at 258-62. Thus, Musk has not provided any evidence to rebut the May 16 statement was made intentionally or recklessly.

Similarly, Musk stated on May 17 that "Twitter's CEO publicly refused to show proof of <5%," which, as Musk's motion confirms, ████████████████████████████ ████████████████████████████████████████████ *See* MSJ Ex. 14 [ECF 253-15] Musk Tr. at 181:6-182:21. Thus, Musk knew his statement was false, and he provides no countervailing evidence to rebut that fact.

The fact that Musk's purported concerns about bots were a mere pretext is also strong evidence of scienter, contrary to Musk's argument that it is "irrelevant." ECF 267 at 16-17. As explained in Plaintiffs' opening brief, Musk was well aware of the prevalence of fake and spam accounts on Twitter long before he agreed to acquire the company. ECF 253, at 3-8. That Morgan Stanley requested any information is also beside the point because it does not rebut whether **Musk's interest** was genuine. And Musk misquotes Armstrong's testimony—Morgan Stanley did not "engage their own counsel" because they were concerned about Twitter's spam calculation or the Sparktoro report—Armstrong clarifies that the conversations were ████████████████ ██████████████████████████████████████████████████████ ████ ECF 267-22, Armstrong Tr. at 305:15-19; 306:24-307:4. The unrebutted evidence is therefore clear that Musk made all of his statements with at least a reckless disregard for the truth. *Gebhart*, 595 F.3d at 1040.

## VII.    Musk's Statements Were Not Mere Opinions

In the face of overwhelming evidence demonstrating the falsity of his statements, Musk pivots to arguing that, even if false, his statements were mere opinions. ECF 267 at 19-20. Without evidentiary support, Musk claims that he was only making a subjective interpretation of contract provisions and that his 20% statements were just estimates. *Id*. In support, Musk cites *Omnicare,* but as explained below, *Omnicare* does not help Musk, and his factual claims are unsupported.

In *Omnicare*, the Supreme Court found that the statement at issue was an unactionable opinion because the company included the words "we believe," and because it was only *later*—in hindsight—that the company learned that the statement was incorrect. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 180, 187 (2015) ("the import of words like 'I think' or 'I believe, … convey some lack of certainty as to the statement's content"). The Supreme Court also held that opinions could be actionable, stating "an unadorned statement of opinion about legal compliance: 'We believe our conduct is lawful'" could be misleadingly incomplete "[i]f the issuer makes that statement without having consulted a lawyer." *Id*. at 188.

Musk made statements of fact—not opinions. He stated "the deal is temporarily on hold" and "cannot move forward,"—neither of which contains any language suggesting this was an opinion. MSJ Exs. 1 at RFA 134, 40, 48 [ECF 253-2, 49, 134]. *See Omnicare,* 575 U.S. at 183 ("a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not.") Moreover, Musk concealed the fact that he was making false statements to aid his undisclosed efforts to renegotiate the price. *See* MSJ Ex. 39 [ECF 253-40] ███████████████████████████████████. Such an omission is unlawful. *See Id*. at 192 ("an issuer must as well desist from misleading investors by saying one thing and holding back another."); *see also In re Intuitive Surgical Sec. Litig*., 2017 WL 4355072, at *3 (N.D. Cal. Sept. 29, 2017) ("opinion statements regarding da Vinci's safety and efficacy" were material under *Omnicare* "because they omitted numerous material facts.").

Even if the Court were to agree that Musk's statements were opinions, Musk had to have a "sincere" and "genuine" belief that **he could put the deal on hold**. To hold such a sincere opinion, Musk would have had to at least reviewed the merger agreement or consulted with his advisors

before he made his statements. ███████████████████████ MSJ Ex. 14 [ECF 253-15], Musk Tr., at 270-271; MSJ Ex. 60 [ECF 253-15] at 4-5. *See Omnicare,* 575 U.S. 175, 188 (legal statements can be misleading "[i]f the issuer makes that statement without having consulted a lawyer.")

The cases cited by Musk support Plaintiffs' position. In *Dearborn Heights*, the false statements involved estimates of goodwill, which depended on management's *subjective* determination of the "fair value" of the assets acquired and liabilities assumed. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017). Here, it is an objective fact that Musk could not, and did not, unilaterally put the deal on hold. Likewise, Musk testified that ████████████████████████████████████ ███████████████████████

Musk incorrectly argues that because he said "I think" on May 16, that his statement is not actionable.[7] But Musk's opposition cites no evidence that he *personally* reviewed any estimates that supported his 20% claim before he made his statement. *See* § II above. Thus, the statement, even if deemed an opinion, is actionable here. *Omnicare*, 575 U.S. at 188–89.

## VIII.   Plaintiffs Established Materiality

### A.    Musk's Materiality Arguments are Convoluted, Meritless, and Unsupported

Musk makes several arguments attacking materiality, each of which attempts to distort the law and the facts to confuse the element of materiality. As explained below, materiality is easily established here.

Materiality is established where "the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Musk argues that the significant 17.85% stock drop alone is not sufficient to establish materiality. But that argument ignores the significance of the stock drop and overlooks all the additional evidence supporting materiality. For example, in the two trading days after Musk's May 13 tweet, Twitter's stock

---

[7] Musk's May 13 and 17 statements contain no language suggesting he was asserting an "opinion," thus Musk's "opinion" argument must be limited to the May 16 statement only.

dropped a massive 17.85% because the market considered the deal a "50/50 chance" of going through and was pricing the stock in the "$40.50-$41.00 range." *See* MSJ Ex. 44 [ECF 253-45]. Indeed, if the deal fell through, analysts predicted the price of Twitter's stock would likely be "sub $30." MSJ Ex. 47 [ECF 253-48]. These unrebutted facts clearly establish that Musk's statements were material. Additionally, as this Court noted previously, "a reasonable investor would find Twitter not complying with its contractual obligations—particularly, its contractual obligation to provide details about its bot calculations—to be material to their investing decision-making." ECF 48 at 21.

Musk next argues that Plaintiffs must prove that "Twitter's stock price would have reacted differently if Musk had simply tweeted the truth that he was getting 'cold feet' and looking for a way to back out." That is not the law. Here, undisputed evidence establishes that Musk's statements had a significant impact on the "total mix" of information available. *See supra*. Additionally, there is evidence that if Musk backed out, Twitter's stock would have dropped significantly more. MSJ Ex. 47 [ECF 253-48] (price would drop to "sub $30.").

Musk cites *In re McKesson HBOC, Inc. Sec. Litig*., but that case is inapplicable to the facts here. In *McKesson*, the court found that shareholders benefited from the alleged misstatements because the merger was a better deal given the accounting issues. *In re McKesson HBOC, Inc. Sec. Litig*., 126 F. Supp. 2d 1248, 1261 (N.D. Cal. 2000). That is not the situation here; shareholders who sold did not benefit from Musk's statements. They sold at artificially deflated prices without knowing that Musk was bluffing, his statements were false, and that he would ultimately pay full price. *McKesson* has also been distinguished by the Ninth Circuit on the same grounds. *See Garbini v. Prot. One, Inc*., 49 F. App'x 169, 170 (9th Cir. 2002) (distinguishing *McKesson* as the plaintiff "actually benefitted financially after an allegedly false or misleading registration statement was issued.")

The rest of Musk's arguments repeat issues addressed above, *e.g.*, that his tweets were truthful and that he had a right to request bot information. The Court should reject them here as well. In short, Musk's testimony on this issue sums up the materiality of his tweets: █████████

████████████████████████████████████████████

███████████ MSJ Ex. 3 [ECF 253-4], Musk SEC Tr. at 282.

**B.    There was no "Revelation" of Musk's Fraud in May 2022**

Musk argues that his false statements were immaterial because Twitter's stock did not move in response to a May 19 Bloomberg article, which reported that Twitter employees were still working on the deal, and a May 25 amendment to Musk's Schedule 13D regarding financing. ECF 267 at 23. In support of this argument, Musk cites one Third Circuit case, *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000). The ***Ninth Circuit has directly rejected Oran***, stating that "adoption of such a rule [as articulated in *Oran*] would contravene the Supreme Court's holdings in *Basic, Inc. v. Levinson . . .* and *TSC Industries, Inc. v. Northway, Inc*." *See No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp*., 320 F.3d 920, 934 (9th Cir. 2003). The Ninth Circuit reiterated that courts should instead engage in the fact-specific inquiry set forth in *Basic*. *Id*.

Here, Musk cannot establish that the May 19 Bloomberg article or the May 25 filing were "revelations" that prove that Musk's statements were immaterial. Reporting that ***Twitter*** was privately reassuring its employees after Musk's false tweets that the "Deal is Proceeding, Not 'On Hold'" was not a corrective "disclosure" as to ***Musk's statements***. ECF 267-9. And the article said nothing about whether Musk still considered the deal on hold, nor did it shed any light on his 20% estimate. Moreover, it was not a "revelation" that Twitter was working to move the deal forward—Twitter wanted the deal to close. Additionally, the fact that Twitter had to convene an "all-hands meeting" to assure Twitter employees the deal was "not on hold" proves that Musk's statements were material and had caused great uncertainty.

Likewise, the May 25 amendment to Musk's Schedule 13D was not a corrective disclosure. The amendment disclosed that Musk's margin loan had expired on May 24 and that he had committed to provide an additional $6.25 billion to fund the merger. ECF 267-38. This filing does not clearly state that Musk was proceeding with the deal, that Musk's 20% estimates were unfounded, or whether Musk would close the deal if he didn't receive the information he was requesting. Moreover, the filing does not disclose that Musk was attempting to renegotiate the price of the deal. Therefore, the May 25 filing is not a corrective disclosure. *See In re Gilead Scis. Sec.*

*Litig.*, 536 F.3d 1049, 1058 (9th Cir. 2008) (purported, but insufficient, corrective disclosure did not contain enough information to significantly undermine prior false statements.)  Accordingly, the Court should reject Musk's *Oran* materiality arguments.

### C.    The May 16 and 17 Statements Were Material and Maintained Twitter's Depressed Stock Price

Musk also challenges the May 16 and 17 statements, arguing that the stock did not have a statistically significant movement, and therefore, the statements were immaterial.  ECF 267 at 24. This argument misstates the law.  "[T]he question of materiality ... is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor."  *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013).  Musk again relies exclusively on *Oran*.  The Court should reject this argument, just as the Ninth Circuit has directly rejected *Oran*. *See No. 84 Emp.-Teamster*, 320 F.3d at 934.

Musk next argues that Plaintiffs are barred from asserting the price maintenance theory because "price maintenance" is not alleged in the FAC, and the "only reason" the May 16 statement survived is due to the allegation that Twitter's stock decreased on May 16.  ECF 267.  These arguments are inaccurate,[8] do not address or rebut ***materiality*** at all, and should be rejected out of hand.

Musk's subsequent arguments that Plaintiffs failed to prove that the misstatements contained "confirmatory information" and criticizing the price maintenance theory also fail to rebut materiality.  *See* ECF 267 24-26.  Here, the May 16 and 17 statements ***confirmed*** that Musk was attempting to create uncertainty in the deal by falsely claiming it was on hold and could not move forward, while also (unfoundedly) claiming that spam and fake accounts were 20% or higher.  *See* ECF 249-11, Tabak Tr. at 26:16-28:8.  This was undoubtedly material information to investors. For example, on May 16 after Musk's statements, Wedbush wrote: "Our view is that the Street is assigning the chance of Musk walking as more than 50% which speaks to the pressure on Twitter shares, coupled by if he stays and does a deal $54.20 is out the window with this circus show now

---

[8]  Both the FAC (¶191) and Plaintiffs' expert reports demonstrate how Musk's false statements helped to maintain the artificial deflation in Twitter's stock price.  *See* ECF 102-2 at ¶8 (Tabak Reply Report).

hard to predict the next move from Twitter's Board."  MSJ Ex. 47 [ECF 253-48].

## IX.    Summary Judgment is Warranted on Class-Wide Reliance

Musk first challenges reliance, arguing that Plaintiffs cannot prove that the misrepresentations were material.  ECF 267 at 26.  As discussed above, the evidence in the record clearly establishes that the misrepresentations were material because they "significantly altered the total mix of information" available to investors.  *Basic*, 485 U.S. at 232.

Musk then tries to argue that he is entitled to rebut Plaintiffs' theory because the claims are somehow contradictory.  ECF 267 at 27.  Musk's recycled argument has already failed at class certification.  *See* ECF 106 at 5-8.  What the Court said there applies in equal force here:

> Musk's argument is somewhat unusual in that he does not appear to contest that Twitter is an efficient market in fact; instead, he argues that Plaintiffs' "own theories of falsity and loss causation are fundamentally incompatible with" an efficient market. . . . Musk's argument proves too much. To start, Plaintiffs never conceded that sophisticated investors were not misled by Musk's tweets. . . . ***Their theory is simply that Musk's statements were misleading—even to sophisticated investors and even in light of the Merger Agreement—and that his statements affected Twitter's stock price as a result. That Musk contests whether his statements were misleading when considered alongside the Merger Agreement does not change Plaintiffs' facially viable theory***.
> Because Plaintiffs adequately allege an efficient market, and Musk does not contest the other prerequisites to establish the *Basic* presumption of reliance at the class certification stage, the *Basic* presumption of reliance applies.

Dkt. 106 at 6-7 (emphasis added).

The same is true now at the summary judgment stage: Musk's statements were misleading even in light of the merger agreement.  That is in no way contradictory.  And Musk offers no evidence, authority, or even a new argument otherwise.

Next, Musk unconvincingly tries to argue that there is a factual dispute regarding whether the presumption applies ***for the entire Class Period***, arguing that the "truth" was revealed as early as May 19.  ECF 267 at 27.  First, the truth was not revealed on May 19 or at any time in May.  *See* §VII.B *supra*, and ECF 272 at 13-15.  Additionally, even if the Court were to entertain this argument, it does not rebut class-wide reliance—instead, it argues that the truth was revealed on May 19, which (according to Musk) would shorten the class period.  At best for Musk, this argument admits that class-wide reliance should apply here, but that it "ended in May 2022."  ECF 267 at 28.

Lastly, Musk claims there is evidence rebutting the fraud on the market reliance presumption, because (according to Musk) the market was aware of the truth. ECF 267 at 28. However, before the "truth-on-the-market" doctrine can be applied, Musk "must prove that the information that was withheld or misrepresented was 'transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insider's one-sided representations.'" *Provenz v. Miller*, 102 F.3d 1478, 1492–93 (9th Cir. 1996). Musk bears "a heavy burden of proof. Summary judgment is proper only if [he] show[s] that 'no rational jury could find' that the market was misled." Musk fails to provide the evidence required to meet this standard. Instead, he simply points to the merger agreement and argues that his rights under the agreement were known to the public. That is insufficient. Musk does not cite any evidence showing that the market knew (i) that he had not internally put the deal on hold, (ii) that his advisors did not believe putting the deal on hold was permitted, (iii) that Musk had no basis for his 20% estimate and was just throwing out numbers, or (iv) that Musk was attempting to undermine the deal and cause Twitter's stock price to decline all in the hopes he could renegotiate the deal price or back out.[9]

## CONCLUSION

For the reasons above, Plaintiffs' motion for partial summary judgment should be granted.

Dated:  September 26, 2025

Respectfully submitted,

COTCHETT, PITRE & MCCARTHY, LLP

*/s/ Tyson C. Redenbarger*
Tyson C. Redenbarger

Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
Tyson C. Redenbarger (SBN 294424)
Gia Jung (SBN 340160)
Caroline A. Yuen (SBN 354388)

840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:  (650) 697-6000
Email:        jcotchett@cpmlegal.com

---

[9] Musk concedes the interstate commerce element by virtue of his non-opposition.

mmolumphy@cpmlegal.com
tredenbarger@cpmlegal.com
gjung@cpmlegal.com
cyuen@cpmlegal.com

BOTTINI & BOTTINI, INC.


 /s/ *Francis A. Bottini, Jr.*
    Francis A. Bottini, Jr.

Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Aaron P. Arnzen (SBN 218272)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:   (858) 914-2001
Email:         fbottini@bottinilaw.com
               achang@bottinilaw.com
               aarnzen@bottinilaw.com

*Lead Counsel for Plaintiffs*

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Tyson C. Redenbarger, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26th day of September 2025, at Burlingame, California.

/s/ Tyson C. Redenbarger
Tyson C. Redenbarger
