COTCHETT, PITRE & MCCARTHY, LLP
Joseph W. Cotchett (SBN 36324)
*jcotchett@cpmlegal.com*
Mark C. Molumphy (SBN 168009)
*mmolumphy@cpmlegal.com*
Tyson C. Redenbarger (SBN 294424)
*tredenbarger@cpmlegal.com*
Elle D. Lewis (SBN 238329)
*elewis@cpmlegal.com*
Gia Jung (SBN 340160)
*gjung@cpmlegal.com*
Carolyn A. Yuen (354388)
*cyuen@cpmlegal.com*
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
*fbottini@bottinilaw.com*
Albert Y. Chang (SBN 296065)
*achang@bottinilaw.com*
Aaron Arnzen (SBN 218272)
*aarnzen@bottinilaw.com*
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001

*Lead Counsel for Lead Plaintiffs and the Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| GIUSEPPE PAMPENA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | Case No. 3:22-cv-05937-CRB<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO EXCLUDE PORTIONS OF OPINION OF EDWARD ROCK**<br><br>Date:        October 31, 2025<br>Time:        10:00 a.m.<br>Courtroom: 6, 17th Floor<br>Judge:       Hon. Charles R. Breyer |

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ...................................................................................................... 1

ARGUMENT ............................................................................................................................... 2

I.     Since Professor Rock Did Not Include *Any* Opinions to Rebut Professor Strauss in His Report, He is Barred From Offering Them at Trial .............................2

II.    Plaintiffs Did *Not* Move to Exclude Expert Testimony Regarding Industry Customs and Practices for Due Diligence and "Seller Friendly" Deal Terms.............5

III.   Prof. Rock's Opinions on Musk's State of Mind and How Investors Should Interpret Musk's Tweets Are Improper .............................................................7

IV.   Prof. Rock's Opinions About Musk's "Power" to Breach the Merger Agreement Fail to Rebut Any of Prof. Badawi's Opinions, and are Unreliable and Irrelevant.................................................................................................8

CONCLUSION ............................................................................................................................ 10

## TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
    738 F.3d 960 (9th Cir. 2013)................................................................................................. 8, 10

*In re Apple Inc. Sec. Litig.*,
    2023 WL 4556765 (N.D. Cal. July 17, 2023)........................................................................... 9

*Blue Bottle Coffee, LLC v. Liao*,
    2023 WL 6850573 (N.D. Cal. Oct. 16, 2023)........................................................................... 3

**Statutes**

Securities Act ...................................................................................................................................... 6

**Other Authorities**

Federal Rule of Civil Procedure:

    Rule 26(a)....................................................................................................... 1, 3, 4, 9

    Rule 37(c)(1) .................................................................................................... 1, 3, 4

Federal Rule of Evidence 702 ......................................................................................... 1, 3, 4, 9

## SUMMARY OF ARGUMENT

Defendant Elon Musk takes a curious approach in opposition to Plaintiffs' motion to exclude certain opinions expressed by Professor Edward Rock ("Prof. Rock").  Rather than explain why *his expert's* opinions are admissible, as was his burden, Musk challenges *Plaintiffs' experts*, Professor Adam Badawi ("Prof. Badawi") and Professor Emily Strauss ("Prof. Strauss"), and essentially uses his brief as a "sur-reply" in support of his own motion to exclude their opinions as inadmissible.

In explaining this approach, Musk criticizes Plaintiffs for "fundamentally misunderstand[ing]" the purpose of Prof. Rock's rebuttal opinions, and openly admits that Prof. Rock was only designated "to respond to the improper legal and state of mind opinions advanced by Plaintiffs' experts" rather than offer admissible opinions himself.  According to Musk, Plaintiffs "cannot have it both ways" and if Plaintiffs' experts are allowed to offer inadmissible opinions at trial, then his expert should as well.

That is not how the federal rules of evidence work.  All expert testimony, including rebuttal testimony, must meet Rule 702's admissibility standard.  And as the party offering Prof. Rock's opinions, it was Musk's burden to demonstrate admissibility in light of Plaintiffs' challenges.  Musk not only failed to do so but effectively conceded that his expert cannot meet that standard.  Thus, for the same reasons detailed in Plaintiffs' motion, Prof. Rock's opinions—with the exceptions noted below—are inadmissible and should be excluded.

First, Prof. Rock offered *no opinions* in rebuttal to *Prof. Strauss*, Plaintiffs' securities market expert.  ECF 247-2 at §V, ¶¶19-24.  Thus, Prof. Rock should not be allowed to offer rebuttal opinions to Prof. Strauss at trial.  In opposition, Musk claims that Prof. Rock offered a valid single opinion that Prof. Strauss' market price analysis was "incorrect and incomplete."  ECF 265 at 7.  But a general criticism of an opposing expert's opinions, without explanation, supporting evidence or reasoning, is not a proper opinion (FRE 702), and the missing analyses precludes him from offering anything new at trial.  FRCP 26(a)(2)(B), 37(c).

Second, Prof. Rock offered improper *legal conclusions* that Prof. Badawi's opinions were "irrelevant" and of "no legal significance," and that deal terms like due diligence had no "determinate legal meaning."  ECF 247-2 at §VI, ¶¶28, 30, 32, 37, 44.  Prof. Rock also gave improper

*state-of-mind opinions* about how, "to my eyes," the market "would understand" the merger terms, the "truthfulness" of Musk's tweets, and Musk's "sincerity" in tweeting that he was putting the deal on hold. *Id.* at §IV, ¶17, §VI, ¶¶52, 55, 66, §VII, ¶¶110-113. In opposition, Musk **concedes** these opinions are all improper, but claims they were only offered because Plaintiffs' expert, Prof. Badawi, gave similar opinions. But even if Prof. Badawi did (he did not), that is not a basis for admission. Musk also argues that Prof. Rock offered valid rebuttal opinions addressing due diligence and whether certain deal terms were commonly understood to be "seller friendly" in the M&A industry (ECF 265 at 9-11)—**but Plaintiffs did not move to exclude those opinions**; to the contrary, Plaintiffs agreed that both experts can offer testimony on these subjects. ECF 247 at 6.

Finally, Musk fails to support Prof. Rock's meandering opinions about Musk's hypothetical option to terminate the merger on "non-legal" grounds (i.e., breaching the merger agreement). ECF 247-2 at §IV, ¶¶56-108. These opinions about subjects like the "Efficient Breach" theory, the difficulty obtaining specific performance in Delaware courts, the history of broken merger deals, and "merger arbitrage" opportunities to corporate law professors, were never covered by Plaintiffs' expert and are far beyond the scope of rebuttal testimony. In opposition, Musk ignores this point and instead asserts that Prof. Rock's opinions are relevant to show that Musk had the "power" to put the deal on hold even though he didn't have the "right" under the merger agreement. But expert testimony isn't needed to make this argument, nor is it relevant since Musk's ability to breach doesn't somehow render his tweets "accurate." The entire discussion should be excluded.

## ARGUMENT

**I.    Since Professor Rock Did Not Include *Any* Opinions to Rebut Professor Strauss in His Report, He is Barred From Offering Them at Trial**

As noted in Plaintiffs' Motion, Prof. Rock included a one-page section of his Report, Section V, entitled "Responses to Professor Strauss." However, Prof. Rock offered no substantive "responses" in this Section, let alone admissible opinions rebutting Plaintiffs' securities market expert, Prof. Strauss. As a result, he should not be allowed to offer testimony addressing Prof. Strauss at trial.

As the party offering Prof. Rock's opinions, Musk had the burden to establish by a preponderance of the evidence that those opinions met the admissibility standards of Rule 702. *Blue Bottle Coffee, LLC v. Liao*, 2023 WL 6850573, at *4 (N.D. Cal. Oct. 16, 2023). Further, having designated Prof. Rock as a rebuttal witness, Musk was required to comply with Federal Rule of Civil Procedure 26(a)(2)(B)(i) and (D)(ii), including the timely production of a written report containing a "complete statement of all opinions the witness will express and the basis and reasons for them." Musk was on clear notice of the impact of non-compliance. Omitting information from an expert report precludes a party from offering it at trial. FRCP 26(a)(2)(B), 37(c); *see also* Guidelines for Civil Trials Before Judge Charles R. Breyer at ¶3.F.1 ("direct testimony of experts will be limited to the matters disclosed in their reports").

Plaintiffs noted these omissions in their Motion to Exclude: (1) the failure to include any opinions addressing Prof. Strauss **and** (2) the failure to include the "basis and reasons" for any opinions. Musk makes no serious effort to address these gaps, nor could he given Prof. Rock's meager discussion of Prof. Strauss in his Report. ECF 247-2 at §5, ¶¶19-24. In fact, while Musk's 18-page opposition attaches Prof. Strauss' deposition transcript **in its entirety**, he fails to attach a single page from Prof. Rock's deposition explaining or supporting his opinions. ECF 265-1.

Musk's opposition half-heartedly claims that two paragraphs in the Rock Report, Paragraphs 23 and 24, contain "proper" rebuttal opinions. ECF 265 at 6-7. But even a cursory review reveals otherwise. They read in full:

> "23.    Professor Strauss then produces stock price charts for Twitter
> and Tesla. While it is true that stock prices fluctuate, Professor Strauss
> provides no explanation for her choice of Twitter and Tesla, or why their
> stock price fluctuations are relevant.
>
> 24.    More importantly, her assertion that the way that stock prices
> change is through the simple mechanisms of supply and demand as
> investors reduce their holdings in response to negative news or increase
> their holdings in response to positive news is incorrect and incomplete.
> Professor Strauss' analysis ignores the impact of positive or negative

information on investors' valuation of stock whether or not they buy or sell."

ECF 247-2 at ¶¶23-24.

These are not admissible opinions under FRE Rule 702, nor do they comply with FRCP Rule 26(a). Paragraph 23 merely questions Prof. Strauss' inclusion of Twitter and Tesla for her stock price comparison and why they are "relevant" to this case. While Prof. Rock's claimed ignorance is understandable given his extremely limited analysis, it is patently obvious why Twitter and Tesla were considered: Musk owned Tesla's shares at the time of the merger, and the complaint alleges that Tesla's share drop significantly reduced his net wealth pledged to purchase Twitter, providing a motive to drive down Twitter's share value and renegotiate the price. This connection is also detailed throughout in Plaintiffs' First Amended Complaint. ECF 31 at ¶¶25-26, 90-106.[1] More to the point, Prof. Rock's view on the relevance of Prof. Strauss' analysis is not an admissible opinion under Rule 702, nor would it assist the jury to resolve any issues in this case.

Similarly, at Paragraph 24 of his Report, Prof. Rock criticizes Prof. Strauss' opinion about the impact of positive or negative information on stock prices as "incorrect and incomplete" because it supposedly did not consider the impact of news on investor valuations "regardless of whether they purchased or sold stock." The criticism is not only nonsensical, but also non-substantive, and fails to explain how Prof. Rock's alternative analysis would be performed or whether it would even impact Prof. Strauss' opinion. Prof. Rock performed no such alternative analysis himself.

To the extent Prof. Rock intended to offer rebuttal opinions at trial, he was required to state them clearly in his report, as well as the basis and reasons for them. FRCP 26(a)(2)(B)(i) and (D)(ii). He did neither. Accordingly, the Court should strike Section V of the Rock Report (¶¶19-24) in its entirety. *See* FRCP 37(c)(1) (party not allowed to use information at trial if not provided as required by Rule 26(a)).

---

[1] Remarkably, Prof. Rock was not provided and did not consider the First Amended Complaint. ECF 247-2 at 43 (App'x A, listing documents considered).

**II.     Plaintiffs Did *Not* Move to Exclude Expert Testimony Regarding Industry Customs and Practices for Due Diligence and "Seller Friendly" Deal Terms**

In Section II.A of his opposition, Musk asserts that Plaintiffs seek to "prevent" Prof. Rock "from opining on the meaning of 'due diligence' in the context of M&A transactions." ECF 265 at 10. Similarly, Musk claims that Plaintiffs seek to bar Prof. Rock from offering any rebuttal to Prof. Badawi's opinions about M&A industry customs and practices relating to "seller friendly" terms in merger transactions in general, and the Twitter merger agreement in particular. *Id.* at 9. Musk is wrong on both counts—***Plaintiffs did not move to exclude these opinions***.

On the contrary, as confirmed in Plaintiffs' Motion, both experts should be allowed to opine on these subject matters. ECF 247 at 6. Both experts have experience and specialized knowledge about industry customs and practices in M&A transactions, including the use and purposes of common M&A deal terms beyond the normal lay juror's experience, such as due diligence, information rights, financing conditions, "bring down" conditions, specific performance, and material adverse effect or "MAE" clauses in public M&A deals. Both experts offered opinions on these industry-specific concepts and whether they are commonly understood in the industry as "seller friendly" or "buyer friendly," terms of art in the M&A field.

The concepts of "business due diligence" and "seller friendly" deal terms also lie at the heart of this action, since they were affirmatively used by Musk and his advisors to negotiate and close the Twitter merger transaction. They are also directly relevant to evaluating Musk's seemingly conflicting positions in defense of this action. For example, while Musk told Twitter (and the SEC) that his proposed merger agreement was meant to be "seller friendly" to Twitter, including his waiver of "due diligence" rights, he now takes the position in this case that he somehow preserved the right to conduct expansive "due diligence" after signing the deal. Expert opinions will help the jury understand the background and context of Musk's representations to Twitter, Musk's team's continued use of the terms during the merger process, and the addition and removal of deal terms in the "seller friendly" version ultimately sent to Twitter, including the removal of due diligence and financing contingencies, and the addition of specific performance rights, limited information rights, and an MAE clause.

Indeed, Prof. Rock offers opinions on all these subjects, including an entire section of his Report entitled, "Mr. Musk did not 'waive' due diligence." ECF 247-2 at 14-16, ¶¶39-40, 47; *see also* ¶18(a). Prof. Rock opines that, contrary to what Musk disclosed to Twitter and in SEC filings, the negotiations and merger terms cannot be viewed as "seller friendly" to Twitter and, in any event, Musk did not actually waive due diligence in the Twitter merger transaction because he had "information rights" under the merger agreement that were akin to due diligence and exchanged information after the deal was signed that was "a customary part of M&A." *Id.* Plaintiffs did not move to exclude and will address Prof. Rock's opinions through cross-examination at trial.

Rather, Plaintiffs' motion to exclude Prof. Rock's legal conclusions was narrowly tailored to his inadmissible opinions included elsewhere in the Rock Report about the "legal significance" of certain evidence and expert testimony. For example, in Section IV.A of the Rock Report, entitled "Introduction: Some Key Features of Mergers and Acquisitions Practice," Prof. Rock offers the legal opinion, as an attorney, not an expert, that any opinion by Prof. Badawi about "customary" M&A practices or the meaning of M&A terms is "irrelevant" because "it is the agreed term that controls…future disputes." ECF 247-2 at ¶¶28, 30. Similarly, in Section IV.B of his Report, after conceding that "seller friendly" is a term of art used in M&A discussions, he offers his legal opinion that the concepts of waiving due diligence and other seller-friendly terms in a merger somehow have "no determinate meaning and, generally speaking, no legal significance." *Id.* at ¶¶32, 37, 44. Later, in Section VI.C, Prof. Rock compares the "due diligence" defense asserted in Securities Act claims (not at issue here) to due diligence conducted in the "M&A context," and once again offers his legal opinion that due diligence "does not have any determinate legal meaning" in the M&A industry. *Id.* at ¶¶41-44.

Each of these legal opinions is improper. The jury can decide for itself what "significance" to apply to the evidence.

**III.    Prof. Rock's Opinions on Musk's State of Mind and How Investors Should Interpret Musk's Tweets Are Improper**

As in other sections of his opposition, Musk concedes that Prof. Rock's opinions on Musk's state of mind are inadmissible but claims that they were included because Plaintiffs' expert covered the same subjects.  ECF 265 at 11-12.  As discussed in opposition to the Motion to Exclude Prof. Badawi's opinions, there are fundamental differences between the two experts' reports, and their expert opinions should be evaluated on their own.[2]

While the Court can start and stop with Musk's concession, Musk raised additional arguments in his opposition, seemingly trying to recast certain of Prof. Rock's state-of-mind opinions as admissible.  To the extent considered by the Court, they should be rejected.  For example, Plaintiffs challenged Paragraph 17 of the Rock Report, where Prof. Rock stated:

> "As I will explain in detail below, I see no reason in the record to think that Mr. Musk's ***apparently sincere statement*** that 'Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users' was ***other than truthful*** and informative and well within his rights under the merger agreement."

Emphasis added.  In opposition, Musk suggests that the Court can "simply strike" the words "apparently sincere" or "truthful" to resuscitate this otherwise inadmissible opinion.  ECF 265 at 13, fn. 8.  However, Prof. Rock is not a market expert, and a jury doesn't need an expert to give them a purely legal conclusion on whether Musk's tweets were "informative."  Similarly, Prof. Rock's personal view as an attorney that Musk's tweets were "well within his rights under the merger agreement" is an obvious legal conclusion interpreting the tweets and the agreement.

Musk's opposition even tries to justify Prof. Rock's narrative recitation of disputed facts in Paragraphs 51 through 55 of his Report.  ECF 265 at 13-14.  Within this particularly-objectionable section, Prof. Rock gives his opinions that (1) "to my eyes," the subject May 13 tweet "was not misleading" (ECF 247-2, ¶51); (2) everyone "operated under the assumption he was entitled to such

---

[2] Musk's examples of "classic state of mind opinions" offered by Prof. Badawi are almost exclusively drawn from his deposition testimony regarding buyer's remorse, responding to questions posed by Musk's counsel, and not from Prof. Badawi's Report.  ECF 265 at 12.

information" and "there was no dispute that he was entitled to information" (*id.*); (3) "to my eyes, the most natural reading of Mr. Musk's tweets" is that the Twitter deal is on hold, which was "common and appropriate for one party to say to the other" (*id.* at ¶52); and (4) Musk publicly tweeting his intent not to move forward with the deal "is a customary part of M&A." *Id.* at ¶54. Prof. Rock wraps up this section by offering his opinion on what the subject tweets "indicate" to the market. *Id.* at ¶55.

Similarly, in the "Conclusion" of this Report, Section VII, Prof. Rock opines that "Mr. Musk's tweet provided valuable information to the market" (*Id.* at ¶110), that "Mr. Musk informed the market of the current state of the transaction" (*Id.* at ¶111), that Musk's tweets "allowed the market to update its expectations" (*Id.* at ¶112), and "Any information that allows the market to update those expectations is valuable to investors" (*Id.* at ¶113).

Clearly, Prof. Rock's opinions about the parties' motives or assumptions, the truth or falsity of Musk's tweets, what they "indicated" to investors, and whether or not they were "valuable to investors, are well beyond his expertise, lack any reliable basis, are improper rebuttal, and go beyond the proper role of an expert. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). The jury can read Musk's tweets and conclude for themselves whether or not his statements were valuable or misleading.

## IV.    Prof. Rock's Opinions About Musk's "Power" to Breach the Merger Agreement Fail to Rebut Any of Prof. Badawi's Opinions, and are Unreliable and Irrelevant

Rather than rebut Prof. Badawi's opinions regarding the actual legal theories and facts at issue, Prof. Rock devoted much of his report, Section VI.E, F and G, pages 20-30, to his views on hypothetical outcomes had Musk exercised his "non-legal" option to breach the merger agreement in May 2022, when he issued the subject tweets. Plaintiffs moved to exclude these opinions—covering disparate theories of efficient breach, the likelihood of obtaining specific performance based on Delaware trial court judicial assignments, and law professor stock trading patterns—for several reasons, including that they were not proper rebuttal to anything that Plaintiffs' experts opined about, inappropriate matters for expert opinion, unreliable, and completely irrelevant to any issues in the case. Musk's cursory response fails to seriously contest these challenges.

For example, Musk claims that Prof. Rock's opinions will "show that Musk did have at least a non-legal basis for his statements (***contrary to Professor Badawi's view***)" (ECF 265 at 15) (emphasis added)).  Musk provided no cite for this claim, let alone a cite where Prof. Badawi expressed a "view" about Musk's non-legal basis for his statements.  That is hardly surprising since Prof. Badawi expressed no such view, and an expert's opinion on the non-legal basis of Musk's tweets would be inadmissible.  Musk's claim is pure fiction, and the Court should exclude Prof. Rock's opinions—a rebuttal expert cannot opine on a matter that was never raised by the other side's expert.  FRCP 26(a)(2)(D)(ii) (permitting rebuttal expert testimony "solely to contradict or rebut evidence on the same subject matter" identified by the other expert).

Similarly, Prof. Rock's opinion that Musk had the hypothetical "power" to breach the merger agreement in May 2022, even if he didn't have the legal "right" to do so, is not the proper subject of expert testimony.  A jury does not need a corporate governance expert to tell them that a party can breach a contract.  Yet, this initial improper opinion is the hook for Prof. Rock's subsequent legal discourse about the possible impacts and outcomes of a hypothetical breach.  Moreover, Prof. Rock fails to provide any reliable basis to opine about what could or would have transpired had Musk preemptively terminated the merger agreement in May 2022, when he issued his tweets, and Prof. Rock's list of possible outcomes is rank speculation in violation of Rule 702.  *See also, In re Apple Inc. Sec. Litig.*, 2023 WL 4556765, at *1 (N.D. Cal. July 17, 2023).[3]

Finally, Prof. Rock's opinions about Musk's hypothetical power to make a "non-legal" breach of the merger agreement and the potential impacts had he done so, are irrelevant to any issues in the case and must be excluded.  *See Daubert I*, 509 U.S. at 589.  To gauge relevancy, the court must decide whether the expert's opinions are sufficiently tied to the facts of the case such that they will aid the jury in resolving a factual dispute.  *Id*. (citation omitted).  Here, Musk contends that evidence of Musk's "power" to terminate the deal in May 2022 would somehow render his tweets "entirely accurate."  ECF 265 at 16.  This argument is nonsensical.  Plainly, the mere hypothetical

---

[3] Musk's opposition fails to cite reliable facts and data supporting Prof. Rock's "non-legal breach" opinions, instead stating in a footnote: "See generally Pls. Ex. A (Rock Rp't)."  ECF 265 at 16, fn 11.  At this stage of the case, referring the Court to the entire Rock Report is inappropriate.

possibility that Musk could have unilaterally breached the merger agreement in May 2022 does not somehow correct his otherwise false statements to shareholders that he had put the Twitter deal "on hold" pending his receipt of Twitter's estimation information, ***particularly since*** Musk had not put the deal on hold, Twitter had not agreed to put the deal on hold, and there was nothing in the agreement allowing Musk to put the deal on hold, let alone based on Twitter's failure to immediately provide its account estimation methodology (which Musk had already decided he didn't even want since he was performing his own analysis).  Nor did Musk's hypothetical power to walk away from the deal render true his false claim that fake accounts made up at least 20% of Twitter's users. Musk's argument is divorced from logic and the actual evidence in the case.

In sum, the Court should not permit Musk to introduce rebuttal expert testimony about Musk's hypothetical "power" to terminate the merger, which was never raised by Plaintiffs' expert, never raised by Musk during the deal, and would have no legal impact on the truth or falsity of the statements at issue in the case.  *Alaska Rent-A-Car, Inc.*, *supra*, 738 F.3d. at 969 (trial court should screen the jury from "unreliable nonsense opinions").

**CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request that the Court exclude the portions of Prof. Rock's Report and opinions identified in the opening brief.  ECF 247 at 11-12.

Dated: September 26, 2025

Respectfully submitted,
**COTCHETT, PITRE & MCCARTHY, LLP**
Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
Elle D. Lewis (SBN 238329)
Tyson C. Redenbarger (SBN 294424)
Gia Jung (SBN 340160)
Carolyn A. Yuen (SBN 354388)
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000

*/s/ Mark C. Molumphy*
Mark C. Molumphy

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Aaron Arnzen (SBN 218272)

*/s/ Francis A. Bottini, Jr.*
        Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Mark C. Molumphy, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26th day of September 2025, at Burlingame, California.

*/s/ Mark C. Molumphy*
Mark C. Molumphy