COTCHETT, PITRE & MCCARTHY, LLP
Joseph W. Cotchett (SBN 36324)
jcotchett@cpmlegal.com
Mark C. Molumphy (SBN 168009)
mmolumphy@cpmlegal.com
Tyson C. Redenbarger (SBN 294424)
tredenbarger@cpmlegal.com
Elle D. Lewis (SBN 238329)
elewis@cpmlegal.com
Gia Jung (SBN 340160)
gjung@cpmlegal.com
Caroline A. Yuen (SBN 354388)
cyuen@cpmlegal.com
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN: 175783)
fbottini@bottinilaw.com
Albert Y. Chang (SBN 296065)
achang@bottinilaw.com
Aaron P. Arnzen (SBN 218272)
aarnzen@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001

*Lead Counsel for Plaintiffs and the Class*

**(PUBLIC -REDACTED VERSION)**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| GIUSEPPE PAMPENA, individually and on behalf of all others similarly situated,<br><br>  Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>  Defendant. | Case No. 3:22-cv-05937-CRB<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION TO DISQUALIFY ALEX SPIRO AS TRIAL COUNSEL**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date:     October 31, 2025<br>Time:     10:00 a.m.<br>Courtroom: 6, 17th Floor<br>Judge:    Honorable Charles R. Breyer |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT,** On October 31, 2025 at 10:00 a.m. this matter will be heard before the Honorable Charles R. Breyer, in Courtroom 6, 17th Floor, of the United States District Court for the Northern District of California, in the Phillip Burton Federal Building & United States Courthouse, 450 Golden Gate Avenue, San Francisco, California, 94102, Plaintiffs Giuseppe Pampena will, and hereby do, move this Court to Disqualify Alex Spiro as Trial Counsel in the instant action.

This Motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, the supporting Declaration of Caroline A. Yuen and all exhibits thereto, all filings in this action, and such other filings and arguments as may be presented to the Court.

Dated: September 26, 2025

Respectfully submitted,

COTCHETT, PITRE & MCCARTHY, LLP

/s/ *Caroline A. Yuen*
Caroline A. Yuen

Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
Tyson C. Redenbarger (SBN 294424)
Gia Jung (SBN 340160)
Caroline A. Yuen (SBN 354388)

840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000
Email:   jcotchett@cpmlegal.com
         mmolumphy@cpmlegal.com
         tredenbarger@cpmlegal.com
         gjung@cpmlegal.com
         cyuen@cpmlegal.com

BOTTINI & BOTTINI, INC.

/s/ *Francis A. Bottini, Jr.*
Francis A. Bottini, Jr.

Francis A. Bottini, Jr. (SBN 175783)

Case No: 3:22-cv-05937-CRB

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Albert Y. Chang (SBN 296065)
Aaron P. Arnzen (SBN 218272)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:  (858) 914-2001
Email:       fbottini@bottinilaw.com
             achang@bottinilaw.com
             aarnzen@bottinilaw.com

*Lead Counsel for Plaintiffs*

## Table of Contents

Page

STATEMENT OF ISSUES TO BE DECIDED ...................................................................1

SUMMARY OF ARGUMENT ............................................................................................1

STATEMENT OF FACTS ....................................................................................................2

    I.    Spiro's High Profile and Leading Role in Musk's Acquisition of Twitter ..............2

    II.    Spiro's Unique Knowledge About Critical Issues that Will be Disputed Through Trial ...............................................................................................................3

        A.    Whether Musk was Deliberately Reckless as to the Truth or Falsity of his May 13 Deal-on-Hold Tweet ................................................................3

        B.    Whether Musk's Deal-on-Hold Tweet Was So Disruptive and Material that Spiro Advised Musk to Walk it Back .....................................4

        C.    Whether Musk Walked Back His Deal-on-Hold Tweet in Response to Spiro's Call ..........................................................................................4

        D.    The Import and Timing of the SparkToro Report.........................................5

        E.    Why Musk's Team Made "Incendiary" Requests for Information from Twitter ...................................................................................................6

        F.    Whether Musk Biographer Walter Isaacson is Telling the Truth about Musk's Vendettas Against Twitter's Officers and Directors........................6

LEGAL STANDARDS ..........................................................................................................8

ARGUMENT ..........................................................................................................................9

    I.    Spiro's Participation as Witness and as Trial Counsel Will Confuse the Jury and Prejudice Plaintiffs ............................................................................................9

    II.    Plaintiffs Genuinely Need Spiro's Testimony ........................................................11

    III.    Plaintiffs Do Not Seek to Disqualify Spiro for Tactical Reasons, and Do Not Expect to Gain Any Tactical Advantage from Disqualification. ............................11

    IV.    Musk's Unexceptional Interest Does Not Outweigh Prejudice to Plaintiffs, Risk of Jury Confusion and Damage to the Judicial Process .........................................12

CONCLUSION ....................................................................................................................13

# Table of Authorities

**Cases**                                                                                                          **Page(s)**

*ABN Corp. et al. v. Groupe PELM Int. Corp. et al.*,
  2025 WL 660194 (N.D. Cal., Feb. 28, 2025) ................................................................8, 12

*In re County of LA*,
  223 F.3d 990 (9th Cir. 2000) ................................................................................................9

*Doe v. Yim*,
  55 Cal.App.5th 573 (2020) ............................................................................................8, 10

*Gas-A-Tron of Arizona v. Union Oil Co. of California*,
  543 F.2d 1322 (9th Cir. 1976) .............................................................................................9

*Gebhart v. SEC*,
  595 F.3d 1034 (9th Cir. 2010) ........................................................................................3, 5

*Lopez v. Lopez*,
  81 Cal.App.5th 412 (2022) ..................................................................................................9

*In re Marvel*,
  251 B.R. 869 (N.D. Cal. 2000) ..........................................................................................11

*U.S. v. Simcho*,
  2007 WL 1100316 (N.D. Cal., Apr. 11, 2007) ..................................................................10

*United States v. Preston*,
  873 F.3d 829 (9th Cir. 2017) .............................................................................................10

*People ex rel. Younger v. Superior Court*,
  86 Cal.App.3d 180 (1978) ...................................................................................................9

*Zhu v. Li*,
  2023 WL 1111507 (N.D. Cal. Jan. 30, 2023) ....................................................................12

**Other Authorities**

CAL. R. PROF. CONDUCT 3.7 ........................................................................................................8

FEDERAL RULES OF EVIDENCE 404(b) ........................................................................................7

NEW YORK R. PROF. CONDUCT 3.7 .............................................................................................9

TUFT ET AL., CAL. PRACTICE GUIDE: PROFESSIONAL RESPONSIBILITY
  (THE RUTTER GROUP 2019) ¶ 8:378 ................................................................................10

Securities Exchange Act of 1934 ................................................................................................12

**STATEMENT OF ISSUES TO BE DECIDED**

Whether the Court should disqualify attorney Alex Spiro as trial counsel, where Spiro (1) was intimately involved in Musk's acquisition of Twitter, (2) will provide unique testimony that will be critical to hotly-disputed issues at trial, (3) worked closely alongside many of the other individuals who will be witnesses in the case, and (4) remains an access point for people seeking Musk's favor.

**SUMMARY OF ARGUMENT**

Attorney Alex Spiro wants to have it both ways. He was heavily involved in virtually all— and played a leading role in many—of the most important events surrounding Musk's efforts to acquire Twitter and his latter attempt to back out of the deal. Spiro is thus a critical first-hand witness in the case. But now Spiro seeks to also serve as Musk's lead trial counsel in a case focused on the very events in which he played a key role. As such, Spiro as trial counsel would examine the very same witnesses (1) with whom Spiro worked on the acquisition, and (2) who have reason to curry favor with Musk, given Musk's enormous wealth, influence, and business interests, and with Spiro, who serves as an access point for Musk and has a place in "the highest circles of American wealth and influence."

Allowing Spiro to unfairly play both of these roles would violate the advocate-witness rule, create a grave risk of jury confusion, make a mockery out of these proceedings, and inflict serious prejudice on Plaintiffs. While Musk seeks to avoid Spiro's disqualification—and take advantage of the resulting confusion—by providing informed consent, California case law nevertheless precludes Spiro's service as trial counsel under the circumstances presented here. This is particularly true here because Spiro has been almost entirely absent from the litigation, helicoptering in (via Zoom) only for Musk's deposition and his own (also via Zoom), while his highly-qualified colleagues have handled all aspects of the case for years.

\* \* \*

**STATEMENT OF FACTS**

This is a shareholder class action relating to Defendant Elon Musk's purchase of Twitter in 2022.[1] As alleged, after Twitter accepted Musk's $44 billion offer to acquire the Company on April 25, 2022, Musk engaged in securities fraud and drove down Twitter's stock price in order to escape the deal or renegotiate a lower price. Spiro is a first-hand witness to key events underlying the acquisition of Twitter, which both sides will present evidence on.

**I.    Spiro's High Profile and Leading Role in Musk's Acquisition of Twitter**

Alex Spiro is reportedly "part lawyer, part deal maker, part fixer," "capable of delivering more than the typical lawyer can," and has a seat in "the highest circles of American wealth and influence" Decl. at ¶ 20 at 0:01–1:30.[2] Spiro recently stated in an interview that "I aim to do things outside of the law (and I will) that I think will be a bigger business than my legal business." *Id.* at 15:59–16:07. Spiro has seen Musk through a number of legal scrapes and has long held a high position in Musk's sphere of influence, being described by some as Musk's consigliere. *Id*. at 18:51-18:57.

Witnesses in this case have characterized Spiro's role on the Twitter deal as ██████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ dealing with advisors, scientists, and Twitter representatives. Decl. at ¶¶ 9-11. Spiro was at the epicenter of virtually every important decision relating to the Twitter acquisition. Spiro, along with Jared Birchall, helped manage Musk's financial, business, and legal affairs, and kept email addresses with Musk's "family office," Excession. Decl. at ¶ 12. After Musk secretly acquired a 9% stake in Twitter between January and March 2022, Spiro located legal counsel for Musk after Musk failed to timely file reports with the SEC. *Id*. Armed with billions of dollars' worth of Twitter stock, Spiro helped Musk organize his unsolicited pursuit of Twitter in April 2022. And during the acquisition, Spiro wore many hats, including business advisor to Musk and the direct supervisor for the work Morgan Stanley and Skadden were doing for Musk. Decl. at ¶¶ 6-13, 15-18, 19.

---

[1] Unless otherwise noted, all dates herein refer to the calendar year 2022.
[2] Citations to "Decl." refer to the Declaration of Caroline A. Yuen, filed in support hereof.

## II. Spiro's Unique Knowledge About Critical Issues that Will be Disputed Through Trial

Plaintiffs seek to prove that Musk used Twitter's estimate of the number of fake/spam accounts as a pretext to exit or renegotiate his obligations to acquire Twitter for $54.20 per share. To prove that, Plaintiffs will present evidence that several other factors—*i.e.*, not fake/spam accounts—motivated Musk to get out of the deal. Plaintiffs will also focus on evidence showing that Musk's statements about the deal were false, highly material to the market for Twitter stock, and made with scienter. Spiro has unique and highly relevant knowledge about each of these issues.

### A. Whether Musk was Deliberately Reckless as to the Truth or Falsity of his May 13 Deal-on-Hold Tweet

Plaintiffs will present evidence at trial that Musk acted with scienter because he never asked his attorneys, bankers, and/or advisors if his statements about Twitter were accurate before making them. *See Gebhart v. SEC*, 595 F.3d 1034, 1044 (9th Cir. 2010) ("A misrepresentation is fraudulent if the maker … knows that he does not have the basis for his representation that he states or implies.") (quoting RESTATEMENT (SECOND) OF TORTS § 526 (1977)). Because of the evidentiary thicket and outstanding factual disputes about the events of May 13, Spiro's testimony will be critical evidence surrounding Musk's false May 13 deal-on-hold tweet.

During his July 12, 2022 testimony to the SEC, Musk testified ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Decl. at ¶ 14; Decl. Ex. 13 at 330:10-339:2. Musk also testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Decl. Ex. 1 at 222:22-223:2. Spiro, in contrast, testified at his deposition that he did have a conversation with Musk on May 13, but did not give advice to Musk that was reflected in the deal-on-hold tweet. Decl. Ex. 2, Spiro Tr. at 12:3–8 ("I don't recall any advice" about making public statements surrounding the merger). Spiro's testimony is therefore extremely important—it is the only first-hand testimony from a witness who remembers these discussions and the evidence that *Musk did not seek advice* from his close confidant/advisor about the accuracy of the May 13 deal-on-hold tweet.

### B. Whether Musk's Deal-on-Hold Tweet Was So Disruptive and Material that Spiro Advised Musk to Walk it Back

Plaintiffs will present evidence that the May 13 deal-on-hold tweet was so materially false that it sent shockwaves through his own team and the broader market. Evidence that Musk's team, including Spiro, saw the tweet and immediately urged him to walk it back will be instrumental in showing how disruptive even Musk's facilitators knew the tweet was. As stated above, Musk does not remember a call from Spiro before or after this May 13 deal-on-hold tweet. Decl. Ex. 1, Musk Tr. at 222:22-223:2. Spiro, in contrast, testified that he saw or heard about the tweet and "thought that I should, given how much was going on with the merger, speak to him [Musk] with all deliberate speed." Decl. Ex. 2, Spiro Tr. at 16:21-17:1. Indeed, it was so urgent that ▌

▌ Decl. Ex. 7, Spiro Decl. at ¶ 7 ▌

*See also* Decl. Ex. 2, Spiro Tr. at 16:11–20. Establishing these facts through the only witness who remembers the call will be extremely important trial evidence.

### C. Whether Musk Walked Back His Deal-on-Hold Tweet in Response to Spiro's Call

Plaintiffs seek to show that Musk posted a tweet that stated "[s]till committed to the acquisition" in order to mitigate the obvious damage caused by his earlier deal-on-hold tweet. Evidence that Musk posted the tweet only after hearing from his confidant/fixer Spiro would strongly support this narrative. Spiro is the only first-hand source with this information, having offered deposition testimony that his May 13 call with Musk "would have been in between the two Tweets." Decl. Ex. 2, Spiro Tr. at 16:11-16.

Spiro further testified that he did not convey to Morgan Stanley representatives that the "still-committed" tweet emanated from a discussion with Spiro. But senior banker Anthony Armstrong testified, in contrast, that Spiro ▌

▌ Decl. Ex. 8, Armstrong Tr. at 288:7–289:21. If Spiro is permitted to act as trial counsel, he will almost certainly cross-examine Armstrong and/or other Morgan Stanely witnesses about his own discussions with them and how Spiro described his call with Musk to them.

### D. The Import and Timing of the SparkToro Report

Musk makes much of a report that somebody on his team found in the blogosphere and estimated that Twitter's users consisted of 20% fake/spam accounts. *E.g.*, ECF 255. The credibility and reliability of SparkToro and its analysis, and whether Musk even knew of SparkToro's report on May 13, May 16, or May 17, will therefore be of critical importance at trial. Spiro's testimony will be essential to the jury's assessment.

Spiro was the first on Musk's team to make contact with data scientist firms in an effort to support Musk's purported concerns over fake/spam accounts on Twitter. In the process, Spiro received names of capable data scientists from others on the team. Decl. Ex. 2, Spiro Tr. at 68:11-19 ("I don't have some preexisting relationship or a rolodex of bot scientists. So somebody likely told me that these are potential people that would have some information."). Spiro then talked to "a few" firms based on those recommendations, made inquiries to understand whether these companies and their people "seem like a legitimate person and company," and made assessments of their "honesty, integrity, and subject matter expertise." Decl. Ex. 2, Spiro Tr. at 69:13–70:20. If these firms met the bar, Spiro passed their names onto Musk's deal team at Skadden; some of these firms were engaged for the project. Decl. Ex. 2, Spiro Tr. at 68:11–69:4; *see also* Decl. Exs. 14-17.

Critically, Spiro testified at his deposition that (1) he does not remember who specifically told him about SparkToro (which makes it less likely that Musk was the one who told Spiro and, in turn, less likely that Musk actually knew of SparkToro in the first place), (2) Spiro ***does not remember whether he or anybody else contacted SparkToro***, and (3) Spiro ***does not believe Musk's team engaged SparkToro to support Musk's fake/spam account conspiracy theories***. Decl. Ex. 2, Spiro Tr. at 72:15–73:5, 73:14-23, 79:4-10. Plaintiffs will elicit this testimony at trial to establish that Musk likely did not even see SparkToro's report before baselessly telling the world that Twitter's fake/spam accounts make up 20% or more of its users, and that the SparkToro report was not a valid basis to make such important (mis)statements because, in Spiro's own analysis, SparkToro lacked the requisite "honesty, integrity, and subject matter expertise." *Id.*, Spiro Tr. at 68:11-70:20. Spiro's testimony will therefore be critical to Plaintiffs' ability to establish that Musk did not have a sufficient basis to make public statements about his estimate of spam/fake accounts on Twitter's platform. *See Gebhart*,

1  595 F.3d at 1044.

2  **E.     Why Musk's Team Made "Incendiary" Requests for Information from Twitter**

3  Plaintiffs will present evidence at trial that Musk supported his efforts to escape the Twitter
4  deal by having his team manufacture onerous requests for information and then use Twitter's inability
5  to quickly comply with those requests as an excuse to terminate the merger. Spiro was right in the
6  middle of this effort.

7  Spiro put Musk in position to falsely tweet on May 17 that the deal could not move forward
8  until Twitter provided data surrounding its fake/spam accounts. ECF 31, First Amended Complaint,
9  ¶ 125. Spiro did so by sending an email ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Decl. Ex. 2, Spiro Tr. at 30:13-16; Decl.
11 Ex. 15. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14 ▮▮▮▮▮▮▮▮▮▮▮▮
15 Indeed, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18 ▮▮▮▮▮ *Id*. (emphasis added). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21 ▮▮▮▮▮ Decl. Ex. 16. These requests came from Musk's confidant and fixer Spiro ▮▮▮▮▮▮
22 ▮▮▮▮▮ by Musk's own team. The fact that Musk ultimately used Twitter's inability to quickly
23 comply with the requests as an excuse to terminate the deal makes this evidence exceptionally
24 important to Plaintiffs' case and makes Spiro an indispensable witness on this topic.

25 **F.     Whether Musk Biographer Walter Isaacson is Telling the Truth about Musk's
             Vendettas Against Twitter's Officers and Directors.**
26
27  Plaintiffs will seek to prove scienter by, *inter alia*, demonstrating Musk's motivations to make
28  false statements and escape his agreement to buy Twitter. These motivations include (1) greed (the

deal's expense had massively increased) and (2) vengeance against Twitter executives who dared cross him. Before Musk's misrepresentations here, Twitter CEO Parag Agrawal refused Musk's demand to fire Twitter Chief Legal Officer Vijaya Gadde (Musk's response: "███████████████████████████████████████████████████████████████████████████████████████████" and publicly corrected Musk's tweets about fake accounts (Musk's response: a "poop" emoji). Decl. Ex. 1, Musk Tr. at 74:17-25; 172:24-173:14; 262:9-263:11. Similarly, Musk was incensed after Gadde noted Musk's failure to comply with SEC disclosure regulations, and after Twitter CFO Ned Segal didn't jump fast enough when Musk demanded information that was not contemplated by the merger agreement. *Id*. at 319:14-325:11. Motivated by these executive-level slights, Musk issued false statements in order to escape the deal and later terminated the executives when the merger closed, simultaneously saving himself millions (greed) and denying his newly-created enemies their severance (vengeance). *Id*. at 172:19-173:15; 330:16-337:3. This evidence helps show the motivations behind Musk's misrepresentations and is admissible at trial as direct and "other acts" evidence. *See* FEDERAL RULES OF EVIDENCE 404(b) (evidence of "motive," "intent" is admissible).

Spiro played a direct role in the efforts to fire the Twitter executives on the very day that Musk took over Twitter. Musk's biographer Walter Isaacson reports that Musk and his team advanced the day of the closing of the merger to effectuate their strategy:

- "'There's a two-hundred-million differential in the cookie jar between closing tonight and doing it tomorrow,'" referring to the severance payments owed to the Twitter executives. Decl. Ex. 18, at 512 (quoting Musk).
- "The field marshal for the Thursday night surprise closing was Musk's longtime lawyer, Alex Spiro." *Id.*
- "Throughout Thursday afternoon, [Musk] wandered in and out of a cramped conference room where Antonio Gracias, Alex Spiro, Jared Birchall, and a few others methodically planned a *jiu-jitsu* maneuver." *Id.*
- Musk's team ordered that the executives' email accounts be deactivated so they could not deliver their resignation letters. "The instant email cutoff was part of the plan.

Agrawal had his letter of resignation, citing the change in control, ready to send. But when his Twitter email was cut off, it took him a few minutes to get the document into a Gmail message. By that point tomorrow, he had already been fired by Musk. 'He tried to resign,' Musk said. 'But we beat him,' Spiro replied." *Id.* at 513.

- The book's chapter on Musk's closing of the merger and his firing of the executives was based in part on an interview with Spiro. *Id.* at 635.

Spiro denies these facts, effectively calling Isaacson a liar. *See* Decl. Ex. 2, Spiro Tr. at 56:22–57:3 (did not agree that he, Spiro, played a leading role or was field marshal, in part because Spiro purportedly does not know what those terms mean); *id*. at 45:8–16 (whether executives' emails were shut off before closing to save $200 million: "I can just tell you from my perspective, no. They were terminated before they resigned because they were terminated before they resigned, whether they had their emails or not."); *id*. at 47:19-48:4 (whether Spiro set up in a conference room: "I'm a move-around kind of guy. So I don't set up in conference rooms like the way you're describing"); *id*. at 49:24–50:12 ("He [Isaacson] never -- he never interviewed me."); *id*. at 51:5-10 (Spiro never saw Musk talk to Isaacson about the Twitter acquisition); *id*. at 61:12-18 (Spiro has "no idea" if Musk said Agrawal "tried to resign" or if Spiro responded "[b]ut we beat him"). These are critical facts for Plaintiffs, and the ability to develop them through the testimony of the field marshal who carried out those efforts will be critically important to Plaintiffs' trial presentation.

## LEGAL STANDARDS

"The 'advocate-witness rule,' which prohibits an attorney from acting both as an advocate and a witness in the same proceeding, has long been a tenet of ethics in the American legal system, and traces its roots back to Roman Law." *Doe v. Yim*, 55 Cal.App.5th 573 (2020). California's version of the advocate-witness rule provides that an attorney "shall not act as an advocate in a trial in which the lawyer is likely to be a witness" except where: "(1) the lawyer's testimony relates to an uncontested issue or matter; … or (3) the lawyer has obtained informed written consent from the client." CAL. R. PROF. CONDUCT 3.7. Even where a client has provided their informed written consent, a court may disqualify the attorney upon "convincing demonstration of detriment to the opponent or injury to the integrity of the judicial process." *ABN Corp. et al. v. Groupe PELM Int. Corp. et al.*, 2025 WL 660194

at *15 (N.D. Cal., Feb. 28, 2025). As an attorney licensed in New York, Spiro is also bound by that State's version of the advocate-witness rule, which does not include an informed consent exception. NEW YORK R. PROF. CONDUCT 3.7. Separately, district courts have an inherent "responsibility to maintain public confidence in the legal profession. This means that a court may disqualify an attorney for not only acting improperly but also for failing to avoid *the appearance of impropriety*." *Gas-A-Tron of Arizona v. Union Oil Co. of California*, 543 F.2d 1322, 1324 (9th Cir. 1976) (emphasis added).

Federal courts apply state law in determining matters of disqualification. *In re County of LA*, 223 F.3d 990, 995 (9th Cir. 2000). Disqualification from trial may be appropriate "to protect the trier of fact from being misled or the opposing party from being prejudiced." *Lopez v. Lopez*, 81 Cal.App.5th 412, 423 (2022). Juror confusion is likely to arise, for example, because "the jury may have difficulty keeping properly segregated the arguments of the attorney acting as advocate and his testimony as a witness." *People ex rel. Younger v. Superior Court*, 86 Cal.App.3d 180, 196 (1978). In deciding a motion under the advocate-witness rule, the Court should also consider:

> (1) whether counsel's testimony is, in fact, genuinely needed; (2) the possibility opposing counsel is using the motion to disqualify for purely tactical reasons; and (3) the combined effects of the strong interest parties have in representation by counsel of their choice, and in avoiding the duplicate expense and time-consuming effort involved in replacing counsel already familiar with the case.

*Lopez*, 81 Cal.App.5th at 424.

## ARGUMENT

### I. Spiro's Participation as Witness <u>and</u> as Trial Counsel Will Confuse the Jury and Prejudice Plaintiffs

One or more jurors would likely suffer serious confusion if Spiro were permitted to play the dual role of fact witness and trial counsel. Given his pervasive presence and involvement throughout the deal—which will be readily evident at trial—the jury would be hard-pressed to separate what Spiro knew about the deal first-hand from what he argues as an advocate. Worse, the jury may be more inclined to accept Spiro's assertions as an advocate because of his direct and personal participation in the deal in real time.

For example, when Spiro-as-advocate attacks (during cross-examination or closing argument) the credibility of witnesses favorable to Plaintiffs (*e.g.*, Spiro's own statements to Isaacson), the jury

may adopt Spiro's perspective given his opportunity to directly observe and assess the witnesses, communications, and key documents during the 2022 events at the heart of this case. *See Yim*, 55 Cal.App.5th at 584-85 ("Lee's dual role posed the risk that the jury would be misled into accepting Lee's assertions during closing argument as evidence based on her personal knowledge as a witness.") The same will be true when Spiro argues during closing that witnesses who favor Musk—***including Spiro himself***—should be believed. This would create all the risks inherent in improper witness bolstering, of which the Ninth Circuit takes a particularly dim view. *E.g.*, *United States v. Preston*, 873 F.3d 829, 846 (9th Cir. 2017) (reversing jury verdict where one witness repeatedly commented on the credibility of another witness, which "unfairly bolstered the victim's credibility"); *see also* TUFT ET AL., CAL. PRACTICE GUIDE: PROFESSIONAL RESPONSIBILITY (THE RUTTER GROUP 2019) ¶ 8:378, p. 8-93 (risk created "where the attorney's testimony is on the key issue in the case on which there is conflicting testimony, and the attorney then proposes to argue to the jury why his or her testimony is more credible than the conflicting evidence") (quoted in *Yim*, 55 Cal.App.5th at 582).

  Additionally, if Spiro comes across as personable and credible during his testimony—any trial lawyer worth his/her salt would strive for such—the jury will be more likely to adopt the positions he takes as advocate on any and all issues, thereby prejudicing Plaintiffs. The same holds true if Spiro is more persuasive from the podium than the witness stand. *See Yim*, 55 Cal.App.5th at 582 (disqualifying counsel because of, *inter alia*, the risk of the "jurors' tying counsel's persuasiveness as an advocate to his credibility as a witness"). To make matters worse, Spiro is a seasoned trial lawyer, narrates extensively when examining witnesses, and has his own media presence, all of which greatly enhances the risk that he will take advantage of his skills and notoriety to cross-contaminate witness testimony and advocacy. Decl. Ex. 19-20, ¶ 21.

  Spiro is so enmeshed with the key events of this case that other key witnesses, including attorneys involved in the Twitter acquisition, will have to testify, *inter alia*, as to communications and interactions they had ***with Spiro***, leading to the perplexing likelihood that ***Spiro himself will cross-examine a number of witnesses about their 2022 interactions with him***. This potential for confusion and clear appearance of impropriety is wholly inconsistent with the fair and effective administration of justice. *U.S. v. Simcho*, 2007 WL 1100316 at *2-3 (N.D. Cal., Apr. 11, 2007) (disqualifying counsel

and finding that regardless of whether counsel testifies, the information he told other people would inject him into the trial such that he functions as an unsworn witness). The chances that Spiro gets the answers he wants from witnesses, or at least is effective in sowing confusion, are only enhanced because trial witnesses will include major players in the business world, most of whom have every incentive to curry favor with, and avoid angering, both Musk and Spiro.

## II. Plaintiffs Genuinely Need Spiro's Testimony

Musk's scienter will likely be the most hotly disputed issue at trial. As such, the context and circumstances surrounding Musk's statements and actions furthering his scheme are of critical importance. These circumstances include Spiro's reaction to and suggestions to mitigate the damage arising from Musk's tweets; Spiro's assistance in Musk's desperate search for evidence supporting his primary excuse to exit the deal (*i.e.*, his purported surprise that there were fake/spam accounts on Twitter); Spiro's personal assessment that SparkToro was not worth calling in the first instance and/or lacked the requisite "honesty, integrity, and subject matter expertise" to hand off to Musk's Delaware litigators for further review; Musk's efforts to manufacture an argument that Twitter refused to comply with his ███████████████████████ and the real reasons he wanted out of the deal, including his vendettas against Twitter's executives and board members. As set forth in prior briefing, Musk, Spiro, and in some cases Musk's biographer Walter Isaacson are the only ones with certain information on these topics. ECF 146, 212. But Musk claimed an incredibly spotty memory of the buyout, and Isaacson has thus far successfully asserted the journalist's privilege.[3] That leaves Plaintiffs in dire need of Spiro's trial testimony. These needs are far more concrete than the "merely anticipatory and speculative" bases with which courts in this Circuit grapple in deciding disqualification motions. *In re Marvel*, 251 B.R. 869, 871 (N.D. Cal. 2000).

## III. Plaintiffs Do Not Seek to Disqualify Spiro for Tactical Reasons, and Do Not Expect to Gain Any Tactical Advantage from Disqualification.

Plaintiffs intend to call Spiro at trial for one reason only—he would provide unique and highly-relevant testimony. Plaintiffs do not foresee any tactical gain from disqualification given that Musk

---

[3] Plaintiffs intend to revisit this issue, having obtained an extension of the fact discovery deadline for this purpose, and having met the privilege's exhaustion requirement.

can be expertly represented at trial without Spiro. Indeed, Musk has been represented by other highly-talented Quinn Emanuel attorneys who know the case backwards and forwards, having managed all aspects of this litigation—from dispositive motions and related hearings to depositions, discovery, meet and confer efforts, and numerous substantive and procedural disputes—since its filing in 2022. To date, Spiro has formally appeared (via Zoom) on only two occasions: Musk's deposition and Spiro's deposition. Decl. ¶ 2. Even at Musk's deposition, one of his other Quinn Emanuel lawyers was physically present in the room with Musk and others were online. *Id.*; Decl. Ex. 1, ¶ 2. Musk Tr. at 2-3 (appearances). As for trial skills, Quinn Emanuel's website boasts 1200+ attorneys with an 86% win rate in 2500+ trials and arbitrations, and several of the individual attorneys on this case have successfully represented Musk in a securities fraud jury trial in this District alongside Spiro, including one who bills himself as "one of the few (and possibly only) lawyers in the country to have obtained complete defense victories at trial in both a class action and an individual securities action brought under the Securities Exchange Act of 1934." Decl. Ex. 21.

### IV. Musk's Unexceptional Interest Does Not Outweigh Prejudice to Plaintiffs, Risk of Jury Confusion and Damage to the Judicial Process

Neither Musk nor Spiro can claim any *exceptional* interest in retaining Spiro as trial advocate. *See ABN,* 2025 WL 660194 at *16 ("[the attorney] asserted only generic interests that any party might have in its chosen counsel" which did not overcome the "substantial risk of juror confusion"). Indeed, other highly-talented Quinn Emanuel attorneys appear far more familiar with this case. Decl., ¶¶ 2, 22. Musk's unexceptional interest cannot outweigh the substantial prejudice to the Class, the serious risk of jury confusion, and injury to the integrity of the judicial process. Disqualification would also not cause a duplication of efforts or significant additional expenses. Musk's other Quinn Emanuel attorneys have worked on all aspects of the case for years and can skillfully try the case with the benefit of Spiro's pre-trial input. Moreover, any possible burden on Musk is lessened by the fact that Musk chose to proceed with Spiro as trial advocate, knowing he would likely be called as a witness. Indeed, Musk's position appears unchanged even after Spiro capitulated on his own motion for a protective order and sat for his deposition. *See Zhu v. Li,* 2023 WL 1111507 (N.D. Cal. Jan. 30, 2023) at *4 (denying motion to preclude plaintiff from calling opposing counsel to testify partly because

defendants were on notice of counsel's relevance); Decl., ¶ 4. In the unlikely event he does not already have one, there remains ample time for Musk to secure a highly-qualified trial attorney. Finally, the scope of any disqualification would likely be limited to jury-facing activities; Spiro would still be permitted to engage in trial preparation, and other proceedings outside the presence of the jury.

## CONCLUSION

For the reasons stated above, Alex Spiro should be disqualified from serving as trial counsel in this matter.

Dated: September 26, 2025

Respectfully submitted,

COTCHETT, PITRE & MCCARTHY, LLP

/s/ *Caroline A. Yuen*
Caroline A. Yuen

Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
Tyson C. Redenbarger (SBN 294424)
Gia Jung (SBN 340160)
Caroline A. Yuen (SBN 354388)

840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000
Email: jcotchett@cpmlegal.com
mmolumphy@cpmlegal.com
tredenbarger@cpmlegal.com
gjung@cpmlegal.com
cyuen@cpmlegal.com

BOTTINI & BOTTINI, INC.

/s/ *Francis A. Bottini, Jr.*
Francis A. Bottini, Jr.

Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Aaron P. Arnzen (SBN 218272)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Email: fbottini@bottinilaw.com
achang@bottinilaw.com
aarnzen@bottinilaw.com

*Lead Counsel for Plaintiffs*

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Caroline A. Yuen, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26th day of September 2025, at Burlingame, California.

                              */s/ Caroline A. Yuen*
                              Caroline A. Yuen