QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice*)
alexspiro@quinnemanuel.com
Jesse A. Bernstein (*pro hac vice*)
Jessebernstein@quinnemanuel.com
Jonathan E. Feder (*pro hac vice*)
jonathanfeder@quinnemanuel.com
296 Fifth Ave., New York, NY 10010
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Stephen A. Broome (Bar No. 314605)
stephenbroome@quinnemanuel.com
Joseph C. Sarles (Bar No. 254750)
josephsarles@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

*Attorneys for Defendant Elon Musk*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | CASE NO. 3:22-CV-05937-CRB<br><br>**DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:         Hon. Charles R. Breyer<br><br>Hearing Date:  October 31, 2025<br>Time:          10:00 a.m.<br>Courtroom:     6, 17th Floor |

**REDACTED FOR PUBLIC FILING**

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE ARGUMENT ...........................................................................................1

ARGUMENT ...........................................................................................................................3

I.   PLAINTIFFS IDENTIFY NO MATERIAL FACTUAL DISPUTES ON THE ISSUE OF FALSITY .........................................................................................................................3

    A.   There Is No Genuine Dispute that Musk's May 13 Tweet Was Accurate..........................3

        1.   Plaintiffs Do Not Genuinely Dispute that Musk Had the Right to Delay Closing  Until He Received the Requested Bot Data .........................................3

        2.   Plaintiffs' "On Hold" Arguments Cannot Defeat Summary Judgment...................6

        3.   The Absence of Price Reaction to the Revelation that Musk and Twitter Continued to Work Toward Closing Dooms Plaintiffs' Previously Rejected "On Hold" Claim .........................................................................................9

    B.   There Is No Genuine Dispute That Musk's May 16 Statement and May 17 Tweet Were Accurate .....................................................................................................10

II.  MUSK'S STATEMENTS WERE INACTIONABLE OPINIONS..................................12

III. PLAINTIFFS CANNOT ESTABLISH SCIENTER AS A MATTER OF LAW .........................14

IV.  PLAINTIFFS LOSS CAUSATION THEORIES FAIL AS A MATTER OF LAW ...................15

    A.   Plaintiffs Did Not Plead and Cannot Prove Price Maintenance .......................................15

    B.   Plaintiffs' Disaggregation Arguments Cannot Rescue Tabak's Unreliable Analysis ...........................................................................................................................17

    C.   The "Constant Percentage" Model Does Not Adjust for Non-Fraud Price Effects...........18

    D.   Plaintiffs Cannot Prove Loss Causation Because They Have No Evidence Twitter's Stock Price Reacted to the Revelation of Any Fraud .........................................19

        1.   Plaintiffs Pleaded—and Must Prove—A Corrective Disclosure ..........................19

        2.   *Dura* Prohibits Plaintiffs From Proving Loss Causation Through Deflation Alone...........................................................................................................19

        3.   Plaintiffs Have No Evidence that the October 4 Letter Corrected Anything ........21

    E.   Plaintiffs Cannot Prove Loss For Any Sales After July 8 .................................................21

V.   PLAINTIFFS CANNOT ESTABLISH SCHEME LIABILITY AS A MATTER OF LAW .............................................................................................................................22

CONCLUSION........................................................................................................................23

DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

**TABLE OF AUTHORITIES**

**Page(s)**

<u>Cases</u>

*In re AGS,*
2024 WL 581124 (D. Nev. Feb. 12, 2024)*, aff'd sub nom. Oklahoma Police Pension
& Ret. Sys. v. PlayAGS, Inc.,* 2025 WL 927296 (9th Cir. Mar. 27, 2025) ...........................................22

*In re Allstate Corp. Sec. Litig.,*
966 F.3d 595 (7th Cir. 2020) .................................................................................................16

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.,*
663 F. Supp. 3d 334 (S.D.N.Y. 2023).....................................................................................20

*BankAmerica Pension Plan v. McMath,*
206 F.3d 821 (9th Cir. 2000) ...................................................................................................1

*Berson v. Applied Signal Tech., Inc.,*
527 F.3d 982 (9th Cir. 2008) ...............................................................................................7, 8

*In re BofI Holding, Inc. Sec. Litig.,*
977 F.3d 781 (9th Cir. 2020) .................................................................................................19

*Braden Partners, LP v. Twin City Fire Ins. Co.,*
2017 WL 63019 (N.D. Cal. Jan. 5, 2017).............................................................................10

*Brody v. Transitional Hosps. Corp.,*
280 F.3d 997 (9th Cir. 2002) ...............................................................................................7, 8

*Calmat Co. v. U.S. Dep't of Lab.,*
364 F.3d 1117 (9th Cir. 2004) ...............................................................................................11

*Dura Pharms., Inc. v. Broudo,*
544 U.S. 336 (2005)......................................................................................................18, 19, 21

*In re Eastman Kodak Co. Sec. Litig.,*
632 F. Supp. 3d 169 (W.D.N.Y. 2022).............................................................................22, 23

*Glickenhaus & Co. v. Household Int'l, Inc.,*
787 F.3d 408 (7th Cir. 2015) .................................................................................................17

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.,*
594 U.S. 113 (2021)...............................................................................................................16

*Hagood v. Sonoma County Water,*
81 F.3d 1465 (9th Cir. 1996) .................................................................................................13

DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

*Homyk v. ChemoCentryx, Inc.*,
    2025 WL 2505483 (N.D. Cal. Aug. 15, 2025) ..............................................................................12

*Homyk v. Chemocentryx, Inc.*,
    No. 21-cv-03343-JST, Dkt. 345 (N.D. Cal. Aug. 15, 2025)...........................................................12

*Iafrate v. Angelo Iafrate*,
    827 F. App'x 543 (6th Cir. 2020) .................................................................................................12

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
    998 F.3d 397 (9th Cir. 2021) ........................................................................................................21

*Levie v. Sears Roebuck & Co.*
    496 F. Supp. 2d 944 (N.D. Ill. 2007) ...........................................................................................20

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ........................................................................................10

*Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*,
    692 F.3d 983 (9th Cir. 2012) ........................................................................................................16

*In re Molycorp, Inc. Sec. Litig*,
    2016 WL 9735753 (D. Colo. May 25, 2016)..................................................................................10

*Noerr-Pennington*, *Theme Promotions, Inc. v. News Am. Mktg. FSI*,
    546 F.3d 991 (9th Cir. 2008) ........................................................................................................23

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
    730 F.3d 1111 (9th Cir. 2013) .............................................................................................17, 20, 21

*Omnicare, Inc. v. Laborers Dist.*,
    575 U.S. 175 (2015)....................................................................................................3, 12, 13, 14, 23

*In re Oracle Corp. Sec. Litig.*,
    2009 WL 1709050 (N.D. Cal. June 19, 2009).............................................................................10, 19

*In re Oracle Corp. Secs. Litig.*,
    627 F.3d 376 (9th Cir. 2010) ..........................................................................................................1

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)............................................................................................................9

*In re Philip Morris*,
    89 F.4th 408 (2d Cir. 2023) ..........................................................................................................12

*Pickern v. Pier 1 Imports (U.S.), Inc.*,
    457 F.3d 963 (9th Cir. 2006) ....................................................................................................16, 19

*Ramirez v. Ghilotti Bros. Inc.*,
    941 F. Supp. 2d 1197 (N.D. Cal. 2013) ..........................................................................................8

DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010)................................................................................17, 18

*Sahadi v. Liberty Mut. Ins.*,
  2019 WL 4417675 (N.D. Cal. Sept. 16, 2019) .......................................................................8, 9

*In re St. Jude Med., Inc., Sec. Litig.*,
  629 F. Supp. 2d 915 (D. Minn. 2009)...............................................................................3, 10, 16

*In re Tesla Inc., Sec. Litig.*,
  2023 WL 4032010 (N.D. Cal. June 14, 2023) .......................................................................9, 18

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) ...............................................................................................14

*Xiaojiao Lu v. Align Tech., Inc.*,
  417 F. Supp. 3d 1266 (N.D. Cal. 2019) .................................................................................6, 13

**Rules**

Rule 10b-5(a) and (c)................................................................................................................22

**Statutes**

Private Securities Litigation Reform Act.............................................................................3, 10, 16

**Other Authorities**

*On Hold*, CAMBRIDGE ENGLISH DICTIONARY,
  https://dictionary.cambridge.org/us/dictionary/english/on-hold...........................................6

DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

## SUMMARY OF THE ARGUMENT

Plaintiffs' Opposition confirms their case should be dismissed.  Musk's Motion for Summary Judgment (Dkt. 255, "MSJ") presented extensive evidence and contractual analysis demonstrating that his at-issue tweets and statements were accurate or, at worst, inactionable opinion.  As the non-moving party with the burden of proof at trial, to oppose summary judgment Plaintiffs had the "burden … to designate *specific facts* demonstrating the existence of genuine issues for trial."[1]  *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 386 (9th Cir. 2010).  "This burden is not a light one … [Plaintiffs] must come forth with evidence from which a jury could reasonably render a verdict in [their] favor."  *Id.*  They fail to do so.  Plaintiffs largely *ignore* Musk's evidence and arguments, thereby conceding them.  *See BankAmerica Pension Plan v. McMath*, 206 F.3d 821, 826 (9th Cir. 2000) ("A party abandons an issue when it has a full and fair opportunity to ventilate its views with respect to an issue and instead chooses a position that removes the issue from the case.").  Instead, they resort to obfuscation and distortion of evidence—falsely claiming, for example, that Musk did not read the Merger Agreement ("MA") before sending his tweets, and that Musk admitted to the SEC that his statements had no basis.  But their assertions are demonstrably false and fail to raise a material dispute of fact.  Musk's Motion should be granted.

Plaintiffs have all but abandoned the primary theory of liability on which the Court permitted this case to proceed—*i.e.*, that, on May 13, 2022, Musk misled investors by falsely tweeting he was entitled to "details supporting [Twitter's] calculation that spam/fake accounts do indeed represent less than 5% of users." Dkt. 48 at 20.  Plaintiffs now concede that on May 6, 2022, *before* the tweet in question, "Twitter executives offered to provide the information that Musk requested" and ultimately produced information in response to Musk's requests.  Opp. 2 & n.6.[2]  They assert Twitter agreed to produce the information merely to be "cooperative," "despite not having the obligation" to do so.  *Id.* 7.  That assertion is unsupported and far-fetched—public companies represented by sophisticated counsel obviously do not

---

[1]  All emphases are added unless otherwise indicated.

[2]  *See also* Opp. 7 ("Twitter Produced the Information Musk Requested"); *id.* ("Twitter produced the data that Musk had requested, while also repeatedly communicating to Musk and his team that information ***would continue to be produced*.**") (emphasis in original); *id.* ("As of July 1, Twitter had complied with Musk's information requests to date or stated in writing that further information was forthcoming."); *id.* at 8 ("as the evidence confirms, Twitter had provided the information Musk requested and promised to continue compiling and producing further information on a rolling basis").

DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

produce sensitive internal data to potential "competitors," Opp. 2, 13, absent obligation.  And Plaintiffs fail to acknowledge, let alone address:  (1) the mountain of evidence (including testimony from Twitter's CEO and lead deal lawyer) showing that Twitter produced the information because Musk "rightfully made" his requests "under the terms of the merger agreement" and the information was necessary "for us to consummate this merger," *see* MSJ at 15-18; and (2) Musk's contractual arguments that, under Sections 6.4, 6.11, and 7.2 of the MA, he was entitled to the information and to delay the deal until he received it and was "satisf[ied]" that Twitter complied with its obligation to produce the information and that Twitter's SEC disclosures were accurate, *id.* at 6-8.  Plaintiffs' complete silence on these issues is telling. In any event, whether Musk had a contractual right to the information is ultimately beside the point because his tweets never mentioned the contract.  He simply stated that the deal was "temporarily on hold pending details"—"details" Plaintiffs now admit *Twitter agreed to provide <u>before</u> Musk's tweets*.  That concession, alone, confirms Musk's tweet was accurate and requires summary judgment in his favor.

Plaintiffs thus pivot to claiming that the tweets were nevertheless false because Musk said the deal was "temporarily on hold pending details" despite never "instruct[ing] anyone to put their pens down." Opp. 10. But they fail to identify a single investor who interpreted the tweet to mean all merger-related work had stopped.  Their own M&A expert says he understood "on hold" to mean that Musk would not *close* until he received the requested information.  Ex. C (Badawi Dep.), at 266:20-267:4.[3]  The Court— and market analysists—interpreted it the same way.  Dkt. 48 at 19; Ex. K (Lippai Dep.) at 68:19-24.  In his Motion, Musk explained at length why specific provisions of the MA permitted him to delay closing until he received the requested information—and that the deal was, in fact, delayed.  MSJ at 12, 19-20. Again, Plaintiffs offer no response, thereby conceding the point.

Given Plaintiffs now (1) admit that Twitter *agreed* to produce the requested Bot Data to Musk *before* he made his at-issue statements and tweets (but had not yet produced it), and (2) tacitly concede that Musk had a right to delay closing until he received the requested information, they cannot possibly prove that Musk's tweets were false when made.  Nor can they prove scienter, or that Musk's statements about his legal rights or estimates of Twitter's bots based on his own experience and analysis performed

---

[3]  Unless indicated otherwise, all "Ex." citations are to the Declaration of Stephen A. Broome in Support of Musk's Motion for Summary Judgment, Dkt. 255-1.  Any exhibits attached to the accompanying Declaration of Stephen A. Broome in Support of Musk's Reply are labeled "Reply Decl."

by "outside firms" were anything more than inactionable opinion under *Omnicare, Inc. v. Laborers Dist.*, 575 U.S. 175 (2015).

Plaintiffs' loss causation argument also fails. They effectively concede they cannot prove the loss causation theories they pleaded. For the May 13 tweet, Plaintiffs pleaded a "corrective disclosure theory" (Dkt. 48 at 35-36) but now assert a "direct causation" theory, Opp. 27. And for the May 16-17 statement and tweet, Plaintiffs pleaded a "direct causation" theory (Dkt. 48 at 37), but now assert a "price maintenance" theory, Opp. 22. The law is clear that because Plaintiffs "survived a motion to dismiss in light of the theories they, themselves, chose; they may not now evade Congress's PSLRA mandates by switching horses midstream and pursuing a new theory." *In re St. Jude Med., Inc., Sec. Litig.*, 629 F. Supp. 2d 915, 921 (D. Minn. 2009); *see also infra* at 15, 19 (citing cases). In any event, even if Plaintiffs were permitted to change their loss causation theories at the eleventh hour, their new theories are equally meritless for the reasons explained *infra* at 15-21.

In sum, there is no genuine dispute that, at the time Musk made his at-issue tweets and statements, he was entitled to delay closing until he received the Bot Data he requested and Twitter agreed to provide—and thus his tweets and statements were true. While Plaintiffs may find it unseemly to "tweet" about the status of a multi-billion dollar merger, Musk specifically bargained for the right to do so (Ex. 30 (MA) § 6.8), and it is not against the law if the tweets are accurate—as they were here. Musk's communication to investors that he had potentially discovered a significant discrepancy in Twitter's reported bot numbers and that he was delaying closing until Twitter addressed his concerns was an act of transparency, not fraud. The Motion should be granted and Plaintiffs' claim dismissed.

## ARGUMENT

**I.    PLAINTIFFS IDENTIFY NO MATERIAL FACTUAL DISPUTES ON THE ISSUE OF FALSITY**

**A.    There Is No Genuine Dispute that Musk's May 13 Tweet Was Accurate**

1.    <u>Plaintiffs Do Not Genuinely Dispute that Musk Had the Right to Delay Closing Until He Received the Requested Bot Data</u>

The Court held that Musk's May 13 tweet was actionable because "Plaintiffs have plausibly alleged that Twitter did not have … an obligation to provide the requested information for the deal to close." Dkt. 48 at 20. Musk's MSJ presented evidence—including an analysis of the MA's terms,

testimony from the lawyers and executives who worked on the merger (including Twitter's lead M&A lawyer and its CEO), and admissions from Plaintiffs' M&A expert Prof. Badawi—that Twitter *did* have such an obligation and, in fact, *agreed* it had such an obligation. MSJ at 21-24. Plaintiffs' failure to acknowledge—let alone respond to—Musk's evidence requires summary judgment for Musk on falsity.

Indeed, Plaintiffs do not genuinely dispute that Musk was entitled to the Bot Data he requested. *See* Opp. 11-13. Instead, they try to sidestep that question by arguing that Musk did not have "boundless information rights" or the right to "conduct broad discovery" into Twitter. Opp. 11, 13. That is a strawman. No one has suggested that Musk's rights were "boundless." The question is whether Musk had a right to data "supporting [Twitter's] calculation that spam/fake accounts do indeed represent less than 5% of users." *Everyone* involved in the merger—*including Twitter*—agreed that Musk was entitled to such information. And as Plaintiffs now concede, Twitter agreed to provide the information *before* Musk made the first at-issue tweet—confirming that his tweet was well-founded and accurate.

Plaintiffs nevertheless argue—without citation to evidence—that Section 6.4's requirement that information requests be "related to the consummation of the" merger somehow limited Musk's access to "information that …would allow him to continue operating the business." Opp. 11. Even if Plaintiffs' self-serving and unsupported interpretation were correct, it would not matter, because Plaintiffs now admit that Twitter *agreed* to provide the requested information. Of course, Plaintiffs' interpretation is not correct. Twitter's CEO, Parag Agrawal, testified that "we were sharing all the right information [*i.e.*, the Bot Data] under the terms of the merger agreement with Musk *in order for us to consummate this merger*." Ex. A (Agrawal Dep.) at 372:2-12. Twitter's lead deal lawyer, Martin Korman, similarly testified that Twitter's deal team attempted to ███████████████████████████ ██████ Ex. I (Korman Dep.) at 237:22-238:7. And Plaintiffs' M&A expert, Prof. Badawi, admitted that "check[ing] the reps and warranties for their truth and accuracy prior to closing"—one of the reasons Musk requested the Bot Data—is "related to the consummation of the merger agreement." Ex. C (Badawi Dep.) at 105:15-23. Plaintiffs' self-serving attempt at narrowing Section 6.4 cannot create a material dispute of fact on this issue where Twitter's deal team and Plaintiffs' own expert admitted that Musk's information requests fell squarely within the terms of Sections 6.4 and 6.11.

Plaintiffs offer no response to Korman's, Agrawal's, or Badawi's testimony. They do not even

cite it. With their heads in the sand, they baldly claim that "Twitter always disputed Musk's right to such information." Opp. 12. But the record conclusively shows that Twitter and Musk's dispute—which did not even materialize until *after* Musk made the at-issue statements—concerned the *scope* of Musk's information rights and whether Twitter materially complied. *See* Opp. 12 (citing Pls. Ex. 5 (letter from Twitter claiming that "many"—but not *all*—of Musk's Bot Data requests "have gone beyond what was called for under Sections 6.4 and 6.11")). Twitter never disputed Musk had the right to at least *some* Bot Data to confirm its calculation—which is all that is necessary to show Musk's statements were accurate.[4]

Nor is there any merit to Plaintiffs' now thoroughly debunked argument that Musk's decision to forego pre-signing due diligence somehow restricted his rights to information under the MA. Opp. 11. Musk's lead M&A lawyer, Mike Ringler, explained that this decision impacted only Musk's ability to conduct diligence *before* signing the MA. Ex. O (Ringler Dep.) at 34:8-36:15, 75:22-77:12. Plaintiffs' M&A expert agreed. Ex. C (Badawi Dep.) at 44:23-45:6; *id.* at 49:20-50:1. Both Ringler and Badawi also agreed that, after Musk signed the MA, his information rights were governed by the contract itself—not any pre-signing representation. Ex. O (Ringler Dep.) at 269:18-270:2 (The MA "explicitly supersedes anything that came before, including this 13D."); Ex. C (Badawi Dep.) at 52:17-54:5; Ex. 230 (Rock Rp't) at ¶ 28; *see also* Ex. 30 (MA) at § 9.8 (MA "supersedes all other prior agreements and understandings, both written and oral, among the parties"). Again, Plaintiffs have no response to this evidence.

Plaintiffs' final argument on this issue—that "Twitter was well within its rights to refuse all requests for information because Musk had repeatedly threatened to start a competitor," and Section 6.4 contained certain limitations and carve-outs (*e.g.*, for competitively sensitive information) Opp. 13—is wrong but ultimately irrelevant because Twitter did not invoke those limitations as a basis to refuse to provide Bot Data.[5] To the contrary, it is now undisputed that Twitter *agreed* to provide—and *did*

---

[4]  Plaintiffs' contention that "the fact that Musk ultimately dismissed all of his own claims in Delaware and paid **full price**, is proof that Musk did not have such information rights," is baffling. Opp. 12. In the Delaware action, Twitter never claimed that Musk did not have a right to Bot Data. It argued that it complied with the MA by *providing* Bot Data. Ex. GG ¶ 74 ("Cognizant of its own obligations under the merger agreement, Twitter proceeded with the May 13 diligence meeting … Twitter explained, among other things, that its spam estimation process entails daily sampling for a total set of approximately 9,000 accounts per quarter that are manually reviewed."); ¶84 ("Twitter also provided a detailed summary document describing the process the company uses to estimate spam as a percentage of mDAU.").

[5]  In the cited Ned Segal testimony, ███████████████████████████████████

provide—Bot Data in response to Musk's requests.[6]

2.    Plaintiffs' "On Hold" Arguments Cannot Defeat Summary Judgment

Unable to credibly dispute that Musk had the right to delay closing until he received Bot Data, Plaintiffs cherry pick two words from his May 13 tweet—"on hold"—and argue that *those two words* were false because Musk "did not instruct anybody to put their pens down" or to stop all merger-related work. Opp. 10. But that is not what Musk's tweet said or how investors interpreted it. To start, Plaintiffs offer no support for their contention that "on hold" is synonymous with "pens down." Although they try to draw a distinction between "on hold" and "delayed," Opp. 17, those terms mean the *same thing*. *On Hold*, CAMBRIDGE ENGLISH DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/on-hold ("If an activity is on hold, it has been intentionally *delayed*") (last visited Sept. 26, 2025).

Moreover, Plaintiffs cannot establish falsity by "cherry-picking" a few of Musk's words while ignoring the rest of his statement. *Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1276 (N.D. Cal. 2019). They "must account for the entirety of [the statements] on which they rely, and not simply invoke selective quoting to make their claims." *Id.* Musk's May 13 tweets stated the deal was "*temporarily* on hold *pending* details supporting calculation that spam/fake accounts do indeed represent less than 5% of users" and that he was "[s]till committed to acquisition." Ex. 163. The second half of the tweet—"pending details supporting calculation"—indicated that the parties were continuing work to address Musk's concerns. The Bot Data could not simply be conjured; Twitter had to gather it and Musk's team had to

█████████████████████████████████████████. *Compare* Opp. Ex. Ex. 8, Segal Tr. at 134:24-135:6 *with* Reply Decl. Ex. X (Segal Dep.) at 252:5-14. Korman's testimony had nothing to do with Twitter's ability to withhold information—████████████████████████ ████████████████████████ He had no idea. Opp. Ex. 7 (Korman Dep.) at 131:10-19.

[6]    Plaintiffs misrepresent the language of the access to information covenant at issue in *Akorn, Inc. v. Fresenius Kabi AG* in their attempt to distinguish it from Section 6.4. 2018 WL 4719347, at *26 (Del. Ch. Oct. 1, 2018). Contrary to their claim, the buyer in *Akorn* did not bargain for the "specific right to information concerning contract compliance," it "bargained for a customary right of reasonable access to Akorn's 'officers, employees, agents, properties, books, Contracts, and records.'" *Compare* Opp. 13 *with Akorn*, 2018 WL 4719347, at *26. This language is almost identical to Section 6.4 and enabled the buyer to conduct an investigation to confirm the target's representations and warranties—just as Musk asked to do. Plaintiffs' other cases discussing "books and records" language do not help them either. *Mickman v. Am. Int'l* noted that "all books and records" was broader than "books and records" while explaining that the latter language still confers substantial inspection rights, 2009 WL 2244608 *2, and *Chartis Warrantyguard v. Nat'l Elecs.* found the provision at issue to be broad because there were only two carve-outs; here there were only three, 2011 WL 336385 *7.

DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

analyze it.  Under a plain reading—applying the dictionary definition of "on hold"—Musk communicated that closing would be "temporarily [delayed] pending":  (1) Twitter gathering and providing the details Musk requested; and (2) Musk's team analyzing the information to confirm it supported Twitter's representations to the SEC.  Plaintiffs concede this was the *exact* state of affairs as of May 13.  Opp. 3 ("from May 10 onward, Twitter employees 'were working 24 hours a day' at 'breakneck speed' to provide [bot] information to Musk's team").  Further, "pending" communicated that, *if* Twitter produced evidence supporting its <5% estimate (it never did), the deal would likely close, and thus financing and other merger-related work should continue to account for that eventuality.

Plaintiffs cite no evidence that the tweet caused any investor to conclude that all merger-related work had stopped.  *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (To be false, a statement "must affirmatively create" in the mind of the reasonable investor "an impression of a state of affairs that differs in a material way from the one that actually exists.").  The undisputed facts— including testimony of market analysts and Plaintiffs' own M&A expert—establish that investors shared the Court's interpretation of the tweet "to mean that, absent the provision of [the requested] information, the deal would not *close*."  Dkt. 48 at 19; Ex. C (Badawi Dep.), at 266:20-267:4 ("on hold" means "I've requested information, I'm not getting a satisfactory response, and I'm not *closing* until I do."); Ex. K (Lippai Dep.) at 68:19-24 (Musk "would not *voluntarily close* the deal based on the bot issue.").

Plaintiffs also argue that even if the tweet was literally true, it nevertheless misled investors given the surrounding circumstances.  Opp. 10-11.  But they cite no evidence of investors being misled on this "on hold" point.  And the cases they cite do not help them.  In *S.E.C. v. Platforms Wireless Int'l Corp.*, the press releases "[c]onsidered as a whole" communicated that an undeveloped product existed.  617 F.3d 1072, 1095 (9th Cir. 2010).  The tweet when "[c]onsidered as a whole" communicated the true state of affairs—that Musk would not close until Twitter produced the Bot Data it agreed to provide.  Ex. C (Badawi Dep.), at 266:20-267:4.  Nor is this case like *Miller v. Thane*, where investors incorrectly inferred from a company's representation that it would seek approval to list its stock publicly that it would actually list the stock if it obtained that approval.  519 F.3d 879, 886 (9th Cir. 2008).  Here, Musk conveyed that the merger would be delayed "pending details," and it was.[7]

---

[7]  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 984 (9th Cir. 2008) has even less applicability.

DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

Without any evidence that the market shared their unsupported interpretation of the tweet, Plaintiffs point to testimony from advisers working on the merger who stated that they did not "formulat[e] an understanding of what on hold means" or otherwise did not understand that it was a legal concept in M&A practice.  Opp. 10.  At best, these statements show that the term was unclear—not that it "affirmatively creat[ed]" the impression that all work on the deal stopped.  *See Brody*, 280 F.3d at 1006.

Contrary to Plaintiffs' contention (Opp. 10), Kate Claassen was not asked to—and did not—interpret what "temporarily on hold pending details …" meant.  Ex. E (Classen Dep.) at 258:2-262:23. She testified she ███████████████████████████████████████████████████████ ████████████████████████████████████████.  *Id.* at 258:15-259:4.  Reading the two pre-market tweets *together*—as a reasonable investor would—███████████████████████ ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ █████.  *Id.* ███████████████████████████████████████████████████████ ██████████  *Id.* at 259:25-260:4.

Plaintiffs' contention, Opp. 18, that Musk did not have the "unilateral right" to place the deal on hold fares no better.  As explained in Musk's MSJ, MA Section 7.2 entitled Musk to delay closing until he was "satisf[ied]" that (1) Twitter materially complied with its obligations under the MA, including its obligation to provide information under Sections 6.4 and 6.11; and (2) Twitter's representations and warranties were accurate.  Again, Plaintiffs offer no response to this argument—they do not even cite Section 7.2 in their brief—and thus concede the point.  *Sahadi v. Liberty Mut. Ins.*, 2019 WL 4417675, at *9 (N.D. Cal. Sept. 16, 2019) (Koh, J) (granting summary judgment to defendant because "Plaintiff fail[ed] to respond to this argument."); *Ramirez v. Ghilotti Bros. Inc.*, 941 F. Supp. 2d 1197, 1210 n.7 (N.D. Cal. 2013) (Breyer, J.) ("[A]bsent unusual circumstances, failure to respond to argument on merits viewed as grounds for waiver or concession of the argument") (internal quotation omitted).

Finally, as Prof. Rock explains, whether or not Musk had the legal right to put the deal "on hold" as of May 13, he certainly had the practical power to do so.  Ex. P (Rock Dep.) at 55:6-24, 59:10-60:11.

There, the court held on review of a motion to dismiss that plaintiffs plausibly alleged defendant committed fraud by categorizing "stop[ed]-work"—for which it was unlikely to ever receive payment—as work the company was contracted to do but had not yet performed.  *Id.*

Again, Plaintiffs offer no response to this point, and thus concede it.

3. The Absence of Price Reaction to the Revelation that Musk and Twitter Continued to Work Toward Closing Dooms Plaintiffs' Previously Rejected "On Hold" Claim

Plaintiffs' "on hold" theory also fails because when the market learned, just days later, that Musk and Twitter were exchanging information to address Musk's concerns and continuing to work toward closing (Exs. 201, WW), Twitter's stock price had no statistically significant response. According to Plaintiffs' expert, Dr. Tabak, that lack of price reaction can mean only one of two things: (1) the market failed to view this information as "new"—i.e., the market had no pre-existing impression that all work on the merger had stopped that these revelations needed to correct, or (2) the market did not view this information—which corrected the alleged misstatement—as "material." Ex. S (Tabak Dep. Vol. 1) at 60:12-21; *id.* at 56:9-13; *see also Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (Alito, J.) ("[I]f a company's disclosure of information has no effect on stock prices, it follows that the information disclosed ... was immaterial as a matter of law."). Therein lies Plaintiffs' problem. They must prove *both* that "on hold" gave a "reasonable investor the impression" that all work on the merger stopped *and* that "the correction of that misstated fact" would have been material. *See In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010, at *7 (N.D. Cal. June 14, 2023). Because Dr. Tabak admitted that Plaintiffs cannot prove both, their "on hold" theory fails.

Plaintiffs have no response. They do not dispute that market did not react to the revelation that Musk and Twitter were still working towards closing. Nor do they dispute that the market's failure to react proves that either (1) the market never believed all merger-related work had stopped, or (2) the market did not deem that information material. Instead, they assert an entirely new theory of falsity. They claim that the tweet was false because Musk was attempting to renegotiate the price and that Musk "never made any public disclosures that he was trying to" do so. *Compare* Opp. 14 *with* FAC ¶ 112. By switching theories midstream, Plaintiffs concede that the "on hold" claim is not viable. Their new omission theory is not either. Musk's May 13 tweet said nothing about renegotiating price and thus cannot be read to leave any false impressions about that matter. Plaintiffs have no evidence any investor was so misled. The opposite is true: many analysts assumed the tweet was a renegotiation tactic. Ex. K (Lippai Dep.) at 25:19-26:9; Ex. Y (Utz Dep.) at 17:9-18:6. Moreover, *Musk did disclose* he was interested in renegotiating price

on both May 16 and May 21.  Reply Decl. Ex. BBB  at 18.  Again, Twitter's stock did not react.

Plaintiffs' remaining arguments fare no better.  Although Musk's testimony and the May 13 stock price drop may be evidence that the May 13 tweet communicated material information (i.e., the truth that Musk had concerns about going through with the merger), it is not evidence that investors understood Musk to be saying "pens down," or if they did, that they viewed that information as material.  The market's failure to react upon news the deal was continuing confirms Plaintiffs' alleged interpretation of "on hold" had no impact.  *See In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1259 (N.D. Cal. 2000).[8]

Finally, Plaintiffs dispute that they cannot revive their "on hold" theory despite the Court's rejection of it.  Opp. 14; Dkt. 48, at 20.  The authority they cite, *Braden Partners, LP v. Twin City Fire Ins. Co.,* 2017 WL 63019, at *6 (N.D. Cal. Jan. 5, 2017), permits a *defendant* to reraise previously rejected arguments at summary judgment; it does not allow Plaintiffs to pursue dismissed theories.  Plaintiffs ignore that their attempt to assert their "on hold" theory "would effectively dispense with the formidable pleading requirements of the PSLRA" and "defeat the PSRLA's purpose."  *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050, at *18-19 (N.D. Cal. June 19, 2009) (rejecting attempt to pursue new falsity theory at summary judgment); *In re St. Jude Med*, 629 F. Supp. 2d at 921.  Under the PSLRA, "Plaintiffs may not proceed past the motion-to-dismiss stage of this proceeding on one theory, while fighting summary judgment on another, untested"—or, in this case, rejected—"theory."  *In re Molycorp, Inc. Sec. Litig*, 2016 WL 9735753, at *5 (D. Colo. May 25, 2016).

**B.     There Is No Genuine Dispute That Musk's May 16 Statement and May 17 Tweet Were Accurate**

As to Musk's May 16 statement at the All In Summit, Plaintiffs cannot escape four undisputed and dispositive facts:  (1) Musk said that Twitter had told him that the number of bots on its platform was "unknowable" and never suggested that he had already obtained, and was basing his statements on, Bot Data from Twitter,[9] Ex. 78 (All In Summit Excerpted Transcript) at 4:5-8 ("[W]hat I'm being told [by

---

[8]  The Court's reasoning that news that Twitter was not complying with its contractual obligations might be material does not help Plaintiffs either.  Opp. 14.  The Court's assumption is not evidence that any investor actually held that view and it has nothing to do with Plaintiffs' theory that the tweet conveyed all deal work had stopped.  Most importantly, any such impression was not false:  it is undisputed that as of May 13, Twitter had not complied with its obligations and promises to produce Bot Data to Musk.

[9]  Plaintiffs make the bizarre argument that Musk admitted "that this information came from Twitter.  *See* ECF 255 at 26 ('***Twitter told him*** the bot calculation is as unknowable as the human soul')."  Opp. 16 (emphasis in original).  Plaintiffs have apparently forgotten why they alleged—and the Court found—the

DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

Twitter] is that [] there's just no way to know the number of bots. It's like as unknowable as the human soul, basically."); (2) Musk explained that his 20 percent estimate was based on analysis by "outside firms" and his anecdotal experience, *id.* at 6:8-8:1; (3) just the day before, two outside firms—Sparktoro and Followerwonk—did indeed publish a study estimating Twitter bots at around 20 percent, Ex. 79;[10] and (4) *every witness* who testified about Musk's May 16 statement (including a Plaintiff) agreed that he never suggested that the estimate was based on Bot Data he obtained from Twitter, Ex. UU (Pls' Resp. to Rog. No. 22) at 38-42; Ex. K (Lippai Dep.) at 79:12-81:4; Ex. H (Garrett Dep. Vol. 2) at 155:3-158:6.

Plaintiffs wave a hand at this dispositive evidence, falsely claiming that it is "inconsistent with Musk's testimony in the SEC investigation." Opp. 15. As explained in Musk's Opposition to Plaintiffs' MSJ, Dkt. 267 at 5-6, the testimony they cite had nothing to do with the May 16 statement. ████████████ ███████████████████████████████████████████████████████ ████████████████████ Reply Decl. Ex. CCC (Musk SEC Tr.) at 306:23-307:1. And Plaintiffs misleadingly quote the SEC attorney's *questions* as Musk's *testimony*, despite the fact that Musk did not agree. The full transcript puts the lie to Plaintiffs' characterization.

Unable to respond to the Sparktoro and Followerwonk Report, Plaintiffs ask the Court to ignore it as unauthenticated hearsay. Opp. 15, n.5. The Report is not hearsay because Musk does not cite it for the truth of its contents; rather, he cites its *existence* as a basis for his statement. *Calmat Co. v. U.S. Dep't of Lab.*, 364 F.3d 1117, 1124 (9th Cir. 2004) ("If the significance of an out-of-court statement lies in the fact that the statement was made and not in the truth of the matter asserted, then the statement is not hearsay."). Nor is its authenticity in doubt. Musk's bankers testified they learned about it on May 15 and produced emails from May 2022 sharing its contents. Exs. HH, QQ. Plaintiffs obtained the Report online, attached

---

May 16 statement was false: "[T]he complaint plausibly alleges that the statement misled the investing public to believe *that Defendant received—and was basing his [May 16] statement on—bot user data from Twitter*, which was not the case .... [A] reasonable investor could have reasonably concluded that Defendant was later able to make a statement about the percentage of bot users *because he had received such information from Twitter*." Dkt. 48 at 23. Musk's statement that "Twitter told him" the number of bots was "unknowable" does not suggest Twitter provided him with bot data—it does the opposite.

[10] Plaintiffs assert that "during his deposition [Musk] failed to reference—presumably because he did not see—the SparkToro Report as a basis for his 20%" estimate. Opp. 15, n.5. That is misleading. Although Musk did not identify Sparktoro by name, he explained that his estimate was based on "multiple analyses … that showed up on my Twitter feed from what appeared to be credible sources." Ex. M (Musk Dep. Vol. 2) at 258:1-8. The Sparktoro and Followerwonk Report was one such analysis. Ex. XX.

it to their RFAs, and asked Musk to authenticate it (which he did).  Reply Decl. Ex. DDD.

As for Musk's May 17 tweet, the Court previously held it was a reiteration of the May 13 tweet and May 16 statement.  Dkt. 48, at 24-25.  Because (1) as shown in the Musk MSJ and above, neither the May 13 tweet nor the May 16 statement were false, and (2) Plaintiffs do not raise any additional falsity arguments specific to the May 17 tweet, the May 17 tweet was not false either.

## II.    MUSK'S STATEMENTS WERE INACTIONABLE OPINIONS

The three at-issue statements reflect subjective opinions about contractual rights and estimates and are thus inactionable under *Omnicare*.  Plaintiffs' arguments to the contrary are meritless.

*First*, Plaintiffs claim there is no "evidentiary support" that Musk sincerely believed his statements.  Opp. 16.  Since Plaintiffs bear the burden to show Musk's opinions were *not* sincerely held, *see Homyk v. Chemocentryx, Inc.*, No. 21-cv-03343-JST, Dkt. 345 at 14 (N.D. Cal. Aug. 15, 2025) (granting summary judgment where plaintiff failed to produce evidence opinion lacked basis),[11] any purported absence of evidence on the issue of the sincerity of Musk's beliefs would require judgment in his favor.  But there is lots of evidence on this issue.  Musk consistently testified—across multiple depositions taken years apart—that he believed he was entitled to the information he requested.  Reply Decl. Ex. CCC (Musk SEC Tr.) at 298:22-299:13; Ex. M (Musk Dep Vol 2.) at 217:5-219:6, 274:5-10.  Musk's lawyers and advisers testified that they shared Musk's belief.  *E.g.*, Ex. O (Ringler Dep.) at 241:14-242:6, 243:6-19.  And Twitter *agreed* to produce the information *before* Musk's at-issue statements.  Plaintiffs cite nothing in response, and their mere claim Musk had a motive to renegotiate or exit the deal, Opp. 18-19, is irrelevant.  It does not create a genuine dispute of fact and there is no "mixed-motive" exception to *Omnicare*.

*Second*, Plaintiffs argue Musk's statements are not opinions because he did not preface them with "I believe" or "I think."  Opp. 17.  "We believe or we think is sufficient—*not necessary*—to render a statement one of opinion rather than fact."  *In re Philip Morris*, 89 F.4th 408, 418 (2d Cir. 2023).  So long as the subject matter of the statement involves "an 'inherently subjective ... assessment,' that is *also* sufficient to render it one 'of pure opinion.'"  *Id.* (quoting *Omnicare*, 575 U.S. at 186).  Musk's tweets, which the Court found implied a statement about Musk's *legal* rights under the MA, undoubtedly

[11]   The court initially restricted public access to this Order before publishing it on PACER, so it is not yet available on Westlaw.  *Homyk v. ChemoCentryx, Inc.*, 2025 WL 2505483, at *1 (N.D. Cal. Aug. 15, 2025).  A copy of the order is attached as Reply Decl. Ex. III.

DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

meet this standard. *Iafrate v. Angelo Iafrate*, 827 F. App'x 543, 548 (6th Cir. 2020) ("subjective interpretation of a contractual provision" cannot support a securities fraud claim). Indeed, in *Omnicare* itself, the Supreme Court made clear that an assertion about one's legal position is a statement of opinion, not fact, and cannot support a securities fraud claim. *Omnicare*, 575 U.S. at 179.

Plaintiffs cannot transform Musk's opinions into statements of fact by improperly isolating the terms "on hold" and "cannot move forward." Opp. 17; *see Xiaojiao Lu*, 417 F. Supp. 3d at 1276. Musk stated the deal was "temporarily on hold pending details"—or, to borrow its dictionary definition, "delayed"—and that it could not "move forward" until Twitter produced the information he requested and which Twitter agreed to provide. The Court previously found that Musk's statements were false because—although he did not reference the MA—his statements *implied* that he had rights thereunder that Plaintiffs alleged he did not have. Dkt. 48 at 20, 25. Contrary to Plaintiffs' assertion, Opp. 18, the Court did not "carefully consider" whether, if Musk was indeed making assertions about his rights under the MA, his statements are inactionable opinions under *Omnicare*. Dkt. 48 at 25-26 (considering *Omnicare* with respect to the now-dismissed May 21 tweet and no other statement). As demonstrated in the Musk MSJ and above, they clearly are. Indeed, Plaintiffs' contention that Musk's "right to obtain bot data" was "*disputed*," Opp. 12, confirms that statements about those rights are inactionable legal opinions, not statements of facts. *Hagood v. Sonoma County Water*, 81 F.3d 1465, 1478 (9th Cir. 1996) ("evidence [that] shows only a disputed legal issue [] is not enough to support a reasonable inference" of falsity).

Ironically, in their attempt to show that Musk's statements about his information rights were not opinions, Plaintiffs concede that Musk's bot estimate *was* opinion. They acknowledge that "*Omnicare* reasoned that 'the import of words like "I think" or "I believe," … 'convey some lack of certainty as to the statement's content.'" Opp. 17 (quoting *Omnicare*). Musk's bot estimates were conditioned with this very language. Ex. 78 at 6:2-10 ("I *think* it's some number that is *probably* at least four or five times" Twitter's 5% figure); Ex. 171 (Twitter's spam numbers "*could* be *much* higher"). His estimates are also opinion because "there is no single 'correct' way to interpret data [, and] qualified data scientists often and reasonably 'disagree over how to analyze data and interpret results.'" *Homyk*, Dkt. 345 at 8.

*Third*, Plaintiffs' contention that Musk's opinions are not protected because he omitted from those statements his alleged desire to renegotiate the merger is illogical and unsupported by *Omnicare*. An

omission is only actionable if it misleads an investor about "how the speaker has formed the opinion" or his basis for it. *Omincare*, 575 U.S. at 188. That the speaker omitted his alleged motive for expressing his opinion is irrelevant. Plaintiffs' related argument that Musk's statements are unprotected because he did not "review the merger agreement or check with his advisors" before tweeting is also without merit. Musk *did* read the MA, formed the opinion that he had these rights (shared by those same advisors he was purportedly required to consult), exercised those rights by requesting information from Twitter, and received assurance from Twitter that it would comply—*all before posting his tweets*. The opinions thus did not rest "on mere intuition," but "legal inquiry," and are thus protected. *See id.*

## III.    PLAINTIFFS CANNOT ESTABLISH SCIENTER AS A MATTER OF LAW

Plaintiffs' scienter arguments largely recycle the failed arguments and mischaracterizations of evidence already addressed above. Each is more meritless than the last.

*First*, Plaintiffs argue that "the falsity of Musk's statements … are themselves proof of scienter." Opp. 20. But Musk's statements were not false, and even if they were "disputed," as Plaintiffs claim, they were inactionable opinions. *See* Musk MSJ, at 26; *supra* at 12-14.

*Second*, Plaintiffs argue that Musk's scienter is proved by the "lack[] of sufficient information for his statements," as demonstrated by the fact that he "did not bother to reread the merger agreement or check in with his advisors, deal attorneys, bankers, or point man (Birchall) to see if his tweets or statements was even remotely accurate." Opp. 20. But he *did* read the MA (he was under no obligation to "reread" it), and the record confirms that his advisors—*and Twitter's executives and advisors*—shared his view and told him he would receive the information before he issued his tweets. *Supra* at 6-7.

*Third*, Plaintiffs argue that Musk admitted to the BBC that he made the statements "because he did not want to pay the $44 billion merger price, not out of a genuine desire for bot data." Opp. 20. This is wrong, but irrelevant—because the statements themselves were not false, it does not matter why he made them. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021) (courts "do not reach the issue[] of scienter" where "falsity is dispositive"). Plaintiffs mischaracterize the interview. Musk *rejected* the interviewer's premise that his concerns about bots were pretextual and stated, "[t]he problem was that the publicly stated user numbers were in excess of the real user numbers … that was *literally the issue*." Reply Decl. Ex. EEE. He went on to analogize Twitter to a warehouse whose owner claims 5 percent of its

-14-                                          Case No. 3:22-CV-05937-CRB

goods are broken but 25 percent actually are, and said that he thought a price reduction was warranted to reflect the discrepancy between Twitter's representations and the extent of bots his team discovered.[12]  *Id.*

*Fourth*, Plaintiffs argue that "Musk even lied to the SEC, claiming Twitter 'never provided us with any method of calculating the less than 5 percent." Opp. 20-21.  This is wrong and irrelevant.  Plaintiffs charge Musk with lying to *the market*; even if he did lie to the SEC in a confidential deposition—and he clearly did not—that is not a basis for Plaintiffs' claim.  In any event, as explained in Musk's Opposition to Plaintiffs' MSJ, Musk did not lie to the SEC:  Twitter never did provide a "method for calculating the less than 5 percent." Dkt. 267 at 6.  In response to Musk's request for that method, Twitter scrambled to prepare a document that was little more than a high-level overview, and did not include a "method" that proved the 5 percent metric.  *Id.*  The employee who prepared it described it as "a mess." MSJ at 13.

*Fifth*, Plaintiffs argue that "Musk's knowledge that his conduct would cause chaos for Twitter's stock price further establishes scienter." Opp. 21.  It does not.  Everyone knows that negative information about a deal or a company has the potential to affect the stock price.  The question is whether Musk knew his statements were *false*, not whether he knew his statements could affect the stock price.

*Finally*, Plaintiffs argue that "Musk's scienter is also demonstrated by his conduct after he was sued for specific performance by Twitter." Opp. 21.  That, months after the statements, Musk threatened to sue executives he believed defrauded him,[13] and made a legal decision to settle litigation presided over by a judge who made clear she was not sympathetic to his position *on issues not relevant here*,[14] is hardly evidence of scienter. Dkt. 48 at 33 (the Court does not give the settlement significant weight).

## IV.     PLAINTIFFS LOSS CAUSATION THEORIES FAIL AS A MATTER OF LAW

### A.     Plaintiffs Did Not Plead and Cannot Prove Price Maintenance

Faced with undisputed evidence that the market did not respond to—and that Plaintiffs thus

---

[12]  Contrary to Plaintiffs' contention that Musk has not "produced any evidence that Twitter's spam/fake account estimate of 5% was inaccurate," Opp. 9, ████████████████████████████████ ████████████████████████████████████████████████████████████████ Ex. FFF.

[13]  As Alex Spiro testified, ████████████████████████████████████████ ██████████████████████████████████ . Dkt. 267-26 at 62:6-63:10.

[14]  Contrary to Plaintiffs' suggestion, the Delaware Action did not turn on whether Musk had the rights to Bot Data or the ability to delay the transaction if none was produced (that was *not* in dispute) but whether Twitter's production of information *after May 17* materially satisfied its obligations and whether there was a Material Adverse Effect that could justify termination.  Reply Decl. Ex. GGG (Delaware Action Complaint) at ¶¶ 126-130; Reply Decl. Ex. HHH (Delaware Action Counterclaims) at ¶¶ 87-108.

suffered no loss from—the May 16 statement and May 17 tweet, Plaintiffs pivot to a new, unpled loss causation theory. Their "price maintenance" theory is barred both procedurally and as a matter of law.

Plaintiffs did not plead price maintenance and cannot change their theory to avoid summary judgment. *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006). They alleged that Musk's tweets "caused Twitter's stock *to decline* substantially in the days following the tweets," FAC ¶ 132, and specifically pled that the May 16 statement "*caused Twitter's stock to drop further …* declin[ing] 8.18%," *id.* at ¶ 124, which the Court relied on in denying dismissal, Dkt. 48 at 37. The PSLRA and judicial estoppel preclude Plaintiffs from pursuing this new theory now. *In re St. Jude Med.*, 629 F. Supp. 2d at 921; *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 993 (9th Cir. 2012).

Their theory also fails on the merits. Price maintenance can only be established if the alleged misstatement "confirm[s] misinformation already in the marketplace." Opp. 23 (quoting *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 612 n.5 (7th Cir. 2020)). Under Plaintiffs' falsity theory, Musk's 20 percent estimate was *new information*. Even the portion of Dr. Tabak's Class Certification Report that they cite notes that only a statement that "maintains the same overall alleged misrepresentation (*i.e.*, *that Mr. Musk was entitled to certain data from Twitter*) would be consistent with a price-maintenance theory." Opp. 22. That is not what Plaintiffs allege Musk said on May 16.

In price maintenance cases, Plaintiffs must prove deflation "indirectly: They point to a negative disclosure about a company and an associated drop [or increase] in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop [or rise] is equal to the amount of inflation [or deflation] maintained by the earlier misrepresentation." *See Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021). Plaintiffs identified no back-end price reaction to any revelation that 20 percent of Twitter's users were *not* bots. There is no relationship between Musk's estimate and the alleged corrective disclosure and thus no proof of price impact. As the Court recognized, it is "unclear how the October 4 announcement … is related to or could have corrected, his prior alleged misstatement that bots make up 20% of Twitter's users." Dkt. 48 at 36. The factual record does not indicate otherwise. *E.g.,* Ex. S (Tabak Dep. Vol. 1) at 166:8-168:17 (October 4 Letter did not correct Musk's 20 percent estimate). Thus, there can be no price impact because "there is a mismatch between

the contents of the misrepresentation and the corrective disclosure." *Goldman Sachs*, 594 U.S. at 123.

## B.     Plaintiffs' Disaggregation Arguments Cannot Rescue Tabak's Unreliable Analysis

Because there are a "tangle of factors" that affect stock price, "evidence that certain misrepresented risks are responsible for a loss must reasonably distinguish the impact of those risks from other economic factors." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1123 (9th Cir. 2013). One factor that must be isolated includes "the disclosure of other [non-fraudulent] company-specific information." *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273–74 (S.D. Cal. 2010). Plaintiffs' analysis for the May 13 tweet fails to meet this burden because Dr. Tabak did not analyze, let alone isolate, the price impact of the allegedly truthful information conveyed by Musk's tweet—that he was getting "cold feet" about the deal. *See Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 422 (7th Cir. 2015) (plaintiffs' expert must either isolate non-fraud related causes of loss or "explain[] in nonconclusory terms" that "no-firm specific, non-fraud related information contributed to the decline in stock price").

Plaintiffs do not deny that Dr. Tabak's failed to account for—and did not even conduct any analysis to rule out—the price impact of the allegedly non-fraudulent information conveyed in the May 13 tweet even though Dr. Tabak *did not dispute* that the market "interpret[ed] Musk's tweet as suggesting a heightened level of buyer's remorse or cold feet" and that the perception that Musk was getting "cold feet contributed to Twitter's stock decline on May 13th." Ex. S (Tabak Dep. Vol. 1) at 33:20-34:9.

Instead, they argue that Dr. Tabak had no obligation to isolate the truthful inferences the market drew from Musk's May 13 tweet. They suggest that any analysis under 10b-5 is limited to the four-corners of the alleged misstatement. But as Plaintiffs repeatedly note elsewhere in their brief, the inquiry is not limited to what the statement literally says, but the "impression" it gives investors. Opp. 11, 13, 16. As the Court noted in its MTD Order, words "cannot be viewed in complete isolation but must instead be read in light of all the information then available to the market to decide if they conveyed a false or misleading impression." Dkt. 48 at 23. To determine whether the alleged misstatements were false, the Court "put[] reasonable *inferences* together" to determine what impression they left. *Id.* at 19. The analyst reports show that investors inferred from the May 13 tweet that Musk was getting "cold feet." Dr. Tabak was thus required to isolate the price impact of that information from the alleged fraud or at least rule it

DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

out. *Glickenhaus*, 787 F.3d at 422.

Next, Plaintiffs make the incredible claim that "Musk is liable for" losses caused by the truthful inferences drawn from the tweet because he "admits" they are the direct product of his "false May 13 statements." Opp. 24. Musk did not make any such admission and the law is unequivocal that he can only be liable for conveying false information or impressions to the market. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (securities laws do "not [] provide investors with broad insurance against market losses, but [] protect them against those economic losses that misrepresentations actually cause"). Plaintiffs' reliance on *In re Tesla, Inc. Sec. Litig.* is inapt. There, the court admitted Musk "ha[d] a point" that the expert's analysis was flawed because he did not isolate the effect of the allegedly misleading information from the truthful statement. 2022 WL 7374936, at *10 (N.D. Cal. Oct. 13, 2022). It did not exclude the opinion because the expert (1) presented evidence that the truthful statement did not cause the price to move and (2) disaggregated other potentially confounding variables that could have impacted the price. *Id.* at *12. Dr. Tabak did neither: he did not analyze the impact of the allegedly truthful impression on the stock price (despite admitting it would have an impact), and chose *not* to disaggregate other confounding variables, instead choosing to attribute Twitter's entire stock decline on May 13 to the alleged misrepresentation. Ex. 200 (Tabak Rp't) at Ex. 5-B; Ex. S (Tabak Dep. Vol. 1) at 127: 12-17.

*Finally*, Plaintiffs claim that Dr. Tabak did not need to disaggregate the impact of the news that Musk was souring on the deal because that information was purportedly already in the market. Opp. 25. But none of the information Plaintiffs identify is a statement from Musk that affirmatively indicated that he was getting "cold feet"—which is what the analyst reports indicate the market was reacting to. Nor is there any evidence that Musk's reluctance to close the deal was already integrated into Twitter's share price before May 13; the analyst reports indicate the opposite. Ex. 233 (Lehn Rp't) at ¶¶ 61-66. Dr. Tabak could have performed an analysis to support Plaintiffs' argument, but he did not. Instead, he admitted that the market's interpretation that Musk had "cold feet" contributed to the stock decline. Ex. S (Tabak Dep. Vol. 1) at 33:10-34:9. His failure to isolate that information's impact was a fundamental flaw.

**C.    The "Constant Percentage" Model Does Not Adjust for Non-Fraud Price Effects**

Plaintiffs' defense of Dr. Tabak's "constant percentage" model misses the point. A valid "constant percentage" model must be calculated based on the results of an event study that removes any non-fraud

based factors from price impact. *See e.g. In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d at 1272-73 (granting summary judgment on loss causation because expert's "constant dollar" method failed to separate loss caused by fraud from loss caused by other company-specific information). And the damages calculated in those models are limited by the actual disaggregated decline in the stock price on the corrective disclosure date, a feature absent from Dr. Tabak's analysis. Because Dr. Tabak's model takes none of this into account, he awards some investors larger damages for no other reason than the fact that the NASDAQ happened to drop more on the day they sold for reasons unrelated to with the alleged fraud. Ex. S (Tabak Vol. 1) at 139:7-140:13. No law supports such an outcome.

### D.    Plaintiffs Cannot Prove Loss Causation Because They Have No Evidence Twitter's Stock Price Reacted to the Revelation of Any Fraud

#### 1.    Plaintiffs Pleaded—and Must Prove—A Corrective Disclosure

Plaintiffs have abandoned their theory that the October 4 statement was corrective of the May 13 tweet and now claim they can prove loss on their May 13 claim through direct causation. But "Plaintiffs plead[ed] loss causation" for their May 13 claim "under a corrective disclosure theory" and "supported the causal connection between the misstatements and depressed nature of prices" through the alleged disclosure of the "prior misrepresentations" on October 4. Dkt. 48 at 35-36. Plaintiffs cannot now pursue this new, unpled theory to avoid summary judgment. *Pickern*, 457 F.3d at 968; *In re Oracle Corp.* 2009 WL 1709050, at *18–19. Contrary to Plaintiffs' assertion, the Court did not find that Plaintiffs pleaded "direct causation" as to Musk's May 13 tweet; it found they pleaded direct causation as to Musk's May 16 "20 percent" bot estimate only. *Compare* Opp. 28 *with* Dkt. 48 at 36-37.

#### 2.    *Dura* Prohibits Plaintiffs From Proving Loss Causation Through Deflation Alone

This new theory of "direct causation" also fails on the merits. Plaintiffs argue that in a "seller's class action" they need not establish loss causation through a corrective disclosure because, unlike in a traditional buyer's class action, sellers necessarily suffer loss before the fraud is revealed. Opp. 28-29. But whether or not the loss occurs before the revelation of the fraud, Plaintiffs cannot avoid *Dura*'s mandate that they establish "a causal connection between the material misrepresentation and the loss" with evidence beyond the fact that a stock was bought or sold at inflated or deflated prices. *Dura Pharms.*, 544 U.S. at 342. The "causal connection" required by *Dura* demands evidence that the alleged fraud was

later corrected and that the stock price responded accordingly.  *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020).  Without a corresponding increase tied to the revelation of *the fraud* (and not some other information), there is no basis to conclude that any loss was caused by misrepresentation.  If the stock never rebounds after the correction, then sellers suffered no actionable loss because they could not have sold at a higher price absent the alleged fraud.  Holding otherwise would write-out 10b-5's "proximate cause" requirement and impermissibly "render[] the concept of loss causation meaningless by collapsing it into transaction causation." *Nuveen*, 730 F.3d at 1121.

Even assuming that Plaintiffs are not "categorically preclud[ed]" from "pleading loss" if they cannot point to a corrective disclosure, they are still required under *Dura* to establish a "chain of causation" beyond the initial stock drop to show that loss was caused by the alleged fraud.  *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 663 F. Supp. 3d 334, 374-76 (S.D.N.Y. 2023).  This is where Plaintiffs' theory— and reliance on *Altimeo*—falls apart.  In *Altimeo*, the court found plaintiffs plausibly pleaded that, "had the market been fully informed of the" truth during the class period, the price of securities would have been higher.  *Id.* at 376.[15]  But here, the undisputed evidence shows that the market learned the alleged truth (*i.e.*, that Twitter and Musk continued to work toward closing) during the class period and Twitter's stock did not rise in a statistically significant way in response.  *Supra* at 9.  These disclosures and the corresponding absence of price reaction conclusively sever the "chain of causation" under Plaintiffs' theories of falsity and defeat even "direct causation" as a matter of law.

Plaintiffs' purported theory of direct causation as to the 20 percent estimate finds even less evidentiary support (which is why they abandoned it for their unpled and unviable price maintenance claim, *supra* 15-16).  Plaintiffs can point to no price reaction at all.  Plaintiffs admit that Twitter's stock *did not fall* in response to Musk's statement and they cannot identify any reaction to the revelation that the estimate was incorrect—because no such revelation occurred.  Thus, even if Plaintiffs could amend the FAC on summary judgment to assert direct causation, they cannot prove it.

---

[15]  The *Altimeo* court, in reaching its holding on a motion to dismiss, made clear that "discovery will test such premises" and found only that the theory was "plausible." *Id.* at 375.  On summary judgment, this court has the benefit of evidence showing that these "premises" are unsupported.  Plaintiffs' reliance on *Levie v. Sears Roebuck & Co.* 496 F. Supp. 2d 944 (N.D. Ill. 2007) is similarly misplaced.  That case addressed class certification, not loss causation, and simply held that sellers *could theoretically* develop a viable theory of loss causation—not that they did.  *Id.*

DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

### 3.     Plaintiffs Have No Evidence that the October 4 Letter Corrected Anything

Finally, Plaintiffs argue that the October 4 Letter was corrective because Twitter's stock price jumped on news that Musk would proceed to close the MA on its original terms. Opp. 30. But that conclusion does not solve their problem. To avoid summary judgment, Plaintiffs must present evidence that the October 4 Letter corrected—or, at the very least, that the market perceived that it corrected—the alleged misrepresentations. They did not. Plaintiffs identify no evidence that any market participants interpreted the October 4 Letter as correcting any of the alleged misstatements in this case. Plaintiffs and securities analysts testified that it did not. *See* MSJ at 20.

Plaintiffs also have no explanation of how the October 4 Letter could be corrective when the market already learned and did not react to information disproving what Plaintiffs allege to be false. *See Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 408 (9th Cir. 2021) ("If the purported revelations—'as opposed to some other fact'—really caused the drops, the funds would have been expected to price the stock consistently downward in response to each revelation, rather than subsequently decreasing, maintaining, or even increasing their valuations."). Neither did Dr. Tabak. Ex. S (Tabak Dep. Vol. 1) at 44:7-16. Though Plaintiffs quibble with Musk's (accurate) description of Dr. Tabak's testimony, they cannot deny that he did not opine that the October 4 Letter corrected the alleged misstatements.

### E.     Plaintiffs Cannot Prove Loss For Any Sales After July 8

Plaintiffs dismiss Musk's argument that they cannot prove post-July 8 loss as "convoluted" (Opp. 33), but they do not dispute its core point: Dr. Tabak did not deny that Twitter's stock price would have fallen to the same level after Musk terminated on July 8 whether or not he ever sent the May 13 Tweet. Ex. S (Tabak Dep. Vol. 1) at 36:24-37:15, 157:22-158:10. Were that the case, anyone who sold after July 8 would have been no worse off had Musk never tweeted in the first place. Dr. Tabak—and Plaintiffs—have no basis to argue otherwise. Plaintiffs claim that Dr. Tabak was not required to affirmatively prove what Twitter's stock price would have been but-for the drop caused by the non-fraudulent July 8 letter. Opp. 33. But that is *exactly what he was required to prove*—that investors sold their stock at a lower price than they otherwise would have *because of the fraud*. *Dura Pharms.*, 544 U.S. at 342; *Nuveen*, 730 F.3d at 1119. He did not. In fact, he opined that the price movement "would have been the exact same" after

July 8 even absent the May 13 tweet. Ex. S (Tabak Dep. Vol. 1) at 169:1-7. Thus, Plaintiffs cannot prove that anyone who sold after July 8 suffered loss attributable to the alleged fraud.

## V.   PLAINTIFFS CANNOT ESTABLISH SCHEME LIABILITY AS A MATTER OF LAW

At the outset, Plaintiffs' so-called "scheme liability" claim cannot survive summary judgment because it was never pled in the first place. Plaintiffs argue that Musk's pleading motions—despite moving to dismiss the FAC in its entirety—are "devoid" of "citations to 10b-5(a) and (c)." Opp. 35. But so *is the FAC itself. See generally*, FAC. Thus, their contention that the Court could not dismiss this claim sua sponte misses the point—there was no "scheme liability" claim to dismiss at all. *In re Alphabet Sec. Litig.* does not hold otherwise. 1 F.4th 687, 709 (9th Cir. 2021).

Even if Plaintiffs did plead such a claim, they admit that it was "based solely on [Musk's alleged] misstatements." Opp. 33. But the Court already held that Musk's Termination Letters were not actionable misstatements (Dkt. 48 at 27-28) and because there is no genuine dispute that the three statements that survived the Motion to Dismiss were accurate or inactionable opinion, Plaintiffs' "scheme liability claim necessarily fails" too. *In re AGS,* 2024 WL 581124, at \*5 (D. Nev. Feb. 12, 2024)*, aff'd sub nom. Oklahoma Police Pension & Ret. Sys. v. PlayAGS, Inc.,* 2025 WL 927296 (9th Cir. Mar. 27, 2025).

Plaintiffs have no answer to *In re AGS* and its commonsense holding—affirmed by the Ninth Circuit—that a misstatement-based scheme liability claim cannot proceed to trial if the underlying misrepresentations are not fraudulent. *Id.* They ignore the case altogether, and argue that because Musk did not move on Rule 10b-5(a) and (c) at the pleadings, the Court could not have dismissed their scheme liability claim. But Plaintiffs miss the point. Even if they maintained a scheme liability claim, it cannot not arise from the Termination Letters because the Court found they were not actionable. *Id.*

Plaintiffs cannot avoid that conclusion by asserting that these dismissed misstatements were not subject to the PSLRA's heightened pleading standards because Plaintiffs alleged they were part of a "scheme." Opp. 34-35. Plaintiffs are "prohibited … from "recasting" or "repackag[ing] their misstatement claims as scheme liability claims to evade the pleading requirements imposed in misrepresentation cases." *Sec. & Exch. Comm'n v. Rio Tinto plc*, 41 F.4th 47, 55 (2d Cir. 2022). Even the authority Plaintiffs cite in support of their argument is in accord. *See e.g.*, *In re Eastman Kodak Co. Sec. Litig.*, 632 F. Supp. 3d 169, 190 (W.D.N.Y. 2022) (cited in Opp. 34) ("[T]he Court's conclusion that

-22-   Case No. 3:22-CV-05937-CRB

Plaintiffs have not sufficiently alleged that that any material false statements or omissions were made is also fatal to Plaintiffs' scheme liability claim."). So whether or not Plaintiffs actually pled or are presently asserting a purported "scheme liability" claim, it cannot arise from the Termination Letters or any of the dismissed misstatements. *Id.*

Even if it could, Plaintiffs have presented no evidence to create a genuine dispute that the Termination Letters and other litigation-related alleged misstatements were sincerely held opinions protected under *Omnicare*, 575 U.S. at 185, or privileged petitioning activity immunized from liability under *Noerr-Pennington*, *Theme Promotions, Inc. v. News Am. Mktg. FSI,* 546 F.3d 991, 1007 (9th Cir. 2008) (A "pre-suit demand letter, falls within the protection of the *Noerr–Pennington doctrine*."). The Opposition ignores these arguments too. And because the May 13 tweet, May 16 statement, and May 17 tweet are not actionable misrepresentations as a matter of law, Plaintiffs have no surviving theory.

## CONCLUSION

Defendant respectfully requests that the Court grant his motion for Summary Judgment.

DATED: September 26, 2025                    QUINN EMANUEL URQUHART & SULLIVAN, LLP

By        /s/ Stephen A. Broome
　　　Alex Spiro
　　　Michael T. Lifrak
　　　Stephen A. Broome
　　　Jesse A. Bernstein

　　　*Attorneys for Defendant Elon Musk*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on this the 15th day of August, 2025.

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By _/s/ Stephen A. Broome_
Alex Spiro
Michael T. Lifrak
Joseph C. Sarles
Stephen A. Broome
Jesse A. Bernstein
Alex Bergjans
Jonathan E. Feder
Stephanie Kelemen

*Attorneys for Defendant Elon Musk*

DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

**ATTESTATION**

Pursuant to Civil L.R. 5-1, I attest under penalty of perjury that concurrence in the filing of this document has been obtained from the other signatories herein.

By  /s/ Alex Bergjans
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Joseph C. Sarles
Jesse A. Bernstein
Alex Bergjans
Jonathan E. Feder
Stephanie Kelemen

*Attorneys for Defendant Elon Musk*

DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT