QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice* )
alexspiro@quinnemanuel.com
Jesse A. Bernstein (*pro hac vice*)
Jessebernstein@quinnemanuel.com
Jonathan E. Feder (*pro hac vice*)
jonathanfeder@quinnemanuel.com
Stephanie Kelemen (*pro hac vice*)
stephaniekelemen@quinnemanuel.com
295 5th Avenue, 9th Floor
New York, NY 10016
Telephone:      (212) 849-7000
Facsimile:      (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Stephen A. Broome (Bar No. 314605)
stephenbroome@quinnemanuel.com
Joseph C. Sarles (Bar No. 254750)
josephsarles@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:      (213) 443-3000
Facsimile:      (213) 443-3100

*Attorneys for Defendant Elon Musk*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | Case No. 3:22-CV-005937-CRB<br><br>**DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF HIS MOTION TO EXCLUDE THE OPINIONS OF ADAM BADAWI**<br><br>Judge:                    Hon. Charles R. Breyer<br>Magistrate Judge:   Hon. Donna M. Ryu<br><br>Hearing Date:        October 31, 2025<br>Time:                     10:00 a.m.<br>Courtroom:            6, 17th Floor |

**FILED UNDER SEAL: REDACTED FOR PUBLIC FILING**

## TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ........................................................................................................ 1

ARGUMENT ............................................................................................................................... 3

I.    THE COURT SHOULD EXCLUDE PROFESSOR BADAWI'S IMPERMISSIBLE
      LEGAL OPINIONS .......................................................................................................... 3

      A.    Plaintiffs Cannot Rewrite Professor Badawi's Report or Ignore His Legal
            Conclusions ........................................................................................................... 3

      B.    Professor Badawi's Comparative Analysis Is Irrelevant, Unreliable, And
            Inadmissible Legal Opinion ................................................................................ 7

            1.    Plaintiffs Cannot Articulate How Professor Badawi's "Comparative
                  Analysis" Will Help the Jury ................................................................... 7

            2.    Professor Badawi Was Required to Interpret the MA to Compare It to
                  Other Agreements ..................................................................................... 9

            3.    Professor Badawi's So-Called "Comparative Analysis" Is Unreliable ................. 10

II.   THE COURT SHOULD EXCLUDE THE REMAINDER OF PROFESSOR BADAWI'S
      OPINIONS ..................................................................................................................... 13

      A.    Plaintiffs Do Not Defend Professor Badawi's Speculative Opinions About
            Imaginary Contract Provisions And Thus Concede They Are Inadmissible ..................... 13

      B.    The Court Should Exclude Professor Badawi's Improper Opinions About Musk
            and the Market's State of Mind ......................................................................... 13

      C.    The Court Should Exclude Professor Badawi's Narration of Facts ................................. 14

CONCLUSION ............................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arista Networks, Inc. v. Cisco Sys. Inc.*,
2018 WL 8949299 (N.D. Cal. June 15, 2018) ................................................................. 2, 13

*Atmel Corp. v. Info. Storage Devices, Inc.*,
189 F.R.D. 410 (N.D. Cal. 1999) ...................................................................................... 11

*Avila v. Ford Motor Co.*,
2025 WL 2538722 (N.D. Cal. Aug. 22, 2025) ................................................................. 2, 14

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
613 F. Supp. 3d 1308 (S.D. Cal. 2020) ............................................................................ 3, 5

*Bona Fide Conglomerate, Inc. v. SourceAmerca*,
2019 WL 1369007 (S.D. Cal. Mar. 26, 2019) ................................................................. 4, 9

*In re ConAgra Foods, Inc.*,
302 F.R.D. 537 (C.D. Cal. 2014) ...................................................................................... 11

*Corbrus, LLC v. 8th Bridge Cap., Inc.*,
2022 WL 4239055 (C.D. Cal. Sept. 13, 2022) ................................................................. 2, 10

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ......................................................................................................... 13

*Fosmire v. Progressive Max Ins. Co.*,
277 F.R.D. 625 (W.D. Wash. 2011) .............................................................................. 2, 10, 11

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ......................................................................................................... 12

*GIC Real Estate, Inc. v. ACE American Insurance Co.*,
2018 WL 5310832 (N.D. Cal. Aug. 20, 2018) ................................................................. 6

*Gold v. Lumber Liquidators, Inc.*,
323 F.R.D. 280 (N.D. Cal. 2017) ..................................................................................... 13

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
252 F. Supp. 2d 1005 (C.D. Cal. 2003) *aff'd sub nom. Mortensen v. Snavely*, 145 F.
App'x 218 (9th Cir. 2005) ............................................................................................... 11

*Johns v. Bayer Corp.*,
2013 WL 1498965 (S.D. Cal. Apr. 10, 2013) ................................................................. 15

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
    874 F. Supp. 2d 169 (S.D.N.Y. 2012) ...................................................................................... 5, 10

*McCoy v. DePuy Orthopaedics, Inc.*,
    2024 WL 1705952 (S.D. Cal. Apr. 19, 2024) ............................................................................ 10

*NIC Holding Corp. v. Lukoil Pan Americas, LLC*,
    2007 WL 1467424 (S.D.N.Y. May 16, 2007) ..................................................................... 1, 5, 10

*Persian Gulf Inc. v. BP W. Coast Prods. LLC*,
    632 F. Supp. 3d 1108 (S.D. Cal. 2022) ...................................................................................... 13

*Sassano v. CIBC World Markets Corp.*,
    948 A.2d 453 (Del. Ch. 2008) ..........................................................................................1, 5, 7

*Sec. & Exch. Comm'n v. Frost*,
    2021 WL 6103551 (C.D. Cal. Nov. 15, 2021) ........................................................................... 15

*Sec. & Exch. Comm'n v. Sabhlok*,
    2010 WL 2944255 (N.D. Cal. July 23, 2010) .............................................................................. 5

*Snapkeys, Ltd. v. Google LLC*,
    539 F. Supp. 3d 1040 (N.D. Cal. 2021) (Koh, J) ................................................................... 4, 13

*Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*,
    206 A.3d 836 (Del. 2019) ............................................................................................................ 5

*Synergy Hematology-Oncology Med. Assocs. Inc. v. Abbott Labs., Inc.*,
    2023 WL 3319218 (C.D. Cal. Mar. 15, 2023) ............................................................................. 4

*Texas Pac. Land Corp. v. Horizon Kinetics LLC*,
    306 A.3d 530 (Del. Ch. 2023) ..................................................................................................... 8

*USI Ins. Services LLC vs. Alliant Ins. Services Inc.*,
    2025 WL 1767988 (D. Ariz. June 26, 2025) ............................................................................. 12

**<u>Rules</u>**

Fed. R. Evid. 403 ............................................................................................................................ 15

Fed. R. Evid. 702(a) ....................................................................................................................... 15

Case No. 3:22-cv-05937-CRB
DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF HIS
MOTION TO EXCLUDE THE OPINIONS OF ADAM BADAWI

## SUMMARY OF ARGUMENT

Plaintiffs cannot defend Professor Adam Badawi's Report, so they try to rewrite it.

Musk moved the Court to strike Professor Badawi's Report as an improper exercise in contract interpretation that contained legal opinions, including that Musk "had no right to terminate the Merger due to a failure [by Twitter] to provide information about fake accounts," that Musk "claim[ed] rights that were at odds with the Merger Agreement [("MA")]," and that Musk's tweets "likely violated section 6.8 of the agreement," rendering him "in breach of the [MA] and unable to exercise [his] right to terminate for any breach by the seller." Ex. 209[1] (Badawi Rp't) at ¶¶ 92, 100, 88. The Opposition does not address these opinions or even acknowledge they exist. In fact, the Opposition hardly discusses *any* of what Professor Badawi actually wrote in his Report and testified to in deposition. It does not contain a *single quotation from either*. Instead, Plaintiffs devote most of their brief to discussing what was said by Musk, his bankers, and his rebuttal expert Professor Edward Rock—none of which has any bearing on the admissibility of Professor Badawi's opinions, which must stand on their own. Plaintiffs' failure to defend Professor Badawi's opinions on their merits concedes that they are inadmissible legal conclusions that should be excluded.

Plaintiffs cannot rescue the remainder of Professor Badawi's opinions about the MA by asserting that they merely give "common meaning" to "customary terms" present in the MA "that have special meaning in merger agreements." Opp. at 11. Delaware law and the very cases Plaintiffs cite in their Opposition prohibit experts from offering such testimony to imbue legal meaning in unambiguous contracts. *Sassano v. CIBC World Markets Corp.*, 948 A.2d 453, 468 n.86 (Del. Ch. 2008) (noting that "industry usage" is inadmissible parol evidence); *see, e.g.*, *Holding Corp. v. Lukoil Pan Americas, LLC*, 2007 WL 1467424, at *4 (S.D.N.Y. May 16, 2007) (excluding impermissible legal conclusion about contract terms) (cited in Opp. at 10). And providing the common meaning to contract terms is not what Professor Badawi did anyway: he could not offer any fixed "common meaning" to the language used in the MA's Access to Information Covenant. Ex. A (Badawi Dep.) at 221:7-222:4, 117:17-118:11. He

---

[1] All "Ex." citations are to the Declaration of Jesse Bernstein filed with the underlying Motion at Dkt. 245-1.

even demurred when asked to give a definition of "due diligence," explaining that the term is "used in different contexts … when it's done … for different purposes." *Id.* at 56:23-57:8.

Plaintiffs' attempt to save Professor Badawi's so-called "comparative analysis"—an ironic description given that he did not compare the MA to any other merger agreement or conduct any associated analysis—fares no better. Professor Badawi's placement of the MA on the "seller-friendly" end of the merger agreement "continuum" is either impermissible contract interpretation (since he must first conclude whether Musk's rights are broad or "restricted" before categorizing them as buyer- or seller-friendly) or irrelevant testimony that the MA is "out of the ordinary." *Corbrus, LLC v. 8th Bridge Cap., Inc.*, 2022 WL 4239055, at *20 (C.D. Cal. Sept. 13, 2022) (excluding comparative testimony). It is not reliable in any event. Plaintiffs do not deny that Professor Badawi's opinion parroted the conclusions of the Coates Report wholesale. They suggest he was allowed to do so because he "read and considered the entire" Coates Report. Opp. at 12. But to rely on a presumptively unreliable made-for-litigation report, Professor Badawi had to independently verify its analysis, conclusions, and underlying evidence—simply reading it is obviously not enough. *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 630 (W.D. Wash. 2011). Plaintiffs do not meaningfully dispute that Badawi did not independently verify Coates' analysis. Nor do they dispute that, without the Coates Report, Professor Badawi's "comparative analysis" is based on little more that his "sense of where the [seller-friendly] continuum is." Ex. A (Badawi Dep.) at 133:21-14. But those are just vibes, not admissible expert testimony.

Finally, the Opposition's argument that Professor Badawi ought to be able to present conclusions about Musk's and unidentified market participant's mental states and presumptive knowledge because he is simply opining on the factual record, Opp. at 14-15, fails on its face. Experts are not pundits; they are not permitted to comment on or vouch for evidence "rather than providing expert opinions." *Arista Networks, Inc. v. Cisco Sys. Inc.*, 2018 WL 8949299, at *3 (N.D. Cal. June 15, 2018). Nor are they allowed to simply point at facts in the record to imply something about another's knowledge or mental state. *Avila v. Ford Motor Co.*, 2025 WL 2538722, at *2 (N.D. Cal. Aug. 22, 2025). Plaintiffs admit that Professor Badawi seeks to do both in front of the jury.

The Court should exclude Professor Badawi's testimony in its entirety.

**ARGUMENT**

**I.      THE COURT SHOULD EXCLUDE PROFESSOR BADAWI'S IMPERMISSIBLE LEGAL OPINIONS**

   **A.      Plaintiffs Cannot Rewrite Professor Badawi's Report or Ignore His Legal Conclusions**

The Opposition contains a glaring omission: it fails to defend, quote, or even reference the conclusions that form the heart of Professor Badawi's Report.  Plaintiffs admit that they intend to present Professor Badawi's testimony on the issue of "whether Musk's tweets claiming the deal was on hold were true or false."  Opp. at 9.  Yet, they ignore—and apparently hope the Court will forget—Professor Badawi's core opinions on that issue rest on his *legal* analysis of the MA:

- Musk "had no right to terminate the Merger due to a failure [by Twitter] to provide information about fake accounts," and the MA "did not contain a covenant allowing the buyer access to information to verify [Twitter's] representations and warranties."  Ex. 209 (Badawi Rp't) at ¶ 92.

- Despite containing plain language stating that Musk is not required to close unless he is "satisf[ied]" that Twitter's representations and warranties were true and correct, MA section 7.2 "falls far short of any requirement to 'prove' that any disclosures were correct." *Id.*

- The description of Musk's rights in his lawyer's July 8, 2022 Termination Letter was "not a correct description of his rights under the [MA]."  *Id.* at ¶ 96.

- Musk "claim[ed] rights that were at odds with the [MA]," and "there was no basis for Mr. Musk's assertions."  *Id.* at ¶ 100.

- Musk's tweets "likely violated section 6.8 of the [MA]," rendering him "in breach of the [MA] and unable to exercise [his] right to terminate for any breach by the seller."  *Id.* at ¶ 88.

- There would be an "extraordinarily high bar" to show a Material Adverse Effect ("MAE") under Section 7.2(b).  *Id.* at ¶¶ 65-66.

- The MA's MAE definition includes "broad carve outs" (though admittedly none that apply in this case).  *Id.* at ¶¶ 67-69; Ex. A (Badawi Dep.) at 168:9-21.

Plaintiffs do not defend or even discuss these opinions because they are indefensible, bald legal conclusions that cannot be admitted at trial.  *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1320-22 (S.D. Cal. 2020) ("Unless a contract is deemed ambiguous or there is a term of the contract that requires an expert's explanation, it is improper for an expert to interpret or construe a

contract in his opinion."); *Bona Fide Conglomerate, Inc. v. SourceAmerca*, 2019 WL 1369007, at \*3 (S.D. Cal. Mar. 26, 2019) ("[An] expert may not be allowed to opine on the meaning and import of disputed [contractual] terms.").

Plaintiffs do not attempt to explain how Professor Badawi's opinions that Musk "claim[ed] rights that were at odds with the MA," and published inaccurate descriptions of his contractual rights, could be based on anything but his interpretation of the MA. It cannot. Accordingly, the Court should exclude these opinions both because Plaintiffs have waived any opposition to Musk's requested relief by not defending them, *see Snapkeys, Ltd. v. Google LLC*, 539 F. Supp. 3d 1040, 1050 (N.D. Cal. 2021) (Koh, J) (holding that plaintiff "has waived the argument" because its "opposition does not address this argument"), and because they are improper and inadmissible legal conclusions, *Synergy Hematology-Oncology Med. Assocs. Inc. v. Abbott Labs., Inc.*, 2023 WL 3319218 (C.D. Cal. Mar. 15, 2023) (excluding expert testimony where the expert "offer[s] his interpretation of the [c]ontract" at issue).

Instead of dealing with Professor Badawi's actual opinions and grappling with case law that mandates their exclusion, Plaintiffs try to rewrite Professor Badawi's Report and ignore this authority. Plaintiffs do not address *a single one of the cases* that Musk cites in his Motion holding that experts cannot offer opinions that purport to interpret disputed contractual terms—the exact exercise that Professor Badawi undertakes in his Report. None of Plaintiffs' arguments holds water.

*First*, Plaintiffs state, without any argument or analysis, that Musk "misses the mark" by "analogizing this case to breach of contract cases where there were disputes about the meaning of ambiguous terms." Opp. at 7. But that analogy is directly on point because Plaintiffs' theory of falsity arises from a dispute over the meaning of contractual terms in the MA.[2] The legal principle that Professor Badawi is barred from offering opinions based in contract interpretation applies whether or not Plaintiffs

---

[2] Plaintiffs have since abandoned their prior position, which they were asserting when they served Professor Badawi's Report, that Musk had no rights to Bot Data under the MA. In their Opposition to Musk's MSJ, Plaintiffs conceded—since the overwhelming and undisputed evidence established—that the MA did entitle him to that information. Dkt. 268 at 2-3. Accordingly, there is no dispute that Musk had the rights referenced in his tweets and that his purported representations about those rights was not false.

are asserting a claim for breach of contract. *Aya Healthcare Servs.*, 613 F. Supp. 3d at 1320-22 (excluding improper contract interpretation opinion in an unfair competition and tortious interference action).

*Second*, Plaintiffs claim that Professor Badawi did not engage in contract interpretation, but instead offered opinions that "touch[ed] upon the common meanings and purposes of [various] terms" and that he defined "customary terms that have a special meaning in merger agreements." Opp. at 10-11. Even if that is what Professor Badawi did—and, as explained below, he did not—such testimony is parol evidence inadmissible under Delaware law, which governs the MA. *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) ("When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions, without resort to extrinsic evidence." (cleaned up)); *Sassano*, 948 A.2d at 468 n.86 (noting that "industry usage" is inadmissible parol evidence). Notably, despite Professor Badawi's claim that the type of testimony he offers is frequently used in Delaware courts, Ex. A (Badawi Dep.) at 220:18-24, Plaintiffs' could not find a *single* Delaware case where the court permitted custom and practices testimony to assist the fact finder understand an unambiguous contract.

The authority Plaintiffs do cite does not even apply Delaware law and supports excluding Professor Badawi's testimony in any event. In *Liberty Media Corp. v. Vivendi Universal, S.A.*, the court precluded an expert from testifying about the meaning and application of the specific disputed clause contained in the merger agreement at issue—precisely what Professor Badawi attempts to do here. *Compare* 874 F. Supp. 2d 169, 176 (S.D.N.Y. 2012) *with e.g.* Ex. 209 (Badawi Rp't) at ¶ 92 (Musk "had no right to terminate the Merger due to a failure [by Twitter] to provide information about fake accounts," and the MA "did not contain a covenant allowing the buyer access to information to verify [Twitter's] representations and warranties."). *NIC Holding Corp. v. Lukoil Pan Americas, LLC*, presents the same problem for Plaintiffs: the court excluded the expert's opinion that the disputed "ETA clause" "did not require [Defendant] to deliver gasoline by any particular date" as an impermissible legal conclusion. 2007 WL 1467424, at *4 (S.D.N.Y. May 16, 2007). And in *Sec. & Exch. Comm'n v. Sabhlok*, the court only permitted the expert to offer the challenged opinion *because there was an ambiguity* in the stock plan at issue. 2010 WL 2944255, at *2 (N.D. Cal. July 23, 2010). Here, Plaintiffs claim the MA is unambiguous. Ex. B (Pls.' Resp. to Interrogatory No. 4).

Even if the law permitted Professor Badawi to opine on the "common meaning" of the terms in the MA, that is not what he did here. Professor Badawi explained that the language contained in the MA provisions that governed Musk's information rights—and thus purportedly support Plaintiffs' fraud claim—did *not* carry any customary or special meaning uniformly applied in M&A transactions. Ex. A (Badawi Dep.) at 221:7-222:4, 117:17-118:11. To the contrary, when asked about the text of Section 6.4 of the MA ("Access to Information"), Professor Badawi testified that "it's not exactly clear what [some of these terms] mean. You have to look at all the facts in this case to understand that." *Id.* at 221:7-222:4. Professor Badawi could not provide a "common" or "customary" meaning of the phrase "related to the consummation of the transactions," and explained that its definition "would depend on legal calls, legal judgment, [and] business judgment." *Compare* Opp. at 10-11 *with* Ex. A (Badawi Dep.) at 101:14-102:8. Similarly, Professor Badawi did not opine that the limited exclusions contained in section 6.4 had any "special meaning in merger agreements;" he testified that one would "need to know information about Twitter's business judgment" to understand "whether or not they're entitled to reject any request." *Compare* Opp. at 10-11 *with* Ex. A (Badawi Dep.) at 117:17-118:11.

Even when discussing "due diligence"—one of the terms Plaintiffs contend has a fixed and common meaning—Professor Badawi stated that he did not "know what post-signing diligence process means." Ex. A (Badawi Dep.) at 37:6-15. And after being confronted with evidence showing that Twitter and Musk engaged in an extensive post-signing information exchange that the parties referred to as "due diligence," Professor Badawi conceded that the term has no fixed meaning at all. When asked whether "due diligence" means, at a high level, "an exchange of information, review of information about the company's business," Professor Badawi demurred and answered that "there's different types of due diligence" and that the term is "used in different contexts … when it's done … for different purposes." *Id.* at 56:11-57:8. Thus, by Professor Badawi's own admission, his opinions do not define the "common meanings" of MA terms at issue in this case because no such "common meanings" exist.[3]

---

[3] *GIC Real Estate, Inc. v. ACE American Insurance Co.*, 2018 WL 5310832 (N.D. Cal. Aug. 20, 2018), cited in Opp. at 10-11, is inapposite. There, the court permitted an expert to provide the customary definition of a specific term, "real estate manager," contained in the parties agreement. Professor Badawi does not identify any customary definitions to any terms contained in the MA provisions governing Musk's right to information. The terms "information rights" and "bring-down conditions" appear

Plaintiffs cannot hide from the Court the actual text of Professor Badawi's Report. He offers legal opinions based on his interpretation and construction of the MA. Those opinions should be excluded.

**B.    Professor Badawi's Comparative Analysis Is Irrelevant, Unreliable, And Inadmissible Legal Opinion**

The remainder of Professor Badawi's opinions about the MA—that it broadly falls on the "seller-friendly" side of the spectrum of merger agreements that he has purportedly reviewed over the course of his professional life—is (1) not relevant and will not help jury to decide whether Musk's statements were false, (2) a legal opinion based on Professor Badawi's interpretation of the MA, and (3) unreliable as it is not derived from any actual comparison that Professor Badawi performed, directed, or verified.

1.    Plaintiffs Cannot Articulate How Professor Badawi's "Comparative Analysis" Will Help the Jury

Plaintiffs do not state a coherent or valid theory of relevance in their Opposition.

*First*, Plaintiffs mischaracterize the Motion, claiming that "[a]ccording to Musk, the only purpose for describing a term as 'seller friendly' is to then show the agreement as a whole was more restrictive to Musk." Opp. at 8-9 (emphasis added). But that point was not made "according to Musk," it is what *Professor Badawi said* the purpose of his analysis was: to show that Musk's rights were "much more restricted" because the MA was "seller friendly." Ex. 209 (Badawi Rp't) at ¶ 92; Ex. A (Badawi Dep.) at 145:7-24.

*Second*, Plaintiffs' claim that Professor Badawi's opinions address Musk's "*conflicting position that he both waived 'due diligence' rights pre-signing but somehow preserved the right to conduct 'due diligence' after signing.*" Opp. at 8 (emphasis in original). But Professor Badawi himself acknowledged there was no conflict in that position. Musk's decision to forego pre-signing diligence only impacted his

---

nowhere in the MA. *Compare* Opp. at 11 *with* Ex. 219 (MA). On the other hand, the term "Material Adverse Effect" has a specific definition set forth in the MA, which governs. Ex. 219 (MA) at p. 5; *see Sassano*, 948 A.2d at 468 n.86. Aside from "due diligence"—to which Professor Badawi refused to ascribe a common definition, Ex. A (Badawi Dep.) at 56:11-57:8—Plaintiffs identify only one term contained but not defined in the MA that they contend has a common meaning: "specific performance." That term has little relevance in this dispute and can be explained by the Court or one of the many percipient witnesses in this case with greater expertise in M&A than Professor Badawi—including the two lead deal lawyers who negotiated the MA, Michael Ringler and Martin Korman. Ex. A (Badawi Dep.) at 34:24-36:1. Moreover, Musk is willing to meet and confer with Plaintiffs to propose an instruction that defines the term for the jury to the extent one is necessary.

ability to obtain information before the MA was executed. After signing, the MA exclusively governed his information rights. Ex. A (Badawi Dep.) at 109:7-21; 51:24-52:3. Plaintiffs also note Musk himself referred to the MA as "seller friendly." Opp. at 9. But Professor Badawi's opinion that the MA is "seller-friendly" will not assist the jury in determining what *Musk* meant when he used the term.

*Third*, Plaintiffs' assertion that Professor Badawi's analysis will aid the jury's understanding of the MA negotiations is equally flawed. The MA's integration clause renders prior representations, drafts, and history irrelevant to its terms. Ex. 219 (MA) § 9.6; *Texas Pac. Land Corp. v. Horizon Kinetics LLC*, 306 A.3d 530, 551 (Del. Ch. 2023) (integration clause prevented the court from considering negotiating history in interpreting shareholder agreement). Thus, as a matter of law, this background information cannot be used to determine what rights the MA conferred on Musk and, accordingly, whether he misrepresented what those rights were. *Id.*

Plaintiffs also misrepresent the factual record to make their argument. They quote a Morgan Stanley ███████████████████████ presentation deck, used as an exhibit in banker Michael Grimes' deposition, to purportedly show that the MA ███████████████████████████. *See* Dkt. 253-23 (Pls.' MSJ Ex. 22). But they neglect to include Mr. Grimes' testimony about the exhibit where he explains that Musk ██████████████████████████████████ ███████████████████████████. Dkt. 253-29 (Pls.' MSJ Ex. 28 (Grimes Dep.)) at 97:15-22. Of course, Musk sought the Bot Data to "satisf[y]" Twitter's "reps and warranties" and contended that he did not need to close until all of the MA's conditions were met—including Twitter's material compliance with the Access to Information covenant. The jury thus does not need Professor Badawi's assistance to consider Musk's team's alleged "internal concessions," Opp. at 9, because Grimes conceded nothing relevant to this case, and he can be cross examined at trial.[4]

---

[4] Plaintiffs' also falsely claim that "several key deal terms" were "removed" from the MA draft sent to Twitter—including a "due diligence" contingency. Opp. at 9. Not true. No "due diligence" contingency was removed from the MA because such contingencies *do not exist*. Dkt. 255-02 (Musk MSJ Ex. O) (Ringler Dep.) at 65:12-17; Dkt. 255-12 (Musk MSJ Ex. R) (Savitt Dep.) at 59:7-62:6. Plaintiffs continue to try to mislead the Court by arguing that Musk's foregoing pre-signing diligence means he had no post-signing information rights. But as Professor Badawi admitted, he did have such rights. Ex. A (Badawi Dep.) at 109:7-21; 51:24-52:3. And the record shows Twitter *agreed* he had such rights.

DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF HIS
MOTION TO EXCLUDE THE OPINIONS OF ADAM BADAWI

*Finally*, Plaintiffs assert that Professor Badawi's opinion that the deal was seller friendly would "allow the jury to better understand Musk's demands for information" and "Twitter's responses to those demands." Opp. at 9. But they offer no explanation why, and Professor Badawi conceded he has no knowledge of Twitter and Musk's post-signing diligence process (he did not even know what "post-signing due diligence" is). Ex. A (Badawi Dep.) at 55:11-64:18 ("Are you aware one way or the other whether Twitter put into the data room information responsive to Musk's requests about bot, spam, and fake accounts? A. I'm not aware one way or the other."). He also conceded that he could offer no insight as to whether the MA entitled Twitter to reject any of Musk's information requests because that required knowledge of "about Twitter's business judgment"—knowledge he does not have. *Id.* at 117:17-118:11.

Professor Badawi's own testimony thus dooms Plaintiffs' relevance arguments.

### 2. Professor Badawi Was Required to Interpret the MA to Compare It to Other Agreements

Plaintiffs also argue that Professor Badawi's "comparative analysis" does not require him to interpret the MA. Opp. at 10. This is incorrect on its face. As the Opposition notes, Professor Badawi concludes Musk "agree[d] to an extremely limited, seller-friendly set of information rights." Opp. at 9; Ex. 209 (Badawi Rp't) ¶ 92. To conclude that Musk's rights were "seller friendly," Professor Badawi first needed to conclude that Musk's rights under the MA were "extremely limited," and to reach that conclusion, Badawi first had to interpret the MA. Opining that Musk's rights under the MA are "extremely limited" because its provisions are purportedly more "seller friendly" than those in other agreements, Opp. at 9, is just "an oblique attempt to interpret the contract" by comparison. *See Bona Fide Conglomerate*, 2019 WL 1369007, at *14. It is still a legal conclusion barred by law.

The "comparative analysis" does not fall within Plaintiffs' so-called "specialized meaning" exception under any circumstance. Opp. at 10. The purpose of Professor Badawi's comparison is not to identify and define terms because they are *common*, but rather to argue that the MA's terms are *unusually* "seller-friendly" and to imbue that language with legal meaning by virtue of its unconventionality. Ex. 209 (Badawi Rp't) ¶ 92. By commenting on the meaning of the specific words used in the MA, Professor Badawi offers the exact type of opinion that Plaintiffs' own authority excluded. *Liberty Media Corp.*, 874 F. Supp. 2d at 176; *NIC Holding Corp.*, 2007 WL 1467424, at *4.

On the other hand, if the purpose of Professor Badawi's comparison is simply to place the MA and its terms on some spectrum to show they are "unusual," it is not admissible either. Mot. at 8-9 (citing *Corbrus, LLC v. 8th Bridge Cap., Inc.*, 2022 WL 4239055, at \*20 (C.D. Cal. Sept. 13, 2022) ("Testimony that a contract provision, as written, is out of the ordinary is not equivalent to testimony offered to assist the trier of fact by offering insight on terms with specialized or technical meaning.") (internal quotations omitted). Plaintiffs have no response to *Corbrus* and—tellingly—fail to identify a single case in which a court allowed a similar "comparative" analysis to go to a jury.

### 3. Professor Badawi's So-Called "Comparative Analysis" Is Unreliable

Finally, Plaintiffs fail to meaningfully address Musk's argument that Professor Badawi's so-called "comparative analysis" is not supported by any specific comparison that Professor Badawi performed, but was built on unreliable foundation: (1) the untested, unverified, made-for-litigation Coates Report and (2) Professor Badawi's *ipse dixit*.

***Plaintiffs Do Not Deny that Professor Badawi Failed to Independently Verify the Coates Report.*** Plaintiffs argue that Professor Badawi can rely on the Coates Report because he "read and considered" it in its entirety, "carefully considered its methodology" for picking its sample, and evaluated its coding parameters. Opp. at 12-13. But before relying on an absent expert's litigation report, Professor Badawi was required to "independent[ly] verif[y] [] the underlying expert's work" and supporting evidence. *Fosmire*, 277 F.R.D. at 630; *McCoy v. DePuy Orthopaedics, Inc.*, 2024 WL 1705952, at \*16 (S.D. Cal. Apr. 19, 2024) ("[A]n expert witness cannot parrot the opinions of other experts without independently investigating the underlying evidence."). Plaintiffs make no argument that he actually did. The *best* Plaintiffs can muster is that he "reviewed some of the merger agreements cited in the Coates Report." Opp. at 13. However, in deposition Professor Badawi was not confident that he had even done that, Ex. A (Badawi Dep.) at 138:11-139:1 ("I believe I looked up some of …"), and did not identify any of these purported agreements in his reliance materials, Ex. 209 (Badawi R'pt) at Appendix B. He certainly did not read all 85 merger agreements that Professor Coates identified. Nor did he review *any* of Coates' back-up data or his spreadsheet where the various merger agreement provisions were coded *before* adopting Coates' opinions wholesale in his Report. Ex. A (Badawi Dep.) at 140:7-15. Conducting a superficial review *after* serving his Report cannot protect Professor Badawi from exclusion. *See Atmel*

-10-

*Corp. v. Info. Storage Devices, Inc.*, 189 F.R.D. 410, 416 (N.D. Cal. 1999) ("It is true that, after the fact, Mr. Kern tried to rebut the articles advanced by the opposing experts and that ... he [later] conducted a literature search.  This did not cure the intentional failure to do the work professionally required for his Rule 26(a)(2)(B) report.").

Musk has little doubt that Professor Badawi has the expertise to conduct a peer review of other academic work to ensure its reliability and accuracy.  Opp. at 13.  The problem is that he did not do so here.  Ex. A (Badawi Dep.) at 142:7-142:15.  The Coates Report was prepared for litigation but was never tested because the litigation for which Coates prepared it settled.  It thus presumptively lacks any indicia of reliability present in the peer reviewed studies that Plaintiffs reference because it was not "intended to be relied upon by experts or others in the performance of their ordinary professional duties outside of litigation."  *See In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1012 (C.D. Cal. 2003) *aff'd sub nom. Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005).  Nothing stopped Professor Badawi from tasking the research assistant who helped prepare his report, Ex. A (Badawi Dep.) at 12:9-12, with performing some basic quality control to confirm that the Coates Report was accurate and rested on a solid evidentiary foundation, as he was required to do before parroting its conclusions as his own. *Fosmire*, 277 F.R.D. at 630.  His failure to do even that besets his opinions with "serious reliability questions" that renders them inadmissible.  *See In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 556 (C.D. Cal. 2014).

***The Remainder of Professor Badawi's Opinions are Supported by No Analysis at All.***  Without the Coates Report, Professor Badawi is left with no foundation to support his "comparative analysis." Indeed, this term itself is a misnomer as Professor Badawi neither compared the MA with any other specific merger agreement or conducted any associated analysis.  *See* Ex. 209 (Badawi Rp't) at Appendix B; *see also* Ex. A (Badawi Dep.) at 139:18-140:6 ("Q. None of those other merger agreements are included in your reliance materials in Appendix B, right? A. No.").  The Opposition's principal response to this massive flaw in Professor Badawi's Report is to invoke his "background" and alleged review of "thousands" of agreements over his career.  Opp. at 14.  However, Professor Badawi intends to present his opinion as an "empirical" analysis, Ex. A (Badawi Dep.) at 133:21-22 ("I'm offering an empirical judgment … ."), which communicates that it is supported by verifiable data and not just his "sense of

where the continuum is" based on his purported recollection of thousands of unidentified and likely unrepresentative agreements, *id.* at 134:9-14. Without presenting *any* specific comparator merger agreements from which the jury can evaluate—and Musk can test—his conclusions, Professor Badawi's analysis is unverifiable and thus unreliable. He expects the jury to rely just on his say so, precisely what *Daubert* prohibits. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

Plaintiffs' effort to distinguish Professor Badawi's "analysis" from the expert *USI Ins. Services LLC vs. Alliant Ins. Services Inc.*, Opp. at 12, further demonstrates his problem. In *USI*, as here, the expert "indiscriminately" included every transaction in his career to support his conclusion. 2025 WL 1767988, at *3 (D. Ariz. June 26, 2025). Plaintiffs contend that Professor Badawi's opinion is different because, unlike the expert in *USI*, he did not "opine[] on specific ranges" or "includ[e] assumptions drawn from unrelated agreements" Opp. at 12. But that is *exactly* what he did. Professor Badawi identified a "continuum" (also known as a "range") of "buyer-friendly" and "seller-friendly" merger terms and placed the MA within that range based on the "sense" he developed from his exposure to unrelated merger agreements over two decades. *Compare USI*, 2025 WL 1767988, at *3 *with* Ex. A (Badawi Dep.) 134:9-14. He did not identify a relevant sample of merger agreements to compare against the MA or use any of the methods he employs in his academic work to conduct an empirical analysis of where its terms fit in within the wider M&A deal market. He simply offered his feeling that the MA and its terms were "seller-friendly." His opinion is not reliable and not admissible.[5]

---

[5] Plaintiffs argue that Professor Badawi's background opinions about general M&A custom and practice, Ex. 209 (Badawi Rp't) at § IV, should be immune from exclusion because that particular section makes no reference to the MA and thus does not suffer from the same defects as the remainder of his Report. Opp. at 7-8. If the Court properly excludes Professor Badawi from testifying about the MA itself, it should also exclude this background as irrelevant since it would be unconnected to the facts of the case and unhelpful to the jury without the MA-specific opinions it supports. *See Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1167 (S.D. Cal. 2022).

## II. THE COURT SHOULD EXCLUDE THE REMAINDER OF PROFESSOR BADAWI'S OPINIONS

### A. Plaintiffs Do Not Defend Professor Badawi's Speculative Opinions About Imaginary Contract Provisions and Thus Concede They Are Inadmissible

Musk moved to exclude Professor Badawi's speculative opinion that the terms of Twitter and Musk's confidentiality agreement "could have expanded or restricted the information rights of the parties." Mot. at 14. Not only is this opinion pure conjecture, it was contradicted by the record: the confidentiality agreement, which Professor Badawi claimed to have read, did no such thing. *Id.* (citing Ex. D (Musk-Pampena-0023104); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993) (expert testimony must be based on more than "subjective belief or unsupported speculation"). Plaintiffs do not respond to this argument or reference this opinion at all. They have waived any opposition and concede its exclusion. *Snapkeys*, 539 F. Supp. 3d at 1050.

### B. The Court Should Exclude Professor Badawi's Improper Opinions About Musk and the Market's State of Mind

Plaintiffs do little to refute Musk's arguments that Professor Badawi's opinions that Musk's tweets and statements "created uncertainty" in the market, that Musk developed "buyer's remorse," and that Musk's concerns about the prevalence of bots on Twitter were pretextual all improperly delved into investors' and Musk's states of mind. The Court should exclude all three opinions. *Gold v. Lumber Liquidators, Inc.*, 323 F.R.D. 280, 294 (N.D. Cal. 2017) ("Courts routinely exclude expert testimony as to intent, motive, or state of mind as issues better left to a jury.").

Plaintiffs make passing reference to Professor Badawi's opinion that Musk's tweets caused "uncertainty" in the market but do not defend it beyond noting that "he opines on the underlying facts." Opp. at 14-15. That is the problem. His testimony is nothing more than "vouching for fact evidence rather than providing expert opinions." *Arista Networks, Inc.*, 2018 WL 8949299, at *3. And Plaintiffs do not deny that he lacks any expertise or foundation to offer any opinions about market certainty in the first place; he is not an economist or loss causation expert nor did he conduct—or possess any experience or training necessary to conduct—any survey of investors to gauge their reactions to Musk's tweets and statements. The Court should strike and exclude those opinions.

The Court should similarly exclude Professor Badawi's opinions concerning Musk's state of mind, including his alleged "buyer's remorse" and supposed knowledge of Twitter's bot problem before he signed the MA. As to Professor Badawi's "buyer's remorse" opinions, Plaintiffs claim that Professor Badawi did not affirmatively state that Musk "had 'buyer's remorse'" but only opined that the conditions that lead to "buyer's remorse" existed. Opp. at 14. As an initial matter, Plaintiffs misstate the facts: Professor Badawi testified that "the factual record suggests that [Musk] has buyer's remorse." Ex. A (Badawi Dep.) at 119:17-19. And even if he had not so testified, Plaintiff's "conditions of buyer's remorse" argument draws a distinction without a difference, since his testimony implicitly opines on Musk's state of mind, which is equally impermissible. *See Avila v. Ford Motor Co.*, 2025 WL 2538722, at *2 (N.D. Cal. Aug. 22, 2025) (excluding opinion implying a party knew certain information because "any additional interpretation or synthesis that [the expert] might offer" beyond identifying facts in the record "would constitute an impermissible state of mind opinion"). This same problem sinks Professor Badawi's opinion that Musk and the public possessed information suggesting that Twitter's bot calculations were inaccurate well before Musk made an offer to buy the company. Whether or not Professor Badawi affirmatively stated that Musk knew or should have known that more than 5 percent of Twitter's monetizable users were spam accounts, he implied that he did and thus improperly offered an opinion as to Musk's state of mind. *Id.*

## C.     The Court Should Exclude Professor Badawi's Narration of Facts

Plaintiffs assert that Professor Badawi did not use his report to narrate the facts, but the report speaks for itself. Substantial portions walk through a chronological timeline of events from the MA's signing to termination, rehashing otherwise admissible evidence without adding expert insight. Ex. 209 (Badawi Rp't) at ¶¶ 41-49, 76-91, 93-95. This includes step-by-step recitations of Musk's May 13 tweet, subsequent communications, and the July 8 termination letter, presented as a factual story rather than analytical opinion. *Id.* This narration does not support his opinions, it merely bolsters Plaintiffs' version of events. Plaintiffs' defense—that Professor Badawi ties facts to his opinions on M&A customs, Opp. at 15—fails because the narrative stands alone, often unaccompanied by any analysis.

Expert reports are not vehicles for storytelling and summation; they must provide specialized knowledge that assists the trier of fact, not duplicate lay witness testimony or documentary evidence. Fed.

R. Evid. 702(a) (expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue").  Courts routinely exclude experts who act as narrators, as this usurps the jury's role in evaluating facts. *See Johns v. Bayer Corp.*, 2013 WL 1498965, at *28 (S.D. Cal. Apr. 10, 2013) (granting motion to exclude where expert spends most of report giving a "chronological picture" of the facts"); *Sec. & Exch. Comm'n v. Frost*, 2021 WL 6103551, at *4 (C.D. Cal. Nov. 15, 2021) (precluding expert testimony that was to be "presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence.") (internal citations omitted).  Professor Badawi's timeline adds nothing beyond what jurors can discern themselves from exhibits and testimony, rendering it unhelpful and prejudicial under Federal Rule of Evidence 403.

## CONCLUSION

Defendant respectfully requests that the Court grant his motion to exclude the opinions of Adam Badawi, or, in the alternative, hold a Rule 104 hearing to determine their admissibility.

DATED:  September 26, 2025                    QUINN EMANUEL URQUHART & SULLIVAN, LLP

By   _____/s/ Stephen A. Broome_____
     Alex Spiro
     Michael T. Lifrak
     Joseph C. Sarles
     Stephen A. Broome
     Jesse A. Bernstein
     Alex Bergjans
     Jonathan E. Feder
     Nathan Archibald
     Stephanie Kelemen

     *Attorneys for Defendant Elon Musk*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on this the 26th day of September, 2025.

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  */s/ Stephen A. Broome*
   Alex Spiro
   Michael T. Lifrak
   Joseph C. Sarles
   Stephen A. Broome
   Jesse A. Bernstein
   Alex Bergjans
   Jonathan E. Feder
   Nathan Archibald
   Stephanie Kelemen

   *Attorneys for Defendant Elon Musk*

Case No. 3:22-cv-05937-CRB
DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF HIS
MOTION TO EXCLUDE THE OPINIONS OF ADAM BADAWI

**ATTESTATION**

Pursuant to Civil L.R. 5-1, I attest under penalty of perjury that concurrence in the filing of this document has been obtained from the other signatories herein.

By  /s/ Alex Bergjans

Alex Spiro
Michael T. Lifrak
Joseph C. Sarles
Stephen A. Broome
Jesse A. Bernstein
Alex Bergjans
Jonathan E. Feder
Nathan Archibald
Stephanie Keleman

*Attorneys for Defendant Elon Musk*

Case No. 3:22-cv-05937-CRB
DEFENDANT ELON MUSK'S REPLY IN SUPPORT OF HIS
MOTION TO EXCLUDE THE OPINIONS OF ADAM BADAWI