# EXHIBIT 12

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GIUSEPPE PAMPENA, individually and on behalf of all others similarly situated,**<br><br>                    Plaintiff,<br><br>          vs.<br><br>**ELON MUSK,**<br><br>                    Defendant. | Case No. 22-cv-05937-CRB |

# SUPPLEMENTAL EXPERT REPORT OF DAVID I. TABAK, PH.D.

### I.     SCOPE OF ANALYSIS AND SUMMARY OF FINDINGS

1.  This report concerns a federal securities class action for which the following class has been certified: "All persons and entities who sold the publicly traded stock or call options, or purchased the put options, of Twitter, Inc. during the period from May 13, 2022 through October 4, 2022, both dates inclusive (the 'Class Period'), and who suffered damages by Defendant's alleged violations of § 10(b) and of the Exchange Act."[1]  Because the October 4, 2022 corrective disclosure occurs during market hours, I end the analysis on October 3, 2022.  I submitted a report on class certification dated May 22, 2024 ("Tabak Class Cert Report") and a rebuttal reply report on class certification dated September 16, 2024 ("Tabak Class Cert Reply Report").  On September 27, 2024,

---

[1] Order Granting Class Certification dated September 27, 2024.

11. In addition to affecting the damages calculation, this also has implications for loss causation (which was, in fact, a key issue in *Dura*). As noted in the December 11, 2023 Order Granting In Part And Denying In Part Defendant's Motion To Dismiss ("MTD Order"), "[l]oss causation is a 'context-dependent' inquiry. … 'Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss.'"[5] In fact, in a seller class, the economic loss typically comes before the revelation of the alleged fraud.

12. Consider, for example, someone who bought Twitter shares in early May 2022, before the start of the Class Period, say for $40 per share. Suppose that the May 13, 2022 Musk tweet caused Twitter's share price to decline by $5, from $40 to $35.[6] Next, suppose that the investor sells their shares for $35 before the October 4 corrective disclosure. The investor has lost $5 per share, and, following *Dura*, at that instant, they no longer possess cash of equivalent value to the true value of the shares (i.e., they now possess $35 in cash and no longer have the $40 that they started with). Similarly, if the stock price had risen to $36 before the investor sold, and if that increase was due to a reduction in deflation (i.e., the deflation was now only $4 while the true value remained at $40), then the investor loses $4 in value due to the fraud. Notably, these sales are assumed to occur while the stock price is still deflated, meaning before the corrective disclosure occurs.

13. Finally, I have been asked by counsel for Lead Plaintiff to calculate damages under Rule 10b-5(b) and also under Rule 10b-5(a) and (c). While I offer no legal opinions, as background to my damages analyses, it is my understanding that damages under Rule 10b-5(b) are calculated based on the effects of misrepresentations or omissions while "guilt for securities fraud and wire fraud 'is not restricted solely to

---

[5] MTD Order at *53-54. Internal and closing citations omitted.

[6] All figures in this hypothetical are just examples and are not meant to reflect actual prices or artificial deflation.

isolated misrepresentations or omissions.'"[7]  For purposes of my damages analyses under Rule 10b-5(a) and (c), I have been asked by counsel for Lead Plaintiff to consider not only the misrepresentations that survived the MTD Order, but also to consider Mr. Musk's July 8, 2022 termination letter.

### V.    MEASUREMENT OF DEFLATION IN TWITTER'S STOCK PRICE

14. In the Tabak Class Cert Report, I presented a market model, which is a statistical analysis of the relationship, in this case, between Twitter's stock-price movements and those of a market and an industry index in Exhibit 8b of that report.  For convenience, that market model is shown again in Exhibit 3 to this report.

15. Defendants did not challenge this market model or the event-study results based on the market model in the class-certification stage of this litigation.  For my damages analysis, I will use the results of the event studies on the relevant dates from that market model for my damages analysis.[8]  In particular, Exhibit 4a shows the price reactions (or event studies) for the three misrepresentations that survived the MTD Order (i.e., "the May 13 tweet that the deal was 'temporarily on hold,' the May 16 statement that fake and spam accounts make up at least 20% of Twitter's users, and the May 17 tweet"[9]), the July 8 termination letter, and the October 4 filing of the amended Schedule 13D.

16. As seen in Exhibit 4a, the May 13, May 16, July 8, and October 4, 2022 price movements are statistically significantly different from zero while the May 17 price movement is not.  Therefore, I do not include the May 17 price movement in my damages analyses.

---

[7] *United States v. Ellison*, 704 F. App'x 616, 619 (9th Cir. 2017).

[8] I reserve the right to respond to any challenges or alternatives that Defendants may bring to the market models and resultant event studies should they do so, including by introducing new market models and event studies.

[9] MTD Order at *59.

17. Next, Mr. Musk's May 16, 2022 statement appears to have been made during the trading day. Twitter's stock price opened at $39.17 on May 16, down from a close of $40.72 on May 13 (the prior trading day). On May 16, Twitter's stock price close was $37.39, slightly above its opening price that day. Thus, there is little evidence of the economic importance of any announcement made during the trading day on May 16 and, for purposes of my damages analysis, I do not consider this statement to be an independent source of loss. However, as discussed below, I do consider whether the drop from the $40.72 close on May 13 to the price of $37.39 on May 16 can be attributed to a continuing reaction to the May 13 tweet that remains part of this case.

18. For the 10b-5(b) analysis, this leaves the May 13, 2022 tweet. This tweet has a two-day price reaction of $8.52.[10] Here, I follow my standard practice of continuing the

---

[10] There was limited additional news on May 13 related to a hiring freeze imposed by Twitter that appeared to be both consistent with recent events in the technology space and accelerated by Mr. Musk's merger offer. See, for example, a 2:32 AM news story titled "Twitter Halts Hiring as Executives Depart -- WSJ" and a 5:30 AM story titled "The Companies Cutting Staff, Freezing Hiring or Slashing Costs: See the List -- WSJ," both published by *Dow Jones Institutional News*. The news of the executives' departure was made public as early as 1:12 PM on May 12. See "Two Senior Twitter Executives Are Leaving Amid Elon Musk Takeover -- WSJ," *Dow Jones Institutional News*, May 12, 2022.

News headlines repeatedly attributed Twitter's stock-price decline on May 13 to Mr. Musk's actions rather than to the hiring freeze. See, for example the following articles published by *Dow Jones Institutional News*: (1) "Twitter Stock Plunges as Elon Musk Says Deal 'Temporarily on Hold' -- Barrons.com"; (2) "Twitter's Stock Tumbles After Elon Musk Tweets Buyout Deal Is 'temporarily On Hold' – MarketWatch"; (3) "Twitter Shares Drop 18% After Musk Tweet Saying Buyout is 'Temporarily on Hold'"; (4) "Twitter Stock Tumbles Premarket After Elon Musk Says Deal Is on Hold – WSJ"; (5) "Twitter Stock Tumbles on Deal Holdup"; and (6) "Twitter Shares Down 10% at Open on Musk Deal Uncertainty."

Mr. Musk's tweet occurred at 5:44 AM on May 13, 2022. Exhibit 4b shows that between 2:32 AM (when the first news about Twitter halting hiring came out) and 5:44 AM, there was almost no movement in Twitter's stock price. However, immediately following the 5:44 AM tweet by Mr. Musk, Twitter's stock price dropped precipitously. This both (1) indicates that Twitter's price movement on May 13 can be attributed to Mr. Musk's tweet and (2) demonstrates that the market for Twitter's stock was active and responding to
(continued)

event window (i.e., the period over which the price reaction is measured) to include all consecutive trading days with a statistically significant price movement.[11]  As both the Friday May 13 and Monday May 16 price movements are statistically significant, both are included in the price reaction and the initial measure of deflation as a result of the May 13 tweet.  This can be split to be the one-day reaction $5.94 as of May 13 and then the full two-day reaction of $8.52 as of May 16.

19. The 10b-5(a) and (c) analysis incorporates both the May 13 tweet and the July 8, 2022 post-market termination letter.  Per Exhibit 4a, this is associated with a $2.93 price reaction on Monday July 11, which is shown graphically in Exhibit 4c.  In other words, the 10b-5(a) and (c) initial measure of deflation is $5.94 on May 13, $8.52 from May 13 through July 8 and $11.45 ($8.52 plus $2.93) from then until July 8, 2022.

20. As mentioned above, I also examine the October 4, 2022 alleged corrective disclosure.  As seen in Exhibit 4a, the news that Mr. Musk would honor the merger agreement caused a $7.27 increase in in Twitter's stock price, and the price movement is depicted graphically in Exhibit 4d.  The fact that there was a statistically significant increase following this news provides additional evidence of the economic importance of

---

important news outside of market hours, meaning that had the hiring freeze been important to the market, we would have expected to see a movement in Twitter's stock price between 2:32 AM and 5:44 AM on May 13.

Given the lack of an intraday price movement from 2:32 AM to 5:44 AM, the time of Mr. Musk's tweet that every news headline discussing Twitter's stock-price decline on the morning of May 13 attributed it to Mr. Musk's actions regarding the deal and none of these articles discussing Twitter's stock-price movement even mentioned the hiring freeze, there is no need to attribute any of the stock-price decline that day to the hiring freeze.

[11] This rule also appears in the academic literature.  See, for example, Koch, James V., Robert N. Fenili, and Richard J. Cebula, "Do investors care if Steve Jobs is healthy?," *Atlantic Economic Journal* 39 (2011): 59-70, p. 63. ("In this paper, we follow a rule that if the daily abnormal return on a subsequent trading day is statistically significant, then we assume that the market is continuing to incorporate information on Jobs' health (Krivin et al. 2003, p.8).")

29. Exhibit 7-SUPP shows the maximum deflation or inflation for each option under the 10b-5(b) claim and under the 10b-5(a) and (c) claims. Because there are well over a thousand options with deflation (for calls) or inflation (for puts), the daily deflation/inflation figures are provided in the electronic backup to this report.

I reserve the right to modify or extend my opinion in light of any new information, including submissions by any experts for Defendants, that becomes available to me.

David I. Tabak
July 18, 2025

---

than volatility to derive the level of volatility that would satisfy the Black-Scholes formula. This level of volatility is referred to as the implied volatility of the stock for that option (i.e., the level of volatility implied by the Black-Scholes formula given the option price and the other inputs). The analysis uses the same implied volatility for all options on a given day, based on the implied volatility of near-the-money options as provided by FactSet Research Systems Inc.