QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice*)
alexspiro@quinnemanuel.com
Ellyde R. Thompson (pro hac vice)
ellydethompson@quinnemanuel.com
Jesse A. Bernstein (*pro hac vice*)
Jessebernstein@quinnemanuel.com
295 Fifth Ave., New York, NY 10010
Telephone:     (212) 849-7000
Facsimile:      (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Stephen A. Broome (Bar No. 314605)
stephenbroome@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:     (213) 443-3000
Facsimile:      (213) 443-3100

*Attorneys for Defendant Elon Musk*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | CASE NO. 3:22-CV-05937-CRB<br><br>**DEFENDANT ELON MUSK'S OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 4 TO PRECLUDE OPINION, TESTIMONY, EVIDENCE, AND ARGUMENT CONCERNING FAKE OR SPAM ACCOUNT ESTIMATES**<br><br>Judge: Hon. Charles R. Breyer<br><br>FILED UNDER SEAL – REDACTED FOR PUBLIC FILING |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................................. 1

RELEVANT BACKGROUND ............................................................................................................. 2

ARGUMENT ........................................................................................................................................ 4

I.  THE SPARKTORO REPORT IS NOT BEING OFFERED AS AN EXPERT OPINION AND THE DATA TEAM ARE PERCIPIENT WITNESSES ............................ 4

II. THE EVIDENCE IS NOT HEARSAY—ITS RELEVANCE IS NOT IN ITS TRUTH BUT IN ITS EXISTENCE AND EFFECT ON MUSK AND HIS TEAM ............. 6

CONCLUSION ..................................................................................................................................... 7

# TABLE OF AUTHORITIES

**Page**

### Cases

*Alivecor, Inc. v. Apple, Inc.*,
   2024 WL 591864 (N.D. Cal. Feb. 13, 2024) ............................................................................. 5

*Britz Fertilizers, Inc. v. Bayer Corp.*,
   2009 WL 1748775 (E.D. Cal. June 17, 2009) .......................................................................... 6

*Calmat Co. v. U.S. Dep't of Lab.*,
   364 F.3d 1117 (9th Cir. 2004) ................................................................................................. 7

*Gomez v. Rivera Rodriguez*,
   344 F.3d 103 (1st Cir. 2003) .................................................................................................... 5

*Goodman v. Staples The Office Superstore, LLC*,
   644 F.3d 817 (9th Cir. 2011) ................................................................................................... 1

*Hynix Semiconductor Inc. v. Rambus Inc.*,
   2009 WL 230039 (N.D. Cal. Jan. 27, 2009) ............................................................................ 6

*U.S. ex rel. Samandi v. Materials & Electrochemical Rsch. Corp.*,
   2010 WL 11470583 (D. Ariz. Mar. 29, 2010) ......................................................................... 5

*Siebert v. Gene Sec. Network, Inc.*,
   2015 WL 13884146 (N.D. Cal. Jan. 20, 2015) ........................................................................ 1

*U.S. v. Mendoza-Prado*,
   314 F.3d 1099 (9th Cir. 2002) ................................................................................................. 4

*Vaxiion Therapeutics, Inc. v. Foley & Lardner LLP*,
   2008 U.S. Dist. LEXIS 51171 (S.D. Cal. July 2, 2008) .......................................................... 6

### Rules and Regulations

Fed. R. Civ. P. 5(b) ......................................................................................................................... 9

Fed. R. Civ. P. 26 ........................................................................................................................... 5

### Statutes

Civil L.R. 5-1 ............................................................................................................................... 10

**INTRODUCTION**

Plaintiffs' Motion in Limine No. 4 conflates two distinct categories: witnesses who possess expertise and witnesses retained as experts. It is well established that, despite possessing medical expertise, a treating physician may testify to "opinions formed during the course of treatment" without submitting a Rule 26 report. *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 819 (9th Cir. 2011). Similarly, despite having accounting expertise, an accountant may testify about her role and observations about underlying accounting treatment without an expert designation. *See Siebert v. Gene Sec. Network, Inc.*, 2015 WL 13884146, at *2-3 (N.D. Cal. Jan. 20, 2015). The text of Rule 26 confirms why: expert disclosure is required only for witnesses "retained or specially employed to provide expert testimony *in the case*[.]" (emphasis added). Musk's deal team retained data scientists in Summer 2022—months before Plaintiffs filed this lawsuit—to investigate Twitter's spam disclosures and provide advice relevant to the transaction. They will testify—based solely on their personal experience in the underlying events—about what they observed and communicated to Musk's team. This will rebut Plaintiffs' theories that Musk's concerns were "pretextual," and that he "capitulated" in Delaware for lack of evidence. Excluding it would allow Plaintiffs to accuse Musk of bluffing while preventing him from showing his cards.

Plaintiffs' effort to exclude the SparkToro and Followerwonk Report (the "SparkToro Report") is particularly misguided. Plaintiffs misleadingly assert that SparkToro "made specialized and technical Fake Account Estimates in connection with the Delaware Litigation." Mot. at 5. That is false—Musk never retained SparkToro, nor was it designated as an expert in Delaware. The SparkToro Report was publicly disseminated on May 15, 2022—the day before Musk's allegedly fraudulent statement at the All-In Summit. Plaintiffs allege that Musk committed securities fraud by stating, without basis, that he estimated 20% of Twitter's users were spam accounts. But Musk clearly stated that this estimate was based on analyses performed by "outside firms"—*i.e.*, Sparktoro and Followerwonk. Plaintiffs cannot accuse Musk of making statements without basis while precluding him from identifying the basis.

The Court should deny the motion for three reasons. *First*, Plaintiffs' relevance arguments are self-defeating: they claim post-May 17 evidence is irrelevant while simultaneously pursuing an

-1-                                           Case No. 3:22-CV-05937-CRB
DEFENDANT'S OPPOSITION TO PLAINTIFFS' MIL NO. 4 TO PRECLUDE OPINION, TESTIMONY,
EVIDENCE, AND ARGUMENT CONCERNING FAKE OR SPAM ACCOUNT ESTIMATES

unpled "scheme" theory based on Musk's post-May 17 investigation, termination of the Merger, and even post-class period events, such as Musk's termination of Twitter executives. Mot. at 2; FAC ¶¶ 156-67. Musk agrees that the three mid-May statements are the conduct at issue in trial—but if the Court permits Plaintiffs to open the door to Musk's post-May 17 conduct, he is entitled to rebut it. *Second*, the data scientists' testimony about their observations, data requests, and communications is classic percipient testimony—not undisclosed expert opinion. The witnesses will testify from their experience working on the underlying events, not based on analyses they performed after being retained as experts in this case. *Third*, none of the advice, statements, or opinions Plaintiffs challenge is hearsay because Musk will offer them not for the truth of Twitter's spam estimates, but for the fact that they existed, were communicated to Musk, and for their effect on Musk's state of mind. Having put Musk's good faith at issue, Plaintiffs cannot now preclude evidence that he acted in good faith

## RELEVANT BACKGROUND

After signing the Merger Agreement, Musk's deal team asked Twitter—during post-signing due diligence—how it determined that spam and fake accounts constituted less than 5% of mDAU. Ex. 563.[1] At the initial due diligence meeting on May 6, 2022, Twitter ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Ex. I at 248:21-250:17. Twitter promised to provide that information by May 12, but instead gave Musk ▬▬▬▬▬▬▬ *Id.* at 280:3-14, 281:4-21. The following morning Musk tweeted "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users."

Musk's tweet inspired various data science firms to investigate Twitter's representations, including SparkToro and Followerwonk. On May 15, 2022, they published a report estimating that 19.42% of Twitter accounts were likely to be fake or spam and tweeted it to Musk. Ex. 598. The Report immediately trended on Twitter ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Ex. I at 304:5-24. Musk saw it on his Twitter feed. Ex. J at 258:22-259:8. On May 16, Musk appeared at

---

[1] All "Ex." citations are to the exhibits attached to the Declaration of Alex Bergjans filed herewith.

the All In Summit where he was asked what he thought the number of fake accounts on Twitter was. He responded that, according to analysis performed by "outside firms," i.e., the SparkToro Report, it "would be probably 20%." Ex. 120 at 2. Plaintiffs allege that statement was false.

Disturbed by the SparkToro Report and Twitter's refusal to produce any of the promised information, Musk's team hired three separate outside data consultant firms—CounterAction, Halo, and Cyabra—to help them determine the true amount of spam on Twitter. Ex. J at 57:21-58:11; Ex. E at 63:25-64:17. They devised data requests, reported to Musk's team that the information Twitter provided was deficient, and issued independent assessments notifying Musk and his lawyers that Twitter's spam information was inaccurate. *E.g.,* Exs. 628, 632, 634, 688, 718, 729. Musk's lawyer, Mike Ringler, relying in part on the work performed by the data scientists, sent a series of letters to Twitter accusing the company of breaching the Merger Agreement by failing to provide adequate information. On July 8, 2022, Ringler sent a letter terminating the Merger based on Twitter's material breach of its information covenant. Ex. 197. The letter also noted that "Mr. Musk has reason to believe that the true number of false or spam accounts on Twitter's platform is substantially higher than the amount of less than 5% "—a representation based on the data team's findings. *Id.*

The Court dismissed Plaintiffs' claims that Ringler's letters to Twitter asking for spam information and terminating the Merger were false, ruling that only those claims predicated on the May 13 tweet, May 16 statement, and May 17 tweet remained. Dkt. 48 at 39. Despite this Order, Plaintiffs purport to pursue a "scheme" liability theory based on dismissed claims that Musk's post-May 17 efforts to obtain spam information and his July 8 termination of the Merger was all a pretextual fraud—seeking damages purportedly caused by the publication of the July 8 Letter.

Plaintiffs previously argued that the post-May 17 conduct of Musk's lawyers and data scientists is at the core of their case, asserting that the work done by the "third-party data scientists goes to the falsity of Musk's May 16 and 17 statements, and Musk's scienter, as well as Musk's defenses." Dkt. 192 at 7. Their FAC alleges that Musk's "capitulat[ion]" in the Delaware Action, based on an alleged lack of support for his claims that Twitter misstated its spam percentage, shows Musk's scienter. FAC ¶¶ 156-167. Plaintiffs sought—and obtained—substantial fact discovery relating to Musk's data team including their internal communications, analyses, and the October 3,

2022 Report of Dr. Emilio Ferrara.  They identified the data team as percipient witnesses and Dr. Ferrara's report relevant evidence in their disclosures.  Ex. CC (Pls' Supp. Disclosures).  They had ample opportunity to depose each of these firms and Dr. Ferrara.  They chose not to.

## ARGUMENT

As a threshold matter, the Court should decide whether post-May 17 evidence is categorically irrelevant.  Plaintiffs argue that "[t]he relevant inquiries in this case are whether Musk's statements [on May 13, 16, and 17] were false or misleading," that "[s]ince Musk retained Cyabra/Counteraction/Halo *after* he made his allegedly false statements, their Fake Account Estimates could not have been a basis for Musk's May 13, 16, or 17 statements," that "Fake Account Estimates that post-date May 17 have no probative value," and therefore the data scientists' "testimony thus would be irrelevant under FRE 402."  Mot. at 1, 5, 6.  Yet they purport to be pursuing an unpled or otherwise dismissed "scheme" theory asserting that Musk's post-May 17 spam investigation, termination of the Merger, and even his post-class period termination of Twitter executives, were all part of a pretextual "scheme" to defraud Twitter's shareholders.  Dkt. 192 at 2; FAC ¶ 156-67 (dismissed at Dkt. 48 at 26-28).  Having put this conduct at issue, Plaintiffs cannot exclude evidence rebutting their theory.  *See, e.g.*, *U.S. v. Mendoza-Prado*, 314 F.3d 1099, 1105 (9th Cir. 2002) (where party "'opens the door' to testimony about an issue by raising it for the first time himself, he cannot complain about subsequent … inquiry into that issue" by opposing counsel).  To the extent they disclaim reliance on post-May 17 conduct, Musk would welcome a stipulation limiting such evidence at trial.  Plaintiffs have offered none.

### I. THE SPARKTORO REPORT IS NOT BEING OFFERED AS AN EXPERT OPINION AND THE DATA TEAM ARE PERCIPIENT WITNESSES

The Court should reject Plaintiffs' request to exclude the SparkToro Report and to preclude Musk's data team from providing percipient testimony about their role, observations, and communications concerning their request for information from Twitter and their spam investigation.

*First*, the Court should reject Plaintiffs effort to exclude the SparkToro Report, which Musk never commissioned and had no role in creating.  The SparkToro Report was publicly disseminated on May 15, 2022—the day *before* Musk's allegedly false statement at the All-In Summit.  It is the

very basis for Musk's statement that "outside firms" estimated spam at approximately 20%. It is plainly relevant to falsity and Musk's state of mind, and Plaintiffs cannot credibly contend that SparkToro or Followerwonk are "undisclosed experts" because Musk has never retained them in this case or any other. *See* Fed. R. Civ. P. 26 (expert subject to Rule 26 disclosures is one who is "retained or specially employed to provide expert testimony *in the case*") (emphasis added).

*Second*, the Court should reject Plaintiffs' request to exclude testimony and evidence from the data scientists Musk hired post-May 17. These witnesses were retained to advise Musk on the merger and/or the Delaware Action, long before Plaintiffs filed this suit. Whether a witness is "lay" or "expert" "depends on the basis of the opinion, not its subject matter." *Alivecor, Inc. v. Apple, Inc.*, 2024 WL 591864, at *8 (N.D. Cal. Feb. 13, 2024). Thus, "[a] party need not identify a witness as an expert so long as the witness played a personal role in the unfolding of the events at issue and the anticipated questioning seeks only to elicit the witness's knowledge of those events." *U.S. ex rel. Samandi v. Materials & Electrochemical Rsch. Corp.*, 2010 WL 11470583, at *2 (D. Ariz. Mar. 29, 2010) (permitting percipient witness to testify about a statistical analysis he performed in his job) (citing *Gomez v. Rivera Rodriguez*, 344 F.3d 103, 113–14 (1st Cir. 2003)). The data team will be called as percipient witnesses to testify about their personal efforts to obtain data, why they drafted certain data requests, Twitter's responses, and their communications with Musk's team.

For example, to rebut Plaintiffs' accusation that Musk's team drafted unreasonable data requests, there will be evidence of what they needed and why. To rebut Plaintiffs' claim that Musk's lawyers had no basis to question the accuracy of Twitter's spam estimates leading up to termination, the data team (and the lawyers themselves) will explain the information that caused their concern. Any testimony concerning the information Twitter provided about its methods and the observations and recommendations the data team made is classic percipient testimony: *i.e.*, "the observations of the witness and the process by which decisions were made." *Britz Fertilizers, Inc. v. Bayer Corp.*, 2009 WL 1748775, at *3 (E.D. Cal. June 17, 2009); *see also Hynix Semiconductor Inc. v. Rambus Inc.*, 2009 WL 230039, at *11 (N.D. Cal. Jan. 27, 2009) ("'expert testimony' [is] testimony that a witness prepares, as opposed to testimony of what a witness observes"); *Vaxiion Therapeutics, Inc. v. Foley & Lardner LLP*, 2008 U.S. Dist. LEXIS 51171, at *8 (S.D. Cal. July 2, 2008) ("If the

witnesses only provide testimony related to the actions they took and things they directly learned, they are not considered specially-retained experts who are required to provide reports.").

As for Dr. Ferrara, Musk intends to call him to rebut Plaintiffs' claim that Musk "capitulated" in the Delaware Action because he lacked evidence supporting his concerns about spam. Dr. Ferrara will testify that he prepared a report—that Plaintiffs have possessed for more than a year and listed in their own disclosures—and shared it with Musk's team. In cases like this, where litigation conduct is at issue, formerly retained experts are permitted to testify as percipient witnesses about their personal involvement in prior litigation. *Britz*, 2009 WL 1748775, at *4 (Witnesses "can [] testify about their personal involvement in the *Skouti* action, including the opinions they expressed as experts in *Skouti*. … [T]he fact that these witnesses were designated as experts in *Skouti* does not alter the percipient nature of their testimony in this action.").[2]

Plaintiffs cannot credibly claim prejudice or surprise. The SparkToro Report has been publicly available since May 15, 2022, and Musk produced all of his data team's work, including the Ferrara Report, more than a year ago. Plaintiffs have long been on notice as to these witnesses' involvement, their observations, and conclusions. Indeed, Plaintiffs noticed some of them for deposition as percipient witnesses, and then cancelled the deposition for no apparent reason. The Court should not exclude this evidence in limine, but should reserve any ruling until it has context for how the evidence will be presented at trial.

## II.    THE EVIDENCE IS NOT HEARSAY—ITS RELEVANCE IS NOT IN ITS TRUTH BUT IN ITS EXISTENCE AND EFFECT ON MUSK AND HIS TEAM

Plaintiffs' hearsay objection misunderstands why this evidence is being offered. Musk does intend to introduce any of this evidence for the truth of its contents—i.e., that Twitter's methods

---

[2] Plaintiffs can hardly complain that this is improper—they sought to do the exact same thing with Twitter's experts from the Delaware Action. Plaintiffs sought to depose and obtain the expert report of John Coates, Twitter's M&A expert from the Delaware Action, arguing that "Mr. Coates' report and testimony is relevant" because, among other things, "they will show that Twitter itself strenuously disagreed with Musk's statements and contentions," which "has a tendency to prove the falsity of the tweets and statements that are directly at issue in this securities fraud class action." Dkt. 149 at 3-4. Moreover, Plaintiffs intend to call Twitter's auditor to opine about the audit analysis PwC performed and Twitter's litigation counsel to provide opinions about the merits of the Delaware Action. Dkt. 358 at 26.

were in fact unreasonable or that its spam estimate was inaccurate. That is not something Musk needs to prove here. Instead, the evidence is offered to refute Plaintiffs' contention that Musk's spam estimates were baseless, that his spam concerns were pretextual, that his lawyers had no reasonable basis for their information requests and positions, and that he capitulated in Delaware for lack of evidence. "If the significance of an out-of-court statement lies in the fact that the statement was made and not in the truth of the matter asserted, then the statement is not hearsay." *Calmat Co. v. U.S. Dep't of Lab.*, 364 F.3d 1117, 1124 (9th Cir. 2004). Each category of evidence Plaintiffs challenge fits this framework:

*The SparkToro Report* is offered to prove that the Report existed and was publicly available and communicated to Musk before his May 16 statement—not that Twitter's true spam percentage was 19.42%. Musk stated at the All-In Summit that "outside firms" estimated spam at approximately 20%. Ex. 120 at 2. The SparkToro Report is the basis for that statement.

*The data team's analyses and communications* are offered for their effect on Musk's deal team—to show why they questioned Twitter's representations and ultimately terminated the Merger. These communications are not offered to prove that Twitter's spam estimate was wrong, but to show what information Musk's team had and why they acted as they did.

*The Ferrara Report* is offered to rebut Plaintiffs' allegation that Musk "capitulated" in Delaware because he lacked any supporting evidence. FAC ¶ 167.

Finally, Plaintiffs' Rule 403 concerns are unfounded. They warn of "mini-trial[s] centered around Fake Account Estimates." Mot. at 6-7. But Musk does not intend to prove Twitter's estimate was wrong or that his team's estimates were correct. He intends only to show these analyses *existed* and *affected* his and his team's decisions. The probative value is high: the evidence goes directly to Musk's state of mind, which Plaintiffs placed at issue by alleging his concerns were "pretextual." The risk of confusion is low: the jury need not decide who was right about spam. Plaintiffs cannot put that question at issue and then exclude the answer.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court deny the motion.

DATED: January 29, 2026

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By   */s/ Stephen A. Broome*
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Ellyde R. Thompson
Jesse A. Bernstein
Alex Bergjans

*Attorneys for Defendant Elon Musk*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on Thursday, January 29, 2026.

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By /s/ Stephen A. Broome
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Ellyde R. Thompson
Jesse A. Bernstein
Alex Bergjans

*Attorneys for Defendant Elon Musk*

**ATTESTATION**

Pursuant to Civil L.R. 5-1, I attest under penalty of perjury that concurrence in the filing of this document has been obtained from the other signatories herein.

By _/s/ Alex Bergjans_
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Ellyde R. Thompson
Jesse A. Bernstein
Alex Bergjans

*Attorneys for Defendant Elon Musk*