QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice*)
alexspiro@quinnemanuel.com
Ellyde R. Thompson (*pro hac vice*)
ellydethompson@quinnemanuel.com
Jesse A. Bernstein (*pro hac vice*)
jessebernstein@quinnemanuel.com
295 Fifth Ave., New York, NY 10010
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Stephen A. Broome (Bar No. 314605)
stephenbroome@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

*Attorneys for Defendant Elon Musk*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> ELON R. MUSK, <br><br> Defendant. | CASE NO. 3:22-CV-05937-CRB <br><br> **DEFENDANT ELON MUSK'S PRETRIAL BRIEF** <br><br> Judge: Hon. Charles R. Breyer |

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................2

I.    MUSK'S MAY 13, 16, AND 17 STATEMENTS DID NOT VIOLATE RULE
10B-5 ...................................................................................................................2

    A.    Plaintiffs Cannot Prove The May 13, 16, and 17 Statements Are Untrue
Statements of Fact ....................................................................................2

        1.    The May Statements Are Not Materially False ................................2

        2.    Plaintiffs' Alternative Material Falsity Theory Is Foreclosed By
*Omnicare* ...........................................................................................3

    B.    Plaintiffs Cannot Prove That Musk Made The Statements With Scienter ................5

    C.    Plaintiffs Cannot Prove Loss Causation ....................................................6

II.    THE COURT SHOULD REJECT PLAINTIFFS' ATTEMPT TO BROADEN THE
CASE TO ENCOMPASS AN AMORPHOUS "SCHEME," DISMISSED
STATEMENTS, AND PROTECTED LITIGATION CONDUCT ......................................9

    A.    Plaintiffs Cannot Pursue A "Scheme" Claim Based On Dismissed
Statements And Unpled Conduct ..............................................................9

    B.    Plaintiffs' Scheme Claim Is Inconsistent with Their Class Certification
Theory Such That Pursuing It At Trial Will Require Decertification ....................13

    C.    Plaintiffs' Purported Scheme Claim Is Barred By *Noerr-Pennington* ...................15

CONCLUSION ..................................................................................................................17

## TABLE OF AUTHORITIES

**Page**

### Cases

*In re AGS, Inc. Sec. Litig.*,
 2024 WL 581124 (D. Nev. Feb. 12, 2024) ................................................................ 12

*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*,
 794 F. Supp. 1424 (D. Ariz. 1992) ........................................................................... 16

*In re Apple Inc. Sec. Litig.*,
 2020 WL 2857397 (N.D. Cal. June 2, 2020) ............................................................. 16

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
 11 F.4th 138 (2d Cir. 2021) ....................................................................................... 7

*Berson v. Applied Signal Tech., Inc.*,
 527 F.3d 982 (9th Cir. 2008) ..................................................................................... 2

*In re BofI Holding, Inc. Sec. Litig.*,
 977 F.3d 781 (9th Cir. 2020) ..................................................................................... 8

*Brody v. Transitional Hosps. Corp.*,
 280 F.3d 997 (9th Cir. 2002) ..................................................................................... 2

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.*,
 856 F.3d 605 (9th Cir. 2017) ..................................................................................... 4

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013) ................................................................................................... 15

*In re Cutera Sec. Litig.*,
 610 F.3d 1103 (9th Cir. 2010) ................................................................................... 2

*Dura Pharms., Inc. v. Broudo*,
 544 U.S. 336 (2005) .............................................................................................. 7, 8

*E.K. v. Nooksack Valley Sch. Dist.*,
 2021 WL 1531004 (W.D. Wash. Apr. 19, 2021) ...................................................... 13

*Gamble v. Kaiser Foundation Health Plan, Inc.*,
 348 F. Supp. 3d 1003 (N.D. Cal. 2018) .................................................................... 12

*GIA-GMI, LLC v. Michener*,
 2007 WL 2070280 (N.D. Cal. July 16, 2007) ............................................................ 6

*In re GlenFed, Inc. Sec. Litig.*,
 42 F.3d 1541 (9th Cir. 1994) ..................................................................................... 6

*Glickenhaus & Co. v. Household Int'l, Inc.*,
   787 F.3d 408 (7th Cir. 2015)........................................................................................7

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
   594 U.S. 113 (2021) ....................................................................................................7

*Hagood v. Sonoma County Water*,
   81 F.3d 1465 (9th Cir. 1996)......................................................................................4

*Hampton v. root9B Techs.*,
   897 F.3d 1291 (10th Cir. 2018)..................................................................................4

*Iafrate v. Angelo Iafrate*,
   827 F. App'x 543 (6th Cir. 2020)..............................................................................4

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
   251 F. Supp. 3d 596 (S.D.N.Y. 2017) .......................................................................4

*Kang v. PayPal Holdings, Inc.*,
   620 F. Supp. 3d 884 (N.D. Cal. 2022) .....................................................................12

*Klein v. Altria Grp., Inc.*,
   525 F. Supp. 3d 638 (E.D. Va. 2021) .......................................................................16

*Labrador v. Seattle Mortg. Co.*,
   2010 WL 3768378 (N.D. Cal. Sept. 22, 2010).........................................................14

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) .......................................................................................8

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016).....................................................................................8

*Lorenzo v. Sec. & Exch. Comm'n*,
   587 U.S. 71 (2019) ....................................................................................................17

*Manistee Town Ctr. v. City of Glendale*,
   227 F.3d 1090 (9th Cir. 2000)............................................................................12, 17

*Mier v. CVS Pharmacy, Inc.*,
   2021 WL 6102519 (C.D. Cal. Nov. 19, 2021).............................................13, 14, 15

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
   730 F.3d 1111 (9th Cir. 2013)................................................................................7, 9

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) ...........................................................................................3, 4, 5

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014)......................................................................................3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Oregon Nat. Res. Council v. Mohla*,
    944 F.2d 531 (9th Cir. 1991) ........................................................................... 12, 17

*In re Philip Morris*,
    89 F.4th 408 (2d Cir. 2023) ..................................................................................... 5

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) .................................................................................. 6

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ................................................................................ 16

*In re Stem, Inc. Sec. Litig.*,
    2025 WL 3675114 (N.D. Cal. Dec. 17, 2025) .................................................... 12

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
    546 F.3d 991 (9th Cir. 2008) .......................................................................... 10, 11

*United States v. AseraCare, Inc.*,
    938 F.3d 1278 (11th Cir. 2019) .............................................................................. 4

*United States v. Koziol*,
    993 F.3d 1160 (9th Cir. 2021) .............................................................................. 16

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) ............................................................................. 5, 7

### Other Authorities

U.S. Const. amend. I ............................................................................................... 17

Fed. R. Civ. P. 23(c)(1)(B) .................................................................................... 15

17 C.F.R. § 240.10b-5 .............................................................................................. 2

17 C.F.R. § 240.10b-5(a) ....................................................................................... 17

17 C.F.R. § 240.10b-5(b) ....................................................................................... 17

17 C.F.R. § 240.10b-5(c) ....................................................................................... 17

# INTRODUCTION

This case is about whether two tweets and a podcast remark constitute securities fraud. That is what survived this Court's decision on the motion to dismiss and that is the class the Court certified. Those two tweets and podcast did not violate securities laws, and no reasonable jury could conclude otherwise. The statements on their face are not different in any material way from the true state of affairs. And Plaintiffs' efforts to imbue the statements with a meaning not obvious from the plain language runs directly into the Supreme Court's decision in *Omnicare*, as applied by the Ninth Circuit to Section 10(b) claims, which deems statements of opinion non-actionable under the securities laws, including specifically as to the legal interpretation of contract rights.

Nor can Plaintiffs prove scienter, both because Musk understood the statements to be true at the time they were made and because the evidence at trial will overwhelmingly confirm that everyone involved in the merger agreed that Musk had rights to data about bots and spam accounts, that Musk's and his bankers' inquiry into spam accounts was sincere, and that Twitter had promised to produce this information to him but had failed to do so before he made any of the statements at issue. Even if Plaintiffs could clear these evidentiary hurdles, they cannot establish the element of loss causation because their own expert does not attribute any losses to two of the three alleged misstatements. Under Ninth Circuit law, Plaintiffs' expert's opinion that the stock dropped following the remaining tweet is insufficient to establish loss causation.

Plaintiffs' misguided effort to avoid a judgment for Musk by expanding their claims should be rejected. Plaintiffs aim to transform what should be a straightforward trial into an amorphous indictment of Musk's supposed "integrated, months-long scheme," *see* Dkt. 372 at 2, but this theory seeks to rely on statements and conduct that Plaintiffs either failed to plead or that the Court has already dismissed. It also seeks to hold Musk liable for constitutionally protected litigation conduct. The Court should reject Plaintiffs' pivot away from the theory they pled—the only theory for which the Court certified a class. But if the Court permits Plaintiffs to advance their alternative theory, then the class must be decertified.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>ARGUMENT</u>

**I.     MUSK'S MAY 13, 16, AND 17 STATEMENTS DID NOT VIOLATE RULE 10b-5**

At the motion to dismiss stage, the Court allowed Plaintiffs' claims to proceed "to the extent they are predicated on the May 13 tweet that the deal was 'temporarily on hold,' the May 16 statement that fake and spam accounts make up at least 20% of Twitter's users, and the May 17 tweet." Dkt. 48 at 39.  At trial, Plaintiffs will be unable to demonstrate that any of those three statements violated Rule 10b-5.

**A.     Plaintiffs Cannot Prove the May 13, 16, and 17 Statements Are Untrue Statements of Fact**

1.     <u>The May Statements Are Not Materially False</u>

Rule 10b-5 prohibits "the making of untrue or misleading statements." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1005 (9th Cir. 2002).  "[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010)  (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)).  Musk's May 13, 16, and 17 statements conveyed only the then-existing state of affairs.  On May 13, Musk tweeted:  "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users." Ex. 97.  Musk then added:  "Still committed to acquisition." Ex. 98.  As Plaintiffs' expert explained, the tweet conveyed:  "I've requested information, I'm not getting a satisfactory response, and I'm not closing until I do." Ex. B (Badawi Dep.) at 266:20–267:4.  As the evidence at trial will show, that captures precisely the existing state of affairs.  It is undisputed that, before Musk made the May 13 statement: (1) he requested information about Twitter's spam/false account calculation; and (2) Twitter agreed to produce that information.  It is also undisputed that Twitter failed to do so by May 13 and Musk refused to close until it did.

On May 16, speaking at a podcast conference, Musk was asked: "What do you think it is [*i.e.*, the number of bots]," "anecdotally?" Ex. CC (All In Summit Excerpted Transcript) at 6:2–5. Musk responded:  "I think it's some number that is probably at least four or five times [Twitter's estimate], . . . [my] estimate would be probably 20 percent." *Id.* at 6:8–11."  He further explained

that his answer was based on "a bunch of quite smart outside firms [that] have done analysis of Twitter and looked at the . . . daily users," and from his own experience on the platform. *Id.* at 6:11–21. Once again, this statement was directly in line with the existing state of affairs. On May 16, Musk did think the number of bots on Twitter was at least four or five times Twitter's estimate; the basis for his belief included an independent third-party report from two outside data analyst firms released the day prior—and shared to Musk's Twitter account—reaching that exact conclusion. Ex. 599; Ex. 598.

Finally, on May 17, Musk reiterated the same two sentiments: "20% fake/spam accounts, while 4 times what Twitter claims, could be *much* higher. My offer was based on Twitter's SEC filings being accurate. Yesterday, Twitter's CEO publicly refused to show proof of 5%. This deal cannot move forward until he does." Ex. 130. As the Court held, this tweet simply reiterated the May 13 and May 16 statements, *see* Dkt. 48 at 24–25. It is not false or misleading for the same reasons.

### 2. Plaintiffs' Alternative Material Falsity Theory Is Foreclosed By *Omnicare*

Nor may Plaintiffs establish material falsity by seeking to imbue the statements with a meaning not obvious from the plain language of the statements that runs afoul of Supreme Court and Ninth Circuit cases forbidding liability based on statements of opinion.

"To be misleading, a statement must be capable of 'objective verification.'" *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund*, 845 F.3d at 1275 (quoting *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014)). Merely "expressing an opinion rather than a knowingly false statement of fact is not misleading." *Id.* "A statement of opinion does not constitute an 'untrue statement of . . . fact' [even if] the stated opinion ultimately proves incorrect." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 176 (2015) (omission in original).

In *Omnicare*, the Supreme Court rejected a securities fraud claim premised on a pharmacy services provider's statement that it believed its contractual arrangements were lawful despite mounting evidence indicating otherwise. *See id.* at 179–82. The Court reasoned that, even if Omnicare's legal position was "ultimately incorrect"—as appeared likely given the federal

government filed suit against Omnicare alleging that the contracts were illegal kickbacks—it was a statement of opinion and thus not "false" so long as it was "sincerely held." *Id.* at 176; *accord City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.*, 856 F.3d 605, 619 (9th Cir. 2017) (defendants' statements about their compliance with Generally Accepted Accounting Principles were nonactionable opinion under *Omnicare* because the statements were not matters of objective fact); *Hagood v. Sonoma County Water*, 81 F.3d 1465, 1477 (9th Cir. 1996) ("evidence [that] shows only a disputed legal issue [] is not enough to support a reasonable inference" of falsity); *Iafrate v. Angelo Iafrate*, 827 F. App'x 543, 548 (6th Cir. 2020) (a speaker's "subjective interpretation of a contractual provision" does not support a securities fraud claim); *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1297 (11th Cir. 2019) (similar); *Hampton v. root9B Techs.*, 897 F.3d 1291, 1299 (10th Cir. 2018) ("[P]ure statements of opinion … are not material misstatements unless they inaccurately represent the speakers' beliefs." (quotation omitted)). Indeed, even if "there is no reasonable basis for [the speaker's] belief," a statement of opinion is not actionable under *Omnicare* so long as it is genuine. *See Dearborn Heights*, 856 F.3d at 616; *see also, e.g.*, *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 619 (S.D.N.Y. 2017) (similar).

Applying these well-established legal principles, Plaintiffs cannot prove that Musk made untrue statements of fact. At the pleading stage, the Court determined that the only way the May 13 statement could be false is if it suggested that Musk had rights under the Merger Agreement that he did not have. *See* Dkt. No. 48 at 18–20. But even if Plaintiffs can prove that at trial, Musk's statement about his rights under the Merger Agreement would ***still*** not be actionable under *Omnicare* because it is irrelevant whether Musk's legal opinion was "ultimately incorrect" so long as it was "sincerely held." *Omnicare*, 575 U.S. at 176; *see also Hagood*, 81 F.3d at 1477–79 (holding that position taken concerning legal dispute could not be false); *Iafrate*, 827 F. App'x at 548 ("subjective interpretation of a contractual provision" cannot support a securities fraud claim). The evidence at trial will undisputedly show that ***everyone*** on both sides of the transaction (including Twitter's lawyers and CEO) agreed Musk had a right to spam/bot information and that Musk sincerely believed he had a right to the information.

1    With respect to Musk's May 16 statement, the *Omnicare* analysis is even more

2    straightforward. *Omnicare* explains that using phrases like "I think" or "I believe" transforms

3    statements of facts into statements of opinion. *Omnicare*, 575 U.S. at 183–84; *see also In re Philip*

4    *Morris*, 89 F.4th 408, 418 (2d Cir. 2023) ("[T]he [Supreme] Court's point was that language like

5    'we believe' or 'we think' is *sufficient—not necessary*—to render a statement one of opinion rather

6    than fact." (emphasis in original)). Musk's May 16 statement was not that the percentage of bots

7    on Twitter **was exactly 20%**. He was asked "What do you **think**…?" and replied "**I think** it's some

8    number that is probably at least four or five times" Twitter's estimate. Ex. CC at 6:2–11. Musk's

9    May 16 statement is therefore not actionable under *Omnicare*.

10    Finally, for the same reasons, Musk's May 17 statement—which merely reiterated the prior

11    two statements—is also at most a non-actionable statement of opinion about the percentage of bots

12    on Twitter and Musk's contractual rights to related information under the Merger Agreement.

13    **B.    Plaintiffs Cannot Prove Musk Made the Statements with Scienter**

14    Nor will Plaintiffs establish scienter at trial. That is because, if Musk believed his statements

15    were true at the time he made them, there is no scienter as a matter of law, as courts routinely instruct

16    juries in securities fraud class actions. *See, e.g.*, Ex. AA, Final Jury Instructions at 13, *In Re JDS*

17    *Uniphase Corp. Securities Litig.*, 4:02-cv-1486-CW (N.D. Cal. Nov. 19, 2007), Dkt. No. 1874 ("An

18    honest or good faith belief on the part of an Individual Defendant that a statement is true is

19    inconsistent with a finding that he acted with scienter in making that statement."); Ex. BB, Charge

20    to the Jury at 29, Instruction No. 24, *In re Vivendi Universal, S.A. Securities Litig.*, 1:02-c v-5571-

21    PAE (S.D.N.Y. Mar. 26, 2010), Dkt. 1023-6 ("Even if a statement turns out to be false or misleading,

22    it is not fraudulent or deceptive if the defendant had a good faith belief in the truth or accuracy of

23    the statement at the time he made the statement."); *see also Omnicare*, 575 U.S. at 186 (holding

24    allegations that a sincerely held belief turned out to be wrong do not establish securities fraud).

25    Here, Plaintiffs will not be able to show that Musk did not believe what he said. Everyone

26    involved in the deal, including Twitter's executives and lawyers, agreed that Musk was entitled to

27    the information he had requested—and they committed to providing it **before** he made the

28

1    statements.  Musk cannot have intended to mislead the market about his information rights by simply

2    taking the position shared by those on both sides of the transaction.

3        While Plaintiffs plan to point to a supposed financial motive to mislead, that is not sufficient

4    to establish scienter.  *See* Dkt. No. 48 at 29 (explaining that "'a motive to commit fraud and

5    opportunity to do so' is not enough" (quoting *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014)

6    (alteration adopted)).  Instead, Plaintiffs must prove that Musk made the statements at issue with

7    knowledge as to their ***material*** falsity since an intent to make an immaterial false statement does not

8    establish the requisite intent to defraud investors.  *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541,

9    1546 (9th Cir. 1994) (noting "no quarrel" with the following formulation of the scienter element:

10   "the courts have uniformly held inadequate a complaint's general averment of the defendant's

11   'knowledge' of material falsity, unless the complaint also sets forth specific facts that make it

12   reasonable to believe that defendant knew that a statement was materially false or misleading"

13   (*quoting Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir. 1992))), *superseded by statute on*

14   *other grounds*); *GIA-GMI, LLC v. Michener*, 2007 WL 2070280, at *9 (N.D. Cal. July 16, 2007)

15   ("[T]he complaint must set forth specific facts that make it reasonable to believe that defendant[s]

16   knew that a statement was materially false or misleading.'" (quoting *Rhodes v. Omega Research,*

17   *Inc.*, 38 F. Supp. 2d 1353, 1363 (S.D. Fla. 1999))).  Thus, while Plaintiffs have indicated they seek

18   to introduce an abundance of irrelevant and prejudicial evidence to prove Musk's financial motive

19   for the alleged misrepresentations, *see* Dkt. No. 371 at 1–4, that is insufficient as a matter of law to

20   establish scienter.  As Plaintiffs all but concede, they will not be able to establish Musk's scienter

21   any other way.

22       **C.    Plaintiffs Cannot Prove Loss Causation**

23       Likewise, Plaintiffs will be unable to establish loss causation at trial, which is an essential

24   element of their claim.

25       *First*, Plaintiffs' own expert concedes that neither the May 16 nor the May 17 statements

26   caused any decline in Twitter's stock price.  Ex. 297 (Tabak Supp. Rp't) at ¶¶ 16–17; *see also* Ex.

27   A (Tabak Dep. Vol. 1) at 103:25–104:3 (acknowledging that his "only source of damages is from

28   the May 13 tweet").  Plaintiffs now attempt to pivot to an unpleaded "price maintenance" theory for

the May 16 statement and May 17 tweet, but they have not identified any "correction" supporting such a theory.  As the Court ruled, the October 4 announcement could not be read to correct any misstatement about the amount of spam on Twitter, Dkt. No. 48 at 36, and Plaintiffs alleged no news or statement correcting the estimate.  Without a corrective disclosure, Plaintiffs cannot prove loss causation under their so-called "price maintenance" theory as a matter of law.  *See Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 594 U.S. 113, 123 (2021) (noting corrective disclosure typically necessary to prove loss causation in price maintenance case).

    *Second*, Plaintiff's expert Dr. Tabak does not offer any opinion as to how Twitter's stock would have reacted had Musk tweeted what Plaintiffs contend is the truth.  Critically, "[t]he amount of [deflation] caused by a false statement is the difference between the stock price after the false statement and what it *would have been* had the statement reflected the truth."  *Glickenhaus & Co.*, 787 F.3d at 417.  Thus, "the proper question for purposes of our inquiry into price impact is not what might have happened had [the defendant] remained silent, but what would have happened if [he] had spoken truthfully." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (emphasis in original); *see also Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 11 F.4th 138, 141 n.3 (2d Cir. 2021) ("[P]rice inflation is measured by what would have happened if the defendant had told the truth." (citing *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015)).  Because Dr. Tabak has not analyzed the relevant but/for world necessary to establish loss causation, Plaintiffs cannot establish this element as a matter of law.

    *Third*, to prove damages, Plaintiffs must "reasonably distinguish the impact of" the alleged fraud "from other economic factors."  *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1123 (9th Cir. 2013); *Glickenhaus & Co.*, 787 F.3d at 421 ("[T]o prove loss causation, plaintiffs in securities-fraud cases need to isolate the extent to which a decline in stock price is due to fraud-related corrective disclosures and not other factors.").  "[O]ther economic factors" that must be isolated include "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005).  Plaintiffs' expert completely fails to disaggregate the impact

of the market's response to two undoubtedly true pieces of information Musk conveyed: that he had concerns about the merger and the merger might be delayed as a result.

*Fourth*, Plaintiffs "must demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some intervening event." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016). Dr. Tabak's model fails this requirement, too. For example, he attributes Twitter's entire stock price drop on May 13 and May 16 to Musk's "temporarily on hold" Tweet and did not consider any intervening news or information that was released between the tweet and the close of trading on May 16, such as the release of SparkToro's report concluding that nearly 20% of Twitter's users were spam or fake accounts.

Moreover, the bulk of Plaintiffs' alleged losses occurred upon the sale of their shares **after** Musk terminated the merger on July 8, 2022, causing a drop in the price of Twitter stock. But the Court already dismissed "Plaintiffs' claims to the extent they are predicated on" the July 8 and subsequent termination letters. Dkt. No. 48 at 39; *see also id.* at 26-28. Plaintiffs cannot prove that losses incurred after the termination were caused by alleged misrepresentations months earlier.

*Finally*, it is black-letter law that proving loss causation requires more than just pointing to an alleged misstatement and a subsequent price impact. Rather, Plaintiffs must satisfy *Dura*'s requirement that they demonstrate "a causal connection between the material misrepresentation and the loss" with evidence beyond the fact that a stock was bought or sold at inflated or deflated prices. *Dura*, 544 U.S. at 342; *id.* at 347 ("[T]he 'artificially inflated purchase price' is not itself a relevant economic loss."); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (loss causation requires that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security"). Plaintiffs must therefore prove not only a stock drop after the alleged misrepresentations but also a corrective disclosure accompanied by a corresponding stock increase.

*Dura*'s requirement remains applicable in a sellers' class. The "causal connection" requirement demands evidence that the alleged fraud was later corrected and that the stock price responded accordingly. *See In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020) ("To establish loss causation in a fraud-on-the-market case, the plaintiff must show that after

1    purchasing her shares and before selling, the following occurred: (1) the truth became known, and

2    (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or

3    eliminated." (quotations omitted)).   But, although Plaintiffs pleaded only a corrective disclosure

4    theory and conceded that a corrective disclosure was necessary to establish loss causation (Dkt. No.

5    31 (First Amended Complaint) ¶¶ 41, 167–168, 176; Dkt. No. 36 (Pls.' Opp. to Def.'s Mot. to

6    Dismiss) at 18), Plaintiffs have not identified a corresponding increase tied to the revelation of ***the***

7    ***fraud*** (and not some other information).   As a result, there is no basis on which a jury could conclude

8    that any loss was caused by a misrepresentation.   If the stock never rebounds after the correction,

9    then sellers suffered no actionable loss because they could not have sold at a higher price absent the

10   alleged fraud.   Holding otherwise would write-out 10b-5's "proximate cause" requirement and

11   impermissibly "render[] the concept of loss causation meaningless by collapsing it into transaction

12   causation." *Nuveen*, 730 F.3d at 1121.  Here, Plaintiffs will be unable to point to any corrective

13   disclosure.   Musk's October 4, 2022 decision to proceed with the deal revealed nothing about any

14   supposed misstatement in the May 13 tweet (or the other statements), and Plaintiffs' expert does not

15   opine otherwise. Ex. A (Tabak Dep. Vol. 1) at 166:8-168:17 ("I have not done an independent

16   analysis, nor am I giving independent opinion on [whether the October 4, 2022 statement is

17   corrective of the May 13 tweet].").

18   **II.    THE COURT SHOULD REJECT PLAINTIFFS' ATTEMPT TO BROADEN THE**
19   **       CASE   TO   ENCOMPASS   AN   AMORPHOUS   "SCHEME,"   DISMISSED**
     **       STATEMENTS, AND PROTECTED LITIGATION CONDUCT**

20   **A.    Plaintiffs Cannot Pursue a "Scheme" Claim Based on Dismissed Statements**
     **        and Unpled Conduct**

21          Perhaps recognizing that they will be unable to prevail at trial based on the three surviving

22   misstatements in May, Plaintiffs seek to present a claim of an "integrated, months-long scheme."

23   Dkt. No. 372.  But Plaintiffs' description of this claim reveals that it amounts to nothing more than

24   (1) the three alleged misstatements at issue; (2) statements the Court has already dismissed; and (3)

25   attempts to transform scienter allegations into allegations of fraudulent conduct.  Specifically:

26   • Plaintiffs point to Musk's "barrage of tweets during the class period."  Dkt. No. 372 at 2 (citing
27     FAC ¶¶ 26, 28–29, 31, 34; 109, 128–130).

28

- o But the only tweets referenced in the cited paragraphs are (1) the May 13 and 17 tweets that are also alleged misrepresentations, and (2) the May 21 tweets, which the Court has dismissed. *See* Dkt. No. 48 at 25–26 ("Accordingly, the Court concludes that Plaintiffs have not adequately pleaded falsity with respect to the May 21, 2022 tweets."); *id.* at 39 (granting Defendant's motion to dismiss "with respect to Plaintiffs' claims to the extent they are predicated on all other challenged statements").

- • Plaintiffs also identify Musk's "misleading statements about Twitter at the May 16 All-In Summit." Dkt. No. 372 at 2 (citing FAC ¶¶ 120–122).

  - o But the only statement from the May 16 All-In Summit referenced is Musk's statement "that fake and spam accounts make up at least 20% of Twitter's users." FAC ¶ 120. That is one of the three remaining alleged misrepresentations.

- • Plaintiffs now assert as a basis for scheme liability Musk's "insistence on going public with his farcical complaints about the deal instead of contacting Twitter directly to hash things out." Dkt. No. 372 at 2 (citing FAC ¶¶ 33–34, 115, 123).

  - o Yet the cited paragraphs nowhere allege that Musk engaged in fraudulent conduct by "going public with his farcical complaints about the deal instead of contacting Twitter directly to hash things out." Instead, they quote a New York Times article, FAC ¶¶ 33–34, and discuss the May 14, 2022 tweet the Court dismissed, *see* FAC ¶ 115; Dkt. No. 48 at 21–22 ("Accordingly, the Court concludes that Plaintiffs have not adequately pleaded falsity with respect to the May 14, 2022 tweets."); *id.* at 39 (granting Defendant's motion to dismiss "with respect to Plaintiffs' claims to the extent they are predicated on all other challenged statements"). The cited paragraphs otherwise discuss a May 16, 2022 tweet the Court dismissed. *See* FAC ¶ 123; Dkt. No. 48 at 21–22 ("Plaintiffs do not state how Defendant's later tweet from this same day . . . is false or misleading, and the Court concludes that Plaintiffs have not adequately pleaded falsity with regard to this tweet."); *id.* at 39 (granting Defendant's motion to dismiss "with respect to Plaintiffs' claims to the extent they are predicated on all other challenged statements").

- • Plaintiffs point to Musk's supposed "letter-writing campaign falsely claiming that Twitter refused to provide information that was required under the merger agreement." Dkt. No. 372 at 2 (citing FAC ¶¶ 135–149).

  - o The Court has already rejected the letters sent to Twitter as a basis for Plaintiffs' claims. *See* Dkt. No. 48 at 26–28 ("The Court is not convinced that Defendant's entry into a legal dispute with Twitter, and statements made in support thereof, 'create an impression of a state of affairs that differs in a material way from the one that actually exists.'" (quotation omitted)); *id.* at 39 (granting Defendant's motion to dismiss "with respect to Plaintiffs' claims to the extent they are predicated on all other challenged statements"). Moreover, even if the Court had not dismissed the letters, they would be insulated by the *Noerr-Pennington* doctrine. *See Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008) (holding that pre-suit demand letters and notices "fall[] within the protection of the *Noerr-Pennington* doctrine").

- • Plaintiffs seek to premise liability on Musk "sending Twitter 'incendiary' requests designed to be impossible to respond to." Dkt. No. 372 at 2 (citing FAC ¶ 139).

- The cited paragraph, however, makes no reference to such allegations. Instead, it quotes a letter sent to Musk's counsel by Twitter's counsel, in response to one of the data request letters sent by Musk's counsel. That falls under the same umbrella as the letters described above that the Court already rejected. *See* Dkt. No. 48 at 26–28.

- Plaintiffs identify Musk "firing Bob Swan, Musk's financing point person, without replacing him." Dkt. No. 372 at 2 (citing FAC ¶¶ 162–163, 165).

  - But the FAC does not allege this was fraudulent conduct by Musk. Instead, it alleges that this is evidence of scienter. *See* FAC ¶¶ 152–166 (setting out allegations of "Musk's scienter and motive and opportunity to commit fraud"); Dkt. No. 34 at 19 (Defendant's motion to dismiss challenging scienter allegations about Bob Swan); Dkt. No. 48 at 34 (Court's order noting that Plaintiffs' arguments that Defendant firing Bob Swan is evidence of scienter were "tenuous").

- Plaintiffs also point to Musk "sending letters purportedly terminating the deal with no legal basis to do so." Dkt. No. 372 at 2 (citing FAC ¶¶ 8, 37, 140–141, 144–145, 147–149).

  - The Court has already rejected the letters sent to Twitter as a basis for Plaintiffs' claims. *See* Dkt. No. 48 at 26–28 ("The Court is not convinced that Defendant's entry into a legal dispute with Twitter, and statements made in support thereof, 'create an impression of a state of affairs that differs in a material way from the one that actually exists.'" (quotation omitted)); *id.* at 39 (granting Defendant's motion to dismiss "with respect to Plaintiffs' claims to the extent they are predicated on all other challenged statements"). Moreover, even if the Court had not dismissed the letters, they would be insulated by the *Noerr-Pennington* doctrine. *See Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008) (holding that pre-suit demand letters and notices "fall[] within the protection of the *Noerr-Pennington* doctrine"); *see also* Dkt. No. 48 at 39 (noting that the termination letters are "potentially incidental to the Delaware Action" but declining to consider *Noerr-Pennington* because the Court had already rejected the letters as a basis for Plaintiffs' claims).

- Plaintiffs also seek to rely on Musk "hiring data scientists to gin up evidence that Twitter was lying." Dkt. No. 372 (citing FAC ¶¶ 156–157).

  - But the FAC does not allege this was fraudulent conduct by Musk. Instead, it alleges that this is evidence of scienter. *See* FAC ¶¶ 152–166 (setting out allegations of "Musk's scienter and motive and opportunity to commit fraud"); Dkt. No. 48 at 33 (Court's Order discussing these precise allegations as evidence of scienter).

- Plaintiffs indicate scheme liability may be found based on Musk "asserting frivolous defenses and counterclaims in the Delaware Action." Dkt. No. 372 (citing FAC ¶¶ 155–160, 162).

  - The FAC, however, does not allege this was fraudulent conduct by Musk. Instead, it alleges that this is evidence of scienter. *See* FAC ¶¶ 152–166 (setting out allegations of "Musk's scienter and motive and opportunity to commit fraud"); Dkt. No. 34 at 19 (Defendant's motion to dismiss challenging these scienter allegations); Dkt. No. 48 at 33 (Court's order discussing these precise allegations as evidence of scienter). Moreover, even if Plaintiffs had pleaded this conduct as part of a scheme, it would be

insulated by the *Noerr-Pennington* doctrine, as it falls squarely within the realm of litigation conduct. Plaintiffs have not alleged, nor can they prove, that this litigation was (1) "objectively baseless," and (2) that the baseless conduct was motivated by a subjective intent to act unlawfully. *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1094 (9th Cir. 2000); *Oregon Nat. Res. Council v. Mohla*, 944 F.2d 531, 534 (9th Cir. 1991).

- Plaintiffs also point to Musk's "behind-the-scenes attempts at renegotiations." Dkt. No. 372 (citing FAC ¶¶ 169–170).

  o Yet again, the FAC does not allege this was fraudulent conduct by Musk. Instead, it alleges that this is evidence of scienter. *See* FAC ¶¶ 152–166 (setting out allegations of "Musk's scienter and motive and opportunity to commit fraud"). Moreover, even if Plaintiffs had pleaded this conduct as part of a scheme, it would be insulated by the *Noerr-Pennington* doctrine, as it falls squarely within the realm of litigation conduct. *See Gamble v. Kaiser Foundation Health Plan, Inc.*, 348 F. Supp. 3d 1003, 1027 (N.D. Cal. 2018) (holding that allegations that defendants "engaged in unlawful and unreasonable litigation tactics and demanded certain settlement terms" were "directed at the petitioning activity or actions incidental to petitioning activity so as to bring them within the scope of *Noerr-Pennington*"). Plaintiffs have not alleged, nor can they prove, that this litigation was (1) "objectively baseless," and (2) that the baseless conduct was motivated by a subjective intent to act unlawfully. *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1094 (9th Cir. 2000); *Oregon Nat. Res. Council v. Mohla*, 944 F.2d 531, 534 (9th Cir. 1991).

Plaintiffs plainly cannot pursue a "scheme" theory at trial that is based on any of the alleged misrepresentations the Court already dismissed. *See In re AGS, Inc. Sec. Litig.*, 2024 WL 581124, at *5 (D. Nev. Feb. 12, 2024), *aff'd sub nom. Oklahoma Police Pension & Ret. Sys. v. PlayAGS, Inc.*, 2025 WL 927296 (9th Cir. Mar. 27, 2025) ("[I]f a plaintiff's scheme liability claim is based on the same alleged set of facts as its misrepresentation claim, and the court finds that those facts do not sufficiently allege fraud (with the requisite scienter) to sustain the misrepresentation claim, the scheme liability claim necessary fails."); *Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 902 (N.D. Cal. 2022) (Breyer, J) ("PayPal correctly argues that this alleged scheme consists entirely of (and fails for the same reasons as) the misstatements analyzed above."); *In re Stem, Inc. Sec. Litig.*, 2025 WL 3675114, at *11 (N.D. Cal. Dec. 17, 2025) ("[B]y its August 30 Order, the Court dismissed plaintiffs' claim alleging scheme liability to the extent said claim was based on allegedly false or misleading statements, finding plaintiffs failed to plead any such statement violated section 10(b)."). These cases stand for the clear proposition that a scheme claim cannot be based on statements that the Court held Plaintiffs failed to plausibly allege were false or misleading.

To the extent Plaintiffs argue that their scheme claim based on these statements remains viable because the Court did not dismiss it, Plaintiffs are wrong. The Court's Order is clear. It dismisses "Plaintiff's claims to the extent they are predicated on all" challenged statements other than the May 13 tweet, May 16 statement, and May 17 tweet. Dkt. No. 48 at 39. That holding forecloses Plaintiffs from presenting claims at trial predicated on statements or conduct beyond the three statements the Court found actionable.

Plaintiffs' claim that they alleged a scheme involving fraudulent conduct such as "firing Bob Swan," "hiring data scientists," "asserting frivolous defenses and counterclaims in the Delaware Action," and "behind-the-scenes attempts at renegotiation," *see* Dkt. No. 372 at 2, fares no better. As Plaintiffs' citations reveal, each of those allegations were made as evidence of Musk's ***scienter***— not as fraudulent conduct independently or as part of a scheme, *see id.* (citing only paragraphs from the scienter allegations in Plaintiffs' complaint, FAC ¶¶ 152–166). Musk moved to dismiss these allegations and the Court properly considered them only as scienter allegations. *See* Dkt. No. 34 at 18–19; Dkt. No. 48 at 32–34. Plaintiffs' assertion that the FAC incorporated by reference all allegations—including those identified only as supporting scienter—as individual acts of misconduct supporting their so-called scheme fails, too. That would be nothing more than improper "shotgun pleading" designed to deprive Defendant of notice of the claims against him. *E.K. v. Nooksack Valley Sch. Dist.*, 2021 WL 1531004, at *2 (W.D. Wash. Apr. 19, 2021). To allege an act is evidence only of scienter, and later claim the act is independently actionable as part of a "scheme," is misleading at best, and hardly provides notice of the claims.

### B.    Plaintiffs' Scheme Claim Is Inconsistent with Their Class Certification Theory Such that Pursuing It at Trial Will Require Decertification

The Court also should reject Plaintiffs' belated attempt to pursue this "scheme liability" theory of their claim for a separate reason: Plaintiffs did not seek certification of their "scheme" claim during the class certification stage. At the outset, the absence of any reference in Plaintiffs' class certification motion to this so-called scheme is, of course, evidence that Plaintiffs were never pursuing a "scheme" theory at all. But, if Plaintiffs are permitted to pursue a theory that they did not raise at the class certification stage, the class should be decertified. *Mier v. CVS Pharmacy,*

*Inc.*, 2021 WL 6102519, at *2 (C.D. Cal. Nov. 19, 2021) (decertifying class where plaintiffs pursued a liability theory not identified in the class certification motion or pleaded); *Labrador v. Seattle Mortg. Co.*, 2010 WL 3768378, at *6 (N.D. Cal. Sept. 22, 2010) ("The Court notes that if Labrador's theory of liability is ultimately rejected or if Labrador abandons this theory in favor of another theory of liability, there would be grounds for revisiting its class certification determination.").

At class certification, Plaintiffs made clear that they were pursuing a case—and certifying a class—based only on the three May statements. The words "scheme" or "manipulation" appeared nowhere in their briefing. When identifying the "common" "questions of law and fact at issue," Plaintiffs identified only:

> (i) whether Musk's May 13, 2022 tweet that "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users" contained material misrepresentations and omissions concerning the status of the Merger and the Parties' obligations under the Merger Agreement; (ii) whether Musk's May 16, 2022 statements that fake and spam accounts made up at least 20% of Twitter's users were false and misleading; (iii) whether Defendant's May 17, 2022 tweet that the number of fake accounts on Twitter could be "much higher" than 20% and that the deal "cannot move forward" were false and misleading; (iv) whether the alleged ***misrepresentations and omissions*** were material and were made with scienter; and (v) whether Defendant's ***misrepresentations and omissions*** caused Class members' damages.

Dkt. No. 76 at 7 (emphasis added).

There was no reference to any other purported misconduct, including the July 8 termination letter. Nor did Plaintiffs raise even the theoretical possibility that any conduct beyond the three challenged statements supported their claims. Their description of the scienter and loss causation elements referred only to "misrepresentations and omissions." *Id.* Plaintiffs repeated this refrain throughout their class certification motion: "Here, there can be no reasonable dispute that questions of law and fact common to every Class member predominate, including: (i) whether Musk issued false and misleading statements and omissions," (*Id.* at 11); "Class Members' Reliance on Defendants' [sic] Fraudulent Misrepresentations and Omissions is Presumed" (*id.*). Plaintiffs confirmed in their reply brief that they were only pursuing and seeking class certification of their

misstatement claims based on the three May statements. Dkt. No. 102. Again, they made no reference to a scheme or manipulation.

The Court also understood that Plaintiffs claims were limited to Musk's three statements in May. Dkt. No. 106 at 2. In its class certification order, the Court denied Plaintiffs' request to appoint Steve Garrett as a lead class representative because "the evidence does . . . preclude Steve Garrett from establishing reliance on any of Musk's allegedly misleading statements." Dkt. No. 106 at 9. The Court explained that Steve Garrett's claims were atypical of the class because "he sold his shares in July 2022 because Musk said that he was terminating the deal, and he ruled out any other reason for doing so." *Id.* The Court reasoned that the July 8 termination was not one of "Musk's allegedly misleading statements" or an act giving rise to Plaintiffs' claims and thus Steve Garrett could not avail himself of the presumption of class-wide reliance. *Id.* at 10. The Court thus recognized that Plaintiffs *have no claim* arising from or in any way based on the July 8 termination— or any other purported misconduct beyond the three misstatements. If they did, Steve Garrett's claim that he suffered losses when he sold in response to the July 8 termination would not have "sever[ed]" the causal chain. *See id.* And it follows that if Steve Garrett's claim is not subject to class treatment, then any claim arising from any conduct beyond the three alleged misstatements is not either.

In short, Plaintiffs' purported "scheme liability claim" is based on dismissed and unpled conduct that was not encompassed by the Court's class certification order. Fed. R. Civ. P. 23(c)(1)(B) ("An order that certifies a class action must define the class and the class claims, issues"). They cannot pursue it as a class claim or seek class damages for it. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("If respondents prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court."). If they do, decertification should follow. *See, e.g.*, *Mier,* 2021 WL 6102519, at *2

## C.    Plaintiffs' Purported Scheme Claim Is Barred by *Noerr-Pennington*

Even if the Court had not dismissed Plaintiffs' claims based on letters sent by Musk's lawyers leading up to and during litigation (it did), and even if Plaintiffs had pleaded Musk's

1   litigation conduct and settlement discussions constituted fraudulent conduct (they did not), Plaintiffs

2   would still be barred by the *Noerr-Pennington* doctrine from pursuing those claims at trial.

3       As a preliminary matter, Ninth Circuit law is clear that the *Noerr-Pennington* doctrine

4   "stands for a generic rule of statutory construction, applicable to any statutory interpretation that

5   could implicate rights protected by the Petition Clause." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929

6   (9th Cir. 2006). Plaintiffs repeatedly and inexplicably ask this Court to ignore this clear directive,

7   citing only a District of Arizona case that predates *Sosa*'s mandate by over a decade. *See, e.g.*, Dkt.

8   No. 359 at 32 (citing *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp. 1424,

9   1448 (D. Ariz. 1992)); Dkt. 365 at 14 (same); Dkt. No. 372 at 7 (same). Moreover, the reasoning

10  underlying *American Continental* is wrong because *Noerr-Pennington* protects all statements

11  related to litigation so long as the underlying litigation is not a sham—the sham exception itself

12  protects against abuse of this rule of law. *See, e.g.*, *Sosa*, 437 F.3d at 936 ("[T]he established sham

13  exception to the *Noerr-Pennington* doctrine provides adequate protection against baseless claims

14  asserted in prelitigation settlement letters.").

15      Finally, courts have acknowledged that *Noerr-Pennington* applies in the securities fraud

16  context. *See, e.g.*, *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *18 (N.D. Cal. June 2, 2020)

17  (addressing *Noerr-Pennington* argument in 10b-5 action and recognizing that *Noerr-Pennington* has

18  been "extended" outside the antitrust context "to shield false statements in other contexts," and only

19  "declin[ing] to dismiss on this ground at this stage"); *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638,

20  662 (E.D. Va. 2021) (considering *Noerr-Pennington* doctrine at the motion to dismiss stage and

21  holding that it could not be resolved on the face of the complaint because allegations invoked the

22  sham exception).

23      Plaintiffs' reliance on *United States v. Koziol*, 993 F.3d 1160, 1181 (9th Cir. 2021), does not

24  change this conclusion. In that case, the defense "conceded in his closing argument" that the

25  litigation at issue "was objectively baseless," such that failing to give a proper *Noerr-Pennington*

26  instruction was harmless. *Id.* Here, the litigation at issue was legitimate, as both Defendant's

27  lawyers and Plaintiffs' lawyers will testify at trial. Moreover, as Defendant argued at the motion to

28  dismiss stage, Plaintiffs failed to plead sufficient facts to meet the high bar to show that Musk's

litigation conduct was (1) "objectively baseless," and (2) that the baseless conduct was motivated by a subjective intent to act unlawfully. Dkt. No. 34 at 23 (first citing *Manistee Town Ctr.*, 227 F.3d at 1094; then citing *Oregon Nat. Res. Council*, 944 F.2d at 533 (a "heightened level of protection is accorded petitioning activity, necessary to avoid a chilling effect on the exercise of this fundamental First Amendment right" (internal citation and quotation marks omitted and alterations adopted))). At the motion to dismiss stage, the Court declined to address Musk's *Noerr-Pennington* argument as it related to termination letters because it had already rejected Plaintiffs' claims predicated on those letters (and on other litigation conduct). Dkt. No. 48 at 39. Allowing Plaintiffs to re-insert that litigation conduct as a basis for liability at trial, along with unpleaded allegations of fraudulent conduct related to Defendant's positions and counterclaims in the Delaware Action, would run headlong into *Noerr-Pennington*.

*    *    *    *    *

In short, Plaintiffs' scheme claim, when stripped of statements that were dismissed, newly alleged fraudulent conduct that Plaintiffs were aware of but did not plead as part of any scheme, and protected litigation conduct, amounts to nothing more than the May 13 tweet, the May 16 statements at the "All In" conference, and the May 17 tweet—*i.e.*, the three misrepresentations at issue. To prevail on a scheme claim based on those misrepresentations, Plaintiffs must—as a threshold question—prove that the statements were false or misleading. *See, e.g.*, *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 78 (2019) ("Dissemination of ***false or misleading statements*** with intent to defraud can fall within the scope of Rules 10b–5(a) and (c)." (emphasis added)). Thus, any way you slice it, the purported Rule 10b-5(a) and (c) "scheme" claim collapses into the Rule 10b-5(b) misrepresentation claim. If the latter fails, so does the former. Allowing Plaintiffs to present a scheme claim in a manner that suggests otherwise to the jury would be error.

## CONCLUSION

Judgment should be entered in favor of Musk.

DATED:  February 5, 2026

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By _____ /s/ Ellyde R. Thompson _____
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Ellyde R. Thompson
Jesse A. Bernstein
Alex Bergjans

*Attorneys for Defendant Elon Musk*

DEFENDANT'S PRETRIAL BRIEF

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on Thursday, February 5, 2026.

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By _/s/ Alex Bergjans_
    Alex Spiro
    Michael T. Lifrak
    Stephen A. Broome
    Ellyde R. Thompson
    Jesse A. Bernstein
    Alex Bergjans

    *Attorneys for Defendant Elon Musk*

## <u>ATTESTATION</u>

Pursuant to Civil L.R. 5-1, I attest under penalty of perjury that concurrence in the filing of this document has been obtained from the other signatories herein.

By  /s/ Alex Bergjans
        Alex Spiro
        Michael T. Lifrak
        Stephen A. Broome
        Ellyde R. Thompson
        Jesse A. Bernstein
        Alex Bergjans

        *Attorneys for Defendant Elon Musk*