COTCHETT, PITRE & MCCARTHY, LLP
Joseph W. Cotchett (SBN 36324)
*jcotchett@cpmlegal.com*
Mark C. Molumphy (SBN 168009)
*mmolumphy@cpmlegal.com*
Tyson C. Redenbarger (SBN 294424)
*tredenbarger@cpmlegal.com*
Elle D. Lewis (SBN 238329)
*elewis@cpmlegal.com*
Gia Jung (SBN 340160)
*gjung@cpmlegal.com*
Caroline A. Yuen (SBN 354388)
*cyuen@cpmlegal.com*
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
*fbottini@bottinilaw.com*
Aaron P. Arnzen (SBN 218272)
*aarnzen@bottinilaw.com*
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001

*Lead Counsel for Plaintiffs and the Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,

Plaintiff,

vs.

ELON R. MUSK,

Defendant.

Case No. 3:22-CV-05937-CRB

**PLAINTIFFS' TRIAL BRIEF**

Date: February 17, 2026
Time: 2:00 p.m.
Courtroom: 6, 17th Floor
Judge: Hon. Charles R. Breyer

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................ 1

STATEMENT OF THE CASE AND CONTROLLING ISSUES OF LAW ........................................ 1

A. Factual Background ........................................ 2

B. Misstatements ........................................ 5

C. Scheme ........................................ 7

OUTSTANDING ISSUES ........................................ 8

I. TRIAL LIMITATIONS ON ALEX SPIRO SERVING AS ADVOCATE-WITNESS ........................................ 8

II. A PROCESS TO RESOLVE PRIVILEGE-BASED REDACTIONS ........................................ 9

III. VERDICT FORM ........................................ 10

A. Musk Filed An Unauthorized Memorandum in Support of its Verdict Form ........................................ 10

B. Plaintiffs' Proposed Verdict Form Is Appropriate ........................................ 11

C. Musk's Verdict Form is Prejudicial ........................................ 12

D. Plaintiffs Propose Alternative Verdict Forms ........................................ 14

IV. RESOLUTION OF CONFIDENTIALITY DE-DESIGNATIONS ........................................ 14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aeroquip Corp. v. Adams*
203 F.3d 830 (9th Cir. 1999) ... 11

*Basic Inc. v. Levinson*
485 U.S. 224 (1988) ... 6

*Berson v. Applied Signal Tech., Inc.*
527 F.3d 982 (9th Cir. 2008) ... 6

*In re Convergent Techs. Sec. Litig.*
948 F.2d 507 (9th Cir. 1991) ... 13

*Cooper v. Thoratec Corp.*
2018 WL 2117337 (N.D. Cal. May 8, 2018) ... 6, 7

*Desai v. Deutsche Bank Sec. Ltd.*
573 F.3d 931 (9th Cir. 2009) ... 7, 8

*Floyd v. Laws*
929 F.2d 1390 (9th Cir. 1991) ... 11

*G & M, Inc. v. Newbern*
488 F.2d 742 (9th Cir. 1973) ... 11

*Galdamez v. Potter*
415 F.3d 1015 (9th Cir. 2005) ... 13

*Gebhart v. S.E.C.*
595 F.3d 1034 (9th Cir. 2010) ... 5, 6, 13

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*
63 F.4th 747 (9th Cir. 2023) ... 5, 12

*Halliburton Co. v. Erica P. John Fund, Inc.*
573 U.S. 258 (2014) ... 13

*Kamakana v. City & Cnty. of Honolulu*
447 F.3d 1172 (9th Cir. 2006) ... 14

*Knapp v. Ernst & Whinney*
90 F.3d 1431 (9th Cir. 1996) ... 11

*Lorenzo v. Sec. & Exch. Comm'n*
587 U.S. 71 (2019) ... 7

*MKB Constructors v. Am. Zurich Ins. Co.*
2015 WL 1188533 (W.D. Wash. Mar. 16, 2015) .......... 14

*Provenz v. Miller*
102 F.3d 1478 (9th Cir. 1996) .......... 12

*Rabkin v. Lion Biotechnologies, Inc.*
2018 WL 905862 (N.D. Cal. Feb. 15, 2018) .......... 7, 8

*Ready Transp., Inc. v. AAR Mfg., Inc.*
627 F.3d 402 (9th Cir. 2010) .......... 10

*S.E.C. v. Platforms Wireless Int'l Corp.*
617 F.3d 1072 (9th Cir. 2010) .......... 6

*S.E.C. v. Reyes*
491 F. Supp. 2d 906 (N.D. Cal. 2007) .......... 5

*Sec. & Exch. Comm'n v. Panuwat*
2024 WL 4602708 (N.D. Cal. Sept. 9, 2024) .......... 13

*Shetty v. City of Folsom*
2022 WL 2757489 (E.D. Cal. July 14, 2022) .......... 10

*In re Tesla, Inc. Sec. Litig.*
2022 WL 1497559 (N.D. Cal. Apr. 1, 2022) .......... 7, 14

*United States v. Gorski*
2012 WL 12895831 (C.D. Cal. July 9, 2012) .......... 10

*United States v. McGraw-Hill Companies, Inc.*
2014 WL 8662657 (C.D. Cal. Sept. 25, 2014) .......... 10

*In re Vivendi Universal, S.A. Sec. Litig.*
765 F. Supp. 2d 512 (S.D.N.Y. 2011) .......... 11

**Statutes**

17 C.F.R. § 240.10b-5 .......... 1, 7, 11, 14

# INTRODUCTION

This case is being tried to determine whether Elon Musk violated Section 10(b) of the Securities and Exchange Act of 1934 by issuing false and misleading statements and engaging in a fraudulent scheme to artificially depress the price of Twitter, Inc. stock and options in connection with his purchase of Twitter in 2022.

Plaintiffs respectfully submit this trial brief to (1) summarize the key facts, claims and controlling law, and (2) identify some anticipated legal and procedural issues that may require the Court to resolve following the parties' pre-trial motions and good faith meet and confer efforts. Plaintiffs raise these issues in the event the Court desires to discuss and resolve them at the pre-trial conference or on its own, in the Court's discretion. These issues include: (i) appropriate limitations on Alex Spiro's involvement at trial, as contemplated in the Court's December 1, 2025 Order (ECF 320); (ii) a process to resolve challenges to redactions made to trial exhibits by Musk or his trial counsel; (iii) a process to determine an appropriate verdict form, including Plaintiffs' response to Musk's unauthorized memorandum in support of his proposed verdict form; and (iv) a process to resolve sweeping confidentiality designations made to trial exhibits, mostly by third parties.

# STATEMENT OF THE CASE AND CONTROLLING ISSUES OF LAW

Plaintiffs bring claims against Defendant Elon Musk for scheme and misstatement liability under each provision of 17 C.F.R. § 240.10b-5, which provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

Plaintiffs will show at trial that Musk made materially false and misleading statements on May 13, 16, and 17, and engaged in a fraudulent scheme from May 13 through October 3, 2022 to artificially depress the price of Twitter stock and options. A summary of the claims with the supporting controlling law is provided below.

**A. Factual Background**

Musk, a long-time and highly influential user of Twitter, Inc.'s eponymous social media platform, directed his broker to secretly purchase (in small lots, during a lengthy period, in order to avoid public detection) approximately 9.2% of the company's stock (more than 72 million shares) for $3.96 billion from January 31 through April 1, 2022. On April 4, 2022, Musk finally disclosed his massive stake in Twitter and, unsurprisingly given his position, the market value of Twitter's stock immediately ***jumped 27%*** on the disclosure. The episode confirmed, in the event there was any doubt, that Musk's conduct with respect to Twitter would, and did, directly impact the price of Twitter's stock. Musk's conduct also violated the federal securities laws—and saved himself many millions of dollars—by failing to disclose his position when it crossed the 5% threshold, as required by federal rules, and Musk was questioned under oath by the SEC concerning his Twitter activity on several sessions.

Twitter's board of directors, after learning of Musk's large holdings, invited him to join the board. On April 5, Musk accepted the invitation. However, just days later, after an in-person meeting with Twitter's CEO, Parag Agrawal, and Chairman, Bret Taylor, where Musk openly boasted of his thoughts to form a competitor to Twitter, Musk suddenly rejected the invitation to join Twitter's board and instead informed them that he was going to make an offer to purchase all of Twitter's shares and take the corporation private. Twitter was not for sale and had not solicited any offer; rather, Musk's offer literally came out of the blue to Twitter's board. While Musk has stated that he sought to buy Twitter to advance free speech, the evidence will show that he expected to make a huge profit on the deal.

Just two days later, on April 11, Musk met with his bankers who presented a range of prices to offer, from $45 to $65 per share. Musk decided on a $54.20 offer price, meaning that all Twitter shareholders (save those who rolled their money into Musk's post-merger, private company) would

receive $54.20 for each share of stock they held when the transaction closed. This $54.20 represented a large premium over the price of Twitter stock and was intended to make the offer more desirable to Twitter. Musk conveyed the offer to Twitter on April 13 and publicly disclosed his proposal on April 14.

At the time, as a public company, Twitter made regular SEC filings about its operations and financial condition. Twitter was very open about its user metrics, including the presence of fake and spam accounts. Its SEC filings regularly described the company's efforts to identify and exclude spam accounts from its platform. While spam accounts are extremely difficult to identify, Twitter devoted substantial resources to the effort, and its SEC filings estimated that fake and spam accounts constituted less than 5% of the platform's monetizable daily active users ("mDAU"). However, even this disclosure was heavily qualified, given the judgment necessary to identify spam, noting that Twitter "applied significant judgment, so our estimation of false or spam accounts may not accurately represent the actual number of such accounts, and the actual number of false or spam accounts could be higher than we have estimated."

Musk claims he read Twitter's SEC filings, including the qualified mDAU estimates, prior to offering to buy Twitter. Far from influencing his decision, Musk viewed the opportunity to reduce spam and fake accounts as one of the very reasons to take Twitter private. Musk was very familiar with Twitter's platform and was its largest individual user with millions of followers. As a result of his large follower base, Musk was frequently targeted with unwanted activity by spam or fake accounts that used Musk's account to disseminate unwanted information or sell products. Musk frequently tweeted about the number of spam accounts on his feed, and when Musk finally went public with his intention to purchase Twitter, he boasted of the opportunity to reduce spam accounts. He believed that spam accounts were so prevalent that he could only make the necessary changes at Twitter to remove them if it was private, since public investors could not stomach the needed long-term fixes.

Accordingly, on April 21, just a week after his initial offer, and having received no response from Twitter, Musk announced that he was improving his initial offer. His bankers at Morgan Stanley called this a "jujitsu" strategy, initially withholding and then later presenting their best offer with a

short fuse, all designed to exert maximum pressure on Twitter's board to accept the offer. Realizing Twitter's reticence to accept a deal that gave a buyer like Musk the opportunity to pull out later, resulting in substantial harm to Twitter and its shareholders, Musk's team opted to remove all contingencies. Indeed, Musk's letter to Twitter touted his new offer as "seller friendly" and boasted that it was "no longer subject to financing" and "***no longer subject to business due diligence***." Musk's SEC filing also disclosed that he already had financing commitments in place to fund the deal, including an equity commitment and $25.5 billion in debt commitments from various lenders. The debt commitments included $12.5 billion in margin loans, the viability of which depended heavily on the value of Musk's Tesla stock.

Plaintiffs will present evidence that Musk's unsolicited "seller friendly" offer, waiving due diligence and removing contingencies, were part of a sophisticated and deliberately crafted strategy to convince Twitter to accept the deal.

On April 24, Musk delivered a draft merger agreement and cover letter to Twitter's Chairman. Musk also tweeted that, if Twitter rejected his offer, he was prepared to launch tender offer, *i.e.*, an offer made directly to Twitter shareholders with ***absolutely no rights to access non-public information***. The deal teams worked over the weekend, as Twitter negotiated a few more concessions from Musk, and the parties executed the Agreement on April 25.

There was no immediate timeline to close the deal; rather, the parties contemplated it would take several months to finalize and obtain shareholder approval. On May 6, Musk attended the first in-person meeting at Twitter's headquarters in San Francisco. It would turn out to be Musk's one and only visit to Twitter before the deal closed. This introductory session was meant to exchange high-level ideas and identify processes to facilitate the merger process, including investors. Twitter CEO Agrawal and CFO Ned Segal attended, and spoke directly to Musk, the head of Musk's family office, Jared Birchall, his lead attorney Alex Spiro, and a well-attended team of additional Musk attorneys and bankers. Musk now focuses on this meeting as the point he "discovered" that Twitter was engaging in a massive fraud; the evidence will paint an entirely different picture.

The evidence will also show that, at this time, several economic factors were causing financial concern for Musk. First, Musk was alarmed about the impact that ongoing and anticipated global

geopolitical conflicts could have on business. At the same time, Tesla's stock price was on the skids. On May 12, the stock closed at $699.23 per share, down 31.9% from the $1,028.10 closing price on the day before Musk's April 20 offer. Because the financing of the deal was largely dependent on Tesla stock, this drop made Musk's acquisition far more expensive. Further, Musk hadn't gotten as much traction from co-investors as he anticipated. ***As of the evening of May 12, Musk was going to have to use up to $16.1 billion more of his own money to close the deal*** (on top of the $3.96 billion he had already spent from January 31 through April 1). The evidence will show that, following the May 6 meeting at Twitter headquarters, Musk was already considering a different price for the Twitter deal.

**B. Misstatements**

"A statement is false or misleading if it "directly contradict[s] what the defendant knew at that time" or "omits material information." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023) (cleaned up). "The law assesses the materiality of a misrepresentation at the time it is made, not after intervening events or remedial action have rendered it harmless." *S.E.C. v. Reye*s, 491 F. Supp. 2d 906, 910 (N.D. Cal. 2007).

During the early morning hours of May 13, Musk initiated a campaign designed to drive down the price of Twitter shares in order to try to escape or renegotiate the deal.

At 2:44 a.m., Musk tweeted: "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users." Musk's "deal on hold" tweet caused immediate panic that the deal was in jeopardy—including panic within Musk's own camp. The evidence will show that Musk knew that investors were relying on his tweets and that the market would move on his statements. Musk was—at the very least—consciously aware that he "lacked sufficient information for [his] statements." *Gebhart v. S.E.C.*, 595 F.3d 1034, 1042-43 (9th Cir. 2010). Indeed, the market reacted very strongly to Musk's tweet in part due to the unusual circumstances surrounding this acquisition. In particular, it was very unusual for a buyer to make a disruptive ***public*** statement like this instead of communicating directly with one's merger partner. All told, Twitter's stock dropped by 17.85% over two trading days after Musk posted his "deal on hold" tweet. The May 13 tweet was undoubtedly material because news that the deal was supposedly

on hold "significantly altered the total mix of information" available to investors. *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988). Contrary to Musk's tweet, Twitter was not withholding any "details" from Musk, nor was he even entitled to them having waived due diligence. The deal was also not on hold, and Musk's entire team continued to work on the deal. The May 13 tweet was false and misleading because it clearly created an "impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008); *see also S.E.C. v. Platforms Wireless Int'l Corp.,* 617 F.3d 1072, 1094-99 (9th Cir. 2010).

After May 13, Musk continued to disparage Twitter and make public comments over the weekend designed to create uncertainty. On May 16, Musk appeared via Zoom at the All-In Summit technology conference in Miami and made the following statement about Twitter's estimate of 5% fake/spam accounts:

> I think it's some number that is probably at least four or five times that number, I'd say. If you did the lowest estimate would be probably 20% and this is a bunch of quite smart outside firms [who have] done analysis of Twitter and looked at the daily users.

The evidence will show that Musk had no factual basis for this 20% assertion. The May 16 statement is straightforwardly "an absolute and unequivocal falsehood." *Platforms Wireless*, 617 F.3d at 1094-95. Musk knew he had no basis—he was consciously aware that he "lacked sufficient information for [his] statements." *Gebhart,* 595 F.3d at 1042-43. Like Musk's May 13 tweet, this statement disrupted the market for Twitter securities. As Musk intended, his May 16 statement maintained the artificial deflation of Twitter's stock price and perpetuated the large gap between the $54.20 merger price and the market's May 16 closing price of $37.39. *Cooper v. Thoratec Corp.*, 2018 WL 2117337, at *4 (N.D. Cal. May 8, 2018) ("this misrepresentation prolonged the artificial inflation of Thoratec's stock price.").

On May 17, 2022, Musk posted another tweet that amplified his May 13 tweet and May 16 statements: "20% fake/spam accounts, while 4 times what Twitter claims, could be *much* higher. My offer was based on Twitter's SEC filings being accurate. Yesterday, Twitter's CEO publicly refused to show proof of <5%. This deal cannot move forward until he does." However, Musk had not put the deal on hold and had no right to. Musk had no basis to state that "20%" of Twitter's

mDAU were spam, nor that it was "4 times" higher than what Twitter represented in its filings. Musk had no basis to state that Twitter's CEO was refusing to provide anything. Indeed, the evidence will show that Musk did not even care about Twitter's methods to estimate spam and had already initiated his own process. When Twitter delivered a detailed written explanation of its estimation process on May 21, Musk disregarded it. All told, Musk's purported interest in Twitter's spam calculations was just a pretext for getting out of the deal or renegotiating a lower price. "[W]hen a "defendant is aware of the facts that made the statement misleading, 'he cannot ignore the facts and plead ignorance of the risk' of misleading others." *In re Tesla, Inc. Sec. Litig.*, 2022 WL 1497559, at *15 (N.D. Cal. Apr. 1, 2022) (quoting *Platforms Wireless*, 617 F.3d at 1094).

The May 17 tweet also maintained Twitter stock's artificially deflated price, as well as the significant gap between the merger price ($54.20) and market price at close on May 17 ($38.32). *Cooper,* 2018 WL 2117337, at *4.

**C. Scheme**

In connection with his false statements, Musk engaged in manipulative conduct constituting a fraudulent scheme to keep Twitter's stock price artificially depressed. *Desai v. Deutsche Bank Sec. Ltd.,* 573 F.3d 931, 940–41 (9th Cir. 2009) ("Manipulative conduct…is actionable under Rule 10b–5(a) or (c) and includes activities designed to affect the price of a security") (*citing Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476-77 (1977)); *Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at *16 (N.D. Cal. Feb. 15, 2018) ("to state a claim for securities fraud based on scheme liability, a plaintiff must allege: (1) the defendant committed a deceptive or manipulative act in furtherance of the alleged scheme"); *Lorenzo v. Sec. & Exch. Comm'n,* 587 U.S. 71, 78-79, (2019) (Provisions of Rule 10b-5(a)-(c) "capture a wide range of conduct").

Throughout the summer of 2022, Musk and his team continued to engage in conduct designed to depress Twitter's stock price, including bombarding Twitter with improper requests for information beyond what he was entitled to and had waived the right to ask for. Musk's unreasonable information requests were designed to be unanswerable and, in turn, support a false claim that Twitter had breached the agreement. Musk also ignored information provided by Twitter to further support this claim. Meanwhile, Musk was having his lawyers "paper" a breach by falsely or unreasonably

claiming that Twitter was refusing to provide information that Musk claimed he was entitled to.

On July 8, Musk delivered a letter to Twitter purporting to terminate the merger, despite understanding that there was no basis for doing so. In response to the termination letter, Twitter brought suit in the Delaware Court of Chancery for specific performance. Musk counterclaimed, taking unsupported and changing positions in the Delaware litigation, all the while trying to renegotiate a lower deal price. Meanwhile, none of Musk's true intentions or actions were being disclosed to the public. *Desai v. Deutsche Bank Sec. Ltd.,* 573 F.3d 931, 941 (9th Cir. 2009) ("manipulative schemes…usually remain undisclosed to the general public"). Instead, Musk continued to Tweet negatively about the Twitter deal, keeping his falsehoods in the public eye and providing the market with the continued false impression that Musk had the right to certain information, Twitter was breaching the agreement, and the deal would not go through. *Rabkin v. Lion Biotechnologies, Inc.,* 2018 WL 905862, at *17 (N.D. Cal. Feb. 15, 2018) (conduct intended to affect stock price includes acts that "are closely connected to the alleged misrepresentations and omissions" even where "the alleged conduct was not disclosed until the alleged scheme unraveled").

Shortly before the Delaware trial was to commence, Musk fully capitulated and publicly disclosed on October 4 that he would proceed with the merger at the original $54.20 per share price, revealing to the market that he had no basis for his statements or actions.

## <u>OUTSTANDING ISSUES</u>

### I. TRIAL LIMITATIONS ON ALEX SPIRO SERVING AS ADVOCATE-WITNESS

Alex Spiro is both Musk's lead trial counsel in this case and a percipient witness to the underlying transaction, previously serving as Musk's personal attorney and the primary liaison with his deal team of lawyers, bankers, and data scientists. *See* ECF 320 at 1. As the Court will recall, in September 2025, Plaintiffs moved to disqualify Spiro as trial counsel based on the advocate-witness rule. ECF 295; 305. Musk opposed. ECF 300. On November 24, 2025, the Court heard oral argument on the motion. At oral argument, the Court expressed concern over having an attorney representing a party in court in front of a jury in a case in which the attorney is a witness. In response, Musk's counsel agreed to safeguards and procedures to reassure Plaintiffs and the Court that Spiro

could conduct his dual role appropriately. The Court subsequently denied Plaintiffs' motion to disqualify. ECF 320. However, in denying Plaintiffs' motion, the Court stated:

> [J]ust because Plaintiffs fail to make this heightened showing does not mean they make invalid points. The Court and the parties can take steps to limit the risk of prejudice. The Court has the ability "to control counsel's questioning and argument" to ensure Spiro conducts his dual role appropriately. *Geringer*, 94 Cal. App. 5th at 825. The Court can also provide limiting instructions to the jury, as needed. As for the parties, Musk has suggested that other trial counsel can cross-examine witnesses that Plaintiffs believe have a high risk of conflict. Opp'n at 10. Such negotiation and compromise are reasonable and expected by the Court.

ECF 320 at 5 (emphasis added).

Pursuant to the Court's order, Plaintiffs made a proposal that tracked Musk's safeguards to mitigate concerns of Spiro acting as an advocate-witness. Declaration of Tyson C. Redenbarger filed herewith ("Redenbarger Decl.") at ¶2. Specifically, Plaintiffs proposed that Spiro be precluded from (1) examining six witnesses (of the dozens designated by both sides) with whom Spiro had direct and important interactions, and (2) giving closing arguments, given the risk that Spiro would argue his own credibility or the credibility of evidence he presented. *Id.*

The six identified witnesses are Musk, Birchall, Agrawal, Segal, Armstrong, and Ringler. *Id.* Other possible safeguards suggested at the hearing—tailored jury instructions and this Court's ability to admonish Spiro for veering off-course—are also subject to continuing discussion between the parties, though seem more appropriate as the trial proceeds as needed.

At the time of submitting this trial brief, Musk has not yet responded to Plaintiffs' proposal. *Id.* at ¶3. In the event the parties are unable to reach an agreement on appropriate safeguards by the pre-trial conference on February 17, 2026, Plaintiffs intend to seek the Court's resolution prior to trial.

## II. A PROCESS TO RESOLVE PRIVILEGE-BASED REDACTIONS

In motions *in limine*, Plaintiffs raised the issue of improperly-redacted communications between Musk's deal team, including attorney-client privilege-based redactions to communications with Musk's third-party data scientists hired to perform various expert analyses of Twitter's spam/fake accounts. Plaintiffs have requested that data scientists be precluded from testifying or, in the event Musk intends to rely on them to show that his actions were reasonable, to order that they be

produced in unredacted form to enable Plaintiffs to fairly assess and rebut Musk's claims. *United States v. McGraw-Hill Companies, Inc.*, 2014 WL 8662657, at *4 (C.D. Cal. Sept. 25, 2014) ("unilateral redactions are inappropriate if they seek not to protect sensitive or protected information, but merely to keep non-responsive information out of an adversary's hands.").

In addition, as a matter of trial process, Plaintiffs anticipate using other trial exhibits—designated by both sides on their respective exhibit lists—containing significant redactions based on privilege. Musk, through his own company, X Corp., has also threatened to intervene in this action to affirmatively object during trial testimony to examination that he claims will reveal Twitter's privileged communications. Depending on the Court's resolution of the motion to intervene, Plaintiffs may request guidance from the Court on a fair and non-disruptive process to appropriately resolve any disputed redaction and privilege issues raised during trial.

## III.   VERDICT FORM

### A.   Musk Filed An Unauthorized Memorandum in Support of its Verdict Form

Without permission from the Court, Musk filed a Memorandum of Law in Support of His Proposed Verdict Form, ECF 367 ("Verdict Memo"). The filing is not provided in the Court's Guidelines for Trial and Final Pretrial Conference (ECF 195) or any other federal or local rule and should be disregarded by the Court. *Shetty v. City of Folsom*, 2022 WL 2757489, at *3 (E.D. Cal. July 14, 2022), *aff'd*, 2023 WL 7101932 (9th Cir. Oct. 27, 2023) (Court did not consider improper filing); *Ready Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 404 (9th Cir. 2010) (finding district courts have inherent powers to control their dockets including striking improper filings). Musk cites no authority allowing him to file such a brief and did not request Court permission to do so. *See United States v. Gorski*, 2012 WL 12895831, at *2 (C.D. Cal. July 9, 2012) ("That the Court will not consider a party's arguments is precisely the risk a party takes in violating the Local Rules. If Defendant wanted to ensure that the Court consider all the arguments in his reply, he should have filed it in compliance with the Local Rules or asked the Court's permission in advance.")

Nor did Musk raise his intent to file such a memorandum at any time during the Parties' correspondence or multiple meet and confers regarding the pretrial filings, effectively sandbagging Plaintiffs. Redenbarger Decl. at ¶4. Indeed, the Verdict Memo was filed on January 27, 2026, at

10:44 PST, after the Parties had filed all their other agreed-to or contemplated pre-trial filings. ECF 367. This gave Musk a tactical advantage by preventing Plaintiffs from drafting or filing a mutual separate memorandum in support of their own verdict form by the midnight deadline, as each party did for their proposed jury instructions.

While the final verdict form is typically finalized later in the trial process, and Plaintiffs strongly prefer deferring this issue to try to resolve their issues with the benefit of trial testimony, Plaintiffs briefly summarize their positions below in the event the Court wants to resolve such issues at this pre-trial stage. Plaintiffs also attached two proposed special verdict forms that serve as a possible compromise of the parties' original competing forms. Redenbarger Decl. Ex. A and B.

**B. Plaintiffs' Proposed Verdict Form Is Appropriate**

Courts regularly approve general verdict forms, with damages special interrogatories, in securities cases. *Knapp v. Ernst & Whinney*, 90 F.3d 1431, 1441 (9th Cir. 1996) (upholding general verdict in 10b-5 case); *G & M, Inc. v. Newbern*, 488 F.2d 742, 745 (9th Cir. 1973) (upholding a general verdict for violations of securities laws and breach of contractual warranties); *see also* Redenbarger Decl. Ex. C, Court's Proposed Verdict Form, *In re Tesla Sec. Litig.*, 18-cv-04865 ECF 585 ("as the Court has previously explained, it generally prefers to use a general verdict form where appropriate to do so for clarity and the sake of simplicity). Courts in other securities class actions—including this Court—have previously used general verdict forms to decide liability. Redenbarger Decl. Exs. D-F (general verdict forms used in securities cases).

"As a general rule, the court has complete discretion over whether to have the jury return a special verdict or a general verdict." *Floyd v. Laws*, 929 F.2d 1390, 1395 (9th Cir. 1991) (citations omitted). Verdicts are also considered with the context of the jury instructions. *Aeroquip Corp. v. Adams*, 203 F.3d 830 (9th Cir. 1999). Because the jury will be given detailed instructions on each element of Plaintiffs' securities claims, they need not make separate findings on an element-by-element basis. *See In re Vivendi Universal, S.A. Sec. Litig*., 765 F. Supp. 2d 512, 580 (S.D.N.Y. 2011) (rejecting argument that the jury should have been required to "check separate boxes" for each element of plaintiffs' Section 10(b) claim because "the Court made clear" that the jury was "required to find each element of a Section 10(b) violation against a particular defendant in order to find against

that defendant”); *see also* Redenbarger Decl. Exs. D-F.

**C. Musk’s Verdict Form is Prejudicial**

Conversely, Musk’s lengthy and convoluted verdict form seems designed to overwhelm the jury and greatly increases the risk of jury confusion by creating unnecessary deliberations and sub-deliberations.

As an initial matter, to the extent Musk’s proposed verdict form purports to address each claim for liability, it fails to contemplate Plaintiffs’ scheme liability claim. Despite raising and losing the argument that Plaintiffs failed to plead a scheme claim at summary judgment (ECF 302), Musk obstinately and improperly refuses to acknowledge that Plaintiffs scheme claim will be part of trial and has made this issue the subject of briefing throughout the Parties’ pretrial motions. *See e.g.,* ECF 342 (Musk’s Motion *in Limine* 4); ECF 343 (Musk’s Motion *in Limine* 5); ECF 358 (Joint [Proposed] Pretrial Order); ECF 359 (Joint [Proposed] Jury Instructions); ECF 366 (Musk’s Memorandum of Law in Support of Defendant’s Disputed Jury Instructions); ECF 365 (Memorandum of Law in Support of Plaintiffs’ Proposed Jury Instructions). If each basis for liability is laid out in the final verdict form, it must include scheme liability in addition to each of the three active misstatements.

As to Musk’s proposed first question, the jury can find liability where the statement was untrue or misleading because it omits material information. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023) (“[a] statement is false or misleading if it directly contradict[s] what the defendant knew at that time or omits material information”) (internal quotes and citations omitted). Both should be included.

As to the proposed second question, the approved Ninth Circuit Model Civil Jury Instruction 18.2 asks if “defendant made an untrue statement of material fact.” *See* ECF 359, Joint [Proposed] Jury Instructions. Musk’s proposal to ask the jury “[d]id the Plaintiffs prove that Statement 1 was materially false” conflates materiality with falsity. *See Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996) (“Materiality is established by ‘showing that a reasonable shareholder would consider the misrepresentation or omission important, because it altered the total mix of available information.’”); Ninth Circuit Manual of Model Civil Jury Instructions 18.3 (Materiality) (“A factual representation concerning a security is material if there is a substantial likelihood a reasonable investor would

consider the fact important in deciding whether to buy or sell that security").

Musk's proposed third question impermissibly raises the required burden of proof for scienter. *Gebhart v. S.E.C.*, 595 F.3d 1034, 1041 (9th Cir. 2010) ("Scienter may be established…by showing that the defendants knew their statements were false, or by showing that defendants were reckless as to the truth or falsity of their statements") (citations omitted). Musk would require the jury to decide if Musk made each statement "with the intent to defraud and actual knowledge that it was materially false." ECF 360. This is not the law, has been rejected, and should be rejected here. *See Sec. & Exch. Comm'n v. Panuwat,* 2024 WL 4602708, at *8 (N.D. Cal. Sept. 9, 2024) (denying arguments that the court lowered the burden by including "recklessly" and omitting the addition of "intent to defraud"); *Sec. & Exch. Comm'n v. Panuwat*, 2024 WL 4602708, at *9 (N.D. Cal. Sept. 9, 2024) (rejecting defendant's proposal "to include an 'intent to defraud' element").

Musk's proposed questions on reliance apply the wrong standard to this class action. Plaintiffs are properly invoking the fraud-on-the-market presumption. ECF 106 at 8, September 27, 2024 Order Granting Class Certification, ("class-wide reliance is presumed"); *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 n.2 (9th Cir. 1991) (holding that in a fraud-in-the-market case the plaintiffs "need only show that they relied on the integrity of the price of the stock as established by the market, which in turn is influenced by information or the lack of it"). The only *Halliburton* factor that requires an independent finding by the jury is that of market efficiency. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014). The first two *Halliburton* factors—i.e., "(1) that the alleged misrepresentations were publicly known," and "(2) that they were material"—are directly subsumed within Plaintiffs' affirmative element of falsity, and there is no reason to pose this question to the jury multiple times and risk juror confusion or an inconsistent verdict. *Id*. The fourth *Halliburton* factor—"(4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed"—is not disputed. *Id.*

Finally, Musk's proposed verdict form is overly complicated and confusing, with overlapping questions and language that deviates substantially from the model jury instructions. *See Galdamez v. Potter*, 415 F.3d 1015, 1026 n.9 (9th Cir. 2005) (refusing to use a special verdict form where it "is unlikely to be illuminating, and in many cases may mislead or confuse the jury or otherwise lead to

error."); *MKB Constructors v. Am. Zurich Ins. Co.*, 2015 WL 1188533, at *29 (W.D. Wash. Mar. 16, 2015), *aff'd*, 711 F. App'x 834 (9th Cir. 2017) (no error where the court refused to adopt a "elaborate, confusing, and slanted special verdict form in favor a simpler form for the jury.").

**D. Plaintiffs Propose Alternative Verdict Forms**

In an effort to bridge the gap, Plaintiffs prepared two alternative verdict forms premised on (1) special interrogatories tracking the elements of Plaintiffs' claims and the Ninth Circuit's model instructions and (2) the various instruction forms attached to Musk's Verdict Memo. Redenbarger Decl. Exs. A and B; s*ee, e.g.* 17 C.F.R. 240.10b-5; Ninth Circuit Manual of Model Civil Jury Instructions 18.2 (Rule 10b-5 Claim); ECF 367-5 (*In re Clarent Corp. Sec. Litig.* Verdict Form); ECF 367-7 (*In re Longtop* Verdict Form); ECF 367-8 (*Hsu v. Puma* Verdict Form); ECF 367-9 (*In re Tesla* Verdict Form); Redenbarger Decl. Exs. D-F.

## IV. RESOLUTION OF CONFIDENTIALITY DE-DESIGNATIONS

The Parties are meeting and conferring and expect to agree on the de-designation of all documents that have been designated confidential in this case by Musk, as well as third parties, with limited exceptions. Redenbarger Decl. at ¶11. However, in the event that the parties and third parties are unable to fully resolve this issue, Plaintiffs intend to ask the Court to order Musk, Twitter, and any third-parties to review and justify or remove any confidentiality designation. *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1181 (9th Cir. 2006).

Dated: February 5, 2026

Respectfully submitted,

**COTCHETT, PITRE & MCCARTHY, LLP**
Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
Tyson C. Redenbarger (SBN 294424)
Elle D. Lewis (SBN 238329)
Gia Jung (SBN 340160)
Caroline A. Yuen (SBN 354388)

*/s/ Tyson C. Redenbarger*
Tyson C. Redenbarger

San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
Aaron P. Arnzen (SBN 218272)

*/s/ Aaron P. Arnzen*
Aaron P. Arnzen

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Tyson C. Redenbarger, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 5th day of February, 2026, at Burlingame, California.

*/s/ Tyson C. Redenbarger*
Tyson C. Redenbarger