IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, et al.,<br><br>   Plaintiffs,<br><br>   v.<br><br>ELON MUSK,<br><br>   Defendant. | Case No. 22-cv-05937-CRB<br><br>**ORDER DENYING EX PARTE MOTION TO CONTINUE TRIAL, MOTION FOR CERTIFICATION, AND MOTION TO REOPEN CLASS CERTIFICATION** |

Seven days before trial, Musk asked this Court for a continuance on an issue that, frankly, should have been raised on his motion to dismiss. Musk takes issue with Plaintiffs' "scheme" liability claim because he believes it is barred by the Noerr-Pennington doctrine and insufficiently pleaded. Indeed, Musk has filed a series of motions premised on these grounds: the aforementioned motion for a continuance (dkt. 446), a motion to reopen class certification (dkt. 429), and a motion for certification for interlocutory appeal (dkt. 448). At the pretrial conference, the Court instructed the parties that scheme liability would be permitted but allowed supplemental briefing on Musk's fourth motion in limine on the topic, based on Musk's request for reconsideration. In this Order, the Court addresses the core arguments underpinning each of Musk's motions and **DENIES** all of them.[1]

### A.   Noerr-Pennington

For starters, Musk cannot seek refuge under the Noerr-Pennington immunity doctrine. Musk represents that the "inclusion of [his] conduct within the scheme" is "an

---

[1] The Court presumes familiarity with the factual background and applicable law. The Court also finds this matter suitable for resolution without oral argument under Civil Local Rule 7-1(b).

issue of first impression." Dkt. 448 at 7. Musk is wrong. The Ninth Circuit has already spoken on this issue—over four decades ago. The Ninth Circuit has squarely held that when "petitioning activity is but a part of a larger overall scheme to restrain trade, there is no overall immunity." Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240, 1263 (9th Cir. 1982). The court explained that a violation "does not enjoy immunity simply because an element of that violation involves an action which itself is not illegal." Id. The court was clear that it was "acting consistently with the theoretical underpinnings of the Noerr doctrine." Id. And Clipper Exxpress remains good law. See, e.g., Alvarado v. W. Range Ass'n, No. 3:22-CV-00249- MMD-CLB, 2023 WL 4534624, at *4 (D. Nev. Mar. 21, 2023) (finding that Noerr-Pennington immunity did not apply under Clipper Exxpress); Databricks, Inc. v. Weisfield, No. C24-1417JLR, 2025 WL 3785324, at *8 (W.D. Wash. Mar. 14, 2025) (recognizing the "Clipper exception").

Like in Clipper Exxpress, Plaintiffs are "not challenging merely the petitioning activity" but Musk's "entire course of conduct." Clipper Exxpress, 690 F.2d at 1265. The Court sees no reason why the Clipper exception would not apply in this securities context, when Musk seeks to invoke the Noerr-Pennington doctrine—which itself originated in antitrust law—to this case.

Musk's argument to the contrary is unavailing. He asserts that his position is entirely consistent with Clipper Exxpress because he is "not contending that Noerr-Pennington bars Plaintiffs' scheme liability claim in its entirety because the purported scheme encompasses protected conduct."[2] Dkt. 453 at 4. Instead, he characterizes his argument as limited to excluding evidence of the petitioning activity at trial, something he states is "squarely within the holding of Clipper." Id. But Clipper Exxpress does not stretch Noerr-Pennington so far. Musk's reading of the case would turn the holding on its head. The Clipper Exxpress court never said evidence of petitioning activity must be

---

[2] The Court notes that Musk's request in his motion in limine functionally asks for dismissal of Plaintiffs' scheme claim: "Defendant respectfully requests that the Court limit Plaintiffs' claim to the May 13 Tweet, May 16 statement, and May 17 Tweet." Dkt. 342 at 7. Limiting the case to just the three alleged misstatements essentially neuters the scheme claim.

2

excluded. To the contrary, the court reasoned that Noerr-Pennington is no obstacle where, as here, petitioning activity is just a part of the overall scheme. Clipper Exxpress, 690 F.2d at 1265 (Clipper "stated a claim for relief as a matter of law" by establishing that the "conspiracy was in part enforced by protests to the ICC."). In short, "[t]he reach of the Noerr-Pennington doctrine is not that extensive."[3] Id.

### B. Rule 9(b)

Additionally, as the Court already explained at the pretrial conference, Plaintiffs' scheme claim is adequately pleaded under Rule 9(b). Musk makes much of the fact that Plaintiffs only use the word "scheme" five times in their complaint. Dkt. 446 at 10. While Rule 9(b) does impose a heightened pleading standard for fraud claims, it does not contain the word count requirement that Musk appears to suggest. Instead, Rule 9(b) "only requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." Walling v. Beverly Enterprises, 476 F.2d 393, 397 (9th Cir. 1973). And Plaintiffs' complaint meets this standard.

Plaintiffs' explicitly discuss their scheme throughout their complaint. Indeed, in the section entitled "Nature of the Action," Plaintiffs claim that, "[t]o try to renegotiate the price or delay [sic] the Merger, Musk made materially false misleading statements and omissions, and engaged in a scheme to deceive the market." FAC (dkt. 31) ¶ 10 (emphasis added). And that the "scheme artificially, and almost immediately, depressed the price of Twitter securities." Id. The next 165 paragraphs of the complaint then describe, in detail, Musk's alleged scheme and conduct from May 13 to October 4, 2022. Plainly, it was inclusive of—yet independent from—the three allegedly false statements that remain at issue for trial. Plaintiffs also reference the scheme in their section on Count 1, claiming that Musk violated "§ 10(b) of the 1934 Act and Rule 10b-5" since he "employed devices, schemes and artifices to defraud" in addition to making "untrue statements of material

---

[3] In recognition of Musk's concerns, the Court will instruct the jury that they may not find scheme liability based on his petitioning activity alone and that they must look at the entire course of his conduct for liability.

3

facts." Id. ¶ 188.

Musk could have moved to dismiss the scheme claim; he did not. Even if he had under Rule 9(b) or Rule 12(b)(6), as explained, the Court would have denied such a motion based on the sufficiency of the complaint. In his motion to dismiss, Musk only challenged alleged misstatements under Rule 10b-5(b). See Dkt. 34 at 11 ("Plaintiffs fail to plead that any of Mr. Musk's statements are false or misleading under the strict and exacting pleading requirements of the PSLRA and Rule 9(b)."). And the Court only ruled on what was before it, permitting only three statements to proceed as allegedly false or misleading. See Dkt. 48. Musk did not challenge scheme liability, so the Court had no reason to discuss it.[4] Accordingly, Musk cannot bind Plaintiffs to the Court's order when scheme liability was never presented as an issue.[5] See Dkt. 342 at 4–5 (relying on the Court's order on Musk's motion to dismiss to bar Plaintiffs from relying on "non-fraudulent statements as part of a scheme").

### C. Class Certification

The Court also rejects Musk's request to reopen class certification. "[T]he purpose of class certification is merely to select the method best suited to adjudication of the controversy fairly and efficiently." Lytle v. Nutramax Lab'ys, Inc., 114 F.4th 1011, 1026 (9th Cir. 2024) (citation omitted), cert. denied, 145 S. Ct. 1308, 221 L. Ed. 2d 396 (2025). It is not a basis to challenge the adequacy of claims. Yet Musk insists "the Court must reopen discovery to permit inquiry into the basis for reliance apart from the fraud-on-the-market presumption." Dkt. 429 at 1. That is because Musk argues that the fraud-on-the-market presumption, which the Court already deemed applicable at class certification,

---

[4] Musk did not challenge the scheme claim in his subsequent motion for judgment on the pleadings, either. Dkt. 59.

[5] Musk attempts to rely on In re AGS to avoid the consequence of his failure to challenge scheme liability in his motion to dismiss. Dkt. 342 (citing In re AGS, Inc. Sec. Litig., 2024 WL 581124 (D. Nev. Feb. 12, 2024), aff'd sub nom. Oklahoma Police Pension & Ret. Sys. V. PlayAGS, Inc., 2025 WL 927296 (9th Cir. Mar. 27, 2025)). But not only is it not binding on this Court, it is also distinguishable. There, the court dismissed a scheme claim after the defendant only challenged misstatements because the plaintiff's scheme claim was not "independent of its misrepresentation claim." In re AGS, 2024 WL 581124 at *5. In the instant case, Plaintiffs' scheme claim certainly includes statements the Court found non-actionable, but it is not solely based on them.

4

"applies only to misstatement-based claims." Id.

Yet again, Musk is wrong. The Supreme Court has applied the fraud-on-the-market presumption to scheme liability, so long as deceptive acts were "disclosed to the investing public." Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, 552 U.S. 148, 160 (2008); see also In re Galena Biopharma, Inc. Sec. Litig., 117 F. Supp. 3d 1145, 1192 (D. Or. 2015) ("The reliance presumptions accepted by the Supreme Court also apply to scheme liability claims."). Although Musk disagrees, the law is entirely consistent with the Court's determination that Plaintiff Steve Garrett could not establish reliance, since Garrett conceded that he did not rely on anything other than Musk's statement that he was terminating the Twitter deal. Dkt. 106 at 9. Reliance on only Musk's termination precludes reliance on any other public statement or action that could be part of Musk's alleged scheme. In contrast, the other lead plaintiffs did demonstrate reliance on Musk's publicly disclosed conduct—in other words, the purported scheme—when they decided to sell their shares. Id. (excerpting deposition transcripts from lead plaintiffs about Musk's public actions).

### D. Delay

The Court also notes Musk's delay in seeking to remedy what he considers sandbagging. On January 21, 2025, Plaintiffs first responded to Musk's request for actionable statements by listing the three at issue and then clarifying that "[a]ll other false and misleading statements and actions identified in the FAC are actionable under . . . Rule 10b-5(a) and (c)." Dkt. 449-2. Then on February 21, 2025, Musk served an interrogatory request on Plaintiffs regarding their scheme claim. Dkt. 446-2. Plaintiffs responded on March 17, 2025 by providing an extensive chart of statements and conduct they allege are at issue, which included—but was not limited to—the three at-issue statements. Id. Nevertheless, Musk contends that he only learned the specifics of the scheme claim on August 12, 2025, after the close of discovery, when Plaintiffs again supplemented their interrogatory responses to describe their scheme claim. Dkt. 446 at 5.

But Musk did not move to reopen discovery at that point. And he did not move to

do so after the Court denied his motion for summary judgment on October 15, 2025. See Dkt. 302. Musk has provided no explanation for why he failed to request that discovery be reopened until the eve of trial. "It is now too late for [Musk] to pursue discovery that could have been undertaken months ago." Davis v. Santa Clara Cnty., 2009 WL 2776849, at *3 (N.D. Cal. Aug. 28, 2009). He cannot now reasonably contend that he would be prejudiced in his "ability to adequately prepare a defense" against a theory that was part of the complaint, brought up during discovery, permitted during summary judgment, and then permitted again after a pretrial motion in limine. See Dkt. 446 at 12.

For the foregoing reasons, the Court **DENIES** Musk's motions.

**IT IS SO ORDERED.**

Dated: February 26, 2026

_____
CHARLES R. BREYER
United States District Judge