QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice*)
alexspiro@quinnemanuel.com
Jesse A. Bernstein (*pro hac vice*)
jessebernstein@quinnemanuel.com
Ellyde R. Thompson (*pro hac vice*)
ellydethompson@quinnemanuel.com
295 Fifth Ave., New York, NY 10010
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Stephen A. Broome (Bar No. 314605)
stephenbroome@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

*Attorneys for Defendant Elon Musk*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | CASE NO. 3:22-CV-05937-CRB<br><br>**DEFENDANT ELON MUSK'S RESPONSE TO THE COURT'S PROPOSED INSTRUCTION RE PRIVILEGE AND ADVICE OF COUNSEL**<br><br>Hon. Judge Charles R. Breyer |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..........................................................................................................................1

BACKGROUND ............................................................................................................................2

    A.    Plaintiffs Volunteer And Elicit Evidence About The Merits Of The Delaware Action..................................................................................................................2

    B.    Plaintiffs Ask Mr. Musk A Question At Trial With The Knowledge He Would Likely Reveal Attorney Client Communications................................................4

ARGUMENT ..................................................................................................................................5

I.    THE PROPOSED CURATIVE INSTRUCTION IS OVERBROAD AND PREJUDICIAL ....................................................................................................................5

    A.    The Court Should Not Find Any Failure To Protect The Privilege Based On Plaintiffs' Improper Attempt To Elicit A Privilege Objection ............................5

    B.    Mr. Musk's Testimony Does Implicate Any Advice of Counsel Defense .........7

    C.    The Court's Instruction Invites The Jury To Draw A Negative Inference From Mr. Musk's Assertion of Privilege .............................................................8

    D.    Plaintiffs Opened The Door To Testimony About The Delaware Litigation ......9

II.    IF THE COURT GIVES ANY INSTRUCTION, THE COURT SHOULD GIVE DEFENDANT'S PROPOSED INSTRUCTION ..........................................................10

III.    THE COURT SHOULD CURE THE MISLEADING IMPRESSION CREATED BY EVIDENCE OF MR. MUSK'S ACQUISITION OF TWITTER STOCK ....................11

CONCLUSION .............................................................................................................................13

# INTRODUCTION

During Mr. Musk's examination, Plaintiffs' counsel asked an open-ended question that elicited the disclosure of attorney-client privileged communications. The answer should not have come as a surprise to Plaintiffs. Mr. Musk gave an almost identical answer to the same question in deposition. He also disclosed publicly, in an April 2023 BBC Interview, the basis for his decision to close the merger—including the fact that his lawyers in the Delaware Action advised him to. Plaintiffs knew about that, too. The interview was cited and linked in the Operative Complaint and is one of **Plaintiffs'** exhibits at trial. Mr. Musk's answer came on the heels of multiple witnesses—including lead Plaintiff Brian Belgrave and Twitter's Chief Legal Counsel—testifying about Mr. Musk's positions and conduct in the Delaware Action.

But Plaintiffs' counsel asked the question in an open-ended fashion anyway. As is clear from the transcript, they did so to elicit a privilege objection. As a result, neither the Court nor Plaintiffs may rely on the lack of an objection to justify a curative instruction. As Defendant previously had raised at sidebar, and the Court agreed, it is blatantly improper to ask questions that counsel knows will elicit privileged information in order to draw an objection and create the prejudicial and improper impression that the witness is hiding something from the jury. Plaintiffs' counsel represented to the Court that he would "never do so." But that is precisely what he did.

In response, the Court proposed a curative instruction. Defendant objects to the proposed instruction. It would tell the jury that "Defendant has elected not to assert an advice of counsel defense," even though that defense was not even available for the communication at issue. The good faith defense in the context of securities fraud applies only to advice given relating to conduct alleged to be unlawful. But there is no dispute that Mr. Musk's decision to close was lawful and no communications about that decision could give rise to an advice of counsel defense. And by instructing the jury that "by Defendant's election, the Plaintiffs have been foreclosed from inquiring into any of the advice given by Defendant's counsel," the Court is inviting an improper inference that Mr. Musk concealed evidence by invoking the privilege. The instruction also would rest all responsibility on Mr. Musk when Plaintiffs' counsel asked a question likely to elicit the privileged communication at issue and have opened the door to testimony

1  concerning Mr. Musk's litigation conduct and positions.

2      To the extent any curative instruction is proper—and Defendant does not believe one is, because
3  the testimony at issue was deliberately elicited by Plaintiffs' counsel, who did not independently move to
4  strike the testimony or request a curative instruction—the Court should give Mr. Musk's proposed
5  instruction. It is simple, correctly states the law, and is tailored to the issues that arose on Day 3 without
6  providing the jury with extraneous information that may cause confusion and prejudice Mr. Musk. With
7  it, the Court should also give the proposed limiting instruction regarding Mr. Musk's purchase of Twitter
8  Stock. Those purchases are not the subject of any claim in this case, were made before the Class Period,
9  and are not alleged to have damaged any plaintiff. Yet Plaintiffs' presentation has suggested the opposite
10 is true: that Mr. Musk violated securities laws by not filing a form with the SEC. The Court should
11 eliminate any misapprehension on this issue immediately and give this proposed instruction today.

## BACKGROUND

13     Throughout this litigation and in the first three days of trial, Plaintiffs have injected and
14 emphasized the role of both Mr. Musk's and Twitter's counsel in the merger transaction and Delaware
15 lawsuit.

16     **A.    Plaintiffs Volunteer And Elicit Evidence About The Merits Of The Delaware Action**

17     Starting with the very first witness who testified in this case, Plaintiffs have injected counsel's
18 role—both in the events leading up to the Delaware litigation and in the litigation itself—at every step of
19 trial. Plaintiffs asked Brian Belgrave, their very first witness, if he "recall[s] ever seeing any evidence
20 that Mr. Musk put up in that lawsuit to support his claim"; in response, Mr. Belgrave responded that Mr.
21 Musk "didn't even put up a defense, which makes me think that the whole, you know, getting out of the
22 deal was just, you know, BS." Trial Tr. at 329:4–19.

23     Plaintiffs' next witness, Twitter's Chief Legal Officer at the time of the events in question, testified
24 extensively about her legal background and the background of other lawyers on Twitter's team. *Id.* at
25 333:24–334:24, 336:5–22, 389:5–23, 393:9–25. She then, in response to questioning from Plaintiffs'
26 counsel, explained that a Schedule 13G is a "report that any investor who buys more than some percentage
27 of a public company is required to file within the SEC within a certain time period," *id.* at 349:1–18, and

28

1   that to her knowledge, Mr. Musk did not "file an SEC form disclosing such," *id.* at 351:14–16. That
2   testimony strongly suggested that Mr. Musk violated securities laws when he initially acquired Twitter
3   stock more than a month before the Class Period began. Plaintiffs asked Ms. Gadde to opine on the
4   meaning of legal concepts they believe helpful to their case, such as "due diligence," "waiving due
5   diligence," and "seller friendly," *id.* at 366:2–12, 376:20–368:11, 375:1–8, 378:25–379:10; to explain
6   what terms Twitter wanted in the Merger Agreement; to interpret the Merger Agreement, *id.* at 381:1–6,
7   381:10–13; to explain key portions of Twitter's SEC filings in order to imply that she, as Twitter's lawyer,
8   had blessed those representations, *id.* at 355:7–356:6, 356:22–357:3; and to confirm her involvement as
9   counsel with Twitter's decisions about what to provide Mr. Musk during the relevant time period, *id.* at
10  396:9–18; to opine on privacy and other regulatory requirements Twitter is subject to in order to suggest
11  to the jury that Twitter's lawyers did not believe they could produce the information Mr. Musk requested,
12  *id.* at 404:23–406:2; to explain Twitter's positions in the Delaware litigation, *id.* at 406:12–407:9; and to
13  respond to the Defendant's allegation that Twitter defrauded him, *id.* at 457:3–9.

14       And Plaintiffs—after telling previously telling this Court that Mr. Spiro is "a critical first hand
15  witness in the case," "at the epicenter of virtually every important decision relating to the Twitter
16  acquisition," "an indispensable witness" whose "testimony will be essential to the jury's assessment."
17  Dkt. No. 279 at 1-3, 5-6, who was, "After Musk…Perhaps the *Most* Important Witness in the Case," Dkt.
18  No. 146 at 2, introduced Mr. Spiro. After representing to the Court that they claimed they were in "dire
19  need of" Mr. Spiro's trial testimony, *id.* at 11, Plaintiffs' counsel asked Mr. Musk during their direct
20  examination of him about communications with Mr. Spiro during the relevant time frame. Plaintiffs even
21  used that opportunity to ask whether Mr. Spiro "works for Quinn Emanuel" and then asked whether that
22  is "the same firm" representing Mr. Musk in this trial. Trial Tr. at 760:15–21. Indeed, **Plaintiffs**
23  specifically asked Mr. Musk whether Quinn Emanuel "pass[ed] along" a certain letter from Twitter's
24  lawyers to him. *Id.* at 817:23–25.

25       Plaintiffs did so even though, after demanding that Mr. Spiro testify at trial, Plaintiffs moved *in*
26  *limine* to preclude Mr. Musk from "emphasizing the presence or role of counsel in connection with the
27  merger." Dkt. No. 347 at 6. Plaintiffs made the motion to purportedly prevent the jury from drawing any
28

inferences related to Mr. Musk's state of mind through the involvement of counsel, *id.* at 1, but in practice have sought to prevent evidence of Mr. Musk's counsel's involvement in public facing activities like the litigation in Delaware while simultaneously pursuing a theory that asserts that Mr. Musk's defense in the Delaware Action was itself part of a fraudulent scheme to defraud.  The events of the litigation are no longer relevant only to Mr. Musk's scienter, but are instead acts that Plaintiffs contend give rise to liability in and of themselves.  As Mr. Musk testified, he was not personally involved in the act of litigating the case (he is, after all, not an attorney) but instead had lawyers mount his defense.  But Plaintiffs apparently seek to impose a rule that would prevent lawyers from testifying about what occurred in the litigation— for instance, the litigation and aftermath of a successful motion to compel spam related data from Twitter—even if such testimony does not implicate any advice those lawyers gave to Mr. Musk.  Indeed, now Plaintiffs apparently do not intend to call Mr. Spiro at all.

> **B.  Plaintiffs Ask Mr. Musk A Question At Trial With The Knowledge He Would Likely Reveal Attorney Client Communications**

In short, in virtually every witness examination from the very outset of trial, Plaintiffs have injected both counsel's role in making the key representations and decisions, have elicited counsel's opinions on disputed legal facts, and have elicited blatantly untrue testimony from their own class representative that Mr. Musk "didn't even put up a defense" in the Delaware litigation.

In Mr. Musk's examination, Plaintiffs' counsel asked him a series of questions relating to the Delaware Action, including "[a]nd yet after all that, you agreed eventually to dismiss your claims and to buy Twitter; right?"  Trial Tr. at 835:10–12.  Counsel then followed up with an open-ended question— one of only three open-ended questions he posed during his more than four hour examination—"Why did you do so?" *Id.* at 835:13.  In response, Mr. Musk gave a truthful answer that recounted the assessment his legal team gave to him regarding his probability of success in the Delaware action. *Id.* at 835:14–20. Counsel was well aware how Mr. Musk would answer that question.  He gave an almost identical answer in his May 19, 2025 deposition, Musk Tr. Vol. 2 at 328:1-16, and publicly stated in an interview with the BBC in April 2023 that he purchased Twitter because his lawyers advised him the Delaware Court of Chancery would have likely ordered him to do so anyway.  Plaintiffs identified and linked to that very

interview in their First Amended Complaint, alleging that "[i]n an interview with the BBC on April 12, 2023, Musk admitted that he agreed to go through with the Buyout at the full $54.20 price in order to avoid a trial in Delaware **because he knew he was going to lose**." Dkt. No. 38 at ¶ 166.

When Mr. Musk gave his answer, Plaintiffs did not move to strike it. The Court raised a concern about its contents *sua sponte* outside the presence of the jury and Mr. Musk's counsel explained that he did not intend to make any argument concerning Mr. Musk's communications with counsel in closing. Following a colloquy with the parties outside the presence of the jury, the Court filed the proposed curative instruction and invited the parties to submit comments.

## ARGUMENT

### I. THE PROPOSED CURATIVE INSTRUCTION IS OVERBROAD AND PREJUDICIAL

Mr. Musk respectfully objects to the Court's proposed curative instruction. The instruction, as written, would amplify the prejudice that Plaintiffs' counsel sought to inject in asking an open-ended question for the purpose of eliciting a privileged objection. Plaintiffs' counsel specifically represented to the Court that he would not use this improper tactic. Beyond that, the proposed curative instruction does not accurately state the relevant law, provides unnecessary and confusing instructions regarding the parties' litigation positions in this case and discovery, raises defenses not at issue, and improperly invites the jury to draw an adverse inference from Mr. Musk's assertion of privilege in this action.

### A. The Court Should Not Find Any Failure To Protect The Privilege Based On Plaintiffs' Improper Attempt To Elicit A Privilege Objection

Contrary to Plaintiffs' arguments, neither Mr. Musk nor his counsel created any sword-shield issue with respect to the attorney-client privilege. Rather, Plaintiffs' counsel intentionally asked a question he knew would invoke privileged communication to invoke a privilege objection as to "why" Mr. Musk decided to close the transaction. Plaintiffs' counsel did so even though he knew that such a tactic was improper and had represented to the Court that he would not employ this improper and highly prejudicial tactic.

This issue arose when Plaintiffs' counsel asked Mr. Musk a rare open-ended question "[W]hy did you do so," in regard to Mr. Musk's decision to close the Twitter merger during the pendency of litigation.

Trial Tr. at 835:13. Plaintiffs' counsel knew that Mr. Musk was likely to provide a response that implicated communications with attorneys because Mr. Musk has consistently responded to the same or substantively similar questions with the same answer. During an April 2023 BBC interview that Plaintiffs designated as a trial exhibit weeks ago (Trial Exhibit 228), Mr. Musk was asked why he elected to cease litigation and close the Twitter deal, and he responded that his lawyers had informed him that he would lose in Delaware. In deposition, Mr. Musk began to provide the same answer after repeated pressing by Plaintiffs' counsel. Musk Dep. 327–28 (**Q:**· Any other reasons? ·**A:**· I was informed by my counsel that . . . [privilege objection]").

Plaintiffs cannot—and did not—argue that Defendant's failure to object waived any attorney client privilege at the time of his testimony. Instead, at the time, Plaintiffs made clear that he did not hear an objection on privilege grounds. Trial Tr. at 836:9–11. Yet, if Plaintiffs' counsel was expecting a privilege objection to its open-ended question, it violated its representation to the Court that it would not ask such questions. On the first day of trial, Defendant raised with the Court that: "plaintiffs' counsel[] has indicated they plan to ask questions with the intent of eliciting a privilege objection, and multiple courts in this district have found that that is prejudicial." Trial Tr. at 332:7–10. Defendant then asked that the Court "inform plaintiffs' counsel that they may not ask questions for the purpose of eliciting a privilege objection." *Id.* at 332:13-15. The Court agreed: "Well, I think that's true." *Id.* at 332:16. And Mr. Arnzen represented: "I would never do so, Your Honor." *Id.* at 332:17.

Yet that is exactly what Mr. Arnzen did. Instead of asking Mr. Musk a leading question—that he did not close the transaction because he believe the judge to be biased—Plaintiffs' counsel asked open-ended question for the purpose of eliciting a privilege objection. The transcript confirms as much, with Mr. Arnzen remarking on the absence of a privilege objection, Trial Tr. at 836:9-11—even though Mr. Arnzen had agreed with the Court that asking a question to elicit such a privilege objection would be prejudicial and he "would never do that." Trial Tr. at 332:17.

The Court's proposed curative instruction would condone this prejudicial tactic and result in extreme prejudice to Defendant.

### B.  Mr. Musk's Testimony Does Implicate Any Advice of Counsel Defense

In any event, Mr. Musk's answer does not implicate the advice of counsel, rendering the Court's proposed instruction incorrect as a matter of law.

*First*, as a factual matter, the "advice of counsel" defense is not applicable to the subject matter of Mr. Musk's testimony: his decision to close the merger. There is thus no formal "advice of counsel defense" that the Defendant could have "elected" to assert or "not to assert." *See* Dkt. No. 472. That is because Mr. Musk's decision to close is not alleged to be fraudulent—to the contrary, Plaintiffs claim it was **corrective**.

*Second*, no "advice of counsel" defense applies in securities fraud cases, meaning the Court's proposed instruction is erroneous. *See, e.g.*, *Draney v. Wilson, Morton, Assaf & McElligott*, 592 F. Supp. 9, 11 (D. Ariz. 1984) ("In reality, reliance on advice of counsel is not so much a defense for liability as it is a factor to be considered."). At most, the advice of counsel may be considered "as a circumstance indicating good faith." *Bisno v. United States*, 299 F.2d 711, 719 (9th Cir. 1961). But, to trigger a "good faith" defense, a defendant must show, *inter alia*, that he "requested the professional's advice as to the **legality** of the contemplated action" and "received advice that it was **legal**." *S.E.C. v. Yuen*, 2006 WL 1390828, *40 (C.D. Cal. March 16, 2006). The defense thus only arises if and when the action about which the defendant sought advice is alleged to have been unlawful. Thus, the relevant testimony does not implicate the good faith defense, either, because Mr. Musk did not testify that he sought or received advice that closing the merger was legal—it plainly was and no one has suggested it was not.

*Third*, the Court cannot give its proposed instruction without also instructing on *Noerr-Pennington* protected conduct. After all, the question posed to Mr. Musk plainly implicated First Amendment protected petitioning conduct—the Delaware litigation. And, under the *Noerr-Pennington* doctrine, evidence that a defendant engaged in protected petitioning conduct in good faith "unlike an advice-of-counsel defense, does not implicitly waive privilege." *Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343, 353 (9th Cir. 2014).

*Finally*, the Court's instruction is legally incorrect because even if Mr. Musk's testimony—or prior public statement to the same effect—could have implicated privilege, any such attendant waiver would be

limited to the subject matter—that is, judicial bias. Fed. R. Evid. 502(a) (referring to "disclosed and undisclosed communications or information concern the same subject matter" that "out in fairness to be considered together). Thus, it would be plainly prejudicial legal error to imply that the jury to link Mr. Musk's testimony implicated the entirety of his privileged communications—it did not.

### C. The Court's Instruction Invites The Jury To Draw A Negative Inference From Mr. Musk's Assertion of Privilege

Defendant also objects to the Court instructing the jury that "[b]y the Defendant's election, the Plaintiffs have been foreclosed from inquiring into any of the advice given by the Defendant's counsel as well as anything that Mr. Musk told his counsel." Dkt. No. 472. That instruction suggests to the jury that the Defendant has done something wrong in so electing or is effectively hiding relevant evidence from Plaintiffs. Such suggestions are improper and highly prejudicial.

It is well established that there should be no negative inference drawn from the assertion of privilege. *See, e.g.*, *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 226 (2d Cir. 1999) ("[W]e know of no precedent supporting such an inference based on the invocation of the attorney-client privilege. This privilege is designed to encourage persons to seek legal advice, and lawyers to give candid advice, all without adverse effect. . . . Such a penalty for the invocation of the privilege would have serious harmful consequences."); *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1265 (9th Cir. 2000) (citing *Nabisco*, explaining that it "reasoned that the policy behind the attorney-client privilege was paramount and trumped the questioner's right to information," and that "those cases in which a negative inference was allowed against a person asserting the privilege stemmed from the recognition that the person refusing to answer the question posed had some affirmative duty to reveal such information").

Yet, despite this black-letter law, the Court continuously has suggested that Mr. Musk has done something improper in preserving his own privilege or preserving the privilege of Twitter. Trial Tr. at 533:18-22 (the Court noting that "what's also peculiar in this case that the jury doesn't know, but you knew full well, was that the attorney/client privilege of -- of Twitter, which evolved to Mr. Musk by virtue of his purchase, even though he was on the other side of the transaction, was being asserted"). There is nothing "peculiar" about asserting privilege. Because the Court has made clear its view that the jury

should know that Mr. Musk has not elected to waive privilege, the proposed instruction can only be read as inviting the jury to draw that adverse inference. That is improper. This sentence of the Court's Order is not necessary and only serves to prejudice Mr. Musk. The jury need not understand the policy reasons underlying the Court's decision to strike the testimony, simply that it is stricken and should be disregarded.

### D.     Plaintiffs Opened The Door To Testimony About The Delaware Litigation

Finally, Mr. Musk objects to the instruction as prejudicial in light of the fact that Plaintiffs—not Mr. Musk—have repeatedly introduced testimony and evidence regarding the circumstances and events of the litigation in Delaware, including evidence from or involving lawyers. Plaintiff Brian Belgrave testified that Mr. Musk "didn't even put up a defense, which makes me think that the whole, you know, getting out of the deal was just, you know, BS." Trial Tr. at 329:4–19. Plaintiffs had Ms. Gadde, Twitter's former Head of Legal, testify about the litigation, including her evaluation of the merits of Mr. Musk's positions. Trial Tr. 406-07, 457. Plaintiffs also showed Mr. Musk a trial exhibit, Exhibit 191, that involved lawyers from Quinn Emanuel receiving data in connection with the Delaware litigation and communicating about it with data scientists.[1] Plaintiffs introduced all of this evidence into the trial—not Mr. Musk—and have opened the door to a response (one that will not, of course, disclose or suggest any attorney client confidences).

"[W]hen a motion *in limine* is granted to exclude evidence, counsel winning the motion may open the door to its admission via conduct that would make it unfair to continue to exclude it." *Geo. M. Martin Co. v. All. Mach. Sys. Int'l, LLC,* 2008 WL 2008638, at *2 (N.D. Cal. May 6, 2008). Neither the Court nor Plaintiffs can point to any error in referring to Mr. Spiro because Plaintiffs opened the door to discussions of his relevance. On direct examination of Mr. Musk, Plaintiffs' counsel asked the following questions of Mr. Musk:

**Q.** Mr. Spiro is bcc'd on here. Who is Mr. Spiro?

**A.** He was one of the lawyers representing me.

---

[1] There are numerous other examples. Plaintiffs spent considerable time burnishing Ms. Gadde's credentials as an attorney before having her testify about Mr. Musk's rights and obligations under the Merger Agreement. Trial Tr. at 333-34, 336, 366, 367-68, 375, 378-79, 381. They also had her, in effect, bless Twitter's SEC disclosures as truthful, even though she is not the Twitter executive who created or signed those disclosures. Trial Tr. 355-56.

|   |   |
|---|---|
| 1 | **Q.** He works for Quinn Emanuel; is that right? |
| 2 | **A.** Correct. |
| 3 | **Q.** That's the same firm that's representing you in this |
| 4 | trial? |
| 5 | **A.** Yes. |

Trial Tr. at 760:15-21.

The Court did not stop the trial, admonish Plaintiffs' counsel, or suggest anything improper about these questions from Mr. Arnzen. Yet, having raised Mr. Spiro in Plaintiffs' examination of Mr. Musk, Plaintiffs' counsel then objected when Mr. Spiro's name came up during Defendant's examination. But Plaintiffs opened the door to such testimony both as to Mr. Spiro specifically—he is, after all, in Plaintiffs' words "a critical first hand witness in the case," "at the epicenter of virtually every important decision relating to the Twitter acquisition," whose "testimony will be essential to the jury's assessment," Dkt. No. 279 at 1–3, 5–6—but to the involvement of lawyers generally. Thus, the questions from Mr. Musk's counsel were entirely proper and precisely in line with the questions from Plaintiffs' counsel. The Court may not apply a different standard to Plaintiffs and Defendant on this issue and seek to enforce a motion *in limine* ruling against Defendant by which Plaintiffs have not abided.

## II. IF THE COURT GIVES ANY INSTRUCTION, THE COURT SHOULD GIVE DEFENDANT'S PROPOSED INSTRUCTION

Defendant respectfully requests that the Court instead give the following proposed instruction to the jury:

> Yesterday, in response to a question from Plaintiffs' counsel, Mr. Musk indicated he had certain discussions with his lawyers in the Delaware litigation regarding that topic. A client may not disclose attorney client communications absent a waiver of the privilege and thus may not rely on privileged communications with attorneys. You are to disregard such privileged conversations.

This proposed instruction is a straightforward statement that accurately characterizes the law, is appropriately tailored to cure the issue raised by the testimony given yesterday, and avoids any suggestion that Mr. Musk improperly sought to conceal evidence by exercising his right to assert the privilege. Because, however, Plaintiffs' counsel purposefully sought to evoke a privilege objection with his open-

ended question—in contravention of his representation to the Court that he would not do so—the Court should not give any curative instruction.

### III. THE COURT SHOULD CURE THE MISLEADING IMPRESSION CREATED BY EVIDENCE OF MR. MUSK'S ACQUISITION OF TWITTER STOCK

Finally, the Court should give Defendant's proposed limiting instruction regarding Section 13D evidence.

The Court previously advised Defendant that it would not give any instructions because "if I start giving instructions midway, it may be very well indicative of what I think of the case." Trial Tr. at 922: 19–20. But, the Court now has indicated that it is appropriate to instruct the jury at this stage. Thus, the Court also should provide a limiting instruction with respect to Mr. Musk's open-market purchases of Twitter stock, which have been the repeated subject of Plaintiffs' presentation over the first three days of trial. Fed. R. Evid. 105.

This is the appropriate time to give this instruction. The Court is unlikely to instruct the jury about Mr. Musk's pre-Class Period stock purchases in its Final Instructions because those purchases are not—and have never been—part of Plaintiffs' claim for damages. *See* Dkt. No. 48 at 2 n.1. Nor are they part of Plaintiffs' purported scheme. Indeed, no party submitted any instructions related to Mr. Musk's pre-Class Period purchases or included them in the Joint Pretrial Order. As the Court has noted, the "scheme" allegedly began on May 13. Mr. Musk made those purchases more than a month before then. Thus, while the Court may ultimately provide other requested instructions (see Dkt. No. 471) at the conclusion of the case, logic and Rule 105 mandate that the Court give it now.

Giving this instruction now could also cure the jury's likely misimpression that Mr. Musk is on trial for buying stock in early 2022 and mitigate the impact of that confusion before it deliberates. The risk of this confusion is acute and has only increased as the trial has progressed. Plaintiffs' counsel referenced Mr. Musk's alleged "secret" stock purchases in opening and proceeded to question every trial witness about it except for Belgrave. Trial Tr. at 205:24–25 (Plaintiffs' opening statement: "But here's the thing: When Musk buys Twitter, he does so secretly …. He didn't file reports with the SEC about it. He kept it secret to keep all that extra money in his own pocket."); Trial Tr. at 348–352 (eliciting from

Ms. Gadde that, even though Twitter knew in March that Mr. Musk had accumulated a large position, Mr. Musk did not "file an SEC form disclosing such"); Trial Tr. at 538 (eliciting testimony regarding failure to make a Section 13 SEC filing from Jared Birchall, even after the Court had previously appeared to call an abrupt recess in Birchall's testimony in anticipation that Plaintiffs' counsel was about to go one question too far (Trial Tr. 529:7-14); Trial Tr. at 669:15–17 (eliciting similar testimony from Mr. Musk).

Because it was always obvious that Plaintiffs would seek to introduce this evidence to suggest that Mr. Musk engaged in additional, unpled wrongdoing and violations of the securities laws, Defendant moved *in limine* on this issue. Dkt. No. 339. At the pretrial conference, after the Court determined that certain facts could come in for a limited purpose, counsel expressed the concern that Plaintiffs would nonetheless ask lines of questioning that suggest Mr. Musk did something wrong. The Court made clear that "They can't do that. They can't do that. Lawyers aren't going to do that." PTC Hrg. Tr. 54-55. Yet, Plaintiffs' lawyers have proceeded to do just that—repeatedly—by eliciting testimony and arguing that Mr. Musk manipulated the stock market through a failure to make SEC filings in order to keep more money in his own pocket. This violated the Court's ruling at the pre-trial conference. Even if it did not, it still risks the jury thinking they can find liability in part or in whole based on this alleged conduct by Mr. Musk. That is a misleading impression, of course. As the Court noted in its motion to dismiss order, "Plaintiffs allege that Defendant engaged in 'market manipulation' by accumulating stock [and not disclosing it] …. [b]ut because Plaintiffs do not allege that this activity caused them losses during the Class Period, the Court does not discuss the issue further." Dkt. No. 48 at 2 n.1. Mr. Musk's purchases of Twitter stock in early 2022 have never been part of Plaintiffs' claim, and the Court should promptly instruct the jury given the extent of airtime this prejudicial sideshow has occupied in the trial thus far.

Mr. Musk's requested limiting instruction is below and should be delivered when the Court issues any other interim instructions.

> You have heard testimony about Mr. Musk's purchases of Twitter stock on the open market between January and April 2022. Mr. Musk is not alleged to have committed securities fraud based on his transactions on the open market and Plaintiffs' claim in this case is limited to the time period from May 13 to October 4, 2022.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court decline to give a curative instruction or, in the alternative, give Defendant's proposed curative instruction, and also give Defendant's proposed limiting instruction on 13D.

DATED: March 5, 2026

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  /s/ Ellyde R. Thompson
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Ellyde R. Thompson
Jesse A. Bernstein
Alex Bergjans

*Attorneys for Defendant Elon Musk*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on Thursday, March 5, 2026.

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By /s/ Alex Bergjans
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Ellyde R. Thompson
Jesse A. Bernstein
Alex Bergjans

*Attorneys for Defendant Elon Musk*

a

**ATTESTATION**

Pursuant to Civil L.R. 5-1, I attest under penalty of perjury that concurrence in the filing of this document has been obtained from the other signatories herein.

By /s/ *Stephen A. Broome*
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Ellyde R. Thompson
Jesse A. Bernstein
Alex Bergjans

*Attorneys for Defendant Elon Musk*