QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice*)
alexspiro@quinnemanuel.com
Jesse A. Bernstein (*pro hac vice*)
jessebernstein@quinnemanuel.com
Ellyde R. Thompson (*pro hac vice*)
ellydethompson@quinnemanuel.com
295 Fifth Ave., New York, NY 10010
Telephone:     (212) 849-7000
Facsimile:      (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Stephen A. Broome (Bar No. 314605)
stephenbroome@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:     (213) 443-3000
Facsimile:      (213) 443-3100

*Attorneys for Defendant Elon Musk*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | CASE NO. 3:22-CV-05937-CRB<br><br>**DEFENDANT ELON MUSK'S MOTION FOR A MISTRIAL**<br><br>Hon. Judge Charles R. Breyer |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................................1

LEGAL STANDARD..................................................................................................................2

ARGUMENT ...............................................................................................................................3

I. THE COURT SHOULD GRANT A MISTRIAL BASED ON INCURABLE PREJUDICE ......................................................................................................................3

    A. Plaintiffs' Repeated Reference To Mr. Musk's SEC Disclosures Related to His Purchasing of Twitter Stock Violated The Court's Ruling And Prejudiced The Jury ..................................................................................................................4

    B. The Court Has Interfered With Defendant's Ability To Rebut Plaintiffs' Unsubstantiated Assertions Regarding Privacy Law .............................................7

    C. The Court Exceeded Its Supervisory Role During The Examinations Of Twitter CFO And CEO ........................................................................................8

    D. The Prejudice Resulting From Plaintiffs' Improper Attempt To Elicit A Privilege Objection Warrants A Mistrial................................................................10

    E. Plaintiffs' Counsel Purposefully Has Injected Irrelevant And Prejudicial Matters Into The Trial ...........................................................................................12

II. THE CUMULATIVE PREJUDICE WARRANTS A MISTRIAL .................................14

CONCLUSION...........................................................................................................................15

**INTRODUCTION**

Defendant Elon Musk moves for a mistrial based on Plaintiffs repeated, improper conduct that the Court has refused to correct and to which, in some instances, the Court has contributed. Such conduct violates the fundamental rule that "[e]very litigant is entitled to a fair, impartial trial." *Maricopa Cnty. of State of Ariz. v. Maberry*, 555 F.2d 207, 224 (9th Cir. 1977). Counsel for Defendant has requested on numerous occasions that the Court act to minimize the prejudicial effect of such conduct, but the Court thus far has declined to do so. As a result, Mr. Musk has been deprived of a fair trial, and the Court should grant this motion for a mistrial.

To start, Plaintiffs' counsel has repeatedly violated the Court's motion *in limine* ruling prohibiting Plaintiffs from suggesting to the jury that Mr. Musk violated securities laws in connection with the purchase of Twitter stock on the open market before his offer to purchase Twitter. The Court unequivocally ruled that, "[t]o the extent they would argue or suggest that [Mr. Musk was] violating the securities laws" in connection with his purchases of Twitter stock on the open market, "it's out." Tr. of Feb. 17, 2026 Proceedings at 54:6–7. Plaintiffs have disregarded this ruling. Plaintiffs' counsel improperly suggested Mr. Musk committed such a violation in opening statements and then repeatedly and specifically asked witnesses about Mr. Musk's disclosure of these stock purchases to the SEC. When Defendant requested that the Court instruct the jury to minimize the prejudice stemming from Plaintiffs' violation of the Court's ruling, the Court declined to give any instruction.

Separately, the Court should grant a mistrial based on the Court's interference with defense counsel's efforts to introduce evidence to rebut Plaintiffs' evidence suggesting that privacy concerns prohibited Twitter from sharing certain data with Mr. Musk. **Plaintiffs** injected the privacy law issue into these proceedings, suggesting that Mr. Musk had asked for information that Twitter could not provide as a pretext to terminate. But, when Defendant tried to introduce evidence to rebut this inaccurate assertion, the Court repeatedly prevented Defendant from doing so, even suggesting that it might have to instruct the jury on European privacy law and foreclosing Defendant's inquiry until Defendant satisfies the Court that Plaintiffs' assertions are wrong

In addition, the Court's interruption of defense counsel's examination of Twitter's former CFO and CEO exceeded the Court's supervisory role. Counsel for Mr. Musk does not take issue with the

1  Court's out-of-court friendships, but rather objects to the Court's repeated intervention that inhibited
2  defense counsel's ability to conduct the examinations.
3        Likewise, the Court should order a mistrial based upon Plaintiffs' improper questioning of Mr.
4  Musk with the apparent intent of eliciting a privilege objection and the Court's subsequent instruction
5  severely prejudiced Mr. Musk.  That courts—the including this Court—widely recognize that simply
6  having to object to such questions on privilege grounds results in prejudice underscores the extreme
7  prejudice stemming from the Court's instruction.
8        And Plaintiffs' counsel has sought to prejudice the jury against Mr. Musk through the introduction
9  of unduly prejudicial evidence.  Plaintiffs' counsel has injected into this proceeding facts regarding Mr.
10 Musk's decisions to move his business out of California and terminate employees.  Plaintiffs have asked
11 several witnesses about whether Mr. Musk sought to have Twitter's top lawyer fired.  And Plaintiffs have
12 stated that numerous tweets that Plaintiffs either did not plead as false or that the Court dismissed were
13 "dishonest and deceptive"—including tweets that pre-date the Class Period.  Meanwhile, the Court has
14 yet to instruct the jury as to the limited purpose for which such evidence may be considered.
15       Finally, even if each of these issues does not independently warrant a mistrial, the cumulative
16 prejudice requires one.  Counsel's conduct and the Court's errors have created an environment in which
17 Mr. Musk cannot have a fair trial.
18       The Court has an obligation to protect Mr. Musk's right to a fair trial. The duty is all the more
19 important given the animosity in the community toward Mr. Musk apparent during jury selection.
20 Plaintiffs' counsel must not be permitted to inflame prejudices and instead must be held accountable for
21 attempts to do so.  The Court should grant a mistrial.

## LEGAL STANDARD

23     "Every litigant is entitled to a fair, impartial trial, before a fair and impartial jury; a jury not
24 impeded or influenced by improper instructions on the law applicable to the particular factual issue they
25 must decide; and not being even possibly influenced by improper questions intentionally put to witnesses
26 who appear before it.  Somewhere the line must be drawn, as it has been done many times before."
27 *Maricopa Cnty. of State of Ariz. v. Maberry*, 555 F.2d 207, 224 (9th Cir. 1977) (reversing and remanding
28 after district court denied motion for new trial).  "A new trial is warranted on the ground of attorney

-2-      Case No. 3:22-CV-05937-CRB

DEFENDANT'S MOTION FOR A MISTRIAL

misconduct during the trial where the 'flavor of misconduct sufficiently permeates an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict.'" *Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337, 346 (9th Cir. 1995) (quotation omitted) (alterations adopted). "Where misconduct permeates the proceeding, the jury is 'necessarily prejudiced.' Constant objections are certainly not required, as they could antagonize the jury." *Id.*

Accordingly, courts have ordered new trials where "comments unfairly and prejudicially directed the jurors' attention away from the merits of this lawsuit towards collateral questions concerning irrelevant matters and inadmissible evidence," *Pac. Mailing Equip. Corp. v. Pitney Bowes, Inc.*, 1979 WL 1697, at *2 (N.D. Cal. Sept. 18, 1979), where counsel "repeated[ly] solicitat[ed] impermissible testimony in violation of the court's *in limine* rulings and references "to matters previously ruled inadmissible 'with the sole purpose of bringing to the jury something it should not have heard,'" *In re Pac. Fertility Ctr. Litig.*, 2021 WL 5161926, at *8 (N.D. Cal. Nov. 5, 2021) (citing *Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337, 346 (9th Cir. 1995)), and where counsel asked questions that were "grossly improper, highly devastating to the defense, carefully planned, and was an attempt to place an alleged opinion as to a legal matter by a non-legal expert (in an area of law not within his professional competency, expertise, or qualifications), before the jury." *Maricopa Cnty. of State of Ariz. v. Maberry*, 555 F.2d 207, 219 (9th Cir. 1977).

## ARGUMENT

### I.  THE COURT SHOULD GRANT A MISTRIAL BASED ON INCURABLE PREJUDICE

From the very beginning of trial, Plaintiffs' counsel has engaged in a pattern of improper and prejudicial conduct. Counsel has violated the Court's orders, presented issues to the jury far outside the scope of the complaint and issues for trial, attempted to elicit prejudicial privilege objections at pivotal moments in Mr. Musk's testimony, and sought to sway the San Francisco jury in their favor and against Mr. Musk through improper questioning. The Court has compounded such prejudice by issuing a "curative" instruction that prejudiced Defendant based on Plaintiffs' improper questioning and by exceeding the supervisory role of the Court, to Defendant's determinant. It should grant a mistrial.

### A. Plaintiffs' Repeated Reference To Mr. Musk's SEC Disclosures Related to His Purchasing of Twitter Stock Violated The Court's Ruling And Prejudiced The Jury

A mistrial is warranted based on Plaintiffs' counsel's repeated and prejudicial violations of the Court's Order on Defendant's Motion *in Limine* No. 1.

At the pretrial conference, the Court clearly stated that "[t]o the extent they would argue or suggest that [Mr. Musk was] violating the securities laws" in connection with his purchases of Twitter stock on the open market, "it's out." Tr. of Feb. 17, 2026 Proceedings at 54:6–7. In response to Defendant's concerns about "[a] line of questioning that suggests he's doing something wrong," the Court responded, "They can't do that. Lawyers aren't going to do that." *Id.* at 55:8–15. But that is precisely what Plaintiffs' counsel did, repeatedly.

First, in Plaintiffs' opening statement, Plaintiffs' counsel told the jury that, when buying Twitter stock on the open market, Mr. Musk "didn't file reports with the SEC about it." Trial Tr. at 206:4–5. Defendant raised the issue with the Court immediately after Plaintiffs' opening statement. *Id.* at 231:14–21. The Court responded that, while "the issue of the SEC is an issue that has been excluded," the Court did not "want to spend a lot of time on this," because "the opening statement is just that." *Id.* at 231:22–232:17. The Court further explained that while Defendant "might be correct," that was "an opening statement, and I'm going to limit their evidence to that which is admissible under the rules of the game." *Id.* at 232:25–233:2.

But then Plaintiffs' counsel went even further. Plaintiffs called Twitter's former Chief Legal Officer, Vijaya Gadde, as their second witness. Plaintiffs asked her "what a Schedule 13G reports to the SEC," and Ms. Gadde explained that it is "a report that any investor who buys more than some percentage of a public company is required to file with the SEC within a certain time period." *Id.* at 349:15–18. At this point, Plaintiffs' counsel had now argued to the jury that Mr. Musk did not file an SEC form and then elicited testimony from a lawyer that such forms are ***required***. Plaintiffs' counsel then doubled down, eliciting testimony from Ms. Gadde that she found out "in early March that [Mr. Musk] owned in excess of 7.5 percent of the company," and then asking, "[t]o your knowledge, did he file an SEC form disclosing such?" *Id.* at 350:24–351:16. This undeniably suggests to the jury the precise inference that the Court ruled Plaintiffs "can't do"—not only that Mr. Musk did something improper, but also that he was

1  specifically required to file an SEC form and failed to do so.

2        Plaintiffs' counsel asked the same improper questions of Mr. Birchall, their next witness. Plaintiffs
3  examined Mr. Birchall about Mr. Musk's purchases of Twitter stock, and then asked, "Nor did he file SEC
4  forms reporting on it, fair?" *Id.* at 538:13–18. Over Defendant's objection, the Court allowed Mr. Birchall
5  to answer that Mr. Musk did not file those forms as of April 3—well after Ms. Gadde had testified Mr.
6  Musk had accumulated 7.5% of Twitter stock. *Id.* Plaintiffs' counsel again suggested during his
7  examination of Mr. Birchall that such forms are ***required***: "So once you own a certain amount of stock in
8  a company, then you've got to tell the SEC when you either buy or sell stock, correct?" *Id.* at 561:23–25.
9  Plaintiffs' counsel asked the same thing of Mr. Musk repeatedly—"You didn't file any SEC forms that
10 disclosed that purchase, right?" and "No SEC forms filed to disclose this to the investing public?" *Id.* at
11 66:15–17, 670:19–21.

12       Plaintiffs' counsel asked Mr. Musk a series of questions about when he did file the form—first,
13 "At long last, in April 2022, you did file a disclosure with the SEC after purchasing 9.2 percent of the
14 company; is that right?", then "And you knew when you made that filing, there would be a good chance
15 that the price of the stock would increase," and finally, "So you didn't tweet about it. You didn't file more
16 SEC forms, and that left more money in your pocket?" *Id.* at 674:25–675:8. Mr. Musk responded that he
17 "filed when [he] was told it was appropriate to file," but that is not nearly enough to undo the prejudicial
18 effect of the questioning.

19       In short, despite a clear order from the Court that they cannot engage in a "line of questioning that
20 suggests he's doing something wrong"—let alone a clear inference that he violated SEC rules—Plaintiffs
21 repeatedly engaging in questioning suggesting just that. Plaintiffs elicited testimony and asked questions
22 telling the jury that SEC forms are required once someone accumulates enough stock. And Plaintiffs
23 repeatedly hammered the point in front of the jury that Mr. Musk did not file those forms for months while
24 he accumulated billions of dollars and 7.5% worth of stock. The implication that suggests to the jury—
25 that Mr. Musk manipulated the stock market through a failure to make SEC filings in order to keep more
26 money in his own pocket—is clear, prejudicial, and violates a Court order.

27       Defendant requested, and the Court refused to give, a limiting instruction relating to this blatantly
28 improper questioning and testimony. *See* Dkt. No. 471 at 5. Defendant then requested a limiting

instruction again, when the Court was already intending to instruct the jury regarding privilege, and the Court rejected it again. *See* Dkt. No. 474 at 11-12. At this point, the prejudice is impossible to cure. *See United States v. Escalante*, 637 F.2d 1197, 1203 (9th Cir. 1980) (explaining that limiting instruction "is the preferred alternative to declaring mistrial" and that a "mistrial is appropriate only where there has been so much prejudice that an instruction is unlikely to cure it").

Here, there is no doubt that counsel's improper comments, questioning, and eliciting of improper testimony has permeated the proceeding at every stage, beginning with opening statements and throughout multiple witnesses. As courts in this district have held, "comments of counsel referr[ing] to matters that are generally outside the evidentiary parameters of this case" may justify a mistrial. *Pac. Mailing Equip.*, 1979 WL 1697, at *1. In that case, the court explained that "counsel's comments unfairly and prejudicially directed the jurors' attention away from the merits of this lawsuit towards collateral questions concerning irrelevant matters and inadmissible evidence." *Id.* at *2. The court further explained that a mistrial was "the fairest action to take" given three factors—(1) "the context of counsel's disregard of the Court's previous orders," (2) "the highly prejudicial content of counsel's statements," and (3) "the early stage of the proceedings, when jurors may be most easy to impress and little time and resources have been expended." *Id.* Each of these factors is present here.

As set forth above, the Court unequivocally excluded any argument or suggestion that Mr. Musk was violating the securities laws in connection with his purchases of Twitter stock on the open market in early 2022, along with any line of questioning that suggests Mr. Musk did something wrong in doing so. Plaintiffs' counsel violated that order repeatedly. These statements are highly prejudicial. The jury knows that Mr. Musk is accused of committing securities fraud in this trial; the jury has received no instruction on the precise factual matters they must determine in this case. As a result, counsel's improper conduct has allowed the jury to form the highly prejudicial impression that it may consider Mr. Musk's SEC disclosures related to the purchase of Twitter stock outside the class period as a basis for liability. This misleading suggestion has permeated the trial from its earliest stages. Such a prejudicial impression at the outset of the case, with no limiting instruction given despite multiple requests, cannot be undone. The Court should grant a mistrial on this point alone.

### B. The Court Has Interfered With Defendant's Ability To Rebut Plaintiffs' Unsubstantiated Assertions Regarding Privacy Law

The Court's interference with Defendant's effort to rebut Plaintiffs' assertion that privacy laws prevented Twitter from producing certain highly relevant data independently warrants a mistrial.

Throughout the first week of trial, Plaintiffs offered evidence that unspecified privacy laws prevented Twitter from sharing user data with Mr. Musk. Plaintiffs' counsel repeatedly elicited such testimony from both lawyers and lay witnesses. *See, e.g.*, Trial Tr. at 404:11–406:2 (eliciting testimony from Ms. Gadde about the GDPR); 405:15–18 (eliciting testimony from Ms. Gadde, through a leading question, that Twitter had to comply with "privacy laws"); *id.* at 1058:2–1059:6 (eliciting testimony from Ms. Conti, through a leading question, that there were legal limitations on sharing information that would implicate users' privacy); *id.* at 1086:8–10 (eliciting testimony from Mr. Segal, through a leading question, that Twitter took its obligations for keeping that personal private information private). Plaintiffs' counsel sought to repeatedly suggest to the jury that some unspecified laws justified Twitter's decision to withhold critical information.

Yet, when Defendant sought to rebut this untrue suggestion, the Court repeatedly intervened to prevent him from doing so. After Mr. Segal's testimony, where he testified—with no objection from Plaintiffs—that Twitter was ordered to provide this data in litigation, the Court *sua sponte* questioned whether the questioning implied a "fair inference" regarding the ability to provide such data. But the Court had never questioned whether the inference Plaintiffs' counsel repeatedly suggested—that Twitter could not share that data—was "fair" or even legally correct. The Court concluded, however, that the inference may "be a fair inference depending on what the Court did in Delaware." Trial Tr. at 1182:1–4. After Defendant provided the Delaware court order, the Court suggested the next morning that the question was "entirely misleading and the inference was entirely inappropriate" and suggested that the Court had said the day before that the inference was "improper," despite the fact that the Delaware order made no reference to overriding privacy laws. *Id.* at 1192:5–19. The Court then prevented defense counsel from inquiring about the interaction between Twitter's privacy policy and privacy laws from Twitter witnesses who testified affirmatively that privacy laws prevented Twitter from sharing that data, because in the Court's view only defense counsel's query—not the many legal questions Plaintiffs' counsel had asked—

was "a legal question." *Id.* at 1308:17–24.

In doing so, the Court presumed the correctness of Plaintiffs' counsel's assertions about unspecified privacy laws and prevented Defendant from examining witnesses about such testimony. The Court allowed Plaintiffs to repeatedly present testimony about privacy laws in front of the jury, but has prohibited Defendant from rebutting such testimony in front of the jury until Defendant proves to the Court that Twitter was permitted to provide this information under privacy laws. Doing so improperly shifts the burden to Defendant and prevents Defendant from rebutting Plaintiffs' arguments in front of the jury. Such action "went far beyond the court's supervisory role." *United States v. Onyeabor*, 649 F. App'x 442, 444–45 (9th Cir. 2016).

### C. The Court Exceeded Its Supervisory Role During The Examinations Of Twitter CFO And CEO

The Court similarly exceeded its supervisory role during the examination of Twitter's former CFO, Ned Segal, and former CEO, Parag Agrawal.

During defense counsel's examination of Mr. Segal, the Court repeatedly interjected and admonished defense counsel in front of the jury. The Court interrupted defense counsel's questioning, with no objection, and claimed that Mr. Segal had already answered a question that he had not answered. Trial Tr. 1153:24–1154:12. Defense counsel moved on without an answer, but in response to the defense counsel's next question—whether Mr. Segal provided a "high-level answer" at the May 6 meeting, the Court interrupted again and, in front of the jury, admonished defense counsel that "nobody has the slightest idea" what he means. *Id.* at 1154:24–1155:13. Then, when defense counsel attempted to properly refresh Mr. Segal with his own testimony characterizing his answer as high level, the Court interrupted again and prevented defense counsel from doing so. *Id.* at 1155:10–25. The Court did so even though Plaintiffs' counsel had repeatedly used the term "high level" in his direct examination of Mr. Segal—with no interruption and no admonishment. *See, e.g., id.* at 1071:22–24 ("On a high level, mDAU is the key metric that Twitter was disclosing to investors; correct?"); *id.* at 1088:4–5 ("This was the very first in-person meeting at a high level between Twitter and Mr. Musk's teams; correct?"); *id.* at 1102:3–7 ("You remember on May 12th that there was a number of documents that were put into a data room to respond to questions that Mr. Musk's team was asking, and one of those documents was an explanation at a high

-8-   Case No. 3:22-CV-05937-CRB
DEFENDANT'S MOTION FOR A MISTRIAL

level of the company's methodology for calculating spam; right?").[1]

Next, the Court sustained an objection that Plaintiffs' counsel didn't make to the question: "And so given that, Mr. Musk had no accurate way, in your mind, to confirm that 5 percent number, did he?" *Id.* at 1163:17–20. When asked to explain the objection, the Court incorrectly stated that defense counsel was "asking him to testify as to what Mr. Musk's state of mind is," *id.* at 1163:21–25, before correcting itself after looking at the transcript. *Id.* at 1164:2–8.

Next, when defense counsel sought to properly impeach Mr. Segal's testimony, the Court—with no request from Plaintiffs' counsel—insisted that defense counsel play an entirely separate answer for completeness. *Id.* at 1166:5–12. In contrast, during Mr. Musk's examination by Plaintiffs' counsel, defense counsel requested asked that two additional lines of a deposition clip be played for completeness, and the Court did not consider the request. *Id.* at 693:24–694:1. The answer the Court requested defense counsel play during Mr. Segal's testimony listed a variety of concerns taken into account when deciding what to provide or not provide Mr. Musk's team; the question defense counsel sought to play reflected Mr. Segal not being able to think of anything specific he declined to provide because he did not think Mr. Musk was entitled to it under the Merger Agreement. *Id.* at 1165:21–1166:6. When Mr. Segal again could not think of anything specific Twitter did not provide for that reason, the Court interrupted again, with no objection from Plaintiffs' counsel, saying in front of the jury, "Actually, that's not accurate. He gave a list of things that . . . were of concern to him, and then he said off of the top of his head he couldn't identify a particular item." *Id.* at 1166:24–1167:10. The Court then, after allowing defense counsel to play the clip, reprimanded defense counsel in front of the jury that "that's not proper impeachment"— even though the question asked in Court was identical to the deposition question. *Id.* at 1167:12–18.

The same thing occurred during Mr. Agrawal's examination. Defense counsel asked Mr. Agrawal if, "sitting here today," he "understand[s] that the process included human reviewers who looked at various things to decide whether accounts they were reviewing were real or spam." Trial Tr. at 1287:21-23. Mr. Agrawal responded that he did. *Id.* at 1287:24. Counsel then asked, "[b]ut you, as CEO, did not know

---

[1] If the Court's objection was to the questioning of a witness about the word choice he had used previously, that, too, is a tactic Plaintiffs' counsel had employed with no objection and no admonishment. *See, e.g., id.* at 538:25–539:17 (refreshing recollection improperly by reading testimony out loud in front of the jury to demonstrate that Mr. Birchall had previously used a specific word).

the details of what those reviewers were seeing in their audits; correct?" *Id.* at 1287:25-1288:1.  Mr. Agrawal responded that he did not as of February 2022, but he did know "some things" about that as of May 2022.  *Id.* at 1288:2-7.  Counsel asked to play a deposition clip as impeachment.  In that clip, from Mr. Agrawal's deposition in October 2022—while he was CEO and after May—Mr. Agrawal testified that he did not "know the details of what they are seeing or not." Agrawal Dep. at 158:18-22.  Not only did the Court not let counsel play the impeachment clip, the Court stated, in front of the jury: "It has nothing to do with it.  It's not impeachment.  It's nothing." Trial Tr. at 1288:21-22.  Counsel asked for a sidebar, and the Court declined.  Trial Tr. at 1288:24-1289:5.

The Court's repeated, one-sided interruptions and admonitions in front of the jury throughout defense counsel's examination prejudiced Defendant and warrant a mistrial.

### D. The Prejudice Resulting From Plaintiffs' Improper Attempt To Elicit A Privilege Objection Warrants A Mistrial

The extreme prejudice resulting from Plaintiffs' effort to elicit a privilege objection followed by the Court's "advice of counsel" instruction also warrants a mistrial.

During Mr. Musk's examination, Plaintiffs' counsel asked him a series of questions relating to the Delaware Action, including "[a]nd yet after all that, you agreed eventually to dismiss your claims and to buy Twitter; right?" Trial Tr. at 835:10–12.  Counsel then followed up with a rare open-ended question— "Why did you do so?" *Id.* at 835:13.  In response, Mr. Musk gave a truthful answer that recounted the assessment of his legal team.  *Id.* at 835:14–20.  Counsel was well aware how Mr. Musk would answer that question.  He gave an almost identical answer in his May 19, 2025 deposition, Musk Tr. Vol. 2 at 328:1-16, and publicly stated in an interview with the BBC in April 2023 that he purchased Twitter because his lawyers advised him the Delaware Court of Chancery would have likely ordered him to do so anyway.  Plaintiffs identified and linked to that very interview in their First Amended Complaint, alleging that "[i]n an interview with the BBC on April 12, 2023, Musk admitted that he agreed to go through with the Buyout at the full $54.20 price in order to avoid a trial in Delaware *because he knew he was going to lose*." Dkt. No. 38 at ¶ 166.  Plaintiffs' counsel then followed up, asking Mr. Musk: "And you based the supposition that the Court was biased against you solely based on its decision in the Tesla case; right?" Trial Tr. 835:21–23.  Plaintiffs' counsel knew that was not correct; Mr. Musk had just testified seconds

before that he based that belief on what his legal team told him. And that is precisely what Mr. Musk, unsurprisingly, repeated. *Id.* at 835:24–836:1. Plaintiffs' counsel, undeterred, asked *a third time*: "Your belief in that bias was simply based on the judge's rulings; is that right?" *Id.* at 836:2–6. Mr. Musk, again, repeated the answer he had given twice already—that his belief was based on what his attorneys told him. *Id.* at 836:7–8.

As is clear from the record, Plaintiffs' counsel knew when he asked the first question—and certainly by the time he asked it a second and third time—what Mr. Musk would say. Plaintiffs' counsel asked regardless to elicit a privilege objection. Indeed, three attempts to draw that objection failed, Plaintiffs' counsel remarked in front of the jury that he "didn't hear an objection on privilege." *Id.* at 836:9–11. He stated that he is "not trying to force an answer on privilege grounds"—after doing that not once but three times. As Defendant previously had raised at sidebar, and the Court agreed, it is improper to ask questions that counsel knows will elicit privileged information in order to draw an objection and create the prejudicial impression that the witness is hiding something from the jury. Plaintiffs' counsel represented to the Court that he would "never do so." *Id.* at 332:2–17. But that is precisely what he did.

The Court then compounded that improper conduct by, *sua sponte*, striking the testimony that Plaintiffs' counsel had thrice elicited, providing an improper, unrequested, inaccurate, and highly prejudicial instruction to the jury in the middle of trial. *Id.* at 937:9–23.

To begin, Plaintiffs did not object to the testimony that ***they*** elicited. Moreover, as Defendant argued, any instruction to the jury about what the "advice of counsel" defense was entirely unnecessary. The jury is not being asked to consider such a defense; they do not need to be instructed about the contours of legal doctrines that are not at issue. Even if a curative instruction were appropriate (it was not), a simple instruction referring to the testimony at issue as implicating privilege, stating that the testimony is stricken, and directing the jury to disregard it and not draw any inference from the assertion of privilege was all that was required. But the Court's instruction suggested to the jury that Mr. Musk had the legal option to assert a defense that he "in good faith followed the advice of counsel" but was not able to do so here. That suggestion is unnecessary and improper, particularly in light of the fact that to trigger a "good faith" defense, a defendant must show, *inter alia*, that he "requested the professional's advice as to the *legality* of the contemplated action" and "received advice that it was *legal*." *S.E.C. v. Yuen*, 2006 WL 1390828,

*40 (C.D. Cal. March 16, 2006). The relevant testimony thus did not even implicate the good faith defense because Mr. Musk did not testify that he sought or received advice that closing the merger was legal—it plainly was and no one has suggested it was not. The Court's curative instruction was incorrect and prejudicial.

### E. Plaintiffs' Counsel Purposefully Has Injected Irrelevant And Prejudicial Matters Into The Trial

The Court also should grant a mistrial based upon Plaintiffs' counsel improper introduction of irrelevant and prejudicial matters into this proceeding.

*First*, during opening statements, Plaintiffs' counsel showed the jury a series of five tweets—(1) a May 13, 2022 tweet that "invites others to do their own statistical analysis of bots on Twitter's platform, Trial Tr. at 218:12–13, Tr. Ex. 114; (2) a May 13, 2022 tweet saying "he'll use a hundred accounts for his sample size because that's what Twitter uses," Trial Tr. at 218:13–15, Tr. Ex. 100; (3) a May 13, 2022 tweet that "bots are angry" at being counted, Trial Tr. at 218:20, Tr. Ex. 340; (4) a May 15, 2022 tweet saying "he hasn't seen any analysis about 5 percent from Twitter," Trial Tr. 218:23–24. Tr. Ex. 118; and (5) a May 15, 2022 tweet that there is "some chance it might be over 90 percent of daily active users that are bots," Trial Tr. 218:24–219:1, Tr. Ex. 597. Plaintiffs' counsel then stated that these were posted "[n]ot because this is true. All of these are deceptive and dishonest." Trial Tr. at 219:1–2. But none of these were pleaded as false or misleading statements. The First Amended Complaint refers to the first two tweets, Dkt. No. 31 at ¶¶ 113–114, but does not say a word suggesting that these tweets are false or misleading. Defendant noted as much in his Motion to Dismiss, Dkt. No. 34 at 6 n.5, and the Court dismissed all challenged statements except for the three surviving misrepresentations, Dkt. No. 48 at 39. The remainder of the tweets listed above are not even mentioned in the First Amended Complaint at all.

Defendant does not rehash here his many arguments that Plaintiffs should not be allowed to present their purported scheme claim at all. But Plaintiffs did not simply argue that these tweets were part of a scheme or provide context, Plaintiffs argued that these tweets themselves were not true and were "dishonest." Separately, even if Plaintiffs' scheme claim is allowed, under Federal Rule of Civil Procedure 9(b), Plaintiffs were required to plead each statement they allege was "deceptive or manipulative." *In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1404 (9th Cir. 1996) ("It is well

established that claims brought under Rule 10b–5 and Section 10(b) must meet the particularity requirements of Fed. R. Civ. P. 9(b)."); *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 577 (S.D.N.Y. 2016) ("[P]laintiffs must also state with particularity what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue.") (cited Pls.' Opp. to Def's Mot. *in Limine* No. 4, Dkt. No. 372, at 4). Plaintiffs cannot argue to the jury that tweets never referenced a single time in their complaint were "deceptive" and give rise to liability.

Defendant requested a curative instruction making clear to the jury—who has been given no instruction about the scope of the case—the issues to be tried in the case. Trial Tr. at 231:7–10. The Court declined to issue any curative instructions. Defendant again requested a limiting instruction in writing. Dkt. No. 471 at 3–4. The Court again declined to give Defendant's proposed instruction. The jury has been left, for a week, with the misimpression that liability may be based on assertions that tweets never mentioned in the operative complaint are false and deceptive. And the Court declined to timely correct that fundamental misimpression.

*Second*, Plaintiffs' counsel has also repeatedly injected prejudicial questioning designed to sway the San Francisco jury to find Mr. Musk liable based on issues related to Mr. Musk's ties to California and have absolutely nothing to do with the legal issues in the case. Plaintiffs began their questioning of Mr. Musk with this colloquy:

> **Q.** You are one of the richest people in the world?
> **A.** Yes.
> **Q.** You made much of that fortune right here in California?
> **A.** Yes.
> **Q.** You no longer live in the state?
> **A.** Yes.
> **Q.** You've moved several of your business operations and headquarters out of the state?
> **A.** Well, we still have substantial presence in California.
> **Q.** You've moved substantial operations and your headquarters of some of those businesses out of the state?
> **A.** Yes.

1  Trial Tr. at 663:11–22.  Those questions have absolutely no probative value; their only purpose is to sway

2  the California jury in their favor and against Mr. Musk for reasons that have nothing to do with the issues

3  before the jury.[2]  Such a tactic is designed to prompt the jury to base its decision on an improper basis.

4        *Third*, Plaintiffs repeatedly elicited testimony about Mr. Musk attempting to terminate Twitter top

5  lawyer, Vijaya Gadde, from at least three witnesses.  Such an event has no relevance to the issues before

6  the jury.  Yet Plaintiffs asked Ms. Gadde, Mr. Musk, and Mr. Agrawal about the termination request.

7  Trial Tr. 383:3–387:16 (Gadde); *id.* at 745:19–746:2 (Musk); *id.* at 1254:6–1255:5 (Agrawal).  When

8  counsel objected to the question posed to Ms. Gadde, Plaintiffs' counsel stated that the questions went to

9  Ms. Gadde's bias.  *Id.* at 383:7–11.  But Plaintiffs' counsel had called Ms. Gadde as a witness and the

10 only conceivable bias would be *against* Mr. Musk.  When Defendant objected to the same line of

11 questioning to Mr. Agrawal based on Rule 403 and the Court's *in limine* ruling, the Court overruled the

12 objection without requiring any explanation from Plaintiffs' counsel.  *Id.* at 1254:25–1255:3 (Agrawal).

13 **II.    THE CUMULATIVE PREJUDICE WARRANTS A MISTRIAL**

14       Considered on their own, each of counsel's actions—from their violations of the Court's *in limine*

15 orders to their parochial attempts to hometown Mr. Musk—and the Court's errors prejudiced Mr. Musk

16 and establish an independent basis to grant a mistrial.  When considered collectively, there is no doubt

17 that the cumulative prejudice flowing from the above misconduct and error have deprived Mr. Musk of a

18 fair trial and mandate a new one.

19       "[E]rrors in a civil trial must be considered 'cumulatively'" and "the combined effect of multiple

20 errors 'may suffice to warrant a new trial even if each error standing alone may not be prejudicial.'" *Sidibe*

21 *v. Sutter Health*, 103 F.4th 675, 688 (9th Cir. 2024) (quoting *Jerden v. Amstutz*, 430 F.3d 1231, 1240–41

22 (9th Cir. 2005)).  When multiple errors have tainted the trial, the Court "need not decide whether" any of

23 the "errors would by itself warrant reversal," but instead is required to consider their "cumulative effect"

24 on the fair administration of the trial.  *Gonzales v. Police Dep't, City of San Jose, Cal.,* 901 F.2d 758, 762

25 (9th Cir. 1990).

---

[2] Plaintiffs' counsel continued this improper tactic by mentioning to Mr. Segal, in front of the jury, the fact that both Mr. Segal and Plaintiffs' counsel had worked at Candlestick Park.  The Court then heightened the problem by aligning himself with Mr. Molumphy and Mr. Segal, again in front of the jury.  Trial Tr. at 1110:21–1112:4.

The cumulative impact of the misconduct and errors here is manifest. The jury has been led to believe that Mr. Musk's purchase of Twitter stock **before** the Class Period violated securities laws and harmed shareholders. At best, jurors have drawn the inference that Mr. Musk is a habitual violator of the law. At worst, they have been led to believe that Mr. Musk is liable for securities fraud. Not for any of his acts and statements during the Class Period, but for his alleged failure to file the required forms weeks before he posted his May 13 tweet. The jury's likely confusion about the claims at issue in this case—and the resulting prejudice to Mr. Musk—has only been compounded by the fact that Plaintiffs keep putting dismissed or unpled statements and theories in front of the jury and by the Court's corresponding failure to issue any curative or limiting instructions. Indeed, the Court has given only two instructions—outside of its standard preliminary instructions—in this case and both were erroneous. The first needlessly and prejudicially injected the advice of counsel defense into the trial and the other misstated European privacy law. And the Court's conduct, comments toward, and admonitions of defense counsel, along with the chummy atmosphere created with Plaintiffs' counsel and Mr. Segal during the latter's examination has "projected an appearance of hostility to the defense" that has "gone beyond the court's supervisory role." *See Onyeabor*, 649 F. App'x at 444–45 ("The court admonished Sherman 39 times in the presence of the jury, often at crucial moments and for innocuous conduct. The court admonished the government only 4 times.").

When reviewed as a whole, the record demonstrates that the cumulative effect of these errors has created the impression that Mr. Musk is guilty of securities violations he is not on trial for, that his counsel has engaged in conduct requiring public rebuke from the Court, and that he and his team are on one side and Plaintiffs, the Court, and community on the other. Counsel's conduct and the Court's errors have created an environment in which Mr. Musk cannot have a fair trial. This cumulative prejudice cannot be cured. A new trial is required.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court declare a mistrial and discharge the jury.

-15-   Case No. 3:22-CV-05937-CRB
DEFENDANT'S MOTION FOR A MISTRIAL

DATED: March 7, 2026

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  /s/ Ellyde R. Thompson
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Ellyde R. Thompson
Jesse A. Bernstein
Alex Bergjans

*Attorneys for Defendant Elon Musk*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on Saturday, March 7, 2026.

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By  /s/ Alex Bergjans
    Alex Spiro
    Michael T. Lifrak
    Stephen A. Broome
    Ellyde R. Thompson
    Jesse A. Bernstein
    Alex Bergjans

*Attorneys for Defendant Elon Musk*

**ATTESTATION**

Pursuant to Civil L.R. 5-1, I attest under penalty of perjury that concurrence in the filing of this document has been obtained from the other signatories herein.

By  /s/ *Alex Bergjans*
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Ellyde R. Thompson
Jesse A. Bernstein
Alex Bergjans

*Attorneys for Defendant Elon Musk*