1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
2  Alex Spiro (*pro hac vice*)
   alexspiro@quinnemanuel.com
3  Ellyde R. Thompson (*pro hac vice*)
   ellydethompson@quinnemanuel.com
4  Jesse A. Bernstein (*pro hac vice*)
   jessebernstein@quinnemanuel.com
5  295 Fifth Ave., New York, NY 10010
   Telephone:     (212) 849-7000
6  Facsimile:     (212) 849-7100
7
   Michael T. Lifrak (Bar No. 210846)
8  michaellifrak@quinnemanuel.com
   Stephen A. Broome (Bar No. 314605)
9  stephenbroome@quinnemanuel.com
   Alex Bergjans (Bar No. 302830)
10 alexbergjans@quinnemanuel.com
   865 S. Figueroa Street, 10th Floor
11 Los Angeles, California 90017
   Telephone:     (213) 443-3000
12 Facsimile:     (213) 443-3100
13
14 *Attorneys for Defendant Elon Musk*
15
                    UNITED STATES DISTRICT COURT
16
                    NORTHERN DISTRICT OF CALIFORNIA
17
   GIUSEPPE PAMPENA, on behalf of         CASE NO. 3:22-CV-05937-CRB
18 himself and all others similarly situated,
                                          **DEFENDANT ELON MUSK'S**
19              Plaintiff,                **RESPONSE TO THE COURT'S**
                                          **QUESTIONS REGARDING PRIVACY**
20        vs.                             **LAW AND REQUEST FOR A CURATIVE**
                                          **INSTRUCTION**
21 ELON R. MUSK,
                                          Hon. Judge Charles R. Breyer
22              Defendant.
23
24
25
26
27
28
                                                         Case No. 3:22-CV-05937-CRB
   DEFENDANT'S RESPONSE TO THE COURT'S QUESTIONS REGARDING PRIVACY LAW AND REQUEST FOR A
                               CURATIVE INSTRUCTION

# INTRODUCTION

Defendant Elon Musk submits this brief in response to the Court's request that the parties address the question of whether Twitter could lawfully have produced private user data to Musk's team prior to the Chancery Court's motion to compel order in Delaware—specifically, whether applicable privacy laws, such as the European Union's General Data Protection Regulation ("GDPR"), permitted earlier production.[1]

At the threshold, the Court should not have needed to address this legal issue at all. The jury need not determine whether Twitter could provide the requested data under privacy laws because that is not an element of the securities fraud claim against Mr. Musk. To the extent Plaintiffs (misleadingly) suggested that Twitter did not produce the data because of privacy law restrictions, the jury is free to evaluate the credibility of the former Twitter witnesses making such assertions. But Defendant must be permitted to challenge their credibility and Plaintiffs' narrative that privacy regulations prevented the production of such data. Likewise, Defendant must be allowed—in the context of this securities fraud case against Mr. Musk, not a breach of contract action—to provide evidence that Twitter only belatedly produced the data Mr. Musk requested. But, even if it were necessary for the Court to decide a question of privacy law, the Court should be asking *Plaintiffs* to answer this question. Afterall, it was *Plaintiffs* who repeatedly referenced Twitter's purported privacy obligations in their opening statement and first elicited testimony on the subject, and it is *Plaintiffs* who have the burden to prove liability in this case.

Because the Court has shifted the burden of answering this question to the Defendant, he demonstrates herein that the law unambiguously provides that Twitter could have produced private user data to Mr. Musk following the signing of the Merger Agreement. All Twitter users must consent to Twitter's Privacy Policy upon account creation. The Privacy Policy expressly provides that Twitter "may share, sell, or transfer information about [users] in connection with a merger, acquisition, reorganization, sale of assets, or bankruptcy." Ex. 813 (Privacy Policy) § 3.5. The Privacy Policy further specifies that

---

[1] At the end of the day on Friday, the Court noted that it wanted a brief explaining "what the law is in this area" and that "both sides can give their opinion." Trial Tr. 1317:18-23. As this was an issue Plaintiffs interjected into this case, on which they have the burden of proof, Defendant asked Plaintiff when they planned to submit their brief so that Defendant could respond. Plaintiffs insisted that Defendant should file first. Defendant did not agree.

1  this sharing is permitted "before and after the close of any transaction." *Id*.  Under GDPR Article 6(1)(a),
2  a data controller that has obtained user consent to the use and sharing of their data may do in accordance
3  with the consented-to terms.  A court order is not necessary.  There was thus no legal impediment to
4  Twitter's voluntary production of private user data to Musk's team during the post-signing due diligence
5  period in 2022.  Plaintiffs' efforts to suggest otherwise—which began on the very first day of trial—have
6  been a ruse.

7  Unfortunately, the Court's attention has been drawn to this issue in a manner that requires a full
8  and frank response.  The record makes clear that it was Plaintiffs—not Defendant—who injected the
9  privacy issue into this case.  The record is equally clear that the Court has misidentified the source of any
10 "misimpression" the jury might have received.  Plaintiffs, through their witnesses, repeatedly elicited
11 testimony suggesting that Twitter *could not* produce private user data because of GDPR and other
12 unidentified privacy regulations.  That was false.  Notably, however, the Court did not raise any concern
13 about *Plaintiffs* creating that misimpression for the jury.  The Court did not interrupt Plaintiffs' counsel's
14 examination on these issues or admonish Plaintiffs' counsel for creating a "misleading" impression.  It
15 was only when Defendant sought to *respond* to the misleading record Plaintiffs created—by pointing to
16 the Delaware court order (which shows production *was* possible), by examining witnesses about Twitter's
17 Privacy Policy (which expressly authorized acquisition-related sharing), and by highlighting that Twitter
18 produced the data once it had no choice—that the Court repeatedly intervened to cut off defense counsel's
19 examination; erroneously instructed the jury that Twitter's Privacy Policy "incorporate[s] by reference the
20 European Union policies [and] state policies" (there is no such reference); and admonished defense
21 counsel for purportedly asking "entirely misleading" questions and creating an "entirely inappropriate"
22 inference—despite the Court's earlier acknowledgement that the inference "may be a fair inference" and
23 its subsequent acknowledgement that the Court is "not an expert in privacy law" and "might be wrong in
24 that regard"  Trial Tr. 1181:24-1182:9, 1192:5-14, 1193:19-1194:9, 1308:2-3, 1311:19-1313:6.

25 The Court has expressed concern that Defendant created a "misimpression" that Twitter could
26 have produced the data but refused to do so.  To be clear:  Defendant did not create a misimpression.
27 *Plaintiffs* created the opposite misimpression—that Twitter could *not* have produced the data because of

28

GDPR. Defendant respectfully submits that the record, the law, and Twitter's own Privacy Policy require that the jury be given a full and accurate picture: Twitter's privacy obligations were no obstacle to production. Twitter could have produced the data; it simply chose not to do so.

Because the Court has weighed in on Plaintiffs' side of this issue in front of the jury and given them an inaccurate description of certain evidence and the law, a curative instruction is necessary.

## BACKGROUND

### A. Plaintiffs Injected the Privacy Issue Into This Case

At the outset, it bears emphasis that Defendant did not introduce privacy law into this litigation. Plaintiffs did.

On the very first day of trial, Plaintiffs told the jury in opening statements that Mr. Musk's request for bot data "caused enormous headaches for Twitter because they have these obligations to protect the privacy rights of Twitter users, account holders." Trial Tr. 224:23-225:3. Plaintiffs told the jury this was evidence that Mr. Musk's true objective was not to close the deal, but "an effort to get out." *Id.* Plaintiffs then called Twitter's Chief Legal Officer, Vijaya Gadde, to explain legal terms and provisions in the "Government Regulations" section of Twitter's 10-K, and elicited testimony about Twitter's obligations under the California Data Protection Act, GDPR, and other privacy laws. Trial Tr. 404:11-406:2; *see id*. at 405:15-18 ("Q. Twitter had to comply with privacy laws especially concerning account holders and information given to Twitter by those account holders; fair? A. Yes.").

Plaintiffs then called Staci Conti and elicited the following testimony through leading questions:

**Q.** At the May 13th meeting, which you were present at, did anybody from Twitter agree to provide the private user data?

**A.** Never.

**Q.** *Because sharing that type of information would implicate users' privacy, and there were limitations on sharing it; correct?*

**A.** That's correct.

**Q.** And Twitter couldn't simply push a button and send that information to Mr. Musk *even if it wanted to*?

**A.** That's correct.

Trial Tr. 1058:25-1059:7 (emphasis added).

Plaintiffs' witness doubled down on cross:

**Q.** And Twitter didn't provide him the private information in May or June of 2022 to get to the right answer; fair?

**A.** That is correct. Because of privacy and antitrust laws, we were prevented from providing anything of that detail.

Trial Tr. 1062:24-1063:2.[2] Notably, although the Court later admonished Defense counsel that it was "improper to ask [Mr. Agrawal] the question" about privacy laws because "[h]e's not a lawyer" and "[h]e's not conversant with the laws of the EU and so forth," Trial Tr. 1312:25-1313:6, the Court did not even blink when Plaintiffs' counsel elicited this testimony from Ms. Conti (also a non-lawyer).

Ms. Conti's testimony was deeply misleading or, at minimum, inaccurate. But Plaintiffs introduced it without objection. Yet, when Defendant attempted to cross-examine Ms. Conti on the very issue by pointing out that Twitter had produced reams of private information on other topics, which undermined the suggestion that it "couldn't" produce the private bot data, the Court sustained Plaintiffs' objection and did not allow Ms. Conti to answer. Trial Tr. 1063:3-6.

Plaintiffs repeated this inquiry with Twitter CFO Ned Segal, eliciting testimony about "protecting privacy" and the company's obligations to "keep[] that personal private information of its users private." Trial Tr. 1086:8-10, 1093:16-1094:5. On examination by Plaintiffs, Mr. Segal testified: "We had to balance providing the buyer information that would help them close with what … we couldn't share for privacy reasons." Trial Tr. 1100:9-19; *see also id.* at 1118:11-17 (Mr. Segal: "[W]e had to be sensitive to the privacy of the people who used the service. In some cases those were our rules; in other cases those were the rules in the European Union or other places about the ability to share data."). Mr. Segal testified (incorrectly) that Twitter could not even produce the private data Mr. Musk requested in a clean room environment because merely "by showing [it] to them, you may have violated privacy rules." Trial Tr. 1169:14-22. Again, despite the Court's subsequent admonishment of Defense counsel that it is

---

[2] It bears noting that Plaintiffs' witness's suggestion that "antitrust laws" somehow prevented data sharing with a *buyer* is not credible. There is no evidence in the record suggesting Twitter believed that sharing user data with Mr. Musk for due diligence purposes would violate U.S. antitrust laws. Defendant is aware of no antitrust law applicable to this situation, and Plaintiffs have never identified any.

"improper" to ask such questions, it permitted Plaintiffs' counsel to elicit this testimony without objection or interruption.

Plaintiffs pursued the same lines of inquiry with Twitter's CEO, Parag Agrawal:

> **Q.** Did you consider the company's privacy concerns … with respect to information that was requested by Mr. Musk?
>
> **A.** Yes. Those were considerations.
>
> **Q.** Those were important to you as the CEO and a board member; right?
>
> **A.** Yes.

Trial Tr. 1270:22-1271:3.

After Defendant properly cross-examined Mr. Segal about the Delaware court's order compelling production of this supposedly un-producible private data—demonstrating that the data *could* be produced, that a court *ordered* it to be produced, and that Twitter ultimately *did* produce it—the Court admonished counsel (outside the presence of the jury):

> **THE COURT:** My concern was that *your question was entirely misleading and the inference was entirely inappropriate*. The impression that you created by asking him about the Delaware order from the court was that this information, which the -- which Twitter had was -- was not produced because they willfully or not -- maybe negligently -- but they made a determination not to make this forthcoming, though they could have made it forth -- they could have produced it. And the evidence that they, quote, could have produced it was the fact that they had to be ordered by a judge in Delaware to produce it. That's the inference.

Trial Tr. 1192:5-14. The Court's characterization cannot be reconciled with the record. Defendant's "inference" was not "entirely inappropriate." It was accurate: Twitter had the data. Twitter's Privacy Policy allowed them to share it with Mr. Musk. A court ordered Twitter to produce it. Twitter produced it. Mr. Musk closed the deal. The conclusion that Twitter *could have* produced the data earlier—without a court order—is not a misleading inference; it is the only rational inference the evidence supports. Defendant was doing nothing more than responding to the misleading narrative that Plaintiffs had spent the first days of trial constructing.

**B.     The Court Has Systematically Intervened To Prevent Defendant From Challenging Plaintiffs' Privacy Narrative**

      The Court's interventions on this issue have been numerous and, taken together, have created a striking imbalance. The record reflects the following pattern:

      ***The Court permitted Plaintiffs to elicit privacy law testimony without restriction.*** Four separate witnesses called by Plaintiffs—Ms. Gadde, Ms. Conti, Mr. Segal, and Mr. Agrawal—testified, in response to Plaintiffs' questions, that Twitter did not produce private user data because of GDPR or other purported privacy regulations or concerns. The Court did not interrupt or prevent these witnesses from offering such testimony. The jury heard all of it.

      ***The Court prevented Defendant from challenging Plaintiffs' privacy law narrative.*** Yet, when Defendant sought to confront Ms. Conti with evidence that Twitter had produced private information in other contexts (contradicting her testimony that privacy laws *prevented* production), the Court sustained Plaintiffs' objection. Trial Tr. 1062:24-1063:6.

      Despite ruling that Defendant could not ask Twitter's CEO what Twitter's Privacy Policy "communicates to users" because it supposedly "calls for a legal conclusion"—it plainly does not—the Court overruled Defendant's objection when Plaintiffs asked Twitter's CEO—who testified that he was not a "privacy law expert" and did not draft Twitter's privacy practices—whether he understood "that different states have different privacy laws and different privacy regulations that might not be the same," whether "Twitter's privacy policy somehow overrules a state or federal or international privacy rule or law." Trial Tr. 1303:24-1304:20. The Court also permitted Plaintiffs to ask Mr. Agrawal whether he understood "that Twitter was also bound by privacy laws and regulations." *Id.* Mr. Agrawal testified that he believed Twitter is legally "bound by both" the privacy policy and privacy regulations. *Id.*

      Yet, when Defendant's counsel sought to explore Twitter's Privacy Policy—the very policy that authorizes acquisition-related data sharing—with the same witness, the Court interrupted Defense counsel's examination by offering its own (incorrect) views on the evidence:

> **Q.** Let's go back to Exhibit 814, which was Twitter's terms of service. Do you see there on the very first page, Mr. Agrawal, it says – it describes which terms apply if you live outside the European Union and if you live inside the European Union?
>
> **THE COURT:** I'm sorry. What --- what are we looking at?

1   **MR. BROOME:** 814, Your Honor.

2   **THE COURT:** Okay.

3   **THE WITNESS:** Yes.

4   **Q.** And regardless of whether you live in -- within or without the European
5   Union, Twitter's privacy policy applies; correct?

6   **THE COURT:** *It doesn't say that.* It says that Twitter accepts the policy.

7 Trial Tr. 1305:20-1306:9. In fact, Twitter's policy says exactly what Defendant's counsel suggested it
8 does—that the same Privacy Policy applies regardless of whether users are inside or outside the European
9 Union. *See* Ex. 814-2. The witness—Twitter's CEO—agreed. *Id.* 1307:5-6 ("the privacy policy link
10 appears to be the same, yes.").

11   The Court continued to interject with the effect of preventing Defendant from challenging the
12 narrative Plaintiffs had offered or the incorrect testimony that Plaintiffs had elicited from witnesses. The
13 Court also prevented Defendant's counsel from asking questions identical to the nature of the questions
14 Plaintiffs' counsel asked, which the Court had permitted:

15   **Q.** And one of the reasons companies like Twitter have privacy policies and
16   get consent to privacy policies is so that they may then use the data in
17   accordance with their terms; right?

18   **MR. ARNZEN:** Objection, lacks foundation.

19   **BY MR. BROOME:**
    **Q.** Notwithstanding --

20   **THE COURT:** Which terms are you talking about?
21
22   **MR. BROOME:** The terms of the privacy policy.

23   **THE COURT:** Which incorporate by reference the European Union
    privacy policies, the state policies. Do you understand -- do you understand
24   what I'm saying?

25   **MR. BROOME:** Yeah, I do.

26   **THE COURT:** Okay. So in other words -- in other words, you're asking
    him the question, does he understand that the policies of Twitter incorporate
27   by reference adherence to the European Union policies, the state policies,

28

any other laws? Is that the question? Is that the question?

**MR. BROOME:** No, Your Honor.

**THE COURT:** Fine. That's not the question. Do you have another question?

**MR. BROOME:** Yes.

**Q.** Mr. Agrawal, do you understand that under GDPR, if you get consent from users to collect, use, and share their data according to the terms of your privacy policy, then you may indeed collect, use, and share the users' data according to the terms of the privacy policy?

**MR. ARNZEN:** Object --

**THE COURT:** Sustained. You're asking him a legal question.

**MR. BROOME:** No further questions, Your Honor.

Trial Tr. 1307:19-1308:25. With due respect, Defendant's counsel was not asking Mr. Agrawal to provide a legal opinion, but, rather, for the CEO's "understanding" of whether Twitter could produce the data to Mr. Musk consistent with the terms of Twitter's Privacy Policy, GDPR notwithstanding—an issue that is now squarely at issue in light of Plaintiffs' misleading privacy narrative.

## ARGUMENT

**I.     THE COURT IS WRONG THAT DEFENDANT HAS MISLEAD THE JURY ON THE QUESTION OF PRIVACY RESTRICTIONS**

**A.     Twitter's Privacy Policy Expressly and Unambiguously Authorized It to Share User Data with Musk's Team Before the Transaction Closed**

Every user who signed up for a Twitter account agreed to Twitter's Terms of Service and Privacy Policy. Those documents are in evidence in this case. Exs. 813 and 814. Section 3.5 of the Policy—titled "As a result of a change in ownership"—states:

> We may share, sell, or transfer information about you in connection with **a merger, acquisition**, reorganization, sale of assets, or bankruptcy. This Privacy Policy will apply to your personal information that is shared with (**before and after the close of any transaction**) or transferred to the new entity.

Ex. 813 (Privacy Policy) § 3.5 (emphasis added). This provision could not be clearer. Twitter told users—

at the time they created their accounts and on an ongoing basis—that their data could be shared with a prospective acquirer "before" the transaction closes.

Section 1.2 of the Privacy Policy describes Twitter's collection of usage information, device information, location information, inferred identity data, and log information—which cover the landscape of private data that Mr. Musk's team requested for purposes of independently verifying the <5% bot representation (and then some). The Privacy Policy put users on express notice that Twitter collects, stores, uses and may share "[i]nformation about your connection, such as your IP address and browser type"; "[i]nformation about your device and its settings, such as device and advertising ID, operating system, carrier, language, memory, apps installed, and battery level"; and location information. Privacy Policy § 1.2. It told users this data could be shared with advertisers, partners, and an acquirer. Privacy Policy §§ 3.1, 3.2, 3.5.

All Twitter users consent to the Terms of Service, which includes the Privacy Policy. Ex. 814 § 2; Trial Tr. 1280:2-9. Section 7 of the Privacy Policy confirms that Twitter's services are available only to users who meet minimum age requirements—meaning every user is presumed to have legal capacity to consent.

In short: the premise underlying Plaintiffs' entire privacy argument—and the premise that the Court appears to have credited—is false. Twitter's users consented, through the Privacy Policy, to exactly the sharing that Mr. Musk and his team requested. There was no legal barrier of any kind to Twitter's voluntary disclosure. Twitter's privacy law argument was not a genuine compliance concern. It was a litigation strategy.

**B.   Twitter Could Lawfully Share User Data Pursuant to the Terms of Its Privacy Policy Consistent with GDPR**

Under the GDPR, the lawful bases for processing and sharing personal data are set out in Article 6(1).[3] *Regulation (EU) 2016/679 of the European Parliament and of the Council* ("GDPR"), Art. 6(1).

---

[3] Under the GDPR, "processing" is defined expansively to include: "any operation or set of operations which is performed on personal data or on sets of personal data, whether or not by automated means, such as collection, recording, organisation, structuring, storage, adaptation or alteration, retrieval, consultation, use, **disclosure by transmission, dissemination or otherwise making available**, alignment or combination, restriction, erasure or destruction." Art. 4(2) (emphasis added).

One of those bases—the one most directly applicable here—is consent: Article 6(1)(a) provides that processing is lawful if "the data subject has given consent to the processing of his or her personal data for one or more specific purposes." GDPR Art. 6(1)(a); *see also* GDPR Art. 7(1) ("Where processing is based on consent, the controller shall be able to demonstrate that the data subject has consented to processing of his or her personal data.").

Article 4(11) of the GDPR defines "consent" as "any freely given, specific, informed and unambiguous indication of the data subject's wishes by which he or she, by a statement or by a clear affirmative action, signifies agreement to the processing of personal data relating to him or her. " GDPR Art. 4(11). Twitter's Privacy Policy satisfies each of these requirements:

- **Freely given**: Users voluntarily create Twitter accounts and accept the Privacy Policy as a condition of use.
- **Specific**: Section 3.5 expressly and specifically describes the merger/acquisition sharing scenario.
- **Informed**: Section 3.5 tells users, in plain language, that their data may be shared before a transaction closes.
- **Unambiguous**: The use of clear, accessible language in a consumer-facing privacy policy that users click to accept constitutes unambiguous consent. *See* GDPR Art. 4(11) and Recital 32 (consent may be given by "a statement or by a clear affirmative action," including "ticking a box when visiting an internet website").

The GDPR's requirements for valid consent are satisfied here. Users explicitly agreed that their data could be shared in connection with an acquisition, before the close of the transaction. That is precisely what Twitter was asked to do. Plaintiffs' suggestion that GDPR prevented Twitter from producing the private data to Mr. Musk is therefore wrong as a matter of law.[4]

The Court has acknowledged that a court order (such as the Delaware court's order) can override privacy restrictions. Trial Tr. 1193:2-8. But the point, which the Court has missed, is that a court order

---

[4] The GDPR also provides at Article 6(1)(f) that processing is lawful where "necessary for the purposes of the legitimate interests pursued by the controller or by a third party, except where such interests are overridden by the interests or fundamental rights and freedoms of the data subject[.]" Twitter's interest in consummating an announced $44 billion acquisition—and in satisfying its contractual information-sharing obligations—is plainly a "legitimate interest" within the meaning of Article 6(1)(f).

is not the *only* mechanism.  User consent and legitimate business interests also supply independent lawful bases under GDPR.  Twitter did not need a court order.  It needed only to comply with its own Privacy Policy.[5]

### C. The Court's "Third-Party Data" Hypothetical Is a Red Herring That Has No Application to the Private User Data Musk Requested

The Court offered the following hypothetical during a colloquy with Defendant's counsel:

> I say to my daughter, here -- and I don't go on Twitter -- here's my health information or here is who -- here is who I intend to be a beneficiary of my will, or something that is highly private, and she then tweets it to my son, 'Here is what Dad intends to do,' then that information now is -- without my consent is now public, can be transferred to third parties without any further consent? ... Is that your understanding of the law?

Trial Tr. 1311:19-1312:15.  With respect, this hypothetical is inapplicable to the facts of this case for two independent reasons.

First, information posted publicly in a tweet is, by definition, public at the very moment it is posted. Twitter's Privacy Policy itself acknowledges this: "Twitter is a public platform. ... Twitter content ... is available for viewing by the general public." Ex. 813-4, 11.  The policy further provides: "Twitter content, including your profile information (e. g., name/pseudonym, username, profile pictures), is available for viewing by the general public." Privacy Policy § 3. 1.  When a user tweets information—including

---

[5]  The analysis is similar under the California Consumer Privacy Act ("CCPA"). The CCPA is an "opt-out" statute that allows a business to collect, use, and share user data, so long as the business, "at or before the point of collection [*e.g.*, when the user first creates their account], inform[s] consumers as to the categories of personal information to be collected and the purposes for which the categories of personal information shall be used," Cal. Civ. Code § 1798.100(b) (effective January 1, 2020-December 31, 2022), and provides the consumer a right to opt out, *id.* at § 1798.120(a).  In addition, the CCPA specifically provides that a business may use consumer data for "the business's or a service provider's operational purposes *or other notified purposes* [*e.g.*, those set forth in the company's Privacy Policy]," including, *inter alia*, "[u]ndertaking activities to verify … the quality … of a service [*e.g.* to confirm mDAU and the percentage of spam]." *Id.* at § 1798.140(d)(7).

Moreover, California Civil Code § 1798.140(t)(2)(D) (2022) provides that "a business does not sell personal information when … [t]he business transfers to a third party the personal information of a consumer as an asset that is part of a merger, acquisition, bankruptcy, or other transaction in which the third party assumes control of all or part of the business" provided that the information shared is disclosed to the consumer if that consumer *requests* it.  *See id.*; *see also id.* §§ 1798.110 and 1798.115.  Under the CCPA, "sell" includes sharing or "disseminating" to a third party.  *Id.* § 1798.140(t)(1).  The disclosure Mr. Musk requested—user data to be reviewed as part of due diligence for Twitter's pending acquisition—is precisely the kind of business-transfer disclosure that Congress and the California Legislature recognized should not be impeded by consumer privacy laws.

information about a third party—that tweet is published to the public internet. It appears in Twitter's public data streams. It is indexed by search engines. It is included in Twitter's "firehose" data—the very data that Twitter acknowledged was public information and which Twitter sold to commercial entities *because* it is public. *See* Ex. 637. Once information is posted in a public tweet, it is no longer "private" in any legally cognizable sense. A user who tweets their father's health information has consented to making that information public. And Twitter's distribution of that public tweet in a data feed is not a privacy violation of any kind.

The Court's contention that Twitter is somehow responsible for keeping its platform free of the private information of *non*-users runs head first into Section 230 of the Communications Decency Act. A tweet is a public communication for which Twitter is not the author or publisher. *See* 47 U.S.C. § 230(c)(1) (platform immunity for third-party content). Once the user posts the tweet, Twitter—and anyone on Twitter—is free to share it with whomever they like. Even the Defendant. We know Twitter agrees because it produced the "firehose" data to Mr. Musk.

This is not to say that the non-user whose information was posted publicly is not aggrieved; perhaps they are, but their grievance is with the user who posted the information, not Twitter. Depending on the jurisdiction, the non-user might even have a common law privacy claim (e.g., publication of private facts). But again, that claim would lie against the user who posted the information, not Twitter.

Second, and most fundamentally, the data Mr. Musk and his team requested was not third-party data. The private data Mr. Musk requested—and the data that Mr. Segal and Ms. Conti described as protected by privacy laws—was data about Twitter's own users. Specifically, Mr. Musk Musk's team sought:

- IP addresses and device identifiers associated with Twitter accounts;
- Account creation metadata (date, device, geolocation at creation);
- Account activity patterns (engagement frequency, following/follower ratios);
- Identity signals used in Twitter's internal bot-detection tools;
- The underlying data samples used to calculate the less-than-5% mDAU representation.

*See* Trial Tr. at 1117:11-1118:5, 1263:22-1264:3; *see also* Exs. 169, 172. All of this data is data *about*

*Twitter users*. It is data that Twitter users generated by using Twitter's platform. It is data that Twitter's Privacy Policy expressly says Twitter may collect, process, and share. And it is data that Twitter's Privacy Policy expressly authorizes Twitter to share with a prospective acquirer before a transaction closes. Privacy Policy §§ 1.2, 3.5. Not a single category of data in Mr. Musk's requests involved data about people who were not Twitter users. The Court's third-party hypothetical is therefore inapplicable.

### D. The Delaware Court Order Is Not Evidence That Twitter Was Legally Prohibited from Voluntarily Producing the Data; It Is Evidence of the Opposite

The Court has also suggested that Defendant's reference to the Delaware court's order compelling production of private user data was "entirely misleading" and created a false inference. Trial Tr. 1192:5-14. Defendant disagrees, and the record supports Defendant's position.

The Delaware court's order compelling Twitter to produce private user data to Mr. Musk's team was issued in the context of the Delaware breach of contract litigation. The significance of that order, for purposes of this case, is not that production required a court order to get around GDPR; it is that Mr. Musk had stated he was awaiting data that his team eventually received from Twitter only after the court ordered Twitter to produce it.

Plaintiffs' witnesses, by contrast, told this jury that Twitter could not produce the data because of GDPR and other privacy laws. *See, e.g*, Trial Tr. 1058:25-1059:7. While the Court expressed concern that the jury might infer Twitter "refused to produce certain information on a ground that was nonexistent or not a bona fide ground," Trial Tr. 1181:25-1182:8, that inference is *correct*. Twitter's purported privacy objection is not a bona fide ground. It is pretextual. And the Delaware court's order instructing Twitter to produce the data—with no mention of GDPR—is evidence of that.[6]

The Court has observed that GDPR restrictions "can be overcome" through "a court process." Trial Tr. 1181:7-12. According to the Court: "That's the exception." Trial Tr. 1181:14-18. That is true, but incomplete. As detailed above, GDPR restrictions can *also* be overcome when the data controller has obtained user consent to the processing or sharing at issue. Twitter obtained that consent through its Terms of Service and Privacy Policy. The court process in Delaware was not the only path. It was simply

---

[6] Indeed, "it is important to note that the party relying on foreign law has the burden of showing such law bars production of documents or information." *Proofpoint, Inc. v. Vade Secure, Inc.*, 2020 WL 504962, *2 (N.D. Cal. Jan. 31, 2020).

the path Twitter chose after it determined that voluntary compliance was not in its interest.

II. **THE COURT MUST CORRECT THE MISLEADING IMPRESSION LEFT ON THE JURY BY ITS COMMENTS AND RULINGS PRECLUDING DEFENDANT FROM RAISING THIS ISSUE WITH WITNESSES**

   A. **The Court's Rulings Have Systematically Prejudiced Defendant by Permitting Plaintiffs to Cement a False Narrative While Blocking Defense Responses**

Defendant recognizes the gravity of raising the issue of judicial partiality, and does so with the full awareness of its obligations of candor and respect for the Court. But the record compels the following observations:

The Court has applied different standards to the parties. Plaintiffs were permitted to ask non-expert witnesses legal questions about privacy obligations. Defendant's objections to those questions were overruled. *See* Trial Tr. 1303:24-1304:20 (Court overruled Defendant's objection to questions asking Twitter's CEO whether Twitter was "bound by privacy laws"). But when Defendant sought to elicit testimony about Twitter's Privacy Policy—a document in evidence, not a legal opinion—the Court sustained Plaintiffs' objections or made its own *sua sponte* objections. Trial Tr. 1305:20-1308:14. On Friday morning, outside the presence of the jury, the Court noted that it would *not* "instruct[] the jury" or "comment[] on" whether the information sought was protected information in case it was "wrong in that regard." Trial Tr. at 1194:5-13. But the Court followed this rule only while Plaintiffs were conducting examinations. During questioning of Mr. Agrawal, for example, the Court made ***multiple*** incorrect factual representations that operated to undermine the defense:

> **Q.** And regardless of whether you live in -- within or without the European Union, Twitter's privacy policy applies; correct?
>
> **THE COURT:** *It doesn't say that.* It says that Twitter accepts the policy. It doesn't say it incorporates -- that -- doesn't say that the -- Well, go ahead. Proceed with your question.
>
> ….
>
> **Q.** And one of the reasons companies like Twitter have privacy policies and get consent to privacy policies is so that they may then use the data in accordance with their terms; right?
>
> **MR. ARNZEN:** Objection, lacks foundation.
>
> **BY MR. BROOME:**

> **Q.** Notwithstanding --
>
> **THE COURT:** Which terms are you talking about?
>
> **MR. BROOME:** The terms of the privacy policy.
>
> **THE COURT:** *Which incorporate by reference the European Union privacy policies, the state policies*. Do you understand -- do you understand what I'm saying?
>
> **MR. BROOME:** Yeah, I do.
>
> **THE COURT:** Okay. So in other words -- in other words, you're asking him the question, does he understand that *the policies of Twitter incorporate by reference adherence to the European Union policies, the state policies, any other laws*? Is that the question? Is that the question?
>
> **MR. BROOME:** No, Your Honor.

Trial Tr. 1306:6-11, 1307:19-1308:12 (emphasis added). The Court's colloquy with Mr. Broome in front of the jury conveyed incorrect factual and legal assertions—*i.e.*, that: (1) the Privacy Policy doesn't apply within and without the European Union (it does), and (2) that Twitter's Privacy Policy "incorporates by reference" EU or other privacy laws (it does not).

### B. The Court Should Issue a Curative Instruction

Because Defendant is correct on the evidence and the law, and because the Court improperly conveyed an incorrect factual and legal assertion, it should cure this issue with the following instruction on Monday morning to ensure the Court's improper statements do not linger with the jury:

> At the end of the day on Friday, during Mr. Broome's cross-examination of Mr. Agrawal, Mr. Broome asked the witness questions about Twitter's Privacy Policy. In response to Mr. Broome's question whether the Privacy Policy applies to both European Union users and users outside the European Union, the Court stated that the Privacy Policy does not say that. The Court was incorrect. In addition, in response to an objection from Plaintiffs' counsel, the Court made comments about the Privacy Policy "incorporating by reference" European Union or other privacy laws. The Court should not have made such comments or indicated that Mr. Broome's question contained an inaccurate premise. Upon further review, it appears that the Privacy Policy does not say that.
>
> The Twitter Terms of Service and Privacy Policy are in evidence as Trial Exhibits 813 and 814, and you may consider them and give them whatever weight you deem appropriate.

## CONCLUSION

For the foregoing reasons, Defendant requests that a curative instruction be given Monday morning.

DATED: March 8, 2026                    QUINN EMANUEL URQUHART & SULLIVAN, LLP


By     /s/ Stephen A. Broome
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Ellyde R. Thompson
Jesse A. Bernstein
Alex Bergjans

*Attorneys for Defendant Elon Musk*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on Sunday, March 8, 2026.

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By  /s/ Alex Bergjans
    Alex Spiro
    Michael T. Lifrak
    Stephen A. Broome
    Ellyde R. Thompson
    Jesse A. Bernstein
    Alex Bergjans

*Attorneys for Defendant Elon Musk*

## ATTESTATION

Pursuant to Civil L.R. 5-1, I attest under penalty of perjury that concurrence in the filing of this document has been obtained from the other signatories herein.

By /s/ Alex Bergjans
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Ellyde R. Thompson
Jesse A. Bernstein
Alex Bergjans

*Attorneys for Defendant Elon Musk*