QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice*)
alexspiro@quinnemanuel.com
Ellyde R. Thompson (*pro hac vice*)
ellydethompson@quinnemanuel.com
Jesse A. Bernstein (*pro hac vice*)
jessebernstein@quinnemanuel.com
295 Fifth Ave., New York, NY 10010
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Stephen A. Broome (Bar No. 314605)
stephenbroome@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

*Attorneys for Defendant Elon Musk*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | CASE NO. 3:22-CV-05937-CRB<br><br>**DEFENDANT ELON MUSK'S MOTION TO PRECLUDE PLAINTIFFS FROM MAKING IMPROPER ARGUMENTS IN CLOSING**<br><br>Hon. Judge Charles R. Breyer |

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ..................................................................................................1

ARGUMENT ..........................................................................................................................2

I.     PLAINTIFFS CANNOT MAKE ALREADY PRECLUDED ARGUMENTS IN
       CLOSING ....................................................................................................................2

       A.     Plaintiffs Cannot Argue That Mr. Musk Closed The Merger Because He Did Not
              Have A Meritorious Defense In The Delaware Action ......................................2

       B.     Plaintiffs Cannot Argue That Mr. Musk Lacked A Basis For His Belief That The
              Percentage Of Spam On Twitter's Platform Exceeded Five Percent ................3

       C.     Plaintiffs Cannot Argue That Mr. Musk's Pre-Class Purchase Of Twitter Stock Was
              Improper Or Caused Investor Harm ...................................................................5

II.    PLAINTIFFS SHOULD BE PRECLUDED FROM MAKING IMPROPER SCHEME
       ARGUMENTS ..............................................................................................................7

       A.     Plaintiffs Cannot Argue That Any Dismissed Statement Was False Or Misleading..........7

       B.     Plaintiffs Cannot Argue That Petitioning Conduct—Including Termination—Can
              Give Rise To Liability ......................................................................................8

       C.     Plaintiffs Cannot Argue That Mr. Musk's Breach Of Any Contract Or Agreement
              Violated Securities Law ....................................................................................9

III.   PLAINTIFFS SHOULD BE PRECLUDED FROM MAKING ANY OTHER IMPROPER
       ARGUMENT IN CLOSING .........................................................................................10

       A.     Plaintiffs Should Not Make Any Argument Or Invite Any Inference That Mr. Musk
              Spoliated Evidence Or Make Any Representations About The Discovery Process..........10

       B.     Plaintiffs Should Be Precluded From Arguing That Privacy Law Prohibited Twitter
              From Providing Information To Mr. Musk.........................................................11

       C.     Plaintiffs Should Be Precluded From Making Any Argument That Mr. Musk Did
              Not Call Or Did Not Obtain Certain Testimony From His Lawyers At Trial .................12

       D.     Plaintiffs Cannot Make Any Argument To Engender Sympathy From The Jury Or
              Paint Mr. Musk As An Outsider ........................................................................13

       E.     Plaintiffs Cannot Argue That The Jury Should Use Its Verdict To "Send A
              Message"..........................................................................................................14

       F.     Plaintiffs Should Not Be Permitted To Suggest That Mr. Musk's Trial Counsel Was
              Involved In The Events At Issue ........................................................................14

CONCLUSION........................................................................................................................15

1

## TABLE OF AUTHORITIES

2

**Page**

3

### Cases

4

*Anheuser-Busch, Inc. v. Nat. Beverage Distributors*,

5
    69 F.3d 337 (9th Cir. 1995) ............................................................................................1

6
*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
    2014 WL 549324 (N.D. Cal. Feb. 7, 2014) ...................................................................12

7

8
*Draper v. Rosario*,
    836 F.3d 1072 (9th Cir. 2016) ......................................................................................12

9
*Foster v. Wilson*,
    504 F.3d 1046 (9th Cir. 2007) ......................................................................................10

10

11
*Gregory v. State of Montana*,
    118 F.4th 1069 (9th Cir. 2024) ......................................................................................11

12

13
*Greisen v. Hanken*,
    252 F. Supp. 3d 1042 (D. Or. 2017) .............................................................................13

14
*Gurary v. Winehouse*,
    190 F.3d 37 (2d Cir. 1999)............................................................................................10

15

16
*Hammonds v. Yeager*,
    2017 WL 10560471 (C.D. Cal. Aug. 9, 2017).............................................................13

17
*Hard2Find Accessories, Inc. v. Amazon.com, Inc.*,
    691 F. App'x 406 (9th Cir. 2017) ..................................................................................9

18

19
*In re Illumina, Inc. Sec. Litig.*,
    2025 WL 2739655 (S.D. Cal. Sept. 26, 2025)...............................................................8

20

21
*Pac. Mailing Equip. Corp. v. Pitney Bowes, Inc.*,
    1979 WL 1697 (N.D. Cal. Sept. 18, 1979) ....................................................................3

22
*In re Palo Alto*,
    2025 WL 2410348 (N.D. Cal. Aug. 19, 2025) ...............................................................8

23

24
*Pappas v. Middle Earth Condo. Ass'n*,
    963 F.2d 534 (2d Cir. 1992)..........................................................................................12

25

26
*Reese v. BP Expl. (Alaska) Inc.*,
    643 F.3d 681 (9th Cir. 2011) ........................................................................................10

27
*In re Stem, Inc. Sec. Litig.*,
    2025 WL 3675114 (N.D. Cal. Dec. 17, 2025)................................................................8

28

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
    546 F.3d 991 (9th Cir. 2008) ...................................................................9

*Twitter v. Musk*,
    Case No. 2022-0613-KSJM (Del. Ch., Sept. 21, 2022)..........................................11

*United States v. Segna*,
    555 F.2d 226 (9th Cir. 1977) ..........................................................10, 12

*Whittenburg v. Werner Enters. Inc.*,
    561 F.3d 1122 (10th Cir. 2009) ...................................................14

## **Other Authorities**

Fed. R. Civ. P. 37.............................................................................11

Fed. R. Evid. 105 .............................................................................6

Fed. R. Evid. 404 .............................................................................7

Fed. R. Evid. 403 .............................................................................6

Rule 10b-5......................................................................................8

1

### SUMMARY OF ARGUMENT

2    In this trial, the jury will be asked to render a verdict on two discrete issues: (1) whether Mr.

3    Musk's statements on May 13, May 16, and May 17 were materially false or misleading and (2) whether

4    Mr. Musk engaged in a scheme to defraud shareholders from May 13, 2022 to October 4, 2022. Yet

5    Plaintiffs have ignored prior Court orders and improperly tried to turn this case into a referendum on Mr.

6    Musk. They have injected into trial—and improperly suggested in violation of the Court's *in limine*

7    rulings—that Mr. Musk violated securities laws and harmed investors when he purchased Twitter stock

8    on the open market before the Class Period began. They have accused Mr. Musk of making false

9    statements based on Tweets and letters that the Court already dismissed. They have suggested that Mr.

10   Musk's petitioning conduct—including his defense of the Delaware litigation—was fraudulent and

11   baseless, while seeking to preclude Mr. Musk from introducing evidence establishing otherwise. They

12   created an unsupported sideshow regarding European privacy laws. They have sought to engender

13   sympathy from the jury by focusing on irrelevant matters and have tried to create an "us versus them"

14   environment casting the Court, Plaintiffs, and jury on one side and Mr. Musk on the other.

15   Throughout the trial, Mr. Musk has tried in vain to cure this prejudice. He repeatedly asked the

16   Court to issue limiting and curative instructions to no avail. He objected to improper evidence. And he

17   even moved for a mistrial. But the Court issued none of the requested instructions—allowing the jury to

18   form fixed and uncorrected misimpressions of the claims and relevant evidence—and has not ruled on the

19   other relief Mr. Musk has sought. And now, as the parties head to closing, it has become apparent that

20   Plaintiffs will seek to take advantage of the uncured confusion and prejudice to make improper arguments

21   inviting the jury to render a verdict outside of the relevant evidence and applicable law.

22   It is thus necessary for Mr. Musk to bring this motion for an order expressly precluding Plaintiffs

23   from making these improper arguments in closing. It is not enough—and would be highly prejudicial—

24   for Mr. Musk to make contemporaneous objections during closing. *Anheuser-Busch, Inc. v. Nat. Beverage*

25   *Distributors*, 69 F.3d 337, 346 (9th Cir. 1995) ("Where misconduct permeates the proceeding, the jury is

26   'necessarily prejudiced.' Constant objections are certainly not required, as they could antagonize the

27   jury."). No objection could un-ring the bell that the improper arguments identified below will toll. To

28   this point, Mr. Musk has not had the fair trial to which he is entitled. There is manifest risk that he will

suffer additional, uncurable prejudice absent prophylactic Court intervention.  The Court should grant this motion and preclude Plaintiffs from making improper arguments in closing.

## ARGUMENT

## I. PLAINTIFFS CANNOT MAKE ALREADY PRECLUDED ARGUMENTS IN CLOSING

In pretrial orders and during the course of trial, the Court specifically precluded Plaintiffs from eliciting evidence, creating inferences, and arguing that (1) Mr. Musk closed the merger because he did not have a meritorious defense against Twitter; (2) his statements and beliefs regarding the number of spam accounts on Twitter's platform—based on the analyses performed by data scientists he retained during the merger—are unsupported or baseless; and (3) Mr. Musk violated any securities laws or harmed investors through his pre-Class Period purchases of Twitter stock.  The Court should enforce these orders and preclude these improper arguments in closing.

### A. Plaintiffs Cannot Argue That Mr. Musk Closed The Merger Because He Did Not Have A Meritorious Defense In The Delaware Action

From the very beginning of trial, Plaintiffs have argued to the jury that Mr. Musk's decision not to continue the Delaware litigation and instead to close the Twitter deal is evidence that his defense in the Delaware litigation had no merit.  Plaintiffs argued:

> And Musk put up the same defense that you'll see here.  He actually said that Twitter is the one that committed fraud.  It's gaslighting.

> After he had a chance to gather evidence, make all his fancy defense arguments, even after he threatened Twitter's board of directors to pursue them like it was World War III until he end of time, he capitulated. . . .

> He abandoned his defenses, including the defense that Twitter was the one doing fraud.  He agreed to pay full price, no concessions.

Tr. 227:20-228:7.  Plaintiffs continued this theme with their very first witness, class representative Brian Belgrave, who testified that Mr. Musk "didn't even put up a defense, which makes me think that the whole, you know, getting out of the deal was just, you know, BS."  Tr. 329:17-19.

As the Court has acknowledged, these arguments, and the fact that Plaintiffs' scheme purports to encompass what is undisputedly petitioning conduct—including the basis for, positions taken in, and resolution of, an entirely different lawsuit—has presented difficulties at trial.  Faced with those difficulties, the Court proposed a solution: "[O]ne way to deal with it is to not allow in argument the suggestion that

– that Mr. Musk settled or agreed to the merger because he thought he didn't have a legal defense or a meritorious defense." Tr. 1325:15-19. Several days later, recognizing that Plaintiffs' arguments, and Defendant's right to rebut them, creates a "sideshow" and a "trial within a trial," Tr. 1652:13-16, the Court presented Plaintiffs—not Defendant—with a choice, Tr. 1658:1-6. Plaintiffs could either allow Defendant to present evidence regarding the Delaware litigation or elect not to argue in closing that Mr. Musk ended the Delaware litigation and closed the transaction "because he didn't have a meritorious defense." Tr. 1658:1-6. Plaintiffs chose the latter. Tr. 1658:18. As a result of Plaintiffs' choice, the Court precluded Defendant from putting on evidence about the public and non-privileged facts of the Delaware litigation and Mr. Musk's defense. Tr. 1658:1-6, 1661:11-14. The Court's Order does not cure the prejudice caused by allowing Plaintiffs to argue facts in opening and present testimony on this issue while simultaneously precluding Defendant from presenting evidence to rebut Plaintiffs' narrative. Indeed, because "jurors may be most easy to impress" at an "early stage of proceedings," *Pac. Mailing Equip. Corp. v. Pitney Bowes, Inc.,* 1979 WL 1697, at *2 (N.D. Cal. Sept. 18, 1979), the jury may well have already formed opinions based on this argument and testimony. At a minimum, however, it is critical that, after precluding Defendant from presenting non-privileged evidence and testimony about the Delaware litigation, the Court ensure that Plaintiffs do not argue, suggest, or insinuate in closing arguments that Mr. Musk's decision to end the litigation and close the transaction demonstrates that he did not have a meritorious defense.

### B.      Plaintiffs Cannot Argue That Mr. Musk Lacked A Basis For His Belief That The Percentage Of Spam On Twitter's Platform Exceeded Five Percent

The Court also should enforce its order prohibiting Plaintiffs from arguing that after May 23, 2022—the date Mr. Musk received the initial analyses from his retained data scientists—Mr. Musk had no basis to assert that the number of spam and false accounts likely exceeded five percent or invite the jury to draw any negative inference from the fact that no report substantiating that belief is in evidence.

Prior to terminating the merger in July 2022, and again during the course of the Delaware litigation, Mr. Musk retained several data scientists to conduct analyses of the prevalence of spam and false accounts. Mr. Musk received initial reports from the data scientists, including Cyabra, as early as May 23, 2022 and subsequent reports through July 2022 and the litigation. The pre-termination reports found that the number of false or spam accounts ranged from 10% to 27%. Based on these analyses, Mr. Musk's counsel wrote

MOTION TO PRECLUDE PLAINTIFFS FROM MAKING IMPROPER ARGUMENTS IN CLOSING

in the July 8 termination letter that "[p]reliminary analysis by Mr. Musk's advisors of the information provided by Twitter to date causes Mr. Musk to strongly believe that the proportion of false and spam accounts included in the reported mDAU count is wildly higher than 5%." Ex. 197-6. To support this statement and rebut any argument that the termination was fraudulent or that he lacked any basis for his continued belief that spam exceeded five percent, Mr. Musk sought to introduce these reports into evidence through the deposition of one of those data scientists, Dan Brahmy of Cyabra, but the Court excluded that evidence under Rule 403.[1] Tr. 1988:9-1989:4. Similarly, in the litigation, Mr. Musk received an expert report that found the number of false or spam accounts on Twitter's platform was approximately 17%. Mr. Musk tried to admit this evidence during his examination but the Court precluded him from doing so. Tr. 951:18-952:7; 960:19-969:2. Mr. Musk contends that both of these decisions were erroneous, as the probative value of that evidence far exceeded the risk of any prejudice.

In issuing these orders, the Court made clear that Plaintiffs were precluded from "gett[ing] up and argu[ing] in their closing" that "you see what the termination report said, that it related to studies? You didn't see any studies in this case, did you? So it was all made up." Tr. 1991:1–5. It reiterated that order, agreeing that Plaintiffs cannot "point to that portion of the letter and they can't say that Mr. Musk did not come in here and show you any … support for that statement in the letter." Tr. 1991:16–24. While this order cannot cure the prejudice caused by the Court's exclusion order—as the jury will naturally assume that the absence of any report in evidence indicates that none exists—at the very least, the Court must vigilantly enforce its order to prohibit Plaintiffs from even suggesting that Mr. Musk lacked support for this belief after he first received data science reports on or around May 23, 2022 or even referencing that portion of the July 8 letter itself. Indeed, any reference by Plaintiff to that portion of the letter or any

---

[1]  Defendant sought to admit approximately 30 minutes of Mr. Brahmy's deposition testimony (Plaintiffs counter-designated around 20 minutes as well) concerning Cyabra's role as a data science firm retained by Mr. Musk to investigate the prevalence of spam accounts on Twitter, the work Cyabra performed, the analyses it issued to Mr. Musk's team, and a phone call he had with Mr. Musk where he discussed Cyabra's initial analysis and its methodology for its interim analysis. Mr. Musk also sought to admit certain exhibits, including two analyses prepared by Cyabra finding a spam percentage of 13.7 percent and between 11 and 27 percent, respectively. The Court excluded Mr. Brahmy's deposition testimony in its entirety except for the portion that discussed his conversation with Mr. Musk, at page 97:23-102:12. Tr. 1988:7-8. However, in his original proposed designation, Defendant intended only to play a portion of Mr. Brahmy's testimony describing that call, lines 97:23-99:17. Thus, when it came time to play the deposition with the jury, Defendant played only a portion of what the Court permitted. The Court's exclusion order removed approximately 90 percent of the testimony Defendant originally intended to play.

statement Mr. Musk made concerning his beliefs regarding the number of bots on Twitter's platform formed after May 23, 2022—when the first reports were transmitted to his team—would remind the jury that no written analyses are in evidence and invite an improper and prejudicial inference. The same is true as to any reference to Mr. Musk's beliefs about the number of spam and fake accounts formed during the Delaware litigation. Plaintiffs should not be able to backdoor through implication the very point the Court excluded them from making in closing. Mr. Musk's opinions, beliefs, and statements from May 23, 2022 onward were informed by the very reports the Court has excluded and any suggestion that they were unsupported or baseless is untrue. It cannot be offered to the jury.

### C. Plaintiffs Cannot Argue That Mr. Musk's Pre-Class Purchase Of Twitter Stock Was Improper Or Caused Investor Harm

Nor may Plaintiffs argue, insinuate, or imply to the jury during summation that Mr. Musk did anything improper with respect to his open-market purchases of Twitter stock between January and April 2022 or that it caused any investor to suffer harm.

More than two years ago, the Court held that Mr. Musk's alleged "market manipulation" via "secret" purchases of Twitter stock was not part of the claim in this case. Dkt. No 48 at 2 n.1 ("Plaintiffs allege that Defendant engaged in 'market manipulation' by accumulating stock from the day he became a 5% stockholder, March 14, 2022, to the day he publicly disclosed his ownership on April 4, 2022, because it allowed him to buy the stock at an artificially low price …. [B]ecause Plaintiffs do not allege that this activity caused them losses during the Class Period, the Court does not discuss the issue further.").

At the pretrial conference, the Court noted that Plaintiffs were entitled to establish only that Mr. Musk's stock purchases were not publicly disclosed because Mr. Musk did not want the stock price to go up. Feb. 17, 2026 PTC Tr. 54: 12-15 ("Why is it in? Because their argument is: If it is known that Elon Musk is buying 10 percent -- 9 percent of the company, the price will go up. And that's what he wanted, at that point, to avoid.").[2] However, the Court made clear that Plaintiffs may not make arguments or ask questions that *suggest* Mr. Musk *did something wrong* by not disclosing his stock purchases earlier:

> **MR. JOBE:** …. The objection was more to a line of questioning of Mr. Musk -- or there
> a couple of other witnesses in the case where this could come up. A line of questioning that

---

[2]    This ruling was error under FRE 404(b) and 403, as set forth in Mr. Musk's motion *in limine* No. 1. *See generally* Dkt. No. 339, 396.

1    suggests that he's doing something wrong –

2    **THE COURT:** They can't do that.

3    **MR. JOBE:** Understood, Your Honor.

4    **THE COURT:** They can't do that. Lawyers aren't going to do that.

5    Feb. 17, 2026 PTC Tr. 55: 8-12.

6        Yet, Plaintiffs' lawyers have done just that—with impunity.  They argued in opening that, "[h]e

7    also knew he didn't want to pay that higher price, so he kept on buying stock, but he did not tweet about

8    it. ***He didn't file reports with the SEC about it. He kept it secret to keep all that extra money in his own***

9    ***pocket***." Tr. 206: 2-6.  There is no question that conveyed an accusation of wrongdoing and a violation

10   of securities laws—exactly what the Court said Plaintiffs "can't do."  Feb. 17, 2026 PTC Tr. 55:12.

11       Plaintiffs then elicited testimony from multiple witnesses that Mr. Musk engaged in "secret" stock

12   purchases and that he failed to file SEC disclosure forms, which, once again, conveyed the inadmissible

13   notion that Mr. Musk was required to but did not file disclosures with the SEC.  *See, e.g.*, Tr. 349:15-

14   351:16 (Gadde); Tr. 538: 6-18 (Birchall).   This improper suggestion has already caused Mr. Musk

15   substantial prejudice, which was compounded by the Court failing to sustain defense objections (*e.g.*, Tr.

16   538) and declining requests for curative and limiting instructions.  Fed. R. Evid. 105 ("If the court admits

17   evidence that is admissible against a party or for a purpose—but not against another party or for another

18   purpose—the court, on timely request, ***must*** restrict the evidence to its proper scope and instruct the jury

19   accordingly.") (emphasis added).   Indeed, when Plaintiffs' damages expert confirmed during cross-

20   examination that Mr. Musk's allegedly "secret" stock purchases caused no investor losses, multiple jurors

21   were visibly confused.  Fed. R. Evid. 403.

22       Now, at the end of trial, the Court must put a stop to Plaintiffs' efforts to try Mr. Musk for

23   wrongdoing that indisputably has never been part of this case.  The admissibility basis Plaintiffs proffered

24   for Mr. Musk's pre-Class Period stock purchases—that Mr. Musk had awareness that his public statements

25   could impact stock price—is evidence in the record by competent witness testimony and other evidence.

26   This obviates the need for any argument regarding Mr. Musk's stock purchases, which Plaintiffs

27   transparently have used, repeatedly and in brazen disregard for the Court's ruling, to suggest that Mr.

28   Musk violated securities laws before the Class Period even began.  Feb. 17, 2026 PTC Tr. 55:12 (The

Court:  "They can't do that.").  Plaintiffs should not be permitted to even mention that Mr. Musk engaged in "secret" or "concealed" stock purchases, that he failed to publicly disclose such sales or file SEC forms, or that his "secret" purchases caused any investor to suffer any  harm.  Anything of that sort clearly suggests wrongdoing by Mr. Musk for which he is not on trial.[3]  Fed. R. Evid. 404(b); Fed. R. Evid. 403.

## II.    PLAINTIFFS SHOULD BE PRECLUDED FROM MAKING IMPROPER SCHEME ARGUMENTS

The Court also must limit the arguments Plaintiffs can make in support of their so-called scheme claim in closing.  Specifically, the Court should preclude Plaintiffs from arguing that any dismissed or unpled statement contained within the scheme was false or misleading or that any petitioning conduct— including Mr. Musk's counsel's pre-litigation letters and July 8 termination—can give rise to liability.

### A.    Plaintiffs Cannot Argue That Any Dismissed Statement Was False Or Misleading

In its Motion to Dismiss Order, the Court dismissed as inactionable most of the allegedly false statements identified in Plaintiffs' First Amended Complaint, including Mr. Musk's May 21 Tweet that "[T]witter still refuse[s] to explain how they calculate that 5% of daily users are fake/spam! Very suspicious," and Mr. Musk's July 8 Termination Letter.  Dkt. No. 48 at 25-28.  But at trial, Plaintiffs have argued and elicited testimony that the May 21 Tweet was false and that the July 8 Termination was fraudulent.  They must be prohibited from making any such arguments in closing.

The law is clear that statements that are not actionable as false or misleading under Rule 10b-5(b) cannot be the basis for scheme liability under Rule 10b-5(a) or (c).  *In re Stem, Inc. Sec. Litig.*, 2025 WL 3675114, at *11 (N.D. Cal. Dec. 17, 2025) ("A scheme liability claim can be based on false or misleading statements that also violate section 10(b) . . . but where the alleged scheme consists entirely of failed section 10(b) statements, a plaintiff likewise fails to adequately plead a scheme") (citation and quotations omitted); *In re Illumina, Inc. Sec. Litig.*, 2025 WL 2739655, at *4 (S.D. Cal. Sept. 26, 2025) ("Here, Plaintiffs' scheme liability claim under Rule 10b-5(a) and (c) is basically a duplicate of their first fraud claim under Rule 10b-5(b) . . .  This scheme consists entirely of the allegations underlying Plaintiffs' first

---

[3]  For the avoidance of doubt, the Court's granting of this motion will not and could not cure the extreme unfair prejudice Mr. Musk has already suffered by the Court's failure to preclude Plaintiffs from introducing such improper evidence and argument throughout the trial, especially when the Court assured Mr. Musk that that Plaintiffs would be prevented from doing so.  Feb. 17, 2026 PTC Tr. 55:12.

claim under Rule 10b-5(b), so it fails for the same reasons.") (citation and quotation omitted)).  As this Court has previously held, in *In re Palo Alto Networks, Inc. Sec. Litig.*, "Plaintiffs cannot remedy their failure to plead falsity or scienter by repackaging their claims as 'scheme liability' claims under SEC Rules 10b-5(a) and (c)." 2025 WL 2410348, at *2 (N.D. Cal. Aug. 19, 2025) (Breyer, J.).

Any implication or argument that statements the Court previously dismissed as not actionable under Rule 10b-5(b) were in fact false or misleading would be an end-run around the Court's Motion to Dismiss Order, contrary to law, and highly prejudicial and misleading.  It is law of the case that the dismissed statements—including the May 21 tweet and July 8 Termination Letter—are not misstatements as a matter of law and Plaintiffs must be precluded from making any suggestions to the contrary.  Although the Court has held—erroneously, *see e.g., In re Palo Alto*, 2025 WL 2410348, at *2 (N.D. Cal. Aug. 19, 2025)—that the jury may consider the dismissed tweets and the termination as part of the so-called scheme, its order makes clear that the jury cannot consider them to be false or misleading statements.  Dkt. No. 48 at 25-28.  Plaintiffs should thus be precluded from arguing that in closing.

**B.    Plaintiffs Cannot Argue That Petitioning Conduct—Including Termination—Can Give Rise To Liability**

Additionally, Plaintiffs should be precluded from arguing that Mr. Musk's petitioning conduct—including the July 8 termination, pre-termination letters to Twitter, and defense in the Delaware Action—can independently give rise to any securities fraud liability.

The Supreme Court made clear in *United Mine Workers v. Pennington* that petitioning conduct is immune from statutory liability "either standing alone or *as part of a broader scheme* itself violative of" the relevant law.  381 U.S. 657, 670 (1965).  It is undisputed that Mr. Musk's conduct in the Delaware litigation and pre-litigation letters, including his notice of termination on July 8, is protected under the *Noerr-Pennington* doctrine.  *E.g, Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008) ("Conduct incidental to a lawsuit, including a pre-suit demand letter, falls within the protection of the Noerr–Pennington doctrine."); *Hard2Find Accessories, Inc. v. Amazon.com, Inc*., 691 F. App'x 406, 407 (9th Cir. 2017) (infringement notice is sufficiently related to petitioning conduct).

Although the Court has held, contrary to *Pennington*, that this conduct may still be considered as part of the overall scheme, Dkt. No. 454 at 1-3, it also acknowledged that "the jury that they may not find

scheme liability based on his petitioning activity alone," *id.* at 3 n. 3.  Plainly, the Court's order and instruction will have no effect if Plaintiffs are permitted to argue in closing that the petitioning conduct itself caused investors to suffer harm.  Such an argument would confuse the jury and prejudice Mr. Musk as it would expressly encourage jurors to hold Mr. Musk liable for any stock drop caused by his exercise of his First Amendment right to petition.  Again, the Court should not allow Plaintiffs to make arguments that would serve as an end-run around the Court's instruction and the law.  They should thus be prohibited from arguing in closing that Mr. Musk violated securities laws and can be held liable for issuing the Termination Letter or participating in the Delaware litigation.

### C.    Plaintiffs Cannot Argue That Mr. Musk's Breach Of Any Contract Or Agreement Violated Securities Law

The Court should also preclude Plaintiffs from arguing or suggesting in closing that the jury can find Mr. Musk liable for securities fraud for breaching contractual obligations to Twitter.  The law is unambiguous: a breach of contract does not constitute securities fraud under either a misstatement or scheme theory of liability.  *See Foster v. Wilson*, 504 F.3d 1046, 1051 (9th Cir. 2007) (affirming dismissal of 10b–5(c) claim, noting that "[a]t most, the claim alleges a breach of contract.  Such a breach, however, does not constitute federal securities fraud under § 10(b).") (citing *Gurary v. Winehouse,* 190 F.3d 37, 44 (2d Cir. 1999) ("The failure to carry out a promise made in connection with a securities transaction is normally a breach of contract.")); *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 692 (9th Cir. 2011) ("This principle that contract breach is not a sufficient predicate for securities fraud has been followed both by our circuit in *Foster* and by courts of other circuits." (citing cases)).  However, during trial, Plaintiffs have suggested and adduced evidence purporting to support an argument that Mr. Musk violated his NDA with Twitter, the Merger Agreement's non-disparagement provision, and the Merger Agreement itself through his termination.  Even if Plaintiffs were correct that these acts constituted breaches of the Merger Agreement—they were not—Plaintiffs cannot be permitted to argue that such acts give rise to securities fraud, even as part of a scheme.  Such arguments would only serve to mislead the jury about the law and would constitute reversible error.  *United States v. Segna*, 555 F.2d 226, 230 (9th Cir. 1977) (holding that "[closing] argument amount[ed] to plain error and require[d] reversal" where "prosecutor made erroneous and misleading statements of the law").

### III. PLAINTIFFS SHOULD BE PRECLUDED FROM MAKING ANY OTHER IMPROPER ARGUMENT IN CLOSING

#### A. Plaintiffs Should Not Make Any Argument Or Invite Any Inference That Mr. Musk Spoliated Evidence Or Make Any Representations About The Discovery Process

Plaintiffs also should be precluded from making any argument in closing that Defendant spoliated evidence or deleted text messages. During Mr. Musk's examination, Plaintiffs' counsel asked him—"Are you aware, sir, that in our investigation, there is a gap in your text messages that starts right at around May 15 and 16, and then they don't pick up again until May 31st?" Tr. 762:14-16. After an objection was sustained, counsel asked—"Are you aware whether or not there is a gap in your text messages between May 15th or 16th through May 31st?" Tr. 762:22-23. Mr. Musk responded that he did not think there was such a gap. Tr. 762:24. Mr. Musk further testified that he did not decide to stop texting about the Twitter deal at this time. Plaintiffs' counsel asked Mr. Musk highly misleading questions suggesting that the supposed gap reflects that Mr. Musk did not send or receive any text messages at all during this time. Tr. 765:8-766:16. There is no basis in evidence to suggest that Mr. Musk spoliated any evidence, nor that he intentionally did not text during this time period for some nefarious reason. Indeed, any such argument would be highly misleading to the jury, who does not understand the limits of discovery obligations.

But as Plaintiffs know—or ought to know since this precise issue was publicly litigated during the Delaware action—the gap exists because Defendant had no responsive texts during that period (during a portion of which Defendant was overseas and not texting at all), not because there was any destruction of evidence. *See* Dkt. 366-11, Opp. to Mot. to Sanction Defs. for Failure to Produce Responsive Phone Messages, *Twitter v. Musk*, Case No. 2022-0613-KSJM (Del. Ch., Sept. 21, 2022). Moreover, Plaintiffs agreed and stipulated that Defendant satisfied all document and ESI discovery obligations by producing only the documents and data exchanged in the Delaware Action. Dkt. 116. Plaintiffs entered this stipulation on notice that the text message gap existed. To now argue to the jury that they should draw an adverse inference from the lack of responsive, produced text messages during this period—when the jury has none of the necessary context and Plaintiffs never moved to compel or for sanctions, *see* Fed. R. Civ. P. 37; *Gregory v. State of Montana*, 118 F.4th 1069, 1080 (9th Cir. 2024)—would be misleading and improper. The Court should preclude such arguments.

More generally, the Court should preclude Plaintiffs from making any comments or

representations about what was and was not produced in discovery. Throughout trial, Plaintiffs made repeated references to the discovery process—which they misleadingly referred to as "our investigation," *e.g.,* Tr. 227:11-13—and made representations about what was and was not produced. To start, any such reference to discovery is inherently prejudicial and misleading because the jury has no way to know whether documents were simply not produced because they were never requested or were subject to discovery rulings. The implication of purportedly "missing" evidence is that a witness or party concealed, destroyed, or otherwise never possessed it—inferences that are not supported by evidence and in many cases may be misleading. Any reference to discovery or Plaintiffs' so-called "investigation" is particularly misleading here because Plaintiffs sought only the discovery produced in the Delaware Action, did not seek the specific documents or testimony on their own, and have no knowledge why certain documents were or were not produced.

### B.    Plaintiffs Should Be Precluded From Arguing That Privacy Law Prohibited Twitter From Providing Information To Mr. Musk

Plaintiffs should be foreclosed from arguing in closing that Twitter was legally prohibited from sharing the private user data Mr. Musk requested based on United States or European Union data privacy laws. There is no contemporaneous evidence that Twitter or its lawyers told Mr. Musk's team that it could not share private user data because of GDPR or any other specified privacy laws. At most, the record reflects that Twitter's lawyer—Martin Korman (who testified he is "not a privacy expert")—asked Mr. Musk's team to propose a protocol for sharing certain information and that potential protocols were discussed in numerous calls with Mr. Ringler. Tr. 1449:7-1450:15.

But neither Twitter nor its counsel ever identified any specific privacy laws as a barrier to sharing information with Mr. Musk. Nevertheless, Plaintiffs elicited testimony—all from lay witnesses—to incorrectly suggest to the jury that GDPR and other unidentified "privacy laws" barred Twitter from sharing with Mr. Musk the private user data that he requested. *See e.g.*, Tr. 404:11-406:2, 1058:25-1059:7, 1062:24-1063:2, 1086:8-10, 1093:16-1094:5, 1100:9-19, 1118:11-17, 1169:14-22, 1270:22-1271:3. Plaintiffs did not offer expert testimony on this issue—because it is simply not true.

As Mr. Musk demonstrated through briefing, GDPR Article 6(1) permits a data processor (like Twitter) to "process" data—which includes sharing data with third parties—if "the data subject has given

consent to the processing." Twitter obtained such consent through its Terms of Service and Privacy Policy in effect during the transaction, which explicitly permitted Twitter to share user data "in connection with a merger[] [or] acquisition … before and after the close of any transaction[.]" Ex. 813 (Privacy Policy) § 3.5; *see also id.* § 1.2 (describing the private data that can be shared).

Plaintiffs should thus be barred from arguing that any law precluded Twitter from providing the information Mr. Musk requested. Indeed, the Court has subsequently acknowledged that EU law and other privacy regulations did not restrict Twitter's ability to provide the private data. Tr. at 1417:19-1418:7; *see also* Dkt. 505 at 12 (Tentative Jury Instructions explaining that "[t]here is no evidence that any privacy law, domestic or international, prohibited the disclosure of Twitter's private user data to the defendant as part of the merger."). Nor should Plaintiffs be permitted to argue, as they do in opposition to the Court's Tentative Data Privacy Instruction, that: (1) "Musk [] ***failed*** to establish that he was ready, willing, and able to protect the data, a necessary and reasonable condition permitted by applicable privacy laws," (2) "Twitter was legally required to ensure that Musk had protocols in place, and intended to follow them, before sharing private data," or (3) "Twitter's privacy policy had no impact on Twitter's obligations to ensure that Musk and his team had these protections in place." *See* Dkt. No. 515-1 at 12-13. No evidence supports these assertions, and despite being invited by the Court to submit a brief on privacy law (Tr. 1317:18-23), Plaintiffs never identified any law supporting the assertions either—indeed, they chose not to submit a brief at all. Plaintiffs must be barred from making the above assertions—or anything similar—during closing. *See Draper v. Rosario*, 836 F.3d 1072, 1084 (9th Cir. 2016) ( "[A]ttorneys may not rely on evidence outside the record during closing argument"); *Segna*, 555 F.2d at 230.

### C. Plaintiffs Should Be Precluded From Making Any Argument That Mr. Musk Did Not Call Or Did Not Obtain Certain Testimony From His Lawyers At Trial

Before trial, Plaintiffs sought and obtained an order from the Court precluding any evidence concerning the presence of counsel in the transaction, with a limited exception for "evidence of public statements by lawyers." Dkt. No. 459 at 2. The Court made clear in the Pretrial Conference that "there be no mention whatsoever of any legal advice or conference or participation in any of this…during this whole period of time of lawyers." Feb. 17, 2026 PTC Tr. 36:20-23. And even for public statements that were otherwise admissible, the Court made clear to the parties that while the statements themselves would

come in—such as the words on the page in a letter—the "'why' would not come in." *Id.* at 36:24-37:9. The Court drew a clear line at trial consistent with that order, precluding evidence of facts identified in certain public attorney communications—including the data science analyses referenced in the July 8 Termination Letter—even when those facts, testimony, and documents were produced in discovery. Tr. 1988:9-1989:4.

The Court also precluded Mr. Musk's attorney Alex Spiro from testifying about public events and statements made in connection with the Delaware Action. Based on the Court's limitations, Defendant did not call certain attorneys—including deal attorney Mike Ringler—and was restricted in the evidence he could offer from his litigation counsel. Accordingly, Plaintiffs should not be permitted to use the order they sought as a sword and shield by precluding lawyer witnesses from being able to testify about the underlying facts supporting their various statements to third parties (and thus removing any reason to call an attorney) while arguing that the jury should draw an inference from the fact that certain attorneys referenced at trial did not appear or otherwise testify about specific events in evidence. It would be misleading, fundamentally unfair, prejudicial, and in direct violation of the Court's prior orders and repeated admonitions that the parties were to create a "construct separating out lawyers from" their client. *See, e.g*, Tr. 1976:24-1977:9.

### D. Plaintiffs Cannot Make Any Argument To Engender Sympathy From The Jury Or Paint Mr. Musk As An Outsider

Throughout trial, Plaintiffs elicited testimony with no probative value in an effort to sway the jury through sympathy and bias rather than evidence relevant to their claims. To take just a few examples, Plaintiffs questioned Mr. Musk about moving his businesses out of California, Tr. 663:17-22, elicited testimony from Ms. Price about Mr. Garrett being in a wheelchair, having mobility issues, having hearing problems, having a pacemaker and defibrillator implanted, and going through weeks of radiation for cancer, Tr. 1358:7-22, and elicited testimony from Mr. Segal about both him and defense counsel working at Candlestick Park, Tr. 1110:22-1112:3. All of this testimony is irrelevant; all of it is prejudicial. It is beyond dispute that appeals to sympathy are improper. It is also well-established that arguments, however subtle, designed to suggest an "us-versus-them" theme to the jury are improper. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 2014 WL 549324, at *13 (N.D. Cal. Feb. 7, 2014). Indeed, other circuits have

found that counsel's appeal to regional bias and a "blatant 'us-versus-them' appeal to the jury" in closing arguments warranted overturning a jury verdict. *See Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 539-41 (2d Cir. 1992). Counsel has already crossed this line repeatedly during trial. The Court should preclude any such appeals to sympathy or bias in closing arguments to avoid further prejudice from such improper and prejudicial conduct.

### E.    Plaintiffs Cannot Argue That The Jury Should Use Its Verdict To "Send A Message"

The Court should also prohibit Plaintiffs from arguing or suggesting to the jury that it should send a message to Mr. Musk—or anyone else—through its verdict. "Where punitive damages are not at issue, urging the jury to 'send a message' by its verdict is generally considered an improper appeal to the jurors' passion and prejudice" and is prohibited. *Hammonds v. Yeager*, 2017 WL 10560471, at *1 (C.D. Cal. Aug. 9, 2017); *see also Greisen v. Hanken*, 252 F. Supp. 3d 1042, 1066 (D. Or. 2017), *aff'd*, 925 F.3d 1097 (9th Cir. 2019) (improper for counsel to make "send a message" argument in non-punitive damages case).

This is not a punitive damages case so any such argument or suggestion would be highly improper and prejudicial. The jury is being asked to determine whether Mr. Musk committed fraud and to award only compensatory damages reflecting the amount of alleged stock price deflation caused by the purported fraud. It is not a referendum on Mr. Musk's tweeting or any other behavior. As jury selection demonstrated, the community—and some of the empaneled jurors—hold strongly held beliefs about Mr. Musk unrelated to this case. Inviting or even suggesting to the jury that the verdict could be used to punish or deter any of Mr. Musk's conduct or behavior would appeal to and invoke these pre-existing opinions, call for the jury to render a verdict based on bias, inflame the passions of the jury, and unfairly prejudice Mr. Musk. The Court should prohibit it at the outset.

### F.    Plaintiffs Should Not Be Permitted To Suggest That Mr. Musk's Trial Counsel Was Involved In The Events At Issue

Finally, Plaintiffs should be barred from inviting the jury to draw any inferences from the fact that the law firm representing Mr. Musk at trial, Quinn Emanuel, also represented him in connection with the Twitter merger and subsequent litigation. Throughout trial, Plaintiffs' counsel has referenced the fact that Mr. Spiro—who did not try the case—and Quinn Emanuel represented Mr. Musk in the underlying transaction and litigation. *E.g.*, Tr. 760:15-21, 817:23-25. They even elicited speculative testimony from

-14-                                                    Case No. 3:22-CV-05937-CRB

one witness that Mr. Musk's deal counsel at Skadden was "taking direction from attorneys at Quinn Emanuel" during the Twitter transaction.  Tr. 1378:21-1379:8.  The implication of these references and less-than-subtle tactics is clear: the jury should not trust Mr. Musk's trial counsel because lawyers from the same firm represented him in the litigation in 2022 that the Court has held (over Defendant's repeated, strenuous objections) the jury may consider as a basis for securities fraud.

Any such argument is inappropriate, prejudicial, and misleading; it seeks to impugn the integrity of Mr. Musk's trial counsel by suggesting (incorrectly) that they were involved in the alleged misconduct.  Attacks on counsel are not permitted.  *E.g., Whittenburg v. Werner Enters. Inc.*, 561 F.3d 1122, 1130-31 (10th Cir. 2009) (reversing and remanding for new trial, in part, due to improper "attacks on counsel" because "[i]t is not the function of closing argument to debase, degrade or impugn the veracity of a litigant or opposing counsel." (citations and quotations omitted)).  And, of course, such argument is even more damaging and prejudicial here because the Court largely prohibited the Quinn Emanuel lawyer who was involved—Mr. Spiro—from fully testifying about his involvement and precluded Defendant from offering evidence that his defense in the Delaware Action was meritorious.  Plaintiffs seek to suggest—without evidence—that Mr. Musk's legal team engaged in unsavory conduct in 2022, impute that conduct to his current trial counsel, and prevent Mr. Musk or his team from mounting any defense in response.  It is highly improper.  As the Court has repeatedly declared, lawyers do not exist in this case.  That rule should be applied to Plaintiffs, too.  The Court should intervene and prevent any negative inference or argument concerning Quinn Emanuel's role in the Twitter merger from even being suggested to the jury.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court issue an order precluding Plaintiffs from making improper arguments in closing.

1

DATED:  March 15, 2026                                    QUINN EMANUEL URQUHART & SULLIVAN, LLP

2

3

4                                                              By _____/s/ Ellyde R. Thompson_____
                                                                       Alex Spiro
5                                                                      Michael T. Lifrak
                                                                       Stephen A. Broome
6                                                                      Ellyde R. Thompson
                                                                       Jesse A. Bernstein
7                                                                      Alex Bergjans

8                                                              *Attorneys for Defendant Elon Musk*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on Sunday, March 15, 2026.

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  /s/ Alex Bergjans
_____
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Ellyde R. Thompson
Jesse A. Bernstein
Alex Bergjans

*Attorneys for Defendant Elon Musk*

## **ATTESTATION**

Pursuant to Civil L.R. 5-1, I attest under penalty of perjury that concurrence in the filing of this document has been obtained from the other signatories herein.


By /s/ Alex Bergjans
  Alex Spiro
  Michael T. Lifrak
  Stephen A. Broome
  Ellyde R. Thompson
  Jesse A. Bernstein
  Alex Bergjans

  *Attorneys for Defendant Elon Musk*