UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
Case Number: 3:22-CV-05937-CRB
PLTF / DEFT
Exhibit No. **304**
Date Admitted: _____
By: _____
Lashanda Scott, Deputy Clerk

**EXHIBIT 5**

**CONFIDENTIAL**

**1.02.XX Spam and False Accounts**
How do you estimate that fewer than 5% of mDAU are false or spam accounts?

**Table of Contents**

| | |
|---|---|
| **1. Definition of spam and false accounts** | **1** |
| **2. Criteria & indicators used to assess spam and false accounts** | **2** |
| **3. Process for collecting account evaluation sample** | **3** |
| **4. Criteria for labeling accounts as spam and false accounts** | **4** |
| **5. Process for identifying spam and false accounts in mDAU** | **4** |
| Investigation Process | 5 |
| Audit and Review Process | 5 |

---

Twitter reports its monetizable daily active usage or users (mDAU) on a quarterly basis in its earnings materials and SEC reports.

Twitter defines mDAU as people, organizations, or other accounts who logged in or were otherwise authenticated, and accessed Twitter on any given day through twitter.com, Twitter applications that are able to show ads, or paid Twitter products, including subscriptions. As part of that reporting process, we include an estimate of spam and false accounts as a percentage of that mDAU number.

Below you will find an overall description of how we estimate the spam and false accounts as a percentage of mDAU.

As described below, we collect and assess approximately 9,000 account samples per quarter.

## 1. Definition of spam and false accounts

The Twitter Rules provide a platform-wide definition of platform manipulation and spam, covering a wide range of behaviors and content types (summarized below). At a high level, an account is considered to be "spam" or "false" if it violates one or more of the Twitter Rules regarding platform manipulation and spam.

These categories principally include (but are not limited to):
1.  Accounts sharing malicious content, including:
    a.  Phishing links, or other attempts to obtain information which could compromise or harm an account holder by convincing them to disclose sensitive personal information (username, password, credit card information, etc).
    b.  Malware links, or other attempts to direct account holders to files or websites which could harm their devices

1

TWTR_000006118
MUSK-PAMPENA-0675931

    c. Scams, including any form of financial scam, relationship/trust-building scheme, money-flipping scheme, fraudulent discount offers, etc.
2. Accounts which use hashtags, replies, or Direct Messages to engage in disruptive or unsolicited conduct, including:
    a. Sending bulk/high-volume, unsolicited replies/mentions or DMs to users who have not requested to be contacted
    b. Sending multiple Tweets which include hashtags or terms/phrases which attempt to interfere with the operation of Search or Trending Topics, including:
        i. Hashtag cramming: Including multiple unrelated hashtags in a single Tweet to attempt to cause that Tweet to appear in Search or Trending Topics for each hashtag
        ii. Hashtag hijacking: Including a hashtag or multiple hashtags in a single Tweet not related to the topic of those hashtags, to attempt to cause that Tweet to appear in Search or Trending Topics for each hashtag
        iii. Hashtag inflation: Using a single account to post repeatedly, or using multiple accounts controlled by a single individual or entity, to artificially inflate the volume of conversation associated with a hashtag (often for the purpose of interfering with Search or Trending Topics)
3. Accounts which use engagements, including Likes, Retweets, and Follows, to artificially inflate the perceived popularity of a Tweet or account, including:
    a. Bulk/indiscriminate engagement behavior, such as rapid or automated engagement with a large number of unrelated Tweets or accounts
    b. Follow churn: Repeated or rapid Following and Unfollowing of a specific account or account(s), typically with the intent to trigger Notifications
    c. Bulk addition or removal of users to/from Lists
    d. Engagement sales, including offers to sell Follows, Likes, etc.
4. Mass-registered or automatically created accounts, whether or not those accounts have yet engaged in any of the above behaviors.

Spam and false accounts may be engaged in multiple of the above behaviors.

## 2. Criteria & indicators used to assess spam and false accounts

Assessing an account as spam or false requires a comprehensive assessment of both public and private signals about the account, including that account's activity (current and historical), the characteristics of how/when it was registered on Twitter, contact information supplied by the accountholder upon registration, and information shared via the account's profile. Specific signals assessed include:

- Public profile information, including the display name, screen name, bio, user-provided location, profile photo, and other profile fields
- Public Tweet and engagement activity, including the content and media of Tweets and Replies, Likes, Retweets, and Follows
- Account creation information, including creation date and signup IP

2

TWTR_000006119

MUSK-PAMPENA-0675932

- Contact information provided by an account holder, such as email address or phone number *(provision of at least one method of contact is compulsory)*
- Recent login IPs
- Applications authorized via oAuth to access or perform actions on behalf of an account
- Geolocation information
- Use of the Tweetdeck Contributors function across multiple accounts

These signals are often used in combination with each other to identify whether an account is spam or false. For example, we may identify accounts as spam or false if:

- They use email addresses or phone numbers known to be used by spammers
- They use "high risk" email carriers, such as certain carriers from Russia
- They exhibit a mismatch between the geolocations of their login IP addresses and the stated location of the account owner
- They exhibit logins from multiple geographically diverse locations in a short period of time

In addition to assessing individual accounts and their activity, we commonly evaluate an account alongside other accounts engaged in similar behavior, or which we identify as linked/related through specific technical signals. For example, multiple accounts registered using the same phone number would be identified as linked/related in our systems. These associations, and commonalities between associated accounts, are used to help establish whether accounts purporting to be real people are in fact spam. Some patterns of spam only become apparent when considered across multiple accounts; for example, mass-registered accounts which have not yet posted spammy content are nevertheless identifiable as spam when evaluated as part of a large group of accounts.

## 3. Process for collecting account evaluation sample

To provide an estimate of the spam and false accounts, we randomly sample a selection of mDAU for human evaluation. Accounts which are (1) suspended or placed in a read-only state due to violations of the Twitter Rules (including our policies related to platform manipulation and spam), (2) placed in a read-only state pending completion of an anti-spam challenge (like a captcha), or (3) placed in a read-only state due to suspected account compromise are not counted as mDAU, and therefore are not included in the population of accounts from which these samples are drawn.

We use the daily sampling process described below to get a random sample that is representative of the mDAU for the quarter. In order to limit the margin of error in our estimate, we use a sample of approximately 9,000 accounts each quarter.

The steps of the daily sampling process are:
1. Collect the user ids for all the accounts who meet the criteria for mDAU (as defined above)

3

TWTR_000006120
MUSK-PAMPENA-0675933

2. Create a combined user-day identifier for each account by prefixing the user id with the timestamp of the start of the sampling day
3. Randomize the combined user-day identifier using a common hash function
4. Sort mDAU by the randomized combined daily identifier to remove any inherent bias from the sampling (for example, any sampling bias from the chronological ordering of account IDs).
5. Select the first 100 users from the randomized list

Over a quarter, the outcome of this procedure is approximately 9,000 accounts sampled randomly from the mDAU for the quarter.

## 4. Criteria for labeling accounts as spam and false accounts

Using the policy defined in section (1) and the signals and data sources defined in section (2), human labelers[1] are responsible for manually evaluating the sample of accounts defined in section (3) to label accounts as spam/false. Accounts are labeled with one of the following designations:

- **Spam:** Accounts which are found to meet the definition of spam and false accounts in section (1).
- **Real User Spam:** Accounts that exhibit violations of the definition of spam and false accounts in section (1), but which also show indications of being operated by real people (i.e. the accounts are not mass-registered or automatically created). We differentiate Real User Spam from Spam because people may inadvertently or episodically engage in bothersome, bulk, or unsolicited behavior, but nevertheless otherwise be healthy users of the Twitter service.
- **Compromised:** Accounts of authentic users who have become compromised (hacked). While these accounts are believed to have been legitimate/authentic at the time of their creation, at the time of evaluation they are found to have been hacked (and consequently may have been engaged in malicious behavior). We differentiate Compromised users from Spam because the remedy for these accounts under our Rules differs; while Spam accounts are removed from Twitter through suspension, our policy and goal is to attempt to restore Compromised accounts to their original owners.
- **Profile Not Found:** Accounts which are not found at the time of review, generally because they have been deleted or deactivated by the account holder in the intervening time between the sample selection and human evaluation.
- **Good:** Accounts which do not fall in any of the above categories, and are therefore identified as being authentic users who do not engage in spammy activity or behavior. These accounts do not have any spam signals / indicators, nor have they posted any content violative of the platform manipulation and spam policy.

---

[1] Human labelers are contractor agents hired by our Twitter Service outsourced vendors. Agents are background checked, have customer service backgrounds and are experienced and trained in policy enforcement and/or data labeling for machine learning.

4

Confidential
Confidential

TWTR_000006121

MUSK-PAMPENA-0675934

The estimate of the "spam and false" accounts included in our SEC filings includes **ALL** accounts labeled as **EITHER** Spam or Real User Spam under the definitions above.

## 5. Process for identifying spam and false accounts in mDAU

At the beginning of every month, the approximately 3,000 accounts identified using the process in section (3) for the previous month are inputted into a human labeling platform (Appen Data Annotation Platform (ADAP)) for review. The accounts are labeled by a human labeler in accordance with the process defined in section (4). These labels are then used to calculate the percentage of spam users for that month using the formula:

(Number of sampled accounts labeled as Spam OR Real User Spam / (Total number of sampled accounts less sampled accounts labeled as Profile Not Found)) * 100

### Investigation Process

Accounts are assessed by labelers using the criteria defined in section (4).

The review process begins with the labeler opening an account in a Twitter-proprietary internal tool that surfaces public and non-public information about a specified account, including the criteria and signals described in section (2). Labelers also may review an account or multiple accounts using a Twitter-proprietary internal tool that displays information about multiple accounts in tabular form, enabling direct review of linked/related accounts as described in section (2).

After the labeler has completed a thorough review of the account, including review of any linked/related accounts, the labeler selects the most appropriate label for the account (Spam, Real User Spam, Compromised, Profile Not Found, or Good).

### Audit and Review Process

This labeling workflow has a multi-step, multi-tier review process where each account is reviewed and investigated by three independent spam policy trained expert labelers. Once the preliminary review task is complete, the resulting labels are passed to the Quality Analyst (QA) team, who are considered subject matter experts in spam policy due to their tenure and advanced training in spam policy. The QAs review all output data in which all three agents did not agree on a label, along with a randomly sampled review of 25% of the accounts that had 100% agent agreement (i.e. all three agents agreed on the label). During this process, the QAs make edits to the labels in the event any discrepancies between an account label and the definition in section (1) is identified. Following this secondary review, in-house Twitter full time staff (not contracted labelers) who are specially trained on labeling for spam and platform manipulation then review all output data and confirm the final reported numbers for each label.

The final percentage of spam and false accounts in the mDAU sample is shared with internal Twitter teams on a quarterly basis. Our reported estimate in SEC filings is based on the average

Confidential
Confidential

TWTR_000006122
MUSK-PAMPENA-0675935

percentage of spam and false accounts for each of the three individual months in the quarter. The spam and false percentage for each month is individually archived.

6

Confidential
Confidential

TWTR_000006123
MUSK-PAMPENA-0675936