QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice*)
alexspiro@quinnemanuel.com
Ellyde R. Thompson (*pro hac vice*)
ellydethompson@quinnemanuel.com
Jesse A. Bernstein (*pro hac vice*)
jessebernstein@quinnemanuel.com
295 Fifth Ave., New York, NY 10010
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Stephen A. Broome (Bar No. 314605)
stephenbroome@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

*Attorneys for Defendant Elon Musk*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> ELON R. MUSK, <br><br> Defendant. | CASE NO. 3:22-CV-05937-CRB <br><br> **DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL** <br><br> Hon. Judge Charles R. Breyer |

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on June 11, 2026 at 10:00 a.m. in Courtroom 5 – 17th Floor of the United States Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, the Honorable Charles R. Breyer presiding, Defendant, through his counsel, will move, and hereby does move the Court, pursuant to Rules 50(b) and 59 of the Federal Rules of Civil Procedure, for judgment as a matter of law in Defendant's favor or, in the alternative, for a new trial.

This motion is based on the Memorandum of Points and Authorities below, the arguments of counsel, and any other matters properly before this Court.  Pursuant to Local Rule 7-2(c) and Paragraph I.C of the Court's Civil Standing Order – General, Defendant also submits herewith a proposed order.

## ISSUES TO BE DECIDED

1. Whether the Court should grant judgment as a matter of law in favor of Defendant on all of Plaintiffs' claims.

2. Whether, in the alternative, the Court should grant a new trial on Plaintiffs' Rule 10b-5(b) claims arising out of the May 13, 2022 tweet and the May 17, 2022 tweet.

3. Whether, in the alternative, the Court should amend the judgment under Rule 59(e) to reflect judgment against Defendant only as to the Class Representatives or some subset of the class or class period.

DATED: May 1, 2026                         QUINN EMANUEL URQUHART & SULLIVAN, LLP

By /s/*Ellyde R. Thompson*
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Ellyde R. Thompson
Jesse A. Bernstein
Alex Bergjans

*Attorneys for Defendant Elon Musk*

Case No. 3:22-CV-05937-CRB
DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

**TABLE OF CONTENTS**

Page

SUMMARY OF ARGUMENT ...................................................................................................1

PRELIMINARY STATEMENT .................................................................................................1

BACKGROUND .........................................................................................................................2

    A.    The Jury's Verdict...........................................................................................................2

    B.    The Insufficient Evidence Supporting The Verdict.........................................................3

        1.    The May 13 Tweet ....................................................................................3

        2.    The May 17 Tweet ....................................................................................8

    C.    The Evidence That The Jury Based Its Verdict On Improper Considerations ...................8

LEGAL STANDARD.................................................................................................................10

ARGUMENT..............................................................................................................................10

I.    THE COURT SHOULD ENTER JUDGMENT FOR DEFENDANT.................................10

    A.    Plaintiffs Failed To Present Legally Sufficient Evidence Of Damages............................10

    B.    Plaintiffs Failed To Present Legally Sufficient Evidence Of Loss Causation ...................14

    C.    Plaintiffs Failed To Present Legally Sufficient Evidence Of Material Falsity .................20

    D.    Plaintiffs Failed To Present Legally Sufficient Evidence Of Scienter ............................22

    E.    Plaintiffs Failed To Present Legally Sufficient Evidence Of Reliance............................23

        1.    The Fraud-On-The-Market Presumption Does Not Apply....................................23

        2.    Plaintiffs Did Not Individually Rely On The Alleged Misstatements...................24

II.    IN THE ALTERNATIVE, THE COURT SHOULD GRANT A NEW TRIAL..........................24

    A.    The Jury's Verdict Is Against The Weight Of The Evidence...........................................25

    B.    The Jury's Verdict Is The Product Of Bias And Passion And Cannot Be Upheld............25

    C.    Defendant Was Prejudiced By The Improper Scheme Liability Claim.............................28

    D.    The Cumulative Prejudice Necessitates A New Trial.......................................................29

III.    IN THE ALTERNATIVE, THE COURT SHOULD ALTER OR AMEND THE JUDGMENT TO REFLECT THE LACK OF CLASS-WIDE LIABILITY...............................30

CONCLUSION...........................................................................................................................30

Case No. 3:22-CV-05937-CRB

DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Herron*,
634 F.3d 1101 (9th Cir. 2011) ...............................................................................................30

*Ambassador Hotel Co. v. Wei-Chuan Inv.*,
189 F.3d 1017 (9th Cir. 1999) ...............................................................................................11

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)..................................................................................................21, 22, 24

*Anheuser-Busch, Inc. v. Nat. Beverage Distributors*,
69 F.3d 337 (9th Cir. 1995) ............................................................................................25, 27, 28

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
2014 WL 549324 (N.D. Cal. Feb. 7, 2014) ..........................................................................26

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)................................................................................................................4, 24

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ....................................................................................2, 16, 17, 19

*Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*,
492 U.S. 257 (1989)..............................................................................................................25, 28

*Caremark, Inc. v. Coram Healthcare Corp.*,
113 F.3d 645 (7th Cir. 1997) ..............................................................................................1, 11, 12

*Connecticut Ret. Plans & Tr. Funds v. Amgen Inc.*,
660 F.3d 1170 (9th Cir. 2011) ...............................................................................................24

*In re Convergent Techs. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991) ..................................................................................................21

*Defeo v. IonQ, Inc.*,
134 F.4th 153 (4th Cir. 2025) ............................................................................................2, 16

*Di Donato v. Insys Therapeutic Inc.*,
2017 WL 3268797 (D. Ariz. Aug. 1, 2017).........................................................................15

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)..............................................................................................12, 14, 15, 17, 19

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)...............................................................................................................10

DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

*In re Exec. Telecard, Ltd. Sec. Litig.*,
  979 F. Supp. 1021 (S.D.N.Y. 1997)......................................................................................18

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*,
  762 F.3d 829 (9th Cir. 2014) ..............................................................................................10

*Glickenhaus & Co. v. Household Int'l, Inc.*,
  787 F.3d 408 (7th Cir. 2015) ....................................................................................2, 17, 18

*Gonzales v. Police Dep't, City of San Jose, Cal.*,
  901 F.2d 758 (9th Cir. 1990)...............................................................................................29

*Greisen v. Hanken*,
  252 F. Supp. 3d 1042 (D. Or. 2017), ..................................................................................26

*Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*,
  2017 WL 114401 (C.D. Cal. Jan. 9, 2017) .........................................................................21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)......................................................................................................23, 24

*Hammonds v. Yeager*,
  2017 WL 10560471 (C.D. Cal. Aug. 9, 2017)....................................................................26

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
  252 F. Supp. 2d 1005 (C.D. Cal. 2003) ....................................................................2, 13, 14

*In Re JDS Uniphase Corp. Securities Litig.*,
  4:02-cv-1486-CW (N.D. Cal. Nov. 19, 2007) .................................................................4, 22

*Jerden v. Amstutz*,
  430 F.3d 1231 (9th Cir. 2005) ..........................................................................................5, 29

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) .....................................................................................1, 10, 19

*Maricopa Cnty. v. State of Ariz. v. Maberry*,
  555 F.2d 207 (9th Cir. 1977) ............................................................................................5, 25

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011).............................................................................................................22

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) .............................................................................3, 21

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ............................................................................................17

*Miller v. Thane Int'l, Inc.*,
  615 F.3d 1095 (9th Cir. 2010) ..........................................................................................4, 23

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ................................................................................................19

*Molski v. M.J. Cable, Inc.*,
481 F.3d 724 (9th Cir. 2007) .................................................................................4, 10, 25, 28

*Montgomery Ward & Co. v. Duncan*,
311 U.S. 243 (1940)......................................................................................................25, 28

*Murphy v. City of Long Beach*,
914 F.2d 183 (9th Cir. 1990) ...............................................................................................25

*In re Newbridge Networks Sec. Litig.*,
1998 WL 765724 (D.D.C. Oct. 23, 1998) ............................................................................11

*In re Novatel Wireless Sec. Litig.*,
2013 WL 12144150 (S.D. Cal. Oct. 25, 2013) .....................................................................13

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
730 F.3d 1111 (9th Cir. 2013) .......................................................................................15, 18

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)................................................................................................3, 20, 22

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) ...............................................................................................15

*In re Oracle Sec. Litig.*,
829 F. Supp. 1176 (N.D. Cal. 1993) .....................................................................................13

*Pommer v. Medtest Corp.*,
961 F.2d 620 (7th Cir. 1992) ...............................................................................................11

*In re REMEC Inc. Sec. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010)....................................................................3, 15, 17

*In re Sci. Atlanta, Inc. Sec. Litig.*,
754 F. Supp. 2d 1339 (N.D. Ga. 2010)................................................................................18

*Sidibe v. Sutter Health*,
103 F.4th 675 (9th Cir. 2024) ..........................................................................................5, 29

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)............................................................................................................21

*In re Vivendi Universal, S.A. Securities Litig.*,
1:02-c v-5571-PAE (S.D.N.Y. Mar. 26, 2010)....................................................................22

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)..............................................................................1, 2, 11, 12, 15

Case No. 3:22-CV-05937-CRB

DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

*Weaving v. City of Hillsboro*,
763 F.3d 1106 (9th Cir. 2014) ............................................................................................10

*Weisgram v. Marley Co.*,
528 U.S. 440 (2000).............................................................................................................14

## Other Authorities

17 C.F.R. § 240.10b-5.................................................................................................... *passim*

Fed. R. Civ. P. 5.................................................................................................................32

Fed. R. Civ. P. 23...............................................................................................................30

Fed. R. Civ. P. 50...........................................................................................................1, 10

Fed. R. Civ. P. 59...........................................................................................1, 1, 10, 25, 30

Fed. R. Evid. 702...............................................................................................................14

DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

**SUMMARY OF ARGUMENT**

The jury's verdict finding Defendant Elon Musk liable for violating Rule 10b-5(b) for posting two tweets about the Twitter merger on May 13 and May 17, 2022 was not supported by sufficient evidence. Plaintiffs failed to meet their burden to prove any of the necessary elements of their claims—a material misrepresentation, scienter, economic loss, loss causation, or reliance, *see Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206 (9th Cir. 2016)—as a matter of law. The trial record establishes that the verdict was the result of bias and prejudice toward a polarizing defendant exacerbated by improper argument, erroneous instructions, and an unfair trial. The Court should grant judgment under Rule 50(b) or, in the alternative, a new trial pursuant to Rule 59.

**Damages:** The Court should grant judgment on the element of economic loss because Plaintiffs presented the jury with no evidence to determine damages under the required legal standard. ***First***, as the Court instructed the jury, securities fraud damages are "measured by the difference between the price at which a stock sold and the price at which the stock would have sold had the statement or fraudulent acts reflected the true state of affairs." Dkt. No. 524 at 27. The inquiry is "not what might have happened had a [defendant] remained silent, but what would have happened if it had spoken *truthfully*." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (emphasis in original); *see also Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 n.6 (7th Cir. 1997) ("In securities fraud cases under Rule 10b–5, damages are usually the difference between the price of the stock and its value on the date of the transaction if the full truth had been known."). Plaintiffs' expert, Dr. David Tabak, repeatedly conceded that he did not even attempt to satisfy that standard. He was "not looking at what would have happened had Mr. Musk made a but-for disclosure *that was true and accurate*," and instead his analysis was "just comparing if Mr. Musk *had said nothing versus what Mr. Musk said*." Trial Tr. at 1902:20–1903:9 (emphasis added). This is plainly insufficient under the Court's instruction and the law. Dr. Tabak admitted that Plaintiffs did not present the jury with the but-for price "had the statement . . . reflected the true state of affairs," and thus judgment should be granted for Defendant.

***Second***, Dr. Tabak failed to isolate damages caused by the alleged fraud contained in the May 13 tweet from stock price drops attributable only to general market and industry effects. As Dr. Tabak admitted, his analysis charged Defendant with higher damages on certain trading days not because of the

DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

impact of the alleged fraud, but simply because the NASDAQ fell more.  The model fails to properly "eliminat[e] [] that portion of the price decline or price difference which is unrelated to the alleged wrong" and cannot establish damages as a matter of law.  *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014–15 (C.D. Cal. 2003), *aff'd sub nom. Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005).

**Loss Causation:** Plaintiffs also failed to prove loss causation as a matter of law.  Loss causation, like damages, can be proven only by showing the difference between the actual stock price after the false statement and what it would have been in the but-for world where the statement was true.  *Vivendi*, 838 F.3d at 258.  Dr. Tabak simply did not perform the required analysis and thus Plaintiffs presented the jury with no evidence to determine that the alleged false statements were the proximate cause of any harm.

Dr. Tabak offered no evidence that the market was reacting to what Plaintiffs claim was false— the alleged misrepresentation that Musk had due diligence rights to "details confirming" the accuracy of Twitter's spam disclosures and the claim that the deal was "on hold," i.e., work had stopped.  *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 792 (9th Cir. 2020) ("[T]he relevant question for loss causation purposes is whether the market reasonably *perceived* [the defendant's] allegations as true and acted upon them accordingly.").  To the contrary, Dr. Tabak admitted that the market already knew that both of those representations were false "at the same time" it was reacting to the May 13 tweet.  Trial Tr. at 1908:24– 1909:19.  The truth—that Twitter had not agreed to put the deal on hold—was "folded in" to Twitter's stock price on May 13.  It is axiomatic that "if investors already know the truth, false statements won't affect the price," *Defeo v. IonQ, Inc.*, 134 F.4th 153, 162 (4th Cir. 2025), so those alleged false statements could not have caused investor losses.

All that Plaintiffs presented to the jury was the fact that Twitter's share price fell after the tweet.  But no authority allows a securities fraud plaintiff to prove proximate causation from front-end price impact alone.  *E.g.*, *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015) ("It's tempting to think that [de]flation can be measured by observing what happens to the stock immediately after a false statement is made.  But that assumption is often wrong.").  Dr. Tabak did not analyze the price impact of truthful disclosures concerning Defendant's information rights and the status of the merger and thus did not offer any evidence that would allow the jury to determine whether the alleged fraud—as

DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

opposed to the market reacting to concerns the deal was "in jeopardy"—caused losses.  Moreover, because Dr. Tabak admitted that he did not identify any corrective disclosures, Plaintiffs cannot prove the theory of loss causation they pled in their operative complaint.  And, critically, Dr. Tabak admitted that Defendant's July 8 Termination Letter—for which the jury did not find liability—may cause the stock to fall to *the exact same price* even if Defendant never posted the May 13 tweet.  In other words, there is no evidence any investor was actually harmed by the May 13 (or May 17) tweet.

At a minimum, the Court should grant judgment on the May 17 tweet claim.  Dr. Tabak admitted that tweet did not cause "a single penny of investor losses."  Trial Tr. at 1887:21–1888:2.  Without any link to a stock price decline, there can be no loss causation.  *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273–75 (S.D. Cal. 2010) (granting summary judgment on statements for which plaintiff provided no admissible expert analysis linking them to a stock-price decline).

**Material Falsity:** Plaintiffs did not prove that the alleged misrepresentations contained in the May 13 and May 17 tweets were materially false.  For information to be material, "there must be a substantial likelihood that the . . . correction of the misstated fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1259 (N.D. Cal. 2000).  It is undisputed that Defendant's waiver of due diligence and information rights was public and already in the "total mix" of available information when he posted the tweets.  And if the tweets could be interpreted as representations about Defendant's rights under the Merger Agreement, the statements would constitute opinions not actionable under the securities laws even if incorrect.  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 176 (2015).  It is undisputed that Twitter's stock did not move when both Musk and Twitter "corrected" any misimpression that the deal was not moving forward to closing—indicating that information was not material.  And it is also undisputed that Plaintiffs' expert did not even opine that Twitter's stock price would have reacted any differently had the May 13 tweet reflected precisely what they claim Musk concealed—that he was seeking to renegotiate the deal.  Nor did Dr. Tabak opine that Twitter's stock price would have reacted any differently had the May 13 tweet reflected the undisputed truth that Musk was not willing to voluntarily close at that time until he obtained the data he had requested.

**Scienter:** Plaintiffs failed to adduce sufficient evidence to establish scienter as a matter of law.

DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

There was no evidence that Defendant knew his statements were false at the time they were made, nor was there sufficient evidence to satisfy the more liberal "deliberate recklessness" standard. The evidence undisputedly showed that Defendant had a good faith belief that his tweet was true, *In Re JDS Uniphase Corp. Securities Litig.*, 4:02-cv-1486-CW (N.D. Cal. Nov. 19, 2007), Dkt. No. 1874 (previously filed at Dkt. No. 366-2) ("An honest or good faith belief on the part of an Individual Defendant that a statement is true is inconsistent with a finding that he acted with scienter in making that statement."). He understood "temporarily on hold" to mean "there's a slight delay" and that "the deal would not close until [he] receiv[ed] the information," Trial Tr. at 772:2–11, which was his intent and exactly what happened.

**Reliance:** Finally, Plaintiffs could not prove either individual or class-wide reliance. Plaintiffs' theory of damages and loss causation—that the market took days to respond to the May 13 tweet—is incompatible with an efficient market, which "exists when the release of financial information results in an 'immediate response' by the market." *Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1103 (9th Cir. 2010). Nor could Plaintiffs establish the fraud-on-the-market presumption for the entire Class Period in light of Dr. Tabak's concession that the news that the deal was not "on hold" was known on May 13 and "folded in" to Twitter's stock price on that same day. *See Basic Inc. v. Levinson*, 485 U.S. 224, 248–49 (1988) (because "news of the merger discussions credibly entered the market and dissipated the effects of the misstatements, those who traded Basic shares after the corrective statements would have no direct or indirect connection with the fraud"). Furthermore, it is undisputed that neither Class Representatives Brian Belgrave or Nancy Price individually relied to their detriment on the alleged misstatements contained in the May 13 tweet—Price was not aware it existed and Belgrave did not sell because of it.

**New Trial:** Even if the Court does not grant judgment as a matter of law for Defendant, it should order a new trial. The above demonstrates that, at the very least, the jury's verdict was "contrary to the clear weight of the evidence." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). Furthermore, the trial record shows that Defendant did not have the "fair, impartial trial, before a fair and impartial jury" to which he is entitled. *Maricopa Cnty. v. State of Ariz. v. Maberry*, 555 F.2d 207, 224 (9th Cir. 1977). As the Court acknowledged, the venire held unprecedented hostility to the Defendant and the verdict—encouraged by Plaintiffs' counsel's facially improper "us versus him" and "send a message" arguments—reflected that improper bias. The jury literally used its verdict to send Defendant a message, writing the

DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

number $4.20 in a different color ink to highlight it on the form.

Separately, Defendant is entitled to a new trial based on the Court's decision to permit Plaintiffs to try a legally infirm, unpled, and boundless scheme liability claim arising from statements the Court previously dismissed (like the July 8 Termination Letter) and Plaintiffs never pled. That Defendant prevailed on the claim is of no moment. Forcing him to litigate, at the eleventh hour, this new and undefined claim materially prejudiced him—the focus of the trial was the scheme and not the narrow misstatements that survived the motion to dismiss. The inclusion of the July 8 Termination Letter as an independent basis for liability prevented him from using the termination offensively to make arguments that the market reaction to the letter broke the chain of causation and established the tweets were not material.

Finally, the above errors and the various other issues Defendant raised during trial—including the Court's failure to give appropriate limiting instructions, error in the final instructions, the improper injection of issues relating to Defendant's purported failure to disclose his purchase of Twitter stock, exclusion of probative evidence, and one-sided treatment of counsel—necessitate a new trial under the doctrine of cumulative error. *Sidibe v. Sutter Health*, 103 F.4th 675, 688 (9th Cir. 2024) ("[E]rrors in a civil trial must be considered 'cumulatively'" and "the combined effect of multiple errors 'may suffice to warrant a new trial even if each error standing alone may not be prejudicial.'" (quoting *Jerden v. Amstutz*, 430 F.3d 1231, 1240–41 (9th Cir. 2005))). These errors, when weighed in the aggregate, establish that Defendant did not receive a fair trial and the resulting verdict is unjust.

**Amending The Judgment:** In the alternative, the Court should amend the judgment to reflect judgment in favor of only the Class Representatives and not the class itself. Even if the Court finds sufficient evidence of individual reliance, the jury verdict does not reflect any finding of fraud-on-the-market reliance, and, absent fraud-on-the-market reliance, there can be no class-wide liability.

DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

**PRELIMINARY STATEMENT**

Plaintiffs brought claims for securities fraud against Defendant Elon Musk but did not present evidence that a single investor was misled, deceived, or harmed by any of the statements he made. Plaintiffs spent most of trial asserting that Defendant engaged in a multi-month fraudulent scheme to deceive the market in order to renegotiate the price of the Twitter merger—a claim that sought to hold Defendant liable for nearly everything he did from May 13 to October 3, including making statements that the Court previously ruled were inactionable—but the jury rejected that claim. Instead, it found Defendant liable for two tweets, on May 13 and 17, that Plaintiffs argued falsely represented that Defendant had stopped all work on the merger and that he had broad "due diligence" rights to information and data relating to Twitter's SEC disclosure that spam and fake accounts represented less than five percent of the platform's monetizable daily active users.

But over ten days of trial, Plaintiffs did not offer any evidence that anyone interpreted the tweets to convey such a message or sold a single share of stock because they were misled. Instead, Plaintiffs own experts conceded that the "[e]veryone knew" that work on the deal had not stopped and what information rights Defendant had under the Merger Agreement. One Class Representative—Plaintiffs' appointed spokesman—admitted that he was not "tricked" by the May 13 tweet, knew that Defendant had waived due diligence, and believed that "on hold" meant that the deal was "in jeopardy" and may not close. That is not surprising. Defendant did not tweet that all work on the merger had stopped or that he had broad diligence rights. Rather, he said that the merger was "temporarily on hold pending details" that he requested from Twitter relating to its spam disclosures—that is, that he would not close until he received that information. That was true. Twitter's former executives testified that Twitter needed to provide additional spam information for the deal to close. Defendant later terminated the Merger Agreement when Twitter failed to provide all of the data necessary to confirm Twitter's spam estimate, and only closed after Twitter produced that data under a court order.

As Plaintiffs' own expert admitted, any news that Defendant was in a dispute with Twitter would cause investors to form legitimate concerns about the state of the deal (and whether it would close at a lower price) regardless of the merits of Defendant's position. But that is not securities fraud. Defendant cannot be held liable for a stock decline caused by his truthful warnings to the markets. Plaintiffs had to

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

prove that Twitter's stock declined in response to the allegedly false information that the tweets communicated, not because the market correctly believed the deal was in jeopardy or that Defendant would refuse to close. They had to prove that Twitter's stock would not have fallen if investors knew the true state of affairs. Plaintiffs did not even try to satisfy that test. Their expert admitted that Twitter's stock did not move when Defendant and Twitter confirmed that the deal was not "on hold"—indicating that alleged false statement did not cause the decline in the first place. And he also admitted that he had no idea whether Twitter's stock would have traded any differently if instead of posting "Twitter deal temporarily on hold" Defendant tweeted what Plaintiffs claimed was the truth. Such a failure of proof requires that judgment be entered for Defendant as a matter of law.

This lack of proof, however, also confirms that the jury's verdict was a product of passion and a desire to send a message to a polarizing public figure. The jury's underlying hostility—confirmed by the unprecedented responses to the juror questionnaires—was only fanned by a cascade of evidentiary and instructional error, improper argument, and the Court's decision to permit Plaintiffs to pursue a legally defective scheme claim. The cumulative prejudice led to this unfair and unsupportable outcome.

Judgment should be entered for Mr. Musk or a new trial ordered.

## BACKGROUND

### A.    The Jury's Verdict

Plaintiffs pursued four grounds for liability at trial—that Defendant engaged in a scheme to defraud the market in violation of Rule 10b-5(a) and/or (c) and that Defendant's May 13, 16, and 17, 2022 statements violated Rule 10b-5(b). Following a ten-day trial, the jury rendered a verdict, rejecting Plaintiffs' scheme liability claim and that Defendant's May 16, 2022 statement that "probably 20 percent" of Twitter's users were spam or fake accounts was an actionable misrepresentation. Dkt. No. 538 at 5, 3. The jury found that two tweets—a May 13, 2022 tweet "Twitter deal temporarily on hold pending details supporting calculation that fake accounts do indeed represent less than 5% of users" and a May 17, 2022 tweet "20% fake/spam accounts, while 4 times what Twitter claims, could be *much* higher. My offer was based on Twitter's SEC filings being accurate. Yesterday, Twitter's CEO publicly refused to show proof of <5%. This deal cannot move forward until he does"—violated Rule 10b-5(b). *Id.* at 1.

The jury's verdict contained four pages of dollar figures for per-share deflation on each day of the

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

class period. *See* Dkt. No. 538. Although the jury completed the verdict form in black ink, the jury wrote the number $4.20 in blue ink, drawing attention to the figure. *See* Dkt. No. 538 at 6–10.

**B.     The Insufficient Evidence Supporting The Verdict**

1.     <u>The May 13 Tweet</u>

Plaintiffs argued that the May 13 tweet was false for two reasons: (1) the Twitter merger was not "on hold" as of May 13 because Defendant's team and Twitter continued to work toward closing and (2) Defendant "didn't have the right to get" the details supporting calculation that fake accounts do indeed represent less than 5% of users because "he waived due diligence." Trial Tr. at 2194:18–2195:1 (Closing).

But Plaintiffs did not present any evidence that the market interpreted the tweet to convey either of those messages or that the tweet deceived a single investor. Their expert, Dr. Tabak, did not "opine in any way . . . on what analysts interpreted any of [Defendant's] statement[s] to mean." Trial Tr. at 1897:24–1898:1. No Twitter investor or shareholder testified at trial that he or she interpreted the tweet to communicate that all work on the merger had stopped, that Twitter had agreed to place the deal on hold, or that Defendant had the right to spam "details." And no investor testified at trial that they sold a single share of Twitter stock because the May 13 tweet misled them about the state of the merger.

Instead, Plaintiffs called only one investor who was even aware the tweet existed before suing. He testified that he was not "trick[ed]" by the May 13 tweet. Trial Tr. at 301:24–303:13 (Belgrave) (admitting that he was not "tricked into buying" shares after May 13 and "wasn't tricked into selling them" either). Class Representative Brian Belgrave—the only person called at trial who personally bought or sold Twitter stock during the Class Period—interpreted "temporarily on hold" to mean "the deal is in jeopardy" and that there was a risk it was "not going to go through." *Id.* at 289:18–290:7. He did not testify that that he interpreted "on hold" to mean that work on the merger had stopped. Instead, he stated that he believed other shareholders sold because the tweet suggested that "the next step is 'I'm not going to go through with the deal,'" i.e., that it warned that termination was potentially on the horizon. *Id.* Belgrave's interpretation was consistent with the state of affairs: the deal was in "jeopardy" of not closing unless Twitter provided Defendant with the information he was seeking. Defendant provided notice of termination on July 8, 2022 after Twitter failed to produce the relevant information. Ex. 197.

Belgrave also testified he knew before May 13 that Defendant waived pre-signing due diligence :

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

Q. Part of your case, sir, is that the May 13th tweet was misleading because Mr. Musk had already waived due diligence and didn't have a right to information; is that correct?
A. That sounds right.
Q. But you were already aware that he had waived presigning due diligence because you had read that in the Wall Street Journal; correct, sir?
A. I was aware of that, yes.

*Id.* at 286:16–286:23. The market knew that Defendant had "waived due diligence" well before May 13—Defendant publicly disclosed that fact on April 20, 2022. Ex. 47. The market also knew the scope of Defendant's information rights under the Merger Agreement because Twitter publicly filed the Merger Agreement on April 25, 2022. Ex. 62. The terms—including Defendant's information rights—were public information and incorporated into Twitter's stock price "within a day or two" of the filing. Trial Tr. at 1877:3–13 (Tabak). Plaintiffs offered no percipient or expert testimony to the contrary or any evidence that anyone interpreted the May 13 tweet to say anything about Defendant's information rights, let alone that it misled a single person into believing his rights were broader than they were.

Nor did Plaintiffs present any evidence that the tweet misled the market into believing that Defendant and Twitter had stopped working on the deal—Plaintiffs' proffered interpretation of "on hold." In fact, their expert Dr. Tabak testified that *the opposite was true*: "Everyone knew that Twitter did not agree to put the deal on hold" and that Defendant "can't put it on hold." Trial Tr. at 1908:24–1909:19 (Tabak). According to Dr. Tabak, "the revelation" that the deal was not on hold "came *at the same time* as the May 13th news," so the market "folded in" that knowledge into Twitter's stock price on "May 13th and 16th." *Id.* In other words, according to Dr. Tabak, Twitter's stock price drop on May 13 and 16 could not have been caused by a mistaken belief that work on the merger had stopped because the market knew otherwise "at the same time." *Id.* Indeed, Dr. Tabak conceded that he was not even opining that "it was material to investors whether Twitter agreed to put the deal on hold." *Id*. at 1907:24–1908:5.

The conclusion was backed by the absence of any market reaction to the numerous public disclosures by both Defendant and Twitter that both parties were working toward closing. Trial Tr. at 1909:25–1910:6. According to Dr. Tabak, the way "to test whether an allegedly false statement causes a stock price reaction is measure how the stock reacts when the supposed truth is revealed." *Id.* at 1906:23–1907:2. If a false statement caused a stock to artificially decline, the public disclosure of the truth would lead to a price increase; if the market does not react to the truth, that indicates that the false statement is

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

not what is weighing down the price. It is the same method Dr. Tabak "commonly" uses in his other cases. *Id*. at 1907:3–5. As he acknowledged, a "significant amount of information regarding the merger and the parties' positions" was made public from May 13 until Defendant terminated the merger, including news that Defendant's team was continuing work to close the deal and Twitter's announcements that the deal was not on hold. *Id.* at 1909:251910:16. But Twitter's stock price had no statistically significant reaction to any of these disclosures because the information "was already known." *Id.* at 1908:1822.

Plaintiffs offered no evidence explaining why Twitter's stock declined in response to the May 13 tweet. Dr. Tabak never opined that the market reacted to either of Plaintiffs' theories of falsity, only that the tweet itself led to a sell-off. *Id.* at 1865:12–1866:6. He did not provide any testimony linking the May 13 and 16 stock drop to the belief that work on the deal had stopped or that Defendant had the right to the information he was requesting (the alleged false statements), as opposed to a concern that the merger was "in jeopardy." Nor did he offer any opinion whether the stock price reaction would have been any different had Defendant added to his tweet or simply tweeted that "he just wanted to renegotiate the deal," *Id.* at 1900:231901:4—precisely what Plaintiffs argued was the true state of affairs. And when asked whether Twitter's stock price reaction would have been any different had Defendant tweeted "Twitter deal temporarily not closing" or "Twitter deal in jeopardy" instead of "Twitter deal temporarily on hold," Dr. Tabak admitted that he had no opinion one way or the other. *Id.* at 1903:10–1904:12.

The evidence presented at trial showed that those statements reflected the true state of affairs of the merger. After signing the Merger Agreement, Defendant requested from Twitter information explaining its process for estimating the prevalence of spam a percentage of monetizable daily active users in order to verify the accuracy of Twitter's disclosures in SEC filings that the number was "less than five percent." *E.g.*, Ex. 88. Defendant sought this information to verify Twitter's representation and warranty in the Merger Agreement that its SEC filings were accurate. Ex. 65, § 4.6. At a meeting with Twitter executives on May 6, 2022, Twitter's CFO Ned Segal gave a high-level explanation of the process, and in response Defendant's team asked for additional information and data supporting the calculation. Trial Tr. at 1160:5–13 (Segal). Twitter agreed to provide it. Ex. 84.

Following the meeting, Defendant expressed serious concerns with Twitter's spam disclosures and process. For instance, on May 8, 2022, he texted his lead banker Michael Grimes that "[a]n extremely

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

fundamental due diligence item is understanding exactly how Twitter confirms that 95% of their daily active users are both real people and not double counted" and explained "[i]f that number is more like 50% or lower…then they have been fundamentally mispresenting the value of Twitter to advertisers and investors." Ex. 565.  He made clear "this deal moves forward if it passes due diligence, but obviously not if there are massive gaping issues." *Id.*  Grimes testified that he read the May 13 tweet as a "public airing" of this text message exchange.  Dkt. No. 516-1, Ex. 900 (Grimes Dep. at 206:2–10).  Defendant made a similar statement to his biographer Walter Isaacson on May 6 or 7, explaining that "[t]here's no way to move forward after what [Twitter] said."  Trial Tr. at 976:11–977:13 (Isaacson).

On May 12, 2022, after nearly a week of promising to provide Defendant's team with additional information supporting its spam calculation, Twitter uploaded to the merger data room a purported response. Ex. 572; Trial Tr. at 1171:22–1173:11 (Segal).  It was four sentences long and, as Segal testified, it simply repeated what Twitter told Defendant at the May 6 meeting.  *Id.* at 1173:9–11 (Segal).  The Twitter staff responsible for exchanging information with Defendant's team, including Stacey Conti, knew when they provided the response to Defendant's team that "he will hate this."  *Id.* at 1029:211031:7 (Conti).  Upon receiving this response, Defendant's banker Anthony Armstrong believed that Twitter was giving Defendant's team "the Heisman" and was "no longer going to provide us the information that they had agreed to provide us."  *Id.* at 1705:15–19 (Armstrong).  He testified that Twitter's failure to provide the information "was an obstacle to getting the deal done" and recommended that Defendant's team cancel an upcoming meeting with Twitter in response.  *Id.* at 1707:6–1708:6.

Defendant posted the May 13 tweet the next morning in response.  As he testified, his statement "temporarily on hold" meant that "there's a slight delay" and that "the deal would not close until [he] receiv[ed] the information." Trial Tr. at 772:2–11 (Musk).  He followed up with a tweet that he was "still committed to the acquisition." Ex. 580.  Twitter's senior leadership did not disagree.  Twitter Chairman Brett Taylor "quote tweeted" Defendant's tweet to the market, linking—and thereby sharing—the entire thread to the public.  Trial Tr. at 1485:19–1486:3 (Taylor).  Three days later, on May 16, Twitter CEO Parag Agrawal posted a tweet thread acknowledging that Twitter had not yet provided all of the information needed to calculate its spam estimate to Musk. Ex. 119, Trial Tr. at 1282:6–24 (Agrawal); *id.* at 797:2–12 (Musk).  Agrawal did not dispute that Defendant was entitled to the information he was

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

requesting. He testified that he "didn't believe that" Defendant "wasn't entitled to that information" and that he "thought we would productively share additional information" supporting Twitter's spam calculation. *Id.* at 1301:1–11. He explained that providing the spam information was "one of the several items we were working through in order to close the deal." *Id.* at 1301:1–16. For good reason. The Merger Agreement entitled Defendant to "information from Twitter "for any reasonable business purpose related to the consummation of the" merger. Ex. 65, § 6.4. Defendant sought this information to test Twitter's representations and warranties, which Plaintiffs' expert Adam Badawi conceded was a purpose "related to the consummation of the merger agreement." Trial Tr. at 504:1–4 (Badawi).

But, as Twitter's CFO Segal testified, Twitter refused to provide Defendant with the information necessary to "verify that 5 percent number." Trial Tr. at 1171:10–1171:21 (Segal). After months of trying and failing to obtain that information from Twitter, Defendant terminated the merger on July 8, 2022 citing Twitter's refusal to produce that data as a basis for the termination. Ex. 192. In the subsequent litigation, "after months of not giving" the information "that is necessary for [Defendant] to verify that 5 percent number," the Delaware Chancery Court ordered Twitter to produce it. Trial Tr. at 1171:10–1171:21. Shortly thereafter, on October 3, 2022, Defendant announced that he would close on the original terms.

Plaintiffs presented no evidence that Twitter's stock price would have reacted any differently had the market learned this information on May 13. Trial Tr. at 1903:10–1904:12 (Tabak). The Court instructed that, to find Defendant liable, Plaintiffs had to prove that the misrepresentation "caused plaintiffs to suffer damages," which are "measured by the difference between the price at which a stock sold and the price at which the stock would have sold had the statement or fraudulent acts reflected the true state of affairs." Dkt. No. 524 at 18, 27. Plaintiffs did not provide that measurement to the jury. Dr. Tabak's damages calculation "was not looking at what would have happened had Mr. Musk made a but-for disclosure that was true and accurate" unless "that but-for disclosure is essentially saying nothing." Trial Tr. at 1902:20–1903:9 (Tabak). His analysis was "just comparing if Mr. Musk had said nothing versus what Mr. Musk said." *Id.*

Additionally, in calculating damages, Dr. Tabak did not control and eliminate stock drops caused by general market and industry effects. Different class members would receive different per-share damages depending on the price of the stock the day they sold, for no other reason than because the general

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

stock market declined that day—losses unrelated to the alleged fraud.  Trial Tr. at 1910:12–1911:19.

### 2.    The May 17 Tweet

As to the May 17 tweet, the evidence established that the statements in the tweet were truthful. The 20% spam estimate identified in the tweet referenced a study published by SparkToro on May 15 estimating that spam/fake accounts constituted 19.42 percent of visible active users on Twitter.  Exs. 598–599; Trial Tr. at 890:7–9 (Musk).  The jury found that Defendant's estimate, which he originally stated at the May 16 All In Summit, was not an actionable misstatement.  Dkt. No. 538 at 3.  Defendant's statement that "[m]y offer was based on Twitter's SEC filings being accurate" referenced the Merger Agreement's representations and warranties covenant.  *Compare* Ex. 130 *with* Ex. 65 § 4.6.  The statement that "[y]esterday, Twitter's CEO publicly refused to show proof of <5%" referred to Agrawal's May 16 tweet thread acknowledging that information had not been provided to Defendant.  *Compare* Ex. 130 *with* Ex. 119.  And the statement "[t]his deal cannot move forward until he does"—which mirrored what Defendant privately told Isaacson a week earlier, Trial Tr. at 976:11–977:13 (Isaacson)—reiterated Defendant's position that the deal would not close until Twitter provided the information, an understanding that Agrawal shared.  *Id.* at 1301:12–16 (testifying that providing spam information was "one of the several items we were working through in order to close the deal.").  The deal did not close until after Twitter provided that information following a court order to do so.  *Id.* at 1171:10–1171:21 (Segal).

And Plaintiffs' expert conceded that the May 17 tweet did not cause any damages at all.  When asked whether the May 17 tweet caused investors to suffer any loss, Dr. Tabak admitted it did not:

> Q.  It's a May 17th, 2022, tweet.  Do you see that?
> A.  I do.
> Q.  You're not claiming this tweet caused any investor losses; correct?
> A.  That is correct.

Trial Tr. at 1884:24–1885:4.

### C.    The Evidence That The Jury Based Its Verdict On Improper Considerations

The introduction of evidence during trial took place against a backdrop of unmitigated juror bias, improper evidence and argument, and prejudicial evidentiary rulings.

Plaintiffs' counsel repeatedly violated the Court's motion *in limine* ruling prohibiting Plaintiffs from suggesting to the jury that Mr. Musk violated securities laws in connection with the purchase of

Twitter stock on the open market before his offer to purchase Twitter. The Court unequivocally ruled that, "[t]o the extent that they would argue or suggest that [Mr. Musk was] violating the securities laws" in connection with his purchases of Twitter stock on the open market, "it's out." Tr. of Feb. 17, 2026 Proceedings at 54:6–7. Yet Plaintiffs suggested as much in opening statements, Trial Tr. at 206:2–6, as the Court recognized. *Id.* at 231:14–21–232:17, 232:25–233:2. And Plaintiffs elicited such testimony from multiple witnesses. *Id.* at 350:24–351:16 (Gadde); 538:6–539:1, 561:23–562:2 (Birchall); 669:15–17, 670:19–21, 674:25–675:10 (Musk).

Plaintiffs seized upon the scheme liability claim to improperly introduce irrelevant and prejudicial matters into the proceeding. Plaintiffs asserted that tweets that were not alleged to be false or misleading (or had been dismissed) were just that. *See, e.g.*, Trial Tr. at 218:12—219:3. Plaintiffs' counsel repeatedly injected prejudicial questioning designed to sway the San Francisco jury to find Defendant liable based on inflamed passions, emphasizing the ties of certain witnesses to California in contrast to Defendant and raising irrelevant matters. *See, e.g.*, *id.* at 663:13–22 (Plaintiffs' counsel questioning Musk about his decision to move out of California and to move some of his business operations out of the state); 1110:22–1112:4 (Plaintiffs' counsel discussing with former Twitter CFO, Ned Segal, that both he and Plaintiffs' counsel had worked at Candlestick Park); 2285:25–2286:6 (Plaintiffs' counsel remarking in closing argument about Plaintiffs expert, Professor Badawi: "I find it amazing that they . . . never called a single professor or academic to contradict Adam Badawi from the University of California. Not a bad school. I personally couldn't get in there myself when I tried years ago. Right across the beautiful bay of ours."). Plaintiffs' counsel also sought to engender sympathy for the Class Representatives. *See, e.g.*, *id.* at 1358:7–1359:2 (Plaintiffs' counsel questioning Class Representative Nancy Price about her husband being in a wheelchair, his problems hearing, his pacemaker and defibrillator, and his radiation treatment).

In each of these instances, the Court either rejected requests for curative or limiting instructions, or instructed the jury in a manner that emphasized—rather than dissipated—the prejudice. *See, e.g.*, *id.* at 230:21–231:18; Dkt. No. 471 (requests for limiting instruction). In the face of a jury expressly hostile to Defendant, Tr. of Feb. 17, 2026 Proceedings at 148:15–18, Plaintiffs' counsel admitted an intent to ask the jury to use its verdict to "send a message." Trial Tr. at 2133:10–24; 2135:4–5 ("[Y]ou bet I'm going to say, 'Send a message.'"). In response, the Court emphasized to the jury that the media attention in this

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

case meant the jury's message would receive close attention.  Dkt. No. 524 at 2.  And, in fact, the jury took that message to heart, highlighting the $4.20 damages number on the verdict form—a number negatively associated with Defendant in the context of business transactions.  Dkt. 538 at 8.

<b><u>LEGAL STANDARD</u></b>

Under Federal Rule of Civil Procedure 50, this Court may "grant a motion for judgment as a matter of law against [a] party on a claim or defense" if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party."  Fed. R. Civ. P. 50(a)(1). "It is error to deny [such relief] when it is clear that the evidence and its inferences cannot reasonably support a judgment in favor of the opposing party."  *Weaving v. City of Hillsboro*, 763 F.3d 1106, 1111 (9th Cir. 2014) (quotation and citation omitted).

A new trial is appropriate under Rule 59(a) where "the verdict is against the weight of the evidence, [] the damages are excessive, or [] for other reasons, the trial was not fair to the party moving."  *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quotation omitted).  The Court under Rule 59 "is not required to view the trial evidence in the light most favorable to the verdict" on a motion for new trial.  *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014).

<b><u>ARGUMENT</u></b>

**I.      THE COURT SHOULD ENTER JUDGMENT FOR DEFENDANT**

As Defendant explained, Dkt. Nos. 503, 507, Plaintiffs did not present legally sufficient evidence to prove any of the elements of a Rule 10b-5(b) claim:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206 (9th Cir. 2016) (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011)).  No reasonable jury could have found that Plaintiffs established these elements. The jury also lacked a legally sufficient basis for any damages award.

**A.      Plaintiffs Failed To Present Legally Sufficient Evidence Of Damages**

The Court should enter judgment for Defendant because Plaintiffs failed as a matter of law to adduce sufficient evidence to prove economic loss or damages—a required element of any 10b-5 claim.

***First,*** Plaintiffs' claims suffer from a fundamental defect:  their expert Dr. Tabak openly conceded at trial that he did not perform the required analysis to establish damages for a Rule 10b-5(b) claim, and

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

Plaintiffs presented no other evidence that could support any damages award.

Plaintiffs sought to recover as damages "out-of-pocket loss," i.e., the "the difference between the value of what the plaintiff gave up and the value of what the plaintiff received." *Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1030 (9th Cir. 1999). As the Court made clear in its instructions, those damages "are measured by the difference between the price at which a stock sold and the price at which the stock would have sold had the statement or fraudulent acts reflected the true state of affairs." Dkt. No. 524 at 27. Thus, to prove damages, the "proper question" is "not what might have happened had a [defendant] remained silent, but what would have happened if it had spoken *truthfully*." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (emphasis in original); *see also Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 n.6 (7th Cir. 1997) ("In securities fraud cases under Rule 10b–5, damages are usually the difference between the price of the stock and its value on the date of the transaction if the full truth had been known."); *Pommer v. Medtest Corp.*, 961 F.2d 620, 628 (7th Cir. 1992) ("Damages under § 10(b), by contrast, usually are the difference between the price of the stock and its value on the date of the transaction if the full truth were known."); *In re Newbridge Networks Sec. Litig.,* 1998 WL 765724, at *2 (D.D.C. Oct. 23, 1998) (same).

But as the Court itself acknowledged during Dr. Tabak's cross-examination, Plaintiffs did not present any evidence that could satisfy that standard. Instead, Dr. Tabak offered an opinion only comparing Twitter's actual stock price with the but-for price had Mr. Musk *said nothing*—not what the price would have been had Mr. Musk's May 13 and 17 statements reflected *the truth*:

> Q.    So you're not trying to figure out what would have happened had Mr. Musk told the truth?
>
> A.    Well put it this way:  Saying nothing is essentially not presenting that misrepresentation.  If you want to say "If he had told the truth," there are a lot of truths out there, and we can have, you know, all kinds of different views.
>
> Q.    Okay.  And just so it's clear –
>
> THE COURT:  He is giving an opinion.  He is giving an opinion as to what would have happened if he had said nothing.
>
> THE WITNESS: That's correct, Your Honor.

Trial Tr. at 1901:9–18.  The Court explained further:

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

THE COURT:  He is not giving an opinion as to what would have happened had he said X, Y, or Z, and that's the distinction.  It's actually *an omission* in a way.  He's not saying – he's saying he looked at the statement.  He was told that the statement was false.  He was told to assume that the statement was untrue.  And then he was asked the question:  Did that statement, in your opinion, have any impact on the price?

That's the extent of his inquiry.  And he can't – the reason it's speculative, he can't answer your question.  He can only answer the question of the statement made and then *no statement given*, and that's exactly what he – what he – what he said.

*Id.* at 1901:19–1902:5 (emphasis added).  Dr. Tabak confirmed that the "Court's explanation was correct," that he was "not looking at what would have happened had Mr. Musk made a but-for disclosure that was true and accurate" unless "that but-for disclosure is essentially saying nothing," and that it was "fair" to say that his analysis was "just comparing if Mr. Musk had said nothing versus what Mr. Musk said."  *Id.* at 1902:20–1903:9.

That is deficient as a matter of law.  Rule 10b-5 neither compels market participants to speak nor mandates them to remain silent.  But "at the moment the [defendant] chooses to speak, [he] takes upon [him]self the obligation to *speak truthfully*, and it is the breach of *that* obligation which forms the basis for the §10(b) claim."  *Vivendi*, 838 F.3d at 258 (emphasis in original).  Damages thus must be measured—and proven—by comparing the actual stock price against the price in a but-for world where the defendant satisfied his obligation to tell the truth.  *Id.*; *Caremark*, 113 F.3d at 649.  That is not controversial.  It is what the Court instructed the jury, Dkt. No. 524 at 27, and is consistent with the Supreme Court's mandate that "plaintiff prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005).  To prove damages, Plaintiffs were required to present the exact computation that Dr. Tabak admitted he did not perform:  the difference between Twitter's stock price and "what would have happened had Mr. Musk made a but-for disclosure that was true and accurate."  Trial Tr. at 1902:20–1903:9. They did not.

**Second**, Plaintiffs failed to present the jury with sufficient evidence to disaggregate and isolate economic loss purportedly caused by the alleged misrepresentations from price drops caused by general market or industry factors during the Class Period.  A defendant is liable only for damages caused by the alleged misrepresentation, so the "proper measure of damages in the securities context thus requires elimination of that portion of the price decline or price difference which is unrelated to the alleged wrong."

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

*In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1014–15 (C.D. Cal. 2003), *aff'd sub nom. Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005). The proper and "necessary" method to isolate the impact of market and industry factors on stock price is to perform an event study throughout the class period to "isolate the influences of information specific to" the company that "defendants allegedly have distorted" from changes caused by unrelated market forces over which the defendants had no control. *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993). Such analysis is required to prove both causation and economic loss and "[t]he absence of an event study for damages, in particular, will result in summary judgment in favor of defendants." *In re Novatel Wireless Sec. Litig.*, 2013 WL 12144150, at *5 (S.D. Cal. Oct. 25, 2013). The reason for such a requirement is simple: a defendant is not liable for damages caused by the stock market's general decline.

Dr. Tabak admitted that he did not isolate the decline in Twitter's stock caused by market and industry effects throughout the Class Period. Trial Tr. at 1840:15–1841:9. Dr. Tabak charged Defendant with higher damages on a given day based only on market and industry effects—"increasing damages []because the stock market went down," even though Defendant was not responsible for the general market drop. *Id.* at 1913:3–8. So, under Dr. Tabak's model, an investor who sold on May 24, 2022 is entitled to approximately $1 more per share in damages than one who sold on May 13, 2022—the day of the alleged fraud—simply because the NASDAQ traded lower on the former than the latter. *Id.* at 1911:4–19.

Dr. Tabak's complete failure to disaggregate unrelated stock market movements means that Plaintiffs cannot possibly have proven damages for this class. The Court certified a class of "All persons and entities who sold the publicly traded stock or call options, or purchased the put options, of Twitter, Inc. during the period from May 13, 2022 through October 4, 2022, both dates inclusive, and who suffered damages by Defendant's alleged violations of § 10(b) and of the Exchange Act." Dkt. No. 106 at 12. That class definition includes investors who both purchased and sold Twitter securities *after* the May 13 tweet. But any damages such class members suffered are not a result of a stock price infected by fraud but solely a result of market and industry effects. An investor who purchased Twitter stock after May 13 bought shares at a 45.7 percent discount caused by the alleged fraud. If he then sold his stock before July 11, the sale price would reflect that same 45.7 percent discount. The alleged fraud thus had the exact same impact, on a percentage basis, on both the Class Period purchase and sale. The net effect of the fraud—as a

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

percentage of the merger discount, which was how Dr. Tabak measured damages—was zero.

Yet, under Dr. Tabak's analysis, if someone purchased Twitter's shares after May 13 and sold the shares later, they might still be able to recover damages so long as they sold on a day where Dr. Tabak's analysis yielded a greater per-share dollar amount of deflation, *even though the effect of the fraud was the same on both days*. For example, under Dr. Tabak's model, two investors who purchased Twitter stock on May 18, 2022 bought at a price deflated by $7.94 per share. *See* Ex. 282-1. Investor A then sells his stock on May 23, 2022 when the price was deflated by $7.47. Investor B sells the following day, May 24, when the price was deflated by $8.44. Under this analysis, Investor A has suffered no damages and instead profited by 47 cents, but Investor B incurred 50 cents in damages. Investor B's losses in that scenario are, by definition, attributable to other factors impacting Twitter's share price and not the alleged fraud.

Defendant is not responsible for those losses under Rule 10b-5. The purpose of the securities laws is "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura*, 544 U.S. at 345. Any investor who bought after May 13—and thus benefitted from the artificial deflation at the purchase—is no worse off than he would have been had there been no alleged fraud at all. But because Dr. Tabak's damages model does not isolate market effects and industry effects, it awards damages to such investors.

Dr. Tabak's analysis produced unreliable results holding Defendant liable for stock declines "unrelated to the alleged wrong." *See In re Imperial Credit*, 252 F. Supp. 2d at 1014–15. These defects not only resulted in Plaintiffs' failure to adduce sufficient evidence to establish damages, they also rendered Dr. Tabak's opinion unreliable and inadmissible under Rule 702. *See* Dkt. No. 249. Plaintiffs thus failed to present any reliable, admissible evidence supporting the jury's damages verdict, requiring judgment for Defendant. *Weisgram v. Marley Co.*, 528 U.S. 440, 456 (2000) (affirming entry of judgment after appellate court concluded that expert testimony that provided the only evidence of a required element was unreliable and inadmissible).

**B.    Plaintiffs Failed To Present Legally Sufficient Evidence Of Loss Causation**

Plaintiffs also failed to carry their burden to present sufficient evidence to prove that Defendant's May 13 and 17 tweets caused the class to suffer any harm.

The Court can dispose of the May 17 claim with ease. "Loss causation is established if . . . a

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

plaintiff suffers a loss as a result of the market's reaction." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010). But the market did not react to the May 17 tweet and Plaintiffs have no evidence or argument that it caused a "a single penny of investor losses." Trial Tr. at 1887:21–1888:2. Dr. Tabak analyzed the tweet's price impact and "determined that it did not cause new investor losses." *Id*. at 1884:15–21. He did not find that it artificially maintained any deflation either; he had no price maintenance opinion. *Id.* at 1882:16–20. There was no evidence that the tweet caused any loss under any theory, so the May 17 claim fails as a matter of law. *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273–75 (S.D. Cal. 2010) (granting summary judgment on statements for which plaintiff had no admissible expert analysis linking them to a stock-price decline); *Di Donato v. Insys Therapeutic Inc.*, 2017 WL 3268797, at *19 (D. Ariz. Aug. 1, 2017) ("With no loss, there can be no loss causation.").

The May 13 claim fares no better. While Plaintiffs made much of the fact that Twitter's stock dropped after Defendant posted the May 13 tweet, no evidence shows they "prove[d] that the defendant's misrepresentation … proximately caused the plaintiff's economic loss." *Dura*, 544 U.S. at 342–48.

***First***, Plaintiffs failed to carry their burden to prove loss causation for the same reason they failed to prove damages: they presented zero evidence that Twitter's stock price would have been any different had Defendant tweeted the truth. Establishing loss causation requires showing that any loss was proximately caused by the fraud—that is, that the loss would not have occurred if the defendant had spoken truthfully. *See Dura*, 544 U.S. at 342–48; *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1118 (9th Cir. 2013) ("The loss causation element, however, requires that [the plaintiff] also show 'proximate' or 'legal' cause."). Proximate cause is proven by showing the difference between the actual stock price after the false statement and what it would have been in the but-for world where the statement was true. *Vivendi*, 838 F.3d at 258. Because any announcement from a company or its acquiror can impact stock prices, simply proving that share prices would have been different had the defendant made no statement at all is insufficient. *Id.* ("[T]he proper question for purposes of our inquiry into price impact is not what might have happened had a company remained silent . . . ."). As discussed *supra* at pp. 11–12, Dr. Tabak admittedly made no attempt to answer the relevant question. He had no opinion whether Twitter's stock would have fallen the same amount, less, or more if Defendant had disclosed the true state of affairs on May 13, he was "just comparing if Mr. Musk had said nothing versus

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

what Mr. Musk said." *Id.* at 1902:20–1903:9. Plaintiffs presented no evidence to satisfy the relevant standard to prove the element or to support a finding that any loss was caused by the fraud.

*Second*, and relatedly, Plaintiffs failed to adduce sufficient evidence to show that Twitter's stock fell on May 13 and 16 because the market was deceived by false statements conveyed in the May 13 tweet. It was not enough for Plaintiffs to prove that Twitter's stock price fell in response to the May 13 tweet, "[t]he relevant question for loss causation purposes is whether the market reasonably *perceived* [the defendant's] allegations as true and acted upon them accordingly." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 792 (9th Cir. 2020) (emphasis in original). Since Plaintiffs argued that the May 13 tweet was false because the deal was "not on hold" and Mr. Musk "waived due diligence," Trial Tr. at 2194:18–22, they had to prove that the market believed the opposite and that misimpression caused Twitter's stock to decline. *See In re BofI Holding*, 977 F.3d at 792.

Plaintiffs did not provide evidence sufficient for a reasonable juror to reach that conclusion. Instead, the undisputed evidence established that the market knew that Defendant did not put the deal on hold, had no right to do so, and had waived due diligence before Twitter completed the stock decline Plaintiffs attributed to the alleged misstatements. "[I]f investors already know the truth, false statements won't affect the price," *Defeo v. IonQ, Inc.*, 134 F.4th 153, 162 (4th Cir. 2025), so Defendant's purported misstatements to the contrary could not have caused any investor losses. Dr. Tabak admitted that "[e]veryone knew that Twitter did not agree to put the deal on hold" and that "[t]here were comments that you can't put it on hold" on May 13. Trial Tr. at 1908:24–1909:19. This "revelation came *at the same time* as the May 13th news" and was "*folded in* with May 13th and May 16th['s]" stock price. *Id.* (emphasis added). As a result, Twitter's stock price reflected that the market knew the truth at all relevant times and could not have been artificially deflated by the alleged false statement. *Defeo*, 134 F.4th at 162. In other words, the 45.7 percent deflation that Dr. Tabak attributed to the May 13 tweet could not have been caused by the market's incorrect perception that the merger was in fact "on hold," because the market knew that it was not "on hold" and "folded" the economic impact of that information into Twitter's stock price at the same time it processed the tweet.

Plaintiffs did not introduce any evidence otherwise. They presented no investors or analysts who testified that the market believed that Defendant had placed the deal on hold or that Twitter had agreed to

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

pause or delay the merger. Trial Tr. at 289:11–290:10 (Belgrave) (testifying he thought "on hold" meant "kind of the same as putting the deal in jeopardy"), 1365:22–1366:2 (Price) (testifying she was not aware of May 13 tweet when it was made). Moreover, Dr. Tabak conceded that when it became "public that Mr. Musk was continuing to work on his financing" for the deal—i.e., that his team had not stopped all work on the merger—"there was no statistically significant stock reaction to that news." *Id.* at 1909:25–1910:6. Without a statistically significant response to the disclosure that work on the deal was proceeding and not "on hold"—as Plaintiffs characterized the statement—there is insufficient evidence to show that false statement caused investor losses as a matter of law. *In re REMEC*, 702 F. Supp. 2d at 1266 (to show loss causation, "the decline in stock price caused by the revelation of th[e] truth must be statistically significant") (citing *Dura*, 544 U.S. at 342–47 and *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008)).

Similarly, Plaintiffs adduced no evidence the market formed any misimpression about Defendant's rights to due diligence or spam information, which drove down the stock price. That Defendant had waived pre-signing due diligence was publicly disclosed on April 21, 2022, weeks before the tweet. The Merger Agreement—which governed Defendant's post-signing information rights—was publicly filed with the SEC, disclosed to the market on April 25, 2022, and incorporated into Twitter's stock price shortly thereafter. Trial Tr. at 1877:3–13. There is no dispute that investors knew that Defendant waived due diligence before he posted the May 13 tweet: Class Representative Belgrave admitted that he did. *Id.* at 273:14–22. There is thus no evidence that the market "reasonably perceived" the alleged false statements "as true and acted upon them accordingly." *See In re BofI Holding*, 977 F.3d at 792.

All Plaintiffs can point to is that Twitter's stock price fell after the tweet, but that is insufficient on its own. "It's tempting to think that inflation"—or, in this case, deflation—"can be measured by observing what happens to the stock immediately after a false statement is made. But that assumption is often wrong." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015). Instead, "[t]he best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward." *Id.* Dr. Tabak "commonly" uses that exact same methodology in his other cases. Trial Tr. at 1906:11–1907:5. Plaintiffs did not conduct that analysis, either. Dr. Tabak claimed he did not find that "any information that came out was corrective of Mr. Musk's alleged false

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

statement," so he did not point to any price increase after the truth was disclosed to calculate what—if any—price impact the false information had on Twitter's stock. *Id.* at 1907:11–14.

Dr. Tabak's failure to identify any evidence beyond the initial stock decline—the entirety of which he attributes to the alleged fraud—to support loss causation is particularly troubling in this case. There are a "tangle of factors that affect" stock price, so "evidence that certain misrepresented risks are responsible for a loss must reasonably distinguish the impact of those risks from other economic factors." *Nuveen*, 730 F.3d at 1123. That is why the law requires a plaintiff to provide "the fact-finder with a basis for evaluating the relative effects of competing causes of a loss" and "sufficient evidence to apportion the loss between fraud-related and non-fraud related causes." *In re Sci. Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1376 (N.D. Ga. 2010)*, aff'd sub nom. Phillips v. Sci.-Atlanta, Inc.*, 489 F. App'x 339 (11th Cir. 2012) (granting summary judgment for failure to disaggregate).

Dr. Tabak did nothing to distinguish the economic impact of the allegedly false information conveyed by the May 13 tweet from non-fraud related information that could have caused Twitter's stock to decline. Dr. Tabak admitted that any news of a dispute between Mr. Musk and Twitter—regardless of its merits—could have caused investors to form "legitimate concerns" that the deal would close at a lower price and lead to a sell off. Trial Tr. at 1906:4–10. But he made no effort to distinguish the price impact of the alleged false statements from the market's reaction to the true information that Defendant had "heightened concerns" about Twitter that put the "deal in jeopardy." *Id.* at 1904:5–1905:20.

Even more egregious was Dr. Tabak's decision to attribute the entire May 16 price drop to Defendant's alleged misstatements without even considering whether other Twitter-specific news from the weekend—including the May 15 publication of the SparkToro Report—had any impact on the stock. *Id.* at 1893:14–1895:9. The failure to consider alternative, non-fraud, factors driving Twitter's price drop renders his opinion unreliable and insufficient to establish causation. *In re Exec. Telecard, Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1026 (S.D.N.Y. 1997) (excluding report for failure to consider non-fraudulent company-specific information as potential cause of price reaction). And his decision to attribute the May 16 stock market drop to the purported fraud in the May 13 tweet—and to use that decline to calculate deflation throughout the Class Period—was defective as a matter of law. Dr. Tabak testified he had "reasons to believe that [the decline on May 16] was a continuation of May 13th," "because often after

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

the close of the market, you get news stories' and "[y]ou get analyst reports."  Trial Tr. at 1896:10-17.  But a stock price drop in response to news stories and analyst reports—"negative characterization[s] of already-public information"—is not caused by the alleged fraud and cannot be attributed to Defendant as a matter of law.  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010).

**Third**, Plaintiffs failed to prove causation as a matter of law because they pled, but did not prove, a corrective disclosure theory of loss causation.  Proving a "causal connection" between a purported misrepresentation and a loss ordinarily requires evidence that the misrepresentation was later corrected, and that the stock price reacted accordingly.  *Dura*, 544 U.S. at 342; *In re BofI Holding,* 977 F.3d at 786, 789.  *Dura*'s logic that a plaintiff has suffered no loss before a corrective disclosure because the "inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value," *Dura*, 544 U.S. at 342 (emphasis in original), applies with equal force to a deflation theory of loss:  a deflated stock sale is offset by cash proceeds from the sale that *at that instant* possesses equivalent value as the stock.  At that point, the seller can buy back in at the same price and is in the same economic position had it held.  It is not until the stock price rebounds in response to the truth—and the investor can no longer buy back in at the equivalent price—that the investor has been deprived of any economic opportunity and suffered a loss.  In any event, Plaintiffs pled a corrective disclosure and must be held to the theory asserted in the FAC.  *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018) ("When plaintiffs plead a causation theory based on market revelation of the fraud, this court naturally evaluates whether plaintiffs have pleaded or proved the facts relevant to their theory.").  They presented no evidence supporting that theory, Trial Tr. at 1907:11–14, so judgment should be entered on these grounds, too.

**Finally**, even if Plaintiffs had carried their burden to prove that the purported fraud in the May 13 tweet caused some loss, Plaintiffs presented no evidence that any investor who sold after July 8—or otherwise would have held absent the alleged misrepresentation—suffered any injury.  In order to prove loss causation for a securities fraud claim, a plaintiff "must demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some intervening event." *Lloyd*, 811 F.3d at 1209.  The evidence at trial was undisputed that the July 8 termination letter was an intervening event that independently caused a significant drop in Twitter's stock price.  *See* Trial Tr. at 1844:24–1845:11 (Tabak).  And Plaintiffs presented no evidence to show that the May 13 tweet continued to have any effect

on Twitter's stock price after Defendant terminated.  Dr. Tabak conceded that he "did not do any analysis to determine whether Twitter's stock price would have fallen to the exact same price level that it did if Mr. Musk had only issued the termination letter and not the May 13th tweet," *id.* at 1918:25–1919:9, and that he did not know "whether Twitter's stock price would have actually fallen more on July 8 had Mr. Musk not issued the May 13th tweet." *Id.* at 1919:10–15.  Plaintiffs thus failed to prove that any post-termination loss was caused by the May 13 alleged misrepresentations, rather than the July 8 intervening event.  At a minimum, the Court should enter judgment for Defendant on post-July 8 sale.

### C.  Plaintiffs Failed To Present Legally Sufficient Evidence Of Material Falsity

For a statement to be actionable under Rule 10b-5(b), it must be an "untrue statement of material fact." 17 C.F.R. § 240.10b-5.  At trial, Plaintiffs presented no legally sufficient evidence to support finding that either the May 13 tweet or the May 17 tweet was materially false.

Defendant's May 13 tweet read:  "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5% of users." Ex. 580.  It was closely followed by a tweet stating that Defendant was "[s]till committed to acquisition." *Id.*  The evidence at trial showed that this tweet was true.  Defendant had requested details, *see* Trial Tr. at 1160:5–13 (Segal), had not yet received them, was entitled to those details, and ultimately terminated the Merger Agreement when he did not receive them, *id.* at 504:1–4 (Badawi).

Plaintiffs argued that the May 13 tweet was untrue in two respects—first, because the deal was not "on hold," and second, because Defendant waived due diligence and therefore had no right to the information he was requesting.  As the evidence at trial showed, the tweet was not false.  First, the tweet did not state that the deal was "on hold."  Rather, it stated that the deal was "temporarily on hold pending details"—and that Defendant was "still committed to the acquisition." *See* Ex. 580.  And the undisputed evidence at trial showed that, while all work on the merger had not stopped, the merger itself was held up and its closing delayed while Defendant and his team sought the spam information identified in the tweet. *See, e.g.*, Ex. 673.  Defendant terminated the merger on the grounds that Twitter had failed to provide him with the spam data he requested and to which he believed he was entitled.  Nor did the tweet state anything about due diligence, and Twitter's own executives agreed that Defendant was entitled to the additional details he requested.  Ex. 580; Trial Tr. at 1301:1–7.  To the extent the tweet could be interpreted as a

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

representation about Defendant's rights under the Merger Agreement, the statement would constitute an opinion not actionable under the securities laws even if incorrect. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 176 (2015).

Even assuming Plaintiffs presented evidence that the tweet conveyed some false information, no reasonable jury could find that such information was material. For information to be material, "there must be a substantial likelihood that the . . . correction of the misstated fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1259 (N.D. Cal. 2000) (alteration adopted) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "Critically, plaintiff must 'demonstrate that a particular statement, *when read in light of all the information then available* to the market . . . conveyed a false or misleading impression.'" *Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*, 2017 WL 114401, at *5 (C.D. Cal. Jan. 9, 2017) (emphasis and omission in original) (quoting *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991)). But, as Dr. Tabak testified, the market already knew or quickly learned that the deal was not literally on hold, and "there was no statistically significant stock reaction to that news." Trial Tr. at 1909:25–1910:6. The absence of any statistically significant stock price reaction to the revelation that Defendant and Twitter were continuing to work to close the merger establishes that the alleged "on hold" misstatement was immaterial. *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 464 (2013) (noting it is "uncontroversial" that "immaterial misrepresentations and omissions by definition do not affect stock prices in an efficient market" (alteration adopted and quotations omitted)).

The same is true for any suggestion in the May 13 tweet that Defendant had the right to conduct due diligence or otherwise possessed broader information rights than those set forth in the Merger Agreement. By May 13, the market knew that Defendant had waived pre-signing due diligence and what information rights Defendant had under the publicly filed Merger Agreement, as Plaintiffs' Class Representative testified. Trial Tr. at 273:14–22. Learning that Defendant had waived due diligence—the correction of the supposedly misstated fact—also would not "have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *In re McKesson*, 126 F. Supp. 2d at 1259. Plaintiffs presented insufficient evidence from which a reasonable juror could conclude

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

that the purported misstatements contained in the May 13 tweet were materially false.

The evidence at trial was also insufficient to establish that the May 17 tweet was materially false. It is undisputed that the May 17 tweet did not affect Twitter's stock price, Trial Tr. at 1884:15–21, and thus was immaterial. *Amgen*, 568 U.S. at 464. Moreover, Plaintiffs made no independent arguments that the May 17 tweet was false, instead simply asserting that it was "the combination, basically, of the two" other allegedly false statements, Trial Tr. at 2216:13–14—the May 13 statement that was not materially false for all the reasons stated above, and the May 16 statement as to which the jury found no liability.

## D.    Plaintiffs Failed To Present Legally Sufficient Evidence Of Scienter

To establish their Rule 10b-5(b) claims, Plaintiffs also had the burden to prove that Defendant acted with scienter. At trial, however, Plaintiffs lacked legally sufficient evidence to support such a finding. To begin, there was no evidence that Defendant knew that his statements were false at the time they were made. Defendant firmly believed his statements were true when he made them (and believes them to this day). *See* Trial Tr. at 769:5–770:16; 781:12–20; 797:2–798:1. There was no evidence to the contrary. No reasonable juror could conclude that the trial evidence satisfied the appropriate standard for scienter—actual knowledge. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) (reserving question whether recklessness suffices).

No reasonable juror could find the trial evidence supports a finding of scienter even applying the lower "deliberate recklessness" standard. Defendant's undisputed, good faith belief his statements were true defeats Plaintiffs' claims. *See* Final Jury Instructions at 13, *In Re JDS Uniphase Corp. Securities Litig.*, 4:02-cv-1486-CW (N.D. Cal. Nov. 19, 2007), Dkt. No. 1874 (previously filed at Dkt. No. 366-2) ("An honest or good faith belief on the part of an Individual Defendant that a statement is true is inconsistent with a finding that he acted with scienter in making that statement."); Charge at 29, Instruction No. 24, *In re Vivendi Universal, S.A. Securities Litig.*, 1:02-c v-5571-PAE (S.D.N.Y. Mar. 26, 2010), Dkt. 1023-6 (previously filed at Dkt. No. 366-4) ("Even if a statement turns out to be false or misleading, it is not fraudulent or deceptive if the defendant had a good faith belief in the truth or accuracy of the statement at the time he made the statement."); *see also Omnicare*, 575 U.S. at 186 (no securities fraud based on sincerely held belief that turned out to be wrong).

The evidence presented at trial confirmed Defendant's belief that the statements made in the tweets

-22-

Case No. 3:22-CV-05937-CRB

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

were true.  Both Twitter's then-CEO Agrawal and then-CFO Segal each testified that they shared Defendant's belief he was entitled to more details about Twitter's spam estimate and further confirmed that Twitter had promised to provide those details but had not done so at the time of the May 13 and May 17 tweets.  *See* Trial Tr. at 1160:5–13; 1301:1–7.  The undisputed evidence also established Defendant sincerely believed, with good reason, that the phrase "deal temporarily on hold" was accurate.  As Defendant testified, he did not tweet that "the deal is off" or stopped.  *Id.* at 770:10–16.  Instead, his statement "temporarily on hold" meant that "there's a slight delay" and that "the deal would not close until [he] receiv[ed] the information."  *Id.* at 772:2–11.  Plaintiffs presented no evidence to refute that was his good faith belief about his intentions and the status of the deal.  To the contrary, that is exactly what happened: Defendant delayed closing until his team received the information they sought from Twitter.

**E.    Plaintiffs Failed To Present Legally Sufficient Evidence Of Reliance**

Finally, no reasonable juror could find Plaintiffs proved either individual or class-wide reliance.

### 1.    The Fraud-On-The-Market Presumption Does Not Apply

To establish class-wide reliance through the fraud-on-the-market presumption, Plaintiffs were required to prove "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014) ("*Halliburton II*").

Plaintiffs did not establish three of the elements.  *First*, as discussed *supra* pp. 20-22, they failed to prove that the alleged misstatements conveyed in the May 13 tweet were materially false.  *Second*, Plaintiffs' theory of loss causation—that the May 13 tweet caused Twitter's stock to drop, stabilize for the last six hours of the trading day, and then fall again on May 16—is incompatible with an efficient market.  *Miller*, 615 F.3d at 1103.  Market efficiency, by definition, "exists when the release of financial information results in an 'immediate response' by the market." *Id.*  While an "*immediate* response is not required for loss causation," *id.* (emphasis in original), Plaintiffs cannot simultaneously avail themselves of the benefits of class-wide reliance by claiming an efficient market but also seek damages from a delayed stock price response to the fraud.  Although a plaintiff is not foreclosed from proving a securities fraud claim if it contends, like Dr. Tabak did, that the stock price did not react immediately to the fraud, it cannot

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

do so under an efficient market theory or on a class-wide basis.  *Third*, Plaintiffs did not establish that the presumption applied to the entire Class Period.  Both Twitter and Defendant made numerous public statements communicating that work on the deal continued in May and June, revealing the "truth" that the deal was not "on hold." Ex. 580; Ex. 758; Ex. 584; Ex. 346; Ex. 146.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 248–49 (1988) (because "news of the merger discussions credibly entered the market and dissipated the effects of the misstatements, those who traded Basic shares after the corrective statements would have no direct or indirect connection with the fraud").  According to Dr. Tabak, the market knew that the deal was not "on hold" on May 13 itself.  Trial Tr. at 1908:24–1909:19.

Even if Plaintiffs had sufficient evidence to establish the presumption, Defendant rebutted it.  The presumption can be rebutted by evidence (1) "showing that the market was already aware of the truth behind the defendant's supposed falsehoods and thus that those falsehoods did not affect the market price," *Connecticut Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1173–74 (9th Cir. 2011), or (2) otherwise demonstrating "that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock." *Halliburton II*, 573 U.S. at 279–80.  The market knew that Defendant waived diligence well before May 13, so that alleged misstatement could not have affected the share price.  And the market learned that the merger was not "on hold" at "the same time" the May 13 tweet made news; it "folded in" the correction to the stock price reaction on May 13 and May 16.  *Id.* at 1908:24–1909:19.  Dr. Tabak admitted that the subsequent disclosures that the deal was proceeding did not affect the market price of Twitter's stock because that information was already baked in from day one.

### 2.    Plaintiffs Did Not Individually Rely On The Alleged Misstatements

Plaintiffs did not prove individual reliance—that they justifiably relied on the misstatements (Dkt. No. 524 at 23)—either.  Belgrave did not see the May 13 tweet when he bought Twitter stock, Trial Tr. at 273:3–17, and sold because Defendant terminated the merger.  And Ms. Price was not even aware of the tweet until after she sued.  *Id.* at 1365:22–1366:2.  Neither were "aware of [Defendant's] statement and engaged in a relevant transaction based on that specific misrepresentation" and cannot show individual reliance as a result.  *Amgen*, 568 U.S. at 461.

## II.    IN THE ALTERNATIVE, THE COURT SHOULD GRANT A NEW TRIAL

In the alternative, the Court should grant a new trial on Plaintiffs' Rule 10b-5(b) claims based on

the May 13, 2022 and May 17, 2022 tweets.

### A. The Jury's Verdict Is Against The Weight Of The Evidence

A new trial is warranted where the verdict is against the weight of the evidence. *See Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). "Upon the Rule 59 motion of the party against whom a verdict has been returned, the district court has 'the duty to weigh the evidence as the court saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in the court's conscientious opinion, the verdict is contrary to the clear weight of the evidence." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (alterations adopted) (quoting *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990)) (vacating judgment and remanding for a new trial).

Here, the jury's verdict on the May 13 and May 17 tweets is plainly against the weight of the evidence for all the reasons described above. While Plaintiffs' failure of proof is so profound that judgment in Defendant's favor is warranted on each of these claims, it certainly surpasses the threshold required to award a new trial. As set forth above, the verdict is against the weight of the evidence on virtually every element of Plaintiffs' Rule 10b-5(b) claims. At a minimum, a new trial is required.

### B. The Jury's Verdict Is The Product Of Bias And Passion And Cannot Be Upheld

"Every litigant is entitled to a fair, impartial trial, before a fair and impartial jury." *Maricopa Cnty. State of Ariz. v. Maberry*, 555 F.2d 207, 224 (9th Cir. 1977). "[A] jury award may not be upheld if it was the product of bias or passion." *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 276 (1989). In particular, "[a] new trial is warranted on the ground of attorney misconduct during the trial where the 'flavor of misconduct sufficiently permeates an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict.'" *Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337, 346 (9th Cir. 1995) (quotation omitted and alterations adopted). "Where misconduct permeates the proceeding, the jury is 'necessarily prejudiced.'" *Id.* The jury's verdict was not the result of an impartial and unbiased assessment of the merits of this case, but was rather the result of a jury pool that was biased against Defendant from the very beginning, Plaintiffs' counsel's deliberate efforts to persuade the jury to reach a verdict on improper grounds, the Court's instructions highlighting to the jury that their verdict would receive media attention, and the jury's ultimate decision to use its verdict to send a message to Defendant.

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

The trial took place against the backdrop of an extreme level of prejudice against Defendant, as reflected during jury selection. The Court observed that the venire's questionnaires "set[] the record," and reflect "a record of responses that I've never seen before." Tr. of Feb. 17, 2026 Proceedings at 148:15–18. During jury selection, the Court observed that it had to impose a higher bar to strike jurors than it would "if it's just one person who has a viewpoint about . . . a defendant," because Defendant is a public figure who "in particular does excite strong views." Trial Tr. at 142:5–17. And, as the Court recognized, this problem was particularly pronounced in the Northern District of California: "[M]aybe if I went in a different part of the country, I might get a different panel." *Id.* at 142:11–12.

Throughout trial, Plaintiffs' counsel worked to exacerbate that prejudice and influence the jury to render a verdict against Defendant based on improper considerations. Plaintiffs repeatedly referred to prejudicial issues beyond the scope of trial that were excluded by the Court and engaged in a transparent attempt to elicit prejudicial privilege objections during Mr. Musk's testimony. *See* Dkt. No. 487 at 4–6, 10–15 (Defendant's mistrial motion). Against the backdrop of jury selection, Plaintiffs carefully developed an "us-versus-them" theme throughout trial, asking almost every witness they called about their ties to San Francisco—and discussing Plaintiffs' counsel's own ties to San Francisco during one witness's direct examination—while questioning Defendant about his decision to move out of California and to move some of his business operations out of California as well. *See id.* at 13–14 & n.2. Such arguments are improper under any circumstances, *see Apple Inc. v. Samsung Elecs. Co., Ltd.*, 2014 WL 549324, at *13 (N.D. Cal. Feb. 7, 2014), and the risk of prejudice was heightened in this case.

Plaintiffs' counsel's efforts to obtain a verdict in their favor based on improper considerations came to a head during closing arguments. Defendant raised a concern in advance that Plaintiffs would improperly urge the jury that it should "send a message to Mr. Musk . . . through its verdict." *See* Dkt. No. 517 at 14; *see also Hammonds v. Yeager*, 2017 WL 10560471, at *1 (C.D. Cal. Aug. 9, 2017) ("[W]here punitive damages are not at issue, urging the jury to 'send a message' by its verdict is generally considered an improper appeal to the jurors' passion and prejudice."); *see also Greisen v. Hanken*, 252 F. Supp. 3d 1042, 1066 (D. Or. 2017), *aff'd*, 925 F.3d 1097 (9th Cir. 2019) (improper for counsel to make "send a message" argument in non-punitive damages case). As the Court explained, "send a message" arguments—which the law considers to be an "improper appeal to the jurors' passion and prejudice" even

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

in the ordinary case, *see Hammonds*, 2017 WL 10560471, at *1— create a heightened risk of prejudice in this case, given the nature of the jury pool's views about Mr. Musk:

[T]he plaintiffs have to be very careful in this area, very careful, because –

You know, we can start at the beginning.  In fairness to Mr. Musk, I have never seen jury questionnaires of the type that I've seen in this case.

There is no question that as a public figure, people have very strong views, and for the most part, they're negative.  I mean, just no question about it.  At least with this jury pool.

And so one has to be very careful that it's not the negativity that dictates the verdict.

Trial Tr. at 2131:4–14.  But even in the face of this admonition, Plaintiffs' counsel was unabashed about his plan: "[Y]ou bet I'm going to say, 'Send a message.'"  *Id.* at 2133:10–24; 2135:4–5.

The very last argument Plaintiffs' counsel made in rebuttal summation was exactly that.  Plaintiffs' counsel reminded the jury of the level of media attention their verdict would garner, and urged the jury to use its verdict to send a message:  "And I'm going to tell you now that there are a lot of people in this courtroom – and it's all about a message, and the message is:  Are we going to allow people like Ms. Price, Mr. Belgrave, and the millions of people in between to not be protected?"  *Id.* at 2291:6–10.

Although Defendant raised this issue in advance of closing arguments, and although Plaintiffs' counsel explicitly informed the Court that he intended to make this improper argument, the Court's actions only exacerbated the prejudice from these arguments.  Over Defendant's objection, *see* Dkt. No. 527 at 3, the Court added language to its "Duty of the Jury" instruction that no party had requested, telling the jury that the case "has received publicity," and that "[i]t is a reasonable assumption that your verdict, whatever it may be, will also be publicized," Dkt. No. 524 at 2.  The instruction was improper and should not have been given.  In effect, the instruction encouraged the jury to consider that media coverage—and the broader community sentiment toward Mr. Musk—in reaching its verdict.

Finally, although prejudice may be presumed on this record, *see Anheuser-Busch*, 69 F.3d at 346, the jury's verdict form itself indicates that the jury did use its verdict to send a message.  The jury's verdict includes a four pages of dollar figures for per-share deflation on each day of the class period.  *See* Dkt. No. 538.  These numbers are written in black ink—with one notable exception.  The damages figure for one day, August 9, 2022, was $4.20, a number often, and negatively, associated with Mr. Musk.  The jury wrote that number only in blue ink—making it jump off the page in a sea of 97 other numbers written in

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

black ink. *See* Dkt. No. 538 at 6–10. That is no coincidence; it reflects a deliberate choice by the jury to use its verdict to send a message about Mr. Musk with its verdict, a verdict that—as both Plaintiffs' counsel and the Court reminded it—would receive significant media attention. The jury's verdict is the "product of bias or passion," was driven by pervasive attorney misconduct, and "may not be upheld." *Browning-Ferris*, 492 U.S. at 276. A new trial is warranted on this ground alone. *Anheuser-Busch*, 69 F.3d at 346.

## C.    Defendant Was Prejudiced By The Improper Scheme Liability Claim

A new trial is also warranted where, "for other reasons, the trial was not fair to the party moving." *Molski*, 481 F.3d at 729 (quoting *Montgomery*, 311 U.S. at 251). Here, Defendant was prejudiced by the Court's decision to include a boundless, and facially invalid, "scheme liability" claim at trial that swept in reams of otherwise inadmissible and highly prejudicial evidence, forced Defendant to divide its time and attention between that claim and the misrepresentation claims, and prevented Defendant from pursuing otherwise valid theories to defend against those claims.[1]

The Court placed virtually no bounds on the scope of the scheme liability claim, explaining that it "can be based on everything that happened between one date and another date." Feb. 17, 2026 Pretrial Conf. Tr. at 83:1–4. The Court limited this only with the general statement that "the probative value of everything that happened" needs to "outweigh[] any prejudicial effect"—but, of course, evidence that speaks only to a legally invalid claim has no proper probative value. As a result of this ruling, every time Defendant sought to exclude highly prejudicial evidence wholly irrelevant to Plaintiffs' narrow Rule 10b-5(b) claims, Defendant was met with the same response: It comes in for the scheme claim. The evidence and arguments at trial therefore included dozens of other statements by Defendant, including statements that the Court had already dismissed or that were not pleaded, which Plaintiffs argued were deceptive and dishonest; emails sent to Defendant well after the alleged misrepresentations that Plaintiffs presented as evidence of a scheme; months of litigation conduct, including purported threats to Twitter; and testimony about Defendant's purchases of Twitter stock on the open market. *See, e.g.*, Trial Tr. at 219:16–220:4 (argument in opening statement about other tweets); 1258:15–1259:6 (Agrawal) (evidence

---

[1]    Defendant repeatedly articulated the myriad deficiencies with the purported scheme liability claim before and during trial, but the Court denied each of Defendant's motions and permitted Plaintiffs to pursue the claim at trial. *See* Dkt. Nos. 342, 366, 399, 406, 429, 446, 448, 453, 454, 459, 503.

and testimony about other tweets); 843:19–844:12 (Musk) (evidence and testimony about an email from Sean Lynch several months after the May 13, 16, and 17 statements); 834:9–836:1 (Musk) (testimony about Delaware litigation); 328:18–329:6 (testimony about the Delaware litigation); 1408:2–7 (Korman) (testimony about purported threats to Twitter); 205:24–206:6 (argument in opening statements about failure to file SEC disclosures about purchases of stock on the open market months before the class period); 350:24–351:17 (Gadde) (testimony about failure to file required disclosures).  Then, after permitting Plaintiffs to introduce this evidence, the Court precluded Defendant from eliciting testimony on the public facts of the Delaware litigation or termination.  *E.g.*, Trial Tr. at 956:1-972:11; 1650:9-1659:2; 1673:24-1676:20; 1968:17-1978:17, 1988:19-1990:25.

The improper inclusion of the scheme claim—and particularly the July 8 termination letter—as a basis for liability prevented Defendant from pursuing otherwise valid arguments on the misrepresentation claims.  It is undisputed that the July 8 termination letter, which the Court dismissed as a misrepresentation at the motion to dismiss stage, *see* Dkt. No. 48 at 27–28, caused a significant drop in Twitter's stock price, *see* Ex. 282.  Defendant intended to argue at trial that stockholder losses after July 8 were not attributable to the alleged fraud—that is, the May 13 tweet.  *See* Dkt. No. 255 at 4, 34 (making that argument in Defendant's motion for summary judgment).  But, because the Court erroneously re-injected the July 8 termination letter into the trial as a basis for liability even though it is protected litigation conduct and was dismissed at the motion to dismiss stage, Defendant was precluded from pursuing this and other arguments related to the July 8 termination letter that would have aided his defense on the misrepresentation claims.

**D.     The Cumulative Prejudice Necessitates A New Trial**

At a minimum, the extensive prejudicial conduct—as detailed above and by Defendants throughout trial, *see, e.g.*, Dkt. Nos. 487, 514, 527—when considered collectively requires a new trial.

"[E]rrors in a civil trial must be considered 'cumulatively'" and "the combined effect of multiple errors 'may suffice to warrant a new trial even if each error standing alone may not be prejudicial.'"  *Sidibe v. Sutter Health*, 103 F.4th 675, 688 (9th Cir. 2024) (quoting *Jerden v. Amstutz*, 430 F.3d 1231, 1240–41 (9th Cir. 2005)).  When multiple errors taint a trial, the Court "need not decide whether" any of the "errors would by itself warrant reversal," but instead considers their "cumulative effect" on the fair administration of the trial.  *Gonzales v. Police Dep't, City of San Jose, Cal.,* 901 F.2d 758, 762 (9th Cir. 1990).

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

Here, errors throughout trial prejudiced Defendant and require a new trial. The Court's pre-trial rulings on Plaintiffs' improper scheme liability claim forced Defendant to divide his attention between the narrow Rule 10b-5(b) claims and the wide-ranging Rule 10b-5(a) and (c) claim, allowed Plaintiffs to focus the trial on swaths of prejudicial evidence that was not probative of any proper claim, and prevented Defendant from pursuing otherwise valid defenses on the Rule 10b-5(b) claims. Plaintiffs' counsel engaged in a deliberate strategy throughout trial and in closing arguments to persuade the jury to render a verdict on improper grounds. Rather than intercede to remedy counsel's improper tactics, the Court declined to remedy and in some instances exacerbated the prejudice to Defendant. Instructional error invited the jury to consider improper factors in reaching a verdict. There can be no doubt that, considering the combined effect of the errors pervading this trial, a new trial is warranted.

## III.    IN THE ALTERNATIVE, THE COURT SHOULD ALTER OR AMEND THE JUDGMENT TO REFLECT THE LACK OF CLASS-WIDE LIABILITY

Finally, in the alternative, the Court should alter or amend the judgment to reflect the absence of class-wide liability, either based upon insufficient proof or the need to decertify the class. Rule 59(e) permits a court to alter or amend the judgment "if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests" or "if such motion is necessary to prevent manifest injustice." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011). As set forth in Defendant's Rule 23 motion for decertification, the jury verdict is silent as to class-wide reliance and thus cannot support a class-wide judgment. As a result, the Court should alter or amend the judgment under Rule 59(e) to reflect judgment only in favor of the three Class Representatives. Separately, to the extent the Court holds Plaintiffs proved certain necessary elements only as to the Class Representatives or for some narrower time period, the judgment should be modified accordingly. Thus, in the alternative, the Court should alter or amend the judgment.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court enter judgment as a matter of law in his favor, or, in the alternative, order a new trial as to the May 13 and May 17 tweets or modify the judgment to reflect the absence of class-wide liability.

DATED:  May 1, 2026                QUINN EMANUEL URQUHART & SULLIVAN, LLP


By */s/ Ellyde R. Thompson*
 Alex Spiro
 Michael T. Lifrak
 Stephen A. Broome
 Ellyde R. Thompson
 Jesse A. Bernstein
 Alex Bergjans

*Attorneys for Defendant Elon Musk*

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on Friday, May 1, 2026.

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By *Alex Bergjans*
    Alex Spiro
    Michael T. Lifrak
    Stephen A. Broome
    Ellyde R. Thompson
    Jesse A. Bernstein
    Alex Bergjans

*Attorneys for Defendant Elon Musk*

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

## ATTESTATION

Pursuant to Civil L.R. 5-1, I attest under penalty of perjury that concurrence in the filing of this document has been obtained from the other signatories herein.

By  /s/Alex Bergjans
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Ellyde R. Thompson
Jesse A. Bernstein
Alex Bergjans

*Attorneys for Defendant Elon Musk*

DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL