**COTCHETT, PITRE & MCCARTHY, LLP**
Joseph W. Cotchett (SBN 36324)
*jcotchett@cpmlegal.com*
Mark C. Molumphy (SBN 168009)
*mmolumphy@cpmlegal.com*
Tyson C. Redenbarger (SBN 294424)
*tredenbarger@cpmlegal.com*
Elle D. Lewis (SBN 238329)
*elewis@cpmlegal.com*
Gia Jung (SBN 340160)
*gjung@cpmlegal.com*
Caroline A. Yuen (SBN 354388)
*cyuen@cpmlegal.com*
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
*fbottini@bottinilaw.com*
Aaron P. Arnzen (SBN 218272)
*aarnzen@bottinilaw.com*
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001

*Lead Counsel for Plaintiffs and the Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | CASE NO. 3:22-CV-05937-CRB<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL**<br><br>Date:   June 18, 2026<br>Time:  10:00 am<br>Ctrm:  6, 17th Floor<br>Judge: Hon. Charles R. Breyer |

**Table of Contents**

Page

STATEMENT OF ISSUES TO BE DECIDED ................................................................i

SUMMARY OF ARGUMENT................................................................................i

FACTUAL BACKGROUND................................................................................1

LEGAL STANDARD ......................................................................................2

ARGUMENT................................................................................................3

I.    PLAINTIFFS PRESENTED COMPELLING AND LEGALLY SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S VERDICT ....................................................3

    A.    Plaintiffs Presented Sufficient Evidence of Substantial Damages.........................3

    B.    Plaintiffs Presented Legally Sufficient Evidence of Loss Causation.....................8

        1.    Plaintiffs Presented Evidence of Direct Causation and a Corrective Disclosure........................................................................8

        2.    Musk's Attack on Dr. Tabak's Use of a Two-Day Window to Measure Price Impact is Without Merit.............................................11

        3.    Musk's Arguments About Disaggregation are Factually Wrong....................12

    C.    Plaintiffs Presented Legally Sufficient Evidence that Musk's Statements Were Materially False ................................................................12

    D.    Plaintiffs Presented Sufficient Evidence that Musk Acted with Scienter............16

    E.    Plaintiffs Presented Legally Sufficient Evidence of Reliance .............................18

II.   MUSK OFFERS NO BASIS FOR A NEW TRIAL........................................................21

    A.    The Jury's Verdict Properly Reflects the Weight of the Evidence......................21

    B.    The Verdict Was Impartial and Unbiased..........................................................22

        1.    Plaintiffs Closely Followed the Court's Orders............................................22

        2.    Plaintiffs' Counsel's Closing Remarks Are Not a Basis for a New Trial......24

        3.    The Verdict Does Not Reflect Prejudice.......................................................25

    C.    Defendant Was Not Prejudiced by Having to Litigate Plaintiffs' Scheme Liability Claim or the Court's Other Procedural and Evidentiary Rulings .........27

    D.    There is No Cumulative Prejudice.....................................................................28

III.  THE COURT SHOULD NOT ALTER OR AMEND THE JUDGMENT TO REFLECT CLASS-WISE LIABILITY ........................................................................30

CONCLUSION ..............................................................................................30

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW     i
OR, IN THE ALTERNATIVE, A NEW TRIAL

**Table of Authorities**

**Cases**                                                                                                          **Page(s)**

*In re Allstate Corp. Sec. Litig.*,
    966 F.3d 595 (7th Cir. 2020) ...............................................................................................8

*Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*,
    189 F.3d 1017 (9th Cir. 1999) .....................................................................................3, 4, 6

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..............................................................................................................2

*In re Apple Inc. Sec. Litig.*,
    2022 WL 354785 (N.D. Cal. Feb. 4, 2022) ...............................................................8

*Apple, Inc. v. Samsung Elecs. Co.*,
    2014 WL 549324 (N.D. Cal. Feb. 7, 2014) .............................................................24

*Baker v. SeaWorld Ent., Inc.*,
    423 F. Supp. 3d 878 (S.D. Cal. 2019).......................................................................7

*Bird v. Glacier Elec. Coop., Inc.*,
    255 F.3d 1136 (9th Cir. 2001) ...........................................................................22, 24

*In re Bofi Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) ...............................................................................10

*Cooper v. Firestone Tire & Rubber Co.*,
    945 F.2d 1103 (9th Cir. 1991) ...............................................................................24

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) .........................................................................6, 10

*Davis v. Woodford*,
    384 F.3d 628 (9th Cir. 2004) ...............................................................................26

*In re Diamond Foods, Inc.*,
    295 F.R.D. 240 (N.D. Cal. 2013)...........................................................................12

*Dura Pharmaceuticals Inc. v. Broudo*,
    544 U.S. 336 (2005)........................................................................................10, 11

*EEOC v. Pape Lift, Inc.*,
    115 F.3d 676 (9th Cir. 1997) ................................................................... ii, 21

*Est. of Brown v. Lambert*,
    478 F. Supp. 3d 1006 (S.D. Cal. 2020)..........................................................26, 30

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*,
    778 F.3d 1059 (9th Cir. 2015) ...............................................................................2

*In re Genius Brands Int'l, Inc.*,
   97 F.4th 1171 (9th Cir. 2024) ................................................................4, 8, 10, 11

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
   594 U.S. 113 (2021).................................................................................................16

*Green v. Occidental Petroleum Corp.*,
   541 F.2d 1335 (9th Cir. 1976) ..................................................................................7

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)...................................................................................................9

*Hatamian v. Advanced Micro Devices, Inc.*,
   2016 WL 1042502 (N.D. Cal. Mar. 16, 2016).........................................................8

*Hemmings v. Tidyman's Inc.*,
   285 F.3d 1174 (9th Cir. 2002) ..............................................................22, 24, 25, 29

*Herman & Maclean v. Huddleston*,
   459 U.S. 375 (1983).................................................................................................16

*Hsu v. Puma Biotechnology, Inc.*,
   2018 WL 4945703 (C.D. Cal. Oct. 5, 2018).....................................................19, 20

*Kansas v. Marsh*,
   548 U.S. 163 (2006).................................................................................................26

*Landes Const. Co., Inc. v. Royal Bank of Canada*,
   833 F.2d 1365 (9th Cir. 1987) ..................................................................................3

*Liteky v. United States*,
   510 U.S. 540 (1994).................................................................................................28

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)...................................................................................................10

*McDonough Power Equip., Inc. v. Greenwood*,
   464 U.S. 548 (1984).................................................................................................30

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) ..................................................................................11

*Molski v. M.J. Cable, Inc.*,
   481 F.3d 724 (9th Cir. 2007)......................................................................................3

*Monroe Cty. Employees' Ret. Sys. v. Southern Co.*,
   332 F.R.D. 370 (N. D. Ga. 2019).............................................................................12

*Mueller v. Dep't of Pub. Safety*,
   595 F. Supp. 3d 920 (D. Haw. 2022).......................................................................22

*Murphy v. City of Long Beach*,
914 F.2d 183 (9th Cir. 1990) ...........................................................................................2

*In re Novatel Wireless Sec. Litig.*,
2013 WL 12247558 (S.D. Cal. Nov. 19, 2013) .................................................................7

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
730 F.3d 1111 (9th Cir. 2013) .........................................................................................10

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
2021 WL 229310 (N.D. Cal. Jan. 21, 2021)......................................................................7

*Reeves v. Sanderson Plumbing Prods.*,
530 U.S. 133 (2000)................................................................................................ *passim*

*Richardson v. Marsh*,
481 U.S. 200 (1987)........................................................................................................26

*Sahakian v. City of Glendale*,
2008 WL 11411720 (C.D. Cal. July 1, 2008)..................................................................25

*Sayce v. Forescout Techs., Inc.*,
2024 WL 2750003 (N.D. Cal. May 28, 2024) ...................................................................4

*Settlegoode v. Portland Pub. Schs.*,
371 F.3d 503 (9th Cir. 2004) ...............................................................................24, 25, 29

*Smilovits v. First Solar, Inc.*,
2019 WL 7282026 (D. Ariz. Dec. 27, 2019) ...................................................................12

*Spencer v. City of Spokane*,
836 F. App'x 516 (9th Cir. 2020) ....................................................................................16

*In re Twitter, Inc. Sec. Litig.*,
2020 WL 4187915 (N.D. Cal. Apr. 17, 2020) (Tigar, J.) .............................................12, 15

*Union Oil Co. of California v. Terrible Herbst, Inc.*,
331 F.3d 735 (9th Cir. 2003) ..........................................................................................22

*Uniram Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*,
2008 WL 11515597 (N.D. Cal. Apr. 17, 2008) ...............................................................11

*United States v. English*,
875 F.2d 319 (9th Cir. 1989) ..........................................................................................28

*United States v. Escalante*,
637 F.2d 1197 (9th Cir.), *cert. denied*, 449 U.S. 856 (1980)...............................................29

*United States v. Greene*,
698 F.2d 1364 (9th Cir. 1983) ........................................................................................28

*United States v. Johnson*,
  610 F.3d 1138 (9th Cir. 2010) ...............................................................................................27

*United States v. Marks*,
  530 F.3d 799 (9th Cir. 2008) ................................................................................................28

*United States v. Mostella*,
  802 F.2d 358 (9th Cir. 1986) ...........................................................................................28, 29

*United States v. Nadler*,
  698 F.2d 995 (9th Cir. 1983) ................................................................................................22

*United States v. Seley*,
  957 F.2d 717 (9th Cir. 1992) ................................................................................................15

*In re Xcelera.com Sec. Litig.*,
  430 F.3d 503 (1st Cir. 2005).................................................................................................20

*Zweizig v. Rote*,
  818 F. App'x 645 (9th Cir. 2020) ..........................................................................................25

**Other Authorities**

17 C.F.R. § 240.10b-5 ("Rule 10b-5")........................................................................ ii, 1, 3, 4, 22

Jonathan R. Macey et al., *Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson*,
  77 VA. L. REV. 1017 ...........................................................................................................20

**STATEMENT OF ISSUES TO BE DECIDED**

1. Whether the Court should deny Elon Musk's motion for judgment as a matter of law ("motion"), which seeks to overturn the jury's unanimous verdict after a two week trial and nearly four full days of thoughtful deliberation.

2. Whether the Court should deny Musk's motion for a new trial, where there is substantial evidence supporting the verdict and Musk cites no legitimate examples of any prejudice.

3. Whether the Court should deny Musk's request that the judgment be amended to apply only to the Plaintiffs, and not the Class, where the jury was instructed and found for Plaintiffs and the Class on all issues.

**SUMMARY OF ARGUMENT**

Contrary to the arguments advanced in defendant Elon Musk's motion, the jury had compelling—and certainly legally sufficient—evidence to reasonably conclude that he committed securities fraud during his 2022 acquisition of Twitter.  Musk's attempts to undermine the jury's verdict runs headlong into two overarching problems for him: the law and the facts.

The Supreme Court has emphasized the deference with which courts approach post-verdict motions based on sufficiency of the evidence.  The Court "must draw all reasonable inferences in favor of the nonmoving party," may not make "credibility determinations or weigh the evidence," and "***must disregard all evidence favorable to the moving party that the jury is not required to believe***."  *Reeves v. Sanderson Plumbing Prods*., 530 U.S. 133, 150-151 (2000) (emphasis added). Casting aside precedent, Musk presents selective evidence that he imagines is favorable to him without addressing the mass of admitted percipient and expert testimony, tweets, text messages, emails, and other exhibits that support the jury's verdict.

Here, the evidence shows that Musk's May 13 and 17 tweets were false and misleading because they conveyed that the deal was on hold and could not move forward absent proof from Twitter that its spam estimates were accurate, that Musk had a legal right to put the deal on hold, and that Musk had a solid basis to believe spam exceeded 5% of mDAU.  In reality, none of these assertions were true.  Many witnesses—including Musk's own bankers—confirmed the deal was not on hold; his decision to waive due diligence and propose a seller-friendly merger agreement

gave him no right to put the deal on hold; and the only basis for his speculation that there were more spam accounts than Twitter estimated was an unreliable blog post that acknowledged it was not disputing Twitter's claims.

The evidence of scienter was also overwhelming—Musk's financial motive alone consisted of a desire to save himself billions of dollars and avoid selling even more of his beloved Tesla stock. Emails also evidence a plot to depress the price of Twitter's stock so that Musk would have an "opportunity to revisit the price." After the May 13 tweet, Musk responded to those emails confirming his "understanding" that he had caused Twitter's stock price to decline, just like his bankers had contemplated. Musk also admitted that he knew investors relied on what he said, and that his conduct had the ability to influence the stock market. As for the reliance element, Plaintiffs' expert provided detailed and lengthy testimony establishing reliance through the fraud-on-the-market presumption, and Musk elected not to call his damages expert to rebut that testimony.

Similarly, Plaintiffs' evidence of damages and loss causation was overwhelming. Plaintiffs established that Musk's tweets caused Twitter's stock price to decline and stay deflated throughout the class period. The jury agreed and awarded damages entirely consistent with Plaintiffs' expert's opinions. As explained herein, Musk's arguments concerning damages and loss causation are unavailing because this is a seller class, where "out-of-pocket damages" occur, are properly measured when the shares are sold, and do not require a corrective disclosure.

Musk also moves for a new trial. But the motion may only be granted where the jury's verdict goes against the "great weight of the evidence, or it is quite clear the jury has reached a seriously erroneous result." *EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir. 1997) (citations omitted). That is certainly not the case here. While Musk has many after-the-fact gripes about the trial, he failed to object to many of the exchanges that form the basis for his motion's featured arguments. To be sure, Musk spills much ink on his claimed surprise at having to defend Plaintiffs' scheme liability claim, but Plaintiffs' complaint clearly alleges securities fraud under all prongs of Rule 10b-5, and the Court considered and decided that same issue repeatedly and well in advance of trial. It certainly does not help Musk that the jury found in his favor on the scheme claim. Musk also cries foul because of Plaintiffs' closing arguments, even though the actual statements were

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW
OR, IN THE ALTERNATIVE, A NEW TRIAL

appropriate, well within the parameters set by the Court, and plainly did not infect the entire proceeding. The jury's exceptionally diligent attention to the trial evidence and jury instructions, lengthy deliberations, and mixed verdict weigh strongly against a new trial.

The motions should be denied.

\* \* \*

## FACTUAL BACKGROUND

Plaintiffs' First Amended Complaint ("FAC") alleges that defendant Elon Musk made a number of false statements about his 2022 acquisition of Twitter, including in a tweet he posted on May 13, 2022; comments he made at the May 16, 2022 All In Summit technology conference; and in another tweet he posted on May 17, 2022 (collectively, the "Trial Misstatements"). Plaintiffs also alleged that Musk engaged in a scheme to defraud Twitter investors by and through his actions and statements during the class period, which extends from May 13, 2022 through October 4, 2022. Musk moved to dismiss Plaintiffs' false statement claims under Rule 10b-5(b); the Court denied the motion as to the Trial Misstatements, and dismissed other false statements alleged in the FAC. ECF 48. Musk did not move to dismiss the scheme liability allegations, and the Court did not address those allegations in its order on the motion to dismiss. The Court subsequently denied the parties' cross motions for summary judgment. ECF 302. The Court heard extensive argument on the parties' *in limine* motions at the February 17 pretrial conference, and presided over jury selection on February 26.

Trial commenced on March 2, 2026, and lasted two weeks. Plaintiffs called two lead plaintiffs, Musk, the head of his family office, his biographer, a Twitter employee, Twitter executives, Twitter's deal attorney, a Twitter board member, and two experts to the stand during their case in chief. *See* Declaration of Mark Molumphy filed in support ("Molumphy Decl.") ¶5. The defense called Musk's bankers, another Twitter board member, a finance professional vying for a job working for Musk, Musk's personal attorney, a Twitter employee involved in Twitter's bot estimation process, and a data scientist hired by Musk. Musk did not call any experts designated as such. *Id.* The parties challenged the credibility of most witnesses and much of the written correspondence admitted into evidence.

The jury was exceptionally focused throughout the trial. Several jurors appeared to take notes on almost every answer given, and every exhibit admitted. Molumphy Decl. ¶6. Indeed, during the course of their deliberations, the jury asked to see a demonstrative exhibit that was shown at trial but not admitted into evidence, and thus not available to them during their deliberations. ECF 532 at 5; Molumphy Decl. Ex. 3 (Trial Exhibit 322). The jury also paid exceptionally close

attention to the jury instructions, asking several questions and even catching a typographical error in the instructions, and asking for clarification. Tr. 2341:20-2342:5.[1] After deliberating for roughly 3.5 days, the jury reached its verdict finding Musk liable for the March 13 and March 17 tweets, and not liable for the May 16 All In Summit statements and the alleged scheme to defraud. ECF 538. The verdict form called for the jury to fill out several pages indicating the amount of deflation caused by Musk's false statements for every day of the class period. *Id*. The jury received class-wide damages evidence from Dr. Tabak, Plaintiffs' damages expert, and used the precise figures he calculated to fill in the verdict form. *Id.*, *see also* Exs. 342, 298. The jury also indicated that prices of Twitter options were inflated or deflated consistent with Tabak's testimony. *Id.*, Ex. 298.

During the course of the trial, the defense moved for a mistrial at least twice, including in reaction to the Court's correction of a typographical error in the jury instructions. Tr. 2308:3-22.

## LEGAL STANDARD

In deciding a party's post-trial motion for judgment as a matter of law, courts are uniquely deferential to the jury's verdict. In reviewing the evidence, the Court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves,* 530 U.S. at 150-151. That is because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Thus, although the court should review the record as a whole, ***it must disregard all evidence favorable to the moving party that the jury is not required to believe***." *Reeves*, 530 U.S. at 151 (quotations omitted; emphasis added); *see also Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1069 (9th Cir. 2015) ("we must draw all reasonable inferences in the favor of the non-mover, and disregard all evidence favorable to the moving party that the jury is not required to believe").

The decision to grant a new trial, in turn, is "confided almost entirely to the exercise of discretion on the part of the trial court." *Murphy v. City of Long Beach*, 914 F.2d 183, 186 (9th Cir. 1990). A new trial may be granted if, "in [the court's] conscientious opinion, the verdict is contrary

---

[1]   "Tr. [page:line]" refers to trial transcripts and "Ex(s)." refers to exhibits admitted during trial.

to the clear weight of the evidence." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Murphy*, 914 F.2d at 187). "But after weighing the evidence, the trial judge faces a difficult task … On the one hand, the trial judge does not sit to approve miscarriages of justice ... On the other hand … in most cases, the judge should accept the findings of the jury." *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987) (citations omitted).

## ARGUMENT

### I. PLAINTIFFS PRESENTED COMPELLING AND LEGALLY SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S VERDICT

Musk argues at length that there was insufficient evidence for the jury to reasonably find in Plaintiffs' favor on any of the elements of their securities fraud claim. But Musk's motion cites only to select evidence that he views (or reimagines) as favorable to his case, and entirely fails to grapple with the mass of testimony and documentary evidence that weighs against him. In so doing, Musk ignores the Supreme Court's instruction that the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 150-151.

### A. Plaintiffs Presented Sufficient Evidence of Substantial Damages

Musk's latest attack on Plaintiffs' damages methodology and evidence represents old wine in a new bottle. He has previously advanced the same exact arguments multiple times, including at the class certification stage, in his motion for summary judgment, and in his *Daubert* motion targeting Dr. Tabak's opinions. The Court denied each of those motions, and should here, too.

In this motion, Musk argues that Plaintiffs' damages calculation must compare "what would have happened if [Musk] had spoken truthfully," as opposed to having "said nothing." EFC 570 at 11. According to Musk, "just comparing if Mr. Musk had said nothing versus what Mr. Musk said" is "deficient as a matter of law." That argument is incorrect.

"The usual measure of damages for securities fraud claims under Rule 10b-5 is out-of-pocket loss; that is, the difference between the value of what the plaintiff gave up and the value of what the plaintiff received." *Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1030 (9th Cir. 1999) (*citing DCD Programs v. Leighton*, 90 F.3d 1442, 1449 (9th Cir. 1996)); *see also* Ninth Circuit Model Jury Instruction 18.9. "Courts regularly reaffirm that the out-of-pocket ... method matches plaintiffs' theory of liability under Section 10(b) of the [Exchange Act], making it

the standard method for calculating damages in virtually every Section 10(b) class action."  *Sayce v. Forescout Techs., Inc.,* 2024 WL 2750003, at *11 (N.D. Cal. May 28, 2024) (quotations omitted).

Plaintiffs' expert, Dr. Tabak, constructed just such an out-of-pocket damages model.  As Dr. Tabak testified, the out-of pocket damages are "the amount you received versus the amount you should have received if there had been no misrepresentations."  Tr. 1841:13-18.  Specifically, Dr. Tabak calculated the "but for" damages for each day in the class period, *i.e.*, he calculated the daily amount of deflation Musk's false statements had on Twitter's stock price.  Tr. 1889:7-13; *see also* Exs. 342, 298.  This was entirely appropriate.  *See e.g., Altimeo Asset Mgmt.*, 663 F. Supp. 3d 334, 374 (S.D.N.Y. Mar. 21, 2023) (seller class was damaged because, "[b]ut for defendants' fraud … [the class's] sales would have been at higher prices, or the sellers would have held onto their shares through to the [merger] date and secured [the merger share price]").  The jury properly accepted Dr. Tabak's model and awarded out-of-pocket damages for each day of the Class, explicitly referring to Exhibits 342 and 298, which set forth daily deflation figures.  ECF 538.

In his motion, Musk argues that Dr. Tabak did not utilize a true "out of pocket" measure of damages since Dr. Tabak did not compute what Twitter's stock price would have been had "the truth" been revealed.  In the Ninth Circuit, there is no such requirement.  In fact, the Ninth Circuit has explicitly endorsed an out-of-pocket measure of damages in a 10b-5 case premised on a stock's price being higher "***than it would have been had the false statements not been made***."  *In re Genius Brands Int'l, Inc.*, 97 F.4th 1171, 1185 (9th Cir. 2024) (emphasis added).  And contrary to Musk's contention, *Ambassador Hotel* does not hold otherwise.  As Musk concedes, *Ambassador Hotel* simply stands for the unremarkable proposition that "[t]he usual measure of damages for securities fraud claims under Rule 10b-5 is out-of-pocket loss; that is, the difference between the value of what the plaintiff gave up and the value of what the plaintiff received."  *Ambassador Hotel*, 189 F. 3d at 1030, *see also* ECF 570 at 11.  In short, *Ambassador Hotel* did not establish any requirement that "the value of what the plaintiff gave up" must be calculated exclusively in terms of the value of the stock "had the truth been revealed."

The out-of-circuit cases relied on by Musk do not require a different result, and none involved challenges to damages awards in jury verdicts.  *See* ECF 570 at 11, 15.  For example, *In*

*re Vivendi, S.A. Sec. Litig.*, involved a challenge to the district court's denial of a *Daubert* motion in a purchaser case. 838 F.3d 223, 256 (2d Cir. 2016). There, the Second Circuit also noted, "[i]t was up to the jury to determine how much, if any, of the artificial inflation identified by Nye was caused by Vivendi's alleged fraud … by assessing the alleged misstatements and their connection to the misconception in question." *Id.* Musk also relies on *Glickenhaus & Co. v. Household Int'l, Inc.,* but that case supports Dr. Tabak's approach by recognizing that: "[i]t's very difficult to know exactly how much stock-price inflation a false statement causes because it requires knowing a counterfactual: **what the price would have been without the false statement**." 787 F.3d 408, 415 (7th Cir. 2015). The *Glickenhaus* court also held that an expert's purported failure to conclusively eliminate all potential non-fraud factors that impacted a stock price is not fatal so long as the expert testifies that he considered such factors and ruled them out, and the defendant does not come forward with evidence of any such causes. *Id.* at 422.[2] Here, Dr. Tabak reviewed news reports and analyst reports for any indication of news that deflated Twitter's stock price other than Musk's statements, but found none. *See, e.g.,* Tr. 1825:5–1826:14; Tr. 1865:2–1867:7. Dr. Tabak explained that there was nothing else in the news cycle that could have caused such a significant decline—"clearly [Musk's] tweet caused the price movement that we see initially over here, and I believe it's the reason for the later price movements over May 13th and May 16th." Tr. 1866:1-6.

*Glickenhaus* is further distinguishable because the plaintiffs' expert there utilized a "leakage model" which failed to identify or measure any price impact caused by each of the allegedly false statements. *Id.* at 423.[3] Here, Dr. Tabak did not use a "leakage model" and instead used a direct causation model, which is often more reliable (measuring price impact at the time of the misstatements, instead of months or years later), especially in a seller case where class members are harmed when they sell, and not later at the time of a corrective disclosure. *See, e.g.,* Ex. 276.

---

[2] The court also rejected defendants' argument that "to be legally sufficient, any loss-causation model must itself account for, and perfectly exclude, any firm-specific, nonfraud related factors that may have contributed to the decline in a stock price. It may be very difficult, if not impossible, for any statistical model to do this." *Glickenhaus*, 787 F.3d at 422.

[3] The Seventh Circuit noted that "[b]ecause this case is one of the few to make it to trial on a leakage theory, the process of submitting the loss-causation issue to the jury was understandably ad hoc." *Glickenhaus*, 787 F.3d at 423.

Musk consistently ignored these significant differences between purchaser and seller cases, and cites only purchaser cases in which class members suffer no harm until they sell after a corrective disclosure. Those purchaser cases frequently discuss the causes of stock-price movements *after* the fraud-induced transactions, which are not relevant in a seller case.

Regardless, Dr. Tabak's damages model substantially tracks the standard as phrased in the jury instructions. "[A]ctual damages are measured by the difference between the price at which a stock sold and the price at which the stock would have sold had the statement or fraudulent acts reflected the true state of affairs." ECF 524 at p. 27. And Dr. Tabak did compute the price at which Twitter stock would have sold had Musk not made his false statements. Because Dr. Tabak used the appropriate out-of-pocket measure, and his damages calculation is fully consistent with *Ambassador* and the law in this Circuit, the Court should reject Musk's argument.

In a similar vein, Musk's also contends that Dr. Tabak's damages model was flawed because it did not explicitly disaggregate or "isolate the decline in Twitter's stock caused by market and industry effects throughout the Class Period." ECF 570 at 13. That argument is simply wrong. Dr. Tabak explained at length that he used an event study to isolate damages and excluded price movements that were unrelated to the allegations including, for example, the price declines related to whistleblower allegations. Tr. 1840:15-1841:9; Tr. 1845:12-20. Dr. Tabak also disaggregated the merger discount, *i.e.*, the difference between Musk's acquisition price and the pre-closing market price. Tr. 1846:19-1847:11. This is sufficient in the Ninth Circuit, where plaintiff need not show that a misrepresentation was the sole reason for a price decline, but rather that it was "one substantial cause." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005) (quotations omitted).

Musk's argument also fails because he never presented evidence demonstrating that there were other material events that moved Twitter's stock price. Musk only offers speculation that a blog post issued on a weekend by a company called "Sparktoro" could have had an effect on Twitter's stock price. But he offered no evidence to support this speculation; in contrast, Dr. Tabak specifically testified that he could not find any news or analyst reports commenting on the blog post before May 16, 2022. Tr. at 1893-94. Thus, even if the Seventh Circuit's approach in *Glickenhaus* were adopted here, Musk never triggered any burden shifting to Plaintiffs. Dr. Tabak's damages

model was therefore properly submitted to the jury, whose verdict is presumed to contain all findings necessary to support the verdict.

Musk also attacks Dr. Tabak for using a constant percentage measure of deflation. ECF 570 at 13-14. But courts have consistently accepted the "constant percentage" inflation or deflation methodology for constructing an inflation/deflation ribbon and calculating out-of-pocket damages under Section 10(b). *See, e.g.*, *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.,* 2021 WL 229310, at *7 (N.D. Cal. Jan. 21, 2021) (determining "how inflation per share may have evolved over the class period ... can be accomplished via ... constant percentage inflation") (cleaned up); *Baker v. SeaWorld Ent., Inc.,* 423 F. Supp. 3d 878, 908 (S.D. Cal. 2019) ("constant percentage inflation [is] another commonly utilized theory"); *In re Novatel Wireless Sec. Litig.,* 2013 WL 12247558, at *3 (S.D. Cal. Nov. 19, 2013) (constant percentage model of damages "may properly be presented to a jury"). Dr. Tabak's approach is particularly appropriate here because Musk's false statements at the very beginning of the Class Period caused the deflation, and there were no other statistically significant effects on Twitter's stock price during the Class Period other than on July 8th and August 23rd, which Dr. Tabak factored into his model. *See* Tr. 1845-3-20.

Musk also argues that, under Dr. Tabak's damages methodology, the amount of deflation during the Class Period increased or decreased based on market factors. ECF 570 at 13. This is the same argument Musk previously advanced in summary judgment and *Daubert* motion, and is wrong for the same reasons noted in Plaintiffs' oppositions to those motions, which the Court properly denied.

With respect to Musk's May 17 tweet, Dr. Tabak concluded that the statements helped maintain the price deflation caused by Musk's May 13 tweet. Specifically, at trial, Dr. Tabak testified that Musk's tweets, including the May 17 tweet, caused the stock to remain deflated throughout the class period. Tr. 1851:1–1853:19; Tr. 1881:6-20 ("the May 16th and May 17th misrepresentations maintained the prior deflation, yes"); Tr. 1943:7–18. This evidence was sufficient to support the jury's verdict with respect to Musk's May 17 false statement. Dr. Tabak similarly testified at his deposition that he found the price maintenance theory applicable to the facts here, and that the theory specifically applied "to the May 17 tweet at issue in this case." *See*

ECF 249-11, Tabak Depo. (Aug. 1, 2025), at 26:19–28:8. In addition, there is evidence in the record that the May 17 tweet did in fact maintain the artificially depressed price. *See* Ex. 262.

Price maintenance is a well-accepted method of demonstrating damages in a 10b-5 case. Courts have repeatedly held that evidence of price maintenance is sufficient to establish loss causation and damages. *See In re Genius Brands*, 97 F.4th at 1185 ("But a plaintiff can also successfully plead that misstatements artificially inflated the value of a security where she can plausibly allege that the stock's price was higher than it would have been had the false statements not been made.") (citations omitted); *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 612 n.5 (7th Cir. 2020) ("[T]he securities laws prohibit corporate representatives from knowingly peddling material misrepresentations to the public—regardless of whether the statements introduce a new falsehood to the market or merely confirm misinformation already in the marketplace.") (citing *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1290 (11th Cir. 2011)). Indeed, the repetition of a prior misleading statement is actionable even though it merely "maintain[s] the [company's] stock price at an artificially inflated level without also causing the price to increase [or decrease] further." *Hatamian v. Advanced Micro Devices, Inc.,* 2016 WL 1042502, at *7 (N.D. Cal. Mar. 16, 2016); *In re Apple Inc. Sec. Litig.,* 2022 WL 354785, at *8 (N.D. Cal. Feb. 4, 2022) ("the stock price may even decline after a false statement, but be inflated nonetheless because the price might have fallen even more if the full extent of the bad news were known"). Given the evidence and the law, Musk's attack on the alleged lack of price impact associated with the May 17 statement is meritless.

**B.  Plaintiffs Presented Legally Sufficient Evidence of Loss Causation**

**1.  Plaintiffs Presented Evidence of Direct Causation and a Corrective Disclosure**

Musk's arguments about loss causation are without merit. His primary argument simply repeats his position described above about damages—namely that Plaintiffs were required to prove what Twitter's stock price would have been had Musk disclosed the truth. ECF 570 at 15. That argument fails for the same reasons discussed above.

Musk's second argument—that Plaintiffs were required to introduce evidence that the market believed that Musk's false statements were true and relied on such statements—conflates

reliance and loss causation. Under the fraud-on-the-market presumption of reliance, class members rely on the false statements by purchasing stock at deflated prices. Musk could then attempt to rebut the presumption of reliance by trying to show that plaintiffs "did not rely on the integrity of the market price in trading stock." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014). Musk's arguments are predicated on the mistaken premise that Plaintiffs had to show actual reliance. But that only arises if Musk rebuts the fraud-on-the-market presumption of reliance, which he failed to do.

Musk's contention that the evidence was undisputed that the market already knew the truth, and thus could not have relied upon the false statements, holds no water. ECF 570 at 16. Twitter may have shared its position that the merger was not on hold or whether Musk had the rights he claimed to have, but both the market and the jury logically perceived there to be a big difference between Twitter saying that and Musk saying the opposite. The same is true with respect to Musk's argument that Twitter's stock price did not move materially in response to an article noting that work on the deal remained ongoing. ECF 570 at 17. Such an article did not contain a statement *from Musk* negating his prior false statements, nor his commitment to complete the merger even if he did not get the demanded information.

Assuming Plaintiffs had to demonstrate that the market believed Musk's false statements (they do not), that evidence was proven at trial by the materiality of Musk's statements. Dr. Tabak testified that the stock movements on May 13 and May 16 were statistically significant, which supports materiality. Tr. 1842:7-13. Twitter's stock price would not have experienced such a significant drop on May 13 and May 16 unless the market believed and reacted to Musk's statements. Musk cites no evidence or testimony rebutting that fact.

Moreover, Musk's claim that the use of a corrective disclosure is the only way to prove loss causation ignores well-established Ninth Circuit authority, which holds that loss causation can be proven in many ways. *See In re Bofi Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020) (describing a corrective disclosure as "the most common way"). Here, Plaintiffs were not required to prove "that a misrepresentation was the sole reason" for a price decline, but rather that it was "one substantial cause." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005) (quoting

*Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 n.5 (11th Cir. 1997)), abrogated on other grounds by *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011).  In the end, "loss causation is simply a variant of proximate cause, [and] the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss."  *In re Genius Brands Int'l, Inc.*, 97 F.4th 1171, 1183 (9th Cir. 2024).

Musk cites *Dura Pharmaceuticals Inc. v. Broudo*, 544 U.S. 336 (2005) in support of his argument that Plaintiffs failed to prove (1) a corrective disclosure theory of loss causations, and (2) that some class members might not have been damaged if they traded during the class period and benefited from the deflation.  ECF 570 at 14, 19.  Besides this being a seller case in which losses are realized before a corrective disclosure, those arguments are unavailing for additional reasons.

For one, a corrective disclosure is not necessary in a seller case, where the seller is harmed at the moment they sell in reliance on the false statement and receive proceeds that are reduced by the deflation at the moment of sale; in contrast, *Dura* cautions against providing "market insurance" for losses that occur *after* the fraudulently induced purchase and before the loss is realized.  *Dura* limits losses to those that are actually realized, which in a seller case **is at the time of sale**.  Here, "loss causation can be established by showing that the Defendants' misrepresentation was directly related to the actual economic loss [the plaintiff] suffered."  *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013).   A plaintiff "can satisfy loss causation by showing that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss."  *Id.* (quotations omitted).  Loss causation "requires no more than the familiar test for proximate cause," and therefore "[t]o prove loss causation, plaintiffs need only show a 'causal connection' between the fraud and the loss."  *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018); *see also* ECF 48, at 37 (Court noted the same in denying Musk's motion to dismiss).  Here, Plaintiffs established that Musk's statements were directly related to the actual economic loss they suffered.

Second, Plaintiffs did present evidence of a corrective disclosure.  The evidence shows that on October 4, 2022, when Musk announced he was going through with the deal on the original terms, the statement corrected the fraud and, as a result, ***Twitter stock jumped more than 22.24%***.

Ex. 262; Ex. 278; Tr. 1867:8–1870:2. The October 4 corrective statement caused Twitter stock to jump so significantly that trading was halted twice that day. Tr. 1869:1-5. This satisfies the Ninth Circuit's jurisprudence on corrective disclosures. *In re Genius Brands Int'l, Inc.*, 97 F.4th 1171, 1184 (9th Cir. 2024) ("To allege loss causation, the plaintiff must plead that 'the truth became known.'") (citing *Dura Pharms*., 544 U.S. at 347). The jury was presented with this evidence, which informed their determination of damages. As a result, substantial evidence supports the jury's finding of loss causation, and Musk's reliance on *Dura* is inapposite.[4]

Finally, Musk makes several hypothetical arguments that assert that some class members *may* have traded during the Class Period and *might* have benefited from the deflated stock price if they traded in specific scenarios. ECF 570 at 14, 19. These arguments do not address loss causation and ignore the fact that there will be a claims process that reviews these very types of trades and excludes gains that may have occurred due to the deflation. *See* ECF 567 at 11.

### 2. Musk's Attack on Dr. Tabak's Use of a Two-Day Window to Measure Price Impact is Without Merit

Musk also recycles his prior argument that Dr. Tabak's use of a two-day window to measure the impact of Musk's May 13 statement was improper. ECF 570 at 18-19. The use of a two-day window goes to the weight of the evidence, which is non-reviewable on this motion since the jury found in Plaintiffs' favor. Further, caselaw amply demonstrates the propriety of using two days to measure price impact. *See, e.g.*, *In re Diamond Foods, Inc.*, 295 F.R.D. 240, 249 (N.D. Cal. 2013) (citing defense expert's assertion that a "proper test of market efficiency" required analyzing whether the market price reacted to new information over more than one trading day to "assess[] whether there are delayed price responses to the events of interest"); *Monroe Cty. Employees' Ret. Sys. v. Southern Co.*, 332 F.R.D. 370, 391 (N. D. Ga. 2019) ("there are many cases that find that multi-day event windows are appropriate for event study analysis in securities fraud class actions").

---

[4] Musk says that Dr. Tabak took no position on whether the October 4 statement was a corrective disclosure, but that is irrelevant because Dr. Tabak viewed that issue as a factual issue for the jury's determination and the verdict must be interpreted in Plaintiffs' favor. *See Uniram Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 2008 WL 11515597 at *5 (N.D. Cal. Apr. 17, 2008) ("Any doubt in a general verdict in a civil case is resolved in favor of the prevailing party: 'Absent [special] interrogatories, the law presumes the existence of findings necessary to support the verdict the jury reached.'") (citation omitted).

### 3.     Musk's Arguments About Disaggregation are Factually Wrong

Musk incorrectly agrues that "Dr. Tabak's complete failure to disaggregate unrelated stock market movements means that Plaintiffs cannot possibly have proven damages for this class." ECF 570 at 13.   The argument ignores the fact that Dr. Tabak clearly did disaggregate.  *See* Tr. at 1843 ("I wanted to see if there were other days during the class period when there was important news that may be unrelated to the allegations, and I found two such dates" and [excluded the stock declines from such dates].")  Tr. 1844:24-1845:24.  Courts have held that "conducting an event study that purports to account for confounding information"—as Dr. Tabak has done here — makes the results sufficiently reliable to "meet[] Rule 702's admissibility threshold."  *Smilovits v. First Solar, Inc.,* 2019 WL 7282026, at *9 (D. Ariz. Dec. 27, 2019).

Musk's argument about the July 8 stock drop fails for the same reason.  ECF 570 at 19.  In securities class actions, "[t]he question of how much of the decline can be attributed to the challenged statements, as opposed to other factors, is a factual question for the jury."  *In re Twitter, Inc. Sec. Litig.,* 2020 WL 4187915, at *16, n.17 (N.D. Cal. Apr. 17, 2020) (Tigar, J.).  Here, the jury resolved that issue against Musk based on the evidence presented at trial.  The fact that Musk attempts to call the July 8 termination letter an "intervening event" is irrelevant, as it was just one among several events that Musk attempted to convince the jury should be exclusively responsible for having caused the losses.  Musk also unsuccessfully attempted to convince the jury that "the truth" was fully known by the market before May 13 and, thus, Musk's false statements could not have caused any losses.  The jury rejected that story, too. Musk may not like the verdict, but he cannot challenge these factual matters that were exclusively within the jury's province.

### C.     Plaintiffs Presented Legally Sufficient Evidence that Musk's Statements Were Materially False

**<u>Not On Hold</u>**.  Musk tweeted on May 13, "Twitter deal temporarily on hold pending details supporting calculation that spam/fake accounts do indeed represent less than 5 percent of users." Ex. 97.  Musk meant for this statement to be read literally, testifying at trial that "I was simply speaking what's on my mind and being extremely literal here," and "I try to be as literal as possible." Tr. 769:5-15.  In the same spirit, the jury could find that the statement was literally false, *i.e.*, that the deal was not on hold.  The evidence admitted at trial shows that Musk did not tell

anybody on his team or at Twitter to stop working on the deal or even to slow down, and there is no evidence that his team stopped working at "ludicrous speed" on the merger. *See e.g.*, Tr. 686:21-687:16 (Musk); Tr. 1603:9-21 (Claassen); Tr. 1103:4-19 (Segal).

Musk's motion puts an exceedingly thick gloss on his plain language, arguing that this tweet was true because he "had requested details, had not yet received them, was entitled to those details, and ultimately terminated the Merger Agreement when he did not receive them." ECF 570 at 20:14-17 (citations omitted). Therefore, according to Musk, the "merger itself was held up and its closing delayed" until he and his team "sought the spam information" at issue. *Id.* at 20:22-25.

But that's just an imaginative reinterpretation of the unambiguous language in an "extremely literal" tweet. And it is contradicted by Musk's own testimony, agreeing that "when you said the deal was on hold pending this information from Twitter, you meant that until you received the information, the deal would not close." Tr. 771:22-772:1. Similarly, when Morgan Stanley banker Kate Claassen was asked about her reading, she had no problem answering without a wholesale reinterpretation of the tweet: "Q. Isn't it a fact that he didn't put the deal on hold? A. Correct. We were never directed to put the deal on hold, to my knowledge." Tr. 1603:12-14; *see also* Tr. 1062:8-15 (Fix-Conti: "we were continuing with the deal process"); Tr. 1103:7-17 (Segal: deal was not "on hold" and Musk's team never "contacted you or any of your team members about putting the deal on hold"); Tr. 1461:10-17 (Taylor: "No, the deal was never on hold.").

Additionally, the Court must "disregard all evidence favorable to the moving party," especially that which "the jury is not required to believe." *Reeves*, 530 U.S. at 150. Accordingly, there is sufficient evidence for the jury to reasonably conclude that Musk's May 13 tweet meant that the deal was on hold, but that, in reality, the deal was not on hold.

**No Right to Put the Deal on Hold.** The May 13 and May 17 tweets also conveyed that Musk had ***the right*** to put the deal on hold. The jury certainly had sufficient evidence to find that this was also false. Several witnesses testified about the sequence and dynamics of Musk's unsolicited offer and the "Jiu-Jitsu" strategy his team used, including using speed to put pressure on Twitter, Musk's waiver of due diligence, and his "seller-friendly" merger agreement with an overnight fuse. *E.g.*, Tr. 347:4-6 (Gadde); Tr. 736:3-738:10 (Musk); Tr. 1733:9-1735:3

(Armstrong). Further, Professor Adam Badawi testified about M&A industry practice surrounding due diligence waivers, "seller-friendly" merger agreements, information rights, and whether merger agreements typically allow a party to put a deal on hold (they do not). Tr. 467:15-476:12. Taken collectively, this trial evidence firmly supports a reasonable conclusion that, contrary to his tweets, Musk had no right to put the deal on hold or claim that it could not move forward until Twitter proved its 5% spam estimate.

**No Legitimate Basis to Assert Spam Exceeded 5% of mDAU.** Like a number of his other public statements, Musk's May 17 tweet also conveyed that he had a solid basis to believe that spam on Twitter exceeded 20% of mDAU. Specifically, the tweet stated: "20% fake/spam accounts, while 4 times what Twitter claims, could be \*much\* higher." Ex. 130. In reality, Musk had no legitimate basis for this assertion. In fact, Musk did not dispute in his SEC investigative testimony that "[t]hese are numbers you're just kind of throwing out there" and stated that the number of bots was "simply unknowable based on the lack of information" provided to him. Tr. 801:14-801:2. And specifically with respect to his statement about 90% bots, Musk admitted that his only basis for this outlandish number was "it was not impossible that it – it could be some very high" number. Ex. 13B. The only basis for believing spam was any specific number other than 5% that Musk mentioned having as of May 17 was a blog post by Sparktoro. But that blogpost specifically stated it was not challenging Twitter's estimate—stating that it only measured accounts that regularly tweet may be fake/spam accounts, as opposed to Twitter's percentage, which estimated that 5% of a much larger number, *i.e.*, users who sign in on a given day. Tr. 827:10-830:21 (Musk); Ex. 599. The difference in denominators is critical here, and Twitter's estimates may well reconcile with Sparktoro's, because "most of the people in mDAU don't tweet" and instead are in "read mode." Tr. 712:1-11 (Musk). This likely explains why the Sparktoro blog post itself states that "[w]e are not disputing Twitter's claim" that spam is estimated to be 5%. Ex. 599. Further, there was no trial evidence to establish that Sparktoro or its methods were reliable, and Musk did not call Sparktoro's personnel to the stand or designate them as experts.

Musk's other falsity arguments can be rejected easily. First, Musk posits that the market already knew the deal was not on hold, but he cites only very brief testimony by Twitter CEO

Agrawal and Dr. Tabak. ECF 570 at 20:26-28; 21:13-15 ("[A]s Dr. Tabak testified, the market already knew or quickly learned that the deal was not literally on hold.") (citing Tr. 1909:25-1910:6). The cited testimony puts the lie to this assertion. Dr. Tabak simply acknowledged that Musk and Twitter made their positions public and that Musk continued to line up his financing. Tr. 1909:25-1910:6 ("Q. Okay. So your testimony is that people knew as of May 13 that *Twitter* had not agreed to put the deal on hold? A. Yes." (emphasis added)). This ignores the fact that *Musk's* public position was that the deal was on hold. Further, the defense did not solicit specific testimony from Dr. Tabak about what disclosures were made and when, or outstanding items other than financing that, for all the investing public knew, Musk had put on hold. And Agrawal simply stated that he believed Twitter could "productively share additional information to help [Musk] understand and contextualize" Twitter's spam estimates, and the testimony cited by Musk does not address *Musk's* stated position at the time surrounding bots. Tr. 1301:1-11.[5]

Musk's materiality arguments fare no better. Musk himself admitted that he tweeted about the deal because "[i]t seemed material information." Tr. 667:6-668:5. Further, the May 13 tweet tanked Twitter's stock price immediately, and Dr. Tabak testified that the stock movements were statistically significant (Tr. 1842:7-13) and the May 17 tweet "could have maintained the deflation and continued it -- not added to it, just continued it." Tr. 1881:7-11; *see also* Tr. 1880:21-1881:3 The jury also received extensive evidence through every fact witness to take the stand about the series of events before, at the time of, and after Musk's tweets, and could see for itself the way in which the market for Twitter stock reacted to his statements and actions. Ex. 262. The jury, therefore, had sufficient evidence to reasonably determine that the May 17 tweet kept the stock price at artificially deflated levels. *See Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 594 U.S. 113, 123 (2021) (under the price maintenance theory, "price impact is the amount of price

---

[5] Musk's brief asserts that "the jury found that Defendant's estimate, which he originally stated at the May 16 All In Summit, was not an actionable statement." ECF 570 at 8:6-8. But the fact that the jury did not find Musk liable for the May 16 statement does not mean it was *truthful*, and the jury's decision to hold Musk liable only for the May 13 and May 17 tweets may well reflect lenity or compromise rather than a conclusion that the May 16 statement was accurate. *Cf.*, *United States v. Seley*, 957 F.2d 717, 723 (9th Cir. 1992) ("The jury may have acquitted for reasons of lenity or compromise, but this did not invalidate the convictions they did reach.").

inflation maintained by an alleged misrepresentation—in other words, the amount that the stock's price would have fallen without the false statement") (internal citation, quotation omitted).

Finally, Musk argues that his false statements merely constituted an opinion about the merger agreement. ECF 570 at 20–21. But based on the evidence presented, the jury could have reasonably found either that (1) his statements were not opinions but instead were meant to convey facts, (2) the statement did convey an opinion, but Musk did "not sincerely hold the view or belief expressed," or the opinion "contain[ed] a material, verifiable statement of fact that is untrue." ECF 524 at 20 (jury instruction re: opinions).

### D. Plaintiffs Presented Sufficient Evidence that Musk Acted with Scienter

Musk's argument that a reasonable jury could not find scienter ignores the robust record developed through two weeks of trial. This is particularly true because a defendant's state of mind is almost always proven through circumstantial evidence. *Herman & Maclean v. Huddleston*, 459 U.S. 375, 390 n.30 (1983) ("proof of scienter required in fraud cases is often a matter of inference from circumstantial evidence"). As such, the law has long recognized that "intent can be inferred from circumstantial evidence, including financial motive." *Spencer v. City of Spokane*, 836 F. App'x 516, 518 (9th Cir. 2020) (quoting, *inter alia*, *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009)).

Here, the evidence of scienter includes documents and testimony showing that:

- Musk had an exceedingly strong motive to renegotiate or escape the deal. This arose in large part because Musk was planning to, and did, use proceeds from selling billions of dollars of his Tesla stock to buy Twitter. *E.g.*, Tr. 555:15-556:2 (Birchall). But Tesla's stock price tanked between the day Musk decided to buy Twitter, *i.e.*, April 8, and his May 13 deal-on-hold tweet. *See* Ex. 261 (compare Tesla $347.74 opening stock price on April 8, 2022 to $242.67 closing price on May 12). Tesla's declining stock price effectively made the deal much more expensive. Adding to Musk's motivation was the fact that "Tesla kind of has a special place in [Musk's] heart." Tr. 742:6-7 (Musk); *see also* Ex. 227 (Musk's 2023 tweeted about buying Twitter: "Sucks that I had to sell so much Tesla stock to do so. Sigh.").

- Musk made clear that one of his goals was to renegotiate his acquisition price. Tr. 976:13-23 (Musk told his biographer on May 6, 2022 that he wanted to pay "literally half or something"); Ex. 85 (banker email advising Musk that he had an "opportunity

to revisit price" if he created a "threat of walking away"); Ex. 85 (Birchall response to banker suggesting "further thoughts/ideas be discussed via phone, with counsel involved").  In fact, Musk wanted to renegotiate or escape the deal so badly that he had his attorneys threaten Twitter's officers and directors in September 2022: "if Mr. Musk were required to go through with the transaction after trial, it would be World War III until the end of time for real."  Tr. 1407:24-1408:11 (Korman: "It was a pretty vivid message, and he called saying that he was specifically delivering a message. It wasn't in passing, but it was he was being told to deliver this message.").

- Musk knew of his virtually unparalleled influence and had tens of millions of followers on Twitter in 2022.  Tr. 664:11-12 (Musk).

- The market for Twitter stock jumped 27% when the investing public learned that Musk had purchased a large stake in the company.  Ex. 262 (stock price increased 27.12% on April 14, 2022).  This is unmistakable evidence that Musk and his actions had an extraordinary impact on Twitter's stock price.

- Musk knew the markets were focused on his statements and, in fact, he thought that actually "people tend to read too much into things that I do."  Tr. 674:7-9.

- Musk knew, as of May 13, that "the public markets were highly attuned to [his] statements, specifically about Twitter" and "expected that people would be following this deal closely."  Tr. 770:18-24 (Musk).

- Musk did not review the merger agreement before posting his May 13 tweet and didn't run the tweet by anybody before posting it to determine whether it was factually accurate.  Tr. 771:3-8 (Musk).

- Musk suggested in his statements that the number of bots on Twitter could exceed 20%, 25%, and even 90%, but did not dispute in his SEC investigative testimony—which was admitted at trial—that "[t]hese are numbers you're just kind of throwing out there" and the number of bots is "simply unknowable based on the lack of information" provided to him.  Tr. 801:14-801:2 (Musk).

- Despite tweeting that the deal was on hold and could not move forward until Twitter provided proof that spam was 5% or less, Musk never told anybody on his team to stop their work or slow down, and likewise never told Twitter "to stop working on the deal" or to slow down.  *E.g.*, Tr. 686:21-687:16 (Musk); Tr. 1603:9-21 (Claassen); Tr. 1103:4-19 (Segal).

- When Musk's banker emailed him that "Twitter seems to have stopped trading on the daily news flow, though I expect it will still move if we get a material tweet ☺", Musk replied: "Wild times!" Ex. 194. This succinctly describes Musk's purpose in tweeting about the acquisition, *i.e.*, to move Twitter's stock price.

- Musk's main excuse for tweeting about the deal—because "I believe in truth and transparency"—is undermined by the fact that he and his team were highly secretive when Musk made his early open-market purchases of over 9% of Twitter's stock. Tr. 665:17-19 (Musk); Tr. 667:18-22 (Musk); Tr. 538:25-539:17 (Birchall).

Taken together, the foregoing evidence was more than sufficient for a reasonable jury to conclude that Musk "ma[de] an untrue statement with knowledge that the statement was false or with deliberate reckless disregard for whether the statement was true." ECF 524 at 21 (jury instruction re: "Securities-Knowingly or Recklessly).

### E.    Plaintiffs Presented Legally Sufficient Evidence of Reliance

Plaintiffs proved reliance through evidence establishing the fraud-on-the-market presumption. As Musk acknowledges, in order to benefit from the presumption, Plaintiffs were required to show "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." ECF 570 at 23 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014). There was compelling evidence to prove each of these facts.

First, there is no dispute that Musk's May 13 and 17 tweets, on which the jury found Musk liable, were available to Musk's "tens of millions of followers on Twitter" and were reported in the financial press. Tr. 309:11-14 (Belgrave); Tr. 664:11-12 (Musk).

Second, the evidence established Musk's false statements were material, as discussed above.

Third, the evidence showed that Twitter securities traded in an efficient market. Specifically, Dr. Tabak testified that Twitter stock traded in an active and open market through testimony (1) that "Twitter stock showed very strong evidence of efficiency in terms of incorporating public information" (Tr. 1810:5-7), (2) there was high trading volume in the stock (Tr. 1814:17-22); (3) a large number of analysts followed Twitter and issued related analyst reports (Tr. 1815:2-1816:8); (4) a high number of financial players made a market for Twitter stock (Tr.

1817:7-1818:15); (5) a large number of institutional investors invested in Twitter (Tr. 1818:16-1820:11); and (6) Twitter had a high market capitalization (Tr. 1823:1-11). Based on these factors, Dr. Tabak "concluded the evidence very strongly pointed to the stock being traded in an efficient market." Tr. 1831:19-23. He also concluded that Twitter options traded in an efficient market based on the "put-call parity condition." Tr. 1832:2-1835:22.

The final factor, that class members traded between the time of the false statements and the time the truth was revealed, is addressed by virtue of the very definition of the class here, *i.e.*, the class includes only investors who sold stock or call options, or purchased put options, between May 13, 2022, the date of Musk's first false tweet, and October 4, 2022, when Musk announced he would proceed with the deal on its original terms. ECF 106 (class certification order).

Musk's arguments to the contrary should be rejected. For example, Dr. Tabak testified that the May 13 deal-on-hold tweet impacted the price of Twitter stock over the course of two trading days, which Musk argues is inconsistent with the immediate reaction that is required for a market to be efficient. But this argument ***confuses when a price reaction begins, with the full period of time during which a price reaction occurs***. Dr. Tabak testified that Twitter's stock price began to react to the May 13 tweet immediately. Tr. 1826:2-8 ("Q. Dr. Tabak, how long did it take Twitter's stock price to react to Mr. Musk's tweet that day? A. It's basically instantaneous."). This initial, instantaneous reaction is entirely consistent with an efficient market. Dr. Tabak also testified that it took two business days for the market to fully digest and incorporate the tweet. Tr. 1865:23-1866:6; Tr. 1889:14-1889:21. As Judge Carter found in *Hsu v. Puma Biotechnology, Inc.*, there is no legal or evidentiary authority "that convincingly shows a two-day loss causation window is inappropriate under the circumstances. To the contrary, the Ninth Circuit has explained that 'adoption of a bright-line rule assuming that [a] stock price will instantly react to negative information would fail to address the realities of the market.'" *Hsu v. Puma Biotechnology, Inc.*, 2018 WL 4945703, at *10 (C.D. Cal. Oct. 5, 2018) (quoting *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003)). In fact, Musk's own financial expert admitted in his deposition that he has "published a paper … that used a three-day event window to estimate abnormal returns associated with corporate acquisition

announcements." Molumphy Decl. Ex. 3, Lehn Depo. at 172:12-17. *See also In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 513 (1st Cir. 2005) (rejecting attacks of two-day and five-day windows "because Plaintiffs' event study captures the same-day reaction of Xcelera's stock price to company-specific events"); Jonathan R. Macey et al., *Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson*, 77 VA. L. REV. 1017, 1031 (1991) ("financial economists often define the event period as the two-day period consisting of the announcement day and the following day").

Musk also argues that he rebutted the fraud-on-the-market presumption because he proved the market "was already aware" that the deal was not "on hold" despite his false tweets. ECF 570 at 24:7-19. However, the evidence cited by Musk does not support his argument. First, Musk argues that the market knew that Musk had waived due diligence. But the trial evidence was mixed, mostly because the defense did its best to muddy the water on what waiving due diligence means. *E.g.*, Tr. 484:12-14 (Badawi testimony: "[I]n your opinion, the exchange of information after a merger agreement is signed is not due diligence? A. That's not typically what we would call due diligence."); Tr. 1687:8-15 (Armstrong testimony: "Q. Now, is the point of pre-signing due diligence to confirm whether a public company's SEC disclosures and filings are accurate? A. No. No. … We all, as investors, people with 401(k)s, mergers -- you have to be able to rely on the veracity of SEC filings."); Tr. 2009:4-5 (Badawi testimony: "Q. Your view is that due diligence is done pre-signing? A. Yes."). Thus, it would require unfounded speculation to conclude what the jury believed the term "due diligence" meant in the context of the Twitter acquisition, much less what the market made of Musk's diligence waiver vis-à-vis his false tweets in 2022.

Musk also confusingly cites Dr. Tabak's testimony about his understanding that Twitter did not agree that the deal was on hold. Tr. 1908:24-1909:19 ("everyone knew Twitter hadn't put the deal on hold"); ECF 570 at 24:14-19. But Twitter's position has nothing to do with whether Musk led the investing public to believe that he had the right to, or had in fact, put the deal on hold. Musk's truth-on-the-market evidence gets even weaker under further scrutiny. Dr. Tabak was not designated as an expert on *Twitter's position*, the defense laid no foundation for Dr. Tabak's knowledge of *Twitter's position*, and the jury had far more evidence than did Dr. Tabak about

*Twitter's position* (having heard testimony from CEO Parag Agrawal, CFO Ned Segal, CLO Vijaya Gadde, and Twitter's outside counsel Martin Korman, and having seen the contemporaneous correspondence between attorneys for Musk and Twitter). The jury, therefore, would have been well within its purview to credit some evidence and discount other evidence in reaching its verdict, and may have decided to give less weight to the exceptionally brief testimony cited by Musk here. *See* ECF 524 (jury instruction re: direct and circumstantial evidence: "It is for you to decide how much weight to give to any evidence."); *see also Reeves*, 530 U.S. at 150-151 (courts "must disregard all evidence favorable to the moving party that the jury is not required to believe" in deciding motion for judgment on the pleadings).

In short, Plaintiffs introduced compelling trial evidence that the market for Twitter securities was efficient, the trial record provides sufficient grounds to invoke the fraud-on-the-market presumption, and Musk fails to show that only an unreasonable jury would reject his argument that the market knew the truth despite his misstatements.

## II.     MUSK OFFERS NO BASIS FOR A NEW TRIAL

### A.     The Jury's Verdict Properly Reflects the Weight of the Evidence

When a motion for new trial is based on insufficiency of the evidence, the court may only grant a new trial if the jury's verdict goes against the "great weight of the evidence, or it is quite clear the jury has reached a seriously erroneous result." *EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir. 1997) (citations omitted). Where there is "substantial evidence that goes both ways," and a court "cannot say that there is any part of the jury's verdict that was against the clear weight of the evidence," then "[i]t is not the courts' place to substitute [its] evaluations for those of the jurors." *Union Oil Co. of California v. Terrible Herbst, Inc.,* 331 F.3d 735, 743 (9th Cir. 2003).

As detailed extensively above, the weight of the evidence established that Musk violated Rule 10b-5 by making false and misleading statements on May 13 and 17. The weight of the evidence also shows that the fraud-on-the-market presumption, loss causation, and damages were all fully and properly established. Thus, the jury's verdict was supported by the great weight of compelling evidence that Musk engaged in securities fraud.

Moreover, the jury's verdict was clearly well considered, as the jury engaged in a thoughtful

multi-day deliberation with questions regarding the law and evidence, and ultimately issued a mixed verdict, deciding for Musk on Plaintiffs' scheme claim and May 16 misstatement claim. *See Mueller v. Dep't of Pub. Safety,* 595 F. Supp. 3d 920, 934 (D. Haw. 2022) (where "there was a split verdict … [t]he verdict reflects the jury's ability to compartmentalize the evidence and follow the court's instructions") (citing *United States v. Vasquez-Velasco*, 15 F.3d 833, 846 (9th Cir. 1994)).

## B.   The Verdict Was Impartial and Unbiased

To warrant a new trial on attorney misconduct grounds, the misconduct must "so permeate the trial as to show that the jury was necessarily prejudiced." *Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1145 (9th Cir. 2001) (internal quotation marks and citation omitted). In a civil case, the Court considers the totality of the circumstances, including the nature of counsel's comments, their frequency, their possible relevance to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case, and the verdict itself. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002). Musk fails to establish any prejudicial misconduct whatsoever or any indication that the verdict was influenced by prejudice.

### 1.   Plaintiffs Closely Followed the Court's Orders

Plaintiffs closely followed the Court's orders, which the Court continued to enforce throughout the trial. *United States v. Nadler*, 698 F.2d 995, 1001 (9th Cir. 1983) (appellate court gives "great deference" to trial court's handling of alleged misconduct at trial). At no point did Plaintiffs' counsel introduce prejudicial evidence—whether in the form of precluded argument regarding Musk's early purchases of Twitter stock and related SEC filings, privileged information, or inflammatory testimony—nor would the Court have allowed such.

First, the Court's Order on Defendant's Motion *in Limine* No. 1 to preclude all reference to the SEC investigation and litigation was exceptionally clear—the Court excluded only evidence of "the investigation itself or the subsequent litigation," but allowed Plaintiffs to introduce the underlying evidence. ECF 459. The Court also ruled that "evidence, that is the purchases and the fact there was not a public disclosure until a certain date of the purchases all comes in," and "[t]o the extent that he is concealing the identity of the purchaser, it's in." February 17, 2026 Pre-Trial Conference ("PTC") Tr. 51:12-14; 54:10-11. At no point did Plaintiffs' counsel or any trial witness

reference the fact that Musk was subject to an SEC investigation or lawsuit. Instead, the evidence admitted at trial merely shows that Musk did not make SEC filings that would have disclosed his early purchases to the investing public, and that such a disclosure would have pushed up the price of Twitter stock to Musk's detriment.

Second, Plaintiffs' questioning about Musk's decision to complete the Twitter acquisition in October 2022 was relevant to the core issues in the case and did not deliberately target privileged information. Musk voluntarily introduced his attorneys' advice into his testimony, contrary to Plaintiffs' admonition at the beginning of his testimony. Tr. 662:11-15. More importantly, Musk's testimony directly contradicted the Court's pretrial instruction to the defense that "when you go back and prepare Mr. Musk for examination, he should be cautioned that he is not to -- not to cite to any lawyer -- that his lawyers agreed with him…I think that's what he says." PTC Tr. 27:15-18. Counter to Musk's assertion that Plaintiffs' counsel was "well aware how Mr. Musk would answer" given his 2023 BBC interview, Musk answered the *exact same questions* without referring to his counsel at his May 19, 2025, deposition. Molumphy Decl., Ex. 4: Musk Depo. Tr. 327:1-16. Given the Court's instruction, Plaintiffs' admonition, and Musk's very capable defense counsel, one could reasonably conclude that Musk affirmatively decided to try to disrupt this trial by testifying about his communications with counsel.

Third, questions about Musk's "ties to California" established his background, ability to buy a multi-billion-dollar company as an individual, and relationship with Twitter, a San Francisco-based company. Similarly, Plaintiffs' counsel's questions of Mr. Segal regarding Candlestick Park established background and context as to the witness's experience, and at worst, provided some levity to otherwise dense, technical testimony. *See Settlegoode v. Portland Pub. Schs.,* 371 F.3d 503, 518 (9th Cir. 2004) ("we are aware of no authority for the proposition that counsel may never call a witness who may elicit sympathy from the jury while also providing relevant testimony"). Musk's counsel did not object to either line of questioning at any point. *Bird v. Glacier Electric Coop. Inc.*, 255 F.3d 1136, 1148 (9th Cir. 2001) ("[w]e will review for plain or fundamental error, absent a contemporaneous objection"); *Hemmings*, 285 F.3d at 1195 (where there was no objection to testimony or related closing argument, "[t]he actions by the court and the parties support an

inference that the misconduct was not prejudicial or fundamentally unfair"). These questions do not rise to misconduct. *See Apple, Inc. v. Samsung Elecs. Co.,* 2014 WL 549324, at \*14 (N.D. Cal. Feb. 7, 2014) (contentions of racial prejudice did not warrant mistrial where misconduct did not permeate the proceedings and counsel did not contemporaneously object).

None of these items were irrelevant or prejudicial, and certainly do not warrant a new trial.

### 2. Plaintiffs' Counsel's Closing Remarks Are Not a Basis for a New Trial

Musk also objects to a singular comment during rebuttal argument that the verdict could "send a message." The remark—about which the defense did not object at the time, seek a curative instruction, or move for mistrial—is taken out of context and does not provide a basis for a new trial. *Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103, 1107 (9th Cir. 1991) (declining to find reversible error where the alleged misconduct occurred only in argument, the remarks were isolated rather than persistent, most of counsel's comments did not draw objections at trial, and the opposing party did not move for a mistrial at the end of argument).

In response to Musk's concerns raised before closing argument that Plaintiffs would encourage the jury to "send a message," the Court indicated what would and would not be allowed during closing argument, which the Plaintiffs closely followed. As the Court reminded the parties, "verdicts send messages…and, by the way, they're intended to. That's one reason why we have public trials." Tr. 2135:9-13. Responding to Musk's concerns, the Court gave guidance on "what I think the constraint of sending a message is … We have [verdicts] to send messages. But you don't want the verdict to be based on the fact that it's the message to be sent." Tr. 2135:8-17. The Court then very clearly described the parameters within which Planitiffs could argue:

> I think you can say these practices which you view … as violative of the -- based upon the evidence is violative of the securities law ought to stop, and there's no better place to stop it than in this case … People are following this case, and this practice is wrong. And you say, 'If you find it is wrong, it will send a message.' But you can't do the reverse. You can't say, 'Because it will send a message, therefore, find the practice is wrong.'

Plaintiffs' argument clearly complied with this guidance. In a singular sentence during rebuttal close, Plaintiffs' counsel closely followed the Court's guidance, asking the jury: "there are a lot of people in this courtroom -- and it's all about a message, and the message is: Are we going

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW    24
OR, IN THE ALTERNATIVE, A NEW TRIAL

to allow people like Ms. Price, Mr. Belgrave, and the millions of people in between to not be protected?" Tr. 2291:6-10. There was nothing inappropriate, and Musk's counsel did not object.

It would be a stretch to call the rebuttal argument emotionally charged. But even if it were, "[u]sing some degree of emotionally charged language during closing argument in a civil case is a well-accepted tactic in American courtrooms." *Settlegoode v. Portland Pub. Schs.*, 371 F.3d 503, 518 (9th Cir. 2004). The failure to raise a contemporaneous objection puts the nail in the coffin. "[F]ederal courts erect a high threshold to claims of improper closing arguments in civil cases raised for the first time after trial." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1193 (9th Cir. 2002) (quotation and citation omitted). "The fact that counsel did not object before the jury was instructed strongly suggests that counsel made a strategic decision to gamble on the verdict and suspected that the comments would not sway the jury." *Hemmings,* 285 F.3d at 1195. And even if this singular sentence in Plaintiffs' rebuttal close was improper, "the alleged misconduct did not sufficiently permeate the entire proceeding to warrant a new trial." *See Zweizig v. Rote*, 818 F. App'x 645, 650 (9th Cir. 2020) (quoting *Claiborne v. Blauser*, 934 F.3d 885, 893–94 (9th Cir. 2019)).

### 3. The Verdict Does Not Reflect Prejudice

Defendant has "not shown any prejudice." *Sahakian v. City of Glendale*, 2008 WL 11411720, at *2 (C.D. Cal. July 1, 2008) (quoting *Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136, 1145 (9th Cir. 2001)) ("To warrant a new trial on attorney misconduct grounds, the misconduct must 'so permeate the trial as to show that the jury was necessarily prejudiced.'"). Musk has not presented any evidence (nor is there any) "that any of the jurors relied on extrinsic evidence" or that any of the jurors reached a determination prematurely.[6] *Davis v. Woodford*, 384 F.3d 628, 654 (9th Cir. 2004). Instead, Musk attempts to show prejudice by virtue of the jury's verdict itself. But there is no evidence that the verdict was caused by any reference to "sending a message" or media

---

[6] Musk references comments made during jury selection, but does not appear to argue that any juror themselves is a basis for mistrial. Plaintiffs thus do not address these comments except to point out that the Court struck a wide swathe of the panel based on negative views of Musk, made several allowances for fairness to Musk, including offering a curative instruction, giving parties additional preemptory challenges, and striking or denying challenge to several prospective jurors over Plaintiffs' objection. PTC Tr. 84:4-23, 85:10-18, 125:6-148:21.

coverage. On the contrary, the jury's defense verdict on Plaintiffs' May 16 misstatement and scheme claims "reflects thoughtful and careful consideration of the evidence." *Est. of Brown v. Lambert*, 478 F. Supp. 3d 1006, 1023 (S.D. Cal. 2020) (rejecting defendants' argument that plaintiffs' counsel engaged in misconduct and denying the request for a new trial on the basis of the jury's mixed verdict).

Courts "presume that jurors follow the instructions." *Kansas v. Marsh,* 548 U.S. 163, 126 (2006); *Richardson v. Marsh,* 481 U.S. 200, 206 (1987) (applying "almost invariable assumption of the law that jurors follow their instructions"). Musk seems to ignore the plain language of the Court's instruction to the jury on media attention—which was to caution the jury *against* considering the fact of publicity in determining the verdict.

> This case, as you know, has received publicity. It is a reasonable assumption that your verdict, whatever it may be, will also be publicized. You are cautioned, however, that you should not consider this fact in determining what your verdict should be. That verdict must be based solely on the evidence you have heard and on the law as I have stated it.

ECF 524 at 2  (Final Jury Instructions.)

Additionally, the Court made clear in its instructions that opening statements and closing arguments are not evidence, and may not be considered in reaching the verdict.

> In reaching your verdict, you may consider only the testimony and exhibits received into evidence … Arguments and statements by lawyers are not evidence … What they have said in their opening statements, closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence.

ECF 534 at 5. The Court should presume that the jury followed its instructions and did not place undue weight on anticipated publicity or a brief comment in rebuttal closing in reaching the verdict.

The jury's use of blue ink on the verdict form does not show bias or passion, let alone anything close to the level sufficient for a new trial. The jury used blue ink in multiple places—to check "yes" for Statement 3, to write "Reference Exhibit 342" next to the Damages section heading in reference to how they were filling out the table below, and for the August 9, 2022, damages figure. The most likely explanation for the sporadic use of blue ink here is that the jury's deliberations were ongoing, and a blue pen was used either interchangeably or subsequently to a black pen. The damages figures entered on the verdict form (including $4.20 on August 9, 2022)

exactly track the damages that Plaintiffs' expert proffered, with no numerical deviations that could indicate bias, passion, or an intent to send a punitive message.  There is nothing that suggests that the verdict is outrageous, shocks the conscience, or is against the clear weight of the evidence.

Moreover, Musk's assertion that 420 is a number "negatively" associated with him is absolutely contrary to the evidence at trial and in the broader zeitgeist.  Musk's own bankers testified that they recommended the number to Musk as the offer price for Twitter shares because Musk had used and made jokes about it in the past—"we knew Mr. Musk had joked about 420 quite a bit, and so we threw it out there as 54.20" (Claassen, Tr. 1524:15-19); "420…numbers that have been associated with Mr. Musk in the media…He's been involved in using that number or date. " Grimes Tr. 60:10-15 ECF 516-1.

### C.    Defendant Was Not Prejudiced by Having to Litigate Plaintiffs' Scheme Liability Claim or the Court's Other Procedural and Evidentiary Rulings

To any capable litigant, it would have been extraordinarily clear—from Plaintiffs' Complaint, discovery propounded by both Parties, summary judgment, pre-trial briefing, and the pre-trial conference—that Plaintiffs would advance their scheme liability claim at trial.  The Court also repeatedly, and clearly, ruled that scheme liability was at issue, and that Plaintiffs would be able to introduce evidence not only of that scheme, but also of statements that "can be considered in determining the falsity of the other statements."  Tr. 922:23-24; ECF 454; ECF 459.  A court's adverse rulings do not show judicial bias—Musk cannot claim that having to litigate a pled claim that the Court ruled would go forward at trial was *de facto* prejudicial.  *See United States v. Johnson*, 610 F.3d 1138, 1148 (9th Cir. 2010) ("Adverse findings do not equate to bias.").

Further, the evidentiary rulings that Musk argues were exacerbated by the scheme claim were well within the Court's appropriate exercise of discretion to manage and control the trial proceedings.  *See United States v. Mostella*, 802 F.2d 358, 361 (9th Cir. 1986) ("It is well established that a trial judge is more than a moderator or umpire … It is entirely proper for him to participate in the examination of witnesses for the purpose of clarifying the evidence, confining counsel to evidentiary rulings, controlling the orderly presentation of the evidence, and preventing undue repetition of testimony"); *United States v. Greene*, 698 F.2d 1364, 1375 (9th Cir. 1983) (judge has broad discretion in supervising trials).  The rulings that Musk believes demonstrate

actual bias or an appearance of partiality reflect only the Court's obligation to ensure the truthful and orderly presentation of evidence in compliance with the Rules of Evidence and the Court's previous rulings. *See United States v. Marks*, 530 F.3d 799, 808 (9th Cir. 2008); *United States v. English*, 875 F.2d 319 (9th Cir. 1989) (properly counteracting improper inference raised).

And at no point was Musk precluded from making any arguments. Indeed, he made the strategic decision to cut short his case in chief. Per the Court's Pre-Trial Order (ECF 195), each side had 25 hours to put on its case. By Plaintiffs' estimate, Musk had over five hours remaining when he rested, and he clearly could have used that time to call percipient or expert witnesses or put forth the arguments that he claims he was "precluded from pursuing." Molumphy Decl. at ¶7.

Finally, even if the scheme claim was not litigated at trial, Musk has not shown that the evidence he cites would not have been introduced for purposes of establishing background and context, or Musk's scienter, motive, and/or state of mind as to the May 13, 16, and 17 tweets.

### D.    There is No Cumulative Prejudice

Musk's claimed errors, even when considered cumulatively, do not rise to the level of prejudice required for a new trial. As explained above, Plaintiffs' conduct comported with the Court's rulings and was not prejudicial. The fact that a judge has made rulings adverse to a party is not a basis for a new trial for fundamental unfairness. *See Liteky v. United States*, 510 U.S. 540, 555 (1994). The Court maintained appropriate control over the proceedings while allowing both parties to present their case. The Court's management of the trial, including its rulings and interventions, fell well within its broad discretion to ensure an orderly and fair proceeding. *Mostella*, 802 F.2d at 361.

What's more, "cautionary instruction from the judge is sufficient to cure any prejudice to the defendant." *United States v. Escalante*, 637 F.2d 1197, 1202–03 (9th Cir.), *cert. denied*, 449 U.S. 856 (1980). Declaring a mistrial "is appropriate only where there has been so much prejudice that an instruction is unlikely to cure it." *Id*. at 1203. The Court's final instructions were thorough, balanced, and clear—including, as relevant here, instructions not to be influenced by personal opinions, prejudices, or sympathy; not to consider the fact that the case or the verdict would receive publicity; that opening and closing arguments and statements by lawyers are not evidence; that

protected litigation conduct cannot itself be considered in determining liability; and that the jury may not decide the case based on information not presented in court.  ECF 524.

The strength of the plaintiffs' case is another factor that weighs against a finding of fundamental unfairness.  *Hemmings*, 285 F.3d at 1195 (finding denial of mistrial proper where, although there was some misconduct by counsel, expert testimony went "largely unrefuted" and plaintiffs "introduced compelling testimony").  Here, as explained above, there was compelling evidence regarding each element of securities fraud, including evidence on damages from Plaintiffs' unrebutted expert and compelling testimony from Twitter executives, Musk and his agents, and Plaintiffs themselves.

Plaintiffs' counsel diligently and respectfully put on the best case possible for their clients and the class.  *Settlegoode v. Portland Pub. Schs.*, 371 F.3d at 518.  Plaintiff Brian Belgrave and his wife attended every day of the trial, and Plaintiffs John Garrett and Nancy Price attended the vast majority of the trial, prevented from attending one day only due to illness.  Molumphy Decl. at ¶3.  In contrast, Musk, the sole defendant, declined to appear for any day of trial except as required for his testimony, immediately left the courtroom after testifying, and never returned.  *Id*. at ¶4.  After stepping down from the witness podium and exiting the courtroom, Musk reposted a message on X asserting that the trial was a "total joke" and "pure witch hunt."  *Id*. Ex. 5.  After the verdict, a user on X posted a picture of the Hon. Charles R. Breyer; to which Musk responded that the "[p]robability of me getting a fair trial if this is how the judge dresses is 0.0%."  *Id.* Ex. 6.

The jury was exceptionally focused and mindful throughout the trial.  A note from the jury on Monday March 9, 2026, in response to an inquiry from the Court as to whether they had seen or heard any public reporting after the first full week of trial shows that they not only did not see outside information, but took steps to avoid such.  Tr. 1427:7-23.  Several jurors appeared to take notes on almost every answer given and every exhibit admitted, and regularly cross-referenced prior notes.  Molumphy Decl. ¶6.  Indeed, during the course of their deliberations, the jury asked to see a demonstrative exhibit that was shown at trial but not admitted into evidence.  ECF 532 at 5; Molumphy Decl. Ex. 3 (Trial Exhibit 322).  The jury also paid exceptionally close attention to the jury instructions, asking several questions and even catching a typographical error in the

instructions, and asking for clarification.  Tr. 2341:20-2342:5.  After deliberating for roughly 3.5 days, the jury's carefully decided verdict shows that it took the case very seriously and was not influenced by prejudice or bias.  *Est. of Brown v. Lambert*, 478 F. Supp. 3d at 1006.

Musk cannot now claim prejudice or bias for failing to make all the arguments he wanted, even though he had plenty of time and opportunity to do so.  Nor can he complain about adverse rulings that were properly and fairly considered under the law, or for evidence he wishes didn't exist.  Musk "is entitled to a fair trial, but not a perfect one, for there are no perfect trials." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553 (1984).  Nothing Musk raised is prejudicial misconduct; even if it were, it has not risen to the level that would warrant a new trial.

**III.     THE COURT SHOULD NOT ALTER OR AMEND THE JUDGMENT TO REFLECT CLASS-WISE LIABILITY**

Contrary to Musk's arguments, as explained above, there were no "manifest errors" nor is there any reason to grant the motion to "prevent manifest injustice."  Likewise, as explained in the concurrently filed opposition to Musk's motion for decertification, there is no basis to grant any relief sought by Musk.

**CONCLUSION**

For the reasons stated above, the Court should deny the motion.

Dated:  May 15, 2026

**COTCHETT, PITRE & MCCARTHY, LLP**
Joseph W. Cotchett (SBN 36324)
Mark C. Molumphy (SBN 168009)
Tyson C. Redenbarger (SBN 294424)
Elle D. Lewis (SBN 238329)
Gia Jung (SBN 340160)
Caroline A. Yuen (SBN 354388)

*/s/ Mark C. Molumphy*
      Mark C. Molumphy

San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone: (650) 697-6000

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
Aaron P. Arnzen (SBN 218272)

/s/ Francis A. Bottini Jr.
    Francis A. Bottini Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001

*Lead Counsel for Plaintiffs and the Class*

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Mark C. Molumphy, attest that concurrence in the filing of this document has been obtained from the other signatory. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of May, 2026, at Burlingame, California.

/s/ Mark C. Molumphy
    Mark C. Molumphy