QUINN EMANUEL URQUHART & SULLIVAN, LLP
Alex Spiro (*pro hac vice*)
alexspiro@quinnemanuel.com
Ellyde R. Thompson (*pro hac vice*)
ellydethompson@quinnemanuel.com
Jesse A. Bernstein (*pro hac vice*)
jessebernstein@quinnemanuel.com
295 Fifth Ave., New York, NY 10010
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100

Michael T. Lifrak (Bar No. 210846)
michaellifrak@quinnemanuel.com
Stephen A. Broome (Bar No. 314605)
stephenbroome@quinnemanuel.com
Alex Bergjans (Bar No. 302830)
alexbergjans@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:    (213) 443-3000
Facsimile:    (213) 443-3100

*Attorneys for Defendant Elon Musk*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GIUSEPPE PAMPENA, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ELON R. MUSK,<br><br>Defendant. | CASE NO. 3:22-CV-05937-CRB<br><br>**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL**<br><br>Hon. Judge Charles R. Breyer |

**TABLE OF CONTENTS**

**Page**

SUMMARY OF ARGUMENT ...................................................................................................1

PRELIMINARY STATEMENT ................................................................................................5

ARGUMENT ..............................................................................................................................5

I.    THE COURT SHOULD ENTER JUDGMENT FOR DEFENDANT ............................5

    A.    Plaintiffs Identify No Legally Sufficient Evidence Of Damages ........................5

    B.    Plaintiffs Failed To Present Legally Sufficient Evidence Of Loss Causation ....8

    C.    Plaintiffs Failed To Present Legally Sufficient Evidence Of Material Falsity .................13

    D.    Plaintiffs Failed To Present Legally Sufficient Evidence Of Scienter ............................15

    E.    Plaintiffs Failed To Present Legally Sufficient Evidence Of Reliance.............................16

II.   IN THE ALTERNATIVE, THE COURT SHOULD GRANT A NEW TRIAL...........................16

    A.    The Jury's Verdict Is Against The Weight Of The Evidence .............................................16

    B.    The Jury's Verdict Is The Product Of Bias And Passion And Cannot Be Upheld............17

    C.    Defendant Was Prejudiced By The Improper Scheme Liability Claim.............................18

    D.    The Cumulative Prejudice Necessitates A New Trial........................................................19

III.  IN THE ALTERNATIVE, THE COURT SHOULD ALTER OR AMEND THE
JUDGMENT TO REFLECT THE LACK OF CLASS-WIDE LIABILITY...............................19

CONCLUSION............................................................................................................................19

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT
AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anheuser-Busch, Inc. v. Nat. Beverage Distributors*,
    69 F.3d 337 (9th Cir. 1995) ...............................................................................4, 17, 18

*In re Bofi Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) ............................................................................2, 6, 9, 10

*Caremark, Inc. v. Coram Healthcare Corp.*,
    113 F.3d 645 (7th Cir. 1997) .......................................................................................6

*Connecticut Ret. Plans & Tr. Funds v. Amgen Inc.*,
    660 F.3d 1170 (9th Cir. 2011) .................................................................................3, 16

*In re Convergent Techs. Sec. Litig.*,
    948 F.2d 507 (9th Cir. 1991) ......................................................................................15

*Defeo v. IonQ, Inc.*,
    134 F.4th 153 (4th Cir. 2025) .....................................................................................10

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) .........................................................................................10, 11, 13

*EEOC v. Pape Lift, Inc.*,
    115 F.3d 676 (9th Cir. 1997) ......................................................................................17

*In re Exec. Telecard, Ltd. Sec. Litig.*,
    979 F. Supp. 1021 (S.D.N.Y. 1997) ..........................................................................12

*In re Genius Brands Int'l, Inc.*,
    97 F.4th 1171 (9th Cir. 2024) ...................................................................................1, 6

*Glickenhaus & Co. v. Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015) ..............................................................................6, 7, 11

*Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*,
    2017 WL 114401 (C.D. Cal. Jan. 9, 2017) ...............................................................15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) .................................................................................................3, 16

*Hammonds v. Yeager*,
    2017 WL 10560471 (C.D. Cal. Aug. 9, 2017) ..........................................................18

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
    998 F.3d 397 (9th Cir. 2021) ......................................................................................13

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT
AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

*In Re JDS Uniphase Corp. Securities Litig.*,
     4:02-cv-1486-CW (N.D. Cal. Nov. 19, 2007) ...............................................................................16

*Lloyd v. CVB Fin. Corp.*,
     811 F.3d 1200 (9th Cir. 2016) .........................................................................................2, 13

*Maricopa Cnty. State of Ariz. v. Maberry*,
     555 F.2d 207 (9th Cir. 1977) ..................................................................................................17

*In re McKesson HBOC, Inc. Sec. Litig.*,
     126 F. Supp. 2d 1248 (N.D. Cal. 2000) .................................................................................14

*Molski v. M.J. Cable, Inc.*,
     481 F.3d 724 (9th Cir. 2007) ............................................................................................3, 17

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
     730 F.3d 1111 (9th Cir. 2013) ...............................................................................................11

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
     575 U.S. 175 (2015).............................................................................................3, 15, 16

*In re Omnicom Grp., Inc. Sec. Litig.*,
     597 F.3d 501 (2d Cir. 2010)....................................................................................................12

*Reese v. Malone*,
     747 F.3d 557 (9th Cir. 2014) ..................................................................................................3

*Reeves v. Sanderson Plumbing Prods., Inc.*,
     530 U.S. 133 (2000).............................................................................................................1, 5

*In re REMEC Inc. Sec. Litig.*,
     702 F. Supp. 2d 1202 (S.D. Cal. 2010).............................................................8, 9, 10, 12

*SEC v. Phan*,
     500 F.3d 895 (9th Cir. 2007) .................................................................................................3

*Suez Equity Invs., L.P. v. Toronto-Dominion Bank*,
     250 F.3d 87 (2d Cir. 2001)......................................................................................................11

*In re Tesla Inc., Sec. Litig.*,
     2023 WL 4032010 (N.D. Cal. June 14, 2023) ......................................................................13

*TSC Indus., Inc. v. Northway, Inc.*,
     426 U.S. 438 (1976)...........................................................................................................3, 14

*In re Twitter, Inc. Sec. Litig.*,
     2020 WL 4187915 (N.D. Cal. Apr. 17, 2020) ......................................................................13

*In re Vivendi, S.A. Sec. Litig.*,
     838 F.3d 223 (2d Cir. 2016)........................................................................................1, 6, 7, 9

Case No. 3:22-CV-05937-CRB
DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT
AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

*In re Williams Sec. Litigation-WCG Subclass*,
   558 F.3d 1130 (10th Cir. 2009) ............................................................................................12

Case No. 3:22-CV-05937-CRB
DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT
AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

## SUMMARY OF ARGUMENT

Plaintiffs are unable to refute Defendant's showing that Musk is entitled to judgment in his favor or, at a minimum, a new trial.

***Damages.*** Plaintiffs have no answer to Dr. Tabak's admission—and the Court's succinct summary of his testimony—that he did not perform the analysis required to prove damages for securities fraud under the law. "[T]he court should give credence to the evidence favoring the nonmovant ***as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses***." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (quotation omitted).[1] Thus, the Court may not disregard this admission from Plaintiffs' expert. The Court properly instructed the jury that damages "are measured by the difference between the price at which a stock sold and the price at which the stock would have sold had the statement . . . reflected the true state of affairs." Dkt. No. 524 at 27. Plaintiffs contend that Dr. Tabak's analysis "substantially tracks the standard," Opp. at 6, but then admit that it did no such thing. Instead, Plaintiffs concede that Dr. Tabak "compute[d] the price at which Twitter stock would have sold had Musk not made his false statements," *id.*, but the law and the Court's instructions are clear that the "proper question" for damages is "not what might have happened had a [defendant] remained silent, but what would have happened if it had spoken *truthfully*." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) (emphasis in original); Dkt. No 524 at 27. Having admitted that they failed to present evidence to satisfy that standard, Plaintiffs now contend the Court's instruction was erroneous. But Plaintiffs agreed at the charging conference that the Court could give it, Trial Tr. at 2094:5–8, and identify no Ninth Circuit law that deviates from the instruction or the weight of authority defining how damages must be determined. The only case they cite, *In re Genius Brands Int'l, Inc.*, 97 F.4th 1171, 1185 (9th Cir. 2024), merely defines the pleading requirements for loss causation and says nothing about how damages must be proven.

***Loss Causation.*** As to the May 17 tweet, which Plaintiffs' expert confirmed caused no damages, Plaintiffs assert that loss causation was established through a "price maintenance" theory. Opp. at 7–8. But they ignore Dr. Tabak's testimony that he offered no such opinion, Trial Tr. at 1882:16–20, and resort

---

[1] All emphases are added unless otherwise noted.

to relying on deposition testimony—not in the trial record—to walk back that admission. Plaintiffs effectively concede that they did not present evidence that the "market reasonably *perceived* [the defendant's] allegations as true and acted upon them accordingly." *In re Bofi Holding, Inc. Sec. Litig.*, 977 F.3d 781, 792 (9th Cir. 2020) (emphasis in original). While Plaintiffs argue, Opp. 8–9, that this requirement applies only to reliance, not loss causation, the Ninth Circuit says otherwise. *Bofi Holding*, 977 F.3d at 792 (explaining this is "the relevant question for loss causation purposes"). Stuck with Dr. Tabak's admissions that the market knew the purported truth that corrected the alleged misstatements contained in the May 13 and 17 tweets and did not react to disclosures confirming the truth—indicating that the allegedly false information did not cause the initial stock drop—Plaintiffs argue that those disclosures are irrelevant because they had to come from Defendant himself. That is plainly incorrect as a matter of law:  Corrective disclosures can be made by anyone. *Id.* at 790 ("A corrective disclosure can instead come from any source, including knowledgeable third parties such as whistleblowers, analysts, or investigative reporters."). Regardless, Defendant disclosed in SEC filings during the Class Period that work on the Merger continued. Ex. 146. Finally, Plaintiffs have no answer to the fact that the July 8 termination—which both the Court and the jury found was not fraudulent—was an intervening event that independently caused Twitter's stock to  drop and thus broke the causal chain. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (defendant cannot be held liable for losses caused by "some intervening event"). Nor do they address Dr. Tabak's concession that he had no idea whether Twitter's stock price would have been the same (or lower) if Defendant simply terminated without ever posting a tweet. Plaintiffs claim that was a question for the jury, but the jury could only find that the May 13 and 17 tweets caused post-July 8 losses if presented with sufficient evidence ruling out the impact of intervening events. Dr. Tabak presented none.

*Material Falsity.*  Plaintiffs identify no legally sufficient evidence that the alleged misstatements were materially false. Plaintiffs argue at length that various aspects of the May 13 tweet were literally false, but do not even attempt to show that *those* purported untruths were material. With respect to the May 17 tweet, Plaintiffs claim (Opp. at 15) "that the May 17 tweet kept the stock price at artificially deflated levels," but their own expert disclaimed any such opinion. Plaintiffs point to no evidence that the market reacted to any misimpression about Defendant's rights under the Merger Agreement or whether

-2-

work on the deal had literally stopped.  No witness testified they formed such an impression and Dr. Tabak conceded the market knew the alleged truth correcting those purported misstatements during the Class Period.  Nor do Plaintiffs point to evidence showing that the difference between the alleged misrepresentation and the actual state of affairs would have been significant to a reasonable investor in her decision to buy or sell a security.  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *SEC v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007) (noting that materiality turns on "the significance of the difference" between the true state of affairs and misrepresentation).  And Plaintiffs offer no argument to rebut the fact that any statement about Defendant's legal rights is a protected opinion that cannot give rise to liability.  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 176 (2015).

*Scienter.*  Plaintiffs marshal evidence of motive—which is insufficient on its own to establish scienter, *see Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014) ("mere recklessness or a motive to commit fraud and opportunity to do so" is not enough to show scienter); Dkt. No. 48 at 29; Dkt. No. 524 at 21—but fail to identify evidence showing that Defendant knew or recklessly disregarded that his statements were false, as they must.

*Reliance.*  Plaintiffs concede they presented no evidence of individual reliance and cannot refute the undisputed evidence that the market knew the alleged truth during the Class Period, defeating the fraud-on-the-market presumption.  Because "the market was already aware of the truth behind the defendant's supposed falsehoods," *Connecticut Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1173–74 (9th Cir. 2011), and because the correction of the asserted misrepresentation "did not affect the market price of the defendant's stock," *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279–80 (2014), no reasonable jury could have found reliance under the fraud-on-the-market presumption.

*New Trial.*  At the very least, the Court should order a new trial because the jury's verdict was against the weight of the evidence and tainted by prejudice.  Plaintiffs' *ipse dixit* argument that the length of deliberations and split verdict indicate that the jury carefully considered the evidence and followed the Court's instructions cannot be squared with an award of damages that even Plaintiffs suggest was inconsistent with the jury's charge.  *See Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 734 (9th Cir. 2007) (remanding for new trial where "the jury instructions provide no basis for making" a finding of liability).

-3-                                               Case No. 3:22-CV-05937-CRB

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT
AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

Plaintiffs fail to rebut the fact that the record is replete with improper attorney argument, that the Court erred by permitting Plaintiffs to try a claim based on the dismissed and unactionable July 8 termination letter, and the clear prejudice to Defendant that resulted.  And Plaintiffs' arguments that Defendant did not object at every such instance are unavailing; "[c]onstant objections are certainly not required, as they could antagonize the jury." *See Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337, 346 (9th Cir. 1995).

   ***Alter Or Amend The Judgment.***  Finally, Plaintiffs offer no argument on the merits for why the judgment should not be altered or amended to exclude class members and dates of the Class Period that Plaintiffs all but concede should not be included in the ultimate judgment and, to reflect judgment only in favor of the individual Class Representatives.  Their procedural argument likewise is meritless because, at the very least, Defendant met the 28-day post-judgment deadline under Rule 59(e).  Fed. R. Civ. P. 59(e).

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT
AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

## PRELIMINARY STATEMENT

Plaintiffs cannot rewrite the trial record, supplement the evidence with testimony the jury never heard, or undo the admissions of their loss causation and damages expert Dr. Tabak that require judgment in favor of Musk. Contrary to Plaintiffs' repeated suggestion that the Court should ignore any evidence favoring Musk, "the court should give credence to the evidence favoring the nonmovant *as well as that evidence supporting the moving party that is uncontradicted and unimpeached*," including testimony from an adverse expert witness. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (quotation omitted). Dr. Tabak's unequivocal admission that he did not analyze whether Twitter's stock price would have traded differently if the alleged misstatement reflected the true state of affairs establishes that Plaintiffs failed to satisfy the legal requirements to prove a claim under Rule 10b-5.

Indeed, the "uncontradicted" evidence—which Plaintiffs ignore—shows Plaintiffs failed to prove any of the elements of their case. At the very least, the verdict is against the weight of the evidence and the product of prejudice. While Plaintiffs seek to minimize their repeated violations of Court orders and the improper, blatant attempt to exploit demonstrated juror bias against Defendant, Plaintiffs cannot rebut that the verdict reflects disapproval of Defendant, not evidence he committed securities fraud.

The Court should enter judgment for Defendant or, at a minimum, grant a new trial. In the alternative, the Court should amend the judgment to reflect the limited nature of the jury verdict.

## ARGUMENT

### I.   THE COURT SHOULD ENTER JUDGMENT FOR DEFENDANT

#### A.   Plaintiffs Identify No Legally Sufficient Evidence Of Damages

Plaintiffs cannot avoid the simple and dispositive fact that the law—as set forth in the Court's instructions—requires securities fraud damages to measure the but-for price of securities had the defendant's statements reflected the true state of affairs, Dkt. 524 at 27, but their damages expert measured the but-for price had Defendant said nothing. This issue alone requires judgment in favor of Defendant.

*First*, Plaintiffs presented no evidence to support a damages finding under the Court's instruction. Plaintiffs had the burden to prove "actual damages," which "are measured by the difference between the price at which a stock sold and the price at which the stock would have sold *had the statement . . . reflected the true state of affairs*." Dkt. No. 524 at 27. Plaintiffs do not genuinely dispute (nor could they) that

Dr. Tabak failed to perform this analysis. Instead, they argue that his "damages model **substantially tracks** the standard." Opp. at 6 (emphasis added). But Plaintiffs contradict their own argument by acknowledging—consistent with Dr. Tabak's testimony—that Dr. Tabak "compute[d] the price at which Twitter stock would have sold had Musk **not made** his false statements." *Id*. (emphasis added). This use of silence—not the truth—as the only comparator is legally insufficient. Dkt. No. 524 at 27; *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016). Indeed, Plaintiffs ignore that the Court made clear the distinction between what the law requires and what Dr. Tabak did: "He is giving an opinion as to what would have happened if he had said nothing," but "[h]e is not giving an opinion as to what would have happened had he said X, Y, or Z, and that's the distinction." Trial Tr. at 1901:9–1902:5. Dr. Tabak did not perform the required analysis, and Plaintiffs identify no other evidence to support a damages award.

*Second*, the Court should reject Plaintiffs' argument that the damages instruction the Court gave the jury was wrong. Plaintiffs waived any objection to the instruction, agreeing at the charge conference that the Court could use the precise standard they now challenge. Trial Tr. at 2094:5–8. Regardless, the Court's damages instruction was correct. To argue otherwise, Plaintiffs rely solely on a single phrase from *Genius Brands*, asserting that "the Ninth Circuit has explicitly endorsed an out-of-pocket measure of damages in a 10b-5 case premised on a stock's price being higher 'than it would have been had the false statements not been made.'" Opp. at 4 (quoting *In re Genius Brands Int'l, Inc.*, 97 F.4th 1171, 1185 (9th Cir. 2024)). But Plaintiffs take that phrase out of context; it has nothing to do with the method to determine out-of-pocket damages and instead addresses pleading requirements for **loss causation**—a different element. That phrase itself quotes *In re Bofi Holding, Inc. Sec. Litig.*, which again deals with alleging loss causation, not the measure of damages. 977 F.3d 781, 789 (9th Cir. 2020).

Plaintiffs fail to grapple with the wealth of authority holding as much, which explains that "damages are usually the difference between the price of the stock and its value on the date of the transaction if the full truth had been known"—not if the Defendant was silent. *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 n.6 (7th Cir. 1997). Instead, they try to distinguish the facts of two cases—*Vivendi* and *Glickenhaus & Co. v. Household Int'l, Inc.*—while ignoring the legal principles they apply. Their attempt to distinguish *Vivendi* (Opp. at 4–5) does not acknowledge its clear articulation of the rule: The "proper question" is "not what might have happened had a [defendant] remained silent, but

-6-    Case No. 3:22-CV-05937-CRB

what would have happened if it had spoken *truthfully*." 838 F.3d 223 at 258 (emphasis in original). The Court has already held that this is the correct standard and instructed the jury accordingly. And *Glickenhaus* likewise explains that "the amount of inflation caused by a false statement is the difference between the stock price after the false statement and what it *would have been* **had the statement reflected the truth**." 787 F.3d 408, 417 (7th Cir. 2015) (first emphasis in original; second emphasis added).

Any other measurement would penalize the defendant for speech itself, a theory this Court already has rejected. Dkt. No. 524 at 27. As the Court has explained, if Defendant stayed silent about the potential issues with the deal and the fact that he might try not to go forward with the acquisition, he would almost certainly be facing a different securities fraud lawsuit alleging that he deceived the market by remaining silent. Trial Tr. at 2096:21–2099:10. The securities laws do not exist to penalize individuals for choosing to speak or for choosing not to speak. They simply require that "at the moment" a market participant "chooses to speak, it takes upon itself the obligation to *speak truthfully*, and it is the breach of *that* obligation which forms the basis for the § 10(b) claim." *Vivendi*, 838 F.3d at 258 (emphasis in original). Plaintiffs did not provide sufficient evidence to meet this correct standard.

Even under Plaintiffs' incorrect standard comparing misrepresentations to silence, Plaintiffs failed to prove damages for every date in the Class Period after the July 8 termination. Dr. Tabak admitted that the July 8 termination independently caused Twitter's stock to decline, that such a decline would be expected whether or not the termination was fraudulent, and that he could not rule out—because he did not analyze—that Twitter's stock would have had the same post-July 8 stock drop or "would have actually fallen *more* on July 8th had Mr. Musk not issued the May 13th tweet." Trial Tr. 1844:24–1845:11, 1917:3–11, 1919:5–15. Plaintiffs thus cannot meet their own incorrect standard because Dr. Tabak offered no evidence Twitter's stock price would have traded differently post-termination absent the May 13 tweet.

*Third*, Plaintiffs fail to rebut Defendant's separate argument that they failed to disaggregate losses purportedly caused by the May 13 tweet from losses caused by general market and industry factors. Dr. Tabak knowingly included in his calculations losses caused solely by unrelated market movements, Trial Tr. at 1910:17–1911:19; 1913:3–8, even though Defendant—by definition—cannot be responsible for those losses. No authority supports such a methodology. Plaintiffs argue (Opp. at 6) that Dr. Tabak's model was sufficient because he used an event study to exclude the two unrelated material events he

identified during the Class Period.  They ignore, however, that Dr. Tabak abandoned his event study on every other day in the Class Period and applied a constant percentage methodology that attributes more or less damage to the May 13 tweet on any given day depending on unrelated stock market movements.  Exs. 282, 341.  Plaintiffs do not argue that Dr. Tabak disaggregated these unrelated movements; he admitted he did not.  Trial Tr. at 1910:17–1911:19; 1913:3–8.  While Plaintiffs argue (Opp. at 7) that a constant percentage methodology is *per se* acceptable, none of Plaintiffs' cited cases stands for that proposition.  Rather, a methodology that applies a constant percentage or dollar amount of damages across a lengthy class period is appropriate only when based on an event study that removes non-fraud-related factors.  *See, e.g.*, *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1269, 1272–73 (S.D. Cal. 2010) (granting summary judgment because expert's "constant dollar" method failed to separate loss caused by fraud from loss caused by other company-specific information).  Dr. Tabak's analysis removes the impact of only two events in the three-month Class Period and is not based on a proper event study on any other day.  It thus improperly charges Defendant with losses attributable only to unrelated market movements.

Indeed, Plaintiffs concede that Dr. Tabak's methodology awards damages to investors who purchased ***after*** the May 13 tweet, such that any difference between the price at the time of purchase and the price at the time of sale could ***only*** be due to other factors, not the pre-existing tweet.  Plaintiffs' only response is that "there will be a claims process that reviews these very types of trades."  Opp. at 11.  But this flaw in Dr. Tabak's damages model confirms he failed to disaggregate, as required.

***Finally***, because Plaintiffs acknowledge that Defendant cannot be charged for damages attributable only to market factors (that is, the damages those investors who bought and sold after May 13 would seek), this independently requires judgment in favor of Defendant as to such investors.  *See* Dkt. No. 570 at 14.  To hold otherwise would charge Defendant with losses he is not responsible for as a matter of law and then rely on unspecified aspects of the claims process to narrow it to its legal bounds.  Because Plaintiffs concede that Defendant should not be charged for losses necessarily included in Dr. Tabak's model and therefore the judgment, the Court should enter judgment in Defendant's favor as to any investors who purchased and then sold shares after the May 13 tweet.

**B.    Plaintiffs Failed To Present Legally Sufficient Evidence Of Loss Causation**

Plaintiffs' related failure to adduce legally sufficient evidence that the alleged misrepresentations

-8-

contained in the May 13 and 17 tweets caused any losses requires judgment for Defendant.

*The May 17 Tweet.* The May 17 tweet did not cause "a single penny of investor losses." Trial Tr. at 1887:21–1888:2 (Tabak). Plaintiffs do not dispute this fact. Instead, they argue that (1) price maintenance is a viable theory of loss causation and (2) Dr. Tabak "concluded that the [May 17 tweet] helped maintain the price deflation caused by Musk's May 13 tweet." Opp. at 7. Defendant does not dispute that courts have recognized that fraud can artificially maintain securities prices, but Plaintiffs can point to no trial evidence supporting that theory. Plaintiffs' citations to the trial record confirm as much. Plaintiffs cite pages of trial testimony that do not mention the May 17 tweet or price maintenance at all. *See* Opp. at 7 (citing Trial Tr. 1851:1–1853:19, 1943:7–18). Plaintiffs next cite one line in which Dr. Tabak hypothesized that, because he "mention[ed] price maintenance in [his] class certification report and at least one deposition, . . . if you want to say that the May 16th and May 17th misrepresentations maintained the prior deflation, yes." *See id.* (citing Trial Tr. at 1881:6–20). But they ignore his following, undisputed testimony that he is "not affirmatively saying this is a price maintenance case." Trial Tr. at 1882:16–20. Evidence of price maintenance can be substantiated only by an admissible expert opinion. *See In re REMEC*, 702 F. Supp. 2d at 1273–75 (granting summary judgment where plaintiff had no admissible expert analysis linking statements to stock-price decline). Dr. Tabak offered no such opinion. Thus, no sufficient evidence supports that theory as a matter of law.[2]

*The May 13 Tweet.* As to the May 13 tweet, Plaintiffs ask the Court to ignore binding law requiring a plaintiff to establish more than an initial stock price reaction to a statement to prove that an alleged material misstatement caused investor losses. Their arguments are unavailing.

*First*, Plaintiffs failed to prove that any purported fraud proximately caused the loss because, again, their damages expert failed to conduct any analysis as to what would have happened to the stock price had the tweet merely reflected what Plaintiffs claim is the truth. *E.g.*, *Vivendi*, 838 F.3d 223 at 258.

*Second*, Plaintiffs failed to present any evidence to answer "[t]he relevant question for loss causation purposes" in their favor—"whether the market reasonably *perceived* [the defendant's] allegations as true and acted upon them accordingly." *In re BofI Holding*, 977 F.3d at 792 (emphasis in

---

[2]  Plaintiffs fall back on a portion of Dr. Tabak's deposition testimony that was not played at trial, was not part of the record before the jury, and cannot be considered with this Motion. Opp. at 7–8.

original). Plaintiffs do not grapple with this case law at all. Instead, they baldly assert that this argument "conflates reliance and loss causation," ignoring the Ninth Circuit's explicit instruction that this is a loss causation requirement. Plaintiffs are the ones conflating the two elements. Reliance asks why specific individuals bought and sold stock; it is about transaction causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). Loss causation asks something different—whether plaintiffs can prove "a causal connection between the material misrepresentation and the loss." *Id.*

Plaintiffs did not do so here. They argued at trial that the May 13 tweet was false for two reasons: because it conveyed that Defendant had not waived his due diligence rights when in fact he waived due diligence before signing the Merger Agreement and because it conveyed that the deal was on hold when it in fact was not. Trial Tr. at 2194:18–22. But they identify no evidence to support a finding that either of those purported falsehoods caused the price drop on May 13. To the contrary, the trial record is clear the market already knew that Defendant had waived due diligence and that Twitter had not agreed to put the deal on hold at the time of the drop, and the market did not react when it learned that work on the deal was progressing. *See* Trial Tr. at 273:14–22 (Belgrave) (admitting he knew Defendant had waived due diligence when he read the May 13 tweet); 1908:24–1909:19 (Tabak) (admitting that the "revelation" that Twitter had not agreed to put the deal on hold "came at the same time as the May 13th news" and was "folded in" with the stock price); 1909:25–1910:6 (testifying that there was no statistically significant stock reaction to that news" when it became public that Defendant was continuing work on the deal).

Plaintiffs argue—without citation—that Dr. Tabak's admissions, Trial Tr. 1908:24–1909:19, 1909:25–1910:6, are irrelevant because the news that Defendant continued to work on the deal did not come "***from Musk***." Opp. at 9 (emphasis in original). That is incorrect as a matter of law and fact. There is no requirement that the truth be revealed from the source of the alleged fraud, *In re BofI*, 977 F.3d at 790 ("A corrective disclosure can instead come from any source, including knowledgeable third parties such as whistleblowers, analysts, or investigative reporters."). Regardless, news that Defendant continued to work on the deal came from a document he filed publicly. Ex. 146; Trial Tr. at 627:9–16 (Birchall). The elements of the tweet Plaintiffs claimed were false could not have caused the loss as a matter of law. *Defeo v. IonQ, Inc.*, 134 F.4th 153, 162 (4th Cir. 2025) ("[I]f investors already know the truth, false statements won't affect the price."); *In re REMEC*, 702 F. Supp. 2d at 1266 (to show loss causation, "the

decline in stock price caused by the revelation of th[e] truth must be statistically significant").

Plaintiffs' argument (Opp. at 9) that statistically significant price movements on May 13 and May 16 prove that the market must have been reacting to the tweets ignores the relevant legal standard. The question is not whether the market reacted, but what the market reacted to—the purported misrepresentations, or something else. Plaintiffs need to prove that the *fraud*—not other aspects of the tweet—proximately caused the loss. *See Dura*, 544 U.S. at 341–48 (holding that law requires "that a plaintiff prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss"). Plaintiffs presented no evidence to answer that critical question, their expert testified to the contrary, and thus the record contains no legally sufficient evidence of loss causation.

***Third***, Plaintiffs continue to insist that a corrective disclosure is not necessary in a seller case, Opp. at 10, but do not address that *Dura*'s logic is equally applicable here—when an investor sells a stock at an artificially deflated price, he is free to buy back in at the same price and has suffered no loss until the stock rebounds. *See Dura*, 544 U.S. at 342. Even if Plaintiffs could prove loss causation by other means, they cannot rely solely on the price drop that followed Defendant's statement, as they attempt to do here. That is legally insufficient because it fails to account for the possibility that other aspects of the statement caused the drop. *See, e.g.*, *Glickenhaus*, 787 F.3d at 415 ("The best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect."). Plaintiffs' citation (Opp. at 10) to *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.* is unavailing. *Nuveen* recognized the "materialization of the risk" approach, that is "the defendant misrepresented . . . the very facts that were a substantial factor in causing the plaintiff's economic loss." 730 F.3d 1111, 1120 (9th Cir. 2013). In those cases, a company may lie about an aspect of its business, *i.e.* misrepresent that its leadership is competent, and those facts—not their revelation to the market—cause the stock to decline (the incompetent executives run the company into the ground). *E.g., Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 97 (2d Cir. 2001) (company concealed negative information from executive background check). Plaintiffs presented no such evidence here. The evidence relates only to whether the tweet ***itself***, not the misrepresented facts, caused loss. *See* Opp. at 10 (arguing Plaintiffs "established that ***Musk's statements***"—not the purportedly misrepresented

-11-                                          Case No. 3:22-CV-05937-CRB

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT
AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

facts within them—"were directly related to the actual economic loss they suffered").

While Plaintiffs claim they presented evidence of an October 4 corrective disclosure, their expert was clear that he was "not claiming that any information that came out was corrective of Mr. Musk's alleged false statement." Trial Tr. at 1907:11–14. Without any such expert opinion, the jury had no basis to conclude that there was a corrective disclosure or that Plaintiffs carried their burden to prove loss causation. *In re REMEC*, 702 F. Supp. 2d at 1269–76 (granting summary judgment where plaintiff failed to present admissible expert testimony of a corrective disclosure); *In re Williams Sec. Litigation-WCG Subclass*, 558 F.3d 1130, 1143 (10th Cir. 2009) (affirming grant of summary judgment where expert failed to present reliable opinion concerning corrective disclosure).

***Fourth***, Plaintiffs failed to prove loss causation as a matter of law because their only evidence—Dr. Tabak's opinion—was fatally flawed. Dr. Tabak attributed the entire May 16 drop to the May 13 tweet without even considering if the SparkToro report—company-specific, non-fraudulent information that entered the market on May 15—could have had an impact on the stock. *See* Trial Tr. at 1893:14–1895:9. That renders his opinion unreliable as a matter of law; because it should have been excluded, Plaintiffs presented no viable evidence of loss causation. *See In re Exec. Telecard, Ltd. Sec. Litig.*, 979 F. Supp. 1021, 1026–27 (S.D.N.Y. 1997) (excluding report for failure to consider non-fraudulent company-specific information as potential cause of price reaction). Dr. Tabak's justification for his two-day window is also insufficient because Defendant is not responsible for losses caused by negative articles and analyst reports repeating public information. *See* Trial Tr. at 1896:10–17 (opining that basis for two-day window was that "often after the close of the market, you get news stories" and "[y]ou get analyst reports"); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) (stock drop in response to "negative characterization[s] of already-public information" does not establish loss causation). Plaintiffs do not address either of these arguments, instead citing law that a two-day window may be appropriate in some cases. That does not excuse Dr. Tabak's failure to consider specific, intervening, non-fraud-related factors that may have impacted the market price or his decision to charge Defendant with losses that may have been caused by independent commentary on public information. To the contrary, the Ninth Circuit has explicitly recognized that a stock's failure to move "consistently downward in response to each revelation, rather than subsequently decreasing, maintaining, or even increasing their

-12-

valuations" indicates that the market was "not responding to the specific revelations [plaintiff] cites." *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 408 (9th Cir. 2021).

**Post-July 8 Losses.**  Even if Plaintiffs could prove loss causation through price drop alone—and without measuring the but-for world had the tweets reflected the truth—they still failed to establish that the alleged misstatements continued to deflate Twitter's stock price after the July 8 termination.  It is undisputed that a defendant cannot be held liable for losses caused by "some intervening event." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (citing *Dura*, 544 U.S. at 343-44).  Dr. Tabak admitted the July 8 termination independently caused Twitter's stock to drop and that he conducted no "analysis to determine whether Twitter's stock price would have fallen to the exact same price level that it did if [Defendant] had only issued the termination letter and not the May 13 tweet." Trial Tr. at 1918:25-1919:4.  In other words, he had no evidence that the post-July 8 deflation was caused by the alleged misrepresentations as opposed to this intervening event.  Plaintiffs' only response—citing *In re Twitter, Inc. Sec. Litig.*, 2020 WL 4187915 (N.D. Cal. Apr. 17, 2020), a case not dealing with intervening events—is that this was a factual question for the jury.  But a jury can only find liability based on sufficient evidence that the stock reaction was caused by the alleged fraud and not some other variable, as in *In re Twitter*. *Id.* at 16 (" Dr. Feinstein did consider confounding factors . . .").  Dr. Tabak admitted that he offered none.  For this reason, judgment should be entered for Defendant on all post-July 8 transactions.

### C.    Plaintiffs Failed To Present Legally Sufficient Evidence Of Material Falsity

Plaintiffs argue at length that various aspects of the May 13 tweet were literally false, but do not even attempt to show that *those* purported untruths were material.  Instead, they argue that the tweet as a whole was material.  But a Rule 10b-5 plaintiff must prove that the specific untrue fact was material, not that a statement containing that fact was generally important.  *In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010, at *7 (N.D. Cal. June 14, 2023).  Plaintiffs did not do so.

As to "on hold," Plaintiffs contend (Opp. at 12–13) that Defendant's statement was literally false because the deal was not "on hold."  Even if a reasonable jury could view this aspect of the tweet as false, no reasonable jury could conclude that the assertion that the deal was "on hold"—according to Plaintiffs, that Defendant told "anybody on his team or at Twitter to stop working on the deal or even to slow down," Opp. at 12–13—was material.  Plaintiffs' expert testified that, when the market learned that work on the

-13-

deal was progressing, "there was no statistically significant stock reaction to that news." Trial Tr. at 1909:25–1910:6. Yet, for a fact to be material, "there must be a substantial likelihood that the . . . correction of the misstated fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1259 (N.D. Cal. 2000) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438 (1976)). Thus, the lack of any stock price reaction to continuing work on the deal defeats any suggestion that any literal falsity of "on hold" was material. While Plaintiffs incorrectly argue (Opp. at 15), that evidence of continued work had to come from Musk's team specifically, that is where it came from. On May 24, Musk publicly filed a Schedule 13D that reflected further work on the deal, including changes to his financing. Ex. 146. The market did not react. Trial Tr. at 1844:24–1845:2, 1909:25–1910:6 (Tabak).

Plaintiffs make no attempt to demonstrate that whether the deal was literally "on hold"—the purportedly false fact—was itself material. Instead, they make general assertions that the tweet as a whole was material because Defendant believed he was communicating material information (ignoring that Defendant did not believe he was communicating that work on the deal had stopped, *see* Trial Tr. at 771:22-772:1), and because the stock price dropped on May 13 (ignoring that there is no evidence tying the drop to whether the deal was "on hold"). Contrary to Plaintiffs' suggestion (Opp. at 15), generic "extensive evidence through every fact witness" about the events surrounding the tweets and evidence of how "the market for Twitter stock reacted to his statements and actions," does not provide sufficient evidence of materiality. And, in fact, no witness even testified that the market reacted to the May 13 tweet because it understood the tweet to mean work on the deal had stopped. Instead, Plaintiffs understood "deal temporarily on hold" to mean the deal was in jeopardy and that a risk existed it was "not going to go through"—*an undisputedly true fact*. Trial Tr. at 289:18–290:10 (Belgrave); 1370:12–14 (Price).

Separately, Plaintiffs argue (Opp. at 13–14) that May 13 tweet was false because it suggested that Musk had the right to put the deal on hold. But Plaintiffs ignore the absence of evidence that the market interpreted the tweet in this manner. In any event, Defendant's rights under the Merger Agreement and that he had waived pre-signing due diligence were public. Trial Tr. at 1877:3–13; Ex. 62; Trial Tr. at 273:14–22 (Belgrave); Ex. 47. "Critically, plaintiff must 'demonstrate that a particular statement, *when read in light of all the information then available* to the market . . . conveyed a false or misleading

impression.'" *Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*, 2017 WL 114401, at *5 (C.D. Cal. Jan. 9, 2017) (emphasis in original) (quoting *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991)).  No reasonable jury could have concluded that the May 13 tweet, read in light of this publicly available information, conveyed a false or misleading impression.  At most, the tweet conveyed Musk's opinion about his publicly available legal rights, which is not actionable.  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 176 (2015).  Plaintiffs' arguments to the contrary, free of any citations to the record, Opp. at 16, fail.  There was no evidence that Defendant's belief about his legal rights was not sincerely held and no embedded, untrue facts in this legal opinion.

Plaintiffs next assert (Opp. at 14–15) that the May 13 tweet was false because it suggested that there was a basis to question the 5% number.  Leaving aside that Plaintiffs did not make this argument to the jury in their closing argument, the jury found that Defendant's May 16 tweet—which clearly conveyed Defendant's doubts about the 5% number—was not fraudulent.  And Plaintiffs again make no effort to show that this purported false fact was itself material.

With respect to the May 17 tweet, Plaintiffs' only evidence that it was material is the suggestion that the jury could have reached its own determination "that the May 17 tweet kept the stock price at artificially deflated levels."  Opp. at 15.  But, as set forth above, Dr. Tabak disclaimed any such opinion, and the jury had no legally sufficient basis to reach that determination without one.  *Supra*, p. 9.

Plaintiffs presented no evidence that any purportedly false aspect of either tweet was material to the market.  As a result, judgment must be entered in Defendant's favor as to both tweets.

**D.       Plaintiffs Failed To Present Legally Sufficient Evidence Of Scienter**

As the Court correctly instructed the jury, "mere recklessness or a motive to commit fraud and opportunity to do so" is insufficient as a matter of law to prove a defendant acted with scienter.  Dkt. No. 48 at 29; Dkt. No. 524 at 21.  But no reasonable jury could have concluded that Plaintiffs showed anything more.  The purported scienter evidence they cite, Opp. at 16–18, is at most that: Defendant had financial motive and *could* move the market, meaning that he had opportunity to commit fraud.  While Plaintiffs imply an attempt to renegotiate the deal, the jury rejected this theory when it rejected the scheme claim.  None of this speaks to the relevant question—whether Defendant knew his tweets were false (or, under the Ninth Circuit's standard, whether he was deliberately reckless).  The evidence showed the opposite.

Case No. 3:22-CV-05937-CRB
DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT
AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

Defendant sincerely believed his tweets were true, Trial Tr. at 769:5–770:16; 781:12–20, and his good-faith belief is inconsistent with a finding of scienter, *e.g.,* Final Jury Instructions at 13, *In Re JDS Uniphase Corp. Securities Litig.*, 4:02-cv-1486-CW (N.D. Cal. Nov. 19, 2007); *Omnicare*, 575 U.S. at 186.

### E.    Plaintiffs Failed To Present Legally Sufficient Evidence Of Reliance

Plaintiffs make no effort to argue that they presented legally sufficient evidence of individual reliance, but that does not lead to the conclusion that Plaintiffs proved fraud-on-the-market reliance.  They did not.  Plaintiffs failed to prove three elements of the presumption: "that the alleged misrepresentations . . . were material," "that the stock traded in an efficient market," and "that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 268 (2014).  Plaintiffs did not prove that any of the purportedly false facts were material. *Supra*, pp. 13–15.  Plaintiffs' theory of loss causation, including the two-day window, cannot be squared with the requirement of an efficient market.  Mot. at 23.  And virtually every class member traded after the supposed truth was revealed because Defendant made clear in May that work on the deal continued. *Id.* at 24.  The undisputed trial record shows that the presumption was rebutted.  The market knew or quickly learned that work on the deal continued yet it did not react. *Id.* And the market knew Defendant's rights under the Merger Agreement. *Id.*  Because "the market was already aware of the truth behind the defendant's supposed falsehoods," *Connecticut Ret. Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1173–74 (9th Cir. 2011), and because the correction of the asserted misrepresentation "did not affect the market price of the defendant's stock," *Halliburton II*, 573 U.S. at 279–80, no reasonable jury could have found reliance under the fraud-on-the-market presumption.

## II.    IN THE ALTERNATIVE, THE COURT SHOULD GRANT A NEW TRIAL

### A.    The Jury's Verdict Is Against The Weight Of The Evidence

The jury awarded damages despite the Court explaining that Plaintiffs' damages expert did not conduct the required analysis; found liability for the May 17 tweet despite undisputed evidence that it caused no losses and did not matter to the market; found liability for the May 13 tweet even though Plaintiffs offered no evidence that the purportedly false aspects of the tweet were material or caused loss; disregarded undisputed evidence that Musk believed his statements to be true in good faith; and found reliance through some unspecified path when Plaintiffs proved neither individual or class-wide reliance.

At a minimum, these deficiencies show that the verdict is against the "great weight of the evidence" and represents "a seriously erroneous result." *EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir. 1997).

Plaintiffs suggest that, because the jury deliberated for several days and reached a split verdict, they carefully considered the evidence and followed the instructions. Opp. at 22. That argument is critically flawed—as Plaintiffs all but admit, the jury ***did not*** follow the instructions. One need look no further than the damages instruction; the Court expressly stated for the jury during Dr. Tabak's testimony that his testimony did not meet the legal standard set forth in the instructions. *Compare* Dkt. No. 524 at 27 *with* Trial Tr. at 1901:9–1902:5. The jury could not have found the instruction satisfied when Dr. Tabak concededly did not perform that analysis. And the Court cannot presume that the jury followed the instructions when it demonstrably did not. *See Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 734 (9th Cir. 2007) (granting new trial where "the jury instructions provide no basis for" the jury's finding).

**B.      The Jury's Verdict Is The Product Of Bias And Passion And Cannot Be Upheld**

Plaintiffs try to minimize each aspect of the trial that contributed to a verdict reflecting bias and passion, but fail to contend with the broader reality. As the Court recognized, it was particularly difficult for this defendant to receive a fair trial in this jurisdiction. Instead of ensuring Defendant's right "to a fair, impartial trial, before a fair and impartial jury," *Maricopa Cnty. State of Ariz. v. Maberry*, 555 F.2d 207, 224 (9th Cir. 1977), Plaintiffs took every opportunity to exacerbate the existing prejudice. Indeed, Defendant need not even demonstrate prejudice: "Where misconduct permeates the proceeding, the jury is 'necessarily prejudiced.'" *Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337, 346 (9th Cir. 1995). The jury's verdict reflects a clear focus on Defendant's identity rather than on the evidence.

Plaintiffs' efforts to dismiss each of their actions that contributed to this result fail. Plaintiffs continue to ignore the Court's order on Motion *in Limine* No. 1 not to "argue or suggest that [Defendant was] violating the securities laws" or engage in "questioning that suggests he's doing something wrong." Tr. of Feb. 17, 2026 Proceedings at 54:6–7, 55:8–15. Plaintiffs did so, repeatedly eliciting testimony that SEC disclosures are required and that Defendant did not file them. *See* Dkt. No. 487 at 4–5. As to Plaintiffs' attempts to elicit a privilege objection, Plaintiffs claim that Defendant "answered the *exact same questions* without referring to his counsel at his May 19, 2025 deposition." Opp. at 23. Plaintiffs attach page 327 of Defendant's deposition, but omit the next two pages, where he explicitly referenced his

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT
AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

counsel, drawing a privilege objection. *See* Ex. 1 to Bergjans Decl., Musk Dep. at 328:17–329:7. Next, Plaintiffs argue (Opp. at 23) that their questions about Musk moving his business operations and about Candlestick Park were relevant. The suggestion is absurd. So too is their suggestion that Defendant should have objected every time Plaintiffs tried to cultivate an "us-versus-them" narrative; doing so would only have exacerbated that dynamic and is not required. *See Anheuser-Busch*, 69 F.3d at 346 ("Constant objections are certainly not required, as they could antagonize the jury."). As to Plaintiffs' "send a message" argument, they suggest the argument was proper because the Court permitted it. But the law clearly holds the opposite. *See Hammonds v. Yeager*, 2017 WL 10560471, at *1 (C.D. Cal. Aug. 9, 2017).

Plaintiffs' efforts to minimize the Court's prejudicial instruction on media attention also fail. They again insist that the jury followed the Court's instructions despite evidence to the contrary, and do not engage with the common-sense notion that reminding the jury immediately before it began deliberations that its verdict would receive media attention is prejudicial. Plaintiffs suggest the jury wrote one number, in the middle of a list of 87 numbers, in blue ink because the "blue pen was used either interchangeably or subsequently to a black pen." Opp. at 26. But they ***admit*** that the jury heard testimony that associated this number with Defendant, Opp. at 27, exposing the implausibility of their argument. The verdict form makes clear the jury considered Defendant's persona and sought to send a message with their verdict.

### C.     Defendant Was Prejudiced By The Improper Scheme Liability Claim

As to the scheme liability claim, Plaintiffs are wrong to argue (Opp. at 27–28) that they should have been able to try a case alleging that the July 8 termination letter was fraudulent and offer no defense to the decision to permit a claim based on dismissed statements or unactionable conduct. But, wholly apart from that, Plaintiffs nowhere confront the resulting prejudice Defendant has demonstrated. *See* Mot. at 28–29. Defendant does not argue here that a new trial is necessary simply because the scheme claim was resurrected on the eve of trial or that he ran out of time at trial. Rather, including the improper scheme claim and the July 8 letter as a basis for liability was prejudicial because it effectively precluded Defendant from making arguments that would have aided his defense on the misrepresentation claims—that the July 8 termination shows that the May 13 tweet was true, and that the July 8 termination was an intervening event that independently caused the majority of the damages at issue—but would have hurt his case on the scheme liability claim. And the scheme claim swept in evidence entirely unrelated to the purported

-18-

misrepresentations, including about the Delaware litigation and attempts to settle it. *See* Mot. at 28–29 (collecting examples of evidence that should not have been introduced). Defendant suffered immense prejudice from having to defend against this wide-ranging, amorphous, legally invalid scheme claim.

### D. The Cumulative Prejudice Necessitates A New Trial

Examination of the trial record reveals a litany of errors that each independently warrant a new trial—but certainly reach the level of cumulative prejudice. As set forth above and in Defendant's filings throughout trial, Plaintiffs repeatedly violated the Court's rulings. The Court failed to provide appropriate limiting instructions when Defendant repeatedly requested them. Plaintiffs' contentions (Opp. at 22–24) that the jury carefully followed the Court's instructions disregard clear evidence to the contrary. Plaintiffs criticize Musk's trial attendance (Opp. at 29), but that is wholly irrelevant to the question whether cumulative error necessitates a new trial. Contrary to Plaintiffs' strawman (Opp. at 30), Defendant does not seek relief for any lack of time to make arguments or rulings that were adverse but legally correct. Rather, Defendant seeks relief for ***errors*** throughout trial—including Plaintiffs' deliberate efforts to sway the jury through improper means—that prejudiced him and denied him a fair trial. A new trial is necessary.

### III. IN THE ALTERNATIVE, THE COURT SHOULD ALTER OR AMEND THE JUDGMENT TO REFLECT THE LACK OF CLASS-WIDE LIABILITY

Finally, as set forth in the briefing on Defendant's decertification motion, at minimum the Court should amend the judgment so it applies only to the Named Plaintiffs. Plaintiffs' primary defense to that motion is that it is untimely. It is not, but, regardless, Plaintiffs cannot and do not contest that the Court can award such relief under Defendant's timely Rule 59(e) motion. The Court must also, at minimum, alter or amend the judgment to reflect that Plaintiffs did not prove their claim for the entire Class Period or the entire class. Plaintiffs all but concede that the judgment is overbroad in these respects, but ask the Court to rely on unspecified aspects of the claims process to narrow it appropriately. Opp. at 11. Doing so would be improper. The Court should amend the judgment to reflect its proper legal bounds.

### CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant his Motion.

DATED:  May 22, 2026          QUINN EMANUEL URQUHART & SULLIVAN, LLP


By */s/ Ellyde R. Thompson*
     Alex Spiro
     Michael T. Lifrak
     Stephen A. Broome
     Ellyde R. Thompson
     Jesse A. Bernstein
     Alex Bergjans

     *Attorneys for Defendant Elon Musk*

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT
AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record electronically or by another manner authorized under FED. R. CIV. P. 5(b) on Friday, May 22, 2026.

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By _/s/ Alex Bergjans_
        Alex Spiro
        Michael T. Lifrak
        Stephen A. Broome
        Ellyde R. Thompson
        Jesse A. Bernstein
        Alex Bergjans

_Attorneys for Defendant Elon Musk_

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT
AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

**ATTESTATION**

Pursuant to Civil L.R. 5-1, I attest under penalty of perjury that concurrence in the filing of this document has been obtained from the other signatories herein.

By  /s/ Alex Bergjans
Alex Spiro
Michael T. Lifrak
Stephen A. Broome
Ellyde R. Thompson
Jesse A. Bernstein
Alex Bergjans

*Attorneys for Defendant Elon Musk*

Case No. 3:22-CV-05937-CRB
DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT
AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL